JUDGE FORREST

12 CIV 2423

Steven Eckhaus (SE 1929)
Evan Belosa (EB 7959)
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
Tel: (212) 940-8800

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------X

MICHAEL QUINN,                    :    Civil Action No._____

       Plaintiff,                 :

                                  :

  -against-                       :    **COMPLAINT**

                                  :

ELI S. JACOBS,                    :

       Defendant.                 :
--------------------------------------------------X

Michael Quinn, for his Complaint against Eli S. Jacobs, alleges:

<u>PARTIES, JURISDICTION AND VENUE</u>

1. Plaintiff, Michael Quinn, is a citizen of California.

2. Defendant, Eli S. Jacobs, is a citizen of New York.

3. The amount in controversy, without interest and costs, exceeds the sum specified by 28 U.S.C. § 1332.

4. A valid consent to jurisdiction and venue selection agreement requires the parties to resolve disputes in this Court. <u>See</u> Exhibit 2 at p. 2.

5. A substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS

6. Mr. Quinn retired from Merrill Lynch in 1999 as Vice Chairman of the Asset Management Division.

7. Mr. Jacobs has invested in numerous early stage businesses in a range of sectors. He had some financial successes, including the $900 million acquisition of Telex Corp., which would be merged with Memorex to form, at the time, the world's second largest manufacturer of computer peripherals. He bought the Baltimore Orioles in 1989, but in 1993, after he filed for bankruptcy protection under Chapter 11, the team was auctioned off by the Bankruptcy Court in New York  Mr. Jacobs continued to invest in a number of companies, and some of Mr. Quinn's former colleagues, other financiers and technologists, as well as the private investment bank, Allen & Company, became investors in those companies.

8. Mr. Quinn maintains a summer residence in Sun Valley, Idaho. In July 2009, during the Allen & Company Sun Valley Conference, one of those investors, Jerome Kenney, whom Mr. Quinn knew well from their years together as executives at Merrill Lynch, introduced him to Mr. Jacobs.

9. The Sun Valley Conference is well known for drawing together innovative technologists, media executives, business leaders, financiers, political figures, cultural icons and philanthropists.

10. At that first meeting, Mr. Jacobs told Mr. Quinn that he held controlling interests in a wide variety of companies that owned "disruptive

technologies," which, he explained, were technologies likely to effect radical changes in their industries.

11. Mr. Jacobs told Mr. Quinn that he badly needed executive talent to direct and manage several of those companies. Mr. Quinn appeared intrigued by that thought, and the meeting ended with the two agreeing to continue the conversation.

12. Unknown to Mr. Quinn, just weeks earlier, Mr. Jacobs had informed an investor that he was unable to repay more than $ 1 million in personal loans and more than $45,000 in missed interest payments. With the consent of the investor, the loans were consolidated, extended and secured with 1,474,282 common membership Units in GeoBiotics, one of the Jacobs companies. See, Exhibit 1, Affidavit of John M. Hennessy.

13. Mr. Jacobs, from the second meeting onward, regularly suggested that Mr. Quinn could have a "senior management role" in at least one of his companies, including board membership, chairing one or two key committees, advising management, and perhaps doing the same for all of Mr. Jacobs' companies in the Colorado area.

14. Between August 2009 and May 2010, Mr. Quinn had numerous meetings with Mr. Jacobs or his associates. They met many times in Denver, and in Golden, Colorado. They met five or six times in Mr. Jacobs' New York City offices; Mr. Quinn was even given a photo ID for access to Mr. Jacobs' offices.

15. Three times in the last four months of 2009, Mr. Quinn flew to Denver from his home in Santa Barbara at Mr. Jacobs' expense, including once to meet Mr. Jacobs for a few hours in the Denver airport, and another time to meet the management of GeoSyn Fuels ("GSF"), a private company led by Mr. Jacobs as Chairman.

16. In September 2009, Mr. Jacobs arranged for Mr. Quinn to visit his New York offices, to meet his young colleagues, and attend a breakfast meeting at the Four Seasons Hotel in New York City. During that trip, Mr. Jacobs also introduced him to the key man at GeoBiotics, a "waste to energy" company. Mr. Jacobs was Chairman of GeoBiotics and urged Mr. Quinn to invest, but Mr. Quinn was not interested.

17. Mr. Jacobs then told Mr. Quinn that Todd Harvey, the CEO of GSF, badly needed the kind of talent and expertise that Mr. Quinn possessed, and that Mr. Quinn could have an important role in the company. Mr. Harvey had technical, mining experience, but never moved a company from small scale to large scale, and did not have any experience in taking a company public---which Mr. Jacobs represented was likely to occur within the next 18 to 24 months.

18. In October 2009, based on Mr. Jacobs' promise of placing Mr. Quinn into a senior role at GSF, and his representations that GSF was close to being able to produce ethanol in commercial quantities, Mr. Quinn made an initial investment in GSF, followed by a second investment a month later.

4

19. The parties continued to speak regularly. In early December, 2009, Mr. Jacobs asked Mr. Quinn to meet him in Denver to learn more about yet another Jacobs venture, Alternative Packaging Solutions, LLC ("APS"). Mr. Jacobs had set a value on APS of between $13-16 million. APS had a single asset, an unusual system of twisting its applicator head onto consumable spray items, such as bleach, hairspray, room fresheners, and the like. Mr. Quinn received a few samples and had family members test them, finding they were easy to use.

20. Environmentally sensitive and caring young adults had created a market for products that were ecologically sound. Given that the aerosol can had not been changed all that much in about 90 years, it seemed to Mr. Quinn that there might be a market for the APS system.

21. Mr. Quinn indicated he might be willing to invest $250,000 in APS if he was granted an active senior management role, a seat on the board, and allowed to head up several crucial oversight committees.

22. Mr. Jacobs agreed that Mr. Quinn would have a significant management role at APS, might even serve as Chairman, and was considering moving APS to Denver to facilitate Mr. Quinn's taking that role. Mr. Jacobs then suggested that Mr. Quinn invest $400,000 in APS.

23. In mid-December 2009, during a meeting in Denver's Hotel Teatro with Mr. Jacobs and his associates, Koichi Kurisu and Dick Harris, Mr. Jacobs reiterated that if Mr. Quinn would invest $400,000 in APS he would be given "senior management responsibilities."

24. Based on Mr. Jacobs' offer of a significant management role, in a company that appeared to have a promising product, Mr. Quinn made the decision to invest the larger amount in APS, purchasing 28,548 APS LLC Units at a per unit price of $14.01, for a total investment of $400,000. Because Mr. Jacobs represented that APS had only $200,000 in Units available, Mr. Quinn purchased half of the APS LLC Units from APS, and half from Mr. Jacobs personally.

25. After months of urging by Mr. Jacobs, Mr. Quinn flew to Denver and drove to Pueblo for a due diligence inspection of The Water Company. Mr. Jacobs had been especially vocal about the potential of The Water Company, and represented that it was near to closing several large contracts involving the abatement of contaminated water at nuclear power plants. Several notable securities industry professionals were on the board of directors of The Water Company, including Stan O'Neal, the former CEO of Merrill Lynch. Mr. Jacobs placed a $100 million valuation on The Water Company.

26. Upon visiting The Water Company, Mr. Quinn was disappointed with what he found. He did not find a budding engineering firm on the brink of large environmental abatement contracts. Instead, he found a small operation that, in Mr. Quinn's opinion, did not appear to have the capacity depicted by Mr. Jacobs.

27. Mr. Jacobs phoned Mr. Quinn as he drove back to Denver. Mr. Quinn conveyed his disappointment, his numerous concerns, and his firm decision that he would not invest in The Water Company. In reaction, Mr. Jacobs