became enraged and verbally abusive. Mr. Jacobs stated that The Water Company was within a year of huge contracts, and would soon be worth one billion dollars.

28. As a result of the phone call after the Pueblo visit, and subsequent phone calls in which Mr. Jacobs exhibited a similar temperament, Mr. Quinn came to understand that Mr. Jacobs did not accept any dissension from those around him. Mr. Jacobs labeled as "seditious," even long time investors and friends who questioned his pronouncements, including John Hennessy, the former Chairman and CEO of Credit Suisse First Boston, who had not only invested in Mr. Jacobs' companies, but had also made personal loans to him.

29. At the same time that Mr. Quinn was learning more about Mr. Jacob's personality, he was waiting for Mr. Jacobs to honor his agreements to place him in leadership roles at APS and GSF.

30. On December 29, in a meeting at Mr. Jacobs' New York City offices also attended by Jerome Kenney, Mr. Jacobs promised to "spell out Mr. Quinn's APS duties . . . within a few days," with a resolution of Mr. Quinn's duties at GSF following closely behind. Mr. Jacobs also agreed that Mr. Kenney arbitrate any disputes that might arise between Mr. Quinn and Mr. Jacobs.

31. During January and February, Mr. Quinn spent considerable time and effort meeting with or talking to Koichi Kurisu and Dick Harris of APS, and helping to connect Mr. Harris with a number of industrial companies that might

assist him in expanding APS. Mr. Harris greatly appreciated those efforts, and in March sent a letter to Mr. Quinn stating as much.

32. In late February, Mr. Jacobs faxed to Mr. Quinn the long-awaited description of his duties for APS. The second point was the duty to "assist in capital raises," which meant, Mr. Jacobs explained, that Mr. Quinn needed to bring other investors into APS.

33. In the nearly eight months that Mr. Jacobs and Mr. Quinn had been discussing Mr. Quinn's potential participation, It had never before been suggested that Mr. Quinn would be expected to solicit investors. Mr. Quinn immediately contacted Mr. Kenney, who agreed that there had never been any discussion of Mr. Quinn having any responsibility for raising capital.

34. Mr. Quinn contacted Mr. Jacobs and made it clear he was ready and willing to commit to all the other aspects of the APS duties Mr. Jacobs had spelled out, but not active "fundraising." Mr. Jacobs summarily ended the conversation.

35. Mr. Jacobs then told Mr. Kurisu and Mr. Harris that Mr. Quinn would "play no role whatsoever in APS going forward." Mr. Harris informed Mr. Quinn of that edict. Mr. Quinn called Mr. Jacobs to inquire, and was told there was nothing more to talk about with regard to APS.

36. Hearing this, Mr. Quinn asked Mr. Jacobs to refund his $400,000 investment in APS. He also asked for Mr. Kenney to arbitrate the dispute over Mr. Jacobs' refusal to appoint him to an APS management role, and to arbitrate

8

the dispute over Mr. Jacobs' continuing failure to appoint Mr. Quinn to the GSF board. In addition to his financial investments in APS and GSF, Mr. Quinn had spent hundreds of hours advising the management and board members of APS and GSF, and he did not take Mr. Jacobs' intransigence lightly.

37. Although Mr. Quinn wanted his APS investment returned immediately, he agreed to give Mr. Jacobs time to attempt to sell APS LLC Units, which would facilitate a refund of his $400,000 investment. In consideration of Mr. Quinn giving Mr. Jacobs time to come up with $400,000, Mr. Jacobs agreed that after a period of time, Mr. Quinn could "put" his Units back to Mr. Jacobs in exchange for the amount of his original investment, $400,000. plus interest.

38. On April 22, 2010, Mr. Jacobs executed and delivered to Mr. Quinn an agreement on Mr. Jacobs' own letterhead, promising to pay Mr. Quinn, *inter alia*, $400,000, with interest, for Mr. Quinn's APS LLC Units, if Mr. Quinn "put" those Units to Mr. Jacobs in the 30 day period beginning January 15, 2012 (the "APS Put Agreement"). The APS Put Agreement, a true copy of which is made Exhibit 2 to this Complaint, states in relevant part that:

> If at January 15, 2012 you should continue to own any Units, you shall have the right, to be exercised within 30 days thereafter, to sell to me, such Units. The purchase price therefor (the "Purchase Price") will be $14.01 per Unit, plus interest thereon beginning July 1, 2010. Interest shall be calculated at a per annum rate of 5% for the period July 1, 2010- December 31, 2010; and after December 31, 2010, interest shall also accrue on the aggregate amount of accrued interest at December 31, 2010.

39. On January 17, 2012, Mr. Quinn informed Mr. Jacobs, by letter sent certified, first class mail, that he was exercising his right to sell Mr. Jacobs his APS LLC Units, (the "Put Letter"). A true copy of the Put Letter is made Exhibit 3 to this Complaint.

40. As set forth in the Put Letter, the total amount owed to Mr. Quinn from Mr. Jacobs for the sale of the APS LLC Units, as of January 15, 2012 was $431,428.63, with interest accruing at a rate of $56.18 per day.

41. This amount represented Mr. Quinn's original investment of $400,000, plus interest determined pursuant to the APS Put Agreement. Mr. Jacobs has not paid the amount he owes to Mr. Quinn for the Units that Mr. Quinn put to him. Mr. Jacobs' failure to pay for the APS LLC Units that Mr. Quinn put to him is a material breach of the APS Put Agreement.

42. Mr. Quinn is not alone in having to chase Mr. Jacobs into Court in order to enforce a written promise.

43. On December 11, 2011, John M. Hennessy, a former Chairman and CEO of Credit Suisse First Boston, who, like Mr. Quinn, was an investor in several of Mr. Jacobs fledgling companies, commenced an action against Mr. Jacobs in Supreme Court, New York County, Index No. 114514-11 ("the Hennessy Action") to recover $1,359,866 plus interest from Mr. Jacobs for non-payment of a consolidated note representing a series of unpaid promissory notes given for personal loans (referred to in Paragraph 12 of this Complaint). The Hennessy

Action was removed to the Southern District of New York on the basis of diversity jurisdiction, as File No. 12 CV 0044 (AJN)(AJP).

44. The consolidated note referred to in the Hennessy Action was secured by 1,474,286 common LLC membership interests in GeoBiotics, which Mr. Jacobs and Mr. Hennessy valued at $1.75 per interest on June 29, 2007, but which, by October 2010, according to Mr. Hennessy's affidavit in the Hennessey Action,

> "had significantly declined in value based on the company's poor performance. In fact, in October 2010, I abandoned my interest in 28,571.4 GeoBiotics common limited liability company membership interests that I owned directly and have written off such investments for Federal income tax purposes."

45. On February 3, 2012, Mr. Jacobs conveyed a suggestion to Mr. Quinn, that he withdraw his put because the APS Units will soon be more valuable. Mr. Quinn conveyed the message that he just wanted his money back and requested Mr. Jacobs pay him for the shares.

## DEMAND FOR JUDGMENT

Therefore, the plaintiff, Michael Quinn, demands judgment against the defendant, Eli S. Jacobs, for $431,428.63 plus interest from January 15, 2012 at the rate of $56.18 per day, and costs.

## DEMAND FOR A JURY TRIAL

Pursuant to the Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure, Mr. Quinn demands trial by jury on all issues.

Dated: New York, New York
March 30, 2012

KATTEN MUCHIN ROSENMAN LLP

By: _____
Steven Eckhaus (SE 1929)
Evan Belosa (EB 7959)
575 Madison Avenue
New York, New York 10022-2585
Steven.eckhaus@kattenlaw.com
Tel: (212) 940-8860
Fax: (212) 894-5925

*Attorneys for the plaintiff*
*Michael Quinn*

To: David E. Ross, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019-6799

*Attorneys for the defendant*
*Eli S. Jacobs*

12