UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

The Authors Guild, Inc., Association of American     :
Publishers, Inc., et al.,     :
    :
      Plaintiffs,     :
    :    Case No. 05 CV 8136-JES
            v.     :
    :    **FILED**
Google Inc.,     :    **ELECTRONICALLY**
    :
      Defendant.     :

---------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL

Michael J. Boni (pro hac vice)
Joanne Zack
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
*Attorneys for Plaintiffs The Authors Guild,
Inc., Herbert Mitgang, Betty Miles, Daniel
Hoffman, Paul Dickson, Joseph Goulden
and the Author Sub-Class*

Bruce P. Keller (BK 9300)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
*Attorneys for Plaintiffs The McGraw-Hill
Companies, Inc., Pearson Education, Inc.,
Penguin Group (USA) Inc., Simon &
Schuster, Inc., John Wiley & Sons, Inc,.
Association of American Publishers, Inc.
and the Publisher Sub-Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. viii

I.      INTRODUCTION. .................................................................................................... 1

II.     PROCEDURAL POSTURE OF THE LITIGATIONS. ........................................... 4

III.    THE MATERIAL TERMS OF THE PROPOSED SETTLEMENT................................ 5

   A.   Specific Definitions And Provisions. .................................................................. 5

      1.   The Settlement Class And Sub-Classes. ........................................................ 5

      2.   Related Definitions.......................................................................................... 6

      3.   The Parties. ...................................................................................................... 7

         a.   Representative Plaintiffs ............................................................................ 7

         b.   Associational Plaintiffs .............................................................................. 8

         c.   Defendant .................................................................................................... 8

      4.   Non-Party Libraries. ........................................................................................ 8

   B.   Details Of Benefits To The Settlement Class.......................................................... 8

      1.   Revenues From Google's Commercial Use Of Books And Inserts. ............... 8

      2.   Classification Of Books. ................................................................................. 9

      3.   Establishment Of The Book Rights Registry, And Payment For Notice And
           Claims Administration. ................................................................................. 10

      4.   Payment For Already Digitized Books. ....................................................... 11

      5.   Rightsholders' Removal And Exclusion Rights............................................ 12

      6.   Hosted Version Of Books To Rightsholders................................................. 13

      7.   Rightsholders' Consumer Subscription Discount. ....................................... 13

      8.   Attorneys' Fees And Costs............................................................................ 13

C.   Author-Publisher Procedures.................................................................... 13

    1.   In-Print Books. ............................................................................... 14

    2.   Out-Of-Print Books. ....................................................................... 14

D.   Plan Of Allocation. .................................................................................. 15

    1.   Institutional Subscriptions. .............................................................. 15

        a.   Usage Fees ............................................................................ 15

        b.   Inclusion Fees ...................................................................... 16

    2.   Subscription Fee Fund And Usage Fee Fund. .................................. 16

    3.   Consumer Uses. ............................................................................... 17

E.   Other Provisions. ...................................................................................... 17

    1.   Participating Library Uses. ............................................................... 17

    2.   Public Access Licenses. .................................................................. 19

    3.   Non-Display Uses. ........................................................................... 20

    4.   Security Provisions. ......................................................................... 20

    5.   Dispute Resolution Mechanism. ...................................................... 20

    6.   Non-Exclusive Rights. ..................................................................... 21

F.   Release....................................................................................................... 21

G.   Notice Program.......................................................................................... 22

IV.   ARGUMENT........................................................................................................ 23

A.   The Standard For Preliminary Approval Is Met........................................ 23

B.   The Settlement Is The Product Of Arms Length, Adversarial Negotiations That Were At All Times Serious, Informed, And Non-Collusive. .................................... 25

C.   The Settlement Does Not Improperly Grant Preferential Treatment To The Named Plaintiffs Or Any Segments Of The Settlement Class. ................................. 26

D.    The Settlement Does Not Provide Excessive Compensation For Plaintiffs'
Counsel. ........................................................................................................ 27

E.    The Substance Of The Settlement Falls Within The Range Of Possible Final
Approval. ...................................................................................................... 27

1.    The Settlement Provides Exceptional Classwide Relief. ............................... 27

2.    The Settlement Provides An Excellent Result In Light Of The Risk And Delay
Of Future Litigation. ..................................................................................... 29

V.    THE SETTLEMENT CLASS AND SUB-CLASSES SHOULD BE
PROVISIONALLY CERTIFIED FOR SETTLEMENT PURPOSES. .......................... 30

A.    Certification Standards. ................................................................................. 30

B.    The Settlement Class And Sub-Classes Should Be Provisionally Certified. .................. 32

1.    Rule 23(a) Requirements Are Satisfied. ........................................................ 32

2.    The Rule 23(b)(2) And 23(b)(3) Requirements Are Satisfied. ..................... 34

VI.    THE COURT SHOULD APPROVE THE PROPOSED FORMS AND
METHODS OF NOTICE. ................................................................................. 36

VII.    CONCLUSION ............................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997)..................................................................................................... 31, 34

*American Geophysical Union v. Texaco Inc.,*
  60 F.3d 913 (2d Cir. 1994)................................................................................................ 30

*Bennett v. Behring Corp.,*
  96 F.R.D. 343 (S.D. Fla. 1982).......................................................................................... 39

*Blank v. Talley Indus., Inc.,*
  64 F.R.D. 125 (S.D.N.Y. 1974) ......................................................................................... 25

*Boucher v. Syracuse Univ.,*
  164 F.3d 113 (2d Cir. 1999).............................................................................................. 32

*Brown v. Kelly,*
  244 F.R.D. 222 (S.D.N.Y. 2007) ....................................................................................... 31

*Campbell v. Acuff-Rose Music,*
  510 U.S. 569 (1994)........................................................................................................29-30

*Denney v. Deutsche Bank, A.G.,*
  443 F.3d 253 (2d Cir. 2006).............................................................................................. 31

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974).......................................................................................................... 36

*Goldberger v. Integrated Res., Inc.,*
  209 F.3d 43 (2d Cir. 2000)................................................................................................ 27

*Gottlieb v. Wiles,*
  11 F.3d 1004 (10th Cir. 1993) .......................................................................................... 36

*In re Austrian & German Bank Holocaust Litig.,*
  80 F. Supp. 2d 164 (S.D.N.Y. 2000).................................................................................. 31

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,*
  410 F. Supp. 659 (D. Minn. 1974)..................................................................................... 25

*In re Deutsche Telekom AG Sec. Litig.,*
  229 F. Supp. 2d 277 (S.D.N.Y. 2002)................................................................................ 31

*In re Luxottica Group S.p.A. Secs. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) ............................................................... 23

*In re NASDAQ Market Makers Antitrust Litig.*,
   176 F.R.D. 99 (S.D.N.Y. 1997) ............................................. 24, 25, 26, 27

*In re NASDAQ Market-Makers Antitrust Litig*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ......................................................... 34, 35

*In re Nassau County Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006)...................................................................... 35

*In re PaineWebber Ltd. Partnerships Litig.*,
   147 F.3d  132 (2d Cir. 1998)..................................................................... 23

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ......................................................... 23, 38

*In re Sumitomo Copper Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999)............................................................... 31

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999)......................................................... 27

*In re Traffic Executive Association-Eastern R.R.s*,
   627 F.2d 631 (2d Cir. 1980)...................................................................... 24

*Jones v. Goord*,
   435 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................................................... 32

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) .................................................................... 30

*Lake v. First Nationwide Bank*,
   900 F. Supp. 726 (E.D. Pa. 1995) ............................................................ 25

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................................... 27

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)...................................................................... 32

*Maywalt v. Parker & Parsley Petroleum Co.*,
   67 F.3d 1072 (2d Cir. N.Y. 1995)............................................................. 39

*Parker v. Time Warner Entm't Co.,*
    331 F.3d 13 (2d Cir. 2003) ................................................................. 34

*Peters v. National R.R. Passenger Corp.,*
    966 F.2d 1483 (D.C. Cir. 1992) ........................................................ 36

*Robinson v. Metro-North Commuter R.R. Co.,*
    267 F.3d 147 (2d Cir. 2001) .............................................................. 34

*Shelter Realty Corp. v. Allied Maintenance Corp.,*
    75 F.R.D. 34 (S.D.N.Y. 1977) ........................................................... 35

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
    396 F.3d 96 (2d Cir. 2005) ...................................................... 23, 25, 39

*Weigner v. City of New York,*
    852 F.2d 646 (2d Cir. 1988) .............................................................. 36

*Weinberger v. Kendrick,*
    698 F.2d 61 (2d Cir. 1982) ................................................................ 39

## Statutes

17 U.S.C. § 101 ............................................................................................. 6

17 U.S.C. § 107 ........................................................................................ 1, 29

17 U.S.C. § 504 ........................................................................................... 11

## Rules

Fed. R. Civ. P. 23 ................................................................................... *passim*

## Treatises

Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.25 (4th ed. 2002) ................. 24

*Manual for Complex Litigation – Fourth*  (4th ed. 2004) ........................................... 24, 25, 26, 27

5-23 Jerold S. Solovy *et al.*,Moore's Federal Practice - Civil § 23.86 (2008) ...................... 32, 35

I.      INTRODUCTION.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs submit this

memorandum in support of an order: (1) granting preliminary approval of a settlement of this

class action; (2) provisionally certifying a settlement class ("Settlement Class")[1] consisting of

two sub-classes, (i) an "Author Sub-Class" (authors of books and other writings) and (ii) a

"Publisher Sub-Class" (publishers of books, Periodicals and other writings); (3) approving the

proposed class notice program; and (4) scheduling a fairness hearing at which the Court may

determine whether the Settlement meets the standards of Rule 23 and merits final approval.

This class action lawsuit arises out of the decision by Defendant Google, Inc. ("Google")

to create digital copies of millions of copyrighted books and other works and make those digital

copies available on its website (the "Google Library Project" or "GLP").  As its principal defense

against the copyright infringement claims that have been brought against it based on this

copying, Google asserted a fair use defense under 17 U.S.C. § 107, largely because it originally

planned to offer the public only "snippets" (several lines of text) of access to those books and

other works.

---

[1]     Unless otherwise specified, all capitalized terms herein shall have the same meaning as in
the Settlement Agreement, although some definitions are also included in this memorandum
for the convenience of the Court.  References to the Settlement Agreement herein appear as
"S.A. § ___."  A copy of the Settlement Agreement and copies of the attachments thereto are
appended to the Declaration of Michael J. Boni.

The parties now have reached an agreement that avoids a trial and appeals over the infringement claims and defenses asserted.[2]  The Settlement, once approved, would provide, among other things, the following material benefits to the Settlement Class:

- At least $45 million to compensate Settlement Class members whose works have already been scanned without permission.

- Another $34.5 million to establish and maintain a Registry of rights to books (the "Book Rights Registry" or "Registry"), which will locate Settlement Class members, maintain a database of their contact information, collect and pay revenues on behalf of the Settlement Class for the use of copyrighted works through this Settlement, and otherwise protect and represent the interests of the Settlement Class.

- Prospectively, 63% of the revenues earned from Google's future commercial uses of the Settlement Class members' works.

- In addition to these and other significant benefits, the proposed Settlement creates a rights clearance mechanism that lets members of the Settlement Class, at all times, retain control over their copyrighted works by giving them the ability to determine the extent to which those works are included or excluded from the Google Library Project.

As a result, the Settlement:

- Creates an innovative marketing program for authors and publishers of in-print books that catapults the publishing industry into the digital age, a result that greatly

---

[2]  Two separate actions are pending before the Court:  (a) the class action, which bears the caption on this memorandum; and (b) the separate action brought by five individual publishing houses, *The McGraw-Hill Companies, et al. v. Google Inc.*, Case No. 05-CV-08881 (JES) (the "McGraw-Hill Action").  Both would be finally resolved upon final approval of the proposed Settlement, described below.

benefits individual authors and publishing houses, which simply could not launch such a program on their own;

•       Addresses what has been a persistent problem, particularly for individual authors – how to breathe new life into older, out-of-print books that are generally inaccessible to the public and have stopped generating revenue;

•       Is designed to maximize Settlement Class member rights by allowing any of them, at any time, to commercially exploit their works in other ways outside of the Google Library Project; and

•       Benefits the Settlement Class, as well as the general public, through the ability to access books on Google's website and, as a result of provisions addressing the extent to which libraries may also use digitized copies of these works, enjoy a new and unprecedented ability to use books and conduct research.

These benefits were reached only after two years of vigorous, hard fought, multi-party negotiations by experienced counsel on all sides.  Each of the parties zealously protected their interests, including those of the authors and publishers as aligned against Google, those of the authors and publishers as they competed on some issues, and those of the libraries that, for the most part, are the source of the works Google is digitally copying and, as a result, also wanted their constituencies to benefit through the access for archival, research and other purposes specified in the Settlement Agreement.

As explained in more detail below, the result is a settlement that, although complex in its structure, is elegantly simple in its result.  It provides extraordinary and previously unattainable benefits to the authors, the book industry, and even the public.  As a result, it falls well within the range of reasonableness necessary for the Court to grant preliminary approval.

II.      **PROCEDURAL POSTURE OF THE LITIGATIONS.**

Both the authors' class action and the publishers' lawsuit pending before the Court were

filed in response to Google's highly publicized Google Library Project.  In 2004, Google

announced that it had entered into agreements with several university and other libraries to

digitize books and other writings contained in those libraries.  Google has already digitized over

seven million books, including books that are in copyright, and has created a searchable books

database that can show users "snippets," meaning several lines of text, from the books.

On September 20, 2005, several published authors and the nation's largest organization

of book authors, The Authors Guild, filed this class action lawsuit against Google alleging

copyright infringement by Google and seeking damages and injunctive relief.  On October 19,

2005, five publishers individually filed a lawsuit, alleging copyright infringement and seeking

injunctive relief against Google.  On June 19, 2006, the *Authors Guild* plaintiffs filed an

amended complaint.

Google answered the initial complaints in November 2005 and the authors' amended

complaint in July 2006.  By agreement of the parties and with the approval of the Court,

coordinated discovery began in both cases.  The author and publisher plaintiffs reviewed millions

of pages of documents related to Google's activities; the author plaintiffs also reviewed

documents produced by the publisher plaintiffs that were relevant to the authors' and publishers'

respective copyright and contractual interests in the books digitized by Google.  Although the

parties were able to avoid bringing most of their discovery disputes to the Court, discovery was

protracted and pockmarked with disagreements created in part by the extraordinary burden all

sides shared by the enormous costs of electronic discovery.

In the fall of 2006, the parties began settlement negotiations, which, given the innovative

nature of the Google Library Project and the competing interests of the parties involved (authors,

publishers, Google, and libraries), proved to be uniquely complex and difficult.  After more than two years of often full-time negotiations, the parties, as well as several participating libraries, reached a proposed settlement of this class action, memorialized in the Settlement Agreement submitted herewith.

Contemporaneously with the filing of this motion, Plaintiffs filed a Second Amended Class Action Complaint in the *Authors Guild* action, adding as plaintiffs in that action the Association of American Publishers, Inc. ("AAP") and the individual publishing house plaintiffs that filed the *McGraw-Hill* action.  As part of the Settlement, the *McGraw-Hill* action will be dismissed with prejudice if and when this Settlement is finally approved and any appeals from the Court's final approval order have been exhausted.  S.A., Attachment M.

## III.   THE MATERIAL TERMS OF THE PROPOSED SETTLEMENT.

### A.   Specific Definitions And Provisions.

#### 1.   The Settlement Class And Sub-Classes.

The Settlement Class is defined as follows:

> "Settlement Class" means all Persons that, as of the Notice Commencement Date, have a Copyright Interest in one or more Books or Inserts.  All Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both.  Excluded from the Settlement Class are Google, the members of Google's Board of Directors and its executive officers. S.A. § 1.142.

> "Author Sub-Class" means members of the Settlement Class who are authors, and their heirs, successors and assigns, and any other members of the Settlement Class who are not members of the Publisher Sub-Class.   S.A. § 1.14.

> "Publisher Sub-Class" means members of the Settlement Class that are (a) companies that publish books, and their exclusive licensees, successors and assignees, and (b) companies that publish Periodicals and have a Copyright Interest in one or more Inserts,

and their exclusive licensees, successors, and assignees.  S.A.
§ 1.120.

## 2.      Related Definitions.

**Copyright Interest:**  As used in the Settlement Agreement, the term "Copyright Interest" is defined as ownership (including joint ownership) of a United States copyright interest or an exclusive license of a United States copyright interest, in each case only if and to the extent the interest is implicated by a use authorized, or for which compensation could be payable, under the Settlement Agreement.  S.A. § 1.38.  As described below, the settlement authorizes certain uses of Settlement Class members' works, and provides for compensation for certain uses of their works.  The copyright interests implicated by those uses are the "Copyright Interests," as that term is used in the Settlement Agreement.

**Books:**  As used in the Settlement Agreement, the term "Book" is defined as a written or printed work that (a) if a "United States work," as defined in 17 U.S.C. § 101, has been registered with the United States Copyright Office as of the Notice Commencement Date, and (b) on or before the Notice Commencement Date, was published or distributed to the public or made available for public access as a set of written or printed sheets of paper bound together in hard copy form under the authorization of the work's U.S. copyright owner, and (c) as of the Notice Commencement Date, is subject to a Copyright Interest.  The definition of "Book" does not include Periodicals (*e.g.*, newspapers, magazines, journals); personal papers (*e.g.*, unpublished diaries or bundles of notes or letters); written or printed works in which more than thirty-five percent (35%) of the pages contain more than fifty percent (50%) music notation and lyrics interspersed, if any (for purpose of this calculation, "music notation" means notes on a staff or tablature); written or printed works in, or as they become in, the public domain under the Copyright Act in the United States; or Government Works (*i.e.*, meaning written works that are

not subject to copyright because they are authored by the U.S. government or that are subject to equivalent treatment under any state's law, as defined in Section § 1.64 of the Settlement Agreement).  S.A. § 1.16.

**Inserts**:  As used in the Settlement Agreement, an "Insert" must: (a) consist either of (1) text, such as forewords, afterwords, prologues, epilogues, poems, quotations, letters, textual excerpts from other Books, periodicals or other works, or song lyrics; or (2) tables, charts, graphs, musical notation (*i.e.*, notes on a staff or tablature), or children's Book illustrations; (b) be contained in a Book, government work or a book that is in the public domain; (c) be protected by a U.S. copyright, where the U.S copyright interest in the Insert is owned or held by someone *other than* a Rightsholder of the Book's "Principal Work" (*e.g.*, the "narrative story" in a work of fiction, a group of short stories published as a collective work, or a play in a Book with a foreword); and (d) be registered, either alone or as part of another work, with the U.S. Copyright Office as of the Notice Commencement Date, unless the Insert or work was first published outside the United States, in which case such registration is not required.  S.A. § 1.72.  Excluded from the definition of "Insert" are (1) pictorial works, such as photographs, illustrations (other than children's Book illustrations), maps and paintings, and (2) works that are in the public domain.  *Id*.

**Rightsholder**:  As used in the Settlement Agreement, the term "Rightsholder" means a member of the Settlement Class who does not opt out of the Settlement.  S.A. § 1.132.

3.      **The Parties.**

a.      **Representative Plaintiffs.**

The Representative Plaintiffs for the Author Sub-Class are Paul Dickson, Joseph Goulden, Daniel Hoffman, Betty Miles, and Herbert Mitgang.  S.A. § 1.125.  The Representative

Plaintiffs for the Publisher Sub-Class are The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., and John Wiley & Sons, Inc.  *Id.*

### b. Associational Plaintiffs.

The action was also brought by an authors' rights group and publishers' rights group: The Authors Guild and the AAP.  These groups are referred to herein as the "Associational Plaintiffs."  S.A. § 1.12.  The Associational Plaintiffs participated in the litigation in order to advance the rights and interests of their members, and served as consultants to Class Counsel during the litigation and negotiations.

### c. Defendant.

Google is the sole defendant in this case.

### 4. Non-Party Libraries.

Though not parties to the litigation, certain libraries have been approved to participate in the Settlement and, if they do so, would receive releases and other benefits under this agreement.

### B. Details Of Benefits To The Settlement Class.

### 1. Revenues From Google's Commercial Use Of Books And Inserts.

The Settlement provides that Google will continue to digitize Books and develop a searchable electronic database of millions of Books (as well as public domain and Government Works), and make a number of revenue-earning Display Uses, including:  (a) selling subscriptions to the database to institutions ("Institutional Subscriptions") (*e.g.*, universities, corporations, government offices) (S.A. § 4.1); (b) selling online access to Books to consumers ("Consumer Purchases") (S.A. § 4.2); (c) displaying "previews" (up to 20% of the Book (S.A. § 4.3)) and "snippets" (about three or four lines of the Book (S.A. § 1.147)) in order to spur

Book sales and earn advertising revenues; (d) placing advertisements on web pages devoted to a single Book (including preview and snippet pages) (S.A. § 4.4); and (e) if agreed between Google and the Registry, future revenue models such as, for example, Consumer Subscriptions, print on demand, custom publishing, PDF downloads, and summaries, abstracts and compilations (S.A. § 4.7).[3]  Revenues earned from these uses will be split between Rightsholders (63%) and Google (37%).  S.A. § 4.5.[4]  The Registry will distribute the revenues to Rightsholders pursuant to the provisions of the Plan of Allocation.  S.A. § 5.4.

### 2.    Classification Of Books.

The Settlement includes different provisions with respect to in-print and out-of-print Books.  S.A. §§ 3.2-3.3.  With respect to in-print Books, the Settlement provides that Google may not make any Display Uses unless Rightsholders affirmatively include their Books in the GLP.  *Id.*  Rightsholders who wish to include their in-print Books in the GLP may avail themselves of the economic terms under the Settlement, or may negotiate different terms with Google.[5]  In contrast, the Settlement provides that out-of-print Books will automatically be included in the GLP and all of its uses, unless the Rightsholder instructs Google not to do so.  *Id.*

---

[3]    These uses are referred to in the Settlement as "Display Uses."  The other Display Uses are Front Matter Display (*i.e.*, display to Google users of the title page, copyright page, table of contents and indexes) and Public Access Services (see Section III.E.2, *infra*).

[4]    In addition, printing fees will be charged to users of the database at public and academic library terminals (see p. 19, *infra*).  Printing revenues, net of the libraries' costs, will go to the Registry on behalf of Rightsholders in accordance with the standard 63/37 revenue split.  S.A. § 4.8(a).  Computer terminals may also be installed at commercial copy centers and other facilities for the purpose of earning per-page printing fees.  S.A. § 4.8(b).

[5]    Google does, however, have the right to make Non-Display Uses (described in Section III.E.3, *infra*) of in-print Books.  S.A. § 3.4(a).

In order to classify Books as in-print or out-of-print, Google will make an initial determination of whether a Book is "Commercially Available" (*i.e.*, presumptively "in-print" for purposes of the Settlement), based on whether the Book is being offered for sale new through one or more customary channels of trade in the U.S. as of the Notice Commencement Date.  S.A. § 3.2(d).  Rightsholders and the Registry will have the right to challenge Google's initial determination, and any disputes with Google will be resolved through the Settlement's arbitration procedures (S.A. Article IX).  S.A. § 3.2(d)(iv).

> **3.**     **Establishment Of The Book Rights Registry, And Payment For Notice And Claims Administration.**

Google has agreed to pay $34.5 million to fund the launch and initial operations of the Book Rights Registry.  S.A. § 2.1(c).  The Registry will locate Rightsholders, identify and coordinate payments to Rightsholders, and otherwise represent the interests of Rightsholders under the Settlement Agreement.  *Id.*

The Registry will set up and maintain a database of Rightsholders' contact information and information regarding Rightsholders' Books and Inserts.  S.A. § 6.1(b).  The Registry will be a not-for-profit entity, and all funds received by the Registry will be for the benefit of Rightsholders.  S.A. § 6.2(a).  The Registry will be funded at first by Google's $34.5 million payment (net of notice and claims administration expenses).  S.A. §§ 2.1(c), 5.2.  Thereafter, the Registry will be funded by an administrative fee taken as a percentage of Rightsholders' revenues.  S.A., Attachment C (Plan of Allocation) § 4.2.  The Registry will have a Board of Directors composed at all times of an equal number of Author Sub-Class and Publisher Sub-Class representatives.  S.A. § 6.2(b).  The $34.5 million settlement payment by Google will also fund the costs of class notice, and of settlement administration until the Registry is fully operational.  S.A. §§ 1.6, 5.2.

### 4.    Payment For Already Digitized Books.

Plaintiffs asserted a monetary relief claim for copyright infringement on behalf of copyright holders of Books and Inserts that Google has digitized without authorization. *See* 17 U.S.C. § 504.  In settlement of these claims, Google has agreed to pay Rightsholders a minimum of $45 million as a cash award for Books and Inserts that Google has digitized without authorization as of the opt-out deadline.  S.A. §§ 2.1(b), 5.1.

- Google will make a Cash Payment of at least $60 per Principal Work, $15 per Entire Insert,[6] and $5 per Partial Insert for which at least one Rightsholder has registered a valid claim by the opt-out deadline.  Only one Cash Payment will be made for the same content that Google digitized, regardless of the number of Books or Inserts containing the same content that Google will have digitized.  For example, only one Cash Payment will be made for the hard cover and soft cover editions of a Book, even if Google digitized both of them separately, and only one Cash Payment will be made for several digitizations of the same Book or for content that is contained, as Inserts, in multiple Books.  Also, only one $60 Cash Payment will be made for content that appears both as a Book and also as an Insert in another Book (*e.g.*, because a portion of the first Book was quoted in the second Book).  Each Book contains only a single Principal Work.  S.A. § 5.1(a).

- If more than US $45 million is required to pay all of the eligible claims for Cash Payments, then Google will pay the additional funds necessary to make all such Cash Payments.  S.A. § 5.1(b).

- Depending on the number of Principal Works and Inserts claimed by Rightsholders, if the total amount distributed to all such Rightsholders is less than $45 million, the Registry will distribute the balance to such Rightsholders up to a maximum of $300 per Principal Work, $75 per Entire Insert, and $25 per Partial Insert.  Any remaining funds thereafter will be paid under the Plan of Allocation.  Plan of Allocation § 3.2.

---

[6]  For purposes of receiving payments for the use of Inserts, the Settlement identifies two types of Inserts: (a) "Entire Insert," which is an Insert that is an entire work, *e.g.*, forewords, afterwords, introductions, entire works included in anthologies, entire poems, entire short stories, the entire lyrics of a song, and entire essays; and (b) "Partial Insert," which is any other type of Insert.  Partial Inserts include excerpts from a work (*e.g.*, excerpts from a Book or magazine article, quotations, stanzas from poems or portions of a song's lyrics).  *See* S.A. §§ 1.50, 1.100.

### 5.      Rightsholders' Removal And Exclusion Rights.

Rightsholders have the right to remove their Books, that is, to require that those Books be deleted from all servers or sources from which Google or the Fully Participating Libraries could make any uses.  S.A. §§ 1.124, 3.5(a)(i).[7]  Google will honor all removal requests made within twenty-seven (27) months of the Notice Commencement Date; thereafter requests will be honored only if the Books have not yet been digitized.  S.A. § 3.5(a)(iii).

Even if Rightsholders miss the deadline to remove a Book from the GLP, they will have a broad set of exclusion rights that they may exercise at any time.  Rightsholders can exclude their Books (or portions thereof) from any or all of the Display Uses (*i.e.*, from the Institutional Subscriptions, Consumer Purchases, preview uses, snippet displays, advertising uses, and uses in other revenue programs,  (see p. 8, *supra*), and Public Access Licenses (see p. 19, *infra*)).  S.A. § 3.5(b).  Insert Rightsholders are entitled to exclude Inserts (or portions thereof) from all (but not less than all) Display Uses.  S.A. § 3.5(b).  Rightsholders will also have the right to change their exclusion decisions at any time.  S.A. § 3.2(e)(i).

There are two qualifications to the exclusion rights.  First, Rightsholders are not entitled to an Inclusion Fee if they exclude their Book or Insert from Institutional Subscriptions.  *See* Plan of Allocation § 1.2(e).  Second, if a Rightsholder of an out-of-print Book excludes a Book from the Subscription Database, then such Book must also be excluded from Consumer Purchases as well.  S.A § 3.5(b)(iii).[8]

---

[7]    A removal request, however, will not require destruction of backup tapes or other backup storage media that may contain copies of the removed Books.  S.A. § 3.5(a)(ii).

[8]    Because the value of the Subscription Database is enhanced by the extent to which it is comprehensive, this provision provides an incentive to Rightholders to include Books in the Subscription Database in order to make it as comprehensive as possible.

### 6.      Hosted Version Of Books To Rightsholders.

At the Rightsholder's request, Google will provide a hosted version of the Rightsholder's

Book(s) for use on the Rightsholder's website.  S.A. § 3.11.

### 7.      Rightsholders' Consumer Subscription Discount.

If Google sells consumer subscriptions to the Subscription Database, then Rightsholders

may be offered a discount on the consumer subscription.  Google and the Registry will negotiate

the amount of the discount if and when the consumer subscriptions are offered for sale.

S.A. § 4.5(b)(vii).

### 8.      Attorneys' Fees And Costs.

In addition to all the other settlement benefits to the Settlement Class, Google has agreed

to pay counsel for the Author Sub-Class attorneys' fees and costs in the amount of $30 million.

Google has agreed to pay those amounts over and above the other consideration to the Class.

S.A. § 5.5.[9]

### C.      Author-Publisher Procedures.

Because members of both the Author Sub-Class and Publisher Sub-Class have U.S.

copyright interests in many of the same Books, the authors' and publishers' respective interests

---

[9]    In addition, separately, Google will pay $15.5 million to the AAP to settle the separate
copyright infringement suit brought by five publishers against Google in *The McGraw-Hill
Companies, Inc. v. Google Inc.*, 05 Civ. 8881 (JES).  This action, which arises out of the
same facts as this class action – Google's copying of Books and other works in the Google
Library Project – was filed on October 19, 2005.  The payment will be used to reimburse
AAP for attorneys' fees and expenses, and to create a fund to serve the interests of both
authors and publishers. The separate agreement between publishers and Google to settle that
action is attached to the Settlement Agreement (Attachment M).

are addressed in the Author-Publisher Procedures, which is Attachment A to the Settlement

Agreement.  Among other things, the Author-Publisher Procedures set forth the authors' and the

publishers' respective rights concerning in-print and out-of-print Books under the Settlement.

### 1.      In-Print Books.

With respect to in-print books, both the author (other than a work-for-hire author, in

which case the publisher owns all rights to the Book), and the publisher must agree to include the

Book in the GLP or it will not be included.  Author-Publisher Procedures ("A-P") § 5.1.  Cash

Payments for an already digitized in-print Book, and the revenues earned from an in-print

Book's use, will be paid to the publisher of the Book, who will then pay authors in accordance

with the terms of the author-publisher contract for each Book.  A-P § 5.5.  If the author believes

he or she is entitled to more than the amount paid by the publisher, the dispute may be resolved

in the Settlement's arbitration process.  *Id.*[10]  The Author-Publisher Procedures also set forth the

respective rights of authors and publishers concerning exclusion, removal, control of pricing, and

changes in Display Uses of in-print Books.  A-P §§ 5.2-5.4.

### 2.      Out-Of-Print Books.

The Author-Publisher Procedures include provisions concerning exclusion, removal,

control of pricing, and changes in Display Uses of out-of-print Books, which may vary

depending on whether the Book is (1) a work-for-hire (100% of revenues to the publisher), or (2)

one for which rights have reverted to the author, or is considered "author controlled" (100% of

---

[10]   This arbitration right does not apply to authors and publishers of Educational Books (*i.e.*,
books intended primarily for sale to educational markets (S.A. § 3.5(c)(i)(2)), and disputes
between those parties must be resolved under the terms of the individual author-publisher
contract for those educational books.  A-P § 5.5.

revenues to the author).  A-P § 6.1.[11]  Cash Payments and revenues earned for out-of-print Books

that are not works-for-hire and that have not reverted or are author-controlled will be split

between the author and publisher of the Book as follows: (a) for Books first published prior to

1987, 65/35 in favor of the author; and (b) for Books first published on or after 1987, 50/50.  A-P

§ 6.2(c).

> **D.     Plan Of Allocation.**
>
> > **1.     Institutional Subscriptions.**

Rightsholders who register their Books with the Registry will be compensated both for

the actual usage of their Books ("Usage Fees") as well as on the inclusion of their Books in the

Subscription Database ("Inclusion Fees").

> > > **a.     Usage Fees.**

The Registry will develop a fair and equitable formula for calculating "usage," based on a

number of factors, including the number of times users view the Book, how much of the Book is

viewed, and the Settlement Controlled Price[12] of the Book.  Plan of Allocation § 1.1(a).

Although there will be no Usage Fees for Inserts, Inserts will be eligible for Inclusion Fees.  Plan

of Allocation 1.1(f).

---

[11]   The Author-Publisher Procedures set forth a procedure for determining whether a Book is
"Author Controlled."  To summarize, where an author requests a reversion of rights from the
publisher in accordance with the author-publisher contract and the publisher does not
respond, then the author may send notice to the Registry.  If the publisher does not respond
to dispute the notice, the Registry shall deem the book to be "Author-Controlled," and the
author will be entitled to 100% of the revenues earned under this settlement and control all
removal and exclusion decisions.  A-P §§ 4.1, 6.1(b), 6.2(a).

[12]   Rightsholders will be able to set the price of their Books (S.A. § 4.2(b)(i)(1)), or can rely on
the "Settlement Controlled Price" developed by Google (S.A. § 4.2(b)(i)(2)).  Settlement
Controlled Prices will be designed to find the optimal revenue-earning price for each Book.
S.A. §§ 4.2(b)(i)(2) & (c).

###### b.      Inclusion Fees.

Inclusion Fees will be paid to Rightsholders from revenues the Registry receives from sales of subscriptions in the targeted amounts of $200 per Book, $50 per Entire Insert, and $25 per Partial Insert, with a $500 maximum Inclusion Fee for all Inserts containing content from a single work (*e.g.*, poem, song lyric, short story).  Plan of Allocation § 1.2(a) & (b).  In order to receive an Inclusion Fee, Rightsholders are required to register Books and Inserts with the Registry within five years of the Effective Date.  Plan of Allocation § 1.2(c)(i).  Books and Inserts are eligible for an Inclusion fee so long as a Rightsholder does not exclude his, her, or its Book or Insert from the subscriptions revenue model.  Plan of Allocation § 1.2(e).

###### 2.      Subscription Fee Fund And Usage Fee Fund.

From the revenues available to Rightsholders from subscription sales (after payment of the Registry's administrative fees), 75% will be paid into a Usage Fee Fund and 25% will be paid into an Inclusion Fee Fund, for the first ten years.  The Inclusion Fee Fund may also receive some or all of the remainder of the $45 million Cash Payment fund, if any such remainder exists and if the Registry Board votes to do so.  After the first ten years, subscription revenues will be divided 90% to the Usage Fee Fund and 10% to the Inclusion Fee Fund.  The Inclusion Fee Fund itself will be divided into two sub-funds:  20% will go into a Book Sub-Fund and 5% will go into an Insert Sub-Fund.  Plan of Allocation § 1.2(f).  The allocation between Usage Fees and Inclusion Fees reflects Plaintiffs' attempt to fairly and equitably balance the following competing considerations: (1) the value of a Book that is actually "used" in a Subscription database, and (2) the value that a Book contributes by its mere inclusion in a Subscription database.

Because Inserts are unable to earn Usage Fees, the Inclusion Fees for Inserts are minimum amounts.  Because Books are able to earn Usage Fees, the Inclusion Fees for Books is

a target amount, but the actual amount could be higher or lower.  After ten years, if there are

insufficient funds to pay all minimum Insert Inclusion Fees and targeted Books Inclusion Fees,

then the Registry Board will decide whether to continue paying Inclusion Fees for Books or

distribute the balance of the Book Sub-Fund proportionally to the registered Books

Rightsholders.  If after ten years the Inclusion Fee Fund is sufficient to pay more than the

minimum Inserts Inclusion Fees and targeted Books Inclusion Fees, then the remainder will be

distributed proportionally to the registered Inserts and Books Rightsholders.  The Insert Sub-

Fund in that case will continue to be funded until all registered Inserts Rightsholders have been

paid their minimum Inclusion Fees.  *Id.*

### 3.    Consumer Uses.

Revenues from Consumer Purchases and uses other than Institutional Subscriptions (or

Consumer Subscriptions, if implemented) will be usage-based, and determined on a Book-by-

Book basis according to actual use or purchase by consumers.  Plan of Allocation § 2.1.

Rightsholders of Inserts will not be paid from revenues earned in Revenue Models other than

subscriptions.  Plan of Allocation § 2.4.

### E.    Other Provisions.

### 1.    Participating Library Uses.

Libraries have contributed to the Settlement by permitting their collections to be

digitized, and the Settlement provides consideration to the libraries in return.  The Settlement

Agreement identifies several categories of Participating Libraries based on the level of their

participation in the Settlement.

- **Fully Participating Libraries** are libraries that are allowing Google to digitize
  Books in their collections and to which Google is providing a "Library Digital
  Copy" or "LDC" of those Books.  *See* S.A. §§ 1.78, 7.2.  As discussed below, the

Settlement Agreement provides that Fully Participating Libraries will be able to make certain uses of their LDCs;

- **Cooperating Libraries** are libraries that receive the same participatory rights and obligations in the Settlement as a Fully Participating Library, except that they do not receive or have access to a LDC (see S.A. § 1.36);

- **Public Domain Libraries** will provide only public domain books to Google for digitization (see S.A. § 1.118); and

- **Other Libraries** will provide Books to Google for digitization, but do not agree to become a Fully Participating Library, Cooperating Library, or Public Domain Library.  *See* S.A. § 1.99.  Because these libraries have not agreed to sign a Library-Registry Agreement, they receive no releases for any uses of any LDCs.

Fully Participating Libraries may make the following uses of their LDCs:

- make copies as necessary to preserve, maintain, manage, and keep current its digital copy;

- provide access to Books in the digital copy to users with physical impairments who are unable to use printed versions of Books;

- create a print replacement copy of a Book that is damaged, deteriorating, lost or stolen (but only after the library has attempted unsuccessfully to obtain a print replacement at a fair price);

- develop, obtain, and use indexes and finding tools (without displaying content from Books, except Snippets for the purpose of verifying that a Book has been identified);

- if the United States Copyright Act is amended to allow use of orphan works, eligible Fully Participating Libraries may use Books from their digital copy in accordance with the statute;

- use for Non-Consumptive Research (discussed below)

- if a Book is not available through an institutional subscription, use by faculty members and research staff of higher educational institutions of up to five pages of out-of-print Books from the institution's LDC for scholarly and classroom use; and

- other uses that a Participating Library requests of the Registry and are approved by the Registry, or the Rightsholder of a Book pursuant to the Settlement Agreement.

S.A. § 7.2(b).

In addition, a Research Corpus – *i.e.*, a database of all of the Fully Participating Libraries' digital copies – will be created and used by eligible persons for non-consumptive, research purposes (*i.e.*, linguistic analysis, the development of new indexing and search techniques, and other research that does not involve reading the text of the Books). S.A. §§ 1.90, 7.2(d).  The Research Corpus and its use by eligible Fully Participating Libraries, and all other usage rights by eligible Fully Participating Libraries, are subject to detailed requirements and limitations designed to ensure that the research corpus is used exclusively for research, as opposed to commercial, purposes.  *See id*.

The Settlement Agreement also prohibits the use by libraries of LDCs for certain purposes, such as selling Books.  S.A. § 7.2(c).  Providing digital copies of Books to libraries will also serve the public interest (a) by facilitating the preservation of Books, (b) by providing access to Books to persons with disabilities, and (c) facilitating research with the Research Corpus.

## 2. Public Access Licenses.

As additional consideration to the libraries for permitting Google to digitize Books in their collections, Google will provide, upon request, at least one "Public Access License" for free to each not-for-profit higher educational institution and public library in the United States. S.A. §§ 1.66, 1.119, 4.8.  Public Access Licenses will provide the same information as offered in Institutional Subscriptions, except that users will not be able to download or copy/paste any portions of a Book (although libraries equipped to charge for printing will do so with the printing fees collected by Google and split between Google and Rightsholders 37/63, in favor of Rightsholders).  S.A. § 4.8.

### 3.        Non-Display Uses.

In addition to the Display Uses, Google also will be permitted to make "Non-Display Uses" of Books, meaning uses that do not involve displaying Books to the public.  Non-Display Uses include full-text indexing (without displaying the text); geographic indexing of Books, algorithmic listings of key terms for chapters of Books, and other internal research. S.A. §§ 1.91, 3.4.

### 4.        Security Provisions.

To safeguard Rightsholders' intellectual property, Google and Plaintiffs (with the assistance of Plaintiffs' security experts), developed security standards to prevent security breaches and unauthorized use of Google's Books database, the libraries' LDCs and the Research Corpus.  S.A. §§ 8.1-8.2.  The security standards may be found as Attachment D to the Settlement Agreement.  The Settlement Agreement provides remedies to Rightsholders for security breaches and unauthorized access to and use of Books and Inserts.  S.A. §§ 8.3-8.7.

### 5.        Dispute Resolution Mechanism.

Google, the Registry, Author Sub-Class members, Publisher Sub-Class members, and the Participating Libraries will attempt to informally resolve disputes concerning matters pertaining to the Settlement.  If they are unsuccessful, then the dispute will be arbitrated, and the arbitrator's decision will be final and binding on the parties to the dispute.  Examples of potential disputes are (1) disagreements over pricing and other economic terms; (2) disagreements over claimed security breaches; (3) disagreements over whether a Book is in-print, out-of-print, or in the public domain; and (4) disagreements over whether Google or a Participating Library has made a use of a Book that is not authorized under the Settlement.  *See generally* S.A. Article IX. The Settlement Agreement also provides that this Court will have continuing jurisdiction over

other disputes concerning the parties' obligations under the Settlement Agreement.  S.A. § 17.23.

Disputes between publishers are not subject to arbitration.

### 6.     Non-Exclusive Rights.

The authorizations granted to Google and the Participating Libraries under the Settlement

Agreement are non-exclusive.  Rightsholders retain the right to authorize, through the Registry

or otherwise, any individual or entity, including direct competitors of Google, to use their Books

in any way, including those identical to Google's uses.  Google's and the Participating Libraries'

authorizations under the Settlement are not transfers of copyright ownership to any Books or

Inserts, and nothing in the Settlement Agreement shall operate to transfer any copyright

ownership interests in any Books or Inserts.  S.A. §§ 2.4, 3.1(a).

### F.     Release.

In exchange for the benefits conferred on the Settlement Class by Google, and also by the

Participating Libraries, all members of the Settlement Class who do not opt out (*i.e.*, all

Rightsholders) will be deemed to have released all claims against Google and each Participating

Library that arise out of certain conduct occurring prior to the Effective Date, including Google's

digitization of Books and Inserts; Google's use of digital copies in Google's products and

services; each library's provision of Books and Inserts to Google for digitization; Google's

provision of digital copies to libraries and the libraries' receipt of those copies (except Google's

provision of digital copies to Other Libraries after 60 days after Settlement Agreement Date);

and the libraries' (except for the Other Libraries') uses of those digital copies in a manner

consistent with the Settlement Agreement.  If, however, an Other Library makes an unlawful use

of any digital copies, no claims against such Other Library for its provision of Books to Google,

or the receipt of any digital copies, are released.  Rightsholders release all claims against Google,

and each Fully Participating Library, Cooperating Library and Public Domain Library that, after

the Effective Date, arise out of any act or omission authorized by the Settlement Agreement or

by an applicable Library-Registry Agreement.  No claims arising after the Effective Date are

released against Other Libraries.  *See* S.A., Article X.

      **G.**      **Notice Program.**

      A proposed Notice of Class Action Settlement ("Notice") and a Summary Notice of Class

Action Settlement ("Summary Notice") are attached to the Settlement Agreement as

Attachments I and J.  The class notice program is designed to provide notice to the widest

practicable group of Settlement Class members inside and outside the United States.  The

program will consist of the following:  (a) sending the Notice (translated from English as

appropriate) by email or first class mail, postage prepaid, to those Class members that reasonably

can be identified, with notice by email whenever possible and postal notice limited to those class

members whose email addresses are unavailable; (b) publishing the Summary Notice (translated

from English as appropriate) in the publications listed on the schedule attached to the Settlement

Agreement as Attachment K (Paid Media Schedule), or reasonable substitutes, if necessary, that

will provide the same level of coverage to the intended audience, as well as using online

advertising directing users to the Settlement website; (c) providing notice materials to websites

and organizations whose constituencies may include Settlement Class members and encouraging

them to direct interested parties to the Settlement Administrator or the Settlement website; and

(d) implementing an aggressive, worldwide media campaign, the issuance of a joint press release

and convening of a joint press conference, all of which will, among other things, provide the

press with the address of the website dedicated to the Settlement as referenced below and contact

information for Settlement Class members to learn about the Settlement and how to obtain the

Notice.  S.A., Article XII.  Plaintiffs and Google will maintain a Settlement website (such as,

www.googlebooksettlement.com)[13] dedicated to the Settlement and on which the Notice, this

Settlement Agreement, and other relevant information (translated into approximately 35

languages) will be displayed.  *Id.*  Additionally, Google will prominently display a statement on

the Google Book Search home page (http://books.google.com/) informing users that an

agreement has been reached with authors and publishers and linking to a user information page.

At the top of such user information page immediately beneath its title, Google will display a

statement directing authors, publishers and copyright holders to visit the Settlement website and

linking to the Settlement website.  *Id.*

## IV.    ARGUMENT.

### A.    The Standard For Preliminary Approval Is Met.

There is a "strong judicial policy in favor of settlements, particularly in the class action

context."  *In re PaineWebber Ltd. Partnerships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998); *see also*

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) ("The compromise

of complex litigation is encouraged by the courts and favored by public policy.") (internal

quotation marks and citations omitted); *In re Luxottica Group S.p.A. Secs. Litig.*, 233 F.R.D. 306,

310 (E.D.N.Y. 2006) ("Class action suits readily lend themselves to compromise because of the

difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation.");

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is

---

[13]   Contemporaneously with the filing of this motion, the parties will endeavor to register this
domain name (www.googlebooksettlement.com).  In the event they are unable to do so, the
parties will register a similar user-friendly domain name.

well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.").

The process by which that policy is implemented "generally involves two hearings.  First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation."  *Manual for Complex Litigation – Fourth* ("*Manual*") § 21.632, at 320 (2004); *see also* 4 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.25, at 38-39 (4th ed. 2002) (endorsing two-step process).

As part of that preliminary evaluation, the court reviews the settlement for concerns "such as unduly preferential treatment of class representatives or segments of the class, inadequate compensation or harms to the class, the need for subclasses, or excessive compensation for attorneys."  *Manual* § 21.632, at 321.  Ultimately, the judge must determine whether the proposed settlement "falls within the range of possible approval."  *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.").  Determination of whether it "falls within the range of possible approval," *id.*, depends on whether there is a conceivable basis for believing that the more rigorous standard for final approval can be satisfied.  In essence, it is "a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."  *In re Traffic Executive Association-Eastern R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980).

In addition, if the class has not been previously certified, "the judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."  *Manual* § 21.632, at 321.  "Once the judge is satisfied as to the certifiability of the class and the results of the initial inquiry into the fairness, reasonableness, and adequacy of the settlement, notice of a formal Rule 23(e) fairness hearing is given to the class members."  *Id.* § 21.633, at 321.

At the second stage of the approval process, the formal fairness hearing, "the proponents of the settlement must show that the proposed settlement is 'fair, reasonable, and adequate.'"  *Id.*

### B.  The Settlement Is The Product Of Arms Length, Adversarial Negotiations That Were At All Times Serious, Informed, And Non-Collusive.

In determining whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations," *NASDAQ Market-Makers*, 176 F.R.D. at 102, courts give "substantial" and "significant" weight to the experience and reputation of the counsel who prosecuted the case and negotiated the settlement.  *See Blank v. Talley Indus., Inc.*, 64 F.R.D. 125, 132 (S.D.N.Y. 1974) ("Another factor favoring the settlement, and one entitled to substantial weight, is that it bears the imprimatur of seasoned and experienced counsel . . . ."); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'") (citation omitted); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 667 (D. Minn. 1974) ("The recommendation of experienced . . . counsel is entitled to great weight.").  Indeed, when a settlement is negotiated at arm's length by experienced counsel, there is a presumption that it is fair and reasonable.  *See Wal-Mart,* 396 F.3d at 116 (2d Cir. 2005) ("[A] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable

counsel after meaningful discovery.") (*quoting Manual for Complex Litigation*, Third, § 30.42 (1995)).

Here, the proposed settlement was negotiated over the course of two years by highly experienced counsel, who benefited from the guidance of the Associational Plaintiffs – the Authors Guild and AAP.  Those organizations are the leading trade organizations dedicated to protecting and advancing authors' and publishers' rights.  Class Counsel have substantial experience litigating class actions, and also substantial experience in copyright law.  The negotiations took place at arm's length, were adversarial, and at times contentious.  The material settlement terms were not reached until Class Counsel thoroughly investigated and researched the relevant facts and law, including reviewing substantial amounts of discovery produced by Google and the Associational Plaintiffs.

The Sub-Classes were separately represented by experienced counsel, as well as by the Authors Guild and AAP, respectively.  When their interests were aligned against Google, the authors' and publishers' representatives negotiated in a cooperative, unified manner.  Where author and publisher interests with respect to the settlement terms were in conflict, particularly in connection with the drafting of the Author-Publisher Procedures (Attachment A to the Settlement Agreement), negotiations between the authors and publishers were adversarial and contentious.

C.     **The Settlement Does Not Improperly Grant Preferential Treatment To The Named Plaintiffs Or Any Segments Of The Settlement Class.**

As for whether the settlement improperly grants "preferential treatment to class representatives or segments of the class," *NASDAQ Market-Makers*, 176 F.R.D. at 102, all members of each sub-class are conferred the same rights and allocated settlement payments according to the same terms.  No preferential classes exist.

**D.** **The Settlement Does Not Provide Excessive Compensation For Plaintiffs'
Counsel.**

The settlement plainly does not provide "excessive compensation for attorneys," *Manual*
§ 21.632, at 321. To the contrary, the parties agreed that Counsel for the Author Sub-Class will
apply for an award of attorneys' fees and expenses in the amount of $30 million, and Google has
agreed to pay those amounts *over and above* the other consideration to the Settlement Class.
S.A. § 5.5. Such attorneys' fees are reasonable in view of the exceptional benefits achieved for
the Settlement Class, the unique and cutting edge nature of the issues presented, the historic
nature of the Settlement Agreement and the remarkable benefits to the worldwide reading public
and research community. *See, e.g., Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47-53 (2d
Cir. 2000); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002); *In re
Sumitomo Copper Litig.*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999).

**E.** **The Substance Of The Settlement Falls Within The Range Of Possible Final
Approval.**

The remaining consideration at the preliminary approval stage is whether the settlement
overall "falls within the range of possible [final] approval," *NASDAQ Market-Makers*,
176 F.R.D. at 102. For the reasons summarized above, and described in more detail below, the
settlement easily satisfies this criterion.

**1.** **The Settlement Provides Exceptional Classwide Relief.**

The Settlement is an exceptional result for the Settlement Class. The Settlement
Agreement will create a digital library that is historic in scope. Approximately 75% of the
Books in United States libraries are out-of-print and have ceased earning any income at all for
their Rightsholders. The Settlement Agreement provides new exposure of those Books on the

most visited website on the Internet and will breathe new commercial life into this vast body of work.  Further, the Settlement provides a new marketing platform for in-print Books.

For example, the Institutional Subscriptions is a new product – a searchable digital library of tens of millions of the world's Books – that is unparalleled in the marketplace for books.  The commercial value to Rightsholders of this new database is obvious as is its value to researchers and the reading public.

The ability to sell downloads of individual books through Google – which operates the most widely used Internet search engine in the United States – also has significant potential.  The revenue split of 63/37 in favor of Rightsholders rewards Google's marketing and technological contribution to the innovative Google Library Project (and takes into account Google's operating expenses for running the Google Library Project), but properly gives primary consideration to the value of the copyrighted works.

The Settlement also gives birth to the Registry.  Google has agreed to pay $34.5 million to establish and maintain the Registry, which will locate Rightsholders, maintain their contact information, collect revenues from Google and pay Rightsholders for Google's use of their copyrighted works.  Rightsholders will have a standing organization to serve their needs and protect their interests in the Google Library Project and other commercial opportunities.

Additionally, Google has agreed to pay at least $45 million to compensate Rightsholders whose Books and Inserts are digitized by Google before the opt-out deadline.  Every Rightsholder who timely makes a claim will receive payments of at least $60 and up to $300 per such Book ($15-$75 per Entire Insert, and $5-$25 per Partial Insert).  Depending on the number of claims received, Google may pay more than $45 million in compensation, as all valid claims

will be paid with respect to Books in the minimum amount of $60 per Book, and, with respect to Inserts, in the minimum amounts of $15 per Entire Insert and $5 per Partial Insert.

The Settlement also affords Rightsholders the ability, at any time, to direct Google not to display their Books and Inserts, to "turn off" advertising on their Book's pages, and to set the sale price of their Books. Further, Rightsholders can exclude the Books from one or more commercial products, or remove their Books altogether from the database.

### 2. The Settlement Provides An Excellent Result In Light Of The Risk And Delay Of Future Litigation.

The Settlement provides excellent relief to class members when weighed against the risk and delay of further litigation. Plaintiffs are confident that they could prevail at trial on their copyright infringement claims against Google. At the same time, they recognize that proceeding to trial is not without risk. The application of the copyright laws to Internet uses is an evolving area of the law, and, at trial, Google would have asserted its "fair use" defense. *See* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."). The success or failure of that defense would turn on an examination of four factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the original work. *See* 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577 (1994).

The commercial nature (*i.e.,* attracting advertisers and users) of Google's use of the copyrighted material favors Plaintiffs' position that the defense should not succeed. *See*

29

*Campbell*, 510 U.S. at 578; *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).  Likewise, that Google copied entire works militates against "fair use."  *See Campbell*, 510 U.S. at 587 (discussing whether a "substantial portion of the infringing work was copied verbatim from the copyrighted work" as relevant to the application of the fair use defense) (citation omitted).

There are, however, countervailing considerations.  Commercial use of a work is no longer dispositive in defeating a fair use defense.  *Campbell*, 510 U.S. at 584.  Moreover, in prior litigation, involving search engines that locate photographs online, Google established that copying and displaying entire photographic works (albeit in "thumbnail" form) may still be fair use.  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818, 822 (9th Cir. 2003) (holding that defendant's use of copyrighted "thumbnail" images constituted fair use in part because it "improve[ed] access to information on the internet").

The Settlement is an excellent result in light of the risks of the litigation.  It affords Rightsholders virtually full control over their Books and Inserts in the Google Library Project, and it creates a potentially lucrative commercial market for Rightsholders of out-of-print Books that have not earned any income for years and decades.  It provides a new platform on which to market in-print Books; it provides rights and compensation to Rightsholders of Inserts; and it compensates Rightsholders for Google's unauthorized digitization of their Books and Inserts.

## V.   THE SETTLEMENT CLASS AND SUB-CLASSES SHOULD BE PROVISIONALLY CERTIFIED FOR SETTLEMENT PURPOSES.

### A.   Certification Standards.

In conjunction with the preliminary approval of a settlement under Rule 23 of the Federal Rules of Civil Procedure, courts routinely grant provisional certification of a plaintiff class for settlement purposes.  Provisional certification is not final or binding, and is reviewed in

connection with the final fairness hearing.  Plaintiffs must then establish that the Settlement

Class satisfies the requirements of Rule 23 and, if so, the class certification will be made final if

the settlement is approved.  *See In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d

164, 172-73 (S.D.N.Y. 2000) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619

(1997)); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 278 (S.D.N.Y. 1999).

      Certification is proper for any purpose – settlement or litigation – where the requirements

of Rule 23(a) and (b) have been met.  *Denney v. Deutsche Bank, A.G.*, 443 F.3d 253, 270 (2d Cir.

2006).  Rule 23(a) imposes four threshold requirements on putative class actions:  numerosity,

commonality, typicality, and adequacy of representation.  *Id*. at 267.  Plaintiffs also must show

that the class is "maintainable" under Rule 23(b), which sets forth three alternative categories

under which classes may be certified.  *See* Fed. R. Civ. P. 23(b)(1)-(3).  Certification pursuant to

Rule 23(b)(2) is warranted where defendants have acted on grounds generally applicable to the

class, making final injunctive or declaratory relief appropriate.  Fed. R. Civ. P. 23(b)(2); *Brown

v. Kelly*, 244 F.R.D. 222, 228 (S.D.N.Y. 2007).  For a class to meet the requirements of Rule

23(b)(3), common questions must "predominate over any questions affecting only individual

members," and class resolution must be "superior to other available methods for the fair and

efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

      "When appropriate, a class may be divided into subclasses that are each treated as a class

under this rule."  Fed. R. Civ. P. 23(c)(5).  Further, a district court's broad discretion to facilitate

the orderly administration of an action "includes the ability to create subclasses."  *In re Deutsche

Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277, 283 (S.D.N.Y. 2002).  Where there are groups

within the proposed class that may have adverse or divergent interests, the division of the class

into subclasses is appropriate.  *See* Fed. R. Civ. P. 23, Notes of Advisory Comm. on 1966

amendments ("Where a class is found to include subclasses divergent in interest, the class may

be divided correspondingly, and each subclass treated as a class."); *Boucher v. Syracuse Univ*.,

164 F.3d 113, 118-19 (2d Cir. 1999) (district court erred in not certifying two subclasses when it

found potential conflicts between class members); 5-23 Jerold S. Solovy *et al.*, *Moore's Federal

Practice - Civil* § 23.86[1][c] (2008) ("Division of a proposed class into subclasses is appropriate

… if there are groups within the proposed class that have adverse interests.").  "Because a

subclass is itself a class, each subclass must separately and independently satisfy the

requirements of Rule 23 for class certification."  *Jones v. Goord*, 435 F. Supp. 2d 221, 232

(S.D.N.Y. 2006); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 378-79 (2d Cir. 1997)

(explaining that subclasses must satisfy requirements of Rule 23(b)).

### B.        The Settlement Class And Sub-Classes Should Be Provisionally Certified.

#### 1.        Rule 23(a) Requirements Are Satisfied.

Here, the proposed sub-classes, and thus the proposed class, are sufficiently numerous.

*See* Fed. R. Civ. P. 23(a)(1) (numerosity).  The proposed Author Sub-Class numbers in the many

thousands.  The Authors Guild alone has over 8,000 published authors in its membership, and the

Sub-Class includes published Book authors and their heirs, successors and assigns worldwide.

The proposed Publisher Sub-Class has many hundreds of members.  The AAP alone has over

three hundred members, and the Sub-Class includes publishers and their successors, exclusive

licensees and assignees worldwide.  Both sub-classes contain authors, publishers and other

Rightsholders located in the United States and around the world.

Class members all share the same interest in resolving such common questions as

whether Google's reproduction for its own commercial use copies of class members' works is

infringement; whether Google's public display of class member's works also infringes their

32

copyrights; whether Google's copying and display of class member's works for its commercial purposes is a "fair use" of their works; whether Google's infringement was willful, and the appropriate measurement of damages under the Copyright Act.  *See* Fed. R. Civ. P. 23(a)(2) (commonality).  Each of the named plaintiffs owns one or more United States copyright interests in Books, and each owns a United States copyright interest in a work that has been copied, or faces an imminent threat of being copied, by Google without authorization.  Thus, the claims of the Representative Plaintiffs for each Sub-Class are typical of those of the rest of the Sub-Class. *See* Fed. R. Civ. P. 23(a)(3) (typicality).  Plaintiffs' claims are typical of class members with interests in Books as well as Inserts.

Representative Plaintiffs have retained experienced counsel who are highly experienced in class action and copyright litigation, and the Representative Plaintiffs in each Sub-Class have no interest antagonistic to the rest of the members of their respective Sub-Classes.  *See* Fed. R. Civ. P. 23(a)(4) (adequacy).  Because the authors and publishers have divergent interests, the Author Sub-Class and Publisher Sub-Class are represented by separate Representative Plaintiffs and separate Class Counsel.  Although authors and publishers have a common interest in establishing Google's liability for the infringement of their works and recovering damages from Google for such infringement, their interests diverged in several respects.  Examples of such divergent interests are whether a Book is in-print or out-of-print; who as between the author and publisher is entitled to make decisions concerning exclusion and removal; and how the authors' and publishers' revenues should be allocated between the author and publisher of Books.  The authors' and publishers' interests have been zealously represented by their respective Sub-Class Counsel, as reflected in the Settlement Agreement, the Plan of Allocation, and Author-Publisher Procedures.  The Representative Plaintiffs and their counsel are adequate Sub-Class

representatives, and fairly and adequately represent the interests of the Sub-Classes.  *See* Fed. R.

Civ. P. 23(a)(4) (adequacy).

### 2.    The Rule 23(b)(2) And 23(b)(3) Requirements Are Satisfied.

Here, Plaintiffs seek certification under Rule 23(b)(2) and 23(b)(3).  *See In re NASDAQ*

*Market-Makers Antitrust Litig*, 169 F.R.D. 493, 515-16 (S.D.N.Y. 1996) ("[W]here injunctive

relief and damages are both important components of relief requested, court[s] have regularly

certified an injunctive class under Rule 23(b)(2) and damages class under Rule 23(b)(3) in the

same action.") (citation omitted).

Certification of an injunctive relief class under Rule 23(b)(2) is warranted, as Plaintiffs

seek to enjoin Google's alleged massive infringement of class members' copyrights.

Certification pursuant to Rule 23(b)(2) is appropriate where the court finds that "(1) even in the

absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the

injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief would be both

reasonably necessary and appropriate were the plaintiffs to succeed on the merits."  *Parker v.*

*Time Warner Entm't Co.*, 331 F.3d 13, 20 (2d Cir. 2003) (citing *Robinson v. Metro-North*

*Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001).  Both conditions are met here.  Numerous

plaintiffs would reasonably seek to enjoin Google from reproducing their copyright-protected

works, and injunctive relief would be the necessary and appropriate outcome of a trial on the

merits.

In addition, the Rule 23(b)(3) requirements – predominance and superiority – are

satisfied.  The purpose of the predominance inquiry is to allow the Court to determine whether

proposed classes are sufficiently cohesive to warrant adjudication by representation.  *See*

*Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed

classes are sufficiently cohesive to warrant adjudication by representation.").  "The

predominance requirement calls only for predominance, not exclusivity, of common questions."

*Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y. 1977).  Here the

common questions (see p. 32, *supra*) predominate over any issues affecting only individual class

members.  *See* Fed. R. Civ. P. 23(b)(3); *see also NASDAQ Market-Makers*, 169 F.R.D. at 517

(explaining the predominance requirement is satisfied "unless it is clear that individual issues

will overwhelm the common questions and render the class action valueless.").

  In addition, a class action is a superior means of fairly and efficiently resolving this

dispute.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  With respect to "superiority," Rule 23(b)(3) requires

that a class action be the "most 'fair and efficient' method of resolving this case."  *In re Nassau

County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) (citing Fed. R. Civ. P. 23(b)(3)).

The claims in this case concern the Book digitization program undertaken by Google, and by

combining the claims of the class members into a single action, plaintiffs' claims are presented

far more fairly and efficiently than they would be in literally countless individual actions, which

would require the same issues to be litigated multiple times.  *See* 5-23 Jerold S. Solovy *et al.*,

*Moore's Federal Practice - Civil* § 23.46[1] ("In determining superiority, courts must consider

alternative methods of adjudicating the dispute. Superiority is determined by comparing the

efficiency and fairness of all available methods of adjudicating the matter.").[14]

  Accordingly, provisional certification of the class and two sub-classes in connection with

preliminary settlement approval is appropriate.

---

[14] In a settlement context, issues of manageability at trial under Rule 23(b)(3) need not be
addressed.  *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class
certification, a district court need not inquire whether the case, if tried, would present
intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is
that there be no trial.").

## VI.   THE COURT SHOULD APPROVE THE PROPOSED FORMS AND METHODS OF NOTICE.

Rule 23(e) provides that "notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs."  The purpose of notice is to "afford members of the class due process which, in the context of the Rule 23(b)(3) class action, guarantees them the opportunity to be excluded from the class action and not be bound by any subsequent judgment."  *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974)).

Accordingly, the notice given to the class must fairly inform class members of the terms of the proposed settlement and their options with respect thereto.  *See Gottlieb v. Wiles*, 11 F.3d 1004, 1012-13 (10th Cir. 1993).  Though notice need not be perfect, it must be the best notice practicable under the circumstances.  Each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members.  *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988).  The notice program proposed here clearly meets this standard.

The proposed notice program comprises multiple components to ensure that as many Settlement Class members as practicable are apprised of the Settlement, including direct notice, published notice, a user-friendly settlement website, and additional outreach to organizations and website operators that may be interested in distributing other information about the Settlement. In addition, because of the historic nature of this Settlement, Google's involvement, the level of press attention the Google Library Project already has received, and an aggressive public relations campaign as part of the notice program, the Settlement will garner a very substantial level of worldwide publicity.

36

A Notice of Class Action Settlement, substantially in the form of Attachment I to the Settlement Agreement, will be sent (translated from English wherever appropriate) to those potential Settlement Class members, both inside and outside of the United States, who can be identified by reasonable means, with notice by email used whenever possible, and postal notice limited to those Settlement Class members whose email addresses are unavailable.

In addition, a Summary Notice (translated from English as appropriate), S.A., Attachment J, will be published, including in the publications listed on the schedule attached to the Settlement Agreement as "Attachment K." The Summary Notice will be published in hundreds of newspapers and magazines worldwide. The Summary Notice identifies the Settlement website that contains the Settlement Agreement, Notice of Class Action Settlement, Claim Forms,[15] an opt-out option, and other relevant information. The Summary Notice also lists a toll-free number to call for information.

The Notice Program contains other significant measures to publicize the Settlement. First, a Settlement website will provide information about the Settlement, including the full Notice, detailed Frequently Asked Questions, and contact information for the Settlement Administrator. Settlement Class members will be able to submit claims for Cash Payments on-line or request a hard-copy version of the claim form. The Settlement website also will provide a link to the Registry website, where Rightsholders can enter their Books and Inserts and control the use and distribution of those works. The website will be translated into approximately 35

---

[15] Potential Settlement Class members will submit claims by way of user-friendly claim forms, either on-line or in hard copy. The parties will submit proposed claim forms to the Court for approval before disseminating Notice.

languages, and an email submission field will allow users to request assistance in additional languages.[16]

Second, there are organizations, websites, and other publications worldwide with a focus on the interests of authors and publishers.  As part of the Notice Program, outreach materials will be provided to over fifty such organizations and other outlets, in an effort to encourage them to publicize the Settlement and direct potential Settlement Class members to the Settlement website.

Third, the Notice Program will seek to publicize the Settlement through earned media in three primary ways.  The parties will issue a joint press release and convene a press conference, announcing the Settlement and providing the press with the address of the Settlment website.  Fourth, if and when the Court grants preliminary approval of the Settlement, the parties will issue another press release at the commencement of the Notice Period.  As earned media coverage is expected to be significant, Plaintiffs have engaged an independent firm specializing in international media analysis to review and analyze the overall contribution of the earned media coverage to the Notice Program.

The proposed notice program is more than adequate: it is extremely comprehensive and robust.  *Cf. In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996) (holding that adequate notice was provided by mailing a full form of notice to each class member whose address could be obtained through reasonable effort, and publication of summary notice in national editions of *Wall Street Journal*, *New York Times*, and *USA Today*).

---

[16]   This website would be launched following the Court's preliminary approval of the settlement.  Contemporaneously with the filing of this motion, the parties have posted introductory information about the Settlement on books.google.com/booksrightsholders, and provided potential Settlement Class members with the ability to submit their contact information in order to receive the full Notice, if and when it becomes available.

The content of the notices is sufficient and appropriate and satisfies the requirements of Rule 23.  "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."  *Wal-Mart*, 396 F.3d at 113.  In order to satisfy the "reasonableness standard, the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'"  *Id*. at 114 (*quoting Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982); *accord Maywalt v. Parker & Parsley Petroleum Co*., 67 F.3d 1072, 1079 (2d Cir. 1995).

Here, the Notice apprises prospective class members of the parameters of the settlement, how they may go about submitting a claim, objecting, or opting out.  The Notice also lists contact information for Class Counsel and the claims administrator, and provides links to the settlement website, all of which enable to class members to obtain specific information about the settlement.  *Cf. Bennett v. Behring Corp.*, 96 F.R.D. 343, 353 (S.D. Fla. 1982) ("It is not the function of the settlement notice to fully inform the class of all the details of the settlement, but merely to put class members on notice of the general parameters of the settlement and to inform them of where information as to specifics may be obtained."), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

The proposed Notice of Class Action Settlement easily satisfies these standards.  It: (a) describes the Settlement Class and Sub-Classes, the proposed Settlement, the history and status of the litigation and the Plan of Allocation; (b) advises class members of their rights, including the right to be heard on the fairness of the settlement and the right to opt out of the Settlement Class; (c) explains the consequences of staying in and opting out of the Settlement Class; (d) sets forth the consideration that will be paid for the benefit of the Settlement Class; (e)

discloses the requested amounts of attorneys' fees and expenses; and (f) sets forth the date, time, and place of the final fairness hearing.  The Summary Notice adequately describes the Settlement Class, the nature of the litigation and settlement, class members' rights to opt out of or object to the settlement, the date, time and place of the final fairness hearing and how to obtain the long-form notice and settlement papers.

**VII.     CONCLUSION.**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the accompanying proposed order granting preliminary approval of the Settlement; provisionally certifying the Settlement Class with two Sub-Classes; directing notice to the Settlement Class;

and scheduling the hearing on final settlement approval and the application for plaintiffs'

attorneys' fees and expenses.

DATED:  October 28, 2008                          Respectfully submitted,


                                                  /s/ Michael J. Boni
                                                  Michael J. Boni (pro hac vice)
                                                  Joanne Zack
                                                  BONI & ZACK LLC
                                                  15 St. Asaphs Rd.
                                                  Bala Cynwyd, PA  19004

                                                  Sanford P. Dumain (SD8712)
                                                  Milberg, Weiss, Bershad & Schulman LLP
                                                  One Pennsylvania Plaza
                                                  New York, NY 10119

                                                  Robert J. La Rocca
                                                  KOHN SWIFT & GRAF, P.C.
                                                  One South Broad Street, Suite 2100
                                                  Philadelphia, PA 19107

                                                  *Attorneys for Plaintiffs The Authors Guild, Inc.,
                                                  Herbert Mitgang, Betty Miles, Daniel Hoffman,
                                                  Paul Dickson, Joseph Goulden and the Author Sub-
                                                  Class*



                                                  /s/ Bruce P. Keller
                                                  Bruce P. Keller (BK9300)
                                                  DEBEVOISE & PLIMPTON LLP
                                                  919 Third Avenue
                                                  New York, NY  10022

                                                  *Attorneys for Plaintiffs The McGraw-Hill
                                                  Companies, Inc., Pearson Education, Inc., Penguin
                                                  Group (USA) Inc., Simon & Schuster, Inc., John
                                                  Wiley & Sons, Inc,. Association of American
                                                  Publishers, Inc. and the Publisher Sub-Class*