**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-12-09

```
-----------------------------------------------------------------x
The Authors Guild, Inc., Association of American   :
Publishers, Inc., et al.,                          :
                                                   :
            Plaintiffs,                            :
                                                   :        Case No. 05 CV 8136-DC
            v.                                     :
                                                   :
Google Inc.,                                       :
                                                   :
            Defendant.                             :
-----------------------------------------------------------------x
```

**LIBRARY ASSOCIATION COMMENTS ON THE PROPOSED SETTLEMENT**

**I.      Description of Class Members and Introduction.**

The American Library Association (ALA) is a nonprofit professional organization of more than 67,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries (ACRL), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.

The Association of Research Libraries (ARL) is a nonprofit organization of 123 research libraries in North America. ARL's members include university, public, governmental, and national libraries. ARL influences the changing environment of

1

scholarly communication and the public policies that affect research libraries and the diverse communities they serve.

Collectively, these three library associations (the Library Associations) represent over 139,000 libraries in the United States employing over 350,000 librarians and other personnel. The Library Associations are both authors and publishers of books, and thus fall within both sub-classes of plaintiffs.

The Library Associations do not oppose approval of the Settlement. The Settlement has the potential to provide unprecedented public access to a digital library containing millions of books. Thus, the Settlement could advance the core mission of the Library Associations and their members: providing patrons with access to information in all forms, including books. However, the digital library enabled by the Settlement will be under the control of Google and the Book Rights Registry. Moreover, the cost of creating such a library and Google's significant lead time advantage suggest that no other entity will create a competing digital library for the foreseeable future.

The Settlement, therefore, will likely have a significant and lasting impact on libraries and the public, including authors and publishers. But in the absence of competition for the services enabled by the Settlement, this impact may not be entirely positive. The Settlement could compromise fundamental library values such as equity of access to information, patron privacy, and intellectual freedom. In order to mitigate the possible negative effects the Settlement may have on libraries and the public at large, the Library Associations request that this Court vigorously exercise its jurisdiction over the interpretation and implementation of the Settlement. Indeed, in its order approving the Settlement, the Court should make clear that it intends to oversee the Settlement closely.

2

Below, the Library Associations explain their concerns with the Settlement, and how the Court's oversight can ameliorate those concerns.

## II.     The Settlement Creates An Essential Facility With Concentrated Control.

The Settlement allows Google to offer services that appear to further the mission of libraries by providing people in the United States with unprecedented online access to books. At no cost, and from the convenience of her home, school, or workplace, a Google user will be able to search millions of books for responsive terms. Depending on the nature of the book, the user will see up to fifteen continuous pages each time the term appears, and up to 20% of the entire book.[1] The Settlement also allows Google to sell to consumers perpetual online access to the full text of individual books, with at least 80% priced below $10 for an initial period.[2] Additionally, the Settlement permits Google to offer institutional subscriptions, which would provide authorized users within an institution full text access to millions of books.[3]

The institutional subscription is the feature of the Settlement most relevant to the broad range of libraries. College and research libraries, for example, are a target market for the institutional subscriptions because faculty and students performing serious research are among the largest and most likely populations to demand the ability to search and read the full text of not commercially available books.[4]

---

[1] Settlement Agreement at § 4.3(b)(i)(1).

[2] *Id.* at § 4.2(c).

[3] *Id.* at § 4.1.

[4] Google is obtaining the copyrighted books that it is scanning from major U.S. research libraries, and these collections were originally assembled to support the teaching and research missions of affiliated institutions of higher education. This underscores the probable high demand at academic libraries for institutional subscriptions. Additionally, this emphasizes that Google will be able to offer the service permitted by the Settlement

3

In the extensive discussion about the Settlement since it was announced, many observers have noted possible deficiencies with the institutional subscription database (ISD), the set of books available through the institutional subscription. Because the Settlement allows the rightsholder of a work contained within another rightholder's book to exercise his rights under the Settlement independently, a book in the ISD may lack important parts of the printed book.[5] A book in the ISD might be missing an essay, poem, short story, foreword, chart or table that appears in the printed version. Similarly, because the Settlement does not apply to pictorial works, Google will black out photographs and illustrations with a different rightsholder from the book's rightsholder.

Moreover, a rightsholder can remove a book from Google Book Search, or exclude it from the ISD.[6] Likewise, Google is obligated to include in the ISD only 85% of the books it scans into the ISD.[7] Thus, the ISD will not include a complete set of in-copyright, not commercially available works.[8]

Notwithstanding these deficiencies in the ISD, an institutional subscription will provide an authorized user with online access to the full text of as many as 20 million books. Students and faculty members at higher education institutions with institutional subscriptions will be able to access the ISD from any computer -- from home, a dorm room, or an office. Accordingly, it is possible that faculty and students at institutions of higher education will come to view the institutional subscription as an indispensable

only because research libraries have invested significant resources in preserving out of print books.
[5] Settlement Agreement at § 3.5(b)(i).
[6] *Id.* at § 3.5.
[7] *Id.* at § 7.2(c)(i).
[8] Under the Settlement's default rule for commercially available books, Google cannot include them in the ISD unless their rightsholders permit Google to do so.

4

research tool. They might insist that their institution's library purchase such a subscription. The institution's administration might also insist that the library purchase an institutional subscription so that the institution can remain competitive with other institutions of higher education in terms of the recruitment and retention of faculty and students.

The settlement of copyright class action litigation might well have been the only feasible way this research tool could have been created. A class action settlement provided perhaps the most efficient mechanism for cutting the Gordian knot of the huge transactions costs of clearing the rights of millions of works whose ownership often is obscure.[9] However, the class representatives and Google structured the Settlement in such a manner as to give them enormous control over this essential facility.[10] This is not surprising, given their economic interests. Indeed, precisely because of their economic interests, it is unlikely that they would have agreed to a structure that did not grant them such control.

To be sure, nothing in the Settlement prevents another entity from undertaking a mass digitization effort similar to Google's. But given the enormous cost of such an effort, and Google's significant lead time advantage (Google has been digitizing in-copyright books since 2004), no other entity is likely to so in the near future.[11] Hence,

---

[9] Many of these books are "orphan" works – works whose rightsholders cannot be identified or located even after a diligent search by a potential user.

[10] Technically, there are two related essential facilities: Google's ISD and the block of copyrights managed by the Registry. The Registry enables the creation of the ISD by licensing the copyrights to Google.

[11] In theory, another entity could embark on a library project like Google's, precipitating a class action that could be settled on terms like this Settlement. Alternatively, Congress could enact a compulsory license, and appropriate funding to a consortium of libraries to launch a mass digitization undertaking. Neither of these are scenarios are likely. If

there is no foreseeable threat to the control Google and the Registry have over this essential research facility.

It is entirely possible that the Registry and Google will not abuse their control over the market for institutional subscriptions. In fact, the differing business models of Google and the Registry suggest that the two might exist in competitive tension with one another. However, as likely consumers of this essential research facility, the Library Associations cannot overlook the possibility that the Registry or Google might abuse the control the Settlement confers upon them. Abuse of this control would threaten fundamental library values of access, equity, privacy, and intellectual freedom.[12]

### III. The Settlement Could Limit Access to the ISD.

The institutional subscription could evolve into an essential research facility, but in the absence of any meaningful competition, the Registry and Google can set the price of the subscription at a profit maximizing point beyond the reach of many libraries.

The Settlement establishes detailed procedures by which Google and the Registry will set the price for institutional subscriptions. The Settlement provides that the economic terms for the institutional subscriptions will be governed by two objectives: "(1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education."[13] Moreover, "Plaintiffs and Google view

---

Google continues on its current path with the Library Project, other entities will have little incentive to enter the market so far behind Google. And if Google abandons the Library Project, other entities will question the economic viability of such an endeavor.
[12] Although some of the libraries partnering with Google in the Library Project participated in some of the Settlement discussions, this handful of libraries did not represent that larger library community.
[13] Settlement Agreement at § 4.1(a)(i).

6

these two objectives as compatible, and agree that these objectives will help assure both long-term revenue to the Rightsholders and accessibility of the Books to the public."[14]

The Settlement also contains "parameters" Google and the Registry will use to determine the price of institutional subscriptions: the pricing of similar products and services available from third parties; the scope of the books available in the ISD; the quality of the scan; and the features offered as part of the subscription.[15]

Pricing will be based on the number of full-time equivalent (FTE) users.[16] The FTE pricing can vary across different categories of institutions. These categories include: (1) corporate; (2) higher education institutions; (3) K-12 schools; (4) government; and (5) public libraries. Lower prices can be charged for discipline-based subsets of the ISD.[17]

Google has the responsibility for proposing an initial pricing strategy consistent with the objectives outlined above that will include target retail prices for each class of institution for access to the entire ISD and the discipline-based collections. Prices in the initial pricing strategy period will be based on "then-current prices for comparable products and services, surveys of potential subscribers, and other methods for collecting data and market assessment."[18] Google will collect data comparing the target retail prices with the prices for comparable products and services, and will provide this data to the Registry. After Google submits the initial pricing strategy to the Registry, Google and

---

[14] *Id.*

[15] *Id.* at § 4.1(a)(ii).

[16] For higher education institutions, FTE means full-time equivalent students. *Id.* at § 4.1(a)(iii).

[17] *Id.* at § 4.1(a)(v).

[18] *Id.* at § 4.1(a)(vii).

the Registry will negotiate its terms for up to 180 days. If Google and the Registry do not reach agreement, the dispute will be submitted to binding arbitration.[19]

The Library Associations appreciate that the Settlement identifies "broad access to the Books by the public, including institutions of higher education" as one of the two objectives of the economic terms for the institutional subscription. Moreover, Google's current business model, based on advertising revenue, suggests that Google will have the incentive to negotiate vigorously with the Registry to set the price of the institutional subscription as low as possible to maximize the number of authorized users with access to the ISD. Nonetheless, Google's business model, at least with respect to the institutional subscription, may change, and at some point in the future it may seek a profit maximizing price structure that has the effect of reducing access.

Significantly, the predominant model for pricing of scientific, technical, and medical journals in the online environment has been based on low volume and high prices. Major commercial publishers have been content with strategies that maximize profits by selling subscriptions to few customers at high cost. Typically these customers are academic and research libraries. Therefore, the Registry and Google may seek to emulate this strategy in the market for institutional subscriptions.

The Settlement's provisions concerning the pricing of the institutional subscription contain several other troubling features that increase the likelihood of this outcome. First, the Settlement states that the price of the institutional subscription will be based in part on the prices of "comparable products and services...." Although there are no comparable products or services to an online database of in-copyright, not

---

[19] *Id.* at § 4.1(a)(vi)(4).

8

commercially available books, the Registry or the arbitrators might erroneously treat online journals as comparable products. In this event, the institutional subscription would become cost prohibitive for most libraries. The annual subscription for some scientific, technical, and medical journals can exceed $20,000 per journal. A university library spends an average total of $ 4.3 million a year for online journal subscriptions.[20] If journal subscriptions are "comparable" to the institutional subscription, and a library pays $ 4.3 million for access to 31,000 journals,[21] one can only imagine the price the Registry might insist upon for a subscription to millions of books.

Second, the Settlement provides for a dispute resolution mechanism with respect to the pricing of the institutional subscription only to Google and the Registry. The Settlement does not explicitly set forth a process by which a library or other potential purchaser of an institutional subscription can challenge whether the pricing of this essential facility created by the Settlement meets the objective of "broad access to the Books by the public."

## IV. The Settlement Will Heighten Inequalities Among Libraries.

The "digital divide" in this country is already too deep, and the pricing of the institutional subscriptions could make it even deeper. In the absence of the price discipline afforded by competition, only those higher education institutions with the greatest resources would be able to afford an institutional subscription without dramatically cutting other library services.

Compounding this inequity is the differential pricing the Settlement allows for different categories of institutions. While this price discrimination could promote

---

[20] Association of Research Libraries, *ARL Statistics 2006-2007* 50-51 (2008).
[21] *Id.* at 31.

economic efficiency by setting the price at the point that meets the demand within that category, it could lead to bizarre results from a societal perspective. Google will conduct surveys among potential subscribers,[22] and might learn that the higher education institutions have a much stronger demand for institutional subscriptions than K-12 schools. The low demand for institutional subscriptions at K-12 schools might cause the price of an institutional subscription for that category to fall so low that many K-12 schools could afford to purchase the subscription. Meanwhile, higher education institutions in the same communities might not have the resources to pay the higher demand-driven prices charged to that category.

Similarly, the public access service terminals that provide free access to the ISD could exacerbate inequalities. A single public access service terminal may satisfy the needs of a lightly trafficked branch of a public library system. But a single terminal would be insufficient for colleges and most library branches. If those colleges and libraries could not afford the institutional subscription, their users would be worse off than the patrons of the lightly trafficked branch.

To be clear, the Library Associations are not objecting to Google's offer to provide free public access service terminals. Rather, we are pointing out the disparities in access that might emerge if institutional subscriptions are too expensive. [23]

---

[22] *Id.* at § 4.1(vii).

[23] The Settlement heightens inequalities among libraries in other ways. It makes a free public access service terminal available at public libraries and higher education institutions, but not K-12 libraries. *Id.* at § 4.8(a)(i). Additionally, remote access to the ISD without special Registry approval is available only to higher education institutions, not other categories of institutional subscribers, including public libraries. *Id.* at § 4.1(a)(iv). Finally, 83% of public libraries do not have sufficient terminals to meet existing needs; they certainly will not have enough terminals to access the ISD effectively, either through an institutional subscription or the public access service. *See*

## V.     The Settlement Does Not Protect User Privacy.

Privacy is one of libraries' core values; libraries do not monitor the reading habits of their patrons. Indeed, 48 states and the District of Columbia have statutes that protect library records from undue intrusion at the expense of privacy, requiring in general a subpoena before a publicly funded library can disclose records with personally identifiable information.[24] The Settlement, by contrast, does not specify how Google and the Registry will protect user privacy. Because Google will provide consumers who have purchased a book with perpetual online access to the book,[25] it must keep records to ensure that the consumer's access persists over time, particularly as the consumer uses different computers to access the book. But the Settlement is silent concerning what information Google will retain concerning the consumer, how it will use the information, and what measures it will take to protect the information's security.

The Settlement also contains few details about user information in the institutional subscription context. Because only authorized users will be able to access the ISD, Google may have the ability to determine which user is accessing which book in the ISD. Moreover, the Settlement states that when a user prints out pages of a book in the ISD, Google will include a visible watermark which displays encrypted session identifying information "which could be used to identify the authorized user that printed the material or the access point from which the material was printed."[26] Here, too, the

---

Denise M. Davis, et al., *Libraries Connect Communities: Public Library Funding & Technology Access Study 2007-2008* 29 (2008).
[24] *See* http://www.library.cmu.edu/People/neuhaus/state_laws.html.
[25] Settlement Agreement at § 4.2.
[26] *Id.* at § 4.1(d).

11

Settlement does not indicate whether Google will retain this information, how it will use the information, and what measures it will take to protect the information's security.[27]

The Settlement's silence concerning user privacy stands in stark contrast to its detail with respect to the measures Google and fully participating libraries[28] must take to protect the security of their digital copies of books. Google and fully participating libraries must develop a security implementation plan that meets the requirements of the Security Standard set forth in an attachment to the Settlement Agreement.[29] The seventeen-page Security Standard addresses topics such as: (1) security management, including security awareness, designation of a security representative, and incident response; (2) identification and authentication, including user identification and authentication, and authentication and password management; (3) access controls, including account management, access approval process, and access control supervision; (4) audit and accountability, including logging and audit requirements, marking of image files, and forensic analysis; (5) network security, including electronic perimeter, network firewall, device hardening, network security testing, remote network accessing, and encryption of digitized files; (6) media protection, including media access, media inventory, media storage, and media sanitization and disposal; (7) physical and

---

[27] Likewise, the Settlement says nothing about user privacy in the public access service context.

[28] Fully participating libraries are libraries that will provide Google with in-copyright books to scan in exchange for a receiving from Google a digital copy of each book the library provides. A fully participating library must sign an agreement with the Registry that releases the library from copyright infringement liability for participating in the Library Project and that restricts what the library can do with the digital copies it receives from Google. Settlement Agreement at § 1.58.

[29] *Id.* at § 8.2(a).

environmental protection, including physical access authorizations, physical access control, visitor control, and access records; and (8) risk assessment.[30]

Google and the fully participating libraries must submit their security implementation plans to the Registry for approval. If Google or the fully participating library and the Registry cannot resolve disagreements as to whether the security implementation plan complies with the Security Standard, the parties must submit the disputes to binding arbitration.[31] Google and the fully participating libraries must permit a third party to conduct an annual audit of their security and usage to verify compliance with their security implementation plan.[32] Upon learning of a prohibited or unauthorized access to the digital copies, Google and the fully participating library must notify the Registry of the breach and attempt to cure it, *e.g.*, block the unauthorized access.[33] The Settlement establishes a detailed schedule of monetary remedies up to $5 million, depending on the harm caused by the breach of the security plan, the recklessness or willfulness of the breaching conduct, the promptness of the cure, and the number of breaches with the same root cause.[34]

Evidently, in the Settlement negotiations the class representatives insisted on these measures to protect the security of digital copies of their books; but no one demanded protection of user privacy. Users of the services enabled by the Settlement also cannot rely on competitive forces to preserve their privacy. In the online environment, competition is perhaps the most powerful force that can help to insure user

---

[30] *See* Attachment D to Settlement Agreement.

[31] Settlement Agreement at § 8.2(a)(iv).

[32] *Id.* at § 8.2(c).

[33] *Id.* at § 8.3.

[34] *Id.* at §§ 8.4-8.7.

privacy. If a user does not like one search engine firm's privacy policy, he can switch to another search engine. Similarly, a user has many choices among online retailers, email providers, social networks, and Internet access providers. The competitive pressure often forces at least a minimal level of privacy protection.[35] However, with the services enabled by the Settlement, there will be no competitive pressure protecting user privacy.

In response to concerns raised by libraries and others, Google has stated that it will take appropriate measures to protect user privacy. The Library Associations expect Google, in consultation with the Library Associations and other representatives of user interests, to meet this commitment. Google and the Registry should develop strong policies to protect personally identifiable information, and provide users with clear notice describing those policies.

## VI. The Settlement Could Limit Intellectual Freedom.

The absence of privacy protection discussed in the previous section could have a chilling effect on a user's right to read because the user might fear the third party monitoring of his or her lines of inquiry. But the Settlement could stifle intellectual freedom in another way as well. The Settlement requires Google to provide free search (including the permitted previews), the public access service, and institutional subscriptions for only 85% of the in-copyright, not commercially available books it has scanned.[36] This requirement in effect allows Google to exclude over a million books

---

[35] To be sure, there are switching costs, and many service providers have adopted a "lowest common denominator" approach to user privacy.

[36] If Google fails to meet this requirement within five years of the Settlement's effective date, the participating libraries and the Registry may engage a third party to provide these services, using the digital copies Google provided to the libraries. Settlement Agreement at § 7.2(e)(i). This provision is intended to force Google to roll out the services under the Settlement in a timely manner.

14

from the ISD. While Google on its own might not choose to exclude books, it probably will find itself under pressure from state and local governments or interest groups to censor books that discuss topics such as alternative lifestyles or evolution. After all, the Library Project will allow minors to access up to 20% of the text of millions of books from the computers in their bedrooms and to read the full text of these books from the public access terminals in their libraries. Although public libraries have often contended with demands to eliminate or restrict access to specific books, any collection management decision by a particular librarian affected only that community. Here, by contrast, if Google bends to political pressure to remove a book, it will suppress access to the book throughout the entire country.

Similarly, foreign governments probably will attempt to coerce Google to exclude books the governments consider embarrassing or threatening. On numerous occasions, foreign governments have pressured Google and other search engine firms to remove links to websites to which the governments objected. For example, China has demanded the removal of links to sites promoting free speech and civil liberties in Tibet; Thailand has required the removal of websites critical of the King of Thailand; and Turkey has requested the removal of sites that discuss the Armenian genocide. It is safe to assume that these governments might attempt to pressure Google to exclude politically offensive books from the ISD.[37] To preempt anticipated complaints, Google might err on the side of caution and proactively suppress entire categories of books. This, in turn, could

---

[37] Even though Google may provide access to the services permitted under the Settlement only to users in the United States, users in other countries can employ technologies to deceive Google's servers concerning their location. Thus, foreign governments would seek to eliminate certain books from the ISD to prevent their citizens from reading them.

deprive students, scholars, journalists and policymakers of access to historically significant materials.[38]

The Settlement also may not sufficiently safeguard intellectual freedom with respect to the Research Corpus. The Settlement allows Google and two institutions to host the set of all digital copies made by Google in the Library Project for purposes of "non-consumptive research" by "qualified users." Non-consumptive research involves computational analysis of the books, and does not include research relating to the intellectual content of the books. The host site has the authority to determine whether a person meets the criteria for a qualified user, and whether her research meets the standards for non-consumptive research.[39] However, the Settlement does not provide a mechanism for a researcher to challenge a host site's rejection of her qualifications or her proposed research agenda. Thus, the host sites could privilege particular lines of inquiry while hampering others, thereby shaping the direction of scholarly research in certain disciplines.

## VII. The Settlement Could Frustrate the Development of Innovative Services.

The Settlement specifically provides that the Registry will have the power, "to the extent permitted by law, [to] license Rightsholder's U.S. copyrights to third parties."[40] This provision permits the Registry to license parties other than Google to provide

---

[38] The Library Associations recognize that it is not a search engine firm's responsibility to uphold the First Amendment, particularly when its employees are threatened with imprisonment by oppressive regimes. The U.S. government should play a much more vigorous role promoting free speech internationally. In particular, the U.S. government should aggressively support U.S. search engines against foreign governmental pressure, and communicate unambiguously that it will not tolerate any attempts to intimidate search engine firms into censoring politically sensitive material.

[39] *Id.* at § 7.2(d)(xi).

[40] *Id.* at § 6.2(b)(iii).

services relating to books. However, as a practical matter, the Registry can grant licenses only with respect to rightsholders that register with it and grant it the authority to act as their agent with respect to parties other than Google. The class action mechanism cannot bind absent rightsholders with respect to third parties not participating in the Settlement.

Still, this provision could permit the development of competitive and innovative services. For example, if the rightsholders of 1 million books register with the Registry, the Registry would be able to license to Amazon.com the right to sell access to the 1 million books. To be sure, the Registry would not be able to license to Amazon the rights to the other 20+ million books that would be in Google's ISD.[41] Still, Amazon in one agreement with the Registry would be able to increase by 500% the titles available through the Kindle.[42] Moreover, it is possible that these 1 million titles would include many of the most useful books to researchers, because their rightsholders are the most likely to make the effort to register with the Registry. Thus, an institutional subscription to the 1 million books could be valuable to some libraries, and could offer competition to Google's larger ISD.

Although the Settlement permits the Registry to license the rights it possesses to third parties such as Amazon, the Settlement does not require it to do so. Nor does it provide standards to govern the terms by which the Registry would license these rights. This means that the Registry could refuse to license the rights to Google competitors on

---

[41] Google's ability to use these works could provide it with a significant competitive advantage over other firms.

[42] Currently consumers can purchase 200,000 titles for download onto the Kindle e-book. Under this arrangement, Amazon would still have to digitize the 1 million titles.

terms comparable to those provided to Google under the Settlement.[43] The Registry,
therefore, could prevent the development of competitive services.

Likewise, the Registry could inadequately represent the true interests of many
class members. The Settlement stipulates that the Author Sub-Class and the Publisher
Sub-Class will have equal representation on the Board of Directors, but the Settlement is
silent on who will select these board members and how class members can ensure that the
Registry will in fact advance their objectives.[44] As noted above, the Library Associations
are both authors and publishers of books, and thus fall within both sub-classes of
plaintiffs. However, writing and publishing books is ancillary to the core mission of
libraries – to provide the public with access to information. Tens of thousands of
members of the Author Sub-Class are similarly situated to the Library Associations:
teachers at all levels write books not for financial gain, but to support their core missions
of education and scholarship. Many, if not most, of these class members care far more
about the potential impact of the Settlement on the advancement of knowledge than about
the modest license fees they may receive under the Settlement.[45]

In other words, many class members will not want the Registry to maximize its
profits; rather, they will want the Registry to maximize public access to books.
Additionally, they will want the Registry to provide broad access to all the data the
Registry collects concerning copyright ownership, thereby minimizing the orphan works
problem. Unfortunately, the Registry's board may not reflect this diversity of
perspectives.

---

[43] The Settlement contains a "most-favored-nation" clause, but this clause benefits
Google, not its competitors. *See* Settlement Agreement at § 3.8(a).
[44] *Id.* at § 6.2(b).
[45] *See* Pamela Samuelson, et al., Letter to the Honorable Denny Chin (April 27, 2009).

## VIII. This Court Can Address The Library Associations' Concerns Through Rigorous Oversight of the Implementation of the Settlement.

The concerns discussed above all flow from the concentration of power over the

two related essential facilities -- the ISD and the block of copyrights managed by the

Registry. Fortunately, the Settlement that created these essential facilities also contains a

means of addressing the possible abuses of the control the Registry and Google possess

over them. Specifically, the Settlement provides that this Court "shall retain jurisdiction

over the interpretation and implementation of the Settlement Agreement."[46] Thus, the

parties acknowledge this Court's authority to regulate their conduct under the

Settlement. The Library Associations urge the Court to exercise this authority vigorously

to ensure the broadest possible public benefit from the services the Settlement enables.

In particular:

- Any library or other possible institutional subscriber must have the ability to request this Court to review the pricing of an institutional subscription. The Court's standard of review should be whether the price meets the economic objectives set forth in the Settlement, *i.e.*, "(1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education."[47]

---

[46] Settlement Agreement at § 17.23.

[47] *Id.* at § 4.1(a)(i). The proposed Book Rights Registry is similar to two organizations that collectively manage performance rights: the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI). Both ASCAP and BMI are subject to consent decrees resolving antitrust actions brought by the U.S. Department of Justice. The ASCAP consent decree has existed, with modifications, since 1941; and the BMI consent decree since 1966. Under the consent decrees, ASCAP and BMI must grant, on a non-discriminatory basis, either a blanket license to their entire catalogue, or a license for the performance of a particular work. A court in this district has continuing jurisdiction over the consent decrees, and has established a rate court to resolve disputes concerning license fees. In proceedings before the rate court, ASCAP and BMI have the burden of proving the reasonableness of the rates they seek. Establishment of a rate court in this case is premature. However, this Court has the authority to adopt the procedures necessary to ensure the fairness of the price of the institutional subscription.

19

- Any entity must have the ability to request this Court to review the Registry's refusal to license copyrights to books on the same terms available to Google.

- Any class member must have the ability to request this Court to review the procedures by which the Registry selects members of its board of directors, and to evaluate whether the Registry properly considers the interests of all class members in its decision-making.

- Any user must have the ability to request this Court to direct Google to provide the user with a list of books excluded from any of its services for editorial or non-editorial reasons, and an explanation of why it was excluded. Google already must provide the Registry with a list of books excluded for editorial reasons.[48]

- Any researcher must have the ability to request this Court to review the reasonableness of a Research Corpus host site's refusal to allow the researcher to conduct a research project at the host site.

- Any user must have the ability to request this Court to direct Google and the Registry to disclose their policies for collecting, retaining, disseminating, and protecting personally identifiable information. Additionally, any user must have the ability to request this Court to review whether Google and the Registry are complying with their privacy policies.

In these comments, the Library Associations have identified certain foreseeable

problems that may require this Court's intervention in the future. The Settlement,

however, is potentially so far-reaching that its full implications are unknowable at this

time. While the Settlement's impact might be limited to the creation of a research tool of

use only to serious scholars, the Settlement might also lead to a restructuring of the

publishing industry and a dramatic change to the nature of libraries. The Court should

be prepared to exercise whatever oversight is necessary, for as long as necessary, to

---

[48] Settlement Agreement at § 3.7(e)(i). The Settlement requires Google and the Registry to compile a variety of databases. *See, e.g., id.* at §§ 3.1(b)(ii), 6.6(c). These databases will have many uses, including assisting in finding the owners of orphan works. Accordingly, Google and the Registry should make these databases publicly available.

maximize the public benefit from the services enabled by the Settlement.

Respectfully submitted,

Mary Ellen K. Davis

Mary Ellen K. Davis
Executive Director
Association of College and Research
  Libraries
50 East Huron Street
Chicago, IL 60611
(312) 280-3248
mdavis@ala.org

Keith Michael Fiels
Executive Director
American Library Association
50 East Huron Street
Chicago, IL 60611
(312) 280-1392
kfiels@ala.org

Charles B. Lowry

Charles B. Lowry
Executive Director
Association of Research Libraries
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-2296
clowry@arl.org

May 4, 2009

# CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2009, I caused true and correct copies of the foregoing comments to be delivered by overnight courier to the Clerk for the U.S. District Court for the Southern District of New York and to be served electronically on the following counsel of record:

> Michael J. Boni, Esq.
> Joanne Zack, Esq.
> Joshua Snyder, Esq.
> Boni & Zack LLC
> 15 St. Asaphs Road
> Bala Cynwyd, PA 19004
> bookclaims@bonizack.com
>
> Jeffrey P. Cunard, Esq.
> Bruce P. Keller, Esq.
> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, NY 10022
> bookclaims@debevoise.com
>
> Daralyn J. Durie, Esq.
> David J. Silbert, Esq.
> Joseph C. Gratz, Esq.
> Keker & Van Nest LLP
> 710 Sansome Street
> San Francisco, CA 94111
> bookclaims@kvn.com

Jonathan Band
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-5675
jband@policybandwidth.com