

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/15/09
```

Australian Society of Authors

05-CV-8136

April 29, 2009

*Submission to Fairness Hearing, Google books settlement, New York 11 June, by Australian Society of Authors.*

The first part of the first Google books settlement no doubt reflects values that will govern agreements in other countries, including those which will govern Australian authors and publishers and the ASA's 3000 members.

The transparency which the public interest requires to be applied to a world-wide monopoly of intellectual property is not apparent in the agreement. The first 17 pages, comprising definitions of words such as 'person', quickly tell a non-legal reader that the language setting out the rights, responsibilities and mechanisms of the agreement is a bewildering shift from ordinary meaning which all-but-guarantees that the non-legal reader will give up the unequal task of understanding the rules governing digital book sales and earnings throughout the world.
The Author's Guild et al v. Google Inc.    Doc. 111

The definitions themselves are incomprehensible without extended excursions into the substantive clauses of both the agreement and 15 attachments. The word 'book' is defined in 190 words; 'Google' in 6. Even with the help of the five-category definition on pages 11 and 12, I am unable, with the experience of 20 years' evaluating publishing contracts behind me, to unravel the effect of the phrase 'non-consumptive research'. Distinguished US academics have had the same difficulty.

That the agreement expressly excludes illustrations other than those of the principle rights holder, or for children's books, leaves out popular and prize-winning books comprising art that tells stories by pictures and in the process transcends the limits of language. In Australia the internationally distinguished storyteller Shaun Tan whose work comprises 'ideas wrapped in paint' would be included where the work is for children, excluded where it is for everyone. If this arbitrary division of a quickly-growing new medium is intentional it is unfair; if it is inadvertent it should be changed.

Australian Society of Authors ABN 26 008 558 700
PO Box 1566, Strawberry Hills NSW 2010 Australia
Ph: 612-9318-0877 Fax: 612-9318-0530 e: asa@asauthors.org

With its access to 100 per cent of 'orphaned' books Google blocks all other companies from obtaining an equivalent licence, opening the possibility, as Harvard Professor Robert Darnton puts it, of raising the price of access to 'unbearable levels'. We do not accept that the goal spelled out in the agreement to reach as many customers as possible is an adequate safeguard against unbearably high prices, particularly since the agreement will be imposed throughout the world, for as long as publishing and the world lasts, by managers and owners who, far from being parties to the agreement, or aware of it, are not yet born.

That the lawyers involved in negotiating and drafting the agreement receive about $45 million, the initial amount to be paid to millions of authors, sets a benchmark for 'fairness' in the agreement. That such a benchmark is acceptable to the Authors' Guild and US publishers does not mean the standards are automatically acceptable elsewhere. Some authors complain they are 'insulted' by Google's $60 offer. Not all of them are aware of the extent of the 'insult': Australian publishers' contracts rarely offer authors more than a third of digital-rights fees.

The ASA supports the proposals that the Book Rights Registry include directors to represent the public interest and libraries' interests as well as authors' and publishers and the proposal to delete the requirement that the BRR cannot offer terms more favourable to another corporation than to Google, a requirement crucial to Google's monopoly of digital books.

The transparency essential to the agreement is not displayed in the opt-out clause [17.33]. The clause says opting out means the agreement does not apply. But Google says it is not obliged to pass titles opted out to the scheme administrator, though this is Google's current policy. Google should be so obliged. Under the present agreement Thomas Kenneally could opt-out Schindler's Ark only to find that Google changed policy, failed to pass on the request and digitised it for profit. Mr Kenneally would then be obliged to sue Google for payment. Why should Google be permitted to behave as if the agreement governed the work, knowing it did not?

That Google may at its discretion exclude particular books from 'one or more Display Uses for editorial or non-editorial reasons' [3.7(e)] leaves room for censorship for sexual, religious, political or any other reason. While the clause expresses Google's, the authors' publishers' and libraries' support for freedom of expression, that expression of support by itself does not solve the problem. Google agrees in the sub-clause to notify the BRR when it excludes a book for editorial reasons but it does not agree to do so when the exclusion is for non-editorial reasons or when

Google relies on confidential information to make the exclusion. Were Google to exclude *Portnoy's Complaint*, banned in Australia when first published, 3.7(e) would not require Google to notify the BRR of the censorship. Were Phillip Roth to complain of the exclusion it would be a complete legal answer for Google to say it relied on confidential information. Since confidential information is by definition secret, the circle of censorship imposed in the dark is complete. Though 6.6(a)(ii) requires Google to identify to the BRR titles excluded for non-editorial reasons, it does not require Google to disclose the reason. That the heirs of great First Amendment traditions acquiesce in this crude censorship mechanism surprises and disappoints America's friends down under.—

Robert Pullan, Chair, Australian Society of Authors.