

Claude Almansi-Béguin
41 av. de Budé
CH-1202 Geneva
Switzerland
Cell: +41 76 40185 69
e-mail: claude.almansi@gmail.com

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

05-CV-8136

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-23-09

The Author's Guild et al v. Google Inc.    Doc. 123

### Concerns: Objections to the Google Book Search Settlement Agreement

Right Honourable Clerk

This is a statement of my objections to the Google Book Search Settlement Agreement ("the Settlement" in further mentions).

I hesitated before writing it, because I am not a lawyer or able to afford the services of one in this matter, and the Settlement is very complex for non-lawyers. But then, many other authors of "not commercially available" books, who form an important proportion of the people affected by the Settlement, might well share this lack of legal knowledge and of means to pay for legal expertise, and therefore also hesitate to send their own objections.

Hence this statement. The objections in it are mine, but sending it is also a way of drawing your attention to the fact that many other people in my situation might have their own objections, though they are not writing to you. Please excuse my generally lay language, and possible mistakes in the use of legal terms.

## Content

Preliminary remarks...........................................................................................................1
   The Theatre of Sleep anthology and the Google scan....................................................2
   The US authors' and publishers' class action and the Settlement...................................2
   Why I object to the settlement.......................................................................................3
Objections..........................................................................................................................3
   1 General objection to US entities interfering in non-US publishing affairs..................3
   2 General objection to the complexity of the Settlement................................................3
   3 General objection to the damaging effect of the Settlement on the image of authors...4
   4 General objection to the dominant position conferred to Google by the Settlement....4
   5 Specific objection concerning the "Not commercially available" status of out-of-print anthologies and collective works under the Settlement....................................................6
   6 Specific objection concerning the copy-pasting and printing restrictions foreseen by the Settlement.....................................................................................................................6
Conclusion..........................................................................................................................8

## Preliminary remarks

My objections to the Settlement are based on:

a) having had to deal with the issues concerning an out-of-print anthology published in 1986 for which my late husband and I were editors and right-holders, which was scanned by Google, and was originally classified as "not commercially available" in the "Search and Claim" database of the Settlement

b) respect for other people's author's rights

c) respect for users' rights.

## The *Theatre of Sleep* anthology and the Google scan

*Theatre of Sleep – an Anthology of Literary Dreams*, published by Pan Books UK in its Picador imprint in 1986, was edited by my late husband Guido Almansi and me, under my maiden name, Claude Béguin. The copyright mention in the book is "© Guido Almansi and Claude Béguin, 1986". We were in charge of the correspondence concerning permission requests for copyrighted texts we wished to include excerpts of, and we were allotted a total budget to cover possible compensation demands from right-holders on these texts. Payments were made by Pan Books to these right holders. Although the anthology got some interesting reviews, it did not sell much, and the royalties theoretically owed us never reached the sum paid us in advance by Pan Books.

In December 2004, when Google announced it would be scanning books in several important libraries[1], my husband had died (2001), leaving me as right-holder, and the anthology had long been out of print. This scanning seemed a great opportunity: Google had the financial means, technical know-how and above all the logical organisational capacity to succeed, thus making out-of-print copyrighted works accessible again unless the right-holders came up to object: just as was already foreseen, for instance, under the waiver in the "Acknowledgements" section of the printed version of *Theatre of Sleep*:

> Every effort has been made to contact copyright holders. In the event of an inadvertent omission or error, the editor should be notified at Picador, Pan Books Ltd, 18-21 Cavaye Place, London, SW10 9PG.[2]

So as to the Google scan of *Theatre of Sleep*, I presumed that right-holders on the texts they had given us permission to use excerpts of in – **and only in** – the Pan Books version could simply demand the withdrawal of these excerpts from the Google offer if they minded. I would not have had to deal with this issue.

## The US authors' and publishers' class action and the Settlement

When the US Authors Guild (AG afterwards) and the Association of American Publishers (APA afterwards) started their class action against Google in 2005 for "massive copyright infringement", I thought it was a very odd idea, considering the above mentioned possibility of right-holders to demand the withdrawal of their scanned texts under existing laws anyway – but I believed it was a US-only issue I would not have to deal with either.

I still do not understand how US authors, US publishers and a US corporation can legally meddle with the permission agreements my late husband (UK citizen) and I (Swiss citizen) negotiated with the (mainly non US) right-holders of the copyrighted texts we quoted from in *Theatre of Sleep* (published by a UK publisher). But the Settlement says that these US parties are legally entitled to do so.

---

1 See "All Booked Up", Official Google Blog, Dec. 14, 2004 <http://googleblog.blogspot.com/2004/12/all-booked-up.html>.

2 Guido Almansi and Claude Béguin (eds): *Theatre of Sleep – an Anthology of Literary Dreams*. London, Pan Books, 1986, p. viii.

## Why I object to the settlement

If the Settlement's options had been acceptable, I would just have used them. But they are not, hence the objections that follow, some of which I also used in challenging the "Not commercially available" status of *Theatre of Sleep* in the claim form of the site of the Settlement.

I am sending you the objections that follow – instead of just stopping at this challenge – because the objections concerning *Theatre of Sleep* also obtain for similar anthologies and for other collective works containing texts under third parties' copyright (see 5 Specific objection concerning the "Not commercially available" status of out-of-print anthologies and collective works under the Settlement below). And on the basis of my correspondence with other authors about the Settlement, I know that my more general objections are shared by severl others.

# Objections

## 1 General objection to US entities interfering in non-US publishing affairs

Again, if the Settlement's conditions had been acceptable, I personally would not have minded the fact that it results from a class action between purely US plaintiffs and defendant. But both in my correspondence with Italian publishers I have worked for, and in conversations with French and other francophone publishers at the Salon du Livre in Geneva, these non-US publishers were deeply irritated by having to deal with a Settlement they were not consulted about at any stage of its elaboration. And the non-US authors I have corresponded/spoken with about the Settlement showed the same irritation.

Whether the APA and the AG really represent US publishers' and authors' views seems arguable too, but this is the US publishers' and authors' problem. But they do not represent the non-US publishers' and authors' views.

## 2 General objection to the complexity of the Settlement

Copyright law is complex enough per se, and its understanding by lay people has been made even more arduous by the recent extensions of copyright duration, which differ according to countries and works types.

The Settlement is even more complex than copyright law for right-holders who are not lawyers, in spite of the laudable attempt to organise simplified access paths based on issues in the FAQs, and in spite of the theoretical possibility to ask Rust Consulting for explanations. Rust Consulting people do answer queries very quickly, but in order to make sure that everybody gets the same information, they use scripted replies from the Settlement and/or from the FAQs. As a result, if you ask a question about a given point in the Settlement, they answer by just quoting back to you the point you do not understand.

Publishers usually have lawyers to deal with copyright issues. But when I contacted the copyright officers of Italian publishing houses for which I had worked in the past, to ask what they intended to do about the Settlement in April 2009 (when the claiming deadline was still May 5, 2009), even they were baffled by it and said they still needed to study it further.

Authors – and especially those whose works publishers have deemed not commercially interesting enough to continue selling them – often do not have a legal counsel, and cannot afford to hire one to deal with the complexity of the Settlement.

As a consequence, many authors have given up both understanding the Settlement and using it, especially if they learned of its existence when the claiming deadline was May 5, 2009: they may not even have learned about the extension of this deadline, because they stopped paying attention to the issue.

In other words, the Settlement worsens the divide between the more commercially successful authors who can afford legal counsel to deal with its complexity, and the less commercially successful ones who cannot.

## 3 General objection to the damaging effect of the Settlement on the image of authors

Authors whose copyrighted works publishers have deemed not commercially interesting enough to continue selling them have not suffered any loss in sales revenue from the scan of these works by Google. Without the Settlement, in case of a given work mistakenly labelled as "not commercially available", the author (or other right-holder) could have notified Google of the mistake and Google would have had to withdraw the work from its offer.

So the Settlement is not about compensating authors for a loss in sales revenue. It is about right-holders making money from the fact that Google may have violated[3] copyright law by scanning in-copyright books: the same extremely unpopular tactic already used by the film and music industries in their attempt to make money from lawsuits, but in worse, because it cannot even be argued that the scan would have harmed the sales of books that are not for sale anymore.[4]

Being – however unwillingly – associated to these tactics by the Settlement is very damaging for the image of authors in general. What Cory Doctorow wrote about another, similarly image-damaging Authors Guild initiative also applies in this case:

> ...One of the most powerful weapons in the publishing industry's arsenal is that it isn't the record or film industry. By and large, publishing is undertaken by bookish people who love books and bookselling and readers and writers. By and large, writers get a decent deal from their publishers -- especially relative to recording artists; most writers don't have to sign over their copyrights, don't have the promotion of their books deducted from their royalties, etc. By and large, publishers don't sue tool-makers or accuse readers of being crooks.
> Unlike the record and film industries, who seem bent on doing everything in their power to build the moral case for ripping them off -- to convince the public that they are a passel of greedy, clueless technophobes who deserve to have their industries killed, if only to protect the 21st century from them -- there are very few people who feel this way about publishing and authorship.
> Unless, that is, groups like the Authors' Guild continue to make us all out to be cut from the same cloth as media execs ...[5]

## 4 General objection to the dominant position conferred to Google by the Settlement

The Settlement states clearly and repeatedly that if right-holders permit Google to offer/sell access – in whatever form – to works they hold copyright for, this will be a non-exclusive right. And Google

---

3 "may" because this scanning could have been considered as fair use, and may have lead to a useful rethinking of the parts about "orphan works" in copyright law – just as other past "violations" (the phonograph violating music printers' rights for instance) have lead to needed adaptations of the copyright law.
4 True, the Settlement also indicates how potential profits Google might make from the scans should be shared with the right-holders, but right-holders could have negotiated this without the Settlement. The same obtains for the Settlement's stipulation of the display forms right-holders can choose of refuse.
5 Cory Doctorow: "Authors' Guild vs. reality: Kindles and read-aloud". Boing Boing, Feb. 25, 2009. <http://boingboing.net/2009/02/25/authors-guild-vs-rea.html>. The AG's allegation that the Kindle's text to speech feature constitutes an audio performance similar to / that might harm the sales of audio books, and Amazon's caving in to the AG's pressure by allowing right-holders to disable text-to-speech in e-books for the Kindle, has resulted in various boycotts: of Kindle e-books in general, of Kindle (and at times printed) books whose publishers have chosen to thus disable text-to-speech in the Kindle e-books they are right-holders for.

has used this argument to rebut accusations that the Settlement would give it a monopoly in the offer of commercially unavailable works.

In fact, when I have apprised academic friends of the existence of the Settlement, their immediate reaction has been to place their commercially unavailable works for which they were right-holders and for which they had a digital copy on Open Access access platforms, and to refuse Google the right to display them under the terms of the Settlement: partly because of the copy-pasting and printing restrictions foreseen by the Settlement (see 6 Specific objection concerning the copy-pasting and printing restrictions foreseen by the Settlement below), partly because they dislike Google, partly because they are shocked that US-only parties should be entitled through the Settlement to decide how their own works should be offered in digital form (see 1 General objection to US entities interfering in non-US publishing affairs above).

However, authors can only choose this Open Access alternative to Google publication if all three conditions in the above example are met:

- A) **Authors must know of the Settlement's existence and understand its consequences.** Not as obvious as it might seem: while the AG's and APA's class action and the Settlement have been covered very visibly by the US media, this is not so in other countries, where media have often relegated this information to their technology or economic sections. And academics, whose "not commercially available" works are likely to form an important part of those Google might potentially offer, often tend to skip these sections. Or they might mistakenly think that a deal between US partners only concerns US works.
  And even if authors know that the Settlement applies to their works, understanding its implications is not easy (see 2 General objection to the complexity of the Settlement above).

- B) **Authors must have a digital version of the work.** Not an absolute must, granted: for the digital version of *Theatre Of Sleep* I have put on the Internet Archive (see **6 Specific objection concerning the copy-pasting and printing restrictions foreseen by the Settlement** below), I have scanned and OCRed the 383 pages of the print edition, then edited the result to remove OCRing mistakes and copyrighted passages that could not legally be offered until I got permission again from their right-holders. But scanning, OCRing and editing is time-consuming: it is not feasible if an author has several "commercially unavailable" works for which s/he does not have a digital version.

- C) **Last but not least: the copyright must be the authors' or have reverted to them.**

Google is therefore advantaged by the Settlement's terms, because:

- if condition A is not met, then unless another right-holder steps in, Google will be authorized by the Settlement to commercialize its scan of the work;

- if condition B is not met, authors – in particular academics who believe in knowledge sharing, whose works probably represent an important proportions of those to which the Settlement applies – are likely to prefer a Google digital publication to unavailability or to the time-consuming scanning, OCRing etc necessary to make their own digital version, even if they disapprove of the Settlement making this digital publication defective by design (see 6 Specific objection concerning the copy-pasting and printing restrictions foreseen by the Settlement below and <http://www.defectivebydesign.org/>);

- if condition C is not met, authors cannot legally offer their own digital version as an alternative to the Google one, unless they get permission from the copyright holder, and this is very unlikely if the copyright holder is a traditional academic publisher.

## 5 Specific objection concerning the "Not commercially available" status of out-of-print anthologies and collective works under the Settlement

An out-of-print anthology – or other collective work – may contain material excerpted from copyrighted works by third parties that are still in print and hence commercially available.

While the Settlement does foresee the possibility for the right-holders on these excerpts to claim them and challenge their "Not commercially available" status, this is awkward: some of these right-holders might not know about the Settlement, or not remember permissions granted decades ago for the use of excerpts in – **and only in** – a given printed edition of a given anthology; moreover, their names often do not appear in the "Search and Claim" database of the Settlement.

Thus the general right-holders on such an anthology/collective work, who negotiated the permissions to use such excerpts from still commercially available copyrighted works by third parties for – **and only for** – a given print edition are put in a very awkward position by the Settlement, because they are answerable to these "partial" right-holders under the previously negotiated agreements.

Re-contacting all the partial right-holders to make sure they are aware of the Settlement might be an option for publishers. It is far too time-consuming for an editor of an anthology who is also general right-holder on it. Challenging the "not commercially available" status of such an anthology – as I have done after much hesitation for *Theatre of Sleep* – might protect the rights of the "partial" right-holders, but it might also run contrary to their wishes, as some of them might actually be keen on having the full work publicized through the display of these excerpts in a Google book.

## 6 Specific objection concerning the copy-pasting and printing restrictions foreseen by the Settlement

Article IV of the Settlement stipulates drastic restrictions to the number of pages a user will be able to copy paste or print from a book, both for institutional subscriptions and for consumer purchases:

> With respect to copy/paste, the user will not be able to select, copy and paste more than four (4) pages of the content of a Display Book with a single copy/paste command. Printing will be on a page-by-page basis or a page range basis, but the user will not be able to select a page range that is greater than twenty (20) pages with one print command for printing.[6]

This too (see 2 General objection to the complexity of the Settlement, above) is a sad repetition of the mistakes already made by the film and music industries. DRM restrictions never prevented anyone from to copying a video or audio file, let alone text: people could make screen-shots, or save the whole page then fish out the relevant "text image" files from the folder of objects, and then print or OCR them, without even illegally tampering with the DRM protection. They might even find a paper copy and scan it themselves.

The argument for such restrictions, as formulated by Dr. Joanne Zack, of Boni & Zack, counsel for the Author Sub-Class, in her kind answer to my questions about objecting to the Settlement, is:

> The purpose of these provisions is to create "speed bumps," so that users will find it simpler and more desirable to simply buy the book rather than copy/paste or print it out in its entirety. (...)
> [the book publishing] industry does not want to experience the massive piracy that the music publishing industry experienced. In order to strike a balance between the need for copyright protection and the need for user friendliness, the settlement has imposed measures far less

---

... for institutional subscriptions, p. 47, and for consumer purchases, p. 48 of the Settlement.

restrictive than DRM, but that might motivate customers to buy a book rather than print out all of the book's pages to avoid buying the book.[7]

This is a rather odd argument considering that:

- the copyrighted books Google will be entitled to sell full access to under the Settlement will be otherwise "not commercially available", so "motivating readers to buy them" does not make sense.

- users will already have paid (indirectly in the case of an institutional subscriptions, directly in commercial purchases) both Google and the right-holders for accessing these books.

- a technical measure that restricts what users can copy-paste and/or print is a form of DRM, according to the WIPO definition in <http://www.wipo.int/edocs/mdocs/copyright/en/sccr_10/sccr_10_2_rev.pdf> and the EU definition in <http://ec.europa.eu/information_society/eeurope/2005/all_about/digital_rights_man/doc/workshop2002/drm_workingdoc.pdf>, for instance.

- technical measures that restrict what users can do with a digital content never worked as "speed bumps" for music[8], and are even less likely to work with text files

These inefficient but annoying printing and copy-pasting restrictions stipulated by the Settlement gratuitously maim books. As an author and as a reader, I find this shocking. For this reason, I not only challenged the "commercially unavailable status" of *Theatre of Sleep* , but I am also offering a DRM-less digital version of it [9]: an in-progress version because content under the copyright of third parties only gets added when the right-holders grant permission again.

---

7   From Dr. Zack's e-mail dated July 1, 2009.
8   As Cory Doctorow said in  *Owned – How Hollywood plans on making the future subservient to the past*, a talk given at Olin College on February 16, 2006, downloadable from <http://craphound.com/?p=627>:
    "We hear often that DRM is (...) a speed-bump that stops you from getting the work in an infringing way and encourages you to go down the legitimate route (...) And we've measured the height of that speed-bump now (...). There's a company called Big Champagne that moderates peer-to-peer network use, and in particular times, how long it takes between the release of a song in iTunes - with no CD release, so it's a DRM-only release - before that is made available on e-Donkey and Kazaa. And they've concluded that it's an average of 180 seconds. So that's the height of the speed-bump."

    The transcribed passage is from 00:49:00 to 00:51:10 ca. Apple has since stopped DRMing the music it sells through iTunes, presumably in view of the inefficiency of DRM in preventing people from making copies – and presumably with the agreement of music producers, as there has been no whacking music action against this change from that quarter..

9   Downloadable from <http://www.archive.org/details/TheatreOfSleep>.

# Conclusion

Some of the problems described above might also have arisen without the Settlement. However the Settlement has made them worse by presenting itself as the official solution, imposed even to authors and publishers the US Authors' Guild and American Publishers Association do not represent by any stretch of imagination.

Without the Settlement, Google would have been unable (and possibly unwilling) to both claim fair use and to maim with useless DRM the books it offers/sells access to. Without the Settlement, authors who do not hold the copyright on their unavailable works might have argued that if Google republished these works, then so could they. Etc.

Therefore can this Settlement please be invalidated? Without it, copyright holders on works no longer available who object to Google offering/selling access to these works can ask for their removal all the same – and Google will have had to remove them under existing copyright laws.

Subsidiarily, is there a legal measure that might prevent the US Authors Guild and American Publishers Association from undertaking in future any similar legal action whose consequences would affect authors and publishers they do not represent at all?

In faith,

Geneva, July 9, 2009.

Claude Almansi-Béguin
Cc by e-mail to:
Boni & Zack LLC, Counsel for the Author Sub-Class
Durie Tangri Lemley Roberts & Kent LLP, Counsel for the Publisher Sub-Class
Durie Tangri Lemley Roberts & Kent LLP, Counsel for Google
Peter Brantley, Internet Archive
Cory Doctorow

An electronic version of this letter can be downloaded from
<http://almansi.wikispaces.com/googlebooksettlement>