UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO  SANTA BARBARA • SANTA CRUZ

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-17-09
```

*1111 Franklin Street, 12th Floor*
*Oakland, California 94607-5200*

August 13, 2009

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

RECEIVED
AUG 14 2009
CLERK'S OFFICE
S.D.N.Y.

**Re: Google Book Search Settlement**

05-CV-8136

Dear Mr. McMahon:

We, the undersigned, are members of the faculty of the University of California. We also constitute the entire membership of the Academic Council, the executive body of the Academic Senate, and the chair of the Academic Senate's Committee on Libraries and Scholarly Communication. The Academic Senate comprises the University's faculty who have a role in University shared governance with the President and Regents. However, in order to be consistent with University policy, we write in our personal rather than our official capacities. As members of the Council, we have the opportunity to interact with a broad spectrum of the University faculty and with its leadership. We believe that we have an understanding of the views of many UC faculty members, a large percentage of whom are authors of scholarly books of the sort likely to be found in the collections of major research libraries, such as those Google has scanned. Many UC faculty are, hence, members of the author sub-class defined in the proposed settlement agreement in the above-captioned matter. We send this letter to express our concerns with some aspects of the settlement agreement as they affect the interests of academic authors of scholarly books.

We are aware that the University of California has publicly stated support for the public benefit that the proposed settlement agreement will provide, and that some UC officials and librarians participated in negotiations that resulted in the agreement which you are being asked to approve. While we commend our UC colleagues for the valiant efforts they made to shape the agreement in ways that are consistent with UC's academic and research values, it is unfortunate that the confidentiality rules governing the negotiations prevented us from having an opportunity to comment on, or provide suggestions for, the agreement.

We take the opportunity now to make comments and suggestions, as this is the first opportunity we have had to provide our input about the settlement agreement.

We recognize the work that the Authors Guild and certain of its members have contributed as putative representatives of authorial interests in respect of the settlement, and we acknowledge that

The Author's Guild et al v. Google Inc. Doc. 134

there are some pro-author provisions in the settlement agreement that we infer must have come from them. Yet, because most Authors Guild members are not academic authors and academic authors did not directly participate in the negotiations over the terms of the settlement agreement, it would appear that the Authors Guild representatives were inspired by priorities different from those that academic authors would have agreed to, had our input been sought or heeded. Specifically, we are concerned that the Authors Guild negotiators likely prioritized maximizing profits over maximizing public access to knowledge, while academic authors would have reversed those priorities. We note that the scholarly books written by academic authors constitute a much more substantial part of the Book Search corpus than the Authors Guild members' books.

We have three main concerns about the proposed settlement agreement. First, to maximize access to knowledge, prices should be reasonable. Unfortunately, the proposed settlement agreement contains inadequate checks and balances to prevent price gouging and unduly restrictive terms for purchasers of books and institutional subscribers. Second, the agreement does not contemplate or make provision for open access choices that have in recent years become common among academic authorial communities, especially with regard to out of print books. The settlement agreement only contemplates that authors would monetize their books and related metadata through the Book Rights Registry (BRR). This is especially worrisome as to the millions of out of print, and likely orphan, books. Third, the agreement contemplates some monitoring of user queries and uses of books in the Book Search corpus that negatively impinge on significant privacy interests of authors and readers and undermine fundamental academic freedom principles.

1) Risks of Price Gouging and Unduly Restrictive Terms

We appreciate the settlement's recognition of two objectives for the economic terms for institutional subscriptions of books – revenue at market rates for rights holders and broad access to books by the public, including institutions of higher education. We also have every reason to believe that Google will make institutional subscriptions available to universities (such as UC) for prices and on terms that the universities will deem reasonable, at least in the near term. We are deeply concerned, however, that prices of institutional subscriptions will rise substantially and unjustifiably over time and that terms of access and use will become more restrictive as the user base expands, generating network effects that will create significant "lock-in" problems arising from the existence of two complementary monopolies, the Google Book Search service and the BRR, that will be created upon approval of the settlement.

UC, like many other major research universities, has suffered grave hardships in recent years as the costs of scientific and technical journals to which UC faculty frequently contribute and on which they rely heavily for their research have skyrocketed. Commercial publishers have been able to raise subscription prices for many journals to astronomical levels simply because researchers need them and no comparable product or service can meet this demand. Moreover, in order to maintain status as a first class research institution, UC campuses must offer faculty, researchers, and students the greatest possible access to available scholarship and knowledge. UC has struggled to find ways to manage its financial resources effectively while still providing its faculty and students with access to materials essential for achieving the university's mission.

Even with the dual objectives of revenue and public access, we perceive grave risks of similar price gouging if the Book Search settlement agreement is approved without some additional safeguards. The agreement now states in Sec. 4.1(a)(ii) that pricing decisions made by Google in consultation with the Book Rights Registry (BRR) will be based on several factors, including importantly

2

"pricing of similar products and services available from third parties." If this clause is meant to refer to pricing of journals from commercial publishers, this bodes ill as a meaningful limitation on price increases, for commercial publishers have priced journal subscriptions at excessive levels for years. If the intent is not to compare institutional subscriptions to the Book Search corpus to these journals, then we are at a loss to comprehend what it might mean. No third party is currently offering comparable products and services, and for reasons set forth below, we doubt that any comparable product or service is possible unless orphan works legislation passes. The absence of competition with regard to orphan works as a check on prices and other terms is deeply disturbing, given that the logic of for-profit monopoly firms is to charge what the market will bear.

The proposed settlement agreement characterizes the license that Google will get, upon approval of the settlement agreement, to commercially exploit in-copyright books as "non-exclusive," and technically speaking, this is so. Other firms, such as Yahoo!, Amazon, Microsoft, and the Internet Archive, could create a digital library containing public domain books and any in-copyright books whose rights holders were willing to license them. But there are at least three serious impediments to meaningful non-exclusivity of that license. One is that, as we understand it, no one but Google will have or will be able to get a license to scan and make available any parts of orphan books in the absence of orphan works legislation, which Congress has considered, but failed to pass several times in recent years. The second is the "most favored nation" clause contained in section 3.8(a) of the settlement agreement under which the BRR is forbidden for ten years from giving any other firm a better deal in any respect than Google has, which undercuts the ability of outsiders to make their offers attractive to the BRR. Third, there also is reason to worry that the BRR will have such a tight and favorable deal from Google that it will not, in practice, license other firms to exploit the books registered with it, even though it could do so if it wanted.

There are a number of ways that this court could contribute to guarding against the grave risks of future price gouging and other unreasonable terms. One would be to retain jurisdiction over this case so that there would be opportunities for judicial review of the agreement insofar as it resulted in price gouging or other unreasonable terms. The court also could appoint a special master to hear such complaints. A second would be to extend the existing arbitration of disputes provision (Article IX of the settlement agreement) so that institutional subscribers could have a venue for arguing that prices or terms are unreasonable. We are encouraged by the announcement that Google's agreement with the University of Michigan libraries gives the libraries the right to submit pricing disputes to independent arbitration. A third would be to insist that the agreement be amended to omit the "most favored nation" clause, thus ensuring more robust competition. A fourth would be to supplement the agreement with provisions requiring that academic authors be represented on the BRR governing body. A fifth would be to require the parties to devise and implement better ways to reset prices than a metric that focuses on hypothesizing prices for similar services or products that don't exist. A sixth would be to amend the agreement so that "unclaimed" funds from public domain and orphan books and books whose owners have not registered with BRR would be used to reduce institutional subscription prices rather than being given to BRR registrants and to nonprofit organizations for purposes of promoting literacy. This last suggestion is a particularly useful example of how the current settlement agreement does not adequately represent the interests of academic authors. As authors, we rely on our ability to use UC's libraries to do our work. We would strongly prefer that UC's libraries pay lower fees for institutional subscriptions rather than paying in to funds that the BRR will give to people who do not own rights to the books in question or to charities who may not be members of the author sub-class.

Perhaps the best way to ensure that prices and other terms for institutional subscriptions to Google's Book Search service will be reasonable over time is for Congress to enact orphan works legislation to permit competitors to scan and make these orphan books available. Google representatives have indicated that they support and will continue to support orphan works legislation, and we hope that approval of the settlement will not change this commitment. In the meantime, however, approval of the settlement means that only Google will be able to undertake book digitization projects without risking copyright lawsuits by previously unidentified rights holders. There is a debate among copyright professionals about whether the settlement of the present lawsuits against Google will effectively weaken fair use defenses raised by a new market entrant who starts scanning out of print books. In coming years, we believe that many academic researchers will want to do small-scale digitization projects for books in their fields but may be deterred by the belief that Google's license means that unlicensed digitization is a copyright violation. We worry that the agreement does not do enough to ensure that Google or the BRR clearly identify books in the Book Search corpus that are in the public domain or are "orphaned," so that academic digitizers can assess the risks of their digitization projects.

Competition from digital libraries containing orphan works also would be more likely than a monopoly to spur Google to make available a full range of books in the Book Search corpus rather than reducing the size of the corpus, as the settlement agreement now contemplates. Innovation in follow-on and complementary products and services also will be spurred by competition far more than by the monopoly that approval of the settlement will bring about. Some UC faculty, for instance, might want to build "virtual book shelf" applications to allow customization of sub-collections for individual users. It is far from clear that Google's proprietary Book Search service will be amenable to innovations not emanating from and not controlled by Google itself.

2) Support for Open Access Preferences

UC, in consultation with the Academic Council and the Academic Senates of the UC campuses, has made a major commitment in recent years to promote open access of research materials produced by its own and other researchers. Many UC faculty now routinely post their work in open access repositories, and UC has done much to promote the open access preferences of faculty members. For example, the California Digital Library hosts an eScholarship website where individual UC authors and research units may deposit papers and other works, including peer reviewed works, for perpetual access.

We understand Google is committed to making freely available for download complete copies of public domain books, which includes books published in the U.S. before 1923, books written by U.S. government employees, books lacking proper copyright notices, and certain books whose copyrights were not renewed. This partial endorsement of open access principles is commendable, as is the commitment the settlement agreement makes to the development of a database of information about public domain books. It would be desirable for Google to make a public commitment that it is willing to make this database freely available and transparent to researchers who want to determine the public domain status of a book. This would include Google making metadata available to the public both about the status of, and information relevant to, searches about its status.

For books in copyright with identified rights holders, the proposed settlement agreement envisions several options for authors and publishers to commercially benefit from revenues generated from uses of the Book Search corpus. They can, for example, sign up for the BRR and share in the revenues generated by use of the corpus that Google will share with the BRR. However, the

4

agreement does not explicitly acknowledge that academic authors might want to make their books, particularly out-of-print books, freely available by dedicating their books to the public domain or making them available under a Creative Commons or other open access license. We think it is especially likely that academic authors of orphan books would favor public domain or Creative Commons-type licensing if it were possible for them to make such a choice through a convenient mechanism. We are concerned that the BRR will have an institutional bias against facilitating these kinds of unfettered public interest, open access alternatives. The notices some of us received from Google as members of the author class do not, for example, mention either public domain dedication or Creative Commons licenses as alternatives to registration for payouts from Google through the BRR.

Many books written by UC faculty members were published some years ago and are currently out of print. The copyrights in those books are sometimes in the hands of the authors, but academic authors have all too often assigned their copyrights to publishers. Some of these assignments may terminate by terms of the publication agreement when the books go out of print, and others are subject to termination of transfer rules under U.S. copyright law. Both strategies enable authors to recapture copyright in their books and to rethink how they should be accessible in the future. Academic authors may well want to terminate transfers of copyright to publishers in order to make their works more accessible through public domain dedication or Creative Commons-type licensing. The proposed settlement agreement, which governs only the relationship between rights holders and Google, does not address the potential for authors to recapture copyright and may create the perception that the BRR stands between authors and registered rights holders. Although the relationship between authors and rights holders is beyond the scope of the proposed settlement agreement, it would be reassuring if the agreement referenced the possibility that authors might recapture copyright and make their books available on an open access basis. The BRR could create tools that would assist authors to complete such transactions.

Many books written by UC faculty members are, of course, in print and in copyright, and our concerns about the importance of open access alternatives for authors who want them should not be viewed as a naïve conception of academic authors as not caring about monetary compensation from successful books. We expect some UC authors will sign up with the BRR, and to the extent they are able to enjoy revenues from the success of the Book Search initiative, the goals of Google, the BRR, and of UC faculty may be well-aligned. But they may be misaligned to the extent that academic authorial open access preferences are not contemplated by the agreement. As faculty were not included in the negotiations about the terms of this agreement, it is very difficult to assess how misaligned the goals are without greater transparency on key details.

Another issue that bears on open access principles is a provision of the settlement agreement that contemplates that subscribers will be able to annotate their books, but restricts the extent to which annotations can be shared. It allows individuals to share their annotations with 25 other persons, but all must be purchasers of that digital book, and they must be identified in advance. The agreement appears to contemplate minimal annotations—personal notes, for example, or, in a group context, the sharing of comments between book club members or a class. In academia, however, annotation is a time-honored form of scholarship, which the annotator may wish to share with a large community for criticism and further comment—but not for monetary profit. Members of that community may wish to forward the annotations to other scholars, add their own comments, and so on. Limiting annotation sharing to only twenty-five specifically identified fellow purchasers will inhibit such exchange and seriously impair the benefits of the bargain for academic authors.

3) Privacy and Academic Freedom Issues

Intellectual privacy and information privacy are fundamental values in academic environments. Academic freedom of inquiry is premised on the right to read and to interact with texts anonymously. Without assurances that information on users' reading habits will either not be collected at all or will, if collected, be protected from unwarranted use and disclosure, the likelihood of a chilling effect on reading, reflection, and analysis is high.

The traditional repositories of books in university settings have been campus libraries, which have long-standing and exceptionally strong commitments to the values of intellectual and information privacy. They abide by the American Library Association's Code of Ethics for Librarians which provides: "We protect each library user's right to privacy and confidentiality with respect to information sought or received and resources consulted, borrowed, acquired or transmitted."

Not only does the proposed settlement agreement contain no equivalent commitment to intellectual and information privacy for the readers of books in the Book Search corpus; it also contains some provisions that call for monitoring book usage in ways that do not respect user privacy. For example, libraries that permit Google to scan books in their possession receive copies of the resulting files in addition to the access to the full Google Book Search corpus that they acquire through a subscription. A library that allows a faculty member to read, print, download or otherwise use up to 5 pages of a book from its "library digital copy" files must keep track of all such uses and report them to the BRR. *See* Section 7.2 (b)(vii). Researchers who wish to do non-consumptive research on the Book Search corpus must submit a research agenda in advance, which may be reviewed by the BRR. *See* Section 7.2 (d)(xi). This would enable the BRR to gather detailed information about the type and extent of academic research. Such monitoring is inconsistent with norms and sound practices within academic communities.

When patrons of brick-and-mortar libraries use information resources in libraries to search for and access books of relevance to their inquiries, they have not typically been personally identifiable in respect to those books (except insofar as they checked the books out, and user privacy interests as to patron check-out records are closely protected by libraries under the ALA code). In digital networked environments, however, every query can reveal very significant information about the user and the inquiry in which he/she is engaged. The potential risks to user privacy in digital networked environments are thus far greater than in traditional library contexts.

Google has made commitments to protect consumer privacy in other contexts (e.g., as to health information), but has yet to make commitments not to collect data about user queries that retrieve results from the Book Search corpus and other uses of books from the corpus except when necessary for a specific purpose, such as billing, to delete the data after the legitimate purpose has been accomplished, or to give users other kinds of controls over personally identifiable information about their uses of the Book Search corpus. We find this silence to be deeply troubling, mainly because of the chilling effect it can have on academic freedom of inquiry, but also because some authors of books on sensitive subjects may not attract as many readers and purchasers as they would if Google made commitments to respecting user privacy.

The settlement agreement does not contain any description of what, if any, protections there will be as to data about user queries and other Book Search-related activities if third parties request that Google turn over information about the user's queries to them. Google should be required to give

6

notice to users about requests for disclosure of such information and to provide the users with an opportunity to object to the disclosure as an unwarranted invasion of his/her privacy.

In concluding this letter, we want to make clear that we are not opposed to the settlement. As we understand it, the question before the court is whether the settlement is fair to the author sub-class whose interests will be affected by the settlement. This letter argues that the settlement is not equally fair to all members of the author sub-class and does not fully address the needs of academic authors. However, with clarifications requested in our letter, some supplementary provisions to address our concerns, and other amendments, we believe it would be fair enough to academic authors to be approved.

We also wish to express our gratitude to the court for the four-month extension in the comment period that has provided us with an opportunity to deliberate about the implications of the proposed settlement agreement for academic authors. If other similar academic commentators do not write by the deadline to express similar concerns, we believe that this will be due primarily to the slow deliberative nature of processes that are typical in academic environments and the mismatch between typical academic calendars and the four-month extension granted in this case (most faculty committees and other deliberative bodies do not meet between mid-May and late August). We believe, however, that faculty colleagues on other university and college campuses share the concerns expressed in this letter.

As individual signatories to this letter, we have included our academic and Senate positions for identification purposes only

Sincerely,

*Mary Croughan*

Mary Croughan, Chair, Academic Council
Professor of Obstetrics and Epidemiology,
UC San Francisco

*Mary K. Firestone*

Mary K. Firestone
Chair, UC Berkeley Divisional Senate
Professor of Soil Microbial Ecology,
UC Berkeley

*Jutta Heckhausen*

Jutta Heckhausen
Chair, UC Irvine Divisional Senate
Professor of Psychology & Social Behavior,
UC Irvine

*Henry C. Powell*

Henry C. Powell, Vice Chair, Academic Council
Professor of Neuropathology, UC San Diego

*R. L. Powell*

Robert Powell
Chair, UC Davis Divisional Senate
Professor of Chemical Engineering and
Materials Science, UC Davis

*Michael Goldstein*

Michael Goldstein
Chair, UC Los Angeles Divisional Senate
Professor of Public Health and Sociology,
UC Los Angeles

*Martha Conklin*
Martha Conklin
Chair, UC Merced Divisional Senate
Professor of Engineering, UC Merced

*Daniel J. Donoghue*
Daniel Donoghue
Chair, UC San Diego Divisional Senate
Professor of Chemistry and Biochemistry, UC San Diego

*Joel Michaelsen*
Joel Michaelsen
Chair, UC Santa Barbara Divisional Senate
Professor of Geography, UC Santa Barbara

*Francis Lu*
Francis Lu
Chair, University Committee on Affirmative Action and Diversity
Professor of Clinical Psychiatry, UC Davis

*Stephen McLean*
Stephen McLean
Chair, University Committee on Educational Policy
Professor of Mechanical and Environmental Engineering, UC Santa Barbara

*Sylvia Hurtado*
Sylvia Hurtado
Chair, Board of Admissions and Relations with Schools
Professor of Education, UC Los Angeles

*Tony Norman*
Anthony Norman
Chair, UC Riverside Divisional Senate
Professor of Biochemistry and Biomedical Science, UC Riverside

*David Gardner*
David Gardner
Chair, UC San Francisco Divisional Senate
Professor of Medicine, UC San Francisco

*Quentin Williams*
Quentin Williams
Chair, UC Santa Cruz Divisional Senate
Professor of Earth and Planetary Sciences, UC Santa Cruz

*Steven Plaxe*
Steven Plaxe
Chair, University Committee on Academic Personnel
Professor of Clinical Reproductive Medicine, UC San Diego

*Helen L. Henry*
Helen Henry
Chair, University Committee on Educational Policy
Professor of Biochemistry, UC Riverside

*Farid Chehab*
Farid Chehab
Chair, Coordinating Committee on Graduate Affairs
Professor in Residence, Laboratory Medicine, UC San Francisco

James Carey
Chair, University Committee on Research Policy
Professor of Entomology, UC Davis

Patricia Conrad
Chair, University Committee on Planning and Budget
Professor of Parasitology, UC Davis

Laurence Armi
Chair, University Committee on Library and Scholarly Communication
Professor of Oceanography,
UC San Diego

Copy: Mark G. Yudof, President
      Lawrence Pitts, Interim Provost and Executive Vice President
      Charles Robinson, Vice President and General Counsel
      Daniel Greenstein, Vice Provost
      Mary MacDonald, Senior Counsel
      Pamela Samuelson, Richard M. Sherman Distinguished Professor of Law
      Michael J. Boni, Esq., Counsel for the Author Sub-Class
      Joanne Zack, Esq., Counsel for the Author Sub-Class
      Joshua Snyder, Esq., Counsel for the Author Sub-Class
      Jeffrey P. Cunard, Esq., Counsel for the Publisher Sub-Class
      Bruce P. Keller, Esq., Counsel for the Publisher Sub-Class
      Daralyn J. Durie, Esq., Counsel for Google
      Joseph C. Gratz, Esq., Counsel for Google