**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Authors Guild, Inc., et al., | ) Case No. 05 CV 8136 (DC) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **OBJECTION OF SCOTT E. GANT** |
| | ) **TO PROPOSED SETTLEMENT,** |
| Google, Inc., | ) **AND TO CERTIFICATION OF THE** |
| | ) **PROPOSED SETTLEMENT CLASS** |
| Defendant. | ) **AND SUB-CLASSES** |
| | ) |

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-20-09
```

**INTRODUCTION**

I am a graduate of Harvard Law School, and a Partner at a national law firm.[1] My law

practice consists primarily of complex commercial litigation, with particular emphasis on class

actions. In my class action work, I have been lead counsel for both Plaintiffs and Defendants.

While in private practice, I have written numerous scholarly articles published in law

journals. In 2007, Simon & Schuster's Free Press published my first book, *We're All Journalists*

*Now: The Transformation of the Press and Reshaping of the Law in the Internet Age*.[2] To the

best of my knowledge, I am a member of the proposed "Author Sub-Class" in this litigation.[3]

---

[1] My law firm is Boies, Schiller & Flexner LLP. A copy of my biography from the Firm's
website is attached as Exhibit A. I am filing this Objection in my individual capacity, not as a
Partner at Boies, Schiller & Flexner, or on behalf of the Firm or any client.

[2] Attached as Exhibit B is a printout from the Settlement Website,
www.googlebooksettlement.com, which lists the results of a search for my works. The
Copyright Registration Number for *We're All Journalists Now* is TX 6-838-539.

[3] References herein to the "class" or "class members" are to the Author Sub-Class and its
members, unless otherwise specified.

As explained in detail below, the Proposed Settlement: (1) is a predominantly commercial transaction which would result in a sweeping transfer of intellectual property rights from current owners to Google, and cannot be imposed through the use of Federal Rule of Civil Procedure 23 (hereinafter "Rule 23"); (2) fails to satisfy the notice requirements imposed by Rule 23 and the Fifth Amendment's Due Process Clause; (3) fails to provide putative class members with adequate compensation; (4) fails to satisfy the typicality and adequacy requirements of Rule 23(a); and (5) would vest Google with significant market power which it could not acquire without the settlement, and raises serious antitrust issues which must be considered as part of this Court's review of the Proposed Settlement.

Because the Proposed Settlement fails in several important respects to satisfy the requirements of Rule 23, and also fails to safeguard the due process rights of absent class members, I urge the Court to reject the Proposed Settlement, and to deny the request for certification of the proposed settlement class and sub-classes. Submitted with this Objection is a Notice of Intent to Appear at the Fairness Hearing, currently scheduled for October 7, 2009.[4]

## ARGUMENT

The Proposed Settlement comes to this Court after, what its sponsors describe as, more than two years of negotiations, involving parties to the underlying litigation as well as third-parties. While settlement negotiations obviously have been extensive, this Proposed Settlement comes relatively early in the life of a complex lawsuit – here, after only limited discovery, before

---

[4]     Because I plan to appear in my capacity as an objecting class member, I do not interpret this Court's Rules as requiring that I move for admission *pro hac vice*.    If directed by the Court, I will file promptly an application for admission *pro hac vice*.

any motions for class certification were filed or adjudicated, and before any motions directed to the merits of the parties' claims.[5]

As the Supreme Court has explained, when a district court "certifies for class action settlement only, the moment of certification requires 'heightened attention' to the justification for binding the class members." *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 849 (1999) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *see also* Manual for Complex Litigation, Fourth, § 21.61 at 309 ("Judicial review [of a proposed settlement] must be exacting and thorough. The task is demanding because the adversariness of the litigation is often lost after the agreement to settle.").

When applying "heightened attention" to this Proposed Settlement it is apparent the Proposed Settlement clearly fails to satisfy the requirements of Rule 23, and to safeguard the due process rights of absent class members.[6] *See Amchem*, 521 U.S. at 629 (Rule 23 must be "applied with the interests of absent class members in close view"); *cf.* Manual for Complex

---

[5] Because most information about the status of the case before settlement is not public, my conclusions are based on a review of the Docket Report for the case and of case filings. These conclusions are supported, however, by the Notice of Class Action Settlement. For instance, the section entitled "Why is there a Settlement?," summarizes the work that preceded the settlement and describes "review of millions of pages of documents produced by the parties," but makes no mention of any depositions or work by experts. *See* Settlement Agreement, Attachment I, at 5. The Notice also states counsel for the Author Sub-Class "incurred approximately $140,000 in expenses as of the date of the Settlement Agreement" (*id.* at 27) – a tiny amount for a complex case or a large class action – further suggesting no significant discovery or expert work occurred.

[6] On November 14, 2008, Judge Sprizzo signed a proposed order granting preliminary approval of the Settlement. The proposed order was entered without any contested briefing and without a hearing. *Cf.* Manual for Complex Litigation, Fourth, § 21.632 at 320 ("Review of a proposed class action settlement generally involves two hearings."). Any class certification ruling is interlocutory, and may be revised at any time before judgment. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Given that, and given preliminary approval was granted without a hearing or adversarial briefing, that Order should not be granted any deference. *Cf.* Dkt. 57 at 30-31 (Plaintiffs' counsel acknowledging "[p]rovisional certification is not final or binding, and is reviewed in connection with the final fairness hearing. Plaintiffs must then establish that the Settlement Class satisfied the requirements of Rule 23 ....").

Litigation, Fourth, § 21.61 at 310 ("[T]he judge must adopt the role of a skeptical client, and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation.").

## I. THE PROPOSED SETTLEMENT SEEKS TO IMPLEMENT THROUGH RULE 23 A PREDOMINANTLY COMMERCIAL TRANSACTION WHICH WOULD EFFECT A SWEEPING REALLOCATION OF INTELLECTUAL PROPERTY RIGHTS

The Proposed Settlement has two distinct parts. One part would release Google and others from liability for *past* copyright infringement in exchange for approximately $45 million – with payments to individual copyright owners in the amount of $15 per insert ($5 for partial inserts) or $60 per book, with the possibility of higher payments if less than the full $45 million is claimed by other class members.[7] The other part is considerably more complicated (accounting for the vast majority of the text of the Settlement Agreement) and, in the words of one of its sponsors, is "audacious."[8]

At its most basic level, this latter part of the Proposed Settlement would transfer to Google (and others)[9] certain intellectual property rights owned and under the exclusive control of class members – in effect, a license permitting specific uses of copyrighted works – in exchange for Google's payment of approximately $25 million to establish an entirely new organization, called the Book Rights Registry (hereinafter "Registry"), and for Google's promise to share

---

[7] *See* Settlement Agreement §§ 2.1(b), 5.1; Settlement Agreement, Attachment C (Plan of Allocation) § 3.2.

[8] *See infra* note 13.

[9] The Proposed Settlement releases from both past *and future* liability numerous partners in Google's Book Search business, even through those partners are not parties in the case, and have not contributed to the settlement's financial terms. *See, e.g.*, Settlement Agreement §§ 10.1, 10.2.

4

future proceeds from its uses of the authors' works.[10] As part of this transfer of rights to Google and others, the Proposed Settlement would preclude class members from suing Google and its partners for the array of uses of authors' works permitted by the Proposed Agreement, thereby releasing Google and others from liability for *future* conduct which would otherwise constitute copyright infringement.

This part of the settlement is fundamentally a commercial transaction, which the settling parties are improperly attempting to impose through the judicial process and the procedural device of Rule 23, rather than through the normal commercial process of negotiation and informed consent. *See* Farnsworth on Contracts, at § 1.2, p. 8 (3d ed. 2004) ("In a market economy the terms of [] bilateral exchanges are arrived at voluntarily by the parties themselves through the process of bargaining.").[11]

---

[10] Under the Settlement Agreement, Google has agreed to provide $34.5 million "to fund the launch and initial operations of the Registry and to fund other Administrative Costs." Settlement Agreement § 2.1(c); *see also id.* § 5.2. The "Administrative Costs" for which this amount is to be used include expenses "preparing and providing notice to the Settlement Class." *Id.* § 1.6. While the amount spent on notice is not public at this time, a reasonable estimate is that the amount left to fund the "launch and initial operations of the Registry" will be approximately $25 million. *See* James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 14 (Apr. 2009) ("Google has spent $7 million on print ads") (Exhibit C). The Notice of Class Action Settlement (Settlement Agreement, Attachment I), incorrectly states on its cover page that the Settlement benefits include "US $34.5 million paid by Google to establish and maintain a Book Rights Registry [] to collect revenues from Google and distribute those revenues to copyright owners." As explained above, the amount remaining for these purposes after paying "Administrative Costs" will be substantially less.

[11] *See also* Lynn Chu, *Google's Book Settlement Is a Ripoff for Authors*, Wall Street Journal (Mar. 28, 2009) ("We already have a good system. It's called the system of private property and free contract, designed for dispersed, autonomous individuals – not command-and-control centers. The U.S. Constitution grants authors small monopolies in their own copyrights . . . . This class action seeks to wipe all of this out – just for Google. But U.S. law does not grant any single publisher monopoly power to herd all of us into its list. For private gain, the Google parties now seek to destroy the health in the system that individual bargaining preserves.") (Exhibit D).

## A. The Proposed Settlement is Predominantly a Commercial Transaction Being Imposed on Class Members Through the Procedural Device of Rule 23

The bulk of the 134-page Settlement Agreement is directed to establishing a complex commercial arrangement, potentially affecting millions of copyrighted works and the owners of the intellectually property rights in those works.[12] Among other things, the Settlement Agreement provides for the establishment and charter of the "Book Rights Registry" (Article VI), outlines the role of Google's library partners in the commercial venture (Article VII), addresses security issues related to the commercial venture (Article VIII), adopts a protocol for the resolution of disputes arising between parties to the commercial arrangement (Article IX), and sets out the economic terms for Google's use of class members' intellectual property (Article IV). Several "Attachments" to the Settlement Agreement provide additional details relevant to the proposed commercial arrangement. *See, e.g.*, Settlement Agreement, Attachment A ("Procedures Governing Author Sub-Class and Publisher Sub-Class Under the Settlement Agreement"); Settlement Agreement, Attachment C (Plan of Allocation).

While the text of the Settlement Agreement itself demonstrates the unmistakable commercial character of the Proposed Settlement, the settling parties and others involved in the settlement negotiations have themselves emphasized the commercial nature of the transaction – with several having acknowledged the commercial arrangement could not have been achieved

---

[12] *See* Settlement Website, FAQs, FAQ 4 ("The class consists of all persons and entities that, as of January 5, 2009, own a U.S. copyright interest in one or more Books or Inserts that are 'implicated by a use' authorized by the Settlement."); Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 9 (describing the Proposed Settlement as "an excellent opportunity to breathe new commercial life into potentially tens of millions of out-of-print Books"); *see also* Anna Stolley Persky, *Paper or Plastic?: Google's Plan to Digitize Books Pits Book Lovers v. Book Innovators*, Washington Lawyer (June 2009) ("The most amazing thing about the Google settlement is its breadth, experts say . . . . The agreement makes Google's prior efforts seem like a baby step in comparison and worries some scholars.").

6

either in the marketplace or through legal resolution of the lawsuit on its merits. The following

sample of quotations makes this clear:

- o Authors Guild Executive Director, Paul Aiken, at the press conference announcing the Settlement:

    - "It's a pleasure to be here to jointly announce what may be the **biggest book deal is U.S. history.**"

    - "The task before us was to take Google's **audacious library digitization project** and transform it into something both good for readers and agreeable to the people who write and publish books. **To do that, we found we had to make the project even more audacious. We succeeded at that.**"[13]

- o Authors Guild President, Roy Blount, Jr., describing the Authors Guild's initial proposal to Google in May 2006:

    - "[I]f you're willing to do **something far more ambitious and useful**, and you're willing to cut authors in for their fair share, then it would be our pleasure to work with you."[14]

- o Joint Public FAQs, issued with announcement of the Settlement:

    - "**This Agreement will enable us to do more together than copyright owners and Google could have done alone or through a court ruling.**"[15]

- o Joint Statement by Google Library Partners, the University of California, the University of Michigan and Stanford University:

    - "The Settlement agreement provides an unprecedented and extraordinarily valuable service . . . that libraries, because of copyright protection, could not offer on their own and **goes well beyond what would have been possible, even if Google had prevailed in defending the lawsuits.**"[16]

---

[13] Exhibit E.

[14] Exhibit F.

[15] Exhibit G.

[16] Exhibit H. *See* Settlement Agreement, Attachment G (List of Library Partners).

- o  Allan Adler, Vice President of the Association of American Publishers:

  - ▪  "[T]his proposed settlement is really unprecedented in its scope and nature .... **[W]hat we have here is not only a settlement agreement that will resolve the pending litigation**, but it's **designed deliberately to establish and create a going forward model** for publishers and authors and other rightsholders in books to work with one of the giants of the online world to move books online for purposes of providing access to a new readership."[17]

In fact, Google's own accounting treatment of its payments under the settlement explicitly characterizes the Proposed Settlement as having two distinct components: "the settlement portion of the agreement" and the "commercial arrangement." According to Google's 10-Q issued immediately after the settlement: "For accounting purposes, $95.1 million was determined to be the fair market value of the settlement portion of the agreement . . . , and $29.9 million was determined to be the fair market value of the *commercial portion of the agreement* and will amortize over an estimated useful life of seven years beginning with the commencement of the *commercial arrangement*." Google Inc., Form 10-Q at p. 20, Sept. 30, 2008 (Exhibit J) (emphasis added).

To change the case from an important yet discrete lawsuit about alleged mass copyright infringement to an unprecedented commercial arrangement, the settling parties had to dramatically revise the definition of the putative classes from the operative complaint preceding settlement to the complaint filed with the settlement documents:[18]

---

[17]  *See* Transcript of July 15, 2009 Interview with Copyright Clearance Center at 6 (Exhibit I).

[18]  "The court faced with a request for an expanded class definition should require the parties to explain in detail what new facts, changed circumstances, or earlier errors support the alteration of the original definition." *See* Manual for Complex Litigation, Fourth, § 21.62 at 318.

| First Amended Complaint (July 24, 2006) | Second Amended Complaint (Oct. 28, 2008) |
|---|---|
| "[A]ll persons or entities that hold the copyright in a work that is contained in the library of the University of Michigan." (¶ 22) | "[A]ll persons or entities that have a United States copyright interest in one or more Books [] or Inserts []." (¶ 34) |
| | "'Author Sub-Class' means members of the Class who are authors, their heirs, successors and assignees, and other owners of a United States copyright interest in one or more Books or Inserts, but who are not members of the Publisher Sub-Class." |

## B. The Transfer of Intellectual Property Rights Integral to the Settlement Cannot Be Imposed Through the Procedural Device of Rule 23

A central feature of the Proposed Settlement's commercial arrangement is the sweeping transfer of intellectual property rights from class members to Google and its partners.

Under the terms of the Settlement Agreement, Google will obtain from class members the right to use class members' intellectual property in ways that would otherwise be proscribed by copyright law. Thus, as many commentators on the settlement have correctly observed, the Proposed Settlement will vest Google (and its partners) with a license from each class member. *See, e.g.*, Pamela Samuelson, *Legally Speaking: The Dead Souls of the Google Book Settlement*, 52 Communication of the ACM, 28-30 (July 2009) ("[T]he proposed settlement of this lawsuit is a privately negotiated compulsory license . . . . By acceding to the certification of these classes through this settlement, Google will get a license from all authors and publishers of books covered by the agreement (which is to say nearly every in-copyright book ever published in the U.S.) so that it can commercialize them through Book Search.") (Exhibit K); James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 1 (Apr. 2009) (The settlement "would give Google a license not only to scan books, but to sell them.") (Exhibit C); Statement of the National Writers Union (announcing NWU opposition to the Proposed Settlement, based in part on the fact "it would give Google a license to reproduce a

9

writer's copyrighted work . . . .") (Exhibit L); *cf. Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent.") (quoting *Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930)). Even the Authors Guild's description of the settlement describes "the *licensing* [it] would enable."[19]

The use of Rule 23 to transfer class members' intellectual property rights to Google and its partners is improper, and would violate the Rules Enabling Act's express mandate that the Rules of procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

"Copyright, of course, is a federal grant of a property interest . . . ." *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007). Federal copyright statutes establish the contours of each class member's substantive rights as they relate to their creative works protected by federal law. Here, the Proposed Settlement seeks to alter the substantive rights of class members in their intellectual property, by allocating some of their "bundle of rights" to Google and its partners. *See id.* ("Like other forms of property ownership, copyright ownership is a 'bundle of rights' regarding the owner's ability to use his property."). The invitation to use Rule 23 to "abridge" and "modify" substantive rights of class members, created by Congress pursuant to its authority under Article I, Section 8 of the Constitution, is impermissible and should be rejected.[20]

---

[19] Authors Guild, A Brief Guide to the Benefits of the Authors Guild v. Google Settlement (Feb. 25, 2009) (Exhibit M) (emphasis added).

[20] Allowing Google to use Rule 23 to put in place a "commercial arrangement" it could not achieve in the marketplace would also reward it for engaging in mass copyright infringement, and thereby run "directly counter to the intent of Congress . . . to 'prevent the infringer from unfairly benefiting from a wrongful act." *Davis*, 505 F.3d at 106 (quoting *Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470 (2d Cir. 1985)).

10

## C. The Court Lacks Jurisdiction to Approve the Commercial Component of the Settlement

The impropriety of using Rule 23 to effect the commercial transaction contemplated by the Proposed Settlement is confirmed by looking to the "case or controversy" requirement of Article III of the U.S. Constitution, as well as Federal Rule of Civil Procedure 82, which provides that the Rules of Civil Procedure "do not extend . . . the jurisdiction of the district courts."

As noted, the commercial component of the Proposed Settlement is distinct from the part of the settlement governing the resolution of claims for *past* infringement with those class members whose works were actually copied by Google. The commercial arrangement, in contrast, concerns not past behavior by Google, but possible *future* conduct and potential *future* claims.

Because the commercial arrangement does not relate to or resolve claims for damages, the only conceivable basis for the Court to exercise jurisdiction in a manner that would encompass approval of the commercial component of the Proposed Settlement would be to view the commercial arrangement as a form of "injunctive relief." But the notion that the commercial component of the Proposed Settlement is a form of injunctive relief could not withstand scrutiny. The Second Amended Complaint, filed contemporaneously with the Proposed Settlement, seeks injunctive relief "barring Google from continued infringement of the copyrights of plaintiffs."[21] The Complaint also seeks a declaration "that Google infringed and continues to infringe . . . the Class's copyrights in violation of the Copyright Act."[22] The Proposed Settlement contains nothing resembling the requested injunctive or declaratory relief. To the contrary, the

---

[21] Second Amended Class Action Complaint at ¶ 68.

[22] Second Amended Class Action Complaint at ¶ 71.

11

commercial transaction proposed by the settling parties would allow Google to make even more extensive use of class members' works than it did prior to reaching a settlement, and the Proposed Settlement does not require Google to forbear from copying works owners by the class members. This cannot reasonably be described as injunctive relief.[23]

Because the commercial component of the Proposed Settlement neither resolves damages claims nor plausibly can be construed as injunctive relief, it is obviously untethered to any genuine "case or controversy" between members of the putative class and Google. As such, the entire commercial arrangement falls outside the bounds of the Court's jurisdiction, and the Court lacks the authority to approve it as part of any settlement of this case under Rule 23.[24] *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints"); *see also* Wright, Miller & Kane, Federal

---

[23] The Order Granting Preliminary Approval (Dkt. 64), signed by Judge Sprizzo (as submitted in the form of a proposed order), provisionally certified the Settlement Class and two sub-classes, but did not specify which provision of Rule 23(b) the provisional certification was based upon. Plaintiffs' memorandum in support of preliminary approval (Dkt. 57) stated they sought certification under Rule 23(b)(2) *and* 23(b)(3), but the memorandum failed to identify the "final injunctive relief or corresponding declaratory relief" secured by the Proposed Settlement which would warrant certification under Rule 23(b)(2). *See* Dkt. 57 at 34. Instead, the memorandum observed "[n]umerous plaintiffs would reasonably seek to enjoin Google from reproducing their copyright-protected works, and injunctive relief would be the necessary and appropriate outcome of a trial on the merits." This, however, is not the relevant inquiry for certification of the proposed *settlement* class – and the cases cited by Plaintiffs' counsel for support on this issue did not involve the certification of settlement classes. The Proposed Settlement affords class members *no injunctive or declaratory relief*, and certification under Rule 23(b)(2) would be improper for that reason alone, as well as other reasons discussed in this Objection. *Cf. Nken v. Holder*, 129 S.Ct. 1749, 1757 (2009) (an injunction is an "extraordinary remedy" which, when employed, "directs the conduct of a party and does so with the backing of its full coercive power"); *Zaldivar v. T-Mobile USA, Inc.*, 2009 WL 2029965, at *5 (W.D. Wash. Jul. 10, 2009) (rejecting argument for settlement class under Rule 23(b)(2), in part, because "there is no suggestion that [defendant] has agreed to have an injunction imposed against it").

[24] Because the Proposed Settlement and certification of the Class should be rejected for the other reasons specified in this Objection, the Court need not reach the jurisdictional issue. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997) (because class certification issues are "logically antecedent to the existence of any Article III issues, it is appropriate to reach them first"); *see also Ortiz v. Fireboard Corp.*, 527 U.S. 815, 830-31 (1999).

12

Practice and Procedure: Civil 3d § 1797.3 at 164 (In *Amchem*, the Supreme Court "expressed serious doubt about the viability of settlements containing future claims."); Fed. R. Civ. P. 82.[25]

## II. NOTIFICATION TO CLASS MEMBERS OF THE SETTLEMENT AND THEIR RIGHT TO OPT-OUT FAILED TO SATISFY THE REQUIREMENTS OF RULE 23 AND THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

Because Plaintiffs' counsel seek class certification under Rule 23(b)(3), the mandatory notice requirements of Rule 23 apply.[26] Rule 23(c)(2)(B) provides:

For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

As the Supreme Court has observed: "We think the import of this language is unmistakable. Individual notice *must* be sent to *all* class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (emphasis added); *see also id.* at 175 ("[T]he express language and intent of Rule 23(c)(2) leave no doubt that individual notice must be provided to those class members who are identifiable through reasonable effort."); *id.* at 176 ("[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is an unambiguous requirement

---

[25] If the commercial component of the settlement were approved in an effort to advance the interests of the public (as opposed to the parties to the litigation) this would raise an additional constitutional problem. *Cf.* Dkt. 57 at 3 (Plaintiffs' counsel describing purported benefits of the Proposed Settlement to "the general public"). Because the Settlement would result in a transfer of intellectual property rights from class members to Google without adequate compensation, with respect to those class members who were not *actually* notified about the settlement and able to opt-out, a court order effecting the transfer to Google of rights owned by class members for the sake of advancing interests of the general public would result in the taking of "private property . . . for public use without just compensation." U.S. Const., Amend. V.

[26] As noted above, *supra* note 23, Plaintiffs' memorandum in support of preliminary approval (Dkt. 57) stated they seek certification under both Rule 23(b)(2) and Rule 23(b)(3), but there is no basis for certification of a class under Rule 23(b)(2). Any assessment of the notice program should be evaluated under the standards set out in Rule 23(c)(2)(B) and (e)(1).

13

of Rule 23."); Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1786 at 492 ("Notice is crucial to the entire scheme of Rule 23(b)(3).").

## A. Efforts to Provide Individual Notice to Class Members Were Inadequate

The Order Granting Preliminary Approval of Settlement directed Plaintiffs' counsel to "cause the Notice to be forwarded to identifiable Settlement Class members by email, postal mail, postage prepaid, at the last known mailing address, or other means of dissemination," and that all notice required "be disseminated no later than February 27, 2009." Dkt. 64 at ¶¶ 16, 18. The Order further directed Plaintiffs' counsel to file, at least five business days before the [Fairness] Hearing, certification of compliance with the notice provisions of the Order "by declaration describing the aforementioned mailings and publications." *Id.* at ¶ 19.

Because Plaintiffs' counsel have not yet filed with the Court any information describing notification to class members of the Proposed Settlement, including details of efforts to identify, locate and contact individual class members, no class member is yet in a position to comment on the details on that aspect of the notice program.[27] Nevertheless, information from media reports and other publicly available sources made clear that the efforts to provide individual notice in this case have been inadequate, and fail to satisfy Rule 23, the standards described by the Supreme Court, or due process requirements.

While the Second Amended Complaint states "plaintiffs reasonably estimate there are at least thousands of Author Sub-Class members" (¶ 40), in reality there are millions, if not tens of

---

[27] On July 28, 2009, I spoke by telephone with lead Plaintiffs' counsel, Michael Boni. At the beginning of the conversation I identified myself as a class member, indicated I was evaluating potential objections to the Proposed Settlement, and requested information about the efforts to provide individual notice to class members. Mr. Boni said he would confer with co-counsel, consider my requests, and get back to me. As of the date of this filing, I have not heard back from Mr. Boni.

14

millions.[28] "The settlement covers essentially all in-copyright books that were published by January 5, 2009."[29] Google appears to have already copied more than 10 million books, about 1.5 million of which it asserts are public domain, leaving more than 8.5 million in-copyright books copied by Google.[30] Many millions more books (and inserts) not yet copied are covered by the Proposed Settlement.

It is apparent that hundreds of thousands, if not millions, of the class members have not received individual notice of the Proposed Settlement.

### 1. Efforts to Provide Individual Notice to Class Members in This Case Would Be Inadequate Even If This Were an Ordinary Settlement

"Individual notice *must* be sent to *all* class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (emphasis added). "[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is an unambiguous requirement of Rule 23." *Id.* at 176.

---

[28] The Second Amended Complaint states there are "at least hundreds of Publisher Sub-Class members." This too seems low compared with the likely actual number. Some of the reasons for rejecting certification of the proposed Author Sub-class also apply to the Publisher Sub-class. Because I am objecting as a member of Author Sub-class, I have limited the scope of this filing to the issues affecting the Author Sub-Class.

[29] Authors Guild, A Brief Guide to the Benefits of the Authors Guild v. Google Settlement (Feb. 25, 2009) (Exhibit M); *see also* Transcript, Copyright Clearance Center Interview of Michael Healy, at 2 ("many millions of books . . . are covered by the terms of the settlement agreement") (Exhibit N).

[30] *See* Thomas Claburn, *Google Readies Its Book Business*, Information Week (July 30, 2009) ("To date Google has scanned over 10 million books, including 1.5 million public domain books"); Google 2008 Annual Report (Exhibit O) ("Today, we are able to search the full text of almost 10 million books.").

15

All available information suggests the notice program in this case was predominantly based on publication of the Summary Notice, and that individual notice was provided to only a fraction of class members.[31]

There is every reason to believe that many, if not most, class members could be contacted and provided with individual notice through reasonable efforts. In understanding why, it is important to note that the Author Sub-class is comprised of owners of works registered with the Copyright Office. *See* Settlement Agreement § 1.16. Therefore, with the exception of anonymous works, all of the authors of the works at issue in this case are known or knowable. And Google certainly knows the identity of the authors of the millions of books it has already copied.

There are substantial sources of public and private information that could be used to locate class members, for the purpose of sending individual notice. For instance, enormous amounts of information about copyright records are available through the United States Copyright Office. *See* 17 U.S.C. §§ 705 & 706; United States Copyright Office, Circular 6: Obtaining Access to and Copies of Copyright Office Records and Deposits; *see also* U.S. Copyright Office, Report on Orphan Works, at 29-30 (Jan. 2006) (noting the Copyright Office "maintains extensive records related to copyright registrations and ownership, and describing publicly available records and resources").

---

[31] I never received individual notice, even though my book was recently published, and my contact information can be obtained readily and inexpensively. I also never observed a paid media publication of the Summary Notice, in print or electronic form. I learned about the settlement from news reports, and then did my own research to obtain the Settlement Agreement and other information about the Proposed Settlement. *Cf.* April 27, 2009 Letter to Hon. Denny Chin from Academic Authors: "We have spoken with many colleagues in the past few weeks who are author subclass members, some of whom have been unaware of the Agreement . . . . Based on our conversations with academic colleagues, we are convinced that there remains widespread ignorance about the agreement.").

Several surveys also suggest that millions of putative class members are both identifiable and able to be located. For instance, Carnegie Mellon University Libraries conducted a study involving requests to digitize the books in its collection and found that copyright owners could be located for more than 75% of the books in the sample. *See* U.S. Copyright Office, Report on Orphan Works, at 92 n.345 (Jan. 2006); Carnegie Mellon Response to U.S. Copyright Office Notice of Inquiry About Orphan Works at 3 (Mar. 22, 2005) (Exhibit P). The Authors Guild itself reported to the Copyright Office, based on its own survey, "the overwhelming majority of published writers – 85% – have 'never' or 'rarely failed to reach a rightsholder to request permission."[32]

As the Authors Guild President recently observed: "Some people have the impression that most out-of-print books are orphans. That is not true. Most authors I know have written some books that are out of print. Me too. *We are all findable*. So are most of the authors I don't know."[33]

There is no doubt that a notice program which fulfilled the individual notice requirement of Rule 23 would have been time consuming and expensive. However, the Supreme Court has made clear that Rule 23's individual notice requirement "may not be relaxed based on high cost." *Amchem*, 521 U.S. at 617; *see also* Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1786 at 506-07 ("[I]t is clearly settled that in Rule 23(b)(3) actions all identifiable class members must be given individual notice *despite the cost that may be involved*.") (emphasis

---

[32] Authors Guild, Notice of Inquiry Concerning "Orphan Works" – Reply Comments, at 2 (May 9, 2005) ("A rightsholder who is temporarily unfindable by a particular method of diligent search should not face the penalty of having her work consigned to the quasi-public domain . . . which may well drain the work of all other licensing value.") (Exhibit Q); *see also id.* at 3 ("The law should not establish artificial licensing schemes.").

[33] Exhibit R; *see also* U.S. Copyright Office, Report on Orphan Works, at 92 (Jan. 2006) ("exactly how frequently the orphan works situation occurs is not entirely clear").

17

added). The fact that there are millions of class members does not excuse the settling parties from their individual notice obligations. *Cf. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 105 (2d Cir. 2005) (describing "direct notice via first class mail to 8,148,236 class members").

It is also important to note that the settling parties have designed the Registry, and touted its virtues, assuming the Registry will be able to locate and contact class members. *See* Settlement Agreement § 2.1(c) ("The Registry will be responsible for locating and collecting information from Rightsholders"); *id.* § 6.1(c) (The Registry "will attempt to locate Rightsholders with respect to Books and Inserts); *id.* § 6.1(d) (The Registry will "receive payments from Google . . . and distribute those payments to Registered Rightsholders"); *see also* Dkt. 57 at 2, 28 (Plaintiffs' counsel explaining the Registry "will locate Rightsholders" and "maintain their contact information.").[34] All steps which might be taken by the Registry to locate and make contact with class members *after* the settlement should have been taken *during the notice process*. Rule 23 and the Due Process Clause require these efforts while class members have an opportunity to opt out, not after.

The settling parties have the burden of establishing that all applicable requirements of Rule 23 have been satisfied, including those imposed by Rule 23(c)(2)(B) concerning individual notice. Because it appears the individual notice requirements have not been met here, the Court should carefully scrutinize submissions by Plaintiffs' counsel and, absent a clear record demonstrating otherwise, reject the Proposed Settlement on this ground.[35]

---

[34] *See also* Settlement Website, FAQs, FAQ 29 ("Google will pay $34.5 million to establish and maintain a Book Rights Registry, to locate rightsholders and create a database of their contact information . . . .").

[35] The settling parties should be required to provide the Court with detailed information describing (1) everything done to identify all of the class members, and (2) each of the steps

18

## 2. The Notice Program Must Be Evaluated in the Context of this Case and the Class Member Rights Affected by the Proposed Settlement

"Under both the Federal Rules of Civil Procedure and due process norms, the adequacy of notice to the class members depends on the particular circumstances of each case." *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 448 (S.D.N.Y. 2004); *see also Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 484 (1988) ("[W]hether a particular method of notice is reasonable depends on the particular circumstances."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 & n.3 (1985) (suggesting the procedural protections owed to absent class members required by due process may vary depending on the claims and interests at issue); *In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 167-70 (2d Cir. 1987) (finding adequate "under the circumstances" a notice protocol which included mailings to more than 100,000 potential claimants, which the district court determined were all "class members who could be identified and located through reasonable effort").

Although it appears the individual notice efforts in this case failed to satisfy the requirements of Rule 23 and due process under even ordinary circumstances, the individual notice obligations are especially significant here given class members would: (1) be bound to the terms of a complex commercial transaction under which some of their intellectual property rights are being transferred to Google and its partners; (2) release claims for *future* acts of infringement; and (3) release economically valuable claims for statutory damages, available

---

taken to transmit individual notice to all identifiable class members. The Court might also conduct an evidentiary hearing concerning issues related to the notice program. "[T]he judge must ensure that there is a sufficient record as to the basis and justification for the settlement. Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements." Manual for Complex Litigation, Fourth, § 21.635 at 322.

19

based on past infringement, for a small fraction of the amount that might be recovered at trial. Individual notice is also particularly important here because the intellectual property rights in question are, for many, deeply personal and have value beyond mere dollars and cents. Most authors invest considerable energy and resources into creating their works, and they deserve to make informed and conscious choices about the allocation and disposition of their intellectual property rights in their own works.

### 3. Scrutiny of Notice to Absent Class Members Must Be Exacting Here, Where Class Members' Property Rights Are Altered if They Fail to Opt-Out

The mandatory notice requirements for classes certified pursuant to Rule 23(b)(3) were designed with the requirements of due process in mind. *See* Fed. R. Civ. P. 23, Adv. Comm. Notes to 1966 Amendments ("mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill the requirements of due process to which the class action procedure is of course subject"); Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1786 at 492 ("Without the notice requirement it would be constitutionally impermissible to give the judgment binding effect against the absent class members."). While Rule 23 may be adapted and interpreted to provide *more* protection for absent class member than is afforded by the due process provisions of the Constitution, the Rule does not authorize *less* protection than the Constitution provides.

It is well-established that "[a]n interest in a copyright is a property right protected by the due process and just compensation clauses of the Constitution." *Roth v. Pritikin*, 710 F.2d 934, 939 (2d Cir. 1983); *see also United States v. Martignon*, 492 F.3d 140, 151-52 (2d Cir. 2007) ("[T]he principal purpose of the Copyright Act is to encourage the origination of creative works by attaching enforceable property rights to them . . . .") (citation omitted).

20

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth and Fourteenth Amendments." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). And the Supreme Court's "precedents establish the general rule that individuals must *receive* notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993) (emphasis added); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (to bind absent plaintiff, the plaintiff "must *receive* notice") (emphasis added); *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 548 (1974) ("[I]n Rule 23 actions the judgment shall include all those found to be members of the class who have *received* notice and who have not requested exclusion.") (emphasis added).

Because the Proposed Settlement would result in a compulsory transfer of intellectual property rights from class members to Google and others, due process in *this case* requires *actual notice* to each class member. *Cf. Madera v. Board of Education*, 386 F.2d 778 (2d Cir. 1967) ("What constitutes due process under any given set of circumstances must depend upon the nature of the proceeding involved and the rights that may possibly be affected by that proceeding."); *see also Mathews*, 424 U.S. at 334 (due process "calls for such procedural protections as the particular situation demands").

In a typical settlement, the failure to opt out due to lack of notice results in a lost opportunity to submit a claim for a share of a settlement fund. In such cases, the absent class member has been deprived of some (usually small) amount of money, but is no worse off than if there had been no lawsuit at all. *This case is different.* Here, an absent class member who does not receive actual notice, and is thereby deprived of the ability to opt-out, would be *worse off* than if no lawsuit has been brought, because Rule 23 and court orders will compel a transfer of

21

the absent class member's intellectual property rights to Google and others, without the class member's knowledge or consent.

The necessity for stringent notice requirements in this case is confirmed by the Rules Enabling Act's mandate that the Rules of procedure "not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). As discussed above, copyright owners have a substantive right – indeed, a property right – conferred by statute. Any use of Rule 23 to "abridge" or "modify" that right without the *actual* consent of the copyright owners would be inconsistent with 28 U.S.C. § 2072(b) – and therefore, any such use of Rule 23 is prohibited. Thus, at least with respect to those copyright owners who *do not actually receive a properly designed notice* apprising them of the Proposed Settlement and its affect on their intellectual property rights, the Rules Enabling Act forecloses the use of Rule 23 to "abridge" or "modify" those rights. *Cf. Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999) ("[A]n absent plaintiff *must* be provided with an opportunity to remove himself from the class.") (emphasis added; quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).[36]

---

[36] Plaintiffs' memorandum in support of preliminary approval contended: "Each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members." Dkt. 57 at 36. The one case cited by Plaintiffs' counsel does not support the notion that the notice program here satisfied the requirements of due process. In *Weigner*, the Second Circuit held, in the circumstances of that case, the "notice sent by ordinary mail of the pendency of the tax lien foreclosure is all that the constitution requires." *Weigner v. City of New York*, 852 F.2d 646, 648 (2d Cir. 1988). While the Court did recognize in *Weigner* that fulfilling the requirements of due process "does not mean that all risk of non-receipt must be eliminated," *id.* at 649, nothing in the Court's opinion suggests that the notice program here satisfies the Constitution's requirements. To the contrary, the Court's observation that "[t]he Supreme Court has frequently said . . . under most circumstances, notice sent by ordinary mail is deemed reasonably calculated to inform interested parties that their property rights are in jeopardy," *id.* at 650, highlights the marked contrast with notice efforts in this case, where a small fraction of the millions of class members were directly contacted through individual notice.

22

## B. The Summary Notice is Likely to Have Resulted in Class Member Confusion or Misunderstanding About the Proposed Settlement

While the defects in the Summary Notice[37] pale in comparison to the other infirmities of the Proposed Settlement, they too are significant and render the Proposed Settlement objectionable.

One significant problem with the Summary Notice flows from its introductory paragraph:

Authors and publishers filed a class action lawsuit claiming Google violated the copyrights of authors, publishers and other copyright holders ("Rightsholders") by scanning in-copyright Books and Inserts, and displaying excerpts, without permission. Google denies the claims. The parties have agreed to a settlement. This summary provides basic information about the settlement.

It would be reasonable for a reader to infer from this language that the settlement resolved a lawsuit about claims based on *past* "scanning [of] in-copyright Books and Inserts, and displaying excerpts, without permission." An author whose work had not been scanned and displayed by Google at the time the notice was read, might reasonably conclude the lawsuit did not involve them, and stop reading. If the Proposed Settlement only involved the resolution of claims for *past* copyright infringement, this paragraph might not be particularly problematic. However, because the Proposed Settlement also has the additional commercial component, which significantly affects the rights of all owners of in-copyright works, and releases claims for *future* infringement, the introductory paragraph constitutes a substantive and material defect in the notice, which renders it inadequate under Rule 23 and due process standards. *Cf. Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 628 (1997) (rejecting proposed class settlement and observing that even if a putative class member receives notice "those without current afflictions

---

[37] *See* Settlement Agreement, Attachment J (and the final version of the Summary Notice, available at the Settlement Website).

may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out").[38]

A further defect in the Summary Notice is the material and misleading statement that "... Google will pay *Rightsholders* 63% of all revenues" generated by its uses of the class members' copyrighted works. *See* Settlement Agreement, Attachment J (emphasis added). This statement is incorrect.[39] Instead, under the terms of the Proposed Settlement, Google will pay the Registry 63% of revenues, but the Registry will retain a portion of that revenue. *See* Settlement Agreement, Attachment C (Plan of Allocation) § 4.2 ("The Registry shall pay net revenues to Rightsholders . . . after deducting the Registry's costs of administration and operations").[40] Contrary to the information conveyed in the Summary Notice, Rightsholders will receive less (perhaps significantly less) than 63% of the revenues generated by Google's use of class members' works.[41]

---

[38] Even among authors generally aware of the Settlement, there is considerable uncertainty about its sweep and implications. *See, e.g.*, Authors Guild, A Brief Guide to the Benefits of the Authors Guild v. Google Settlement (Feb. 25, 2009) ("Some authors told us that they think of the settlement as covering only books for adults or nonfiction books.") (Exhibit M).

[39] The Notice of Class Action Settlement contains a similar misstatement. *See* Settlement Agreement, Attachment I, at 1 ("Settlement benefits to the class include: 63% of the revenues earned by Google's sales . . . .").

[40] The Registry is not a "Rightsholder." *See* Settlement Agreement § 1.132 ("Rightsholder means a member of the Settlement Class who does not opt out of the Settlement by the Opt-Out Deadline.").

[41] The defects in the Summary Notice are especially problematic because the notice efforts in this case relied heavily on notice by publication (rather than individual notice), which used the Summary Notice to describe the Proposed Settlement. *See* Settlement Agreement, Article XII at 117 (describing the "Paid Media" component of the notice program as "publishing the Summary Notice" in the publications listed on the Paid Media Schedule, Settlement Agreement, Attachment K).

24

## III. THE PROPOSED SETTLEMENT FAILS TO PROVIDE CLASS MEMBERS WITH ADEQUATE COMPENSATION AND FAILS TO SATISFY THE REQUIREMENTS OF RULE 23(e)(2)

The Court may approve the Proposed Settlement only upon finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "Counsel for the class and the other settling parties bear the burden of persuasion" to establish these requirements are met. *See* Manual for Complex Litigation, Fourth, § 21.631 at 318.

The Proposed Settlement must be rejected because the compensation to class members is plainly inadequate, and because it will interfere with existing contractual arrangements between authors and publishers.

### A. The Compensation for Past Copyright Infringement is Inadequate

The Proposed Settlement would release Google and others from liability for *past* copyright infringement in exchange for approximately $45 million – with payments to individual authors in the amount of $15 per insert ($5 for partial inserts) or $60 per book, with the possibility of higher payments if less than the full $45 million is claimed by other class members.[42] These payments substantially undervalue the claims being released, and render this aspect of the Proposed Settlement unfair, unreasonable and inadequate.

Again, it is important to recall that this case concerns only works registered with the Copyright Office. *See* Settlement Agreement § 1.16. This point is significant in evaluating the adequacy of the payment to class members for releasing claims for past copyright infringement, because statutory damages are available to copyright owners whose works are infringed. If a defendant is found to have infringed a work registered with the Copyright Office, the *minimum* statutory damages award is $750. *See* 17 U.S.C. § 504(c)(1) (providing for statutory damages "in a sum of not less than $750 or more than $ 30,000"). Statutory damages may be increased

---

[42] *See* Settlement Agreement §§ 2,1(b), 5.1; Settlement Attachment C (Plan of Allocation) § 3.2.

substantially for acts of willful infringement. *See* 17 U.S.C. § 504(c)(2) ("the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000").

Plaintiffs' counsel offer no meaningful justification for accepting nominal damages payments ($5, $15, or $60) to release class members' valuable statutory damages claims. To the contrary, Plaintiffs' Second Amended Complaint asserts "Plaintiffs and the Class are likely to succeed on the merits of their copyright infringement claim" (Dkt. 59 at ¶ 66), and their memorandum in support of preliminary approval similarly asserts "Plaintiffs are confident that they could prevail at trial on their copyright infringement claims against Google" (Dkt. 57 at 29). These representations to the Court cannot be reconciled with the compensation terms agreed to in the Proposed Settlement.[43] *See* Manual for Complex Litigation, Fourth, § 21.62 at 315 ("Adequacy of the settlement involves a comparison of the relief granted relative to what class members might have obtained without using the class action device."). As the National Writers Union appropriately observed when announcing its opposition to the Proposed Settlement: "Compared to the number and seriousness of violations, the amount being offered by Google is ridiculously low."[44]

While any experienced litigator recognizes no case is without risk, Plaintiffs' counsel have failed to substantiate that payments of $5, $15 or $60 to class members for each copied work is "adequate" compensation for the release of their claims – a release that covers not only Google, but non-defendant libraries (which have made no monetary contribution to the

---

[43] Plaintiffs' counsel nevertheless assert in their motion for preliminary approval: "[t]he Settlement is an excellent result in light of the risks of the litigation." Dkt 57 at 30. This conclusory assertion is made without any support except the observation that Google successfully asserted a fair use defense in another case.

[44] Exhibit L.

26

settlement in exchange for the releases they would obtain).[45]  *Cf.* Manual for Complex Litigation, Fourth, § 21.635 at 322 ("[T]he judge must ensure that there is a sufficient record as to the basis and justification for the settlement.").

The failure to substantiate the adequacy of the settlement amount is exemplified by the fact that the two pages dedicated to the issue in the memorandum seeking preliminary approval never mentions the issue of statutory damages, or the risk to Google that it will be deemed to have engaged in willful copyright infringement given the unassailable fact that Google consciously and systematically copied millions of in-copyright works without permission as part of a commercial enterprise (and continued to do so after it was sued for copyright infringement).[46]  The failure of the Summary Notice and Notice of Class Action Settlement to address these issues was also a material omission, which renders them objectionable.

## B. The "Benefits" to Class Members of the Proposed Settlement's Commercial Component are Too Contingent and Uncertain to Warrant Approval

In addition to the other problems associated with the commercial component of the Proposed Settlement discussed in this Objection, that part of the settlement should also be rejected because the "compensation" to class members for transferring rights to Google and

---

[45]  Among the "recurring potential abuses in class action litigation" is "releasing claims against parties who did not contribute to the class settlement."  *See* Manual for Complex Litigation, Fourth, § 21.61 at 310-11.

[46]  Because the settling parties bear the burden of persuasion, the Court should reject the Proposed Settlement based on the failure to carry that burden. The Court has the authority to order counsel for the settling parties to provide additional information about the amount of the settlement payment, order discovery on the issue, and/or conduct a hearing.  *See* Manual for Complex Litigation, Fourth, § 21.631 at 320 (describing additional information that might be sought to provide "complete and detailed information about the factors that indicate the value of the settlement"); *see also* Manual for Complex Litigation, Fourth, § 21.612 at 314 (If "the case is filed as a settlement class action or certified for settlement with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims and defenses, to determine the appropriate definition of the class, and to consider how class members will actually benefit from the proposed settlement.").

27

others, and for releasing claims for future copyright infringement, is too speculative, contingent and uncertain to satisfy the requirements of Rule 23(e)(2).

For instance, all of the purported benefits to class members under the Proposed Settlement's commercial arrangement depend on the successful establishment and operation of the as-of-now non-existent Book Rights Registry. While the Proposed Settlement requires Google to make a monetary contribution to establish the Registry, the Agreement does not guarantee the Registry will operate as planned, or that future funding will be sufficient to ensure it can fulfill the functions described in the Proposed Settlement. In fact, the person widely expected to be the first Executive Director of the Registry if the Proposed Settlement is approved has acknowledged there is no assurance the Registry will not fail.[47] What happens to class members if the Registry does not operate as planned? If the Registry does not make timely payments? If the Registry runs out of money?[48] It appears that under the terms of the Proposed Settlement Google would retain all of the rights obtained from copyright owners by virtue of the Settlement Agreement, while copyright owners would have no apparent mechanism for redress or ability to rescind the transfer of their rights to Google.

Moreover, even if the Registry operates as planned, some of the purported financial benefits to class members are uncertain. For instance, as noted earlier, while Google will pay the Registry 63% of revenues generated through the use of class members' intellectual property, it is unknown how much of that money class members will receive because the Registry will retain a

---

[47] *See* Transcript, Copyright Clearance Center Interview of Michael Healy, at 2 ("[T]o a great extent, [the Registry's] success or failure will depend on its ability to manage very complicated, very volatile data in the interests of rights holders") (Exhibit N).

[48] For instance, there are questions about the status of the Registry itself under the antitrust laws. *See infra* note 78. If the Registry were sued for alleged violations of the antitrust laws, it might lack sufficient funds to defend itself against lawsuits, let alone pay any judgments entered against it – and, in any event, the money spent on such cases would diminish the economic value of the commercial arrangement to class members.

28

share of that revenue to fund its operations.[49]  Neither the Settlement Agreement, nor the motion in support of preliminary approval provide any information that would allow the Court (or class members) to reasonably determine how much money they are likely to receive for participating in the commercial component of the Proposed Settlement – or when class members are likely to start receiving payments for the various uses of their intellectual property.[50]

## C.  The Commercial Component of the Proposed Settlement Interferes With Existing Contractual Arrangements Between Authors and Publishers

The commercial component of the Proposed Settlement also fails to satisfy the requirements of Rule 23(e)(2) because it will complicate and/or frustrate existing contractual agreements between authors and publishers.[51]

A threshold problem is that existing author-publisher contracts may *preclude* one or both parties from conferring upon Google and its partners the rights they would obtain under the Proposed Settlement.  For example, an author-publisher contract may provide a publisher with exclusive rights to all uses of an author's work for a period of time.  This would foreclose an author from conveying even non-exclusive rights to Google.  The Proposed Settlement disregards the prospect of such contracts, presupposing there are no contractual impediments to the transfer of intellectual property rights which would be effected if approval is granted.  The

---

[49] *See* Settlement Agreement, Attachment C (Plan of Allocation) § 4.2 ("The Registry shall pay net revenues to Riightsholders . . . after deducting the Registry's costs of administration and operations").

[50] *See* Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 11 ("It will take considerable time to implement the commercial uses authorized under the Settlement."); *see also* Settlement Agreement § 3.7(a) ("Google shall implement both of the Contemplated Rightsholder Services . . . within *five (5) years* after the Effective Date.") (emphasis added).

[51] As the National Writers Union's observed in opposing the Proposed Settlement, "it interferes or might interfere with the relationship writers have with their publishers . . . . The settlement makes assumptions about electronic rights that writers may or may not have assigned to publishers and it sets up an unfair binding arbitration process to resolve disputes between writers and publishers."  Exhibit L.

failure of the Proposed Settlement to address this important set of circumstances is further reason for rejecting the Proposed Settlement.

Another set of problems relates to the "Author-Publisher Procedures" in the Proposed Settlement. As the settling parties apparently recognize, the interests of authors and publishers diverge with respect to many issues.[52] In light of this fact, the settling parties drafted rules to govern disputes between authors and publishers arising from implementation of the Proposed Settlement. *See* Settlement Agreement, Attachment A. These procedures are "an important part of the Settlement." *See* Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 7. And it is because of their importance to the Proposed Settlement that these Procedures are particularly troubling.

Specifically, the Author-Publisher Procedures purport to "*establish* procedures for determining the[] *respective rights*" of authors and publishers. *See* Settlement Agreement, Attachment A, at 1 (emphasis added). Yet the "respective rights" of authors and publishers are, in most cases, already "established" by contract law. The provisions of these contracts will sometimes differ in material respects from the protocol governing author-publisher relationships set out in the Settlement Agreement. The Proposed Settlement nevertheless seeks to superimpose its Author-Publisher Procedures over existing contractual relationships, thereby modifying or displacing existing contract rights of authors and/or publishers. Is so doing, the Proposed Settlement once again conflicts with the Rules Enabling Act. *See* 28 U.S.C. 2072(b).[53]

---

[52] *See, e.g.,* Dkt. 57 at 33 (Plaintiffs' counsel observing that "authors and publishers have divergent interests").

[53] The modification of contract rights through the Proposed Settlement also raises due process issues with respect to those class members – authors and publishers – who do not receive actual notice of the Proposed Settlement. *See* Section II above.

In addition to the conflict between the "Author-Publisher Procedures" and Rules Enabling Act, the Procedures fail to account for situations where an author or the author's publisher opts out, *but the other does not.* In such cases, these "important" Procedures seemingly will be a nullity, because either the author or publisher will not be bound by the terms of the Settlement. This, and similar problems related to the Author-Publisher Procedures in the Proposed Settlement, are additional grounds for rejecting it.

## IV.  THE PROPOSED SETTLEMENT FAILS TO SATISFY RULE 23(a)

Rule 23(a) provides that a putative class representative may pursue claims on behalf of all other putative class members only if the claims of the potential representative are "typical" of the claims of the rest of the putative class, and if the potential representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3) & (4). The Proposed Settlement should be rejected because these requirements are not satisfied here.

### A.  The Proposed Settlement Affects the Rights of At Least Four Groups of Authors, Each With Distinct Interests, and Each Requiring Representation by Separate Counsel

The Proposed Settlement seeks certification of a single Author Sub-Class, and the appointment of class counsel to represent that entire Sub-Class. This should be rejected because there are at least four author Sub-Classes with materially distinct interests, which may diverge from one another. Each of those Sub-Classes should have separate class representatives and separate counsel.

As explained above, the Proposed Settlement has two distinct parts – a cash payment for past copyright infringement, and a commercial component whereby class members would transfer certain rights to Google and other entities, in exchange for a share of potential future revenues from the sale of parts of class members' works. The Proposed Settlement proposes to

31

combine *in a single class* persons both (1) those whose works have been copied by Google before the Opt-Out Deadline (and are therefore eligible for a nominal cash payment),[54] and (2) those whose works have not been copied (and therefore have no damages claims). Yet the interests of these two groups are not necessarily aligned. Those whose works have been copied may want to settle their claims for past infringement for the greatest amount of money obtainable, and have little or no interest in the commercial component of the settlement. Meanwhile, those whose works were not copied are likely to have much more interest in securing beneficial terms for the commercial arrangement, and relatively limited interest in maximizing the cash component of the settlement payable to those who allege past copyright infringement of their works.

Another readily identifiable divergence of interests is between owners of orphan works and owners of non-orphan works. The very basis for categorizing a work as an "orphan" is that its owner is exceedingly difficult or impossible to identify.[55] The viability, and ostensible desirability, of the Proposed Settlement, however, depends in (at least) two ways on being able to identify and locate the owners of the works in question.

First, as discussed above, both Rule 23 and due process require a notice program designed to inform class members of the proposed settlement, its effects on their rights, and the opportunity to opt out. Because orphan works' owners are – by definition – very difficult to identity and/or locate, there will be special problems associated with trying to provide them the

---

[54] *See* Settlement Agreement § 5.1(a).

[55] Although there in no objective test to discern whether a work is an "orphan," the concept generally refers to a situation "where the owner of a copyrighted work cannot be identified and located by someone who wishes to make use of the work in a manner that requires permission of the copyright owner." U.S. Copyright Office, Report on Orphan Works, at 1 (Jan. 2006).

32

required notice.[56] This point seemingly was acknowledged by the Authors Guild President when he observed "[t]he Settlement will allow Google to make these [orphan works] available to readers without tracking down the books' rightsholders."[57]

Second, one of the supposed "benefits" of the settlement for class members is the ability to earn profits from their works through the commercial ventures of Google and their partners. Under the terms of the Proposed Settlement, the Registry will locate and contact class members so they can receive these payments.[58] Yet, the potential benefits of the commercial component of the settlement for owners of orphan works may be illusory since they are unlikely to receive those payments because they cannot be located.[59] In fact, under the terms of the Proposed Settlement the revenues owed to a class member which go unclaimed for a period of time would be reallocated to other authors or the Registry[60] – a provision likely to have a disproportionately adverse affect on owners of orphan works.[61]

---

[56] There is, of course, the additional problem of finding a class representative for an orphan works sub-class, since owners of orphan works are supposed to be impossible to find.

[57] Exhibit R.

[58] *See* Settlement Agreement §§ 2.1(c), 6.1(b), (c) & (d).

[59] As the Author's Guild President acknowledged: "The Settlement will allow Google to make these [orphan works] available to readers without tracking down the books' rightsholders." Exhibit R. *See also* Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 3 (July 2009) ("The orphan holders cannot act and the settlement agreement neatly sweeps them up to give Google releases for the ongoing use of their works.") (Exhibit S); Anna Stolley Persky, *Paper or Plastic?: Google's Plan to Digitize Books Pits Book Lovers v. Book Innovators*, Washington Lawyer, 37 (June 2009) ("Critics say the settlement allows Google to skirt copyright law governing orphan works and eclipse recent legislative efforts to gain the exclusive right to digitize and display orphan works.")

[60] *See* Settlement Agreement § 6.3(a); Settlement Agreement, Attachment C at §§ 1.1(e), 2.3.

[61] James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 15 (Apr. 2009) ("This reallocation illustrates a clear conflict of interest between non-orphan owners (including, by definition, all of the named plaintiffs) and the orphan members of the plaintiff class.") (Exhibit C).

33

Considering these two bases for delineating members of the omnibus Author Sub-Class, it is apparent there are four potential sub-classes which might be formed, each with distinct interests and potential goals in resolving this litigation.

|  | **Copied Without Permission** | **Not Copied/Copied With Permission** |
|---|---|---|
| **Orphan** | Owner of Copyright in Orphan Work Copied by Google Without Permission | Owner of Copyright in Orphan Work Not Copied by Google or Copied With Permission |
| **Not Orphan** | Owner of Copyright in Non-Orphan Work Copied by Google Without Permission | Owner of Copyright in Non-Orphan Work Not Copied by Google or Copied With Permission |

Supreme Court and Second Circuit case law make clear that Rule 23(a) precludes certification of a single Author Sub-Class. *See, e.g., Ortiz v. Fireboard Corp.*, 527 U.S. 815, 856 (1999) ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel."); *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F3d 229, 246 (2d Cir. 2007) (remanding for certification of subclass "[b]ecause the antagonistic interests apparent in the class should be adequately and independently represented"); *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 17 (2d Cir. 1981) ("The named plaintiffs in a class action 'cannot represent a class of whom they are not a part,' and can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class.") (quoting *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962); citation omitted); *see also* Rule 23, 2003 Adv. Comm. Notes ("Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or

34

designate subclasses. Redefinition of a certified class under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B).").

## B. The Authors Guild Has Not Fairly and Adequately Represented the Interests of the Author Sub-Class

The Proposed Settlement should also be rejected for several reasons having to do with the adequacy of the class representatives – and in particular the Authors Guild.

The formal status of the Authors Guild is this case is a matter of some confusion. In the original Complaint the Authors Guild was described as an "Associational Plaintiff" and sought only to "pursue claims for injunctive and declaratory relief on behalf of its members." *See* Dkt. 1 at 4-5. The same is true in the Second Amended Complaint, filed by consent contemporaneously with the Settlement Agreement and motion for preliminary approval of the settlement and class certification. *See* Dkt. 59 at ¶¶ 27, 28. However, the Second Amended Complaint, as well as the motion for preliminary approval and Order granting preliminary approval, do not appear to advance the Authors Guild as a class representative for purposes of Rule 23.

For instance, the memorandum submitted by Plaintiffs' counsel states "[t]he Associational Plaintiffs participated in the litigation in order to advance the rights and interests of their members, and served as consultants to Class Counsel during the litigation and negotiations." Dkt. 57 at 8. It later asserts the "Representative Plaintiffs" (which does not include the Authors Guild) "are adequate representatives, and fairly and adequately represent the interests of the Sub-Classes." *Id.* at 33-34. The Order Granting Preliminary Approval, prepared by the settling parties, lists five individuals "designated as Representative Plaintiffs for the Author Sub-Class," and makes no mention of the Authors Guild. Dkt. 64 at ¶ 8. The Second Amended Complaint likewise only mentions the individual "Author Plaintiffs" (which does not

35

include the Authors Guild) when alleging that the typicality and adequacy requirements of Rule 23(a) are met. *See* Dkt. 59 at ¶¶ 42, 43.[62]

In contrast with the confusion regarding the formal role of the Authors Guild in this case, the Guild's significant role in the two-year negotiation leading to the Proposed Settlement is not in doubt. Publicly available information demonstrates the Authors Guild was effectively the lead plaintiff for the proposed Author Sub-Class during the litigation – and, more importantly, during the extensive negotiation process.[63] Google has repeatedly stated it reached a settlement *with the Authors Guild*.[64] This raises several concerns with respect to the requirements of Rule 23(a).

As a threshold matter, the Authors Guild never asserted it had standing to pursue damages claims against Google for copyright infringement – as reflected in the Complaints, where it sought to pursue only injunctive or declaratory relief. It is therefore apparent that the Authors Guild did not – and never could have – served as an appropriate class representative with respect to the litigation of damages claim, or the negotiation of a potential resolution of those claims. Yet it appears the Authors Guild was intimately involved in negotiating the compromise of class members' damages claims, culminating in the Proposed Settlement.

---

[62] Because the Authors Guild could only serve as a class representative for purposes of pursing injunctive or declaratory relief, and because the Proposed Settlement does not involve either (see *supra* note 23), the Guild cannot serve as a representative of the proposed Author Sub-Class. Thus, it is not surprising that the Guild is not listed as a Plaintiff in the Order granting preliminary approval and provisional certification.

[63] *See, e.g.*, Exhibits E, F and G.

[64] *See, e.g.*, Google Inc., Form 10-Q at p. 20, Sept. 30, 2008 (Exhibit J) ("On October 28, 2008, we announced a settlement agreement with the Authors Guild and AAP."); Google Inc., Form 10-Q at p. 45, Mar. 31, 2009 (Exhibit T) ("In the U.S. we announced a settlement agreement with the Authors Guild and Association of American Publishers"); Google 2008 Annual Report (Exhibit O) ("In October 2008, we reached a settlement with the Authors Guild and the Association of American Publishers . . . .").

Moreover, public statements by the Authors Guild make clear it viewed the litigation as a means of securing an agreement with Google and its partners which extended well beyond the specific controversy at issue in the original Complaint. Early on in the litigation, the Authors Guild seemingly previewed its desire to use the lawsuit to effectuate a massive licensing scheme, publicly stating:

> Authors (and the Guild) aren't opposed to making their works searchable online with a proper license. With a proper license, in fact, far more than 'snipets' could be made available to users. The opportunities are boundless, but it all starts with a valid license.

The Authors Guild apparently pursued this vision with zest in this case, but in so doing failed to adequately represent the interests of *all* class members.

For instance, despite that many class members had economically valuable claims for past copyright infringement – which the Proposed Settlement seeks to settle for what amounts to nuisance value given Google's business interests and potential liability – at the press conference announcing the settlement, Authors Guild Executive Director, Paul Aiken, acknowledged: "Money was never our chief concern ...."[65] Authors Guild President, Roy Blount, similarly noted that a "small share" of $45 million would go to each class member, acknowledging "[f]ar more interesting for most of us . . . is the prospect for future revenues."[66]

Other statements by the Authors Guild cast doubt on the adequacy of that organization to represent any absent class member authors – let alone *all* authors.[67] For instance, when recently defending the Proposed Settlement the Authors Guild President described so-called "out of print"

---

[65] Exhibit E.

[66] Exhibit F.

[67] Even if all of the Author Guild's 8,000 members are class members, they are a tiny fraction of the millions of class members, and there is no reason to think the Guild's views reflect those of most other authors. In fact, the National Writers Union recently announced its strong opposition to the Proposed Settlement (Exhibit L), as did the American Society of Journalists and Authors.

37

books as having "no market" because they are deemed "unfit for continued commerce by traditional print publishers."[68] This view ignores the present and future impact of technological developments, such as "Print on-demand," which may render antiquated the very idea of an "out of print" book.[69] The Authors Guild nevertheless appears to have played a central role in negotiating the Proposed Settlement propelled in part by this dubious premise, and the idea that a commercial venture with Google was necessary to revive books with "no market."[70]

The apparent effort to convert the Authors Guild from a class representative to a "consultant" in the settlement filings (Dkt. 57 at 8) does not curse the Rule 23(a) problems flowing from the deep involvement of the Authors Guild in the case – and in particular, in the negotiation of the Proposed Settlement.[71] Moreover, while it is clear the Authors Guild was not an adequate representative of the Author Sub-Class, there is also nothing before the Court establishing that any of the other named plaintiffs played any meaningful role in the case or the settlement negotiations, or were otherwise adequate class representatives. *See* Dkt. 57 at 33-34 (conclusory assertions concerning satisfaction of Rule 23(a)'s requirements).

---

[68] Exhibit R.

[69] *See* Exhibit U (Statement by William Morris Endeavor agency regarding the Proposed Settlement, observing "most major publishers will take the position that none of their backlist is commercially unavailable . . . because of the availability of on-demand and other electronic editions . . . ."). Of course, the Proposed Settlement would confer Google and its partners with a significant competitive advantage over other on-demand publishers.

[70] The Authors Guild expressed a different view after it sued Google, but before the settlement. *See* Authors Guild, *Is Google a charity?: Some handy talking points for the Google Class-Action Lawsuit* ("Out of print books are valuable. Out of print books are republished every day, bringing welcome new advances to authors and the prospect of new royalty income.") (Exhibit V).

[71] Plaintiffs' counsel should be required to disclose the nature of the consultant role, and the details on any arrangement, including compensation, paid to the Authors Guild for this "consulting" work.

38

Both Rule 23 and due process require "that the named plaintiff *at all times* adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (emphasis added). And class action judgments rendered where absent parties were not adequately represented are subject to collateral attack. *See Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 171 (2d Cir. 2006) ("This Circuit, and many others, have allowed such collateral attacks in recent years."). Based on the present record, it appears the adequacy requirement of Rule 23 has not been satisfied in this case, and certification of the Author Sub-Class cannot be granted.

## V. THE SETTLEMENT CANNOT BE APPROVED UNDER RULE 23 BECAUSE IT WOULD HAVE SIGNIFICANT ANTICOMPETITIVE EFFECTS AND FACILITATE ANTICOMPETITIVE CONDUCT

The Proposed Settlement should be rejected for the reasons explained in Sections I – IV of this Objection. An additional set of reasons for rejecting the Proposed Settlement relate to its impact on competition, and to the possibility that the Agreement may itself violate the antitrust laws.[72]

### A. The Proposed Settlement Would Have Significant Anticompetitive Effects and Facilitate Anticompetitive Conduct

Many of the comments and objections received by the Court have focused, and will focus, on the competitive implications of the Proposed Settlement.[73] This is unsurprising since the Proposed Settlement is predominantly a massive commercial transaction that could never be

---

[72] The Court should consider that the Settlement Agreement itself may violate the antitrust laws – specifically Section 1 of the Sherman Act and/or the attempted monopolization provision of Section 2 of the Sherman Act. Among other things, the Agreement can be viewed as seeking to restrain trade through coordination and concerted action between horizontal competitors.

[73] The Department of Justice has informed the Court it is conducting an antitrust investigation into the Proposed Settlement itself, as well as its competitive impact. *See* July 2, 2009 Letter from William F. Cavanaugh, Deputy Assistant Attorney General (Dkt 120). The Court has given the Department of Justice until September 18, 2009, to submit its views in writing. *Id.*

39

obtained in the marketplace. This transaction will put Google and its partners at a significant competitive advantage compared with actual and potential competitors in a number of different markets.[74]

Many of these competitive advantages will flow directly from the fact that the commercial arrangement is being implemented by virtue of Rule 23 and its ostensibly binding effect on all class members who do not affirmatively opt out of the settlement. Another party seeking to obtain for itself the same licenses obtained by Google and Google's partners through the force of Rule 23 would find the task impossible – facing what antitrust law describes as a "barrier to entry," which can only be overcome with a class action settlement enforced through Rule 23.[75] The Engineering Director of Google Books, Don Clancy, seemingly acknowledged this point when he observed: "The settlement is valuable because comprehensiveness is valuable."[76] Thus, despite the formality that Google licenses from class members are non-exclusive, "[t]his is really a Google-only deal."[77]

---

[74] *See, e.g.*, Miguel Helft, *Google's Plans for Out-of-Print Books Is Challenged*, New York Times (Apr. 4, 2009) (quoting Michael Boni, lead counsel for the named Plaintiffs, as conceding "Google will always have the advantage of having access to 100 percent of orphan works."); *see also* Exhibit R (Authors Guild President: the Settlement would give Google a license to intellectual property rights in orphan works while "no one else will have this option."

[75] *See* Pamela Samuelson, *Legally Speaking: The Dead Souls of the Google Book Settlement*, 52 Communication of the ACM, 28-30 (Jul. 2009) (noting the only way for an aspiring competitor to obtain the breath of licenses that would be secured by Google through the Settlement, would be through its own litigation and settlement, and observing such a strategy for a potential Google competitor "would be very costly and very risk . . . [and] [c]hances are slim that the plaintiffs in such a lawsuit would be willing or able to settle on equivalent of even similar terms" to those obtained by Google) (Exhibit K).

[76] D.C. Denison, *Google Books causes concern: Digital library's growth has some worried it may be building a monopoly*, Boston Globe (July 24, 2009).

[77] James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 10 (Apr. 2009) (Exhibit C).

The competitive concerns presented by the Proposed Settlement are too extensive to comprehensively address here. However, several scholarly analyses of the Proposed Settlement already published provide instructive discussions of the some of the antitrust problems. *See, e.g.,* Eric Fraser, *Antitrust and the Google Books Settlement: The Problem of Simultaneity*, at 2 (June 2009) ("The Google Books Settlement Agreement probably violates federal antitrust law.") (Exhibit W); Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 3 (July 2009) (The proposed agreement "is not the result that would emerge under pure competition between authors/rightsholders and seems likely to run afoul of Section 1 of the Sherman Act.") (Exhibit S); James Grimmelmann, *How to Fix the Google Book Settlement*, Journal of Internet Law, at 13 (Apr. 2009) (arguing the proposed Book Registry "walks and quacks like a cartel," and asserting that with the Settlement both the registry and Google pose "antitrust threat[s]"); *see also* Robert Darnton, *Google & the Future of Books*, New York Review of Books (Feb. 12, 2009) ("[T]he settlement creates a fundamental change in the digital world by consolidating power in the hands of one company.").[78] Some initial submissions to the Court have also raised important points about the competitive implications of the Proposed Settlement,[79] and others will certainly be filed by the September 4, 2009 deadlines for objections to the Proposed Settlement. And, of course, the Department of Justice, and possibly other

---

[78] The Registry may also be viewed as a joint venture – a term generally applied in the antitrust context to "any collaborative activity, short of full merger, by which independent firms [or persons] pool resources to produce or sell a common product or service, to obtain needed inputs, or to pursue some other common objective." ABA Section of Antitrust Law, Antitrust Law Developments, at 433 (6th ed. 2007). Because joint ventures can reduce or eliminate competition among competitors, they are subject to antitrust scrutiny. *See id.* at 434-40.

[79] *See, e.g.,* Library Association Comments on the Proposed Settlement at 9-11 (Dkt. 100) (discussing possible effects on libraries other than those partnering with Google).

government agencies, will soon present their views about some of the competitive issues raised

by the Proposed Settlement.[80]

## B. The Anticompetitive Effects of the Proposed Settlement Must be Considered as Part of the Court's Rule 23 Inquiry

Although Rule 23 makes no specific reference to considering the competitive

implications of a Proposed Settlement, examination of Rule 23 and the Rules Enabling Act

makes clear the decision whether to approve this Proposed Settlement must include a rigorous

assessment of the antitrust issues it raises.

As discussed earlier in the context of other grounds for this Objection, the Rules Enabling

Act provides that Rules of procedure "shall not abridge, enlarge or modify any substantive

right." 28 U.S.C. § 2072(b). Here, if there is merit to the argument that the Proposed Settlement

would facilitate or permit (or constitutes) conduct proscribed by the antitrust laws outside of the

---

[80] It is evident the settling parties, and some of the Settlement's proponents, applaud it as a solution to a "problem" with "orphan works." Two things are clear, however. One is this problem – however it is defined – is a matter of public policy, which should be resolved by the political branches of the government, not the judicial branch through the vehicle of Rule 23. *See* James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 2, 12 (Apr. 2009) ("Laundering orphan works legislation through a class action lawsuit is both a brilliant response to legislative inaction and a dangerous use of the judicial power"; the Proposed Settlement "is a judicial solution to a legislative problem") (Exhibit C); U.S. Copyright Office, Report on Orphan Works, at 93 (Jan. 2006) (After a year-long ambitious study of the orphan works issue, the U.S. Copyright Office acknowledged it lacks "any regulatory authority to address the orphan works issue in any meaningful way, and thus legislation is necessary to help resolve the problems inherent in orphan works."). The second is that this "solution" is no solution at all. The settlement would "solve" this problem by giving one private company (and its partners) rights that no one else will possess, or is likely to possess. Indeed, the "problem" has been so vexing, and the source of debate in Congress and elsewhere, precisely because it cannot be solved in the marketplace. The Proposed Settlement would only "solve" the problem of orphan works by changing it, in a way that raises a host of new problems, including many under the antitrust laws. *See* Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 4 (July 2009) ("[T]he lawsuit is the device by which the initial orphan works monopoly is created: without the lawsuit, Google would acquire *no* rights to use the orphan works.") (emphasis in original) (Exhibit S).

context of the settlement, then the settlement itself cannot be approved under Rule 23 because doing so would "enlarge" substantive rights beyond those that exist under the antitrust laws. Simply put, if conduct would be proscribed by the antitrust laws absent the settlement, Rule 23 cannot be used to render that conduct permissible.

The Court is also obligated to carefully examine the competitive implications of the Proposed Settlement in connection with the Court's inquiry under Rule 23(e)(2), to ensure that it is "fair, reasonable, and adequate." As the Second Circuit has explained, while "[i]n a class action settlement, the normal focus is on the fairness, reasonableness and adequacy of the settlement to the plaintiff class[,] [w]here the rights of third parties are affected, however, their interests too must be considered." *In re Masters Mates & Pilots Pension Plan and Irap Litigation*, 957 F.2d 1020, 1025-26 (2d Cir. 1992) (citations omitted). Because the Proposed Settlement would dramatically alter the competitive landscape, and tilt the "playing field" decidedly in the direction of Google and its partners, the Court must consider the possible adverse effects on actual and potential competitors when it decides whether to approve the settlement.

## C. The Settling Parties Might Use Approval of the Settlement to Immunize Their Use of Market Power Conferred by the Settlement From Challenge Under the Antitrust Laws

The Court should also carefully consider the competitive implications of the Proposed Settlement because, were the settlement approved, the settling parties – in particular Google – might attempt to use the litigation process, and any Court approval of the settlement, as a shield against challenges to future anticompetitive conduct.

For instance, Google might resist a future antitrust lawsuit concerning its Book Search business by invoking the *Noerr-Pennington* doctrine, named for two Supreme Court decisions

giving rise to it. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). At its most general level the doctrine is "a judicially-created policy that shields an antitrust defendant from liability for competitive injuries resulting from individual or concerted petitioning conduct that is reasonably calculated or genuinely intended to petition government decision-makers for redress." ABA Section of Antitrust Law, Monograph 25, The *Noerr-Pennington* Doctrine, at 1-2 (2009). Were the Proposed Settlement approved, Google could seek immunity from lawsuits predicated on activities related to the settlement, on the ground they are authorized by a court-approved settlement obtained through petitioning activity shielded from liability under *Noerr-Pennington*.[81]

While I believe any such argument by Google should be rejected for a variety of reasons, there is some danger that a court presented with the issue might confer immunity on Google based on judicial approval of the Proposed Settlement. *See* ABA Section of Antitrust Law, Monograph 25, The *Noerr-Pennington* Doctrine, at 63 (2009) ("In certain circumstances, settlement of litigation also can be protected under *Noerr-Pennington*."); ABA Section of Antitrust Law, Intellectual Property and Antitrust Law Handbook, at 271 (2007) ("[L]itigants obtaining court approval of their settlement, more than just a dismissal, may be within the immunity afforded by *Noerr*."); Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 26 n.86 (July 2009) ("[T]he caselaw is not clear on whether *Noerr-Pennington* immunity would attach to the court's approval of the settlement agreement.")

---

[81] A similar argument might be made on the basis of the so-called "state action" doctrine, under which immunity may attach to conduct required or actively supervised by the government. *See generally* ABA Section of Antitrust Law, Antitrust Law Developments, at 1273-84 (6th ed. 2007).

44

(Exhibit S); *see also* Herbert Hovenkamp, Mark D. Janis & Mark A. Lemley, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property § 7.2(c) (examining application of *Noerr-Pennington* immunity to settlement agreements, and arguing for settlements approved by courts that "immunity should attach only if a court exercises supervisory authority over the settlement of the sort it would under the Tunney Act."); *cf. Sanders v. Brown*, 504 F.3d 903, 913 n.8 (9th Cir. 2007) ("We do not address whether *Noerr-Pennington* immunity may protect an anticompetitive settlement agreement between two *private* entities, who conceivably could claim that the act of petitioning the court to accept their agreement immunizes the agreement itself.") (emphasis in original).

The risk that approval of the Proposed Settlement may shield Google and others from liability for conduct that would otherwise be actionable under the antitrust laws is further reason for the Court to carefully analyze the Proposed Settlement's competitive implications.[82]

## CONCLUSION

Rule 23 was adopted to resolve genuine cases and controversies filed in the federal courts. The parties to this Proposed Settlement are asking the Court to use the Federal Rules of Civil Procedure to implement a predominantly commercial transaction that Google could not achieve in the marketplace without considerably more effort and expense, if it could be achieved

---

[82] If the Court decides to approve the Proposed Settlement, or any revised proposed settlement, the Court might consider making clear that approval rendered in the context of Rule 23 is not intended to confer Google or any of its partners with immunity under the antitrust laws for any liability to which they would otherwise be subject, including liability based upon the negotiation or implementation of the Settlement Agreement, or the use of any market power created by or flowing from the Settlement Agreement. In this regard, the Court should scrutinize the "Bar Order" in the Settlement Agreement which, among other things, seemingly attempts to preclude class members from bringing future antitrust actions against Google and others if the claims "directly or indirectly relate to, are based upon or arise out of the commencement, prosecution, defense or *settlement* of the Action, or to the *negotiation or execution of this Settlement Agreement or the Library-Registry Agreements.*" Settlement Agreement § 10.2(d) (emphasis added).

45

at all. The Court should decline this invitation to turn Rule 23 into a policymaking tool. *Cf.* *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (The text of Rule 23 "limits judicial inventiveness.").[83] The Court should also decline the request to dramatically reshape the digital commerce landscape through the power of the federal judiciary. But, most importantly, the Court should reject the Proposed Settlement because it is inconsistent with federal law – failing to satisfy the requirements of Rule 23, the Rules Enabling Act, and the due process guarantee of the Constitution's Fifth Amendment.

The members of the putative class have meritorious claims against Google (and perhaps others). Those claims should be pursued, and their injuries redressed. It may be that some of those claims could properly be resolved through a class settlement. Yet this is not such a settlement. For the reasons explained above, this Proposed Settlement is so flawed that the class members are truly better off with no settlement at all.[84] With regret, I request that the Court reject the Proposed Settlement, and that the Court order the putative Author Sub-Class be broken

---

[83] Like in *Amchem*, the settling parties here seek to use Rule 23 to remedy perceived shortcomings in existing law by using the judicial system to implement changes which have not materialized through the political process. But, like in *Amchem*, Rule 23 "must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 629 (1997). And this case, like *Amchem*, reminds us that "the rulemakers' prescriptions for class actions may be engendered by 'those who embrace Rule 23 too enthusiastically just as they are by those who approach the Rule with distaste.'" *Id.* (citation omitted).

[84] I take no position at this time about specific provisions of an alternative agreement which I might support. The issue before the Court is whether or not to approve this particular agreement. It is not the responsibility of the Court, or objectors, to rewrite the agreement. *See* Manual for Complex Litigation, Fourth, § 21.61 at 309 ("The judicial role in reviewing a proposed settlement is critical, but limited to approving the settlement, disapproving it, or imposing conditions on it. The judge cannot rewrite the agreement."). However, the Court might instruct the settling parties to decouple the two components of the Proposed Settlement – the resolution of claims for past infringement, and the commercial transaction involving the transfer of rights from copyright owners to Google and others. If the settling parties believe the terms of the commercial component of the Proposed Settlement are attractive, they are free to implement them outside of the context of a Rule 23 proceeding, and invite copyright owners to participate.

into sub-classes, so the distinct interests of each group can be advanced by separate counsel and separate class representatives as this case proceeds.[85]

August 2009                                    Respectfully submitted,

                                               Scott E. Gant
                                               5301 Wisconsin Avenue, NW
                                               Suite 800
                                               Washington, DC 20015
                                               gbsobj@hotmail.com

---

[85] In light of the substantial problems with the Proposed Settlement discussed in this Objection, the award of fees requested by Plaintiffs' counsel is unwarranted. *See* Settlement Agreement § 5.5. If the Court decides to approve the Settlement, in part or in whole, some of the $30 million set aside as fees for counsel to the proposed Author Sub-Class should be redirected to the author class members themselves.