**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, et. al., | Case No. 05 CV 8136-DC |
| Plaintiffs, | DECLARATION OF MR ASHOEK ADHIKARI, ESQ. |
| v. | GENERAL COUNSEL AND GENERAL MANAGER: CORPORATE, LEGAL |
| Google Inc., | AND INNOVATION, MEDIA24, CAPE TOWN, |
| Defendant. | SOUTH AFRICA |

1.      I, Ashoek Adhikari, am the General Counsel and General Manager:
Corporate, Legal and Innovation, of Media24, a holding company controlling the
Southern African group of book publishing companies listed in Appendix A to this
Declaration.  The parent holding company of Media24 is Naspers, which controls many
international and local sister companies in the media industry.  Media24, through its
subsidiary book publishing company, Via Afrika, controls publishing companies in South
Africa and the neighbouring Southern African countries of Botswana, Namibia and
Zambia.  Except as otherwise stated, I have personal knowledge of the matters I discuss
below.

2.      Media24 is active in both the publishing and distribution of books,
magazines and digital content.  Via Afrika is the book publishing (and direct sales)
division of Media24.  Media24's publishing activity, in its Via Afrika division, is
primarily editorial in nature, and focuses on purchasing or developing content, and
creating, reworking, packaging and/or repackaging textual content.  This publishing
activity is undertaken primarily in traditional formats such as hard-copy books or in



electronic formats such as CDs, with some limited online and mobile content publishing. Media24's distribution activity focuses on providing and selling print and digital products through channels such as wholesalers, clubs and stores. Moreover, Media24 owns the online bookseller "Kalahari.net", see www.kalahari.net.

3.      Media24's book publishing companies and imprints date back to the beginnings of the South African publishing industry. For instance, Van Schaik Publishers (previously JL van Schaik) is a small publishing company which was founded in 1914/1915, later acquired by Naspers, the holding company of Media24. The local publishing activities of Media24's various publishing houses cover all markets (educational, trade, religious, professional, etc.); they include publications in all eleven official languages of South Africa and publications in most publishing genres (*e.g.* adult fiction, adult nonfiction, including full-colour illustrated nonfiction, reference, children's books, etc.). Media24's publishing houses in Botswana, Namibia, and Zambia publish educational books in all subjects for all grades in the languages of the respective countries.

4.      Company records show that Media24, through its book publishing division Via Afrika, published at least 1,814 distinct titles in the last two years. Media24 has at least 7,840 book titles in stock. However, I am advised that the number of Media24 book titles listed under various imprints in the Google Database is at the very least 16,799. (I am advised that so far searches could only be performed for the imprints under NB Publishers, Jonathan Ball Publishers and Van Schaik Publishers. Other imprints may very well produce many more hits).

2

5.       As either the copyright owner, or exclusive licensee, of the books that Media24 publishes, the relevant Media24 group company acting as the publisher owns the exclusive right to exploit the books that it publishes or to authorize others to do the same. The Via Afrika division of Media24 must devote time and resources to publish its works and is able to recoup its investment, and remain in operation, primarily because it is able to secure the exclusive rights to these works, such that no one else can exploit them. Accordingly, Media24's entire business model is based on this fundamental legal right, which is recognized under South African copyright law and throughout the world.

6.       The Settlement Agreement that Google has asked this Court to approve would undermine these well-recognized rights and disproportionately disadvantage copyright holders throughout the world – especially, as explained below, those publishing works by new authors, in emerging markets, and in "minority languages" (*i.e.,* a language spoken by less than 10 million native speakers world-wide). Media24 thus respectfully requests that this Court not approve the Settlement Agreement, with respect to foreign (non-US) rightsholders at a minimum, for the reasons set forth in our accompanying Objections and below.

## Media24 Catalogue and Membership In The Class

7.       I am advised that Media24, through its book publishing companies listed in Appendix A, has published at least 15,000 titles since 1922. It is thus the copyright holder of one or more Books or Inserts, as those terms are used in the Settlement Agreement,

8.       Neither Media24 nor its book publishing companies publishes or authorises the publication of American editions of its works in a significant way. A very

3



limited selection of titles of Media24's books are available through agents in the United States, and some in very limited numbers through library channels. Media24's non-English titles are virtually unavailable in the United States. Media24 publishes less than 1% percent of its publishing holdings in the United States, and it publishes the rest (more than 99% percent) only in South Africa in at least one of South Africa's 11 official languages.

9.     Neither Media24 nor its publishing companies has registered its books with the United States Copyright Office.

### Notice Problems

10.     Media24 was not aware of the Settlement Agreement until November 2008 when it received an unofficial written announcement and documentation about the Settlement Agreement by email from the Publishers' Association of South Africa, the industry organization of which several Media24 group companies are members. That documentation was in English – one of South Africa's eleven official languages. The English version formal notice of the Settlement Agreement was received by Media24 at some later stage on or about January 2009. As far as I am aware, Media24 did not receive any formal notice from the parties that was translated into any of South Africa's other official languages.

11.     Media24 did receive an email from the parties to this case in or about May 27, 2009 in the Afrikaans language, asking one of Media24's affiliated companies to help publicize notice of the Settlement. A true and correct copy of that email is attached here as Exhibit A.



4

12. Media24 and its publishing companies were thus forced to rely on the English version of the Settlement notice. As noted, English is one of South Africa's eleven official languages. But many of Media24's authors and publishing companies in South Africa and neighbouring countries are non-native English speakers, and were placed at a serious disadvantage when they were compelled to acquaint themselves with this complex and lengthy legal document written in English. Indeed, many of the senior staff at Media24 are non-native English speakers, and have been similarly disadvantaged by the parties' failure to provide any non-English translations of the notices and the Settlement Agreement. Moreover, the May 2009 email that was sent to Media24 was written in Afrikaans, demonstrating the parties' knowledge of the need to communicate in this country, in that language.

13. To the best of my knowledge, Google's own website indicates that neither Afrikaans nor any of the remaining 9 official languages of South Africa are among the 35 available translations of the English notice. Consequently, neither Media24, nor its group companies ever received a notice in Afrikaans or the remaining official languages of South Africa. Within South Africa, there exists a continuing practice to publish documents of a legal nature or of some political importance into at least English and Afrikaans, as well as one of the other 9 official languages widely spoken in South Africa, such as isiZulu, Sesotho or isiXhosa (the choice among the remaining 9 languages is in practice often influenced by the Province or region within which laws or political documents are published so as to reach the highest possible number of members of the public).

14.     In addition, the Settlement Agreement has not, to my knowledge, ever been translated into any of the official languages of South Africa (other than English) or its neigbouring countries. It is my firm belief that a significant number of individual South African and Southern African authors would not be able to review or understand this complex document as written in English. As mentioned above, even for senior non-native English-speaking staff at Media24, the document is extraordinarily difficult to read, let alone understand in any meaningful way.

## The Burdens The Settlement Agreement Improperly Seeks To Impose

15.     The Settlement Agreement requires publishers like Media24 group companies to take burdensome, active steps if they wish to preserve their existing copyright protections, remain legally unaffected by the Settlement Agreement and avoid having their works permanently licensed to Google for Google's use. In particular, we are required to read and comprehend the complex Notice in English without the benefit of a well-translated Settlement Agreement simply to determine whether the affirmative act of opting-out is in our interest. If we wish to opt-out, we must submit formal paperwork to the Settlement Administrator by a date certain, or forever lose this right. Moreover, in order to effectively opt-out, we are required to provide information including which sub-class we belong to, our address and any pseudonym used by an author of the noted works. We must also identify all of the imprints under which we publish, or have published, our works. This is in contrast to the existing laws of copyright recognized by our country and internationally, under which we would not be required to take any action at all to preserve our fundamental exclusive right to control the use of our works.



16.     If we do not opt-out, the Settlement imposes additional, cumbersome administrative burdens in order to direct Google not to use our works. We must submit a lengthy, 8-page Claim Form, which directs us to read the lengthy English notice and: (1) individually "claim" each one of our Books and Inserts; (2) provide detailed information about each work (including each author, co-author and contributor, imprint, whether the publisher owns worldwide rights to the work and rights to all of the pictorial works within the work); (3) find each work on a books database that Google maintains at http://www.googlebooksettlement.com (the "Books Database"); (4) determine whether Google has classified such work as Commercially Available; (5) inform Google if we agree with such determination (even though the Settlement defines Commercially Available vaguely); (6) provide a description of each Insert; (7) determine if we are Confident or Highly Confident that our works have not reverted to an author; and (8) certify a number of matters, including that the use of any Insert claimed required our permission and we did not give permission for their online use after June 1, 2003.

17.     As set forth above, in order to "direct" Google not to use our works, we would have to provide the above information to Google for at least 15,000 individual works published since 1922, even though, under existing law anywhere in the world, we would not be required to take any action to preserve our exclusive rights against Google's unauthorized use of our works.

18.     Providing this "direction" to Google is an onerous and difficult task under the Settlement Agreement, especially because, as described below and elsewhere in our Objections and accompanying submissions, the Books Database is difficult to work with and flawed in numerous respect.

7

## The Books Database and The Classification of Books as "Commercially Available"

19. Under the Settlement Agreement, our works are "Commercially Available" only when we are currently (meaning when Google looks into things) offering the works for sale through one or more then-customary channels of trade in the United States. The definition of Commercially Available is critical because, as I understand, Google obtains extensive exploitation rights over works that do not fit within that definition – that is, works that, at a particular time, are deemed to be "out-of-print."

20. The Settlement Agreement is premised on the simplistic, counterfactual assumption that a foreign book goes through a straight, linear life from unpublished manuscript to "published and in-print" to "commercially available in the US through normal channels of trade" to "not commercially available" (or, "out-of-print"). But in Media24's experience, that is not the case at all. Rather, demand for books fluctuates over time and the life of books is often more cyclical than linear. In certain circumstances, publishers will – by design – remove commercially available books from circulation, rendering them "out of print" for a time, only to reintroduce them into the marketplace at a later time. The Settlement Agreement's definition of "Commercially Available" ignores this basic publishing fact.

21. For example, Media24 publishes through its book division a multitude of titles for small, niche or minority language interests. It is Media24's mission to keep these languages alive in the written form and to promote mother-tongue language speakers to publish in these languages. In order to accomplish this goal, Media24 must carefully manage and recoup the development and production costs of a book over a number of print and commercial sales cycles. As part of Media24's business model,

8



certain titles are promoted for a number of years and then with the express consent or understanding of the author, left to go "out-of-print" without Media24 losing the rights to the titles in question. Media24 will then re-promote the same titles at a later time.

22.     Thus, it is not uncommon for Media24 to rotate works through a cycle of commercial availability – the works go in successive spells in-print and out-of-print, *i.e.*, they become commercially available and unavailable numerous times in the course of their useful economic life. In Media24's experience, cyclical promotion has proved to maximize revenue far better than keeping a small number of titles in commerce all the time, and the higher revenue in turn allows for greater re-investment into new literature.

23.     The Settlement Agreement's false dichotomy between "Commercially Available" and not "Commercially Available" would seriously interfere with the business model of Media24 which is tried-and-tested, specifically for minority and small language groups. The Settlement Agreement will thus not only prejudice existing titles owned by Media24, but seriously jeopardize the production of new titles that are only viable with a long-term, cyclical publishing strategy as described above.

24.     Moreover, through new print-on-demand solutions, Media24 may very well in future bring back a huge number of out-of-print titles into a commercial market and to the United States – again, subject to the extended business life-cycle that Media24 has worked out periodically to promote specific titles. The case is not dissimilar from DVD sales, where DVD's of "classic movies" made many years ago are periodically re-promoted and brought out in new and revised editions, sometimes in the original edition, sometimes with additional supplementary material to commemorate an event or occasion. With respect to books never before made commercially available in the United States, the

9



Settlement Agreement's definition of "Commercially Available" would seriously prejudice Media24's rights because it would give Google exploitation rights in the United States before Media24 has the opportunity to exploit a potentially valuable United States edition for itself.

25.     The Settlement Agreement's definition of "Commercially Available" also prejudices foreign rightsholders such as Media24 because it looks only to "customary channels of trade in the United States" to determine whether a work is currently "commercially available." But that means that Google can obtain far-reaching exploitation rights over certain foreign works that are not out-of-print and are in fact actively distributed in customary channels of trade outside of the United States.

26.     The foregoing is correct, even if the Settlement Agreement works correctly and is implemented in the best possible way with a functioning Book Database. However, I am advised by my colleagues in and outside of Media24, that there are numerous shortcomings in Google's Book Database, some of which are described below. For example, based on a search of the database for works listed as published under the imprints used by NB Publishers, Jonathan Ball Publishers and Van Schaik Publishers, and assuming that the creators of the database spelled our imprint names correctly in all cases, I am advised that we have located at least 16,799 entries in the Google database concerning our works. By way of example, I am advised that the Book Database lists the following titles as "not commercially available":

*Ysterkoei-blues* by Breyten Breytenbach;

*Proteus* by Deon Meyer

*Droë wit seisoen* by André Philippus Brink

10

*Kringe in 'n bos* by Dalene Matthee

*30 nagte in Amsterdam* by Etienne van Heerden

*Beauty's Gift* by Sindiwe Magona

*Confessions of a gambler* by Rayda Jacobs

However, Media24 commercially exploits *all* of these works according to Media24's own stock list (which, as noted, contains at least 7,840 titles held in stock that Media24 currently exploits). In the real world, these titles are as "commercially available" as a title can be. Under the Settlement Agreement, however, they are effectively treated as "out-of-print", or not "Commercially Available", books simply because they are not now distributed in the United States. That results in serious prejudice to the rights of foreign rightsholders who actively disseminate their works, but do not do so in the United States. For any titles that Media24 may make available in the United States in future, Google's Settlement creates prejudice, as these rights would be at their highest value before they are available at all in the US. The sale of American territorial publishing rights to an American publisher to first publish these books would be undermined, by making the book available through one or several of Google's services.

27.    In addition, many of the titles that the current Settlement Agreement deems or classifies not "Commercially Available" are in fact available through the online bookselling platform Kalahari.net, which, as mentioned above in paragraph 2, Media24 also controls. Apparently, in applying the Settlement Agreement's definition of "Commercially Available", Google is not treating online book sales from non-United States websites as part of the "customary" channels of trade in the United States.



28.      To take another example, a search of the Book Database revealed that out of a total of 8,792 items identified on the Book Database, as having been published under the imprints of *Human & Rousseau, Tafelberg* and *Kwela* (imprints of NB Publishers, as listed in Appendix A to this Declaration, used by way of example) only 482 titles are listed as Commercially Available.   Yet, Media24 actively exploits many of the remaining items that the Book Database identifies as not Commercially Available.  Given the number of duplicate entries, it is difficult to identify how many additional books are identified by the Book Database.   AC Nielsen, a book trade information company active in South Africa, lists at least 1,503 titles that are available through the outlets that AC Nielsen covers. I am advised that our own records and stock lists would put that number at least as high as 3,000 titles commercially available (out of at least 6,000 titles ever published) for the imprints of *Human & Rousseau, Tafelberg* and *Kwela* alone. The information provided on the Book Database does not provide clarity, however, on how many of the 3,000 commercially available titles of the above imprints are among the 8,792 items Google captured in the Book Database which Google may contemplate digitizing and including in the database now or in future.

29.      Moreover, to date, according to the Books Database, Google has digitized 10.68% of the titles published under the above three imprints: Google professes to have digitized 939 items of a total of 8,792 items listed.  However, the Books Database gives us no information about how many of the remaining titles in the database, or other titles which we own and control, Google may seek to digitize in the future.  Moreover, Google through its Book Database does not provide information regarding how many of the 8,792 items listed are duplicate entries.  (As noted, we would estimate about 3,000

12

commercially available works from these imprints, and 6,000 works total over the years). Accordingly, it is impossible for our company to predict how many of our books Google will scan, use and/or pay for in the future and, accordingly, what the Settlement Agreement will mean for us.

30.     For each of the foregoing reasons, and for the reasons set forth in the Objections, Media24, on behalf of the Media24 books division (Via Afrika), objects to the Settlement Agreement and respectfully urges the Court not to approve it.



13

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on August __ , 2009

_____

[ASHOEK ADHIKARI]

AFFIDAVIT

I, Ashoek Adhikari, do hereby make oath and state that the foregoing, together with the Annexure A herafter, has bee deposed by me and that the facts, unless otherwise stated, are in my personal knowledge and true and correct.

_____

[ASHOEK ADHIKARI]

SIGNED and SWORN/AFFIRMED to before me at Cape Town on this 30 day of August 2009 , the Deponent having acknowledged that he/she knows and understands the contents of this Affidavit, which is deposed to in accordance with the regulations governing the administration of an oath as more fully set out in Government Notice R 1258 of the 21st July 1972, as amended by Government Notice 1648 dated the 19th of August 1977 and Government Notice 903 dated the 10th July 1998.

_____

COMMISSIONER OF OATHS

Full Names:
Status:
Street address:

SUSANNA VIVIER
COMMISSIONER OF OATHS
ATTORNEY SOUTH AFRICA
3rd Floor
11-on-Buiten
11 Buitensingel
CAPE TOWN, SOUTH AFRICA
8001

SUSANNA VIVIER
NOTARY PUBLIC
3rd Floor
11-on-Buiten
11 Buitensingel
CAPE TOWN, SOUTH AFRICA
8001

14