UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, et. al., <br><br> Plaintiffs, <br><br> v. <br><br> Google Inc., <br><br> Defendant. | Case No. 05 CV 8136-DC <br><br> DECLARATION OF JERKER FRANSSON |

1. I, Jerker Fransson, am the company lawyer of the Swedish book publishing company known as Studentlitteratur AB ("Studentlitteratur"). I am not a native speaker of the English language, although I have some fluency in the language. Except as otherwise stated, I have personal knowledge of the matters I discuss below.

2. Studentlitteratur is a publishing company which was founded in 1964. Studentlitteratur publishes approximately 200 books per year and holds a stock of over 3,200 titles, which are mainly educational titles for Universities, upper secondary schools, high schools and professionals.

3. As either the copyright owner, or exclusive licensee, of the books that we publish, Studentlitteratur owns the exclusive right to exploit the books that it publishes or to authorize others to do the same. Studentlitteratur must devote time and resources to publish its works and is able to recoup its investment, and remain in operation, primarily because it is able to secure the exclusive rights to these works, such that no one else can exploit them. Accordingly, Studentlitteratur's entire business model is based on this fundamental legal right, which is well-recognized under Swedish copyright law and

throughout the world. The Settlement Agreement that Google has asked this Court to approve would upend these well-recognized rights and is an affront to copyright holders throughout the world. Studentlitteratur thus respectfully requests that this Court not approve the Settlement Agreement, with respect to foreign rightsholders at a minimum, for the reasons set forth in our accompanying Objections and below.

**Studentlitteraturs Catalogue and Membership In The Class**

4. Studentlitteratur is the copyright holder of one or more Books or Inserts, as those terms are used in the Settlement Agreement, having published well over 5,000 titles since 1964.

5. Studentlitteratur commercially exploits 39 titles in the United States.

6. Studentlitteratur has not registered its books with the United States Copyright Office.

**Notice Problems**

7. Studentlitteratur received a written notice of the Settlement Agreement earlier this year.

8. The written notice that Studentlitteratur read was translated into Swedish, but it contained numerous translation errors that made the notice extremely difficult to read or understand. I understand that these translation errors will be detailed for the Court by Svenska Förläggareföreningen, the association of book publishers in Sweden, so I do not detail them here.

9. The Settlement Agreement to which the written notice refers has, to my knowledge, never been translated into Swedish. While Studentlitteratur would have wished to review that full agreement, it was not able to do so in any meaningful way,

2

given that it was made available only in English on the website dedicated to this case. Like Studentlitteratur, virtually all of the publishing houses in Sweden are of modest size, do business primarily in Sweden and lack the proficiency needed to read or understand the English-only Settlement Agreement. Furthermore, the agreement has been made in a different legal context than the one we are used to. It is my firm belief that individual authors also are not able to review or understand this complex legal document as written in English.

10. Studentlitteratur has only gradually come to understand the full importance of this Settlement Agreement, and even today, there still remains a number of unclear issues, to us as well as to the lawyers that we have consulted. We understand that even publishers who have English as their mother language are having difficulties fully understanding the agreement. The fact that this complex legal document is still not accessible in Swedish, makes it even harder for us to understand it.

11. The Settlement Agreement has caused substantial confusion within our company and, it seems, also within and between other publishing houses in Sweden. There remains substantial uncertainty regarding such basic matters as the scope of the agreement, the titles that are affected, and the future exploitation rights that it purports to grant to Google. Indeed, the very idea that a settlement in a foreign country between parties with which one has no business relation could actually affect one's own business would strike the ordinary Swedish rightsholder as quite surprising, if not outlandish. It is contrary to the ordinary business proceedings – *i.e.*, the ways of entering contracts or solving disputes – of Swedish publishers. As a consequence, it is my sense that a number

3

of Swedish publishers who have heard about the Settlement Agreement probably believe – erroneously – that it only affects U.S. publishers or multinational media corporations.

**The Burdens The Settlement Agreement Improperly Seeks To Impose**

12. The Settlement Agreement requires publishers like Studentlitteratur to take burdensome affirmative action if they wish to preserve their existing copyright protections, remain legally unaffected by the Settlement Agreement and avoid having their works permanently licensed to Google for Google's use. This action requires us to read and comprehend the complex, poorly translated Notice – without the benefit of a translated Settlement Agreement – simply to determine whether the affirmative act of opting-out is in our interest. If we wish to opt-out, we must submit formal paperwork to the Settlement Administrator by a date certain, or forever lose this right. Moreover, in order to effectively opt out, we are required to provide information including which sub-class we belong to, our address and any pseudonym used by an author of the noted works. We must also identify all of the imprints under which we publish, or have published, our works. This is in contrast to the existing laws of copyright recognized by our country and internationally, under which we would not be required to take any action at all to preserve our fundamental exclusive right to control the use of our works.

13. If we do not opt-out, the Settlement imposes additional, cumbersome administrative burdens in order to direct Google not to use our works. We must submit a lengthy, 8-page Claim Form, which directs us to read the poorly translated lengthy notice and: (1) individually "claim" each one of our Books and Inserts; (2) provide detailed information about each work (including each author, co-author and contributor, imprint, whether the publisher owns worldwide rights to the work and rights to all of the pictorial

works within the work); (3) find each work on a books database that Google maintains at http://www.googlebooksettlement.com (the "Books Database"); (4) determine whether Google has classified such work as Commercially Available; (5) inform Google if we agree with such determination (even though the Settlement defines Commercially Available vaguely); (6) provide a description of each Insert; (7) determine if we are Confident or Highly Confident that our works have not reverted to an author; and (8) certify a number of matters, including that the use of any Insert claimed required our permission and we did not give permission for their online use after June 1, 2003.

14. As set forth above, in order to "direct" Google not to use our works, we would have to provide the above information to Google for well over 5,000 individual works, even though under existing law we would not be required to take any action to preserve our exclusive rights against Google's unauthorized use of our works.

15. Providing this "direction" to Google is an onerous and difficult task under the Settlement Agreement, especially because, as described below and elsewhere in our Objections and accompanying submissions, the Books Database is difficult to work with and flawed in numerous respect.

**The Books Database and The Classification of Books as "Commercially Available"**

16. The Books Database is riddled with errors. In order to estimate the number of errors, we examined the first 100 entries listed under our name. Of these, 13 entries are works that we do not even publish. Furthermore, the entries contain information about printing years and editions that often are incorrect, and information about subsequent editions that are sometimes erroneous and often incomplete. These errors could very well be damaging to us, since titles which we are actively keeping up to

date by frequent revisions will erroneously appear to be discontinued or obsolete in the Books Database. For example, eight of the first 100 entries we examined are titles that we currently publish in editions later than the ones identified in these entries.

17. We also believe that the Books Database seriously underestimates how many of our works are Commercially Available. Based on a search of the database for works listed as published by Studentlitteratur (assuming that our name was always correctly spelled by the parties who created the database), we have located 9,661 entries in the Google database concerning our works. Only ten of these titles are listed by Google as being Commercially Available. In order to estimate how many of these 9,661 entries are in fact commercially available, we again examined the first 100 entries on the list. Of these, Studentlitteratur commercially exploits 31, or 31% of the first 100 entries. Assuming that is representative of the entire database, that would mean that Studentlitteratur commercially exploits 31% of its 9,661 entries in the database – or, over 2,900 entries. But again, the Google database implausibly claims that only *ten* of our titles are Commercially Available.

18. According to the Books Database, Google has digitized nine of these entries to date. However, the Books Database gives us no information about how many of the remaining titles in the database, or other titles which we own and control, Google may seek to digitize in the future. Accordingly, it is impossible for our company to predict how many of our books Google will scan, use and/or pay for in the future and, accordingly, what the Settlement Agreement will mean for us.

19. For each of the foregoing reasons, and for the reasons set forth in the Objections, Studentlitteratur objects to the Settlement Agreement and respectfully urges the Court not to approve it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 27, 2009

*[signature]*

Jerker Fransson