proceedings, identified by the bullet points in the Summary Points.  The Summary Notice described the all-important Books Right Registry as a "Buchrechteregister," which is simply a list or database of information, not the institution which the Settlement Agreement purports to create and through whom rightsholders must act.  The Summary Notice translates the word "sub-classes" to "Unter-Klassifizierung," which is not a term that would be used here to describe people or parties.  The failure to translate this phrase in a meaningful way is particularly troublesome given that litigations do not proceed in Germany on a class basis.

23.     On July 29, 2009, the Börsenverein received a Summary Notice form regarding the Settlement Agreement from Kinsella/Novak Communications.  A true and correct copy of this Summary Notice is attached here as Exhibit H.  It is unclear to our organization what new information was provided in this new notice, as the notice sent to us was in French, and not in German.  I have been informed by a number of our members that they too received this French language document.  In addition, I have been informed that on July 7, 2009, class member Borntraeger Verlag received a summary notice in English by mail from the Settlement Administrator.  A true and correct copy of this mailing is attached here as Exhibit I.  The cover letter addressed the publishing company as an author.  The publisher was confused and therefore contacted Börsenverein and VG Wort.  It is puzzling that the parties sent recipients in Germany these notices in French and English.  This is yet another example of how deficient and confused the notice process has been with regard to German class members.

24.     Given these errors, I believe that large numbers of putative class members in Germany (to the extent they received notice of this action) misunderstand the scope of

the Settlement Agreement and their need to take action with this Court to either object or

opt-out of the Settlement Agreement if they do not wish to be bound by it. There are

additional reasons, separate and apart from the above translation errors, why

rightsholders in Germany and other countries outside of the United States are likely to

fail to take action here. Many rightsholders of older books that are out-of-print in these

countries may fail to respond because they do not know that their books are protected by

copyright in the U.S. In addition, unlike in the U.S, there exist in Europe networks of

reproduction rights organizations in the publishing world, such as VG Wort to whom

rightsholders look to manage the collection of some parts of their royalties from foreign

sources. Thus, European rightsholders often do not need to take individual action with

respect to managing the exploitation of their works. For this reason, European

rightsholders may mistakenly believe that they need not take individual action in this

matter. And, as set forth above, German law does not recognize this kind of collective

action, such that the average German class member would not comprehend the stakes at

issue in this settlement even if they were able to comprehend the Notice or Revised

Notice.

## The Problems Associated With The Books Database and the Classification of Commercially Available

25.     Google maintains a Books Database at

http://www.googlebooksettlement.com/ (the "Books Database") ostensibly for

rightsholders to determine whether their books have been or will be digitized, and to

claim rights in their Books and/or Inserts under the Settlement Agreement. The Books

Database is the sole means by which an author or publisher can determine what books

Google may or may not have digitized to date and whether Google has classified that

work as "Commercially Available." I am informed that the Books Database contains bibliographic information for approximately 80 million entries. Serious deficiencies in the Books Database make it difficult for German publishers and authors to use to obtain the information they need to understand the status of their books under the Settlement Agreement.

26.    The Books Database is accessible only after registering on the website by clicking a button to "claim books and inserts," but, the term "insert" on the German version has been translated into a yet another incorrect German term – Beilage – that would describe a print supplement to a newspaper or magazine; not the kind of Insert as issue here. Therefore, users of the Books Database who own rights to Inserts are likely to be misled about their rights and may not understand that they may claim rights to such works.

27.    Once a publisher or author accesses the Books Database, they encounter a vast amount of irrelevant and useless information, as the Books Database contains bibliographic information (metadata) for books (and journals) regardless of whether or not such works are touched by the Settlement Agreement. The sheer volume of search results from 80 million entries is cumbersome and renders targeted searches difficult.

28.    While the Books Database does provide information on whether works have been or will be digitized, in many cases the information is riddled with errors and duplicative or conflicting information. In some instances, Books have been assigned incorrect ISBNs, creating difficulties in identifying specific works or editions. In some cases, nearly identical editions of the same Book have been classified separately in the Books Database. In other cases, no clear distinction has been made between publishers

13

and imprints, and/or publishing companies have been named inconsistently – raising the probability that publishers will not locate all of their Books listed in the Books Database even with a diligent search. In the case of the work "Psychiatrische Therapie" by Josef Aldenhoff, the entry referring to the 2006 edition is incorrect, as the work was published in 2007 only. But the only record containing the correct year of publication provides an OCLC number instead of an ISBN, contains no information on the author, and doubles up the information on the publisher. These errors make the work difficult to locate and to identify correctly in the Books Database. A similar case is "Die Begleitung schwer kranker und sterbender Menschen" by Christoph Schmeling-Kludas, e.a., (also published by Schattauer) where two entries referring to the 2006 and the 2007 editions each contain repetitions and confusing information on authors. In fact, this work was published in 2007 only. The work "Veterinary Anatomy of Domestic Mammals" is listed at least three times. Only one record seems to be accurate. The two other records contain errors in the author field, and inconsistent information on the publisher (Schattauer).

29.    Publisher names are often misspelled. For example, the book "Bundesrepublik Deutschland, Rohstoffsituation 2006" was published by E. Schweizerbart'sche Verlagsbushhandlung (Naegele u. Obermiller). The Books Database uses a made up abbreviation for this publisher (Schweizerbart Sche Vlgsb) in some instances and misspells the publisher name (at least seven different ways) in others.

30.    For these reasons, the same Book may turn up numerous times in the Books Database, but with incorrect information concerning publishers, imprints, and/or editions. I have been informed that these errors have made it difficult and burdensome for German publishers to identify their works in the Books Database (something they are

forced to do if they wish to protect their rights), and to assess the digitization and commercial availability status of their works, as set forth by Google and as explained in more detail in certain other declarations being presented to this Court in connection with our Objections. This burden is compounded by the fact that Google apparently "updates" the information on the Books Database without notice.

31.     Significantly, the spreadsheets to which users of the Books Database may download their search results are all in English, including embedded texts which include directions on how to manage books.

32.     Our organization has notified Google of these problems but, despite our repeated requests that Google improve the quality of the Books Database, it remains error-filled.

33.     It is my belief that the poor quality of the Books Database records is due, in part, to the process by which Google constructed the Books Database in the first place. Upon information and belief, whenever Google has reached an agreement with a particular library, Google has taken the metadata from that library's catalogue and added it to the Books Database. Yet such library catalogues often are imprecise because they contain records compiled many years in the past, according to criteria that today are obsolete. Upon information and belief, Google dumped the metadata from many library catalogues into the Books Database, and attempted – in many cases unsuccessfully – to match the information with records from a metadata provider, resulting in a Books Database with incorrect and multiple records for individual Books.

34.     Additionally, many books published as recently as 2008 and 2009 by German publishers are classified as not "Commercially Available," although these works

15

are in fact widely available for purchase in bookstores and through the Internet.
Examples include works published by German publisher Schattauer, such as
"Computertomographie bei Hund und Katze" by G. Wedekind and M. Streicher (2009);
"Interpersonelle Psychotherapie bei Depressionen und anderen psychischen Störungen"
by E. Schramm (ed.) (2009); and "Arbeitsbuch Psychoedukation" by A. Heinz et al.
(2008). Based on my experience, I estimate that approximately 75% of the books
identified as "in-print" by the leading German source of such information (the
"Verzeichnis lieferbarer Bucher") are not identified as Commercially Available by
Google.

35.    The Settlement Agreement deems a work Commercially Available only if
Google deems these works to be sold as new, at the relevant time period, through
customary channels of trade in the U.S. and grants Google wide rights to use any works
that Google deems to be not Commercially Available. This is particularly problematic
because works that have been made available by publishers only outside of the U.S. and
not yet in the U.S. may have particular value in the U.S. market, as they have the
potential to be privately licensed for exploitation in the U.S. If Google is given broad
rights to exploit these works by default (as the Settlement Agreement currently provides),
rightsholders of these works could rapidly lose the entire U.S. market potential for them.

36.    For all of these reasons, even if German class members have understood
that they should search the Books Database to locate their works, they likely have been
confused by deficient and contradictory search results. These Books Database issues
combined with the notice problems discussed above make it highly likely that German

publishers will fail to locate a number of their works in the Books Database, and/or be confused about the status of many of the works that they were able to locate.

**Widespread Opposition To The Settlement**

37.    Although German class members remain confused over this sweeping Settlement Agreement, widespread, grassroots opposition has emerged across the country regarding the possibility that this Court could approve the agreement and upend their time-honored exclusive rights to control the use of their copyrighted works.  For example, in late April 2009, a group of 1,300 German authors sent a letter – which has been named the "Heidelberg Appeal" – to German President Horst Köhler, Chancellor Angela Merkel, and the heads of Germany's 16 federal states to express their opposition to Google's usurpation of their copyright rights.  A true and correct copy of the Heidelberg Appeal (in its original German and translated into English) is attached here as Exhibit J.

38.    Thus, regardless of how many individuals present formal objections to this Court, it is clear that hundreds of class members in Germany are deeply opposed to the Settlement Agreement.  If anything, the authors' direction of their opposition to heads of government in Germany, and not to this Court, demonstrates that many German class members do not understand the ostensible notice provided of this action and how to properly lodge their objections to the Settlement Agreement with this Court.

39.    Many German authors, especially those who also have signed the Heidelberg Appeal, have published articles and interviews in which they protest against the Settlement Agreement.  The famous German writer Julia Franck (who was recently awarded the most important German literature award Deutscher Buchpreis) gave an

17

interview in the newspaper "Die Welt", see: http://www.welt.de/die-welt/article3728939/Das-Internet-gefaehrdet-die-Existenz-der-Autoren.html, objecting to the Settlement Agreement.

40.    Recognizing the seriousness of these protests, the DG Internal Market of the European Commission has commenced an official fact-finding mission to assess the Settlement and its impact on foreign rightsholders.   The Commission has issued a call for comments and scheduled a public hearing on September 7, 2009 to determine how the Settlement Agreement would affect the rights of European authors and publishers and the European book market.  A true and correct copy of the Commission's notice, entitled Google Book Settlement Call for Comments and Public Hearing, is attached here as Exhibit K.

**Current European Digitization and Rights Projects**

41.    In contrast to the Settlement Agreement, which usurps copyright holder's rights, including the owners of so-called orphan works, Germany and other European countries have devoted significant time and resources to create framework for the use of orphan works and the digitization of European works while protecting authors' and publishers' rights.  These efforts have been undertaken under the European Commission's i2010 Digital Libraries Initiative, which is a part of the European Commission's strategic framework for European Information Society and media which was launched in September 2005.  This initiative sets out to make all Europe's cultural resources and scientific records – books, journals, films, maps, photographs, music, etc. – accessible to all, and preserve it for future generations.

42.     For instance, the Accessible Registries of Rights Information and Orphan Works towards Europeana (ARROW) "is a project of a consortium of European national libraries, publishers and collective management organizations, also representing writers through their main European associations and national organizations" that aims to "find[] ways to identify rightholders, rights and clarify the rights status of a work including whether it is orphan or out of print." *See* http://arrow-net.eu/, last accessed July 24, 2009.

43.     In addition, in 2005, the Commission sponsored a project known as Europeana, a European Digital Library that already contains 4.6 million digitised books, maps, photographs, film clips and newspapers, digitized with permission from the rightsholder. The collection of Europeana has more than doubled since it was launched in November 2008 ( IP/08/1747 ). On August 28, the European Commission, in a policy document declared as its target to bring the number of digitised objects to 10 million by 2010. See http://www.europeana.eu/portal/aboutus.html, last visited on August 8, 2009, and
http://ec.europa.eu/information_society/newsroom/cf/itemlongdetail.cfm?item_id=5181.

44.     Since 2007, regular meetings have been held between Börsenverein, the German national library (Deutsche Nationalbibliothek), the reprographic rights organization VG Wort, and the German Research Foundation (Deutsche Forschungsgemeinschaft) to develop a framework to support Europeana. This project also has the support of German authors. The parties have agreed on a detailed licensing model for orphan works which is based on a diligent search for the rightsholder. If such a search on the part of the library has been documented and has remained without result, libraries may receive a license from VG Wort to make use of the orphan work. This

solution provides a safe haven for libraries, but also ensures remuneration for the rightsholder from an escrow fund, should one or more rightsholders come forward later. The rightsholder may then also request removal of the work from the library's online service. Plans for an automated rights clearance platform to assist in the diligent search are moving forward.

45.     In addition, publishers in Germany have spent significant time and resources building "Libreka!," an on-line platform for the digital exploitation of books, where users can browse texts of book, do research, and read and purchase books. This platform offers only those books which it has been authorized to use. It would get direct and unfair competition from Google's uses of German books under the Settlement Agreement as German internet users are – without any breach of German laws – allowed to use so called proxy servers to circumvent any geoblocking that Google may seek to use to restrict its American websites to American internet users only.

46.     For each of the foregoing reasons, and for the reasons set forth in the Objections, Börsenverein objects to the Settlement Agreement and respectfully urges the Court not to approve it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 31, 2009

Dr. Christian Sprang

20