# Exhibit A

-----Ursprüngliche Nachricht-----
Von: Csillag, Sandra [mailto:csillag@literar.at]
Gesendet: Freitag, 27. März 2009 14:24
An: 'GoogleSettlement'
Betreff: AW: Legal Information for Your Members Re: Google Book Search
Settlement

Dear Madam or Sir,

This is to confirm, that I have already sent information to my members four
weeks ago. Every of Literar-Mechana´s 13.000 members got information on the
Google-settlement, the official website, an understandable summary of the
Notice and the business model of Literar-Mechana under the settlement in
development.

You should notice that the German version of the Notice is hardly
understandable without knowing the English version. In many cases the German
translation differs completely from the original text and/or is simply wrong.
The German Notice-text cannot be regarded as sufficient information on the
settlement.

Sincerely,
Sandra Csillag
Chief Executive

-----Ursprüngliche Nachricht-----
Von: GoogleSettlement [mailto:GoogleSettlement@KinsellaMedia.com]
Gesendet: Donnerstag, 26. März 2009 20:20
An: office@literar.at
Betreff: Legal Information for Your Members Re: Google Book Search Settlement

We are writing a final time to encourage you to provide your members with
information about the settlement of a class action lawsuit in the United
States regarding Google's scanning of books and other writings. The proposed
settlement affects the legal rights in the United States of authors and
publishers throughout the world.

A summary of the Google Book Search settlement appears at the end of this
email.  Detailed information about the settlement is available at
http://www.googlebooksettlement.com (which is translated into 35 languages).
Please read the full Notice, which has detailed information about the
settlement, important terms, the claims process, and key dates.  These
documents and assistance with the claims process are also available from the
Settlement Administrator by email
(BookSettlement@rustconsulting.com) or telephone (The toll # is
+1.612.359.8600.  Toll-free numbers for many countries are available on
the website or by request via reply to this email).

We would be grateful if you would please forward this email, or the Notice
itself with introductory language of your choice, to your members.  If you
have already done so, please let us know, so that our report to the court is
comprehensive.  Please let us know if you have any questions, and thank you
for your assistance.

Sincerely,
Kinsella Media, LLC
(court-approved Notice Provider) GoogleSettlement@kinsellamedia.com
+1.202.686.4111

Persons Outside the United States:

This settlement may affect you because it covers U.S. copyright interests in books published outside the United States. If you hold such an interest in a book or other material in a book, this settlement will bind you unless you timely opt out.

If You Are a Book Author, Book Publisher or Other Person
Who Owns a Copyright in a Book or Other Writing,

Your rights may be affected by a class action settlement regarding Google's scanning and use of Books and other writings.

Authors and publishers filed a class action lawsuit, claiming Google violated the copyrights of authors, publishers and other copyright holders ("Rightsholders") by scanning in-copyright Books and Inserts, and displaying excerpts, without permission. Google denies the claims. The parties have agreed to a settlement. This summary provides basic information about the settlement. "Books" and "Inserts" are described below.

What Does the Settlement Provide?

The settlement, if Court-approved, will authorize Google to scan in-copyright Books and Inserts in the United States, and maintain an electronic database of Books.  For out-of-print Books and, if permitted by Rightsholders of in-print Books, Google will be able to sell access to individual Books and institutional subscriptions to the database, place advertisements on any page dedicated to a Book, and make other commercial uses of Books.  At any time, Rightsholders can change instructions to Google regarding any of those uses.  Through a Book Rights Registry ("Registry") established by the settlement, Google will pay Rightsholders 63% of all revenues from these uses.

Google also will pay $34.5 million to establish and fund the initial operations of the Registry and for notice and settlement administration costs, and at least $45 million for cash payments to Rightsholders of Books and Inserts that Google scans prior to the deadline for opting out of the settlement.

Who Is Included?

The settlement class includes all persons worldwide who own a U.S. copyright interest in any Book or Insert. The meaning of "U.S. copyright interest" is broad. Wherever you are located, please read the full Notice to determine whether you are included in the settlement.

There are two Sub-Classes:
* The "Author Sub-Class" (authors of Books and other writings, and their heirs, successors and assigns), and
* The "Publisher Sub-Class" (publishers of Books and periodicals, and their successors and assigns).

What Material Is Covered?

"Books" include in-copyright written works, such as novels, textbooks, dissertations, and other writings, that were published or distributed in hard copy format on or before January 5, 2009.  U.S. works must be registered with the U.S. Copyright Office to be included in the settlement.  "Books" do not include periodicals, personal papers, sheet music, and public domain or government works.

"Inserts" include any text and other material, such as forewords, essays, poems, quotations, letters, song lyrics, children's Book illustrations, sheet music, charts, and graphs, if independently protected by U.S. copyright, contained in a Book, a government work or a public domain book published on or before January 5, 2009 and, if U.S. works, registered (alone or as part of another work) with the U.S. Copyright Office.  Inserts do not include pictorial content (except for children's Book illustrations), or any public domain or government works.

The Notice contains a more detailed description of these terms and other essential information about the settlement.

What Should I do?

Please read the full Notice, which is available at http://www.googlebooksettlement.com. Decide whether you should:
* Remain in the settlement.  If you do so, you will be bound by the Court's rulings, including a release of your claims against Google.
* Object to or comment on the settlement.  You must object/comment in writing by May 5, 2009.
* Opt out of the settlement and keep your right to sue Google individually. You must opt out in writing by May 5, 2009.
* File a claim for a cash payment (if you are eligible to do so).  You must file your claim by January 5, 2010.

The Court has appointed Class Counsel to represent the two Sub-Classes. If the settlement is approved, Class Counsel for the Author Sub-Class will request attorneys' fees and expenses that Google has agreed to pay. You can also hire your own attorney at your own cost.

The Court will determine whether to approve the settlement at a Fairness Hearing on June 11, 2009 at 1:00 p.m.


Get Complete Information, Including the Full Notice:
Visit: http://www.googlebooksettlement.com     Call: 1.888.356.0248
Write:   Google Book Search Settlement Administrator, c/o Rust Consulting
P.O. Box 9364, Minneapolis, MN  55440-9364  United States of America

# Exhibit B

"profil" Nr. 30/09 vom 20.07.2009          Seite: 100
Ressort: Kultur

Von: Wolfgang Paterno

# Die Bücherfresser

Internet. Das US-Unternehmen Google hat bereits Millionen von Büchern
eingescannt und in Auszügen oder in voller Länge veröffentlicht. Ist der Vormarsch
des Informationsimperiums noch zu stoppen?

Selbst in dieses schmucklose Kellergewölbe, tausende Kilometer von der Zentrale
entfernt, reichen die krakenartigen Fangarme des Milliardenkonzerns. Das Büro des
Dichters Gerhard Ruiss, seit Jahrzehnten oberster Interessenvertreter der
österreichischen Autorinnen und Autoren, liegt in einer beschaulichen Seitengasse
im siebenten Wiener Bezirk; der mit Büchern und Akten vollgestopfte Raum befindet
sich unter Straßenniveau. Eine Fensteröffnung erhellt das Zimmer dürftig, von den
vorbeieilenden Passanten sind von unten nur Schienbeine zu sehen. In den mit
einem Topf Edelweiß behübschten Arbeitsraum des Literaturlobbyisten verirren sich
selten Besucher.

Dennoch fühlt sich Ruiss, 58, seit geraumer Zeit unter verschärfte Beobachtung
gestellt. Rund sechzig seiner während der vergangenen Jahrzehnte publizierten
Einzelveröffentlichungen – Kataloge, Gedichtbände, Jahresschriften, jede Art von
Publizistik, vieles davon vergriffen – fand der Autor kürzlich in einem vom US-
Internetkonzern Google erstellten Verzeichnis gelistet, mit dem der
Suchmaschinengigant sich in Zukunft etwaige Publikationsmöglichkeiten am
Ruiss'schen Werk zu sichern beabsichtigt. „Ich habe Tage damit zugebracht, den
Schock über das größte Kapern von Rechten, das es je gab, zu verarbeiten", erinnert
sich der Schriftsteller, der jede Form von Alarmismus scheut – und dennoch Alarm
schlägt: „600 Jahre Buch- und Kulturgeschichte werden von Google restlos und
systematisch geplündert. Bislang wurde die Angelegenheit dramatisch unterschätzt.
Anfangs hielt man die Debatte für eine rein inneramerikanische Angelegenheit,
langsam wird aber klar, in welchem Ausmaß die Causa auch uns betrifft."

Die planvolle Informationsbeschaffung mittels Digitalisierung ist das mit Verve
vorangetriebene Hauptprojekt des im kalifornischen Mountain View ansässigen,

global agierenden Datenverarbeiters mit dem niedlichen Slogan „Don't be evil!" (zu Deutsch: Sei nicht böse!). „Google hat sich der Buchbranche mit vorgehaltener Pistole als neuer Verleger vor die Nase gesetzt", kommentiert eine renommierte US-Literaturagentin die Speicheroffensive, durch die das gewachsene Gefüge aus Textproduzenten und Verlagen, Buchproduktion und Handel nachhaltig durcheinanderzugeraten droht. „Das Weltwissen organisieren, um es universell verfügbar und nutzbar zu machen", so definieren die Suchmaschinenbetreiber ihr Ziel. Während die einen „Epochenwandel" („Die Zeit") ausmachen, erblicken andere in der von Google angestrebten Info-Demokratisierung schlicht „Piraterie" („taz"). Das 1998 gegründete US-Unternehmen hat 2004 damit begonnen, urheberrechtlich geschützte Bücher in großem Stil zu digitalisieren und auf books.google.com in Auszügen oder in voller Länge verfügbar zu machen. Laut eigenen Angaben hat der Internetdienst trotz Rechtsunsicherheit bis November des Vorjahrs rund sieben Millionen Exemplare aus US-Bibliotheken gescannt.

Maschinenpark. Erklärtermaßen sollen davon je eine Million lizenzfrei sein und eine aus Programmen mit Rechteinhabern stammen. Der Hauptteil dessen, was unter Einsatz eines gigantischen Maschinenparks digital eingelesen und in pdf-Dateien umgewandelt wurde, besteht aus Druckerzeugnissen mit bestehendem Copyrightschutz, die vergriffen und käuflich nicht mehr erwerbbar sind. Bei diesen so genannten „verwaisten Werken", Schriften, die nach wie vor unter das hierzulande vor 200 Jahren eingeführte Urheberrecht fallen, ist es vielfach unmöglich, die jeweiligen Rechtsvertreter ausfindig zu machen. (Hinzu kommen „gemeinfreie Bücher", Drucke, bei denen kein Verfasserschutz mehr besteht – in den USA alle vor 1923 veröffentlichten Titel; hierzulande werden Romane und Sachbücher siebzig Jahre nach Ableben eines Autors rechtefrei.)

Kenner der Materie wie Gerhard Ruiss gehen allerdings von einer doppelt so hohen Zahl an bereits eingescannten Einzelbänden aus. Zum Vergleich: Das vor über zehn Jahren gegründete Projekt Gutenberg, das ausgesuchtes, klassisch-rechtefreies Lesematerial kostenlos ins Netz stellt, umfasst derzeit rund 1800 vollständige Romane, Erzählungen und Novellen.

Die österreichischen Bibliotheken verweigern bis dato laut eigener Kundmachung jede Kooperation mit den US-Web-Kopisten; im deutschsprachigen Raum hat lediglich die Bayrische Staatsbibliothek Google eingestandenermaßen eine Million urheberfreie Folianten zur Verfügung gestellt. Pro Band, so eines der raren Details

des lange Zeit geheim gehaltenen Deals, fielen rund vierzig Euro Einscannkosten an, teilte unlängst ein Sprecher der Sammlung mit.

Im Jahr 2005 brachte die US-Autorengewerkschaft Authors Guild, die mehr als 8000 Schriftstellerinnen und Schriftsteller vertritt, gemeinsam mit dem Verlegerverband Association of American Publishers Klage gegen Google wegen Verletzung des Urheberrechts in Millionen von Fällen ein.

Der Raubkopiererei wurde Ende Oktober 2008 von einem US-Gericht ein zumindest vorläufiges Ende bereitet. In einem Vergleich – dem „Google Book Settlement" – haben sich die Streitparteien zu einem hunderte Seiten umfassenden, von einem Stab millionenteurer Anwälte ausgehandelten Arrangement durchgerungen. Auf seiner Homepage gibt der Textdealer bekannt, dass er „noch mehr Bücher dieser Welt online verfügbar zu machen" gedenke, wovon „Autoren, Verlage, Forscher und Leser gleichermaßen langfristig" profitierten. Der Börsenverein des Deutschen Buchhandels warnt hingegen davor, dass „Google antritt, die weltweite Wissens- und Kulturverwaltung zu übernehmen". Im kürzlich publik gemachten „Heidelberger Appell" wenden sich 1300 namhafte Intellektuelle – darunter Hans Magnus Enzensberger, Siegfried Lenz, Daniel Kehlmann und Sibylle Lewitscharoff – mit der dringenden Aufforderung zu Sofortmaßnahmen an die deutsche Bundesregierung: Das „verfassungsmäßig verbürgte Grundrecht von Urhebern auf freie und selbstbestimmte Publikation", so der Text der Resolution, sei durch die Daten-Akkumulation nachhaltig bedroht. Als erster prominenter Schriftsteller scherte Lars Gustafsson aus der Einheitsfront der Google-Verächter aus: „Es ist scheinheilig, wenn sich Autoren, die im Jahr nur 600 Exemplare verkaufen, über Google beklagen", so der schwedische Romancier kürzlich in einem Interview. „Die sollten froh sein, dass sie dadurch ein paar Leser mehr haben." Der Wiener Buchmarktexperte Rüdiger Wischenbart, der im Richtungsstreit eine überaus differenzierte Position einnimmt, plädiert ebenfalls dafür, Google keinesfalls zu verteufeln (siehe Kasten).

Konkurrenzkampf. Die österreichischen Interessenverbände und Verwertungsgesellschaften haben sich in einer akkordierten Aktion auf einen Maßnahmenkatalog geeinigt – im Auftrag der Autoren soll die Literar-Mechana, die größte heimische Urheberrechtsorganisation für Textarbeiten, gegenüber Google unter anderem Vergütungsansprüche geltend machen sowie das Recht wahrnehmen, vergriffene Bücher aus dem Digitalisierungsprogramm zu entfernen.

Das Ende vergangenen Jahres getroffene Settlement sieht unter anderem vor, dass Google eingescannte, nicht mehr lieferbare Druckerzeugnisse in verschiedener Form nutzen darf, von der Veröffentlichung in Abschnitten bis zum Daten-Online-Verkauf vollständiger Bücher. Die Internetfirma erklärt sich bereit, für Werke, die bis zum 5. Mai 2009 digitalisiert worden sind, eine einmalige Entschädigung von 60 Dollar pro Buch zu erstatten – falls sich Rechteinhaber melden; vorgesehen ist zudem eine 63-prozentige Beteiligung am digitalen Verwertungsgewinn der Einzelveröffentlichung – etwa durch Platzierung von Web-Werbung und preislich gestaffelte Lizenzvergaben an Privatanwender, Institutionen und Bibliotheken.

Die Zeit drängt: Die Widerspruchoption („Opt out"-Klausel) zum Google Book Settlement läuft am 4. September ab. All jene Autorinnen und Autoren, die dem Vergleich bis dahin nicht widersprochen haben, werden automatisch so behandelt, als hätten sie ihm zugestimmt: Der Buchgrossist könnte sich so das Monopol auf die weltweit größte digitale Bibliothek und die umfassendste Backlist auf Jahrzehnte hinaus sichern. „Da zeichnet sich eine heftige Konkurrenz zwischen Google und Amazon ab", konstatiert Konsulent Wischenbart.

Im April 2011 soll das „Removal"-Recht verfallen, jene Einspruchsmöglichkeit, mit der Einträge aus der Google-Datenbank entfernt werden können; wer sich bis Anfang 2010 auf books.google.com nicht um die Eröffnung eines entsprechenden Kontos bemüht haben wird, verliert jeden Anspruch auf finanzielle Entschädigung. Nicht zuletzt verpflichtet sich Google zur Schaffung einer Rechteagentur (Book Rights Registry), die sich dereinst um die Entschädigungshonorare und die Verteilung der lukrierten Werbeeinnahmen kümmern soll. Offenbar rechnet der Internet-Literaturvermittler mit geringer Nachfrage: Lediglich 34 Millionen Dollar sind zur Eröffnung der Verwertungsgesellschaft für mögliche Autorenforderungen reserviert. Google, so vermuten Insider, gehe davon aus, dass höchstens einer von zehn Copyright-Inhabern seine Ansprüche geltend machen wird. Am 7. Oktober 2009, 10 Uhr Ortszeit, wird der New Yorker Richter Denny Chin darüber entscheiden, ob der Vergleich in dieser Form genehmigt wird.

Als Verfechter großer Zahlen präsentiert sich der Netzkonzern andernorts. „Google versucht so gut wie jeden Text, der jemals gedruckt erschienen ist, in seine Digitalarchive einzuspeisen", sagt Literaturfunktionär Ruiss. „Dabei denkt das Unternehmen nicht redaktionell. Die Devise lautet: Wir übernehmen jetzt den Laden,

und dann beschließen wir, was wir damit anfangen. Was wirft mehr, was weniger Geld ab? Was ist Kupfer? Was ist Blech? Was ist Gold?"

Im Pool jener Autoren, deren Werk Google bald legal der methodischen Monetarisierung unterziehen will, finden sich nicht nur die Namen bekannter Größen wie Peter Handke (mit diversen Übersetzungen mehr als 500 Titel) und Elfriede Jelinek (350 Titel). Das 2007 publizierte Debüt des jungen Grazers Clemens J. Setz ist ebenso im Google'schen Textreservoir vorhanden wie 23 Veröffentlichungen der kürzlich verstorbenen Dichterin Elfriede Gerstl. Mit erschreckender Gründlichkeit wird die Buchlandschaft vermessen: Vom inzwischen nahezu vergessenen Wiener Lokalmatador Joe Berger (1939–1991) ist seit Langem kein Titel lieferbar. Google will in Zukunft über zwölf Bücher des Radikalpoeten verfügen.

Bild: Schöne neue Lesewelt Bibliothek der US-Universität Stanford; Serverfarm Bild: Literaturlobbyist Ruiss „Das größte Kapern von Rechten, das es je gab"