UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

The Authors Guild Inc., Association of American
Publishers Inc., et al.,

                        Plaintiffs,

       - v. –

Google Inc.,

                      Defendant.

Case No. 05-cv-8136 (DC)

# MEMORANDUM OF LAW IN OPPOSITION TO THE SETTLEMENT PROPOSAL ON BEHALF OF THE FEDERAL REPUBLIC OF GERMANY

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Theodore C. Max, Esq. (TM-1742)
Edwin C. Komen, Esq. (*Pro Hac Vice* Application Pending)
30 Rockefeller Plaza, 24th Floor
New York, New York 10017
Tel.: (212) 332-3602
Fax: (212) 332-1201
Counsel for Federal Republic of Germany

Dated: New York, New York
       August 31, 2009

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................. 1

INTEREST OF AMICUS ........................................................................................................ 3

ARGUMENT .......................................................................................................................... 9

CONCLUSION........................................................................................................................ 22

# TABLE OF AUTHORITIES

Cases

Amchem Products, Inc. v. George Windsor,
    521 U.S. 591 (1997)................................................................................................................21

Baffe v. Donaldson, Lufkin & Jenrette Sec. Corp.,
    222 F.3d 52, 60 (2d Cir. 2000)..............................................................................................21

East Tex. Motor Freight System, Inc. v. Rodriguez,
    431 U.S. 395 (1977)................................................................................................................21

Kelly v. Arriba Soft Corp.,
    336 F.3d 811 (9th Cir. 2003) .................................................................................................12

Perfect 10, Inc. v Amazon.com Inc.,
    487 F.3d 701 (9th Cir. 2007) .................................................................................................12

Schelsinger v. Reservists Committee to Stop the War,
    418 U.S. 208 (1974)................................................................................................................21

Statutes

Federal Rules of Civil Procedure 23(a) .........................................................................................21

## PRELIMINARY STATEMENT

The Federal Republic of Germany ("Germany") hereby submits this Memorandum of Law to apprise the Court of the significant adverse impact that the proposed Settlement would have on German authors, publishers and digital libraries, in particular, and more generally on authors, publishers and digital libraries in the European Union ("EU") and other countries outside the United States ("U.S."). Although this submission is directed specifically to the interest of the amicus curiae, it is believed that many of the issues troubling German authors, publishers and digital libraries will be of similar concern to authors, publishers and digital libraries in the United States and throughout the world.

The 134-page proposed Settlement (not including attachments) sets forth what purports to be a comprehensive system for exploitation of copyrights in the digital age. This system, however, has not been enacted by any legislative or industry body, as would, without regard to commercial advantage or profit, typically take into account domestic and worldwide developments and trends in the industry and copyright law. Instead, to the contrary, the proposed Settlement is a privately-negotiated document that is shrouded in secrecy, formulated behind closed doors by three interested parties, the Authors Guild, the Association of American Publishers and Google, Inc. ("Google"), resulting in a commercially driven document that is contrary to established international treaties and laws. These principally include the world's oldest and most venerable multilateral copyright treaty, the Berne Convention ("Berne"),[1] as well

---

[1] The Berne Convention for the Protection of Literary and Artistic Works first signed on September 9, 1886 with entry into force on December 5, 1887. The Berne Convention has since undergone seven principal revisions, the most recent being the Paris Revision signed on July 24, 1971 with entry into force on October 10, 1974. The Berne Convention is administered by the World Intellectual Property Organization, generally known as WIPO, headquartered in Geneva, Switzerland. Germany was among the first signatories in 1886. The Berne Convention now counts 164 countries as contracting parties with the United

as the more recent World Copyright Treaty (the "WCT") which attempts to regulate international copyright relations in the digital age.[2] The Settlement also runs afoul of the applicable German national laws, as well as European public initiatives to create non-commercial worldwide digital libraries. While each of the three interested parties purports to represent a well-defined constituency, or sub-class, none represent the interests of German authors, publishers and digital libraries nor are they truly accountable. Further, should the Court approve the Settlement as presently drafted, there is good reason to believe that they are unlikely to be held accountable in the future.

Although the Settlement on its face purports only to apply to works under United States copyright law, the Settlement, by its sweeping grant of rights and immunities to defendant Google, will irrevocably alter the landscape of international copyright law by impacting the rights of German authors, publishers and digital libraries not only within the U.S. borders but also beyond to undermine the traditional contours of internationally accepted copyright standards and values as expressed in both the Berne and WCT treaties to which also the U.S. adheres. However, should it be facilitated by judicial approval, this merely private agreement has the potential for violating many of the most fundamental of exclusive rights under copyright, namely, the rights of reproduction and making works available to the public. These are rights not only clearly and unmistakably required by Berne and the WCT, but also expressly implemented under the laws of the U.S., Germany and virtually every other nation.

---

States joining as of March 1, 1989. See WIPO website, www.wipo.int/treaties, visited on August 31, 2009.

[2] Formally named the WIPO Copyright Treaty, adopted in Geneva on December 20, 1996, slightly more than 110 years after the Berne Convention. Once again, Germany was one of the original signatories. The United States became a contracting party as of March 6, 2002. See WIPO website, www.wipo.int/treaties, visited on August 31, 2009.

## INTEREST OF AMICUS

The Federal Republic of Germany is historically called "Das Land der Dichter und Denker" (the land of poets and thinkers). German literature can be traced back to the Middle Ages and the works of such accomplished authors as Walther von der Vogelweide and Wolfram von Eschenbach. German authors and poets have won great renown, including Johann Wolfgang von Goethe and Friedrich Schiller. The Brothers Grimm folk tales popularised German folklore on an international level. German authors such as Thomas Mann, Bertolt Brecht, Hermann Hesse, Heinrich Böll and Günter Grass have been famed for their Twentieth Century literature. Twelve German authors have won the Nobel Prize for literature, putting Germany third most in countries with the most Nobel Laureates for literature.

Germany can rightfully claim the mantle of birthplace of modern printing and publishing. In 1439, Johannes Gutenberg of Mainz initiated the worldwide revolution in information through his invention of movable type printing technology, a transformation that can only be likened to the Internet of today. The high quality and relatively low cost of the Gutenberg Bible established the superiority of movable type and, as a result, printing presses rapidly spread across Europe, and later throughout the world, greatly influencing the spread of science and culture that became known as the Renaissance. It is small wonder that Gutenberg's press has been extolled by many as the most important invention of the second millennium. Germany continues its proud literary tradition as the third largest book producer in the world. German authors and publishers produce around ninety thousand new books each year. The German book market currently represents eighteen percent of all of the books published worldwide. Germany's Frankfurt Book Fair, one of the oldest and most prestigious, has a tradition that spans over five hundred years and is still considered the most important for

international publishing. Another world-class book fair is staged every spring in Leipzig and serves in particular as a bridge to Eastern European countries.[3]

Germany has always zealously protected the rights of authors who create these invaluable cultural and scientific assets through its adherence to the Berne Convention since 1886 and as an original signatory to the WCT. The U.S. has likewise adhered to these treaties. The proposed Settlement is contrary to both the Berne Convention and the WCT. For example, pursuant to Article 6 of the WCT, authors enjoy the exclusive right of making available the original and copies of their literary works to the public. Similarly, Germany and EU law grants to authors the exclusive right of making available. See German Copyright Act, Section 19a;[4] and corresponding EU-Directive, Article 3, para. 2.[5] Under the German Copyright Act, authors as rightholders must give consent before any literary work is digitally copied or displayed. Digitization constitutes reproduction within the meaning of Section 16 of the German Copyright Act and thus represents an exclusive right of the author.

Even Google's seemingly benign rules on library on-premises display are at odds with the corresponding, but much more limited, rule on such displays in Germany. Google would make books broadly available at library access terminals. Such an unfettered right of use and access does not exist under German law. The German safe harbor for public library use grants a limited right for the making available of works at terminals on the library premises.

---

[3]   Declaration of Ministerialdirigent Dr. Johannes Christian Wichard, Deputy Director General of Directorate Commercial and Economic Law in the Federal Ministry of Justice of the Federal Republic of Germany, sworn to August 31, 2009.

[4]   (The German) Law Dealing with Copyright and Related Rights of September 9, 1965, as amended.

[5]   Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonization of certain aspects of copyright and related rights in the information society.

Article 52b, entitled, "Communication of works at terminals in public libraries, museums and archives," clearly provides, "So far as there are no contractual provisions to the contrary, it shall be permissible to make published works available from the stocks of publicly accessible libraries, museums or archives, which are not for direct or indirect economic or commercial advantage, exclusively on the premises of the relevant institution at terminals dedicated to the purpose of research and for private study. In principle, copies of a work in excess of the number stocked by the institution shall not be made simultaneously available at such terminals. Equitable remuneration shall be paid in consideration of their being made available. The claim can be made only through a collecting society."[6]

Based upon German and European legal developments with respect to digitization of written and published works, several public and private projects, including the European Digital Library ("Europeana") and the Deutsche Digitale Bibliothek (the German Digital Library or "DDB") or the commercial project, www.libreka.de, have sought to make such works available to the public where the rightholder's consent has been obtained or when a statutory exception applies. Europeana and DDB, thus, seek to ensure that digital control of the European

---

[6] Just prior to enactment of this measure, as part of the so-called "Second Basket" of the copyright law reform, the German Ministry of Justice issued a press release from Berlin, 5 July 2007, describing this carefully tailored balancing of rights:

> Building upon the first reform enacted in 2003, the Second Basket will further adapt German copyright law to the "digital age" and new technological developments. The Act establishes an appropriate balance between copyright holders' interests in the safeguarding and exploitation of their intellectual property and the interests of the equipment industry, consumers and science in using the works of right holders. "The basic parameters of copyright law must be analyzed regularly and adapted to technological changes. The balance between the rights of copyright holders and the public interest must be constantly fine-tuned. This Act is something we can be proud of. It provides an important contribution that will help Germany stay up to date in the information society," stated Federal Minister of Justice Brigitte Zypries.

and national cultural heritage remains with the public, and thus a democratic responsibility, while fully respecting existing copyright rights.

The proposed Settlement also attempts to characterize itself as applying to actions taken only within the United States and, hence, without impact in other countries where U.S. copyright rules do not apply. Nowhere is this more clearly incorrect than in the realm of making the books available over the Internet. Once the database is posted, Internet users even in Germany will have access to the Google Books Search by using a freely accessible U.S. proxy server. In other words, even if the digital book database is entirely localized within the United States, it will still be available for search requests from Germany.

Privacy is another key area of conflict. The proposed Settlement has few provisions protecting the privacy of authors, publishers or users. In sharp contrast, Germany strongly protects the privacy of individuals who use the Internet through the Federal Data Protection Act (Bundesdatenschutzgesetz or "BDSG") of 1990, as amended in 2009, and the Telemedia Act (Telemediengesetz or "TMG") of 2007, as amended in 2009. German law requires that any provider of services on the Internet must offer anonymizing or pseudonymizing services to recipients of the service if this is technologically feasible and reasonable. Providers of services may only collect and use personal data for the provision of telemedia only to the extent that the Telemedia Act or another statutory provision referring expressly to telemedia permits it or that the recipient of the service has given his approval. Personal data collected for the provision of telemedia may be used by the service provider for other purposes only to the extent that the Telemedia Act or another statutory provision referring expressly to telemedia permits it or if the recipient of the service has given his approval. Data subjects must be informed of the type, scope and purpose of the collection, processing and use of personal data

and the user's right to withdraw permission at any time prior to the beginning of the collection. The EU-Directive 2002/58/EC of 2002 further ensures that such personal data is protected in the same manner throughout the single European market. By failing to ensure similar or adequate privacy protections, the proposed Settlement violates well-established national and international privacy laws.

The proposed Settlement raises an even more fundamental issue of fairness, causing concern that German authors may find their own voices unheard. The plaintiff Authors Guild, representative of the author sub-class, cannot adequately and fairly represent German authors or their interests because of its limitations on membership. For an author to join the Authors Guild, he or she must have been published by an established American publisher.[7] A publication by a non-U.S. publisher will not qualify an author for membership. This fails to acknowledge the important role that German authors play in world literature or that not all German authors will have secured a U.S.-publishing arrangement. As a consequence, there are few German authors who are members of the Authors Guild. This, in turn, means that German authors have had little or no say in the settlement process even though any German author who published a book on or after January 1, 1923 and on or before January 5, 2009 is a member of a sub-class represented by an organization that excludes them from membership.

Similarly, the plaintiff Association of American Publishers does not adequately and fairly represent German publishers or their interests because its membership is only open to "all U.S. companies actively engaged in the publication of books, journals, and related electronic

---

[7]  See the Authors Guild website at https://www.authorsguild.org/join/eligibility.html, visited on August 31, 2009.

media."[8] A non-U.S. publisher by definition would not be permitted membership. As a consequence, there are no German publishers who are members of the Association of American Publishers. The occupational and professional organization representing the German book trade is the Börsenverein des Deutschen Buchhandels in Frankfurt/Main (the "BDB"), which was founded in Leipzig in 1825. It represents book publishers, intermediaries and general book retailers. In 1964, the BDB founded the Ausstellungs und Messe GmbH, which organizes the previously described Frankfurt Book Fair. The highpoint of every Frankfurt Book Fair is the award of the Peace Prize of the German Book Trade. In spite of its prestigious roots, the BDB is nowhere found to be part of or represented in the proposed Settlement.

For the reasons summarized above, the proposed Settlement will have an immediate impact upon German authors, publishers and digital libraries by setting a industry-changing precedent that not only gives defendant Google an unfair advantage over all other digital libraries (commercial and non-commercial) in the United States and Germany, but also will flout German laws that have been established to protect German authors and publishers, including with respect to digital copying, publishing and the dissemination of their works. The decision of this Court with respect to this Settlement will have the dramatic and long-range effect of creating a new worldwide copyright regime without any input from those who will be greatly impacted -- German authors, publishers and digital libraries and German citizens who seek to obtain access to digital publications through the Google service.

---

[8]  See Association of American Publishers website,
     http://www.publishers.org/main/Membership/member_01.htm, visited on August 31, 2009.

ARGUMENT

The principal problem with the class action process, ostensibly designed to make whole victims of prior harm while discouraging future misconduct by the defendant, is that it is being used by Google to obtain a compulsory license to all books in copyright throughout the world, which it could not get otherwise under law. It is likewise being used by the Authors Guild and Association of American Publishers to take control over the emerging market for digital literary works, create a new collecting body, the Book Rights Registry, and receive the revenue from commercialization of digital rights, which they could not get otherwise under law. The proposed Settlement provides a detailed structure binding the parties, many either unknowingly or unwillingly, to a prospective regulatory scheme forever governing their copyright and privacy rights while providing no incentive for the defendant to modify its conduct of violating the copyright laws and then later seeking to legitimize its wrongdoing in a class action context. This is not a typical class action settlement. There is simply no precedent for the breadth of this plan which is too lengthy, too inclusive, and too invasive of the traditional contours of copyright law to be free of any proper public discourse and compromise. It has been a process which wholly circumvents the constitutionally mandated give and take of the legislative process that would normally require passage by the House and Senate and signature by the President. This blunderbuss approach should be discouraged given the Settlement's potential effect on the rights of the authors, publishers and digital libraries of one of the U.S.'s principal trading partners, namely, Germany.

Simply put, under the proposed Settlement, you are either in the class or you are out. In order to be out, you must opt out and you must tell the Court you don't want "in". If you remain silent, you are deemed in, which is contrary to the basics tenets of copyright law, which

requires a written license where the author grants his or her exclusive rights. If you are in, you are bound by the judicially sanctioned departure from international copyright law formulated by three American entities. These changes include the creation of an extra-judicial body known as the Book Rights Registry and the implementation of a formality laden, private regulatory regime requiring, among other things, filing detailed claim forms and disclosing private personal data. If an author is "in" and does not file, the author receives nothing. Moreover, if the author opts out, he or she has no right to object because, we are told, that the Settlement -- which covers all books found in U.S. libraries that were published anywhere in the world on or before January 5, 2009 -- does not affect those who opt out.[9] If one wants to object, the author must stay in and be bound. Such is the "one size fits all" reality of a class action settlement that does not lend itself to a case that impacts international copyright laws and the rights of many worldwide, including German authors, publishers and digital libraries.

The opt out mechanism stands on its head the most fundamental and essential underlying principal of international copyright law and the laws of Germany -- exclusivity. Under both U.S. and German copyright law, no one may use an author's intellectual property without permission. While narrowly drafted exceptions have always been recognized both in the

---

[9] Google's official FAQs found at http://www.googlebooksettlement.com/help/bin/answer.py?answer=118704&hl=en, includes the following:

Question 21 – What happens to the books of authors and publishers who opt out of the settlement? – If an author or publisher opts out of the Settlement, the terms of the Settlement will not apply to this author or publisher. This means that the author or publisher is retaining all rights to bring a legal action against Google, for digitizing and displaying the author's or publisher's books and Inserts, and against the Participating Libraries, if desired. It also means that the Settlement neither authorizes Google to make certain uses of these books and Inserts **nor does it prohibit Google from doing so**. (Emphasis added). The bolded language conveys the clear implication that Google will not feel bound by the opting out process and may very well choose to continue infringing the books of those who opt out, possibly in reliance on the same "fair use" arguments that resulted in the present class action.

United States, Germany and elsewhere, nowhere has there ever been a blanket exception granting a compulsory license for digital reproduction, distribution and display of published works on such a massive scale. Furthermore, the presumed "license" is automatic and compulsory even if an author simply forgets or neglects to say "no", namely, "opt out" -- on or before September 4, 2009. After that day, you are deemed in. This includes not only American authors but also authors from around the world, including Germany, whether or not they are even aware of the present suit. In truth, even many U.S. authors are unaware of how their copyright interests are about to be forever altered, let alone authors in Germany or elsewhere. The end result will effectively vest control over all pre-1/6/09 books -- both U.S. and international -- in a single, private corporation subject to the jurisdiction of this Court, with little public oversight, whether or not such control is benignly characterized as "non-exclusive." This concept -- that an American entity could gain control over the works of German and other foreign authors and the privacy rights of German citizens without their consent -- is so contrary to German law and inherently disturbing that Germany could not permit the September 4th deadline to come and go without voicing its opinion to this Court on behalf of one of its most valued intellectual and cultural bodies, namely, Germany's authors, publishers and digital libraries.

As viewed by Germany, and summarized below, the primary flaws of the proposed Settlement are:

- The Settlement will have a significant impact on the interests of German and European authors and publishers, since they are bound by the provisions of the Settlement unless they expressly opt out;

- Google's conduct is not compatible with the fundamental principles and provisions of German and European copyright law, pursuant to which each author's consent must be obtained before digital reproduction, display and distribution. The Settlement is a private consensual "agreement" with a commercial American company which owes its primary legal obligations to its shareholders and not the public interest.

- An essential feature of international copyright law, as mandated by Berne, is the prohibition of any formality as a precondition for enjoying or enforcing a copyright interest. The U.S. eliminated such statutory formalities when it joined Berne. The Settlement re-imposes such formalities by requiring registration of authors and their works in order to enjoy any of the benefits of the Settlement, thus assuring that many authors will be left out through oversight.

- The creation of digital copies by Google for the purpose of developing a commercially driven database is not permitted under German law as this violates the author's exclusive right of reproduction. Under German copyright law, rightholders must give their consent before any copies, including digital copies, of books are made. Google's actions are not justified by any existing exceptions (Sections 44a to 62 of the German Copyright Act);

- Google's creation of digital copies for the purpose of developing a commercially driven database is likewise not permitted under European law. Pursuant to Article 2 of the Directive on the Harmonisation of Certain Aspects of Copyright and Related Rights in the Information Society (see 2001/29/EC the "Copyright Directive"), the European Community author has an exclusive right of reproduction. Google's actions violate this exclusive right and cannot be justified by any of the exceptions provided for in Article 5, ¶¶ 2 and 3 of the Copyright Directive;

- Digitization also constitutes reproduction under U.S. copyright law. Unauthorized reproduction by Google on such a massive scale is not justified by application of any "transformative" or "fair use" defense recognized by the U.S. federal courts.[10] Google more or less concedes this point by seeking this Settlement. Nevertheless, the proposed Settlement compounds the infringement by forcing non-consenting German authors to grant a license for acts that violate their rights under U.S. and German law through a judicially-sanctioned compulsory implied "consent."

- Furthermore, opting out is unlikely to keep a German author's books from being digitized and displayed as Google has intimated that it will continue to treat the books of those authors as fair game under the rubric of fair

---

[10] The outer limits of "fair use" in the digital realm appear to have been delineated by the Ninth Circuit, in cases generally holding that use of "thumbnails" of photos for indexing purposes -- namely, providing a mechanism to locate the authorized high resolution images -- was a permissibly transformative fair use. Kelly v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003) and Perfect 10, Inc. v. Amazon.com Inc., 487 F.3d 701 (9th Cir. 2007), the case involving Google as a defendant. Any use beyond the indexing function, however, appears to fall outside the fair use privilege.

use.[11] If an author does not agree and opts out, he or she has the "option" to sue Google;

- The Settlement also permits Google to digitally scan books of German authors and make them available to the public in the U.S. Authors of "commercially available" books will still need to grant consent for this display. However, should Google unilaterally determine that a book is not commercially available (out-of-print), it need not secure any rightholder permission -- meaning those who opted in by not opting out. Instead, Google may make such display uses as it chooses unless the rightholder follows the filing requirements. It seems unlikely that most German authors will make such formal filings as such filings would, as discussed above, normally be considered a formality prohibited by international copyright laws. In failing to file, however, the works of the vast majority of German authors will be held hostage to whatever uses Google, in its sole discretion, chooses to make;

  o As a consequence, the Settlement breaches the WCT which provides in Article 6 that authors enjoy the exclusive right of authorizing the making available to the public of the original and copies of their works. Under the Settlement, no express authorization by rightholders is required for out-of-print works. For the reasons outlined above, most works of German authors will be deemed commercially unavailable either because they are out-of-print in the U.S. (generally because of the limited demand for German language books in the U.S.), or the authors neglected to file formal claim forms, or because these authors are not easily found by Google. The determination of commercial availability is solely within Google's discretion and may, in close cases, give Google an incentive to balance considerations in a manner that favors a finding that a book is out-of-print;

  o At the same time, the Settlement contravenes both German and European law, since both recognize the right of "making available" as an author's exclusive right (Section 19a of the German Copyright Act and Article 3, Para. 2 of the Copyright Directive). This right is analogous to the distribution and display rights that "make available" public access to any given work. As a result, U.S. law comports with international copyright standards but the proposed Settlement does not;

  o Under the provisions of the Settlement, Google is granted, as a practical matter, a virtual monopoly in the U.S. on orphan

---

[11]  See Footnote 10, *supra*.

works, namely, those works protected by copyright where the authors or rightholders are unidentified or cannot be located. While not specifically identified as such in the Settlement, orphan works still play an important role. Since orphan works are usually out of print, Google does not need express authorisation to make them publicly available, so that it faces no adverse consequences should an author of an orphan ever come forward. It is likely that many German authors will fail to file claims, so that their works will become the legal equivalent of orphan works. As such, the revenues generated by their orphans will fall into the Settlement fund for distribution only to authors who have filed rather than to the many non-filing German authors;

o  Other market competitors who might compete with Google will not enjoy the same legal safe harbor from orphan work liability. Such legal safe harbor would only be available to competitors through legislation or litigation, thus, giving Google a head start that can only lessen competition. In contrast, Germany only recognizes such a limited safe harbor for certain non-commercial uses of digitized works by virtue of an enactment by the German legislature rather than a private agreement. Similarly, the U.S. Congress has been considering passage of orphan works legislation that would, through a careful balancing of public interests, provide universal access to orphan works while still maintaining some measure of accountability by users. The Settlement, thus, not only contradicts the laws of Germany but will also likely hamper Congressional efforts to balance these competing interests. In so doing, the orphans, whether from German or U.S. soil, will not receive all of the protections they might otherwise have enjoyed;

o  Google searches conducted from Germany would include orphan works. Such a service would violate German and EC law because no consent has been given. Giving Google free rein to unfairly compete in the marketplace will weaken German and EC competitors while failing to adequately compensate German authors for their creative endeavours;

o  The proposed Settlement results in a <u>de facto</u> monopoly on information and an intensification of media concentration in Google. As a result, the right of free access to information as well as the existing cultural diversity in both Germany and Europe, will be usurped; and

- o German and European non-commercial library projects, such as the Europeana and the DDB, currently in development expose the fallacy of Google's argument that the social benefits of the Google Library Project and Book Search outweigh the copyright interests of the authors and publishers. The German initiatives continue to advance even while complying with traditional copyright rules. As shown by the German laws, the social benefits can be achieved without the need or justification to vest virtual monopoly power in a single private corporation.

For these reasons, the Settlement effectuates a sea change in U.S. copyright practices which effectively reduces the scope of copyright protection to German and other foreign authors. This could eventually prove embarrassing to the U.S., which insists that other countries, including Germany, observe high standards of protection of intellectual property rights. Germany and other countries can only expect the same in return.

Germany's concern for its authors is only heightened by the proposed Settlement's shroud of secrecy and hint of an uncontrolled, authoritarian concentration of power in a single American corporate entity, Google, that generates more revenue than many countries.[12] The seriousness of these concerns is self-evident, given the plain language of the proposed Settlement itself.

First, Google, the alleged willful infringer, obtains in settlement something it would never be able to achieve in an arm's length negotiation, a most-favored nations provision. If the Registry (or any substantially similar entity organized by rightsholders using any data or resources that Google provides) obtains more advantageous terms, then Google must be offered the same terms. (Settlement, § 3.8(a)). This curious provision will have the effect of stifling competitors who know, in advance, that they can never establish even niche specialized markets because Google, a much larger and well-funded competitor, will always get the benefit of any

---

[12] Google's reported revenue in 2008 was nearly 22 billion U.S. dollars. http://investor.google.com/fin_data.html, visited on August 31, 2009.

such negotiation. Rather than calling this a most-favored nations clause, it would be more aptly described as a "more" favored nation.

Second, still another aspect of the proposed Settlement runs contrary to German law. Under the Settlement, Google may exclude books from the available database at its own discretion. (Settlement, § 3.7(e)). This effectively empowers Google to censor written content that may be considered politically or socially sensitive, thus limiting the public's meaningful access to the marketplace of ideas. This unfettered power would clearly be unconstitutional in the hands of the government and is questionable even in a state-sanctioned Settlement. Calling the Settlement non-exclusive is specious given the likelihood that little meaningful competition will be fostered because of Google's size, vast economic resources, and advanced head start aided by its unauthorized activity[13] and the exclusive competitive advantages sanctioned by the Settlement, such as the "most-favored nation" clause.

Third, Google's market power to set prices has been cloaked under the auspices of an "objectively reasonable" pricing algorithm. (Settlement, § 4.2(c)). Of course, the algorithm is designed by Google and unlikely to lead to a pricing policy adverse to Google's best interests. Furthermore, although the Registry has the right to audit or validate the pricing algorithm, the underlying methods remain confidential and are proprietary property known only to Google. (Settlement, § 4.2(c)(ii)(3)).

Fourth, audit procedures of financials are likewise subject to stringent confidentiality restraints. German authors and publishers, in particular, will never be in a position to verify audit procedures or their accuracy, especially since German authors and

---

[13] One should never forget that Google would not be in this favored position had it not chosen to disregard the copyright laws and scan books on a massively unprecedented scale without permission.

publishers are not represented by plaintiffs. Even the Court would not appear entitled to this information under the strict terms of the Settlement. (See Settlement, § 4.6(e) and § 6.3(d)).

Fifth, the purported need for secrecy also is reflected in the provisions allowing Google to meet with the Registry to discuss library uses and such meetings will likely be closed to the public unless the Court orders otherwise. (See Settlement, § 7.5). Furthermore, audits of security measures used to protect the digitized books will remain confidential. The audited parties are entitled to review such reports in advance so that they may remove any information that they consider to be trade secrets or proprietary (Settlement, § 8.2(c)), all without any apparent supervision by the Court.

Sixth, the alleged transparency of the Settlement is further belied by Section 17.19 (at page 131), which provides that counsel for the Author Sub-Class, counsel for the Publisher Sub-Class and counsel for Google, ". . . will destroy all copies of, and erase from computer memory, all documents produced to them pursuant to the Action. . . ." This provision, buried in the minutiae of "Article XVII – Miscellaneous Provisions," would effectively eliminate any inquiry into the only equivalent of legislative history or parol evidence available for future use in interpreting and applying the complex Settlement provisions. Rather than sanction the destruction of these documents, the Court should order them publicly posted to the Internet for review by all prior to the Fairness Hearing.

Seventh, the so-called proposed public access terminals (Settlement, § 4.8), in effect, are merely window dressing which severely limits rather than expands access since Google will only be obligated to provide one terminal per library or other qualified institution. Furthermore, this obligation only extends to U.S. library locations. German authors, whose contribution will be well-reflected in the unauthorized database, will be denied a similar

privilege in their home territory. Under the contrasting German laws and regulations, the non-commercial libraries, such as Europeana and DDB, have the obligation of establishing public access terminals for its database which includes works in the public domain and works under license from the author.

Eighth, even the Registry's power will be severely limited in relationship to Google's unfettered rights. Perhaps most telling is Section 6.2(b) that charters the Registry, but that specifically limits the Registry's discretion and authority by providing:

> In addition, the Charter will prohibit the Registry from coordinating Rightsholders for purposes of representing them as a sub-group regarding any matter under this Settlement Agreement, or working with any sub-group of Rightsholders to exclude their Books from Display Uses or non-Display Uses, or to advocate that any sub-group of Rightsholders decrease it participation in the Settlement in any manner.

In short, the Registry, supposedly created as a safeguard and advocate for the authors, finds its First Amendment rights muzzled precisely where needed most -- when the rights of the individual authors supposedly represented by the Registry may conflict with Google's commercial interests.

Ninth, perhaps even more insidiously, the immediately preceding Article XVI (at page 125), astonishingly provides that Google, the Author Sub-Class and the Publisher Sub-Class each will have the right to terminate the Settlement, ". . . if the withdrawal conditions set forth in the Supplemental Agreement Regarding Right to Terminate between Plaintiffs and Google have been met." This *private* right by Google to completely undo the Settlement -- which Settlement is promoted as serving the *public* interest -- is shrouded in secrecy: "The Supplemental Agreement Regarding Right to Terminate is confidential between Plaintiffs and Google, and will not be filed with the Court except as provided therein." (see Article XVI at page 125). The parties, in effect, attempt to cover-up what may be one of the most important

provisions of the Settlement not only from the public in general, but also from class members, whose interests the Plaintiffs purportedly represent, as well as the Court. All such documents, including the confidential Supplemental Agreement, should be shared with the public and potential class members, including those authors who are citizens or domiciliaries of Germany, prior to their decision as to whether to opt in with respect to the Settlement.

The fallacy of the alleged so-called social benefit of the proposed Settlement touted by Google may be best reflected in the division of revenues. The proposed Settlement provides that Google will receive 10% of revenues for its expenses before the remainder of gross profits is split 30%/70% with the Registry. Thus, the Settlement effectively grants Google a return of one third of all revenues as a financial reward for undertaking an unauthorized and allegedly infringing digital copying campaign. The attorneys for the Author Sub-Class get, immediately upon approval (namely, right now), a pay-out of $30 million and the attorneys for the Publisher Sub-Class get $15.5 million. The Registry, as represented by the Authors Guild and the Association of American Publishers, receives an additional $34.5 million to get established. In contrast, while Google receives immediate benefits, the payout to the authors is in the future at some undetermined time. The Settlement warns that the Registry and distribution procedures may take some time to establish so that settling class members should not expect any immediate payout.[14] Compared to the immediate financial benefits to Google and the Plaintiffs,

---

[14]    Google's Official FAQs provide:

QUESTION 45 -- When will payments be sent?

It will take considerable time to implement the commercial uses authorized under the Settlement, implement the elections made by Rightsholders for their Books and Inserts, and make Cash Payments. The commercial uses and other settlement benefits described in this Notice will not occur until after the Effective Date, and further time will be required in order to establish the Registry and clear rights so that the appropriate Rightsholders receive their due and owing benefits. Please be patient, and visit the Settlement Website at http://www.googlebooksettlement.com regularly for updates.

the authors receive a lump sum settlement fee of $60 per book, $15 per insert and $5 for a partial

insert; an inclusion fee (assuming they authorize display uses) of $200/$50/$25 and a revenue

split to be determined by a complex formula on an attached schedule. As the FAQs states:

"Please be patient, and visit the Settlement Website . . . (URL omitted) . . . regularly for

updates." It seems unfair that many German authors have to wait an uncertain, likely prolonged,

period of time for compensation when everyone else who is profiting from the authors'

endeavors get paid much sooner.

An even more fundamental issue of fairness is whether German, or other

international authors, should even be included in the Author Sub-Class at all. Class actions are

certified on the basis that the representative of the class effectively represents the interests of the

class members. In this case, the author sub-class is represented by the Authors Guild. As is

apparent from its own website, German authors would generally be excluded from membership.

"Self-published works and works published by subsidy presses do not qualify an author for

membership. **Works published by <u>foreign publishers</u> are not accepted as a basis for**

**membership."** (https://www.authorsguild.org/join/eligibility) (reviewed on 7/28/09) (Emphasis

added). Since non-U.S. authors, including Germans, are generally excluded from the Authors

Guild, but not from the scope of the Settlement, it is reasonable to conclude that the Authors

Guild does not have the same incentive to effectively and responsibly represent the best interest

of German authors.[15]

---

See
http://www.googlebooksettlement.com/help/bin/answer.py?answer=118704&hl=en#q38,
visited on August 31, 2009. In other words, the payout may come sooner, but more likely
much later.

[15] The Supreme Court elaborated on when the class action representatives "fairly and
adequately protect the interests of the class," under the Federal Rules of Civil
Procedure ("FRCP") 23(a)(4).

Similarly, the Association of American Publishers has as its membership, "all U.S. companies actively engaged in the publication of books, journals, and related electronic media," which necessarily does not include German book publishers, intermediaries and general book retailers. Since non-U.S. book publishers, intermediaries and book retailers are excluded from membership in the Association of American Publishers, but not from this scope of the Settlement, it is likewise reasonable to conclude that the Association of American Publishers may not adequately and responsibly represent the interests of German publishers. The only effective way of avoiding this conclusion would be either to decertify the Action as a class action

In Amchem Products, Inc. v. George Windsor, the Supreme Court explained that the adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. Id., 521 U.S. 591, 625 (1997). Further, a class representative must be a part of the class and "possess the same interest and suffer the same injury" as the class members. Id. at 625-26 (quoting Schelsinger v. Reservists Committee to Stop the War, 418 U.S. 208, 216 (1974)); East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403 (1977). In applying this standard in Amchem, which involved an asbestos settlement-only class action, the Supreme Court affirmed the Third Circuit's holding that the class should not have been certified by the district court because the Rule 23 adequacy requirements had not been satisfied. Specifically, the adequacy of representation was not satisfied because "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class [were] not aligned." Amchem, 521 U.S. at 626. The Court pointed out that the "currently injured" portion of the class interests were in immediate conflict with the "exposure only" portion of the class. Id. Since, there was clear conflict between the representatives' interests and a portion of the class, there was "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." Id. at 627. Here, the interests of members of the Authors Guild would seem clearly at odds with those of all foreign authors excluded from membership since the fewer foreign authors who file claims with the Registry, the more revenue will be available for division among the Authors Guild membership.

The Second Circuit has expanded on the Supreme Court's general test that the class representative must posses the same interest and suffer the same injury. The Second Circuit applies a two factor analysis for adequacy of representation inquiring whether: "(1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorney's are qualified experienced and able to conduct litigation." Baffe v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000); see also Amchem, 521 U.S. at 625-26. While all of the participating attorneys are unquestionably qualified, the interests of the parties they represent, and to whom they owe their professional loyalty, are clearly antagonistic to those of non-U.S. authors.

suit, change the Settlement to an "opt in" basis, or, at the very least, limit the Author and Publisher Sub-Classes to exclude German and other international authors and publishers.

Germany respectfully requests that this Court consider these critiques and recommendations in determining whether the proposed Settlement is truly in the best interest of the parties and the public interest or if, instead, and as believed to be the case by Germany, the Settlement unfairly deprives German authors and publishers a voice in deciding how and when their literary works are made available to the public, while providing an undue economic advantage and market power to a single, private American corporate entity.

## CONCLUSION

For all the foregoing reasons, the Court should reject the settlement proposal in its entirety or, in the alternative, exclude German authors and publishers from the class.

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: _____

Theodore C. Max, Esq. (TM-1742)
  Edwin C. Komen, Esq. (*Pro Hac Vice* Application Pending)
30 Rockefeller Plaza, 24th Floor
New York, NY 10112
Tel.: (212) 332-3602
Fax: (212) 332-1201
Counsel for Federal Republic of Germany