UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

The Authors Guild, Inc., Association
of American Publishers, et. al.,

    Plaintiffs,

v.

Google Inc.,

    Defendant.

Case No. 05 CV 8136-DC

DECLARATION OF BENEDIKT FOEGER

1. I, Benedikt Foeger, am publisher and Chief Executive Officer of the Austrian book publishing company known as Czernin Verlag ("Czernin"). I am not a native speaker of the English language, although I have some fluency in the language, and, accordingly, this declaration was translated for me into German before I signed it below. Except as otherwise stated, I have personal knowledge of the matters I discuss below.

2. Czernin is a small publishing company which was founded in 1999 by Hubertes Czernin, a well-known journalist. Czernin publishes works from authors in the fields of journalism, science and the arts. Czernin works to publish "inconvenient" topics to support a critical discourse within Austrian society and to promote the idea of democracy. One of Czernin's major strengths is its ability to publish books on current topics in a relatively short period of time. Czernin publishes approximately 30 books per year and currently has a backlist of over 230 titles.

3. As either the copyright owner, or exclusive licensee, of the books that we publish, Czernin owns the exclusive right to exploit the books that it publishes or to

authorize others to do the same. Czernin must devote time and resources to publish its works and Czernin is able to recoup its investment, and remain in operation, primarily because it is able to secure the exclusive rights to these works, such that no one else can exploit them. Accordingly, Czernin's entire business model is based on this fundamental legal right, which is well recognized under Austrian copyright law and throughout the world. The Settlement Agreement that Google has asked this Court to approve would upend these well recognized rights and is an affront to copyright holders throughout the world. Czernin thus respectfully requests that this Court not approve the Settlement Agreement, with respect to foreign rightsholders at a minimum, for the reasons set forth in our accompanying Objections and below.

**Czernin's Catalogue and Membership In The Class**

4. Czernin is the copyright holder of one or more Books or Inserts, as those terms are used in the Settlement Agreement, having published over 230 books since 1999.

5. Czernin does not commercially exploit in the United States virtually any of the books that it publishes. Czernin does not publish its publishing holdings in the United States. Rather, it publishes these works in German speaking countries.

6. Czernin has not registered its books with the United States Copyright Office.

**Notice Problems**

7. Czernin only became aware of the Settlement Agreement because I am the Vice President of the Hauptverband des Osterreichischen Buchhandels ("HVB"), a publishing association operating in Austria, which was notified of the Settlement

2

Agreement by the Federation of European Publishers. As far as I am aware, Czernin did not receive any direct notice from the parties to this case (or their agents), although I understand that the parties have stated that it sent such a notice to certain authors and publishers in Austria.

8. Although Czernin did not receive any written notice directly from the parties to this case, I have since had the opportunity to see the written notice that I understand was sent (or to be sent) to certain authors/publishers here in Austria. This written notice was virtually incomprehensible as written in German and contained so many translation errors that it became impossible to read or understand. I understand that these translation errors will be detailed for the Court by Dr. Christian Sprang, so I do not detail them here.

9. I have been told that the parties to this case created a new written notice ostensibly to correct the translation errors contained in poorly translated notice that they originally distributed in Austria to certain authors and publishers. As far as I am aware, Czernin never received such a corrected notice.

10. I am aware through my affiliation with HVB that the parties published a summary notice of the Settlement Agreement in one daily newspaper in Austria, known as Kurier. I do not regularly read this publication and, to my knowledge, I have never seen this notice as published. I thus believe a large number of publishers and authors would not have seen these notices either. A publication in a publishing specific journal would have reached more authors and publishers.

11. The Settlement Agreement to which the written notice refers has, to my knowledge, never been translated into German. While Czernin would have wished to

review that full agreement, it was not able to do so in any meaningful way, given that it was made available only in English on the website dedicated to this case. Like Czernin, virtually all of the publishing houses in Austria are of modest size, do business primarily in German-speaking countries and lack the proficiency needed to read or understand the English-only Settlement Agreement. It is my firm belief that individual Austrian authors also are not able to review or understand this complex document as written in English.

12. Fortunately for Czernin, and given my position with HVB, Czernin has been able to educate itself about the Settlement Agreement, such that it could protect its rights should it be forced to if this Court approves the agreement. However, many other authors and publishers do not understand this Settlement Agreement at all or how their rights may be affected by it. This is especially so because the idea that a publisher here would be bound by a court proceeding that occurred in the United States and to which the publisher is not a party, regarding books that have never been published in the United States, is completely unknown in this country.

**The Burdens The Settlement Agreement Improperly Seeks To Impose**

13. The Settlement Agreement requires publishers like Czernin to take burdensome affirmative action if they wish to preserve their existing copyright protections, remain legally unaffected by the Settlement Agreement and avoid having their works permanently licensed to Google for Google's use. This action requires us to read and comprehend the complex, poorly translated Notice – without the benefit of a translated Settlement Agreement – simply to determine whether the affirmative act of opting-out is in our interest. If we wish to opt-out, we must submit formal paperwork to the Settlement Administrator by a date certain, or forever lose this right. Moreover, in


order to effectively opt out, we are required to provide information including which subclass we belong to, our address and any pseudonym used by an author of the noted works. We must also identify all of the imprints under which we publish, or have published, our works. This is in contrast to the existing laws of copyright recognized by our country and internationally, under which we would not be required to take any action at all to preserve our fundamental exclusive right to control the use of our works.

14. If we do not opt out, the Settlement imposes additional, cumbersome administrative burdens in order to direct Google not to use our works. We must submit a lengthy, 8-page Claim Form, which directs us to read the poorly translated lengthy notice and: (1) individually "claim" each one of our Books and Inserts; (2) provide detailed information about each work (including each author, co-author and contributor, imprint, whether the publisher owns worldwide rights to the work and rights to all of the pictorial works within the work); (3) find each work on a books database that Google maintains at http://www.googlebooksettlement.com (the "Books Database"); (4) determine whether Google has classified such work as Commercially Available; (5) inform Google if we agree with such determination (even though the Settlement defines Commercially Available vaguely); (6) provide a description of each Insert; (7) determine if we are Confident or Highly Confident that our works have not reverted to an author; and (8) certify a number of matters, including that the use of any Insert claimed required our permission and we did not give permission for their online use after June 1, 2003.

15. As set forth above, in order to "direct" Google not to use our works, we would have to provide the above information to Google for over 230 individual works,

5

even though under existing law we would not be required to take any action to preserve our exclusive rights against Google's unauthorized use of our works.

16. Providing this "direction" to Google is an onerous and difficult task under the Settlement Agreement, especially because, as described below and elsewhere in our Objections and accompanying submissions, the Books Database is difficult to work with and flawed in numerous respect.

**The Books Database and The Classification of Books as "Commercially Available"**

17. Czernin has logged onto the Books Database. It was quite difficult to use this Books Database. In addition to finding out how to start the database, it was enormously time consuming to get an overview of the works presented by Google and the publishing information provided.

18. The Books Database is riddled with errors. Some books are presented more than once which will make it very difficult for a publishing house that wishes to claim its works to be sure it has comprehensively identified those works for Google. For example, our work *Über Totschweigen und Schönreden* is presented four times. The Books Database also provides incorrect years of publication for the listed works. For example, *Der Hühnerstall, oder die Kunst zu überleben* was published in 2008 and not, as presented on the Google database, in 2005. When these titles are listed more than once, the duplicate listings include inconsistent and incorrect years of publication. For example, *Die Fälschung* was published in 1999 but the Books Database shows various entries for the work, including one stating, incorrectly, that the work was published in 2006. *Wien* and *Haider light* are also presented twice, with alternating publishing years 2004/2008 and 2000/2001, respectively. The Books Database often is missing the author

6

name in its listings. For example, no authors are listed for the books *Das sind wir. Sind wir das?*, *Unsichtbar*, *Lieben, leisten, hoffen*, and *The corruption monster* which were authored by Rainer Urbach, Klaus Kienesberger et al., Christian Friesl and Martin Kräutner. The Books Database lists books using incorrect titles, whether because of typos (*Schwarz auf Wei* instead of *Schwarz auf Weiß*), or (*Längst nicht meht koscher* instead of *Längst nicht mehr* koscher); or, in the case of a bilingual title, identifying the title using only one language *Meneküles bescbe-* instead of *Flucht nach Wien - Meneküles bescbe*.

19. These errors make it quite difficult to work with the Books Database. Because so many works are listed more than once and with inconsistent information, it will be difficult for a publisher who wishes to claim its works, and to direct Google not to use them, to be sure it has done so comprehensively. For example, it is difficult to determine whether we have to claim one version or all of them. This holds especially true for the opt-out scenario.

20. The Books Database also identifies certain Czernin works that are no longer available for exploitation due to legal and other reasons, or where never available at all including, *Gesundheitsrisiko Schweinefleisch* and *Der dritte Mann*. This presentation on the Google database gives a completely wrong impression which could have serious consequences for the publishing house. For example, the respective authors (or other owners of the copyrights) could detect their works on the Google database and draw the wrong conclusion that Czernin has violated the agreement not to sell them any longer. The Books Database also lists works that Czernin has not yet exploited, including *Integration im Abseits; Die Akte Bach; Das Leben Jesu; Wissenschaft für viele*.



21. The Books Database also identifies a number of Czernin works as not Commercially Available, even though Czernin is actively exploiting such works now. Examples include:

| Author | Title |
|---|---|
| Paul Divjak | Kinsky |
| Josef Peter Ortner | Bist du jetzt ein Donaufisch |
| Hubertus Czernin | Über Totschweigen und Schönreden |
| Manfred Rebhandl | Löcher, noch und nöcher |
| Thomas Maurer | Das Hirn muss einen Saumagen haben |
| Peter Pirker | Widerstand vom Himmel |
| Erzherzog Johann | Der Brandhofer und seine Hausfrau |
| Catarina Tessmar | Wiener Platzerln |
| Wolfgang Neugebauer et al. | Der Wille zum aufrechten Gang |
| Armin Wolf, Euke Frank | Promipolitik |
| Oliver Lehmann | In den Fängen des Dr. Gross |
| Doris Knecht | So geht das |
| Manfred Rebhandl | Lebensabende und Blutbäder |

22. According to the Books Database, Google has digitized 74 of Czernin works to date. However, the Books Database gives us no information about how many of the remaining titles in the database, or other titles which we own and control, Google may seek to digitize in the future. Accordingly, it is impossible for our company to predict how many of our books Google will scan, use and/or pay for in the future and, accordingly, what the Settlement Agreement will mean for us.

23. For each of the foregoing reasons, and for the reasons set forth in the Objections, Czernin objects to the Settlement Agreement and respectfully urges the Court not to approve it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August **31**, 2009

_(signature)_

Benedikt Föger