UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

The Authors Guild, Inc., *et al.*,                    :

                                                                     :

      Plaintiffs,                                          :          Case No. 05 CV 8136-DC

                                                                     :

      vs.                                                        :          OBJECTION OF AMAZON.COM,

                                                                     :          INC., TO PROPOSED

Google, Inc.                                                   :          SETTLEMENT

                                                                     :

      Defendant.                                          :          *Filed Electronically*

-------------------------------------------------------------x

AMAZON.COM, INC.
David Zapolsky, Esq. (DZ-8058)
davidz@amazon.com
Vice President & Associate General Counsel
Litigation & Regulatory Affairs
1200 12th Avenue South
Suite 1200
Seattle, Washington 98144
Telephone:     (206) 266-1323
Facsimile:     (206) 266-7010

IRELL & MANELLA LLP
David Nimmer
(CA State Bar No. 97170)
(*Pro Hac Vice* Application Pending)
dnimmer@irell.com
Alexander F. Wiles
(CA State Bar No. 73596)
(*Pro Hac Vice* Application Pending)
awiles@irell.com
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067-4276
Telephone:     (310) 277-1010
Facsimile:     (310) 203-7199

Counsel for Objector Amazon.com, Inc.

2043089

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 2

ARGUMENT ...................................................................................................... 7

I.   The Proposed Settlement Should Be Rejected Because Congress, Not This Court, Is The Proper Body to Establish a Regime for the Digitization and Use of Works Whose Copyright Holders Cannot Be Found. ........................................... 7

    A.   Class actions in copyright infringement cases have never been used to legislate changes in the law. ............................................................... 7

    B.   Congress has repeatedly acted to amend copyright law to address technological advances. ............................................................... 10

    C.   The Proposed Settlement short-circuits proposed legislation. ........................... 13

II.  The Proposed Settlement Should Be Disapproved Because It Would Restrain Competition by Creating a Cartel of Rightsholders and Establishing Google as the Exclusive Distributor of Electronic Copies of Millions of "Orphan" and Other Works ........................................................... 15

    A.   The Registry would have price setting powers for the collective of Rightsholders that are highly suspect, if not *per se* illegal, under the Sherman Act .............................................................. 18

        1.   The Registry's role in setting prices for consumer purchases of books. ............................................................... 18

        2.   The Registry's role in setting prices for subscriptions to an electronic database of books. ............................................................... 22

    B.   The Registry will deal exclusively with Google, shutting out potential competitors ............................................................... 24

    C.   Google's exclusive rights threaten to harm Rightsholders because the Proposed Settlement grants Google monopsony power. ........................... 27

    D.   The Registry's governance rules create a risk that current Rightsholders will harm future Rightsholders. ........................................... 28

    E.   Taken together, these threats to healthy competition compel rejection of the Proposed Settlement. ............................................................... 29

III. The Proposed Settlement Must Be Rejected Because It Relies Upon Expropriation to Achieve Control Over "Orphan Works" in Violation of the Copyright Act ............................................................... 32

IV.    The Proposed Settlement Must Be Rejected Because it Purports to Release Google and Others From Liability For Actions They May Take in the Future That Are Not at Issue in the Litigation. .................................................................34

    A.    A settlement can only extinguish claims that are based on the "identical factual predicate" as the class claims. .................................................35

    B.    Future facts and future conduct are never part of the same factual predicate as the underlying litigation. ...................................................35

    C.    The Proposed Settlement improperly releases Google and its partner libraries from future claims based on future conduct. ............................38

CONCLUSION .....................................................................................................................40

Page(s)

**Cases**

*Amchem Prod., Inc v. Windsor,*
    521 U.S. 591 (1997)................................................................................................ 36

*American Geophysical Union v. Texaco, Inc.,*
    802 F. Supp. 1 (S.D.N.Y. 1992)............................................................................... 8

*Angel Music, Inc. v. ABC Sports, Inc.,*
    112 F.R.D. 70 (S.D.N.Y. 1986) ............................................................................. 10

*Arizona v. Maricopa County Med. Soc'y,*
    457 U.S. 332 (1982)............................................................................................... 19

*Associated Press v. United States,*
    326 U.S. 1 (1945)................................................................................................... 29

*Auscape Int'l v. National Geographic Soc'y,*
    409 F. Supp. 2d 235 (S.D.N.Y. 2004)................................................................... 10

*Baker v. Carr,*
    369 U.S. 186 (1962)............................................................................................... 15

*Basic Books, Inc. v. Kinko's Graphics Corp.,*
    758 F. Supp. 1522 (S.D.N.Y. 1991)......................................................................... 8

*Bd. of Trade of Chicago v. United States,*
    246 U.S. 231 (1918)............................................................................................... 18

*Bernstein v. Universal Pictures,*
    79 F.R.D. 59 (S.D.N.Y. 1978) .............................................................................. 10

*Broadcast Music, Inc. v. CBS,*
    441 U.S. 1 (1979)................................................................................................... 22

*Cahn v. Sony Corp.,*
    No. 90 Civ. 4537 (S.D.N.Y. filed July 9, 1990) .............................................. 9, 11

*Catalano, Inc. v. Target Sales, Inc.,*
    446 U.S. 643 (1980)............................................................................................... 19

*CBS v. Am. Soc'y of Composers, Authors & Publishers (CBS-Remand),*
    620 F.2d 930 (2d Cir. 1980)...................................................................... 18, 19, 21

*Eldred v. Ashcroft,*
    537 U.S. 186 (2003)............................................................................................... 15

*Frank Music Corp. v. CompuServe Corp.,*
    No. 93 Civ. 8153 (JFK) (S.D.N.Y. filed Nov. 29, 1993)........................... 10, 12

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) ................................................................. 16, 22

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
   386 F.3d 485 (2d Cir. 2004)......................................................................... 27

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) .................................................................... 16, 21

*In re Agent Orange Prod. Liab. Litig.*,
   818 F.2d 179 (2d Cir. 1987).......................................................................... 34

*In re Asbestos Litig.*,
   90 F.3d 963 (5th Cir. 1996) ........................................................................ 36

*In re Austrian and German Holocaust Litig.*,
   250 F.3d 156 (2d Cir. 2001).......................................................................... 15

*In re Montgomery County Real Estate Antitrust Litig.* (*Montgomery County*),
   83 F.R.D. 305 (D. Md. 1979)........................................................................ 16

*Japan Whaling Ass'n v. American Cetacean Soc.*,
   478 U.S. 221 (1986)..................................................................................... 15

*K-91, Inc. v. Gershwin Publ'g Corp.*,
   372 F.2d 1 (9th Cir. 1967) ............................................................................ 17

*Muzak LLC v. Broadcast Music, Inc.*,
   275 F.3d 168 (2d Cir. 2001).......................................................................... 21

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978)..................................................................................... 18

*Nat'l Super Spuds, Inc. v. N. Y. Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) ............................................................................. 35

*NCAA v. Board of Regents*,
   468 U.S. 85 (1984)....................................................................................... 22

*Peer Int'l Corp. v. Pausa Records, Inc.*,
   909 F.2d 1332 (9th Cir. 1990) ..................................................................... 10

*Princeton Univ. Press v. Michigan Doc. Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ......................................................................... 8

*Random House, Inc. v. Rosetta Books LLC*,
   150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd per curiam*, 283 F.3d 490 (2d
   Cir. 2002) ................................................................................................... 40

*Ryan v. Carl Corp.*,
   23 F. Supp. 2d 1146 (N.D. Cal. 1998) .......................................................... 10

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
157 F. Supp. 2d 561 (E.D. Pa. 2001) ............................................................ 36

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ...................................................................................... 31

*Stewart v. Abend*,
495 U.S. 207 (1990) ...................................................................................... 31

*Uhl v. Thoroughbred Technology and Telecommunications, Inc.*,
309 F.3d 978 (7th Cir. 2002) ............................................................ 36, 37, 38

*UniSuper Ltd. v. News Corp.*,
898 A.2d 344 (Del. Ch. 2006) ................................................................ 35, 38

*United States v. Am. Soc'y of Composers, Authors & Publishers* (*ASCAP Decree*),
2001 U.S. Dist. LEXIS 23707 (S.D.N.Y. June 11, 2001) .............. 17, 21, 24, 25

*United States v. Am. Soc'y of Composers, Authors & Publishers*,
1950 U.S. Dist. LEXIS 1900 (S.D.N.Y. Mar. 14, 1950) ............................ 17, 28

*United States v. Am. Soc'y of Composers, Authors & Publishers*,
1960 U.S. Dist. LEXIS 4967 (S.D.N.Y. Jan. 7, 1960) ............................... 17, 28

*United States v. Broadcast Music, Inc.* (*BMI Decree*),
1966 U.S. Dist. LEXIS 10449 (S.D.N.Y. Dec. 29, 1966) ......................... passim

*United States v. Broadcast Music, Inc.*,
1994 U.S. Dist. LEXIS 21476 (S.D.N.Y. Nov. 18, 1994) .......................... 17, 24

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005) ......................................................................... 27

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ................................................................................. 19, 20

*United States v. Terminal R.R. Ass'n of St. Louis*,
224 U.S. 383 (1912) ...................................................................................... 29

*Varacallo v. Mass. Mut. Life Ins. Co.*,
226 F.R.D. 207 (D.N.J. 2005) ....................................................................... 36

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ....................................................................... 35, 40

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 312 (2007) ...................................................................................... 28

## Statutes

15 U.S.C. § 1 .......................................................................................... 18, 21

17 U.S.C. § 1001-1010 ................................................................ 11

17 U.S.C. § 106 ......................................................................... 31

17 U.S.C. § 110(2) ..................................................................... 11

17 U.S.C. § 114 ......................................................................... 12

17 U.S.C. § 115 ......................................................................... 12

17 U.S.C. § 201(e) ............................................................. 32, 33, 37

17 U.S.C. § 302 ......................................................................... 31

17 U.S.C. § 303 ......................................................................... 31

17 U.S.C. § 504 ......................................................................... 27

17 U.S.C. § 506(a) ..................................................................... 39

Act of Nov. 6, 1978, Pub. L. No. 95-598, 92 Stat. 2549 ............................ 33

Audio Home Recording Act of 1992, Pub. L. No. 102-563, 106 Stat. 4237 ........... 9, 11

Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39,
        109 Stat. 336 (1995) ......................................................... 12

Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008) .......................... 14

Preservation of Orphan Works Act Pub. L. 109-9, Sec. 401, 119 Stat. 218 (2005) ... 14

Pub. L. No. 105-304, Sec. 405(a), 112 Stat. 2860, 2890 (1998) .................... 12

Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008) .............. 14

Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, 116 Stat. 2780
        (2002) ....................................................................... 12

Technology, Education, and Copyright Harmonization Act of 2002, Pub. L. No.
        107-273, Sec. 13301, 116 Stat. 1758 (2002) .................................. 11

U.S. Const. art. I, § 8, cl. 8 .............................................. 15, 31

Webcaster Settlement Act of 2008, Pub. L. No. 110-435, 122 Stat. 4974 (2008) ..... 12

Webcaster Settlement Act of 2009, Pub. L. No. 111-036 (June 30, 2009) ............ 12

**Rules**

Fed. R. Civ. P. 23 ................................................................ passim

## Other Authorities

151 Cong. Rec. H2114 (daily ed. Apr. 19, 2005) ........................................ 14

2 *Nimmer on Copyright* § 8.03[E][3] ................................................. 14

2 *Nimmer on Copyright* § 8.15[C][2] ................................................ 11

2 *Nimmer on Copyright* §§ 8.21-8.24 ............................................... 12

2 *Nimmer on Copyright* §§ 8B.01-8B.08 ............................................. 11

7B Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1797.3 ................................................. 36

Andrew Richard Albanese & Norman Oder, *Corner Office: Google's Dan Clancy*, Libr. J., May 1, 2009 ....................................................... 39

H.R. Rep. 102-873, pt. 1, at 10 (1992) .............................................. 9

James Boyle, *The Public Domain* 10 (2008) ......................................... 25

Marc H. Greenberg, *Reason or Madness:  A Defense of Copyright's Growing Pains*, 7 J. Marshall Rev. Intell. Prop. L. 1, 43 (2007) ...................... 13

Miguel Helft, *Google Book-Scanning Pact to Give Libraries Input on Price*, N.Y.Times, May 20, 2009 ......................................................... 24

*Notice of Inquiry*, 70 Fed. Reg. 3739, 3739 (Jan. 26, 2005) ....................... 13

*Orphan Works:  Proposals for a Legislative Solution:  Hearing Before the Subcomm. on Intellectual Property of the S. Comm. on the Judiciary, 109th Cong. (2006)* ............................................................. 14

Rebecca Tushnet, *Naming Rights:  Attribution and Law*, 2007 Utah L. Rev. 789 ...... 13

Register of Copyrights, *Report on Orphan Works* 92-93, 93 (Jan. 2006) ............. 13

*Report on Orphan Works by the Copyright Office, Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary* (Mar. 8, 2006) ......................................................... 14

S. Rep. No. 104-315 (1996) ......................................................... 31

*Statement of Marybeth Peters, Register of Copyrights, Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary* (Mar. 13, 2008) ...................................................... 14

Vigdis Bronder, *Saving the Right Orphans: The Special Case of Unpublished Orphan Works*, 31 Colum. J.L. & Arts 409 (2008) ................................. 13

## INTRODUCTION

Amazon.com, Inc. ("Amazon") objects to the proposed settlement of this action and gives notice that it intends to appear at the fairness hearing currently scheduled to be held on October 7, 2009. Amazon is a member of the class by virtue of its ownership of a copyright duly registered with the United States Copyright Office. Amazon also brings a unique perspective to this Court because it has engaged in a book scanning project very similar to Google's, with one major distinction: As to books still subject to copyright protection, Amazon has only scanned those for which it could obtain permission to do so from the copyright holder. Amazon's scanning project has to date resulted in the lawful scanning of over 1 million English-language works and 3 million books in total.

The settlement proposed by the parties to this case should not be approved. It is unfair to authors, publishers, and others whose works would be the subject of a compulsory license for the life of the copyright in favor of Google and the newly created Book Rights Registry. It is anticompetitive and violates antitrust laws because it provides Google an effective monopoly in the scanning and exploitation of millions of works whose copyright holders cannot be located or choose not to involve themselves in this class action. It also creates a cartel of authors and publishers—the Books Rights Registry—operating with virtually no restrictions on its actions, with the potential to raise book prices and reduce output to the detriment of consumers and new authors or publishers who would compete with the cartel members. Indeed, the agreement is even arguably unlawful on its face because it constitutes price fixing by horizontal competitors— namely, the Rightsholders, who are agreeing collectively on a mechanism for setting the highest possible prices to be charged for their works. Finally, the proposed settlement improperly seeks to stretch the boundary of this Court's power beyond its lawful limits, using the class action mechanism embodied in Rule 23 of the Federal Rules of Civil Procedure to create a massive and complex business arrangement of perpetual duration among class members, Google and the Registry. The settling parties propose to force this business arrangement upon class members by requiring, in contravention of controlling Second Circuit authority, that, as part of the settlement,

they release Google and others from claims of copyright infringement for future uses of copyrighted works, some of which are totally divorced from the current facts and connected to this case only under the guise of being an anticipated project of the business venture created by the Settlement Agreement.

Amazon recognizes the surface appeal of the proposed settlement:  Digitization of books creates tremendous opportunities for public benefit, and the digitization of so-called "orphan works" that this settlement allows would enhance those benefits.  Indeed, Amazon has long supported efforts to pass copyright reform legislation that would make it easier for booksellers and the public to gain access to these books.

Digitization of books, however, is far from the first technological advance requiring harmonization of the potential public benefits with existing copyright law.  As detailed below, in each such instance in the past, that task has been performed by the United States Congress.  Class actions, though a common vehicle to challenge the infringement made possible by new technologies, have never until this case been used to set out nationwide the rules and regulations by which use of those new technologies would be determined to be lawful or unlawful.  The reasons for this history seem obvious, especially when juxtaposed against the public policy issues raised by the current settlement:  Class actions can resolve disputes between parties and can clarify the law for others, but they cannot make changes to the rules in a way that applies evenhandedly to the entire universe of copyright holders and potential users of the new technologies.  Nor is a court holding a hearing on the fairness of a class action settlement equipped to balance and make the adjustments necessary to accommodate the many public interests at stake when a new technology emerges that offers both the promise of public benefit and the danger of abuse of both copyright holders and consumers.

## <u>FACTUAL BACKGROUND</u>

Amazon was founded in 1994.  It started as an online seller of books.  While Amazon has since diversified to sell a wide range of consumer products, sales of media products accounted for 58 percent of Amazon's net sales in 2008.  Prior to January 5, 2009, Amazon duly submitted

to the United States Copyright Office an application, deposit, and fee to register the work: *DVD On Demand: A CustomFlix® Guide to Profitably Distributing Your Film with Inventory-Free Fulfillment* by Darren Giles.

Beginning in 2002, Amazon commenced a book-scanning program in order to enhance the quality of services it offered to customers who use its web-based bookstore. Amazon initially started its program by scanning only the front and back covers and small excerpts of books. It then made those parts available for viewing by customers on the web pages of Amazon.com where the books were displayed for sale. Amazon called this program "Look Inside the Book." In 2003, Amazon dramatically expanded this program, now called "Search Inside." It approached publishers for permission to scan the entire contents of books and then to display to customers up to 20 percent of those books in response to specific customer queries. Today, Amazon has 3 million unique titles scanned and available worldwide to customers who wish to search inside those books and display the text surrounding the words they have queried. Amazon estimates that its book detail pages are viewed tens, if not hundreds, of millions of times each week. Amazon has been able to accomplish this level of scanning and electronic availability even though it has scanned only books in the public domain and books for which it has obtained permission from the copyright owner. Amazon does not scan or display on its website in-copyright works for which no rightsholder can be located (referred to as "orphan works").

Google first announced its book scanning project in October 2004. According to published reports, this program has two components. Google's "Partner Program" allows authors or publishers to sign up with Google and provide copies of their books to Google for electronic display on the Google website. According to Google, that program now has over 20,000 publisher participants, with published reports suggesting that about 1 million books have been scanned, made fully searchable and available to be previewed on Google's website as a result of this program.[1] ("Previewing" refers to the capability of searching the text of a book and

---

[1] *See* Posting of David Drummond, *New chapter for Google Book Search*, to The Official Google Blog, http://googleblog.blogspot.com/2008/10/new-chapter-for-google-book-search.html

then displaying the text surrounding the word for which the user has searched.)  Plaintiffs did not challenge the Google "Partner Program" in their complaint.

Beginning in late 2004, Google also entered into a series of "Digitization Agreements" with various public and university libraries to create digital archives of the libraries' collection of books.  The Authors Guild, Inc., et al.'s Second Amended Complaint ¶¶ 4, 47.  Those agreements allow Google "to reproduce and retain for its own commercial use a digital copy of the libraries' archives."  *Id.* ¶ 4.  They also require Google to provide each library with a digital copy of what Google had scanned from that library's collection.  Declaration of David Nimmer in Support of Objection of Amazon.com, Inc. ("Nimmer Decl."), Exs. A & B (Digitization Agreement between Google and the University of Michigan, and Amendment).  Google never sought to obtain permission from copyright owners to copy, use or display works included in the library collections and thus made no effort to exclude "orphan works" from its digitization program.

According to Google, it has now scanned seven million books.  *See* Posting of Drummond, *New chapter for Google Book Search*, http://googleblog.blogspot.com/2008/10/new-chapter-for-google-book-search.html.  Of the in-copyright works that Google has digitized, only those that are in its partner program are available for previewing on Google's website.  *Id.*  Google displays only "snippets" of in-copyright books scanned without copyright holder permission (*i.e.*, in response to a user query, Google displays portions of the affected work that contain the queried language, plus a few surrounding lines on either side).  Google also has announced that it expects to scan in the future millions more books of which it has not yet made digital copies.  *Id.*

In their Second Amended Complaint ("SAC"), filed several days after the parties announced the tentative settlement, plaintiffs allege that Google's unauthorized digitization and

---

(Oct. 28, 2008, 7:14 AM and 7:55 AM); *see also* Juan Carlos Perez, *In Google Book Settlement, Business Trumps Ideals*, PC World, Oct. 30, 2008, *available at*: http://www.pcworld.com/businesscenter/article/153085/in_google_book_settlement_business_trumps_ideals.html.

display of their works constitutes copyright infringement.  Plaintiffs assert that by engaging in these acts "Google has derived, and intends to continue to derive, revenue from this program by attracting more viewers and advertisers to its website." SAC ¶ 7; *see id.* ¶¶ 49, 63.  Nowhere in their complaint do plaintiffs accuse Google of selling printed or electronic copies of their books or even of having a plan to do so.

In October 2008, the parties announced that they had reached a settlement subject to certain conditions, among them court approval.  The settlement is not so much a release of claims for past conduct as an agreement on behalf of a class of millions of authors and publishers, both known and unknown, to engage in a complex business arrangement with Google for the perpetual exploitation of millions of copyrighted works.  The settlement releases Google both for its past infringement and *for future infringement* in exchange for an upfront payment and an agreement by Google to pay 63 percent of the revenues Google earns from future exploitation of the copyrighted works.  Settlement Agreement dated October 28, 2008 ("Proposed Settlement") §§ 2.1, 10.1, 10.2.  Many of the contemplated uses of those works are things that Google has not yet done, *e.g.*, sales of subscriptions to an electronic book database and sale of online access to books.  *See, e.g, id.* §§ 4.1, 4.2.  The settlement also releases non-parties, including specifically the libraries that made, or in the future choose to make, their collections available to Google to be digitized.  *See id.* §§ 10.1, 10.2.

The Proposed Settlement creates a new entity, called the Books Rights Registry (the "Registry"), consisting of the entire "Author Sub-Class" and "Publisher Sub-Class."  *See id.* § 6.1, *see also id.* §§ 1.14, 1.120.  The Proposed Settlement charges the Registry, acting as a cartel for its members, and Google with responsibility for determining the prices to be charged institutions who purchase subscriptions to the digitized collection and provides that, under Registry and Rightsholder oversight, Google will use a Google "Pricing Algorithm" to set prices for consumers who purchase books.  *Id.* §§ 4.1, 4.2.  Those provisions explicitly provide that Google's task will be to "find the optimal . . . price for each Book and, accordingly, to maximize revenue for each Rightsholder."  *Id.* § 4.2(b)(i)(2).

The Registry is also charged with negotiating collectively on behalf of the entire class to allow Google to pursue "new revenue models" such as "Print on Demand," "Custom Publishing," "PDF download," "Consumer Subscription Models," and the provision of "Summaries, Abstracts and/or Compilation" of books. *Id.* § 4.7. The Registry has no ability to enter into similar business arrangements with entities besides Google except in two limited circumstances: (1) if an individual author or publisher explicitly gives it permission to do so, *see id.* § 6.2(b)(iii), Attach. I § 8.B; or (2) if Google fails within five years to implement a consumer book purchasing program and fails to begin selling institutional subscriptions, the Registry can negotiate substitute arrangements with third parties.[2] *Id.* §§ 3.7(c), 1.34.

Other provisions of the Proposed Settlement set forth circumstances under which a Rightsholder may ask that his or her work not be digitized, used or displayed by Google and state that the authority of the Registry to negotiate on behalf of Rightsholders is non-exclusive, *i.e.*, Rightsholders retain the authority to engage in separate negotiations. *See id.* §§ 3.5, 2.4. Yet another provision of the Proposed Settlement addresses the certainty that many Rightsholders will not sign up with the Registry, either because they choose not to do so or because they cannot be found, and thus will not be entitled to share in the revenues the Registry receives, leaving substantial "unclaimed funds." *Id.* § 6.3. That provision mandates that the Registry distribute "unclaimed funds" in such a way that Rightsholders who do sign up with the Registry will benefit from Google's exploitation of works of those who do not sign up. *Id.*

---

[2] If Google enters into an agreement with the Registry that covers new revenue models, the settlement provides that Google is released from liability, including liability for copyright infringement, for actions taken pursuant to such an agreement. *Id.* § 10.1. Similarly, for third parties who copy or use copyrighted works in reliance on an agreement with the Registry negotiated following Google's failure to pursue a business model, the settlement purports to provide a release of claims of infringement that could otherwise be brought by the copyright holder. *Id.* § 3.7(c). Both releases apply even though the rightsholder in such a situation never gave the Registry permission to negotiate on his or her behalf. *Id.*

# **ARGUMENT**

**I.     The Proposed Settlement Should Be Rejected Because Congress, Not This Court, Is The Proper Body to Establish a Regime for the Digitization and Use of Works Whose Copyright Holders Cannot Be Found.**

**A.     Class actions in copyright infringement cases have never been used to legislate changes in the law.**

Digitization presents an enormous opportunity for public good.  The existence of large numbers of "orphan works" and works whose copyright holders choose to remain aloof from licensing poses a barrier to the full exploitation of this new technology.  Amazon knows this as well as anyone, given that it has devoted massive resources over the past seven years to obtaining the rights to digitize books and then actually doing so.  But, what the parties seek to do through the Proposed Settlement—using Rule 23 of the Federal Rules of Civil Procedure to impose a compulsory license on all Rightsholders who do not affirmatively opt out of the class and then applying that license to millions of "orphan works"—represents an unprecedented rewriting of copyright law through judicial action.

The problem posed by the advance of technology in this case is far from unique in the annals of copyright.  Indeed, the history of copyright law is one of accommodation to technology.  Not only was the world's first copyright statute enacted as a consequence of the invention of the printing press, but successive advances in communications throughout the twentieth and twenty-first centuries have confronted the law time and again with challenges about how it will adapt.  Myriad and distinct rules now govern, depending on whether the subject exploitation is webcasting of musical compositions, making a sound-alike version of a popular recording, cablecasting over-the-air television signals, and on and on.  But, amidst all of these myriad rules, one thing stands out—the complexity that marks the various features of the law does not result from settlements of class action lawsuits; rather, it uniformly comes from Congressional intervention.

If class actions for copyright infringement arising from technological advances were new or rare, the absence of any examples of systemic change through settlements might be less telling.  But, they are not.  To the contrary, class actions have been numerous and varied, and

none of them has ended in an agreement that operates like a legislative initiative. Rather, whether settled or not, those class actions have addressed the dispute between the parties over the subject activity and, depending upon how they resolved it, the conduct has either proceeded or stopped.

One good example arises from the advent of the photocopying machine. In *American Geophysical Union v. Texaco, Inc.*, 802 F. Supp. 1 (S.D.N.Y. 1992), publishers brought a class action "on behalf of themselves and others similarly situated." *Id*. at 1. The district court found that Texaco's use of copying machines to copy journal articles constituted copyright infringement and awarded judgment to plaintiffs. *Id*. at 28. On appeal, a divided panel of the Second Circuit affirmed. 60 F.3d 913 (2d Cir. 1995).

The result of that successful class action was to resolve the pertinent legal doctrines in favor of the copyright owners. Following similar results in other suits against photocopying services, business practices in the United States adjusted to the now clarified legal rules. *See Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1547 (S.D.N.Y. 1991) (granting injunctive relief against copyshop chain); *Princeton Univ. Press v. Michigan Doc. Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) (*en banc*) (holding that copyshop engaged in copyright infringement in producing coursepacks and remanding for issuance of tailored injunction, which would apply against present and future copyrighted works).

The history of photocopying litigation is as notable for what it did not accomplish. The plaintiffs in the litigation did not agree that Texaco and Kinko's could continue to engage in their photocopying conduct, and increase its scope exponentially, in exchange for payment to the class members. Neither did the parties purport to bind to any such agreement a large class of rightsholders who may not even have known about the lawsuit. Instead, the class plaintiffs used the court system for its designated purpose—to obtain judicial redress of their grievance. Having prevailed, they thereafter enforced their rights, and affected businesses largely altered their practices lest they be held culpable again for copyright infringement.

Another example, involving a class action against digital taping, illustrates how the parties to a class action can advance copyright law to address the challenges posed by new technologies. In *Cahn v. Sony Corp.*, No. 90 Civ. 4537 (S.D.N.Y. filed July 9, 1990), veteran songwriter Sammy Cahn brought a class action "on behalf of all owners of copyrights in musical compositions. . . ." Nimmer Decl., Ex. C (Complaint in *Cahn v. Sony*) ¶ 10. The suit targeted the imminent sale of digital audio tape ("DAT") recorders and blank cassettes, alleging that Sony has "inaugurat[ed] a new era in unauthorized home taping of copyrighted musical compositions. For the first time, a home taper will be able to make perfect copies of . . . compact discs." *Id.* ¶ 1. The complaint in this class action prayed for injunctive relief against that impending technology. *Id.* ¶ B.

But matters never went that far. Instead, the parties resolved their dispute by settling the litigation and jointly agreeing to ask Congress to amend the Copyright Act. Congress passed the resulting bill on October 28, 1992. *See* Pub. L. No. 102-563, 106 Stat. 4237. The result was the Audio Home Recording Act of 1992, an act whose legislative history even recounts the role that the litigation played on the path towards formulating that legislation. H.R. Rep. 102-873, pt. 1, at 10 (1992) (noting that bills before Congress resulted from successful settlement negotiations among litigants).

The history of this litigation is again notable for what the parties did not do. In theory, the parties to *Cahn v. Sony* could have agreed to a settlement agreement that would have operated solely for the benefit of the named defendant, empowering Sony Corp. to be the only entity within the United States authorized to purvey DAT recorders, and channeling monopoly profits on that basis to the members of the plaintiff class. But, the parties did not choose that path. Due regard for the different roles assigned the legislature and the judiciary constrained them to present their overhaul of copyright laws to the only body empowered to bring them to fruition, namely the Congress of the United States.

*Cahn v. Sony* is not an outlier.[3]  Several years later, in the same court, a prominent music publisher filed a class action regarding exploitation of music on the Internet.  *See* Nimmer Decl., Ex. D (Complaint in *Frank Music Corp. v. CompuServe Corp.*, No. 93 Civ. 8153 (JFK) (S.D.N.Y. filed Nov. 29, 1993)).  The plaintiff class in that case consisted of 140 publishers, who each acted through the instrumentality of The Harry Fox Agency, Inc.  *Id.* ¶ 2.  That class alleged that defendant infringed its copyrights by "maintaining a storage of unauthorized recordings of The Frank Works and Class Compositions (uploaded by its subscribers) in and as a part of CompuServe's computer database."  *Id.* ¶ 13(A).

Like *Cahn v. Sony*, the parties in *Frank Music v. CompuServe* quickly settled the class action.  *See* Nimmer Decl., Exs. E & F (Settlement Agreement Between Frank Music Corp. and CompuServe filed Nov. 7, 1995 and approved by order dated Dec. 19, 1995).  Again, that resolution is most notable for what it did not attempt to accomplish.  At the end of the day, the parties scheduled 947 Class Compositions belonging to a specific group of class members, all of which were clients of named plaintiff The Harry Fox Agency.  They limited their agreement to those works, at the same time offering the identical terms to all other music publishers who already qualified as affiliates of The Harry Fox Agency through their own voluntary action.  *Id.* Ex. F paras. II, 3(A), 10.  That methodology is as different as could be from the Proposed Settlement, the hallmark of which is that it transmogrifies the release that typically accompanies a class action settlement into a license to make future use of the copyrighted work in a wide variety of commercial contexts, without any affirmative consent of the Rightsholder.

### B.     Congress has repeatedly acted to amend copyright law to address technological advances.

Although class actions have not fundamentally altered the terrain of copyright law, it is beyond dispute that technology has fundamentally altered that terrain.  A full review is obviously

---

[3] Space prevents a full ventilation of the many class actions that plaintiffs have brought alleging copyright infringement.  For a sampling of such cases, *see Auscape Int'l v. National Geographic Soc'y*, 409 F. Supp. 2d 235 (S.D.N.Y. 2004); *Ryan v. Carl Corp.*, 23 F. Supp. 2d 1146 (N.D. Cal. 1998); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir. 1990); *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70 (S.D.N.Y. 1986); *Bernstein v. Universal Pictures*, 79 F.R.D. 59 (S.D.N.Y. 1978).

beyond the scope of this Objection, but some examples illustrate the difference between the proper role of Congress and of class actions.

*TEACH Act.*  As discussed above, copyright owners repeatedly filed litigation to challenge the practice of photocopying.  With the advent of the Internet, Congress itself intervened.  The Technology, Education, and Copyright Harmonization Act of 2002 ("TEACH Act") represents an elaborate amendment to the Copyright Act.  *See* Pub. L. No. 107-273, Sec. 13301, 116 Stat. 1758, 1762 (2002).  It allows transmission of material over secure channels to students duly enrolled in "accredited nonprofit educational institutions."  17 U.S.C. § 110(2).

Because the TEACH Act forms part of the Copyright Act as a whole, it applies across the board to all copyright owners throughout the United States.  Congress acted in a detailed and nuanced fashion, exercising its prerogative to alter the strictures of general application throughout the country.  *See* 2 *Nimmer on Copyright* § 8.15[C][2].

*Audio Home Recording Act of 1992.*  Following the settlement in *Cahn v. Sony*, the parties petitioned Congress to enact legislation regulating the use of DAT recorders and blank tapes.  The product of their joint efforts won enactment as the Audio Home Recording Act of 1992, which added an entire new chapter to the Copyright Act, consisting of ten sections.  *See* Pub. L. No. 102-563, 106 Stat. 4237 (1992).  Those sections regulate in minute detail the copying controls that must be incorporated into DAT recorders to allow their manufacture and sale within the United States, the accounting obligations for those who sell DAT recorders and blank tapes, the royalties thereby collected and how they are allocated among rightsholders, remedies, and conduct that remains actionable as copyright infringement.  *See* 17 U.S.C. § 1001-1010.  The result is a complex change in the law that applies across the board to all copyright owners throughout the United States.  *See* 2 *Nimmer on Copyright* §§ 8B.01-8B.08.

The parties to *Cahn v. Sony* did not arrange a private accommodation that would allow Sony Corporation alone to sell DAT tapes and recorders.  Instead, given the magnitude of the change required to embrace the emerging technology, they successfully petitioned Congress to amend the copyright statute.

*Webcasting*.  Shortly after *Frank Music v. CompuServe* settled, all of the affected industries achieved Congressional implementation of their longstanding goal, namely enactment of the Digital Performance Right in Sound Recordings Act of 1995.  *See* Pub. L. No. 104-39, 109 Stat. 336 (1995).  Congress implemented complex and elaborate provisions to regulate minutely two emerging domains whereby music was being exploited over the Internet:  webcasting and digital download delivery.  *See* 17 U.S.C. §§ 114, 115.

In terms of sustained involvement, however, the legislative intervention here dwarfed those previously considered.  Three years later, Congress needed to return to this domain.  *See* Pub. L. No. 105-304, Sec. 405(a), 112 Stat. 2860, 2890 (1998).  Yet, given continued dissatisfaction of the parties, Congress took up the issue a third time, and once again passed an amendment to the Copyright Act to update and adjust its previous handiwork, under the name Webcaster Settlement Act of 2002.  *See* Pub. L. No. 107-321, 116 Stat. 2780 (2002).  Nonetheless, the parties soon realized that that third effort was also flawed and so prevailed upon Congress to act a fourth time, via the Webcaster Settlement Act of 2008.  *See* Pub. L. No. 110-435, 122 Stat. 4974 (2008).  President Obama recently signed into law the parties' latest handiwork, the Webcaster Settlement Act of 2009.  *See* Pub. L. No. 111-036 (June 30, 2009).  Collectively, these amendments once again form part of the Copyright Act as a whole, governing on that basis all copyright owners throughout the United States.  *See* 2 *Nimmer on Copyright* §§ 8.21-8.24.

A more trenchant counterpoint to the Proposed Settlement is hard to imagine.  Had the parties believed in judicial authority to bind non-parties whose interests were implicated, it would have been much easier for them to have relied upon an application to Judge John F. Keenan than to go to Congress five times.  Their repeated return to Congress testifies eloquently that court approval of a class action settlement cannot make an end-run around Congress' exclusive role in implementing fundamental reform of the copyright bargain binding all parties throughout the country.

### C. The Proposed Settlement short-circuits proposed legislation.

The Proposed Settlement invades the prerogatives of Congress and attempts to legislate a private solution to a problem that can only truly be solved with across-the-board changes to the copyright law that affect everyone. In seeking approval, the parties do not ask this Court to answer the traditional Rule 23 question of whether the Proposed Settlement is a fair resolution of the claims of the class members on account of Google's unauthorized digitization of their works. Rather, they ask this Court to approve the Proposed Settlement because, in their view, its restructuring of rights and remedies with respect to "orphan works," among others, will be good for society generally and for the class members (not to mention Google) in particular. That question, however, is not one that this Court, or any court, may legitimately address.

Not surprisingly, the organs of government charged with effectuating sound copyright policy have deliberately confronted the problems of "orphan works," and are moving towards yet another amendment to the Copyright Act designed to redress the problems that those works pose to the copyright system. Several years back, the Senate Judiciary Committee asked the U.S. Copyright Office "whether there are compelling concerns raised by orphan works that merit a legislative, regulatory or other solution, and what types of solutions could effectively address these concerns without conflicting with the legitimate interests of authors and rights holders." *Notice of Inquiry*, 70 Fed. Reg. 3739, 3739 (Jan. 26, 2005). The Copyright Office's resulting report concluded that legislation is necessary to provide a meaningful and comprehensive solution. Register of Copyrights, *Report on Orphan Works* 92-93, 93 (Jan. 2006), *available at* http://www.copyright.gov/orphan/orphan-report-full.pdf [hereinafter *Orphan Report*] ("[L]egislation is necessary to help resolve the problems inherent in orphan works. There appears to be clear support among a wide variety of stakeholders for legislation . . . .").[4]

---

[4] Commentators have likewise emphasized the need for a legislative solution to the orphan works problem. *See* Rebecca Tushnet, *Naming Rights: Attribution and Law*, 2007 Utah L. Rev. 789; Marc H. Greenberg, *Reason or Madness: A Defense of Copyright's Growing Pains*, 7 J. Marshall Rev. Intell. Prop. L. 1, 43 (2007) ("general consensus that [the orphan works situation] is a problem that needs to be addressed through new legislation"); Vigdis Bronder, *Saving the Right Orphans: The Special Case of Unpublished Orphan Works*, 31 Colum. J.L. & Arts 409, 411-12 (2008).

To grapple fully with the issue of "orphan works,"[5] companion bills were introduced in the House and Senate last year. *See* Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008); The Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008). Those bills follow in the train of numerous congressional hearings over the years.[6]

To appreciate the disparity between the bills introduced in Congress last year and the Proposed Settlement, let us imagine that both reach fruition this year, that "orphan works" exist which both Amazon and Google digitize in 2013, and that the implicated "orphan rightsholders" come forward in 2014 to assert their newly found rights. Following notification, Amazon would have to completely cease exploitation of the subject works; if it fails to do so, Amazon faces injunctive relief. *See* S. 2913 & H.R. 5889, Sec. 514(c)(2).[7] By contrast, Google would not have to remove the subject works from its collection following notification. Instead, the Proposed Settlement affords it a safe harbor, thereby immunizing Google from injunctive relief.[8] Simply put, the Proposed Settlement tilts the playing field by liberating Google (and Google alone) pursuant to a uniquely liberal set of eligibility requirements, at the same time that each and every

---

[5] In 2005, Congress passed a narrow, technical amendment entitled "Preservation of Orphan Works Act." Pub. L. 109-9, Sec. 401, 119 Stat. 218 (2005). Its effect is limited to library exploitation of works during the last twenty years of copyright subsistence, to the extent that such works are not "available in the marketplace at a reasonable price." 151 Cong. Rec. H2114 (daily ed. Apr. 19, 2005) (Statement of Rep. Berman). *See* 2 *Nimmer on Copyright* § 8.03[E][3]. That narrow legislation therefore fails to grapple with the larger "orphan works" issue.

[6] *See Orphan Works: Proposals for a Legislative Solution: Hearing Before the Subcomm. on Intellectual Property of the S. Comm. on the Judiciary*, 109th Cong. (2006); *Report on Orphan Works by the Copyright Office, Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary* (Mar. 8, 2006), *available at* http://commdocs.house.gov/committees/judiciary/hju26410.000/hju26410_0f.htm; *Statement of Marybeth Peters, Register of Copyrights, Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary* (Mar. 13, 2008), *available at* http://www.copyright.gov/docs/regstat031308.html.

[7] The bills disallow injunctions, provided that the infringer pays reasonable compensation, only for certain transformative uses. *See id.* § 514(c)(2)(B)(ii).

[8] "The right to Remove . . . is limited to requests made within 27 months from the Notice Commencement Date. Thereafter, requests will be honored only to the extent that the Books have not yet been Digitized as of the date the request is made . . . ." Proposed Settlement § 3.5(a)(iii).

one of Google's competitors would remain subject to the more rigorous requirements and penalties likely to be found in the orphan works legislation.

Against this background, the flaw in the Proposed Settlement comes into focus: Although this case began as a routine infringement action under existing copyright law, the question now presented is whether the copyright regime should be effectively amended with the Proposed Settlement's quasi-legislative solution.[9]  Because such a resolution would fly squarely in the face of Congress's constitutionally delegated role to legislate changes to the copyright law, it must be rejected.  *See* U.S. Const. art. I, § 8, cl. 8; *see also Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003) (upholding the constitutionality of the Copyright Term Extension Act; "[w]e have also stressed . . . that it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives.").[10]

## II. The Proposed Settlement Should Be Disapproved Because It Would Restrain Competition by Creating a Cartel of Rightsholders and Establishing Google as the Exclusive Distributor of Electronic Copies of Millions of "Orphan" and Other Works.

As a substitute for Congressional action, the settling parties seek to create the Registry. They offer private cooperation among Rightsholders in forming and running the Registry, and between the Registry and Google, as a solution that would be best for all who are directly

---

[9] It is no answer to suggest that judicial action is warranted because "orphan works" legislation has not yet passed Congress.  Had the parties sought an injunction commanding all members of Congress to pass a bill (and override a veto, if necessary) embodying their proposed new system for exploiting orphan works, this Court would not hesitate to dismiss the political question thereby posed out of deference to the constitutional separation of powers.  Yet the same result is effectively being sought through the current request that the Court use its Rule 23 power to "enact" the Proposed Settlement.

[10] *See also Baker v. Carr*, 369 U.S. 186, 217 (1962) (as "a function of the separation of powers," courts may not act in the face of "a textually demonstrable constitutional commitment of the issue to a coordinate political department"); *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230 (1986) (noting that separation of powers principle "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch"); *In re Austrian and German Holocaust Litig.*, 250 F.3d 156, 163 (2d Cir. 2001) (granting mandamus against district court with the observation: "Under Article III of the Constitution of the United States, the province of the Judicial Branch of the federal government is the adjudication of the rights of the parties to cases or controversies under the applicable laws . . . . The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive or the Legislative Branch.").

involved, and indeed for the rest of society as well. In making this proposal, the settling parties run headlong into United States antitrust laws. "Antitrust laws acknowledge [the] benefits [of cooperation], but still treat the arrangements with skepticism, for seemingly benign agreements may conceal highly anticompetitive schemes." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1140 (9th Cir. 2003). The combinations envisioned here by the Proposed Settlement pose significant antitrust dangers.

A court cannot approve a class action settlement that violates federal antitrust laws. *See, e.g., Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) ("a court cannot lend its approval to any contract or agreement that violates the antitrust laws."); *In re Montgomery County Real Estate Antitrust Litig.* (*Montgomery County*), 83 F.R.D. 305, 319 (D. Md. 1979) ("It is obvious that no court may lend its approval to an illegal agreement or to one which has an illegal effect."). In evaluating whether a settlement violates antitrust law, a court must do more than simply look at whether the agreement is illegal on its face. Rather, the court can ask the parties to submit evidence concerning the competitive impact of the proposed settlement on the market, reject the settlement if it is anticompetitive, and, if possible, offer solutions to the parties that would cure the anticompetitive aspects of the proposal. *Montgomery County*, 83 F.R.D. at 313-15. As the district court did in *Montgomery County*, this Court can and should evaluate the competitive effects of the Proposed Settlement.[11] As described below, the anticompetitive aspects of the Proposed Settlement require the Court to reject it.

---

[11] In *Montgomery County*, the district court addressed objections to a proposed class action settlement from the defendants' competitors, who argued that the proposed settlement was an improper agreement in restraint of trade. 83 F.R.D. at 313-14. After all the objectors had spoken at the fairness hearing, the court asked the parties to submit evidence in support of their contention that the settlement's market effects would be insignificant. *Id.* at 314. The court collected data on the market before, during, and after the hearing. *Id.* At the conclusion of this inquiry, the court informed counsel that it would not approve the settlement without certain modifications that would cure its antitrust concerns. *Id.* The parties then submitted a revised settlement with the district court's suggested modifications. *Id.* at 314-15. In its decision approving the revised settlement, the district court again examined the potential anti-competitive effect of the settlement on the market. *Id.* at 319-320. This time it found no "unreasonable anticompetitive effect." *Id.* at 320.

The settling parties' plan to create the Registry is usefully compared and contrasted to the existing models in the music industry of the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI), both of which license the right to use music on behalf of large aggregations of music copyright holders. The antitrust concerns posed by ASCAP and BMI have been blunted over the years by consent decrees entered between these organizations and the Department of Justice.[12]  As one court stated in finding that ASCAP's blanket licensing of musical compositions was permissible, ASCAP has managed to comply with the law by staying within the decree's bounds:  though not immunized by its consent decree with the Department of Justice, "as a potential combination in restraint of trade, ASCAP has been 'disinfected' by the decree."  *K-91, Inc. v. Gershwin Publ'g Corp.*, 372 F.2d 1, 4 (9th Cir. 1967).

Here, the Registry would accumulate greater powers than ASCAP or BMI, but the Proposed Settlement is missing critical protections that both the ASCAP and BMI consent decrees incorporate.  The Proposed Settlement risks harming:

- competition between copyright holders for individual consumer sales through collusive price restraints;

- competition among electronic distributors of books or book databases and among search engine providers through an exclusive dealing arrangement with Google—an injury to competition that damages not only consumers and Google's competitors but also the proposed Registry's constituent Rightsholders; and,

- potentially, competition between existing authors or publishers and future authors or publishers through the creation of an unfettered cartel controlled by insiders who could exclude outsiders.

As a result, it cannot be approved.

---

[12] The latest consent decree between DOJ and ASCAP was entered in 2001.  *United States v. Am. Soc'y of Composers, Authors & Publishers*, 2001 U.S. Dist. LEXIS 23707 (S.D.N.Y. June 11, 2001) [hereinafter *ASCAP Decree*].  This decree superseded the previous amended 1950 decree, *United States v. Am. Soc'y of Composers, Authors & Publishers*, 1950 U.S. Dist. LEXIS 1900 (S.D.N.Y. Mar. 14, 1950), and 1960 decree, *United States v. Am. Soc'y of Composers, Authors & Publishers*, 1960 U.S. Dist. LEXIS 4967 (S.D.N.Y. Jan. 7, 1960).

BMI is governed under a 1966 decree, *United States v. Broadcast Music, Inc.*, 1966 U.S. Dist. LEXIS 10449 (S.D.N.Y. Dec. 29, 1966) [hereinafter *BMI Decree*], as amended in 1994, *United States v. Broadcast Music, Inc.*, 1994 U.S. Dist. LEXIS 21476 (S.D.N.Y. Nov. 18, 1994).

**A.    The Registry would have price setting powers for the collective of Rightsholders that are highly suspect, if not *per se* illegal, under the Sherman Act.**

Currently, Rightsholders have the authority individually to license their works for electronic distribution and thus compete against each other, both for inclusion of their works in subscription programs and for resale of their works to end-users.  If the Proposed Settlement becomes effective, however, Rightsholders will combine into a single Registry, which will then be empowered to coordinate pricing of the works of thousands of competitors.  This prospect raises major antitrust concerns, as "[n]o antitrust violation is more abominated than the agreement to fix prices."  *Freeman*, 322 F.3d at 1144.  The Proposed Settlement's use of the Registry to price subscription services is probably not illegal as a *per se* violation of section 1 of the Sherman Act,[13] but likely will fail when tested under the rule of reason because of the lack of restrictions of the type imposed on ASCAP and BMI that accompanied their sale of blanket licenses.  However, the agreement in the Proposed Settlement calling for the use of a Google designed formula to price sales of books to consumers, and for oversight of that pricing by the Registry, seems to fall squarely within the *per se* illegal category and, even on the off chance it does not, would fail when tested under the rule of reason because of the danger it poses of collusive and monopolistic pricing.

*1.    The Registry's role in setting prices for consumer purchases of books.*

The Proposed Settlement allows Google to offer consumers the ability to purchase books. Proposed Settlement § 4.2.  Under that provision, a Rightsholder can elect to set its own price, or else it can choose to sell its book at a price created by a "Pricing Algorithm" to be developed by

---

[13] Section 1 covers all contracts, combinations or conspiracies that restrain trade, and it provides for two modes of analyses.  15 U.S.C. § 1; *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687-88, 692 (1978).  A challenged restraint is a *per se* antitrust violation when it is "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."  *Nat'l Soc'y*, 435 U.S. at 692.  The alternative is the rule of reason, where the court must analyze "facts peculiar to the business, the history of the restraint, and the reasons why it was imposed" to decide whether the practice on balance promotes or suppresses competition.  *Id.* at 691-92, 692; *see also Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918).  The rule of reason asks if a practice's "anti-competitive effects outweigh its pro-competitive effects."  *CBS v. Am. Soc'y of Composers, Authors & Publishers* (*CBS-Remand*), 620 F.2d 930, 934 (2d Cir. 1980).

Google—with the latter as the default. *Id.* § 4.2(b). Such coordinated pricing is unlawful. As the Second Circuit pointed out in *CBS-Remand*:

> If ASCAP were to make a per use charge for each song, it would have to determine a price to be charged. Whether or not that price varied for each song, the determination of any price for use of a song by a membership organization of competing songwriters would be classic price-fixing.

620 F.2d at 936 (footnote omitted); *see also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-48 (1980) ("Indeed, a horizontal agreement among competitors to use a specific method of quoting prices may be unlawful."); *cf. Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982) (agreement among doctors to set maximum fees for the purposes of contracting with health insurance found *per se* illegal). It matters not that the coordination would be executed through use of a common formula:

> [P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon.

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940); *see also id.* at 223 ("As we have indicated, the machinery employed by a combination for price-fixing is immaterial. Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.").

Indeed the Proposed Settlement's vision for the "Pricing Algorithm" makes the risks even more explicit, as Google is to design the formula "to find the optimal such price for each Book and, accordingly, to maximize revenue for each Rightsholder." Proposed Settlement § 4.2(b)(i)(2). The Proposed Settlement provides that the price of an individual book will be based "upon aggregate data collected with respect to Books that are similar to such Book" and will be subject to change "over time in response to sales data." *Id.* § 4.2(c)(ii)(2). The clear implication of these provisions is that the algorithm will be written to take into account, where possible, that it can optimize the price for a certain slice of books simply by increasing all prices of similar books at the same time—a high-tech form of the backroom agreements that are the

stuff of antitrust nightmares.  True, individual Rightsholders are allowed to opt out by setting their own prices, but if a cartel that maximizes prices for all competitors can be put in place legally, it is hard to imagine many Rightsholders opting out because they feel they can get a better price for their own works by doing so.  In addition, the Proposed Settlement provides that the Registry will be informed of the price determined by Google's "Pricing Algorithm" even for works of Rightsholders who do elect to set their own prices.  *Id.* § 4.2(c)(iii).

Such an arrangement is *per se* illegal under the antitrust laws even without proof of competitive effects.  *Socony-Vacuum Oil Co.*, 310 U.S. at 222.  Given the nature of the book business, however, it is clear that a very high risk exists that this price-setting arrangement will result in serious anti-competitive effects, to wit, monopoly pricing in areas of that business that are now competitive.  The book business is characterized by numerous niche markets (e.g., medical textbooks) and by rapid technological changes in how books are delivered to customers.  Book industry niches frequently have several readily identifiable publishers.  Those publishers are increasingly relying on electronic means and "print on demand" to distribute their books.  If each of the publishers in a given niche elects not to remove its books from the purview of the settlement, then prices for electronic editions of all of the now competing titles would be set by Google through the use of its algorithm.  The fact that the settlement does not cover traditional printed copies of those books does little to ameliorate the harm.  The "print on demand" business is rapidly displacing more traditional manufacturing techniques; many new titles are being published only electronically and through print on demand.[14]  Since the settlement expressly identifies "print on demand" as one of the new revenue models that may be implemented by Google and the Registry, the publishers of books in a given niche would effectively be able to use the Registry and Google to fix the prices of all, or virtually all, of the sales of their books.

---

[14]  "Print On Demand" books are identical to mass produced books; only the method of manufacturing differs.  Thus, it is entirely possible that major publishers could stop pre-printing many of their new books and sell copies only through electronic distribution and "print on demand."

The consumer pricing provisions of the Proposed Settlement stand in striking contrast to the provisions of the consent decrees between ASCAP and BMI, on the one hand, and the Department of Justice, on the other. The ASCAP decree permits licensing of individual musical works by ASCAP only if both the potential licensee and the copyright holder ask it to do so, the only exception being where the copyright holder is unresponsive. *ASCAP Decree*, 2001 U.S. Dist. LEXIS 23707, at *13. The BMI decree is similar, although it has no provision for a missing owner. *BMI Decree*, 1966 U.S. Dist. LEXIS 10449, at *10. But, unlike under the Proposed Settlement, there is limited potential for abuse by either ASCAP or BMI because the district court has rate-setting authority if those organizations and a potential licensee cannot agree on a price. *See Muzak LLC v. Broadcast Music, Inc.*, 275 F.3d 168, 177-78 (2d Cir. 2001) (per piece rates under BMI decree subject to district court's authority).

Amazon assumes that the settling parties hope to justify this provision by pointing to "orphan works," works where by definition the Rightsholder cannot be located.[15] But, even if there exists a rationale for collective pricing of those works, that cannot justify naked price-fixing among known Rightsholders. There are no efficiencies associated with this price-fixing. Moreover, even as to the "orphan works" the use of collective pricing by a single organization without any checks or balances presents a significant danger that consumers will be overcharged. In the ASCAP and BMI situations, the Department of Justice insisted upon, and continues to enforce, stringent controls, up to and including giving the courts the ultimate authority to resolve rate disputes. No such mechanism exists in the Proposed Settlement; in fact, its stated objective is to extract the maximum amount of money possible from consumers. Whether viewed as *per se* unlawful price-fixing or judged under the rule of reason, the provisions of the Proposed Settlement dealing with the pricing of "Consumer Purchases" are illegal. For this reason alone, the Proposed Settlement cannot be approved by this Court. *See Grunin*, 513 F.2d at 123.

---

[15] As the Second Circuit tepidly noted in *CBS-Remand*, "[i]f licensing directly from individual copyright owners were not feasible, then it would be arguable that per use pricing by ASCAP might be that rare instance when price-fixing does not necessarily violate § 1." 620 F.2d at 936. Even as to the particular factual setting of "orphan works," this statement suggests only that it is possible to design a pricing scheme for "orphan works" that could survive antitrust scrutiny.

2. *The Registry's role in setting prices for subscriptions to an electronic database of books.*

For the planned sale of institutional subscriptions to the book database being created by Google (and the envisioned consumer subscription to that database), the Proposed Settlement provides that the Registry and Google will set the price of access to the entire database, using a specific set of parameters. Proposed Settlement §§ 4.1, 4.7(d). It also provides a pricing mechanism for any specialized "discipline-based collections" that Google may choose to offer as an alternative to a subscription to the entire database. *See id.* § 4.1(a)(v). And, it provides a mechanism for adjusting subscription prices. *Id.* § 4.1(a)(vi), (viii). Finally, the Proposed Settlement sets out certain terms of the subscription that Google may and may not offer. *Id.* § 4.1(d)-(f). Google will pay the Registry 63 percent of the revenue generated from sales of institutional subscriptions, and the Registry will in turn distribute that revenue to Rightsholders according to a "Plan of Allocation" that leaves no room for individual negotiation. *Id.* §§ 2.1(a), 4.5, Attach. C.

These provisions constitute a form of price-fixing: The Registry is setting the price that will be charged for a subscription that includes the works of thousands of competitors and the Proposed Settlement divides up the Rightsholders' share of that revenue without any room for individual negotiation. "Although price fixing is almost always a *per se* violation of section 1, there are 'very narrow' exceptions." *Freeman*, 322 F.3d at 1150. The Supreme Court's decision in *Broadcast Music, Inc. v. CBS*, 441 U.S. 1 (1979), is one such exception. *See Freeman*, 322 F.3d at 1150 (describing *BMI v. CBS* and *NCAA v. Board of Regents*, 468 U.S. 85 (1984), as the exceptions). One suspects the settling parties hope to fit the provisions of their agreement relating to the institutional subscriptions within a narrow exception to the rule of *per se* illegality.

In *BMI v. CBS*, the Supreme Court held that blanket licenses offered by ASCAP and BMI were not *per se* violations of section 1, but rather subject to the rule of reason. 441 U.S. at 24-25. ASCAP and BMI are collective licensing agents working on behalf of music publishers, composers, and copyright owners; "[a]lmost every domestic copyrighted composition is in the repertory either of ASCAP . . . or of BMI . . . ." *Id.* at 5. The challenged practice in that case

was blanket licensing, "which give[s] the licensees the right to perform any and all of the compositions owned by the members or affiliates as often as the licensees desire" usually for "a percentage of total revenues or a flat dollar amount . . . [that does not] directly depend on the amount or type of music used." *Id.* at 5, 6-7. The Supreme Court first noted that ASCAP and BMI had been constrained by consent decrees with the Department of Justice; while not dispositive, the Court considered this limitation informative. *Id.* at 13-16. The Court ultimately held that rule of reason scrutiny was more appropriate than *per se* treatment for blanket licensing "across the board." *Id.* at 18, 24-25. In reaching that conclusion, the Court relied on three premises: that copyright law's very existence suggests that "market arrangements reasonably necessary to effectuate the rights . . . granted" should not be *per se* unlawful, *id.* at 18-19, 19; that particular difficulties with selling, monitoring and enforcing rights in the music licensing market make the blanket license attractive,[16] *id.* at 19-21; and that blanket licenses are to a degree "a different product . . . of which the individual compositions are raw material," *id.* at 21-23, 22.

Given the analogy between the sale of a blanket license by ASCAP and BMI, on the one hand, and the proposed licensing by the Registry, through Google, of institutional subscriptions to an entire database of Books, on the other, Amazon does not dispute that the provisions of the Proposed Settlement relating to the pricing of institutional subscriptions fall outside the *per se* rule outlawing price-fixing agreements. However, as discussed in greater detail below, serious questions arise whether those provisions could pass muster under rule of reason analysis. The

---

[16] As the Court explained,

ASCAP and the blanket license developed together out of the practical situation in the marketplace: thousands of users, thousands of copyright owners, and millions of compositions. Most users want unplanned, rapid, and indemnified access to any and all of the repertory . . . and the owners want a reliable method of collecting . . . . Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers. . . . [T]he costs are prohibitive for licenses with individual radio stations, nightclubs, and restaurants, and it was in that milieu that the blanket license arose.

*Id.* at 20 (citation omitted).

blanket license offered by ASCAP and BMI survived judicial scrutiny under the rule of reason only because the consent decrees and continued oversight of those decrees by the Department of Justice "disinfected" their operations. These provisions included a requirement that all comers be licensed, that pricing be non-discriminatory for similarly situated licensees, and ultimately that the court retain jurisdiction to set a price where licensor and licensee could not agree on one. *ASCAP Decree*, 2001 U.S. Dist. LEXIS 23707, at *10, *12-*14, *15, *17-*23; *United States v. Broadcast Music, Inc.*, 1994 U.S. Dist. LEXIS 21476, at *2-*5; *BMI Decree*, 1966 U.S. Dist. LEXIS 10449, at *7-*8, *10, *11. Because the Proposed Settlement lacks any comparable safeguards, the unfettered power of the Registry and Google to set the price of the institutional subscription should be judged very differently under the rule of reason than the blanket licenses sold by ASCAP and BMI.[17]

     **B.**     **The Registry will deal exclusively with Google, shutting out potential competitors.**

The prior section outlines the anticompetitive concerns the proposed Registry poses on its own to entities who distribute books (such as Google or Amazon) and to consumers who seek to

---

[17] The very limited pricing review provided in the Amendment to Cooperative Agreement between Google and the University of Michigan (and the substantially similar Amendment to Cooperative Agreement between Google and the University of Wisconsin, *available at* http://www.library.wisc.edu/digitization/googleamendment.pdf (last visited August 30, 2009)) is not a meaningful check on the power of the Registry and Google to set the price of institutional subscriptions. *See* Nimmer Decl. Ex. B Attach. A para. 3(c). First, the review is limited to "the Pricing Categories of Institutional Subscriptions offered to Higher Education Institutions," and thus does not cover the prices for any other category of institution listed in section 4.1(a)(iv) of the Proposed Settlement, such as corporate or government. *Id.* Attach. A para. 3(c)(1). Additionally, only institutions defined as "Interested Institutions" can initiate and pursue the review. *Id.* Attach. A para. 3(c). To the best of Amazon's knowledge, as of today the University of Michigan and the University of Wisconsin are the only such "Interested Institution[s]." And both have little incentive to bring a potentially costly pricing review. The Amendment provides Michigan with a free Institutional Subscription for twenty five years. *Id.* para. 23; *see also* Miguel Helft, *Google Book-Scanning Pact to Give Libraries Input on Price*, N.Y.Times, May 20, 2009, *available at* http://www.nytimes.com/2009/05/21/technology/companies/21google.html ("Since Michigan is lending a large number of books, it will receive Google's service free for 25 years."). Similarly, the Amendment to Cooperative Agreement between Google and the University of Wisconsin provides Wisconsin with a significant discount on the cost of its Institutional Subscription. Amendment to Cooperative Agreement between Google and the University of Wisconsin para. 19. This pricing review provision is simply too insubstantial to affect any rule of reason calculus.

purchase books and use book databases. As the sole representative of the Rightsholders, the Registry itself would create a danger to healthy competition, but the Proposed Settlement adds an additional dimension to that threat by anointing a sole distributor, Google, for "orphan works" and perhaps millions of other works. In stark contrast to the non-discriminatory dealing imposed by the consent decrees on ASCAP and BMI, the Proposed Settlement presents the imminent danger of installing Google as a monopolist through an arrangement that results in Google, and only Google, having access to a large percentage of the titles in existence. This danger arises directly from the Proposed Settlement—by compelling participation in a business arrangement with Google by all who do not affirmatively opt out, the Proposed Settlement itself is the mechanism for collective action by Rightsholders in selecting a distributor.

Even though ASCAP and BMI represent only members who affirmatively elected to join, both were compelled to submit to consent decrees that require them to license all similarly-situated users on a non-discriminatory basis. *See ASCAP Decree*, 2001 U.S. Dist. LEXIS 23707, at *10, *12-*14, *15; *BMI Decree*, 1966 U.S. Dist. LEXIS 10449, at *7-*8, *10, *11. The Proposed Settlement's provisions work in the opposite manner. Section 6.2(b)(iii) provides that the Registry will be allowed "to the extent permitted by law, [to] license Rightsholders' U.S. copyrights to third parties," which, as interpreted by the Settlement Notice, means that the Registry would "represent the interests of the Rightsholders . . . including with companies other than Google (subject to the express approval of the Rightsholders of the Books involved in such other commercial arrangements)," Proposed Settlement Attach. I § 8.B (emphasis added); *see also* Proposed Settlement § 2.4 (authorizations to Google are non-exclusive, so individual Rightsholders may license others). For the "orphan works," however, the Registry cannot license entities besides Google (because, by definition, the Registry cannot obtain an express authorization to do so from missing Rightsholders).[18]

---

[18] By definition, the magnitude of this state of affairs is also impossible to quantify—but it is indisputably very large. A recent book published by Yale University Press estimates over 95% of books published in the twentieth century are under copyright protection yet commercially unavailable, and a "substantial proportion of that total is made up of orphan works." James Boyle, *The Public Domain* 10 (2008).

As a practical matter, Google's exclusive rights are likely to be even broader than "orphan works."[19]  Even as to Rightsholders who identify themselves to the Registry, the Proposed Settlement lacks any clear means by which the Registry can obtain the express approval to include their works in commercial arrangements with third parties.  In all likelihood, the process would be an individual one, with the Registry having to seek approval of each Rightsholder for each commercial arrangement involving their works.  When a Rightsholder ignores the offer, the Registry would be unable to conclude an arrangement with the third party with respect to that Rightsholder's work.  Google, however, would retain rights over that same book (*i.e.*, the one whose Rightsholder was silent) because, under the Proposed Settlement, affirmative action is required to remove a book from its purview.

Furthermore, the Registry remains perfectly free, under the Proposed Settlement, to decline to negotiate commercial arrangements with third parties.  Given the time and expense involved in gaining Rightsholder approval, the Registry could well conclude that lining up additional distributors is not worth the effort.  In that case, Google's exclusive arrangement would extend to all works except those whose Rightsholders directly negotiated an alternative arrangement with a third party.

Given that the scope of the available titles could be critical to the attractiveness of search and subscription services and to the long term survival of businesses that sell books to consumers over the Internet, the Proposed Settlement, by giving Google a monopoly over access to "orphan works" and perhaps millions of other works, creates a glaring risk that Google will become the sole source of these services.  Without the ability to negotiate an arrangement with the Registry, competitors will have no realistic chance of accessing the "orphan works" and effectively competing with Google; Google's exclusive deal with the Registry will have choked off the

---

[19] The Proposed Settlement empowers the Registry to negotiate with another entity as to the predominant use of these works only if Google fails to commercialize an opportunity.  Proposed Settlement §§ 3.7(c), 3.7(e)(i), 7.2(e)(ii).  Although these provisions afford Google the opportunity to walk away from its monopoly position over "orphan works," they do not serve to check the threat of that monopoly.  Moreover, even if Google were to walk away, nothing in the Proposed Settlement prevents the Registry from simply granting these exclusive rights to another entity.

supply of a necessary ingredient.[20]  *See Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2d Cir. 2004) (finding a prima facie section 1 claim arises from exclusive dealing between input supplier and drug maker, in circumstances where the input was difficult to obtain anywhere else); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005).  The competitive imbalance will be even more drastic if the Registry chooses not to negotiate licenses with third parties for titles whose Rightsholders have identified themselves to the Registry or if a significant percentage of those Rightsholders do not affirmatively give consent to arrangements brokered by the Registry covering their works.

In sum, the Proposed Settlement breaks sharply from the ASCAP and BMI decrees, where prohibitions on discriminatory licensing prevented these music registries from crowning a champion among competing users of music.  By going in the opposite direction and using the mechanism for collective action created by Rule 23 to give Google an exclusive deal that clearly handicaps, and may eliminate, competitors for the provision of search and subscription services and for the sale of books to consumers, the Proposed Settlement amounts to an unlawful restraint of trade in those fields.

### C.    Google's exclusive rights threaten to harm Rightsholders because the Proposed Settlement grants Google monopsony power.

Although the Proposed Settlement is billed as benefiting Rightsholders, the exclusive dealing aspect discussed above has a quixotic characteristic that inures to the detriment of

---

[20] It is erroneous to posit that competitors, such as Amazon, could scan the "orphan works" and achieve the same result when a lawsuit is brought against them on behalf of Rightsholders.  Prevailing in such a lawsuit would not give the competitor the right to sell the scanned book or subscriptions including the scanned book because, as even Google acknowledges, the fair use doctrine cannot be stretched that far.  *See infra* note 28.  Nor could a competitor count on settling the claim in a way that allowed it to sell books and institutional subscriptions to a database that included those books.  With no obligation to license additional distributors, and an uncertain economic benefit from authorizing a second distributor, the Registry or another class representative might simply choose to litigate in the hopes of collecting massive statutory damages for Rightsholders rather than settle and authorize a new distributor.  *See* 17 U.S.C. § 504(c)(1) (for non-willful infringement, allowing recovery of statutory damages up to $30,000 per registered work); *id.* § 504(c)(2) (for willful infringement, up to $150,000).  And, of course, any competitor considering adopting this high risk approach could not hope to obtain a better deal than Google since the Proposed Settlement provides that any deal offered to the competitor that includes rights granted to a significant portion of the "orphan works" must be given to Google as well.  Proposed Settlement § 3.8(a).

Rightsholders—once the Registry chooses Google as its exclusive distributor of "orphan works," the Registry can never change its partner. Google is installed permanently (unless Google elects to leave) as the sole buyer of the Registry's orphan works licenses. Google becomes a monopsonist. Although the carve-out in Section 4.9 of the Proposed Settlement of any renegotiation of the revenue split between Google and the Registry decreases the odds of Rightsholders being subjected to a monopsonist's classic strategy of artificially depressing prices, *see Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320-21 (2007) (describing the lower price recoupment phase of a predatory bidding scheme), the Rightsholders are exposed to a variant of this harm, in that the Registry can never break orphan works away from Google, even if the market develops in such a way as to show that Google is not the best option for the Rightsholder class. Thus, Rightsholders cannot get a better deal even if another entity comes to the Registry with a more favorable offer to sell institutional subscriptions or search services for a database that includes "orphan works."

### D. The Registry's governance rules create a risk that current Rightsholders will harm future Rightsholders.

How the proposed Registry might grow also poses another potential antitrust problem. The history of the ASCAP consent decree evidences the need to be concerned with the threat that current members of a cartel might stifle potential competition from future members. Although the 1950 decree had provisions to limit restrictions on withdrawal, to require payment based primarily on use surveys, to impose protections relating to voting and classification, and to require admission if certain criteria were met, a more elaborate further amendment addressing ASCAP's internal rules was made in 1960. *Am. Soc'y of Composers, Authors & Publishers*, 1950 U.S. Dist. LEXIS 1900, at *5, *15, *16-*17, *18; *Am. Soc'y of Composers, Authors & Publishers*, 1960 U.S. Dist. LEXIS 4967. BMI's decree had fewer details in comparison to the 1960 ASCAP amendment, but did have provisions on admission, payments after the end of contracts, and rate disclosure. *See BMI Decree*, 1966 U.S. Dist. LEXIS 10449, at *3-*4, *5-*6.

The Proposed Settlement, in contrast, contains little on such topics. Some sections suggest that the Registry is to reach "a fair and equitable usage formula" that is driven at least in

part by factors relating to the usage of a Book. *See* Proposed Settlement Attach. C §§ 1.1(a), 1.3. Other sections outline a structure for accumulating and distributing fees based solely on inclusion in the database. *Id.* § 1.2; *see also id.* § 1.1(b). There is a basic governance outline provided in section 6.2(b) of the main agreement but little in terms of voting. The Proposed Settlement creates a framework for excluding works from Google, *see* Proposed Settlement § 3.5, Attach. C § 1.2(e), but proposes nothing in terms of admission.

Although exploiting each of the internal controls of a cartel could advantage some members over others, it is admission to a cartel that most obviously lends itself to suppressing competition. *See Associated Press v. United States*, 326 U.S. 1 (1945) (finding an antitrust violation where the AP had onerous admission requirements for new members who competed with an existing member, coupled with a prohibition on sharing content with non-members); *United States v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383 (1912) (injunctive relief compelling railroad collective to admit applicants, and give non-members equal access, because the collective owned all means of crossing the river at St. Louis and hence threatened to harm non-member railroads). Once the Registry forms, it will wield substantial power that could be bent to anticompetitive aims in order to discourage competition from new authors and publishers. Such a schism is likely present even among the current class, since presumably some members plan to produce new works in the future while others seek only to reap the highest possible rewards from existing works. The creation of the Registry poses a risk of stifling the ability to compete of some class members as well as other future authors, and the Court must consider this danger.

### E. Taken together, these threats to healthy competition compel rejection of the Proposed Settlement.

A cartel of competitors is an extremely unusual animal on the American economic landscape. It is so rare because it is so dangerous. Certain market conditions and realities permit entities like ASCAP and BMI to exist, but they are carefully hemmed in by consent decrees and ongoing monitoring by the United States Department of Justice. The Proposed Settlement authorizes the creation of just such a cartel to the detriment of individual consumers, large

research institutions, competitors of Google and even future competitors of the cartel members. The problem with the Proposed Settlement from an antitrust perspective is that it rushes to create this cartel while avoiding all restrictions that would cage its power to prevent harm to the public interest. The Proposed Settlement creates a pricing mechanism that is fraught with the dangers associated with price-fixing, a harmful exclusive deal that sacrifices consumers and competitors to entrench Google as a monopsonist facing down Rightsholders, and a cartel structure that leaves the public susceptible to abuses that deter future innovation.

For Amazon and its customers, these dangers are real and immediate. Amazon currently negotiates with publishers for the price of book titles. It is able to drive prices down by playing one publisher off against another. Under the settlement, the Books Rights Registry will be empowered to negotiate the price to be charged to consumers for all of the publishers who give it consent to do so. This would likely have a significant impact on the cost to consumers of acquiring books. Similarly, Amazon may also wish to sell subscriptions to the works it has scanned. But, the Proposed Settlement means that, if Amazon makes the investment in such a product, it will face a competitor who, unlike Amazon, is free to scan and include in its database millions of "orphan works." The two products will simply not be competitive for most major institutions, and thus there is little reason for Amazon (or anyone else but Google) to make the investment in an institutional subscription sales program. Consumers and institutional subscribers in turn will be forced to pay more because of the lack of competition. And, over time, Google's ability to offer and sell far more titles than Amazon and other booksellers will make Google's website the destination of choice for persons desiring to view or purchase books over the Internet. Google will certainly find a way to use that economic advantage to make consumers pay more.

The primary defense offered by proponents of the settlement is that, despite these anti-competitive effects, the settlement enhances consumer welfare overall because it makes available "products" which, but for the settlement, would not be available to anyone (i.e., databases containing "orphan" and other unclaimed works, along with the ability to purchase electronic

copies of those same works).  That defense ignores the reason that such products are not currently available—Congress has made it illegal to exploit copyrighted works without an express authorization from the rightsholder.  *See* 17 U.S.C. § 106.[21]  Rightly or wrongly, Congress has made the substantive judgment that copyrights are to stay in force for a very long time; indeed, so long that it becomes difficult or impossible for potential licensees to track down rightsholders and obtain licenses as new technologies make licensing more desirable.[22] Although the proponents of the settlement are free to condemn that legislative judgment as bad public policy, it is beyond the purview of this Court to use the postulated consumer welfare benefits of overriding that policy to justify the anti-competitive features of the Proposed Settlement.  *See Stewart v. Abend*, 495 U.S. 207, 230 (1990) ("it is not our role to alter the delicate balance Congress has labored to achieve"); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) ("As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product.").

Moreover, those proponents fail to grapple with the reasons that Congress determined to confer a long term of copyright protection.  The most obvious rationale for providing expansive intellectual property rights is to encourage innovation and creativity; in this case, the writing of books.[23]  Those who defend the settlement's anti-competitive features entirely ignore this form of social welfare enhancement (thereby disdaining the value that Congress chose to maximize).

---

[21] Google clearly recognizes this limitation, as its scanning program did not encompass making these "products" available.  Google's scanning program merely laid the groundwork for offering them if and when it became legal to do so.

[22] *See* 17 U.S.C. §§ 302, 303 (duration of copyright protection is the life of the author plus seventy years, duration of copyright protection for anonymous and pseudonymous works, and works made for hire, is 95 years from date of publication).

[23] *See* U.S. Const. art. I, § 8, cl. 8 ("To promote the progress of science and useful arts . . ."); S. Rep. No. 104-315, at 11 (1996) ("the primary purpose of a proprietary interest in copyrighted works that is descendible from authors to their children and even grandchildren is to form a strong creative incentive for the advancement of knowledge and culture in the United States."); *id.* at 3 (providing that the purpose of the Copyright Term Extension Act of 1998 is, among other things, to "stimulat[e] the creation of new works and provid[e] enhanced economic incentives to preserve existing works. . . .").

Nor do they account for the detriment to social welfare caused by the reduction in incentives to innovate or create that would be caused if Google and, later, others are allowed to use the class action device to avoid complying with the law that prevents them from exploiting works that they have not licensed. In reality, this defense of the anti-competitive features of the Proposed Settlement simply serves to highlight its most basic flaw—the settling parties are asking this Court to substitute its policy judgments for those of Congress and make a global change to copyright law that the settling parties postulate would be better for society as a whole.[24]

The Proposed Settlement plainly violates the antitrust laws. For this reason alone, it cannot be approved.

## III. The Proposed Settlement Must Be Rejected Because It Relies Upon Expropriation to Achieve Control Over "Orphan Works" in Violation of the Copyright Act.

A separate flaw of the Proposed Settlement is that it depends on expropriation to achieve control over the vast, amorphous corpus of "orphan works," in contravention of the Copyright Act, which provides:

> When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

17 U.S.C. § 201(e).

To the extent the Proposed Settlement purports to reallocate the rights of copyright owners, it can constitute a valid exercise of judicial power only over those authors who have previously given express or implied consent. Where the Proposed Settlement purports to apply more broadly, reaching authors who have not previously transferred their copyrights voluntarily and who have not clearly authorized such a transfer, it runs afoul of this statutory provision.

---

[24] Re-focusing on the proper role of Congress makes clear another flaw in the Settlement proponents' economic argument that any provision of these services—even accompanied by price fixing and the creation of a monopoly—is superior to no availability at all. Congress can change the law, allowing these services to be provided, and it can do so while protecting against behavior that hurts consumers. Although ignored by proponents, that is the "but for" world that exists absent the settlement.

By definition, it is impossible to ascertain the status of any individual orphan work. Nonetheless, many such works undoubtedly fall within the plain meaning of the ban on expropriation. Examples could include:

- A self-published textbook;

- An autobiography for which the publisher purportedly secured the author's exclusive right to publish, but which turns out to be defectively conveyed;

- A travel guide published with nominal permission of the author's employer, but under circumstances by which the employer failed to comply with the work-made-for-hire doctrine—meaning that the author, who did not grant any rights to the publisher, remains the only true copyright owner.

One could multiply the foregoing scenarios. Each category contains an indeterminate number of works that cannot be subject to court-ordered disposition (except in bankruptcy court).[25] The Proposed Settlement cannot stand insofar as it applies to any of them.

Apart from the fact that *this Court* cannot by law expropriate copyright interests belonging to authors who have not previously transferred them, *the Registry* likewise is barred from undertaking that role. *See* 17 U.S.C. § 201(e) ("no action by any governmental body *or other* official or *organization* purporting to seize, expropriate, . . . [copyrights] shall be given effect under this title") (emphasis added). The Proposed Settlement clothes the Registry with the right to grant additional rights in the orphan works to Google as needed to implement "new revenue models." *See* Proposed Settlement § 4.7. The Registry, as "an organization," falls under the same type of disability to expropriate described above. Accordingly, the Proposed Settlement cannot stand to the extent that it allows the Registry to expropriate copyrights in "orphan works" whose authors have not previously transferred their copyright interests voluntarily.

This defect cannot be remedied. A major thrust of the Proposed Settlement is to relieve Google of liability to orphans, the status of whose rights by definition cannot be ascertained. In

---

[25] The exception at the end of § 201(e) referencing title 11 was added to allow courts hearing involuntary bankruptcy proceedings to transfer copyrights, as otherwise those courts would be powerless to dispose of copyrights as part of the bankruptcy estate. *See* Act of Nov. 6, 1978, Pub. L. No. 95-598, 92 Stat. 2549.

so doing, the proposed Settlement runs roughshod over the rights of all authors who have not previously transferred their copyright interests voluntarily—and there is no way to know how many of the millions of orphans fit that profile, nor to disentangle their status from that of the remaining orphans whose rights are purportedly transferred en masse via the Proposed Settlement. Unlawful expropriation constitutes yet another reason why this Court should decline to approve the Proposed Settlement.

## IV. The Proposed Settlement Must Be Rejected Because it Purports to Release Google and Others From Liability For Actions They May Take in the Future That Are Not at Issue in the Litigation.

This Court cannot approve the Proposed Settlement because the releases it grants to Google and others in Article X are overbroad. The Proposed Settlement does more than just resolve the dispute between Class Plaintiffs and Google that is the subject of the underlying litigation. The entire premise of the settlement is that, once effective, the Rightsholders automatically release Google and its library partners from claims for infringement that took place before the Effective Date of the settlement, *and also for claims arising from future infringement by Google or its library partners*, so long as the releasee acts in a manner authorized by the Settlement Agreement. The Proposed Settlement would thus immunize Google and the libraries with which it contracts from future claims based on future conduct, including copyright infringement for revenue models that Google has not and does not currently exploit, such as Consumer Purchases, Sales of Subscriptions, Print on Demand, PDF Download, and Custom Publishing of the Rightsholders' works. These future acts are clearly beyond the scope of the underlying litigation, and this Court has no power to bar Class Members from suing over actions that Google has not yet taken.[26]

---

[26] The court also has no power to sanction the creation of a private group that determines how to use a portion of the settlement fund. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 184-86 (2d Cir. 1987) (rejecting conveyance of settlement funds to a "class assistance foundation" on grounds that "there is no principle of law authorizing such a broad delegation of judicial authority to private parties," despite the "[g]reat expectations underlying the foundation proposal."). Yet the Proposed Settlement allows the Registry to do exactly this. *See* Proposed Settlement § 6.3(a)(i)(3) ("then, for any Unclaimed Funds remaining thereafter, to not-for-profit entities described in Section 510(c)(3) [sic] of the Internal Revenue Code chosen by the Registry after consultation with Google and, acting through the Designated Representative, the Participating Libraries and the Cooperating Libraries.").

A class action settlement can only extinguish claims that arise from the same factual predicate as the class claims. Future acts can never be part of the same factual predicate of the litigation, and courts thus reject settlements purporting to release future claims for future conduct. Since the business arrangement contemplated by the Proposed Settlement cannot survive without these overbroad releases, the Proposed Settlement must likewise be rejected.

### A. A settlement can only extinguish claims that are based on the "identical factual predicate" as the class claims.

While a settlement can release claims that were not specifically alleged in the litigation, a settlement cannot release claims that are not part of the "identical factual predicate" as the class claims. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (approving settlement and concluding that scope of release was proper because all released claims arose out of the "identical factual predicate" as claims in the complaint); *Nat'l Super Spuds, Inc. v. N. Y. Mercantile Exch.*, 660 F.2d 9, 16-18 (2d Cir. 1981) (reversing approval of settlement in class action alleging harm to those who liquidated their positions in certain futures contracts during specific period, when release extended to claims by persons who had not liquidated their positions by the end of that period); *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006) ("A settlement can release claims that were not specifically asserted in an action, but can only release claims that are based on the 'same identical factual predicate' or the 'same set of operative facts' as the underlying action."). It follows that if a judgment after trial cannot extinguish certain claims, these claims cannot be released in a settlement of that action. *See Nat'l Super Spuds*, 660 F.2d at 17.

### B. Future facts and future conduct are never part of the same factual predicate as the underlying litigation.

Future claims for future conduct cannot be released by a settlement agreement because they are not part of the same factual predicate as the purported claims. Courts therefore reject such settlements. *See UniSuper*, 898 A.2d at 347-48, 347 (rejecting settlement; "a release is overly broad if it releases claims based on a set of operative facts that will occur in the future. *If the facts have not yet occurred, then they cannot possibly be the basis for the underlying*

*action*.") (emphasis added) (footnote omitted); *see also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001) (rejecting settlement; "[t]he release is . . . too broad because it bars later claims based on future conduct.").[27]  Settlements that were originally rejected because they released future claims based on future conduct have later been approved when the release is revised to no longer cover such claims.  *See Schwartz v. Dallas Cowboys Football Club, Ltd.*, 2001 WL 1689714 at *1 (E.D. Pa. 2001) (revised settlement agreement approved because, among other reasons, "the Revised Settlement Agreement limits the scope of the defendants' release to claims arising from current or past policies, practices, contracts, conduct or provisions . . . References to future claims . . . were eliminated").  Likewise, courts occasionally note that a settlement's release is *not* overbroad because it does *not* release future claims based on future conduct.  *See Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 244 (D.N.J. 2005) (rejecting objections to the scope of a settlement release because "[f]uture claims for future conduct are not included in the release"); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975) (enforcing release encompassing unknown claims based on past conduct; "there is nothing in the public policy behind antitrust laws that prohibits general releases encompassing antitrust claims, *provided that the release does not seek to waive damages from future violations of antitrust laws*.") (emphasis added).

The settling parties may argue that *Uhl v. Thoroughbred Technology and Telecommunications, Inc.*, 309 F.3d 978 (7th Cir. 2002), allows this Court to approve a class action settlement that includes a release by class members of future claims arising from future conduct.  In *Uhl*, the defendant "announced that it had the right to install conduits for fiber optic

---

[27] It appears likely that the Supreme Court would find that the rule limiting the courts' power to impose releases of future claims on class members has Constitutional underpinnings. *See In re Asbestos Litig.*, 90 F.3d 963, 1015-1026 (5th Cir. 1996) (Smith, J., dissenting) (noting that no case has "advanced the radical proposition that a federal court, in approving a class action settlement—i.e., in the exercise of its Article III jurisdiction—can release claims not presenting a case or controversy"); *see also* 7B Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1797.3 (commenting that in *Amchem Prod., Inc v. Windsor*, 521 U.S. 591 (1997), the Supreme Court "expressed serious concerns about the viability of settlements containing future claims," but that "these challenges to the judicial resolution of possible future claims remain undecided.")

cables along railroad right-of-way corridors." *Id.* at 980.  Plaintiffs believed this constituted slander of title and would constitute trespass, and entered into negotiations with the defendant. *Id.* at 980-81.  The parties agreed on a proposed settlement, and then plaintiffs sued, on behalf of 58,000 owners of land adjacent to the tracks, and sought approval of the classwide settlement. *Id.*  That settlement required all class members to convey an easement to their property to a company that was established pursuant to the settlement agreement, which would in turn convey the easements to the defendant for the specific purpose of laying cable.  *Id.* at 982.

A class member objected to the settlement, arguing, *inter alia*, that the claims for anticipated trespass were not justiciable because they had not yet occurred and because it could not be determined if any owner's property would actually have cable laid on it.  The court rejected this objection, holding that the claims were justiciable because the slander of title had already occurred and because the defendant would have to enter the property of the class members at least to do the surveying needed to determine upon which property it needed to lay cable.  The fact that the laying of cable would not occur until the future did not affect the justiciability of the claims.  *Id.* at 984-85.

On examination, any claimed resemblance between *Uhl* and this case evaporates.  *Uhl* involved easements and real property rather than implicating the special considerations that arise out of intellectual property.  In this case, unlike in *Uhl*, an independent reason bars this Court from conveying to Google and the Registry a compulsory license over a broad range of copyrighted works:  the Copyright Act forbids such an order.  *See* Section III *supra* (discussing expropriation ban of 17 U.S.C. § 201(e)).  Even more fundamentally, the court in *Uhl* did not confront the core issue presented here, inasmuch as the objectors in *Uhl* failed to argue that the court lacked authority to release (or license) future actions in derogation of the property rights of the plaintiffs.  Accordingly, the *Uhl* court was never asked to resolve the question of its authority to do so.  Moreover, the easements in *Uhl* were limited to grants enabling the defendant to engage in the specific actions that were the subject of the litigation; the litigation challenged

defendant's right to lay cable and the easements granted were for the "specific purpose of laying cable." *Id*. at 982. *Uhl* thus cannot be used to justify the terms of the Proposed Settlement.

### C. The Proposed Settlement improperly releases Google and its partner libraries from future claims based on future conduct.

In order to implement the complex business arrangement negotiated by the settling parties, the Proposed Settlement releases Google "*after the Effective Date*, [for] any act or omission authorized by this Settlement Agreement." Proposed Settlement § 10.1(f) (emphasis added). The Proposed Settlement also releases Cooperating Libraries, Fully Participating Libraries, and Public Domain Libraries for the same post-Effective Date acts or omissions. *Id*. §§ 10.1(b), (d), & (j). Upon final approval of the Proposed Settlement, Rightsholders will be barred by court order from filing or pursuing any claims released in the settlement. *Id*. § 10.2. These "act[s] or omission[s]" include future acts similar to those that Google and its partner libraries have already engaged in, such as the digitization of books not yet digitized by Google. *Id*. § 3.1(a). Yet the fact that Google has already taken similar actions in the past does not bring such future actions into the same factual predicate as the underlying litigation. *UniSuper*, 898 A.2d at 347. For those Rightsholders whose work Google has yet to digitize, this Court has no power to bar them from asserting claims should Google do so in the future.

Even more egregiously, the settlement releases future claims against Google for *types* of infringement expected to be undertaken for the first time *after* the Effective Date of the Settlement. These actions are not part of the identical factual predicate of the litigation, and the Court has no power to bar Class Members from suing over the nearly unlimited array of future actions Google may take. These actions include:

- Sale of institutional subscriptions to the digitized database of books and inserts, Proposed Settlement § 4.1;

- Sale to consumers of books and inserts and of the right to view, print, and copy/paste those words or portions thereof, *id.* § 4.2;

- New revenue models, including, but not limited to, Print on Demand, Custom Publishing, PDF Download, Consumer Subscription Models, and Summaries, Abstracts and/or Compilation of Books, *id.* § 4.7; and

- Unspecified future amendments to the Settlement Agreement, *id.* § 17.27.

The sale of books or subscriptions to a database of scanned works is conduct in which Google has not yet engaged and, because of criminal sanctions, likely would never engage without a clear license to do so. *See* 17 U.S.C. § 506(a) (defining copyright infringement as criminal offense when undertaken willfully and for commercial advantage). That conduct is thus not at issue in the litigation. Likewise, "new revenue models" and "future amendments" to the settlement are by definition not at issue in this litigation as they do not yet exist.[28]

More egregiously still, the settling parties purport to limit relief against Google even when it operates outside the parameters of the business arrangement contemplated by the Proposed Settlement. A review of the dense language of the Settlement Agreement reveals that it extends to "Other Google Programs" (which may or may not yet be in existence); in effect, it creates a private copyright universe in which Rightsholders who do not opt out of the class have fewer rights following infringement by Google than they would have under copyright law against third parties, such as Amazon, who engage in exactly the same conduct. *See, e.g.*, Proposed Settlement § 3.5(c)(ii)(5). Of course, this conduct could not conceivably fall within the "identical factual predicate" of the ongoing litigation.[29] This benefit to Google from the

---

[28] Even Dan Clancy, Engineering Director for Google Book Search, acknowledges the breadth of the settlement's releases compared to what Google could have achieved through litigation and final judgment. In an interview with the *Library Journal*, Clancy said:

> The settlement was driven by what we felt was, in the end, better for everyone and better for users in particular. . . . This settlement is an opportunity to do what, I think, from a user perspective is far better. The snippets we've been showing are a far cry from what the user wants, and really the only solution was a partnership. We assume we would have gone through the courts and won. But once we won, we still would've had snippets.

Andrew Richard Albanese & Norman Oder, *Corner Office: Google's Dan Clancy*, Libr. J., May 1, 2009, at 26, 26, *available at* http://www.libraryjournal.com/article/CA6652445.html.

[29] This portion of the Settlement Agreement focuses on books licensed before 1992 with no explicit grant of electronic rights. Given that copyright subsists in works published since 1923, it affects seven decades of literary production, with correspondingly great effects. To appreciate that status, let us imagine that Google has already scanned *Lonesome Dove* and included it in the Google Books Program, that Technology X is invented in 2016, and that Google decides in 2020 to inaugurate widescale exploitation of books via that new technology, including *Lonesome Dove*. To the extent that author Larry McMurtry objects to that exploitation in 2021 (in the same way that previous litigation contested the scope of his grant of book rights to his publisher in *Lonesome Dove* at the dawn of the age of audio books), a dispute may develop between author and publisher. The Settlement Agreement goes out of its way to immunize Google from any liability for copyright infringement under those circumstances. Proposed

Proposed Settlement is just another example of the settling parties' disregard for the limitations that exist on this Court's powers to affect the rights of absent class members under Rule 23 of the Federal Rules of Civil Procedure.

Finally, the releases contemplated by the Proposed Settlement are so overbroad that they even apply to third parties, such as libraries that may in the future participate in Google's digitization process and entities that copy or use copyrighted works in reliance on an agreement with the Registry following Google's failure to pursue a business model. Proposed Settlement § 10.1. While releasing libraries that have already allowed Google to digitize their collections is arguably legitimate, *see Wal-Mart Stores, Inc.,* 396 F.3d at 109, the "identical factual predicate rule" would condemn releases for third parties who have had no involvement to date in the activity that led to the claims against Google.

It is plain that the releases contemplated by the Proposed Settlement are far too broad. The Court simply does not have the power to bar future claims arising from future conduct against Google, its partner libraries or unknown third parties. The Proposed Settlement must therefore be rejected.

## CONCLUSION

Amazon respectfully asks the Court not to approve the Proposed Settlement. The Proposed Settlement calls upon this Court to exercise powers that it does not have. It restrains

---

Settlement § 3.5(c)(ii)(5). So long as Google prospectively ceases to purvey *Lonesome Dove* via Technology X after receiving McMurtry's objection, the Settlement provides that Google bears "no liability and no responsibility" for its previous activities. Proposed Settlement § 3.5(c)(ii)(4).

The contrast with Amazon is stark—if it begins in 2020 to offer *Lonesome Dove* via Technology X under license from the publisher, author Larry McMurtry objects to that status in 2021 (claiming that he never conveyed those particular rights to his publisher), and Amazon promptly disables that function pending resolution of the author/publisher dispute, then Amazon will be held culpable for its unwitting copyright infringement committed in 2020, to the extent that the court ultimately sides with McMurtry against his publisher. Given the many occasions on which courts have interpreted contracts in favor of authors and against publishers attempting to engage in new technological exploitations, the competitive disadvantage imposed on Amazon (and all other competitors with Google) is both real and significant. *See, e.g.*, *Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001) (finding that the right granted by authors to "print, publish and sell the work in book form" did not extend to eBooks because the Internet "is a separate medium from the original use—printed words on paper"), *aff'd per curiam*, 283 F.3d 490 (2d Cir. 2002).

competition in ways that ought not be sanctioned by this Court and that cannot be fixed without taking this Court even further afield from the powers it possesses to manage and resolve class actions. Finally, the Proposed Settlement usurps the role of Congress in legislating solutions to the complex issues raised by the interplay between new technologies and the nation's copyright laws.

Dated: September 1, 2009

Respectfully submitted,

IRELL & MANELLA LLP

By: _____

David Nimmer
(CA State Bar No. 97170)
(*Pro Hac Vice* Application Pending)

_____

Alexander F. Wiles
(CA State Bar No. 73596)
(*Pro Hac Vice* Application Pending)

IRELL & MANELLA LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199
dnimmer@irell.com
awiles@irell.com

Counsel for Objector Amazon.com, Inc.

AMAZON.COM, INC.

By: __s/ David Zapolsky_____
David Zapolsky, Esq. (DZ-8058)
Vice President & Associate General Counsel
Litigation & Regulatory Affairs
1200 12th Avenue South
Suite 1200
Seattle, Washington 98144
Telephone:    (206) 266-1323
Facsimile:    (206) 266-7010
davidz@amazon.com