# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMMY CAHN,  JAC MUSIC CO., INC.,
FORT KNOX MUSIC, INC., TRIO
MUSIC CO., INC. and PEER
INTERNATIONAL CORPORATION,

90 CIV. 4587

                 :    90 Civ. _____

          Plaintiffs,

                :

    - against -

                :

SONY CORPORATION, SONY USA INC.            COMPLAINT - CLASS ACTION
and SONY CORPORATION OF AMERICA,    :

                :

          Defendants.
- - - - - - - - - - - - - - - -x

Plaintiffs, by their attorneys, Kramer, Levin-Nessen, Kamin & Frankel, for their complaint allege as follows:

1.   Plaintiffs, on their own behalf and on behalf of the class described below, bring this action seeking declaratory and injunctive relief against the named manufacturers, importers and/or distributors of digital audio tape ("DAT") recorders and blank DAT cassettes. By introducing DAT recorders and blank DAT cassettes into the consumer marketplace in the United States, defendants are inaugurating a new era in unauthorized home taping of copyrighted musical compositions. For the first time, a home taper will be able to make perfect copies of vinyl records, pre-recorded cassettes and -- most critical -- compact discs. Indeed, DAT recorders are primarily intended for unauthorized home taping, and defendants are actively promoting the ability of DAT recorders to make perfect digital copies of compact discs.

This message has not been lost on prospective purchasers: a recent survey by The Roper Organization confirms that virtually every person who is interested in purchasing a DAT recorder and using its recording capability intends to tape pre-recorded music.

2.  The threatened harm is immediate and profound. Copyright protection, under the Constitution, promotes creativity by providing a financial incentive -- and the financial ability -- to create new works. Unauthorized taping on DAT recorders will undermine this scheme. It displaces sales of records, pre-recorded cassettes and especially compact discs, and each lost sale results in the loss of the mechanical royalties to which members of the class are entitled under copyright law. But members of the plaintiff class will only be the first to suffer through this erosion of their rights; in the end the public will be greatly harmed by an inevitable reduction in the creation of new songs.

3.  Plaintiffs, accordingly, seek an urgently needed declaration that a) unauthorized home audio taping of their copyrighted musical compositions on DAT recorders is an infringe-ment of their copyrights in the musical compositions under the Copyright Act of 1976, 17 U.S.C. § 101 et seq. (the "Act") and b) defendants are or will be liable for contributory infringement through their provision to consumers in the United States of DAT recorders and/or blank DAT cassettes designed and intended for

unauthorized taping of copyrighted musical compositions. Plain-
tiffs also seek injunctive relief prohibiting defendants from
manufacturing, importing and distributing for sale to consumers
in the United States DAT recorders and blank DAT cassettes
because they are the means for unauthorized home taping of
copyrighted musical compositions.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the action
pursuant to 28 U.S.C. § 1338(a). Venue is proper under 28 U.S.C.
§1400(a).

## THE PARTIES

5.    Sammy Cahn is a citizen of the State of
California and is a professional songwriter. He wrote the lyrics
for, among many other well-known songs, "High Hopes", "Love and
Marriage", "Come Fly With Me", "The Second Time Around" and "It's
Magic". Cahn also does business as a music publisher under the
name of Cahn Music Company ("Cahn Music"), through which he is
engaged in licensing the use of and otherwise exploiting a number
of musical compositions as to which he is the co-author and co-
copyright owner. Among many others, Cahn is the co-copyright
owner of the United States copyright in and to the musical
composition "Three Coins In The Fountain" written and composed by
Cahn (lyrics) and Jules Styne (music), both citizens of the
United States, and with respect to which:

-3-

a.      The composition was duly registered for
copyright with the United States Copyright Office as a published
work on March 19, 1954 in the name of Robbins Music Corporation,
and the Register of Copyright issued to Robbins Music Corporation
a Certificate of Copyright Registration therefor bearing
Registration No. EP 79076;

b.      On January 8, 1982 the copyright in the
composition was duly renewed upon the filing of a renewal
application in the names of Cahn and Styne (as co-authors),
whereupon the Register of Copyrights issued a Certificate of
Copyright Renewal bearing No. RE 116650; and

c.      Cahn has duly complied with all relevant
provisions of the Act and all laws governing copyright with
respect to the composition.

6.      Jac Music Co., Inc. ("Jac"), a New York
corporation with offices in Los Angeles, California, is a music
publisher engaged in the business of licensing the use of and
otherwise exploiting musical compositions. Jac is the co-
copyright owner of the United States copyright in and to the
musical composition "What The World Needs Now Is Love" written
and composed by Hal David and Bert Bacharach, both citizens of
the United States, and with respect to which:

a.      The composition was duly registered for
copyright with the United States Copyright Office on July 16,

-4-

Case 1:05-cv-08136-DC  Document 207-4  Filed 09/01/09  Page 6 of 25

1965 and the Register of Copyrights issued to Jac (and to the co-owner) a Certificate of Registration bearing Registration No. EP 204882; and

      b.    Jac has duly compiled with all relevant provisions of the Act and all laws governing copyright with respect to the composition.

David, the president and principal stockholder of Jac, is the co-author of many other well known songs, including "Alfie," "Raindrops Keep Fallin' on My Head," "To All the Girls I've Loved Before," "Promises, Promises" and "Do You Know The Way to San Jose?"

      7.    Fort Knox Music, Inc. ("Fort Knox") is a New York corporation with offices in New York, New York. Trio Music Co., Inc. ("Trio") is a New York corporation with offices in Los Angeles, California. Fort Knox and Trio are music publishers engaged in the business of licensing the use of and otherwise exploiting musical compositions. They are the joint owners of the copyright in the musical composition "Fever" written and composed by John Davenport and Eddie Cooley, both citizens of the United States, and with respect to which:

      a.    The composition was published with Notice of Copyright on March 14, 1956 by Jay & Cee Music Corporation ("Jay & Cee"), which received from the Register of Copyrights a Certificate of Registration bearing No. EP 97666;

-5-

Case 1:05-cv-08136-DC Document 207-4 Filed 09/01/09 Page 7 of 25

b. By written agreement dated December 9, 1955, John Davenport and Eddie Cooley transferred the original and renewal term U.S. copyright in and to the composition to Jay & Cee. This agreement and transfer has been delivered to the United States Copyright Office, for recordation with payment of the appropriate fee therefor on July 6, 1990;

c. By written transfer dated February 15, 1983 and duly recorded in the Copyright Office on May 16, 1983 at Volume 2004, Pages 606, et seq., Jay & Cee transferred its rights in and to said composition to Fort Knox Music Company, a joint venture consisting of F & B Music, Inc. and Trio Music Co., Inc. On June 20, 1983, by Certificate of Amendment duly filed with the Secretary of State of the State of New York, F & B Music, Inc. amended its Certificate of Incorporation to change its name from F & B Music, Inc. to Fort Knox Music, Inc.;

d. On April 9, 1984, the copyright in the composition was duly renewed upon the filing of a renewal application in the names of John Davenport and Eddie Cooley (as co-authors), whereupon the Register of Copyrights issued a certificate of renewal registration identified as RE 207-287; and

e. Fort Knox and Trio have duly complied with all relevant provisions of the Act and all laws governing copyright with respect to the composition.

-6-

8.    Peer International Corporation ("Peer"), a New
Jersey corporation with offices in New York, New York, is a music
publisher engaged in the business of licensing the use of and
otherwise exploiting musical compositions.  Peer is the sole and
exclusive owner of the United States copyright in and to the
musical composition "Walk Like An Egyptian" written and composed
by Liam Sternberg, a citizen of the United States, and with
respect to which:

a.    The composition was duly registered for
copyright with the United States Copyright Office on February 11,
1986 and the Register of Copyrights issued to Peer a Certificate
of Registration bearing Registration No. PA 278841;

b.    By written transfer of copyright dated July
10, 1984, Sternberg transferred to Peer all of his rights and
copyrights in and to the composition, which transfer was duly
recorded in the Copyright Office on February 10, 1986 in Volume
2172 at Page 487; and

c.    Peer has duly complied with all relevant
provisions of the Act and all laws governing copyright with
respect to the composition.

9.    Upon information and belief, Sony Corporation is a
Japanese corporation and is the parent of Sony USA Inc. ("Sony
USA"), a New York corporation with offices in New York, New York.
Upon information and belief, Sony USA is the parent of Sony

-7-

Corporation of America ("Sony-America"), a Delaware corporation with offices in New York, New York. Upon information and belief, Sony Audio Component Systems Co. and Sony Magnetic Products Co. are divisions of Sony-America. Upon information and belief, defendants manufacture, import and distribute for sale in this District and elsewhere in the United States consumer electronic products. Upon information and belief, these defendants are, or shortly will be, manufacturing, importing and distributing DAT recorders and blank DAT cassettes for sale to consumers in the United States.

## CLASS ACTION ALLEGATIONS

10.    Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all owners of copyrights in musical compositions, and all transferees of the exclusive rights to authorize the making of sound recordings and the distribution of phonorecords, who are entitled to receive mechanical royalties from record companies licensed by The Harry Fox Agency, Inc. ("Fox") on behalf of its publisher clients.

11.    This action is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(B) and 23(b)(2).

12.    The class is so numerous that joinder of all members is impracticable. There are approximately 40,000 members

-8-

of the class located throughout the United States, holding in the aggregate over 450,000 copyrights.

13.   There are questions of law and fact which are common to the class and which predominate over questions affecting any individual class members.  The common questions include, inter alia, the following:

(a)   Does home taping of copyrighted musical compositions on DAT recorders constitute an infringement of the rights of the copyright owners under § 106 of the Act?

(b)   Are DAT recorders designed and intended for home copying of copyrighted musical compositions?

(c)   Are defendants liable for contributory infringement arising from home taping?

(d)   Will plaintiffs and the other members of the class be irreparably damaged unless the Court enjoins the sale and distribution of DAT recorders and blank DAT cassettes?

14.   The claims of plaintiffs are typical of the claims of the other members of the class, and plaintiffs have the same interests as the other members of the class.

15.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs are adequate representatives

-9-

of the class and will fairly and adequately protect the interests
of the class.

16.   Plaintiffs anticipate that there will not be any
difficulty in the management of this action, in which only
declaratory and injunctive relief is being sought.

17.   A class action is superior to other available
methods for the fair and efficient adjudication of the contro-
versy, and the requirements of Fed. R. Civ. P. 23 are satisfied.

### BACKGROUND ALLEGATIONS

A.   Mechanical Rights

18.   A major source of income for the plaintiff class
under the Act is the payment of royalties due upon the distri-
bution of phonorecords of musical compositions.  The right to
such payments is generally referred to as the "mechanical right,"
and the payments as "mechanical royalties."

19.   The mechanical right was originally created by the
Copyright Act of 1909 (the predecessor of the Act).  That statute
gave owners of copyrighted music the exclusive control over
reproduction of their works by recording or other mechanical
means, subject to a "compulsory license."

20.   In the terminology of the Act, "sound recordings"
are "works that result from the fixation of a series of musical,
spoken or other sounds, but not including the sounds accompanying

-10-

a motion picture or other audiovisual work . . .," 17 U.S.C. §
101 -- that is, versions or renditions of musical compositions.
Sound recordings are copyrightable, separate from the underlying
musical compositions.  "Phonorecords" is the term used in the Act
for the material objects in which sound recordings are fixed and
includes vinyl records, pre-recorded cassettes and compact discs.

        21.  Under § 115 of the Act, once phonorecords of a
sound recording of a musical composition have been publicly
distributed in the United States with the consent of the copy-
right owner, anyone else may -- under the conditions of § 115 --
make and distribute phonorecords of a new sound recording of the
copyrighted musical composition without express permission from
the copyright owner.  In particular, the section provides for
payment of a royalty to the copyright owner for each phonorecord
made and distributed under the compulsory license.  The amount of
the royalty is set from time to time by the Copyright Royalty
Tribunal; currently, the royalty amount on each phonorecord sold
on or after January 1, 1990 is the greater of 5.7 cents for each
copyrighted work or 1.1 cent per minute of playing time.

        22.  The Act includes detailed procedures for seeking a
compulsory license and for paying the mechanical royalties.  In
common practice Fox, as licensing and collection agent for its
music publisher clients, grants licenses directly to record
companies pursuant to the statutory provisions, with some agreed-
to modifications by publishers on an individual basis.  Cur-

-11-

rently, Fox represents some 7,500 publishers. Under the form of statutory license issued by Fox, record companies must account for, and pay, mechanical royalties based upon all phonorecords manufactured and distributed. Fox, in turn, remits the royalties to the publishers. Royalties are shared by music publishers and songwriters pursuant to the terms of the grants conveying rights in the songwriters' musical compositions to the publishers, who promote the compositions. Typically, songwriters receive 50% or more of these royalties under the controlling grants.

23.   The more popular songs are recorded multiple times by different performers, under separate licenses. For example, since 1984 Fox has issued over 40 licenses for different phono-records of both "Fever" and "Three Coins in the Fountain." Certain versions of these songs, as well as "What the World Needs Now Is Love" and "Walk Like an Egyptian," are available in vinyl record, pre-recorded cassette and compact disc formats.

24.   While the royalty received by the copyright owners under the mechanical right is only a few cents per phonorecord, the amount of royalties from the numerous sound recordings of a song add up to substantial amounts, and these royalties represent a critical portion of the earnings of songwriters and music publishers. By way of illustration, the royalties collected in 1989 on recordings of "Fever" were $21,896; of "Walk Like an Egyptian," $91,338; and of "Three Coins in the Fountain" (first

-12-

Case 1:05-cv-08136-DC  Document 207-4  Filed 09/01/09  Page 14 of 25

published in 1954), $6,423.  In the aggregate, Fox collected over
$170 million in mechanical royalties last year.

25.  Mechanical royalties depend on an accurate count
of sales.  If sales are lost, revenues are lost.  For each phono-
record that is not sold, songwriters and music publishers lose
revenues.

B.  Unauthorized Home Taping

26.  By permitting persons to obtain copies of sound
recordings of copyrighted musical compositions without purchasing
phonorecords, the practice of unauthorized home audio taping
strikes at the core of the royalty structure.  Every copy made at
home that substitutes for a purchased phonorecord results in a
loss of mechanical royalties for the songwriter and the music
publisher.

27.  Unauthorized taping is not an isolated occurrence;
on the contrary, it has become widespread.  What it entails is
the reproduction on home audio equipment of the sound recording
of one or more musical compositions.  All that is required is a
tape recorder that can be attached to a playback source.  For
example, if a phonograph, compact disc player, FM/AM radio tuner
and tape recorder are connected through an amplifier, the tape
recorder can make copies from any of these sources -- that is, a
vinyl record (played on the phonograph), a compact disc (played
on the compact disc player), a pre-recorded cassette (played on

-13-

Case 1:05-cv-08136-DC  Document 207-4  Filed 09/01/09  Page 15 of 25

one well, if the tape deck is a dual-well machine), or a radio broadcast (recorded off-the-air).  Recordings can also be made on many models of portable stereo units ("boom boxes") or personal stereo units ("walkman").

28.   The technology of tape recorders currently in widespread use is generally described as "analog"; this involves transcribing on the tape physical or electrical marks in a continuous range of frequencies.  Copies of sound recordings made on analog tape -- and, even more, copies of copies -- lose in sound quality through the process of copying.  This is especially true when compact discs are copied.  Compact discs are "digitally" recorded -- that is, by a transcription of a series of on/off pulses which represent binary numbers (zeros and ones) like those used in a computer -- and their sound is frequently described as perfect or flawless.  An analog copy of a digital compact disc is of substantially diminished sound fidelity, and analog copies of analog sources are even more substantially diminished.

29.   Despite the flaws in reproduction, unauthorized taping occurs today for several different uses.  Some tapers want extra copies of a particular sound recording -- so they can have an extra copy for their car, their walkman or their second resi-dence.  Rather than purchase an extra copy of the sound recording in pre-recorded cassette format, the taper buys one copy for home use (in whatever format) and reproduces the desired extras for

-14-

convenience -- a self-help "buy one-get one free" scheme.   In
other cases, a taper makes copies to give to, or trade with,
friends.  This practice is especially prevalent among students.
Tapers also record sound recordings off-the-air, to add them to
their audio libraries -- often then making extra copies for their
convenience, without having ever purchased an initial copy.
Tapers also make composite tapes, including selections of their
own choosing, and make these tapes part of their permanent
collections.

        30.  Home taping results in lost potential sales of
phonorecords -- and with it, lost royalties for the songwriter
and music publisher.  In the last year alone, it is estimated
that over one billion infringing tapes were made in the U.S.,
including 500 million tapes of complete albums.

        31.  Not only do songwriters and music publishers suf-
fer due to unauthorized taping; the practice harms the public.
The creation of new musical compositions requires active stimu-
lation and sustenance.  Due to lost revenues, songwriters are
less able to devote themselves to songwriting.  In the same way,
publishers are less able to promote musical compositions and to
provide financial support to unestablished songwriters.     The
consequence is a smaller number of new musical compositions.

        32.  Despite this loss of revenues, it would be
impractical to attempt to stop home taping on equipment already
owned by consumers, and this action does not attempt to do so.

                              -15-

This action, instead, is addressed to the new equipment that defendants are now introducing onto the market, and it is brought only against companies that directly profit from the practice of home taping.

C.   **DAT Recorders**

33.   DAT recorders afford an entirely new opportunity and incentive for unauthorized taping and virtually all purchasers will use them to copy pre-recorded copyrighted music. Because of the digital process -- instead of analog -- DAT recorders enable a taper for the first time to make unauthorized perfect copies.  Their use will be most significant with compact discs, for DAT recorders can make "digital clones" -- that is, tapes of a sound fidelity equal to the sound quality of compact discs.  In addition, a DAT recorder can also copy from analog sources with virtually no loss of sound quality in the copying process.

34.   DAT recorders have been designed for and are intended for the purpose of copying compact discs.  Even if DAT recorders have a playback capability, there is virtually no available pre-recorded DAT programming so that purchasers will not be using DAT recorders to play pre-recorded DAT cassettes. Defendants know and expect that consumers will instead purchase DAT recorders in order to make perfect copies of pre-recorded compact discs, vinyl records and analog cassettes, and defendants

-16-

are actively promoting such use both through their own advertise-
ments and through the Home Recording Rights Coalition.

35.    Up until now, defendants and the other manufac-
turers of electronic equipment did not manufacture, import or
distribute DAT recorders for home use in the United States.    Some
models of DAT recorders have been sold in the United States for
professional recording uses, and some consumer models have been
imported into the United States through the "gray market" (that
is, goods not intended by their manufacturers for the United
States market).  However, defendants -- holding themselves out as
"The Leader in Digital Audio" -- have just introduced DAT
recorders for consumer use in the United States.

36.    The consumer models offered by defendants for sale
in the United States are said to have a limitation on their
copying capability.  In particular, these DAT recorders are to be
equipped with a Serial Copying Management System ("SCMS"), which
defendants claim will prevent second generation copying.  However
-- even if the SCMS operates as represented and cannot be easily
circumvented -- these machines will permit an unlimited number of
unauthorized perfect copies to be made from the original compact
disc or other source and an unlimited number of analog copies to
be made from a DAT copy.  Indeed, the inclusion of the SCMS
confirms that defendants know and intend that DAT recorders will
be used to copy pre-recorded music.

-17-

37.  DAT recorders and blank DAT cassettes are being
introduced at prices higher than analog recorders and tapes.  As
a result, the DAT recorders will be inappropriate for tape
recorder uses that do not require the high-fidelity capability of
DAT recorders -- such as dictation or telephone answering
machines.  Instead, they will be used for high fidelity copying
of musical compositions.

38.  The imminent threat to the plaintiff class is
severe, because the compact disc is an increasingly popular for-
mat of pre-recorded music and taping on DAT recorders is certain
to displace sales of compact discs.

## Count I

39.  Plaintiffs repeat and reallege the allegations of
paragraph 1 through 38, above.

40.  This claim is brought pursuant to the Act and to
28 U.S.C. § 2201(a), seeking declaratory relief.  There is an
actual controversy between the plaintiff class and defendants.

41.  Under § 106 of the Act, plaintiffs and the other
members of the class have, with respect to each of their copy-
righted musical compositions, "the exclusive rights to do and to
authorize any of the following:

"(1)  to reproduce the copyrighted work in copies and
phonorecords;

-18-

"(2)  to prepare derivative works based upon the
copyrighted work;

"(3)  to distribute copies or phonorecords of the
copyrighted work to the public by sale or other
transfer of ownership. . . ."

42.  Unauthorized taping of copyrighted musical
compositions on DAT recorders constitutes an infringement of the
exclusive rights under § 106 of the Act.  Tapers are or will be,
without authorization, copying the entirety of copyrighted works,
resulting in the loss of substantial royalties for the members of
the plaintiff class.

43.  DAT recorders have been designed and are intended
by defendants to enable copying of copyrighted musical compo-
sitions, especially sound recordings fixed in compact discs but
also sound recordings fixed in vinyl records and pre-recorded
cassette tapes or broadcast on the radio.  The only plausible,
overwhelmingly predominant use for DAT recorders is for infring-
ing taping activities.  Currently, there are virtually no pre-
recorded DAT cassettes.  Purchasers of DAT recorders are using
them, or will use them, to copy the copyrighted musical compo-
sitions controlled by plaintiffs and by members of the plaintiff
class.  Defendants are manufacturing, importing and/or
distributing DAT recorders in total disregard of the rights of
the plaintiff class.  Upon information and belief, the copyrights
of plaintiffs and of members of the plaintiff class have been or

-19-

will be infringed through unauthorized taping on DAT recorders
made available by defendants.

44.   Upon information and belief, defendants are
manufacturing, importing and/or distributing DAT recorders and
blank DAT cassettes for sale in the United States for the purpose
of inducing, causing, encouraging and enabling the purchasers
thereof to copy, on DAT recorders, the copyrighted works of the
members of the plaintiff class without the authorization of the
owners of the copyrights. Upon information and belief,
defendants know and intend that such purchasers will use DAT
recorders and blank DAT cassettes for unauthorized audio taping.

45.   Upon information and belief, defendants are manu-
facturing, importing and/or distributing DAT recorders and blank
DAT cassettes for sale in the United States for the additional
purposes of inducing, causing, encouraging and enabling pur-
chasers thereof to build and maintain tape recordings of the
copyrighted musical compositions of members of the plaintiff
class, and to trade, lend, swap, and duplicate recordings of the
copyrighted musical compositions of members of the plaintiff
class.  Upon information and belief, defendants know and intend
that such purchasers will use DAT recorders and blank DAT
cassettes for these stated uses.

46.   By manufacturing, importing and/or distributing
DAT recorders and/or blank DAT cassettes for sale to consumers in
the United States, and by inducing, causing, encouraging and

enabling consumers to tape copyrighted musical compositions, defendants are or will be contributorily infringing the copyrights of plaintiffs and of the other members of the plaintiff class.

47.  Defendants threaten to engage, or continue to engage, in the acts and conduct set forth above. As a direct and proximate result of the foregoing acts and conduct of defendants, plaintiffs have been, or are about to be, damaged due to a loss of mechanical royalties to which they are entitled under the Act.

48.  By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between plain-tiffs and defendants concerning the rights of defendants under the Act, now and in the future, to manufacture and distribute DAT recorders and blank DAT cassettes for use in home audio taping. Specifically:

a)  Plaintiffs contend that unauthorized audio taping on DAT recorders is an infringement under the Act and that defendants are, or will be, contributorily liable for this infringement; and

b)  Upon information and belief, defendants deny and dispute plaintiffs' contentions.

49.  By reason of the claims and contentions made and asserted by plaintiffs and defendants, it is necessary that the respective rights, duties and obligations of plaintiffs and

-21-

defendants with respect to the manufacture and distribution of
DAT recorders and blank DAT cassettes be determined by the Court.

## Count II

50.   Plaintiffs repeat and reallege the allegations of
paragraph 1 through 47, above.

51.   Unauthorized taping of copyrighted musical com-
positions results in the loss of substantial mechanical royalties
to which the members of the class are entitled under the Act.

52.   As a practical matter, the plaintiff class cannot
directly enforce its rights with respect to unauthorized taping.

53.   The manufacture, importation and distribution of
DAT recorders and blank DAT cassettes for sale to consumers in
the United States has already begun to cause, or threatens
shortly to cause, substantial losses for the members of the
plaintiff class.

54.   Plaintiffs have no adequate remedy at law.

55.   Unless defendants are enjoined from manufacturing,
importing and distributing DAT recorders and blank DAT cassettes
for sale in the United States, the members of the plaintiff class
will be irreparably injured.

-22-

WHEREFORE, plaintiffs pray for judgment and relief as follows:

A.    On Count I, for a declaration in favor of the plaintiff class and against defendants that i) unauthorized home audio taping on DAT recorders of copyrighted musical compositions is an infringement of the copyrights in such compositions under the Act, and ii) defendants are or will be contributorily infringing the copyrights of the members of the plaintiff class through the manufacture, importation and distribution of DAT recorders and/or blank DAT cassettes for sale to consumers in the United States;

B.    On Count II for injunctive relief enjoining defendants, and their respective agents, employees and all other persons acting under, in concert with or for them, from manufacturing, importing or distributing for sale to consumers in the United States DAT recorders and blank DAT cassettes that enable the unauthorized home taping of copyrighted musical compositions;

C.    On both counts, for a direction that defendants pay the costs of this action, including reasonable attorneys' and expert witness' fees; and

Case 1:05-cv-08136-DC  Document 207-4  Filed 09/01/09  Page 25 of 25

          D.    On both counts, for such other and further relief

as the Court may deem just and proper.


July 9, 1990

                              KRAMER, LEVIN, NESSEN,
                               KAMIN & FRANKEL

                              By: _Marvin E. Frankel_
                                  Marvin E. Frankel (M.F. 7101)
                                  Michael S. Oberman
                                  Robin S. Feingold
                              Attorneys for Plaintiffs
                              919 Third Avenue
                              New York, New York  10022
                              (212) 715-9100

                                -24-