UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ :
The Authors Guild, Inc., Association of American :
Publishers, Inc., et. al., :
  :
  :
           Plaintiffs, :
  :         Case No. 05 CV 8136-DC
           v. :
  :         **FILED**
Google, Inc., :         **ELECTRONICALLY**
  :
           Defendants. :
_____ :

## OBJECTIONS OF CLASS MEMBERS
**THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC., GRAPHIC ARTISTS GUILD, THE PICTURE ARCHIVE COUNCIL OF AMERICA, THE NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION AND INDIVIDUAL PHOTOGRAPHERS JOEL MEYEROWITZ, DAN BUDNIK, PETE TURNER AND LOU JACOBS, JR. TO THE PROPOSED SETTLEMENT BETWEEN PLAINTIFFS THE AUTHORS GUILD, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., ET AL. AND GOOGLE, INC.**

Class members The American Society of Media Photographers, Inc. ("ASMP"), the

Graphic Artists Guild ("GAG"), the Picture Archive Council of America ("PACA") and the

North America Nature Photography Association ("NANPA"), together with individual

photographers Joel Meyerowitz, Dan Budnik, Pete Turner and Lou Jacobs, Jr. (collectively, the

"Objectors"), hereby submit these objections to the proposed settlement ("Proposed Settlement")

of the class action filed by plaintiffs Authors Guild, Inc. ("AG") and joined by the Association of

American Publishers, Inc. ("AAP"), together with various publishers and representative authors,

against defendant Google, Inc. ("Google") arising from the "Google Library Project" ("GLP")

(collectively, the "Settling Parties").[1]  A declaration from ASMP Managing Director and General

---

[1]     The term "Objectors" as used herein encompasses the four trade associations named
herein and their members.  "Objectors" also includes the four photographers named herein.  For
brevity purposes, the term "Visual Arts Rights Holders" will be used herein to refer to all
members of the trade association Objectors, including photographers, illustrators, graphic artists
and other copyright owners or their licensees that derive income from the licensing of visual
images in books.

DSMDB-2658679v01

Counsel, Victor S. Perlman, in support of all Objectors is submitted as Exhibit A hereto ("Perlman Dec.").

The Objectors are trade associations for freelance photographers, graphic artists and illustrators, and further include four of the leading photographers in the United States.[2]  As set forth herein, Objectors' interests would be adversely and permanently affected by approval of the Proposed Settlement, which Objectors oppose.  The Proposed Settlement would sacrifice the interests of Visual Arts Rights Holders to promote the interests of a subset of copyright owners (authors and publishers) and Google.  This abuse of the class action process cannot fairly be judged to be in the public interest.

The Objectors are largely excluded from the "Settlement Class" definition of authors and publishers contained in the Proposed Settlement.  If the Settlement receives final approval, they would, therefore, not receive any of the compensation for past infringement provided for in the Proposed Settlement, however inadequate it may be.  Nor would they benefit from the Book Registry and revenue-sharing provisions of the Proposed Settlement on a going-forward basis.

While largely excluded from the Proposed Settlement, Objectors would nevertheless suffer profound and far-reaching prejudice if it were to be approved.  The technology prowess of Google, together with its unparalleled market power, would establish new and price-limiting market "norms" that would further damage the already weak bargaining position of Visual Arts Rights Holders.  They would find it difficult, if not impossible, to obtain fair compensation for the licensed use of their works in the digital environment, even though they had no input into the settlement terms and were apparently included in the class solely to enhance the negotiating position of authors.

_____

[2]      A brief description of ASMP, GAG, PACA and NANPA is provided in Exhibit B to these Objections.

2

The deliberate exclusion of the Objectors from a Proposed Settlement that would nonetheless damage their interests in the marketplace is fundamentally unfair, constitutes a breach of the fiduciary duty of class counsel and the class representatives to all members of the class, and will permanently damage Objectors' ability to obtain fair and equitable relief from Google's willful and ongoing infringement. Accordingly, the Objectors request that the Court:

(i) Deny approval of the Proposed Settlement;

(ii) Strike the Second Amended Complaint, which purports to exclude Objectors from the Settlement Class;

(iii) Appoint new class counsel to represent the interests of the Objectors, for purposes of either reopening settlement negotiations or continuing the litigation;

(iv) Appoint new class representatives to represent the interests of Objectors; and

(v) Such other relief as this Court deems necessary and appropriate.

In sum, if there is to be a fair and equitable settlement of this class action, a comprehensive settlement would better serve the public interest in broad access to copyrighted works while still protecting the rights and economic status of all copyright owners.

I.      **INTRODUCTION AND SUMMARY**

The Proposed Settlement purports to be a comprehensive settlement of this class action that would serve both the public interest and the interests of the class members as well as Google. In fact, the Proposed Settlement is not a comprehensive settlement of this dispute and would serve only the financial interests of the Settling Parties and class counsel, while irrevocably damaging the interests of other members of plaintiffs' class who would be largely written out of the Proposed Settlement. As a result, the vast majority of Visual Arts Rights Holders, whose works have been and continue to be digitized by Google without authorization, and who have been members of the plaintiffs' class since July 2006, would receive nothing under the Proposed Settlement -- not a dime of compensation for past infringement, and not any benefit

3

from the various elements of the Proposed Settlement providing for going-forward relief for which the Settling Parties seek Court approval.

The Objectors have copyright interests at stake in this controversy that are identical to those of the copyright interests of authors and publishers. Indeed, plaintiffs' class counsel recognized as much when he amended the complaint in this action in July 2006 to encompass not only the Objectors but all copyright owners whose works were found in the University of Michigan and other library collections that Google was, and presumably still is, digitizing.

Having acknowledged the legitimacy of Objectors' copyright interests and their substantial stake in this controversy, and having obtained whatever leverage was gained by the expansion of the plaintiffs' class to include them, class counsel then proceeded to eliminate the Objectors from the scope of the settlement -- without any notice therein and with the result of cutting a deal for the benefit of a subset of the class (*i.e.*, authors) to the detriment of other members of the class. This manipulation of the class action procedure to enrich some members of the class at the expense of others, with the accompanying very substantial proposed remuneration to be paid to class counsel ($30 Million), constitutes an abuse of the class action system that should not be condoned or rewarded by this Court.

The truth is that this Proposed Settlement, if approved, would not only exclude many of the Objectors from receiving any of the benefits of compensatory relief and other elements of the Proposed Settlement, it would also permanently damage their ability to protect their copyright interests both with respect to past and future infringements arising from the GLP. If the Proposed Settlement is approved, the Objectors will most likely lack the bargaining power or resources either to continue this litigation in some form (or file separate actions), or to negotiate a settlement that provides for comparable or even more favorable protection for the interests of Visual Arts Rights Holders, who are historically among the most vulnerable and powerless in the real-world enforcement of copyright rights.

4

DSMDB-2658679v01

While the Objectors do not believe that the terms of the Proposed Settlement would provide fair compensation to all Visual Arts Rights Holders for past and future infringements arising from the GLP if they were included on the same basis as creators of other "Inserts," it is quite clear that being excluded from the Proposed Settlement would make it virtually impossible for the Objectors to obtain comparable relief, however adequate or inadequate it may be.  Indeed, the Objectors believe that the establishment of the Proposed Settlement scheme, once in practical effect, will establish a ceiling for the payment of fair compensation in the future to Visual Arts Rights Holders not only by Google, but equally as important, also by other infringers or potential licensees.  To the extent that some of the Objectors' works are included in the Proposed Settlement, they believe that compensation is inadequate and will have a negative impact on the values of all of their and their members' copyrights.

As a matter of economic reality, the implementation of that scheme will make it virtually impossible for Objectors' members to negotiate fair compensation for past and future infringements by Google or by other parties.  Nor will Objectors be able to negotiate and benefit on the basis of a fair and equitable system for compensating their members for future infringements caused by the continuation and expansion of the GLP to include multiple libraries.

The enormous market power of Google and the publishers, together with the exclusion of the Objectors from the Proposed Settlement, will doom their members to second-class status in all future negotiations with Google, publishers or other parties whose bargaining positions already far exceed those of Visual Arts Rights Holders.  This Court's endorsement of a class action settlement that selectively protects the interests of some copyright owners and affirmatively damages the identical copyright interests of other members of the class would be a miscarriage of justice.  Accordingly, the Proposed Settlement should not receive final approval by this Court.

DSMDB-2658679v01

II.      **FACTUAL BACKGROUND**

      A.      **The Evolution of the Class Definition**

In the initial complaint filed by class counsel on September 20, 2005, the class was defined narrowly to include only persons or entities holding copyrights in literary works contained in the University of Michigan collection.  *See* Exh. C, Class Action Complaint, ¶ 22. Given the definition of "literary works" under the Copyright Act, 17 U.S.C. § 101, which provides that such works are "expressed in words, numbers, or other verbal or numerical symbols or indicia…," this definition of the class excluded non-text works such as photographs and graphic art.[3]

Nine months later on July 24, 2006, class counsel amended the initial complaint to expand significantly the definition of the class of copyright owners alleging infringement by Google's GLP.  The new definition of the class expanded it to include "all persons or entities that hold the copyright in any work that is contained in the library of the University of Michigan." Exh. D, First Amended Class Action Complaint, ¶ 22.  This new definition represented a dramatic expansion of the class.  Under this expanded definition, all copyright owners, including but not limited to the Objectors, holding copyrights in works contained in the University of Michigan collection were included in the class.  Thus, the newly defined class was no longer limited to authors of "literary works"; as of July 24, 2006, and continuing until the Settling Parties proposed to redefine the class in the Second Amended Complaint filed contemporaneously with the Proposed Settlement, the class was defined to include Visual Arts

---

[3]      Photographs, graphic art and designs fall under the definition of "Pictorial, graphic and sculptural works" under the Copyright Act, a category of works distinct from "literary works" for purposes of that statute.  Under the copyright statute, "Pictorial, graphic, and sculptural works" are defined to include "two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models and technical drawings, including architectural plans."  17 U.S.C. § 101.

DSMDB-2658679v01

Rights Holders -- indeed, it included the copyright owners of all copyrighted works in that collection, regardless of the form or media of such works.

Having obtained whatever negotiating advantage may have been conferred by an extremely broad definition of the class as of June 2006, class counsel then proceeded to negotiate owners of "Pictorial, graphic and sculptural works" out of the class. In the Second Amended Complaint filed on October 28, 2008, the Settling Parties insured that the definition of the plaintiffs' class tracked the proposed "Settlement Class." Specifically, the Second Amended Complaint changed the class definition to "all persons that… have a Copyright Interest in one or more Books or Inserts." Exh. E, Second Amended Complaint, ¶ 34. Books were defined in the conventional manner, but "Inserts" (a new term coined for purposes of the Proposed Settlement) were defined to exclude "pictorial works, such as photographs, illustrations…maps, paintings and works that are in, or as they become in, the public domain…." *Id*.[4]

Consistent with the changed definition of plaintiffs' class in the Second Amended Complaint, the Settling Parties then proposed a definition of the "Settlement Class" that would exclude the Objectors and any other owner of a copyright interest other than in "Books" and "Inserts" as defined in the Proposed Settlement. Specifically, the proposed "Settlement Class" was defined as "all Persons that… have a Copyright Interest in one or more Books or Inserts." Settlement Agreement ("S.A."), § 1.142. *See* Pls. Mem. at 5. Those persons would be "either members of the Author Sub-Class or the Publisher Sub-Class, or both." *Id*. Again, the Settling Parties chose not to tell the Court that the Settlement Class definition was inconsistent with the definition of the class that was established under the First Amended Complaint. *See* Pls. Mem.

---

[4]    It is striking that nowhere in their Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Settlement Approval ("Pls. Mem.") did the Settling Parties inform the Court that the class had been dramatically expanded in the First Amended Complaint and then drastically changed in the newly-filed, post-settlement negotiations Second Amended Complaint. *See* Pls. Mem. at 5 (mentioning the Second Amended Class Action Complaint, but failing to point out the changed definition of the class reflected therein, which was both narrowed and expanded simultaneously).

DSMDB-2658679v01

at 5-6 (discussing the "Settlement Class" but failing to state that its definition departed from the class definition in the First Amended Complaint and thus the "Settlement Class" did not include many copyright owners included in the First Amended Complaint).

B.    **Only "Books" and "Inserts" Are Covered
by the Proposed Settlement**

The Proposed Settlement is applicable only to two types of "Copyright Interests" (another defined term, *see* S.A., § 1.38; Pls. Mem. at 6). First, the Proposed Settlement is applicable to "Books", which are defined as "a written or printed work" meeting three requirements pertaining to copyright registration, publication or distribution, and "Copyright Interests" (meaning that it cannot be a work in the public domain). S.A., § 1.16; Pls. Mem. at 6-7. An "Insert" under the Proposed Settlement must consist either of:

(1)    text, such as forewords, afterwords, prologues, epilogues, poems, quotations, letters, textual excerpts from other Books, periodicals or other works, or song lyrics; or

(2)    tables, charts, graphs, musical notation (*i.e.*, notes on a staff or tablature), or children's book illustrations.

S. A., § 1.72; Pls. Mem. at 7.

In addition, an "Insert" must meet three other requirements:

(b)    be contained in a Book, government work or a book that is in the public domain;

(c)    be protected by a U.S. copyright, where the U.S. copyright interest in the Insert is owned or held by someone *other than* a Rightsholder of the Book's "Principal Work" (*e.g.*, the "narrative story" in a work of fiction, a group of short stories published as a collective work, or a play in a Book with a foreword); and

DSMDB-2658679v01

(d)     be registered, either alone or as part of another work, with the U.S. Copyright Office as of the Notice Commencement Date (another defined term), unless the Insert or work was first published outside the United States, in which case such registration is not required.

S.A., § 1.72; Pls. Mem. at 7 (italics in Mem.).

Specifically excluded from the definition of "Insert" are the following of particular interest here:

(1) pictorial works, such as photographs, illustrations (other than children's book illustrations), maps and paintings; and

(2) works that are in the public domain.

S.A., § 1.72; Pls. Mem. at 7.

Given these terms, the vast majority of photographs, graphic art and other non-text works are expressly excluded from the scope of the Proposed Settlement. The only way in which photographs, for example, would be covered by the Proposed Settlement is with respect to Books in which the contents of a Book are photographs, the Book of photographs was published and was registered in the Copyright Office, and the copyright in the Book is owned by the photographer. *See* definition of "Book", 1.16.

### C.     **Plaintiffs Class Counsel Would Be Paid a Substantial Sum for a Partial Settlement**

The Proposed Settlement provides for the payment of attorneys' fees and costs by Google of $30 Million for counsel for the "Author Sub-Class" alone. S.A., § 5.5; Pls. Mem. at 13. That is the same class counsel who first added the Objectors to the class definition and then negotiated a settlement that would exclude them from it.

DSMDB-2658679v01

In addition, as part of the settlement of the separate copyright infringement action brought by five publishers, the AAP would be paid $15.5 Million by Google in part to cover attorneys' fees and expenses.  Pls. Mem. at 13, n. 9; Attachment M thereto.

## ARGUMENT

I.         **THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT WOULD EXCLUDE THE VAST MAJORITY OF THE OBJECTORS FROM THE BENEFITS OF THE SETTLEMENT**

      A.     **The Objectors Would Receive No
               Compensation for Past Infringements**

If the Proposed Settlement is approved, the Objectors and their members would not receive a penny of the $45 Million to be paid by Google to compensate authors and publishers for past unauthorized infringements.  According to the Settling Parties, the $45 Million would be paid "to compensate Settlement Class members whose works have already been scanned without permission."  Pls. Mem. at 2.  But there is no dispute that the entire contents of books have been "scanned without permission" of the copyright owners by Google, including photographs, graphic art and other non-text works.  Thus it is clear and undisputed that all members of the class as defined by the First Amended Complaint have been the victims of Google's unilateral decision to "scan…without permission."  *Id*.  Yet Visual Arts Rights Holders would be paid nothing for Google's admitted past infringement -- solely because they were negotiated out of the Settlement Class by class counsel, the class representatives and Google.

There is no rational reason why this Proposed Settlement of a class action that included Visual Arts Rights Holders in the class for litigation purposes should provide for payment for past infringements to some copyright owners in the class (namely, authors and publishers), but not for others (namely, the Objectors and their members).  Google committed systematic, willful copyright infringement by digitizing the entire contents of books in the University of Michigan collection (and in other library collections).  A partial settlement that selectively provides for

10

DSMDB-2658679v01

compensation only to certain categories of copyright owners (*i.e.*, authors and publishers) and not for other types of copyright owners (*i.e.*, Visual Arts Rights Holders) is fundamentally unfair and arbitrary, and inevitably would place the excluded copyright owners in a compromised position. Approval of this Proposed Settlement would leave Visual Arts Rights Holders with no financial compensation and very little practical ability to pursue a remedy for a separate financial package after this class action is terminated. The resulting prejudice is undeniable and inexcusable.

**B.  The Objectors Would Not Be Eligible
to Participate in the "Book Rights Registry"**

Under the Proposed Settlement, Google is obliged to pay an additional $34.5 Million on top of the $45 Million compensation fund in order to establish a "Books Rights Registry" ("Registry") that will reach out to Settlement Class members, secure their contact information and collect and pay revenues to them "for the use of copyrighted works through this Settlement." Pls. Mem. at 2. In addition, the Registry would "otherwise protect and represent the interests of the Settlement Class." *Id*.

Once again, the Objectors, having been excluded from the proposed Settlement Class despite being included in the litigation class, would not receive any benefits from this new structure to be established by Google at its expense. Nor is there any rational reason for such a structure to be established for the benefit of some copyright owners who have been the victims of Google's unauthorized digitization project while other similarly situated copyright owners are completely shut out of the Registry. Needless to say, there is little prospect that the Objectors would ever have the resources, both financial and technological, to establish and administer such a Registry for their works, which are excluded from the Registry under the Proposed Settlement.[5]

---

[5]      As the Settling Parties stated in their motion for preliminary approval of the settlement, it would "catapult…the publishing industry into the digital age, a result that greatly benefits individual authors and publishing houses, which simply could not launch such a program on their

compensation only to certain categories of copyright owners (*i.e.*, authors and publishers) and not for other types of copyright owners (*i.e.*, Visual Arts Rights Holders) is fundamentally unfair and arbitrary, and inevitably would place the excluded copyright owners in a compromised position. Approval of this Proposed Settlement would leave Visual Arts Rights Holders with no financial compensation and very little practical ability to pursue a remedy for a separate financial package after this class action is terminated. The resulting prejudice is undeniable and inexcusable.

**B.  The Objectors Would Not Be Eligible
to Participate in the "Book Rights Registry"**

Under the Proposed Settlement, Google is obliged to pay an additional $34.5 Million on top of the $45 Million compensation fund in order to establish a "Books Rights Registry" ("Registry") that will reach out to Settlement Class members, secure their contact information and collect and pay revenues to them "for the use of copyrighted works through this Settlement." Pls. Mem. at 2. In addition, the Registry would "otherwise protect and represent the interests of the Settlement Class." *Id*.

Once again, the Objectors, having been excluded from the proposed Settlement Class despite being included in the litigation class, would not receive any benefits from this new structure to be established by Google at its expense. Nor is there any rational reason for such a structure to be established for the benefit of some copyright owners who have been the victims of Google's unauthorized digitization project while other similarly situated copyright owners are completely shut out of the Registry. Needless to say, there is little prospect that the Objectors would ever have the resources, both financial and technological, to establish and administer such a Registry for their works, which are excluded from the Registry under the Proposed Settlement.[5]

---

[5]      As the Settling Parties stated in their motion for preliminary approval of the settlement, it would "catapult…the publishing industry into the digital age, a result that greatly benefits individual authors and publishing houses, which simply could not launch such a program on their

DSMDB-2658679v01

Thus, the simple reality is that the Registry to be established and administered under the Proposed Settlement will be the only one of its kind in the marketplace. To the extent that aggrieved copyright owners whose interests are adversely affected by Google's unauthorized digitization program are excluded from the operation of the Registry, they will inevitably suffer substantial prejudice and additional financial loss, with no practical means of redress.

C. **The Objectors Would Not Receive Financial Remuneration for Google's Future Commercial Uses of their Copyrighted Works**

Closely tied to the establishment of the Registry, the Proposed Settlement further provides that 63% of the revenues earned from Google's future commercial uses of the works of copyright owners included in the Settlement Class will be paid to them, presumably through the operation of the Registry. Pls. Mem. at 2. Since Google has digitized and continues to digitize entire books, including photographs and non-textual material, the future commercialization of those digitized works are likely to include the entire contents of the books.[6] If and when such commercialization occurs, the Objectors would receive no share of the resulting revenues -- indeed, they would be cut out of the infrastructure for calculating and paying the "royalties" of 63% altogether.

D. **The Objectors Would be Deprived of the "Rights Clearance Mechanism" Provided for in the Proposed Settlement**

---

own." Pls. Mem. 2-3. The precise point can be made about the Objectors and their members, who are equally, if not more so, unable to set up a comparable program on their own.

[6] It is implausible to suggest that, when it comes time to commercialize the digitized "books," photographs, visual art, illustrations and other non-text works will be excised from them. It is highly unlikely that customers of this commercialization effort would find it acceptable to gain access to portions of books, from which these materials have been excised. To the extent that there is commercial value in the digitized works, that value arises from the works as a whole, not from piecemeal dissemination of their contents. To put it bluntly, an illustrated book without its illustrations is not worth much compared to its illustrated counterpart.

DSMDB-2658679v01

As the Settling Parties informed the Court, in addition to the benefits outlined above, "the proposed Settlement creates a rights clearance mechanism that lets members of the Settlement Class, at all times, retain control over their copyrighted works by giving them the ability to determine the extent to which those works are included or excluded from the Google Library Project." Pls. Mem. at 2. Unfortunately, the Objectors would not have access to this rights clearance mechanism. And they would therefore have no ability to decide whether their works should, or should not, be included in the GLP. Instead, they would be in the same position they are today -- their works have been and will continue to be systematically digitized without their authorization or knowledge, and if this class action is settled without their representation and participation, they lack the ability and resources either to benefit from that digitization or to do anything to insure their works are not included in it. The resulting prejudice to the interests of the Objectors would be both immediate and enduring.

## II. THE PROPOSED SETTLEMENT WOULD ESTABLISH A NEW, POWERFUL VALUE MODEL FOR THE USE OF COPYRIGHTED WORKS IN THE ONLINE ENVIRONMENT THAT WOULD RESTRICT PRICE COMPETITION AND DAMAGE THE NEGOTIATING POSITIONS OF THE OBJECTORS

The Proposed Settlement would establish a new, technology-driven, potentially far-reaching model for selling and, therefore, valuing "books" and "inserts" in the online environment. That model, driven by Google's extraordinary market power and the still-formidable market power of publishers, is likely to have a profound effect on the rights and financial position of the Objectors. More specifically, the pricing structure established by the Proposed Settlement, whereby specific monetary values are assigned to commercial uses of "books" and "inserts," is likely to be used in the marketplace to set an upper limit on what would be "fair compensation" for the online use of photographs, graphic art, illustrations and other non-text works that are not covered by the Proposed Settlement and are excluded from the model. The market power of this new economic model is likely to be such that the future value of the

DSMDB-2658679v01

copyrighted works of Objectors would inevitably be affected -- even though they had no input into the valuation structure established by the Proposed Settlement and even though it expressly excludes those works from its coverage.

Such a result would further deplete the already woefully weak negotiating position of most small copyright owners, including Visual Arts Rights Holders who have historically been among the weakest in terms of negotiating power. They would likely find it difficult, if not impossible, to negotiate compensation higher than that provided for in the Proposed Settlement for unauthorized uses of copyrighted works by infringers or by parties seeking to license those works prospectively for online use. Once the valuation model of the Proposed Settlement is in place, the market realities would be such that Visual Arts Rights Holders would have even less ability than they have today (which is already little enough) to negotiate a fair and equitable price for the use of their works. *See* Exh. A, Perlman Dec., ¶¶ 42-43.

For example, with respect to the payment by Google for past infringements (a minimum of $45 Million), Google will make a cash payment of $60 per "Principal Work", $15 per "Entire Insert," and $5 per "Partial Insert" (defined as any other "insert" that is less than an entire foreword, afterword, introduction, song lyrics etc., *see* Pls. Mem. at 11, n. 6). But only one such cash payment for these works will be made by Google, regardless of the number of times it may have digitized that work. *Id.*[7]

While the Objectors had no input into the negotiation of these values, and while these payments may be viewed as absurdly low and surely fail to take into account differences in

---

[7]    The Proposed Settlement defines an "insert" to include texts such as forewords, epilogues and even song lyrics, as well as tables, charts, graphs and musical notation. S.A. § 1.72. Yet the definition of "insert" excludes "pictorial works" such as photographs, illustrations, maps and paintings, while including "children's Book illustrations." *Id.* One can fairly question the logic of and rationale for these arbitrary distinctions. It is not intuitively obvious why song lyrics or charts should be covered by the Proposed Settlement, and yet other types of "pictorial" works that plainly add value and character to a "book" are left out. Presumably these judgments reflect the outcome of negotiations between the Settling Parties, but their arbitrariness demonstrates the consequences of the Objecting Parties having no "seat at the table."

DSMDB-2658679v01

quality or value of different copyrighted works, the Objectors will likely find themselves presented with these values as purported evidence of the market value of "similar" works in the online environment. *See* Exh. A, Perlman Dec., ¶ 41. In such a case, the Objectors will have the worst of both worlds -- they will have been excluded from the negotiations leading to the establishment of these valuations, they will be excluded from any "upside" value associated with the Proposed Settlement and the structures it puts into place, and yet they will suffer the potential "downside" effects of the pricing mechanisms therein established.

**III.     CLASS COUNSEL AND CLASS REPRESENTATIVES BREACHED THEIR FIDUCIARY DUTY TO OBJECTORS**

Class counsel and class representatives owe a fiduciary duty to Objectors. Once a complaint is filed, an attorney for a class owes a fiduciary duty to the entire class. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 801 (3d Cir. 1995); Newberg & Conte, *Newberg on Class Actions* § 11.65 (4th ed. 2003). *See also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 375 B.R. 719, 727 (S.D.N.Y. 2007) ("The representative plaintiff owes a fiduciary duty to absent members even before the class is certified") (citing *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 331 (1980)); *In re Avon Securities Litig.*, 1998 WL 834366, at *10 n.5 (S.D.N.Y. 1998) (same). Class representatives owe the same fiduciary duty. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *Shelton v. Pargo*, 582 F.2d 1298, 1306 (4th Cir. 1978). Thus, once the class was defined to include Objectors, class counsel and class representatives owed them a fiduciary duty.

Class counsel and class representatives breached this fiduciary duty by failing to adequately represent their interests and by actively prejudicing their interests in the class action litigation.

DSMDB-2658679v01

A. **Class Counsel and Class Representatives Breached Their Fiduciary Duty to Objectors by Failing To Adequately Represent the Interests of Absent Class Members in Their Negotiations with Google**

Far from adequately, class counsel and class representatives did not represent Objectors' interests at all in their negotiations with Google. A fiduciary, even at the pre-certification stage, must adequately represent the interests of the absent class members. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 375 B.R. 719, 720 (S.D.N.Y. 2007). *Cf.* Fed. R. Civ. P. 23(g)(2)(A) advisory committee's note (2003) ("[A]n attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole."). Adequate representation of these interests must include, at its core, bargaining on behalf of all members of the putative class. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 375 B.R. 719, 726–28 (S.D.N.Y. 2007). A settlement that purports to protect the interests of some class members and provides no relief for other class members cannot be reasonably considered fair to the class as a whole.

By representing the interests of some members of the class and jettisoning the interests of others, class counsel and class representatives have inevitably breached that fiduciary duty by negotiating a settlement prejudicial to the interests of the Objectors. By filing the First Amended Class Complaint that defined the class broadly enough to include Objectors, class counsel and class representatives assumed a fiduciary duty to the Objectors and all other members of the class. That fiduciary duty did not somehow disappear by the convenient mechanism of negotiating a "Settlement Class" that excluded Objectors. *See also In re Holocaust Victim Assets Litig.*, 2007 U.S. Dist. LEXIS 92117, at 20 (E.D.N.Y. Dec. 14, 2007) (noting that a class representative has a fiduciary duty to bargain on behalf of the class). Indeed, as the Supreme Court has made clear, when the district court "certifies for class action settlement only, the moment of certification requires 'heightened attention' to the justification for binding

DSMDB-2658679v01

the class members." *Orvitz v. Fireboard Corp.*, 527 U.S. 815, 849 (1999) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).

Moreover, excluding the Objectors from the Proposed Settlement impermissibly furthered the interests of the Settlement Class at the expense of other class members. The members of the two "sub-classes" of the Settlement Class would obtain substantial benefits from the Proposed Settlement. Class counsel's interests were enriched at the expense of the Objectors because the Settlement Agreement provides for $30 million in attorneys' fees for class counsel, while the Objectors received nothing. *See* S.A., § 5.5. *See also Assoc. of Bar of the City of N.Y.*, Op. 2004-01, available at 2004 WL 2155078, at *6 (March 2004) ("A class lawyer's decision [to settle], likewise, may not be influenced by the lawyer's desire to increase the fees he or she will receive."). Rather than bargaining on behalf of the Objectors, whose interests class counsel and class representatives introduced into the case, they proceeded to bargain them away.

B. **Class Counsel and Class Representatives Breached Their Fiduciary Duty to Objectors By Prejudicing Their Interests in the Class Action**

Class counsel and class representatives have done more than fail to represent Objectors' interests -- rather, class counsel and class representatives have actually forfeited them. Prejudicing putative class members' substantive legal interests in the class litigation, even prior to class certification violates the fiduciary duty to those class members owed by class counsel and class representatives. *See Schick v. Berg*, 2004 WL 856298, at 5 (S.D.N.Y. Apr. 20, 2004), *aff'd*, 430 F.3d 112 (2d Cir. 2005) (noting that class counsel's fiduciary duties arise because class counsel "acquires certain limited abilities to prejudice the substantive legal interests of putative class members even prior to certification."). *See also Rothman v. Gould*, 52 F.R.D. 494, 496 (S.D.N.Y. 1971) (noting these same dangers to absent class members when a class action is filed); *Turoff v. Union Oil Co. of Cal.*, 61 F.R.D. 51, 56 (N.D. Ohio 1973) (noting the danger that

17

when a class definition is narrowed, the statute of limitations may bar those who rely on a class plaintiff's first broader class definition from asserting claims).

Under the circumstances of this Proposed Settlement, the resulting prejudice to the interests of the Objectors is manifest at several levels.

First, given the length of time that this suit has been pending, it is unclear whether the three-year statute of limitations for copyright infringement is implicated. While clearly there are factual questions surrounding how copyright owners could have learned of the unauthorized copying of their works by Google under the Project, to the extent that the Proposed Settlement may create statute of limitation issues, it should not be approved. *See also In re New York City Mun. Sec. Litig.*, 87 F.R.D. 572, 581 (S.D.N.Y. 1980) (noting the danger of the statute of limitations barring claims of class members who mistakenly rely on a class to represent their interests in a well publicized case).

Second, as noted above, the exclusion of the Objectors from the Proposed Settlement obviously means that they receive no monetary compensation for Google's past infringements. Whether or not the $45 Million to be paid by Google is fair and reasonable to those authors and publishers who were also the victims of Google's past infringements may be debatable, but it is surely true that zero compensation for the Objectors is detrimental to their interests. Any suggestion that the Objectors can be adequately compensated for past infringements by filing separate actions or a "new" class action fails to conform to reality. Objectors lack the resources to file multitudes of individual infringement actions and there is no justification for forcing them to resort to a "new" class action and thereby be consumed by years of litigation and negotiation with Google over the terms of a separate deal.

A look at the timing of the class complaints further illustrates the prejudice to Objectors' claims. For almost two and a half years, the operative class definition included the Objectors, even though they were never informed of that fact. Not knowing that their members had been included in the class when it was expanded in July 2006, Objectors did not realize that

18

their members had been cut out of the "Settlement Class" when the settlement between authors, publishers and Google was announced in October 2008. As far as Objectors knew, the class definition had been limited to authors for the duration of the litigation. Neither class counsel nor class representatives ever informed Objectors that the class definition had been expanded to include photographers and other Visual Arts Rights Holders. Nor were Objectors informed that the class definition was subsequently contracted to exclude them and at the same time broadened to encompass vastly more authors. Accordingly, Objectors lacked the knowledge to protect their interests, and class counsel and class representatives had an obligation to do so.

IV.     **AMENDING THE COMPLAINT TO REMOVE OBJECTORS FROM THE CLASS DEFINITION AND TREATING IDENTICALLY SITUATED PARTIES DIFFERENTLY IN THE PROPOSED SETTLEMENT AGREEMENT ABUSES THE CLASS ACTION DEVICE**

The Proposed Settlement is the product of an intolerable abuse of the class action process by class counsel and the representative plaintiffs. "District courts…have an ample arsenal to checkmate any abuse of the class action procedure, if unreasonable prejudice to absentee class members would result, irrespective of the time when the abuse arises." *Shelton v. Pargo*, 582 F.2d at 1306. Where certain plaintiffs have assumed the fiduciary role of class representative, they may not use the class action device for unfair personal aggrandizement to the detriment of absent class members. *Elliott v. Allstate Investigations, Inc.*, 2008 U.S. Dist. LEXIS 21090, at 4–5 (S.D.N.Y. Mar. 19, 2008). Courts have "supervisory power over and … special responsibility in … class actions to see that representative parties do nothing, whether by way of settlement of his individual claim or otherwise, in derogation of the fiduciary responsibility it has assumed, which will prejudice unfairly the class he seeks to represent." *Shelton v. Pargo*, 582 F.2d at 1306. *See also Phillips Petroleum Co. v. Shutts*, 472 U.S. at 812 (noting that Rule 23 and due process require that "the named plaintiff at all times adequately represent the interests of the absent class members.").

DSMDB-2658679v01

The potential for abuse exists even at the pre-certification stage. *Soskel v. Texaco, Inc.*, 94 F.R.D. 201, 203 (S.D.N.Y. 1982). *See also* Manual for Complex Litigation (Fourth) § 21.61 (2004) (noting a variety of abuses of the class action device in proposed settlements). Among abuses that arise are when class counsel amends a complaint to eliminate the class portions of the complaint for strategic purposes, or when settlements treat identically situated parties differently. *See id.* at § 21.61 n.954, 956 and accompanying text; *see, e.g.*, *Yaffe v. Detroit Steel Corp.*, 50 F.R.D. 481, 483 (N.D. Ill. 1970).

> A. **Class Counsel and the Representative Plaintiffs Abused the Class Action Device by Amending the Complaint to Remove the Objectors from the Settlement Class**

Class counsel and the representative plaintiffs have impermissibly abused the class action process by purporting to represent the Objectors' interests when they, in fact, did not. When plaintiffs amend a complaint striking all reference to a class action in exchange for a substantial settlement for the named plaintiffs, courts have found an impermissible abuse of the class action device. *See, e.g.*, *Munoz v. Ariz. State Univ.*, 80 F.R.D. 670, 672 (D.C. Ariz. 1978); *Magana v. Platzer Shipyard, Inc.*, 74 F.R.D. 61, 71 (S.D. Tex. 1977); *Yaffe v. Detroit Steel Corp.*, 50 F.R.D. 481, 483 (N.D. Ill. 1970). Abuse exists because the "[p]resence of class allegations in a complaint gives a plaintiff leverage in negotiations. …Courts have accordingly found abuse of the class procedure where a plaintiff obtains a higher settlement for itself by amending a complaint to omit class allegations or by settling a class action without damages for unnamed plaintiffs.… In such cases, the plaintiff effectively abandons other class members' claims when offered the favorable settlement. This potential for such abuse may be most acute before certification of a class." *Wyman v. Conn. Gen. Life Ins. Co.*, 1990 U.S. Dist. LEXIS 18762 at 18–19 (N.D. Ill. Sept. 25, 1990) (citations omitted).

For example, in *Yaffe v. Detroit Steel Corp.*, certain Detroit Steel shareholders, seeking money damages and equitable relief on their own behalf and on behalf of a class of other

DSMDB-2658679v01

shareholders, brought suit to challenge the legality of a tender offer. No formal motion for class certification was filed. Without explaining the circumstances, these plaintiffs subsequently sought and were granted leave by the emergency judge to amend their complaint to strike all reference to a class action. Following this amendment, the named plaintiffs reached a settlement. 50 F.R.D. 481, 483 (N.D. Ill. 1970). The court vacated the emergency judge's order permitting amendment of the complaint. *Id.* The court further ordered a hearing to be held to determine if plaintiffs and their counsel would "fairly and adequately protect the interests of the class." *Id.* Key to this decision was the leverage named plaintiffs had acquired when negotiating their individual claims. *Id.* The court noted that defendants might be willing to pay the plaintiffs a premium for the elimination of a class. The court stated that "[n]o litigant should be permitted to enhance his own bargaining power by merely alleging that he is acting for a class." *Id.* (citation omitted).

Here, the redefining of the Settlement Class to include Objectors during the settlement negotiations, followed by the narrowing of the Settlement Class to exclude Objectors raises the same specter of abuse. The expansion of the class from "literary works" to "all works" provided leverage to class counsel and the class representatives to threaten vastly larger damages. Moreover, the timing of the First Amended Complaint further coincides with commencement of settlement negotiations. *See* Final Notice of Class Action Settlement, at 5 (stating in October 2008, "after more than two years of settlement negotiations"). These circumstances strongly suggest that class counsel and class representatives used the existence of Objectors as members of the class to draw Google to the bargaining table and then discarded them to facilitate a settlement. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279–80 (7th Cir. 2002) (noting that the potential for abuse in a settlement that effects the dismissal of a class action requires judges to "exercise the highest degree of vigilance in scrutinizing proposed settlements").

DSMDB-2658679v01

**B.** **Class Counsel and the Representative Plaintiffs**
**Abused the Class Action Device by Treating**
**Similarly Situated Parties Differently in the**
**Proposed Settlement**

The fact that the Proposed Settlement explicitly excludes Objectors while including

parties who are identically situated further justifies an inference of abuse. *See Mehling v. New*

*York Life Ins. Co.*, 248 F.R.D. 455, 459 n.9 (E.D. Pa. 2008) (noting that relevant factors to

consider in determining whether a proposed settlement is fair, adequate, and reasonable include

"the existence and probable outcome of claims by other classes and subclasses" and "the

comparison between the results achieved by the settlement for individual class or subclass

members and the results achieved -- or likely to be achieved -- for other claimants"); *Manual for*

*Complex Litigation* (Fourth) § 21.61 at n.956 and accompanying text (2004) (noting that treating

similarly situated class members differently is a recurring abuse in class action settlements of

which judges should be wary). *Cf. id.* at § 21.62 (determining that a settlement is fair "calls for a

comparative analysis of the treatment of class members vis-à-vis each other and vis-à-vis similar

individuals with similar claims who are not in the class."); *id.* at § 21.222 ("If the [class]

definition fails to include a substantial number of persons with claims similar to those of the

class members, the definition of the class may be questionable.").

In *McDonald v. United Air Lines, Inc.*, the district court originally defined the class in

an employment discrimination case as "all women who were employed by United as

stewardesses and who resigned or were terminated because of United's no-marriage policy."

587 F.2d 357, 359 (7th Cir. 1978). Then without explanation, the district court vacated the class

order and narrowed the class to include only those women who were discharged between the

certain dates, thus excluding those who resigned under United's no-marriage rule in

contemplation of marriage. *Id.* The Seventh Circuit reversed the district court's judgment and

held that the first class determination was correct. *Id.* at 359–60. The Seventh Circuit found no

DSMDB-2658679v01

distinction between stewardesses who were fired and stewardesses who resigned voluntarily rather than await firing.

Similarly, no distinction exists here between the infringement claims of the Objectors and those of the Settlement Class. Even if class counsel believed there was a conflict between the Objectors and the Settling Plaintiffs, the proper action would have been to create a subclass rather than exclude the Objecting Parties altogether. *See* Fed. R. Civ. P. 23(c)(4) & (5) (a class may be divided into subclasses which may each be treated as a class or the class may be narrowed to deal with specific issues).

## CONCLUSION

For the foregoing reasons, the Proposed Settlement should not be approved by this Court, and Objectors request the right to be heard at the Fairness Hearing on October 7, 2009.

DATED: September 2, 2009

Respectfully submitted,

<div style="margin-left: 40%">

S/ Shirley O. Saed

Charles D. Ossola
Elaine Metlin
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403

Shirley Saed
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY  10019-6708
Tel:  (212) 277-6500
Fax:  (212) 277-6501

Victor S. Perlman
Managing Director and General Counsel
AMERICAN SOCIETY OF MEDIA
PHOTOGRAPHERS, INC.
150 North Street
Philadelphia, PA  19106
Tel:  (215) 451-2767
Fax:  (215) 451-0800

</div>

DSMDB-2658679v01