UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et. al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 05 CV 8136-DC |
| | : | |
| v. | : | **FILED** |
| | : | **ELECTRONICALLY** |
| Google, Inc., | : | |
| | : | |
| Defendant. | : | |

**DECLARATION OF VICTOR S. PERLMAN, ESQ.
IN SUPPORT OF OBJECTIONS OF CLASS MEMBERS, AND MOTION TO
INTERVENE BY, THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC.,
GRAPHIC ARTISTS GUILD, THE PICTURE ARCHIVE COUNCIL OF AMERICA
AND THE NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION, AND
THE OBJECTIONS OF INDIVIDUAL PHOTOGRAPHERS JOEL MEYEROWITZ,
DAN BUDNIK, PETE TURNER AND LOU JACOBS, JR.**

I, Victor S. Perlman, being over 18 years of age, hereby declare as follows:

1.      I am General Counsel and Managing Director of the American Society of
Media Photographers, Inc. ("ASMP"). I have served as General Counsel for the last
fifteen years and as Managing Director for the last fourteen years. Before joining
ASMP, I was in private law practice in Philadelphia for twenty-three years, where
among other clients, I represented photographers on a broad range of copyright,
contractual and other matters. All in all, I have been involved in the negotiation,
protection and enforcement of photographers' rights for over 30 years.

**The Objectors/Proposed Intervenors**

2.      Objector ASMP is the nation's preeminent organization representing the
interests of photographers working in the field of publication photography. Founded by
a group of highly accomplished freelance photographers in 1944, ASMP has long

included in its membership the world's leading photographers whose works have been published in an extraordinarily broad range of publications, including magazines such as *Life*, *Sports Illustrated*, *Vogue*, *National Geographic* and *Time*, and also including books on every conceivable subject, including biographies, textbooks and historical studies, as well as books consisting entirely of their photographs.  ASMP members' photography has also been published throughout the world in newspapers such as *The New York Times*, *The Washington Post*, the *International Herald Tribune* and many others.

3.      ASMP has 39 chapters across the country and its 7,000 members include many of the world's foremost photographers.  ASMP's members are almost entirely freelance photographers who operate small businesses, the principal assets of which are the copyrights to the body of works created by them over the course of their careers. Many of ASMP's members, including most of the individual photographers who join these objections (see §§ 7-10, *infra*), have published their photographs in books that fall within the class defined in the Proposed Settlement Agreement ("Proposed Settlement") *(i.e.*, books consisting of their photographs in which they own the copyrights to both the books and the individual photographs appearing in the books, and which books have been registered in the Copyright Office).  As to these "books" of photographs, those ASMP members are part of the Settlement Class.

4.      However, many of our members – often the same individuals who have one or more "books" covered by the Proposed Settlement - collectively own copyrights in millions of other photographs that the Proposed Settlement has expressly excluded from the definition of "Inserts."  Thus, as for those ASMP members, they own some

works (*i.e.*, "books") that are included, and many that are excluded (*i.e.*, images not included in "books"), from the Proposed Settlement.

5.      Many other members of ASMP do not own copyrights in any "books" of photographs.  Collectively, those ASMP members own copyrights in millions of photographs that are not found in "books" as defined in the Proposed Settlement.  Since such photographs are expressly excluded from the definition of "inserts" under the Proposed Settlement, those photographers are not covered at all by it.

6.      In sum, ASMP has some members who own the copyrights in works (*i.e.*, "books" of photographs) covered by the Proposed Settlement, but for whom the rest of their body of work is not covered.  And ASMP has members who do not own the copyrights in any "books" as defined in the Proposed Settlement.  The inherent unfairness and arbitrariness of this disparate impact of the Proposed Settlement is readily apparent from these facts.

7.      Objector Joel Meyerowitz is an award-winning photographer whose work has appeared in over 350 exhibitions in museums and galleries around the world.  His first book, *Cape Light*, is considered a classic work of color photography and has sold more than 100,000 copies during its 25-year life.  He is the author of 15 other books, including *Aftermath: The World Trade Center Archive*, *Bystander: The History of Street Photography*, and *Tuscany: Inside the Light*.  Meyerowitz is a two- time Guggenheim fellow, a recipient of both the NEA and NEH awards, as well as a recipient of the Deutscher Fotobuchpreis.  His work is in the collection of the Museum of Modern Art, the Boston Museum of Fine Art and many others.

8.     Objector Dan Budnik is an American photographer noted for his portraits of famous people and photographs of the Civil Rights Movement.  Budnik received ASMP's prestigious Honor Roll Award in 1988.  Budnik's work is included in the collections of the King Center in Atlanta, Georgia, and the Museum of Modern Art. Budnik has also exhibited his work at the Agnes gallery.  Budnik is the author of *The Book of Elders: The Life Stories of Great American Indians*, and his photographs appear in numerous other books, including a number of Time-Life books.

9.     Objector Pete Turner's photographs are in the permanent collections of major museums, including the MEP in Paris, the Tokyo Metropolitan Museum of Photography and ICP in New York. The George Eastman House International Museum of Photography and Film in Rochester is the central depository of Turner's life's work. Turner has received innumerable awards from various design groups and photography associations, including The Outstanding Achievement in Photography award from ASMP.  In 1986, Harry Abrams published *Pete Turner Photographs*, Turner's first monograph.  Turner's second monograph, *Pete Turner African Journey*, is the visual diary of his adventures in Africa, which began with his first journey in 1959 from Cape Town to Cairo.  Turner's latest book, *The Color of Jazz*, is a comprehensive collection of his memorable and provocative jazz album covers that have become legendary.

10.     Objector Lou Jacobs Jr. is a freelance editorial photographer whose work spanning more than five decades has been published in dozens of magazines.  In the mid-50s, Jacobs began writing for photographic magazines, illustrating stories with his journalistic and fine art photographs.  In 1960, Jacobs wrote his first "how-to" photography book, followed by 36 more how-to books covering subjects such as

4

photojournalism, selling stock photographs, studio photography, a college textbook and

more.  His best selling books are *Petersen's Basic Guide to Photography* (1973 -

500,000 copies) and *How To Take Great Pictures with Your SLR* (1974 - 300,000

copies). Jacobs has also worked with numerous book publishers, authoring 15 books for

young readers on topics such as air traffic control, transportation, space exploration,

Polaroid photography and jumbo jets.  Jacobs was President of ASMP in 1984-85 and

served on the national ASMP Board of Directors for more than 15 years.  His prints are

in the collections of George Eastman House, Los Angeles County Museum of Art,

International Center of Photography and California Museum of Photography.

### ASMP's Mission

11.     Since its founding in 1944, ASMP has been at the forefront of freelance

photographers' struggle to protect and commercially benefit from the value of their

copyrights in their photographs.  Generally, ASMP members retain their copyrights and

grant their clients one-time publication rights for the use of the licensed photographs in

specified publications, or for certain periods of time, or for specified purposes.  As

ASMP has advocated for many years, photographers must attempt to preserve their

ownership of the copyrights in their published photographs, for it is those photographs

that generally have the greatest value in the marketplace as potentially licensable to other

clients for other purposes (or to the same clients for different purposes).  Those

copyrights are the source of a valuable and continuing stream of income.  Accordingly,

ASMP's members have historically depended on their retention of copyright rights in

their works, and the corresponding revenue stream that results from licensing them in the

marketplace, to sustain their businesses and build a foundation for their retirement income.

12.     Throughout the years, ASMP has fought to protect the rights of photographers through negotiations with publishers, by participating in significant copyright cases in the federal courts, in policy discussions and testimony before the Copyright Office, in legislative consideration of copyright reform in the Congress and in educational campaigns to provide useful information to its members about copyright law, contractual issues and good business practices.  Among the most notable of the copyright cases in which ASMP participated as an *amicus curiae* was the Supreme Court case of *Community For Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), which unanimously rejected the argument that freelance photographers' works should be considered "works made for hire" under the 1976 Copyright Act.  This important victory preserved freelance photographers' copyright rights in their works created for publication purposes (absent a written agreement to the contrary) and confirmed that they should not be considered "employees" of publishers or other corporations for copyright purposes, but not for any other purposes.

13.     ASMP also filed an *amicus curiae* brief in one of the first Supreme Court cases to address the impact of digital technology on the rights of authors and other creators.  In *The New York Times Co., Inc. v. Tasini*, 533 U.S. 483 (2001), ASMP argued, and the Court ultimately held, that publishers could not re-use an author's work first published in a periodical in an electronic compendium of such periodicals on the false premise that the compendium was a "revision" of the original issue under §201 (c) of the Copyright Act.

14.    ASMP similarly supported photographer Jerry Greenberg in his ultimately unsuccessful battle with the National Geographic Society over its alleged right to re-publish Greenberg's photographs without his permission in an electronic collection of the issues of *National Geographic* magazine. *Greenberg v. Nat'l Geo. Soc.*, 244 F. 3d 1267 (5th Cir. 2001).

15.    The success of freelance creators in *Tasini*, followed by the setback in *Greenberg*, are illustrative of the volatile legal landscape in which photographers, graphic artists, illustrators and other copyright owners or their licensees that derive income from licensing of visual images in books (collectively "Visual Arts Rights Holders") struggle to retain and economically benefit from their copyrights in their works.

**The Challenges Faced by Photographers and Other Visual Arts Rights Holders**

16.    I have personally testified before Congress and the Copyright Office on numerous occasions on behalf of ASMP on a broad range of issues implicating the copyright rights of photographers.  Recently, these issues have included Congress' consideration of the copyright status of so-called "orphan works," the Copyright Office's roundtables on "orphan works," its efforts to facilitate group copyright representation of photographs by freelance photographers and its consideration of amendments to §108 of the Copyright Act.

17.    As Congress and the Copyright Office have long recognized, and as ASMP members have long experienced, photographers and other Visual Arts Rights Holders have historically been among the most vulnerable of copyright owners with respect to their ability to retain and profit from their copyrights.  Like other individual or

7

small business copyright owners, photographers and other Visual Arts Rights Holders have traditionally found themselves in a weak bargaining position when negotiating with publishers, corporations and other clients.

18.     With the decline of traditional media such as magazines and newspapers, combined with the rise of new forms of electronic media, the negotiating position and economic status of publication photographers and other Visual Arts Rights Holders have dramatically declined.  Thousands of professional photographers and Visual Arts Rights Holders have been forced to abandon their profession because they simply could not make a living.  Those who have survived have suffered a decline in income and increasingly few opportunities to license their works.  The consolidation of potential clients has resulted in a worsening of the "David and Goliath" bargaining position for photographers and other Visual Arts Rights Holders.  The recent economic downturn has exacerbated these problems, and Visual Arts Rights Holders have sought new and innovative ways to license their works, especially in the context of the expanding opportunities available via electronic media.

19.     The digital age has also presented new challenges to photographers and other Visual Arts Rights Holders with respect to the growing and widespread infringement facilitated by the Internet.  Even before the proliferation of infringement on the Internet, they generally found it impractical and beyond their means to file copyright infringement actions in the federal courts.  They often lacked the resources to register their substantial bodies of works in the Copyright Office on a regular basis, which resulted in the unavailability of statutory damages under the Copyright Act.[1].  Aside

---

[1]     Under § 412 of the Act, registration of a work in the Copyright Office prior to the commencement of infringement has been and remains a prerequisite to entitlement for statutory

from the limited damages available to photographers and other Visual Arts Rights

Holders, they did not have the staff or resources, financial or otherwise, to sustain

lengthy and frequently complex copyright battles, particularly against corporate

infringers.  Other factors have made it almost impossible for them to find copyright

attorneys who are willing to accept representations in infringement actions on a

contingent fee basis.  As a result, photographers and other Visual Arts Rights Holders

lack any effective remedy to stop traditional forms of copyright infringement, much less

to address the ubiquitous infringement of copyrights via electronic means (such as by

digitizing photographs with a scanner) that have been greatly facilitated by the Internet.

       20.    At the same time, the new and innovative uses of images and other

copyrighted works in Internet publications has opened up potentially lucrative new

opportunities for electronic licensing.  But photographers and other Visual Arts Rights

Holders, like other individual and small business owners, have lacked the resources and

infrastructure to take advantage of these opportunities—a plight worsened by the Fifth

Circuit's retrenchment in *Greenberg* from freelancers' success in the Supreme Court in

the *Tasini* case.  Ironically, it is the Internet that presents both the greatest dangers to the

value of Visual Arts Rights Holders' copyrights and the greatest opportunities for

creating and exploiting new markets for digital uses of copyrighted materials.  Thus far,

photographers and other Visual Arts Rights Holders have suffered the consequences

associated with widespread infringement on the Internet and have been

---

damages of $ 750 to $ 30,000 per work infringed, which can be increased to a maximum of
$150,000 per work infringed. *See* 17 U.S.C. §§ 412, 504(c)(1),(2).  Photographers filing an
infringement action usually register their photographs shortly before commencing the action,
thereby limiting damages to actual damages or the defendant's profits attributable to
unauthorized use of the work. *Id.* § 504(b).

unable to benefit from new potential licensing opportunities that medium presents.

## Other Organizations Joining in ASMP's Objections

21.     The other organizations joining in ASMP's objections, which include the Graphic Artists Guild ("GAG"), the Picture Archive Council of America ("PACA"), and the North American Nature Photography Association ("NANPA"), also represent the interests of freelance creators facing a challenging digital environment.  I am authorized to submit this declaration on their behalf, and on behalf of their members, as well as on behalf of ASMP and its members.

22.     The negotiating positions of the members of GAG, PACA and NANPA are as weak as those of ASMP members.  The members of those organizations face similar legal and business challenges and uncertainties to those faced by ASMP's members.  Their members often struggle merely to survive in this economic climate.

23.     Facing similar challenges and uncertainties to those confronting ASMP, GAG, PACA and NANPA share ASMP's concerns about the potentially disastrous impact of the Proposed Settlement upon Visual Arts Rights Holders working in any media.  As discussed below, the combination of the exclusion of many Visual Arts Rights Holders from the Proposed Settlement with the enormous market impact that would result from the new business model it would establish, suggest that its approval would damage their negotiating position, suppress price competition and establish market "norms" that would be both adverse and difficult to avoid for all of them.

## The Authors Guild Class Action Against Google

24.     ASMP first learned that Google was digitizing thousands of books without the authorization of copyright owners when announcements about the Google "Book

Project" became public in 2004. ASMP had no specific knowledge that photographs in the digitized books were also being copied by Google, which we later found out was indeed occurring.

25.   With the public announcement of the filing of the class action by the Authors Guild, ASMP became aware that authors were challenging the legality of Google's "Book Project" and were seeking both injunctive relief and damages for Google's unauthorized digitization of their works. At about the time that I became aware that the class action would be or had been filed, I contacted Paul Aiken, Executive Director of the Authors Guild, to see whether and how ASMP and its members could be involved in the litigation. He informed me that the class action was limited to texts and text authors because he and/or class counsel wanted to keep an already complex situation as comparatively simple as possible.

26.   Shortly after the announcement of the Proposed Settlement, ASMP's Executive Director Eugene Mopsik, GAG's Executive Director Tricia McKiernan, and I had a meeting in November 2008 with class counsel Michael Boni about the Proposed Settlement and how it might affect the interests of photographers. Among the matters discussed was the possibility that ASMP would make direct contact with Google for the purpose of undertaking face-to-face negotiations to resolve photographers' concerns about the Google "Book Project." In fact, we had scheduled a meeting with Google in order to explore resolution of our concerns.

27.   Shortly thereafter, I received a request from Mr. Boni to participate in a conference call with him and Paul Aiken. On or about December 19, 2008, ASMP Executive Director Eugene Mopsik and I joined them in a conference call. During that

conference call, Mr. Boni discouraged us from engaging in any direct discussions with Google. He advised us that any such discussions at that point could taint the propriety of any settlement into which ASMP and Google might enter in connection with any class action that ASMP might file. Based on Mr. Boni's advice, we canceled our meeting with Google.

28.     At no time during these conversations was I informed by the Authors Guild or by class counsel that during the course of the lawsuit, indeed while the Proposed Settlement was being negotiated, the class definition had been expanded to include all copyright owners, including photographers, owning the copyrights to works in the University of Michigan library. *See* First Amended Class Action Complaint, filed July 24, 2006, ¶ 22. To the contrary, class counsel and the Authors Guild affirmatively misled us by failing to advise us that the class had previously been expanded to encompass photographers and other copyright owners.

29.     From July 2006, when the class was expanded to include photographers and other Visual Arts Rights Holders, until the Proposed Settlement was made public in October 2008, ASMP was unaware that the class had been increased to encompass them. To my knowledge, no one at ASMP and not a single one of our members, was ever informed about, or was aware of, this significant—and to Visual Arts Rights Holders critically important--expansion of the class.

30.     ASMP was also unaware, prior to the October 2008 announcement of the Proposed Settlement, that settlement discussions were underway among authors, publishers and Google. We were never contacted by Mr. Boni or any class representative informing us that photographers were included in the class or soliciting

our input or participation in the settlement discussions, which I understand went on for over two years.

31.     Lacking notice that the class had been expanded to include photographers and other Visual Arts Rights Holders and lacking any knowledge of the existence or substance of the settlement negotiations, ASMP was unable to protect the interests of its members in the negotiations.  This is a particularly disturbing consequence, given that it is now abundantly clear that class counsel and the class representatives apparently had no intention of including most photographers' works in the Proposed Settlement, despite their expansion of the class definition in July of 2006.  The same lack of knowledge was true of other organizations, such as GAG, PACA and NANPA, whose members were also added by the expanded definition of the class effectuated in July of 2006.  In reality, class counsel and the class representatives not only failed to represent the interests of photographers and other Visual Arts Rights Holders in the class action litigation and in the settlement discussions, they affirmatively sacrificed those interests in order to promote the interests of a subset of class plaintiffs—authors—and class counsel's own interests in the attorneys' fees that would be paid under any class action settlement approved by the Court.

32.     ASMP had no notice or knowledge that the class definition had been expanded to include photographers and other Visual Arts Rights Holders, and then narrowed to exclude most of their works, until well after the Proposed Settlement was announced -- when ASMP retained special counsel with class action expertise to review the pleadings and advise ASMP as to its rights and potential courses of action.  Only then did ASMP discover the existence of the First Amended Complaint, filed on July 24,

2006, in which the class was expanded to include "all persons or entities that hold the copyright in a work that is contained in the library of the University of Michigan." *See* First Amended Class Action Complaint, ¶ 22. The definition of "works" in that pleading did not exclude photographs and was not limited to books; to the contrary, "works" were defined simply as "those works that are not in the public domain...." *Id.* § 3.

33.    We further discovered that in connection with the Proposed Settlement and the new "Settlement Class" of authors and publishers only, class counsel had filed (and Google and the publishers had approved) a Second Amended Class Complaint on October 28, 2008. In that pleading, the "class" was both narrowed and expanded; it was narrowed to include only authors and publishers, thereby excluding most photographers and other Visual Arts Rights Holders, and it was expanded to apply far beyond the scope of the University of Michigan collection. In fact, the new class was unlimited with respect to the "books" and "inserts" as to which the provisions of the Proposed Settlement would apply: "[A]ll persons or entities that have a United States copyright interest in one or more Books or Inserts." *See* Second Amended Complaint, filed Oct. 28, 2008, ¶ 34.

34.    Thus, remarkably, the newly narrowed and yet widened class applied to any "book" (as defined in the Proposed Settlement) regardless of where it was located, thereby giving Google the right to digitize any "book" far beyond the confines of the University of Michigan collection. However, "inserts" were defined narrowly to specifically exclude photographs, graphic arts and illustrations, while inexplicably including such works as "children's Book illustrations" in that definition (along with tables, charts, graphs, musical notations. Settlement Agreement ("S.A."), ¶ 1.72.

**The Impact of the Proposed Settlement on Photographers and Other**
**Visual Arts Rights Holders**

35.     The Proposed Settlement, if approved, will likely have a profoundly

negative impact on the interests of photographers and other Visual Arts Rights Holders

who are both excluded from the settlement terms and yet will be adversely affected by

them.                                             .

36.     First, and most obvious, Google has committed wholesale, willful

copyright infringement of photographs and other visual copyrighted works such as

illustrations published in "books", and yet photographers and other Visual Arts Rights

Holders will be paid nothing for past infringement.  By its own admission, Google "has

already digitized over seven million books", all without authorization of the copyright

owner(s).  *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary

Settlement Approval ("Pls. Mem."), at 4.  Many of those books contain photographs,

graphic art or other non-text works which the copyrights were retained by their creators,

and the publishers were granted one-time publication rights.  Yet not a cent of the $45

Million set aside by the Proposed Settlement for payment of compensation for past

infringements would be paid to photographers or other Visual Arts Rights Holders, with

the narrow exception of those who themselves (rather than the publisher or author) own

the copyrights in the "books" that were scanned by Google.

37.     There are, of course, many published books of photographs and graphic

art in existence and some of them, presumably, have already been digitized by Google.

But the vast majority of books have copyright owners other than photographers or other

Visual Arts Rights Holders.  That is true even for those books (in fact most books) that

contain photographs or graphic art in which the copyrights to those photographs are not

owned by the authors or publishers, but rather by the creators of those work.  For these books, even though the entire contents therein have been digitized by Google, the copyright owners of those photographs and visual art receive zero compensation under the Proposed Settlement.  There is no conceivable justification for this unjust result that deprives a significant subset of the class of any compensation for past infringement.

38.     Second, under the Proposed Settlement, Google would have an unlimited license to digitize and commercialize "books" in the future, and yet photographers and other Visual Arts Rights Holders would be excluded from the revenue-sharing formula specified for "Google's future commercial uses of the Settlement Class members' works."  Pls. Mem. 2.  Thus, one of the principal benefits of the Proposed Settlement for Settlement Class members would not benefit most photographers or other Visual Arts Rights Holders.  Potentially millions of "books" include photographs, graphic art or other non-text works in which the copyrights are owned by their creators.  Yet,  when Google digitizes these "books" and commercializes their contents in the future, photographers and other Visual Arts Rights Holders would receive no compensation for either the digitization itself (indeed, they would have no advance knowledge that such unauthorized digitization was about to occur), or for the subsequent commercialization of the "books."

39.     The granting of a virtually unlimited license to Google to commercialize books, together with the complete lack of compensation for past infringement and future unauthorized uses of non-text works in those books, would be manifestly unfair to photographers and other Visual Arts Rights Holders.  It is undisputed that Google has already digitized millions of "books" from the University of Michigan library and other

library collections that contain photographs, graphic art and other non-text works in which authors and publishers are not the copyright owners. Google has made clear its intention to continue this massive digitization effort in the future, which the Proposed Settlement would purport to authorize. Pls Mem. at 8. But the owners of the copyrights in those works have not authorized either the past or future digitization of them, and would receive no compensation for such willful infringement.[2]

40.     Under the Proposed Settlement, "Google is authorized to, in the United States, sell subscriptions to the Institutional Subscription Database, sell individual Books. . . and make other commercial uses of Books. . . . " S.A. § 2.1(a). Presumably, Google intends to remove, or otherwise block the display of, photographs, graphic art and other non-text works in a "Book" before they are sold or displayed to subscribers or other Google customers. We have serious reservations as to how successful any such efforts would be, and believe that it is likely that many "Books" will be sold or displayed in their entireties, including photographs, graphic art and other non-text works.[3] For those photographs, graphic art and other non-text works included in the sale or display of "Books," Google would, in effect, acquire a royalty-free license for the use and display of those works. Convincing others to pay fair compensation for other uses or displays of these works will be a difficult proposition at best.[4]

---

[2]     Under the Proposed Settlement, to "digitize" a work involves the act of copying that work "into an electronic representation." S.A. § 1.46. This constitutes a violation of the copyright owner's exclusive right "to reproduce the copyrighted work in copies. . . ." 17 U.S.C. § 106(1). The subsequent acts of distributing and/or displaying digitized photographs to the public would constitute additional, separate acts of infringement. *Id.* § 106(2), (5).

[3]     As the Settling Parties state, "the value of the Subscription Database is enhanced by the extent to which it is comprehensive. . . . " Pls. Mem. at 12, n.8.

[4]     The Proposed Settlement provides that "[e]xcept as expressly permitted. . . Google shall not (i) display any Expression from Books or Inserts. . . . " S.A. § 3.10(a). This prohibition

17

41.     Third, the valuation scheme provided for in the Proposed Settlement, while not specifically applicable to photographs, graphic art and most other non-text works, would very likely become the "market standard" if the Proposed Settlement is approved.  The payment by Google of a mere $15 per "insert" or $60 per "book" for past infringement is woefully inadequate and comes nowhere close to approximating the true market value of any particular copyrighted work, which is often dictated by the stature and reputation of the photographer or Visual Arts Rights Holder, the quality of the image, graphic art or illustration and the proposed uses that the licensee contemplates. Such paltry amounts surely would not fairly compensate photographers or other Visual Arts Rights Holders, even if they were included in the Proposed Settlement.

42.     Ironically, having been excluded from the terms of the Proposed Settlement and without class counsel, class representatives, or anyone else representing their interests in the litigation or the settlement negotiations, photographers and other Visual Arts Rights Holders would be victimized by its consequences.  This is because the market power of Google and the publishers is such that any negotiations for fair compensation for the use of a Visual Arts Rights Holders work in the future is likely to be circumscribed—that is, capped--by the nominal amounts to be paid for "books" and "inserts" under the Proposed Settlement.  There would be a "market standard" in place

---

addresses only "Books" and "Inserts" as defined, and the definition of the latter (as discussed above) excludes photographs, graphic art and most illustrations.  S.A. § 1.72.  Thus, the prohibition against the display of the contents of "Inserts" except as authorized by the Proposed Settlement is meaningless for most photographers and other Visual Arts Rights Holders.  More importantly, for those photographs, graphic art and other non-text work included in "Books" of which the photographers and other Visual Arts Rights Holders are not the copyright owners, they nevertheless have no "standing" under the Proposed Settlement to object to the display of their copyrighted material by Google because they are not "Rightsholders" as defined therein. *See* S.A. §1.132 (defining "Rightsholders" as "a member of the Settlement Class which does not opt out of the Settlement by the Opt-Out Deadline.")

18

that valued past infringement, and arguably future infringement, at extraordinary low levels of compensation. And for those photographers and other Visual Arts Rights Holders seeking to license their works for future uses, especially in the digital context, this Proposed Settlement is likely to dominate the marketplace to such an extent that they will be unable to obtain fair compensation in such licensing transactions.

43.     Photographers and other Visual Arts Rights Holders would thereby suffer the worst of both worlds---cut out of almost all of the potential benefits flowing from the Proposed Settlement (however meager they may be), and yet permanently and adversely affected by the marketplace impact of the *de minimus* valuations reflected in the settlement terms. Further, if the Proposed Settlement --- and new definition of the narrowed and yet expanded "Settlement Class" --- were to be approved by the Court, it would serve *de facto*, and perhaps *de jure*, as a limiting factor if photographers or other Visual Arts Rights Holders were to attempt to file a separate class action against Google.

44.     Finally, and going right to the heart of the fairness issue, photographers and other Visual Arts Rights Holders were deprived of a seat at the negotiating table, and their interests as class members were unprotected---indeed, as noted above, they were sacrificed. Class counsel and class representatives abandoned the interests of identically situated members of the class in order to strike a deal with Google that stands to richly reward themselves and/or their members ($125 Million, including fees to class counsel of $30 Million, is a very rich reward, indeed).

45.     In my view, the sordid record of this litigation starkly demonstrates the dangers of one subgroup of class members acting for their own benefit (and facilitated by class counsel) and to the detriment of other class members. Photographers and other

Visual Arts Rights Holders were used in order to enhance the bargaining position of the authors and then cast adrift. Photographers and other Visual Arts Rights Holders were added to the class in the First Amended Complaint, thereby benefiting the negotiating position of the authors. Photographers and other Visual Arts Rights Holders were then unceremoniously dumped overboard by class counsel and class representatives in the Second Amended Complaint – but only after that enhanced bargaining position had succeeded in driving a settlement between authors, publishers (who were not even part of this class action until they were added in the Second Amended Class Complaint) and Google.

46.    I submit to the Court that this brazen and unjustified abuse of the class action process should not be ignored, condoned or rewarded. I further submit to the Court, on behalf of the members of ASMP, GAG, PACA, NANPA and Visual Arts Rights Holders everywhere, that approval of the Proposed Settlement, as currently constituted, would be a grave injustice to the interests of photographers and all other Visual Arts Rights Holders around the world, and to the public interest in a fair and reasonable resolution of this unprecedented dispute.

I declare under penalty of perjury the foregoing is true and correct.

Dated: September 2, 2009

Victor S. Perlman