UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et. al.,<br><br>            Plaintiffs,<br><br>    vs.<br><br>Google Inc.,<br><br>            Defendant. | Case No. 05 CV 8136 (DC) |

## **OBJECTIONS TO THE PROPOSED SETTLEMENT AGREEMENT**

### **Preliminary Statement**

    DC Comics has a Copyright Interest, as defined by the proposed Settlement Agreement (the "SA"), in thousands of works impacted by the proposed SA. As a class member, DC Comics respectfully objects to the proposed SA.[1]

    Under the proposed SA, Google will obtain a significant position in several book search-related markets and will shift the burden of determining copyright ownership to, and will impose significant administrative expenses and monitoring costs upon, copyright owners. This agreement is unique for the vast array of rights it awards a litigant in the form of a so-called "settlement". It is extraordinary that such rights can be negotiated and potentially conveyed in

---

[1] Time Warner Inc. has a number of subsidiaries each of which is separately incorporated. Each of Time Warner Inc. and its other subsidiaries are discrete and distinct corporate entities from DC Comics. Each separate corporate entity will take its own independent position regarding the proposed SA. AOL LLC is not a member of either Sub-Class and therefore takes no position regarding the settlement.

the form of what purports to be a "class action". Accordingly, on both procedural and substantive grounds, DC Comics objects to the proposed SA as set forth below.

As DC Comics understands the origins of the class action lawsuit and the proposed settlement, Google's stated goal is "to make the full text of all the world's books searchable by anyone".[2] The more books scanned and indexed, the more valuable Google's search tool and revenue models become. In an effort to populate and promote use of its Google Book Search product, Google scanned and displayed thousands of in-copyright works without authorization or license from the copyright owners. Instead of respecting the interests of copyright owners, Google appears to have applied a "copy first and negotiate later" approach. In so doing, Google has cast an extraordinarily wide net—and caught an unbelievably big fish in the form of a settlement that would essentially provide it with legal rights to precisely that which it sought to take illegally.

If approved in its proposed form, the SA would grant Google a license to scan, display and sell access to millions of in-copyright works—both those that are commercially available and those that are out-of-print works, including orphan works (*i.e.*, in-copyright works for which the owner cannot be identified or located). No other digital books provider is similarly positioned to receive such rights—indeed, to follow the Google model a would-be digital competitor would need to "copy first and negotiate later". Accordingly, once approved and implemented as intended, access to millions of works will be consolidated into one company. Moreover, all of this access comes at an enormous cost to the fish caught within the net—the copyright owners.

---

[2] *See* Posting of Adam M. Smith (Google Print Product Manager), Official Google Blog: Making books easier to find, http://googleblog.blogspot.com/2005/08/making-books-easier-to-find.html (Aug. 12, 2005, 1:31 pm PDT) (describing the goals of Google Print, later renamed Google Books).

As written, the proposed SA shifts significant administrative costs from Google onto Rightsholders[3] by turning basic licensing defaults on their head.  Under the proposed SA, Google is not required to seek approval to digitize and display in-copyright but out-of-print works.  Instead, the onus is on Rightsholders to initiate contact with Google and to provide copyright ownership and other information.  For Rightsholders who participate in the proposed SA and who are intent on protecting their copyrights, the proposed SA's scheme imposes substantial administrative and monitoring costs.  Moreover, copyright owners seeking to opt out of the proposed SA also bear significant transaction costs.  In order to meaningfully opt out of the Settlement, a copyright owner must identify all persons with a Copyright Interest in a Book or Insert and ensure that each opts out.  *See* SA § 17.33.  In an industry where copyright owners often license and transfer media rights, the proposed SA's opt out mechanism does not meaningfully address a predominate form of conducting business.  DC Comics remains a settlement participant only as a means to shelter its works from the pernicious effects of the Settlement.  DC Comics does not support the approval of the proposed SA.

Should the Court approve the proposed SA, there would continue to be a host of critical unknowns that would likely compound the administrative cost problem.  When reviewing the proposed SA, "the court's primary concern is with the substantive terms of the settlement and, thus, the court needs to compare the terms of the compromise with the likely rewards of litigation".  *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 112 (S.D.N.Y. 1999) (internal quotations and alterations omitted).  Further, the court must also determine the adequacy of Class Counsel and the ability of the Class Counsel to represent the interests of the entire class.  *Id.* at 112, 118-19.  It is apparent from the terms of the proposed SA that Class Counsel did not

---

[3] Under the proposed SA § 1.132, "Rightsholder" is defined as "a member of the Settlement Class who does not opt out of the Settlement by the Opt-Out Deadline".

contemplate many of DC Comics' works during settlement negotiations. Many of DC Comics' works are ancillary to the primary dispute between Google, authors and publishers. Nevertheless, the proposed SA sweeps in thousands of its works. Accordingly, DC Comics, as a bystander to the original dispute, now faces a series of open-ended questions. Without further refinement of the proposed SA, Rightsholders will likely become burdened with additional costs. DC Comics respectfully requests that the Court reject the proposed SA and suggests that Google and Class Counsel clarify the proposed SA terms and provide additional precision in the following areas:

- First, the terms "Book", "Insert" and "Periodical" are unduly broad and create uncertainties for various categories of material including individual comic books, original graphic novels and collected comic book editions.

- Second, Google's obligation under SA § 3.2(d)(ii) to identify the commercial status of Books is indefinite and open-ended. A more precise interval is necessary to protect Rightsholders.

- Third, as SA § 17.33 is currently drafted, an opt-out will be effective only if *all* members of the Settlement Class with a Copyright Interest in a particular Book or Insert opt out. In order to provide a meaningful opt-out right, an opt-out by *any* copyright owner should control.

- Fourth, the implementation procedures of the proposed SA remain undeveloped and uncertain. In order to further examine the administrative costs of the proposed SA, the Court should require a demonstration of the Settlement's implementation. Further, the Court, through a special master or otherwise, should monitor the performance of the settlement mechanisms to ensure the fairness and reasonableness of the proposed SA as implemented.

## Argument

I. **Rule 23(e) Requires a Class Settlement to be Fair, Reasonable and Adequate.**

Rule 23(e) requires that a court approve any dismissal or settlement of a class action. Under this Rule, a court may approve a class action settlement only if its terms are "fair, reasonable, and adequate". Fed. R. Civ. P. 23(e)(2). In approving a proposed class action

settlement, the district court "act[s] as the protector of the rights of the absent class members, who will be bound by the res judicata effects of the settlement". *Polar Int'l Brokerage Corp.*, 187 F.R.D. at 112.

II. **The Proposed SA Rewards Google With a Significant Position in Several Book Search-Related Markets and Will Shift Administrative Costs to Rightsholders.**

  A. **The Proposed SA is a "Land Grab"—It Gives Google Too Much Control Over Copyrighted Works.**

Google's goal is to maximize book search-related revenues by making the full text of as many books as possible searchable by anyone. Prior to this lawsuit, Google pursued two types of arrangements to populate its books database: the Partner Program and the Library Project. Under the Partner Program, Google entered into traditional licensing agreements with Publishers.[4] Despite these agreements, Google attempted a "land grab" for in-copyright books. It adopted a "scan and display first, ask questions later" operating principle for the Library Project. Google asserted a unilateral right to scan entire works of copyrighted material and display portions of such works without first obtaining copyright owners' permission.

Under the proposed SA, Google has achieved its goal. If approved, Google would obtain a broad license to digitize and display millions of in-copyright Books, including orphan works; a legal protection currently unavailable to digital book rivals. Accordingly, Google would obtain a significant position in several book search-related markets (*e.g.*, search, advertising, consumer purchases, institutional subscriptions).

---

[4] According to Google's website, numerous Publishers joined Google's program in 2004: Blackwell, Cambridge University Press, the University of Chicago Press, Houghton Mifflin, Hyperion, McGraw-Hill, Oxford University Press, Pearson, Penguin, Perseus, Princeton University Press, Springer, Taylor & Francis, Thomson Delmar and Warner Books. *See* About Google Book Search—History, http://books.google.com/intl/en/googlebooks/history.html (last visited Aug. 25, 2009).

B. **The Proposed SA Shifts Substantial Administrative Expense and Monitoring Costs from Google to Rightsholders.**

The proposed SA shifts the burdens and administrative expense of copyright licensing from Google to Rightsholders. The traditional copyright scheme places the burden on the user to determine the ownership of a particular copyrighted work and negotiate a license with the copyright owner. *See* 17 U.S.C. § 101 *et seq.* The proposed SA, however, turns copyright licensing on its head.

Under the proposed SA, Google has no responsibility to conduct a reasonably diligent search for Rightsholders prior to reproducing and displaying millions of Books. *See, e.g.,* SA §§ 1.28, 3.2(b), 3.2(d)(i)-(ii), Attach. A § 3.1 (describing a set of default display rules for Books that are not Commercially Available). Instead, the Rightsholder must initiate contact with Google in order to control the reproduction and display of her work. Accordingly, Rightsholders bear the administrative and monitoring costs of the licensing scheme. *See, e.g.,* SA § 3.2(e)(i) ("[a] direction to change the classification of a Book to a No Display Book . . . must be initiated by the Rightsholder of the Book"); § 3.5(a) (Rightsholder must affirmatively identify each Book to be Removed); § 3.5(b) (Rightsholder must affirmatively identify each Book to be Excluded from particular Display Uses, Revenue Models, etc.); § 13.1(c)(iii) (Rightsholder must provide "information sufficient" to identify each Book claimed). Rightsholders become data-entry drones for Google, turning over publishing and private contract data for each and every work included in the proposed SA. *See* SA § 13.1(c).

C. **The Proposed SA Creates a Dangerous Precedent and Makes Similar Copyright "Land Grabs" More Attractive.**

As noted, Google made a calculated business decision to pursue their book search ends without approval or licenses from copyright owners. If the proposed SA is approved, Google will leapfrog digital book rivals by obtaining rights to digitize and display millions of

Books while shifting administrative and monitoring costs to Rightsholders. Accordingly, approval of the proposed SA will set a dangerous precedent by "lower[ing] the cost of infringement to infringers, thus making infringement more attractive". *Davis v. Blige*, 505 F.3d 90, 106 (2d Cir. 2007) (noting that an "economic incentive to infringe runs directly counter to the intent of Congress in passing 17 U.S.C. § 504—namely to compensate the copyright owner for losses from the infringement, and . . . to prevent the infringer from unfairly benefiting from a wrongful act" (internal quotations and citations omitted)). If Google is rewarded for its "land grab" in this instance, Google (and others) will have the incentive to pursue similar actions in other contexts.

III.  **If the Proposed SA is Approved Without Clarification and Increased Precision, Rightsholders Will Likely Face Additional Administrative Costs.**

    A.  **The Terms "Book", "Insert" and "Periodical" are Unduly Broad and Create Uncertainties for Several Categories of Works.**

The proposed SA casts an unduly broad net and will likely cause unintended consequences for many copyright owners. The breadth of the terms also indicates that Class Counsel inadequately represented the interests of non-traditional authors and publishers. As defined in the proposed SA, the term "Book" reaches far past its ordinary meaning. For example, under the proposed SA, "Book" could arguably include calendars and movie scripts. *See* SA § 1.16 ("a written or printed work . . . published or distributed to the public or made available for public access as a set of written or printed sheets of paper bound together in hard copy form"). Accordingly, SA § 1.16 should be amended to exclude calendars, scripts, and any other ancillary works, the inclusion of which, would extend the proposed SA past the dispute between Google, authors and publishers.

Moreover, the terms "Book", "Insert" and "Periodical" create uncertainties for various categories of material owned by DC Comics: individual comic books, original graphic

-7-

novels and collected editions. S*ee* SA §§ 1.16, 1.72, 1.102. For example, the proposed SA does not clearly define whether an individual comic book published by DC Comics is a "Periodical" and, therefore, excluded from the settlement. DC Comics interprets the proposed SA to define these works as Periodicals. However, because the meaning remains unsettled, the status of thousands of individual comic books hinges on this ambiguity (which is further clouded by the inclusion of some individual comic books in the "Books Database"[5]). Accordingly, DC Comics respectfully requests that the parties amend SA § 1.102 to explicitly include individual comic books as "Periodicals" and, therefore, exclude such works from the proposed SA.

Similarly, the status of collected editions (*e.g.*, issues one through six of a Batman series) and original graphic novels remains unclear. Conversations with Class Counsel indicate that Class Counsel did not contemplate the effect of the proposed SA on such works, even though such works have experienced a strong rise in popularity in recent years.[6] DC Comics interprets the proposed SA to define these works as Books. However, the illustrated nature of these works may create an ambiguity under the proposed SA, because the definition of Book includes all Inserts, and the definition of Inserts specifically excludes "pictorial works, such as . . . illustrations". *See* SA §§ 1.16, 1.72. Accordingly, DC Comics respectfully requests that the parties amend SA § 1.16 to explicitly include original graphic novels and collected editions as "Books" and, therefore, include such works in the proposed SA.

Further, under the proposed SA, a work is only considered a Book if it has been registered with the United States Copyright Office as of the Notice Commencement Date. *See* SA § 1.16. Without clarification and additional precision, this definition could be interpreted to

---

[5] *See* SA §§ 1.18, 3.1(b)(ii).

[6] The New York Times recently began publishing a "best sellers" list for "Graphic Books", which includes both collected editions and original graphic novels.

exclude from the proposed SA copyrighted works that have not been registered by DC Comics for any number of reasons. As an example, individual contributions to a "collective work" or "compilation"[7] are often registered, but the compilation or collected edition may not be. If the individual works are registered, the compilation or collected edition of such individual works should qualify as a "Book" regardless of each individual works' inclusion in (or exclusion from) the proposed SA and notwithstanding the compilation's or collected edition's registration status.[8] Accordingly, DC Comics respectfully requests that the parties amend SA § 1.16 to clarify that compilations of individually registered works are "Books" whether or not there is an independent registration for the compilation.[9]

> B.  **Google's Responsibility to Make a Determination of Commercial Availability is Indeterminate and Open Ended.**

Under the proposed SA, Google's initial determination of commercial availability will occur "as of the Notice Commencement Date and thereafter *from time to time*". SA § 3.2(d)(ii) (emphasis added). DC Comics often reprints works several years after a work goes out

---

[7] As such terms are defined in the Copyright Act, 17 U.S.C. § 101.

[8] *C.f.* 2 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 7.16[B][2][b] (Matthew Bender, Rev. Ed. 2009) ("Given that a derivative work by definition consists of matter that would be infringing if it had been derived from the pre-existing work without the copyright proprietor's consent, it follows analytically that the owner of a registered underlying work, in that capacity alone, should be able to maintain such a suit. So long as the infringement relates to material common to both the underlying and derivative work, the copyright owner can simply allege violation of the former.").

[9] Even if the parties were to make the changes suggested above, copyright owners would continue to face a substantial risk of copyright infringement. Notably, Google has not made any commitment to refrain from adopting the same "copy first and negotiate later" approach for works deemed outside the scope of the proposed SA (*e.g.*, Periodicals, unregistered works, works registered after the Notice Commencement Date). DC Comics remains concerned that Google would continue to copy and display many of DC Comics' works without authorization. The Books Database, for instance, contains numerous DC Comics works that would likely fall outside the scope of the proposed SA. To DC Comics' knowledge, there are no commitments by Google to remove such works from its databases. Accordingly, DC Comics respectfully requests confirmation by Google that it will not digitize, display or make any unauthorized use of copyrighted works outside the scope of the proposed SA.

of print. When these works are reprinted and sold, each should be classified as Commercially Available as soon as practicable. However, Google's responsibilities under the proposed SA are indefinite and open ended. *Compare* SA Attach. A §§ 3.2, 3.3 (requiring action by Rightsholders), *with* SA § 3.2(d)(ii) (only requiring Google actions "from time to time"). Google and the Plaintiffs should replace the term "from time to time" with a reasonable period such as "every thirty days".

      C.      **In Some Cases, the Proposed SA Will Apply Even if A Copyright Owner Opts Out of the Settlement.**

As currently drafted, SA § 17.33 does not adequately protect the opt-out rights of copyright owners who possess a joint Copyright Interest in a Book or Insert. The proposed SA will not apply to a Book or Insert only "[i]f *all of the members* of the Settlement Class who have a Copyright Interest in a particular Book or Insert opt out of the Settlement by the Opt-Out Deadline". SA § 17.33 (emphasis added). If joint copyright owners take conflicting opt-out actions (*e.g.*, a publisher opts out of the settlement but the author does not), the proposed SA will govern Google's reproduction and display of the work. Accordingly, for many copyright owners, the power to opt out and exclude their works will be effectively revoked by a joint copyright holder's failure to do the same. As currently drafted, the only way for a joint copyright holder to meaningfully protect their works by opting out is to identify each joint copyright owner and enter into negotiations to obtain a commitment from each to opt out. Such an outcome fails to take into consideration a common business arrangement between copyright owners for media rights. In order to provide a meaningful opt-out right, SA § 17.33 should be amended as follows: "If *any* of the members of the Settlement Class who have a Copyright Interest in a particular Book or Insert opt out of the Settlement by the Opt-Out Deadline . . . this Settlement Agreement will . . . no longer apply to such Book or Insert".

### D. The Implementation Procedures Under the Proposed SA Remain Undeveloped and Uncertain.

Despite over 130 pages of text and numerous attachments, the practical implementation and procedures of the proposed SA remain undeveloped and uncertain. Without further refinement, Rightsholders will likely face additional administrative costs. For example, to date, the Books Database has not performed as intended under the proposed SA. Preliminary searches of the Books Database returned several thousand of DC Comics' works. Some works are listed multiple times due to typographical errors or are listed with different ISBN's. The correct copyright owner is not listed for many of the works. When a digital bibliography is available, the information is often inconsistent with the summary page for the work. Due to these inconsistencies and errors, the Books Database has not adequately served its "purpose of identifying all Books . . . that Google has Digitized or reasonably anticipates that it might Digitize under this Settlement Agreement". SA § 3.1(b)(ii). Accordingly, DC Comics respectfully requests the Court, through an appointed representative or otherwise, supervise the proper implementation of the Books Database as described in the proposed SA.

As noted, Rightsholders will shoulder a significant administrative burden under the proposed SA. The default licensing terms require each Rightsholder to, among other things, identify each and every Book and Insert for which it has a Copyright Interest, monitor each work's commercial availability, and to direct Google's display, exclusion or removal of such works. Further, Rightsholders often have numerous obligations (*e.g.*, royalty splits) in connection with their works. If a Rightsholder were to permit Google to sell any of her works, she would require full and clear detail of all revenues, on a work-by-work basis. To date, the practical implementation of these critical issues remains undeveloped and unknown to Rightsholders. Accordingly, DC Comics respectfully requests that the Court require a

demonstration of the settlement's implementation (removal and exclusion procedures, work-by-work sales information provided to Rightsholders, commercial availability determinations, effect of the proposed SA on existing contracts covering e-book display rights, etc.). An illustration will enable the Court (or a special master) to understand the administrative costs of this scheme and provide insight into the host of critical unknowns Rightsholders currently face. DC Comics also seeks continued Court supervision to ensure the fairness and reasonableness of the proposed SA's implementation.

IV. **Conclusion**

For the foregoing reasons, DC Comics respectfully objects to the proposed SA and seeks the clarifications and modifications noted above.

Dated: September 3, 2009

CRAVATH, SWAINE & MOORE LLP

by

_____/s/ Katherine B. Forrest_____
        Katherine B. Forrest
        Mark L. Silverstein

Worldwide Plaza
  825 Eighth Avenue
    New York, NY  10019
      (212) 474-1000
        (212) 474-3700 (fax)
          kforrest@cravath.com
            msilverstein@cravath.com

*Counsel for DC Comics*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of September, 2009, I caused true and correct copies of the foregoing objections to be served electronically on the following counsel of record:

Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts & Kent LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
bookclaims@durietangri.com


   /s/ Katherine B. Forrest
Katherine B. Forrest, Esq.

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
(212) 474-3700 (fax)
kforrest@cravath.com

*Counsel for DC Comics*