Daniel J. Fetterman
Peter J. Toren
Charlotte A. Pontillo
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Phone: (212) 506-1700
Fax: (212) 506-1800

Attorneys for Amicus Consumer Watchdog

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et al., | ) ) ) |
| Plaintiffs, | ) ) Case No. 05 CV 8136-DC |
| v. | ) ) |
| Google, Inc., | ) ) |
| Defendant. | ) ) |

**BRIEF *AMICUS CURIAE* OF CONSUMER WATCHDOG**
**IN OPPOSITION TO THE PROPOSED SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

I.    THE PROPOSED SETTLEMENT IS NOT FAIR, REASONABLE, OR
      ADEQUATE BECAUSE IT FAR EXCEEDS THE ACTUAL CONTROVERSY
      BEFORE THE COURT AND ABUSES THE CLASS-ACTION PROCESS.................. 2

      A.    The Settlement Is Not Fair, Reasonable, Or Adequate Because It Forces
            Absent Class Members Into A New Business Venture With Google.................... 3

      B.    The Proposed Settlement Further Should Not Be Approved Under Rule 23
            Because It Fails To Protect The Rights Of Absent Class Members ...................... 6

II.   THE PROPOSED SETTLEMENT IS AN UNAUTHORIZED ATTEMPT TO
      REVISE THE RIGHTS AND REMEDIES OF U.S. COPYRIGHT LAW ...................... 7

      A.    Only Congress Has The Authority To Grant Exclusive Rights And Remedies
            For Copyrights ......................................................................................... 8

      B.    The Settlement Agreement Would Privately Alter Copyright Law And
            Improperly Divest Rightsholders Of Their Exclusive Rights................................. 9

      C.    The Settlement Addresses The Orphan Works Problem To The Unfair And
            Anticompetitive Benefit Of Google...................................................................... 11

III.  THE PROPOSED SETTLEMENT CONFLICTS WITH INTERNATIONAL LAW..... 14

IV.   THE PROPOSED SETTLEMENT GIVES GOOGLE AN UNLAWFUL AND
      ANTI-COMPETITIVE MONOPOLY ........................................................................... 18

      A.    The Proposed Settlement Would Grant Google Monopoly Power By Making
            It The Only Player In The Market Of Book Databases ....................................... 19

            1.    The Settlement Will Provide Google With A Monopoly ........................ 19

            2.    Potential Competitors Have Significant Barriers To Entry, Ensuring
                  Google's Monopoly Power .................................................................... 20

      B.    The Settlement Would Have Anti-Competitive Effects Because Existing
            Copyright Law Would Block Competition............................................................. 22

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc., v. Windsor,*
 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).................................... 5, 7

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
 441 U.S. 1 (1979)................................................................................................. 23

*Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers,*
 744 F.2d 917 (2d Cir. 1984) ................................................................................. 23

*City of Detroit v. Grinnell Corp.,*
 495 F.2d 448 (2d Cir. 1974) ................................................................................... 5

*Clement v. Am. Honda Fin. Corp.,*
 176 F.R.D. 15 (D. Conn. 1997) .............................................................................. 2

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.,*
 749 F.2d 154 (3d Cir. 1984) ................................................................................... 9

*Eldred v. Ashcroft,*
 537 U.S. 186, 123 S. Ct. 769, 154 L. Ed. 2d 683 (2003)......................... 8, 14, 18, 21

*Flast v. Cohen,*
 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968)........................................ 5, 6

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.,*
 386 F.3d 485 (2d Cir. 2004) ............................................................................. 18, 19

*Harper & Row Publishers, Inc. v. Nation Enters.,*
 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985).................................. 10, 11

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
 55 F.3d 768 (3d Cir. 1995) .............................................................................. 2, 4, 5

*In re Nissan Motor Corp. Antitrust Litig.,*
 552 F.2d 1088 (5th Cir. 1977) .............................................................................. 14

*Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.,*
 812 F.2d 786 (2d Cir. 1987) ................................................................................. 19

*Jack Adelman, Inc. v. Sonners & Gordon,*
 112 F. Supp. 187 (S.D.N.Y 1934) .......................................................................... 9

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.,*
 660 F.2d 9 (2d Cir. 1981) .................................................................................. 3, 7

*Robertson v. Nat'l Basketball Ass'n,*
    556 F.2d 682 (2d Cir. 1977) ........................................................... 18

*Schwartz v. Dallas Cowboys Football Club, Ltd.,*
    157 F. Supp. 2d 561 (E.D. Pa. 2001) ............................................. 4, 5

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417, 104 S. Ct. 774, 78 L.Ed.2d 574 (1984)............... 8, 9, 10, 11

*Stonehill Commc'ns, Inc. v. Martuge,*
    512 F. Supp. 349 (S.D.N.Y. 1981) ..................................................... 8

*TBK Partners, Ltd. v. W. Union Corp.,*
    675 F.2d 456 (2d Cir. 1982) ............................................................. 7

*Troll Co. v. Uneeda Doll Co.,* 483 F.3d 150 (2d Cir. 2007)...................... 18

*United States v. Am. Soc'y of Composers, Authors, & Publishers,*
    Civil Action No. 13-95, 1950 U.S. Dist. LEXIS 1900 (S.D.N.Y. Mar. 14, 1950) .................. 24

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005) ............................................................ 22

*United States v. Griffith,*
    334 U.S. 100, 68 S. Ct. 941, 92 L. Ed. 1236 (1948)............................ 22

**Statutes**

15 U.S.C. § 2 ............................................................................................. 18

17 U.S.C. § 106.................................................................................. 9, 14, 17

17 U.S.C. § 107............................................................................................ 3

17 U.S.C. § 205.......................................................................................... 16

17 U.S.C. § 302.......................................................................................... 14

17 U.S.C. § 411.......................................................................................... 16

28 U.S.C. § 2072(b) ...................................................................................... 5

The Berne Convention Implementation Act,
    Pub. L. No. 100-568, 102 Stat. 2853 (1988)................................... 15, 16

**Other Authorities**

Senate Report on the Berne Convention Implementation Act of 1988,
    S. Rep. No. 100-352 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 3706 ............... 15, 16

U.S. Register of Copyrights, Report on Orphan Works (Jan. 2006) .......................... 12, 13, 14, 15

**Rules**

Fed. R. Civ. P. 23(a)(4) ......................................................................................... 7

Fed. R. Civ. P. 23(e) ............................................................................................. 2

Fed. R. Civ. P. 82 .................................................................................................. 5

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 .................................................................................. 8

U.S. Const. art. III, § 2, cl. 1 ............................................................................... 5

**International Agreements**

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886
(Paris Text 1971, as amended 1979), S. Treaty Doc. No. 99-27 ................................. 14, 15, 17

## PRELIMINARY STATEMENT

Consumer Watchdog makes a special appearance as *amicus curiae* to ask the Court to reject the proposed settlement in this case.

Established in 1985, Consumer Watchdog is a nationally recognized non-partisan, non-profit organization representing the interests of taxpayers and consumers. Its mission is to provide an effective voice for the public interest. Consumer Watchdog's programs include health care reform, oversight of insurance rates, energy policy, protecting legal rights, corporate reform, and political accountability. With no financial interest in the outcome of the litigation, and no bias, except for the public interest, Consumer Watchdog provides a credible and independent voice as a friend of the Court.

The proposed class-action settlement is monumentally overbroad and invites the Court to overstep its legal jurisdiction, to the detriment of consumers and the public. Consumer Watchdog believes the settlement is not "fair, reasonable, and adequate" because it far exceeds the actual controversy between the parties, abusing the class-action mechanism to the detriment of absent class members. Essentially the parties propose to sell the works of absent class members, and then split the proceeds among themselves in the likely event that any absent class member fails to step forward to claim his or her rights. In the process, the parties have reallocated existing rights and remedies under copyright law—a role rightly left to Congress by the U.S. Constitution—for the exclusive and anti-competitive benefit of Google. Indeed, had Google attempted such a scheme outside the context of this settlement, it would have been exposed to millions of dollars in statutory damages for willful copyright infringement. Further, not only does the proposed Settlement Agreement attempt to do an end-run around the legislative process, but it also proposes a scheme that Congress could not have adopted because it imposes conditions on foreign authors and publishers that violate the anti-formality requirements of The

Berne Convention for the Protection of Literary and Artistic Works. Finally, if the settlement were approved, it would give Google a default monopoly to books for which the rightsholders cannot be located, resulting in unfair competitive advantages to Google in the search engine, electronic book sales, and other markets. For all of these reasons, Consumer Watchdog urges this Court to reject the proposed Settlement Agreement.

## I. THE PROPOSED SETTLEMENT IS NOT FAIR, REASONABLE, OR ADEQUATE BECAUSE IT FAR EXCEEDS THE ACTUAL CONTROVERSY BEFORE THE COURT AND ABUSES THE CLASS-ACTION PROCESS

The proposed class action settlement claims to resolve the actual dispute between the parties, but it also goes much, much farther, and purports to enroll millions of absent class members in a series of new business "opportunities." For those absent class members who fail to step forward and claim their share, however, this "opportunity" operates as a theft—essentially the parties propose to sell the copyrighted works of absent class members, and then split the proceeds among themselves.

This Court acts as a fiduciary, guarding the interests of absent class members and evaluating whether the proposed Settlement Agreement is "fair, reasonable, and adequate." *See Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 29 (D. Conn. 1997) ("In assessing a class action settlement, the court has the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests are represented adequately.") (quotation omitted); Fed. R. Civ. P. 23(e). The proposed Settlement Agreement so exceeds the scope of the original dispute, and so plainly compromises the interests of absent class members, that the Court cannot find that it is "fair, reasonable, and adequate" under any interpretation of that phrase. *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 810 (3d Cir. 1995) (holding that "substantial concerns [about a

settlement are] created by the dramatic divergence of the settlement terms from the relief originally sought"); *see also Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir. 1981) ("An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class.").

A. **The Settlement Is Not Fair, Reasonable, Or Adequate Because It Forces Absent Class Members Into A New Business Venture With Google**

The original dispute in this litigation concerned the launch of Google's "Library Project": Google's plan to copy millions of copyrighted books (as well as books in the public domain) into an electronic database, and to display "brief excerpts" of those books online in response to search requests. (D.I. 36 ¶¶ 2-4, 21, 30-31, 34; D.I. 37 ¶ 31.) Plaintiffs alleged that Google's plans and actions violated the Plaintiffs' exclusive rights to copy, distribute, and publicly display their respective Books, under the Copyright Act (Title 17 of the U.S. Code) (D.I. 36 ¶¶ 5-6), and Google countered that its activities were covered by the "fair use" exceptions to copyright law under 17 U.S.C. § 107. (*See* D.I. 57 at 1.) Notably, Google asserted that fair use applied because it planned to display on its web site only "snippets" of the works in response to search engine requests. (*Id.*) Nowhere—in the original complaints, nor in any press releases—was there any indication that Google planned to <u>sell</u> copies of the books it had digitized, nor did Google assert that the outright sales of these books could be considered "fair" under the fair use provisions. *See* 17 U.S.C. § 107 (examples of fair use include "purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research"). Plaintiffs sought a permanent injunction, among other relief. (D.I. 36 ¶ C.)

The Settlement Agreement goes well beyond this controversy. Indeed, Plaintiffs goal was "to do something far more ambitious and useful," "provide[] extraordinary and previously

unattainable benefits to the authors, the book industry, and even the public," and "provide[] new exposure of [out of print] Books . . . [to] breathe new commercial life into this vast body of work."  (Statement of Roy Blount Jr., Author's Guild President (Oct. 28, 2008) (hereinafter "Blount Stmt.");[1] D.I. 57 at 3, 27-28; *see also* S.A. §§ 3.7(a)-(c).)[2]  To implement this plan, the Settlement Agreement mandates the creation of two new "monetization opportunities"—the Consumer Purchase program and Institutional Subscriptions—with the profits to be split between the Rightsholders and Google.  (*See* S.A. §§ 3.7(a), 4.5.)  Under the "Consumer Purchase" program, access to individual books will be sold online, or sold through "print on demand" or "PDF download."  (S.A. §§ 4.2(a), 4.7.)  Under the "Institutional Subscription" program, organizations such as libraries or corporations would be able to purchase time-limited subscriptions for their students or employees to access the full contents of the "Institutional Subscription Database"—which would consist essentially of all the Books, worldwide, that Google has scanned, absent any Books that have been removed at the request of the Rightsholder.  (S.A. §§ 1.74, 1.131, 3.5(b)(i), 4.1.)

This scheme, however, cannot be "fair, reasonable, and adequate" because these "monetization opportunities" have nothing to do with the dispute between the parties.  *See In re Gen. Motors*, 55 F.3d at 810; *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001) (rejecting a proposed settlement under Rule 23(3) because, among other things, the release "bars later claims based on future conduct").[3]  Instead, these

---

[1] *Available at* http://www.authorsguild.org/advocacy/articles/member-alert-google.html (visited Aug. 28, 2009).

[2] For the Court's convenience, capitalized terms herein are used as defined in the Settlement Agreement ("S.A."), unless otherwise specified.  References to the Settlement Agreement, which is Exhibit 1 to D.I. 56, appear herein as "S.A. § __."

[3] To evaluate whether a settlement is substantively fair and reasonable, courts in the Second Circuit consider the well-established "Grinnell factors," which typically evaluate the settlement in light of the

"opportunities" create an ongoing business arrangement, and purport to release future claims for the "monetization" of Rightsholders' works. (S.A. §§ 10.1-10.2.) Conscripting potentially millions of members of the public into an ongoing business relationship with Google is an abuse of the jurisdiction conferred by the class-action mechanism. *See Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 613, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right . . . .'" (citing 28 U.S.C. § 2072(b) and Fed. Rule Civ. P. 82 ("These rules do not extend or limit the jurisdiction of the district courts . . . .")))). This Court should not condone a class-action settlement that abuses the judicial process by vastly exceeding the bounds of the original dispute between the class and the defendant. *See In re Gen. Motors,* 55 F.3d at 789-90 (noting that failure to apply vigorous standards in considering class settlements harms "not only inadequately represented class members but also the <u>federal courts as an institution</u> . . . .") (emphasis added); *Schwartz*, 157 F. Supp. 2d at 571 ("[T]he role of the court in class action settlements extends beyond the important function as protectorate of the absentee class members and includes ensuring the integrity of the judicial process itself.").[4]

---

original claims and defenses. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Considering the enlarged scope of the settlement, however, the Court should consider these factors as if the actual controversy between the parties included the proposed Institutional Subscription and Consumer Purchase programs. Google's "fair use" defense would have held little or no weight, and the Plaintiffs would likely have been well-entitled to an injunction. In that light, the following *Grinnell* factors would strongly weigh in favor of rejecting the settlement: the risks of establishing liability, the risks of establishing damages, the ability of the defendants to withstand a greater judgment, the range of reasonableness of the settlement fund in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

[4] That the agreement purports to resolve "future" claims, far outside the scope of the original dispute, strongly indicates that the settlement also is outside the scope of this Court's Article III jurisdiction, which is limited to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl 1; *Flast v. Cohen*, 392 U.S. 83, 94-95, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968). The case and controversy restriction limits **"the business of federal courts to questions presented in an adversary context and in a form historically viewed**

**B.** **The Proposed Settlement Further Should Not Be Approved Under Rule 23 Because It Fails To Protect The Rights Of Absent Class Members**

The Settlement Agreement is further unreasonable because, for any of the millions of absent class members that fail to timely understand the impact of this settlement, these "opportunities" are more like thefts—the parties will commercialize the absent Rightsholders works, without their permission or even knowledge, to the financial benefit of Google and the Rightsholders who enroll with the registry (the "present" Rightsholders).

The settlement divides the scanned Books into two categories: in-print (or "Commercially Available") and out-of-print (or "Not Commercially Available.") (S.A. §§ 1.28, 3.2(b), 3.2 (d)(ii).) Any Books that Google determines are "in-print" in the United States will not be enrolled in the monetization programs without the Rightsholders' permission. (S.A. § 4.2(a)-(b).) By contrast, any Book that Google determines is "out-of-print" in the United States will be automatically enrolled unless a Rightsholder opts-out of the settlement entirely, or opts-out of "one or more" of the new business ventures. (S.A. §§ 4.2, 3.2(e).)[5]

But while the absent Rightsholder must "opt out" to <u>avoid</u> these "monetization" uses, the Rightsholders must <u>opt in</u> to be <u>compensated</u> for them: Unclaimed Funds will be distributed by the Registry to (1) the Registry itself, to cover operating expenses, and then (2) to other Rightsholders who have registered with the Registry. (S.A. §§ 6.3(a)(i)-(ii), Attach. C §1.1(e).)

---

as capable of resolution through the judicial process." *Flast*, 392 U.S. at 95. It further "define[s] the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." *Id.* It is well-established that "no justiciable controversy is presented when"—as here—"the parties are asking for an advisory opinion." *Id.* (quotations omitted.) The class members' claims against Google for reproduction and sale of complete works, which the settlement releases, are not properly before the Court, are not justiciable, are not redressed by the settlement and are neither a case nor a controversy under Article III of the Constitution.

[5] A close reading of the Settlement Agreement reveals that "out of print" Books are automatically enrolled in the "Consumer Purchase" program described in § 4.2. "Out of print" books are, by default, put in the "Display" category of works, subject to certain restrictions by type of work. (S.A. § 3.2(b), Attach. F.) "Display" uses, in turn, are defined as including "Access Uses" (*id.* § 1.48), which in turn is defined as including "Consumer Purchase" (*id.* §1.1).

In other words, the agreement establishes a regime whereby Google sells the work of absent class members, takes its cut, and then distributes the remainder to the named plaintiffs (and other "present" class members) in the very likely event that absent class members do not come forward. Such an arrangement cannot be considered "fair, reasonable, and adequate." *See, e.g.*, *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982) (courts must take "special care" when a class action settlement purports to release claims "not asserted within [the] class action or not shared alike by all class members"); *see also Nat'l Super Spuds,* 660 F.2d at 19 ("An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class.").[6] In its role as fiduciary, protecting the interests of the absent class members, the Court could not rightfully approve such a settlement that "monetizes" the works of absent class members—potentially millions of members of the public, worldwide—to the financial benefit of Google and the named plaintiffs and other "present" class members.

## II. THE PROPOSED SETTLEMENT IS AN UNAUTHORIZED ATTEMPT TO REVISE THE RIGHTS AND REMEDIES OF U.S. COPYRIGHT LAW

The proposed Settlement Agreement, if approved, would so massively reallocate the existing rights and remedies under copyright law that it would effectively rewrite the existing statutory regime for the benefit of a single player—Google. But Supreme Court precedent is clear: courts may not modify copyright law. Only Congress has "the constitutional authority

---

[6] Further, because the proposed Settlement Agreement creates a scheme whereby named (and other "present") class members benefit financially at the expense of absent class members, the named class members have an insurmountable conflict with the absent class members, and accordingly the class cannot be certified under Rule 23(a)(4) because the Plaintiffs cannot "fairly and adequately protect the interests of the class." *See Amchem,* 521 U.S. at 625-27 (instructing that class certification should be denied where class representatives do not possess the same interests and suffer the same injury as the absent class members).

and the institutional ability to accommodate fully the varied permutations of competing interests" that must be balanced when amending the Copyright Act. The parties claim that this wholesale rights-grab is for the "public benefit," but they ignore that the entire statutory framework of copyrights <u>already</u> is for the public benefit. Congress has been charged with balancing multiple competing interests to "promote the Progress of Science and the useful Arts." U.S. Const. art. I, § 8, cl. 8. This Court should resist the parties' invitation to overstep its jurisdictional authority and usurp Congress's constitutional mandate to enact copyright laws for the public's interest.

### A. Only Congress Has The Authority To Grant Exclusive Rights And Remedies For Copyrights

Unlike with traditional torts, where judges have historically created remedies that compensate the victim of a harm, the copyright statutes are designed "to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S. Ct. 774, 78 L.Ed.2d 574 (1984). "As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors to give the public appropriate access to their work product." *Id.* at 429; *accord Eldred v. Ashcroft*, 537 U.S. 186, 212-13, 123 S. Ct. 769, 154 L. Ed. 2d 683 (2003). "[T]he protection given to copyrights is <u>wholly statutory</u>." *See Sony,* 464 U.S. at 431 (emphasis added and citations omitted). Accordingly, courts refrain from enlarging or narrowing the scope of copyright protection. *Id.* ("The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme."); *accord Stonehill Commc'ns, Inc. v. Martuge*, 512 F. Supp. 349, 351 (S.D.N.Y. 1981) (failure to enforce a section of the copyright statute "would be tantamount to repeal by judicial decision").

This prohibition against judicial interference continues where, as in the present case, new circumstances or technologies challenge traditional applications of the existing statutes. As the Supreme Court stated:

> Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. <u>Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests</u> that are inevitably implicated by such new technology.

*Sony*, 464 U.S. at 429 (emphasis added); *see also Jack Adelman, Inc. v. Sonners & Gordon*, 112 F. Supp. 187, 190 (S.D.N.Y 1934) ("The Congress may enact into law some plan to meet the situation but this court has no power to read into the present statutes provisions which are not now contained in them."); *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 157 (3d Cir. 1984) ("[I]t is the role of the Congress, not the courts, to formulate new principles of copyright law when the legislature has determined that technological innovations have made them necessary.").

### B.     The Settlement Agreement Would Privately Alter Copyright Law And Improperly Divest Rightsholders Of Their Exclusive Rights

Under existing copyright law, all of the members of the proposed class—Rightsholders to the Books and Inserts covered by the agreement—have the exclusive right to copy, distribute and publicly display their works. 17 U.S.C. §§ 106 (1), (3), (5). But as explained above in Section I, the proposed Settlement Agreement proposes to strip these exclusive rights from Rightsholders, and grant to Google the ongoing ability to not only copy and display snippets of works, but also sell complete copies of the Rightsholders works. Provided a Rightsholder even has notice of the Settlement, and understands its scope, a Rightsholder must either opt out of the settlement entirely, or register with the Registry and manage whether, and to what extent, his or her Book will be licensed as part of institutional subscriptions, and sold by Google via print-on-demand or

online-access schemes.  An absent class member who fails to timely opt out may elect to

withdraw his or her work from the "monetization" schemes, but cannot undo the releases for

Google's otherwise-unauthorized copying, public display, and distribution of the entire work.  In

other words, the proposed Settlement Agreement is a judicially mandated licensing regime

imposed on any class member who fails to timely opt out, granted to Google and Google alone.

Such judicially imposed compulsory licensing regimes are not permissible.  *See Harper & Row

Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 570, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)

("Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory

[copyright] license' [via application of the fair use doctrine].").  When applied on such a massive

scale, this licensing scheme eradicates the exclusive rights to copy, distribute, and publicly

display their works that Congress established, by liquidating class members' rights for a tiny

fraction of the value of the damages remedy that Congress deemed appropriate for infringement.

Indeed, if Google had attempted any of these "monetization" schemes without the Court's

approval of this settlement, Google would be:  (i) liable for willful copyright infringement in the

amount of up to $150,000 in statutory damages per act of infringement, plus attorneys fees; (ii)

enjoined from selling the work(s); and (iii) possibly subject to criminal penalties.  *See Sony*, 464

U.S. at 433-34 & n.15 (citing 17 U.S.C. §§ 502-506); *see also* Google's Response to Notice of

Inquiry Regarding Orphan Works at 3-4, 6-7 (Mar. 25, 2005) (acknowledging that using orphan

works incurs liability under current copyright laws and advocating for legislation that limits the

remedies available against users of orphan works).[7]  This Court should decline the invitation to

legislate away the rights and remedies that Congress created.  *See Sony*, 464 U.S. at 446 n.28 ("It

---

[7] *Available at* http://www.copyright.gov/orphan/comments/OW0681-Google.pdf.

is not the role of the courts to tell copyright holders the best way for them to exploit their copyrights . . . .").

While the Parties attempt to cover their egregious misuse of the class-action settlement process by touting the supposed advantages of the agreement, including the creation of a digital library, access for researchers, and improved access to out-of-print works (*see* D.I. 57 at 3), attempting to claim public interest benefits is a common refrain among copyright infringers. *See Harper & Row*, 471 U.S. at 570 ("Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work."). But more importantly, these alleged public "benefits" are not outweighed by the clear harm to the public interest that the agreement will cause. The existing copyright law is already a public benefit that has been carefully crafted by Congress—indeed, the entire copyright regime is designed "to motivate the creative activity of authors . . . and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony,* 464 U.S. at 429. The creation of this public benefit requires a careful balance between competing public interests. As the Supreme Court has noted:

> Because [defining the scope of copyright] involves a difficult balance between the interests of authors and inventors in the control and exploitation of their writings and discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand, our patent and copyright statutes have been amended repeatedly.

*Id.* Consequently, the Court should decline the parties' invitation to overstep its jurisdiction, and instead should leave to Congress the resolution of significant issues like "orphan works."

### C.      The Settlement Addresses The Orphan Works Problem To The Unfair And Anticompetitive Benefit Of Google

Granting Google the default rights to commercialize out-of-print books on an "opt out" basis appears further designed to obtain the exclusive rights to commercialize "orphan works." (*See, e.g.*, Blount Stmt., *supra* at 4; S.A. § 3.8(b).) "Orphan" is "a term used to describe the

situation where the owner of a copyrighted work cannot be identified and located by someone who wishes to make use of the work in a manner that requires permission of the copyright owner."  U.S. Register of Copyrights, Report on Orphan Works (Jan. 2006) ("Orphan Report") at 1.[8]  The orphan problem can range from mere difficulty in locating an author's current address, to identifying and locating an author's heirs, some of whom may not realize they have inherited copyright interests.  *Id.* at 16, 28.  Where the owner or assignee is a corporation, the task of locating the copyright owner can be complicated if assignments, asset purchases, or bankruptcies leave no clear title to works.  *Id.* at 16, 26-28.  A potential user of copyrighted "orphan" works faces "uncertainty—she cannot determine whether or under what conditions the owner would permit use."  *Id.* at 15.

If any entity, such as Google or one of its competitors, wished to obtain the rights to millions of books—for example, for inclusion in Google's search engine database or the institutional subscription program—a significant challenge would lie in identifying, locating, and obtaining permissions from the relevant Rightsholders.  For "orphan" books, it may very well be "time-consuming, difficult or even impossible to locate the copyright owner."  *Id.* at 16.  The potential users of orphan works must often forgo such use "because there is always a possibility, however remote, that a copyright owner could appear and bring an infringement action after that use has begun."  *Id.* at 15.[9]

---

[8] *Available at* http://www.copyright.gov/orphan/orphan-report.pdf (visited August 28, 2009).

[9]  There is no requirement in the proposed settlement that Google make any effort whatsoever to diligently locate Rightsholders of "out of print" works.  Rather, these Rightsholders must affirmatively seek out Google to prevent their works from being "commercialized."  Thus the scope of the works swept into this settlement agreement because Rightsholders fail to come forward—for whatever reason—would naturally be larger than the scope investigated by the Copyright Office, which included only those works whose Rightsholders could not be located after a reasonable search.

The "orphan" problem stems, in part, from revisions to the copyright law instituted as part of the 1976 Copyright Act, which made it easier to obtain and maintain copyright protection in works. *See id.* at 41-42. While these changes helped to harmonize United States law with international standards, *id.*, it also exacerbated the orphan work issue "in that a user generally must assume that a work he wishes to use is subject to copyright protection, and often cannot confirm whether a work has fallen into the public domain by consulting the renewal registration records of the Copyright Office." *Id.* at 43. That the copyright laws helped create the problem demonstrates that a legislative, not judicial, solution is required. The U.S. Copyright Office, after studying the orphan work problem, issued a report to Congress with recommendations that attempted to reach the "proper balance between removing unnecessary obstacles to productive uses of the work and preserving the interests of authors and copyright holders." *Id.* at 23. The proposed legislation would severely limit the remedies available against any good-faith infringers of orphan works who try to find the owner before using the work. *Id.* at 127. Congress has proposed, but not yet passed, such legislation.

The parties—particularly Google—are attempting to bypass the congressional process and "solve" the orphan works problem by stipulating that all "out of print" books are automatically enrolled in the new "monetization opportunities" unless the Rightsholder opts out.[10] But however much Google may wish to utilize orphaned works, a counterbalancing public-interest consideration must be addressed. These "orphans" in fact have "parents," albeit ones who are difficult to locate, who have the exclusive right to copy and distribute that book for

---

[10] The parties have publicly argued that the number of unidentifiable Rightsholders is not significant. But this position is belied by the fact that the Settlement Agreement conscripts Rightsholders of out-of-print Books into Google's new business venture, rather than merely offering Rightsholders the opportunity to market their works through Google, as it does to Rightsholders of "in print" Books. Clearly the parties anticipated that Authors and Publishers of "out-of-print" Books would be more difficult to locate, or otherwise unwilling to participate in the program.

a significant period of time, currently the life of the author plus seventy years.[11]  *See Eldred*, 537

U.S. at 192-93; 17 U.S.C. § 106.  If the parent (Rightsholder) fails to appear—due to lack of

notice,[12] understanding, or for any other reason—this automatic enrollment means stripping the

exclusive grant of copyrights, from perhaps millions of absent class members, in direct

contradiction to current copyright law.  The previous attempts by Congress to resolve the orphan

works problem took into consideration the counterbalancing rights of the Rightsholders, the

public, as well as international concerns, and this court should not sidestep the legislative

process.  *See* Orphan Report at 94.  Moreover, and as discussed further in Section IV, this

settlement resolves the "orphan" problem to the benefit of a single entity—Google—which

hinders competition and is not in the public interest.

### III.  THE PROPOSED SETTLEMENT CONFLICTS WITH INTERNATIONAL LAW

Not only does the proposed Settlement Agreement attempt to do an end-run around the

legislative process, but it also proposes a scheme that Congress could not have adopted because

of its clear violation of the United States' international obligations under the Berne Convention

for the Protection of Literary and Artistic Works, Sept. 9, 1886 (Paris Text 1971, as amended

1979), S. Treaty Doc. No. 99-27 (hereinafter "Berne Convention" or "Berne").  As Congress has

---

[11] The length of the grant varies depending on multiple factors, including when the work was first published, and whether the author is an individual or a corporation.  For example, for an anonymous, pseudonymous, or "work for hire" work published January 1, 1978, the copyright endures for 95 years from first publication, or 120 years from creation, whichever expires first.  *See* 17 U.S.C. § 302.

[12] Indeed, the Court should carefully scrutinize whether notice was provided in a reasonable manner to all class members.  Notably, while the parties propose sending actual notice of the settlement to those Class members that reasonably can be identified (*see* D.I. 57 at 36-37), this proposal does not explain what steps the parties will take to "reasonably" identify the class members.  Especially with a proposed Settlement Agreement of this magnitude, reasonable measures should include comprehensive steps to identify, and individually send notice to, each Rightsholder.  *Cf. In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1096-97 (5th Cir. 1977) (holding that plaintiffs were obligated to review roughly 1.7 million customer records in order to obtain the last known addresses of class members so that individual notice might be sent to them).  These notice deficiencies (which have been highlighted by numerous other objectors) further exacerbate the potential harm the proposed Settlement Agreement could cause.

noted, "[a]dherence to [Berne] is in the national interest because it will ensure a strong, credible U.S. presence in the global marketplace." The Senate Report on the Berne Convention Implementation Act of 1988, S. Rep. No. 100-352, at 2 (May 2, 1988), *as reprinted in* 1988 U.S.C.C.A.N. 3706. By attempting to impose requirements on international Authors and Publishers that are directly contrary to the anti-formality provisions of Berne Art. 5(2), the parties are asking the Court to put the international business interests of the United State's "artists, authors and other creators" at risk. *See id.*

The Berne Convention is "the highest internationally recognized standard for the protection of works of authorship of all kinds." *Id.* at 2. First established in 1886, it constitutes a "Union for the protection of the rights of authors in their literary and artistic works." Berne Convention, Art. 1. Member nations grant to foreign authors of other member nations reciprocal copyright protection, regardless of the country of origin of the work, "as well as the rights specially granted by this Convention." *Id.* Art. 5(1). The United States became a signatory in 1988, to "secure the highest available level of multilateral copyright protection for U.S. artists, authors and other creators." S. Rep. No. 100-352, at 2; *see also* The Berne Convention Implementation Act ("Implementation Act"), Pub. L. No. 100-568, 102 Stat. 2853 (1988).

The Berne Convention specifically prohibits conditioning the "enjoyment and the exercise" of copyright protection on compliance with formalities. Berne Convention Art. 5(2).[13] Generally speaking, formalities are "any conditions or measures . . . without the fulfillment of which the work is not protected or loses protection. Registration, deposit of the original or a copy, and the indication of a notice are the most typical examples." Orphan Report at 60. This

---

[13] Other international copyright agreements similarly prohibit formalities, including the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), the World Intellectual Property Organization ("WIPO") Copyright Treaty, and the WIPO Performances and Phonograms Treaty. *See* Orphan Report at 42, n.96.

formality prohibition posed a particular challenge to the United States, because it conflicted with U.S. registration requirements (among other aspects of U.S. law at that time). *See* 2 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright*, §7.01[A] (2009) ("For decades, the outstanding feature distinguishing United States copyright law from that of the rest of the world has been its emphasis on formalities.").

Under older provisions of U.S. Copyright law, all copyright owners were required to register the copyright prior to bringing an infringement action in U.S. courts. 17 U.S.C. § 205(d) (1987), *superseded by statute* 17 U.S.C. § 205 (2009); *see also* S. Rep. No. 100-352, at 11 ("The only real difference . . . that makes the U.S. law incompatible with the Berne Convention consists in the notice and registration requirements." (quoting the congressional testimony of Dr. Arpad Bogsch, the Director-General of the World Intellectual Property Organization)). To comply with Berne, this registration requirement was modified, after some debate. Proponents of the requirement argued to Congress that requiring a litigant to register his or her work with the U.S. Copyright office, before bringing suit, did not violate the formality prohibition because it was not "a condition for copyright to exist." S. Rep. No. 100-352, at 12. Ultimately, however, Congress concluded that formalities were not limited to mere requirements for a copyright to exist, and that the registration requirement constituted a barrier to the "enjoyment and exercise" of copyright. *See* Implementation Act § 4; S. Rep. No. 100-352, 13-25. Accordingly, 17 U.S.C. § 411 was amended to exclude foreign "Berne Convention" works from the registration requirement.[14]

---

[14] *See Jose Armando Bermudez & Co. v. Bermudez Intern.*, No. 99 CV 9346, 2000 WL 1225792, at *10 (S.D.N.Y. Aug. 20, 2000) (noting that "[n]o proof of registration is required if the work for which plaintiff seeks protection has been authored in a foreign country covered by an applicable Convention," and that the Berne Convention is such an applicable convention) (citing 17 U.S.C. § 411(a)). Section 411 has since been amended to explicitly limit the registration requirement to a "copyright in any United

The Google agreement, if entered as a final judgment, would require the exact "formality" that Congress already determined was a violation of the Berne Convention: registration as a prerequisite to the "enjoyment and exercise" of foreign Rightsholders' exclusive rights. Presently, international authors enjoy the exclusive right to copy, distribute, and publicly display their works. *See* 17 U.S.C. § 106; Berne Convention Art. 5.1. But if the agreement were approved, rather than enjoying their exclusive rights free from formality encumbrances, foreign Rightsholders must register with the Book Rights Registry, maintain contact with the Registry on an ongoing basis, and choose whether or not to participate in new (and future) "monetization opportunities," or otherwise appear in this Court to opt out of the agreement. (*See* S.A. § 3.5.) As described above, if foreign Authors or Publishers of "out-of-print" books fail to step forward, their works will be "monetized" by default—copied, distributed, and publicly displayed—with the proceeds going to Google and the "present" Rightsholders. (S.A. §§ 6.3(i)-(ii), Attach. C §1.1(e).) Plainly, the failure to register with this Court (to opt out), or the Books Rights Registry (to claim profits) negatively impacts the "enjoyment" of these Rightsholders' copyrights.[15] Indeed, Congress rejected a registration requirement that merely asked a litigant to register his or her copyright prior to bringing an infringement action in U.S. Courts. What the Settlement Agreement will impose is much harsher, in that a Rightsholder who fails to register stands to lose control over how his or her work is used.

---

States work," 17 U.S.C. § 411 (2009), rather than excluding "Berne Convention works" from the requirement. 17 U.S.C. § 411 (1997); *see* Pub. L. 105–304 (1998).

[15] This registration requirement is especially onerous on foreign authors, and not just because they are being asked to understand the complexities of a foreign legal system and settlement. The "out-of-print" determination is based on whether the book is Commercially Available <u>in the United States</u>. (S.A. §§ 1.28.) Thus a foreign author, with a book that is "in-print" in foreign countries, may not even realize that Google could classify the book as "out-of-print." It is also entirely likely that Google could "commercialize" a foreign Rightsholders' work before the Author or Publisher has an opportunity to implement a book-publishing agreement in the United States.

The Court should not approve what is tantamount to private legislation for the benefit of Google that would violate an international agreement and jeopardize the public's interest in international copyright relations.[16]

## IV. THE PROPOSED SETTLEMENT GIVES GOOGLE AN UNLAWFUL AND ANTI-COMPETITIVE MONOPOLY

Finally, the settlement is further improper because it suspends existing copyright law just for Google, opening the door for Google to become the dominant player in new markets for online book search engines and book subscription programs. Accordingly, the settlement should be further rejected because it would create a monopoly that violates Section 2 of the Sherman Act, which makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2; *see also Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (the court must satisfy itself that "the settlement authorizes no future conduct that is clearly illegal").

A violation of Section 2 of the Sherman act occurs when a party (A) possesses monopoly power, and (B) willfully acquires or maintains that power in the relevant market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966); *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 495 (2d Cir. 2004). The proposed Settlement Agreement would create such a monopoly power, and allow Google to maintain that

---

[16] Since the United States joined Berne, Congress has continued to amend U.S. copyright law to comply with international standards. For example, in 1994, as part of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), § 104A was amended to restore copyrights for a wide range of foreign works that had previously entered the public domain in the United States because of noncompliance with certain formalities, primarily notice of copyright, imposed by U.S. copyright law. *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 153 (2d Cir. 2007); *see also Eldred*, 537 U.S. at 205-206 ("By extending the baseline United States copyright term to life plus 70 years, Congress sought to ensure that American authors would receive the same copyright protection in Europe as their European counterparts.").

power, because it provides Google with the exclusive ability to amass an "historic" Book database consisting of nearly every book ever published, with which no challenger could compete without facing significant liability for copyright infringement. The proposed Settlement Agreement would thus create a single actor in new markets, to the detriment of the public interest.

### A. The Proposed Settlement Would Grant Google Monopoly Power By Making It The Only Player In The Market Of Book Databases

Monopoly power is the power to exclude competition or control prices, which can be inferred when an actor has a large percentage of the share in the relevant market. *Geneva Pharm.*, 386 F.3d at 500. To determine if market share leads to a fair inference of monopoly power, courts consider such factors as "the strength of competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Id.* at 501 (quoting *Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987)). If Google is permitted to obtain the rights to millions of books through the purported class-action settlement mechanism, it will be the <u>only</u> player realistically able to provide an Institutional Subscription or book-search database, and practically the only player able to commercialize orphan works, because significant practical and legal barriers will prevent others from entering these markets.

### 1. The Settlement Will Provide Google With A Monopoly

The scope of this agreement should not be underestimated. The Google Book Search database would be a "searchable electronic database of many millions of Books (as well as public domain books and government works)" that is "historic in scope." (S.A. Attach. I at 11; D.I. 57 at 27.) Under the terms of the settlement, Google's "historic" book-search database could legally include not just all public-domain books, but all U.S. published Books and Inserts

that have been registered with the United States Copyright Office as of the notice date, and all internationally published Books and Inserts authored by a national of one of the hundreds of countries with which the United States has reciprocal copyright agreements, unless the Books or Inserts are affirmatively withdrawn by the Rightsholder. (*See* S.A. § 1.16; 17 U.S.C. § 104(b)(1); U.S. Copyright Office Circular 38A.[17]) Besides this search-engine database, Google could also sell access to an "Institutional Subscription" database that would at least contain all of the above Books and Inserts that were out-of-print (less those opted out), as well as any in-print Books that are opted in. (S.A. § 4.1.) Finally, the Settlement also anticipates the creation of a "Research Corpus"—which is a set of all Digital Copies of Books made in connection with the Google Library Project, other than those removed by Rightsholders, to which Google will partially control access. (*Id.* § 1.130.)[18] Should any considerable portion of Rightsholders fail to withdraw their works, Google will have created an enormous database of books that it may profit from. (*See* S.A. §§ 1.16, 2.1, 3.1(b)(ii).) And, because by definition the copyright holders for orphan works cannot be located, Google would further be the only entity selling copies of domestic and international orphan works, for example through its "Consumer Purchase" program. (*See id.* § 4.2.)

### 2. Potential Competitors Have Significant Barriers To Entry, Ensuring Google's Monopoly Power

Plainly, these digital book collections, particularly the book-search database and the Institutional Subscription database, have value in their completeness (*i.e.*, the sum is greater than the whole of its parts.) (*See, e.g.*, *id.* § 4.1(a)(ii) (noting that the value of the Institutional

---

[17] *Available at*:  http://www.copyright.gov/circs/circ38a.pdf (visited Aug. 28, 2009).

[18] Only Qualified Users will be allowed to perform certain analysis and research on the entire "corpus" of scanned material, and Google, the Registry, as well as certain Libraries will be able to control that access. (*See* §§ 1.121, 1.130, 1.90(a)-(e), 7.2(d).)

Subscription will change based on the number of books available.))  But Google would be the only entity with the right to create such complete databases because, while the settlement purports to be a non-exclusive grant of rights (*id.* § 2.4), practical and legal barriers would prevent competition.

Plainly, Google has competitors that would like to participate in the market of digitizing Books and making them available for purchase—indeed, some of these potential competitors are objecting to the Proposed Settlement Agreement.[19]  The public can only benefit from such unrestricted competition.  But while any competitor could institute its own "book photocopying" program, because the vast majority of books included in the proposed database are protected by copyright, a competitor would need to identify, locate and obtain the permission of each Rightsholder and the necessary releases to enter the market to compete with Google, or else face potential damages for willful copyright violation.  *See Eldred*, 537 U.S. at 248 (Breyer, J., dissenting) (noting that the copyright statute imposes "search costs that themselves may prevent reproduction even where the author has no objection"), *see also* page 10, *supra*.  By utilizing the class action settlement mechanism to obtain these releases, Google avoids the transaction costs that any potential competitor would have to incur.  The "opt out" nature of the settlement further obtains releases for copyrighted material that could not be obtained otherwise for orphan works (as well from disinterested class members).  No other competitor could reasonably be able to compete with Google's database(s), because no other company offering a book search engine or

---

[19] Google has publicly implied, and may argue, that because it is in the position, technologically, to distribute millions of copyrighted works to the public, that it should be allowed to do so.  Putting aside that Google is essentially arguing that it should be allowed to keep the fruits of its wholesale copyright infringement, these arguments merely highlight the antitrust concerns.  In any event, competitors should be offered a fair opportunity to enter this market.

Institutional Subscription could amass the legal rights to such a body of works absent a guarantee of an agreement as favorable as Google's.

While the settlement will release Google for its digitization, search engine, and commercialization activities, it does not provide releases for any competitor to make use of the corpus in the same fashion, nor does it ensure that the plaintiff class would ever offer similar favorable terms to Google's competitors. (S.A. § 10.2.) Without competitors, Google is free to sell advertising on its Book Search web site, and sell its Institutional Subscription, at any prices it chooses. For example, while the agreement proposes that Google (together with the Registry)[20] will base the pricing for Institutional Subscriptions on "pricing of similar products and services available from third parties," (*id.* § 4.1(ii)), no comparable third-party offerings are likely to exist, as described above. The settlement will thus grant Google with monopoly power, which would be enforced because existing copyright laws, and the practical considerations of obtaining releases from all class members individually, would block competition.

### B. The Settlement Would Have Anti-Competitive Effects Because Existing Copyright Law Would Block Competition

The second part of a Section 2 analysis looks at whether the monopoly market power could "foreclose competition." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (quoting *United States v. Griffith*, 334 U.S. 100, 107, 68 S. Ct. 941, 92 L. Ed. 1236 (1948)). "The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Id.*

Here, competition—by all rivals—is severely restricted by the copyright laws themselves, which bar the very activities that Google plans to undertake. While the Settlement Agreement

---

[20] That Google and an organization representing essentially all worldwide authors of books propose to collaborate and set prices for online book sales further raise significant vertical price fixing concerns. *See* S.A. §§ 4.1(a), 4.2(c)(i).

opens the door for Google to enter these new markets, it simultaneously closes the door to competition because there is no requirement that the parties fairly negotiate with potential competitors. For example, Google is "released" for its digitization, search engine, and commercialization activities, but there is no guarantee that the plaintiffs will fairly grant similar terms to competitors. (*See* S.A. § 10.2.) And, while Rightsholder may authorize, "through the Registry or otherwise," any other use of their work, nothing in the agreement gives the Registry the right to negotiate with third parties, such as competing search-engine or "institutional subscription" providers, on behalf of absent Rightsholders (*id.* § 2.4),[21] unless Google fails to "monetize" the Books (*id.* §3.7). The agreement further gives Google the ability to "distribute" its search-engine database, but there is no requirement that Google do so on fair or reasonable terms. (*Id.* § 3.9.)

This type of chilling effect on competition has been specifically forbidden in the analogous area of copyrighted music. In the music industry, ASCAP and BMI are associations of music authors, composers, and other copyright holders, which serve as clearinghouses to non-exclusively license public performances of members' copyrighted works. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 4-5 (1979). These clearinghouses would be functionally analogous to the book Registry, when formed. But unlike the Registry, both ASCAP and BMI operate under consent decrees, *see Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 744 F.2d 917, 922-23 (2d Cir. 1984) (discussing history of ASCAP and BMI litigations) that require these entities to license all potential users, and to do so on a non-discriminatory basis. *See United States v. Am. Soc'y. of Composers, Authors, &*

---

[21] The Proposed Settlement Agreement further contains a "most-favored nation" clause that serves to protect Google from being discriminated against by the Registry (or another "substantially similar entity") in favor of future competitors. (*See* S.A. § 3.8.)

*Publishers*, Civil Action No. 13-95, 1950 U.S. Dist. LEXIS 1900, at *3-4 (S.D.N.Y. Mar. 14, 1950) ("*ASCAP Decree*") and *United States v. Broad. Music, Inc.*, Civil Action No. 64 Civ. 3787, 1966 U.S. Dist. LEXIS 10449, at *7 (S.D.N.Y. Dec. 29, 1966) ("*BMI Decree*"). The Settlement Agreement, however, has no such requirement. (*See, e.g.*, S.A. §§ 3.7, 3.9.) Indeed, most of the pricing structures in the agreement are advisory, and subject to change. (*Id.* § 4.) Further, both BMI and ASCAP must do business with third parties that request a non-exclusive license to perform the compositions in the ASCAP or BMI repertories, yet the agreement here does not require Google to do business with third parties. *Compare ASCAP Decree,* 1950 U.S. Dist. LEXIS 1900, at *9, and *BMI Decree,* 1966 U.S. Dist. LEXIS 10449, at *7-8, *with* S.A. § 3.9. The proposed Settlement Agreement's failure to provide for fair dealings, such as the ones required in the ASCAP and BMI consent decrees, will help solidify Google's monopoly in these new markets.

## CONCLUSION

The proposed Settlement Agreement would strip rights from millions of absent class members, worldwide, in violation of national and international copyright law, for the sole benefit of Google. If, as Google claims, its "limited" search-engine activities were protected by fair use, the public deserves an adjudication on this matter, to allow the creation of a competitive book-search market. And it is up to Congress to create a solution to the orphan-works problem that would allow all potential users to benefit, while protecting the copyright holders as well as international interests. The parties simply cannot justify this "solution" which does not adequately protect the Rightsholders and unfairly benefits a single party. Accordingly, Consumer Watchdog respectfully asks that the Court not approve the settlement.

Dated:   September 7, 2009          Respectfully submitted,

 /s/ Daniel J. Fetterman
Daniel J. Fetterman
Peter J. Toren
Charlotte A. Pontillo
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Phone: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Amicus Consumer Watchdog*