Yasuhiro Saito, Esq.
Rose Auslander, Esq.
Pamela Shelinsky, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for Members of the Japan P.E.N. Club, Takashi Atouda, Susumu Nakanishi, Akiko Shimojyu, Jiro Asada, Takeaki Hori, Yuko Matsumoto, Chihaya Takahashi, Shinobu Yoshioka, Kenta Yamada, Tomotsuyo Aizawa, Yu Ohara, Yasumasa Kiyohara, Takashi Tsujii, Akira Nogami, Hiroyuki Shinoda, Toshihiko Yuasa, Koichi Kato, Masahiko Motoki, Hidehiko Nakanishi, Yashio Uemura, Nobuo Uda, and Tsukasa Yoshida*
*Members of Proposed Author Sub-Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| The Authors Guild, Inc., et al., | : | Case No. 05 CV 8136 (DC) |
|  | : |  |
|  | : | **OBJECTION TO THE PROPOSED** |
|  | : | **SETTLEMENT AND TO** |
|  | : | **CERTIFICATION OF THE** |
|  | : | **PROPOSED SETTLEMENT CLASS** |
|  | : | **AND SUB-CLASS BY MEMBERS** |
|  | : | **OF JAPAN P.E.N. CLUB, TAKASHI** |
| Plaintiffs, | : | **ATOUDA, SUSUMU NAKANISHI,** |
|  | : | **AKIKO SHIMOJYU, JIRO ASADA,** |
|  | : | **TAKEAKI HORI, YUKO** |
|  | : | **MATSUMOTO, CHIHAYA** |
| v. | : | **TAKAHASHI, SHINOBU** |
|  | : | **YOSHIOKA, KENTA YAMADA,** |
|  | : | **TOMOTSUYO, AIZAWA, YU** |
|  | : | **OHARA, YASUMASA KIYOHARA,** |
|  | : | **TAKASHI TSUJII, AKIRA** |
|  | : | **NOGAMI, HIROYUKI SHINODA,** |
|  | : | **TOSHIHIKO YUASA, KOICHI** |
| Google, Inc., | : | **KATO, MASAHIKO MOTOKI,** |
|  | : | **HIDEHIKO NAKANISHI, YASHIO** |
| Defendant. | : | **UEMURA, AND NOBUO UDA,** |
|  | : | **TSUKASA YOSHIDA** |
|  | : |  |

------------------------------------------------------------x

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................2

FACTUAL BACKGROUND .......................................................................................4

    A.   Objecting Parties.............................................................................................4

    B.   Japan's Publishing Business ...........................................................................5

    C.   Japan's Legal System .....................................................................................6

    D.   Notice to Japanese Rightsholders ..................................................................6

    E.   Class Counsel's Statements in Japan .............................................................7

ARGUMENT ..............................................................................................................8

I. This District Court Lacks the Jurisdiction to Bind the Rightholders in Japan ......................8

    A.   Lack of Personal Jurisdiction........................................................................8

    B.   This Court Should Exercise its Discretion to Refrain from Exercising Jurisdiction ...10

II.  NOTICE TO JAPANESE RIGHTSHOLDERS WAS INSUFFICIENT AND DEFECTIVE.............................................................................................12

    A.   Failure to Give "Best Notice Practicable" ..................................................12

    B.   Content of notice was defective ...................................................................15

III. PROPOSED SETTLEMENT FAILS TO SATISFY REQUIREMENTS OF FED. R. CIV. P. 23(a)..............................................................................16

    A.   "Ascertainability" ........................................................................................16

    B.   "Commonality" and "Typicality" ................................................................18

    C.   "Adequacy"...................................................................................................19

        1.   Adequacy of the class representative ...................................................19

        2.   Adequacy of class counsel ...................................................................21

IV. PROPOSED SETTLEMENT FAILS TO SATISFY REQUIREMENTS FOR "OPT-OUT" CLASSES UNDER RULE 23(b)(3)..................................................23

    A.   "Predominance"............................................................................................23

    B.   "Superiority"..................................................................................................24

V.  PROPOSED SETTLEMENT VIOLATES LETTERS OF THE BERNE CONVENTION AND PERVERTS ITS FUNDAMENTAL PURPOSE............................25

CONCLUSION............................................................................................................27

6501237.6

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander Grant & Co. v. McAlister*, 16 F.R.D. 583 (S.D.N.Y. 1987) ..............................24

*Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) ..............................................................................................15

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) .....................................24

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) .........................................24

*Clay v. American Tobacco Co.*, 188 F.R.D. 483 (S.D. Ill. 1999) ........................................16

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992) ........................19

*East Texas Motor Freight System Inc., v. Rodriguez*, 431 U.S. 395 (1977) .......................20

*Eisen v. Carlisle and Jacquelin*, 417 U.S. 156 (1974) ........................................................13

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990) ................................................................................ 18-19

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ...............................16

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) .............................................18

*Hansberry v. Lee*, 311 U.S. 32 (1940) .................................................................................19

*Hartman v. Wick*, 678 F. Supp. 312 (D.D.C. 1988) ...........................................................13

*Hassine v. Jeffes*, 846 F.2d 169 (3d Cir. 1988) ..................................................................20

*In re Initial Public Offering Securities Litigation*, 227 F.R.D. 65 (S.D.N.Y. 2004) ................................................................................................................16

*In re Initial Public Offering Securities Litigation*, 243 F.R.D. 79 (S.D.N.Y. 2007) ................................................................................................20

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..............................8

*Jackson Pontiac, Inc. v. Cleveland Press Pub. Co.*, 102 F.R.D. 183 (N.D. Ohio 1984) ................................................................................................18

*J.H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994 (7th Cir. 1980) ..............................................................................................19

*Kent v. SunAmerica Life Insurance Co.*, 190 F.R.D. 271 (D. Mass. 2000) ....................16

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987) .................................19

*Kline v. Security Guards, Inc.*, 196 F.R.D. 261 (E.D. Pa. 2000) ........................17

*Mateo v. M/S Kiso*, 805 F. Supp. 761 (N.D. Cal. 1991) ................................25

*McKernan v. United Technologies Corp.*, 12 F.R.D. 452 (D. Conn. 1980) ..................20

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ..............................13

*Montelongo v. Meese*, 803 F.2d 1341 (5th Cir. 1986) ..................................13

*Mueller v. CBS, Inc.*, 200 F.R.D. 227 (W.D. Pa. 2001) ............................17

*Ouellette v. International Paper Co.*, 86 F.R.D. 476 (D.Vt. 1980) ..................25

*In re Paxil Litigation*, 212 F.R.D. 539 (C.D. Cal. 2003) .............................17

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...................... 8-9

*Riordan v. Smith Barney*, 113 F.R.D. 60 (N.D. Ill. 1986) ..................25

*Rios v. Marshall*, 100 F.R.D. 395 (S.D.N.Y. 1983) ..................16

*Rodriguez v. Carlson*, 166 F.R.D. 465 (E.D. Wash. 1996) ..................24

6501237.6

*Sequihua v. Texaco*, 847 F. Supp. 61 (S.D.Tex. 1994) ........................................10

*In re Southern Florida Waste Disposal Antitrust Litigation*, 896 F.2d 493 (11th
    Cir. 1990) .......................................................................................................14

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1984) .............................................18

*White v. State of Alabama*, 74 F.3d 1058 (11th Cir. 1996) ................................15

*Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) ......................25

*World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286 (1980).......................8

## FEDERAL STATUTES

Fed. R. Civ. P. 23(a) ...............................................................................4, 16, 18, 20

Fed. R. Civ. P. 23(b)(3) ............................................................................4, 13, 23, 24

Fed. R. Civ. P. 23(c)(2) .................................................................................. 12-13, 15

Fed. R. Civ. P. 23(g).................................................................................................21

## MISCELLANEOUS

Restatement (Third) of the Foreign Relations Law of the United States §403 .................10

4  Melville  B.  Nimmer  and  David  Nimmer,  Nimmer  on  Copyright
    §17.01[B][1] (Matthew Bender, Rev. Ed.)..................................................26

# INTRODUCTION

Imagine an average writer in Japan.

She was born in Japan and has lived in Japan her whole life. She is published in Japan but not elsewhere. She has never been to the United States. Nor has she ever tried to sell her books in the United States.

About a month or two ago, she starts hearing about a "Google Book Search Settlement." She might have ignored it at first. How can a lawsuit in the United States have anything to do with her? She is not even published there. And no one has sent her a letter or anything official about it. Surely that had to happen before she is affected, hadn't it?

She is wrong, as it turns out. Apparently, a group of people in the United States have gotten together and decided to "help" her by giving away the right to scan her books in the United States, in exchange for … what? It is not immediately clear to her what the benefit is. The "benefit" to her, it seems, is that she will be bound by a very complex commercial contract (134 pages of it) -- already agreed to by "her lawyers" in the United States.

If she had found the Notice posted on the internet, it would tell her that she can "opt out" of the settlement. It would also tell her that she should seek professional legal advice if she has any questions about "opting out," but she can not afford to hire an attorney. The Notice would also tell her that, if she chooses not to "opt out," she can "object" to the proposed settlement, but this objection has to be done in a court in the United States and must be in English.

In other words, she is given no meaningful options. By the way, the 134 page, complex contact she will be bound by? That is available in English only, and has never been translated into Japanese. So she does not know what is in it.

She just hopes that this will not hurt her in the long run.

**How did this happen?**

This happened because of the fundamental misuse of two major legal devices -- the class action and the Berne Convention. Both devices were made to protect people like her. Here, both are used to harm people like her.

A class action presupposes that its class members will have no voice individually. That is, given the nature and size of the injury, they would not be able to raise their voices alone in the legal system. The fundamental raison d'etre of a class action is to protect these voiceless individuals.

And it works, when it is used as intended -- i.e., as a shield to protect the class members. However, the class action mechanism is extremely dangerous and can bring about a perverse result if it is used as a sword to impose one's will on these class members. In effect, it simply becomes a device to take advantage of the fact that they are voiceless. Because of the very nature of a class action, if you organize a class action based on some supposed injury and proceed to inflict similar harm on the class members in the context of the class action, the chances are that the individual members will not be able to fight back separately outside of the class action. That appears to be exactly what happened here.

Similar topsy-turvyism is being committed here with regard to the Berne Convention. The essential purpose of the Berne Convention is to protect copyrights. It has given copyrights expansive reach across borders in order to prevent a book copyrighted in one country from being copied freely in another country. It is an utter perversion of this system to use the Convention as a hook to lure everyone's copyrights worldwide into one country to allow a few individuals in that country to stake out all books worldwide as their territory.

**The Proposed Settlement Should Be Rejected.**

In addition to these fundamental reasons, the Proposed Settlement should be rejected and class certification over Japanese rightsholders should be denied because (i) this Court lacks jurisdiction over the foreign rightsholders, (ii) the Notice to Japanese rightsholders was defective, (iii) this action fails to meet the "ascertainability," "commonality," "typicality," and "adequacy" requirements under Rule 23(a), (iv) it fails to meet the "predominance" and "superiority" requirements under Rule 23(b)(3), and (v) it violates the basic purpose of the Berne Convention.

Given the grave threat this Proposed Settlement poses to the freedom of expression and the publishing culture in Japan and worldwide, the named members of the Japan P.E.N. Club object to the Proposed Settlement as well as the certification of class and sub-classes thereunder.

Submitted with this Objection is a Notice of Intent to Appear at the Fairness Hearing, currently scheduled for October 7, 2009.

## FACTUAL BACKGROUND

### A.     Objecting Parties

This objection is brought on behalf of 22 Japanese authors, who are the leaders and key committee members of the Japan P.E.N. Club.  They include some of the most-respected and best-known authors in Japan, and are prominent names in Japan's publishing world.[1]

---

[1]  The objecting parties are:  Takashi Atouda (President, the Japan P.E.N. Club); Susumu Nakanishi (Vice President); Akiko Shimojyu (Vice President); Jiro Asada (Managing Director); Takeaki Hori (Executive Director); Yuko Matsumoto (Executive Director); Chihaya Takahashi (Executive Director); Shinobu Yoshioka (Executive Director); Kenta Yamada (Director; Chairperson, Freedom of Expression Committee); Tomotsuyo Aizawa (Director); Yu Ohara (Director); Yasumasa Kiyohara (Director); Takashi Tsujii (Director); Akira Nogami (Director); Hiroyuki Shinoda (Member, Freedom of Expression Committee); Toshihiko Yuasa (same); Koichi Kato (same); Masahiko Motoki (same); Hidehiko Nakanishi (same); Yashio Uemura (same); Nobuo Uda (same); and Tsukasa Yoshida (same).

B.     **Japan's Publishing Business**

Japan's publishing business is significant in its size as well as its importance in Japanese culture.  Declaration of Naoki Gokita, dated September 4, 2009 ("Gokita Decl.") at ¶2.  According to some figures, the total annual revenue earned by Japan's publishing business from book and magazine sales is on par with the total annual revenue earned by the publishing industry in the United States from book sales.  *Id.*

While they do share certain similarities, Japan's book publishing business is quite different from that in the United States.  The difference exists in all areas and includes fundamental differences in: the business custom and practice; the overall distribution system and structure for the books and the logistics surrounding them; the method of marketing and publicity; the method of planning and procurement; and the relationship between authors and publishers.  Gokita Decl. at ¶4.

Unlike in the United States, publishers in Japan sell their books through an intermediary on a consignment basis to retail bookstores, and the books which remain unsold after a given period of time are returned to the publishers.  *Id.* at ¶5.  Also, literary agents do not typically exist in Japan, and publishers sometimes take on some functions that may be played by literary agents in the United States.  *Id.*  For these and many other reasons, the pricing and the cost structure as well as the incentives of those involved in the publishing industry in Japan are quite different from these in the United States.  *Id.*

In addition, Japan has a very active *manga* (comics) business, which enjoys a large share of the publishing market through specialized magazines which serialize *manga* stories.  *Id.* at ¶3.  Japan's *manga* business has a strong presence worldwide.  *See id.* at ¶15.

Obviously, we are looking at two countries with two very different overall business models in the publishing industry.  *Id.* at ¶6.

## C.     Japan's Legal System

Copyright Law

Japan's copyright law takes the continental, civil-law approach, in contrast to the Anglo-American, common-law approach taken in the United States. Declaration of Jiro Makino, dated September 4, 2009 ("Makino Decl.") at ¶2.

Japan does not recognize the doctrine of "fair use." *Id.* at ¶3. Japan's copyright law prohibits scanning of copyrighted materials without prior authorization. *Id.* at ¶4. While there are exceptions to this rule, these exceptions are few and clearly defined, and would not apply to the actions of Google in these circumstances. *Id.*

Google's conduct -- both the scanning and the internet-posting -- would have been considered a clear copyright violation under Japan's copyright law. *Id.* at ¶5. Copyright infringement is criminally punishable in Japan. *Id.* at ¶7.

Japan is one of the signatories of the Berne Convention.[2]

No class action

Like most other countries outside of the United States, Japan does not allow class action lawsuits. Makino Decl. at ¶8.

## D.     Notice to Japanese Rightsholders

As far as we could ascertain, no individual notice was sent to authors in Japan. Gokita Decl. at ¶7.

The primary means of notice given in Japan appears to have been by a Summary Notice which was only printed in a single issue of three publications. *Id.* at ¶8. A Summary Notice was printed in *Asahi Shimbun* and *Yomiuri Shimbun* (both major Japanese dailies) on February 24, 2009. *Id.* at ¶8, Exhs. A and B. Another Summary Notice was printed in *Shinbunka* (a publishing industry paper) on July 2, 2009. *Id.* at ¶8.

---

[2] *See* http://www.worldcopyrightcenter.com/signatories-berne-convention.html.

The Summary Notice printed in these papers was in small print and difficult to read. *Id.* at ¶9. Further, as explained in the Declaration of Naoki Gokita submitted in support of this objection, both the Summary Notice and the Notice posted on the internet were impossible to understand because they were riddled with translation errors and awkward expressions. *Id.* at ¶10.

The notice given in Japan was, thus, invalid on its face.

**E.    Class Counsel's Statements in Japan**

On May 23, 2009 -- after the Proposed Settlement had already been agreed by the class representatives in the U.S. and after the original opt-out deadline, and over three years after the commencement of this class action-- counsel for the Author Sub-Class and the Publisher Sub-Class (collectively, the "Class Counsel") finally visited some of Japan's publishing industry representatives for the first time. Gokita Decl. at ¶13. Their statements at the meeting highlight some of the problems with the Proposed Settlement as it applies to the proposed Japanese class members. *See id.* at ¶¶14-17.

- Concerning their complete failure to communicate with rightsholders in Japan until the Proposed Settlement was agreed on, Class Counsel insisted that they could not communicate with Japanese rightsholders because they "could not share information concerning the settlement due to the confidentiality obligation imposed on the parties." Gokita Decl. at ¶ 14. This was disingenuous. Class Counsel could have advised Japanese rightsholders about the status of the case, could have asked about their interests and concerns, and could have responded to their inquiries if they were truly interested in serving the interests of Japanese rightsholders.

- Class Counsel acknowledged that they failed to take into account the significance of *manga* (comics) in Japan as well as in the worldwide market and further acknowledged that it was their mistake not to have spelled out how *manga* would be treated explicitly in the Proposed Settlement. Gokita Decl. at ¶15. Because of this omission, some *manga*, though already being scanned by Google, will not be included in the eventual settlement, according to Class Counsel's own admission. *Id.*

- Concerning the Proposed Settlement's definition of "Commercially Available," which makes books published only in Japan *not* "Commercially Available" under the Proposed Settlement and makes them automatically subject to Display Uses by Google, Class Counsel stated that if these books were available in the United States through a website such as "amazon.co.jp" then Google will consider them "Commercially Available," but did not state they would correct this problem in any

other way. Gokita Decl. at ¶16. Because of the failure to address this problem, Class Counsel admitted that, as of now, the books published in Japan but not sold in the U.S. will be treated as *not* "Commercially Available" and will be subject to Display Use, according to Class Counsel. *Id.*

- Interestingly, Class Counsel also stated that they could have limited the definition of the class to the rightsholders in the U.S. only and exclude the foreign rightsholders. Gokita Decl. at ¶17.

## ARGUMENT

## I.

## THIS DISTRICT COURT LACKS THE JURISDICTION TO BIND THE RIGHTHOLDERS IN JAPAN

### A.    Lack of Personal Jurisdiction

In the traditional context, the Due Process Clause of the Constitution requires that a party possess certain minimum contacts with the forum state such that it would be "reasonable and just, according to our traditional conception of fair play and substantial justice" for the court to exercise personal jurisdiction over the defendant." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319-20 (1945) (stating that the Due Process Clause did not permit a State to make a binding judgment against a person with whom the State had no contacts, ties, or relations); *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 287 (1980) (stating that for the Due Process Clause to be satisfied there must be sufficient contacts between the defendant and the forum state such that the defendant "should reasonably anticipate being haled" into that State for litigation).

Typically, this "minimum contact" requirement is significantly relaxed for absent class action plaintiffs. The Supreme Court has held that absent class action plaintiffs are not afforded the same degree of due process protections, primarily because an absent class action plaintiff is not subject to the same burdens as a defendant in a civil action lawsuit -- such as having to hire his or her own attorney, or risk suffering long-term consequences from court's prescriptive negative judgment. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809-810

(1985). Further, in most class actions, an absent class action plaintiff is provided at least with an opportunity to "opt out" of the class.[3] *Id.* at 810-811.

However, the Supreme Court's reasons for relaxing the "minimum contact" requirement for absent class action plaintiffs are not present here.

First, the burdens on the proposed foreign absent class plaintiffs -- particularly those in Japan -- are enormous. Unlike absent class action plaintiffs in most class action settlements who are asked to accept payment of certain (often relatively insignificant) amounts of compensation in exchange for release of their claims, the foreign rightsholders here are asked to enter into a complex and perpetual commercial arrangement that will be operated in another country (*i.e.*, the U.S.). Not only have these foreign absent class action plaintiffs been forced to respond to the Notice of the Proposed Settlement, but they also will have to participate in and monitor the operation of the complex arrangement set forth in such settlement in a different country and will have to live with the unknown consequences of that arrangement in the future.

Indeed, the language of the Notice itself demonstrates the unusually heavy burden placed on the foreign rightsholders. The Notice first advises all foreign authors and publishers to assume that they are part of the Proposed Settlement.[4] Then, it advises them to

---

[3] In this connection, it is worth noting that opting out does not present a realistic commercial option for many Japanese and other foreign rightsholders -- precisely because of the overreaching breadth of the Proposed Settlement. The very fact that the Notice purports to inform all authors and publishers who own rights in Books published in countries that have copyright relations with the United States that they are included as members of the class unless they affirmatively opt out of the class action, when seen in the context of the dominant position Google enjoys in the search engine business, signals to the rightsholders that the Proposed Settlement, if approved, will likely usher in a new regime of digital publishing dominated by Google, and that those who fail to join the new regime by opting out will risk becoming irrelevant in the future marketplace. In other words, the Proposed Settlement threatens to establish a new dominant (and the only relevant) arena in digital publishing worldwide, and then asks the rightsholders whether they want to be a players or a bystanders. That is not a realistic choice at all -- at least to many.

[4] The Notice states:
> [Y]ou should assume that you own a U.S. copyright interest in your Book, unless you are certain that your Book was published in, and that you reside and are located in, one of the few countries that have not had or do not now have copyright relations with the United States.
Notice at p. 5, available at http://www.googlebooksettlement.com/r/view_notice.

seek advice from an attorney or a "Reproduction Rights Organization."[5]  While the Notice's "advice" to hire counsel is technically conditioned upon the author or publisher having a question concerning whether to opt out, one is hard pressed to find any rightsholder in Japan without questions about this suit, about the U.S. class action system, and about what the Notice means -- let alone whether to opt out of the Proposed Settlement.

Moreover, this Notice language highlights the unprecedentedly broad intended reach of the Proposed Settlement.  The Proposed Settlement places authors and publishers around the globe under this Court's jurisdictional reach -- without regard to the fact that most of the foreign rightsholders have had and will have no contact or other relationship with the United States.  Such unfettered exercise of personal jurisdiction over the entire world should be rejected.

**B.     This Court Should Exercise its Discretion to Refrain from Exercising Jurisdiction**

This Court should exercise its discretion and refrain from exercising its jurisdiction over the rightsholders in Japan, in light of the deep and wide-ranging impact this Proposed Settlement will have on the rightsholders there, and given the greater interest Japanese government (and its legal, executive and legislative branches) has on regulating their interests and behavior.

Under the principle of international comity, a court in one country may not exercise jurisdiction to prescribe law with respect to a person or activity having connection with another state when the exercise of such jurisdiction is unreasonable.  *Restatement (Third) of the Foreign Relations Law of the United States* §403; *see also Sequihua v. Texaco,* 847 F.Supp. 61 (S.D.Tex. 1994) (dismissing claim based on the principle of comity under which

---

[5] "If you own a copyright in a Book or Insert published outside the United States, you are advised to seek advice from an attorney or a Reproduction Rights Organization if you have questions concerning whether to participate in or opt out of the Settlement." Notice at p. 5, available at http://www.googlebooksettlement.com/r/view_notice.

"a court should decline to exercise jurisdiction under certain circumstances in deference to the laws and interests of another foreign country").

Section 403 of the Restatement (Third) of the Foreign Relations Law of the United States lists eight factors that are among those that may be considered by a court in determining whether a court's exercise of jurisdiction over a matter is or is not unreasonable.[6]

Here, analysis of the factors show that this Court should refuse to exercise jurisdiction over Japanese and other foreign rightsholders (with a twist that the ones "regulated" for the purposes of this analysis are not defendants but the foreign rightsholders upon whom the Proposed Settlement is being forced):

(a) the imposition of the arrangement will have grave impact on the rights and activities of Japanese rightsholders in Japan;

(b) the imposed arrangement would affect virtually all authors and publishers in Japan, most of whom have no connection with the U.S.;

(c) the Japanese government has a strong interest in regulating Japan's publishing industry and in having a say when a new dominant publishing regime and structure is being established affecting virtually all authors and publishers in Japan;

(d) the proposed arrangement will destroy the justified expectation shared by the authors and publishers worldwide that their copyrighted materials cannot be distributed without their explicit permission; it also destroys the justified expectation that a court sitting in a different country cannot unilaterally force wholesale licensing of all books without permission, through a system of lawsuit

---

[6] The eight factors are:

(a) the link of the activity to the territory of the regulating state, (i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory); (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect; (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted; (d) the existence of justified expectations that might be protected or hurt by the regulation; (e) the importance of the regulation to the international political, legal, or economic system; (f) the extent to which the regulation is consistent with the traditions of the international system; (g) the extent to which another state may have an interest in regulating the activity; and (h) the likelihood of conflict with regulation by another state.

(*i.e.*, class action) that does not exist elsewhere and through a process that does not provide actual notice to the rightsholders;

(e) the regulation of the publishing industry, and authors and publishers, is of vital importance to the international political, legal, and economic system, and should not be left to a single court in one country, let alone a limited group of interested individuals and businesses;

(f) the imposed arrangement is wholly inconsistent with the traditions of the international system, both in substance (licensing without permission) and in method (American-style class action);

(g) Japan has an interest in regulating the activities involved, though not necessarily the individual incidents of scanning that take place in the United States, but the wholesale imposition of a particular commercial arrangement on virtually all Japanese writers and publishers; and

(h) despite the Settlement's recitation of U.S.-centric activity, the blanket permission to scan virtually all books published in Japan (unless explicitly instructed otherwise) will fundamentally contradict with the purpose of the copyright laws and regulations in Japan.

In the interest of international comity this Court should refuse to exercise its jurisdiction here.

## II.
## NOTICE TO JAPANESE RIGHTSHOLDERS WAS INSUFFICIENT AND DEFECTIVE

**A.    Failure to Give "Best Notice Practicable"**

Rule 23(c)(2) requires that, "[i]n any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The Supreme Court has stated that "each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may

remain in the class and perhaps participate in the management of the action." *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 173 (1974).

In most cases, "the best notice practicable" involves the mailing of an individual notice to known class members and then publication of that notice in order to reach class members whose names and addresses are unknown. *See, e.g., Molski v. Gleich,* 318 F.3d 937, 952-953 (9th Cir. 2003) (ruling that notice provided at service stations and in four major newspapers to disabled rights groups was inadequate under the stringent notice requirements of Rule 23(b)(3), when individualized notices could have been mailed to disabled drivers by using the motor vehicle database). In certain circumstances, the court may require that additional measures be taken. *See, e.g., Montelongo v. Meese,* 803 F.2d 1341, 1351 (5th Cir. 1986) (determining that in a class action brought by migrant farm workers, many of whom were likely not to be proficient in English, mailing individual notices in English and Spanish and ordering bilingual radio and newspaper announcements met the requirements of Rule 23); *Hartman v. Wick,* 678 F. Supp. 312, 329-330 (D.D.C. 1988) (in an employment discrimination class action that involved numerous unidentified class members, Rule 23 would be satisfied by mailing notices, publishing notices in the largest newspapers within 18 of the largest Standard Metropolitan Statistical Areas and in newspapers and magazines where defendant advertised job openings, and posting notices in all government employment offices).

The notice requirements of Rule 23(c)(2) for 23(b)(3) class actions are mandatory and may not be waived at the discretion of the district court. In *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156 (1974), for example, the United States Supreme Court held that where the names and addresses of 2,250,0000 class members were easily ascertainable, individual notice to each class member was required and could not be waived by the district court even though, as the plaintiff argued, providing such notice would be prohibitively expensive, and

no absent class member so notified would have a large enough stake to justify separate litigation of his or her individual claim.

Under Rule 23, class representatives must take those steps which are "practicable … under the circumstances" to ensure that individual class members receive notice. Class representatives are required to make "reasonable efforts" to discover the names and addresses of individual class members. *See, e.g., In re Southern Florida Waste Disposal Antitrust Litig.,* 896 F.2d 493, 494 (11th Cir. 1990) (ruling that class counsel had made a "reasonable effort" to ensure that class members received notice when counsel sent notice to all persons or entities that purchased defined waste disposal services in a two-county area during 10-year time period).

Here, the notice given to Japanese rightsholders was woefully deficient. While we have not been able to ascertain the precise methods of notice used due to the settlement proponents' failure to provide that information to date, we have not been able to identity any author, including those who are prominent and successful in Japan, who received an individual actual notice in the mail. Gotika Decl. at ¶7. The only publication notices we have been able to identify appeared in a single publication of two major daily newspapers on the same day, and in a single publication of a trade paper on a subsequent date. *Id.* at ¶8. Each of these notices was in fine print and very difficult to understand due to the inartful translation. *Id.* at ¶¶9-10. In addition, to date, *no Japanese translation of the Proposed Settlement has ever been provided.*

This lack of effort is striking especially when contrasted with the attempts by some Japanese publishers to contact authors individually after they received the news of the Proposed Settlement (Gokita Decl. at ¶12), and the efforts undertaken by Japan's National Diet Library (Japan's Library of Congress) to contact and obtain permission from each and

every author before it attempts to scan their books even for the purpose of preserving its collection. Makino Decl. at ¶6.

This abdication of obligation to ensure adequate notice is given to affected rightsholders is particularly troubling in this case, which presents the appearance that a handful of parties in the U.S. have made a private arrangement among themselves to be imposed on the rest of the world. One of the very purposes of requiring the best notice practicable of the proposed settlement is to address this very problem -- *i.e.*, to protect the rights of those whose interests may not have been given due regard by the negotiating parties, and to prevent private arrangements from advancing at the expense of the best interests of the class. *Armstrong v. Board of School Directors of City of Milwaukee,* 616 F.2d 305, 313 (7th Cir. 1980).

## B.    Content of notice was defective

Rule 23(c)(2)(B) requires that the notice be written "clearly and concisely … in plain, easily understood language" and include certain information including the definition of the class. The settlement notice should be printed in readable type and should be worded in such a way that the members of the class will be able to understand it. *See, e.g., White v. State of Ala.,* 74 F.3d 1058 (11th Cir. 1996) (in a class action suit that challenged the mechanism for electing state judges, finding that district court had erred when it inferred that the lack of response to a settlement notice indicated that the class members found it unobjectionable where the notice "was printed in very small type and couched in 'legalese' at times so dense that even a lawyer would have had difficulty determining the settlement's probable impact on Alabama's judicial system and on the rights of Alabama voters").

Here, the Summary Notice was in small print and was extremely difficult to read. Gokita Decl. at ¶12. Both the Summary Notice and the Notice suffered from severely awkward and sloppy translation, making it impossible for Japanese rightsholders to

understand their meaning.  Gokita Decl. at ¶10.  The notice to Japanese rightsholders was defective in its content as well.

## III.
## PROPOSED SETTLEMENT FAILS TO SATISFY REQUIREMENTS OF FED. R. CIV. P. 23(A)

The Supreme Court has stated that a court should undertake a "rigorous analysis" to determine whether a party seeking class action certification has satisfied the requirements of Rule 23(a), because class actions depart from "the usual rule that litigation is conducted by and on behalf of the individual named parties only." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155 (1982).  The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) (*i.e.,* numerosity, commonality, typicality, and adequacy of representation) is met, and also that the court-imposed requirement that there be "ascertainability," as discussed immediately below, is satisfied.

### A.    "Ascertainability"

Courts have implied a requirement that there be an identifiable class in addition to the express criteria set forth in Rule 23(a).  *See, e.g., In re Initial Public Offering Securities Litigation,* 227 F.R.D. 65 (S.D.N.Y. 2004).  Courts often have referred to this implied requirement as "ascertainability." *Id.*  A class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.  *See Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D. Ill. 1999); *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y. 1983).

A precise class definition is essential so that a court can decide, among other things, "who will receive notice, who will share in any recovery, and who will be bound by the judgment." *Kent v. SunAmerica Life Ins. Co.,* 190 F.R.D. 271, 278 (D. Mass. 2000).  If a court certifies a class action with an imprecise or ambiguous class definition, it will face

various due process and manageability difficulties down the road.  For example, a class definition that is too indefinite to ascertain the actual number of class members would make the determination of factors such as typicality more difficult and would raise questions as to whether all members of the class were provided sufficient notice.  *In re Paxil Litig.,* 212 F.R.D. 539, 545-546 (C.D. Cal. 2003).  In this regard, an indefinite class definition is contrary to the efficiencies and streamlining benefit sought to be achieved in class actions. *Kline v. Security Guards, Inc.* 196 F.R.D. 261 268 (E.D. Pa. 2000).  Thus, if the proposed class definition is amorphous or indefinite, a court has the power to limit or redefine a class definition in order to bring the class within Rule 23.  *See Mueller v. CBS, Inc.,* 200 F.R.D. 227, 234 (W.D. Pa. 2001).

Here, the class definition is both amorphous and indefinite.  The number and scope of the class members based on the current definition (*i.e.*, essentially anyone with a copyright interest in books worldwide) is so ambiguous that the class proponents themselves appear to have given up determining who the members are with any precision, and have left the work of ascertaining class membership to those reading the Notice.  *See* the Notice at 5 ("You should assume that you own a U.S. copyright interest in your Book, unless you are certain that your Book was published in, and that you reside and are located in, one of the few countries that have not had or do not now have copyright relations with the United States").  The resulting manageability and due process difficulties have already manifested themselves in the proponents' failure to: give actual notice to even those rightsholders who can be readily located; provide translation of the Proposed Settlement into Japanese and into the languages of the other foreign rightsholders; and take into consideration the varying characteristics, rights and interests of the affected rightsholders worldwide in drafting the Proposed Settlement.

The Proposed Settlement should be rejected for its failure to provide an ascertainable class.

**B.    "Commonality" and "Typicality"**

Under Rule 23(a)(2) and (3), before a court may certify a class, it must find that "there are questions of law or fact common to the class" (the "commonality" requirement) and that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (the "typicality" requirement).

The "typicality" requirement is not met when the named plaintiff's individual circumstances are markedly different from those of the class members it seeks to represent. *Weiss v. York Hosp.,* 745 F.2d 786, 809 n.36 (3d Cir. 1984).  For instance, courts have found that a named plaintiff whose business transactions with the defendants is of a more limited nature than those of the majority of the class does not satisfy the typicality requirement. *Jacksaw Pontiac, Inc. v. Cleveland Press Pub. Co.,* 102 F.R.D. 183 (N.D. Ohio 1984).

Here, the circumstances of the class representatives are markedly different from those of the foreign rightsholders.  Being outside of the U.S., the foreign rightsholders' relationships with Google and other interested parties in the U.S. are different; their concerns and priorities regarding Google's violation of their rights in the U.S. are different; and they have different business models, incentives, and bottomlines from those of the interested parties in the U.S.

Additionally, a plaintiff class representative does not meet the typicality requirement if the defendant can raise unique defenses against the representative that could not be raised against other class members.  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir. 1990).  "[T]he presence of even an arguable defense peculiar to the named plaintiff may prevent certification (or it may lead to the substitution of another named

class representative, if one is available, to whom the defense is not applicable)." *J.H. Cohn & Co. v. American Appraisal Assocs., Inc.*, 628 F.2d 994, 998 (7th Cir. 1980).  As the Second Circuit stated, "whether the issue [of unique defenses] is framed in terms of the typicality of the representative's claims, or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Gary Plastic Packaging Corp.*  903 F.2d at 180.

As discussed further in connection with "predominance" below, Japan's copyright law does not recognize "fair use," Google's main defense in this case.  Thus, the position of Japanese rightsholders is far from similar with regard to responding to defense as well.

## C.     "Adequacy"

Adequate representation requires findings by the court regarding both the class representative and class counsel.  Whether the class representative and class counsel can adequately protect the class depends on the particular facts and circumstances surrounding the case.  *Kirkpatrick v. J.C. Bradford & Co.*,  827 F.2d 718, 728 (11th Cir. 1987).  To certify the class, the court first must find that the interests of the named plaintiffs are sufficiently aligned with those of the absentee plaintiffs and that potential conflicts among various members of the class do not exist.  *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).  Second, the court must find that class counsel is qualified and will be able to serve the interests of the entire class.  *Id.*

### 1.     *Adequacy of the class representative*

Adequacy of representation has long been regarded as the cornerstone of due process in the class action context.  *See Hansberry v. Lee*, 311 U.S. 32 (1940).  At a constitutional minimum, adequacy in the constitutional sense requires a determination that the interests of absent class members are sufficiently closely aligned with the interests of their representatives such that it is fundamentally fair to bind the former to the results of litigation

conducted by the latter. *See In re Initial Public Offering Sec. Litig.*, 243 FRD 79, 85-86,

(S.D.N.Y. 2007); *McKernan v. United Technologies Corp.*, 12 FRD 452, 454-55 (D. Conn.

1988).

"[A] class representative must be part of the class and 'possess the same interest and

suffer the same injury' as the class members." *East Texas Motor Freight System Inc., v.

Rodriguez,* 431 U.S. 395, 403 (1977).  Evaluating the adequacy of the class representative

under Rule 23(a)(4) also involves assessing whether the named representative will pursue the

action vigorously so that the rights of the class members will be protected. *See Hassine v.

Jeffes,* 846 F.2d 169, 179 (3d Cir. 1988) (a court should determine that the named

representative "has the ability and the incentive to represent the claims of the class

vigorously").

Here, the interests of Japanese and other foreign proposed class members cannot be

said to be even roughly aligned with the interests of the named plaintiffs -- especially in the

context of the complex commercial deal these named representatives have negotiated with

Google.  These foreign proposed class members do not share the same economic incentives

as the named U.S. plaintiffs.  They primarily operate in completely different publishing

markets with different business structures in marketing, distribution, compensation, and all

other aspects of business including the rights and relationships of rightsholders *vis-à-vis* each

other.  Moreover, these foreign proposed class members do not share the same concerns

regarding the operation and security of the Registry and internet display and distribution as

the named U.S. plaintiffs.  For instance, the business concessions and compromises these

limited number of representative plaintiffs from the U.S. are willing to accept (after over two

years of negotiation) are very different from what the foreign rightsholders are willing to or

can afford to swallow.  Furthermore, the risk to the foreign proposed class members of the

scanned data leaking out of the U.S. territory (into their home country) and the strength of the

security measures taken by Google and its partners to prevent this from occurring is clearly a much larger concern for the foreign rightsholders.  Nor do the foreign proposed class members and the named U.S. plaintiffs share the same perspective concerning Google's scanning of their materials in the U.S. territory thus far, and whether the current blanket permission to scan virtually all books published in their home countries is an appropriate remedy/compromise flowing from the original problem in the U.S.

   2.    *Adequacy of class counsel*

Factors relevant in examining the adequacy of class counsel include counsel's experience in similar litigation and knowledge of the applicable law and any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.  Fed. R. Civ. P. 23(g).

Here, Class Counsel has not demonstrated that they can adequately represent the interests of the foreign rightsholders.  Indeed, compared to the gravity of the impact this class action and the Proposed Settlement have had all over the world, Class Counsel has shown relatively little care and concern for the rightsholders outside the U.S.

Firstly, both the Proposed Settlement and the Motion for Preliminary Settlement Approval, submitted in support of the Proposed Settlement, include very little language to indicate and alert the Court about the grave international impact of the Proposed Settlement. Rather, the Proposed Settlement -- which contains almost nothing to signal the international consequences of the arrangement -- appears to underplay the global aspect of the agreement by simply stressing that it addresses U.S. copyrights and not matters outside of the United States.[7]  Other provisions of the Proposed Settlement mentioning the term "foreign" in the

---

[7] For instance, the Proposed Settlement defines "Book" as follows:

> 1.16  <u>Book</u>" means a written or printed work that (a) if **a "United States work"**, as defined in 17 U.S.C. §101, has been registered with **the United States Copyright Office** as of the Notice commencement Date, (b) on or before the Notice Commencement Date, was published or distributed to the public or made available for public access as a set of written or printed sheets of paper bound together in hard

title also appear to create an impression the focus and impact of the Proposed Settlement primarily is in the United States and not elsewhere.[8]

Indeed, it is not until one reads the language of the Notice under the section titled "ATTENTION: AUTHORS AND PUBLISHERS OUTSIDE THE UNITED STATES," which essentially advises all rightsholders in the world to assume that their rights are affected, that one realizes the extremely wide and significant reach of the proposed arrangement. One cannot help wondering whether the global part of the agreement was an afterthought -- or if its significance was deliberately deemphasized throughout the process.

In addition, during the prolonged period of negotiation concerning the terms of the agreement, plaintiffs counsel never approached the rightsholders in Japan (or anywhere else abroad to our knowledge) to advise them of the status of the litigation, to obtain information about their concerns and interests, or to respond to inquiries from them. This is striking especially given that the named parties commenced this litigation over three years ago and that, according to their own account, the reason the negotiations had taken so long and the

---

copy form under the authorization of **the work's U.S. copyright owner**, and (c) as of the Notice Commencement Date, is subject to a Copyright Interest. * * * [emphasis added.]

The "Settlement Class" is defined simply as follows:

    1.142 "Settlement Class" means all Persons that, as of the notice Commencement Date, have a Copyright Interest in one or more Books or Inserts. * * *

And the "Copyright Interest", referenced in the both definitions above, is defined as:

    1.38 "Copyright Interest" means (a) ownership (including joint ownership) of **a United States copyright interest** or (b) an exclusive license of **a United States copyright interest**, in each case only if and to the extent the interest is implicated by a use that is authorized or for which compensation could be payable under this Settlement Agreement. [emphasis added]

[8] Section 10.7(d) of the Proposed Settlement, entitled "Foreign Claims," states:

    No rightsholder releases any claim for the reproduction, distribution, transmission, display, adaptation or preparation of derivative works of any Book or Insert in any jurisdiction outside the United States.

Section 17.7 of the Proposed Settlement, entitled "Foreign Public Domain Works," states:

    Further, with respect to Books that are not in the public domain under the Copyright Act in the United States, but are in the public domain in any jurisdiction outside the United States, this Settlement Agreement neither authorizes nor prohibits Google from exploiting those Books in such jurisdiction; provided, however, that, in countries that do not have a copyright law that provides for a copyright term of at least the life of the author and fifty (50) years after the author's death for literary works that are not anonymous or pseudonymous where copyright is granted to natural persons, then Google will not treat Books as in the public domain in such jurisdiction.

resultant agreement became so complex was that they had to listen to the competing interests of all the parties who were on the table. *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Settlement Approval, at 4-5. In other words, it had taken over two years for the named and other parties participating in the settlement negotiation to come to the current commercial deal by taking into account the interest of those participating, but plaintiffs counsel could not be bothered to listen to the voice of the untold number of rightsholders throughout the rest of the world, including Japan. Only <u>after</u> the Proposed Settlement was agreed on did Class Counsel approach Japanese rightsholders. Gokita Decl. at ¶13.

Indeed, this failure has resulted in some glaring errors and omissions in the Proposed Settlement from an international perspective. For instance, by failing to take into account the importance and great significance of *manga* (comics) in Japan and in the worldwide market, the Proposed Settlement neglected to spell out the treatment for *manga* explicitly in its language. Class Counsel admitted that was their mistake and stated that, because of the omission, some *manga*, although already being scanned by Google, will not be included in the eventual settlement.

# IV.

## PROPOSED SETTLEMENT FAILS TO SATISFY REQUIREMENTS FOR "OPT-OUT" CLASSES UNDER RULE 23(B)(3)

A.     **"Predominance"**

Rule 23(b)(3) requires a court to find that the questions of law or fact common to class members predominate over any questions affecting only individual members. Essentially, the predominance determination requires a "pragmatic assessment of the entire

action and the issues involved." *Rodriguez v. Carlson,* 166 F.R.D. 465, 477 (E.D. Wash. 1996).

For instance, common theories of liability asserted or the same basic defense raised by all class members may also support predominance. *See Alexander Grant & Co. v. McAlister,* 16 F.R.D. 583, 590 (S.D.N.Y. 1987). In addition, courts have stressed that variations in law as applied to class claimants from different jurisdictions, amplified by the associated choice-of-law problems (i.e., the problems associated with looking to the laws of various different jurisdictions to determine which law should apply) may undermine a finding of predominance. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 741 (5th Cir. 1996); *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1014 (7th Cir. 2002).

Here, the single predominating issue on liability is Google's "fair use" defense, and the topic of "fair use" has dominated the discussion of the merits of the case. However, as noted above, Japan does not recognize the doctrine of "fair use" or any other similar concept. Makino Decl. at ¶¶3-4. Given the unusually invasive feature of the Proposed Settlement -- that it stakes out the entire corpus of books in Japan as fair game for Google's scanning in the future -- there exists a legitimate choice of law issue as to whether the "fair use" doctrine can even be invoked in connection with Japanese books. Therefore, the "predominance" requirement cannot be met as to Japanese rightsholders.

## B.     "Superiority"

Rule 23(b)(3) also requires that a court find that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Among the factors to be considered in making this determination are the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(C) and (D).

Here, geographical dispersion of the vast number of class members globally and their diverse interests and circumstances, as well as the differences in the commercial, legal and political systems they operate under, will make the joinder of class members globally impracticable.

Concerning the difficulties of managing the class action, manageability is a factual issue left to the discretion of the court. *Windham v. American Brands, Inc.,* 565 F.2d 59, 65 (4th Cir. 1977). Among the considerations that bear on the manageability of a class action are: whether the class is finite and easily identifiable (*Ouellette v. International Paper Co.,* 86 F.R.D. 476 (D.Vt. 1980)); whether the potential class members can be contacted (*Mateo v. M/S Kiso,* 805 F.Supp. 761, 774 (N.D. Cal. 1991)); whether the location of class members is known (*Riordan v. Smith Barney,* 113 F.R.D. 60, 66 (N.D. Ill. 1986)); and whether the potential class members are hostile to certification (*id.*).

All these considerations indicate the difficulty of managing this case as a class action: the class here is infinite in number and the class proponents have not been able to identify them; the class proponents, for whatever reason, have failed to contact the majority of the proposed foreign class members in any meaningful way; and the class members, especially those residing abroad, appear overwhelmingly opposed to the class certification.

This case is unmanageable as a class action, at least in the way it is configured now.

## V.
## PROPOSED SETTLEMENT VIOLATES LETTERS OF THE BERNE CONVENTION AND PERVERTS ITS FUNDAMENTAL PURPOSE

While a full discussion of the Berne Convention is beyond the scope of this particular brief, it is important to note that the Proposed Settlement violates both the provisions of the Convention as well as its fundamental sprit.

The Berne Convention was created in order to recognize copyright protection across borders.  4 Melville B. Nimmer and David Nimmer, Nimmer on Copyright §17.01[B][1] (Matthew Bender, Rev. Ed.)(the Berne Convention was born when "nations banded together to recognize copyright protection across their national boundaries").  This basic purpose -- *i.e.*, expansion of copyright protection worldwide -- is wholly perverted by the Proposed Settlement, which attempts to use the Berne Convention in order to reach across national borders to erode copyrights-holders rights.  Further, by applying the "opt out" system to foreign proposed class members who do not have U.S. copyrights, the Proposed Settlement violates explicit provisions of the Convention, such as Article 9(1), which provides that the owners of "works protected by this Convention shall have the exclusive right of authorizing the reproduction of these works, in any manner or form," because the foreign rightsholders are automatically deemed to grant authorization to Google to reproduce their works unless they speak up and "opt out" of the arrangement.

## **CONCLUSION**

For each of the foregoing reasons, the named members of the Japan P.E.N. Club respectfully request that this Court reject the Proposed Settlement and/or decline to certify the class with respect to Japanese and other foreign rightsholders.

Dated: New York, New York
    September 8, 2009

Respectfully submitted,

CARTER LEDYARD & MILBURN LLP

By: _____
    Yasuhiro Saito, Esq.
    Rose Auslander, Esq.
    Pamela Shelinsky, Esq.
2 Wall Street
New York, New York 10005
Tel: (212) 238-8614
Fax: (212) 732-3232
*Attorneys for Members of the Japan P.E.N. Club, Takashi Atouda, Susumu Nakanishi, Akiko Shimojyu, Jiro Asada, Takeaki Hori, Yuko Matsumoto, Chihaya Takahashi, Shinobu Yoshioka, Kenta Yamada, Tomotsuyo Aizawa, Yu Ohara, Yasumasa Kiyohara, Takashi Tsujii, Akira Nogami, Hiroyuki Shinoda, Toshihiko Yuasa, Koichi Kato, Masahiko Motoki, Hidehiko Nakanishi, Yashio Uemura, Nobuo Uda, and Tsukasa Yoshida*
*Members of Proposed Author Sub-Class*