UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                              x
The Authors Guild, Inc., *et al.*,                            x
                                                              x
                        Plaintiffs,                           x
                                                              x
        v.                                                    x    Case No. 05 CV 8136 JES
                                                              x
Google Inc.,                                                  x
                                                              x
                        Defendant.                            x
------------------------------------------------------------- x

## OBJECTIONS TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR ON BEHALF OF CLASS MEMBERS HAROLD BLOOM, ET AL.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

BACKGROUND ............................................................................................................... 2

ARGUMENTS IN OPPOSITION TO THE PROPOSED SETTLEMENT ................................... 2

I.    The Forced-License Model Used in the Proposed Settlement Turns
      Copyright Law on Its Head ....................................................................................... 4

      A.    Forced Licensing Scheme Contradicts the Literal Text and Policy
            Behind Copyright Law .................................................................................... 4

      B.    The Proposed Settlement Is Too Broad; Its Forced License Applies
            to a Variety of Future Uses ............................................................................. 5

II.   The Proposed Settlement Provides the Registry and Google with
      Dangerous Monopoly Power ..................................................................................... 13

      A.    The Sweeping Power and Control Provided to the BRR May
            Violate Antitrust Laws .................................................................................... 13

      B.    The Proposed Settlement Will Bestow Monopoly Power on Google
            for Both Known Rightsholders and Orphan Works ......................................... 17

            1.    Google's Power in Digital Works Arises Directly from the
                  Proposed Settlement ............................................................................. 17

            2.    Non-exclusive Licenses Do Not Mitigate Google's
                  Monopoly .............................................................................................. 18

            3.    The "Most-Favored" Clause Will Act to Preserve Google's
                  Monopoly Power .................................................................................... 18

      C.    Rightsholders Who Opt Out of the Proposed Settlement Will Be
            Unduly Harmed ............................................................................................... 19

III.  Conflicts Exist Within the Author Sub-Class and Between the Author and
      Publisher Sub-Classes .............................................................................................. 20

      A.    Known Rightsholders Cannot Adequately Represent Orphan-
            Works Rightsholders ........................................................................................ 21

      B.    The Proposed Settlement Exacerbates Economic Conflicts
            Between Authors and Publishers ...................................................................... 25

IV.   Attorneys' Fees Are Disproportionate to the Value of the Recovery of the
      Class ................................................................................................................................ 26

CONCLUSION ........................................................................................................................... 28

## TABLE OF AUTHORITIES

**Pages**

**Cases:**

*"Agent Orange" Prod. Liab. Litig.*, *In re*, 818 F.2d 216 (2d Cir. 1987) ......................................26

*Amchem v. Windsor*, 521 US 591 (1997) ...................................................................................20

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .......................................................................10

*Brown v. Board of Educ.*, 349 U.S. 294 (1955) ...........................................................................10

*Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824 (9th Cir. 1997) ......................................4

*Drexel Burnham Lambert Group, Inc.*, *In re*, 960 F.2d 285 (2d Cir. 1992) ..................................20

*FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411 (1990) ..................................................16

*Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189 (2d Cir. 1985) .......................................5

*Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999) ...............................................................................28

*Levine v. American Export Indus., Inc.*, 473 F.2d 1008 (2d Cir. 1973) .........................................24

*National Football League v. Primetime 24 Joint Venture*, No. 98 Civ. 3778 LMM,
     1999 WL 760130 (S.D.N.Y. Sept. 27, 1999) ......................................................................12

*National Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9
     (2d Cir. 1981) ........................................................................................................................6

*Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F. Supp. 2d 561
     (E.D. Pa. 2001) ...................................................................................................................6, 7

*Shults. v. Champion Int'l Corp.*, 821 F. Supp. 520 (E.D. Tenn. 1993) ...........................................8

*Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77 (2d Cir. 2004) ...................................................5

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) ..............................................10

*United States v. ASCAP*, No. 41-1395 (S.D.N.Y. 1941) ...............................................................15

*United States v. ASCAP*, No. 42-245 (S.D.N.Y. 1947) .................................................................15

*United States v. Delta Dental*, 943 F. Supp. 172 (D.R.I. 1996) ....................................................19

*United States v. Grinnell Corp.* 384 U.S. 563 (1966) ...................................................................17

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko LLP,*
     540 U.S. 398 (2004) ............................................................................................................17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ....................................2, 13

**Statutes and Rules:**

15 U.S.C. § 1 ................................................................................................................16

17 U.S.C. § 106 .............................................................................................................4

17 U.S.C. § 115(a) .........................................................................................................4

17 U.S.C. § 201(d) .........................................................................................................4

17 U.S.C. § 501 ............................................................................................................24

17 U.S.C. § 504(c)(1) ...................................................................................................11

17 U.S.C. § 504(c)(2) ...................................................................................................11

Fed. R. Civ. P. 23 .................................................................................................3, 4, 13

Fed. R. Civ. P. 23(e) ....................................................................................................26

**Other Authorities:**

Roy Blount, Jr., *10/28/08 - $125 Million Settlement in Authors Guild v. Google*
    (Oct. 28, 2008), http://www.authorsguild.org/advocacy/articles/member-
    alert-google.html ....................................................................................................8

Thomas Claburn, *Google Readies Its Book Business*, Information Week
    (Jul. 30, 2009), http://www.informationweek.com/news/internet/google/
    showArticle.jhtml?articleID=218900194 ...........................................................11

4 Alba Conte & Herbert Newberg, *Newburg on Class Actions* § 11.46 (4th ed.
    2002) .......................................................................................................................6

Google Book Settlement, Notice to Putative Class Members, *available at*
    http://www.googlebooksettlement.com/r/view_notice .......................................11

myebook, http://www.myebook.com..............................................................................12

6 William F. Patry, *Patry on Copyright* § 22.75 (2009) .................................................4

Press Release, U.S. Dep't of Justice, *Justice Department Announces Agreement to
    Modify ASCAP Consent Decree* (Sept. 5, 2000), *available at*
    http://www.usdoj.gov/atr/public/press_releases/2000/6404.htm .......................14

Public Performance Rights Organizations: Hearing Before the Subcomm. on
    Courts, the Internet and Intellectual Property of the H. Comm. on the
    Judiciary, 109th Cong. (May 11, 2005), *available at* http://frwebgate.
    access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_house_hearings&
    docid=f:21140.pdf...........................................................................................................14

Calvin Reid, *Myebook Wants Your E-Book*, Publishers Weekly (Jul. 13, 2009),
    http://www.publishersweekly.com/article/CA6670368.html?q=myebook%
    2Ecom. .......................................................................................................................12

Second Amended Final Judgment, *United States v. ASCAP*, No. 41-1395 (WCC)
    (S.D.N.Y. June 21, 2001), *available at* http://www.ascap.com/reference/
    ascapafj2.pdf...............................................................................................................14

www.authorsguild.org/services/legal_services/books.html.........................................................15

Class members Harold Bloom, fifty-seven other authors, and the American Society of Journalists & Authors (the "Bloom Objectors")[1] hereby object to the proposed class action Settlement Agreement ("Proposed Settlement") in the above-captioned matter and give notice of their intent to appear through counsel at the fairness hearing scheduled for October 7, 2009, at 10:00 a.m.  The National Writers Union also joins this objection as amicus.

The individual Bloom Objectors are a group of well-known, domestic authors who are members of the putative Plaintiffs' Author sub-class, having written and registered a United States Copyright for many books and inserts.  The American Society of Journalists & Authors ("ASJA") is the professional organization of independent nonfiction writers.  To be eligible to join the ASJA, a writer must have written a minimum of two nonfiction books or eight, full-length articles in a national magazine.  The ASJA is also the publisher and author of several works.  As such, the ASJA is a member of the Author sub-class and potentially a member of the Publisher sub-class.  The National Writers Union (United Auto Workers Local 1981, AFL/CIO) ("NWU") is a national labor union and advocacy organization for freelance and contract writers in all genres, media, and formats.  The NWU works to defend the rights, and to improve the economic and working conditions, of all writers.  The NWU's 1450 members include journalists, book authors, business and technical writers, website and email newsletter content providers, bloggers, poets, playwrights, academic writers, and editors, among others.

---

[1] A complete list of the represented Objectors, along with a short description of recent or notable works is provided in Ex. A.

## BACKGROUND

The Proposed Settlement arises from a suit filed on behalf of authors and book publishing companies against Google Inc. ("Google") for digitally copying books that are under United States Copyright protection. *See* Second Am. Compl. ("Complaint" or "Compl.") ¶¶ 1, 4-7. In December 2004, Google announced an ambitious plan to scan millions of copyrighted books to make these books searchable for users worldwide. *See id.* ¶ 47. In addition to digitizing these books, Google also stated its plans to make the search results and some portion of the books available on its commercial website. *See id.* ¶ 50.

On or about September 20, 2005, the Authors Guild ("the Guild"), among others, brought a putative class-action complaint, alleging that Google's actions constitute a continuing copyright infringement; depreciating the value and ability to license books and inserts; causing lost profits and opportunities; and damaging the goodwill and reputation of the copyright holders. *See id.* ¶ 52. The Guild, certain publishers, and certain authors filed a motion for preliminary approval of the Proposed Settlement on October 28, 2008. Prior to reaching the Proposed Settlement, the dispute was in the early stages of discovery. As of the Proposed Settlement, no dispositive motions had been brought. Nor had Plaintiffs moved for class certification.

## ARGUMENTS IN OPPOSITION TO THE PROPOSED SETTLEMENT

Under well-settled law, a class-action settlement should be approved only if it is "fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation marks omitted). In this case, four fatal deficiencies make the Proposed Settlement unfair, inadequate, and unreasonable to members of the putative class. First, the Proposed Settlement is effectively a forced license that takes property rights away from class members unless they opt out. This unprecedented structure uses

2

Federal Rule of Civil Procedure 23 to turn default copyright law upside down: after approval, Rightsholders will be deemed to have granted a license by virtue of doing nothing. Second, the Proposed Settlement provides Google and the new Book Rights Registry ("Registry" or "BRR") with dangerous monopoly power over all works published prior to 2009. The Proposed Settlement ensures through a multiplicity of protective clauses, including a "most-favored clause," that Google will not find itself at a competitive disadvantage in the markets for digitizing, publishing, and displaying copyrighted books and inserts for at least the next decade. Third, the nominal class representatives do not and cannot represent all putative class members in this case. Substantial conflicts of interest exist within the Author sub-class, especially with respect to orphan works. The Proposed Settlement also exacerbates inherent conflicts between authors and publishers. Finally, the attorneys' fees of $30 million for counsel representing the Author sub-class and $15 million for counsel representing publishers are disproportionate to the value of the recovery of the class. Indeed, the total attorneys fees requested are equal to (or may be *greater* than) the funds paid directly to class members. To assist the Court, the Bloom Objectors have attached a list of proposed amendments to the Settlement Agreement that illustrate the impact of their objections in practical fashion.[2] By a separate motion, the Bloom Objectors also seek limited discovery that arises directly from these objections and seeks to illuminate material issues regarding the fairness and adequacy of the Proposed Settlement.[3]

---

[2] *See* Proposed Amendments to the Settlement Agreement. (Attached as Ex. G).
[3] *See* Discovery Requests to the Representatives of the Author's Sub-Class (Attached as Ex. F).

I.    **The Forced-License Model Used in the Proposed Settlement Turns Copyright Law on Its Head**

A.    **Forced Licensing Scheme Contradicts the Literal Text and Policy Behind Copyright Law**

By operation of Federal Rule of Civil Procedure 23, the Proposed Settlement effectively grants a broad future license in the works of all rights-holding class members, unless they take affirmative action to preclude this result. This is directly contrary to established legal rights and turns traditional expectations and practices on their head. The Copyright Act vests copyright owners with the *exclusive* right to enter into licenses and transfer ownership in their copyrights. *See* 17 U.S.C. §§ 201(d), 106 ("[T]he owner of a copyright under this title has the ***exclusive*** rights to do and to authorize . . . (3) . . . copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.") (emphasis added). Apart from a few limited exceptions – all of which were created explicitly by Congress, *see, e.g.,* 17 U.S.C. § 115(a) (requiring compulsory licenses for phonorecords of a non-dramatic musical work) – rightsholders have complete control over their own rights such that they can license them broadly or not at all.[4]

As a result of the Copyright Act, courts have adopted a policy against forcing copyright owners to provide licenses for their work. Courts routinely issue injunctions in copyright infringement cases so as to avoid making the plaintiff an involuntary licensor of its copyrighted materials. *See Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 828 n.8 (9th Cir. 1997); *see also* 6 William F. Patry, *Patry on Copyright* § 22:75, at n.7 (2009) (failure to enjoin continuing infringement is tantamount to creation of a compulsory license with future damages

---

[4] The license is limitless in scope and time, especially with respect to orphan works. Members of that sub-class have no ability whatsoever to either opt out of the Proposed Settlement or opt out of providing Google with a license to copy, publish, and sell a book or insert.

becoming a royalty) (currently Senior Copyright Counsel at Google).  This Circuit has noted that "[i]n the copyright realm" there are numerous cases that support the proposition that "an injunction should be granted if denial would amount to a forced license to use the creative work of another." *See Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004) (citing authorities).[5]  Indeed, this Circuit has long held that "irreparable harm may ordinarily be presumed from copyright infringement." *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985) (Friendly, J.).

Rightsholders should not be stripped of exclusive control of their copyrights as a condition of the Proposed Settlement.  That result is contrary to law and settled expectations.  Moreover, the current rapid technological change means that the precise nature of all of the new derivative works and uses in digital media of the works being granted to Google cannot be ascertained, anticipated, or fully valued in advance by the class representatives who have taken upon themselves to negotiate a *de facto* mass license.

### B.    The Proposed Settlement Is Too Broad; Its Forced License Applies to a Variety of Future Uses

The breadth of the Proposed Settlement bears little relationship to the Complaint in this case, which focused largely on Google's alleged infringement from its scanning of copyrighted works.  The forced license scheme created by the Proposed Settlement is the opposite of a more traditional injunction or agreement to end the alleged infringing conduct.  And payments from

---

[5] *Silverstein* is instructive because the Second Circuit decided *not* to issue an injunction in that case.  There, the plaintiff sued to enjoin the publication of a collection in which he did not own any of the copyrights in the underlying works and his only copyright was in the organization and selection of the poems in the collection.  In denying the plaintiff's claim for an injunction, the court explained that an injunction would negatively impact the *value* of the underlying poems themselves and that the plaintiff's copyright interest in the collection was too trivial to warrant such drastic relief.  *See id.* at 84-85.  Importantly, the Second Circuit was very much concerned about the ownership interest in the underlying works.

Google to author class members cannot be fairly characterized as damages for infringement by scanning, because they derive largely from revenues arising out of future uses by Google that will be blessed by the Proposed Settlement. In all these respects, the Proposed Settlement is dramatically different than the usual class settlement whereby a common set of grievances and damages are addressed retrospectively in consideration for a release of known claims.

In assessing whether a settlement is fair, adequate, and reasonable, courts have reviewed the breadth of the settlement to ensure it relates adequately to the relief requested in the complaint. *See, e.g.*, *Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F. Supp. 2d 561 (E.D. Pa. 2001). As one respected treatise has explained, "[c]ourts have refused to approve" settlements "on the grounds that . . . the relief sought in the original complaint had little to do with the negotiated settlement." 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.46, at 137 (4th ed. 2002). This concern is especially apt here, where the Proposed Settlement is far broader in scope than the relief to which the Plaintiffs or Google would be entitled if the case were litigated to conclusion.[6] *See National Super Spuds, Inc. v. New York Mercantile Exch.,* 660 F.2d 9, 18 (2d Cir. 1981) (Friendly, J.) ("If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either.").

---

[6] To emphasize the point, consider the following hypothetical. If this case were litigated, Google would most likely present a fair-use defense, arguing that scanning, searching, and publishing snippets of a book online were protected uses. If Google were to win that argument, it would have vindicated its ability to scan, search, and publish small pieces of the copyrighted works. Google, however, would still not be able to sell the book, allow PDF downloads, or publish the book itself (as those activities would clearly be outside the scope of fair use) without the threat of a viable additional lawsuit. Thus, the Proposed Settlement allows Google to engage in these activities to monetize copyrighted works in a way it could not otherwise, even if it was victorious in litigation.

The Complaint alleges that Google has "already copied Books from the collections of various libraries" and continues to do so without the permission of the copyright holders, in violation of their rights under copyright. Compl. ¶¶ 50-51. The Complaint further states that Google has "announced plans to publicly display the Books on its commercial website." *Id.* ¶ 50. The Complaint, however, does not allege with any detail how Google plans to use the books and inserts it copies on its commercial website. Nor does the Complaint allege that certain such future uses – specified or not – constitute further violations of Plaintiffs' copyrights.[7]

The difference between the scope of the Complaint and the Proposed Settlement is striking. The Proposed Settlement is 134 pages long with an additional 13 attachments totaling more than 300 pages. It reads more like the Code of Federal Regulations than a release of claims. In this regard, *Schwartz v. Dallas Cowboys Football Club* is instructive. There, the court rejected a proposed settlement of a class action under the Sherman and Clayton Acts, challenging the NFL's requirement that satellite-television viewers purchase a bundle of all regular season Sunday afternoon games. Even though the court had preliminarily approved the settlement, it refused to grant final approval and outlined three main concerns about the breadth of the proposed settlement. First, the settlement's release provision included issues that did not arise from the same set of facts alleged in the complaint. *See* 157 F. Supp. 2d at 577. Second, the court disagreed with the settlement's bar on "later claims based on *future* conduct." *Id.* at 578 (emphasis added). Third, the court was concerned that the defendant would receive a very broad release in return for a modest outlay of cash and small benefits to the class members.

---

[7] For example, a plagiarism alert system could be devised, and sold on a subscription basis to authors and publishers, by Google. Since never anticipated in this Proposed Settlement, no negotiated proceeds of such derivative exploitation of all of the digitized works (or "research corpus") would come to the owners, on any pro-rata or other fair, negotiated basis.

These same issues are all present in this case. First, the Proposed Settlement is dramatically broader and more future oriented than the infringing facts alleged in the Complaint. For example, the Proposed Settlement would seem to allow the BRR to license Rightsholders' copyrights to third parties. *See* Proposed Settlement § 6.2(b) (stating that the BRR will be organized so that it can "to the extent permitted by law, license Rightsholders' U.S. copyrights to third parties."). This proliferation of licenses does not even purport to be a remedy for the alleged harm arising from Google's actions in creating a digital copy of a book or displaying that copy on its website. *See* Compl. ¶ 50. Instead, the parties have essentially created a new business enterprise that the Registry will manage without any individualized agreement by Rightsholders. Roy Blount, Jr., the Guild President, described the Guild's initial proposal to Google of May 2006 in exactly those terms: "[I]f you're willing to do something far more ambitious and useful, and you're willing to cut authors in for their fair share, then it would be our pleasure to work with you."[8] Further, the Proposed Settlement provides that the BRR and Google "may, over time, agree to new revenue models" such as custom publishing, PDF downloads, and print on demand. Proposed Settlement § 4.7. Again, there is no allegation in the Complaint that Google intended to infringe on copyrights by providing any of the services listed in § 4.7 of the Proposed Settlement.

Second, the Proposed Settlement does not confine itself to a straightforward release of legal claims arising from past damage, but rather creates a complex scheme that releases Google from future conduct and precludes future suits by shunting them to arbitration. *See Shults. v. Champion Int'l Corp.*, 821 F. Supp. 520, 524 (E.D. Tenn. 1993) ("No settlement that precludes future, unknown causes of action can be considered fair, reasonable, or in the best interests of the

---

[8] Roy Blount, Jr., *10/28/08 - $125 Million Settlement in Authors Guild v. Google* (Oct. 28, 2008), http://www.authorsguild.org/advocacy/articles/member-alert-google.html. (Attached as Ex. B).

class as a whole."). Class members will be releasing Google from a wide range of potential

future infringement, regardless of whether the infringing acts were the subject of the Complaint.

For example, if Google decides (and the BRR agrees) to allow PDF downloads of books, it will

be able to do so. *See* Proposed Settlement § 4.7. Rightsholders will not have the ability to

challenge that decision because they have effectively already licensed that activity.[9]

Moreover, the Proposed Settlement broadly precludes Rightsholders from bringing suit

for future infringement in federal court. This will have far reaching effects on authors,

apparently foreclosing their access to federal court to determine, for example, what rights in

online digital uses were granted to a publisher under an author's book contract or whether any

uses after January 5, 2009, of works digitized by Google before that date, and for which payment

is not set out in the Proposed Settlement, infringe the owners copyright. *See* Proposed

Settlement § 9.1(a) (providing that all disputes between Google, the BRR, Rightsholders, and

Participating Libraries that arise out of the Proposed Settlement shall be subject to arbitration,

with a few exceptions). Presumably, this waiver of rights to sue in federal court would survive

even if Rightsholders explicitly decided to remove their copyrighted work pursuant to § 3.5 in an

attempt to revoke their license. An appropriate class action settlement should assess reasonable

damages for a waiver of past infringement occurring prior to the conclusion of settlement,

January 5, 2009; not *deal in* the class's copyrights by licensing them to the infringer on an

ongoing basis.

---

[9] The response that a Rightsholder can always opt out of a given program is unavailing. By
providing a blanket license to the BRR and Google, the Rightsholders must constantly monitor
their rights to determine whether they need to take affirmative action to opt out. Additionally,
orphan-works owners cannot opt out at all, and, thus, Google and the BRR will always have a
group of conscripted participants.

It is true that in some circumstances courts have adopted broad, remedial injunctions when necessary to correct ongoing harm. *See, e.g., Brown v. Board of Educ.*, 349 U.S. 294, 300-01 (1955) (ordering the integration of schools to rectify or prevent continued racial discrimination); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 29-30 (1971) (holding that busing children outside their immediate neighborhood was a legitimate tool for promoting school integration; allowing district court judges to enter orders directing the use of busing to eliminate school segregation); *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir. 2001) (upholding injunction against prison that required it to modify its policies and procedures, to provide training to its staff, to provide reasonable accommodations to disabled prisoners and parolees, and to provide communication regarding hearings and appeals).

These broad, structural injunctions are not analogs to this case, however. Such aggressive remedies have been used generally to prevent ongoing constitutional violations by governmental institutions. Moreover, the injunctions are typically only used to restore a certain constitutional standard of behavior. Thus, in those cases, only a court could require the public institution to behave in a constitutional fashion – even if that means placing them under an ongoing injunctive scheme.

By contrast, a structural injunction is simply not appropriate here. Google does not need court supervision to meet its copyright and other legal obligations nor is Google engaged in ongoing constitutional violations. The Complaint alleges that Google digitized copyrighted works and may attempt to display some portion of them on its website. This conduct is easily remedied by a traditional injunction – that is, an injunction that prevents Google from committing the same violation in the future.

Third, even if the broad future release in the Proposed Settlement were appropriate (and it is not), the consideration paid by Google to the class is insufficient. The Proposed Settlement provides Google with the right to "[d]igitize all Books and Inserts." Proposed Settlement § 3.1(a). To put that in perspective, this Proposed Settlement covers virtually *every* "written or printed work" that is registered and was published prior to January 5, 2009 – estimated at tens of millions of works.[10] *See* Notice to Putative Class Members.[11] Google will pay only $45 million directly to the Class for these broad rights. Class members who allege that they have already had their rights violated by Google will only receive $60 per book, $15 per insert, or $5 per partial insert. *See* Proposed Settlement § 5.1(a). By contrast, these same copyright holders would be able to collect up to $150,000 per violation if they were to sue Google individually. *See* 17 U.S.C. 504(c)(2). At minimum, they would be able to collect $750 for each work, *see* 17 U.S.C. 504(c)(1), which is substantially more than the $60 offered in the Proposed Settlement, even after discounting for the inherent risk of litigation. Moreover, advertising revenue for ads positioned on books, if navigated from Google's general search, is excluded from the net revenues to be paid to the owners. *See* Proposed Settlement § 3.14. Advertising revenue will likely be a very material source of revenue from the display of books online; advertising currently constitutes the lion's share of Google's revenue. And non-display uses may also generate substantial revenue in the future. The settling parties have put no evidence in the approval record that explains the basis for the $60, $15 or $5 cash payments – much less any

---

[10] Google reportedly has already copied more than 10 million books of which 1.5 million may be part of the public domain. *See* Thomas Claburn, *Google Readies Its Book Business*, Information Week (Jul. 30, 2009),
http://www.informationweek.com/news/internet/google/showArticle.jhtml?articleID=218900194 (Attached as Ex. C).

[11] Google Book Settlement, Notice to Putative Class Members, *available at* http://www.googlebooksettlement.com/r/view_notice. ("Notice").

valuation study that substantiates the adequacy of those payments. Similarly, the settling parties

have not offered estimates or studies attempting to quantify the revenue potentially generated

from the display and non-display uses that Google will have the right to engage in upon approval

of the Proposed Settlement. On this record, the parties have not carried their burden to

demonstrate that the settlement consideration is fair, reasonable or adequate.

Even if this Court concludes that the small benefit that accrues to the class members is

sufficient, such benefit should not be calculated on an *ex ante* basis and codified into a skewed

allocation of pooled revenues. The Proposed Settlement allows Google to lock up a perpetual

37% gross of the aggregate revenue stream generated – 30% off the top and 7% for Google's

"overhead." *Id.* § 2.1(a). This amount is much higher than the current market allocation

between authors and publishers. To put the current deal in perspective, there are online

publishing companies that currently charge 10% or less.[12] And Google will make no attempt to

pay individualized royalties to any Rightsholder. *See id.* and Plan of Allocation (Attachment C

to the Proposed Settlement). Finally, the Registry will take a self-determined commission for its

services, which are estimated at 10-20%, but are uncapped under the Settlement Agreement.

This Court should not approve a settlement that monetizes in advance the consideration paid for

future infringement. *Cf. National Football League v. Primetime 24 Joint Venture*, No. 98 Civ.

3778 LMM, 1999 WL 760130, at *4 (S.D.N.Y. Sept. 27, 1999) (refusing to create a compulsory

license that would turn future damages into a royalty stream).

---

[12] *See*, *e.g.*, myebook, http://www.myebook.com; *see also* Calvin Reid, *Myebook Wants Your E-Book*, Publishers Weekly (Jul. 13, 2009),
http://www.publishersweekly.com/article/CA6670368.html?q=myebook%2Ecom. (Attached as Ex. D).

II.    **The Proposed Settlement Provides the Registry and Google with Dangerous Monopoly Power**

The Proposed Settlement imbues the Registry and Google with sweeping powers. By operation of Federal Rule of Civil Procedure 23, the Registry will spring into being and immediately have enormous reach, resources, and control over licensing, mediating ownership disputes, processing payments, maintaining copyright information, and negotiating on behalf of *both* publisher and author class members. In addition, Google will be established as the dominant player in the searchable digital works market for years. In both cases, the market power accrues as a direct result of the Proposed Settlement, rather than accretive growth of a loyal and well-served membership in the case of the BRR or long-term superior products and business acumen in the case of Google.

Recognizing the potential for abuse, the United States Department of Justice ("DOJ") is currently investigating the antitrust issues arising from the Proposed Settlement. Regardless of whether the DOJ concludes its investigation prior to the Final Approval hearing, the settlement approval process does not provide a mechanism to resolve the antitrust concerns in favor of the parties – either now or in the future. The predominant focus of the antitrust laws is the preservation of competition for the benefit of the consumer. By contrast, the settlement approval standard focuses almost entirely on the reasonableness of the settlement from the perspective of the litigating parties. *See Wal-Mart*, 396 F.3d at 116-17.

A.    **The Sweeping Power and Control Provided to the BRR May Violate Antitrust Laws**

The Registry will be given a broad mandate pursuant to the Proposed Settlement. On behalf of Rightsholders, the Registry will (i) own and maintain a rights information database, (ii) attempt to locate Rightsholders, (iii) receive payments from Google and distribute them to Rightsholders, (iv) assist in the resolution of disputes between Rightsholders, and (v) license

13

class members' U.S. copyrights to third parties to the extent permitted by law. *See* Proposed

Settlement §§ 6.1 & 6.2.

These far-reaching powers arise directly from the Proposed Settlement. Upon final

approval, the Registry will wield full authority, including re-licensing rights, to deal in all

existing works that were not opted out of the Proposed Settlement. Given typical opt-out rates in

a class action settlement involving individuals, it seems likely that the Registry will have power

over a very large percentage of all existing copyrighted works – probably in excess of 98%. To

put that power in perspective, The American Society of Composers, Authors and Publishers

("ASCAP"), which is one of the largest music licensing organizations in the country, acts on

behalf of only approximately 50% of existing performing rights.[13] And ASCAP, by contrast,

grew to its present size because authors, composers, and publishers joined voluntarily –

presumably because they believed they would be better off as ASCAP members. Yet even

though ASCAP started small and with a voluntary membership, it quickly ran afoul of antitrust

laws and has operated under a DOJ consent decree continuously since 1941. In fact, the consent

decree was recently renewed in 2001 even though ASCAP faces competition from other

organizations like Broadcast Music, Inc. ("BMI") (also under consent decree) and SESAC, Inc.[14]

The record on Final Approval provides little comfort that the Registry will be able to

avoid the antitrust temptations that ASCAP found inescapable. Nothing in the Proposed

---

[13] *See* Public Performance Rights Organizations: Hearing Before the Subcomm. on Courts, the Internet and Intellectual Property of the H. Comm. on the Judiciary, 109th Cong. (May 11, 2005), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_house_hearings&docid=f:21140.pdf.

[14] *See* Second Amended Final Judgment, *United States v. ASCAP*, No. 41-1395 (WCC) (S.D.N.Y. June 21, 2001), *available at* http://www.ascap.com/reference/ascapafj2.pdf; *see also* Press Release, U.S. Dep't of Justice, *Justice Department Announces Agreement to Modify ASCAP Consent Decree* (Sept. 5, 2000), *available at* http://www.usdoj.gov/atr/public/press_releases/2000/6404.htm. (Attached as Ex. E).

Settlement specifically limits the Registry's ability to abuse its power with respect to potential licensees or to discriminate against certain authors or groups of authors – even though these types of conduct have historical antecedents. *See, e.g., United States v. ASCAP*, No. 41-1395 (S.D.N.Y. 1941); *United States v. ASCAP*, No. 42-245 (S.D.N.Y. 1947).

To the contrary, the Proposed Settlement creates a host of inherent conflicts of interest for the Registry. For example, the Registry is "*authorized* to act on behalf of Rightsholders," (emphasis added) yet nowhere in the Proposed Settlement is the Registry *required* to act in the best interests of Rightsholders, much less assigned a fiduciary obligation to do so. Proposed Settlement § 6.1(a). This is of particular concern since all of the Registry's initial funding is provided by Google and all of its continuing funding derives from a percentage of revenues generated from Google's use of class members' works. Similarly, the Registry's records and reporting and audit obligations run only to Google. Rightsholders have no explicit ability to seek an accounting of the Registry's activities or to view its annual reports. *See id.* §§ 6.3(c) & (d).[15] Nor do Rightsholders have a clear right to periodic accountings from Google (individual or otherwise) concerning revenues generated by exploitation of their individual works. The audit that the Registry may seek from Google is subject to confidentiality, and, thus, individual Rightsholders may not be privy to its details. *See id.* § 4.6(e). These conflicts serve to highlight the fact that the Registry has no real independence from Google.

The Registry has an additional conflict of interest with respect to revenues generated from use of orphan works. Revenues derived from orphan works will be held for five years to give orphan Rightsholders an opportunity to claim them. After five years, however, the Registry

---

[15] Ironically, this lack of accountability runs counter to the Authors Guild's legal recommendation to its author members that they "insist on at least a bi-annual accounting" and "include an audit clause" in their contracts with publishers. *See* www.authorsguild.org/services/legal_services/books.html.

is entitled to first use of these funds to defray Registry operating expenses. *See id.* § 6.3(a)(i). Any remaining funds go next to the benefit of registered Rightsholders in the form of pro rata payments. *See id.* § 6.3(a). And finally, remaining funds, if any, will be distributed to charities chosen by the Registry after consultation with Google. *See generally id.* § 6.3. Thus, the Registry and registered Rightsholders have an explicit financial interest in revenues generated from the license in orphan works, but the Registry and the registered Rightsholders only benefit from their interest to the extent that the holders of orphaned rights are not identified.

Finally, the Proposed Settlement expressly requires the Registry to agree with Google on prices and pricing strategies for a range of offerings. With respect to institutional subscriptions and other offers, all prices and pricing strategy decisions for institutional offerings will derive from explicit coordination between Google and the Registry. *See, e.g., id.* § 4.1(a) (vi) ("Google shall propose initial pricing strategy"); *id.* § 4.1(a)(vi)(4)(a) ("initial Pricing Strategy must be agreed upon by Google and the Registry . . . ."). Even for consumer offerings, "Google and the Registry will agree upon a set of pre-defined prices for Books" unless the Rightsholder comes forward and specifically identifies a sales price for the work in question. *See id.* §§ 4.2(b) & (c).

Any agreement in restraint of trade is illegal. *See* 15 U.S.C. § 1. And agreements among competitors to fix prices have been held to be per se illegal. *See FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 432-36 (1990). Thus, the Registry's broad powers, its funding sources, its obligations to Google, and its mandate to coordinate pricing with Google all raise serious antitrust concerns.

These concerns cannot be assuaged by general statements in the Proposed Settlement that Google's activities will be of "great benefit to copyright owners . . . and to libraries, researchers, and the reading public." *See* Proposed Settlement at 1. The parties' general statements with

16

respect to Rightsholders cannot be viewed as more than aspirational given that the Registry does not actually represent authors or publishers and has no agency duty to them. The purported benefits to the general public, even if true, come at the direct expense of Rightsholders.

**B.    The Proposed Settlement Will Bestow Monopoly Power on Google for Both Known Rightsholders and Orphan Works**

The Proposed Settlement ensconces Google in a dominant position in the market for searchable digital works for all Rightsholders that do not opt out. It further ensures via a "most-favored" clause that Google cannot be out maneuvered by its competitors for a period of ten years. Both these features arise directly from the Proposed Settlement and raise serious antitrust concerns.

**1.    Google's Power in Digital Works Arises Directly from the Proposed Settlement**

Google has made no efforts to negotiate for a broad license with all the known Rightsholders individually (even though it is well positioned to do so). And, of course, a comprehensive negotiation relating to the orphaned Rightsholders is impossible by definition. Nor can Google fairly claim that its preeminent position in digital works flows out of a superior product or business acumen because Google has not pursued a model by which it sought to persuade Rightsholders to sign up for its service voluntarily. *See, e.g., Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 407 (2004) (Abuse of monopoly power is "'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'") (quoting *United States v. Grinnell Corp.* 384 U.S. 563, 570-71 (1966)).

Rather, Google plunged into its digitization program with little apparent concern for Rightsholders. After the Guild sued on their behalf, Google persuaded the Guild to go along with the Proposed Settlement, which has the effect of collectivizing Rightsholders and provides

Google with a broad and forward-looking license in all copyrighted works whose owners do not affirmatively disavow the Proposed Settlement. Thus, Google's market power in searchable digitized works will not be the result of a superior product, business acumen, or history. It will result directly from Google's clever settlement.

### 2. Non-exclusive Licenses Do Not Mitigate Google's Monopoly

Google may argue that it does not have a monopoly in the copyrighted works because it only receives a non-exclusive license from the Rightsholders. This argument has superficial appeal, but it ignores practical realities. First, the Proposed Settlement explicitly does not allow competitors to access Google's digitized scans at any price or on any terms. *See* Proposed Settlement § 6.6(b). Thus, the obvious route for competition has been foreclosed. To the extent competitors decide to pursue the project of re-inventing the wheel by re-scanning all domestic works prior to January 2009, competitors will face substantial barriers to entry. Would-be competitors will have to gain access to the original books and inserts. To gain access, the competitors would have to convince the libraries to provide books again for scanning. Many libraries may object to the duplicative handling of their collections, especially with respect to the older works. Would-be competitors would then have to get sued and settle on near-identical terms as Google in order to compete effectively. All this seems very unlikely. There is no probability that a subsequent infringement action will include the same parties as Plaintiffs and a willingness on their part to settle for substantially identical consideration.

### 3. The "Most-Favored" Clause Will Act to Preserve Google's Monopoly Power

Finally, the "most-favored" clause largely defeats the non-exclusivity of Google's license by creating another substantial barrier to entry. The Proposed Settlement's "most-favored" clause provides that the BRR and "any substantially similar entity" must "extend economic and

other terms" to Google that "do not disfavor or disadvantage Google as compared to . . . third parties" for a period of 10 years. *Id.* § 3.8 (a). In addition, the BRR must provide Google the details of any side agreement made between the BRR and third parties, ostensibly so that Google can "obtain the benefits of such authorization." *Id.* This later provision allows Google to receive forewarning of any competitor who may attempt to enter Google's market.

Under the rule of reason, a "most-favored" clause can run afoul of antitrust laws if the anticompetitive effects of the clause outweigh its legitimate justifications. *See United States v. Delta Dental*, 943 F. Supp. 172, 179-80 (D.R.I. 1996) (holding that the government's allegations were sufficient to show that the most-favored nation clause was anticompetitive under the rule of reason). The only apparent purpose of the "most-favored" clause in this Proposed Settlement is to ensure that Google remains dominant in this field by creating another barrier to entry. The Proposed Settlement operates to prevent the BRR from offering better deals to Google's competitors. For example, if a Google competitor offered authors 60% of gross revenues (and other incentives) instead of the 63% in the Proposed Settlement, the BRR would be forced to reject the offer or give Google the same deal. Further, Google would know the exact terms of any agreement and thus would be able to anticipate any actions made by its competitor (e.g., the adoption of new revenue models, etc.).

### C.    Rightsholders Who Opt Out of the Proposed Settlement Will Be Unduly Harmed

Any Rightsholder who opts out of the Proposed Settlement will be harmed by the monopolies held by Google and the BRR. If the Proposed Settlement is adopted in its current form, Google and the BRR will have no practical incentive to negotiate with opt-out Rightsholders. This is partly due to practical considerations and partly due to business incentives. Any Rightsholder who opts out of the Proposed Settlement is likely to be placed at

19

the end of the line for digitization and publishing because for the near-future Google will likely have more than enough to do dealing with the works of class members who did not opt out of the Settlement. Google and the BRR will also be in a position to tender "take it or leave it" terms to those who opt out, since they know that no other entities can provide services of similar scale and scope. And authors who opt out will have already foregone valuable exposure for their works. Finally, there is a legitimate fear that Google will discriminate against authors who opt out by altering its search protocols or advertising algorithms so as to impede their ability to promote their works through alternative channels. In essence, anyone who opts out is presented with a Hobson's choice: either accept a sub-par deal that greatly devalues your copyright or opt out of the agreement and take your chances that Google and the BRR will act as benevolent monopolists. A settlement agreement that forces rightsholders to make that decision should not be approved.

**III.     Conflicts Exist Within the Author Sub-Class and Between the Author and Publisher Sub-Classes**

When a court has not certified a litigation class pursuant to a contested hearing, it must review any proposed settlement class with heightened scrutiny. *See Amchem v. Windsor*, 521 US 591 (1997). This heightened review is of vital importance because the court lacks the opportunity to adjust the class later in response to evidence and arguments advanced through the adversarial process. *Id.*; *see also In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992) (holding that where the "district court simultaneously certifies a class and approves a settlement of the action," the Circuit court will "more rigorously scrutinize the district court's analysis of the fairness, reasonableness and adequacy of both the negotiation process and the proposed settlement").

In any class action it is imperative that the class be represented by those who have the same interests as members of the class. Without unitary interest, class members may be forced to give up rights and benefits to which they are entitled. This is especially true in the case where a class member is giving up a valuable property right and not simply foregoing a legal right to sue on a claim. The Proposed Settlement has at least two obvious structural conflicts. First, known Rightsholders are in direct financial conflict with those who own copyrights in books and inserts but are not yet known (i.e., orphan works). These two distinct groups cannot be represented by the same plaintiffs and counsel. Instead, the Court should create an orphan-works sub-class and appoint class counsel to represent it. Second, conflicts between publishers and authors will be exacerbated by the Settlement regime.

### A.   Known Rightsholders Cannot Adequately Represent Orphan-Works Rightsholders

The Proposed Settlement contains provisions that create a direct financial conflict between authors who are registered Rightsholders and Rightsholders of orphan works. By definition, Rightsholders of orphan works cannot be contacted to get their input or instructions with respect to their copyright interest in a work.

The Proposed Settlement provides that revenues derived from an orphan work will be paid first to the BRR and then to registered Rightsholders, if the Rightsholder of the orphan work does not come forward within five years of when the book first earned revenues.[16] *See* Proposed

---

[16] The Proposed Settlement differentiates between those who are registered Rightsholders and those who are not. An orphan-work's author, by definition, must be part of the non-registered Rightsholders category. Once an orphan-work's author comes forward to register a work, the work ceases to be an "orphan work."

Settlement § 6.3(a)(i). Registered Rightsholders, as a class, can receive up to 63%[17] of the gross revenue received by Google for a particular book with the remainder provided to a 501(c)(3) organization, which can only be chosen in consultation with Google. *See* Proposed Settlement § 6.3(a)(i). Given that the amount of revenue to be distributed to each individual registered Rightsholder, on a proportional basis, will be greater if the number of registered Rightsholders remains small, the registered Rightsholders do not have an incentive to find authors of orphan works. In fact, they have an economic incentive to discourage or prevent authors from coming forward to register on the BRR.

The Proposed Settlement also forces orphan-works Rightsholders to accept a settlement-controlled price, which is set by Google. *See id.* § 4.2(b)(iii). This Proposed Settlement-controlled price only needs to be "reasonable[]," *see id.* § 4.2(c)(ii)(2), which provides enormous latitude to Google. Conversely, registered Rightsholders have the ability to set their own price for their works. *See id.* § 4.2(b)(i)(1). This disparate treatment reinforces the fact that those representing registered Rightsholders cannot also represent orphan-works Rightsholders.

Moreover, the economic interests of the Rightsholders in the Proposed Settlement may not be their only consideration. It has long been recognized, however, that copyright holders act based on numerous incentives, with economics being only one of many factors that are relevant to accepting a licensing deal. The orphan-works authors do not have a mechanism to voice either their displeasure or their acceptance of such an arrangement. It may be the case that at least some subset of the orphan-works Rightsholders would prefer that their works be available

---

[17] Of course, even registered Rightsholders will not receive the full 63% as the Registry will use a portion of that revenue for administrative costs and operations. *See id.*, Attach. C (Plan of Allocation) § 4.2.

under another license scheme (e.g., Creative Commons licenses), or put in the public domain. The current class structure and the Proposed Settlement, however, preclude any such resolution.

Google may argue that because an orphan-work owner is, by definition, unknown, it is impossible to get their express permission to engage in the acts contemplated by Google and the Proposed Settlement. But that is exactly the point. Anyone (other than Google) who attempted to copy or otherwise use orphan works would run the risk of having the owner come forward and sue for willful copyright infringement. It is not surprising that most companies and individuals will avoid using orphan works in a manner that could subject them to liability under the copyright statute. Although the status quo may not be ideal, in the sense that there may be under-utilization of orphan works, Congress created the status quo and has left it in place for some time now even though the orphan issue has received significant attention. This Court should not allow the parties to rewrite legislation through a class action settlement.

The orphan-works Rightsholders have no opportunity to opt out of these proceedings. If in the future an owner comes forward to claim ownership in a copyright that was covered by this class action, the owner would be precluded from opting out of any of the requirements at that point. Certainly, the owner could not sue Google for its use of his work given the broad release language in the Proposed Settlement. The inability to opt out unfairly prejudices those who are orphan-works Rightsholders. The class action vehicle gives Google an advantage that it otherwise could not get on an individual basis because it would be unable to negotiate with all orphan-works Rightsholders.

To crystallize the point consider the following hypothetical: If Google were forced to defend individual lawsuits against copyright holders for copyright infringement, it would not be subject to lawsuits from orphan-works holders because an orphan-works holder is by definition

unknown, and lawsuits must be brought by known Rightsholders. Further, no one would be able to sue in lieu of the orphan-works owner for copyright infringement. *See* 17 U.S.C. § 501. At some later time, however, if an owner came forward to claim what was previously considered an orphan work, that owner would have a cause of action against Google for copyright infringement. The owner's claim would encompass the period in which Google engaged in copyright infringement; it would not start at the time the owner came forward to claim ownership in the work.[18]

Contrast that scenario with the Proposed Settlement where Google would not be subject to any claim by an orphan-works Rightsholder who later came forward. The owner would be unable to opt out of the Proposed Settlement for the period prior to coming forward to claim ownership in the orphan work. More importantly, the owner would be precluded from suing Google for copyright infringement for this period – a right Google would be *unable* to enjoy without the class action device. Thus, as currently structured, the Proposed Settlement provides Google rights that it could not otherwise obtain without the class action procedure at the expense of those who are orphan-works Rightsholders.

The inherent problems with deciding the best interests of unknown Rightsholders compel the Court to remove all orphan works from the definition of the settlement class. At the very least, given the conflict of interest between orphan-works Rightsholders and known Rightsholders, there is a need to appoint a class representative for orphan-works Rightsholders. The orphan-works Rightsholders should be separately represented so that counsel can focus solely on their interests without also attempting to satisfy the interests of other Rightsholders. *See Levine v. American Export Indus., Inc.*, 473 F.2d 1008, 1009 (2d Cir. 1973) (stating that "[i]n

---

[18]Statute of limitations, laches, and other estoppel arguments are not considered for purposes of this hypothetical.

the event that a conflict of interest looms upon the horizon, the appointment of separate counsel for each [subclass] . . . may well be advisable").

Any argument that the representative plaintiffs from the Author sub-class can represent the interests of the orphan-works owners is simply wrong. Named plaintiffs are all named and known copyright holders and as such cannot be adequate representatives of the interests of the orphan-works class. The Guild, which is an associational plaintiff, claims to represent its member authors. But the Guild only claims to represent approximately 8,000 authors, which is only a tiny fraction of the authors affected by the Proposed Settlement. Moreover, the Guild professes no expertise with the computer or internet industry, or its business models, or the terms of any licenses of electronic products, services, or rights. There appears to have been no professional evaluation of the economic value of the digitizations being licensed to Google in this matter. And there has been no economic valuation (at least disclosed by Google or the class representatives) for the claims of past infringement.[19]

## B.    The Proposed Settlement Exacerbates Economic Conflicts Between Authors and Publishers

Authors and publishers have traditionally been economic adversaries – negotiating from opposite sides of the table over their respective shares of published, copyrighted works. Often both authors and publishers will hold rights in the same work, at least for a specified period of time. Judicial notice can be taken of the many disputes that have arisen between authors and publishers.

This case has authors and publishers aligned on the caption and as members of the same class because both claimed injury from Google's digitizing activities. The Proposed Settlement,

---

[19] In concurrently filed discovery requests, the Bloom Objectors ask Google and class representatives to disclose any calculations or economic valuations that justify the Proposed Settlement amounts. *See* Discovery Requests (Attached as Ex. F).

by defining "Rightsholders" to include both authors and publishers, forces these traditional adversaries to sort out which of them is entitled to compensation Google will pay pursuant to the Proposed Settlement – whether in the form of the upfront cash payment of $60 per Work or later revenues generated from any of Google's subsequent activities.  Indeed, the settling parties recognized that "Publishers and Authors . . . may have legitimate and overlapping rights to authorize use of and receive compensation for Books."  Procedures Governing Author Sub-Class and Publisher Sub-Class Under the Settlement Agreement at 1 (Attachment A to Proposed Settlement) ("Procedures").  Thus, they developed a complicated set of procedures by which authors and publishers must sort out their rights to claim compensation for the same Work. These Procedures, for example, include definitions and tests to determine whether a book is in print or not and create a dispute resolution mechanism under the auspices of the Registry in the event of disagreements.

The Proposed Settlement thus displaces a critical portion of the existing contract between an author and publisher for any given work.  The Proposed Settlement also supersedes existing rights to sue for breach of contract or breach of copyright in a court of law by imposing the Registry and binding arbitration on class members instead.  Both of these post-hoc modifications of the class's pre-existing rights are inappropriate and unnecessary for the reasons mentioned above in Section I.  Moreover, the Settlement regime will invite abuse and overreaching because of the presence of tangible remuneration.  And the disturbing likelihood exists that the claiming procedures will unduly favor publishers because of their greater resources and organization.

## IV.    Attorneys' Fees Are Disproportionate to the Value of the Recovery of the Class

Federal Rule of Civil Procedure 23(e) requires careful scrutiny of fee requests to prevent excessive fees and public hostility toward the judicial process and class actions in particular.  *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 225 (2d Cir. 1987).  Given that the

Proposed Settlement prevents Google from "undermin[ing] in any way, or encourag[ing] anyone
else to undermine in any way" the fee award, there will be little adversarial process by which to
test the appropriateness of the forthcoming fee petition. Proposed Settlement § 5.5. Counsel for
the Author sub-class has stated that it "will request that the Court" award attorneys' fees and
expenses of $30 million, the maximum allowed by the Proposed Settlement.[20] Counsel for the
Publisher sub-class have an agreement that Google will not object to fees up to $15 million.

 Forty-five million dollars in attorneys' fees is excessive when compared to the $45
million that the Proposed Settlement *may* provide to members of the Author sub-class. Although
class counsel may argue that the total settlement value is $125 million, most of that amount is not
earmarked for the benefit of the class. Thirty-five million is dedicated to set up the Registry and
$45 million is set aside for attorneys fees. While the BRR may provide revenue to class
members in the future, that revenue must be viewed at present as speculative – especially since
the settling parties have not put any studies or valuations into the record on approval that purport
to estimate future compensation to class members.

 The Bloom Objectors asked Plaintiffs, in concurrently filed discovery requests, to
provide itemized time and expense records in this case in order to review counsel's request for
$45 million in fees for reasonableness. Until counsel provides such information and Bloom
Objectors have a chance to review for reasonableness, no fee should be awarded.

---

[20] *See* Notice at 27.

## CONCLUSION

For the foregoing reasons the Court should not approve the Proposed Settlement.[21]  The Bloom objectors further give notice of their request to appear at the fairness hearing through counsel.

Respectfully submitted,

*s/ Michael J. Guzman*
Michael J. Guzman (admitted pro hac)
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC  20036-3209
Tel:  (202) 326-7900
Fax:  (202) 326-7999
mguzman@khhte.com

Lynn Chu, Esq.
Writers Reps LLC
116 West 14th Street, 11th Floor
New York, NY  10011-7305
lynnchu@writersreps.com

September 8, 2009

*Counsel for Harold Bloom, et al.*

---

[21] Under *Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999), an objector need not file a motion to intervene in a class action case to preserve his rights to appeal so long as he has an "interest that is affected" by the district court's judgment. *Id.* at 66-67.  To the extent that objectors must file a motion to intervene to preserve appellate rights, objectors ask the Court to construe this brief as a motion to intervene and objection to the Proposed Settlement.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system on September 8, 2009. Any other counsel of record will be served via

electronic and first class mail.

*/s/ Michael J. Guzman*
Michael J. Guzman (admitted pro hac)
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC  20036-3209
Tel:  (202) 326-7900
Fax:  (202) 326-7999
mguzman@khhte.com

*Counsel for Harold Bloom, et al.*
