UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

The Authors Guild, Inc., Association of    :
American Publishers, Inc., et al.,

                         :    Case No. 05-cv-8136 (DC)

           Plaintiffs,

                         :    ECF

          v.

                         :

Google, Inc.,

           Defendant.          :

                         :

------------------------------------ X

## *AMICUS CURIAE* BRIEF OF SONY ELECTRONICS INC. IN SUPPORT OF PROPOSED GOOGLE BOOK SEARCH SETTLEMENT

COOLEY GODWARD KRONISH LLP
Jennifer B. Coplan (JC-6123)
Janet L. Cullum (JC-2083)
1114 Avenue of the Americas
New York, New York 10036
Tel.: (212) 479-6000

COOLEY GODWARD KRONISH LLP
Jeffrey M. Gutkin (216083)
Benjamin R. Jones (255471)
101 California Street 5th Floor
San Francisco, CA 94111-5800
Telephone:    (415) 693-2000

*Attorneys for Amicus Curiae, Sony Electronics Inc.*

# TABLE OF CONTENTS

**Page**

I.  STATEMENT OF INTEREST ............................................................................ 1

II.  SUMMARY OF ARGUMENT ........................................................................ 2

III.  ARGUMENT .................................................................................................... 3

    A.    The Settlement's Pro-Competitive Benefits Outweigh Any Arguable
        Anticompetitive Effects and Counsel Strongly in Favor of Approval .................. 3

    B.    The Settlement Offers Substantial Procompetitive Benefits ................................. 4

        1.    Approval of the Settlement would enhance consumers' ability to
               find the copyrighted content they want...................................................... 4

        2.    The Settlement would dramatically increase the volume and
               variety of e-books available to the marketplace ........................................ 5

        3.    The Settlement would lower e-book licensing transaction costs .............. 7

        4.    The Settlement promises to fuel competition and innovation in the
               marketplace for e-book readers.................................................................. 8

    C.    The Settlement will Not Produce Anticompetitive Effects................................... 11

        1.    Google's rights under the Settlement are non-exclusive ......................... 12

        2.    Rightsholders are free to compete with each other on price .................... 13

        3.    Market power obtained without anticompetitive conduct is not
               unlawful .................................................................................................... 14

IV.  CONCLUSION................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979)............................................................................................4

*Broadcom Corp. v. Qualcomm, Inc.,*
  501 F.3d 297 (3d Cir. 2007)...........................................................................11

*Buffalo Broad. Co. Inc. v. Am. Soc'y of Composers, Authors & Publishers,*
  744 F.2d 917 (2d Cir. 1984)...........................................................................13

*D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001).............................................................................3

*Joel A. v. Giuliani,*
  218 F.3d 132 (2d Cir. 2000)...........................................................................3

*Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.,*
  299 F. Supp. 2d 370 (D. Del. 2004)...............................................................13

*Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.,*
  No. C-08-04548 MHP (N.D. Cal. Aug. 11, 2009)..........................................9

*Paladin Assocs., Inc. v Montana Power Co.,*
  328 F.3d 1145 (9th Cir. 2003) ........................................................................6

*Texaco Inc. v. Dagher,*
  547 U.S. 1 (2006)............................................................................................4

*U.S. v. Brown Univ.,*
  5 F.3d 658 (3d Cir. 1993)...............................................................................6

*U.S. v. Grinnell Corp.,*
  384 U.S. 563 (1966)........................................................................................14

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004)........................................................................................14

OTHER AUTHORITIES

David Balto, *The Earth is Not Flat: The Public Interest and the Google Book Search Settlement: A Reply to Grimmelmann*, (July 22, 2009), *available at* http://www.acslaw.org/node/13812. ................................................................6, 13

Tony Bradley, *As eBook Readers Heat Up, Standardization Will Be Critical*, PC World (Aug. 5, 2009), *available at* http://www.pcworld.com/businesscenter/article/169675/as_ebook_readers_heat_up_standardization_ will_be_critical.html .....................................11

Einer R. Elhauge, *Why the Google Books Settlement is Procompetitive* (Sept. 2, 2009), Harvard, John M. Olin Center for Law, Economics, and Business Discussion Paper No. 646, *available at* http://ssrn.com/abstract=1459028 ..................................................12, 13

Geoffrey A. Fowler & Niraj Sheth, *Sony Opens New Chapter in Rivalry with Amazon Over E-Book Readers*, The Wall Street Journal (Aug. 26, 2009), *available at* http://online.wsj.com/article/SB125121418474557227.html .....................................5

Jerry A. Hausman & J. Gregory Sidak, *Google and the Proper Antitrust Scrutiny of Orphan Books* 5(3) J. of Comp. L. & Econ., 411 (2009)..................................................12, 13

Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* (3d ed. 2005) .....................................................................................................14

Farhad Manjoo, *How to Beat the Kindle*, Slate (Aug. 27, 2009), *available at* http://www.slate.com/id/2226503 .....................................................................8, 11

Richard A. Posner, *Antitrust in the New Economy* (Nov. 2000), U Chicago Law & Econ., Olin Working Paper No. 106, *available at* http://ssrn.com/abstract=249316 ........................14

Patricio Robles, *Will Open Standards Win Out in the E-book Wars?*, eConsultancy (Aug. 14, 2009), *available at* http://econsultancy.com/blog/4429-will-open-standards-win-out-in-the-e-book-wars ....................................................................................11

Jennifer Saba, *Special Report: Will E-readers Help Save Newspapers?*, Editor & Publisher (Aug. 28, 2009), *available at* http://www.editorandpublisher.com/eandp/news/article_display.jsp?vnu_content_id=1004007001................................................................................................8

Brad Stone, *Sony Plans to Adopt Common Format for E-Books*, The New York Times (Aug. 12, 2009), *available at* http://www.nytimes.com/2009/08/13/technology/internet/13reader.html................................5

## I. STATEMENT OF INTEREST

Sony Electronics Inc. ("Sony Electronics") is a leading provider of audio/video equipment, computers and other electronic products for the consumer and professional markets in the United States. For decades, Sony Electronics and its parents and affiliates have been at the forefront of technological innovation and have played a central role in the development of many widely-used technologies such as CD, DVD and high-definition Blu-ray Disc media.

In recent years, Sony Electronics has been developing, marketing and distributing electronic book readers ("e-book readers" or "e-readers"), which are portable devices that allow users to download and read electronic copies of books ("e-books"). In 2006, Sony Electronics introduced the first of its "Reader" line of e-book readers. The Reader family includes three current models, each offering different features and functionality, such as a touch screen interface, a smaller "pocket" size and, in the forthcoming Reader Daily Edition, wireless connectivity. In connection with its e-reader products, Sony Electronics has also licensed the rights to distribute e-books, and it currently makes over one million titles, including both copyrighted and public domain works, available to U.S. consumers.

As a participant in both the e-book and e-reader markets, Sony Electronics offers its perspective on the potential benefits of the proposed settlement in the above-captioned matter (the "Settlement").[1] Sony Electronics submits that the relationship the Settlement forges between Google and the plaintiff class, including both the author and publisher sub-classes (collectively the "Plaintiff Class"), has the potential to impact profoundly and positively the markets for both e-books and e-book readers. As *amicus*, Sony Electronics provides its

---

[1] Settlement Agreement, *The Authors Guild, Inc. v. Google Inc.*, No. 05 CV 8136-DC (S.D.N.Y. Oct. 28, 2008).

comments to describe the benefits that will flow to these markets if the Court approves the Settlement.

## II.    SUMMARY OF ARGUMENT

If approved, the Settlement will accelerate a fundamental transformation in the means by which books are found and accessed. Google has digitized millions of texts previously available only to those with access to a substantial library collection. The Settlement will make the contents of these works instantly searchable by U.S. consumers and researchers over the Internet. This will help readers find books of interest, which will inevitably lead to increased sales of books (digital and traditional). But this is only the start of the benefits the Settlement offers.

The Settlement also will dramatically enlarge and diversify the universe of available e-books. It gives U.S. consumers the ability to purchase online access to the full text of a wealth of copyrighted works. Once these digital versions are available for full-text access, any U.S. consumer with a web-enabled computer, smartphone, personal digital assistant or e-reader will be able to browse for and (for a fee) read potentially millions of e-books. Many of these copyrighted works are rare, out of print and otherwise difficult for most consumers to find -- even in paper form -- today. Thus, the Settlement represents a groundbreaking advancement for society.

The Settlement is likely also to streamline the process for obtaining licenses to distribute e-books and thereby reduce the transaction costs inherent in that process. The Settlement creates and funds a not-for-profit "Books Rights Registry" to represent and protect the interests of copyright holders. In addition to representing rightsholders in their dealings with Google, the Registry is tasked with building a publicly available database of identified rightsholders and identifying currently unknown rightsholders. For rightsholders that give the Registry authorization, it also has the ability to negotiate licenses with distributors other than Google.

The Registry is, therefore, likely to create efficiencies in the e-book licensing process that will inure to all e-book distributors and further hasten the expansion of digital content.

Because the Settlement increases the volume and variety of available e-books, it will undoubtedly increase demand for e-book readers, intensify competition among e-reader manufacturers and spur innovation. The history of technology markets has repeatedly borne out that the combination of widely available content and manufacturer competition leads to better products and falling prices. Improved and less expensive e-readers, in turn, will open up new distribution channels and drive new digital content demand. In these ways, the Settlement has the potential to invigorate the markets for e-books and e-readers, to the benefit of both consumers and the Plaintiff Class.

Finally, the Settlement creates no barriers to competition in the e-book content market. The non-exclusivity provision of the Settlement -- which makes plain that the rights given to Google do not prevent copyright holders or the Registry itself from licensing e-book rights to others -- ensures that healthy, price-driven competition will remain after the Settlement is approved.

The Court should not allow vast numbers of books to be relegated to library shelves, when the Settlement provides a means to put that valuable resource at consumers' fingertips.

## III.    ARGUMENT

### A.    The Settlement's Pro-Competitive Benefits Outweigh Any Arguable Anticompetitive Effects and Counsel Strongly in Favor of Approval.

In deciding whether to approve a class action settlement, the Court must determine whether the settlement is "fair, reasonable, and adequate" in light of the possible risks and rewards of the litigation. *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). Although this standard focuses on

the interests of the parties before the Court, significant commentary has addressed the competitive repercussions the Settlement may have on various interrelated markets. To the extent the Court takes account of the competitive landscape, the operative inquiry from an antitrust perspective is what procompetitive benefits the Settlement will produce and whether those benefits outweigh any anticompetitive effects that might flow from it. *See, e.g., Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 24 (1979) (blanket licensing program should be evaluated under the "rule of reason" -- balancing anticompetitive effects against procompetitive benefits); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (presumption of "rule of reason" analysis in antitrust cases). Sony Electronics submits that, by increasing available digital content and creating efficiencies in the provision of that content, the Settlement is likely to energize the markets for e-books and e-readers. These procompetitive benefits far outweigh any anticompetitive effects the Settlement might arguably have.

**B.      The Settlement Offers Substantial Procompetitive Benefits.**

**1.      Approval of the Settlement would enhance consumers' ability to find the copyrighted content they want.**

As an initial matter, the Settlement will enable Google to provide a searchable library of millions of copyrighted works, many of which have been unavailable or scarcely available to the general public. Prior to Google's digitization project, a person looking for books discussing a narrow research topic would typically need to travel to a library, search the library's cataloging system to identify books on the relevant general topic, and then look through each book in hopes of identifying a relevant passage. If the Settlement is approved, that same person could conduct the search with a web-enabled device from anywhere in the country by simply keying unique words or phrases into the Google Book Search tool. The search would immediately provide

bibliographical information of every scanned book containing the sought-after words or phrases and, for many books, would provide snippets of the text where the searched terms are found.

The Settlement would thus trigger an immediate leap forward in the power to search for and within copyrighted books. It empowers consumers to identify books of particular interest easily and effectively, which will, in turn, spur increased books sales, both electronic and traditional.

### 2. The Settlement would dramatically increase the volume and variety of e-books available to the marketplace.

Demand for e-books is growing and the market is poised for significant expansion. A recent report estimates that U.S. e-book sales totaled $14 million in June 2009 alone, an increase of more than 130 percent from the prior year.[2] As part of its offerings in the e-book marketplace, Sony Electronics has already made over a million e-book titles available for download via agreements with publishers and other rightsholders and, with respect to public domain books, via an agreement with Google.[3] Today's consumers are clearly receptive to obtaining books in digital form.

The Settlement promises to increase the number and diversity of licensed, digitized books substantially. Unless the applicable rightsholders specify otherwise, the Settlement enables U.S. consumers to purchase online access to the full text of the entire spectrum of "Commercially Unavailable" copyrighted works that Google has scanned.[4] The Settlement also provides an efficient mechanism for rightsholders of "Commercially Available" books to agree to offer full

---

[2] See Brad Stone, *Sony Plans to Adopt Common Format for E-Books*, The New York Times (Aug. 12, 2009), *available at* http://www.nytimes.com/2009/08/13/technology/internet/13reader.html.

[3] See Geoffrey A. Fowler & Niraj Sheth, *Sony Opens New Chapter in Rivalry with Amazon Over E-Book Readers*, The Wall Street Journal (Aug. 26, 2009), *available at* http://online.wsj.com/article/SB125121418474557227.html.

[4] See Settlement §§ 3.2(b), 1.47, 1.48, 1.1.

online access to their works.[5]   Importantly, the books made available for reading in full-text format go far beyond best-sellers and other works with proven commercial viability and will include research texts, out-of-print books, rare editions and other highly specialized volumes.

If the Settlement is approved, any U.S. consumer with a web-enabled computer or other device, including an appropriately equipped e-reader, will be able to go online and read any book offered in full-text from this vast reservoir of digital content.[6]   This would effect an extraordinary expansion of consumer choice.[7]   Indeed, one commentator compared the future Google Books database to a modern day Library of Alexandria[8] and Stanford University's librarian said, "[t]he [S]ettlement promises to change profoundly the level of access that may be afforded to the printed cultural record, so much of which is presently available to those who are able to visit one of the world's great libraries."[9]

Additionally, the Settlement expressly contemplates a future agreement between Google and the Registry that would enable Google to permit downloading of certain digitized copyrighted works.[10]   If rightsholders agree, the Registry could also license download rights to

---

[5] See id. § 3.2(e)(i).

[6] Although the precise number of books to which full-text access will become available is unknown, according to Google, "[o]nce [the Settlement] has been approved, you'll be able to purchase full online access to millions of books." See http://books.google.com/googlebooks/agreement/#1.

[7] See Paladin Assocs., Inc. v Montana Power Co., 328 F.3d 1145, 1157 (9th Cir. 2003) ("Improving customer choice is procompetitive."); U.S. v. Brown Univ., 5 F.3d 658, 675 (3d Cir. 1993) ("Enhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a procompetitive benefit."). The Settlement improves consumers' access to copyrighted texts in a manner similar to what Lexis/Nexis and Westlaw did for the legal field when they began offering copies of legal texts electronically. Digitization brought a universe of case authorities previously restricted to law libraries straight to the computers of attorneys all over the country.

[8] See David Balto, The Earth is Not Flat: The Public Interest and the Google Book Search Settlement: A Reply to Grimmelmann, (July 22, 2009), available at http://www.acslaw.org/node/13812.

[9] See http://news-service.stanford.edu/news/2008/october29/google-102908.html.

[10] See Settlement § 4.7 ("The Registry and Google may, over time, agree to new revenue models, and discount programs (if any) for such revenue models, including ... Downloadable PDF versions of Books.")

others.[11]  With these future agreements, the range of e-books available for download would also increase enormously.

### 3.    The Settlement would lower e-book licensing transaction costs.

The Settlement is likely to reduce the transaction costs of obtaining the distribution rights to digital books as well.  One of the express purposes of the Registry, which the Settlement not only creates but also funds,[12] is to "attempt to locate Rightsholders" whose identities are unknown.[13]  This service, coupled with the strong financial incentives to come forward that the Settlement itself provides,[14] increases the likelihood that previously unclaimed works will be claimed by their copyright owners, making it possible to negotiate licenses to distribute those works.  Moreover, the Registry will "maintain a rights information database for Books ... and their authors and publishers" and it will "make *publicly available* whether or not a Book has been registered with the Registry and ... the identity of the Registered [r]ightsholder," unless the rightsholder requests that that information be kept private.[15]  This too makes identifying e-book rightsholders easier and cheaper.

---

[11] *See id.* § 6.2(b)(iii) ("The Registry will be organized on a basis that allows the Registry, among other things, to ... to the extent permitted by law, license Rightsholders' U.S. copyrights to third parties."); Settlement Attachment I – Notice of Class Action Settlement § 8(B) ("The Registry will represent the interests of the Rightsholders, both in connection with the Settlement as well as in other commercial arrangements, including with companies other than Google (subject to the express approval of the Rightsholders of the Books involved in such other commercial arrangements).").

[12] *See* Settlement § 2.1(c).

[13] *See id.* § 6.1(c) ("Before the Effective Date, Plaintiffs will establish a registry that ... will attempt to locate Rightsholders with respect to Books and Inserts.").

[14] For example, the Settlement requires Google to pay the Registry, for the benefit of rightsholders, 63% of revenues Google earns from any use of the digitized books, including online advertising, authorized by the Settlement. *See, e.g., id.* §§ 2.1(a), 4.5(a), 6.3.

[15] *See id.* §§ 6.1(b), 6.6(d)(emphasis added).

In addition, the Settlement provides that, where it has obtained the relevant rightsholders' authorization, the Registry can license rightsholders' U.S. copyrights to third parties.[16] Presumably, many rightsholders, especially those who are lesser-known and unlikely to be approached on an individual basis, will elect to take advantage of the efficiencies inherent in allowing the Registry to negotiate and license on their behalf. Creating a mechanism by which individual rightsholders can choose to authorize the Registry to grant copyright licenses to their e-books would sharply reduce the costs (time and effort) inherent in negotiating individual licenses with those rightsholders, as distributors must do before offering e-books today. Reduction of transaction costs would lead to lower e-book prices, which would further stimulate demand.

### 4.     The Settlement promises to fuel competition and innovation in the marketplace for e-book readers.

Demand for e-book readers also has grown substantially in recent years. A recent industry report estimates that Sony Electronics and Amazon -- two of the leading manufacturers of e-readers -- together sold more than one million e-book readers as of the end of 2008, and the same report predicted that by 2012 the e-book reader market could grow to 12 million units.[17] Other manufacturers currently offer competing devices, and more, including Barnes & Noble (via Plastic Logic), are expected to enter the marketplace in the near future.[18]

Because approval of the Settlement would add a virtual torrent of content to the stream of e-book commerce, it would be a boon to the entire e-reader industry. New digital books (for

---

[16] *See* note 11 *supra.*

[17] *See* Jennifer Saba, *Special Report: Will E-readers Help Save Newspapers?*, Editor & Publisher (Aug. 28, 2009), *available at* http://www.editorandpublisher.com/eandp/news/article_display.jsp?vnu_content_id=1004007001 (citing Forrester Research market research report).

[18] *See* Farhad Manjoo, *How to Beat the Kindle*, Slate (Aug. 27, 2009), *available at* http://www.slate.com/id/2226503.

online access or for download) will incent Sony Electronics and its competitors to invest in expansion, improve their economies of scale and reduce the cost of bringing e-book readers to market, all to the benefit of consumers. The history of the technology industry is replete with examples of this phenomenon. The first digital versatile disc (DVD) players released in the United States in 1997 cost roughly $1,000.[19] Today, with the widespread adoption of this medium and the resulting increase in competition among manufacturers, a DVD player can cost less than $50.[20]

The increase in available e-books will also increase consumer demand for e-readers, which, in turn, will surely trigger innovation in e-book devices and services to meet that demand, compounding the Settlement's public benefits. Indeed, beginning with just one Reader product in 2006, Sony Electronics has recently released a Reader with a touch screen interface (including digital page turning) and a pocket-sized Reader, and has announced a wireless Reader that can download content over a 3G network.[21]

Higher demand will foster creativity and diversity in the business models and distribution channels for e-books. For example, Sony Electronics recently announced the compatibility of its Reader devices with e-books that public libraries around the country are making available for patrons to "borrow."[22] Projects like this, which the Settlement is likely to encourage, will further broaden the audience for e-books and create new ways for rightsholders to commercialize their

---

[19] See http://news.cnet.com/DVD-players-finally-arrive/2100-1001_3-260569.html

[20] See http://reviews.cnet.com/dvd-players/sony-dvp-ns57p-b/4505-6473_7-32331264.html?tag=mncol;lst. Of particular note, the exponential growth in demand for DVDs has generated massive revenues for the copyright holders who sell content in that format. As the Northern District of California recently found, a group of major motion picture studios earned $12.5 billion from the sales of DVDs in 2007 alone, along with an additional $2 billion from DVD rentals. See Memorandum & Order at 6, *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, No. C-08-04548 MHP (N.D. Cal. Aug. 11, 2009). So too would a robust e-book and e-book reader market benefit the Plaintiff Class here.

[21] See http://news.sel.sony.com/en/press_room/consumer/computer_peripheral/e_book/release/41492.html.

[22] See id.

content. In this way, the Settlement has the potential to create a self-sustaining cycle that benefits the Plaintiff Class, consumers and technology suppliers: better and cheaper devices will increase demand for content; more content made available to meet that demand will increase demand for devices; increased demand will allow manufactures to invest in expansion and innovation for even better and less expensive devices.

Finally, the Settlement has the potential to move the e-book market toward standardization on an "open" file format.[23] The "EPUB" open standard, which Google and Sony Electronics currently use for the public domain e-books that they offer,[24, 25] was developed by the International Digital Publishing Forum and is poised to become the e-book industry standard.[26] If, in the future, rightsholders agree to allow the Registry to grant download licenses, which they would be incented to do, those rightsholders would presumably seek to have the e-books be usable on as many reading devices as possible so that the industry could enjoy the positive

---

[23] An "open" standard file format is one that is made publicly available for widespread adoption by content distributors and device manufactures. Content saved in an "open" format can be used on the device of any manufacturer that supports the format. By contrast, a "proprietary" file format is one that is typically designed by a single manufacturer and not shared in the marketplace. Content saved in a proprietary format can be used only on devices made by the manufacturer that created the format.

[24] *See* http://booksearch.blogspot.com/2009/08/download-over-million-public-domain.html.

[25] Other content distributors currently (or will soon) make their e-books available in the EPUB format, including the more than 200 participating members of the American Booksellers Association and Powell's Books, the largest independent bookseller in the world. *See* http://news.sel.sony.com/en/press_room/consumer/computer_peripheral/e_book/release/41494.html.

[26] The American Association of Publishers' Digital Issues Working Group has formed an EPUB subcommittee and written an open letter supporting that format. *See* http://www.idpf.org/ ("EPUB Support from List of Publishers: An Open Letter from AAP to IDPF"). The EPUB subcommittee includes Penguin Group USA, HarperCollins Publishers, Cambridge University Press, Pelican Publishing Company, Inc., John Wiley & Sons Inc., Oxford University Press, Random House, Simon & Schuster, Harlequin Enterprises Ltd. and many other publishers.

network effects that flow from standardization.[27]   E-book format standardization would benefit consumers by allowing them to purchase content based on the selection and price offered by a variety of book sellers, rather than being limited to purchasing only the content supplied by the maker of their device, and by enabling consumers to switch between manufacturers' devices without losing access to the e-books they have already purchased.[28]

### C.    The Settlement will Not Produce Anticompetitive Effects.

Sony Electronics is also in the business of acquiring the rights to distribute e-books. Some competitors for digital distribution have argued that approval of the Settlement will inhibit competition in the market for distribution rights and consequently drive up e-book prices.   In particular, the argument is that the Settlement will give Google a form of monopoly (or monopsony) on digitized books and/or that the Registry will facilitate collusion among copyright holders on the pricing of their works.   These arguments are not well taken for the following reasons.

---

[27] Numerous commentators have noted the benefits that standardization would have on the e-reader market. *See, e.g.*, Tony Bradley, *As eBook Readers Heat Up, Standardization Will Be Critical*, PC World, (Aug. 5, 2009), *available at* http://www.pcworld.com/businesscenter/article/169675/as_ebook_readers_heat_up_standardization_ will_be_critical.html ("Ultimately, the success or failure of the eBook and eBook reader market is going to depend on establishing a standard format."); Manjoo, *supra*, note 18 ("Publishers would have a big incentive to feed [an EPUB-based online store] with all their books -- if they provide books only to Amazon, they'd be helping to create a monopolist in their industry, and that's never good for business."); Patricio Robles, *Will Open Standards Win Out in the E-book Wars?*, eConsultancy (Aug. 14, 2009), *available at* http://econsultancy.com/blog/4429-will-open-standards-win-out-in-the-e-book-wars ("[T]he fact that major stakeholders in the market have coalesced around an open standard before the market really takes off is [a] good sign for consumers because it should provide more choice and greater competition.").

[28] *See, e.g.*, *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 308-09 (3d Cir. 2007) ("[S]tandards that ensure the interoperability of products facilitate the sharing of information among purchasers of products from competing manufacturers, thereby enhancing the utility of all products and enlarging the overall consumer market. ... Industry-wide standards may also lower the cost to consumers of switching between competing products and services, thereby enhancing competition among suppliers. ... Each of these efficiencies enhances consumer welfare and competition in the marketplace and is, therefore, consistent with the procompetitive aspirations of antitrust law."). Google has publicly touted the benefits of an open e-book content ecosystem. *See* http://www.nytimes.com/2009/06/01/technology/internet/01google.html?_r=2&th&emc=th.

### 1.    Google's rights under the Settlement are non-exclusive.

First and foremost, the rights granted to Google under the Settlement are non-exclusive.[29] There is nothing in the Settlement that prevents the Registry from licensing to Google's competitors or that prevents individual copyright holders from licensing digital copies of their works to any other licensee outside the confines of the Registry. Thus, Google's attainment of these rights does nothing to impair a more-efficient competitor from also creating a competing digitized library and offering lower prices to consumers and/or better returns to rightsholders.[30]

From Sony Electronics' perspective, this non-exclusivity is vitally important. As discussed, the mere creation of the Registry has the potential to streamline the process for obtaining digital rights from great numbers of rightsholders. The non-exclusivity provision, however, ensures that for any licenses as to which the Registry does not offer sufficiently attractive terms, distributors and other licensees would be able to continue to engage in direct

---

[29] *See* Settlement § 2.4 ("The authorizations granted to Google in this Settlement Agreement are *non-exclusive only*, and nothing in this Settlement Agreement shall be construed as limiting any Rightsholder's right to authorize, through the Registry or otherwise, any Person, *including direct competitors of Google*, to use his, her or its Books or Inserts *in any way*, including ways identical to those provided for under this Settlement Agreement.") (emphasis added).

[30] *See* Einer R. Elhauge, *Why the Google Books Settlement is Procompetitive* at 4 (Sept. 2, 2009), Harvard, John M. Olin Center for Law, Economics, and Business Discussion Paper No. 646, *available at* http://ssrn.com/abstract=1459028 ("Indeed, the settlement affirmatively lowers rival entry barriers because it: (1) allows rivals to free ride off of Google's digitization efforts; (2) lowers transaction costs by expanding the number of known rightsholders and clarifying the commercial value of their books, (3) lowers risk-bearing costs for distributing unclaimed books without a license by clarifying that those books have rightsholders who lack the interest or ability to claim rights, and (4) provides a roadmap for how the class action vehicle could be used by rivals to get similar default rights, perhaps through a second competing Registry."); Jerry A. Hausman & J. Gregory Sidak, *Google and the Proper Antitrust Scrutiny of Orphan Books*, 5(3) J. of Comp. L. & Econ., 411, 412 (2009) ("[C]ompanies such as Microsoft and Amazon, which are competitors of Google in search engines and electronic book sales, ... could invest in parallel projects and compete with [Google Book Search] if they chose to do so.").

negotiations with the rightsholders.[31]  Similarly, if Google does not make online access to (or

downloads of) its scanned copies available on acceptable terms, licensed distributors can scan

books themselves or obtain digitized copies from publishers.  Both the Registry and Google will

have to be efficient and fair, or distributors and other licensees will go elsewhere.[32]

### 2.    Rightsholders are free to compete with each other on price.

Second, the Settlement will not inhibit price competition between rightsholders.  In fact,

competition among rightsholders will continue unabated, as each retains the right to set

consumer online access prices for itself and, therefore, the incentive to lower prices to capture

sales.[33]  The pricing algorithm contemplated by the Settlement is merely a mechanism to price

works where the copyright holders do not choose to do so individually.[34]  A rightsholder may

well be incentivized to set individual prices when it perceives an advantage based on

circumstances unique to it and the work at issue.  For example, an emerging author may decide

that the exposure from wide distribution of a new work is a sufficient incentive to offer a

---

[31] *See Buffalo Broad. Co. Inc. v. Am. Soc'y of Composers, Authors & Publishers,* 744 F.2d 917, 925 (2d Cir. 1984) ("[T]rade is restrained, sometimes unreasonably, when rights to use individual copyrights or patents may be obtained only by payment for a pool of such rights, but ... the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available."); *see also Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.,* 299 F. Supp. 2d 370, 377 (D. Del. 2004) ("If the antitrust plaintiff has the opportunity to license independently, then the pool of rights does not restrain trade in violation of Section 1 of the Sherman Act. It likewise does not violate Section 2 of the Sherman Act because Section 2 requires proof of an anti-competitive act to acquire or maintain a monopoly.")

[32] Some have argued that the Settlement gives Google substantial market power for the distribution of so-called "orphan works."  Although this issue is beyond the scope of this brief, Sony Electronics notes that several scholars who have focused on this aspect of the Settlement have concluded that Google's rights to the orphan works will also have no meaningful anticompetitive ramifications.  *See* Balto, *supra,* note 8 ("Google will affirmatively not obtain a monopoly over orphan works because the settlement does nothing to make entry more difficult for a second entrant. Indeed, any company that chooses to begin scanning orphan works will face fewer obstacles - due to the settlement - than Google has confronted."); Elhauge, *supra,* note 30 at 34-42; Hausman & Sidak, *supra,* note 30 at 419-24. Additionally, the inclusion of the orphan works in the Settlement may be preferable to the status quo, under which no one can locate these rightsholders to negotiate with them to make their works available.  As mentioned, one of the purposes of the Registry is to proactively work to identify rightsholders.

[33] *See* Settlement § 4.2(b)(i).

[34] *Id.*

minimal or no license fee. The ability of copyright holders to set their own prices ensures that free and open competition (no different from that in a traditional book store) will continue, and neither the rightsholders nor Google will have the ability to charge supracompetitive prices for e-books.

### 3. Market power obtained without anticompetitive conduct is not unlawful.

Finally, even if one accepted the claim that Google will obtain substantial market power, or even monopoly power, in the market for digitized books, the Settlement would not violate the law. Mere possession of substantial market power is not illegal; the antitrust laws only condemn monopoly when it is created or maintained *by anticompetitive means*.[35] Google has taken an enormous risk and made a substantial investment of resources to scan and digitize the text of books. The antitrust laws are not meant to punish such entrepreneurial behavior. Moreover, as leading antitrust scholar Professor Herbert Hovenkamp has observed, "[t]he continual creation of monopoly, and its eventual correction by competitive entry is part of a never-ending process that explains *most of the technical achievements of modern industry* in market economies."[36]

## IV.    CONCLUSION

Absent the Settlement, an immensely valuable resource will languish while the parties continue to expend energy and time on uncertain litigation, all to the detriment of consumers, the

---

[35] *See, e.g., Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("*Trinko*"); *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

[36] Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 6.3 (3d ed. 2005) (emphasis added); *see also Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices - at least for a short period - is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.") (emphasis in original); Richard A. Posner, *Antitrust in the New Economy* (Nov. 2000), U Chicago Law & Econ., Olin Working Paper No. 106, *available at* http://ssrn.com/abstract=249316 ("competition to *obtain* a monopoly is an important form of competition") (emphasis in original). Additionally, the antitrust laws will continue to constrain all parties' conduct in connection with the rights granted under the Settlement and ensure that the book database is not used for anticompetitive ends.

related markets and the Plaintiff Class.  Sony Electronics appreciates the Court's consideration of

its comments.

Dated: September 8, 2009

Jeffrey M. Gutkin (Cal. Bar # 216083)
Benjamin R. Jones (Cal. Bar # 255471)

101 California Street, 5th Floor
San Francisco, CA 94111-5800
(415) 693-2000

Respectfully submitted,

COOLEY GODWARD KRONISH LLP

By: _____
Jennifer B. Coplan (JC-6123)
Janet L. Cullum (JC-2083)

1114 Avenue of the Americas
New York, NY  10036
(212) 479-6000

*Attorneys for Amicus Curiae, Sony
Electronics Inc.*

1568970 v1/NY

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of September, 2009, I caused true and correct copies

of the foregoing document to be to be served on the following counsel of record via the ECF

Filing System of the U.S. District Court for the Southern District of New York:

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
ddurie@durietangri.com

Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

Jennifer B. Coplan
Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, NY  10036
(212) 479-6000
jcoplan@cooley.com