## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC., ET AL.

       Plaintiffs,

           v.

GOOGLE, INC.

       Defendant.

Case No. 05 CV 8136-JES

## AMICUS BRIEF OF ANTITRUST LAW AND ECONOMICS PROFESSORS
## IN SUPPORT OF THE SETTLEMENT

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF INTEREST ................................................................................. 1

II.   SUMMARY OF ARGUMENT ............................................................................... 1

III.  PROCOMPETITIVE EFFECTS THAT CUT ACROSS ALL BOOK CATEGORIES ............................. 2

IV.   EFFECTS ON OUT-OF COPYRIGHT BOOKS .............................................................. 3

V.    EFFECTS ON SALES OF IN-COPYRIGHT BOOKS ....................................................... 4

VI.   INSTITUTIONAL SUBSCRIPTIONS TO VIEW ALL GOOGLE BOOKS ..................................... 21

VII.  THE SETTLEMENT COMPARES FAVORABLY TO *BMI* ................................................ 23

VIII. CONCLUSION ............................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Atlanta Center Ltd. v. Hilton Hotels Corp.*, 848 F.2d 146 (11th Cir. 1988) ...............................10

*BMI v. CBS*, 441 U.S. 1 (1979) ......................................................................................1, 23, 24

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .....................12

*CBS v. American Society of Composers, Authors and Publishers*, 620 F.2d 930 (1980) ...........................................................................................................................24

*Herrera v. Katz Commc'n, Inc.*, 532 F. Supp. 2d 644 (S.D.N.Y. 2008) .......................................10

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ............................11, 12

*Nat'l Labor Relations Bd. v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197 (2d Cir.2003) ...............................................................................................10

*Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 490 (2d Cir. 2002) ..............................................................................5

*United States v. BMI*, 1966 Trade Cas. (CCH) ¶71,141...............................................................24

*Walsh v. Schlecht*, 429 U.S. 401 (1977).......................................................................................10

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ...................12

### STATUTES

17 U.S.C. §504(c)(1) .........................................................................................................................4

### MISCELLANEOUS

E. Allan Farnsworth, *Farnsworth on Contracts* §7.11 (3d ed. 2004) ...........................................10

Alexander Macgillivray, *A Discussion Around the Google Book Search Settlement*, Berkman Center for Internet & Society at Harvard University (July 21, 2009), video available at http://cyber.law.harvard.edu/events/luncheon/2009/07/macgillivray ...............................9

Einer Elhauge, *United States Antitrust Law & Economics*, 441 (2008) .......................................11

Einer Elhauge, *Why the Google Books Settlement Is Procompetitive*, Harvard Law School Olin Center Discussion Paper 646 (August 2009) .........................................*passim*

iii

Eric M. Fraser, *Antitrust and the Google Books Settlement: The Problem of Simultaneity*, 15 (June 23, 2009) ...................................................................7, 19

James Gibson, *Google's New Monopoly*, Wash. Post, Nov. 3, 2008............................................19

James Grimmelmann, *How to Improve the Google Book Search Settlement*, 12 J. Internet L. 1 (April 2009) .................................................................................19

Pamela Samuelson, *The Dead Souls of the Google Book Search Settlement,* Communications of the ACM, July 2009 (Vol. 52, No. 7) ......................................16, 19

Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, U. Chicago Law School Olin Working Paper No. 462 (July 2009)................................................................................................7, 11, 16, 19

Restatement (Second) of Contracts § 203(a) (1981) ....................................................10

Restatement (Second) of Contracts §207 (1981) .......................................................10

Robert Darnton, *Google & the Future of Books*, 56 N.Y. Rev. Books 2 (Feb. 12, 2009).........................................................................................................19

United States Copyright Office, *Report on Orphan Works*, 22 (2006)....................................5, 15

## I. STATEMENT OF INTEREST

The undersigned antitrust law and economics professors (collectively, the "*Amici*") are professors of law and economics who study, teach, write, or research antitrust law and policy. *Amici* have an interest in ensuring the proper application of antitrust and economic principles generally, and in this matter specifically. *Amici* have a particular interest in supporting the broad access to knowledge that the Settlement will provide. Approval of the Settlement will allow *Amici* the ability to search for and obtain information contained in the works at issue in this case that will be important to them in their research efforts. Those efforts will be stunted if the Settlement is not approved.[1]

## II. SUMMARY OF ARGUMENT

The settlement procompetitively increases book output by expanding unfettered competition in book licensing and reducing legal and logistical barriers to their distribution by both Google and its rivals. For out-of-copyright books, the settlement procompetitively expands output by clarifying which books are in the public domain and making them digitally available for free. For in-copyright books, the settlement procompetitively expands output by clarifying who holds their rights, making them digitally searchable, and allowing individual digital display and sales at prices set by competing rightsholders or with an algorithm designed to mimic competitive pricing. The output expansion is particularly dramatic for out-of-print books, for which there is currently no new output at all. The settlement also procompetitively creates a new subscription product that provides digital access to a near-universal library at free or competitive rates. The settlement is even more procompetitive and less restraining than the agreement in *BMI*.

---

[1] *Amici* are identified in the signature block of this brief. Professor Elhauge has received research funding from Google, Inc. for his work underlying this brief. The views expressed, however, are his own. None of the other *Amici* who have joined the brief have received any compensation related to this matter.

### III. PROCOMPETITIVE EFFECTS THAT CUT ACROSS ALL BOOK CATEGORIES

*Allowing Online Book Searches.*  Unless a book's rightsholder chooses otherwise, the settlement allows Google to digitize all books published before January 5, 2009, make their text searchable, and provide indexing information about the books found in searches.[2]  Google then uses this information to direct searchers to where they can find the books, not only on Google but also at booksellers or local libraries.[3]  This vastly increases the ability of buyers to find which books they want and where to buy them, without in any way impeding competition among booksellers. Without the settlement, Google might have lost the litigation and been unable to digitize any in-copyright books and make them searchable unless it affirmatively secured permission from each rightsholder, which would have imposed prohibitive costs.

*Lower Costs for Non-Consumptive Research, Including Book Search Algorithms.*  Under the settlement, Google will designate two research centers to house all its digitized books, and qualified researchers will get free access to conduct "non-consumptive" research (unrelated to any book's intellectual content) in linguistics, translation, or search protocols that would be unfeasible absent the settlement.[4]  Further, the settlement permits commercial exploitation of any new search algorithms,[5] thus allowing rivals to free ride on Google's creation of this research corpus to use it to discover superior search algorithms for their own book search software.

*Lower Research Costs and Distortions.*  The settlement also dramatically aids general research by making the bulk of past published books available online for free search, free preview,

---

[2] *See* Settlement §§ 1.91, 3.1(a), 3.2(b), 3.4(a), 3.5(a)(i).

[3] *See* Google, *The Future of Google Book Search*, *available at* http://books.google.com/agreement (accessed August 3, 2009).

[4] *See* Settlement §§ 1.90, 1.130, 7.2(d)(ii), 7.2(d)(i).

[5] *See* Settlement § 7.2(d)(x).

and free or lower cost purchase. Online researchers will be able to find and obtain books with relevant content much more easily, including many out-of-print books that are currently hard or impossible to obtain. The settlement can thus help cure the distortion that results today when researchers instead favor less-developed, more-ephemeral sources because of their greater online availability. Research will correspondingly improve, and every industry performing online research will recognize efficiency gains. The settlement also encourages a digitization of books that protects against books getting damaged or lost to history.

   ***Expanding Print-Disabled Book Output.*** Under the settlement, Google intends to display books so that print-disabled users can access them to the same extent as other users, and Google must provide displays that accommodate their disabilities without charging them a higher price.[6] For the 15-30 million Americans who are print-disabled, who currently can access only a small subset of these books, the settlement will dramatically expand their access to written knowledge, perhaps more than anything since the invention of Braille.[7]

## IV. Effects on Out-of Copyright Books

   ***Effective Expansion of Public Domain.*** The settlement expands the number of books that are effectively in the public domain by clarifying their out-of-copyright status. Currently, books published in the U.S. from 1923-1963 are in copyright only if the copyright was both noticed in the publication and properly renewed.[8] It is costly to determine when these tests are satisfied, especially because the renewal records were not digitized and the value of these books can be slight compared to these costs and the risk of tens of thousands of dollars of statutory damages for

---

[6] *See* Settlement §§3.3(d), 7.2(g).
[7] *See* Einer Elhauge, *Why the Google Books Settlement Is Procompetitive*, Harvard Law School Olin Center Discussion Paper 646, at 49 (August 2009).
[8] *See* http://copyright.cornell.edu/resources/publicdomain.cfm

mistakenly replicating a copyrighted book.[9]  Thus, many books in this time frame have not been offered by Google or others, even though 93% are actually out-of-copyright.[10]  The settlement lowers these costs and risks by providing a process for determining which books are out of copyright that is binding on rightsholders and funded by Google and the Registry.[11]  Because the settlement makes this information publicly available, rivals can free ride on it to offer all out-of-copyright books without incurring similar costs and risks.[12]

*Lower Reader Costs*.  The Google Book Search program allows users to immediately read, download, or print out-of-copyright books for free.[13]  Because the settlement expands the set of books that are available as digitized out-of-copyright books, it lowers the costs and delays of buying and reading these books to zero, and thus increases the output of book copies and reading experiences.  The expanded availability of free out-of-copyright books should also put downward pressure on used-book prices for these books and on licensing fees and book prices for in-copyright books that compete with out-of-copyright books.

## V. EFFECTS ON SALES OF IN-COPYRIGHT BOOKS

*Clarifying Rights*.  The settlement increases the output of in-copyright books by reducing rights uncertainties that can prevent these books from being licensed.  *First*, the settlement clarifies whether the author or publisher holds book rights.  Currently, it is often unclear – even for some in print books – whether the author or publisher holds digital rights because their contractual language

---

[9] 17 U.S.C. §504(c)(1).

[10] *See* Elhauge, *supra* note 7, at 9 & n.11.

[11] *See* Settlement §3.2(d)(v); Settlement Attachment E.

[12] *See* Elhauge, *supra* note 7, at 10 n.13.

[13] *See* Joint Public FAQ from Authors Guild, Association of American Publishers & Google, Question # 9, available at http://books.google.com/googlebooks/agreement/faq.html (accessed August 11, 2009).

frequently did not anticipate digitization.[14]  Further, when a publisher allows a book to go out of print, it is often unclear whether all reproduction rights have reverted to the author.  Both uncertainties can lead to an unfortunate state of affairs where, because prospective book royalties are low compared to statutory damages, neither the author nor publisher may be willing to license a book although each would sue if the other did.  The settlement lowers these transaction and risk-bearing costs by (1) providing a process under which, despite digital rights uncertainty, decisions can be made about digitizing, displaying and selling books, and (2) providing and funding a mechanism for resolving reversion issues.[15]

*Second,* the settlement helps locate rightsholders.  Even when it is clear whether the author or publisher held the relevant rights, it takes effort to locate them or identify their successors in interest.[16]  Without the settlement, books with unknown rightsholders would likely go unutilized because, compared to the small rewards from publication, the costs of identifying rightsholders are too high and the risk of penalties for violating copyright law by not getting a license are too great.[17] The settlement lowers the costs of identifying unknown rightsholders by funding a Registry that is required to search for rightsholders and by incentivizing rightsholders to identify themselves by giving them royalties if they register.[18]  It is likely that at least 80% of currently unknown rightsholders would become known under the settlement.[19]  Rivals will be able to free ride on these costly efforts to resolve uncertainty and locate rightsholders because the settlement provides that the

---

[14] *See Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 490 (2d Cir. 2002) (contract giving right to "print" a book does not give a right to make digital copies).

[15] *See* Settlement Attachment A, Article IV-VI.

[16] *See* United States Copyright Office, *Report on Orphan Works*, at 22-34 (2006).

[17] *Id.* at 1.

[18] *See* Settlement §§ 5.2, 6.1(c), 6.3(a)(i), 6.4.

[19] *See* Elhauge, supra note 7, at 35.

5

Registry will make publicly available a database that identifies all registered rightsholders.[20]  The above thus makes it much easier for both Google and its rivals to license these books, and thus increases the output of these books and competition in their licensing and sale.

***Allowing Preview Displays and Nonexclusive Book Sales Through Google***.  The settlement also provides an additional nonexclusive vehicle for promoting in-copyright books.  By default, display of book previews is allowed for out-of-print books and not for in-print books, but rightsholders of either may change the display status of their books at any time.[21]  If the rightsholder chooses to allow display, then its book is by default available for non-exclusive sale on Google, but a rightsholder may at any time choose to make its displayed book unavailable for sale.[22]  For any sales under the settlement, Google pays rightsholders 63% of revenues from sales and advertising associated with their books.[23]  Each rightsholder can set whatever price it wants for sale of its book on Google or allow Google to set the price using an algorithm that, as shown below, is designed to mimic the competitive prices that rightsholders would set if they had Google's information.[24]  Rightsholders can also switch back and forth between the two pricing methods.[25]  Further, given the nonexclusivity provisions, rightsholders can also (1) sell through a Google rival instead of, or in addition to, selling through Google, (2) bargain with Google to sell on Google on terms different from those offered in the settlement; or (3) display book previews on Google, but have Google direct potential buyers to a Google rival rather than allowing sale by Google.

These provisions have strong procompetitive effects.  They add a new nonexclusive promotional platform by which buyers can more easily identify the books they want and purchase

---

[20] *See* Settlement §6.6(d).

[21] *See* Settlement §§ 1.1, 1.48, 1.91, 3.2(b), 3.3(a), 3.4(a), (b).

[22] *See* Settlement §§ 1.1, 1.48, 1.131, 2.4, 3.5(b).

[23] *See* Settlement §§ 2.1(a), 4.5(a).

[24] *See* Settlement §4.2(b).

them either through Google or its rivals in digital or non-digital form.  These provisions do not take away or impede any existing vehicles for promoting or selling books, but add a new one with lower distribution costs and without any shipping delay.  The effects are even more procompetitive on out-of-print books because, for them, these provisions makes commercially-unavailable books commercially available.  To be sure, there is a used-book market for out-of-print books.  But the used-book market is limited, constituting 3% of regular book sales, only a subset of which are also both out-of-print and in-copyright.[26]  Further, the used book market cannot produce any new copies of these books.  The settlement thus clearly and sharply increases the current output of out-of-print books from a baseline of zero.

These provisions have no anticompetitive effects given that they leave individual rightsholders entirely unrestrained from selling at any price and through any distributor or multiple distributors.  Some have objected that these provisions allow rightsholders to appoint Google as their agent to set cartel prices for them, and thus amount to a horizontal agreement in restraint of trade.[27]  One might similarly object that the royalty split amounts to a horizontal agreement by rightsholders to demand 63% of all sales.  But these critiques are mistaken on several grounds.

***First***, there is no horizontal agreement among the rightsholders because none of them have agreed with each other that they will accept Google's algorithm price and royalty split.  All the settlement provides is a nonexclusive *offer* by Google to display and sell their books at certain prices with a 63% royalty split.  Each rightsholder then must individually decide whether it wants to (1) accept the offer, in which case it is still free to sell at any other price or royalty through a Google

[25] *See* Settlement §4.2(b).

[26] *See* Elhauge, supra note 7, at 33 & n.58.

[27] *See* Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, U. Chicago Law School Olin Working Paper No. 462, at 1, 3, 17, 27 (July 2009); Eric M. Fraser, *Antitrust and the Google Books Settlement: The Problem of Simultaneity*, at 15-17 ( June 23, 2009).

rival; (2) reject the offer and instead sell through a Google rival at any price or royalty it wishes, (3) reject the standard form offer and try to bargain for different terms from Google; (4) accept the Google offer to display its book but not to sell its book; or (5) accept the Google offer to sell its book but set the price for that book itself.  To the extent multiple rightsholders eventually accept Google's offer, this does not create a horizontal agreement among them to do so, but rather a series of vertical agreements between each rightsholder and Google whereby the individual rightsholder agreed to Google's standard form offer.  For whatever set of rightsholders eventually choose to distribute their books through Google, the situation is just like any case where a distributor offers many suppliers an opportunity to sell through the distributor at a given price and commission and many suppliers agree.  In such cases, we have a series of vertical agreements on the price and commission, but no horizontal agreement.  Further, because the opportunity is nonexclusive, we have the sort of vertical agreements that solely affect distribution through that particular distributor and have no exclusionary effect on rivals of that distributor.

   ***Second***, for rightsholders who do choose to accept the Google-set price, the settlement requires Google to set prices using an algorithm designed to mimic competitive pricing.

> In this option, the Rightsholder permits *the* price for which *its* Book authorized for Consumer Purchase is to be sold to be determined by an algorithm . . . that Google will design to find the optimal such price for *each* Book and, accordingly, to maximize revenue for *each* Rightsholder.[28]

This provision does not authorize Google to use an algorithm that sets a schedule of cartel prices for *all* books that would maximize revenue for *all* rightsholders collectively.  Instead, it requires Google to set "the price" for "each book" separately to maximize revenue for "each" rightsholder, given the prices for other books.  Suppose there are two books which are partial substitutes but have enough distinctive demand that with competitive pricing they would each sell at $5 rather than at

8

the marginal cost of $0, and that if they entered into a cartel the *joint* profit-maximizing price would be $10 for each book. This provision would be violated if Google set a price of $10 for each book, because each rightsholder would earn more revenue if it undercut that price slightly to take sales away from the other book. The same would be true for any price Google might set between $5 and $10. Thus no price above $5 would maximize revenue for "each" rightsholder when separately setting "the" price for "its" book.

Other provisions likewise make clear that the algorithm price must be separately set for each *individual* book given data about the demand for it. The settlement specifies:

> The Pricing Algorithm shall base *the* Settlement Controlled Price of an *individual* Book upon aggregate data collected with respect to Books that are similar to such Book. Based on the Pricing Algorithm, Google may change *the* price of an *individual* Book over time in response to sales data and in order to collect additional data to establish the optimal price for such Book.[29]

This provision allows Google to use information about the demand elasticity for an individual book in order to derive the demand curve for that individual book, and thus to determine the optimal price for each book under competitive pricing. But it does not allow Google to raise prices for multiple books simultaneously to cartel levels.

Consistent with the above, Google has stated that its algorithm will work just as I have described, finding the competition-mimicking price for each book that maximizes its revenue given its book-specific demand elasticity, but does not set prices for all books simultaneously to maximize group revenue.[30] To the extent the provision is at all ambiguous, if interpreting the provision to allow setting supracompetitive prices would create an antitrust violation, then standard canons of

---

[28] *See* Settlement §4.2(b) (italics added).

[29] *See* Settlement §4.2(c)(ii)(2) (italics added).

[30] *See* Alexander Macgillivray, *A Discussion Around the Google Book Search Settlement*, Berkman Center for Internet & Society at Harvard University (July 21, 2009), video available at http://cyber.law.harvard.edu/events/luncheon/2009/07/macgillivray (see video at 00:20:35).

contractual construction would require reading the provision to avoid that illegality.[31]   Indeed, even if interpreting the provision to allow supracompetitive prices were not illegal, then contractual canons would require reading the term to maximize competition and further the public interest.[32]

   ***Third,*** if Google tried to misuse its pricing ability to set book prices at supracompetitive levels, each rightsholder would undercut the price in order to increase sales of its book.  Suppose that in the above hypothetical Google did try to set prices at $10 per book.  Then each rightsholder would have incentives to specify a slightly lower price because that would increase its profits.  The other rightsholders in turn would have incentives to undercut that price, until the prices spiraled down to the competitive level of $5.  They could do so without giving up Google display or distribution by simply directing Google to charge a lower price.  They could also do so by charging a lower price through a Google rival, and wouldn't even have to give up having their book sold or displayed on Google unless they wanted to do so.  The latter would be particularly costly to Google because it would lose the 37% profit on books sales as well as market share to rivals.

   Thus Google would have powerful incentives not to even attempt any price less attractive than the prices that are available through rival retailers for those same books, which includes not only printed books but digital books at rivals such as Amazon Kindle, Sony Reader and Project Gutenberg.[33]   Because those rivals would be the only sellers in the but-for world where Google

---

[31]  See *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977); *Nat'l Labor Relations Bd. v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197, 202 (2d Cir.2003); Restatement (Second) of Contracts § 203(a) (1981).

[32]  Restatement (Second) of Contracts §207 (1981); E. Allan Farnsworth, *Farnsworth on Contracts* §7.11, at 304 (3d ed. 2004); *Atlanta Center Ltd. v. Hilton Hotels Corp.*, 848 F.2d 146, 148 (11th Cir. 1988); *Herrera v. Katz Commc'n, Inc.*, 532 F. Supp. 2d 644, 647 (S.D.N.Y. 2008).

[33]  Google currently has 0% market share in books.  Even if we assume printed and digital books will prove to be in separate markets, which will not be clear until we learn more about the extent to which buyers will regard them as reasonably interchangeable, Google is unlikely to gain a large market share in digital books.  The reason is that, given that the settlement by default gives it no rights to distribute in-print books and that those books generally are distributed by existing publishers, Google will primarily be selling books that are out of print because of limited consumer demand and that currently constitute less than 3% of all books sales.  Further, Google's digital books will be readable only online, *see* Settlement §§1.32, 1.74, and thus may be less attractive than digital books through Kindle or Sony.  There is thus little reason to think Google will gain a dominant market share or market power in any digital book market.

could not sell digital books, Google's prices thus could be no higher than the but-for prices that would be available without the settlement.  Google's lack of incentives to attempt to set supracompetitive prices are even stronger when one recognizes that it derives 97% of its revenue from advertising, and thus would not want to sacrifice website traffic by charging high book prices.[34]

*Fourth*, no anticompetitive effect can flow from any rightsholders' vertical agreements to the 63% royalty split that Google offers under the settlement.  This royalty split cannot affect consumer pricing because it does not alter the incentives or algorithm for setting book prices, but instead alters only the distribution of any resulting revenue.  Each rightsholder thus has incentives to set a price that maximizes the revenue for its book, whether it gets 63% or any other share of that revenue, and the settlement algorithm requires Google to set prices in the same way.

Nor can the 63% royalty split prevail if it does not match an efficient split.  Imagine that Google's 37% share turns out to too high a markup for its distribution efforts.  Then any rightsholder could decide to instead sell its book at a Google rival that offers a lower distribution markup.  Some critics argue that rightsholders would have no incentives to license a Google rival.[35] But rightsholders would have the same incentives to minimize the distribution markup that any upstream supplier has.[36]  Now imagine instead that the 37% Google share turns out to be inefficiently low, meaning that it fails to provide sufficient revenue to induce an efficient level of distribution effort.    Then, just like a manufacturer in any vertical distributional restraint,

---

[34] *See* Google, Inc. SEC Form 10-K at 42 (February 13, 2009).

[35] *See* Picker, *supra* note 27, at 21, 27.

[36] *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 896 (2007) ("in general, the interests of manufacturers and consumers are aligned with respect to retailer profit margins. The difference between the price a manufacturer charges retailers and the price retailers charge consumers represents part of the manufacturer's cost of distribution, which, like any other cost, the manufacturer usually desires to minimize."); Einer Elhauge, *United States Antitrust Law & Economics*, at 441-442 (2008).

11

rightsholders would want to increase the downstream share of profits in order to induce an efficient level of distribution effort.[37]  They thus would agree to pay a higher share to Google or its rivals in order to induce or get commitments for more efficient distribution effort because that would increase their book sales enough to offset the higher distribution fee.

Moreover, to the extent rightsholders would not pay more than 37% for distribution because that is what Google offers under the settlement, this does not mean the rightsholders have horizontally agreed to pay no more than 37%.  It simply means that the 37% distribution fee that Google is individually offering has driven the market price for distribution, much like the price individually offered by any marginal seller might drive the market price for any good or service, leaving independent buyers without any incentive to pay more than the market price.  Offering a low price for distribution or anything else is not predatory as long as that price is above cost,[38] and no one claims that 37% results in below-cost pricing for Google's distribution services.  Nor would the answer be any different if we instead view Google as buying books and reselling them: the price Google is individually willing to pay for book licenses might drive their market price, but paying an excessive price for book licenses would not be predatory unless it resulted in below-cost pricing in the downstream book market, which again no one claims here.[39]

***Fifth,*** the agreements here are less restrictive than the usual set of agreements between authors and an individual publisher.  In the typical publishing agreement, unlike here, the authors agree (1) to exclusivity so that rival publishers cannot distribute the same book and (2) to have their prices set by a common publisher who faces no constraint from authors free to set their own book prices and who is under no obligation to set prices to mimic competition among its book offerings.

---

[37] *See PSKS*, 551 U.S. at 896; Elhauge, *supra* note 36, at 441-442.

[38] *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).

[39] *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007).

For such standard publishing contracts, the fact that many authors may agree to the prices and royalty rates offered by the publisher, perhaps in a standard form contract sent to all authors, is deemed neither horizontal nor otherwise problematic.

**Sixth,** new output of out-of-print books would remain zero but for the settlement, which means the price of new output would exceed anyone's willingness to pay given the thin demand and relevant economies of scale in publishing. Even if one thought the settlement would allow monopoly pricing, such pricing would necessarily be at levels that many are willing to pay and thus would be below this but-for price and increase output from zero to something. These are unambiguous procompetitive effects from the proper but-for baseline.

***Making Unclaimed Books Available.*** The settlement has even more procompetitive effects on books with unknown rightsholders. Today, these unclaimed books not only have zero output, but cannot feasibly be licensed or sold, making their effective royalty and price infinity. Under the settlement, over 80% of these currently unknown rightsholders will likely become known, given Registry searches and incentives for self-identification. This will not only have all the procompetitive effects noted above for claimed books, but also will make these books available for licensing by Google and its rivals, reducing the effective royalty rate for licensing these books from infinity and increasing the licensing of these books from zero to something. Thus, for currently unclaimed books, the effects will be unambiguously procompetitive for at least 80% of them.

For the less than 20% of currently unclaimed books whose rightsholders would remain unknown, the results are also unambiguously procompetitive. These books are effectively not only unclaimed but unclaimable given the relevant rewards and costs for making a claim. In the but-for world, such unclaimable books would be both commercially unavailable and unlicensable. Their output would be zero, and their effective royalty rate would be infinity. Further, without a class

13

action settlement, this would be true in any conceivable but-for world because if these rightsholders cannot be identified with this settlement, they are almost certainly unidentifiable through any feasible means. The settlement thus clearly increases the output of these unclaimable books from zero and reduces their effective price and royalty rate from infinity.

To be sure, to the extent the rightsholders remain unknown, they could not individually set prices on Google or decide to license rivals. However, when setting prices for unclaimed books, Google must use the same competition-mimicking algorithm used for claimed books.[40] Pricing for unclaimed books will thus be constrained by the direct terms of the competition-mimicking algorithm. In addition, the fact that the *same* algorithm must be used for both unclaimed and claimed books means that any attempt to misuse the algorithm to set supracompetitive prices for unclaimed books will be constrained by all the market forces (described above) that would prevent supracompetitive pricing for claimed books, including the fact that rightsholders of claimed books would undercut any supracompetitive prices. Given that over 97% of the revenue comes from in-print books that are claimed, most out-of-print revenue comes from currently claimed books, and at least 80% of currently unclaimed out-of-print books will become claimed under the settlement, this means that over 99% of all book revenue will come from claimed books. Google could not plausibly profit from using supracompetitive prices that lose it market share in over 99% of the market in order to increase profits in less than 1% of the market.

Several other factors would also constrain Google from trying to misuse the competitive-pricing algorithm to set supracompetitive prices for unclaimed books. *First*, unclaimed books compete with claimed books. If claimed books, which form over 99% of the market, are being priced competitively, it is unlikely that supracompetitive prices can be charged for unclaimed

---

[40] *See* Settlement §4.2(b).

books, especially because the main reason the latter will be unclaimed is that there is little demand for them.

     ***Second***, Google makes 97% of its revenue from advertising.  Supracompetitive pricing on unclaimed books that reduced traffic to its site would thus likely lose Google more advertising revenue than it could gain in sales.

     ***Third***, if Google tried to set supracompetitive prices on unclaimed books, that would strongly increase the incentives of their rightsholders to identify themselves to get their royalties. After all, rightsholders are typically unidentified because they are difficult to locate, not because they are unaware that they hold copyrights.[41]  Thus, given the negligible costs of registering, one would expect them to do so if they could reap supracompetitive profits.

     ***Fourth***, if supracompetitive pricing does not induce unknown rightsholders to identify themselves, it may well induce some rivals to offer their books without a license.  Normally, publishers are reluctant to sell any book without a copyright license, but if (by hypothesis) these rightsholders have not bothered to register to earn supracompetitive profits, they are unlikely to file copyright infringement cases either, making the odds of copyright penalties low.  The supracompetitive pricing would also increase the benefits of publishing without a license.  Google would be particularly reluctant to induce this sort of rival competition because the rival could easily undercut Google given that the rival would not be paying any royalties: the rival could charge 37% of the price that Google charges and still earn the same profit per book sale.  To be sure, if a rival sold unclaimed books without a license, it might invite a class action lawsuit on behalf of unregistered rightsholders.  But if so, that brings us to the next constraint.

     ***Fifth***, supracompetitive pricing for unclaimed books would be constrained by the ability of

---

[41] *See* United States Copyright Office, *Report on Orphan Works*, at 22-34 (2006).

Google rivals to obtain similar default licensing rights for these books through the same class action mechanism. Settlement critics argue that provoking such a second class action lawsuit would be prohibitively risky.[42] But the risks would seem lower than those incurred by Google, even if the same digitization were done, because at that time there was no precedent for such a settlement. The rival could further lower its risks by limiting its digitization to unclaimed books. Given that the affected rightsholders would be unknown, it would seem difficult to find named plaintiffs for such a class action and also difficult to get a court to award monetary recovery when there is no way to identify who would receive the damages. If the rival's digitization did not provoke a second class action, then the rival would effectively get free rights to the same books that Google pays 63% to sell. This possible payoff may well be worth any financial risk, especially because if the rival digitization did provoke a second class action, then the rival could settle on terms that gave it the same sort of default license over unclaimed books that Google obtained.

Settlement critics argue that the plaintiffs in a second class action would be unlikely to give the rival as good a settlement as Google got.[43] But their argument seems to presuppose that the second class action would be controlled by the same group that brought the first. This is not clear. A rival class action might well involve different groups and the creation of a second Registry, which would have incentives to settle on terms that licensed the rival at prices that undercut Google because then the rival would gain market share and pay more into the second Registry.

Even if the first Registry were allowed to represent the unregistered rightsholders in the rival class action, the first Registry would also have incentives to undercut any supracompetitive Google pricing in a settlement licensing the rival, because doing so would minimize the distribution

---

[42] Pamela Samuelson, *The Dead Souls of the Google Book Search Settlement,* Communications of the ACM, July 2009 (Vol. 52, No. 7).

[43] Samuelson, *supra* note 42; Picker, *supra* note 27, at 24.

markup.  Suppose Google were on average charging a supracompetitive price of $10 for unclaimed books when the competitive price would be $5.  The Registry would be receiving $6.30 per book sale from Google, and thus should be happy to charge $6.30 per book to a rival that charged consumers $9 instead.  The Registry would have incentives to do so because at a lower downstream price, more books would be sold and thus the Registry would receive $6.30 per book on more book sales.  Although the Google settlement has a nondiscrimination provision for licenses covering a significant portion of unclaimed books within ten years of the settlement, that provision would not be violated because the Registry would be charging the rival the same dollar license fee per unclaimed book and a higher percentage royalty of 70% ($6.30/$9), so the Registry would not be licensing the rival on terms that "disfavor or disadvantage Google."[44]

The nondiscrimination clause thus does not restrict the Registry from acting on its incentives to minimize the distribution markup by licensing Google rivals who are willing to undercut Google's markup.  The ability to license rivals will thus constrain the distribution markup to the extent 37% is too high a distribution fee.  It will also constrain book pricing because, given that Google is paid a percentage of book revenue, any supracompetitive book price would result in a supracompetitive distribution markup that the Registry would have incentives to undercut.  To be sure, the Registry could not take less than a 63% royalty split when licensing unclaimed books to Google rivals.  But given that unknowable rightsholders are by definition unable to make their own decisions about the minimum royalty they would take, class counsel had to make some choice on their behalf, and this choice is a reasonable one.  Indeed, given that this is the same rate being offered to compete for claimed books, it is presumptively competitive for unclaimed books as

---

[44] *See* Settlement §3.8(a).

well.[45]

**Sixth**, the settlement arguably allows rivals to obtain rights to offer unclaimed books without a second class action because the settlement "allows the Registry ... to..., ... to the extent permitted by law, license Rightsholders' U.S. copyrights to third parties."[46]  The effect of this provision depends on what one believes the law permits.  If one believes that the current class action settlement could not legally permit the Registry to license rivals because there is no current case or controversy involving those rivals, then a second class action (or orphan books legislation) would be necessary to authorize the Registry to license Google rivals, but the settlement will still have done all it legally could to allow it.  If one instead believes that the rightsholders represented in the current class action could legally permit the Registry to license rivals, then this provision would affirmatively give the Registry the power to provide Google rivals the same default licenses that the settlement provides Google, which the Registry would have incentives to do if Google ever attempted supracompetitive pricing.

**Seventh**, even if the settlement *did* allow monopoly pricing over unclaimable books, the settlement would still be procompetitive because one market option is better than none and monopoly pricing is better for consumer welfare than no market at all.  The but-for alternative for unclaimable books is no licensing at all, which produces the anticompetitive output of zero and effective prices and royalty rates of infinity on new output.  Even monopoly pricing would necessarily increase output and lower effective prices and royalty rates from that but-for baseline.

**Lowering Rival Entry Barriers.**  Nothing in the settlement in any way impairs the ability of

---

[45] Any minimal constraint this nondiscrimination provision imposes would, in any event, be fully justified by the need to protect Google against facing a permanent cost disadvantage for distributing unclaimed books after Google invested hundreds of millions of dollars in making those books distributable.  *See* Elhauge, *supra* note 7, at 41.

[46] *See* Settlement 6.2(b)(iii);  *see also* Settlement §6.1(a).  Several other settlement provisions expressly contemplate the possibility that the Registry might license rivals and make clear the settlement does not prevent the Registry from doing so.  *See* Settlement §§2.4, 3.8(a), 6.3(a)(i).

any Google rival to compete in distributing digital books.  There are barriers to doing so, but they are not barriers imposed by the settlement.  They are barriers imposed by the transaction costs of locating and negotiating with rightsholders and the risk-bearing costs of situations where rights are unclear or unknown.  The settlement overcomes these barriers to entry for Google without raising them for any rival because every right that the settlement gives Google to digitize, display, or sell books is expressly non-exclusive.[47]  Indeed, the settlement affirmatively lowers rival entry barriers because it:  (1) lowers transaction costs by clarifying who holds book rights and what they are likely to be worth, (2) lowers risk-bearing costs for distributing unclaimed books without a license by clarifying that those books have rightsholders who lack the knowledge, interest, or ability to claim rights, (3) provides a roadmap for how the class action vehicle could be used by rivals to get similar default rights, perhaps through a second competing Registry, and (4) authorizes the Registry to license Google rivals to distribute books whenever that is legally permissible.

Settlement critics argue that these entry barriers are likely to remain insuperable for rivals after the settlement, so that the settlement will give Google a *de facto* exclusive license in offering unclaimed books and a comprehensive set of out-of-print books.[48]  But if Google is the only firm willing or able to incur these costs and risks, that does not mean that the settlement confers a *de facto* exclusive license.  The *de facto* exclusivity would be provided by the unwillingness or inability of Google rivals to overcome entry barriers that the settlement did not create, and in fact lowers.

Further, if critics are right in their factual premise that these entry barriers are insuperable

---

[47] *See* Settlement §§ 2.4, 3.1(a).

[48] *See* Fraser, *supra* note 27, at 2; Picker, *supra* note 27, at 3-4 Samuelson, *supra* note 42; James Gibson, *Google's New Monopoly*, Wash. Post, Nov. 3, 2008, at A21; James Grimmelmann, *How to Improve the Google Book Search Settlement*, 12 J. Internet L. at 1, 11-20 (April 2009); Robert Darnton, *Google & the Future of Books*, 56 N.Y. Rev. Books 2 (Feb. 12, 2009).

without this sort of class action settlement, it means that the but-for alternative to this settlement is a world where *no* firm offers either unclaimed books or a comprehensive set of out-of-print books. In other words, the critics' own premise confirms that this settlement provides a powerful procompetitive benefit – making available books that could not be available without the settlement. Even if the critics are right that no Google rival could overcome the barriers to entry in a similar way, a market with one competitor is better than a market with none, because it increases market options and output from nothing to something, thus improving consumer welfare. If the critics are wrong, and other rivals can overcome the same entry barriers (perhaps because the settlement lowers them), then the settlement is even more procompetitive – creating a competitive market in digital distribution of a set of books that otherwise would not be offered at all. Nonetheless, the applicable antitrust test is whether the settlement improves consumer welfare from the but-for world, not whether it maximizes consumer welfare to the fullest extent conceivable,[49] and this test is easily met whether or not critics are right in their assessment of rival entry barriers.

In contrast, barring the settlement would anticompetitively raise entry barriers to prohibitive levels for Google and any other firm hoping to distribute in-copyright books that are out of print. Absent this sort of class action settlement, the transaction and risk-bearing costs created by copyright law have proven to be too high to offer widespread digital access to in-copyright, out-of-print books, even for giants like Google, Microsoft, and Amazon.[50] A holding that such a settlement violates antitrust law would not only prevent Google from overcoming these entry barriers, but set a precedent preventing any rival from overcoming them either, condemning us all to zero output of these books and an effective price of infinity for new copies of them.

---

[49] DOJ-FTC, Antitrust Guidelines for Collaborations among Competitors §3.3 (2000) ("Rule of reason analysis focuses on the state of competition with, as compared to without, the relevant agreement.")

[50] *See* Elhauge, *supra* note 7, at 15-16.

## VI. INSTITUTIONAL SUBSCRIPTIONS TO VIEW ALL GOOGLE BOOKS

The settlement also procompetitively creates a brand new product, the institutional subscription, which gives institutions the ability to fully view all out-of-print books that are available for purchase through Google and all in-print books that the rightsholders elect to include in the subscription.[51] Rightsholders can withdraw their books from the institutional subscription or directly license or sell their books to anyone who prefers that option to the institutional subscription. In addition to selling institutional subscriptions, Google must provide free access to them at one terminal per public library and one or more terminals per college.[52] Creating this new product is a huge procompetitive benefit that could not exist absent the settlement. Non-digital technology simply does not permit a book supplier to sell blanket access to millions of volumes.

Settlement critics object that Google and the Registry will be able to charge monopoly prices for institutional subscriptions. But this concern is misplaced for several reasons. *First*, the settlement requires that institutional subscriptions be priced to achieve two objectives:

> (1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education.[53]

The first objective requires that revenue be realized at "market" rates for "each" book, and thus requires that pricing achieve only competitive market returns, just like the competitive-pricing algorithm does for individual consumer purchases. The second objective reinforces this goal by requiring that pricing be low enough to realize "broad access" by the public. If the price were raised to a high enough level that a substantial number of institutions decided to refrain from

---

[51] *See* Settlement §4.1(a)(v); §3.5(b)(iii).

[52] The settlement agreement itself says Google "may" provide this public access, Settlement §4.8(a)(i), but in a separate agreement Google has contractually committed to do so within two years. *See* Amendment to Cooperative Agreement (Between Google and the University of Michigan) Attachment A (May 19, 2009), at §3(a).

[53] *See* Settlement §4.1(a)(i).

subscribing, Google will be obligated to lower the price to achieve broad access. In essence, this requirement bars any supracompetitive pricing that would produce allocative inefficiency in terms of some significant set of buyers not taking the output. To the extent this provision were at all ambiguous on these points, it must (like the competitive-pricing algorithm) be interpreted to avoid antitrust illegality and advance the public interest.[54]

**Second**, any attempt to charge excessive institutional subscription fees would be constrained by other forces, including competition from free library terminals, the ability to purchase books through Google or other sources, Google's incentives to keep fees low to promote the search engine that generates the advertising revenue that provides 97% of its profits, and rightsholders' ability to directly license or sell books included in the institutional subscriptions.

High subscription fees would also be constrained by the prospect of rivals offering their own institutional subscriptions at lower rates. Rightsholders will be just as able as Google to obtain licenses for in-print books and journals, which are what institutions mainly buy.[55] Rivals who wanted to offer an institutional subscription of comparable scope could also seek licenses for any out-of-print books, which the settlement makes easier in several ways. *(A)* The settlement creates a public database that makes it easy for rivals to make a mass offer to all registered rightsholders to license their books. *(B)* The settlement allows the Registry to collect licenses from multiple registered rightsholders and license them in aggregate to rivals, which the Registry and rightsholders have incentives to do in order to minimize Google's distribution markup. *(C)* The settlement might authorize the Registry to license books to Google rivals absent rightsholder

---

[54] Although some settlement critics object that these requirements are enforceable only by the Registry, Darnton, *supra* note 48, they actually are also enforceable by rightsholders, university libraries, and perhaps other institutions. *See* Elhauge, *supra* note 7, at 45-46.

[55] *See* http://www.ala.org/ala/mgrps/divs/acrl/publications/trends/2007/index.cfm (the bulk of library spending is on current periodicals).

objection.  *(D)* The settlement provides a roadmap as to how rivals could engage in digitization to provoke a second class action.  If the last two methods prove feasible, a Google rival could obtain default rights over all out-of-print books and offer precisely the same institutional subscription as Google.  If they prove unfeasible, rivals could not obtain licenses over unclaimed books, but given that unclaimed books will provide less than 1% of book revenue, rival institutional subscriptions could be a close substitute for the Google subscription, and perhaps more attractive if the rival offers more in-print books, lower prices, or additional features.

*Third,* even if the settlement gives Google the power to price institutional subscriptions at monopoly levels and rivals could not possibly offer a similar competing subscription, the settlement would still be procompetitive because having one firm offer a desired product is preferable to having no firm offer it.  After all, if rivals cannot offer an institutional subscription, and blocking the settlement makes it impossible for Google to do so either, then no one will offer a similar institutional subscription.  The but-for output of such subscriptions will thus be zero and the but-for price will effectively be infinity.  Even monopoly output and pricing would thus expand output and lower effective prices relative to the proper but-for baseline.

## VII. THE SETTLEMENT COMPARES FAVORABLY TO *BMI*

The settlement compares favorably to the blanket licenses for copyrighted songs that the opinions in *BMI vs. CBS* held were too procompetitive to be subject to the per se rule and too lacking in anticompetitive effect to violate the rule of reason.  In that case, like here, millions of rightsholders provided copyright licenses to an intermediary, which in turn sold blanket licenses to users that combined all their copyrighted materials.  The Supreme Court held that this agreement was not per se illegal because it furthered the procompetitive purposes of (1) lowering the transaction costs of identifying and negotiating with millions of individual rightsholders, and (2)

23

creating a new product (the blanket license) that otherwise would not be possible.[56]  Both those procompetitive effects are equally applicable here, but the settlement in addition clarifies rights and digitizes the copyrighted material to make it far easier to find and use.

On remand, the Second Circuit held that the agreement survived the rule of reason because it lacked any anticompetitive effect, given that users remained free to directly license the copyrighted material from rightsholders.[57]  The same logic is equally applicable here, with the difference that the settlement is even less restraining in multiple respects.  (1) The *BMI* intermediary offered blanket licenses but not individual songs, and the plaintiff sought the remedy of requiring individual song sales.[58]  In contrast, under the settlement Google already offers books on both a blanket and individual basis.  (2) The *BMI* rightsholders could set their own prices only by going outside the intermediary, which was costly.  In contrast, here the settlement explicitly allows rightsholders not only to license directly, but also to set their own prices for sales through the intermediary for all individual book sales.[59]  (3) The *BMI* rightsholders could *not* license the same song through an intermediary and rival intermediary at the same time.[60]  In contrast, the settlement allows rightsholders to license their books for distribution through any Google rival and Google at the

---

[56] *BMI v. CBS*, 441 U.S. 1 (1979).

[57] *CBS v. American Society of Composers, Authors and Publishers*, 620 F.2d 930 (1980).

[58] *BMI*, 441 U.S. at 18.

[59] *See* Settlement §4.2(b)(i)(1).  Individual buyers cannot possibly set their own prices for a blanket license (like in *BMI* or the institutional subscription here) because the collection of all their rights is what is being sold.  However, in *BMI*, neither the Supreme Court nor the appellate court opinions found this troubling.  Although both noted that the consent decree allowed a court to review whether blanket license prices were reasonable, neither relied on that aspect of the consent decree; instead, they relied on the fact that the consent decree preserved the option of buying directly from individual rightsholders.  *BMI*, 441 U.S. at 11-12, 23-24; *CBS*, 620 F.2d at 933, 935.  Even if the reasonable-fee review were relevant to the *BMI* decisions, an even more constraining review is supplied here by the settlement provisions requiring that institutional subscription prices be set to earn only competitive returns and assure broad access, which provide more objective review standards than the reasonable-fee test used in the *BMI* consent decrees.

[60] *United States v. BMI*, 1966 Trade Cas. (CCH) ¶71,141, at Consent Decree § VI.A.

same time.[61]  Further, here the Registry can assemble aggregations of book rights and perhaps even license default rights over out-of-print books to rivals who wish to offer their own institutional subscriptions, even though Google is offering the same books.

## VIII. CONCLUSION

For the foregoing reasons, we urge the Court to approve the Settlement.

Dated: September 8, 2009                          Respectfully submitted,

/s/ Matthew Ingber
Matthew D. Ingber

MATTHEW D. INGBER
**MAYER BROWN LLP**
1675 Broadway
New York, New York 10019-5820
Tel: 212 506 2500
Fax: 212 262 1910

*Attorneys for Antitrust Law and Economics Professors*

---

[61] *See* Settlement §2.4.

*AMICI CURIAE* ANTITRUST AND ECONOMICS LAW PROFESSORS[*]

| | |
|---|---|
| William J. Baumol<br>Professor, Academic Director, Berkley Center for Entrepreneurial Studies, Stern School of Business, New York University | Dr. Roger D. Blair<br>Walter J. Matherly Professor of Economics<br>Professor, University of Florida Warrington College of Business Administration |
| James F. Blumstein<br>University Professor,<br>Vanderbilt Law School | Timothy Bresnahan<br>Department of Economics, Landau Professor in Technology and the Economy,<br>Stanford University |
| Darren Bush<br>Associate Professor of Law,<br>University of Houston Law Center | Daniel A. Crane<br>Professor of Law,<br>University of Michigan Law School |
| Joshua Paul Davis<br>Professor and Director, Center for Law and Ethics,<br>University of San Francisco School of Law | Einer R. Elhauge<br>Petrie Professor of Law,<br>Harvard School of Law |
| Daniel J. Gifford<br>Robins, Kaplan, Miller & Ciresi Professor of Law, University of Minnesota Law School | Warren S. Grimes<br>Professor of Law, Southwestern Law School |
| Jeffrey L. Harrison<br>Stephen C. O'Connell Chair, University of Florida Levin College of Law | Herbert Hovenkamp<br>Ben and Dorothy Willie Chair, The University of Iowa College of Law |
| Keith N. Hylton<br>The Honorable Paul J. Liacos Professor of Law, Boston University School of Law | Thomas E. Kauper<br>Henry M. Butzel Professor of Law, University of Michigan Law School |
| John B. Kirkwood<br>Associate Professor and Associate Dean Seattle University School of Law | Thomas G. Krattenmaker<br>Former Professor of Law,<br>Georgetown University Law Center,<br>Former Dean and Professor of Law at Marshall-Wythe School of Law at the College of William and Mary |

---

[*] The views expressed by the *Amici* are their own. The institutional affiliations of the *Amici* are for identification purposes.

| | |
|---|---|
| Marina Lao<br>Edward S. Hendrikson Professorship,<br>Seton Hall University School of Law | Anup Malani<br>Professor and Aaron Director Research<br>Scholar, University of Chicago Law School |
| David McGowan<br>Lyle L. Jones Professor of Innovation and<br>Competition Law,<br>University of San Diego School of Law | Alan J. Meese<br>Ball Professor of Law<br>William and Mary School of Law |
| William H. Page<br>Marshall M. Criser Eminent Scholar and<br>Senior Associate Dean for Academic Affairs,<br>University of Florida Levin School of Law | J. Mark Ramseyer<br>Mitsubishi Professor of Japanese Legal<br>Studies, Harvard Law School |
| Barak Richman<br>Professor, Duke Law School<br>Strategy Faculty Research Associate, Fuqua<br>School of Business | David Scheffman<br>Senior Advisor<br>Cornerstone Research,<br>Adjunct Professor of Business Strategy and<br>Marketing at the Owen Graduate School of<br>Management, Vanderbilt University |
| David Schleicher<br>Assistant Professor of Law,<br>George Mason University School of Law | David S. Sibley<br>John T. Stuart Centennial Professor in<br>Economics, University of Texas at Austin |
| D. Daniel Sokol<br>Assistant Professor,<br>University of Florida Levin College of Law | John L. Solow<br>Associate Professor<br>Department of Economics<br>The University of Iowa |
| Richard Squire<br>Associate Professor<br>Fordham University School of Law | Alan O. Sykes<br>James and Patricia Kowal Professor of Law,<br>Stanford Law School |
| Joshua D. Wright<br>Assistant Professor of Law,<br>George Mason University School of Law | Todd J. Zywicki<br>Foundation Professor of Law,<br>George Mason University School of Law |

**CERTIFICATE OF SERVICE**


I herby certify that I electronically filed the foregoing Amicus Brief of Antitrust Law and Economics Professors with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all lead attorneys to be noticed in this matter including those counsel of record identified below.

This the 8th day of September, 2009.


/s/ Matthew Ingber
Matthew D. Ingber


Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
mboni@bonizack.com

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bpkeller@debevoise.com

Daralyn J. Durie, Esq.
David J. Silbert, Esq.
Joseph C. Gratz, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111
ddurie@durietangri.com

28