UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

The Authors Guild, Inc., Association of American   :
Publishers, Inc., Associational Plaintiffs, and   :
  :
Herbert Mitgang, Betty Miles, Daniel Hoffman,   :    Case No. 05 CV 8136 (DC)
Paul Dickson, Joseph Goulden, The McGraw-Hill   :
Companies, Inc., Pearson Education, Inc., Penguin   :
Group (USA) Inc., Simon & Schuster, Inc., and   :
John Wiley & Sons, Inc., individually and on   :    **OBJECTIONS OF MICROSOFT**
behalf of all others similarly situated,   :    **CORPORATION TO**
  :    **PROPOSED SETTLEMENT**
      Plaintiffs,   :    **AND CERTIFICATION OF**
  :    **PROPOSED SETTLEMENT**
  :    **CLASS AND SUB-CLASSES**
v.   :
  :
Google Inc.,   :
  :
      Defendant.   :
  :

-------------------------------------------------------------x

**MICROSOFT CORPORATION**

Thomas C. Rubin (TR8845)
Chief Counsel for Intellectual Property Strategy
*tom.rubin@microsoft.com*

Jule L. Sigall
Senior Policy Counsel
*jsigall@microsoft.com*

Legal and Corporate Affairs
One Microsoft Way
Redmond, WA 98052
(425) 882-8080

**MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP**

Charles B. Casper
123 South Broad Street
Philadelphia, PA 19109
(215) 772-1500
*ccasper@mmwr.com*

R. Montgomery Donaldson
1105 N. Market Street
Suite 1500
Wilmington, DE 19801
(302) 504-7800
*rdonaldson@mmwr.com*

*Attorneys for Microsoft Corporation*

Dated: September 8, 2009

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 6

I.    THE PROPOSED SETTLEMENT USURPS CONGRESS'S EXCLUSIVE
      CONSTITUTIONAL ROLE TO DEFINE AND ALTER  THE RIGHTS AND
      REMEDIES OF COPYRIGHT OWNERS ...................................................... 6

      A.    The Constitution Vests Authority to Restructure Copyrights Exclusively
            in Congress, Not the Courts ................................................................... 7

      B.    Congress Has Resolved Similar Matters Many Times, Including
            Those That First Arose in Class Action Litigation ................................. 8

      C.    The Proposed Settlement Would Interfere with Congress's Resolution
            of Important Copyright Issues .............................................................. 10

II.   THE PROPOSED SETTLEMENT DOES NOT SATISFY THE
      REQUIREMENTS OF RULE 23 ................................................................... 16

      A.    The Class Cannot Be Certified Because Plaintiffs' Interests Conflict with
            Those of Proposed Class Members, Contrary to Rule 23(a)(4) ........... 17

      B.    Rule 23 May Not Be Used to Create a "Joint Venture" Licensing
            Copyright Infringement Not Alleged in The Complaints or Litigated ... 20

      C.    The Court Lacks Jurisdiction to Approve the Proposed Settlement
            Because it Would Release Claims for Future Infringement .................. 23

CONCLUSION ......................................................................................................... 25

## INTRODUCTION

"The final settlement is a complex license, involving a worldwide class of millions of copyright owners, and resembles a joint venture among publishers, authors, Google and the libraries that provide books to Google for scanning."

-- Counsel for the Publisher Sub-Class[1]

The purpose of class action is to resolve a legal dispute, not launch a "joint venture." Google and the three authors and five publishers who filed these actions ask the Court to conscript the vast majority of the world's copyright owners in books into this "joint venture" that would create a monopoly in digital books. The proposed settlement is unrelated to the narrow legal dispute before the Court and, if approved, would constitute an unprecedented misuse of the judicial system. It invades the exclusive power over copyright that Article I of the Constitution grants to Congress and exceeds the Court's authority under Rule 23 and Article III of the Constitution. The proposed settlement must be rejected.

The complaints that commenced these cases in 2005 challenged the Google Library Program, which scanned books from library shelves to make them electronically searchable on Google's website in order to display *brief excerpts* in response to searches. The proposed settlement does not resolve this narrow issue, but rather confers on Google a new monopoly by authorizing Google (and Google alone) to engage in the wholesale *commercial* exploitation of *entire* copyrighted books. The broad uses granted Google include "Institutional Subscriptions," "Consumer Purchases" and "New Revenue Models," as well as "Non-Display Uses"

---

[1] Debevoise & Plimpton LLP, *Debevoise advises worldwide class of publishers and Association of American Publishers in landmark settlement with Google*, Nov. 25, 2008, *available at* http://www.debevoise.com/newseventspubs/news/RepresentationDetail.aspx?exp_id=a3dba5c6-7e25-4b70-a9c7-0156917fee0d. (Ex. A).

encompassing a wide array of valuable uses for which no compensation whatsoever will be paid to class members.[2]

Millions of copyright owners around the world who did *not* participate in and do not even know about this litigation – many of whose works Google has not even scanned – stand on the verge of having their copyrights infringed in ways exponentially greater than the conduct challenged in the complaints.  A class action settlement is the wrong mechanism, this Court is the wrong venue, and monopolization is the wrong means to carry out the worthy goal of digitizing and increasing the accessibility of books.  Indeed, Congress and numerous academic, non-profit and commercial providers are working towards that goal by way of legitimate legislative and contractual efforts.

Microsoft Corporation has substantial interests in this proceeding.[3]  It owns Microsoft Press, a large technical publisher, and is a member of both the Publisher Sub-Class and the Author Sub-Class defined in Section 1.142 of the proposed settlement agreement with thousands of copyrighted works covered by its terms.  It also operates Bing, an Internet search engine that provides users with access to all types of digital information and would be harmed by the anti-competitive effects of the proposed settlement.  Until May 2008, Microsoft operated a book digitization project like Google Books but with the clear distinction that Microsoft did not scan and display any copyrighted books without permission of the copyright owner.  As explained last

---

[2] As one commentator explained: "It seems likely that the 'nondisplay uses' of Google's scanned corpus of text *will end up being far more important than anything else in the agreement*.  Imagine the kinds of things that data mining all the world's books might let Google's engineers build: automated translation, optical character recognition, voice recognition algorithms.  And those are just the things we can think of today.  Under the agreement, Google has unrestricted, royalty-free access to this corpus."  Fred von Lohmann, *Google Book Search Settlement: A Reader's Guide*, Electronic Frontier Foundation Deep Links Blog, Oct. 31, 2008 (emphasis added), http://www.eff.org/deeplinks/2008/10/google-books-settlement-readers-guide. (Ex. B).

[3] Microsoft intends to appear at the Fairness Hearing on October 7, 2009 to present the arguments made in these Objections.

year, Microsoft was and remains interested in search technology to improve access to digital books, an interest that would be substantially harmed by approval of the proposed settlement.[4] Finally, as an owner, user and licensee of copyrighted works, including books, Microsoft has a strong interest in the copyright rules and business arrangements that govern such works.

No one can object to the laudable goal of creating universal and broadly accessible repositories of digital books. Numerous entities – public (including the U.S. Copyright Office and Library of Congress), non-profit (including the Internet Archive), educational (including leading universities) and commercial (including Google, Amazon, Yahoo and Microsoft) – have invested countless time and hundreds of millions of dollars in such efforts. Breakthroughs in digital technology and progress in copyright reform before Congress – efforts that Microsoft actively supports – have brought achievement of that goal closer than ever. These competitive and transparent efforts affirm the benefits of an open market, and the Constitutionally mandated legislative process ensures that the diverse interests of the many stakeholders are considered and balanced, accommodating copyright owners, online services, libraries and the public.

The proposed settlement, on the other hand, pursues an illegitimate approach. Following closed-door negotiations that excluded millions of copyright owners and the very public that copyright law serves,[5] Google and the plaintiffs seek to arrogate public policymaking to themselves, bypass Congress and the free market, and force a sweeping "joint venture" – built on copyrights owned by a largely absent class – via this Court's order. The proposed settlement would usurp the role that Article I, Section 8 of the Constitution vests in Congress alone to alter

---

[4] *See generally* Microsoft, *Book Search Winding Down*, Bing Search Blog, May 23, 2008, http://www.bing.com/community/blogs/search/archive/2008/05/23/book-search-winding-down.aspx. (Ex. C).

[5] *See Mazer v. Stein*, 347 U.S. 201, 219 (1954) ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'").

the copyright laws in the face of new technologies, a role that Congress actively pursues in legislation to make orphan works more widely available, to enact copyright exceptions for libraries to further their mission, and to meet other changing needs.[6]

Four basic facts about the proposed settlement highlight problems that render it inappropriate to foist on millions who had no role in its negotiation yet would be bound by its terms:

*First*, the plaintiffs no longer seek redress only for past or continuing infringement – the proper bounds of a copyright lawsuit.  Rather, the settling parties now seek this Court's approval of a "joint venture" that would *authorize new future* infringements and expropriate and impair the exclusive rights of millions of absent class members for the *life* of their copyrights.

*Second*, the proposed settlement seeks to divvy up rights that would *never* be the subject of contested litigation.  Unlike the infringement claims and fair use defense for displaying brief excerpts alleged in the pleadings, the wholesale uses of entire books that the proposed settlement would authorize are *unquestionably* infringing, as Google acknowledges.[7]  In other words, the class representatives bargained away millions of absent class members' incontestable rights to prevent the reproduction, distribution, public display, public performance and other uses of their copyrighted books – rights that are not remotely in dispute in this case.

*Third*, each of the five Publisher Sub-Class representatives that negotiated the proposed settlement already has a commercial partnership with Google and its own side deal that contains terms that have not been disclosed to class members.  These separate agreements are likely to be

---

[6] *See, e.g.*, Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008) (passed by Senate on Sept. 26, 2008).

[7] *See* Andrew R. Albanese, *Deal or No Deal: What if the Google Settlement Fails?*, Publishers Weekly, May 25, 2009, *available at* http://www.publishersweekly.com/article/CA6660295.html ("Even if Google had prevailed with its fair use claim, [Google Engineer Dan] Clancy explains, that ruling would only have facilitated its book *scanning*. Its display still would have been limited to brief 'snippets.'") (emphasis in original). (Ex. D).

different and more advantageous than the proposed settlement negotiated for the absent class members. Unlike the class representatives, however, the millions of class members would become participants in Google Books by means of conscription, not volition.

*Fourth*, the Publisher Sub-Class representatives that negotiated the proposed settlement are widely expected to exclude their own books from its terms. The class representatives intend to walk away from the deal that they seek to impose on millions of absent copyright owners.

These facts and many others cited in objections filed with the Court demonstrate that the sweeping scope of the proposed settlement is improper and that the parties that negotiated it do not represent the diverse interests of the massive class.[8]

The settling parties seek to misuse Rule 23 to create their "joint venture" via an unprecedented "compulsory license for the benefit of one company," as U.S. Register of Copyrights Marybeth Peters calls it.[9] This would have profound anticompetitive effects.[10] Potential customers of the proposed commercial venture, including libraries,[11] universities[12] and

---

[8] As Publishers Weekly concluded: "[O]ur take is this: there is simply too much confusion and too little support for anyone to feel comfortable. … [F]or all the good and bad scenarios raised by the deal, was it ever reasonable to think that such a revolutionary, unprecedented pact, negotiated in secret over three years by people with loose claims of representation, concerning a wide range of stakeholders, both foreign and domestic, involving murky issues of copyright and the rapidly unfolding digital future, could be pushed through as a class action settlement within a period of months, in the teeth of a historic media industry transition?" Andrew R. Albanese, *Unsettled: The PW Survey on the Google Book Settlement*, Publishers Weekly, Aug. 24, 2009, *available at* http://www.publishersweekly.com/article/CA6685412.html. (Ex. E).

[9] Miguel Helft, *It's Not Just Microsoft Balking at Google's Book Plans*, New York Times BITS Blog, Apr. 4, 2009, http://bits.blogs.nytimes.com/2009/04/04/its-not-just-microsoft-thats-balking-at-googles-book-plans/. (Ex. F)

[10] The U.S. Department of Justice has informed the Court of a pending antitrust investigation of the proposed settlement. *See* Order dated July 2, 2009 (Doc. No. 120). In light of that pending investigation, this brief does not address the legality of the proposed settlement under federal antitrust law, including its implications for Google's already dominant position in search advertising and potential monopoly in the markets for digitized books and library subscription services.

[11] *See, e.g.*, Library Association Comments (Doc. No. 100) at 6 ("there is no foreseeable threat to the control Google and the Registry have over this essential research facility"); Urban Libraries Council Comments (Doc. No. 158) at 4 ("The practical effect of the proposed settlement will be a monopolistic situation."); Robert Darnton, *Google & the Future of Books*, The New York Review of Books, v. 56, n.2, Feb. 12, 2009, *available at* http://www.nybooks.com/articles/22281 ("Google will enjoy what can only be called a monopoly – a monopoly of a new kind, not of railroads or steel but of access to information."). (Ex. G).

consumer groups,[13] criticize it for creating a concentrated market power, as do leading academics in the fields of intellectual property and competition.[14]  Even the parties that negotiated the proposed settlement acknowledge that it would forestall competition:

> Richard Sarnoff, chairman of the Association of American Publishers, said that the structure of the registry will be "tough to replicate for [Google's] competitors."[15]

> Michael J. Boni, the lead lawyer representing the Authors Guild, conceded that "Google will always have the advantage of having access to 100 percent of the orphan works."[16]

Google and its chosen partners would receive immunity from the purported class for massive copyright infringement that no other entity could obtain.

Facilitating the digitization of books is a worthy goal, but the profound interests implicated here can only be resolved by Congress, not this Court.

## ARGUMENT

## I.  THE PROPOSED SETTLEMENT USURPS CONGRESS'S EXCLUSIVE CONSTITUTIONAL ROLE TO DEFINE AND ALTER THE RIGHTS AND REMEDIES OF COPYRIGHT OWNERS

The proposed settlement goes well beyond the legitimate role of a copyright lawsuit –

---

...Continued

[12] *See, e.g.*, Letter to J. Michael McMahon from Mary Croughan, et al. (University of California Faculty) of Aug. 13, 2009 (Doc. No. 134) at 3 ("there are at least three serious impediments to meaningful non-exclusivity of that license").

[13] *See, e.g.*, Jef Pearlman, *Public Knowledge and the Google Book Search Settlement*, Public Knowledge Blog, May 1, 2009, http://www.publicknowledge.org/node/2129 (Ex. H); Wendy Davis, *Consumers Not Considered In Google Book Search Settlement*, Consumer Watchdog, Apr. 7, 2009, http://www.consumerwatchdog.org/corporateering/articles/?storyId=26151. (Ex. I).

[14] *See, e.g.*, Pamela Samuelson, *Legally Speaking: The Dead Souls of the Google Booksearch Settlement*, O'Reilly Radar, Apr. 17, 2009, http://radar.oreilly.com/2009/04/legally-speaking-the-dead-soul.html ("The proposed settlement agreement would give Google a monopoly on the largest digital library of books in the world.") (Ex. J); Elise Ackerman, *Google's Book Club*, San Jose Mercury News, May 3, 2009 (quoting Randal C. Picker) ("Google will walk away from the settlement agreement with a huge competitive advantage"). (Ex. K).

[15] Timothy B. Lee, *Publisher speculates about Amazon/Google e-book "duopoly,"* Ars Technica, Feb. 23, 2009, *available at* http://arstechnica.com/tech-policy/news/2009/02/publisher-speculates-about-amazongoogle-e-book-duopoly.ars. (Ex. L).

[16] Miguel Helft, *Google's Plan for Out-of-Print Books Is Challenged*, New York Times, Apr. 4, 2009, *available at* http://www.nytimes.com/2009/04/04/technology/internet/04books.html?pagewanted=1&_r=2. (Ex. M).

resolving claims for infringement – and imposes a slew of provisions that would restructure the rights and remedies of absent copyright owners throughout the world. The proposed settlement would improperly: (1) require copyright owners to comply with formalities, including registration and notice, to preserve and enforce their copyrights against Google; (2) permit clearly infringing reproduction, distribution and other uses of copyrighted works without the owner's affirmative consent; (3) force owners to allow Google and its partners to make far-reaching and lucrative "non-display" uses of copyrighted books; (4) impose a private arbitration system to resolve various copyright disputes; and (5) grant broad immunities not only to Google but to libraries, contractors and others not party to this litigation.

A class action cannot restructure copyright rights, remedies, immunities and defenses as the proposed settlement seeks to do. Such changes can only come from Congress, which alone has the "constitutional authority and institutional capability" to determine the rights and remedies of copyright. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984). Accordingly, the Court should reject the proposed settlement and instruct the parties to litigate or settle the claims actually raised in the complaints. A broader resolution must be left to Congress, where it can be publicly vetted – and, if appropriate, enacted – with the participation of all impacted stakeholders. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999) (reversing class certification and settlement in "litigation [that] defies customary judicial administration and calls for national legislation") (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 598 (1997)).

## A. The Constitution Vests Authority to Restructure Copyrights Exclusively in Congress, Not the Courts

The Constitution empowers Congress to "promote the progress of science …, by securing for limited times to authors … the exclusive right to their respective writings …." U.S. Const., art. I, § 8. "[I]t is generally for Congress, not the courts, to decide how best to pursue the

Copyright Clause's objectives." *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003). "[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors … to give the public appropriate access to their work product." *Id.* at 205 (quoting *Sony Corp.*, 464 U.S. at 429). This role is particularly important in the face of new technology, as here. "Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology." *Sony Corp.*, 464 U.S. at 430-31 (footnotes and citations omitted).

Congress has worked hard on legislation to revise copyright law to meet the challenges of the digital age. Microsoft and scores of others (including the settling parties) are active participants in those deliberations. Many aspects of the proposed settlement, including its treatment of orphan and non-U.S. works and of libraries, run afoul of legislative efforts. While some of these provisions may have benefits as a policy matter, their inclusion in the proposed settlement amounts to an end run around Congress to further the parties' private "joint venture."

### B. Congress Has Resolved Similar Matters Many Times, Including Those That First Arose in Class Action Litigation

Congress has a long record of amending copyright law to respond to advances in technology, including enacting industry-specific mechanisms that recognize and reconstruct the rights of copyright owners. *See, e.g.*, 17 U.S.C. § 111 (compulsory license for retransmission of television signals by cable systems); § 112(e) (compulsory license for ephemeral reproduction of sound recordings by webcasters and other digital music services); § 114 (compulsory license for public performance of sound recordings by certain digital music services); § 115 (compulsory license for making phonorecords of musical compositions); § 116 (compulsory license for use of music by jukeboxes); § 118 (compulsory license for use of works by public television stations); §§ 119, 122 (compulsory license for retransmission of television signals by satellite carriers);

§ 1001 *et seq.* (resolving disputes over reproduction of copyrighted music by digital audio recording devices). Congress can do so here as well.

In *Cahn v. Sony Corp.*, No. 90 Civ. 4537 (S.D.N.Y. complaint filed July 9, 1990), music publishers filed a class action asserting copyright infringement claims against the manufacturer of digital audio tape recorders, which consumers could use to make digital copies of copyrighted musical works. At the urging of the litigating parties, Congress effectively resolved the case by enacting the Audio Home Recording Act of 1992 ("AHRA").[17] In contrast, the proposed settlement improperly seizes the legislative function of Congress by attempting to mimic the AHRA and compulsory license schemes. It provides immunity from copyright liability for the users of the copyrighted works;[18] requires payment from some of those users to the copyright owners;[19] creates a mechanism for collecting payments, making claims on those payments and distributing payments to copyright owners;[20] and includes procedures to resolve disputes about payments, claims and related matters.[21]

But these Congressional solutions differ in three fundamental ways from the "compulsory license" the proposed settlement would impose. Unlike the proposed settlement, legislated changes to copyright owners' rights and remedies: (1) result from an open and transparent process; (2) balance and accommodate the legitimate concerns of all stakeholders;

---

[17] 17 U.S.C. § 1001 *et seq.* Counsel for the Publisher Sub-Class represented the defendants in the *Cahn* litigation and were instrumental in transforming *that* class action litigation into Congressional legislation.

[18] *Compare* Settlement Agreement ("SA") Art. X ("Releases") *with* 17 U.S.C. § 1008 ("Prohibition on Certain Infringement Actions").

[19] *Compare* SA Art. IV ("Economic Terms for Google's Use of Books") *with* 17 U.S.C. § 1004 ("Royalty payments").

[20] *Compare* SA Art. VI ("Establishment and Charter of Registry") *with* 17 U.S.C. §§ 1005-07 ("Deposit of royalty payments and deduction of expenses"; "Entitlement to royalty payments"; & "Procedures for distributing royalty payments").

[21] *Compare* SA Art. IX ("Dispute Resolution") *with* 17 U.S.C. §§ 1009-10 ("Civil remedies" & "Determination of certain disputes").

and (3) are available to *all* similarly situated entities, not just to a "joint venture" involving one company and its chosen partners.  Congress has the "constitutional authority and institutional capability" to resolve the issues that the proposed settlement raises.  *See Sony Corp.*, 464 U.S. at 431.  Congress has done it before and can do it again.

### C.  The Proposed Settlement Would Interfere with Congress's Resolution of Important Copyright Issues

The proposed settlement would alter and abridge class members' substantive rights, including those to which Congress has devoted considerable attention in recent years.  Some of the proposed settlement's changes may be beneficial reforms that, *if enacted by Congress*, would improve the copyright system for the digital age.  But they may *only* be enacted by Congress, not imposed through the misuse of a class action lawsuit.

*Orphan Works*.  Congress and the Copyright Office have been studying the orphan works issue intensively for the past four years and received input from hundreds of interested parties, including Microsoft.[22]  In contrast to the parties' closed-door discussions, the legislative process is extensive, transparent and public,[23] as the Copyright Office explained in its 2006 Report on Orphan Works:

> The response from the public to this study was extraordinary. We received over 850 written comments, most of which were filed by individuals who have concerns about the use of orphan works.  As you know, the roundtable discussions we held in Washington,

---

[22] *See* Letter from Thomas C. Rubin, Microsoft, to U.S. Copyright Office of Mar. 25, 2005, *available at* http://www.copyright.gov/orphan/comments/OW0695-Microsoft.pdf; *Orphan Works: Proposals for a Legislative Solution: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong. (Apr. 6, 2006) (Testimony of Thomas Rubin), *available at* http://judiciary.senate.gov/hearings/testimony.cfm?id=1847&wit_id=5223.

[23] *See, e.g.*, *Oversight Hearing on the "Report on Orphan Works": Hearing Before the House Subcomm. on Courts, the Internet, and Intellectual Property*, 109th Cong. (Mar. 8, 2006); *Orphan Works: Proposals for a Legislative Solution: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong. (Apr. 6, 2006); H.R. 5439, 109th Cong. (2006); *Hearing on Promoting the Use of Orphan Works: Balancing the Interests of Copyright Owners and Users: Hearing Before the House Subcomm. on Courts, the Internet, and Intellectual Property*, 110th Cong. (Mar. 13, 2008); H.R. 5889, 110th Cong. (2008); S. 2913, 110th Cong. (2008).

D.C. and California were well-attended, and the participants engaged in thoughtful and productive discussion of the many complex issues involved in this matter….[24]

The difficulty of obtaining rights to orphan works as part of a mass digitization project was the subject of comments filed by interested parties, including the settling parties.[25]  Congress and the Copyright Office took great pains to consider how an orphan works solution would affect the owners of those works and the copyright system itself, both in the United States and internationally.[26]

As many note, the proposed settlement would give Google an exclusive license to the orphan works of absent class members because the Registry could not grant to others the same rights without the right holder's permission – which no orphan owner will be available to grant.[27]  Moreover, under the terms Google and plaintiffs drafted, Google would be able to use those orphan works on terms that Congress and the Copyright Office *rejected*.  In 2008, the Senate passed legislation recommended by the Copyright Office that would require a "diligent search" for an orphan work's owner before using the work, in part to ensure that the legislation meets

---

[24] Letter from Marybeth Peters, Register of Copyrights, to Senators Orrin G. Hatch and Patrick Leahy of Jan. 23, 2006, included in U.S. Copyright Office, *Report on Orphan Works* (Jan. 2006) ("Report on Orphan Works"), *available at* http://www.copyright.gov/orphan/orphan-report-full.pdf.

[25] *See, e.g.*, Letter from Allan Adler, Association of American Publishers, et al., to U.S. Copyright Office of Mar. 24, 2005 ("AAP Initial Comment"), *available at* http://www.copyright.gov/orphan/comments/OW0605-AAP-AAUP-SIIA.pdf; Letter from David Drummond, Google, to U.S. Copyright Office of Mar. 25, 2005 ("Google Initial Comment"), *available at* http://www.copyright.gov/orphan/comments/OW0681-Google.pdf; Letter from Allan Adler, Association of American Publishers, et al., to U.S. Copyright Office of May 6, 2005 ("AAP Reply Comment"), *available at* http://www.copyright.gov/orphan/comments/reply/OWR0085-AAP-AAUP-SIIA.pdf; Letter from Paul Aiken, The Authors Guild, to U.S. Copyright Office of May 9, 2005 ("Authors Guild Reply Comment"), *available at* http://www.copyright.gov/orphan/comments/reply/OWR0135-AuthorsGuild.pdf.

[26] *See Report on Orphan Works* at 59-68.

[27] *See* SA § 6.2(b)(iii), and Attach. I (Settlement Notice) § 8.B; Samuelson, *supra*, n.14; Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, Univ. of Chicago, Olin Law and Economics Program, Research Paper Series (Apr. 16, 2009), *available at* http://www.mediainstitute.org/IntellectualProperty/IPI_ViewPoints_061709.html (Ex. N); James Grimmelmann, *Google and the Zombie Army of Orphans*, Feb. 27, 2009, *available at* http://james.grimmelmann.net/essays/ZombieArmy. (Ex. O).

international treaty requirements.[28]  The proposed settlement would place no diligent search burden on Google, replacing it with a requirement that copyright owners proactively register their works with a registry – a concept that plaintiffs opposed in the legislative proceedings, the Copyright Office rejected, and the Senate omitted from the bill it passed last year.[29]

        In addition, the proposed settlement would establish an "escrow" system under which funds are collected from customers to be disbursed to orphan work owners if and when they surface.  The Copyright Office also considered and *rejected* the use of an escrow, and nearly all interested parties, including Google, the Association of American Publishers ("AAP") and the Authors Guild, opposed it.[30]  The proposed settlement's escrow system would be even worse than the proposal the Copyright Office and the Senate rejected.  It would create conflicts of interest among the class by imposing an escrow and then re-allocating unclaimed funds to *other* copyright owners and the Book Rights Registry, thereby creating an economic *dis*incentive to find orphan work owners.[31]

---

[28] *See Report on Orphan Works* at 121.

[29] *See Report on Orphan Works* at 104-05.  *See also* AAP Reply Comment, *supra* n.25, at 3 ("a legislative solution to encourage the use of 'orphan works' should place the affirmative responsibility for due diligence 'squarely on the user' *by requiring the user to conduct a reasonable efforts search* to obtain permission from the copyright owner before using the 'orphan work.'") (emphasis added); Authors Guild Reply Comment, *supra* n.25, at 5-7 ("Above all, the law must not take away the rights of owners who could be found by a truly diligent search.  *An owner who cannot be readily located should not be deemed guilty of 'neglecting' or abandoning his or her work.* … These [registration-based] proposals are unjustifiably overbroad, and they would unfairly affect individual owners much more than corporations and institutions…") (emphasis added); *cf.* S. 2913, 110th Cong. § 2 (2008) (reasonably diligent search approach).

[30] *See Report on Orphan Works* at 113-14; *see also* Transcript of Orphan Works Roundtable at 165 (July 26, 2005), *available at* http://www.copyright.gov/orphan/transcript/0726LOC.PDF; AAP Initial Comment, *supra* n.25, at 6; Authors Guild Reply Comment, *supra* n.25, at 7.

[31] These are just two of the ways in which the proposed settlement would bypass the democratic process and Congress's exclusive Constitutional role.  The settling plaintiffs changed positions on these central issues – in which they abandoned fundamental positions that other class members still hold – also calling into question their qualifications to serve as class representatives.

*International Treaty Obligations Forbidding Formalities*.  International treaties obligate the United States to protect foreign works,[32] and for decades Congress has ensured that the Copyright Act complies with those treaties, including their restrictions on formalities.[33]  The treaties guarantee fair treatment of foreign works in the United States and U.S. works abroad.[34]

The proposed settlement would require copyright owners, including foreign right holders, to comply with formalities that U.S. copyright law does not require and that international treaties likely prohibit.[35]  For example, under the proposed settlement foreign copyright owners who wish merely to preserve the *status quo* for their copyrights in the United States would have to opt out of the settlement by September 4, 2009.  Those who do not affirmatively act would become bound by the settlement, have to locate and register their copyrights with the proposed Registry, and have to file various notices to prevent certain uses by Google.  Notice and registration are two formalities that international treaties prohibit as forbidden "condition[s] on the enjoyment and exercise of copyright."[36]  Imposing this new regime can only be done by Congress – and to the extent it implicates international treaties, the President – not the courts.

*Library Uses*.  For decades, Congress has amended the Copyright Act to adjust copyright law's balance between copyright owners and libraries as technology advances.  *See* 17 U.S.C. § 108.  Most recently, the Library of Congress, through the Copyright Office and the National

---

[32] *See, e.g.*, Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"); Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS" Agreement).

[33] *See, e.g.*, Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (Oct. 31, 1988); Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (Dec. 8, 1994).

[34] *See, e.g.*, *Golan v. Gonzalez*, 501 F.3d 1179, 1187-88 (10th Cir. 2007).

[35] *See* Berne Convention, art. 5(2) (requiring that "[t]he enjoyment and the exercise of these rights shall not be subject to any formality").

[36] *See* Mihaly Ficsor, *Guide to the Copyright and Related Rights Treaties Administered by World Intellectual Property Organization* ¶ BC-5.7 (2003) ("Formalities are any conditions or measures … without the fulfillment of which the work is not protected or loses protection.").

Digital Information Infrastructure and Preservation Program, sponsored the Section 108 Study Group, which published just last year an extensive "reexamination of the exceptions and limitations applicable to libraries and archives under the Copyright Act, specifically in light of digital technology."[37]  The goal was "to provide a basis on which legislation could be drafted and recommended to Congress."[38]

The proposed settlement would scuttle that and other considered public efforts with a rushed privately-negotiated and judicially imposed scheme designed to supplant existing law governing libraries' uses of copyrighted digital books.[39]  It would do so by forcing class members to release copyright infringement claims they might have against libraries, including claims based on libraries' *future* activities in conjunction with *unknown* aspects of the proposed "joint venture," for activity that goes well beyond what current law permits.  As Google itself acknowledged, "many of the uses offered by the subscription service would not have been possible in the old regime due to copyright law."[40]  The proposed settlement also limits remedies available to class members, including statutory damages granted by Congress, as Google has touted:  "Libraries wanted to move from a statutory damages regime to an actual damages regime, which the settlement accomplishes.  The likelihood that the actual damages will be significant is very[,] very small."[41]

---

[37] *Section 108 Study Group Report* at ii (Mar. 2008), (quoting *Section 108 Study Group Mission Statement* (Apr. 2005)) *available at* http://www.section108.gov/docs/Sec108StudyGroupReport.pdf.

[38] *Section 108 Study Group Report* at ii.

[39] *See generally* SA Art. VII.

[40] *A Raw Deal for Libraries*, Open Content Alliance Blog, Dec. 6, 2008 (comment of Daniel Clancy, Engineering Manager for Google Book Search), *available at* http://www.opencontentalliance.org/2008/12/06/a-raw-deal-for-libraries/#comment-232. (Ex. P) (excerpt).

[41] Mark Liberman, *The Google Books Settlement, Language Log,* Aug. 28, 2009 (quoting Daniel Clancy), *available at* http://languagelog.ldc.upenn.edu/nll/?p=1698. (Ex. Q).  Beneficial as this idea may be, only Congress may enact it.

The parties crafted this immunity and limitation despite Section 108's safeguards against abuse of the library exception for commercial advantage and the centrality of that issue in Congress's consideration of Section 108 amendments for the digital age.[42]  There is one other problem here:  the proposed settlement fundamentally restructures copyright owners' rights and remedies even though libraries are not parties to this litigation.[43]  Only Congress can alter copyright exceptions for libraries.[44]

\*  \*  \*

The proposed settlement reflects how a handful of private parties who are not representative of the wide array of competing interests at stake would like to resolve complex public policy issues for their own commercial benefit.  Only Congress is vested with the authority to consider and weigh the relevant factors to "decide how best to pursue the Copyright Clause's objectives" by enacting amendments to the Copyright Act to benefit the public.  *Eldred*, 537 U.S. at 212.  Congressional deliberation may at times be slow, but that provides no excuse to circumvent the constitutionally mandated process.  Congress might have acted by now had the parties taken even a fraction of the resources they have invested in advancing the proposed settlement and devoted them to pursuing legislative copyright reform instead.  Microsoft and

---

[42] *See, e.g.*, § 108(a)(1) ("without any purpose of direct or indirect commercial advantage"); § 108(b) ("solely for purposes of preservation and security or for deposit for research …"); § 108(c) ("solely for the purpose of replacement of a copy … that is damaged, deteriorating, lost or stolen, or if the existing format … has become obsolete …"); §§ 108(d), (e) ("the copy … becomes the property of the user, and the library or archives has had no notice that the copy …would be used for any purpose other than private study, scholarship or research …."). *See also Section 108 Study Group Report* at iv (recommending an amendment to permit a library "to authorize outside contractors to perform … some activities permitted under section 108" provided that, *inter alia*: the contractor receives no *"other direct or indirect commercial benefit"* and the contractor is *"prohibited from retaining copies"*) (emphasis added).

[43] *See* SA § 10.2.

[44] There are many additional areas in which the proposed settlement would fundamentally restructure class members' rights and remedies.  *See, e.g.*, 17 U.S.C. §§ 203, 304 (right to terminate transfers), § 201(ownership and transfer of copyright) §110(2) (distance learning) and §107 (fair use).  The proposed settlement also raises significant issues about involuntary transfer that would violate § 201(e).

many other objectors embrace the goal of digitization of books in a diverse marketplace and welcome the parties to join them in that effort.

## II.     THE PROPOSED SETTLEMENT DOES NOT SATISFY
##            THE REQUIREMENTS OF RULE 23

In removing this issue from open debate before Congress and negotiating it in a back room where the many diverse and competing interests are unrepresented, the parties fail to meet the requirements of Rule 23.  A class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. … [A]ctual, not presumed, conformance with Rule 23(a) remains … indispensable."  *In re Initial Public Offerings Secs. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006) (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).  A class proposed to be certified only for settlement purposes "requires 'heightened attention' to the justification for binding the class members," *Ortiz*, 527 U.S. at 849 (quoting *Amchem*, 521 U.S. at 620), because the benefits of the adversarial system are lost when all parties to the lawsuit unite to persuade the district court to approve the settlement.  *See also Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (court must "scrutinize the fairness of the settlement with even more than the usual care" where class notice is given along with notice of settlement).

When rigorously analyzed with heightened attention, the proposed class and sub-classes cannot be certified and the proposed settlement cannot be approved.  Rule 23 and the Constitution:  (1) do not permit inadequate representatives whose interests conflict with those of millions of proposed class members to bargain away their rights; (2) do not allow a class action settlement to abridge, enlarge, and modify substantive rights by creating a "joint venture" to license copyright infringement not raised in the complaints – most of which will be committed in the future; and (3) do not expand the jurisdiction of Article III courts over future infringement

-16-

that presents no present case or controversy.  The proposed settlement would misuse Rule 23 to do all of these things**.**

### A.    The Class Cannot Be Certified Because Plaintiffs' Interests Conflict with Those of Proposed Class Members, Contrary to Rule 23(a)(4)

Rule 23(a)(4) meets the demands of due process by requiring that the named plaintiffs "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625.  To satisfy Rule 23(a)(4), plaintiffs must "'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citing *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974)).  An important consideration in this analysis is the "forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class, so as to insure them due process." *Mersay v. First Republic Corp.*, 43 F.R.D. 465, 470 (S.D.N.Y. 1968).  Rule 23's requirements, including Rule 23(a)(4), "designed to protect absentees by blocking unwarranted or overbroad class definitions … demand undiluted, even heightened attention in the settlement context."  *Amchem*, 521 U.S. at 620.

The Second Amended Complaint alleges only two sub-classes with separate representation:  one for authors and the other for publishers.  Sec. Am. Compl. ¶¶ 34-36.  But the proposed class, comprising authors and publishers throughout the world with a U.S. copyright interest, is vast, enormously diverse, and rife with conflicting interests that are not separately represented, as demonstrated by numerous objections from academic authors to foreign publishers.  In *Amchem*, the U.S. Supreme Court overturned a massive settlement because the class members, who had been exposed to asbestos but had varying degrees of exposure and

injuries, had conflicting interests yet were swept into a single class without separate representation and consigned to a single nationwide claims administration scheme.  521 U.S. at 609-11; *see also Stephenson v. Dow Chemical Co.*, 273 F.3d 249, 260-61 (2d Cir. 2001), *aff'd in part by an equally divided court and vacated in part on other grounds*, 539 U.S. 111 (2003).

Here, conflicts between settling plaintiffs and class members are even greater:

*First*, each of the five plaintiff publishers has its own separate deal with Google for making its books available, and they all reportedly plan to exclude their books from the settlement terms that most class members, who lack the plaintiff publishers' knowledge, relationships and sophistication, will have to live with in perpetuity.  Plaintiffs McGraw-Hill, Pearson, Penguin, Simon & Schuster, and John Wiley & Sons all participate in the Google Books Partner Program, a separate contractual arrangement, under terms that have not been disclosed.[45] Industry experts, including one of the largest agencies representing authors and publishers, report that most major publishers such as the plaintiffs do not intend to make their out-of-print books available through the proposed settlement's terms.[46]  Rather, they will rely on their knowledge and ability to negotiate separate contracts.  These class representatives cannot represent the interests of the many class members that have no preexisting deals, and may never want to enter into a deal, with Google.

The economic terms of the proposed settlement reflect the multiple conflicts of interest present here.  Some $45 million is set aside to compensate owners of books already scanned, and

---

[45] Google, *Google Book Search* The Story at 14, Feb. 2007, *available at* http://www.google.co.uk/press/files/book-search-en.pdf. (Ex. R).

[46] *WME Letter About Google Settlement*, Publishers Weekly, Aug. 17, 2009, *available at* http://www.publishersweekly.com/article/CA6677143.html?q=WME+Letter (Ex. S); *see also* Daphne Ireland, *Tracing the Impact of the Google Settlement*, Newsletter of the Ass'n of Am. University Presses, June 11, 2009, *available at* http://aaupblog.aaupnet.org/?p=123 (former Houghton Mifflin counsel Lois "Wasoff reported that most publishers will likely opt-in to the settlement, remove many of their works, and continue to participate in Google Book Search through the Partner Program"). (Ex. T).

the payment per book already scanned will vary from $60 to $300 depending upon how many claims are filed.[47]  Those whose books have not been scanned get no such payments and thus have an interest assuring payments for future infringements.  Compensation to that sub-class will depend upon the new commercial offerings, the success of which is not assured.[48]  The class representatives failed to resolve this conflict, such as by ensuring payments for *all* books that are infringed, because they had no stake in its outcome:  their interests are protected by their separate deals and not by the proposed settlement terms.

     *Second,* class members with commercially valuable books may prefer high royalties and restrictive licensing terms, while others may want wider distribution at lower or no cost.  The small subset of commercial publishers and authors who are the settling plaintiffs, for example, seek to maximize revenues; many other class members, including many academic authors and even technical publishers, may seek broader access to their works.[49]

     *Third*, the settling plaintiffs and those who come forward may have an interest in higher royalties, while orphan works and many other copyright owners who do not register – who are unidentified and thus will be unable to collect anything under the settlement – have no reason to seek anything other than wide availability with no or low royalties.  Orphan works owners are a "very large subclass unlikely to benefit from this agreement."[50]  Google admits that rights in approximately 93% of copyrighted books the proposed settlement covers are in a legal "Twilight

---

[47] SA § 2.1(a); SA Attach. I (Settlement Notice) ¶ 8(C) at 12.

[48] *See, e.g.*, SA Attach. I (Settlement Notice) ¶ 9(K)(1)(b) at 17 ("Google's sale of subscriptions to a database of Books is a new business model.  Accordingly, the compensation for the inclusion and use of any Books and Inserts in subscriptions cannot be quantified with any degree of certainty.").

[49] Letter of Prof. Pamela Samuelson to The Honorable Denny Chin of Apr. 27, 2009 (*referenced in* Doc. No. 89) at 3 ("we usually want our works to be as accessible as possible, whether or not we are compensated directly for every reproduction") (writing on behalf of sixteen university professors).

[50] Grimmelmann, *supra*, at n.27.

Zone"[51] and acknowledged "millions" of orphan works in 2005.[52]  Two scholars estimated

copyrights that were not renewed, a strong indicator of orphan works and those unlikely to be

registered, at 86%.[53]  The conflict between identified and orphan/non-registered owners is

especially severe because the proposed settlement re-allocates unclaimed royalties after five

years to identified owners (including the class representatives), the Registry and elsewhere.[54]

### B.    Rule 23 May Not Be Used to Create a "Joint Venture" Licensing Copyright Infringement Not Alleged in The Complaints or Litigated

The Court should not approve the proposed settlement because the parties' efforts to use

Rule 23 to create a "joint venture" to license copyright infringement not alleged in the

complaints or litigated violates the Rules Enabling Act, 28 U.S.C. § 2072(b).

The two complaints filed in 2005 accused Google of scanning books in the University of

Michigan Library, planning to scan books in four other libraries, creating digital copies that the

public could search on its website, and displaying "brief excerpts" that the searches retrieved.

Authors' Complaint ("Auth. Compl.") ¶¶ 29-32; Publishers' Complaint ("Pub. Compl.") ¶¶ 4,

25-31.  Google claimed that copying to facilitate electronic searching and displaying "brief

excerpts" was a fair use under the Copyright Act that needed no permission.  Pub. Compl. ¶ 8.

The Second Amended Complaint ("Sec. Am. Compl."), filed along with the proposed settlement,

similarly complains of the display of "brief excerpts."  Sec. Am. Compl. ¶ 47.  The Summary

---

[51] *See* Jon Orwant, *Google Book Search: Past, Present and Future*, O'Reilly Tools of Change for Publishing Conference, Feb. 10, 2009, at 47, *formerly available* at http://www.toccon.com/toc2009/public/schedule/detail/5033. (Ex. U) (excerpt) (Google estimates that 80% of available books were published after 1923 and are likely copyrighted, but 75% are in a legal "Twilight Zone" because they are out of print, orphan works or have "unclear copyright status."  Thus, approximately 93% (75% of 80%) of books subject to the settlement are in the "Twilight Zone.").

[52] Google Initial Comment, *supra* n.25, at 3.

[53] William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright* 38 (John M. Olin Law & Economics Working Paper No. 154, 2d Series, 2002), *available at* http://www.law.uchicago.edu/files/files/154.wml-rap.copyright.new_.pdf.  (Ex. V) (excerpt).

[54] SA § 6.3(a).

Notice also focuses on "excerpts." It begins: "Authors and publishers filed a class action lawsuit claiming Google violated the copyrights of authors, publishers and other copyright holders … by scanning in-copyright Books and Inserts, and *displaying excerpts*, without permission."[55] Google confirmed that it displayed only "snippets": "Google doesn't show even a single page to users who find copyrighted books …. At most we show only a brief snippet of text where their search term appears, along with basic bibliographic information and several links to online booksellers and libraries."[56] Had the case been litigated, fair use for creating digital server copies to facilitate searching and for displaying "brief excerpts" would have been the main contested issue.

The proposed settlement goes far beyond the copying of books for the purpose of displaying "brief excerpts" in search results alleged in the complaints. It would grant what the U.S. Register of Copyrights rightly calls "a compulsory license for the benefit of one company" and create a "joint venture" under which institutional and consumer subscriptions, and the right to view and print entire books, would be sold – indisputably infringement, not even arguably a fair use, and authorized only by this Court's approval.[57] In addition, Google and the Registry "may, over time, agree to new revenue models" without consent of copyright owners.[58] No one can predict what new forms of infringement the proposed settlement would authorize.

 "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b)." *Amchem*, 521 U.S. at 613. The very

---

[55] *See* SA Attach. J (Summary Notice) (emphasis added).

[56] Susan Wojcicki, *Google Print and the Author's Guild*, The Official Google Blog, Sept. 20, 2005, http://googleblog.blogspot.com/2005/09/google-print-and-authors-guild.html. (Ex. W).

[57] *See* Helft, *supra*, n.9.

[58] SA § 4.7.

purpose of the proposed "joint venture" is to abridge and modify the proposed class members' substantive rights in their copyrights and to enlarge Google's rights to use those copyrights.

The parties' own statements confirm the transformation of this action from a legal dispute into a business deal.  In answering a Frequently Asked Question when announcing the proposed settlement, the parties said:  "This Agreement will enable us to do more together than copyright owners and Google could have done alone or through a court ruling."[59]  An AAP executive told an interviewer:

> [T]his proposed settlement is really unprecedented in its scope and nature … [W]hat we have here is not only a settlement agreement that will resolve the pending litigation, but it's designed deliberately to establish and create a going forward model for publishers and authors and other rightsholders in books to work with one of the giants of the online world to move books online for purposes of providing access to a new readership.[60]

Counsel for the AAP and Publisher Sub-Class similarly explained:

> Had we litigated rather than settled, the central issue in the case would have been whether Google's acts were protected by the Copyright Act's fair use doctrine.  The settlement agreement, which took more than two years to negotiate, operates as a complex set of authorizations from a worldwide class of millions of copyright owners. It establishes new business models among publishers, authors and Google….[61]

Google too has summed it up:  "But once we won, we still would've had [only] snippets.  Really, the only solution was a partnership."[62]

Using Rule 23 in this way – to launch a "joint venture" involving the sale of entire books that could not be accomplished after a trial of the claims alleged – would abridge, enlarge and modify the substantive rights of millions of proposed class members in violation of the Rules

---

[59] Google Books Settlement Agreement, *Joint Public FAQ from Authors Guild, Association of American Publishers, and Google*, http://books.google.com/googlebooks/agreement/faq.html. (Ex. X)

[60] Copyright Clearance Center, The Authors Guild, AAP, Google Settlement: Allan Adler, Vice President of the Association of American Publishers (AAP) Speaks About the Settlement with CCC, at 6, July 15, 2009, available at http://www.copyright.com/media/pdfs/Transcript-AdlerInterview.pdf. (Ex. Y).

[61] Law 360, *Q&A With Debevoise & Plimpton's Jeffrey Cunard*, June 12, 2009. (Ex. Z).

[62] Albanese, *supra*, n.7.

Enabling Act, 28 U.S.C. § 2072(b).  "If a judgment after trial cannot extinguish claims not

asserted in the class action complaint, a judgment approving a settlement in such an action

ordinarily should not be able to do so either."  *National Super Spuds, Inc. v. New York*

*Mercantile Exchange*, 660 F.2d 9, 18 (2d Cir. 1981).

### C.    The Court Lacks Jurisdiction to Approve the Proposed Settlement Because it Would Release Claims for Future Infringement

Not only does the proposed "joint venture" reach far beyond the infringement alleged in

the complaints, it would license *future* unlawful conduct – Google's copying and use of books

not yet scanned and "new revenue models" not yet conceived.[63]

Plaintiffs and the defendant must have an actual case or controversy for the court to have

jurisdiction under Article III of the U.S. Constitution.  *Warth v. Seldin*, 422. U.S. 490, 498

(1975).  "The filing of a suit as a class action does not relax this jurisdictional requirement."

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006).  "To meet the Article III

standing requirement, a plaintiff must have suffered an 'injury in fact' that is 'distinct and

palpable'…" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Whitmore

v. Arkansas*, 495 U.S. 149, 155 (1990)).  While not every class member must submit evidence of

personal standing, "[t]he class must therefore be defined in such a way that anyone within it

would have standing."  *Denney*, 443 F.3d at 264.  Here, the proposed class encompasses *all*

holders of U.S. copyright interests in books – millions of authors and publishers.  The class

definition encompasses members whose books have not even been scanned and others whose

works may be infringed in as-yet undetermined ways.  These proposed class members have

suffered no "distinct and palpable" injury and have no claim over which the Court has

---

[63] SA §§ 4.7, 3.7(c), 17.2.

jurisdiction under Article III. *Lujan*, 504 U.S. at 560; *Whitmore*, 495 U.S. at 155; *Denney*, 443 F.3d at 263. They must be excluded from the class definition before a class could be certified or a settlement approved.

In a class action settlement, released claims must "arise out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 107 (2d Cir. 2005) (quoting *TBK Partners, Ltd. v. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *In re Auction Houses Antitrust Litig.*, 42 Fed. App'x 511, 519 (2d Cir. 2002) (same); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 577 (E.D. Pa. 2001) (same); *Unisuper Ltd., v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006) (same). As the *Unisuper* court observed:

> A settlement can release claims that were not specifically asserted in an action, but can only release claims that are based on the "same identical factual predicate" or the "same set of operative facts" as the underlying action. *Thus, it follows that a release is overly broad if it releases claims based on a set of operative facts that will occur in the future.*

*Unisuper*, 898 A.2d at 347 (emphasis added). Here, plaintiffs' allegations of Google's infringement by scanning some authors' and publishers' copyrighted books has *no* effect on other authors and publishers whose books it has *not* scanned. Google's new future infringements of books they have not yet scanned will not, by definition, arise out of the *identical* factual predicate as the conduct alleged in the complaints. Thus, those claims cannot be released.

Proposed settlements that release claims for *different* conduct than alleged in the complaints, as here, must also be disapproved because they too fail the identical factual predicate test. In *Schwartz*, for example, plaintiffs alleged that defendants violated the Sherman and Clayton Acts by selling NFL Sunday games only to satellite television subscribers who bought a package that included all Sunday games for all NFL teams. 157 F. Supp. 2d at 564. The proposed settlement released future claims not only for satellite but also for broadcast and Internet distribution, which the complaint barely mentioned and which were potential – but not

current – product offerings. *Id.* at 564, 566. The court rejected the settlement both because it covered future conduct and also because "the release extends far beyond the conduct challenged in the litigation." *Id.* at 576.[64]

Here, the settling parties seek to create a "joint venture" to display and sell entire books that extends infringement far beyond Google's display of "brief excerpts," as the original complaints allege. As in *Schwartz*, such a settlement cannot be approved.

### CONCLUSION

The Constitution confers upon the United States Congress alone the task of defining the scope of copyright owners' rights and remedies. The proposed settlement seeks to resolve broad and important public policy issues that go well beyond the scope of this case. The named plaintiffs do not adequately represent the interests of the many diverse and absent class members. For each of these reasons, the proposed settlement must be rejected.

Respectfully submitted,

Dated:  September 8, 2009

**MICROSOFT CORPORATION**

/s/ Thomas C. Rubin
Thomas C. Rubin (TR8845)
Chief Counsel for Intellectual Property Strategy
*tom.rubin@microsoft.com*

Jule L. Sigall
Senior Policy Counsel
 *jsigall@microsoft.com*

Legal and Corporate Affairs
One Microsoft Way
Redmond, WA  98052
(425) 882-8080

---

[64] A few months later, the court approved a revised settlement that released only past claims and only for satellite broadcasting. *Schwartz v. Dallas Cowboys Football Club, Ltd.*, No. CIV.A. 97-5184, 2001 WL 1689714, at *1-*2 (E.D. Pa. Nov. 21, 2001).

**MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP**

Charles B. Casper
123 South Broad Street
Philadelphia, PA  19109
(215) 772-1500
*ccasper@mmwr.com*

R. Montgomery Donaldson
1105 N. Market Street
Suite 1500
Wilmington, DE  19801
(302) 504-7800
*rdonaldson@mmwr.com*
Attorneys for Microsoft Corporation