UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

The Authors Guild, Inc., Association of American : 
Publishers, Inc., Associational Plaintiffs, and :
:
Herbert Mitgang, Betty Miles, Daniel Hoffman, :    Case No. 05 CV 8136 (DC)
Paul Dickson, Joseph Goulden, The McGraw-Hill :
Companies, Inc., Pearson Education, Inc., Penguin :
Group (USA) Inc., Simon & Schuster, Inc., and :
John Wiley & Sons, Inc., individually and on :    **APPENDIX OF EXHIBITS**
behalf of all others similarly situated, :    **TO OBJECTIONS OF**
:    **MICROSOFT CORPORATION**
:    **TO PROPOSED SETTLEMENT**
        Plaintiffs, :    **AND CERTIFICATION OF**
:    **PROPOSED SETTLEMENT**
   v. :    **CLASS AND SUB-CLASSES**
:
Google Inc., :
:
        Defendant. :
:
-------------------------------------------------------------x

**EXHIBITS**

Footnote/Exhibit No.

| | |
|---|---|
| 1/A | Debevoise & Plimpton LLP, *Debevoise advises worldwide class of publishers and Association of American Publishers in landmark settlement with Google*, November 25, 2008 |
| 2/B | Fred von Lohmann, *Google Book Search Settlement: A Reader's Guide*, Electronic Frontier Foundation Deep Links Blog, October 31, 2008 |
| 4/C | Microsoft, *Book Search Winding Down*, Bing Search Blog, May 23, 2008 |
| 7/D | Andrew R. Albanese, *Deal or No Deal: What if the Google Settlement Fails?*, Publishers Weekly, May 25, 2009 |
| 8/E | Andrew R. Albanese, *Unsettled: The PW Survey on the Google Book Settlement*, Publishers Weekly, August 24, 2009 |
| 9/F | Miguel Helft, *It's Not Just Microsoft Balking at Google's Book Plans*, New York Times BITS Blog, April 4, 2009 |

| | |
|---|---|
| 11/G | Robert Darnton, *Google & the Future of Books*, The New York Review of Books, February 12, 2009 |
| 13/H | Jef Pearlman, *Public Knowledge and the Google Book Search Settlement*, Public Knowledge Blog, May 1, 2009 |
| 13/I | Wendy Davis, *Consumers Not Considered In Google Book Search Settlement*, Consumer Watchdog, April 7, 2009 |
| 14/J | Pamela Samuelson, *Legally Speaking: The Dead Souls of the Google Booksearch Settlement*, O'Reilly Radar, April 17, 2009 |
| 14/K | Elise Ackerman, *Google's Book Club*, San Jose Mercury News, May 3, 2009 |
| 15/L | Timothy B. Lee, *Publisher speculates about Amazon/Google e-book "duopoly,"* Ars Technica, February 23, 2009 |
| 16/M | Miguel Helft, *Google's Plan for Out-of-Print Books Is Challenged*, New York Times, April 3, 2009 |
| 27/N | Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, Univ. of Chicago, Olin Law and Economics Program, Research Paper Series, April 16, 2009 |
| 27/O | James Grimmelmann, *Google and the Zombie Army of Orphans*, February 27, 2009 |
| 40/P | *A Raw Deal for Libraries*, Open Content Alliance Blog, December 6, 2008 (comment of Daniel Clancy, Engineering Manager for Google Book Search) (excerpt) |
| 41/Q | Mark Liberman, *The Google Books Settlement Language Log*, August 28, 2009 |
| 45/R | Google, *Google Book Search* The Story, February 2007 |
| 46/S | *WME Letter About Google Settlement*, Publishers Weekly, August 17, 2009 |
| 46/T | Daphne Ireland, *Tracing the Impact of the Google Settlement*, Newsletter of the Association of American University Presses, June 11, 2009 |
| 51/U | Jon Orwant, *Google Book Search: Past, Present and Future*, O'Reilly Tools of Change for Publishing Conference, February 22, 2009 (excerpt) |

53/V      William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright* (John M. Olin Law & Economics Working Paper No. 154, 2d Series, 2002) (excerpt)

56/W      Susan Wojcicki, *Google Print and the Author's Guild*, The Official Google Blog, September 20, 2005

59/X      Google Books Settlement Agreement, *Joint Public FAQ from Authors Guild, Association of American Publishers, and Google*

60/Y      Copyright Clearance Center, The Authors Guild, AAP, Google Settlement: *Allan Adler, Vice President of the Association of American Publishers (AAP) Speaks About the Settlement with CCC*, July 15, 2009

61/Z      Law 360, *Q&A With Debevoise & Plimpton's Jeffrey Cunard*, June 12, 2009

# Exhibit A

# DEBEVOISE & PLIMPTON LLP

**News**

**Debevoise advises worldwide class of publishers and Association of American Publishers in landmark settlement with Google**
November 25, 2008

Debevoise & Plimpton LLP is representing five publisher plaintiffs, acting as representatives of the U.S. publishing industry – The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., John Wiley & Sons, Inc. and Simon & Schuster, Inc. in an unprecedented settlement announced in connection with the Google Library Project.

These publishers, all members of the Association of American Publishers, alleged that Google infringed their copyrights by scanning books in connection with the Google Library Project, making them searchable and offering users "snippets" of the books.

The litigation phase of the case involved wide-ranging discovery from each of the five publisher clients including more than 140 fact witnesses, and the review of millions of pages of documents produced by the parties.

In the summer of 2006 the parties commenced settlement discussions. The final settlement is a complex license, involving a worldwide class of millions of copyright owners, and resembles a joint venture among publishers, authors, Google and the libraries that provided books to Google for scanning.

If approved by the Court, the Settlement Agreement will allow Google to make the full text of out-of-print books available to consumers and institutions and, if authorized by the copyright holder, the full text of in-print books available, in exchange for compensation that will be paid to the copyright holders through a Book Rights Registry. The Book Rights Registry, would, among other things, identify copyright owners and distribute their share of Google's revenues from exploitation of the books.

Under the Agreement, Google will also make payments totaling at least $125 million, which will be used to, among other things, establish the Registry, pay compensation to copyright owners whose books have been scanned by Google and cover legal fees.

The litigation phase of the case was led by partner Bruce P. Keller with associate James J. Pastore, Jr. and also included counsel Michael Potenza and associates Tracy A. Burnett, Richard S. Lee, Matthew Getz , Andrew Gilden and Andrea Glen.

Partner Jeffrey P. Cunard led the settlement negotiations, with support from associate James J. Pastore. Partner Gary W. Kubek provided antitrust advice and partner David W. Rivkin assisted in developing the settlement's dispute resolution procedures. Associates Richard S. Lee and W. Barton Patterson provided additional support.

Partner Seth L. Rosen and associates Joshua Gewolb and Juixiang Yin provided assistance in developing the Registry's bylaws and certificate of incorporation, as well as tax advice regarding the Settlement and the Registry.

Partners Jeremy Feigelson, Jeffrey S. Jacobson and Roger E. Podesta also
provided advice regarding the Settlement.

The AAP is the national trade association of the U.S. book publishing
industry. The McGraw-Hill Companies is a leading global information services
provider meeting worldwide needs in the financial services, education and
business information markets through leading brands such as Standard &
Poor's, McGraw-Hill Education, BusinessWeek and J.D. Power and Associates.
Pearson is a global leader in educational publishing. Penguin Group (USA)
publishes literary, fiction, reference, autobiography, academic and classic
books. John Wiley is a global publishing company. Simon & Schuster is a
publishing company which is part of CBS Corporation. Debevoise & Plimpton
LLP is a leading international law firm with offices in New York, Washington
D.C., London, Paris, Frankfurt, Moscow, Hong Kong and Shanghai.

# Exhibit B



October 31st, 2008

# Google Book Search Settlement: A Reader's Guide

*Legal Analysis by Fred von Lohmann*



UPDATE (Aug. 2009): If you are an **author**, head over to our Google Books page.

UPDATE (Jan. 2009): The official class notice has now been published. Anyone who owns a copyright and has questions about the settlement should start there. Also, I strongly recommend Prof. James Grimmelmann's analysis of the settlement.

As we reported earlier this week, Google has settled the lawsuit brought in 2005 by authors and book publishers regarding its massive book scanning and indexing project. Although the settlement must still be approved by the court and is unlikely to go into effect until sometime late in 2009, commentary has already been flooding the blogosphere. Generally, opinions are split between excitement for users ("better access to zillions of out-of-print books") and suspicion of Google ("one library to rule them all, and in the darkness bind them").

We are still digesting the ~300-page proposed settlement agreement (for those seeking a good overview, the 39-page notice to class members is a good place to start).

So far, two things are plain.

First, this agreement is likely to change forever the way that we find and browse for books, particularly out-of-print books. Google has already scanned more than 7 million books, and plans to scan millions more. This agreement will allow Google to get close to its original goal of including all of those books into Google's search results (publishers got some concessions, however, for in-print books). In addition to search, scanned public domain books will be available for free PDF download (as they are today). But the agreement goes beyond Google's Book Search by permitting *access*, as well. Unless authors specifically opt out, books that are out-of-print but still copyrighted will be available for "preview" (a few pages) for free, and for full access for a fee. In-print books will be available for access only if rightsholders affirmatively opt in. The upshot: Google users will have an unprecedented ability to search (for free) and access (for a fee) books that formerly lived only in university libraries.

Second, this outcome is plainly second-best from the point of view of those who believe Google would have won the fair use question at the heart of the case. A legal ruling that scanning books to provide indexing and search is a fair use would have benefited the public by setting a precedent on which everyone could rely, thus limiting publishers' control over the activities of future book scanners. In contrast, only Google gets to rely on this settlement agreement, and the agreement embodies many concessions that a fair user shouldn't have to make.

But the settlement has one distinct advantage over a litigation victory: it's much, much faster. A complete victory for Google in this case was probably years away. More importantly, a victory would only have given the green light for scanning in order to index and provide snippets in search results; it would not have provided clear answers for all the other activities addressed in the settlement, such as providing display access for out-of-print books, allowing nondisplay research on the corpus, and providing access for libraries. Litigating all of those fair use questions could easily have taken a decade

or more. As University of Michigan head librarian Paul Courant points out, those are years that we would never get back. (University of Virginia's Prof. Siva Vaidhyanathan offers a differing view: "These claims are not convincing when one considers just how great an alternative system could be, if everyone would just mount a long-term, global campaign for it rather than settle for the quick fix.").

Conclusions beyond those two are harder to draw. Many devils are buried in the details of the 300-pages of legalese, and much will turn on how the agreement is implemented. Here are the 6 "big picture" concerns that I'm keeping in mind as I review those details:

**Fair Use**: How will this agreement impact future fair use cases involving book scanning? Others (like the Open Content Alliance) are scanning books, and they may not have Google's ability (or budget) to strike a deal with the world's publishers. UCLA Law's Prof. Neal Netanel has a few preliminary thoughts along this line at the Balkinization blog.

**Innovation**: It seems likely that the "nondisplay uses" of Google's scanned corpus of text will end up being far more important than anything else in the agreement. Imagine the kinds of things that data mining all the world's books might let Google's engineers build: automated translation, optical character recognition, voice recognition algorithms. And those are just the things we can think of today. Under the agreement, Google has unrestricted, royalty-free access to this corpus. The agreement gives libraries their own copy of the corpus, and allows them to make it available to "certified" researchers for "nonconsumptive" research, but will that be enough?

**Competition**: In the words of Prof. Michael Madison, "Has Google backed away from an interesting and socially constructive fair use fight in order to secure market power for itself?" Does this deal give Google an unfair head start against any second-comers to book scanning? The agreement creates an independent, nonprofit Book Rights Registry to dole out Google's royalties, and the parties clearly hope that the Registry will be able to license others on similar terms. But the Registry is empowered to cut a deal with Google on behalf of *all* rightsholders by virtue of the class action; in order to offer similar blanket licenses to others, it would have to independently acquire rights from each and every copyright owner individually. How long will that take? What about the Registry itself? It hopes to be a monopoly that fixes prices for the entire market of copyright owners -- precisely the kind of thing that landed ASCAP and BMI, which dole out blanket licenses for music, in antitrust trouble decades ago.

**Access**: This agreement promises unprecedented access to copyrighted books. But by settling for this amount of access, has Google made it effectively impossible to get *more* and better access? The agreement allows you to "purchase" digital access for out-of-print books, but does not include the right to download the book (unlike public domain books). So you can read the book, but only on Google's terms. Libraries get more access, but for an undisclosed price (OK, one computer for free) and still with a variety of restrictions. In the words of Harvard's head librarian, "As we understand it, the settlement contains too many potential limitations on access to and use of the books by members of the higher education community and by patrons of public libraries."

**Public Domain**: Early reports are that public domain materials are not regulated by the agreement. Moreover, Google has negotiated a "safe harbor" that protects it from liability for mistakes in evaluating the copyright status of a book. That should result in more willingness to forge ahead with the free PDF posting of books published between 1923-1963, where a public domain determination turns on checking government records to see whether the copyright had been renewed. But will Google impose restrictions on these "safe harbor" public domain works? Will the libraries that receive a digital copy of their own public domain holdings impose restrictions on those copies?

**Privacy**: The agreement apparently envisions a world where Google keeps all of the electronic books that you "purchase" on an "electronic shelf" for you. In other words, in order to read the books you've paid for, you have to log into Google. Google is also likely to keep track of which books you browse (at least if you're logged in). This is a huge change in the privacy we traditionally enjoy in libraries and

bookstores, where nobody writes down "Fred von Lohmann entered the store at 19:42:08 and spent 2.2 minutes on page 28 of 0-486-66980-7, 3.1 minutes on page 29, and 2.8 minutes on page 30." If Google becomes the default place to search, browse, and buy books, it will be able to keep unprecedented track of what you read, how you read it, and collate that with all the other information it has about you. Does the agreement contain ironclad protections for user privacy?

*Related Issues: Innovation, Intellectual Property*

*Related Cases: Author's Guild v. Google*

[Permalink: http://www.eff.org/deeplinks/2008/10/google-books-settlement-readers-guide] [Email this article]

Printed Material Notice: Any and all original material on the EFF website may be freely distributed at will under the Creative Commons Attribution-NonCommercial License, unless otherwise noted. All material that is not original to EFF may require permission from the copyright holder to redistribute.

# Exhibit C

- COMMUNITY
  - what's new
  - 🔊 subscribe
- BLOGS
  - all blogs
  - search blog
  - webmaster blog
  - developer blog
  - travel blog
  - maps blog
- FORUMS
  - all forums
  - developer
  - maps
  - search
  - webmaster
- MEDIA
  - all media
- EVENTS
  - all events

## book search winding down

May 23, 2008, 02:45 AM by Bing | 61 Comments

Today we informed our partners that we are ending the Live Search Books and Live Search Academic projects and that both sites will be taken down next week. Books and scholarly publications will continue to be integrated into our Search results, but not through separate indexes.

This also means that we are winding down our digitization initiatives, including our library scanning and our in-copyright book programs. We recognize that this decision comes as disappointing news to our partners, the publishing and academic communities, and Live Search users.

Given the evolution of the Web and our strategy, we believe the next generation of search is about the development of an underlying, sustainable business model for the search engine, consumer, and content partner. For example, this past Wednesday we announced our strategy to focus on verticals with high commercial intent, such as travel, and offer users cash back on their purchases from our advertisers. With Live Search Books and Live Search Academic, we digitized 750,000 books and indexed 80 million journal articles. Based on our experience, we foresee that the best way for a search engine to make book content available will be by crawling content repositories created by book publishers and libraries. With our investments, the technology to create these repositories is now available at lower costs for those with the commercial interest or public mandate to digitize book content. We will continue to track the evolution of the industry and evaluate future opportunities.

As we wind down Live Search Books, we are reaching out to participating publishers and libraries. We are encouraging libraries to build on the platform we developed with Kirtas, the Internet Archive, CCS, and others to create digital archives available to library users and search engines.

In partnership with Ingram Digital Group, we are also reaching out to participating publishers with information about new marketing and sales opportunities designed to help them derive ongoing benefits from their participation in the Live Search Books Publisher Program.

We have learned a tremendous amount from our experience and believe this decision, while a hard one, can serve as a catalyst for more sustainable strategies. To that end, we intend to provide publishers with digital copies of their scanned books. We are also removing our contractual restrictions placed on the digitized library content and making the scanning equipment available to our digitization partners and libraries to continue digitization programs. We hope that our investments will help increase the discoverability of *all* the valuable content that resides in the world of books and scholarly publications.

Satya Nadella
Senior vice president search, portal and advertising

Bing - Book search winding down - Search Blog - Bing Community
http://www.bing.com/community/blogs/search/archive/2008/05/23/book-search-winding-down.aspx
Screen clipping taken: 9/1/2009, 3:04 PM

# Exhibit D



invisalign *teen* The Clear Alternative to Braces    **FIND OUT MORE →**    CLEARLY **FITS YOUR LIFE**

« Back | Print

## Deal or No Deal: What if the Google Settlement Fails?

*By Andrew Richard Albanese — Publishers Weekly, 5/25/2009*

The deal was almost done. In June, a tense four-year period of legal conflict between publishers, authors and Google over its library scanning program was poised to end with the approval of a visionary class action settlement. But just one week from a key May 5 deadline—by which authors and rights holders opposed to the settlement (agreed to last October; see time line) would have been required to opt out of or object to the deal—the federal judge overseeing the approval process surprised court watchers by granting a four-month extension, asked for by a group of authors led by Gail Knight Steinbeck. Suddenly, a deal that had looked all but certain just weeks earlier now seemed in serious jeopardy.

"This thing is going to die," one close observer of the settlement told *PW*. "Let's put it this way—with all the sketchy things in the agreement, there is no way [the parties] want people to look at this longer, rather than shorter."

Say what you will of the Google Book Search settlement, one thing it is not is the path of least resistance. The solution to what began in 2005 as a simple copyright question is now a complex blueprint for an entirely new digital book business, a $125 million legal puzzle that involves a dizzying array of moving parts: thousands of authors, millions of titles and editions, libraries, public interest issues, murky copyright law, orphan works and even the creation of a new, central rights-granting authority in the U.S., the Book Rights Registry. One notable thing the settlement doesn't do, however, is address the original claim in the suits—whether Google's scanning of library books to create an online index is legal.

For publishers and authors, that means the stakes are sky-high: if this settlement fails to win approval—and opposition is gathering momentum—what happens next? "Back to the world of private deals for putting books into digital formats," suggests James Grimmelmann, a professor of law at the New York Law School, who has written extensively on the settlement. "No deals at all for orphan works, and one very big lawsuit over scanning and searching."

### Defending the Settlement

"The task before us was to take Google's audacious library digitization project and transform it into something both good for readers and agreeable to the people who write and publish books," Authors Guild president Paul Aiken said last October, announcing the settlement. "To do that, we found we had to make the project even more audacious."

What may be the most audacious thing of all, however, is the enormous gamble publishers and authors orgnaizations have made. Specifically, betting that this sprawling, private licensing deal, crafted in response to a rather straightforward copyright question, would not only survive an unpredictable class action legal process but would do so in time to have a chance of actually working in a rapidly evolving digital marketplace. Whether the settlement is quickly approved, sent back for modifications, or rejected altogether, one has to wonder: was there not a better, simpler—and quicker—solution to making books discoverable on the Web than years of expensive, uncertain class action litigation?

For Google, the settlement is a no-brainer. For $125 million, pocket change to the well-capitalized search giant, the company now stands to secure a license to the entire U.S. book backlist, including exclusive access to orphan works, all while ending its legal exposure for infringement. If $125 million seems like a lot, it pales in comparison to the potential damages Google faced for the unauthorized scanning of millions of works. But Google's lead engineer on the books project, Dan Clancy, says Google's decision to settle was ultimately based on something else: it was better for users.

Even if Google had prevailed with its fair use claim, Clancy explains, that ruling would only have facilitated its book *scanning*. Its display still would have been limited to brief "snippets." The settlement, if approved, would allow users to access more books and view significantly more content, as much as 20% of a book. "We didn't start this to win a court case on fair use," Clancy said. "We started it to provide discovery tools. We assume we would've gone through the courts and won. But once we won, we still would've had snippets. Really, the only solution was a partnership."

However long the settlement process may take, it appears that time is on Google's side. Google officials say its partner program, a separate venture from its library scanning that scans books and displays them online with permission, now has more than 20,000

participants, including all of the major houses. That's double the number of partners it claimed just two years ago. The subtext is clear: one way or another, Google will get books.

On the other hand, despite acknowledgements that Google's scanning program offered potential benefits for books, publisher and authors have not been able to get past the copying issue. "It's the appropriation of our material for commercial benefit," Nick Taylor, then president of the Authors' Guild, said at a November 2005 forum at the New York Public Library. "None of us wants to be invisible on the Internet. We recognize how suicidal that would be. The principle here is that we want to control our material." Whether the issue of control raised by Google's scan plan will justify years of legal action remains to be seen.

### Library and Orphan Issues

Is the settlement in jeopardy? "Complete hogwash," one major publisher says, strongly dismissing talk of the settlement's being embattled as the grumblings of would-be competitors, adding that criticism and objection are part of every class action legal process. Perhaps—but as Steinbeck's attorney, Andrew Devore, pointed out in his motion to the court, "this is not a typical class action settlement." Rather, he observed, "it is a decision about perpetual future rights," and rights that "may well prove to be the most important and valuable channel for the distribution and exploitation of creative works."

Embattled or not, concern is mounting. When the deal was first announced, the reading public seemed on its way to having access to the kind of universal library that only Jorge Luis Borges could have imagined—every book in print and out of print searchable at the touch of a screen, with commerce welcome, rewarding publishers, authors, estates and the host to it all, Google. The library community, however, partners in Google's scanning efforts as well as publishers' best customers, have greeted the settlement with a mix of cautious optimism and concern.

"The Settlement is potentially so far-reaching that its full implications are unknowable at this time," notes a brief filed by the major library organizations in early May, comments that court-watchers say the judge will consider closely. The plan could very well lead to "a restructuring of the publishing industry and a dramatic change to the nature of libraries." Specifically, librarians warned that the potential high costs and unclear controls over Google's database could compromise "fundamental library values" such as equity of access to information, patron privacy and intellectual freedom.

Notably, despite a litany of concerns and obvious unease, the library community did not oppose the deal. That's partly out of an underlying belief that the benefit of a massive database of book content helps them fulfill their mission, and partly, no doubt, because of risk. Should this deal fail, libraries could face legal exposure for their own digital library initiatives, and possibly for their contributory role in Google's book-scanning efforts.

The Internet Archive in San Francisco, meanwhile, is at the fore of a growing number of organizations that are urging the court to reject the settlement, claiming the deal amounts to "private orphan works legislation." Orphan works are those books published after 1923, but for which there is no identifiable copyright owner. Experts say these works constitute a sizable majority of the books on library shelves; Google has already scanned as many as five million books in this copyright twilight zone and reportedly plans to scan another 15 million.

What's the problem with the orphans? Under the settlement, Google would be allowed to scan and make these works available without fear of legal action should the copyright owners step forward. The settlement parties claim the settlement plan is actually *good* for orphan works, that it would, over time, little by little, eliminate the issue entirely, because, given an economic incentive, authors are more likely to come forward and claim their rights. The Internet Archive, however, which includes the Open Content Alliance, a competing book-scanning project that would very much benefit from the same protections granted to Google under this deal, objects. "If the settlement is approved, it would be legal protection for Google, and only for Google," IA founder Brewster Kahle argues. "I, personally, am amazed at this creative use of class action law. The three parties have managed to skirt copyright law, bypass legislative efforts and feather their own nests—all through the clever use of law intended to remedy harms."

### Here Come the Feds

In addition to all the players in this deal so far, Google, publishers, authors, libraries, and the judiciary, two additional players have yet to put their cards on the table: the executive and legislative branches of government. The most stealthy, yet perhaps serious threat to the deal right now may come from federal antitrust regulators. In his detailed critique, published shortly after the settlement was announced, New York Law School's Grimmelmann was among the first to point out the numerous antitrust issues raised by the settlement. In April, publishing officials confirmed that the Department of Justice had inquired. While the DoJ will not comment on the extent of its interest, government intervention now looms as a potentially significant obstacle.

"Google isn't a guild, and it didn't set out to create a monopoly," Harvard University librarian Robert Darnton argued in the *New York Review of Books*. "But the class action character of the settlement makes Google invulnerable to competition."

That's because most U.S. book authors and publishers are covered by the settlement, he argues. "They can opt out of it," Darnton notes, "but whatever they do, no new digitizing enterprise can get off the ground without winning their assent one by one, a practical impossibility, or without becoming mired down in another class action suit." In other words, if this settlement is approved, any competing effort would have to go through the same, or an even more arduous process—an insurmountable barrier to entry for would-be competitors. While the architects of this deal insist the issues are minor and should not keep the deal from approval, such criticism certainly does not bode well for a comfortable road ahead.

Meanwhile, a number of the deal's critics suggest that Congress should have a role, stating that the issues here are too broad to be solved via a class action. So far, Congress has barely taken note. At a Columbia University forum on the settlement this winter, Register of Copyrights Marybeth Peters told attendees that not one member of Congress had asked the Copyright Office to comment on the settlement, despite the fact that the deal could fundamentally affect both user behavior and the industry. If this complex deal somehow manages to get tied up in the legislature, all bets are off.

The judicial process, of course, still looms as the biggest threat. Consider this: in October, right around the same time the Google settlement is to get its fairness hearing, the defining legal drama of the digital publishing era so far, the class action settlement part of *Tasini* v. *New York Times* is scheduled to go back to the U.S. Supreme Court, more than four years after *that* deal was reached—and some 15 years since the initial suit was first filed. While *Tasini*, a class action case involving freelance articles used without permission in digital databases, draws only indirect comparisons, its underlying lesson is clear: class action is an unwieldy beast. Over the next four months, the parties in the Google settlement will hope for a definitive result. If, however, years from now the Google Book Search settlement is still not in place, whether because court approval is still at issue, or implementation of the deal is buckling under its own weight, the big loser will be books.

### *Tangled Web*

#### October 2004

Google Print officially launches at the Frankfurt Book Fair. Initial partners include Penguin, Hyperion, Scholastic, Houghton Mifflin and a number of university presses. Notable resistance comes from Random House. The program initially includes only books for which publishers give permission.

#### December 2004

Google announces the launch of the Google Print Library Project with five major libraries— Harvard, Stanford, Oxford, the New York Public Library and the University of Michigan, which agrees to have its entire book collection scanned, some seven million volumes. Google claims the scanning is allowed under fair use, arguing that it will display only random "snippets" of books still under copyright. Copyright owners can "opt out" of the program by notifying Google. Publishers immediately object.

#### June 2005

AAP asks Google to stop scanning for six months. In August, Google agrees to halt its scanning of copyrighted works until the end of the year.

#### September 20, 2005

The Authors Guild files suit against Google for copyright infringement. "This is a plain and brazen violation of copyright law," says then Authors Guild president Nick Taylor.

#### October, 2005

The Internet Archive and its cofounder Brewster Kahle announce the launch of the Open Content Alliance (OCA). The OCA partners with Yahoo!, the University of California and the University of Toronto, with funding from Microsoft, which also announces plans for a competing book search service. OCA says it will only digitize copyrighted works with permission of the author.

#### October 19, 2005

Five major publishers, coordinated by the AAP, also sue Google. "The bottom line," says then president Pat Schroeder, "is that Google is seeking to make millions of dollars by freeloading on the talent and property of authors and publishers."

#### November 2005

Google Print is renamed Google Book Search, and the case gets the closest thing to a trial it has seen so far. At a New York Public Library panel called "The Battle for Books," Google's David Drummond, AAP's Allan Adler, Authors Guild president Nick Taylor and

Stanford University law professor Lawrence Lessig face off before a paid audience. "I'm most worried that you guys will settle with this rich company," Lessig tells Adler at a pitched moment. "What that will mean is that people who are not rich, libraries or universities or other people who want to engage in the same kind of freedom to copy and to build indexes in exactly this way can't, because you've imposed a tax on this particular kind of use."

**December 2005**

Microsoft launches the beta for its competing Microsoft Live Book Search Project. It vows not to scan books without permission. A Microsoft spokesperson tells reporters, "This is not a money-maker for the company. This is very much a strategic bet for search overall."

**August 2006 to December 2007**

Now valued at more than $90 billion, a surging Google rapidly expands its book-scanning efforts and partnerships with both libraries and publishers. By the end of 2007, it has signed up 28 library partners and some 10,000 publishers, and authors from over 100 countries have signed up for the Book Search Partner Program.

**May 2008**

Microsoft kills Live Book Search after digitizing 750,000 books. "Based on our experience," an announcement reads, "we foresee that the best way for a search engine to make book content available will be by crawling content repositories created by book publishers and libraries."

**October 28, 2008**

The AAP, Authors Guild and Google announce a settlement under which Google will make payments totaling $125 million, including $35 million to establish a Book Rights Registry to collect fees and administer rights, the rest to pay authors, roughly $60 per book scanned, and legal costs.

**November 2008**

The court overseeing the settlement grants "preliminary approval" to the deal.

**February 2009**

Harvard librarian Robert Damton publishes an essay crystallizing opposition to the program in the New York Review of Books, raising concerns about a Google monopoly over book content.

**March 2009**

Google officials say that its publisher partner program now has more than 20,000 members—including stalwart holdout Random House.

**April 2009**

Brewster Kahle and the Internet Archive/OCA file a motion to intervene, asking that the court overseeing the settlement alter the deal, citing the fate of orphan works. The motion is denied, but in his ruling, the judge invites comments and objections from the IA. The Department of Justice, meanwhile, contacts Google and publishers about a possible antitrust investigation. In late April, the court grants an extension lobbied for by a group of writers led by Gayle Knight Steinbeck, pushing back a May 5 deadline to object or opt out of the deal.

**September 4 and October 7, 2009**

The dates Judge Denny Chin has set to opt out of or object to the settlement, and the new date of the fairness hearing, respectively.

« Back | Print

© 2009, Reed Business Information, a division of Reed Elsevier Inc. All Rights Reserved.

Advertisement



# Exhibit E

Publishers Weekly Mobile

Log In | Register    FREE Newsletter Subscriptions!



FRANKFURTER BUCHMESSE    More opportunities.

Home | PW in Print | Newsletters | Reviews | Bookselling | Book News | Book Life | Bestseller Lists | Commentary | Job Zone | Tools

PWK | Publishing News | Web Reviews    SEARCH | BookLife    ... Publishers Weekly ... Limited time offer ... Receive
SUBSCRIBE TO Publishers Weekly Virtual Edition

PW COMING TO PW SEPTEMBER 7 ... Music Books ... ADVERTISE NOW, CONTACT YOUR REP

⊞ Share | 🔊 RSS | ⊞ Subscriptions | Reprints/License | 🖨 Print | ✉ Email

## Unsettled: The PW Survey on the Google Book Settlement

### A PW readership survey examines the Google Book Search Settlement

*By Andrew Richard Albanese – Publishers Weekly, 8/24/2009*

At a July 28 event on the Google Book Search Settlement at the New York Public Library, Washington-based lawyer Jonathan Band alluded to the increasingly ugly national debate over health-care reform and asked a simple question: what made rights holders potentially aggrieved by the proposed Google Book Search Settlement think they'd get a better deal via the legislative process? If not this deal, realistically, what better solution, he asked, was out there? It was a sobering moment in what has, over the last few months, become an intensely polarized discussion.

Indeed, from the day the settlement was unveiled in October 2008, it has been portrayed by its supporters more as the work of visionaries than litigants—as a bold new model to save publishing for the digital era and a new standard of fairness. Opponents, meanwhile, have cast the deal as an illegal, brazen rights grab that could affect competition in the publishing business. But behind the headlines, behind the boosterism and the naysayers, we at *PW* were curious: how was the settlement playing with rank-and-file stakeholders?

So, we asked. On July 16, *PW* sent out a survey to readers of our e-newsletters. With some 890 responses and more than 900 written comments, the simple questionnaire yielded a rich sample of opinion. We didn't ask about free books, monopolies, the planned Book Rights Registry, orphan works or the great new digital library of the future.

We asked: who are you and what do you think about the settlement? What we found: tepid support for the deal, significant confusion, or indecision—and no shortage of hyperbole.

#### Tepid Support

If there is good news for the architects of the deal, it is that net support for court approval outweighs opposition—overall, 41% of respondents supported approval of the settlement, while 23% opposed the deal. Just weeks before the September 4 deadline for opting out or objecting to the settlement, however, it is notable that more than a third (36%) remain unsure of or indifferent to the settlement. Publishers (52%) support the settlement in the greatest numbers, followed by authors (42%) and librarians (29%).

Whether 41 percent overall support is good news for a deal with such broad implications is open to debate—and more than two-thirds of that support is qualified: 19% said they supported the deal "with reservations" while another 10% said they supported the deal "with changes"; just 13% of respondents said they enthusiastically support approval. On the other hand, 14% said they oppose the deal.

**What's your position on the settlement?**

| Position | % |
|---|---|
| I am still unsure | 28% |
| I support approval with reservations | 19% |
| I oppose it | 14% |
| I enthusiastically support it | 13% |
| I support it with changes | 10% |
| I oppose it w/o key changes | 9% |
| I am indifferent | 8% |
| Other | 4% |

There were extreme comments from both sides: "My CEO helped negotiate the settlement. He is a smart guy, so if he's in favor, so am I." commented one go-getter. "This will destroy the book industry," offered one opponent. But there were a significant number of insightful, measured comments. "I'm generally in favor, but with fairly significant concerns about the slippery slope, the administration of the settlement and permitting Google too much power over distribution and content," wrote one respondent. "Despite its flaws, the settlement is better than ongoing, protracted, disruptive and expensive litigation and continued unauthorized scanning of our books," wrote another.

Advertisement



ConstantContact®

**RELATED INDUSTRY LEADERS**

Getty Images : Find an image. Clear it, and use it. Our image services couldn't be simpler

Getty Images : Forget complicated image rights. Right-Ready gives you single click image selection

Industry Leaders : Keep your publication cutting edge with our product and service suppliers

**MORE CONTENT**

BLOGS | PODCASTS | PHOTOS

Sorry, no blogs are active for this topic.

» VIEW ALL BLOGS

The comments also revealed a good deal of ambivalence. "I love that we may be able to find out-of-print books through a Google Search and then print them. I say that with my researcher hat on. I hate that Google will have a stranglehold on this market. I don't think Google's long-term plans are altruistic in the least," noted one undecided respondent.

"A court is probably not the correct forum for resolution of this issue," concluded another.

**Standing**

We asked whether respondents had standing to participate in the settlement—that is, whether they owned a copyright to a book potentially covered in the settlement. Some 39% said they did, mostly authors (57%) and publishers (40%). When the survey is reduced to respondents who have standing, the percentages change: net support rises to 53% from 41%. Opposition, however, also rises to 26% from 23%.



If you have standing, how will you act?

Notably, some 23% of respondents said they were unsure whether they had standing—hinting at the level of confusion surrounding the settlement. In comments, some said they didn't know what it meant to have standing; others said they hadn't yet looked into their situation. Some, however, suggested they were unsure who owns the copyrights in question. "Even though I'm an author whose work has been posted by Google, I don't know if I have standing in the suit or if only my publisher does," one author commented. "E-mails to my publisher's legal department have gone unanswered, so I'm really in the dark here."

Because they are a party to the suit and chief architects and proponents of the settlement, we also broke out the 86 respondents who said they were members of the Authors Guild—just under 10% of the entire sample. Not surprisingly, a higher percentage of Authors Guild members favored approval of the settlement (62%). Still, we were somewhat surprised that less than a quarter of Authors' Guild members we surveyed "enthusiastically supported" the settlement (24%). Some 19%, meanwhile, opposed the deal—four brave members said they actually planned to formally object to the settlement.

Librarians offered another interesting window into the settlement—only 3% said they had standing to participate, and librarians are largely not party to the deal's approval. We included them, however, because the settlement could not exist without them—they provide the books to Google to scan; they curate millions of out-of-print volumes, often with public money, years after publishers and authors have walked away from them; and they are a major part of the deal going forward, as they will comprise the market for institutional subscriptions.

Overall, the greatest number of librarians (37%) said they were undecided, while 29% supported approval, and 21% opposed. Librarians were most notable in the comments, where they voiced concerns about pricing, orphan works, privacy and public access issues more prominently than other respondents. That suggests to us that librarians are indeed fulfilling a vital role in the settlement process as a public voice.

**Notice and Confusion**

Some 66% of respondents said they were "very" or "somewhat familiar" with the terms of the settlement, while 23% said they were "vaguely familiar." Some 13% said they were "not at all familiar." The level of engagement among those with standing is considerably higher, with 86% saying they were "very or somewhat familiar" and less than 1% "not at all familiar." Two-thirds of those with standing said they have been sufficiently informed to make a decision on whether to participate in the settlement. We did not ask readers how they were notified or became aware of the settlement—whether through the mail, or the media.

It became clear, however, that being familiar with the settlement doesn't necessarily mean understanding it. "It makes me nervous, I don't understand it, I don't know what to do, and I don't have time to read through all of the info," noted one respondent. "No one really seems to be able to explain, clearly, what is about to happen," wrote another. Said an author: "I have not talked to a single person who is not confused by the settlement. Not one. Even my agent and publisher think the wording is as clear as mud."

Were you adequately notified?

Advertisements





PW
INDUSTRY
LEADERS
LEARN MORE



WEBCAST ALERT
The Summon™
Service in Real Life:
Early Adopter Libraries
Speak Out on Web-Scale
Discovery

In the FREE ongoing series
Returning the Researcher
to the Library

VIRTUAL EDITION



CLICK COVER FOR VIRTUAL EDITION
FAQ

NEWSLETTERS

Click on a title below to learn more.

PW Daily

**Action**

Overall, a surprisingly high number (61%) said they planned to take no action at all—roughly a third (32%) said they will take no action while 29% said they haven't yet decided if they will participate. That number is inflated, however, by respondents who do not have standing—because without works to claim, respondents have fewer options; they can file comments, but otherwise have no need to act. When limited to those with standing, participation levels rise considerably, but still not to high levels. Just over half of those with standing (55%) said they have or will register to assert their rights by the January 5 deadline—rights that include receiving a $60 payment from Google if their book has been scanned.

Consider this: if Google has set aside $45 million to pay rights holders for scanned books, our survey suggests they may end up paying just over half of what they budgeted. Why not register and get the check? In comments, respondents suggested that their individual books had so little value to them they couldn't be bothered to engage with the publishers' initial suit against Google. "The financial impact on me is so minor, that it doesn't seem worthwhile to take action," wrote one respondent. "The settlement doesn't grant authors enough compensation," added another. "A settlement that amounts to paying each author for the price of one copy of each book is insane," concluded yet another.

**Opt Outs and Objections**

While a quarter of respondents with standing said they opposed the settlement, just 12% said they either have opted out or plan to opt out. Overall, Some 5% said they will let the court know they disapprove of the deal, with some saying they would file comments (2.3%) and others saying they have or will formally object (2.7%).

A significant number of comments, however, maintained the plan should be opt in rather than opt out. Ironically, this shift in the copyright burden was part of the publishers' initial suit against Google. AAP lawyers argued that Google's original opt-out provision "turned copyright on its head," an objection the organization gave up to settle, but that many constituents apparently have held on to.

"The settlement was made by organizations that do not represent me, did not inform me, and assume my support if I don't send them an objection," wrote one outraged respondent. "The opt-out is in direct contradiction to U.S. copyright law," writes another. Those that did opt out, meanwhile, despite the benefits of being in the settlement, said they did so mostly for moral reasons—they didn't want Google to benefit from what they saw as malfeasance in scanning their books. "I believe that Google should be punished for what they did," one objector wrote. "I'm being robbed," wrote another. "This will do nothing to help my bottom line, but Google will thrive."

If the deal is somehow not approved and litigation continues, it will be interesting to see whether publishers resurrect their objections to the opt-out provision.

**Why We Fight**

Perhaps the most surprising result came from a simple but provocative question: we asked whether respondents supported the filing of the *initial lawsuits*, whether they believed the scanning was fair use or illegal, or the suits were ill-advised or well considered—for whatever reason. Notably, less than half of all respondents (49%) supported the original lawsuits.



**Did you support the initial lawsuits?**

No 15%

Yes 49%

No Opinion 36%

By constituency, librarians were least supportive of the suits, with only 25% backing them. However, support for the lawsuits was surprisingly underwhelming even among authors (62%) and publishers (55%). On the other hand, just 15% of respondents said the suits were ill-advised or thought Google's scanning was fair use—still, overall a whopping 36% *had no opinion*. If one is going to propose such a sweeping class action legal settlement for the entire universe of U.S. copyright holders and sell it as an urgently needed blueprint for the digital future, shouldn't the underlying cause of action be more popular?

In the more than 450 comments on this question, many respondents invoked much of the same polarized language that framed the original lawsuits: piracy, thievery, unauthorized use, illegal. There was a heavy moral component as well: Google's "arrogant disregard" or "contempt for intellectual property" was often cited. Some, however, expressed more support for litigating the original questions than settling. "I fully supported the lawsuits in 2005," wrote one respondent. "I no longer support the Author's Guild after its attempt to parlay my rights into a class settlement."

Religion BookLine
Children's Bookshelf
PW Comics Week
Cooking the Books

Signup Now →

**Conclusions**

Your take on the results of our survey may differ our take is this: there is simply too much confusion and too little support for anyone to feel comfortable. For us, the survey highlights a fundamental question: for all the good and bad scenarios raised by the deal, was it ever reasonable to think that such a revolutionary, unprecedented pact, negotiated in secret over three years by people with loose claims of representation, concerning a wide range of stakeholders, both foreign and domestic, involving murky issues of copyright and the rapidly unfolding digital future, could be pushed through as a class action settlement within a period of months, in the teeth of a historic media industry transition?

Whether it is approved after its scheduled October 7 fairness hearing, delayed, sent back for modification or rejected outright, behind the Google Book Search Settlement, there is a visionary plan for books. And, yes, this deal could very likely do every remarkable thing its supporters say it will do. The bottom line, however, is that, when the parties sued over a copyright question, no one asked, or expected these litigants to come back with a sweeping plan to transform publishing. And in the sprint to sell this deal, one simply has to look at how the settlement is being sold to know that the parties still don't seem to grasp how significant a challenge that represents.

"In the countdown to the October 7 court hearing on the Google Book Settlement, we are encountering heated rhetoric from opponents," Tom Allen, Association of American Publishers' executive director, wrote in a June 25 open letter, "much of it hyperbolic and misleading." Allen then proceeded to call the settlement "a revolution" that would "turn every public library building in the U.S. into a world-class research facility." If claims of a brighter future weren't enough to persuade skeptics to get behind the settlement, there was fear. Allen warned that if the settlement failed to win approval, "authors and publishers will have no effective means to stop the widespread use of copyrighted material that is likely to follow." That statement is a rather telling slip of the pen—since when did publishers regard the widespread use of copyrighted materials as something to be stopped?

In a *PW* Soapbox (June 15, 2009), Allen claimed the deal represented "the best opportunity for book publishing to confront the digital world without suffering the fate of the newspaper industry," whilediscounting the settlement's opposition as the work of "groups that advocate weakening copyright in the digital environment." Still, every statement of support seemed matched headline for headline by concern or opposition. In June, the American Society of Journalists and Authors announced its opposition to the settlement, as did the National Writers Union and the William Morris Agency—three groups hardly known for their desire to weaken copyright. Last week, an author, class member and class action lawyer, Scott Gant, filed a blistering objection. And, of course, as Allen suggested, the deal's would-be competitors are not about to sit this one out. Microsoft, Amazon and Yahoo have all objected. To say nothing of an antitrust investigation at the Department of Justice, and whisperings in the *Wall Street Journal* about possible congressional hearings.

It's worth noting that the deal will be approved or rejected by a judge, not a vote. And the judge, Denny Chin, may very well decide that, as one commenter noted, "the good should not be the enemy of the perfect." However, if our survey is any guide, it is less than clear whether the complex deal is, in fact, good. Judge Chin may have the final say, but it should surprise no one that a great many respondents to our survey indicated they would prefer to face the future on their own terms rather than the settlement's.

*[Editor's Note: As is common with such surveys, we rounded percentages off to the closest whole number. In some cases, this means that aggregates may total slightly over 100%.]*

*How the Survey Was Done*

On July 16 *PW* distributed a 12-question survey to readers of our e-newsletters, *PW Daily*, *Children's Bookshelf* and the *Library Journal Academic Newswire*. We received 891 responses, and 937 written comments. Respondents included mostly authors, publishers and a strong showing from librarians, as well as literary agents, booksellers, bloggers, foreign rights holders, lawyers and others. We closed the survey on August 6.



| | |
|---|---|
| ▓ U.S. authors | ■ Both author & publisher |
| ■ Librarian | ■ Self-published author |
| ▓ Small U.S. publisher | ▓ Academic publisher |
| ■ Large U.S. publisher | ▓ Foreign author |
| ▓ Literary agent | ▓ Foreign publisher |
| ▓ Bookseller | ▓ Other |
| ■ Medium U.S. publisher | ▓ Not involved in book industry |

⊞ Share   🔊 RSS   ⊞ Subscriptions   Reprints/License   🖨 Print   ✉ Email

**TALKBACK**

» SUBMIT FEEDBACK

The fuss over this settlement is di....
*Micheal W. Perry - 08/25/09*

If those in America think the settl....
*Rick Shers - 08/24/09*

» MORE

**RELATED CONTENT**

TOPICS | AUTHOR

**MOST POPULAR PAGES**

Fiction Reviews: 8/31/2009

The PW Morning Report: Monday, August 31, 2009

Web to Print and Back Again

Disney to Acquire Marvel Comics for $4 Billion

Nonfiction Reviews: 8/31/2009

Random House Down in First Half of 2009

**PW PARTNERS**



CALLING ALL INDEPENDENT AUTHORS, FILMMAKERS AND MUSICIANS!

Self-Publish and Make Your Books, Music and Video Available on Amazon.com and other channels.

No Setup Fees and No Inventory Needed to Start Selling.

createspace

Case 1:05-cv-08136-DC   Document 276-2   Filed 09/08/09   Page 25 of 38

About Us | Advertising Info | Submissions | Site Map | Contact Us | Subscriptions

©2009 Reed Business Information, a division of Reed Elsevier Inc. All rights reserved.
Reed Elsevier Inc. All rights reserved.
Use of this Web site is subject to its Terms of Use | Privacy Policy

**Please visit these other Reed Business sites**

**Media & Publishing:**
BroadcastIng & Cable | LA 411 | Library Journal | Multichannel News | New York 411 | Publishers Weekly | School Library Journal | Criticas | Tradeshow Week | Variety | Video Business

**Manufacturing:**
Control Engineering | Consulting Specifying Engineer | Design News | Industrial Distribution | Logistics Management | Kellysearch | Manufacturing Business Technology | Modern Materials Handling | Plant Engineering | Purchasing | Purchasing Data | Supply Chain Management Review

**Subscriptions:**
All Magazine and eNewsletter Subscriptions

**Business & Printing:**
Converting | DM2-DecisionMaker | Expert Business Source | Graphic Arts Blue Book | Graphic Arts Monthly | Hot Frog | Packaging Digest | Tracom Group | Zibb

**Gifts & Furnishings:**
Casual Living | Furniture Today | Gifts & Decorative Accessories | Home Textiles Today | Home Accents Today | Jewelers.U Circular Keystone | Kids Today | Playthings

**Hospitality:**
Chain Leader | Foodservice Equipment & Supplies | HOTELS | Restaurants & Institutions

**Electronics:**
EDN | Instat | PV Society | Semiconductor International | Test & Measurement World | TWICE

**Building & Construction:**
Building Design & Construction | CanaData | Construction Equipment | Custom Builder | Daily Commercial News | Housing Giants | HousingZone | Interior Design | Journal of Commerce | Market Insights | Professional Builder | Professional Remodeler | Reed Connect | Reed Construction Bulletin | Reed Construction Data | SmartBuilding Index | RS Means

# Exhibit F

**Welcome to TimesPeople**
Get Started

TimesPeople Lets You Share and Di       4:56 PM

Recommend

- Get Home Delivery
- Log In
- Register Now

- Home Page
- Today's Paper
- Video
- Most Popular
- Times Topics



Search All NYTimes.com    Go

**The New York Times**

Tuesday, September 1, 2009

# Technology

- World
- U.S.
- N.Y. / Region
- Business
- Technology
- Science
- Health
- Sports
- Opinion
- Arts
- Style
- Travel
- Jobs
- Real Estate
- Autos

Search Technology    Go

**Inside Technology**

- Internet
- Start-Ups
- Business Computing
- Companies

**Bits**

Blog »

Personal Tech »

- Cellphones,
- Cameras,
- Computers
- and more



**Bits**

**Business ∎ Innovation ∎ Technology ∎ Society**

April 4, 2009, *4:18 pm*

# It's Not Just Microsoft Balking at Google's Book Plans

*By Miguel Helft*

**Updated 10 a.m.** Added reference to Consumer Watchdog.

Earlier this week, Google's public relations team sent around to reporters a story from Wired suggesting that Microsoft was behind the opposition to its sweeping settlement with book publishers and authors over its book scanning project. I covered a focal point of the opposition to the agreement, the concerns over Google's virtually exclusive license to millions of so-called orphan books, in Saturday's Times.

There's no question that Microsoft has made it a mission to cause trouble for Google in Washington. And the Wired article noted that Microsoft is helping to finance research on the books settlement at the Institute for Information Law and Policy at New York Law School.

That said, plenty of others besides Microsoft are concerned about the settlement. The issues were raised most visibly by Robert Darnton, the director of the Harvard University library system, in a lengthy essay in the New York Review of Books in February. For those interested in more details, Professor Darnton's article is worth a read, as are some of the responses, which include a defense of the agreement by Paul Courant, dean of libraries at the University of Michigan.

Others who have publicly expressed concerns include prominent and independent intellectual property and antitrust experts, including Pamela Samuelson, a law professor at the University of California at Berkeley and co-director of the Berkeley Center for Law and Technology, and Jane Ginsburg, a professor at Columbia Law School, which recently held an all-day conference where the settlement was debated. At the conference, Randall Picker, a professor at the University of Chicago Law School, said he

saw potential antitrust problems with the settlement. His slides are available here.

Also at the conference, Marybeth Peters, the United States Register of Copyrights, called the agreement "a compulsory license for the benefit of one company." More coverage of the Columbia debate is available on the LibraryLawBlog here and here.

Librarians, represented by the American Library Association, the Association of Research Libraries and the Association of College and Research Libraries, have raised a different set of issues. In a joint amicus brief, they plan to voice a range of concerns, from the cost of library subscriptions for Google's book service, to what they say are a lack of guarantees that Google will not monitor the reading habits of library patrons. Alexander Macgillivray, the lead lawyer representing Google in negotiations, said Google "would be mindful of privacy" in designing its library products.

The dilemma for many of the critics is that virtually all agree that the settlement does a lot of good, and they don't necessarily want it struck down. Google's book scanning project will bring new life to millions of out-of-print books, making them available at libraries across the country, and potentially providing a new source of revenue for authors and publishers, as my colleague Motoko Rich described earlier this year.

Even James Grimmelmann of New York Law School's Institute for Information Law and Policy, one of the most vocal critics of the agreement, wants the settlement to be approved. In an amicus brief, however, he will ask the court to slow down the approval process and solicit advice from the Justice Department and the Federal Trade Commission, and will say that it should appoint someone to represent the interests of orphan works. (Prof. Grimmelmann, as well as Microsoft, insist that Microsoft's funding of the institute's research on the book settlement doesn't influence its conclusions. Prof. Grimmelman first detailed his concerns in November, months before Microsoft began backing the institute.)

Representing orphan works, and the public's interest in that vast swath of books, is precisely what a group of lawyers led by Professor Charles Nesson of Harvard Law School are hoping to do, with a petition to intervene in the case that they plan to file next week.

Google, as well as the Author's Guild and the Association of American Publishers, have strongly defended the agreement. Google describes its terms and benefits here.

And in a letter sent last week, Consumer Watchdog, a public interest group in Southern California, has asked the Justice Department to intervene in the case to "bring about changes that will truly serve the public interest."

Mr. Macgillivray, who listened to critics — as well as supporters — for hours at the Columbia conference, said he wasn't terribly surprised that the complex 134-page agreement had sparked a lot of concern.

"This is a deal that was negotiated with various parties that don't typically get along," he said. "I don't think it is perfect from the perspective of any of the people who negotiated it. It is not surprising that other people had issues with it." He later added: "I do think it is a tremendous improvement from where we are today."

- E-mail This

- Print
- Share Close
    - o Linkedin
    - o Digg
    - o Facebook
    - o Mixx
    - o My Space
    - o    Yahoo! Buzz
    - o Permalink
    - o
- Sign in to Recommend

Company News, Internet, News Analysis, Policy and Law, Silicon Valley, Technology and Society, Books Settlement, Copyright, Google

## Related Posts

**From Bits**

- Leader of Authors Guild Defends Google Book Settlement

- Libraries Ask Judge to Monitor Google Books Settlement

- Viacom Sees a Concession in Google Settlement

- Quick Bits: New Copyright Law and Dull Apple Rumors

- Quick Bits: Rebound Edition

- *Previous post* World's Fastest Broadband at $20 Per Home
- *Next post* Health Care Industry Moves Slowly Onto the Internet

## From 1 to 25 of 31 Comments

1 2 Next »

1. 1. April 4, 2009 5:03 pm Link

    There are lots of issues to be debated here. And perhaps most importantly, Congress should consider addressing the problem of orphan works. ITIF is hosting a debate on this in Washington, DC on April 21.

    "Copyright, Content and Class Action Lawsuits: A Debate on the Google Book Search Settlement "

    http://www.itif.org/index.php?id=235

# Exhibit G

Google & the Future of Books - The New York Review of Books

# The New York Review of Books

VOLUME 56, NUMBER 2 · FEBRUARY 12, 2009

## Google & the Future of Books

### By Robert Darnton

How can we navigate through the information landscape that is only beginning to come into view? The question is more urgent than ever following the recent settlement between Google and the authors and publishers who were suing it for alleged breach of copyright. For the last four years, Google has been digitizing millions of books, including many covered by copyright, from the collections of major research libraries, and making the texts searchable online. The authors and publishers objected that digitizing constituted a violation of their copyrights. After lengthy negotiations, the plaintiffs and Google agreed on a settlement, which will have a profound effect on the way books reach readers for the foreseeable future. What will that future be?

No one knows, because the settlement is so complex that it is difficult to perceive the legal and economic contours in the new lay of the land. But those of us who are responsible for research libraries have a clear view of a common goal: we want to open up our collections and make them available to readers everywhere. How to get there? The only workable tactic may be vigilance: see as far ahead as you can; and while you keep your eye on the road, remember to look in the rearview mirror.

When I look backward, I fix my gaze on the eighteenth century, the Enlightenment, its faith in the power of knowledge, and the world of ideas in which it operated—what the enlightened referred to as the Republic of Letters.

The eighteenth century imagined the Republic of Letters as a realm with no police, no boundaries, and no inequalities other than those determined by talent. Anyone could join it by exercising the two main attributes of citizenship, writing and reading. Writers formulated ideas, and readers judged them. Thanks to the power of the printed word, the judgments spread in widening circles, and the strongest arguments won.

The word also spread by written letters, for the eighteenth century was a great era of epistolary exchange. Read through the correspondence of Voltaire, Rousseau, Franklin, and Jefferson—each filling about fifty volumes— and you can watch the Republic of Letters in operation. All four writers debated all the issues of their day in a steady stream of letters, which crisscrossed Europe and America in a transatlantic information network.

I especially enjoy the exchange of letters between Jefferson and Madison. They discussed everything, notably the American Constitution, which Madison was helping to write in Philadelphia while Jefferson was representing the new republic in Paris. They often wrote about books, for Jefferson loved to haunt the bookshops in the capital of the Republic of Letters, and he frequently bought books for his friend. The purchases included Diderot's *Encyclopédie*, which Jefferson thought that he had got at a bargain price, although he had mistaken a reprint for a first edition.

Two future presidents discussing books through the information network of the Enlightenment—it's a stirring sight. But before this picture of the past fogs over with sentiment, I should add that the Republic of Letters was democratic only in principle. In practice, it was dominated by the wellborn and the rich. Far from being able to live from their pens, most writers had to court patrons, solicit sinecures, lobby for appointments to state-controlled journals, dodge censors, and wangle their way into salons and academies, where reputations were made. While suffering indignities at the hands of their social superiors, they turned on one another. The quarrel between Voltaire and Rousseau illustrates their temper. After reading Rousseau's *Discourse on the Origins of Inequality* in 1755, Voltaire wrote to him, "I have received, Monsieur, your new book against the human race.... It makes one desire to go down on all fours." Five years later, Rousseau wrote to Voltaire. "Monsieur,...I hate you."

The personal conflicts were compounded by social distinctions. Far from functioning like an egalitarian agora, the Republic of Letters suffered from the same disease that ate through all societies in the eighteenth century:

privilege. Privileges were not limited to aristocrats. In France, they applied to everything in the world of letters, including printing and the book trade, which were dominated by exclusive guilds, and the books themselves, which could not appear legally without a royal privilege and a censor's approbation, printed in full in their text.

One way to understand this system is to draw on the sociology of knowledge, notably Pierre Bourdieu's notion of literature as a power field composed of contending positions within the rules of a game that itself is subordinate to the dominating forces of society at large. But one needn't subscribe to Bourdieu's school of sociology in order to acknowledge the connections between literature and power. Seen from the perspective of the players, the realities of literary life contradicted the lofty ideals of the Enlightenment. Despite its principles, the Republic of Letters, as it actually operated, was a closed world, inaccessible to the underprivileged. Yet I want to invoke the Enlightenment in an argument for openness in general and for open access in particular.

If we turn from the eighteenth century to the present, do we see a similar contradiction between principle and practice—right here in the world of research libraries? One of my colleagues is a quiet, diminutive lady, who might call up the notion of Marion the Librarian. When she meets people at parties and identifies herself, they sometimes say condescendingly, "A librarian, how nice. Tell me, what is it like to be a librarian?" She replies, "Essentially, it is all about money and power."

We are back with Pierre Bourdieu. Yet most of us would subscribe to the principles inscribed in prominent places in our public libraries. "Free To All," it says above the main entrance to the Boston Public Library; and in the words of Thomas Jefferson, carved in gold letters on the wall of the Trustees' Room of the New York Public Library: "I look to the diffusion of light and education as the resource most to be relied on for ameliorating the condition promoting the virtue and advancing the happiness of man." We are back with the Enlightenment.

Our republic was founded on faith in the central principle of the eighteenth-century Republic of Letters: the diffusion of light. For Jefferson, enlightenment took place by means of writers and readers, books and libraries—especially at Monticello, the University of Virginia, and the Library of Congress. This faith is embodied in the United States Constitution. Article 1, Section 8, establishes copyright and patents "for limited times" only and subject to the higher purpose of promoting "the progress of science and useful arts." The Founding Fathers acknowledged authors' rights to a fair return on their intellectual labor, but they put public welfare before private profit.

How to calculate the relative importance of those two values? As the authors of the Constitution knew, copyright was created in Great Britain by the Statute of Anne in 1710 for the purpose of curbing the monopolistic practices of the London Stationers' Company and also, as its title proclaimed, "for the encouragement of learning." At that time, Parliament set the length of copyright at fourteen years, renewable only once. The Stationers attempted to defend their monopoly of publishing and the book trade by arguing for perpetual copyright in a long series of court cases. But they lost in the definitive ruling of *Donaldson* v. *Becket* in 1774.

When the Americans gathered to draft a constitution thirteen years later, they generally favored the view that had predominated in Britain. Twenty-eight years seemed long enough to protect the interests of authors and publishers. Beyond that limit, the interest of the public should prevail. In 1790, the first copyright act—also dedicated to "the encouragement of learning"—followed British practice by adopting a limit of fourteen years renewable for another fourteen.

How long does copyright extend today? According to the Sonny Bono Copyright Term Extension Act of 1998 (also known as "the Mickey Mouse Protection Act," because Mickey was about to fall into the public domain), it lasts as long as the life of the author plus seventy years. In practice, that normally would mean more than a century. Most books published in the twentieth century have not yet entered the public domain. When it comes to digitization, access to our cultural heritage generally ends on January 1, 1923, the date from which great numbers of books are subject to copyright laws. It will remain there—unless private interests take over the digitizing, package it for consumers, tie the packages up by means of legal deals, and sell them for the profit of the shareholders. As things stand now, for example, Sinclair Lewis's *Babbitt*, published in 1922, is in the public domain, whereas Lewis's *Elmer Gantry*, published in 1927, will not enter the public domain until 2022.[1]

To descend from the high principles of the Founding Fathers to the practices of the cultural industries today is to leave the realm of Enlightenment for the hurly-burly of corporate capitalism. If we turned the sociology of

knowledge onto the present—as Bourdieu himself did—we would see that we live in a world designed by Mickey Mouse, red in tooth and claw.

Does this kind of reality check make the principles of Enlightenment look like a historical fantasy? Let's reconsider the history. As the Enlightenment faded in the early nineteenth century, professionalization set in. You can follow the process by comparing the *Encyclopédie* of Diderot, which organized knowledge into an organic whole dominated by the faculty of reason, with its successor from the end of the eighteenth century, the *Encyclopédie méthodique*, which divided knowledge into fields that we can recognize today: chemistry, physics, history, mathematics, and the rest. In the nineteenth century, those fields turned into professions, certified by Ph.D.s and guarded by professional associations. They metamorphosed into departments of universities, and by the twentieth century they had left their mark on campuses—chemistry housed in this building, physics in that one, history here, mathematics there, and at the center of it all, a library, usually designed to look like a temple of learning.

Along the way, professional journals sprouted throughout the fields, subfields, and sub-subfields. The learned societies produced them, and the libraries bought them. This system worked well for about a hundred years. Then commercial publishers discovered that they could make a fortune by selling subscriptions to the journals. Once a university library subscribed, the students and professors came to expect an uninterrupted flow of issues. The price could be ratcheted up without causing cancellations, because the libraries paid for the subscriptions and the professors did not. Best of all, the professors provided free or nearly free labor. They wrote the articles, refereed submissions, and served on editorial boards, partly to spread knowledge in the Enlightenment fashion, but mainly to advance their own careers.

The result stands out on the acquisitions budget of every research library: the *Journal of Comparative Neurology* now costs $25,910 for a year's subscription; *Tetrahedron* costs $17,969 (or $39,739, if bundled with related publications as a *Tetrahedron* package); the average price of a chemistry journal is $3,490; and the ripple effects have damaged intellectual life throughout the world of learning. Owing to the skyrocketing cost of serials, libraries that used to spend 50 percent of their acquisitions budget on monographs now spend 25 percent or less. University presses, which depend on sales to libraries, cannot cover their costs by publishing monographs. And young scholars who depend on publishing to advance their careers are now in danger of perishing.

Fortunately, this picture of the hard facts of life in the world of learning is already going out of date. Biologists, chemists, and physicists no longer live in separate worlds; nor do historians, anthropologists, and literary scholars. The old map of the campus no longer corresponds to the activities of the professors and students. It is being redrawn everywhere, and in many places the interdisciplinary designs are turning into structures. The library remains at the heart of things, but it pumps nutrition throughout the university, and often to the farthest reaches of cyberspace, by means of electronic networks.

The eighteenth-century Republic of Letters had been transformed into a professional Republic of Learning, and it is now open to amateurs—amateurs in the best sense of the word, lovers of learning among the general citizenry. Openness is operating everywhere, thanks to "open access" repositories of digitized articles available free of charge, the Open Content Alliance, the Open Knowledge Commons, OpenCourseWare, the Internet Archive, and openly amateur enterprises like Wikipedia. The democratization of knowledge now seems to be at our fingertips. We can make the Enlightenment ideal come to life in reality.

At this point, you may suspect that I have swung from one American genre, the jeremiad, to another, utopian enthusiasm. It might be possible, I suppose, for the two to work together as a dialectic, were it not for the danger of commercialization. When businesses like Google look at libraries, they do not merely see temples of learning. They see potential assets or what they call "content," ready to be mined. Built up over centuries at an enormous expenditure of money and labor, library collections can be digitized en masse at relatively little cost— millions of dollars, certainly, but little compared to the investment that went into them.

Libraries exist to promote a public good: "the encouragement of learning," learning "Free To All." Businesses exist in order to make money for their shareholders—and a good thing, too, for the public good depends on a profitable economy. Yet if we permit the commercialization of the content of our libraries, there is no getting around a fundamental contradiction. To digitize collections and sell the product in ways that fail to guarantee wide access would be to repeat the mistake that was made when publishers exploited the market for scholarly journals, but on a much greater scale, for it would turn the Internet into an instrument for privatizing knowledge

that belongs in the public sphere. No invisible hand would intervene to correct the imbalance between the private and the public welfare. Only the public can do that, but who speaks for the public? Not the legislators of the Mickey Mouse Protection Act.

You cannot legislate Enlightenment, but you can set rules of the game to protect the public interest. Libraries represent the public good. They are not businesses, but they must cover their costs. They need a business plan. Think of the old motto of Con Edison when it had to tear up New York's streets in order to get at the infrastructure beneath them: "Dig we must." Libraries say, "Digitize we must." But not on any terms. We must do it in the interest of the public, and that means holding the digitizers responsible to the citizenry.

It would be naive to identify the Internet with the Enlightenment. It has the potential to diffuse knowledge beyond anything imagined by Jefferson; but while it was being constructed, link by hyperlink, commercial interests did not sit idly on the sidelines. They want to control the game, to take it over, to own it. They compete among themselves, of course, but so ferociously that they kill each other off. Their struggle for survival is leading toward an oligopoly; and whoever may win, the victory could mean a defeat for the public good.

Don't get me wrong. I know that businesses must be responsible to shareholders. I believe that authors are entitled to payment for their creative labor and that publishers deserve to make money from the value they add to the texts supplied by authors. I admire the wizardry of hardware, software, search engines, digitization, and algorithmic relevance ranking. I acknowledge the importance of copyright, although I think that Congress got it better in 1790 than in 1998.

But we, too, cannot sit on the sidelines, as if the market forces can be trusted to operate for the public good. We need to get engaged, to mix it up, and to win back the public's rightful domain. When I say "we," I mean we the people, we who created the Constitution and who should make the Enlightenment principles behind it inform the everyday realities of the information society. Yes, we must digitize. But more important, we must democratize. We must open access to our cultural heritage. How? By rewriting the rules of the game, by subordinating private interests to the public good, and by taking inspiration from the early republic in order to create a Digital Republic of Learning.

W hat provoked these jeremianic- utopian reflections? Google. Four years ago, Google began digitizing books from research libraries, providing full-text searching and making books in the public domain available on the Internet at no cost to the viewer. For example, it is now possible for anyone, anywhere to view and download a digital copy of the 1871 first edition of *Middlemarch* that is in the collection of the Bodleian Library at Oxford. Everyone profited, including Google, which collected revenue from some discreet advertising attached to the service, Google Book Search. Google also digitized an ever-increasing number of library books that were protected by copyright in order to provide search services that displayed small snippets of the text. In September and October 2005, a group of authors and publishers brought a class action suit against Google, alleging violation of copyright. Last October 28, after lengthy negotiations, the opposing parties announced agreement on a settlement, which is subject to approval by the US District Court for the Southern District of New York.[2]

The settlement creates an enterprise known as the Book Rights Registry to represent the interests of the copyright holders. Google will sell access to a gigantic data bank composed primarily of copyrighted, out-of-print books digitized from the research libraries. Colleges, universities, and other organizations will be able to subscribe by paying for an "institutional license" providing access to the data bank. A "public access license" will make this material available to public libraries, where Google will provide free viewing of the digitized books on one computer terminal. And individuals also will be able to access and print out digitized versions of the books by purchasing a "consumer license" from Google, which will cooperate with the registry for the distribution of all the revenue to copyright holders. Google will retain 37 percent, and the registry will distribute 63 percent among the rightsholders.

Meanwhile, Google will continue to make books in the public domain available for users to read, download, and print, free of charge. Of the seven million books that Google reportedly had digitized by November 2008, one million are works in the public domain; one million are in copyright and in print; and five million are in copyright but out of print. It is this last category that will furnish the bulk of the books to be made available through the institutional license.

Case 1:05-cv-08136-DC Document 276-2 Filed 09/08/09 Page 36 of 38
Page 5 of 7
Google & the Future of Books - The New York Review of Books

Many of the in-copyright and in-print books will not be available in the data bank unless the copyright owners opt to include them. They will continue to be sold in the normal fashion as printed books and also could be marketed to individual customers as digitized copies, accessible through the consumer license for downloading and reading, perhaps eventually on e-book readers such as Amazon's Kindle.

After reading the settlement and letting its terms sink in—no easy task, as it runs to 134 pages and 15 appendices of legalese—one is likely to be dumbfounded: here is a proposal that could result in the world's largest library. It would, to be sure, be a digital library, but it could dwarf the Library of Congress and all the national libraries of Europe. Moreover, in pursuing the terms of the settlement with the authors and publishers, Google could also become the world's largest book business—not a chain of stores but an electronic supply service that could out-Amazon Amazon.

An enterprise on such a scale is bound to elicit reactions of the two kinds that I have been discussing: on the one hand, utopian enthusiasm; on the other, jeremiads about the danger of concentrating power to control access to information.

Who could not be moved by the prospect of bringing virtually all the books from America's greatest research libraries within the reach of all Americans, and perhaps eventually to everyone in the world with access to the Internet? Not only will Google's technological wizardry bring books to readers, it will also open up extraordinary opportunities for research, a whole gamut of possibilities from straightforward word searches to complex text mining. Under certain conditions, the participating libraries will be able to use the digitized copies of their books to create replacements for books that have been damaged or lost. Google will engineer the texts in ways to help readers with disabilities.

Unfortunately, Google's commitment to provide free access to its database on one terminal in every public library is hedged with restrictions: readers will not be able to print out any copyrighted text without paying a fee to the copyright holders (though Google has offered to pay them at the outset); and a single terminal will hardly satisfy the demand in large libraries. But Google's generosity will be a boon to the small-town, Carnegie-library readers, who will have access to more books than are currently available in the New York Public Library. Google can make the Enlightenment dream come true.

But will it? The eighteenth-century philosophers saw monopoly as a main obstacle to the diffusion of knowledge—not merely monopolies in general, which stifled trade according to Adam Smith and the Physiocrats, but specific monopolies such as the Stationers' Company in London and the booksellers' guild in Paris, which choked off free trade in books.

Google is not a guild, and it did not set out to create a monopoly. On the contrary, it has pursued a laudable goal: promoting access to information. But the class action character of the settlement makes Google invulnerable to competition. Most book authors and publishers who own US copyrights are automatically covered by the settlement. They can opt out of it; but whatever they do, no new digitizing enterprise can get off the ground without winning their assent one by one, a practical impossibility, or without becoming mired down in another class action suit. If approved by the court—a process that could take as much as two years—the settlement will give Google control over the digitizing of virtually all books covered by copyright in the United States.

This outcome was not anticipated at the outset. Looking back over the course of digitization from the 1990s, we now can see that we missed a great opportunity. Action by Congress and the Library of Congress or a grand alliance of research libraries supported by a coalition of foundations could have done the job at a feasible cost and designed it in a manner that would have put the public interest first. By spreading the cost in various ways— a rental based on the amount of use of a database or a budget line in the National Endowment for the Humanities or the Library of Congress—we could have provided authors and publishers with a legitimate income, while maintaining an open access repository or one in which access was based on reasonable fees. We could have created a National Digital Library—the twenty-first-century equivalent of the Library of Alexandria. It is too late now. Not only have we failed to realize that possibility, but, even worse, we are allowing a question of public policy—the control of access to information—to be determined by private lawsuit.

While the public authorities slept, Google took the initiative. It did not seek to settle its affairs in court. It went about its business, scanning books in libraries; and it scanned them so effectively as to arouse the appetite of others for a share in the potential profits. No one should dispute the claim of authors and publishers to income

from rights that properly belong to them; nor should anyone presume to pass quick judgment on the contending parties of the lawsuit. The district court judge will pronounce on the validity of the settlement, but that is primarily a matter of dividing profits, not of promoting the public interest.

As an unintended consequence, Google will enjoy what can only be called a monopoly—a monopoly of a new kind, not of railroads or steel but of access to information. Google has no serious competitors. Microsoft dropped its major program to digitize books several months ago, and other enterprises like the Open Knowledge Commons (formerly the Open Content Alliance) and the Internet Archive are minute and ineffective in comparison with Google. Google alone has the wealth to digitize on a massive scale. And having settled with the authors and publishers, it can exploit its financial power from within a protective legal barrier; for the class action suit covers the entire class of authors and publishers. No new entrepreneurs will be able to digitize books within that fenced-off territory, even if they could afford it, because they would have to fight the copyright battles all over again. If the settlement is upheld by the court, only Google will be protected from copyright liability.

Google's record suggests that it will not abuse its double-barreled fiscal-legal power. But what will happen if its current leaders sell the company or retire? The public will discover the answer from the prices that the future Google charges, especially the price of the institutional subscription licenses. The settlement leaves Google free to negotiate deals with each of its clients, although it announces two guiding principles: "(1) the realization of revenue at market rates for each Book and license on behalf of the Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education."

What will happen if Google favors profitability over access? Nothing, if I read the terms of the settlement correctly. Only the registry, acting for the copyright holders, has the power to force a change in the subscription prices charged by Google, and there is no reason to expect the registry to object if the prices are too high. Google may choose to be generous in it pricing, and I have reason to hope it may do so; but it could also employ a strategy comparable to the one that proved to be so effective in pushing up the price of scholarly journals: first, entice subscribers with low initial rates, and then, once they are hooked, ratchet up the rates as high as the traffic will bear.

Free-market advocates may argue that the market will correct itself. If Google charges too much, customers will cancel their subscriptions, and the price will drop. But there is no direct connection between supply and demand in the mechanism for the institutional licenses envisioned by the settlement. Students, faculty, and patrons of public libraries will not pay for the subscriptions. The payment will come from the libraries; and if the libraries fail to find enough money for the subscription renewals, they may arouse ferocious protests from readers who have become accustomed to Google's service. In the face of the protests, the libraries probably will cut back on other services, including the acquisition of books, just as they did when publishers ratcheted up the price of periodicals.

No one can predict what will happen. We can only read the terms of the settlement and guess about the future. If Google makes available, at a reasonable price, the combined holdings of all the major US libraries, who would not applaud? Would we not prefer a world in which this immense corpus of digitized books is accessible, even at a high price, to one in which it did not exist?

Perhaps, but the settlement creates a fundamental change in the digital world by consolidating power in the hands of one company. Apart from Wikipedia, Google already controls the means of access to information online for most Americans, whether they want to find out about people, goods, places, or almost anything. In addition to the original "Big Google," we have Google Earth, Google Maps, Google Images, Google Labs, Google Finance, Google Arts, Google Food, Google Sports, Google Health, Google Checkout, Google Alerts, and many more Google enterprises on the way. Now Google Book Search promises to create the largest library and the largest book business that have ever existed.

Whether or not I have understood the settlement correctly, its terms are locked together so tightly that they cannot be pried apart. At this point, neither Google, nor the authors, nor the publishers, nor the district court is likely to modify the settlement substantially. Yet this is also a tipping point in the development of what we call the information society. If we get the balance wrong at this moment, private interests may outweigh the public good for the foreseeable future, and the Enlightenment dream may be as elusive as ever.

Notes

[1]The Copyright Term Extension Act of 1998 retroactively lengthened copyright by twenty years for books copyrighted after January 1, 1923. Unfortunately, the copyright status of books published in the twentieth century is complicated by legislation that has extended copyright eleven times during the last fifty years. Until a congressional act of 1992, rightsholders had to renew their copyrights. The 1992 act removed that requirement for books published between 1964 and 1977, when, according to the Copyright Act of 1976, their copyrights would last for the author's life plus fifty years. The act of 1998 extended that protection to the author's life plus seventy years. Therefore, all books published after 1963 remain in copyright, and an unknown number—unknown owing to inadequate information about the deaths of authors and the owners of copyright—published between 1923 and 1964 are also protected by copyright. See Paul A. David and Jared Rubin, "Restricting Access to Books on the Internet: Some Unanticipated Effects of U.S. Copyright Legislation," *Review of Economic Research on Copyright Issues*, Vol. 5, No. 1 (2008).

[2]The full text of the settlement can be found at **www.googlebooksettlement.com/agreement.html**. For Google's legal notice concerning the settlement, see page 35 of this issue of *The New York Review*.

Letters

March 26, 2009: Edward Mendelson, **Google & Books: An Exchange**

Copyright © 1963-2009, NYREV, Inc. All rights reserved. Nothing in this publication may be reproduced without the permission of the publisher.