# Exhibit H

# • Public

## Public Knowledge and the Google Book Search Settlement

**By Jef Pearlman on May 1, 2009 - 3:44pm**

This week, the Honorable Judge Chin of the Southern District of New York granted us permission to file an amicus brief regarding the proposed Google Book Search settlement. Since the proposal's announcement back in October, we've been poring over the 320 pages of text and attachments, meeting with parties on all sides of the issue, and weighing the upsides and the downsides of the deal. In the end, we have some serious concerns about aspects of the proposed settlement, and plan to bring those concerns to the attention of the Court before Judge Chin makes a final ruling. On Wednesday, he granted a 4-month extension for those who wish to file, so there is still much to be done, but we thought we'd give you a preview of the issues we plan to raise.

Our concerns center around the role of orphan works – works under copyright whose owners can't be found – in the proposed settlement. As I discussed in an earlier post, the proposed settlement does some interesting things with orphan works. Of primary concern to us, however, is the way in which it goes about effectively licensing orphan books which have at some point (since 1923) been registered with the copyright office.

This license has a number of troubling features. It is authorized by only two organizations and a handful of individuals comprising a small subset of authors and publishers – who are by definition not orphan authors and who do not necessarily share their interest. Perhaps worse, it is offered to only one party – no one else can legally use these works. And in the end, the authors and publishers who can be found get paid for the works of those who can't.

The effect of the settlement as proposed would also essentially be a change of the default rules of copyright regarding books for just one player. While we might not always agree with the balance that Congress has chosen for copyright, it is still the legislature's domain to alter those rules. The judiciary is not the appropriate place to make such a change – especially with regard to only one party.

If the settlement goes through in its current form, it will also create some serious competition questions. It will result in a situation where, by getting sued for scanning and indexing (which we argue are fair use), one party has gotten the

rights to fully display orphan books. But because those authors can't be found and the settlement doesn't give anyone the ability to license their works to other parties, no one else can get that license. And because this change to the rules required a class action settlement to create, no one else is likely to be able to replicate it judicially without getting sued and settling in a collusive-looking future action.

Let be clear here – there are some things about the settlement which, taken alone, would be great. The possibility of making the full text of millions of out-of-print books available to the public online is a compelling one. And a centralized registry to help locate authors and more clearly determine which works are orphaned – if done right – could be a great boon to the public. And if a structure looking something like this settlement could be offered to all potential users – and legislatively – we might come to different conclusions.

Way back in 2005, we asked Congress to stay out of the Google Book Search kerfuffle. But that was back when we were only talking about scanning, indexing, and snippets, and we could expect a ruling that either confirmed that Google's uses were fair or (mistakenly) went the other way – in which case we could take it to Congress for a proper fix.

Now, the situation is different. we've got Google, book publishers, and authors all at the table saying that this sort of license is a good thing. I'm inclined to agree. So maybe it's time for Congress to step in and give Americans the access to works that everyone seems to want them to have. They have a good deal of time before there's any chance of the settlement being final. That's time enough to do this right.

# Exhibit I

# Consumer Watchdog – Group: Consumers Not Considered In Google Book Search Settlement

Expose · Confront · Change

Home » Fighting Corporateering » Group: Consumers Not Considered In Google Book Search Settlement

PERMALINK: http://www.consumerwatchdog.org/corporateering/articles/?storyId=26151

In the media — April 07, 2009

## Group: Consumers Not Considered In Google Book Search Settlement

*By Wendy Davis, ONLINE MEDIA DAILY*

Advocacy group Consumer Watchdog has joined the ranks of organizations expressing concern about the proposed Google Book Search settlement.

The group criticizes the settlement on the grounds that it would give Google "an effective monopoly over digitized books" and is asking the Department of Justice to intervene.

"Because the settlement was negotiated between the parties in a class action suit, there has been little opportunity to represent the interests of consumers," the group said in a letter to the Attorney General dated last week.

U.S. District Court Judge Denny Chin in New York is currently reviewing the settlement. If it is approved, the agreement would resolve a lawsuit filed against Google in 2005 by the Authors Guild and the Association of American Publishers. They alleged that Google infringed copyright by digitizing books.

The agreement calls for Google to fund a new book rights registry, and allows the company to digitize books and sell downloads at prices it sets with the registry.

Consumer Watchdog flagged two areas of concern in its letter to the Justice Department. The organization says that the new registry guarantees Google "most favored nation" status, which would mean that no other future competitors get better terms than Google. "The registry would be prevented from offering more advantageous terms to, for example, Yahoo or Microsoft, even if it thought better terms would be necessary to enable either to enter into the digital books business," the letter states.

The second deals with "orphan works," or works under copyright, but whose owner isn't known. The agreement would protect Google from copyright infringement liability for publishing those works, but Consumer Watchdog says that other companies should also receive the same protections.

Last week, Chin granted a request by New York Law School to file a friend-of-the-court brief that also addresses orphan works. The law school professor heading the effort, James Grimmelmann, said the deal presents antitrust issues because it would result in Google becoming the only company able to safely publish orphan works.

A Google spokesperson said last week that the settlement "stands to expand access to millions of books in the U.S."

## Rate This Article:

Unrated

About Us  |More CWD Websites  |Books  |Contact Us

©2000-2008 Consumer Watchdog. All Rights Reserved. Read our Terms of Use and Privacy Policy

# Exhibit J



# O'REILLY radar

# Legally Speaking: The Dead Souls of the Google Booksearch Settlement

By Pamela Samuelson on April 17, 2009 1:35 AM | Permalink | Comments (59) | TrackBacks (0)

*Guest blogger Pamela Samuelson is the Richard M. Sherman Distinguished Professor of Law and Information at the University of California, Berkeley, as well as a Director of the Berkeley Center for Law & Technology and an advisor to the Samuelson High Technology Law & Public Policy Clinic at Boalt Hall. She has written and spoken extensively about the challenges that new information technologies pose for traditional legal regimes, especially for intellectual property law.*

*This piece will appear in the July 2009 issue of Communications of the ACM. Readers may also be interested in the slides from Pam's recent presentation, "Reflections on the Google Book Search Settlement."*

Google has scanned the texts of more than seven million books from major university research libraries for its Book Search initiative and processed the digitized copies to index their contents. Google allows users to download the entirety of these books if they are in the public domain (about 1 million of them are), but at this point makes available only "snippets" of relevant texts when the books are still in copyright unless the copyright owner has agreed to allow more to be displayed.

In the fall of 2005, the Authors Guild, which then had about 8000 members, and five publishers sued Google for copyright infringement. Google argued that its scanning, indexing, and snippet-providing was a fair and non-infringing use because it promoted wider public access to books and because Google would take out of the Book Search corpus any digitized books whose rights holders objected to their inclusion. Many copyright professionals expected the *Authors Guild v. Google* case to be the most important fair use case of the 21st century.

This column argues that the proposed settlement of this lawsuit is a privately negotiated compulsory license primarily designed to monetize millions of orphan works. It will benefit Google and certain authors and publishers, but it is questionable whether the authors of most books in the corpus (the "dead souls" to which the title refers) would agree that the settling authors and publishers will truly represent their interests when setting terms for access to the Book Search corpus.

## Orphan Works

An estimated 70 per cent of the books in the Book Search repository are in-copyright, but out of print. Most of them are, for all practical purposes, "orphan works," that is, works for which it is virtually impossible to locate the appropriate rights holders to ask for permission to digitize them.

A broad consensus exists about the desirability of making orphan works more widely available. Yet, without a safe harbor against possible infringement lawsuits, digitization projects pose significant copyright risks. Congress is considering legislation to lessen the risks of using orphan works, but it has yet to pass.

The proposed Book Search settlement agreement will solve the orphan works problem for books—at least for Google. Under this agreement, which must be approved by a federal court judge to become final, Google would get, among other things, a license to display up to 20 per cent of the contents of in-copyright out-of-print books, to run ads alongside these displays, and to sell access to the full texts of these books to institutional subscribers and to individual purchasers.

## The Book Rights Registry

Approval of this settlement would establish a new collecting society, the Book Rights Registry (BRR), initially funded by Google with $34.5 million. The BRR will be responsible for allocating $45 million in settlement funds that Google is providing to compensate copyright owners for past uses of their books.

More important is Google's commitment to pay the BRR 63 per cent of the revenues it makes from Book Search that are subject to sharing provisions. The revenue streams will come from ads appearing next to displays of in-copyright books in response to user queries and from individual purchases of and institutional subscriptions to some or all of the books in the corpus. Google and the BRR may also develop new business models over time that will be subject to similar sharing.

One of the main jobs of the BRR will be to distribute the settlement revenues. The money will go, less BRR's costs, to authors and publishers who have registered their copyright claims with BRR. Although the settlement agreement extends only to books published prior to January 5, 2009, BRR is expected to attract authors and publishers of later-published books to participate in the revenue sharing arrangement that Google has negotiated with BRR.

## Class Action Settlement

By now, readers may be a bit puzzled. How can Google be getting a license to make millions of in-copyright books available through Book Search just by settling a lawsuit brought by a small fraction of authors and publishers?

U.S. law allows the filing of "class action" lawsuits whose named plaintiffs claim they represent a class of persons who have suffered the same kind of harm from the defendant's wrongful conduct as long as there are common issues of fact and law that make it desirable to adjudicate the claims in one lawsuit instead of many.

The Authors Guild and three of its members sued Google, claiming to represent a class of similarly situated authors whose books Google was scanning and whose copyrights Google was violating. By bringing a class action, the Authors Guild put considerable financial pressure on Google because the winner of a class action lawsuit is entitled to compensation that equals all of the monies owed to the class, which may be exponentially higher than awards to individual plaintiffs.

In the absence of the proposed settlement, Google would almost certainly have vigorously fought against certification of the class in the *Authors Guild* case. After all, the guild has only a few thousand members and most of them do not write the kinds of scholarly works that are typically found in major university research libraries. Many scholars would want their books to be scanned by the Book Search project so they would be more accessible to potential readers.

The publisher lawsuit did not start out as a class action, perhaps in part because McGraw-Hill, et al., recognized how difficult it would be for them to prove they adequately represented a class of all book publishers whose books Google had scanned.

However, the settlement agreement that Google has negotiated with the Authors Guild and the Association of American Publishers would, if approved, be settled as a class action on behalf of *all* book authors and publishers, with the Guild and AAP claiming to represent their entire respective classes. By acceding to the certification of these classes through this settlement, Google will get a license from all authors and publishers of books covered by the agreement (which is to say nearly every in-copyright book ever published in the U.S.) so that it can commercialize them though Book Search.

## Google's New Monopoly

The proposed settlement agreement would give Google a monopoly on the largest digital library of books in the world. It and BRR, which will also be a monopoly, will have considerable freedom to set prices and terms and conditions for Book Search's commercial services. BRR is unlikely to complain that the price is too high, the digital rights management technology is too restrictive, or the terms are too onerous.

Google will also be the only service lawfully able to sell orphan books and monetize them through subscriptions. BRR will get 63 per cent of these revenues which it will pay out to authors and publishers registered with it, even as to books in which they hold no rights. (Some unclaimed orphan book funds may go to charities that promote literacy.) No author whose books are in the corpus can get paid by the BRR unless he/she has registered with it.

Virtually the only way that Amazon.com, Microsoft, Yahoo!, or the Open Content Alliance could get a comparably broad license as the settlement would give Google would be by starting its own project to scan books. The scanner might then be sued for copyright infringement, as Google was. It would be very costly and very risky to litigate a fair use claim to final judgment given how high copyright damages can be (up to $150,000 per infringed work). Chances are also slim that the plaintiffs in such a lawsuit would be willing or able to settle on equivalent or even similar terms.

## Dead Souls

The Book Search settlement brings to mind Nikolai Gogol's story, *Dead Souls*. Chichikov, its main character, travels around the Russian countryside to buy "dead souls" so that he can become a wealthy and influential man. In the early 19th century, you see, Russian landowners had to pay annual taxes on the number of serfs (counted as "souls") they owned as of the last census.

Chichikov offered to buy "dead souls" (i.e., serfs who had died since the last census) from the landowners. His plan was to acquire enough of these souls so that he could take out a large loan secured by his portfolio, and thereby to become a wealthy man.

In Gogol's story, Chichikov's scheme falls apart. Rumors fly that the souls he owns are all dead and he flees the town in disgrace.

However, Google's "dead souls" scheme may pay off handsomely, as the settlement would, in effect, give Google the exclusive right to commercially exploit millions of orphan books.

## Representativeness?

As galling as it is to realize that the BRR and its registered authors and publishers will derive income from millions of books they didn't write or publish, it is even more galling that copyright maximalists will almost certain dominate the BRR governing board.

(The Authors Guild president, for example, recently complained about the "read aloud" feature of Kindle, denoting it a "swindle," and a copyright infringement. The AAP is supporting legislation to forbid the National Institutes of Health from promoting "open access" policies for articles written under NIH grants. And of course, the Authors Guild and AAP characterized Google as a thief for scanning books from research libraries.)

If asked, the authors of orphan books in major research libraries might well prefer for their books to be available under Creative Commons licenses or put in the public domain so that fellow researchers could have greater access to them. The BRR will have an institutional bias against encouraging this or considering what terms of access most authors of books in the corpus would want.

In reviewing the settlement, the judge who is supposed to consider whether the settlement is "fair" to the classes on whose behalf the lawsuits were brought. He may assume the settlement is fair because money will flow to authors and publishers. But importantly absent from the courtroom will be the orphan book authors who might have qualms about the Authors Guild and AAP as their representatives.

## Conclusion

In the short run, the Google Book Search settlement will unquestionably bring about greater access to books collected by major research libraries over the years. But it is very worrisome that this agreement, which was negotiated in secret by Google and a few lawyers working for the Authors Guild and AAP (who will, by the way, get up to $45.5 million in fees for their work on the settlement—more than all of the authors combined!), will create two complementary monopolies with exclusive rights over a research corpus of this magnitude. Monopolies are prone to engage in many abuses.

The Book Search agreement is not really a settlement of a dispute over whether scanning books to index them is fair use. It is a major restructuring of the book industry's future without meaningful government oversight. The market for digitized orphan books could be competitive, but will not be if this settlement is approved as is.

## Tags

- copyright
- google
- policy

- publishing

# Exhibit K

# San Jose Mercury News (CA)

## GOOGLE'S BOOK CLUB

SOME AUTHORS, PUBLISHERS OPPOSE PLAN TO ALLOW SEARCH
GIANT TO DIGITIZE, SELL OUT-OF-PRINT BOOKS May 3, 2009
Section: Business
Edition: Valley Final
Page: 1E
  Elise Ackerman, Mercury News
**Memo:** TIMELINE OF THE DISPUTE
Sept. 20, 2005: Authors Guild files suit against Google.
Oct. 19, 2005: Publishers file suit against Google.
Oct. 28, 2008: The Authors Guild, the Association of American Publishers
and Google announced the landmark settlement of Authors Guild vs. Google.
Sept. 4, 2009: The last day to opt out of the settlement as a whole.
Oct. 7, 2009: A court hearing will take place to determine the fairness of the
settlement.
Jan. 5, 2010: Deadline for filing claim for cash payment for Google's pre-
settlement scanning and digitization of books.
Source: Authors Guild

Google's effort to bring millions of books and some of the world's greatest
university collections online is running into some surprising opposition from
librarians, academics and consumer advocates.
Last week, a group of authors that included John Steinbeck's son and
daughter-in-law, musician Arlo Guthrie, and university professors from
around the country persuaded a federal judge to delay approval of a court
settlement that would have given the Internet giant unprecedented rights to
digitize and sell out-of-print books whose copyright status is murky.
"It is clear to us that the settlement, if approved, will shape the future of
reading, research, writing and publication practices for decades to come,"
Pamela Samuelson, the co-director for the Berkeley Center for Law and
Technology, wrote in a letter to U.S. District Judge Denny Chin.
Chin ended up granting a four-month reprieve, rescheduling a hearing on the
fairness of the settlement from June 11 to Oct. 7.
The agreement is meant to resolve a 3-1/2-year legal fight between Google
and the Authors Guild and the Association of American Publishers over
Google Book Search, a project to digitize the collections of major university
libraries, including Harvard, Oxford and Stanford, that began in September
2005.
On the defense
"Google's mission is to organize the world's information and make it

universally accessible and useful. Today, together with the authors, publishers, and libraries, we have been able to make a great leap in this endeavor," said Sergey Brin, co-founder and president of technology at Google, when the settlement was announced in October. "While this agreement is a real win-win for all of us, the real victors are all the readers. The tremendous wealth of knowledge that lies within the books of the world will now be at their fingertips."

The authors and publishers claimed the project, which was intended to eventually include every book ever published, was a flagrant violation of copyright law.

The former courtroom adversaries say they are not opposed to an extension, which will give authors and publishers who oppose the settlement time to study the 134-page document and send comments to the judge. They say the settlement represents a reasonable resolution to their dispute, and that it will benefit the public by dramatically expanding access to books, while fairly compensating creators. Authors who had their books scanned without permission could get a token payment from Google.

In addition, authors and publishers will get a cut of any future profit that Google makes from their work, thanks to the creation of a new organization that will distribute the money and resolve disputes.

"This gives writers a degree of control that no writer has ever enjoyed before," said Paul Aiken, executive director of the Authors Guild.

But opponents of the settlement, who include librarians, law professors, antitrust experts, copyright specialists, authors and digital activists, say the far-reaching agreement grants Google unique privileges that could turn the Mountain View company into both the world's largest library and its biggest book store.

Specific objections to the settlement range from sweeping intellectual arguments about the public's right to information from multiple sources to practical concerns about how the deal will work. However, the main issue that critics are focused on is their contention that the agreement will give Google a de facto monopoly on the digital versions of so-called "orphan works," out-of-print books whose copyright holders can't easily be found. These works, which are estimated to number in the tens of millions, could make the search giant the most powerful information broker on the planet, able to determine what books the public gets to read and at what cost.

Opponents of the deal agree the public would benefit from access to digital works but they would like to see Congress create a level playing field rather than having Google be the sole gatekeeper.

"Google will walk away from the settlement agreement with a huge competitive advantage," said **Randal C. Picker**, a law professor at the University of Chicago. Picker said Google's ability to set prices for digital works as a result of the deal raises antitrust concerns and could mean consumers pay more.

The Department of Justice has opened an inquiry into the settlement, according to three people who have spoken with investigators. Such inquiries

don't necessarily turn into formal investigations, though some advocates are pressing the government to get involved.

"We'd like to have them intervene and delay the settlement until the antitrust issues get fixed," said John Simpson of Consumer Watchdog, a nonprofit group that contacted the Justice Department about the settlement a month ago.

Aiken said the concerns about the settlement are overblown and in some cases inaccurate. To say that Google will have a monopoly on out-of-print books is like saying that "Google is cornering the market on something that is unmarketable," Aiken said.

"Monopoly is a big word and people are throwing it around a lot," said Alexander Macgillivray, the Google lawyer who negotiated the agreement. He said the deal is not creating a barrier to competition, but removing barriers that were created by the convoluted U.S. copyright system.

Value of books

At the heart of the controversy is the value of books that are no longer sold except occasionally in used-book stores and whose legal ownership is unclear. The vast majority of written work exists in this limbo in libraries around the world. Of the more than 7 million books Google has scanned since December 2004, only 1 million books were in the public domain, whose copyright has expired, and 1 million were still in copyright and also in print. The remaining 5 million books appear to be in copyright but out of print, and Google continues to scan more books each day.

It is these so-called orphan books that was the focus of the lawsuit brought by the authors and publishers. Google didn't need permission to scan books in the public domain, and publishers gave Google permission to scan books that were in print.

But the ownership of the copyright of out-of-print books was often difficult to determine. Google argued that it had authority to scan these books without explicit permission under a legal concept known as "fair use."

The group of authors and publishers accused Google of deliberately violating copyright law. "Our position was: The hell you say. Of such disagreements, lawsuits are made," Roy Blount, president of the Authors Guild, wrote in an Oct. 28, 2008, letter to the organization's 8,000 members that recounted the origin of the lawsuit and announced the terms of its settlement.

The agreement gives Google the right to sell individual digital books, as well as access to its database and advertising linked to books. Google can also make other commercial uses of the books.

In return, Google will pay 63 percent of the revenues that it earns from the books to a Books Rights Registry that will distribute the money to authors and publishers. Google will also contribute $34.5 million to establish the registry and will put a minimum of $45 million into a separate settlement fund that will pay copyright holders at least $60 for each book it scanned.

Critics contend that the settlement gives Google a broad license to digitize and market out-of-print works without fear of any liability except from authors who chose to opt out of the agreement. "As the only legal place

where all books can be searched, Google gets enormous market power," author Cory Doctorow wrote on the Boing Boing blog. "The leverage they attain over publishing and authors through this settlement is incalculable." James Gleick, an author who helped negotiate the settlement on behalf of the Authors Guild, said the most important thing is that the settlement stopped Google from copying books without permission. But, he acknowledged, "Google still ends up with a great deal of power, and a special position in the marketplace because they were so aggressive in making this database." Gail Knight Steinbeck, chair of the Creative Property Rights Alliance and daughter-in-law of writer John Steinbeck, said the settlement is rewarding Google for bad behavior. "I love Google, don't get me wrong," she said. "But this leaves a bad taste in my mouth."

Opt-out date

Authors have until Sept. 4 to opt out of the settlement and preserve their right to sue Google. But few consider that a realistic alternative. "This settlement is being foisted on us," said Siva Vaidhyanathan, a media scholar at the University of Virginia and an author who is not a member of the Authors Guild.

Vaidhyanathan said for practical purposes authors can neither opt out nor choose to remove their books from the database, which is another option presented by Google. "That would mean our works would disappear entirely from the only meaningful and searchable resource," he said. "Google's market power makes this an offer we can't refuse."

Corey Williams, a spokeswoman for the American Library Association, which claims to be the oldest and largest library association in the world, said librarians are not only afraid that Google will be the only organization with a comprehensive database, but that Google will be able to chose which books go into the database, in effect censoring the information available to library patrons. "There's a concern that if it's a monopoly and others can't get into the game, libraries won't have an alternate product to chose from," Williams said. The agreement allows Google to provide free access to its database through a single terminal at a public library. But with libraries already facing lines out the door for computers, Williams said, a single terminal might not be adequate. As important as access is privacy, she added. "Google will know what pages you read and how many seconds you spent on a page," she said. "It's important to remember we haven't actually designed the product yet," said Macgillivray, the Google lawyer. "But as we do that of course we are going to keep privacy in mind."

Brewster Kahle, founder of the Open Content Alliance, said there is an alternative to giving Google an exclusive license. The alliance is working with the Internet Archive, a nonprofit library cofounded by Kahle, to scan both in-print and out-of-print books, which could then be lent out. Kahle said Congress could pass a law that would allow for-profit uses of out-of-print books.

Macgillivray said Google would support such legislation, which came close to passing in the last Congress. "We have been for the last five years trying to

get good orphan-work legislation that would allow this type of thing to
happen not just for us but for everyone," he said.
Contact Elise Ackerman at eackerman@mercurynews.com or 408-271-3774.

# Exhibit L

# Publisher speculates about Amazon/Google e-book "duopoly"

Speaking at Princeton on Thursday, Richard Sarnoff, chairman of the Association of American Publishers, discussed the landmark settlement in the Google Book Search case. Sarnoff speculated that the agreement could effectively give Google and Amazon a "duopoly" in the online book market.

*By Timothy B. Lee | Last updated February 23, 2009 7:10 AM CT*

Richard Sarnoff, chairman of the Association of American Publishers, speculated last week that the landmark Google Book Search settlement could create a duopoly in the electronic books market. Speaking at Princeton University's Center for Information Technology Policy, Sarnoff noted that Amazon currently dominates the market for downloadable e-books. He said that the settlement "forces Google to become a provider of electronic books with a different business model" in direct competition with Amazon. And he said that some aspects of the massive settlement would be "difficult to replicate" for Google's competitors.

Sarnoff said the publishers he represents didn't set out to create a monopoly in the markets for book search engines or online book sales. But he didn't deny that the settlement could have that effect. After all, he noted, "copyright itself is a monopoly."

Sarnoff also speculated that what competition does occur will "emerge thematically." That is, rather than building another comprehensive book search engine, competitors will offer niche search engines tilted toward particular industries, such as medicine. Legal hurdles may make it infeasible for any other firms to build a search engine comparable to Google Book Search.

## A blueprint for 21st century book publishing

Sarnoff outlined the terms of the settlement, which is expected to be approved by the courts later this year. It reads like a blueprint for the future of electronic book publishing, covering topics as wide-ranging as advertising, library access, and the treatment of orphan works. A key element of the agreement is the creation of a Book Rights Registry that will collect payments from Google and distribute them to authors and publishers. Sarnoff said the publishers pressed for the creation of this registry in part because it would be too "easy to disintermediate the publisher over time" if Google paid authors directly. Sarnoff said that the structure of the registry will be "tough to replicate for [Google's] competitors."

Google made significant concessions to get the agreement. First, Google agreed to pay $60 for every scanned book whose rights-holders could be identified. In addition, rights-holders will have the power to decide whether to allow ads to appear alongside their books on Google's site, and will be entitled to advertising revenue if they choose to allow advertising. Finally, Google will help pay the plaintiffs' legal bills.

The agreement will create another important new revenue stream for authors and publishers: library subscriptions. Libraries will be able to pay fees to Google for access to the complete library of books in Google's catalog, and Google will pass most of those revenues along to publishers. Finally, the agreement has a provision that would provide free access to a limited number of terminals in public libraries for patrons who couldn't otherwise afford to buy e-books from Google.

## No "transfer of files"

This might provoke a feeling of déjà vu among those readers who signed up for Google's ill-fated online video store a few years ago. The new Google book store, like Google's earlier video store, will require users to log into their Google accounts in order to access the works they have purchased.

The agreement sets Google up as an e-book vendor, and Sarnoff said that measures would be taken to discourage the illicit sale of books purchased using Google's online store. Under the system he described, electronic books purchased from Google "will not be resident on your computer." Instead, the books will be stored on the Google "cloud," and users will access the books they have purchased a few pages at a time using a Web-based viewer. Apparently drawing a distinction between transient caching and permanent storage, Sarnoff said that the system Google has agreed to implement won't "involve the transfer of files."

This might provoke a feeling of *déjà vu* among those readers who signed up for Google's ill-fated online video store a few years ago. The new Google book store, like Google's earlier video store, will require users to log into their Google accounts in order to access the works they have purchased. Users who want to read their e-books on their laptops while they are out of range of an access point will be out of luck. Finally, Sarnoff said that users' ownership of a book will continue only "as long as Google exists." If Google ever decided to stop supporting the online book service, as it did with its video service, users would be cut off from access to their books.

It's a bit of a puzzle what this DRM-like scheme is supposed to accomplish. Under the system Sarnoff described, it would be trivial to write a FireFox plugin to automatically page through a book, download individual pages, and stitch them together into

a PDF. So although it will inconvenience legitimate users who want to read their lawfully purchased books without an Internet connection, we're willing to bet that it won't make a dent in book piracy.

Serving the technologist for $1.1156 \times 10^{-1}$ centuries

# Exhibit M

**The New York Times**

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution
to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit
www.nytreprints.com for samples and additional information. Order a reprint of this article now.



PRINTER-FRIENDLY FORMAT
SPONSORED BY

April 4, 2009

## Google's Plan for Out-of-Print Books Is Challenged

By **MIGUEL HELFT**

SAN FRANCISCO — The dusty stacks of the nation's great university and research libraries are full of orphans — books that the author and publisher have essentially abandoned. They are out of print, and while they remain under copyright, the rights holders are unknown or cannot be found.

Now millions of orphan books may get a new legal guardian. Google has been scanning the pages of those books and others as part of its plan to bring a digital library and bookstore, unprecedented in scope, to computer screens across the United States.

But a growing chorus is complaining that a far-reaching settlement of a suit brought against Google by publishers and authors is about to grant the company too much power over orphan works.

These critics say the settlement, which is subject to court approval, will give Google virtually exclusive rights to publish the books online and to profit from them. Some academics and public interest groups plan to file legal briefs objecting to this and other parts of the settlement in coming weeks, before a review by a federal judge in June.

While most orphan books are obscure, in aggregate they are a valuable, broad swath of 20th-century literature and scholarship.

Determining which books are orphans is difficult, but specialists say orphan works could make up the bulk of the collections of some major libraries.

Critics say that without the orphan books, no competitor will ever be able to compile the comprehensive online library Google aims to create, giving the company more control than ever over the realm of digital information. And without competition, they say, Google will be able to charge universities and others high prices for access to its database.

The settlement, "takes the vast bulk of books that are in research libraries and makes them into a single database that is the property of Google," said Robert Darnton, head of the Harvard University library system. "Google will be a monopoly."

Google, which has scanned more than seven million books from the collections of major libraries at its own expense, vigorously defends the settlement, saying it will bring great benefits to the broader public. And it says others could make similar deals.

"This agreement expands access to many of these hard-to-find books in a way that is great for Google, great for authors, great for publishers and great for readers," said Alexander Macgillivray, the Google lawyer who led the settlement negotiations with the Association of American Publishers and the Authors Guild.

Most of the critics, which include copyright specialists, antitrust scholars and some librarians, agree that the public will benefit. But they say others should also have rights to orphan works. And they oppose what they say amounts to the rewriting, through a private deal rather than through legislation, of the copyright rules for millions of texts.

"They are doing an end run around the legislative process," said Brewster Kahle, founder of the Open Content Alliance, which is working to build a digital library with few restrictions.

Opposition to the 134-page agreement, which the parties announced in October, has been building slowly as its implications have become clearer. Groups that plan to raise concerns with the court include the American Library Association, the Institute for Information Law and Policy at New York Law School and a group of lawyers led by Prof. Charles R. Nesson of Harvard Law School. It is not clear that any group will oppose the settlement outright.

The groups representing publishers and authors, which filed a class-action lawsuit against Google in 2005 in the Federal District Court for the Southern District of New York on behalf of their members, are defending the settlement, as are some librarians at major universities.

"What we were establishing was a renewed access to a huge corpus of material that was essentially lost in the bowels of a few great libraries," said Richard Sarnoff, former chairman of the Association of American Publishers and co-chairman of the American unit of Bertelsmann, the parent company of Random House.

The lawsuit claimed that Google's practice of showing snippets of copyrighted books in search results was copyright infringement. Google insisted that it was protected by fair use provisions of copyright law.

The settlement, which covers all books protected by copyright in the United States, allows Google to vastly expand what it can do with digital copies of books, whether they are orphans or not.

Google will be allowed to show readers in the United States as much as 20 percent of most copyrighted books, and will sell access to the entire collection to universities and other institutions. Public libraries will get free access to the full texts for their patrons at one computer, and individuals will be able to buy online access to particular books.

Proceeds from the program, including advertising revenue from Google's book search service, will be split; Google will take 37 percent, and authors and publishers will share the rest. Google will also help set up a Book Rights Registry, run by authors and publishers, to administer rights and distribute payments.

Authors are permitted to opt out of the settlement or remove individual books from Google's database. Google says it expects the pool of orphan books to shrink as authors learn about the registry and claim their books.

While the registry's agreement with Google is not exclusive, the registry will be allowed to license to others only the books whose authors and publishers have explicitly authorized it. Since no such authorization is possible for orphan works, only Google would have access to them, so only Google could assemble a truly comprehensive book database.

"No other company can realistically get an equivalent license," said Pamela Samuelson, a professor at the University of California, Berkeley, and co-director of the Berkeley Center for Law and Technology.

Mr. Macgillivray said Google shared with many of its critics the goal of making orphan works more widely accessible. He said Google would continue to lobby for legislation to that effect. And he said that nothing prevented a potential rival from following in its footsteps — namely, by scanning books without explicit permission, waiting to be sued and working to secure a similar settlement.

Yet even Michael J. Boni, the lead lawyer representing the Authors Guild, conceded that "Google will always have the advantage of having access to 100 percent of the orphan works."

Mr. Darnton of Harvard said he feared that without competition Google would be free to "raise the price to unbearable levels."

But Mr. Macgillivray and Mr. Boni said prices would be kept in check, in part by the goal, spelled out in the agreement, to reach as many customers as possible.

Some of Google's rivals are clearly interested in the settlement's fate. Microsoft is helping to finance the research on the settlement at the New York Law School institute. James Grimmelmann, an associate professor at the institute, said its work was not influenced by Microsoft. Microsoft confirmed this but declined to comment further.

Amazon also declined to comment. An unmatchable back catalog could eventually make Google a primary source for digital versions of books, old and new, threatening other e-book stores.

Copyright 2009 The New York Times Company

# Exhibit N



Home  |  About TMI  |  Site Map  |  Contact Us

August 31 2009

**SHARE**

Browse

"Content Wars"

National
CyberEducation
Project

Press Releases

Communications
Forum

Awards Banquet

Law and Policy

Special Programs

Trustees & Advisory
Councils

Publications List

Links

Blog

Donate

Intellectual Property
Issues

› Back to Intellectual Property Issues

## The Google Book Search Settlement: A New Orphan-Works Monopoly?

**Prof. Randal C. Picker, The University of Chicago Law School**

*June 18, 2009*

Google is a company of modest ambitions. As it puts it in its brief corporate statement, Google's mission is to "organize the world's information and make it universally accessible and useful." Organize it, put it online, display it, and make a few dollars at the same time.

Google's Book Search is a core piece of this vision. Think of the world's great libraries, all merged into one collection and all available online through any device connected to the Internet. Universal access indeed.

But creating such a wonder isn't a simple undertaking. Books have to be found, bought or borrowed, and copied. The resulting digital files need to be sliced and diced to make them as useful as possible but also preserved so that looking at books online is very much like looking at them offline. This is a substantial technical undertaking, plus we need to figure out a business model for accessing the books.

In the past — and still today, of course — individuals purchased books or borrowed them from libraries, which in turn had purchased the books. Will digital copies be purchased in the same fashion or will different rules apply? Were these technical and economic challenges not enough, we would confront the really hard problem, namely, how do we match an 18th century legal system with early 21st century opportunities?

Google moved forward nonetheless and launched Google Book Search (GBS) in pursuing its goal of organizing the world's information. Even though Google was sensitive to copyright values, the service relied on mass copying and thus Google undertook a substantial legal risk in setting up the service. That risk was realized with the lawsuits by the Authors Guild and the Association of American Publishers.

But a settlement is now on the table and, if approved by a federal district court at a hearing in early October 2009, the settlement agreement will create an important new copyright collective and will legitimate broad-scale online access to United

States books registered before early January 2009. This is exciting as successful new book platforms are rare — since Gutenberg have there been any? — and Google's is of breathtaking ambition.

Google digitized books through partnership agreements that it struck with libraries – but without licenses from rightsholders, it isn't clear what Google could do with its digital collection. Google might have litigated a fair use claim to limit its exposure for copyright infringement, but it has instead chosen to settle the lawsuit. The settlement agreement itself operates as a rights license. That license sits between Google, as owner of its digital files collection, and the rightsholders and the registry that the settlement creates to act on behalf of the rightsholders.

Google's original action of copying raised a bunch of juicy copyright questions, but with the settlement, much to the dismay of many, those issues will be left for another day. Instead, the settlement itself is now the focus, and that takes us away from copyright proper and into class action law and antitrust.

I won't focus on class action law here but instead will consider the antitrust issues. On June 9, 2009, it was reported that federal antitrust authorities had sent information requests — civil investigative demands or CIDs in antitrust lingo — to some of the parties involved in the settlement agreement. That suggests that the Antitrust Division is undertaking a serious look at the potential competition consequences of the settlement agreement. The settlement agreement itself is exceedingly complex but, in a longer consideration of these issues, I have focused on three issues that raise antitrust and competition policy concerns.

First, the agreement calls for Google to act as agent for rightsholders in setting the price of online access to consumers. Google is tasked with developing a pricing algorithm that will maximize revenues for each of those works. Direct competition among rightsholders would push prices toward some measure of costs and would not be designed to maximize revenues. As I think that that level of direct coordination of prices is unlikely to mimic what would result in competition, I have real doubts about whether the consumer access pricing provision would survive a challenge under Section 1 of the Sherman Act.

Second, and much more centrally to the settlement agreement, the opt-out class action will make it possible for Google to include orphan works in its book search service. Orphan works are works for which the rightsholder can't be identified or found. (See the U.S. Copyright Office's discussion for more.) That means that a firm like Google can't contract with an orphan holder directly to include his or her work in the service and that would result in large numbers of missing works.

The opt-out mechanism — which shifts the default from copyright's usual "out" to the class action's "in" — brings these works into the settlement. Rightsholders affirmatively need to opt out of the settlement or their works will become part of the broad

license the settlement creates.

The great accomplishment of the settlement is precisely in the way that it uses the opt-out class action to sidestep the orphan-works problem. But this gives Google an initial monopoly — and possibly a long-running one — over the use of the orphan works.

This emerges *directly* from the court's role in this case because the settlement agreement between Google and active rightsholders could have been implemented as a private matter without a lawsuit, though perhaps with substantial antitrust attention. But the lawsuit is the device by which the initial orphan-works monopoly is created: Without the lawsuit, Google would acquire *no* rights to use the orphan works.

However, the settlement agreement also creates market power through this mechanism. Absent the lawsuit and the settlement, active rightsholders could contract directly with Google, but it is hard to get large-scale contracting to take place and there is, again, no way to contract with orphan holders. The opt-out class action then is the vehicle for large-scale collective action by active rightsholders. Active rightsholders have little incentive to compete with themselves by granting multiple licenses of their works or of the orphan works. Plus under the terms of the settlement agreement, active rightsholders benefit directly from the revenues attributable to orphan works used in GBS.

We can mitigate the market power that will otherwise arise through the settlement by expanding the number of rights licenses available under the settlement agreement. Qualified firms should have the power to embrace the going-forward provisions of the settlement agreement. We typically find it hard to control prices directly and instead look to foster competition to control prices. Nonprofits are unlikely to match up well with the overall terms of the settlement agreement, which is a share-the-revenues deal.

But we should take the additional step of unbundling the orphan-works deal from the overall settlement agreement and create a separate license to use those works. All of that will undoubtedly add more complexity to what is already a large piece of work, and it may make sense to push out the new licenses to the future. That would mean ensuring now that the court retain jurisdiction to do that, and/or giving the new registry created in the settlement the power to do this sort of licensing.

Third, there is a risk that approval by the court of the settlement could cause antitrust immunities to attach to the arrangements created by the settlement agreement. It is highly unlikely that the fairness hearing will undertake a meaningful antitrust analysis of those arrangements. Therefore, if the district court approves the settlement, the court should include a clause — call this a "no *Noerr*" clause — in the order approving the settlement providing that no antitrust immunities attach from the court's approval.

This is a moving situation. What started as a case turning on rich copyright questions has morphed now into a tricky exercise in

institution building and competitive design. Our prior experience with copyright collectives — namely ASCAP and BMI — suggests that we are at the very first step in what is likely to be a very long road of antitrust regulation of the particular joint copyright activities embedded in the proposed book search settlement. The government has been pursuing antitrust actions against ASCAP and BMI since 1940 — I detail some of this history here — and yet antitrust regulation of those organizations is still going on strong.

The GBS settlement agreement promises a new, wonderful resource, but we are going to have to sort through the antitrust issues before we can get there.

**Want to comment on this article? Submit your comments below.**
(Please note: All comments are screened for language prior to posting.)

Name:

E-mail:

Comments:

☐ Would you like to be part of our emailing list?

Submit Comment

---

# The Media Institute

**2300 Clarendon Blvd., Suite 503
Arlington, VA 22201
Tel. (703) 243-5700
Fax (703) 243-8808**

If you have any questions or comments,

please email our webmaster.

**Copyright © 2009 The Media Institute**

**Website maintained by CreationDepot**

# Exhibit O

Google and the Zombie Army of Orphans

# Google and the Zombie Army of Orphans

James Grimmelmann

I'd like to talk a bit about ends and means in the Google Book Search settlement. I'll try to keep this as simple as possible. Unfortunately, when talking about a settlement agreement with 141 pages and 15 attachments, what's possible isn't always simple.

The lawsuit started out as a challenge to Google's project to digitize and to make searchable every book it could get its hands on. Google wanted to add books to its search results: type in a term, and Google would tell you what books that term appeared in and where they appeared within the books. Google wouldn't give you the books themselves; instead, Google would tell you what was out there and it would generally be up to you to go track down the actual books themselves if you wanted to read them. It was purely a project about indexing.

I thought this was an unambiguously good thing. Google was creating a general index of everything that had ever been written. An index like that is a remarkable tool for the discovery and transmission of knowledge. Having one greatly accelerates the speed at which people can share creativity and ideas. For researchers, the difference between a good index and a truly comprehensive one is immense.

I also thought the Book Search project ought to be an unambiguous fair use because of the inordinate difficulty of negotiating a deal with all book copyright owners—authors and publishers—to authorize the program. It's not just that some owners would drive hard bargains or hold out for spiteful reasons. It's also that some wouldn't negotiate at all, because no one can find them to negotiate with at all.

A specter is haunting American copyright law—the specter of orphan works. Many, many books under copyright have gone out of print and have copyright owners who can't be found. Perhaps the author didn't leave a will and her heirs don't know that they're now the owners of her copyrights. Perhaps the publisher went out of business, and whoever bought up its assets was thinking of the printing presses, not the copyrights. Problems like these confront a substantial fraction of all books in copyright; they make it essentially impossible to secure permission from everyone affected by Google's scanning. Thus, rejecting Google's fair use defense would have meant vetoing forever its attempts to create a comprehensive catalog. That would have struck me as a great loss.

Although Congress has debated ways of improving access to orphan works, legislation on the issue died in committee in the House last year. The settlement does what Congress hasn't; because the lawsuit is a class action, copyright owners are bound by the settlement's terms unless they speak up. Thus, not only can Google scan books whose owners say, "Yes, please," it can also scan books whose owners don't affirmatively say, "No way!" The class action sweeps in by default every book whose owner never shows up to say anything at all. Congratulations, orphan works owners, wherever you are: you're about to be part of Google's index.

The settlement, however, goes well beyond just book search. In addition to authorizing Google to scan and index books, the settlement lets it sell full-text access to them, either as individual book purchases or through a subscription to the entire collection. It may well turn into the world's largest bookseller. The deal seems broadly fair for authors and publishers; Google will pass 63% of the revenue from selling books to them. As for absentee orphan works owners, the settlement sets up a Book Rights Registry that will hold on their behalf the money Google collects from selling their books, paying out if and when they show up. In effect, this private settlement through litigation solves

a problem that has become stuck in the political process because it's so contentious. The result has great benefits for readers, for copyright owners, and of course, for Google.

The settlement in its current form also has substantial problems. It creates a significant danger that we might give control of the distribution of books and knowledge to one monolithic entity. If it becomes becomes a dominant platform, Google could well become the only game in town for serious online access to many books. The Registry will also have enormous power to establish the terms of access to books and copyrights.

The settlement makes almost no provision for the privacy of readers; Google could, under the settlement' terms, be tracking you as you read page by page. How much Marx; how much Marx Brothers? Google can do disturbing things with that information. Privacy is at the very heart of intellectual freedom.

Similarly, there are few protections in the settlement for consumer rights. If I went to a library and borrowed a book there, or if I bought a paperback at a bookstore, I'd have all sorts of guaranteed rights under copyright law. Google's version of electronic access may well take away many of those freedoms on the ground. I also wonder how consumers will feel if they buy a book only to discover that some of its pages are unreadable due to scanning mistakes—and what recourse they'll have if that happens.

How can one raise these issues in a way that makes sense in the context of the settlement?The public-interest principles I've mentioned—competition, privacy, and consumer rights—don't fit naturally into a purely private agreement worked out between the litigants. Shouldn't authors and publishers just be concerned with getting the most money out of the system? What right does anyone have to complain that they struck an amicable deal with Google?

No, the real issue here is the use of that class action device. The lawsuit didn't need to be a class action to answer the question of whether Google is legally permitted to scan books and make them searchable. Authors and publishers who objected to what Google was doing could simply have sued it for infringing their particular copyrights. They might have won; they might have lost. Either way, the ruling would have resolved the central legal issue.

But that's not how it was done. Instead, a few copyright owners filed the lawsuit in the form of a class action, dragooning everyone who owns a copyright into being one of the plaintiffs along with them. That includes a lot of people in this room. It may well include you. Until just now, did you realize that you were a plaintiff? I'm still not sure whether I'm a class member or not.

Out of that huge plaintiff class, there's one very large subclass unlikely to benefit from this agreement. I'm thinking of the very orphan works owners whose existence made this situation so problematic for Google in the first place. The orphan works owners are by definition the ones who can't be found. They couldn't be found to negotiate with Google originally, they can't be found to show up and claim their money under the settlement, and most importantly, they can't be found to show up and object that maybe the terms of this deal aren't what they would have wanted for themselves or for society.

Of course, this class-action bargain is necessary to make the deal work. It gives us, the reading public, access to all these books going forward. But as part of that deal, the small number of people who are actually in court are lining their own pockets, and not always in ways that are in society's best interests.

Thus, Google gets a legally backed head start on digitizing books and making them available. None of its competitors can go and start selling the whole corpus of books without getting individual permissions from every copyright owner. But of course they can't do that for the same reasons that Google couldn't initially do it. They'll have to file their own class action lawsuit, and there's no guarantee that they could find somebody to settle with them. Google has this market locked up: no one else can get the same kind of legal permissions it can.

I've heard the argument that we have class actions precisely so that courts can reach this sort of result. Isn't the whole purpose of a class action to resolve issues all at once like this? Yes and no. A typical class action involves someone who's made a dangerous drug or a product that doesn't work. Everyone who's bought one or is affected by one sues, the company pays out a pile of money, and it gets split up among everyone. It's compensation for wrongs done in the past.

This class action, though, this one is special. It's not just Google ponying up for past wrongs. Instead, this is a structural settlement; it reshapes the entire book industry by giving Google and Google alone access to this comprehensive out-of-print backlist. To make that happen, the settlement takes away the rights of people who aren't before the court. Indeed, knowing what we do about the orphan works problem in copyright law, we know that these absent class members are highly unlikely to be able to do anything about this massive giveaway to Google taking place supposedly in their name.

It's a version of Russell's paradox, applied to class action litigation. There's a class here that consists of all people who don't realize they're part of it. Under the guise of this class action, the named plaintiffs have been able to use the huge collection of orphan works copyrights as a bargaining chip. The named plaintiffs negotiated away everyone else's rights, lining up all those millions of books for Google's benefit. The orphans have become zombies, raised from the dead by the dark magic of a class action, turned into a shambling army under Google's sole control.

This, I submit to you, is not the way things ought to be done a democracy. We have political processes for resolving major social issues. We have a Congress; it holds hearings and passes bills. We have administrative agencies that can take expert advice and make reasoned decisions. The courtroom isn't supposed to be the place where we resolve huge issues that involve the carefully regulated copyrights of multi-million-member classes. Litigation is structured to sort out individual adversarial you-versus-me disputes. It's a uniquely bad way to sort out complex, sweeping questions—such as how we get at all of our information and all of our books.

The settlement is still a net positive for society: good things can come of corrupt practices. But we should be concerned that this isn't how it ought to be done. The parties here have reached a result that's different from what society has a right to expect. Perhaps the regular political processes are too jammed-up to be able to come up with something good for book search and orphan works on their own. But we shouldn't let that fact stop us from demanding something better than, "It's better than nothing."

---

*March 14, 2009*

Revision history:

- Revised for distribution (March 14, 2009)
- Initial presentation, <u>Google and the Future of Higher Education</u>, Georgetown University Library (February 27, 2009)

This essay is licensed under a Creative Commons Attribution 3.0 United States License. It is canonically available at http://james.grimmelmann.net/essays/ZombieArmy.

I welcome your comments, critiques, and corrections.