# Exhibit S

Publishers Weekly Mobile

Log In | Register    FREE Newsletter Subscriptions!


Invisalign can change that.    invisalign

| Home | PW in Print | Newsletters | Reviews | Bookselling | Book News | Book Life | Bestseller Lists | Commentary | Job Zone | Tools |

PWK    Publishing News    Web    Reviews    SEARCH    BookLife    ...Publishers Weekly... Limited time offer... Receive SUBSCRIBE TO Publishers Weekly Virtual Edition

PW Bookbrunch READ ALL ABOUT IT Fair Dealer    REPORTING LIVE FROM FRANKFURT BOOK FAIR 2009

⊞ Share  🔊 RSS  ⊞ Subscriptions  Reprints/License  🖨 Print  ✉ Email

## WME Letter About Google Settlement

-- Publishers Weekly, 8/17/2009 2:05:00 PM

WME has advised its clients, to opt out of the Settlement for the following reasons: We believe that our clients benefit from their stature, the negotiating power of the Agency, as well as long established precedent in our book contracts that other authors may not share. Our original memo was addressed to and meant for our clients alone. We give no advice to authors in general, and it might conceivably be in an individual author's best interest to not opt out of the Settlement. Our advice designed specifically to meet the needs of our clients.

The terms of the Settlement are interminable. The duration, in the absence of a subsequent court order, is for the term of copyright for each subject book. While an author may change his or her election to allow in- and out-of-print books to be sold under the terms of the Settlement, the overall terms and limitations of the Settlement cannot be modified by either party.

There is an important right that is relinquished under the terms of the Settlement that the Authors Guild does not adequately address. In addition to waiving their right to sue Google for infringement, they waive, again for the term of copyright, their right to have Google remove their work from its database if they haven't done so within twenty-seven months from the Notice Commencement Date. As of today, it appears to us that "nondisplay" uses constitute fair use, but it is impossible for anyone to predict that such use will always be the case. And if such inclusion is not fair use, there may come a time when the author or their heirs might wish to remove their work from the Google database for any reason. The authors waive that right, forever, if they do not opt out of the Settlement.

Few if any major publishers currently intend to make their "in print" works available for sale through the Settlement program. When it comes to "in print" works, the more restrictive instructions to Google from either the publisher or the author control. This means that if either the author or the publisher does not want an "in print" work sold through the program, Google will not have the right to sell it.

It appears that most major publishers will not allow their "out of print" books to be sold through the Settlement program either. In fact, we believe that most major publishers will take the position that none of their backlist is "commercially unavailable" as defined in the Settlement because the availability of on-demand and other electronic editions will constitute the works as being in print.

The Guild is confident that the terms of the Settlement will not impede an author's ability to negotiate separately with Google. However, we believe that the license being given to Google to publish and display with impunity out-of-print "orphan" works (where the rights owner is unknown and estimated by the Financial Times to be between 2.8 and 5 million books out of 32 million books protected by copyright in the United States) will open the door to establishing Google as the most comprehensive database, potentially a monopoly, with unfair bargaining power. Under current copyright law, no one can publish a book without the express written consent of the copyright holder. If the copyright holder cannot be found, permission cannot be obtained. While there are those who say that for the public good orphan works should be available, to give Google and Google alone this right, as well as a release from all claims, is simply not in the best interest of authors. The only way for any potential competitor to obtain similar rights, absent new legislation, is to infringe, get sued, and hope to reach a settlement on terms similar to Google's. We believe that giving Google special treatment does not appear to be the way to foster a competitive market place to the benefit of you, our authors.

It appears that only the rights owners of reverted works, if anyone, will sell books through the Settlement program, and since those same authors will necessarily need to negotiate separate terms for books published on or after January 5, 2009, there doesn't seem to be a compelling reason to lock in the royalty rate provided by the Settlement at the high cost of the other tradeoffs of the Settlement.

⊞ Share  🔊 RSS  ⊞ Subscriptions  Reprints/License  🖨 Print  ✉ Email

**TALKBACK**

» SUBMIT FEEDBACK

Advertisement


.TEL the World
How to Find Your Business
NetworkSolutions.

**RELATED INDUSTRY LEADERS**

Getty Images : Find an image. Clear it, and use it. Our image services couldn't be simpler

Getty Images : Tailored offerings for book publishers, including images, footage, music & more

Mark Logic : Build digital content products with our asset management & content delivery solutions

Mark Logic : Read our press releases for the latest on our data management & XML products

**MORE CONTENT**
BLOGS | PODCASTS | PHOTOS

Sorry, no blogs are active for this topic.

» VIEW ALL BLOGS

William Morris makes important poin....
*Michael W. Perry - 08/19/09*

» MORE

### RELATED CONTENT

| TOPICS | AUTHOR |

Guild Responds to Second WME Letter on Google Settlement 08/17/2009

Unsettled 08/24/2009

Authors, Publishers, Google Embrace Settlement 10/28/2008

Richard Sarnoff 01/05/2009

Soapbox: Path to the Future, Defend the Google Settlement 06/15/2009

### MOST POPULAR PAGES

'Hunger Games 2': A First Look

Unsettled: The PW Survey on the Google Book Settlement

Counting Down to 'Catching Fire'

*Mastering the Art of French Cooking* Reaches Young Readers Again

Fiction Book Reviews: 8/24/2009

Soapbox: We'll Be Back

### PW PARTNERS

| Book self publishing | Pre-Settlement Funding | Bills / Debt Hardship |
| --- | --- | --- |
| Self-Publishing Is Simple With CreateSpace. Free Setup. www.CreateSpace.com | Super Fast Pre-Settlement Funding Available 24/7 Call Now! addisonpsf.com/presettlementfunding | American Citizen: Credit/Debt help. Unsecured Debt of $10k+ may apply. www.NFS1.org |

Ads By Goooooogle

**Advertisements**





**VIRTUAL EDITION**



CLICK COVER FOR VIRTUAL EDITION
FAQ

### NEWSLETTERS

Click on a title below to learn more.

☐ PW Daily

- [ ] Religion BookLine
- [ ] Children's Bookshelf
- [ ] PW Comics Week
- [ ] Cooking the Books

[ Signup Now → ]

About Us | Advertising Info | Submissions | Site Map | Contact Us | Subscriptions

©2009 Reed Business Information, a division of Reed Elsevier Inc. All rights reserved.
Reed Elsevier Inc. All rights reserved.
Use of this Web site is subject to its Terms of Use | Privacy Policy

Please visit these other Reed Business sites

**Media & Publishing:**
Broadcasting & Cable | LA 411 | Library Journal | Multichannel News | New York 411 | Publishers Weekly | School Library Journal | Críticas | Tradeshow Week | Variety | Video Business

**Manufacturing:**
Control Engineering | Consulting Specifying Engineer | Design News | Industrial Distribution | Logistics Management | Kellysearch | Manufacturing Business Technology | Modern Materials Handling | Plant Engineering | Purchasing | Purchasing Data | Supply Chain Management Review

**Subscriptions:**
All Magazine and eNewsletter Subscriptions

**Business & Printing:**
Converting | DM2-DecisionMaker | Expert Business Source | Graphic Arts Blue Book | Graphic Arts Monthly | Hot Frog | Packaging Digest | Tracom Group | Zibb

**Gifts & Furnishings:**
Casual Living | Furniture Today | Gifts & Decorative Accessories | Home Textiles Today | Home Accents Today | Jewelers Circular Keystone | Kids Today | Playthings

**Hospitality:**
Chain Leader | Foodservice Equipment & Supplies | HOTELS | Restaurants & Institutions

**Electronics:**
EDN | Instat | PV Society | Semiconductor International | Test & Measurement World | TWICE

**Building & Construction:**
Building Design & Construction | CanaData | Construction Equipment | Custom Builder | Daily Commercial News | Housing Giants | HousingZone | Interior Design | Journal of Commerce | Market Insights | Professional Builder | Professional Remodeler | Reed Connect | Reed Construction Bulletin | Reed Construction Data | SmartBuilding Index | RS Means

# Exhibit T

# The Exchange Online
The Newsletter of the Association of American University Presses

**Categories:**
General
From the Archive
Miscellany
Calendar
Issues by Date
Fall 2006
Winter/Spring 2007
Fall 2007
Winter 2008
Spring 2008
Summer 2008
Fall 2008
Winter 2009
Spring 2009
Development
Association News
Marketing & Sales
Copyright & Related Issues
Reviews
International Affairs
Digital Issues
Publishing Technologies
Electronic Marketing
The Big Picture
Digital Publishing Projects
Books for Understanding
AAUP Annual Meetings
Design & Production
Green Publishing
Libraries
Press and University Relations

## 06/11/09

### Tracing the Impact of the Google Settlement

Filed under: General, Copyright & Related Issues, Digital Issues, Future of Scholarly Communications, Spring 2009

Posted by: site admin @ 9:09 am

Daphne Ireland
Director of Intellectual Property and Documentary Publishing, Princeton University Press

Everyone is talking about the Google settlement. On March 13 the Columbia Law School hosted "The Google Settlement: What Will It Mean for the Long Term?" a day-long symposium with exceptional speakers assembled from the publishing, legal, and academic spheres. Conference attendees, including nine rights professionals from AAUP presses, were privileged to hear expert debate on a broad continuum of issues. The day began by considering whether this class action settlement has the effect of legislation, continued with discussion of anti-trust concerns, and moved to projections about the future of book publishing, Google Book Search as compulsory license, and possible complementary orphan works legislation.

The first session of the day was "Legislating through Settlement." Mary Beth Peters, U.S. Register of Copyrights, observed that the settlement has a legislative effect without having been considered or approved by Congress. It incorporates aspects of legislation for orphan works, Section 108 library exceptions, treaty obligations, and compulsory licensing. Peters said she had many unanswered questions, including whether the Settlement is actually a compulsory license for the benefit of one company and what effect it might have on foreign authors and journal articles. She found it interesting that she had not been asked by Congress to comment on or study the scope of Settlement.

The technical aspects of the anti-trust question were addressed in "Competition Issues" by Randal C. Picker, Professor of Commercial Law at University of Chicago Law School. He identified in the Settlement three key features to measure how easily they might be multiplied to allow competition: digital files, scope of the rights license, and the mechanism of the Registry. How would competitors gain access to digital scans: will they negotiate anew with libraries for their own access and scanning, or will Google allow copying of their digital files? Is the scope of the settlement's rights license able to be multiplied among competitors? Is it possible to have multiple registries? For Picker, the core of the settlement is its "one-way most favored nation clause," which guarantees no other party can be offered license terms that are more

Future of Scholarly Communications
Governmental Affairs
In Memoriam
Writing of Place

Search:

[Search]

Archives:
June 2009
March 2009
February 2009
November 2008
September 2008
July 2008
March 2008
January 2008
October 2007
September 2007
August 2007
July 2007
June 2007
May 2007
March 2007
February 2007

Meta:
Login
Podcasts
RSS
Comments RSS

September 2009
M T W T F S S
    1  2  3  4  5  6
 7  8  9 10 11 12 13
14 15 16 17 18 19 20
21 22 23 24 25 26 27
28 29 30
« Jun

favorable than Google's terms in the settlement. Another anti-trust consideration is that even with competitors in this digital marketplace, Google could privilege its own book material through its Google search engine results ranking. Picker sketched an intriguing analogy between Google's search engine/digital file access regime and the public utility access regime of the nation's electricity grid. Finally, he explored the idea of the settlement as a compulsory license, where exclusive right holders are required to license works without prior approval on the condition that they receive royalties — similar to ASCAP and BMI in the music industry.

In "The Future of 'Books'," Richard Sarnoff, a chairman at Bertelsmann and Chairman of the Board of the Association of American Publishers (AAP), described the settlement as a confirmation of copyright law that sets up a mutually beneficial framework to speed the co-existence of print and digital publishing. Alan Adler, AAP, explained that it looks backward to resolve litigation and creates a path forward by designing a licensing structure to plug in with other competitors. He suggested that publishers may decide to place new works not covered by settlement terms (i.e., those copyrighted after January 5, 2009) under a Google Partner Program contract, the terms of which will likely parallel settlement terms. Lois Wasoff, former counsel at Houghton Mifflin, confessed to everyone's relief that the settlement is "a little tough to get your arms around." Business model and contract differences mean implications will be different among trade publishers, STM publishers, and university presses. Wasoff reported that most publishers will likely opt-in to the settlement, remove many of their works, and continue to participate in Google Book Search through the Partner Program. Richard Sarnoff summarized it well: "If you look at the settlement, there's one thing that's shot absolutely through it. It is the rights holder's choice—in every possible circumstance—that rules what happens with the rights holder's works. Outside of what I hope will be a radically shrinking number of truly orphaned works that are never claimed by anyone (and even within those, I hope with the right legislation we can handle them more actively), you are going to have the rights holder deciding whether the book will be in there in the first place, what the display uses are… and pricing…The entire settlement is set up with the full flexibility to decide how their work is to be used by Google or by anybody else."

Authors' opinions were surveyed in the panel "Authors and Incentives." Jan Constantine, counsel for the Authors' Guild, can see no downside for authors whose works are out-of-print, and applauded the development that authors and publishers will now move forward in mutual agreement about how works will be offered digitally. Arthur Klebanoff, a publisher and literary agent, highlighted the involvement of author estates in Book Rights Registry claims. In another vein, he commented that publishers will want to take care to remove previous editions of books from the Google offerings, to prevent inaccurate scholarship and edition confusion. Tracy Armstrong, President of Copyright Clearance Center, pondered the ramifications of Google Book Search, which she said certainly will include more self-publishing by authors. Armstrong speculated that one day Google Book Search's ubiquitous user-interface could become a storefront for self-publishing intermediaries, such as iUniverse and Blurb. She wondered about legitimate incentives for competitors since Google enjoys the "first-mover advantage from this 'ask forgiveness, not permission' model", and regretted that some parties might therefore imitate that illicit model.

"The Public Interest" panelists discussed whether the settlement sidestepped

library and public interest and whether other industries might use this class action structure to settle their legislative issues. In his opening statement, Alex MacGillivray, counsel at Google, said "Google is in this to make search better," to create access for researchers regardless of whether their library is financially privileged, and to serve the needs of the print-disabled. MacGillivray echoed Alan Adler's earlier observation that the Registry will be able license the corpus to third parties. Robert Darnton, Professor and Director of Harvard University Library, thoughtfully expressed that the settlement creates the possibility of a reader's utopia. However, he said that the Google Book Search corpus is so rich and unique that competition may be impossible. He also expressed concern that the settlement gives Google a "monopoly in fact" and that there is too great a potential for abuse of power by "ratcheting up prices" for institutional subscriptions over time, a practice he termed "cocaine pricing." But not all monopolies are bad, in particular those providing public services. Memorably, Darnton quoted an old General Motors motto, having adapted it to: "What's good for Google is good for the United States." He openly invited Congress to examine the settlement and its effect on public interest. Jeffrey Cunard, counsel for AAP at DeBevoise & Plimpton, expanded on the notion that the Registry can be a licensing agency, adding that it could administrate a compulsory license for non-commercially available works, should Congress decide to enact such a license. James Grimmelman, Associate Professor at New York Law School, was insightful and brief. He is concerned about concentrated power: direct price setting, a single dominant cultural source, preservation and quality issues, changing fair use, library Section 108, first-sale doctrine, and the incentive to remain exclusive. Grimmelman believes the settlement is workable with discrete changes, which include guarantees about privacy, making the Registry accountable through transparency and oversight by the Federal Trade Commission, and a modified "most favored nation clause." He believes this class-action settlement risks interpretation as a privately negotiated substitute for orphan works legislation.

Threaded through every panel were the topics of "out-of-print" and "non-commercially available works," at times imprecisely discussed as "orphan works." Google's exclusive possession of digital scans of orphan works from libraries is an indicator of monopoly. Yet all agreed that the settlement's greatest impact is the creation of new access to non-commercially available works. In Paul Courant's words: "What I've gotten out of today is that absolutely everybody thinks that meaningful orphan works legislation would greatly improve the quality of this settlement." Google and AAP have actively supported orphan works legislation for several years (as has AAUP). Access to truly orphan works is certainly in the public's interest. In listening to panelists, one can imagine Congress considering orphan works legislation in the form of a compulsory license to be administered by the Registry.

There have been a couple of developments since the outstanding March conference. On April 28, the Federal District of New York postponed the deadline for right holders to opt-out and/or file oppositions to the settlement, which is now September 5, 2009. In a separate move on the same day, the Justice Department announced its inquiry into the settlement's anti-trust issues.

There were many more speakers and compelling ideas, but this report attempts only to trace a continuum, highlighting possible long-term implications. It is likely the settlement will be approved in some form at some point in the coming year, and it has surely awakened interest on all sides.

*Peter Givler was instrumental in planning the conference and roster of distinguished speakers. The following university press attendees enjoyed this stellar symposium, as well as each others' views and good company at lunch: Lisa Bayer, Barbara Cohen, Carol Hupping, Daphne Ireland, Linda Klein, Mindy Koyanis, Jill Phillips, Clare Wellnitz, and Vicky Wells. No briefing can adequately convey the depth of the conference; fortunately, a video is available online. For details and discussion, please watch the symposium at http://kernochancenter.org/Googlebookssettlementrecording.htm*

Comments are closed.