# Exhibit V

# CHICAGO

### JOHN M. OLIN LAW & ECONOMICS WORKING PAPER NO. 154
### (2D SERIES)



# Indefinitely Renewable Copyright

*William M. Landes and Richard A. Posner*

## THE LAW SCHOOL
## THE UNIVERSITY OF CHICAGO

This paper can be downloaded without charge at:
The Chicago Working Paper Series Index:
http://www.law.uchicago.edu/Lawecon/index.html

The Social Science Research Network Electronic Paper Collection:
http://ssrn.com/abstract_id=319321

(wine and cigar bars, health clubs, and so forth) because it is easier in the former case to identify the innovator. Many people could probably make credible claims of being the first to come up with the idea of baggy pants or pastel shades of clothing or combining exercise and social opportunities under the same roof. Having the legal system try to sort out these competing claims would involve substantial costs that would usually be avoided when someone was seeking to restore a copyright in an obscure public domain work and would never arise when one was seeking merely to renew an existing copyright.

Third, many new business ideas may now be legally protectable by "business method" patents. Such protection often provides incentives for firms to invest in marketing and promotion that would be subject to free riding in the absence of protection.

## IV. EMPIRICAL ANALYSIS OF COPYRIGHT
### REGISTRATIONS AND RENEWALS

Data on copyright registrations and renewals during the past 100 years bear directly on the subject of this paper. If it turned out that all or most copyrighted works created before the 1976 Copyright Act (which became effective on July 1, 1978) were renewed, the implication would be that a system of indefinite renewals might approach perpetual copyright, though this would also depend on how steep the renewal fee was. Conversely, if renewals are infrequent even under the current system of nominal fees,[44] then probably only a relatively few highly valuable works would remain under copyright beyond the initial term even if indefinite renewals were permitted.

### A. The Data

The U.S. Copyright Office publishes data on registrations and renewals.[45] Although the number of registrations is only a proxy for the number of copyrighted works because registration has always been optional, the 1909 and 1976 copyright acts created strong incentives to register a copyright and to register it promptly. Not only is registration (or, under the 1976 Act, an application to register) a prerequisite for filing a suit for infringement,[46] but it must be done before the infringement (or within three months of first publication) if the copyright holder wants to recover statutory damages and attorney fees. As noted earlier, the 1909 Act fixed the copyright term at 28 years from the date of first publication (or, for works that were copyrighted but not published, from

---

[44] See note 7 above.

[45] See *Annual Report of the Register of Copyrights*, various years, published by the U.S. Copyright Office. See also Barbara A. Ringer, "Renewal of Copyright," in *Studies on Copyright: Arthur Fisher Memorial Edition*, vol. 1, p. 503 (1963 [1960]).

[46] Under the Berne Convention Implementation Act of 1988, the registration requirement only applies to a "United States work"—i.e., a work first published in the United States or where the author is United States national or lives here. See Sec. 101 for a complete definition of an "United States work."

the date of registration), and at the end of the term the copyright could be renewed for an additional 28 years (raised to 47 years in 1962 and to 67 years in October 1998) if the copyright holder applied for renewal within the last year of the initial term. Beginning in 1992 renewal became automatic,[47] so renewal registrations were sure to decline after that, but not to zero because there was still an incentive to file, mainly because a renewal registration is prima facie evidence of the validity of the copyright during its extended term and of the facts stated in the certificate of renewal. Another important change in the law was the extension of federal protection by the 1976 Act from published works to all works fixed in a tangible medium, whether or not they are published. This change could be expected to increase the number of registrations without any increase in the output of copyrightable works.

Our primary focus is on renewals because they allow us to estimate the expected economic life of a copyright.[48] But we need data on registration as well because the number of initial registrations determines the number of works that are potentially renewable 28 years later. For example, works renewed in 1938 were registered initially in 1910. To obtain the number of 1910 registrations, however, we have to deduct renewal registrations in 1910 (from works first copyrighted in 1882) because the Copyright Office includes renewal registrations in its tabulation of registrations.

### B. Copyright Registrations and Renewals

Figures 2, 3, and 4 illustrate registrations, renewals, and the renewal/registration ratio, respectively, over the past century; the renewal/registration ratio in year *t* being simply the number of renewals in *t* divided by the number of initial registrations in *t* − 28.

---

[47] Remember that these are renewals of copyrights that date from before the effective date of the 1976 Act, which gave the copyright owner a nonrenewable term of life plus 50 (later 70) years.
[48] Economists have used patent application and renewal data to estimate the expected life and distribution of patent values. For a summary of these studies, see Jean O. Lanjouw, Ariel Pakes, and Jonathan Putnam, "How to Count Patents and Value Intellectual Property: Uses of Patent Renewal and Application Data," 46 *Journal of Industrial Economics* 405 (1998). See also note 64 below.

## FIGURE 2
## COPYRIGHT REGISTRATIONS (EXCLUDING RENEWALS)



## FIGURE 3
## RENEWALS IN YEAR T



Figures 2 and 3 reveal that copyright registrations and renewals rose rapidly in the twentieth century, but that, as expected, renewals began to decline in 1992 when they became automatic.[49] The rise doubtless reflects an increase in the number of copyrightable works brought about by growth in the output of expressive activities, as well as reflecting changes in the copyright law. Why, then, did both registrations and renewals peak in 1991, declining by almost 20 percent by 2000, with the decline concentrated in the last year? The answer may be, in part anyway, that the registration fee was doubled in 1991, from $10 to $20, and increased again in 2000, to $30, while the renewal fee was doubled to $12 in 1991, rose to $20 in 1993, and more than doubled, to $45, in 2000. Although these fees seem small in relation to the inconvenience of registering and complying with other requirements of registration, such as submis-

---

[49] Recall that the 1909 Copyright Act (effective July 1, 1909) extended the renewal term from 14 to 28 years. Works that been renewed for 14 years in the period 1895 to 1909 were entitled to a further renewal of 14 years, for a total renewal period of 28 years. We do not include the 14-year extensions in our count of renewals in the 1910 to 1923 period. Our analysis of renewal data begins with the fiscal year ending June 30, 1910, the first fiscal year of the 1909 Act.

sion of a copy of the work to the Copyright Office,[50] Figures 2 and 3 suggest substantial negative responses to higher fees for both original and renewal registrations. The effect on the latter is more ambiguous, of course, because of the automatic renewal amendment in 1992, although the amendment did not eliminate all incentive to register a renewal, since by doing so an author could recapture rights in already created derivative works

FIGURE 4
RATIO OF RENEWALS IN T TO REGISTRATIONS IN T – 28

As Figure 4 shows, the fraction of works renewed increased significantly between 1910 and 1991, then plummeted—no doubt mainly because of automatic renewal, though higher fees may also have played a role.[51] Prior to 1992 (the first fiscal year for automatic renewal), renewal rates ranged from a low of .03 in 1914 to a high of .22 in 1991. Although the full cost of renewal includes both a small renewal fee and the monetary equivalent (probably small) of the inconvenience and other costs associated with renewal, the fact that a small fraction of works are renewed implies that most copyrights have very little economic value after 28 years. Put differently, the decision to renew a copy-

---

[50] Another reason for the decline in registrations may be that since March 1989 registration has no longer been a condition for bringing an infringement suit for foreign works protected by the Berne Convention and the World Trade Organization, though it is remains a prerequisite for seeking statutory damages and attorneys fees. The fact has little quantitative importance, however, because foreign works are only a small fraction of copyright registrations. See text at note 54 below.

[51] We analyze the impact of fee changes in the regression analysis below, but point out here that it would be a mistake to think that the ratio of renewals to registrations should not change in response to higher fees for *both* renewals and registrations. The mistake lies in failing to note that the ratio of renewals to registrations is calculated from renewals in year *t* and registrations in year *t*–28, and obviously an increase in fees in 1991 could not affect the number of registrations in 1963, the denominator in the 1991 ratio. The only effect of higher fees on that ratio would come through the effect of a higher renewal fee on the number of renewals that year. Note also that the renewal ratio in Figure 4 is biased downward from 1910 to 1937 because registrations data from 1881 to 1909 include both new registrations and 14 year renewal registrations (from works first registered in 1867 to 1895). We account for this bias in our regression analysis

right depends upon a comparison of the discounted value of the expected future revenues from the copyright compared to the full costs of renewal. If the latter exceeds the former, the copyright will not be renewed. Since only a small fraction of works are renewed, it follows that the expected economic value of the 80 percent or so of copyrighted works that are not renewed is less than the small cost of renewal. The analysis would not be changed in essentials if, to reduce administrative costs, an owner of copyrights made a one-time decision to renew all his copyrights when they expired.

Of course, we cannot dismiss the possibility that some fraction of nonrenewals are due to simple oversight, or careless failure to comply with required formalities. Ignorance of renewal formalities is possible even when the work was initially registered, as the book or other work may have gone out of print (or the equivalent for nonbooks), the copyright may have reverted to the author by contract, and the author may not know about renewal or the renewal date. Nonrenewals by corporations or other owners of works for hire might therefore be a better index of decisions not to renew based on lack of commercial value; but we do not have those data.

If, as both the raw data in Figures 2 and 3 and the regression analysis indicate, registrations and renewals respond significantly to modest changes in fees, it is likely that (1) the size of the public domain will expand under a system of indefinite renewals compared to the present copyright system; (2) the average value of works in the public domain will decline; (3) the expected economic life of most copyrighted works is short;[52] and (4) a system of indefinite renewals, at least if limited to works copyrighted after the system is created, will separate valuable works in which continued copyright protection may be socially efficient from works in which the cost of continuing that protection almost certainly exceeds the sum of administrative and access (including transaction) costs.

### C. Depreciation and the Economic Life of Copyrights

Depreciation rates of copyrighted material can be calculated from data on renewals and registrations. Initial registrations constitute one year's stock of copyrighted works. Renewal registrations of those works constitute a different, smaller stock of the same works 28 years later (renewals must be registered in the last year of the initial term). The annual rate at which the first stock shrinks to become the second is the depreciation rate of the first stock. That rate is given by $REN_t = (REG_{t-28})e^{-\delta t28}$ where $REN_t$ denotes renewals in $t$ of works registered 28 years earlier (=$REG_{t-28}$) and $\delta$ equals the annual average depreciation rate for copyrights registered in period $t-28$. Figure 5 depicts annual depreciation rates, measured in year $t$, of works 28 years earlier. Thus the depreciation rate of .054 in 1990 (5.4 percent) is the annual de-

---

[52] The actual life of some of these works is longer; an author may err in his estimate of the demand for his work and therefore fail to renew his copyright, though in fact the work has continued value.

Case 1:05-cv-08136-DC   Document 276-13   Filed 09/08/09   Page 8 of 44

preciation rate of works registered in 1962. The higher the renewal ratio, of course, the lower the depreciation rate, since we are computing the depreciation rate from the fraction of copyrighted works that are renewed.

Figure 5 indicates that the average annual depreciation rate of copyrighted works has ranged from a low of 5.4 percent in 1990 to a high of 12.2 percent in 1914 (for works first registered in 1886), the overall average being 8.3 percent.[53] The long-term trend (setting to one side the effect, beginning in 1992, of automatic renewal) is toward lower depreciation, implying that copyrightable works have become more valuable. One reason may be the increase beginning in 1962 in the renewal term from 28 to 47 years, which increased the present value of copyrights by extending their potential term. But given discounting, the effect should not have been great, and so it is not surprising that most of the decline in the depreciation rate occurred before 1962.

Why there was *any* decline in depreciation is unclear, however. Even if the demand for copyrightable works has been growing, the supply of new works would be expected to respond at roughly the same rate in order to keep the real value of copyrights roughly constant. One possible reason for the decline in depreciation is that new technologies, such as long-playing records, stereo equipment, radio, and television, have extended the economic life of copyrights. For example, the growth in demand for prerecorded music made possible by technological advances such as radio and television broadcasting, high-quality home stereo systems, and even the automobile (which increases the number of people listening to radio) should have increased the overall demand for copyrighted music. Some of this demand would be satisfied by older though still copyrighted music, resulting in higher renewal rates and hence a lower depreciation rate.

### FIGURE 5
### ANNUAL DEPRECIATION OF REGISTERED COPYRIGHTS



---

[53] As noted earlier, estimates of depreciation for the years 1910 to 1937 are biased downward because registration data in the period 1882 to 1909 include renewal registrations.

Here we should mention a complication arising from the fact that as a result of the signing of the Berne Convention by the United States, copyright protection was restored for a number of works that were protected in their country of origin but had fallen into the public domain in this country, mainly because of failure to comply with the requirements of notice or renewal. This has two potential effects on the calculation of depreciation. First, if foreign works were less likely to be renewed (or more likely to fall into the public domain because of improper notice) than U.S. works, depreciation of the latter would be lower than shown in Figure 5. Second, the size of the public domain would be smaller today. These effects are likely to have only a negligible impact on our empirical analysis, however, because we estimate that foreign works constitute only between 1 and 5 percent of copyright registrations.[54]

The reciprocal of depreciation is the average expected life of a copyrighted work. Although the statutory term of copyright works first published in the period 1881 through 1972 and renewed for a second term varied from 56 to 95 years, the commercial life $(=1/\delta)$ of the average copyrighted work was much lower, ranging from 8.19 years to 18.5 years for works first registered in 1886 and 1962, respectively. In the first group, 3.3 percent were renewed (in 1914); in the second, 22 percent were renewed (1990).

It is also possible to estimate the number of works registered in 1934 that retain commercial value today. We chose that year because works first published then could be renewed for 47 years in 1962, and another 20 years were tacked on in 1998, so that a copyright first registered in 1934 need not enter the public domain until 2029. Yet the estimated depreciation rate of works registered in 1934 is .07, implying that of the works registered that year 50 percent had fully depreciated by 1944, 90 percent by 1977, and 99 percent by 2000; fewer than 1 in 750 works registered in 1934 will have commercial value in 2030. Had renewals been permitted every five or ten years, then after an initial term of 20 or so years about 99 percent of the works registered in 1934 would have fallen into the public domain by the year 2000 because by then their commercial value had fallen below the cost and inconvenience of renewal. Of course, the 1 percent that would still be under copyright would mainly be the more valuable and enduring works.

### D. Depreciation Rates for Books, Graphic Arts, and Music

The Copyright Office publishes separate data on registrations and renewals for books (including, however, pamphlets—which indeed account for 80 percent of the category), music, and graphic arts (applied art, posters, fine arts, labels, photographs, technical drawings, and maps). As shown in Figure 6, the time trend of these three categories closely tracks the time trend of overall registrations (the correlation is .99). This is not surprising, because these categories account for 70 percent of all registrations.

---

[54] We were able to obtain foreign registrations for only some of the years between 1961 and 1977, however.

**FIGURE 6**
**REGISTRATIONS OF ALL COPYRIGHTS, BOOKS, MUSIC, AND GRAPHIC ARTS**



In Figure 7 we see that the number of musical copyrights has grown the fastest, the number of book copyrights the second fastest, and graphic arts the slowest. We estimated simple regressions of the form $log\ y_t = a + rt + u$, where $y$ denotes either book, music, or graphic art registrations, $t$ time, and $u$ the residual. The coefficient $r$, which measures the rate of growth per year, equaled .021 (24.5) for books, .025 (41.5) for music, and .014 (7.44) for graphic arts. The t-statistics (in parentheses) indicate that these growth rates are highly significant.[55] The differences in growth rates between any two of the three categories are also statistically significant.

---

[55] However, books include periodicals for the 1909–1926 period, which artificially increases the number of book registrations in that period and so lowers the estimated rate of growth. If we estimate the growth rate from 1927 (rather than 1909) to 2000, the coefficients (and t-statistics) on $r$ are .024 (27.4) for books, .026 (33.3) for music, and .022 (12.8) for graphic arts. Although the growth rates for books and music are much closer, all differences remain statistically significant at the .10 level.

FIGURE 7
SEPARATE REGISTRATIONS FOR BOOKS, MUSIC,
AND GRAPHIC ARTS



We can also link up renewals with registrations for each of the three cate-
gories to estimate category-specific depreciation rates, though since the earli-
est category-specific registration data we have are for 1909, we can only use
renewal data starting in 1937. Figures 8 and 9 graph the renewal ratio and
depreciation rates.

FIGURE 8
THE RATIO OF RENEWALS IN T TO REGISTRATIONS IN T–28



## FIGURE 9
### DEPRECIATION IN T OF REGISTRATIONS IN T-28



Notice that only about 3 percent of graphic-arts works were renewed after 28 years, compared to 8 percent for books and 32 percent for music which peaked at more than 40 percent for works renewed in 1944 and 1956. Music renewal rates have been falling sharply since 1956, while book renewal rates have been rising during this period so that by 1969 renewal rates were greater for books than music for works first copyrighted in 1942. By the same token, depreciation rates are highest for graphic arts (averaging about 14 percent) and lowest for music (about 4 percent), with books in the middle (above 9 percent).[56] We also observe declining depreciation rates for both books and graphic arts, while depreciation of music began to increase in the mid-1950s and by 1969 was just slightly below that of books.

What explains these differences? The graphic-arts category is dominated by commercial art, such as advertising layouts and fabric designs for fashion items, the useful life of which tends to be no longer than the advertising campaign or latest fashion season. (Mickey Mouse is a dramatic exception.) At the other extreme, music written for one use can have many other uses in the future. For example, a song written for a Broadway show might be recorded by many different artists over a long period of time or be used as background music in a movie or a television program.[57] In addition, music is less tied to cultural change than purely verbal works, which are often extremely topical and

---

[56] We noted earlier that of 10,027 books published in 1930, only 174 were still in print in 2001. An annual depreciation rate of 5.7 percent would produce this more than fifty-fold decline. From our data, we estimate a depreciation rate of 8.9 percent for books registered in 1930, but this is the average rate over the period 1930 to 1958 (the date of renewal). Overall, the depreciation rate for books is 9.2 percent for books registered between 1909 and 1941. The probable explanation for the discrepancy between this rate and the 5.7 percent estimate is the fact noted in the text that the book category in our data includes pamphlets and leaflets, which tend to be ephemeral.

[57] Rappaport, note 36 above, at 3 n. 5 remarks that "in the case of music,...its 'timeless' quality allows themes to be recycled endlessly." Notice, however, that depreciation rates of music rose in the 1956 to 1969 period, suggesting that more recent popular music is less durable than works created in the 1920s and earlier.

therefore depreciate rapidly. Books are more enduring than most applied art if only because the costs of storing them is relatively low and there is some chance of turning a book into a movie or rekindling interest in the author.

Whatever the reasons for the differences in depreciation rates across these categories, the differences bolster the case for indefinite renewals. Current copyright law does not differentiate among different types of work. All copyrightable works, from computer programs to novels to installation art (which is typically site-specific and lasts only the length of the exhibition), have the identical term despite the large differences in commercial life expectancy. A system of indefinite renewals would automatically distinguish the enduring from the ephemeral. Most works of graphic art probably would not be renewed even if the initial term were only five years. Because books and music are likely to have more lasting value, their renewal rates would be greater. We have seen that it may be socially beneficial to continue property rights in—and only in—intellectual property that retains sufficient value to offset access and administrative costs, because of the investment disincentives and congestion externalities that are likely to result when valuable property is unowned.

### E. Regression Analysis

We can use multiple regression analysis to estimate the impact on registrations and renewals of changes in fees, statutory changes in copyright law, and changes in the underlying demand for expressive works. Tables 1 (registrations) and 2 (renewals) present the results of our regression analysis, which provide additional insight into the likely effects of a system of indefinite renewals.

The dependent variable in Table 1 is the logarithm of the annual number of registrations in the period 1910 to 2000. We present both OLS (ordinary least squares) and Cochrane-Orcutt estimates (the latter to correct for significant autocorrelation). The independent variables in equations (1.1) and (1.2) are a time trend (*Year*), the copyright registration or renewal fee (*LogFee*) deflated by the Consumer Price Index (CPI), the expected copyright duration (*LogE(Life)*) computed from our estimates of depreciation, and annual recreation expenditure (*LogRecExp*) that are for expressive (and thus often copyrighted) works of music, movies, books, and periodicals),[58] also deflated by the CPI. The registration, fee, duration, and recreational-expenditure variables are in log form; their regression coefficients are therefore elasticities. Equations (1.3) and (1.4) add several dummy variables denoting significant changes in the copyright statute that are likely to effect the number of registrations. These include the 1962 amendment extending the renewal term to 47 years (*1962RenExt*), the extension of copyright protection to sound recordings in 1972 (*1972Sound*), the 1976 Copyright Act, effective in 1978 (*1976Act*), the

---

[58] We estimate that expenditures on expressive goods account for about 50 percent of the recreation category.

1988 ratification of the Berne Convention effective in 1989 (*1988Berne*)[59] and the 1998 (Sonny Bono) Copyright Term Extension Act (*1998BonoExt*), which added 20 years to the copyright term. These variables take a value of 1 for all years in which the given change is in effect and of 0 otherwise.

All four equations reveal a significant growth rate of copyright registrations of about 1 to 2 percent per year. The time trend variable (*Year*) picks up increases in population, income, wealth, and education that are positively correlated with time over the 90-year period covered by our data and are likely to increase the demand for expressive activities. A positive time trend was visible in Figure 2, but regression analysis enables us to conclude that the trend is the result of (or at least is positively correlated with) an increase in the underlying growth in demand for expressive activities rather than of changes in fees, the law, or other policy variables. Although the regression coefficients on recreation expenditures are positive in all the equations in Table 1, only the OLS estimates (equations (1.1) and (1.3)) are statistically significant.

The most interesting result in Table 1 is the negative and highly significant effect of registration fees (t-statistics between 4.6 and 9.1) on registrations. The coefficients on fees yield a negative elasticity of around .20, implying that a 25 percent increase in fees would reduce copyright registrations by more than 5 percent, even though fees are very small. (For example, the registration fee in 2000 was only $30, and it had averaged only $20.48 in 2000 dollars over the 1910 to 2000 period.) The implication is that most copyrights have negligible expected value, because even very small increases in already very low fees deter many owners of intellectual property from seeking to register it. While registration is now optional rather than a precondition of obtaining a copyright, it confers procedural advantages that should motivate any copyright holder who thinks his work retains significant commercial value to register his copyright.

The number of registrations is also highly responsive to the expected commercial life (*LogE(Life)*) of a work, which for all but a few works is shorter than the statutory copyright term. For example, a 10 percent increase in that expected life leads, other things being equal, to a 3.2 percent increase in registrations in equation (1.4), and this effect is highly significant statistically.[60]

Of the remaining variables, only the 1976 Copyright Act and 1988 Berne Convention dummy variables have statistically significant effects on registrations after we adjust for autocorrelation. Extending the renewal term in 1962 and adding sound recordings to the Copyright Act in 1972 have positive and significant effects on registrations in the OLS but not in the Cochrane-Orcutt estimates. It is not surprising that the term-extension variables (in 1962 and

---

[59] The Copyright Act was amended in 1988 (effective in March 1989) to comply with the substantive provisions of the Berne Convention. The most significant amendment was to make copyright notice optional.

[60] The only exception to the significant effect of *LogE(Life)* is equation (1.1). But the significance of this equation in our analysis is marginal because it does not adjust for autocorrelation and excludes five important statutory variables.

1998) are insignificant, because the expected commercial life of a copyrighted work is so much shorter than the copyright term, making an increase in the term irrelevant to most potential registrants. Amendments to the Copyright Act that accompanied ratification of the Berne Convention are associated with about a 10 percent increase in registrations. These amendments (e.g., notice and the need to record some transfers and licenses became optional) effectively lowered the full cost (including inconvenience costs) of registration, which in turn should increase the number of registrations.[61]

TABLE 1

REGRESSION ANALYSIS OF REGISTRATIONS

(*t*-STATISTICS IN PARENTHESES)

| Independent Variables | Log Registrations | | | |
|---|---|---|---|---|
| | OLS (1.1) | COREG (1.2) | OLS (1.3) | COREG (1.4) |
| Year | .013 (3.71) | .018 (5.44) | .005 (1.88) | .018 (4.78) |
| LogFee | −.31 (9.06) | −.24 (5.57) | −19 (5.93) | −.20 (4.67) |
| LogE(Life) | .07 (.79) | .35 (3.79) | .37 (4.01) | .35 (3.57) |
| LogRecExp | .20 (2.49) | .03 (.50) | .18 (2.56) | .02 (.26) |
| 1962RenExt | — | — | .08 (2.28) | .02 (..39) |
| 1972Sound | — | — | .16 (3.80) | .03 (.48) |
| 1976 Act | — | — | .07 (1.77) | −.14 (2.19) |
| 1988Berne | — | — | .12 (2.86) | .11 (1.86) |
| 1998BonoExt | — | — | .02 (.27) | .06 (1.06) |
| Constant | −13.8 (2.43) | −24.1 (5.11) | −.92 (.19) | −24.3 (3.47) |
| Durbin-Watson | .50 | 2.25 | .87 | 2.11 |
| rho | — | .84 | — | .88 |
| $R^2$ | .97 | .72 | .98 | .66 |
| No. observations | 90 | 89 | 90 | 89 |

---

[61] An offset, however, is that registration for Berne Convention and WTO works is no longer a prerequisite to being able to sue for copyright infringement, though registration is still required for certain remedies.

One puzzling result is that the 1976 Act seems, after correction for other factors, to have reduced the number of copyright registrations by about 14 percent. Since the Act eliminated common law copyright and brought unpublished works under the federal statute, one would have expected the number of registrations to increase. The negative coefficient on the 1976 Act is the consequence of a sharp drop in registrations in 1978 (the year the Act took effect)—from more than 420,000 in 1977 to 310,742 in 1978, followed, however, by an increase to more than 400,000 the following year. If equation (1.4) is re-estimated treating fiscal year 1979 rather than fiscal year 1978 as the first full year of the 1976 Act, the coefficient on the *1976 Act* variable becomes positive and highly significant (.16 with a t-statistic of 3.08), indicating a 16 percent increase in registrations as a result of the Act. There are no changes in the effect of the other variables when we date fiscal year 1979 as the first year of the 1976 Act.

In Table 2 the dependent variable is the log of the number of renewals per year. Equation (2.1) presents OLS estimates and equation (2.2) Cochrane-Orcutt estimates. Since renewals depend in part on the number of works registered 28 years earlier, we include two registration variables—one for annual registrations from 1882–1910 and the other for annual registrations from 1911–1972—to account for the fact that data on registrations included both new registrations and renewal registrations through (most of fiscal year) 1910. We do not include variables for the 1972, 1976, 1988, and 1998 statutory amendments, as we would not expect them to affect renewals, holding registrations constant. For example, adding 20 years to the renewal term in 1998 increased the expected value (though only slightly) of a renewal but did not affect the incentive to renew because beginning in 1992 renewals had become automatic.

TABLE 2
REGRESSION ANALYSIS OF RENEWALS
(T-STATISTICS IN PARENTHESES)

| Independent Variables | Log Renewals | |
|---|---|---|
| | OLS (2.1) | COREG (2.2) |
| *Year* | .018 (2.56) | .023 (2.61) |
| *LogFee* | −.09 (1.08) | −.22 (2.13) |
| *LogReg$_{-28}$1882-1910* | .95 (10.34) | .86 (5.18) |
| *LogReg$_{-28}$1911-1972* | .99 (10.64) | .89 (5.38) |
| *LogRecExp* | −.02 (.14) | −.12 (.67) |
| *1962RenExt* | −.07 (.69) | −.06 (.48) |
| *1992AutoRen* | −.64 (6.37) | −.47 (3.82) |
| *Constant* | −36.4 (3.10) | −44.0 (2.99) |
| *Durbin-Watson* | 1.08 | 2.12 |
| *rho* | — | .55 |
| R$^2$ | .98 | .90 |
| *No. Observations* | 90 | 89 |

Table 2 indicates that renewals are highly responsive to registrations 28 years earlier. Not only are both regression coefficients highly significant, but we cannot reject the hypothesis that the coefficients are both equal to one—that is, that for each 1 percent increase in registrations 28 years earlier, renewals increased by 1 percent. As expected, the automatic renewal amendment in 1992 is statistically significant and indicates that renewals fell by about 50 percent after the amendment. Extending the renewal term from 28 to 47 years beginning in 1962 had no significant effect on renewals, but this is not surprising. Consider the copyright holder who has to decide whether to renew his copyright after expiration of the initial term of 28 years. Since the expected additional commercial life of such works is likely to be shorter than 28 years, adding 19 years to the renewal period should not significantly influence the decision whether to renew.

Turning to the *Year* variable, we find a statistically significant increase in renewals of 2 percent per year (holding registrations eligible for renewal constant). This is consistent with a long-term growth in the demand for and hence in the value of expressive activities, since in response to that growth copyright holders would have a greater incentive to renew their copyrights. After adjusting for this upward trend, we do not find any significant effect of recreation expenditures on renewals.[62]

Like initial registrations, renewals are responsive to changes in fees. Although the coefficient on fees in not significant in equation (2.1), autocorrelation in the OLS estimate produces standard errors that are not unbiased. Equation (2.2) corrects for this bias and reveals a statistically significant effect of fees on renewals: a 10 percent increase in the inflation-adjusted renewal fee results in a 2.2 percent decrease in the number of renewals.[63]

### F. Trademark Renewal Rates

Additional light is cast on our subject by considering renewal rates for trademarks. A trademark has no fixed expiration date, but maintaining a federally registered trademark (which like a registered copyright confers procedural advantages) requires the owner to file an affidavit during the sixth year after registration, and in every tenth year, stating that the trademark is still in use, and he must also file a renewal application every 10 years.[64] Prior to the Trademark Law Revision Act of 1988 (effective November 16, 1989), registrations and renewals remained in force for 20-year periods subject to the owner's having to file an affidavit of continued use every 10 years. Thus, the Act reduced both the registration and the renewal periods to 10 years. Since there is no limit on the number of times a trademark can be renewed, we have in trademark law a model for how a system of indefinite copyright renewals might operate.

Since trademarks can be renewed indefinitely, renewals in period $t$ arise from (1) trademarks first registered in $t - 20$ and (2) trademarks registered initially in $t - 40$, $t - 60$, and so on that had been continuously renewed (the last time in $t - 20$) and are still in force at time $t$.[65] Assuming a constant rate of depreciation for trademarks in the interval $t - 20$ to $t$, we have the following

---

[62] This result is expected since there is a .87 correlation between the logarithm of recreation expenditures and *Year*.

[63] The reason equations (2.1) and (2.2) do not include an independent variable for the expected life of a copyrighted work is that renewals are used to estimate depreciation and hence expected duration, so that adding the log of expected duration to the right-hand side of the regression equation would place the log of renewals for the same year on both sides of the equation.

[64] 15 U.S.C. § 1058.

[65] Since our renewal data run through the end of fiscal year 1999 (September 30, 1999), slightly less than a decade after the Trademark Law Revision Act went into effect, all renewals in our sample come from trademarks that had been in force for at least 20 years.

identity: $REN_t = (REG_{t-20} + REN_{t-20})e^{.520}$ where $REN$ and $REG$ denote renewals and registrations respectively, $t$ denotes time, and $\delta$ the depreciation rate.

Figures 10 and 11 plot renewal and depreciation rates for trademarks from 1934 to 1999, the period for which we have data. Trademark renewals averaged 27 percent, annual depreciation was 6.6 percent, and the expected life (equal to the reciprocal of depreciation) was 15.4 years. Trademark renewal rates and the average effective life of a trademark are greater and depreciation lower than the corresponding data for copyrights (see Figures 4 and 5). For an exact comparison, between 1934 and 1991[66] trademark renewals averaged 28 percent, depreciation was 6.4 percent, and the expected life was 15.7 years, while the corresponding figures for copyright renewals were 14 percent, 7.3 percent, and 14 years. Notice that although trademark renewal rates are double copyright renewal rates, the difference in depreciation and in life expectancy is less than 15 percent. The reason is that during that era trademarks were renewed after 20 years but copyrights after 28 years. So we would observe substantially higher renewal rates for trademarks than for copyrights even if depreciation were the same.

### FIGURE 10
### THE RATIO OF TRADEMARK RENEWALS IN T TO REGISTRATIONS RENEWALS IN T – 20: 1934–1999



66 We use these dates because 1934 is the earliest year for which we are able to calculate trademark renewal rates (which requires that we have renewals from 1914) and 1991 is the last year for accurately estimating copyright renewals because renewals became automatic starting in 1992.

# Exhibit W

SEARCH BLOG   FLAG BLOG   SHARE   Next Blog»                    Create Blog | Sign In



Search
powered by Google™

Site Feed

Google

534K readers
BY FEEDBURNER



The Official **Google** Blog    Insights from Googlers into our products, technology, and the Google culture.

**Archives**

Archives

**More Blogs from Google**

Visit our directory for more information about Google blogs.

## Google Print and the Authors Guild

9/20/2005 09:04:00 PM
Posted by Susan Wojcicki, Vice President, Product Management

Today we learned that the Authors Guild filed a lawsuit to try to stop Google Print. We regret that this group chose to sue us over a program that will make millions of books more discoverable to the world -- especially since any copyright holder can exclude their books from the program. What's more, many of Google Print's chief beneficiaries will be authors whose backlist, out of print and lightly marketed new titles will be suggested to countless readers who wouldn't have found them otherwise.

Let's be clear: Google doesn't show even a single page to users who find copyrighted books through this program (unless the copyright holder gives us permission to show more). At most we show only a brief snippet of text where their search term appears, along with basic bibliographic information and several links to online booksellers and libraries. Here's what an in-copyright book scanned from a library looks like on Google Print:

Sign up to get our posts via email. No more than one message per day.

Subscribe

Delivered by FeedBurner

**Recent posts from our blogs**

Monday Art Day
Blogs of Note

Going faster than a roller coaster
iGoogle Developer Blog

Google Voice for Newbies:
Forwarding phone numbers
Google Voice Blog

Get local with the Local Business Center newsletter
AdWords Agency Blog

Quer conhecer o AdWords?
AdSense Blog-Portuguese



Google respects copyright. The use we make of all the books we scan through the Library Project is fully consistent with both the fair use doctrine under U.S. copyright law and the principles underlying copyright law itself, which allow everything from parodies to excerpts in book reviews. (Here's an article by one of the many legal scholars who have weighed in on Google Print.)

Just as Google helps you find sites you might not have found any other way by indexing the full text of web pages, Google Print, like an electronic card catalog, indexes book content to help users find, and perhaps buy, books. This ability to introduce millions of users to millions of titles can only expand the market for authors' books, which is precisely what copyright law is intended to foster.

**Newest Google blogs**

Google Ad Manager Blog

EMEA Developer Blog

Public Sector Blog

Conversion Room - DE

Google Wave Developer Blog

Permalink

Labels: books + book search, policy and issues

## Links to this post

Google Book Settlement
Blog Carnival: Google
Background: Google's Journey to the eLibrary
Buzz about Google Print and the lawsuit / Official blogs | Google Blog
publishers rush to digitise

Official Google Blog: Google Print and the Authors Guild

What happened with Google Print Project

ebook versus e-text updates

news : yahoo claims it isn't building an online library

Google, Copyright and the Courts

the google book search project ran into another roadblock last ...

What goes into selecting security questions?

Three Cheers for Categorizers!

Google has Copyright Problems

a year of google blogging posted by karen wickre, google blog team ...

the incredibly shrinking printed word the printing...

E-book news

No More Information Piracy: Say Goodbye to Direct Quotes ...

Does reading need a new medium?

Does reading need a new medium?

books & internet (a compilation of recent news)

Congress Throwing Rocks At New Things: Google Edition

Converging trends create opportunities for publishers. When will ...

column: let google scan...

book author to her publishing company: your lawsuit is not helping ...

Book author to her publishing company: your lawsuit is not helping ...

google, yhteinen perintömme ja sananvapaus

bio-info-nana convergence explained.

the hobson and holtz report - podcast #70: september 22, 2005

in an act of classic old-media cluelessness, the a ...

the canadian path to google print

How Much Longer Will You Need To Use That Library Card

Google/Authors Guild analysis, Yahoo's new online library

in an act of classic old-media cluelessness, the a ...

digital extras, 9/30/05

authors guild sues google

NYT OpEd in favor of Google Print Library Project

google sued, rolling out wifi

google print roundup

Transformative Use Justifies GooglePrint Scans of Entire Books as ...

Google unveils screen shots of Library program

google defends itself on blog... one good use for ...

a message from google print

jaberwockynmt @ 2005-09-27t18:16:00

google扫描圖書考验當作著作权法

Author's Guild Sues Google for Copyright Infringement - The ...

first they ignore you, then they laugh at you, th...

google print

Authors Sue Google Over Digitization Project

gnc-2005-09-23 #102

gnc-2005-09-23 #102

AdWords, AdSense, and the Google blog

a few notes on google print

when the pen picks up the sword

The Hobson & Holtz Report - Podcast #70: September 22, 2005

дело authors guild против google

the hobson and holtz report - podcast #70: september 22, 2005

google print

innovation under attack


The official
Google Channel on You Tube

**Labels**

accessibility (24)

acquisition (7)

ads (49)

Africa (2)

apps (266)

April 1 (3)

Asia (7)

books + book search (33)

developers (80)

diversity (5)

education (35)

enterprise (50)

Europe (20)

faster web (13)

free expression (34)

gadgets (5)

Geo (29)

Google at 10 (14)

google.org (25)

googlers and culture (140)

green (37)

healthcare (18)

India (11)

Innovation (10)

Latin America (7)

Mac (2)

measurement (7)

mobile (58)

online safety (10)

open source (8)

personalization (52)

photos (21)

policy and issues (95)

politics (38)

privacy (45)

recipe (8)

recruiting and hiring (26)

scholarships (18)

search (261)

search quality (10)

security (12)

user experience and usability (27)

video (46)

Innovation under Attack
watching rita: newsnow has a page of constantly-up...
Other Shoe Drops, Authors Sue Google
Burning Alexandria
Google responds to Authors Guild
google print ima težave
Authors Guild sues Google
vested interests...
Google, Publishers, Copies and "Being Evil"
the (un)american author's guild
Google Responds
i'm thinking cluetrain should be required reading for the authors ...
this is all a little rich...
Google Print: a Story in Modern Web Harmony (Alan Wexelblat)
google print and copyright law
google and the law
who is getting shafted by google print?
google print in court
Author's Guild Suit, and Google's Response: My Thoughts
google responds to authors guild lawsuit
Media Disintermediation, Redux
Google Print soon to be world's largest searchable archive of ...
google's response to suit
google defends self on blog
In re Google Print Project: The Authors Guild Sues Google
Google Blog: Google Print and the Authors Guild
Google Print
у нас свои "кирилл и мефодий"
authors guild sues google
google print saksøkt av forfattere
google print wird von autoren verklagt
Forfatterforbund sagsøger Google Print Det var læn...
this is very important...
My Comments on Google Print
the canadian path to google print

Create a Link

Newer Post                                      Home                          Older Post

Copyright © 2008 Google Inc. All rights reserved.
Privacy Policy | Terms of Service

**We Love Feedback**

Do you want to comment on a
post? Send us some email.

**More Google**

Web Search
Downloads
Image Search
Maps
Labs
News
Zeitgeist
Mobile
More...

**What We're Reading**

Ars Technica
Ask.com Blog
Google Guide
Google OS
John Battelle's Searchblog
Marketing Pilgrim
MSN Search Weblog
O'Reilly Radar
Pandia Search World
Philipp Lenssen's Google
Blogoscoped
Read/Write Web
Search Engine Journal
Search Engine Land
Search Engine Roundtable
Search Engine Watch Blog
Slashdot - Google
Techdirt
The Launch Pad - X PRIZE
Traffick
WebmasterWorld
Yahoo Search Blog

**Blogs By Googlers**

20-Something Finance
Abe Tries Again
Alon Chen's Diary-חן אלון
Beyond Satire
Bikin' my Bloggin'
Bladam 2.0
Bolinfest Changeblog
Bricoleur

Catspaw's Guide to the
Inevitably Insane
Christian Pezzin
Confessions of a Digital Packrat
Damon Kohler
Donal Mountain's notes
Dr. Razavi's Good-to-Know-Info
Ego Food
Erica's Joys
Germart
Grokster
iBanjo
It Has Come to My Attention
Jens Meiert
JR Says
Kraneland
Lorem Ipsum
Marketing w Internecie (Polish)
Matt Cutts: Gadgets, Google and
SEO
Nanaze
Occam's Razor
Otaku
Ovidiu Predescu's Weblog
P@ Log
persistent.info
Peter Fleischer: Privacy?
Piaw's Blog
Reza Behforooz
Sergey's Blog
Shuman Ghosemajumder
Silicon Thoughts
snarfed.org
Stevey's Blog Rants
Technical Revenue
techno.blog
tins:::Rick Klau's weblog
tropophilia
Zoviri Industries

Google Blog is powered by
Blogger. Start your own weblog.



# Exhibit X

# Google books

Home

Thoughts and
Opinions

Press Center

**FAQ**

## Google Books Settlement Agreement

**Joint Public FAQ from
Authors Guild,
Association of
American Publishers,
and Google**

If you're an author, publisher, or copyright holder, please visit the settlement administration site for information.

1. Why did the Class Plaintiffs, the Authors Guild, Association of American Publishers (AAP), and Google come to an agreement?
2. If approved by the court, what will the settlement offer?
3. In what new ways will this agreement enable users to access books?
4. In what ways will this agreement benefit rightsholders?
5. How can rightsholders find out how to claim their payments?
6. With this agreement, what change will users see when they visit Google Books?
7. What is included in an Institutional Subscription? Who qualifies to purchase one?
8. What will users experience when they access books at public libraries or other locations through Public Access licenses, and who is eligible to receive a Public Access Service license?
9. Does this agreement affect how users access public domain books through Google Books?
10. How are libraries involved in this agreement?
11. Google has been working with libraries already through its Book Search project. How will this agreement impact its current and future partnerships?
12. How much will it cost to get full access to a book?
13. Will advertising be shown with the books included in this project?
14. How long will it take for these new services to become publicly available?
15. Will any of these new services be available to Google Books users outside the U.S.?
16. Why was this agreement limited to Google Books users within the U.S.?
17. Does this agreement extend to all publishers and authors in the U.S.? What about internationally?
18. How will rightsholders be compensated for the online access to their in-copyright works?
19. What are the other financial terms of the agreement?
20. What is the role of the Book Rights Registry? What is its charter, and who will manage it?
21. Can the Registry work with other third parties?
22. Does the settlement agreement cover scanning of journal volumes?
23. I understand Google isn't scanning some types of journals, but what if that content appears in a book?

**1. Why did the Class Plaintiffs, the Authors Guild, Association of American Publishers (AAP), and Google come to an agreement?**

This agreement will enable us to do more together than copyright owners and Google could have done alone or through a court ruling. Our agreement promises to benefit readers and researchers, and to enhance the ability of authors and publishers to distribute their content in digital form, by significantly expanding online access to works through Google Books. It also acknowledges the rights and interests of copyright owners, provides an efficient means for them to control how their intellectual property is accessed online and enables them to receive compensation for online access to their works. The agreement opens new opportunities for everyone - authors, publishers, libraries, Google, and readers.

**2. If approved by the court, what will the settlement offer?**

If approved, the settlement would provide:

- More Access to Out-of-Print Books -- Generating greater exposure for millions of in-copyright works, including hard-to-find out-of-print books, by enabling readers in the U.S. to search these works and preview them online;

- Additional Ways to Purchase Copyrighted Books -- Building off publishers' and authors' current efforts and further expanding the electronic market for copyrighted books in the U.S., by offering users the ability to purchase online access to many in-copyright books;

- Institutional Subscriptions to Millions of Books Online -- Offering a means for U.S. colleges, universities and other organizations to obtain subscriptions for online access to collections from some of the world's most renowned libraries;

- Free Access From U.S. Libraries -- Providing free, full-text, online viewing of millions of out-of-print books at designated computers in U.S. public and university libraries; and

- Compensation to Authors and Publishers and Control Over Access to Their Works -- Distributing payments earned from online access provided by Google and, prospectively, from similar programs that may be established by other providers, through a newly created independent, not-for-profit Book Rights Registry. The Book Rights Registry will locate rightsholders, collect and maintain accurate rightsholder information, and provide a way for rightsholders to request inclusion in or exclusion from the project.

**3. In what new ways will this agreement enable users to access books?**

The agreement significantly expands access to millions of in-copyright books through Google Books.

Specifically, readers will be able to access books through:

- Preview -- Allows users to freely preview a limited number of pages of in-copyright works to help users decide if the book is right for them to buy. Generally, out-of-print books will be available for preview, and in-print books will not unless the rightsholder decides to activate previews through their

participation in this settlement or through the Book Search Partner Program.

- Consumer Purchase – Offers individual users the ability to purchase access to view an entire in-copyright book online. The rightsholder may set the price or allow the price to be set by a Google algorithm.

- Institutional Subscription – For academic, corporate, and government organizations. Gives members of the institution full access to in-copyright, out-of-print books.

- Free Public Library Access -- Authorizes free, full-text, online viewing of in-copyright, out-of-print books at designated computers in U.S. public and university libraries at no charge to the library or the reader, with added revenues to the rightsholders through per page printing fees.

- Future Services -- The agreement allows for other services and uses, such as Print-On-Demand, Consumer Subscription and others, to be agreed in the future.

### 4. In what ways will this agreement benefit rightsholders?

The agreement acknowledges the rights and interests of copyright owners, provides an efficient means for them to control how their intellectual property is accessed online, and enables them to receive compensation for online access to their works. The distribution of payments earned from online access provided by Google and, prospectively, from similar programs that may be established by other providers, will take place through a newly created independent, not-for-profit Book Rights Registry that will also locate rightsholders, collect and maintain accurate rightsholder information, and provide a way for rightsholders to request inclusion in or exclusion from the project.

### 5. How can rightsholders find out how to claim their payments?

Cash payments will be made for books scanned prior to the deadline for opting out of the settlement. In addition, rightsholders will be paid a share of revenues for future uses of their books. Essential information for authors, publishers and other book copyright holders may be found in the Notice of Settlement and at this website: http://books.google.com/booksrightsholders. Authors should also consult the Authors Guild website for detailed advice, or Counsel for the Author Sub-Class [Michael J. Boni and Joanne Zack of Boni & Zack LLC, Bala Cynwyd, PA, 610-822-0200, www.bonizack.com, bookclaims@bonizack.com]. Publishers should consult the AAP website or Counsel for the Publisher Sub-Class [Jeffrey P. Cunard and Bruce P. Keller of Debevoise & Plimpton LLP, New York, NY, 212-909-6000, www.debevoise.com, bookclaims@debevoise.com] for detailed advice.

### 6. With this agreement, what change will users see when they visit Google Books?

Content for Google Books primarily comes from two sources: the Book Search Partner Program for publishers and other rightsholders, and Google's Library Project. Until now, Google Books only showed bibliographic information and up to three snippets of text for in-copyright books contributed through the Library Project. In other words, if a user searched for a topic and found a relevant book, in some cases, the user only saw a few lines of text from the book related to the search. With this agreement, readers in the U.S. will be able to preview out-of-print works to help them decide if the book is right for them to buy. Rightsholders of in-print works can authorize preview through their participation in this agreement or through the Google Partner Program. In addition, consumers will have the ability to purchase

online access to many in-copyright books for online reading, highlighting, limited printing, and other potential features. These features will be available for all in-copyright, out-of-print books unless the rightsholder chooses to deactivate these features, as well as for in-copyright, in-print books if the rightsholder chooses to activate these features. The agreement allows for Google and the Book Rights Registry to expand upon this with future additional offerings such as Print-on-Demand, Consumer Subscription, and other uses and services. Some genres of books, such as dictionaries, will be excluded from default preview.

**7. What is included in an Institutional Subscription? Who qualifies to purchase one?**

The Institutional Subscription will allow users to search, read online (including through remote access) and print books made available through this agreement. These features will be included in the basic subscription. This will be similar to other products in the market where academic and other institutions can subscribe to the service and their users will be able to access all the books contained within the subscription. A variety of groups will be eligible to purchase Institutional Subscriptions, including academic institutions, libraries, corporations, and government organizations.

**8. What will users experience when they access books at public libraries or other locations through Public Access licenses, and who is eligible to receive a Public Access Service license?**

The Public Access Service license will allow free, full-text, online viewing of millions of out-of-print books at designated computers at U.S. public libraries. If these libraries offer printing services, the agreement requires them to offer printing as part of this license for a per page fee. Google will collect these fees for the Registry, and it has volunteered to pay the cost of printing by users for the first 5 years or up to $3 million, whichever comes first. Public libraries are eligible to receive one free Public Access Service license for a computer located on-site at each of their library buildings in the United States. Public libraries will also be able to purchase an Institutional Subscription which would allow them to offer access through additional terminals within the library building and not charge for printing. Higher education institutions will also be eligible to receive free Public Access Service licenses for on-site computers, the exact number of which will depend on the number of students enrolled.

**9. Does this agreement affect how users access public domain books through Google Books?**

This agreement does not affect books that are in the public domain in the United States and are searchable through Google Books. For books that are in the public domain, Google will continue to provide access to the entire book online for free and allow the user to download a PDF copy of the book for free, as it always has. For all books in Google Books, where the information is available, there is a link to places where users can buy the book in hard copy directly from the publisher or other booksellers, and where users can find the book in a library near them.

**10. How are libraries involved in this agreement?**

Libraries at the Universities of California, Michigan, Wisconsin, and Stanford have provided input into the settlement and expect to participate in the project, including by making their collections available. Along with a number of other U.S. libraries that currently work with Google, their significant efforts to preserve, maintain and provide access to books have played a critical role in achieving this agreement and, through their anticipated participation, they are furthering such efforts while making books even more accessible to students, researchers and readers in the U.S. It is expected that additional libraries in the U.S. will participate in this project in the future.

**11. Google has been working with libraries already through its Book Search project. How will this agreement impact its current and future partnerships?**

This agreement gives libraries the opportunity to make their collections more accessible to students, researchers and readers in the U.S. A number of U.S. libraries that currently work with Google will make their collections available for this project. We anticipate that additional libraries in the U.S. will participate in the future.

**12. How much will it cost to get full access to a book?**

The price of purchasing online access to a book will be set in one of two ways, at the rightsholder's option. Google will automatically set and adjust prices through an algorithm designed to maximize revenues for the book. This algorithm will be based on multiple factors; it is not a subjective evaluation of each individual book. Google and the Book Rights Registry will work to ensure that the algorithmic pricing maximizes the value for the rightsholder. Rightsholders will also be able to set the price for access to their books if they wish. For the Institutional Subscription, Google will work with the Book Rights Registry to set the price based on the type of institution and the expected number of users at an institution, e.g. academic research libraries, corporations, government offices, etc. This is similar to other subscriptions in the market today.

**13. Will advertising be shown with the books included in this project?**

As with advertising currently offered through Google's Partner Program, advertising may be displayed on books.google.com webpages. Advertising will not be overlaid on pages from a book. Rightsholders will receive the majority of the revenue from the advertising on web pages for specific books. As with all revenues paid by Google to rightsholders, if the rightsholder cannot be found immediately, the Book Rights Registry will hold the advertising revenue for a reasonable period of time for the rightsholder to claim.

**14. How long will it take for these new services to become publicly available?**

Before any of these services can be made publicly available, the settlement needs approval by the court before which the class action is pending. Once authorized, Google and the Book Rights Registry will be working to launch these services as soon as possible.

**15. Will any of these new services be available to Google Books users outside the U.S.?**

Outside the United States, the users' experience with Google Books will be the same as it is today. In other words, users will be able to search for books and may see snippets of in-copyright books, but they will not be able to purchase access to books online and the subscription will not be offered to institutions outside the United States, unless these services are authorized by the rightsholder of a book.

**16. Why was this agreement limited to Google Books users within the U.S.?**

Because this agreement is the result of a U.S. lawsuit, it directly affects the Google Books experience for those accessing the site in the U.S.

**17. Does this agreement extend to all publishers and authors in the U.S.? What about internationally?**

Holders of U.S. copyrights worldwide can register their works with the Book Rights Registry and receive compensation from institutional subscriptions, book sales, ad revenues and other possible sources, as well as a cash payment if their works have already been digitized. For example, a foreign author whose book was published outside the U.S. can register with the Book Rights Registry, and receive

compensation, if that book is in the collection of a U.S. library from which it was digitized.

**18. How will rightsholders be compensated for the online access to their in-copyright works?**

Revenues earned from subscriptions, consumer online purchase, advertising on web pages for specific books (including snippets or preview pages devoted to a single book), and from per-page printing at Public Access Service terminals will be divided between the rightsholder and Google at a 63-37 split respectively. Google will pay those revenues to the Book Rights Registry, and the Book Rights Registry will pay registered rightsholders their earnings after administrative costs.

**19. What are the other financial terms of the agreement?**

In addition to the revenue from the sale of subscriptions, consumer online purchase, advertising, and per-page printing at Public Access Service terminals, there are other financial terms of the agreement. Google will make a payment of $125 million to establish the Book Rights Registry, to resolve existing claims by authors and publishers and to cover legal fees. Of this total, Google will pay $34.5 million for the establishment and initial operations of the Book Rights Registry. Google will also pay a minimum of $45 million to pay rightsholders whose Books and Inserts were digitized prior to the deadline for rightsholders to opt out of the settlement.

**20. What is the role of the Book Rights Registry? What is its charter, and who will manage it?**

The agreement requires that a newly created independent, not-for-profit Book Rights Registry will be established for the purposes of locating rightsholders, collecting and maintaining accurate rightsholder information, providing a way for rightsholders to request inclusion in or exclusion from the project, distributing payments earned from online access provided by Google, and representing rightsholders' interests in connection with similar programs that may be established by other providers. The Books Rights Registry will be managed by a board of directors consisting of an equal number of author representatives and publisher representatives.

**21. Can the Registry work with other third parties?**

One of the benefits of this agreement is the creation of the Book Rights Registry, which will work on behalf of rightsholders for this project and for similar programs that may be established by other providers.

**22. Does the settlement agreement cover scanning of journal volumes?**

No. The agreement does not cover the scanning of journals. In the near term, Google will focus its Book Search digitization efforts on material covered by the settlement agreement. We will not be scanning or showing in-copyright active journal volumes (in-copyright volumes of journals that are still publishing new issues as well as in-copyright journal volumes that have already been digitized) for a period of three years unless Google is working directly with the journal publisher. During this time, we will also not display journal content from in-copyright active journal volumes that we have already digitized. We will continue to scan and display journal volumes that are not in-copyright or that are part of journals that are inactive.

**23. I understand Google isn't scanning some types of journals, but what if that content appears in a book?**

Content from journals that appears in books is generally covered under the agreement as an insert to the book. In other words, if Google digitizes a book containing journal content, that journal content will be digitized as well and will be

Google Books Settlement Agreement

displayed as part of the book.

©2009 Google

# Exhibit Y

**The Authors Guild, AAP, Google Settlement:**
**Allan Adler, Vice President of the Association of American Publishers (AAP)**
**Speaks About the Settlement with CCC**

KENNEALLY:  We are at the peak of summer, but we're already looking forward to important dates in the fall. Welcome. My name is Chris Kenneally. I'm Director of Business Development for the nonprofit Copyright Clearance Center, and I am continuing a series of programs that Copyright Clearance Center is presenting on the Google, Authors Guild and Association of American Publishers proposed settlement in the so-called Google Books case.

Joining me today is Allan Adler, who is Vice President for Legal and Governmental Affairs in the Washington, DC office of the Association of American Publishers, and welcome, Allan.

ADLER:  Thank you, Chris. It's a pleasure to be speaking with you today.

KENNEALLY:  Well, we appreciate you joining us, and I'm sure you've got some very important things to tell us about, in particular because AAP is one of the original plaintiffs in this very important case. And as our audience, I believe, knows, the reason we're here in July talking about all of this is that the original deadline for responding to the proposal of May 5th was pushed back to September 4th. And so I want to take that opportunity to ask you, what is AAP, and your partners in this settlement, the Authors Guild, doing at the moment to address the questions that rightsholders and others are asking about the settlement?

ADLER:  Well, ever since the settlement agreement was publicly announced last October, we and the Authors Guild have been independently having a continuous stream of, I guess you'd say multiple conversations within our respective communities about the agreement. On the part of AAP, we have talked, of course, with our own members, with US publishers who are not members of the organization. But most of our time has been spent discussing the settlement with foreign publishers, because the scope of the settlement, although it's under US law, due to international copyright agreements, does reach works that have been published in the United States, even though they may have originated in their publication abroad. And so explaining the settlement agreement, and indeed, explaining the lawsuit that the agreement grew out of, has been virtually a full-time job.

KENNEALLY:  Well, I can well imagine. The settlement documents themselves, which are available online, run into hundreds of pages. When rightsholders are asking you questions – and perhaps you want to break it down between the questions that are coming from US rightsholders and then perhaps for, very generally speaking,

ⒸⒸ COPYRIGHT CLEARANCE CENTER
www.ccpyright.com

the ones that are non-US – what are their concerns?  And how do you summarize the benefits of the settlement for them?

ADLER:  Well, initially the concerns, of course – and this applies to both US and foreign publishers – is they want to understand whether they are already covered by the settlement agreement.  In other words, are they already members of the settlement class as it's defined in that agreement, or are there certain things they have to do to become members of the class.  So we explain –

KENNEALLY:  And, Allan, if I can – just because a lot of our members are not – or, sorry, our listeners, I should say, and even many of your members – are not attorneys, as you are, and a very experienced one too, but perhaps you want to just define very quickly what you mean by class.  This is, of course, a class action lawsuit.

ADLER:  That's right.  And a class action lawsuit is a lawsuit in which a certain number of parties become plaintiffs in a case.  They bring legal action against another party or group of parties with whom they have a common argument.  Essentially, in this case, publishers generally and authors generally who are rightsholders to the books that Google was scanning and making complete copies of as part of its library project in the Google book search program all believe that this act by Google was an infringement of their rights.  So when the lawsuit was filed originally by the Authors Guild, it was filed as a class action lawsuit, which meant that it defined as the plaintiff class all individual rightsholders of the books that were scanned by Google, because they all had the same common interest against the same party, which was the claim of copyright infringement.

KENNEALLY:  So that would include authors and publishers.

ADLER:  So that's right, originally included authors and publishers.  Ultimately, when the publishers filed their suit, they filed a suit that was not a class action.  It had five specific members of AAP who were plaintiffs in that case.  But ultimately, as the settlement negotiation discussions were underway, and were wrapped up, there was an amended complaint filed with the court that made it clear that there would be two subclasses represented by the class action and the settlement agreement.  It would be the authors who were rightsholders to scanned books, and it would also be the publishers who were rightsholders to scanned books.

So as I said at the outset, one of the things that we first had to do was explain to people that if they were, in fact, rightsholders for books that were published in the United States and were believed to still be under copyright – in other words, typically we're talking about works published after 1923 – they were presumptively members of the class, and were covered by the settlement agreement.  And therefore, their choices were whether they wanted to remain members of the class.

(cc) COPYRIGHT CLEARANCE CENTER
www.copyright.com

They could opt out of the class, or they could remain members, and either exercise their rights as members under the settlement agreement, or if they had some concerns or objections about the settlement agreement, they could raise those issues with the court. So we had to explain that.

But then, of course, in order to make them understand the significance of those choices, we did have to explain to them, what does the settlement agreement, in broad terms, mean to them? And for the rightsholders whose works had been scanned by Google without their permission, it meant a number of good things. It meant, for one thing, that they would be able to see some money as compensation for that unauthorized scanning, to the extent that they stepped forward and claimed their works, identifying themselves as the rightsholders.

KENNEALLY: You're referring to the fee, I believe, that would be paid, $60 or something that –

ADLER: That's right. That's right. But beyond that, of course, as rightsholders for the books, they would have options with respect to whether they wanted to have their books contained within the scope of the various access models that the settlement agreement would provide, for example, consumer purchase model, where people can purchase the ability to read these books online, or whether they wanted to participate in the institutional subscription model, whereby the whole collection of works that that Google had scanned would be subject to a subscription by, say, a university library, or a corporation, or a government agency. And to the extent that individual rightsholders' works are included within that subscription, they would benefit both from the exposure of their works to new audiences, and also possibly obtaining revenue from the subscription fees that would be developed.

So we explained to them that, basically, if you look at it in broad terms, the benefits to these rightsholders were that works that largely are now out of print, and therefore not commercially available to the public, would not only be rediscovered by the public in a fairly easy way because of the capabilities of the Google Book Search search engine capacity, but also, they would be able to get access to those books in a variety of different ways that would allow them to utilize the knowledge contained in those books that essentially was lost to them unless they had access to them in their obscure locations in the various libraries in which existing copies of those works might still be located.

We also explained to them that, with respect to the works that are in copyright and still commercially available, they would have complete control over whether or not those works would figure at all under the Google Books settlement. They could either decide to remove them completely, or to exercise options to make those works available as they chose.

Ⓒ COPYRIGHT CLEARANCE CENTER
www.copyright.com

KENNEALLY: Right, and so, in a nutshell, then, it's about availability and accessibility.

ADLER: And discovery.

KENNEALLY: And discovery.

ADLER: It's the ability for people to find out about works that had long since disappeared from the marketplace, and from the public eye. It's the ability to access those works, and it's the ability to make choices about whether or not rightsholders wanted to make Google Book Search yet another venue to sell their works to the public, in addition to the way they traditionally do in the book market.

KENNEALLY: And the settlement envisions creation of a new organization, the so-called Book Rights Registry. And earlier in this series, we spoke with Michael Healy, who is expected to become the first Director of that, and is already, in his own role currently as the Director of the Book Industry Study Group, providing some input and some very important background as a librarian and a metadatician, if you will, in terms of creating all of that. But can you briefly tell our audience from AAP's perspective how the Book Rights Registry is expected to operate?

ADLER: Well, the Book Rights Registry is going to be a not-for-profit entity that is being established under the laws of New York State, and will exist with a board of directors who will be composed entirely of representatives of the author and publisher communities. And the Book Rights Registry is going to have the ability to essentially act as an agent for the rightsholders of books in dealing with whether those books are going to be included in the various access models provided for under the settlement agreement, and how they will be specifically included within those access models.

KENNEALLY: And then the access models are the ones you really referred to –

ADLER: That's right. And additionally, the Rights Registry is going to play a very important role in dealing with the problem of so-called orphan works. I've already indicated that largely the two different categories of books under the settlement agreement are those that are commercially available, which are sort of the ones that are still in print, and the ones that are not commercially available, essentially those books that have gone out of print. And within the category of books that have gone out of print, there is a subcategory that people generally refer to as orphan works. Those are books that, generally speaking, are – rights are held by rightsholders who cannot be contacted or located, or in some cases even identified today, for purposes of obtaining permission for people who want to make certain uses of those works that would require permission. For example, if they wanted to reintroduce them into the marketplace, implicating the reproduction and distribution rights of the rightsholders, they would need permission to do that. But in many instances, they

Ⓒ COPYRIGHT CLEARANCE CENTER
www.copyright.com

can't find the rightsholder, or can't identify who they are, so that's raised the notion of these books being considered orphans, in the sense that even though they are there for people to want to make use of them, the uses can't be made safely without the risk of copyright infringement liability, unless you're able to identify and contact the copyright owners for permission.

So one of the things the Book Rights Registry is going to be doing, which is really revolutionary, is it's going to be beating the bushes, essentially looking for those rightsholders to come forward to the Registry and claim those books, so that we will reduce the universe of orphan works, bring books that previously could not be used by third parties because they couldn't get the necessary permissions from rightsholders, and bring them back into the world of books that can actively be traded in the marketplace, with permissions from the rightsholders, allowing third parties to make whatever uses they might want to of those books.

And this is going to be something that we think is very valuable. As you know, Congress for the last six years has been considering orphan works legislation to try to deal with the problem of the universe of orphan works out there. But the book settlement, through the Registry, is going to be able to affirmatively act to reduce the number of orphans that exist, and to bring those books back into the world of exploitation by both readers and rightsholders.

KENNEALLY: Well, we are speaking right now with Allan Adler, who is Vice President for Legal and Governmental Affairs for the Association of American Publishers, and this is part of the ongoing Copyright Clearance Center series on the Authors Guild/AAP Google settlement. So I guess, Allan, the next thing to do is to just ask you about the reported inquiry that the US Department of Justice is making about this proposed settlement. They're looking into the potential for antitrust implications. What's your reaction at AAP to that inquiry?

ADLER: Well, it's not really surprising that there is such an inquiry, for two reasons. One is the institutional reason, which is simply that we have a new administration in Washington, a Democratic President elected, and that means that the Justice Department, particularly its antitrust division, is going to take a somewhat different view of its responsibilities than did the antitrust division of the Justice Department under the previous Bush administration. Republicans and Democrats, as you may know, tend to have very different views of antitrust law, and generally speaking, the Democratic administrations have been much more activist in their enforcement of antitrust law. And we all saw that when the newly appointed head of the antitrust division gave a speech a few months back indicating that they would be more active than their predecessor. And they even indicated the types of cases that they would be looking at, which included some of the cases involving the dotcom world. And it shouldn't surprise people that Google, which is one of the major

(CC) COPYRIGHT CLEARANCE CENTER
www.ccpyright.com

players in that world, is someone who comes within the radar of the Justice Department.

But apart from the institutional concern, of course, the fact is that this proposed settlement is really unprecedented in its scope and nature. Unlike other class action settlements, that usually resolve an issue involving consumer concerns or complaints about a particular product or service, and the case ends when there is a settlement agreeing to either reimburse them or give them some other compensation to mitigate their complaint, what we have here is not only a settlement agreement that will resolve the pending litigation, but it's designed deliberately to establish and create a going forward model for publishers and authors and other rightsholders in books to work with one of the giants of the online world to move books online for purposes of providing access to a new readership. And so this is unprecedented, and it isn't surprising to us that the Justice Department would want to take a look at it.

KENNEALLY: And it's important to emphasize here that, in fact, this is a proposed settlement. It has yet to be reviewed and accepted by the court. And I know that the new President and CEO of AAP, Tom Allen, has published an open letter, which is available online at your site, publishers.org. And he speaks to the potentials if the settlement is not approved. Do you want to just briefly tell us how AAP sees that?

ADLER: That's right. Most people focus on questions of whether or not Google is given too much power with respect to the books that are covered by the settlement agreement, or whether or not there are going to be questions of other players being able to get into the marketplace for those same works, particularly the works that are no longer commercially available. But the reality is that if people stop for a moment and consider what the situation would be like if we didn't have this settlement, for one thing, the litigation would continue to go forward, draining resources both from the author and publisher community, and ultimately would probably reach a fairly narrow decision by the Supreme Court on the application of the Fair Use Doctrine to the scanning of books that Google was engaged in.

And I don't think anyone believes that the decision that would ultimately resolve this litigation would be one that would ultimately resolve all of the questions about what can be done with books by third parties who are not rightsholders without seeking the permission of rightsholders, if they want to digitize those books, if they want to distribute or provide access to digital copies of those works, or if they want to put those works online and provide access to them in that venue. So, for one thing, the litigation would continue. It would continue with a great deal of resources being used, and probably would reach a result that would not ultimately resolve many of the issues that are of interest to the stakeholders.

(CC) COPYRIGHT CLEARANCE CENTER
www.ccpyright.com

Beyond that, there is also the concern about the uncertainty that would be left for authors, publishers, and other rightsholders about who else might decide to take the same chances that Google did in going ahead and scanning these works in their entirety, and using them in support of a commercial enterprise, without first obtaining permission from the rightsholders. So there's a great deal of uncertainty that would still be there, that would be vexatious for the rightsholder community. It would delay their implementation of plans to move books into the digital world, and into the online world, and also would leave questions about what other major players – for example, like Amazon – would continue to gain ground in the book market without any real competition from other players of equal size.

So, overall, I think there were – Tom was correct in his essay, in asking people to consider not only the benefits that come from the agreement, but all of the uncertainty and the risk that are avoided if the agreement is approved rather than being disapproved.

KENNEALLY: Well, that strikes me as the note that you've been sounding throughout our conversation here, which is that this is very much a matter not only about past transgressions, but about future possibilities. And so I'm going to ask Allan, as a final question here, to take out your crystal ball and look ahead five years, and give me some sense, from your perspective, as to how this is going to change the publishing business, the media, and the information society we live in. And I'll just point out that, in a previous life, you were an ACLU attorney, and very much concerned with information and the freedom of information. How do you think the settlement, if it's approved, will just improve the information society that we live in?

ADLER: Well, for one thing, it will test on a very large scale, and in a variety of ways, what consumers think about accessing the contents of books online. We already are familiar with the fact that, as books appear in the marketplace in digital formats, there are a variety of ways in which they can be utilized. Books are used as audiobooks, books are used as eBooks, books can also be available to people as downloads from online Websites. But they could also be used by individuals by simply accessing them online without downloading them. The settlement agreement, at the moment, doesn't deal with the download questions. It only deals with online access. But it would establish the foundation and the predicate for experimentation with a variety of digital formats, and a variety of ways in which readers might access and use the contents of published books.

And this is something that, of course, the book publishing community has been very anxious about in recent years. Of course, there has not been an overwhelming demand in the marketplace to simply leave behind print books and move everything into the digital space. So publishers have had to keep one foot firmly planted in the world of traditional print publishing, while experimenting with a


COPYRIGHT CLEARANCE CENTER
www.ccpyright.com

variety of digital formats that allow people to utilize books with different functional capabilities that aren't available with print versions. And this is only going to hasten that experimentation, broaden the ability of people to try different means of accessing works and using them, and provide a variety of options, both for readers and for authors and publishers who have a common interest in making published books as widely available in the marketplace as possible.

KENNEALLY: Well, it certainly makes the world of copyright and book publishing a very exciting place to be, and it should stay that way for some time to come.

We have been speaking with Allan Adler, who is Vice President for Legal and Governmental Affairs for the Association of American Publishers, which is the US trade organization representing book and journal publishing industries. Allan, thank you so much for joining me today.

ADLER: It's my pleasure, Chris.

KENNEALLY: And indeed, our pleasure as well. This is Chris Kenneally with Copyright Clearance Center thanking you for joining us in another in our series of discussions about the Authors Guild/AAP/Google settlement seminar series. You can hear again this program and others in our series, including my interview with Michael Healy, online at copyright.com. Thank you again for joining us.

END

COPYRIGHT CLEARANCE CENTER
www.ccpyright.com

# Exhibit Z



# Q&A With Debevoise & Plimpton's Jeffrey Cunard

Law360, New York (June 12, 2009) -- Jeffrey P. Cunard is the managing partner in the Washington, D.C., office of Debevoise & Plimpton LLP and leads the firm's corporate intellectual property and information technology practices. He has broad experience in transactions, including mergers and acquisitions, licenses, joint ventures and outsourcing arrangements.

Cunard also works on copyright litigation matters. His practice also encompasses U.S. and international media and telecommunications law, including privatizations and regulatory advice.

**Q: What is the most challenging case you've worked on, and why?**

A: Certainly the Tasini case, which involved a question of whether The New York Times and other periodical and electronic database publishers could include freelance articles in their online and CD-ROM editions, posed difficult questions of first impression.

Although the U.S. Supreme Court ultimately ruled against our clients, in the long run, changing technology and business practices have largely mooted the specific legal issue presented in that case.

More recently, my most complex representation has been negotiating the settlement of the Google Book Search class action, currently set for a fairness hearing later this year.

We represent the Association of American Publishers and five publisher plaintiffs, acting as representatives of the U.S. publishing industry — The McGraw-Hill Cos. Inc., Pearson Education Inc., Penguin Group (USA) Inc., John Wiley & Sons Inc. and Simon & Schuster Inc.

These publishers, all members of the AAP, sued Google for infringing their copyrights by scanning books in connection with the Google Library Project, making them searchable and offering users "snippets" of the books.

Had we litigated rather than settled, the central issue in the case would have been whether Google's acts were protected by the Copyright Act's fair use doctrine.

The settlement agreement, which took more than two years to negotiate, operates as a complex set of authorizations from a worldwide class of millions of copyright owners. It establishes new

business models among publishers, authors and Google, with a key role played by the libraries that have preserved the books that Google has been scanning. The settlement has been widely publicized and is the subject of scrutiny from various interests.

The biggest overall challenge in the practice of intellectual property law, however, is keeping pace with the technological developments and business practices that make practicing copyright law in the digital age so fascinating.