**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

The Authors Guild, Inc., Association of American          :
Publishers, Inc., et al.,                                 :          Case No. 05 CV 8136-DC
                                                          :
        Plaintiffs,                               :          **PRIVACY AUTHORS AND**
                                                          :          **PUBLISHERS' OBJECTION TO**
  v.                                                    :          **PROPOSED SETTLEMENT[1]**
                                                          :
Google Inc.,                                              :
                                                          :
        Defendant.                                :          **ECF CASE**
                                                          :
---------------------------------------------------------------- x

Cindy Cohn (*admitted pro hac vice*)
Jennifer Granick
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333 x108
Cindy@eff.org

Aden J. Fine
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10001
(212) 549-2693
afine@aclu.org

Jennifer Lynch (*admitted pro hac vice*)
Jason Schultz
Samuelson Law, Technology & Public Policy
Clinic[2]
UC Berkeley School of Law
389 Simon Hall
Berkeley, CA 94720

David I. Pankin
The Law Offices of David I. Pankin, P.C.
48 Willoughby Street
Brooklyn, NY 11201
(718) 243-2444
Dpankin@pankinlaw.com

Counsel for Privacy Authors and Publishers

---

[1] The full list of objecting class member Privacy Authors and Publishers is in Attachment A.

[2] The brief was drafted with the help of law students Sara Stringfellow, Kelsey Linnett and Shane Witnov, interns at the Samuelson Law, Technology & Public Policy Clinic at UC Berkeley School of Law.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

II.    INTERESTS OF THE OBJECTORS ................................................................. 3

III.   STATEMENT OF FACTS ................................................................................ 6

IV.    ARGUMENT................................................................................................... 10

       A.   To Be Approved, The Settlement Must Adequately Protect All Members of the Class
            and Be Consistent with the Public Interest. .............................................................. 10

       B.   Readers Will Be Chilled If Privacy Protections Are Not Put In Place. ..................... 12

       C.   Privacy Authors and Publishers Will Suffer Expressive and Financial Losses Without
            Privacy Protections in the Settlement. ....................................................................... 16

       D.   Because the Settlement Fails to Follow Well-Established Privacy Caselaw, Statutes
            and Policies, It is Neither In the Interest of the Class Nor in the Public Interest. ...... 16

            1.   The Settlement Ignores Well-Established Caselaw Protecting Reader Privacy........ 17

            2.   The Settlement is Inconsistent With State Laws for Reading Privacy and
                 Congressional  Protections for the Private Receipt of Expressive Materials. ...... 19

            1.   The Settlement Fails to Acknowledge that Reader Privacy is a Prominent Part of
                 the Library Code of Ethics ................................................................................. 20

       C.   To Protect The Interests Of The Privacy Authors And Publishers and the Public,
            Reader Privacy Protections Must Be Incorporated Into The Settlement. ................... 20

            1.   The Privacy Protections Must Be Enforceable and U.S. Legal Protections Must
                 Apply ................................................................................................................ 21

            2.   There Must Be Adequate Protection Against Disclosure......................................... 22

            3.   There Must Be Limited Tracking of User Information............................................ 22

            4.   Users Must Have Control Over Their Personal Information. .................................. 23

            5.   There Must Be Sufficient Transparency. ................................................................ 24

V.     CONCLUSION................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACLU v. Gonzales*, 478 F. Supp. 2d 775 (E.D. Pa. 2007) ............................................ 13

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................ 10

*Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) ............................................... 16

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ....................................................... 11

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ....................................... 11

*Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Commission*, 518 U.S. 727 (1996) ........................................................................... 12

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ..................................................................... 5

*Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1958) ............. 15

*Gonzales v. Google, Inc.,* 234 F.R.D. 674 (N.D. Cal. 2006) ........................................ 14

*Griswold v. Connecticut,* 381 U.S. 479 (1965) .............................................................. 5

*In re Grand Jury Subpoena to Amazon.com*, 246 F.R.D. 570 (W.D. Wis. 2007) ................. 13, 18

*In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc.,* 26 Media L. Rep. (BNA) 1599 (D.D.C. 1998) ........................................................................................................ 13, 18

*In re JetBlue Airways Corp. Privacy Litigation*, 79 F. Supp. 2d 299 (E.D.N.Y. 2005) ................. 8

*In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020 (2d Cir. 1992) ................. 11

*In re Orthopedic Bone Screw Products Liability Litigation*, 176 F.R.D. 158 (E.D. Pa. 1997) .... 11

*In re Verizon Internet Servs., Inc.*, 257 F. Supp. 2d 244 (D.D.C. 2003) ....................... 6

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ...................................... 12, 16, 17

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (U.S. Ohio, 1995) ................... 15

*NAACP v. Alabama*, 357 U.S. 449 (1958) .................................................................. 15

*New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ........................................ 17

*Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 514 F.2d 767 (2d. Cir. 1975) ................................................................................................................. 11

*Pinero v. Jackson Hewitt Tax Service, Inc.*, 594 F. Supp. 2d 710 (E.D. La., 2009) ...................... 7

*Schneider v. State*, 308 U.S. 147 (1939) ................................................................... 15

*Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ....................................... 6

*Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) ....... 11

*Stanley v. Georgia*, 394 U.S. 557 (1969) ............................................................... 15, 17

*Tattered Cover v. City of Thornton*, 44 P.3d 1044 (Colo. 2002) ................................... 18

*United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) ................................................ 14

*United States v. Rumley*, 345 U.S. 41 (1953) ......................................................... 12, 17

*Va. State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976) .. 15

*Viacom Int'l, Inc. v. YouTube, Inc.,* 253 F.R.D. 256 (S.D.N.Y. 2008) ........................................ 14

**Statutes**

18 U.S.C. § 2710(b) .................................................................................. 19

47 U.S.C. § 551(h) .................................................................................. 19

Ariz. Rev. Stat. § 41-1354(C) .................................................................. 19

Ark. Code. Ann. § 13-2-702 .................................................................... 19

Cal. Gov. Code § 6254(j) ......................................................................... 19

Cal. Gov. Code § 6267 ............................................................................ 18

D.C. Code § 39-108(d) ............................................................................ 19

Fed. R. Civ. P. 23 ................................................................................... 10

Fla. Stat. Ann. § 257.261(4) ..................................................................... 19

Mich. Comp. Laws Ann. § 445.1712 ........................................................ 19

Mont. Code. Ann. § 22-1-1111 ................................................................ 19

N.Y. C.P.L.R. § 4509 .............................................................................. 18

R.I. Gen. Laws § 11-18-32 ...................................................................... 19

## Other Authorities

2 *McLaughlin on Class Actions* 6:9 ............................................................ 11

American Library Association Council, *Library Code of Ethics*, Jan. 22, 2008 ........................ 20

Cade Metz, *Google Book Search – Is it the Last Library?*, THE REGISTER, Aug. 29, 2009 .......... 2

Caroline Daniel & Maija Palmer, *Google's goal: to organise your daily life*, FINANCIAL TIMES, May 22, 2007 .................................................................... 7

Chris Soghoian, *Debunking Google's log anonymization propaganda*, CNET, Sept. 11, 2008.... 9

*Comments Made By* Class Action Reports *To Advisory Committee On Civil Rules*, CLASS ACTION REPORTS (Thomson Reuters/West), Feb. 2002 ......................... 20

Dawinder S. Sidhu, *The Chilling Effect of Government Surveillance Programs on the Use of the Internet by Muslim-Americans*, 7 U. MD. L.J. RACE, RELIGION, GENDER & CLASS 375 (2007) .................................................................................................. 13

Eric Lichtblau, *F.B.I., Using Patriot Act, Demands Library's Records*, N.Y. TIMES, Aug 26, 2005 ...................................................................................................... 14

Google Books Privacy Policy (last accessed Sept. 3, 2009) .............................................. 7, 19, 20

Google Health Privacy Policy (last accessed Apr. 28, 2009) ...................................... 22

Google Mobile Help, Privacy: Location History (last accessed Apr. 28, 2009) ................. 22

Google Privacy Policy (last accessed Sept. 3, 2009) ....................................................... 7

Haw. OIP Opinion Letter No. 90-30 (1990) ............................................................... 18

Ky. OAG 82-149 (1982 ................................................................................................. 18

Latanya Sweeney, *Uniqueness of Simple Demographics in the U.S. Population*, LABORATORY FOR INTERNATIONAL DATA PRIVACY (2000) ................................... 9

Maureen Dowd, *Dinosaur at the Gate*, N.Y. TIMES, Apr. 14, 2009 ............................... 7

Michael Barbaro & Tom Zeller, Jr., *A Face is Exposed for AOL Searcher No. 4417749*, N.Y. TIMES, Aug. 9, 2006 .......................................................................... 9

Motoko Rich, *Google Hopes to Open Trove of Little-Seen Books*, NEW YORK TIMES, Jan. 4, 2009. .............................................................................................. 2

Peter Fleischer to The Official Google Blog, *How long should Google remember searches?* (June 11, 2007, 10:08 PM) ........................................................... 8

*Publisher Fights DEA on Book Buyers' Names*, CONTRA COSTA TIMES, Oct. 30, 1997.............. 14

Saul Hansell, *Online Trail Can Lead to Court,* N.Y. TIMES, Feb. 4, 2006................................... 14

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

*If there is no privacy of thought — which includes implicitly the right to read what one wants, without the approval, consent or knowledge of others — then there is no privacy, period.*

—Michael Chabon, author

*I believe that the fear of tracking will create a chilling effect on my readers, reduce my readership and therefore my revenue from these books. Moreover, I write these books in order to participate in the public debate on issues. Reduced readership negatively impacts my expressive interests as an author.*

—Bruce Schneier, author

The class member authors and publishers listed in Appendix A ("Privacy Authors and Publishers") hereby object to the proposed Settlement because it fails to safeguard reader privacy, and thus, is unfair, unreasonable, and inadequate to protect the interests of the class. The Privacy Authors and Publishers believe that the lack of privacy protections in the current settlement will deter readers and thereby harm their expressive and financial interests in sustaining and building a readership that browses, reviews, and purchases their works. Additionally, each Privacy Author is also a reader and researcher and is concerned that the lack of safeguards for privacy will interfere with his or her own freedom to read.

The Class Representatives did not adequately represent the interests of the class when they reached this Settlement, because the Settlement gives Google sweeping copyright permissions for their works but includes no privacy protections for their readers. The Settlement authorizes Google to offer a set of services using scanned copies of the Privacy Authors and Publishers' works, which along with the works of other authors and publishers, will likely create the world's largest search and browsing tool, library, bookstore and book access service combined. The project creates exciting opportunities for expanded public access to books of all kinds. However, given the tremendous number of out-of-print and "orphan" books that the Settlement will allow Google alone to scan and provide to readers, and the fact that the product

1

will also be available in institutions and libraries, Google Book Search services may well become the only available choice for readers seeking certain books. In part because of the scope of the project, the Google Book Search scans have been called "the last library."[3]

Unfortunately, the Settlement includes no limitations on collection and use of reader information and no privacy standards for retention, modification, deletion or disclosure of that information to third parties or the government. Without those limitations, an unprecedented quantity of information about readers' activities will be, and indeed already is being collected. Google Book Search can link a reader to every book searched for, browsed, purchased and read. It even tracks which particular pages the user reads and for how long. For example, in a *New York Times* article in January 2009, a senior member of Google Book Search's engineering team admitted that he "was monitoring search queries recently when one . . . caught his attention." The engineer could easily tell that the reader spent four hours perusing 350 pages of an obscure 1910 book.[4]

This granular tracking will create a chilling effect on readers, especially readers seeking, browsing or buying books on controversial or sensitive subjects such as politics, religion, sexuality and health. This chilling effect, which is well documented in contexts involving physical books, serves as the basis for a long line of legal precedents, statutes and policies strongly protecting reader privacy.

The failure of the Settlement to take account of readers' privacy interests is relevant to this Court in considering both whether the agreement is fair, reasonable and adequate to all class

---

[3] Cade Metz, *Google Book Search – Is it the Last Library?*, THE REGISTER, Aug. 29, 2009, available at http://www.theregister.co.uk/2009/08/29/google_books/ (quoting Professor Geoffrey Numberg of the University of California, Berkeley, School of Information).

[4] Motoko Rich, *Google Hopes to Open Trove of Little-Seen Books*, NEW YORK TIMES, Jan. 4, 2009, available at http://www.nytimes.com/2009/01/05/technology/internet/05google.html.

members, and whether the Settlement is in the public interest. This is especially true given the tremendous breadth of the Google Book Search services that will emerge from the Settlement and the likely impact they will have on future authors, readers, libraries, and the book market.

The Court should not approve the settlement until the privacy protections described in Section IV.E. below are put into place, either through the terms of the Settlement itself or through an enforceable commitment by Google backed by the ongoing jurisdiction of this Court. Importantly, as described further below, while privacy protections are crucial to ensuring the fairness of the Settlement, the Privacy Authors and Publishers' concerns can be addressed without need for a second opt-out period for class members.

## II.     INTERESTS OF THE OBJECTORS

The Privacy Authors and Publishers submitting this brief in support of their objection to the Settlement are class members and members of the Author Sub-Class. Each owns a United States copyright interest in one or more books published before January 5, 2009. None are Class Representatives or members of the Authors Guild.

Several of the Privacy Authors and Publishers are particularly cognizant of, and affected by, the privacy harm created by the Settlement because of the sensitive or controversial nature of their works. For example:

- Pulitzer Prize winning author Michael Chabon has written about homosexuality, broken families, religious identity, anti-Semitism and fatherhood.

- MacArthur Fellowship recipient Jonathan Lethem's books address issues of drugs, race, disease, class and puberty.

- Poet Lawrence Ferlinghetti, co-founder of City Lights Booksellers & Publishers and publisher of many influential San Francisco Beat authors, is a philosophical anarchist who advocates political activism.

- Anthony Romero, the Executive Director of the American Civil Liberties Union, has written a book that is critical of many governmental decisions and policies as it chronicles the courageous, yet sometimes unpopular, positions taken by individuals on the front lines of the fight for civil liberties in the post-9/11 world.

- Author Ayelet Waldman critiques the war on drugs and writes candid portrayals of adultery, broken relationships and the difficulties of motherhood.

- Author Cory Doctorow's acclaimed latest book for a teen audience, *Little Brother*, explores whether America is heading towards a dystopian future and provides information about how to use computers and computer networks to undermine authoritarian regimes.

- Beverly Potter of Ronin Publishing publishes books advocating the legalization of marijuana and reform of the United States' drug policies. Ronin Publishing has already faced a Drug Enforcement Agency subpoena seeking the names and addresses of all residents in the state of Arizona who had purchased one of Ronin's books on marijuana hydroponics.

- Security expert Bruce Schneier's books often criticize, as well as describe how to circumvent, the computer and physical security efforts of government and private authorities.

- Author Carol Queen writes and edits books about sex and sexuality, including exhibitionism, homosexuality, and erotic fantasies.

The Privacy Authors and Publishers object to the settlement in order to protect their interest in free expression. They write to deliver their ideas to as wide an audience as possible. Their audience will be severely diminished if people must wonder and worry if information

4

about their reading habits could end up in the hands of the government, health insurers, divorcing spouses or other third parties via subpoena. This chilling effect on readers will also impact the Privacy Authors and Publishers financially, because their audience will simply avoid reading or purchasing their books.

The Privacy Authors and Publishers further object as readers themselves, who seek to read and conduct research without being monitored. The Supreme Court has long recognized that "[t]he right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read." *Griswold v. Connecticut,* 381 U.S. 479, 482 (1965). If they had been consulted by the named Class Representatives, the Privacy Authors and Publishers would certainly have made clear that they would not agree to any settlement that would harm their own ability to receive information without being tracked.

The Privacy Authors and Publishers cannot adequately protect their interests by opting-out of the Settlement. They should not be placed between Scylla and Charybdis -- choosing between losing readers due to Google's tracking or losing readers because their books are excluded from the world's largest system of locating and accessing books, and thus are relegated to musty card catalogs and shrinking local library and bookstore shelf space. Moreover, opting-out would force under-represented class members to sue separately, even if they do not object to the majority of the proposed Settlement Agreement. This would surely undermine the efficiency goals of the class action mechanism.

In addition to asserting their own financial and constitutional interests, the Privacy Authors and Publishers object on behalf of their readers. The interests of readers are properly before this Court, both because the Court must consider the public interest in approving the Settlement and because the First Amendment's liberal standing rules allow parties such as the Privacy Authors and Publishers to raise their readers' interests in cases involving chilling effects on speech. Courts relax standing rules in First Amendment cases "precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech." *Eisenstadt v. Baird*, 405 U.S. 438, 445 n.5 (1972) (lecturer displaying and distributing contraceptives has

5

standing to assert the rights of those denied access to contraceptives); *see also Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984) (the danger of chilling free speech warrants relaxing prudential limitations on standing in the First Amendment context).[5]

## III.    STATEMENT OF FACTS

The Court is aware of the general Settlement terms, so the Privacy Authors and Publishers only highlight the lack of reader privacy protections. Google wishes to offer three services as part of Google Book Search: "Preview Use," "Institutional Subscription" and "Consumer Purchase." For each, other than some specific data collection requirements for security and auditing,[6] the Settlement is silent about (1) what information Google can or will collect about readers and (2) what Google can and will do with the sensitive information it collects or (3) what control users will have over the information about them that Google collects. This glaring omission renders the Settlement unfair to the public and to the Privacy Authors and Publishers, particularly since Google has made clear that it wants to amass and analyze as much

---

[5] Booksellers and internet service providers have asserted their customers' free speech rights in other legal matters where reader privacy is at stake. *See In re Grand Jury Subpoena (Amazon.com)*, 246 F.R.D. at 572 (Amazon may challenge grand jury subpoena on behalf of "buyers' First Amendment right to maintain the privacy of their reading choices"); *In re Verizon Internet Servs., Inc.*, 257 F. Supp. 2d 244, 258 (D.D.C. 2003) (Verizon "may assert a First Amendment challenge on . . . behalf" of its subscribers).

[6] For instance, the Preview Use product requires tracking only to ensure that no computer (not user) accesses more than twenty percent of any book. Settlement at § 3.9.1. For the Consumer Purchase product, Google will need to collect some personal information in order to charge a consumer for access to a book and will need some way to ensure that the book remains available to that person. Settlement at § 1.32. Google does not, however, need to continue to link financial and true identity information with the book record after the monetary transaction is completed and that information need not be used for any other purpose by Google. For Institutional Subscriptions, Google needs only to verify a reader's affiliation with an institution through IP address or other means. *Id.* at § 3.9.3. Finally, while Google has promised to add a trackable watermarks to book "pages" to allow it to find out whether a reader has printed out pages in violations of its terms of use, this watermark does not need to be decipherable by any entities outside of Google and Google need not disclose the identifying information without a court order. *Id.* at § 4.2(a).

information as possible about users of all of its services.[6] Given Google's well-documented view that the more it knows about individuals, the more profits its advertising business model can generate, it is reasonable to demand enforceable privacy protection to ensure that Google does not collect, retain and use more information from its users than necessary to provide the specific services approved by the Settlement.[7]

On September 3, 2009, just one business day prior to the filing date for Objections set by this Court, Google released a privacy policy for Google Book Search.[8] Google says that this policy is in addition to its general privacy policy, which it says also applies to Google Book Search.[9] Both of these privacy policies can be revised by Google at any time so at best they represent Google's current position about user privacy. More importantly, if this Court does not retain jurisdiction over these privacy policies, they may not be enforceable by authors, publishers or readers using Google Book Search even when they are clearly violated, at least in the eyes of some courts. *See e.g. Pinero v. Jackson Hewitt Tax Service, Inc.*, 594 F. Supp. 2d 710 (E.D. La 2009) (no breach of contract or other claim for violation of privacy policy resulting in public availability of tax information provided to tax preparation website due to lack of monetary

---

[6] Google CEO Eric Schmidt told the *Financial Times*: "We are very early in the total information we have within Google. The algorithms will get better and we will get better at personalization. The goal is to enable Google users to be able to ask the question such as 'What shall I do tomorrow?' and 'What job shall I take?' [. . .] We cannot even answer the most basic questions because we don't know enough about you. That is the most important aspect of Google's expansion." Caroline Daniel & Maija Palmer, *Google's goal: to organise your daily life*, FINANCIAL TIMES, May 22, 2007, available at http://www.ft.com/cms/s/2/c3e49548-088e-11dc-b11e-000b5df10621.html.

[7] Google CEO Eric Schmidt told the *New York Times*: "The whole secret here is the ads are worth more if they're more targeted, more personal, more precise." Maureen Dowd, *Dinosaur at the Gate*, N.Y. TIMES, Apr. 14, 2009, available at www.nytimes.com/2009/04/15/opinion/15dowd.html., at A27.

[8] Google Books Privacy Policy, http://books.google.com/googlebooks/privacy.html (accessed September 3, 2009)

[9] Google Privacy Policy, http://www.google.com/privacy.html (accessed September 3, 2009) ("Google Privacy Policy")

damages); *In re JetBlue Airways Corp. Privacy Litigation*, 379 F. Supp. 2d 299 (E.D.N.Y. 2005) (no claim for violation of privacy policy when airline gave customer records to government due to lack of monetary damage).[10]

The current Google Privacy Policies provide that Google may track a reader's past and present online actions and locations through some unstated combination of cookies, IP addresses, referrer logs, and numerous distinguishing characteristics of a reader's hardware and software.[11] This level of tracking allows Google to know what books are searched for, which are browsed (even if not purchased) what pages are viewed of both browsed and purchased books, and how much time is spent on each page. Most of this tracking is something bookstores and libraries could never do, short of hiring an agent to follow patrons around the stacks and then into their homes.

The Settlement allows Google to aggregate the information it learns from Google Book Search with other information it knows about readers from other sources, including its other services and its DoubleClick product that places cookie-traced advertising on millions of non-Google websites across the Internet. *See* Google Privacy Policy ("We may combine the information you submit under your account with information from other Google services or third parties").

The Settlement also contains no limits on how long Google retains the information it collects and aggregates about Book Search readers. Extended retention is particularly problematic for reader privacy because the Settlement allows Google Book Search to keep data

---

[10] Those decisions have been criticized. *See e.g.*
http://blog.ericgoldman.org/archives/2005/12/when_does_a_pri.htm;
http://blog.ericgoldman.org/archives/2009/01/the_nonenforcea.htm

[11] *See* Google Privacy Policy. Referrer logs, which identify the website from which a Google Book Search user is coming, can reveal the content of searches done by readers to locate information, which can contain extremely sensitive of information since it reveals reader interests.

in a form that identifies readers and their reading habits individually.[12] Even with heavily redacted records, experience shows that readers can be identified. For example, in 2006, AOL disclosed "anonymized" search records that nonetheless enabled reporters to identify 62-year-old Thelma Arnold, who was shocked to see her "whole personal life" publicly revealed through her search records. Michael Barbaro & Tom Zeller, Jr., *A Face is Exposed for AOL Searcher No. 4417749*, N.Y. TIMES, Aug. 9, 2006, at C4. Similarly, research findings indicate that seemingly generic information can be combined to identify individuals.[13] For these reasons, extended retention, even of seemingly "anonymized" data, poses a serious privacy threat.

The Settlement similarly fails to contain any safeguards that would prevent improper disclosure to law enforcement and third parties pursuant to subpoena. As discussed further below in Section D, in traditional libraries and physical bookstores, book records are generally subject to an extremely high standard for disclosure. Google's current policy, on the other hand, is to treat reader information essentially in the same way Google treats user information it collects through its other services. This means that it can share information with law enforcement or

---

[12] Although Google's privacy policy does not require it to anonymize user data, Google has informally stated that it does partially anonymize user IP addresses after approximately 18 months. *See* Posting of Peter Fleischer, The Official Google Blog, *How long should Google remember searches?* http://googleblog.blogspot.com/2007/06/how-long-should-google-remember.html (June 11, 2007). However, this announcement does not address other important information Google obtains through cookies, authentication processes and the "purchase" of books. Moreover, Google is not bound to continue this practice, and some have argued Google's current anonymization practices are insufficient to protect reader privacy. *See* Chris Soghoian, *Debunking Google's log anonymization propaganda*, CNET, Sept. 11, 2008, http://news.cnet.com/8301-13739_3-10038963-46.html. For example, Google partially anonymizes IP addresses by erasing the last eight bits (e.g. from 173.192.103.121 to 173.192.103.XXX). *Id.* However, this method still identifies a reader as one among 254 computers, and if cookie data remains intact, restoring the full IP address is not difficult. *Id.*

[13] *See* Latanya Sweeney, *Uniqueness of Simple Demographics in the U.S. Population*, LABORATORY FOR INT'L DATA PRIVACY (2000), available at http://privacy.cs.cmu.edu/dataprivacy/papers/LIDAP-WP4abstract.html. Sweeney found that 87% of the population in the U.S. reported characteristics on the U.S. Census that "likely made them unique" based only on ZIP code, gender, and date of birth. Therefore, "few characteristics are needed to uniquely identify a person." *Id.*

private parties based solely on its own "good faith belief" that disclosure is "reasonably necessary to satisfy any applicable law, regulation, legal process or enforceable government request." Google Privacy Policy. Importantly, disclosure is predicated upon Google's subjective belief rather than on the objective issuance of a warrant or order by a court. This subjective standard leaves readers at risk from overreaching government and private parties and at the mercy of Google's internal decision-making on disclosure rather than on the judgment of a court.

Google's recently issued Google Books Privacy Policy does not change this. The policy merely provides that Google will follow the law in the jurisdictions where specific "book laws exist and apply to Google Books."  Google Books Privacy Policy. Of course, no privacy policy is needed to require Google to follow the laws that specifically apply to it. For all other state and federal processes, which are either uncertain or likely do not apply, Google merely says that it plans to "continue its strong history of fighting for high standards to protect users." *Id.* Google's aspirations, while noble, are simply not the same as an enforceable commitment.

The Settlement also does not require Google Book Search to report how many disclosure requests it receives or how many reader records it discloses. As a result, neither the public nor authors and publishers concerned about disclosure of their readers will know when, why, or how often Google Book Search records are transmitted to third parties, be they civil litigants or government.

## IV.  ARGUMENT

### A.  To Be Approved, The Settlement Must Adequately Protect All Members of the Class and Be Consistent with the Public Interest.

Before the Court may approve the Settlement, it must determine that the Settlement is fair, reasonable, and adequate to the class. Fed. R. Civ. P. 23(e)(2) . The Court must take extra care in evaluating the Settlement for fairness to *all* class members, not just the named representatives. Fed. R. Civ. P. 23. Advisory Committee Notes 2003 ("[C]ourt review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement."). A Settlement should not be approved if it is "a global

10

compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 595 (1997). "Many courts have stated that the reaction of the class should be accorded the greatest weight in the fairness review." 2 *McLaughlin on Class Actions* 6:9, (citing, *e.g.*, *In re Orthopedic Bone Screw Products Liability Litigation*, 176 F.R.D. 158, 184 (E.D. Pa. 1997)). None of the Privacy Authors and Publishers are members of the Authors Guild, nor did they participate in shaping the Settlement. Thus, the Court must carefully consider whether the Settlement fairly and adequately represents their interests now and in the future.

The Settlement must also be consistent with the interests of the reading public. *Patterson v. Newspaper & Mail Deliverers' Union of New York and Vicinity*, 514 F.2d 767, 771 (2d Cir. 1975) (affirming district judge's approval of a class action settlement agreement as "equitable to all persons concerned and in the public interest"). In *In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1026-1027 (2d Cir. 1992), the Second Circuit held that "[w]here the rights of third parties are affected, . . . their interests too must be considered" during the court's evaluation of "the fairness, reasonableness and adequacy of the settlement . . . ." The Second Circuit further articulated that "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *Id.* at 1026. Thus, this Court can and should take the interests of readers into account.

While this Court cannot unilaterally modify the Settlement, it can suggest modifications of the proposed settlement to the parties and subsequently either grant or withhold approval. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). This Court can also approve modifications that increase the value of the settlement for the class without resort to an additional round of class notifications. For example, in *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006), the Second Circuit allowed a modification that benefited the class by providing funds to pay opt-outs, without requiring an additional notice period, stating: "[a]n additional opt-out period is not required with every shift in the marginal attractiveness of the settlement . . . ." The *Denney* court relied in part on the fact that, as here, the Settlement itself provided that the

terms might change. *See* Settlement at § 17.27. Similarly in *Shaw v. Toshiba America Information Sys., Inc.*, 91 F. Supp. 2d 942, 974, 984 (E.D. Tex. 2000), the court approved a settlement of a class action concerning defective laptops with one modification that extended a coupon redemption date that conferred a substantial benefit on the class and another changing the method of proving ownership that the court found to be minor, both without providing additional notice to the class.

### B.      Readers Will Be Chilled If Privacy Protections Are Not Put In Place.

The tracking and retention of data on Google Book Search users' reading and browsing habits will chill people from accessing and purchasing books unless sufficient safeguards are put in place to prevent that information from being disclosed to the government or to third parties. It is well established that readers change or curtail their reading if they fear government surveillance. As Justice Douglas observed, "Once the government can demand of a publisher the names of the purchasers of his publications . . . [f]ear of criticism goes with every person into the bookstall . . . [and] inquiry will be discouraged." *United States v. Rumley*, 345 U.S. 41, 57 (1953) (Douglas, J., concurring). The Supreme Court has likewise held that cable subscribers would be deterred from filing a written request for sex-related programming out of "fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel." *Denver Area Educational Telecom. Consortium, Inc. v. Federal Communications Commission*, 518 U.S. 727, 754 (1996). Similarly, in *Lamont v. Postmaster General*, 381 U.S. 301 (1965), the Supreme Court struck down a requirement that individuals must file written request with the postal service to receive "communist political propaganda" through the mails, because such a requirement is "almost certain to have a deterrent effect." The Court especially noted that "[P]ublic officials, like schoolteachers who have no tenure, might think they would invite disaster if they read what the Federal Government says contains the seeds of treason." *Id.* at 307.

Similarly, in rejecting a government subpoena for the reading records of 120 Amazon.com customers, the Western District of Wisconsin similarly noted that:

> [I]f word were to spread over the Net—and it would—that the FBI and the IRS had demanded and received Amazon's list of customers and their personal purchases, the chilling effect on expressive e-commerce would frost keyboards across America . . . well-founded or not, rumors of an Orwellian federal criminal investigation into the reading habits of Amazon's customers could frighten countless potential customers into canceling planned online book purchases, now and perhaps forever.

*In re Grand Jury Subpoena to Amazon.com,* 246 F.R.D. 570, 573 (W.D. Wis. 2007).

These chilling effects are not hypothetical. In *In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc.,* 26 Media L. Rep. (BNA) 1599, 1600 (D.D.C. 1998), the court found that as a result of a grand jury subpoena for a patron's book purchases, "[m]any customers have informed Kramerbooks personnel that they will no longer shop at the bookstore because they believed Kramerbooks to have turned documents over . . . that reveal a patron's choice of books." *Id.* at 1601.

Studies have also documented the chilling effect government surveillance has on reading and use of the Internet. One survey found that 8.4% of Muslim-Americans changed their internet usage because they believed their habits were being tracked by the government. Dawinder S. Sidhu, *The Chilling Effect of Government Surveillance Programs on the Use of the Internet by Muslim-Americans*, 7 U. MD. L.J. RACE, RELIGION, GENDER & CLASS 375, 391 (2007). Indeed, without anonymity, it is clear that many individuals will not access certain types of Internet speech. *See, e.g., ACLU v. Gonzales*, 478 F. Supp. 2d 775, 805-06 (E.D. Pa. 2007) (finding that "[m]any people wish to browse and access material privately and anonymously, especially if it is sexually explicit," that "[a]s a result of this desire to remain anonymous, many users who are not willing to access information non-anonymously will be deterred from accessing the desired information," and that "web site owners such as the plaintiffs will be deprived of the ability to provide this information to those users").

These reader concerns about being monitored are neither irrational nor far-fetched. There is no doubt that once Google builds this repository of information, both the government and third parties will attempt to gain access to it. The government has a long history of trying to collect

and use evidence of reading habits. For example, at the McCarthy hearings, people were questioned on whether they had read Marx and Lenin. *See e.g*., Senate Permanent Subcommittee on Investigations of the Committee on Government Operations, Vol. 2, 964, Mar. 24, 1953 (testimony of Jerre G. Mangione). They were even asked whether their spouses or associates had books by or about Stalin and Lenin on their bookshelves. *Id.* at 1697, Sep. 2, 1953 (testimony of Mary Colombo Palmiero).

Between 2001 and 2005, libraries were contacted by law enforcement seeking information on patrons at least 200 times. Eric Lichtblau, *F.B.I., Using Patriot Act, Demands Library's Records*, N.Y. TIMES, Aug 26, 2005, at A11. Indeed, in 2006, AOL received almost 1,000 requests for information in criminal and civil cases per month. Saul Hansell, *Online Trail Can Lead to Court*, N.Y. TIMES, Feb. 4, 2006, at C1. Google itself has been the target of governmental requests for massive amounts of information concerning what information users of its search engine are looking to find. *Gonzales v. Google, Inc.*, 234 F.R.D. 674 (N.D. Cal. 2006) (discussing the Department of Justice's subpoena to Google seeking to require Google to produce every single query made to Google's search engine over a two-month period). So too has objector Ronin Publishing, who was subpoenaed by the Drug Enforcement Agency for the names and addresses of all residents in the state of Arizona who had purchased one of Ronin's books on marijuana hydroponics. *See Publisher Fights DEA on Book Buyers' Names*, CONTRA COSTA TIMES, Oct. 30, 1997 at A9.

Third party litigants have also sought the viewing habits of Americans. In a recent copyright case, the court granted Viacom's motion to compel Google subsidiary YouTube to disclose "all data from [its logging] database concerning each time a YouTube video has been viewed on the YouTube website or through embedding on a third-party website." *Viacom Int'l, Inc. v. YouTube, Inc.*, 253 F.R.D. 256, 261-262 (S.D.N.Y. 2008).[14]

---

[14] The decision was criticized and the matter was later resolved by a privacy protective stipulation. *See e.g.* http://www.eff.org/deeplinks/2008/07/viacom-narrows-request-youtube-information.

Monitoring creates a significant harm – and possibly danger – for people who read about controversial subjects. *See United States v. Curtin*, 489 F.3d 935, 959 (9th Cir. 2007) (Kleinfeld, J. concurring) (noting that, "In the 1950s, people with leftist books sometimes shelved them spine to the wall, out of fear that visitors would see and report them"). By compiling extensive data on readers' reading habits, Google Book Search will almost certainly become a source for governmental entities and private litigants seeking this sensitive, associational information on readers. The Court should not approve a settlement that enables that scenario to unfold, as the Supreme Court has recognized the vital importance of privacy to the exercise of First Amendment protected activities. *See, e.g., NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("inviolability of privacy in group associations may in many circumstances be indispensable to preservation of freedom of association"); *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 544 (1963); *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 357 (1995) (holding that there is a constitutional right to engage in anonymous speech); *Stanley v. Georgia*, 394 U.S. 557, 568 (1969) (holding that there is a First Amendment right to private possession of even obscene material).

It is no answer to instruct readers to use other methods to acquire information or to tell authors that they do not need to have their books available on Google Books. *See, e.g., Schneider v. State*, 308 U.S. 147, 163 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place"); *Va. State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 757 n.15 (1976) ("We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means . . ."). This is particularly true here because over time other methods of accessing controversial books may become less available. The Settlement envisions that Google Book Search will be available in universities and libraries, reducing the need for other sources to acquire books. And, if successful as a book access purchasing service, Google Book Search could also lead to a significant reduction in the number and size of physical bookstores.

15

**C.    Privacy Authors and Publishers Will Suffer Expressive and Financial Losses Without Privacy Protections in the Settlement.**

Because of these chilling effects, the lack of privacy protections in the Settlement threatens the expressive and financial interests of all authors and publishers, but particularly authors and publishers of controversial or sensitive subject matter such as the Privacy Authors and Publishers. Many Google Book Search readers will modify their reading choices if they fear that they are being surveilled. Readers will be less inclined to read books on controversial government policies, sexuality, drugs, health, or religion through Google Book Search if they are subject to pervasive tracking and monitoring must worry how information about their reading habits may be used or shared. The price of this reluctance to be tracked will be shrinking readership and, in turn, shrinking revenue for the Privacy Authors and Publishers. It will also severely inhibit public debate. As the Court observed in *Lamont*, if individuals could be required to provide their names to receive certain materials, "[i]t would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont*, 381 U.S. at 308.

The Privacy Authors and Publishers are also concerned about their own privacy interests as readers. That is especially the case for authors using Google Book Search to conduct research necessary to produce accurate and effective books, who may be wary of producing suspicious reading records. For example, author Ayelet Waldman may want to be able to research deadly weapons for one of her mystery novels, without fear that the government will learn of it and suspect her of criminal activity. When Jonathan Lethem researches a disease like Tourette's Syndrome for his novel *Motherless Brooklyn*, he does not want his insurance company to be able to discover that information in a lawsuit and to draw improper assumptions from it. If authors cannot research freely, their ability to create and communicate will suffer, which is exactly the opposite of copyright law's aim.

**D.    Because the Settlement Fails to Follow Well-Established Privacy Caselaw, Statutes and Policies, It is Neither In the Interest of the Class Nor in the Public Interest.**

The Google Book Search services created by the Settlement are only possible with the sanction of the Court both though its approval of the Settlement and through its ongoing

jurisdiction to interpret and implement the agreement. Settlement Agreement § 17.23. This Court's ongoing involvement in a settlement agreement that implicates constitutional concerns is a form of a state action. *Cohen v. Cowles Media Co*., 501 U.S. 663, 668 (1991) (state action found in court application of promissory estoppel doctrine against a newspaper in a manner allegedly restricting First Amendment freedoms); *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (court action can be state action in a civil matter between private parties when the court imposes invalid restrictions on the constitutional freedom of speech).

This is particularly true for the license the Court would be granting to Google on behalf of currently unidentified and possibly unidentifiable class members, the holders of the so-called "orphan works," who would otherwise not be bound by the agreement without this Court's power and jurisdiction. For these class members, state action is the *only* power that allows Google to use their copyrighted works to deliver the services contemplated in the Settlement. Because state action is involved, the Court must be highly sensitive to the First Amendment and privacy expectation problems raised by the Settlement's lack of affirmative privacy protections, and the fact that they allow Google to depart radically from well-established caselaw, statutes and policies protecting reader privacy.[15]

### 1.     The Settlement Ignores Well-Established Caselaw Protecting Reader Privacy.

Recognizing the existence and harms of a chilling effect on society, the United States Supreme Court and other courts have long protected anonymous reading. In *Rumley*, 345 U.S. 41, the Court held that a man could not be convicted for refusing to provide a list of individuals to whom he had made bulk sales of political books for further distribution. In *Lamont*, 381 U.S. 301, the Court struck down a federal statute that required individuals wishing to receive materials the government had labeled as "communist political propaganda" to return to the Post

---

[15] To the extent companies other than Google, such as Amazon, monitor and collect information about their Internet readers, the Privacy Authors and Publishers have identical privacy and speech concerns.  What makes this situation unique is the Court's involvement in being asked to create an institution that will jeopardize constitutional rights.

Office a signed notice stating they wanted to receive such materials. In *Stanley*, 394 U.S. at 565, the Court held that justifications for criminalizing obscenity do not "reach into the privacy of one's own home" and that, "[i]f the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch."

Federal and state courts have consistently safeguarded readers from governmental attempts to obtain reader records. In *In re Grand Jury Subpoena (Amazon.com)*, 246 F.R.D. 570, the court quashed a government subpoena seeking the identities of 120 book buyers because "it is an unsettling and un-American scenario to envision federal agents nosing through the reading lists of law-abiding citizens while hunting for evidence against somebody else." *Id.* at 573. The Colorado Supreme Court similarly held that government access to book records only passed muster under the free speech provision of the state constitution if a "warrant plus" standard was met by the government, requiring not only a warrant but a prior adversarial hearing, notice to the provider, and showing of a compelling need. *Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1059 (Colo. 2002).  And when federal investigators attempted to use a grand jury subpoena to obtain Monica Lewinsky's reading records from Kramerbooks bookstore in Washington, D.C., the court held that the First Amendment required the government to "demonstrate a compelling interest in the information sought . . . [and] a sufficient connection between the information sought and the grand jury investigation . . . ." *In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc*, 26 Media L. Rep. at 1601.

The Settlement completely ignores these constitutional issues and essentially leaves it to Google's discretion whether and when to disclose reader information. Google's privacy policies make no additional commitment to require high standards before disclosure, except where statutes already specifically require it to do so.

2.    **The Settlement is Inconsistent With State Laws for Reading Privacy and Congressional Protections for the Private Receipt of Expressive Materials.**

Virtually every state protects public library reading records by statute, in recognition of the importance of having a citizenry that can freely avail itself of all the information in all the books without fear of monitoring.[16] *See, e.g.*, N.Y. C.P.L.R. § 4509; Cal. Gov. Code §§ 6267, 6254(j). In many states, violating a public library reading record statute is a misdemeanor criminal violation. *See, e.g*., Ariz. Rev. Stat. § 41-1354(C) (2008), Ark. Code. Ann. § 13-2-702; D.C. Code § 39-108(d); Fla. Stat. Ann. § 257.261(4); Mont. Code Ann. § 22-1-1111. The Settlement authorizes Google to digitize millions of *library* books and to place access terminals in the public libraries, but does not include any provisions to continue to protect reader privacy consistent with these laws. Without explicit privacy protections in the Settlement, these long-held rights to privacy and freedom to read could be extinguished in this new digital age merely because Google converts public library books into a private set of services.[17] The Settlement must take account of these state laws and the need to protect reader privacy to be fair and adequate to the interests of the class and the public.

Congress has also recognized the privacy interests of users of expressive material by creating strong protections for video renters, purchasers and subscribers and cable subscribers. The Video Privacy Protection Act prohibits disclosure of video viewing records without a

---

[16] The two states that do not have library confidentiality laws are Hawaii and Kentucky. However, the Attorney Generals' Offices in each state have issued opinions in support of reader privacy. Haw. OIP Opinion Letter No. 90-30 (1990) (disclosure of library circulation records "would result in a clearly unwarranted invasion of personal privacy"); Ky. OAG 82-149 (1982 "all libraries may refuse to disclose for public inspection their circulation records. . . . [W]e believe that the privacy rights which are inherent in a democratic society should constrain all libraries to keep their circulation lists confidential.").

[17] Rhode Island and Michigan both have laws prohibiting book sellers from disclosing information. R.I. Gen. Laws § 11-18-32 (2009); Mich. Comp. Laws Ann. § 445.1712 (2009). Michigan law requires a warrant or court order before any business selling, renting, or lending books may disclose identifying information about a customer. *Id.* Presumably these two laws are what Google refers to when it promises to be bound by specific "book laws" in the Google Books Privacy Policy.

19

warrant or court order. 18 U.S.C. §§ 2710(b)(2)(C), 2710(b)(2)(F), 2710(b)(3). The Cable

Communications Policy Act similarly prohibits disclosure of cable records absent a court order.

47 U.S.C. § 551(h). It would be strange indeed for this Court to endorse a Settlement that allows

less privacy for readers of books than that enjoyed by customers of video services or cable

companies.

### 3. The Settlement Fails to Acknowledge that Reader Privacy is a Prominent Part of the Library Code of Ethics

 The American Library Association has also protected patron privacy as part of its core

mission. The Library Code of Ethics, first adopted in 1938, now reads: "We protect each library

user's right to privacy and confidentiality with respect to information sought or received and

resources consulted, borrowed, acquired or transmitted."[18] Librarians have fiercely defended

patron privacy through several eras of government surveillance.

### E. To Protect The Interests Of The Privacy Authors And Publishers and the Public, Reader Privacy Protections Must Be Incorporated Into The Settlement.

 The Settlement entrusts an extensive digital library and bookstore to Google, yet requires

none of the traditional privacy protections in return. To make the Settlement fair, reasonable and

adequate the Privacy Authors and Publishers ask this Court to require Google Book Search to

conform to the same privacy standards that currently exist for offline and library books.

Specifically the Privacy Authors and Publishers respectfully request that the Settlement not be

approved unless it is modified as described below. Alternatively, Google could enter into an

enforceable commitment implementing these protections, subject to the ongoing jurisdiction of

the Court, to accomplish the same goals with even less disruption to the Settlement process.[19]

---

[18] American Library Association Council, *Library Code of Ethics*,  Jan. 22, 2008,
http://www.ala.org/ala/aboutala/offices/oif/statementspols/codeofethics/codeethics.cfm
(September 5, 2009).

[19] *See e.g. Comments Made By* Class Action Reports *To Advisory Committee On Civil Rules*,
CLASS ACTION REPORTS (Thomson Reuters/West), Feb. 2002, at 2 (If "some class members or
subgroups receiv[e] enhanced side benefits [that] are not at the expense of the class," this side
agreement "should require disclosure, though not necessarily court approval."). Here, the privacy

Just prior to the Objection filing date, on September 3, 2009, Google issued an additional privacy policy specifically for Google Books. To assist the Court in understanding which provisions have been addressed by Google and which remain, those issues currently addressed by Google's new privacy policy, or that Google promises to address in the future, are marked below with an asterisk (*).[20] As the list below demonstrates, while the Google Books Privacy Policy addresses several of these protections, many are not addressed at all or are not sufficiently addressed to provide readers the privacy to which they are entitled, and the policy as a whole may not be enforceable by readers, authors or publishers.

1. **The Privacy Protections Must Be Enforceable and U.S. Legal Protections Must Apply**

Privacy protections that are not enforceable by the people they are intended to protect are merely illusory. The readily changeable, possibly unenforceable Google Books Privacy Policy is neither fair, reasonable nor adequate to protect the class. To ensure that reader privacy is actually protected throughout the life of the Court-approved Google Book Search services, the following is required:

- Privacy protections should be subject to the continuing jurisdiction of this Court and made clearly and easily enforceable by readers as well as the Privacy Authors and Publishers and other class members.

- All data Google collects about U.S. Google Book Search users must be stored such that it is subject to U.S. legal protections.

---

benefits would actually assist the entire class, not just a subclass. Regardless, the benefits certainly would not come at the expense of the class, so a separate commitment from Google might not even require further court approval.

[20] Privacy Authors and Publishers note that their counsel has submitted a more lengthy and technically specific version of this list to Google directly that should serve as the basis for any further negotiations.

### 2.    There Must Be Adequate Protection Against Disclosure.

Readers should be able to read and purchase books on Google Book Search without worrying that the government or a third party may be effectively reading over their shoulder. To ensure that any stored information linking Google Book Search users to the books they view or purchase is not disclosable to the government or to third parties without proper protections, Google must:

- Commit not to disclose information about Google Book Search users to government entities or third parties in a pending civil or administrative action absent a warrant or court order unless they are expressly compelled by law to do so. *See Tattered Cover,* 44 P.3d at 1059.

- Notify each user prior to complying with any government or third party request for her or his information, unless forbidden to do so by law or court order.*

- Guarantee not to provide the titles of books purchased by any identifiable person to any third party, including the Book Rights Registry or any entity assisting with billing or another portion of the transaction.*

### 3.    There Must Be Limited Tracking of User Information.

Just as readers may anonymously browse books in a library or bookstore, readers should be able to search, browse, and preview books on Google Book Search without being forced to identify themselves to Google Books. *See McIntyre,* 514 U.S. at 357. At a minimum Google must:

- Ensure that searching and preview of books do not require user registration or the affirmative disclosure of any personal information.*

- Commit not to connect any information it collects from an individual's use of Google Book Search with information from the same individual's use of other Google services without specific, informed, opt-in consent.*

- Purge all logging or other information related to individual uses of Google Book Search no later than 30 days after the use in a manner that ensures that this

22

information cannot be used to connect particular books viewed to particular computers or users.[21]

- Allow users of anonymity services, such as Tor, proxy servers, and anonymous Virtual Private Network providers, to access Google Book Search.

Similarly, in order to protect the privacy of users of institutional subscriptions to Google Book Search, at a minimum, Google must:

- Collect no information about the browsers or computers of Google Book Search institutional users other than encrypted or anonymous session identifying information from the institution.*

- Ensure that information about an individual's use of an institutional subscription is not connected to the same individual's use information from other Google services.*

### 4.    Users Must Have Control Over Their Personal Information.

To preserve the right to communicate anonymously, registered users should have complete control over information Google stores about their book previews and purchases. In order to protect the privacy of registered users of Google's various services when they purchase and read books on Google Book Search, at a minimum, Google must:

- Allow users to delete their own access to books and ensure that this deletion removes any record of the purchase.*

- Allow registered users to control what other local or remote computer users can see about their Google Book Search use through the use of separate password-protected "bookshelves" or other technical means.

---

[21] Google already does this for other sensitive user information. Google Health, which allows a user to organize and store health information, stores use information, such as number of log-ins, for only two weeks, and does not correlate that information with other Google services information. *See* Google Health Privacy Policy, (last accessed Apr. 28, 2009), available at http://www.google.com/intl/en-US/health/privacy.html. Similarly, Google built privacy protections for users into Google Latitude, a cell phone service that finds the location of friends, by overwriting historical data. *See* Google Mobile Help, Privacy: Location History (Apr. 28, 2009), available at http://www.google.com/support/mobile/bin/answer.py?hl=en&answer=136652. Like medical records and location tracking, book records paint a revealing and intimate portrait of the reader; book records should be comparably well-protected.

- Establish a method to allow private reading, and giving of purchased books, such as allowing users to anonymously transfer or "gift" purchases to accounts that do not have Google Checkout or other identifying features, including transfer to others or to other accounts controlled by that user with no record of the fact of the original purchase* (note that the Google Books Privacy Policy is unclear about whether Google plans to eliminate tracking on gifts to others).

### 5.    There Must Be Sufficient Transparency.

To ensure that reader privacy is actually protected and to aid in the enforceability of these privacy protections, at a minimum, Google must:

- Provide a robust, easy-to-read notice of Google Book Search privacy provisions on the Google Book Search pages themselves.
- Ensure that any watermarks or other marking technologies used on Google Book Search for security purposes do not contain identifying information about users in a format that third parties can read or decipher and require a court order before providing that information in unencrypted form. Any watermarks with personally identifying information about users should be disclosed to users sufficiently to alert them to the existence of such marks and the type of information they include.
- Annually publish online, in a conspicuous and easily accessible area of its website, the type and number of requests it receives for information about Google Book Search Users from government entities or third parties.

## V.    CONCLUSION

Courts, libraries, and legislatures have fiercely protected the right to read without fear of being watched or reported upon. The Settlement, if approved, may enable Google Book Search to become the world's largest public library, institutional library, book "purchasing" and ongoing access system combined. It is no understatement to say that this Settlement may create the central way that books are accessed in the future, and the only way to access certain books. Because of its potential to greatly expand book access, Google Book Search is extremely exciting.

Yet that future potential will be undermined if this Court allows Google to collect intimate, invasive and previously unavailable information on readers, aggregate that that sensitive information with information about them collected by and through other Google products, and by doing so create a real risk of disclosure of that sensitive information to prying governmental entities and private litigants. This chilling effect will hurt all authors and publishers, but especially those who write about sensitive or controversial topics. It will also hurt the public interest, as the advance of digitization would come at the cost of reader privacy.

The Privacy Authors and Publishers were not adequately represented in the settlement negotiations. They would not have agreed to a Settlement so bereft of privacy protections. Without additional protections, the Settlement is not fair, reasonable or adequate to the class members or to the public. It should not be approved until sufficient privacy protections are put into place.

DATED: September 8, 2009

Respectfully submitted,

By _____ */s/Cindy A. Cohn*_____

Cindy Cohn (*pro hac vice*)
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Jennifer Lynch (*pro hac vice*)
Samuelson Law, Technology & Public Policy Clinic
UC Berkeley School of Law
389 Simon Hall
Berkeley, CA 94720

Aden J. Fine
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10001
(212) 549-2693
afine@aclu.org

25

David I. Pankin
The Law Offices of David I. Pankin, P.C.
48 Willoughby Street
Brooklyn, NY 11201
(718) 243-2444
Dpankin@pankinlaw.com

**CERTIFICATE OF SERVICE**

I, David Pankin, hereby certify that on September 8, 2009, I caused a true and correct copy of the annexed: PRIVACY AUTHORS AND PUBLISHERS' OBJECTION TO PROPOSED SETTLEMENT to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by first-class mail to any additional counsel who have appeared to date in the action.


*/s/ David Pankin*_____
David Pankin