UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

The Authors Guild, Inc., *et al.*,                    :

                                                       :

          Plaintiffs,                                  :

                                                       :

          vs.                                          :          Case No. 05 CV 8136-DC

                                                       :

Google Inc.,                                           :

                                                       :

          Defendant.                                   :

-------------------------------------------------------x


MEMORANDUM OF AMICUS CURIAE OPEN BOOK ALLIANCE
IN OPPOSITION TO THE PROPOSED SETTLEMENT
BETWEEN THE AUTHORS GUILD, INC., ASSOCIATION OF
AMERICAN PUBLISHERS, INC., ET AL., AND GOOGLE INC.

Gary L. Reback
(CA State Bar No. 100118)
(*Pro Hac Vice* Application Pending)

Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA  94303

Counsel for Amicus Curiae Open Book Alliance

## TABLE OF CONTENTS

I.    THE PARTIES HAVE CRAFTED A PROPOSAL TO FIX PRICES AND MAINTAIN MONOPOLIES..................................................................................................................3

    A.    Crisis in book publishing ......................................................................................3

    B.    Vulnerability of libraries to price exploitation.......................................................9

    C.    Opportunity for Google to maintain and extend monopolies ...............................11

II.   THE PARTIES SUCCEEDED BY WILLFUL MISDIRECTION. ...................................14

III.  COMPULSORY LICENSING MAY REMEDY THE ANTITRUST CONCERNS........26

## TABLE OF AUTHORITIES

**Cases**

*Discon, Inc. v. Nynex Corp.,*
    93 F.3d 1055 (2d Cir. 1996).................................................................. 27

*FTC v. Indiana Fed. of Dentists,*
    476 U.S. 447 (1986)............................................................................ 26

*Grunin v. Int'l House of Pancakes,*
    513 F.2d 114, 123 (8th Cir. 1975) ...................................................... 28

*In re Masters Mates & Pilots Pension Plan and IRAP Litigation,*
    957 F.2d 1020, 1025-26 (2d Cir. 1992) .............................................. 28

*In re Microsoft Corp. Antitrust Litigation,*
    185 F. Supp. 2d 519, 529 (D. Md. 2002) ............................................ 28

*In re Union Oil Co. of California,*
    Dkt. No. 9305 (March 4, 2003) (FTC Complaint).............................. 22

*Interstate Circuit, Inc. v. U.S.,*
    306 U.S. 208 (1939).............................................................................. 26

**United States Code**

28 C.F.R. § 50.6 ................................................................................................. 17

**Other Authorities**

Anick Jesdanun, *Google Book Project: Digital-Age Test of Copyright Law*, USA TODAY,
    September 18, 2005 .............................................................................. 21

Barbara Krasnoff, *Sony Reader PRS-700 Takes on Amazon's Kindle 2*, NETWORKWORLD, March
    30, 2009.................................................................................................. 8

Brian Lavoie & Roger C. Schonfeld, *A Systemwide View of Library Collections*, CNI Spring
    Task Force Meeting (April 5, 2005) .................................................... 24

Chris Anderson, *The Long Tail: Forget Squeezing Millions From a Few Megahits at the Top of
    the Charts. The Future is in the Millions of Niche Markets at the Shallow End of the
    Bitstream*, WIRED, Issue 12:10 (October 2004) .................................. 3

Christine McFadden, *Google Files Book Settlement*, THE STANFORD DAILY, November 3, 2008....20

David Hart, *On the Origins of Google*, NATIONAL SCIENCE FOUNDATION (August 17, 2004) .... 31

Edward Rothstein, *If Books Are on Google, Who Gains and Who Loses?*, N.Y. TIMES, November 14, 2005....................................................................................................................... 15

Email from Michael Smith, Executive Director, International Digital Publishing Forum (IDPF), to IDPF Members................................................................................................... 5

Eric Pfanner, *Book Publishers Take Leaps Into Digital*, N.Y. TIMES, November 9, 2008............. 5

Eric Schmidt, *Books of Revelation*, WALL STREET JOURNAL, October 18, 2005.......................... 15

FEDERAL TRADE COMMISSION & THE UNITED STATE DEPARTMENT OF JUSTICE, ANTITRUST GUIDELINES FOR COLLABORATION AMONG COMPETITORS (April 2000) ........................... 26

Galen Ward, *New Google is the Old Microsoft*, TECHFLASH: SEATTLE'S TECHNOLOGY NEWS SOURCE, (last updated August 14, 2009) ......................................................................... 13

Jack Shafer, *Does the Book Industry Want to Get Napstered?*, SLATE, July 15, 2009................... 5

James Gleick, *How to Publish Without Perishing*, N.Y. TIMES, November 30, 2008................. 20

Jeffrey Toobin, *Google's Moon Shot: The Quest for the Universal Library*, THE NEW YORKER, February 5, 2007 ..................................................................................................... 20

Jim Milliot, *As Amazon Soars, Bookstores Creep: Media Sales at the E-Tailor Jumped 104% in Five Years; Bookstores up 3%*, PUBLISHERS WEEKLY, April 14, 2008 ............................... 3

Letter from David Drummond, Vice President, Corporate Development and General Counsel, Google, Inc., to Jule L. Sigall, Associate Register for Policy & International Affairs, U.S. Copyright Office (March 25, 2005) ................................................................................. 14

Lisa Richmond, *The Dark Side of Online Journals: Commercial Publishers Dominate Online Scholarly Journal Production*, Z MAGAZINE: THE SPIRIT OF RESISTANCE LIVES (June 2009) ......................................................................................................................... 9

Mark J. McCabe, *A Portfolio of Journal Pricing: Print v. Digital*, working paper at 3 (revised June 2003)..................................................................................................................... 9

Mark J. McCabe, *Law Serials Pricing and Mergers: A Portfolio Approach*, THE B.E. JOURNAL OF ECONOMICS ANALYSIS & POLICY, Vol 3: Issue 1 (Contributions), Article 11 at 1 (2004)......................................................................................................................... 9

Mark J. McCabe, *The Impact of Publisher Mergers on Journal Prices: An Update*, ASSOCIATION OF RESEARCH LIBRARIES: A BIMONTHLY REPORT, no. 207 (December 1999) ................... 9

Motoko Rich, *Barnes & Noble Plans an Extensive E-Bookstore*, N.Y. TIMES, July 20, 2009 ....... 6

Motoko Rich, *Preparing to Sell E-Books, Google Takes on Amazon*, N.Y. TIMES, June 1, 2009 . 7

Nancy Kranich, *Scholarly Publications Hold Universities Hostage: Monopoly on Journals Cause Prices to Soar*, FAIRNESS & ACCURACY IN REPORTING (January/February 1999)  10

Joseph Tartakoff, *Analysts: Kindle Book Price Hikes Are Coming*, PAIDCONTENT.ORG, June 19, 2009 ................................................................................................................................. 6

Patricia Schroeder, *Google Cannot Rewrite U.S. Copyright Laws*, WALL STREET JOURNAL, October 25, 2005 .................................................................................................... 15

Paul Aiken, Two Guideposts: Press Conference Remarks of Guild Executive Director, The Authors Guild (October 28, 2008) .................................................................................. 20

Press Release, Debevoise & Plimpton LLP, Debevoise Advises Worldwide Class of Publishers and Association of American Publishers in Landmark Settlement with Google, Nov. 25, 2008 ............................................................................................................ 17, 20

Press Release, United States Department of Justice, Yahoo! and Google Inc. Abandon Their Advertising Agreement, Nov. 5, 2008 ............................................................................ 11

Robert Mitchell, *Amazon Pulls a Microsoft*, COMPUTERWORLD BLOGS, March 28, 2008 ........... 3

RON CHERNOW, TITAN: THE LIFE OF JOHN D. ROCKEFELLER, SR. 136 (1st ed. 1998) ................... 2

Roy Blount, *Let's Not Lose Our Heads Over a "Monopoly" of Orphans*, THE AUTHORS GUILD, June 24, 2009 ................................................................................................................. 4

Scherer, F.M., *The Political Economy of Patent Policy Reform in the United States*, in HARVARD UNIVERSITY JOHN F. KENNEDY SCHOOL OF GOVERNMENT FACULTY RESEARCH WORKING PAPER SERIES RWP07-042 (October 2007) ..................................................................... 30

*The Time Has Come To Regulate Search Engine Marketing And SEO*, TECHCRUNCH (July 13, 2009) .............................................................................................................................. 12

Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1543 (2004) ........ 6

Thomas Kalil, *Google: Lessons for America's Innovation Policy*, CENTER FOR AMERICAN PROGRESS (May 14, 2004) ............................................................................................... 31

Tim O'Reilly, *Long Tail Evidence from Safari and Google Book Search*, O'REILLY RADAR, May 15, 2006.................................................................................................................... 4

Timothy B. Lee, *Publisher speculates about Amazon/Google e-book "duopoly"*, ARS TECHNICA (last updated February 23, 2009) ...................................................................... 23

Videotape: CFP Google Book Deal Panel (Creating the Future 2009 Conference, June 2, 2009) ............................................................................................................................. 20

Videotape: The GigaOm Show – Episode 12: Interview of Marissa Mayer, Oct. 11, 2007 ........ 14

In 1871, three powerful railroads secretly approached John D. Rockefeller, proposing an audacious scheme. The railroads wanted Rockefeller to transport his oil over their lines. More than that, the railroads needed to suppress cutthroat competition among themselves, to raise prices to customers and to protect their markets against new competitive innovations. So the railroads secretly proposed that Rockefeller act as their "evener," to ensure a stable market division among them. Through Rockefeller, the three railroads consolidated their market positions and insulated themselves from the rigors of competition.

In aid of their own business interests, the railroads dramatically increased Rockefeller's market power. The railroads secretly proposed rate increases to Rockefeller's competitors and provided hidden rebates to Rockefeller's own company, making Rockefeller "all but omnipotent in oil refining," according to one biographer. Rockefeller seized the opportunity. At the time he was only one of many competitors in the oil refining market. But he saw that he could dramatically improve his own competitive position by helping to suppress competition in the rail industry.

The rail competitors created a cartel known as the "South Improvement Company" to implement their scheme. But public announcement of the rate hikes precipitated widespread outrage, even rioting, among Rockefeller's smaller competitors. After only a few months, the railroads agreed to abrogate SIC's contract.

Nevertheless, the damage was done. In just those three months, Rockefeller took over 22 of his 26 Cleveland competitors, using the threat of the railroads' rate structure to force them to sell out. The South Improvement Company gave Rockefeller the momentum he needed to gain control of the national refining market. Indeed, SIC became Rockefeller's "master blueprint." Ron Chernow, Rockefeller's biographer, called the South Improvement Company "an

1

astonishing piece of knavery, grand-scale collusion such as American industry had never witnessed."[1] The public reaction to Rockefeller's "knavery" produced the Sherman Act in 1890, a statute intended to prevent secret combinations, conspiracies to fix price, and monopolization.

The parties before this Court have created in the Google Book Settlement their own modern day version of the South Improvement Company. Google and the plaintiff publishers secretly negotiated for 29 months to produce a horizontal price fixing combination, effected and reinforced by a digital book distribution monopoly. Their guile has cleared much of the field in digital book distribution, shielding Google from meaningful competition.

The parties now seek the Court's formal blessing to fix prices, restrain competition, and retard technological advancement. More specifically, they seek waivers in the enforcement of both our nation's antitrust laws (to create a horizontal cartel of thousands of book publishers through the contrivance of class certification) and the nation's copyright laws (to sell for their own benefit orphan books they do not own). The parties argue that the evils of price-fixing and monopoly necessarily attend the creation of their new product – that there will be no universal library and bookstore without stifling competition. But that is not so. There are far less onerous alternatives. For example, through the simple expedient of compulsory licensing, a technique well known and successfully employed in antitrust, many of the competitive problems associated with the parties' scheme can be avoided.

---

[1] RON CHERNOW, TITAN: THE LIFE OF JOHN D. ROCKEFELLER, SR. 136 (1st ed. 1998).

I

## THE PARTIES HAVE CRAFTED A PROPOSAL TO FIX PRICES AND MAINTAIN MONOPOLIES.

The great bulk of the parties' proposal, including its most controversial provisions, flows not from the lawsuits filed in 2005 but rather from the needs and desires to achieve broader business goals, some of them flatly illegal. The business pressures and opportunities confronting the parties illuminate the scheme's anticompetitive effects and explain the reason that a broad collection of libraries, consumer groups, small publishers, and commercial interests now oppose the proposal. If approved, the proposal will damage competition in scores of markets, particularly those dependent on web commerce.

### A.    Crisis in book publishing

The book publishing industry includes tens of thousands of publishers but no more than a half-dozen large companies dominate the publishing industry. These companies confront declining demand for their products (book sales dropped precipitously this past year after five years of only the most tepid growth), while continuing to bear an obsolete and inefficient cost structure. In addition, most books are still sold through large retail chains, comprised of individual stores that can stock only a fraction of the total books available for purchase. Distribution costs are high. The cost of maintaining redundant inventory at hundreds of stores, higher still. Each store can draw only from a limited local population, meaning that only the most popular books can be stocked.[2] Sales from bookstores have been flat at best.

By contrast, web sales of conventional books have shown real gains over the last several years, and publishers have grown increasingly dependent on that channel, although web sales

---

[2] Chris Anderson, *The Long Tail: Forget Squeezing Millions From a Few Megahits at the Top of the Charts*, WIRED, Issue 12:10 (October 2004), *available at* http://www.wired.com/wired/archive/12.10/tail.html.

still constitute a minority of overall book sales.[3]  Many books published before the ubiquity of web commerce failed to generate a profit and went out of print – and even became orphaned.  A large number of those books would have been profitable under the web's model, which can match geographically dispersed buyers to a product of their choice efficiently, in contrast to the old distribution model based on storefronts.  The extant copies of old (mostly used) books can now be matched to eager buyers and sold for profit, even though the limited demand for each individual title would not have proved sufficient under the old distribution model.  In the aggregate, the potential profits from the sale of old books are enormous.  Some proponents of the settlement claim that orphan works lack sufficient monetary value to worry about in terms of antitrust enforcement.[4]  Those claims are disingenuous, and ignore the value of these books in potential direct sales, as part of broader library subscription models, and in other markets.

Currently, publishers gain no direct compensation from the sale of these old books.  And the limited supply of print copies of each book title caps the aggregate profit that can be made, even on the web, from the sale of old books.  Nevertheless, the robust market for older books on the web demonstrates to publishers the vast profit that can be made from out-of-print books if additional digital copies can be created.  Only about four percent of all titles ever published are still being commercially exploited.[5]

The transition from print books to digital books (sometimes called electronic books or e-books) exacerbates the challenges the big publishers face.  The sales of digital books, though still a tiny percentage of overall book sales, are soaring even as the sales of conventional

---

[3] *See* Robert Mitchell, *Amazon Pulls a Microsoft*, COMPUTERWORLD BLOGS, March 28, 2008, *at* http://blogs.computerworld.com/amazon_pulls_a_microsoft; Jim Milliot, *As Amazon Soars, Bookstores Creep: Media Sales at the E-Tailor Jumped 104% in Five Years; Bookstores up 3%*, PUBLISHERS WEEKLY, April 14, 2008, *at* http://www.publishersweekly.com/article/CA6550867.html.
[4] Roy Blount, *Let's Not Lose Our Heads Over a "Monopoly" of Orphans*, THE AUTHORS GUILD, June 24, 2009, *at* http://www.authorsguild.org/advocacy/articles/roy-blount-on-google-orphans.html.
[5] Tim O'Reilly, *Long Tail Evidence from Safari and Google Book Search*, O'REILLY RADAR, May 15, 2006, *at* http://radar.oreilly.com/2006/05/long-tail-evidence-from-safari.html.

books languish.  For the first nine months of 2008, book sales in the United States fell 1.5%

but trade sales of digital books at wholesale rose 55%.  The first two quarters' 2009 sales of

electronic books at wholesale exceeded all of 2008 (up almost 150%).  Sales are expected to

exceed 30 million units by 2013, with many industry insiders expecting digital sales to surpass

sales of paper-and-ink books by 2018.[6]

      On one hand, the consumer transition from paper-and-ink books to electronic books

presents an opportunity for the publishers to reap an enormous windfall from older, out-of-print

books that are still under copyright.  Of course, the opportunity lies in aggregation; the returns on

each individual title may not be large.

      But the conversion to digital produces more trepidation than confidence among big

publishers.  The price point for bestselling digital books, currently available in the hundreds of

thousands of titles on electronic reading devices made by Amazon and Sony and, soon, a myriad

of other producers, sits far below that of conventional print books – less than ten dollars for a

digital copy, compared to a hard copy list price of around $26.[7]  From the very beginning of

digital book distribution, digital prices fell well below print prices.  It is far easier to transmit

digital books to a user's computer or reading device than it is to manufacture, print, manage

inventory, store and ship physical books.  The lower price point also reflects a consumer

perception of a lesser value for digital as opposed to print books, similar to the price points for

music recordings.  Because of rights management restrictions, most digital books can neither be

resold nor lent to a friend to read.  They cannot be displayed handsomely on home bookshelves.

---

[6] Email from Michael Smith, Executive Director, International Digital Publishing Forum (IDPF), to IDPF Members (*citing* eBook sales statistics for June 2009 as released by the Association of American Publishers and IDPF *available at* http://www.idpf.org/DOC_LIBRARY/INDUSTRYSTATS.HTM); Eric Pfanner, *Book Publishers Take Leaps Into Digital*, N.Y. TIMES, November 9, 2008, *at* http://www.nytimes.com/2008/11/10/business/worldbusiness/10kindle.html?scp=3&sq=Google%20November%2010,%202008&st=cse.
[7] Jack Shafer, *Does the Book Industry Want to Get Napstered?*, SLATE, July 15, 2009, *at* http://www.slate.com/id/2222941/.

And authors wonder why publishers should get such a substantial portion of book proceeds, when, in a digital world, they no longer need to bear the costs of printing and distribution.

Finally, the current below-$10 price point also reflects the willingness of electronic reader manufacturers to sell digital books well below list price in recognition of the customer perception that e-books should cost less. Sony, Barnes & Noble and Amazon have all announced that they will offer digital books at a $9.99 retail price point.[8]

Publishing executives worry that the low price point for digital copies will, in time, force them to lower their list prices for print books, significantly reducing overall margins.[9] The *New York Times* recently observed that retail pricing for electronic books "has become one of the most delicate topics in book circles."[10] The publishing industry desperately wants to raise the retail price point for digital books. The Book Settlement permits them to achieve that by working with Google. Out-of-print books are automatically covered by the settlement unless the rights holder takes affirmative action to withdraw them. Studies show that fewer than one percent of rights holders will exercise this option.[11] The settlement's provisions can therefore be expected to cover the lion's share of out-of-print books. Nominally, inclusion in the settlement is "nonexclusive," but rights holders rarely have renderings of out-of-print books to offer to Google's competitors.

The settlement authorizes Google to sell digital versions of these out-of-print books. The Book Settlement proposal empowers Google to set the price for consumer "purchases" of individual books at either the price specified by the rights holder, or alternatively, to group

---

[8] Motoko Rich, *Barnes & Noble Plans an Extensive E-Bookstore*, N.Y. TIMES, July 20, 2009, *at* http://www.nytimes.com/2009/07/21/technology/internet/21book.html.
[9] Joseph Tartakoff, *Analysts: Kindle Book Price Hikes Are Coming*, PAIDCONTENT.ORG, June 19, 2009, *at* http://paidcontent.org/article/419-analysts-kindle-book-price-hikes-are-coming/.
[10] Rich, *supra* note 10.
[11] Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1543 (2004).

comparable books and set the price for each group through an algorithm designed "to find the optimal such price for each Book and, accordingly, to maximize revenue for each Rightsholder." This means that books covered by the settlement will not compete against each other as the copyright law intends.

A few months after announcing the settlement, Google changed its "Partners Program" to permit consumers to buy digital editions of in-print books (with publishers' permission) directly from Google and read them on any device with Internet access, including cell phones. Google previously indexed books in its Partners Program and displayed bibliographic information (with publishers' permission), but directed potential buyers to other merchants for purchase. Google announced that it will permit each publisher to set the retail prices for books sold by Google through its Partners Program, up to and including charging consumers the same price for digital editions as for hardback versions.[12]

Publishers have the option of leaving in-print books published before January of 2009 in the settlement. Alternatively, publishers can put these in-print books published before 2009 into the Partners Program on a nonexclusive basis. In either case, under Google's programs, publishers can set the retail prices of their in-print digital books published before 2009. And as explained above, publishers can also place digital books published after January 2009 into the Google Partners Program.

Control of the settlement corpus (mostly out-of-print books) gives Google an enormous advantage over competitors in the sale of in-print books. Although it is certainly possible to sell digital editions of in-print books without also selling out-of-print books, consumers normally gravitate to the supplier with the largest and most diverse offering. Reviewers are already

---

[12] Motoko Rich, *Preparing to Sell E-Books, Google Takes on Amazon*, N.Y. TIMES, June 1, 2009, *at* http://www.nytimes.com/2009/06/01/technology/internet/01google.html.

touting Sony's agreement with Google to publish hundreds of thousands of books from the settlement corpus on Sony's new e-Reader as a reason to purchase the Sony device over Amazon's Kindle.[13]  Google intends to exploit these consumer preferences; it has merged its book offerings together so that a user search produces an integrated set of results.  From the user's perspective, Google will have a single, unified book offering.

Control of the settlement corpus gives Google a retail edge.  The publishers want to give Google that edge because Google has announced that, unlike aggressive price discounters, Google will let publishers set a high price for digital editions of in-print books.  Once Google has the retail edge, publishers can decide individually either to place their new titles exclusively with Google, secure in the knowledge that Google will charge high prices, or publishers can use the threat of exclusive placement with Google to force the discounters to raise retail prices, as a condition of getting new titles.  Either way, consumers will pay more for digital books.

Google will cooperate with the publishers' plan because (a) it will make a lot of money from the sale of books and library subscriptions at high prices, and (b) it will secure valuable information and content to perpetuate its dominant position in the search advertising and search syndication markets.  This is explained in greater detail below.

The settlement also gives the Registry the power to negotiate – again, collectively, as a cartel – over "new business models" for the distribution of digital books.  "New business models" include all mechanisms for the sale of digital books except the two specifically enumerated in the settlement – subscription sales and consumer sales that involve viewing through a browser.  So, the settlement solidifies the publishers' insulation from competition by

---

[13] Barbara Krasnoff, *Sony Reader PRS-700 Takes on Amazon's Kindle 2*, NETWORKWORLD, March 30, 2009, *at* http://www.networkworld.com/reviews/2009/033009-sony-reader-prs-700-takes-on.html.

giving them control over digital pricing on book distribution mechanisms such as e-Readers or print-on-demand books.

**B.     Vulnerability of libraries to price exploitation**

Over the past two decades, a small group of international publishers has seized upon the transition from print to digital distribution of academic and scientific journals and legal serials to cynically and ruthlessly exploit research libraries. These publishers have consolidated control of key journals, bundled titles into vast portfolios, and raised prices to unprecedented and budget-breaking levels, shutting smaller publishers out of the market and forcing libraries to curtail purchases of monographs and other collections.

Libraries, especially research libraries, are particularly vulnerable to this type of exploitation for several reasons. First, at colleges and universities, the faculty who use these resources and demand access to them do not pay for them, and, hence, are seldom price-sensitive. The top research libraries must offer the best and largest collections, so demand is inelastic, and libraries exhibit strong licensing preferences for the largest possible portfolios, because they compete with each other over the size of collections. Finally, libraries frequently welcome the option of digital collections over maintaining print collections, as they are under enormous budget pressure to reduce the "overhead" costs associated with maintaining legacy print collections.[14]

Scholars, information specialists, and economists, particularly former Antitrust Division economist Mark J. McCabe, have documented the exploitation of libraries by commercial publishers of digital portfolios and have produced an extensive body of academic literature on

---

[14] *See e.g.,* Lisa Richmond, *The Dark Side of Online Journals: Commercial Publishers Dominate Online Scholarly Journal Production,* Z MAGAZINE: THE SPIRIT OF RESISTANCE LIVES (June 2009), *at* http://www.zmag.org/zmag/viewArticle/21606.

9

the subject.[15]  A recent article by Wheaton College librarian Lisa Richmond summarizes some of

this literature.[16]  "The current publishing environment is a monopoly-like marketplace

increasingly dominated by large commercial conglomerates," warns one study.  "A scholarly

marketplace dominated by a few corporate giants is holding our universities hostage," the study

concludes.[17]

In addition to authorizing sales of individual books to consumers, the Book Settlement

authorizes the sale of subscriptions of the entire book database to libraries.  The literature

identifies several practices that publishing conglomerates have used to ravage library budgets as

part of the journal and serial transition to digital, all of which Google and the plaintiff publishers

have incorporated into their settlement proposal:

- Consolidating control over large portfolios.  Publishers create the largest possible portfolios to acquire leverage over libraries that need the largest number of titles.  The Book Settlement permits all publishers to place all of their past titles under common pricing and distribution control.

- Bundling titles for "sale" together in a single database.  By bundling titles together, big publishers have been able to force smaller publishers out of the market (smaller portfolios are not adequate substitutes) and to extract maximum rents from large numbers of titles with modest individual demand.  Here, similarly, the settlement proposal will ensure that Google has the largest portfolio.  Later entrants with smaller portfolios will provide little competition.

- Publishers sign libraries to multi-year contracts, making switching to competitors difficult and expensive.  The Settlement agreement permits this.  By the time a competitor appears in the market (if ever), libraries will be committed to the Google product.  Libraries can't afford duplicative collections; they will have little ability to deal with a Google competitor.

---

[15] *See e.g.,* Mark J. McCabe, *A Portfolio of Journal Pricing: Print v. Digital,* working paper at 3 (revised June 2003); Mark J. McCabe, *The Impact of Publisher Mergers on Journal Prices: An Update,* ASSOCIATION OF RESEARCH LIBRARIES: A BIMONTHLY REPORT, no. 207 (December 1999), *available at* http://www.arl.org/resources/pubs/br/br207/br207jrnlprices.shtml; Mark J. McCabe, *Law Serials Pricing and Mergers: A Portfolio Approach,* THE B.E. JOURNAL OF ECONOMICS ANALYSIS & POLICY, Vol 3: Issue 1 (Contributions), Article 11 at 1 (2004).
[16] Richmond, *supra* note 16.
[17] Nancy Kranich, *Scholarly Publications Hold Universities Hostage: Monopoly on Journals Cause Prices to Soar,* FAIRNESS & ACCURACY IN REPORTING (January/February 1999), *at* http://www.fair.org/index.php?page=3784.

- Publishers price discriminate, charging each library the maximum it can pay, thereby fully exploiting the publishers' market power. The Settlement does not prohibit price discrimination, and Google can freely exploit this technique.

The journal publishers' track record of exploitation of libraries with respect to journals provides a blueprint for the parties to use for their digital book portfolio. This is the reason library associations have joined the Open Book Alliance. Their concerns about exploitation by Google and the book publishers are not remote and hypothetical. Their concerns arise from their experiences.

## C.    Opportunity for Google to maintain and extend monopolies

According to the Department of Justice, Google dominates the market for search advertising and search syndication on the Web, with a greater than 70% share in both markets.[18] These markets are difficult to enter because of powerful network effects and scale characteristics; recent entry has been all but futile. Search and search advertising generate a substantial portion of the revenues earned in the Internet economy.[19]

These markets are special and different – even from other web markets. Google's dominant share in these markets means that substantial numbers of web-based enterprises secure much of their business through "referrals" from Google's search engine or advertisements placed by Google's ad platform. This dominant market share makes Google the arbiter of each web business (books or medical supplies, as an example). In each case, Google decides which company succeeds and which company fails by its placement in search results and ad listings on the Google site. Google claims it uses neutral, mathematically-based algorithms to prioritize search and ad listings.

---

[18] Press Release, United States Department of Justice, Yahoo! and Google Inc. Abandon Their Advertising Agreement, Nov. 5, 2008, *available at* http://www.usdoj.gov/atr/public/press_releases/2008/239167.htm.
[19] Search syndication allows Google to replicate its search box on various other websites. Google uses search syndication deals to ensure that search traffic generated on publishers' website is directed exclusively at Google.

Of course, these algorithms are also designed to maximize Google's revenue. For a variety of reasons, including the desire to prevent undesirable manipulation of the results, neither Google nor its competitors reveal the criteria for prioritization in the search result or ad listings. Under the terms of the Google "auction," an advertiser might be willing to pay more, for example, but paying more does not necessarily secure top placement. The opaque, confusing, and complex nature of selection criteria leaves web sites and advertisers vulnerable to discipline, and wary of the threat of discipline. A web-based business could be severely damaged by Google's manipulation of search results and ad listings, using means not even visible to the outside world.

In the search advertising and search syndication markets, then, only the presence of strong competition prevents supplier abuse. Even a dominant search company would have to pause before manipulating search or advertising results if the victim of the manipulation had realistic alternatives. Google's market dominance has created great concern in Silicon Valley, and not just among antitrust enforcers and Google competitors. Some commentators have even called for government regulation of search criteria to prevent market abuse by Google.[20]

Search advertising and search syndication are scale markets. A supplier improves its search product by crawling and indexing collections of materials/postings to determine word associations and other relationships. The greater the amount and the higher the quality of material crawled and the greater the number of queries run on a platform, the better the algorithms powering search engine become. Similarly, search advertising becomes more lucrative as individual preferences are tracked more frequently. A comprehensive book database holds great opportunity for Google. By placing advertising next to digital book pages (especially

---

[20] *The Time Has Come To Regulate Search Engine Marketing And SEO*, TECHCRUNCH (July 13, 2009), *at* http://www.techcrunch.com/2009/07/13/the-time-has-come-to-regulate-search-engine-marketing-and-seo/.

if it has exclusive rights), Google gains a very valuable source of revenue. More importantly, Google obtains access to an increased volume of queries from users that wish to search Google's exclusive book content. This increased use data allows Google to modify its search engine more quickly and in ways competitors cannot.[21]

Moreover, books are edited and therefore represent valuable collections of word associations. By crawling and indexing a collection of all the world's books, Google can vastly improve its search engine. By denying its competitors the opportunity to index a similarly comprehensive collection, Google increases its share and gains an insurmountable lead. Google clearly intends this effect in the search advertising market: the settlement agreement prohibits anyone in possession of the database – even libraries given digital copies of public domain works from their own collections – from permitting Google's competitors to crawl and index the works. Overall, then, both publishers who want to maintain high retail prices for their books, and Google, which wants to extend its lead in the search advertising market, benefit by inhibiting and suppressing Google's competitors.

Google's bundling practices will also quickly threaten the quality and extent of competition for online sales of digital books. Google has announced it will use its search dominance to favor its book site over those of competitors. When a user enters the name of an author or book title into google.com, the user will see results from Google's book site, not those of competitors. Google has used this technique in the past to disadvantage competitors, including to damage MapQuest's business, and Google currently favors its own services in the

---

[21] The search syndication market is similar in that more users and more advertisers lead to higher revenue per search and thus the ability to make more lucrative search syndication offers to website publishers. More search syndication deals brings in more users and start the process over.

consumer checkout market and the online real estate business, as well as online maps.[22]
According to a Google executive, this is all part of the company's grand design: "Ultimately
[innovative vertical sites] will either be acquired or partnered or in some way we will develop
that same type of functionality in a one stop shop."[23]

## II

### THE PARTIES SUCCEEDED
### BY WILLFUL MISDIRECTION.

On December 14, 2004, Google announced a program to digitize books still under
copyright, by scanning the collections of some of the nation's leading research libraries, without
securing the permission of the books' rights holders.  From the day of its first public
announcement, Google emphasized that it intended to create only a vast index, a "giant library
catalog," its officers said again and again, so that consumers could find libraries and bookstores
near to them where they could secure physical copies of particular titles.  The Google service
even contained a utility that permitted consumers, by entering zip codes, to find nearby libraries.
Its conduct was protected under the fair use doctrine, the company contended.

The following March (2005), Google's General Counsel referred to his company's new
service in a formal submission to the United States Copyright Office as a "lightning-fast card
catalog."  He went on:  "If [a] book is still covered by copyright, we make its bibliographic

---

[22] Galen Ward, *New Google is the Old Microsoft*, TECHFLASH: SEATLLE'S TECHNOLOGY NEWS SOURCE, (last updated August 14, 2009), *at*
http://www.techflash.com/seattle/2009/08/The_new_Google_is_the_old_Microsoft_52839567.html.
[23] Videotape: The GigaOm Show – Episode 12: Interview of Marissa Mayer, Oct. 11, 2007, at 10:18, *available at* http://revision3.com/gigaom/mmayer.

information available and may display short snippets of text relevant to the search terms to help people decide whether to buy the book or look for it in the library."[24]

In an op-ed published in the *Wall Street Journal* six months later, Google CEO Eric Schmidt explained that his company was "making a full copy" of a given work "just to index it." He referred to Google's product as an "ordinary card catalog." He explained what users would get from a book search on Google: "For many books, these results will, like an ordinary card catalog, contain basic bibliographic information and, at most, a few lines of text where your search terms appear." Schmidt disclaimed any intention to sell digital books: "We refer people who discover books through Google Print to online retailers, but we don't make a penny on referrals."[25] Google search results linked to Amazon, among other book sites, for consumer purchases.

The plaintiffs objected to Google creating a card catalog by scanning books without permission. The Authors Guild brought suit against Google in September of 2005, as did five big publishers a month later. Both suits joined issue over whether Google could index books and display snippets. Patricia Schroeder, the President and Chief Executive Officer of the Association of American Publishers, explained the plaintiffs' position in a *Wall Street Journal* op-ed published two days after Schmidt's piece. She accused Google of violating the copyright laws by making digital copies and merely displaying snippets.[26]

Journalists and other public commentators understood and accepted Google's statement of intentions – the creation of a card catalog, not a universal library or bookstore. For example,

---

[24] Letter from David Drummond, Vice President, Corporate Development and General Counsel, Google, Inc., to Jule L. Sigall, Associate Register for Policy & International Affairs, U.S. Copyright Office (March 25, 2005) (on file with U.S. Copyright Office).
[25] Eric Schmidt, *Books of Revelation*, WALL STREET JOURNAL, October 18, 2005, at A18.
[26] Patricia Schroeder, *Google Cannot Rewrite U.S. Copyright Laws*, WALL STREET JOURNAL, October 25, 2005, at A15.

on November 14, 2005, the *New York Times* arts and culture critic, Edward Rothstein, explained: "Google has specified the extremely limited form such use will take for copyrighted library material: enough to allow a search that will provide information about the book (including places to buy or borrow it) and three citations restricted to small passages that should suffice to illustrate the book's importance or relevance to the researcher."[27]

The litigation remained open for the next three years but little of note was reported in the press. From time to time, the parties reiterated their respective positions publicly. Then, on October 28, 2008, Google made a stunning announcement. Google announced a collaborative business venture with the plaintiffs to market a universal library and bookstore containing digital copies of virtually every book every published under U. S. copyright from the founding of the Republic through January of 2009. Google intends to compete against Amazon and other online book merchants instead of merely referring customers to them. Google intends to make money selling libraries subscription services rather than just referring patrons to them.

The parties billed the announcement as the settlement of the pending litigation, but such a venture was never at issue in the case. Google had repeatedly disclaimed any intention to market the products it subsequently announced. The parties never litigated over Google's new proposal. Nevertheless, as of October 28, 2008, Google reversed its public position and the plaintiffs stated that they had agreed to license the new venture, which was, according to the parties, already near to completion. While the world thought the parties were litigating the merits of Google's fair use defense, they were, in reality, negotiating a new venture as to which the fair use doctrine was irrelevant.

---

[27] Edward Rothstein, *If Books Are on Google, Who Gains and Who Loses?*, N.Y. TIMES, November 14, 2005, at E3, *available at* http://www.nytimes.com/2005/11/14/arts/14conn.html?pagewanted=all.

Antitrust law shows deference in some circumstances to the settlement of an intellectual property case, even if a few of the settlement's terms appear anticompetitive. But that approach cannot be applied to this case. This settlement does not embody a likely outcome of the litigation. The parties' proposal deals with issues beyond those in the litigation and at variance with the factual predicate of the case. The parties could have settled their existing dispute on terms far less injurious to competition. And, the proposal implicates the economic standing of others not party to the litigation.

The parties propose a new collaboration involving both horizontal and vertical restraints of trade. It must meet the antitrust criteria of a lawful joint venture to escape legal condemnation. The publishers' lawyers admit as much. Their press release explains: "The final settlement is a complex license, involving a worldwide class of millions of copyright owners, and resembles a joint venture among publishers, authors, Google and the libraries that provided books to Google for scanning."[28]

Rather than seeking "Business Review" from the Antitrust Division (28 C.F.R. § 50.6) – which is the normal procedure for antitrust clearance of problematic proposals of this type – the parties hastily petitioned the court to certify classes of authors and publishers, so as to bind all rights holders to the business terms agreed upon in secret negotiations. The publishers drafted a new complaint to substitute for their initial filing, because the publishers' complaint under which the case had proceeded for more than three years did not seek, nor did it even mention, class certification – further attesting to the vast difference between the subject matter of the case itself and the business deal the parties proposed for the Court's approval. (Class certification was

---

[28] Press Release, Debevoise & Plimpton LLP, Debevoise Advises Worldwide Class of Publishers and Association of American Publishers in Landmark Settlement with Google, Nov. 25, 2008, *available at* http://www.debevoise.com/newseventspubs/news/RepresentationDetail.aspx?exp_id=a3dba5c6-7e25-4b70-a9c7-0156917fee0d.

unnecessary for an adjudication of Google's fair use defense or the injunctive relief the five plaintiffs sought, but vital to sustaining control of the new publishing venture the parties now propose.)

The actions of the parties – the long standing public pronouncements, followed by Google's dramatic change in business plan (apparently induced by a proposal from the plaintiffs, worked out over 29 months of secret negotiations) – denied Google's competitors seats at the bargaining table. The plaintiffs never made any of Google's competitors the deal the parties presented to the court as a *fait accompli*. Nor were affected customers, like libraries and ordinary consumers, apprised of the proposal and negotiations – not to mention consumer protection groups, small publisher associations, writers' groups, the Copyright Office or government antitrust enforcement officials – all of whom would have wished to participate in negotiations over a universal digital library and bookstore. The secrecy and exclusivity of the new joint venture has denied the public the benefit of competition, and much more.

Had Google announced in 2004 that it intended to make digital copies of protected works and sell them without permission, it would have been sued and enjoined immediately. Competitors, public interest groups, and other interested parties could have moved the court to intervene, so they could participate in any licensing negotiations the plaintiffs proposed. Likewise, had the plaintiffs offered Google's competitors the same arrangement they offered Google at the time they offered it to Google, consumers and libraries would not now be facing the prospect of monopoly.

The abrupt public change in position by the parties affected the economic interests of many others. That, in itself, has antitrust consequences. But in this case, there is more, much

more – a trail of what can only be called misdirection intended, apparently, to exclude competitors and deny consumers the benefits of a competitive marketplace.

Ten months after Google revealed its plan to scan library collections without seeking rights holders' permissions, Yahoo and the Internet Archive announced plans of their own. Their initiative, known as the Open Content Alliance (which was soon joined by Microsoft), pledged to scan library collections, but only those books in the public domain. Furthermore, the resulting database was to work with any search engine, unlike the Google program in which digitized books would only show up through a Google search. The publishers' initial complaint filed in this case specifically referenced the Yahoo – Internet Archive initiative with approval, as a plan the plaintiffs supported and would work with. Complaint ¶ 5. (The publishers deleted these statements from their amended complaint, filed along with the settlement.) Patricia Schroeder's *Wall Street Journal* op-ed in October of 2005 also specifically cited Yahoo's initiative with approval.

On December 5, 2006, Microsoft launched a service to compete with Google's offering. Like Google, Microsoft said it would scan library collections. But like Yahoo and Internet Archive (and unlike Google), Microsoft said that it would scan and index only public domain books and books for which it secured rights holders' permissions. The approach openly endorsed by the publishers – the one taken by Microsoft, Yahoo and the Internet Archive – cost far more than Google's shelf-clearing strategy. Google scanned everything on library shelves without regard to copyright protection. Google's competitors, in deference to the publishers' position, first manually separated out books under copyright and scanned only the remainder.

The very next day after Microsoft's announcement, the Association of American Publishers extended a formal invitation to senior attorney Tom Rubin of Microsoft's legal

19

department to speak at the association's annual meeting about Microsoft's book search project. Rubin gave his speech on March 6, 2007. He quoted the Associations's criticism of the Google program reported in the press and he emphasized that the Microsoft book scanning project did not copy protected material without the rights holders' permissions.

Unbeknownst to Microsoft, Yahoo or the Internet Archive, the plaintiffs had proposed the "core terms" for their new venture – presumably including the retail sale of digital books and library subscriptions – in a secret meeting with Google almost a year earlier, *in May of 2006*. We now know this because the Executive Director of the Authors Guild has since disclosed it (perhaps inadvertently).[29] The publishers association's outside counsel – the same publishers association that invited Rubin to speak months later – led the settlement negotiations for the plaintiffs.[30] And, according to an article written by a member of the plaintiffs' negotiating team, the plaintiffs "persuaded Google to do more than just scan the books for purposes of searching, but go further, by bringing them back to commercial life."[31] The point could not be clearer – the plaintiffs secretly proposed a new business venture to Google ("go further," they proposed).

In fact, we now know that by the time of the Association of American Publishers' invitation to Microsoft in December of 2006, the secret talks between the parties were so far along that Google brought its most important cooperating libraries into the negotiations.[32] For its

---

[29] Paul Aiken, Two Guideposts: Press Conference Remarks of Guild Executive Director, The Authors Guild (October 28, 2008), *available at* http://www.authorsguild.org/advocacy/articles/settlement-resources.attachment/press-conference-remarks-of-guild-executive/Press%20Conference%20Remarks%20of%20Guild%20Executive%20Director.pdf.

[30] Press Release, Debevoise & Plimpton LLP, Debevoise Advises Worldwide Class of Publishers and Association of American Publishers in Landmark Settlement with Google, Nov. 25, 2008, *available at* http://www.debevoise.com/newseventspubs/news/RepresentationDetail.aspx?exp_id=a3dba5c6-7e25-4b70-a9c7-0156917fee0d.

[31] James Gleick, *How to Publish Without Perishing*, N.Y. TIMES, November 30, 2008, at WK10, *available at* http://www.nytimes.com/2008/11/30/opinion/30gleick.html.

[32] Christine McFadden, *Google Files Book Settlement*, THE STANFORD DAILY, November 3, 2008, *available at* http://www.stanforddaily.com/cgi-bin/?p=1103.

part, Google continued to publicly assert at this time that it was making only "the equivalent of a giant card catalog."[33]

All of this explains why Google continued to scan in-copyright books in the face of two lawsuits alleging millions upon millions of dollars in liability. Google claims that by scanning protected works, it took a risk no other company was willing to take and it should now be entitled to economic rewards, including even a monopoly.[34] But the facts reveal a more likely explanation for Google's conduct. The company took no risk. It continued to scan books with impunity because it had already worked out the details in secret negotiations of a business arrangement that shielded it from liability, an arrangement never offered by the publishers to any of Google's competitors.

With the deal's framework in place by the end of 2006, did it really take two more years for the parties to finalize their arrangement? Perhaps. But every day that went by with Google scanning books while its competitors pursued a false objective for want of accurate information pushed the company further into an insurmountable lead. By the time of the parties' announcement in October of 2008, Google neared completion of its scanning efforts, having amassed a 10 million book portfolio no competitor could challenge.

The publishers filed the lawsuit against Google now before the Court in October of 2005. They brought the suit for what is called in the law an *in terrorem* effect: the publishers used the threat of similar litigation against Google's competitors to induce those companies to comply with the publishers' wishes – to scan only out-of-copyright books. The publishers made no bones about their intentions:

---

[33] Jeffrey Toobin, *Google's Moon Shot: The Quest for the Universal Library*, THE NEW YORKER, February 5, 2007, *available at* http://www.newyorker.com/reporting/2007/02/05/070205fa_fact_toobin.
[34] Videotape: CFP Google Book Deal Panel (Creating the Future 2009 Conference, June 2, 2009) *available at* http://www.ustream.tv/recorded/1596405.

"If Google is seen as being permitted to do this [scan in-copyrighted books without permission] without any response, then probably others will do it," said Alan Adler, a vice president at the Association of American Publishers. "You would have a proliferation of databases of complete copies of these copyrighted works."[35]

The ploy had its intended effect. Google's competitors all announced programs to scan only out-of-copyright books – to bear the costs and other burdens of separating out protected works before scanning. The publishers feted Google's rivals for their decisions, all the while conniving to give Google a monopoly behind the rivals' backs. Instead of inviting Microsoft's lawyer to give a speech, the publishers should have invited representative of Mircrosoft, Yahoo, the Internet Archive, Amazon, and other affected parties to the negotiating table.

After the parties' settlement announcement, Google began to license portions of its portfolio. Yahoo had long since terminated its book scanning effort. The Internet Archive continued to scan from library shelves, but at a much slower rate than Google. Amazon always sought rightholders' permission to scan books. Microsoft did its best to compete, while honoring the publishers' position. The company expanded its search service in mid-2007. But in May of 2008, only a few months before the parties announced their "settlement," Microsoft terminated its book scanning project, having never received the offer tendered to Google, much less a truthful accounting of details.

Today, only Google has a near-to-comprehensive digital library and bookstore. Google's position did not result from aggressive, pro-competitive business conduct for which the company deserves a reward. The monopoly that Google can now almost grasp flows instead from misdirection to the company's competitors coupled with years of secret negotiations to form a cartel. The public now finds itself bereft of the protections competition provides. No court

---

[35] Anick Jesdanun, *Google Book Project: Digital-Age Test of Copyright Law*, USA TODAY, September 18, 2005, *available at* http://www.usatoday.com/tech/products/services/2005-09-18-google-copyright_x.htm.

should countenance that result. On the contrary, the antitrust authorities frequently sue companies that couple misdirection with horizontal agreements to achieve market dominance. *See e.g.*, *In re Union Oil Co. of California*, Dkt. No. 9305 (March 4, 2003) (FTC Complaint).

Google could never have achieved through free-market competition the dominant position in digital books it seeks through the proposed settlement. Google tried the free-market approach and failed. Before even starting its library program, Google attempted to build its database the same way its rivals did – through cooperation with publishers. But Google could get no more than 15% of books into its program.[36] Unwilling to compete for share in the open market, Google chose instead to use court process to achieve dominance.

Not content with merely providing Google a five-year head start, the parties drafted a "settlement" agreement that makes it impossible for any other company to enter the market and compete effectively. The "settlement" grants Google rights to orphan works and imposes upon all class members procedures and waivers that clear the way for Google to market its database. Subsequent entrants must negotiate with the Registry for rights. But the Registry, under the terms of the settlement proposal, can bind only those rights holders who show up and register their works – not the unidentified owners of orphan works, nor unregistered rights holders who later come forward to contest the classification of their titles in the public domain, nor any other unregistered rights holders who are members of the class.

The settlement provides no method at all for any company other than Google to secure rights to orphan and unclaimed works. To secure those rights, Google's rivals must scan protected works, invite litigation, and find a plaintiff's lawyer and a judge willing to replicate the terms Google has secured – something that even the parties and their counsel admit is far-

---

[36] *See id.*

fetched.[37]  A rival *could* undertake such an arduous and perilous process (assuming it is not an abuse of the judicial process), but no rational company ever *would*.  The public will be left without competition.

The Registry may, at its discretion, grant Google's rivals rights to works with known and registered rights holders, but the scheme provides no incentive for the Registry to do so.  Indeed, because the proposal requires Google to maximize revenue for rights holders on consumer sales (or, alternatively, permits rights holders to set profit-maximizing resale prices), creating competition for Google by granting rights to its rivals would only diminish the return to rights holders, unless, of course, those rivals were also required to charge the rights holders' profit-maximizing prices.  Either way, consumers will pay more than they would in a freely competitive market, unencumbered by a horizontal cartel.  Even with respect to library subscriptions where Google's obligation to maximize return is somewhat more ambiguous, it is unclear why the rights holders who control the Registry would benefit from creating competition for Google.

Even if the "settlement" were amended in some manner to permit Google's rivals the rights to orphan works, and even if the Registry were willing, contrary to the interest of those it represents, to grant Google's competitors rights to works of registered rights holders, the grants of rights, by themselves, are insufficient to create a marketable product.  Neither the Registry nor rights holders have digital copies of most out-of-print books.  So, even with grants of all necessary rights, a potential competitor would still have to arrange to scan books for which there are no extant and available digital renderings.

---

[37] Timothy B. Lee, *Publisher speculates about Amazon/Google e-book "duopoly"*, ARS TECHNICA (last updated February 23, 2009),  *at* http://arstechnica.com/tech-policy/news/2009/02/publisher-speculates-about-amazongoogle-e-book-duopoly.ars.

Libraries that permitted Google to scan their collections have no incentive to bear the disruption a second time, as they have already been (or will be) handsomely rewarded by Google in terms of free digital copies, cash payments, lengthy subscription rights, and the like. A new competitor would have to cobble together a database by scanning the less extensive collections of many smaller libraries. Studies of library collections indicate a large number of uniquely-held works (held in one library, but not others), so even scanning a large number of less-extensive collections will not likely replicate the Google corpus.[38] Overall, then, efforts by competitors (even if all necessary rights are secured) will be less efficient, more costly, and, in the end, likely to produce an inferior product – if a product can be produced at all.

If a competitor secured all necessary rights and bore all the costs of scanning, it would still not be able to take its product to market without the elaborate array of waivers and conflict resolution mechanisms the parties have created for Google's benefit in the settlement. For example, the settlement provides copyright releases for libraries, contractors, subcontractors and the like that worked with Google. Mistakes by Google in book groupings and public domain designations are bound to arbitration. Disputes over revenue splits between authors and publishers are resolved by compulsory process. All of these provisions clear the way for Google to get its product to market. But they also represent insurmountable barriers to entry for competitors. The settlement does not appear to empower the court or the Registry to establish similar waivers and procedures for Google's competitors. Without comparable mechanisms, competitors will face the threat of disabling lawsuits.

Finally, any company that managed to secure all necessary grants, waivers, dispute resolution mechanisms and complete the necessary scanning would face in Google a competitor

---

[38] Brian Lavoie & Roger C. Schonfeld, *A Systemwide View of Library Collections*, CNI Spring Task Force Meeting (April 5, 2005), *available at* www.oclc.org/research/presentations/lavoie/cni2005.ppt.

with a five-year head start. Amazon actually started scanning books (with permission) before

Google did. Google's other significant competitors started book scanning shortly after Google

did. But the publishers never offered those competitors the deal they offered Google, and several

of the competitors closed down their own scanning operations. A company starting from scratch

at this point could not enter the market for several years, even assuming expeditious and

successful negotiation with the as-yet formed Registry. By that time, research libraries would

have signed long term subscription contracts with Google. And competition for consumer

purchases of digital books and competition in the markets for search and search advertising

would be grievously injured.

### III

### COMPULSORY LICENSING MAY
### <u>REMEDY THE ANTITRUST CONCERNS.</u>

The Department of Justice publishes antitrust guidelines for the legal evaluation of

proposed joint ventures. Courts have also rendered a number of decisions in the area. Basically,

in making legal determinations, courts look both to the overall effect of the venture and to the

legality of its various provisions, employing either the *per se* rule or the rule of reason, as

appropriate. Under a rule of reason approach, the court asks whether the proposed venture will

raise prices or otherwise injure consumers and, if so, whether competition from outside the

venture (either new entry or sales by existing members) will ameliorate these effects. At bottom,

the court looks for alternatives that cause less injury to competition: One question is whether

there are less restrictive means to accomplish the venture's benefits. Another is whether the

agreement among venture members only reduces competition in ways that are essential to the

functioning of the venture. In performing a legal evaluation, the terminology employed by the

parties (here, claims of that the arrangements are "nonexclusive") carry no weight.[39]  Rather, the court looks to likely conduct of the venture members in light of the various incentives written into the proposal.[40]

The parties' current proposal embodies both a conspiracy in restraint of trade, violating Section 1 of the Sherman Act, *see Interstate Circuit, Inc. v. U.S.,* 306 U.S. 208 (1939), and a conspiracy to monopolize various markets, *see Discon, Inc. v. Nynex Corp.,* 93 F. 3d 1055 (2d Cir. 1996).  In addition, many of the provisions in the "settlement" constitute *per se* illegal price fixing agreements.  For example, the publishers jointly set the future prices for digital books through algorithms written by Google.  Similarly, the publishers jointly decide whether to approve "new business models" for digital book distribution and pricing.

Even under a rule of reason analysis, these provisions fail because sales outside the cartel are unlikely to curb the cartel's ability to stabilize book prices.  Google's five-year head start coupled with the impediments to new entry written into the settlement proposal makes the prospect of competition by Google's rivals remote.  And class members are unlikely to make many sales of out-of-print books outside the cartel if only because they rarely possess digital scans to offer Google's competitors, to say nothing of their financial incentive to keep digital book prices high by maintaining Google's dominance over out-of-print books.  Even with respect to in-print books, the settlement establishes a pricing floor and the ability to demand high resale prices from digital book merchants, regardless of the sales volume outside the cartel.

Sometimes a proposed joint venture can be saved from antitrust condemnation by striking a few illegal provisions.  But merely eliminating a few of the most egregious terms of the proposed settlement will not save it.  Most assuredly, the horizontal agreements to set prices

---

[39] FEDERAL TRADE COMMISSION & THE UNITED STATE DEPARTMENT OF JUSTICE, ANTITRUST GUIDELINES FOR COLLABORATION AMONG COMPETITORS (April 2000).
[40] *Id.; see also FTC v. Indiana Fed. of Dentists,* 476 U.S. 447 (1986).

must go.  And neither the publishers jointly through the Registry nor Google by itself should be permitted to restrain new business models for the distribution of out-of-print books.

But approving the proposed settlement – even after excising the provisions to fix future prices – would leave Google in command of digital book sales through control of the book database.  Google has already announced that it will honor publisher requests to set their own high resale prices for digital books.  Even without the provisions in the settlement agreement expressly permitting horizontal price fixing, publishers will be able to raise consumer prices for digital books by designating high list prices for these out-of-print books and combining their in-print lists into the portfolio Google acquired from this settlement.

Leaving Google in unfettered control of the book database opens libraries to exploitation and reinforces Google's dominance in online search, permitting Google to exert control of all the various online businesses dependent on search referrals.  An effective remedy to the anticompetitive injury threatened by the settlement must protect competition in all of these areas.

These factors – together with the collusion, stealth and misdirection that account in large measure for the paucity of formidable challengers with comprehensive book databases of their own – weigh against bestowing upon Google a monopoly in multiple market sectors.  Courts must look to the public interest as well as the interests of those directly before it in evaluating a class action settlement.[41]  The case law teaches that courts do not approve class action settlements that violate the federal antitrust laws.[42]  Nor do courts approve class action settlements through which dominant companies disadvantage their competitors.[43]

---

[41] *See e.g., In re Masters Mates & Pilots Pension Plan and IRAP Litigation*, 957 F.2d 1020, 1025-26 (2nd Cir. 1992).
[42] *See e.g., Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975).
[43]  *See In re Microsoft Corp. Antitrust Litigation,* 185 F. Supp. 2d 519, 529 (D. Md. 2002).

Putting aside the formidable legal difficulties and Constitutional concerns attendant to class certification in this case, the settlement could be modified, at least in theory, to provide the public with the benefits of a near-to-comprehensive digital library without the costs of conspiracy and monopoly. These changes are difficult for the court to effect on its own, but the Antitrust Division has the power and ability to demand changes in the proposal *before* serious consideration by this Court. Approving the settlement contingent on continuing vague judicial and Justice Department oversight, as some library associations propose, will accomplish little. Neither the court nor the Justice Department knows what "new business models" to permit, as but one example. Markets run best on competition, not regulation. Continuing government oversight will be desirable for specific issues, not for the overall operation of the businesses.

Appropriate modifications of the parties' proposal might begin with compulsory licensing of the database. Compulsory licensing is but one approach and it might be combined with new orphan works legislation, or other remedies. It is appropriate in special circumstances. The course of conduct here, coupled with market entry impediments, such as competitors' in ability to secure orphan works, makes compulsory licensing particularly appealing.

The settlement contemplates that Google will be granted all rights and have the benefit of all procedures necessary to bring the database to market. Google should be ordered to license the database with all attendant rights to a number of competitors, under the supervision of the Department of Justice. Unlike physical assets such as plants and equipment, the database can be copied quickly and accurately, and conveyed through licensing agreements to companies that will compete against Google by selling digital books and library subscriptions. These licensees must be permitted, in turn, to sell competitors of Google and the publishers the right to crawl and

index the database for their own commercial uses, in order to prevent competitive injury in the search market.

Many provisions and important details will have to be worked out by the Antitrust Division, of course. Payments to rights holders for past digitization of their works can be apportioned among the competitors selling the database. A registry already exists to apportion distributions to writers' namely, the Author's Registry, a not-for-profit clearinghouse founded in 1995 by a consortium of U.S. authors' organizations: The Authors Guild, The American Society of Journalists & Authors, the Dramatists Guild, and the Association of Authors' Representatives (literary agencies). To date, the Author's Registry has distributed over $8,000,000 to authors in the United States. There is simply no need to create a new registry, and certainly not one dominated by big publishers.[44] Rights holders should be entitled to a fair competitive return on copies of their works sold by any of the competitors. Google can sell subscriptions and individual books in a competitive market, and make a fair, competitive return instead of a monopoly profit.

Working out a compulsory licensing plan is not without considerable challenges and difficulties. But the Antitrust Division has considerable experience with compulsory licenses in its long history. The technique has been used successfully many times to restore competition in markets plagued by conspiracy or monopoly.[45] Indeed, Silicon Valley exists precisely because the Antitrust Division ordered AT&T to license its key invention, the transistor, for nominal payments. William Shockley bought a license for $25,000 and started his own company that, in

---

[44] Besides the Author's Registry, there is yet another umbrella group, the Author's Coalition of America LLC, an association of twenty independent authors' organizations representing more than 120,000 authors and artists which channels payments for non-title specific royalty payments.

[45] *See* Scherer, F.M., *The Political Economy of Patent Policy Reform in the United States, in* HARVARD UNIVERSITY JOHN F. KENNEDY SCHOOL OF GOVERNMENT FACULTY RESEARCH WORKING PAPER SERIES RWP07-042 (October 2007), *available at* http://web.hks.harvard.edu/publications/getFile.aspx?Id=270.

30

turn, spawned the American semiconductor industry.  Some economic studies show that companies whose products are licensed by compulsory process do not lose competitive drive and initiative.[46]

There remains the question of how much Google should be entitled to charge licensees for a copy of the database and relevant metadata.  Economists have created a number of economic models to aid in the calculation of compulsory licensing fees.  But the short answer to the question is "not much."  The models normally include incentive payments to the licensor as a reward for its initiative.  Such incentive calculations are neither necessary nor appropriate here. Google said from the beginning of its project that it would continue to scan for the purpose of making a card catalog unless enjoined by a court.  It did not need the incentive of monopoly profits on library subscriptions and digital books for motivation.  And given what we now know about the early concessions from plaintiffs in the long-running settlement negotiations, the motivations for Google's scanning and the associated legal risk are open to serious question. Competitors should pay, at most, nominal amounts to Google to license the database for resale. Not-for-profit institutions that wish to scan orphan works for the purpose of creating a better database than the one Google offers should be entitled to license the necessary rights from Google free of charge.

---

[46] *See id.*

Date: September 4, 2009

Respectfully submitted,

Gary L. Reback
(CA State Bar No. 100118)
(*Pro Hac Vice* Application Pending)

Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA  94303

Hadrian R. Katz
Catherine Rowland
Michael E. Ginsberg
John Hutchins
Brent Stephen LaBarge
ARNOLD & PORTER LLP
555 12 Street, NW
Washington, DC 20004
Tel.: 202-942-5707
Fax: 202-942-5999
E-mail: hadrian.katz@aporter.com

John Maltbie
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Tel.: 212-715-1103
Fax: 212-715-1399
E-mail: john.maltbie@aporter.com


Counsel for Amicus Curiae
Open Book Alliance