UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

The Authors Guild Inc., Association of American
Publishers Inc., et al.,

                        Plaintiffs,

            – v. –

Google Inc.,

                        Defendant.

Case No. 05-cv-8136 (DC)

---

## MEMORANDUM OF LAW IN OPPOSITION TO THE SETTLEMENT PROPOSAL ON BEHALF OF THE FRENCH REPUBLIC

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Edwin Komen, Esq. (EK-DC Bar No. 924209)(*Pro
Hac Vice* Application Pending)
Theodore C. Max, Esq. (TM-1742)
30 Rockefeller Plaza
New York, New York  10017
Tel.: (212) 332-3602
Fax:  (212) 332-1201
Counsel for French Republic

Dated: New York, New York
       September 8, 2009

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS………………………………………………………............. i

TABLE OF AUTHORITIES……………………………………………………… ii-iii

PRELIMINARY STATEMENT……………………………………………………… 1

INTEREST OF AMICUS ……………………………………………………………….4

I. ARGUMENT…………………………………………………………………………9

    A.    The Google Book Settlement Is Contrary to French Copyright Law, and European Union Directives, and the World Copyright Treaty and Threatens Fundamental Rights of French Authors and Publishers………………9

    B.    The "Opt-Out" Provision Violates French Copyright Law, the Berne Convention and WCT .......................................................................................10

    C.    The Proposed Settlement Imposes a Compulsory and Perpetual License Contrary to French and International Copyright Laws ……………………….13

    D.    The Provisions of the Proposed Settlement Create Grave Concerns for French Authors, Publishers and Cultural Diversity .............................................17

    E.    Rather Than Provide a "Social Benefit," the Proposed Settlement Disadvantages French Authors, Publishers and the French Public by Effecting a Change in International Copyright Law in the Class Action Context, Where They Have No Voice or Representation………………………21

CONCLUSION……………………………………………………………………..25

TABLE OF AUTHORITIES

Federal Cases

Amchem Products, Inc. v George Windsor,
    521 U.S. 591, 625-27 (1997) ...................................................................................23, 24

Baffe v. Donaldson, Lufkin & Jenrette Sec. Corp.,
    222 F.3d 52, 60 (2d Cir. 2000).............................................................................24

East Tex. Motor Freight System, Inc. v. Rodriguez,
    431 U.S. 395, 403 (1977)....................................................................................23

Kelly v. Arriba Soft Corp.,
    336 F.3d 811 (9th Cir. 2003) ..............................................................................14

Perfect 10, Inc. v Amazon.com Inc.,
    487 F.3d 701 (9th Cir. 2007) ..............................................................................14

Schelsinger v. Reservists Committee to Stop the War,
    418 U.S. 208, 216 (1974)....................................................................................23


Constitutions

Constitution of the Fifth Republic of France, adopted on October 4, 1958...........................17


Treaties

Berne Convention for the Protection of Literary and Artistic Works of September 9, 1886,
    variously revised including at Paris on July 24, 1971 and amended on September 28,
    1979.......................................................................................................................2

World Intellectual Property Organization Copyright Treaty (WIPO Copyright Treaty) of
    December 10,1996 ...........................................................................................2, 15

The Agreement on Trade Related Aspects of Intellectual Property Rights (or TRIPs),
    administered by the World Trade Organization (WTO) and negotiated as part of the Uruguay
    Round of the General Agreement on Tariffs and Trade (GATT) in 1994..............................12


Statutes

Code de la propriete intellectuelle (French Intellectual Property Code or CPI)......3, 6, 11, 12, 16

The French Act of August 10, 1981 on the Price of the Book, aka, the "Loi Lang".............5, 19

<u>Directives</u>

European Union – The Information Society Directive, also known as the EU Copyright
    Directive, 2001/29/EC May 22, 2001...................................................................6, 14


<u>Declarations</u>

Universal Declaration of Human Rights, adopted by the United Nations General Assembly on
    December 10, 1948...............................................................................17


<u>Rules</u>

Fed. R. Civ. P. 23.........................................................................................23

## PRELIMINARY STATEMENT

The French Republic ("France") hereby submits this Memorandum of Law to apprise the Court of the significant adverse impact that the proposed Settlement would have on French authors, publishers and digital libraries, in particular, and more generally on authors, publishers and digital libraries in the European Union ("EU") and other countries outside the United States ("U.S."). Although this submission is directed specifically to the interest of the amicus curiae, it is believed that many of the issues troubling French authors, publishers and digital libraries will be of similar concern to authors, publishers and digital libraries in the United States and throughout the world.

Of particular concern to the French Government is the threat the proposed Settlement poses to cultural diversity. By placing such unchecked, concentrated power over the digitization and making available of the vast wealth of literary works created from 1923 through January 5, 2009 in a single private entity, the Settlement positions Google as the gatekeeper of public knowledge in a manner likely to stifle the rich diversity of voices heard and enjoyed by France and other nations. By anointing Google with the power to rank books, choose algorithms for deciding what books are displayed in response to a research inquiry and to even decide what books may or may not be included in the publicly available database, the proposed Settlement homogenizes (or "Googlizes") and demeans those special elements that distinguish the unique cultural traditions of France by turning books into a merely industrial byproduct of a computer database. Furthermore, the proposed Settlement's protective provisions virtually assure Google the revenue flow necessary to preserve its concentration of power long into the future.

The 134-page proposed Settlement (not including attachments) sets forth what purports to be a comprehensive system for exploitation of copyrights on books in the digital age.

This system, however, has not been enacted by any legislative or industry body, as would, without regard to commercial advantage or profit, typically take into account domestic and worldwide developments and trends in the industry and copyright law. Instead, to the contrary, the proposed Settlement is a privately-negotiated document that is shrouded in secrecy, formulated behind closed doors by three interested private parties, the Authors Guild, the Association of American Publishers and Google, Inc. ("Google"), resulting in a commercially-driven combination that is contrary to established international treaties and laws. These principally include the world's oldest and most venerable multilateral copyright treaty, the Berne Convention ("Berne")[1], as well as the more recent World Copyright Treaty (the "WCT") which attempts to regulate international copyright relations in the digital age.[2] The Settlement also runs

_____

[1]    The Berne Convention for the Protection of Literary and Artistic Works first signed on September 9, 1886 with entry into force on December 5, 1887. The Berne Convention was developed at the instigation of Victor Hugo as the Association Littéraire et Artistique Internationale. It was influenced by the French "right of the author" which contrasts with the Anglo-Saxon concept of "copyright" which only dealt with economic concerns. Under the Berne Convention, copyrights for creative works are automatically in force at creation, without being asserted or declared: an author need not "register" or "apply for" a copyright in countries adhering to the Convention. As soon as a work is "fixed", that is, written or recorded on some physical medium, its author is automatically entitled to all copyrights in the work and to any derivative works, unless and until the author explicitly disclaims them or until the copyright expires. Foreign authors were treated equivalently to domestic authors, in any country that signed the Convention. The Berne Convention has since undergone seven principal revisions, the most recent being the Paris Revision signed on July 24, 1971 with entry into force on October 10, 1974. The Berne Convention is administered by the World Intellectual Property Organization, generally known as WIPO, headquartered in Geneva, Switzerland. France was among the first signatories in 1886. The Berne Convention now counts 164 countries as contracting parties with the United States joining as of March 1, 1989. See WIPO website, www.wipo.int/treaties, visited on September 4, 2009.

[2]    Formally named the WIPO Copyright Treaty, adopted in Geneva on December 20, 1996, slightly more than 110 years after the Berne Convention. Once again, France was one of the original signatories. The United States became a contracting party as of March 6, 2002. See WIPO website, www.wipo.int/treaties, visited on September 4, 2009.

afoul of the *Code de la propriete intellectuelle* (French Intellectual Property Code or "CPI"),[3] as well as European laws and initiatives to create digital libraries in France and Europe. While each of the three interested parties purports to represent a well-defined constituency, or sub-class, none represent the interests of French authors, publishers and digital libraries nor are they truly accountable. Further, should the Court approve the proposed Settlement as presently drafted, there is good reason to believe that these parties are unlikely to be held accountable in the future.

Although the Settlement on its face purports only to apply to works under United States copyright law, the Settlement, by its grant of effectively a compulsory license of rights and immunities to defendant Google, will irrevocably impact the rights of French authors, publishers and digital libraries not only within the U.S. borders but also beyond to undermine the traditional contours of internationally accepted copyright standards and values. The U.S. and France both comply with the Berne Convention and the WCT . However, should the proposed Settlement be facilitated by this Court's approval, this private agreement has the potential for violating the most fundamental of exclusive rights under copyright, namely, the rights of reproduction and making works available to the public. These are rights not only clearly and unmistakably required by the Berne Convention and the WCT, but also expressly implemented under the laws of the U.S., France and virtually every other nation.

---

[3]    Emblematic of this fact is that the French Publishing Group La Martiniere, which owns the French company, Le Seuil, Delachaux and Niestle in Switzerland and Harry N. Abrams in the United States, has sued Google in France for counterfeiting and breach of intellectual property rights because it has digitized one hundred of its titles without permission.

# I.
# INTEREST OF AMICUS

The copyright law of France developed from the *droit d'auteur* or "right of the author" in the eighteen century, which recognized the unrestricted right of property of the author on his work.  France has been renowned for its long tradition of critical thinkers and philosophers such as Pascal, Descartes, Voltaire, Diderot, Rousseau and Sartre.  France's literary tradition also includes the theatrical tradition of comedy and tragedy of giants such as Molière, Racine, Marivaux, Beaumarchais, Rostand, Giraudoux, Anouilh, Sartre, Ionesco and Genet, who have brought laughter and pathos to theatre audiences around the world.

French authors and poets have chronicled the human experience and have known worldwide literary fame, including Baudelaire, Balzac, Flaubert, Verlaine, Mallarmé, Hugo, Dumas, Verne, Zola, Maupassant, Gautier, Stendhal, Proust, Céline, Camus and Saint -Exupéry.  During the twentieth century, sixteen authors writing in French have won the prestigious Nobel Prize for Literature, including Anatole France, Colette, Albert Camus, Jean-Paul Sartre, Claude Simon, Gao Xingjian and J.M.G. Le Clézio.  In fact, French people of letters have been awarded more Nobel Prizes in Literature than those from any other single country.  French writers had so distinguished the language itself that by the 18th Century, the French language had become the literary lingua franca and the language of diplomacy for much of the world.

Promoting cultural diversity and the many creative voices of authors worldwide, irrespective of their commercial success, is of paramount importance to France. For example, each year in November since 1987, France, through its National Center for the Book for the Ministry for Culture and Communication, has promoted global literature and cultural diversity by inviting a group of writers from a single nation or linguistic region to take part in a series of lectures across France in partnership with bookshops, libraries, universities and cultural

associations. These events are known as "les Belles Etrangeres" and bring to the French public contemporary works by international authors who would not otherwise have exposure. This year the National Center for the Book has chosen the United States and invited twelve American contemporary authors: Charles D'Ambrosio, Percival Everett, Forrest Gander, Andrew Sean Greer, John Haskell, Matt Madden, Jack O'Connell, Eleni Sikelianos, Hannah Tinti, Yuri Slezkine, Richard White and Colson Whitehead. Their works will be published in an anthology along with a motion picture film featuring the authors.

France is the world's third largest book producer and French authors and publishers produce more than sixty thousand new books per year. The total turnover for book publishing was more than 2.9 billion euros in 2006.

There is an expression in France that underscores how literature and publishing are viewed as different from other French industries for cultural reasons: "Le livre, un produit pas comme les autres." ("The book, a product unlike other products."). This fact was recognized with the passage of the Act of August 10, 1981 ("Loi Lang"), which provided that the publisher is free to set the selling price to the public of the book he publishes. All other book sellers must respect the price set by the publisher. The objective of this law is primarily cultural as it is designed to maintain the richness and diversity of creative writing and authorship so that publishers are able and willing to take risks on authors, especially those who are unknown or not celebrated.[4]

France has always protected the rights of its authors of these invaluable assets through its adherence to the Berne Convention and as an original signatory to the WCT. Even

---

[4]    Declaration of Nicolas Georges, Director of Book and Reading within the Ministry of Culture and Communication of the French Republic, Sworn to September 8, 2009.

though the U.S. also has adhered to these treaties, the proposed Settlement is contrary to both the Berne Convention and the WCT. For example, pursuant to Article 6 of the WCT, authors enjoy the exclusive right of making available the original and copies of their literary works to the public. Similarly, France and EU law each grant to authors the exclusive right of making available. See CPI, Article L.122-2 2°, 122-4 and L. 335-3 and EU Copyright Directive, Article 3, para. 2.[5] Under the French CPI, authors as rightholders must give consent before any literary work is digitally copied or displayed. Digitization constitutes reproduction within the meaning of Article L. 122-3 , L. 122-4 and L. 335-3 of the French CPI and is an exclusive right of the author.

Even Google's seemingly benign rules on library on-premises display are at odds with the corresponding, but much more limited, rule on such displays in France. Google would make books broadly available at library access terminals. Such an unfettered right of use and access does not exist under French law. The French safe harbor for public library use grants a limited exception for certain acts of making available of works at terminals on the Library premises (Article L. 122-5 8° CPI).

Based upon French and European legal developments with respect to digitization of written and published works, several projects, including the European Digital Library, www.europeana.eu ("Europeana") and the Bibliotheque Nationale de France (the French Digital Library, www.gallica.bnf.fr or "Gallica"), have sought to make such works available to the public where the rightholder's consent has been obtained. The Gallica project has involved the investment of over twenty-five million euros to date, which expense Google has allegedly

---

[5]    Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonization of certain aspects of copyright and related rights in the information society.

avoided by intentionally ignoring copyright laws and formalities. Europeana and Gallica, thus, seek to ensure that digital control of the European and French national cultural heritage remains free and unconcentrated within one location to ensure cultural diversity, while balancing the interests in promoting economic and technological advancement for all nations and peoples and existing copyright rights. In short, France has never sought to impede the creation and application of digital tools to expand public access to literature and knowledge but has, instead, sought to promote and ensure their use by all in a manner calculated to enrich and enlarge upon cultural traditions, without harming the time-honored and tested laws of copyright and each individual author's dignity and moral rights.

The proposed Settlement also mistakenly characterizes itself as applying to only United States territory and, hence, without impact outside of the United States where its copyright laws rules do not reach. This is theoretical and ignores the power of digitization to make books available around the world over the Internet. Once the Google database is created and accessible, Internet users throughout the world and in France will be able to access the Google Books Search by using a freely accessible U.S. proxy server. In other words, even if the Google digital book database is entirely located within the United States and supposedly reserved to IP addresses located therein, it may still be available for search requests from France.

The proposed Settlement raises a fundamental issue of fairness, because French authors are not fairly represented and have not received proper notice. The plaintiff Authors Guild, the representative of the author sub-class, cannot adequately and fairly represent French authors or their interests because of its limitations on membership. For an author to join the

Authors Guild, his or her books must have been published by an American publisher.[6]  A

publication by a non-U.S. publisher will not qualify an author for Authors Guild membership.

This fails to acknowledge the important role that French authors play in world literature or that

not all French authors will have their books published by a U.S.-publisher.  As a consequence,

there are few French authors who are in the Authors Guild.  This, in turn, gives French authors

little or no representation in the settlement process even though any French author who published

a book on or after January 1, 1923 and on or before January 5, 2009 is a member of a sub-class

represented by an organization that excludes them from membership.

        Similarly, the plaintiff Association of American Publishers does not adequately

and fairly represent French publishers or their interests because its membership is only open to

"all U.S. companies actively engaged in the publication of books, journals, and related electronic

media."[7]  A non-U.S. publisher by definition is not eligible for membership.  As a result, there

are no French publishers who are members of the Association of American Publishers.  The

occupational and professional organization representing the French book trade is the Syndicat

National de l'Edition ("SNE"), which was established in 1892 and represents approximately 400

book publishers.  The SNE represents the French publishing profession as a member of both the

Federation of European Publishers and the International Publishers Association ("IPA").  The

Paris Book Fair, which was established by the SNE in 1981 features over 1,700 exhibiting

publishers and 3,000 authors, takes place in March and is an annual event for international book

publishing.  The Paris Book Fair has featured an electronic library which showcases the new

---

[6]    See the Authors Guild website at https://www.authorsguild.org/join/eligibility.html, visited on September 4, 2009.

[7]    See Association of American Publishers website, http://www.publishers.org/main/Membership/member_01.htm, visited on September 4, 2009.

digital technologies for booksellers of tomorrow -- <u>Lectures de dem@in</u> and the <u>Librairie de dem@in</u> ("Bookshop of Tomorrow").

       For the reasons outlined above, the proposed Settlement will have an immediate impact upon French authors, publishers and digital libraries by setting an industry-changing precedent that not only gives defendant Google an unfair advantage over all other digital libraries (commercial and non-commercial) in the United States and France, but also will flout French laws that have been established to protect French authors and publishers, including with respect to digital copying, publishing and the dissemination of their works.  The decision of this Court with respect to this Settlement will have the dramatic and long-range effect of creating a new worldwide copyright regime without any input from those who will be greatly impacted -- French authors, publishers and libraries as well as French citizens who seek to obtain access to digital publications through the Google service.

## II.
## ARGUMENT

**A.**    **The Google Book Settlement Is Contrary to French Copyright Law, and European Union Directives, and the World Copyright Treaty and Threatens Fundamental Rights of French Authors and Publishers.**

       The chief defect of the United States class action process -- ostensibly designed to make whole victims of prior harm while discouraging future misconduct by the defendant Google -- is that Google is using this unusual device to obtain something that Google could never achieve in Court -- a compulsory license to all books in copyright throughout the world.  It is likewise being used by the Authors Guild and Association of American Publishers to take over management of the growing market for digital literary works by creating a new collecting body, the Book Rights Registry, and receive revenue from commercialization of digital rights, which they also could never obtain otherwise under law even if they prevailed in Court.  The proposed

Settlement provides the structure for a prospective regulatory scheme forever governing worldwide copyright and privacy rights, essentially rewarding defendant Google for its wholesale violation of national copyright laws and then later seeking to obtain a compulsory license in a class action context. There is no international precedent for the breadth of this audacious and unilateral proposed Settlement which is too lengthy, too inclusive, and too invasive of the established contours of copyright law. It is the product of a process which wholly circumvents the constitutionally mandated give and take of the legislative process that would normally require passage in the United States by the House and Senate and execution by the President or an international treaty were it to impact authors and publishers in France.

**B.    The "Opt-Out" Provision Violates French Copyright Law, the Berne Convention and WCT**

The proposed Settlement, unlike the normal international copyright regime which steadfastly requires prior approval of the author, instead mandates that the author must "opt out" and advise the Court that he or she does not want to take part in the compulsory licensing scheme. If the author remains silent or does not receive notice, he or she is deemed in, which is contrary to the established foundation of international copyright law, which requires a written license where the author grants his or her exclusive rights. Under this proposed Settlement, if the author is silent, he or she is bound by the judicially-sanctioned departure from international copyright law agreed-upon by three American entities. This unusual result also established an apparatus to perpetuate this inequity -- the creation of an extra-judicial body in the United States known as the Book Rights Registry and the implementation of a formality laden, private regulatory authority requiring, among other things, the filing of detailed claim forms and disclosing private personal data. If an author is "in" and does not file, that author receives nothing. This is contrary to the Berne Convention, which does not require registration.

Moreover, if the author opts out, he or she has no right to object because the proposed Settlement -- which covers all books found in U.S. libraries that were published anywhere in the world on or before January 5, 2009 -- does not affect those who opt out.[8] If one wants to object, the author must stay in and be bound. Such is the inequity of a class action settlement in the context of international copyright law which has the far-reaching effect of undermining international copyright laws and usurping the rights of many worldwide, including French authors, publishers and digital libraries.

The opt out mechanism turns the world upside down and deprives authors of the most fundamental and essential of aspects of international and French copyright law -- exclusivity. Under both U.S. copyright law and the French CPI, no one may use an author's intellectual property without permission. See Article L. 122-4 ("any complete or partial (public) performance or reproduction without the consent of the author or his successors in title shall be unlawful. The same shall apply to translation, adaptation or transformation, arrangement or reproduction by any technique or process whatsoever"); Article L. 122-3 ("Reproduction shall consist in the physical fixation of a work by any process permitting it to be communicated to the

---

[8]     Google's official FAQs found at http://www.googlebooksettlement.com/help/bin/answer.py?answer=118704&hl=en includes the following:

"Question 21 – What happens to the books of authors and publishers who opt out of the settlement? -- If an author or publisher opts out of the Settlement, the terms of the Settlement will not apply to this author or publisher. This means that the author or publisher is retaining all rights to bring a legal action against Google, for digitizing and displaying the author's or publisher's books and Inserts, and against the Participating Libraries, if desired. It also means that the Settlement neither authorizes Google to make certain uses of these books and Inserts **nor does it prohibit Google from doing so**." (Emphasis added.) The bolded language conveys the clear implication that Google will not feel bound by the opting out process and may very well choose to continue digitizing the books of those who opt out, possibly in reliance on the same "fair use" arguments that resulted in the present class action.

public in an indirect way").  While narrowly drafted exceptions have always been recognized in the United States, France and elsewhere, nowhere has there ever been a blanket exception granting a compulsory license for digital reproduction, distribution and display of published works on such a massive scale.  See Article L. 122-5 ("analyses and short quotations justified by the critical, polemic, educational, scientific or informatory nature of the work in which they are incorporated;" "press reviews;" the reproduction of a work and its public performance, for the purpose of preservation or aimed at preserving the conditions of their consultation for the purpose of research or private study by individual members of the public by dedicated terminals within publicly accessible libraries, museums or archives, under the condition that they do not seek for a commercial or economic advantage").  Significantly, Article L. 122-5 of the CPI provides: "The exceptions listed in this article cannot conflict with a normal exploitation of the work nor unreasonably prejudice the legitimate interests of the rights holder."  In fact, this reflects the traditional three-part test for copyright exceptions as enunciated in Berne, Article 9(a)(2) which limits such exception for literary works to, "certain **special cases**, provided that such reproduction **does not conflict with a normal exploitation** of the work and **does not unreasonably prejudice the legitimate interests** of the author." (Emphasis added.)  The same test is found in Article 13 of TRIPs:[9] "Members shall confine limitations and exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the rights holder."  Clearly, the proposed Settlement undercuts established law and moves well beyond the delimited boundaries of international law for permissible exceptions to copyright.

---

[9]     The Agreement on Trade Related Aspects of Intellectual Property Rights (or TRIPs), administered by the World Trade Organization (WTO) and negotiated as part of the Uruguay Round of the General Agreement on Tariffs and Trade (GATT) in 1994.

C.     **The Proposed Settlement Imposes a Compulsory and Perpetual License Contrary to French and International Copyright Laws**

Furthermore, the "license" created by the Settlement Agreement is compulsory and in perpetuity, notwithstanding the fact that no action has been taken by an author before September 4, 2009.  After that date, whether or not an author neglected to "opt out" or not, you are deemed in.  American authors as well as authors worldwide, including French authors, whether or not they are even aware of the present lawsuit, are included.  Many authors in France or elsewhere are unaware of the implications of the proposed Settlement.  The Settlement will effectively place management over all pre-1/6/09 books -- both U.S. and international -- in a single, private commercial entity, subject only to the jurisdiction of a U.S. court, with little public or international oversight.  This concept -- that an U.S. corporation could obtain control over the works of French and other international authors as well as impact the privacy rights of French citizens without their prior consent -- is contrary to established French law.  France, by this filing, is voicing its objections to the proposed Settlement to underscore the serious risk to its valued intellectual and cultural resources, namely, France's authors, publishers and digital libraries and its literary traditions which protect the rights of the author.

As viewed by France, and summarized below, the primary flaws of the proposed Settlement are:

- The proposed Settlement will greatly impact French and European authors and publishers, since their interests are affected by the provisions of the proposed Settlement, unless they expressly opt out;

- Google's proposed Settlement and its conduct to date are contrary to the fundamentals of international, European and French copyright law, which require that each author's consent must be obtained in order to digitally reproduce, display and distribute.  The proposed Settlement gives unfettered power to Google, an American company, which owes its primary legal obligations to its shareholders and not the public interest of the citizens of France;

- An essential feature of the French CPI and international copyright law, as mandated by the Berne Convention, is the prohibition of any registration formality as a precondition for enjoying or enforcing a copyright interest. When the United States joined the Berne Convention, it eliminated such statutory formalities. The proposed Settlement illegally re-imposes such formalities by requiring that authors register their works in order to enjoy any of the benefits of the proposed Settlement;

- Digitization of books by Google without any permission from the authors is not permitted under the French CPI because this infringes the exclusive right of reproduction. Under the French CPI, before any digital copies of books are made, the author must give consent. Google's wilful actions contrary to the CPI are not justified or excused by any French law exception;

- Google's creation of digital copies is likewise not permitted under European law. The European Community affords authors an exclusive right of reproduction. Under Article 2 of the Directive on the Harmonisation of Certain Aspects of Copyright and Related Rights in the Information Society. (See 2001/29/EC the "Copyright Directive"). Google's actions violate this exclusive right and cannot be excepted under Article 5, ¶¶ 2 and 3 of the Copyright Directive;

- Google's massive scale of unauthorized digitalization was not justified by application of any "transformative" or "fair use" defense under U.S. copyright law." The proposed Settlement compounds the scope of Google's unauthorized infringements by effecting for Google a compulsory license from non-consenting French authors, unless they opt out, for acts that violate their rights under U.S. and French law through a judicially-sanctioned compulsory implied "consent";

- Furthermore, even opting out is unlikely to protect a French author's books from being unlawfully digitized as Google has stated that it will continue to treat the books of those authors as fair game under the rubric of fair use.[10] If a French author does not agree and opts out, he or she has the "option" to sue Google and thus there is no positive effect of the Settlement to stop further infringing activity by Google;

---

[10]    The outer limits of "fair use" in the digital realm appear to have been delineated by the Ninth Circuit, respectively, in cases generally holding that use of "thumbnails" of photos for indexing purposes -- namely, providing a mechanism to locate the authorized high resolution images -- was a permissibly transformative fair use. Kelly v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003) and Perfect 10, Inc. v Amazon.com Inc., 487 F.3d 701 (9th Cir. 2007). Any use beyond the indexing function, however, appears to fall outside the fair use privilege.

- To the contrary, the proposed Settlement also effectively encourages Google to digitally scan books of French authors and make them publicly available in the U.S.  Authors of "commercially available" books will still need to grant consent for such display.  But, should Google unilaterally determine that a book is not commercially available (out-of-print), Google need not secure any author's permission -- meaning those who opted in by not opting out.  Google may make such display uses as it chooses unless the author makes the required filing.  It seems unlikely that most French authors will make such required formal filings because such filings are considered a formality prohibited by international copyright laws.  By not filing, however, the works of the vast majority of French authors will be held hostage to whatever uses Google, in its sole discretion, chooses to make[11];

- As a consequence, the proposed Settlement breaches the WCT which provides in Article 6 that authors enjoy the exclusive right of authorizing the making available to the public of the original and copies of their works.  Under the proposed Settlement, no express authorization by

---

[11]   Indeed, Google need not secure permission even from authors of commercially available books for non-display uses such as key word advertising which may ultimately be as equally valuable nor is Google obligated to share any revenue from such uses.  That this latter exclusion from revenues has gone unnoticed is hardly surprising since the craftily delineated revenues subject to sharing with the Books Registry is hidden in a bewildering array of interrelated, cross-referenced provisions, some of which do not even mention revenues in their headings.  These include definitional provisions found at 1.7 (Advertising Uses), 1.63 (Google Products and Services), 1.65 (Gross Revenues), 1.86 (Net Advertising Revenues), 1.87 (Net Purchase Revenues), 1.97 (Online Book Pages) as well as such other provisions as 2.1(a) (Benefits), 3.14 (Advertising Uses), 4.5(a)(i) and (ii) (Obligation to Pay Revenue Share) and 6.3(a)(i) (Unclaimed Funds").  Intriguingly, the meaning of "Gross Revenues" is only found in 6.3(a)(i) dealing with "Unclaimed Funds."  Essentially there are three distinct revenue streams, only one of which is subject to the 37/63% split between Google and the Books Registry.  The first is revenue from the Revenue Models which is limited to display uses and advertising uses.  Somewhat semantically disingenuously,  "Advertising Uses" excludes advertising on Google pages featuring general search results which do not pertain to a specific book (see 3.14).  The second revenue stream is from those advertising uses that are not "Advertising Uses" within the meaning of 3.14.  The third, and possibly the most valuable, revenue stream is from non display uses over which authors and publishers have no control absent complete withdrawal of their books prior to April 5, 2011.  It takes little imagination to see how Google's share could quickly reach at least 50% of all revenues associated with the book database for which Google will remain wholly unaccountable.  Such an amassing of money generates the kind of power further enabling Google to homogenize and monetize these cultural artifacts as though they were nothing more than fungible assembly-line products.

rightholders is required for out-of-print works. Most works of French authors will be deemed commercially unavailable either because they are out-of-print in the U.S. (generally because of the limited demand for French language books in the U.S.), or the authors neglected to file formal claim forms, or because these authors are not readily located by Google. The determination of commercial availability is solely within Google's discretion and may, in close cases, give Google an incentive to balance considerations in a manner that favors a finding that a book is out-of-print;

- At the same time, the proposed Settlement is contrary to both French and European law, since both recognize the right of "making available" as an author's exclusive right (Article L.122-2; Article L.122-4 CPI). This right is analogous to the distribution and display rights that "make available" public access to any given work and includes "any complete or partial (public) performance or reproduction made without the consent of the author . . . shall be unlawful." As a result, U.S. law comports with international copyright standards but the proposed Settlement does not;

- Under the provisions of the Settlement, Google is granted, as a practical matter, a virtual U.S. monopoly with respect to orphan works, namely, those works protected by copyright where the authors or rightholders are unidentified or cannot be located. While not specifically identified in the proposed Settlement, orphan works, which are usually out of print, play an integral role. Google does not need an express approval to make them publicly available, so that it faces no adverse consequences should an author of an orphan ever come forward. To the extent that many French authors will undoubtedly fail to file claims, their works will become the legal equivalent of orphan works. As such, the revenues generated by their orphans will fall into the Settlement fund for distribution only to authors who have filed rather than to the many non-filing French authors;

- Other market competitors who might compete with Google will be disadvantaged by observing the CPI and copyright laws since failing to enjoy the same legal safe harbor from orphan work liability. Such a legal safe harbor would only be available to competitors through legislation and litigation, thus, giving Google a head start that can only lessen competition. In contrast, France doesn't recognize such a safe harbor. The proposed Settlement, thus, not only contradicts the French CPI but will also likely hamper U.S. Congressional efforts to balance these competing interests. In so doing, the orphans, whether from French or U.S. soil, will not receive all of the protections they might otherwise have enjoyed;

- Google searches conducted from France would include orphan works. Such a service would violate the French CPI and EC law because no consent has been given. Giving Google free rein to unfairly compete in the marketplace will weaken French and EC competitors while failing to adequately compensate French authors for their creative endeavors;

- The proposed Settlement results in a <u>de facto</u> monopoly on information and an intensification of media concentration in Google.[12]  As a result, the right of free access to information, which must be guaranteed according to the 1948 Universal Declaration of Human Rights (art. 19) as well as the Declaration of the Rights of Man and the Citizen which is part of the French constitution (art. 11),  as well as the existing cultural diversity in both France and Europe, will be threatened; and

- French and European library projects, such as Europeana and Gallica, currently in development demonstrate that the social benefits of a universal digital library need not come at the cost of imposing a compulsory license and usurping fundamental copyright interests of the authors and publishers.  The French initiatives continue to advance even while complying with traditional copyright rules.  As shown by the French CPI and European Community laws, the social benefits can be achieved without empowering Google, a single private corporation, with a monopoly.

For these reasons, the proposed Settlement not only radically changes U.S. copyright law but also effectively reduces the scope of copyright protection afforded to French and other foreign authors under the Berne Convention and WCT.  This could eventually prove embarrassing to the U.S., which insists that other countries, including France, observe and enforce high standards of intellectual property protection.  France and other countries expect the same reciprocal treatment with respect to their laws.

**D.    The Provisions of the Proposed Settlement Create Grave Concerns for French Authors, Publishers and Cultural Diversity**

France's concern for its authors is only heightened by the proposed Settlement's shroud of secrecy and hint of an uncontrolled, autocratic concentration of power in a single

---

[12]    It has been reported that the Antitrust Division of the United States Department of Justice has begun antitrust investigations of the Settlement.  Apart from noting that the laws of France limit the concentration of market power of the type envisioned by the Settlement, France will not comment on the U.S. antitrust law and the U.S. Department of Justice's investigation of the adverse antitrust impact of the Settlement.

corporate entity, Google, that generates more revenue than many countries.[13]  The seriousness of these concerns is self-evident, given the plain language of the proposed Settlement itself.  By vesting in Google the power to exercise an effective compulsory license to digitize certain books and to choose and reject which books appear in its digital library and, by insulating Google from further litigation, effectively undercutting and eliminating competition from other digital libraries worldwide, the proposed Settlement threatens cultural diversity and the free exchange of ideas through literature.

First, Google, the alleged wilful infringer, obtains in settlement something it would never be able to achieve in an arm's length negotiation, a most-favored nations provision, by flagrantly ignoring the exclusive rights of authors and publishers.  If the Registry (or any substantially similar entity organized by rightsholders using any data or resources that Google provides) obtains more advantageous terms, then Google must be offered the same terms.  (Settlement, § 3.8(a)).  This curious provision will have the effect of putting Google in an unassailable position and stifling fair trade because competitors know, in advance, that they can never even establish niche-specialized markets because Google will always have the upper hand in any such negotiation.  Rather than calling this a most-favored nations clause, it would be more aptly described as a "Google-favored" clause.

Second, still another aspect of the proposed Settlement is an important concern for France.  Under the proposed Settlement, Google may exclude books from the available database at its own discretion.  (Settlement, § 3.7(e)).  This effectively empowers Google to censor written content, including books, that may be considered politically or socially sensitive,

---

[13]    Google's reported revenue in 2008 was nearly 22 billion U.S. dollars.  http://investor. google.com/fin_data.html, visited on August 6, 2009.

thus limiting the public's meaningful access to the marketplace of ideas and the resulting cultural diversity. This unfettered power would clearly be unconstitutional in the hands of the government and is questionable even in a state-sanctioned Settlement. Calling the proposed Settlement non-exclusive is specious especially given the likelihood that little meaningful competition will be fostered because of Google's size, vast economic resources, and advanced head start fostered by its unauthorized, allegedly infringing activity[14] and the exclusive competitive advantages sanctioned by the proposed Settlement, such as the "most-favored nation" clause.

Third, Google's market power to set prices has been disguised under the cloak of an "objectively reasonable" pricing algorithm. (Settlement, § 4.2(c)). Of course, the Google-created algorithm is unlikely to lead to an adverse pricing policy because it serves Google's best interests. Although the Registry has the right to audit or validate the pricing algorithm, the underlying methodology behind the Google algorithm is confidential and known only to Google. (Settlement, § 4.2(c)(ii)(3)). This is directly contrary to the spirit of the "Loi Lang" and the protections afforded publishers in order to preserve and foster cultural diversity.

Fourth, audit procedures of financials are likewise subject to stringent Google confidentiality restraints. French authors and publishers, in particular, will never have the ability or opportunity to verify audit procedures or their accuracy, especially since French authors and publishers are not represented by plaintiffs. Under the proposed Settlement, even the Court does not have the right to this information. (See Settlement, § 4.6(e) and § 6.3(d)).

---

[14]     One should never forget that Google would not be in this favored position had it not chosen to disregard the copyright laws and scan books on a massively unprecedented scale without permission.

Fifth, Google's purported need for utmost secrecy also is reflected in the proposed Settlement provision which allows Google to meet with the Registry to discuss Library uses but requires that such meetings are closed to the public unless the Court orders otherwise. (See Settlement, § 7.5). Furthermore, the proposed Settlement requires that audits of security measures shall remain confidential. The audited parties are entitled to review such reports in advance so that they may remove any information that they consider to be trade secrets or proprietary (Settlement, § 8.2(c)), all without any apparent court supervision.

Sixth, the level to which the proposed Settlement lacks any alleged transparency is underscored by Section 17.19 (at page 131), buried in the minutiae of "Article XVII – Miscellaneous Provisions," which requires that counsel for the Author Sub-Class, counsel for the Publisher Sub-Class and counsel for Google, ". . . will destroy all copies of, and erase from computer memory, all documents produced to them pursuant to the Action. . . ." This provision effectively eliminates any inquiry into the history behind the Settlement and destroys the only equivalent of legislative history or parol evidence available for future use in interpreting and applying the complex Settlement provisions. Rather than sanction the destruction of these critical documents, the Court should order them maintained and publicly posted to the Internet for review by all prior to the Fairness Hearing.

Seventh, even the Registry's power will be severely limited in comparison to Google's unfettered rights. Section 6.2(b) that charters the Registry but that specifically limits the Registry's discretion and authority demonstrates this fact:

> In addition, the Charter will prohibit the Registry from
> coordinating Rightsholders for purposes of representing them as a
> sub-group regarding any matter under this Settlement Agreement,
> or working with any sub-group of Rightsholders to exclude their
> Books from Display Uses or non-Display Uses, or to advocate that

any sub-group of Rightsholders decrease it participation in the
Settlement in any manner.

The Registry, which is supposedly created as a safeguard and advocate for the authors, is

constricted and muzzled precisely where its voice is most needed -- when the rights of the

individual authors supposedly represented by the Registry may conflict with Google's unfettered

commercial interests.

Eighth, the immediately preceding Article XVI (at page 125), incredibly gives

Google, the author sub-class, and the publisher sub-class, each the right to terminate the

Settlement, ". . . if the withdrawal conditions set forth in the Supplemental Agreement Regarding

Right to Terminate between Plaintiffs and Google have been met." This *private* right by Google

to completely undo the Settlement -- which Settlement is promoted as serving the *public* interest

-- is a mystery and not explained in the proposed Settlement:  "The Supplemental Agreement

Regarding Right to Terminate is confidential between Plaintiffs and Google, and will not be filed

with the Court except as provided therein." (see Article XVI at page 125).  The parties, in effect,

attempt to hide what may be one of the most important provisions of the Settlement not only

from the public in general, but also from the class members, whose interests the Plaintiffs

purportedly represent, as well as the Court.  All such documents, including the confidential

Supplemental Agreement, should be made available to the public and potential class members,

including French authors, prior to their decision as to whether to opt in with respect to the

Settlement.

**E.**      **Rather Than Provide a "Social Benefit," the Proposed Settlement Disadvantages**
         **French Authors, Publishers and the French Public by Effecting a Change in**
         **International Copyright Law in the Class Action Context, Where They Have No**
         **Voice or Representation**

The illusory nature of the so-called "social benefit" of the proposed Settlement

alleged by Google is underscored by the division of revenues.  The proposed Settlement provides

that Google will receive ten percent of revenues for its expenses before the remainder of gross profits is split 30%/70% with the Registry. Thus, the Settlement effectively guarantees Google a return of one third of all revenues as a financial reward for undertaking its massive and unauthorized digital copying campaign. The attorneys for the author sub-class get, immediately upon approval (namely, right now), a huge windfall of $30 million and the attorneys for the Publisher Sub-Class get a payday of $15.5 million. The Registry, as represented by the Authors Guild and the Association of American Publishers, gets an additional $34.5 million to become established. In contrast, while Google reaps immediate benefits, the authors patiently must wait to be compensated a lump sum settlement fee of $60 per book, $15 per insert and $5 for a partial insert; an inclusion fee (assuming they authorize display uses) of $200/$50/$25 and a revenue split to be determined as the FAQs make plain by a complex formula on an attached schedule at some undetermined future date: "Please be patient, and visit the Settlement Website . . . (URL omitted) . . . regularly for updates." The Settlement stresses that the Registry and distribution procedures may take some time to establish so that settling class members (unlike plaintiffs' counsel and Google) should not expect any immediate payout.[15] It is unfair that French authors

---

[15]    Google's Official FAQs provide: "QUESTION 45 -- When will payments be sent?

It will take considerable time to implement the commercial uses authorized under the Settlement, implement the elections made by Rightsholders for their Books and Inserts, and make Cash Payments. The commercial uses and other settlement benefits described in this Notice will not occur until after the Effective Date, and further time will be required in order to establish the Registry and clear rights so that the appropriate Rightsholders receive their due and owing benefits. Please be patient, and visit the Settlement Website at http://www.googlebooksettlement.com regularly for updates."

See http://www.googlebooksettlement.com/help/bin/answer.py?answer=118704&hl=en#q38, visited on September 4, 2009. In other words, the payout may come sooner, but more likely much later.

would have to wait for an uncertain, likely prolonged,  period of time for compensation when everyone else who is profiting from the authors' endeavors get paid much sooner.

The more fundamental issue of fairness is whether French, or other international, authors should properly even be included in the author sub-class at all.  Class actions are certified on the basis that the representative of the class effectively represents the interests of the class members.  In this case, the author sub-class is represented by the Authors Guild.  As is apparent from its own website, French authors would generally be excluded from membership. "Self-published works and works published by subsidy presses do not qualify an author for membership.  **Works published by <u>foreign publishers</u> are not accepted as a basis for membership."**  (https://www.authorsguild.org/join/eligibility) (reviewed on September 4, 2009) (emphasis added).  Since non-U.S. authors, including French, are generally excluded from the Authors Guild, but not from the scope of the Settlement, it is reasonable to conclude that the Authors Guild does not have the same incentive to effectively and responsibly represent the best interest of French authors.[16]

---

[16]    The Supreme Court elaborated on when the class action representatives "fairly and adequately protect the interests of the class," under the Federal Rules of Civil Procedure ("FRCP") § 23(a)(4).

In <u>Amchem Products, Inc. v. George Windsor</u>, the Supreme Court explained that the adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.  521 U.S. 591, 625 (1997).  Further, a class representative must be a part of the class and "possess the same interest and suffer the same injury" as the class members.  <u>Id</u>. at 625-26 (<u>quoting Schelsinger v. Reservists Committee to Stop the War</u>, 418 U.S. 208, 216 (1974)); <u>East Tex. Motor Freight System, Inc. v. Rodriguez</u>, 431 U.S. 395, 403 (1977).  In applying this standard in <u>Amchem</u>, which involved an asbestos settlement-only class action, the Supreme Court affirmed the Third Circuit's holding that the class should not have been certified by the district court because the Rule 23 adequacy requirements had not been satisfied.  Specifically, the adequacy of representation was not satisfied because "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses.  In significant respects, the interests of those within the single class [were] not

Similarly, the membership of the Association of American Publishers is comprised of "all U.S. companies actively engaged in the publication of books, journals, and related electronic media," which necessarily excludes French book publishers, intermediaries and general book retailers. Since non-U.S. book publishers, intermediaries and book retailers are not included in the membership in the Association of American Publishers, but are reached by the unfettered scope of the proposed Settlement, it is likewise elementary to conclude that the Association of American Publishers will not adequately and responsibly represent the interests of French publishers.

France respectfully requests that this Court consider these critiques and suggestions set forth herein in holding that the proposed Settlement is not truly in the best interests of all parties concerned and the public interest because the Settlement unfairly deprives French authors and publishers a voice in deciding how and when their literary works are made available to the public, while providing an undue economic advantage and market power to a

---

aligned." Amchem, 521 U.S. at 626. The Court pointed out that the "currently injured" portion of the class interests were in immediate conflict with the "exposure only" portion of the class. Id. Since, there was clear conflict between the representatives' interests and a portion of the class, there was "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." Id. at 627. Here, the interests of members of the Authors Guild would seem clearly at odds with those of all foreign authors excluded from membership since the fewer foreign authors who file claims with the Registry, the more revenue will be available for division among the Authors Guild membership.

The Second Circuit has expanded on the Supreme Court's general test that the class representative must posses the same interest and suffer the same injury. The Second Circuit applies a two factor analysis for adequacy of representation inquiring whether: "(1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorney's are qualified experienced and able to conduct litigation." Baffe v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000); see also Amchem, 521 U.S. at 625-26. While all of the participating attorneys are unquestionably qualified, the interests of the parties they represent, and to whom they owe their professional loyalty, are clearly antagonistic to those of non-U.S. authors.

single, private corporate entity, Google and retarding natural competition in the marketplace of digital libraries.

## CONCLUSION

For all the foregoing reasons, the Court should reject the settlement proposal in its entirety or, at least, exclude French/foreign authors and publishers from the class.

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: _____

Edwin Komen (Pro Hac Vice Application Pending)
Theodore C. Max, Esq. (TM-1742)
30 Rockefeller Plaza, Suite 2400
New York, NY  10112
Tel.: (212) 332-3602
Fax: (212) 332-1201
Counsel for French Republic