UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHOR'S GUILD, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE, INC. <br><br> Defendant. | ECF Case <br><br> Civil Action No.: <br> 05-CV-8136 (DC) |

## OBJECTION OF YAHOO! INC. TO FINAL APPROVAL OF THE PROPOSED CLASS ACTION SETTLEMENT

Michael S. Elkin
Thomas P. Lane
Robert C. Turner
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700

*Attorneys for Class Member
Yahoo! Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Procedure 7.1, Class Member Yahoo! Inc. ("Yahoo!") states that it is a publicly traded company.  Yahoo! has no parent corporations and no publicly held company owns more than 10% of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................... i

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ..................................................................................... 1

ARGUMENT .......................................................................................... 2

I.     THE PROPOSED SETTLEMENT USURPS CONGRESS' AUTHORITY
      OVER COPYRIGHT LAW............................................................................ 2

     A.    Congress Has an Expressed and Active Interest in Orphan Work
          Legislation................................................................................. 3

     B.    The Proposed Settlement Requires Absent Orphan Owners to Opt-
          Out........................................................................................... 7

II.    THE SETTLEMENT PROCESS IS IRREDEEMABLY FLAWED ............................ 10

     A.    The Putative Class Representatives Inadequately Represent
          Owners of Copyrights in Orphan Works .................................... 13

          1.    The Class Is in Conflict and Does Not Possess the Same
               Interests ......................................................................... 13

          2.    The Class Does Not Share Injury.......................................... 16

          3.    Class Rights Will Be Abridged............................................. 18

          4.    The Class as Constituted Is Not Sufficiently Ascertainable ................... 19

III.   THE PROPOSED SETTLEMENT RAISES ANTICOMPETITION
      CONCERNS ...................................................................................... 21

     A.    The Improper Power of the Registry ................................................ 21

     B.    The Barriers to Entry for Potential Competitors Are
          Insurmountable ........................................................................ 23

     C.    Google Gains an Unfair Advantage in the Search Marketplace ......................... 25

CONCLUSION........................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adashunas v. Negley*,
    626 F.2d 600 (7th Cir. 1980) ...............................................................................17

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)............................................................................... *passim*

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141 (1989)..............................................................................................3

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberg v. Integrated
    Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) ...........................................................11

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)..............................................................................................3

*Cortigiano v. Oceanview Manor Home for Adults*,
    227 F.R.D. 194 (E.D.N.Y. 2005) ................................................................... 19-20

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)....................................................................................11

*East Texas Motor Freight System, Inc. v. Rodriguez*,
    431 U.S. 39S (1977)..............................................................................................17

*Eldred v. Ashcroft*,
    537 U.S. 186, 212 (2003).......................................................................................2

*Fogarazzao v. Lehman Bros., Inc.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................... 10-11

*Goldstein v. California*,
    412 U.S. 546 (1973)..............................................................................................3

*Grant v. Bethlehem Steel Corp.*,
    823 F.2d 20 (2d Cir. 1987)....................................................................................11

*Grunin v. Int'l House of Pancakes*,
513 F.2d 114 (8th Cir. 1975) ...................................................................................21

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992)...................................................................................14

## TABLE OF AUTHORITIES – Continued

**Page(s)**

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
  209 F.R.D. 323 (S.D.N.Y. 2002) ..........................................................................11

*In re Peregrine Entertainment, Ltd.*,
  116 B.R. 194 (C.D. Cal. 1990) ...............................................................................3

*Jermyn v. Best Buy Stores L.P.*,
  256 F.R.D. 418 (S.D.N.Y. 2009) ..........................................................................20

*Kahle v. Gonzalez*,
  487 F.3d 697 (9th Cir. 2007) ..............................................................................7, 8

*Levitt v. Rogers*,
  257 F. App'x 450 (2d Cir. 2007) ..........................................................................11

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1995)............................................................................13, 14

*National Super Spuds, Inc. v. N.Y. Mercantile Exchange*,
  660 F.2d 9 (2d Cir. 1981) .....................................................................................19

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)...............................................................................................24

*Ortiz v. Fireboard Corp.*,
  527 U.S. 815 (1999)........................................................................................ passim

*Polar Internaitonal Brokerage Corp. v. Reeve*,
  187 F.R.D. 108 (S.D.N.Y. 1999) ..........................................................................11

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  244 F. Supp. 2d 289 (S.D.N.Y. 2003)...................................................................17

*Robinson v. Metro-North Commuter Railroad Co.*,
  267 F.3d 147 (2d Cir. 2001)..................................................................................14

*Roth v. Pritikin*,
  710 F.2d 934 (2d Cir. 1983)....................................................................................9

*Schlesinger v. Reservists Committee to Stop the War*,
  418 U.S. 208 (1974)...............................................................................................17

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
  157 F. Supp. 2d 561 (E.D. Pa. 2001) ....................................................................18

**TABLE OF AUTHORITIES – Continued**

<u>Page(s)</u>

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)..................................................................................................2-3

*Stewart v. Abend*,
  495 U.S. 207 (1990)....................................................................................................2

*United States v. American Society of Composers, Authors and Publishers*,
  41-CV-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001) ...................................23

*United States v. Broadcast Music, Inc.*,
  64-CV-3787, 1994 WL 901652 (S.D.N.Y. Nov. 18, 1994)......................................23

*Unisuper Ltd v. News Corp.*,
  898 A.2d 344 (Del. Ch. 2006)...................................................................................18

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)..................................................................................11, 12

**STATUTES**

U.S. Const., art. 1, § 8, cl. 8 ........................................................................................2

15 U.S.C. § 13(a) .......................................................................................................24

17 U.S.C. § 111 ............................................................................................................7

17 U.S.C. § 112(e) ........................................................................................................7

17 U.S.C. § 114 ............................................................................................................7

17 U.S.C. § 115 ............................................................................................................7

17 U.S.C. § 116 ............................................................................................................7

17 U.S.C. § 118 ............................................................................................................7

17 U.S.C. § 119 ............................................................................................................7

17 U.S.C. § 122 ............................................................................................................7

17 U.S.C. § 201(e) ......................................................................................................10

17 U.S.C. § 301 ............................................................................................................3

17 U.S.C. § 501 ..........................................................................................................19

**TABLE OF AUTHORITIES – Continued**

**Page(s)**

17 U.S.C. § 1001 ...........................................................................................7

28 U.S.C. § 2072(b) .....................................................................................18

RULES

Fed. R. Civ. P. 23 ................................................................................. *passim*

Fed. R. Civ. P. 23(a) ...................................................................................10

Fed. R. Civ. P. 23(a)(4)...............................................................................14

TREATIES & LEGISLATIVE MATERIAL

Agreement on Trade-Related Aspects of Intellectual Property Rights,
    1869 U.N.T.S. 299, 33 I.L.M. 1197 (1994) ...........................................9

Berne Convention for the Protection of Literary and Artistic Works,
    1 B.D.I.E.L. 715 (1979) .........................................................................9

Copyright Amendments Act of 1992,
    Pub. L. No. 102-307, 106 Stat. 264 (1992)............................................7

Family Entertainment and Copyright Act of 2005,
    Pub. L. No. 109-9, 119 Stat. 218 (2005) ...............................................4

The Orphan Works Act of 2008,
    H.R. 5889, 110th Cong. (2008).........................................................5, 6

Preservation and Restoration of Orphan Works for Use in Scholarship and Education
    (PRO-USE) Act of 2005, H.R. 24, 109th Cong. (2005) .........................4

Public Domain Enhancement Act,
    H.R. 2601, 108th Cong. (2003)..............................................................4

Shawn Bentley Orphan Works Act of 2008,
    S. 2913, 110th Cong. (2008)..............................................................5, 6

Sonny Bono Copyright Term Extension Act,
    Pub. L. No. 105-298, 112 Stat. 2827 (1998)..........................................7

**TABLE OF AUTHORITIES – Continued**

**Page(s)**

**OTHER AUTHORITIES**

Andrew R. Albanese & Norman Oder, *Corner Office:  Google's Dan Clancy*, Libr. J.,
    May 1, 2009, *available at* http://www.libraryjournal.com/article/CA6652445.html ........ 16-17

Roy Blount, Jr., *Let's Not Lose Our Heads Over a "Monopoly" of Orphans*, June 24,
    2009, *available at* http://www.authorsguild.org/advocacy/articles/roy-blount-on-
    google-orphans.html ...................................................................................................9, 25

Vigdis Bronder, *Saving the Right Orphans:  The Special Case of Unpublished Orphan
    Works*, 31 Colum. J.L. & Arts 409 (2008) ..............................................................4

Copyright Clearance Center, *The Authors Guild, AAP, Google Settlement:  Allan Adler,
    Vice President of the Association of American Publishers (AAP) Speaks About the
    Settlement with CCC*, at 6, July 15, 2009, *available at*
    http//www.copyright.com/media/pdfs/Transcrip-AdlerInterview.pdf ....................17

Google, *Google Book Search:  The Story*, Feb. 2007, *available at*
    http://www.google.co.uk/press/files/book-search-en.pdf ........................................15

Marc H. Greenberg, *Reason or Madness:  A Defense of Copyright's Growing Pains*,
    7 J. Marshall Rev. Intell. Prop. L. 1 (2007) ...............................................................4

James Grimmelmann, *How to Fix the Google Book Search Settlement*, 12 J. of Internet
    L.105 (Apr. 2009) ......................................................................................................14

Miguel Helft, *It's Not Just Microsoft Balking at Google's Book Plans*, New York Times
    BITS Blog, Apr. 4, 2009, *available at* http://bits.blogs.nytimes.com/2009/04/04/its-
    not-just-microsoft-thats-balking-at-googles-book-plans/ ..........................................7

Daphne Ireland, *Tracing the Impact of the Google Settlement*, Newsletter of the Ass'n of
    Am. Univ. Presses, June 11, 2009, *available at* http://aaupblog.aaupnet.org/?p=123 ...... 15-16

William Landes & Richard Posner, *Indefinitely Renewable Copyright,* U. Chicago Law &
    Economics, Olin Working Paper No. 154 (August 1, 2002), *available at*
    http://ssrn.com/abstract=319321 ...............................................................................4

Manual for Complex Litigation 2d § 30.45 (3d ed. 1995) ............................................11

Jon Orwant, *Google Book Search:  Past, Present, and Future*, O'Reilly Tools of Change
    for Publishing Conference, February 10, 2009 .........................................................4

Peter Norvig, *Theorizing from Data:  Avoiding the Capital Mistake,* May 31, 2007,
    *available at* http://www.youtube.com/watch?v=nU8DcBF-qo4 .............................25

**TABLE OF AUTHORITIES – Continued**

<u>**Page(s)**</u>

Anand Rajaraman, *More Data Usually Beats Better Algorithms,*
  Mar. 24, 2008, *available at* http://anand.typepad.com/datawocky/2008/03/more-data-
  usual.html.........................................................................................................................25

Pamela Samuelson, et al., Letter to The Honorable Denny Chin Re: *Authors Guild v.*
  *Google Inc.*, No. 05-civ-8136 (DC), April 27, 2009, *available at*
  http://www.eff.org/files/judge%20chin%20letter%204.27.09.pdf .........................................20

United States Copyright Office, *Report on Orphan Works,* January 2006........................... *passim*

7 AA Wright, Miller & Kane, Fed. Practice & Proc. Civ. 3d § 1785.1 (2005) ...........................17

Class member Yahoo! Inc. ("Yahoo!") hereby submits its objection to final approval of the class action settlement in *The Author's Guild, Inc., Association of American Publishers, Inc., et al. v. Google, Inc.* (the "Proposed Settlement" or "PS"), and intends to appear at the Fairness Hearing currently scheduled for October 7, 2009.

## INTRODUCTION

Yahoo! is a provider of a wide array of internet-related services and is also a publisher of written works covered by the Proposed Settlement in this action.[1]  Yahoo! has chosen to opt-in to the Proposed Settlement and is thus a member of the plaintiff class.  As a class member, Yahoo! respectfully files this objection to the Proposed Settlement.

Although there has been no shortage of hyperbole associated with the Proposed Settlement, Yahoo! files this objection not to increase that furor but to attempt to explain what it sees as three fundamental, and fatal, flaws in the Proposed Settlement.  First, there can be no doubt that Congress is the constitutionally mandated body responsible for determining copyright rights and remedies.  A class action, particularly one that seeks to create a new and unprecedented ongoing business venture as opposed to remedying and compensating past harm, is simply not an appropriate legislative vehicle.  Second, the Proposed Settlement does not comply with Rule 23.  It covers an unascertainable, and conflicted, group of plaintiffs, many of whom have not yet even been harmed (and provides for uses that have not yet come to pass).  Third, the Proposed Settlement also raises competition concerns relating to the use of orphan works, creates barriers to entry for future competitors to Google in the scanning, archiving,

---

[1] For example, Yahoo! is the copyright claimant for *Yahoo! Unplugged:  Your Discovery Guide to the Web*, Nov. 1, 1995, Reg. No. TX0004740929 and *The Art of Capacity Planning*, Sept. 23, 2008, Reg. No. TX0006877454.  Yahoo! also, of course, operates a search engine providing millions of users with access to broad categories and types of digital information.

searching, and presentation of books and inserts online, and impacts a further market related to search.

The growth of technology and the expansion of digitization no doubt bring with them significant public benefits, and Yahoo! does not dispute that a suitably tailored settlement agreement may provide such benefits. Yet the structure and effect of this Proposed Settlement, one which creates public policy in private, one which seeks to release claims that have not yet arisen (and ensnares authors who are not yet aware), and one which may raise significant competition concerns, is contrary to law, policy, and common sense. Therefore, Yahoo! respectfully requests that the Court reject the Proposed Settlement.

## ARGUMENT

## I.
## THE PROPOSED SETTLEMENT USURPS CONGRESS' AUTHORITY OVER COPYRIGHT LAW

The Proposed Settlement seeks to impose a unified copyright structure for all covered books, orphan or not. Sweeping change of such wide impact is appropriately left to Congress, which can elicit adequate comment from all interested parties and ensure fair and impartial representation of even those parties who may never appear. Indeed, the United States Constitution grants Congress the exclusive right to promulgate copyright law and policy. U.S. Const., art. 1, § 8, cl. 8.

The Supreme Court has also long recognized that the formulation of copyright policy lies solely in the hands of Congress. "It is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003). *See Stewart v. Abend*, 495 U.S. 207, 230 (1990) ("The evolution of the duration of copyright protection tellingly illustrate the difficulties Congress faces . . . . It is not our role to alter the delicate balance Congress has labored to achieve"); *Sony Corp. of America v. Universal City*

*Studios, Inc.*, 464 U.S. 417, 429 (1984) ("It is Congress that has been assigned the task of defining the scope of [rights] that should be granted to authors or to inventors in order to give the public appropriate access to their work product"); ("Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.") *Id.* at 431.

Further, the Copyright Act is to ensure "predictability and certainty of copyright ownership," "promote national uniformity," and "avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various States." *In re Peregrine Entm't, Ltd.*, 116 B.R. 194, 199 (C.D. Cal. 1990). *See also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989) ("One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property . . ."); *see also* 17 U.S.C. § 301; *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41 (1989); *c.f.*, *Goldstein v. California*, 412 U.S. 546, 555 (1973) (objective of copyright clause in Constitution was to facilitate granting of rights "national in scope"). Orphan works are clearly included within Congress' purview, and subject to the enactment of specific legislation should Congress determine that to do so is in the public interest.

A.    **Congress Has an Expressed and Active Interest in Orphan Work Legislation**

Orphan works are those for which the copyright holder cannot be located through diligent search. These works are not in the public domain, but remain protected by copyright and potentially available for use. *See generally*, United States Copyright Office, *Report on Orphan Works*, January 2006 (the "*Report*"). However, the works themselves are largely unusable. Those wishing to make use of an orphan work must do so at risk of an infringement action and significant monetary damages. The issues surrounding orphan works are complex, pervasive,

and raise concerns of representation and ownership. While there is no dispute among the class that orphan works are of potentially immense public utility, the Proposed Settlement is simply too broad and encompassing a fix, and too dull an instrument with which to tackle the orphan works problem.[2] The solution should spring from legislation, not litigation.[3]

Congress considered orphan works in connection with its enactment of the Copyright Act in 1976, and again in 1998 in connection with the Sonny Bono Copyright Term Extension Act, and then again in 1999 in connection with the Copyright Office's study on Copyright and Digital Distance Education. More recently, both the Copyright Office and Congress have recognized the need to address orphan works with bills introduced in both the House and the Senate several times since 2001. *See* Family Entertainment and Copyright Act of 2005, Pub. L. No. 109-9, 119 Stat. 218, 226 (2005); Preservation and Restoration of Orphan Works for Use in Scholarship and Education (PRO-USE) Act of 2005, H.R. 24, 109th Cong. (2005); Public Domain Enhancement Act, H.R. 2601, 108th Cong. (2003). Although these efforts to amend the Copyright Act to

---

[2] The scope of the orphan works problem is significant. Google has estimated that 20% of Books (as defined in the Proposed Settlement) are in the public domain, leaving 80% covered by copyright. Jon Orwant, *Google Book Search: Past, Present, and Future*, O'Reilly Tools of Change for Publishing Conference, February 10, 2009. Of those still protected by copyright, approximately 5% may be in print, while 95% are out of print and potentially orphan works. *Id.* A 2002 analysis found that between 1937 and 1970, only 8% of the copyrights in books registered with the Copyright Office were renewed, illustrating that even during a time when continuation of copyright protection depended solely on the act of the copyright holder, 92% of works were under a copyright not actively exploited, and potentially orphan. William Landes & Richard Posner, *Indefinitely Renewable Copyright*, U. Chicago Law & Economics, Olin Working Paper No. 154 (August 1, 2002), available http://ssrn.com/abstract= 319321; *see also* H.R. Rep. No. 94-1476, at 136 (1976).

[3] Commentators have stressed the need for a legislative solution to the orphan works problem. *See* Marc H. Greenberg, *Reason or Madness: A Defense of Copyright's Growing Pains*, 7 J. Marshall Rev. Intell. Prop. L. 1, 43 (2007) ("general consensus that [the orphan works situation] is a problem that needs to be addressed through new legislation"); Vigdis Bronder, *Saving the Right Orphans: The Special Case of Unpublished Orphan Works*, 31 Colum. J.L. & Arts 409, 411-12 (2008).

address general use of orphan works have, as of yet, proved unsuccessful in dealing with the issue, that does not justify an extra-legislative solution.

The continued discussion and debate over orphan works indicate that Congress embraces its exclusive right granted by the Constitution to legislate, or not, with regard to the Copyright Act. Indeed, in January 2005, the Senate Judiciary Committee's subcommittee on Intellectual Property, with the support of the subcommittee on Courts, Internet, and Intellectual Property of the House Judiciary Committee, asked the Copyright Office to prepare a report on the use of orphan works. The Copyright Office released that report in January 2006. In the Report, the Copyright Office concluded that the Copyright Act does not adequately address orphan works and recommended further legislation to resolve issues pertaining to the general use of orphan works. *Report* at 7-14. The Copyright Office also further recommended that any legislation require: (1) a reasonably diligent search for the copyright owner before the work is used; (2) attribution to the author and copyright owner of the work if such attribution is possible and reasonable under the circumstance; (3) limitation of monetary damages to reasonable compensation for use; (4) no monetary damages for noncommercial use when the user ceases use expeditiously upon notice; and (5) and the elimination of injunctive relief for derivative works in order to allow the creator to exploit the derivative work. *Id.* at 8-12.

Congress listened. The recommendations of the Copyright Office resulted in a House bill and a Senate bill, both of which were introduced in 2008. *See* Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008); The Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008). Although there were differences between the two bills, both included the Copyright Office's recommended approach of requiring a diligent search, attribution, and a limitation on remedies to reasonable compensation. Although Congress did not enact either bill,

both are currently pending, evidencing Congress' obvious intention to continue considering this issue.

The Proposed Settlement not only allows Google to exploit orphan works to the exclusion of all other potential users, but it also allows this use without the conditions set forth in the Report or proposed bills.  For example, both bills include provisions whereby, should an orphan work copyright holder appear and assert his or her rights, any user must cease its use of the previously orphan work, or face injunctive relief.  S. 2913 § 514(c); H.R. 5889 § 514(c).  Under the Proposed Settlement, Google is immunized from injunctive relief, even if an orphan work copyright holder appears in the future.  PS § 3.5(a)(iii).  Moreover, the Proposed Settlement contains no diligent search or attribution requirement and no reasonable compensation requirement (other than payments to the Book Rights Registry created by the Proposed Settlement generally), as suggested by the Copyright Office.  *Report* at 8-12.  And, of course, the Proposed Settlement applies not to all users uniformly, but only to Google.  This one-sided result contradicts the goal, and indeed invades the Congressional province, of creating uniform, national copyright policy.

While copyright issues surrounding orphan works should be left to Congress, the Proposed Settlement fundamentally alters the nature of copyrights for the written word, and creates a new entity to determine the scope of those rights.  This result squarely invades Congress' exclusive jurisdiction to make copyright law and policy, and the Proposed Settlement cannot stand as written.  *See e.g. Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999) (reversing

class certification and settlement in "litigation that . . . calls for national legislation") (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997)).[4]

### B. The Proposed Settlement Requires Absent Orphan Owners to Opt-Out

The Proposed Settlement would impermissibly allow a group of private parties to rewrite the copyright law with respect to orphan works – for the benefit of a select few in a manner inconsistent with existing law and policy.[5]  Indeed, the Proposed Settlement would effectively grant Google an exclusive future license for orphan works which could not be granted to others without the owner's permission – which the absent owner would not be around to grant.  *See* PS § 6.2(b)(iii).

Before 1978, copyright renewal was an "opt-in" system in which copyright owners had to affirmatively renew their copyrights.  Failing renewal, the work would fall into the public domain under the Copyright Act.  *See Kahle v. Gonzalez*, 487 F.3d 697, 699 (9th Cir. 2007).  Congress subsequently amended the Copyright Act to eliminate the renewal requirement and later, to further extend the term of copyright.  Copyright Amendments Act of 1992, Pub. L. No. 102-307, 106 Stat. 264 (1992); Sonny Bono Copyright Term Extension Act, Pub. L. No. 105-298, 112 Stat. 2827 (1998).  It is recognized that the combination of the term extension and the elimination of the renewal requirements resulted in more works remaining under copyright

---

[4] Although there is no question that certain past class action litigation has involved copyright claims, Yahoo! is unaware of any class action copyright case which has resulted in a resolution which effectively creates a future compulsory license – which may encompass uses and harm not yet realized – as opposed to a traditional settlement release.  Moreover, Congress has not been shy about adopting evolutionary changes to the Copyright Act, recognizing the continued march of technology.  *See e.g.*, 17 U.S.C. §§ 111, 112(e), 114, 115, 116, 118, 119, 122 and 1001.  Its deliberative judgment should not be usurped by litigants eager to monetize new revenue streams.

[5] As the Register of Copyrights remarked, this scheme amounts to a "compulsory license for the benefit of one company."  Miguel Helft, *It's Not Just Microsoft Balking at Google's Book Plans*, New York Times BITS Blog, Apr. 4, 2009, *available at* http://bits.blogs.nytimes.com/2009/04/04/its-not-just-microsoft-thats-balking-at-googles-book-plans/.

protection for longer periods of time.  487 F.3d at 699 (recognizing that the statutory change is most noticeable in the context of orphan works).  As the Ninth Circuit explained in *Kahle*, the copyright renewal requirement served as a "filter" that passed into the public domain primarily those works with no commercial value.  *Id.*  When the Copyright Amendments Act and the Sonny Bono Copyright Term Extension Acts eliminated the renewal requirement and extended the term of protection, works that previously would have passed into the public domain through non-renewal remained subject to copyright protection, thereby increasing the number of orphan works.  *Id.* at 698-99.

Currently, it is incumbent upon the party wishing to make use of the copyrighted work to seek out the copyright holder, and to secure permission for use of the copyrighted work.  Indeed, this is the most material provision for the treatment of orphan works recommended by the United States Copyright Office.  *Report* at 96-110.  The Copyright Office recognized that the public interest in making orphan works accessible must nevertheless account for the interests of the copyright holders of those orphan works.

Google, through the Proposed Settlement, manages to circumvent this step.  The Proposed Settlement as written reinstitutes the pre-amendment opt-in system.  The class is defined as ". . . all persons who own a U.S. copyright interest in one or more Books or Inserts that is implicated by a use authorized by the Settlement."  PS § 1.142.  Thus, the class includes all copyright owners, including owners of copyrights in orphan works.  By bringing orphan works under the aegis of the class action process, the parties oblige the copyright holders of those works to choose one of two paths:  opt in or opt out.  Those that opt out may pursue the protection and marketing of their copyrighted works in whatever way they see fit.  Those that opt in receive the benefits of the Proposed Settlement, including payments derived, at least in part,

from the sale of access to orphan works.  Yet those who can neither opt-in nor opt-out are swept

in.  And precisely because they are unknown, copyright holders of orphan works receive no

benefit from the sale of their works, while the rest of the putative class profits.[6]

In fact, the right to opt out is meaningless for copyright holders of orphan works.  By

forcing copyright holders to come forward and affirmatively opt out of the Proposed Settlement,

the rights of orphan works copyright holders are subverted, and Google bears no burden of

investigation prior to use – the orphan work copyright holder had his or her chance to come

forward, and is henceforth foreclosed from asserting his or her rights, beyond requesting (if the

owner surfaces) that his or her work be removed from Book Search.  PS § 3.5.

Such a system is fundamentally unfair to a huge swath of class members.  The right to

use, at least to a certain extent, the content of orphan works will pass to Google unencumbered,

as has been acknowledged by Author's Guild itself.[7]  In allowing copyright holders of orphan

works to be *per se* opted-in, the Proposed Settlement strips such copyright holders of any rights

to their own work without consent, proper notice, or due process.  *Roth v. Pritikin*, 710 F.2d 934,

939 (2d Cir. 1983) ("interest in a copyright is a property right protected by the due process and

just compensation clauses of the Constitution.").  The opt in/opt out nature of the Proposed

Settlement does not merely deny copyright holders of orphan works a piece of the Book Search

---

[6] Binding authors who do not affirmatively opt-out (and requiring them to register their copyrights and notify Google to prevent certain uses) also has the potential to run afoul of international treaties, where the United States is obligated to protect foreign works.  *See, e.g.* Berne Convention for the Protection of Literary and Artistic Works, 1 B.D.I.E.L. 715 (1979) ("Berne Convention"); Agreement on Trade-Related Aspects of Intellectual Property Rights, 1869 U.N.T.S. 299, 33 I.L.M. 1197 (1994) ("TRIPS" Agreement).

[7] Roy Blount, Jr., *Let's Not Lose Our Heads Over a "Monopoly" of Orphans*, June 24, 2009, *available at* http://www.authorsguild.org/advocacy/articles/roy-blount-on-google-orphans.html ("The settlement will allow Google to make [orphan works] available to readers without tracking down the books' rightsholders.").

pie.  By denying orphan work copyright holders a portion of the initial settlement payment under

§ 5.1 and parceling out revenue generated by orphan works to other class members, it effectively

transfers certain property rights in orphan works out of the hands of their legitimate, albeit

absent, owners.  This is in direct contravention of the Copyright Act, which precludes any

"action by any governmental body or other official or organization purporting to seize,

expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the

exclusive rights under a copyright . . ." when an individual copyright owner has not previously

transferred his or her rights.  17 U.S.C. § 201(e).

Those copyright owners who previously had to do nothing to continue the protections of

the Copyright Act now have to affirmatively opt-out to maintain the status quo.  If they do not,

the Proposed Settlement allows Google to digitize their books and inserts, sell subscriptions to its

database, sell the individual books from its database and sell advertising on book pages, all

without the copyright owners' consent.  Short Form Class Notice, ¶ 9(B), p. 12 (giving Google

right to make all uses of out-of-print books "without further action or direction by the Book's

Rightsholder . . . .").  Of course, the chances that an unknown copyright owner will even get

notice of the settlement, let alone take affirmative action to opt-out, is obviously quite low.

Therefore, in effect, the owners of orphan works will get swept into the class and thereby

involuntarily cede rights afforded to them by the Copyright Act.

## II.
## THE SETTLEMENT PROCESS IS IRREDEEMABLY FLAWED

A class representative may negotiate and settle on behalf of all class members only if (1)

the class is sufficiently numerous; (2) the class has at least one common question of fact or law;

(3) the class representative presents claims that are typical of the class as a whole; and (4) the

class representative will adequately represent the class.  Fed. R. Civ. P. 23(a).  In addition, the

proposed class members must be reasonably ascertainable. *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005) (noting implied requirement of ascertainability) (citing *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 336 (S.D.N.Y. 2002)). The Court may only approve class action settlements that are fair and reasonable to the class as a whole, especially those class members that may be unrepresented. *Amchem*, 521 U.S. at 629 (the court must consider Fed. R. Civ. P. 23 "with the interests of absent class members in close view."). The Court must determine that a class action settlement is fair, reasonable, adequate and not a product of collusion. *See, e.g., Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22-23 (2d Cir. 1987).[8] A court determines fairness or reasonableness by examining both the negotiating process leading to settlement and the terms of the settlement itself. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). Further, because it arises after an extremely limited amount of litigation, the Proposed Settlement should be subjected to an even higher level of scrutiny. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 113 (S.D.N.Y. 1999) ("'An early settlement will find the court and class counsel less informed than if substantial discovery had occurred. As a result, the court will find it more difficult to determine the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement.'") (quoting Manual for Complex Litigation 2d § 30.45 (3d ed. 1995)).

The Proposed Settlement has been crafted by a small number of self-interested parties,

---

[8] In determining whether a settlement is fair and reasonable, the Court must consider, *inter alia*: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; and (3) the stage of proceedings and amount of discovery completed. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberg v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Levitt v. Rogers*, 257 F. App'x 450, 453 (2d Cir. 2007).

after a series of private negotiations.  There has been no discovery, no dispositive motion

practice, and, perhaps most importantly for purposes of this objection, no motions for class

certification.  The court in *Weinberger* stated that "district judges who decide to employ

[precertification settlement] are bound to scrutinize the fairness of the settlement agreement with

even more than usual care . . . we will demand a clearer showing of a settlement's fairness,

reasonableness and adequacy and the propriety of the negotiations leading to it in such

cases . . . ."  698 F.2d at 73.  Despite a dearth of actual comment by the parties, the Proposed

Settlement seeks to create a whole new rights structure for the written word.  Because of the

significant rights involved and the immense impact of the Proposed Settlement on millions of

copyright holders, the Court must review the Proposed Settlement critically.  *Ortiz*, 527 U.S. at

849.  Reviewed under these standards, it is clear that the Proposed Settlement fails to comply

with the procedural requirements of class action settlements.

The Proposed Settlement is unfair and unreasonable; it adversely impacts many class

members, rights holders, and the public.  It presents a class in conflict, without common interests

or actual realized harm, and one unable to be fully ascertained.  Most notably, copyright holders

of orphan works have been left without an active and unbiased voice in settlement negotiations,

tainting the negotiations and increasing the likelihood of an unfair result.  Treatment of orphan

works in the Proposed Settlement fails a test for fairness and reasonableness not merely because

of the negative reaction of many class members and commentators, but because of the multitude

of class members who are by definition unable to react at all.  Moreover, despite the risks

attendant to continued litigation, any purported reasonableness of the Proposed Settlement is far

outweighed by the damage such a settlement could wreak.  The Proposed Settlement benefits a

single set of plaintiffs over the class as a whole, and indeed the entire public – leaving the

"benefit" of the Proposed Settlement far outside any bounds of reasonableness. The Proposed

Settlement should be rejected.

### A.    The Putative Class Representatives Inadequately Represent Owners of Copyrights in Orphan Works

Although the Plaintiffs purport to represent the interests of all Book or Insert copyright

owners,[9] the Plaintiffs simply cannot adequately represent the interests of an absent, and

unreachable, subset of class members. Because copyright holders of orphan works are by

definition absent, the proposed named Plaintiffs cannot determine, and indeed cannot even begin

to guess, what interests these absent class members would put forth were they given a voice.

Ultimately, the Court must "ensure that the interests of class members are not subordinated to the

interests of either the class representatives or class counsel . . . ." *Maywalt v. Parker & Parsley

Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995). The Proposed Settlement, however, fails to

properly address the particular concerns raised by orphan works, suggesting that the Plaintiffs

have not, to this point, adequately represented the entire class. Most notably, the requirement

that class members affirmatively opt out of the Proposed Settlement effectively mandates

inclusion of all orphan works in any eventual settlement. Moreover, as discussed below, the

Proposed Settlement confers the benefits arising from the inclusion of orphan works both to

Google and to the other class members. PS § 6.3(a) (allowing for unclaimed revenue to be

released to the Registry and active copyright holders). The class is in conflict, does not share

injury, abridges rights, and cannot be sufficiently ascertained.

### 1.    The Class Is in Conflict and Does Not Possess the Same Interests

Copyright holders of orphan works are noticeably absent, yet their interests stand in

direct conflict with those of the putative class representatives. *Maywalt*, 67 F.3d at 1077

---

[9] PS §§ 1.16, 1.72.

("Inherent in any class action is the potential for conflicting interests among the class representatives, class counsel, and absent class members."). Here, the conflict is not merely "potential," as the named Plaintiffs are in fact pursuing a Proposed Settlement that is openly antagonistic to copyright holders of orphan works. This conflict completely negates the adequacy of the putative class representatives, and undermines any claim that the Proposed Settlement is reasonable or fair. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001) (Rule 23(a)(4) requires "absence of conflict" between the named representatives and the class).

The Proposed Settlement allows each copyright holder who has "opted in" to share in the settlement payment provided by Google. PS §§ 2.1(b), 5.1. Copyright holders of orphan works, so long as they remain unreachable, will clearly not benefit from this portion of the settlement. Much more meaningful, however, is the impact of the proposed license of intellectual property rights to Google in return for future proceeds from Google Book Search program. PS §§ 5.2, 5.4, 6.3. Through this process, all active copyright holders will receive a share of the earnings generated not only from use of their own works, but also from the use of orphan works, because this revenue is, after a period of time, re-allocated to other authors or the Registry itself. PS § 6.3(a).[10] The named Plaintiffs, then, and indeed all active class members, have a vested interest in keeping orphan works orphaned. James Grimmelmann, *How to Fix the Google Book Search Settlement*, 12 J. of Internet L.10, at 15 (Apr. 2009) (the reallocation of revenue from orphan works to active copyright holders "illustrates a clear conflict of interest between the non-orphan copyright owners (including, by definition, all of the named plaintiffs) and the orphan members of the plaintiff class."). This conflict cannot be cured by the platitudes of the Author's

---

[10] This is effectively an escrow, which has been previously rejected by the Copyright Office. *See Report* at 113-114.

Guild or assurances that the named Plaintiffs will act in the interests of *all* copyright holders, whether easily reachable or orphan.

Certainly, Plaintiffs will argue that allowing Google to make unfettered use of (and even sell) orphan works without the threat of infringement confers a significant benefit to the public. However, any change to a party's ability to utilize orphan works should be determined by Congress, with all affected parties represented, not through a private contract between a select few stakeholders.[11]  Nor do the Federal Rules of Civil Procedure allow putative class representatives, who are in direct conflict with a large group of potential plaintiffs, to bargain away absent class members' property rights.  Thus, the Proposed Settlement not only establishes new copyright policy, but does so in favor of only a small group of plaintiffs, while actively impinging (and in conflict with) the rights of others.  In fact, several major publishers, including the five named Plaintiff publishers, have separate deals with Google that will not be subject to the terms of the Proposed Settlement.  Google, *Google Book Search:  The Story*, at 14-15, Feb. 2007, *available at* http://www.google.co.uk/press/files/book-search-en.pdf.  The terms of this "Partner Program" have not been disclosed, but it is unlikely that these publishers, or any publisher who negotiates individually with Google, will allow users access to out-of-print books with the same freedom as the Registry allows users access to orphan works.  Daphne Ireland, *Tracing the Impact of the Google Settlement*, Newsletter of the Ass'n of Am. Univ. Presses, June 11, 2009, *available at* http://aaupblog.aaupnet.org/?p=123.  The named Plaintiffs, and in particular the publisher class, cannot adequately represent orphan work holders if they

---

[11] The unauthorized wholesale copying of orphaned works has not occurred because it is *illegal*, not because the public welfare was being ignored.  It is neither within the power of Google nor these class representatives to decree otherwise.

themselves take no part in the Proposed Settlement, but are rather subject to separately negotiated deals.

### 2.    The Class Does Not Share Injury

Here, the named Plaintiffs (and indeed any plaintiff who opts-in to the Proposed Settlement) seek settlement of claims potentially quite different from those that an orphan work copyright holder may raise in the future, most notably because the orphan work copyright holder will have been unreasonably included in the settlement without his or her consent. While Google's actions that precipitated this lawsuit and the resulting Proposed Settlement arise from Google's attempted copying of copyrighted works owned by the class, the individual extent of infringement, and possible use of the infringed work, could conceivably be different for each individual copyright holder. In fact, this case began as an infringement suit related to whether Google's copying to allow search and display of "brief excerpts," and whether that was a fair use. It has now evolved into a suit and Proposed Settlement that has abandoned any pretense of being about "brief excerpts" as opposed to being about the copying of entire works (which could never be a fair use in this context) and future uses, both real and to be realized.[12] In fact, even Google has admitted that it is attempting to achieve in a judicially sanctioned settlement that which it could not through a verdict or final judgment: "The snippets we've been showing are a far cry from what the user wants, and really the only solution was a partnership. We assume we would have gone through the courts and won. But once we won, we still would've had snippets." Andrew Richard Albanese & Norman Oder, *Corner Office:  Google's Dan Clancy*, Libr. J., May 1, 2009, at 26, *available at* http://www.libraryjournal.com/article/CA6652445.html (Comments of Google Engineering Director Dan Clancy).

---

[12] *See, e.g.,* PS §§ 3.7(c), 4,1, 4.2, 4.7, 17.2.

Rule 23 does not require that the plaintiff class share *identical* claims, but it does require that a plaintiff must have *some* claim against the defendant. Plaintiffs must "'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 39S, 403 (1977) (citing *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974)); *see also Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (affirming denial of a plaintiff class because the definition of the class was "so amorphous and diverse" that it was not "reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 334 (S.D.N.Y. 2003) ("each member of the class must have standing with respect to injuries suffered as a result of defendants' action"); 7 AA Wright, Miller & Kane, Fed. Practice & Proc. Civ. 3d § 1785.1 (2005) ("[T]o avoid a dismissal based on a lack of standing, the court must be able to find that both the class and the representatives have suffered some injury requiring court intervention."). The Proposed Settlement, however, releases Google from any claims for both past infringement of Books or Inserts already scanned, and for *future* infringement and *future* usage of any other copyrighted work covered by the Proposed Settlement. PS § 2.1. This release is of unprecedented scope, and wholly undermines shared injury of potential class members.[13] Because orphan work copyright holders are unreachable, it is impossible to determine whether, and to what extent, they have been injured by Google's actions, or will be injured in the future by this or other uses.

---

[13] As plaintiff Association of American Publishers ("AAP") has recognized: "This proposed settlement is really unprecedented in its scope and nature . . . it's designed deliberately to establish and create a going forward model." Copyright Clearance Center, The Authors Guild, AAP, Google Settlement: Allan Adler, Vice President of the Association of American Publishers (AAP) Speaks About the Settlement with CCC, at 6, July 15, 2009, *available at* http://www.copyright.com/media/pdfs/Transcript-AdlerInterview.pdf.

The proposed class is so broad, and covers so many copyrighted works, that even a class consisting solely of currently reachable copyright holders includes both those whose works have already been copied by Google, and others whose works may only be copied and affected by the Proposed Settlement in the future. Indeed, the class includes copyright holders who may *never* be impacted by Google's actions, and are thus never harmed. Although Google has already scanned millions of works, there is no guarantee (and it indeed seems highly unlikely) that Google will eventually scan every work encompassed by the Proposed Settlement. Yet the Proposed Settlement releases Google from all future claims, and although the Court may have the power to accept a settlement covering parties whose injury has not yet manifested itself, the party must have been exposed to the harm. *Ortiz*, 527 U.S. at 864 ("a class divided between holders of present and future claims requires division into homogenous subclasses . . . .") (citing *Amchem*, 521 U.S. at 627).[14] Potential plaintiffs who have yet to be harmed by Google's scanning activity should not be releasing Google from future claims without ever having been harmed.[15]

### 3.        Class Rights Will Be Abridged

The Proposed Settlement further runs afoul of Rule 23, as the terms of the Proposed Settlement conflict with the Rules Enabling Act by modifying and abridging the rights of every class member. 28 U.S.C. § 2072(b); *Amchem*, 521 U.S. at 613 ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive

---

[14] Here, the only subclasses are two: authors and publishers. Sec. Am. Compl. ¶¶ 34-36.

[15] *See, e.g. Unisuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006) (same) ("a release is overly broad if it releases claims based on a set of operative facts that will occur in the future. If the facts have not yet occurred, then they cannot possibly be the basis for the underlying action."); *see also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001) ("[t]he release is . . . too broad because it bars later claims based on future conduct.").

right . . . .'"). By releasing Google from any liability for future infringement, the Proposed Settlement abridges the Constitutional rights of all class members, and in particular the rights of orphan work holders who have no voice in the settlement. Each orphan work rights holder will have any future claims against Google extinguished, without ever having had such claims individually raised or adequately represented by another class member. The Proposed Settlement does what the underlying litigation could not; it frees Google from claims that have never been raised against it, and strips orphan works rights holders of a fundamental aspect of the Copyright Act, the right to sue for infringement under 17 U.S.C. § 501. Further, this "going forward model" as AAP calls it, expressly abridges yet another aspect of copyright – the right to determine the extent and scope of use. Google is granted a carte blanche to use orphan works as it sees fit, and the Registry is effectively prohibited from negotiating the use of orphan works with any other party. The Proposed Settlement thus places extreme limitations on the use of orphan works. In doing so, the Proposed Settlement places a procedural process – class certification and settlement – in conflict with the Constitution and the Copyright Act.

In light of this, and without some consistency in the claims across the plaintiff class, the Court cannot permit the putative class representatives to act on behalf of all plaintiffs, known and unknown. *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981) ("If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either."). The Proposed Settlement makes no effort to adequately represent the interests of copyright holders in orphan works; to be fair and reasonable, the Proposed Settlement must be limited to a truly typical subset of rights holders affected by Google's actions, and must not abridge rights.

### 4.    The Class as Constituted Is Not Sufficiently Ascertainable

Included in Rule 23 is an implied requirement of ascertainability, which necessitates a determination that the putative class not only shares claims and harm, but that individual members may be determined in an administratively feasible manner. *Jermyn v. Best Buy Stores L.P.*, 256 F.R.D. 418, 432 (S.D.N.Y. 2009) (citing *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 207 (E.D.N.Y. 2005)). Plaintiffs have asserted a class definition of "all Persons that, as of [January 9, 2009] have a copyright interest in one or more Books or Inserts." PS § 1.142. As discussed above, this "Settlement Class" includes all copyright holders of works that have not yet passed into the public domain, including those who cannot be ascertained. Copyright holders in orphan works are, by definition, presently unascertainable. Plaintiffs have proposed direct mailing or e-mailing of settlement materials to the "Settlement Class," but this is only possible to the extent that a potential class member's contact information is reasonably available. Plaintiffs have not indicated what "reasonable means" will be utilized to identify and contact the copyright holders of orphan works.[16] Proposed Settlement Art. XII. Without more diligent notice provisions, the copyright holders of orphan works are likely to remain unascertainable, and thus unable to opt out of the settlement. Despite the potentially high cost in ascertaining individual class members and providing notice, the requirement "may not be relaxed based on high cost." *Amchem*, 521 U.S. at 617.

Further, the Proposed Settlement already contains a provision for ascertaining and noticing individual class members through the Registry. PS §§ 2.1(c), 6.1(d). This process, however, will occur only *after* the settlement is accepted by the Court. *See* Pls. Mem. Supp.

---

[16] Indeed, it appears that many easily ascertainable copyright holders may have not received adequate, or any, notice regarding the Proposed Settlement. *See, e.g.,* Pamela Samuelson, et al., Letter to The Honorable Denny Chin Re: *Authors Guild v. Google Inc.*, No. 05-civ-8136 (DC), April 27, 2009, *available at* http://www.eff.org/files/judge%20chin%20letter%204.27.09.pdf

Prelim. Settlement Approval, Dkt. 57, at 28 ("the Registry . . . will locate Rightsholders, maintain their contact information, collect revenues from Google and pay Rightsholders for Google's use of their copyrighted works.").  The Proposed Settlement stands to have a tremendous impact on the rights of potential class members, and notice must be adequate *prior* to the settlement, not after.

### III.
### THE PROPOSED SETTLEMENT RAISES ANTICOMPETITION CONCERNS

Several provisions of the Proposed Settlement collectively lead to an anticompetitive result.  These anticompetitive ramifications have been widely covered in the news media as well as in scholarly criticism, and are likely to be the focus of other objections and interventions.[17]

The Court cannot sanction the Proposed Settlement if it violates federal law.  *See, e.g. Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) (the court "cannot lend its approval to any contract or agreement that violates the antitrust laws").  Although there may be good and sufficient reasons for broader antitrust concerns under the Proposed Settlement, Yahoo! will focus on the anticompetitive provisions specifically related to the scope of the Registry's power, orphan works, and the impact on the search marketplace.

### A.    The Improper Power of the Registry

Google and the Plaintiffs have crafted a settlement agreement that establishes the Registry as the main, and sole, ministerial agency for copyrights in Books and Inserts.  The Proposed Settlement essentially legitimizes control by the Registry over the works covered by the Proposed Settlement, and frustrates the ability of copyright holders and third parties to impact the terms of the Proposed Settlement going forward.

---

[17] The U.S. Department of Justice has recently instituted a pending investigation of the Proposed Settlement.  *See* Order dated July 2, 2009 (Doc. No. 120).

Under the Proposed Settlement, the Registry is charged with negotiating a variety of issues on behalf of all authors and publishers. The Registry would have power to act as the sole negotiator of a wide range of rights for the entire class. For example, the Registry can approve or disapprove security standards, devise formulae for dividing revenue among publishers and authors, and negotiate terms of new revenue models. PS §§ 4.7, 8.2(a)(iv), Attachment C § 1.1(a). Although the Registry cannot prevent individual authors or publishers from licensing their work outside of the Book Search program, the Registry is authorized to make decisions with regard to the future development of the Proposed Settlement structure on behalf of the entire class, including copyright holders of orphan works. This broad undertaking confers tremendous power in the Registry, as no other entity can broker agreements that are binding on any copyright holder who does not affirmatively opt out of the system. Indeed, the Registry exerts substantial power over orphan works, because it is the sole entity charged with negotiating the price for individual works and subscription services with Google. PS §§ 4.1, 4.2(b), 4.7(d). There are no provisions in the Proposed Settlement that affirmatively protect orphan works from pricing policies that minimize the value of the orphan work, nor prevent the Registry from coordinating a specific, and potentially anti-competitive, Registry-wide pricing scheme.[18]

The Registry as currently proposed is, in many ways, similar to other licensing organizations, such as ASCAP or BMI. But these groups operate under antitrust consent decrees, with the potential for pricing abuse undermined by district court and Department of Justice supervision. *See United States v. Am. Soc'y of Composers, Authors and Publishers*, 41-

---

[18] Even if authors or publishers could theoretically negotiate individually with potential competitors, the "most-favored nation" clause insulates Google from price competition. This guarantees that no third party may negotiate terms more favorable than those currently granted Google. PS § 3.8(a). Thus, the overall effect of the Proposed Settlement is to create an exclusive and protected market for Google.

CV-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001); *United States v. Broad. Music, Inc.*, 64-CV-3787, 1994 WL 901652 (S.D.N.Y. Nov. 18, 1994).  The Registry would operate under no such restrictions, and have no such safeguards.  The limited opt-out provisions included in the Proposed Settlement allow copyright holders to remove themselves from the Proposed Settlement, but once accepted by this Court, the Proposed Settlement will empower the Registry to negotiate on behalf of all class members – and all class members could be bound by the terms of any negotiation.

There is no guarantee that the Registry will not negotiate a formula for dividing revenue among copyright holders that is detrimental to the copyright holders of orphan works.  Moreover, the Registry could negotiate, and structure, any deals regarding emerging business models in an anticompetitive manner by preferencing certain emerging technologies or content delivery models.  Because these negotiations are done with the imprimatur of all copyright holders, the mere existence of the Registry creates a centralized entity that could, theoretically, greatly expand the inequity already faced by orphan work copyright holders, or make the Book Search program even more preferential for Google.  In sum, the Registry confers too much power in a single entity, with too little oversight.[19]

---

[19] Even where copyright owners have authorized the Registry to negotiate on their behalf, competitors remain at a severe disadvantage.  For the category, however broad or limited, of works for which the Registry may negotiate usage rights, a competitor gains access to the negotiating power of the Registry, sidestepping any need for individual negotiation.  And the most-favored-nation clause guarantees that no competitor can effectively compete with Google through the first ten years of the Proposed Settlement.  The ability to fix prices, which is naturally attendant to the monopoly power, remains per se illegal.  15 U.S.C. § 13(a); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (citing cases finding § 13(a) violations).  The Registry is strictly forbidden from providing a competitor with better terms, even if that competitor offers a substantially different or improved book search service, than are made available to Google.  Google is guaranteed a deal with the Registry that cannot be undercut by any competitor  – effectively fixing the price of access for a single entity.

**B.      The Barriers to Entry for Potential Competitors Are Insurmountable**

Allowing Google the exclusive ability to include orphan works in its digital book

database creates an insurmountable barrier to entry for other would-be competitors in the book

search market.  This gives Google exclusive control over orphan works, and the attendant ability

to charge supra-competitive prices.  Although nothing in the Proposed Settlement expressly

prohibits the entry of any other potential market participant into the field of digital book

scanning and searching, the structure of the Proposed Settlement ensures that the market is

functionally closed to new entrants.  Through the Proposed Settlement, Google has sidestepped

the tremendously laborious process of negotiating with rights holders for individually tailored

licensing deals.  Any would-be competitor attempting to negotiate directly with each rights

holder would be faced with insurmountable transaction costs and impossibility:  a potential

competitor simply *cannot* negotiate with every rights holder covered by the Proposed Settlement

because of the large percentage of those rights holders that cannot be found.  Although a

competing book search provider could negotiate with the Registry itself, the Registry may only

negotiate on behalf of rights holders who have given their express approval.  PS § 2.4.  Orphan

works holders (unless they emerge) cannot give the Registry authorization to negotiate on their

behalf, and thus the Registry will never be granted the power to negotiate the use of orphan

works with third parties.  Google effectively receives the sole rights to orphan works, barring the

appearance of an orphan work rights holder at some point in the future.  Because Google is

granted blanket rights to use orphan works, it is protected from litigation should an orphan work

rights holder surface in the future.[20]  Competitors receive no such protection, and the possibility

---

[20] Indeed, the President of the Author's Guild has plainly admitted that "Google will be the sole
purveyor authorized by the settlement . . . for those out-of-print books whose rightsholders
cannot be found."  Blount, Jr., *Let's Not Lose Our Heads Over a "Monopoly" of Orphans*, June
24, 2009.

of orphan work-related litigation alone chills the potential for competition.  While the risk arising out of the use of orphan works can be minimized by simply excluding orphan works from an offering, a competitor who cannot harness the vast base of knowledge contained in orphan works is doomed to fail, particularly when forced with a competitor in Google which can use the orphan works.

### C.     Google Gains an Unfair Advantage in the Search Marketplace

This exclusive market has yet one more anti-competitive effect:  it secures for Google access to a database capable of vastly improving Google's central product, Google Search.  With sole access to this data, Google can better refine its search algorithm and gain a tremendous advantage against other search providers.  This result is unreasonable and unfair to class members, competitors, and consumers alike.  As a consequence of Google's singular position in the emerging book search marketplace and its control of orphan works, as discussed above, Google will gain a tremendous advantage in its core business area:  Google Search.  Google, and other search providers, have developed proprietary algorithms and search models that are constantly evolving in an effort to provide higher quality search results in the minimum amount of time.  Search engineers generally agree, however, that the more data available, the better the resulting algorithm and the better the search engine.  Indeed, search providers have long used the wealth of information available on the Internet to help refine their proprietary search algorithms. Google's own Director of Research, Peter Norvig, has stated that "if you go from a 1 million word training set to a 10 million word training set . . . the very worst algorithm at 10 million words is better than the very best algorithm at 1 million words.  So rather than arguing about which [algorithm] is better or trying to discover a better one, why not just go out and gather more data."  Peter Norvig, *Theorizing from Data:  Avoiding the Capital Mistake*, May 31, 2007,

*available at* http://www.youtube.com/watch?v=nU8DcBF-qo4.[21]  This is exactly what Google

has done, but it has done so in a way that unfairly excludes all other market participants from this

pool of data.  In obtaining what amounts to a compulsory license to orphan works that no would

be competitor could ever likely achieve, Google simultaneously enhances its primary market for

Internet search.

### CONCLUSION

For the foregoing reasons, Yahoo! respectfully requests that the District Court reject the

Proposed Settlement.


Dated: New York, New York
      September 8, 2009

                           WINSTON & STRAWN LLP


                           By:   /s/ Thomas P. Lane

                           Michael S. Elkin (ME 2300)
                           Thomas P. Lane (TL 8983)
                           Robert C. Turner (RT 7980)
                           200 Park Avenue
                           New York, New York 10166
                           (212) 294-6700

                           *Attorneys for Class Member*
                           *Yahoo! Inc.*

---

[21] Other commentators have also made the argument for more data over better algorithms.  *See* Anand Rajaraman, *More Data Usually Beats Better Algorithms*, Mar. 24, 2008, *available at* http://anand.typepad.com/datawocky/2008/03/more-data-usual.html.