UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Authors Guild Inc., Association of American Publishers Inc., et al.,<br><br>        Plaintiffs,<br><br>  - v. –<br><br>Google Inc.,<br><br>        Defendant. | Case No. 05-cv-8136 (DC)<br><br>Declaration of Nicolas Georges |

STATE OF NEW YORK )
         )  S.S.:
COUNTY OF NEW YORK )

  I, Nicolas Georges, declare under the penalty of perjury, depose and say:

  1. I am the Director of Book and Reading within the Ministry of Culture and Communication of the French Republic ("France") and make this declaration based upon my personal knowledge. I submit this declaration to apprise the Court of the significant adverse impact that the proposed Settlement would have upon authors, publishers and digital libraries in France and the European Union ("EU").

  2. The copyright law of France developed from the *droit d'auteur* or "right of the author" in the eighteen century, which recognized the unrestricted right of property of the author on his work. France has been renowned for its long tradition of critical thinkers and philosophers such as Pascal, Descartes, Voltaire, Diderot, Rousseau and Sartre. France's literary tradition also includes the theatrical tradition of comedy and tragedy of giants such as Molière, Racine, Marivaux, Beaumarchais, Rostand, Giraudoux, Anouilh, Sartre, Ionesco and Genet, who have brought laughter and pathos to theatre audiences around the world.

3. French authors and poets have chronicled the human experience and have known worldwide literary fame, including Baudelaire, Balzac, Verlaine, Mallarmé, Hugo, Dumas, Verne, Zola, Maupassant, Gautier, Stendhal, Proust, Céline, Camus and Saint-Exupéry. During the twentieth century, sixteen French authors or writing in French have won the prestigious Nobel Prize for Literature, including Albert Camus, Anatole France, Colette, Jean-Paul Sartre, Claude Simon, Gao Xingjian or J.M.G. Le Clézio.

4. France is the world's third largest book producer and French authors and publishers produce more than sixty thousand new books per year. The total turnover for French book publishing is more than 2.9 billion euros in 2006.

5. There is an expression in France that underscores how literature and publishing are viewed as different from other French industries for cultural reasons: "Le livre n'est pas un produit comme les autres." ("The book, a product unlike other products."). This fact was recognized with the passage of the Act of August 10, 1981 ("Loi Lang"), which provided that the publisher is free to set the selling price to the public of the book he publishes. All other book sellers must respect the price set by the publisher. The objective of this law is primarily cultural as it is designed to maintain a strong network of independent bookshops in France, in order to ensure the richness and diversity of creative writing and authorship so that publishers are able and willing to take risks on authors, especially those who are unknown or not celebrated.

6. Promoting cultural diversity and the many creative voices of authors worldwide, irrespective of their commercial success, is of paramount importance to France. For example, each year in November since 1987, France, through its National Center for the Book for the Ministry for Culture and Communication, has promoted global literature and cultural diversity by inviting a group of writers from a single nation or linguistic region to take part in a series of lectures across France in partnership with bookshops, libraries, universities and cultural

associations. These events are known as "les Belles Etrangères" and bring to the French public contemporary works by international authors who would not otherwise have exposure. This year the National Center for the Book has chosen the United States and invited twelve American contemporary authors: Charles D'Ambrosio, Percival Everett, Forrest Gander, Andrew Sean Greer, John Haskell, Matt Madden, Jack O'Connell, Eleni Sikelianos, Hannah Tinti, Yuri Slezkine, Richard White and Colson Whitehead. Their works will be published in an anthology along with a motion picture film featuring the authors.

7. By vesting in one entity, Google, the power to exercise an effective compulsory license to digitize certain books and to choose and reject which books appear in its digital library and, by insulating Google from further litigation, effectively undercutting and eliminating competition from other digital libraries worldwide, the proposed Settlement threatens cultural diversity and the free exchange of ideas through literature.

8. France has always protected the rights of its authors of these invaluable assets through its adherence to the Berne Convention[1] and as an original signatory to the World

---

[1] The Berne Convention for the Protection of Literary and Artistic Works first signed on September 9, 1886 with entry into force on December 5, 1887. The Berne Convention was developed at the instigation of Victor Hugo as the Association Littéraire et Artistique Internationale. It was influenced by the French "right of the author" which contrasts with the Anglo-Saxon concept of "copyright" which only dealt with economic concerns. Under the Berne Convention, copyrights for creative works are automatically in force at creation, without being asserted or declared: an author need not "register" or "apply for" a copyright in countries adhering to the Convention. As soon as a work is "fixed", that is, written or recorded on some physical medium, its author is automatically entitled to all copyrights in the work and to any derivative works, unless and until the author explicitly disclaims them or until the copyright expires. Foreign authors were treated equivalently to domestic authors, in any country that signed the Convention.

The Berne Convention has since undergone seven principal revisions, the most recent being the Paris Revision signed on July 24, 1971 with entry into force on October 10, 1974. The Berne Convention is administered by the World Intellectual Property Organization, generally known as WIPO, headquartered in Geneva, Switzerland. France was among the first signatories in 1886. The Berne Convention now counts 164 countries as contracting parties with the United States joining as of March 1, 1989. See WIPO website, www.wipo.int/treaties, visited on September 2, 2009.

Copyright Treaty.[2] Even though the U.S. also has adhered to these treaties, the proposed Settlement is contrary to both the Berne Convention and the WCT. For example, pursuant to Article 6 of the WCT, authors enjoy the exclusive right of making available the original and copies of their literary works to the public. Similarly, France and EU law each grant to authors the exclusive right of making available. See CPI, Article L. 122-2 2°, 122-4 and L. 335-4;[3] EU Copyright Directive, Article 3, para. 2.[4] Under the French CPI, authors as rightholders must give consent before any literary work is digitally copied or displayed. Digitization constitutes reproduction within the meaning of Article L. 122-3, L. 122-4 and 335-3 of the French CPI and is an exclusive right of the author. Google's actions by making digital copies and making them available constitute an infringement under the French CPI.[5]

        9. Under the French CPI, no one may use an author's intellectual property without permission. See Article L. 122-4 ("any complete or partial (public) performance or reproduction without the consent of the author or his successors in title shall be unlawful. The same shall apply to translation, adaptation or transformation, arrangement or reproduction by any technique or process whatsoever"); Article L. 122-3 ("Reproduction shall consist in the physical fixation of a work by any process permitting it to be communicated to the public in an indirect way").

---

[2] Formally named the WIPO Copyright Treaty, adopted in Geneva on December 20, 1996, slightly more than 110 years after the Berne Convention. Once again, France was one of the original signatories. The United States became a contracting party as of March 6, 2002. See WIPO website, www.wipo.int/treaties, visited on September 2, 2009.

[3] Act No. 2003-517 of June 2003, Art. 1, Official Journal of 19 June 2003, in force on August 1, 2003.

[4] Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonization of certain aspects of copyright and related rights in the information society.

[5] Emblematic of this fact is that the French Publishing Group La Martinière, which owns the French company, Le Seiul, Delachaux and Niestlé in Switzerland and Harry N. Abrams in the United States, has sued Google in France for counterfeiting and breach of intellectual property rights because it has digitized one hundred of its titles without permission.

While narrowly drafted exceptions have always been recognized in France, nowhere has there ever been a blanket exception granting a compulsory license for digital reproduction, distribution and display of published works on such a massive scale. See Article L. 122-5 ("analyses and short quotations justified by the critical, polemic, educational, scientific or informatory nature of the work in which they are incorporated;" "press reviews;" "the reproduction of a work and its public performance, for the purpose of preservation or aimed at preserving the conditions of their consultation for the purpose of research or private study by individual members of the public by dedicated terminals within publicly accessible libraries, museums or archives, under the condition that they do not seek for a commercial or economic advantage"). Significantly, Article L. 122-5 of the CPI provides: "The exceptions listed in this article cannot conflict with a normal exploitation of the work nor unreasonably prejudice the legitimate interests of the rightsholder." The "license" created by the Settlement Agreement is compulsory and in perpetuity, notwithstanding the fact that no action has been taken by an author before September 4, 2009. After that date, whether or not an author neglected to "opt out" or not, you are deemed in. American authors as well as authors worldwide, including French authors, whether or not they are even aware of the present lawsuit, are included. Many authors in France or elsewhere are unaware of the implications of the proposed Settlement. The Settlement will effectively place management over all pre-1/6/09 books -- both U.S. and international -- in a single, private commercial entity, subject only to the jurisdiction of a U.S. court, with little public or international oversight. This concept -- that an U.S. corporation could obtain control over the works of French and other international authors as well as impact the privacy rights of French citizens without their prior consent -- is contrary to established French law. France by this filing is voicing its objections to the proposed Settlement to underscore the serious risk to its valued

intellectual and cultural resources, namely, France's authors, publishers and digital libraries and its literary traditions which protect the rights of the author.

10. Even Google's seemingly benign rules on library on-premises display are at odds with the corresponding, but much more limited, rule on such displays in France. Google would make books broadly available at library access terminals. Such an unfettered right of use and access does not exist under French law. The French safe harbor for public library use grants a limited exception for certain acts of the making available of works at terminals on library premises. (Article L. 122-5 8° CPI).

11. Based upon French and European legal developments with respect to digitization of written and published works, several projects, including the European Digital Library, www.europeana.eu ("Europeana") and the Bibliotheque Nationale de France (the French Digital Library, www.gallica.bnf.fr or "Gallica"), have sought to make such works available to the public where the rightholder's consent has been obtained. The Gallica project has involved an investment of over twenty-five million euros to date, which expense Google has allegedly avoided by intentionally ignoring copyright laws and formalities. Europeana and Gallica, thus, seek to ensure that digital control of the European and French national cultural heritage remains unfettered by commercialism and remains free, while balancing the interests in promoting economic and technological advancement and existing copyright rights.

12. The proposed Settlement raises a fundamental issue of fairness, because French authors are not fairly represented and have not received proper notice. The plaintiff Authors Guild, the representative of the author sub-class, cannot adequately and fairly represent French authors or their interests because of its limitations on membership. For an author to join the Authors Guild, his or her must have been published by an American publisher.[6] A

---

[6] See the Authors Guild website at https://www.authorsguild.org/join/eligibility.html, visited on September 8th, 2009.

publication by a non-U.S. publisher will not qualify an author for Authors Guild membership. This fails to acknowledge the important role that French authors play in world literature or that not all French authors will have their books published by a U.S.-publisher. As a consequence, few, if any, French authors are in the Authors Guild. This, in turn, gives French authors little or no representation in the settlement process even though any French author who published a book on or after January 1, 1923 and on or before January 5, 2009 is a member of a sub-class represented by an organization that excludes them from membership.

13. Similarly, the plaintiff Association of American Publishers does not adequately and fairly represent French publishers or their interests because its membership is only open to "all U.S. companies actively engaged in the publication of books, journals, and related electronic media."[7] A non-U.S. publisher by definition is not eligible for membership. As a result, there are no French publishers who are members of the Association of American Publishers. The occupational and professional organization representing the French book trade is the Syndicate National de l'Edition ("SNE"), which was established in 1892 and represents approximately 400 book publishers. The SNE represents the French publishing profession as a member of both the Federation of European Publishers and the International Publishers Association ("IPA"). The Paris Book Fair, which was established by the SNE in 1981 features over 1,700 exhibiting publishers and 3,000 authors, takes place in March and is an annual event for international book publishing. The Paris Book Fair has featured an electronic library which showcases the new digital technologies for booksellers of tomorrow -- Lectures de dem@in and the Librairie de dem@in ("Bookshop of Tomorrow").

14. For the reasons outlined above, the proposed Settlement will have an immediate impact upon French authors, publishers and digital libraries by setting a industry-

---

[7] See Association of American Publishers website, http://www.publishers.org/main/Membership/member_01.htm, visited on September 8th, 2009.

changing precedent that not only gives defendant Google an unfair advantage over all other digital libraries (commercial and non-commercial) in the United States and France, but also will flout French laws that have been established to protect French authors and publishers, including with respect to digital copying, publishing and the dissemination of their works. The decision of this Court with respect to this Settlement will have the dramatic and long-range effect of creating a new worldwide copyright regime without any input from those who will be greatly impacted -- French authors, publishers and digital libraries, as well as French citizens who seek to obtain access to digital publications through the Google service.

15. I, Nicolas Georges, declare under the penalty of perjury under the laws of the United States, that foregoing is true and correct.

Dated: Paris, France
       September 8th 2009

*[Signature]*
Le directeur du livre
et de la lecture, par Intérim
Nicolas GEORGES