UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---

THE AUTHORS GUILD, INC.,
ASSOCIATION OF AMERICAN PUBLISHERS, INC.,
ET AL.,

Case No. 05-cv-08136-DC

                              Plaintiffs,

              v.

GOOGLE INC.,

                              Defendant.

---

## MEMORANDUM OF AMICUS CURIAE THE INTERNET ARCHIVE IN OPPOSITION TO SETTLEMENT AGREEMENT

ARNOLD & PORTER LLP

Hadrian R. Katz
Catherine Rowland
Michael E. Ginsberg
John Hutchins
Brent LaBarge
555 12 Street, NW
Washington, DC 20004
Tel.: 202-942-5707
Fax: 202-942-5999
E-mail: hadrian.katz@aporter.com

Anthony Boccanfuso
John Maltbie
399 Park Avenue
New York, NY 10022
Tel.: 212-715-1103
Fax: 212-715-1399
E-mail: john.maltbie@aporter.com

Susan P. Koniak
BOSTON UNIVERSITY SCHOOL OF LAW
Boston, MA 02215

# TABLE OF CONTENTS

**PAGE**

The Internet Archive..................................................................................................3

I.     Background ...........................................................................................4

     a.    The Orphan Works Problem ......................................................4

     b.    The Proposed Settlement's Impact on the Orphan Works
          Problem.................................................................................6

     c.    The Role of the Proposed Registry ...........................................9

II.    Internet Archive's Objection to the Settlement Agreement ...................................10

        1.    The Proposed Settlement Is Inconsistent With the
             Requirements for Class Certification .....................................10

     a.    Failure To Satisfy the Notice and Fairness Requirements of
          Federal Rule of Civil Procedure 23 (c) (2) (B) and 23 (e) ...........10

     b.    Failure To Satisfy the Adequacy of Representation
          Requirement of Federal Rule of Civil Procedure 23 (a)(4)............13

     c.    Failure To Satisfy the Typicality Requirement of Federal
          Rule of Civil Procedure 23 (a) (3) ...........................................16

     d.    Failure To Satisfy the Commonality Requirement of Federal
          Rule of Civil Procedure 23 (a)(2) ............................................18

     e.    Failure To Satisfy the Predomination Requirement of
          Federal Rule of Civil Procedure 23 (b) (3).................................19

     f.    Failure To Satisfy the Superiority Requirement of Federal
          Rule of Civil Procedure 23 (b) (3) ...........................................20

        2.    The Proposed Settlement Is Anticompetitive.................................20

        3.    The Proposed Settlement Is Unfair to Authors of
             Foreign Works.....................................................................24

        4.    The Proposed Settlement Threatens Personal Privacy.................26

Conclusion .............................................................................................................27

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., ET AL., | Case No. 05-cv-08136-DC |
| Plaintiffs, | |
| v. | |
| GOOGLE INC., | |
| Defendant. | |

## MEMORANDUM OF AMICUS CURIAE THE INTERNET ARCHIVE IN OPPOSITION TO SETTLEMENT AGREEMENT

The Internet Archive ("the Archive") respectfully submits this Memorandum in opposition to the Settlement Agreement (the "Agreement") between the plaintiffs and defendant Google Inc. ("Google") to the extent that the Agreement would apply to members of the asserted class that do not affirmatively elect to participate. For the reasons set out below, we submit that certifying the proposed settlement class would be a violation of rule 23 (b) (3), and an abuse of the class procedure.

In particular, the Agreement has been structured to grant Google broad rights to copy, utilize, and distribute millions of "orphan works," that is, published books the copyrights in which belong to unknown and unidentifiable owners. Most commentators have concluded that these orphan rights owners would likely constitute a large majority of the proposed class. But there is no practical way to notify these rights owners – many of whom, children and heirs of deceased authors, may be unaware that they are rights owners – of the likely impact of the settlement upon them.

It is impossible to know if the ostensible class representatives are typical of the entire class, because it is impossible to know what the orphan rights owners would want and what they would perceive to be in their interest. Some may be delighted to have Google use and distribute their works. Others may be appalled at the commercial exploitation of works that the authors' heirs might not want distributed. Others might want to grant exclusive rights to the highest bidder, or to the most sympathetic non-profit cause. There is no way that the ostensible class representatives can adequately represent the orphan rights owners' interests, as no one can know what those interests are.

Class litigation was designed to streamline dispute resolution by adjudicating a typical case, and extending the results to similarly situated prospective litigants. Here there has been no adjudication of anything, and it is anyone's guess if there are any other prospective litigants and whether, if there are, they are similarly situated. The effect of the settlement would be simply to give Google an enormous bundle of rights unavailable to anyone else.

Acceptance of the proposed Agreement and certification of the proposed class would directly and adversely affect the Archive and many other prospective competitors of Google for access to copyrighted works. The Archive has been creating a library of digital copies of published and out-of-print books that it hopes to make available without charge and on fair terms to interested readers. Google, with its massive resources and long head start, is already a daunting competitor. Acceptance of the Agreement would make Google unchallengeable.

If there is to be any settlement in this case, it should be limited to the plaintiffs and any rights owners that affirmatively elect to participate. Permitting streamlined intervention would accomplish the parties' objectives, without giving Google unfair power over the rights of unrepresented persons.

We have no objection to rights owners willingly licensing their rights through a Registry, provided that there is no exclusivity, no most-favored-nations clause running in favor of Google, and suitable antitrust scrutiny by government agencies.

### The Internet Archive

The Archive is a section 501 (c) (3) non-profit corporation that was founded in 1996 (two years before the claimed founding of Google) to build a library, with the purpose of offering researchers, historians, and scholars permanent access to historical collections. The Archive has over 700,000 registered users, and operates one of the 400 most popular Web sites in the world.

The principal project of the Archive is the Wayback Machine – a collection of some 85 billion pages of historical Internet content that enables users to view and search Web sites as they existed at various dates in the past. Additionally, the Archive has compiled a recorded music archive of over 300,000 sound recordings, a live music archive of some 60,000 concerts, and a moving images archive of over 150,000 movies.

Of more pertinence to this litigation, the Archive has established also a text archive of over one million books. Many of these works are in the public domain or are available through Creative Commons licenses. The purpose of this text archive is to provide the public with access to creative works, to promote the distribution of knowledge and the stimulation of creativity. With the exception of two books,[1] the Archive has not knowingly digitized orphan works for inclusion in its text archive. Such works would add greatly to the value of the text archive, broadening the public's ability to gain free access to otherwise unavailable material and to create new or derivative works. But the Archive has been reluctant to include orphan works knowingly because the law

---

[1] The text archive currently includes two known orphan works: *The Power of Positive Living: Everyday Psychology for Getting What You Want Out of Life* and *Libraries of the Future.*

regarding their use is unsettled and the Archive cannot responsibly risk liability for statutory damages.

Although the Archive is not a party to this litigation, its position is analogous to that of an absent party defendant. The plaintiffs sued Google because of its ongoing activities involving the copying of books and materials. The Archive and other Internet content publishers participate in the same industry as Google, namely, publication of content on the Internet. As Google, the Archive and other libraries have an interest in using orphan works, but because they did not choose to begin the copying of protected works, they were not brought into the suit. Nevertheless, these libraries desire to make orphan works available to users, and as a result, a settlement that provides favorable terms to Google for the use of orphan works puts these competitors, including the Archive, at a disadvantage.

## I.    Background

### a.    The Orphan Works Problem

Orphan works have long presented a conundrum to third parties who wish to use works for which the author or current owner is unidentifiable. Orphan works have traditionally been defined as works protected by copyright law for which an owner of the copyright cannot be identified and/or located, thereby making it difficult (if not impossible) for a third party to obtain permission to use the work. *See* COPYRIGHT OFFICE, REPORT ON ORPHAN WORKS 15 (2006) (hereinafter, the "Copyright Office Report"). Orphan works can arise as a result of a variety of common situations, including the dissolution or organizational restructuring of a corporate copyright owner, the death of an individual rights owner, multiple transfers of rights in protected works, multiple potential owners, and bankruptcy of the owner, among many other possibilities. *Id.* at 23-33. When any of these situations occurs, the task of identifying the current owner(s) of the rights in a particular work is daunting and may be fruitless. Because it can be impossible to identify the rights owner, it may

4

also be impossible to determine whether the owner would wish to license its work. It cannot be assumed that all owners of orphan works would prefer that their works lie dormant and not be used. But neither can it be assumed that all owners of orphan works wish uncontrolled copying and distribution. The issue is especially pressing because "specialists say orphan works could make up the bulk of the collections of some major libraries." Miguel Helft, *Google's Plan for Out-of-Print Books Is Challenged*, N.Y. TIMES, Apr. 3, 2009.

Current copyright law makes no exceptions for orphan works;[2] it still requires that third parties obtain permission from the copyright owner before making use of the protected work, *even if the work is an orphan.*[3] Accordingly, if a third party wishes to use an orphan work, it is faced with the dilemma of either using the work in the face of potential liability for statutory damages or forgoing the use altogether.[4] This is because third parties seeking to use orphan works simply do not have sufficient information to contact the rights owner and request permission. Any use or dissemination of orphan works is at the user's peril.

A wide variety of entities have recognized that orphan works present pressing problems. Groups as diverse as the Copyright Office, the National Film Preservation Foundation, Save the Music, Creative Commons, and even the plaintiff American Association of Publishers, Inc. and defendant Google have publicly stated that the orphan works situation would benefit from more

---

[2] As noted by the Copyright Office Report, some provisions of the Copyright Act appear to protect uses of certain "orphan" works in narrow circumstances, but there is no overarching law that covers the majority of orphan works issues. *See* Copyright Office Report at 44-52.

[3] The history of how the orphan works issue became important is rooted in the enactment of the 1976 revision to the Copyright Act. These revisions protected copyrighted works automatically as soon as they were fixed in a tangible medium. The 1976 Act also extended the term of copyright ownership and dispensed with many formalities associated with copyright law, such as the requirement for registration and renewals.

[4] Of course, third parties would still be able to argue that certain defenses, such as fair use, apply, but the state of the law currently does not explicitly protect unauthorized uses of orphan works. Any user of orphan works faces the possibility of a lawsuit.

concrete rules. When the Copyright Office issued its 2005 Notice of Inquiry regarding orphan

works, it was deluged with hundreds of public comments.[5] By way of example, Google noted:

> Orphan works represent an untapped wealth of information that can
> and should be made accessible to the public. . . . As a result, millions
> of works, representing hundreds of years of study and experience
> remain forgotten and unused, gathering dust on library shelves.
> Google believes that these works should instead serve as a
> foundation of knowledge upon which future generations can build.

Google's Response to Notice of Inquiry Regarding Orphan Works, March 25, 2005. Although the

problem of *how* to deal with orphan works is often the subject of debate, there is broad consensus

that the problem should be addressed.

There have been recent attempts to enact legislation that would provide some certainty to

orphan works. Orphan works legislation was introduced in both the House of Representatives and

the Senate last year.[6] The legislation, however, stalled in the House of Representatives and

failed to become law.

    b.    The Proposed Settlement's Impact on the
            Orphan Works Problem

The parties have crafted a Settlement Agreement that provides Google with a unique,

almost unlimited ability to exploit orphan works, bypassing legislation and trying to gain the

benefit of a statutory-like scheme by having the Court approve what is in substance a private

contract between counsel for Google and the counsel for ostensible class representatives. Because

---

[5] The Copyright Office has established a web page on the www.copyright.gov Web site devoted
to the orphan works issue. *See* http://www.copyright.gov/orphan/. The Copyright Office has
included comments to its notice regarding orphan works on this site.

[6] The Senate bill was the Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong.
(2008), and the House bill was the Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008).
The Senate Bill was reported out of committee and passed in the Senate, but the House bill was
merely introduced.

of the scope of the Agreement, Google would obtain rights to display and use millions of orphan

works without the possible liability that other entities would face.

The heart of the Agreement is the definition of "Books."[7]  Section 1.16 of the Agreement

defines a Book as:

> [A] written or printed work that (a) if a "United States work," as
> defined in 17 U.S.C. § 101, has been registered with the United
> States Copyright Office as of the Notice Commencement Date, (b)
> on or before the Notice Commencement Date, was published or
> distributed to the public or made available for public access as a set
> of written or printed sheets of paper bound together in hard copy
> form under the authorization of the work's U.S. copyright owner,
> and (c) as of the Notice Commencement Date, is subject to a
> Copyright Interest. The term "Book" does not include: (i)
> Periodicals, (ii) personal papers (e.g., unpublished diaries or bundles
> of notes or letters), (iii) written or printed works in which more than
> thirty-five percent (35%) of the pages contain more than fifty
> percent (50%) music notation and lyrics interspersed, if any (for
> purpose of this calculation, "music notation" means notes on a staff
> or tablature), (iv) written or printed works in, or as they become in,
> the public domain under the Copyright Act in the United States, or
> (v) Government Works. References in this Settlement Agreement to
> a Book include all Inserts contained in the Book, except where this
> Settlement Agreement provides otherwise.

Under this definition, "Books" encompass almost any book that was (a) if a United States work,

registered, (b) published or distributed, and (c) subject to a copyright interest[8] prior to the Notice

Commencement Date.  This is an enormous universe comprised of millions of books.  The

definition does not carve out orphan works; instead, the broad definition pulls in all orphan works

that satisfy very general requirements.

---

[7] The Agreement also covers "Inserts," which are defined in Section 1.72.  For purposes of this
Memorandum, it is sufficient to note that Inserts cover certain copyright protected and registered
works in Books or government or public domain books.

[8] Section 1.38 defines "Copyright Interest" as "(a) ownership (including joint ownership) of a
United States copyright interest or (b) an exclusive license of a United States copyright interest,
in each case only if and to the extent the interest is implicated by a use that is authorized or for
which compensation could be payable under this Settlement Agreement."

The Agreement would provide Google with an astonishing array of rights to Books. Google would be allowed to digitize Books, both before and after the Agreement is approved. Moreover, Google may make "Display Uses" of all "Display Books."[9]  *See* Article III of the Settlement.  Display Books initially include all books that the copyright owners consent to being displayed and those books that Google determines are not "commercially available."[10]  *See id.* at Section 3.2.  Orphan works are likely to be considered not "commercially available" because if a copyright owner is difficult or impossible to identify, it is likely that his or her work is not in print or widely distributed.  As a result of the Agreement's method for determining what Books are "Display Books," orphan works are more likely than other works to automatically to fall under the "Display" category, and thus may be more fully exploited by Google.  Moreover, the Settlement allows Google to provide certain consumers with the option to print and otherwise use Display Books, which further extends the scope of how Google can use Books, including orphan works.

While the Agreement would require Google to make certain payments to copyright owners, it also contains a "most favored nation" clause that limits Google's obligations to terms that are at least as good as any terms that Google's competitors may later obtain.  *See id.* at Section 3.8 (a). Because Google is and is likely to remain the user with the deepest pockets, it is unlikely that any prospective competitor would be able to bargain for acceptable terms.

The Agreement would thereby create a structure giving Google rights to use a large quantity of orphan works, likely in a broad manner, in a way that other archivists and public interest groups such as the Archive cannot.  Google would have unprecedented access to and use of

---

[9] The 134-page Agreement includes 17 pages of definitions.  We focus here on the terms that are most relevant.

[10] The Agreement also includes ways to change the status of books from Display to No Display or vice versa, as well as challenges to the status of Books.

orphan works. All of this is to be done without the actual consent of, or participation by, the owners of rights in orphan works, as such rights owners are by definition unidentifiable. Non-parties, such as the Archive, would have no mechanism to seek or obtain similar rights directly from the rights owners.

   c. <u>The Role of the Proposed Registry</u>

  The Agreement also establishes a Books Rights Registry (the "Registry"), an entity that is supposed to represent the interests of rights owners in connection with both the Agreement and potential licenses to other users other than Google. The Registry will be funded by an initial $34.5 million from Google, and subsequent payments from Google for use of Registry works. The Registry will have considerable authority to represent the rights owners' interests; to create a database of contact information for rights owners; to distribute payments to rights owners; and to assist in resolving disputes among rights owners. See Agreement, § 6.1. The Registry is also tasked with locating rights owners, a responsibility that appears to overlap with the obligation of the litigants to notify authors and publishers of the class action and the Agreement. Id., § 6.1(c).

  The Registry's far-reaching authority has important implications for rights owners. The Registry is supposed to represent rights owners' interests, but it is unclear how the Registry will be able to determine what those interests are, and the Registry's dependence on Google funding creates a potential conflict.. Moreover, the Registry will have unprecedented access to a mass of rights owner information, much of which will also be accessible by Google.

## II.    Internet Archive's Objection to the Settlement Agreement

### 1.    The Proposed Settlement Is Inconsistent With the Requirements for Class Certification

a.    Failure To Satisfy the Notice and Fairness Requirements of Federal Rule of Civil Procedure 23 (c) (2) (B) and 23 (e)

Under rule 23 (e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." It is not sufficient for the class representatives to make reasonable efforts to identify class members; they are required to identify all class members and to give direct notice in a reasonable manner to all class members. The Supreme Court has stated that rule 23 (e) "protects unnamed class members 'from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (*citing* 7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1797, p. 340-41 (2d ed.1986)). Moreover, the Second Circuit Court of Appeals has recognized that the court acts "as a fiduciary who must serve as a guardian of the rights of absent class members" in considering settlements of class actions. *George v. Parry*, 77 F.R.D. 421, 424 (S.D.N.Y. 1978) (*citing City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977)); *see also Weinberger v. Kendrick*, 698 F.2d 61, n.10 (2d Cir. 1982).

Indeed, "[t]he court's paramount role on a Rule 23 (e) motion is to protect the interests of absent plaintiffs before permitting dismissal." *Schultzen v. Woodbury Cent. Cmty. Sch. Dist.*, 217 F.R.D. 469, 470 (N.D. Iowa 2003). One of the major concerns that led to the addition of Rule 23 (e) was the concern that class representatives might enter into settlements beneficial to them but not to the class at large. "A representative plaintiff in a class action cannot simply agree to a settlement that might be advantageous for him personally but not for the other plaintiffs. The court has the responsibility of ensuring that all of the plaintiffs in the class are treated fairly." *Id.* at 470

(citation omitted). Courts have recognized that the "prophylactic purpose" of rule 23 (e) is "to protect absent class members from collusive activity between representative plaintiffs and defendants.". *Brooks v. State Bd. Of Elections*, 173 F.R.D. 547, 552 (S.D. Ga. 1997).

But it is impossible to provide notice to the owners of rights in orphan works: The purported class representatives do not know who they are, and have no practical way of finding that out. Indeed, what makes providing adequate notice particularly infeasible is that the owners of rights in orphan works typically do not know that they are the owners of rights in orphan works. Even if they were to receive information about the case and proposed settlement, for example by viewing a notice on Google's Web site or in a newspaper or television advertisement, they would not recognize that they were class members.

Because it is impossible to provide orphan rights owners with notice, adjudicating their rights through a settlement may deprive them of their due process rights. The courts appear to require more than a mere *pro forma* opt out clause for class action notice requirements. In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813-14 (1985), the Supreme Court excluded from the class persons for whom the notice and opt out form were undeliverable. *Shutts* at 813-14. A similar approach would make sense here, to ensure that orphan rights owners do not discover years after any settlement of this case that their rights had been forfeited.

This case differs from those in which the class was too large for individual notice, but members of the class were readily able to identify themselves as members of the class. For example, in *In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 169 (2d Cir. 1987), involving claims for health problems by Vietnam veterans exposed to the Agent Orange defoliant, the Court found notice adequate when state governments and the mass media made the public aware of the lawsuit. The court recognized the notoriety of the case and took judicial notice of the

11

publicity surrounding the case. Vietnam veterans who might have been exposed to Agent Orange were aware of that, and if they encountered published notice or the publicity surrounding the case they could reasonably have been presumed to have been made aware that their rights were being adjudicated in the class action.

But there is no level of notoriety or publicity that will provide adequate notice to orphan rights owners. In the instant case – unlike *In re Agent Orange* – the class members are not aware that they are rights owners. Publicity surrounding the instant case cannot be presumed to give the class members notice of their potential loss of rights. Commentators have recognized the vulnerability of unidentifiable class members. Such individuals are represented by individuals they have never met, over whom they have no control, and may not even be aware that their rights are being adjudicated. *See* Susan P. Koniak, *Through the Looking Glass at Ethics and the Wrong with Rights We Find There*, 9 Geo. J. Legal Ethics 1, 13-14 (1995).

The Third Circuit Court of Appeals faced an analogous situation in dealing with asbestos settlements, where classes were decertified in part because they would include individuals who might have been exposed to asbestos, but were not aware of the exposure. Those class members might one day develop an asbestos-related disease, only to discover that their rights had already been adjudicated in the settlement. For example, in *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), the court held:

> Furthermore, in this class action, plaintiffs may become bound to the settlement even if they are unaware of the class action or lack sufficient information to evaluate' it. Problems in adequately notifying and informing exposure-only plaintiffs of what is at stake in this class action may be insurmountable. First, exposure-only plaintiffs may not know that they have been exposed to asbestos within the terms of this class action. Many, especially the spouses of the occupationally exposed, may have no knowledge of the

exposure. For example, class representatives LaVerne Winbun and
Nafssica Kekrides did not learn that their husbands had been
occupationally exposed to asbestos until the men contracted
mesothelioma. Second, class members who know of their exposure
but manifest no physical disease may pay little attention to class
action announcements. Without physical injuries, people are
unlikely to be on notice that they can give up causes of action that
have not yet accrued.

This case involves the type of conflict that led to the addition of rule 23 (e). The plaintiffs favor

the digitization and distribution of their works, and obviously believe that the payments to be made

to them by Google are adequate consideration for licensing their works. But there is no reason to

believe that the unidentifiable owners of rights in orphan books share that belief.

  b.  Failure To Satisfy the Adequacy of Representation
     Requirement of Federal Rule of Civil Procedure 23 (a)(4)

  Rule 23 (a) (4) requires that the class representatives "fairly and adequately protect the

interests of the class." The courts have adopted a two-part test to determine whether class

representatives satisfy that obligation: First, the representative plaintiffs' attorneys must be

qualified, experienced, and generally able to conduct the litigation; and second, the plaintiffs'

interests must not be antagonistic to those of the remainder of the class. *See Bourlas v. Davis Law*

*Assocs.*, 237 F.R.D. 345, 352 (E.D.N.Y. 2006); *Wolfert v. Transamerica Home First, Inc.*, 439

F.3d 165, 173 (2d Cir. 2006). In this case, the second element cannot be met – the interests of the

class representatives and the orphan rights owners are incompatible.

  Copyright law provides rights owners with significant protections, so significant that those

rights are backed by criminal sanctions if violated. Under the Agreement, orphan rights owners

would be losing – *in absentia* – these legal rights. They have no say in the matter. In effect, the

Agreement grants Google the right to commit what might otherwise be considered a crime against

an absent class of plaintiffs.

Given the large number of orphan rights owners, it is inevitable that many of them would not wish to make their works available in the Google Books archive, and would instead prefer to make them available by other means, or not at all. If one were to conduct a poll of individuals owning orphan rights as to whether they would want to include their works in the Google Books repository, there would be no way to predict the outcome.

Compelling absent, unidentified orphan rights owners to be bound by the proposed settlement would raise due process issues similar to those in the seminal case of *Hansberry v. Lee*, 311 U.S. 32 (1940). In *Hansberry*, the respondent sought to enjoin the petitioner from committing a breach of a restrictive covenant regarding land use entered into by a large number of the land owners. The covenant was to take effect if 95 percent of the landowners agreed, and in an earlier litigation a state court had held that the requirement had been met. During the trial phase of the *Hansberry* case, however, the trial court determined that only 54 percent of the landowners had actually agreed to the covenant, and that the earlier state court decision had been the result of a fraudulent stipulation by the litigants. Nevertheless, the *Hansberry* trial court held that the covenant was enforceable on *res judicata* grounds. On appeal, the state supreme court held that the earlier state case was a class action, and that the petitioners in *Hansberry* were bound by the earlier decision as members of the class.

The United States Supreme Court reversed, holding that enforcing the class judgment and binding the petitioners under the covenant was a violation of the petitioners' due process rights. The Court stated:

> It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation, is either to assert a common right or to challenge an asserted obligation. *Smith v. Swormstedt, supra*; *Supreme Tribe of Ben-Hur v. Cauble, supra*; *Groves v. Farmers State Bank*, 12 N.E.2d 618. It is quite another to hold that all those

> who are free alternatively either to assert rights or to challenge them
> are of a single class, so that any group merely because it is of the
> class so constituted, may be deemed adequately to represent any
> others of the class in litigating their interests in either alternative.
> Such a selection of representatives for purposes of litigation, whose
> substantial interests are not necessarily or even probably the same as
> those whom they are deemed to represent, does not afford that
> protection to absent parties which due process requires. The
> doctrine of representation of absent parties in a class suit has not
> hitherto been thought to go so far.

*Hansberry*, 311 U.S. at 44-45. The Court reversed the state supreme court, holding that the

petitioners could not be bound by the earlier class litigation as absent members of that class.

Orphan rights owners here would be in a similar position to the *Hansberry* petitioners.

They are property owners who may not want to participate in the proposed settlement and who

may not want to make their works available to Google. Under *Hansberry*, this property interest

must be protected. A settlement binding orphan works owners *in absentia* would violate their due

process rights. The absent orphan rights owners should be free to assert their rights and use their

property as they choose – whether to assert rights against Google, or refuse outright to allow

Google to use their works, or contract with a third party to make their works available over the

Internet.

Other cases make clear that a class should not be certified where the interests of some class

members differ from those of others. *See, e.g., Gibb v. Delta Drilling Co.*, 104 F.R.D. 59, 82 (N.D.

Tex. 1984) (proposed class of plaintiffs who accepted early retirement bonus not certified where

some alleged retirees were coerced while others were satisfied with their retirement and bonus).

As discussed above, the case of *Georgine v. Amchem Prods., Inc., supra,* involved a class of

individuals exposed to asbestos, some of whom had already contracted diseases related to the

exposure, and others that had not yet (and might never) contract any disease. The *Georgine* court,

in reasoning affirmed by the Supreme Court, noted that the presently ill class members had an

15

incentive to maximize present-day payments from the defendant, whereas class members who were not yet ill had an incentive to seek lower immediate damages payouts, to preserve defendants' money in the event they became sick at a later time. The court found that these diverse interests were antagonistic and therefore could not be adequately represented in a single class. *Georgine*, 83 F.3d at 630-31.

As noted previously, significant differences may exist between the class of known rights owners and unknown orphan rights owners. The class of unknown orphan rights holders is vast, and likely includes individuals who – if identified – might have interests antagonistic to the class. Following the reasoning in *Georgine*, these class members would not be adequately represented, and should not be bound by the Settlement.

Creating subclasses would not solve the problem. One could only guess at the variety of subclasses that would be necessary – owners of orphan rights that did not wish to license Google; owners of orphan rights that wished to license Google but not to have works displayed; owners of orphan rights that wished to license Google but only to have works displayed; owners of orphan rights that were willing to license Google but only if royalties exceeded some level; owners of orphan rights that wished to license Google but not to have works distributed; owners of orphan rights that wished to license Google but not to have works distributed east of the Mississippi; and so on and so on.

    c.      Failure To Satisfy the Typicality Requirement of Federal
                Rule of Civil Procedure 23 (a) (3)

The typicality requirement in this circuit "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Bourlas*, 237 F.R.D. at 351 (citations omitted). In this case there

is no way of knowing whether the orphan rights owners would make legal arguments similar to those of the class representatives to prove the defendant's liability. Indeed, there is no way of knowing what arguments orphan rights owners would make at all.

As noted previously, the absent orphan works rights owners' interests may differ from those of the known members of the Settlement class. The class representatives cannot be assumed to be "typical" with respect to the unknown orphan rights owners. Indeed, the class representatives cannot possibly be typical of class members who are not aware that they have come to own copyrights in books. The class representatives cannot know the interests or desires of the unknown rights owners, the extent, if any, of their injuries, and the remedy they would seek in this case. *Cf. In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 532 (3d Cir. 2004) (upholding a settlement class where "all [plaintiffs] shared the same goal of establishing the liability of [defendant], suffered the same injury resulting from the overpayment for warfarin sodium, and sought essentially the same damages by way of compensation for overpayment"); *Georgine*, 83 F.3d at 632 (finding that the interests of future plaintiffs – those who had been exposed to asbestos but had not yet developed any diseases – did not meet the typicality requirement because it could not be determined what, if any, recovery they were entitled to until the extent of the damages (*i.e.*, the resulting illness) was known).

*Georgine* noted that the different potential future outcomes among the class members undermines the typicality of the class representatives. In *Georgine*, the class consisted of individuals exposed to asbestos. Some members of the class might have ultimately suffered serious disease as a result, others less serious disease, and still others might ultimately suffer no disease at all. As the *Georgine* court noted, these "futures plaintiffs" "share[d] too little in common to generate a typical representative. It is simply impossible to say that the legal theories of

named plaintiffs are not in conflict with those of the absentees." *Georgine*, 83 F.3d at 632.

Similarly, in this case the damages to the "futures plaintiffs" – the orphan rights owners – are

unknown. As in the *Georgine* case, this uncertainty prevents the class representatives from

meeting the typicality requirement.

       Some unknown class members might not want to make their works available through

Google at all. Such rights owners might desire an injunction to bar Google's use of their works

and to require Google to remove the works from Google servers. Such injunctive relief would be

significantly different from the payment of royalties that the Agreement would provide known

class members. In *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 82-83 (E.D.N.Y. 2007), the court ruled

that the typicality requirement was not met where most of the class members were entitled to only

equitable relief, while a smaller part of the class, including the class representatives, stood to

receive a large settlement fund. *Id.* at 83; *see Southern States Police Benevolent Assn. v. First*

*Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 88 (D. Mass. 2007) (finding that a police association

seeking only injunctive relief was not typical of a class of claimants seeking monetary damages

related to body armor manufactured by defendant). Further undermining the typicality of the class

was the fact that the settlement required all class members to give up any claims against the

defendant, even claims unrelated to the particular claims asserted. *Karvaly*, 245 F.R.D. at 88.

      d.      Failure To Satisfy the Commonality Requirement of <u>Federal</u>
                <u>Rule of Civil Procedure 23 (a)(2)</u>

       Rule 23 (a) (2) requires that "there are questions of law or fact common to the class." *See*

*Bourlas*, 237 F.R.D. at 351. As noted above, this case and its proposed settlement raise different

questions of law for the plaintiffs and the orphan rights owners. For known class members, the

legal issue is whether publication of their works by Google represents a copyright violation, and if

so, what is the proper remedy. By contrast, the question of how to treat orphan works as a legal

and policy matter has been the subject of significant debate and legislative interest, and despite congressional hearings and much academic study of the subject, it remains an unsettled question. It is a far different and more complicated legal and policy issue than the dispute between a known copyright holder and Google; the Agreement represents a contract between two bargaining parties in settlement of litigation, something that happens all the time.

The danger in treating the known class members and the orphan works owners as having "common" questions of law and fact is that the proposed settlement would result in a de facto resolution of the treatment of orphan works with respect to Google and only Google. This would follow even though orphan rights issues are separate and distinct from the issues raised by the Google activity that prompted the instant suit.

e.    Failure To Satisfy the Predomination Requirement of
Federal Rule of Civil Procedure 23 (b) (3)

The many possible differences in the positions of identifiable class members and the unidentifiable orphan rights owners makes it impossible to conclude with any certainty that common questions of law and fact predominate. "The Rule 23 (b) (3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," and is a more demanding criterion than the rule 23 (a) commonality inquiry. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997).

The Second Circuit Court of Appeals has held that the predominance required by rule 23 (b) is present if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof. *See In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 132 (2d Cir. 2001). In this case, there are significant questions of law that apply uniquely to the absent orphan rights owners. Those

questions deal with the orphan rights owners' property rights and how, if at all, they choose to exercise or surrender those rights. *See In re Grand Theft Auto Video Game Consumer Litig. II*, 251 F.R.D. 139, 157-58 (S.D.N.Y. 2008) (finding individualized issues among the class members sufficient to decertify the class). The Agreement purports to answer those questions by providing almost unlimited rights to Google, but that is a simplistic answer to a question that has vexed Congress and academia. If this case were certified as a class action consistent with the Agreement, the predominant effect would be to strip millions of unnotified class members of their property rights.

      f.      Failure To Satisfy the Superiority Requirement of Federal
              Rule of Civil Procedure 23 (b) (3)

For all the reasons set forth above, we submit that rule 23 (b) (3) class certification is not the superior approach to resolving this litigation. The superior approach is to permit the plaintiffs and the defendant to settle the case pursuant to their Agreement, and to establish a procedure under which additional authors and publishers are permitted to sign on to the Agreement and join the Registry

No one would be disadvantaged by this solution. The plaintiffs, and the authors and publishers that chose to join them, would receive all of the income and benefits provided by the Agreement. Google would receive a release of liability, and broad rights with respect to an enormous body of works. And the status of orphan rights owners would remain unchanged and their rights would be preserved, leaving Congress to adjudicate a resolution of the issues they raise.

      2.      The Proposed Settlement Is Anticompetitive

This case was initiated to adjudicate whether Google had infringed the rights of copyright owners by scanning entire published books without permission. Google asserted that such

scanning was fair use, and issue was joined. An adjudication of the availability of a fair use defense in that context would have been a useful development of copyright law.

But something very different happened. This class case was turned from a test of the lawfulness of Google's actions into a wholesale transference of rights to Google from known and unknown rights owners. This conversion of the litigation into a windfall for Google is a distortion of the class mechanism, with resulting adverse impact on a large universe of third party victims. The purpose of class actions is to have issues determined between adequate representatives of adverse interests, not to permit the litigants to concoct a settlement that advantages them at the expense of competitors, consumers, and absent class members.

If the Court certified the settlement class contemplated by the Agreement, the Archive and other competitors of Google would be seriously disadvantaged. An entity wishing to make use of orphan works risks serious liability, and as a result, many entities such as the Archive have been deterred from copying or distributing orphan works. However, Google, through the proposed settlement, would be able to bypass that risk and reap considerable gain. If the Court approves the Settlement, it would be, in effect, establishing a mechanism for using orphan works – which Internet Archive and others unsuccessfully sought from Congress for all parties – exclusively for the benefit of Google. No other entity would have the privilege of exploiting orphan works with such certainty and lack of risk. Conversations with other parties, including United States Government attorneys, indicates a concern that Google's strategy in this case might be replicated in later cases regarding other forms of orphan works, such as pictures or film.

Should Google be exclusively granted these terms for the use of orphan works, it would potentially have a dramatic impact on the development of the market for making books available electronically. At the very least, Google alone would have a period of time in which it could

21

develop a system for making orphan works available online. Even if another party ultimately was granted similar orphan rights, Google's solution might well be so predominant by that time that competitors seeking to bring their own solutions to market would not be able to establish themselves.

The Agreement may likely deter orphan rights owners from donating their works to parties such as the Archive once they become aware of their rights. The Archive is a non-profit organization that is not in the position to offer compensation for use of works. Accordingly, when faced with the decision of whether to provide rights to orphan works to Google in exchange for a monetary payment or providing the works for free to the Archive, an owner has less motivation to donate to the Archive.

Moreover, the Agreement may operate to weaken the fair use arguments available to competitors, by arguably creating a monetary market that was previously not available. When analyzing whether a use is protected as fair under the Copyright Act, 17 § U.S.C. 107, courts review "the effect of the use upon the potential market for or value of the copyrighted work." Without the Agreement, the market for orphan works is basically nonexistent, but the Agreement establishes a market that could impede an otherwise legitimate fair use defense.

The preceding paragraphs underscore the unfairness and, indeed, the unreasonableness of the proposed settlement. The Court must ensure that a settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23 (e) (2); *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, (3d Cir. 1998). Google is gaining a benefit, namely an exclusive regime for using orphan works, despite the fact that it was the only party that plaintiffs alleged were infringing their copyrights. It is unreasonable for Google, as a defendant, to obtain rights through the settlement of the case where no other internet publisher was accused of copyright

22

infringement in the first instance.  It would be unfair for the Court to grant Google rights that no
other Internet library can obtain.

The *In re Prudential* court listed several factors generally considered in determining the
fairness of a settlement.  *Id.* at 317.  The *In re Prudential* court also listed several factors it
considered potentially adding to that list, based on several years' experience in determining the
fairness of class action settlements.  Key among these potential additional factors were:

- Whether the representation of members of the class is adequate, taking into account
  the possibility of conflicts of interest in the representation of persons whose claims
  differ in material respects from those of other claimants;

- Whether the settlement will have significant effects on parties in other actions
  pending in state or federal courts;

*Id.* at n.37 (citation omitted).

These factors further support the Archive's opposition to the proposed settlement.  There
are significant conflicts of interest between Google and other Internet content providers, including
the Archive.  Google, as an Internet content provider, has negotiated for itself a mechanism for
using orphan works under the terms of the Agreement, and obtaining the certainty that its use of
those orphan works would not violate copyright law.  Google has thereby bargained for an
advantage over other Internet content providers, including the Archive.  In this case, Google's
desire to settle the action – and gaining a benefit in the process – is a stronger interest than
defending its prior use of the copyrighted works belonging to the plaintiff class.  As such, Google's
interests are sufficiently different from those of the Archive and other content providers as to
generate a conflict between their interests and Google's interest.

The Archive further notes the unusual circumstances of this case, and the strong public interest in the outcome. Settlement would disadvantage not only the Archive, but the public at large. If Google were allowed to obtain the privileged position envisioned in the proposed settlement, the public would likely be forced to rely on Google alone to obtain access to orphan works. Such actions would prevent entities such as the Archive from providing these important works through other mechanisms to benefit the public, free of charge.[11] This result is antithetical to the free exchange of ideas and even Google's own position that "[o]rphan works represent an untapped wealth of information that can and should be made accessible to the public [and that] Google believes that these works should instead serve as a foundation of knowledge upon which future generations can build."

### 3. The Proposed Settlement Is Unfair to Authors of Foreign Works

Settlement would also present significant challenges for foreign authors. As Google explains in its Google Book Settlement FAQs, the definition of "Books" covers works that were (1) "published or distributed to the public or made available for public access under the authorization of the work's U.S. copyright owner or owners on sheets of paper bound together in hard copy form"; (2) "registered with the U.S. Copyright Office, *UNLESS the work is not a "United States work" under the U.S. Copyright Act, in which case such registration is not required*"; and (3) "subject to a U.S. copyright interest (either through ownership, joint ownership, or an exclusive license) implicated by a use authorized by the Settlement." Google Book Settlement FAQs, 11, *available at* http://www.googlebooksettlement.com (emphasis supplied); *see*

---

[11] For example, the Archive has considered a procedure in which available copies of apparently orphaned works would be obtained and digitized, after which the printed copy would be locked away, and the electronic version made available free for a limited period to exactly one user at a time. Such an approach, very different from anything apparently contemplated by Google, would be a true analog of traditional public lending libraries.

Agreement § 1.16. Accordingly, authors of foreign works that are granted copyright protection in

the United States, but who have not taken the affirmative step of registering their works with the

United States Copyright Office, will fall within the class, and their works will be available to

Google under the terms of the Agreement.

The Agreement's inclusion of these non-United States works presents at least two major

problems.

*First*, it is likely that many foreign copyright owners will not know that the Settlement is a

final adjudication of Google's ability to use the foreign works in the United States. United States

law provides many foreign copyright owners with copyright protection in the United States,

including the ability to bring suit, without requiring these foreign owners to register with the

Copyright Office.[12] *See* 17 U.S.C. §§ 104 (a) - (b), 411 (a); Berne Convention for the Protection

of Literary and Artistic Works, Article 5 (2), Sept. 9, 1886 (as revised at Paris on July 24, 1971 and

amended in 1979), 828 U.N.T.S. 221; 3 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 9:10.

Because these foreign copyright owners need not make the effort of registering their works in the

United States and may not be familiar with United States copyright law, they may not be aware

that they have rights that would be affected by the Agreement, or that, if they do not opt out in a

timely manner, Google will be allowed to use their works in the United States without fear of

liability. In light of these complex international legal implications, the Agreement's attempt to

sweep countless foreign works into its scope is troubling. Similar to orphan works, it is simply

---

[12] One of the main international copyright treaties is the Berne Convention, which has more than
160 signatories, including countries on every continent except Antarctica. The United States
acceded to the Berne Convention on March 1, 1989.

impossible to determine if these foreign copyright owners as a whole would desire Google to make use of their works.[13]

   *Second*, foreign copyright owners' works are at a higher risk of initially being classified as a "Display" work rather than a "No Display" work, and thus being more fully exploited by Google. As discussed above, section 3.2 (b) of the Agreement states that "Google will initially classify a Book as . . . Display if it is determined not to be Commercially Available . . . ." Unfortunately for foreign authors, "commercially available" is defined as "with the respect to a Book, that the Rightsholder . . . is, at the time in question, offering the Book . . . for sale new through one or more then-customary channels of trade *in the United States.*" *Id.*, § 1.28 (emphasis added). Because foreign authors are likely to make use of their works abroad, the restrictive definition of "commercially available," which focuses exclusively on United States use, is insufficient to determine whether the foreign owner is deriving economic value from its work. Accordingly, Google likely will classify foreign works as "commercially unavailable" even if those works are thriving abroad.

   4.   The Proposed Settlement Threatens Personal Privacy

   As described above, the Agreement is formidable in scope and length, including dozens of definitions and inappropriately incorporating orphan and foreign works. Yet, despite the wide-ranging subjects included, the Agreement fails to make any mention of how Google will protect the personal information it will obtain from users. This is problematic because Google will be able to collect vast quantities of personal information, including user names and reading habits. This type of data traditionally has been protected by various laws, including numerous state laws that

---

[13] In fact, several foreign entities have already lodged objections to the Settlement. *See, e.g.,* June 22, 2009 Letter from SYNDIKAT -Autorengruppe deutschsprachige Kriminalliteratur; May 18, 2009 Letter from The Publishers' Association on Book Distribution of Tokyo, Japan.

prevent libraries from disclosing circulation records without receiving subpoenas or in accordance

with statutes. *See* Karl T. Gruben, *What is Johnny Doing in the Library? Libraries, the U.S.A.*

*Patriot Act, and its Amendments*, 19 ST. THOMAS L. REV. 297, 301 (2006) ("In addition, most of

the states have statutes requiring that the registration and circulation records are confidential and

may only be obtained by using a valid court order."). In light of the Agreement's complete lack of

privacy protection for user information, Google may make numerous uses of the information it

obtains, including by combining all of the information it has on specific users to create a

comprehensive user profile, among other things. The Archive is thus concerned that the

Agreement does not provide adequate protections for user privacy, which further exacerbates the

numerous problems raised by the proposed settlement.

### Conclusion

This is not the first proposed class settlement to raise issues of adequate notice, or

commonality, or typicality, or adequacy of representation, or manageability, or superiority.

Neither is it the first proposed class settlement to raise antitrust issues, or to affect the rights and

property interests of unrepresented third parties and members of the public. But it nonetheless is

unprecedented in its ambitions, not just because it raises all of these problems at once, but because

it does so in a bid to have the court "settle" issues that go far beyond the scope of the original

complaint, including matters that are properly the subject of legislative resolution, such as the

appropriate balance to be struck between orphan rights owners and the public benefit to be gained

by the freer circulation of the copyrighted works of deceased authors with uncertain heirs.

Legislatures are designed to deal with interests of that breadth and scope, not the courts.

The Agreement is fraught with problems and unintended consequences for persons other

than the parties to the Agreement. Internet content providers and the market generally will be

significantly impacted by the terms of the Agreement, particularly as they regard orphan works.

The Agreement resolves only for Google the long unresolved issue of the use of orphan works, a

problem for which many market participants have sought legislative solutions. And it is the

legislative process – with its ability to weigh and address all competing interests, and craft a

solution that deals fairly with everyone – that is the appropriate vehicle for achieving a just result.

    For the aforementioned reasons, the Archive objects to the terms of the proposed

settlement. This is not properly a class action, and any settlement should apply only to willing

participants.

                     Respectfully submitted,

Dated: September 8, 2009

Hadrian R. Katz
Catherine Rowland
Michael E. Ginsberg
John Hutchins
Brent LaBarge
ARNOLD & PORTER LLP
555 12 Street, NW
Washington, DC 20004
Tel.: 202-942-5707
Fax: 202-942-5999
E-mail: hadrian.katz@aporter.com

Anthony Boccanfuso
John Maltbie
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Tel.: 212-715-1103
Fax: 212-715-1399
E-mail: john.maltbie@aporter.com

Susan P. Koniak
BOSTON UNIVERSITY SCHOOL OF LAW
Boston, MA 02215