USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-9-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
THE AUTHORS GUILD, et al.                 :

              Plaintiffs,          :          CIV. NO: 05-CVF-8136 (DC)

              V.                        :

GOOGLE, INC.,                             :

              Defendant.           :
------------------------------------------------X


## BRIEF OF AMICUS CURIAE


R. Emmett McAuliffe
RIEZMAN BERGER, P.C.
7700 Bonhomme Avenue, 7th Floor
St. Louis, Missouri
(314) 727-0101

The Author's Guild et al v. Google Inc.                                        Doc. 315

Attorney for Amicus Curiae, The Media Exchange Company Inc.

## Table of Contents

Table of Authorities..................................................................................iii, iv

Statement of Interest of Amicus.................................................................1

Argument......................................................................................................1

I.  A DIGITAL MEDIA EXCHANGE IS THE ONLY SYSTEM WHICH
    HARMONIZES THE RIGHTS OF BOOK OWNERS WITH THE ECONOMIC
    INTERESTS OF THE PARTIES...................................................................1

    A.  The Inevitability of the creation of an Exchange......................1

    B.  How an Exchange Works.............................................................2

    C.  Anticipated objections.................................................................4

    D.  The "Seat" of Copyright Holders at the Exchange....................5

II.  A DIGITAL MEDIA EXCHANGE IS THE ONLY SYSTEM WITH THE
     CAPABILITY OF MATCHING THE DEMANDS OF THE DIGITAL AGE
     WITH THE CONSTITUTIONAL GOAL OF PROGRESS AND SOCIAL
     UTILITY.....................................................................................................5

III. A DIGITAL MEDIA EXCHANGE DOES NOT REQUIRE COPYRIGHT LAW
     REFORM AND IS FULLY CONSISTENT WITH PRESENT
     LAW............................................................................................................7

     A. Fair Use....................................................................................7

     B. *Cablevision II*..........................................................................9

     C. Escrow/ Depositary Law..........................................................11

     D. First Sale.................................................................................11

IV.  THE GOOGLE BOOK SETTLEMENT FAILS TO DEAL WITH THE
     PROBLEM OF BOOK OWNERS AND RUNS THE RISK OF CREATING
     ECONOMIC INCENTIVES FOR BOTH BOOK OWNERS AND THE
     PARTIES WHICH WILL CREATE SOCIAL WASTE............................12

V.   THE EXCHANGE ADDRESSES ALL OF THE OTHER OBJECTIONS AT
     BAR TO THE SETTLEMENT.......................................................................13

|   |   | A. Anti-Trust…………………………………….…………………………………13 |
|   |   | B. Transparency………………………………………………………………...13 |
|   |   | C. Conflict of Laws………………………………………………………………..14 |
|   |   | D. Quality……………………………………………………………………………14 |

**VI.** THE EXCHANGE REPRESENTS A SIGNIFICANT SOLUTION TO THE PROBLEM OF ORPHAN WORKS WITHOUT INVOLVING CONGRESSIONAL ACTION……………..………………………….…............14

Conclusion……………….…………………………………………………………………..…15

**APPENDIX I** - HOW DOES AN EXCHANGE WORK FOR COPYRIGHTED DATA?: COMPARISON TO SUCCESSFUL AUTOMATED FINANCIAL EXCHANGES………………….……………………………………………………………...16

## Table of Authorities

### Cases

*Hustler Magazine, Inc. v. Moral Majority, Inc.,*
    796 F.2d 1148, 1155 (9th Cir. 1986)…………………………………………………8

Real Networks Inc. v. DVD Copy Control Association Inc., No. C 08-04548 MHP, U.S.
    D. C. (N.D. Cal.), Or. Granting Defs. Mot. P.I. 40 (Aug. 11, 2009)…………………9

*Sony Corp. of Amer. v. Universal City Studios Inc.,*
    464 U.S. 417, 78 L. Ed. 2d 574, 104 S. Ct. 774…………………………………………8

*Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F.Supp. 2d 607
    (S.D.N.Y. 2007), *rev'd. Cartoon Network LP, LLP v. CSC Moldings, Inc.*, 536 F.3d
    121 (2d Cir. 2008), *cert denied* No. 08-448 (June 29, 2009)……………………….. 9

### Statutes and Other Authorities

17 U.S.C., §109…………………………………………………………………………………11

Eckersley, Peter, *Google Book Search Settlement; Foster Competition, Escrow The Scans*
    *Electronic Frontier Foundation*, http://www.eff.org/deeplinks/2009/06/should-
    google-have-s, accessed September 7, 2009…………………………………………13

*First-Sale Doctrine*...…………………………………………………………………4, 12, 15

*Method and apparatus for digital copyright Exchange*, filed March 4, 2005…………….1

*Nimmer on Copyright* § 8.12.................................................................................12

*Nimmer on Copyright* §13.05................................................................................9

*Settlement, pg. 65*................................................................................................7

Taillieu, Olivier A.: *Cartoon Network v. CSC Holdings: Remote DVR Does Not Violate Copyright Protections Afforded to Television Program Copyright Holders* http://www.lawupdates.com/commentary/icartoon_network_v_csc_holdings_i_remot e_dvr_does_not_violate_copyright_pro/, September 18, 2008, accessed September 7, 2009..................................................................................................................11

U.S. Constitution, Article I, §8, Cl. 8.......................................................................6

———————

## Statement of Interest of Amicus

The Media Exchange Company, Inc. ("TMEC") is the assignee of patent application 10/591,416 (*Method and apparatus for digital copyright Exchange*, filed March 4, 2005) and is the operator of an interactive website, The Digital Content Exchange ("The Exchange") found at www.thedce.com. As such, TMEC is the only voice for owners of digital books who wish to exercise their right to first-sale and owners of physical books who wish to exercise their fair use right to have their books digitized.

## Argument

## I. A DIGITAL MEDIA EXCHANGE IS THE ONLY SYSTEM THAT HARMONIZES THE RIGHTS OF BOOK OWNERS WITH THE ECONOMIC INTERESTS OF THE PARTIES.

### V. The Inevitability of the Creation of an Exchange.

Doing "a Google Search" will mean not just searching the internet but also searching every book and magazine you have on your "bookshelf". Every book ever written can be purchased at market-fluctuating prices and read immediately upon the click of a button. Every book ever written could be searched from a user's home computer or portable device. The collection of the world's libraries will be available for borrowing at the click of a button using the internet. Furthermore, this comprehensive collection of digitized books is owned by the people.

This is the inevitable future of digitized books. The Settlement has provisions that hasten that future but some glaring omissions that will needlessly forestall it.

The good news is that the original genius of U.S. Copyright Law in combination with the free-market economic system is sufficient to maximize the social utility of digitized books and thereby hasten the digital future described above. There is only one thing lacking: An exchange system for book owners. This exchange would function

1

similar to a stock exchange. In recognizing that digital goods are a fungible commodity that can be traded, sold and borrowed electronically, the Court can unleash the economic activity and social utility that all parties, plus objectors and amici desire. A digital media exchange works for digitized books for the same reason a stock exchange works: it is the only logical system for organizing and facilitating commodity ownership (book owners) and commodity issuance (copyright-holders). A media exchange is made ever more fertile for economic activity because the subject matter of books is limitless (unlike stocks) and thus can be more profitably advertised against.

The Settlement brings together the parties who possess the wherewithal to start the Exchange: Google, with its unparalleled scanning efforts plus its innovative web advertising revenue model; the Authors and Publishes as the producer of the commodity. But the party that is missing from the settlements yet is essential to filling the exchange with books, is the book owners themselves. The book owners do not have to be formally joined as a party-class. All that is necessary is for the present parties to affirm, and the Court to approve, the legal reality that an owner who has lawfully purchased a book is not committing a crime by digitizing that book for his or her own personal use and that they have the right to authorize third-parties to do this on their behalf. This brief will attempt to establish this legal reality. But first, we will offer an outline of how the Exchange works and how it maximizes the social utility of digitized works and allays the fears of most of the defendants, the objectors, and amici.

## B.     How an Exchange Works[1]

---

[1] The process will be described not just for books but for all media items inasmuch as the DCE patent application is for books, music, video and other digital media. Please note that this is but a brief outline and does not cover all the functionality of the DCE. To review other functions, refer to the DCE.com, "How it Works" link.

The Exchange applies the principles of an exchange to the fungible commodity of media. That the commodity is media presents two unique challenges: verification and use and enjoyment of the commodity by the owner.

After an Owner ("O") has set up an account with The Digital Content Exchange ("DCE" or "Exchange" both used herein) "O" may purchase media from other members on the Exchange, or may begin depositing his or her own media item. To make a deposit, "O" ships the physical media item to the DCE. The DCE Staff verifies the item by visual inspection and a bar code scan when available. For non-physical items (media items that were originally purchased digitally), "O" may also make a deposit as long as the member's user name and password for the digital vendor account are provided to the DCE and the purchase is verified. Once the physical or digital item is verified, the content is converted to a master digital file which in turn can be converted to virtually any digital format that any user may require, for either download or reading (*streaming* in the case of sequenced content such as music or video) via internet transmission. Most importantly for books, the user may search all books deposited in the DCE through a search algorithm but the search results will only show him more than a snippet if he is a verified owner.. Any physical media item is then permanently immobilized in the DCE warehouse.[2] Thus, when a sale, trade or loan of the item takes place between two members via the web application, the physical item does not move, only the access[3] to that item online.

---

[2] Provisions will be made for users who later change their mind and wish to have the artifact returned, thus losing access.

[3] Such "access" includes: viewing (on any popular device and in any popular format), downloading, word-searching (across their entire collection of books[1]), converting (to any desired format), and selling, trading, loaning or bequeathing, of their books.

*Economics of the Exchange Transaction.* The seller is paid money by the buyer. The lender is paid money by the borrower (or a not-for-profit lending library may choose to provide the loan for free). The DCE "clears" the transaction just as a stock exchange would: verifying that the commodity offered is owned by the seller, is what it purports to be and changing the record of ownership in the item from seller to buyer. Unlike a stock exchange, however, the DCE will "switch on" buyer's access and "switch off" seller's access. It is also possible to charge a fee to the seller and/or buyer for the economic benefit obtained by virtue of the Exchange. The Exchange is willing to charge a transaction fee, which the DCE will pay to any entity that provides value to the transaction. In the case of books, such entities may include the author, the publisher, and the provider of the scanning service. It can also be those who provide reviews or other metadata, which enriched the selling opportunity. Inasmuch as authors or publishers may be paid, it will represent a publishing industry breakthrough because it will mark the first time publishers have been paid on secondary sales. Their copyrights in their copies having been exhausted under the first-sale doctrine, such *voluntary non-exhaustion* or *commercial non-exhaustion* is one of the unique features provided by a digital media exchange. (*See First-Sale Doctrine, infra.*)

### C. Anticipated objections

The objection is sometimes made, "How do we prevent a user from selling an item on the exchange while yet retaining a downloaded book on the user's computer?" First, this is not a problem endemic to the DCE but is widespread, since the advent of the digital age. Second, inasmuch as authors and copyright holders currently receive no

compensation when users choose to "rip and ship" (i.e. take a digital copy from the commercially-sold tangible copy and then sell it via, e.g., Amazon or E-Bay), the DCE at least provides a mechanism for payment to the publishers for this secondary sale. Third, since the DCE represents to the user a cloud-based, anywhere-in-the-world access to the user's media, possessing a media item *outside of* the DCE will become less and less desirable as the DCE becomes the standard. Fourth, to the extent any copyright holder wishes to pursue a copyright infringement complaint, the record of that user's purchase and subsequent sale of the "ripped and shipped" item will be valuable evidence against such purchaser.

### D. The "Seat" of Copyright Holders at the Exchange

If the concept and importance of *Ownership* is understood in Section B, above, the reader may readily see that an author or book publisher holding the right to sell an author's book under contract for a term is nothing more or less than an owner of an infinite number of books. Just like a publicly traded corporation that may have a seat at an exchange, such author is free to authorize the sale of $x$ number of copies of a book at $y$ price ("offer"). By accessing its seller account (akin to a "seat" at a financial exchange), a book publisher may raise or lower the offer price instantaneously. Buyers of books can make "bids" (or "wishes") of any desired price and a seller can meet that price if he chooses. (See Appendix I for further comparison with financial exchanges.)

## II. A DIGITAL MEDIA EXCHANGE IS THE ONLY SYSTEM WITH THE CAPABILITY OF MATCHING THE DEMANDS OF THE DIGITAL AGE WITH THE CONSTITUTIONAL GOAL OF PROGRESS AND SOCIAL UTILITY.

The Court must map everything it does back to the constitutional intent of copyright law. The U.S. Constitution, Article I, §8, Cl. 8, empower Congress to make laws "To promote the progress of science and the useful arts..." Thus, *progress, science,* and *utility* are enshrined into law.

It should be clear from the discussion in Section I above that a Digital Media Exchange is the only system available (and is the only *invention* proposed in the context of The Settlement) that keeps up with the demands of the digital age, while minimizing social waste and apportioning the legitimate interest of the parties. The monopoly grant to authors was built principally on the exclusivity to vend copies to buyers and ownership has been the backbone of the system.

The objection is sometimes made that it would be impossible to warehouse the millions of books that would be immobilized under a Digital Content Exchange. The answer to this objection is that the books are currently being warehoused, just in individual homes and libraries. Books that are immobilized can be better kept in temperature-controlled conditions and (paradoxically!) recycled in an organized fashion upon an act of some Congress in the future that would declare these emblems of ownership no longer necessary to evidence ownership. Providing ready and affordable scanning to physical book owners through an exchange would acclimate users to digital book technology, jump-start the conversion of the public to digital books and therefore increasing the demand for digital books over physical books. The Exchange is not a totally green solution, but the greenest available, furthering the goal of a sustainable Earth, one of the essential aims of *science*.

In order to varnish the Settlement with a *pro bono publico* veneer, and to be said to be promoting *science*, the parties have lavished exclusive privileges on libraries that are entirely unwarranted. First, the aggregation of all the world's book owners depositing their books in the DCE for digital access and trading is a better source of obtaining scans. Second, a reader's ability to keep his or her reading habits private are not well-protected by providing narrow points of access via "in the case of each public library, no more than one terminal per Library Building"[4], that users must travel to, which are maintained by quasi-governmental entities requiring proof of address and other personally indentifying information.

By contrast, a DCE user accesses his or her books and book searches through his or her own terminal at home. The DCE user is better protected from privacy breaches by a User Agreement with a private entity that is financially responsible and non-sovereign immune. Third, the financial incentive for a DCE member to allow his or her books to be borrowed will create more borrowing opportunities than public lending libraries with limited resources can provide. In the digital age, the distinction between a library and a private collection available for loan through an Exchange melts away. A library becomes just another user with an account on the Exchange. As does a bookstore.

## III. A DIGITAL MEDIA EXCHANGE DOES NOT REQUIRE COPYRIGHT LAW REFORM AND IS FULLY CONSISTENT WITH PRESENT LAW.

### A. Fair Use

Google's claim to Fair Use may have been well-grounded. The grounds for this claim will not, however, be decided by the Court. The use of the scans by Google which

---

[4] *Settlement, pg. 65*

have been agreed-upon in the Settlement will become enshrined as a custom practiced by the most popular website in the world. It will become a *de facto* standard.

TMEC, on behalf of book owners, seeks the inclusion, by the parties' assent, of another potential fair use right that will not get ruled on. This is the fair use right of an owner to convert a book to any format the owner may desire, including from a physical book to a digital book (via scanning) and from a digital-visual format to a digital-auditory format (via conversion)[5].

It is well-established that copying a work in its entirety does not preclude a finding of fair use. *See Sony Corp. of Amer. v. Universal City Studios Inc.*, 464 U.S. 417, 78 L. Ed. 2d 574, 104 S. Ct. 774, (and note that the copier of the entire work was not even an owner of a copy of the work). *See also, Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986) (and note that the defendant did not make a copy for its own personal use and enjoyment but rather made 29,600 copies and had them publicly distributed for commercial purposes).

Although mass producers of copyrighted work have been cagey about it, and have avoided bringing cases squarely to the attention of a binding tribunal[6], a "rip" of a CD, video, or book to a more convenient format lies at the very heart and center of ownership rights. *Nimmer* writes, "It has long been stated that 'fair use presupposes good faith and

---

[5] TMEC has observed that text-to-speech (TTS) software is a fast-advancing field. The ability to convert digital text to human speech should be among the fair use conversion rights of book owners. This right will be especially valued by owners who in later years develop failing eyesight.

[6] It is noteworthy that content providers seem unusually interested in obtaining windfall sales when few formats are embraced by consumers. Thus the legality of the acts of format-shifting (e.g. ripping) has been allowed to remain in legal limbo. This state of affairs sends all the wrong economic signals. It communicates to developers of new and better formats and hardware that their market will be limited to only those willing and able to pay twice for the same content. It communicates to the content providers that more of their energy should be spent on marketing the same content multiple times over than discovering and developing new talent.

fair dealing'".[7] The user of the Exchange is in the most benign position of all "copiers" with respect to such good faith and fair dealing because he or she has actually *paid money*, and not only paid money, but the *full asking price* for the copyrighted item. There is nothing about the copyright owner's rights in a copy that should involve *preventing the owner from reading his own book*. Reading is, indeed, fundamental. Although it is not a First Amendment-based example of fair use it is a common-sense based one.

As Judge Marilyn Hall Patel scolded a recent copyright holder attempting to obviate a fair use defense:

The purpose of copyright law, and the fair use that copyright law embodies as an exception to protection, is not to protect the business model of any particular company.

Real Networks Inc. v. DVD Copy Control Association Inc., No. C 08-04548 MHP, U.S. D. C. (N.D. Cal.), Or. Granting Defs. Mot. P.I., 40 (Aug. 11, 2009)

### B. *Cablevision II*

The proposition that a user who requests a service-provider to perform an act of copying or transmitting which would be legal had the user done it himself or herself without the service-provider being held liable for direct copyright infringement, was bolstered recently by the U.S. Supreme Court's "let-stand" decision in *Cablevision II*. *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F.Supp. 2d 607 (S.D.N.Y. 2007), *rev'd. Cartoon Network LP, LLP v. CSC Moldings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert denied* No. 08-448 (June 29, 2009).

---

[7] 4-13 Nimmer on Copyright § 13.05

As this Court well-knows, the case involved a remote-storage DVR service which was charged with direct copyright infringement by some television programs. The Court focused on whose volitional conduct caused the allegedly infringing copy to be made. Despite the "switch being thrown" by the defendant, since it was ordered by the customer, the defendant was not liable. The Court looked past the fact that the copy was resident on defendant's servers. The Court seemed to take note that if it were a set-top DVR no copyright infringement would have been alleged. The Court also rejected the plaintiff's allegation that the streaming of the program infringed its public performance right, a time-shifted television viewing at home being essentially a private use.

The case upholds TMEC's position that it can do on behalf of owners what the owner could do for himself. All the volitional conduct in the Exchange is with the owner, as with *Cablevison*. In addition, TMEC's case is stronger because the DCE's user owns the content and the DCE is not involved in packaging third-party content.

Many commentators are applauding the ruling for allowing consumers increased flexibility and offering developers of new technology a more generous interpretation of copyright law.[8] The decision accomplishes this goal without crippling any reasonable expectation of the copyright holder regarding the incentive for producing content.

---

[8] Taillieu, Olivier A.: *Cartoon Network v. CSC Holdings: Remote DVR Does Not Violate Copyright Protections Afforded to Television Program Copyright Holders*
http://www.lawupdates.com/commentary/icartoon_network_v_csc_holdings_i_remote_dvr_does_not_viola te_copyright_pro/, September 18, 2008, accessed September 7, 2009

emmett's brief / 25145-003          10

## C. Escrow/ Depositary Law

The question arises, "How does a Digital Media Exchange 'verify' that the owned content is at all times undergirding the digital rights enjoyed by the owner?"

Fortunately, this situation has come up numerous times in the context of other chattel. It is sufficient for the purposes of this brief to simply note that the Exchange can assume the role of either depositary, bailee, or escrow agent depending on whether the media is held in digital or physical form and the particular wishes of the depositor as reduced to a user agreement. This is not a novel or unworkable situation. The Exchange can easily fulfill its role as provider of the digital file and through technology, the Exchange can at all times vouch for the validity of the members ownership rights "immobilized" in the exchange and accept the member's commands for the download, streaming or loaning of the digital file.

## D. First Sale

Section 109 of the Copyright Act provides an exception to the copyright owner's exclusive rights which effectively allows the owner of a copy the free right of disposal of the owned copy by sale, lease, etc.[9][10]  Some commentators have speculated that the exception may not apply to digital sales.

---

[9] 17 U.S.C.§109: *Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord. (a) Notwithstanding the provisions of section 106(3) [17 USCS § 106(3)], the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.* (Emphasis added)

[10] The 1976 amendment of the first-sale doctrine incorporated the substance of the first-sale rule but chose for the first time to use the term "owner". *2-8 Nimmer on Copyright § 8.12.* Ownership is thus part of the copyright law, as well as the common law, yet is not mentioned once in the Settlement. The Settlement, when it comes close to discussing owners, uses the term "the reading public" three times *(Settlement; whereas clauses 3 and 8, para. 6.3 (a)(1))* yet does not define the term. The term "reading public" is not contained anywhere in the Copyright Act.

*Nimmer on Copyright* has taken the position that while there is definitely a digital

first-sale doctrine, there is a practical problem in effecting such a sale:

> users theoretically have every legal right to invoke a digital first sale
> defense pursuant to Section 109(a). But in this instance, those same
> practicalities may prevent that scenario from unfolding in the real world--
> *unless and until new technologies rise to the fore that permit it to be*
> *realized.* (Emphasis added)

2-8 *Nimmer on Copyright* § 8.12. Some have suggested a solution in so-called "forward

and delete" CMS technology. This does not obviate, however, the problem of whether

the forwarded copy "reassembled" by the buyer qualifies as "a particular copy" for

purposes of the exception. *Nimmer* tends to doubt it.

The Exchange quite possibly represents that "new technology rising to the fore".

A digital copy of a media item originally sold on the DCE is clearly "a particular copy"

for purposes of the exception. Thus, a digital copy residing on the DCE server is

accessed by the owner in the same manner as he or she would if the file resided on his

home PC. But when he or she goes to transfer it, the digital file stays put with the

depositary, the DCE.

Amicus respectfully points out that the Settlement contemplates digital sales but

does not admit that a digital first-sale right attaches to the books sold. Nor has any

mechanism been created by the Settlement parties to effect such a sale. Such digital sales

contemplated in the agreement may involve surprised purchasers when they go to sell

their "property" and find they cannot.

## IV. THE GOOGLE BOOK SETTLEMENT FAILS TO DEAL WITH THE PROBLEM OF BOOK OWNERS AND RUNS THE RISK OF CREATING ECONOMIC INCENTIVES FOR BOTH BOOK OWNERS AND THE PARTIES THAT WILL CREATE SOCIAL WASTE.

Just like compact disc owners of the 1980's, book owners will increasingly seek to avail themselves of technological advances that allow them freer use of the *object* they lawfully purchased and own, in this case, instead of a CD, a book. Book owners may be greatly prejudiced by a settlement that ignores them. This prejudice stems from the entry-barriers to scanning services that will be erected by a settlement which endows a legal privilege on private entities while at the same time not requiring any covenant by these entities that they will not contest a book owner's right to scan his or her owned-book and/or provide such owner with the fruits of said scan at a reasonable price.[11] By neglecting the technological realities, the Court will be establishing the wrong incentives for individual book owners just as the music labels did with unfavorable results.

## V. THE EXCHANGE ADDRESSES ALL OF THE OTHER OBJECTIONS AT BAR TO THE SETTLEMENT.

### A. Antitrust.

Antitrust is not impacted by the DCE solution because Google and others who are prepared to scan works will only have access to the scans given to it for scanning jobs by the book owners themselves. It is impossible for there to be illegal cooperation, or any scheme whatsoever, by such a decentralized, even atomized cooperation among individual book owners.

### B. Transparency

Deriving its genius from the financial exchange model, the DCE is a paragon of transparency. Every copyright holder, book owner, book dealer or interested person will

---

[11] And as has been pointed out by a commentator, producing social waste as a by-product of the Settlement. *See* Eckersley, Peter, *Google Book Search Settlement; Foster Competition, Escrow The Scans Electronic Frontier Foundation*, http://www.eff.org/deeplinks/2009/06/should-google-have-s, accessed September 7, 2009

be able to check online the market data up to the second for each book on the exchange. ~~Sellers will understand how much they were paid, and why. In the book example these~~ fee recipients may include The Book Rights Registry, Publishers, Authors directly, Reviewers, and the DCE itself. All payments will be clearly visible to all concerned.

### C. Conflict of Laws

Commentators on the settlement from Germany, The Netherlands, Austria, and other countries have expressed concern about the treatment of copyrights that may be under their jurisdiction. This creates a conflict-of-laws mess. This mess is obviated by the DCE's emphasis on ownership. While the copyright treaties and trade and tariff agreements may legitimately come into play into the Court's Settlement approval, no country purports to tell another country what it can and cannot do with respect to chattel.

### D. Quality

Concerns have been expressed that there will be no effective check on the quality of the scans tendered by Google. This concern is obviated by the zeal and diligence of the individual book owner, who having purchased and cherished the book, is the most familiar with how it should look. The Owner will police the Exchange and demand a satisfactory scan. Further, TMEC welcomes the participation of the book authors and publishers in the improving the quality and quantity of the digital content that they are party to.

### VI. THE EXCHANGE REPRESENTS A SIGNIFICANT SOLUTION TO THE PROBLEM OF ORPHAN WORKS WITHOUT INVOLVING CONGRESSIONAL ACTION.

Many parties and amici curiae admit that the settlement is a bust when it comes to out-of-print and/or orphan works. It is true that to the extent these works represent a

valuable body of knowledge that is lost to the public, it is a tragedy. Out-of-print does not mean out of commerce. Orphan does not mean without an owner. The Exchange will incentivize owners of these books to get them digitized into the Exchange. Once this happens there will be a more vibrant stream of commerce. It is quite simply the consistent application of technology to a problem. Even damaged copies of these works, having been bought and paid for and subject to the first-sale rule, can be recovered through digitization.

## Conclusion

The Court should advise the parties to amend the settlement to uphold the rights of book owners, *all* copyright owners and embody the principles of a digital media exchange. Amicus request permission to appear at the Fairness Hearing currently set to be held on October 7, 2009.

Dated: St. Louis, Missouri
September 8, 2009

Respectfully submitted,

By:/s/ R. Emmett McAuliffe
R. Emmett McAuliffe
mcauliffe@riezmanberger.com
7700 Bonhomme Avenue, 7th Floor
St. Louis, Missouri 63105
(314) 727-0101

How does an Exchange work for Copyrighted data?
Comparison to successful automated Financial Exchanges.
March, 2006

**Background**

Everyone will agree that automation of the Exchange function has worked well for the Financial
Securities Industry. The largest financial exchanges in the world operate primarily as automated
Exchanges. The New York Stock Exchange (NYSE) has used automation of transactions since the 1970's
and recently merged with the largest automated only exchange. The NASDAQ stock market instituted
automation in the early 1970s and also operates primarily as an automated exchange today. The current
high volume of transactions would not be possible without this automation and its underlying
standardized support structure including depositories and clearing facilities. The current facilities
surrounding the financial markets and providing the ability of any person to obtain accurate information
and participation are widely available and largely taken for granted by the participating public today.
The existing Exchanges and their associated companies and individuals had to learn and innovate, as there
were no operating examples for them to follow. The development paralleled the development of the
technology that enabled the changes. Many activities that previously existed were diminished or ceased to
exist along the way. Activities that previously did not exist grew and prospered as the processes evolved
to the current state. These processes and activities continue to evolve.

The Exchange automated activities rely upon several features to make them reliable and able to handle
large volumes of transactions upon demand.
1. Standardization – This takes the form of unique identifiers for each entity as well as agreed upon
   processes for the advertisement of interest (see Advertising below) and the completion of transactions.
2. Physical document immobilization – This is done with the common use and ownership of the
   Depository Trust Company that eliminates the physical transfer of certificates of ownership in favor of
   the digital accounting counterpart. This process works for products that are identical and easily
   substituted for each other allowing their ownership to be transferred electronically. Generally this is
   referred to as fungible. (See separate document for discussion of Immobilization.)
3. Clearing facilities – The rapid verification and agreement of all parties to the conditions of a trade.
   This includes the identification of the parties and transaction items as well as the money amounts due
   and payable to each party.
4. Trust – The Exchange must provide the ability of those who use it to trust the transaction will be
   completed as agreed. The checks and balances of the transaction processes are combined with the trust
   established by the participants through normal rules of commerce to create the trust in the Exchange.
   This is backed up by enforcement of violations of this trust.
5. Advertising – The prices potential buyers are willing to pay and the prices that owners are willing to
   accept are advertised through a central facility. These prices are called a bid and ask and are displayed
   through a quote system in the Financial Industry. A system also displays the prices of recently
   completed transactions to further show the value of a particular asset. This is called a ticker. Systems
   are available to search and display portions of the current status of any asset as well as summarize the
   activity of the marketplace. These systems are generally called quote services. This type of system is
   used for price discovery and maintains a market (consumer) driven price.

The Exchange is generally considered the best way to balance supply and demand in the commercial
market place. The Exchange will provide the best current price for both sides of the transaction. One
instance of the operation of the Exchange is the initial offering of shares at a single price where the price
is set by the seller to maximize the revenue while selling all the shares offered.

Although there are some underlying differences between financial assets and copyrighted media the basic Exchange framework that is the core of commercial activity still applies. The Exchange mechanism can easily be adjusted to accommodate these differences just as the financial exchanges have adjusted over time.

## Copyrighted Media

The Copyrighted Media businesses are encountering the technical age where products are easily and economically digitized, reproduced and distributed. These businesses include Music, Movies, Games, Software, Photos and Book publishing. Not since the invention of the printing press has such a radical change occurred. **The changes are enabled by irreversible technical development. History shows those that embrace the technology and evolve emerge as the leaders.**

## Retail View

Examining the Copyrighted Media businesses from the point of view of an Exchange marketplace shows that the Copyrighted Media businesses have operated in the initial offering mode in their physical products (setting a single price). The Copyrighted Media Businesses have tried to apply that same business model to the digital world with very poor results. They seem to be reluctant to recognize that the environment has changed. Since Copyrighted Media businesses have not had experience in the Exchange type of marketplace (the resale of the fungible product) they have no internal knowledge of how to use it to their advantage. We believe that their evolution and profitability, and perhaps, their long-term existence, will depend upon the application of the Exchange principles to their businesses.

It is critical to understand that Copyrighted Media has changed within the marketplace from physical to digital and has become fungible. (See separate discussion of Immobilization.) Previously, the recording (copying) of media was not applicable to this change as the copied product was of inferior quality to the original and, therefore not fungible. Ebay is considered similar to an Exchange but it is not as the products are not interchangeable for each other and, therefore not fungible. Ebay is really just another retail store. Once a product has become fungible the Exchange becomes the over-riding best and most profitable method of commerce. There can be many stages and a great deal of time for the transition to occur. The eventual outcome is set. Those that embrace the evolution early have the best chance of being the final winners.

## The Digital Copyright Exchange (DCE)

The patent pending DCE applies the Exchange principles to transactions involving copyright (royalty) payments to copyright holders regardless of the type of transaction (physical or digital) or the participants. The DCE increases the opportunities for transactions that pay royalties (See separate discussion of this point.) and decreases the enforcement costs for the copyright holder. At the same time the DCE empowers the product owner by reducing his costs of ownership and increasing his ability to exchange and use his assets legally.