USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9-9-09

# EDWARD HASBROUCK

1130 Treat Avenue, San Francisco, CA 94110, USA
phone +1-415-824-0214
edward@hasbrouck.org
http://hasbrouck.org

Member, National Writers Union (UAW Local 1981, AFL/CIO)

31 August 2009

District Judge Denny Chin
U.S. District Court for the Southern District of N.Y.
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

**Re:     The Authors Guild, Inc., et al. v. Google Inc., No. 05 CV 8136**

By this letter, I opt out of the proposed settlement in this case. Although the settlement notice claims that, "your opt-out request … must state which Sub-Class you wish to opt out of (either the Author Sub-Class or Publisher Sub-Class)," I believe that this is both incorrect and improper: Since I am opting out of the proposed settlement, I am not subject to its purported division of the proposed class into sub-classes. In any case, it is possible that if I didn't opt out I might be found (under the vague and ambiguous definitions and the partially yet-to-be-determined decision-making procedures of the settlement, the outcomes of which I am unable to predict) to be a member of either or both the Author Sub-Class and/or the Publisher Sub-Class. Accordingly, I am opting out of <u>both</u> Sub-Classes, and of the settlement in its entirety.

I also note that many of my works, including portions of my books, were first published on my Web site and/or in my e-mail newsletter from servers located outside the USA. Accordingly, my reserved claims and rights are not limited to those I may have with respect to "U.S. works" as defined in U.S. copyright law, but also include all of my moral rights and other rights under the Berne Convention with respect to these or any other works.

I am opting out, in part, because it is impossible for me to predict whether I would be determined to be a (or the) "Rightsholder", as that term is used in the proposed settlement. Neither I nor, I suspect, most freelance authors, can say with certainty whether we are or would be determined to be (after the fact) members of the class, or of which sub-class(es). Copyright is, I have always been told, an infinitely divisible bundle of rights, but the proposed settlement and the claim forms use the terms "Rightsholder" and "rights" as unitary terms.

I am also opting out because I cannot afford to take the risk that, if I opted in so as to have standing to object, and my objections were overruled, I would be bound by the proposed settlement including its reallocation between authors and print publishers of substantive and procedure rights of control and revenue sharing, its "Author-Publisher Procedures", and its release of potential claims not just against Google but also (undisclosed in any of the so-called "notices" of the proposed settlement) against publishers, the Authors Guild, and class counsel.

I am writing to you, even though I am opting out and thus no longer have any personal financial interest in the outcome of this case, because of the depth of my objections to the proposed settlement and my concern that some of the most serious objections may not be brought

The Author's Guild et al. v. Google, Inc.          Doc. 316

to the court's attention. Authors must choose either to opt out to protect themselves against the potential for the settlement to deprive them of their rights in their life's work, or opt in and object, but not both. The more strongly we object to the proposed settlement (or, as I would put it, the more carefully we have studied the settlement and realized its implications), the more likely we are to opt out entirely to protect our rights. By the nature of this process, the court will not hear from those who object most strongly, because we will opt out. And the only objectors from whom the court will hear will be those who regard the proposed settlement as only mildly flawed, and who at the end of the day are willing if necessary to accept being subject to the settlement as currently proposed. The false impression is thus likely to be created with the court, and perhaps also with the public, that those authors who object are fundamentally satisfied with the proposed settlement, and only wish to propose minor repairs. Nothing could be further from the truth. Most of the other authors I know who are opting out are doing so because they regard the settlement not merely as objectionable, but as too objectionable to risk being subjected to.

I have analyzed in more detail the unfair situation in which this places authors, and the dilemma with which it confronts us, in an article previously published on my Web site and attached to this letter, "Google Books and Writers' Rights", available at http://hasbrouck.org/articles/GoogleBooks-WritersRights.pdf.

If you have not heard more about these objections, that is also in significant part a result of the failure of the so-called "Notices" to disclose some of the most objectionable (and, for authors, dangerous and potentially damaging) aspects of the proposed settlement: the releases of authors' claims against (1) print publishers, (2) class counsel, and (3) the Authors Guild.

No claims by authors against any of these parties were made in any of the complaints. Neither print publishers, class counsel, nor the Authors Guild were named as defendants. No claims by authors against them were litigated in these cases, and no discovery was conducted against them by authors. This court has no jurisdiction in this case to release any such claims.

Even if this court finds that it has jurisdiction to release such claims, such a release would require notice to potential class members, as part of the settlement notices. But neither the one-page "Summary" notice, nor the 32-page detailed "Notice", nor any of the FAQ's or other information anywhere on the settlement Web site (except the complete text of the proposed settlement) or on the Web site of the Authors Guild makes any mention of this release of claims against categories of parties other than, and unrelated to, Google. Only those who ignore or mistrust the seemingly detailed description of the releases in the Notice, and read closely through the more than 300 pages of inscrutable legalese of the complete proposed settlement, would discover what may be its most objectionable, but well hidden, aspect.

The detailed settlement notice, in sections 12-14, devotes more than a full page of fine print to a purported description of the release of claims, beginning with the following:

12.    What entities am I releasing?

As of the Effective Date, Rightsholders will release claims against Google and all of the Participating Libraries, and each of their past, present, and future parents, predecessors, successors, subsidiaries, affiliates, anddivisions, and each of their respective officers, directors, employees and others listed in Article X of the Settlement Agreement.

By not including, "... and against print publishers, class counsel, and the Authors Guild", this

statement is clearly incomplete and inaccurate as a description of the entities released.

Section 13, which follows, purports to say "If I remain in the Settlement, what claims am I specifically giving up?" But none of its twelve paragraphs mentions the release of claims against print publishers, class counsel, or the Authors Guild. It refers readers to Article X of the proposed settlement for "more details regarding the released claims". But neither print publishers, class counsel, nor the Authors Guild are "details" within the categories of releasees associated with Google and disclosed in the notice. They are entirely distinct categories of parties, entirely undisclosed in any of the notices or anywhere on the settlement Web site.

Finally, Section 14 of the notice purports to describe the implications of opting out:

> If you do not want to be included in the Settlement and you want to retain the right to sue Google and the Participating Libraries, you must take steps to "opt out" of the Settlement. By opting out, you retain the right to file your own lawsuit or join another lawsuit against Google about the claims in this lawsuit.

The repeated references to "against Google and the the Participating Libraries" and to "against Google" falsely and misleadingly imply that these are the only parties or categories of parties against whom claims would be released by those who opt in (or don't opt out).

The deficiency of the settlement notice, in failing to mention the the releases of authors' claims against print publishers, class counsel, and the Authors Guild, is sufficient in itself to compel this court not to approve the proposed settlement, at least until a sufficient new follow-up notice and new opportunity to object or opt out is provided to all identifiable class members. It would be difficult to cure the defective and incomplete notice, since authors seeing a follow-up notice would be likely to disregard it, assuming that it was the same notice they had seen before.

Authors have a well-founded basis for concern that they may have significant claims against print publishers, class counsel, or the Authors Guild – potential claims which were not made in this case, which have not been the subject of discovery or litigation, and which it would be premature for them to release through this settlement:

1. **Print publishers:** As discussed in my attached article, "Google Books and Writers' Rights", this settlement proposal is made in the context of a longstanding and ongoing record of litigation between authors and print publishers as to the ownership, terms, and revenue sharing for electronic usage of works first published in hardcopy form. I believe that this court can take judicial notice of the cases – all originating in this Federal district – of Ryan v. CARL, New York Times v. Tasini, Random House v. Rosetta Books, and Reed Elsevier v. Muchnick, each of which concerned author-publisher disputes as to ownership of electronic rights to print works. Reed Elsevier v. Muchnick – in which many of the claims made against Google in this case are being made against print publishers, and many of the same objections made to the proposed settlement with Google are being raised against a settlement with print publishers – is scheduled for argument in the Supreme Court the same day as the hearing in this case, 7 October 2009. When some of the same issues are being argued the same day in the Supreme Court by the same class counsel on behalf of some of the same organizational plaintiffs, it's obvious that there is a real likelihood that, in the absence of a settlement precluding them, there might be claims brought before this court by authors against publishers related to disputed claims to ownership, licensing terms, or revenues for work "used" by Google.

2. **Class counsel:** Class counsel's prior misconduct in Reed Elsevier v. Muchnick, which I previously reported on my Web site in the attached article, "Lies from 'my' lawyers in copyright class action lawsuit", http://hasbrouck.org/blog/archives/000812.html, gives authors reasonable grounds for mistrust of class counsel in this case, and reluctance to release claims against class counsel related to counsel's conduct in this case. This published history also creates cause for this court to exercise great care in reviewing the adequacy of representation of the entirety of the proposed Author Sub-Class in this case.

3. **The Authors Guild:** As I've noted, the adequacy of representation of the entirety of the author class by the Authors Guild is already an issue in Reed Elsevier v. Muchnick, currently before the Supreme Court, and is certain to be an issue in this case. Moreover, the Authors Guild has made misleading public statements about the proposed settlement which, at a minimum, may raise reasonable doubt as to whether the Authors Guild has acted in good faith in providing possible class members with accurate notice of the proposed settlement. For example, on its Web site, "Should I Opt Out? Should I Fear Google? What about the Money? Answers about the Google Book Settlement", http://www.authorsguild.org/advocacy/articles/should-i-opt-out.html, the Authors Guild says, "Opting out of the settlement is for authors who want to preserve their right to sue Google themselves.... Then, do I need to sign up somewhere? You don't have to—your rights are fully protected either way." But this isn't true: opting out is obviously also for those who want to retain their right to sue (and not to forfeit rights without being sued by) print publishers, class counsel, and/or the Authors Guild. And your rights to do so aren't "fully protected either way", but are protected only if you opt out.

Regardless of what print publishers, class counsel, or the Authors Guild think of the merits of any such potential claims, any release of those claims must be made knowingly by authors, not by stealth or without notice as would occur if the proposed settlement is approved.

I request that this court disapprove the proposed settlement and allow this case to resume progress toward trial (or toward such new and fair settlement as may be proposed by the parties, subject to full corrective notice and a renewed opportunity to opt out or object).

Having opted out, I realize that the court may find that I have no standing to object. If the court finds it necessary to do so in order to consider these objections, please consider this letter and the attached articles as a pro se brief as amicus curiae in support of the objectors to approval of the proposed settlement, and if further necessary as a motion for leave to file such a brief, and a motion for leave to appear pro se as amicus curiae in support of these arguments at the hearing on 7 October 2009. I don't know if anyone who isn't opting out will raise these issues.

Respectfully submitted,

*Edward John Hasbrouck*

Edward John Hasbrouck

Attachments:

"Google Books and Writers' Rights" (10 pages)

"Lies from 'my' lawyers in copyright class action lawsuit" (8 pages)

# EDWARD HASBROUCK

1130 Treat Avenue, San Francisco, CA 94110, USA
phone +1-415-824-0214
edward@hasbrouck.org
http://hasbrouck.org

Member, National Writers Union (UAW Local 1981, AFL/CIO)

# Google Books and Writers' Rights:
## The proposed settlement of the Google Books lawsuit

### 1. The Google Books lawsuit and the proposed settlement.

The Google Books class-action lawsuit and proposed settlement have a confusing mix of features which are similar to, and features very different from, "Reed Elsevier v. Muchnick" (the so-called "Copyright Class Action" lawsuit which is now in the Supreme Court). The Google Books lawsuit has a much less complex procedural history, at least as of now, but the proposed Google Books settlement is vastly more complex than the Reed Elsevier v. Muchnick settlement.

In 2004, Google began scanning books, at first obtained from cooperating libraries, and redistributing electronic copies of these books on the Google Web site in various forms (in whole or in part, as page images or as text). Google got the "permission" of the libraries whose copies were scanned, but of course those libraries didn't own the copyrights to the books. Google neither sought nor obtained any permission from publishers, authors, or other holders of rights to electronic publication of the text, illustrations, or other content of the books.

In one aspect, Google was taking the same approach that publishers of print periodicals had followed in Reed Elsevier v. Muchnick: they ignored their lack of ownership of copyright, infringed first, and negotiated with the holders of electronic rights only after the fact, if and when copyright holders sued.

But in another way, Google Books Search was different. In the events that gave rise to New York Times v. Tasini and Reed Elsevier v. Muchnick, as well as in Amazon.com's "Search Inside the Book" (a somewhat similar book-scanning scheme launched in 2003), the publishers of electronic copies have at least purported to obtain licenses from print publishers. Since the print publishers didn't, in most cases, actually own the electronic rights, that made the print publishers parties to the infringement jointly with the electronic publishers. Both print and electronic publishers were defendants in New York Times v. Tasini and Reed Elsevier v. Muchnick.

Rightsholders did sue Google. But because Google hadn't paid off or even purported to get permission from the print publishers, the alignment of parties was different than in the previous cases. Instead of writers as plaintiffs against both print and electronic publishers as defendants, the Google Books lawsuit put writers and print publishers together as plaintiffs against Google, the electronic publisher (and copyright thief) as defendant.

Although the group I belong to, the NWU, initially took no action against Google (or Amazon.com), lawsuits were filed against Google by the Authors Guild, a group of individual authors, and a group of publishers (mainly large New York publishers). These cases against Google were consolidated, with attorney Michael Boni – who was and is simultaneously

"representing" (and selling out the interests of) the NWU, the Authors Guild, and the individual writers in Reed Elsevier v. Muchnick – as lead counsel for the authors. (For more about Mr. Boni's prior misconduct, see my article at http://www.hasbrouck.org/blog/archives/000812.html.)

Once the lawsuit was filed, Google adopted the same strategy that had worked so well for the defendants in Reed Elsevier v. Muchnick: use the lawsuit to negotiate a "settlement" that wouldn't just provide compensation for past infringement, but would give the defendants – the copyright thieves – a license by default, in perpetuity, to continue their previously infringing conduct, protected from further liability by the release of claims embodied in the settlement.

With Google's deep pockets, they were able to get an even better deal for themselves than the one the defendants had negotiated with Boni in Reed Elsevier v. Muchnick. Google had to pay a bit more – a total of $125 million including $30 million to Boni and his co-counsel – but for that they got a settlement that would, among other features, give Google an effectively exclusive license for the rest of the life of the copyright to market electronic copies of all out-of-print but in-copyright books for which the rightsholders don't come forward to claim a share of the revenues or object to Google's "use' of their work.

Holders of the rights to electronic reproduction of books who do come forward to claim their share of the settlement will get $60-$300 per book (depending on how many rightsholders come forward, but most likely $60) or $15 per article if their work turns out to have been scanned by Google, even though the law provides for *minimum* statutory damages of $750. (The settlement's broad definition of "book" and narrow exception for "periodicals" mean that it includes as "books" many magazines, journals, pamphlets, chapbooks, ephemera, etc., and authors of articles, poems, etc. in them, although the settlement notice doesn't make that clear.)

The settlement would also establish a new collective licensing scheme for rights to electronic reproduction of books, and a "Book Rights Registry" to administer it. Much like the Publication Rights Clearinghouse created by the NWU in 1997 (and originally staffed by Irv Muchnick, now the lead lead objector to the settlement in the case that now carries his name, "Reed Elsevier v. Muchnick"), except that the Book Rights Registry would be funded by Google and jointly controlled by publishers and authors, whereas the Publication Writers Clearinghouse was founded by the NWU and controlled by, and operated solely in the interest of, writers.

There's much more to the settlement than I could possibly discuss here, and I haven't heard from anyone – even law professors – who claims to believe that they fully understand what the settlement is supposed to mean. I presume that Google wanted it that way, since they can afford to pay more for lawyers to support their interpretation than any possible opponent.

Several public interest legal organizations, and the U.S. government, have taken an interest in the settlement, but mostly for reasons unrelated to writers' interest or rights. In particular, they have objected to the *de facto* exclusivity for Google in the deal. Google claims that the Book Rights Registry to be established if the settlement is approved would be free to license book rights to competing electronic publishers as well as Google. That's true, but only for books for which the rightsholders come forward. Since current copyright law – quite properly – operates on an opt-in rather than an opt-out basis, no other publisher would be able to acquire the default license to reproduce and distribute electronic copies of unclaimed books that would be granted to Google, and Google alone, through the terms of the settlement. (Unless they followed Google's strategy of infringing first, getting sued, and negotiating a settlement similar to Google's. The settlement would thereby create a compelling incentive for copycat infringements that will reward infringers with an advantage over non-infringers who can't get such a license, and force rightsholders to sue a succession of Google's would-be competitors.) Many others have

argued, and I agree, that any such default license should be (a) nonexclusive and (b) granted only by Congress, as part of a reform of copyright law through the legislative process, not as part of the settlement of a lawsuit. The Department of Justice has announced that they are investigating whether the exclusivity of this "license by default" to Google would give Google a monopoly, in violation of antitrust law.

Privacy advocates, including some authors, have also expressed concern that the settlement would allow Google to track who reads what portions of which books on the Google Web site, to retain that data for as long as Google likes, to use it for any purpose whatsoever of Google's choosing, and to sell, rent, or "share" it with anyone at all (including government agencies anywhere in the world), for Google's sole profit, in Google sole discretion as a for-profit corporation, in complete secrecy and without notice or consent of the reader or the author. This is of course particularly troubling in the case of books on sensitive or controversial topics. Knowing that Google is looking over their shoulder, and might be tattling to the government, could have a chilling effect on both readers and writers.

There's also been lots of discussion of "orphan works" (books for which Google and/or the original print publisher claim that they can't find the rightsholder, or perhaps haven't tried to do so, or where the rightsholder doesn't come forward to claim their rights – perhaps because they presume that by default they retain their rights, as in fact they now do under U.S. and foreign copyright law). But there has been scarcely any discussion of the core issue for authors: Whether the settlement would fairly compensate writers of non-orphaned, in-copyright books for the overtly commercial for-profit electronic reproduction and sale of licenses to their work.

I and most other writers who have tried to study the settlement think the answer is, "No". The compensation for past infringement (unauthorized scanning and posting on the Web of entire in-copyright books, with no pretense of a license from anyone even pretending to hold those rights) would be a fraction of the minimum statutory damages to which rightsholders are entitled. While Google would graciously "allow" rightsholders to license their books for electronic distribution by Google, Google itself – not to mention competing electronic publishers – already offers rightsholders more favorable payment terms if they include their books in other Google scanning and electronic publishing programs than would be offered under the settlement! And electronic self-publishing may offer authors better terms than any third party.

There's little reason for publishers to be involved at all in making decisions about electronic publication of most of these works. The vast majority of in-copyright books subject to the settlement (a) were published before e-books or the Internet were conceived of, and (b) are out of print. Authors never assigned publishers any electronic rights to most of these books. For the minority for which e-rights were assigned (as part of a "subsidiary rights" clause applicable to "all rights" or "rights in all media now known or hereafter invented") those rights have under typical contracts long since reverted to the author as a result of the book going out of print. While some have tried to portray the settlement as being "primarily" about orphan works, by the numbers it is overwhelmingly about books for which the e-rights are 100% author-owned, and with respect to which the settlement would transfer a share of control and revenues to publishers.

There's simply no reason – other than Google's greed, and the willingness of the lawyers to sell out their clients in exchange for a fee award that the lawyers can live on for the rest of their lives – for compensation to known rightsholders for past infringement for profit by Google as a commercial entity to be tied to future licensing terms, terms for orphan works, terms for "fair use", terms for non-commercial users and uses, or a license or forfeit of rights by default. As long as authors' moral and legal right to decide whether and on what terms to license our work is recognized, we don't need Google, or the proposed settlement, to be able to – if we so choose –

place our books in the public domain, give electronic copies of them away, license them under a Creative Commons or other license, re-use them or authorize others to do so, self-publish them electronically, or sell electronic copies through our own Web sites or any other distribution channels of our choosing. And "orphan works" call for action by Congress, not the courts.

## 2. But wait, there's more!

The proposed settlement appears to have been written mainly with commercially successful large-press publishers in mind, assuming that all contracts follow their models. That may be true for most of the members of the Authors Guild, the named plaintiff authors, or the big New York publisher plaintiffs, but it's not true for all authors or all publishers. It's unclear how well the settlement will serve the interests of authors with small presses (who may have less standardized contract terms) and more typical, less commercially successful authors who receive little revenue from book sales, whose books rapidly go out of print, and who may have more (proportionately) to gain from putting their books' content on their own Web sites, or licensing or using it in other ways. That can happen now either under a contractual provision for reversion of rights when a book is "out of print" (however that is defined or whatever it is interpreted to mean in the publisher-author contract) or sooner if the author retained exclusive or nonexclusive electronic rights in the original contract (as was typical before e-books were imagined, and as authors and their agents typically still seek in book or other print rights contract negotiations).

The proposed settlement is ambiguous with respect to authors who have not signed all-rights contracts, particularly those who have reserved electronic rights to a book. Both in the settlement and in the claim forms, the terms "rightsholder" and "rights"are used as unitary terms -- there's no explicit consideration of book contracts that separate print and electronic rights, where rights can be jointly exercised, where rights are nonexclusive or conditional or time-limited, or where a single use by Google "implicates" multiple subdivisions of the rights, to which different contractual terms for ownership, control, and/or revenue sharing apply. Some of the writers with the most to lose from the settlement may be those who negotiated more favorable than standard electronic rights terms, who may have to share e-book decision-making, control, and/or revenues with their publisher even though they were supposed to own 100% of electronic rights. Only someone with an "exclusive" interest in a right is a "rightsholder" for purposes of the settlement. I don't know if this was intended to punish writers who had succeeded in retaining nonexclusive rights to publish their own e-books, but it looks to me like it could have that effect.

The proposed settlement is also ambiguous with respect to what happens if an author opts out of the settlement. If you and your publisher opt in, both have to consent for your book to be scanned and distributed in electronic form by Google. But if you opt out of the settlement, you cease to be a member of the "settlement class", and your publisher may be able to include your book without your consent. Your publisher could then use the fact that your book is available electronically through Google to argue that it is still "in print" within the terms of the author-publisher contract, and thus refuse to revert the rights or refuse to allow you to use your book's content on your Web site or in other ways. (This is only one of the many ways that "uses" by Google authorized by the settlement could constitute "trigger conditions" with additional consequences under existing contracts.) When I asked Google's lawyer about this at a public forum, he claimed that a publisher would not be able to include a book in the Google electronic publishing scheme without the author's consent. But as I read the proposed settlement, that appears to be true only if the author remains in the "settlement class" and is determined under the Author-Publisher Procedures to be the holder for settlement purposes of the relevant rights. If you opt out, or opt in but are determined not to hold those rights, it appears to me that your publisher would be able to include your books without your consent. Your only recourse if that happens would be to bring a Federal copyright infringement case against your publisher.

There's a strange set of provisions in the proposed settlement for different treatment of books and rights depending on whether rights have "reverted". This too seems to be based on publishers' interpretations of standard big-publisher contracts, and to presume that all book contracts initially assign all rights to the publisher until such time as they "revert". But that ignores what the courts have already found: that a grant of all rights is not implicit in a print publication contract. And it leaves unclear cases where certain rights – such as electronic rights – haven't "reverted" because they were never assigned to anyone other than the original author/rightsholder – again, as is probably the case for the majority of (older) books.

There are bound to be disputes between publishers and authors as to how to divide the revenues received by the Book Rights Registry from Google, or whether (under existing author-publisher contracts), publishers are required to pass on to authors some share (and if so, what percentage share) of the revenues publishers receive from the Book Rights Registry.

Several fundamental disputes of publisher-author contract interpretation, which will be relevant to the division of payments from Google, have already become apparent in disputes over the division of other e-book and e-rights revenues.

In particular, typical author-publisher contracts provide that the author receives only a small percentage of the revenues for sales of printed books (typically around 5-15%), while the author receives a much larger share (typically 40-60%, most often 50%) of revenues for licenses of "subsidiary" rights to the copyrighted content of the book. This difference in the revenue split is entirely appropriate, because the publisher bears all of the costs of printing, warehousing, and distribution for paper books, but has none of those costs when subsidiary rights are licensed.

In the absence from the author-publisher contract of either an explicit definition of the term "book" as including "e-book" for royalty purposes, or some other provision explicitly subjecting "e-books" or electronic rights in general to the "book" royalty split rather than the "subsidiary rights" revenue split, it's clear that e-book licenses, like other licenses of electronic rights, are licenses of subsidiary rights for which authors are entitled under existing contracts to the much higher (typically 50%) sub rights revenue share, not just the much smaller book royalty percentage.

Both large and small publishers, across the board -- whether by coincidence or by (illegal) collusion, have claimed to authors that a license for an e-book is a "sale" of a "book" for which the author is entitled to only the book royalty percentage. (This claim to authors directly contradicts the claim made to readers who purchase licenses to e-books. The end-user licenses for e-books, such as the user agreement for e-book use on Amazon.com's "Kindle" reader device, make explicit that what is purchased by the reader is a license, not a sale, which conveys no ownership of the "e-book" and carries none of the rights – such as the right to resale – implicit in the sale of a physical copy of a paper book.) There are already numerous disputes between authors, book publishers, and Amazon over whether to treat Kindle Edition revenues under book sale royalty or "sub rights" contract terms for licensing and revenue sharing.

We can take it for granted that authors and publishers of print books will have exactly this same dispute over the meaning of our existing contracts as they apply to the rights "implicated" (in the language of the proposed settlement) by Google's "uses" of our work. How this dispute will be resolved will make a huge difference to how much we are paid, and whether the Google Books settlement ends up benefitting authors or mainly benefitting print book publishers.

The proposed Google Books settlement, if approved, would foreclose many possible actions by authors to defend their rights, at least as they relate to revenues from Google's e-book

distribution, by substituting a new set of procedures (including binding arbitration on an individualized author-by-author basis, precluding litigation and eliminating any possibility of collective action by authors to negotiate or to defend our contractual rights) and establishing a new body to allocate revenues, the Book Rights Registry, with as-yet-unknown procedures.

I'm not a lawyer, and many of these problems with the language of the settlement are ambiguities and omissions. But how will these open questions be resolved? Under the proposed settlement, they will be resolved either by Google (accountable only to its duty to its shareholders to maximize its profits), through binding arbitration, or through the yet-to-be-determined and opaque internal procedures of the proposed Book Rights Registry. Not through collective bargaining, not by the courts, and not through whatever procedures are provided for by existing contracts between authors and print book publishers.

In its terms defining rights and interests, and for resolving disputes between publishers and writers, the proposed settlement would affect not just relations with Google, but relations between publishers and authors. And the settlement would purport to release authors' claims against publishers (and against the Authors Guild and class counsel), although that wasn't disclosed in the settlement "notice". But the lawsuit never presented authors and publishers as adversaries (they were both plaintiffs) or provided a proper forum to resolve their many serious differences, not least over whether electronic rights are owned by print publishers or writers.

And why should Google have any say in labor relations, negotiations, agreements, terms of work and compensation, or modes of dispute resolution between print publishers and writers? As writers, we have enough difficulties and a sufficiently lopsided balance of power in negotiating contracts with print publishers without inviting Google or other electronic publishers into the negotiating room. Most pre-existing author-print publisher contracts already have specific terms for procedures and for the division of awards or settlements for copyright infringement claims (although it's unclear what effect those clauses would have on the settlement).

When you think about it, there's no reason for the settlement to mention "authors" or "print publishers" at all. The issue in the lawsuit is that Google infringed copyrights – not whether the relevant rights were owned by, or had been licensed to, publishers or authors or third parties, individually or jointly, exclusively or nonexclusively. Given that Google never tried to claim that it had purchased or licensed or owned any rights (their only claim was of so-called "fair use"), the question of who owned the rights in question was completely irrelevant to the question presented: Whether Google's actions had infringed the rights of whomever owned those rights?

Any settlement of the lawsuit against Google should have spoken solely of "holders of rights" to electronic publishing and usage of copyrighted works. Any disputes between print publishers and writers over who owns those rights, and how the revenues from them should be divided – and there have been, are, and will continue to be such disputes -- should be resolved *between print publishers and writers* through existing means, according to existing author-publisher contracts, through collective rights negotiations or through the courts or through other mechanisms provided by those existing agreements. Google is not a party to those disputes between authors and print publishers, and has no right to a place at the table in those proceedings.

### 3. What happens next?

Anyone who wants to opt out of the settlement, object to the settlement, intervene in the case as an additional party, file a "friend of the court" brief, or speak at the hearing on the proposed settlement (individual authors who object to the settlement have the right to speak for themselves "pro se" at the hearing, with prior notice, although they may get only a minute or two

each to talk to the Judge), must file their objections, notices, or legal briefs with the Court in new York by the close of business on Friday, September 4, 2009.

The judge hearing the case has scheduled a hearing on whether to approve the proposed settlement in Federal court in New York City on Wednesday, October 7, 2009. The date of the hearing may be changed, because the lead lawyer for the class of authors in the Google Books case, Michael Boni, is also the lead lawyer for the Authors Guild, the NWU, and the other authors in Reed Elsevier v. Muchnick, which is scheduled for oral argument in the Supreme Court that same day. There has also been some speculation that the hearing might be postponed to give the U.S. Department of Justice time to complete its antitrust investigation of the proposed settlement.

The judge could rule at the hearing on whether to approve the settlement, but most likely he will issue an opinion some days, weeks, or months later. It seems likely that the current settlement proposal may be rejected by the judge, for one reason or another.

If the proposed settlement is approved as is, authors who didn't opt out will then have another deadline by which to decide, on a book by book basis, whether to allow their books to be distributed and used by Google, or whether to opt individual books out of some or all of Google's proposed uses. That decision to opt out of some or all of Google's proposed uses is separate and different from the initial decision of whether to opt out of the entire proposed settlement.

If the proposed settlement is rejected by the judge, the case will proceed toward trial while the parties (or their lawyers) try to negotiate a new settlement to satisfy the judge's objections. A revised settlement could eventually be proposed. If that happens, there might or might not be another chance for authors to opt out of that proposed settlement or to be heard by the court.

If no settlement is ever approved, the case will eventually be decided either by the judge or a trial. Whatever the District Court decides, one of the parties or objectors is likely to appeal. No money is likely to be paid out until years from now, after any appeals are complete.

### 4. What are our choices?

As individual authors, our choices in the Google Books lawsuit are:

A) Do nothing. If you do nothing, you will be considered to have opted in by default. You will receive no money from Google or the settlement, but Google will be allowed to scan and use your books, and you will be legally bound by the settlement. While you could later ask to have your books excluded from "use" by Google, whether you own the necessary rights to be able to do so under the settlement will be decided by Google or the yet-to-created Registry, or through case-by-case binding arbitration. If you opt in (either by doing nothing, or by filing a claim) your acceptance of the arbitration clause of the settlement – including for disputes with your publisher about the ownership or revenue split for rights granted to Google – is irrevocable.

B) File a claim. This may involve complicated discussions with your print publisher(s), depending on how copyright for your books was registered and the terms of your contracts.

C) Object to the settlement. You can both object and file a claim, but if you do either, you are bound by any eventual settlement, even if you objected to the settlement terms. So there is a risk to objecting: If your objections are overruled, and the settlement is approved, you will be subject to the very settlement to which you objected. If you want to object solely on the grounds that the settlement doesn't protect the privacy of writers and readers, and allows Google to monitor who reads what, you can sign on to the brief being prepared by the Electronic Frontier Foundation.

D) Opt out of the settlement. If you opt out, you can neither file a claim nor object, but you are not bound by any settlement. Opting out is the safest choice.

E) Work with other writers and/or through writers' organizations, such as the NWU (some of which may seek to intervene in the case or file "friend of the court" briefs), lobby Congress, and/or engage in other activities outside of court.

As an individual author, doing nothing is almost certainly the worst possible choice. If you do nothing, you will get no money, but by default you will give up your rights and be bound by the settlement. The real choices are whether to opt out or make a claim, and whether to object and how to exercise your various choices under the settlement if you don't opt out.

Once again it's important to realize that there are two separate opportunities to opt out of different parts of the settlement. The first deadline (4 September 2009) is to decide whether to opt out of the entire settlement. If you opt in to the settlement (either by doing nothing or by making a claim), you can later decide to opt out of authorizing certain uses of your books or articles, but you are stuck with arbitration clause and other "Author-Publisher Provisions" in perpetuity. It's unclear what happens if you opt out of the settlement, but your publisher opts in, particularly if you have different opinions of who owns which rights to your work.

It's unclear to me, but many authors may also be eligible to participate in the settlement – and thus may have a choice of whether to opt out, object, and/or make a claim – as members of the "Publisher Sub-Class" as self-publishers (including self-publishers of electronic editions of works previously published by others in print form), although their claims to be the "publisher" of an electronic edition would likely be disputed by claims from the publisher of the original print edition to be the "publisher" of a potential electronic edition, with those disputes among those to be resolved through the "Author-Publisher Procedures" including binding arbitration.

I can't predict with certainty whether I would be determined to be a "Rightsholder". The claim form requires an author to chose either "I own the rights (including through reversion to me or my predecessor in this interest from the publisher)", "Rights have not reverted to me (or my predecessor in this interest) from the publisher", or "I do not know if the rights have reverted". It's unclear what you are supposed to say if you own some but not all rights, if some but not all rights have reverted, or if rights haven't reverted because they were never assigned.

After much thought, I've decided to opt out. I have strong objections, but I can't afford to take the risk of being subject to the settlement if it is approved in its present form. (I'm also sending a copy of this article to the court, although since I've opted out, the court doesn't have to consider it.) I hope that the court will give special consideration to the objections of organizations such as the National Writers Union, in recognition of the fact that those authors with the strongest objections will, as individuals, opt out, and won't be heard by the court.

Edward Hasbrouck

Note: I am not a lawyer. This article is written purely in my individual capacity, and should not be taken as indicative of the views of any organization (including those of which I am a member). Nor should any of my comments about publishers or publisher-author relations be taken as indicative of anything about any of the publishers of my own work, or my relations with them. This article is not intended to advocate any specific choices for individual authors

Appendix: Links to Web sites for further information and opinion, pro and con (mostly con)

**Some links for further information about the proposed Google Books settlement**
**http://hasbrouck.org/blog/archives/001703.html**

Google Books and Writers Rights (most recent version of this article):
  http://hasbrouck.org/articles/GoogleBooks-WritersRights.pdf

Previous misconduct by authors' lead lawyer Michael Boni:
  http://hasbrouck.org/blog/archives/000812.html

Science Fiction & Fantasy Writers of America: "The settlement should be rejected by the court":
  http://www.sfwa.org/2009/08/sfwa-statement-on-proposed-google-book-settlement/

National Writers Union statement opposing the proposed settlement:
  http://www.nwuboston.org/google/pr.html
  http://www.nwuboston.org/google/pr.pdf

Objections by author and attorney Scott E. Gant (quoting and including the NWU press release):
  http://graphics8.nytimes.com/packages/pdf/technology/Gant_Objection.pdf

Electronic Frontier Foundation (if you want to sign on to EFF's brief as an objector):
  http://www.eff.org/issues/privacy/google-book-search-settlement

ACLU letter-writing campaign to Google (not formal objections to the court):
  http://www.aclunc.org/googlebooks

Electronic Privacy Information Center (focuses on privacy issues, but also a good overview):
  http://epic.org/privacy/googlebooks/

Open Book Alliance:
  http://www.openbookalliance.org/

Official information from the settlement administrator, including PDF of the complete proposal:
  http://www.googlebooksettlement.com/

HTML version of the settlement text (easier to follow than PDF) with comments and discussion:
  http://thepublicindex.org/

Documents filed with the court (unofficial collection via Justia.com):
  http://news.justia.com/cases/featured/new-york/nysdce/1:2005cv08136/273913/

Friend-of-the-court briefs, objections, and opt-outs (unofficial collection via ThePublicIndex.org)
  http://thepublicindex.org/documents/responses

Writer Anita Bartholemew, objector in Reed Elsevier v. Muchnick, recommends writers opt out:
  http://editorialconsultant.wordpress.com/

"I have opted out of Google, and I'm urging others to do the same" (Irv Muchnick):
  http://www.beyondchron.org/news/index.php?itemid=6857

Irv Muchnick blogs about Reed Elsevier v. Muchnick and the proposed Google Books settlement:
  http://freelancerights.blogspot.com/

Authors Guild supports the proposed settlement:
  http://www.authorsguild.org/advocacy/articles/settlement-resources.html

Google supports the proposed settlement:
  http://books.google.com/googlebooks/agreement/

Google Book Settlement and European Authors (Gillian Spraggs; also relevant to US authors)
  http://www.gillianspraggs.com/gbs/google_settlement.html
  http://www.gillianspraggs.com/gbs/google_book_settlement_and_european_authors.pdf

Gillian Spraggs blogs about the proposed settlement:
  http://wolfinthewood.livejournal.com/

Google Settlement Steals Rights and Rewards Appropriation (media prof. Robert G. Picard):
  http://themediabusiness.blogspot.com/2009/08/google-settlement-steals-rights-and.html

Law prof. James Grimmelmann blogs about the proposed settlement:
  http://laboratorium.net/

Scrivener's Error: Author's Guild v. Google (an author blogs about the proposed settlement):
  http://www.scrivenerserror.com/weft/aggoogle2.shtml

The Google Book Settlement's accounting details are ugly, the default assumptions worse... (by
literary agent and lawyer Lynn Chu):
  http://www.writersreps.com/feature.aspx?FeatureID=157

FAQ on the Google Book Settlement (by Lynn Chu):
  http://www.writersreps.com/feature.aspx?FeatureID=158

WritersReps.com (see sidebar for links to more by Lynn Chu about the Google settlement):
  http://www.writersreps.com/

Video of panel about the proposed settlement with Google's lead counsel Alexander Macgillivray,
including my questions (at the Computers, Freedom, and Privacy conference, June 2009):
  http://www.ustream.tv/recorded/1596405

Audio of publishers' panel about Google Books at BookExpoAmerica, May 2009:
  http://bookexpocast.com/2009/07/23/google-book-search-library-project/

Google & the Library (by writer & publisher Karen Christensen, 2005):
  http://www.berkshirepublishing.com/blog/?p=1461

What others are saying about the proposed settlement (quotes collected by Gillian Spraggs):
  http://www.gillianspraggs.com/gbs/links.html

The economics of e-books (November 2003; my reaction to Google's book original plans):
  http://hasbrouck.org/blog/archives/000057.html

Writing and Publishing (more from this category of my blog):
  http://hasbrouck.org/blog/archives/cat_writing_and_publishing.html



# Edward Hasbrouck's blog

<u>« USA Today on holiday flights</u> | <u>Blog Home Page</u> | <u>"The Amazing Race 8: Family Edition" broadcasts start this Tuesday; "The Amazing Race 1" on DVD »</u>

# Saturday, 24 September 2005

### Lies from "my" lawyers in copyright class action lawsuit

On the eve of the court hearing scheduled for this coming Tuesday to decide whether to approve a <u>proposed settlement</u> giving the *New York Times* and its co-defendant copyright infringers future rights in perpetuity to sell, license, and sublicense the electronic rights to freelance articles that they've been stealing for years, the *Times* this past Monday began <u>charging new fees</u> (a US$50 monthly subscription fee and/or a per-article fee, none of which goes to the authors) for online access to articles (including those to which the *Times* has never paid for, nor acquired, the electronic rights).

The *Times* has been <u>gearing up</u> for this for months. So it's odd that they launched the new subscription fee and services now, rather than waiting a week for the settlement granting them rights to be approved. But their greed is, apparently, impatient. Clearly this is their attempt to monetize, as quickly as possible and without even waiting to get the settlement approved, the value of the settlement's grant of future electronic rights to freelance work.

<u>TimesSelect</u> has been launched with intense <u>promotion</u> including an 8-page insert in Monday's print edition, and has prompted a lot of discussion in print and the blogosphere this week on the value of electronic rights to archived articles.

For example, the boldface money quote in <u>this article</u> is from Scott Heekin-Canedy, President & General Manager, The New York Times: "Our research very strongly supports willingness to pay far beyond what we're charging."

<u>Editor & Publisher</u> says:



**NEWSLETTER**

Subscribe to my e-mail newsletter:

( Subscribe ) <u>AOL users click here!</u>

<u>Subscribe to notifications of new entries in this blog (by topic category)</u>

**AROUND-THE-WORLD AIRLINE TICKETS**



<u>Around-The-World and Multi-Stop International Airline Tickets</u>

<u>Airtreks.com (USA and worldwide)</u>
<u>Long Haul Travel (Canada)</u>

**ONE-WAY, ROUND-TRIP, AND DOMESTIC TICKETS**

Martin Nisenholtz, president of New York Times
Digital, says the catalyst for the shift in strategy is to
build a significant online revenue stream on top of
advertising.... Nisenholtz is convinced that
TimesSelect has a good shot at achieving that goal....
He points out that NYTimes.com has offered a number
of piecemeal premium services in the past, but in
aggregate they only brought in a couple million dollars
a year. The ambition is to have a much larger revenue
stream. He's looking for significant numbers. The goal
won't be met with TimesSelect subscription numbers in
the tens of thousands, Nisenholtz says; it needs to be in
the hundreds of thousands in the early years, and even
more over the long term.

At US$50 per month per subscriber, that adds up.

And the *Times* and its co-defendants in the copyright class
action lawsuit are proposing a settlement that values rights in
perpetuity to the freelance portion of the *Times* archives, *and*
those of tens of thousands of other publishers, *and* the entirety
of over 100,000 books included in Amazon.com's "Search
Inside the Book", at US$10-18 million?

Given the value they place on electronic rights, I assume the
reason the *Times* didn't start charging for electronic access
sooner is that they didn't want to call attention -- while the
settlement negotiations were going on, and while authors still
had the opportunity to demand more in the settlement, or to opt
out of the settlement -- to how much more valuable the rights
they are getting will be to them than the amount they will pay in
the settlement.

The deadline for writers to opt out of the proposed settlement
was Monday, 12 September 2005. The new "TimesSelect"
scheme went into effect at the start of the very next week, on
Monday, 19 September 2005.

The timing... well, you can draw your own conclusions.

The settlement sucks , and the lawyers who purport to represent
writers are lying to the Federal Court hearing the case, to try to
justify the sell-out.

Some of those lies relate directly to my conversations with
counsel for the class and for one of the organizations to which I
belong, the National Writers Union. I've opted out of the class
subject to the settlement in order to preserve my rights even if
the settlement is approved. But I also felt obligated, once I knew
that "my" lawyers were lying about me in their pleadings, to
send the following e-mail message today regarding this:

**From: "Edward Hasbrouck"**
edward@hasbrouck.org
**To:** mboni@kohnswift.com , ajd@girardgibbs.com ,
drice@hosielaw.com
**Cc: Copyright Class Action counsel and parties**
**Date: Sat, 24 Sep 2005 18:02:02 -0800**
**Subject: False statements in your memo**

It has come to my attention that your "Memorandum of
Law in Support of Plaintiffs' Motion for Final
Settlement Approval" in "In Re Literary Works In
Electronic Databases Copyright Litigation", contains
materially false statements of material facts, which you
knew to be false when you filed that memo.

I found a copy of your memo , signed by Mr. Boni over
the names of himself and co-lead class counsel and
dated 19 September 2005, at:

http://www.asja.org/media/nr050329b.pdf

To my personal knowledge, on the basis of my e-mail
correspondence and telephone conversation with you,
you were personally aware of the falsehood of the
following two claims in your memo:

(1) "None of the thousands of visitors to the
Associational Plaintiffs joint website has voiced any
criticism of the Settlement." (section III ( C )(2), page
22 of your memo)

(2) "Neither the author nor Chalmers claims that the
book in question has ever been copied by any Defense
Group member." (section III (E)(3)(a), pages 49-50 of
your memo, referring to me as "the author" and to one
of my books as "the book in question")

I am writing to make sure that all class counsel and
other parties to the case, and of course the Court, are
aware that you as class counsel have lied to the Court
in your pleadings.

I don't know if this is a crime, a tort, professional
malpractice, an attempt to perpetrate a fraud on the
Court, misconduct as an officer of the Court, some of
the above, or all of the above.

I do know that it is wrong, unethical, and offensive.

As you know, I have opted out of the settlement, as
explained in my declaration filed with the Court and
posted at:

http://hasbrouck.org/articles/
copyrightclassaction.pdf

As you know, I was unable to use the form on the Web
site for the proposed settlement to seek advice as to
whether I was a member of the class eligible to submit
a claim or to object to the settlement. This was because
the form to submit "comments" requires as a condition
of submitting a comment that the would-be commenter
check a box labelled, "By checking the "I Agree" box, I
hereby certify that I am a class member," which I
couldn't certify because I didn't know and was trying to
find out.

Being unable to obtain advice through the Web form, I
sent an e- mail message on Thursday, 1 September
2005, to the address on the Contact Us page of the Web
site, "CopyrightSettlement@girardgibbs.com".

Having received no response to that e-mail message, I
sent a follow-up e-mail message on Wednesday, 7
September 2005 to the individual e-mail addresses
given in the detailed settlement notice for each of the
three co-lead class counsel. If you don't keep copies of
the e-mail messages you receive from clients, it has
been posted (with my permission) at:

http://freelancerights.blogspot.com/2005/09/author-
edward-hasbrouck-why-im-opting.html

The three addressees of this message were three of the
four names that appeared as "Co-Lead Class Counsel"
on your memo of 19 September 2005.

I know from their responses that **at least** two of the
three of your firms received that message, and thus
were aware that I, as a visitor to the Associational
Plaintiffs' Web site, had voiced criticisms of the
proposed settlement.

(For the record, many others voiced criticisms of the
proposed settlement in forums in which I participate as
a freelance writer and as a member of one of the
associational plaintiffs, the National Writers Union.)

I received a response by e-mail on Friday, 9 September
2005, from a paralegal at class counsel Girard Gibbs &
De Bartolomeo.

I received a voicemail message later that same day,
Friday, 9 September 2005, from a person who
identified himself as Michael Boni , and asked me to
call him back at 215-238-9570. I called that number,

and my call was answered by what sounded like the same person who again identified himself as Michael Boni. Mr. Boni and I then spoke for about half an hour.

At the start of the call, Mr. Boni volunteered that he understood from reading my e-mail message that I had unable to use the Web comment form, and had not received a response to my e-mail to the address on the Web site. "I apologize for that, and that a lawyer didn't contact you sooner," he said.

Next Mr. Boni asked me what my status was with respect to the proposed settlement. I explained that my problem, with which I was seeking the assistance of class counsel as my attorneys, was that I was unable to determine whether I was a member of the class. I made clear that it was a criticism of the proposed settlement that I and others similarly situated could not determine whether or not we are members of the class eligible to participate. It was clear to me that Mr. Boni understood this to be a criticism of the proposed settlement, even though he was not persuaded that it was a justified criticism.

After receiving my e-mail, and after our conversation, how could you sign a memo stating in its description of "The Reaction of the Class to the Settlement" (section III ( C )(2), page 22), that "None of the thousands of visitors to the Associational Plaintiffs joint website has voiced any criticism of the Settlement"?

I had voiced such criticism directly to you, and you knew of my inability to use the Web comment form and the lack of response to e-mail sent to the address on the Web site.

The description of the proposed settlement in section II ( C )(1)(a) at page 6 of your brief erroneously describes the "Defense Group" as consisting only of (1) certain named database operators and (2) certain named newspaper publishers.

In fact, as I pointed out in my e-mail message, and again during our conversation, the definition of "Defense Group" in section (1)(h) of the proposed settlement also includes their "affiliates".

Similarly, the "Released Claims" as defined in section (1)(n) of the proposed settlement include claims against "all of their past, present, and future ... affiliates ... and all of their respective ... licensees".

According to the Supplemental Notice of Settlement,
Amazon.com is, or purports to be (I do not concede that
Amazon.com has any valid license to my work) a
"licensee" of "one or more of the Database defendants".
And Amazon.com says on its Web site that it has "over
1,000,000" affiliates:

http://www.amazon.com/gp/browse.html/?
node=3435371

So, as I pointed out to you in my e-mail message to you
and in our phone conversation, whether I or any other
author whose work was infringed by Amazon.com's
Search Inside The Book program is a member of the
class eligible to participate in the settlement, and
whether my and others' claims against Amazon.com
would be released by the settlement, depends on the
terms of Amazon.com's "license", and on whether
Amazon.com and any member(s) of the Defense Group
are among each other's million and more "affiliates".

I asked you specifically whether I was a member of the
class. You said you didn't know, and you could suggest
no methodology by which I could determine that.

I asked you whether my works were included in
Amazon.com's "license". You said you didn't know,
and you could suggest no methodology by which I
could determine that.

I asked you whether Amazon.com and any member(s)
of the defense group were "affiliates". You said you
didn't know, and you could suggest no methodology by
which I could determine that.

But in section III (E)(3)(a) at pages 49-50 of your brief,
you say with respect to my book, and me as its author,
"Neither the author nor Chalmers claims that the book
in question has ever been copied by any Defense Group
member."

You know that this statement in your brief is not true.

I **had** made such a claim, to you, both in my e-mail --
which you acknowledged to me that you received -- and
during our phone conversation.

I claimed (and continue to claim) that Amazon.com
has copied my book, and that Amazon.com is probably
a Defense Group member as an affiliate and/or licensee
of one or more of the Database Defendants.

Why did you lie to the Court and deny that I had made this claim to you?

Your brief continues, "the work [i.e. my book] gives rise to no claim and is subject to no release under the Settlement".

If you knew that I had no claim, why did you tell me you did not know, and had no way to determine, whether the infringement of my book by Amazon.com made me eligible to make a claim?

Why did you tell me one thing -- as your client who was seeking your advice as my legal counsel in this matter, as a member of one of the Associational Plaintiffs you represent, and a possible member of the class you claim to represent -- and tell the Court something contrary in your brief? Whose interests were you actually representing when you spoke with me? And if that's what happened to me, as someone who actually persevered until I got a response from class counsel, what does that say about the advice that other potential claimants did or didn't receive?

I believe that the most appropriate form of apology and redress would be for you to withdraw your motion for approval of the proposed settlement (including its provisions with respect to attorneys' fees) and any motions for attorneys' fees, withdraw your appearance as counsel for the National Writers Union (of which I am a member) and for the class, and release the National Writers Union and all of its present and past officers from the obligations contained in section 9, pages 24-25 of the proposed settlement agreement with respect to their support for the proposed settlement agreement and their communications with their members, other potential members of the class, and the public.

Should you decline to do the right thing, and withdraw yourselves and your motions from this case, I will have no recourse other than to ask the Court, and/or other disciplinary bodies with jurisdiction over your professional misconduct, to impose appropriate sanctions including, but not limited to, the denial of your motions for approval of the proposed settlement and award of fees. I would find it unconscionable, as I trust the Court would, to award fees to you for such misconduct.

I am copying this message to all class counsel and to all other interested counsel (as identified from those

other pleadings in this case which I have seen) whose e-mail addresses are known to me.

I am also copying this to several officers of the National Writers Union, the Associational Plaintiff on whose behalf (among others) you filed your memo, and of which I am a member, so that they will be aware that knowingly false statements have been made to the court by you as NWU counsel, and that I as a member of the NWU have been misrepresented by you as NWU counsel. And for the benefit of others who might be misled by the false claims in your memo, I am posting this in my blog at:

http://hasbrouck.org/blog/archives/000812.html

I look forward to your prompt response before the hearing on your motions currently scheduled for this Tuesday in New York.

Sincerely,

Edward Hasbrouck

Link | Posted by Edward on Saturday, 24 September 2005, 14:49 ( 2:49 PM) | TrackBack (1)

## COMMENTS

## POST A COMMENT

Name:

Save personal info as cookie?
○Yes  ●No

Email Address:

URL:

Comments:

So that I know you are a human and not a comment spam-bot, enter "travel" (without the quotation marks) in

## Certificate of Service

I, Edward John Hasbrouck, certify that I have this day served complete copies of (1) my 4-page letter dated 31 August 2009 to District Judge Denny Chin, "Re: The Authors Guild, Inc., et al. v. Google Inc., No. 05 CV 8136", (2) two attached articles, "Google Books and Writers Rights" (10 pages) and "Lies from 'my' lawyers in copyright class action lawsuit" (8 pages), and (3) this certificate of service, by (a) sending copies by electronic mail, as attachments in PDF format, to each of the e-mail addresses below and (b) depositing sealed envelopes with the U.S. Postal Service, with first-class postage affixed, containing a complete set of photocopies, addressed to each of the postal addresses below.

Executed in the City and County of San Francisco, California, USA
31 August 2009

*Edward John Hasbrouck*

Edward John Hasbrouck

Office of the Clerk of Court (for filing)
U.S. District Court for the Southern District of N.Y.
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

Google Book Search Settlement Administrator
c/o Rust Consulting
PO Box 9364
Minneapolis, MN 55440-9364

Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts & Kent LLP
32 Pine St., Ste. 200
San Francisco, CA 94104
bookclaims@durietangri.com