
Competitive Enterprise Institute


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-9-09

September 4, 2009

**BY FAX (212) 805-7906**
The Honorable Denny Chin
United States District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

**Re: The Authors Guild et al. v. Google, Inc. Case No. 1:05 cv8136 (S.D.N.Y)**

Dear Judge Chin:

The Competitive Enterprise Institute, a 501(c)(3) non-profit public interest organization that studies the intersection of risk, regulation and markets, hereby requests the Court's permission to submit this letter as an amicus curiae in *The Authors Guild et al. v. Google, Inc.*

Several organizations have criticized the Google Book Settlement on the grounds that it fails to adequately safeguard user privacy. A brief filed by the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries states that the Settlement "does not specify how Google and the Registry will protect user privacy."[1] Additionally, the Electronic Frontier Foundation (EFF) has announced its intention to object to the Settlement on privacy grounds and has encouraged rightsholding authors to grant EFF "affirmative approval to file on their behalf."[2] EFF argues that the Settlement should include "protections for reader privacy" and has stated that it may demand that the Court "disapprove the settlement until it has sufficient protections for authors and their readers."

Privacy concerns are important. However, as shown below, they should not determine this Court's evaluation of the proposed settlement. The data collection restrictions proposed by the aforementioned groups and others would reduce Google's incentive to scan books, deprive rightsholders of revenues, and ultimately hurt Google Book Search users.

Imposing stringent limits on data collection would undermine Google's ability to deliver precisely targeted advertisements to Google Book Search users, making it less likely that users see

---

[1] Library Association Comments on the Proposed Settlement filed by The American Library Association (ALA), The Association of College and Research Libraries (ACRL), and The Association of Research Libraries (ARL). (May 4, 2009) http://www.scribd.com/doc/14955716/ALA-ACRL-ARL-Google-Book-Settlement-Brief
[2] Electronic Frontier Foundation, "Google Book Search Settlement and Reader Privacy." (July 2009) http://www.eff.org/issues/privacy/google-book-search-settlement

-1-

1899 L Street NW, 12th Floor • Washington, DC 20036 • Phone 202.331.1010 • Fax 202.331.0640
www.cei.org • www.globalwarming.org • www.libertyweek.org • www.openmarket.org

advertisements that interest them.[3] Worse, data collection limits would make it harder for advertisers to target a desired audience, depressing the value of advertisements.[4] This would undercut Google's incentive to scan books by depressing the potential revenues Google could earn from its Book Search service. Data collection limits also mean rightsholders will earn less, as they are entitled to 63 percent of Google Books advertising revenues by the Settlement.[5] Data collection limits, therefore, would harm the *very class of rightsholders* that the Court is tasked with protecting.[6]

EFF and others have equated the Google Books service with traditional public libraries, which in many states face strict legal restrictions on the recording and disclosure of individuals' reading histories.[7] But bricks-and-mortar libraries are hardly the same as digital ones. While over a dozen states have enacted laws that govern library records, as the ALA and others note, such laws generally apply exclusively to government-operated libraries or libraries that receive public funds. Libraries may resemble Google Book Search in that both enable members of the general public to access books, but the business model that sustains non-profit libraries differs substantially from that which will sustain Google Books.[8]

Demands that Google Books collect minimal user data for the sake of privacy ignore the many benefits that data collection can deliver. Targeted advertising is playing an increasingly important role in online advertising, fueled by data collection about specific users.[9] Many of the most popular Internet destinations today are sustained in large part by advertising, including numerous news sites, blogs, search engines, and e-mail services. The vast majority of Google's total revenue comes from advertising, enabling Google to offer a number of free services to consumers that would otherwise cost money, such as Gmail and Google Maps.[10] In the same vein, Google Books will be financially supported in part by advertisers, and thus data collection will play an important role in financing the scanning and indexing of books, including orphan works. *In short, limits on data collection, while supposedly aimed at benefiting users, would in fact end up injuring them by reducing quantity of books available to them.*

The Google Book Settlement will not prevent individuals from visiting libraries and reading or checking out books anonymously. In fact, according to ALA et al., the Settlement "could advance the core mission of the Library Associations and their members," meaning privacy-conscious individuals

---

[3] Szoka, Berin & Thierer, Adam, "Online Advertising & User Privacy: Principles to Guide the Debate" Progress and Freedom Foundation Progress Snapshot. (September 2008) http://www.pff.org/issues-pubs/ps/2008/pdf/ps4.19onlinetargeting.pdf
[4] Szoka, Berin & Thierer, Adam, "Targeted Online Advertising: What's the Harm & Where Are We Heading?" Progress and Freedom Foundation Progress on Point. (June 2009) http://pff.org/issues-pubs/pops/2009/pop16.2targetonlinead.pdf
[5] Krazit, Tom, Cnet News, "An author's guide to the Google Books flap" (September 1, 2009) (http://news.cnet.com/8301-30684_3-10322574-265.html
[6] Radia, Ryan, Washington Examiner Opinion Zone, "Is Google book deal a threat to privacy?" (August 20, 2009) http://www.washingtonexaminer.com/opinion/blogs/Examiner-Opinion-Zone/Is-Google-book-deal-a-threat-to-privacy-53812257.html
[7] Neuhaus, Paul, Carnegie Mellon University, "State Laws on the Confidentiality of Library Records." (April 20, 2005) http://eps.library.cmu.edu/rooms/documents/libraries-and-collections/People/neuhaus/state_laws2.html
[8] Bogatin, Donna, ZD Net Digital Markets, "Google: Advertising supported books?" (January 22, 2007) http://blogs.zdnet.com/micro-markets/?p=890
[9] Lenard, Thomas and Rubin, Paul, Technology Policy Institute, "In Defense of Data: Information and the Costs of Privacy." (May 2009) http://www.techpolicyinstitute.org/files/in%20defense%20of%20data.pdf
[10] See Google Inc. First Quarter 2008 Results, "Total advertising revenues: 99%" http://investor.google.com/releases/2008Q1_google_earnings.html

-2-

would be able to continue to enjoy anonymously reading books. Under the Settlement, users worried about privacy will be able read Google's privacy policy and choose for themselves whether to use Google Books or stick with libraries. Just as some people find tangible books more accessible than digital books, some users may prefer the anonymous nature of libraries and continue to rely on them regardless of what Google Books offers. Thus, even if Google Books offers privacy protections or data collection practices that many users find unacceptable, those users will simply seek out alternative book outlets. There is no reason, therefore, to expect that the Settlement will result in any *net decrease* in reader privacy—no matter what policies Google ultimately adopts.

Moreover, the privacy concerns that have been raised with regard to the Settlement are highly speculative in nature. Proponents of strict limits on data collection have provided no concrete evidence that the nightmare scenarios they envision will actually occur.[11] There is no reason to believe that Google or any other parties to the settlement will actually create or share reader "dossiers" with irresponsible parties or that Google will collude with government to turn over sensitive information without being ordered to do so by a court of law. In fact, Google has a history of vigorously resisting government data requests if it deems them invalid; in 2006, Google successfully fought a request from the U.S. Department of Justice that it hand over logs containing millions of user search queries.[12]

Empirical evidence further calls into question the privacy objections to the Settlement. Indeed, today's digital book marketplace demonstrates that reader privacy and data collection can peacefully coexist without government dictating privacy policies. A number of firms currently offer books in digital format for purchase to U.S. consumers. One such firm, Amazon.com, sells an electronic book reading device called Kindle. Amazon.com has sold millions of digital books since Kindle's launch in 2008.[13] Amazon.com captures records of all the books that its users purchase, subject to a privacy policy that Amazon.com formulated voluntarily without prompting from any governmental body.[14] Despite Amazon.com's collection of user data into so-called "dossiers," however, no reports have been brought to light that indicate that any Kindle user's privacy has been violated.[15]

Amazon.com's privacy policy is not an anomaly in the online world; far from it, nearly all major online firms that record potentially sensitive user data in the course of business maintain similarly strong privacy policies governing user information. To the extent that users care about their privacy, they can and do take it into consideration in deciding which online services to use. In fact, several major online firms such as Yahoo!, tout their own unique privacy practices as product differentiators aimed at attracting more users.[16] As such, concerns that Google, left to its own devices, would

---

[11] See Center for Democracy & Technology's "Privacy Recommendations for the Google Book Search Settlement." (July 27, 2009) http://cdt.org/copyright/20090727_GoogleRecs.pdf

[12] *Alberto R. Gonzalez v. Google, Inc.*, Case 5:06-mc-80006- JW. (March 17, 2006) http://www.google.com/press/images/ruling_20060317.pdf

[13] Schonfeld, Erick. "How Big Can The Kindle Get?" TechCrunch. (May 7, 2009) http://www.washingtonpost.com/wp-dyn/content/article/2009/05/07/AR2009050702188.html

[14] See Kindle's Terms of Service (http://www.amazon.com/gp/help/customer/display.html?nodeId=200144530) and Amazon.com Privacy Notice (http://www.amazon.com/gp/help/customer/display.html?nodeId=468496) (accessed September 4, 2009)

[15] See EFF's "Google Book Search Settlement and Reader Privacy" and CDT's "Privacy Recommendations for the Google Book Search Settlement."

[16] Albanesius, Chloe. *PC Magazine*, "Yahoo Cuts Data Retention Time to Three Months." (December 17, 2008) http://www.pcmag.com/article2/0,2817,2337078,00.asp (In December 2008, Yahoo announced it would cut user search

disregard or inadequately protect reader privacy if the Settlement were approved ignore the overwhelming market pressure on Google to safeguard sensitive data just as diligently as it has with other products such search and e-mail. While individualized reading histories are intimately personal, individualized search query histories are arguably even more intimate.

Privacy technologies and policies are evolving at a breakneck pace. New tools aimed at empowering users to selectively block the transmission of sensitive data online are coming to the market all the time.[17] As such, carving Google Book Search data collection rules in stone in 2009, as some groups have proposed, would be premature.[18] Indeed, even a data collection policy that seems reasonable today may end up severely hindering Google Books a few years down the road as advertising platforms mature.[19] Flexible, market-driven privacy protections have served consumers remarkably well for over a decade, and there is no reason to believe that Google Book Search endangers privacy any more so than a number other services that have a strong privacy track record.

Balancing user privacy protections with the need for data mining and collection is a task best left to Google and its competitors, who are subject to market pressures and competitive discipline. While privacy is an important value, the privacy objections described above should not affect this Court's decision on the Settlement.

Respectfully submitted,

*[signature]*

Ryan Radia
Information Policy Analyst
Competitive Enterprise Institute

Cc: Michael Boni, Boni & Zack, LLP (bookclaims@bonizack.com)
Jeffrey Cunard, Debevoise & Plimpton, LLP (bookclaims@debevoise.com)
Daralyn C. Durie, Durie Tangri Lemley Roberts & Kent, LLP (bookclaims@durietangri.com)

---

query data retention time from thirteen to three months, which at the time resulted in Yahoo! maintaining the smallest data retention window of all major search providers.)
[17] Gohring, Nancy, IDG News Service, "EFF: Technology Can Help in Absence of Privacy Laws." (August 5, 2009) http://pcworld.about.com/od/securit1/EFF-Technology-Can-Help-in-Ab.htm
[18] Kaste, Martin, NPR Morning Edition, "Google Deal With Publishers Raises Privacy Concerns." (August 12, 2009) http://www.npr.org/templates/story/story.php?storyId=111797207
[19] Crews, Wayne and Radia, Ryan, *San Jose Mercury News*, "Rigid Federal Mandates Hinder Privacy Technologies." (June 15, 2008) http://www.mercurynews.com/opinion/ci_9593341