

UNIVERSITY OF CALIFORNIA

**PAMELA SAMUELSON**
Richard M. Sherman Distinguished
Professor of Law

University of California, Berkeley
School of Law
434 Boalt Hall NA
Berkeley, CA 94720
Tel: 510-642-6775
Fax: 510-643-5814

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-9-09
```

September 3, 2009

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York NY 10007

Attention: The Honorable Denny Chin

Re: Academic Author Objections to the Google Book Search Settlement,
    Case No. 1:05-CV-8136-DC (S.D.N.Y.)

Dear Judge Chin:

The signatories of this letter are academic authors who object to the Google Book Search Settlement on the grounds that the Authors Guild and the named individual author plaintiffs did not adequately and fairly represent the interests of academic authors during the litigation and the negotiations that produced this agreement.[1] The purpose of this letter is two-fold: first, to identify some terms in the Settlement Agreement that run counter to academic author interests and norms, and second, to urge you to condition your approval of the Settlement Agreement on modification of various terms identified herein so that the Agreement will be fairer and more adequate toward academic authors who constitute a far more sizeable proportion of the Author Subclass than the members of the Authors Guild do.

As scholars, researchers, and authors, we support the digitization of books for purposes of making the knowledge embodied in this part of the cultural heritage of mankind more accessible. The settlement, if approved, will unquestionably bring about greater access to public domain and out-of-print books. But we are seriously worried about how the settlement will affect the cultural ecology of public access to books, transforming the public good of the traditional library into a commercial enterprise controlled by two complementary monopolies, Google and the Book Rights Registry.

This letter has four parts. Part I discusses reservations that grow out of our overarching concern that neither the Authors Guild nor the individual plaintiff-authors in the *Authors Guild v. Google*

---

[1] Bellovin, Borgman, Bowker, Butler, Cohen, Crews, Cronin, Cuff, Drucker, Duguid, Elman, Gideonse, Glushko, Hesse, Hoffman, Justice, Kang, Litman, Loren, Maldonado, Nimmer, Nunberg, Pitman, Radin, Reese, Samuelson, Saxenian, Solove, Spafford, Strandburg, Sullivan, Tanaka, Vaidhyanathan, von Hippel, and Weinstein are among the signatories to this letter who hold a U.S. copyright interest in one or more published books and hence are members of the Author Subclass. Most other signatories (other than law professors) are members of the Author Subclass by virtue of the book-bound copies of their Ph.D. dissertations filed in research libraries of the universities from which they received their degrees.

case have fairly and adequately represented the interests of academic authors during the litigation or in the course of negotiations that led up to the proposed settlement. It gives numerous examples of terms in the Settlement Agreement that are antithetical to academic author interests. Part II explains why the opacity of the settlement agreement and the parties' intentions with respect to it have made it difficult for many authors, especially academic authors, to make well-informed decisions about how to respond to it. Part III highlights what Berkeley historian Carla Hesse has called the "too big to fail" problem with the Settlement Agreement. Part IV recommends that the court ask the parties to the Settlement Agreement to modify or supplement it to address academic author concerns.

I. The Author-Plaintiffs Did Not Adequately and Fairly Represent the Interests of Academic Authors On Numerous Important Issues.

An important policy underlying Rule 23's requirement that named plaintiffs in class action lawsuits fairly and adequately represent the interests of the defined class is to prevent collusion between plaintiffs and defendants that would achieve an outcome beneficial for them, but not so much for other class members whose rights are being affected. With the powerfully strong commercial interests at stake in the *Authors Guild v. Google* case, there is reason to be concerned that the Settlement Agreement with its extensive new regime for rights clearances, procedures for determining the copyright and in- or out-of-print status of books, criteria for price setting for subscriptions, payout schedules, and dispute resolution, among others, is one that may serve well the interests of those who negotiated the settlement, but not necessarily a majority of class members, including but not limited to academic authors.

Herbert Mitgang, Betty Miles, and Daniel Hoffman (none of whom is an academic author) initiated a class action lawsuit against Google in September 2005, charging it with copyright infringement for unauthorized scanning books for purposes of indexing them and making snippets available. (The Authors Guild was named as an associational plaintiff in the case.) The complaint defined the class on whose behalf the lawsuit was brought as "all persons or entities that hold copyright to a literary work that is contained in the library of the University of Michigan."[2]

We very much doubt that this class could have been certified for at least two reasons. First, we do not believe that the three author-plaintiffs could have fairly and adequately represented the interests of publishers who were rights holders in respect of many books in the University of Michigan library, especially after five major publishers brought a separate and similar lawsuit against Google two months later. But secondly, and for purposes of this letter more importantly, Mitgang and his co-plaintiffs have interests and legal perspectives that are significantly different from those of many academic authors whose books are in the Michigan library.

We believe, for example, that most academic authors would be inclined to agree with the signatories of this letter that scanning books to index them and make snippets available is likely

---

[2] Class Action Complaint, Authors Guild v. Google, Inc., No. 05 CV 8136, Sept. 20, 2005, parag. 20.

and should be considered fair use.[3] Consequently, Mitgang, Miles, and Hoffman could not fairly and adequately represent the interests of all author-members of the defined class because the legal perspectives of academic authors on the core issue in that lawsuit diverge so sharply from theirs.[4]

The non-representativeness of Mitgang, Miles, and Hoffman is even more profound in respect to the proposed Settlement Agreement. The extraordinary range of issues addressed and resolved in this agreement dwarfs the fair use issue on which the litigation was focused. In addition, the vastly broadened class on whose behalf the settlement is being proposed inevitably has more diverse interests and legal perspectives than the three named plaintiffs.[5] Owing to U.S. treaty obligations, the class now essentially comprises all rights holders of all in-copyright books in the world. Mitgang, Miles and Hoffman cannot possibly represent all of the authors who are members of the proposed settlement's author subclass, as the interests of authors vary quite substantially. The named plaintiffs seem, in any event, to have delegated responsibility for negotiating author class interests in a settlement to the Authors Guild, but the Guild has not adequately and fairly represented academic author interests either.

Academic authors would, we believe, have insisted on much different terms than the Authors Guild did, especially in respect of pricing of institutional subscriptions, open access, annotation sharing, privacy, and library user rights to print out pages from out-of-print books. Academic authors would also have pushed harder than the Authors Guild seems to have done for more researcher-friendly non-consumptive research provisions and for commitments to quality scans and metadata.

**A. Pricing.** Academic authors would have insisted that the settlement include criteria for pricing of institutional subscriptions that would meaningfully limit the risks of price-gouging. Section 4.1(ii) sets forth criteria which Google and the Registry plan to use to determine the price of institutional subscriptions: "pricing of similar products and services available from third parties, the scope of Books available, the quality of the scan and the features offered as part of the Institutional Subscription." There are, however, no similar products or services to the institutional subscription contemplated by the settlement agreement,[6] and it is very unlikely that there will ever be a similar product or service because no other firm will realistically be able to get a comparably broad license to books as the one that Google would get from the settling class.

---

[3] See, e.g., Hannibal Travis, Google Book Search and Fair Use: iTunes for Authors or Napster for Books?, 61 U. Miami L. Rev. 601 (2006); Neil Netanel, Google Book Search Settlement, Balkinization Blog, Oct. 28, 2008, available at http://balkin.blogspot.com/2008/10/google-book-search-settlement.html.

[4] See Vulcan Golf LLC v. Google, Inc., 2008 U.S. Dist. LEXIS 102819 (N.D. Ill. 2008) (denying certification of a class of trademark owners because the legal claims of the named plaintiffs were not typical of members of the proposed class, some of whom would have thought the challenged action was fair use).

[5] Settlement Agreement, Authors Guild, Inc. v. Google, Inc., Case No. 05 CV 8136-JES, Attachment H, parag. 7 ("Settlement Agreement") (defining the settling class as encompassing all owners of U.S. copyright interests in books as of January 5, 2009)

[6] Dan Clancy, chief engineer of the Google Book Search project, stated that there are no comparable products or services at a meeting with Pamela Samuelson and several other Berkeley faculty members on June 22, 2009, in response to a question about how much of a constraint this factor would be on pricing levels for the subscriptions.

We take little comfort in the stated dual objectives of the Settlement Agreement as a constraint on pricing decisions by Google and the Registry.[7] Even if institutional subscription prices are initially quite modest in order to attract institutions to subscribe,[8] we worry that ten, twenty, thirty or more years from now, when institutions have become ever more dependent on GBS subscriptions and have consequently shed books from their physical collections, and indeed when electronic publishing begins to supplant traditional methods of publication for some texts, the temptation to raise prices to excessive levels will be very high.[9] There are no meaningful limits in the Settlement Agreement to stop this from happening.

Profit-maximization is a rational strategy for firms such as Google, especially if the Book Search initiative proves to be a profitable enterprise. Many authors and publishers who are GBS partners can be expected to push for profit-maximization. Although the Registry will formally be a nonprofit organization, its mission is to represent copyright owners, many of whom will also favor profit maximization.

There are several possible criteria for constraining prices of institutional subscriptions for which academic authors would have pushed. One would be to direct that institutional subscription prices should go down if the overhead costs of the GBS and Registry services go down over time, as they should if these entities are well-run. A second would be to limit the profit margin to a determined percentage over costs of operating the service. A third would be to limit the percentage by which institutional subscriptions could rise during each price period (say, by 5% or peg price rises to changes in the Consumer Price Index). A fourth would be to cap subscription prices to a certain percentage of the institution's overall budget, so that prices would only rise when the institution expanded its operating budget. A fifth would be to redirect the money set aside for orphan books for five years so that the unclaimed funds would not be distributed to the Registry's customers and to the Registry's favorite charities, [10] but would instead be used to lower the subscription prices to make books more accessible.[11] The preference that the Authors Guild seemingly had for maximizing revenues to registrants as to

---

[7] Settlement Agreement, sec. 4.1(a)(i).

[8] The Agreement does contemplate pricing bands for different kinds of institutions and initial discounts, id. sec. 4.1(a)(iv)-(viii).

[9] See, e.g., Aaron S. Edlin & Daniel L. Rubinfeld, Exclusion or Efficient Pricing: The "Big Deal" Bundling of Academic Journals, 72 ABA: Antitrust J., No. 1 (2004)(discussing supracompetitive pricing of packages of journals to which many institutions subscribe).

[10] The Settlement Agreement seems to contemplate that the Registry would be a suitable entity for licensing orphan books to other entities besides Google if Congress enacts orphan works legislation. Settlement Agreement, sec. 6.2(b). However, we question whether the Registry and registered rights holders should have the right to collect revenues for orphan books which would be either used to fund the Registry's operations or paid out to persons and entities who don't own rights in these books. From our standpoint as academic authors, true orphan books would more appropriately be treated as though they were in the public domain. Further, we believe that prices of institutional subscriptions should be lowered insofar as Google learns later that it mistakenly collected revenues for books that were actually in the public domain rather than directing the Registry to distribute these revenues to its registrants.

[11] The Agreement even contemplates that registered rights holders might receive payouts for public domain books that Google mistakenly thought were in copyright, or returned to Google for distribution to a charity. Id., Sec. 6.3(b).

money set aside for orphan books they didn't author is a particularly stark example of the Guild representing the interests of only some members of the author subclass. Another modest way to check against excessive pricing might be to ensure representation of academic authors, librarians, and/or consumer protection experts on the Registry's board.

One sign that the possibility of price gouging is already a source of anxiety among prospective institutional subscribers is the arbitration procedure set forth in a side agreement between Google and the University of Michigan.[12] The procedure set forth for the pricing review is truly byzantine, even Kafkaesque, and is fraught with complications and limitations. Even leaving aside the complexity and opacity of the proposed arbitration procedure, the fundamental problem is that the Settlement Agreement has inadequate criteria for meaningful limitations on price hikes. Because of this, we believe it is highly unlikely that the arbitration procedure contemplated in the Michigan side agreement will prove to be more than a symbolic gesture.

**B. Open Access.** As the UC Academic Council letter to the court in this matter explains, the proposed Settlement Agreement "does not explicitly acknowledge that academic authors might want to make their books, particularly out-of-print books, freely available under a Creative Commons or other open access license. We think it is especially likely that academic authors of orphan books would favor public domain or Creative Commons-type licensing if it were possible for them to make such a choice through a convenient mechanism." [13] If the Authors Guild had truly been representing the interests of academic authors during the negotiations leading up to the Settlement Agreement, it would have recognized and insisted upon open access options for academic authors.

None of the millions of notices sent to members of the class made reference to public domain dedication or open access alternatives.[14] The Settlement Agreement presumed that all rights holders would want the $60 settlement fee plus the opportunity to share in the benefits of commercialization that the Settlement Agreement contemplates. Only after Google became aware that the UC Academic Council letter was about to be sent to the court did Google and the Authors Guild announce their support for open access choices of authors.[15] While these announcements were welcome, it remains as yet unclear how truly responsive and helpful the Registry will be in providing meaningful support for open access preferences of authors. It would have been far better for Google and the Registry to have contemplated open access as a possibility during the negotiations and as they drafted the notice to class members. That they ignored this possibility is an indication that the Authors Guild didn't have the interests of academic authors in mind during the negotiations. We also worry that the Registry will have an institutional bias against facilitating open access preferences of academic authors, even if the

---

[12] See Amendment to Cooperative Agreement, entered into between Google, Inc. and the Regents of the University of Michigan, effective May 19, 2009, Attachment A, sec. 3.

[13] Letter from Mary Croughan, Chair of the Academic Council of the University of California, to J. Michael McMahon, Aug. 13, 2009, p. 5.

[14] It is, however, possible for rights holders to set the price for books they register at zero.

[15] See, e.g., Xian Ke, Bringing the Power of Creative Commons to Google Books, available at booksearch.blogspot.com/2009/08/bringing-power-of-creative-commons-to.html.

Guild and class counsel are now willing to express support for open access preferences in order to get the settlement approved.

**C. Annotation-Sharing**: The Settlement Agreement contemplates that subscribers will be able to annotate their books, but restricts the extent to which annotations can be shared.[16] Individuals can share their annotations only with 25 persons, all of whom must be purchasers of the digital book, and they must be identified in advance. Only minimal annotations are anticipated, such as personal notes, or in a group setting, sharing comments among members of a book club or a class. In academia, annotation is a time-honored form of communication, and the practice of sharing annotations within a scholarly community, and not just with 25 or fewer people, is normal. Collaborative uses of annotation and tagging are, moreover, a growth area in the fields of information retrieval and social networking,[17] a trend that the annotation-sharing restriction would countermand. Had academic authors been fairly and adequately represented during the negotiations leading up to the Settlement Agreement, we do not believe that this restriction on annotations would have been made part of the agreement.[18] Most classes taught at most large public universities have enrollments much higher than 25 persons, and so the annotation restriction would preclude meaningful sharing of annotations among class members. It would be particularly ironic if these restrictions prevented a professor who was also the author and rights holder in the book from letting her students share annotations for the class.

**D. User Privacy**: Because the UC Academic Council letter and some submissions by nonprofit organizations have elaborated on the inadequate guarantees of user privacy in the proposed Book Search Settlement Agreement, we will not dwell on this point. But we do wish to express our distress that the only provision in the Settlement Agreement that calls for a privacy policy is one that protects personal data of rights holder.[19] Numerous provisions contemplate monitoring or reporting data about users.[20] Had academic authors been able to participate in the negotiations or been well-represented by the Authors Guild, there would have been meaningful commitments in the Settlement Agreement to respect user privacy.

We are especially concerned that Google may be intending to disintermediate librarians from their roles as trusted guardians of patron privacy.[21] Librarians adhere to strict ethical rules and

---

[16] Settlement Agreement, Sec. 3.1(c)(ii)(5).

[17] See, e.g., Jane Hunter, Collaborative Semantic Tagging and Annotation Systems, in Annual Review of Information Science and Technology, American Society for Information Science & Technology (2009).

[18] In a conversation between Pamela Samuelson and a lawyer who participated in the Book Search Settlement negotiations, in New York City on August 5, 2009, Samuelson was informed that the annotation restriction was put in the agreement at the insistence of a prominent member of the Guild (who was not a named plaintiffs in the Guild's lawsuit) because he finds annotation sharing objectionable. Why his preference on this matter should be given deference is a mystery, particularly given that most of the books in the Book Search corpus are academic authors' books, and their preferences would be quite different.

[19] Settlement Agreement, Sec. 15.3.

[20] See, e.g., Electronic Privacy Information Center, Google Book Settlement and Privacy, available at http://epic.org/privacy/googlebooks/default.html (chart of GBS settlement provisions affecting privacy).

[21] The GBS Settlement Agreement does not, for instance, conform to the norms set forth in the International Coalition of Library Consortia Privacy Guidelines for Electronic Resources Vendors (2002), available at http://www.library.yale.edu/consortia/2002privacyguidelines.html.

state laws mandating protections for patron confidentiality. Google was able to build this corpus of books through libraries, but the company has so far refused to stand in the shoes of librarians with respect to duties of patron confidentiality.

The digitization of books raises new privacy issues that existing state library privacy laws do not address, nor does Google or the Settlement Agreement. Insofar as GBS anticipates unique serialization of books, it raises the risk that a particular book will be permanently linked to an individual. In the library context, by contrast, librarians strive to unlink patron identity from a book after it is returned. Librarians have adhered to data destruction responsibilities, but Google's model has been to keep user data for extended periods of time. Existing library confidentiality guarantees focus on third parties' reuse of patron records, but Google's model is to employ user data for internal marketing purposes. We think that academic authors would, in general, object to any marketing use of patron data, whether first-party or third-party. Targeted advertisements linked to book viewing and reading history could chill inquiry, especially on sensitive topics.

Librarians and bookstores have also resisted law enforcement requests for user data, and this resistance has led to a series of decisions strongly protective of patron privacy rights. Google has thus far been unwilling to commit to such duties to users of GBS. The settlement will make Google a private arbiter of book privacy rights. This contravenes the public policy goals of states that have acted affirmatively to create protections for all book readers.

**E. Print-out Restrictions and Fees**: Academic authors would not have agreed to the provision that severely restricts the number of pages that users of the Book Search subscription database can cut and paste from particular "display" books or can print out at any one time.[22] Given that the institutional subscription database available both to institutional subscribers and to public libraries will consist mainly of out-of-print books, we think the cut-and-paste and page print-out restrictions are unreasonable narrow. The older the book, we believe, the broader fair use privileges should be for those books, and if the books are truly orphans, cut-and-paste and printout privileges should be correspondingly broader. The Settlement Agreement restrictions are inconsistent with these fair use principles.

Nor would academic authors have been willing to agree to the provision that requires libraries that charge even modest fees for print-out services (i.e., just enough to recoup costs of providing printing to patrons) to pay a fee to Google for user print-outs,[23] even if the print-outs would have been fair uses under copyright law. The Agreement calls for Google to pay the per-printout fee from the libraries to the Registry. This print-out fee will fundamentally change the default rules for libraries and library patrons whose fair use rights will thereby have been substantially curtailed. We think this is unfair and disadvantageous to academic authors and researchers, and we would not have been willing to agree to such terms.

---

[22] See Settlement Agreement, Secs. 4.01(d), 4.2(a).

[23] Id., Sec. 4.8(a)(ii).

**F. Non-consumptive Research Restrictions**: The Settlement Agreement restricts the class of persons eligible to be "qualified users" of the GBS research corpus for purposes of engaging in non-consumptive research to non-profit researchers.[24] Many academic researchers routinely engage in joint research projects with researchers from profit-making firms. The Authors Guild did not adequately appreciate that the restriction on who could be a qualified user would be harmful to the research freedoms of academic researchers. The Settlement Agreement also inhibits new models of scholarly production and scholarly collaboration. Many researchers now develop information services that add value to primary sources by making scholarly information easier to find or by extracting factual information from primary sources. Once deployed, other researchers can build upon the information services built by their colleagues.

Especially objectionable are the provisions in the Settlement Agreement that forbid commercial use of information extracted from books in the corpus unless both Google and the Registry have expressly consented as well as those that forbid the use of data extracted from the research corpus for services to third parties if such services compete with services offered by rights holders or Google.[25] Information is not within the scope of copyright in books, and the Supreme Court has affirmed that reuse of information and data is important to achieving the constitutional purposes of copyright in promoting advances in knowledge.[26] We are puzzled by the settling parties' attempt to restrict access to information obtained through non-consumptive research. While we do not expect to engage in non-consumptive research in order to develop services that would compete with Google or a rights holder, we think that freedom to engage in research should not be fettered in this manner.

We also object to the requirement that academics who want to engage in non-consumptive research must provide a "research agenda" in advance;[27] it ought to suffice that academic researchers would affirm that they will engage in non-consumptive research.

**G. Quality Issues**: Neither in the Settlement Agreement, nor as we understand it, in the side agreements Google has been negotiating with library partners, has Google committed itself to providing guarantees as to the quality of digital scans, nor as to metadata (such as the name of the author, the title of the book, and the year of publication). As scholars, researchers, and academic authors, we are seriously concerned that the Book Search corpus will fail to achieve its potential as an important scholarly resource unless Google makes meaningful commitments to improving the quality in both respects.[28] While members of the Authors Guild are primarily concerned that users of the Book Search find their individual books, scholars regard as more important that books be interconnected, so that works from similar periods or on similar topics

---

[24] Settlement Agreement, Sec. 1.121. Prior written consent from both Google and the Registry must be obtained before for-profit researcher can participate in non-consumptive research.

[25] Settlement Agreement, Secs. 7.2(d)(viii), 7.2(d)(ix).

[26] Feist Pubs., Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991)(copyright protection in compilations does not extend protection to facts and information).

[27] Settlement Agreement, sec. 7.2(d)(xi)(2).

[28] See, e.g., Robert B. Townsend, Google Books: What's Not to Like?, American Historical Ass'n Blog, April 30, 2007, available at http://blog.historians.org/articles/204/google-books-whats-not-to-like.

can be found and searched together. For this, robust metadata is vital and Google Books Search has yet to show that it can provide this.[29] Its inattention to quality issues is yet another respect in which the Authors Guild did not adequately represent the interests of academic authors during negotiations that led to the Settlement Agreement.

II.      The Settlement Agreement is Opaque and Confusing, Making It Difficult for Academic and Other Authors to Comprehend Its Implications.

We find the GBS Settlement Agreement to be very confusing and opaque. In this reaction, we are apparently far from alone.[30] We understand that academic author class members have the right to sign up for participation in the Registry; less well understood is that academic author class members can also sign up directly with Google through its partner program. There is, however, no indication about the pros and cons of signing up with one than the other, and even Google spokesmen and lawyers for the parties have few insights to offer about this.

We are aware that some academic authors are unhappy with the Settlement Agreement, and some of these are considering opting out as a consequence. However, as we understand it, the only benefit of opting out is the right to bring a separate lawsuit against Google for scanning your books and making them available. Realistically that's unlikely to be a meaningful option for most academic authors. Opting out doesn't even get your books removed from the corpus. If an opt-out author's books are out of print, Google will commercialize them anyway, whether their authors like it or not. Even if the author asks for her books to be removed from GBS, this does not mean that Google will actually purge them from its servers; these books will just be less accessible than if the author hadn't asked for them to be removed.[31]

To most academic authors, it would seem like "remove" and "exclude" were the same thing, but these terms mean quite different things under the Settlement Agreement. Exclusion involves choices about whether to disallow displays of one's books or participation in certain revenue models. We suspect that most academic authors, as well as most others whose rights are affected by the settlement, do not realize that Google will be able to make some very valuable (to it) non-display uses of excluded books.

GBS raises many questions for academic authors. What kinds of books will be in the institutional subscriptions? Will public domain books be included in these subscriptions? Are there any kinds of books that Google will not scan or include in the corpus? How, if at all, will Google exercise its right under the Settlement Agreement to exclude up to 15% of books from the corpus for editorial and non-editorial reasons? What GBS content will be available to public

---

[29] See, e.g., Geoffrey Nunberg, Google's Book Search: A Disaster for Scholars, The Chronicle of Higher Education, Aug. 31, 2009, available at http://chronicle.com/article/Googles-Book-Search-A/48245/ (characterizing the metadata problems with GBS as "pervasive").

[30] See, e.g., Richard Albanese, Unsettled: The PW Survey on the Google Books Settlement, Publishers Weekly, Aug. 24, 2009, available at http://www.publishersweekly.com/article/CA6685412.html.

[31] The term "remove" is defined in the Settlement Agreement to mean that the book will not be accessible. Settlement Agreement, sec. 1.124.

libraries? How big will the corpus become? At what point will Google decide the corpus is big enough? How much information will Google or the Registry provide to the general public in respect of books that are in the public domain and/or orphan books? How transparent will the Registry and Google be about registrants and terms on which books have been licensed? It is difficult to discern answers to these simple questions from the Settlement Agreement or from public statements of the parties and their lawyers. It would be helpful to know the answers to these questions before making decisions about whether and how academic authors might want to participate in the Settlement Agreement.

At a meeting at UC Berkeley with Berkeley faculty and UC librarians on June 22, 2009, Google representatives Dan Clancy and Alex Macgillivray made a number of statements in response to questions like these. They have, however, been unwilling to reaffirm these statements, despite requests that they do so. UC librarians have recently promulgated statements about their understanding of the settlement's meaning based upon representations Clancy and Macgillivray made at the June 22 meeting.[32] We would be less worried about the Settlement Agreement's implications for academic authors and researchers if Google made documented public commitments on these matters.

III.    The Book Search Corpus Is a Public Good in Which Society Has A Significant Interest.

The GBS corpus is a public good which should be preserved, even if for one reason or another, the settlement doesn't work out as the parties intend. Google could conceivably lose interest in GBS, for instance, go out of business or go bankrupt, sell the GBS corpus to China, Rupert Murdoch or Wal-Mart, neglect to fulfill its promises under the Settlement Agreement, or lose the Authors Guild lawsuit. Many other things could go wrong as well.[33] A significant part of the anticipated benefit of the agreement would be undermined if a large percentage of out-of-print but in-copyright book rights holders are unwilling to make their books available for institutional subscriptions or preview uses. The Registry could fail to develop a workable database, to attract authors and publishers as registrants, to provide desired services to its registrants, or to run a competent dispute resolution system. No one, of course, predicts that any of these failures will occur. In reviewing the Settlement Agreement, we think that the court should consider what will or should happen to the GBS corpus if something seriously goes awry.

The Settlement Agreement does contemplate that if Google doesn't provide required library services, an alternative service provider could take over Google's role,[34] but what if no one else wants to provide this service? It also contemplates that the agreement could be terminated,[35]

---

[32] See Office of Scholarly Communications, University of California, document on Google Books, available at http://osc.universityofcalifornia.edu/google/gbs_UC_libraries_doc.pdf.

[33] An important reason why it would be socially desirable for other firms besides Google to be able to offer a comprehensive digital library is to ensure public access to this library in case there are problems with Google's servers. See, e.g., Ryan Singel, Gmail Down, Again—Update, WIRED, Sept. 1, 2009, available at http://www.wired.com/epicenter/2009/09/gmail-down-again/.

[34] Settlement Agreement, Sec. 3.7(c), (d).

[35] Id., Art. XVI.

although the termination agreement has not been disclosed, even to the court. We are left to guess what would happen to the corpus if the agreement terminates.

While withdrawal of public access to the GBS corpus would be lamentable under any circumstance, it would be especially tragic if a large number of institutions had become dependent on the availability of GBS subscriptions and had, for example, decided to sell off or give away the physical books in its collection because the GBS subscriptions provided such a valuable extensive collection for their patrons. As academic authors and researchers who could become dependent on GBS subscriptions as a resource, we recommend that there be some documented public commitment by the parties about what will happen to public access to the GBS corpus if something goes wrong.

IV.     The Court Should Condition Approval of the Settlement on Modifications to the Agreement That Would Address Problems Identified in this Letter.

Rarely does a judge have the power to affect the future of public access to knowledge as profoundly as the court has in respect to this particular settlement. Judicial review of class action settlements typically involves ensuring that members of the class had adequate notice of the settlement, the settlement will bring some benefit to class members, and the fees to class counsel are not exorbitant. Because the settlement in this case will fundamentally transform the future marketplace for books and have huge spillover effects for the ecology of knowledge, extra close scrutiny of the fairness and reasonableness of the settlement is important.

As we understand it, the ordinary expectation is that the courts will either approve or disapprove class action settlements negotiated by the parties. We believe that courts also have the authority to identify issues as to which a particular settlement agreement is not as fair and adequate to the class as it should be and to condition approval of the settlement on modifications to address these concerns.

Our letter has identified a number of academic author concerns, including the lack of meaningful limits on institutional subscription pricing, under-appreciation of open access preferences of authors, unwarranted restrictions on annotation-sharing and non-consumptive research, inadequate user privacy protections and transparency guarantees, inattention to quality issues, and clarification about what will happen to the Book Search corpus if things go awry. Supplemental or amended provisions could address these concerns.

We wish finally to note that if the court decides to disapprove the settlement, we doubt that the future of public access to books in digital form would be as dim as Google predicts. Google will almost certainly continue to scan books from major research libraries, expand the Book Search corpus, and resume its fair use defense of its scanning for purposes of making indexes and providing snippets. It has, after all, made very substantial investments in this project and its founders believe GBS is important to the company's mission of organizing the world's

information.[36] Under its partner program, Google will almost certainly continue to work with publishers of in-print books to make these books available under terms mutually acceptable to Google and the publishers. Now that authors and publishers of many out-of-print books are aware of the Book Search project, many of them may wish to sign up to make digital versions of their books available through GBS as well. Google would have much stronger incentives to support orphan works legislation, and would no longer have the unfair advantage as to orphan books that the Settlement Agreement would give it. Congress is probably the more appropriate venue for addressing the mass digitization of books. Those who do not want to participate in the GBS initiative can still ask for their books to be removed from the corpus, just as they would be able to do under the Settlement Agreement. Many authors and publishers may find the prospect of earning revenues from institutional subscriptions desirable enough that this could become a viable market, but one that more than one firm could realistically contemplate entering to make out-of-print books more widely available. A more open and competitive ecosystem for digital books would then become possible, even if progress toward broad public access to books would be somewhat slower than if the settlement was approved.

Whatever the outcome of the fairness hearing, we believe strongly that the public good is served by the existence of digital repositories of books, such as the GBS corpus. We feel equally strongly that it would be better for Google not to have a monopoly on a digital database of books. The future of public access to the cultural heritage of mankind embodied in books is too important to leave in the hands of one company and one registry that will have a de facto monopoly over a huge corpus of digital books and rights in them. Google has yet to accept that its creation of this substantial public good brings with it public trust responsibilities that go well beyond its corporate slogan about not being evil.

Respectfully,

Pamela Samuelson, Professor of Law & Information, University of California, Berkeley

On behalf of the following academic authors and researchers (institutional affiliations are for identification purposes only and do not suggest an institutional view of the issue):

Ann Bartow, Professor of Law, University of South Carolina School of Law.
Steven Bellovin, Professor of Computer Science, Columbia University
Matt Blaze, Professor of Computer Science, University of Pennsylvania
Christine L. Borgman, Professor & Presidential Chair, Dept of Information Studies, UCLA
Geoffrey C. Bowker, Professor of Information Sciences, University of Pittsburgh
Shane Butler, Associate Professor of Classics and Associate Dean of the Humanities, UCLA

---

[36] See, e.g., Nunberg, supra note 29 (quoting Google founder Sergey Brin on Google's mission).

.

Michael W. Carroll, Professor of Law, American University, Washington College of Law

Danielle Citron, Professor of Law, University of Maryland

Julie E. Cohen, Professor of Law, Georgetown University

Michael Cole, University Professor of Communication, Psychology, and Human Development, University of California, San Diego

Nathan Cortez, Assistant Professor of Law, Southern Methodist University

Ronald C. Cohen, Professor of Chemistry and of Earth and Planetary Science, University of California, Berkeley

Lorrie Faith Cranor, Associate Professor of Computer Science and Engineering & Public Policy, Carnegie Mellon University

Kenneth D. Crews, Director, Copyright Advisory Office, and Lecturer-in-Law, Columbia University

Blaise Cronin, Professor of Information Science and Dean of the School of Library and Information Science, Indiana University, Bloomington

Dana Cuff, Professor, Architecture and Urban Design, School of the Arts and Architecture, UCLA

Johanna Drucker, Professor of Information Studies, UCLA

Paul Duguid, Adjunct Professor, School of Information, University of California, Berkeley

Jeffrey Elman, Professor of Cognitive Science and Dean of Social Sciences, University of California, San Diego

Edward Felten, Professor of Computer Science, Princeton University

A. Michael Froomkin, Professor of Law, University of Miami

Laura Gasaway, Professor of Law and Associate Dean, University of North Carolina

Ted Gideonse, Instructor, University of California, San Diego

Robert J. Glushko, Adjunct Professor, School of Information, University of California, Berkeley

J. Alex Halderman, Assistant Professor of Computer Science, University of Michigan

Carla Hesse, Professor of History, Dean of Social Sciences, University of California, Berkeley

Lance J. Hoffman, Professor of Computer Science, George Washington University

Steven Justice, Professor of English, University of California, Berkeley

Jerry Kang, Professor of Law, UCLA School of Law

Eric Kansa, Adjunct Professor, School of Information, University of California, Berkeley

Amy Kapczynski, Assistant Professor of Law, University of California, Berkeley

S. Blair Kauffman, Law Librarian and Professor of Law, Yale University

Christopher Kutz, Professor of Law, University of California, Berkeley

Jessica D. Litman, Professor of Law, University of Michigan

Lydia Pallas Loren, Professor of Law, Lewis & Clark Law School

Michael Madison, Professor of Law, University of Pittsburgh

Solangel Maldonado, Professor of Law, Seton Hall University

Brian Malone, Instructor, University of California, Santa Cruz

Patrick McDaniel, Professor of Computer Science, Pennsylvania State University

Erin Murphy, Assistant Professor of Law, University of California, Berkeley

Raymond T. Nimmer, Professor and Dean of the Law School, University of Houston

Geoffrey Nunberg, Adjunct Professor, School of Information, University of California, Berkeley

Anne J. O'Connell, Assistant Professor of Law, University of California, Berkeley

Frank A. Pasquale III, Professor of Law, Seton Hall University

James Pitman, Professor of Statistics, University of California, Berkeley

Thomas Pogge, Professor of Philosophy and International Affairs, Yale University Margaret Jane Radin, Professor of Law, University of Michigan

R. Anthony Reese, Professor of Law, University of California, Irvine

Annalee Saxenian, Professor and Dean of the School of Information, University of California, Berkeley

Paul Schwartz, Professor of Law, University of California, Berkeley

Lea Bishop Shaver, Associate Research Scholar & Lecturer in Law, Yale Law School

Daniel Solove, Professor of Law, George Washington University

Eugene H. Spafford, Professor of Computer Science, Purdue University

Katherine Strandburg, Professor of Law, New York University

Charles A. Sullivan, Professor of Law and Director of the Rodino Law Library, Seton Hall University

Stefan Tanaka, Professor of History, University of California, San Diego

Kathleen van den Heuvel, Adjunct Professor and Director of the Law Library, University of California, Berkeley

David Touretzky, Research Professor, Carnegie Mellon University

Siva Vaidhyanathan, Associate Professor of Media Studies, University of Virginia

Eric von Hippel, Professor, Sloan School of Management, Massachusetts Institute of Technology

David Wagner, Professor of Computer Science, University of California, Berkeley

Dan Wallach, Associate Professor of Computer Science, Rice University

Alan Weinstein, Professor of Mathematics, University of California, Berkeley

Michael Zimmer, Assistant Professor of Information Studies, University of Wisconsin-Milwaukee

Cc:

Michael J. Boni, Esq., Counsel for the Author Subclass

Joanne Zack, Esq., Counsel for the Author Subclass

Joshua Snyder, Esq., Counsel for the Author Subclass

Jeffrey P. Cunard, Esq., Counsel for the Publisher Subclass

Bruce P. Keller, Esq., Counsel for the Publisher Subclass

Daralyn J. Durie, Esq., Counsel for Google

Joseph C. Gratz, Esq., Counsel for Google