

# INSTITUTE OF INTELLECTUAL PROPERTY & SOCIAL JUSTICE, INC.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-9-09

ADVANCING IDEAS
ENCOURAGING ENTERPRISE
PROTECTING PEOPLE

September 8, 2009

BY FACSIMILE: 212-805-7906

The Honorable Denny Chin
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: <u>The Authors Guild et al. v. Google, Inc. Case No. 1:05 cv 8136 (S.D.N.Y.)</u>

Dear Judge Chin:

    We are members of the Faculty of the Howard University School of Law, and the directors of the Institute of Intellectual Property and Social Justice. We strongly support the proposed Settlement Agreement among Google, authors, and publishers for two core reasons. First, in our judgment, implementation of the settlement will help empower historically and currently disadvantaged and underserved groups in American society by providing them with unprecedented access to books and concomitantly greater opportunities to create new expressive and artistic works. Second, by expanding copyright access for all Americans and by providing all authors with new opportunities to disseminate their works, the Settlement Agreement serves the fundamental objectives of American copyright law as an engine for creative expression and the promotion of social justice. Accordingly, we respectfully submit that the Settlement Agreement should be approved by the Court.

## The Settlement Agreement Promotes Copyright Social Justice

    It is important to consider the Settlement Agreement within the broader context of the copyright purposes of social utility and social justice. The digitization of information and creative expression, coupled with the development and expansion of the Internet, has challenged copyright law more than any prior

WWW.IIPSJ.ORG                                           INFO@IIPSJ.ORG

IIPSJ Submission on the Google Book Search Project, Copyright, and the Digital Divide

technological advance. While digital information technology dramatically increased the availability of literature, art, music, and information for Americans who enjoyed full access to the Internet, Americans stranded on the wrong side of a growing Digital Divide saw little change in their cultural and pedagogical options. The poor, the elderly, the physically challenged, and many racial and ethnic minorities, lacking affordable access to computers and the marvel of the Internet, languished in a state of relative techno-illiteracy and cultural inhibition, notwithstanding the ever-increasing proliferation of new technological options for intellectual enlightenment and exchange.

Unfortunately, most copyright scholars and commentators, as well as many governmental and educational institutions, were slow to appreciate the relationship between copyright social utility and the Digital Divide, and initially perceived the problem solely as a dilemma of social welfare. The dialogues and controversies which have arisen in connection with the Google Book Project, however, have illuminated that to the extent that overlooked and unconnected segments of the population are without effective access to copyrighted works, the members of these communities will be unable to learn from and build upon these works, and are therefore less able make their own contributions to society and culture.

The Google Book Project is an important and large step toward resolving this and related contemporary copyright challenges. Google's Book Project, combining digitization of text with widespread access to it, can be a boon to those who heretofore had little or no access to such materials. As a result of the Google Book Project, these materials will become available not only to those who enjoy the privilege of access to elite libraries, but to anyone with access to a computer and the Internet. The blind and visually impaired will have dramatically expanded access to material through technologies that can vocalize digital text and expand the font size to more easily readable sizes. Many people will have access through public libraries in their communities while others will gain access through schools and through outreach by various organizations that seek to aid particular historically and currently marginalized groups.

Copyright licensing difficulties often stand as a counter-productive barrier to access to many works for millions of Americans. Many of the books encompassed within the Settlement Agreement are in copyright, but are out-of-print or are "orphan works." Even in those instances where it is possible to locate the author and publisher of a work, it is often difficult and costly to determine whether the copyright has reverted to the author, and, indeed, who owns the rights to digitize the work. Moreover, the transaction costs of licensing the work may exceed the expected market value from the work, and thus the work would remain available only to those who are privileged to attend or to be employed by a major research institution where a particular volume is housed.

Because the anticipated consumer interest in certain works is relatively small, the segment of the public interested in these works remains underserved and to the

IIPSI Submission on the Google Book Search Project, Copyright, and the Digital Divide

extent that they are so underserved, the central public policy of copyright law is frustrated. While the commercial market may have forgotten about certain works, we cannot overlook the millions of Americans who deserve access to them, as well as the myriad authors who want to make their works accessible once again. By establishing a mechanism to compensate copyright holders of these works, the Settlement Agreement can achieve these public-interest goals by making it easier for *anyone* to license books that are still under copyright but that are out-of-print or are commercially unpopular or controversial.

The Current Objections to Approval of the Settlement Agreement

In our view, most of the current objections to approval of the Settlement Agreement can be grouped into one of three categories. First, some objections have been made by certain copyright sub-constituencies and parties with indirect (and generally pecuniary) interests who feel that the Settlement Agreement could be more beneficial to their interests than it is. Second, some objections have been offered by some who argue that the government should step in and construct a legislative solution to the book digitization issue. Third, some objections have been raised by those who are concerned that certain details have not been thoroughly addressed—details concerning the ultimate breadth of the digital text access made possible by the Settlement Agreement or details concerning safeguards against potential abuses of this access. We believe that the benefits to be derived from approval of the Settlement Agreement outweigh all of these objections, which we address in turn below.

First, many of the copyright sub-constituencies who oppose approval of the Settlement Agreement seek to reverse the priorities of the copyright law. American copyright law favors neither the author nor the individual user of aesthetic works, but rather holds paramount the interests of society in developing and nurturing a thriving, vibrant culture. The short-term gains desired by a particular group of copyright constituents do not necessarily serve (and indeed, more typically do not serve) the long-term interests of our cultural development. Indeed, given that copyright holder property ownership interests have already been addressed in the Settlement Agreement by way of class action negotiation among qualified representatives of those interests, proper concern should now be turned toward the public benefit generally, and in particular, the needs of that segment of the public that has been largely overlooked until now. To continue to deny the digitally marginalized and underserved so that individual sub-constituencies can bargain for further gain is to leverage the resolution of this issue on the backs of the poor and unheard.

Second, the calls for legislative intervention are untimely and, at this juncture, largely unnecessary. For example, some opponents to the Settlement Agreement argue that the adoption of "orphan works" legislation would be a superior

3

IIPSJ Submission on the Google Book Search Project, Copyright, and the Digital Divide

alternative to approving the Settlement. However, these arguments present a false choice that neither the Court nor Congress should accept for at least two reasons. First, the orphan books issue has been exaggerated because in the majority of cases it is possible to find the rights-holder. Second, for the relatively few genuine orphan works, the Settlement Agreement provides a mechanism to ultimately compensate owners if ever found. In the meantime, it makes those works available pending a more complete, but ultimately complementary, not exclusive, legislative solution. Even in the absence of legislation, opening up access to these books through the Google Book Project provides an incontrovertible benefit.

It may well have been best for all concerned if governmental institutions had recognized the Digital Divide as a problem of copyright social utility decades ago. Now that a comprehensive mechanism for bridging the divide has been presented from the private sector, however, it would be most unfair and, we think, unwise to attempt to turn back the clock just when a boon to the marginalized is on the horizon. Thus far it has been the digitally disenfranchised who has paid the price for this lack of vision, and they should not have to endure years of additional delay after being overlooked for almost a quarter of a century. Going forward, governmental institutions such as the Copyright Office have an important role to play in addressing these issues, and when they have decided upon specific recommendations, they should be made to Congress for it to act upon. In the meantime, the ongoing deleterious effect of the Digital Divide makes evident, in the words of Dr. King, "Why We Can't Wait."

With respect to the third objection, various speculations regarding possible abuse of digital text use and access, the concerns do not warrant further delay, but instead counsel just the opposite. Copyright is intended to be an engine of cultural development, not a brake on it.

New technological uses for copyrighted material have raised these kinds of concerns in the past, and private as well as legislative solutions have been developed to address them. With the advent of sound recordings, royalty collection societies were created and the music and recording industries have flourished for 100 years under a system established essentially by private parties. The private societies were established to implement the correct balance of interests and objectives, and judicial and legislative involvement ultimately strengthened what began as a private agreement. That system remains in place today under a court approved settlement and antitrust consent decree that is decades old, and all of this was achieved without grinding progress to a halt or awaiting a legislative solution or insuring that all possible details had been foreseen and addressed.

Implementation of the Settlement Agreement will accomplish much the same in the digital environment with respect to text as the music rights societies accomplished nearing a century ago with respect to musical compositions. To the extent changes are needed and improvements found, those can be worked into the framework of the Settlement or adopted through appropriate legislation. The

4

IIPSJ Submission on the Google Book Search Project, Copyright, and the Digital Divide

Settlement provides a vehicle through which to mold an optimal solution over time, and outreach organizations, together with publishers, users, and government agencies, will be involved in effectuating the social justice dimensions of this endeavor.

In drafting the Copyright Clause, our Constitution's Framers penned a broad directive of social utility, one amenable not only to legislative and judicial interpretation and application, but also to private initiative and adaptation to the changing realities of an evolving national culture. The proliferation of personal computers and computer software programs, and the concomitant rise of the Internet created a socio-intellectual barrier dividing those who have had access to the brave new world from those who have not. The Google Book Project and the proposed Settlement Agreement have redirected attention in contemporary copyright protection to the necessary balance between the social utility and social justice ends of copyright and the protection of copyright property rights as a means to serve those ends. The Google Book Project as effectuated by the Settlement Agreement positively affects social justice by equalizing access to information; this opportunity should not be missed.

Accordingly, for all of the foregoing reasons, we respectfully submit that the Settlement Agreement should be approved by the Court.

Respectfully submitted,

Lateef Mtima,
Professor of Law and Director,

Steven D. Jamar,
Professor of Law and Associate Director

Institute of Intellectual Property and Social Justice
Howard University School of Law
2900 Van Ness Str. NW
Washington, DC 20008
202-806-8017
stevenjamar@iipsj.org