```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED: 9-9-09               │
└─────────────────────────────────┘
```

# JONATHAN BAND PLLC

## TECHNOLOGY LAW & POLICY

21 Dupont Circle NW
Washington, DC 20036
policybandwidth.com

jband@policybandwidth.com
(202) 296-5675 (phone)
(202) 872-0884 (facsimile)

September 3, 2009

The Honorable Denny Chin
United States District Court Judge
U.S. Courthouse, 500 Pearl Street
New York, NY 10007-1312

Re: *Authors Guild v. Google Inc.*, No. 05 CV 8136 (DC)

Dear Judge Chin:

Enclosed please find courtesy copies of the following filings in this matter:

1) Library Association Comments on the Proposed Settlement, submitted by the American Library Association (ALA), the Association of College and Research Libraries (ACRL), and the Association of Research Libraries (ARL) on May 4, 2009;
2) Supplemental Library Association Comments on the Proposed Settlement, submitted by ALA, ACRL, and ARL on September 2, 2009;
3) Library Associations' Notice of Intent to Appear, submitted by ALA, ACRL, and ARL on September 2, 2009; and
4) A letter from the International Federation of Library Associations and Institutions (IFLA), with an attached Position on the Google Book Settlement, submitted on September 1, 2009.

These library associations are authors and publishers of books, and thus fall within both sub-classes of plaintiffs.

Respectfully,

Jonathan Band

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
The Authors Guild, Inc., Association of American  :
Publishers, Inc., et al.,                         :
                                                  :
        Plaintiffs,                               :
                                                  :     Case No. 05 CV 8136-DC
                                                  :
        v.                                        :
                                                  :
Google Inc.,                                      :
                                                  :
        Defendant.                                :
------------------------------------------------------------x
```

**LIBRARY ASSOCIATION COMMENTS ON THE PROPOSED SETTLEMENT**

**1.    Description of Class Members and Introduction.**

The American Library Association (ALA) is a nonprofit professional organization

of more than 67,000 librarians, library trustees, and other friends of libraries dedicated to

providing and improving library services and promoting the public interest in a free and

open information society.

The Association of College and Research Libraries (ACRL), the largest division

of the ALA, is a professional association of academic and research librarians and other

interested individuals. It is dedicated to enhancing the ability of academic library and

information professionals to serve the information needs of the higher education

community and to improve learning, teaching, and research.

The Association of Research Libraries (ARL) is a nonprofit organization of 123

research libraries in North America. ARL's members include university, public,

governmental, and national libraries. ARL influences the changing environment of

1

scholarly communication and the public policies that affect research libraries and the diverse communities they serve.

Collectively, these three library associations (the Library Associations) represent over 139,000 libraries in the United States employing over 350,000 librarians and other personnel. The Library Associations are both authors and publishers of books, and thus fall within both sub-classes of plaintiffs.

The Library Associations do not oppose approval of the Settlement. The Settlement has the potential to provide unprecedented public access to a digital library containing millions of books. Thus, the Settlement could advance the core mission of the Library Associations and their members: providing patrons with access to information in all forms, including books. However, the digital library enabled by the Settlement will be under the control of Google and the Book Rights Registry. Moreover, the cost of creating such a library and Google's significant lead time advantage suggest that no other entity will create a competing digital library for the foreseeable future.

The Settlement, therefore, will likely have a significant and lasting impact on libraries and the public, including authors and publishers. But in the absence of competition for the services enabled by the Settlement, this impact may not be entirely positive. The Settlement could compromise fundamental library values such as equity of access to information, patron privacy, and intellectual freedom. In order to mitigate the possible negative effects the Settlement may have on libraries and the public at large, the Library Associations request that this Court vigorously exercise its jurisdiction over the interpretation and implementation of the Settlement. Indeed, in its order approving the Settlement, the Court should make clear that it intends to oversee the Settlement closely.

Below, the Library Associations explain their concerns with the Settlement, and how the Court's oversight can ameliorate those concerns.

## II.  The Settlement Creates An Essential Facility With Concentrated Control.

The Settlement allows Google to offer services that appear to further the mission of libraries by providing people in the United States with unprecedented online access to books. At no cost, and from the convenience of her home, school, or workplace, a Google user will be able to search millions of books for responsive terms. Depending on the nature of the book, the user will see up to fifteen continuous pages each time the term appears, and up to 20% of the entire book.[1] The Settlement also allows Google to sell to consumers perpetual online access to the full text of individual books, with at least 80% priced below $10 for an initial period.[2] Additionally, the Settlement permits Google to offer institutional subscriptions, which would provide authorized users within an institution full text access to millions of books.[3]

The institutional subscription is the feature of the Settlement most relevant to the broad range of libraries. College and research libraries, for example, are a target market for the institutional subscriptions because faculty and students performing serious research are among the largest and most likely populations to demand the ability to search and read the full text of not commercially available books.[4]

---

[1] Settlement Agreement at § 4.3(b)(i)(1).

[2] *Id.* at § 4.2(c).

[3] *Id.* at § 4.1.

[4] Google is obtaining the copyrighted books that it is scanning from major U.S. research libraries, and these collections were originally assembled to support the teaching and research missions of affiliated institutions of higher education. This underscores the probable high demand at academic libraries for institutional subscriptions. Additionally, this emphasizes that Google will be able to offer the service permitted by the Settlement

3

In the extensive discussion about the Settlement since it was announced, many observers have noted possible deficiencies with the institutional subscription database (ISD), the set of books available through the institutional subscription. Because the Settlement allows the rightsholder of a work contained within another rightholder's book to exercise his rights under the Settlement independently, a book in the ISD may lack important parts of the printed book.[5]  A book in the ISD might be missing an essay, poem, short story, foreword, chart or table that appears in the printed version.  Similarly, because the Settlement does not apply to pictorial works, Google will black out photographs and illustrations with a different rightsholder from the book's rightsholder.

Moreover, a rightsholder can remove a book from Google Book Search, or exclude it from the ISD.[6]  Likewise, Google is obligated to include in the ISD only 85% of the books it scans into the ISD.[7]  Thus, the ISD will not include a complete set of in-copyright, not commercially available works.[8]

Notwithstanding these deficiencies in the ISD, an institutional subscription will provide an authorized user with online access to the full text of as many as 20 million books.  Students and faculty members at higher education institutions with institutional subscriptions will be able to access the ISD from any computer -- from home, a dorm room, or an office.  Accordingly, it is possible that faculty and students at institutions of higher education will come to view the institutional subscription as an indispensable

only because research libraries have invested significant resources in preserving out of print books.

[5] Settlement Agreement at § 3.5(b)(i).

[6] *Id.* at § 3.5.

[7] *Id.* at § 7.2(e)(i).

[8] Under the Settlement's default rule for commercially available books, Google cannot include them in the ISD unless their rightsholders permit Google to do so.

4

research tool. They might insist that their institution's library purchase such a subscription. The institution's administration might also insist that the library purchase an institutional subscription so that the institution can remain competitive with other institutions of higher education in terms of the recruitment and retention of faculty and students.

The settlement of copyright class action litigation might well have been the only feasible way this research tool could have been created. A class action settlement provided perhaps the most efficient mechanism for cutting the Gordian knot of the huge transactions costs of clearing the rights of millions of works whose ownership often is obscure.[9] However, the class representatives and Google structured the Settlement in such a manner as to give them enormous control over this essential facility.[10] This is not surprising, given their economic interests. Indeed, precisely because of their economic interests, it is unlikely that they would have agreed to a structure that did not grant them such control.

To be sure, nothing in the Settlement prevents another entity from undertaking a mass digitization effort similar to Google's. But given the enormous cost of such an effort, and Google's significant lead time advantage (Google has been digitizing in-copyright books since 2004), no other entity is likely to so in the near future. [11] Hence,

---

[9] Many of these books are "orphan" works – works whose rightsholders cannot be identified or located even after a diligent search by a potential user.

[10] Technically, there are two related essential facilities: Google's ISD and the block of copyrights managed by the Registry. The Registry enables the creation of the ISD by licensing the copyrights to Google.

[11] In theory, another entity could embark on a library project like Google's, precipitating a class action that could be settled on terms like this Settlement. Alternatively, Congress could enact a compulsory license, and appropriate funding to a consortium of libraries to launch a mass digitization undertaking. Neither of these are scenarios are likely. If

5

there is no foreseeable threat to the control Google and the Registry have over this essential research facility.

It is entirely possible that the Registry and Google will not abuse their control over the market for institutional subscriptions. In fact, the differing business models of Google and the Registry suggest that the two might exist in competitive tension with one another. However, as likely consumers of this essential research facility, the Library Associations cannot overlook the possibility that the Registry or Google might abuse the control the Settlement confers upon them. Abuse of this control would threaten fundamental library values of access, equity, privacy, and intellectual freedom.[12]

## III.   The Settlement Could Limit Access to the ISD.

The institutional subscription could evolve into an essential research facility, but in the absence of any meaningful competition, the Registry and Google can set the price of the subscription at a profit maximizing point beyond the reach of many libraries.

The Settlement establishes detailed procedures by which Google and the Registry will set the price for institutional subscriptions. The Settlement provides that the economic terms for the institutional subscriptions will be governed by two objectives: "(1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education."[13]   Moreover, "Plaintiffs and Google view

---

Google continues on its current path with the Library Project, other entities will have little incentive to enter the market so far behind Google. And if Google abandons the Library Project, other entities will question the economic viability of such an endeavor.
[12] Although some of the libraries partnering with Google in the Library Project participated in some of the Settlement discussions, this handful of libraries did not represent that larger the library community.
[13] Settlement Agreement at § 4.1(a)(i).

6

these two objectives as compatible, and agree that these objectives will help assure both long-term revenue to the Rightsholders and accessibility of the Books to the public."[14]

The Settlement also contains "parameters" Google and the Registry will use to determine the price of institutional subscriptions: the pricing of similar products and services available from third parties; the scope of the books available in the ISD; the quality of the scan; and the features offered as part of the subscription.[15]

Pricing will be based on the number of full-time equivalent (FTE) users.[16]  The FTE pricing can vary across different categories of institutions.  These categories include: (1) corporate; (2) higher education institutions; (3) K-12 schools; (4) government; and (5) public libraries.  Lower prices can be charged for discipline-based subsets of the ISD.[17]

Google has the responsibility for proposing an initial pricing strategy consistent with the objectives outlined above that will include target retail prices for each class of institution for access to the entire ISD and the discipline-based collections.  Prices in the initial pricing strategy period will be based on "then-current prices for comparable products and services, surveys of potential subscribers, and other methods for collecting data and market assessment."[18]  Google will collect data comparing the target retail prices with the prices for comparable products and services, and will provide this data to the Registry.  After Google submits the initial pricing strategy to the Registry, Google and

---

[14] *Id.*

[15] *Id.* at § 4.1(a)(ii).

[16] For higher education institutions, FTE means full-time equivalent students. *Id.* at § 4.1(a)(iii).

[17] *Id.* at § 4.1(a)(v).

[18] *Id.* at § 4.1(a)(vii).

7

the Registry will negotiate its terms for up to 180 days. If Google and the Registry do not reach agreement, the dispute will be submitted to binding arbitration.[19]

The Library Associations appreciate that the Settlement identifies "broad access to the Books by the public, including institutions of higher education" as one of the two objectives of the economic terms for the institutional subscription. Moreover, Google's current business model, based on advertising revenue, suggests that Google will have the incentive to negotiate vigorously with the Registry to set the price of the institutional subscription as low as possible to maximize the number of authorized users with access to the ISD. Nonetheless, Google's business model, at least with respect to the institutional subscription, may change, and at some point in the future it may seek a profit maximizing price structure that has the effect of reducing access.

Significantly, the predominant model for pricing of scientific, technical, and medical journals in the online environment has been based on low volume and high prices. Major commercial publishers have been content with strategies that maximize profits by selling subscriptions to few customers at high cost. Typically these customers are academic and research libraries. Therefore, the Registry and Google may seek to emulate this strategy in the market for institutional subscriptions.

The Settlement's provisions concerning the pricing of the institutional subscription contain several other troubling features that increase the likelihood of this outcome. First, the Settlement states that the price of the institutional subscription will be based in part on the prices of "comparable products and services...." Although there are no comparable products or services to an online database of in-copyright, not

---

[19] *Id.* at § 4.1(a)(vi)(4).

8

commercially available books, the Registry or the arbitrators might erroneously treat online journals as comparable products. In this event, the institutional subscription would become cost prohibitive for most libraries. The annual subscription for some scientific, technical, and medical journals can exceed $20,000 per journal. A university library spends an average total of $ 4.3 million a year for online journal subscriptions.[20] If journal subscriptions are "comparable" to the institutional subscription, and a library pays $ 4.3 million for access to 31,000 journals,[21] one can only imagine the price the Registry might insist upon for a subscription to millions of books.

Second, the Settlement provides for a dispute resolution mechanism with respect to the pricing of the institutional subscription only to Google and the Registry. The Settlement does not explicitly set forth a process by which a library or other potential purchaser of an institutional subscription can challenge whether the pricing of this essential facility created by the Settlement meets the objective of "broad access to the Books by the public."

**IV.    The Settlement Will Heighten Inequalities Among Libraries.**

The "digital divide" in this country is already too deep, and the pricing of the institutional subscriptions could make it even deeper. In the absence of the price discipline afforded by competition, only those higher education institutions with the greatest resources would be able to afford an institutional subscription without dramatically cutting other library services.

Compounding this inequity is the differential pricing the Settlement allows for different categories of institutions. While this price discrimination could promote

---

[20] Association of Research Libraries, *ARL Statistics 2006-2007* 50-51 (2008).
[21] *Id.* at 31.

9

economic efficiency by setting the price at the point that meets the demand within that category, it could lead to bizarre results from a societal perspective. Google will conduct surveys among potential subscribers,[22] and might learn that the higher education institutions have a much stronger demand for institutional subscriptions than K-12 schools. The low demand for institutional subscriptions at K-12 schools might cause the price of an institutional subscription for that category to fall so low that many K-12 schools could afford to purchase the subscription. Meanwhile, higher education institutions in the same communities might not have the resources to pay the higher demand-driven prices charged to that category.

Similarly, the public access service terminals that provide free access to the ISD could exacerbate inequalities. A single public access service terminal may satisfy the needs of a lightly trafficked branch of a public library system. But a single terminal would be insufficient for colleges and most library branches. If those colleges and libraries could not afford the institutional subscription, their users would be worse off than the patrons of the lightly trafficked branch.

To be clear, the Library Associations are not objecting to Google's offer to provide free public access service terminals. Rather, we are pointing out the disparities in access that might emerge if institutional subscriptions are too expensive. [23]

---

[22] *Id.* at § 4.1(vii).

[23] The Settlement heightens inequalities among libraries in other ways. It makes a free public access service terminal available at public libraries and higher education institutions, but not K-12 libraries. *Id.* at § 4.8(a)(i). Additionally, remote access to the ISD without special Registry approval is available only to higher education institutions, not other categories of institutional subscribers, including public libraries. *Id.* at § 4.1(a)(iv). Finally, 83% of public libraries do not have sufficient terminals to meet existing needs; they certainly will not have enough terminals to access the ISD effectively, either through an institutional subscription or the public access service. *See*

10

**V.    The Settlement Does Not Protect User Privacy.**

Privacy is one of libraries' core values; libraries do not monitor the reading habits

of their patrons. Indeed, 48 states and the District of Columbia have statutes that protect

library records from undue intrusion at the expense of privacy, requiring in general a

subpoena before a publicly funded library can disclose records with personally

identifiable information.[24] The Settlement, by contrast, does not specify how Google and

the Registry will protect user privacy. Because Google will provide consumers who have

purchased a book with perpetual online access to the book,[25] it must keep records to

ensure that the consumer's access persists over time, particularly as the consumer uses

different computers to access the book. But the Settlement is silent concerning what

information Google will retain concerning the consumer, how it will use the information,

and what measures it will take to protect the information's security.

The Settlement also contains few details about user information in the

institutional subscription context. Because only authorized users will be able to access

the ISD, Google may have the ability to determine which user is accessing which book in

the ISD. Moreover, the Settlement states that when a user prints out pages of a book in

the ISD, Google will include a visible watermark which displays encrypted session

identifying information "which could be used to identify the authorized user that printed

the material or the access point from which the material was printed."[26] Here, too, the

---

Denise M. Davis, et al., *Libraries Connect Communities: Public Library Funding & Technology Access Study 2007-2008* 29 (2008).

[24] *See* http://www.library.cmu.edu/People/neuhaus/state_laws.html.

[25] Settlement Agreement at § 4.2.

[26] *Id.* at § 4.1(d).

11

Settlement does not indicate whether Google will retain this information, how it will use the information, and what measures it will take to protect the information's security.[27]

The Settlement's silence concerning user privacy stands in stark contrast to its detail with respect to the measures Google and fully participating libraries[28] must take to protect the security of their digital copies of books.  Google and fully participating libraries must develop a security implementation plan that meets the requirements of the Security Standard set forth in an attachment to the Settlement Agreement.[29] The seventeen-page Security Standard addresses topics such as: (1) security management, including security awareness, designation of a security representative, and incident response; (2) identification and authentication, including user identification and authentication, and authentication and password management; (3) access controls, including account management, access approval process, and access control supervision; (4) audit and accountability, including logging and audit requirements, marking of image files, and forensic analysis; (5) network security, including electronic perimeter, network firewall, device hardening, network security testing, remote network accessing, and encryption of digitized files; (6) media protection, including media access, media inventory, media storage, and media sanitization and disposal; (7) physical and

---

[27] Likewise, the Settlement says nothing about user privacy in the public access service context.

[28] Fully participating libraries are libraries that will provide Google with in-copyright books to scan in exchange for a receiving from Google a digital copy of each book the library provides.  A fully participating library must sign an agreement with the Registry that releases the library from copyright infringement liability for participating in the Library Project and that restricts what the library can do with the digital copies it receives from Google.  Settlement Agreement at § 1.58.

[29] *Id.* at § 8.2(a).

environmental protection, including physical access authorizations, physical access control, visitor control, and access records; and (8) risk assessment.[30]

Google and the fully participating libraries must submit their security implementation plans to the Registry for approval. If Google or the fully participating library and the Registry cannot resolve disagreements as to whether the security implementation plan complies with the Security Standard, the parties must submit the disputes to binding arbitration.[31] Google and the fully participating libraries must permit a third party to conduct an annual audit of their security and usage to verify compliance with their security implementation plan.[32] Upon learning of a prohibited or unauthorized access to the digital copies, Google and the fully participating library must notify the Registry of the breach and attempt to cure it, *e.g.*, block the unauthorized access.[33] The Settlement establishes a detailed schedule of monetary remedies up to $5 million, depending on the harm caused by the breach of the security plan, the recklessness or willfulness of the breaching conduct, the promptness of the cure, and the number of breaches with the same root cause.[34]

Evidently, in the Settlement negotiations the class representatives insisted on these measures to protect the security of digital copies of their books; but no one demanded protection of user privacy. Users of the services enabled by the Settlement also cannot rely on competitive forces to preserve their privacy. In the online environment, competition is perhaps the most powerful force that can help to insure user

---

[30] *See* Attachment D to Settlement Agreement.
[31] Settlement Agreement at § 8.2(a)(iv).
[32] *Id.* at § 8.2(c).
[33] *Id.* at § 8.3.
[34] *Id.* at §§ 8.4-8.7.

13

privacy. If a user does not like one search engine firm's privacy policy, he can switch to another search engine. Similarly, a user has many choices among online retailers, email providers, social networks, and Internet access providers. The competitive pressure often forces at least a minimal level of privacy protection.[35]   However, with the services enabled by the Settlement, there will be no competitive pressure protecting user privacy.

In response to concerns raised by libraries and others, Google has stated that it will take appropriate measures to protect user privacy. The Library Associations expect Google, in consultation with the Library Associations and other representatives of user interests, to meet this commitment. Google and the Registry should develop strong policies to protect personally identifiable information, and provide users with clear notice describing those policies.

### VI.    The Settlement Could Limit Intellectual Freedom.

The absence of privacy protection discussed in the previous section could have a chilling effect on a user's right to read because the user might fear the third party monitoring of his or her lines of inquiry. But the Settlement could stifle intellectual freedom in another way as well. The Settlement requires Google to provide free search (including the permitted previews), the public access service, and institutional subscriptions for only 85% of the in-copyright, not commercially available books it has scanned.[36]   This requirement in effect allows Google to exclude over a million books

---

[35] To be sure, there are switching costs, and many service providers have adopted a "lowest common denominator" approach to user privacy.

[36] If Google fails to meet this requirement within five years of the Settlement's effective date, the participating libraries and the Registry may engage a third party to provide these services, using the digital copies Google provided to the libraries. Settlement Agreement at § 7.2(e)(i). This provision is intended to force Google to roll out the services under the Settlement in a timely manner.

14

from the ISD. While Google on its own might not choose to exclude books, it probably
will find itself under pressure from state and local governments or interest groups to
censor books that discuss topics such as alternative lifestyles or evolution. After all, the
Library Project will allow minors to access up to 20% of the text of millions of books
from the computers in their bedrooms and to read the full text of these books from the
public access terminals in their libraries. Although public libraries have often contended
with demands to eliminate or restrict access to specific books, any collection
management decision by a particular librarian affected only that community. Here, by
contrast, if Google bends to political pressure to remove a book, it will suppress access to
the book throughout the entire country.

Similarly, foreign governments probably will attempt to coerce Google to exclude
books the governments consider embarrassing or threatening. On numerous occasions,
foreign governments have pressured Google and other search engine firms to remove
links to websites to which the governments objected. For example, China has demanded
the removal of links to sites promoting free speech and civil liberties in Tibet; Thailand
has required the removal of websites critical of the King of Thailand; and Turkey has
requested the removal of sites that discuss the Armenian genocide. It is safe to assume
that these governments might attempt to pressure Google to exclude politically offensive
books from the ISD.[37] To preempt anticipated complaints, Google might err on the side
of caution and proactively suppress entire categories of books. This, in turn, could

---

[37] Even though Google may provide access to the services permitted under the Settlement
only to users in the United States, users in other countries can employ technologies to
deceive Google's servers concerning their location. Thus, foreign governments would
seek to eliminate certain books from the ISD to prevent their citizens from reading them.

15

deprive students, scholars, journalists and policymakers of access to historically significant materials.[38]

The Settlement also may not sufficiently safeguard intellectual freedom with respect to the Research Corpus. The Settlement allows Google and two institutions to host the set of all digital copies made by Google in the Library Project for purposes of "non-consumptive research" by "qualified users." Non-consumptive research involves computational analysis of the books, and does not include research relating to the intellectual content of the books. The host site has the authority to determine whether a person meets the criteria for a qualified user, and whether her research meets the standards for non-consumptive research.[39] However, the Settlement does not provide a mechanism for a researcher to challenge a host site's rejection of her qualifications or her proposed research agenda. Thus, the host sites could privilege particular lines of inquiry while hampering others, thereby shaping the direction of scholarly research in certain disciplines.

**VII.    The Settlement Could Frustrate the Development of Innovative Services.**

The Settlement specifically provides that the Registry will have the power, "to the extent permitted by law, [to] license Rightsholder's U.S. copyrights to third parties."[40] This provision permits the Registry to license parties other than Google to provide

---

[38] The Library Associations recognize that it is not a search engine firm's responsibility to uphold the First Amendment, particularly when its employees are threatened with imprisonment by oppressive regimes. The U.S. government should play a much more vigorous role promoting free speech internationally. In particular, the U.S. government should aggressively support U.S. search engines against foreign governmental pressure, and communicate unambiguously that it will not tolerate any attempts to intimidate search engine firms into censoring politically sensitive material.
[39] *Id.* at § 7.2(d)(xi).
[40] *Id.* at § 6.2(b)(iii).

16

services relating to books. However, as a practical matter, the Registry can grant licenses only with respect to rightsholders that register with it and grant it the authority to act as their agent with respect to parties other than Google. The class action mechanism cannot bind absent rightsholders with respect to third parties not participating in the Settlement.

Still, this provision could permit the development of competitive and innovative services. For example, if the rightsholders of 1 million books register with the Registry, the Registry would be able to license to Amazon.com the right to sell access to the 1 million books. To be sure, the Registry would not be able to license to Amazon the rights to the other 20+ million books that would be in Google's ISD.[41] Still, Amazon in one agreement with the Registry would be able to increase by 500% the titles available through the Kindle.[42] Moreover, it is possible that these 1 million titles would include many of the most useful books to researchers, because their rightsholders are the most likely to make the effort to register with the Registry. Thus, an institutional subscription to the 1 million books could be valuable to some libraries, and could offer competition to Google's larger ISD.

Although the Settlement permits the Registry to license the rights it possesses to third parties such as Amazon, the Settlement does not require it to do so. Nor does it provide standards to govern the terms by which the Registry would license these rights. This means that the Registry could refuse to license the rights to Google competitors on

---

[41] Google's ability to use these works could provide it with a significant competitive advantage over other firms.

[42] Currently consumers can purchase 200,000 titles for download onto the Kindle e-book. Under this arrangement, Amazon would still have to digitize the 1 million titles.

terms comparable to those provided to Google under the Settlement.[43] The Registry, therefore, could prevent the development of competitive services.

Likewise, the Registry could inadequately represent the true interests of many class members. The Settlement stipulates that the Author Sub-Class and the Publisher Sub-Class will have equal representation on the Board of Directors, but the Settlement is silent on who will select these board members and how class members can ensure that the Registry will in fact advance their objectives.[44] As noted above, the Library Associations are both authors and publishers of books, and thus fall within both sub-classes of plaintiffs. However, writing and publishing books is ancillary to the core mission of libraries – to provide the public with access to information. Tens of thousands of members of the Author Sub-Class are similarly situated to the Library Associations: teachers at all levels write books not for financial gain, but to support their core missions of education and scholarship. Many, if not most, of these class members care far more about the potential impact of the Settlement on the advancement of knowledge than about the modest license fees they may receive under the Settlement.[45]

In other words, many class members will not want the Registry to maximize its profits; rather, they will want the Registry to maximize public access to books. Additionally, they will want the Registry to provide broad access to all the data the Registry collects concerning copyright ownership, thereby minimizing the orphan works problem. Unfortunately, the Registry's board may not reflect this diversity of perspectives.

---

[43] The Settlement contains a "most-favored-nation" clause, but this clause benefits Google, not its competitors. *See* Settlement Agreement at § 3.8(a).
[44] *Id.* at § 6.2(b).
[45] *See* Pamela Samuelson, et al., Letter to the Honorable Denny Chin (April 27, 2009).

18

## VIII. This Court Can Address The Library Associations' Concerns Through Rigorous Oversight of the Implementation of the Settlement.

The concerns discussed above all flow from the concentration of power over the two related essential facilities -- the ISD and the block of copyrights managed by the Registry. Fortunately, the Settlement that created these essential facilities also contains a means of addressing the possible abuses of the control the Registry and Google possess over them. Specifically, the Settlement provides that this Court "shall retain jurisdiction over the interpretation and implementation of the Settlement Agreement."[46] Thus, the parties acknowledge this Court's authority to regulate their conduct under the Settlement. The Library Associations urge the Court to exercise this authority vigorously to ensure the broadest possible public benefit from the services the Settlement enables.

In particular:

- Any library or other possible institutional subscriber must have the ability to request this Court to review the pricing of an institutional subscription. The Court's standard of review should be whether the price meets the economic objectives set forth in the Settlement, *i.e.*, "(1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education."[47]

---

[46] Settlement Agreement at § 17.23.

[47] *Id.* at § 4.1(a)(i). The proposed Book Rights Registry is similar to two organizations that collectively manage performance rights: the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI). Both ASCAP and BMI are subject to consent decrees resolving antitrust actions brought by the U.S. Department of Justice. The ASCAP consent decree has existed, with modifications, since 1941; and the BMI consent decree since 1966. Under the consent decrees, ASCAP and BMI must grant, on a non-discriminatory basis, either a blanket license to their entire catalogue, or a license for the performance of a particular work. A court in this district has continuing jurisdiction over the consent decrees, and has established a rate court to resolve disputes concerning license fees. In proceedings before the rate court, ASCAP and BMI have the burden of proving the reasonableness of the rates they seek. Establishment of a rate court in this case is premature. However, this Court has the authority to adopt the procedures necessary to ensure the fairness of the price of the institutional subscription.

19

- Any entity must have the ability to request this Court to review the Registry's refusal to license copyrights to books on the same terms available to Google.

- Any class member must have the ability to request this Court to review the procedures by which the Registry selects members of its board of directors, and to evaluate whether the Registry properly considers the interests of all class members in its decision-making.

- Any user must have the ability to request this Court to direct Google to provide the user with a list of books excluded from any of its services for editorial or non-editorial reasons, and an explanation of why it was excluded. Google already must provide the Registry with a list of books excluded for editorial reasons.[48]

- Any researcher must have the ability to request this Court to review the reasonableness of a Research Corpus host site's refusal to allow the researcher to conduct a research project at the host site.

- Any user must have the ability to request this Court to direct Google and the Registry to disclose their policies for collecting, retaining, disseminating, and protecting personally identifiable information. Additionally, any user must have the ability to request this Court to review whether Google and the Registry are complying with their privacy policies.

In these comments, the Library Associations have identified certain foreseeable

problems that may require this Court's intervention in the future. The Settlement,

however, is potentially so far-reaching that its full implications are unknowable at this

time. While the Settlement's impact might be limited to the creation of a research tool of

use only to serious scholars, the Settlement might also lead to a restructuring of the

publishing industry and a dramatic change to the nature of libraries. The Court should

be prepared to exercise whatever oversight is necessary, for as long as necessary, to

---

[48] Settlement Agreement at § 3.7(e)(i). The Settlement requires Google and the Registry to compile a variety of databases. *See, e.g., id.* at §§ 3.1(b)(ii), 6.6(c). These databases will have many uses, including assisting in finding the owners of orphan works. Accordingly, Google and the Registry should make these databases publicly available.

20

maximize the public benefit from the services enabled by the Settlement.

Respectfully submitted,

Mary Ellen K. Davis
Executive Director
Association of College and Research
     Libraries
50 East Huron Street
Chicago, IL 60611
(312) 280-3248
mdavis@ala.org

Keith Michael Fiels
Executive Director
American Library Association
50 East Huron Street
Chicago, IL 60611
(312) 280-1392
kfiels@ala.org

Charles B. Lowry
Executive Director
Association of Research Libraries
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-2296
clowry@arl.org

May 4, 2009

21

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2009, I caused true and correct copies

of the foregoing comments to be delivered by overnight courier to the Clerk for the U.S.

District Court for the Southern District of New York and to be served electronically on

the following counsel of record:

>       Michael J. Boni, Esq.
>       Joanne Zack, Esq.
>       Joshua Snyder, Esq.
>       Boni & Zack LLC
>       15 St. Asaphs Road
>       Bala Cynwyd, PA 19004
>       bookclaims@bonizack.com
>
>       Jeffrey P. Cunard, Esq.
>       Bruce P. Keller, Esq.
>       Debevoise & Plimpton LLP
>       919 Third Avenue
>       New York, NY 10022
>       bookclaims@debevoise.com
>
>       Daralyn J. Durie, Esq.
>       David J. Silbert, Esq.
>       Joseph C. Gratz, Esq.
>       Keker & Van Nest LLP
>       710 Sansome Street
>       San Francisco, CA 94111
>       bookclaims@kvn.com

Jonathan Band
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-5675
jband@policybandwidth.com

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
The Authors Guild, Inc., Association of American   :
Publishers, Inc., et al.,                          :
                                                   :
        Plaintiffs,                                :
                                                   :   Case No. 05 CV 8136-DC
            v.                                     :
                                                   :
Google Inc.,                                       :
                                                   :
        Defendant.                                 :
-----------------------------------------------------------------x
```

### SUPPLEMENTAL LIBRARY ASSOCIATION COMMENTS ON THE
### PROPOSED SETTLEMENT

The American Library Association, the Association of Research Libraries, and the

Association of College and Research Libraries (the Library Associations) submit these

comments to address developments relating to the proposed Settlement that have arisen

since the Library Associations filed their initial comments with this Court on May 4,

2009. In particular, these comments discuss the amendment Google and the University

of Michigan (Michigan) entered into on May 20, 2009 that expanded the 2004 agreement

that allowed Google to scan books in the Michigan library for inclusion in Google's

search database. These developments have not changed the Library Associations'

position on the Settlement: to prevent the possible negative effects the Settlement may

have on equity of access to information, patron privacy, and intellectual freedom, this

Court must regulate the conduct of the Book Rights Registry (Registry) and Google

under the Settlement.

1

**I. Summary of May 4 Comments**

In their May 4 comments, the Library Associations stated that they do not oppose this Court's approval of the Settlement. The Settlement has the potential to provide unprecedented public access to a digital library containing millions of books. Thus, the Settlement could advance the core mission of the Library Associations and their members: providing patrons with access to information in all forms, including books.

The Library Associations expressed their belief that but for the Settlement, the services it enables would not come into existence in the near term. A class action Settlement provides perhaps the most efficient mechanism for cutting the Gordian knot of the huge transaction costs of clearing the copyrights in millions of works whose ownership often is obscure.

At the same time, the Library Associations recognized that the digital library enabled by the Settlement would be under the control of Google and the Registry. The cost of creating such a library and Google's significant lead time advantage suggest that no other entity would create a competing digital library for the foreseeable future. In the absence of competition for the services it will enable, the Settlement could compromise fundamental library values such as equity of access to information, patron privacy, and intellectual freedom.[1]

In order to mitigate the possible negative effects the Settlement may have on libraries and the public at large, the Library Associations requested this Court to exercise

---

[1] The Urban Library Council (ULC) and the International Federation of Library Associations and Institutions (IFLA) have expressed similar concerns in their filings with this Court. ULC, for example, identified problems of implementation and principle (such as the implications for first sale, fair use, and public domain) relating to the fee for printing out pages from the free Public Access Service terminals in public libraries.

2

its jurisdiction vigorously over the interpretation and implementation of the Settlement. In the Settlement Agreement itself, the parties acknowledged this Court's authority to regulate their conduct under the Settlement.

## II. Pricing Review

In the May 4 comments, the Library Associations observed that the institutional subscription service enabled by the Settlement could evolve into an essential research facility. However, in the absence of meaningful competition, the Registry and Google could set the price of the subscription at a profit maximizing point beyond the reach of many libraries. To address this concern, the Library Associations stated that "any library or other possible institutional subscriber must have the ability to request this Court to review the pricing of an institutional subscription."[2]

On May 20, 2009, Google and Michigan entered into an amendment that expanded the 2004 agreement that allowed Google to scan books in the Michigan library for inclusion in Google's search database.[3] The Amendment is followed by an Attachment A, which sets forth provisions that will apply to all of Google's partner libraries.[4] Attachment A establishes a "pricing review" mechanism that allows those libraries partnering with Google to challenge the price of the institutional subscription. Although this new pricing review could be helpful to libraries, it contains several significant limitations.

---

[2] Library Association Comments at 19.

[3] In July, two other libraries partnering with Google, the University of Wisconsin-Madison and the University of Texas-Austin, also entered into amended agreements.

[4] Attachment A is titled "Collective and Certain Settlement Agreement Related Terms." Google's partner libraries are those libraries that will provide Google with in-copyright books for scanning (*i.e.*, Fully Participating and Cooperating Libraries under the Settlement).

To understand this new procedure, one must first review how the price of the institutional subscription gets set under the Settlement. Google has the responsibility of proposing to the Registry an initial pricing strategy consistent with these objectives: "1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and 2) the realization of broad access to the Books by the public, including institutions of higher education."[5] The Registry and Google can then negotiate terms of the pricing strategy for up to 180 days. If Google and the Registry do not reach agreement, the dispute will be submitted to binding arbitration.[6] Only Google and the Registry would be parties to this arbitration.

The new procedure described in Attachment A of the Amendment would occur after the price-setting process set forth in the Settlement. Sixty days after Google first offers an institutional subscription to the higher education market, and every two years thereafter, a partner library can initiate a review of the pricing of the institutional subscription to determine whether the price properly meets the objectives set forth in the settlement agreement. Only one review can be conducted per two-year period, so if several partner libraries seek to review the price, they must do so jointly through a "designated representative." The pricing review will be conducted by "an independent, qualified third party" designated by the initiating library, subject to Google's approval.[7] Google will pay up to $100,000 of the reviewer's fees and costs for the first two reviews.[8]

---

[5] Settlement Agreement at 4.1(a)(i).

[6] *Id.* at 4.1(a)(iv)(4)a).

[7] Attachment A at 3.c(1).

[8] The potential cost to libraries of challenging the price of the institutional subscription, either through the pricing review established by Attachment A or directly before this Court, underscores the importance of the Antitrust Division of the U.S. Department of

4

Google must provide to the reviewer specified categories of information, some of which the reviewer cannot make directly available to the partner libraries.[9]  The reviewer will prepare a Pricing Review Report, which he or she will provide to Google and all partner libraries.

Ninety days after receipt of the Pricing Review Report, any partner library can initiate an arbitration with Google.   The arbitration will be subject to the dispute resolution procedures in the Settlement Agreement, meaning that the arbitrator's decision will be final and non-appealable.  Additionally, "[a]ny such arbitration will be the exclusive mechanism to resolve disputes between Google and the Initiating Libraries with respect to whether Google is pricing the Reviewable Subscriptions in accordance with the objectives set forth in ... the Settlement Agreement."[10]  Thus, if a partner library agrees to Attachment A, then it is forgoing the ability to request this Court to review the institutional subscription price.

If the arbitrator determines that the price is too high or that Google is not achieving the broad access required by the settlement, he or she can order Google to adjust the price.  The adjustment amount is limited to Google's net revenue (in essence, 37% of the subscription price).[11]

While this new pricing review could benefit libraries, it contains several significant limitations.  First, only Google's partners can initiate the review.  If these

---

Justice closely monitoring implementation of the Settlement – particularly the pricing of the institutional subscription. *See* Section VI below.

[9] This information includes the number of institutions that have institutional subscriptions; a histogram showing the percentage of institutions that pay each price within a pricing category; and Google's list price for each pricing category. Attachment A at 3.c(1).

[10] Attachment A at 3.c(2).

[11] Attachment A at 3.c(3).

5

partner libraries receive large discounts on the institutional subscription, they may not have the financial incentive to pursue this new procedure.[12]  Second, while the procedure allows the arbitrator to order Google to adjust the price downwards, the adjustment amount is limited to Google's net revenue – 37% of the subscription price.[13]  Thus, the subscription price might remain beyond the means of many libraries.  Third, as noted above, the arbitrator's decision is final and unappealable.  This could be problematic to the extent that the arbitrator just "splits the baby" and does not engage in a thorough review of the pricing.

Given these limitations, libraries not partnering with Google must retain the ability to request this Court to evaluate whether the pricing of the institutional subscription meets the objective of "the realization of broad access to the Books by the public, including institutions of higher education."  Moreover, this Court should have access to all the pricing information provided by Google or the Registry under the pricing review procedure.[14]

**III. Intellectual Freedom**

In their May 4 comments, the Library Associations expressed concern that in response to political pressure, Google may exclude entire categories of books from the services permitted under the Settlement.  This, in turn, could deprive students, scholars, journalists, and policymakers of access to historically important materials.  To address this problem, the Library Associations argued that "[a]ny user must have the ability to request this Court to direct Google to provide the user with a list of books excluded from

---

[12] Michigan, for example, will receive a free institutional subscription in perpetuity.

[13] Attachment A at 3.c(3).

[14] *See* note 9, *supra.*

6

any of its services for editorial or non-editorial reasons, and an explanation of why it was excluded."[15]

Attachment A to the Michigan Amendment takes a step towards resolving this issue by requiring Google to provide to the partner libraries' designated representative information concerning whether a book is being excluded from any display uses for editorial or non-editorial reasons, and if for non-editorial reasons, whether the exclusion was for quality, technical, or legal reasons. However, a partner library may disclose to the public only the identity of books excluded for editorial reasons – not the rest of the information about excluded books that Google provides the partner libraries.[16] The Library Associations continue to believe that public disclosure of all this information is the strongest deterrent against censorship. Accordingly, as the Library Associations previously requested, any user must have the ability to request the Court to direct Google to provide a list of excluded books with an explanation for each exclusion.

**IV. Privacy**

In their May 4 comments, the Library Associations noted that the Settlement Agreement was silent on the issue of user privacy. To address this concern, the Library Associations asserted that "any user must have the ability to request this Court to direct Google and the Registry to disclose their policies for collecting, retaining, disseminating, and protecting personally identifiable information."[17] Moreover, "any user must have

---

[15] Library Association Comments at 20.

[16] Attachment A at 10.e.

[17] Library Association Comments at 20.

7

the ability to request this Court to review whether Google and the Registry are complying with their privacy policies."[18]

On July 23, 2009, Google issued a statement about privacy and the Settlement. Google stated that because the Settlement had not yet been approved, and the services authorized by the agreement had not yet been built or even designed, "it's very difficult (if not impossible) to draft a detailed privacy policy."[19] Google added that

[w]hile we know that our eventual product will build in privacy protections – like always giving users clear information about privacy, and choices about what if any data they share when they use our services – we don't yet know exactly how all this will work. We do know that whatever we ultimately build will protect readers' privacy rights, upholding the standards set long ago by booksellers and by libraries whose collections are being opened to the public through this settlement.[20]

The statement linked to an "FAQ" which provided additional detail. In the FAQ, Google stated that "[i]mportant principles from our Google Privacy Policy would apply to this service, as with every Google service. For example, we will never sell personal information about our users. In fact, we will never share individual users' information at all unless the user tells us to …."[21] Google made clear that it would not provide individual user data to the Registry. Google explained that is not required under the Settlement Agreement to provide individual user data to the Registry; to the contrary, "the settlement specifies that in circumstances where the Registry seeks this data, it

---

[18] *Id.*

[19] The Google Books settlement and privacy,
http://googlepublicpolicy.blogspot.com/2009/07/google-books-settlement-and-privacy.html.

[20] *Id.*

[21] The Google Books settlement and privacy: Frequently asked questions,
http://booksearch.blogspot.com/2009/07/google-books-settlement-and-privacy.html

should use legal processes to do so."[22] The Registry would receive aggregate usage data that is needed for the allocation of revenues under the Settlement, but this data would not include information specific to individual users.

According to the FAQ, users of the preview function will not be required to have a Google account nor to provide personal information to Google; thus, "[a]nyone can freely search Google Books and preview up to 20% of most books without logging into Google."[23] With the institutional subscription, "users will be authenticated either using the student's or the institution's [Internet Protocol] address, or using other methods such as Shiboleth -- a technology that lets Google confirm that a user is part of a subscribing institution without knowing who that user is."[24] Likewise, for the free Public Access Service terminals in public libraries, "authentication will be based upon IP and Google will not have information about the individual user."[25] Accordingly, unless a user "chooses to log in to use a Google account, [Google] will not have any information that would uniquely identify them when they access Google Books from a public access terminal in a public library."[26]

The Library Associations welcome the issuance of the FAQ as a positive first step towards Google explaining how it will treat user privacy. At the same time, the FAQ is no substitute for a detailed privacy policy. While the Library Associations agree with Google that "it's very difficult (if not impossible) to draft a detailed privacy policy" before a service is designed and built, Google already is in a position to make more

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*

9

specific and enforceable commitments than those in the FAQ. Many of Google Book Search's privacy features do not turn on detailed engineering and design decisions.

The Center for Democracy and Technology has issued a paper listing many such important privacy features.[27] At this time, Google could make commitments concerning: the posting of a dedicated Google Book Search privacy policy; limiting collection of usage data; having institutional subscribers authenticate their own users; limiting use of users' book annotation; providing users with access to account data; allowing users to delete purchase histories and annotations; seeking a probable cause standard for disclosure of user data to the government and a compelling-interest standard for civil litigant access to user data; releasing aggregate information about requests for user data; disclosing only aggregate data to the Registry; retaining identifying data no longer than necessary; and securing user data. Privacy protections should be addressed before product design is completed so that privacy decisions guide product design, rather than the opposite.

The Library Associations hope that Google, prior to the fairness hearing, will issue a more specific and enforceable statement concerning the privacy measures it intends to take. For example, Google should state explicitly the conditions under which it would disclose an individual's reading history to government entities – an issue the FAQ does not address. If this Court approves the Settlement, Google should continue to consult on privacy issues with the Library Associations and other representatives of user interests as it refines its offerings under the Settlement. When Google completes designing and building these services, it must disclose a detailed privacy policy.

_____

[27] Center for Democracy and Technology, *Privacy Recommendations for the Google Book Settlement*, July 27, 2009, http://cdt.org/copyright/20090727_GoogleRecs.pdf.

10

Thereafter, users must have the ability to request this Court to require Google to comply with this privacy policy, as well as Google's previous commitments concerning privacy.

## V. Diversity on the Registry Board

In their May 4 comments, the Library Associations argued that many class members, such as the Library Associations themselves, "will not want the Registry to maximize its profits; rather, they will want the Registry to maximize public access to books."[28] To ensure that the Registry's board reflects this diversity of perspectives, the Library Associations stated that "[a]ny class member must have the ability to request this Court to review the procedures by which the Registry selects members of its board of directors, and to evaluate whether the Registry properly considers the interests of all class members in its decision-making."[29]

Google is building its institutional subscription database (ISD) by scanning books found in the collections of major research libraries. The ISD, therefore, will reflect the nature of the research libraries' collections. The collections of research libraries are fundamentally different from the collection of a typical public library or the types of books sold in bookstores. Research libraries contain primarily scholarly books. Research libraries acquire popular books only if they are of scholarly interest. Thus, of the 45,429 titles a major distributor sold to research libraries in North America between July 1, 2007 and June 30, 2008, the distributor categorized only 1,572 as "popular:" "a work intended for a public library or a browsing collection."[30] The distributor labeled none of these

---

[28] Library Association Comments at 18.

[29] *Id.* at 20.

[30] *See* Blackwell, North American Approval Coverage and Cost Study, http://www.blackwell.com/librarian_resources/coverage_and_cost.

11

45,429 titles as "geared toward a wide readership," and classified 32,009 titles as aimed at "specialists:" "those who have a familiarity with the subject matter and knowledge of the conventions of the field." Similarly, 12,297 of these titles were published by university or other non-profit publishers. While these books are all in print, the proportions likely are similar for the older, out-of-print books in the research libraries' collections. That is, probably less than 10% of the books are of a popular nature, and more than 25% of the books were published by university or other non-profit publishers.

The precise composition of the ISD cannot be determined until after Google has completed its scanning and those rightsholders who do no not want Google to distribute their books have removed their books from under the Settlement. Nevertheless, based on the composition of the collections of research libraries, it is safe to assume that a very large percentage of the books in the ISD – probably an overwhelming majority – were written by scholars and specialists for other scholars and specialists. It is further safe to assume that these scholars and specialists are more interested in the broad availability of their out-of-print books, and their increased access to the out-of-print books of other scholars and specialists, than in maximizing their royalties from Google Book Search. In other words, these class members would want the price of the institutional subscription set well below the profit maximizing point. Indeed, they might want the price of the institutional subscription just to cover the operating costs of the institutional subscription service.

In public fora since May 4, representatives of the Authors Guild have stated that the Registry will have advisory committees, which will provide various stakeholders such as libraries and scholars with a mechanism for expressing their views to the Registry's

12

board and management. Advisory committees, however, simply are not an adequate

substitute for actual representation of scholarly rightsholders on the Registry board. The

board will set Registry policy on a wide range of issues, particularly the pricing of the

institutional subscription, and the perspectives of the rightsholders of the majority of the

books in the ISD must be reflected on the board itself. Accordingly, the Library

Associations' earlier request that this Court oversee the Registry's selection of board

members remains unchanged.[31]

### VI. Communication with the Antitrust Division

On July 29, 2009, the Library Associations sent William F. Cavanaugh, Deputy

Assistant Attorney General in the Antitrust Division of the U.S. Department of Justice, a

letter to follow-up on a meeting the Library Associations had with Antitrust Division

staff on May 27, 2009. The letter stated that the Division should join the Library

Associations in urging this Court to supervise the Settlement closely, particularly with

respect to the pricing of the institutional subscription and the composition of the Registry

board of directors.

Furthermore, the Library Associations urged the Division to take a proactive role

in the implementation of the Settlement:

> During our meeting, we mentioned that the settlement agreement was in
> essence a "*de facto* consent decree." We now believe that the Division
> should treat the settlement, if approved, as a consent decree to an antitrust
> action it brought. It should monitor the parties' compliance with the
> settlement's provisions as it would monitor the conduct of parties under an
> antitrust consent decree, and it should request the court to take action

---

[31] The Library Associations believe that there would be a diversity of rightsholder
interests with respect to Registry policy if the Settlement were approved. Nonetheless,
class certification is appropriate because the requirements of Rule 23(a) and (b) have
been met.

when it concludes that the parties have not met their obligations under the settlement.

In particular, the Division should ask the court to review the pricing of an institutional subscription if the Division concludes that the price does not meet the economic objectives set forth in the settlement, *i.e.*, "(1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education." Settlement Agreement at 4.1(a)(i). To assist the Division in evaluating the price of the institutional subscription, the Division should have access to all relevant price information from Google and the Registry.

The Division should also request the court to review any refusal by the Registry to license copyrights on books on the same terms available to Google. Finally, if necessary, the Division should ask the court to review the procedures by which the Registry selects members to its board of directors, and to evaluate whether the Registry properly considers the interest of all rightsholders in its decision-making.

[…]Additionally, the Division should ask the court, in its order approving the settlement, to confirm the Division's standing to request the court to enforce the settlement's provisions.

## VII. Conclusion

The likely demand among academic libraries for an institutional subscription is

high; faculty and students performing serious research will insist on the ability to search

and read the full text of out-of-print books. This means that libraries probably will be

among the primary fee-paying users of the services enabled by the Settlement.

Accordingly, this Court should pay special attention to the perspectives of libraries on the

approval and implementation of the Settlement.

Respectfully submitted,

Mary Ellen K. Davis
Executive Director
Association of College and Research
Libraries
50 East Huron Street
Chicago, IL 60611
(312) 280-3248
mdavis@ala.org


Keith Michael Fiels
Executive Director
American Library Association
50 East Huron Street
Chicago, IL 60611
(312) 280-1392
kfiels@ala.org


Charles B. Lowry
Executive Director
Association of Research Libraries
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-2296
clowry@arl.org

September 2, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2009, I caused true and correct copies of the foregoing comments to be delivered by overnight courier to the Clerk for the U.S. District Court for the Southern District of New York and to be served electronically on the following counsel of record:

Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
David J. Silbert, Esq.
Joseph C. Gratz, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111
bookclaims@kvn.com

Jonathan Band
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-5675
jband@policybandwidth.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
The Authors Guild, Inc., Association of American  :
Publishers, Inc., et al.,                         :
                                                  :
       Plaintiffs,                                :
                                                  :        Case No. 05 CV 8136-DC
             v.                                   :
                                                  :
Google Inc.,                                      :
                                                  :
       Defendant.                                 :
-----------------------------------------------------------------x
```

### LIBRARY ASSOCIATIONS' NOTICE OF INTENT TO APPEAR

The American Library Association, the Association of Research Libraries, and the

Association of College and Research Libraries (the Library Associations), members of

both the author and publisher sub-classes, hereby give notice of their intent to appear at

the fairness hearing on October 7, 2009.  Jonathan Band, himself a member of the author

sub-class, will speak on behalf of the Library Associations.  Mr. Band's contact

information is:

> Jonathan Band
> 21 Dupont Circle NW, Suite 800
> Washington, D.C. 20036
> (202) 296-5675
> jband@policybandwidth.com

Respectfully submitted,

Mary Ellen K. Davis
Executive Director
Association of College and Research
Libraries
50 East Huron Street
Chicago, IL 60611
(312) 280-3248
mdavis@ala.org

Keith Michael Fiels
Executive Director
American Library Association
50 East Huron Street
Chicago, IL 60611
(312) 280-1392
kfiels@ala.org

Charles B. Lowry
Executive Director
Association of Research Libraries
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-2296
clowry@arl.org

September 2, 2009

2



INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTIONS
FEDERATION INTERNATIONALE DES ASSOCIATIONS DE BIBLIOTHECAIRES ET DES BIBLIOTHEQUES
INTERNATIONALER VERBAND DER BIBLIOTHEKARISCHEN VEREINE UND INSTITUTIONEN
FEDERACION INTERNACIONAL DE ASOCIACIONES DE BIBLIOTECARIOS Y BIBLIOTECAS
МЕЖДУНАРОДНАЯ ФЕДЕРАЦИЯ БИБЛИОТЕЧНЫХ АССОЦИАЦИЙ И УЧРЕЖДЕНИЙ

国际图书馆协会与机构联合会

الاتحاد الدولي لجمعيات ومؤسسات المكتبات

September 1, 2009

The Honorable Denny Chin
United States District Court Judge
U.S. Courthouse, 500 Pearl Street
New York, NY 10007-1312

Re: *Authors Guild v. Google Inc.*, No. 05-eiv-8136 (DC)

Dear Judge Chin:

The International Federation of Library Associations and Institutions (IFLA) is the leading international body representing the interests of library and information services and their users. It is the global voice of the library and information profession. Founded in 1927, IFLA has 1600 member associations and institutions in approximately 150 countries around the world. IFLA is headquartered in The Hague, the Netherlands.

IFLA is both the author and publisher of books, and thus falls within both sub-classes of plaintiffs.

On August 28, 2009, IFLA's Governing Board adopted the attached Position on the Google Book Settlement. The Position is consistent with the May 4, 2009, comments on the proposed settlement submitted to this Court by the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries (these associations are IFLA members), which noted that the settlement has the potential to provide unprecedented public access to a digital library containing millions of books. At the same time, in the absence of competition for the services it will enable, the settlement could compromise fundamental library values such as equity of access to information, patron privacy, and intellectual freedom. Accordingly, IFLA joins the above-mentioned American library associations in requesting this Court to exercise its jurisdiction vigorously over the interpretation and implementation of the settlement.

Additionally, the Position expresses IFLA's concern about the territorial limits of the settlement. The expanded services permitted under the settlement will be available only to users in the United States. Unless Google is willing and able to reach agreements with rightsholders in other countries, there will be an ever-widening global inequality in access to books in digital format.

Please let me know if you have any questions concerning the IFLA Position.

Respectfully,

Jennefer Nicholson
Secretary General, IFLA

cc: Michael J. Boni, Esq.
    Daralyn J. Durie, Esq.
    Jeffrey P. Cunard, Esq.

Enclosure

## IFLA Position on the Google Book Settlement

The International Federation of Library Associations and Institutions (IFLA) is committed to the principles of freedom of access to information and the belief that universal and equitable access to information is vital for the social, educational, cultural, democratic, and economic well-being of people, communities, and organizations.

IFLA therefore welcomes Google's contribution to achieving these goals. The Google Book Search programme has the potential to provide public access to a digital library of millions of books. It can be, when fully and properly developed, an unprecedented source for the advancement of learning and human development.

Google and representatives of a few libraries, publishers and authors have come to an agreement on how to settle the copyright and other legal issues in relation to the Book Search Project. This settlement is now under review by the United States District Court, Southern District of New York. IFLA hopes that the proposed settlement will serve as the beginning of a fruitful cooperation that will benefit the millions of users whom libraries serve throughout the world, bringing us closer to the achievement of our goal of providing equitable access to information.

However, IFLA believes that the following issues must be satisfactorily addressed before IFLA can support this, or any similar subsequent agreements among libraries, rightsholders and corporate partners:

### _Territoriality – The Digital Divide_

IFLA, the International Federation of Library Associations and Institutions, is deeply worried about the territorial limits of the settlement.

The copyright laws of a country apply only within that country. Therefore, the settlement, which is based on US litigation, would apply only in the United States of America. As a consequence, the expanded services permitted under the settlement' would be provided only to users located in the United States. Users outside of the USA would have access only to the current Book Search service, which for books in copyright permits the display of only three "snippets" consisting of a few sentences of text.

The expanded services would be available to users located in countries outside USA only if Google reaches settlements with rights owner's organisations on a country-by-country basis.

Whether this is possible would depend not only on the good will of the parties involved, but also on the copyright legislation of the countries - e.g., whether their laws allow for class actions or extended collective licensing, or whether they have collecting societies or other organisations with sufficiently broad legal authority to enter into an agreement with Google.

IFLA is concerned that if the Google settlement is approved in the United States and if Google is not able or willing to reach agreements with rights holders in other countries, the consequence will be an ever-widening inequality in access to books in digital format and IFLA will push for continuing discussions on this matter.

1

### *Control of information by one corporate entity*

Google has not disclosed the size of the project, but independent experts estimate that it may amount to digitising 30 million books at a cost of c. $750 million. The immensity of the project, and the fact that Google has a 5-year lead, makes it challenging for other enterprises or institutions to start viable competing projects. In consequence, a large proportion of the world's heritage of books in digital format could be under the control of a single corporate entity should the settlement be approved.

In view of the potential monopolistic nature of the project, IFLA urges the court to exercise its authority to ensure the realization of the broadest possible public benefit from the services enabled by the settlement.

### *Long-term preservation*

When the digitisation project is concluded, it will comprise a large proportion of the world's heritage of books in digital format. The participating libraries will have copies of "their" files for preservation or other uses. Although the Google settlement has provisions for business continuity, the settlement does not seem to include provisions for the long-term preservation of the entire database. Analyses of cost effectiveness may at some point in the future lead Google to reduce the amount of data by discarding parts of them.

The importance and utility of the entire database for users worldwide requires that the agreement include provisions ensuring the long-term preservation of the database as a whole and IFLA urges the court to take this into its considerations.

### *Pricing policy*

The economic terms for the Institutional Subscriptions Database will be governed by two objectives: (1) the realisation of revenue at market rates, and (2) the realisation of broad access by the public, including institutions of higher education. Libraries' recent experience has been that publishers of scientific journals have given priority to the generation of revenue at the cost of broad access, forcing many libraries to cancel subscriptions. If the beneficial societal effects of the Book Search Project are to be fully realised, it is critical that the importance of broad access be given strong weight in the settlement.

In view of the potential monopolistic nature of the project, and the collaborative manner in which it must be implemented, IFLA asserts that libraries must have an integral (not merely advisory) role both in the establishment of pricing for the ISD and the manner in which revenue from it is allocated to the parties, including libraries. It must therefore be possible for any library or institutional subscriber to request the court to review the pricing of services provided.

### *Censorship*

According to the proposed settlement, Google may exclude from the database 15 % of scanned books that are under copyright, but out-of-print. This could lead to the exclusion of one million books.

2

Google is likely to come under pressure from interest groups and even governments to exclude books that are purported to contain "undesirable" information. If Google submits to political pressure and removes books from the database, this could lead to the suppression of these books worldwide and the contravention of censorship legislation or rights of freedom of expression. It is therefore of the utmost importance that Google be obliged under the settlement to publish lists of books that are excluded from its services, and the reason for the exclusion.

### *Privacy*

Patrons' privacy is such a core value for libraries that a court order is usually required to force a library to disclose individuals' use of library resources. Some of the services to be offered under the proposed settlement imply that Google will collect and retain information about users' activities. However, the settlement does not specify how users' privacy will be protected.

IFLA urges the court to require Google to cooperate with library associations and other representatives of users' interests to ensure that adequate measures are taken to protect personally identifiable information.

### *Contracts v statutory exceptions and limitations*

In copyright, contracts too often override statutory exceptions and limitations in ways that diminish users' rights. IFLA asserts that the settlement should therefore clearly state that nothing in it supersedes legislated users' rights, including specific and general exceptions for libraries and their users, and any existing or new approaches to making orphan works accessible.

### *Research*

The database containing the digital copies of the scanned books represents a unique corpus for computational analysis and research. Under the proposed settlement, Google and two institutions may host this Research Corpus for purposes of "non-consumptive research" by "qualified users".[ii] The host site has the authority to decide whether a user is qualified and whether the research is non-consumptive. There is no mechanism to challenge the host's decision and in consequence, certain types of research may be privileged. There seems to be no possibility for foreign researches to get access to the database for research purposes.

It should be possible to request an independent body to review whether the host site's decision to refuse certain researchers or research projects is reasonable, and opportunities for research should be available to qualified researchers throughout the world. IFLA urges that this be taken into the court's considerations.

---

[1] The expanded services consist of three primary services:

o   Previews
    All users in the United States may search Google's entire search database for digitized books free, and see
    up to 20 % text from out-of-print books. (Special rules for special categories e.g. fiction vs. non-fiction.).

o   Consumer purchases

3

Consumers may buy perpetual online access to the full text of out-of-print books. In-print books require that the copyright owner "opt in".

o   Institutional subscriptions.
     Users within an institution may view the full text of all the books in the Institutional Subscription Database (ISD, which will include all the books in the in-copyright but out-of-print category.

"  "Non-consumptive" means that the text is not accessed for display or reading.

August 28, 2009

4