```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9-9-09
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

The Authors Guild, Inc., Association
of American Publishers, et. al.,

      Plaintiffs,

          v.

Google Inc.,

      Defendant.

Case No. 05 CV 8136-DC (ECF)

---

**OBJECTIONS OF HARRASSOWITZ, MEDIA24, STUDENTLITTERATUR AB,**
**NORSTEDTS FÖRLAGSGRUPP AB, NORSTEDTS KARTOR AB, AND**
**LEOPARD FÖRLAG AB TO PROPOSED SETTLEMENT AND BRIEF OF**
**AMICI CURIAE BÖRSENVEREIN DES DEUTSCHEN BUCHHANDELS,**
**SCHWEIZER BUCHHÄNDLER – UND VERLEGER–VERBAND SBVV,**
**HAUPTVERBAND DES ÖSTERREICHISCHEN BUCHHANDELS, AND**
**SVENSKA FÖRLÄGGAREFÖRENINGEN**

MACHT, SHAPIRO, ARATO &
  ISSERLES LLP
Alexandra A.E. Shapiro (AS 4816)
Cynthia S. Arato (CA 8350)
1114 Avenue of the Americas
45th Floor
New York, New York 10036
Phone: (212) 479-6724
Fax: (212) 202-6417

*Attorneys for Harrassowitz, Media24,*
*Studentlitteratur AB, Norstedts*
*Förlagsgrupp AB, Norstedts Kartor AB,*
*Leopard Förlag AB, Börsenverein des*
*Deutschen Buchhandels, Schweizer Buchhändler*
*– und Verleger–Verband SBVV, Hauptverband*
*des Österreichischen Buchhandels, and Svenska*
*Förläggareföreningen*

## Table of Contents

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 3

A. The Objecting Parties .......................................................................................................... 3

B. The Vast, Worldwide Scope Of The Settlement ................................................................. 4

ARGUMENT ............................................................................................................................... 6

I. Notice To Foreign Rightsholders Was Inadequate ................................................................. 6

A. The Parties Violated This Court's Order By Failing To Translate The
Settlement Agreement ............................................................................................................ 6

B. The Failure To Translate The Settlement Also Violated Foreign
Rightsholders' Rights Under Rule 23 And The Due Process Clause ......................... 8

C. Foreign Rightsholders Did Not Receive Adequate Notice Because The
Notice Documents Contain Fundamental Translation Errors and Because
Individual Notice Was Not Sent To All Class Members ........................................... 11

II. The Settlement Conflicts With U.S. Treaty Obligations Under The Berne
Convention ............................................................................................................................ 13

A. This Country Has A Longstanding Commitment To Honoring Its
International Obligations Under Berne ..................................................................... 13

B. The Settlement Would Conflict With Fundamental Berne Protections
That The U.S. Promised To Uphold ......................................................................... 15

1. The Settlement Eviscerates Exclusive Rights ....................................................... 15

2. The Settlement Imposes Formalities That Impair Copyright ........................... 17

3. The Settlement Treats Certain Foreign Rightsholders Less Favorably
Than It Treats U.S. Citizens .................................................................................. 21

C. Approval of the Settlement Would Be Contrary To U.S. Public Policy
And Would Harm U.S. Interests .............................................................................. 24

III. The Settlement Is Not Fair, Reasonable Or Adequate ........................................................... 25

IV. The Named Plaintiffs, All Of Whom Are Domestic Entities Or Authors,
Have Not Adequately Represented The Class .................................................................. 29

CONCLUSION .................................................................................................................... 30

**Table of Authorities**

<u>Cases</u>

*Adsani v. Miller*, 139 F.3d 67 (2d Cir. 1998)........................................................................ 11

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).................................................. 29

*Augustin v. Sava,* 735 F.2d 32 (2d Cir. 1984)...................................................................... 12

*Austin v. Pennsylvania Dep't of Corrections*, 876 F. Supp. 1437 (E.D. Pa. 1995) ............ 9

*Boddie v. Connecticut*, 401 U.S. 371, 380 (1971) ............................................................... 11

*Bridgeport Fittings, Inc. v. NLRB*, 877 F.2d 180 (2d Cir. 1989)........................................ 10

*Carell v. The Shubert Organization, Inc.*, 104 F. Supp. 2d 236 (S.D.N.Y. 2000)............. 15

*Cody v. Hillard*, 88 F. Supp. 2d 1049 (D.S.D. 2000) ........................................................... 9

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) .............................................. 25, 26

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)........................................................... 11

*Gates v. Rohm and Haas Co.*, 248 F.R.D. 434 (E.D. Pa. 2008) .......................................... 9

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)........................................ 25

*In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436
    (S.D.N.Y. 2004) .................................................................................................................. 9

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................... 12

*In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)............................................................................................... 9

*In re Warner Communications Securities Litigation*, 798 F.2d 35 (2d Cir. 1986) ........... 26

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir. 1998)...... 15

*Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832 (9th Cir. 1996)...................... 10

*Marisol A. by Forbes v. Giuliani*, 185 F.R.D. 152 (S.D.N.Y. 1999)................................. 12

*Marriott In-Flite Servs. Div. v. NLRB*, 417 F.2d 563 (5th Cir. 1969................................. 10

*Mersay v. First Republic Corp.*, 43 F.R.D. 465 (S.D.N.Y. 1968) ...................................... 29

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .......................... 8, 11

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)................................................ 11

*Perez v Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007) .......................................... 9

*Rios v. Read*, 73 F.R.D. 589 (E.D.N.Y. 1977) ................................................................... 12

*Roebuck v. Hudson Valley Farms, Inc.*, 239 F. Supp. 2d 234 (N.D.N.Y. 2002) .............. 12

*Royal Ahold N.V. Securities & ERISA Litigation*, No. Civ. 103MD01539,
    2006 WL 132080 (D. Md., Jan. 9, 2006) ........................................................................ 12

*Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561
    (E.D. Pa. 2001)................................................................................................................ 27

*Sims v. Montgomery County Comm'n*, 890 F. Supp. 1520 (M.D. Ala. 1995) ..................... 9

*Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088 (9th Cir. 1994)....... 15

*W.Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d Cir. 1971) ............................................ 11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ................. 8, 12, 25

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ................................................. 8-9, 26


**Statutes and Legislative Material**
17 U.S.C. § 106................................................................................................................... 15

17 U.S.C. § 411(a) ............................................................................................................. 14

Berne Convention Implementation Act of 1988 § 3(a)(1), Pub. L. 100-568, 102 Stat.
    2853, 17 U.S.C. § 101................................................................................................... 14

House Report on the Berne Convention Implementation Act of 1988,
    H.R. Rep. No. 100-609, 100th Cong., 2d Sess. 27 (1988)................................ 13, 14, 25


**Rules**
Fed. R. Civ. P. 23 .......................................................................................................*passim*


**Other Authorities**
Agreement on Trade-Related Aspects of Intellectual Property Rights............................. 14

Berne Convention for the Protection of Literary and Artistic Works,
    Sept. 8, 1886 (Paris Text 1971, as amended Sept. 28, 1979),
    828 U.N.T.S. 221 ................................................................................................ *passim*

Orrin G. Hatch, *Better Late Than Never: Implementation of the 1886
    Berne Convention*, 22 Cornell Int'l L.J. 171 (1989) ......................................... 14, 15, 18

Brian Lavoie et al., *Anatomy of Aggregate Collections: The Example of
    Google Print for Libraries*, D-Lib Magazine, September 2005 ...................................... 6

*EBF statement on the Association of American Publishers, Authors' Guild,
    Google settlement agreement*, European Booksellers Federation,
    November 2009............................................................................................28

Honor Mahony, *EU states concerned over Google library plans*, EUobserver,
    May 27, 2009 ........................................................................................................... 6

*5 Moore's Federal Practice* § 23.162[3] (2009) ................................................................. 8

*3 Newberg on Class Actions* § 8:32 (2009) ........................................................................ 8

Ralph Oman, *The United States and the Berne Union: An Extended Courtship*,
    3 J.L. & Tech. 71 (1988)............................................................................................. 18

U.S. Copyright Office, Circular 38A, International Copyright Relations
    of the United States.......................................................................................................... 5

World Intellectual Property Organization, *Guide to the Berne Convention for the
    Protection of Literary and Artistic Works* (Paris Act 1971) (1978) ............................. 18

7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil*
    § 1765 (3d ed. 2005) ...................................................................................................... 29

## INTRODUCTION

The scope of the proposed Settlement Agreement (the "Settlement")[1] and, in particular, its international reach, is unprecedented.  It seeks to grant Google the enormously valuable right to exploit digitally, and in perpetuity, every non-public domain book ever published or made available virtually anywhere in the world – regardless of whether the book was ever before published in the U.S., or whether Google has previously exploited or copied it.  So long as a book exists somewhere in the world, Google automatically gets rights to it.  Moreover, the Settlement seeks to strip foreign copyright owners of their bedrock exclusive rights to control the use of their works in the U.S.  Yet, remarkably, the parties failed to properly notify the foreign class members of their overreaching resolution of this action.

The Settlement is fundamentally unfair to foreign rightsholders and this Court should reject it or decline to certify the class with respect to these foreign class members, for the following reasons:

*First,* the Settlement purports to bind hundreds of thousands of foreign rightsholders who reside in non-English speaking countries and either do not speak English at all or do not speak it with the proficiency needed to comprehend the settlement documents.  Nonetheless, the parties never translated the complex, 334-page Settlement into a single foreign language for any foreign class member to review – even though the named Plaintiffs represented to this Court that the parties would translate it into 35 different languages and this Court ordered the parties to do just that.  The parties' failure to translate this document into any foreign language deprived foreign rightsholders

---

[1] Capitalized terms not separately defined herein have the meaning set forth in the Settlement.

residing in non-English speaking countries of any meaningful opportunity to review the Settlement or fully understand its terms before being forced to make important and permanent decisions affecting their rights in this action, including whether to object to, or opt out of, the Settlement. Even the formal Notices, which were translated, were unintelligible to non-English speakers due to numerous translation errors. Accordingly, the notice to putative foreign class members was not reasonable or adequate under this Court's Order, Federal Rule of Civil Procedure 23 or the Due Process Clause.

*Second*, the Settlement, which seeks to upend the bedrock rights of foreign copyright holders to control the exploitation of their works, contravenes the U.S.'s treaty obligations under the Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, (Paris Text 1971, as amended Sept. 28, 1979), 828 U.N.T.S. 221 ("Berne Convention" or "Berne"). If approved, the Settlement would (1) grant Google automatic rights to exploit digitally millions of Books and Inserts found throughout the world without requiring Google to obtain *any* authorization from *any* foreign copyright owner; and (2) require rightsholders to jump through burdensome hoops simply to exercise a watered-down contractual right to halt such use. That unprecedented usurpation of copyright owners' rights violates Berne's most fundamental provisions, including its protection of copyright owner's exclusive rights and the prohibition against imposing formalities that would impair the exercise of those rights. The Settlement also violates Berne's requirement that this country treat foreign rightsholders no less favorably than it treats its own nationals.

The Settlement's attempt to violate Berne is particularly unfair, given that it expressly *relies* on Berne to sweep foreign rightsholders into its embrace. It purports to

extend to every foreigner, even if their works were never published in the U.S., so long as their "country has copyright relations with the United States because *it is a member of the Berne Convention*." Notice, p. 5 (emphasis added). Yet the Settlement then proceeds to deprive foreign rightsholders of the very protections that Berne affords. It would be fundamentally unfair, and an affront to international comity, for this Court to allow the parties to proceed in this fashion and to have it both ways.

*Third,* for each of the additional reasons set forth below and by other objecting class members and in which we join, the Settlement – which purports to resolve "claims" never asserted in this case in order to fuel Google's private business enterprise and by usurping time-honored copyright rights – is not fair, reasonable or adequate.

*Finally*, the named Plaintiffs, who are all domestic entities, cannot adequately represent, and have not adequately represented, unnamed foreign rightsholders, whose rights these Plaintiffs have cavalierly disregarded.

## FACTUAL BACKGROUND

### A. The Objecting Parties

These objections are brought on behalf of class members Harrassowitz, Media24, Studentlitteratur AB, Norstedts Förlagsgrupp AB, Norstedts Kartor AB, Leopard Förlag AB (the "Objecting Class Members"), as well as foreign publishing associations for the Federal Republic of Germany (Börsenverein des Deutschen Buchhandels), Switzerland (Schweizer Buchhändler – und Verleger–Verband SBVV), Austria (Hauptverband des Österreichischen Buchhandels), and Sweden (Svenska Förläggareföreningen) (the "Foreign Associations").

The Objecting Class Members are preeminent book publishers located in Europe

and have published, collectively, tens of thousands of books, spanning a vast array of
genres, since 1922. Although the Objecting Class Members publish some of their works
in the U.S., they publish the majority of their works within Europe, and never anticipated
that their works would be authorized for publication in the U.S. without their affirmative
consent. However, under the proposed Settlement, each of the Objecting Class Members
is a member of the Settlement Class.[2]

Each of the Foreign Associations is the leading and largest advocate for book
publishers in its respective nation and represents the public policy interests of numerous
book publishers who are members of the putative Settlement Class.[3] Accordingly, the
Foreign Associations are uniquely positioned to advise this Court about how the
Settlement will prejudice their members and foreign rightsholders.

### B. The Vast, Worldwide Scope Of The Settlement

The Settlement purports to bind all persons and entities that, as of January 5, 2009,
own a "U.S. Copyright Interest" in one or more Books or Inserts (*e.g.*, works published in
or after 1922). Settlement § 1.38, 1.142; Notice, p. 5. Persons owning a "U.S. Copyright
Interest" are not limited to domestic rightsholders or even foreign rightsholders who have
published works in the U.S. To the contrary, anyone who has ever published, authored or

---

[2] Declaration of Barbara Krauss, sworn to on August 31, 2009 ("Krauss Decl.") ¶ 4; Declaration
of Ashoek Adhikari, sworn to on August 30, 2009 ("Adhikari Decl.") ¶ 7; Declaration of Jerker
Fransson, sworn to on August 27, 2009 ("Fransson Decl.") ¶ 4; Declaration of Maria Hamrefors,
sworn to on August 31, 2009 ("Hamrefors Decl.") ¶ 4; Declaration of Dan Israel, sworn to on
August 31, 2009 ("Israel Decl.") ¶ 4.

[3] Declaration of Dr. Christian Sprang, sworn to on August 31, 2009 ("Sprang Decl.") ¶¶ 2-3;
Declaration of Inge Kralupper, sworn to on August 27, 2009 ("Kralupper Decl.") ¶¶ 2-3;
Declaration of Dani Landolf, sworn to on August 28, 2009 ("Landolf Decl.") ¶¶ 2-3; Declaration
of Kristina Ahlinder, sworn to on August 28, 2009 ("Ahlinder Decl.") ¶¶ 2-3. Although the
Foreign Associations are not Objecting Class Members, they respectfully request leave to join
this brief as amici curiae.

translated a Book or Insert in *any* country having "copyright relations" with the U.S.

under the Berne Convention is "likely to own a U.S. copyright interest" and to thus be

included in the Settlement Class.[4]  As the Notice states:

> If you are a rightsholder who is a national of, or is otherwise located in, a
> country other than the United States, you are likely to own a U.S.
> copyright interest if (a) your Book was published in the United States, or
> (b) your Book was not published in the United States, but your country has
> copyright relations with the United States because it is a member of the
> Berne Convention . . . **You should assume that you own a U.S.
> copyright interest in your Book, unless you are certain that your Book
> was published in, and that you reside and are located in, one of the
> few countries that have not had or do not now have copyright
> relations with the United States.**

Notice, p. 5 (emphasis in original).

The Settlement will give Google, by default, a range of perpetual digital rights to

exploit (ostensibly in the U.S. only) copyrighted works of those members of the

Settlement Class who take no action in this case, for any reason.  Google will obtain these

rights without the affirmative consent of the rightsholder and with respect to any and all

Books and Inserts published in the world even if Google has not yet (1) digitized those

works; or (2) identified them on their Books Database. *See* Settlement §§ 3.1(b)(ii);

Notice, p. 6.

Although the Settlement purports to provide copyright owners with certain

"rights" to direct Google not to use their works, those "rights" are available only to

members of the Settlement Class who (1) do not opt out of the Settlement; (2) jump

through a series of complicated and cumbersome administrative hoops to notify Google

---

[4] As of March 2009, the United States had copyright relations with approximately 179 of the 194
countries existing in the world today. *See* U.S. Copyright Office, Circular 38A, International
Copyright Relations of the United States (July 2009).

not to use their works; (3) permanently waive their right to sue Google for copyright infringement if Google fails to honor their directions. Settlement §§ 1.132, 3.5, 10.2.

The Settlement's impact on foreign rightsholders is real and substantial. Even estimating conservatively, foreign rightsholders likely own and control over half of the Books and Inserts that the Settlement purports to reach.[5] In addition, as demonstrated below, the Settlement prejudices foreign rightsholders in unique ways. As Google spokesperson Bill Echikson has stated, the Settlement is "groundbreaking," and "creates a new marketplace for both European authors and publishers to sell their works." Honor Mahony, *EU states concerned over Google library plans*, EUobserver, *at* http://euobserver.com/871/28193 (May 27, 2009).

**ARGUMENT**

## I.    NOTICE TO FOREIGN RIGHTSHOLDERS WAS INADEQUATE

### A.    The Parties Violated This Court's Order By Failing To Translate The Settlement Agreement

Given the worldwide reach of this proposed settlement, the parties understood the critical need to translate the Settlement Agreement for non-English speaking foreign rightsholders. Accordingly, in seeking approval of their Notice Plan, Plaintiffs expressly promised this Court that "Plaintiffs and Google will maintain a Settlement website . . . on which the Notice, *this Settlement Agreement*, and other relevant information (*translated into approximately 35 languages*) will be displayed." Memorandum of Law in Support

---

[5] For example, a 2005 study of approximately 10.5 million Books contained in the Books Database and collected from five major research libraries located in the U.S. and England demonstrated that over 50% of those works were non-English, likely published abroad. *See* Brian Lavoie et al., *Anatomy of Aggregate Collections: The Example of Google Print for Libraries*, D-Lib Magazine, September 2005, *at* http://www.dlib.org/dlib/september05/lavoie/09lavoie.html.

of Plaintiffs' Motion for Preliminary Settlement Approval (Docket # 57), p. 23 (emphasis added).

This Court's Order Granting Preliminary Settlement Approval (the "Order") requires the parties to comply with the Plaintiffs' promise. The Order states, "[b]eginning on January 12, 2009 or earlier, Class Counsel shall . . . comply with the Notice program as set forth in Article XII of the Settlement Agreement." Order ¶ 17. Article XII(e), in turn, provides that the parties will maintain "a website dedicated to the Settlement and through which the Notice, this Settlement Agreement, and other relevant information (*translated from English whenever appropriate*) will be made available . . . ." (emphasis added).

Inexplicably, since its launch over seven months ago, the Settlement Website has never included *any* translation of the Settlement – even though large numbers of foreign rightsholders lack the language skills necessary to read or comprehend this dense 334-page document in English. Krauss Decl. ¶ 10; Adhikari Decl. ¶ 14; Fransson Decl. ¶ 9; Hamrefors Decl. ¶ 9; Israel Decl. ¶ 9; Sprang Decl. ¶ 5; Landolf Decl. ¶ 5; Kralupper Decl. ¶ 5; Ahlinder Decl. ¶ 5.[6]  Because the parties violated this Court's Order and thus deprived foreign language speakers of any genuine opportunity to read the Settlement Agreement, or understand all of its complex terms (*id.*), the Settlement should not be approved.

---

[6] The Settlement Website masks the parties' failure to translate the Settlement. When a user accesses the Settlement Website in any one of the available foreign languages, a translated version of the site's home page appears, with an option to access the Settlement. When the user selects the Settlement option, the table of contents for the Settlement appears, again translated into the applicable foreign language. However, when the user selects any provision listed on that table, only an *English* version of the Settlement is provided.

### B. The Failure To Translate The Settlement Also Violated Foreign Rightsholders' Rights Under Rule 23 And The Due Process Clause

Federal Rule of Civil Procedure 23(e)(1) requires that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by [a settlement] proposal." This notice must also satisfy the Due Process Clause, with "[t]he standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules [being] measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). In determining what is reasonable, it is well established that "process which is a mere gesture is not due process." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). Rather, "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.*

"Because the Rule 23(e) notice is designed only to be a summary of the litigation and the settlement, it is *crucial to apprise class members of the right and opportunity to inspect the complete settlement documents*, papers, and pleadings filed in the litigation." 3 *Newberg on Class Actions* § 8:32 (2009) (emphasis added); *see also* 5 *Moore's Federal Practice* § 23.162[3], 23-559 (2009) ("If the agreement itself is omitted from the notice because of its length, the notice may inform the members of a place where copies of the settlement are available for their inspection."). Accordingly, although the formal "notice" document need not itself contain the entire settlement agreement, numerous courts have recognized that class members must be given the opportunity to examine the underlying agreement in any class action settlement. For example, in *Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982), the Second Circuit approved a class notice plan, in part, because "[t]hose who wanted to probe more deeply could, as the notice plainly told

8

them, examine '[t]he settlement stipulation' . . . ." *Id.* at 71; *accord In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 326-28 (3d Cir. 1998) ("Rule 23(e) notice is designed . . . to apprise class members of the right and opportunity to inspect the complete settlement documents . . . ."); *Gates v. Rohm and Haas Co.*, 248 F.R.D. 434, 445 (E.D. Pa. 2008) (same).[7]

Here, it was particularly critical to make the Settlement available, because, as the parties and this Court plainly recognized, anyone wanting to *fully* comprehend the scope of this lengthy and complex document must read the Settlement itself.   Indeed, the Notice – which was written by the Parties and approved by this Court – expressly cautions that it *"is only a summary of the Settlement Agreement and your rights.  You are encouraged to review the complete Settlement Agreement carefully."*  Notice, p. 4 (emphasis in original).  The Notice expressly directs the reader to the Settlement, on virtually every page, on at least 24 separate occasions and with respect to a myriad of different settlement provisions, including significant provisions relating to the scope of a Rightsholder's release, "Author-Publisher" procedures, Rightsholder's rights, Google's obligations, limitations on Google's use of the so-called Research Corpus, and definitions of key terms such as "Principal Work."  *See, e.g.*, Notice, pp. 4, 6-11, 14-20, 23-24, 28. On these occasions, the Notice omits critical portions of the Settlement or conceals their

---

[7] *See also In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 449 (S.D.N.Y. 2004) (approving notice, in part because agreement was available on website); *Pérez v Asurion Corp.*, 501 F. Supp. 2d 1360, 1376-77 (S.D. Fla. 2007) (approving notice, in part, because agreement could be printed from website); *Cody v. Hillard*, 88 F. Supp. 2d 1049, 1056 (D.S.D. 2000) (Rule 23(e) satisfied where, among other things, copies of the Settlement in prison-related case were available in prison libraries and provided upon request); *Austin v. Pennsylvania Dep't of Corrections*, 876 F. Supp. 1437, 1455-56 (E.D. Pa. 1995) (approving notice, in part, because location of agreement was included); *Sims v. Montgomery County Comm'n*, 890 F. Supp. 1520, 1528 (M.D. Ala. 1995) (Rule 23(e) satisfied because, among other things, class members were provided with a copy of the proposed promotion/settlement plan).

meaning so that the true impact of the Settlement becomes clear only upon a careful reading of its actual terms.[8]

Nevertheless, the parties made only an English-only version of the Settlement available for review on the Settlement Website. That, of course, was a meaningless gesture for the vast number of foreign rightsholders, who reside in non-English speaking countries, whom the Settlement purports to bind and who lack the English language skills necessary to read or comprehend this dense 334-page document. *See, supra* p. 7.

The parties' failure to make translations of the Settlement available to non-English speaking foreign rightsholders is a fundamental defect that this Court should not excuse. As the Second Circuit has recognized, where a significant number of stakeholders "may have been prevented from intelligently participating in a proceeding due to a failure to translate," the proceeding "should be set aside." *Bridgeport Fittings, Inc. v. NLRB*, 877 F.2d 180, 187 (2d Cir. 1989) (discussing circumstances under which a failure to translate a union ballot would require invalidating union election results); *see also Marriott In-Flite Servs. Div. v. NLRB*, 417 F.2d 563, 567 (5th Cir. 1969) (setting aside election due to failure to translate ballot); *cf. Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 835 (9th Cir. 1996) ("To comply with the spirit of [these] rule[s], it is necessary that the notice be given in a form and manner that does not systematically leave an identifiable

---

[8] The Notice does not disclose that the Settlement releases Google from all potential trademark claims, *compare* Settlement § 10.1(f) *with* Notice, p. 24; that the Settlement grants Google the right to authorize third-party websites to provide Snippet Displays of Books, *compare* Settlement § 3.9 *with* Notice, p. 15; or that the Settlement authorizes Google to use Books and Inserts in any "products and services offered to the public by Google directly or indirectly through third parties," *compare* Settlement §§ 1.63 and 2.2 *with* Notice, pp. 11-15. *See also* Notice, pp. 7, 10, 11, 17, 19 (directing reader to the full Settlement for a complete description of Author-Publisher Procedures, definition of Principal Work, Hosted Version of Book for Rightsholders, "Rightsholders rights," limitations of the Research Corpus, and information on remedies for security breaches).

10

group without notice.").[9]

### C. Foreign Rightsholders Did Not Receive Adequate Notice Because The Notice Documents Contain Fundamental Translation Errors and Because Individual Notice Was Not Sent To All Class Members

Foreign class members also did not receive adequate notice of the settlement because both the Notices and Summary Notices are rife with translation errors. In order to satisfy Rule 23(c) and the Due Process Clause, notice of this action must have been provided to the foreign rightsholders "in plain, easily understood language," in the manner needed "as reasonably to convey the required information" and with the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B) and Advisory Committee Note to 1966 Amendment; *Mullane*, 339 U.S. at 314-15; *Eisen*, 417 U.S. at 173-74.

In order to meet these requirements, courts routinely order the translation of class action notices when non-English speaking class members are involved – which is why this Court's Order correctly required the parties to translate the Notice into dozens of different languages. *See, e.g., W.Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1083 (2d Cir. 1971) (approving settlement and noting that the District Court ordered translated

---

[9] It is of no moment that foreign rightsholders could have commissioned their own translation of the dense, 334-page Settlement. The cost of obtaining such a translation is prohibitively expensive, ranging from $21,000 to $65,000. Sprang Decl. ¶ 6; Landolf Decl. ¶ 6; Kralupper Decl. ¶ 6; Ahlinder Decl. ¶ 6. Imposing this cost on rightsholders would thus unreasonably burden their rights in violation of Rule 23 and the Due Process Clause. *Cf. Boddie v. Connecticut*, 401 U.S. 371, 380 (1971) (cost requirement offends due process where it "operates to foreclose" party's right); *Adsani v. Miller*, 139 F.3d 67, 78-79 (2d Cir. 1998) (excessive appeal bond may unconstitutionally undermine right to appeal). And of course the costs of notice are always imposed only on the parties – not on unnamed class members. *See, e.g., Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 355-56 (1978); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178-79 (1974).

notices).[10]  Of course, where translations are required, they must be accurate and correct.
*Augustin v. Sava,* 735 F.2d 32, 38 (2d Cir. 1984) (finding that immigrant was denied
procedural rights where translations relating to proceedings were inaccurate or
nonsensical); *see also Roebuck v. Hudson Valley Farms, Inc.*, 239 F. Supp. 2d 234, 241
(N.D.N.Y. 2002) (ordering that "all translations of the notice and consent from English
into another language must be verified by a federal court-certified translator").

As set forth in the Sprang and Ahlinder Declarations, the German and Swedish
Notices were rife with translation errors that rendered the Notices and Summary Notices
nonsensical in critical respects and were written in artificially stilted, difficult-to-read
language, as if they were translated by an automated computer program, causing
confusion among foreign class members.  Sprang Decl. ¶¶ 10-22; Ahlinder Decl. ¶¶ 10-
17.  Given these errors, it is possible, and indeed likely, that the translations of the notice
documents in other languages were incorrect as well.  At least, Google has provided
misinformation about the Settlement when responding to inquiries.  Ahlinder Decl. ¶ 19.

The parties conceded that at least the Swedish and German translations were
fatally flawed and thus rushed to create corrected versions of the Notices and Summary
Notices in those languages.  Yet the parties neither alerted class members via the
Settlement Website that both notice forms had been corrected nor republished any of the

---

[10] *See also Royal Ahold N.V. Securities & ERISA Litigation*, No. Civ. 103MD01539, 2006 WL
132080, at *4 (D. Md., Jan. 9, 2006) (ordering translation of notice and other documents in
numerous languages); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1011-12 (N.D.
Ill. 2000) (notice given in Spanish and English); *Marisol A. by Forbes v. Giuliani*, 185 F.R.D.
152, 160 (S.D.N.Y. 1999) (same); *Rios v. Read*, 73 F.R.D. 589, 600-01 (E.D.N.Y. 1977) (same);
*cf. Wal-Mart Stores*, 396 F.3d at 116 (rejecting due process challenge regarding sufficiency of
English-only notices sent to Spanish speaking class members residing in the United States
because objector failed to provide sufficient evidence that such members could not read, or
conduct business in, English).

corrected Summary Notices in the publications in which the original flawed notices

appeared. And it appears that the parties also did not re-send any of the corrected full-

length Notices to individual class members residing in Germany, Austria and

Switzerland. Sprang Decl. ¶ 20; Kralupper Decl. ¶¶ 7-9; Landolf Decl. ¶ 7-9.[11]  Thus, at

best, the parties took inadequate and ineffective half-measures to remedy the translation

errors that never should have occurred in the first place.

Finally, the parties did not make adequate efforts to provide individual notice to

foreign class members. Krauss Decl. ¶¶ 7-11; Adhikari Decl. ¶¶ 10-14; Fransson Decl.

¶¶ 7-11; Hamrefors Decl. ¶¶ 7-10; Israel Decl. ¶¶ 7-11; *see also* Objection of Scott E.

Gant to Proposed Settlement, and to Certification of the Proposed Settlement Class and

Sub-Classes (Docket # 143) at pp. 13-22.

## II.    THE SETTLEMENT CONFLICTS WITH U.S. TREATY OBLIGATIONS UNDER THE BERNE CONVENTION

The proposed settlement should not be approved because it would impair the

rights of foreign copyright holders in conflict with the U.S.'s international treaty

obligations under the Berne Convention.

### A. This Country Has A Longstanding Commitment To Honoring Its International Obligations Under Berne

The Berne Convention, which was first established in 1886, is "the oldest and

most respected international copyright treaty." House Report on the Berne Convention

Implementation Act of 1988, H.R. Rep. No. 100-609, 100th Cong., 2d Sess. 27, at § III.A

(1988) ("House Report"). When implementing Berne, Congress found that U.S.

adherence to Berne would "manifest a firm and sustained commitment to achieving

---

[11] In addition, Notices and Summary Notices were disseminated in South Africa only in English, and not in Afrikaans, thereby making it difficult, if not impossible, for many class members in that country to comprehend the Settlement. Adhikari Decl. ¶ 13.

strong and uniform protection for intellectual property worldwide" and "strongly

encourage other countries to adopt and enforce high levels of [copyright] protection,"

thereby creating "a strong and viable international legal regime that will develop to the

benefit of the United States, not only to the advantage of proprietary interests but also to

the public good." House Report, at § III.B. Congress also found that "U.S. adherence to

Berne will . . . promote trade in copyrighted works." *Id.* Congress reaffirmed its

commitment to Berne in 1994 when it joined the World Trade Organization's Agreement

on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"). TRIPS Art. 9(1)

("Members must comply with Articles 1 through 21 of the Berne Convention.").

By implementing Berne, the U.S. committed itself to honoring *all* of Berne's

provisions. Berne Convention Implementation Act of 1988 § 3(a)(1), Pub. L. 100-568,

102 Stat. 2853, 17 U.S.C. § 101 note (the "Berne Act") (mandating that the "provisions

of the Berne Convention . . . shall be given effect under title 17, as amended by this Act,

and any other relevant provision of Federal or State law, including the common law").

Congress has enacted major legislation over the years to ensure that the U.S. adheres to

Berne, including Berne's prohibition against formalities. Of particular significance here,

before the U.S. accession to Berne, copyright holders were barred from bringing a suit in

the U.S. for copyright infringement unless and until they had registered their infringed

work with the U.S. Copyright Office (*see* 17 U.S.C. § 411(a)), a formality that Congress

recognized was prohibited by Berne. Orrin G. Hatch, *Better Late Than Never:*

*Implementation of the 1886 Berne Convention*, 22 Cornell Int'l L.J. 171, 194-5 (1989).

Accordingly, to bring U.S. law into compliance with Berne, Congress eliminated the

14

registration requirement for foreign copyright holders who have not published their
works in the U.S. *Id.*

Although the Berne Convention is not self-executing, courts look to Berne when
construing the rights of copyright owners. *See, e.g., Itar-Tass Russian News Agency v.
Russian Kurier, Inc.*, 153 F.3d 82, 90-91 (2d Cir. 1998) (reviewing pertinent provisions
of the Berne Act and the Berne Convention in choice of law analysis); *Subafilms, Ltd. v.
MGM-Pathe Communications Co.*, 24 F.3d 1088, 1097 (9th Cir. 1994) (declining to find
extraterritorial application of the U.S. Copyright Act because such application "would be
contrary to the spirit of the Berne Convention," "might offend other member nations" and
"undermine Congress's objective of achieving 'effective and harmonious' copyright laws
among all nations"); *Carell v. The Shubert Organization, Inc.*, 104 F. Supp. 2d 236, 259
(S.D.N.Y. 2000) (recognizing that Berne "may provide support for the decision of a U.S.
court to hear claims brought under foreign copyright laws, and may be important to
decisions regarding choice of law").

### B. The Settlement Would Conflict With Fundamental Berne Protections That The U.S. Promised To Uphold

The Settlement disregards three fundamental Berne guarantees.

1. The Settlement Eviscerates Exclusive Rights

Berne mandates that owners of "works protected by this Convention *shall have
the exclusive right of authorizing the reproduction* of these works, in any manner or
form." Berne, Art. 9(1) (emphasis added).[12] However, if approved, the Settlement would
grant Google automatic rights to exploit digitally millions of Books and Inserts found

---

[12] U.S. law currently accords with this provision by guaranteeing that U.S. copyright owners have
the "exclusive rights to . . . reproduce the copyrighted work in copies or phonorecords . . . ." 17
U.S.C. § 106.

15

throughout the world without requiring Google to obtain *any* authorization from *any* foreign copyright owner. Settlement § 2.1(a). This eviscerates copyright owners' exclusive rights to authorize the reproduction of their works, as guaranteed by Berne Article 9(1).

The parties have attempted to conceal this profound impairment of exclusive rights by proclaiming that the Settlement gives rightsholders the "right" to direct Google not to use their works. That purported "right" is, in practice, illusory.

*First*, regardless of what the Settlement allows copyright holders to do *if* and *after* they choose to remain within the Settlement's regime, the Settlement grants Google rights to exploit anyone's copyrighted works at the outset, by default and without any affirmative grant of rights by the rightsholder. That alone turns the black-letter law of exclusive rights on its head. And although a portion of rightsholders may in fact exercise their so-called "right" to direct Google not to use their works, it is apparent that vast numbers of rightsholders will not, whether out of ignorance, confusion, lack of diligence or resources, or, with respect to orphan works, because they cannot be found. This, of course, is exactly what Google is counting on and why this Settlement is so valuable to it. Indeed, if this Settlement simply obligated Google to do what copyright law already requires of it – to not exploit copyrighted works absent affirmative consent – there would be no reason for much of the Settlement in the first place.

*Second*, this alleged "right" of participating class members to direct Google not use particular works is far from unfettered. As explained below (*see supra* Section II.B.2), it is available only to members of the Settlement Class who do not opt out of the Settlement and who then jump through a series of hoops to direct Google not to use their

works. Settlement § 3.5; *see also* Claim Form.  It also comes at a steep price, in that class members who do not opt out of the Settlement forever waive their rights to sue Google for copyright infringement in the future, or even, in certain circumstances, to recover damages for a breach of contract, even if Google fails to honor those member's directives and exploits their works over their objection. Settlement §§ 2.2, 8.3, 10.2.

*Third*, this alleged "right" is also incomplete.  For example, Google will honor rigthtsholders' requests not to use their work only if the rightsholders file their Claim Form and identify each applicable Book or Insert that is the subject of such request, on or before April 5, 2011. Settlement § 3.5.  After that date, Google will honor these requests only if it has not digitized the applicable work as of the date of the request and only for select Display Uses. *Id.*  Google will in such cases retain the right to make Non-Display Uses of such works, allowing Google to compete with a class member's own exploitation of his or its work in valuable ways. *Id.*  In addition, although Google will "mask" Inserts from on-line displays of Books that contain them, should a rightsholder direct Google not to use his Insert, Google will continue to copy and harvest the data contained in any Insert covered by the Settlement. *Id.*  Thus, to the extent the Settlement protects a "right" by non-opting-out class members to force Google not to use their works, it is a highly circumscribed right that bears no relationship to the exclusive rights that the Copyright Act and Berne guarantee.

> 2.     The Settlement Imposes Formalities That Impair Copyright

Berne mandates that the "enjoyment and exercise of these rights shall not be subject to any formality" in "countries of the Union other than the country of origin." Berne Art. 5(1), (2). As the World Intellectual Property Organization ("WIPO"), a

17

leading authority on Berne, has explained, "(f)irst and foremost" among the many principles of the Berne Convention is Article 5(2)'s requirement that "protection may not be made conditional on the observance of any formality whatsoever . . . *If protection depends on observing any such formality, it is a breach of the Convention.*" WIPO, *Guide to the Berne Convention for the Protection of Literary and Artistic Works* (Paris Act 1971) 33 (1978) (emphasis added). "In the context of the Berne Convention, formalities are generally understood to be legal conditions that, if not fulfilled, affect the existence, *scope of rights*, or continuing validity of a copyright." Ralph Oman, *The United States and the Berne Union: An Extended Courtship*, 3 J.L. & Tech. 71, 81-82 (1988) (emphasis added); *see also* Hatch, *supra*, at 192 (Berne "prohibits signatories from creating 'formalities' which might pose obstacles for the 'enjoyment or exercise' of rights of authors seeking copyright protection."). The Settlement flouts Berne by erecting formalities that impair foreign rightsholder's exclusive rights.

*First*, and most obviously, the class action settlement procedures require foreign rightsholders to take burdensome affirmative action – *i.e.,* to opt out – if they wish to preserve their existing copyright protections and remain legally unaffected by the Settlement. This action requires foreign rightsholders to read and comprehend a complex, poorly translated Notice – along with a 334-page, dense English-only Settlement (to the extent it is even feasible) – simply to determine whether the affirmative act of opting out is in the rightsholder's best copyright interests. Rightsholders then must submit formal paperwork to the Settlement Administrator by a date certain, or forever lose this right. Moreover, in order to effectively opt out, rightsholders are required to provide information including their Sub-Class, name, address and any pseudonym used to

author their works. Notice, p. 25. Publishers must also "identify all of the imprints" under which they publish, or have published their works. *Id.* By requiring rightsholders to take these steps simply to preserve the set of rights currently guaranteed to them under Berne, the Settlement erects a barrier to copyright protection that is inconsistent with Berne's prohibition against formalities.

*Second*, for those who do not opt out, the Settlement imposes additional, cumbersome administrative burdens in order to ensure that rightsholders retain whatever lessened rights exist under the Settlement's compulsory license regime to direct Google not to use their works. Members of the Publisher Sub-Class must submit a lengthy, 8-page Claim Form, which directs them to read the 29-page Notice and requires them to: (1) individually "claim" each one of their Books and Inserts; (2) provide detailed information about each work (including each author, co-author and contributor, imprint, whether the publisher owns worldwide rights to the work and rights to all of the pictorial works within the work); (3) find each work on the Books Database; (4) determine whether Google has classified such work as Commercially Available; (5) inform Google if they agree with such determination (even though the Settlement defines Commercially Available vaguely); (6) provide a description of each Insert; (7) determine if they are Confident or Highly Confident that their works have not reverted to an author; and (8) certify a number of matters, including that the use of any Insert claimed required publisher's permission and publisher did not give permission for their online use after June 1, 2003. *See* Claim Form.

The Books Database is, moreover, seriously flawed in numerous respects, making it extremely difficult for rightsholders to identify all of their works, should they wish to

direct Google not to use them or to challenge Google's designation of a work as not Commercially Available. This is because the Books Database does not group works by "book." Rather, the database contains multiple, and at times, duplicative listings for each work—80 million record entries, which are riddled with errors and conflicting information, including incorrect ISBNs, misspellings of publisher and author names and incorrect publisher and author information, and misuse of publisher and imprint categories. Krauss Decl. ¶¶ 16-17; Adhikari Decl. ¶¶ 26-28; Fransson Decl. ¶ 16; Hamrefors Decl. ¶¶ 15-16; Israel Decl. ¶ 16; Sprang Decl. ¶¶ 25-30. Rightsholders who wish to direct Google not to use their works must identify *all* such listings for Google, yet, given these errors, no rightsholder can locate all manifestations of his work on the Books Database using any one isolated query (i.e., by publisher, title, etc.). Krauss Decl. ¶¶ 14-15; Adhikari Decl. ¶¶ 17-18; Fransson Decl. ¶¶ 14-15; Hamrefors Decl. ¶¶ 13-14; Israel Decl. ¶¶ 14-15; Sprang Decl. ¶ 30. Thus, rightsholders cannot exercise their supposed "right" to direct Google not to use their works without engaging in laborious, painstaking and burdensome efforts of multiple searching and cross-referencing of search results. Sprang Decl. ¶ 36.

Google has been notified of these problems but, despite repeated requests that Google improve the quality of the Books Database, it remains error-filled. Sprang Decl. ¶ 32. Of course, these errors benefit Google, because they make it more likely that rightsholders will be unable to identify all manifestations of their work when seeking to direct Google not to use their works or to correct erroneous classifications of commercial availability, such that Google will end up with unintended rights to exploit rightsholders' works.

Despite these obstacles, many foreign rightsholders will undoubtedly feel compelled to participate in the Settlement, and undertake these administrative burdens, because that is the only way to ensure that Google will commit to not use a copyright holder's works (subject to the limitations noted above). *See* Google Book Settlement FAQ No. 21. Thus, whether a foreign rightsholder decides to opt out of, or remain within, the Settlement Class, the Settlement seeks to impose formalities that impede foreign rightsholders' enjoyment or exercise of their exclusive rights and are contrary to Berne.[13]

> 3. The Settlement Treats Certain Foreign Rightsholders Less Favorably Than It Treats U.S. Citizens

Finally, the Settlement allows Google to treat certain foreign rightsholders less favorably than U.S. citizens. This is contrary to the principle of "national treatment" codified in Article 5(1) of Berne, which provides that "[a]uthors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention."

Foreign rightsholders can be uniquely disadvantaged by the Settlement's definition of the term "Commercially Available," which is meant to embrace those works that are "in-print" and actively marketed by their owners. Notice, pp. 11-12. The Settlement

---

[13]The Settlement also unjustly exploits Berne's prohibition against formalities to maximize the number of foreign citizens captured within its reach. As explained above, in order to honor Berne's prohibition against formalities, Congress extinguished the Copyright Act's requirement that foreigners register their works with the U.S. Copyright Office as a precondition to suing for infringement in a U.S. court. *See supra* p. 14. Thus, while the Settlement reaches only those domestic citizens who have registered their works with that office (because only those citizens have standing to sue for copyright infringement), the Settlements purports to bind all foreigners, regardless of any such registration (because, solely as a result of Berne, foreigners do not need to register their works to have such standing). *See supra* pp. 4-5.

21

provides that Google may not make any Display Uses of any "Commercially Available" Book unless the Rightsholder affirmatively authorizes such use, in recognition of the fact that Google's exploitation of an "in-print" would impair the economic value of that work and should never be allowed absent the owner's clear consent to the same. Settlement §§ 3.2, 3.4. In contrast, Google obtains extremely broad rights to make all Display Uses of Books (including selling and/or displaying the entire Book to consumers) that are *not* "Commercially Available" (*i.e.*, "out-of-print"), on the rationale that those works are, and would remain, essentially dormant absent Google's use. Settlement §§ 3.2, 3.3.[14]

Under the Settlement, however, a work is "Commercially Available" only if its owner is, "at the time in question, offering the Book (other than as derived from a Library Scan) for sale new through one or more then-customary channels of trade in the United States." Settlement § 1.28. The Settlement, which sets no parameters regarding these channels of trade, thus grants Google wide discretion to *ignore* a book's "commercial availability" in a foreign country or through a foreign website, opening the door for disparate treatment of foreign and domestic rightsholders. If a U.S. author is commercially distributing his work in his home country – the U.S. – and nowhere else, then Google will have limited exploitation rights over that work under the Settlement. Yet, if a German author is commercially distributing his work in his home country (Germany) and nowhere else, including through a foreign internet site accessible by U.S. citizens, then Google can deem such work not Commercially Available and thus obtain radically expanded exploitation rights over that work. As a result of this definition,

---

[14] This rationale has no place in today's digital world, where works may be exploited on demand and are thus intentionally cycled "in" and "out of print." *See* Adhikari Decl. ¶¶ 20-24. Accordingly, the Settlement Agreement prejudices publishers who market their works in this fashion. *Id.*

22

foreign rightsholders who actively exploit their Books in their own country will be deprived of the protections afforded to similarly-situated domestic rightsholders under the Settlement, seriously prejudicing their rights vis-à-vis domestic rightsholders. Indeed, currently, the Books Database identifies countless works as not Commercially Available, even though they are available for sale in their country of origin. Krauss Decl. ¶¶ 17, 19; Adhikari Decl. ¶¶ 19-28; Fransson Decl. ¶ 17; Hamrefors Decl. ¶¶ 17-18; Israel Decl. ¶ 17; Sprang Decl. ¶¶ 34-35; Ahlinder Decl. ¶ 20. That disparate treatment is foreclosed by Berne.

The exclusion from the definition of "Commercially Available" of Books derived from a Library Scan has additional unfair implications in the European context. In Europe, libraries are permitted to scan a copyrighted book only after obtaining a rightsholder's permission, with a very limited exception for orphan works after a diligent search is made by the library. Thus, the digitization of a protected Book in a European library has generally been explicitly authorized by the Rightsholder, who had to take an affirmative step to join Library's digitization program. Allowing Google to digitize Books derived from Library Scans would give Google an unfair advantage over European libraries, since the latter had to bear the costs of the diligent search for the Rightsholder. Such authorization would also disregard the specific reasons that European Rightsholders might have for authorizing digitization by a particular library but not commercializing the Book in the U.S.

23

### C. Approval of the Settlement Would Be Contrary To U.S. Public Policy And Would Harm U.S. Interests

The congressional-recognized interests of promoting protection of U.S. works abroad and developing international trade in copyrighted U.S. works would be undermined if this Settlement were to be approved.

Approval of the Settlement with regard to foreign class members would send a message to the world that the U.S. is moving away from the clear standards of Berne, toward a more piecemeal policy that allows private entities to use the U.S. court system to abrogate copyrights through judicial decree. This would weaken U.S. efforts to promote strong copyright protections for U.S. works abroad and could encourage U.S. trading partners to misinterpret their treaty obligations and to impose burdensome and complex administrative schemes that would hurt U.S. copyright owners' interests. It would also undermine U.S. efforts to combat such moves in the future. Notably, the Settlement's usurpation of exclusive rights stands in marked contrast to international efforts to address the same digitization and orphan works issues that this action implicates. Those efforts, including the Accessible Registries of Rights Information and Orphan Works, the Europeana, and the European Commission's i2010 Digital Library Initiative and Germany's Libreka!, seek to respect the rights of copyright owners. Sprang Decl. ¶¶ 41-45.

Taking such a drastic step through judicial action alone also would invade the prerogatives of Congress, in violation of Berne and the U.S. Constitution. Article 9(2) of Berne provides for a narrow exception to Berne's protection of copyright owner's exclusive rights, but that exception is limited to legislative acts, providing that it "shall be a matter for *legislation* in the countries of the Union to permit the reproduction of such

24

works in certain special cases." (Emphasis added). Here, the Court is being asked to

authorize an agreement that would allow Google to reproduce copyrighted works, absent

affirmative consent from the owners of such works.

In addition, in implementing Berne, Congress explained that the framers of the

U.S. Constitution:

> assigned to Congress, the most politically representative of the three
> branches of the federal government, the role of establishing intellectual
> property laws in exchange for public access to creations . . . As this
> country has developed and as new technologies have burst upon the scene,
> Congress has adjusted this nation's intellectual property laws to
> incorporate new subject matter and to redefine the balance between public
> and proprietary interests.

House Report, at § III.C. The Settlement, which would create new national policy in an

area reserved to Congress, should be rejected for this reason as well.

## III.    THE SETTLEMENT IS NOT FAIR, REASONABLE OR ADEQUATE

Federal Rule of Civil Procedure 23(e)(2) requires that the Court find that the

Settlement is "fair, reasonable and adequate." *See also D'Amato v. Deutsche Bank*, 236

F.3d 78, 85 (2d Cir. 2001) (noting that a court must "carefully scrutinize the settlement to

ensure its fairness, adequacy and reasonableness"). Where, as here, the settlement was

negotiated before a class was certified, the settlement "is subject to a higher degree of

scrutiny in assessing its fairness." *Id.* A court determines a settlement's fairness by

looking at both the settlement's terms and the negotiating process leading to the

settlement, with "the quality of representation [being] best measured by results." *Wal-*

*Mart Stores*, 396 F.3d at 116-117 (quoting *Goldberger v. Integrated Res., Inc.*, 209 F.3d

43, 55 (2d Cir. 2000)). In making this assessment the Court is guided by the so-called

"*Grinnell*" factors, including:

25

> (1) the complexity, expense and likely duration of the litigation, (2) the
> reaction of the class to the settlement, (3) the stage of the proceedings and
> the amount of discovery completed, (4) the risks of establishing liability, (5)
> the risks of establishing damages, (6) the risks of maintaining the class
> action through the trial, (7) the ability of the defendants to withstand a
> greater judgment, (8) the range of reasonableness of the settlement fund in
> light of the best possible recovery, [and] (9) the range of reasonableness of
> the settlement fund to a possible recovery in light of all the attendant risks of
> litigation.

*D'Amato*, 236 F.3d at 86 (citations omitted).  In addition, in assessing fairness, a district

court is not "an umpire in typical adversary litigation" but is a fiduciary or "guardian for

class members who have not received a notice or who lack the intellectual or financial

resources to press objections."  *Weinberger*, 698 F.2d at 69 n.10 (citations omitted); *see

also In re Warner Communications Securities Litigation*, 798 F.2d 35, 37 (2d Cir. 1986).

     The Settlement is not fair, reasonable or adequate with respect to foreign

rightsholders, as required by Rule 23(e)(2), for the reasons set forth in Points I and II for

the following additional reasons (as well as those to be presented to this Court by

domestic rightsholders):

     *First*, and most importantly, the Settlement does not satisfy *Grinnell* factors (1), (3),

(4), (5), (6), (8) and (9) – because of how far it strays from the underlying case.  The

Settlement, if approved, would grant Google perpetual rights to exhibit, display, and sell

any Book or Insert in the world in a wide variety of new ways that far exceed the narrow

Snippet Display use (and attendant copying) at issue in the litigation.  Settlement § 2.2.

And the Settlement purports to do so with respect to millions of Book or Insert found

anywhere in the world, in violation of foreign rightsholders' exclusive rights and to

benefit one private, commercial entity.  That bears little relation to the claims actually

asserted in this action and is manifestly unfair.[15]

Various substantive provisions of the Settlement also unfairly disfavor the unnamed foreign class members. As set forth above, the Settlement's treatment of Commercially Available books can deprive foreign rightsholders of protections afforded to similarly-situated domestic rightsholders. The Book Rights Registry ("BRR") to be established by the Settlement is also unfair with respect to foreign rightsholders. This new entity, whose members consist of the entire "Author's Sub-Class" and "Publisher Sub-Class," will be charged with negotiating on behalf of the class such important matters as "new revenue models" that Google seeks to implement as well as licensing arrangements with third-parties. Settlement, Art. VI. Yet the Settlement makes no provision for any foreign representation on the Registry's board, even though the BRR's foreign "members," comprised of foreign rightsholders from approximately 180 countries, will obviously overwhelm the organization's domestic "membership."

The dispute resolution mechanisms in the Settlement Agreement mandate that disputes relating to foreign claims, should Google seeks to use the agreement as a defense to foreign claims, are to be arbitrated in New York, even though the Settlement Agreement ostensibly does not govern foreign claims. Settlement §§ 9.1(b)(v). Judgments obtained against Google are not enforceable in foreign courts, even those having jurisdiction over Google. *Id.* § 9.3.[16] Google's exploitation of foreign works that

---

[15] *See, e.g., Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001) (rejecting class settlement because it purported to resolve future claims).

[16] The Settlement is fundamentally unfair in other ways as well, granting Google a wide safe-harbor for violations of the Settlement, even if such violations would otherwise have been actionable under the United States Copyright laws; allowing Google to "reclassify" a work as not Commercially Available; and giving the BRR power to allow Google to alter the texts of orphan works. Settlement §§ 3.2(d)(ii) and (iii), (e)(ii) and 3.10(c)(i).

27

have not previously been published in the U.S. usurps a copyright owner's potentially

valuable right to be the first to enter the U.S. marketplace with his or its works.  Sprang

Decl. at ¶ 35; Adhikari Decl. ¶ 26.  And although the Settlement ostensibly authorizes

Google's exploitation in the U.S. only, users from around the world will be able to access

Google's U.S. sites through the use of, for example, proxy servers, regardless of any

commitment made by Google to restrict its U.S. sites to U.S. internet users only.  Sprang

Decl. at ¶ 45.

Finally, the reaction of the foreign class, factor (2) in the *Grinnell* analysis, strongly

favors rejection of the Settlement.  Large numbers of foreign class members have

expressed their outrage over the unprecedented scope of the Settlement and the parties'

improper use of the class action mechanism to ensnare foreign rightsholders in Google's

digital book venture.  Sprang Decl. ¶¶ 37-40; Kralupper Decl. ¶ 10; Ahlinder Decl. ¶ 21;

*see also EBF statement on the Association of American Publishers, Authors' Guild,*

*Google settlement agreement*, European Booksellers Federation, *at* http://www.ebf-

eu.org/papers.html (November 2008) (characterizing the Settlement as a "Trojan horse"

which "amounts to an expropriation of authors through the backdoor").  Recognizing the

seriousness of these protests, the European Economic Commission has commenced an

official fact-finding mission to assess the Settlement and its impact on foreign

rightsholders.  Sprang Decl. ¶ 40.  And many rightsholders are simply not in a position

to assert their own objections, due to a lack of resources or because they do not

understand the need, or how, to do so.  Sprang Decl. ¶ 3; Landolf Decl. ¶ 3; Kralupper

Decl. ¶ 3; Ahlinder Decl. ¶ 3.

## IV.   THE NAMED PLAINTIFFS, ALL OF WHOM ARE DOMESTIC ENTITIES OR AUTHORS, HAVE NOT ADEQUATELY REPRESENTED THE CLASS

This class cannot be certified unless the Plaintiffs prove, and this Court finds, that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, "the court [must] be certain the representatives will adequately protect the interests of *all* class members." 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1765 at 320 (3d ed. 2005) (emphasis added). A main consideration in this analysis is the "forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class, so as to insure them due process." *Mersay v. First Republic Corp.,* 43 F.R.D. 465, 470 (S.D.N.Y. 1968). The evaluation of this requirement, which "protect[s] absentees by blocking unwarranted or overbroad class definitions . . . demand[s] undiluted, even heightened attention in the settlement context." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

The named Plaintiffs abdicated their duty to ensure that the Settlement was made available in translated form and that the Notices sent to foreign rightsholders were properly translated, demonstrating their failure to adequately represent foreign rightsholders or to safeguard their rights. *See supra* Section I. The named Plaintiffs ignored U.S. obligations under Berne, and instead allowed Google to exploit this country's membership in Berne, to catapult huge numbers of foreign rightsholders into the Settlement's reach. The named Plaintiffs also failed to protect foreign rightsholders by agreeing to a Settlement that prejudices foreign rightsholders. They cannot adequately represent, and have not adequately represented, the unnamed foreign class members.

29

## CONCLUSION

For each of the foregoing reasons, the Objecting Class Members and the Foreign

Associations respectfully request that this Court reject the Settlement and/or decline to

certify the class with respect to foreign rightsholders.

Dated:    August 31, 2009
          New York, New York

                          MACHT, SHAPIRO, ARATO &
                            ISSERLES LLP

                                     s/
                     _____

                   By:  Alexandra A.E. Shapiro (AS 4816)
                         Cynthia S. Arato (CA 8350)
                         1114 Avenue of the Americas
                         45th Floor
                         New York, New York 10036
                         Phone:  (212) 479-6724
                         Fax:  (212) 202-6417
                         ashapiro@machtshapiro.com
                         carato@machtshapiro.com

*Attorneys for Harrassowitz, Media24,*
*Studentlitteratur AB, Norstedts*
*Förlagsgrupp AB, Norstedts Kartor AB,*
*Leopard Förlag AB, Börsenverein des*
*Deutschen Bushhandels, Schweizer Buchhändler*
*– und Verleger–Verband SBVV, Hauptverband*
*des Österreichischen Buchhandels, and Svenska*
*Förläggareföreningen*