UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X
The Author's Guild, Inc., Association of American

Publishers, Inc., et al.

        Plaintiffs,        Case No.: 05 CV 8136 (DC)

    v.

Google, Inc.,

        Defendant.
_____X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/10/09

## OBJECTION AND NOTICE OF INTENT TO APPEAR OF CLASS MEMBER SHOJIRO AKASHI TO PROPOSED SETTLEMENT BETWEEN PLAINTIFFS THE AUTHORS GUILD, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., ET AL. AND GOOGLE, INC.

      I, Shojiro Akashi, a journalist engaged in literary pursuits in Japan, have published a total of 10 books through several publishers, including Mainichi Newspapers, Kodansha, and Shueisha. I have confirmed that one of my books, to which I held the copyright, has been digitally scanned by Google without my permission and that those images have been made available for Internet download by the general public at any time from Google's database in the United States. Because this act is a clear violation of the copyright laws of Japan, I have already asked the Metropolitan Police Department of Japan to criminally charge Google and its CEO for this violation. Incidentally, the Japanese copyright law is "penal law" and those who violate it can be arrested. The purpose of this statement is to convey my clear intention, as a victim of copyright infringement, to object to the proposed settlement.

### INTRODUCTION

      The proposed settlement is untenable as it is extremely unfair for non-American copyright holders, including the Japanese. Therefore, it should be rejected by this court. The reasons are more clearly delineated below:

*Support for this Statement Objecting to the Proposed Settlement*

I.        Approval of Class Action Status Would Be Improper:

In Japan, an advertisement entitled "legal notice" posted by the settlement administrator appeared in two newspaper columns only once on February 24, 2009. Therefore, I have no doubt that there will be many copyright holders who had no knowledge of this class action lawsuit and whose interests are not addressed in the proposed settlement.

A "Class Action," which is a part of the American judicial system, is needless to say "a system for victims". For class action status to be properly approved in this lawsuit, the basic premise must be that every copyholder in the world who is a victim of copyright infringement in this suit, has been identified, accurately informed of the fact that he/she is a victim, provided with the details of the suit, and then provided with relief. With regard to victims in Japan, the notification of this lawsuit and the proposed settlement have not been proper by any means.

In Japan, the proposed settlement agreement has not been translated into Japanese by the settlement administrator. The only documents that have been distributed in Japanese are a translation of Attachment I to the settlement agreement, called "Notice", which is only a summary of the agreement, and "FAQ". Therefore, English illiterate Japanese copyright holders cannot completely understand the contents of the formal settlement agreement that copyright holders should read and consider. The proposed settlement agreement is written only in English has created an obstacle for Japanese copyright holders who wish to protect their rights. For Japanese people with few English skills, the proposed settlement agreement is unreasonable and unfair because they cannot understand and consider the details of the proposed settlement.

Moreover, a lot of misinterpretation and cryptic translations are found in the Notice distributed in Japanese. For example, at the top of Page 20, it reads in Japanese "書籍に関してはレジストリの知事の過半数が書籍下位資金への支払いの打ち切りを投票した場合にはその限りではありません". In the original English version of the proposed settlement agreement, the word "理事 (Director)" is used, instead of "知事 (Governor)".

2

Furthermore, using the word "若い (pronounce WAKAI, meaning YOUNG in English)" in lieu of "和解 (pronounce WAKAI, meaning SETTLEMENT in English)" on Page 21 of the Notice is a mistranslation. Those two separate words are phonetically identical. However, they have completely different meanings. It can be assumed that this error was caused by the fact that both are pronounced as "WAKAI" in Japanese. Nevertheless, the contents of the proposed settlement agreement cannot be understood accurately from the Notice that contains such inaccurate translations.

Remarkably, nothing has been done to remedy such mistranslations until they were finally corrected in July of this year. However, an updated version of the "notice" withheld the fact that the translation has been corrected.

This means that the settlement administrator kept changing the contents of the Notice without giving any notice to copyright holders. This also means that the content of the Notice has been different, depending on when you visit the settlement administrator's website.

The Notice has been published without checking not only mistranslations but also simple typos. It is clear that the Notice prepared for Japanese copyright holders was not seriously, but rather but loosely, written.

Moreover, on Page 15 of the Notice, it reads, "As for how the pricing will be set, please refer to Section 4.1 of the proposed settlement agreement." How the pricing will be set is an important consideration for copyright holders. However, Section 4.1 of the proposed settlement agreement is only written in English. If the settlement administrator had committed himself to promoting a fair settlement, this section should have been translated into Japanese. The Notice as provided is unaccommodating to the Japanese and an impediment to their understanding how the pricing will be set. The proposed settlement does not offer a fair process to the Japanese copyright holders.

Class action status should not be approved in this lawsuit, unless a fair process is provided for all class members. Since the notification of class action process has not been thorough, maintaining the opt-out deadline of "September 4, 2009" and the deadline for claims against Google and the copyright registry is squarely contrary to the purpose of providing "relief

for victims" that the class action system vows to promote. If the proposed settlement is to be treated as a class action settlement, at the very least the deadline to opt-out and file claims against Google and the copyright registry should be reset.

II.     The copyright registry does not represent the interests of the Japanese copyright holders

It has been said that the board of the copyright registry that will be established in New York will consist of 4 copyright holders and 4 representatives of publishers. However, it is very likely that the board will be dominated by Americans and it is highly questionable to what extent rights of non-American copyright holders, including the Japanese, will be protected. According to the proposed settlement, the copyright registry will deduct 10 to 20% in administrative costs from the subscription / inclusion fees paid by Google.

With these administrative costs collected from the subscription / inclusion fees of the copyright holders worldwide, it is apparent that the total amount paid to the copyright registry will be enormous. Yet, the percentage of these administrative costs was not mentioned at all in the Japanese translation of the Notice.

Assuming for the sake of illustration that the current 7 million books in the Google's digital book collection generates profit of $1.00 per book and its 63% (63 cents) will be collected by the copyright registry. The total subscription / inclusion fees payable to the copyright registry by Google (63 cents × 7 million books) easily exceeds 40 million dollars. Further, the low estimate of the administrative costs will be 4.41 million dollars in total and the high estimate will be 8.82 million dollars in total. It should be stressed that this money is something that could not have been obtained if Google did not in the first place digitally scan books without copyright holders' permission.

This means that the copyright registry is a new business model that generates huge profits by using someone else's copyright. Still, in the proposed settlement agreement, the copyright registry is described as a "nonprofit organization". Furthermore, the proposed settlement does not provide for when the payment to copyright holders and publishers will be made. With no

4

rough time frame given, the possibility of "not getting paid forever" cannot be entirely eliminated. In addition, because the "anti-conflict provision" of the settlement uses the U.S. system, it would be fair to say that relief for non-American copyright holders is practically nonexistent.

There is another problem with the proposed settlement agreement in that there are provisions that are only written in the English version of the agreement. For example, there is a clause which provides that Google's right to use books is "transferrable". This right can also be transferred through merger and acquisition. Something that important is not even mentioned in the summary of the proposed settlement that was translated into Japanese. If Google goes bankrupt, will copyrights of books written by Japanese authors be bounced around all over the world?

To start with, the nature of copyright does not allow "uniform management" and the idea of the copyright registry included in the current proposed settlement gives nothing but satisfaction to interests of Google and the copyright registry. With "AdSense" ads or "partner programs", Google has already established systems to deal with local corporations and individuals directly. This means that Google already has the ability to pay directly to copyright holders and the related financial control. If so, then there is no need to bother to establish this copyright registry, and even more, there is no reason for the copyright registry to collect administrative costs.

III. The proposed settlement will marginalize libraries

Needless to say, authors can make money only when people buy their books. However, as customary, an unspecified number of people are allowed to read books time and time again at a library. It has been widely understood that a library, where those who do not have money can read books, is a device humans created to allow everyone to engage in cultural activities and enjoy the fruits of wisdom.

When I was young and poor, I largely enjoyed the benefits libraries offered. It is no exaggeration to say that I went into my current profession thanks to libraries. I believe that it

was Google's trespassing on the good intentions of copyright holders with regard to libraries that in some sense brought about this Google Book Search lawsuit. Copyright holders have always trusted libraries and were satisfied to assert their rights only by requesting that libraries not to allow their patrons to make copies of their entire books. That is, the generosity of copyright holders toward libraries inadvertently led to this incident.

If Google had brought its full financial power into action, it seems that it would have been very easy for Google to buy every book on the market and scan all of them, but of course there is a reason why they scanned only the collection of libraries. The reason is: Google would not be able to claim "fair use" as to those books that are on the market. Let's take 100 steps back and suppose that the fair use principle is applied to digitalization of a library collection. This exception should be for students and the general public, not for one profit-making business. Therefore, lending books to Google, who publicly announced a plan of digital scanning, is nothing but abuse of the fair use exception. Thus, copyright holders suffer an unreasonable loss as a result of their good faith in libraries.

There has been series of lawsuits called "Karaoke copyright suit", which became instrumental in forcing Karaoke bars across Japan to sign a copyright agreement for use of songs. What would happen if every copyright holder whose book is a part of the library collection files lawsuits all at once and demand royalties for each read against those libraries that abuse "fair use" as a result of the copyright holder's continuous suffering of an unreasonable loss? Some of the copyright holders may demand royalties retroactively. Others may target the libraries that joined hands with Google's library project, saying that "we were betrayed by the libraries we have always trusted," and demand loss of profit in addition to royalties. As a result, costs for handling such claims would balloon, and there would be many libraries driven into bankruptcy and closure.

IV. The risk of human rights violations by re-distributing out-of-print books

Among the books published so far in the world include books whose authors were sued for defamation or human rights violations and became out-of-print as a result. If those books get

scanned and distributed through the Internet, it may cause a risk of human rights violations and defamation again. In some situations, books digitally scanned by Google without permission may cause human rights violations and defamation, and not only Google, but also publishers of the original prints and copyright holders, may get sued again though they may not have agreed to the proposed settlement. The proposed settlement does not provide any measures to prevent such an eventuality.

V.  If the proposed settlement is approved, acts of "plagiarism" can no longer be asserted.

Hiroshi Ito (Maiden Name: Hiroshi Takahashi. Former Kyodo News writer. Current associate professor at Poole Gakuin Junior College), the co-author of my book "Ikki" (Insurgency)", which was published by Tsukiji Shokan and digitally scanned entirely by Google, makes the following remarks in his statement submitted to the Metropolitan Police Department in connection with his criminal complaint. They are quoted below:

> I have been teaching at a junior college and giving my students research report trainings. With regard to the citation of literary works and research papers, I have always explained to my students the existence of copyrights and set strict standards for citations (authors, titles, publishers, published years, and pages cited). I have explained to my students the hardships that authors of literary works and research papers endure while writing and repeatedly taught them how they should show their respect for them in citing.
>
> Indeed, as an author, I want as many people as possible to read my literary works and research papers. This does not eliminate a situation wherein an unspecified number of people can freely access my writing for viewing through the Internet. However, it should be done only if copyright is respected and authors receive proper explanation and give their approval. The primary objective for release of full text of published papers and work through the Internet is to contribute to the development of research areas I am associated with. Also, there has to be the authors' will to provide the information to many interested people. Although authors cannot ensure that is being done as intended, such information should never be provided for one company's profit. If we allow an issue like this to pass, we will lose reasonable ground to question copyright infringement and plagiarism committed by students.

7

Needless to say once again, "copyright" is a concept created by those who came before us to control those who make money by making pirated copies of books, CDs, and DVDs. The basic concept has not changed since the Berne Convention was developed until present. In my view, the Google Book Search Settlement is nothing different than the piracy cases, in which the Internet and digital technology are abused.

VI.  Sixty dollars per principal work is not sufficient compensation for copyright infringement

First, the true reconciliation process cannot be begun until Google admits its own misconduct and apologizes to copyright holders. Moreover, when it comes to the $60 per principal work lump-sum payment, the proposed settlement agreement does not even provide when it is to be made. Moreover, it does not provide adequate compensation for copyright infringement. If Google repudiates the payment, it will be highly unlikely to find any Japanese copyright holders who would bother to go all the way to court to recover the unpaid $60 per principal work payment. In the currently proposed settlement, even in the event of breach of payment, the Japanese copyright holders will virtually be forced to bear it.

The unfair terms that I would like this court to fully consider in connection with the proposed settlement at the hearing are stated above. Because this proposed settlement dons a façade of "class action" but in reality does not offer relief for victims, I strongly urge this court to reject the proposed settlement.

By: *[signature]*

Name: Shojiro Akashi
Pro Se

Akasi Office
2-18-18-502 Kasuga-Cho
Nerima-Ku, Tokyo 179-0074
Japan
Tel: +81-3-3577-5456
Fax: +81-3-3577-5458

8