



# The proposed Google Settlement

# Views from The Booksellers Association
## of the United Kingdom & Ireland Limited
[party to the Settlement]



To

**Office of the Clerk, J Michael McMahon**

U.S. District Court for the Southern District of New York

500 Pearl Street

New York

New York 10007

2nd September 2009



# The proposed Google Settlement: views from The Booksellers Association of the United Kingdom & Ireland Limited

**This document is laid out in twenty sections:**

| | |
|---|---|
| **Executive Summary**……………………………………………… | **Page 3** |
| **Recommendations**……………………………………………….. | **Page 4** |
| 1. The Booksellers Association of the UK & Ireland……… | Page 5 |
| 2. Party to the Settlement…………………………………….… | Page 6 |
| 3. Importance of the book……………………………………… | Page 7 |
| 4. Importance of copyright……………………………....……… | Page 7 |
| 5. Importance of the bookseller……………………………….. | Page 8 |
| 6. Importance of the public library…………………………… | Page 9 |
| 7. Aspirations of Google…………………………………….… | Page 9 |
| 8. Global consequences……………………………….……… | Page 9 |
| 9. Proposed Settlement………………………………………… | Page 10 |
| 10. Effect on consumers……………………………………….. | Page 10 |
| 11. Effect on Google…………………………….……………… | Page 11 |
| 12. Monopolistic implications………………………………….. | Page 11 |
| 13. The Book Rights Registry………………………………….. | Page 12 |
| 14. Influence on price………………………………………….. | Page 12 |
| 15. Orphan works………………………………………………. | Page 13 |
| 16. Fewer bookshops………………………………………….. | Page 13 |
| 17. Fewer libraries……………………………………………… | Page 14 |
| 18. Conclusion………………………………………………….. | Page 14 |

**Appendices**

| | | |
|---|---|---|
| A | Titles owned by the BA that have been scanned by Google……. | Page 15 |
| B | BA contact details……………………………………………………. | Page 16 |

# Executive Summary

- The BA is a party to the Settlement and has already agreed to 'opt in' [2.1]

- Scanning a copyrighted title without seeking first the permission of the rightsholder would be a breach of copyright in the UK and, we believe, throughout the European Union as a whole [4.3]

- UK and Irish booksellers are affected because they sell very many of the titles that have been scanned in to the Google database [8.3]

- UK consumers are able to purchase directly from US retailers <u>already</u>. And in a digital world, this is even easier and less costly, in view of no freight charges and (presumably) no custom checks [8.4]

- Because this is a US Class Action, those outside the United States can only be involved in the sub-class as a rightsholding author or publisher. UK, Irish and other European publishers and booksellers have had no involvement in negotiating the Agreement [8.5]

- It seems that non-US publishers are put at a competitive disadvantage, as all out-of-print ["O/P"] titles are automatically included in Google's digital library unless the copyright holders have elected to opt out [8.6]

- The Settlement, if approved, would seem to remove the rights of foreign authors and publishers enshrined in the Berne convention, of which most countries are signatories [8.7]

- Google already have a dominant position in the marketplace. According to the independent research organisation, Hitwise, 90% of search engine enquiries from UK consumers come first to Google [11.1]

- There seems to be some confusion as to what is meant by '*commercially available*'. Does this mean books available in the US through customary channels of trade (e.g. seen on a bookseller's website, or in a bookshop)? Would the availability of, say, an on-demand book or, indeed, any other electronic editions, mean that the work was 'commercially available'? [11.6]

- What happens outside the US? Would a title available for sale on a UK website which US consumers could access be regarded as commercially available? What happens if a book is commercially available in Europe, but not in the US? [11.7]

- No one else would find it easy to do what Google have done to date by scanning in 10 million books. No company in the book trade, we believe, has the resource. No one wants to start scanning titles and run the risk of being sued for breach of copyright [12.2]

- It is proposed that the Registry is controlled by US publishers and authors. But much of the material held electronically comes from authors and publishers outside the US [13.4]

- Having such a control over price, Google could initially lower prices to wipe out the competition and then move prices up [14.2]

- There is no representative on the Board of the Book Rights Registry who has the responsibility to look after the interests of Orphan Works. The latter have not been represented in the class action [15.4]

- The Settlement seems to give Google an explicit, perpetual licence to digitise, sell and post ads against Orphan Works [15.5]

- We have seen in the UK's music industry the effect that iTunes has had on the retail infrastructure. Most of the specialist independent and chain record shops have been wiped out. We are fearful of something similar happening in the book industry, or of our members being locked out from these developments [16.1]

- Fewer bookshops in towns and villages will lead to less promotion of the book locally in shop windows; less opportunity to browse diverse titles; reduced activity in the community promoting books and reading; a detrimental impact on culture and society generally [16.2]

- In view of this, we very much welcome the preliminary discussions we have had with Google to see how bricks and mortar bookshops might become their digital partners by selling Google editions [16.3]

- All the information that in the past was under the control of public libraries will, in future, be in the hands of one private company, Google [17.3]

# Recommendations for consideration by the New York Court

**Copyright province of Congress**

1   Copyright is fundamental to the creation of ideas. It is too big an issue to be part of a private deal. The BA believes that these matters concerning copyright should be determined by law (e.g. Congress in the US) and that the same rules should apply to everyone and no one should have a privileged position.

**Orphan Works outside the Settlement**

2   Similarly, with great respect, we do not believe that a civil court case in the US should decide on granting exclusive rights to Orphan Works. Orphan Works – that affect book trades in the US and in other countries - should be outside the Settlement.

**Book Rights Registry governance to involve Europeans**

3   If the Settlement is approved by the Court, then we urge that the Book Rights Registry has European representatives, and that no independent registry should be prevented from offering a better deal to Google's competitors.

**Definition of 'commercially available'**

4   We do think it would be helpful for book trades outside the US if it could be made crystal clear as to what is meant by '*commercially available*'. The definition has a considerable bearing on Display Uses.

**Public access**

5   We would urge that anyone should have the opportunity to access the Book Rights Registry.

**Bookseller access**

6   If approved, the Settlement as it stands is likely to lead to fewer bookshops and libraries, which would – we believe – not be in the public interest. In order to redress this downward turn, we urge Google to enable booksellers to be able to access Google's electronic book repository and the Orphan Works, and then for the booksellers to have an opportunity to purchase and re-sell the digital material, at trade terms, which will produce a profit for the rightsholders, for Google and for booksellers.

| 1 | **THE BOOKSELLERS ASSOCIATION OF THE UK & IRELAND** |
|---|---|

1.1     The Booksellers Association of the United Kingdom & Ireland Limited is a trade association situated in London, United Kingdom. It was first formed 114 years ago and its aims are to help its members (booksellers) to:

- Increase sales
- Reduce costs
- Improve competitiveness, efficiency and productivity
- Network
- Represent their views.

1.2     We very much welcome, therefore, the opportunity to give our thoughts and comments on the proposed Google Settlement to the District Court of New York.

*Membership*

1.3     The Booksellers Association ["the BA"] has a diverse membership, covering many different types of businesses, large chains and small independents, general and specialist, traditional and non-traditional, terrestrial and online, retailer and wholesaler, located both on – and off – high streets.

1.4     3,901 bookselling outlets are currently in membership of the BA, of which 3,685 are situated in the UK and 226 in the Republic of Ireland.

1.5     It is very easy to set up a bookshop in the UK (although less easy to make a success of the business). There are no barriers to entry.

1.6     Similarly, joining the BA is easy. The only main requirements are that retail businesses have to have in stock at least $8,170 worth of books (at publishers' recommended retail prices), be open to the public and pay business rates.

1.7     Members sell printed books, audio books, electronic books (e-books), and e-readers. One bookseller in London has now installed a 'print-on-demand' ["POD"] Espresso machine, which produces a bound paperback from a remote digital file in around four minutes.

   

(Left to right) *Printed, audio, e-books and print-on-demand - all formats currently sold by BA members*

1.8      84 of our companies/businesses are currently selling e-books.  Google, as a bookseller, would be welcome to join the BA in the future.

*Period of change*

1.9      UK and Irish booksellers operate in a very competitive marketplace, competing particularly on:

- Price
- Service
- Location
- Stock range.

1.10     Our book market is one of the most competitive in the world, and since 1995, when the UK's Restrictive Practices Court ended our Net Book Agreement ["NBA"] (which allowed publishers the opportunity to impose minimum prices in the market place), UK and Irish bookselling has gone through a period of great change.  There is now widespread price competition without any protection such as the Robinson Patman Act in the US.  According to the independent marketing research agency, Book Marketing Limited, over 50% of all books in the UK's consumer book market are now bought below the recommended cover price.

1.11     In a UK market without any price controls, supermarkets began to sell books in large numbers.  We then saw the arrival of internet bookselling.

1.12     Supermarkets and the internet booksellers have put pressure on the traditional high street booksellers.  In 1995 we had 1,894 independent booksellers in BA membership;  in 2009 (June) we now have 1,289.

1.13     The arrival of the e-book in the consumer book market is yet another challenge to booksellers that have faced increased competition and costs since 1995.

1.14     So when a significant development comes along like the Google Settlement, our aim is to do everything we can to ensure that we end up with a strong and vibrant bookselling sector, able to give first class service to the consumer in a retail environment in which competition is fair.

1.15     We want our members to be part of the digital revolution, to be able to have easy access to digital material and to be able to sell that material to the consumer, if the latter elects to buy it through a bookseller.

## 2      PARTY TO THE SETTLEMENT

2.1      The BA is a party to the Settlement and has already agreed to 'opt in', as titles owned by us have been scanned by Google [see attached spreadsheet *Appendix A*].

2.2      We wish to make clear that we are very impressed by much of what Google has done generally.  Most of us use Google on a daily basis.  We believe we have a good rapport with their senior executives - whom we like and respect - in their Library and Book Programmes.

2.3      Nevertheless, we do have some public interest concerns about the Settlement itself, which we would like to outline in this submission.

## 3  IMPORTANCE OF THE BOOK

3.1    Books, we believe, are central to the acquisition of literacy, education and knowledge of all kinds: specialist and general, informal and formal, whether for adults or children, providing the basis of reading skills, inquiry, comprehension and individual enterprise.

3.2    Books build and transmit the culture, science and history of a society. The identity of a culture lives through the written word.

3.3    In our view, a book is 'a book', whether it is a hardback, paperback, audiobook or e-book, and the 'Bookseller of the Future' will supply a title to consumers in a multitude of different formats.

3.4    The UK book trade's bibliographic database, Nielsen BookData, currently holds over 8 million title records. Over 120,000 new books are published each year in the UK, on every subject under the sun. There is great choice and diversity.

## 4  IMPORTANCE OF COPYRIGHT

4.1    Underpinning this creativity is copyright. Creativity without the protection of copyright would be stifled. Authors and publishers would not spend time and effort in creating original works if not rewarded.

4.2    In the UK, books are protected by copyright until 70 years have elapsed since the author's death. Copying copyrighted material under UK law requires the prior permission of a rightsholder (unless a license of dispensation has been previously obtained).

4.3    Scanning a copyrighted title without seeking first the permission of the rightsholder would be a breach of copyright in the UK and, we believe, throughout the European Union as a whole.

4.4    The UK Government has recently carefully considered options for 'fair use". In Chapter 4 of the *Digital Britain* report (June 2009), titled *Creative Industries in the Digital World* they came to the following conclusion:

> *The Government has considered whether there should be a modernisation of 'fair use' rights for consumers to reflect the realities of the digital age. The Government has concluded that the scope for such modernisation is heavily constrained within the EU copyright framework.*

4.5    Analysys Mason was commissioned by the UK Government to assess the drivers of and barriers to creative ambition in digital media in the UK. The research highlighted the difficulties in trialling new business models involving the use of IP: *"Rights holders find it hard to understand what business models will enable them to protect and monetise their rights online, and they are concerned that making rights available for use in unproven models may lead to piracy and generally a loss in the value of their rights."*

4.6    The UK Government also published a report, *What role for a Digital Rights Agency?* in March 2009 followed by a Summary of Responses in June 2009 and the aspect of voluntary registration of rights was not widely supported (except possibly for orphan works). There were a lot of fears around voluntary rights registration contravening the Berne Convention if it became de facto compulsory. Meaning that rightsholders would be severely disadvantaged if they were not to register their rights.

4.7     When Microsoft were conducting their own scanning programme, it took all reasonable steps to contact the copyright owners to seek permission before scanning.

4.8     If Google similarly had first sought the permission of the copyright owners before scanning books from library collections into their database and then offering browsers 'snippets', this US Class Action would not have been necessary.

## 5  IMPORTANCE OF THE BOOKSELLER

5.1     Specialist booksellers don't just put books on shelves.  They provide a plethora of services, including:

- Advice and information on books as gifts, or for educational purposes
- Ability to obtain books not in stock
- Running of author events
- Organisation of book groups
- Promotion of books and reading, especially to schools

5.2     Many bookshops are central to their local communities.

5.3     And in the future will, as we have explained, provide consumers with e-books in a range of different formats.

5.4     So in view of this, we very much welcome the recent comments made by Dan Clancy, Google's Director of Engineering, about the importance of the bookshop in society:



"Right now the physical bookstores are a critical part of our book ecosystem. A huge amount of books are bought because people go into a physical bookstore and say, hey I want this, I want that. It's a mistake if we think of our future digital world as digital means online and physical means offline. Because if that happens and 10 percent of the world goes digital, that's going to be really hard for all the bookstores to sustain their business model."

*Dan Clancy, Google's Engineering Director*

| 6 | **IMPORTANCE OF THE PUBLIC LIBRARY** |
|---|---|

6.1    Similarly, the public library plays a very important role in the UK & Ireland, allowing consumers free access to publications. This is of particular benefit to the less wealthy members of society.

6.2    We can put it no better than in the words of President Obama:



*President Obama*

"More than a building that houses books and data, the library represents a window to a larger world, the place where we've always come to discover big ideas and profound concepts that help move the American story forward and the human story forward. That's the reason why, since ancient antiquity, whenever those who seek power would want to control the human spirit, they have gone after libraries and books. Whether it's the ransacking of the great library at Alexandria, controlling information during the Middle Ages, book burnings, or the imprisonment of writers in former communist block countries, the idea has been that if we can control the word, if we can control what people hear and what they read and what they comprehend, then we can control and imprison them, or at least imprison their minds."

| 7 | **ASPIRATIONS OF GOOGLE** |
|---|---|

7.1    Google have already scanned 10 million books into their database. Their aim is to expand this number quickly to 30 million titles.

7.2    But, in fact, their ambition is greater than this. In a presentation to the European Booksellers Federation (of which our Association is a member) on 4th July 2005, Jens Redmer, from Google, stressed it was Google's mission to organise all the world's information, and to make it universally accessible and useful. [Jens also stressed at the time it was never Google's intention to move into bookselling or publishing.]

| 8 | **GLOBAL CONSEQUENCES** |
|---|---|

8.1    It is Google's ambition is to scan into their system all the world's information.

8.2    Already many of the titles that have been scanned in are published by publishing houses outside the United States.

8.3    UK and Irish booksellers are affected because they sell very many of the titles that have been scanned in to the Google database.

8.4    UK consumers are able to purchase directly from US retailers already. Moreover, in a digital world, this is even easier and less costly, in view of no freight charges and (presumably) no custom checks.

8.5    And yet, because this is a US Class Action, those outside the United States can only be involved in the sub-class as a rightsholding author or publisher. UK, Irish and other European publishers and booksellers have had no involvement in negotiating the Agreement.

8.6   Furthermore, it seems that non-US publishers are put at a competitive disadvantage, as all out-of-print ["O/P"] titles are automatically included in Google's digital library unless the copyright holders have elected to opt out.

8.7   Moreover, the Settlement, if approved, would seem to remove the rights of foreign authors and publishers enshrined in the Berne convention, of which most countries are signatories.

## 9   PROPOSED SETTLEMENT

9.1   This is reported as being a $125,000,000 class action settlement, applying to hardcopy books published anywhere before 5th January 2009. This is huge in our terms, and therefore having the potential to have a very considerable influence on how digital bookselling in the UK and Ireland will unfold.

9.2   It seems to us there are three main parts to the proposed Settlement. Google to:

- Search, discover and store copyrighted material
- Pay rightsholders a sum for the books that have already been scanned
- Co-ordinate payments to authors and publishers via an independent Book Rights Registry on digital sales in the future [63% of the revenue being paid to rightsholders; 37% to Google].

9.3   The Settlement, if approved, will make Google:

- The world's biggest holder of digital content
- Potentially, the world's biggest digital bookseller.

## 10   EFFECT ON CONSUMERS

10.1   Superficially, all this looks rather good news for consumers:

- Expanded access to books and knowledge
- Titles that are out of copyright becoming freely available
- Up to (usually) 20% of the content of a book in copyright being accessed via a consumer's PC

10.2   Ultimately, this should lead to more people reading globally, whether by means of ink on paper, or words on a screen.

10.3   However, if the Settlement is approved as is, we believe there will also be drawbacks. And that these drawbacks will not just be confined to the US market, but also to the UK and other book markets.

10.4   We now want to outline our perceived drawbacks.

| 11 | EFFECT ON GOOGLE |
|---|---|

11.1    Google already have a dominant position in the marketplace. According to the independent research organisation, Hitwise, 90% of search-engine enquiries from UK consumers come first to Google (76% google.co.uk in UK, 14% google.com in US).

11.2    The Settlement would give:

- Consumers in the US access to Google's expanded electronic content

- Consumers free access in nearly 20,000 US public libraries to the entire on-line repository of content (only charging fees to print)

- Other institutions and businesses the ability to take out subscriptions from Google and then allow their users access.

11.3    Google will have the right to make non display and display uses of any work published in hard copy before 5th January 2009 which is found at any time to be commercially unavailable, as well as non-display uses of commercially available works.

11.4    Once the rightsholder has claimed a work, he or she can request at any time that display uses are turned off or challenge the Book rights Registry's determination of that work's status; for non-display uses to be turned off, the rightsholder will have to request that the book is removed altogether (an irreversible decision).

11.5    The commercial availability status of works will be assessed on a rolling basis. It is likely that when the commercial availability status of a work is changed, the Registry will notify the rightsholder who will then have thirty days to turn off display uses before they are activated by default.

11.6    But there seems to be some confusion as to what is meant by *commercially available*. Does this mean books available in the US through customary channels of trade (e.g. seen on a bookseller's website, or in a bookshop)? Would the availability of, say, an on-demand book or, indeed, any other electronic editions, mean that the work was 'commercially available'?

11.7    And what happens outside the US? Would a title available for sale on a UK website which US consumers could access be regarded as commercially available? What happens if a book is commercially available in Europe, but not in the US?

| 12 | MONOPOLISTIC IMPLICATIONS |
|---|---|

12.1    It is difficult not to take the view that the Settlement would give Google such a powerful position - verging on a possible monopoly. Google seem to be given exclusive rights to commercialize millions of out of print books, without having to negotiate for them individually.

12.2    No one else would find it easy to do what Google have done to date by scanning in 10 million books. No company in the book trade, we believe, has the resource. No one wants to start scanning titles and run the risk of being sued for breach of copyright.

12.3   And in the future, Google have said they want to look at consumer subscriptions, print-on-demand, custom publishing, PDF downloads, and the production of summaries, abstracts and compilations – all areas of key interest to existing booksellers.

12.4   In the New York Review of Books, the highly respected historian, Robert Darnton, said:



"Google could become the world's largest book business ..... an electronic supply service that could out-Amazon Amazon. It will enjoy what can only be called a monopoly – a monopoly of a new kind, not of railroads or steel but access to information"

*Robert Darnton*
*US historian*

## 13   THE BOOK RIGHTS REGISTRY

13.1   One of the main jobs of the Registry is to locate the rightsholders.

13.2   The creation of the Registry records all the rightsholders that agree to join in the Settlement in a single database.

13.3   This again is another sort of monopoly.

13.4   Furthermore, it is proposed that the Registry is controlled by US publishers and authors. But much of the material held electronically comes from authors and publishers outside the US. There is, for instance, no European representative on the Board of the Books Registry.

13.5   Moreover, many have the perception that the Google database only concerns books in the English language. We understand, for instance, that around 10% of books already scanned are in Spanish.

13.6   From a competition point of view, we found it interesting to note that the Registry is prevented from offering a better deal to any of Google's competitors during the first ten years of its operation. This seemed to us surprising if the Registry is meant to be independent.

## 14   INFLUENCE ON PRICE

14.1   The Registry, it is proposed, would set prices for all commercial terms for unclaimed works. Google executives have suggested that over 50% of titles will be priced at $5.99 or less;  80% of titles will be priced at $14.99 or less.

14.2   We have two specific concerns:

- That after initially contacting the Google site, consumers are unlikely to move to other sites
- And having such a control over price, Google could initially lower prices to wipe out the competition and then move prices up.

| 15 | ORPHAN WORKS |
|---|---|

15.1    The position of Orphan Works is a particular worry to the BA.

15.2    Orphan Works are titles with no identifiable rightsholder. Some experts believe that since 1932, Orphan Works account for between 50% and 70% of all titles published.

15.3    The UK Government also considered options for Orphan Works in the *Digital Britain* report:

> *The Government has considered whether there should be a modernisation of 'fair use' rights for consumers to reflect the realities of the digital age. The Government has concluded that the scope for such modernisation is heavily constrained within the EU copyright framework.*
>
> *Mass digitisation projects are thwarted because of the orphan works problem. In order to pave the way for a more effective framework to deal with orphan works, the Government proposes to introduce legislation to enable commercial schemes for dealing with orphan works to be set up on a regulated basis.*
>
> *As such a scheme would enable the operators of orphan works schemes to grant rights without the consent of the rights holder, appropriate safeguards will need to be put in place. The form of new legislative provisions will be outlined fully as work progresses on how such schemes might be administered.*
>
> *However, the expectation is that anybody wishing to use orphan works will be expected to secure appropriate permission from the Government first, and permission will only be granted where the proposed operator can satisfy the Government that the business methods and procedures involved satisfy key minimum requirements, including making appropriate searches for the true owners and making provision for the reimbursement of rights holders who are subsequently found and claim the use of their work.*
>
> *This work will also explore the extent to which powers to grant rights over certain works could be exercised by collecting societies or equivalent bodies through an extended licensing arrangement as operates in the Nordic countries. This would permit collecting societies or equivalent bodies, subject to appropriate safeguards, to assume a mandate to collect fees on behalf of rights holders who have not specifically signed up to that society.*
>
> *These provisions, which have operated in Nordic countries for many years, would help streamline the problem of rights clearance. If a rights holder wishes to opt out of an extended licensing system, then they will have that option – thus maintaining control over the exclusive right. It will extend the ability of consumers to enjoy cultural works and it will collect royalties for the benefit of creators. That is good for creators and simpler for consumers and businesses.*

15.4    In the proposal under consideration in the US, there is no representative on the Board of the Book Rights Registry who has the responsibility to look after the interests of these Orphan Works. The latter have not been represented in the class action.

15.5    Since Google is the only party under threat of being sued, it seems that it will be the only company that gets the right to sell Orphan Works. The Settlement seems to give Google an explicit, perpetual licence to digitise, sell and post ads against these Orphan Works. No one else has this privileged position. It is difficult not to conclude that Google would have a monopoly over Orphan Works.

| 16 | FEWER BOOKSHOPS |
|---|---|

16.1    We have seen in the UK's music industry the effect that iTunes has had on the retail infrastructure. Most of the specialist independent and chain record shops have been wiped out. We are fearful of something similar happening in the book industry, or of our members being locked out from these developments.

16.2  Fewer bookshops in towns and villages will lead to:

- Less promotion of the book locally in shop windows
- Less opportunity to browse diverse titles
- Reduced activity in the community promoting books and reading
- Detrimental impact on culture and society generally

16.3  In view of this, we very much welcome the preliminary discussions we have had with Google to see how the bricks and mortar bookshops might become their digital partners by selling Google editions.

## 17  FEWER LIBRARIES

17.1  Most of the books scanned by Google to date have come from the collections of the one UK and four US libraries who initially agreed to participate (we understand at least another 25 libraries have also signed agreements).

17.2  These libraries have been very much in favour of the agreement. But if consumers can come along to a PC in a library and have access, potentially, to the inside of Book X through the Google Book Registry, then what's the point of having Book X in physical form twenty feet away on a shelf? There will be little need of libraries in the future.

17.3  Furthermore, all the information that in the past was under the control of public libraries will, in future, be in the hands of one private company, Google.

17.4  Is this in the public interest?

## 18  CONCLUSION

18.1  We do believe that the present Settlement does have some drawbacks for consumers and society and places booksellers in a position of some disadvantage. But we do believe that there are practical ways in which Google can allay our fears and we hope that the Court will reject the Settlement as it stands and act on our Recommendations (see page 4) before the Settlement is re-presented.

18.2  Finally, we would like to admit that we found the Settlement horrendously complex. We have not been directly involved, we are not lawyers, and we apologise unreservedly in advance to all the parties for any misunderstandings or errors.

**Tim Godfray**   tim.godfray@booksellers.org.uk

**Sydney Davies**   sydney.davies@booksellers.org.uk

Copy:
Counsel for the Publisher Sub-Class:  bookclaims@debevoise.com
Counsel for the Author Sub-Class:  bookclaims@bonizack.com
Counsel for Google:  bookclaims@durietangri.com

## Appendices

### A  BA titles scanned in by Google

| Title | Author or other contributor | Publication year | Digitization status (book has been digitized or may be digitized on or before May 5, 2009 without authorization) |
|---|---|---|---|
| Report of the 1948 Book Trade Committee | Booksellers Association of Great Britain and Ireland, Book Trade Committee, Publishers' Association, Joint Committee of the Publishers' Association of Great Britain and Ireland and the Associated Booksellers of Great Britain and Ireland | 1954 | Yes |
| Machine readable codes for the book trade | Machine Readable Codes Joint Working Party, Machine Readable Codes Joint Working Party (Great Britain), Julian Blackwell, Booksellers Association of Great Britain and Ireland | 1979 | Yes |
| Trade reference book | Booksellers Association of Great Britain and Ireland | 1976 | Yes |
| Directory of book publishers and wholesalers | Booksellers Association of the United Kingdom & Ireland | 1984 | Yes |
| Directory of book publishers and wholesalers |  | 1990 | Yes |
| Directory of book publishers & wholesalers | Kirsten Schlesinger, Booksellers Association of Great Britain and Ireland | 1985 | Yes |
| Directory of book publishers & wholesalers | Deborah Elliott, K. Schlesinger, Booksellers Association of Great Britain and Ireland | 1988 | Yes |
| Report | 1948 Book Trade Committee, Hubert M. Wilson | 1954 | Yes |
| Directory of book publishers and wholesalers with their terms, and agents for overseas publishers | Kate Pocock, Andrea Livingstone, Booksellers Association of Great Britain and Ireland | 1982 | Yes |
| Economic Survey | Booksellers Association of Great Britain and Ireland, Kenya. Ministry of Finance and Economic Planning. Statistics Division | 1971 | Yes |
| Trade Reference Book | Booksellers Association of Great Britain and Ireland | 1984 | Yes |
| Trade Reference Book | Booksellers Association of Great Britain and Ireland | 1970 | Yes |
| A Directory of British publishers and their terms including agents for overseas publishers | Booksellers Association of Great Britain and Ireland, Kate Pocock, Booksellers Association Service House | 1980 | Yes |
| Economic Survey | Charter Group, Booksellers Association of Great Britain and Ireland, Charter Group Staff | 1973 | Yes |

## B    *BA contact details*

 

The Booksellers Association
272 Vauxhall Bridge Road
London SW1V 1BA
United Kingdom
www.booksellers.org.uk

Tel: 00 44 207 802 0802
e-mail: tim.godfray@booksellers.org.uk

CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2009, I caused a true and correct copy of the foregoing THE PROPOSED GOOGLE SETTLEMENT VIEWS FROM THE BOOKSELLERS ASSOCIATION OF THE UNITED KINGDOM & IRELAND LIMITED served by electronic mail and United States First Class Mail upon the following:

Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts & Kent LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
bookclaims@durietangri.com

_____
Tim Godfray, Chief Executive
Booksellers Association of the UK & Ireland Ltd
272 Vauxhall Bridge Road
London SW1V 1BA
United Kingdom
Direct tel: +44 [0] 20 7802 0809
Tel: +44 [0] 20 7802 0802
Fax: +44 [0] 20 7802 0803
www.booksellers.org.uk