**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
  The Authors Guild, Inc., Association of American    :
  Publishers, Inc., et al.,                           :
                                                       :
              Plaintiffs,                              :
                                                       :        Case No. 05 CV 8136-DC
              v.                                       :
                                                       :
  Google Inc.,                                         :
                                                       :
              Defendant.                               :
------------------------------------------------------------x
```

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: _9/10/09_

**SUPPLEMENTAL LIBRARY ASSOCIATION COMMENTS ON THE**
**PROPOSED SETTLEMENT**

The American Library Association, the Association of Research Libraries, and the

Association of College and Research Libraries (the Library Associations) submit these

comments to address developments relating to the proposed Settlement that have arisen

since the Library Associations filed their initial comments with this Court on May 4,

2009.  In particular, these comments discuss the amendment Google and the University

of Michigan (Michigan) entered into on May 20, 2009 that expanded the 2004 agreement

that allowed Google to scan books in the Michigan library for inclusion in Google's

search database.  These developments have not changed the Library Associations'

position on the Settlement: to prevent the possible negative effects the Settlement may

have on equity of access to information, patron privacy, and intellectual freedom, this

Court must regulate the conduct of the Book Rights Registry (Registry) and Google

under the Settlement.

**I. Summary of May 4 Comments**

In their May 4 comments, the Library Associations stated that they do not oppose this Court's approval of the Settlement. The Settlement has the potential to provide unprecedented public access to a digital library containing millions of books. Thus, the Settlement could advance the core mission of the Library Associations and their members: providing patrons with access to information in all forms, including books.

The Library Associations expressed their belief that but for the Settlement, the services it enables would not come into existence in the near term. A class action Settlement provides perhaps the most efficient mechanism for cutting the Gordian knot of the huge transaction costs of clearing the copyrights in millions of works whose ownership often is obscure.

At the same time, the Library Associations recognized that the digital library enabled by the Settlement would be under the control of Google and the Registry. The cost of creating such a library and Google's significant lead time advantage suggest that no other entity would create a competing digital library for the foreseeable future. In the absence of competition for the services it will enable, the Settlement could compromise fundamental library values such as equity of access to information, patron privacy, and intellectual freedom.[1]

In order to mitigate the possible negative effects the Settlement may have on libraries and the public at large, the Library Associations requested this Court to exercise

---

[1] The Urban Library Council (ULC) and the International Federation of Library Associations and Institutions (IFLA) have expressed similar concerns in their filings with this Court. ULC, for example, identified problems of implementation and principle (such as the implications for first sale, fair use, and public domain) relating to the fee for printing out pages from the free Public Access Service terminals in public libraries.

its jurisdiction vigorously over the interpretation and implementation of the Settlement. In the Settlement Agreement itself, the parties acknowledged this Court's authority to regulate their conduct under the Settlement.

## II. Pricing Review

In the May 4 comments, the Library Associations observed that the institutional subscription service enabled by the Settlement could evolve into an essential research facility. However, in the absence of meaningful competition, the Registry and Google could set the price of the subscription at a profit maximizing point beyond the reach of many libraries. To address this concern, the Library Associations stated that "any library or other possible institutional subscriber must have the ability to request this Court to review the pricing of an institutional subscription."[2]

On May 20, 2009, Google and Michigan entered into an amendment that expanded the 2004 agreement that allowed Google to scan books in the Michigan library for inclusion in Google's search database.[3] The Amendment is followed by an Attachment A, which sets forth provisions that will apply to all of Google's partner libraries.[4] Attachment A establishes a "pricing review" mechanism that allows those libraries partnering with Google to challenge the price of the institutional subscription. Although this new pricing review could be helpful to libraries, it contains several significant limitations.

---

[2] Library Association Comments at 19.

[3] In July, two other libraries partnering with Google, the University of Wisconsin-Madison and the University of Texas-Austin, also entered into amended agreements.

[4] Attachment A is titled "Collective and Certain Settlement Agreement Related Terms." Google's partner libraries are those libraries that will provide Google with in-copyright books for scanning (i.e., Fully Participating and Cooperating Libraries under the Settlement).

To understand this new procedure, one must first review how the price of the institutional subscription gets set under the Settlement. Google has the responsibility of proposing to the Registry an initial pricing strategy consistent with these objectives: "1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and 2) the realization of broad access to the Books by the public, including institutions of higher education."[5] The Registry and Google can then negotiate terms of the pricing strategy for up to 180 days. If Google and the Registry do not reach agreement, the dispute will be submitted to binding arbitration.[6] Only Google and the Registry would be parties to this arbitration.

The new procedure described in Attachment A of the Amendment would occur after the price-setting process set forth in the Settlement. Sixty days after Google first offers an institutional subscription to the higher education market, and every two years thereafter, a partner library can initiate a review of the pricing of the institutional subscription to determine whether the price properly meets the objectives set forth in the settlement agreement. Only one review can be conducted per two-year period, so if several partner libraries seek to review the price, they must do so jointly through a "designated representative." The pricing review will be conducted by "an independent, qualified third party" designated by the initiating library, subject to Google's approval.[7] Google will pay up to $100,000 of the reviewer's fees and costs for the first two reviews.[8]

---

[5] Settlement Agreement at 4.1(a)(i).
[6] *Id.* at 4.1(a)(iv)(4)a.
[7] Attachment A at 3.c(1).
[8] The potential cost to libraries of challenging the price of the institutional subscription, either through the pricing review established by Attachment A or directly before this Court, underscores the importance of the Antitrust Division of the U.S. Department of

Google must provide to the reviewer specified categories of information, some of which the reviewer cannot make directly available to the partner libraries.[9]  The reviewer will prepare a Pricing Review Report, which he or she will provide to Google and all partner libraries.

Ninety days after receipt of the Pricing Review Report, any partner library can initiate an arbitration with Google.   The arbitration will be subject to the dispute resolution procedures in the Settlement Agreement, meaning that the arbitrator's decision will be final and non-appealable.   Additionally, "[a]ny such arbitration will be the exclusive mechanism to resolve disputes between Google and the Initiating Libraries with respect to whether Google is pricing the Reviewable Subscriptions in accordance with the objectives set forth in … the Settlement Agreement."[10]  Thus, if a partner library agrees to Attachment A, then it is forgoing the ability to request this Court to review the institutional subscription price.

If the arbitrator determines that the price is too high or that Google is not achieving the broad access required by the settlement, he or she can order Google to adjust the price.  The adjustment amount is limited to Google's net revenue (in essence, 37% of the subscription price).[11]

While this new pricing review could benefit libraries, it contains several significant limitations. First, only Google's partners can initiate the review.  If these

---

Justice closely monitoring implementation of the Settlement – particularly the pricing of the institutional subscription. *See* Section VI below.

[9] This information includes the number of institutions that have institutional subscriptions; a histogram showing the percentage of institutions that pay each price within a pricing category; and Google's list price for each pricing category. Attachment A at 3.c(1).

[10] Attachment A at 3.c(2).

[11] Attachment A at 3.c(3).

partner libraries receive large discounts on the institutional subscription, they may not have the financial incentive to pursue this new procedure.[12]  Second, while the procedure allows the arbitrator to order Google to adjust the price downwards, the adjustment amount is limited to Google's net revenue – 37% of the subscription price.[13]  Thus, the subscription price might remain beyond the means of many libraries.  Third, as noted above, the arbitrator's decision is final and unappealable.  This could be problematic to the extent that the arbitrator just "splits the baby" and does not engage in a thorough review of the pricing.

Given these limitations, libraries not partnering with Google must retain the ability to request this Court to evaluate whether the pricing of the institutional subscription meets the objective of "the realization of broad access to the Books by the public, including institutions of higher education."  Moreover, this Court should have access to all the pricing information provided by Google or the Registry under the pricing review procedure.[14]

**III. Intellectual Freedom**

In their May 4 comments, the Library Associations expressed concern that in response to political pressure, Google may exclude entire categories of books from the services permitted under the Settlement.  This, in turn, could deprive students, scholars, journalists, and policymakers of access to historically important materials.  To address this problem, the Library Associations argued that "[a]ny user must have the ability to request this Court to direct Google to provide the user with a list of books excluded from

---

[12] Michigan, for example, will receive a free institutional subscription in perpetuity.
[13] Attachment A at 3.c(3).
[14] *See* note 9, *supra.*

any of its services for editorial or non-editorial reasons, and an explanation of why it was excluded."[15]

Attachment A to the Michigan Amendment takes a step towards resolving this issue by requiring Google to provide to the partner libraries' designated representative information concerning whether a book is being excluded from any display uses for editorial or non-editorial reasons, and if for non-editorial reasons, whether the exclusion was for quality, technical, or legal reasons. However, a partner library may disclose to the public only the identity of books excluded for editorial reasons – not the rest of the information about excluded books that Google provides the partner libraries.[16] The Library Associations continue to believe that public disclosure of all this information is the strongest deterrent against censorship. Accordingly, as the Library Associations previously requested, any user must have the ability to request the Court to direct Google to provide a list of excluded books with an explanation for each exclusion.

## IV. Privacy

In their May 4 comments, the Library Associations noted that the Settlement Agreement was silent on the issue of user privacy. To address this concern, the Library Associations asserted that "any user must have the ability to request this Court to direct Google and the Registry to disclose their policies for collecting, retaining, disseminating, and protecting personally identifiable information."[17] Moreover, "any user must have

---

[15] Library Association Comments at 20.
[16] Attachment A at 10.e.
[17] Library Association Comments at 20.

the ability to request this Court to review whether Google and the Registry are complying with their privacy policies."[18]

On July 23, 2009, Google issued a statement about privacy and the Settlement. Google stated that because the Settlement had not yet been approved, and the services authorized by the agreement had not yet been built or even designed, "it's very difficult (if not impossible) to draft a detailed privacy policy."[19] Google added that

> [w]hile we know that our eventual product will build in privacy protections – like always giving users clear information about privacy, and choices about what if any data they share when they use our services – we don't yet know exactly how all this will work.  We do know that whatever we ultimately build will protect readers' privacy rights, upholding the standards set long ago by booksellers and by libraries whose collections are being opened to the public through this settlement.[20]

The statement linked to an "FAQ" which provided additional detail.   In the FAQ, Google stated that "[i]mportant principles from our Google Privacy Policy would apply to this service, as with every Google service. For example, we will never sell personal information about our users. In fact, we will never share individual users' information at all unless the user tells us to …."[21]  Google made clear that it would not provide individual user data to the Registry.  Google explained that is not required under the Settlement Agreement to provide individual user data to the Registry; to the contrary, "the settlement specifies that in circumstances where the Registry seeks this data, it

---

[18] *Id.*
[19] The Google Books settlement and privacy,
http://googlepublicpolicy.blogspot.com/2009/07/google-books-settlement-and-privacy.html.
[20] *Id.*
[21] The Google Books settlement and privacy: Frequently asked questions,
http://booksearch.blogspot.com/2009/07/google-books-settlement-and-privacy.html

should use legal processes to do so."[22] The Registry would receive aggregate usage data that is needed for the allocation of revenues under the Settlement, but this data would not include information specific to individual users.

According to the FAQ, users of the preview function will not be required to have a Google account nor to provide personal information to Google; thus, "[a]nyone can freely search Google Books and preview up to 20% of most books without logging into Google."[23] With the institutional subscription, "users will be authenticated either using the student's or the institution's [Internet Protocol] address, or using other methods such as Shiboleth -- a technology that lets Google confirm that a user is part of a subscribing institution without knowing who that user is."[24] Likewise, for the free Public Access Service terminals in public libraries, "authentication will be based upon IP and Google will not have information about the individual user."[25] Accordingly, unless a user "chooses to log in to use a Google account, [Google] will not have any information that would uniquely identify them when they access Google Books from a public access terminal in a public library."[26]

The Library Associations welcome the issuance of the FAQ as a positive first step towards Google explaining how it will treat user privacy. At the same time, the FAQ is no substitute for a detailed privacy policy. While the Library Associations agree with Google that "it's very difficult (if not impossible) to draft a detailed privacy policy" before a service is designed and built, Google already is in a position to make more

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*

specific and enforceable commitments than those in the FAQ. Many of Google Book

Search's privacy features do not turn on detailed engineering and design decisions.

The Center for Democracy and Technology has issued a paper listing many such

important privacy features.[27] At this time, Google could make commitments

concerning: the posting of a dedicated Google Book Search privacy policy; limiting

collection of usage data; having institutional subscribers authenticate their own users;

limiting use of users' book annotation; providing users with access to account data;

allowing users to delete purchase histories and annotations; seeking a probable cause

standard for disclosure of user data to the government and a compelling-interest standard

for civil litigant access to user data; releasing aggregate information about requests for

user data; disclosing only aggregate data to the Registry; retaining identifying data no

longer than necessary; and securing user data. Privacy protections should be addressed

before product design is completed so that privacy decisions guide product design, rather

than the opposite.

The Library Associations hope that Google, prior to the fairness hearing, will

issue a more specific and enforceable statement concerning the privacy measures it

intends to take. For example, Google should state explicitly the conditions under which it

would disclose an individual's reading history to government entities – an issue the FAQ

does not address. If this Court approves the Settlement, Google should continue to

consult on privacy issues with the Library Associations and other representatives of user

interests as it refines its offerings under the Settlement. When Google completes

designing and building these services, it must disclose a detailed privacy policy.

---

[27] Center for Democracy and Technology, *Privacy Recommendations for the Google Book Settlement*, July 27, 2009, http://cdt.org/copyright/20090727_GoogleRecs.pdf.

Thereafter, users must have the ability to request this Court to require Google to comply with this privacy policy, as well as Google's previous commitments concerning privacy.

**V. Diversity on the Registry Board**

In their May 4 comments, the Library Associations argued that many class members, such as the Library Associations themselves, "will not want the Registry to maximize its profits; rather, they will want the Registry to maximize public access to books."[28] To ensure that the Registry's board reflects this diversity of perspectives, the Library Associations stated that "[a]ny class member must have the ability to request this Court to review the procedures by which the Registry selects members of its board of directors, and to evaluate whether the Registry properly considers the interests of all class members in its decision-making."[29]

Google is building its institutional subscription database (ISD) by scanning books found in the collections of major research libraries. The ISD, therefore, will reflect the nature of the research libraries' collections. The collections of research libraries are fundamentally different from the collection of a typical public library or the types of books sold in bookstores. Research libraries contain primarily scholarly books. Research libraries acquire popular books only if they are of scholarly interest. Thus, of the 45,429 titles a major distributor sold to research libraries in North America between July 1, 2007 and June 30, 2008, the distributor categorized only 1,572 as "popular:" "a work intended for a public library or a browsing collection."[30] The distributor labeled none of these

---

[28] Library Association Comments at 18.
[29] *Id.* at 20.
[30] *See* Blackwell, North American Approval Coverage and Cost Study, http://www.blackwell.com/librarian_resources/coverage_and_cost.

45,429 titles as "geared toward a wide readership," and classified 32,009 titles as aimed at "specialists:" "those who have a familiarity with the subject matter and knowledge of the conventions of the field." Similarly, 12,297 of these titles were published by university or other non-profit publishers. While these books are all in print, the proportions likely are similar for the older, out-of-print books in the research libraries' collections. That is, probably less than 10% of the books are of a popular nature, and more than 25% of the books were published by university or other non-profit publishers.

The precise composition of the ISD cannot be determined until after Google has completed its scanning and those rightsholders who do no not want Google to distribute their books have removed their books from under the Settlement. Nevertheless, based on the composition of the collections of research libraries, it is safe to assume that a very large percentage of the books in the ISD – probably an overwhelming majority – were written by scholars and specialists for other scholars and specialists. It is further safe to assume that these scholars and specialists are more interested in the broad availability of their out-of-print books, and their increased access to the out-of-print books of other scholars and specialists, than in maximizing their royalties from Google Book Search. In other words, these class members would want the price of the institutional subscription set well below the profit maximizing point. Indeed, they might want the price of the institutional subscription just to cover the operating costs of the institutional subscription service.

In public fora since May 4, representatives of the Authors Guild have stated that the Registry will have advisory committees, which will provide various stakeholders such as libraries and scholars with a mechanism for expressing their views to the Registry's

board and management. Advisory committees, however, simply are not an adequate

substitute for actual representation of scholarly rightsholders on the Registry board. The

board will set Registry policy on a wide range of issues, particularly the pricing of the

institutional subscription, and the perspectives of the rightsholders of the majority of the

books in the ISD must be reflected on the board itself. Accordingly, the Library

Associations' earlier request that this Court oversee the Registry's selection of board

members remains unchanged.[31]

## VI. Communication with the Antitrust Division

On July 29, 2009, the Library Associations sent William F. Cavanaugh, Deputy

Assistant Attorney General in the Antitrust Division of the U.S. Department of Justice, a

letter to follow-up on a meeting the Library Associations had with Antitrust Division

staff on May 27, 2009. The letter stated that the Division should join the Library

Associations in urging this Court to supervise the Settlement closely, particularly with

respect to the pricing of the institutional subscription and the composition of the Registry

board of directors.

Furthermore, the Library Associations urged the Division to take a proactive role

in the implementation of the Settlement:

> During our meeting, we mentioned that the settlement agreement was in
> essence a "*de facto* consent decree." We now believe that the Division
> should treat the settlement, if approved, as a consent decree to an antitrust
> action it brought. It should monitor the parties' compliance with the
> settlement's provisions as it would monitor the conduct of parties under an
> antitrust consent decree, and it should request the court to take action

---

[31] The Library Associations believe that there would be a diversity of rightsholder
interests with respect to Registry policy if the Settlement were approved. Nonetheless,
class certification is appropriate because the requirements of Rule 23(a) and (b) have
been met.

when it concludes that the parties have not met their obligations under the settlement.

In particular, the Division should ask the court to review the pricing of an institutional subscription if the Division concludes that the price does not meet the economic objectives set forth in the settlement, *i.e.*, "(1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education." Settlement Agreement at 4.1(a)(i). To assist the Division in evaluating the price of the institutional subscription, the Division should have access to all relevant price information from Google and the Registry.

The Division should also request the court to review any refusal by the Registry to license copyrights on books on the same terms available to Google. Finally, if necessary, the Division should ask the court to review the procedures by which the Registry selects members to its board of directors, and to evaluate whether the Registry properly considers the interest of all rightsholders in its decision-making.

[…]Additionally, the Division should ask the court, in its order approving the settlement, to confirm the Division's standing to request the court to enforce the settlement's provisions.

## VII. Conclusion

The likely demand among academic libraries for an institutional subscription is high; faculty and students performing serious research will insist on the ability to search and read the full text of out-of-print books. This means that libraries probably will be among the primary fee-paying users of the services enabled by the Settlement. Accordingly, this Court should pay special attention to the perspectives of libraries on the approval and implementation of the Settlement.

Respectfully submitted,

Mary Ellen K. Davis
Executive Director
Association of College and Research
Libraries
50 East Huron Street
Chicago, IL 60611
(312) 280-3248
mdavis@ala.org

Keith Michael Fiels
Executive Director
American Library Association
50 East Huron Street
Chicago, IL 60611
(312) 280-1392
kfiels@ala.org

Charles B. Lowry
Executive Director
Association of Research Libraries
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-2296
clowry@arl.org

September 2, 2009

15

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2009, I caused true and correct

copies of the foregoing comments to be delivered by overnight courier to the Clerk for

the U.S. District Court for the Southern District of New York and to be served

electronically on the following counsel of record:

Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
David J. Silbert, Esq.
Joseph C. Gratz, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111
bookclaims@kvn.com

Jonathan Band
21 Dupont Circle NW, Suite 800
Washington, D.C. 20006
(202) 296-5675
jband@policybandwidth.com