JESUS F. GONZALEZ
81 Brookfield Rd.
Lititz, PA
17543
(717) 575-9694
jfgonzalez@dejazzd.com



August 25, 2009

Office of the Clerk, J. Michael McMahon
US District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

05 Civ 8136 (DC)

Re: The Author's Guild, Inc., et al., vs. Google

Dear Honorable Clerk,

This is a statement of my objections to the Google Book Search Agreement ("the Settlement" in further mentions).

According to the terms of the recent Class Action Settlement in the Class Action Lawsuit (Author's Guild, Inc. et al. vs. Google), I am a member of the proposed "Author Subclass. As a part of the Settlement, and as the author and legal copyright holder of several works (specifically fifteen books and dozens of short stories, or "inserts", as the Settlement calls them), I am required to either opt in to the proposed Settlement or opt out. I have opted in to the Settlement to preserve and protect my interest in my works, which Google has not yet scanned, but apparently plans to do (two of those works have been deemed not in print and not commercially available by Google, which is a matter I will discuss further). While opting in to the Settlement would give the false notion that I am accepting, or agreeing, with the terms outlined in the Settlement, my primary reason for taking this action is to protect my works from possible misuse and to object to the terms of the Settlement.

### Preliminary remarks

My objections to the Settlement are based on:

  a) My concern over my ability to properly exploit, sell, lease, or otherwise assign licenses for the intellectual property I have created to publishers without Google hindering or otherwise damaging those rights by usurping them in the form of the terms outlined in this Settlement.
  b) Respect for the rights of other authors.

### My works and the Google scan

My first novel, Clickers, was originally published as a trade paperback by a very small publishing house located in Kansas City, KS. It was written with another author, Mark

Williams (deceased). The copyright mention in the book is © 1999, 2000 by J. F. Gonzalez (the majority of my work is published under my initials 'J. F. Gonzalez'; the 1999 date reflects a previous e-Book appearance). Mark Williams' interest in the copyright passed on to me upon his death in 1998. The book has been continually in print since then, appearing again in 2005 by Hard Shell Word Factory and, most recently in 2008, by Delirium Books.

In addition, I have since published fourteen or so other books, some in multiple editions. Most of these works are still in print and are commercially available through various outlets, both in bookstores and online venues.

In late 2004, I learned Google was planning to scan books in several university libraries. Because the initial plan concerned public domain works, the program didn't concern me. At the time, all of my work had been issued by small publishers, and the libraries in question did not contain copies of my works.

## The Class Action Plaintiffs and the Settlement

When the Author's Guild (hereinafter AG) and the Association of American Publishers (hereinafter APA) started their class action against Google in 2005 for "massive copyright infringement", I wasn't aware of it. I did not become aware of the suit, and the resulting Settlement, until April 28, 2009, a little over one week before the original opt out deadline of May 5.

After researching the available information regarding the Settlement, I am still perplexed by one underlying issue: how AG (to which I do not claim membership), the APA, and Google can legally usurp the rights granted in the permission agreements between myself and the companies that have published my books. Likewise, I do not understand how this same class of Plaintiffs can interfere with the permission agreements between myself and other individuals or companies pertaining to my material, referenced as "inserts" in the Settlement, contained in short story anthologies [1]. Such anthologies contain work by numerous right-holders. According to the terms of this Settlement, Google can exploit these individual inserts for their own use.

## Why I object to the Settlement

If Google had contacted individual rights-holders and attempted to negotiate the use of these works, I would have negotiated in good faith and, most likely, would have gladly assigned them a license to use my work after we had reached a common ground on the terms, conditions, and payment for the issuance of said licenses. They have not done so and, according to their actions, had never planned to do so, hence the resulting lawsuit and this objection to the Settlement.

---

[1] It is common practice for short story contracts concerning material appearing in anthologies (i.e., books containing stories by different authors) to be between the author and the editor of the anthology. The anthology editor's contract is with the publisher.

## OBJECTIONS

### 1. Specific objections to the opt out provision which violates US Copyright law

The "opt out" mechanism proposed for this Settlement contradicts the very foundation of copyright.

Under the terms of the Settlement, copyright holders must "opt out" of the Settlement if they do not wish for their works to be scanned and put into use by Google as part of the Google Book Search program. If copyright holders do not "opt out" by the deadline of September 4, 2009, they are automatically "opted-in" to the Settlement, and they are locked into terms to which they have not legally consented to. Google can then utilize their property as part of the Search Program and can likewise lease, sell, or distribute copies of their work to third parties, make them available for sale as downloads or as print-on-demand books. Under current copyright law, this constitutes theft. Google claims their use of the works fall under the Fair Use statute of Copyright law. However, Fair Use is defined as utilizing brief excerpts of the work in scholarly or academic works; one can also embody brief excerpts of the work in critical reviews (such as book reviews); Fair Use does extend to utilizing copies of the work for research purposes, including use in classrooms. However, this use must be for non-commercial uses [2]. A teacher photocopying multiple copies of a short story for study in the classroom is Fair Use; that same teacher using the same story in a volume of other stories and then selling the volume to the students constitutes copyright infringement. Google's plans to sell subscriptions to libraries for the use of research, copying, and general access to these works would be copyright infringement since Google is using the work for their commercial use.

Furthermore, Google plans to utilize the work by embedding advertising in the "snippets" of the copyrighted work, which also falls outside of the Fair Use doctrine. As such, their plans to make available, sell, and distribute the works to Third Parties constitutes utilizing the works for commercial purposes, which falls outside of the Fair Use guidelines.

By failing to "opt out" of the Settlement, the rights-holder is therefore effectively "opting in" by default. With no legal contract between the rights-holder and the company or individual exploiting the rights for commercial gain, there is no legally binding license between the parties. Google exploiting the rights for their commercial gain is in strict violation of the Copyright Act of 1978 regardless of the rights-holder's lack of action to opt in or opt out to this Settlement. Forcing rights-holders to opt in or opt out of the Settlement circumvents the entire copyright system.

### 2. General objection to the complexity of the Settlement

---

[2] US Copyright Law, Section 107; Limitations on Exclusive Rights; Fair Use.

Copyright law is complex. It is made even more so by the recent extensions of copyright duration, which differ according to countries and type of work.

The Settlement is even more complex than copyright law itself, and is even more so than most book contracts (not to mention film option/purchase contracts). In spite of the attempt to organize and simplify various issues of the Settlement through the use of FAQs (Frequently Asked Questions), my attempt at learning the complexity of this issue has proved stifling. I am not a lawyer, and I have represented myself on most of the licensing arrangements with my books to various publishers, therefore, I am well versed in copyright law and terms most commonly found in the contracts of book publishers. Despite this, the Settlement is arduous, incredibly layered, and contains language that seems intentionally misleading and confusing for most people, including most authors; even many literary agents I've consulted with regarding the Settlement are confused by it.

The complexity of the Settlement provides an unfair advantage between more successful authors who can afford legal counsel to deal with its complexity, and the less commercially successful ones who cannot. Most authors cannot afford the services of an attorney who specializes in copyright law, therefore, many of them will simply give up trying to grasp the complexity of the Settlement due to the very nature of the way the Settlement was written and structured.

## 3. Specific objection to the burden placed on copyright holders to 'claim' their works

Copyright for a writer exists the moment the work is created, and is held by the writer (unless it is under the conditions of a work-for-hire agreement in which the copyright is then held by a second party), and later his/her heirs. Many writers take copyright a step further and actually file formal copyright with the US Copyright Office. Most writers, however, consider the act of creation and, later, first publication, as their copyright.

Likewise, record keeping for various works will vary from author to author. Many keep detailed files and lists of first publications, reprints, foreign publications, and the like. Others don't keep such a detailed list.

Requiring writers to "claim" their works through Google places an undue burden due to the fact that many writers hold copyright in dozens, sometimes hundreds, of individual works. In the case of those who are prolific, this could number in the thousands. Google's requirement of writers to claim their work (and, in some cases, to prove they hold the copyright) amounts to invasion of privacy between the individual writer and the individual or corporation with whom they have an existing or past licensing agreement.

In regards to inserts, this creates an added burden on the author in that many of these inserts have been reprinted in numerous volumes and would require the author to submit numerous claims for the same insert for these multiple volumes. Not counting periodical appearances, one of my inserts (a short story) has appeared in three separate books, from different publishing companies, under three different editors. I know other writers who

have had the same insert appear in over twenty (20) separate volumes. Requiring the rights-holder to claim the same insert multiple times places an undue burden on the writer.

## 4. General objection to the dominant position conferred to Google by the Settlement

The Settlement states clearly and irrevocably that if right-holders permit Google to offer/sell access, in whatever form, to works in which they hold the copyright, this will be a non-exclusive right. Google has used this argument to rebut accusations that the Settlement would give it a monopoly in their offering of commercially unavailable works.

However, close examinations by legal scholars, literary agents, and other writers who have studied the issue have declared otherwise. Between various published articles on the potential Settlement and various conversations I've had with other writers and agents, it is clear that the Settlement will establish Google as the only legal place where books can be searched and indexed in the manner under the terms of the Settlement. As the only legal entity in which books can be scanned and searched, Google gets enormous power. They have the ability to alter their search algorithm to make bestsellers or banish books to obscurity. Likewise, the leverage they will attain over the publishing industry and authors' dealings with publishers is incalculable.

The proposed Settlement agreement would give Google a monopoly on the largest digital library of books in the world. It and the Books Rights Registry (see Objection #5), which will also be a monopoly, will have considerable freedom to set prices and terms and conditions for Google Book Search's commercial services.

## 5. General objection to the Books Rights Registry

Under the terms of the Settlement, Google will create a separate entity called The Books Rights Registry, which will operate like ASCAP, the music industry's clearinghouse for songwriter's royalties. Google and the Books Rights Registry will have considerable freedom to set prices and terms and conditions for Google's Book Search commercial services. While authors who opt in can set terms, pricing, and can authorize only partial views, snippets, or have their work removed entirely, so-called "orphan works" can have a price set at the Book Rights Registry's whims.

The Books Rights Registry will pay out 63 per cent of the total revenues collected to authors and publishers registered with it. In the case of books that are out of print in which the author holds all the rights, a certain portion of the revenue will be paid to the publisher despite the fact that the publisher no longer holds the rights. If all rights have reverted back to the author and the book is out of print, for what reason will the publisher be entitled to receive revenue from the Book Rights Registry? None. Likewise, no author can get paid for the use of their books by the Book Rights Registry unless he/she has registered with it.

This provision fails to address the complex structure of book contracts and the fact that many publishers still do not license electronic rights. Some publishers only license trade paperback rights; others hardcover, trade paper and mass market paperback. Many publishers license all print, audio, and electronic rights. For an author of an out of print work to which the original publishing license was for trade paperback rights only, with the author reserving all other rights, and the trade paperback rights have reverted back to the author, it makes no sense for the publisher to receive part of the monies due to the author for Google's use of the work under the terms of the Settlement. The publisher is no longer entitled to them.

While the Book Rights Registry will be started by Google among the $125 million dollars Settlement money, once the Registry is under operation, administration costs will be paid out of the 63% revenue the Registry will collect on behalf of the authors. There is no clear-cut figure on how much of the author's share of the 63% royalty will be deemed "Administration fees" by the Book Rights Registry. Likewise, the Book Rights Registry will be an entirely separate entity. Should it fail, authors will still be held under the terms and conditions of the Settlement with Google.

One final concern about the Book Rights Registry: according to the terms of the Settlement, it is entitled to charge unlimited expenses taken from payments due to the copyright holders, including reviewing the publishing contracts for every edition of every book in the Settlement (see Objection #3). This is guaranteed to outstrip the "startup money" the Settlement says Google has to provide to the Registry. It may well end up that some copyright holders, perhaps many, have to pay more to the Registry than they receive. Likewise, there are no audit provisions for authors concerning the Book Rights Registry. All publishing contracts contain audit provisions that authors can act on should they disagree with royalty payments. There is nothing in the Settlement in which it states the Book Rights Registry will have audit provisions for authors.

## 6. Specific objection to Settlement terms as it pertains to existing contracts with publishers

The Settlement terms attempt to usurp existing contracts authors have with publishers, especially contracts concerning the use of electronic rights.

Electronic, or digital rights, are now standard in most mass market and trade publishing contracts. Publishers will lease those rights along with mass market/trade paperback rights and hardcover rights. Many publishers do not exploit those rights, but will lease them from the author for possible later use. By forcing rights-holders to opt out of the Settlement in order to protect their work, there is the potential for authors to be in breach of their contract should Google later decide to scan and index these works (which, while Google has stated they will remove the works of authors who have opted out of the Settlement, they are not obligated to refrain from scanning future works by these authors)

[3]. For those who opt in to the Settlement and instruct Google to remove their works from display, search capability, or for sale, they should have no worries. However, the potential for mishaps is too great, especially for those works that have already been scanned.

## 7. Specific objection to Google's definition of what constitutes an orphaned work and the terms "Not Commercially Available"

The debate over so-called "orphaned works" has drawn the most attention to this Class Action and the Settlement. According to Google's available information, orphaned works are defined as those works for which no rights-holder can be located.

According to various sources, it is believed the number of orphaned books number in the tens of millions; about seventy-five percent of all published works. Despite that number, technology has made it easier than ever for one to locate the proper rights-holders. I know two editors who routinely reprint the works of authors who have fallen out of the public eye, whose works are still in-copyright. In every case, they have located the proper rights-holder, who was only too happy to grant a license for the reprinting, thus earning income for the author or the author's heirs. This is one of the reasons why copyright exists; it is a tangible piece of property of monetary value that one can earn income from and pass on to their heirs so that they might earn potential income too.

However, Google's definition of the term "orphaned works", as well as the process they employ to determine if a work is orphaned, is problematic. Using my case as an example, two of my works (now out of print) would have been deemed "orphaned works" by Google. I am actually quite easy to find, and publishers wishing to work with me have done very well locating me with a simple "Google Search". What are Google's search guidelines? What is their notification process? Who will oversee this process? Considering the scope of the rights possibly being granted to Google, checks and balances should be in place. The Settlement asserts Google has the right to reprint in-copyright works such as this, which by their accounting have fallen out of print within a year, and for which their processes have determined that the rights-holders cannot be located.

Likewise, Google's definition of what constitutes a book as "Not Commercially Available" (or "out of print") versus books that it deems "Commercially Available" are inconsistent. In the publishing industry, a book is deemed out of print under the following conditions: 1) the book sells out its print run and the publisher has no copies in stock (a work can be deemed out of print by the publisher even if the work in question is still

---

[3] Google Book Search Settlement, Opt Out Provision: "Although Google has no obligation under the Settlement to comply with such requests, Google has advised the Settlement Administrator that its current policy is to voluntarily honor such requests and refrain from digitizing your books or, if they have already been digitized, refrain from displaying them." This may be their current policy, but policies can change. Since they have no obligation under the Settlement to comply with such requests, what's not to prevent them from changing their mind about this policy in the future?

available in stores), or 2) in the case of a print-on-demand title when a book can be put into print utilizing a digital file and print-on-demand printing technology, a book can be deemed out of print by mutual consent of both the publisher and author and/or, if the terms of the contract have expired and the print-on-demand rights have not automatically renewed by either party, in which case the publisher removes the book (and the digital files) from the various print-on-demand printing and distribution systems. Print-on-demand books can be declared out of print (or Not Commercially Available) according to the Settlement, but the criteria for doing so are completely undefined. The publisher (and author) can be happy with the volume of sales, but Google can declare the work Not Commercially Available, thereby asserting their right to step in and reprint the book regardless. The Settlement applies to the entire remaining length of the book's copyright once Google declares it out of print.

The Settlement gives Google the right to sell these "Not Commercially Available" books as e-Books, print-on-demand books and as anthologies put together by Google, as soon as the book has been "Not Commercially Available" for one year. Furthermore, the book's status as "Not Commercially Available" is declared solely by Google. Print-on-demand printing technology is an increasingly popular method of publishing; books produced in this fashion can be declared "Not Commercially Available" according to the Settlement, but the criteria are nowhere defined.

### 8. Specific objection to the misrepresentation on behalf of the AG and AAP

I am not a member of the Author's Guild, which represented the sub-class labeled "Authors". The AG filed the suit on the behalf of their members; my objection lies in their representation of those authors who do not belong to their guild. Therefore, their representation of me as a plaintiff in the Sub-Class, and agreement to the terms of the Settlement on my behalf, represents a gross misrepresentation since I never received legal notification (by phone, email or postal mail) that I was part of a class action suit, nor was I informed prior to the filing of the suit, or entered into any prior agreement, written or verbal, with the AG. By agreeing to the terms of this Settlement, should it be approved by the Court, the class has arbitrarily dictated the terms of how I license my work to publishers, and they have done so without my express written permission.

Had the AG attempted to contact me (and millions of other non-Author Guild writers) prior to or during the course of the lawsuit, thereby allowing me to be an informed participant with a voice regarding the terms and conditions of the Settlement proposed by Google, I probably would have allowed them to represent me. However, the terms agreed to in the Settlement were approved without my knowledge or consent. As a writer who is not a member of the AG and, therefore, was not a participating member of the suit, I object to many of the terms of this agreement for the simple fact that, had I been involved from the very beginning, I would have argued for these causes due to the fact that they reflect my interests in this case.

### 9. Specific objection to the terms of use of Google utilizing copyrighted work and payment for said work

J.F. Gonzalez - Google Settlement Response

The arrangement between authors and publishers is negotiable. If at any point during the negotiation process the author finds the terms offered by the publisher unsatisfactory, the author can walk away and seek publication elsewhere, under better terms.

My objection to this particular point is due to the following:

a) The Google Book Search Settlement does not offer negotiable terms. Opting out of the Settlement is a choice many authors will want to make if the terms under the Settlement are not to their satisfaction. However, according to Google, while the company will voluntarily remove their works from scanning and the database, they are not obligated to do so in the future (See #6 and Footnote #3). This is akin to a publisher, who did not reach agreeable terms with an author during negotiations, and publishing the book at a later date without a legal contract. Of course, those authors can sue Google for copyright infringement, but at a cost that would be prohibitive to most authors. Therefore, the only option many authors will have is to opt in and object to specific terms of the Settlement.
b) The $60-$300 per book ($15-$5 per insert) offered by Google as a one-time Settlement payment is insultingly low and is non-negotiable. Again, the notion of the free-market enterprise is in play here. Had a publisher offered me similar terms for my backlist of books, I would have countered the offer with terms more favorable to me until we'd reached a mutual decision.

### 10. Specific objection concerning the nature of this class action

Class actions were never intended to establish the kind of licensing agreement that Google is attempting to obtain through this Settlement. The proposed Settlement will result in a court-ordered lease of certain copyrights from class members to Google. Had I not been made aware of this Settlement by an off-handed remark by a colleague, I never would have learned of it. It is very possible that had the original deadline for opt out not been extended to September 4, and the Settlement had been approved, a large array of certain rights to my work would have transferred to Google without my express consent or knowledge and I would have been in breach of contract with several publishers. Actual notice should have been sent to each class member at some point during the litigation of this class action or immediately upon Settlement.

### Conclusion

The current Settlement is fundamentally flawed for the reasons I have stated, as well as for reasons stated more eloquently by other class members who have filed objections. I reject Google's willful misinterpretation of "Fair Use" in copyright law to mask outright theft. I urge the US District Court to dismiss this Settlement, in which Google will redefine current copyright law. Contrary to Google's position on the matter (Google's literature defines in-copyright work as work registered with the US copyright office), copyright exists from the time of creation of the literary work. Registration with the US copyright office has not been required for over thirty years, since the passage of the

Copyright Law of 1978. The US District Court should not allow Google to ignore US copyright law in this regard, nor should the court tolerate Google's assertion that authors and other proprietors of literary works must let Google utilize their works indefinitely if they do not opt out of this Settlement by the specified date.

I hope that the US District Court will take these concerns, as well as the concerns of other copyright holders who have filed objections and statements, along with the statements of those who have opted out into consideration and will reject this Settlement and not sanction Google's blatant disregard for intellectual property rights and US copyright law.

Thank you for your attention.

Sincerely,

JESUS F. GONZALEZ

Ccs:

Counsel for Author Sub-Class
Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004

Counsel for the Publisher Sub-Class
Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY  10022

Counsel for Google
Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts & Kent LLP
332 Pine Street, Suite 200
San Francisco, CA  94104