UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-10-09

The Authors Guild, Inc., Association of American Publishers, Inc., et al.,

    Plaintiffs,

v.

Google, Inc.

    Defendant.

Case No. 05 CV 8136-JES

**OBJECTION AND NOTICE TO APPEAR ON BEHALF OF ABSENT CLASS MEMBER, DAVID MEININGER**

The Author's Guild et al v. Google Inc.   Doc. 531

### OBJECTION AND NOTICE TO APPEAR ON BEHALF OF ABSENT CLASS MEMBER, DAVID MEININGER

Class action settlements, unlike typical settlements, require court approval for the protection of those class members whose rights may not have been given due regard by the negotiating parties. As guardian of absent class members, the Court cannot approve the settlement without independently evaluating the evidence and finding that the settlement is "fair, reasonable and adequate to all concerned." Fed. Rules Civ. Proc., rule 23(e). Moreover, the case at bar demands heightened scrutiny because the parties reached a settlement prior to class certification and are no longer in an adversarial posture. *See, e.g. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620-21 (1997) (holding that the rights of absent class members "demand undiluted, even heightened, attention in the settlement context"). The parties seeking approval bear the burden of showing that the settlement is fair, reasonable and adequate. *See Williams v. Ryan,* 78 F.R.D. 364, 369 (1978). They have failed to meet this burden.

We provide the following objections to the settlement:

1. The proposed compensation to absent class members is grossly inadequate especially when contrasted with statutory penalties available for the copyright violations alleged. In this regard, Google is obligated to make cash payments in the amount of $5 (partial inserts),

1

$15 (entire inserts) and $60 (principal works) for works digitized without permission on or before May 5, 2009. Only one cash payment will be made for each of the aforementioned regardless of the number of times that Google digitized such works or regardless of the number of books in which such works appear. See Settlement Agreement, Article V., Section 5.1.

2. The governance and operations for the proposed Registry is at best vague and lacks any meaningful measures to ensure sufficient transparency. It is unclear, for example, how the Board of Directors of the Registry shall be selected and which specific governance procedures the organization shall employ. Apart from indicating that the Registry shall have equal representation as between the Author Sub-Class and the Publisher Sub-Class on its Board of Directors, it is unclear how many Board Members shall be selected, whether there may be other Board Members selected representing different organizations, including Google, and their numbers, and whether the Board shall, for example, receive monetary compensation. While indicating the Registry is to be a not-for-profit-entity, it is unclear whether or not the expenses occasioned by its formation, management, and continuing operations shall vastly outweigh income derived pursuant to subscription usage and inclusion fees generated pursuant to the proposed Settlement. While the Registry is to receive from Google 63% of all revenues received from designated uses pursuant to the Settlement Agreement, it is unclear how much of this portion shall actually be related to absent class members once Registry operational costs and/or other expenses are taken into account. The Court should require far more information from Class Counsel as to formation,

2

structure, governance and operations of the proposed Registry prior to granting this proposed settlement final approval. Indeed, as the settling parties, are, in effect, presenting a commercial endeavor to the Court for its approval, the settling parties are obligated to articulate a sound business plan and vision to show that the proposed Registry is viable and shall yield sufficiently meaningful benefits to absent class members (the purported beneficiaries) to justify its creation in exchange for a release of claims. The Court should also require that the number of Board Members for the proposed Registry be capped and require Class Counsel to provide a proposed operating budget and income statement to show that this self-proclaimed "innovative marketing" scheme really works. The Board Members selected for the proposed Registry should also be, at least initially, subject to Court approval so that staffing based on patronage, partisanship, and nepotism is conspicuously avoided. The Court should also insist that the management and operations of the Registry be sufficiently transparent so that absent class members know, for example, precisely what the Registry is doing and how it is spending class member money. The proposed Registry should be obligated to report to the Court or a Special Master on a going forward basis so that sufficient monitoring and oversight of its operations, management, and governance is maintained. The Court should require, for instance, that the Registry post its operating budget online so that absent class members know or can learn how their money is being spent and/or allow absent class member participation in its operations, management, and governance. The fig-leaf of merely providing equal board representation as between the author and publisher sub-classes is

3

woefully inadequate and fails to sufficiently address key operational and governance issues. There is a tremendous risk that the proposed Registry, once formulated, shall be an organization largely unaccountable to the absent class members who purportedly possess a beneficial interest in it and lack the sufficient and meaningful transparency necessary to instill absent class members with confidence vis-à-vis an organization potentially deriving millions of dollars per year in subscription and inclusion usage fees, not to mention a significant portion of the up-front money derived pursuant to the proposed Settlement. In short, far more information is needed so that a comprehensive analysis of the pros and cons for the proposed Registry, a core element of the proposed Settlement, can be meaningfully considered. The conspicuous lack of information is troubling and raises many questions as to both its viability and appropriateness.

3. The Court should be hesitant to approve a class action settlement that pursuant to its own Notice, is really, in large part, a commercial agreement designed as an "innovative marketing tool for authors and publishers." The Court should not be placed in a position to bless commercial enterprises or so-called "innovative" marketing tools. The Court should limit itself to dealing solely with statutory violations and other real cases and controversies and decline invitations, however, rosy, by settling parties to use the class action device not as a remedy for past wrongs, but rather a tool to coble disparate interests together in order to optimize a commercial venture and otherwise overcome inconveniences occasioned by such things as Copyright law. The attempt to vitiate copyrights and other substantive claims is

4

unwarranted based on the facts alleged in the pleadings and the manner, scope and degree of relief contemplated. This is an impermissible use of Rule 23. While the settling parties shall likely try and characterize the commercial aspects of this proposed settlement, *e.g.*, the proposed Registry and future subscription revenue, as injunctive relief; this characterization is erroneous. Google is simply not having any of its substantive conduct restrained which resulted in the underlying claims for alleged copyright violations. Rather, in simplest terms, Google is only required to pay, for example, the subscriptions (at vastly reduced commercial rates that it would not otherwise obtain in the commercial marketplace with a bona fide arms length transaction in one neat and easy deal) associated with conduct that is continuing and would be unlawful, potentially subjecting it to massive copyright infringement exposure absent this proposed settlement.

4. It is unclear as to the role the lead Plaintiffs shall or intend to play with respect to formation of the proposed Registry and whether they will be in a position, through selection of, for example, Registry employees and its Board of Directors, to obtain windfall compensation or other substantive benefits for which they otherwise would not be entitled to receive. The Court should require far more specificity with regard to the role each of the lead Plaintiffs anticipates playing with regard to operation, management, and governance for the proposed Registry and whether that role conflicts with their capacity as lead plaintiffs with regard to prosecution of the underlying case. For example, it is unclear whether and to what extent the Authors Guild, Inc. and/or its officers, directors, employees, etc. intends to play with respect to the

5

proposed Registry and how such anticipated role squares with duties and obligations pursuant to Rule 23 requiring that they be adequate representatives with typicality and commonality of claims. It is unclear, moreover, the role(s) played by other class representatives in the context of settlement negotiations and/or or post-final approval matters such as the proposed Registry and how their involvement, like that of the Authors Guild, Inc. squares with Rule 23 requirements.

5. It appears that sub-classes should have been created to the deal with the inherent conflicts of interest which exist within the Author-Sub Class based on whether, for example, the particular author dealt with out print books versus in print books, inserts versus books, out of print inserts versus in print inserts, and the quantity of past digitization by Google along with the potentiality for repeat and/or future digitization and usage. The Court should require far more information from the settling parties so that adequacy of representation can be properly addressed. Indeed, *Nat'l Super Spuds,* 660 F. 2d at 9, exemplifies this principle. There, a class of holders of potato future contracts liquidated between April 13, 1976 and May 7, 1976 (*id.* at 16-17) agreed to give a release applying to holders of potato future contracts not liquidated at those times; *i.e.,* unliquidated contracts. On the objection of a class member holding both types of contracts, the court held that the scope of the release was limited to contracts liquidated during the class period, explaining: *"plaintiffs had no power to release any claims based on any other contracts."*[1] *Id.* at 18. The core

---

[1] The court further explained that it is essential to understand the consequences of the limitation of the plaintiff class' power: *"If the case had proceeded to trial and a judgment had been entered in favor of the defendants, that judgment would have barred all members of the class who had not opted out*

6

proposition underlying *Nat'l Super Spuds* is that *"[t]here is no justification for requiring [persons in objectors' position] to release claims based on unliquidated contracts as part of a settlement which payments to class members are to be determined solely on the basis of the contracts they liquidated."* In other words, there is no reason why some class members should be forced to give up something of value to enable other class members to benefit from a settlement made richer at their expense. *"An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class."*[2] *Nat'l Super Spuds*, 660 F.2d at 18, 19. *See also Int'l Union of Elec., Elec., Salaried, Mach., and Furniture Workers, AFL-CIO v. Unisys Corp.*, 155 F.R.D. 41, 48 (E.D.N.Y.1994) (*"National Super Spuds thus stands for the proposition that a federal district court may not approve a class-action settlement that seeks to release claims that are inadequately represented by the named plaintiffs"*). Here, the settlement

---

*from bringing any claim based on contracts they liquidated. Such a judgment would not have barred members of the class from bringing any other claim they might be able to assert against the defendants, including claims based on contracts unliquidated at the close of trading on May 7. If a judgment after trial cannot extinguish claims not asserted in a class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either."* *Nat'l Super Spuds*, 660 F.2d at 18.

[2] A plaintiff in a class action authorized to represent class members with respect to one set of claims lacks the ability to release a different set of claims possessed only by some class members. *Id.* at 18. *See also Petruzzi's Inc. v. Darling-Delaware* Co. 880 F. Supp. 292, 300 (M. D. Pa. 1995) (*"the gain of one segment of the class should not be premised on the sacrifices of the other segment..."*).

7

contemplates disparate treatment based on, for example, the type of work digitized and fails to properly account for repeat past usage.

6. The proposed release is far too broad especially in light of the relief contemplated and foundational questions concerning adequacy of representation and the failure to properly employ sub-Classes to deal with inherent conflicts of interest, including the retention of separate counsel for the additional sub-Classes.

7. The requested attorneys' fees are excessive. Class Counsel evidently intends to seek $30 million in compensation. However, the minimum payment requirement vis-à-vis settlement value is $45 million plus an additional payment of $34.5 million for the proposed Registry, Notice, and Claims Administration. See Settlement Agreement, Article V., Section 5.1 (b); Section 5.2. Accordingly, absent the aforementioned administrative costs, Google is only obligated to fund the substantive aspects of the settlement with regard to $45 million with the benefits to be derived from the proposed Registry, at this point, unknown. Attorneys' fees should be awarded with an eye to moderation. Here, the settling parties have failed to meaningfully monetize the overall benefits (in total and from the perspective of an individual class member) from the proposed Registry separate and apart from glib statements about "innovative marketing" schemes. According to the Second Circuit, "no matter which method [for awarding fees] is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the

settlement; and (6) public policy considerations.'" *In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.,* 724 F.Supp. 160, 163 (S.D.N.Y. 1989) (summarizing *Grinnell* opinions)). This is a case which almost from its inception went into settlement negotiations and little real risk. Moreover, the costs involved with regard to the prosecution of this case appear to have been relatively minimal. An award of $30 million is far in excess of what should be paid for the services rendered.

_____
John W. Davis, CA Bar #200113
*Pro Hac Vice* Application Pending
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.4870
Facsimile: 619.342.7170

*Counsel for David Meininger*

## PROOF OF SERVICE

I am over 18 years of age, not a party to this action and employed in the County of San Diego, California at 501 W. Broadway, San Diego, California 92101. I am readily familiar with the practice of this office for collection and processing of correspondence for mailing with the United States Postal Service and service by electronic transmission. Correspondence is deposited with the United States Postal Service that same day in the ordinary course of business for first class mailing.

On September 3, 2009, I served the following documents via electronic mail. No errors were reported concerning transmission of these documents.

1. **Objection and Notice to Appear on Behalf of Absent Class Member, David Meininger**

The firms served are as follows:

| | | |
|---|---|---|
| Joanne Zack, Esq. | Jeffrey P. Cunard, Esq. | Daralyn J. Durie, Esq. |
| Joshua Snyder, Esq. | Bruce P. Keller, Esq. | David J. Silbert, Esq. |
| Boni & Zack LLC | Debevoise & Plimpton LLP | Joseph C. Gratz, Esq. |
| 15 St. Asaphs Road | 919 Third Avenue | Keker & Van Nest LLP |
| Bala Cynwyd, PA 19004 | New York, NY 10022 | 710 Sansome Street |
| | | San Francisco, CA 94111 |
| bookclaims@bonizack.com | bookclaims@debevoise.com | bookclaims@kvn.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on September 3, 2009.

Dated: San Diego, California
September 3, 2009

John W. Davis