USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-10-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, et al.,

    Plaintiffs,

v.

GOOGLE, INC.

    Defendant.

Civil Action No. 05-CV-8136 JES DC

**QUESTIA MEDIA, INC.'S AMICUS CURIAE BRIEF IN OPPOSITION TO THE SETTLEMENT AGREEMENT**

Questia Media, Inc. ("Questia") urges the Court not to approve the Settlement Agreement between Google, Inc. and the Plaintiffs. Among other things, the settlement calls for Google to:

- Make de minimis payments to rightsholders for Google's unauthorized scanning;

- Fund and enable an entity that must give Google the best licensing deal going forward;

- Pay Plaintiffs' attorneys $30 million; and in return

- Receive a priceless monopoly over millions of "orphan works."

Thus, instead of merely redressing Google's copyright infringement, the settlement grants Google the exclusive right to scan and commercially exploit millions of "orphan works," while protecting Google from competition. Inexplicably, the settlement rewards Google and runs afoul of antitrust law by creating a monopoly that undermines the diligent and lawful approach of companies like Questia, the creator of an on-line academic research library, and one which researched the copyright status of works in its collection, created a business model that serves rightsholders and customers alike, and pays authors and publishers royalties rather than misappropriating their works. The Court should reject the proposed settlement.

The Author's Guild et al v. Google Inc.                                                                                          Doc. 532

**ARGUMENT**

**I.   Questia has been building an on-line academic research library for ten years.**

Questia was formed in 1998, with the goal of providing students and researchers with equal access to the world's written knowledge—to democratize information while respecting copyright and properly compensating rightsholders. To that end, Questia launched its on-line academic research library in January 2001. For a low monthly fee, subscribers to Questia gain access to books, journals, newspapers, and magazines that they otherwise may not be able to read.

Questia has been building its library the right way for ten years, respecting copyrights and rewarding rightsholders. First, Questia asks its librarians to identify the important titles needed to create a top-flight academic research library with the requisite depth and breadth in subjects like architecture, psychology, history, and economics, among others. Targeting those titles, Questia dedicates significant resources to identifying the rightsholder of each work. Once it identifies a rightsholder, Questia works to establish a relationship with that person or entity, advising the rightsholder that there is an uncaptured market for the work in question and thus additional value in the copyright. Making the fractured publishing industry aware of this market opportunity is a difficult and time-consuming process. Negotiations with rightsholders can take anywhere from six months to two years. When negotiations are completed, Questia must work with each individual publisher or author to obtain a copy of the physical book or digital file, sometimes purchasing a used version from a third party, before processing the work and adding it to the library.

More than 325 publishers and 1,600 authors have granted licenses to Questia, which to date has served more than 400,000 retail subscribers worldwide. Questia also offers institutional sales that currently provide access to 250,000 high school students globally. Questia's

subscribers have access to 74,000 books, 181,000 journal articles, 213,000 magazine articles, and 2.1 million newspaper articles. Questia strives to keep the price of its electronic library as low as possible—providing access to one entire subject area (e.g. history, or business and economics) for less than $10 per month and access to the entire library for only $19.95 per month.

Questia works to offer a collection of continually increasing value to its subscribers; it routinely expands its collection by acquiring important works from existing and new partners. It does so by identifying and seeking out rightsholders, conducting good-faith negotiations with them, and showing them the additional revenue stream that Questia can generate for them. Questia's efforts to expand are constrained because this process is expensive and time-consuming. Questia cannot simply add millions of in-copyright "orphan works"—books whose rightsholders cannot be located by a reasonably diligent search—to its library. Such books might be a boon to academic researchers, but Questia cannot ethically or legally make use of copyrighted works without a license to do so.

For its part, Google chooses to ignore the services offered by Questia. On its website concerning the proposed settlement, Google claims that "[o]ut-of-print books aren't actively being published or sold, so the only way to procure one is to track it down in a library or used bookstore." Google Books Settlement Agreement: The Future of Google Books, http://books.google.com/googlebooks/agreement/#3 (last visited Sept. 3, 2009). Not true. Google knows that Questia provides its users with access to thousands of out-of-print books, and anyone can search Questia's library for free, subscribing only if searches reveal helpful material.

The proposed settlement further explains Google's refusal to favor Questia with the type of link it already provides to Barnes & Noble, Amazon, and others, when displaying certain book-related search results. Questia and its publisher partners have specifically requested such

links to book content on Questia's site in light of Google's role as the main aggregator of demand as a result of its dominant position in the search marketplace, but Google has refused. The truth is that Google aims to leverage its dominance in online search to redraw the competitive landscape in several industries, including book publishing. The fact that Google now attempts to obtain—via class action settlement—a monopoly over millions of orphan work books is simply additional proof of that fact.

## II. There is a legislative solution to the "orphan works" problem.

Under current copyright law, a potential user cannot use an orphan work without facing copyright infringement damages of up to $150,000 per work. Thus, "[w]hen a copyright owner cannot be identified or is unlocatable, potential users abandon important, productive projects, many of which would be beneficial to our national heritage."[1] March 13, 2008 Statement of Marybeth Peters, the Register of Copyrights, before the Subcomm. on Courts, the Internet, & Intellectual Property of the House Comm. on the Judiciary, http://www.copyright.gov/docs/regstat031308.html (last visited Sept. 3, 2009). This problem is not new and has been the subject of recent attention in the United States Congress.

In 2005, Congress asked the United States Copyright Office to conduct a comprehensive investigation of the orphan works issue. The Copyright Office prepared a report on the issue that laid out a framework for a possible solution:

> First, any system to deal with orphan works should seek primarily
> to make it more likely that a user can find the relevant owner in the
> first instance, and negotiate a voluntary agreement over permission

---

[1] Google has explained that "[o]rphan works represent an untapped wealth of information that can and should be made accessible to the public. These works include those for which the author or assignee of a work—the work's "parent"—can no longer be determined, usually because the contact information included on the copyright registration is out of date. Letter from David Drummond, Vice President, Corporate Development and General Counsel, Google, Inc. to Jule L. Sigall, U.S. Copyright Office 2 (March 25, 2005) (http://www.copyright.gov/orphan/comments/OW0681-Google.pdf (last visited Sept. 3, 2009)).

4

and payment, if appropriate, for the intended use of the work. Second, where the user cannot identify and locate the copyright owner after a reasonably diligent search, then the system should permit that specific user to make use of the work, subject to provisions that would resolve issues that might arise if the owner surfaces after the use has commenced.

U.S. Copyright Office, Report on Orphan Works 24 (January 2006) (http://www.copyright.gov/orphan/orphan-report-full.pdf (last visited Sept. 3, 2009)). Using this framework, the Copyright Office recommended an amendment to the copyright laws, but one that would not "unduly prejudice the legitimate rights of a copyright owner by depriving him of the ability to assert infringement or hinder his ability to collect an award that reflects the true value of his work." March 13, 2008 Statement of Marybeth Peters, the Register of Copyrights, before the Subcomm. on Courts, the Internet, & Intellectual Property of the House Comm. on the Judiciary, http://www.copyright.gov/docs/regstat031308.html (last visited Sept. 3, 2009).[2]

The Copyright Office's proposed solution offers protection to an unauthorized user of an orphan work who conducts a good faith, reasonably diligent (but unsuccessful) search for the copyright owner before using the work. The unauthorized user must mark the work as an orphan, and the rightful owner—if he or she comes forward—may still bring an action for "reasonable compensation" but not statutory damages as currently defined.

The proposal was well-received. It was incorporated in the Orphan Works Act of 2006, introduced in the 109th Congress. When Congress adjourned without taking action on the bill, the proposal was re-introduced as the Shawn Bentley Orphan Works Act of 2008, S. 2193, in the United States Senate. The Senate passed the bill by unanimous consent on September 26, 2008.

---

[2]Google also proposed a solution, but it suggested placing the entire burden on the copyright owner and provided almost complete protection for unauthorized users of orphan works. Letter from David Drummond, Vice President, Corporate Development and General Counsel, Google, Inc. to Jule L. Sigall, U.S. Copyright Office 4-7 (March 25, 2005) (http://www.copyright.gov/orphan/comments/OW0681-Google.pdf (last visited Sept. 3, 2009))

Unfortunately, the House again failed to take action on the legislation before Congress adjourned.

There is still broad support for solving the orphan works problem through legislation, but the proposed settlement circumvents those efforts.

## III. Google rightfully faces exposure for copyright infringement.

Google made unauthorized digital scans of approximately 6,000,000 in-copyright books, including an estimated 5,000,000 orphan works, violating the copyright holders' exclusive rights to copy their works. 17 U.S.C. § 106. Google simply asked libraries to permit it to make scans of their collections, but the libraries are not the rightsholders. Google made no attempt to obtain authorization from the true rightsholders. Google's rush to scan millions of books to benefit its search engine business exposed it to billions in potential damages for copyright infringement. At a minimum, with statutory damages calculated at only $750 per work, 17 U.S.C. § 504(c)(1), Google's liability exceeded $4 billion. Additionally, rightsholders were entitled to have Google turn over its illegal scans to the rightsholder or destroy them. *Rogers v. Koons*, 960 F.2d 301, 313 (2d Cir. 1992) (citing 17 U.S.C. § 503(b)).

The remedies for copyright infringement—including forfeiture of the infringer's profits are intended to "mak[e] infringement worthless to the infringer." *See Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 933 (7th Cir. 2003). Under the terms of the settlement agreement, however, the rightsholders, particularly the orphan works rightsholders, are not protected, any wrongdoing is not remedied, and the infringement has immense value to the infringer. Instead, the settlement rewards Google, handing it a monopoly over the millions of orphan works and protecting its use of those works from competition.

## IV. The proposed settlement gives Google a monopoly—the exclusive right to use millions of orphan works.

The proposed settlement grants Google—and Google alone—the right to copy and commercially exploit the millions of orphan works. The settlement, unlike the Copyright Office's proposed legislation, does not require Google to follow industry "best practices" to track down orphan works' rightsholders before making use of the works. It does not, unlike the proposed legislation, permit rightsholders who come forward in the future to establish the fair market value of their works and demand payment in that amount for Google's unauthorized use. In every way, the settlement benefits Google at the expense of Questia and any other entity that followed the law and respected the rights of copyright holders.

### A. Google receives the exclusive right to scan orphan works.

The settlement gives Google the right to digitize all orphan work books from any source. Settlement Agreement § 3.1(a)(i) ("Google may . . . Digitize all Books and Inserts obtained by Google from any source"). No other entity receives this right. Other entities—like Questia—cannot obtain permission from orphan works' rightsholders, who are by definition unknown or unlocatable.

Google admits that its rivals have only one option in order to compete: violate copyright law. Google in-house attorney Alexander Macgillivray concedes that the only way for a potential competitor to obtain these books is to scan them without permission, wait to be sued, and hope to secure a settlement on the same terms. *See* Miguel Helft, *Google's Plan for Out-of-Print Books is Challenged*, N.Y. Times, April 4, 2009 (available at http://www.nytimes.com/2009/04/04/technology/internet/04books.html?pagewanted=2&_r=1 (last visited Sept. 3, 2009)). WME Endeavor—agent for many authors—reached the same conclusion, noting the monopoly Google will enjoy and advising its authors to opt out of the

7

settlement. Publisher's Weekly, *WME Letter About Google Settlement* (Aug. 17, 2009), http://www.publishersweekly.com/article/CA6677143.html (last visited Sept. 3, 2009) (stating that the "only way for any potential competitor to obtain similar rights, absent new legislation, is to infringe, get sued, and hope to reach a settlement on terms similar to Google's").

In order to offer any of the orphan works, Questia would be forced to risk exposure for statutory copyright damages. For each orphan work it scans, Questia could face up to $150,000 in damages, and critically, Questia would lack the fair use defense Google offered in this litigation. Google, claiming to be a neutral (albeit dominant) search engine, has asserted that scanning these millions of books to build an index is fair use, but the settlement will also allow it to sell online access to the orphan works, either individually or collectively. By contrast, Questia's open aim is to include the books in its online research library, undercutting any fair use defense.

The settlement also prevents Questia from going to one of the libraries that allowed Google to scan their collections. While the libraries receive, at minimum, a digital copy of the works in their collections, the library is forbidden to allow Questia to use that digital copy without Google's consent. Settlement Agreement § 3.12. So too, even rightsholders—were they to come forward—may not permit Questia to use the digital copy of their works that Google originally made without authorization. *Id.*

Even Plaintiffs' attorney Michael J. Boni has admitted that the settlement gives Google an insurmountable advantage, explaining that "Google will always have the advantage of having access to 100 percent of the orphan works." Miguel Helft, *Google's Plan for Out-of-Print Books is Challenged*, N.Y. Times, April 4, 2009 (available at http://www.nytimes.com/2009/04/04/technology/internet/04books.html?pagewanted=2&_r=1

(last visited Sept. 3, 2009)). The settlement, if approved, will provide Google an unfair advantage in both cost and time to market to offer millions of titles in relationship to companies that followed the law. While repeatedly stating that its goal is to expand access to orphan works, Google is making certain that it will be the sole source for that access.[3]

### B. Google receives the best possible terms and a built-in escape hatch.

Even if a large number of orphan works' rightsholders were identified, they cannot reward Questia—or others—who followed the law and respected their copyrights. Under the settlement, Google receives the best possible economic terms—"most favored nation" status—for ten years. Settlement Agreement 3.8(a).

Rightsholders might have reason to disfavor Google and favor a company like Questia. Google is accused of violating copyrights on a massive scale, and Questia scrupulously respects copyrights and their rightsholders. Nevertheless, equal treatment is mandated by the settlement. If rightsholders give Questia a better deal, Google gets to take advantage of it. Incredibly, even if rightsholders form another entity—separate from, but similar to, the Registry—and that entity gives Questia a better licensing deal, Google gets that same deal from the Registry, if the new entity so much as uses data or resources *similar to but not actually provided by* Google. *Id.* (requiring Registry to extend the same terms as "any substantially similar entity organized by Rightsholders that is using any data or resources that is using any data or resources that Google provides, *or that is of the type that Google provides*, to the Registry relating to this Settlement").

Notably, Google has built into the settlement an option to escape from its terms, just in case. If Congress passes and the President signs orphan works legislation, Google has the right to take advantage of the legislation or opt out of the settlement. Settlement Agreement 3.8(b). In

---

[3] Google's sole control over orphan works is troubling because under the settlement Google has absolute discretion to exclude books from the corpus for "editorial" reasons. Settlement Agreement § 3.7(e).

9

other words, Google's agreement to pay for use of orphan works ends as soon as those payments put Google at a competitive disadvantage.

## V. The settlement does not protect the rights of the absent orphan works rightsholders.

Orphan works rightsholders are not protected by the settlement. Because such rightsholders are unknown and unlocatable, they have no ability to opt out of the settlement. No one knows who to advise of their right to opt out when it comes to the orphan works. By creating an opt-out settlement, Google is assured of receiving the right to commercially exploit *all* orphan works, and all such works will be included in the settlement.

Orphan works' rightsholders are by definition unaware that they are being involuntarily forced into this settlement. Once part of the settlement, however, they begin losing their rights as time passes. After twenty-seven months, they will forever lose their right to have digital copies of their books permanently removed from Google's collection. Settlement Agreement § 3.5(a)(iii). After five years, they will begin losing the right to a share of the revenue their works have been generating. That revenue will eventually be distributed to other rightsholders or to charity. *See, generally*, Settlement Agreement § 6.3. Finally, orphan works rightsholders immediately lose the right to have the Registry represent their collective interests as a sub-group in a way that might decrease their participation in the settlement. *Id.* § 6.2(b). Even were the Registry—the representative of orphan works rightsholders under the settlement—to conclude that excluding or removing orphan works from Google's revenue models is in the rightsholders' best interests, it cannot work to that end. *Id.* ("the Charter will prohibit the Registry from . . . working with any sub-group of Rightsholders to exclude their Books from Display Uses of Non-Display Uses, or to advocate that any sub-group of Rightsholders decrease its participation in the Settlement in any manner").

Even though the overwhelming majority of the works at issue in the settlement are theirs, orphan works rightsholders have no one that is truly speaking for them in this litigation.[4] If this settlement is reached, their "representative" is prohibited from speaking for them as a separate group. At bottom, the settlement gives short shrift to the orphan works rightsholders. At every turn, it prefers the interests of Google instead.

VI.  **The settlement violates the antitrust laws of the United States by granting Google a monopoly as a result of its copyright infringement.**

The settlement also represents an egregious violation of the Sherman Antitrust Act. As Robert Darnton, head of the Harvard University library system, explained it, "Google will be a monopoly." Miguel Helft, Google's Plan for Out-of-Print Books is Challenged, April 4, 2009 *New York Times*. Google's acquisition of the right to use and exploit all orphan works through the settlement is a blatant act of monopolization, as prohibited by 15 U.S.C. § 2.

"The act of monopolization prohibited by 15 U.S.C. § 2 consists of two elements: 'the possession of monopoly power in the relevant market and . . . the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 666 (S.D.N.Y. 2002) (footnote omitted) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). The settlement grants Google a monopoly: the exclusive right to make use of millions of orphan works. As Professor Pamela Samuelson notes, "[t]he proposed settlement would give Google a monopoly on the largest digital library of books in the world." Pamela Samuelson, *Legally Speaking: The Dead*

---

[4] Google originally agreed, challenging Plaintiffs' class certification efforts. Having obtained everything it wanted in the settlement, Google has now changed its position.

11

*Souls of the Google Booksearch Settlement*, http://radar.oreilly.com/2009/04/legally-speaking-the-dead-soul.html (last visited Sept. 3, 2009). Google's monopoly power has not been obtained by growth or development but by copyright violation on a massive scale. The settlement is necessary only because Google purposefully copied millions of books—mainly orphan works—without authorization. Had Google obtained rightsholder authorization before making its scans, there would have been no need for this lawsuit. However, Google did not devote the time and money necessary to obtain authorizations. It has been much easier to use settlement negotiations to secure what Google could not otherwise obtain. As the only party with a digital copy of the orphan works and the right to exploit them commercially, Google will have the undisputed power to set prices for orphan works. Settlement Agreement § 4.2(b)(i)(2); *see U. S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 389 (1956) ("Our cases determine that a party has monopoly power if it has, over any part of the trade or commerce among the several states, a power of controlling prices or unreasonably restricting competition." (citation omitted)).

The settlement by design creates "a pernicious market structure by specific intent in which the 'concentration of power saps the salubrious influence of competition.'" *Yankees Entm't*, 224 F. Supp. 2d at 666 (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979)). It prevents competition, intentionally so, ensuring that Google will always receive the best pricing deal from rightsholders, ensuring that rightsholders cannot allow Google's potential competitors to use the unauthorized digital copies Google made, and ensuring that no one will be allowed to represent the true interests of the orphan works rightsholders. Far from "refrain[ing] at all times from conduct directed at smothering competition," *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979), Google's actions have been

intended to do precisely that, with the hope that the Court's approval of the settlement forecloses any later reexamination of its monopoly.

Google's monopoly position in the online search market[5] only exacerbates the settlement's danger to competition. By virtue of its domination of the online search market, Google has the power to prefer its digital book offerings to those of its competitors, whose books will always be a link or two away, thus gaining an additional competitive advantage in violation of § 2. *Berkey Photo*, 603 F.2d at 276 ("the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market.") Moreover, Google's search market power creates an additional danger with respect to the settlement. That power makes it far less likely that small publishers and academic presses will feel comfortable opting out of the settlement, no matter the terms. Most publishers must have access to the global aggregation of demand the search giant's market power provides.

The Court should refuse to approve the settlement in part because of these valid antitrust concerns.

## VII. The settlement's grant of a monopoly to Google will provide Google unfair time to market and significant cost advantages.

Even were there no antitrust concerns, the Court should deny the settlement. "The Book Search agreement is not really a settlement of a dispute over whether scanning books to index them is fair use. It is a major restructuring of the book industry's future without meaningful

---

[5] Google possesses at least 65% market share in the online search engine market. comScore, Press Release: comScore Releases June 2009 U.S. Search Engine Rankings, http://www.comscore.com/Press_Events/Press_Releases/2009/7/comScore_Releases_June_2009_U.S._Search_Engine_Rankings. 65% market share is sufficient to establish a prima facie case of market power. *Envirosource, Inc. v. Horsehead Resource Dev. Co.*, No. 95 CIV. 5106, 1996 WL 363091, at *12 (S.D.N.Y. July 1, 1996) (finding allegation of 65% market share sufficient to state a claim); *see also Avery Dennison Corp. v. Acco Brands, Inc.*, No. CV99-1877DT, 2000 WL 986995, at *13 (C.D. Cal. Feb. 22, 2000) ("Courts have generally found that a 65% market share establishes a prima facie case of market power.").

government oversight." Pamela Samuelson, *Legally Speaking: The Dead Souls of the Google Booksearch Settlement*, http://radar.oreilly.com/2009/04/legally-speaking-the-dead-soul.html. The restructuring will favor Google at the expense of any potential competition, including those who, like Questia, opted to follow the law. Google alone will control 100% of the orphan works, without having made the significant investment in time and money necessary to obtain these rights through arms-length transactions within the law.

By ignoring copyright laws and by twisting this class action settlement to its own ends, Google will obtain a monopoly for the commercial exploitation of millions of orphan works. Questia asks the Court not to provide Google with an unfair advantage. The orphan works problem can be solved, but it should be solved through legislation for the benefit of all, not through a class action settlement for the benefit of one company.

Respectfully submitted,

Lee L. Kaplan
LEAD ATTORNEY
(SUBMITTING PRO HAC VICE)
State Bar No. 11094400
**SMYSER KAPLAN & VESELKA, L.L.P.**
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2323
(713) 221-2320 (fax)
lkaplan@skv.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2009, a true and correct copy of **Questia Media, Inc.'s Amicus Curiae Brief in Opposition to the Settlement Agreement** was served on all counsel of record by first class mail, postage pre-paid.

_/s/ Lee L. Kaplan_
Lee L. Kaplan