

**SYNDICAT NATIONAL DE L'ÉDITION**

September 3, 2009

Le Président

By Fax and regular mail
+1 212 805 7906

The Honorable Denny Chin
United States District Judge
Daniel Patrick Moynihan Courthouse,
500 Pearl Street
New York, NY 10007

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-11-09
```

Email copies to:
- Counsel for the Author sub-class: bookclaims@bonizack.com;
- Counsel for the Publisher sub-class: bookclaims@debevoise.com; jpcunard@debevoise.com
- Counsel for Google: bookclaims@kvn.com; bookclaims@durietangri.com;

The Author's Guild et al v. Google Inc.  Doc. 537

*Re: The Authors Guild Inc. et al. v. Google Inc., No 05 Civ. 8136 (DC)*

Dear Judge Chin:

I, Serge Eyrolles, am a citizen of France and President of the French Publishers Association (Syndicat National de l'Edition/ SNE), the leading association of book publishers in my country. SNE represents 530 member companies whose combined business endeavors account for the bulk of French publishing. Its missions include: advocating publishers' interests, supporting creativity by defending freedom to publish and promoting the respect of intellectual property rights, promoting and defending the fixed book price and promoting literacy.

The vast majority, if not all, of SNE's members are putative members of the Settlement class, as defined in the Settlement, as they own or control the copyrights to Books or Inserts, as also defined in that document. SNE's members are astonished over and oppose the unprecedented settlement that the parties have asked this Court to adopt and impose upon them. Most of our members, however, are not in a position to present objections to this Court individually, given their unfamiliarity with the United States' legal system and the cost and expense that they would incur in doing so themselves. Accordingly, on September 2, 2009, our Executive Committee and General Council formally authorized SNE to present objections to this Court regarding the Settlement. As such, SNE is uniquely positioned to provide this Court with information about how the Settlement will prejudice our members and French right-holders.

SNE is in a particular situation as it joined publishing group La Martinière as a party in its lawsuit filed on June 2, 2006 against Google Inc. and Google France, along with the French Authors Association (Société des Gens de Lettres/ SGDL), objecting to the unauthorized digitization and making available of copyrighted works. As Google continues to illegally digitize copyrighted books through its Library program, this legal action on the grounds of copyright infringement and on the defence of the collective interests of the publishing industry is, therefore, reinforced.[1]

Part I - The Settlement and the international copyright regime ................................................. 3
1. The Settlement disregards fundamental principles of international copyright ................. 3
2. No search of the rights-holder before using the content ..................................................... 3
Part II - Quality of the management system established for the Settlement ............................. 4
3. Definition of commercial availability .................................................................................. 4
   3.1. Too narrow definition of channels of trade ................................................................... 4
   3.2. Limitation of "commercial availability" to books offered "for sale" .......................... 5
4. Objection to the basis for the determination of availability in § 3.2 (d) (i) ....................... 5
   4.1. Use of European resources of information on commercial availability ..................... 6
   4.2. Metadata fields to be used to determine commercial availability ............................... 6
5. Unfair information processing by Google ........................................................................... 7
6. Bad quality of the database .................................................................................................. 7
   6.1. Lack of minimum quality requirements for the database ............................................ 7
   6.2. Need for grouping different books containing the same "Principal Work" ............... 8
   6.3. Incorrect use of standards in the database ..................................................................... 9
7. Lack of representation of non-US rightsholders in the Book Rights Registry (BRR). ....... 9
8. Lack of proper notification and translation of the settlement notice................................ 10
9. Deadline for financial compensation too close to deadline for opt-out and objections ... 11
Part III - Excessive power granted to Google ............................................................................ 11
10. Editorial control .................................................................................................................. 11
11. Unfair dispute resolution .................................................................................................... 12
12. The safe harbor for Google is too broad ............................................................................ 12
13. Rules for the determination of commercial availability are at the sole benefit of Google 13
14. The scheduling for remedy of errors is too long. .............................................................. 13
15. Lack of security measures .................................................................................................. 13
Part IV - Effects on the market .................................................................................................... 14
16. The Settlement grants Google a monopoly position concerning orphan and unclaimed works 14
17. Risk of the creation of a dominant position in the sector of electronic libraries and e-distributors and booksellers ....................................................................................................... 14
18. The Settlement could potentially jeopardize other digitization projects .......................... 14
19. The settlement does not provide a solution for works published after January 5, 2009 15
20. The financial compensation proposed for past uses is too little ....................................... 15
21. The Settlement not only provides for an agreement to put an end to a dispute but also for solutions for the future with strong business implications ................................................. 15

---

[1] http://www.sne.fr/pdf/06-11-20%20FAQ%20Google%20US.pdf

# Part I - The Settlement and the international copyright regime

## 1. The Settlement disregards fundamental principles of international copyright

The planned settlement deprives the author and the publisher of their crowning right to be able to decide for themselves the use of their works, in particular as "non commercially available books" may be digitized and displayed without prior authorization.

By letting Google reproduce works, by legitimizing the "opt-out" principle for "non commercially available works", by compelling right-holders to register to a one-stop-shop (the Books Rights Registry) in order to be able to assert their rights and by ignoring authors' moral rights, this system goes against copyright which is the only enabler for the development of a sustainable and diversified offer of digital contents.

Indeed, the Berne Convention provides in Article 5 that '(2) *the enjoyment and the exercise of these rights shall not be subject to any formality.* Section 408 of **the US Copyright Act of 1976 about "permissive registration" also stipulates that registration of a work is not a prerequisite for copyright protection in the US.**

The Berne Convention also says in Article 9 (1); '*Authors of literary and artistic works protected by this Convention shall have the exclusive right of authorizing the reproduction of these works, in any manner or form*'. Prior consent to use protected works, even via "snippets" forms the basis of international legislation. In the US, Chapter 1 - section 106 of **the Copyright law also recognizes the exclusive right of reproduction and public display** as it confirms that "*the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords; [...]
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly;[...]*".

By going against those principles, the settlement actually sets up **rules that are not only contrary to the US Copyright regime but also to the international obligations of the US.** This could certainly lead to a dispute at WTO level for infringement of the TRIPS agreement.

## 2. No search of the rights-holder before using the content

It is unacceptable that the Settlement does not provide for any obligation for Google and/or the BRR to proactively look for the rights-holders of out-of-print works, in order to ask prior authorization or, at least, to alert them of the use of their works.

The notification process just at the beginning of 2009 was not sufficient to warn all the rights-holders, and European right-holders in particular, because of the problems illustrated below. There are tools, such as bibliographic databases to do this in a reasonable way and at acceptable costs. For instance, for the publishing side, a unique – sufficiently reliable – global resource for knowing all the addresses of publishers world wide does exist, the PIID (Publishers International ISBN Directory), available at very reasonable costs.

Therefore, the Settlement should be changed to include diligent search of rights-holders also for the case of "non commercially available" Books before any use of copyrighted content. This at least would limit non authorized use to so called "orphan works", if the objection of the 1st § is not accepted by the parties.

It is important to know that systems to facilitate right-holders search are under construction in Europe within the so called ARROW project[2]. When such tools will be in place, Google and/or the BRR should be obliged within the Settlement to use them, at least to alert individually relevant right-holders.

## Part II - Quality of the management system established for the Settlement

### 3. Definition of commercial availability

The **determination of commercial availability** in the Settlement Agreement is unfair to European rights-holders.

The importance of the determination of commercial availability, or not, of a book is that it is used to determine the default display uses under the settlement. A commercially available book will automatically be removed from display uses while a non-commercially available book will require action from the rights-holder. Unless European publishers change the classification one-by-one, which places an **unnecessary administrative burden** on them, European books will be tagged as non-commercially available and Google will be exploiting the book commercially as foreseen in the settlement.

Another reason why the commercial availability is important is that according to Annex A (Author-Publisher procedure) in the Settlement, if the book is tagged as commercially available, the publisher will receive 100% of the revenues and share it with the author according to the contract. If the book is considered as non-commercially available, and the rights have not reverted to the author, the publisher will receive 50% and the author 50% (for works published before 1987 the split will be 35% for the publisher, 65% for the author).

According to section 1.28 of the proposed agreement *"commercially available means, with respect to a Book, that the Rightsholder of such Book, or such Rightsholder's designated agent, is, at the time in question, offering the Book (other than as derived from a Library Scan) for sale new through one or more then-customary channels of trade in the United States"*.

The adopted definition has **two elements that create unjustifiable prejudice to publishers** (and equally to authors), in particular to the European ones.

#### 3.1. Too narrow definition of channels of trade
The definition obviously does not reflect the fact that US **customers can nowadays purchase books from European sources such as online retailers**. In particular, US libraries, which are the main target of the new products proposed within the Settlement, often rely on **specialized library vendors based in the country of publication** of the books they are interested in, such as Casalini in Italy, Harrassowitz in Germany or Ebsco-Swets in France and in other European countries.

---

[2] http://www.arrow-net.eu/

Today, as a matter of fact, this definition is unjustifiably **prejudicing European rightsholders, as it has for consequence that ¾** of European books in average are currently considered as non commercially available, a proportion totally unrealistic. Many tests conducted in the Settlement database demonstrated that even books that are in the current European best-seller lists, as well as important long-sellers are considered as non commercially available, although US consumers can buy them easily via the Internet.

Therefore, generally if a US publisher does not claim the book (or claims a book and does not change the defaults) he will enjoy a "safety net" that European publishers will not. The situation will be particularly unfair for the **European rights-holders who happen to participate in the settlement just by default and do not claim their books**: Google will end up exploiting ¾ of their books just because these books are classified according to an erroneous criterion.

For this reason, as a minimum, the definition of "commercially available" in § 1.28 should be changed **from "*channels of trade in the United States*" to simply "*channels of trade*"**.

### 3.2. Limitation of "commercial availability" to books offered "for sale"

Commercial availability is conditioned by the fact that the rights-holder or his/her agent "*is, at the time in question, offering the Book (...) for sale new...*". Therefore, the only business model that is considered is that based on sales. This definition is surprisingly based on a lack of awareness of the existence of alternative models. In particular, a book can be offered by a rights-holder for free on the web according to a model based on advertising revenues or on "authors pay" model in the "Open access" environment, etc.

Therefore, the definition of § 1.28 should be further changed through **deleting the words "for sale new", so as to consider that any offer of the content has the same value in the determination of the availability of a book.**

Comprehensively, the § 1.28 should hence be changed as follows: "~~commercially~~ *available means, with respect to a Book, that the Rightsholder of such Book, or such Rightsholder's designated agent, is, at the time in question, offering the Book (other than as derived from a Library Scan)* ~~for sale new~~ *through one or more then-customary* ~~channels of trade in the United States~~"

### 4. Objection to the basis for the determination of availability in § 3.2 (d) (i)

The method to pass from the general definition given in § 1.28 to the actual determination of commercial availability is provided for in the section 3.2 (d) (i) of the settlement *"Google shall determine whether a Book is Commercially Available or not Commercially Available based on an analysis of multiple third-party databases as well as an analysis of the Book's retail availability based on information that is publicly available on the Internet. When analyzing the third-party databases, Google will use the publishing status, product availability and/or availability codes to determine whether or not the particular database being used considers that Book to be offered for sale new through one or more then-customary channels of trade in the United States".*

### *4.1. Use of European resources of information on commercial availability*

The provision is too vague and does not offer any clarity on the actual method used by Google, nor any possibility for rightholders to assess or verify such method. Since important consequences come from this determination (as said above), the lack of clarity and transparence on the method creates unjustifiable costs to rightholders that are obliged to control – Book by Book – if the determination is correct just to avoid to be prejudiced by any wrong determination. The section refers to "third party databases" and to "information that is publicly available on the Internet". However, Google is not obliged to provide any information about which third-party databases are used, and how they are used, in particular in case of conflicting information about one single Book. In fact, the quality of the databases is critical for the correct functioning of the system.

The Settlement *de facto* creates an incentive to consider a Book as non commercially available (since, if not claimed, it can be used) and the only consequence in case of wrong determination is an ex post remedy (so actually at no cost for Google). This lack of precise requirements concerning Google's obligation creates a clearly unbalanced situation between Google and the rights-holders.

Therefore, Google should commit in the settlement to use non-US – including **European - metadata providers to ensure that they have correct information regarding whether a book is commercially available or not**. This must be done prior to making any display uses under authorizations in the settlement agreement.

Furthermore, and very importantly, Google should commit to make publicly available the list of databases and Internet information used and the method to merge the different sources and to solve possible cases of conflicts in the information retrieved.

**Individual European publishers associations should be able to submit to Google further databases and Internet resources that Google should commit to use** to the extent that (1) Google can obtain access to such databases on fair and commercially reasonable terms, (2) those databases generally provide information regarding availability of Books, and (3) Google is not already taking such information into account through other sources Google use in determining the Commercial Availability of Books, provided that such decision is approved by the relevant publishers association which will be responsible for assessing the actual equivalence.

In using such databases Google should commit to follow the instruction of the relevant publishers association with respect to prevalence among the multiple sources of data that are used to determine whether Books are classified as Commercially Available.

These rules are essential to: (i) reduce Google's discretionality in the determination of Book availability, (b) reduce costs for European rights-holders who, in this case, can be confident that when a Book is correctly listed as available in a customary source used in the trade, it is also correctly determined as for use in the Settlement agreement.

### *4.2. Metadata fields to be used to determine commercial availability*

The section 3.2 (d) (i) of the settlement provides that "*Google will use the <u>publishing status, product availability and/or availability codes</u>*" to determine the commercial availability at title level.

It is to be noted that the three metadata fields mentioned in this phrase have different meaning and thus may carry different information. There is no clarity on how such conflicts will be solved.
- "Publishing status" is the code – defined as such in the ONIX standard – that carries the information about the publisher declaration of a book as out of print, i.e. not commercialized anymore by that publisher
- The "Product availability" codes can contain, instead, different information conceived for serving the physical book supply chain, so as to inform booksellers of temporary out of stock (e.g. when a book is under reprint, or when there is a lack of copies in one particular distributor or wholesaler).

It is evident that only the first data are relevant in the determination of the "non availability" under the settlement. So, the section should be changed as follows:

*"Google will use the <u>publishing status</u> data element, or equivalent, or – only when this is not available – other data such as <u>product availability and/or availability codes</u>...."*

## 5. Unfair information processing by Google

The current process for rights-holders to interact with Google and in particular to know whether their works are concerned is very unfair and burdensome for rights-holders. Indeed **Google does not provide the list of the digitized books, but rights-holders have to search a 100 million records database to find the 7 million records tagged as "digitized".**

The current communication model Google has set up can be simplified as such: "Please tell me what your books are and I'll tell you what I did with them", which is not a fair way to notify people that they may be concerned. The correct approach should be: "These are the books I digitized, and these are the books I have intention to digitize in the future..., please tell me if I am authorized to do so".

Technically speaking, it is extremely difficult for publishers, especially small ones (and even more for individual authors), to use the database, check their works and their status, claim them, communicate their wishes and possibly challenge the availability status. The **absence of national intermediaries** makes this process particularly complicated for foreign rightholders.

## 6. Bad quality of the database

### 6.1. Lack of minimum quality requirements for the database

**The database that Google is using and has made available plays a central role** within the mechanism set up by the settlement. It is the only tool for rights-holders to check if their works are concerned, to claim them and to let Google know about their wishes regarding their possible use. It also displays crucial information such as the status of the work in terms of commercial availability, which will determine how Google may use it. This is why it is of utmost importance that **Google should be responsible for the quality and reliability of the database in an enforceable way**.

It is to be noted that the Google database, different than that planned to be set up by the Registry, will keep on playing a role even after the current initial phase. For example, initial determination of Book availability will be Google's responsibility also in the long term, although the Registry will have the capacity to challenge such determination.

So far, **the quality of the database is extremely poor**. For instance, it has been detected that:

- several records have wrong identifiers,
- the same publisher has different names in different records;
- several records have wrong publishers;
- the same contributor has different names in different records;
- several records have wrong contributors;
- several records have wrong titles or year of publication;
- several records have wrong information about availability status (in print);
- several records have missing information about title, contributor, year of publication, etc.
- some works, such as journals or music scores, which are not part of the settlement are included in the database.

It is urgent that the quality and functioning of the database are improved in order to allow rights-holders to make full use of it. Currently, it is extremely burdensome and confusing for a European publisher to claim books in the database.

The bad quality is a direct result of the lack of instruments in the Settlement to enforce or at least to encourage an improvement of the quality of the database. Although Google is indicating that it is currently working on improving the database, it is necessary that the quality of its job should be measurable and assessable by an independent party (for instance the BRR, upon the condition that it becomes fully representative – see following objection).

The **costs** associated with the acquisition of licenses for the use of European databases and bringing significant improvements to the Google database in order to reach a reasonable level of quality should be borne by Google at their own expense, possibly within an additional financial envelope in the framework of the settlement.

Therefore, the Settlement should provide clear rules for that:
o The quality of the database should be defined according to **measurable criteria** agreed between Google and the Registry, while paying due attention to the non-US books;
o Google should reach such pre-determined level of quality **before starting any use of the scanned Books**.


### 6.2. Need for grouping different books containing the same "Principal Work"

In Section 3.2(d)(i) of the settlement, the notion of Book availability is correctly based on "Principal works" and not individual "manifestations" of that work, i.e. individual editions containing the same content. This means that a Book will be considered available when at least one edition of the content is available. However, all the existing metadata providers do not manage this type of information, but provide availability status at manifestation level and not at work level.

Therefore, it is necessary to group together, *ex novo*, all the different books that have been published containing the same Principal Work. From a technical viewpoint, this is a big challenge and, at least for European books, the database systematically provides erroneous data about the relations between metadata records and between different editions for the same Principal work.

According to tests made, for example, for *all* the novels of leading Italian authors like Italo Calvino, Primo Levi, Umberto Eco or Oriana Fallaci (which represents a significant asset for the Italian publishers), there is at least one edition that is marked as non commercially available within the database and thus, if not claimed, can be digitized and used without authorization. It is to be underlined that since the source of the digitization programs are the

libraries, and libraries very often do not have the last edition of a book but an early edition, it is highly probable that the particular book entering the scanning program is the one defined as non commercially available; hence the presence of many errors for this reason.

A rule similar to that proposed in §4.1 should therefore be established to correct this situation. **A measurable and assessable quality criteria should be fixed, and agreed quality thresholds should be reached before starting any use of scanned Books.**

Furthermore, **the result of the grouping process should be made public via the Settlement database,** which is essential both to assess the quality and for individual rights-holders to challenge incorrect determination of the groups.

### 6.3. Incorrect use of standards in the database

Google recommends rights-holders to send information using the Onix format (the most reliable standard for metadata exchange in the book trade). However, this is completely misleading. In fact, the system itself is not Onix compliant, as we verified after appropriate tests.

In fact, the website does not provide for any specification of which Onix message is to be used by publishers (which is a mandatory requirement for compliance), nor which minimum data elements to be included in such Onix message.

According to our tests, it is possible to send any type of Onix-like message (i.e. also non valid Onix file written in an XML with similar syntax) out of which which the system only takes into consideration a few elements. This creates a critical misunderstanding among publishers who may trust that all the information they are sending are taken into consideration for the search of the relevant records within the database.

Furthermore, the system provides as feedback only records that match some pre-defined (but not made public) criteria. So publishers using the "Onix" tool will miss many records referred to their books, thus receiving misleading information. Typically, although the publisher's Onix record may match a record of one specific edition of the book,the answer he/ she may receive may not mention the records of other editions, and possibly the one indicating that the Book has been scanned and is considered non available, may not be provided in the answer.

**Google should be obliged to either be compliant with the Onix standard, providing clear information of the way the tool works, or to stop using this functionality.**

### 7. Lack of representation of non-US rightsholders in the Book Rights Registry (BRR).

Section 6.2 (b) of the settlement establishes that the *"Registry will be organized on a basis that allows the Registry, among other things to (i) represent the interest of Rightholders in connection with this settlement Agreement...The Registry will have equal representation of the Author Sub-Class and the Publisher Sub-Class on its Board of Directors..."*

The BRR will represent rights-holders world wide to negotiate on their behalf very important matters including terms of new revenue models. Furthermore it will be in charge of the data management and for the creation of a new huge database with very valuable information, ready to be used also beyond the relations with Google.

Google indicated that among the 6 million copyright protected books it already digitized, half of them are in non English language. Given the strong direct interests of foreign rights-holders, **it is therefore unfair that nothing in the settlement ensures that there will be non-US publishers and authors in the Board of the BRR**. Such a commitment is necessary in order to protect the interests of non-US copyright owners.

Furthermore, in the BRR governance, it should be established that when an issue especially affects non US rights-holders (e.g. the use of metadata resources for the determination of availability of European Books), they have a majority voice in the decision making process.

## 8. Lack of proper notification and translation of the settlement notice

It is unfair that in certain European countries rights-holders have been notified either too late or through means that are unlikely to be effective. As a matter of fact, the way the notice summary was formulated and presented in the French press made it look like a mere advertisement by Google, so that most French rights-holders did not take it seriously and did not feel concerned.

Practically speaking, **the Notice does not even answer the basic question of which works are covered by settlement**, as the process implies that the burden is on rights-holders to figure it out by undertaking Internet research in the Google database.

Furthermore, the full settlement agreement is not available in any other language except English. The only translated document into some European languages has been the notice of class action settlement (Attachment I) and, in spite of the efforts made by the settlement administrator to improve them, **most of the translations are not satisfactory and often very confusing for European rights-holders**. The French Publishers Associations advised its members to use the original English version of the notice and drafted its own FAQs, because of several risks of misunderstanding contained in the French translation.

The different language versions of the Settlement website also contain many misleading errors. Just to take an example, in the header of the spreadsheet used as the main tool to give publishers the data about their books, the term "imprint" is translated as "édition", instead of "marques" (brands). Since "édition" means "edition", it is very confusing for the publisher to understand that he/ she has to provide for the names of his/her brands instead.

The French Publishers Association was notably asked to assist the settlement administrator to improve the quality of the translation. A lot of work was therefore undertaken by the representatives of the rights-holders themselves. However not all the modifications were implemented.

The notice also needs proper "localization" beyond mere translation. A paradigmatic example is the follow: when a rights-holder claims a Book, the system asks him/her to declare if that Book is or is not a "work for hire", which is a concept that does not exist outside the United States. There is not any note or online help to understand this step. And it is not permitted to go ahead in the claiming process without declaring (under one's own responsibility) something that is completely obscure.

The French Publishers Association had in particular proposed to modify the translation of **the notion of "works for hire"**, since the current translation as "ouvrage écrit contre remuneration" is extremely confusing and misleading as it literally means "book written against remuneration", which is the case for the majority of books. And yet, this wording is

still currently used on the claiming form for individual books and on the spreadsheet used to download the results of a query.

**Proper and understandable translations and localization of all necessary documents must be provided before the settlement is approved.** It is unfair that rights-holders are bound by the settlement if they did not have the proper information to make an informed decision before the deadline to opt out.

## 9. Deadline for financial compensation too close to deadline for opt-out and objections

As the settlement may be finally endorsed at the end of the year, rights-holders may have very little time to ask for a financial compensation as the deadline remains January 5, 2010. Given **the characteristics of the information processing and the bad quality of the database** described above, it is just impossible for rights-holders to do this job properly within such a short timeframe.

A new delay would be even more justified as **Google has not yet provided the final list of books it has digitized by May 5, 2009**.

# Part III - Excessive power granted to Google

## 10. Editorial control

It should not be up to Google to choose unilaterally to exclude some books from "one or more Display uses for editorial or non-editorial reasons". [3.7 (e)] leaves room for **censorship and restrictions to intellectual freedom** for sexual, religious, political or any other reason. One can imagine that Google may find itself under pressure from governments or interest groups to censor books that discuss topic such as alternative lifestyles or that may be seen as politically offensive. For instance, China has demanded the removal of links to sites promoting free speech and civil liberties in Tibet. Google may also proactively suppress entire categories of books, just to pre-empt anticipated complaints.

Google agrees in the sub-clause to notify the BRR when it excludes a book for editorial reason but **does not agree to disclose the reason when the exclusion is for non-editorial reasons or when Google relies on confidential information to make the exclusion**.

This power given to Google is even more unacceptable if the sort of exception granted to Google concerning non-claimed out of print Books is confirmed: Google will then have a sort of **quasi-monopolistic license for out of print Books in the US, with the right to unilaterally exclude some of them and the impossibility for other users to get a license anywhere else.**

[3.7 (e)] should therefore be modified so that any exclusion should be discussed beforehand with the rights-holder. In case of disagreement, the question should be referred to **an independent body**, such as the International Freedom of Expression eXchange/ IFEX which includes the International Publishers Association, the PEN Centers and the International Federation of Library Associations.

## 11. Unfair dispute resolution

The dispute resolution mechanism set up by the settlement **tends to favor Google, particularly as it concerns claims outside the US**:

- In 9.1(b)(v), it should be the publisher's election whether to arbitrate claims over Google's attempt to use the agreement as a defense to foreign claims (under 10.2(b)). If the Agreement does not pertain to foreign claims, then its mandatory arbitration provision should not apply in this situation.
- In 9.3(a), if the publisher elects to arbitrate, the forum and choice of law should not be New York if the dispute concerns a "legal claim outside the U.S."
- In 9.7, judgment should be capable of entry outside the Southern District of New York, in any court having jurisdiction over the parties (as is the case in 9.11, which deals with injunctive relief).
- Under 8.6(b), the publishers should not have to arbitrate if there is willful failure of a Security Implementation Plan, and damages should not be capped. These limits might be acceptable for non-willful breaches, but a willful security failure should not be shielded from greater liability.

## 12. The safe harbor for Google is too broad

When Google does any sort of mistake (see the bad quality of the database), the only consequence is that it has to remedy, **without any possibility for rights-holders to ask for damages**, even in case of evident violation of some obligation of the Settlement.

For instance, the section 13.6 exemption of all the Settlement parties from liability for any claim involving *"(a) any decision with respect to any Cash Payment or (b) actions taken with respect to any Cash Payments or other disbursements from the Settlement Fund"* is apparently overbroad, as it could seemingly allow Google and the Registry to make no payments at all despite their obligations under the Agreement. A similar provision is in section 11.5 of the Author-Publisher Procedures. This needs to be clarified, in order to ensure that publishers have legal recourse – in some form – if they are not given the payments they are due under any other provision of the Agreement.

Google is committed by the Settlement to determine in the right way the commercial availability (and to cluster books containing the same work), but the only consequence it will suffer in case of error is that it will have to remove the content and/or change again the status. The absence of a real sanction makes this commitment not enforceable.

There is a **strong incentive for Google not to comply**: they can more easily make books available, while rightholders have in interest in controlling their data just to defend themselves, at no cost for Google,.

Concerning more precisely the **"Safe Harbor Public Domain Process."** in attachment E:

- It doesn't address the seemingly more important point that an initial foreign publication, followed quickly by a U.S. publication (within 30 days, for purposes of 17 U.S.C. 104A(h)(6)(D)) renders the work a U.S. work, even though the foreign publication was first.
- In 1.5 and 1.6 there are references to U.S. "Copyright Renewal Records" and "Copyright Registration Records," with capital letters, but we do not find any definitions anywhere.
- Finally, in Section 3 of attachment E, there is a reference to Section 302 of the Copyright Act, which makes no sense at all: section 302 is about "works created on or after Jan. 1,

1978," while Section 3 of attachment E is about "Pre-1923 Works Not Presumed U.S. Publications." This section does not seem to have been completely thought through.

### 13. Rules for the determination of commercial availability are at the sole benefit of Google

It is unfair that an asymmetric rule is provided for the determination of commercial availability. When the BRR tells Google to change the status from in-print to out-of-print, Google does it automatically, but when it tells the opposite, Google asks for clear evidence. Furthermore, when rights-holders claim their Books, they are invited to provide evidence if they want Google to classify them as "available".

This creates a real paradox. Usually the user must ask permission to make any use of a work and thus has to gather evidence on the copyright status, whereas, in this case, rights-holders have to provide evidence of such a basic information about their Books.

This asymmetry should be removed from the Settlement and Google should trust the rights-holder's declaration without asking evidence, neither directly nor indirectly (through the BRR). **It should be up to Google to provide evidence of the opposite, by challenging the information provided by the rights-holder.**

### 14. The scheduling for remedy of errors is too long.

Google is supposed to remove books digitized without permission or change the determination of out of print within 30 days, which in the Internet is a "geological era". Everything may happen to a rightholder's content if it stays for 30 days in the Google services.
The Settlement should refer to notice and take down procedures, which are very common in the US and which allow for **not more than 24 hour period** for similar cases.

### 15. Lack of security measures

There are no security measures or sanctions to prevent **fraud** via the database provided by Google, so that it is technically possible to claim someone else's works and benefit from them as long as they don't claim them as well.

Moreover, **it is not clear whether the removal procedure is really definitive**. Even though rights-holders may request that copies of digitized books be deleted from Google's servers or sources from which Google and the Participating Libraries could make any use, Google is still allowed to keep a **backup copy** of the book.

Besides, there is **no formal guarantee in the settlement that Google will respect rights-holders' wishes not to have some of their books digitized in the future.**

# Part IV - Effects on the market

### 16. The Settlement grants Google a monopoly position concerning orphan and unclaimed works

All the books considered as non commercially available will be used by Google unless rights-holders disagree. As it is not certain that the Registry is responsible for searching for rightholders, there may be many works which will never be claimed in the Google database. Google will thus have the right to exploit them, as though it benefited from an **exception to copyright at its sole profit**. In application of the settlement, competitors willing to use orphan works would have to try to seek permission in advance from each rights-holder. Accordingly **they will not be able to offer the same services that could compete in any meaningful way with Google**.

This unique position obviously raises **antitrust issues**. What is even more unacceptable is that the reason why Google acquired this position is because for years **it ignored authors' and publishers' pleas to cease copying and making their works available without authorization**.

Practical solutions should be found in order to facilitate the digitization and making available of orphan works but this should be done via a dialogue involving all interested stakeholders, in particular rights-holders. **It should not be up to Google, as a for profit company with market power, to decide upon the use of orphan works**.

### 17. Risk of the creation of a dominant position in the sector of electronic libraries and e-distributors and booksellers

Today, Google already enjoys a dominant position as a search engine on the European market (95.6 % of Internet searches in Europe). The system created by the settlement would allow Google to undertake wide uses of 7 million already digitized books, which **would solidify Google's dominant position by making it biggest digital library in the world**. According to Robert Darnton, the director of Harvard University Library, the settlement will give Google "what can only be called a monopoly of a new kind, not of railroads or steel but of access to information." By making Google a leader as a search engine, a bookseller, a publisher and a library, this could have an impact on the concentration of media ownership and on cultural diversity. This situation could increase the pressure on small publishers dependant on Google to gain visibility and to weaken other digitization projects.

In particular, **the "most favored nation" clause**, 3.8 (a), which guarantees that the settlement parties cannot offer any other party – whether for profit or non for profit firms – a deal that is better than the one that Google is getting, will prevent smaller competitors from entering the market. In the field of literary and artistic works, it is vital to oppose any intent to reach a dominant position or a quasi-monopoly.

### 18. The Settlement could potentially jeopardize other digitization projects

The Settlement creates an unfair advantage in favor of one operator in the sector of digitization projects. In fact, all other projects around the world are **based on the full respect of copyright, therefore implying asking consent of rights-holders**. The process of actively searching for rights-holders takes more time and thus generates higher costs. For this reason the competition will be fully unbalanced.

### 19. The settlement does not provide a solution for works published after January 5, 2009

Google may scan these works and make them available, unless rightholders sue them again. Rights-holders may thus feel **obliged to conclude partnership agreements with Google** in order to make sure to control the uses related to those works. There is, again, **no legal certainty** provided in this matter.

### 20. The financial compensation proposed for past uses is too little

60$ per book, 15$ per Entire Insert and 5$ per Partial Inserts are too little amounts to compensate for counterfeiting acts. This is especially unfair since there is **only one payment in case there are several editions of a book,** although the existence of different ISBNs makes each of these books a different product

### 21. The Settlement not only provides for an agreement to put an end to a dispute but also for solutions for the future with strong business implications

This is not a typical class action settlement, proposing some compensation for a past injury, but a **decision about perpetual future rights**. It is difficult for publishers to engage into business models about which they have not been really fully informed (market studies concerning potential revenues to expect...) and which have huge strategic business implications for the future. Although the digital publishing market is only starting to develop, it obviously has a huge potential of growth.

Respectfully submitted,

Serge EYROLLES