05-CV-8136

## *Inkling Books*
*Michael W. Perry, Editor*

Ph: 206.365.1624   Editor@InklingBooks.com
6528 Phinney Ave. N, Suite A,   Seattle, WA 98103
Internet: http://www.InklingBooks.com

Wednesday, September 2, 2009

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-11-09

The Honorable Denny Chin,

    I should introduce myself. I was also one of the seven authors or their representatives who requested that the court extend the deadlines for the Google settlement by four months. Since a number of the other writers are well known. I joke with friends that I represented the "Who's he?" category of writers before the court. In letter, I will try to speak from those writers, particularly writers with limited resources.

    I'm not quite unknown. I have contributed to, edited, or written some two dozen books on a wide variety of topics from literature and politics to history. I was the assistant editor of *The C. S. Lewis Readers Encyclopedia*, which won an award as one of the best biographies of 1998. I ghosted half of a standard reference work, *Presidential Scandals*, for Congressional Quarterly. I'm also the author of *Untangling Tolkien*, the only book-length chronology of J. R. R. Tolkien's complex *The Lord of the Rings*.

    I have received recognition from other writers. In his last book, Michael Crichton, the well-known author of *Jurassic Park*, praised a book on eugenics that I edited. Martin Gilbert, Winston Churchill's authorized biographer, has said kind words about my latest book, *Chesterton on War and Peace: Battling the Ideas and Movements that Led to Nazism and World War II*. A few weeks ago that book won an award from the American Chesterton Society as the best G. K. Chesterton book of 2009.

    In addition, since 2000, I've run Inkling Books, a small publishing company in Seattle. That means I wear many hats, as researcher, writer, editor and publisher, and that makes me well qualified to comment on the Google settlement. That is why I am asking leave to address this court informally in a letter.

    Stated briefly I believe that the Google settlement is bad for writers, bad for publishers and, despite all the claims to the contrary, bad for those doing research. That's why I asked for that four-month extension. It is also why I am writing this personal letter.

    First, I'll deal with research. The media, echoing Google, often claims the settlement will create, a "digital library for the world." As you know, it's not a library for the world. The dispute is about U.S. copyrights. If the settlement is approved, Google will keep anyone outside the U.S. from displaying the books they have scanned. To put it bluntly, America will be robbing the rest of the world.

    Does that mean that it is still a good idea for those doing research in the U.S.? Not really. The sheer volume of the collection Google hopes to create can't manufacture quality out of quantity. Instead, it destroys quality by its sheer size. Here's an illustration.

Thanks to Michael Crichton's commendation, a book that I edited, *Eugenics and Other Evils*, is the second bestselling book on that topic sold on Amazon. Crichton praised the additional material I added, but the real reason that a book written almost 90 years ago continues to sell well is its brave author, G. K. Chesterton. When he wrote it, virtually everyone of importance praised eugenics, including his two friends, H. G. Wells and Bernard Shaw. That's why he chose such an 'in your face' title. If he had called it *Eugenics Thoughtfully Considered*, people would have considered it yet another in the flood of books praising eugenics. (As I point out in *Chesterton on War and Peace*, Chesterton was also ahead of his time in condemning once fashionable ideas about racial supremacy. He denounced the ideas in Nazism, which he called Teutonism, before Nazism existed.)

Now it happens that I also have that same book in one of Google's legitimate schemes—their Google Partners program, which displays books *with* the permission of authors and publishers. The last time I checked, there Chesterton's ground-breaking book ranks a pitiful #78, placing it near the bottom of the eighth page of searches. It's essentially invisible. That's how quality smothers quantity. Books that don't matter, books that are little more than yellowing trash, overwhelm books that deserve respect. Quantity has destroyed quality.

Still worse for research is Google's quirky scheme to limit online display to only part of a book. Imagine a book from the 1930s in which a historian is describing some commonly held point of view. Just before his description ends, a researcher's quota of screen displays runs out. He fails to read the next page, which begins, "The evidence, however, indicates that what I've just described is not true." That's bad. If you want to understand what a books says, you need the book itself, not this settlement's castrated slice of it.

Keep in mind that I'm not against displaying books online. I use them all the time. What I'm against is a scheme that violates copyright on a vast scale, creating a vast collection that benefits no one but Google, and then in an odd spasm of self-flagination, appeases its guilt by ripping text out of its original context and striping out maps, graphs, and written by others ("inserts"). Books treated in such a brutal and cavalier fashion are virtually worthless for research.

I don't want to criticize without being constructive. What's needed isn't a what Google wants to create, a kleptomaniac mad man's attic cluttered, willy-nilly, with titles stolen (in copyright terms) from libraries. What's needed is the sort of library we create for ourselves, one based on an intelligent selection of books that really matter, books that haven't been mutilated in some mechanical fashion. Most important of all, we need a digital library that grows carefully over time rather than one that's thrown together in haste like this one. Built wisely, the effort to locate an author and get the proper permission won't require as much expense or trouble as this insane effort to digitize and database every paper text.

Keep in mind that asking authors for their permission will, even in the short run, make the building process go smoother. People are much more likely to say "yes," if they know that their "no" will be honored. Anger them, and you will have no end of trouble. I've talked to a number of authors, one the former president of the German writers union, who are furious at what Google has been trying to do behind their back. If the court permits Google to carry out its scheme, we will have no end of trouble. Digital libraries that are genuinely useful will be delayed for years by a fuss over one that's poorly executed.

Here's a modest illustration. Just a few weeks after the Dachau concentration camp was liberated the U.S. Army published a report on the camp that included interviews with survivors. Because that report is hard to find, I brought it back into print, newly typeset, as *Dachau Liberated*. I also added something that wasn't a part of the original—chillingly graphic drawings made by a combat artist who arrived the day after the camp's liberation. Even though I knew work done for the U.S. government is almost always in the public domain, I went to the trouble of locating the artist and asking his permission. He thanked me quite generously and complained about those who fail to ask. Google doesn't ask, it takes.

That brings up another major point. As an author, I can believe that the Google settlement is even worse for authors than for researchers. For an author, copyright is like a door that the owner of a store locks before he goes home, or the entrances to your home that you make sure are locked before you go to sleep each night. Copyright protects the results of an author's labors and offers a chance to be rewarded for long labors.

That's why anything that threatens copyright law is a threat to authors and, to be blunt, this settlement is copyright law rewritten in. It is that bad. If you understand a typical writer's circumstances, one glance at the settlement will confirm that. Let me explain.

As with any law, what matters most is the burden that copyright law imposes on those it should protect. The more you or I must do to ensure that our rights aren't violated, the less value a law is to us. Copyright law already imposes a heavy burden, the cost of legal counsel. A successful author can sue and win in situations where a less successful one can do nothing.

That's why it is no exaggeration to state that, if approved, the Google settlement will gut copyright law, leaving it a shadow of its former self. It destroys a bedrock principle of copyright law, that an author need do little or nothing to be provided with the full protection of the law. Europe and the United States long debated over whether an author needed to register a work for it to be protected, only reaching a compromise in the 1980s. But they've always agreed on the inviolate principle that once a copyright exists, permission is required for publication.

That concept is a major principle of the Berne Convention, which has been signed by over 160 countries, including the U.S. If a book goes out of print and the author refuses to authorize a new edition, that book cannot be reprinted, however popular it might be. If an author shuts himself up on a mountain top and refuses to talk to anyone, his book can't be published. Even if the author simply can't be found (the orphan works problem), a book must remain out of print. Expediency can't trump the rule of law. Copyright law in general and the Berne Convention in particular make no demand that an author make himself available and willing to entertain offers before providing protection.

The Google settlement targets that bedrock principle, and to destroy it uses the much criticized class action, forced opt-in provision. The implications of forced opt-in are all too obvious. To protect his U.S. copyright, an author, wherever he lives in the world, must hear about this settlement. That's already a major barrier for authors in many parts of the world. He must then grasp its true meaning, even though it's written in legal terms in a language he does not understand. Finally, he must act to protect his copyright by a certain date, in this case September 4, 2009. If he does not, his U.S. copyright is effectively gutted. In certain and more benevolent contexts, Google will publish far larger portions of his book than fair use permits. In other contexts the taking is more brutal, all of the book will be published without the

3

author's knowledge or consent. It is impossible to imagine a more clear violation of the Berne Convention.

Taken alone, that's foul. But keep in mind something that Google itself is insisting on. Faced with criticism that this settlement permits only Google to brush aside the copyrights of millions of authors, Google has suggested that anyone can do what they've done. Legal scholars have pointed out that it might be hard for another giant corporation (such as Amazon or Microsoft) to find an American Publishers Association and an Authors Guild willing to sue them and settle in this same way. But they are missing what really matters.

In the U.S., that sort of second-time-around contrivance might be hard to achieve. But in other countries, it would be all too easy to find governments willing and even eager to do something similar, judicially or legislatively, to 'get even' for what the this settlement has done to their authors. That's why I've pointed out elsewhere that, if approved, this settlement could effectively destroy the international copyright treaties we have carefully built up over the past century. The resulting conflict would not affect just books, where profits are typically modest. It would also include the far more lucrative fields of music and movies. Never forget that there are countries, some of them very populous and increasingly prosperous, that would love an excuse to set aside their obligations under the Berne Convention. "What the U.S. can do," they will say, "we can do." And they will be right.

A global copyright war would be bad for everyone, but I want to stress the implications for more ordinary authors, wherever they might live. You have a copy of the settlement. Glance over it. Do you think it is something the average writer of say, young adult novels, can understand? Obvious not. Then ask yourself how much that author would have to pay a lawyer to make sense of it. No doubt thousands of dollars and, even then, the lawyer would admit that there were parts whose meaning was unclear. I know someone who manages an literary estate so valuable, she employs teams of lawyers to protect it. Yet even they can't tell her what the settlement's full implications are.

Multiple that burden by at least 160, roughly the number of countries with which we have copyright agreements. As it stands now, those treaties are marvelous for authors such as myself. I write a book and, by simply registering it with the U.S. copyright office, I have copyright protection in virtually every country in the world, all without cost or expense.

But if that settlement is approved by this court, it could destroy that marvelous system, so carefully built up over the last century. I and other authors will no longer be able to simply register a book with our nation's copyright office and rest easily. In good health or poor, we will have to monitor the news constantly. At present, we only have to fret about Google's schemes and protect ourselves from them. But note that Google claims that any similar business situated anywhere in the world has a right to do what they are doing. How can any author track what's happening in 160 countries and respond before a similar opt-out-or-you-will-be-forcibly-opted-in deadline? He can't.

Last of all, I don my publisher's cap. Keep in mind that, for about a decade, publishers, especially the more established ones, have been bewildered by technological change. Online stores, particularly Amazon, along with the emerging market for ebooks, have left them wondering what the future holds. What a writer does, create useful and interesting content, has changed little. What a publisher does is changing rapidly. I entered publishing just as these

4

changes began, so they don't bother me. But for someone who has been distributing printed books for 20, 30, or every 40 years, publishing has grown scary.

Someone who is frightened listens to any voice that sounds confident, particularly when that voice comes from a company as successful as Google. "Surely Google," they think, "knows what is going to happen in publishing and can guide us." Google may or may not know what will happen, but they have little interest in helping traditional publishers succeed. Google's success is what matters to Google.

Google knows that for many people, especially those in the next generation, books are not only going digital, they're going online. In a few years many people won't have a large library of paper books. They won't even have a large collection of digital books stored on their computer. Both are a hassle to manage. Instead, they'll purchase access to an online library.

Google intends to own the largest of those online libraries. That's what this dispute is all about. The settlement already permits Google to sell libraries full access to books without an author's permission, something no other publisher can do. They'll soon want to sell access to individuals on those same terms. When that happens, many of the books you and I buy won't be published by Macmillan and bought from a Barnes & Noble. They'll come either directly from Google or through some distributor with close ties to Google. By doing nothing to oppose the Google settlement, many publishers may be signing their own death notices.

I would like to thank you for taking the time out of your busy schedule to read my remarks. I close by noting that there are legitimate issues that the Google settlement is attempting to address. But they're not issues that can be resolved in a district court by a complex, class-action agreement between three private parties. They involve the rights of authors and publishers around the world and can only be address by international treaties that are fair to all involved.

The most of important of those treaties, the Berne Convention, was revised or completed eight times between 1886 and 1979, an average of once every eleven years. In spite of enormous technological change, in the last thirty years it has not been revised a single time. The solution to our troubles lies in revising Berne and adapting it to new circumstances and not in hastily brushing it aside like this settlement attemptsNo index entries found. to do.

Sincerely,

*Michael W. Perry*
Michael W. Perry

Copies of this letter have been sent to counsel for the author's subclass, the publishers subclass, and Google.