UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Authors Guild, Inc., et al,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>Google, Inc.<br><br>　　　　　　　Defendant. | Case No. 05 CV 8136 (DC)<br><br>OBJECTION TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR OF THE UNDERSIGNED STATES REPRESENTED BY THEIR RESPECTIVE ATTORNEYS GENERAL ON BEHALF OF THEMSELVES AND REGISTERED CHARITIES WITHIN THEIR POLITICAL BOUNDARIES |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-11-09

The undersigned states hereby object to the proposed class action settlement and give notice of their intent to appear through counsel (Norman W. Marden, representing the Commonwealth of Pennsylvania) at the fairness hearing scheduled for October 7, 2009.

The undersigned states' Attorneys General have standing by virtue of their respective states' ownership of registered copyrights[1] and/or their statutory mandate to represent registered charities under their jurisdiction. State copyright ownership for purposes of standing is based on copyrights registered in the name of the state or assigned

---

[1] Without addressing the validity of this definition, the settlement agreement at § 1.142 defines the Settlement Class as: all Persons that, as of the Notice Commencement date, have a Copyright Interest in one or more Books or Inserts. All Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both. Excluded from the Settlement Class are Google, the members of Google's Board of Directors and its executive officers. Person is defined in the settlement agreement at § 1.103 as: a natural person and any corporation, partnership, limited liability company, association, whether incorporated or not, and any other entity organized under United States federal or state law, or under foreign law.

to it as well as works whose rights have escheated to the respective states under their rules of intestacy. For example the Commonwealth of Pennsylvania is the holder of 107 copyrights registered in its name and is authorized under the Commonwealth Attorneys Act to intervene in any action involving charitable bequests and trusts. 71 P.S. § 732-204(c).

As explained in greater detail below, the state Attorneys General Objectors (State Objectors) oppose this settlement because its treatment of unclaimed funds generated as profits by the proposed licensing scheme will violate state unclaimed property statutes and impermissibly dispose of charitable assets. This treatment will violate fundamental tenets of fairness and adequate representation because future profits generated through the commercial use of properties owned by unregistered class members will not be preserved for their benefit, but instead will be used primarily for the benefit of registered class members, who do not own the underlying work generating those profits.

The State Objectors have limited this objection to these two state specific issues not addressed by other Objectors. This limitation is intended to avoid duplicating what other Objectors have already adequately addressed, and is not meant to comment on the proposed settlement's analysis under federal laws, including the Federal Rules of Civil Procedure and the antitrust laws nor does it indicate that the State Objectors have no other concerns regarding the proposed settlement.

## Background

Because the court is aware of the history of this case we set forth here only those facts necessary to understand the settlement and its deficiencies. This settlement arises

out of a class action filed by The Authors Guild and other named Plaintiffs. The class in its final form consists of all owners of registered copyrights, including authors and publishers, of works which were registered with the Copyright Office prior to January 5, 2009. This class purports to include those states which are registered copyright holders and charities whose assets include works with registered copyrights.

The Settlement Agreement currently before the court proposes the creation of a Book Rights Registry (BRR) as detailed in Article VI of the Settlement Agreement. The BRR's duties include locating Rightsholders and receiving payments from Google under the settlement agreement and distributing those payments to Registered Rightsholders in accordance with the agreement, the Plan of Allocation and Author-Publisher Procedures.

Funds remitted to the BRR from Google are for the use of specific works licensed to Google by the Settlement Agreement. These funds are assigned to a particular work based on the number of times it is accessed, the number of pages viewed, advertising revenues generated on the web page where the work is displayed and sales of electronic versions of the work itself. Settlement Agreement Art IV. Funds transferred to the BRR under the Settlement Agreement are identified as attributed to a particular work at the time they are received as commercial profits by Google. Google will extract its share of the profits generated by these works prior to transferring the remaining funds to the BRR. Both the Settlement Agreement and the Plan of Allocation propose that the BRR hold these funds for five years, during which time the Rightsholder may register with the BRR. When the five-year period is over, the BRR will redistribute these unclaimed funds to (in order of priority) itself, other Registered Rightsholders or cy pres to charities chosen by the BRR.

**Argument**

The State Objectors' believe that the treatment of unclaimed funds proposed in the Settlement Agreement would likely: 1) convert charitable assets to commercial purposes by dispersing unclaimed funds to authors and publishers or to a charity not approved by a court of proper jurisdiction; and 2) would either authorize or attempt to circumvent the operation of state unclaimed property laws by redistributing unclaimed funds for the maintenance of the Book Rights Registry and to reimburse authors and publishers by "topping up" their payments under the distribution plan. S.A. § 6.3. Both of these concerns stem from the same operative section of the proposed settlement and could likely be addressed by changes limited to this particular section of the proposed Settlement Agreement.

The State Objectors understand that there is case law available which declines to apply state unclaimed property statutes to unclaimed settlement funds. This may apply to the approximately $45 million fund specified in the proposed settlement as payment for the alleged past infringement of protected works, but this is distinguishable from future unascertainable amounts generated as profits by a new corporation. The new corporation must abide by all state laws applicable to it. These funds are not paid by Google to the parties to settle any harm currently before the court, and instead constitute a contractual relationship to pay for future use of a copyrighted work.

This contractual portion of the proposed Settlement Agreement will generate profits which are identifiable to the specific protected work which generates that income, and should accrue to the benefit of the owner of the underlying work. The share of profits transferred to the Rightsholders by Google will be administered by the BRR, not

this Court, and the only recourse the parties to this litigation possess for resolving disputes regarding these funds is by arbitration. These terms work to exclude these future payments from the continuing jurisdiction of this Court, which other courts have found significant regarding settlement funds not subject to state unclaimed property laws. *Com. v. BASF Corp.*, 2001 WL 1807788, 18 (Pa.Com.Pl. 2001) (Pennsylvania Unclaimed Property Law did not apply to settlement funds to which the court had exclusive continuing jurisdiction to disburse).

Since § 6.3 of the proposed Settlement Agreement is a contractual agreement between Google and class members for the use of property owned by class members, the funds generated by operation of this commercial agreement should become the property of the owner of the work generating the profits at the time of use. This triggers the operation of state abandoned and unclaimed property disposition statutes.

Under the state unclaimed property statutes, all abandoned and unclaimed property and property without a rightful or lawful owner is subject to the custody and control of the state. For example, the appropriate provision in Pennsylvania is 72 P.S. § 1301.2, which mandates that the state treasury preserve unclaimed property for the rightful owner. Under Pennsylvania's statute, this applies to intangible property such as intellectual property if:

> "…the last known address of the owner, as shown by records of the holder, is within the Commonwealth or the last known address of the owner as shown by the records of the holder within the jurisdiction the laws of which do not provide for the escheat or custodial taking of such property and the domicile of the holder is within the Commonwealth or no address of the owner appears on the records of the holder and the domicile of the holder is within the Commonwealth." 72 P.S. § 1301.2 (a) (2).

Funds generated under this type of an agreement would properly be handled by the applicable state unclaimed property laws regarding property held by an organization such as the BRR. For example, the appropriate provision in Pennsylvania would be 72 P.S. § 1301.6 – property held by business associations, which applies to "any sum due as a dividend, profit, distribution, payment or distributed share of principal or owing by a business association whenever the owner has not claimed such sum or corresponded in writing with the business association concerning it within five years after the date prescribed for payment or delivery" would be subject to the custody and control of the Commonwealth under this statute. Failure to transfer unclaimed property to the appropriate state authority can carry civil and criminal liability. In Pennsylvania, it would constitute a misdemeanor which carries a penalty ranging from $1,000.00 to $10,000.00 and up to 12 months imprisonment as well as liability to pay interest of twelve per centum per annum to the Treasurer. This type of disposition of unclaimed funds is the means utilized by the American Society of Composers, Authors and Publishers ("ASCAP") and Broadcast Music, Inc. ("BMI"). These groups both collect license fees on behalf of their members and distribute them as royalties.

The Parties to the proposed Settlement Agreement appear to have contemplated the BRR performing an analogous function on behalf of the book author and publisher community to the function that ASCAP and BMI provide (primarily) to the music industry. Neither ASCAP nor BMI has found compliance with state unclaimed property laws to be an insurmountable task, since states receive unclaimed property payments from both organizations on an annual basis. The proper treatment of profits generated by a particular work under the unclaimed property statutes will resolve both of our concerns

6

related to the legality of the proposed settlement agreement and its treatment of charitable assets.

The United States Supreme Court established rules to determine the proper state to dispose of unclaimed property in *Texas v. New Jersey*, 379 U.S. 674 (1965) and 380 U.S. 518 (1965). The Court also reiterated these rules in *Pennsylvania v. New York*, 407 U.S. 206 (1972), stating that the Court should resolve disputes among states over the right to escheat abandoned intangible personal property in three steps: (1) first, the Court must determine the precise debtor-creditor relationship, as defined by the law that created the property at issue; (2) because the property interest in any debt belongs to the creditor rather than the debtor, the primary rule gives the first opportunity to escheat to the state of the creditor's last known address, as shown by the debtor's books and records; and (3) if the primary rule fails because the debtor's records disclose no address or because the creditor's last known address is in a state whose laws do not provide for escheat, then the secondary rule comes into play, which awards the right to escheat to the state in which the debtor is incorporated. Here, BRR would receive funds for the use of the Rightsholder's property under a contractual arrangement to offer the work commercially between the Rightsholder and Google, and would be placed in the debtor position with respect to those funds to the Rightsholder of the underlying work. The proper state for disposal of any unclaimed property would be the last known address of the Rightsholder as determined by BRR's records. If no address is known, then the funds should be turned over to BRR's state of incorporation under its unclaimed property law. BRR's stated core mandate is locating Rightsholders, therefore its records should become more complete as time passes. This coupled with the initial copyright registration should

provide a last known address for nearly all book titles, leaving only unattributed inserts under state of incorporation unclaimed property laws.

Fifty-two states and territories have unclaimed property laws, which can be classified generally under three headings. The first two groups consist of states that have adopted a modified version of either the Uniform Unclaimed Property Act of 1981 or the Uniform Unclaimed Property Act of 1995. These groups consist of twenty-eight and eleven states or territories respectively. The third group consists of thirteen states which have enacted their own statutes. This third group includes Pennsylvania, as well as the likely places of incorporation or operation of BRR, Delaware and New York.

It is well documented that courts rely on four primary options to dispose of unclaimed settlement funds: (1) *pro rata* distribution to claiming class members; (2) general or specific escheat to a governmental body; (3) reversion to the defendant; and (4) *cy pres* distribution. *See Powell v. Georgia-Pacific Corp,* 843 F.Supp. 491, 495 (W.D. Ark. 1994); *Motorsports Merch. Antitrust Litig.,* 160 F.Supp.2d 1392, 1393-94 (N.D. Ga. 2001); *3* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §§ 10.13 to 10.25 (4th ed.2002); *Diamond Chemical Co., Inc. v. Akzo Nobel Chemicals B.V.,* 517 F.Supp.2d 212, 217 (D.D.C. 2007). In deciding among these distribution options, courts are guided by "the objectives of the underlying statute and the interests of the silent class members." *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1307 (9th cir. 1990); *see also Powell,* 843 F.Supp. at 495-96 and *Diamond,* 517 F.Supp.2d at 217.

Here, the copyright statutes are the underlying statute, whose purpose is to encourage creativity by vesting exclusive rights in the creator of the work. Failing to preserve these profits, assuming that they constitute settlement funds, would ignore the

exclusive rights of the owners of these works, particularly with regard to the silent class members, in favor of others such as Google and the Registered Rightsholders of other works. Such a result is unfair; since the unregistered Rightsholder would be worse off than if there had been no settlement at all.

The disposition proposed by the settlement agreement also amounts to a "private escheat." These types of agreements attempt to circumvent state unclaimed property laws in favor of benefitting private parties with no cognizable right to the funds escheated. These types of provisions have been rejected in every jurisdiction in which the issue has arisen, including: California, New Jersey, Illinois, Kentucky, Maryland, Michigan, Utah, Georgia and the District of Columbia.

In closing if this Court approves the Proposed Settlement, the State Objectors suggests a modification of the proposed settlement agreement requiring the parties to include a provision in the BRR's articles of incorporation or other enabling document to comply with state unclaimed property laws in the same manner as ASCAP and BMI. This will ensure the fairest and most reasonable result for rightsholders, ensure the preservation of charitable assets and further the public purposes of the unclaimed property laws.

Respectfully submitted,

THOMAS CORBETT, JR.
Attorney General

By: *(signature)*
James A. Donahue, III
Chief Deputy Attorney General
Attorney ID #42624
jdonahue@attorneygeneral.gov

_____
Norman W. Marden
Deputy Attorney General
Attorney ID #203423
nmarden@attorneygeneral.gov

Jennifer A. Thomson
Deputy Attorney General
Attorney ID #89360
jthomson@attorneygeneral.gov

Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530

ROBERT M. MCKENNA
Attorney General of Washington

TINA E. KONDO
Deputy Attorney General
Antitrust Division Chief

JONATHAN A. MARK
WSBA No. 38051
Assistant Attorney General
Attorney General of Washington
800 5th Ave., Suite 2000
Seattle, WA 98104-3188
Tel: (206) 389-3806
Fax: (206) 464-6338

Respectfully submitted,

THE COMMONWEALTH OF
MASSACHUSETTS

By its attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

_____
Matthew M. Lyons, BBO 657685
Assistant Attorney General
Public Protection and Advocacy Bureau
Antitrust Division
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200, Ext. 2128
matthew.lyons@state.ma.us

September 8, 2009

-

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Authors Guild, Inc., et al,<br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>Google, Inc.<br>　　　　　　　Defendant. | Case No. 05 CV 8136 (DC)<br><br>OBJCTION TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR OF THE UNDERSIGNED STATES REPRESENTED BY THEIR RESPECTIVE ATTORNEYS GENERAL ON BEHALF OF THEMSELVES AND REGISTERED CHARITIES WITHIN THEIR POLITICAL BOUNDARIES |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Objections to class action settlement and notice of intent to appear of the undersigned states represented by their respective attorneys general on behalf of themselves and registered charities located within their political boundaries was served upon the following, by First Class Mail this 8th day of September, 2009.

James A. Donahue, III
Chief Deputy Attorney General