



```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-11-09
```



SEP 11 2009

JUDGE CHIN'S CHAMBERS

Office of the Clerk
J. Michael McMahon
US District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007
USA

*Via Fax (+1.212..805.7906), UPS & Hand Delivered*

**To the attention of the Honorable Denny Chin**

**Re:** **The Authors Guild Inc, Association of American Publishers, Inc. v. Google (Case No. 05 CV 8136 JES) – Objections of Dunod Editeur SA to Proposed Class Settlement**

Paris, September 3rd, 2009

Dear Judge Chin:

1.    I, Nathalie Jouven, signatory of this letter, am a citizen of France and Chief Executive Officer of Dunod Editeur SA.

2.    Dunod Editeur SA, having its registered office and principal place of business in Paris, France, objects, to the settlement agreement proposed in the above-captioned matter (The "Proposed Settlement").

3.    Dunod Editeur SA ("**Dunod**"), is a French-based company. It does business in the publishing of books principally universitary textbooks, as well as various books on education, in the French language. Dunod is a subsidiary of Hachette Livre SA, the parent company of a multinational group having many European publishing subsidiaries. As a parent company, Hachette Livre SA is also filing objections to the Proposed Settlement.

4.    Dunod has not opted-out and is thus a member of the Publisher Sub-Class.



5. As a European publisher, Dunod objects to the Proposed Settlement and strenuously urges the Court to reject it due to the significant unfair and inequitable effects that it will have on all non-US Authors and Publishers[1]. The Proposed Settlement is purely and simply unacceptable from the point of view of a European publisher.

6. As a European publisher, Dunod has ten material objections to the Proposed Settlement. None of these objections concern the proposed indemnification (extremely marginal, on a per-book basis) for the injury caused by Google for past unauthorized digital copying[2] of some ten million works in print[3], of which approximately half have been generally estimated (including by Google itself in various public declarations) to be works published in languages other than English.

7. The bulk of the 134-page Settlement Agreement (334 pages with the appendices) is directed to establishing a complex commercial arrangement, potentially affecting millions of copyrighted works and the owners of the intellectually property rights in those works on a worldwide scale. Among other things, the Settlement Agreement provides for the establishment and charter of the "Book Right Registry" (Article VI), outlines the role of Google's library partners in the commercial venture (Article VII), addresses security issues related to the commercial venture (Article VIII), adopts a protocol for the resolution of disputes arising between parties to the commercial arrangement (Article IX), and sets out the economic terms for Google's use of class member's intellectual property (Article IV). Several "Attachments" to the Settlement Agreement provide additional details relevant to the proposed commercial arrangement, including Attachment A ("Procedures Governing Author Sub-Class and Publisher Sub-Class Under the Settlement Agreement"). As a European publisher, Dunod is obliged to object to many of these provisions of the Proposed Settlement with the utmost conviction.

8. Indeed, as a European publisher, Dunod objects to the Proposed Settlement in that it would be a predominantly commercial transaction having a worldwide scope. The "contract" underlying the commercial transaction is not being determined through market forces but through US laws and the US judicial system, to the exclusion of all other laws and judicial systems throughout the world. Such commercial transaction would result in a sweeping transfer of rights from current rights owners worldwide to Google. As part of this transfer of rights to Google, the Proposed Settlement would preclude class members from suing Google and its partners for the array of uses of authors' works permitted by the Proposed Agreement, thereby releasing Google and others from liability for *future* conduct which would otherwise constitute copyright / *droit d'auteur* infringement. This part of the Proposed Settlement is fundamentally a commercial transaction having unprecedented effects on Authors and Publishers worldwide which the settling parties are improperly attempting to

---

[1] In this letter, capitalized terms deriving from the Proposed Settlement shall have the same meaning as that used in the Proposed Settlement.

[2] Copying was perhaps facilitated and agreed to by libraries but unauthorized by copyright / *droit d'auteur* holders. Thus, copying by Google was legally unauthorized.

[3] Cf. Information Week, *Google Readies Its Book Business*, (July 30, 2009) ("To date Google has scanned over 10 million books, including 1.5 million public domain books"); Google 2008 Annual Report ("Today, we are able to search the full text of almost 10 million books").

impose through the judicial process and the procedural device of class actions as set forth in Rule 23 of the Federal Rules of Civil Procedure, rather than through the normal commercial process of negotiation and informed consent.

9.  As stated above, Dunod's objections to the Proposed Settlement derive exclusively from the illegal, unfair and inequitable effects that said Proposed Settlement will have on it as a European publisher. An American publisher would not be concerned by the objections of Dunod. Indeed, one of the striking features of the Proposed Settlement is that it is predicated on the implicit premise that, since it is a US-negotiated settlement between US-based plaintiffs and a US based company, that the Class itself is a US-class only. As shown below, this is far from the truth. All Authors and Publishers worldwide are potentially members of the Class.

10. As a European publisher, Dunod  sets out below its ten fundamental and material objections to the Proposed Settlement:

(i)   The negotiations leading to the proposed settlement and the proposed settlement itself do not take into account non-US interests;

(ii)  The proposed settlement has not been the subject of sufficient notice to non-US Rightsholders;

(iii) The proposed settlement violates the Bern Convention;

(iv)  The proposed settlement is incompatible with French and continental European principles of *droit d'auteur* / author's rights;

(v)   The provisions of the proposed settlement on "out of print" works would cause Dunod  to violate contracts under French law;

(vi)  The dispute resolution mechanism is unfair to non-US Rightsholders;

(vii) The proposed settlement violates Article 81 EC and is thus automatically null and void within the territory of the European union;

(viii) The proposed settlement constitutes *ipso facto*  an abuse by Google of its dominant market position and thus a violation of Article 82 EC;

(ix)  The concept of "commercial availability" used in the Proposed Settlement does not take into account non-US Rightsholders;

(x)   The proposed Book Rights Registry is unfair to non-US Rightsholders.


## I.  THE NEGOTIATIONS LEADING TO THE PROPOSED SETTLEMENT AND THE PROPOSED SETTLEMENT ITSELF DO NOT TAKE INTO ACCOUNT NON-US INTERESTS

11. Rule 23 ("Class Actions") of the Federal Rules of Civil Procedure states that a class action may be maintained only if *"the claims or defenses of the representative parties are typical of the claims or defenses of the class (…)"*.

**12.**     The Proposed Settlement does not comply with Rule 23 in that it totally ignores the specific features of non-US Rightsholders. It is obvious that the Proposed Settlement will have an impact on non-US Rightsholders The commercial intent deriving from the Proposed Settlement is to grant to Google the extremely valuable right to exploit digitally, and in perpetuity, every non-public domain Book or Insert published before January 5, 2009 as made available virtually anywhere in the world.

**13.**     Pursuant to its Articles 1.38 and 1.42, the Proposed Settlement purports to bind all persons and entities that, as of January 5, 2009, own a "US Copyright Interest" in one or more Books or Inserts. The key point is that persons owning a "US Copyright Interest" are not limited to American rightsholders or even foreign rightsholders who have published works in the US. To the contrary, anyone who has ever published, authored or translated a Book or Insert in *any* country having "copyright relations" with the US under the Berne Convention is likely to own a "US Copyright Interest" and to thus be included in the Settlement Class[4]. As the Notice itself states at page 5:

> "*If you are rightsholder who is a national of, or is otherwise located in, a country other than the United States, you are likely to own a US copyright interest if (a) your Book was published in the United States, or (b) your Book was not published in the United States, but your country has copyright relations with the United States because it is a member of the Berne Convention... You should assume that you own a US copyright interest in your Book, unless you are certain that you Book was published in, and that you reside and are located in, one of the few countries that have not had or do not now have copyright relations with the United States.*"

**14.**     The automatic impact of Articles 3.1 (a) and 1.16 of the Proposed Settlement, when combined, to non-US Authors and Publishers who, having failed to opt-out will have been deemed to have opted-in, is obviously unfair in practical terms. Indeed, under the Proposed Settlement, Google could obtain a Book in any European language from any source and digitize it as long as there is a "US Copyright Interest" of said Book and the opt-out option has not been exercised. This is a totally unprecedented use of the US class action mechanism to modify the rights of persons who are not normally subject to US law. Indeed, in normal circumstances, a European publisher would have no reason to believe that he should be concerned by the US legal system in publishing a book in France, Spain or England (to mention several non-US markets in which Dunod has a leading role). Dunod is a European Publisher and Dunod 's economic model would be greatly affected by the fact that Google would be able to sell digitized French, Spanish or English versions of its Books online to anyone in the entire world. In the same way, a European publisher could grant a licence to a US publisher for an English language version of a book in the US. The work would be made available in the US with the authorization of the original European publisher, the work's US copyright owner. Yet it may not have been the initial intention of the European publisher – who is totally outside of the US legal system – to grant any rights whatsoever to Google in connection with the work and to have Google selling digitized versions of its Books online.

---

[4] It is Dunod's understanding that, as of March 2009, the United States had copyright relations with approximately 179 of the 194 countries existing in the world today.

**15.**     The examples of this fundamentally unfair use of US legal mechanisms which would result from the Proposed Settlement are virtually endless. The true effect of the Proposed Settlement would be to impose a commercial arrangement on all non-US Authors and Publishers worldwide having – it would appear – any nexus whatsoever with a "US Copyright Interest".

**16.**     Although approximately half of the scanned works subject to the Proposed Settlement are non-US works, no specific consideration was given to non-US Authors and Publishers in the negotiations of the Proposed Settlement. Yet, the Proposed Settlement purports to do much more than indemnify members of the class for past injury. Its true significance lies in the fact that it purports to set out rules for the future years governing marketing and sale of Books published before January 5, 2009, including the ten million works already digitized, and this on a perpetual basis.

**17.**     To the best knowledge of Dunod, the representatives of the two sub-classes having negotiated the Proposed Settlement are all US Authors and Publishers. The attorneys appointed to represent the two sub-classes are attorneys admitted to practice in the United States only. None of them can be deemed to adequately represent non-US Rightsholders. Indeed, the Class representatives and Class Counsel have totally disregarded the rights and interests of non-US Rightsholders.

**18.**     The order of November 17, 2008 granting preliminary settlement approval is defective in that it does not take into account any of the specific characteristics or constraints of non-US Rightsholders who would be members of the Class and which totally distinguish them from US Rightsholders. Dunod 's own research into US law leads it to believe that the approval of a mass worldwide class having so many disparate non-US elements to be contrary to the Supreme Court's holding in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, S.Ct. 2231, 138 L.Ed.2d 689 (1997). In that case, the Court found that the proposed class was not "sufficiently cohesive". Although all members of the class shared experience of asbestos exposure, this did not meet the predominance requirement under Rule 23 (b)(3). in fact, there were many individual issues and many categories of persons who were exposed and injured or exposed but not yet injured. The supposed class was too "sprawling" to meet the Rule 23 requirement.

**19.**     This fundamental failure of the Proposed Settlement constitutes, in and of itself, sufficient cause for the Court to outright reject it.

## II.     THE PROPOSED SETTLEMENT HAS NOT BEEN THE SUBJECT OF SUFFICIENT NOTICE TO NON-US RIGHTSHOLDERS

**20.**     The Proposed Settlement would impose a commercial arrangement upon Dunod, due to the fact that Dunod has not opted out. The Proposed Settlement constitute in reality a commercial contract. Nonetheless, this complex contract of 334 pages (including the appendices) was never translated into the world's principal foreign languages for the benefit of Dunod and other non-US Rightsholders.

21. Dunod also objects that a significant number of non-US Rightsholders will not have received effective notice of the pending class action as it is acknowledged in the Notice that: *"it is expected that a sizable portion of the Settlement Class will consist of heirs, successors and assignees"*.

22. Simple knowledge of the Notice is radically insufficient for non-US Rightsholders. Anyone wanting to fully comprehend the scope of the proposed commercial arrangement must read the Proposed Settlement itself. Indeed, the Notice expressly cautions that it *"is only a summary of the Settlement Agreement and your rights. You are encouraged to review the complete Settlement Agreement carefully"*. The Notice expressly directs the reader to the Proposed Settlement, on virtually every page, on at least 24 separate occasions and with respect to a myriad of different settlement provisions, including significant provisions relating to, *inter alia,* the scope of a Rightsholder's release, "Author-Publisher" procedures, Rightsholder's rights, Google's obligations, limitations on Google's use of the co-called Research Corpus, and definition of the key terms.

23. Moreover, it is not reasonable to assume that the Notice will have reached a sufficiently sizeable portion of non-US Authors and Publishers. Given this fact, it is unfair that, unknowingly, they may be *"bound by all determinations and judgments in this case relating to the Proposed Settlement, whether favorable or unfavorable"* (*cf.* order of November 17, 2008). The Court should also admit that even if validly notified, a non-US Author or publisher may not be familiar with the particularities of US procedural rules and more generally of US class action procedures. Such class action procedures constitute a specific feature of the US legal system. On a worldwide basis, almost all other legal systems do not have a class actions mechanism in any way comparable to the US system. Dunod  considers that the full understanding of the opt-out option by any non-US Author or Publisher should be considered as a fundamental right which cannot be properly exercised under the terms of the Proposed Settlement. This is extremely important to the extent that the Proposed Settlement purports not only to (rather modestly) indemnify past injury but, far more importantly, govern future commercial relationships having a value of billions of United States dollars, and this without any limitation of time.

24. The Court should reasonably assume that the overwhelming majority of non-US Authors and a very significant number of non-US Publishers will not fully appreciate what the opt-out option entails. It is not reasonable for the Court to act as if any non-US Author or Publisher should be compelled to know the English language, to be specifically familiar with American legal concepts including the class action mechanism and to have retained US counsel to be appropriately advised in this instance. For example, non-US Authors and Publishers have been told by counsel of the parties to the class action that the Proposed Settlement authorizes Google to make use of their copyright interests solely in the United States. This statement give false comfort, it is perfectly ambiguous and is subject to interpretation, given that no territory is expressly defined in the Proposed Settlement. In reality, the commercial relationships created by the Proposed Settlement will have a worldwide scope. However, it may be contested whether Rule 23 – which the Proposed Settlement must comply with – may be used as a tool to create a commercial arrangement which produces effects on non-US Authors and Publishers on a worldwide basis.

25.  Dunod  has reviewed a copy of the French translation of the Notice. It is full of glaring translation errors and false statements, too numerous to mention. One need read no further than page 2 of the translation to find such fundamental errors. The French translation states, "To participate in the Transaction, you must complete a request form" (*"Pour participer au Règlement, vous devez remplir le Formulaire de demande."*). This is not only false, as a statement, it totally misrepresents the opt-out nature of the Proposed Settlement. Translation errors have made some parts of the French version of the Notice totally unintelligible.

## III.   THE PROPOSED SETTLEMENT VIOLATES THE BERNE CONVENTION

26.  The Proposed Settlement, which seeks to upend the fundamental rights of non-US Rightholders to control the exploitation of their works, contravenes the US's treaty obligations under the Berne Convention for the Protection of Literary and Artistic Works, of September 9, 1986, as amended ("Berne Convention"). If approved, the Proposed Settlement would (i) grant Google automatic rights to exploit digitally millions of Books and Inserts found throughout the world without requiring Google to obtain *any* authorization from non-US Rightsholders and (ii) require any non-US Rightsholder to go through an extremely complex and burdensome and largely unworkable procedure simply to exercise a watered-down contractual right to halt such use.

27.  Such unprecedented usurpation of the rights owned by non-US Rightholders violates the Berne Convention's most fundamental provisions, including its protection of copyright / *droit d'auteur* owners' exclusive rights and the prohibition against imposing formalities that would impair the exercise of those rights.

28.  Article 9 (1) of the Berne Convention provides that the author of a work has the sole and exclusive right to authorize its reproduction. However, the commercial arrangement of the Proposed Settlement grants to Google an effective "license" to exercise these rights, in a way incompatible with the said Article 9 (1).

29.  Finally, some procedures set out in the Proposed Settlement run contrary to fundamental principles of the Berne Convention.  The Proposed Settlement, although it allows the removal of Books by the Author and/or Publisher from the Google database, burdens Rightholders with a series of steps and formalities to undergo in order to remove their books from Display that are contrary to the principles of the Berne Convention which provide for an enjoyment of authorship rights with no added formalities.

## IV.   THE PROPOSED SETTLEMENT IS INCOMPATIBLE WITH FRENCH AND CONTINENTAL EUROPEAN PRINCIPLES OF *DROIT D'AUTEUR* / AUTHOR'S RIGHTS

30.  Dunod objects to the Proposed Settlement in that it is totally incompatible with the legal framework within which it publishes in France and the rest of Continental Europe, based upon principles of *droit d'auteur* / author's rights. It is uncontested that the Continental European conception of *droit d'auteur* is substantially different from the meaning of copyright within the US meaning of the term.

31.    As a publisher headquartered in France, Dunod's practice of the publishing business is anchored in French law.

32.    French law on *droit d'auteur* grants to an author exclusive rights over his work, which results in a monopoly on the works use, publication and reproduction. As stated in Article L. 111-1 of the French Intellectual Property Code:

> *"The author of an original work (oeuvre de l'esprit) shall enjoy, by the simple act of its creation, an exclusive right of intangible property which is enforceable against everyone.*
>
> *This right includes components of an intellectual and legal nature, as well as a patrimonial nature, which are set out in Books 1 and 3 of the present Code.*
>
> *The existence or creation of a contract for the hire of a work or of services by an author of an original work shall not give rise to any derogation from the enjoyment of the right recognized in the first paragraph."* [5]

33.    French law further provides that any publication or reproduction whatsoever of a protected work or part thereof without the authorization of the author is illegal. These are no exceptions such as "fair use" to this fundamental principle under French law.

34.    The right to publish or reproduce a work can only be transferred on a work-by-work basis, and the means of publication or reproduction must be specified specifically by contract (type of media and network, territory, language, etc.).

35.    Dunod, as a French and European publisher is obliged to reject a Settlement Agreement which – as a result of the sweeping license granted to Google – deprives it of its fundamental rights under French law, as a holder of rights assigned to it by its authors, to authorize or prohibit the publication or reproduction of works under the terms of the law applicable to it when it publishes in France, which is French law.

36.    French law, as well as many other non-US laws based upon *droit d'auteur / author's rights* includes provisions which protect the "moral rights" (*droit moral*) of authors. Under this fundamental principle, an author holds an inalienable right by which he may in all cases require that publication or reproduction of a work be stopped and that the work be withdrawn from commerce in cases in which he believes that use of the work is not as intended. This fundamental principle is unknown in US copyright. The Proposed Settlement violates such absolute right.

---

[5]    In the French original: « *L'auteur d'une œuvre de l'esprit jouit sur cette œuvre, du seul fait de sa création, d'un droit de propriété incorporelle exclusif et opposable à tous. (suite bas de page 6)*

   *Ce droit comporte des attributs d'ordre intellectuel et moral ainsi que des attributs d'ordre patrimonial, qui sont déterminés par les livres Ier et III du présent code.*

   *L'existence ou la conclusion d'un contrat de louage d'ouvrage ou de service par l'auteur d'une œuvre de l'esprit n'emporte aucune dérogation à la jouissance du droit reconnu par l'alinéa 1er.* »

**37.**     Finally, it should be emphasized that the Proposed Settlement includes potential remedies ostensibly intended to allow for some protection to non-US Rightsholders but which are in reality complex, burdensome and ultimately unworkable.  For instance, in order to direct Google not to use their works, members of the Publisher Sub-Class must submit a lengthy, 8-page Claim Form, which directs them to read the 29-page Notice and requires them to: (1) individually "claim" each one of their Book and Inserts; (2) provide detailed information about each work (including each author, co-author and contributor, imprint, whether the publisher owns worldwide rights to the work and rights to all of the pictorial works within the work); (3) find each work on the Books Database; (4) determine whether Google has classified such work as Commercially Available; (5) inform Google if they agree with such determination (even though the Settlement defines Commercially Available vaguely); (6) provide a description of each Insert; (7) determine if they are Confident or Highly Confident that their works have not reverted to an author, and (8) certify a number of matters, including that the use of any Insert claimed required publisher's permission and publisher did not give permission for their online use after June 1, 2003. This is totally unworkable for non-US Rightsholders as a system and justifies in and of itself the rejection of the Proposed Settlement.

## V.      THE PROVISIONS OF THE PROPOSED SETTLEMENT ON "OUT OF PRINT" WORKS WOULD CAUSE DUNOD  TO VIOLATE CONTRACTS UNDER FRENCH LAW

**38.**     The Proposed Settlement allows Authors to maintain control once out of print Books. In the event of disagreement between an Author and Publisher concerning categorization of an individual Book as out of print, the matter is adjudicated by the Registry in conformity with a procedure based upon American legal concepts.

**39.**     Under French law, where an author has assigned publication/reproduction rights to a publisher by contract, the publisher remains the holder of the rights for as long as the contract remains in force. This situation is not modified by the fact that a book may be categorized as "out of print". In other words, as a general rule, the publisher, as assignee, remains holder of the assigned rights unless the author has complied with a procedure defined by statute to terminate the contract.

**40.**     Finally, disputes between French publishers and their authors are subject to French law. The dispute resolution procedure set out in Appendix A to the Proposed Settlement may contravene the contractual obligations of the parties under French law. A decision by the Registry under the procedure set out in Appendix A of the Proposed Settlement would probably not be enforceable in France.

## VI. THE DISPUTE RESOLUTION MECHANISM IS UNFAIR TO NON-US RIGHTSHOLDERS

41.     Should a dispute arise in connection with any alleged non-performance by Google and any participating library, any non-US Author or Publisher shall be subject to arbitration, in New York, under the rules of the American Arbitration Association (AAA), which arbitration shall be non appealable.  Application of the arbitration clause set out in Article 9.3 of the Proposed Settlement to all non-US Authors and Publishers, who would not have expressly opted out, is highly objectionable, given the imposition of mandatory jurisdiction and the costs which would be incurred by non-US Authors and Publishers in engaging any litigation under the Proposed Settlement in the United States only.

## VII. THE PROPOSED SETTLEMENT VIOLATES ARTICLE 81 EC AND IS THUS AUTOMATICALLY NULL AND VOID WITHIN THE TERRITORY OF THE EUROPEAN UNION

42.     The commercial arrangement put into place by the Proposed Settlement does not, in any way, prevent Google from selling digitized versions of Books to customers in the entire world[6].

43.     As sale of the Books would involve coordinated efforts, including on pricing, between Google – which will immediately obtain a dominant market position worldwide through the Settlement Agreement – and Publishers, one may validly ask whether competition will be distorted on the worldwide market deriving from the Proposed Settlement. Pursuant to press reports, the Proposed Settlement has raised a number of antitrust issues in the United States. However, the relevant markets are worldwide. This means that not only US antitrust law would apply to the Proposed Settlement, but also the antitrust rules of other jurisdictions, including the EU. The Proposed Settlement infringes Article 81 (1) of the EC Treaty. As a result, pursuant to Article 81 (2) EC, it is automatically null and void within the territory of the EU and Google and the Publishers may be subject to substantial fines for violation of EU law. Dunod  objects to a settlement which it considers to be null and void in the EU and which could potentially expose it and other Publishers as to enforcement action by the European Commission or other European enforcement agencies as well as civil lawsuits before the courts. In this respect, pursuant to Article 81 of the EC Treaty ("Article 81 EC"), "All agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition" in the European Union are prohibited (unless they have a compensatory economic justification meeting the statutory exemption criteria set out in Article 81(3) EC). Pursuant to Article 81(2) EC, any such restrictive agreements are automatically null and void.

---

[6] Article 10.2[b] on Releases does not in any way forbid Google from copying (including by digitizing), displaying, transmitting or distributing a Book outside of the United States. That article only concerns the cases in which the Releases granted to Google would be effective or not effective.

44.     The antitrust implications of the Proposed Settlement are both extremely novel and complex. The violation of Article 81 EC stems principally from the fact that the Proposed Settlement (i) will include as parties thereto a vast number of competing enterprises ("undertakings") and (ii) sets out an agreed-to pricing mechanism, which will allow for prices to be set, in many cases, not by market forces but rather according to collectively agreed to pricing methods. In particular, the default method of settlement controlled price in consumer purchases as set out in Article 4.2 (b) (i), by which consumer prices will be "determined by an algorithm (the "Pricing Algorithm") that Google will design to find the optimal such price for each Book" appears, at first view, to be contrary to Article 81 (1) EC. In addition, the setting of "Institutional subscriptions" under Article 4.1 (a) (i) may also be considered, at first view, as contrary to Article 81 (1) EC.

45.     The Google pricing mechanism allows for publishers to agree upon Google setting prices between their competing products. The Proposed Settlement will stymie competitive pricing of electronic books. Given that unified pricing results from an agreement, Dunod  believes that said mechanism constitutes a covenant restrictive of competition contrary to Article 81 EC. If it is contrary to Article 81 EC, it is automatically null and void under EU law.

## VIII.   THE PROPOSED SETTLEMENT CONSTITUTES *IPSO FACTO* AN ABUSE BY GOOGLE OF ITS DOMINANT MARKET POSITION AND THUS A VIOLATION OF ARTICLE 82 EC

46.     Pursuant **to Article 82 of the EC Treaty**, "*Any abuse by one or more undertakings of a dominant position within the [European Union] or in a substantial part of it shall be prohibited (…) insofar as it may affect trade between the Member States.*"

47.     In this respect, the Proposed Settlement would appear to create and protect a *de facto* monopoly or quasi monopoly in the broad market for digital books on worldwide markets. Even if competitors of Google were to enter the market and compete head-on with Google (highly unlikely, given Google's current first mover advantage and headstart to market supremacy through previous digitizing of seven million works), there is every reason to believe that Google would be in a position to maintain monopoly power on worldwide markets. In *ITT Promedia/Commission*[7], the European Court of First Instance ruled that an undertaking in a dominant position could abuse of that dominant position by simply entering into a contract, even where such contract would be perfectly valid to enter into for an undertaking which was not in a dominant position.

48.     The mere fact that Google were to enter into the Proposed Settlement could constitute, at first view and in conformity with the above-cited case law, a violation of Article 82 EC, since Google would create or reinforce a dominant market position on worldwide markets not through market forces but through contract. For this reason, we believe that a competition enforcement authority or a court would see in the Proposed Settlement a contractual means for Google to reinforce -- indeed ensure -- its dominant market position, in a way contrary to Article 82 EC.

---

[7]     European Court of First Instance, Case T-111/96, *ITT Promedia NV v. Commission,* July 17, 1998, [1998] ECR II-02937

**IX. THE CONCEPT OF "COMMERCIAL AVAILABILITY" USED IN THE PROPOSED SETTLEMENT DOES NOT TAKE INTO ACCOUNT NON-US RIGHTSHOLDERS**

49. Dunod objects to the fundamental concept of "Commercial Availability" at the heart of the Proposed Settlement, which does not fairly and equitably take into account the interests of non-US Rightsholders.

50. Pursuant to **Article 1.28** of the Proposed Settlement "*Commercially available means, with respect to a Book, that the Rightsholder of such Book, or such Rightsholder's designated agent is, at the time in question, offering the Book (other than as derived from a Library Scan) for sale through one or more then-customary channels of* **trade in the United States**."

51. The Proposed Settlement, which sets no parameters regarding these channels of trade, thus grants Google wide discretion to *ignore* a book's "Commercial Availability" in a non-US jurisdiction or through a non-US website, opening the door for disparate treatment of non-US Rightsholders. If a US Author is commercially distributing his work in his home country – the United States – and nowhere else, then Google will have limited exploitation rights over that work under the Proposed Settlement. Yet, if a French author is commercially distributing his work in France and nowhere else, including through a foreign on internet site accessible by US citizens, then Google can deem such work not Commercially Available and thus obtain radically expanded exploitation rights over that work. As result of the above definition, non-US Rightsholders who actively exploit their Books in their own country will be deprived of the protection afforded to similarly-situated US Rightsholders under the Proposed Settlement, seriously prejudicing their rights vis-à-vis US Rightsholders.

52. In general terms, the concept of Commercial Availability does not take into account the rights of non-US Authors and Publishers, under other laws and other economic and trade realities:

   - it reflects a too narrow conception of channels of trade;

   - it does not provide for an impartial determination of the Commercial Availability of a work written and published outside the United States, and thus grants an unchecked power to Google to decide on the Display Use of such work.

53. Under the commercial arrangement of the Proposed Settlement, US customers may purchase Books from European online retailers. Indeed, US buyers often rely on specialized vendors based in the country of publication of the books they are interested in. Many works effectively sold in this way would not be considered as Commercially Available under the Proposed Settlement. As a European publisher, Dunod estimates that, under the Proposed Settlement, three-quarters of European books, on average, would be currently considered as non-commercially available. Such proportion is totally unrealistic given the reality of e-commerce, in particular. Many tests conducted through the database currently used by Google have demonstrated that even books that are in the current European best seller lists would be considered as not Commercially Available under this definition, although US consumers can buy them easily via Internet.

54.     **Article 3.2 (d) (i)** of the Proposed Settlement states: "*Google shall determine whether a Book is Commercially Available or not Commercially Available based on an analysis of multiple third-party databases as well as an analysis of the Book's retail availability based on information that is publicly available on the Internet.*"

55.     The Proposed Settlement does not provide sufficient guarantee that the analysis finally retained by Google will be impartial and reasonably meet non-US Authors' and Publishers' interests.

56.     No reasonable possibility is afforded to non-US Rightsholders to assess or verify that Google's determination is in compliance with the provisions of the Proposed Settlement. Under the current format, Rightsholders will be obliged to verify – for every single Book – whether Google's determination is correct, so as to avoid suffering damage as a result of wrong determination. It is unreasonable to expect that a European Publisher such as Dunod would have to go through all available database references to verify the corrections of Google's determinations. This would necessarily create unjustifiable costs for them and result in preventing them *de facto* from exercising their rights under the Proposed Settlement.

57.     Under Article 3.2 (d) (i) which refers to "*third party databases*" and to "*information that is publicly available on the Internet*", Google has no obligation to provide any information whatsoever about third-party databases or publicly available information it will have used for deciding to make Display Uses of a book it will have determined to be out of print. The quality of the databases used by Google is obviously critical for the rights of the Rightsholders to be fully protected. This is a particularly sensitive issue, even more so in case of conflicting databases or information about a book. It is commercially unacceptable to a European publisher such as Dunod .

58.     Under the current Proposed Settlement, Google does not have to provide a full list of digitized Books. Non-US Rightsholders will thus be obliged to constantly search through a 100 million records database to find the seven million references tagged as "digitized". Technically speaking, it would be extremely difficult for publishers and individual authors, to use the databases and to monitor Google's use of their Books.

59.     This problem is compounded by the fact that Google uses deficient and unreliable databases from the point of view of non-US Rightsholders. At present, the databases used by Google are deficient and unreliable for a number of reasons including, *inter alia*:

* Some records show wrong identifiers,
* The same publisher has different names in different records,
* Some records show wrong publishers,
* The same contributor may have different names in different records,
* Some records show wrong contributors,
* Some records show wrong titles or year of publication,
* Some records show wrong information about availability status (in print)

- Some records show missing information about title, contributor, year of publication, etc.
- Some works, such as journals, which are not part of the settlement are included in the database.

## X.   THE PROPOSED BOOK RIGHTS REGISTRY IS UNFAIR TO NON-US RIGHTSHOLDERS

60.   **Article 6.2(b)** of the Proposed Settlement establishes that the Book Rights Registry will be *"organized on a basis that allows the Registry, among other things to (i) represent the interest of Rightsholders in connection with this settlement Agreement… The Registry will have equal representation of the Author Sub-Class and the Publisher Sub-Class on its Board of Directors…"*

61.   Although approximately half of the ten million works digitized by Google are non-US works, non-US Rightsholders would be denied any specific representation to represent their own specific interests as distinct from US Rightsholders.

62.   Finally, Dunod  strenuously objects to the fact that the Registry be entitled under Article 6.2 (b) of the Proposed Settlement to *"license Rightsholders' US copyrights to third party"*, even if it is to the extent *"permitted by law"*. The granting of such right is unacceptable. The reference to the legality of such right provides no protection whatsoever to non-US Rightsholders, since it does not specify which law is concerned and could be interpreted as meaning US law only.

*          *
*

63.   This letter sets out a series of ten fundamental objections from the point of view of a European Publisher. It is necessarily not limitative. Indeed, the Proposed Settlement is infinitely complex for a non-US Rightsholder. It is very difficult to understand in its entirety.

64.   Dunod objects to the statement contained in paragraph 22 of the Notice pursuant to which Class Counsel, as defined in the Notice, is prepared to fairly represent its interests of the entire Class, and thus implicitly the specific interests of all non-US Authors and Publishers. There is no indication that Class Counsel has taken into account any of the specific features of non-US Authors and Publishers as described in this letter.

## CONCLUSION

For each of the foregoing reasons, Dunod  respectfully requests that this Court reject the Proposed Settlement and/or decline to certify the class with regard to non-US Rightsholders.

Respectfully submitted,

*N. Jouven*

Nathalie Jouven
Chief Executive Officer, Dunod Editeur SA


COPY TO:

Counsel for the Author Sub-Class

Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
United States of America
bookclaims@bonizack.com



Counsel for the Publisher Sub-Class

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
United States of America
bookclaims@debevoise.com



Counsel for Google

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts & Kent LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
United States of America
bookclaims@durietangri.com

bookclaims@kvn.com

- 15 -