



**FREE PLAY**
Productions
P.O. Box 667
Ivy, Virginia 22945
434.245.4084
www.freeplay.com

Stephen Nachmanovitch, Ph.D.

3 September 2009

U.S. District Court for the Southern District of New York
Office of the Clerk, J. Michael McMahon
500 Pearl Street
New York, New York 10007

Re. Objections regarding the Google Book Settlement
Case No. 05 CV 8136-JES and 05 DV 8881-JES

Dear Chief Judge Preska and Honorable Judges of the Court:

Digitizing the contents of the great libraries of the world – for both the functions of backup and accessibility – is an exciting project. It has already proven profoundly useful, to me and to many others, to be able to access scholarly and other literature that is available on the Web. One no longer needs to live near Widener Library or other great repositories of physical books to do research. This can be a great democratizing project. As an author in both the trade and scholarly fields, I am delighted by the idea of finding and being found in a new and wider ecology of ideas. However, the Google Book Settlement as it stands is disturbing for a number of reasons.

**Censorship**: Google has, over many years, obliged the Chinese government by selectively deleting numerous terms such as "democracy" or "Dalai Lama" from searches – making vast amounts of documentation "disappear" and making it possible to identify persons who search for such documentation. While Google's searches within the United States and other Western democracies are free of such constraints, Google has demonstrated their willingness and ability to censor. Censorship may occur for political, commercial, personal or other reasons. "Software glitches" are easy to invoke for the disappearance or misdirection of information.

**Erosion of the concept of public domain**: The classics and other works of the past gradually pass into the public domain, which is vital to the core of our civilization. If a single commercial entity comes to dominate access to these works they eventually become de facto owner of the works. The dangers of censorship and of monopolistic commercial practices then encroach on a common heritage of humanity. There are disturbing analogies developing in the field of genetics, in which commercial entities are claiming patent rights on naturally occurring or naturally disseminated genomes. You (the court) would not want a commercial entity to claim ownership of either your genetic makeup or your civilization. It is important to *specify* safeguards to protect the public domain and keep it public, while still enjoying the broader access to information that technology can provide.

**Erosion of the rights of copyright holders:**

1) Over a period of years, Google becomes, by default, the sole publisher of any significance for works which are in copyright but out of print. Traditional publishers, whether by paper or electronic distribution, will now have a disincentive to republish or continue to publish many works, because of the scale of Google, creating monopolistic conditions of which the dangers are well known. Without competition, copyright holders may be forced to either accept one-sided contracts of adhesion with Google or see their works disappear.

2) The settlement provides for royalty payments to authors for downloaded works, but the royalties must be claimed by the authors who will have no mechanism for knowing when their works are downloaded.

3) The scanning of books and the creation of online databases are not proprietary technologies, but are easily available to individuals and institutions. There is no reason why one company should be granted special monopoly privileges for this activity, which are best distributed among many entities both public and private. The settlement, without benefit of legislation, fundamentally alters both antitrust and copyright law.

4) The agreement sets up the Book Rights Registry as a partial replacement for the functions performed by United States Copyright Office. The current marketplace which is ruled by copyright law and contracts individually negotiated between authors and publishers continues to work well. Under current law, those who wish to quote from copyrighted work seek out the copyright holders and their publishers and negotiate permission. There is no reason why such negotiations cannot continue to occur in a free marketplace.

5) The Google Books pages already in place for all books, both in copyright and public domain, state "©2009 Google." While this © symbol presumably refers to the software code or organization of the web page, it creates an implication that the words on the page belong to Google and not to the author.

**Conclusion:** Over the past four decades I have created literary, scholarly, and musical works, but have also written software and have been part of the computer industry, so I can see many sides to this complex issue. There is no sharp line dividing producers and consumers of literature and other varieties of information. Every author – regardless of the medium of expression – is also a researcher, and the more people know the more they can not only think for themselves but create. I have chosen to remain part of the settlement at least for the moment, in order to contribute to this vital conversation. I will make no comment regarding monetary specifics for copyright owners, and the availability independent audits and reports for each book, though there are important issues to raise there as well. But to me the important issues are how at this crucial time we create the patterns by which the store of information by which our society lives will remain alive and vital.

We must look not just to the immediate consequences of this settlement for stakeholders, but to the pattern that the settlement may set up for future years and decades. Decades in the future, literature, research, news and other information will have to an enormous extent moved from a paper base to a digital base, and we are obliged to consider the impact of what we do today.

Respectfully submitted,

*Stephen Nachmanovitch*