

**Left Coast Press** Inc.
1630 N. Main Street, #400
Walnut Creek, California 94596
925 935-3380 phone and fax
www.LCoastPress.com



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-11-09

05-CV-8136

September 4, 2009

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: Google Book Settlement**

I am writing as president, publisher, and owner of Left Coast Press, Inc., a scholarly for-profit publishing house of humanities and social sciences based in the San Francisco Bay Area, and on behalf of the authors we publish. While we are electing to OPT IN of the Settlement between Google and publishers, we do so with no joy, relief, or satisfaction. We wish to express our objections to the settlement before the settlement administrator here and hope you reject the settlement terms and force this monopolistic organization to account for the multitude of legitimate players in the system that provides information to the scholarly world.

Google has digitally scanned many of our titles, published under our imprint and the ISBN prefix 978-1-59874. We also publish a selected group of titles under different ISBN prefixes, representing the work of several small non-profit academic organizations for whom we have taken on publishing responsibilities. We will provide the specifics when we make our settlement claim. We own the copyrights in the overwhelming majority of the titles we publish and, in the few instances where we do not, we have been granted by our authors the exclusive license to publish and vend their works in all formats – hardcopy, audio, video and digital – and in all languages.

Our dissatisfactions with the language and terms of the Google settlement are simple. An organization with the size and economic power of Google has decided that they can do what they wish to centuries of established copyright law by digitizing and making available copyrighted material en masse without the permission of existing copyright holders.

Were we, as a small press, to engage in such activity, we would be subject to lawsuits of such significant magnitude that it could bankrupt our company. Because of Google's size, they've been able to muscle the parties who rightly objected to their illegal activities into a settlement, the amount of which represents a sum so small as to represent a rounding error in one of their annual statements. There is no reason that Google should not be obliged to seek prior permission from the publisher, copyright holder, or licensee of a work before selling any work or portion of a publisher's work like anyone else, other than the sheer magnitude of their illegal actions and their ability to minimize their penalties for it. While Google may object that the process of negotiation with copyright owners may be time consuming, it is their choice to enter this world where the interests of multiple parties – publishers, authors, and literary estates – have to be recognized and negotiated.

We also object most strongly to any language or clause in the settlement that pre-determines the split of revenues, or the terms under which such splits shall be governed, from any sales or revenue-generating transactions made by Google of publishers' copyrighted or licensed materials. We object to any language that takes away from the publisher the ability to set the selling price of publishers' copyrighted or licensed materials. The right to set the price, or the terms of sale, or the commercial value, of the copyrighted properties that it owns or controls, is legally the sole right of the copyright owner, and must not be undermined in any way. This is particularly true in the scholarly publishing world, where financial models that include the ability to sell information in electronic formats will now compete with Google's ability to provide this information to potential users for free, with Google benefitting from the advertising dollars that go with this access. Large players in this system – such as multinational communication organizations and state-sponsored university research libraries – can afford to share some of their revenue/cost with Google. Small organizations who provide technical research to a limited number of specialized users cannot.

As would be expected, the settlement is designed with large players in mind. Smaller parties, such as Left Coast Press, are obligated to agree or risk being financially bankrupted by the competing desires of these large institutions.

While we have agreed to opt IN to the settlement agreement, it is only because the alternative would leave small organizations such as ours bypassed entirely by these large commercial forces on both sides. We will also be participating in the Google partner program with equal unwillingness – the amount of material that Google forces partners make available for free public access exceeds the norms in scholarly publishing – but not to participate in the program would mean that any attempt to market our information independently would be frozen out by Google's domination of the search process.

Should the settlement not be approved and Google forced to compete the way everyone else does, they will necessarily have to accommodate the needs of organizations such as mine and be more flexible in tailoring their future agreements to the needs of smaller information providers. Again, we hope you reject the settlement terms and force this monopolistic organization to account for the other legitimate participants in the domain of disseminating scholarly knowledge.

Sincerely,

Mitchell Allen
Publisher and President
Left Coast Press, Inc.