USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-11-09

**EDITIS HOLDING**

Société Anonyme au capital de 27.190.032 €
Siège social : 26, avenue des Champs Elysées - 75008 Paris
*RCS Paris : 452 942 451*

RECEIVED
SEP - 3 2009
CLERK'S OFF
S.D.N.Y.

Paris, September 2, 2009

By Fax (+1 212 805 7906)/ Post/In own hands
Hon. Denny Chin
United States District Judge
U.S. Courthouse, 500 Pearl Street
New York, NY 10007-1312

Re: *The Authors Guild Inc. et al. v. Google Inc., No 05 Civ. 8136 (DC)*

Dear Judge Chin:

We, EDITIS HOLDING, are writing to you in regards to the proposed Settlement Agreement between Google Inc., and the Authors Guild (AG) and the Association of American Publishers (AAP). We would like to raise the following objections that arise in Europe/ France from the above mentioned Settlement Agreement.

EDITIS HOLDING is a member of the Board of the French Publishers Association (Syndicat National de l'Edition/ SNE). We are directly and strongly affected by the settlement as we found out that more than 12 000 of our books were digitized by Google without our permission before May 5, 2009, and that a huge number of our books are listed in the Google database and could also be digitized and potentially exploited in the future by Google in application of this settlement.

We are in a particular situation as the French Publishers Association (Syndicat national de l'édition/ SNE) joined publishing group La Martinière as a party in its lawsuit filed on June 2, 2006 against Google Inc. and Google France, along with the French Authors Association (Société des Gens de Lettres/ SGDL), objecting to the unauthorized digitization and making available of copyrighted works. As Google continues to illegally digitize copyrighted books through its Library program, this legal action on the grounds of copyright infringement and on the defence of the collective interests of the publishing industry is, therefore, reinforced.

1.  Definition of commercial availability ..................................................................................
   1.2. Lack of consideration of European channels of trade to the United States......................
   1.2.   Limitation of "commercial availability" to books offered "for sale"..........................
2.  Objection to the basis for the determination of commercial availability in § 3.2 (d) (i)......
   2.1. Use of European resources of information on commercial availability............................
   2.2. Metadata fields to be used to determine commercial availability ................................ 5
3.  Unfair information processing by Google............................................................................ 5
4.  Bad quality of the database. ................................................................................................. 5
5.  Lack of representation of non-US rightsholders in the Book Rights Registry (BRR). ....... 6
6.  Deadline for financial compensation too close to deadline for opt-out and objections ..... 7
7.  Editorial control..................................................................................................................... 7
8.  Unfair dispute resolution....................................................................................................... 8
9.     The safe harbour for Google is too broad......................................................................... 8
10.    The scheduling for remedy of errors is too long. ............................................................ 9

## 1. Definition of commercial availability

The first objection we want to raise is the unfairness of the **determination of commercial availability** in the Settlement Agreement to European rights-holders.

For several months, European publishers associations attempted to obtain an agreement through the intermediary of the Federation of European Publishers with Google, AAP and the Authors' Guild on the following notions of commercial availability and the basis for its determination. The Publishers Sub-Class Counsel had even announced to the French trade press on February 18 that an agreement had been reached and that Google had accepted to change the definition of commercial availability and its basis according to the wishes of European publishers. Unfortunately, such discussions were not successful in the end, notably because Google wanted to keep the decision-making power upon the overlapping nature of the databases recommended by European publishers.

The importance of the determination of commercial availability, or not, of a book is that it is used to determine the default display uses under the settlement. A commercially available book will be automatically removed from display uses while a non-commercially available book will require action from the rights holder. Unless European publishers change the classification one-by-one, which places an **unnecessary administrative burden** on them, EU books will be tagged as non-commercially available and Google will be exploiting the book commercially as foreseen in the settlement.
Another reason why the commercial availability is important is that according to Annex A (Author-Publisher procedure) in the Settlement, if the book is tagged as commercially available, the publisher will receive 100% of the revenues and share it with the author according to the contract. If the book is considered as non-commercially available, and the righst have not reverted to the author, the publisher will receive 50% and the author 50% (for works published before 1987 the split will be 35% for the publisher, 65% for the author).

According to section 1.28 of the proposed agreement *"commercially available means, with respect to a Book, that the Rightsholder of such Book, or such Rightsholder's designated agent, is, at the time in question, offering the Book (other than as derived from a Library*

*Scan) for sale new through one or more then-customary channels of trade in the United States".*

The adopted definition has three elements that create unjustifiable prejudice to publishers, in particular to the European ones.

### 1.1. Too narrow definition of channels of trade

The definition obviously does not reflect the fact that US **customers can nowadays purchase books from European sources such as online retailers.** In particular, US libraries, which are the main target of the new products proposed within the Settlement, often rely on **specialized library vendors based in the country of publication** of the books they are interested in, such as Casalini in Italy, Harrassowitz in Germany, …..

Today, as a matter of fact, this definition is unjustifiably **prejudicing European rightsholders, as it has for consequence that** ¾ of European books in average are currently considered as non commercially available, a proportion totally unrealistic. Many tests conducted in the Settlement database demonstrated that also books that are in the current European best seller lists, as well as important long sellers are considered as non commercially available, although US consumers can buy them easily via the Internet.

Therefore, generally if a US publisher does not claim the book (or claims a book and does not change the defaults) he will enjoy a "safety net" that European publishers will not. The situation will be particularly unfair for the **European rights-holders who happen to participate in the settlement just by default and do not claim their books**: Google will end up exploiting ¾ of their books just because these books are classified according to an erroneous criterion.

For this reason, as a minimum, the definition of "commercially available" in § 1.28 should be changed from *"channels of trade in the United States"* to simply *"channels of trade"*.

### 1.2 Limitation of "commercial availability" to books offered "for sale"

Commercial availability is conditioned by the fact that the rightholder or his/her agent *"is, at the time in question, offering the Book (...) for sale new…"*. Therefore, the only business model that is considered is that based on sales. This definition is surprisingly based on a lack of awareness of the existence of alternative models. In particular, a book can be offered by a rightholder for free on the web according to a model based on advertising revenues or on "authors pay" model in the Open access environment, etc.

Therefore, the definition of § 1.28 should be further changed through deleting the words "for sale new", so as to consider that any offer of the content has the same value in the determination of the availability of a book.

### 2. Objection to the basis for the determination of commercial availability in § 3.2 (d)

The method to pass from the general definition given in § 1.28 to the actual determination of commercial availability is provided in the section 3.2 (d) (i) of the settlement *"Google shall determine whether a Book is Commercially Available or not Commercially Available based on an analysis of multiple third-party databases as well as an analysis of the Book's retail availability based on information that is publicly available on the Internet. When analyzing*

*the third-party databases, Google will use the publishing status, product availability and/or availability codes to determine whether or not the particular database being used considers that Book to be offered for sale new through one or more then-customary channels of trade in the United States".*

### 2.1. Use of European resources of information on commercial availability

The provision is too vague and does not offer any clarity on the actual method used by Google, nor any possibility for rightholders to assess or verify such method. Since important consequences come from this determination (as said above), the lack of clarity and transparence on the method creates unjustifiable costs to rightholders that are obliged to control – Book by Book – if the determination is correct just to avoid to be damaged from wrong determination. The section refers to "third party databases" and to "information that is publicly available on the Internet". However, Google is not obliged to provide any information about which third-party databases are used, and how they are used, in particular in case of conflicting information about one single Book. In fact, the quality of the databases is critical for the correct functioning of the system.

The Settlement *de facto* creates an incentive to consider a Book as non commercially available (since, if not claimed, it can be used) and the only consequence in case of wrong determination is an ex post remedy (so actually at no cost for Google). This lack of precise requirements from Google creates a clearly unbalanced situation between Google and the rightholders.

Therefore, Google should commit in the settlement to use non-US, such as **European metadata providers to ensure that they have correct information regarding whether a book is commercially available or not**. This must be done prior to making any display uses under authorisations in the settlement agreement.

Furthermore, and very important, Google should commit to make publicly available the list of databases and Internet information used and the method to merge the different sources and to solve possible cases of conflicts in the information retrieved.

Individual European publishers associations should be able to submit to Google further databases and Internet resources that Google should commit to use to the extent that (1) Google can obtain access to such databases on fair and commercially reasonable terms, (2) those databases generally provide information regarding the status of Books as Commercially Available, and (3) Google is not already taking such information into account through other sources Google use in determining the Commercial Availability of Books, provided that such decision is approved by the relevant publishers association which will be responsible for assessing the actual equivalence,.

In using such databases Google should commit to follow the instruction of the relevant publishers association with respect to prevalence among the multiple sources of data that are used to determine whether Books are classified as Commercially Available.

These rules are essential to: (i) reduce Google discretionality in the determination of commercial availability, (b) reduce costs for European rightholders that, in this case, can be confident that when a Book is correctly listed as in print in a customary source used in the trade, it is also correctly determined as for use in the Settlement agreement.

### *2.2. Metadata fields to be used to determine commercial availability*

The section 3.2 (d) (i) of the settlement provides that *"Google will use the publishing status, product availability and/or availability codes"* to determine the commercial availability at title level.

It is to be noted that the three metadata fields mentioned in this phrase have different meaning and thus may carry different information. There is no clarity on how such conflicts will be solved.
- "Publishing status" is the code – defined as such in the ONIX standard – that carries the information about the publisher declaration of a book as out of print, i.e. not commercialized anymore by that publisher
- The "Product availability" codes can contain, instead, different information conceived for serving the physical book supply chain, so to inform booksellers of temporary out of stock (e.g. when a book is under reprint, or lack of copies in one particular distributor or wholesaler).

It is evident that only the first data are relevant in the determination of the "non commercial availability" under the settlement. So, the section should be changed as follow:

*"Google will use the publishing status data element, or equivalent, or – only when this is not available – other data such as product availability and/or availability codes...."*

### 3. Unfair information processing by Google

The current process for rights-holders to interact with Google and in particular to know whether their works are concerned is very unfair and burdensome for rights-holders. Indeed **Google does not provide the list of the digitized books, but rights-holders have to search a 100 million records database to find the 7 million records tagged as "digitized".**

The current communication model Google have set up can be simplified as such "please tell me what your books are and I tell you what I did with them", which is not a fair way for notifying people that they may be concerned. The correct approach should be: "these are the books I digitized, and these are the books I have intention to digitize in the future..., please tell me if I am authorized to do".

Technically speaking, it is extremely difficult for publishers, especially small ones, and individual authors, to use the database, check their works and their status, claim them, communicate their wishes and possibly contest their status. The **absence of national intermediaries** makes this process particularly complicated for foreign rights-holders.

### 4. Bad quality of the database.

**The database that Google is using and has made available plays a central role** within the mechanism set up by the settlement. It is the only tool for right-holders to check if their works are concerned, to claim them and to let Google know about their wishes about its possible use. It also displays crucial information such as the status of the work in terms of commercial

availability, which will determine how Google may use it. This is why it is of utmost importance that **Google should be responsible for the quality and reliability of the database in an enforceable way**.

So far, **the quality of the database is extremely poor**. For instance, it has been detected that:
- several records have wrong identifiers,
- the same publisher has different names in different records;
- several records have wrong publishers;
- the same contributor has different names in different records;
- several records have wrong contributors;
- several records have wrong titles or year of publication;
- several records have wrong information about availability status (in print);
- several records have missing information about title, contributor, year of publication, etc.
- some works, such as journals, which are not part of the settlement are included in the database.

It is urgent that the quality and functioning of the database is improved in order to allow righstholders to make full use of it. Currently, it is extremely burdensome and confusing for a European publisher to claim books in the database.

Besides, section 3.2(d)(i) of the settlement refers to the need to group books together if a book is commercially available and a previous edition is also in the database. In this case, both books would have to be tagged as commercially available in order to avoid "cannibalisation" of new editions. This is however currently not the case, at least for European books, leading to lengthy and costly processes for the publishers, who have to claim the same book several times to be sure that it will be tagged as commercially available. Today, the database is so seriously deficient that there is a serious danger that many books in print will be made available without consent – even if a collecting society requests removal for all works that it can identify. **A correct functioning of the database in practical terms should be a precondition before any display uses foreseen in the settlement are allowed**.

Although Google is indicating that it is currently working on the improvement of the database, it is necessary that the quality of its job should be measurable and assessable by an independent party (for instance the BRR, upon the condition that it becomes fully representative – see following objection). The **costs** associated with the acquisition of licences for the use of European databases and bringing significative improvements to the Google database in order to reach a reasonable level of quality should be borne by Google at their own expense, possibly within an additional financial envelope in the framework of the settlement.

Moreover, Google recommends rights-holders to send information using the Onix format whereas its own system does not seem Onix compliant.

**5. Lack of representation of non-US rightsholders in the Book Rights Registry (BRR).**

Section 6.2 (b) of the settlement establishes that the "*Registry will be organized on a basis that allows the Registry, among other things to (i) represent the interest of Rightholders in*

*connection with this settlement Agreement...The Registry will have equal representation of the Author Sub-Class and the Publisher Sub-Class on its Board of Directors..."*

The BRR will represent rightholders world wide negotiating on their behalf very important matters including terms of new revenue models. Google indicated that among the 6 million copyright protected books it already digitized, half of them are in non English language. Given the strong direct interests of foreign rights-holders, **it is therefore unfair that nothing in the settlement ensures that there will be non-US publishers and authors in the Board of the BRR**. Such a commitment is necessary in order to protect the interests of non-US copyright owners.

### 6. Deadline for financial compensation too close to deadline for opt-out and objections

As the settlement may be finally endorsed at the end of the year, rights-holders may have very little time to ask for a financial compensation as the deadline remains January 5, 2010. Given **the characteristics of the information processing and the bad quality of the database** described above, it is just impossible for rights-holders to do this job properly within such a short timeframe. A new delay would be even more justified as **Google has not provided yet the final list of books it has digitized by May 5, 2009**.

### 7. Editorial control

It should not be up to Google to choose unilaterally to exclude some books from "one or more Display uses for editorial or non-editorial reasons". [3.7 (e)] leaves room for **censorship and restrictions to intellectual freedom** for sexual, religious, political or any other reason. One can imagine that Google may find itself under pressure from governments or interest groups to censor books that discuss topic such as alternative lifestyles or that may be seen as politically offensive. For instance, China has demanded the removal of links to sites promoting free speech and civil liberties in Tibet. Google may also proactively suppress entire categories of books, just to pre-empt anticipated complaints.

Google agrees in the sub-clause to notify the BRR when it excludes a book for editorial reason but **does not agree to disclose the reason when the exclusion is for non-editorial reasons or when Google relies on confidential information to make the exclusion**.

This power given to Google is even more unacceptable if the sort of exception granted to Google concerning orphan works is confirmed: Google will then have a sort of **quasi-monopolistic license for orphan works in the US, with the right to unilaterally exclude some of them and the impossibility for other users to get a licence anywhere else**.

**[3.7 (e)] should therefore be modified so that any exclusion should be discussed beforehand with the rightholder, and in case of disagreement, the question should be referred to an independent body.**

## 8. Unfair dispute resolution

The dispute resolution mechanism set up by the settlement **tends to favor Google, particularly as it concerns claims outside the US**:

- In 9.1(b)(v), it should be the publisher's election whether to arbitrate claims over Google's attempt to use the agreement as a defense to foreign claims (under 10.2(b)). If the Agreement does not pertain to foreign claims, then its mandatory arbitration provision should not apply in this situation.

- In 9.3(a), if the publisher elects to arbitrate, the forum and choice of law should not be New York if the dispute concerns a "legal claim outside the U.S."

- In 9.7, judgment should be capable of entry outside the Southern District of New York, in any court having jurisdiction over the parties (as is the case in 9.11, which deals with injunctive relief).

- Under 8.6(b), the publishers should not have to arbitrate if there is willful failure of a Security Implementation Plan, and damages should not be capped. These limits might be acceptable for non-willful breaches, but a willful security failure should not be shielded from greater liability.

## 9. The safe harbour for Google is too broad

When Google does any sort of mistake (see the bad quality of the database), the only consequence is that its has to remedy, **without any possibility for rights-holders to ask for damages**, even in case of evident violation of some obligation of the Settlement. For instance, the section 13.6 exemption of all the Settlement parties from liability for any claim involving *"(a) any decision with respect to any Cash Payment or (b) actions taken with respect to any Cash Payments or other disbursements from the Settlement Fund"* is apparently overbroad, as it could seemingly allow Google and the Registry to make no payments at all despite their obligations under the Agreement. A similar provision is in section 11.5 of the Author-Publisher Procedures. This needs to be clarified, to ensure that the publishers have legal recourse – in some form -- if they are not given the payments they are due under any other provisions of the Agreement.

Google is committed by the Settlement to determine in the right way the commercial availability (and to cluster books containing the same work), but the only consequence they will suffer in case of error is the fact that they have to remove the content and/or change again the status. The absence of a real sanction makes this commitment not enforceable. There is a **strong incentive for Google not to comply**: they have advantage in digitizing books and also from the fact that rights-holders do control their data with no cost for Google, just to defend themselves.

**10. The scheduling for remedy of errors is too long.**

Google is supposed to remove books digitized without permission or change the determination of out of print within 30 days, which in the Internet is a "geological era". Everything may happen to a rights-holder's content if it stays for 30 days in the Google services. It should be referred to notice and take down procedures, which are very common in the US and which allow for a **24 hour period** for similar cases.

**Alain KOUCK**
**CEO**

## EDITIS HOLDING PUBLISHING HOUSES

- **Bordas**
- **CLE International**
- **De Boeck**
- **Editions First**
- **Editions Gründ**
- **La Découverte**
- **Le Cherche Midi Editeur**
- **Les Dictionnaires Le Robert**
- **Nathan**
- **Perrin**
- **Presses de la Renaissance**
- **Place des éditeurs**
  *Acropole*
  *Belfond*
  *Convergences*
  *Hemma*
  *Hors Collection*
  *Langue au chat*
  *Le Pré aux Clercs*
  *Lonely Planet*
  *Omnibus*
  *Presses de la Cité*
  *Solar*
- **Plon**
- **Editions Retz**
- **Robert Laffont**
  *Julliard*
  *NiL*
  *Seghers*
- **Univers Poche**
  *10/18*
  *Fleuve Noir*
  *Kurokawa*
  *Pocket*
  *Pocket Jeunesse*
- **XO Editions**
  *Oh ! Editions*