UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC. *et al.*,

       Plaintiffs,

           v.

GOOGLE INC.,

       Defendant.

05 Civ. 8136 (DC)

**ECF CASE**

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA REGARDING PROPOSED CLASS SETTLEMENT

WILLIAM F. CAVANAUGH
U.S. Department of Justice
Deputy Assistant Attorney General
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Tel.: (202) 353-1535

PREET BHARARA
United States Attorney for the
Southern District of New York

JOHN D. CLOPPER
Assistant United States Attorney
86 Chambers Street, 5th Floor
New York, New York 10007
Tel.: (212) 637-2716

## TABLE OF CONTENTS

I.   Aspects of the Proposed Settlement in Its Current Form Require Modification to
     Satisfy Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.   The Most Forward-Looking Provisions of the Agreement Require
          Modification to Satisfy Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.   The Parties Have Not Demonstrated that the Class Representatives
          Adequately Represent Absent Class Members . . . . . . . . . . . . . . . . . . . . . . . . 8

     C.   The Scope of the Proposed Settlement Requires Robust Notice, and
          the Record Requires Further Development of Whether Such Notice Has
          Been Provided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     D.   The Parties Should Consider Modifications to Address the Requirements
          of Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.  The Proposed Settlement May Be Inconsistent with Antitrust Law . . . . . . . . . . . . . 16

     A.   Horizontal Agreements Among Authors and Publishers as to Terms
          of Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          1.   Collective Agreement on Wholesale Terms . . . . . . . . . . . . . . . . . . . . 19

          2.   Restrictions on Retail Price Competition . . . . . . . . . . . . . . . . . . . . . . 21

          3.   Terms of Sale for Orphan Works . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     B.   Potential Foreclosure of Competition in Digital Distribution . . . . . . . . . . . 23

III. Additional Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 10, 12

*Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982) . . . . . . . . . . . . . . . . . . 17, 18, 20

*Assoc. Press v. United States*, 326 U.S. 1 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979). . . . . . . . . . . . . . . . 18, 19

*Catalano, Inc. v. Target Sales*, 446 U.S. 643 (1980) (per curiam). . . . . . . . . . . . . . . . 17, 20, 22

*Citizen Publ'g, Co. v. United States*, 394 U.S. 131 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395 (1977) . . . . . . . . . . . . . . . . . . . . . 5

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Literary Works in Elec. Databases Copyright Litig.*, MDL No. 1379 (S.D.N.Y. Sept. 25, 2005), *rev'd on other grounds*, 509 F.3d 116 (2d Cir. 2007), *cert. granted*, *Reed-Elsevier, Inc. v. Muchnick*, No. 08-103 (Mar. 2, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). . . . . . . . . . . . . . . . 17

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981) . . . . . . . . . . 6

*Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679 (1978) . . . . . . . . . . . . . . . . . . . . . . 20

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 17

*New York v. St. Francis Hosp.*, 94 F. Supp. 2d 399 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . 21

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985) . . . 23, 24

*State Oil Co. v. Khan*, 522 U.S. 3 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*TFWS, Inc. v. Schaefer*, 242 F.3d 198 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002) . . . . . . . . . . . . . 6

*United States v. Aquafredda*, 834 F.2d 915 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980) . . . . . . . 24

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538 (4th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . 21

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 6, 7

## Other

*Hearing on Competition and Commerce in Digital Books: The Proposed Google Book Settlement Before the House Comm. on the Judiciary*, 111th Cong., 1st Sess. (2009) (statement of Marybeth Peters, Register of Copyrights) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*House Comm. on the Judiciary*, 111th Cong., 1st Sess. (2009) (statement of Paul Aiken, Executive Director of the Authors Guild) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

XI Herbert Hovenkamp, *Antitrust Law* ¶ 1907c at 246-48 (2d ed. 2005) . . . . . . . . . . . . . . . . . 20

The United States of America, by and through counsel, submits this statement of its views concerning the proposed class action settlement (the "Proposed Settlement" or "Agreement") between the American Association of Publishers, *et al.* (the "Class Plaintiffs") and Google Inc. ("Google").

The United States has been informed by the parties that they are continuing to consider possible modifications of the Proposed Settlement to address the many concerns raised by various commenters and by the United States in its discussions with the parties. The Proposed Settlement is one of the most far-reaching class action settlements of which the United States is aware; it should not be a surprise that the parties did not anticipate all of the difficult legal issues such an ambitious undertaking might raise. Further, the parties have represented to the United States that they put this Court on notice of their ongoing discussions and that they may present a modified version of the Proposed Settlement in the future. The United States is committed to working with the parties constructively with respect to alterations the parties may propose.

The United States strongly supports a vibrant marketplace for the electronic distribution of copyrighted works, including in-print, out-of-print, and so-called "orphan" works. The Proposed Settlement has the potential to breathe life into millions of works that are now effectively off limits to the public. By allowing users to search the text of millions of books at no cost, the Proposed Settlement would open the door to new research opportunities. Users with print disabilities would also benefit from the accessibility elements of the Proposed Settlement, and, if the Proposed Settlement were approved, full text access to tens of millions of books would be provided through institutional subscriptions. Finally, the creation of an independent, transparently-operated Book Rights Registry (the "Registry") that would serve to clarify the

copyright status and copyright ownership of out-of-print works would be a welcome development.

Nonetheless, the breadth of the Proposed Settlement – especially the forward-looking business arrangements it seeks to create – raises significant legal concerns. As a threshold matter, the central difficulty that the Proposed Settlement seeks to overcome – the inaccessibility of many works due to the lack of clarity about copyright ownership and copyright status – is a matter of public, not merely private, concern. A global disposition of the rights to millions of copyrighted works is typically the kind of policy change implemented through legislation, not through a private judicial settlement. If such a significant (and potentially beneficial) policy change is to be made through the mechanism of a class action settlement (as opposed to legislation), the United States respectfully submits that this Court should undertake a particularly searching analysis to ensure that the requirements of Federal Rule of Civil Procedure 23 ("Rule 23") are met and that the settlement is consistent with copyright law and antitrust law. As presently drafted, the Proposed Settlement does not meet the legal standards this Court must apply.

This Memorandum sets forth the concerns of the United States with respect to the current version of the Proposed Settlement; these concerns may be obviated by the parties' subsequent changes to the agreement. Commenters' objections to the Proposed Settlement fall into three basic categories: (1) claims that the Proposed Settlement fails to satisfy Rule 23; (2) claims that the Proposed Settlement would violate copyright law; and (3) claims that the Proposed Settlement would violate antitrust law. In the view of the United States, each category of objection is serious in isolation, and, taken together, raise cause for concern. The Proposed Settlement seeks to implement a forward-looking business arrangement rather than a settlement of past conduct, using

2

the mechanism of Rule 23 in a manner that implicates the principle that copyright owners

generally control whether and how to exploit their own works during the term of copyright.  At

the same time, the Proposed Settlement would establish a marketplace in which only one

competitor would have authority to use a vast array of works – especially so-called "orphan"

works[1] – that may provide significant value both to Google and to the Registry, a collective which

would control exploitation of those works.  As the United States has previously advised the Court,

the Antitrust Division of the Department of Justice is investigating the Proposed Settlement;

although that investigation is still ongoing, the United States is providing in this Memorandum a

preliminary explanation of its antitrust concerns.

      The United States' views on the Proposed Settlement are informed by three basic

principles.  *First*, one goal of the settlement – making large numbers of copyrighted works

available to the public in electronic form while providing compensation to authors and publishers

– is a public benefit that, to date, has not come to pass due to certain realities of the copyright

system, including, for example, the fact that copyright owners are not required to formally

register or otherwise assert their ownership.  In particular, the rediscovery of currently unused or

inaccessible works and the digitization of those works in formats that are accessible to persons

with disabilities are important public policy goals.  The United States believes that, through the

actions of private entities and Congress (if necessary), steps should be taken to advance these

objectives.

---

[1]  The United States notes that, as a general matter, "orphan works" refers to the subset of
rightsholders who likely cannot be located after a diligent search.  In the context of the
settlement, some out-of-print works will be orphan works, while others may belong to copyright
owners who may be locatable but will not come forward to join the Registry.

*Second*, the end result should be a marketplace in which consumers can be assured that they are paying competitive prices for the benefit they receive – in a marketplace in which they have multiple outlets from which to obtain access to works.  The benefits of this settlement should not be achieved through unjustified restrictions on competition.

*Third*, the structural safeguards of Rule 23 must be satisfied to ensure that the rights of absent class members are fully protected.  This Court should engage in a careful and searching examination of the Proposed Settlement and any revised version that may be submitted.

The United States recognizes that the only question before the Court is whether to approve or disapprove the Proposed Settlement.  Given the parties' express commitment to ongoing discussions to address concerns already raised and the possibility that such discussions could lead to a settlement agreement that could legally be approved by the Court, the public interest would best be served by direction from the Court encouraging the continuation of those discussions between the parties and, if the Court so chooses, by some direction as to those aspects of the Proposed Settlement that need to be improved.  Because a properly structured settlement agreement in this case offers the potential for important societal benefits, the United States does not want the opportunity or momentum to be lost.

## I.     Aspects of the Proposed Settlement in Its Current Form Require Modification to Satisfy Rule 23

Rule 23 is designed to ensure that the settlement of a class action resolves disputes on behalf of plaintiffs who have aligned interests and protects the legal rights of absent class members whose interests may diverge from those of the named class representatives.  To  prevent abuses and to provide structural guarantees of fundamental fairness, Rule 23 requires that the class be defined in terms of commonality, typicality, and adequacy of representation, and that

4

class settlements be fair, reasonable, and adequate. *See Amchem Prods., Inc. v. Windsor*, 521

U.S. 591, 620, 628-29 (1997); *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982);

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403-05 (1977).

The United States submits that, as currently drafted, the Proposed Settlement does not

satisfy these requirements. As discussed below, there are changes that the United States has

identified that may reduce potential conflicts among class members and address concerns about

the adequacy of representation for absent class members. Moreover, the most sweeping forward-

looking licensing provisions of the current Proposed Settlement (which give open-ended control

to the Registry and Google for the exploitation of the rights of absent class members unless those

class members opt out of those provisions) both exacerbate potential conflicts between the

interests of the class representatives and those of absent class members – especially rightsholders

of out-of-print works and foreign rightsholders – and are difficult to square with the requirements

of Rule 23. In addition, as discussed below, the record at this time does not establish that the

class was afforded adequate notice, which is critical given the size and geographic scope of the

class, and the alteration in copyright protection that the Proposed Settlement would effectuate.

The parties have indicated that they are renegotiating a number of aspects of the Proposed

Settlement. Until the parties agree on new provisions, however, it is impossible to determine

whether a modified settlement will satisfy Rule 23's strictures. Accordingly, the United States

respectfully submits that, as identified below, there are various ways to address the foregoing

concerns that the parties should consider in their future discussions. The United States looks

forward to the opportunity to provide the Court with its comments regarding any modified version of the Proposed Settlement that the parties may negotiate.

**A.     The Most Forward-Looking Provisions of the Agreement Require Modification to Satisfy Rule 23**

Various commenters have suggested that the Proposed Settlement must be limited to compensation for past conduct and should provide for little in the way of forward-looking relief (other than a prohibitory injunction going forward). Citing cases such as *Amchem*, 521 U.S. at 620, 628-29, *National Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9, 17 (2d Cir. 1981), and *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106-13 (2d Cir. 2005), these objectors contend that Rule 23 precludes settlements of claims that go beyond the four corners of the complaint filed, or that address claims that have not arisen. The United States does not advocate such a categorical view here. As a theoretical matter, a properly defined and adequately represented class of copyright holders may be able to settle a lawsuit over past conduct by licensing a broader range of conduct to obtain global "copyright peace." At least one federal court of appeals has approved a class action settlement with a forward-looking licensing component covering claims that had not yet fully accrued. *See Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 982 (7th Cir. 2002) (affirming class settlement that resolved trespass and slander of title claims by granting easements in railroad rights-of-way).

That said, the concerns that animated the Supreme Court's decision in *Amchem*, which rejected a proposed class settlement of all present and future claims by workers exposed to asbestos because the currently-injured plaintiffs had different interests and goals from those workers that had been exposed but had not yet suffered any injury, 521 U.S. at 626-27, and those that led the Second Circuit in *Wal-Mart* to conclude that Rule 23 does not permit release of

6

claims of absent class members unless those claims arise from the "identical factual predicate," 396 F.3d at 107, apply with significant force to the most forward-looking provisions of the Proposed Settlement. In *Amchem*, *Wal-Mart*, and other cases, the courts have cast doubt on the circumstances in which class representatives could adequately represent absent class members with respect to as-yet uncertain injuries or rights that were far removed from the facts underlying the complaint.

Against this backdrop, the United States has greater concerns about some provisions in the Proposed Settlement than it has about others. At one end of the spectrum are the provisions that settle the specific allegations of infringement in the Complaint – Google's scanning of millions of copyrighted works and making available small portions of such works in response to search requests. As to those claims, there are strong arguments that an appropriate set of publisher and author class representatives can adequately represent all members of the class with respect to reaching a settlement for payments to be made to publishers and authors for the use of their works. The claims are based on specific conduct and present facts, and, assuming representation of those with potentially different interests, adequate representation seems possible.

At the other extreme are the provisions of the Proposed Settlement that authorize the Registry to license Google to exploit the copyrighted works of absent class members for unspecified future uses (potentially derivative works or other uses) – essentially authorizing, upon agreement of the Registry, open-ended exploitation of the works of all those who do not opt out from such exploitations. *See* Proposed Settlement Agreement, dated Oct. 28, 2008 ("S.A.") § 4.7 (allowing the Registry to authorize future business models without any class notification). Such licensing is far afield from the facts alleged in the Complaint. And the rights conferred are so

7

amorphous and malleable that it is difficult to see how any class representative could adequately

represent the interests of all owners of out-of-print works (including orphan works). The parties

appear willing to address this problem by limiting the future rights that may be controlled by the

Registry and Google. The United States looks forward to working with the parties to address

these concerns across the entire spectrum of provisions in the Proposed Settlement.

### B.    The Parties Have Not Demonstrated that the Class Representatives Adequately Represent Absent Class Members

The Proposed Settlement raises concerns about the adequacy of representation afforded to

absent class members, especially owners of "orphan" out-of-print works and foreign

rightsholders. We address each set of concerns separately.

First, the Proposed Settlement draws distinctions between in-print and out-of-print works.

Google must obtain the permission of copyright owners of in-print works before making use of

those works (beyond scanning). *See* S.A. §§ 3.2(b), 3.4(b). But Google can incorporate out-of-

print works into new commercial products without the owner's permission, S.A. §§ 3.2(b), 4.7.

Copyright owners of out-of-print works can deny Google permission to use their works in certain

ways if they learn of the agreement and their rights under it. S.A. §§ 3.2(e)(i), 3.5, 4.7. But,

copyright owners of out-of-print works provide a release to Google for any exploitation of their

rights that occurred prior to those owners becoming aware of Google's use. S.A. §§ 10.1(f),

10.1(m)-(n), 10.2(a). And, because the owners of orphan works are an incredibly diverse group

that includes not only living authors or active publishers, but heirs, assignees, creditors, and

others who acquire the property interest by contract or operation of law, these rightsholders are

difficult or impossible to locate, and thus difficult to notify. Moreover, no amount of notice is

likely to protect those orphan rightsholders who are unaware of their rights or unclear how or

whether they want to exploit them.  Yet, if an out-of-print copyright owner does not come

forward within five years, profits from the commercial use of the out-of-print work are distributed

to pay the expenses of the Registry and then to the Registry's registered rightsholders.  *See* S.A. §

6.3; S.A. Attachment C, Plan of Allocation §§ 1.1(e), 2.3.

      The structure of the Proposed Settlement itself, therefore, pits the interests of one part of

the class (known rightsholders) against the interests of another part of the class (orphan works

rightsholders).  Google's commercial use of orphan works will generate revenues, which will be

deposited with the Registry.  Any unclaimed revenues, however, will inure to the benefit of the

Registry and its registered rightsholders.  Thus, the Registry and its registered rightsholders will

benefit at the expense of every rightsholder who fails to come forward to claim profits from

Google's commercial use of his or her work.  And, as noted above, the broad scope of the

Proposed Settlement's licensing provisions exacerbate this conflict.  The greater the economic

exploitation of the works of unknown rightsholders by Google and the Registry, the stronger the

incentive for known rightsholders to retain the unclaimed revenues for themselves.

      The provisions of the Agreement that allow Google to negotiate with the Registry to

develop new derivative products create additional adequacy-of-representation concerns.  The

class representatives who negotiated these terms are all known rightsholders.[2]  Thus, while these

rightsholders are willing to authorize Google to develop future uses of copyrighted works, their

own works are fully protected from unanticipated future uses:  these owners can deny Google

permission to use their works in ways they deem objectionable.  Out-of-print rightsholders,

---

[2]  The parties have represented that all of the current class representatives have interests in both
in-print and out-of-print works, with the exception of a single author representative whose works
recently went out-of-print.

however, will not enjoy such protections unless they learn of the Proposed Settlement and its terms (and in some cases their own ownership rights) before Google begins a new use of their works. It is noteworthy that the parties have indicated their belief that the largest publisher plaintiffs are likely to choose to negotiate their own separate agreements with Google (*i.e.*, they will not opt in to the future provisions of the settlement), while benefitting from the out-of-print works that will be exploited by Google due to the effect of the opt-out requirement for those works. There are serious reasons to doubt that class representatives who are fully protected from future uncertainties created by a settlement agreement and who will benefit in the future from the works of others can adequately represent the interests of those who are not fully protected, and whose rights may be compromised as a result.

The parties respond to these concerns by contending that these conflicts are more theoretical than real. They submit that the Proposed Settlement will breathe new economic life into out-of-print works, which will create incentives for their owners to self-identify so that they can benefit from copyrights currently lacking commercial value. This theory is certainly plausible. But where, as here, the structure of a settlement agreement creates a conflict among known and unknown class members, a court cannot ignore or excuse that conflict based on an untested hypothesis that economic incentives will operate to obviate the conflict. *See Amchem*, 521 U.S. at 627 (looking to "structural assurance of fair and adequate representation"). That out-of-print rightsholders might benefit from a fundamental alteration of their rights is insufficient to show that they were adequately represented by named plaintiffs whose rights will not be altered (or who can readily avoid such alteration), and who stand to gain if out-of-print rightsholders do

10

not opt out.[3] The United States looks forward to reviewing modifications to the Proposed

Settlement that will provide structural assurances to minimize this conflict.

Second, the Proposed Settlement raises concerns about the adequacy of representation

with respect to foreign rightsholders. The Proposed Settlement operates to sweep in untold

numbers of foreign works, whose authors, under current law, are not required to register in the

same manner as U.S. rightsholders. Many of those authors have never published works in the

United States and are not members of the Authors Guild or the Association of American

Publishers, which exclude many foreign copyright owners from membership by virtue of their

membership criteria. Moreover, the interests of these class members likely differ from those of

the class representatives. As the filings of France and Germany make clear, some of the United

States' trading partners have serious concerns about application of the Proposed Settlement to

foreign authors[4] and, in any event, the parties have not demonstrated that the class included

representation sufficient to protect the interests of these foreign rightsholders.

Thus, although the Proposed Settlement may well provide overall benefits to a wide range

of authors and publishers and to the public, there are at present insufficient assurances that absent

---

[3] As the Register of Copyrights has explained, the Proposed Settlement's far-reaching authorization to the Registry and ultimately Google to exploit out-of-print works without prior consent of the rightsholders, alters the traditional understanding of copyright law that allows the owner to exclude others from using a copyrighted work absent authorization of the copyright owner. *Hearing on Competition and Commerce in Digital Books: The Proposed Google Book Settlement Before the House Comm. on the Judiciary*, 111th Cong., 1st Sess. at 3, 6-8 (2009) (statement of Marybeth Peters, Register of Copyrights), available at http://judiciary.house.gov /hearings/pdf/Peters090910.pdf (accessed Sept. 18, 2009).

[4] *See* Mem. of Law in Opp'n to the Settlement Proposal on Behalf of the French Republic at 1 (D.E. 179); Mem. of Law in Opp'n to the Settlement Proposal on Behalf of the Federal Republic of Germany, at 1 (D.E. 287) ("Germany Opp'n").

class members' interests were adequately represented. The parties should continue to work on modifications to the Proposed Settlement to address these concerns.

      C.    **The Scope of the Proposed Settlement Requires Robust Notice, and the Record Requires Further Development of Whether Such Notice Has Been Provided**

Sufficient notice is a distinct requirement of Rule 23. The notice requirement is designed to ensure that absent class members are provided with the opportunity to protect their interests. As the Supreme Court explained in *Amchem*, "[t]o alert class members to their right to 'opt out' of a (b)(3) class, Rule 23 instructs the court to 'direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.' Fed. R. Civ. P. 23(c)(2); *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-177 (1974) (individual notice to class members identifiable through reasonable effort is mandatory in (b)(3) actions; requirement may not be relaxed based on high cost)." 521 U.S. at 617.

The adequacy of notice is particularly important in this case because the Proposed Settlement seeks to certify a broad class, including individuals or entities who have not yet been injured in any fashion and whose rights may be exploited (without prior consent) in a form as-yet unknown based on future decisions by the Registry and Google. It is a difficult legal question whether notice could be formulated to be legally sufficient with respect to the many undefined and uncertain future uses the Proposed Settlement would authorize Google to make. *Amchem,* 521 U.S. at 628 (noting "the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous"). Once again, foreign rightsholders present special problems of notice, especially given the fact that

some may not, to date, have sought to exploit their works in the United States, but may wish to in the future, and because the Proposed Settlement grants Google and the Registry broad rights to unclaimed works.

The record on the notice provided is, at this point, undeveloped. Some commenters have complained that they did not receive notice by any direct means. *See, e.g.*, Objection of Scott E. Gant to Proposed Settlement at 16 n.31 (D.E. 143). Although the United States is not in a position to opine on whether the notice provided by Google has met the strictures of Rule 23, it believes the Court should undertake a searching inquiry to ensure both that a sufficient number of class members will be reached and that the notice provided gives a complete picture of the broad scope of the Proposed Settlement. The Court should not hesitate to require the parties to undertake further efforts to notify the class.

### D.    The Parties Should Consider Modifications to Address the Requirements of Rule 23

The United States is heartened that the parties are actively considering modifications of the Proposed Settlement and believes the best result is a negotiated solution that can satisfy the dictates of Rule 23, the copyright law, and the antitrust laws. The United States is fully cognizant that this is *the parties'* agreement and that even small modifications to the Proposed Settlement may require significant renegotiation. Nevertheless, in an effort to assist the parties in their future discussions and to apprise the Court of the United States' views, the United States identifies below provisions that the parties could consider modifying to address concerns with the Proposed Settlement as currently drafted.

As a threshold matter, changing the forward-looking provisions of the current Proposed Settlement applicable to out-of-print rightsholders from an opt-out to an opt-in would address the

13

bulk of the Rule 23 issues raised by the United States.  This would put the out-of-print rightsholders and in-print rightsholders in the same situation and respond to a significant concern expressed by foreign rightsholders.  Such a revision would, of course, not give Google immediate authorization to use all out-of-print works beyond the digitization and scanning which is the foundation of the plaintiffs' Complaint in this matter.  Google has suggested that the vast majority of known authors and publishers of out-of-print works who have or will receive notice of the settlement will wish to be bound by it; if that is true, creating an opt-in mechanism would not seem to work a significant hardship for a broad category of affected works.  Coupled with enhanced requirements of the Registry to search for rightsholders (who may then elect to opt in), such a change may achieve a significant portion of the benefit of the settlement as currently envisioned without running afoul of Rule 23.  As noted in testimony by the Authors Guild before the House Judiciary Committee, "finding the rights owners of a book is not as daunting as many seem to believe."[5]

The United States does not mean to suggest, however, that such a modification is the only means to revise the Proposed Settlement to make it consistent with Rule 23.  A combination of other revisions affecting the scope of the forward-looking license provisions and protecting the interests of absent class members could also alleviate at least some of the United States' concerns.

With respect to the interests of owners of out-of-print works (or any rightsholder that does not receive notice), extending the time for opting out of the class and for claiming escrowed profits owed to unknown rightsholders would minimize potential conflicts.  Alternatively, the escrow provisions could be revised to eliminate the distribution of residual profits to registered

_____

[5] *See House Comm. on the Judiciary*, 111th Cong., 1st Sess. (2009) (statement of Paul Aiken, Executive Director of the Authors Guild at 8).

14

rights owners. Instead, unclaimed profits could be devoted entirely to the search for rightsholders of orphan works, and the Registry could be authorized to petition the court for an alternative distribution based on a showing that search efforts had been fully exhausted. Another possibility would be to appoint persons to the Registry to serve as guardian representatives of orphan works owners. All of these steps could at least partially address the current conflict in the plaintiff class by moderating the incentive of known rightsholders to disadvantage unknown rightsholders or leverage their own economic interests on those of rightsholders who have not come forward.

The risk of such improper leveraging might also be reduced by narrowing the scope of the license. A settlement that simply authorized Google to engage in scanning and snippet displays in the future would limit the profits that others could potentially derive from out-of-print works whose owners fail to learn of their right to claim those profits. Other less significant limitations on the scope of the forward-looking license may be possible, and the United States looks forward to hearing from the parties on possible proposals.

The United States also believes progress can be made with respect to protecting the interests of foreign rightsholders. Google has already indicated that it will take steps to address the concerns of foreign rightsholders, though, to date, those actions do not appear to have addressed the concerns of the United States' trading partners, which believe that an opt-out regime for foreign rightsholders is prohibited. *See, e.g.,* Germany Opp'n at 9-11. In addition to consideration of an opt-in, as the parties continue discussions over modifications to the settlement, they should consider addressing the adequacy of representation of foreign rightsholders by adding foreign owners of in-print and out-of-print works to the class

15

representatives, to provide some assurance that the interests of absent foreign rightsholders have been accommodated.

These are a few of many possible revisions that could be considered. The United States believes such future discussion between the parties is necessary and could be productive.

## II.     The Proposed Settlement May Be Inconsistent with Antitrust Law

The Department of Justice has opened an investigation into the competitive impact of the Proposed Settlement. That investigation is not yet complete, and future modifications of the Proposed Settlement in response to comments filed in the instant proceeding may bear on the conclusions of that investigation. For these reasons, the United States cannot now state with certainty whether the Proposed Settlement violates the antitrust laws in any respect. Nevertheless, the Department's views on certain core issues are sufficiently well developed that articulating them now may be beneficial to the Court in its consideration of the Proposed Settlement and to the parties in their continuing negotiations regarding possible modifications.[6]

In the view of the Department, the Proposed Settlement raises two serious issues. First, through collective action, the Proposed Settlement appears to give book publishers the power to restrict price competition. Second, as a result of the Proposed Settlement, other digital distributors may be effectively precluded from competing with Google in the sale of digital library products and other derivative products to come. These problems are evident on the face of the Proposed Settlement and the concerns they raise have not to this point been convincingly

---

[6] The parties have represented to the United States that, with regard to any potential challenge to the legality of the settlement, they will not raise a defense based on the *Noerr-Pennington* doctrine.

addressed by the parties.  The parties have indicated, however, a willingness to consider

modifications that would address at least some of the concerns set forth below.

A.    **Horizontal Agreements Among Authors and Publishers as to Terms of Sale**

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits agreements in "unreasonable"

restraint of trade.  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  Some restraints are so manifestly

anticompetitive and without redeeming value that they are deemed illegal per se under Section 1.

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  Other restraints are

evaluated under the rule of reason, allowing consideration of the parties' market power and any

procompetitive justifications, as well as the restraint's anticompetitive effects.

In at least three respects, the collectively negotiated provisions of the Proposed Settlement

appear to restrict price competition among authors and publishers:  (1) the creation of an industry-

wide revenue-sharing formula at the wholesale level applicable to all works; (2) the setting of

default prices and the effective prohibition on discounting by Google at the retail level; and (3)

the control of prices for orphan books by known publishers and authors with whose books the

orphan books likely compete.  Although they arise in a unique context, these features of the

Proposed Settlement bear an uncomfortably close resemblance to the kinds of horizontal

agreements found to be quintessential per se violations of the Sherman Act.  *See Arizona v.*

*Maricopa County Med. Soc'y*, 457 U.S. 332 (1982); *Catalano, Inc. v. Target Sales*, 446 U.S. 643

(1980) (per curiam).  And, even if the provisions were considered under the rule of reason, a

strong countervailing "procompetitive justification," *NCAA v. Bd. of Regents of Univ. of Okla.*,

468 U.S. 85, 100 (1984), would be needed to avoid antitrust condemnation of what appear to be

direct and unnecessary restraints on price competition.

17

As a threshold matter, the parties contend that the Proposed Settlement's pricing terms should be viewed not as a form of horizontal collective action by publishers and authors actionable under Section 1, but simply as a unilateral offer by Google to each individual rightsholder to contract on specified terms. The Department is not persuaded by this description. Class representatives – who compete with each other – collectively negotiated these pricing terms on behalf of all rightsholders. That some individual authors or publishers might opt out of those terms does not make them any less the product of collective action by competitors.

Alternatively, the parties contend that the Proposed Settlement should be considered a joint venture like the one at issue in *Broadcast Music, Inc. v. Columbia Broadcast. System, Inc.*, 441 U.S. 1 (1979). In *BMI*, the Supreme Court held that the blanket licenses issued and priced by the music performing rights organizations ASCAP and BMI were not subject to per se invalidation under Section 1 because: (1) they allowed for new, integrated products "entirely different from the product that any one composer was able to sell by himself," *see Maricopa*, 457 U.S. at 355;[7] (2) they generated substantial transaction-cost savings; (3) they were a practical necessity if songwriters were to be paid for the use of their compositions; and (4) ASCAP and BMI already operated under DOJ consent decrees.

The present situation is quite different. Wholly apart from whatever new integrated products Google might offer using the rights it obtains in the Proposed Settlement, Google will also act as a joint sales agent, offering each rightsholder's books for individual sale. *Contrast BMI*, 441 U.S. at 22 (approving only blanket license that was distinct from individually licensed

---

[7] A legitimate joint venture may set the price for its own offering without incurring per se antitrust liability, *see Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), but it must involve an efficiency-enhancing integration, and not a mere joint marketing of competitors' products. S*ee Maricopa*, 457 U.S. at 355-57.

compositions).  Additionally, the Proposed Settlement's revenue-sharing provision reduces

incentives for authors and publishers to compete at the wholesale level through bilateral

negotiations with Google.  In contrast, ASCAP and BMI have always negotiated separate bilateral

agreements with rightsholders, preserving competition among the rightsholders for their share of

the blanket license revenues – just as Google (through its Partner Program) and competitors such

as Amazon.com and Sony have done with thousands of publishers.  Moreover, unlike music

rightsholders who need the ASCAP/BMI organizations to detect the "fleeting" uses of their

compositions on the airwaves, *id.* at 19, book authors and publishers have not shown that they

lack a practical means to be paid for uses of their works in the absence of collectively negotiated

pricing mechanisms.  Finally, unlike both ASCAP and BMI, *id.* at 10-15, 24, no actor here has its

market power constrained by a consent decree with the Department of Justice, which, among

other things, allows licensees to ask the court to set the price of a license.

Thus, the parties' threshold arguments do not justify forgoing a thorough inquiry into the

anticompetitive potential of the Proposed Settlement's collectively negotiated pricing terms.  As

will be shown, absent modification by the parties, there is a significant possibility that the

Department will conclude that those terms violate the federal antitrust laws.

1.     Collective Agreement on Wholesale Terms

Currently, publishers compete with each other over the terms on which they will sell hard-

copy and digital books to distributors, including Google.  The pricing terms in the Proposed

Settlement appear to restrict that competition.  The parties have fixed the royalty rate at 63% of

all revenues Google earns under the settlement.  *See* § 2.1(a).  This term operates as a price floor

(even for those who elect not to use the Proposed Settlement's default pricing mechanisms),

19

diminishing the incentives of individual authors or publishers to discount or offer other terms more favorable to the purchaser. *See Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-82 (1975) (holding that price floor for legal services is illegal price fixing); *Maricopa*, 457 U.S. at 349 (agreement among doctors to set maximum fee they would accept for purposes of contracting with health insurers is per se illegal); *Catalano*, 446 U.S. at 646-50 (fixing price related terms in wholesale agreements is per se unlawful). Thus, for antitrust purposes, it is immaterial that authors and publishers can negotiate individually rather than accept the Proposed Settlement's terms. *Maricopa*, 457 U.S. at 341, 349-54.

The parties' contention that this kind of industry-wide pricing mechanism is necessary to create a vibrant market for digital books is difficult to reconcile with the facts on the ground. Millions of digital books are already available for purchase, including growing numbers of out-of-print books, as a result of bilateral negotiations between distributors and individual rightsholders. In the same vein, it is difficult to justify a uniform royalty rate on the theory that it will eliminate transaction costs between Google and publishers. The antitrust laws do not permit parties to justify their conduct on the ground that competition itself is undesirable. *See* XI Herbert Hovenkamp, *Antitrust Law* ¶ 1907c at 246-48 (2d ed. 2005) (reducing transaction "costs of operating the competitive market itself" is not a valid defense because "[o]ur entire market system is built on the premise that these costs are worth their price in the great majority of cases."); *see also*, *e.g.*, *Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 687, 692-95 (1978).

2.       Restrictions on Retail Price Competition

The Proposed Settlement also directs Google to develop a pricing algorithm to set default

retail prices for individual books governed by the settlement.[8]  In other contexts, courts have

repeatedly rejected as per se illegal the establishment of a joint price-setting mechanism.  *Citizen*

*Publ'g, Co. v. United States*, 394 U.S. 131, 134-35 (1969); *Va. Excelsior Mills, Inc. v. FTC*, 256

F.2d 538, 540-41 (4th Cir. 1958); *New York v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412-14

(S.D.N.Y. 2000).  Similarly, courts have held that the use of formulas agreed upon among

competitors to set the price of competing goods is per se illegal.  *United States v. Socony-Vacuum*

*Oil Co.*, 310 U.S. 150, 198-99, 222-23 (1940); *Va. Excelsior Mills*, 256 F.2d at 540.  This feature

of the Proposed Settlement warrants particularly close scrutiny.

The Proposed Settlement also restricts Google from discounting off a rightsholder's list

price without authorization of the Registry and notification of the rightsholder, either of which

may veto the discount.  S.A. § 4.5(b)(ii).  This term discourages Google from funding discounts

and making the rightsholder whole, as any other retailer might.[9]  And allowable discounts are

limited to 40% off a book's list price.  In other contexts, such collective restraints on discounting

---

[8]  *See* S.A. §§ 4.2(b)(i)(2), 4.2(c)(ii).  The Proposed Settlement also establishes retail "pricing bins," which define the prices at which algorithm-priced books may actually be offered for sale. S.A. § 4.2(c).  It identifies twelve initial pricing bins ranging from $1.99 to $29.99 and the initial percentage of books to be assigned to each bin, S.A. § 4.2(c)(ii)(1), but also states that Google and the Registry may add or modify the bins at any time, S.A. § 4.2(c)(i).  Google will create a pricing algorithm to determine the retail price bin into which each book is placed, as a default option. This algorithm must:  (1) "maximize revenue for each Rightsholder," S.A. § 4.2(b)(i)(2); and (2) determine the retail price for books based "upon the aggregate data collected with respect to Books that are similar to such Book," S.A. § 4.2(c)(ii)(2).

[9]  The Agreement authorizes Google to fund "temporary" discounts, without elaborating on such a discount's permissible duration.  S.A. § 4.5(b)(i).  This uncertainty reduces the ability of discounts under this Section to have any meaningful impact on consumer prices.

have been held to be per se violations of Section 1.  *See Catalano*, 446 U.S. at 648 (ban on extending credit is "tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing"); *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 210 (4th Cir. 2001) (volume discount ban per se illegal); *United States v. Aquafredda*, 834 F.2d 915, 917 (11th Cir. 1987) (criminal violation based on agreement to cease offering discounts).

        3.      Terms of Sale for Orphan Works

The Proposed Settlement also appears to limit price competition by giving publishers, through the mechanism of negotiations conducted by the Registry, the ability to control the future pricing of orphan works that may compete with the works of known rightsholders.   The Registry is effectively controlled by large commercial publishers.  Allowing it to set the prices of orphan works effectively allows known rightsholders to choose the price at which their competitors' books (those of unknown rightsholders) are offered for sale.  *Citizen Publ'g*, 394 U.S. at 134-135 (joint sales of newspaper advertising and subscriptions by competing newspapers held to be "plain beyond peradventure" per se violations of § 1).  Known rightsholders would appear to have every incentive to ensure that the orphan works will not offer effective competition.

* * * * *

In each of the respects described above, the Proposed Settlement's pricing terms appear to constrain competition among authors and publishers.  Moreover, none seems reasonably necessary to achieve the stated benefit of the Proposed Settlement – breathing new commercial life into millions of long-forgotten, commercially unavailable works.  Accordingly, absent modification of those terms, there is a significant potential that the Department will conclude that they violate the Sherman Act.

#### B.    Potential Foreclosure of Competition in Digital Distribution

Under the Proposed Settlement, competing authors and publishers grant Google de facto exclusive rights for the digital distribution of orphan works. Such "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" have significant anticompetitive potential and may violate the antitrust laws. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)).

The Proposed Settlement appoints the Registry to negotiate with Google on behalf of the entire class regarding new commercial uses of digital books, and releases Google from any copyright liability arising from those new uses. S.A. §§ 4.7, 10.1(f), 10.2(a). The Proposed Settlement does not forbid the Registry from licensing these works to others. But the Registry can only act "to the extent permitted by law." S.A. § 6.2(b). And the parties have represented to the United States that they believe the Registry would lack the power and ability to license copyrighted books without the consent of the copyright owner – which consent cannot be obtained from the owners of orphan works. If the parties are correct, the Registry will lack the ability to provide competitors with licenses that will allow them to offer to the public anything like the full set of books Google can offer if the Settlement Proposal is approved.

Google's competitors are unlikely to be able to obtain comparable rights independently. They would face the same problems – identifying and negotiating with millions of unknown individual rightsholders – that Google is seeking to surmount through the Settlement Proposal. Nor is it reasonable to think that a competitor could enter the market by copying books en masse

23

without permission in the hope of prompting a class action suit that could then be settled on terms comparable to the Proposed Settlement.  Even if there were reason to think history could repeat itself in this unlikely fashion, it would scarcely be sound policy to encourage deliberate copyright violations and additional litigation as a means of obtaining approval for licensing provisions that could not otherwise be negotiated lawfully.  Moreover, the "most favored nation" clause in the Proposed Settlement, S.A. § 3.8(a), discourages potential competitors (including those sponsored by rightsholders) from attempting to follow Google into digital-book distribution because it could not obtain better terms than Google.

This de facto exclusivity (at least as to orphan works) appears to create a dangerous probability that only Google would have the ability to market to libraries and other institutions a comprehensive digital-book subscription.  The seller of an incomplete database – *i.e.*, one that does not include the millions of orphan works – cannot compete effectively with the seller of a comprehensive product.  Foreclosure of newcomers is precisely the kind of competitive effect the Sherman Act is designed to address.  *See Assoc. Press v. United States*, 326 U.S. 1, 13-14 (1945).  At this stage in the Department's investigation, it is not at all clear that this aspect of the Proposed Settlement can be "justified by plausible arguments that [it is] intended to enhance overall efficiency and make markets more competitive."  *Nw. Wholesale Stationers*, 472 U.S. at 294.  To the contrary, the Proposed Settlement appears to share features of collective agreements courts have rejected.  *See Toys "R" Us, Inc.*, 221 F.3d at 936 (condemning agreements between Toys "R" Us and key suppliers "to disadvantage . . . competitors . . . by inducing the suppliers to collude [by selling only through Toys R Us], rather than to compete independently for shelf space in the different [] retail stores."); *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp.

24

412 (S.D.N.Y. 1980) (condemning agreement in which competing movie studios exclusively licensed their movies to a single cable channel formed by the studios through a joint venture, the profits of which were shared according to a profit-sharing agreement).

This risk of market foreclosure would be substantially ameliorated if the Proposed Settlement could be amended to provide some mechanism by which Google's competitors' could gain comparable access to orphan works (whatever such access turns out to be assuming the parties negotiate modifications to the settlement).[10]  *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, MDL No. 1379 ("Order for Final Approval of Settlement and Final Judgment") (S.D.N.Y. Sept. 25, 2005) (numerous companies beyond the named defendants allowed to obtain benefits of settlement) (available at www.copyrightclassaction.com/ final_judge.pdf), *rev'd on other grounds*, 509 F.3d 116 (2d Cir. 2007), *cert. granted*, *Reed-Elsevier, Inc. v. Muchnick*, No. 08-103 (Mar. 2, 2009).  Analysis of such provisions would have to take into account the limitations of Rule 23, but they would have an important impact on the antitrust analysis.

If Rule 23 permits the class to enter into an agreement with Google that extends well beyond the scope of the alleged violation, and to set up an industry-wide arrangement for the licensing of copyrighted works for digital distribution, that arrangement should conform to the procompetitive mandate of the federal antitrust laws.  Consumers may benefit from the creation of

---

[10]  Authorizing the Registry to license the orphan works to third parties would appear to expand only the circumstances under which it could exercise the authority to act as continuing agent for the rightsholders with respect to orphan works already granted to it under the Agreement.  *See* S.A. § 4.7 (empowering Registry to authorize Google to distribute books under new, unspecified business models); § 3.7(c) (authorizing Registry to empower "one or more provider(s)" to sell the class's books if Google decides it no longer wants to sell the books as the Agreement envisions).

digital libraries that would not otherwise be feasible, but they should not be required to pay the price of eliminating competition among authors and publishers on the one hand and de facto exclusive control of the library by Google on the other.

## III.     Additional Considerations

In addition to the issues discussed above, the United States offers two additional observations with respect to the Proposed Settlement.

First, the parties have sought to maximize accessibility in a way that will provide individuals with print disabilities with a substantially similar experience as users without print disabilities.  In the Proposed Settlement, Google has committed to providing accessible formats and comparable user experience to individuals with print disabilities – and if these goals are not realized within five years of the agreement, Google will be required to locate an alternative provider who can accomplish these accommodations.  Along with many in the disability community, the United States strongly supports such provisions.

Second, given the nature of the digital library the Proposed Settlement seeks to create, the United States believes that, if the settlement is ultimately approved, data provided should be available in multiple, standard, open formats supported by a wide variety of different applications, devices, and screens.  Once these books are digitized, the format in which they are made available should not be a bottleneck for innovation.  Google has made clear in the past that it started this project on the premise that anyone, anywhere, anytime should have the tools to explore the great works of history and culture.  However the Proposed Settlement is modified by the parties, this approach should continue to be at its heart.

26

**CONCLUSION**

This Court should reject the Proposed Settlement in its current form and encourage the parties to continue negotiations to modify it so as to comply with Rule 23 and the copyright and antitrust laws.

Respectfully submitted,

WILLIAM F. CAVANAUGH                    PREET BHARARA
U.S. Department of Justice              United States Attorney
Deputy Assistant Attorney General,
Antitrust Division               By:    __ /s/ John D. Clopper_____
950 Pennsylvania Avenue, NW             JOHN D. CLOPPER
Washington, DC 20530                    Assistant United States Attorney
Telephone: (202) 353-1535               86 Chambers Street
                                        New York, NY 10007
                                        Telephone: (212) 637-2716
                                        Facsimile: (212) 637-0033

                                        john.clopper@usdoj.gov

Dated: September 18, 2009

## CERTIFICATE OF SERVICE

I hearby certify that on the 18th day of September, 2009, I caused a true and correct copy of the foregoing STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA REGARDING PROPOSED CLASS SETTLEMENT to be served electronically via the CM/ECF system on the lead attorneys to be noticed in this matter, including those counsel of record identified below.

  /s/ John D. Clopper
JOHN D. CLOPPER

Michael J. Boni, Esq.
Joanne Zack, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004


Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022


Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts & Kent LLP
332 Pine Street, Suite 200
San Francisco, CA 94104