# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD,
Associational Plaintiff, and HERBERT
MITGANG, BETTY MILES,
DANIEL HOFFMAN, PAUL
DICKSON, and JOSEPH GOULDEN,
Individually and on Behalf of All
Others Similarly Situated,

       Plaintiffs,

v.

GOOGLE, INC.,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 05-CV-8136

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9-23-09

## BRIEF OF *AMICUS CURIAE*
## PUBLIC KNOWLEDGE
## IN OPPOSITION TO THE PROPOSED SETTLEMENT

The Author's Guild et al v. Google Inc.

Jef Pearlman
Sherwin Siy
Public Knowledge
1875 Connecticut Ave. NW
Suite 650
Washington, DC 20009
(202) 518-0020

Sept. 8, 2009

Doc. 733

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* .............................................................................................. 1

INTRODUCTION ....................................................................................................................... 2

I.  The settlement as drafted creates antitrust and competition problems in violation of
the law and sound policy ......................................................................................................4

   A.  Google will become the sole party able to license orphan books. .......................................5

      1.  Google's acquisition of a monopoly on orphan works violates Sections 1 and
2 of the Sherman Antitrust Act ......................................................................................6

      2.  The Book Rights Registry should be subject to antitrust scrutiny ...............................10

   B.  The settlement also violates the Sherman Act with regard to non-orphan works ..............11

      1.  The opt-out nature of the license unfairly advantages Google in licensing the
works of known authors ...............................................................................................11

      2.  The Book Rights Registry should be scrutinized for antitrust violations for
claimed works as well. ................................................................................................14

      3.  The Most Favored Nation clause implicates sections 1 and 2 of the Sherman
Antitrust Act ...............................................................................................................16

         i.  The MFN clause acts as a contract to restrain trade. ...............................................16

         ii.  The MFN clause serves as an attempt to foreclose competition ..............................18

         iii.  The prerequisites for triggering the MFN clause do not save it from
scrutiny ...............................................................................................................18

II.  A class action settlement is the improper mechanism by which to determine the rights
of orphan works authors with regard to a single user. ...........................................................19

   A.  The proposed settlement exceeds the scope of a permissible class action release
because it releases new, future activities which were not part of the underlying
suit. ..............................................................................................................................20

      1.  Google has never engaged in the unlicensed sale of the full text of books,
while the proposed settlement would license that use. ................................................21

      2.  Class action law does not permit the release of behavior which was not a part
of the underlying suit and which has never occurred. .................................................22

      3.  If the Court concludes that the released claims share the same factual
predicate, it should require the release of other potential defendants ..........................25

B. The provisional plaintiff class can not be certified because orphan authors' interests conflict with named plaintiffs' in violation of F.R.C.P. 23(a)(4). ........................25

C. The settlement is unnecessary and incompatible with the purpose of class actions. .........30

III. The Court should perform additional review before approving a settlement with the above problems. ..................................................................................................................31

A. The Court should deny class certification and not approve a settlement which distributes the rights of orphan authors to a single party. ...................................................31

B. The Court should seek to allow any competitor to license under the same terms as Google. ........................................................................................................................32

1. Eliminate or alter the MFN clause. ...............................................................32

2. Allow competitors to obtain licenses to digitize books. .............................................32

C. The Court should consider input from relevant agencies. ..................................................33

CONCLUSION .................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ........................................ 8

*Amchem Products, Inc v. Windsor*, 521 U.S. 591 (1997) .................................................. 27, 29, 30

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ...................................... 7

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) ........................................... 15

*Buffalo Broad. Co., Inc. v. Am. Soc'y. of Composers, Authors and Publishers*, 744 F.2d 917 (2d Cir. 1984) ......................................................................................................... 14, 15

*Cent. States Southeast and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ................................................................ 26

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) .................................... 7

*Freedom Holdings, Inc. v. Spitzer*, 363 F.3d 149 (2d Cir. 2004) ................................................... 8

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) .............................. 23

*In re Joint Eastern and S. Dist. Asbestos Litig.*, 982 F.2d 721 (2d Cir. 1992) ............................. 29

*In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020 (2d Cir. 1992) ................................................................................................................................... 4

*In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001)...................... 28

*In re Worldcom, Inc. ERISA Litig.*, 339 F. Supp. 2d 561 (S.D.N.Y. 2004). .................................. 4

*RxCare of Tenn*, 121 FTC 762 (1996) ......................................................................................... 17

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ........................................ 2

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) .................................................................... 6

*TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456 (2d Cir. 1982) ............................... 22, 23, 24

*United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172 (D.R.I. 1996) ......................... 17

*United States v. Delta Dental Plan*, 1995-1 Trade Cas. (CCH) ¶ 71,048 (D. Ariz. 1995) ........... 16

*United States v. Delta Dental*, 1997-2 Trade Cas. (CCH) ¶ 71, 860 (D.R.I. 1997)...................... 17

*United States v. Lykes Bros. S.S. Co.*, 60 Fed. Reg. 52 (DOJ Oct. 5 1995)................................... 17

*United States v. Medical Mutual of Ohio*, 1999-1 Trade Cas. (CCH) ¶ 72,465 (N.D. Ohio 1999) ................................................................................................................................ 16

*United States v. Oregon Dental Serv.*, 1995-2 Trade Cas. (CCH) ¶ 71, 062 (N.D. Cal. 1995) ................................................................................................................................ 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................... 22, 24, 25

**Statutes**

15 U.S.C. § 1 ......................................................................................................................... 6

15 U.S.C. § 2 ......................................................................................................................... 7

F.R.C.P. 23(a)(4) ................................................................................................................ 26

**Other Authorities**

Amended Complaint, *Authors Guild et al. v. Google* (S.D.N.Y. Oct. 30, 2008) (No. 05-CV-8136) ......................................................................................................................... 21

Denise Troll Covey, *Comments of Carnegie Mellon University Libraries on Orphan Works* (Mar. 22, 2005) ....................................................................................................... 7

*Final Notice of Class Action Settlement, available at* http://www.googlebooksettlement.com/intl/en/Final-Notice-of-Class-Action-Settlement.pdf ....................................................................................................................... 21

H.R. Rep. No. 94-1476, at 65-66 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5679 ........................ 23

Jonathan M. Jacobson, *Antitrust Law and Developments* (6th ed. 2007) ...................................... 16

Michael B. Rutner, *The ASCAP Licensing Model and the Internet: A Potential Solution to High-Tech Copyright Infringement*, 39 B.C. L. Rev. 1061 (1998) ........................................... 15

Preliminary Settlement Approval, *Authors Guild et al. v. Google* (S.D.N.Y. Nov. 11, 2008) (No. 05-CV-8136) ....................................................................................................... 26

*Proposed Settlement* .......................................................................................................... passim

Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, John M. Olin L. & Econ. Working Paper No. 462 (2009), *available at* http://www.law.uchicago.edu/Lawecon/index.html ................................................................. 32

Second Amended Complaint, *Authors Guild et al. v. Google* (S.D.N.Y. Oct. 30, 2008) (No. 05-CV-8136) ............................................................................................................ 21, 23

Timothy Wu, *Copyright's Communications Policy*, 103 Mich. L. Rev. 278 (2004) .................... 15

Tom Krazit, *Google Pushes for New Law on Orphan Books*, Cnet (July 31, 2009), *at*
http://news.cnet.com/8301-1023_3-10300887-93.html ............................................................. 32

U.S. Copyright Office, *Report on Orphan Works*, *available at*
http://www.copyright.gov/orphan/orphan-report-full.pdf .......................................................... 5

## INTEREST OF *AMICUS CURIAE*

Public Knowledge is a non-profit public interest organization devoted to preserving the free flow of information in the digital age. Through day-to-day policy advocacy, public education, and legal action, Public Knowledge works for a balanced copyright regime that promotes creativity, innovation, competition, and civic discourse, and limits corporate control over the flow of knowledge. Such a regime should ensure that the rights of the artist are protected while providing both artists and users with the most open, competitive artistic marketplace possible.

Among the many copyright issues important to Public Knowledge is the fate of orphan works—works whose copyright holders are unknown or who cannot be found. In such a situation, the work becomes inaccessible for reprinting, adaptation, or other future uses, since the owner is not present to negotiate or grant a license. Despite the owner's absence, potential republishers, adapters, or other users of a work will often decide to let such works lay dormant because of the potential for extensive statutory damages should an owner appear at a later date. Public Knowledge has been involved for years in seeking legislative solutions to this problem, with the goal of enabling broader public access to and use of these works while seeking to find ways for users of orphan works to find their owners.

Google Book Search is an invaluable tool for making knowledge and creative works available to the general public. This service makes it possible for the researchers, readers, and anyone else who is interested to find books on nearly any topic, many of which would have lain dormant in the back of a university library or been otherwise undiscovered by all but the most diligent and resource-endowed researcher. Public Knowledge believes that the uses Google has

1

made in creating and offering Google Book Search – specifically, the scanning, indexing, and displaying of short excerpts of books – are already lawful, and require no licenses or permission.

While public access to orphan works is a goal towards which *amicus* and the parties all strive, it is necessary that this access be open to all comers on a level playing field. Access through one rights organization governed by non-representative authors and publishers and a single distributor is not truly access at all, and such a solution ultimately benefits neither artists nor the public. Further, because a solution to the problem of orphan works will require changes to the operation of copyright law, those changes must be made by the legislature through a public process involving all stakeholders rather than through a judicial process where both parties stand to gain from licensing the rights of absentees.

The precarious balance of interests involved in debates around orphan works also make it essential that any orphan works solution have a legal basis and integrity that cannot be impugned. Public Knowledge therefore submits this brief in the hope that any settlement will not prejudice a fair and effective solution to the problem of access to orphan works.

## INTRODUCTION

Copyright law seeks to strike a balance between the rights of the creators and the rights of users of copyrighted works. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431-32 (1984) (*quoting Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)). The current balance struck by the law likely does not permit commercial entities to digitally display the full text of in-copyright books to the general public without the permission of the rightsholder, even if he or she cannot be found or is unaware of his or her rights. The proposed settlement would constitute an extraordinary shift in this balance for both orphan and non-orphan

2

books.[1] Should the settlement be approved, books that currently cannot be safely republished or digitally distributed without first acquiring the owner's permission would be made available to both institutions and individual users.

While such a result may benefit the public interest by increasing available access to knowledge, this access will be provided only through a single bottleneck comprising the proposed Book Rights Registry ("BRR") and Google. In essence, the default rules of copyright will be rewritten without the input or consent of Congress, and only for Google and the BRR. The law does not support such an outcome: the mechanism by which the parties currently hope to license the ability to display digitized books exceeds the limits of class action procedure and produces anticompetitive limitations on access to orphan works.

The proposed agreement risks stretching class action procedure too far in its attempt to achieve in a settlement what is impossible in private contract. The settlement's use of class action procedure leads to detrimental, anticompetitive limitations on the availability of orphan works. The sought-after access to orphan works would be provided to the public by only one party, with legal barriers erected against any others attempting to provide access to the public on different terms. Further, the provisional class purports to include members who are defined by their absence and logically defy representation, and the proposed settlement seeks to release liability for future acts not contemplated in the activities leading up to the complaint.

Public Knowledge respectfully requests that the Court not approve the settlement unless its flaws in antitrust effects, class representation, and scope of release can be remedied.

---

[1] We note that the settlement itself does not specifically reference "orphan works," but divides works only into "claimed" and "unclaimed" categories. Because it is effectively impossible to individually distinguish between rightsholders who are unidentifiable or nonexistent and those who have simply chosen not to participate, the proposed settlement is poised to alter the default rules of copyright for the owners of unclaimed worked as well as true orphans. The arguments presented therefore apply with nearly equal force to those rightsholders.

3

## I. The settlement as drafted creates antitrust and competition problems in violation of the law and sound policy.

This Court should carefully consider the proposed settlement's effects on competition. In approving a settlement, a court must account for the interests of third parties when the settlement will affect their rights. *In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1025-26 (2d Cir. 1992) ("[w]here the rights of third parties are affected, . . . their interests too must be considered" during the court's evaluation of "the fairness, reasonableness and adequacy of the settlement[.]"); *quoted in In re Worldcom, Inc. ERISA Litig.*, 339 F. Supp. 2d 561, 567 (S.D.N.Y. 2004). In addition the litigants' interests, the interests of potential competitors, the public at large, and other third parties will be affected by this proposed settlement. If the proposed settlement goes forward, Google will in many cases receive preferential, if not sole, access to licenses for the books of both known and orphan authors, with potentially harmful effects on consumers and competitors. These effects may lead to violations of the Sherman Antitrust Act, requiring the Court to reject the settlement as proposed. *See, e.g., Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) ("a court cannot lend its approval to any contract or agreement that violates the antitrust laws."); *In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305, 319 (D. Md. 1979) ("no court may lend its approval to an illegal agreement or to one which has an illegal effect."). However, the Court's analysis of competitive effects does not start or end with the letter of that law. The Court's obligations are not merely to prevent explicitly illegal acts in the settlement of a lawsuit, but also to protect the public interest from other harms.

4

*A. Google will become the sole party able to license orphan books.*

Orphan works simply cannot be licensed due to the absence of their copyright owners. In this settlement, however, Google proposes to incorporate all registered orphan books into its licensing scheme absent any ability of the absent authors to say otherwise.

As a sub-class of the proposed plaintiff class, orphan rightsholders occupy a distinct legal position. Although some works may become "un-orphaned" as rightsholders emerge, works are not considered orphaned just because their rightsholders fail to find out about their usage, nor simply because rightsholders lack a meager financial incentive to identify themselves. Instead, many rightsholders are unfindable because they *do not know* that they are the proper holders of the rights. There are a number of reasons that a work might be orphaned: a deceased author's beneficiaries may not have been properly notified that they had an ownership interest in a work, or even be aware that a deceased author had created a work; the copyright owner may not have updated the registration; transfer of ownership may not have been properly recorded; or the author may have died without heirs, reverting the copyright to the state. *See* U.S. Copyright Office, *Report on Orphan Works* 21-29, *available at* http://www.copyright.gov/orphan/orphan-report-full.pdf.

Nor will the BRR or active rightsholders have much of an incentive to alter this state of affairs. Since unclaimed funds for orphan works will, after a time, be distributed among registered rightsholders or used to pay BRR expenses, neither the BRR nor the registered rightsholders will have a financial incentive to encourage orphans to emerge. *See Proposed Settlement* § 6.3(a).

This selective licensing of the orphan authors' rights goes far beyond the standard power of a class action suit to waive the claims of non-present parties. As discussed below, orphan rightsholders are not adequately represented by class counsel or named plaintiffs, and the claims

5

that absent rightsholders might have against Google for scanning works stem from a different factual predicate than any claims they might have for Google making their works available online. While courts reviewing class action suits and settlements may make certain determinations regarding parties not before the court, the procedural requirements and safeguards surrounding the process prevent the court from usurping the powers of the legislature. Yet the proposed settlement shifts significant issues of copyright policy from the legislative process into this particular lawsuit, deciding that a smaller set of exclusive rights will be granted to the authors of certain books unless they take affirmative action. Those who do not so act (or who cannot act) are compelled to grant a license for the use of their works.

One of the consequences of this is that the landscape of copyright changes, but only for Google and for the BRR. This results in a market for orphan works that becomes the sole province of these two entities. Anyone wishing to enter that market would have to risk extensive copyright liability of a sort no one – including the defendant – ever has. The competitive issues surrounding the parties' ability to use orphan works must therefore be examined closely.

      1. Google's acquisition of a monopoly on orphan works violates Sections 1 and 2 of the Sherman Antitrust Act

The settlement agreement constitutes a contract that grants Google the sole right to license orphan (and otherwise unclaimed) works. This agreement thus operates alongside copyright law to restrain trade and maintain Google's monopoly position unfairly, in violation of Sections 1 and 2 of the Sherman Act, respectively.

Section 1 of the Sherman Act prohibits "every contract, combination...or conspiracy in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. This requires both the existence of a contract, combination, or conspiracy, and a resulting restraint of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 59-60 (1911).

6

Section 2 prohibits monopolization and any attempts to monopolize. 15 U.S.C. § 2. Violations of Section 2 require a finding of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 480 (1992) (*quoting United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966)). While Section 2 thus allows for monopolies to exist, exclusionary behavior on the part of the monopolist is prohibited. Exclusionary behavior has been defined as "behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (*quoting* 3 P. Areeda & D. Turner, Antitrust Law 78 (1978)).

Since no party other than Google can license the use of orphan works, Google will have an absolute monopoly on selling access to these works. The agreement prevents Google from licensing to others the use of any of the scanned works (*Proposed Settlement* § 2.2), and unless the agreement allows the BRR to license orphan works to other parties, this means no other entity has the legal ability to display or distribute orphan works. While the number of orphan books at stake may be debated,[2] it remains true that for every single work orphaned, Google becomes the only permitted user, insulated from potentially massive copyright liability.

Therefore, the settlement agreement that places Google in its monopoly position violates Section 1 of the Sherman Act by serving as a contract, combination, or conspiracy in restraint of

---

[2] A study by Carnegie Mellon, based upon a random, statistically significant sample of books in its collection, found that 22% of the time, the publishers of a book could not be located. Of the books whose publishers could be identified, 36% did not respond to letters of inquiry. This suggests that up to 50% of books may have rightsholders who would not come forward. Denise Troll Covey, *Comments of Carnegie Mellon University Libraries on Orphan Works* (Mar. 22, 2005), *available at* http://www.copyright.gov/orphan/comments/OW0537-CarnegieMellon.pdf.

7

trade. Through its agreement with the plaintiff class, Google is able to circumvent a legal restraint that applies to all other potential licensees. These other licensees, by abiding by the copyright laws, will be laboring under the need to locate potentially unlocatable orphan rightsholders before licensing their works, and will therefore be restrained from even entering the market.[3]

Through this same sidestepping of legal barriers, the settlement agreement allows Google to monopolize illegally in violation of Section 2 of the Sherman Act. Through the settlement, Google's monopoly over orphan works becomes an insurmountable one, maintaining monopoly by means not attributable to competition in the marketplace. If Google is allowed this ability to license orphan works, the only way for a competitor to enter the market would be to (1) get sued by a class of authors broad enough to include orphan authors, and (2) come to a settlement agreement with that class to allow the provision of orphan works to the public. Each of these situations depends upon a set of circumstances so unlikely to occur as to be nearly impossible.

First of all, there are already substantial doubts as to whether a class of plaintiffs suing a hypothetical Google competitor can actually be approved if it is drawn so inclusively as to include orphan authors. As noted above, such a broad class will likely fail to be adequately represented by class counsel. As for a settlement agreement that parallels the present one, plaintiffs would be unlikely to accede to an agreement that would give them no additional advantages. A new licensing scheme with this hypothetical defendant would not be allowed to contain better terms than the agreement with Google, given the proposed settlement's "Most

---

[3] The *Noerr-Pennington* doctrine, which immunizes from antitrust action efforts to restrain trade through lobbying the government, does not immunize all uses of the law to restrain trade or monopolize. If the restraint results directly from private action, there is no immunity. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988). Statutes themselves have been held in the Second Circuit to be in furtherance of anticompetitive behavior. *See Freedom Holdings, Inc. v. Spitzer*, 363 F.3d 149 (2d Cir. 2004). In this case, the restraint of trade occurs through the private action of the settlement agreement, which allows existing law to restrain others from competing with the parties.

8

Favored Nation" ("MFN") clause. With Google already providing a market for digital provision of books and little advantage to be gained by having an additional licensee, the plaintiff class, if it ever formed, would likely seek a remedy that would look substantially different from this settlement, and one that may well not include a licensing provision. If indeed such a provision were the aim of the hypothetical defendant, plaintiffs would also have every incentive to advantage themselves in other provisions of the settlement, such as monetary compensation. This likelihood would raise the cost and risk of an already risky strategy for the defendant. All of these factors together make it fanciful to suggest that competitors might enter the market through engineering class action litigation.

Even if the plaintiff class and the hypothetical defendant were to come to an agreement that mirrored the present proposed settlement, such an outcome, unreachable via the remedies available in copyright law and already demonstrated by this litigation, would suggest improper collusion between the parties. As here, the future defendant would receive the right to scan and display orphan works, a right unavailable to it through the normal process of private contracting, while the named plaintiffs would be reaping the benefits of waiving someone else's rights for them. But unlike here, both parties would already be aware of how class action law had been used to strike this otherwise impossible bargain. This Court should be wary of creating a market that can only be entered through mass litigation.

Though Google will be able to offer a new product in a market heretofore unavailable, this situation differs significantly from the monopoly created by the inventor of a new business method or the holder of an enforceable patent or copyright. Here, the barrier to competitors was neither legislatively ordained (as with intellectual property rightsholders), nor the result of historical happenstance (as with monopolists who are business innovators). Instead, competitors

9

are kept from this market through the operation of copyright law and an overextension of the factual predicate for the proposed releases. Unlike new markets created through innovation and invention, the market in orphan works will suffer from the lack of experimentation and negotiation that accompany the development of new markets. Unlike a monopoly created through the grant of a specific patent or copyright, there will be no bidding for licenses for further use, nor the ability to invent around the monopoly grant. Not only does the settlement attempt to use this Court to create a new market, it asks the Court to now designate that market's structure and operation, naming the parties as the dominant players. Absent an approval of a deal like the one proposed by the settlement, the market would be an illegal one.

By permitting Google to enter a market legally barred to all other competitors, the proposed settlement would restrain trade and allow Google to monopolize the market in orphan books. This Court should not only prohibit the parties from engaging in anticompetitive behavior, it should refrain from acting as the means by which a monopoly is created and maintained.

2. The Book Rights Registry should be subject to antitrust scrutiny.

Google is not the only entity that will amass market power via the proposed settlement; the BRR itself also poses a significant antitrust concern. Just as Google becomes the sole licensee of orphan books, the BRR, created as a means by which to carry out the will of the plaintiffs into the future, will become the assumed representative of the missing authors. While active individual rightsholders can dilute the market power of the BRR by arranging side licenses with distributors and digitizers, orphan works – whose rightsholders are not available to make such alternative licensing agreements – will be licensable only by the BRR. This not only raises many of the same antitrust questions as Google's orphan works monopoly, it also leaves the BRR near complete freedom to engage in price-fixing. Indeed, as prices are by default set by the

10

settlement agreement, subject to alteration by individual copyright holders, where those copyright holders are unable to make any decision, the prices will default to those specified in the system agreed upon between Google and the BRR. *See Proposed Settlement* § 4.2(b)(i).

The status of orphan works is central to the proper outcome of this litigation. Absent any alteration to the settlement agreement, the result is the creation and maintenance of a new monopoly in orphan works, enforced in part by this Court and in part by copyright law.

*B. The settlement also violates the Sherman Act with regard to non-orphan works.*

The antitrust implications of the settlement agreement are not restricted to orphan works; the agreement, as it stands, also has powerful market effects on the availability of non-orphan works, whether they are unclaimed or claimed.

        1. The opt-out nature of the license unfairly advantages Google in licensing the works of known authors

The anticompetitive facets of the settlement agreement are not limited to orphan works. As noted above, the proposed settlement is structured so as to convert the class action opt-out procedure into a quasi-statutory licensing scheme. This legal alchemy would place the BRR in a singular position of retaining, by default, the digital licensing rights to all in-copyright registered U.S. books published before January 2009 – even works for which direct licensing is not a practical or possible option. *See Proposed Settlement* § 1.16. Beyond the difficulties that this creates for orphan works, the settlement's peculiarities also give Google an outsized market advantage in licenses for works with known rightsholders.

It should first be noted that the market for these works *will* be marginally more competitive than that for orphan works. Authors of known works may choose their level of participation in the settlement and in the ensuing licensing program. Furthermore, the license

11

granted by the authors to Google will be non-exclusive, allowing authors to license their works to other electronic distributors, or even to alternative licensing pools competing with the BRR.

However, the license to Google possesses an overwhelming advantage over any other agreement that an author might attempt to enter into. Since all class members are assumed to be included in the settlement, only those who actively decide to opt out will be absent from the pool of licenses available to Google. Any other licensee, who did not have the benefit of the class action structure, would need the active approval of each author it wished to include in its pool of licenses. Put another way, because individual licensing is far harder than licensing through the BRR, only the defendant will have effective access to *all* unclaimed works, even those that are not truly orphaned.

The same would be true if the BRR itself, acting on behalf of rightsholders, were to attempt to license works to any other entity. While the proposed settlement contemplates the BRR potentially acting as a rights clearinghouse for other parties (see *Proposed Settlement* § 6.2(b)(iii)), it is doubtful that the BRR would be authorized to represent all class members in negotiations with entities not party to this litigation.

This discrepancy in the pool of licenses available to Google, versus others, creates a considerable, artificial market advantage. Even among the smaller set of rightsholders who exist, know their rights, and have been informed of the settlement, it is highly likely that far more rightsholders will passively choose not to opt out of this arrangement with Google than would actively opt into an agreement with any other party. These rightsholders would then have, through inaction, granted an ongoing, essentially exclusive license to Google. The proposed settlement would thus give Google a sizeable lead in the novel market for the collective licensing and display of digitized books.

12

This market is so novel as to be created by the parties' very actions in this litigation.[4]
Google's proposed offering differs in significant part from the existing market in digital books.
Whereas current digital book outlets such as Amazon's Kindle store, Barnes & Noble's eBook
store, and Google's own current Book Search product must build their offerings by obtaining
rights from each author to be included in their collections, Google's use of the opt-out class
action mechanism means the majority of existing U.S. books will automatically be on offer. The
nature of this arrangement makes Google not just quantitatively different from any potential
competitors in the number of books available, but qualitatively different. Access to an entire
body of digital books is valuable beyond the value of the individual books combined, provided
that the catalog is large enough. The settlement thus creates a new sort of service—not merely
access to discrete texts, but access to a whole body of copyrighted literature. It makes Google a
"one-stop shop" for those who wish to find or purchase books, because no other vendor can ever
approach the level of coverage that Google will possess.

This makes Google the most powerful, if not the sole, licensee of this corpus and the sole
purveyor of the corpus to individuals and institutions alike. The settlement agreement could thus
run afoul of Section 2 of the Sherman Act, as Google will be exercising monopoly power in this
new market and maintaining that power through means other than standard competition. Those
means include the judicially-approved settlement agreement itself. The irony of this is that the
mechanism of the class action is invoked precisely because of the difficulty of assembling groups
of rightsholders to grant blanket licenses. The same difficulty used to justify the process that
creates this new market will serve to exclude competitors.

---

[4] The fact that this settlement agreement goes so far as to create entirely new types of markets should serve as some
indication that the process of class action settlement is performing functions for which it was not designed. See Part
II, *infra.*

13

As with its effects on orphan works, the agreement leverages the class action opt-out structure to act as a barrier to entry for other potential licensees that does not result from the characteristics of the product, acumen in pursuing market competition, or historical accident. Instead, the restriction against competitors results from a mischaracterization of the factual predicate of this litigation. Should the BRR be precluded from licensing to others the works of class members to all interested parties on the same terms as it licenses them to Google, Google will have successfully used this proceeding to maintain its monopoly position in violation of Section 2.

These same features of the settlement are problematic under Section 1 of the Sherman Act as well. The settlement agreement as a whole can also be characterized as a contract, combination, or conspiracy between Google and the collective plaintiff class that operates in restraint of trade. Though a mere refusal to license to others may be permissible under Section 1, *see Buffalo Broad. Co., Inc. v. Am. Soc'y. of Composers, Authors and Publishers*, 744 F.2d 917 (2d Cir. 1984), the present situation involves more than an agreement that simply fails to include competitors. Here, the restraint of trade results from a combination of (1) the advantage granted by the opt-out structure and (2) the copyright laws that simply and logically forbid potential competitors from assuming that authors have agreed to license to them absent affirmative consent. The same advantage manufactured by the use of the class action to maintain monopoly status is thus also used to restrain trade.

> 2. The Book Rights Registry should be scrutinized for antitrust violations for claimed works as well.

As the future representative of the named plaintiff's interests, the BRR represents a horizontal combination of rightsholders who, separately, might well compete with each other in pricing licenses for the right to digitize and display their works. "[A]greements among

14

competitors to fix prices on their individual goods or services are among those concerted activities that the Court has held to be within the *per se* [illegal] category." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979). Instead of an open market between individual authors and potential digitizers, there is instead the BRR, a combination of collective licensing body and collecting society, much in the way that the American Society of Composers, Authors, and Publishers ("ASCAP") or Broadcast Music, Inc. ("BMI") negotiate licenses and collect revenues for the creators of musical works. While those organizations currently operate legally, this Court is no doubt aware that their operation has for the past several decades been contingent upon constant scrutiny. Given the history of antitrust scrutiny leveled at musical collecting societies, it is only natural that the BRR be examined, at the least under the rule of reason. *See Id.* at 24.[5] This Court's inquiry into the BRR's effects should also be more searching due to the fact that unlike the performance rights societies, the BRR would be specifically created under the auspices of this Court, and not merely examined for legality under the antitrust statutes.

As a combination of book copyright holders, the BRR must be carefully scrutinized to ensure that it does not act to restrain trade in licenses to digitize books. As with orphan works, the BRR is the collective body that will be negotiating the prices set for non-orphan works that are bundled into institutional subscriptions. *See Proposed Settlement* § 4.1. Known authors will have little ability, except through representation in the BRR, to determine what prices are set for the subscription licenses. As noted above, the market for Google subscription service is so

---

[5] The licensing scheme to be employed by the BRR can be compared to that used by the performance rights societies in that just like ASCAP and BMI, the BRR would offer licenses to a vast repertory of works. It is important to recognize that this comparison overlooks one crucial difference: unlike the BRR, ASCAP and BMI do not offer licenses for works whose copyright owners are not their members, and membership is entirely opt-in. See Michael B. Rutner, *The ASCAP Licensing Model and the Internet: A Potential Solution to High-Tech Copyright Infringement*, 39 B.C. L. Rev. 1061, 1074-1081 (1998); Timothy Wu, *Copyright's Communications Policy*, 103 Mich. L. Rev. 278 (2004)).

15

differentiated from the sale and licensing of individual books that authors' abilities to conduct side negotiations will have little to no effect on the BRR's price-setting ability.

The problems with the settlement agreement that give rise to monopoly power in orphan works thus also affect the market for works whose authors are known. The anticompetitive effects on the market for these works should also be carefully scrutinized.

> 3. The Most Favored Nation clause implicates sections 1 and 2 of the Sherman Antitrust Act.

In addition to the inherent market advantages granted to Google and the BRR by the structure of the settlement agreement, section 3.8(a) of the *Proposed Settlement* imposes a "most favored nation" clause.[6] This clause would prevent the BRR (or any other book licensing body) from offering a Google competitor a lower licensing fee. While an innovative product will naturally allow a business to be a legal monopoly, the MFN clause acts as a contract to unfairly restrain trade, and attempt to maintain monopoly status by foreclosing competition.

> *i.  The MFN clause acts as a contract to restrain trade.*

The MFN clause in the proposed agreement easily acts as a restraint of trade in violation of Section 1 of the Sherman Act. MFN clauses have come under increasing antitrust enforcement scrutiny, due to their potential for suppressing competition. *See* Jonathan M. Jacobson, *Antitrust Law and Developments* 148 (6th ed. 2007). Antitrust enforcement authorities have, in several cases, used consent decrees to bar the use or enforcement of MFN clauses. *See, e.g.*, *United States v. Delta Dental Plan*, 1995-1 Trade Cas. (CCH) ¶ 71,048 (D. Ariz. 1995); *United States v. Medical Mutual of Ohio*, 1999-1 Trade Cas. (CCH) ¶ 72,465 (N.D. Ohio 1999); *United States v.*

---

[6] Section 3.8(a) states, in relevant part:

The Registry (and any substantially similar entity organized by Rightsholders...) will extend economic and other terms to Google that, when taken as a whole, do not disfavor or disadvantage Google as compared to any other substantially similar authorizations granted to third parties by the Registry (or any substantially similar entity organized by Rightsholders...) when such authorizations (i) are made within ten (10) years of the Effective Date and (ii) include rights granted from a significant portion of Rightsholders other than Registered Rightsholders.....

16

*Delta Dental*, 1997-2 Trade Cas. (CCH) ¶ 71, 860 (D.R.I. 1997); *United States v. Oregon Dental Serv.*, 1995-2 Trade Cas. (CCH) ¶ 71, 062 (N.D. Cal. 1995); *United States v. Lykes Bros. S.S. Co.*, 60 Fed. Reg. 52, 208 (DOJ Oct. 5 1995); *RxCare of Tenn*, 121 FTC 762 (1996). Federal courts have also upheld the notion that MFN clauses may be anticompetitive. In *United States v. Delta Dental of Rhode Island*, a district court agreed with the Department of Justice that it is possible for an MFN clause to trigger a violation of Section 1. 943 F. Supp. 172, 174-5 (D.R.I. 1996). In that case, the government characterized an MFN clause in a contract between an insurance company and its care providers as a "concerted action" in violation of the Sherman Act. *Id.* The clause also threatened a restraint of trade, as it aimed not to lower prices for an insurance firm's customers, but to exclude potential rivals. *Id.* at 177. The court held that that these characterizations could survive a motion to dismiss. *Id.*

In the settlement agreement, the concerted action between the BRR and Google serves to restrain trade by requiring any book licensing collective—even one arising as an alternative or a competitor to the BRR—to offer any later-arising licensees the same or a worse deal than Google's. Google may thus, for the ten years specified in the MFN, preserve its first mover advantage while removing a major incentive for the BRR to deal with alternative digital distributors.

It should also be noted that the MFN purports to apply not only to the BRR, but to "any substantially similar entity" organized by rightsholders. Not only does the settlement disadvantage potential licensees, it also forecloses an offer of competitive rates by any collective licensing bodies that might arise as alternatives to the BRR. Thus, any authors who fail to opt out of the settlement entirely—even those authors who do not register with the BRR and do not enter into the profit-sharing agreement—will be bound by this clause even if they create a separate

17

collective to compete with the BRR. In effect, the MFN makes such attempts at competition with the BRR futile, unless the competing registry is to consist entirely of the limited number of rightsholders who opt out of the whole settlement.

### ii. *The MFN clause serves as an attempt to foreclose competition.*

The MFN clause also acts as an attempt at monopolization in violation of Section 2 of the Sherman Act. Google's position as a monopoly power in the relevant market for mass digital access to books is clear.

The MFN clause maintains that power beyond what Google would be normally entitled to based on its innovation in creating its digital book products. The MFN clause artificially heightens existing barriers to entry into the market for digital access to books. It also reduces incentives for any other competitors to attempt to deal with the BRR or any similarly situated licensing collective, ensuring that consumers will have fewer choices for access to these works. MFN clauses are typically allowed when they can be seen as a pro-competitive means for lowering the costs passed on to consumers. Here, however, the absence of any existing competition makes the MFN clause function far more like an exclusionary measure than as a cost-reducing measure.

### iii. *The prerequisites for triggering the MFN clause do not save it from scrutiny.*

The MFN clause in the settlement agreement contains two conditions that must be met before its restrictions are triggered. However, their presence does not prevent the MFN clause from operating to restrain trade or exclude competition.

The first condition – that less than ten years have elapsed from the time of the Effective Date – merely allows the MFN provision to sunset after a lengthy period of time. Ten years is an

18

eternity in the context of online, digital access to information – over a third the lifetime of the commercially-available Internet.

The second condition requires the license to include a "significant" number of rightsholders who have not registered with the Registry. Although this limitation means that the MFN clause will only apply to certain competitors, its nature ensures that only those competitors who pose a more serious threat to Google's dominance—by offering books that are unavailable to Google—will be targeted by the MFN. Whether such an anticipated competing agreement contains a "substantial" number of non-Registered Rightsholders because it involves orphan works or Rightsholders who have decided for other reasons not to actively register with the BRR, the MFN clause's structure still operates to ensure that Google will retain an advantage not only among competing licensees, but that that advantage will extend to other licensors competing with the BRR.

## II. A class action settlement is the improper mechanism by which to determine the rights of orphan works authors with regard to a single user.

The very fact that this settlement, if approved, will create an entirely new market, resolve the rights of parties not present, allocate payment for those rights to the present parties, and license uses which where never contemplated prior to the suit should put the Court on alert that this is not a traditional class action settlement. The proposed settlement stands poised to effectively alter the rights of authors – especially those rightsholders of orphan works – indefinitely. As described above, the result will be a legal regime in which only one party can lawfully offer a large library of books to the public. It accomplishes this through two legally impermissible class action mechanisms. First, even though to date Google has engaged only in the non-infringing scanning, indexing, and excerpting of books, the proposed settlement purports to release it from liability for the entirely new activities of full-text display and sale of those

19

books. Second, the provisional class includes many orphan rightsholders who are not only poorly represented by the named plaintiffs, but have interests antagonistic to those professing to represent them.

The antitrust problems described above illustrate exactly why class action law does not permit releases of this type. If the law were to allow a class, represented by only a few named plaintiffs, to go beyond redress of harms and license entirely new activities, then parties will have the incentive to use class actions as an easy mass licensing tool rather than a method for aggregating and redressing group harm. With this tool, named plaintiffs will be able to benefit from the mass licensing of others' rights without any actual pre-existing harm, proper notice, adequate representation, or consent of absent class members. Such suits will almost inevitably create monopolies because, as here, other parties will not be able to directly license rights from the entire class, and replicating a class action lawsuit as a defendant would be difficult or impossible. It is difficult to see where the limit of such a class action mechanism would lie.

The proper place both for changes to the defaults of copyright laws and the balancing of interests of parties who are unable to protect their own interests in court is the legislature, not class action law. The Court should therefore not approve a settlement that shifts the balance of copyright in favor of a lone party by mass licensing new uses of rights belonging to an inadequately represented subclass of artists to create a single point of access and distribution for their works.

*A. The proposed settlement exceeds the scope of a permissible class action release because it releases new, future activities which were not part of the underlying suit.*

Because the defendant has never sold or otherwise granted full-text access to books without first obtaining a license, a settlement that releases them for liability for these activities is impermissible under Second Circuit law.

20

1. Google has never engaged in the unlicensed sale of the full text of books, while the proposed settlement would license that use.

The proposed settlement licenses works – including unclaimed works – for institutional and individual sale, allowing Google to provide access to the entire text of those books. *See, e.g.*, *Proposed Settlement* § 3.3(a). The complaint, however, contemplates only the "public display of *portions* of such Books and Inserts on its commercial website." Second Amended Complaint at 14, *Authors Guild et al. v. Google* (S.D.N.Y. Oct. 30, 2008) (No. 05-CV-8136).[7] In fact, Google has never provided and does not currently provide the full text of works unless it has acquired a full display license, and nothing in the record indicates otherwise.

The final notice of proposed settlement provides further evidence of this disconnect between the scope of the claims and the scope of the settlement. The notice describes only "claims that Google violated the copyrights of authors, publishers and other owners of U.S. copyrights in books and other writings by digitizing (scanning) them, creating an electronic database of books, and *displaying short excerpts* without the copyright owners' permission." *Final Notice of Class Action Settlement, available at*

http://www.googlebooksettlement.com/intl/en/Final-Notice-of-Class-Action-Settlement.pdf (emphasis added). And while it lists a "benefit" of the settlement as a portion of the revenues from "sale of online access to Books uses" and says that rightsholders may "determine whether and to what extent Google may use their work," there is nothing in the notice to suggest that those uses will go far beyond the "short excerpts" underlying the suit. *See id.*[8]

---

[7] Notably, among the amendments made to Plaintiffs' complaint was the addition of the word "portions" to its description of Google's display of works on its website. *Cf.* Amended Complaint ¶ 25(e), *Authors Guild et al. v. Google* (S.D.N.Y. Oct. 30, 2008) (No. 05-CV-8136); Second Amended Complaint ¶ 41(e), *Authors Guild et al. v. Google* (S.D.N.Y. Oct. 30, 2008) (No. 05-CV-8136).

[8] We have not analyzed legally significance of the language in the notice, since when the underlying settlement is impermissible, the notice is irrelevant. However, the lack of clarity about the difference between the scope of the settlement and the scope of the claims suggests that notice may be inadequate.

21

The settlement thus proposes to release future claims against the defendant based on actions the defendant has never taken.

> 2. Class action law does not permit the release of behavior which was not a part of the underlying suit and which has never occurred.

Because the Second Circuit does not allow releases of claims for future activities which are not part of an 'identical factual predicate,' much less those that have never occurred at all, the Court cannot approve a settlement which authorizes these new activities on behalf of class members.

In the Second Circuit, for a class action release to include claims not presented, the conduct must "arise[] out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005). That court has "previously 'assumed that a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon *the very same set of facts.*'" *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (emphasis added) (citing *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 18 n.7 (2d Cir. 1981)). This condition is not met in the instant case; plaintiffs could not have brought a claim for the offering of full books based on the facts as they exist today. Such a claim was not and could not have been presented because it is not part of an "identical factual predicate" or "the very same set of facts," as indexing and display of excerpts, and therefore may not be released.

In *TBK Partners*, the court explained the reason a court might allow release of unpresented claims: "[I]n order to achieve a comprehensive settlement that would *prevent relitigation of settled questions at the core of a class action*, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class

22

action even though the claim was not presented and might not have been presentable in the class action." *TBK Partners* 460 (emphasis added). Were the instant case to be litigated to completion, a later case involving claims for the full text display of books would raise no settled questions. There is no question raised by the current case regarding the full-text display of books. The record points only to legal claims about scanning and short excerpts of books. Even in listing questions common to the class, the amended complaint raises no questions about whether Google had engaged in the display or sale of the full text of books or whether such activities constitute copyright infringement. *See* Second Amended Complaint at 13-14, *Authors Guild et al. v. Google* (S.D.N.Y. Oct. 30, 2008) (No. 05-CV-8136).

Were this suit to be pursued to completion, the only questions settled would be whether defendant's previous activities of scanning, indexing, and displaying "short excerpts" were infringing. A later suit alleging infringement for full display as well as consumer and institutional sale of online book access would raise wholly different legal questions and a determination of legality would have to be based on specific factual circumstances – circumstances which could not have been litigated in this action because they have not occurred. *See, e.g., Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) (explaining that in copyright litigation, "fair use analysis must always be tailored to the individual case"); H.R. Rep. No. 94-1476, at 65-66 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5679 ("the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. . . . the courts must be free to adapt the doctrine to particular situations on a case-by-case basis").

When the Second Circuit has approved settlements releasing additional claims, they have been based on events which had already occurred, and would have merely have provided

23

alternate venues or formulations of the claims. For instance, in *Wal-Mart*, the additional claims released were alternate legal theories based on the same set of exclusionary rules which credit card companies had been sued for using. *Wal-Mart* 107-08. Similarly, in *TBK Partners*, the court allowed the release of state court claims in a federal suit because those claims "hinge[d] on the identical operative factual predicate: the correct valuation of whatever reversionary interest was owed to . . . shareholders." *TBK Partners* 460.

Neither example approaches the factual disparity present here, as both were based on different ways of litigating the same, pre-existing facts. Offering the full text of a book is a different activity and would provide a wholly different set of facts than scanning, indexing, or presenting short "snippets" of books. Allowing purchase of full access to those books, either individually by consumers or in bulk by institutions is even farther from the events which have actually occurred. None of these proposed uses are part of the "identical factual predicate" as the existing uses.

The instant case also fails tests announced in other circuits but cited for support by the Second Circuit. *See, e.g.*, *Wal-Mart* 460 n.13 ("The Fifth Circuit has noted, 'The weight of authority establishes that . . . a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or *in connection with any matter or fact set forth or referred to in the complaint*.'") (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. Apr.1981) (emphasis added)). And as discussed above, none of the potential facts including sale and display of full works were "set forth or referred to in the complaint." This Court therefore may not release those additional claims here, licensing future uses of orphan works which were never described in the complaint or executed in fact.

3. If the Court concludes that the released claims share the same factual predicate, it should require the release of other potential defendants.

It is worth noting that if the Court concludes that the release and the complaint do share the same factual predicate, then the Court may also be able to approve a settlement which releases non-parties from liability. *See Wal-Mart* 109 (approving the release of "claims against non-parties where . . . the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled" when released non-parties were corporate members of defendants' organization and contributed to the settlement.).

Allowing other providers to license orphan and unclaimed works under the same or similar terms as the defendant will result in broader access to books and the reduction of the concerns surrounding a single party being the only legally protected source for those books. Such an outcome, while still problematic, would be far better for the public good and the goals of competitive, open access to creative works and protection of orphan authors from the will of a single distributor, and would prove less troubling than the settlement as it stands today. Therefore, if the Court finds that offering the full text of books falls within the same factual predicate as scanning, indexing, and excerpts, it should only approve a settlement which releases other potential users of plaintiffs' books from liability under the same or similar or similar terms.

*B. The provisional plaintiff class can not be certified because orphan authors' interests conflict with named plaintiffs' in violation of F.R.C.P. 23(a)(4).*

The rights of orphan authors are not well-protected when the named plaintiffs, plaintiff organizations, and defendant all stand to directly and continually benefit from the licensing of rights belonging to others.

Because the provisional class contains a significant subset of "orphan rightsholder" members who have interests antagonistic to those of the named plaintiffs, the class does not meet

25

the statutory requirements of F.R.C.P. 23(a)(4). Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class" before a class may be certified. The Second Circuit has "provisionally certified for settlement purposes only" a class comprising "All Persons that, as of January 5, 2009, have a Copyright Interest in one or more Books or Inserts." Order Granting Preliminary Settlement Approval at 2, *Authors Guild et al. v. Google* (S.D.N.Y. Nov. 11, 2008) (No. 05-CV-8136).

As described above, this class contains an unknown, but significant number of "orphan rightsholders" – owners of copyright interests who are unidentified and potentially unidentifiable. Named plaintiffs, on the other hand, comprise several individual, non-orphan authors, as well as membership organizations covering a very small fraction of book rightsholders. These named plaintiffs stand to continually financially benefit from licensing of the rights belonging to owners of orphans and unclaimed works. Because there is a large subclass with fundamentally different interests from the named plaintiffs and because the presence of these class members undermines the typicality and commonality requirements for a class certification, a class containing orphan rightsholders should not be certified.

To ensure adequate representation under F.R.C.P. 23(a)(4), "a district court must determine whether plaintiff's interests are antagonistic to the interest of other members of the class." *Cent. States Southeast and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (internal quotation omitted). Here, orphan rightsholders have interests directly opposed to those of named plaintiffs, who have updated their registrations, are represented by the Authors Guild or the Association of American Publishers, are actively licensing and exploiting their works, or have claimed their works directly, especially in light of the revenue structure dictated by the proposed settlement.

26

In the proposed settlement, rightsholders who register with the BRR ("registered rightsholders") will receive both a portion of the revenues from subscriptions (which include access to unclaimed works) and a portion of the revenues directly attributable to both sale of and the advertising placed around them. *See* Proposed Settlement § 6.3(a). Thus, registered rightsholders and named plaintiffs will financially benefit if the orphan works remain orphaned, and if the class members who are orphan rightsholders are not found and do not claim their works, either before or after the settlement is approved. And unlike most class actions, where compensation is either shared at the time of settlement or dispersed from a fund for later-discovered harms, this fund contains a continuing incentive for current beneficiaries to reduce the compensation to later ones. Because those who register with the BRR will continue to receive payments for use of unclaimed works, they will benefit indefinitely from those books remaining unclaimed. Orphan authors, however, are in the opposite situation, and will receive no benefit at all unless they are located and given the chance to exercise their rights and claim compensation.

A unitary class such as this one, with conflicting subclasses, is therefore improper. For example, in *Amchem Products v. Windsor*, the Supreme Court analyzed a proposed settlement for asbestos exposure to determine, *inter alia*, whether class members who are already injured had sufficiently overlapping interests with those who were merely exposed to meet the requirements of Rule 24(a)(4). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626-28 (1997). The Court concluded that because there were "discrete subclasses" with conflicting interests, a settlement could not be approved without separate subclasses with corresponding representatives. *Id.* 627. Because "for the currently injured, the critical goal [was] generous immediate payments" while "the interest of exposure-only plaintiffs [was] ensuring an ample, inflation-protected fund for the future," a unitary class was improper. *Id.* 627.

27

The conflict of interest present in the instant case is even more direct. In *Amchem*, as in most class actions, both the immediate payment and the fund could be evaluated at the time of settlement. Those already injured would receive payment immediately, and would not have future incentives to reduce the fund's size. Those governing the fund would not receive any benefit if those who later discovered harms stepped forward to claim their share. Here, the opposite is true. Although the proposed settlement proposes that the BRR "will attempt to locate Rightsholders with respect to Books and Inserts," *Proposed Settlement* § 6.1(c), the author and publisher rightsholders who govern the BRR (*see Proposed Settlement* § 6.2(b)) will have a continuing, perpetual, and opposite incentive *not* to find orphan rightsholders who would then claim a portion of the fund.

Cases where the Second Circuit has found adequate representation when two different subclasses are inapposite. For instance, in *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001) (superseded by statute on other grounds), the court found that where methods of calculating damages would result in differing recovery amounts for plaintiff class members, interests were not sufficiently antagonistic to deny certification. Here, however, the conflict of interest goes far beyond an initial allocation of money, and is neither "speculative" nor "hypothetical," but fundamental to the treatment of the orphan rightsholder subclass. *Cf. id.* 145.

Orphan rightsholders' conflicting interests go far beyond purely monetary concerns. Named plaintiffs and other rightsholders who are actively engaged in the licensing and sale of their works gain benefits and abilities under the settlement that orphan rightsholders effectively do not. Long after the chance to opt out of the settlement has passed, named plaintiffs will be able, through the BRR, to control the price, terms of use, and even availability of their works.

28

Owners of orphan works, by definition, cannot do any of these things. This means that orphan works will continue to be made available perpetually under default terms while those defaults are determined by those who can rest safe in the knowledge that they may change them in the future. In essence, the fate of orphan works and the rights of their owners will be permanently at the mercy of the large publishers, Authors Guild members, and the lone distributor who govern the BRR.

This conflict of interest is problematic for other class certification requirements, as well. "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Products* 626 n.20 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

For the reasons given above, rights of orphan authors are neither fairly nor adequately represented by named plaintiffs who are able to later control the use of their works, restrict the use of their works, and financially benefit from the absence of those orphan rightsholders. As the Second Circuit has observed, even if class representatives believe "that the Settlement serves the aggregate interests of the entire class, [] the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consent given by those who understand that their role is to represent solely the members of their respective subgroups." *In re Joint Eastern and S. Dist. Asbestos Litig.*, 982 F.2d 721, 743 (2d Cir. 1992). Therefore, a singular class with the named representatives, whose interests are antagonistic to orphan rightsholders, should not be certified for this proposed settlement.

29

*C. The settlement is unnecessary and incompatible with the purpose of class actions.*

The proposed release of new, unrelated claims runs afoul of the basic purpose of class action law: to aggregate individual claims for past harms. Neither registered nor unregistered rightsholders need this class action settlement to collectively redress past copyright harms, because to date no such harms have occurred. Nor is a class action necessary to enable the future, licensed full-text use of the works of those rightsholders who have made themselves available. Even in the absence of this settlement, Google could fund a Books Rights Registry and license future uses of those rightsholders' works directly. Structured correctly to be open and competitive, such a registry would likely pass antitrust scrutiny. The *only* part of this settlement which could not be accomplished without the aid of a class action is the licensing of future uses of works belonging to rightsholders who are not present to defend their rights, as they have chosen not to register with the BRR or are altogether inaccessible.

"'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.'" *Amchem Products* 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997)). The problem here is not that orphan or unregistered rightsholders lack the incentives to bring solo actions. First, there is as yet no harm for them to seek redress as no infringing uses of any works have been made. Second, with the exception of a 5-year window within which they may be able to claim collected royalties, these people will continue to receive no redress. But unlike most class actions, where this failure to receive compensation for past harms is balanced by the judicial finality and closure of the issue, this settlement contemplates indefinite future uses (and

30

legal "harms"), making ongoing use of the rights that belong to orphan rightsholders without any
real likelihood of compensation for those future uses.

Because the basic purpose of class action law does not support the licensing of new,
future uses of underrepresented parties' rights, the Court should not approve the perpetual
licensing of orphan authors' rights through this proposed settlement.

## III. The Court should perform additional review before approving a settlement with the above problems.

*A.  The Court should deny class certification and not approve a settlement which distributes the rights of orphan authors to a single party.*

A number of the described problems with the proposed settlement and provisional class
certification stem from the inclusion of orphan rightsholders in the settlement. Orphan
rightsholders' interests are not represented by named plaintiffs, who are actively exploiting their
own rights. Further, the distribution of these rights without the permission of the owners and
only to a single defendant amounts to a wholesale change to the way copyright law is applied to
the defendant with regard to books. This type of broad change to the copyright landscape can and
should only be made by the federal legislature, which defines copyright law in the first place, and
which has the institutional expertise to both balance the interests of the public and the various
stakeholders and create a legitimate, nationwide solution which does not create a new monopoly.
Therefore, the simplest solution with regard to the settlement is to deny certification to any class
which includes the orphan rightsholders. This may mean that no opt-out class of copyright
holders can be certified, or that such a class must be carefully constructed to only include the
works belonging to known, identifiable rightsholders.

The Court can also remedy this problem by the equivalent action of leaving the class
description broad, but making the class opt-in. In this manner, the settlement will only affect
those who have chosen to allocate their rights in this way, effectively removing unclaimed works

31

and their rightsholders from the settlement. The settlement would then remain as a far more legitimate way to settle the future rights of those who actively want their default rights under copyright law changed in this fashion.

### B. The Court should seek to allow any competitor to license under the same terms as Google.

There are two ways in which the Court might improve competition: remove the MFN clause, and expand the settlement to allow licensing to third parties.

#### 1. Eliminate or alter the MFN clause.

The MFN clause presents one of the more easily-solved problems of the settlement. Its removal from the settlement would eliminate any anticompetitive effects. Alternatively, the MFN could simply be made symmetrical, so that no other licensee would be faced with an additional disadvantage to Google as a competitor.

#### 2. Allow competitors to obtain licenses to digitize books.

Even removal or alteration of the MFN clause does not guarantee that potential Google competitors will be able to competitively license the display of books from the BRR. Although the settlement contemplates licenses from the BRR to other parties, there is no indication that either this settlement or copyright law would permit the BRR to issue licenses for a list of books constructed via an opt-out procedure, as it will for Google. Instead, other licensees would only be able to receive licenses for the smaller set of books whose authors have opted in to a licensing agreement. *See* Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, John M. Olin L. & Econ. Working Paper No. 462 at 14 (2009), *available at* http://www.law.uchicago.edu/Lawecon/index.html; Tom Krazit, *Google Pushes for New Law on Orphan Books*, Cnet (July 31, 2009), *at* http://news.cnet.com/8301-1023_3-10300887-93.html.

32

It is this disparity that creates the antitrust and overall policy questions that are most troubling with the proposed outcome of the settlement. To eliminate this disparity, the settlement agreement should ensure that Google must license works to other book access providers on the same or similar terms as it itself receives. Such an arrangement would simply require the plaintiff class to grant Google an additional ability, and require Google not to abuse its market power. That power should be disciplined by antitrust scrutiny and the threat of antitrust litigation.

A more complete solution to the competition problem would be to allow the BRR to license to other parties the same sets of works that are available to Google. If the factual predicate on which the plaintiffs' claims are based encompasses behavior such as the display of full text by Google, then it may be sufficiently broad as to encompass similar uses by third parties. See *supra* at 25. In such a scenario, Google would be able to provide access to its corpus of scanned works, while other digitizers would also be able to compete with Google in the new market for mass access to books. Existing collections of digitized books could be made available through subscription services by acquiring the appropriate license from the BRR.

*C. The Court should consider input from relevant agencies.*

The BRR, with or without the ability to license works on an opt-out basis, would still be the most centralized clearinghouse of book rights, and a powerful collective. Its role as a gatekeeper to bulk and blanket licenses of books deserves the same ongoing supervision afforded to the performing rights societies. The BRR should be monitored by the appropriate antitrust authorities under a consent decree, to ensure that licensee and licensors approaching it will be treated fairly, and not solely to the benefit of incumbent parties in its licensing agreements. The Court should also carefully consider the input of federal agencies concerned with competition, consumer protection, and copyright law such as the Department of Justice Antitrust Division,

33

Federal Trade Commission, and Copyright Office, and seek the input of such agencies where proper.

## CONCLUSION

The goal of access to written works is a noble one. However, access by means of judicially-granted monopoly does not comport with the need for access to information to be available through as many avenues as possible. The current structure of the settlement agreement would permit certain forms of access to orphan works through the single channel of Google and the BRR, but truly open access must be granted not by grace, but by right. For the foregoing reasons, the Court should therefore not approve a settlement which creates this forward-looking single-source license for unclaimed and orphan works.

In the alternative, a broad interpretation of the factual predicate underlying the proposed settlement can justify not just the settlement as proposed, but also a settlement that releases third parties from conduct identical to Google's. If this Court allows the release of claims stemming from Google's future offerings of full-text works, other parties should be provided the same latitude to provide access to the public, fueling a freer public discourse in a competitive landscape.

Jef Pearlman

Sherwin Siy

Public Knowledge
1875 Connecticut Ave. NW
Suite 650
Washington, DC 20009
(202) 518-0020

Sept. 8, 2009

34

## CERTIFICATE OF SERVICE

I, Jef Pearlman, hereby certify that the BRIEF OF *AMICUS CURIAE* PUBLIC KNOWLEDGE IN OPPOSITION TO THE PROPOSED SETTLEMENT was transmitted to the chambers of Judge Denny Chin via overnight letter delivery, and is being served by e-mail on:

Michael J. Boni
Counsel for the Author Sub-Class
Boni & Zack LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
mboni@bonizack@.com

Jeffrey P. Cunard
Counsel for the Publisher Sub-Class
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022
bpkeller@debevoise.com

Daralyn J. Durie
Counsel for Google
Keker & Van Nest LLP
710 Sansome St.
San Francisco, CA 94111
ddurie@durietangri.com

Jef Pearlman
Public Knowledge
1875 Connecticut Ave. NW
Suite 650
Washington, DC 20009
(202) 518-0020

Dated: Sept. 8, 2009

35