**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Authors Guild, Inc., Association of | ) |
| American Publishers, Inc., et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|        vs. | ) |
| | )   Case No. 05 CV 8136-DC |
| Google Inc., | ) |
| | ) |
|     Defendant. | ) |
| | ) |

## EPIC'S OBJECTIONS TO THE PROPOSED SETTLEMENT

Pursuant to the Court's September 4, 2009 Order, the Electronic Privacy Information

Center (EPIC) files its objections to the proposed settlement agreement in this action. EPIC asks

the Court to reject the proposed settlement unless the parties revise the agreement to include

meaningful privacy protections for readers -- safeguards that are presently absent from the

proposed settlement.

Marc Rotenberg
(*pro hac vice* motion pending)
  *Counsel of Record*
John Verdi
Electronic Privacy
  Information Center (EPIC)
1718 Connecticut Ave. NW
  Suite 200
Washington, DC 20009
(202) 483-1140

September 8, 2009

i

Dockets.Justia.com

## TABLE OF CONTENTS

EPIC'S OBJECTIONS TO THE PROPOSED SETTLEMENT ............................................... i

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................... iv

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EPIC'S
OBJECTIONS TO THE PROPOSED SETTLEMENT .......................................... 1

STATEMENT OF FACTS ............................................................................................. 1

I.   EPIC Routinely Files Briefs in Federal Courts in Matters Representing Consumers' Privacy
     Interests ............................................................................................................. 1

II.  No Parties In This Litigation Represent Readers' Privacy Interests ......................... 2

III. Readers' Privacy Interests are Deeply Implicated in the Settlement ....................... 3

     A.   The Settlement Grants Google Broad Authority to Collect Readers' Data ............. 3

     B.   The Settlement Provides for the Book Rights Registry to Collect and Distribute
          Data ............................................................................................................ 7

     C.   Books Excluded from the Google Book Search Database Could Reveal Readers'
          Data ............................................................................................................ 7

IV.  The Settlement Does Not Guarantee Reader Privacy Protections ............................ 8

     A.   The Settlement Does Not Provide for Privacy Safeguards Regarding Google's
          Collection of Readers' Login Data .................................................................. 8

     B.   The Settlement Does Not Provide for Privacy Safeguards Regarding Data
          Collection by the Book Rights Registry ............................................................ 9

     C.   The Settlement Does Not Provide for Privacy Safeguards Regarding Data
          Collection Concerning Books Excluded from the Google Book Search Database ......... 9

V.   Google's Business Model Integrates Personal Information Across Several Different
     Products and Services ......................................................................................... 10

**ARGUMENT** .......................................................................................................................... **12**

I.  The Settlement Fails to Protect Readers' Privacy Interests, and the Existing Parties Do
    Not Adequately Represent Such Interests ............................................................................. 12

II.  The Court Should Grant Reject the Settlement Unless the Parties Incorporate
     Terms that Protect Readers' Privacy Interests ...................................................................... 12

III.  The Settlement Would Permit An Unprecedented Merger of Book Purchaser and
      Borrower Information with Other Personal Data ................................................................. 13

IV.  The Settlement Would Violate Readers' Right to Read Anonymously .................................. 15

V.  Library Patrons' Privacy in the Physical World is Well Established ...................................... 17

VI.  Routine Privacy Safeguards for Library Patrons are Missing from the Settlement
     Agreement ............................................................................................................................ 21

**RULE 7.1 DISCLOSURE** ........................................................................................................ **22**

**CERTIFICATE OF SERVICE** .................................................................................................. **23**

# TABLE OF AUTHORITIES

## Cases

*Bd. of Educ., Island Trees Union Free Sch. Dist.*, 457 U.S. 853, 867 (1982).............................. 15
*Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008) ........................................... 2
*Department of Justice v. City of Chicago*, 537 U.S. 1229 (2003).................................................. 2
*Doe v. Chao*, 540 U.S. 614 (2003)................................................................................................. 2
*Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009)............................................................ 2
*Herring v. United States*, 129 S. Ct. 695 (2009)........................................................................... 2
*Hiibel v. Sixth Judicial Circuit of Nevada*, 542 U.S. 177 (2004)................................................... 2
*IMS Health, Inc. v. Ayotte*, 550 F.3d 42, (1st Cir. 2008) .............................................................. 2
*In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2002) ........................ 2
*McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 341-42 (1995)...................................... 16
*Mirfasihi v. Fleet Mortgage Corp.*, 551 F.3d 682 (7th Cir. 2006) *cert. denied* 129 S. Ct. 2767
  (2009)............................................................................................................................................. 2
*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)............................................... 16
*Nelson v. Salem State College*, 845 N.E.2d 338 (Mass. 2006) ..................................................... 2
*Reno v. Condon*, 528 U.S. 141 (2000) .......................................................................................... 2
*Smith v. Doe*, 538 U.S. 84 (2003) ................................................................................................ 2
*Stanley v. Georgia*, 94 U.S. 557, 565 (1969) ........................................................................ 15, 16
*State v. Tanaka*, 67 Haw. 658, 662 (1985) ................................................................................. 21
*Talley v. California*, 362 U.S. 60, 64 (1960)............................................................................... 15
*Watchtower Bible and Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002)....... 2

## Statutes

1 Vt. Stat. Ann. § 317 (2009).......................................................................................................... 19
27 Me. Rev. Stat. § 121 (2009)....................................................................................................... 19
75 Ill. Comp. Stat. 70/1(1) (2009).................................................................................................. 19
Ala. Code § 41-8-10 (2009)............................................................................................................ 18
Alaska Stat. § 40.25.140 (2009)...................................................................................................... 18
Ariz. Rev. Stat. § 41-1354 (LexisNexis 2008)............................................................................... 20
Ark. Code Ann. § 13-2-701 (2009)................................................................................................. 19
Ark. Code Ann. § 13-2-702 (2009)................................................................................................. 19
Ark. Code Ann. § 13-2-703 (2009)................................................................................................. 19
Cal. Gov't Code § 6254 (Deering 2009) ......................................................................................... 19
D.C. Code § 39-108(a) (LexisNexis 2009)..................................................................................... 18
D.C. Code Ann. § 39-108 (a)-(d) (LexisNexis 2009) ..................................................................... 19
Fl. Stat. § 257.261(4) (2009)........................................................................................................... 20
Ga. Code Ann. § 24-9-46 (2009) .................................................................................................... 20
Ken. Rev. Stat. Ann. 61.878(1)(a) (LexisNexis 2009).................................................................... 20
Mich. Comp. Laws § 397.603 (2009).............................................................................................. 19
Mich. Comp. Laws Ann. §§ 397.601-605 (2009) ........................................................................... 13
Minn. Stat. § 13.40 (2008)............................................................................................................... 19
Miss. Code Ann. § 39-3-365 (2008) ............................................................................................... 19
Mont. Code Ann. § 22-1-1111 (2007)............................................................................................. 20

N.M. Stat. Ann. § 18-9-4 (West 2009) ........................................................................................ 19
N.Y. C.P.L.R § 4509 (Consol. 2009) ..................................................................................... 18, 19
N.Y. C.P.L.R. § 4509 (Consol. 2009) ........................................................................................ 18
R.I. Gen. Laws § 38-2-2 (2009) ................................................................................................. 19
S.C. Code Ann. § 60-4-10 (2008) .............................................................................................. 18
W.V. Code § 10-1-22 (2009) ...................................................................................................... 18
Wis. Stat. § 43.30 (2008) ........................................................................................................... 19

## Other Authorities

American Library Association, INTELLECTUAL FREEDOM MANUAL, 107 (4th ed. 1992) ............. 15
Julie E. Cohen, *A Right to Read Anonymously: A Closer Look at "Copyright Management" in Cyberspace*, 28 Conn. L. Rev. 981, 1007-12 (1996) ................................................................. 16

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EPIC'S OBJECTIONS TO THE PROPOSED SETTLEMENT

The Electronic Privacy Information Center (EPIC) respectfully objects to the proposed settlement in the present case. This action arises from a dispute concerning Google, Inc.'s practice of scanning books, creating an electronic database, and displaying portions of printed works. On October 28, 2008, the parties notified the Court that they reached a proposed settlement (the "Settlement"). Although the facts underlying this lawsuit are fairly narrow, the Settlement is unprecedentedly broad. It mandates the collection of the most intimate personal information, threatens well-established standards that safeguard intellectual freedom, and imperils longstanding Constitutional rights, including the right to read anonymously. Furthermore, it threatens to eviscerate state library privacy laws that safeguard library patrons in the United States. EPIC is uniquely qualified to advocate for readers' privacy interests, which have heretofore been unrepresented by any party to this lawsuit.

EPIC objects to the proposed settlement, and urges the Court to reject the agreement unless the parties revise the agreement to include meaningful privacy protections for readers.

## STATEMENT OF FACTS

### I. EPIC Routinely Files Briefs in Federal Courts in Matters Representing Consumers' Privacy Interests

The Electronic Privacy Information Center (EPIC) is a public interest research center in Washington, D.C. EPIC was established in 1994 to focus public attention on emerging civil liberties issues and to protect privacy, the First Amendment, and other Constitutional values. EPIC routinely participates as *amicus curiae* before federal and

1

state courts in cases concerning emerging privacy issues, new technologies, and Constitutional interests. *See, e.g., Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009); *Herring v. United States*, 129 S. Ct. 695 (2009); *Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008); *Hiibel v. Sixth Judicial Circuit of Nevada*, 542 U.S. 177 (2004); *Doe v. Chao*, 540 U.S. 614 (2003); *Smith v. Doe*, 538 U.S. 84 (2003); *Department of Justice v. City of Chicago*, 537 U.S. 1229 (2003); *Watchtower Bible and Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002); *Reno v. Condon*, 528 U.S. 141 (2000); *IMS Health, Inc. v. Ayotte, 550 F.3d 42*, (1st Cir. 2008); and *Nelson v. Salem State College*, 845 N.E.2d 338 (Mass. 2006).

EPIC has also represented consumer privacy interests in class action settlements in this Court. *In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2002). In that proceeding, EPIC was granted the opportunity to address the court on the privacy impact of a proposed settlement concerning online advertising and the collection and use of personal data. EPIC also received a substantial *cy pres* award from another Federal District Court in support of EPIC's ongoing work to address emerging consumer privacy issues. *See Mirfasihi v. Fleet Mortgage Corp.*, 551 F.3d 682 (7th Cir. 2006) *cert. denied* 129 S. Ct. 2767 (2009).

## II.   No Parties In This Litigation Represent Readers' Privacy Interests

The named plaintiffs in this litigation are: (1) The Authors Guild, Inc.; (2) Association of American Publishers. Inc.; (3) Pearson Education, Inc.; (4) Penguin Group (USA) Inc.; (5) McGraw-Hill Companies Inc.; (6) John Wiley & Sons Inc., individually and on behalf of others similarly situated; (7) Simon and Schuster Inc.; and (8) author plaintiffs, individual plaintiffs and publisher plaintiffs. Google, Inc. is the sole defendant.

Second Amended Class Action Complaint. *The Author's Guild, Inc., et al. v. Google*, No.
05 CV 8136-JES (S.D.N.Y. Oct. 31, 2008). The named plaintiffs purport to represent a
class consisting of "all persons and entities that as of January 5, 2009 own a U.S.
copyright interest in one or more books or inserts that are 'implicated by a use'
authorized by the settlement." Proposed Order Granting Preliminary Settlement
Approval, *The Author's Guild, Inc., et al. v. Google*, No. 05 CV 8136-JES (S.D.N.Y. Nov.
14, 2008). None of the parties have legal, equitable, or other obligations to represent
readers' interests in this lawsuit.

## III.   Readers' Privacy Interests are Deeply Implicated in the Settlement

The digital book system established by the Settlement will profoundly transform
the circumstances under which individuals will obtain access to information in the digital
age. Readers will be required to disclose sensitive, personal information that the parties
will collect and store, and link to other services that will enable the creation of detailed,
secret profiles on individuals who seek access to digital works. The Settlement places no
meaningful limits on how the parties obtain, use, or disclose readers' information. This is
an unprecedented change in access to knowledge that deeply implicates intellectual
freedom, state privacy laws, and Constitutional interests that cannot be ignored by this
Court.

### A.   The Settlement Grants Google Broad Authority to Collect Readers' Data

The Settlement anticipates three models for access to the full text of copyrighted
books, each of which requires users to identify themselves prior to accessing a digital
book: (1) an "Institutional Subscription Model," which "will enable users [at subscribing
institutions] to view, copy/paste, and print pages of a Book, and may enable Book

3

Annotations;" (2) a "Consumer Purchase" model, which "will enable purchasers to view,

copy/paste and print pages of a Book, and may enable Book Annotations;" and (3) "New

Revenue Models," including a "Consumer Subscription Model," which is an "individual

version of an Institutional Subscription." Settlement at §§ 4.1(d), 4.1(a), 4.7(d). The

Settlement contains numerous terms that mandate the collection, retention, and transfer of

personally identifiable user information pursuant to these models.

### *User Authentication Requirements*

The Settlement requires users to submit personally identifiable information to

Google when using the Consumer Purchase Model:

> Google shall use commercially reasonable efforts to authenticate
> individual End Users purchasing access to individual Books through the
> use of account login or other equivalent method. An End User that is
> logged in will be identified as an Identified User based upon such End
> User's login account information.

Settlement Attachment D at § 3.9.2.

The Settlement also requires users to submit personally identifiable information

when using the Institutional Subscription Model:

> Google shall use commercially reasonable efforts to authenticate
> individual End Users for access to Books in an Institutional Subscription
> by verifying that an individual is affiliated with an institution with an
> active subscription. Google's efforts will be in partnership with the
> subscribing institutions in a manner consistent with, or otherwise
> equivalent to, generally accepted industry standards for authentication of
> use of subscriptions. Techniques used may include IP address
> authentication, user login, and/or leveraging authentication systems
> already in place at an individual institution.

Settlement Attachment D at § 3.9.3.

In the Institutional Subscription Model, the Settlement requires use of "encrypted

session identifying information provided by the subscribing institution" that can be "used

4

to identify the authorized user that printed [copyrighted] material or the access point from which the material was printed." Settlement at § 4.1(d). The Consumer Purchase Model contains an identical requirement. Settlement at § 4.2(a). Under the Settlement, Google must "limit access to books to appropriate individuals within the subscriber institution" and the company retains the right "to restrict or terminate a user's account . . . if the user distributes the copyrighted material from a Book in a manner that is prohibited by the terms and conditions or applicable law." Settlement at § 4.1(e) These requirements necessitate the collection, retention, and transfer of user data.

*Authentication Using Google Accounts*

The Settlement provisions indicate that users will practicably be required to use a Google Account to use the Google Book Search database. Such a requirement would permit Google to integrate Google Book Search users' information with data concerning other Google products. The Settlement contemplates integration of Google Book Search and other products, stating that Google may create hyperlinks to Preview Use Book pages from its other revenue generating services "including, for example, Google Web Search, Google Earth and other Google services that show search results by browsing." Settlement at § 3.10(b). In addition, the Settlement Agreement allows Google to place advertisements on Google Book Search pages as long as those advertisements are not placed "on, behind, or over the contents of a Book or portion thereof." Settlement at § 3.10(c)(iii); *see also* Settlement at § 3.14 ("Google may display advertisements on Preview Use pages and other Online Book Pages."). Given Google's long-standing use of an advertising revenue model, it is unsurprising that Google negotiated an agreement that "does not otherwise limit Google's right to display advertising anywhere on Google

5

Products and Services." Settlement at § 3.14. It is well known that Google's advertising revenue depends on its ability to target advertising to its customers, and such targeted advertising would be facilitated by a Google Account login that allows it to consolidate user data across several Google Products.

### Combination of Borrower and Purchaser Records

The Settlement states that, for institutional subscriptions, Google will "limit access to Books to appropriate individuals within the subscriber institution." Settlement at § 4.1(e). To do so, Google will need borrower data from the libraries that will allow it to authenticate and identify users.

### Google's Use of Book Annotation Data

Under the Settlement, users of institutional subscriptions or individuals who purchase books under the consumer purchase option may make annotations to those books. *See* Settlement at § 1.17; Settlement at § 3.10(c)(ii)(5). The Settlement limits a user's ability to share book annotations with other users in several ways. In addition, the Settlement requires Google to implement limitations on annotations, which necessitates collection of personal information from users.

### Visible Watermark on Institutional Subscription Printouts

When users of the institutional subscription database print out book pages, Google will include a visible watermark that "displays encrypted session identifying information provided by the subscribing institution during such session, and *which could be used to identify the authorized user that printed the material or the access point from which the material was printed.*" *Id.* at § 4.1(d) (emphasis added). In order to place this watermark,

6

Google must necessarily be provided with personally identifiable information of each user.

## B. The Settlement Provides for the Book Rights Registry to Collect and Distribute Data

The Settlement also requires that Google provide data to the Book Rights Registry (BRR), including the "name of any library to which it has provided Digital Copies of Books Digitized in the United States." Settlement at § 6.6(a)(i). Google must also provide quarterly updates to the list of books it "has digitized under the Settlement Agreement[,] along with Metadata." Settlement at § 6.6(a)(ii). Although the Settlement provides examples of metadata, it broadly defines metadata as "data that describes other data." Settlement at § 1.85. Google is also required to provide the BRR with data on books sold, library scans, usage data, registration/claims process data, and any additional information reasonably necessary for the BRR to perform its obligations under the Settlement. Settlement at § 6.6(a). This information may also implicate reader privacy.

## C. Books Excluded from the Google Book Search Database Could Reveal Readers' Data

Under the Settlement, Google may, at its sole discretion, exclude books from the Google Book Search database for editorial or non-editorial reasons. Settlement at § 3.7(e). Google must notify the BRR that such books have been excluded from the database and provide the BRR with a digital copy of the book. Settlement at § 3.7(e)(i). Because Google has removed these books from its database, the Settlement allows the BRR to solicit a third party service provider to provide consumer purchases and institutional subscriptions for these works. *Id.* This third party is "deemed a successor of

Google" under the Settlement, and, as such, it will be bound by the Settlement to the same extent as Google. *Id.*

## IV.    The Settlement Does Not Guarantee Reader Privacy Protections

### A.    The Settlement Does Not Provide for Privacy Safeguards Regarding Google's Collection of Readers' Login Data

The settlement does not place any restrictions on Google's collection or use of personally identifiable information that is collected from users when they access books using either consumer purchases or institutional subscriptions. Nothing in the current Settlement terms prevents Google from requiring all users to obtain a Google Account as a condition of accessing the book search service. In fact, the Settlement explicitly authorizes Google's use of an "account login" to authenticate users. Settlement Attachment D at § 3.9.2.

Additionally, the settlement places no restrictions on Google's use of borrower data from libraries. Because the Settlement also does not limit Google's use of consumer purchase data, the Settlement does not prevent Google from combining a user's Borrower and Purchaser records to make connections between a particular user's borrower and purchaser history.

Furthermore, the Settlement places no restrictions on Google's or the BRR's use of user-created book annotation. The Settlement also fails to restrict these entities' use of the personal information that identifies the twenty-five individuals with whom a reader may share his or her book annotations.

Finally, the settlement places no restrictions on data that is used to create visible watermarks that are placed on institutional subscription printouts and can be used to individually identify users. The settlement does not clearly state what information would

8

be collected to create the watermarks, the amount of this information that may be maintained by Google, and the length of time that Google or a participating library may maintain this personal information.

**B.     The Settlement Does Not Provide for Privacy Safeguards Regarding Data Collection by the Book Rights Registry**

Although the Settlement requires Google to provide the BRR with usage data, it places no limitations on the level of granularity of usage data that will be collected and reported to the BRR. It also does not limit the extent to which Google and libraries will provide readers' personally identifiable information to the BRR. The settlement only restricts Google's transfer of *rightsholders'* personally identifiable information. Settlement at § 15.3.

**C.     The Settlement Does Not Provide for Privacy Safeguards Regarding Data Collection Concerning Books Excluded from the Google Book Search Database**

With respect to books that may be excluded from the Google Book Search database, the Settlement places no explicit restrictions on how a third party service provider would protect the privacy of its users concerning access to works that are excluded by Google. Given the sensitive nature of works that are likely to be included in a third party database of books excluded from the GBS database, additional privacy protections may be necessary for the individuals who use that third party database.

## V.     Google's Business Model Integrates Personal Information Across Several Different Products and Services

Google operates the largest Internet search engine in the United States. In March of 2009, approximately 293.8 million searches were performed on Google every day – a total share of 63.7% of all Internet searches.[1]

Since its founding, Google has branched out into many different applications and services. In order to use many of Google's non-search applications, users are required to have a Google Account.[2] Without a Google Account, a user's actions on Google could only be identified by the user's IP address, but the user may not be able to access the full range of Google services. Though not every Google application requires a Google Account, a single Google account can be used to log in to all Google services. Once a user logs in once he or she is logged in for every service until that person actively logs out.

Google asks for some personal information when creating a Google Account, including your email address and a password. *Id.* Google provides that it may share personal information amongst its various services in order to customize content and enhance services.[3] Related Google applications include Google News, Google YouTube, Google Earth, Gmail, and Google Docs.[4]

No Settlement terms prevent Google from integrating information about individual access to Google Books with Google's university related applications and other Google products. Google Apps Education Edition is a hosted communication and

---

[1] *See* USA SEO Pros, http://blog.usaseopros.com/2009/04/15/google-searches-per-day-reaches-293-million-in-march-2009

[2] *See* Google Privacy Notice, http://www.google.com/intl/en/help/privacy_fusionph.html.

[3] Privacy Glossary, http://www.google.com/privacy_glossary.html#account.

collaboration applications designed for schools and universities.[5] Google currently offers schools that enroll a package that includes Gmail, Google Calendar, Google Talk, Google Sites, Google Docs, and Google Video.[6] Google has a University webpage devoted to encouraging universities (and their students) to subscribe to particular Google services.[7] A long list of schools, including Northwestern University, the University of Notre Dame, and George Washington, have adopted Google Education

Other Google services will be tied to Google Books. Google has created a layer within its Google Earth platform that will make geographic connections between various book offerings for users.[8]

Google tracks the pages that are viewed by users in Google Book Search, either through the users Google Account or, if the user is not logged in, through the use of the IP Address and cookies.[9] Google requires that a user to log in to a Google Account in order to see certain pages that are covered under copyright.[10] Certain features of Google Books, such as "My Library," will be inaccessible to a user without a Google Account. "My Library" allows the user to create a library of his or her own books and publish book reviews and ratings for those books.[11]

---

[4] Descriptions available at http://www.google.com/press/descriptions.html.

[5] *See* http://www.google.com/a/help/intl/en/edu/.

[6] https://www.google.com/support/a/bin/answer.py?answer=139019.

[7] http://services.google.com/university/.

[8] *See* http://books.google.com/support/bin/answer.py?hl=en&answer=74785.

[9] *See* http://books.google.com/support/bin/answer.py?hl=en&answer=43733.

[10] See http://books.google.com/support/bin/answer.py?hl=en&answer=43730.

[11] http://books.google.com/googlebooks/mylibrary/.

## ARGUMENT

### I. The Settlement Fails to Protect Readers' Privacy Interests, and the Existing Parties Do Not Adequately Represent Such Interests

As set forth above, the Settlement establishes a system that would require readers to disclose detailed personal information, yet places no meaningful restrictions on the collection, use, or disclosure of the data. All named parties are for-profit corporations representing the interests of their owners, or individual rightholders representing their own interests. None represent readers' interests.

The parties to the Settlement do not represent the privacy interests of the users of the proposed services. The Settlement's absence of privacy safeguards for readers' data demonstrates that consumer interests are unrepresented in this lawsuit, the proposed settlement, and the digital library contemplated by the parties. The Settlement describes a system that requires the collection, retention, use, and disclosure of readers' personal information. Yet the agreement fails to safeguard readers' privacy, or even address privacy in a meaningful way. The only reference to privacy in the entire Statement states that all data provided to Google by rightholders, "shall be subject to a Registry privacy policy." Settlement § 6.6 (vi). This clause only addresses the privacy of *rightsholder* data and does not govern reader privacy. As discussed above, readers' privacy is deeply implicated in the Settlement, and the failure to incorporate commonsense protections threatens to strip readers of long-cherished privacy rights.

### II. The Court Should Grant Reject the Settlement Unless the Parties Incorporate Terms that Protect Readers' Privacy Interests

As discussed below, the Settlement. if approved, would permit an unprecedented merger of book purchaser and borrower information with other personal data, violate

12

readers' right to read anonymously, and abrogate library privacy laws. The Settlement deeply impacts readers' privacy. establishing a system of mandatory data collection, retention, use, and disclosure. Further, the Settlement threatens readers' privacy interests and rights, including the Constitutional right to read anonymously and statutory rights under numerous state library privacy laws. The Court's approval of the Settlement would harm readers' privacy and defeat the public interest.

The Court can prevent this looming catastrophe for readers' privacy rights by rejecting the Settlement unless the parties incorporate commonsense privacy safeguards against the unfettered collection, retention, use, and disclosure of readers' personal information. Such protections are consistent with citizens' Constitutional right to read anonymously, as well as the privacy safeguards enshrined in strong library privacy laws throughout 51 American jurisdictions.

## III. The Settlement Would Permit An Unprecedented Merger of Book Purchaser and Borrower Information with Other Personal Data

The Settlement requires users to provide information to Google concerning book purchases and borrowing, Settlement Attachment D at §§ 3.9.2 - 3.9.3, but it places no restrictions on Google's use and combination of the use of both book purchaser and borrower information. *See supra.* Currently, libraries only collect the personal data of borrowers and when the do so are subject to a wide range of laws, and practices that seek to safeguard reader privacy. Recognizing the many dimensions a reader privacy, a "Library Record" is typically broadly defined to include any personal identifying information, including name, address, or telephone number, or that identifies a person as having requested or obtained specific materials from a library. *See* Mich. Comp. Laws Ann. §§ 397.601-605 (2009). Even book merchants who may collect more detailed

13

information about customers for the purposes of sales, inventory management, and marketing, simply do not have the ability to interconnect an individual reader's interest with the contents of their email contents, their web search histories, their online document production, the Internet video interests, their advertising related activities, their blog posts, or the many other Internet-based services that Google offers.

Thus the Settlement would transfer detailed personal information that has been subject to some of the best privacy laws and practices in the United States and make it available to one company that already has more information about the interests of Internet users than any other organization in the world in a way that is without precedent and without constraint.

Google already possesses reader data from other Google products, such as Blogger, Calendar, Docs, Gmail, Groups, Knol, Orkut, Picasa, Reader, Sites, SketchUp, Talk, Translate, Youtube, and many others.[12] The Settlement implies that users may be required to employ a Google Account to use the Google Book Search database, and it explicitly authorizes Google's use of an "account login" to authenticate users. Settlement Attachment D at § 3.9.2. Such a requirement could facilitate Google's integration of Google Book Search with other products. The Settlement also "does not otherwise limit Google's right to display advertising anywhere on Google Products and Services." Settlement §3.14. Therefore, the Settlement could further create an unprecedented combination of book purchaser and borrower information with other personal identifiable information.

_____

[12] http://www.google.com/intl/en/options/.

14

## IV. The Settlement Would Violate Readers' Right to Read Anonymously

"The freedom to read is essential to our democracy." American Library Association, INTELLECTUAL FREEDOM MANUAL, 107 (4th ed. 1992). The American right to send and receive information anonymously is as old as the country itself; even the Federalist Papers, a collection of 85 essays written to support ratification of the Constitution, were all signed pseudonymously by the Founding Fathers. *See Talley v. California*, 362 U.S. 60. 64 (1960). The American Library Association has specifically identified and encouraged the protection of a right to read anonymously, stating that "protecting user privacy and confidentiality is necessary for intellectual freedom and fundamental to the ethics and practice of librarianship." American Library Association, *Policy Manual.* [13]

United States courts have also long recognized that the First Amendment encompasses a fundamental right to receive and read information anonymously. *E.g., Bd. of Educ.. Island Trees Union Free Sch. Dist.*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them. . . . More importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom."); *Stanley v. Georgia*, 94 U.S. 557, 565 (1969) (striking down criminal prohibition on private possession of obscene materials as inconsistent with "the right to be free from state inquiry into the contents of [one's] library"); *see also* Julie E. Cohen, *A Right to Read Anonymously: A Closer Look at "Copyright Management" in Cyberspace*, 28 Conn. L.

---

[13] http://www.ala.org/ala/aboutala/governance/policymanual/index.cfm

Rev. 981, 1007-12 (1996) (reviewing court decisions recognizing or implicitly relying on a right to receive information anonymously).

Readers may be deterred from exercising their right to receive information if their anonymity is not assured. Readers may desire anonymity for a variety of legitimate reasons. *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 341-42 (1995) ("The decision to favor anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."). In addition to free speech rights, these reasons also implicate privacy rights, *Stanley v. Georgia*, 394 U.S. 557 (1996), and, to the extent that inferences about one's affiliations may be drawn from what he reads, associational rights, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.").

These rights are no less critical for electronic access of reading material; the majority of users feel that the medium's most valuable asset is anonymity—the ability to conceal one's identity while communicating.[14] Anonymity allows the persecuted, the underserved, and the simply embarrassed to seek and disseminate information while maintaining their privacy and reputations in both cyberspace and the material world. This value will become even more important as people use the Internet to access increasing amounts of information. History is rife with minority ideas that have taken hold and

---

[14] EPIC, *Internet Anonymity*, http://epic.org/privacy/anonymity/ (last accessed June 5, 2009).

16

changed the way people think: Copernicus' description of a heliocentric universe; Darwin's research into evolution; and Newton's theories of gravity.[15]

Yet this anonymity is precisely what the proposed Settlement puts at risk. By proposing conditions that are practically silent on the issue of privacy, *see supra* at Section I(C), the Settlement does nothing to prevent Google and the BRR from collecting and using personal information from its subscribers in any way they deem appropriate, a result contrary to United States policy and common law.

Although Google is a private party, it is obvious that once Google is in possession of so much information about the activities of individuals, it will be subject to administrative subpoenas and search warrants that implicate state action. Privacy laws have typically regulated the circumstances under which such information may be disclosed to the government. But there are no such restrictions contemplated in the Settlement, which underscores the threat to the right to receive information anonymously and the associated First Amendment interests.

## V.    Library Patrons' Privacy in the Physical World is Well Established

Currently, state statutes governing library privacy restrict the collection, retention, use, and disclosure of readers' personal information in 51 American jurisdictions. Strong library privacy laws safeguard readers' personal records, prohibit disclosure to third parties, require a court order to force disclosure, and impose strict penalties for violations. These state laws codify library patrons' common sense expectation of privacy.

---

[15] *See, generally*, The Copernican Model: A Sun-Centered Solar System, http://csep10.phys.utk.edu/astr161/lect/retrograde/copernican.html; Darwin's Theory Of Evolution - A Theory in Crisis, http://www.allaboutscience.org/darwins-theory-of-evolution.htm; Sir Isaac Newton: The Universal Law of Gravitation, http://csep10.phys.utk.edu/astr161/lect/history/newtongrav.html.

17

The Settlement threatens to abrogate these well established statutes by transferring library resources that are subject to these privacy safeguards to a new digital library system that is run by a private company, containing none of the protections included in state library privacy laws.

All 50 States and the District of Columbia protect library patron records. Readers' library privacy rights are protected by statute in forty-eight states and the District of Columbia while Hawaii and Kentucky protect library privacy pursuant to a State Attorney General's Opinions. *See* American Library Association, *Privacy: An Interpretation of the Library Bill of Rights.*[16]

State library privacy laws make clear the need to safeguard readers' personal information. *See, e.g.,* Ala. Code § 41-8-10 (2009) ("It is recognized that public library use by an individual should be of confidential nature."); N.Y. C.P.L.R § 4509 (Consol. 2009) ("Library records, which contain names or other personally identifying details regarding the users of ... library systems of this state ... shall be confidential"); *see also* Alaska Stat. § 40.25.140 (2009); D.C. Code § 39-108(a) (LexisNexis 2009); W.V. Code § 10-1-22 (2009).

Library privacy statutes limit disclosure of patron records to third parties. *See, e.g.,* N.Y. C.P.L.R. § 4509 (Consol. 2009) (library records which contain names or other personally identifying details "shall not be disclosed"); S.C. Code Ann. § 60-4-10 (2008) (library records "may not be disclosed except to persons acting within the scope of their duties in the administration of the library"); *see also* Cal. Gov't Code § 6254 (Deering

---

[16] available at
http://www.ala.org/ala/aboutala/offices/oif/statementspols/statementsif/interpretations/pri

2009); Mich. Comp. Laws § 397.603 (2009); Wis. Stat. § 43.30 (2008). Some states go farther, barring the retention of borrower records after materials have been returned.

Libraries are required to develop privacy enhancing technologies that limit or eliminate the collection of personally identifiable information. Arkansas requires an "automated or Gaylord-type circulation system that does not identify a patron with circulated materials after materials are returned." Ark. Code Ann. § 13-2-703 (2009).

All personally-identifiable information concerning readers is generally kept confidential, including digital records. *See* Ark. Code Ann. § 13-2-701 (2009) ("'Confidential library records' means documents or information in any format retained in a library ... including ... computer database searches"); N.Y. C.P.L.R § 4509 (Consol. 2009) (protecting readers' records "including but not limited to ... computer database searches"); *see also* R.I. Gen. Laws § 38-2-2 (2009); 1 Vt. Stat. Ann. § 317 (2009).

Law enforcement access to library records typically requires a court order or a subpoena with notice to the subject. *See* 75 Ill. Comp. Stat. 70/1(1) (2009) ("Except pursuant to a court order, no person shall publish or make any information contained in [library] records available to the public"); 27 Me. Rev. Stat. § 121 (2009) (library records "may only be released with the express written permission of the patron involved or as the result of a court order."); *see also* D.C. Code Ann. § 39-108 (a)-(d) (LexisNexis 2009); Minn. Stat. § 13.40 (2008); Miss. Code Ann. § 39-3-365 (2008); N.M. Stat. Ann. § 18-9-4 (West 2009).

Library privacy laws impose statutory penalties for violations of patron privacy rights. *See, e.g.,* Ark. Code Ann. § 13-2-702 (2009) ("Any person who knowingly

---

vacy.cfm; http://www.state.hi.us/oip/opinionletters/opinion%2090-30.pdf;

violates any of the provisions of this subchapter shall be guilty of a misdemeanor and shall be punished by a fine of not more than two hundred dollars ($ 200) or thirty (30) days in jail, or both, or a sentence of appropriate public service or education. or both); Mont. Code Ann. § 22-1-1111 (2007) (imposing criminal liability on violators, creating a private cause of action, and authorizing statutory damages as well as attorneys' fee awards); *see also* Ariz. Rev. Stat. § 41-1354 (LexisNexis 2008); Fl. Stat. § 257.261(4) (2009); Ga. Code Ann. § 24-9-46 (2009).

In Kentucky, Ken. Rev. Stat. Ann. 61.878(1)(a) (LexisNexis 2009) exempts public records "containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy..." The Attorney General interpreted this as requiring a balancing test "weighing an individual's right of privacy against the public interest in the transaction involved." Request by James A. Nelson. State Librarian; opinion by Steven L. Beshear, Attorney General; Carl Miller, Assistant Attorney General. OAG 81-159, 1981 KY AG LEXIS 273 (April 21, 1981). The Attorney General determined that "the individual's privacy rights as to what he borrows from a public library (books, motion picture film, periodicals and any other matter) is overwhelming. In fact we can see no public interest at all to put in the scales opposite the privacy rights of the individual." *Id.*

The Hawaii Attorney General concluded that "In our opinion, individuals have a significant privacy interest in information that that reveals the materials that they have requested, used, or obtained, from a public library." Office of Information Practices Opinion Letter No. 90-30, issued October 23, 1990; *State v. Tanaka*, 67 Haw. 658, 662

---

http://www.wku.edu/~bryan.carson/librarylaw/kentucky%2Bag.html.

(1985), the Hawaii Supreme Court explained that "article I, section 7 of the Constitution of the State of Hawaii was intended to protect individuals from unwarranted governmental intrusion in activities or matters which reveal an individual's "activities, associations and beliefs," such as an individual's choice of reading materials." *Id.* at 662.

## VI. Routine Privacy Safeguards for Library Patrons are Missing from the Settlement Agreement

The Settlement Agreement lacks the routine privacy safeguards, described above, that protect reader privacy. In fact, the digital library system contemplated in the Settlement allows Google to collect personal information from readers that libraries do not collect today. This dramatically amplifies the risk to intellectual freedom. Even if the parties adopted some post-Settlement privacy "policies," there is no absolutely no assurance that such policies, drafted by interested parties, would contain the strong privacy safeguards and enforcement mechanisms that currently exist in state library privacy laws.

## RULE 7.1 DISCLOSURE

Pursuant to Fed. R. Civ. P. 7.1(a), the Electronic Privacy Information Center

("EPIC") certifies that it is a 501(c)(3) non-profit corporation incorporated in the District

of Columbia. EPIC has no parent corporation, affiliates, or subsidiary. No publicly held

company owns 10% or more of EPIC's stock.

September 8, 2009

Marc Rotenberg
(*pro hac vice* motion pending)

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 8, 2009, I caused to be served, by U.S. Mail, copies of EPIC'S OBJECTIONS TO THE PROPOSED SETTLEMENT and the supporting memorandum of points and authorities upon:

**Joseph M. Beck**
Kilpatrick Stockton. LLP (GA)
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309
(404)-815-6406
(404)-541-3126 (fax)
jbeck@kilpatrickstockton.com

**Robert Jay Bernstein**
The Law Offices of Robert J. Bernstein
488 Madison Avenue
9th Floor
New York, NY 10022
(212) 705-4811
212 593 9175 (fax)
rjb@robert-bernsteinlaw.com

**Michael J. Boni**
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200
(610) 822-0206 (fax)
mboni@bonizack.com

**Adam Howard Charnes**
Kilpatrick Stockton LLP (NC )
1001 West Fourth Street
Winston-Salem, NC 27101
(336)-607-7382
(336)-734-2602 (fax)
acharnes@kilpatrickstockton.com

**Jeffrey A. Conciatori**
Quinn Emanuel Urquhart Oliver & Hedges LLP (NYC)
51 Madison Avenue
22nd Floor
New York, NY 10010
212-702-8130

212-702-8200 (fax)
jeffreyconciatori@quinnemanuel.com

**Nathan Z. Dershowitz**
Dershowitz, Eiger & Adelson, P.C.
220 Fifth Avenue, Suite 300
New York, NY 10001
(212) 889-4009
(212) 889-3595 (fax)
ndershowitz@lawdea.com

**Sanford P. Dumain**
Milberg LLP (NYC)
One Pennsylvania Plaza
New York, NY 10119
212-594-5300
212-868-1229 (fax)
sdumain@milberg.com

**Daralyn Jeannine Durie**
Durie Tangri Lemley Roberts & Kent, LLP
332 Pine Street
Suite 200
San Francisco, CA 94104
(415) 362-6666
(415) 236-6300 (fax)
ddurie@durietangri.com

**Alex Seth Fonoroff, S**
Kilpatrick Stockton, LLP (GA)
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309
(404)-815-6436
(404)-541-3202 (fax)
afonoroff@kilpatrickstockton.com

**Joseph C. Gratz**
Durie Tangri Lemley Roberts & Kent, LLP
332 Pine Street
Suite 200
San Francisco, CA 94104
(415) 362-6666
(415) 236-6300 (fax)
jgratz@durietangri.com

**James Taylor Lewis Grimmelmann**
New York Law School
Institute for Information Law and Policy
57 Worth Street
New York, NY 10013
(212) 431-2368
(212) 791-2144 (fax)
james.grimmelmann@nyls.edu

**Laura Helen Gundersheim**
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212)554-1463
(212)554-1444 (fax)
Laurag@blbglaw.com

**Joseph Solomon Hall**
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC (DC)
1615 M Street, N.W., Suite 400
Washington, DC 20036
202 326 7983
202 326 7999 (fax)
jhall@khhte.com

**Bruce P. Keller**
Debevoise & Plimpton, LLP (NYC)
919 Third Avenue
31st Floor
New York, NY 10022
212 909-6000
212 909-6836 (fax)
bpkeller@debevoise.com

**Daniel Joseph Kornstein**
Kornstein Veisz Wexler & Pollard, LLP
757 Third Avenue
NY, NY 10017
(212) 418-8610
(212) 826-3640 (fax)
DKornstein@KVWMail.com

**Mikaela Ann McDermott**
Kornstein Veisz Wexler & Pollard, LLP
757 Third Avenue
NY, NY 10017

(212)-418-8606
(212)-826-3640 (fax)
mmcdermott@kvwmail.com

**Melissa J. Miksch**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400
(415) 397-7188 (fax)

**Ronald Lee Raider**
Kilpatrick Stockton, LLP (GA)
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309
(404)-532-6909
(404)-815-6555 (fax)
rraider@kilpatrickstockton.com

**J. Kate Reznick**
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200
(610) 822-0206 (fax)

**Hadley Perkins Roeltgen**
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700

**Matthew Christian Schrurers**
Computer and Communications Industry Association
900 17th Street
Suite 1100
Washington, DC 20006
(202) 783-0070
(202) 783-0534 (fax)

**Joanne E. Zack**
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004

26

(610)-822-0202
(610)-822-0206 (fax)
jzack@bonizack.com

Marc Rotenberg