UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

The Authors Guild, Inc., Association of American　　　　:
Publishers, Inc., et al.,　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　Plaintiffs,　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　Case No. 05 CV 8136 (DC)
　　　　　v.　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　**FILED**
Google Inc.,　　　　　　　　　　　　　　　　　　　　　:　　**ELECTRONICALLY**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　Defendant.　　　　　　　　　　　　　　　　　　:

----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
## OF AMENDED SETTLEMENT AGREEMENT

Michael J. Boni (pro hac vice)
Joanne Zack
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
(610) 822-0200 (phone)
(610) 822-0206 (fax)
MBoni@bonizack.com
JZack@bonizack.com
*Attorneys for Plaintiffs The Authors Guild,*
*Inc., Herbert Mitgang, Betty Miles, Daniel*
*Hoffman, Paul Dickson, Joseph Goulden,*
*Maureen Duffy, Daniel Jay Baum,*
*Margaret Drabble, Robert Pullan, and the*
*Author Sub-Class*

Bruce P. Keller
Jeffrey P. Cunard
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)
bpkeller@debevoise.com
jpcunard@debevoise.com
*Attorneys for Plaintiffs The McGraw-Hill*
*Companies, Inc., Pearson Education, Inc.,*
*Penguin Group (USA) Inc., Simon &*
*Schuster, Inc., John Wiley & Sons, Inc,.*
*Association of American Publishers, Inc.,*
*Harlequin Enterprises Limited, Macmillan*
*Publishers Limited, Melbourne University*
*Publishing Limited, The Text Publishing*
*Company, and the Publisher Sub-Class*

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF FACTS .......................................................................... 2

III.   OVERVIEW OF THE AMENDMENTS TO THE PROPOSED
SETTLEMENT............................................................................................ 3

   A.   The Amended Class Definition........................................................... 3

   B.   The Definition of "Commercially Available"..................................... 5

   C.   Addressing Competition Concerns ..................................................... 6

   D.   Limitations on Additional Revenue Models ....................................... 8

   E.   Fiduciary for Unclaimed Books; Unclaimed Funds ........................... 9

   F.   Other Amendments ........................................................................... 10

IV.    ARGUMENT............................................................................................... 12

   A.   The Standard For Preliminary Approval............................................ 12

   B.   The ASA is the Product of Serious, Informed, Non-Collusive Negotiations
Among the Parties.............................................................................. 14

   C.   The Amendments Do Not Improperly Grant Preferential Treatment to the
Named Plaintiffs or Any Segments of the Sub-Classes..................... 16

   D.   The ASA Falls Within the Range of Possible Final Approval. ........... 16

   E.   Conditional Certification of the Amended Settlement Class is Appropriate........ 17

     1.   Certification Standards................................................................ 18

   F.   The Amended Settlement Class and Sub-Classes Should Be Provisionally
Certified. ........................................................................................... 20

     1.   Rule 23(a) Requirements Are Satisfied. ..................................... 20

     2.   The Rule 23(b)(2) and 23(b)(3) Requirements Are Satisfied. ..... 22

G.  The Court Should Approve the Proposed Form and Method for Disseminating the Supplemental Notice; Extend the Period for Exclusion Requests and Objections; and Reschedule the Fairness Hearing. ................................ 24

    1.  Supplemental Notice .................................................................................. 24

    2.  45-Day Period to Object, Opt-Out Or Opt-In; Rescheduled Fairness Hearing ...................................................................................................... 27

H.  Objectors May be Heard at the Final Approval Stage, But Not at the Preliminary Approval Stage ............................................................................. 28

V.  CONCLUSION ...................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................................18, 23, 24 n.5

*American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) .........................................................28

*Blank v. Talley Indus., Inc.*, 64 F.R.D. 125 (S.D.N.Y. 1974) .......................................................14

*Boucher v. Syracuse Univ.*, 164 F.3d 113 (2d Cir. 1999) ............................................................19

*Brown v. Kelly*, 244 F.R.D. 222 (S.D.N.Y. 2007) .........................................................................19

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .................................................................................28

*Denney v. Deutsche Bank, A.G.*, 443 F.3d 253 (2d Cir. 2006) .....................................................18

*Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985)..............................................................26

*In re Auction Houses Antitrust Litig.*, 138 F. Supp. 2d 548 (S.D.N.Y. 2001) ..............................26

*In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164 (S.D.N.Y.
    2000) .........................................................................................................................................18

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F. Supp. 2d
    184 (D. Me. 2003).....................................................................................................................25

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.
    Supp. 659 (D. Minn. 1974) .......................................................................................................14

*In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277 (S.D.N.Y. 2002)............................19

*In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99 (S.D.N.Y. 1997)..............13, 14, 16

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996)................22, 23

*In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) .......................................24

*In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999)..................................................18

*In re Traffic Executive Association-Eastern R.R.s*, 627 F.2d 631 (2d Cir. 1980).........................13

*In re Diet Drugs Products Liability Litig.*, MDL No. 1203, 2002 U.S. Dist.
    LEXIS 24771 (E.D. Pa. Dec. 10, 2002)....................................................................................26

*In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000) ...........................................18

*Jones v. Goord*, 435 F. Supp. 2d 221 (S.D.N.Y. 2006) ..................................................................20

*Lake v. First Nationwide Bank*, 900 F. Supp. 726 (E.D. Pa. 1995) ..............................................14

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) ....................................................................20

*Park v. The Thomson Corp.*, 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008).................................27

*Parker v. Time Warner Entm't Co.*, 331 F.3d 13 (2d Cir. 2003)...................................................23

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001)...............................23

*Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34 (S.D.N.Y. 1977)....................23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................................14

## Rules

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

## Treatises

4 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.25, at 38-39
   (4th ed. 2002) ............................................................................................................................12

5-23 *Moore's Federal Practice - Civil* (2008).......................................................................19, 24

*Manual for Complex Litigation – Fourth* (2004)............................................................12, 13, 14

I.     **INTRODUCTION**

The Settlement Agreement, setting forth a proposed resolution of this class action, received preliminary approval by Order dated November 14, 2008. Notice to the Class was disseminated in accordance with the Court's Order. During the notice period, the parties received numerous objections to and comments on the settlement from class members and others. In addition, the United States Department of Justice ("DOJ") filed a Statement of Interest setting forth its views on the settlement, and engaged in extensive discussions with the parties.

After consideration of the filings and substantial and meaningful negotiations, the parties have reached agreement on certain amendments to the Settlement Agreement, which are reflected in an Amended Settlement Agreement ("ASA"). A copy of the ASA is attached to the Declaration of Michael J. Boni In Support Of Preliminary Approval Of ASA ("Boni Decl. In Supp. Of Prelim. Appr."), filed herewith. A Third Amended Complaint, which adds new author and publisher class representatives from Canada, the United Kingdom and Australia for each of the sub-classes, is being filed concurrently herewith.

The modifications reflected in the ASA generally benefit the members of the Amended Settlement Class, and significantly reduce the number of class members. The ASA is fair, reasonable, adequate and in the best interests of the Amended Settlement Class. It unquestionably falls within a range of reasonableness, which is the standard under which these motions are decided.

Accordingly, plaintiffs respectfully request that the Court: (a) grant preliminary approval of the ASA; (b) conditionally certify the Amended Settlement Class; (c) direct that supplemental notice of the ASA be disseminated to the Amended Settlement Class in the form and manner proposed by plaintiffs; (d) provide an additional period for Amended Settlement Class members to opt out, opt back in, or object (with any objections to the ASA limited to the provisions amended from the Settlement Agreement); and (e) schedule a final fairness hearing.

## II.    <u>STATEMENT OF FACTS</u>

Plaintiffs filed their motion for preliminary approval of the original Settlement Agreement on October 28, 2008.  Plaintiffs' memorandum of law, D.I. 57, set forth the reasons why preliminary approval should be granted.  On November 14, 2008, the Court entered an order granting preliminary approval of the settlement and directing that notice be disseminated to the Class in the form and manner proposed by the parties.  D.I. 64. Notice has been given in accordance with the Court's Order, and plaintiffs will file a declaration of compliance with the Order in advance of the final fairness hearing.

During the notice period, both objections and statements in support of the settlement were filed with the Court.  Most of the objections came from parties outside the United States, including class members, rights groups and others.  Objections were filed by the Governments of the Federal Republic of Germany and the French Republic. D.I. 179, 287.

In addition, on July 2, 2009, the DOJ Antitrust Division informed the Court that it had opened an investigation into the settlement, D.I. 120, and, on September 18, 2009, the DOJ filed a Statement of Interest expressing its concerns with the original Settlement Agreement.  D.I. 720.  After intensive discussions with the DOJ about its views, the parties amended the Settlement Agreement as set forth in the ASA.

III.     **OVERVIEW OF THE AMENDMENTS TO THE PROPOSED SETTLEMENT**[1]

    A.     **The Amended Class Definition**

The ASA substantially reduces the scope of the class from the Settlement Agreement.  First, and most significantly, the international scope of the class has been reduced by narrowing the definitions of "Book" and "Insert."  Only Rightsholders in a "Book" or "Insert," as those terms are defined in the ASA, are members of the Amended Settlement Class.[2]  "Book" is defined as follows in the ASA:

> "Book" means a written or printed work that as of January 5, 2009 (a) had been published or distributed to the public or made available for public access as a set of written or printed sheets of paper bound together in hard copy form under the authorization of the work's U.S. copyright owner, (b) was subject to a Copyright Interest, and (c) (1) if a "United States work," as defined in 17 U.S.C. § 101, was registered with the United States Copyright Office, and (2) if not a United States work, either (x) was registered with the United States Copyright Office, or (y) had a place of

---

[1]     Capitalized terms have the meaning ascribed to them in the ASA.

[2]     The Third Amended Complaint adds as Representative Plaintiffs certain authors and publishers that reside or are located in and whose Books were published in Canada, the United Kingdom or Australia.

publication in Canada, the United Kingdom or Australia, as evidenced by information printed in or on a hard copy of the work. Relevant information printed in or on a hard copy of the work may include, for example, a statement that the book was "Published in [Canada] or [the UK] or [Australia]," or the location or address of the publisher in one of those three countries.  The term "Book" does not include: (i) Periodicals, (ii) personal papers (e.g., unpublished diaries or bundles of notes or letters), (iii) written or printed works in which more than twenty percent (20%) of the pages of text (not including tables of contents, indices, blank pages, title pages, copyright pages and verso pages) contain more than twenty percent (20%) music notation, with or without lyrics interspersed (for purpose of this calculation, "music notation" means notes on a staff or tablature), (iv) written or printed works in, or as they become in, the public domain under the Copyright Act in the United States, (v) Government Works, or (vi) calendars. References in this Settlement Agreement to a Book include all Inserts contained in the Book, except where this Settlement Agreement provides otherwise.

ASA § 1.19.

A work is now included in the settlement only if, by January 5, 2009, it has been registered with the United States Copyright Office, or published in Canada, the United Kingdom, or Australia.  This geographical limitation likewise limits the scope of persons who are members of the Amended Settlement Class because they own a Copyright Interest in an Insert.

The class has been narrowed from the Settlement Agreement by other changes as well.  Music notation and children's book illustrations are excluded from the definition of "Insert," and works for which 20% of pages contain more than 20% music notation are

excluded from the definition of "Book."[3]  Books reproduced in microform are now

excluded from the definition of "Book," as are calendars.  Finally, comic books and

compilations of Periodicals now are explicitly treated as Periodicals, and are thus

excluded from the definition of "Book."  All of these changes further narrow the scope of

the Amended Settlement Class.

### B.     The Definition of "Commercially Available"

As in the original Settlement Agreement, the ASA provides that Google may

make Display Uses of Books that are Commercially Available only after the

Rightsholders affirmatively authorize Google to do so.  Although Google is authorized by

default to make Display Uses of Books that are not Commercially Available, the

Rightsholder can turn those uses off at any time.

The ASA clarifies the definition of "Commercially Available."  Under the

amended definition, a Book is categorized as Commercially Available, and thus will not

be displayed without explicit permission, if new copies are available for purchase by

consumers in the United States, Canada, the United Kingdom, or Australia from sellers

anywhere in the world.  Thus, for example, a Book published in the United Kingdom and

available to purchasers in the United States, Canada, the United Kingdom, or Australia

from an online bookseller in South Africa will be classified as "Commercially

Available."  In addition, the parties will use metadata sources from the Canada, the

---

[3]     The amendments with respect to music notation were achieved with the guidance
and assistance of the Songwriters Guild of America, which has agreed to withdraw
its objection to the settlement.

United Kingdom, and Australia, as well as the United States, to classify Books as Commercially Available.

Under the ASA, Google has agreed to give the Book Rights Registry (the "Registry") sixty days' notice after Google classifies a Book as not Commercially Available before it makes any Display Uses of that Book. This cushion affords Rightsholders time to challenge the classification, thereby preventing Google from displaying the Book unless and until the challenge is resolved in Google's favor, and also sufficient time to set the Book's price and other options. ASA § 3.3(a).

### C.     Addressing Competition Concerns

The parties, after considerable research, concluded that the original Settlement Agreement would survive antitrust scrutiny. They nevertheless agreed to make several modifications after their discussions with the DOJ, including:

*First*, the parties deleted Section 3.8(a), which provided "Most Favored Nation" status to Google.

*Second*, Section 4.2(b)(2) describes the Pricing Algorithm that sets default prices for the Consumer Purchase of Books where the Rightsholder does not specify a price. That section now makes clear that the Pricing Algorithm will be designed to simulate how a Rightsholder would unilaterally price its Book in a competitive market. Thus, the Pricing Algorithm could not seek to maximize prices by, for example, raising the price on all dictionaries in tandem.

Section 4.2(c)(ii)(2) also clarifies that the Pricing Algorithm will be developed by Google without Registry or Rightsholder involvement (although, as before, the Registry's third-party experts may confirm the validity of the Pricing Algorithm). In addition, the ASA clarifies that the Registry may not disclose to any Rightsholder the algorithmic price of any other Rightholder's Book. ASA § 4.2(c)(iii).

*Third*, the ASA makes clear that a Rightsholder may specify *any* price for a Book for Consumer Purchase, including $0.00. ASA § 4.2(b)(i)(1). Rightsholders may also choose to allow their Books to be made available at no charge under alternative licensing schemes, such as Creative Commons licenses. ASA § 4.2(a)(i).

*Fourth*, the ASA permits Google or a Rightsholder to renegotiate the revenue split for Commercially Available Books for all Revenue Models. ASA § 4.5(a)(iii). Rightsholders can also approve different non-price features from those set forth in the ASA, such as the twenty-page print limitation and four-page copy/paste limitation on users of Consumer Purchase and Institutional Subscriptions. ASA § 3.3(g).

*Fifth*, the ASA makes clear that Google, like any other retailer, may make Books available at a discount, while paying the same amount to the Rightsholder as if the Book had been made available at full price. ASA § 4.5(b)(i). The Registry may also authorize Google to make special offers of Books for Consumer Purchase at reduced prices and pay 63% of the discounted List Price to the Rightsholders. Claiming Rightsholders (and the

fiduciary for unclaimed Books), however, can disapprove these special offers for their (or unclaimed) Books.  ASA § 4.5(b)(ii).

*Sixth*, Google will allow others to resell access to Books through the Consumer Purchase model, permitting the reseller to retain a majority of Google's share of Net Purchase Revenues for that reseller's sales.  ASA § 4.5(b)(v)(2).

*Seventh*, the proposed Final Judgment and Order of Dismissal provides that this Court's approval of the settlement does not provide any immunity from the antitrust laws, such as via the *Noerr-Pennington* Doctrine.  ASA Attachment L ¶ 17.

**D.    Limitations on Additional Revenue Models**

Like the original Settlement Agreement, the ASA provides for future Revenue Models, subject to Registry approval, in addition to Institutional Subscriptions, Consumer Purchases, Advertising Uses, and the Public Access Service.  The ASA provides that the Registry and Google may only agree to the following additional Revenue Models:

- Print on Demand, through which print copies of Books that are not Commercially Available could be sold;

- File Download (formerly ".PDF Download"), through which electronic copies of Books could be made available for download as PDF files or in other formats so that they could be used, for example, on electronic book reading devices; and

- Consumer Subscription, which would permit individual consumers to access the Institutional Subscription Database.

ASA § 4.7(a)-(c). The ASA does not provide for any other additional Revenue Models. If Google and the Registry agree to launch an additional Revenue Model, claiming Rightsholders (and the fiduciary for unclaimed Books, *see* Section III.E., *infra*) will receive sixty days' notice before such launch, and may exclude their Books from any additional Revenue Model at any time. ASA § 4.7.

### E.    Fiduciary for Unclaimed Books; Unclaimed Funds

The ASA now provides that the Registry's Charter will ensure that an independent fiduciary will be delegated the responsibility to represent the interests of the Rightsholders of unclaimed Books and Inserts with respect to the exploitation of their works under the ASA. ASA § 6.2. Further, no unclaimed funds will be distributed to claiming Rightsholders or go to the operations of the Registry (except, as described below, solely for the purpose of locating Rightsholders of unclaimed works).

The ASA also changes the provisions relating to the use and disposition of funds generated by a Book whose Rightsholder has not made a claim. Now, the Registry will hold these funds, for the benefit of that Rightsholder, for at least ten years (extended from five years under the original Settlement Agreement). ASA § 6.3(a)(i)(1). Beginning five years after the Effective Date, subject to the approval of the fiduciary, the Registry may use 25% of all funds earned in any one year that have remained unclaimed for at least

five years for the sole purpose of locating the Rightsholders of unclaimed works.  ASA § 6.2(a)(i)(2).

Beginning ten years after the Effective Date, any unclaimed funds will be allocated proportionally to the United States, Canada, the United Kingdom, and Australia, based on the number of Books registered with the United States Copyright Office (for the United States) and the number of Books published in Canada, the United Kingdom, and Australia.  The Registry may file motions with the Court recommending how unclaimed funds held at least ten years should be distributed to literacy-based charities in each such country that directly or indirectly benefit the Rightsholders and the reading public, after consultation with Google and the Fully Participating Libraries and Cooperating Libraries.[4]

Abandoned funds due to Registered Rightsholders will be held by the Registry unless and until they must be distributed to the appropriate governmental authority in accordance with applicable law.  ASA § 6.3(a)(ii).

**F.    Other Amendments**

The ASA contains a number of other changes, including:

---

[4]    The amendments described in Sections C, D and E above (up to this point in this Section E) were made after extensive discussions with the DOJ.

- The Board of Directors of the Registry will have at least one representative of each sub-class from each of the United States, Canada, the United Kingdom, and Australia.

- Rightsholders who have a dispute with Google, the Registry, or another Rightsholder that is arbitrated pursuant to Article IX of the ASA need not go to the expense of traveling in order to participate in proceedings, but instead may choose to participate in that proceeding by telephone or videoconference. ASA § 9.3(a).

- The deadline for submitting Cash Payment claims for already scanned Books and Inserts is extended from January 5, 2010 to March 31, 2011. Rightsholders may claim Books and Inserts at any time in order to manage their Books and Inserts and to control and receive revenues from their uses; this deadline applies only to eligibility for Cash Payments.

- Usage Fees will be held for Rightsholders who have not yet claimed their Books for at least ten years and Rightsholders will be eligible for Inclusion Fees if they claim their Books or Inserts within ten years of the Effective Date, instead of, in both cases, five years, as was provided in the original Settlement Agreement.

- The deadline for Removal of one's Book from Google's databases has been extended from April 5, 2011 to March 9, 2012. (The April 5, 2011

deadline for Removal from the libraries' digital copies remains as it was in the Settlement Agreement.)

- In order to provide for additional printing revenues for Rightsholders and additional access to works by the reading public, the ASA permits the Registry to authorize additional Public Access Service terminals over and above the one terminal per public library building that is guaranteed by Section 4.8(a)(3).

- The ASA provides that Google will not reveal personally identifiable information about users to the Registry absent valid legal process. ASA § 6.6(a)(v).

- The parties are committed to continue making ongoing improvements to the claiming process. ASA § 13.3.

## IV.   ARGUMENT

### A.   The Standard For Preliminary Approval

"Review of a proposed class action settlement generally involves two hearings. First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation." *Manual for Complex Litigation – Fourth* ("*Manual*") § 21.632, at 320 (2004); *see also* 4 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.25, at 38-39 (4th ed. 2002) (endorsing two-step process).

The Court should review the ASA for concerns "such as unduly preferential treatment of class representatives or segments of the class, inadequate compensation or harms to the class, the need for subclasses, or excessive compensation for attorneys." *Manual* § 21.632, at 321.  Ultimately, the Court must determine whether the ASA "falls within the range of possible approval."  *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.").  Determination of whether the ASA "falls within the range of possible approval" depends on whether there is a conceivable basis for believing that the more rigorous standard for final approval can be satisfied.  In essence, it is "a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."  *In re Traffic Executive Association-Eastern R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980).

At the second stage of the approval process, the final fairness hearing, "the proponents of the settlement must show that the proposed settlement is 'fair, reasonable, and adequate.'"  *Manual* § 21.634, at 321.

The Court previously determined that the original Settlement Agreement met the standards for preliminary approval.  As explained below, the ASA amply meets those standards as well.

### B.    The ASA is the Product of Serious, Informed, Non-Collusive Negotiations Among the Parties.

In determining whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations," *NASDAQ Market-Makers*, 176 F.R.D. at 102, courts give "substantial" and "significant" weight to the experience and reputation of the counsel who prosecuted the case and negotiated the settlement.  *See Blank v. Talley Indus., Inc.*, 64 F.R.D. 125, 132 (S.D.N.Y. 1974) ("Another factor favoring the settlement, and one entitled to substantial weight, is that it bears the imprimatur of seasoned and experienced counsel . . . ."); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'") (citation omitted); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 667 (D. Minn. 1974) ("The recommendation of experienced . . . counsel is entitled to great weight.").  Indeed, when a settlement is negotiated at arm's length by experienced counsel, there is a presumption that it is fair and reasonable*. See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("[A] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (quoting *Manual for Complex Litigation*, Third, § 30.42 (1995)).

Here, the original Settlement Agreement was negotiated over the course of more than two years, and the changes in the ASA are the result of further intensive, arm's-length negotiations.  Plaintiffs were represented in these negotiations by highly

experienced counsel, who benefited from the guidance of the Associational Plaintiffs –
the Authors Guild and AAP – as well as recently from the Canadian Publishers' Council,
the United Kingdom Publishers Association, the Australian Publishers Association, and
the Authors Licensing and Collecting Society of the United Kingdom, with respect to
issues affecting Canadian, U.K., and Australian publishers and authors.  Those
organizations are among the leading trade organizations dedicated to protecting and
advancing publishers' and authors' rights.  Class Counsel have substantial experience
litigating class actions, and also substantial experience in copyright law.  The
negotiations took place at arm's length, were adversarial, and at times contentious.  The
material terms of both the original Settlement Agreement and the ASA were not reached
until Class Counsel thoroughly investigated and researched the relevant facts and law.

      The sub-classes were separately represented by experienced counsel.  When their
interests were aligned against Google, the authors' and publishers' representatives
negotiated in a cooperative, unified manner.  Where author and publisher interests with
respect to the settlement terms were in conflict, particularly in connection with the
drafting of the Author-Publisher Procedures (Attachment A to the Settlement
Agreement), negotiations between the authors and publishers were adversarial and
contentious.

      Moreover, the changes made to the ASA, were negotiated by the parties after
extensive discussions with the DOJ and with certain objectors and amici.

### C. The Amendments Do Not Improperly Grant Preferential Treatment to the Named Plaintiffs or Any Segments of the Sub-Classes.

As for whether the settlement improperly grants "preferential treatment to class representatives or segments of the class," *NASDAQ Market-Makers*, 176 F.R.D. at 102, all members of each sub-class are conferred the same rights and allocated payments under the ASA according to the same terms. No preferential classes exist.

### D. The ASA Falls Within the Range of Possible Final Approval.

The remaining consideration at the preliminary-approval stage is whether the ASA "falls within the range of possible [final] approval," *NASDAQ Market-Makers*, 176 F.R.D. at 102. In granting preliminary approval of the original Settlement Agreement, the Court found that the proposed compromise met this standard. The same finding is warranted with respect to the ASA.

The ASA leaves the material terms – indeed, the overwhelming majority of the terms – of the original Settlement Agreement unchanged. The ASA, like the original Settlement Agreement, provides for:

- At least $45 million (and a minimum of $60 per Book, $15 per entire Insert, and $5 per Partial Insert) to compensate Amended Settlement Class members whose works were scanned without permission on or before May 5, 2009.

- $34.5 million to establish and maintain the Registry, which has provided class notice and claims administration, and which will prospectively locate

Amended Settlement Class members, maintain a database of their contact

information, collect and pay revenues on behalf of the Amended

Settlement Class for the use of copyrighted works through the Settlement,

and otherwise protect and represent the interests of the Amended

Settlement Class.

- Prospectively, payment of 63% of the revenues earned from Google's

    future Display Uses of the Books of the members of the Amended

    Settlement Class.

In addition to these and other significant benefits, the ASA creates a rights

clearance mechanism by which members of the Amended Settlement Class, at all times,

retain control over their copyrighted works by determining the extent to which those

works are included or excluded from Display Uses.  It also creates meaningful security

provisions that will protect the class's works against unauthorized use.

Perhaps most importantly, the settlement provides a brand new market for out-of-

print Books; the Rightsholders of those Books can now enjoy a new revenue stream and a

new audience for their Books.  This, of course, provides an historic benefit to the reading

public as well.

## E.      Conditional Certification of the Amended Settlement Class is Appropriate.

In granting preliminary approval to the original Settlement Agreement, this Court

held that the original definition of the settlement class provisionally met the applicable

standards under Rule 23 of the Federal Rules of Civil Procedure. Because the class

definition in the ASA is substantially narrower than that in the original Settlement

Agreement (as a result of the narrowed definition of the term "Books"), conditional

certification of the Amended Settlement Class is likewise appropriate. *See* Fed. R. Civ.

P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or

amended before final judgment.").

### 1. <u>Certification Standards</u>

In conjunction with the preliminary approval of a settlement under Rule 23 of the

Federal Rules of Civil Procedure, courts routinely grant provisional certification of a

plaintiff class for settlement purposes. Provisional certification is not final or binding,

and is reviewed in connection with the final fairness hearing. Plaintiffs must then

establish that the Amended Settlement Class satisfies the requirements of Rule 23 and, if

so, the class certification will be made final if the settlement is approved. *See In re*

*Austrian & German Bank Holocaust Litig.*, 80 F. Supp.2d 164, 172-173 (S.D.N.Y. 2000)

(citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619 (1997)); *In re Sumitomo*

*Copper Litig.*, 189 F.R.D. 274, 278 (S.D.N.Y. 1999); *In re Toys "R" Us Antitrust Litig.*,

191 F.R.D. 347, 351 (E.D.N.Y. 2000).

Certification is proper for any purpose – settlement or litigation – where the

requirements of Rule 23(a) and (b) have been met. *See Denney v. Deutsche Bank, A.G.*,

443 F.3d 253, 270 (2d Cir. 2006). Rule 23(a) imposes four threshold requirements on

putative class actions: numerosity, commonality, typicality, and adequacy of

representation. *Id*. at 267. Plaintiffs also must show that the class is "maintainable"
under Rule 23(b), which sets forth three alternative categories under which classes may
be certified. *See* Fed. R. Civ. P. 23(b)(1)-(3). Certification pursuant to Rule 23(b)(2) is
warranted where defendants have acted on grounds generally applicable to the class,
making final injunctive or declaratory relief appropriate. Fed. R. Civ. P. 23(b)(2); *Brown
v. Kelly*, 244 F.R.D. 222, 228 (S.D.N.Y. 2007). For a class to meet the requirements of
Rule 23(b)(3), common questions must "predominate over any questions affecting only
individual members," and class resolution must be "superior to other available methods
for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

"When appropriate, a class may be divided into subclasses that are each treated as
a class under this rule." Fed. R. Civ. P. 23(c)(5). Further, a district court's broad
discretion to facilitate the orderly administration of an action "includes the ability to
create subclasses." *In re Deutsche Telekom AG Sec. Litig*., 229 F. Supp.2d 277, 283
(S.D.N.Y. 2002). Where there are groups within the proposed class that may have
adverse or divergent interests, the division of the class into subclasses is appropriate. *See*
Fed. R. Civ. P. 23, Notes of Advisory Comm. on 1966 amendments ("Where a class is
found to include subclasses divergent in interest, the class may be divided
correspondingly, and each subclass treated as a class."); *Boucher v. Syracuse Univ*., 164
F.3d 113, 118-119 (2d Cir. 1999) (district court erred in not certifying two subclasses
when it found potential conflicts between class members); 5-23 *Moore's Federal
Practice - Civil* § 23.86[1][c] (2008) ("Division of a proposed class into subclasses is

appropriate … if there are groups within the proposed class that have adverse interests.").
"Because a subclass is itself a class, each subclass must separately and independently
satisfy the requirements of Rule 23 for class certification." *Jones v. Goord*, 435 F. Supp.
2d 221, 232 (S.D.N.Y. 2006); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 378-79 (2d
Cir. 1997) (explaining that subclasses must satisfy requirements of Rule 23(b)).

### F.     The Amended Settlement Class and Sub-Classes Should Be Provisionally Certified.

#### 1.     Rule 23(a) Requirements Are Satisfied.

Here, the proposed sub-classes, and thus the proposed class, are sufficiently
numerous to satisfy the numerosity requirements.  *See* Fed. R. Civ. P. 23(a)(1)
(numerosity).  The proposed Author Sub-Class numbers in the many tens or hundreds of
thousands.  The Authors Guild alone has over 8,000 published authors in its membership,
and the sub-class includes published Book authors and their heirs, successors and assigns.
The proposed Publisher Sub-Class has many thousands of members.  The AAP alone has
over three hundred members, and the Sub-Class includes publishers and their successors,
exclusive licensees and assignees.  Both sub-classes contain authors, publishers and other
Rightsholders located in the United States, Canada, the United Kingdom, and Australia
and (albeit to a much lesser extent) around the world.

Amended Settlement Class members all share the same interest in resolving such
common questions as whether Google reproduced for its own commercial use copies of
class members' works; whether Google's public display of their works infringes their
copyrights; whether Google's copying, and its display on its commercial website, of their

works is a "fair use"; whether Google's infringement was willful; the appropriate measurement of damages under the Copyright Act; and the fashioning of an equitable remedy to govern future conduct.  *See* Fed. R. Civ. P. 23(a)(2) (commonality).  Each of the named plaintiffs owns one or more United States copyright interests in Books, and each owns a United States copyright interest in a work that has been copied and displayed, or faces an imminent threat of being copied and displayed, by Google without authorization.  Thus, the claims of the Representative Plaintiffs for each Sub-Class are typical of those of the rest of the Sub-Class.  *See* Fed. R. Civ. P. 23(a)(3) (typicality). Plaintiffs' claims are typical of Amended Settlement Class members with copyright interests in Books as well as Inserts.

Representative Plaintiffs have retained counsel who are highly experienced in class action and copyright litigation, and the Representative Plaintiffs have no interest antagonistic to the rest of the members of their respective Sub-Classes.  *See* Fed. R. Civ. P. 23(a)(4) (adequacy).  Because the authors and publishers had some divergent interests with respect to the matters addressed in the Author-Publisher Procedures, the Author Sub-Class and Publisher Sub-Class are represented by separate Representative Plaintiffs and separate Class Counsel.  Although authors and publishers have a common interest in establishing Google's liability for the infringement of their works, recovering damages from Google for such infringement, and securing equitable relief governing Google's conduct, their interests diverged in several respects.

Examples of divergent interests included whether a Book is in-print or out-of-print; who, as between the author and publisher, is entitled to make decisions concerning exclusion and removal; and how the authors' and publishers' revenues should be allocated between the authors and publishers of Books.  In addressing those interests, the authors and publishers have been zealously represented by their respective Sub-Class Counsel, as reflected in the ASA, the Plan of Allocation, and Author-Publisher Procedures.  The Representative Plaintiffs and their counsel are adequate Sub-Class representatives, and fairly and adequately represent the interests of the Sub-Classes.  *See* Fed. R. Civ. P. 23(a)(4) (adequacy).

### 2.      The Rule 23(b)(2) and 23(b)(3) Requirements Are Satisfied.

Plaintiffs seek certification under Rule 23(b)(2) and 23(b)(3).  *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 515-16 (S.D.N.Y. 1996) ("[W]here injunctive relief and damages are both important components of relief requested, court[s] have regularly certified an injunctive class under Rule 23(b)(2) and damages class under Rule 23(b)(3) in the same action.").

Certification of an injunctive relief class under Rule 23(b)(2) is warranted, as Plaintiffs seek to enjoin Google's alleged massive infringement of the copyrights of members of the Amended Settlement Class.  Certification pursuant to Rule 23(b)(2) is appropriate where the court finds that "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief would be both reasonably

necessary and appropriate were the plaintiffs to succeed on the merits." *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 20 (2d Cir. 2003) (citing *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001).  Both conditions are met here.  Numerous plaintiffs would reasonably seek to enjoin Google from reproducing and displaying their copyright-protected works and injunctive relief would be the necessary and appropriate outcome were plaintiffs to prevail following a trial on the merits.

In addition, the Rule 23(b)(3) requirements – predominance and superiority – are satisfied.  The purpose of the predominance inquiry is to allow the Court to determine whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  *See Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.").  "The predominance requirement calls only for predominance, not exclusivity, of common questions." *Shelter Realty Corp. v. Allied Maintenance Corp*., 75 F.R.D. 34, 37 (S.D.N.Y. 1977).  Here the common questions – infringement liability, the fair use defense, the amount of damages for past infringement, and the fashioning of an equitable remedy to govern future conduct – predominate over any issues affecting only individual class members.  *See* Fed. R. Civ. P. 23(b)(3); *see also NASDAQ Market-Makers*, 169 F.R.D. at 517 (explaining the predominance requirement is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless").

In addition, a class action is a superior means of fairly and efficiently resolving this dispute.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  With respect to "superiority," Rule 23(b)(3) requires that a class action be the "most 'fair and efficient' method of resolving this case."  *In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) (citing Fed. R. Civ. P. 23(b)(3)).  The claims in this case concern the book digitization program undertaken by Google, and by combining the claims of the class members into a single action, plaintiffs' claims are presented far more fairly and efficiently than they would be in individual actions, which would require the same issues to be litigated multiple times.  *See* 5-23 *Moore's Federal Practice - Civil* § 23.46[1] ("In determining superiority, courts must consider alternative methods of adjudicating the dispute. Superiority is determined by comparing the efficiency and fairness of all available methods of adjudicating the matter.")[5]

> **G.**    **The Court Should Approve the Proposed Form and Method for Disseminating the Supplemental Notice; Extend the Period for Exclusion Requests and Objections; and Reschedule the Fairness Hearing.**

> **1.**    **Supplemental Notice**

Plaintiffs propose disseminating a Supplemental Notice to inform the Amended Settlement Class of the amendments to the original Settlement Agreement, substantially in the form attached as Attachment N to the ASA.  As the ASA itself provides, the

---

[5] In a settlement context, issues of manageability at trial under Rule 23(b)(3) need not be addressed.  *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial.").

Supplemental Notice will be posted prominently on the dedicated settlement web site,

www.googlebooksettlement.com, and the websites of Google and the Associational

Plaintiffs.  Individual copies of the Supplemental Notice will also be mailed or emailed to

all members of the original Settlement Class who provided their contact information

through the settlement web site, submitted claims, opted out of or objected to the original

Settlement Agreement, or filed comments.  The Supplemental Notice will also be sent by

email to Reproduction Rights Organizations and other Rightsholder organizations.  In

addition, the Settlement Administrator will continue its informational toll-free telephone

service.

        The notice program for the original settlement was broader and included an

extensive publication campaign as well as more broadly disseminated direct notice.  A

more limited notice program is appropriate for the ASA, the core terms of which, as

noted above, are the same as those in the original Settlement Agreement and as to which

the amendments clarify original provisions, do not materially impair Amended

Settlement Class members' rights, and in many respects confer enhanced benefits on the

Amended Settlement Class.  A more limited notice program also is appropriate given the

substantial original notice program, the widespread coverage of the settlement in the

general and trade press, the substantial discussion of the settlement worldwide, and the

inevitable widespread news coverage of the ASA.

        In *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 292 F.

Supp. 2d 184 (D. Me. 2003), the court denied final approval of a proposed settlement

after a program of individual and publication notice to the class.  The parties then

proposed an amended settlement.  The court granted preliminary approval and approved a

supplemental notice program under which defendants' informational websites were

continuously updated and maintained to reflect the terms of the amended settlement; an

informational toll-free number was continued; and objectors and opt-outs were sent

written notice of the amended settlement.  The court concluded that "such notice was

sufficient because it would be too burdensome and costly to repeat a mailing to the over

eight million class members informing them of favorable changes in the proposed

amendment, especially to those who never objected to the first proposed settlement."  *Id.*

at 186.  "The relevant case law supports limited notice to non-objectors when the class

members have already received an earlier form of notice."  *Id.  See In re Diet Drugs*

*Products Liability Litig.*, MDL No. 1203, 2002 U.S. Dist. LEXIS 24771, at *19-20 (E.D.

Pa. Dec. 10, 2002) (notice of amended settlement agreement sent to individually

represented claimants and posted on the settlement website was sufficient where

proposed changes benefited the class and conformed "to the purposes of the underlying

Settlement Agreement"); *In re Auction Houses Antitrust Litig.*, 138 F. Supp. 2d 548, 549

& n.3 (S.D.N.Y. 2001) (court granted final approval of settlement conditioned on certain

amendments to settlement documents, but did not require sending of new notice to class,

although parties' ensuing submissions were served on objectors who had already come

forward); *Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985) ("Under these

limited circumstances where the amendment [to the consent decree] is narrow and it is

clearly apparent that the interests of the classes are not substantially impaired, the court is

of the opinion that the notice already given is adequate and that additional notice is not

required pursuant to Rule 23(e)."). *See also Park v. The Thomson Corp.*, 2008 WL

4684232 (S.D.N.Y. Oct. 22, 2008) (granting final approval to an amended settlement

agreement and ordering notice of the amendments to be disseminated following final

approval).

> ## 2. 45-Day Period to Object, Opt-Out Or Opt-In; Rescheduled Fairness Hearing

Plaintiffs propose that members of the Amended Settlement Class be given 45

days after the date the Supplemental Notice is disseminated to opt out of, object to any of

the provisions that are amended by the ASA (and only such provisions), or (if they have

already opted out) opt back into the settlement.  Plaintiffs further propose that the

Statement of Interest of the DOJ ("DOJ Statement") be due one week after such 45-day

period.  Plaintiffs request that the final fairness hearing on the settlement be rescheduled

for a date as close as possible to three weeks after the end of the foregoing 45-day period.

In addition, plaintiffs propose that their motion for final settlement approval and all

supporting papers be due one week before the date of the final fairness hearing.

Based on this proposed schedule, Plaintiffs propose the following dates:

Supplemental Notice Commencement Date:  December 14, 2009; Supplemental Opt-Out

Deadline: January 28, 2010; filing of DOJ Statement: February 4, 2010; Plaintiffs'

motion for final settlement approval and supporting papers:  February 11, 2010; Final

Fairness Hearing:  February 18, 2010.

**H.     Objectors May be Heard at the Final Approval Stage, But Not at the Preliminary Approval Stage.**

Because of its broad scope of relief and its social importance, this settlement has generated a large number of responses, both in support of the settlement and in opposition to it.  Amended Settlement Class members who object may be granted the opportunity to be heard when the Court considers final approval of the settlement. Objections, however, are improper at the preliminary approval stage.

Until the final approval stage, "potential class members are merely passive beneficiaries of the action brought on their behalf." *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 551 (1974).  The class action device provides that representative parties conduct the litigation on behalf of the others.  "[T]he class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979).

For these reasons, although Amended Settlement Class members' objections to the amendments made by the ASA may be heard in connection with final approval, the Court should not accept objections prior to its preliminary approval.

**V.    CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that the Court enter the accompanying proposed order granting preliminary approval of the ASA; conditionally certifying the Amended Settlement Class; directing that Supplemental Notice be disseminated to the Amended Settlement Class in the form and manner set forth herein and in the proposed order filed herewith; providing a period for Amended Settlement Class members to object to the provisions in the ASA that amend the Settlement

Agreement, opt out, or (if they have already opted out) opt back in; and rescheduling the

final fairness hearing.

DATED:  November 13, 2009                              Respectfully submitted,


/s/ Bruce P. Keller                              /s/ Michael J. Boni
Bruce P. Keller                                  Michael J. Boni (pro hac vice)
Jeffrey P. Cunard                                Joanne Zack
DEBEVOISE & PLIMPTON LLP                          BONI & ZACK LLC
919 Third Avenue                                 15 St. Asaphs Rd.
New York, NY  10022                              Bala Cynwyd, PA  19004
(212) 909-6000 (phone)                            (610) 822-0200 (phone)
(212) 909-6836 (fax)                              (610) 822-0206 (fax)
bpkeller@debevoise.com                            MBoni@bonizack.com
jpcunard@debevoise.com                            JZack@bonizack.com

*Attorneys for Plaintiffs The McGraw-Hill*       Robert J. LaRocca
*Companies, Inc., Pearson Education, Inc.,*      KOHN SWIFT & GRAF, P.C.
*Penguin Group (USA) Inc., Simon &*             One South Broad Street, Suite 2100
*Schuster, Inc., John Wiley & Sons, Inc.,*      Philadelphia, PA 19107
*Association of American Publishers, Inc.,*     (215) 238-1700 (phone)
*Harlequin Enterprises Limited, Macmillan*      (215) 238-1968 (fax)
*Publishers Limited,  Melbourne University*     rlarocca@kohnswift.com
*Publishing Limited, The Text Publishing*
*Company, and the Publisher Sub-Class*          Sanford P. Dumain
                                                 MILBERG LLP
                                                 One Pennsylvania Plaza
                                                 New York, NY 10119
                                                 (212) 594-5300 (phone)
                                                 (212) 868-1229 (fax)
                                                 sdumain@milberg.com

                                                 *Attorneys for Plaintiffs The Authors Guild,*
                                                 *Inc., Herbert Mitgang, Betty Miles, Daniel*
                                                 *Hoffman, Paul Dickson, Joseph Goulden,*
                                                 *Maureen Duffy, Daniel Jay Baum,*
                                                 *Margaret Drabble, Robert Pullan, and the*
                                                 *Author Sub-Class*