# EXHIBIT 2

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

The Authors Guild, Inc., Association of American     :
Publishers, Inc., et al.,

        :

      Plaintiffs,                                :

                      :

         v.                                   :

                      :

Google Inc.,                                :

                      :

      Defendant.                               :

-----------------------------------------------------------------------x

Case No. 05 CV 8136-~~JES~~DC

**AMENDED SETTLEMENT
AGREEMENT**

ARTICLE I — DEFINITIONS ................................................................2

ARTICLE II — SETTLEMENT BENEFITS – OVERVIEW AND
      AUTHORIZATIONS ......................................................~~19~~23
2.1    Benefits to the Amended Settlement Class – Overview. ...............~~19~~23
2.2    Authorization of Google, Fully Participating Libraries and Cooperating
    Libraries ....................................................................~~20~~25
2.3    Author-Publisher Procedures ..............................................~~21~~25
2.4    Non-Exclusivity of Authorizations .......................................~~21~~25

ARTICLE III — GOOGLE BOOK SEARCH – RIGHTS, BENEFITS AND
      OBLIGATIONS ............................................................~~21~~26
3.1    Digitization, Identification and Use of Books. ..........................~~21~~26
3.2    Initial Display and No Display Book Classification. ...................~~23~~28
3.3    Display Books. .............................................................~~27~~33
3.4    No Display Books. .........................................................~~28~~35
3.5    Right to Remove or Exclude. .............................................~~28~~35
3.6    Technical Adaptations .....................................................~~34~~42
3.7    Contemplated Rightsholder Services. ....................................~~34~~42
3.8    Effect of ~~Other Agreements and~~ Changes in Law. ...............~~37~~45
3.9    Distribution Arrangements ................................................~~37~~46
3.10   Specific Prohibitions. ......................................................~~38~~46
3.11   Hosted Version for Rightsholders ........................................~~40~~49
3.12   Use of Digital Copies. .....................................................~~40~~49
3.13   Communication of Rightsholder Directions to Google ...............~~40~~49
3.14   Advertising Uses. ..........................................................~~41~~49
3.15   Extent of Rights and Authorizations. ....................................~~41~~50

ARTICLE IV — ECONOMIC TERMS FOR GOOGLE'S USE OF BOOKS............~~41~~50
4.1    Institutional Subscriptions. ...............................................~~41~~50
4.2    Consumer Purchases. .....................................................~~48~~58
4.3    Preview Uses. ..............................................................~~51~~62
4.4    Advertising Revenue Model ..............................................~~56~~67
4.5    Standard Revenue Splits and Discounting. .............................~~56~~68
4.6    Payment Terms. ...........................................................~~58~~71
4.7    ~~New~~Additional Revenue Models ...................................~~59~~73
4.8    Public Access Service. ....................................................~~60~~74
4.9    Economic Terms Renegotiation. .........................................~~61~~75

ARTICLE V — OTHER SETTLEMENT BENEFITS ...................................~~61~~75
5.1    Cash Payment to Class Members Whose Books and Inserts Have Been
    Digitized. ....................................................................~~61~~75

i

5.2 Payment For Registry, Notice and Claims Administration ........................ 62 76
5.3 Timing of Payments under Sections 5.1 and 5.2. ....................................... 62 77
5.4 Plan of Allocation .................................................................................... 64 79
5.5 Attorneys' Fees ....................................................................................... 64 80

ARTICLE VI — ESTABLISHMENT AND CHARTER OF REGISTRY ................. 65 80
6.1 Functions ................................................................................................. 65 80
6.2 Charter. .................................................................................................... 65 81
6.3 Unclaimed Funds and Public Domain Funds. .......................................... 66 83
6.4 Funding and Technical Assistance ........................................................... 68 86
6.5 Google's Rights to Registry Data. ........................................................... 68 86
6.6 Exchange of Data between Google and the Registry. ............................... 69 87
6.7 Authorization of Registry ....................................................................... 71 90

ARTICLE VII — FULLY PARTICIPATING LIBRARY AND COOPERATING
    LIBRARY RIGHTS AND OBLIGATIONS ..................................... 72 90
7.1 Becoming a Fully Participating Library or a Cooperating Library ............ 72 90
7.2 Fully Participating Library Uses. ............................................................. 72 91
7.3 Google's Obligations. .............................................................................. 89 110
7.4 Fully Participating Libraries' and Cooperating Libraries' Exercise of
    Collective Rights ..................................................................................... 89 111
7.5 Meetings to Discuss Library Uses. .......................................................... 92 114
7.6 When Fully Participating Libraries, Cooperating Libraries and Public
    Domain Libraries are Bound .................................................................... 93 115

ARTICLE VIII — SECURITY AND BREACH ...................................................... 93 115
8.1 Obligations of Google, the Fully Participating Libraries and the Host
    Sites ........................................................................................................ 93 115
8.2 Security Standard, Security Implementation Plan and Security Audits. ..... 94 116
8.3 Breaches – General Principles. ................................................................ 97 120
8.4 Remedies for Breaches of the Security Implementation Plan that Do
    Not Result in Unauthorized Access or Prohibited Access ........................ 100 124
8.5 Remedies for Breaches Resulting in Unauthorized Access by Google or
    Prohibited Access by a Fully Participating Library or a Host Site ............ 101 125
8.6 Remedies for Security Violations by Third Parties ................................... 103 127
8.7 Adjustments to Liability Ranges and Caps ............................................... 105 129

ARTICLE IX — DISPUTE RESOLUTION ............................................................ 105 130
9.1 Arbitration of Disputes and Exceptions. ................................................... 105 130
9.2 Executive Escalation ................................................................................ 106 131
9.3 Arbitration. .............................................................................................. 106 131
9.4 Notice to Rightsholders ........................................................................... 108 134
9.5 Notice to Registry; Consolidation ............................................................ 108 134

ii

9.6    Precedential Effect ................................................................. ~~108~~134
9.7    Decision ................................................................................. ~~108~~134
9.8    Confidentiality ....................................................................... ~~108~~134
9.9    Fees and Costs ....................................................................... ~~109~~134
9.10   Joinder................................................................................... ~~109~~135
9.11   Injunctive Relief ................................................................... ~~109~~135
9.12   Continuing Jurisdiction ......................................................... ~~109~~135

ARTICLE X — RELEASES ................................................................ ~~109~~135
10.1   Definitions. ........................................................................... ~~109~~135
10.2   Releases. ............................................................................... ~~113~~140

ARTICLE XI — PRELIMINARY SETTLEMENT APPROVAL .......................... ~~117~~145

ARTICLE XII — CLASS NOTICE PROGRAM ...................................... ~~117~~145
12.1   Original Notice ..................................................................... 145
12.2   Supplemental Notice ............................................................. 146

ARTICLE XIII — SETTLEMENT ADMINISTRATION PROGRAM.................. ~~118~~147
13.1   Registration and Completing Claims..................................... ~~118~~147
13.2   Validating and Challenging Claims. ..................................... ~~120~~149
13.3   Claiming Process and Website .............................................. 152
13.4   Time for Filing Deadline for Registration/Claim Forms ........................... ~~122~~152
~~13.4~~13.5 ................................................Registry Determination of Rightsholder    ~~122~~152
~~13.5~~13.6 ................................................ Final Report Regarding Cash Payments.    ~~123~~153
~~13.6~~13.7 ................................No Liability For Settlement or Registry Administration    ~~123~~154

ARTICLE XIV — FINAL FAIRNESS HEARING............................................ ~~124~~154

ARTICLE XV — CONFIDENTIALITY ................................................. ~~124~~154
15.1   Confidential Information ....................................................... ~~124~~154
15.2   Obligations ........................................................................... ~~124~~155
15.3   Confidentiality of Rightsholder Information ......................... ~~124~~155
15.4   Disclosures Required by Law ................................................ ~~125~~155

ARTICLE XVI — ~~RIGHT TO TERMINATE AGREEMENT125~~INTENTIONALLY OMITTED    156

ARTICLE XVII — MISCELLANEOUS PROVISIONS .............................. ~~125~~156
17.1   Good Faith Efforts ................................................................ ~~125~~156
17.2   Plaintiffs' Participation in Settlement................................... ~~126~~156
17.3   Final if Not Terminated ........................................................ ~~126~~156
17.4   Dismissal of Action ............................................................. ~~126~~156
17.5   Effect of Termination............................................................ ~~126~~156
17.6   Reimbursement if Terminated ............................................... ~~126~~157

17.7    Jurisdiction............................................................................127157
17.8    Contact with Rightsholders........................................................127158
17.9    Separate Agreements with Amended Settlement Class Members............127158
17.10   Scan Quality.............................................................................128159
17.11   Use of Contractors.....................................................................128159
17.12   Effect of Right to Exclude...........................................................128159
17.13   Patent Indemnity.......................................................................129159
17.14   No Liability for Consequential Damages .......................................129160
17.15   Notices. ..................................................................................130160
17.16   Time Periods ...........................................................................130161
17.17   Public Statements.....................................................................131161
17.18   Tax Consequences.....................................................................131162
17.19   Destruction..............................................................................131162
17.20   Attachments.............................................................................131162
17.21   No Other Representations..........................................................131162
17.22   Governing Law .........................................................................131162
17.23   Court's Continuing Jurisdiction....................................................131162
17.24   Extensions of Time ...................................................................132163
17.25   Complete Defense .....................................................................132163
17.26   Entire Agreement......................................................................132163
17.27   Amendments ............................................................................132163
17.28   No Party Is the Drafter...............................................................132163
17.29   No Prevailing Party ..................................................................132163
17.30   Assignment ..............................................................................133163
17.31   Counterparts............................................................................133164
17.32   Interpretation...........................................................................133164
17.33   Effect of Opt-Out.....................................................................134165
17.34   Compliance with Law................................................................134165

# <span style="color:blue">AMENDED</span> SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs, individually and on behalf of the <span style="color:blue">Amended</span> Settlement Class, have alleged that Defendant Google Inc. has violated the copyright laws of the United States; and

WHEREAS, Google believes that its conduct was lawful at all times in all respects, and has not admitted any of the allegations of copyright infringement in the complaint or amended complaints filed by Plaintiffs in the Action; and

WHEREAS, certain libraries have granted Google access to their collections with the intention of providing great benefits to researchers and the reading public, and those libraries believe that their conduct was lawful at all times and in all respects; and

WHEREAS, Class Counsel have conducted a thorough investigation into the facts and issues raised in the Action; and

WHEREAS, Class Counsel, while continuing to believe that the claims asserted in the Action have substantial merit, have also weighed the benefits of a possible settlement against the possible outcomes, risks, and delay of continued litigation, including the likelihood of appeals from rulings on the merits in favor of either Plaintiffs or Google; and

WHEREAS, Plaintiffs and Google, in consideration of all of the circumstances and after prolonged and adversarial arms' length settlement negotiations, wish to settle and finally resolve all actual and potential claims pertaining to the matters asserted in the Action; and

WHEREAS, Plaintiffs and Class Counsel conclude that this <span style="color:blue">Amended</span> Settlement Agreement is fair, reasonable, adequate and in the best interests of the <span style="color:blue">Amended</span> Settlement Class in light of the risks inherent in prosecuting the Action and the benefits obtained under this <span style="color:blue">Amended</span> Settlement Agreement; and

WHEREAS, Plaintiffs and Google further conclude that the Settlement will be of great benefit to copyright owners (including authors and publishers) and to libraries, researchers, and the reading public; and

WHEREAS, Google has agreed to enter into this Amended Settlement Agreement to conclude finally and definitively all claims brought in the Action and to reduce further expense, inconvenience, and the distraction of burdensome and protracted litigation, notwithstanding that Google does not admit any wrongdoing alleged in the Action; and

WHEREAS, Plaintiffs and Google agree to seek certification of the Amended Settlement Class only for settlement purposes.

NOW, THEREFORE, it is agreed by and among the undersigned that the claims of Plaintiffs in the Action shall be settled with Google, subject to approval of the Court as required by Rule 23(e) of the Federal Rules of Civil Procedure, on the following terms and conditions:

## ARTICLE I — DEFINITIONS

As used in this Amended Settlement Agreement and in other agreements that refer to the definitions in this Amended Settlement Agreement, the following terms are defined as set forth below. Additional terms are defined elsewhere in this Amended Settlement Agreement.

1.1 "Access Uses" means uses that may display Protected material from a Book or Insert to users of Google Products and Services in addition to material that is allowed to be displayed in Snippet Display, Front Matter Display or Preview Uses. Institutional Subscriptions, Consumer Purchase and the Public Access Service are the only Access Uses authorized as of the Effective Date.

1.2 "Accommodated Service" has the meaning set forth in Section 7.2(g) (Accommodated Service).

1.3 "Action" means The Authors Guild, Inc., et al. v. Google Inc., Case No. 05 CV 8136 (S.D.N.Y.).

1.4 "Additional Contemplated Rightsholder Services Provider" has the meaning set forth in Section 3.7 (Contemplated Rightsholder Services).

2

1.5     "Adjunct Product" has the meaning set forth in Section 4.1(a)(ix) (Adjunct Products).

1.6     "Administrative Costs" means the reasonable costs of (a) preparing and providing notice ~~to the Settlement Class~~ pursuant to ~~the~~ Article XII (Class Notice Program) or as otherwise ordered by the Court; (b) setting up and operating the Settlement Administration Program and the Registry; and (c) any escrow fees paid to the Depository Bank and payments to an independent third party for services and expenses in connection with administration of the Settlement Fund, including the preparation and mailing of tax forms and tax returns.

1.7     "Advertising Uses" has the meaning set forth in Section 3.14 (Advertising Uses).

1.8     "Affiliate" of an entity means any legally recognizable entity that directly or indirectly Controls, is Controlled by, or is under common Control with such first entity, where "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies, whether through the ownership of voting shares, by contract, or otherwise, for so long as such Control exists.

1.9     "Affiliate Program" has the meaning set forth in Section 4.5(b)(v) (Sale of Consumer Purchases through Affiliate Programs and Resellers).

1.10     "Alternative Accommodated Service Provider" has the meaning set forth in Section 7.2(g)(ii)(2) (Alternative Accommodated Service Provider).

1.11     "Amended Settlement Agreement" means this agreement and all of its attachments, as each may be amended from time to time pursuant to Section 17.27 (Amendments).

1.12     "Amended Settlement Agreement Date" means the date set forth at the end of this Amended Settlement Agreement.

1.13 "Amended Settlement Class" means all Persons that, as of January 5, 2009, have a Copyright Interest in one or more Books or Inserts.  All Amended Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both.  Excluded from the Amended Settlement Class are Google, the members of

Google's Board of Directors and its executive officers, and the departments, agencies and instrumentalities of the United States Government, and the Court.

1.14 "Arbitrator" has the meaning set forth in Section 9.3(a) (AAA Arbitration).

1.12 1.15 "Associational Plaintiffs" means The Authors Guild, Inc. and the Association of American Publishers, Inc.

1.13 1.16 "Audited Party" has the meaning set forth in Section 8.2(c)(i) (Audited Parties).

1.14 1.17 "Author Sub-Class" means members of the Amended Settlement Class who are authors, and their heirs, successors and assigns, and any other members of the Amended Settlement Class who are not members of the Publisher Sub-Class.

1.15 1.18 "Author-Publisher Procedures" means the document attached hereto as Attachment A (Procedures Governing Author Sub-Class and Publisher Sub-Class Under the Amended Settlement Agreement).

1.16 1.19 "Book" means a written or printed work that (a) if a "United States work," as defined in 17 U.S.C. § 101, has been registered with the United States Copyright Office as of the Notice Commencement Date, (b) on or before the Notice Commencement Date, was as of January 5, 2009 (a) had been published or distributed to the public or made available for public access as a set of written or printed sheets of paper bound together in hard copy form under the authorization of the work's U.S. copyright owner, and (c) as of the Notice Commencement Date, is (b) was subject to a Copyright Interest, and (c) (1) if a "United States work," as defined in 17 U.S.C. § 101, was registered with the United States Copyright Office, and (2) if not a United States work, either (x) was registered with the United States Copyright Office, or (y) had a place of publication in Canada, the United Kingdom or Australia, as evidenced by information printed in or on a hard copy of the work. Relevant information printed in or on a hard copy of the work may include, for example, a statement that the book was "Published in [Canada] or [the UK] or [Australia]," or the location or address of the publisher in one of those three countries. The term "Book" does not include: (i) Periodicals, (ii) personal papers (*e.g.*, unpublished diaries or bundles of notes or letters), (iii) written or printed works in which more than thirty-five twenty percent (35 20%) of the pages of text (not including tables of contents, indices, blank pages, title pages, copyright pages and verso pages) contain more than fifty twenty percent (50 20%) music notation and, with or without lyrics interspersed, if any (for purpose of this calculation, "music notation"

means notes on a staff or tablature), (iv) written or printed works in, or as they become in, the public domain under the Copyright Act in the United States, ~~or~~ (v) Government Works, or (vi) calendars.  References in this Settlement Agreement to a Book include all Inserts contained in the Book, except where this Settlement Agreement provides otherwise.

~~1.17~~1.20    "Book Annotation" means user-generated text that is both (a) associated with the content on the page of a Book and (b) displayed on or over any web page on which a page of a Book appears.

~~1.18~~1.21    "Books Database" has the meaning set forth in Section 3.1(b)(ii) (Books Database).

~~1.19~~1.22    "Business Day" means any day other than Saturday, Sunday, New Year's Day, the observance of the Birthday of Martin Luther King, Jr., Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day and any other day appointed as a federal or New York state holiday.

~~1.20~~1.23    "Cash Payment" has the meaning set forth in Section 5.1(a) (Cash Payments).

~~1.21~~1.24    "Charter" means the certificate of incorporation and bylaws of the Registry.

~~1.22~~1.25    "Claim" has the meaning set forth in Section 10.1(a) (Claim).

~~1.23~~1.26    "Claim Form" has the meaning set forth in Section 13.1 (Registration and Completing Claims).

~~1.24~~1.27    "Claimant" has the meaning set forth in Section 13.1 (Registration and Completing Claims).

~~1.25~~1.28    "Class Counsel" means the firms of Boni & Zack LLC, Milberg LLP, and Kohn, Swift & Graf, PC, as counsel for the Author Sub-Class, and the firm of Debevoise & Plimpton LLP, as counsel for the Publisher Sub-Class.

1.261.29        "Class Notice Program" means the class notice program described in Article XII (Class Notice Program).

1.271.30        "Collection" means the Books held by a Fully Participating Library or a Cooperating Library that have been Digitized or are targeted for Digitization pursuant to a Digitization Agreement between Google and such Fully Participating Library or such Cooperating Library, which Books may be some or all of such Fully Participating Library's or such Cooperating Library's holdings.

1.281.31        "Commercially Available" means, with respect to a Book, that the Rightsholder of such Book, or such Rightsholder's designated agent, is, at the time in question, offering the Book (other than as derived from a Library Scan) for sale new, from sellers anywhere in the world, through one or more then-customary channels of trade into purchasers within the United States., Canada, the United Kingdom or Australia.

1.291.32        "Competent Authority" means an individual who is employed in one of the professional occupations that is qualified to diagnose Print Disabilities under the federal law and regulations that govern the National Library Service for the Blind and Physically Handicapped or is licensed or otherwise certified or authorized under applicable state law or regulations to diagnose the existence of a Print Disability pursuant to standard and generally accepted methods of clinical evaluation.

1.301.33        "Confidential Information" has the meaning set forth in Section 15.1 (Confidential Information).

1.311.34        "Consumer Price Index" has the meaning set forth in Section 8.2(c)(iii) (Adjustment to Audit Costs).

1.321.35        "Consumer Purchase" and "Consumer Purchases" mean a service provided by Google that allows a user, for a fee, to access and view Online the full contents of a Display Book, as specified in and subject to Section 4.2 (Consumer Purchases).

1.331.36        "Consumer Subscription" has the meaning set forth in Section 4.7(dc) (Consumer Subscription Models).

6

1.34~~1.34~~1.37    "Contemplated Rightsholder Services" means Consumer Purchases and Institutional Subscriptions.

1.35~~1.35~~1.38    "Continuous Preview" has the meaning set forth in Section 4.3(c)(iii) (Continuous Preview).

1.36~~1.36~~1.39    "Cooperating Library" means any library physically located in the United States and organized as or within a not-for-profit or government entity that (a) has signed or signs a Digitization Agreement with Google not later than two (2) years after the Effective Date (unless an extension of such time is approved by the Registry), (b) provides Books to Google for Digitization but agrees that Google will not provide to such library a Digital Copy of such Books unless otherwise authorized by the Rightsholder, (c) agrees to delete or permanently render unusable promptly any Digital Copies of Books previously provided by Google to such library or that such library receives from Google in the future, and (d) enters into a Library-Registry (Cooperating) Agreement.

1.37~~1.37~~1.40    "Copyright Act" means the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq*.

1.38~~1.38~~1.41    "Copyright Interest" means (a) ownership (including joint ownership) of a United States copyright interest or (b) an exclusive license of a United States copyright interest, in each case only if and to the extent the interest is implicated by a use that is authorized or for which compensation could be payable under this Amended Settlement Agreement.

1.39~~1.39~~1.42    "Coupling Requirement" has the meaning set forth in Section 3.5(b)(iii) (Coupling Requirement).

1.40~~1.40~~1.43    "Court" means the U.S. District Court for the Southern District of New York.

1.41~~1.41~~1.44    "Creative Commons License" means a Creative Commons license or similar contractual permission for use that is published by the Creative Commons Corporation at  http://www.creativecommons.org (or successor website).

1.45 "Decision" has the meaning set forth in Section 9.7 (Decision).

7

1.421.46    "Depository Bank" means Citizens Bank.

1.431.47    "Designated Representative" means a Person designated from time to time by the Fully Participating Libraries and the Cooperating Libraries pursuant to Attachment 1 to Exhibit C of the Library-Registry (Fully Participating) Agreement and Attachment 1 to Exhibit C of the Library-Registry (Cooperating) Agreement (Selection of Designated Representative and Security Representatives and Establishment of Governance Rules) to convey to Google and/or the Registry, as applicable, instructions, decisions and positions of the Fully Participating Libraries and the Cooperating Libraries, or only the Fully Participating Libraries, as the case may be, on matters to which Section 7.4(a) (Designated Representative and Security Representatives) of this Amended Settlement Agreement refers.

1.441.48    "Digital Copy" of a Book or Insert means a set (or portion thereof) of electronic files created by or for Google or provided to Google in connection with GBS, including the image files of the individual pages of the Book or Insert along with text (currently generated from OCR technology), coordinate information for the text, information about the ordering of pages along with page-level metadata such as page number and other similar information, regardless of the means or technology used to prepare such copy, whether now known or hereafter developed, and any digital copy of such set of electronic files.

1.451.49    "Digitization Agreement" means an agreement between Google and a library to Digitize works held by that library, as such agreement may be amended from time to time.

1.461.50    "Digitize" means to convert a work from a hard copy (not including microform) format into an electronic representation, using any means and any technology, whether now known or hereafter developed, including making necessary technical adaptations to achieve such conversion (but not including adapting or altering the content of such written work).  "Digitization," "Digitizing" and "Digitized" have corresponding meanings.

1.471.51    "Display Books" means Books for which one or more Display Uses are authorized pursuant to this Amended Settlement Agreement.

1.481.52    "Display Uses" means the following:  Snippet Display, Front Matter Display, Access Uses and Preview Uses.

8

~~1.49~~1.53	"<u>Effective Date</u>" means the first date upon which each and all of the following events shall have occurred:  (a) the Final Approval Date has occurred; (b) the Court has entered the Final Judgment and Order of Dismissal with prejudice as to Google against Plaintiffs and all Rightsholders; and (c) the time for any appeal from the Final Judgment and Order of Dismissal in the Action and the Court's approval of this Amended Settlement Agreement has expired, or, if appealed, the Final Judgment and Order of Dismissal has been affirmed in its entirety by the court of last resort to which any such appeal has been taken and such affirmance has become no longer subject to further appeal or review.  Neither Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into consideration in calculating the above-stated time periods.

~~1.50~~1.54	"<u>Entire Insert</u>" means an Insert that is an entire work, including forewords, afterwords, introductions, entire works included in anthologies, and entire poems, short stories, song lyrics or essays.

~~1.51~~1.55	"<u>Expression</u>" means either (a) Protected expression, which, in the case of text, means no fewer than three (3) contiguous words, or (b) any contiguous set of ten (10) or more words from a Book or Insert, not counting expression that is not Protected.

~~1.52~~1.56	"<u>Fiction</u>" has the meaning set forth in Section 4.3(b)(i)(1) (Standard Preview).

~~1.53~~1.57	"<u>Final Approval Date</u>" means the date the Court has certified the Amended Settlement Class and approved this Amended Settlement Agreement in all respects, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

~~1.54~~1.58	"<u>Final Fairness Hearing</u>" has the meaning set forth in Article XIV (Final Fairness Hearing).

~~1.55~~1.59	"<u>Final Settlement Deposit</u>" has the meaning set forth in Section 5.3(b) (Final Settlement Deposit).

~~1.56~~1.60	"<u>Fixed Preview</u>" has the meaning set forth in Section 4.3(b)(iii) (Fixed Preview).

1.57 1.61     "Front Matter Display" means the display to users of Google Products and Services of one or more of the title page, copyright page, table of contents, other pages that appear prior to the table of contents at the front of the Book, and indexes of a Book.

1.58 1.62     "Fully Participating Library" means a library physically located within the United States and organized as or within a not-for-profit or government entity that (a) has signed or signs a Digitization Agreement with Google not later than two (2) years after the Effective Date (unless an extension of such time is approved by the Registry) and (b) enters into a Library-Registry (Fully Participating) Agreement.

1.59 1.63     "Google" means Google Inc. and its Affiliates.

1.60 1.64     "Google Book Search," or "GBS," means the program(s) pursuant to which Google, having Digitized works obtained pursuant to the Google Partner Program, the GLP or other means authorized by the Book's Rightsholder or the Registry (or having obtained works in Digitized form through such programs or other means authorized by the Book's Rightsholder or the Registry), transmits Online (a) information about such works and (b) portions of, and in some cases all of, the Digitized works, whatever such program(s) may be called by Google from time to time.

1.61 1.65     "Google Library Project" or the "GLP" means the program(s) pursuant to which Google obtains Books and other works from libraries or other sources (including through book drives, from Rightsholders directly or elsewhere, but not including the Google Partner Program), for the purposes of Digitizing them (if not obtained in Digitized form) and including them in GBS, whatever such program(s) may be called by Google from time to time.

1.62 1.66     "Google Partner Program" means the program(s) pursuant to which Persons who have Copyright Interests in works contract with Google (other than by operation of this Amended Settlement Agreement) to grant to Google the right to include such works in GBS, whatever such program(s) may be called by Google from time to time.

1.63 1.67     "Google Products and Services" means any and all products and services offered to the public by Google directly or indirectly through third parties from time to time, now or in the future, whereby Google makes information accessible to a user Online, using any means and any technology, whether now known or hereafter developed.  Google Products and Services include GBS.

1.641.68    "Government Works" means written or printed works covered by Section 105 of the Copyright Act or state law equivalents thereto.

1.651.69    "Gross Revenues" has the meaning set forth in Section 6.3(a)(i) (Unclaimed Funds-Non-Subscription Revenue Models).

1.66    "Higher Education Institution" means an Institution of Higher Education, as defined by the Carnegie Classifications of Institutions of Higher Education from time to time or, if and when the Carnegie Foundation for the Classification of Teaching is no longer classifying colleges and universities in the United States, as such term or its successor term is defined by any successor classification system used to classify colleges and universities in the United States.

1.671.70    "Host Site" means an institution authorized under this Amended Settlement Agreement to host the Research Corpus pursuant to the requirements of Section 7.2(d)(ii) (Host Sites).

1.681.71    "Host Site-Registry Agreement" has the meaning set forth in Section7.2(d)(ii) (Host Sites).

1.691.72    "Hosting Fully Participating Library" has the meaning set forth in Section 7.2(b)(ixx)(1) (Fully Participating Libraries Hosting for Other Fully Participating Libraries).

1.701.73    "Inconsequential Breach" means a breach that (a) is not the result of reckless, willful or intentional misconduct by Google, a Host Site or a Fully Participating Library, (b) does not lead to, or present an immediate risk of, any Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access, (c) does not represent an extensive or systematic failure to comply with the Security Standard or the applicable then-current Security Implementation Plan and (d) when identified, is promptly corrected or cured.

1.711.74    "Initial Settlement Deposit" has the meaning set forth in Section 5.3(a) (Initial Settlement Deposit).

1.721.75    "Insert" means the following content, if and to the extent such content is independently Protected by the Copyright Act and, if a "United States work" as

defined in 17 U.S.C. § 101, is covered by a registration with the United States Copyright Office as of ~~the Notice Commencement Date~~January 5, 2009, either as a stand-alone work or as part of another, registered work from which it was excerpted, and is either (a) contained in a Book if there is no Person who has a Copyright Interest in such content ~~and~~as well as a Copyright Interest in such Book's Principal Work, (b) contained in a Public Domain Book, or (c) contained in a Government Work that, on or before ~~the Notice Commencement Date,~~January 5, 2009, was published or distributed to the public or made available for public access: (i) text, such as forewords, afterwords, prologues, epilogues, essays, poems, quotations, letters, song lyrics, or excerpts from other Books, Periodicals or other works; and (ii) ~~children's Book illustrations; (iii) musical~~ notation ~~(*i.e.*, notes on a staff or tablature); and (iv)~~ tables, charts and graphs. The term "Insert" does not include (1) pictorial works, such as photographs, illustrations ~~(other than children's Book illustrations)~~, maps ~~or~~, paintings, or music notation (*i.e.*, notes on a staff or tablature) or (2) works that are in, or as they become in, the public domain under the Copyright Act in the United States.

~~1.73~~1.76 "Institutional Consortium" means a group of libraries, companies, institutions or other entities located within the United States that is a member of the International Coalition of Library Consortia ~~with the exception of Online Computer Library Center (OCLC)—affiliated networks~~.

~~1.74~~1.77 "Institutional Subscription" means any service of a limited duration provided by Google to an institution for a fee that allows Online access to and viewing of the full contents of the Institutional Subscription Database, as specified in and subject to Section 4.1 (Institutional Subscriptions).

~~1.75~~1.78 "Institutional Subscription Database" has the meaning set forth in Section 4.1(a)(v) (Versions of Institutional Subscriptions).

~~1.76~~1.79 "ISBN" means International Standard Book Number or, if and when ISBNs are no longer being issued, the number issued pursuant to any successor system used internationally to uniquely identify books and book-like products.

~~1.77~~1.80 "Library Building" means a building physically located in the United States that, in whole or in part, is used by a Public Library and the part so used is predominantly used for the storage of, and access to, such Public Library's library books or library services.

~~1.78~~1.81    "Library Digital Copy" or "LDC" means the set (or portion thereof) of all Digital Copies of Books in a Fully Participating Library's Collection, which Digital Copies are made by copying the Library Scan (or are otherwise made pursuant to Section 7.2(a) (Making of Library Digital Copies)), and which Google provides to the Fully Participating Library.

~~1.79~~1.82    "Library Link" means a link placed on pages in Google Book Search dedicated to a single Library Work that directs a user to existing Online sources, which, free of charge to the user (and with no out-of-pocket payments by Google to third-party providers of such sources), assists such user in finding that Library Work in a library.

~~1.80~~1.83    "Library-Registry Agreement" means an agreement substantially similar in form to one of the agreements attached hereto as Attachment B (Form of Library-Registry Agreements) between the Registry and a Fully Participating Library, Cooperating Library or Public Domain Library.  The Library-Registry (Fully Participating) Agreement attached hereto as Attachment B-1 is for Fully Participating Libraries.  The Library-Registry (Cooperating) Agreement attached hereto as Attachment B-2 is for Cooperating Libraries.  The Library-Registry (Public Domain) Agreement attached hereto as Attachment B-3 is for Public Domain Libraries.

~~1.81~~1.84    "Library Scan" means the Digital Copy of a Library Work Digitized by or for Google or by or for a Fully Participating Library or a Cooperating Library and received by Google, and all Digital Copies of such Digital Copy.

~~1.82~~1.85    "Library Work" means a Book that a Fully Participating Library or a Cooperating Library makes available to Google, either in hard copy (not including microform) format to be Digitized, or in a form Digitized by or for such Fully Participating Library or Cooperating Library, for the Google Library Project.

~~1.83~~1.86    "Limited Subscription" means an Institutional Subscription offered to a library that allows the subscribing library access only to the Books Digitized from that library, or only to the Books held by that library.

~~1.84~~1.87    "List Price" means the then-current price for Institutional Subscriptions and Consumer Purchases determined in accordance with Sections 4.1 (Institutional Subscriptions) and 4.2 (Consumer Purchases), respectively.

13

1.85 1.88    "Metadata" means data that describes other data (*e.g.*, a library catalog of publications and the author, title, publisher, ISBN, and date of publication of the publications in the catalog are all types of Metadata).

1.86 1.89    "Net Advertising Revenues" means, subject to Section 4.5(b) (Discounting, Special Offers and Subsidies) and Section 4.6(b) (Exceptions), the revenues actually received by Google for Advertising Uses displayed to U.S. users, less ten percent (10%) for Google's operating costs.

1.87 1.90    "Net Purchase Revenues" means, subject to Section 4.5(b) (Discounting, Special Offers and Subsidies) and Section 4.6(b) (Exceptions), the revenues actually received by Google from subscribers or purchasers within the U.S. from all Revenue Models other than Advertising Uses, less ten percent (10%) for Google's operating costs.

1.88 1.91    "No Display Books" are Books for which no Display Uses are authorized pursuant to this Amended Settlement Agreement.

1.89 1.92    "No Preview" has the meaning set forth in Section 4.3(b)(ii) (No Preview).

1.90 1.93    "Non-Consumptive Research" means research in which computational analysis is performed on one or more Books, but not research in which a researcher reads or displays substantial portions of a Book to understand the intellectual content presented within the Book.  Categories of Non-Consumptive Research include:

(a)    Image Analysis and Text Extraction – Computational analysis of the Digitized image artifact to either improve the image (*e.g.*, de-skewing) or extracting textual or structural information from the image (*e.g.*, OCR).

(b)    Textual Analysis and Information Extraction – Automated techniques designed to extract information to understand or develop relationships among or within Books or, more generally, in the body of literature contained within the Research Corpus. This category includes tasks such as concordance development, collocation extraction, citation extraction, automated classification, entity extraction, and natural language processing.

14

(c)     Linguistic Analysis – Research that performs linguistic analysis over the Research Corpus to understand language, linguistic use, semantics and syntax as they evolve over time and across different genres or other classifications of Books.

(d)     Automated Translation – Research on techniques for translating works from one language to another.

(e)     Indexing and Search – Research on different techniques for indexing and search of textual content.

~~1.91~~1.94     "Non-Display Uses" means uses that do not display Expression from Digital Copies of Books or Inserts to the public.  By way of example, display of bibliographic information, full-text indexing without display of Expression (such as listing the number or location of search matches), geographic indexing of Books, algorithmic listings of key terms for chapters of Books, and internal research and development using Digital Copies are all Non-Display Uses.

~~1.92~~1.95     "Not Counted Library Work" means any Library Work with respect to the Library Scan of which Google has reasonable quality, legal, or technical concerns that are not solely editorial-based concerns.

~~1.93~~1.96     "Notice" has the meaning set forth in Article XII (Class Notice Program).

~~1.94~~1.97     "Notice Commencement Date" means ~~the first date of the Class Notice Program, as agreed between Plaintiffs and Google and approved by the Court.~~ January 5, 2009.

~~1.95~~1.98     "OCR" means optical character recognition.

~~1.96~~1.99     "Online" means over the Internet or other data or communication network, with or without caching, through a browser or other computer program used for accessing sites or information on a network.

~~1.97~~1.100     "Online Book Page" means any page in Google Products and Services dedicated to a single Book, including any Preview Use page, any Snippet

Display page, any page of a Book displayed in Google Products and Services, and search results pages resulting from a search within a single Book.  Any general search results page in which the search is performed over multiple Books and/or over other content such as web pages in response to a user query is not considered to be a page dedicated to a single Book, even if a single Book is the sole search result of a given search on the search results page.

1.981.101        "Opt-Out Deadline" means the deadline fixed by the Court to opt out of the Settlement pursuant to Rule 23 of the Federal Rules of Civil Procedure.

1.99   "Other Library" means a library physically located within the United States and organized as or within a not-for-profit or government entity that has signed a Digitization Agreement with Google, but has not entered into a Library-Registry Agreement.

1.1001.102        "Partial Insert" means an Insert other than an Entire Insert.

1.1011.103        "Participating Libraries" means Fully Participating Libraries, Cooperating Libraries, Public Domain Libraries and Other Libraries.

1.1021.104        "Periodical" means a newspaper, magazine, comic book, or journal and any other publication  (a) that is published at a stated frequency with the intent to continue publication indefinitely; (b) whose continuity shows from issue to issue (*e.g.*, by serialization of articles or by successive issues carrying the same style, format, theme, or subject matter); (c) whose primary purpose is to transmit information; (d) whose content consists of original or reprinted articles on one topic or many topics, listings, photographs, illustrations, graphs, a combination of advertising and nonadvertising matter, comic strips, legal notices, editorial material, cartoons, or other subject matter; and (e) for which the primary distribution of each issue is made before that of each succeeding issue.; including any book form compilation of any of the foregoing.

1.1031.105        "Person" means a natural person and any corporation, partnership, limited liability company, association, whether incorporated or not, and any other entity organized under United States federal or state law, or under foreign law.

1.1041.106        "Plaintiffs" means Representative Plaintiffs and Associational Plaintiffs.

16

~~1.105~~1.107      "Plan of Allocation" means the Plan of Allocation attached hereto as Attachment C (Plan of Allocation).

~~1.106~~1.108      "Preview Uses" means uses that may display Protected material from a Book to users of Google Products and Services in addition to material that is allowed to be displayed in Snippet Display or Front Matter Display, as specified in and subject to Section 4.3 (Preview Uses).

~~1.107~~1.109      "Price Change Cut Off Date" has the meaning set forth in Section 4.1(a)(viii)(2) (Registry Proposed Adjustments).

~~1.108~~1.110      "Pricing Algorithm" has the meaning set forth in Section 4.2(b)(i)(2) Settlement Controlled Price).

~~1.109~~1.111      "Pricing Bin" has the meaning set forth in Section 4.2(c)(i) (Pricing Bins).

~~1.110~~1.112      "Pricing Strategy" has the meaning set forth in Section 4.1(a)(vi) (Pricing Strategy).

~~1.111~~1.113      "Principal Work" means a Book's principal written work.  A Principal Work can be a collective work, such as a collection of short stories or plays.  A Book contains only one Principal Work but may contain other text, such as a foreword, afterword and annotations.  A foreign language translation or an abridged version of a Principal Work is a different Principal Work.  Two (2) or more Books that contain the same Principal Work but that each contains different or additional Protected Expression are considered to be different Books.  By way of example, two (2) Books that have the same Principal Work (*e.g.*, ~~*The Old Man and the Sea*~~*To Kill a Mockingbird*) but have different forewords or additional annotations (*e.g.*, the ~~Hueber Verlag~~J.B. Lippincott and the ~~Scribner~~Harper Collins editions) are different Books under this Amended Settlement Agreement.  A hard cover Book and a soft cover Book may have the same Principal Work, but are considered different Books under this Amended Settlement Agreement (even if they contain no additional matter) if the hard cover Book and the soft cover Book have different ISBNs.

~~1.112~~1.114      "Print Disability" means any condition in which a user is unable to read or use standard printed material due to blindness, visual disability, physical limitations, organic dysfunction, or dyslexia.

17

1.113**1.115**     "<u>Prohibited Access</u>" means reproduction or display by a Fully Participating Library or Host Site of any Digital Copy of a Book that is prohibited by the applicable Library-Registry Agreement or the applicable Host Site-Registry Agreement, and is not otherwise authorized by the Rightsholder.

1.114**1.116**     "<u>Protected</u>," when used in connection with "works," "material," "Expression," or "content" means works, material, Expression or content as to which a Person has a Copyright Interest under Section 106 of the Copyright Act, without giving effect to Sections 107 through 122 of the Copyright Act.

1.115**1.117**     "<u>Public Access Service</u>" means a service provided by Google to each Public Library and each not-for-profit Higher Education Institution that allows users to search and view the entire then-current Institutional Subscription Database, as specified in and subject to Section 4.8 (Public Access Service).

1.116**1.118**     "<u>Public Domain Book</u>" means a written or printed work that would be a "Book" but for the work being in the public domain under the Copyright Act in the United States, without regard to whether such work contains an Insert; provided, however, that, if the work is a "United States work" as defined in 17 U.S.C. § 101, it need not have been registered with the United States Copyright Office to be considered to be a Public Domain Book.

1.117**1.119**     "<u>Public Domain Funds</u>" has the meaning set forth in Section 6.3(b) (Public Domain Funds).

1.118**1.120**     "<u>Public Domain Library</u>" means a library physically located in the United States and organized as or within a not-for-profit or government entity that (a) will not provide materials to Google for Digitization when it knows that those materials are Books, (b) agrees to delete or permanently render unusable promptly any Digital Copies of Books previously provided by Google to such library or that such library receives from Google in the future, and (c) enters into a Library-Registry (Public Domain) Agreement.

1.119**1.121**     "<u>Public Library</u>" means a library that (a) is accessible by the public, (b) is, or is part of, a not-for-profit or government-funded institution other than a not-for-profit or government-funded institution that is classified under the Carnegie Classification of Institutions of Higher Education, and (c) allows patrons to take books and other materials off the premises but may also have non-circulating reference

18

collections or provide other library services; however, "Public Library" does not include any library primarily funded or managed by the federal government or an agency thereof.

~~1.120~~1.122    "Publisher Sub-Class" means members of the Amended Settlement Class that are (a) companies that publish books, and their exclusive licensees, successors and assignees, and (b) companies that publish Periodicals and have a Copyright Interest in one or more Inserts, and their exclusive licensees, successors, and assignees.

~~1.121~~1.123    "Qualified User" means a Person who (a) wishes to conduct Non-Consumptive Research, (b) is (i) affiliated with a Fully Participating Library or a Cooperating Library or (ii) a suitably qualified individual (1) who has the resources to perform such Non-Consumptive Research, (2) who has an affiliation described below, (3) who is pre-registered by a Fully Participating Library or a Cooperating Library (*i.e.*, registered prior to conducting Non-Consumptive Research), and (4) for whose use of the Research Corpus such Fully Participating Library or Cooperating Library takes responsibility, and (c) is bound by an agreement described in Section 7.2(d)(xi)(2) (Research Agenda).  A for-profit entity may only be a "Qualified User" if both the Registry and Google give their prior written consent.  Except as set forth in the preceding sentence, a Qualified User must have an affiliation with one of the following:

> a)         ~~(a)~~ an accredited United States two (2)- or four (4)-year college or university;

> b)         ~~(b)~~ a United States not-for-profit research organization, such as a museum, observatory or research lab;

> c)         ~~(c)~~ a United States governmental agency (federal, state or local); or

> d)         ~~(d)~~ to the extent that an individual does not come within clauses (a) through (c) above in this Section ~~1.121~~1.123 (Qualified User), an individual may become a "Qualified User" by demonstrating to a Fully Participating Library or a Cooperating Library that he or she (directly or through the entities with which he or she is affiliated) has the necessary capability and resources to conduct Non-Consumptive Research, provided that such individual (or the entities with which he or she is affiliated) may be required by the Registry to enter into other terms and conditions with respect to such Non-Consumptive

19

Research and the commercial exploitation of any of the results thereof consistent with the restrictions set forth in this Amended Settlement Agreement.

~~1.122~~1.124    "Registered Rightsholder" means any Person who is a Rightsholder and who has registered with the Registry his, her or its Copyright Interest in a Book or Insert.

~~1.123~~1.125    "Registry" means the registry established pursuant to ~~Article~~ ARTICLE VI —(Establishment and Charter of Registry).  In addition, the term "Registry" means the Settlement Administrator until such time as the Registry is fully operational.

~~1.124~~1.126    "Removed" means, with respect to a Book that is removed pursuant to Section 3.5(a) (Right to Remove) and subject to Section 3.5(b)(vi) (Continuing Obligations), that ~~Digital Copies of such~~ Book ~~are not accessible (including through the Research Corpus),~~ other than on back-up tapes or other electronic back-up storage media~~.~~,

       (a)    if the request is made on or before April 5, 2011, Digital Copies of the Book are not accessible to Google or Fully Participating Libraries; and

       (b)    if the request is made after April 5, 2011, but on or before March 9, 2012, Digital Copies of the Book are not accessible to Google except that Google may use Digital Copies for the purpose of (i) providing Digital Copies, as authorized under this Amended Settlement Agreement, and making ongoing technological updates for Fully Participating Libraries and Host Sites and (ii) acting as a Host Site as authorized by Section 7.2(d)(ii) (Host Sites).

"Remove" and "Removal" have corresponding meanings.

~~1.125~~1.127    "Representative Plaintiffs" means the following Persons, who, subject to Court approval, represent the Author Sub-Class:  Paul Dickson, Joseph Goulden, Daniel Hoffman, Betty Miles, ~~and~~ Herbert Mitgang, Maureen Duffy, Daniel Jay Baum, Margaret Drabble and Robert Pullan; and the following Persons, who, subject to Court approval, represent the Publisher Sub-Class:  The McGraw-Hill Companies, Inc.,

Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., ~~and~~ John Wiley & Sons, Inc., Harlequin Enterprises Limited, Macmillan Publishers Limited, Melbourne University Publishing Limited and The Text Publishing Company.

~~1.126~~1.128    "Requesting Fully Participating Library" has the meaning set forth in Section 7.2(b)(x)(1) (Fully Participating Libraries Hosting for Other Fully Participating Libraries).

~~1.127~~1.129    "Required Library Services" has the meaning set forth in Section 7.2(e)(i) (Obligation).

~~1.128~~1.130    "Required Library Services Requirement" means the requirement set forth in Section 7.2(e)(i) (Obligation).

~~1.129~~1.131    "Research Agenda" means a document that describes a research project in sufficient detail to demonstrate that it will be Non-Consumptive Research.

~~1.130~~1.132    "Research Corpus" means a set of all Digital Copies of Books made in connection with the Google Library Project, other than Digital Copies of Books that have been Removed by Rightsholders on or before April 5, 2011 pursuant to Section 3.5 (Right to Remove or Exclude) or withdrawn pursuant to Section 7.2(d)(iv) (Right to Withdraw Library Scans), which Google provides to a Host Site or that Google, if and as a Host Site, uses.

~~1.131~~1.133    "Revenue ~~Model~~Models" means Institutional Subscriptions, Consumer Purchases, Advertising Uses, Public Access Service and any other revenue models agreed between the Registry and Google pursuant to Section 4.7 (~~New~~Additional Revenue Models).

~~1.132~~1.134    "Rightsholder" means a member of the Amended Settlement Class who does not opt out of the Settlement by the Supplemental Opt-Out Deadline.

~~1.133~~1.135    "Rightsholder Releasors" has the meaning set forth in Section 10.1(m) (Rightsholder Releasors).

1.1341.136    "Security Implementation Plan" means an implementation plan describing the processes and procedures that Google, a Fully Participating Library, or a Host Site, as the case may be, will employ in order to comply with the Security Standard.

1.1351.137    "Security Representatives" has the meaning set forth in Section 8.2(b) (Changes to Security Standard).

1.1361.138    "Security Standard" means the security standard set forth in Attachment D (Security Standard).

1.1371.139    "Settlement" means the settlement of the Action as set forth in this Amended Settlement Agreement.

1.1381.140    "Settlement Administration Program" means the Settlement administration program described in Article XIII (Settlement Administration Program).

1.1391.141    "Settlement Administrator" means Rust Consulting, Inc.

1.140   "Settlement Agreement" means this agreement and all of its attachments, as each may be amended from time to time pursuant to Section 17.27 (Amendments). 1.142   "Settlement Agreement" means the original Settlement Agreement and all of its attachments, as filed with the Court on October 28, 2008.

1.141   "Settlement Agreement Date" means the date set forth at the end of this Settlement Agreement.

1.142   "Settlement Class" means all Persons that, as of the Notice Commencement Date, have a Copyright Interest in one or more Books or Inserts.  All Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both.  Excluded from the Settlement Class are Google, the members of Google's Board of Directors and its executive officers.

1.143   "Settlement Controlled Price" has the meaning set forth in Section 4.2(b)(i)(2) (Settlement Controlled Price).

22

1.144  "Settlement Discussions Confidentiality Agreement" means the Settlement Discussions Confidentiality Agreement dated August 18, 2006 between Google and certain representatives of Plaintiffs.

1.145  "Settlement Fund" means the Initial Settlement Deposit, the Final Settlement Deposit and the Supplemental Deposit, and all interest accrued thereon.  The Settlement Fund will be held and administered in an account at the Depository Bank.

1.146  "Settlement Website" has the meaning set forth in Article XII (Class Notice Program).

1.147  "Snippet Display" means uses that display to users of Google Products and Services up to three (3) "snippets" (each snippet being about three (3) to four (4) lines of text) per search term per user.

1.148  "Standard Preview" has the meaning set forth in Section 4.3(b)(i)(1) (Standard Preview).

1.149  "Specified Price" has the meaning set forth in Section 4.2(b)(i)(1) (Specified Price).

1.150  "Standard Revenue Split for Advertising" has the meaning set forth in Section 4.5(a)(ii) (Net Advertising Revenues).

1.151  "Standard Revenue Split for Purchases" has the meaning set forth in Section 4.5(a)(iii) (Net Purchase Revenues).

1.152  "Standard Revenue Splits" has the meaning set forth in Section 4.5(a)(iii) (Agreed Revenue Splits).

1.1521.153  "Summary Notice" has the meaning set forth in Article XII (Class Notice Program).

1.1531.154  "Supplemental Deposit" has the meaning set forth in Section 5.3(c) (Supplemental Deposit).

23

1.1541.155    "Supplemental Notice" has the meaning set forth in Article XII (Class Notice Program).

1.156 "Supplemental Opt-Out Deadline" means the deadline fixed by the Court to opt out of the Amended Settlement Agreement pursuant to Rule 23 of the Federal Rules of Civil Procedure.

1.157   "Third-Party Required Library Services Provider" has the meaning set forth in Section 7.2(e)(ii) (Third-Party Required Library Services Provider).

1.1551.158    "Third-Party Unauthorized Access" means any access (other than Prohibited Access) by any third party to any Digital Copy of a Book that is not authorized by this Amended Settlement Agreement, the applicable Library-Registry Agreement, or the applicable Host Site-Registry Agreement, and is not otherwise authorized by the Rightsholder.

1.1561.159    "Unauthorized Access" means any display or reproduction in the United States by Google of any Digital Copy of a Book or Insert that is not authorized by this Amended Settlement Agreement or the Rightsholder.

1.1571.160    "Unclaimed Funds—Non-SubscriptionWorks Fiduciary" has the meaning set forth in Section 6.3(a)(i) (Unclaimed Funds-Non-Subscription Revenue Models).

1.158   "Unclaimed Funds—Subscription" has the meaning set forth in Section 6.3(a)(ii) (Unclaimed Funds-Subscription Revenue Models6.2(b) (Organizational Structure).

1.1591.161    "Unclaimed Funds" means has the meaning set forth in Section 6.3(a)(Unclaimed Funds—Non-Subscription and Unclaimed Funds—Subscription).

1.1601.162    "United States" or "U.S." means the states and territories, the District of Columbia, and the possessions of the United States of America.

ARTICLE II — **SETTLEMENT BENEFITS – OVERVIEW AND AUTHORIZATIONS**

2.1     Benefits to the Amended Settlement Class – Overview.

(a)     Google Book Search.  Google is authorized to, in the United States, sell subscriptions to the Institutional Subscription Database, sell individual Books, place advertisements on Online Book Pages, and make other commercial uses of Books, all as further described in this Amended Settlement Agreement.  Google shall pay to the Registry, for the benefit of the Rightsholders, seventy percent (70%) of all revenues earned by Google through uses of Books in Google Products and Services in the United States authorized under this Amended Settlement Agreement, less ten percent (10%), for Google's operating costs, deducted from such revenues prior to such calculation (*i.e.*, sixty-three percent (63%) of all revenues earned by Google through uses of Books in Google Products and Services in the United States authorized under this Amended Settlement Agreement).  The Registry will distribute the revenues to Rightsholders pursuant to the provisions of the Plan of Allocation.

(b)     Cash Payment.  Google shall pay a minimum of forty-five million United States dollars (U.S. $45 million) into the Settlement Fund to pay Amended Settlement Class members whose Books and Inserts have been Digitized ~~prior to the Opt-Out Deadline~~on or before May 5, 2009.  Such forty-five million United States dollars (U.S. $45 million) will be distributed from the Settlement Fund in the form of Cash Payments of at least sixty United States dollars (U.S. $60) per Principal Work; fifteen United States dollars (U.S. $15) per Entire Insert; and five United States dollars (U.S. $5) per Partial Insert in accordance with the Plan of Allocation.  To the extent that funds greater than forty-five million United States dollars (U.S. $45 million) are required in order to pay every such Amended Settlement Class member his, her or its Cash Payment, Google shall make an additional payment to enable such Cash Payments to be made to the Rightsholders from the Settlement Fund.  To the extent funds remain from the forty-five million United States dollars (U.S. $45 million) after all Cash Payments are made, such excess will be distributed pursuant to the Plan of Allocation.

(c)     Registry/Notice/Claims Administration Funding.  Google ~~shall~~is obligated to pay thirty-four and one-half million United States dollars (U.S. $34.5 million) (of which twelve million United States dollars (U.S. $12 million) has been paid) to fund the launch and the initial operations of the Registry and to fund other Administrative Costs.  The Registry will be responsible for locating and collecting information from Rightsholders, identifying and coordinating payments to Rightsholders, and otherwise representing the interests of Rightsholders under this Amended Agreement.

(d)     Attorneys' Fees and Costs.  Google shall pay Plaintiffs' attorneys' fees and costs in accordance with Section 5.5 (Attorneys' Fees).

(e)     Summary Only.  This Section 2.1 (Benefits to the Amended Settlement Class – Overview) is a summary of some of the provisions of this Amended Settlement Agreement and is subject to all of the other provisions of this Amended Settlement Agreement.

2.2     Authorization of Google, Fully Participating Libraries and Cooperating Libraries.  In exchange for the benefits conferred in this Amended Settlement Agreement on Plaintiffs and Rightsholders, Rightsholders, as of the Effective Date, authorize (a) Google to make Display Uses and Non-Display Uses of their Books and Inserts in GBS and other Google Products and Services, (b) each Fully Participating Library to use its Library Digital Copy and (c) each Host Site to make the Research Corpus available, all in accordance with the terms and conditions of this Amended Settlement Agreement, a Library-Registry Agreement or a Host Site-Registry Agreement, as applicable.  As of the Effective Date, Rightsholders authorize Google, the Fully Participating Libraries, the Cooperating Libraries and the Host Sites to engage in the activities, and only the activities, set forth in this Amended Settlement Agreement, a Library-Registry Agreement or a Host Site-Registry Agreement, as applicable, and only in accordance with such terms and conditions as are applicable to those activities; provided that the remedy for any breach of a term or condition of this Amended Settlement Agreement or a Library-Registry Agreement shall not be termination of such authorizations except as provided in Section 3.7(b) (Failure to Provide Contemplated Rightsholder Services).  This Amended Settlement Agreement does not authorize Google, any Participating Library or any Host Site to make any uses of Books and Inserts other than those uses that are authorized under this Amended Settlement Agreement.  This Amended Settlement Agreement neither authorizes nor prohibits, nor releases any Claims with respect to, (i) the use of any work or material that is in the public domain under the Copyright Act in

26

the United States, (ii) the use of books in hard copy (~~including~~such term does not include microform) format other than the creation and use of Digital Copies of Books and Inserts, or (iii) any Participating Library's Digitization of Books if the resulting Digitized Books are neither provided to Google pursuant to this Amended Settlement Agreement nor included in any LDC, or the use of any such Digitized Books that are neither provided to Google pursuant to this Amended Settlement Agreement nor included in any LDC.

2.3     Author-Publisher Procedures.  All rights of Books Rightsholders under this Amended Settlement Agreement are subject to the Author-Publisher Procedures.

2.4     Non-Exclusivity of Authorizations.  The authorizations granted to Google in this Amended Settlement Agreement are non-exclusive only, and nothing in this Amended Settlement Agreement shall be construed as limiting any Rightsholder's right to authorize, through the Registry or otherwise, any Person, including direct competitors of Google, to use his, her or its Books or Inserts in any way, including ways identical to those provided for under this Amended Settlement Agreement.

## ARTICLE III — **GOOGLE BOOK SEARCH – RIGHTS, BENEFITS AND OBLIGATIONS**

3.1     Digitization, Identification and Use of Books.

(a)     Non-Exclusive Digitization Rights.  As of the Effective Date, in the United States (i) Google may, on a non-exclusive basis, Digitize all Books and Inserts obtained by Google from any source (whether obtained before or after the Effective Date), (ii) Fully Participating Libraries and Cooperating Libraries may provide Books and Inserts to Google in hard copy (not including microform) format to be Digitized (or in a form Digitized by or for such Fully Participating Library or Cooperating Library), and (iii) Google and Fully Participating Libraries may use such Books and Inserts as provided in this Amended Settlement Agreement and the Library-Registry (Fully Participating) Agreements.  The authorizations to use Books and Inserts provided for by this Amended Settlement Agreement or a Library-Registry Agreement are not transfers of copyright ownership to such Books or Inserts, and nothing in this Amended Settlement Agreement or a Library-Registry Agreement shall operate to transfer any copyright ownership in Books or Inserts.  The foregoing authorization for Google to Digitize Books and Inserts includes authorization of Google's contractors to Digitize Books and Inserts for Google, including libraries that may Digitize Books and Inserts, or portions thereof, at Google's request.

27

(b)     Identification of Digitized Books and Government Works.

(i)     List of Digitized Books and Government Works. ~~As of the Notice Commencement Date, and upon Plaintiffs' request, Google will provide~~Google has previously provided Plaintiffs, in a form mutually agreed, with a list of the Books, Public Domain Books with a copyright date after 1922 and Government Works that Google has Digitized as of ~~the Notice Commencement Date~~January 5, 2009 and the date each Book, Public Domain Book with a copyright date after 1922 or Government Work was Digitized by Google, and a separate list of all Books, Public Domain Books with a copyright date after 1922 and Government Works that Google reasonably ~~anticipates~~anticipated it ~~will Digitize on or before the Opt-Out Deadline, in each case, to the extent that Google is permitted to do so under then-existing contracts with Metadata providers.  Google and Plaintiffs will cooperate to obtain such Metadata providers' permission for Google to provide Plaintiffs with such lists; provided, however, that the Registry shall be responsible for payment of any additional license fees to the extent required by such providers.  Further, as soon as practicable, Google will provide Plaintiffs, in a form mutually agreed,~~would Digitize on or before May 5, 2009.  On November 2, 2009, Google provided Plaintiffs with a final list of all Books, Public Domain Books with a copyright date after 1922 and Government Works that Google Digitized on or before ~~the Opt-Out Deadline.~~May 5, 2009.

(ii)     Books Database. ~~As of the Notice Commencement Date, Google, with or through the Registry, will make~~ Google has made a searchable online database available to members of the Amended Settlement Class through the Internet (1) for the purpose of identifying all Books, Public Domain Books with a copyright date after 1922 and Government Works that Google has Digitized or reasonably anticipates that it might Digitize under this Amended Settlement Agreement, and (2) for purposes of Article V (Other Settlement Benefits), identifying whether such Books, Public Domain Books with a copyright date after 1922 or Government Works have been Digitized as of the Notice Commencement Date or Google reasonably anticipates that it might Digitize such Books, Public Domain Books or Government Works ~~prior to the Opt-Out Deadline.~~on or before May 5, 2009. Such database shall be referred to in this Amended Settlement Agreement as the "Books Database." The Books Database ~~will support~~supports queries by author, title, publisher, ISBN, and date of publication.  The inclusion of a work within the Books Database does not, in and of itself, mean that the work is a Book within the meaning of Section 1.19 (Book).

28

(iii)    Books.  Google will also allow members of the Amended Settlement Class to submit bibliographic information (*e.g.*, title, author, and publication date) for Books not in the Books Database.

(iv)    Inserts.

(1)    Submission.  The Books Database will allow each member of the Amended Settlement Class to submit identifying information regarding his, her or its Inserts, such as the Books, Public Domain Books with a copyright date after 1922 or Government Works in which such Inserts were published, the location of such Inserts within Books, Public Domain Books with a copyright date after 1922 or Government Works and any other identifying information about such Inserts (*e.g.*, whether the Insert is an introduction, a foreword, etc.).

(2)    Insert Identification.  For content that may be an Insert, the Books Database will allow any Person who might be a member of the Amended Settlement Class to submit a digital copy of his, her or its content that may be an Insert or to otherwise identify such content that may be an Insert, and Google will perform searches to identify Books, Public Domain Books with a copyright date after 1922 or Government Works, if any, that contain such submitted content.  If Google identifies any Books, Public Domain Books with a copyright date after 1922 or Government Works that may contain such submitted content, Google will notify such Person of such Books, Public Domain Books with a copyright date after 1922 or Government Works in order to enable him, her or it to determine whether the submitted content is an Insert in such Books, Public Domain Books with a copyright date after 1922 or Government Works and the pages on which such content appears.  Google shall have no liability for failure to identify an Insert under this Section 3.1(b)(iv)(2) (Insert Identification).

3.2    Initial Display and No Display Book Classification.

(a)    General Guidelines.  Pursuant to Section 3.2(b). (Display/No Display Classification), Google and the Registry will classify all Books in one of two categories, either Display Books, as described in Section 3.3 (Display Books), or No Display Books, as described in Section 3.4 (No Display Books).

(b)     <u>Display/No Display Classification</u>.  Google will initially classify a Book as No Display if it is determined to be Commercially Available as of the Notice Commencement Date, and Display if it is determined not to be Commercially Available as of the Notice Commencement Date.  A Rightsholder, Google, or the Registry (pursuant to Section 3.2(e)(i) (Change Requests by Rightsholders)), may change a Book's classification as Display or No Display as set forth in this Article III (Google Book Search – Rights, Benefits and Obligations).

(c)     <u>Notification of Display/No Display Classification</u>. The Books Database will identify whether a Book has been classified as a Display Book or a No Display Book.

(d)     <u>Commercial Availability, In Print/Out of Print and Public Domain Determination</u>.

(i)     <u>Basis for Determination</u>.  Google shall determine whether a Book is Commercially Available or not Commercially Available based on ~~an~~<u>its</u> analysis of multiple third-party databases as well as ~~an~~<u>its</u> analysis of the Book's retail availability based on information that is publicly available ~~on the Internet~~<u>to it on the Internet.  Google will use third-party databases from a range of United States, Canadian, United Kingdom, and Australian sources that can be obtained on fair and commercially reasonable terms</u>.  When analyzing the third-party databases, Google will use the publishing status, product availability and/or availability codes to determine whether or not the particular database being used considers that Book to be ~~offered for sale new through one or more then-customary channels of trade in the United States~~<u>Commercially Available</u>.  When analyzing information that is publicly available <u>to it </u>on the Internet, Google will determine retail availability by consulting various sources to determine whether the Book is ~~available for sale new~~<u>Commercially Available</u>.  Each of these sources may contain errors; ~~by combining information from multiple sources,~~ Google<u>, however,</u> shall <u>use commercially reasonable efforts to </u>determine whether a Book is Commercially Available or is not Commercially Available ~~in a manner that is~~<u>using a methodology</u> reasonably <u>agreed to by Google and the Registry that is </u>designed to minimize the overall error rate.  All Books for which Google does not have information from the sources identified above will be determined to be not Commercially Available.  Rightsholders may provide information directly to Google that a Book is ~~being offered for sale new through one or more then-customary channels of trade in the United~~

~~States~~Commercially Available when they submit their Claim ~~Form~~Forms, through the Books Database or, at any time after such submission, to Google or the Registry. When ~~Rightsholders provide such information to Google, unless~~Google receives such information from Rightsholders or the Registry or Rightsholders otherwise assert that their Books are Commercially Available, such Books promptly shall be classified as Commercially Available. If Google reasonably believes that ~~the~~such information or assertion is inaccurate, ~~the Book shall be determined to be Commercially Available and Google shall change~~then Google may challenge the classification ~~of the Book to a No Display Book within thirty (30) days of receipt of such information~~pursuant to Article IX (Dispute Resolution).

> (1) <u>In-Copyright Principal Work</u>. If a Book's Principal Work is not in the public domain under the Copyright Act in the United States and that Book is Commercially Available, then any other Book that has the same Principal Work (such as a previous edition) is also deemed to be Commercially Available, whether or not such other Book is at the time in question also Commercially Available.

> (2) <u>Public Domain Principal Work</u>. If a Book's Principal Work is in the public domain under the Copyright Act in the United States, and that Book is Commercially Available and also contains an Insert (*i.e.*, content that qualifies as an Insert and is not in the public domain under the Copyright Act in the United States), then any earlier edition of such Book that contains such Insert is also deemed to be Commercially Available.

> (ii) <u>In-Print/Out-of-Print</u>. Google's initial determination of whether or not a Book is Commercially Available will be used to initially classify Books as "In-Print" or "Out-Of-Print," as such classifications are defined in the Author-Publisher Procedures, and only for purposes of the Settlement. Google shall provide the Registry with the determination as to whether a Book is Commercially Available as of the Notice Commencement Date and thereafter from time to time. Classification of Books as In-Print or Out-Of-Print pursuant to the terms of the Author-Publisher Procedures shall be the responsibility of the Registry. If the Registry re-classifies a Book as Out-Of-Print, the Registry will direct Google to change the classification of the Book to a Display Book, which Google shall do within thirty (30) days unless the Rightsholder of the Book, subject to Section 3.2(e)(i) (Change Requests by Rightsholders), expressly requests that the Book be treated as a No Display Book. If the Registry re-classifies a Book as In-Print, the

Registry will direct Google to change the classification of the Book to a No Display Book only upon the express request of the Rightsholder of the Book, subject to Section 3.2(e)(i) (Change Requests by Rightsholders).

(iii)     <u>Mistakes</u>.  If a Book was mistakenly determined by Google not to be Commercially Available, then the Rightsholder of the Book may notify Google, or may authorize the Registry to notify Google, of such mistaken determination.  To verify the claim, the Registry will provide, upon Google's reasonable request, information supporting any assertion by the Rightsholder of the Book that the Book is Commercially Available.  If the Rightsholder ~~demonstrates~~<u>asserts</u> that the Book is Commercially Available, then, as Google's sole obligation and the Rightsholder's sole remedy (subject to Section 3.2(d)(iv) (Disputes)), Google <u>promptly</u> shall correct the determination as to whether the Book is Commercially Available ~~within thirty (30) days~~.

(iv)     <u>Disputes</u>.  The Registry and Google shall work together to resolve any disputes regarding the determination of whether a Book is Commercially Available.  If they are unable to do so, then the dispute shall be resolved pursuant to Article IX (Dispute Resolution).  If the Arbitrator, in such dispute, finds in favor of the Rightsholder, then Google shall pay the Rightsholder's reasonable attorneys' fees and costs, including arbitration costs.

(v)     <u>Safe Harbor Public Domain Determination</u>.

(1)     <u>Safe Harbor Process</u>.  Attachment E (Public Domain) sets forth the process by which Google may determine whether a book is a Public Domain Book for the sole purpose of determining whether Section 3.2(d)(v)(3) (Safe Harbor) is applicable.  Attachment E (Public Domain) may be amended by Google and the Registry from time to time if Google develops and provides to the Registry additional or different processes for determining whether a book is a Public Domain Book.  If the Registry reasonably believes that such processes do not identify Public Domain Books accurately, then the Registry shall notify Google thereof.  Google shall respond to such notice within thirty (30) days, either by modifying such process or by explaining how such process can reasonably identify Public Domain Books accurately.  Any disputes as to whether the process can reasonably identify Public Domain Books for purposes of determining

the applicability of Section 3.2(d)(v)(3) (Safe Harbor) shall be resolved pursuant to Article IX (Dispute Resolution).

(2)     List.  Google shall identify to the Registry books that it has determined to be Public Domain Books pursuant to the process set forth in Attachment E (Public Domain) and for which Google wants the safe harbor described in Section 3.2(d)(v)(3) (Safe Harbor).  For each such book, Google shall provide the supporting reasons and information that Attachment E (Public Domain) requires.  At any time, the Registry or a Rightsholder may notify Google that it or a Rightsholder believes that any such book is not a Public Domain Book (with supporting reasons and information) and, upon receipt of such notice, Google shall promptly review the supporting reasons and information and shall either (a) re-classify the Book as in copyright or (b) notify the Registry and any notifying Rightsholder that Google continues to believe the book is a Public Domain Book.  Any disputes with respect to whether a book is a Public Domain Book shall be resolved pursuant to Article IX (Dispute Resolution); in any such dispute, the burdens of proof as to whether the book is in copyright or in the public domain under the Copyright Act in the United States (and the allocation and shifting of such burdens) shall be as if the action were one for copyright infringement brought under the Copyright Act.

(3)     Safe Harbor.  If, with respect to a book, Google has followed the process set forth in Attachment E (Public Domain) and neither the Registry nor a Rightsholder has notified Google pursuant to Section 3.2(d)(v)(2) (List), then Google may treat such book as if it is in the public domain under the Copyright Act in the United States for the purposes of this Amended Settlement Agreement, and Google will have no liability or obligation (a) for any use of such book to the extent that such use would be authorized under this Amended Settlement Agreement if such book were a Display Book or (b) for providing downloadable versions of such book.  If the Registry or a Rightsholder has notified Google pursuant to Section 3.2(d)(v)(2) (List), Google otherwise obtains actual knowledge that a Book is not in the public domain under the Copyright Act in the United States, or a Book is determined to be in copyright pursuant to Article IX (Dispute Resolution), then, commencing five (5) Business Days from the date of such notice, knowledge or determination, the foregoing limitation on Google's liability or obligation will not apply.

33

(e)     Change of Display/No Display Classification.

(i)     Change Requests by Rightsholders.  For all Books, the Registered Rightsholder of the Book or the Registry, for unclaimed Books, the Unclaimed Works Fiduciary (subject to the last sentence of this Section 3.2(e)(i) (Change Requests by Rightsholders)) may direct Google or the Registry to change the classification of a Book or group of Books to a Display Book or Display Books or to a No Display Book or No Display Books or to include in, or, pursuant to Section 3.5 (Right to Remove or Exclude), exclude any or all of his, her or its Books or group of Books from, one or more of the Display Uses.  In the event the Rightsholder directs that any of his, her or its Books be included in one or more of the Display Uses, (1) the provisions of Section 3.5(b)(iii) (Coupling Requirement) will apply to such Books, (2) such Books will be considered Display Books, and (3) such Display Uses will be deemed authorized.  Google will implement a direction to change the classification of a Book within thirty (30) days after Google receives notice of such direction.  The Registry shall be able to direct Google to change the classification of a Book to a Display Book or a group of Books to Display Books.  A direction to change the classification of a Book to a No Display Book or a group of Books to No Display Books, however, must be initiated by the Rightsholder of the Book or Books.

(ii)     Change Requests by Google.  At any time after one (1) year from the Final Approval Date, Google shall have the right to request that the classification of a Book be changed to a Display Book if Google believes that the Book is not Commercially Available at that time, or if Google believes that a mistake was made in initially determining the Book to be Commercially Available.  Upon receipt of such a request from Google, the Registry shall have one hundred and twenty (120) days to attempt to contact the Rightsholder of the Book to inform such Rightsholder of such request and/or collect evidence with respect to whether the Book is Commercially Available.  The Registry shall notify Google if it is able to contact such Rightsholder and will inform Google whether such Rightsholder wants the Book to remain classified as a No Display Book.  If the Rightsholder of the Book provides evidence that the Book is Commercially Available or otherwise directs Google that he, she or it wants the Book to remain a No Display Book, or if the Registry otherwise determines that the Book is Commercially Available, then the Registry will notify Google, and Google will not change the classification of the Book to a Display Book at that time on that basis.  If, by the end of the one hundred twenty (120)-day period, the Registry is unable to contact the Rightsholder or to find accurate evidence regarding whether the Book is Commercially

34

Available, then the Registry shall inform Google and Google may change the classification of the Book to a Display Book, subject to Section 3.5 (Right to Remove or Exclude).

3.3    Display Books.

(a)    Display and Non-Display Uses.  Subject to Section 3.5 (Right to Remove or Exclude) and Section 4.3 (Preview Uses), Google may make Display Uses and Non-Display Uses of all Display Books.; provided, however, that Google will not make Display Uses of any Book that Google has classified as not Commercially Available until the later of the Effective Date or sixty (60) days after notifying the Registry that Google has classified such Book as not Commercially Available.  If, within such sixty (60)-day period, a dispute under Section 3.2(d)(iv) (Disputes) arises between the Rightsholder or the Registry and Google regarding whether such Book is Commercially Available, Google will not make Display Uses of the Book unless and until Google prevails under Article IX (Dispute Resolution).

(b)    Inserts in Display Books.  If a Book is classified as a Display Book, then, subject to Section 3.5 (Right to Remove or Exclude), Google may make Display Uses and Non-Display Uses of all Inserts in such Book.  If a Book is classified as a No Display Book, then all Inserts in that Book are also subject to Section 3.4 (No Display Books).

(c)    Inserts in Government Works and Public Domain Books.  Google may use all Inserts in Government Works and Public Domain Books in connection with any uses of such Government Works and Public Domain Works in Google Products and Services, subject to Section 3.5(b) (Right to Exclude from Display Uses and Revenue Models).

(d)    Accommodation of Print Disabilities.  Google may provide the Display Uses in a manner that accommodates users with Print Disabilities so that such users have a substantially similar user experience as users without Print Disabilities.

(e)     **Change to No Display**.  Rightsholders of Books may, pursuant to Section 3.2(e)(i) (Change Requests by Rightsholders), direct Google or the Registry to change the classification of a Display Book to a No Display Book.

(f)     **Author Landing Page Links**.  If, in any Display Use of a Book in GBS for which Display Use is authorized pursuant to this Amended Settlement Agreement, Google presents any web page (i) dedicated to an individual author that includes hyperlinks to that author's Books and other features, or (ii) with content from a Book that includes a hyperlink to the website of the publisher of such Book, then Google will also include on such page a hyperlink (or similar or appropriate technology) to that author's website, in either case only if (1) the Registry provides Google with such hyperlink, and (2) such website promotes the author's works, or provides relevant information about the author, and is otherwise appropriate for such purposes; provided that Google may remove any such hyperlink if Google becomes aware that such hyperlink no longer functions to link to such website.

(g)     Display Use Attributes.  With respect to their Display Books, Google and the Rightsholders may negotiate and Rightsholders may authorize Google to modify or remove the restrictions that are placed on Google in Section 4.1(d) (Basic Features of Institutional Subscriptions) and 4.2(a) (Basic Features of Consumer Purchase), and comparable restrictions that may apply to additional Revenue Models that may be agreed pursuant to Section 4.7 (Additional Revenue Models).

3.4     **No Display Books**.

(a)     **Non-Display Uses**.  Subject to Section 3.5 (Right to Remove or Exclude), Google may make Non-Display Uses of all No Display Books.

(b)     **Change to Display**.  Rightsholders of Books may, pursuant to Section 3.2(e)(i) (Change Requests by Rightsholders), direct Google or the Registry to change the classification of a No Display Book to a Display Book, or to include any or all of their No

Display Books in one or more of the Display Uses, in which case such Books will then be considered to be Display Books, and Article IV (Economic Terms for Google's Use of Books) shall apply.

3.5     Right to Remove or Exclude.

(a)          Right to Remove.

(i)          Right to Remove.   A Rightsholder of a Book may direct that his, her or its Book not be Digitized, or if already Digitized, that the Book be Removed.  If a Book has not yet been Digitized when Google receives a Removal request for that Book, Google will use reasonable efforts not to Digitize that Book, but, in any event, will comply with the request to Remove.  Google will implement a Rightsholder's Removal direction ~~within~~as soon as reasonably practicable, but in any event no later than thirty (30) days after notice from the Registry, and in accordance with Section 3.5(b) (Right to Exclude from Display Uses and Revenue Models), will simultaneously act promptly to exclude a Book for which it has received a Removal request.  A Fully Participating Library will implement a Rightsholder's Removal direction ~~within~~for a Book as soon as reasonably practicable, but in any event no later than ninety (90) days after notice from the Registry.

(ii)          Back-up Storage.  Google and Fully Participating Libraries may maintain Books on back-up tapes or on any other back-up storage media subject to compliance with the Security Standard.  If any back-up tape or other back-up storage media containing such Book is restored, then any Book that has been Removed pursuant to Section 3.5(a)(i) (Right to Remove) shall also be Removed from any copy made from the back-up tape or other back-up storage media.

(iii)          Limitations on Right to Remove.  The right to Remove under Section 3.5(a)(i) (Right to Remove) is limited to requests made ~~within twenty-seven (27) months from the Notice Commencement Date~~on or before April 5, 2011 for Removal as described in Section 1.126(a) (Removed) or after April 5, 2011 but on or before March 9, 2012, for Removal as described in Section 1.126(b) (Removed).  Thereafter, requests will be honored only to the extent that the Books have not yet been Digitized as of the date the request is made; if the Books at issue have already been Digitized, the

37

Rightsholder may request exclusion from particular Display Uses (under Section 3.5(b)(i) (Right to Exclude)) but not Removal (under Section 3.5(a)(i) (Right to Remove)).

(b)     Right to Exclude from Display Uses and Revenue Models.

(i)     Right to Exclude.  Any Rightsholder of a Book at any time may direct Google or the Registry to exclude his, her or its Book, or any portion thereof, from any one or more, or all, Display Uses, Revenue Models or the Book Annotation sharing feature under Section 3.10(c)(ii) (Hyperlinks and Book Annotations), and any Rightsholder of an Insert at any time may direct that his, her or its Insert, or any portion thereof, be excluded from all (but not less than all) Display Uses; provided that any Rightsholder of an Insert may only direct that his, her or its Insert, or any portion thereof, be excluded but not the entire Book, Public Domain Book or Government Work in which its Insert is contained.  Google shall implement any such direction as follows.  Google will implement a Rightsholder's exclusion direction ~~within~~promptly, but in any event no later than thirty (30) days after notice from the Registry or from resolution of the dispute in favor of such Rightsholder (in the case of a challenge under Section 3.5(b)(ii) (Challenging Insert Exclusion Requests) or Section 3.5(b)(vii) (Government Works and Public Domain Works)).  Google shall use commercially reasonable efforts to develop a mechanism for excluding no more of Books or Inserts than Rightsholders direct.  If, after using such commercially reasonable efforts, Google is unable to limit its exclusion to the Insert or portion of the Book or Insert directed by a Rightsholder, Google may exclude up to the entire page or pages on which such Insert or portion appears.  If, however, Google or the Registry develops a tool that enables Rightsholders to specify with precision the location and amount of material in an Insert or portion of a Book or Insert that is less than an entire page and for which the Rightsholder has directed exclusion, Google shall, upon receipt of such direction, exclude such Inserts or portions of Books or Inserts, but no more than that, from Display Uses as directed.

(1)     Exclusion from Library Digital Copy.  Notwithstanding Section 3.5(b)(i) (Right to Exclude), no Rightsholder may direct that his, her or its Book or Insert be excluded from any Library Digital Copy provided, however, that, in the case of a Book, a Rightsholder of the Book may request Removal of such Book pursuant to Section 3.5(a) (Right to Remove).

38

(ii)     <u>Challenging Insert Exclusion Requests</u>.  The Rightsholder of a Book that contains an Insert that the Rightsholder of the Insert has directed be excluded may challenge such direction under law or contract rights, and any dispute regarding such challenge shall be resolved pursuant to Article IX (Dispute Resolution).  In addition, if (a) the Rightsholder of a Book that contains an Insert for which the Insert Rightsholder has directed exclusion is not a Registered Rightsholder or (b) the Registered Rightsholder of the Book that contains such Insert (1) determined not to challenge such exclusion pursuant to the previous sentence and (2) does not object to Google making such challenge, then Google may challenge whether the Rightsholder of the Insert would have a right under the Copyright Act to exclude such Insert.  Google and the Registry will develop a process to implement the foregoing.  Any dispute regarding such challenge shall be resolved pursuant to Article IX (Dispute Resolution).

(iii)     <u>Coupling Requirement</u>.  Notwithstanding Section 3.5(b)(i) (Right to Exclude), if the Rightsholder of any Library Work authorizes Consumer Purchase or any ~~new~~<u>additional</u> Revenue Model that may be developed pursuant to Section  4.7 (~~New~~<u>Additional</u> Revenue Models) (except for any ~~new~~<u>additional</u> Revenue Model in which access to the Library Scan of that Library Work is provided to users free of charge) of or for such Library Work and Google uses a Library Scan of such Library Work for Consumer Purchase or for such ~~new~~<u>additional</u> Revenue Model, then the Rightsholder authorizes Google to include such Library Work in all Institutional Subscriptions (the "<u>Coupling Requirement</u>"); provided, however, that if a Library Work is Commercially Available as of the Notice Commencement Date or becomes Commercially Available at any time during the two (2)-year period after the Notice Commencement Date, the Coupling Requirement will not apply to that Library Work; provided, further, that if, at any time after the end of such two (2)-year period, the Library Work ceases to be Commercially Available, then the Coupling Requirement shall thereafter apply to such Library Work if Google is using the Library Scan for Display Uses.

(iv)     <u>Mistakes and the Coupling Requirement</u>.  If, as of the Notice Commencement Date, a Library Work for which Google uses a Library Scan for Consumer Purchase or any ~~new~~<u>additional</u> Revenue Model that may be developed pursuant to Section 4.7 (~~New~~<u>Additional</u> Revenue Models) (except for any ~~new~~<u>additional</u> Revenue Model in which access to the Library Scan of that Library Work is provided to users free of charge) is not Commercially Available but Google mistakenly determined such Library Work to be Commercially Available, and such Library Work does not

39

become Commercially Available at any time during the two (2)-year period following the Notice Commencement Date, then, upon a determination that the Library Work is not Commercially Available after such two (2)-year period, the Coupling Requirement will apply to such Library Work if Google is using a Library Scan for Display Uses.  If, as of the Notice Commencement Date or at any time during the two (2)-year period following the Notice Commencement Date, such Library Work is mistakenly determined to be not Commercially Available, then, upon determination that the Library Work is Commercially Available, the Coupling Requirement will not apply to such Library Work; provided, however, that if, at any time after the end of such two (2)-year period, the Library Work ceases to be Commercially Available, then the Coupling Requirement shall thereafter apply to such Library Work if Google uses a Library Scan for Display Uses.

(v)     <u>Waiver of Coupling Requirement</u>.  Google and the Registry may, with the consent of a Fully Participating Library or a Cooperating Library, agree to waive the Coupling Requirement as to Library Works of which such Fully Participating Library or Cooperating Library is the source and for which Google uses a Library Scan for Display Uses; provided, however, that for any Library Work for which a Library Scan is constructed from more than one physical copy of a Library Work, such waiver requires the consent of all Fully Participating Libraries and Cooperating Libraries that are the source of copies of such Library Work. Any Fully Participating Library and Cooperating Library may also agree to such a waiver in its Digitization Agreement with Google or upon notice to Google, in which event Google shall notify the Registry of such waiver. Google and the Registry may, with the consent of all of the Fully Participating Libraries and the Cooperating Libraries, acting through the Designated Representative, agree to waive the Coupling Requirement as to all Library Works subject to the Coupling Requirement.

(vi)     <u>Continuing Obligations</u>.  If Google is authorized to make a Display Use of a Book and, subsequent to such authorization, a Rightsholder Removes such Book or excludes such Book or an Insert contained therein, Google shall cease such Display Use except that Google may make such Display Use of such Book or Insert to the extent necessary to fulfill its obligations as of the date of such Removal or exclusion request to any user who previously purchased access to or use of the Book through any Institutional Subscription (for a period not to exceed ten (10) months or the term of the Institutional Subscription, whichever is less, after the date of such Removal or exclusion request) or Consumer Purchase or any substantially

40

similar Google Product or Service based on authorizations granted to Google under a separate agreement entered into directly with the Rightsholder.

(vii)     <u>Government Works and Public Domain Works</u>.  If a Rightsholder of an Insert in a Government Work or a Public Domain Book (not an Insert in a Book) directs Google to exclude its Insert from Display Uses, Google may elect to reject such direction.  In the event of such a rejection, such Rightsholder may, notwithstanding any release in this <u>Amended</u> Settlement Agreement, bring either a judicial action in United States federal court against Google with respect to Google's use of the Insert, in which judicial action the Rightsholder may seek to recover any and all relief available pursuant to the Copyright Act or, alternatively, the Rightsholder may initiate dispute resolution under Article IX (Dispute Resolution) with respect to Google's rejection of the Rightsholder's direction.  If the Rightsholder prevails in such arbitration, (i) the Arbitrator shall issue an order prohibiting Google from making any and all Display Uses of such Insert that the Arbitrator determines would be an infringement of such Rightsholder's Copyright Interest, (ii) Google shall pay the Rightsholder's reasonable attorneys' fees and costs, including the cost of the arbitration, and (iii) the foregoing and any other injunctive relief deemed appropriate by the Arbitrator shall be Google's sole obligation and the Rightsholder's sole remedy for rejecting the Rightsholder's direction for exclusion of its Insert in a Government Work or Public Domain Book from Display Uses (in addition to any award of injunctive relief, to prevent a continuing infringement of such Rightsholder's Copyright Interest in his, her or its Insert, that may be awarded by the Arbitrator).  Pending the Decision of the Arbitrator, Google shall stop any and all Display Uses of the Insert.

(c)     <u>Take-Down or Transfer Requests</u>.

(i)     <u>Definitions</u>.  As used in this Section 3.5(c) (Take-Down or Transfer Requests), the following terms have the following meanings:

(1)     "<u>Counter-Notice</u>" means a request, in the form of notice attached as Exhibit B to the Author-Publisher Procedures, that states, under penalty of perjury, that the Initial Authorizing Rightsholder has the good faith belief that he, she or it has rights in a Book that is the subject of a Take Down Request or a Transfer Request necessary to authorize Google to exploit such Book as it is being exploited in such Other Google Program.

(2)  "<u>Educational Books</u>" means Books that, when published, were intended primarily for sale to educational markets (*i.e.*, K-12, higher education, continuing education, vocational, professional, self-study, and similar educational markets) for use in educational programs.

(3)  "<u>Initial Authorizing Rightsholder</u>" means the Person who had given Google permission to use a Book that is the subject of a Take Down Request or a Transfer Request.

(4)  "<u>Notifying Rightsholder</u>" means a Rightsholder who has a good faith belief that Google is exploiting a Book in an Other Google Program without the necessary authorization from such Rightsholder.

(5)  "<u>Other Google Program</u>" means a Google program other than, but similar to, the Revenue Models, including the Google Partner Program.

(6)  "<u>Take Down Request</u>" means a request, in the form of notice attached as Exhibit A to the Author-Publisher Procedures, that Google remove a Book from an Other Google Program.

(7)  "<u>Transfer Request</u>" means a request, in the form of notice attached as Exhibit A to the Author-Publisher Procedures, to transfer a Book from an Other Google Program to one or more Display Uses in one or more of the Revenue Models.

(ii)  <u>Procedures</u>.  The following procedures will apply to each Book classified as In-Print under the Author-Publisher Procedures (except for Educational Books) that is the subject of a contract between an author and a publisher regarding publication of such Book executed prior to 1992 and that has not been amended thereafter to expressly grant or retain all electronic rights pertinent to an Other Google Program if such Book is displayed in an Other Google Program.

(1)  If Google receives a Take Down Request or a Transfer Request from the Registry, Google shall send a copy to the Initial Authorizing Rightsholder.

42

(2)        If the Initial Authorizing Rightsholder fails to respond within thirty (30) days, then, if the request satisfies the requirements set forth in the Author-Publisher Procedures, Google shall take down such Book or transfer such Book into the Revenue Models, as specified in the request.  If Google transfers such Book into the Revenue Models, such Book shall become subject to this Amended Settlement Agreement.

(3)        If the Initial Authorizing Rightsholder responds to a Take Down Request by filing a Counter-Notice, the Registry will forward the Counter-Notice to Google and the Notifying Rightsholder.  If the Counter Notice requirements set forth in the Author-Publisher Procedures are met, Google may, in its discretion, take down, maintain or restore access to such Book in the Other Google Program.

(4)        If the Initial Authorizing Rightsholder responds to a Transfer Request by filing a notice of objection with the Registry, then Google shall not include such Book in the Revenue Models and shall stop displaying such Book in the Other Google Program while the Notifying Rightsholder and the Initial Authorizing Rightsholder resolve the dispute. Google shall only restore access to such Book in any of the Revenue Models or the Other Google Program once (a) the Initial Authorizing Rightsholder and the Notifying Rightsholder jointly authorize Google to do so or (b) either the Initial Authorizing Rightsholder or the Notifying Rightsholder obtains a court (or, if the contract between the author and publisher regarding publication of such Books permits, arbitration) ruling giving it authority to direct Google to do so.

(5)        In any disputes between an Initial Authorizing Rightsholder and a Notifying Rightsholder over which of them has the right to authorize Google to exploit a Book in the Other Google Program or in the Revenue Models, Google will not be named as a party or brought into the dispute in any manner and will have no liability or responsibility with respect to any such dispute.

3.6     Technical Adaptations.  Except with respect to Books Removed under Section 3.5(a) (Right to Remove), Google may make technical adaptations to (but not adapt or alter the content of) all Books (whether Display or No Display) and Inserts as reasonably necessary to preserve, maintain, manage, and keep technologically current its copies of the Books and Inserts.

43

3.7    Contemplated Rightsholder Services.

(a)    Obligation.  Google shall implement both of the Contemplated Rightsholder Services (*i.e.*, Institutional Subscriptions and Consumer Purchases) within five (5) years after the Effective Date.  If Google discontinues both of the Contemplated Rightsholder Services prior to the fifth (5th) anniversary of the Effective Date, Google shall implement comparable replacement monetization opportunities for the Rightsholders within a period of one year from the date that Google discontinues the Contemplated Rightsholder Services.  Google's sole obligation and the sole remedy for any failure under this Section 3.7(a) (Obligation) is set forth in Sections 3.7(b) (Failure to Provide Contemplated Rightsholder Services) through (d) (Third-Party Required Library Services Provider).

(b)    Failure to Provide Contemplated Rightsholder Services.  If (i) Google fails to implement either of the Contemplated Rightsholder Services within five (5) years after the Effective Date or (ii) Google discontinues both of the Contemplated Rightsholder Services prior to the fifth (5th) anniversary of the Effective Date, and does not implement comparable replacement monetization opportunities for the Rightsholders within a period of one year from the date that Google discontinues the Contemplated Rightsholder Services, then, in either case, Google's right to make any and all Non-Display Uses and Display Uses shall terminate ninety (90) days after notice to Google by the Registry, except as may be authorized by the Registry; provided, however, that if Google subsequently offers one of the Contemplated Rightsholder Services, Google's rights to make any and all Non-Display Uses and Display Uses shall be immediately re-instated.  Notwithstanding the foregoing, if Google believes that any actions or inactions of the Registry have proximately caused Google to fail to provide the Contemplated Rightsholder Services, then Google will provide the Registry with notice describing the Registry's actions or inactions within such ninety (90)-day notice period, and the Registry's notice of termination will have no effect and Google may continue to make any and all Non-Display Uses and Display Uses.  Any dispute over whether any action or inaction of the Registry has proximately caused Google to fail to provide the Contemplated Rightsholder Services shall be subject to the dispute resolution provisions of Article IX (Dispute Resolution) and Google may make any and all Non-Display and Display Uses pending the Decision of the Arbitrator.

44

(c)     Additional Contemplated Rightsholder Services Provider.  In addition, if (i) Google fails to implement both of the Contemplated Rightsholder Services within five (5) years after the Effective Date or (ii) Google discontinues both of the Contemplated Rightsholder Services and does not implement comparable replacement monetization opportunities for the Rightsholders within a period of one year from the date that Google discontinues the Contemplated Rightsholder Services, then, in either case, the Registry on the one hand and/or the Fully Participating Libraries and the Cooperating Libraries on the other hand, acting reasonably, may work to find one or more provider(s) that can provide Consumer Purchases, Institutional Subscriptions and/or the ~~new~~additional Revenue Models listed in Section 4.7 (~~New~~Additional Revenue Models), and/or Required Library Services, on substantially the same terms described in this Amended Settlement Agreement.  Any such arrangement shall be subject to the consent of the Registry, on the one hand, and the Fully Participating Libraries and the Cooperating Libraries acting through the Designated Representative, on the other hand (but in the case of the Fully Participating Libraries and the Cooperating Libraries only as to Library Scans), which consent of the Registry and the Fully Participating Libraries and the Cooperating Libraries shall not be unreasonably withheld or delayed (any such provider is referred to in this Amended Settlement Agreement as an "Additional Contemplated Rightsholder Services Provider").  If an Additional Contemplated Rightsholder Services Provider is identified and the foregoing required consent is obtained, then Google will provide such Additional Contemplated Rightsholder Services Provider with Digital Copies of the Library Scans (so long as the Digital Copies are not restricted from further distribution under the Digitization Agreement between Google and a Fully Participating Library or a Cooperating Library) and Digital Copies of other Books that may be provided by Google without restriction.  Such Digital Copies may be used by the Additional Contemplated Rightsholder Services Provider solely to provide the Contemplated Rightsholder Services and/or the ~~new~~additional Revenue Models listed in Section 4.7 (~~New~~Additional Revenue Models) and/or Required Library Services in accordance with the terms of this Amended Settlement Agreement and, in addition, with respect to Digital Copies of Library Scans only, the terms of Google's agreements with each of the Fully Participating Libraries and the Cooperating Libraries.  Such Additional Contemplated Rightsholder Services Provider is, in connection with any Claim arising out of its making available Digital

Copies of Books, deemed to be a successor of Google for purposes of Section 10.1(g) (Google Releasees).

(d)      <u>Third-Party Required Library Services Provider</u>. If Google provides a Digital Copy of the Library Scans to a Third-Party Required Library Services Provider under Section 7.2(e) (Required Library Services Requirement), then the Contemplated Rightsholder Services may also be provided by the Third-Party Required Library Services Provider in addition to the Required Library Services, and Google will have no obligation to provide Contemplated Rightsholder Services and will have no liability or obligation with respect to Contemplated Rightsholder Services provided by the Third-Party Required Library Services Provider.

(e)      <u>Google's Exclusion of Books</u>.  Google may, at its discretion, exclude particular Books from one or more Display Uses for editorial or non-editorial reasons.  However, Google's right to exclude Books for editorial reasons (*i.e.*, not for quality, user experience, legal or other non-editorial reasons) is an issue of great sensitivity to Plaintiffs and Google.  Accordingly, because Plaintiffs, Google and the libraries all value the principle of freedom of expression, and agree that this principle is an important part of GBS and other Google Products and Services, Google agrees to notify the Registry of any such exclusion of a Book for editorial reasons and of any information Google has that is pertinent to the Registry's use of such Book other than Confidential Information of Google and other than information that Google received from a third party under an obligation of confidentiality.

(i)      <u>Digital Copy of Excluded Books</u>.  Google will provide to the Registry a Digital Copy of any Book that Google excludes for editorial reasons.  The Registry may, subject to Section 3.5 (Right to Remove ~~and~~<u>or</u> Exclude), engage, with the consent (not to be unreasonably withheld) of the Fully Participating Library or the Cooperating Library from which the Library Scan of such Book was made (including, if Google constructed a Digital Copy of a Book pursuant to Section 7.2(a)(i) (Fully Participating Library Collections) from one or more physical Books, all such libraries that were the source of such physical Books), a Third-Party Required Library Services Provider that, once engaged, may make available to users a Digital Copy of that Book for uses comparable to Display Uses and Non-Display Uses; provided that, if a Book is not then Commercially Available and the

46

Third-Party Required Library Services Provider makes available the Book for a fee, then the Third-Party Required Library Services Provider must also offer the Required Library Services (Section 7.2(e) (Required Library Services Requirement)) for the Book to the extent required by such Fully Participating Library or Cooperating Library.  Such Third-Party Required Library Services Provider is, in connection with any Claim arising out of its making available such Digital Copy of the Book, deemed to be a successor of Google for purposes of Section 10.1(g) (Google Releasees).

3.8     Effect of Other Agreements and Changes in Law.

(a)     Effect of Other Agreements.  The Registry (and any substantially similar entity organized by Rightsholders that is using any data or resources that Google provides, or that is of the type that Google provides, to the Registry relating to this Settlement) will extend economic and other terms to Google that, when taken as a whole, do not disfavor or disadvantage Google as compared to any other substantially similar authorizations granted to third parties by the Registry (or any substantially similar entity organized by Rightsholders that is using any data or resources that Google provides, or that is of the type that Google provides, to the Registry relating to this Settlement) when such authorizations (i) are made within ten (10) years of the Effective Date and (ii) include rights granted from a significant portion of Rightsholders other than Registered Rightsholders.  With respect to any such authorization, the Registry promptly will provide Google with notice that an authorization has been granted with sufficient detail of the terms to allow Google to obtain the benefits of such authorization pursuant to this Section 3.8(a) (Effect of Other Agreements).

3.8     (b) Effect of Changes in Law.  Google will be able to take advantage of any future legislative change(s), such as legislation allowing the use of orphan works (if enacted), that put Google at a competitive disadvantage in its use of Books in any Google Products and Services that are subject to this Amended Settlement Agreement; provided, however, that Google may choose to receive the benefit of such change(s) only if a third party is actually taking advantage of such law(s) in connection with services that competitively disadvantage Google in its provision of any such Google Products and Services; provided, further, that no changes in the "fair use" doctrine as codified in Section 107 of the Copyright Act shall trigger this Section 3.8(b)3.8 (Effect of Changes in Law).

3.9     Distribution Arrangements.  When Google may make any Snippet Display of a Book under this Amended Settlement Agreement, Google may also allow third parties that have entered into agreements with Google (a) to display snippets served by Google on their websites in response to user interactions on their websites and (b) to

cache temporarily snippets transmitted by Google as described in the foregoing clause (a) for future display on their websites in response to user interactions on their websites.

3.10    Specific Prohibitions.

(a)    Prohibitions on Display.  Except as expressly permitted by this Amended Settlement Agreement or otherwise by Registered Rightsholders or the Registry, for unclaimed works, by the Unclaimed Works Fiduciary, Google shall not (i) display any Expression from Books or Inserts; (ii) display any Expression from Books or Inserts in a manner that would constitute a derivative work of such Books or Inserts under the Copyright Act; or (iii) display summaries or abstracts of, or compilations from, Books or Inserts created using Digital Copies.

(b)    Prohibitions on Linking.  Except as expressly permitted by this Amended Settlement Agreement or otherwise by Registered Rightsholders or, for unclaimed Books, by the Unclaimed Works Fiduciary, Rightsholders or the Registry, Google shall not create hyperlinks to Preview Use Book pages permitted by the terms of this Amended Settlement Agreement from revenue generating products or services if the effect of those links in the aggregate is to detract from revenue under this Amended Settlement Agreement that the Rightsholder(s) of such Book(s) would realize if the links did not exist, unless such services or products (i) are search services (including, for example, Google Web Search, Google Earth and other Google services that show search results by browsing instead of by entering a search query), or (ii) have the effect of making discovery of Books easier, more efficient, more widespread, or more useful.  If Plaintiffs or any Rightsholders believe that this Section 3.10(b) (Prohibitions on Linking) has been violated, as Plaintiffs' and Rightsholders' sole remedy and Google's sole obligation, the Registry will notify Google of the existence of such links and if it is agreed or an Arbitrator, pursuant to Article IX (Dispute Resolution), determines that this Section 3.10(b) (Prohibitions on Linking) has been violated, Google will expeditiously remove said links or come to a separate agreement with the Registry to permit them.

(c)    Integrity of the Text.

(i) No Alteration of Text.  Except as expressly authorized by the Registered Rightsholder or the Registry, for unclaimed works, by the Unclaimed Works Fiduciary, or in this Amended Settlement Agreement, Google may not intentionally alter the text of a Book or Insert when displayed to users.  Changes in the formatting or presentation of text are not considered to be alteration of the text, *e.g.*, for the Accommodated Service.

(ii) Hyperlinks and Book Annotations.  Except as expressly authorized by the Registered Rightsholder or the Registry, for unclaimed Books, by the Unclaimed Works Fiduciary, Google may not add hyperlinks to any content within a page of a Book or facilitate the sharing of Book Annotations, except that Google may:

(1) add hyperlinks within the Book for specific internal references from text contained within the Book to other sections of the Book, such as from a table of contents entry to the referenced page, from a page number in the index to the page, or from internal references in the Book to footnotes, endnotes, bibliographical material, appendices, figures, and illustrations,

(2) add a hyperlink from an explicit reference in the Book to an online version of an external source cited in a footnote, endnote, or bibliographical material,

(3) add a hyperlink to a URL that the Rightsholder included in a Book,

(4) temporarily highlight or otherwise emphasize words in response to a user's action, so long as such highlight or emphasis appears only on the user's monitor and/or on a page printed by such user, and

(5) Subject to the Rightsholder's right to exclude its Books from the Book Annotation sharing feature, allow a user to make Book Annotations for the user's own personal use and to share those Book Annotations with a limited number of other users, provided that the feature that enables Book Annotations within Google Products and Services is subject to the following limitations:

49

a)      Book Annotations may not be shared with the general public, and

b)      Book Annotations may not be accessible to any user who has not expressly chosen to access it either by active selection or by participation in a group such as a class for which this feature is used, and

c)      Book Annotations may not be displayed with the Book for other users who do not already have the right to view the Book, and

d)      for sharing of a Book Annotation in connection with Consumer Purchase, the user may only share such Book Annotation with no more than twenty-five (25) individuals and the user must identify (*e.g.*, by name, login or user id) each individual with whom such Book Annotation will be shared, and

e)      for sharing of a Book Annotation as part of an Institutional Subscription, the user may only share such Book Annotation with the following other users of such Institutional Subscription:  instructors and students in a single academic course sharing such Book Annotation in connection with such course during an academic year or with students of the same course during a subsequent academic year, and employees of the subscriber of the Institutional Subscription sharing such Book Annotation in connection with a discrete work project during the course of that project.

(iii)      <u>Advertising Content</u>.  Google may not place on, behind or over the contents of a Book or portion thereof (including on Preview Use pages or Snippet Display pages), as displayed to a user, any pop-up, pop-under, or any other types of advertisements or content of any kind.  In addition to a Rightsholder's right to exclude one or more of his, her or its Books from Advertising Uses pursuant to Section 3.5(b)(i) (Right to Exclude), the ~~Registry is authorized to act on behalf of Rightsholders that are not Registered Rightsholders to~~<u>Unclaimed Works Fiduciary may</u> exclude from Advertising Uses one or more <u>unclaimed </u>Books ~~of such Rightsholders~~ if Google displays animated, audio or video advertisements in conjunction

50

with those Books and the Registry determines that exclusion from such Advertising Uses is in the best interests of ~~such~~ Rightsholders~~.~~ of such unclaimed Books.

3.11    Hosted Version for Rightsholders.  Upon request by a Rightsholder of a Book, Google will provide a hosted version of such Book for use in conjunction with such Rightsholder's website, similar to Google's hosted version of Books in the Google Partner Program.  Such hosted version will contain the "look and feel" of the Rightsholder's website with minimal Google branding, which branding may be tailored by the Rightsholder upon the Rightsholder's further reasonable request.

3.12    Use of Digital Copies.  Except as permitted by Sections 3.7(c) (Additional Contemplated Rightsholder Services Provider), 3.7(e) (Google's Exclusion of Books), 7.2(b)(ix) (Other Uses), 7.2(e)(ii) (Third-Party Required Library Services Provider) or 7.2(g)(ii)(2) (Alternative Accommodated Service Provider), neither Rightsholders nor the Registry may authorize any Person to use Digital Copies of their Books or Inserts made by or for Google without Google's consent; provided that Rightsholders may authorize any Fully Participating Library to use Digital Copies of their Books or Inserts in such Fully Participating Library's LDC consistent with such Fully Participating Library's Digitization Agreement with Google.

3.13    Communication of Rightsholder Directions to Google.  Rightsholders shall communicate to the Registry or, at their election and provided that Google implements an Online interface for such purpose, directly to Google, all directions for Removal, exclusion, inclusion, and pricing, and any other directions for Books and Inserts provided for in this Amended Settlement Agreement.  If, however, a Rightsholder communicates directly with Google, then Google shall, before implementing any such direction, (a) notify the Registry and provide the Registry with the Rightsholder's contact information and direction and (b) subject to Section 13.2 (Validating and Challenging Claims), receive confirmation from the Registry that (i) for Books, the Person communicating with Google is an appropriate Rightsholder under the Author-Publisher Procedures, and (ii) Google is authorized to implement such direction under this Amended Settlement Agreement, including (for Books) the Author-Publisher Procedures. The Registry will promptly respond to any such notification and request for confirmation from Google and, in any event, within the same period of time as the Registry typically responds to requests directly from Rightsholders to the Registry.

3.14    Advertising Uses.  Google may display advertisements on Preview Use pages and other Online Book Pages ("Advertising Uses").  Advertising on general search results pages in which the search is performed over multiple Books and/or over other content such as web pages in response to a user query is not considered to be an "Advertising Use," even if a single Book is the sole search result of a given search on a search results page.  Except as set forth in Section 3.10(c)(iii) (Advertising Content) and

Section 3.5(b)(i) (Right to Exclude), this Amended Settlement Agreement does not otherwise limit Google's right to display advertising anywhere on Google Products and Services.

      3.15    Extent of Rights and Authorizations.

          (a)    Books. A Book Rightsholder's rights and Google's authorizations under this Amended Settlement Agreement apply to all of the Protected Expression of such Rightsholder contained in a Book in which such Rightsholder holds a Copyright Interest.

          (b)    Inserts. A Rightsholder of an Insert has no rights under this Amended Settlement Agreement with respect to any Book or any portion of any Book in which such Insert appears, other than the Insert itself, *e.g.*, a Rightsholder of an Insert has no right to Remove the Book in which his, her or its Insert appears, or to authorize or to prohibit Display Uses of the Book in which his, her or its Insert appears.

          (c)    Other Content. If content (*e.g.*, text or images) in a Book is (i) in the public domain under the Copyright Act in the United States or (ii) subject to a Copyright Interest not owned by any Rightsholder of such Book or by any Rightsholder of any Insert in such Book, this Amended Settlement Agreement neither authorizes nor prohibits, nor releases any Claims with respect to, the use of such content.

## ARTICLE IV — ECONOMIC TERMS FOR GOOGLE'S USE OF BOOKS

      4.1    Institutional Subscriptions.

          (a)    General Guidelines for Pricing of Institutional Subscriptions.

      (i)    Objectives. The economic terms for Institutional Subscriptions of Books will be governed by two objectives: (1) the realization of revenue at market rates for each Book and license on behalf of

Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education. Plaintiffs and Google view these two objectives as compatible, and agree that these objectives will help assure both long-term revenue to the Rightsholders and accessibility of the Books to the public.

(ii) <u>Parameters</u>. Google and the Registry will use the following parameters to determine the price of Institutional Subscriptions: pricing of similar products and services available from third parties, the scope of Books available, the quality of the scan and the features offered as part of the Institutional Subscription. Plaintiffs and Google expect that the number of Books available through an Institutional Subscription will change over time. As such, the value and price of Institutional Subscriptions may also change over time.

(iii) <u>FTE Basis</u>. Pricing will be based on FTEs (Full-Time Equivalency). For Higher Education Institutions, FTE is defined as full-time equivalent students.

(iv) <u>Pricing Bands</u>. FTE-based pricing, including pricing bands, may vary across broad categories of institutions. The categories are:

(1) Corporate (may include per seat licensing in addition to FTE);

(2) Higher Education Institutions, which will be sub-divided into sub-categories based on the Carnegie Classifications for Institutions of Higher Education within the United States;

(3) School (K-12) (no remote access without Registry approval);

(4) Government (no remote access without Registry approval) (may include per seat licensing in addition to FTE);

(5) Public (no remote access without Registry approval); and

53

(6)     Additional categories, as agreed between Google and the Registry.  Subdividing the market into additional categories may be one mechanism used to ensure broad accessibility of Books to end users.

(v)     <u>Versions of Institutional Subscriptions</u>.  When Google offers any Institutional Subscription, Google will offer a version of the Institutional Subscription that provides access to all Books available for Institutional Subscriptions pursuant to this <u>Amended</u> Settlement Agreement (the "<u>Institutional Subscription Database</u>") for a fee.  In addition, Google may identify Institutional Subscriptions for a small number of discipline-based collections of Books that Google would offer as an alternative to the version of the Institutional Subscription that provides access to the entire Institutional Subscription Database.  To provide an incentive for institutions to subscribe to the entire Institutional Subscription Database, Google shall design the pricing of the different versions of the Institutional Subscription such that the price for access to the entire Institutional Subscription Database will be less than the sum of the prices for access to the discipline-based collections.

(vi)     <u>Pricing Strategy</u>.  Prior to beginning to sell Institutional Subscriptions, Google shall propose an initial pricing strategy and, thereafter, Google shall propose subsequent pricing strategies, consistent with the objectives set forth in Section 4.1(a)(i) (Objectives) (each, a "<u>Pricing Strategy</u>"), to the Registry.

(1)     <u>Elements of Pricing Strategy</u>.  Each Pricing Strategy shall include:

a)     Any discipline-based collections that would be offered as an Institutional Subscription, as an alternative to the version of the Institutional Subscription that provides access to the entire Institutional Subscription Database.

b)     A target retail price for each Institutional Subscription for each of the classes of institutions identified in Section 4.1(a)(iv) (Pricing Bands), including Institutional Subscriptions for each of the discipline-based collections that may be offered, Institutional Subscriptions that provide access to the

54

entire Institutional Subscription Database, and any Limited Subscriptions.

        c)        The period of time over which Google will have the authorization to sell the versions of the Institutional Subscription at such target retail prices.

        d)        Any expected increases or decreases in the price of each version of the Institutional Subscription at annual anniversary points during the period in which the then-current Pricing Strategy will be in effect.

        e)        The amount of discount, if any, that Google is authorized to offer to institutions and to Institutional Consortia. Any discounts above the approved discount require Registry approval.

        f)        The Price Change Cut Off Date.

(2)        <u>Discounting</u>.  The initial Pricing Strategy will also include a discount from the List Prices that will be offered for a limited period of time to subscribers.  This discount will be defined against the List Price and is designed to encourage potential customers to subscribe. The period for an initial discount will be included in the initial Pricing Strategy.

(3)        <u>Duration</u>.  The period for the initial Pricing Strategy to be in effect is expected to be between two (2) and three (3) years.  Google and the Registry shall agree as to the periods for which subsequent Pricing Strategies will be in effect.

(4)        <u>Process</u>.

        a)        <u>Initial Pricing Strategies</u>.  The initial Pricing Strategy must be agreed upon by Google and the Registry before Google sells any Institutional Subscriptions.  Google shall submit a proposed initial Pricing Strategy to the Registry by no later than

one year after the Effective Date. Following submission of the initial Pricing Strategy, Google and the Registry shall negotiate for a period of up to one hundred and eighty (180) days. If, after one hundred and eighty (180) days (or earlier, as mutually agreed), Google and the Registry do not reach agreement on the initial Pricing Strategy, the dispute shall be resolved pursuant to Article IX (Dispute Resolution).

b) <u>Subsequent Pricing Strategies</u>. Google shall submit subsequent proposed Pricing Strategies to the Registry at least ninety (90) days prior to the expiration of the then-current Pricing Strategy, and Google and the Registry shall negotiate for a period of up to ninety (90) days. If, after ninety (90) days (or earlier, as mutually agreed), Google and the Registry do not reach agreement on such proposed Pricing Strategy, the dispute shall be resolved pursuant to Article IX (Dispute Resolution). In the event of such a dispute, the then-current Pricing Strategy will continue to apply unless and until the earlier of (1) Google and the Registry agreeing on a subsequent Pricing Strategy or (2) the Arbitrator rendering a Decision.

(vii) <u>Comparable Products and Services</u>. FTE-based prices in the initial Pricing Strategy will be based upon then-current prices for comparable products and services, surveys of potential subscribers, and other methods for collecting data and market assessment. Google shall be responsible for collecting data comparing the target retail prices for the versions of the Institutional Subscription to the prices of similar products and services (including by use of a third party to collect such data if the Registry requests that Google use a third party, which third party will be subject to the Registry's approval not to be unreasonably withheld or delayed) and shall provide such data to the Registry.

(viii) <u>Adjustments to Pricing Strategy</u>.

(1) <u>Google Proposed Adjustments</u>. Google may propose adjustments to the then-current agreed upon Pricing Strategy. If Google and the Registry cannot agree to a change to the Pricing Strategy after negotiating for a period of sixty (60) days after Google's notice of its proposal for adjustments, then the dispute shall be resolved pursuant to Article IX (Dispute Resolution) consistent with the objectives set forth in

56

Section 4.1(a)(i) (Objectives).  Such sixty (60)-day period may be changed by mutual written agreement of Google and the Registry.  In the event of such a dispute, the then-current price will continue to apply unless and until the earlier of (a) Google and the Registry agreeing to changes to the Pricing Strategy or (b) the Arbitrator rendering a Decision; provided, however, that Google and the Registry may agree, or an Arbitrator pursuant to Article IX (Dispute Resolution) may require, that the new pricing be retroactive to sixty (60) days after the date of Google's notice of adjustments to the then-current agreed upon Pricing Strategy.

(2)  Registry Proposed Adjustments.  The Registry may propose adjustments to the then-current agreed upon Pricing Strategy.  If Google and the Registry cannot agree to a change to the Pricing Strategy after negotiating for a period of sixty (60) days after the Registry's notice of its proposal for adjustments, then the dispute shall be resolved pursuant to Article IX (Dispute Resolution) consistent with the objectives set forth in Section 4.1(a)(i) (Objectives).  Such sixty (60)-day period may be changed by mutual written agreement of Google and the Registry.  In the event of such a dispute, the then-current price will continue to apply unless and until the earlier of (a) Google and the Registry agreeing to changes to the Pricing Strategy or (b) the Arbitrator rendering a Decision. If the renegotiation of the Pricing Strategy concludes, or if the Arbitrator renders a Decision, prior to the Price Change Cut Off Date, then any increase in the price resulting from the renegotiation or Decision will take effect for the academic year first starting after the Price Change Cut Off Date.  If the renegotiation of the Pricing Strategy concludes, or if the Arbitrator renders a Decision, on or after the Price Change Cut Off Date, then any price increase will take effect not for the academic year first starting after the Price Change Cut Off Date, but in the next following academic year.  In addition, any price increase will not apply to any then-existing subscriber contracts until they are renewed or extended.  "Price Change Cut Off Date" means a date that is prior to the commencement of the academic year first starting after such date and that is set to provide Google with a reasonable period of time within which to sell the Institutional Subscription for that academic year without an intervening price increase for Institutional Subscriptions, which period of time reasonably approximates the typical sales cycle for comparable products and services.

(ix)  Adjunct Products.  Google will inform the Registry of any Google Products and Services that Google offers for a fee as an adjunct to any Institutional Subscription or (if Google and the Registry agree to offer

57

Consumer Subscriptions) Consumer Subscription, which product or service meets the following conditions:

(1)     the preponderance of the value of such product or service to users of the subscription is realized through access to Books through such subscription, and

(2)     such product or service exploits access to Books by users of the subscription in a manner that could not, with similar efforts, be similarly exploited by other entities ((1) and (2) together, an "Adjunct Product").

(3)     The Registry will have the right immediately to renegotiate and, if necessary, resolve pursuant to Article IX (Dispute Resolution), with Google the prices of the applicable Institutional Subscription(s) or Consumer Subscription(s) with which such Adjunct Product is used under the procedures set forth in Section 4.1(a)(viii) (Adjustments to Pricing Strategy), which revised prices will apply prospectively only.  Google, at its sole discretion, may choose to remove access to Books as part of the Adjunct Product or modify the Adjunct Product in a manner that ensures that conditions in clauses (1) and (2) above are no longer met if Google wishes to avoid the Registry's option of renegotiating or resolving pursuant to Article IX (Dispute Resolution). Renegotiation and resolution pursuant to Article IX (Dispute Resolution), as set forth in this Section 4.1(a)(ix) (Adjunct Products), shall be the Registry's sole remedy and Google's sole obligation for disputes under this Section 4.1(a)(ix) (Adjunct Products).

(b)     Institutional Consortia.  Google may work through Institutional Consortia to sell Institutional Subscriptions.

(c)     Intermediaries.  Google may work through intermediaries to sell Institutional Subscriptions, subject to Registry approval, which approval shall not be unreasonably withheld or delayed.

(d)     Basic Features of Institutional Subscriptions.  Institutional Subscriptions will enable users to view, copy/paste, and print pages of a Book, and may enable Book Annotations.  With

58

respect to copy/paste, the user will not be able to select, copy and paste more than four (4) pages of the content of a Display Book with a single copy/paste command. Printing will be on a page-by-page basis or a page range basis, but the user will not be able to select a page range that is greater than twenty (20) pages with one print command for printing. Google will include a visible watermark on pages printed from the Institutional Subscription Database, which identifies the material as copyrighted and displays encrypted session identifying information provided by the subscribing institution during such session, and which could be used to identify the authorized user that printed the material or the access point from which the material was printed. Such watermark will not obscure the content of the printed pages.

(e)       Institutional Subscription Terms and Conditions. In its terms and conditions applicable to Institutional Subscriptions, (i) Google will (1) limit access to Books to appropriate individuals within the subscriber institution (*e.g.*, in the case of educational institutions, faculty, students, researchers, staff members, librarians, personnel and business invitees of the subscriber and walk-in users from the general public; in the case of corporate or government offices, personnel and business invitees; and, in the case of Public Libraries, library patrons and personnel), (2) permit users to view, copy/paste, and print pages of Books only to the extent authorized under this Amended Settlement Agreement, (3) permit users to make available the Books and Inserts in the Institutional Subscription Database to other users of that Institutional Subscription through hyperlinks, or similar or appropriate technology, when such Books and Inserts are served by Google, for course use (*e.g.*, e-reserves and course management systems), only to the extent authorized under this Amended Settlement Agreement, (4) not prohibit any uses of Books or Inserts that would otherwise be permitted under the Copyright Act without the need for express authorization from the Rightsholder, and (5) include the right for Google to restrict or terminate a user's account, including additional restrictions on printing and copy/paste, if the user distributes the copyrighted material from a Book in a manner that is prohibited by the terms and conditions or applicable law, and (ii) Google may enable Book Annotations. Prior to Google's initial launch of the Institutional Subscription, Google will provide to the Registry a copy of the terms and conditions applicable to any Institutional Subscriptions offered by Google.

(f)     Subscriber Experience.  The experience and rights provided to subscribers and their users under Institutional Subscriptions will be no less favorable to them than the experience and rights offered in the Consumer Purchase, except that such experience and rights will be time-limited to the duration of the Institutional Subscription.  In addition, and without limiting the foregoing, Institutional Subscriptions must permit searching the full text of Books in the Institutional Subscription Database and, in the case of Higher Education Institutions, permit users to make available the Books and Inserts in the Institutional Subscription Database to other users of the Institutional Subscription through hyperlinks, or similar or appropriate technology, as described in Section 4.1(e) (Institutional Subscription Terms and Conditions).

(g)     Beta Testing.  Google may provide Institutional Subscriptions to a limited number of institutions as a beta product free of charge prior to the initial launch.  Unless otherwise agreed by the Registry, Google shall be authorized to offer Institutional Subscriptions in beta form to up to five (5) Fully Participating Libraries and Cooperating Libraries, up to two (2) Public Libraries, up to two (2) not-for-profit institutions within each of the Carnegie Classifications for Institutions of Higher Education within the United States and, as agreed between Google and the Registry, other libraries.  At least one institution from each such category of institutions shall be included in the beta-test group.  Google shall provide to the Registry all pricing-related data collected from these beta-test partners to assist in the pricing for the versions of the Institutional Subscriptions.  Once the beta Institutional Subscription is launched, Google shall be able to continue to support then-existing beta customers until the earlier of (i) two (2) years from the launch of the beta product (unless a longer period of time is agreed by the Registry) or (ii) launch of the Institutional Subscription.

4.2     Consumer Purchases.

(a)     Basic Features of Consumer Purchase.  Consumer Purchase will enable purchasers to view, copy/paste and print pages of a Book, and may enable Book Annotations.  With respect to copy/paste, the user will not be able to select, copy and paste more than four (4) pages of the content of a Display Book with a single copy/paste command.  Printing will be on a page-by-page basis or a

60

page range basis, but the user will not be able to select a page range that is greater than twenty (20) pages with one print command for printing. Google will include a visible watermark on pages printed from the Consumer Purchase, which identifies the material as copyrighted and displays encrypted session identifying information, and which could be used to identify the authorized user that printed the material or the access point from which the material was printed. Such watermark will not obscure the content of the printed pages.

(i)         Alternative License Terms.  In lieu of the basic features of Consumer Purchase set forth in Section 4.2(a) (Basic Features of Consumer Purchase), a Rightsholder may direct the Registry to make its Books available at no charge pursuant to one of several standard licenses or similar contractual permissions for use authorized by the Registry under which owners of works make their works available (*e.g.*, Creative Commons Licenses), in which case such Books may be made available without the restrictions of such Section.

(b)         Pricing Options.

(i)         Pricing of Consumer Purchases.  A Rightsholder may select one of two pricing options for Consumer Purchases:

(1)         Specified Price.  In this option, the Rightsholder identifies the price (which may be as low as $0.00) for which it wants its Book authorized for Consumer Purchase to be sold.  This pricing option is referred to in this Amended Settlement Agreement as the "Specified Price." The Specified Price may only be changed by the Rightsholder and is not subject to Article IX (Dispute Resolution).

(2)         Settlement Controlled Price.  In this option, the Rightsholder permits the price for which its Book authorized for Consumer Purchase is to be sold to be determined by an algorithm (the "Pricing Algorithm") that Google will design to find the optimal ~~such~~ price for each such Book ~~and, accordingly,~~in order to maximize ~~revenue for each Rightsholder~~revenues for the Rightsholder for such Book and without regard to changes to the price of any other Book (but Google may use historical price data of other Books in designing the Pricing Algorithm).  This pricing plan is referred to in this Amended Settlement

61

Agreement as the "Settlement Controlled Price," and is governed by the provisions in Section 4.2(c) (Settlement Controlled Pricing).

(ii)     Change of Pricing Option.  At any time, the Rightsholder of a Book may switch between the Specified Price and Settlement Controlled Price upon seven (7) days' prior notice to Google or the Registry.

(iii)     Default Pricing Option.  If the Rightsholder of a Book has not specifically directed that its Book be sold at a Specified Price, then Consumer Purchase of that Book will be sold at the Settlement Controlled Price.

(c)     Settlement Controlled Pricing.

(i)     Pricing Bins.  For Books that will be sold at the Settlement Controlled Price, Google and the Registry will agree uponuse a set of pre-defined prices for Books ("Pricing Bins"), and each Book will be priced at one of those prices.  The initial Pricing Bins for Books will be: $1.99, $2.99, $3.99, $4.99, $5.99, $6.99, $7.99, $8.99, $9.99, $14.99, $19.99 and $29.99.  Google and the Registry may agree toestablish additional or different Pricing Bins between, below and above these prices at any time; provided, however that (a) the Unclaimed Works Fiduciary has the right to approve the use of such additional or different Pricing Bins for unclaimed Books and (b) the use of such additional or different Pricing Bins for a Registered Rightsholder's Books is subject to thirty (30) days' prior notice to such Rightsholder.  At any time, the Rightsholder of a Book may specify a maximum and/or a minimum Pricing Bin for its Book and Google will implement such specification within seven (7) days after Google receives notice thereof.  In any event, either Google or the Registry has the option to require renegotiation of the number of Pricing Bins or the prices of the Pricing Bins at the end of the three (3)-year period commencing with the Effective Date, and every four (4) years thereafter.  Google or the Registry shall give the other party notice at least ninety (90) days prior to the end of the then-current three (3)- or four (4)-year period, as applicable, of its exercise of its option to renegotiate.  Such ninety (90)-day period may be extended by mutual written agreement of Google and the Registry.  In the event that Google and the Registry cannot agree on changes to the number of Pricing Bins or the prices for each Pricing Bin, as applicable, then the dispute shall be resolved pursuant to Article IX (Dispute Resolution).  In the event of such a dispute, the then-current number of Pricing Bins and the

prices for each Pricing Bin will continue to apply unless and until the earlier of (1) Google and the Registry agreeing to such changes or (2) the Arbitrator rendering a Decision.

(ii)     Pricing and Distribution of Books Into Pricing Bins.

(1)     Initial Pricing Bin Distribution.  The initial distribution percentages of Settlement Controlled Price Books that Google offers for Consumer Purchase in the Pricing Bins will be:  5% ($1.99), 10% ($2.99), 13% ($3.99), 13% ($4.99), 10% ($5.99), 8% ($6.99), 6% ($7.99), 5% ($8.99), 11% ($9.99), 8% ($14.99), 6% ($19.99) and 5% ($29.99).

(2)     Development of Pricing Algorithm and Changes to Pricing Bin Distribution.  Google will develop the Pricing Algorithm ~~and~~unilaterally, with no involvement of or control by the Registry or any Rightsholder; provided, however, that Google employees and contractors who may be Rightsholders are not precluded from performing their assigned duties with respect to development of the Pricing Algorithm.  In developing the Pricing Algorithm, Google will analyze sales data to ensure the reasonableness of the Pricing Algorithm.  The Pricing Algorithm shall base the Settlement Controlled Price of a Book, on an individual Book by Book basis, upon aggregate data collected with respect to Books that are similar to such Book and will be designed to operate in a manner that simulates how an individual Book would be priced by a Rightsholder of that Book acting in a manner to optimize revenues in respect of such Book in a competitive market, that is, assuming no change in the price of any other Book.  Based on the Pricing Algorithm, Google may change the price of an individual Book over time in response to sales data and in order to collect additional data to establish the optimal price for such Book.  The distribution of Books sold on the basis of Settlement Controlled Prices among the Pricing Bins may change over time as the prices of individual Books are adjusted based on the Pricing Algorithm.

(3)     Validation of Pricing Algorithm.  The Registry has the right ~~to validate~~, through the use of a reasonable number of third-party experts, ~~the reasonableness of the Pricing Algorithm and~~ to verify that the conclusions ~~it~~the Pricing Algorithm produces are statistically valid; provided that (a) Google has no obligation to disclose the Pricing Algorithm or any other Confidential Information of Google to the Registry or any third-party experts retained by the Registry, except as necessary for

63

the Registry's experts to validate the reasonableness of the Pricing Algorithm and to verify its conclusions, (b) Google will not be required to disclose Confidential Information of Google not originally developed for the Pricing Algorithm, (c) Google may not rely on or introduce into evidence any such non-disclosed Confidential Information in any arbitration pursuant to Article IX (Dispute Resolution) regarding the reasonableness of the Pricing Algorithm, and (d) Google bears the burden of proving that the Pricing Algorithm is reasonable. The Registry's experts' receipt of any Confidential Information of Google related to the Pricing Algorithm will be subject to strict non-disclosure agreements, provided that such experts may disclose their conclusions to the Registry and the Registry may disclose their conclusions to Rightsholders.

(4) <u>Disputes</u>. Disputes regarding the Pricing Algorithm or its application shall be resolved pursuant to Article IX (Dispute Resolution).

(iii) <u>Provision of Settlement Controlled Prices to Registry</u>. Google shall determine and provide to the Registry both the Settlement Controlled Price for all Settlement Controlled Price Books and what would be the Settlement Controlled Price for every Specified Price Book, as if the Rightsholder of such Specified Price Book had selected the Settlement Controlled Price option. Such information is the Confidential Information of Google. Subject to Section 15.4 (Disclosures Required by Law), the Registry shall not disclose the Settlement Controlled Price for any Book to any Person other than the Rightsholders of such Book and, if the price of a Book is publicly available, the Registry shall not disclose whether that price is the Settlement Controlled Price.

4.3 <u>Preview Uses</u>.

(a) <u>Preview Use Permitted</u>. Google may offer a free Preview Use to allow users to sample a Book prior to making a purchase decision, unless a Rightsholder of a Book directs Google or the Registry not to allow Preview Use of that Book.

(b) <u>Default Settings for Preview Use</u>. The default settings for Preview Use will be as follows:

(i)  Standard Preview.  Except as set forth below in this Section 4.3(b) (Default Settings for Preview Use), the default Preview Use is Standard Preview.

(1)  Standard Preview.  "Standard Preview" means that Google may display (in addition to the table of contents, title page, copyright page and other pages that appear prior to the table of contents, and the index) up to twenty percent (20%) of the pages of a Book to a user but no more than five (5) adjacent pages at a time (*i.e.*, when a user lands on a given page from a search or navigation, the user will be limited to viewing no more than four (4) additional adjacent pages at a time), before or after which no fewer than two (2) pages are blocked; provided that, for Fiction, Google will block the final five percent (5%) of the Book's pages (or a minimum of the final fifteen (15) pages in the Book).  In addition, "Standard Preview" for Fiction means that, at Google's option, Google may display up to twenty percent (20%) of the pages of a Book to a user, subject to the following:  (i) Google may display up to five percent (5%) of a Fiction Book, or fifteen (15) pages, whichever is less, adjacent to where a user lands on a given page from a search or navigation and (ii) Google will block the final five percent (5%) of the Book's pages (or a minimum of the final fifteen (15) pages in the Book).  As used in this Section 4.3(b)(i)(1) (Standard Preview), "Fiction" means Books associated with BISAC codes for Fiction, Juvenile Fiction, Comics & Graphic Novels, Drama, Humor, Literary Collections and Poetry, and, for any Books that do not have a BISAC code, any Books comprising works of imaginative narration.  If the Registry disagrees with Google's categorization of a Book as Fiction, the Registry may notify Google and if Google and the Registry do not agree on whether a Book is Fiction, the dispute shall be resolved pursuant to Article IX (Dispute Resolution).  If Google and the Registry determine, or if an Arbitrator decides, that a Book was mistakenly categorized to be Fiction or non-Fiction, then Google promptly shall change the categorization of the Book after the determination or decision, and such change, if made, shall be the Rightsholder's and the Registry's sole remedy and Google's sole obligation for such mistaken categorization.

(2)  Adjustments to Percentages.  Rightsholders may increase the percentages in Fixed Preview, Standard Preview and Continuous Preview.

65

(3)     No Copy/Paste, Print or Book Annotations.  Unless approved by the Registry or the Rightsholder, Google will not offer to users copy/paste, print or Book Annotation functionalities as part of Preview Uses.

(ii)     No Preview.  The default setting for the categories of Books listed on Attachment F (Preview Uses) under the heading "No Preview" is no Preview Use ("No Preview").

(iii)     Fixed Preview.  The default setting for the categories of Books listed on Attachment F (Preview Uses) under the heading "Fixed Preview" is Fixed Preview.  "Fixed Preview" means that Google may display (in addition to the table of contents, title page, copyright page and other pages that appear prior to the table of contents, and the index) up to ten percent (10%) of the pages of a Book to a user and such pages are fixed (*i.e.*, they do not vary from user to user or depend on a user's search).  Google will choose the pages displayed in Fixed Preview unless the Registry develops a mechanism to identify for Google particular pages selected by the Rightsholder, in which case the pages will be those chosen by the Rightsholder.

(iv)     Determination of Categories.  Google shall use BISAC codes or an equivalent classification scheme in order to determine whether a Book is in a category listed on Attachment F (Preview Uses).  Google shall not be responsible for errors in its determination of whether a Book is in a particular category listed on Attachment F (Preview Uses).  Upon notification by the Registry or the Rightsholder that Google has inaccurately determined whether a Book is in a category listed on Attachment F (Preview Uses), Google shall adjust the amount of the Book available through Preview Use or Fixed Preview for such Book in accordance with the correct category.  Such adjustment by Google shall be Google's sole obligation and the sole remedy for any errors in determining the category of a Book.

(c)     Rightsholder Options for Preview Use.  Regardless of the default setting for Preview Use of a Book set forth in Section 4.3(b) (Default Settings for Preview Use), a Rightsholder will be able to choose from the following settings for Preview Use for any Book:

(i)          <u>Fixed Preview</u>.

(ii)         <u>Standard Preview</u>.

(iii)        <u>Continuous Preview</u>. "<u>Continuous Preview</u>" means that Google may display up to ten percent (10%) of the pages of a Book to a user without the adjacent page limitations of Standard Preview.

(d)        <u>List of Blocked Preview Use Pages</u>. Unless the Rightsholder has authorized display of one hundred percent (100%) of the pages of a Book in Preview Use, Google will maintain a list of Book pages that cannot be viewed in any Preview Use. The list will consist of at least five percent (5%) of the pages of a Book, which blocked pages shall be selected by Google unless the Registry develops a mechanism to identify for Google particular pages selected by the Rightsholder totaling not more than five percent (5%), in which case the blocked pages will be those chosen by the Rightsholder.

(e)        <u>Google Tests</u>.

(i)        <u>Fixed Preview Books</u>. For Books in categories listed on Attachment F (Preview Uses) as Fixed Preview, Google may conduct tests in consultation with the Registry to determine if another Preview Use category increases sales and revenues of such Books. For purposes of such tests, Google may randomly select no more than five percent (5%) of the Books within a category in Attachment F (Preview Uses) for which only Fixed Preview is permitted and display those Books through Standard Preview, Continuous Preview or No Preview for a limited time only as necessary to gather statistically significant information as to which Preview Uses increases sales and revenues of such Book. Google shall present the results of these tests to the Registry. The Registry, in consultation with Google, shall be responsible for determining whether to modify Attachment F (Preview Uses) to move Books from Fixed Preview to Standard Preview, Continuous Preview or No Preview taking into account the data provided by such tests and other data available to the Registry that is relevant to such Preview Use determination. The Registry shall make this decision taking into account whether the data indicate that sales and revenues of a particular category of Books that are currently included in Consumer Purchase will be

increased by moving from Fixed Preview to Standard Preview, Continuous Preview or No Preview and, considering such data, acting in the best interests of the Rightsholders of that category of Books to maximize revenues for those Rightsholders

(ii)     <u>No Preview Books</u>.  For Books in categories listed on Attachment F (Preview Uses) as No Preview, Google may conduct tests in consultation with the Registry to determine which Preview Use setting increases Book sales and revenues for Books in the different Pricing Bins set forth in Section 4.2(c)(i) (Pricing Bins).  For purposes of such tests, Google may randomly select no more than five percent (5%) of the Books within a category in Attachment F (Preview Uses) for which No Preview is permitted and display those Books through Fixed Preview, Standard Preview or Continuous Preview for a limited time only as necessary to gather statistically significant information as to which Preview Use increases sales and revenues of such Book.  At the Registry's request, during the first ten (10) years after the Effective Date and thereafter by agreement between Google and the Registry, Google shall collect and provide to the Registry empirical data concerning the extent to which each Preview Use has an effect on Book sales and revenues (including data on the number of accesses and purchases of particular Books and categories of Books), to enable Rightsholders and the Registry to change the Preview Use settings or to modify the percentage of a Book displayed through Preview Use for Books or categories of Books.  The Registry, in consultation with Google, shall be responsible for determining whether to modify Attachment F (Preview Uses) to move Books from No Preview to one of the other Preview Use settings taking into account the data provided by such tests and other data available to the Registry that is relevant to such Preview Use determination.  The Registry shall make this decision taking into account whether the data indicate that sales and revenues of a particular category of Books included in Consumer Purchase will be increased by moving from No Preview to one of the other Preview Use settings and, considering such data, acting in the best interests of the Rightsholders of that category of Books to maximize revenues for those Rightsholders.

(iii)     <u>Standard, Continuous, Fixed Preview or No Preview Books</u>.  Upon request of the Registry, for Books in any Preview Use category, Google shall make commercially reasonable efforts to conduct tests to determine if another Preview Use setting increases sales and revenues of such Books.  The Registry, in consultation with Google, shall be responsible for determining whether to modify Attachment F (Preview Uses) for any category of Books by choosing from among the Preview Use

68

settings, taking into account the data provided by the tests conducted pursuant to this Section 4.3(e) (Google Tests) and other data available to the Registry that is relevant to such Preview Use determination. The Registry shall make this decision taking into account whether the data indicate that sales and revenues of a particular category of Books will be increased by changing the Preview Use setting and, considering such data, acting in the best interests of the Rightsholders of that category of Books to maximize revenues for those Rightsholders.

(iv)     Books Excluded from Testing. In no event shall any tests under clauses (i), (ii) or (iii) above either (1) make Display Uses of Books that the Rightsholder has expressly excluded from Display Uses or that the Registry reasonably requests to be excluded or (2) change the Preview Use of Books from settings (a) expressly set by the Rightsholder or (b) expressly set by the Registry by modification of Attachment F (Preview Uses) under clause (iii) above.

(v)     Registry's Ability to Adjust Preview Use Settings. In addition to amendments to Attachment F (Preview Uses) described in clauses (i), (ii) and (iii) above, the Registry may adjust the Preview Use setting for a particular Book in exceptional circumstances for good cause shown.

(f)     Preview Use Pages Served on Non-Google Websites. When Google makes any Preview Use of a Book as authorized under this Amended Settlement Agreement and allows third parties to display Preview Use pages served by Google on non-Google websites, then Google agrees to include Metadata about that Book, including the title and author of the Book.

(g)     Unclaimed Books. The Registry's power to act with respect to the Preview Uses under this Section 4.3 (Preview Uses) will be delegated to the Unclaimed Works Fiduciary.

4.4     Advertising Revenue Model. Revenues generated from Advertising Uses will be allocated between Google and the Rightsholders in accordance with Section 4.5(a)(ii) (Net Advertising Revenues).

4.5     Standard Revenue Splits and Discounting.

(a)        Obligation to Pay Revenue Share.

(i)        Net Purchase Revenues.  Google shall pay to the Registry, on behalf of the Rightsholders, the Standard Revenue Split for Purchases. The "Standard Revenue Split for Purchases," paid by Google to Rightsholders, through the Registry, is seventy percent (70%) of Net Purchase Revenues.

(ii)        Net Advertising Revenues.  Google shall pay to the Registry, on behalf of the Rightsholders, the Standard Revenue Split for Advertising.  The "Standard Revenue Split for Advertising," paid by Google to Rightsholders, through the Registry, is seventy percent (70%) of Net Advertising Revenues.

(iii)        Agreed Revenue Splits.  Notwithstanding clauses (i) and (ii) above, for any Revenue Model(s) for any Book(s) classified as Commercially Available, Google and the Rightsholder(s) of such Book(s) each has the right to request that the other negotiate a revenue split different from the Standard Revenue Split for Advertising and the Standard Revenue Split for Purchases (together, the "Standard Revenue Splits").  If Google or a Rightsholder requests that the revenue split be negotiated for any Revenue Model(s) and Google and the Rightsholder are unable to agree on a revenue split different from the Standard Revenue Splits for such Revenue Model(s), then such Standard Revenue Splits (or the then applicable previously negotiated and agreed revenue split, if any) shall apply to such Books for that Revenue Model(s); provided that Google may choose not to make such Books available through such Revenue Model(s) as permitted under Section 3.7(e) (Google's Exclusion of Books)) and the Rightsholder may choose to exclude its Book(s) from such Revenue Model(s) pursuant to Section 3.5(b) (Right to Exclude from Display Uses and Revenue Models).  If Google and such Rightsholder(s) agree to a revenue split, then beginning within sixty (60) days after the date of such agreement, any calculations in Section 4.5(b) (Discounting, Special Offers and Subsidies) and any payments in Section 4.6 (Payment Terms) shall be based on such agreed revenue split rather than the Standard Revenue Splits.  Google or the Rightsholder(s) shall notify the Registry of any agreed revenue split, the date of agreement to such revenue split, and the Books to which it applies. The Registry may not disclose information about any agreed revenue split with any Rightsholder (other than

70

any other Rightsholder(s) of the Book(s) to which such agreed revenue split applies) unless such information is otherwise publicly available.  Once a Book is classified as not Commercially Available, the Standard Revenue Splits shall apply beginning no later than sixty (60) days after such reclassification, notwithstanding any prior agreed revenue split between Google and a Rightsholder.

(b)        Discounting, Special Offers and Subsidies.

(i)        Temporary Discounts.  Google may provide temporary discounts off the List Prices from time to time at its sole discretion.  If Google elects to provide such discounts, the Standard Revenue Split for Purchases paid to the Registry for the benefit of the Rightsholders will be based on the List Prices, unless otherwise set forth in this Section 4.5(b) (Discounting, Special Offers and Subsidies) or unless otherwise agreed by Google and the Registry.

(ii)        Consumer Purchases.  The Registry may authorize Google to make special offers of Books available through Consumer Purchases at discounts of up to forty percent (40%) offreduced prices from the List PricePrices, subject to notification of such discountreduced price to the Registered Rightsholders of the Book, with an opportunity for any such Rightsholder (for his, her or its claimed Books) or the Unclaimed Works Fiduciary (for unclaimed Books) not to approve such discountreduced price.  If Google sells Books at such a discountedreduced price, the Standard Revenue Split for Purchases or a revenue split agreed pursuant to Section 4.5(a)(iii) (Agreed Revenue Splits) will be based on such discountedreduced price.

(iii)        Use of Intermediaries for Institutional Subscription Sales Generally.  Google may offer a discount of up to ten percent (10%) off the List Prices for Institutional Subscriptions for any Institutional Subscriptions sold through intermediaries.

(iv)        Sales of Institutional Subscriptions through Institutional Consortia.  Approved discounts, if any, that Google is authorized to offer to an Institutional Consortium or its members will be included as part of the Pricing Strategy.  Additional discounts will require Registry approval.  Unless otherwise agreed upon by the Registry, Google is only authorized to

71

offer discounts to Institutional Consortia if members of the Institutional Consortium purchase Institutional Subscriptions for at least seventy percent (70%) of the FTEs (*i.e.*, full-time equivalent students) of the members of the Institutional Consortium. For purposes of this Section 4.5(b)(iv) (Sales of Institutional Subscriptions through Institutional Consortia), absent agreement of the Registry, Google may not offer such discount to any Institutional Consortium (or its members) that was not a member of the International Coalition of Library Consortia as of the date on which the then-current Pricing Strategy became effective and that was formed for the primary purpose of entering into an Institutional Subscription agreement with Google. Google will notify the Registry no less than thirty (30) days prior to entering into an Institutional Subscription agreement, with an approved Institutional Consortium discount, with an Institutional Consortium (or its members) that was not a member of the International Coalition of Library Consortia as of the date on which the then-current Pricing Strategy became effective.

(v)　　　　Sale of Consumer Purchases through Affiliate Programs and Resellers.

(1)　　　(v) Sale of Consumer Purchases through Affiliate Programs. With respect to sales of Books through Consumer Purchase through an Affiliate Program, Google may deduct from the money otherwise owed to the Registry for the benefit of the Rightsholders from such sale pursuant to Section 4.5(a)(i) (Net Purchase Revenues), up to three and three-quarters percent (3.75%) of the List Price as compensation actually paid through the Affiliate Program; provided, however, that such deduction will be made only to the extent and in an amount equal to one-half (1/2) the compensation actually paid by Google through the Affiliate Program. "Affiliate Program" means a program by which Google authorizes third parties to link their websites to Google Products and Services using specially formatted links and pays such third parties referral fees for sales of Books through Consumer Purchase to users referred to Google through such links.

(2)　　　Resellers. To the extent that Google makes Books available through Consumer Purchases pursuant to this Amended Settlement Agreement, Google will allow resellers to sell access to such Books to their end users. Google will be responsible for hosting and serving the Digital Copies of such Books, and will be responsible for the security of such Digital Copies in accordance with Article VIII (Security

72

and Breach).  Google will permit the reseller of a Book to retain a majority of Google's share of Net Purchase Revenues from Consumer Purchases through such reseller.

(vi)     Subsidies for Fully Participating Libraries and Cooperating Libraries.  Google may subsidize the purchase of Institutional Subscriptions by Fully Participating Libraries and Cooperating Libraries and the amount paid to the Registry, on behalf of Rightsholders, will be as if no such subsidy had been provided.

(vii)     Rightsholders' Consumer Subscription Discount.  If and at such time as a Consumer Subscription is available from Google pursuant to Section 4.7(dc) (Consumer Subscription Models), individual Rightsholders may, at the Registry's discretion, be offered a discount off of the price for such Consumer Subscription, which discount is subject to the approval of Google and the Registry.

(c)     Sales and Other Taxes.  In all cases, Net Purchase Revenues and Net Advertising Revenues shall not include sales or other government charges or taxes.  Google shall charge any applicable sales or other government charges or taxes in addition to the List Price or any other price authorized pursuant to this Amended Settlement Agreement.

4.6     Payment Terms.

(a)     Payment Terms.  Google shall remit payment to the Registry under this Article IV (Economic Terms for Google's Use of Books) within (i) sixty (60) days after the end of each calendar quarter for payments made with respect to Net Advertising Revenues and Net Purchase Revenues received by Google during the first full twelve (12) months after the Effective Date, and (ii) sixty (60) days after the end of each calendar month for payments made with respect to Net Advertising Revenues and Net Purchase Revenues received by Google thereafter.  Payments to the Registry shall be made either by check or (if by wire transfer) pursuant to the wire transfer instructions provided by the Registry.

73

(b)     Exceptions.  Notwithstanding the foregoing provisions of Section 4.5 (Standard Revenue Splits and Discounting) and this Section 4.6 (Payment Terms), Google shall not be required to pay the Registry for (i) any purchase of or access to Books through any fraudulent or invalid means, including the fraudulent use of credit cards or other means of payment, as determined by Google in its sole discretion, (ii) purchases that are refunded prior to Google's payment pursuant to Section 4.6(a) (Payment Terms), or (iii) purchases that are subject to a credit card charge back.  Google reserves the right to grant refunds in its sole discretion.  Google reserves the right to withhold payment to the Registry due to any of the foregoing, pending Google's reasonable investigation.  The Registry will cooperate with Google in its investigation of any of the foregoing.  Google will not seek any refunds from the Registry or Rightsholders for amounts once paid to the Registry.

(c)     Fraud.  Neither Google, the Registry, nor Plaintiffs shall, nor shall each authorize or encourage any third party to, directly or indirectly purchase or otherwise obtain access to Books through any automated, deceptive, fraudulent or other invalid means, the use of robots or other automated query tools and/or computer generated search requests, and/or the fraudulent use of software or credit cards.

(d)     Taxes.  Google and the Registry each agree to pay all applicable taxes or charges imposed on them by any government entity in connection with all matters contemplated by this Amended Settlement Agreement.

(e)     Audit Rights.  The Registry may, upon thirty (30) days' prior notice and at its own expense, retain a nationally recognized independent and mutually-acceptable independent auditor (whose fees are not contingency based), under a duty of confidentiality to Google, to review and audit Google's relevant records to confirm the payments due under Section 4.5 (Standard Revenue Splits and Discounting).  The audit shall:  (a) be subject to Google's security and confidentiality requirements; (b) occur no more than once every calendar year and not during the first or last three (3) weeks of a calendar quarter; (c) transpire during Google's normal business hours; and (d) cover a period not to exceed the previous four (4) calendar years.  Google will promptly pay to the

Registry the amount of any underpayment determined by the audit and the Registry will promptly pay to Google (or Google may offset) the amount of any overpayment determined by the audit. In addition, if the audit reveals an underpayment of five percent (5%) or more in the payments for any calendar quarter, then Google shall pay for the reasonable costs associated with the audit. The accounting firm may only disclose to the Registry whether or not Google is in compliance with its payment obligations under Section 4.5 (Standard Revenue Splits and Discounting) and, if Google is not in compliance, the amount of any underpayment or overpayment and supporting calculations.

4.7 ~~New~~Additional Revenue Models. The Registry (for unclaimed Books, the Unclaimed Works Fiduciary) and Google may~~, over time, agree to new revenue models, and discount programs (if any) for such revenue models, including~~ agree to one or more of the following additional Revenue Models:

(a) Print on Demand ("POD")~~ — POD copies of Books~~. This service would permit purchasers to obtain a print copy of a non-Commercially Available Book distributed by third parties. A Book's availability through such POD program would not, in and of itself, result in the Book being classified as Commercially Available.

(b) ~~Custom Publishing — Per-page pricing of Books, or portions thereof, for course materials, and other forms of custom publishing for the educational and professional markets.~~File Download. This service would permit purchasers of Consumer Purchase for a Book to download a copy of such Book in an appropriate file format such as PDF, EPUB or other format for use on electronic book reading devices, mobile phones, portable media players and other electronic devices ("File Download").

~~(c) PDF Download — Downloadable PDF versions of Books.~~

(c) ~~(d)~~ Consumer Subscription Models~~ — An~~. This service would permit the purchase of individual ~~version of an~~access to the Institutional Subscription Database or to a designated subset thereof ("Consumer Subscription").

~~(e) Summaries, Abstracts and/or Compilations of Books.~~

75

~~Google may not offer any new revenue models with respect to Books without authorization from the Registry or the Rightsholder.~~

Subject to Section 4.5(a)(iii) (Agreed Revenue Splits), the revenue split for POD and File Download for a Book shall be the same as that for Consumer Purchase for such Book and the revenue split for Consumer Subscription for a Book shall be the same as that for the Institutional Subscription for such Book.  The Registry will give Registered Rightsholders and the Unclaimed Works Fiduciary at least sixty (60) days' notice prior to Google offering any additional Revenue Model, and the right to exclude their Books or unclaimed Books, as the case may be, from such additional Revenue Model pursuant to Section 3.5(b) (Right to Exclude from Display Uses and Revenue Models).

      4.8    <u>Public Access Service</u>.

      (a)    <u>Public Access Service</u>.

    (i)    <u>Free Public Access Service</u>.  Google may provide the Public Access Service to each not-for-profit Higher Education Institution and Public Library that so requests at no charge (and without any payment to the Rightsholders, through the Registry or otherwise (other than as set forth in Section 4.8(a)(ii) (Printing)) as follows:

    (1)    in the case of not-for-profit Higher Education Institutions that do not qualify as Associate's Colleges pursuant to the Carnegie Classification of Institutions of Higher Education, one computer terminal for every ten thousand (10,000) Full-Time Equivalency (*i.e.*, full-time equivalent students) at each such institution (which computer terminal may change from time to time);

    (2)    in the case of not-for-profit Higher Education Institutions that qualify as Associate's Colleges pursuant to the Carnegie Classification of Institutions of Higher Education, one computer terminal for every four thousand (4,000) Full-Time Equivalency (*i.e.*, full-time equivalent students) at each such institution (which computer terminal may change from time to time); and

    (3)    in the case of each Public Library, ~~no more than~~ one terminal per Library Building~~.~~; provided, however, that the Registry may authorize one or more additional terminals in any Library Building under

76

such further conditions at it may establish, acting in its sole discretion and in furtherance of the interests of all Rightsholders.

(ii)    <u>Printing</u>.  Google shall design the Public Access Service to enable users at a not-for-profit Higher Education Institution to print pages from Display Books for a per-page fee, and to enable users at a Public Library to print pages from Display Books for a per-page fee to the extent that such Public Library offers per-page printing services for a fee for other products and services.  The Registry shall set a reasonable fee for such printing.  Google shall collect all such printing fees and shall pay them to the Registry in accordance with the Standard Revenue Split for Purchases.

(iii)    <u>Additional Public Access Service</u>.  The Registry and Google may agree that Google may make available the Public Access Service to one or more Public Libraries or not-for-profit Higher Education Institutions either for free or for an annual fee, in addition to the Public Access Service provided under Section 4.8(a)(i) (Free Public Access Service).

(b)    <u>Commercial Public Access Service</u>.  The Registry and Google may agree to make a commercial public access service available to copy shops and other entities for an annual fee per concurrent user and a fee per printed page.

4.9    Economic Terms Renegotiation.  Unless otherwise agreed by the Registry and Google, the economic terms pertaining to any ~~new~~additional Revenue Models agreed pursuant to Section 4.7 (~~New~~Additional Revenue Models) may, at the option of Google or the Registry, be renegotiated at the end of the three (3)-year period commencing with the Effective Date, and every four (4) years thereafter, or as otherwise mutually agreed by Google and the Registry.  Google or the Registry shall give the other party notice at least ninety (90) days prior to the end of the then-current three (3)- or four (4)-year period, as applicable, of its exercise of its option to renegotiate.  Such ninety (90)-day period may be extended by mutual written agreement of Google and the Registry.  If the renegotiation is not successful, then the dispute shall be resolved pursuant to Article IX (Dispute Resolution).  The then-current economic terms will apply unless and until the earlier of (a) Google and the Registry agreeing to such renegotiated terms or (b) the Arbitrator rendering a Decision.  Without limiting the foregoing, the term "economic terms," as used in this Section 4.9 (Economic Terms Renegotiation), does not include the Standard Revenue Split for Advertising or the Standard Revenue Split for Purchases.

## ARTICLE V — **OTHER SETTLEMENT BENEFITS**

5.1    Cash Payment to Class Members Whose Books and Inserts Have Been Digitized.

(a)    Cash Payments.  For every Principal Work, Entire Insert or Partial Insert that Google Digitized ~~prior to the Opt-Out Deadline~~on or before May 5, 2009 without the Rightsholder's authorization and that is the subject of a validated claim pursuant to Article XIII (Settlement Administration Program), Google will make a Cash Payment to the Settlement Fund of at least sixty United States dollars (U.S. $60) per Principal Work, fifteen United States dollars (U.S. $15) per Entire Insert, and five United States dollars (U.S. $5) per Partial Insert (each, a "Cash Payment").  Such Cash Payments shall be distributed to the Rightsholders in accordance with the Plan of Allocation and the Author-Publisher Procedures.  Only one Cash Payment will be made per Principal Work, Entire Insert or Partial Insert regardless of the number of times that Google has Digitized such Principal Work or Insert and regardless of the number of Books in which such Principal Work or Insert appears.  If a Cash Payment is made for a Book, then no Cash Payment will be made for any portions of such Book that are used as Inserts.  If a soft cover Book Digitized by Google and a hard cover Book Digitized by Google contain the same Principal Work, if the two (2) Books do not contain additional or different Protected Expression, only one Cash Payment for the Principal Work will be made even if the soft cover Book and

hard cover Book have different ISBNs.  A Rightsholder may claim either a Cash Payment for a Principal Work or a Cash Payment for any Expression from such Principal Work that is an Entire Insert or Partial Insert in any other Book, but not both.

(b)  <u>Funding of Cash Payments</u>.  To fund the Cash Payments, Google shall pay a minimum of forty-five million United States dollars (U.S. $45 million) into the Settlement Fund.  If the total Cash Payments to be made in accordance with Section 5.1(a) (Cash Payments) exceed such amount, then Google shall pay to the Settlement Fund, in addition to such amount, the amount necessary to make all Cash Payments.

(c)  <u>Distribution of Overage</u>.  If the amount distributed from the Settlement Fund to Rightsholders under Section 5.1(a) (Cash Payments) is less than forty-five million United States dollars (U.S. $45 million), then the remaining funds shall be reallocated in accordance with the Plan of Allocation.

5.2  <u>Payment For Registry, Notice and Claims Administration</u>.  In addition to the Cash Payments provided for in Section 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized), Google has paid or shall pay into the Settlement Fund thirty-four million five hundred thousand United States dollars (U.S. $34.5 million), as set forth in Section 5.3 (Timing of Payments under Sections 5.1 and 5.2).  Plaintiffs will use all such funds for Administrative Costs.

5.3  <u>Timing of Payments under Sections 5.1 and 5.2</u>.

(a)  <u>Initial Settlement Deposit</u>.  ~~No later than ten (10) Business Days after the Settlement Agreement Date, Google shall deposit the amount of~~Google deposited twelve million United States dollars (U.S. $12 million) (the "<u>Initial Settlement Deposit</u>") on November 10, 2008 into an interest bearing escrow account by wire transfer to the Depository Bank.  The Initial Settlement Deposit, and any additional funds from the Final Settlement Deposit that Google may deposit pursuant to agreement of Google and Class Counsel, shall be held in escrow in the Settlement Fund and administered by the Settlement Administrator, Class Counsel and the Depository Bank, pursuant to an escrow agreement approved by Class Counsel and Google and subject to Section 5.3(f) (Investment).  Pursuant to

79

the terms of the escrow agreement, upon the Effective Date, any and all rights of Google to the Initial Settlement Deposit, any such additional funds, and any interest or income earned thereon shall cease to exist.  Consequently, the terms of the escrow agreement will provide that, as of the Effective Date, the entire balance of the Initial Settlement Deposit and any such additional funds shall be in the sole control of Class Counsel, subject to Section 5.3(d) (Limitation of Use).

(b)     Final Settlement Deposit.  No later than ten (10) Business Days after the Effective Date, Google shall deposit the amount of sixty-seven million five hundred thousand United States dollars (U.S. $67.5 million) (the "Final Settlement Deposit"), less any funds in addition to the Initial Settlement Deposit that may have been paid pursuant to Section 5.3(a) (Initial Settlement Deposit), in the Settlement Fund by wire transfer to the Depository Bank.  The Final Settlement Deposit consists of the balance of the amount owed under Sections 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized) and 5.2 (Payment for Registry, Notice and Claims Administration).

(c)     Supplemental Deposit.  In the event Google is required to make additional Cash Payments pursuant to the second sentence of Section 5.1(b) (Funding of Cash Payments), Google shall deposit in the Settlement Fund an amount sufficient to fund the additional Cash Payments ("Supplemental Deposit") by wire transfer to the Depository Bank, within ten (10) Business Days after the later of (i) the date on which the Registry issues to the Plaintiffs and Google its final report regarding Cash Payments pursuant to Section 13.513.6 (Final Report Regarding Cash Payments) or (ii) the Effective Date.

(d)     Limitation of Use.  Except as otherwise provided in this Amended Settlement Agreement, no disbursement or other use of any portion of the Settlement Fund shall be made without approval of the Court.

(e)     Designation.  The Settlement Fund is intended as, and shall be, a separate escrow fund of moneys held at Depository Bank and shall qualify as a "qualified settlement fund" within the

meaning of Treasury Regulation Section 1.468B-1. Class Counsel or its designee shall be the "administrator" of the Settlement Fund within the meaning of Treasury Regulation Section 1.468B-2(k)(3). Class Counsel or its designee shall apply, or shall cause application to be made, to the Internal Revenue Service for an employer identification number on behalf of the Settlement Fund and shall further cause to be prepared on behalf of the Settlement Fund any and all required tax returns. Class Counsel or its designee shall file such tax returns with all appropriate tax authorities and shall cause any taxes shown due on such returns or otherwise and payable by the Settlement Fund to be paid to the United States Treasury or other taxing authority on behalf of the Settlement Fund from the funds on deposit in the Settlement Fund. Class Counsel or its designee shall do or cause to be done any and all other acts as may be reasonably required to cause the Settlement Fund to qualify and remain qualified as a "qualified settlement fund" as described above.

(f)      Investment.  Until such time after the Effective Date as the Settlement Fund is distributed to Rightsholders consistent with the terms of this Amended Settlement Agreement and as otherwise ordered by the Court, the Settlement Fund shall be invested and reinvested by Class Counsel in United States Treasury Bills, Notes or other obligations of the United States or its instrumentalities of no more than six (6) months' duration, except that such portions of the Settlement Fund as may reasonably be needed to pay current Administrative Costs, including expenses associated with providing notice of the Settlement to the Amended Settlement Class, or payment of taxes arising with respect to income earned by the Settlement Fund (including the reasonable expenses of a tax attorney or consultant and mailing and distribution costs and expenses related to filing tax returns), may be held in the form of cash or money market instruments.  All interest and gains earned on the Settlement Fund or any portion thereof shall become and remain a part thereof. No party shall be responsible for any losses, principal or otherwise, of the Settlement Fund.

(g)      Payment of Administrative Costs.  Prior to the Effective Date, disbursements may be made from the Initial Settlement Deposit, or any additional funds that may have been paid pursuant to Section 5.3(a) (Initial Settlement Deposit), for reasonable expenses actually incurred in paying Administrative Costs, in a total amount not to exceed twelve million United States dollars (U.S. $12

million), or such other amount as Google and Class Counsel may agree, without further order of the Court, and the amounts for Administrative Costs incurred (including accrued-but-not-yet-paid expenses) shall not be refundable to Google in the event this Amended Settlement Agreement is disapproved, voided, or otherwise fails to become final.  No other payments, disbursement, or transfers of any kind from the Settlement Fund, including Class Counsel's attorneys' fees and costs of litigation, shall be made prior to the Effective Date without leave of Court for good cause shown.  Google shall have no responsibility for the administration, operation, investment or distribution of the Settlement Fund.  Plaintiffs shall use commercially reasonable efforts to minimize expenditures from the Settlement Fund.

    (h)  <u>Google Rights and Obligations</u>.  Google shall not have any responsibility to make any filings relating to the Settlement Fund, and Google shall have no responsibility to pay taxes, including interest and penalties due thereon, on interest earned by the Settlement Fund.  In the event the Settlement is not approved by the Court or is otherwise terminated, the Settlement Fund (less any Administrative Costs incurred) shall be promptly returned to Google, and in such event Google shall be responsible for payment of all taxes on interest earned on the Settlement Fund after the date of such return.

   5.4  <u>Plan of Allocation</u>.  The Plan of Allocation sets forth the plan of allocating payments Google makes to or for the benefit of Registered Rightsholders under Sections 4.1 (Institutional Subscriptions), 4.2 (Consumer Purchases), 4.4 (Advertising Revenue Model), 4.7 (~~New~~Additional Revenue Models), 4.8 (Public Access Service) and 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized).  The Registry shall make payments to Registered Rightsholders from amounts received by it pursuant to Article IV (Economic Terms for Google's Use of Books), or shall cause payments to be made from the Settlement Fund as provided in the Plan of Allocation and the Registry shall be responsible for correcting or causing to be corrected any errors in making such payments.

   5.5  <u>Attorneys' Fees</u>.  Counsel for the Author Sub-Class shall apply to the Court for an award of attorneys' fees and reimbursement of expenses in a total amount not to exceed thirty million United States dollars (U.S. $30 million).  Google has agreed to pay those amounts over and above the other consideration to the Amended Settlement Class, and agrees not to undermine in any way, or encourage anyone else to undermine in any way, the petition for attorneys' fees filed by Counsel for the Author Sub-Class so

long as such petition seeks fees and reimbursement of expenses in the amount of thirty million United States dollars (U.S. $30 million).  In no event will Google be obligated to pay any attorneys' fees and expenses for Counsel for the Author Sub-Class in excess of thirty million United States dollars (U.S. $30 million).  Attorneys' fees and expenses consistent with this Section 5.5 (Attorneys' Fees) that are granted by the Court shall be paid by the Depository Bank within ten (10) Business Days after the Effective Date by wire transfer to counsel for the Author Sub-Class.

ARTICLE VI — **ESTABLISHMENT AND CHARTER OF REGISTRY**

6.1 <u>Functions</u>.  Before the Effective Date, Plaintiffs will establish a registry that:

(a) is authorized to act on behalf of Rightsholders as set forth in this Amended Settlement Agreement,

(b) will own and maintain a rights information database for Books and Inserts and their authors and publishers,

(c) will attempt, from its inception, use commercially reasonable efforts to locate Rightsholders with respect toof Books and Inserts,

(d) will, on behalf of Rightsholders, receive payments from Google under this Amended Settlement Agreement and distribute those payments to Registered Rightsholders in accordance with this Amended Settlement Agreement, the Plan of Allocation and the Author-Publisher Procedures,

(e) will assist in the resolution of disputes between Rightsholders,

(f) will, upon request, monitor Google's display and pricing of Books for Rightsholders located outside of the United States to ensure that they conform to the requirements of this Amended Settlement Agreement and to such Rightsholders' instructions, and use commercially reasonable efforts to provide a means for such Rightsholders themselves to monitor and verify their claimed Books, and

83

(g)        (f) will have such other responsibilities (i) as are set forth in this Amended Settlement Agreement and (ii) as the Charter may permit or as the Board of Directors of the Registry may determine are consistent with the Registry's functions and are not inconsistent with this Amended Settlement Agreement.

6.2    Charter.

    (a)        Not-For-Profit Entity.  The Registry will be organized and operated as a not-for-profit entity, and all funds received by the Registry under this Amended Settlement Agreement will be for the exclusive direct or indirect benefit of the Rightsholders, subject to the restrictions herein.

    (b)        Organizational Structure.

    (i)        General.  The Registry will be organized on a basis that allows the Registry, among other things, to (i) represent the interests of Rightsholders in connection with this Amended Settlement Agreement, (ii) respond in a timely manner to requests by Google, Fully Participating Libraries and Cooperating Libraries, and (iii) to the extent permitted by law, license Rightsholders' U.S. copyrights to third parties (in the case of unclaimed Books and Inserts, the Unclaimed Works Fiduciary may license to third parties the Copyright Interests of Rightsholders of unclaimed Books and Inserts to the extent permitted by law).

    (ii)        Board of Directors.  The Registry will have equal representation of the Author Sub-Class and the Publisher Sub-Class on its Board of Directors, with each act of the Board requiring a majority of the directors, with such majority including at least one director who is a representative of the Author Sub-Class and one director who is a representative of the Publisher Sub-Class. The Board of Directors will have at least one representative of the Author Sub-Class from each of the following countries: the United States, Canada, the United Kingdom and Australia; and at least one representative of the Publisher Sub-Class from each of the following countries: the United States, Canada, the United Kingdom and Australia.

84

(iii)    Unclaimed Works Fiduciary.  The Charter will provide that the Registry's power to act with respect to the exploitation of unclaimed Books and Inserts under the Amended Settlement will be delegated to an independent fiduciary (the "Unclaimed Works Fiduciary") as set forth in Sections 3.2(e)(i) (Change Requests by Rightsholders), 3.10 (Specific Prohibitions), 4.2(c)(i) (Pricing Bins), 4.3 (Preview Uses), 4.5(b)(ii) (Consumer Purchases), 4.7 (Additional Revenue Models), 6.2 (Charter), and 6.3 (Unclaimed Funds and Public Domain Funds) of the Amended Settlement Agreement and Sections 3.2 and 3.3 (Procedures for Changing Classification of a Book) of the Author-Publisher Procedures, and otherwise as the Board of Directors of the Registry deems appropriate.  The Unclaimed Works Fiduciary will be a person or entity that is not a published book author or book publisher (or an officer, director or employee of a book publisher).  The Unclaimed Works Fiduciary (and any successor) will be chosen by a supermajority vote of the Board of Directors of the Registry and will be subject to Court approval.

(iv)    Unclaimed Funds and Public Domain Funds.  The Charter will also direct the Registry to follow the guidelines in this Amended Settlement Agreement regarding Unclaimed Funds and Public Domain Funds described in Section 6.3 (Unclaimed Funds and Public Domain Funds).  The Registry will use funds from the Settlement, as well as Unclaimed Funds as described in Section 6.3 (Unclaimed Funds and Public Domain Funds), to attempt to locate Rightsholders of unclaimed Books and Inserts.

(v)    (b) Organizational Structure.  The Registry will be organized on a basis that allows the Registry, among other things, to (i) represent the interests of Rightsholders in connection with this Settlement Agreement, (ii) respond in a timely manner to requests by Google, Fully Participating Libraries and Cooperating Libraries, and (iii) to the extent permitted by law, license Rightsholders' U.S. copyrights to third parties.  The Registry will have equal representation of the Author Sub-Class and the Publisher Sub-Class on its Board of Directors, with each act of the Board requiring a majority of the directors, with such majority including at least one director who is a representative of the Author Sub-Class and one director who is a representative of the Publisher Sub-Class.  The Charter will also direct the Registry to follow the guidelines in this Settlement Agreement regarding Unclaimed Funds and Public Domain Funds described in Section 6.3 (Unclaimed Funds and Public Domain Funds)Limitations.  In addition, the Charter will prohibit the Registry from coordinating Rightsholders for purposes of representing them as a sub-group regarding any matter under this

Amended Settlement Agreement, or working with any sub-group of Rightsholders to exclude their Books from Display Uses or Non-Display Uses, or to advocate that any sub-group of Rightsholders decrease its participation in the Settlement in any manner. Notwithstanding the foregoing, nothing herein shall limit or restrict the Registry from being able to represent the interests of all Author Sub-Class members as a sub-group or all Publisher Sub-Class members as a sub-group.

(c) Registry Commitments. The Plaintiffs shall cause the Registry (i) to ratify this Amended Settlement Agreement at the first meeting of its Board of Directors; (ii) to adopt a resolution by which the Registry shall become a signatory to this Amended Settlement Agreement; (iii) to adopt a Certificate of Incorporation and bylaws that implement the requirements of Sections 6.1 (Functions), 6.2 (Charter) and 6.3 (Unclaimed Funds and Public Domain Funds); and (iv) to not take any act inconsistent with its obligations under this Amended Settlement Agreement. Google will have the right to approve such Certificate of Incorporation and bylaws for conformance with the foregoing commitments prior to their filing or adoption (as the case may be), such approval not to be unreasonably withheld or delayed.

6.3 Unclaimed Funds and Public Domain Funds.

(a) Unclaimed Funds.

(i) Unclaimed Funds for Unclaimed Books.

(1) Subject to clauses (2) and (3) below, any revenues paid to the Registry and due to Rightsholders of Books that are unclaimed by such Rightsholders under this Amended Settlement Agreement ("Unclaimed Funds") will be held by the Registry for the benefit of the Rightsholder(s) of such Books until such Rightsholders register and claim such Books.

(2) Beginning with the sixth year after the Effective Date, and every year thereafter, subject to the approval of the Unclaimed Works Fiduciary, the Registry may use up to twenty-five percent (25%) of Unclaimed Funds earned in any one year that have remained unclaimed

86

for least five (5) years (such percentage to be allocated across all unclaimed Books in proportion to the Unclaimed Funds that they earned) for the purpose of attempting to locate the Rightsholders of unclaimed Books.  The Board of Directors of the Registry, in consultation with the Unclaimed Works Fiduciary, will determine how to use such Unclaimed Funds to attempt to locate the Rightsholders of unclaimed Books, including the use, as appropriate, of national and international licensing and collecting societies, reproduction rights organizations, and associations of authors and publishers.

(3)        (i) Unclaimed Funds-Non-Subscription Revenue Models.  Any revenues paid to the Registry and due to Rightsholders of Books under Sections 4.2 (Consumer Purchases), 4.4 (Advertising Revenue Model), 4.8(a)(ii) (Printing), and, if agreed, 4.7(a) – (c) (Print on Demand, Custom Publishing and PDF Download, respectively), but that are unclaimed by such Rightsholders within five (5) years of the last date of the reporting period in which the Books earned such revenues ("Unclaimed Funds—Non-Subscription"), will be distributed by the Registry in accordance with the Plan of Allocation as soon as practicable following the end of such five (5)-year period as follows:  (1) first, to defray reasonable and necessary operational expenses of the Registry that are related to its performance, on behalf of the Rightsholders, of the functions described in Section 6.1 (Functions) and, as determined by the Board of Directors of the Registry in the exercise of its fiduciary duties, maintain reserves for such expenses on a proportional revenue basis with respect to revenue from licensees of the Registry other than Google, (2) then, any remaining Unclaimed Funds will be paid on a proportional basis to the Registered Rightsholders of a Book until all such Rightsholders of a Book have received, in the aggregate, together with all amounts paid to such Rightsholders under Section 4.5(a) (Obligation to Pay Revenue Share), seventy percent (70%) of the Gross Revenues received by Google for such Book, and (3) then, for any Unclaimed Funds remaining thereafter, to not-for-profit entities described in Section 510(c)(3) of the Internal Revenue Code chosen by the Registry.Beginning ten (10) years after the Effective Date, any Unclaimed Funds shall be allocated proportionally to the United States, Canada, the United Kingdom and Australia, based, respectively, on the number of Books registered with the United States Copyright Office (for the United States) and the number of Books published in Canada, the United Kingdom and Australia.  Subject to the approval of the Unclaimed Works Fiduciary as to the timing of such motions, the Registry may file a motion or motions with the Court recommending how Unclaimed Funds held at least ten (10) years should be distributed to literacy-based charities

87

in each such country ~~that directly or indirectly benefit the Rightsholders and the reading public,~~ after consultation with Google and, acting through the Designated Representative, the Fully Participating Libraries and the Cooperating Libraries. The ~~Registry shall choose not-for-profit entities described in Section 501(c)(3) of the Internal Revenue Code that directly or indirectly benefit the Rightsholders and the reading public, and will include~~charities will be entities that advance literacy, freedom of expression, and/or education~~,~~ and are (a) described in Section 501(c)(3) of the Internal Revenue Code (for Unclaimed Funds from Books registered with the United States Copyright Office), (b) organizations qualifying as "Charitable Organizations," as defined in Section 149.1 of the Income Tax Act of Canada (for Books published in Canada), (c) any body recognized as a charity under the Charities Act 2006, Charities and Trustee Investment (Scotland) Act 2005 or Charities Act (Northern Ireland) 2008 or any legislation replacing or amending such acts (for Books published in the United Kingdom), or (d) charities that are exempt from income tax in Australia (for Books published in Australia) and, for avoidance of doubt, will not include the Authors Guild, ~~the~~ Association of American Publishers or other trade organizations. ~~"Gross Revenues" means all of the revenues received by Google from the Revenue Models identified in this Section 6.3(a) (Unclaimed Funds), and only such Revenue Models~~Such motion or motions will be made with notice to and an opportunity to be heard by the attorneys general of all states in the United States, all Rightsholders whom the Registry will have been able to locate as of that time, and all Fully Participating Libraries and Cooperating Libraries. This Section 6.3(a)(i) (Unclaimed Funds for Unclaimed Books) is subject to Section 17.23 (Court's Continuing Jurisdiction).

(ii) ~~Unclaimed~~Abandoned Funds ~~Subscription Revenue Models for Claimed Books~~. Any revenues ~~paid to the Registry and due to Rightsholders of Books under Section 4.1 (Institutional Subscriptions) and, if agreed, Section 4.7(d) (Consumer Subscription Models), but that are unclaimed by such Rightsholders within (5) years of the last date of the reporting period in which the Books earned such revenues ("Unclaimed Funds-Subscription"), will be distributed by the Registry as soon as practicable~~due to Registered Rightsholders of claimed Books will be held by the Registry for the benefit of such Rightsholders until paid to such Rightsholders in accordance with this Amended Settlement Agreement; provided that, any such revenues that are abandoned in accordance with applicable law will be distributed to the appropriate governmental authority in accordance with ~~the Plan of Allocation following the end of such five (5) year period.~~applicable law.

88

(b)       Public Domain Funds.  Funds that may be mistakenly paid by Google to the Registry for books that are in the public domain under the Copyright Act in the United States ("Public Domain Funds") will be distributed according to the guidelines set forth in this Section 6.3(b) (Public Domain Funds).  If Google pays the Registry Public Domain Funds derived from Institutional Subscriptions or Consumer Subscriptions, then those funds will be distributed on a proportional revenue basis among Registered Rightsholders whose Books are included within each subscription.  If Google pays the Registry Public Domain Funds from Consumer Purchases, Advertising Uses, per-page printing fees pursuant to Section 4.8(a)(ii) (Printing), or additional Revenue Models set forth in Sections 4.7~~(a) — (c) (Print on Demand, Custom Publishing and PDF Download, respectively~~ (Additional Revenue Models) (if Google and the Registry agree to implement such Revenue Models) and such funds have not yet been paid to a Registered Rightsholder, then the Registry will return those Public Domain Funds to Google for distribution, at Google's option, to a not-for-profit entity or to any consumer that may have purchased access to a book that is in the public domain under the Copyright Act in the United States.  Google will have no right to reclaim Public Domain Funds for a book that is in the public domain under the Copyright Act in the United States from a Person who claimed he, she or it is a Rightsholder of such book once the Registry pays such funds to such Person.

(c)       Records and Reporting.  The Registry shall keep accurate records of its disbursement of Unclaimed Funds and Public Domain Funds.  The Registry shall prepare annual written reports of the same and shall submit such reports to Google within forty-five (45) days after the end of each calendar year.

(d)       Audit Rights.  Google may, upon thirty (30) days' prior notice and at its own expense, retain a nationally recognized independent and mutually-acceptable independent auditor (whose fees are not contingency based), under a duty of confidentiality to the Registry, to review and audit the Registry's relevant records to confirm the payments made under Section 6.3(a) (Unclaimed Funds) and Section 6.3(b) (Public Domain Funds).  The audit shall:  (i) be subject to the Registry's security and confidentiality requirements; (ii) occur no more than once every calendar year and not during the first or last three (3) weeks of a calendar quarter; (iii) transpire during the Registry's normal business hours; and (iv) cover a period not to

89

exceed the previous four (4) calendar years.  The Registry will promptly correct any payment errors.  In addition, if the audit reveals an underpayment of five percent (5%) or more in the payments for any calendar quarter, then the Registry shall pay for the reasonable costs associated with the audit.  The accounting firm may only disclose to Google whether or not the Registry is in compliance with its payment obligations under Section 6.3(a) (Unclaimed Funds) and Section 6.3(b) (Public Domain Funds) and, if the Registry is not in compliance, the amount of any underpayment and supporting calculations.

6.4    <u>Funding and Technical Assistance</u>.  Google shall:

(a)    fund the set-up and operations of the Registry according to the terms set forth in Section 5.2 (Payment For Registry, Notice and Claims Administration); and

(b)    provide reasonable technical assistance with respect to the design, development and maintenance of the Registry.

6.5    <u>Google's Rights to Registry Data</u>.

(a)    <u>Data for Google</u>.  The Registry will provide Google with access to such Registry data, including all updates, as are reasonably necessary for Google to perform its obligations under this <u>Amended</u> Settlement Agreement.

(b)    <u>Data for Fully Participating Libraries</u>.  The Registry will provide Google with access to such Registry data, including all updates, as are reasonably necessary for Fully Participating Libraries to perform their obligations under their respective Library-Registry (Fully Participating) Agreements.  Google may provide to the Fully Participating Libraries such Registry data, including all updates, as are reasonably necessary for Fully Participating Libraries to perform their obligations under their respective Library-Registry (Fully Participating) Agreements.

(c)    <u>Survival</u>.  Google's rights to have access to data about a Book or Insert will survive the expiration of the term of the

U.S. copyright in such Book or Insert and, to the extent that Google requires access to data after the expiration of the terms of all U.S. copyrights in all Books and Inserts, the Registry, if still operational at such time, shall provide such access.

6.6    Exchange of Data between Google and the Registry.

(a)    Data Provided by Google.  Google shall provide the following to the Registry:

(i)    Digital Copies to Libraries.  The name of any library to which it has provided Digital Copies of Books Digitized in the United States and, upon request of the Registry, the library at which a particular Book has been Digitized.

(ii)    Digitized Books.  On at least a quarterly basis, an update to the list of Books, Public Domain Books with a copyright date after 1922 and Government Works that Google has Digitized under this Amended Settlement Agreement along with Metadata with respect to such Books to the extent that Google is permitted to do so under then-existing contracts with Metadata providers.  Google, Plaintiffs, and the Registry will cooperate to obtain such Metadata providers' permission for Google to provide Plaintiffs and the Registry with such lists; provided that the Registry shall be responsible for payment of any additional license fees to such providers to the extent required.  In communicating between them, Google and the Registry will use a unique identifier for each Book, Public Domain Book with a copyright date after 1922 or Government Work.  The update for a Book, Public Domain Book with a copyright date after 1922 or Government Work will be available within a reasonable period after Digitization and completion of processing of such Book, Public Domain Book with a copyright date after 1922 or Government Work by Google.  The data provided shall include information for each Book regarding the Display Uses, if any, that are being made of the Book and identification of any Books that Google is not offering for sale, including any Books that Google excludes from Display Uses for non-editorial reasons (in addition to Google's obligation under Section 3.7(e) (Google's Exclusion of Books)). The Registry will use this information for internal purposes only, provided that an individual record of a Book, Public Domain Book with a copyright date after 1922 or Government Work may be disclosed by the Registry to any Rightsholder of that Book or an Insert in that Book, Public Domain

91

Book with a copyright date after 1922 or Government Work. The Registry may need permission from Metadata providers to obtain such Metadata, and will be responsible for payment of any additional license fees to the extent required by such providers.

(iii)     Books Sold.  Along with the payments required under Section 4.6 (Payment Terms) for the applicable period, a list of the Books sold, the number of Books sold, and, for each such sale, the sale price.

(iv)     Library Scans.  Upon request by the Registry and if a Fully Participating Library or a Cooperating Library invokes its rights pursuant to Section 7.2(e)(ii) (Third-Party Required Library Services Provider), reasonable information regarding Google's provision of Required Library Services, to determine compliance with Section 7.2(e)(i) (Obligation).

(v)     Usage Data.  Data sufficient to enable the Registry to calculate Subscription Usage Fees and Book Usage Fees, as defined in the Plan of Allocation.

(vi)     Registration/Claims Process Data.  All data provided to Google by members of the Amended Settlement Class or their agents in connection with the registration, claims, and opt out processes.  Such data shall be subject to a Registry privacy policy.

(vii)     Additional Information.  Additional data, including updates, as reasonably necessary for the Registry to perform its obligations under this Amended Settlement Agreement.

(b)     No Google Licenses.  Except with respect to (i) the limited right to use Digital Copies of Library Scans and of Books other than Library Works provided by Google pursuant to Section 3.7(c) (Additional Contemplated Rightsholder Services Provider), Section 7.2(e)(ii) (Third-Party Required Library Services Provider) and Section 7.2(g)(ii)(2) (Alternative Accommodated Service Provider) and (ii) the limited right to use information provided by Google pursuant to Section 6.6(a) (Data Provided by Google), no licenses are granted by Google to the Rightsholders, the Registry,

92

Plaintiffs or any other Person pursuant to this Amended Settlement Agreement, by implication, estoppel or otherwise.

(c)     Data Provided by the Registry.  The Registry shall provide the following to Google:

(i)     Books Claimed.  A list of all Books and Inserts for which a Registered Rightsholder has registered with the Registry, instructions with respect to the Removal of Books and the exclusion or inclusion of Books and Inserts pursuant to Article III (Google Book Search – Rights, Benefits and Obligations) and to the Specified Price pursuant to Section 4.2(b)(i)(1) (Specified Price), and any other directions for Books and Inserts provided for in this Amended Settlement Agreement.

(ii)     Metadata Corrections.  Any corrections to the Metadata, and any other corrections or modifications to information the Registry previously provided to Google regarding a Book or Insert.

(iii)     Registered Rightsholders.  The identity of any Registered Rightsholder for a given Book or Insert; provided, however, that if the Book or the Insert was published under a pseudonym, then the Registry will only disclose that pseudonym to Google and, provided further, that if a Rightsholder requests that his, her or its identity not be disclosed to Google, then the Registry will only disclose an alias.  The Registry will neither encourage Rightsholders to request, nor discourage Rightsholders from requesting, such non-disclosure.  The Registry will also provide a means for Google to match contact information and other identifying information for a Rightsholder against the Registry's information pertaining to that Rightsholder.  Such mechanism need not reveal the Rightsholder's contact information to Google.  Rightsholder information provided by the Registry is subject to the terms of Section 15.3 (Confidentiality of Rightsholder Information).

(d)     Claimed Books to be Public.  The Registry will make publicly available whether or not a Book has been registered with the Registry and, for Books that have been registered, the identity of the Registered Rightsholder, unless the Registered Rightsholder requests that such information not be made public for reasonable privacy concerns, as determined by the Registry.

93

(e)        Copyright Status.  The Registry and Google will provide each other with information that each obtains bearing on the copyright status of works that are or may be Books or Inserts.

(f)        No Personally Identifiable Information.  In no event will Google provide personally identifiable information about end users to the Registry other than as required by law or valid legal process.

6.7     Authorization of Registry.  Where this Amended Settlement Agreement confers on the Registry rights and obligations with respect to Books and Inserts, including with respect to the Registry's relationship with each of Google, the Fully Participating Libraries, the Cooperating Libraries and the Public Domain Libraries, Plaintiffs and all Rightsholders, as of the Effective Date, shall be deemed to have authorized the Registry to exercise such rights and perform such obligations on behalf of the Rightsholders with respect to their respective Books and Inserts, including to enter into Library-Registry Agreements.  In no event, however, may the Registry direct Google to change the classification of a Book, include or exclude a Book or Insert in or from any Display Use, or take any other action, that is contrary to such Book or Insert Rightsholder's express direction with respect to such Book or Insert, as made pursuant to and in conformance with this Amended Settlement Agreement.

ARTICLE VII — **FULLY PARTICIPATING LIBRARY AND COOPERATING LIBRARY RIGHTS AND OBLIGATIONS**

7.1     Becoming a Fully Participating Library or a Cooperating Library.  Google shall notify the Registry when it has identified a library that wishes to become a Fully Participating Library or a Cooperating Library.  The Registry shall have approval rights as to whether a library may become a Fully Participating Library or a Cooperating Library; provided, however, that in all cases the Registry may only withhold its approval for a library to become a Fully Participating Library or a Cooperating Library due to (a) reasonable concerns as to whether the library can comply with the obligations imposed on a Fully Participating Library or a Cooperating Library by this Amended Settlement Agreement or the applicable Library-Registry Agreement or (b) the library expressing its intent not to comply with the obligations imposed on a Fully Participating Library or a Cooperating Library by this Amended Settlement Agreement or the applicable Library-Registry Agreement.  The libraries identified on Attachment G (Approved Libraries) are approved to become Fully Participating Libraries and Cooperating Libraries upon execution of an applicable Library-Registry Agreement.

7.2     Fully Participating Library Uses.

        (a)        Making of Library Digital Copies.

        (i)        Fully Participating Library Collections.  Google may provide each Fully Participating Library with (and each Fully Participating Library may receive and retain) a Library Digital Copy.  Google may construct a Digital Copy of a Book from one or more physical books into a composite version of the Book, which may include alternative page images from different copies of the Book that Google obtains from sources other than the Fully Participating Library.  Google may provide to a Fully Participating Library, as technology improves, a technologically updated Library Digital Copy of Books in that Fully Participating Library's Collection.

        (ii)        Books Not Digitized From the Fully Participating Library's Collection.  Google may provide a Fully Participating Library with Digital Copies of Books in the Fully Participating Library's Collection that Google did not Digitize from the Fully Participating Library's Collection; provided, however, that a Fully Participating Library may receive an LDC of all of the Books in its Collection only if, for a ~~Collection~~Fully Participating Library with holdings of nine hundred thousand (900,000) ~~Books~~volumes (*i.e.,* books and not Periodicals or bound volumes of Periodicals) or more, Google Digitizes more than three hundred thousand (300,000) ~~Books~~volumes from that Fully Participating Library's ~~Collection~~holdings, or, for a ~~Collection~~Fully Participating Library with holdings of fewer than nine hundred thousand (900,000) ~~Books~~volumes, Google Digitizes more than thirty percent (30%) of the ~~Books~~volumes from that Fully Participating Library's ~~Collection~~holdings.  Google will not provide a Fully Participating Library with a Digital Copy of any Book that is not held by that Fully Participating Library.

        (iii)        Institutional Consortia.  For any Institutional Consortium that (1) exists as of the Amended Settlement Agreement Date, and (2) with which Google has a Digitization Agreement, Google may provide each Fully Participating Library that is a member of that Institutional Consortium with Digital Copies of Books in that Fully Participating Library's Collection that Google did not Digitize from that Fully Participating Library's Collection, provided, however, that a Fully Participating Library may receive an LDC of all of the Books in its Collection only if at least ten thousand (10,000)

~~Books~~volumes (*i.e.*, books and not Periodicals or bound volumes of Periodicals) were Digitized from such Fully Participating Library's ~~Collection~~holdings, and (a) if the sum of the ~~Collections~~holdings for all Fully Participating Libraries in the Institutional Consortium is two million (2,000,000) ~~Books~~volumes or more, Google Digitizes more than six hundred fifty thousand (650,000) ~~Books~~volumes from those Fully Participating Libraries' ~~Collections~~holdings, or (b) if the sum of the ~~Collections~~holdings for all Fully Participating Libraries in the Institutional Consortium is fewer than two million (2,000,000) ~~Books~~volumes, Google Digitizes more than thirty percent (30%) of the ~~Books~~holdings in aggregate from those Fully Participating Libraries' ~~Collections~~holdings.  Google will not provide such a Fully Participating Library with a Digital Copy of any Book that is not held by that Fully Participating Library.

(iv)        ~~Limitation~~Limitations.  Google shall not provide Digital Copies of Books Digitized in the United States to any Person other than a Fully Participating Library, except as authorized in this Amended Settlement Agreement, or with prior Registry or Rightsholder approval.  This Amended Settlement Agreement neither authorizes nor prohibits, nor releases any Claims with respect to, any volumes that are Digitized by Google and provided to any Fully Participating Library except and solely to the extent that such volumes are Books or contain Inserts.

(b)        Use of Library Digital Copies.  Each Fully Participating Library may make the following uses of its LDC:

(i)        Technical Adaptations.  The Fully Participating Library may reproduce and make technical adaptations to (but not adapt or alter the content of) its LDC as reasonably necessary to preserve, maintain, manage, and keep technologically current its LDC.

(ii)        Users with Print Disabilities.

(1)        Special Access.  The Fully Participating Library may provide special access to Books in its LDC to a user who has provided written documentation that a Person having the credentials of a Competent Authority has certified that such user has a Print Disability.  A professional librarian shall not be permitted to certify a user's claimed Print Disability for purposes of this Section 7.2(b)(ii)(1) (Special Access)

96

except in those circumstances in which the user affirms in writing to such librarian that no Competent Authority is available to the user for that purpose or in which the user has a Print Disability that is readily apparent upon physical observation of the user. A certified user may be permitted to access Books in the LDC in the form of electronic text used in conjunction with screen enlargement, voice output, or refreshable Braille displays. A Fully Participating Library will not provide a certified user with such special access to Books in its LDC in a manner that would make any copy ordinarily accessible to anyone other than such certified user, or ordinarily accessible to such certified user for a longer period than is reasonably necessary to facilitate such special access, except in circumstances in which the Fully Participating Library cannot otherwise provide the user with a reasonable accommodation for such user's Print Disability.

(2) <u>Certification</u>. A Fully Participating Library that provides special access to certified users under this Section 7.2(b)(ii) (Users with Print Disabilities) shall require each such user to sign or otherwise personally acknowledge a standard form agreement (to be agreed upon by the Registry and such Fully Participating Library) that will evidence such user's awareness and acceptance of terms of use that prohibit use, reproduction or distribution that is prohibited by the Copyright Act or by such terms and conditions of Books in the LDC, and that will provide for the loss of further special access to such Books through the LDC as a possible consequence of violating such terms. Each Fully Participating Library shall also maintain data about its provision of such access to each certified user that is sufficient to enable an auditor to annually certify the Fully Participating Library's compliance with this Section 7.2(b)(ii) (Users with Print Disabilities) but does not disclose the identity of any certified user.

(3) <u>Limitation</u>. The provisions of this Section 7.2(b)(ii) (Users with Print Disabilities) apply to and authorize a Fully Participating Library's use of Books in its LDC only for the purpose of reasonably accommodating the needs of certified users with Print Disabilities as required by applicable federal or state law and regulations, and do not authorize access to or use of Digital Copies in the LDC of such Books by other Persons for such purpose or any other purpose except for Persons assisting such certified users with Print Disabilities.

97

(4)     <u>Changes</u>.  When warranted by changes in disability laws, the Copyright Act, the nature of Print Disabilities, or the assistive technology available to reasonably accommodate Print Disabilities, the Registry will, upon request by a Fully Participating Library, grant such Fully Participating Library permission to provide a certified user with special access to Books in the LDC in a form or manner that is not permitted by the terms of this Section 7.2(b)(ii) (Users with Print Disabilities), but is deemed necessary to reasonably accommodate the Print Disability needs of that user.  The Registry will not unreasonably withhold or delay its approval of these requests and will, where it can reasonably anticipate the receipt of the same request from other Fully Participating Libraries, extend the same permission to all Fully Participating Libraries through an appropriate process of written notice to the Designated Representative.

(iii)     <u>Replacements</u>.

(1)     <u>Replacement Copy</u>.  The Fully Participating Library may use its LDC to create a print format replacement copy of a Book solely for the purpose of replacing a copy of such Book that is damaged, destroyed, deteriorating, lost, or stolen, or if the existing format in which the Book is stored has become obsolete, provided that the Fully Participating Library has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price.  For these purposes an "unused replacement" for a copy in print format means an unused copy that is offered for sale in print format and does not derive from a copy Digitized from a Fully Participating Library.

(2)     <u>Replacement of Replacement Copies</u>.  Any replacement copy made by the Fully Participating Library under Section 7.2(b)(iii)(1) (Replacement Copy) that itself is damaged, destroyed, deteriorating, lost, or stolen may be replaced pursuant to this Section 7.2(b)(iii) (Replacements).

(3)     <u>Limitation</u>.  Notwithstanding anything herein to the contrary (including Section 7.2(d) (Research Corpus)), any use by a Fully Participating Library of a print format replacement copy made under Section 7.2(b)(iii) (Replacements) is not subject to the terms of this <span style="color:blue">Amended </span>Settlement Agreement.

(iv)     Finding Tools.  The Fully Participating Library may develop or obtain and may deploy finding tools that allow its users to identify pertinent Books within its LDC or generate information from its LDC.  Such tools or generated information will not permit users to read or view any material from the LDC that is Protected Expression, except that such users may read or view Front Matter Display and, in response to a search request, a limited number of Snippets for the purpose of enabling the user to verify which Book has been identified.  For a No Display Book, if requested by a Rightsholder of that Book, Fully Participating Libraries will stop displaying Snippets as part of the finding tools.  Such tools or generated information may not involve the creation of any additional copies of Protected Expression other than transitory copies for Non-Display Uses.  For purpose of this provision, representations of Books in index form are not copies.

(v)     Orphan Works.  If the Copyright Act is amended after the Amended Settlement Agreement Date to allow use of orphan works, the Fully Participating Library may use such works from its LDC in accordance with the statute.

(vi)     Use for Non-Consumptive Research.  Upon notice to the Registry in accordance with its Library-Registry (Fully Participating) Agreement, the Fully Participating Library may allow Qualified Users to conduct Non-Consumptive Research on its LDC, provided that such Fully Participating Library complies with the provisions of Section 7.2(d) (Research Corpus) as if such Fully Participating Library were a Host Site and as if the Fully Participating Library's LDC were the Research Corpus.

(vii)     Personal Scholarly Use and Classroom Use.  The Fully Participating Library, if part of a Higher Education Institution, may allow faculty members and research staff of that Higher Education Institution to read, print, download or otherwise use up to five (5) pages of any Book from its LDC that is not Commercially Available for the following purposes:  (1) personal scholarly use (for each Book, no more than once per person per term) and (2) classroom use in such Higher Education Institution that is limited to the instructors and students in the class and for the term in which the class is offered; provided that (a) the Fully Participating Library does not know at the time of such use that it is in material non-compliance with Section 8.2 (Security Standard, Security Implementation Plan and Security Audits) with respect to uses of the LDC authorized pursuant to this Section 7.2(b)(vii) (Personal Scholarly Use and Classroom Use), and (b) the Fully

99

Participating Library keeps track of and reports all such uses of Books to the Registry in the course of the audit conducted pursuant to Section 8.2(c) (Audits) or, otherwise, upon reasonable request of the Registry, provided that such requests may be made no more than semi-annually.  The Registry may make information from such reports regarding the usage of an individual Book available to the Rightsholder of such Book upon request of the Rightsholder.  A Fully Participating Library may not read, print, download or otherwise use a Book or Insert through its LDC pursuant to this Section 7.2(b)(vii) (Personal Scholarly Use and Classroom Use) if such use is available through the Institutional Subscription and the Institutional Subscription service is offered or is available to the Fully Participating Library (whether for a fee or as a beta product) at the time such Fully Participating Library seeks to make such use.

(viii)    <u>Support Personnel</u>.  ~~(i)~~ The Fully Participating Library may allow the Fully Participating Library's support personnel, archivists, information technology personnel and legal counsel to read, print, download, or otherwise use Books from its LDC as reasonably necessary to carry out their responsibilities with respect to the LDC.  A Hosting Fully Participating Library's support personnel, information technology personnel and legal counsel may have access to the LDC of a Requesting Fully Participating Library as reasonably necessary to carry out their responsibilities with respect to hosting such LDC.

(ix)    <u>Other Uses</u>.

(1)    <u>Approval by Registry</u>.  If agreed by the Registry, a Fully Participating Library may, upon request, make lawful uses of its LDC other than the uses authorized by this <u>Amended</u> Settlement Agreement, provided that such uses do not impair the rights of Rightsholders under this <u>Amended</u> Settlement Agreement.

(2)    <u>Approval by Rightsholders</u>.  The Registry will forward requests from any Fully Participating Library for authorization from any Registered Rightsholder of a Book to make a use of its Digital Copy of that Book which use is otherwise prohibited or not authorized by this <u>Amended</u> Settlement Agreement.  The Registry will provide a response to such Fully Participating Library promptly in the event that the Registered Rightsholder provides a response to the Registry and, if agreed by the Registered Rightsholder, allow the Fully Participating Library to contact

the Registered Rightsholder directly to discuss such request. A Fully Participating Library may make uses of its LDC authorized by such Registered Rightsholder and consistent with such Fully Participating Library's Digitization Agreement with Google.

(x)      Use of Contractors.

(1)      Fully Participating Libraries Hosting for Other Fully Participating Libraries. Any Fully Participating Library (the "Requesting Fully Participating Library") may authorize another Fully Participating Library or group of Fully Participating Libraries acting together (each such other Fully Participating Library, a "Hosting Fully Participating Library") to host and store the Requesting Fully Participating Library's LDC in a single repository, separately or together with other Requesting Fully Participating Libraries' LDCs. The Hosting Fully Participating Library shall protect the security of the Requesting Fully Participating Library's LDC from Prohibited Access and Third-Party Unauthorized Access in the same way that it is obligated to protect the security of its own LDC under Article VIII (Security and Breach). The Requesting Fully Participating Library may use its LDC as permitted under this Amended Settlement Agreement. The Hosting Fully Participating Library, and not the Requesting Fully Participating Library, shall be liable for the Hosting Fully Participating Library's compliance with Article VIII (Security and Breach) with respect to the Requesting Fully Participating Library's LDC hosted by the Hosting Fully Participating Library; provided that the Requesting Fully Participating Library is responsible for any act of the Requesting Fully Participating Library that results in any Prohibited Access or any Third-Party Unauthorized Access to its LDC. The Hosting Fully Participating Library may not make any use of the Requesting Fully Participating Library's LDC, except to the extent required to host the Requesting Fully Participating Library's LDC and to enable the Requesting Fully Participating Library to use its LDC as permitted under this Amended Settlement Agreement.

(2)      Other Uses of Contractors. Any Fully Participating Library may authorize third parties to exercise rights on behalf of such Fully Participating Library or to perform any of its obligations under this Amended Settlement Agreement, including the hosting and storage of such Fully Participating Library's LDC, in which case such Fully Participating Library shall, at all times, be and remain responsible for ensuring that such parties act in accordance with this Amended Settlement

101

Agreement, except as set forth otherwise in Section 7.2(b)(x)(1) (Fully Participating Libraries Hosting for Other Fully Participating Libraries). Such Fully Participating Library shall be liable for any such third party's nonconformance with or breach of this Amended Settlement Agreement, and such breaches shall be regarded as breaches by such Fully Participating Library for purposes of Article VIII (Security and Breach), except as set forth otherwise in Section 7.2(b)(x)(1) (Fully Participating Libraries Hosting for Other Fully Participating Libraries).

(c)     Prohibited Uses of Library Digital Copies.  Each Fully Participating Library is prohibited from making the following uses of its LDC unless authorized by (i) the Book Rightsholder pursuant to Section 7.2(b)(ix)(2) (Approval by Rightsholders) or otherwise or (ii) the Registry pursuant to Section 7.2(b)(ix)(1) (Approval by Registry):

(i)     Directly or indirectly selling Books or access to Books;

(ii)     Except as permitted pursuant to Section 7.2(b) (Use of Library Digital Copies), directly or indirectly providing access that enables any Person to read, print or download any Protected Expression from the LDC, provided, however, that if, at any time, an Institutional Subscription is neither offered by nor available from any of Google, an Additional Contemplated Rightsholder Services Provider or a Third-Party Required Library Services Provider, on the terms set forth in this Amended Settlement Agreement, such Fully Participating Library may, if part of a Higher Education Institution, for faculty, staff and students of, or other users who would be entitled to use the Institutional Subscription in, that Higher Education Institution, make use of Books in its LDC that are not Commercially Available at such time, except as prohibited by any of Section 7.2(c)(i), (iii), (iv), (v), or (vi), if (A) such use is first approved by both (1) the University Librarian of such Fully Participating Library, his or her functional equivalent, or his or her designee, and (2) the General Counsel of such Fully Participating Library, his or her functional equivalent, or his or her designee; and (B) such Fully Participating Library maintains records of any such uses and submits reports of such uses to the Registry promptly upon request from the Registry, provided that such requests may be made no more than semi-annually;

(iii)     For inter-library loan;

102

(iv)    For e-reserves;

(v)    In course management systems; and

(vi)    Any other use not so authorized that would violate the U.S. copyright of the Rightsholder of such Book.

(d)    <u>Research Corpus</u>.

(i)    <u>Creation and Use</u>.  The Research Corpus may be created and used for Non-Consumptive Research in accordance with this Section 7.2(d) (Research Corpus).

(ii)    <u>Host Sites</u>.  The Research Corpus may be hosted at up to two Host Sites at any given time.  At the request of a Fully Participating Library or a Cooperating Library, Google may also become a Host Site (which would be a third Host Site if the Research Corpus is already hosted at two Host Sites) with the approval of the Registry, such approval not to be unreasonably withheld or delayed.  Each Host Site must be located in the United States.  The Host Sites will be chosen by the Fully Participating Libraries and the Cooperating Libraries, acting through the Designated Representative, in consultation with Google.  Google will inform the Registry of the identity of each Host Site.  Any Host Site that is not a Fully Participating Library, a Cooperating Library or Google must be approved by the Registry, such approval not to be unreasonably withheld or delayed; provided, however, that in all cases the Registry may only withhold its approval for an institution to become a Host Site due to (1) reasonable concerns as to whether the Host Site can comply with the obligations imposed on a Host Site by this <u>Amended</u> Settlement Agreement or the Host Site-Registry Agreement or (2) the Host Site expressing its intent not to comply with the obligations imposed on a Host Site by this <u>Amended</u> Settlement Agreement or the Host Site-Registry Agreement.  An institution becomes a Host Site upon execution of an agreement with the Registry (the "<u>Host Site-Registry Agreement</u>") that incorporates the applicable provisions of this Section 7.2(d) (Research Corpus), Article VIII (Security and Breach), the Security Standard, the provisions of Article IX (Dispute Resolution) and other reasonable terms, and upon provision of a Security Implementation Plan under the procedures of Article VIII (Security and Breach); provided that Google is not required to execute a Host-Site Registry Agreement in

103

order to become a Host Site; provided, further, that if Google becomes a Host Site, Google shall comply with this Section 7.2(d) (Research Corpus) and with the procedures of Article VIII (Security and Breach) applicable to a Host Site and any access by Google in breach of the terms of this Section 7.2(d) (Research Corpus) shall constitute Prohibited Access. The Host Site-Registry Agreement will authorize the Host Site to enter into agreements with Qualified Users, reviewers and challengers pursuant to Section 7.2(d)(xi)(2) (Research Agenda) and Section 7.2(d)(xi)(8) (Reviewers and Challengers) on behalf of the Registry, as the Registry's agent. Any disputes between the Registry and the Host Site as to the terms to be included in the Host Site-Registry Agreement shall be resolved pursuant to Article IX (Dispute Resolution).

(iii)     <u>Qualified Users; Non-Consumptive Research</u>. The Host Sites may provide both on-site and remote access to Qualified Users to use the Research Corpus for Non-Consumptive Research purposes only and to reviewers and challengers of such Non-Consumptive Research, subject to Section 7.2(d)(xi)(8) (Reviewers and Challengers). Only Qualified Users, reviewers and challengers, and the Host Site will have access to the Research Corpus, and only for the purposes set forth in this Section 7.2(d) (Research Corpus).

(iv)     <u>Right to Withdraw Library Scans</u>. If a Library Work is Commercially Available as of the Notice Commencement Date or becomes Commercially Available at any time during the two (2)-year period after the Notice Commencement Date, a Rightsholder of such Library Work may, at any time during such two (2)-year period or thereafter, withdraw the Library Scan of that Library Work from the Research Corpus; provided that, if, at any time after the end of such two (2)-year period the Library Work ceases to be Commercially Available, then the Library Scan of that Library Work will be returned to the Research Corpus. If, as of the Notice Commencement Date, a Library Work for which Google uses a Library Scan is not Commercially Available but Google mistakenly determined it to be Commercially Available, and such Library Work does not become Commercially Available at any time during the two (2)-year period following the Notice Commencement Date, then upon determination that the Library Work is not Commercially Available after such two (2)-year period, the Rightsholder will not have any right to withdraw such Library Scan from the Research Corpus pursuant to this Section 7.2(d)(iv) (Right to Withdraw Library Scans). If, as of the Notice Commencement Date or at any time during the two (2)-year period following the Notice Commencement Date, a Library Work is Commercially Available but is mistakenly determined to be

104

not Commercially Available, then, upon determination that such Library Work is Commercially Available, the Rightsholder will have the right to withdraw the Library Scan of that Library Work from the Research Corpus; provided, however, that, if, at any time after the end of such two (2)-year period the Library Work ceases to be Commercially Available, then, if the Library Scan of such Library Work had been previously withdrawn, such Library Scan will be returned to the Research Corpus. This Amended Settlement Agreement does not restrict the addition of other books to the Research Corpus (*e.g.*, Public Domain Books and Books obtained from the Google Partner Program Digitized with authorization from the Rightsholder).

(v)      <u>Identification of Works in Research Corpus</u>.  Google or the Host Site will make available to Qualified Users information about what Books are included in the Research Corpus.

(vi)      <u>Limitations on Non-Consumptive Research</u>.  The Host Site shall be responsible for oversight over research performed on the Research Corpus so that such research adheres to the following limitations:

(1)      No Person may, in the course of conducting, reviewing or challenging the results of, Non-Consumptive Research use Protected material through the Research Corpus for purposes that involve reading portions of a Book to understand the intellectual content presented within a Book;

(2)      It is permissible, however, for Qualified Users to read Protected material within the Research Corpus as reasonably necessary to carry out Non-Consumptive Research, and for reviewers or challengers of the results of Non-Consumptive Research to read Protected material as reasonably necessary to analyze or verify such results; and

(3)      A Qualified User may extract from the Research Corpus and disclose to other Persons only a limited amount of Protected material as reasonably necessary to explain or discuss the Non-Consumptive Research and its results.

(vii)      <u>Publication of Results</u>.  Qualified Users are permitted to report the results of their Non-Consumptive Research in scholarly publications, which may constitute indirect commercial use (*e.g.*, reporting

results in journal articles or in books sold to the academic community or to the public).

(viii)    No Commercial Use.  Except with the express permission of the Registry and Google, direct, for profit, commercial use of information extracted from Books in the Research Corpus is prohibited.

(ix)    Use of Data.  Use of data extracted from specific Books within the Research Corpus to provide services to the public or a third party that compete with services offered by the Rightsholder of those Books or by Google is prohibited.  When requested by a Rightsholder or by the Registry on behalf of a Rightsholder, a Qualified User will be required to remove any and all data extracted from the Books of that Rightsholder from a service offered to the public or a third party by the Qualified User if that service competes with services offered by the Rightsholder of those Books.  When requested by Google, a Qualified User will be required to remove any and all data extracted from Books from a service offered to the public or a third party by the Qualified User if that service can reasonably be construed as competing with services offered by Google at the time the Qualified User's service is first made accessible.

(x)    Use of Algorithms.  Commercial exploitation of algorithms developed when performing Non-Consumptive Research on the Research Corpus is permitted.

(xi)    Governance and Maintenance.  Governance of the maintenance and use of the Research Corpus shall be as follows:

(1)    Qualified Users Only.  Only Qualified Users will be permitted to conduct Non-Consumptive Research using the Research Corpus.

(2)    Research Agenda.  Prior to engaging in Non-Consumptive Research, a Qualified User will file with the Host Site:  (a) a Research Agenda, (b) an agreement between the Qualified User and the Host Site, as agent for the Registry, that prohibits access to and use of the Research Corpus except for permitted Non-Consumptive Research and that makes the Qualified User directly liable to the Registry for any breach of its terms, and (c) a letter from a Fully Participating Library, a

106

Cooperating Library, the Registry, Google or the Host Site indicating that the submitting entity will accept responsibility for the Qualified User's use of the Research Corpus. The Host Site shall maintain these documents on file and shall make them available to the auditors for review pursuant to Section 7.2(d)(xi)(6) (Audits). Except to the extent that disclosure is required by law or this Amended Settlement Agreement, the Host Site, the Registry and auditors will treat all Research Agendas as confidential.

(3)     <u>Review of Research Agenda</u>. Prior to allowing a Qualified User access to the Research Corpus, the Host Site will review each Research Agenda for the purpose of determining whether the agenda demonstrates that the research will be Non-Consumptive Research. Through the audit performed pursuant to Section 7.2(d)(xi)(6) (Audits), the Registry reserves the right to verify that the Host Site implements such review process.

(4)     <u>Reasonable Discretion</u>. A Host Site may deny a Qualified User's access to the Research Corpus at its reasonable discretion.

(5)     <u>Management</u>. Each Host Site will manage the Research Corpus in adherence with the governance and maintenance provisions of this Section 7.2(d)(xi) (Governance and Maintenance).

(6)     <u>Audits</u>. Regular audits of each Host Site will be performed by a qualified third party reasonably acceptable to the Registry and the Host Site to ensure compliance with the governance and use terms set forth in this Section 7.2(d)(xi) (Governance and Maintenance). The audit shall be subject to reasonable prior notice to the Host Site, shall be conducted during the Host Site's normal business hours and shall be conducted no more than once in any twelve (12)-month period. The costs of the audit will be subject to the terms of Section 8.2(c) (Audits).

(7)     <u>Development</u>. Each Host Site will have the ability to access the Research Corpus for purposes of developing, testing and maintaining the Host Site platform, creating back-up copies of the Research Corpus, and keeping the Research Corpus technologically current.

(8)        Reviewers and Challengers.  Prior to a Qualified User providing reviewers and challengers with access to Books within the Research Corpus, such reviewers and challengers shall execute an agreement with the Host Site, as agent for the Registry, limiting their use to reviewing and challenging the research conducted pursuant to Section 7.2(d)(xi)(2) (Research Agenda).

(xii)        No Other Restrictions.  None of the restrictions in this Section is intended to limit the right to access or use (1) any copyrighted material obtained from sources outside of the Research Corpus or (2) except as specifically set forth in Section 7.2(d)(viii) (No Commercial Use) and Section 7.2(d)(ix) (Use of Data), any material not Protected under the Copyright Act.

(xiii)        Costs.  The Registry is not responsible for any costs relating to the use of the Research Corpus, except as specifically set forth in Section 8.2(c) (Audits).

(e)        Required Library Services Requirement.

(i)        Obligation.  Google will provide the following services listed in clauses (1) and (2) below (together, "Required Library Services") by no later than five (5) years from the Effective Date:

(1)        For eighty-five percent (85%) of Library Scans other than (a) Not Counted Library Works and (b) Display Books, free search services Online through Google Products and Services (including Preview Use or Snippet Display if permitted under this Agreement) and a Library Link; and

(2)        For eighty-five percent (85%) of Library Scans other than (a) Not Counted Library Works, (b) No Display Books, and (c) Library Scans that are not authorized to be included in Institutional Subscriptions pursuant to the terms of this Amended Settlement Agreement, free search services Online through Google Products and Services (including Preview Use or Snippet Display if permitted under this Agreement), a Library Link, the Public Access Service, and Institutional Subscription for Higher Education Institutions.

(ii)       <u>Third-Party Required Library Services Provider</u>.  If Google fails to meet the Required Library Services Requirement, or if Google gives notice to the Registry, the Fully Participating Libraries and the Cooperating Libraries of its intent not to meet the Required Library Services Requirement at any time after the Effective Date, and does not cure this failure within ninety (90) days after notice from the Fully Participating Libraries and the Cooperating Libraries invoking this provision, acting through the Designated Representative, then the Fully Participating Libraries and the Cooperating Libraries, or the Registry, may seek to engage one or more third parties (each, a "<u>Third-Party Required Library Services Provider</u>") to provide any or all of the Required Library Services (provided that, at a minimum, the Third-Party Required Library Services Provider provides at least one of the Required Library Services not provided by Google that caused the foregoing right to use a Third-Party Required Library Services Provider to be triggered) on substantially the same terms described in this Amended Settlement Agreement.  Any such arrangement will be subject to the consent of each of (1) the Registry and (2) the Fully Participating Libraries and the Cooperating Libraries, acting through the Designated Representative, which consents shall not be unreasonably withheld or delayed.  If a Third-Party Required Library Services Provider is identified and the foregoing required consents are obtained, then Google will provide such Third-Party Required Library Services Provider with a Digital Copy of Library Scans (excluding particular Library Scans that are restricted from further distribution under the Digitization Agreement between Google and a Fully Participating Library or a Cooperating Library) to be used solely to provide Required Library Services (as such Required Library Services may evolve over time) in accordance with the terms of this Amended Settlement Agreement and the terms of Google's Digitization Agreements with each of the Fully Participating Libraries and the Cooperating Libraries. If, within one hundred and twenty (120) days after the Fully Participating Libraries and the Cooperating Libraries invoke this provision following such failure by Google, a Third-Party Required Library Services Provider has not been agreed upon, then the Fully Participating Libraries and the Cooperating Libraries, if they wish, may continue to attempt to engage a Third-Party Required Library Services Provider in the manner described above or may elect to provide the Required Library Services themselves.  Any such self-provision shall be subject to the applicable terms of this Amended Settlement Agreement and to the Registry's approval, which approval shall not be unreasonably withheld or delayed.  In any event, the Fully Participating Libraries may continue to use their LDCs in accordance with Section 7.2(b) (Use of Library Digital Copies), Non-Consumptive Research may continue to be conducted using the Research Corpus in accordance with the provisions of Section 7.2(d) (Research Corpus), and the requirement that the Fully

109

Participating Libraries and the Host Sites comply with the Security Standard in Article VIII (Security and Breach) will continue to be in effect. Any Third-Party Required Library Services Provider is, in connection with any Claim arising out of its providing any or all of the Required Library Services, deemed to be a successor of Google for purposes of Section 10.1(g) (Google Releasees).

(iii)    <u>Reporting</u>.  Upon request by the Fully Participating Libraries and the Cooperating Libraries, Google will provide such libraries with reasonable information regarding the number of Library Scans and the Required Library Services being provided by Google to determine Google's compliance with the standard set forth in Section 7.2(e)(i) (Obligation).

(iv)    <u>Exercise or Waiver of Rights</u>.  The Fully Participating Libraries and the Cooperating Libraries may exercise their rights under this Section 7.2(e) (Required Library Services Requirement) or may consent to any agreement between Google and the Registry to waive the Required Library Services Requirement as to all Library Scans, acting through the Designated Representative.  Further, the Fully Participating Libraries and the Cooperating Libraries may exercise their rights under Section 3.7(c) (Additional Contemplated Rightsholder Services Provider) with respect to Contemplated Rightsholder Services or may consent to any agreement between Google and the Registry to waive Google's obligation to provide Contemplated Rightsholder Services as to all Library Scans, acting through the Designated Representative.

(f)    <u>Third-Party Beneficiary</u>.

(i)    <u>Fully Participating Libraries</u>.  With respect to the use of Books and Inserts, the Library-Registry (Fully Participating) Agreement will bind a Fully Participating Library only with respect to the LDC.  Plaintiffs and Google acknowledge and agree that each such Fully Participating Library is a third-party beneficiary of the following provisions of this <u>Amended</u> Settlement Agreement, entitled to enforce such provisions directly, as if such Fully Participating Library were a party hereto:  (i) Article X (Releases) (as applicable to Fully Participating Libraries) and (ii) the terms of Sections ~~1.28~~<u>1.31</u> (Commercially Available), 3.2(d)(iii) (Mistakes), 3.5(a)(ii) (Back-up Storage), 3.5(b)(i)(1) (Exclusion from Library Digital Copy), 3.5(b)(iii) (Coupling Requirement), 3.5(b)(v) (Waiver of Coupling Requirement), 3.7(c) (Additional Contemplated Rightsholder Services

110

Provider), 3.7(e)(i) (Digital Copy of Excluded Books), 4.1(d) (Basic Features of Institutional Subscriptions), 4.1(e) (Institutional Subscription Terms and Conditions), 4.1(f) (Subscriber Experience), 6.2(a) (Not-For-Profit Entity), 6.3 (Unclaimed and Public Domain Funds), 6.5(b) (Data for Fully Participating Libraries) and 17.14 (No Liability for Consequential Damages) and Articles VII (Fully Participating Library and Cooperating Library Rights and Obligations) and VIII (Security and Breach).  Any action to enforce any such provision that arises out of the same facts or breach brought by one or more Fully Participating Libraries and, pursuant to Section 7.2(f)(ii) (Cooperating Libraries), one or more Cooperating Libraries, must be brought by all such libraries as a single consolidated action, to the extent that such consolidation is permitted by the Court or Arbitrator, with one such Fully Participating Library or Cooperating Library, and/or one counsel for all the libraries bringing such action, having primary responsibility for communicating with the party or parties against which the action is brought.

(ii)      Cooperating Libraries.  Plaintiffs acknowledge and agree that each Cooperating Library is a third-party beneficiary of the following provisions of this Amended Settlement Agreement, entitled to enforce such provisions directly, as if such Cooperating Library were a party hereto:  (i) Article X (Releases) (as applicable to Cooperating Libraries) and (ii) the terms of Sections 1.281.31 (Commercially Available), 3.2(d)(iii) (Mistakes), 3.5(b)(iii) (Coupling Requirement), 3.5(b)(v) (Waiver of Coupling Requirement), 3.7(c) (Additional Contemplated Rightsholder Services Provider), 3.7(e)(i) (Digital Copy of Excluded Books), 4.1(d) (Basic Features of Institutional Subscriptions), 4.1(e) (Institutional Subscription Terms and Conditions), 4.1(f) (Subscriber Experience), 6.2(a) (Not-For-Profit Entity), 6.3 (Unclaimed Funds and Public Domain Funds), and 17.14 (No Liability for Consequential Damages) and Article VII (Fully Participating Library and Cooperating Library Rights and Obligations).  Any action to enforce any such provision that arises out of the same facts or breach brought by one or more Cooperating Libraries and, pursuant to Section 7.2(f)(i) (Fully Participating Libraries), one or more Fully Participating Libraries, must be brought by all such libraries as a single consolidated action, to the extent such consolidation is permitted by the Court or Arbitrator, with one such Cooperating Library or Fully Participating Library, and/or one counsel for all the libraries bringing such action, having primary responsibility for communicating with the party or parties against which the action is brought.

(iii)      Failure to Comply.  No failure by a Fully Participating Library or a Cooperating Library to comply with its Library-Registry Agreement will affect such library's third-party beneficiary rights specified

111

in Section 7.2(f)(i) (Fully Participating Libraries) and Section 7.2(f)(ii) (Cooperating Libraries), respectively.

(iv)     <u>No Modification Without Consent</u>.  None of the provisions set forth in paragraphs (i) - (iii) above, this paragraph (iv), or the provisions referred to therein as to which the Fully Participating Libraries or the Cooperating Libraries, as applicable, are express third-party beneficiaries may be modified or amended in a way that negatively affects the interests of the Fully Participating Libraries or the Cooperating Libraries, as applicable, without their agreement, acting through the Designated Representative.  In addition, the provisions of Sections 2.2 (Authorization of Google, Fully Participating Libraries and Cooperating Libraries), 3.1(a) (Non-Exclusive Digitization Rights), 4.1(a)(i) (Objectives) and 6.6 (d) (Claimed Books to be Public) may not be modified or amended in a way that negatively affects the interests of the Fully Participating Libraries or the Cooperating Libraries without the agreement of the Fully Participating Libraries and the Cooperating Libraries, as applicable, acting through the Designated Representative.

(v)     <u>Related Agreements with Google</u>.  Each Fully Participating Library and each Cooperating Library also may enter into a separate agreement with Google (or an amendment to its current Digitization Agreement with Google) setting forth other agreements between them relating to this Amended Settlement Agreement, including agreements, if any, setting forth which provisions of this Amended Settlement Agreement Google is required to enforce (which provisions may be publicized by Google and/or such Fully Participating Library or Cooperating Library); provided, however, that no such amendment or other agreement will permit any Fully Participating Library to make any uses of its LDC that are prohibited by its Library-Registry (Fully Participating) Agreement or by this Amended Settlement Agreement.

(g)     <u>Accommodated Service</u>.

(i)     <u>Definition</u>.  "<u>Accommodated Service</u>" means a service that offers the text of Books to users of Access Uses and other Revenue Models in the form of electronic text used in conjunction with screen enlargement, voice output, and refreshable Braille displays, or, at Google's option and with the Registry's approval, other technologies to reasonably accommodate Print Disabilities, at no greater charge than the charge to view

112

Books in a similar manner to users of Access Uses and other Revenue Models without a Print Disability.

(ii)     <u>Google Intention</u>.  Google intends to make Digital Copies of Books and Inserts accessible to users with Print Disabilities consistent with Section 3.3(d) (Accommodation of Print Disabilities).  To the extent that Google is unable to make Books and Inserts accessible as set out in Section 7.2(g)(ii)(1) (Offering of Accommodated Service), Google will reasonably cooperate to enable access to Books and Inserts pursuant to Section 7.2(g)(ii)(2) (Alternative Accommodated Service Provider).

(1)     <u>Offering of Accommodated Service</u>.  To satisfy the requirements of this Section 7.2(g) (Accommodated Service), Google must (a) use commercially reasonable efforts to enable an Accommodated Service for Books and Inserts for Access Uses and other Revenue Models as authorized under this <u>Amended</u> Settlement Agreement; (b) for users of the Institutional Subscription with Print Disabilities, offer an Accommodated Service for all Books and Inserts in the Institutional Subscription Database for which Google's automated OCR system is successful; and (c) not unreasonably withhold its consent to a request from a Fully Participating Library to work with particular third-party contractors to provide access to the full text of Books and Inserts as described in this Section 7.2(g) (Accommodated Service) and to improve the quality of such Books (*e.g.*, OCR quality and structure extraction) for the purpose of providing such access.  In order to develop the Accommodated Service, Google may work with any third parties to provide access to the full text of Books and Inserts as described in this Section 7.2(g)(ii)(1) (Offering of Accommodated Service), and to improve the quality of such Books (*e.g.*, OCR quality and structure extraction) for the purpose of providing such access.  The third-party contractors working with Google in such efforts shall not otherwise be permitted to use or distribute such Books or Inserts and, when such efforts are completed, shall return any such Books and Inserts to Google and delete all copies of any such Books and Inserts that have been provided by Google or created by any such third-party contractors in the course of such efforts.

(2)     <u>Alternative Accommodated Service Provider</u>.

a)     <u>Identification of Alternative Accommodated Service Provider</u>.  If, within five (5) years from the Effective Date,

Google has not complied with Section 7.2(g)(ii)(1) (Offering of Accommodated Service), or if, following such five (5)-year period, Google ceases to comply with Section 7.2(g)(ii)(1) (Offering of Accommodated Service), then, upon notice to Google and the Registry by the Fully Participating Libraries and the Cooperating Libraries acting through the Designated Representative, Google shall use commercially reasonable efforts to identify and work with an alternative provider (the "<u>Alternative Accommodated Service Provider</u>") to readily provide copies of Books and Inserts requested by the Alternative Accommodated Service Provider solely for the purpose of the Alternative Accommodated Service Provider making Digital Copies of these Books and Inserts accessible to users with Print Disabilities.

b) <u>Agreement With Alternative Accommodated Service Provider</u>.  The Alternative Accommodated Service Provider will enter into an agreement with Google and the Registry that includes terms protecting the security of the Books and Inserts, terms similar to those contained in Section 7.2(b)(ii) (Users with Print Disabilities) and terms that require the Alternative Accommodated Service Provider to make available to users with Print Disabilities the services of an "authorized entity" within the meaning of 17 U.S.C. § 121.  The terms of any such agreements shall be made available to the Designated Representative.

7.3    <u>Google's Obligations</u>.

(a)    <u>Notification of Libraries</u>.  Google will notify each library providing Books to Google as part of the GLP pursuant to a Digitization Agreement of the requirements to become a Fully Participating Library if it wishes to have a LDC, and will use commercially reasonable efforts to obtain such library's agreement to enter into the Library-Registry (Fully Participating) Agreement and become a Fully Participating Library.

(b)    <u>Breach By Participating or Cooperating Libraries</u>. Google will reasonably cooperate with the Rightsholders and/or the Registry in connection with any material breach by a Fully Participating Library or a Cooperating Library of its Library-Registry Agreement or the terms of this <u>Amended</u> Settlement Agreement

applicable to such Fully Participating Library or Cooperating Library; provided, however, that Google is not required to disclose confidential or personally identifiable information other than as required by law or valid legal process.

7.4     Fully Participating Libraries' and Cooperating Libraries' Exercise of Collective Rights.

(a)     Designated Representative and Security Representatives.

(i)     Role.  To the extent that Sections 3.5(b)(v) (Waiver of Coupling Requirement), 3.7(c) (Additional Contemplated Rightsholder Services Provider), 6.3(a) (Unclaimed Funds), 7.2(d)(ii) (Host Sites), 7.2(e)(ii) (Third-Party Required Library Services Provider), 7.2(e)(iv) (Exercise or Waiver of Rights), 7.2(f)(iv) (No Modification Without Consent), 7.2(g)(ii)(2) (Alternative Accommodated Service Provider), 7.5 (Meetings to Discuss Library Uses) and 8.2(b) (Changes to Security Standard) contemplate that any Fully Participating Library or Cooperating Library may exercise rights or waive rights acting through the Designated Representative or Security Representatives, such library may do so only by acting through the Designated Representative or Security Representatives, as applicable.  Google and the Registry, in dealing with the Fully Participating Libraries and the Cooperating Libraries, are obligated to accept instructions, decisions and positions only from such Designated Representative or Security Representatives, as applicable, regarding such matters.  Google and the Registry may rely on instructions, decisions and positions provided to Google and the Registry by the Designated Representative or Security Representatives, as applicable.  All Fully Participating Libraries and all Cooperating Libraries shall be bound by the instructions, decisions and positions conveyed to Google and the Registry by the Designated Representative or Security Representatives, as applicable, regarding all matters referenced in the Sections set forth in the first sentence of this Section 7.4(a) (Designated Representative and Security Representatives).

(ii)     Selection and Failure to Select.  The Fully Participating Libraries and the Cooperating Libraries shall select a Designated Representative within thirty (30) days after the Effective Date, and the Fully Participating Libraries shall select Security Representatives by the two (2)-year anniversary of the Effective Date.  If, after the date set for the

115

appointment of the initial Designated Representative or of the initial Security Representatives, as the case may be, the Registry or Google requests the consent, waiver or agreement of the Designated Representative or of the Security Representatives, as the case may be, and if the Designated Representative or Security Representatives, as the case may be, fail to respond (whether due to failure to have been appointed or otherwise) to such request within sixty (60) days, then the Registry or Google, as the case may be, may extend such sixty (60)-day period or, if not extended, may proceed as if such consent, waiver or agreement had been given; provided that, the Registry or Google, as the case may be, will give ten (10) days' prior notice of its intent to proceed unless the Designated Representative or Security Representatives, as the case may be, respond within such ten (10)-day period. Any such request shall be made in writing by Google or the Registry to the Designated Representative or the Security Representatives, as the case may be, if so appointed at the time. However, if the Registry makes such a request of the Designated Representative or the Security Representatives, and no Designated Representative or Security Representatives, as the case may be, have been appointed at the time, then the Registry may direct such request to Google. Any such request directed to Google satisfies the foregoing expectation that the Registry will deal with the Designated Representative or Security Representatives, as the case may be. In addition, to the extent Google provides instructions, decisions or positions in response to such request, the Registry's obligation to accept instructions, decisions and positions only from the Designated Representative or the Security Representatives, as the case may be, is fulfilled; provided that if Google fails to respond to such request within sixty (60) days, then the Registry may extend such sixty (60)-day period or, if not extended, may proceed as if such consent, waiver or agreement had been given.

(b)      Notification of Identity.  One of the Fully Participating Libraries or the Cooperating Libraries will notify Google and the Registry of the initial Designated Representative and one of the Fully Participating Libraries will notify Google and the Registry of the initial Security Representatives by written notice, which written notice shall be signed on behalf of (but not necessarily by) all Fully Participating Libraries and Cooperating Libraries in the case of the Designated Representative, or on behalf of (but not necessarily by) all Fully Participating Libraries in the case of the Security Representatives.  Any changes in the identity of the Designated Representative or Security Representatives shall be communicated promptly to Google and the Registry by one of the Fully Participating Libraries, by one of the Cooperating Libraries or

116

by the existing or previous Designated Representative or an existing or previous Security Representative, as applicable.

(c)    Authority.  The Designated Representative will not have independent authority to make decisions on behalf of the Fully Participating Libraries and/or the Cooperating Libraries, as the case may be, but will, instead, convey to Google and/or the Registry, as applicable, instructions, decisions and positions of the Fully Participating Libraries and the Cooperating Libraries on matters as referred to in Section 7.4(a) (Designated Representative and Security Representatives).

(d)    Revocation of Instructions, Decisions and Positions.  If any Fully Participating Library or Cooperating Library believes that the Designated Representative, or if any Fully Participating Library believes that the Security Representatives, have conveyed to Google and/or the Registry any instructions, decisions or positions of the Fully Participating Libraries and/or the Cooperating Libraries, as the case may be, that had not been agreed upon in accordance with the governance rules established pursuant to Attachment 1 to Exhibit C of the Library-Registry (Fully Participating) Agreement and Attachment 1 to Exhibit C of the Library-Registry (Cooperating) Agreement (Selection of Designated Representative and Security Representatives and Establishment of Governance Rules), then such Fully Participating Library or Cooperating Library in the case of instructions, decisions or positions of the Designated Representative, or such Fully Participating Library in the case of instructions, decisions or positions of the Security Representatives, may countermand such instruction, decision or position in writing to Google and/or the Registry, as applicable, and Google and/or the Registry, as applicable, will, only if it has not yet acted upon such instruction, decision or position, delay acting upon such instruction, decision or position unless and until the Designated Representative or Security Representatives, as applicable, re-affirms such instruction, decision or position to Google and/or the Registry, as applicable.

(e)    Selection Process and Establishment of Governance Rules.  Attachment 1 to Exhibit C of the Library-Registry (Fully Participating) Agreement and Attachment 1 to Exhibit C of the Library-Registry (Cooperating) Agreement

117

(Selection of Designated Representative and Security Representatives and Establishment of Governance Rules) establishes the process for selecting the Designated Representative and Security Representatives and for establishing governance rules among the Fully Participating Libraries and the Cooperating Libraries.

7.5     Meetings to Discuss Library Uses.

(a)     Operational Matters.  The Registry, Google and the Fully Participating Libraries will meet from time to time as mutually agreed to discuss operational matters regarding the applicable Library-Registry (Fully Participating) Agreements, and the provisions of this Amended Settlement Agreement that are applicable to Fully Participating Libraries, including the communication of requests from Fully Participating Libraries to Rightsholders regarding uses of LDCs, communication of information to Fully Participating Libraries required for them to implement this Amended Settlement Agreement and the applicable Library-Registry (Fully Participating) Agreements (*e.g.*, the Commercial Availability status), and how the Fully Participating Libraries are using the LDC for personal scholarly and classroom purposes, as authorized by Section 7.2(b)(vii) (Personal Scholarly Use and Classroom Use).

(b)     Establishing Standards.  Within six (6) months after the Effective Date, the Registry and the Fully Participating Libraries, acting through the Designated Representative, will establish reasonable uniform standards for the Fully Participating Libraries' maintenance of records, submissions to the auditor and reports to and notifications of the Registry of uses (i) authorized pursuant to Section 7.2(b)(vi) (Use for Non-Consumptive Research), (ii) authorized pursuant to Section 7.2(b)(vii) (Personal Scholarly Use and Classroom Use), and (iii) made pursuant to the proviso in Section 7.2(c)(ii), and for the auditing of such uses.  Such standards will provide that the maintenance of records, the submissions to the auditor and reports to and notifications of the Registry include, at a minimum, the following information:  (1) the name of the Fully Participating Library; (2) with respect to Section 7.17.2(b)(vi) (Use for Non-Consumptive Research), the same information that Host Sites are obligated to maintain and report to the auditor pursuant to Section 7.2(d) (Research Corpus); and (3) with respect to uses made pursuant to Section 7.2(b)(vii) (Personal Scholarly Use and

118

Classroom Use) and the proviso in Section 7.2(c)(ii), for each Book used by the Fully Participating Library, the title and author of the Book, a description of the type of use made of the Book, and the amount of pages of the Book used.  Such standards, and any template used by the Fully Participating Libraries to maintain, submit to the auditor and report to and notify the Registry of such information, will be attached to each Library-Registry (Fully Participating) Agreement. Without limiting the foregoing, neither the Registry nor the Fully Participating Libraries, acting through the Designated Representative, shall unreasonably delay discussions on, or unreasonably withhold agreement to, such standards; provided, however, that if the Designated Representative unreasonably fails to discuss or agree to such standards, the Registry may establish such standards for the Fully Participating Libraries that are consistent with this Section 7.5(b) (Establishing Standards); provided, however, that the Fully Participating Libraries, acting through the Designated Representative, may, in lieu of complying with such standards established by the Registry, invoke an arbitration pursuant to Article IX (Dispute Resolution) in which the Arbitrator would establish, on a de novo basis, reasonable standards that are consistent with this Section 7.5(b) (Establishing Standards); pending the Arbitrator's Decision, the Fully Participating Libraries will provide at least the minimum information set forth in the second sentence of this Section 7.5(b) (Establishing Standards).

7.6     When Fully Participating Libraries, Cooperating Libraries and Public Domain Libraries are Bound.  Notwithstanding anything to the contrary in this Amended Settlement Agreement, no Fully Participating Library, Cooperating Library or Public Domain Library is bound by any provision of this Amended Settlement Agreement; rather, each Fully Participating Library's, Cooperating Library's and Public Domain Library's rights and obligations are as set forth in the applicable Library-Registry Agreement and no library has any rights or obligations as a third-party beneficiary under this Amended Settlement Agreement unless and until it enters into a Library-Registry Agreement and becomes a Fully Participating Library or a Cooperating Library.

ARTICLE VIII — **SECURITY AND BREACH**

8.1     Obligations of Google, the Fully Participating Libraries and the Host Sites. Google, each Fully Participating Library and each Host Site shall be responsible for the security of Digital Copies of Books and any LDC (and, in the case of a Host Site, the Research Corpus) in accordance with this Article VIII (Security and Breach) while any

119

such Digital Copies and any LDC (and, in the case of a Host Site, the Research Corpus) are in the possession, custody or control of such entity.

    8.2    <u>Security Standard, Security Implementation Plan and Security Audits</u>.

        (a)        <u>Security Implementation Plan</u>.

        (i)        <u>Compliance</u>.  At all times, Google, each Fully Participating Library and each Host Site shall comply with its own, then-in-effect Security Implementation Plan.

        (ii)        <u>Initial Security Implementation Plan</u>.  Google, each Fully Participating Library and each Host Site shall formulate an initial Security Implementation Plan that meets the requirements of the Security Standard and shall implement such initial Security Implementation Plan promptly on or before the Effective Date.  After the Effective Date, until it submits to the Registry and implements an initial Security Implementation Plan (a) Google shall not make any Display Uses, other than Snippet Display of a Display Book, except as authorized by the Rightsholder or the Registry, (b) a Fully Participating Library shall not make any uses of its LDC or receive an LDC from Google, and (c) Google shall not provide a Host Site with a Research Corpus.

        (iii)        <u>Revised Security Implementation Plan</u>.  Google, each Fully Participating Library and each Host Site may revise its Security Implementation Plan from time to time and, if it does so, shall implement such revised Security Implementation Plan.

        (iv)        <u>Approval of Security Implementation Plan</u>.  Google, each Fully Participating Library and each Host Site shall submit its initial and any revised Security Implementation Plan to the Registry.  The Registry shall review such Security Implementation Plan.  Within sixty (60) days after such submission, the Registry will (1) approve such Security Implementation Plan, (2) notify Google, the Fully Participating Library or the Host Site, as applicable, that the Registry reasonably believes that any such Security Implementation Plan does not meet the requirements of the Security Standard, citing specific reasons for such belief, or (3) notify Google, the Fully Participating Library or the Host Site, as applicable, that the Registry requires additional time for such review for good cause, the reason therefor, and the date by which the Registry will respond, which additional time shall,

120

in any event, not exceed sixty (60) additional days; provided, however, that if the Registry does not provide such notice, the Security Implementation Plan shall be deemed to be approved. Google, the Fully Participating Library or the Host Site, as applicable, if it determines to implement a new or revised security plan, shall respond to any notice given under clause (2) above within sixty (60) days, either by amending its Security Implementation Plan or by explaining in writing how its Security Implementation Plan meets the requirements of the Security Standard. Any disputes related thereto shall be resolved pursuant to Article IX (Dispute Resolution).

(b)     Changes to Security Standard. Every two (2) years after the Effective Date during the term of this Amended Settlement Agreement, upon the Registry's written request, Google, the Registry and up to a total of four (4) representatives on behalf of the Fully Participating Libraries (which four (4) representatives may include a representative of the Host Sites, at the option of the Fully Participating Libraries acting through the Designated Representative, and shall be selected in the manner set forth in Attachment 1 (Selection of Designated Representative and Security Representatives and Establishment of Governance Rules) to Exhibit C of the Library-Registry (Fully Participating) Agreement and are defined therein as the "Security Representatives") will review and, if necessary, revise the Security Standard to take account of technological developments, including new threats to security, and will agree on a schedule for implementation of any changes in the Security Standard. This procedure is not intended to alter the relative obligations of Google, the Registry, the Fully Participating Libraries and the Host Sites under this Amended Settlement Agreement or analogous provisions incorporated into the Library-Registry (Fully Participating) Agreement or Host Site-Registry Agreement, as applicable, but to allow for changes in technology. To the extent possible, any such revisions to the Security Standard will not require drastic changes, substantial unreasonable additional costs, or new technology. If they are unable to agree upon changes, Google, the Registry and the Security Representatives shall resolve the dispute pursuant to Article IX (Dispute Resolution). The Fully Participating Libraries may change the Security Representatives for any reason, in the manner set forth in Attachment 1 to Exhibit C of the Library-Registry (Fully Participating) Agreement (Selection of Designated Representative and Security Representatives and Establishment of Governance Rules). Notwithstanding the foregoing, if the Fully Participating Libraries fail to designate any representatives by the two (2)-year

anniversary of the Effective Date, thereafter, if, and for so long as, the Fully Participating Libraries have failed to select Security Representatives, Google and the Registry may agree to revisions to the Security Standard or, if they are unable to agree, then Google and the Registry shall resolve the dispute pursuant to Article IX (Dispute Resolution).

(c)        Audits.

(i)        Audited Parties.  Google, each Fully Participating Library and each Host Site (each, an "Audited Party") will permit a mutually agreeable third party to conduct annual audits (or, if reasonably necessary, then semi-annual audits) of its security and usage to verify compliance with the Audited Party's then-in-effect Security Implementation Plan.  The auditor will be subject to a reasonable non-disclosure agreement (an "NDA") provided by the Audited Party that protects the Audited Party's confidential information.  The auditor may provide a report of the audit to the Registry that the Audited Party is permitted to review in advance of its disclosure to ensure that no trade secrets or other proprietary information is disclosed by the auditors in the report.  Such audit shall be conducted on reasonable prior notice on a date and at a time that is mutually agreed with the Audited Party and shall be conducted during the Audited Party's normal business hours.

(ii)        Share of Audit Costs.  Google and the Registry will share equally the Registry's out-of-pocket costs of conducting audits of the Audited Parties, subject to the following limits:

(1)        If there are a total of twenty-five (25) or fewer Host Sites and Fully Participating Library locations at which LDCs are located, Google's share will not exceed two hundred thousand United States dollars (U.S. $200,000) for such costs incurred during a calendar year;

(2)        For every additional ten (10) locations that are Host Sites and at which LDCs are located, Google's share shall increase by one hundred thousand United States dollars (U.S. $100,000) for such costs incurred during a calendar year.  Google shall be obligated to pay such one hundred thousand United States dollars (U.S. $100,000) toward such incurred costs when the first Fully Participating Library or Host Site over the previous group of ten (10) Fully Participating Libraries and Host Sites

122

signs a Library-Registry (Fully Participating) Agreement or Host Site-Registry Agreement (*i.e.*, the 26th, 36th, 46th, etc. Fully Participating Library or Host Site).

(iii)      Adjustment to Audit Costs.  The limits set forth in Section 8.2(c)(ii) (Share of Audit Costs) shall be adjusted as of January 1 of each year to that amount which is equal to the product obtained by multiplying (1) the amount specified, by (2) a fraction, the numerator of which is the Consumer Price Index published for the immediately preceding year and the denominator of which is the Consumer Price Index published for 2008.  The term "Consumer Price Index" means the "Consumer Price Index, for All Urban Consumers, Subgroup "All Items" (Base Year 1982-84=100)," which is, as of the Amended Settlement Agreement Date, published by the United States Department of Labor, Bureau of Labor Statistics.  If, however, the Consumer Price Index is changed so that the base year is altered from that used as of the Amended Settlement Agreement Date, then the Consumer Price Index shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics, to obtain the same results that would have been obtained had the base year not been changed.  If no conversion factor is available or if the Consumer Price Index is otherwise changed, revised or discontinued for any reason, there shall be substituted in lieu thereof and the term "Consumer Price Index" as used in this Amended Settlement Agreement shall thereafter refer to the most nearly comparable official price index of the United States Government to obtain substantially the same result as would have been obtained had the original Consumer Price Index not been changed, revised or discontinued, which alternative index shall be selected by Google and shall be subject to the Registry's reasonable approval.

(iv)      No Carry Forward.  If Google's share of the Registry's out-of-pocket costs incurred in conducting audits for any calendar year does not exceed the limits set forth in Section 8.2(c)(ii) (Share of Audit Costs), then any difference between Google's actual contribution toward such costs and such limits may not be carried forward to future years.

(v)      Use of LDC for Non-Consumptive Research.  If the use by one or more Fully Participating Libraries, other than any Fully Participating Libraries that are Host Sites, Hosting Fully Participating Libraries or Requesting Fully Participating Libraries, of its or their LDCs for Non-Consumptive Research pursuant to Section 7.2(b)(vi) (Use for Non-Consumptive Research) results in any additional out-of-pocket costs to the

123

Registry of conducting audits of such Fully Participating Libraries, beyond the costs of conducting audits at Fully Participating Libraries that do not make such use of their LDCs, then the Fully Participating Libraries that use their LDCs for such purposes shall bear all such additional costs to the extent reasonable.

8.3     Breaches – General Principles.

(a)     Notification of Registry by Google, Fully Participating Library or Host Site; Cure. If Google, a Fully Participating Library or a Host Site becomes aware of (i) a breach of its then-in-effect Security Implementation Plan, other than an Inconsequential Breach, (ii) in the case of Google, a breach by it of any other provision of this Amended Settlement Agreement resulting in Unauthorized Access, (iii) in the case of a Fully Participating Library or a Host Site, any Prohibited Access, or (iv) any Unauthorized Access by Google, any Prohibited Access by a Fully Participating Library or a Host Site or any Third-Party Unauthorized Access (even if Google, the Fully Participating Library or Host Site, as applicable, has complied with this Amended Settlement Agreement and its then-in-effect Security Implementation Plan), it shall (1) promptly notify the Registry of any such breach, Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access; (2) promptly cure any such breach or block such Unauthorized Access (which may include, in the case of Google, temporary suspension of Display Uses of a Book), Prohibited Access or Third-Party Unauthorized Access, as applicable; (3) if such breach cannot be cured or such Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access blocked promptly, report to the Registry on an on-going basis the status of its efforts to do so; (4) promptly notify and confer with the Registry on ways to prevent any such breach or such Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access, as applicable, from reoccurring; and (5) promptly negotiate with the Registry (in the case of a breach of its then-in-effect Security Implementation Plan) and with the Registry and/or affected Rightsholder(s) (in the case of an Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access), an appropriate monetary remedy, if any, in accordance with Sections 8.4 (Remedies for Breaches of the Security Implementation Plan that Do Not Result in Unauthorized Access or Prohibited Access), 8.5 (Remedies for Breaches Resulting in Unauthorized Access by Google or Prohibited Access by a Fully Participating

124

Library or a Host Site), or 8.6 (Remedies for Security Violations by Third Parties), as applicable. Each Audited Party shall report to the auditor in connection with the audit described in Section 8.2(c) (Audits) all breaches of its then-in-effect Security Implementation Plan that pose a reasonable risk of compromising the security of Digital Copies or of proximately causing any other breaches that are not Inconsequential Breaches.

(b)        Notification of Registry by Rightsholders.  All Rightsholders who wish to make a claim against Google, a Fully Participating Library, and/or a Host Site shall first notify the Registry pursuant to this Amended Settlement Agreement, the Library-Registry (Fully Participating) Agreement and the Host Site-Registry Agreement, respectively.

(c)        Notification of Google, Fully Participating Library or Host Site by Registry.  The Registry promptly shall provide notice to Google, the Fully Participating Library and/or the Host Site, as applicable, of the claimed breach.

(d)        Consolidation of Claims.  If the Registry or a Rightsholder has a claim against Google for breach of any provision of this Article VIII (Security and Breach) or against a Fully Participating Library or a Host Site for breach of the analogous provisions incorporated in the Library-Registry (Fully Participating) Agreement or the Host Site-Registry Agreement, respectively, then, at the option of the allegedly breaching party or the Registry, such claims will be consolidated as set forth below:

(i)        Rightsholder Notice.  Upon the Registry's receipt of a notice sent pursuant to Section 8.3(b) (Notification of Registry by Rightsholders), or if the Registry wishes to, on its own, make a claim against Google, a Fully Participating Library, and/or a Host Site, the Registry shall notify all affected Rightsholders whose Books may be subject to Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access of a claim arising out of a breach of a then-in-effect Security Implementation Plan and, in its discretion, of any other claim of Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access affecting more than one Rightsholder; provided, however, that, with respect to a claim against Google or a Fully Participating Library, for so long

125

as the contents of such notification would reasonably be expected to result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access, then the Registry, in its discretion, may, or at Google's or, in the case of a Fully Participating Library, the Fully Participating Library's request, or in the case of a Host Site, the Host Site's request, shall, delay in providing such notice; and, provided further, that Google or the Fully Participating Library, as applicable, will promptly notify the Registry when notification under this Section 8.3(d)(i) (Rightsholder Notice) would no longer reasonably be expected to result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access.

(ii)  <u>Notification of Same Claims</u>.  Rightsholders will be required to notify the Registry of all claims arising out of the same claimed breach within ninety (90) days of the date of notice to Rightsholders under Section 8.3(d)(i) (Rightsholder Notice), and the Registry shall have ninety (90) days after the end of such ninety (90)-day period to investigate and pursue the claiming Rightsholders' claims for breach, provided that the Registry cannot, absent the approval of an affected Rightsholder, settle such a claim, except that affirmative approval from every affected Rightsholder is not necessary so long as those Rightsholders are given prior notice and an opportunity to be heard if they wish.

(e)  <u>Claim Resolution</u>.  If the Registry does not pursue such claims for breach within the periods specified in Section 8.3(d)(ii) (Notification of Same Claims), a claiming Rightsholder will then have an additional sixty (60) days after the end of such periods to submit the claims for resolution pursuant to Article IX (Dispute Resolution).  If the Registry does pursue such claims within such periods, the Registry shall inform Google, the Fully Participating Library or the Host Site, as applicable, of the responses of Rightsholders and, based on those responses, Google, the Fully Participating Library, or the Host Site, as applicable, shall have the opportunity to negotiate a settlement with the Registry.  Following agreement on a settlement proposal, the Registry will notify the affected Rightsholders of the potential settlement of such claims, and each affected Rightsholder shall have the opportunity to accept or reject the Registry's settlement proposal for such Rightsholder's claim.  Any Rightsholder that rejects the Registry's settlement proposal for his, her or its claim shall have one hundred twenty (120) days after the date of such notice of potential settlement to submit such claim for resolution pursuant to Article IX (Dispute Resolution).

126

(f)  Sole Means.  The procedures set forth in this Section 8.3 (Breaches – General Principles) and in Article IX (Dispute Resolution) shall be the sole means for a Rightsholder to bring a claim arising out of this Article VIII (Security and Breach).

(g)  Remedies.  The monetary damages for any breach of any Security Implementation Plan, or for any breach of this Amended Settlement Agreement resulting in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access would be difficult to approximate and, therefore, the amounts set forth in Sections 8.4 (Remedies for Breaches of the Security Implementation Plan that Do Not Result in Unauthorized Access or Prohibited Access), 8.5 (Remedies for Breaches Resulting in Unauthorized Access by Google or Prohibited Access by a Fully Participating Library or a Host Site) and 8.6 (Remedies for Security Violations by Third Parties), as such amounts may be modified by Section 8.7 (Adjustments to Liability Ranges and Caps), are deemed to be reasonable approximations of such damages and shall not be deemed to be penalties.  Subject to the last sentence of this Section 8.3(g) (Remedies), such monetary remedies (whether or not any damages are awarded) shall be the sole remedy and Google's, each Fully Participating Library's and each Host Site's sole obligation for any such breaches (in addition to injunctive relief to prevent a continuing breach which may be awarded by the Arbitrator pursuant to Article IX (Dispute Resolution)), unless any Fully Participating Library or Host Site elects otherwise pursuant to Section 8.4(d) (Election of Remedies).  With respect to all of the monetary remedies set forth in such Section, the monetary remedies applicable to Host Sites are the same as the monetary remedies applicable to the Fully Participating Libraries for Host Sites that are, or are similar to, Fully Participating Libraries, and the same as the monetary remedies applicable to Google for any other Host Sites (*e.g.*, for any commercial enterprises).  A Host Site's Host Site-Registry Agreement shall specify the monetary remedies applicable to such Host Site.  If a Fully Participating Library uses its LDC for Non-Consumptive Research pursuant to Section 7.2(b)(vi) (Use for Non-Consumptive Research) and either (i) breaches its obligation to notify the Registry of such use pursuant to such Section or (ii) an Arbitrator determines, pursuant to Article IX (Dispute Resolution), that such Fully Participating Library has materially breached its obligation, as set forth in such Section, to comply with the provisions of Section 7.2(d) (Research Corpus) as if such Fully Participating Library were a Host

127

Site and as if the Fully Participating Library's LDC were the Research Corpus, then the Arbitrator may, as a further remedy, if appropriate under the circumstances, determine that such Fully Participating Library may not use its LDC for Non-Consumptive Research; provided, however, that if, to the Registry's or the Arbitrator's reasonable satisfaction, the Fully Participating Library demonstrates subsequently that it is able and intends to so comply, then such Fully Participating Library may use its LDC for Non-Consumptive Research.

8.4     Remedies for Breaches of the Security Implementation Plan that Do Not Result in Unauthorized Access or Prohibited Access.  Monetary remedies for Google's, a Fully Participating Library's or a Host Site's breach of its Security Implementation Plan that does not result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access, are as follows:

(a)     Inconsequential Breach.  If Google, a Fully Participating Library and/or a Host Site has breached its then-in-effect Security Implementation Plan, but such breach constitutes an Inconsequential Breach, then Google, such Fully Participating Library and/or such Host Site, as applicable, will not be responsible for any damages to the Rightsholder or Registry.

(b)     Single or Non-Willful/Intentional Breach of Security Implementation Plan.  If Google, a Fully Participating Library and/or a Host Site has breached its then-in-effect Security Implementation Plan, and such breach is not an Inconsequential Breach and the breaching conduct is not willful or intentional misconduct, then the Registry and the breaching party will negotiate or arbitrate (pursuant to Article IX (Dispute Resolution)) an appropriate monetary remedy, if any, that will be, subject to Section 8.7 (Adjustments to Liability Ranges and Caps), within the range of zero to twenty-five thousand United States dollars (U.S. $0 - $25,000) in the case of Google and zero to twelve thousand five hundred United States dollars (U.S. $0 –$12,500) in the case of a Fully Participating Library, which amounts may depend, among other things, on the type of breach and whether the breaching conduct was reckless conduct.  The breaching party shall pay all such amounts to the Registry.  There will be no monetary remedy for the foregoing breaches described in this Section 8.4(b) (Single or Non-Willful/Intentional Breach of Security Implementation Plan), however, if the breaching party (i) promptly and fully reports the

128

breach to the Registry upon discovery and (ii) cures the breach as expeditiously as practical.

(c)  Repeated or Willful/Intentional Breaches of Security Implementation Plan.  If Google, a Fully Participating Library or a Host Site has breached its then-in-effect Security Implementation Plan, and such breach is not an Inconsequential Breach and either is the second (or more) of the same breach (*i.e.*, the second or more breach with the same root cause) within a six (6)-month period or the breaching conduct is willful or intentional misconduct, then the Registry and the breaching party will negotiate or arbitrate (pursuant to Article IX (Dispute Resolution)) an appropriate monetary remedy, if any, that will be, subject to Section 8.7 (Adjustments to Liability Ranges and Caps), within the range of zero to fifty thousand United States Dollars (U.S. $0 –$50,000) in the case of Google and zero to twenty-five thousand United States dollars (U.S. $0 –$25,000) in the case of a Fully Participating Library, which amounts may depend, among other things, on the number and type of breach and whether the breaching conduct was willful or intentional misconduct.  The breaching party shall pay all such amounts to the Registry.

(d)  Election of Remedies.  Each Fully Participating Library, in its Library-Registry (Fully Participating) Agreement, and each Host Site, in its Host Site-Registry Agreement, must, for all breaches that are subject to this Section 8.4 (Remedies for Breaches of the Security Implementation Plan that Do Not Result in Unauthorized Access or Prohibited Access), make an election to either (i) agree to the monetary remedies specified in Section 8.4(b) (Single or Non-Willful/Intentional Breach of Security Implementation Plan) or 8.4(c) (Repeated or Willful/Intentional Breaches of Security Implementation Plan), or (ii) subject itself to a judicial action or an arbitration pursuant to Article IX (Dispute Resolution) (at the Registry's election) allowing the Registry to seek all available remedies in equity and at law.

8.5  Remedies for Breaches Resulting in Unauthorized Access by Google or Prohibited Access by a Fully Participating Library or a Host Site.  Monetary remedies for breaches of this Amended Settlement Agreement by Google, a Fully Participating Library or a Host Site, or the Library-Registry (Fully Participating) Agreement or Host Site-Registry Agreement, as applicable, including breaches of its then-in-effect Security

Implementation Plan that result in Unauthorized Access (in the case of Google) or Prohibited Access (in the case of a Fully Participating Library or a Host Site) are as follows; provided, however, that if such then-in-effect Security Implementation Plan was not yet approved by the Registry and such Unauthorized Access or Prohibited Access is a proximate result of an element of such then-in-effect Security Implementation Plan that is determined not to meet the requirements of the Security Standard, then the provisions of Section 8.5(b) (Reckless, Willful or Intentional Misconduct) shall apply and not the provisions of Section 8.5(a) (Inadvertent and Negligent Conduct), unless Google, the Fully Participating Library, or the Host Site, as applicable, demonstrates to the Arbitrator that its implementing of such then-in-effect Security Implementation Plan, including the element in issue, was not reckless.

               (a)        **Inadvertent and Negligent Conduct**. If Google, a Fully Participating Library or a Host Site has inadvertently or negligently breached this Amended Settlement Agreement resulting in Unauthorized Access (in the case of Google) or breached this Amended Settlement Agreement, the Library-Registry (Participating) Agreement or the Host Site-Registry Agreement resulting in Prohibited Access (in the case of a Fully Participating Library or a Host Site), then the Registry and/or the affected Rightsholders, in accordance with Section 8.3(d) (Consolidation of Claims), and the breaching party will negotiate or arbitrate (pursuant to Article IX (Dispute Resolution)) an appropriate monetary remedy, if any, that will be limited to actual damages. Notwithstanding the foregoing, neither Google, nor a Fully Participating Library nor any Host Site will be responsible for any damages from such Unauthorized Access or Prohibited Access, as applicable, if (i) Google has complied with the process for determining whether a book is in the public domain under the Copyright Act in the United States under Section 3.2(d)(v) (Safe Harbor Public Domain Determination) and, despite such compliance, has mistakenly identified one or more Books as being in the public domain under the Copyright Act in the United States, resulting in such Unauthorized Access or Prohibited Access, as applicable, (ii) Google, a Fully Participating Library or a Host Site has relied on incorrect or incomplete information provided by the Registry and that incorrect or incomplete information caused the Unauthorized Access or Prohibited Access, as applicable, or (iii) the Unauthorized Access or Prohibited Access occurred as a result of reasons beyond the control of Google, the Fully Participating Library or the Host Site, as applicable. In any of the cases set forth in clauses (i)-(iii) above, each breaching party shall cure the breach as expeditiously as practical. Aggregate damages recoverable by Rightsholders for all claims under this Section 8.5(a) (Inadvertent and

Negligent Conduct) from a single incident of such breach (*i.e.*, all breaches resulting from the same root cause) shall be, subject to Section 8.7 (Adjustments to Liability Ranges and Caps), in the case of Google, ten million United States dollars (U.S. $10 million) and, in the case of a Fully Participating Library, three hundred thousand United States dollars (U.S. $300,000).

(b)      Reckless, Willful or Intentional Misconduct.  If Google, a Fully Participating Library or a Host Site has breached this Amended Settlement Agreement resulting in Unauthorized Access (in the case of Google) or Prohibited Access (in the case of a Fully Participating Library or a Host Site), and the breaching conduct was reckless or was willful or intentional misconduct, then the Registry and/or the affected Rightsholders, in accordance with Section 8.3(d) (Consolidation of Claims), and the breaching party will negotiate or arbitrate (pursuant to Article IX (Dispute Resolution)) an appropriate monetary remedy, if any, which will attempt to approximate actual damages for such breach.  Such damages may be in the range beginning with zero and up to the statutory damages available to the affected Rightsholders under Section 504 of the Copyright Act. Aggregate damages recoverable by Rightsholders for all claims resulting from a single incident of such breach (*i.e.*, all breaches resulting from the same root cause) described in this Section 8.5(b) (Reckless, Willful or Intentional Misconduct) shall be, subject to Section 8.7 (Adjustments to Liability Ranges and Caps), in the case of Google, forty million United States dollars (U.S. $40 million) if the breaching conduct was reckless, and fifty million United States dollars (U.S. $50 million) if the breaching conduct was willful or intentional misconduct, and, in the case of a Fully Participating Library, five million United States dollars (U.S. $5 million) if the breaching conduct was reckless and seven and one-half million United States dollars (U.S. $7.5 million) if the breaching conduct was willful or intentional misconduct.

8.6      Remedies for Security Violations by Third Parties.  Remedies for security violations by a third party are as follows:

(a)      Compliance with Security Implementation Plan. If, due to a security failure, a third party violates Google's, a Fully Participating Library's or a Host Site's security and obtains Third-Party Unauthorized Access, and such Third-Party Unauthorized Access does not result from the failure of Google, such Fully

Participating Library, or such Host Site, as applicable, to comply with its then-in-effect Security Implementation Plan, then neither Google, nor the Fully Participating Library, nor the Host Site, as applicable, will be responsible for any damages to a Rightsholder or the Registry; provided, however, that if such then-in-effect Security Implementation Plan was not yet approved by the Registry and such access is a proximate result of an element of such then-in-effect Security Implementation Plan that is determined not to meet the requirements of the Security Standard, then the provisions of Section 8.6(b) (Breach of Security Implementation Plan) shall apply and not the provisions of this Section 8.6(a) (Compliance with Security Implementation Plan); provided, further, that a Fully Participating Library is not considered to be a third party when accessing its own LDC, a Host Site is not considered to be a third party when accessing the Research Corpus and a Hosting Fully Participating Library is not considered to be a third party when hosting an LDC of a Requesting Fully Participating Library. Google, the Fully Participating Library and the Host Site will reasonably assist the Registry in seeking remedies against the third party; provided, further, that, in no event shall Google, the Fully Participating Library or the Host Site be required to disclose confidential or personally identifiable information except as compelled by law or valid legal process. Conduct by Google, a Fully Participating Library or a Host Site in compliance with a Security Implementation Plan approved by the Registry will not in any event be deemed to be or constitute negligence, recklessness or intentional misconduct.

(b) <u>Breach of Security Implementation Plan</u>. If Google, a Fully Participating Library or a Host Site has breached its then-in-effect Security Implementation Plan and a third party violates Google's, such Fully Participating Library's or such Host Site's security and obtains Third-Party Unauthorized Access as a proximate result of such breach, or if Google, a Fully Participating Library or a Host Site had complied with its then-in-effect Security Implementation Plan but its then-in-effect Security Implementation Plan was not yet approved by the Registry and the access was a proximate result of an element of such then-in-effect Security Implementation Plan that is determined not to meet the requirements of the Security Standard, then the Registry and/or affected Rightsholders, in accordance with Section 8.3(d) (Consolidation of Claims), and each breaching party will negotiate or arbitrate (pursuant to Article IX (Dispute Resolution)) an appropriate

132

monetary remedy, if any, which will attempt to approximate actual damages for such breach of the Security Implementation Plan, provided that a Fully Participating Library is not considered to be a third party when accessing its own LDC, a Host Site is not considered to be a third party when accessing the Research Corpus and a Hosting Fully Participating Library is not considered to be a third party when hosting an LDC of a Requesting Fully Participating Library. Such damages may be in the range beginning with zero and up to the statutory damages available to the affected Rightsholders under Section 504 of the Copyright Act. Aggregate damages recoverable by Rightsholders for all claims resulting from a single incident of such breach (*i.e.*, all breaches resulting from the same root cause) described in this Section 8.6(b) (Breach of Security Implementation Plan) shall be, subject to Section 8.7 (Adjustments to Liability Ranges and Caps), in the case of Google, fifteen million United States dollars (U.S. $15 million) if the breaching conduct was negligent, twenty million United States dollars (U.S. $20 million) if the breaching conduct was reckless and twenty-five million United States dollars (U.S. $25 million) if the breaching conduct was willful or intentional misconduct, and, in the case of a Fully Participating Library, two million United States dollars (U.S. $2 million) if the breaching conduct was negligent, three million United States dollars (U.S. $3 million) if the breaching conduct was reckless and five million United States dollars (U.S. $5 million) if the breaching conduct was intentional or willful misconduct.

(c)        No Multiple Damages.  If the Registry and/or affected Rightsholders recover damages from a third party who has obtained Third-Party Unauthorized Access to one or more Books or Inserts, then any amounts recoverable by the Registry and/or such Rightsholders against Google, a Fully Participating Library or a Host Site under this Section 8.6 (Remedies for Security Violations by Third Parties) for any claim arising out of such Unauthorized Access shall be reduced by the amount of such damages.

8.7    Adjustments to Liability Ranges and Caps.  The liability ranges and caps set forth in Sections 8.4 (Remedies for Breaches of the Security Implementation Plan that Do Not Result In Unauthorized Access or Prohibited Access), 8.5 (Remedies for Breaches Resulting in Unauthorized Access by Google or Prohibited Access by a Fully Participating Library or a Host Site) and 8.6 (Remedies for Security Violations by Third Parties) shall be adjusted on the tenth (10th) anniversary of the Effective Date and every tenth (10th) anniversary thereafter during the term of this Amended Settlement

133

Agreement to that amount which is equal to the product obtained by multiplying (a) the amount specified in each such section, by (b) a fraction, the numerator of which is the Consumer Price Index published for the year immediately preceding the year in which the calculation is made and the denominator of which is the Consumer Price Index published for 2008.

## ARTICLE IX — **DISPUTE RESOLUTION**

9.1     <u>Arbitration of Disputes and Exceptions</u>.

(a)     <u>General Rules</u>.  Unless otherwise set forth in this Section 9.1 (Arbitration of Disputes and Exceptions), all disputes between and among Google, Rightsholders, Claimants, the Registry and Participating Libraries arising out of this Amended Settlement Agreement, and disputes pursuant to Section 13.2(d) (Claims for Content that is Neither a Book nor an Insert), shall be subject to this Article IX (Dispute Resolution), including disputes involving Claimants and Rightsholders of Inserts; provided, that disputes relating to Books between member(s) of the Author Sub-Class, on the one hand, and member(s) of the Publisher Sub-Class, on the other hand, shall be subject to this Article IX (Dispute Resolution) only to the extent provided in the Author-Publisher Procedures, and disputes between and among members of the Publisher Sub-Class relating to Books shall not be subject to this Article IX (Dispute Resolution) unless otherwise agreed between such members.; and, provided further, that with respect to any dispute between or among Rightsholders and Claimants, the parties to such dispute may elect to resolve such dispute in court or by such other dispute resolution procedure as they may agree.

(b)     <u>Exceptions</u>.  This Article IX (Dispute Resolution) shall not apply to disputes regarding:

(i)     Breaches of this Amended Settlement Agreement that occur prior to the Effective Date;

(ii)     Google's obligation to provide Digital Copies to an Additional Contemplated Rightsholder Services Provider pursuant to Section 3.7(c) (Additional Contemplated Rightsholder Services Provider);

134

(iii)        Section 4.7 (~~New~~Additional Revenue Models);

(iv)        Section 7.2(a)(iv) (~~Limitation~~Limitations);

(v)        Google's obligation not to make certain assertions in any proceeding outside the United States pursuant to the last sentence of Section 10.2(b) (Limitations on Releases); or

(vi)        Section 17.19 (Destruction).

9.2     <u>Executive Escalation</u>.  With respect to all disputes subject to this Article IX (Dispute Resolution), Google, any Plaintiff, any Rightsholder, <u>any Claimant,</u> the Registry, any Fully Participating Library, any Cooperating Library, and/or any Host Site, as applicable, shall immediately submit such disputes to a contact provided by each party to the dispute ("<u>Contact</u>") for resolution.  For thirty (30) days after the submission, or such other period of time as the parties to the dispute may mutually agree (the "<u>Resolution Period</u>"), the Contacts shall meet in person or by telephone and attempt to resolve such dispute.  The Contacts must be personnel who have the proper authorizations, from each of their respective parties, to resolve the dispute in a final and binding fashion.  The Contact for Google is its General Counsel, or his or her designee. The Registry will appoint a Contact.  Any party other than Google and the Registry that is subject to this Article IX (Dispute Resolution) must identify a Contact at the time that a dispute involving such party is first raised or within ten (10) Business Days of receiving notice of a dispute.

9.3     <u>Arbitration</u>.

(a)        <u>AAA Arbitration</u>.  With respect to all disputes subject to this Article IX (Dispute Resolution) that have not been resolved within the Resolution Period, each of the parties to the dispute shall compile a specific list of the matters relating to the dispute to which it believes the parties to the dispute have not reached agreement, in each case setting forth its respective position in as succinct a manner as reasonably possible (collectively, the "<u>Matters in Dispute</u>").  The parties to the dispute shall, upon expiration of the Resolution Period, agree upon and appoint one or more arbitrators from the pool of potential arbitrators selected in accordance with Section 9.3(c) (Pool of Potential Arbitrators).  The selected arbitrator(s) (the "<u>Arbitrator</u>") shall decide the Matters in Dispute, and only the Matters in Dispute.  If the disputing parties fail to select

135

the Arbitrator within fifteen (15) days after the expiration of the Resolution Period, either party may immediately file a petition for arbitration before the American Arbitration Association (the "AAA"). The place of arbitration shall be New York, New York unless the parties to the dispute agree otherwise or unless a Rightsholder or Claimant who is party to a dispute requests that the arbitration be held by telephone or videoconference in order to save time, travel and other costs. If the AAA ceases to operate in New York, New York, then the Court shall, upon the consent of Google and the Registry, appoint another entity to administer the dispute resolution procedures. The arbitrators shall apply New York law to the merits of any dispute or claim, without reference to rules of conflict of law.

(b)         Arbitrator. The Arbitrator shall be drawn from a special pool of arbitrators who will be familiar with the area of the dispute (*e.g.*, the publishing industry, security, the Internet) as well as this Amended Settlement Agreement.

(c)         Pool of Potential Arbitrators. Google and the Registry will create the pool of arbitrators in conjunction with the AAA; provided, however, that, for disputes involving any Fully Participating Library, Cooperating Library or Public Domain Library, the arbitrators need not be selected from such pool. The pool will be drawn from one or more of the following:

(i)         Current AAA arbitrators;

(ii)         Individuals recommended by Google and the Plaintiffs; and

(iii)         Individuals identified through a search in conjunction with (or conducted by) AAA.

(d)         Expedited Procedures. Except for disputes listed in Section 9.3(e) (Other Disputes), all disputes subject to this Article IX (Dispute Resolution) shall be arbitrated before a single Arbitrator under the Expedited Procedures of the AAA Commercial Arbitration Rules; provided, however, that a party may petition the Arbitrator for

discovery, if reasonably necessary for resolution of the dispute and the parties may mutually agree on other procedures.

(e)    Other Disputes.  Any disputes arising under the following Sections shall be arbitrated under the AAA Commercial Arbitration Rules, unless the parties agree to the procedures set forth in Section 9.3(d) (Expedited Procedures), and the Arbitrator shall be a panel of three (3) arbitrators:

(i)    Sections 3.7(a) (Obligation) and (b) (Failure to Provide Contemplated Rightsholder Services);

(ii)    Section 3.8 (Effect of Other Agreements and Changes in Law);

(iii)    Section 4.1 (Institutional Subscriptions);

(iv)    Section 4.2 (Consumer Purchases);

(v)    Section 4.5(b) (Discounting, Special Offers and Subsidies);

(vi)    Section 4.9 (Economic Terms Renegotiation);

(vii)    Section 6.3 (Unclaimed Funds and Public Domain Funds);

(viii)    Section 7.2 (Fully Participating Library Uses);

(ix)    Section 8.2 (Security Standard, Security Implementation Plan and Security Audits); and

(x)    Any breach of Article VIII (Security and Breach) related to a Security Implementation Plan or claims related to the security of Digital Copies of Books, the Research Corpus or any LDC.

9.4    Notice to Rightsholders.  The Registry will provide notice to Registered Rightsholders as required pursuant to Section 8.3(d) (Consolidation of Claims) and concerning the disputes identified in Sections 9.3(e)(i)-(vi) (Other Disputes).

9.5    Notice to Registry; Consolidation.  Notice of all disputes subject to this Article IX (Dispute Resolution) will be provided to the Registry as well as AAA.  If the Registry believes that multiple disputes raise common issues, the Registry may request the parties to consolidate them; however, certain disputes are subject to mandatory consolidation pursuant to Section 7.2(f)(i) (Fully Participating Libraries), Section 7.2(f)(ii) (Cooperating Libraries) and Section 8.3(d) (Consolidation of Claims).

9.6    Precedential Effect.  The AAA or the Registry shall maintain a database of Decisions rendered pursuant to this Article IX (Dispute Resolution) for purposes of this Amended Settlement Agreement only.  The Arbitrators may rely on or be guided by such precedent, as appropriate, but *stare decisis* will not apply.  In any dispute between Google and the Registry and/or a Rightsholder subject to this Article IX (Dispute Resolution), however, no such party to such dispute shall seek to admit into evidence, or otherwise refer to, the fact that Google has entered into or concluded any negotiation or arbitration with a Participating Library.

9.7    Decision.  The Arbitrator shall decide the Matters in Dispute by written opinion with clear and express language (the "Decision").  The Decision shall be final, binding and nonappealable, and judgment on the Decision may be entered only in the Court.  Upon receipt of the Decision, the parties shall immediately effect the resolution in accordance with the Decision.

9.8    Confidentiality.  The entire contents of all papers and records related to the arbitration, and, except as provided in Section 8.3(d) (Consolidation of Claims) and Section 9.4 (Notice to Rightsholders) or as agreed by the parties to the arbitration, the fact of the arbitration, shall be deemed to be confidential information of the parties to the arbitration; provided, however, that (a) the Registry may be permitted to disclose the existence and costs of arbitrations to which it is a party in connection with required financial disclosures; and (b) all Registered Rightsholders and parties to an arbitration will have access to all Decisions; provided, further, (i) such Rightsholders and/or parties shall have executed an agreement obligating the Rightsholders and/or parties to use the Decisions only for the prosecution or defense of a claim and not to make the Decisions public; and (ii) names, other personally identifiable information and any confidential information will be redacted from the Decisions before the Decisions are made available to such Rightsholders and/or parties.

9.9    Fees and Costs.  Any Arbitrator's fees and any costs payable to the Arbitrator shall be shared equally by the parties to the arbitration, unless otherwise agreed under this Amended Settlement Agreement (including the Author-Publisher Procedures).

Each party to the arbitration will bear his, her or its own legal fees and expenses, unless otherwise provided under this Amended Settlement Agreement.

9.10    Joinder.  Joinder is permissible if required for complete resolution of claim.

9.11    Injunctive Relief.  If a party would be prejudiced or irreparably harmed by delay (*e.g.*, the party has need for emergency or temporary injunctive relief, which could be in the form of specific performance), a party has repeatedly, willfully or intentionally not complied with its obligations under this Amended Settlement Agreement, or a party is claiming a breach of Section 15.2 (Obligations), the party claiming a breach of this Amended Settlement Agreement may apply to any court of competent jurisdiction (or, if the dispute involves a Fully Participating Library, the Court) for a temporary restraining order, preliminary injunction, other interim or conservatory relief or injunctive relief, as necessary, without breach of this Article IX (Dispute Resolution) and without any abridgment of the powers of the Arbitrator, while simultaneously following the process set forth in Section 9.2 (Executive Escalation) and, if unsuccessful, the arbitration procedure set forth in this Article IX (Dispute Resolution).

9.12    Continuing Jurisdiction.  This Article IX (Dispute Resolution) is subject to Section 17.23 (Court's Continuing Jurisdiction).

## ARTICLE X — **RELEASES**

10.1    Definitions.

(a)        "Claim" means any claim (including any claim relating to any right, contract, obligation, debt, dues, sum of money, or attorneys' fees), action, cause of action, proceeding, adjustment, execution, offset, judgment, suit, accounting, reckoning, bond, bill, trespass, damage, demand (whether written or oral), liability, controversy, expense, and loss whatsoever, whether arising in law or in equity, based on United States federal, state, territorial or common law, whether foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued, existing now or arising in the future.

(b)        "Cooperating Library Released Claims" means each and every Claim of every Rightsholder (including all Claims of copyright infringement, trademark infringement, or moral rights violation) against each Cooperating Library Releasee that arises out

139

of, with respect to Books and Inserts held by such Cooperating Library Releasee: (A) any of the following actions taken on or before the Effective Date, (i) such Cooperating Library Releasee's provision of Books and Inserts (or Books and Inserts in a form Digitized by such Cooperating Library Releasee) to a Google Releasee for the purposes of Digitization and use in Google Products and Services, (ii) any Google Releasee's Digitization of such Books and Inserts and any Google Releasee's use of Digital Copies of such Books and Inserts for Google's use in Google Products and Services, (iii) such Cooperating Library Releasee's receipt from a Google Releasee of Digital Copies of such Books and Inserts, (iv) such Cooperating Library Releasee's use of Digital Copies of such Books and Inserts, to the extent such use is described as a use permitted by a Fully Participating Library under Section 7.2(b) (Use of Library Digital Copies) or permitted by the applicable Library-Registry (Cooperating) Agreement, as if the Cooperating Library had been a Cooperating Library at the time of such use, and (v) such Cooperating Library Releasee's use of Digital Copies of such Books and Inserts for Non-Consumptive Research; and (B) after the Effective Date, any act or omission authorized by this Amended Settlement Agreement or the Library-Registry (Cooperating) Agreement when that act or omission is undertaken by or on behalf of a Person who is authorized to undertake it under this Amended Settlement Agreement or such Library-Registry (Cooperating) Agreement.

(c) "<u>Cooperating Library Releasees</u>" means each Cooperating Library and all of such Cooperating Library's past, present, and future parents, predecessors, subsidiaries, affiliates, and divisions, all of its and their respective contractors, and licensees, all of its and their respective officers, directors, trustees, regents, owners, partners, governors, patrons, students, members, employees, and agents, and all of its and their respective nominees, successors, assigns and legal representatives.

(d) "<u>Fully Participating Library Released Claims</u>" means each and every Claim of every Rightsholder (including all Claims of copyright infringement, trademark infringement, or moral rights violation) against each Fully Participating Library Releasee that arises out of, with respect to Books and Inserts held by such Fully Participating Library Releasee: (A) any of the following actions taken on or before the Effective Date, (i) such Fully

Participating Library Releasee's provision of Books and Inserts (or provision of Books and Inserts in a form Digitized by such Fully Participating Library Releasee) to a Google Releasee for the purposes of Digitization and use in Google Products and Services, (ii) any Google Releasee's Digitization of such Books and Inserts and any Google Releasee's use of Digital Copies of such Books and Inserts for Google's use in Google Products and Services, (iii) such Fully Participating Library Releasee's receipt from a Google Releasee of Digital Copies of such Books and Inserts, (iv) such Fully Participating Library Releasee's use of Digital Copies of such Books and Inserts, to the extent such use is described as a use permitted under Section 7.2(b) (Use of Library Digital Copies) or is permitted by the applicable Library-Registry (Fully Participating) Agreement, as if the Fully Participating Library had been a Fully Participating Library at the time of such use, and (v) such Fully Participating Library Releasee's use of Digital Copies of such Books and Inserts for Non-Consumptive Research; and (B) after the Effective Date, any act or omission authorized by this Amended Settlement Agreement or the Library-Registry (Fully Participating) Agreement when that act or omission is undertaken by or on behalf of a Person who is authorized to undertake it under this Amended Settlement Agreement or such Library-Registry (Fully Participating) Agreement.

(e)      "<u>Fully Participating Library Releasees</u>" means each Fully Participating Library and all of such Fully Participating Library's past, present, and future parents, predecessors, subsidiaries, affiliates, and divisions, all of its and their respective contractors and licensees, all of its and their respective officers, directors, trustees, regents, owners, partners, governors, patrons, students, members, employees, and agents, and all of its and their respective nominees, successors, assigns and legal representatives.

(f)      "<u>Google Released Claims</u>" means each and every Claim of every Rightsholder that has been or could have been asserted in the Action against any Google Releasee (including all Claims of copyright infringement, trademark infringement, or moral rights violation) that arises out of:  (A) any of the following actions taken on or before the Effective Date, (i) any Fully Participating Library Releasee's, Cooperating Library Releasee's, Public Domain Library Releasee's or Other Library Releasee's provision of Books and Inserts (or the provision of Books and Inserts in a form Digitized by such Fully Participating Library Releasee, Cooperating Library

141

Releasee, Public Domain Library Releasee or Other Library Releasee) to a Google Releasee for the purposes of Digitization and use in Google Products and Services, (ii) any Google Releasee's Digitization of such Books and Inserts and any Google Releasee's use of Digital Copies of Books and Inserts for Google's use in Google Products and Services other than such uses that are based on authorizations granted to Google under separate agreements entered into directly with the Rightsholder, (iii) the distribution to each Fully Participating Library, Cooperating Library and Public Domain Library of Digital Copies of Books and Inserts held by such library, (iv) any use by a Fully Participating Library, a Cooperating Library or a Public Domain Library of such Digital Copies, to the extent such use is described as a use permitted by a Fully Participating Library under Section 7.2(b) (Use of Library Digital Copies) or is permitted by the applicable Library-Registry Agreement, as if such Fully Participating Library, Cooperating Library or Public Domain Library had been a Fully Participating Library, Cooperating Library or Public Domain Library at the time of such use, and (v) any Fully Participating Library Releasee's, Cooperating Library Releasee's or Public Domain Library Releasee's use of Digital Copies of such Books and Inserts for Non-Consumptive Research; and (B) after the Effective Date, any act or omission authorized by this Amended Settlement Agreement, or a Library-Registry Agreement when that act or omission is undertaken by a Person who is authorized to undertake it under this Amended Settlement Agreement or such Library-Registry Agreement; and (C) on or before sixty (60) days after the Settlement Agreement Date, December 27, 2008, the distribution to each Other Library of Digital Copies of Books and Inserts held by such library.

(g)     "Google Releasees" means Google and all of its past, present, and future parents, predecessors, subsidiaries, affiliates, and divisions, all of its and their respective contractors and licensees, all of its and their respective officers, directors, owners, partners, governors, employees, and agents, and all of its and their respective nominees, successors, assigns and legal representatives, provided, however, that the Google Releasees do not include any library or any other Person providing a Book or Insert to Google for purposes of Digitization by Google or providing Books and Inserts to Google in a Digitized form, except to the extent such library acts as a contractor to Google as contemplated by Section 3.1 (Digitization, Identification and Use of Books).

142

(h)       "<u>Other Library Released Claims</u>" means each and every Claim of every Rightsholder (including all Claims of copyright infringement, trademark infringement, or moral rights violation) against each Other Library Releasee that arises out of, with respect to Books and Inserts held by such Other Library Releasee:  (A) any of the following actions taken on or before the Effective Date, (i) such Other Library Releasee's provision of such Books and Inserts (or Books and Inserts in a form Digitized by such Other Library Releasee) to a Google Releasee for the purposes of Digitization and use in Google Products and Services, and (ii) any Google Releasee's Digitization of such Books and Inserts and any Google Releasee's use of Digital Copies of such Books and Inserts for use in Google Products and Services; and (B) on or before ~~sixty (60) days after the Settlement Agreement Date,~~December 27, 2008, such Other Library Releasee's receipt from a Google Releasee of Digital Copies of such Books and Inserts (but, for purposes of clarification, not such Other Library Releasee's use of such Digital Copies).

(i)       "<u>Other Library Releasees</u>" means each Other Library, and all of such Other Library's past, present, and future parents, predecessors, subsidiaries, affiliates, and divisions, all of its and their respective contractors and licensees, all of its and their respective officers, directors, trustees, regents, owners, partners, governors, patrons, members, students, employees, and agents, and all of its and their respective nominees, successors, assigns and legal representatives.

(j)       "<u>Public Domain Library Released Claims</u>" means each and every Claim of every Rightsholder (including all Claims of copyright infringement, trademark infringement, or moral rights violation) against each Public Domain Library Releasee that arises out of, with respect to Books and Inserts held by such Public Domain Library Releasee:  (A) any of the following actions taken on or before the Effective Date, (i) such Public Domain Library Releasee's provision of Books and Inserts (or provision of Books and Inserts in a form Digitized by such Public Domain Library Releasee) to a Google Releasee for the purposes of Digitization and use in Google Products and Services, (ii) any Google Releasee's Digitization of such Books and Inserts and any Google Releasee's use of Digital Copies of such Books and Inserts for Google's use in Google Products and Services, (iii) such Public Domain Library Releasee's receipt from a Google Releasee of Digital Copies of such Books and Inserts, and (iv) such

143

Public Domain Library Releasee's use of Digital Copies of such Books and Inserts for Non-Consumptive Research; and (B) after the Effective Date, any act or omission authorized by this Amended Settlement Agreement or the Library-Registry (Public Domain) Agreement when that act or omission is undertaken by a Person who is authorized to undertake it under this Amended Settlement Agreement or such Library-Registry (Public Domain) Agreement.

(k)       "<u>Public Domain Library Releasees</u>" means each Public Domain Library and all of such Public Domain Library's past, present, and future parents, predecessors, subsidiaries, affiliates, and divisions, all of its and their respective contractors and licensees, all of its and their respective officers, directors, trustees, regents, owners, partners, governors, patrons, members, students, employees, and agents, and all of its and their respective nominees, successors, assigns and legal representatives.

(l)       "<u>Releases</u>" means the releases set forth in Section 10.2 (Releases) by all of the Rightsholder Releasors and by all of the Google Releasees.

(m)       "<u>Rightsholder Releasors</u>" means Plaintiffs, any and all Rightsholders, and each Plaintiff's and Rightsholder's heirs, executors, administrators, beneficiaries, predecessors, successors, assigns, employees, and agents, any person claiming by or through any Rightsholder and any Person representing any or all Plaintiffs and/or Rightsholders.

(n)       <u>Scope of Release</u>.  Where, in this Article X (Releases), Claims are released, such release includes the reproduction, distribution, transmission, display, and preparation of derivative works of such Books or Inserts undertaken for the purpose of, and only to the extent reasonably required for, making the released use, by whatever means and technology.

10.2    <u>Releases</u>.

(a)       <u>Release of Google Releasees, Fully Participating Library Releasees, Cooperating Library Releasees, Public Domain</u>

144

<u>Releasees and Other Library Releasees</u>.  Without further action by anyone, as of the Effective Date, the Rightsholder Releasors, for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be deemed to have, and by operation of law and the Final Judgment and Order of Dismissal shall have, fully, finally, and forever released, relinquished, settled, and discharged (i) the Google Released Claims against each and every one of the Google Releasees, except as provided in Section 3.5(b)(vii) (Government Works and Public Domain Works), (ii) the Fully Participating Library Released Claims against each and every one of the Fully Participating Library Releasees, (iii) the Cooperating Library Released Claims against each and every one of the Cooperating Library Releasees, (iv) the Public Domain Library Released Claims against each and every one of the Public Domain Library Releasees, (v) the Other Library Released Claims against each and every one of the Other Library Releasees, provided that no Other Library Released Claims are released, relinquished, settled or discharged against any Other Library Releasee if and to the extent such Other Library Releasee, at any time, makes any infringing use of a Digital Copy, (vi) all Claims against the Google Releasees, Fully Participating Library Releasees, Cooperating Library Releasees, Public Domain Releasees, Class Counsel and Plaintiffs that relate in any way to the commencement, prosecution, defense or settlement of the Action or to the negotiation or execution of the original Settlement Agreement or this Amended Settlement Agreement, or the Library-Registry Agreements or the Supplemental Agreement Regarding Right to Terminate, and (vii) any and all Claims for attorneys' fees, costs or disbursements incurred by Class Counsel or other counsel representing Plaintiffs in connection with or related in any manner to the Action, the settlement of the Action, including the negotiation and execution of the original Settlement Agreement, this Amended Settlement Agreement, or the Author-Publisher Procedures, the Library-Registry Agreements or the Supplemental Agreement Regarding Right to Terminate, or the administration of the Action provided that in the case of this clause (vii) Google meets its payment obligations under Section 5.5 (Attorneys' Fees).

(b)     <u>Limitations on Releases</u>.  The Releases are subject to the following:  (i) nothing in this Amended Settlement Agreement releases or adversely affects any Claims of any Amended Settlement Class members who opted out of the original Settlement Agreement by September 4, 2009 or who opt out of the Amended Settlement by

145

~~the~~Agreement between the Amended Settlement Agreement Date and the Supplemental Opt-Out Deadline, (ii) no Claims are released with respect to any Digitization or any other form of copying or use of Books or Inserts outside the United States (*e.g.*, making a copy of, or using, a Book in Finland), (iii) no Claims are released with respect to any acts or omissions after ~~the Settlement Agreement Date~~October 28, 2008 that, if occurring after the Effective Date, would not be authorized by this Amended Settlement Agreement, (iv) no Claims are released with respect to breaches of this Amended Settlement Agreement after the Effective Date, and (v) no Claims are released with respect to any acts of copying, transmission or distribution of a Book or Insert that Google undertakes in response to a search or other request of a user outside of the United States that results in displaying parts or all of such Book or Insert in such user's jurisdiction, except if such display is lawful in such jurisdiction or Google has the appropriate permission for such display in such jurisdiction. Google agrees that, in asserting or responding to any legal claim outside the United States for copyright infringement arising from any use of Books or Inserts outside the United States, it will not in any way assert, including by way of defense, that, based on the fact that this Amended Settlement Agreement or the Final Judgment and Order of Dismissal authorizes, or releases Claims relating to, the making of copies or uses of Books and Inserts in the United States, either applicable non-United States law or a Rightsholder authorized such use of Books or Inserts outside the United States.

(c)    <u>Effect of Dismissal</u>.  The Final Judgment and Order of Dismissal shall have the effect of a dismissal with prejudice of all Fully Participating Library Released Claims, Cooperating Library Released Claims, Public Domain Library Released Claims and Other Library Released Claims as though each Fully Participating Library Releasee, Cooperating Library Releasee, Public Domain Releasee and Other Library Releasee had been named a defendant in the Action, and the Final Judgment and Order of Dismissal shall bar all such Fully Participating Library Released Claims, Cooperating Library Released Claims, Public Domain Library Released Claims and Other Library Released Claims by any Rightsholder Releasor, provided that the Final Judgment and Order of Dismissal shall have no such effect with respect to, and shall not bar, any Other Library Released Claims against any Other Library Releasee if and to the extent such Other Library Releasee, at any time, makes any infringing use of a Digital Copy.

146

(d) <u>Bar Order</u>.  The Final Judgment and Order of Dismissal shall forever bar (a) all Rightsholder Releasors from instituting, maintaining, prosecuting, assigning or collecting on any and all (i) Claims against any Google Releasee, Fully Participating Library Releasee, Cooperating Library Releasee, and Public Domain Library Releasee that directly or indirectly relate to, are based upon or arise out of the commencement, prosecution, defense or settlement of the Action, or to the negotiation or execution of ~~this~~<u>the original Settlement Agreement, this Amended</u> Settlement Agreement or the Library-Registry Agreements, (ii) Google Released Claims against any of the Google Releasees, except as provided in Section 3.5(b)(vii) (Government Works and Public Domain Works), (iii) Fully Participating Library Released Claims against any of the Fully Participating Library Releasees, (iv) the Cooperating Library Released Claims against any of the Cooperating Library Releasees, (v) the Public Domain Library Released Claims against any of the Public Domain Library Releasees, and (vi) Other Library Released Claims against any of the Other Library Releasees, provided that no Rightsholder Releasor is barred from instituting, maintaining, prosecuting, assigning or collecting on any Other Library Released Claim against an Other Library Releasee if and to the extent such Other Library Releasee, at any time, makes any infringing use of a Digital Copy, including without limitation, by participating in, or recovering as a result of, any class or representative action, whether under United States federal or state law, in which any such Google Released Claims, Fully Participating Library Released Claims, Cooperating Library Released Claims, Public Domain Library Released Claims, or Other Library Released Claims have been or may be brought, and (b) all Google Releasees, all Cooperating Library Releasees, all Fully Participating Library Releasees, all Public Domain Library Releasees and all Other Library Releasees from instituting, maintaining, prosecuting, assigning or collecting on, any and all Claims against any Rightsholder Releasor or Class Counsel that directly or indirectly relate to, are based upon or arise out of the commencement, prosecution, defense or settlement of the Action, or the negotiation and execution of ~~this~~<u>the original Settlement Agreement, this Amended</u> Settlement Agreement or the Library-Registry Agreements.

(e) <u>Release of Rightsholder Releasors and Class Counsel</u>.  Without further action by anyone, as of the Effective Date, each of the Google Releasees, for good and sufficient consideration,

the receipt and adequacy of which are hereby acknowledged, shall be deemed to have, and by operation of law and the Final Judgment and Order of Dismissal shall have, fully, finally and forever released, relinquished, settled, and discharged, each Rightsholder Releasor and Class Counsel, from any and all Claims that directly or indirectly relate to, are based upon or arise out of, the commencement, prosecution or settlement of the Action, or the negotiation and execution of ~~this~~the original Settlement Agreement or this Amended Settlement Agreement.

(f)     <u>Mutual Releases by Insert/Book Rightsholder Releasors</u>.  Without further action by anyone, as of the Effective Date, each of the Rightsholder Releasors, for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be deemed to have, and by operation of law and the Final Judgment and Order of Dismissal shall have, fully, finally, and forever released, relinquished, settled, and discharged Claims arising out of the inclusion, removal or exclusion of a Book or an Insert in or from Google Products and Services by (i) any Rightsholder Releasor that has a Copyright Interest in an Insert against each and every Rightsholder Releasor that has a Copyright Interest in a Book that contains such Insert and (ii) any Rightsholder Releasor that has a Copyright Interest in a Book against each and every Rightsholder Releasor that has a Copyright Interest in an Insert contained in such Book.

(g)     <u>Waiver of Section 1542</u>.  With respect to any and all of the Releases, upon the Effective Date and without further action, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, all Rightsholder Releasors and Google Releasees shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever expressly waived and relinquished, to the fullest extent permitted by law, any and all provisions, rights, and benefits of Section 1542 of the California Civil Code and any and all provisions, rights, and benefits of any United States federal, state or territorial law, rule or regulation or principle of common law that is similar, comparable, equivalent or identical to Section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Each Rightsholder Releasor and Google Releasee may hereafter discover facts other than or different from those that he, she, or it knows or believes to be true with respect to the Claims released by the Releases, but, notwithstanding Section 1542 and any similar provisions, rights, and benefits of any United States federal, state or territorial law, rule or regulation or common law principle, each such Person hereby expressly waives and fully, finally, and forever settles and releases, upon the Effective Date, any known or unknown, suspected or unsuspected, contingent or non-contingent Claim that is released by the Releases, without regard to the subsequent discovery or existence of such different or additional facts.

        (h)      **Foreign Claims**.  No Rightsholder releases any Claim for the reproduction, distribution, transmission, display, adaptation or preparation of derivative works of any Book or Insert in any jurisdiction outside the United States.

## ARTICLE XI — **PRELIMINARY SETTLEMENT APPROVAL**

As soon as practicable after the Amended Settlement Agreement Date, Plaintiffs shall file a Motion For Preliminary Approval of the Amended Settlement ~~Approval~~Agreement, together with a Proposed Order For Preliminary Settlement Approval substantially in a form attached hereto as Attachment H ([Proposed] Order Granting Preliminary Settlement Approval).

## ARTICLE XII — **CLASS NOTICE PROGRAM**

**12.1**    **Original Notice.**  In connection with the motion filed ~~pursuant to Article XI (Preliminary~~ on October 28, 2008 for preliminary approval of the Settlement ~~Approval)~~Agreement, Class Counsel ~~will submit~~submitted to the Court a proposed Notice of Class Action Settlement ("Notice") and a Summary Notice of Class Action Settlement ("Summary Notice") ~~substantially~~ in the forms attached hereto, respectively, as Attachment I (Notice of Class Action Settlement) and Attachment J (Summary Notice of Class Action Settlement).  Class Counsel ~~will recommend~~recommended to the Court that the Class Notice Program provide notice to the widest practicable group of ~~Settlement Class~~original settlement class members inside and outside the United States,

and that the Class Notice Program ~~will~~<ins>would</ins> consist of the following: (a) Direct Notice – sending the Notice (translated from English whenever appropriate) by email or first class mail, postage prepaid, to those ~~Settlement Class~~<ins>original settlement class</ins> members that ~~can~~<ins>could</ins> be identified by any reasonable means, with notice by email used whenever possible, and postal notice limited to those ~~Settlement Class~~<ins>original settlement class</ins> members whose email addresses ~~are~~<ins>were</ins> unavailable; (b) Paid Media – publishing the Summary Notice (translated from English whenever appropriate) in the publications listed on the Paid Media Schedule attached hereto as Attachment K (Paid Media Schedule), or reasonable substitutes, if necessary (*e.g.*, if certain publications ~~decline~~<ins>declined</ins> to publish the Summary Notice), that ~~will~~<ins>would</ins> provide the same level of coverage to the intended audience, as well as using online advertising directing users to the Settlement Website; (c) Earned Media – utilizing press coverage, including the issuance by Google and the Plaintiffs of joint press releases and convening of a joint press conference, which ~~will~~<ins>would</ins>, among other things, provide the press with the address of the website dedicated to the Settlement as referenced below and contact information for ~~Settlement Class~~<ins>original settlement class</ins> members to learn about the Settlement and how to obtain the Notice; (d) Additional Outreach – providing notice materials to websites and organizations whose constituencies may ~~include Settlement Class~~<ins>have included original settlement class</ins> members and encouraging them to direct interested parties to the Settlement Administrator or the Settlement Website; and (e) Settlement Website – maintenance of a website dedicated to the Settlement and through which the Notice, ~~this~~<ins>the original</ins> Settlement Agreement, and other relevant information (translated from English whenever appropriate) ~~will~~<ins>would</ins> be made available<ins>, located at http://www.googlebooksettlement.com</ins> (the "Settlement Website"). In connection with clause (d), ~~from the Settlement Agreement Date to the Opt-Out Deadline, Google~~<ins>Google agreed to</ins> prominently ~~will~~ display a statement on the Google Book Search home page (http://books.google.com/) informing users that an agreement ~~has~~<ins>had</ins> been reached with authors and publishers and linking to a user information page. At the top of such user information page immediately beneath its title, Google ~~will~~<ins>agreed to</ins> display a statement directing authors, publishers and copyright holders to visit the Settlement Website and linking to the Settlement Website. ~~All Administrative Costs, including the costs of the Class Notice Program, shall be paid solely out of the Settlement Fund.~~<ins>By Order dated November 14, 2008, the Court approved the form and aforementioned manner of dissemination of the Notice and Summary Notice, and Plaintiffs implemented the Class Notice Program as ordered.</ins>

<ins>12.2     Supplemental Notice. Class Counsel will submit to the Court a proposed Supplemental Notice of Class Action Settlement ("Supplemental Notice") substantially in the form attached hereto as Attachment N (Supplemental Notice). Class Counsel will recommend to the Court that the Supplemental Notice (translated into the same languages into which the original Notice was translated) be (a) emailed or sent by postal mail to all Persons who provided contact information on the Settlement Website or on a Claim Form, who opted out of the original Settlement Agreement, or who filed an objection,</ins>

amicus position or other statement with the Court, (b) emailed or sent by postal mail to all authors' and publishers' groups and Reproduction Rights Organizations that assisted Plaintiffs in the dissemination of the original Notice, (c) placed on the Settlement Website, and (d) announced in and outside the United States, Canada, the United Kingdom and Australia with a press release issued by the Supplemental Notice provider. In addition, the Settlement Administrator will continue its informational toll-free telephone service.  All Administrative Costs, including the costs of the Class Notice Program, shall be paid solely out of the Settlement Fund.

## ARTICLE XIII — **SETTLEMENT ADMINISTRATION PROGRAM**

13.1    <u>Registration and Completing Claims</u>.  To receive the benefits of the Settlement, a Person claiming to be a Rightsholder or acting on behalf of a Rightsholder (a "<u>Claimant</u>") must provide to the Registry the information set forth below on ~~a claim form that Plaintiffs and Google will submit to the Court for its approval prior to the Notice Commencement Date~~ the claim form provided by the Settlement Administrator ("<u>Claim Form</u>"); provided that, if a Publisher Sub-Class Claimant selects Section 13.1(c)(ii)(2)(B) rather than Section 13.1(c)(ii)(2)(A) for a Book, then Claimant may not make a claim for a Cash Payment for that Book and may not Remove that Book, but Claimant's rights under the Amended Settlement Agreement (including the right to exclude a Book from Display Uses) will not otherwise be affected by such selection. Claimants will be able to complete and submit their Claim Forms on the Settlement Website, by postal mail, and otherwise as the Registry may determine in order to maximize Rightsholder efficiency in completing the Claim Forms.

(a)    <u>General Information</u>.  A Claimant must provide the following:

(i)    his, her or its name and contact information, including postal address, telephone number and, if available, email address, and if the Claimant is, or is acting on behalf of, a U.S. Person, that Person's social security number or other tax identification number; and

(ii)    an attestation that (1) all of the information submitted on the Claim Form is true to the best of his, her or its knowledge, information and belief, and (2) the Claimant has a good faith belief that he, she or it holds a Copyright Interest in the Book or the Insert that is the subject of the claim, or that the Person who holds such a Copyright Interest has authorized the Claimant to act on such Person's behalf.

151

(b)     Pre-Population of Claim Forms.  Based on a Claimant's identification of Books, Google, through a search and selection interface, will pre-populate information regarding those Books in the Settlement Website's Claim Form for Books.

(c)     Books.  To claim a Book (not including its Inserts), a Claimant must:

(i)     identify whether he, she or it is the author, publisher, heir, successor or assignee, or other type of Rightsholder of the Book;

(ii)     indicate on the Claim Form, to the best of Claimant's knowledge, whether such Book:

(1)     is or is not a work for hire, and

(2)     for a Publisher Sub-Class member Claimant, whether (A) such Publisher Sub-Class member is highly confident that the Book is not reverted (based, *e.g.*, on the individual Book or contract for the Book) or (B) such Publisher Sub-Class member is confident that the Book is not reverted (based, *e.g.*, on the type of Book or type of contract for the Book), or

(3)     for an Author Sub-Class member Claimant, whether (A) such Book is or is not reverted or (B) Claimant does not know whether such Book is reverted;

(iii)     provide information sufficient to identify such Book, including, at a minimum, either the (1) title of the Book and the name(s) of the author(s) and/or editors of the Book or (2) ISBN (if the Book has an ISBN); and

(iv)     state either (1) that such Claimant believes that such Book is not a "United States work," as defined in 17 U.S.C. § 101 or (2) that such Claimant believes that such Book was registered with the U.S. Copyright Office by the Notice Commencement Date.  A Claimant may provide information through a data feed, an electronic spreadsheet or such other

152

means as the Registry may specify in order to maximize Rightsholder efficiency in completing the claim forms.

        (d)      <u>Inserts</u>.  To claim an Insert, a Claimant must identify whether he, she or it is the author, publisher, heir, successor or assignee, or other type of Rightsholder of the Insert and must provide information sufficient to identify such Insert, which information shall include:

        (i)      identification or a description of the content of the Insert, and identification of the Book, Public Domain Book or Government Work in which the Insert appears;

        (ii)      a statement that, although the Claimant believes such permission was required, (1) the Claimant did not give permission for Online use of the Insert as part of the work in which the Insert appears, or (2) if such permission was granted, it was no longer in effect on or after June 1, 2003; and

        (iii)      a statement either (1) that such Claimant believes that the Insert is not part of a work that was first published in the United States or (2) that such Claimant believes that such Insert, either alone or as part of another work, was registered with the U.S. Copyright Office by the Notice Commencement Date.

13.2    <u>Validating and Challenging Claims</u>.

        (a)      <u>Registry Claim Review</u>.  The Registry may review claim forms to verify that the information provided by a Claimant is accurate and supports the claim that the Claimant, or the Person on whose behalf the Claimant is acting, is a Rightsholder of a Book or an Insert.  Google may also provide to the Registry any information that Google may have regarding the validity of claims.  The Registry may challenge the validity of a claim either on its own accord or based on a dispute between or among Rightsholders under the Author-Publisher Procedures.  If the Registry reasonably requests that a Claimant provide additional information to validate such claim, the Claimant shall provide such information if it is within his, her or its possession or control.  The Registry may consider such

153

information and, in its discretion, consult with the Claimant to validate the claim.  The Registry will advise the Claimant whether the Registry has validated or rejected its claims.

(b)        Claimant-Registry Challenges.  The Claim Form will provide that the Claimant may challenge, pursuant to Article IX (Dispute Resolution), any Registry decision not to validate his, her or its claim.

(c)        Google-Claimant Challenges.

(i)        As set forth in this Section 13.2(c) (Google-Claimant Challenges), to deter and discover fraud, mistake, intentional misconduct or negligence by Claimants in submitting Claim Forms, Google may challenge whether a Claimant is a Rightsholder of the Book or Insert that he, she or it has claimed only in the case that the Claimant has requested Cash Payments or Removal.

(ii)        Google may only make such a challenge under the following conditions:

(1)        in the case of requests for Cash Payments, Google may only make such a challenge if the total amount of all claims for Cash Payments exceeds forty-five million United States dollars (U.S. $45 million), and

(2)        in the case of requests for Removal of Books that are not Commercially Available, Google may only make such a challenge if the total number of Books that are not Commercially Available that Claimants have directed to be Removed exceeds two hundred thousand (200,000).

(iii)        Further, Google may only make such a challenge if:

(1)        (A) such Claimant has filed such claims for more than (I) a number of Books or Inserts agreed between Google and the Plaintiffs in the case of a challenge brought pursuant to clause (ii)(1) above, or (II)

154

another number of Books agreed between Google and the Plaintiffs in the case of a challenge brought pursuant to clause (ii)(2) above, in a confidential letter agreement, such numbers not disclosed herein for the purpose of fraud prevention, or (B) Google believes that such Claimant is a Person that has registered multiple claims under one or more aliases, and

(2)    no dispute between such Claimant and any other Claimants for the Book was, or is being, resolved pursuant to the Author-Publisher Procedures.

(iv)    Any challenge in the case of:

(1)    clause (ii)(1) above may be made no later than ninety (90) days after the later of (A) the date Google receives the Registry's final report under Section ~~13.5~~13.6 (Final Report Regarding Cash Payments) or (B) the Effective Date, or

(2)    clause (ii)(2) above may be made no later than ninety (90) days after the later of (A) the condition in clause (ii)(2) has been met, (B) the Effective Date or (C) the date the request for Removal was made.

(v)    Any challenge brought pursuant to this Section 13.2(c) (Google-Claimant Challenges) must be based on Google's good faith belief, supported by evidence, that the Claimant's claim may be invalid.  Google shall not challenge claims in an effort to deter Claimants from submitting valid claims.

(vi)    Google will initiate challenges by providing notice to the Registry, and the Registry will forward such notice to the Claimant.  Google will attempt to resolve the challenge with the Registry, or another representative chosen by the Claimant, on behalf of the Claimant.  If Google is unable to resolve the challenge with the Registry or such other representative on behalf of the Claimant and continues to have a good faith belief, supported by evidence, that the Claimant's claim may be invalid, then Google may initiate dispute resolution pursuant to Article IX (Dispute Resolution).  Provided that the Claimant completes the Claim Form as required, including providing all required attestations, Google will bear the burden of providing clear and convincing evidence, including significant evidence specific to the Books or Inserts that are the subject of the claim,

155

which evidence is reviewed by an individual such as a Google attorney, that a reasonable number of the Claimant's claims within a set of claims identified by Google are invalid; provided that information about Books other than those that are the subject of Claimant's claims will only be used by Google to challenge the Claimant's claims for an imprint if Google shows that such information is relevant to such claims; provided, further that evidence of industry-wide baseline error rates in claims filed with the Registry is not clear and convincing evidence. (For purposes of this Section 13.2(c)(vi), a "set of claims," means, with respect to claims of a member of the Publisher Sub-Class, claims of Books published by such member's imprint, that are similar with respect to such evidence and that share other characteristics, such as genre and date of publication.) If Google meets this burden, the Claimant will bear the burden of proving the validity of the claims within such set. If Google does not meet this burden, Google will bear the burden of proving the invalidity of the challenged claims.

(vii)     A claim for a Commercially Available Book shall not be subject to any challenge under this Section 13.2(c) (Google-Claimant Challenges) unless, upon review of the Claim Form and other information that Google may reasonably consult, there is no apparent link between the Claimant and the publisher of the Book. In any challenge with respect to a Commercially Available Book where Google asserts that the claim is invalid because rights in the Book have reverted, Google shall provide clear and convincing evidence specific to such Book.

(d)     Claims for Content that is Neither a Book nor an Insert. Nothing in this Amended Settlement Agreement obligates Google to take directions for which this Amended Settlement Agreement provides, or to make Cash Payments, with respect to content that is not a Book or an Insert. Any Claimant may dispute a determination by Google or the Registry that the content that such Claimant has claimed is not a Book or an Insert only pursuant to Article IX (Dispute Resolution).

13.3    Claiming Process and Website. The Registry and, for so long as Google continues to provide operational support for the Registry, Google, will (i) assist Claimants in claiming Books pursuant to Section 13.1 (Registration and Completing Claim Forms) and (ii) maintain and improve the Settlement Website so as to facilitate the claiming of Books pursuant to Article XII (Class Notice Program). Google will also use reasonable commercial efforts to correct errors in the Books Database as Google discovers such errors or as they are identified to Google.

**13.4**    ~~13.3~~Time for Filing Deadline for Registration/Claim Forms. Rightsholders may register to participate in the Settlement at any time, provided that a Rightsholder who may be eligible for a Cash Payment pursuant to Section 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized) shall be required to complete and submit the portion of the Claim Form relating to the claim for such Cash Payment ~~within one year of the Notice Commencement Date~~by midnight, Eastern Time, March 31, 2011 or such other time as the Court may order.

**13.5**    ~~13.4~~Registry Determination of Rightsholder.  The Registry will maintain a database of Rightsholders and their respective rights under, and directions made pursuant to, this Amended Settlement Agreement.  Except as provided in Section 13.2 (Validating and Challenging Claims), in the event of a dispute as to such rights and directions, the Registry will determine the appropriate Rightsholder(s) (for Books, pursuant to the Author-Publisher Procedures) or, if the Registry cannot resolve any such dispute, such dispute will be resolved as provided in Article IX (Dispute Resolution). Until such determination is made, the Registry shall not make any Cash Payment or other payment, or implement any direction for Removal, exclusion, inclusion, or pricing, or any other directions with respect to the matters that are the subject of such dispute.

**13.6**    ~~13.5~~Final Report Regarding Cash Payments.

(a)    Draft Final Report.  Within a reasonable time after the period set forth in Section ~~13.3~~13.4 (Time for Filing Deadline for Registration/Claim Forms) for a Rightsholder to submit a Claim Form for a Cash Payment, the Registry shall issue a draft final report to Google and Class Counsel setting forth:  (i) the number of valid Claim Forms requesting such Cash Payment, (ii) a list of the Books claimed, (iii) a list of the Inserts claimed and the Books, Government Works or Public Domain Works in which they appear, and (iv) the amount of the Supplemental Deposit, if any, that Google is required to make pursuant to Article V (Other Settlement Benefits) based on the information in such draft final report.

(b)    Further Information.  Based on the draft final report, Google will provide the following information:

(i)    any Book for which a Cash Payment has been requested (1) that has the same Principal Work as another Book for which a Cash Payment has also been requested and (2) where the soft cover Book does not contain additional or different Protected Expression as compared to the hard cover Book but a Cash Payment has been requested for both,

157

(ii)      any Insert for which a Cash Payment has been requested (1) for appearance of the Insert in more than one Book, Principal Work or Government Work, and (2) for the Book in which such Insert appeared as content that was not an Insert, and

(iii)      any Principal Work for which a Cash Payment has been requested both for that Principal Work and for Expression from that Principal Work that is an Insert.

(c)      Final Report.  The Registry will issue a final report setting forth the information in Section 13.513.6(a) (Draft Final Report), as amended to take into account the further information provided by Google pursuant to Section 13.513.6(b) (Further Information) and to be consistent with Google's obligations under Section 5.1(a) (Cash Payments).

(d)      Disputes.  Any disputes regarding the final report shall be resolved pursuant to Article IX (Dispute Resolution).

13.7     13.6 No Liability For Settlement or Registry Administration.  No Person will have any claim against Plaintiffs, Class Counsel, Google, the Registry, the Settlement Administrator or any agent of any such Person for (a) any decision with respect to any Cash Payment or (b) actions taken with respect to any Cash Payments or other disbursements from the Settlement Fund.  Except as expressly set forth herein, this Amended Settlement Agreement is not intended to, nor shall it in any way be construed or interpreted to, create or support any cause of action or any claim for damages or injunctive relief against Plaintiffs, Class Counsel, the Registry, Settlement Administrator or other agents designated by Class Counsel, Google or its counsel, or any third party.

ARTICLE XIV — **FINAL FAIRNESS HEARING**

Plaintiffs shall, at least one week prior to the hearing for final approval of this Amended Settlement Agreement (the "Final Fairness Hearing"), as set by the Court, or some other time as the Court may order, file a Motion for Final Judgment and Order of Dismissal substantially in the form attached hereto as Attachment L ([Proposed] Final Judgment and Order of Dismissal).

ARTICLE XV — **CONFIDENTIALITY**

158

15.1    Confidential Information.  "Confidential Information" means any information relating to or disclosed in the course of implementing ~~this~~the original Settlement Agreement or this Amended Settlement Agreement by any Plaintiff or Google, which is, or should be reasonably understood to be, confidential or proprietary to the disclosing party, including the content of negotiations between any of Plaintiffs and Google, information about any customers, resellers and advertisers, technical processes and algorithms, source code, product designs, sales, cost and other unpublished financial information, product and business plans, projections and marketing data or pricing of any Plaintiff or Google, including information that may be disclosed by an auditor under Sections 4.6(e) (Audit Rights), 6.3(d) (Audit Rights) and 8.2(c) (Audits).  "Confidential Information" shall not include information (a) that members of the Amended Settlement Class reasonably have the right to know as Amended Settlement Class members represented in the Action, (b) already lawfully known by the receiving party without an obligation of confidentiality, (c) independently developed by the receiving party at any time without use of or reference to Confidential Information, (d) disclosed in published materials, (e) generally known to the public, or (f) lawfully obtained from any third party without breach of such third party's obligations of confidentiality.

15.2    Obligations.  Confidential Information shall be governed by the Settlement Discussions Confidentiality Agreement and such agreement shall continue to be in effect according to its terms.  The Registry and Google will enter into a non-disclosure agreement that will supersede the Settlement Discussions Confidentiality Agreement on a going forward basis.

15.3    Confidentiality of Rightsholder Information.  Google shall maintain and keep in strict confidence, and shall not use or disclose for any purpose other than to effectuate this Amended Settlement Agreement, any Rightsholder's personally identifiable information (*i.e.*, any information that can be used to uniquely identify, contact or locate a single person, including the Rightsholder's computer's unique identifier information) that Google receives in connection with the process by which Rightsholders register with the Registry, claim Books and Inserts or otherwise participate under this Amended Settlement Agreement, whether such information is received from the Registry or from the Rightsholder.  These restrictions, however, do not apply to Rightsholder information that is publicly available or obtained by Google from other sources, and shall not limit any uses by Google that are authorized by the Rightsholder.

15.4    Disclosures Required by Law.  In the event disclosure of Confidential Information is required of any party under the laws, rules or regulations of any applicable governing body, the party requested to make the disclosure (the "Disclosing Party") will (a) only disclose that portion of the Confidential Information of the other party (the "Other Party") reasonably required to be disclosed, (b) submit a request to such governing body that the Confidential Information or portions thereof receive confidential treatment under the laws, rules and regulations of such governing body or otherwise be

held in the strictest confidence to the fullest extent permitted under the laws, rules or regulations of any other applicable governing body, (c) provide notice to the Other Party in advance of the disclosure so the Other Party may, at its election, seek confidential treatment for the Confidential Information, a protective order or other appropriate remedy, relief or assurances, and (d) co-operate with the Other Party to obtain such confidential treatment, orders or other remedies, relief or reliable assurances that confidential treatment will be afforded the Confidential Information so disclosed. Disclosure under this Section 15.4 (Disclosures Required by Law) shall not relieve the Disclosing Party of its obligations of confidentiality generally under this Amended Settlement Agreement.  In no event shall the Disclosing Party oppose an action by the Other Party to obtain a protective order or other relief requiring that Confidential Information to be disclosed under this Section 15.4 (Disclosures Required by Law) be treated confidentially.

ARTICLE XVI — ~~RIGHT TO TERMINATE AGREEMENT~~INTENTIONALLY OMITTED

~~Google, the Author Sub-Class, and the Publisher Sub-Class each will have the right but not the obligation to terminate this Settlement Agreement if the withdrawal conditions set forth in the Supplemental Agreement Regarding Right to Terminate between Plaintiffs and Google have been met.  Any decision by Google, the Author Sub-Class or the Publisher Sub-Class to terminate this Settlement Agreement pursuant to this Article XVI (Right to Terminate Agreement) will be in accordance with the procedures set forth in the Supplemental Agreement Regarding Right to Terminate.  The Supplemental Agreement Regarding Right to Terminate is confidential between Plaintiffs and Google, and will not be filed with the Court except as provided therein.~~

ARTICLE XVII — **MISCELLANEOUS PROVISIONS**

17.1    <u>Good Faith Efforts</u>.  Google and Plaintiffs shall cooperate in good faith to effectuate this Amended Settlement Agreement as soon as practicable, including cooperating as set forth herein in seeking the Court's certification of the Amended Settlement Class, the Court's preliminary and final approval of the Settlement, and the Court's approval of procedures to secure the prompt, complete and final dismissal with prejudice of the Action.  Further, Google and the Registry shall at all times perform their respective obligations under this Amended Settlement Agreement in good faith and with fair dealing.

17.2    <u>Plaintiffs' Participation in Settlement</u>.  None of the Representative Plaintiffs or Associational Plaintiffs will opt out of or object to the Settlement.

17.3 <u>Final if Not Terminated</u>.  This Amended Settlement Agreement, if not terminated pursuant to any provision hereof, shall become final on the Effective Date and shall expire on the date on which the last U.S. copyright in any Book or Insert terminates.

17.4 <u>Dismissal of Action.</u>  Upon the Final Approval Date, Plaintiffs and Rightsholders shall be deemed to have stipulated that the Action shall be dismissed with prejudice.

17.5 <u>Effect of Termination</u>.  In the event this Amended Settlement Agreement does not become final for any reason, this Amended Settlement Agreement shall be null and void (except for the second sentence of Section 5.3(h) (Google Rights and Obligations), the first sentence of Section 15.2 (Obligations) and Section 17.6 (Reimbursement if Terminated), which will remain in full force and effect) and of no force and effect (unless all Plaintiffs and Google agree to proceed with the Settlement as they may agree to modify it (subject to Section 7.2(f)(iv) (No Modification Without Consent)), in which event Plaintiffs and Google shall proceed with this Amended Settlement Agreement as so modified), and this Amended Settlement Agreement and all negotiations and proceedings connected with it shall be without prejudice to the rights of either Google or any of the Plaintiffs, shall not be deemed or construed to be an admission by Google or any of the Plaintiffs of any fact or matter, and shall not be used in any way in the Action or in any other action or proceedings, and all parties shall have the same legal rights and obligations as they had before the Amended Settlement Agreement Date with respect to the matters covered by this Amended Settlement Agreement, except with respect to payments of Administrative Costs.  In addition, the Settlement Discussions Confidentiality Agreement shall continue to be in effect according to its terms.

17.6 <u>Reimbursement if Terminated</u>.  ~~Subject to Article XVI (Right to Terminate Agreement), if this~~If this Amended Settlement Agreement becomes null and void pursuant to Section 17.5 (Effect of Termination), within five (5) Business Days of notice by Google to Plaintiffs of such event, the balance of the Settlement Fund, including interest, shall be disbursed to Google by wire transfer into an account designated by Google, less all Administrative Costs incurred or owing for the Settlement Administration Program.  For purposes of the disbursement made pursuant to this Section 17.6 (Reimbursement if Terminated), no deduction shall be made for fees of Class Counsel for the Author Sub-Class or for any costs other than those Administrative Costs already incurred.  Class Counsel shall not be responsible for any losses, principal or otherwise, of the Settlement Fund.

17.7    Jurisdiction.

(a)         Use Outside the United States.

(i)         No Other Authorizations.  This Amended Settlement Agreement does not authorize the Digitization or any other form of copying, Display Use, Non-Display Use, or any other use of Books and Inserts, outside the United States.

(ii)        Foreign Public Domain Works.  Further, with respect to Books that are not in the public domain under the Copyright Act in the United States, but are in the public domain in any jurisdiction outside the United States, this Amended Settlement Agreement neither authorizes nor prohibits Google from exploiting those Books in such jurisdiction; provided, however, that, in countries that do not have a copyright law that provides for a copyright term of at least the life of the author and fifty (50) years after the author's death for literary works that are not anonymous or pseudonymous where copyright is granted to natural persons, then Google will not treat Books as in the public domain in such jurisdiction.

(iii)       Notification of Foreign Use.  Google agrees to notify the Registry if and when Google commences any use of Books or (to Google's knowledge) Inserts outside of the United States that displays Protected material other than material that is allowed to be displayed in Snippet Display.

(b)        Public Domain.  Except as specifically set forth in Section 17.7(a)(ii) (Foreign Public Domain Works), nothing herein restricts Google's use of public domain material, nor are any authorizations given with respect to such material.

17.8    Contact with Rightsholders.  Google may contact Rightsholders through the Registry with announcements related to uses of their Books and Inserts authorized by this Amended Settlement Agreement or the Registry, provided that such announcements are no more than quarterly in frequency and provided that any Rightsholder may opt out of receiving such announcements.  Google shall notify Rightsholders of the existence of the Registry and the means by which Rightsholders can register and/or submit claims with the Registry, for example, through a link to the Registry on a page soliciting

162

participation in the Google Partner Program, before initiating communication concerning the Settlement with Rightsholders with whom Google is not already in communication.

17.9 <u>Separate Agreements with Amended Settlement Class Members</u>. Google may already have, and may in the future enter into, separate agreements directly with individual members of the Amended Settlement Class regarding their Books, *e.g.*, through the Google Partner Program. Nothing herein restricts or affects Google's and such members' right to enter into or maintain such separate agreements; however, except with respect to any member of the Amended Settlement Class with whom Google has such separate agreements as of the Amended Settlement Agreement Date, at the outset of any initial communication with such a member regarding matters under this Amended Settlement Agreement, Google shall inform such member (a) of the reason for the communication, (b) that such member's interests are affected by the terms of this Amended Settlement Agreement and are represented by the Registry, together with a brief explanation of both, (c) that such member is free to continue to have his, her or its interests so represented, as opposed to dealing directly with Google, and (d) if such member remains interested in dealing directly with Google, Google is prepared to do so. The non-exclusive rights of Google under this Amended Settlement Agreement are in addition to any rights granted to Google by any Rightsholder in any such separate agreement; provided, however, that any specific prohibitions imposed upon Google by a Rightsholder in any such other agreement shall apply during the term of such other agreement. In cases in which Google has, on or after the Amended Settlement Agreement Date, a direct agreement with a Rightsholder with respect to that Rightsholder's Books (through the Google Partner Program or otherwise), then the payments required to be paid to the Registry set forth in Article IV (Economic Terms for Google's Use of Books) shall not apply to those Books and the payments set forth in the applicable direct agreement will apply; provided, however, that Google shall comply with the procedures in Section 3.5(c) (Take-Down or Transfer Requests).

17.10 <u>Scan Quality</u>. Google will strive to detect and eliminate errors in the Digitization quality or Metadata. Google makes no guarantees, however, regarding the Digitization quality or Metadata quality of any Book or Insert and, accordingly, Google will not be deemed in breach of the authorizations under this Amended Settlement Agreement due to omissions of text that may occur unintentionally due to technical limitations.

17.11 <u>Use of Contractors</u>. If and to the extent that Google uses third parties to exercise its rights, including to Digitize Books or Inserts, or to perform any of its obligations, as set forth in this Amended Settlement Agreement, Google shall, at all times, be and remain responsible for ensuring that such parties act in accordance with Google's obligations under this Amended Settlement Agreement. Google shall be liable for any such third party's nonconformance with or breach of this Amended Settlement

163

Agreement, and such breaches shall be regarded as breaches by Google for purposes of Article VIII (Security and Breach).

17.12   Effect of Right to Exclude.  Google shall not base its determination of whether to sell a Book through Consumer Purchase or Institutional Subscriptions solely on the decision of the Rightsholder to exclude that Book from a particular Display Use, unless Google demonstrates that its inability to make Preview Use or Snippet Display, as applicable, results in economic harm to Google in selling that Book or that type of Book. In the event that Google makes a determination not to sell through Consumer Purchase or Institutional Subscription a Book that the Rightsholder has excluded from Preview Use or Snippet Display, then Google will notify the Registry thereof and will state its reasons for that determination and, if the determination was based on the decision of the Rightsholder to exclude the Book from Preview Use or Snippet Display, Google will, with such notice, provide the Registry with data and information demonstrating that Google's inability to make Preview Use or Snippet Display, as applicable, results in economic harm to Google in selling that Book or that type of Book.  All disputes under this provision shall be resolved pursuant to Article IX (Dispute Resolution); provided, however, that until the Arbitrator renders a Decision in favor of Google, Google shall not refrain from selling such Book through Consumer Purchase or Institutional Subscriptions.

17.13   Patent Indemnity.  Google, at its own expense, shall defend or, at its option settle, any claim, suit or proceeding brought against the Registry or its directors, officers, employees and agents by a third party arising out of a claim that Google's Digitization of Books or Inserts, Google's use of Books or Inserts in Google Products and Services under this Amended Settlement Agreement or any other acts of Google undertaken pursuant to or in furtherance of this Amended Settlement Agreement infringe any such third party's United States patents, or that the Registry induced any such infringement.  Google shall indemnify and hold harmless the Registry and any and all of its directors, officers, employees and agents from any liabilities, damages and costs awarded in any such claim, suit or proceeding or agreed to by Google in settlement thereof, or otherwise incurred by Google or by the Registry at Google's direction in connection therewith.  The foregoing obligations are subject to the Registry providing Google with:  (a) prompt written notice of such claim, suit or proceeding, (b) exclusive control over the defense and settlement of such claim, suit or proceeding and (c) proper and full information and assistance, at Google's expense, to settle or defend any such claim, suit or proceeding.  Notwithstanding the foregoing, in no event shall Google have any obligations or liability under this Section 17.13 (Patent Indemnity) to the extent that any such claim, suit or proceeding arises out of any content, information or data provided to Google by the Registry or any Rightsholder.  The Registry may, at its own expense, assist in the defense of any claim, suit or proceeding for which Google indemnifies the Registry under this Section 17.13 (Patent Indemnity) if the Registry so chooses.

17.14   No Liability for Consequential Damages.  In no event will Google, a Fully Participating Library, a Cooperating Library, Plaintiffs, Class Counsel, or the Registry be liable for lost profits or any form of indirect, special, incidental, consequential or punitive damages of any character from any claims arising out of this Amended Settlement Agreement, whether based on breach of contract (including breach of the Security Standard or any Security Implementation Plan), tort (including negligence), or otherwise, and whether or not Google, a Fully Participating Library, a Cooperating Library, Plaintiffs, Class Counsel or the Registry has been advised of the possibility of such damage.

17.15   Notices.

(a)      Legal Notices.  All notices and demands concerning (i) any breach or alleged breach of this Amended Settlement Agreement, (ii) any dispute under this Amended Settlement Agreement, (iii) any exercise of audit rights under this Amended Settlement Agreement, (iv) pricing of Institutional Subscriptions, Consumer Purchases, additional Public Access Service and other Revenue Models under this Amended Settlement Agreement, (v) payment of any amounts under any provision of this Amended Settlement Agreement, (vi) any Alternative Accommodated Service Provider, (vii) any Third-Party Required Library Services Provider, and (viii) any matter under Articles XI (Preliminary Settlement Approval), XII (Class Notice Program), XIII (Settlement Administration Program), and XIV (Final Fairness Hearing), and XVI (Right to Terminate Agreement) and Section 17.6 (Reimbursement if Terminated) shall be sent (1) before the Effective Date, to counsel for the Author Sub-Class, counsel for the Publisher Sub-Class, and Google's General Counsel, and (2) after the Effective Date, to the chief executive officer of the Registry and Google's General Counsel.

(b)      Other Notices.  All other notices, demands, and requests for which the recipient is not specified in this Amended Settlement Agreement shall be sent (i) before the Effective Date, to counsel for the Author Sub-Class, counsel for the Publisher Sub-Class, and Google's General Counsel, and (ii) after the Effective Date, to Google's Vice President, Content Partnerships and, until such time as the Registry designates other counsel, to counsel for the Author Sub-Class and counsel for the Publisher Sub-Class.

165

(c)     Delivery.  All notices, demands and requests as specified herein shall be in writing and shall be sent by e-mail (if practicable) and either by overnight courier or by such other delivery methods as provide the sender with proof of the recipient's receipt and actual notice or, alternatively, with respect to notices under Section 17.15(b) (Other Notices) only, through a mode of electronic communication agreed between Google and the Registry.  Notice shall be deemed received upon written verification from overnight courier or such other delivery methods of the recipient's receipt. Contact information shall be updated in writing as necessary to ensure that each such party has current information regarding all such contacts.  In no event shall the time period for taking any action under this Amended Settlement Agreement be extended by reason of Rule 6(d) of the Federal Rules of Civil Procedure.

17.16   Time Periods.  All time periods set forth herein shall be computed in calendar days unless otherwise provided.  In computing any period of time prescribed or allowed by this Amended Settlement Agreement or by order of the Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be so included, unless it is a Saturday, Sunday or otherwise not a Business Day, or, when the act to be done is the filing of a paper in Court, a day on which weather or other conditions have made the office of the Clerk of the Court inaccessible, in which event the period shall run until the end of the next day that is not one of the aforementioned days.

17.17   Public Statements.  Any party may make public statements about the Action, the Settlement and this Amended Settlement Agreement, including statements to the press, subject to the limitations regarding confidentiality set forth in Article XV (Confidentiality).

17.18   Tax Consequences.  No opinion or advice concerning the tax consequences of this Amended Settlement Agreement to individual members of the Amended Settlement Class is being given or will be given by Class Counsel.  No representation or warranty in such regard is made by virtue of this Amended Settlement Agreement.  The Notice will direct members of the Amended Settlement Class to consult their own tax advisors regarding the tax consequences of the Settlement and any tax reporting obligations they may have with respect thereto.  Each such member's tax obligations, and the determination thereof, are the sole responsibility of such member, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual member of the Amended Settlement Class.

17.19   Destruction.  Within thirty (30) days after the Effective Date, counsel for the Author Sub-Class, counsel for the Publisher Sub-Class and counsel for Google will

destroy all copies of, and erase from computer memory, all documents produced to them pursuant to the Action, except for documents that the producing party agrees in writing are necessary for the Registry and/or the claims administration process. Counsel for the Author Sub-Class and counsel for the Publisher Sub-Class will notify Google, and Google will notify counsel for the Author Sub-Class class and Counsel for the Publisher Sub-Class, that such destruction has occurred.

17.20  <u>Attachments</u>.  All of the Attachments to this Amended Settlement Agreement are material and integral parts hereof, and are incorporated in this Amended Settlement Agreement by reference herein.

17.21  <u>No Other Representations</u>.  Other than as set forth in this Amended Settlement Agreement, ~~the Supplemental Agreement Regarding Right to Terminate,~~ and the separate ~~settlement agreement~~Amended Settlement Agreement between the Representative Plaintiffs that represent the Publisher Sub-Class and Google in *The McGraw-Hill Companies, Inc. v. Google Inc.*, 05 Civ. 8881 (~~JES~~DC) (which ~~settlement agreement~~Amended Settlement Agreement is attached hereto as Attachment M (Amended Settlement Agreement Between Publishers and Google)), no party to this Amended Settlement Agreement has relied on any representation of another party in entering into this Amended Settlement Agreement.

17.22  <u>Governing Law</u>.  This Amended Settlement Agreement, including the Author-Publisher Procedures, shall be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflicts of laws.

17.23  <u>Court's Continuing Jurisdiction</u>.  The Court shall retain jurisdiction over the interpretation and implementation of this Amended Settlement Agreement.  Except as provided in Article IX (Dispute Resolution), any claims, disputes or actions arising under or to enforce this Amended Settlement Agreement shall be commenced and maintained only in the Court.

17.24  <u>Extensions of Time</u>.  Plaintiffs and Google reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of this Amended Settlement Agreement, subject to Section 7.2(f)(iv) (No Modification Without Consent).

17.25  <u>Complete Defense</u>.  This Amended Settlement Agreement may be pleaded as a full and complete defense, and may be used as the basis for an injunction against, any action, suit, or other proceeding that may be instituted, prosecuted, maintained, or attempted in breach of this Amended Settlement Agreement.

17.26  <u>Entire Agreement</u>.  This Amended Settlement Agreement, including all of the Attachments hereto, together with the ~~Supplemental Agreement Regarding Right to Terminate and the~~ letter agreement referred to in Section 13.2(c)(iii)(1)(A), contain the

entire, complete, and integrated statement of each and every term and provision agreed to by and among Plaintiffs and Google; set forth the entire agreement among Plaintiffs and Google with respect to their subject matter; and are not subject to any condition not provided for in this Amended Settlement Agreement and the Supplemental Agreement Regarding Right to Terminate.  Plaintiffs and Google shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of this Amended Settlement Agreement.

17.27   Amendments.  Prior to the Final Approval Date, Plaintiffs and Google may, by written agreement, amend this Amended Settlement Agreement, subject to Court approval.  At any time on or after the Final Approval Date but prior to the Effective Date, Plaintiffs and Google may, by written agreement, amend this Amended Settlement Agreement, without notice to or approval of the Court, only if such amendment is not materially inconsistent with the Court's Final Judgment and Order of Dismissal and does not impair the rights of the Amended Settlement Class under this Amended Settlement Agreement.  After the Effective Date, the Registry and Google may, by written agreement, amend this Amended Settlement Agreement, without notice to or approval of the Court, only if such amendment does not impair the rights of the Amended Settlement Class under this Amended Settlement Agreement.  This Section 17.27 (Amendments) is subject to any approvals of any Fully Participating Libraries and any Cooperating Libraries required by Section 7.2(f)(iv) (No Modification Without Consent).

17.28   No Party Is the Drafter.  Neither Google nor any of the Plaintiffs shall be considered the drafter of this Amended Settlement Agreement or any provisions hereof for the purpose of any statute, case law or rule of interpretation or construction that might cause any provision to be construed against the drafter hereof.

17.29   No Prevailing Party.  Neither Google nor any of the Plaintiffs is a "prevailing party" in the Action.

17.30   Assignment.  Google Inc. may assign its rights and delegate its duties under this Amended Settlement Agreement to a division or an Affiliate of Google Inc., provided that such division or Affiliate agrees to be bound by all of the terms hereof and, provided further, Google Inc. may assign this Amended Settlement Agreement without consent to a successor-in-interest in connection with a merger or the sale of all or substantially all of its assets to which this Amended Settlement Agreement relates.  Any attempted assignment, delegation or transfer in derogation hereof shall be null and void.  This Amended Settlement Agreement shall be binding upon the heirs, successors, and permitted assigns of each of Plaintiffs, of Rightsholders and of Google.

17.31   Counterparts.  This Amended Settlement Agreement may be signed in counterparts, each of which shall constitute a duplicate original.  Execution by facsimile shall be fully and legally binding on a party.

17.32  Interpretation.  In this Amended Settlement Agreement, except as otherwise provided,

(a)      the headings in this Amended Settlement Agreement are inserted for convenience only and do not form a part of this Amended Settlement Agreement and are not intended to interpret, define or limit the scope, extent or intent of this Amended Settlement Agreement or any provision hereof;

(b)      the terms "include," "including," "such as," and "*e.g.*," when following any general statement or term, are not to be construed as limiting the general statement or term to the specific items or matters set forth, but rather as permitting the general statement or term to refer to all other items or matters that could reasonably fall therein;

(c)      where in this Amended Settlement Agreement, Rightsholders are deemed to have authorized Google or a Fully Participating Library to make a specified use of Books or Inserts in specified ways, such authorization includes:

(i)      the right to reproduce, distribute, display, and make technical adaptations to (but not to adapt or alter the content of) such Books or Inserts for the purposes of making, and to the extent reasonably required to make, such authorized use, using any means and any technology, whether now known or hereafter devised; and

(ii)      use of a Book without (1) its Inserts or any portions that have been excluded by any Insert Rightsholder or the Book Rightsholder, and pages of the Book on which such Inserts or portions appear, (2) Inserts of a member of the Amended Settlement Class who has opted out of the Settlement and (3) other Expression in that Book that is not an Insert, *e.g.*, because it is an image;

(d)      all accounting terms not otherwise defined herein have the meanings assigned to them by, and all calculations to be made hereunder are to be made in accordance with, United States generally accepted accounting principles, as applied on a consistent basis; and

169

(e)      a reference to a required agreement, approval, authorization or consent means written agreement, approval, authorization or consent, as the case may be.

17.33   Effect of Opt-Out.  If all of the members of the Amended Settlement Class who have a Copyright Interest in a particular Book or Insert opt out of the Settlement by the Supplemental Opt-Out Deadline, then neither this Amended Settlement Agreement nor any Library-Registry Agreement authorizes or prohibits the use of such Book or Insert, no Claims with respect to such Book or Insert are released by this Amended Settlement Agreement or the Final Judgment and Order of Dismissal or any Library-Registry Agreement, and this Amended Settlement Agreement will, after the Supplemental Opt-Out Deadline, no longer apply to such Book or Insert.

17.34   Compliance with Law.  Notwithstanding any other provision of this Amended Settlement Agreement, nothing in this Amended Settlement Agreement requires Google, a Rightsholder, a Participating Library, the Registry or any Plaintiff to take any action that would violate any applicable law and none of them shall be held to have breached this Amended Settlement Agreement by omitting to take any action that, if taken, would violate any applicable law.

This Amended Settlement Agreement is dated October 28, 2008.November 13, 2009.

170

**DEFENDANT:**

**GOOGLE INC.**

By: _____
       Name: David C. Drummond
       Title: Senior Vice President, Corporate Development and Chief Legal Officer

1600 Amphitheatre Parkway
Mountain View, CA 94043
(650) 253-0000 (phone)
(650) 253-0001 (fax)

| **COUNSEL FOR PLAINTIFFS:** | |
|---|---|
| **DEBEVOISE & PLIMPTON LLP** | **BONI & ZACK LLC** |
| By: _____ | By: _____ |
| Name: Jeffrey P. Cunard<br>      Bruce P. Keller<br>      ~~James J. Pastore, Jr.~~ | Name: Michael J. Boni<br>      Joanne Zack |
| DEBEVOISE & PLIMPTON LLP<br>919 Third Avenue<br>New York, NY 10022<br>(212) 909-6000 (phone)<br>(212) 909-6836 (fax)<br>jpcunard@debevoise.com<br>bpkeller@debevoise.com<br>~~jjpastor@debevoise.com~~ | BONI & ZACK LLC<br>15 St. Asaphs Road<br>Bala Cynwyd, PA 19004<br>(~~215~~610) 822-0200 (phone)<br>(~~215~~610) 822-0206 (fax)<br>mboni@bonizack.com<br>jzack@ bonizack.com |
| *Attorneys for Plaintiffs*<br>*~~The McGraw-Hill Companies, Inc.,~~*<br>*~~Pearson Education, Inc.,~~* | *Attorneys for Plaintiffs*<br>*The Authors Guild, Inc.,* |

| ~~Penguin Group (USA) Inc.,~~ | ~~Herbert Mitgang,~~ |
|---|---|
| ~~Simon & Schuster, Inc.,~~ | ~~Betty Miles,~~ |
| ~~John Wiley & Sons, Inc.,~~ | ~~Daniel Hoffman,~~ |
| *Association of American Publishers, Inc., and* | ~~Paul Dickson,~~ |
| *The Publisher Sub-Class* | ~~Joseph Goulden,~~ *and* |
| | *The Author Sub-Class* |

**<u>Attachments</u>:**

A— Procedures Governing Author Sub-Class and Publisher Sub-Class Under the <u>Amended</u> Settlement Agreement

B—Form of Library-Registry Agreements

    B-1—Form of Library-Registry (Fully Participating) Agreement

    B-2—Form of Library-Registry (Cooperating) Agreement

    B-3—Form of Library-Registry (Public Domain) Agreement

C—Plan of Allocation

D—Security Standard

E—Public Domain

F—Preview Uses

G—Approved Libraries

H—[Proposed] Order Granting Preliminary Settlement Approval

I—Notice of Class Action Settlement

J—Summary Notice of Class Action Settlement

K—Paid Media Schedule

L—[Proposed] Final Judgment and Order of Dismissal

M—Amended Settlement Agreement Between Publishers and Google

N – Supplemental Notice

# ATTACHMENT A

## PROCEDURES GOVERNING AUTHOR SUB-CLASS AND PUBLISHER SUB-CLASS UNDER THE AMENDED SETTLEMENT AGREEMENT

Publishers and Authors recognize that they may have legitimate and overlapping rights to authorize use of and receive compensation for Books. Accordingly, in the course of settling the Action, Publishers and Authors have established procedures for determining their respective rights with respect to Books, the Settlement Fund and revenues earned from Books under the Amended Settlement Agreement.

### ARTICLE I. Definitions; Cross-References

1.1 A capitalized term in these Author-Publisher Procedures shall have the same meaning as set forth in the Amended Settlement Agreement, unless otherwise provided.

1.2 <u>Author</u> means a member of the Author Sub-Class.

1.3 <u>Educational Books</u> means Books that, when published, were intended primarily for sale to educational markets (*i.e.*, K-12, higher education, continuing education, vocational, professional, self-study, and similar educational markets) for use in educational programs.

1.4 <u>Other Google Program</u> means a Google program other than, but similar to, the Revenue Models, including, but not limited to, the Google Partner Program.

1.5 <u>Publisher</u> means a member of the Publisher Sub-Class.

1.6 Unless otherwise stated, all references herein to Articles and Sections refer to Articles and Sections of these Author-Publisher Procedures.

# ARTICLE II.  Scope of Procedures

2.1     <u>Scope</u>.  Except as set forth in Article X, the terms of these Author-Publisher Procedures apply only to the rights and obligations under this Amended Settlement Agreement with respect to Rightsholders' Books.

2.2     <u>Effective Date</u>.  The Author-Publisher Procedures are effective as of the Effective Date, provided, however, that if the Registry is operational prior to that date, an Author and a Publisher may, by mutual agreement, invoke the procedures set forth in these Author-Publisher Procedures.

# ARTICLE III.  Classification of Books

3.1     <u>Initial Classification of a Book</u>.  Books that are initially classified as Commercially Available under the Amended Settlement Agreement on the Notice Commencement Date will be classified under these Procedures as In-Print Books, subject to Sections 3.2 and 3.3.3.3; provided, however, that each Book in which all Copyright Interests are owned by an Author will be classified under these Procedures as an Out-of-Print Book and treated as Author-Controlled under Sections 6.1 and 6.2.  Books that are initially classified under the Amended Settlement Agreement on the Notice Commencement Date as not Commercially Available will be classified under these Procedures as Out-of-Print Books, subject to Sections 3.2 and 3.3.

3.2     <u>Tests for Determining Classification of Books</u>.  Either an Author (or the Author directors of the Board of Directors of the Registry) (other than for a work-for-hire Book) or a Publisher (or the Publisher directors of the Board of Directors of the Registry) (other than for a reverted or Author-Controlled (defined in Article IV) Book) or the Unclaimed Works Fiduciary can challenge the classification of its Book or a group of its Books as In-Print or as Out-of-Print based on the following tests.

         (a)     A Book shall be classified as In-Print if it meets either of the following tests:

                 (i)     <u>Test 1</u>:

                         The author-publisher contract for the Book does not provide for reversion to the Author of rights in the Book under any circumstances, or the Book is "in-print" under the author-publisher contract.  For this purpose, the Book may be "in-print" even if the contract does not use the term "in-print," provided, however:

2

(1)     If the contract measures "in-print" by reference to revenues and more than fifty percent (50%) of the revenues paid to a Publisher from exploitation of a Book are earned from the Revenue Models, then those revenues shall not be considered in determining whether this Test 1 has been met.

(2)     If the contract measures "in-print" by units sold or measures other than revenues, then an equivalent principle will be applied in determining whether this Test 1 has been met.  The fact that a Book or information about a Book is included in a database or that information about the Book is provided in search engine results does not, by itself, mean that the Book is "in-print."

(3)     A Book is not "in-print" if the author-publisher contract provides for reversion to the Author of rights in the Book and all of the criteria for reversion have been met (except that the Author need not have sent a request for reversion to the Publisher).

(ii)     <u>Test 2</u>:

To the extent consistent with any rights in the Book that it may have under the author-publisher contract, the Publisher publicly has announced to the trade that it has undertaken concrete steps to publish an existing or new edition of the Book, and such edition is published within twelve (12) months of the announcement.

(b)     If neither of the Tests in Section 3.2(a)(i) or (ii) is met, then the Book shall be classified as Out-of-Print.

3.3     <u>Procedures for Changing Classification of a Book</u>.

(a)     An In-Print Book shall be reclassified as an Out-of-Print Book if, pursuant to Section 3.2(d)(i) (Basis for Determination) of the <u>Amended</u> Settlement Agreement, such Book is determined to be not Commercially Available unless, pursuant to Article III, an Author or Publisher of such Book (or the Author directors or Publisher directors of the Board of Directors of the Registry <u>or the Unclaimed Works Fiduciary</u>, respectively), demonstrates to the Registry, and the Registry finds, that such Book meets either Test 1 or Test 2.

(b)     An Author or Publisher of a Book, or the Author directors or Publisher directors of the Board of Directors of the Registry <u>or the Unclaimed Works Fiduciary</u>, respectively, challenging the classification of such Book as In-Print or Out-of-

3

Print shall file a notice with the Registry with evidence (such as contracts, royalty statements, or trade announcements) sufficient to establish whether that Book meets either Test 1 or Test 2 (such evidence may, if no documentary evidence is reasonably available, include an affidavit).

(c)     The Registry shall notify the other party of such challenge and evidence.  If the other party, upon receipt of such notice, does not object and provide evidence rebutting the challenge within one hundred twenty (120) days from the time such notice is sent by the Registry, and the Registry finds that the evidence is sufficient to establish whether or not the Book meets either Test 1 or Test 2, then the Registry will deem the challenger's evidence dispositive and will promptly change the status of the Book from In-Print to Out-of-Print, or vice versa, as appropriate.

(d)     If the parties have each timely submitted evidence and have not resolved the matter between them within sixty (60) days from the date such evidence is submitted to the Registry, the Registry will determine whether the evidence submitted establishes that the Book should be classified as In-Print or Out-of-Print under Section 3.2 by reviewing each party's documentary submissions, as well as any other relevant evidence submitted by the parties, including documents, affidavits, the course of dealing between the parties, or industry standards and practices.

(e)     Any such determination by the Registry shall be final, provided, however:

(i)     A determination by the Registry that a Book classified as In-Print should actually be classified as Out-of-Print shall not preclude the Publisher of that Book from subsequently publishing the Book that would result in a further reclassification of the Book as In-Print, provided doing so is consistent with the terms of the author-publisher contract.

(ii)     Nothing precludes the Author of a Book from at any time challenging the status of that Book as In-Print on the ground that the Book fails to meet either Test 1 or Test 2.

(f)     If (i) a challenge to the classification of a Book or group of Books is brought by the Author directors or the Publisher directors of the Board of Directors of the Registry or the Unclaimed Works Fiduciary pursuant to Section 3.2, (ii) such challenge is brought before the Board of Directors and (iii) the Board of Directors is unable to make any determination pursuant to Section 3.3(b), then the matter shall be submitted to dispute resolution pursuant to Article IX (Dispute Resolution) of the Amended Settlement Agreement.

4

# ARTICLE IV.  Author-Controlled Determination

4.1  <u>Procedures</u>.  The following procedure shall apply in determining whether any Book for which the rights have not reverted to the Author (other than a Book that is a work-for-hire or for which the author-publisher contract does not provide for reversion of rights to the Author in any circumstances) shall be classified as Author-Controlled solely for purposes of the Revenue Models and other Registry-brokered licenses:

(a)  An Author shall send or shall have previously sent to the Publisher (either before or after the Effective Date) a request for reversion to the Author of rights in such Book, in accordance with the author-publisher contract.

(b)  If the Publisher does not respond or did not previously respond in writing to such request within (i) ninety (90) days or (ii) the applicable written response period specified in the author-publisher contract, if any (whichever period is longer) (the "<u>Response Period</u>"), then the Author may send a "<u>Change Status Notice</u>" to the Registry (with a copy to the Publisher).  The Change Status Notice must:

(i)  affirm that the Author believes that the Book is no longer "in-print," as defined in Test 1 and that the Response Period has expired, and request that the Book be deemed to be Author-Controlled;

(ii)  include a copy of the request for reversion previously sent to the Publisher; and

(iii)  include a copy of the applicable author-publisher contract if the Author has it.

(c)  Upon receipt of a Change Status Notice for a Book, the Registry shall escrow all revenues from Revenue Models thereafter owed to an Author and Publisher of the Book.

(d)  If, within one hundred twenty (120) days of the date of the Change Status Notice, the Publisher does not respond in writing to the Registry and the Author to dispute the Change Status Notice, the Registry shall deem the Book to be Author-Controlled.  Such Author-Controlled Book shall be subject to Section 6.1(b) and escrowed revenues shall be distributed according to Section 6.2(a).

(e)     If, within one hundred twenty (120) days of the date of the Change Status Notice, the Publisher disputes the Change Status Notice, the parties shall submit the issues in dispute to the Registry for decision.

(i)     At either party's request, the Registry shall review both parties' documentary submissions, as well as any other relevant evidence, to determine whether the Book should be classified as In-Print or as Out-of-Print pursuant to the procedures and tests in Article III.

(ii)     The Registry shall review both parties' documentary submissions, as well as any other relevant evidence, to determine whether rights in the Book are subject to reversion to the Author according to the terms of the author-publisher contract.

(iii)     If the Registry determines that the conditions in the author-publisher contract for reversion to the Author of rights in the Book have been met, the Registry shall deem the Book to be Out-of-Print and Author-Controlled, the Book shall be subject to Section 6.1(b), and all escrowed revenues shall be distributed according to Section 6.2(a).

(iv)     If the Registry determines that the conditions in the author-publisher contract for reversion to the Author of rights in the Book have not been met and that the Book is Out-of-Print, then the Out-of-Print Book shall be subject to Section 6.1(a) or 6.1(c), as applicable, and all escrowed revenues shall be distributed pursuant to Section 6.2(b) or 6.2(c), as applicable.

(v)     If the Registry determines an Out-of-Print Book should be reclassified as an In-Print Book, then the In-Print Book shall be subject to Article V.

4.2     <u>Notification of Procedures</u>.  If a Publisher claims or registers a Book pursuant to Section 13.1(c)(ii)(2)(B) of the Amended Settlement Agreement and an Author claims or registers the same Book pursuant to Section 13.1(c)(ii)(3)(B) of the Amended Settlement Agreement, the Registry will notify both the Author and Publisher of such claims and of the procedures available under this Article IV.

## ARTICLE V.  In-Print Books

5.1     <u>Permitted Uses</u>.  Both an Author (other than a work-for-hire Author) and the Publisher of an In-Print Book will be considered a Rightsholder for purposes of

Section 3.5 (Right to Remove or Exclude) of the Amended Settlement Agreement. Except for Books that are works-for-hire, for an In-Print Book, both the Author and the Publisher of such Book must agree, in accordance with the following procedure, that Google may make one or more Display Uses of the Book:

(a)     The Publisher shall initially notify the Registry and the Author of the Book as to any and all Display Uses the Publisher wishes to authorize (*e.g.*, whether or not to allow Preview Use for a Book).  The Author shall have the right, within thirty (30) days from the provision of such notice by the Publisher, to notify the Publisher and the Registry that the Author does not authorize some or all of the requested Display Uses. The Display Uses requested by the Publisher shall commence after such thirty (30)-day period absent notice from the Author that it does not authorize one or more of the requested Display Uses.  If the Author objects to one or more Display Uses, then only the mutually authorized Display Uses shall commence.

(b)     After the thirty (30)-day period in Section 5.1(a), each of the Author and the Publisher for an In-Print Book shall continue to be considered a Rightsholder for purposes of Section 3.5 (Right to Remove or Exclude) of the Amended Settlement Agreement (*i.e.*, for purposes of directing Removal, exclusion, changes in Display Uses and/or levels of access for any Revenue Model) and Section 5.2 will apply.

(c)     Nothing herein precludes an Author from informing the Publisher and the Registry at any time that the Author wants the Book made available for one or more Display Uses.

5.2     Removal; Exclusion; Changes in Display Uses.  Subject to Section 5.3, either the Author or the Publisher may direct the Registry to Remove or exclude, or change Display Uses of, an In-Print Book pursuant to Section 3.5 (Right to Remove or Exclude) of the Amended Settlement Agreement, and, upon such direction, the Registry will notify Google and either the Author or the Publisher of the Book, as appropriate.

5.3     Conflicting Directions.  If, at any time, the Author and the Publisher of a Book issue conflicting directions to the Registry for an In-Print Book pursuant to Section 3.5 (Right to Remove or Exclude) of the Amended Settlement Agreement, the more restrictive directions as to Removal, exclusions, changes in Display Uses or levels of access will control (*i.e.*, the Registry shall act in accordance with the request authorizing the fewest or most limited uses of the In-Print Book).

5.4     Control of Pricing.  If, either by the procedure set forth in Section 5.1 or pursuant to a Transfer Request under Article X for an In-Print Book in an Other Google Program, the Publisher and Author agree to authorize one or more Display Uses for a

7

Book, then the Publisher has the right to determine the pricing of the Book for Consumer Purchase and to negotiate a revenue split for the Book pursuant to Section 4.5(a)(iii) (Agreed Revenue Splits), provided, however, that an Author will continue to be considered a Rightsholder pursuant to Section 3.5 (Right to Remove or Exclude) of the Amended Settlement Agreement with rights to Remove or exclude the Book if the Author objects to the pricing.

5.5     Distribution of Payments/Revenues.  All payments under Section 5.1 (Cash Payments to Class Members Whose Books and Inserts Have Been Digitized) of the Amended Settlement Agreement and all revenues from Revenue Models for In-Print Books shall be remitted by the Registry to the Publisher and flow through the royalty statements of the Publisher.  The Publisher shall provide to the Author the appropriate splits or royalties as may be specified in the author-publisher contract for the Book or as the parties may otherwise agree.  If an Author wishes to dispute the split or royalty rate paid by the Publisher on such revenues, Article VII shall apply, provided, however, that Article VII shall not apply to Educational Books.

## ARTICLE VI.  Out-of-Print Books

6.1     Permitted Uses and Pricing.  The following terms shall apply with respect to uses of Out-of-Print Books:

(a)     For all Out-of-Print Books that are works-for-hire, only the Publisher of such Books shall be considered the Rightsholder for purposes of directing Removal, exclusion, changes in Display Uses and/or levels of access for any Revenue Model.  The Publisher will control the pricing for Consumer Purchase of any such Books.

(b)     For all Out-of-Print Books for which the rights have reverted to the Author or are determined to be or treated as Author-Controlled, only an Author of such Books shall be considered a Rightsholder for purposes of directing Removal, exclusion, changes in Display Uses and/or levels of access for any Revenue Model.  The Author will control the pricing for Consumer Purchase of such Books.

(c)     For all Out-of-Print Books for which the rights have not reverted to the Author and that are neither works-for-hire nor Author-Controlled, both (i) the Author and (ii) the Publisher shall be considered the Rightsholder for purposes of directing Removal, exclusion, changes in Display Uses and/or levels of access for any Revenue Model, provided, however, that any such direction by the Publisher must be for good reason articulated (*e.g*., for the Publisher's legal, technical, editorial, policy, commercial or economic reasons), provided, further, that, for purposes of the foregoing proviso, Removing, excluding or restricting Display Uses and/or levels of access for any Revenue

8

Model for the purpose of benefiting any other book with which such Out-of-Print Book might compete is not a "good reason." If, at any time, an Author and the Publisher of a Book issue conflicting directions to the Registry regarding the uses authorized for such Out-of-Print Book, the more restrictive directions as to levels of access will control (*i.e.*, the Registry shall act in accordance with the request authorizing the fewest or most limited uses of the Out-of-Print Book). Either an Author or the Publisher may set the price for Consumer Purchase of any such Books, provided, however:

(i)     upon receipt of a request to change the price for Consumer Purchase of such Book, the Registry shall notify the other party, if such a party has been identified; and

(ii)     in the case of a timely objection by the other party, the Registry will maintain the higher of the prices specified until the parties can agree on a new price for Consumer Purchase.

6.2     Distribution of Payments/Revenues.  All payments under Section 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized) of the Amended Settlement Agreement and revenues earned from Revenue Models shall be distributed by the Registry as follows:

(a)     For Out-of-Print Books for which the rights have reverted to the Author or are Author-Controlled, the Registry will remit one hundred percent (100%) of such revenues to the Author.

(b)     For Out-of-Print Books that are solely works-for-hire, the Registry will remit one hundred percent (100%) of such revenues to the Publisher.

(c)     For Out-of-Print Books other than those described in Sections 6.2(a) and 6.2(b), the Registry will separately remit payment to both the Author and the Publisher as follows:

(i)     For such Out-of-Print Books with a Publication Year prior to 1987, the Registry will pay out sixty-five percent (65%) of such revenues to the Author and thirty-five percent (35%) to the Publisher.

(ii)     For such Out-of-Print Books with a Publication Year during or after 1987, the Registry will pay out fifty percent (50%) of such revenues to the Author and fifty percent (50%) to the Publisher.

9

(iii)   For purposes of this Section 6.2(c), "Publication Year" means the earliest copyright year that appears in or on the Book, or if no copyright year appears in or on the Book, the year of initial publication set forth in a copyright registration for the Book.

(iv)   The Publisher will not owe splits or royalties to the Author on the revenues remitted to the Publisher by the Registry under this Section 6.2.

6.3   <u>Author Claim of Reversion</u>.  If an Author in claiming or registering an Out-of-Print Book pursuant to Section 13.1(c)(ii) of the Amended Settlement Agreement indicates that, to the best of the Author's knowledge, such Book is not a work-for-hire and is reverted, and a Publisher claims or registers the same Book pursuant to Section 13.1(c)(ii)(2)(B) of the Amended Settlement Agreement, then such Book will be presumed reverted for purposes of this Article VI and solely for purposes of the Revenue Models and exercising rights under the Amended Settlement Agreement and other Registry-brokered licenses.  The Registry shall notify such Publisher of such indication by the Author.  If, within a reasonable time after such notification, the Publisher comes forward with evidence that the Author is not a Rightsholder of the Book and/or the Book is not reverted, the Registry will notify the Author as to such evidence and give the Author an opportunity to submit his or her own evidence.  If there is a dispute based on the evidence submitted to the Registry by the Author and the Publisher, the dispute will be resolved pursuant to Article IX (Dispute Resolution) of the Amended Settlement Agreement based on all the evidence presented.  In each such dispute, the Arbitrator will determine who shall bear the burden of proof under the circumstances.

6.4   <u>Resolving Conflicting Claims</u>.  Except where otherwise specifically provided in these Author-Publisher Procedures, if both an Author and a Publisher claim or register an Out-of-Print Book other than an Educational Book and there is a conflict between their Claim Forms with respect to their asserted rights in the Book, the Author and the Publisher shall follow the procedures in this Section 6.4.  First, the parties shall attempt to resolve the matter informally.  If they are unable to do so, either party may submit the dispute to the Registry for resolution.  After a decision by the Registry, either party may thereafter submit the dispute for resolution pursuant to Article IX (Dispute Resolution) of the Amended Settlement Agreement.  In reaching a decision, the Registry or the Arbitrator will give primary consideration to the terms of the written contract and amendments thereto, if any, between the parties.  If the contract has no conclusive or determinative wording, the Registry or the Arbitrator may consider extrinsic evidence, including documents, affidavits, the course of dealing between the parties, or industry standards and practices.

10

# ARTICLE VII.  Disputes

7.1     Scope.  This Article VII shall apply to disputes:

(a)     Between an Author and a Publisher referenced in Section 5.5, except if the dispute regards an Educational Book, provided, however that if the dispute concerns whether a Book is an Educational Book, then that dispute shall be subject to Article IX (Dispute Resolution) of the Amended Settlement Agreement;

(b)     Between and among non-Publisher Rightsholders (*e.g*., co-authors and heirs and assignees of an Author) with respect to pricing, negotiation of revenue splits pursuant to Section 4.5(a)(iii) (Agreed Revenue Splits), Removal, inclusion or exclusion of a Book, or authorization of one or more Display Uses of a Book, under the Amended Settlement Agreement.

7.2     Procedures.  The following procedures shall apply to disputes described in Section 7.1:

(a)     The Rightsholder will notify the Registry of a dispute; the Registry will not pay any Rightsholder for the Book until after a final decision according to the oprocedures procedures in this Article VII.

(b)     After notification to the Registry of a dispute, the parties will attempt to resolve the dispute amicably.  If no such resolution is reached within ninety (90) days from the date the Registry was notified of such dispute (which period can be extended by agreement of the parties), any party can submit the dispute for resolution under the procedures of Section 9.3 (Arbitration) of the Amended Settlement Agreement, subject to the additional terms of this Article VII, and all parties to the dispute will then be bound to follow such procedures to resolve such dispute.

(c)     All decisions of the Arbitrator will be binding.  In reaching a decision, the Arbitrator will give primary consideration to the terms of the written contract and amendments thereto, if any, between the parties.  If the contract has no conclusive or determinative wording, the Arbitrator may consider extrinsic evidence, including documents, affidavits, the course of dealing between the parties, or industry standards and practices.

7.3     Fees.  The Registry shall set filing fees for disputes taking into account the objectives of facilitating dispute resolution, deterring frivolous filings and defraying the

Registry's expenses, such that the dispute resolution process benefits Rightsholders but does not unduly financially burden the Registry.

(a)     In cases of disputes brought pursuant to Section 7.1(a), the party submitting the dispute to the Arbitrator shall pay a filing fee to the Registry of $300 (subject to adjustment by the Registry), and, if such party is the prevailing party, half of such filing fee will be refunded at the conclusion of the arbitration.

(b)     The Registry will adopt fees and rules for disputes brought pursuant to Section 7.1(b), which may differ from those adopted for disputes brought pursuant to Section 7.1(a).

(c)     Except as provided in this Section 7.3, all costs of the dispute resolution process will be borne by the Registry.

## ARTICLE VIII.  ~~Unclaimed Funds~~  Timing of Payments

~~8.1          Unclaimed Authors' Funds.  If revenues earned by an Out-of-Print Book are owed to the Author pursuant to Section 6.3(a) (Unclaimed Funds and Public Domain Funds) of the Settlement Agreement but the Author fails to register with the Registry, the revenues to which the Author otherwise is entitled shall be designated Unclaimed Authors' Funds.  All such Unclaimed Authors' Funds shall be subject to Section 6.3(a) (Unclaimed Funds and Public Domain Funds) of the Settlement Agreement and, if distributed by the Registry to Rightsholders pursuant to that section, shall be distributed to Registered Rightsholders who are Authors.~~

~~8.2          Unclaimed Publishers' Funds.  If revenues earned by an Out-of-Print Book are owed to the Publisher pursuant to Section 6.3(a) (Unclaimed Funds and Public Domain Funds) of the Settlement Agreement but the Publisher fails to register with the Registry, the revenues to which the Publisher otherwise is entitled shall be designated Unclaimed Publishers' Funds.  All such Unclaimed Publishers' Funds shall be subject to Section 6.3(a) (Unclaimed Funds and Public Domain Funds) of the Settlement Agreement and, if distributed by the Registry to Rightsholders pursuant to that section, shall be distributed to Registered Rightsholders who are Publishers.~~

~~8.3          Allocation of Unclaimed Funds.  All revenues earned by Books that neither an Author nor a Publisher claims within five (5) years after the end of the reporting period during which such revenues were earned will be allocated between the Unclaimed Authors' Fund and the Unclaimed Publishers' Fund pursuant to Section 6.2(c), based on the Publication Year of such Books.~~

~~8.4~~ 8.1    Timing of Payments.  No payments under Section 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized) of the Amended Settlement Agreement or revenues from the Revenue Models shall be paid or distributed to Authors or Publishers until the Effective Date or one (1) year after the Final Approval Date, whichever is later, so that Authors or Publishers or their representatives may submit challenges, pursuant to Article III, to the initial classifications of Books.  With respect to Books for which the initial classifications are challenged in that time period, payments under Section 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized) of the Amended Settlement Agreement and revenues from the Revenue Models shall not be paid to Authors or Publishers until the challenges are resolved pursuant to Article III.

## ARTICLE IX.  Releases and Precedential Effect

9.1    Releases.  Except as set forth in Sections 9.2 and 10.3, nothing herein shall constitute a release of any claim by an Author against a Publisher or by a Publisher against an Author, and all rights to bring such claims are expressly reserved by Authors and Publishers.

9.2    All Claims Governed.  The provisions of these Author-Publisher Procedures shall govern all claims and disputes between Authors and Publishers regarding the inclusion and exploitation of any Book in the Revenue Models, and (except for Educational Books) the royalty splits for revenue derived from the Revenue Models.

9.3    No Precedential Effect.  Any decisions of the Registry (or of an Arbitrator pursuant to Article IX (Dispute Resolution) of the Amended Settlement Agreement) with respect to any dispute brought pursuant to these Author-Publisher Procedures will be final.  Except as expressly provided in Article X, any such decision, including but not limited to decisions made pursuant to Articles III, IV, VI, VII or X, shall apply solely with respect to and for purposes of the Amended Settlement Agreement, the Revenue Models, and any other Registry-brokered licenses.  Neither a Publisher nor an Author, nor either's agent or associational representative, may rely on or cite the Registry's determination with respect to an individual Book, or any group or pattern of determinations, as legal or other precedent or authority, "course of dealing," "industry practice," or otherwise, as an aid or support in the negotiation, enforcement, interpretation and/or construction of an author-publisher contract, nor with respect to any other Books or any programs other than the Revenue Models or other Registry-brokered licenses.

# ARTICLE X.  Other Google Programs

10.1     Application of Decisions.  For each In-Print Book published under an author-publisher contract executed prior to 1992 that has not been amended thereafter to expressly grant or retain all electronic rights pertinent to the Revenue Models or any Other Google Program, any decision in a dispute initiated pursuant to Section 5.5 regarding the royalty split for a Display Use of that Book will also apply to all royalty splits for uses of that Book in any Other Google Programs that are the same as or substantially identical to that Display Use.

10.2     Take Down and Transfer Requests.  The following procedures will apply to each In-Print Book (except for Educational Books) that is the subject of an author-publisher contract executed prior to 1992 that has not been amended thereafter to expressly grant or retain all electronic rights pertinent to an Other Google Program if such Book is displayed in an Other Google Program:

(a)     A Rightsholder who has a good faith belief that Google is exploiting such Book in an Other Google Program without the necessary authorization from such Rightsholder (the "Notifying Rightsholder"), may, by using the form of notice described in Section 10.2(b) (the "Notice"), request, through the Registry, that Google either remove such Book from such Other Google Program (a "Take Down Request") or transfer such Book from the Other Google Program to one or more Display Uses in one or more of the Revenue Models (a "Transfer Request").

(b)     The form of Notice is Exhibit A hereto, and will be available online (including through the Registry's website).

(c)     The Notifying Rightsholder shall submit the Notice to the Registry. Upon receipt, the Registry shall forward a copy of the Notice to Google, and the person who had given Google permission to use such Book (the "Initial Authorizing Rightsholder") will be sent a copy of the Notice by Google pursuant to Section 3.5.(c)(ii)(1) of the Amended Settlement Agreement.

(d)     The Initial Authorizing Rightsholder shall have thirty (30) days to respond to the Notice, as set forth in Sections 10.2(e) or 10.2(h).  If Google, pursuant to Section 3.5(c)(ii)(2) of the Amended Settlement Agreement, transfers such Book into the Revenue Models, such Book shall become subject to these Author-Publisher Procedures, as applicable.

(e)     If the Notice is a Take Down Request, the Initial Authorizing Rightsholder may respond, at its election, by:

(i)     Not objecting to the Take Down Request; or

(ii)     Objecting to the Take Down Request by filing with the Registry a counter notice that states, under penalty of perjury, that the Initial Authorizing Rightsholder has the good faith belief that he, she or it has rights in such Book necessary to authorize Google to exploit such Book as it is being exploited in such Other Google Program (the "Counter-Notice").  The Counter Notice shall include documentation supporting such belief.

(f)     The form of Counter-Notice is Exhibit B, and will be available online (including through the Registry's website).

(g)     The Registry shall forward the Counter-Notice to Google and the Notifying Rightsholder.  If the Counter-Notice requirements are complied with, then:

(i)     If, pursuant to Section 3.5(c)(ii)(3) of the Amended Settlement Agreement, Google does not maintain or restore access to such Book in the Other Google Program, then the Initial Authorizing Rightsholder may file a lawsuit against the Notifying Rightsholder (or follow the dispute resolution procedures in the author-publisher contract) to determine who has the right to authorize Google to exploit such Book in the Other Google Program; or

(ii)     If Google does maintain or restore access, then the Notifying Rightsholder may file a lawsuit against the Initial Authorizing Rightsholder (or follow the dispute resolution procedures in the author-publisher contract) to determine who has the right to authorize Google to exploit such Book in the Other Google Program.

(h)     If the Notice is a Transfer Request, the Initial Authorizing Rightsholder may respond, at its election, by:

(i)     Not objecting to such Book being moved into the Revenue Models; or

(ii)     Objecting to the Transfer Request by filing a notice of objection with the Registry.

15

(i)     If the Initial Authorizing Rightsholder objects to the Transfer Request pursuant to Section 10.2(h)(ii), then:

(i)     The provisions of Section 3.5(c)(ii)(4) and (5) of the Amended Settlement Agreement will apply; and

(ii)     Either the Notifying Rightsholder or the Initial Authorizing Rightsholder may file a lawsuit against the other (or otherwise follow the dispute resolution procedures in the author-publisher contract) to assert that it has the rights to exploit such Book in either the Revenue Models or Other Google Programs, and nothing in these Author-Publisher Procedures or the Amended Settlement Agreement may be read to release or waive any such claims.

(j)     To the extent that any provision of this Article X conflicts with any other provision of these Author-Publisher Procedures, the provision of this Article X shall control.

10.3     Retention of Rights.  All Rightsholders will retain any and all rights that they have under 17 U.S.C. § 512 with respect to all Books in Other Google Programs, except that Rightsholders will instead follow the procedures in this Article X for all Books covered by this Article X.

## ARTICLE XI.  Miscellaneous

11.1     Delegation.  The Registry may delegate one or more of the functions specified in Articles III, IV or VI to an Arbitrator designated pursuant to Article IX (Dispute Resolution) of the Amended Settlement Agreement.

11.2     Notice.  All notices, demands and requests as specified herein shall be given to the parties specified herein and not pursuant to Sections 17.15(a) (Legal Notices) and 17.15(b) (Other Notices) of the Amended Settlement Agreement, and shall be in writing.  Such notices, demands and requests shall be sent by e-mail (if practicable), postal mail, or other delivery methods.  Notice shall be deemed received upon proof of receipt.

11.3     Assistance.  Publishers and Authors shall use commercially reasonable efforts to provide author-publisher contracts to assist the Registry (or Arbitrator) in classifying Books as In-Print or Out-of-Print and in resolving disputes brought pursuant

16

to these Author-Publisher Procedures, subject to an appropriate confidentiality agreement that will be executed by each party.

      11.4    <u>Amendments</u>.  The Registry may amend the terms of these Author-Publisher Procedures pursuant to Section 17.27 (Amendments) or otherwise; provided, however, that no amendment may impair the rights of the Amended Settlement Class, or, without Google's consent, Google's rights, under the Amended Settlement Agreement. The Registry shall not make any such amendment except with a vote of the Board of the Directors of the Registry, in accordance with ~~is~~its By-Laws.

      11.5    <u>No Liability For Settlement or Registry Administration</u>.  No Rightsholder will have any claim against any Plaintiff, Class Counsel, Google or the Registry for (i) any decision with respect to payment of any Cash Payment under Section 5.1 (Cash Payment to Class Members Whose Books and Inserts Have Been Digitized) of the Amended Settlement Agreement or (ii) actions taken in good faith for payments or other disbursements from the Settlement Fund.  Except as expressly set forth herein, these Author-Publisher Procedures are not intended to, nor shall they in any way be construed or interpreted to, create or support any cause of action or any claim for damages or injunctive relief against any Plaintiff, Class Counsel, Google or the Registry.

      11.6    <u>Plan of Allocation</u>.  All distributions under these Author-Publisher Procedures will be made in accordance with the Plan of Allocation.

      11.7    <u>Scope</u>.   Nothing in these Author-Publisher Procedures shall create any rights in favor of, or impose any obligations upon or with respect to, anyone who opted out of the Amended Settlement Class.

# ATTACHMENT A
# (EXHIBIT A)

## NOTICE OF TAKE DOWN/TRANSFER REQUEST

The undersigned holds a Copyright Interest in the following Book:

Title:

Author:

Publication Date:

Publisher:

ISBN:

Other Identifying Information:

The undersigned has a good faith belief that such Book is included in a Google program without the necessary authorization from the undersigned.

The undersigned hereby requests that (check one):

[    ]    Google cease using the Book ("Take Down Request").

[    ]    Google transfer the Book to the Google Library Project, subject to the terms and conditions of the Settlement Agreement ("Transfer Request").


_____

Name:

Title:

Date:

# ATTACHMENT A
# (EXHIBIT B)

## **COUNTER-NOTICE**

The undersigned has a good faith belief that he, she or it has the rights in the Book that is the subject of the Notice attached hereto that are necessary to authorize Google to use such Book in the Google Partner Program or [other Google program]. Documentation supporting such good faith belief is attached hereto.

Signed under penalty of perjury.


_____

Name:

Title:

Date:

# ATTACHMENT B1

## FORM OF LIBRARY-REGISTRY (FULLY PARTICIPATING) AGREEMENT

This LIBRARY-REGISTRY (FULLY PARTICIPATING) AGREEMENT (with all of the exhibits hereto, the "Library Agreement") is entered into by and between ~~_____, a _____ with its principal offices at _____ (the "Registry"~~Class Counsel (in anticipation of the formation of the Books Rights Registry), on behalf of ~~itself and~~ all Rightsholders (the "Registry"), and _____, with its principal offices at ~~_____~~_____ ("Library"), ~~is entered into~~ as of _____ and is effective on the later of such date or the Effective Date of the Amended Settlement Agreement (the "Library Agreement Effective Date"). The Registry and Library are sometimes referred to hereinafter individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, pursuant to ~~a~~the Amended Settlement Agreement between Google and Plaintiffs dated as of ~~October 28, 2008,~~November 13, 2009, the Registry has been established as a clearinghouse for the administration of the rights of Rightsholders under the Amended Settlement Agreement; and

WHEREAS, all of the Rightsholders, through the Settlement embodied in the Amended Settlement Agreement, are deemed to have authorized the Registry to enter into this Library Agreement on their behalf; and

WHEREAS, Library desires to become a Fully Participating Library under the Amended Settlement Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth in this Library Agreement, Registry and Library hereby agree as follows:

1. **Definitions.** Capitalized terms have the meanings ascribed to them in Exhibit A (Amended Settlement Agreement Definitions).

2. **Amended Settlement Agreement Terms.**

    (a) **Authorizations of Library.** As of the Effective Date, the Registry authorizes Library to (i) use its Library Digital Copy in accordance with the terms and conditions of this Library Agreement and (ii) engage in the activities, and only the activities, set forth in this Library Agreement, and only in accordance with such terms and conditions as are applicable to those activities; provided that the remedy for any breach of a term or condition of this Library Agreement

shall not be termination of such authorizations except as provided in Section 8.3(g) (Remedies) of Exhibit E (Security and Breach).  This Library Agreement does not authorize Library to make any uses of Books and Inserts other than those uses that are authorized under this Library Agreement.  This Library Agreement neither authorizes nor prohibits, nor releases any Claims with respect to, (1) the use of any work or material that is in the public domain under the Copyright Act in the United States, (2) the use of books in hard copy (~~including~~such term does not include microform) format other than the creation and use of Digital Copies of Books and Inserts, or (3) Library's Digitization of Books if the resulting Digitized Books are neither provided to Google pursuant to the Amended Settlement Agreement nor included in the Library Digital Copy provided to Library by Google, or the use of any such Digitized Books that are neither provided to Google pursuant to the Amended Settlement Agreement nor included in such LDC.

(b)     Non-Exclusive Digitization Rights.  As of the Effective Date, in the United States, (i) Library may provide Books and Inserts to Google in hard copy (~~including~~such term does not include microform) format to be Digitized (or in a form Digitized by or for Library), and (ii) Library may use such Books and Inserts as provided in this Library Agreement.  The authorizations to use Books and Inserts provided for by this Library Agreement are not transfers of copyright ownership to such Books or Inserts, and nothing in this Library Agreement shall operate to transfer any copyright ownership in Books or Inserts.

(c)     Library Digital Copy.  The obligations and restrictions set forth in this Library Agreement regarding Digital Copies of Books apply only to the Library Digital Copy provided to Library by Google.  If, pursuant to Section 3.5(a) (Right to Remove) of the Amended Settlement Agreement, a Rightsholder exercises its right to have its Book Removed, then Library agrees to also Remove such Book from its Library Digital Copy; provided that, pursuant to such section, the right to Remove is limited to requests made ~~within twenty-seven (27) months from the Notice Commencement Date.~~on or before April 5, 2011.  Library may maintain Books on back-up tapes or on any other back-up storage media in accordance with Section 2(g) (Security of Library Digital Copy) below.  If any back-up tape or other back-up storage media containing any Book that has been Removed is restored by Library, then such Book shall also be Removed from the copy made from the back-up tape or other back-up storage media.  Library will implement a Rightsholder's Removal direction within ninety (90) days after notice from the Registry.

(d)     Use of Library Digital Copy.  The Registry, on behalf of the Rightsholders, and Library agree to the terms and conditions set forth in Exhibit B (Fully Participating Library Uses).

(e)     Fully Participating Libraries' and Cooperating Libraries' Exercise of Collective Rights.  In each case in which the Fully Participating Libraries and the Cooperating Libraries have the right as a group to exercise or waive a right or grant or withhold consent under

certain sections of the Amended Settlement Agreement, as set forth in Exhibit C (Exercise of Collective Rights), Library agrees to the terms of such Exhibit C (Exercise of Collective Rights) and to the terms of Attachment 1 (Selection of Designated Representative and Security Representatives and Establishment of Governance Rules) thereto.

(f)　　Meetings to Discuss Library Uses.  The Registry, Google, Library and other Fully Participating Libraries will meet from time to time as mutually agreed to discuss operational matters regarding the Library-Registry (Fully Participating) Agreements and the provisions of the Amended Settlement Agreement that are applicable to Fully Participating Libraries, as set forth in Exhibit D (Meetings to Discuss Library Uses).

(g)　　Security of Library Digital Copy.  Library and the Registry agree to the terms and conditions set forth in Exhibit E (Security and Breach).  Library shall implement an initial Security Implementation Plan prior to using the LDC after the Effective Date.  For all breaches of its Security Implementation Plan that are subject to Section 8.4 (Remedies for Breaches of the Security Implementation Plan that Do Not Result in Unauthorized Access) of Exhibit E (Security and Breach), Library and the Registry agree either [ ] that the monetary remedies specified in Sections 8.4(b) (Single or Non-Willful/Intentional Breach of Security Implementation Plan) or 8.4(c) (Repeated or Willful/Intentional Breaches of Security Implementation Plan), as applicable, of such Exhibit apply to Library or [ ] Library will be subject to a judicial action or an arbitration under Section 8 (Dispute Resolution) of this Library Agreement (at the Registry's election) allowing the Registry to seek all available remedies in equity and at law. [Library to check one of the two alternatives in the preceding sentence.]

(h)　　Hosting by Fully Participating Libraries.  The Hosting Addendum attached hereto indicates whether Library will host an LDC for another Fully Participating Library, or whether another Fully Participating Library will host Library's LDC for Library, and the applicable terms therefor.  Library promptly will provide a revised Hosting Addendum to Registry in the event that, if Library is a Hosting Fully Participating Library, Library terminates its hosting arrangement with a Requesting Fully Participating Library or, if Library is a Requesting Fully Participating Library, Library terminates its hosting arrangement with one Hosting Fully Participating Library or enters into another hosting arrangement with a different Hosting Fully Participating Library for hosting of Library's LDC.

3.　　Digital Copy of Excluded Books.  In the event that Google excludes a Book from one or more Display Uses for editorial reasons, and provides to the Registry a Digital Copy of such Book pursuant to Section 3.7(e)(i) (Digital Copy of Excluded Books) of the Amended Settlement Agreement, then the Registry may, subject to Section 3.5 (Right to Remove and Exclude) of the Amended Settlement Agreement, engage, with the consent (not to be unreasonably withheld) of the Fully Participating Library or the Cooperating Library from which the Library Scan of such Book

3

was made (including, if Google constructed a Digital Copy of a Book pursuant to Section 7.2(a)(i) (Fully Participating Library Collections) of the Amended Settlement Agreement from one or more physical Books, all such libraries that were the source of such physical Books), a Third-Party Required Library Services Provider that, once engaged, may make available to users a Digital Copy of that Book for uses comparable to Display Uses and Non-Display Uses; provided that, if a Book is not then Commercially Available and the Third-Party Required Library Services Provider makes available the Book for a fee, then the Third-Party Required Library Services Provider must also offer the Required Library Services (Section 7.2(e) (Required Library Services Requirement) of the Amended Settlement Agreement) for the Book to the extent required by such Fully Participating Library or Cooperating Library.  Such Third-Party Required Library Services Provider is, in connection with any Claim arising out of its making available such Digital Copy of the Book, deemed to be a successor of Google for purposes of Section 10.1(g) (Google Releasees) of the Amended Settlement Agreement.

4.    Term And Termination.

(a)    Effective Date. This Library Agreement, if not terminated pursuant to any provision hereof, shall become effective on the Library Agreement Effective Date.

(b)    Term.  This Library Agreement shall continue in full force and effect until the last to expire of the U.S. copyright in each Book and Insert, unless otherwise terminated at an earlier date pursuant to Section 4(c) (Termination if Amended Settlement Agreement Not Final) or Section 4(d) (Termination by Library).

(c)    Termination if Amended Settlement Agreement Not Final.  In the event that the Registry and Library agree that the Effective Date will never occur, this Library Agreement shall be null and void.

(d)    Termination by Library.  Library may terminate this Library Agreement at any time for any reason or for no reason, upon thirty (30) days' notice to the Registry.  In the event of such termination, Library shall delete or permanently render unusable its LDC, and shall certify to the Registry in writing that it has done so.  This obligation shall survive termination pursuant to this Section 4(d) (Termination by Library).

5.      Representations, Disclaimer And Limitation Of Liability.

      (a)      Mutual Warranties.  Each Party represents and warrants to the other that (i) it has full power and authority to enter into this Library Agreement and to perform its obligations hereunder; and (ii) this Library Agreement constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

      (b)      Disclaimer.  The warranties explicitly set forth above are the only warranties provided herein and are in lieu of all other warranties by the Parties, express or implied, with respect to the subject matter of this Library Agreement.

      (c)      Limitation of Liability.  In no event will Library or the Registry be liable for lost profits or any form of indirect, special, incidental, consequential or punitive damages of any character from any claims arising out of this Library Agreement, whether based on breach of contract (including, without limitation, breach of the Security Standard referred to in Exhibit E (Security and Breach)), tort (including negligence), or otherwise, and whether or not such Party has been advised of the possibility of such damage.

6.      Releases.

      (a)      Use of Digital Copies by Library.  Pursuant to Section 10.2(a) (Release of Google Releasees, Fully Participating Library Releasees, Cooperating Library Releasees, Public Domain Releasees and Other Library Releasees) of the Amended Settlement Agreement, as of the Effective Date, Library is released by Rightsholder Releasors from the Fully Participating Library Released Claims.  Such section is set forth in Exhibit F (Fully Participating Library Releases).

      (b)      Library Releases of Rightsholders. Without further action by anyone, as of the Effective Date, Library, for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be deemed to have fully, finally and forever released, relinquished, settled, and discharged, each Rightsholder Releasor and Class Counsel, from any and all Claims that directly or indirectly relate to, are based upon or arise out of, the commencement, prosecution or settlement of the Action, or the negotiation or execution of this Library Agreement.

5

7. <u>Third-Party Beneficiary</u>.

(a) <u>Library</u>.  The Registry, on behalf of Rightsholders, acknowledges and agrees that Library is a third-party beneficiary of certain provisions of the Amended Settlement Agreement, as set forth in and according to the terms of <u>Exhibit G</u> (Third-Party Beneficiary).

(b) <u>Rightsholders</u>.  Library acknowledges and agrees that each Rightsholder is a third-party beneficiary of this Library Agreement, entitled to enforce it in accordance with Section 8.3 (Breaches – General Principles) of the Amended Settlement Agreement and Section 8.3 (Breaches – General Principles) of <u>Exhibit E</u> (Security and Breach) as if such Rightsholder were a party hereto.

8. <u>Dispute Resolution</u>.  Library hereby agrees that all disputes arising under this Library Agreement shall be subject to <u>Exhibit H</u> (Dispute Resolution).  Except as provided in <u>Exhibit H</u> (Dispute Resolution), any claims, disputes or actions arising under or to enforce this Library Agreement shall be commenced and maintained only in the U.S. District Court for the Southern District of New York, and all actions regarding the interpretation, implementation and enforcement of this Library Agreement shall be brought exclusively in such Court, with the Registry and Library submitting to the personal jurisdiction thereof, unless venue in the state in which Library is located is required by the law of such state.

9. <u>Miscellaneous Provisions</u>.

(a) <u>Notices</u>.  Unless provided for to the contrary in this Library Agreement, any and all notices or other communications or deliveries required or permitted to be made under this Library Agreement shall be in writing and sent to the Parties at their addresses identified above (or as otherwise provided by notice given pursuant to this Section 9(a) (Notices)).  Notice shall be deemed received (i) upon receipt when delivered personally, (ii) upon written verification of receipt from overnight courier, (iii) upon verification of receipt of registered or certified mail or (iv) upon verification of receipt via facsimile or electronic mail, provided that such notice is also sent simultaneously via first class mail.  Contact information shall be updated in writing as necessary to ensure that each Party has current information regarding all such contacts.

(b) <u>Governing Law</u>.  This Library Agreement shall be governed by and construed in accordance with the law of the State of _____, without reference to principles of conflicts of laws.  [Governing law to be specified in each Library-Registry Agreement.  Governing law will be New York or the state in which Library is located if required by the law of such state.]

(c) <u>Entire Agreement</u>.  This Library Agreement, including exhibits, sets forth the entire agreement between the Registry and Library with respect to its subject matter.

(d)    Amendment.  This Library Agreement may be amended by a written agreement signed by both Parties, only if such amendment does not impair the rights of Rightsholders under this Library Agreement.

(e)    Assignment.  Except with respect to the use of contractors pursuant to Section 9(h) (Use of Contractors), and as provided in the following sentence, neither Party may assign any of its rights or delegate any of its duties under this Library Agreement without the prior written consent of the other Party, which shall not unreasonably be withheld or delayed.  Notwithstanding the foregoing, Class Counsel shall assign this Library Agreement to the Book Rights Registry promptly after its formation.  Any attempted assignment, delegation or transfer in derogation hereof shall be null and void.  This Library Agreement shall be binding upon the successors and permitted assigns of both Parties, including, in the case of the assignment by Class Counsel, the Book Rights Registry.

(f)    Severability.  If any provision of this Library Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Library Agreement shall otherwise remain in full force and effect and remain enforceable between the Parties.

(g)    No Waiver.  The failure of either Party to act in the event of a breach of this Library Agreement by the other shall not be deemed a waiver of such breach or a waiver of future breaches.

(h)    Use of Contractors.  Library may use third parties to exercise its rights or to perform any of its obligations under this Library Agreement, including the hosting and storage of Library's LDC.  If and to the extent that Library uses third parties to exercise its rights or to perform any of its obligations as set forth in this Library Agreement, Library shall, at all times, be and remain responsible for ensuring that such third parties act in accordance with this Library Agreement.  Library shall be liable for any such third party's nonconformance with or breach of this Library Agreement, and such breaches shall be regarded as breaches by Library for purposes of Exhibit E (Security and Breach), except as otherwise set forth in the Hosting Addendum.

(i)    Interpretation.  The interpretive provisions of Section 17.32 (Interpretation) of the Amended Settlement Agreement apply to this Library Agreement.

(j)    Compliance with Law.  Notwithstanding any other provision of this Library Agreement, nothing in this Library Agreement requires Library or the Registry to take any action that would violate any applicable law and neither of them shall be held to have breached this Library Agreement by omitting to take any action that, if taken, would violate any applicable law.

(k)    Counterparts.  This Library Agreement may be signed in counterparts, each of which shall constitute a duplicate original.  Execution by facsimile shall be fully and legally binding on a Party.

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned duly authorized representative of each Party.

Registry:                                       Library:

By:                                             By:

Print Name:                                     Print Name:

Title:                                          Title:

Date:                                           Date:

| **CLASS COUNSEL:** | |
| --- | --- |
| **DEBEVOISE & PLIMPTON LLP** (for the Publisher Sub-Class) | **BONI & ZACK LLC** (for the Author Sub-Class) |
| By: _____ | By: _____ |
| Name: Jeffrey P. Cunard  Bruce P. Keller | Name: Michael J. Boni  Joanne Zack |
| DEBEVOISE & PLIMPTON LLP 919 Third Avenue New York, NY 10022 (212) 909-6000 (phone) (212) 909-6836 (fax) jpcunard@debevoise.com bpkeller@debevoise.com | BONI & ZACK LLC 15 St. Asaphs Road Bala Cynwyd, PA 19004 (610) 822-0200 (phone) (610) 822-0206 (fax) mboni@bonizack.com jzack@bonizack.com |

8

## Exhibits

**[The Exhibits  of each Library-Registry (Fully Participating) Agreement will attach, or incorporate by reference, the following sections from the Amended Settlement Agreement.]**

Exhibit A:  Amended Settlement Agreement Definitions [Relevant definitions from the Amended Settlement Agreement]

Exhibit B:  Fully Participating Library Uses [Section 7.2 (Fully Participating Library Uses)]

Exhibit C:  Exercise of Collective Rights [Section 7.4 (Fully Participating Libraries' and Cooperating Libraries' Exercise of Collective Rights) and Attachment 1 hereto]

Exhibit D:  Meetings to Discuss Library Uses [Section 7.5 (Meetings to Discuss Library Uses)]

Exhibit E:  Security and Breach [Article VIII (Security and Breach)]

Exhibit F:  Fully Participating Library Releases [Fully Participating Library releases from Section 10.2 (Releases) and the related definitions from 10.1 (Definitions)]

Exhibit G:  Third-Party Beneficiary [Section 7.2(f)(i) and the sections to which it refers]

Exhibit H:  Dispute Resolution [Article IX (Dispute Resolution)]

Hosting Addendum

Hosting Addendum

Check here if Library is a Hosting Fully Participating Library: __

    List Requesting Fully Participating Library(ies) for which Library will host:
_____

Check here if Library is a Requesting Fully Participating Library: __

    List Hosting Fully Participating Library that will host for Library:
_____

    If Library is a Hosting Fully Participating Library, Library shall protect the security of all of the LDCs of all of the Requesting Fully Participating Library(ies) from Prohibited Access and Third-Party Unauthorized Access in the same way that it is obligated to protect the security of its own LDC as described in Exhibit E (Security and Breach). If Library is a Hosting Fully Participating Library, then Library, and not any of the Requesting Fully Participating Library(ies), shall be liable for Library's compliance with Exhibit E (Security and Breach) with respect to any of the LDCs of Requesting Fully Participating Library(ies) hosted by Library; provided that any Requesting Fully Participating Library is responsible for any act of such Requesting Fully Participating Library that results in any Prohibited Access or any Third-Party Unauthorized Access to its LDC. If Library is a Requesting Fully Participating Library, then Library shall not be liable for its Hosting Fully Participating Library's compliance with Exhibit E (Security and Breach) with respect to Library's LDC, provided that Library is responsible for any act of Library that results in any Prohibited Access or any Third-Party Unauthorized Access to its LDC. If Library is a Hosting Fully Participating Library, it may not make any use of the LDCs of any of the Requesting Fully Participating Library(ies) except to the extent required to host such LDCs and to enable the Requesting Fully

Participating Library(ies) to use its or their LDCs pursuant to its or their respective Library-Registry (Fully Participating) Agreement(s).


Library:

By:

Print Name:

Title:

Date:

**Attachment 1**
**Selection of the Designated Representative and Security Representatives, and Establishment of Governance Rules**

1.      Designated Representative.

        a.      Selection.  The initial Designated Representative shall be selected by a majority of the votes (expressed in writing or at a meeting (which may include one or more (including all) libraries participating by telephone conference)) of the Fully Participating Libraries and the Cooperating Libraries (voting together as a single class), with each of them having one vote per Book Digitized from such Fully Participating Library's or Cooperating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized).  If no candidate succeeds in garnering such majority, then, at the request of any group of Fully Participating Libraries and Cooperating Libraries constituting not less than 10% of the votes as aforesaid, a meeting will be held upon not less than fourteen (14) days' written notice from such group in order to select the initial Designated Representative.  At any such meeting, libraries will be entitled to participate by telephone conference.  At any such meeting, the initial Designated Representative shall be selected by a plurality of votes as aforesaid.  Following the selection of the initial Designated Representative, the Designated Representative may be removed at any time by a majority vote as aforesaid.  The election of any successor Designated Representative will be carried out pursuant to such governance rules as may be established pursuant to Section 1(b) (Governance Rules) below; provided, however, in the absence of creation of relevant governance rules, then the process for determining a successor Designated Representative will be the same process as employed pursuant to this Section 1(a) (Selection) for selection of the initial Designated Representative.

        b.      Governance Rules.  The rules for how the Fully Participating Libraries and the Cooperating Libraries will share the expenses of the Designated Representative, designate a successor Designated Representative, and make decisions regarding the instructions, decisions, and positions to be communicated by the Designated Representative to Google and/or the Registry, as applicable, initially shall be determined by a majority of the votes of the Fully Participating Libraries and the Cooperating Libraries (voting as a single class), with each such library having one vote per Book Digitized from such Fully Participating Library's or Cooperating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized).  For each of the instructions, decisions and positions to be communicated by the Designated Representative pursuant to Section 7.4(a) (Designated Representative and Security Representatives) of the Amended Settlement Agreement,

such governance rules will include the voting rule by which the Fully Participating Libraries and Cooperating Libraries will determine such instructions, decisions and positions (*i.e.*, whether a majority, super-majority, unanimous or other vote is required for each particular instruction, decision and position); provided, however, that (i) such governance rules shall require the affirmative vote of a Fully Participating Library or a Cooperating Library on any matter that would require that Fully Participating Library or Cooperating Library to take any action (as opposed to consenting as a group to a matter not requiring action by that Fully Participating Library or Cooperating Library) other than to pay its share of the routine expenses of the Designated Representative as determined by the governance rules, (ii) such governance rules shall require the consent of all of the Fully Participating Libraries and all of the Cooperating Libraries with respect to an instruction, decision or position regarding any modification or amendment of the Amended Settlement Agreement specified by Section 7.2(f)(iv) (No Modification Without Consent), (iii) for any governance rule that requires a super-majority or unanimous vote, changing such governance rule will also require the same super-majority or unanimous vote, as the case may be, and (iv) in no event shall any of the Cooperating Libraries have any right to consent or vote with respect to any instruction to the Designated Representative regarding any matters under Article VIII (Security and Breach).

      2.    <u>Security Representatives</u>.

      a.    <u>Selection</u>. Each of the initial four (4) representatives of the Fully Participating Libraries described in Section 8.2(b) (Changes to Security Standard) of the Amended Settlement Agreement (each a "<u>Security Representative</u>") shall be selected by a majority of the votes (expressed in writing or at a meeting (which may include one or more (including all) libraries participating by telephone conference) of the Fully Participating Libraries, with each of them having one vote per Book Digitized from such Fully Participating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized). If four (4) candidates do not succeed in garnering such a majority approval, then, at the request of any group of Fully Participating Libraries constituting not less than 10% of the votes as aforesaid, a meeting will be held upon not less than fourteen (14) days written notice from such group in order to select such of the initial four (4) Security Representatives that were not previously approved by majority vote. At any such meeting, libraries will be entitled to participate by telephone. At any such meeting, such initial Security Representatives shall be selected by a plurality of votes as aforesaid. Following the selection of the initial Security Representatives, any Security Representative may be removed at any time by a majority vote as aforesaid. The election of any successor Security Representative will be carried out pursuant to such governance rules as may be established pursuant to Section 2(b) (Governance Rules) below; provided, however, in the absence of creation of relevant governance rules, then the process for determining a successor Security Representative will be the same process as employed pursuant to this Section 2(a) (Selection) for selection of the initial Security Representatives.

14

b. <u>Governance Rules</u>. The rules for how the Fully Participating Libraries will share the expenses of the Security Representatives, designate successor Security Representatives, and make decisions regarding the instructions, decisions, and positions to be communicated by the Security Representatives to Google and/or the Registry (including as to their freedom to operate independently of such instructions), initially shall be determined by a majority of the votes of the Fully Participating Libraries, with each such library having one vote per Book Digitized from such Fully Participating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized). For each of the instructions, decisions and positions to be communicated by the Security Representatives pursuant to Article VIII (Security and Breach) of the Amended Settlement Agreement, such governance rules will include the voting rule by which the Fully Participating Libraries will determine such instructions, decisions and positions (*i.e.*, whether a majority, super-majority, unanimous or other vote is required for each particular instruction, decision and position), including as to their freedom to operate independently of such instructions; provided, however, that (i) such governance rules shall require the affirmative vote of a Fully Participating Library on any matter that would require that Fully Participating Library to take any action (as opposed to consenting as a group to a matter not requiring action by that Fully Participating Library) other than to pay its share of the routine expenses of the Security Representatives as determined by the governance rules, (ii) for any governance rule that requires a super-majority or unanimous vote, changing such governance rule will also require the same super-majority or unanimous vote, as the case may be, and (iii) in no event shall any of the Cooperating Libraries have any right to consent or vote with respect to any instruction to the Security Representatives regarding any matters under Article VIII (Security and Breach).

c. <u>Limitation on Authority</u>. Prior to communicating any instruction, decision or position to Google or the Registry, the Security Representatives must (i) notify each Fully Participating Library of each such instruction, decision or position, (ii) confirm (which confirmation will be deemed to have been given if a Fully Participating Library fails to respond to expressly deny such confirmation within thirty (30) days after such notification) with each Fully Participating Library that such instruction, decision or position will not require such Fully Participating Library to take any action that would constitute a violation of any policy of such Fully Participating Library adopted in good faith prior to such Fully Participating Library's notice of such instruction, decision, or position.

3. <u>Designated Representative and Security Representative Representations</u>.

In communicating any instruction, decision or position to Google or the Registry, the Designated Representative and the Security Representatives, as applicable, shall confirm to Google or the Registry that the Fully Participating Libraries and the Cooperating Libraries have authorized

15

the Designated Representative and the Security Representatives to do so, in accordance with the procedures set forth on this Attachment 1.

# ATTACHMENT B2

# FORM OF LIBRARY-REGISTRY (COOPERATING) AGREEMENT

This LIBRARY-REGISTRY (COOPERATING) AGREEMENT (with all of the exhibits hereto, the "Library Agreement") is entered into by and between ~~_____, a _____ with its principal offices at _____ (the "Registry"~~Class Counsel (in anticipation of the formation of the Books Rights Registry), on behalf of ~~itself and~~ all Rightsholders (the "Registry"), and _____, with its principal offices at ~~_____~~ _____ ("Library"), ~~is entered into~~ as of _____ and is effective on the later of such date or the Effective Date of the Amended Settlement Agreement (the "Library Agreement Effective Date").  The Registry and Library are sometimes referred to hereinafter individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, pursuant to ~~a~~the Amended Settlement Agreement between Google and Plaintiffs dated as of ~~October 28, 2008,~~November 13, 2009, the Registry has been established as a clearinghouse for the administration of the rights of Rightsholders under the Amended Settlement Agreement; and

WHEREAS, all of the Rightsholders, through the Settlement embodied in the Amended Settlement Agreement, are deemed to have authorized the Registry to enter into this Library Agreement on their behalf; and

WHEREAS, Library desires to become a Cooperating Library under the Amended Settlement Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth in this Library Agreement, Registry and Library hereby agree as follows:

1.      Definitions.  Capitalized terms have the meanings ascribed to them Exhibit A (Amended Settlement Agreement Definitions).

2.      Amended Settlement Agreement Terms.

        (a)     Authorizations of Library.  As of the Effective Date, the Registry authorizes Library to engage in the activities, and only the activities, set forth in this Library Agreement, and only in accordance with such terms and conditions as are applicable to those activities.

        (b)     Non-Exclusive Digitization Rights.  As of the Effective Date, in the United States, Library may provide Books and Inserts to Google in hard copy (not including microform) format to be Digitized (or in a form Digitized by or for Library).

(c)     <u>No Digital Copies Returned</u>.  Library has a Digitization Agreement with Google and provides Books subject to the Amended Settlement Agreement to Google for Digitization but agrees that Google will not provide to Library any Digital Copies of Books subject to the Amended Settlement Agreement, unless authorized by the Rightsholder.

(d)     <u>Obligation to Delete</u>.  As of the Library Agreement Effective Date, Library hereby certifies that it has deleted or permanently rendered unusable any Digital Copies of Books provided by Google to Library prior to the Library Agreement Effective Date.  If, after the Library Agreement Effective Date, Library discovers any such Digital Copies of Books or Google provides any Digital Copies of Books to Library, Library will delete or permanently render such Digital Copies unusable promptly upon discovery or receipt.

(e)     <u>Use of Research Corpus</u>.  The Registry, on behalf of itself and all Rightsholders, and Library agree to the terms and conditions set forth in <u>Exhibit B</u> (Research Corpus).

(f)     <u>Fully Participating Libraries' and Cooperating Libraries' Exercise of Collective Rights</u>.  In each case in which the Fully Participating Libraries and the Cooperating Libraries have the right as a group to exercise or waive a right or grant or withhold consent under certain sections of the Amended Settlement Agreement, as set forth in <u>Exhibit C</u> (Exercise of Collective Rights), Library agrees to the terms of such <u>Exhibit C</u> (Exercise of Collective Rights) and to the terms of Attachment 1 (Selection of Designated Representative and Security Representatives and Establishment of Governance Rules) thereto.

3.     <u>Digital Copy of Excluded Books</u>.  In the event that Google excludes a Book from one or more Display Uses for editorial reasons, and provides to the Registry a Digital Copy of such Book pursuant to Section 3.7(e)(i) (Digital Copy of Excluded Books) of the Amended Settlement Agreement, then the Registry may, subject to Section 3.5 (Right to Remove and Exclude) of the Amended Settlement Agreement, engage, with the consent (not to be unreasonably withheld) of the Fully Participating Library or the Cooperating Library from which the Library Scan of such Book was made (including, if Google constructed a Digital Copy of a Book pursuant to Section 7.2(a)(i) (Fully Participating Library Collections) of the Amended Settlement Agreement from one or more physical Books, all such libraries that were the source of such physical Books), a Third-Party Required Library Services Provider that, once engaged, may make available to users a Digital Copy of that Book for uses comparable to Display Uses and Non-Display Uses; provided that, if a Book is not then Commercially Available and the Third-Party Required Library Services Provider makes available the Book for a fee, then the Third-Party Required Library Services Provider must also offer the Required Library Services (Section 7.2(e) (Required Library Services Requirement) of the Amended Settlement Agreement) for the Book to the extent required by such Fully Participating Library or Cooperating Library.  Such Third-Party Required Library Services Provider is, in connection with any Claim arising out of its making available such Digital Copy of the Book, deemed to be a successor of Google for purposes of Section 10.1(g) (Google Releasees) of the Amended Settlement Agreement.

4.      Term And Termination.

(a)      Effective Date. This Library Agreement, if not terminated pursuant to any provision hereof, shall become effective on the Library Agreement Effective Date.

(b)      Term.  This Library Agreement shall continue in full force and effect until the last to expire of the U.S. copyright in each Book and Insert, unless otherwise terminated at an earlier date pursuant to Section 4(c) (Termination if Amended Settlement Agreement Not Final) or Section 4(d) (Termination by Library).

(c)      Termination if Amended Settlement Agreement Not Final.  In the event that the Registry and Library agree that the Effective Date will never occur, this Library Agreement shall be null and void.

(d)      Termination by Library.  Library may terminate this Library Agreement at any time for any reason or for no reason, upon thirty (30) days' notice to the Registry.

5.      Representations, Disclaimer And Limitation Of Liability.

(a)      Mutual Warranties.  Each Party represents and warrants to the other that (i) it has full power and authority to enter into this Library Agreement and to perform its obligations hereunder; and (ii) this Library Agreement constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(b)      Disclaimer.  The warranties explicitly set forth above are the only warranties provided herein and are in lieu of all other warranties by the Parties, express or implied, with respect to the subject matter of this Library Agreement.

(c)      Limitation of Liability.  In no event will Library or the Registry be liable for lost profits or any form of indirect, special, incidental, consequential or punitive damages of any character from any claims arising out of this Library Agreement, whether based on breach of contract, tort (including negligence), or otherwise, and whether or not such Party has been advised of the possibility of such damage.

6.      Releases.

        (a)      Use of Digital Copies by Library.  Pursuant to Section 10.2(a) (Release of Google Releasees, Fully Participating Library Releasees, Cooperating Library Releasees, Public Domain Releasees and Other Library Releasees) of the Amended Settlement Agreement, as of the Effective Date, Library is released by Rightsholder Releasors from the Cooperating Library Released Claims.  Such section is set forth in Exhibit D (Cooperating Library Releases).

        (b)      Library Releases of Rightsholders.  Without further action by anyone, as of the Effective Date, Library, for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be deemed to have fully, finally and forever released, relinquished, settled, and discharged, each Rightsholder Releasor and Class Counsel, from any and all Claims that directly or indirectly relate to, are based upon or arise out of, the commencement, prosecution or settlement of the Action, or the negotiation or execution of this Library Agreement.

7.      Third-Party Beneficiary.

        (a)      Library.  The Registry, on behalf of Rightsholders, acknowledges and agrees that Library is a third-party beneficiary of certain provisions of the Amended Settlement Agreement, as set forth in and according to the terms of Exhibit E (Third-Party Beneficiary).

        (b)      Rightsholders.  Library acknowledges and agrees that each Rightsholder is a third-party beneficiary of this Library Agreement, entitled to enforce it in accordance with Section 8.3 (Breaches – General Principles) of the Amended Settlement Agreement as if such Rightsholder were a party hereto.

8.      Dispute Resolution.  Library hereby agrees that all disputes arising under this Library Agreement shall be subject to Exhibit F (Dispute Resolution).  Except as provided in Exhibit F (Dispute Resolution), any claims, disputes or actions arising under or to enforce this Library Agreement shall be commenced and maintained only in the U.S. District Court for the Southern District of New York and all actions regarding the interpretation, implementation and enforcement of this Library Agreement shall be brought exclusively in such Court, with the Registry and Library submitting to the personal jurisdiction thereof, unless venue in the state in which Library is located is required by the law of such state.

9.      Miscellaneous Provisions.

        (a)      Notices.  Unless provided for to the contrary in this Library Agreement, any and all notices or other communications or deliveries required or permitted to be made under this Library Agreement shall be in writing and sent to the Parties at their addresses identified above (or as otherwise provided by notice given pursuant to this Section 9(a) (Notices)).  Notice shall be deemed

received (i) upon receipt when delivered personally, (ii) upon written verification of receipt from overnight courier, (iii) upon verification of receipt of registered or certified mail or (iv) upon verification of receipt via facsimile or electronic mail, provided that such notice is also sent simultaneously via first class mail.  Contact information shall be updated in writing as necessary to ensure that each Party has current information regarding all such contacts.

(b)      Governing Law. This Library Agreement shall be governed by and construed in accordance with the law of the State of _____, without reference to principles of conflicts of laws. [Governing law to be specified in each Library-Registry Agreement.  Governing law will be New York or the state in which Library is located if required by the law of such state.]

(c)      Entire Agreement. This Library Agreement, including exhibits, sets forth the entire agreement between the Registry and Library with respect to its subject matter.

(d)      Amendment.  This Library Agreement may be amended by a written agreement signed by both Parties, only if such amendment does not impair the rights of Rightsholders under this Library Agreement.

(e)      Assignment.  Neither Party may assign any of its rights or delegate any of its duties under this Library Agreement without the prior written consent of the other Party, which shall not unreasonably be withheld or delayed.  Notwithstanding the foregoing, Class Counsel shall assign this Library Agreement to the Book Rights Registry promptly after its formation.  Any attempted assignment, delegation or transfer in derogation hereof shall be null and void.  This Library Agreement shall be binding upon the successors and permitted assigns of both Parties, including, in the case of the assignment by Class Counsel, the Book Rights Registry.

(f)      Severability.  If any provision of this Library Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Library Agreement shall otherwise remain in full force and effect and remain enforceable between the Parties.

(g)      No Waiver.  The failure of either Party to act in the event of a breach of this Library Agreement by the other shall not be deemed a waiver of such breach or a waiver of future breaches.

(h)      Interpretation.  The interpretive provisions of Section 17.32 (Interpretation) of the Amended Settlement Agreement apply to this Library Agreement.

(i)      Compliance with Law.  Notwithstanding any other provision of this Library Agreement, nothing in this Library Agreement requires Library or the Registry to take any action that

would violate any applicable law and neither of them shall be held to have breached this Library Agreement by omitting to take any action that, if taken, would violate any applicable law.

(j)     <u>Counterparts</u>.  This Library Agreement may be signed in counterparts, each of which shall constitute a duplicate original.  Execution by facsimile shall be fully and legally binding on a Party.

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned duly authorized representative of each Party.

~~Registry:~~

~~By:~~

~~Print Name:~~

~~Title:~~

~~Date:~~

Library:

By:

Print Name:

Title:

Date:

| | |
|---|---|
| **CLASS COUNSEL:** | |
| **DEBEVOISE & PLIMPTON LLP** (for the Publisher Sub-Class) | **BONI & ZACK LLC** (for the Author Sub-Class) |
| By: _____ | By: _____ |
| Name: Jeffrey P. Cunard       Bruce P. Keller | Name: Michael J. Boni       Joanne Zack |
| DEBEVOISE & PLIMPTON LLP 919 Third Avenue New York, NY 10022 (212) 909-6000 (phone) (212) 909-6836 (fax) jpcunard@debevoise.com bpkeller@debevoise.com | BONI & ZACK LLC 15 St. Asaphs Road Bala Cynwyd, PA 19004 (610) 822-0200 (phone) (610) 822-0206 (fax) mboni@bonizack.com jzack@ bonizack.com |

**Exhibits**

**[The Exhibits of each Library-Registry (Cooperating ) Agreement will attach, or incorporate by reference, the following sections from the Amended Settlement Agreement.]**

Exhibit A:  Amended Settlement Agreement Definitions [Relevant definitions from the Amended Settlement Agreement]

Exhibit B:  Research Corpus [Section 7.2(d) (Research Corpus)]

Exhibit C:  Exercise of Collective Rights [Section 7.4 (Fully Participating Libraries' and Cooperating Libraries' Exercise of Collective Rights) and Attachment 1 hereto]

Exhibit D:  Cooperating Library Releases [Cooperating Library releases from Section 10.2 (Releases) and the related definitions from 10.1 (Definitions)]

Exhibit E:  Third-Party Beneficiary [Section 7.2(f)(ii) and the sections to which it refers]

Exhibit F:  Dispute Resolution [Article IX (Dispute Resolution)]

**Attachment 1**
**Selection of the Designated Representative and Security Representatives, and Establishment of Governance Rules**

  1. <u>Designated Representative</u>.

    a. <u>Selection</u>.  The initial Designated Representative shall be selected by a majority of the votes (expressed in writing or at a meeting (which may include one or more (including all) libraries participating by telephone conference)) of the Fully Participating Libraries and the Cooperating Libraries (voting together as a single class), with each of them having one vote per Book Digitized from such Fully Participating Library's or Cooperating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized).  If no candidate succeeds in garnering such majority, then, at the request of any group of Fully Participating Libraries and Cooperating Libraries constituting not less than 10% of the votes as aforesaid, a meeting will be held upon not less than fourteen (14) days' written notice from such group in order to select the initial Designated Representative.  At any such meeting, libraries will be entitled to participate by telephone conference.  At any such meeting, the initial Designated Representative shall be selected by a plurality of votes as aforesaid.   Following the selection of the initial Designated Representative, the Designated Representative may be removed at any time by a majority vote as aforesaid.  The election of any successor Designated Representative will be carried out pursuant to such governance rules as may be established pursuant to Section 1(b) (Governance Rules) below; provided, however, in the absence of creation of relevant governance rules, then the process for determining a successor Designated Representative will be the same process as employed pursuant to this Section 1(a) (Selection) for selection of the initial Designated Representative.

    b. <u>Governance Rules</u>.  The rules for how the Fully Participating Libraries and the Cooperating Libraries will share the expenses of the Designated Representative, designate a successor Designated Representative, and make decisions regarding the instructions, decisions, and positions to be communicated by the Designated Representative to Google and/or the Registry, as applicable, initially shall be determined by a majority of the votes of the Fully Participating Libraries and the Cooperating Libraries (voting as a single class), with each such library having one vote per Book Digitized from such Fully Participating Library's or Cooperating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized).  For each of the instructions, decisions and positions to be communicated by the Designated Representative pursuant to Section 7.4(a) (Designated Representative and Security Representatives) of the <u>Amended</u> Settlement Agreement, such governance rules will include the voting rule by which the Fully Participating Libraries and

Cooperating Libraries will determine such instructions, decisions and positions (*i.e.*, whether a majority, super-majority, unanimous or other vote is required for each particular instruction, decision and position); provided, however, that (i) such governance rules shall require the affirmative vote of a Fully Participating Library or a Cooperating Library on any matter that would require that Fully Participating Library or Cooperating Library to take any action (as opposed to consenting as a group to a matter not requiring action by that Fully Participating Library or Cooperating Library) other than to pay its share of the routine expenses of the Designated Representative as determined by the governance rules, (ii) such governance rules shall require the consent of all of the Fully Participating Libraries and all of the Cooperating Libraries with respect to an instruction, decision or position regarding any modification or amendment of the Amended Settlement Agreement specified by Section 7.2(f)(iv) (No Modification Without Consent), (iii) for any governance rule that requires a super-majority or unanimous vote, changing such governance rule will also require the same super-majority or unanimous vote, as the case may be, and (iv) in no event shall any of the Cooperating Libraries have any right to consent or vote with respect to any instruction to the Designated Representative regarding any matters under Article VIII (Security and Breach).

2.      Security Representatives.

a.      Selection.  Each of the initial four (4) representatives of the Fully Participating Libraries described in Section 8.2(b) (Changes to Security Standard) of the Amended Settlement Agreement (each a "Security Representative") shall be selected by a majority of the votes (expressed in writing or at a meeting (which may include one or more (including all) libraries participating by telephone conference) of the Fully Participating Libraries, with each of them having one vote per Book Digitized from such Fully Participating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized).  If four (4) candidates do not succeed in garnering such a majority approval, then, at the request of any group of Fully Participating Libraries constituting not less than 10% of the votes as aforesaid, a meeting will be held upon not less than fourteen (14) days written notice from such group in order to select such of the initial four (4) Security Representatives that were not previously approved by majority vote.  At any such meeting, libraries will be entitled to participate by telephone.  At any such meeting, such initial Security Representatives shall be selected by a plurality of votes as aforesaid.  Following the selection of the initial Security Representatives, any Security Representative may be removed at any time by a majority vote as aforesaid.  The election of any successor Security Representative will be carried out pursuant to such governance rules as may be established pursuant to Section 2(b) (Governance Rules) below; provided, however, in the absence of creation of relevant governance rules, then the process for determining a successor Security Representative will be the same process as employed pursuant to this Section 2(a) (Selection) for selection of the initial Security Representatives.

b.      Governance Rules.  The rules for how the Fully Participating Libraries will share the expenses of the Security Representatives, designate successor Security Representatives, and

make decisions regarding the instructions, decisions, and positions to be communicated by the Security Representatives to Google and/or the Registry (including as to their freedom to operate independently of such instructions), initially shall be determined by a majority of the votes of the Fully Participating Libraries, with each such library having one vote per Book Digitized from such Fully Participating Library's Collection for the GLP at the time of the vote (even if a Book ceases to be a Book by reason of its having become a Public Domain Book after having been Digitized). For each of the instructions, decisions and positions to be communicated by the Security Representatives pursuant to Article VIII (Security and Breach) of the Amended Settlement Agreement, such governance rules will include the voting rule by which the Fully Participating Libraries will determine such instructions, decisions and positions (*i.e.*, whether a majority, super-majority, unanimous or other vote is required for each particular instruction, decision and position), including as to their freedom to operate independently of such instructions; provided, however, that (i) such governance rules shall require the affirmative vote of a Fully Participating Library on any matter that would require that Fully Participating Library to take any action (as opposed to consenting as a group to a matter not requiring action by that Fully Participating Library) other than to pay its share of the routine expenses of the Security Representatives as determined by the governance rules, (ii) for any governance rule that requires a super-majority or unanimous vote, changing such governance rule will also require the same super-majority or unanimous vote, as the case may be, and (iii) in no event shall any of the Cooperating Libraries have any right to consent or vote with respect to any instruction to the Security Representatives regarding any matters under Article VIII (Security and Breach).

c. <u>Limitation on Authority</u>. Prior to communicating any instruction, decision or position to Google or the Registry, the Security Representatives must (i) notify each Fully Participating Library of each such instruction, decision or position, (ii) confirm (which confirmation will be deemed to have been given if a Fully Participating Library fails to respond to expressly deny such confirmation within thirty (30) days after such notification) with each Fully Participating Library that such instruction, decision or position will not require such Fully Participating Library to take any action that would constitute a violation of any policy of such Fully Participating Library adopted in good faith prior to such Fully Participating Library's notice of such instruction, decision, or position.

3. <u>Designated Representative and Security Representative Representations</u>.

In communicating any instruction, decision or position to Google or the Registry, the Designated Representative and the Security Representatives, as applicable, shall confirm to Google or the Registry that the Fully Participating Libraries and the Cooperating Libraries have authorized the Designated Representative and the Security Representatives to do so, in accordance with the procedures set forth on this Attachment 1.

# ATTACHMENT B3

## FORM OF LIBRARY-REGISTRY (PUBLIC DOMAIN) AGREEMENT

This LIBRARY-REGISTRY (PUBLIC DOMAIN) AGREEMENT (with all of the exhibits hereto, the "Library Agreement") is entered into by and between ―――――――, a ―――――― with its principal offices at ―――――――――― (the "Registry"Class Counsel (in anticipation of the formation of the Books Rights Registry), on behalf of itself and all Rightsholders (the "Registry"), and ――――――――――――, with its principal offices at ―――――――― ("Library"), is entered into as of ――――――――― and is effective on the later of such date or the Effective Date of the Amended Settlement Agreement (the "Library Agreement Effective Date"). The Registry and Library are sometimes referred to hereinafter individually as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, pursuant to a the Amended Settlement Agreement between Google and Plaintiffs dated as of October 28, 2008, November 13, 2009, the Registry has been established as a clearinghouse for the administration of the rights of Rightsholders under the Amended Settlement Agreement; and

WHEREAS, all of the Rightsholders, through the Settlement embodied in the Amended Settlement Agreement, are deemed to have authorized the Registry to enter into this Library Agreement on their behalf; and

WHEREAS, Library desires to become a Public Domain Library under the Amended Settlement Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth in this Library Agreement, Registry and Library hereby agree as follows:

1. <u>Definitions</u>. Capitalized terms have the meanings ascribed to them in <u>Exhibit A</u> (Amended Settlement Agreement Definitions).

2. Amended <u>Settlement Agreement Terms</u>.

(a) <u>Public Domain Books Only</u>. Library has a Digitization Agreement with Google pursuant to which Library provides material to Google for Digitization. Library agrees that it will not provide materials to Google for Digitization when it knows that those materials are Books.

(b) <u>Obligation to Delete</u>.  As of the Library Agreement Effective Date, Library hereby certifies that it has deleted or permanently rendered unusable any Digital Copies of Books provided by Google to Library prior to the Library Agreement Effective Date.  If, after the Library Agreement Effective Date, Library discovers any such Digital Copies of Books or Google provides any Digital Copies of Books to Library, Library will delete or permanently render such Digital Copies unusable promptly upon discovery or receipt.

3.      <u>Term And Termination</u>.

(a)     <u>Effective Date</u>. This Library Agreement, if not terminated pursuant to any provision hereof, shall become effective on the Library Agreement Effective Date.

(b)     <u>Term</u>.  This Library Agreement shall continue in full force and effect until the last to expire of the U.S. copyright in each Book and Insert, unless otherwise terminated at an earlier date pursuant to Section 3(c) (Termination if <span style="color:blue">Amended</span> Settlement Agreement Not Final) or Section 3(d) (Termination by Library).

(c)     <u>Termination if <span style="color:blue">Amended</span> Settlement Agreement Not Final</u>.  In the event that the Registry and Library agree that the Effective Date will never occur, this Library Agreement shall be null and void.

(d)     <u>Termination by Library</u>.  Library may terminate this Library Agreement at any time for any reason or for no reason, upon thirty (30) days' notice to the Registry.

4.      <u>Representations, Disclaimer And Limitation Of Liability</u>.

(a)     <u>Mutual Warranties</u>.  Each Party represents and warrants to the other that (i) it has full power and authority to enter into this Library Agreement and to perform its obligations hereunder; and (ii) this Library Agreement constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(b)     <u>Disclaimer</u>.  The warranties explicitly set forth above are the only warranties provided herein and are in lieu of all other warranties by the Parties, express or implied, with respect to the subject matter of this Library Agreement.

(c)     <u>Limitation of Liability</u>.  In no event will Library or the Registry be liable for lost profits or any form of indirect, special, incidental, consequential or punitive damages of any character from any claims arising out of this Library Agreement, whether based on breach of contract, tort (including negligence), or otherwise, and whether or not such Party has been advised of the possibility of such damage.

2

5.    <u>Releases</u>.

(a)    <u>Use of Digital Copies by Library</u>.  Pursuant to Section 10.2(a) (Release of Google Releasees, Fully Participating Library Releasees, Cooperating Library Releasees, Public Domain Releasees and Other Library Releasees) of the <u>Amended</u> Settlement Agreement, as of the Effective Date, Library is released by Rightsholder Releasors from the Public Domain Library Released Claims.  Such section is set forth in <u>Exhibit B</u> (Public Domain Library Releases).

(b)    <u>Library Releases of Rightsholders</u>.  Without further action by anyone, as of the Effective Date, Library, for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be deemed to have fully, finally and forever released, relinquished, settled, and discharged, each Rightsholder Releasor and Class Counsel, from any and all Claims that directly or indirectly relate to, are based upon or arise out of, the commencement, prosecution or settlement of the Action, or the negotiation or execution of this Library Agreement.

6.    <u>Third-Party Beneficiary</u>.  Library acknowledges and agrees that each Rightsholder is a third-party beneficiary of this Library Agreement, entitled to enforce it in accordance with Section 8.3 (Breaches – General Principles) of the <u>Amended</u> Settlement Agreement as if such Rightsholder were a party hereto.

7.    <u>Dispute Resolution</u>.  Library hereby agrees that all disputes arising under this Library Agreement shall be subject to <u>Exhibit C</u> (Dispute Resolution).  Except as provided in <u>Exhibit C</u> (Dispute Resolution), any claims, disputes or actions arising under or to enforce this Library Agreement shall be commenced and maintained only in the U.S. District Court for the Southern District of New York and all actions regarding the interpretation, implementation and enforcement of this Library Agreement shall be brought exclusively in such Court, with the Registry and Library submitting to the personal jurisdiction thereof, unless venue in the state in which Library is located is required by the law of such state.

8.    <u>Miscellaneous Provisions</u>.

(a)    <u>Notices</u>.  Unless provided for to the contrary in this Library Agreement, any and all notices or other communications or deliveries required or permitted to be made under this Library Agreement shall be in writing and sent to the Parties at their addresses identified above (or as otherwise provided by notice given pursuant to this Section 8(a) (Notices)).  Notice shall be deemed received (i) upon receipt when delivered personally, (ii) upon written verification of receipt from overnight courier, (iii) upon verification of receipt of registered or certified mail or (iv) upon verification of receipt via facsimile or electronic mail, provided that such notice is also sent simultaneously via first class mail.  Contact information shall be updated in writing as necessary to

3

ensure that each Party has current information regarding all such contacts.

(b)     Governing Law. This Library Agreement shall be governed by and construed in accordance with the law of the State of _____, without reference to principles of conflicts of laws.  [Governing law to be specified in each Library-Registry Agreement.  Governing law will be New York or the state in which Library is located if required by the law of such state.]

(c)     Entire Agreement. This Library Agreement, including exhibits, sets forth the entire agreement between the Registry and Library with respect to its subject matter.

(d)     Amendment.  This Library Agreement may be amended by a written agreement signed by both Parties, only if such amendment does not impair the rights of Rightsholders under this Library Agreement.

(e)     Assignment.  Neither Party may assign any of its rights or delegate any of its duties under this Library Agreement without the prior written consent of the other Party, which shall not unreasonably be withheld or delayed.  Notwithstanding the foregoing, Class Counsel shall assign this Library Agreement to the Book Rights Registry promptly after its formation.  Any attempted assignment, delegation or transfer in derogation hereof shall be null and void.  This Library Agreement shall be binding upon the successors and permitted assigns of both Parties, including, in the case of the assignment by Class Counsel, the Book Rights Registry.

(f)     Severability.  If any provision of this Library Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Library Agreement shall otherwise remain in full force and effect and remain enforceable between the Parties.

(g)     No Waiver.  The failure of either Party to act in the event of a breach of this Library Agreement by the other shall not be deemed a waiver of such breach or a waiver of future breaches.

(h)     Interpretation.  The interpretive provisions of Section 17.32 (Interpretation) of the Amended Settlement Agreement apply to this Library Agreement.

(i)     Compliance with Law.  Notwithstanding any other provision of this Library Agreement, nothing in this Library Agreement requires Library or the Registry to take any action that would violate any applicable law and neither of them shall be held to have breached this Library Agreement by omitting to take any action that, if taken, would violate any applicable law.

(j)     Counterparts.  This Library Agreement may be signed in counterparts, each of

4

which shall constitute a duplicate original.  Execution by facsimile shall be fully and legally binding on a Party.

5

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned duly authorized representative of each Party.

~~Registry:~~                              Library:

~~By:~~                                    By:

~~Print Name:~~                            Print Name:

~~Title:~~                                 Title:

~~Date:~~                                  Date:

| **CLASS COUNSEL:** | |
|---|---|
| **DEBEVOISE & PLIMPTON LLP**<br>(for the Publisher Sub-Class) | **BONI & ZACK LLC**<br>(for the Author Sub-Class) |
| By: _____ | By: _____ |
| Name: Jeffrey P. Cunard<br>        Bruce P. Keller | Name: Michael J. Boni<br>        Joanne Zack |
| DEBEVOISE & PLIMPTON LLP<br>919 Third Avenue<br>New York, NY 10022<br>(212) 909-6000 (phone)<br>(212) 909-6836 (fax)<br>jpcunard@debevoise.com<br>bpkeller@debevoise.com | BONI & ZACK LLC<br>15 St. Asaphs Road<br>Bala Cynwyd, PA 19004<br>(610) 822-0200 (phone)<br>(610) 822-0206 (fax)<br>mboni@bonizack.com<br>jzack@ bonizack.com |

Attachment B-3-Form of Library-Registry (Public Domain) Agreement

**Exhibits**

**[The Exhibits of each Library-Registry (Public Domain) Agreement will attach, or incorporate by reference, the following sections from the Amended Settlement Agreement.]**

Exhibit A:  Amended Settlement Agreement Definitions [Relevant definitions from the Amended Settlement Agreement used in this Library Agreement]

Exhibit B:  Public Domain Library Releases [Public Domain Library releases from Section 10.2 (Releases) and the related definitions from 10.1 (Definitions)]

Exhibit C:  Dispute Resolution [Article IX (Dispute Resolution)]

# ATTACHMENT C

# PLAN OF ALLOCATION

## ARTICLE I.

### Subscriptions

The Registry shall distribute to Rightsholders, as set forth below, all revenues received from Google for all Institutional Subscriptions based on (<u>a</u>) all use of Books in the Institutional Subscription Database ("<u>Subscription Usage Fees</u>"), and (<u>b</u>) the availability of Books and Inserts in the Institutional Subscription Database ("<u>Inclusion Fees</u>").

**1.1** <u>**Subscription Usage Fees**</u>.

(a)      <u>Usage Formula</u>.  To calculate the Subscription Usage Fees for each Book used by users of Institutional Subscriptions, the Registry will develop a fair and equitable usage formula.  The formula may include factors such as the number of times users view a Book, how much of the Book is viewed, whether and how much of the Book is copied/pasted and/or printed, and each Book's Settlement Controlled Price.

(b)      <u>Usage Fund</u>.  To pay Subscription Usage Fees, during the first ten (10) years after the Registry receives the first payment from Google for an Institutional Subscription, the Registry will, subject to Section 4.2 below, deposit into a Subscription Usage Fund seventy-five percent (75%) of the revenues it receives from Google for Institutional Subscriptions.  After the first ten (10) years, the Registry shall fund Subscription Usage Fees in accordance with Section 1.2(f) below.

(c)      <u>Eligibility</u>.  To claim Subscription Usage Fees for a Book, a Rightsholder must register with the Registry within ~~five~~<u>ten</u> (~~5~~<u>10</u>) years of the end of the reporting period in which the Book earned such Subscription Usage Fees.  (The Registry will determine an appropriate reporting period pursuant to Section 4.1 below.)

(d)      <u>Payment</u>.  At the end of each reporting period, and subject to the minimum amount for payment established pursuant to Section 4.1 below, the Registry shall pay Subscription Usage Fees to each Registered Rightsholder whose Book was used during that period.  ~~If, at any time within five (5) years after the end of such period, a Rightsholder whose Book was used during that reporting period registers, such Rightsholder shall be paid Subscription Usage Fees for such reporting period.~~

~~(e)      Unclaimed Funds.  Any and all Subscription Usage Fees for a reporting period not claimed by a Rightsholder within five (5) years after the end of such period shall be reallocated by the Registry as follows:  first, if the Subscription Inclusion Fund is insufficient to pay all Inclusion Fees, to the Subscription Inclusion Fund (see Section 1.2 below); second, to defray reasonable and necessary operational expenses of the Registry~~

~~that are related to its performance on behalf of the Rightsholders of the functions described in Section 6.1 (Functions) of the Settlement Agreement and, as determined by the Board of Directors of the Registry in the exercise of its fiduciary duties, to maintain reserves for such expenses; and, third, as to any remaining funds, to Registered Rightsholders whose Books earned Subscription Usage Fees during such reporting period on a basis proportionate to the usage of such Books during such reporting period.~~

~~(f)~~ (e)  Inserts.  Rightsholders of Inserts will not be paid Subscription Usage Fees. They will, however, be eligible for Inclusion Fees, as set forth in Section 1.2 below.

**1.2** **Inclusion Fees**.

(a)  Amounts.  Inclusion Fees are targeted at US $200 per Book, although the actual per Book Inclusion Fee may be greater or less than US $200, as calculated pursuant to Section 1.2(f) below.  Inclusion Fees for Inserts shall be no less than US $50 per Entire Insert and US $25 per Partial Insert (subject to Sections 1.2(b) and 1.2(h) below).  Inclusion Fees will be funded from (i) Institutional Subscription revenues, (ii) if implemented, Consumer Subscription revenues, and (iii) if approved by the Registry pursuant to Section 3.2 below, some or all of any excess funds from the US $45 million Google will pay the Registry for Cash Payments.

(b)  Inserts.  The Registry shall pay an Inclusion Fee for each Insert.  The total of all Inclusion Fees paid for all Inserts consisting of Expression from the same work (*e.g*., from a Book, poem, song lyric, short story, or news article), however, may not exceed US $500.

(c)  Eligibility.  A Rightsholder will be eligible to receive an Inclusion Fee provided he, she or it satisfies the following criteria:

(i)  Such Rightsholder must have registered a Book or Insert with the Registry within ~~five~~ten (~~5~~10) years of the Effective Date; and

(ii)  On the fifth (5th) anniversary of the Effective Date or at any time thereafter when such Inclusion Fee is to be paid, (1) if a Book, such Book is a Display Book and no Book Rightsholder has, at that time, directed that such Book be excluded from Institutional Subscriptions; or (2) if an Insert, no Rightsholder of such Insert has, at that time, directed that such Insert be excluded from all Display Uses.

(d)  One Inclusion Fee Per Book.  Only one Inclusion Fee will be paid per Book (not counting any Inserts therein).

(e)     No Exclusion After Payment.  Once a Rightsholder has been paid any portion of the Inclusion Fee for its Book or Insert, such Rightsholder may not thereafter exclude such Book or Insert from Institutional Subscriptions unless such Rightsholder returns to the Registry all or such portion of the Inclusion Fee previously received by such Rightsholder for such Book or Insert.

(f)     Funding.

(i)     Initial Ten Years.

(1)     Beginning on the date on which the Registry receives the first payment from Google for an Institutional Subscription, and during the ten (10) years thereafter, the Registry will, subject to Section 4.2 below, deposit twenty-five percent (25%) of the revenues the Registry receives from Google for Institutional Subscriptions into the Subscription Inclusion Fund and seventy-five percent (75%) of such revenues into the Subscription Usage Fund.  The Subscription Inclusion Fund will be divided into two sub-funds:  eighty percent (80%) (of the 25%) for the Book Sub-Fund and twenty percent (20%) (of the 25%) for the Insert Sub-Fund.

(2)     If, by the end of such ten (10)-year period, the Book Sub-Fund and the Insert Sub-Fund are sufficient to pay US $200 for every Book of an eligible Book Rightsholder and US $50 and US $25 for every Entire Insert and Partial Insert, respectively, of an eligible Insert Rightsholder, the Registry shall complete the payment of all such Inclusion Fees and shall thereafter cease allocating revenues to the Inclusion Fund.

(3)     If, at the end of such ten (10)-year period, the amount in the Book Sub-Fund exceeds the amount necessary to pay US $200 for every Book of an eligible Book Rightsholder, or the amount in the Insert Sub-Fund exceeds the amount necessary to pay US $50 or US $25 for every Entire Insert or Partial Insert of an eligible Insert Rightsholder, then such excess shall be paid to eligible Rightsholders of Books from the Book Sub-Fund, and to eligible Rightsholders of Inserts from the Insert Sub-Fund, with each Rightsholder of an Entire Insert being paid twice the amount paid to each Rightsholder of a Partial Insert.

(ii)     Subsequent Ten-Year Periods.

(1)     Book Sub-Fund.  If, at the end of the initial ten (10)-year period (or at the end of any subsequent ten (10)-year periods), the Book Sub-Fund is insufficient to pay US $200 for every Book of an eligible

Rightsholder, a majority of the Board of Directors of the Registry shall determine whether to continue allocating Institutional Subscription revenues to the Book Sub-Fund for one or more additional ten (10)-year periods, until such time as the amount in the Book Sub-Fund is sufficient to pay US $200 for every Book of an eligible Rightsholder. In the absence of a determination by a majority of the Board to cease such allocation, such allocation shall continue. If the Board votes to cease such allocation, the Inclusion Fee paid for each Book under this Plan of Allocation may be less than US $200. If, at any time before the end of any subsequent ten (10)-year period authorized by the Board, the amount in the Book Sub-Fund is sufficient to pay US $200 for every Book of an eligible Book Rightsholder, the Registry shall complete the payment of such amount and shall thereafter cease allocating revenues to the Book Sub-Fund.

(2)     Insert Sub-Fund. If, at the end of the initial ten (10)-year period (or at the end of any subsequent ten (10)-year periods), the Insert Sub-Fund is insufficient to pay US $50 for every Entire Insert and US $25 for every Partial Insert of an eligible Insert Rightsholder, the Registry shall continue to allocate Institutional Subscription revenues to the Insert Sub-Fund until such time as the amount in the Insert Sub-Fund is sufficient to pay such amounts for every Entire Insert and Partial Insert of an eligible Insert Rightsholder. If, at any time before the end of any such subsequent ten (10)-year period, the amount in the Insert Sub-Fund is sufficient to pay US $50 per Entire Insert and US $25 per Partial Insert of an eligible Insert Rightsholder, the Registry shall, at such time, pay such amount and shall thereafter cease allocating revenues to the Insert Sub-Fund.

(3)     Deposits After First Ten Years. After the initial ten (10)-year period, if the Registry continues to allocate revenues from Institutional Subscriptions to one or both of the Sub-Funds pursuant to paragraphs (1) or (2) above, then the Registry will, subject to Section 4.2 below, deposit ten percent (10%) of such revenues into the Subscription Inclusion Fund and ninety percent (90%) of such revenues into the Subscription Usage Fund. The Registry shall determine what percentage of the amounts deposited into the Subscription Inclusion Fund shall be further allocated to the Book Sub-Fund and/or Insert Sub-Fund (depending on whether all of the Inclusion Fees for Books and/or Inserts have been paid).

(4)     Allocation of Revenues After Payment of All Inclusion Fees. After all Inclusion Fees have been paid pursuant to this Section 1.2 above, all revenues the Registry receives from Google for Institutional Subscriptions shall be deposited into the Subscription Usage Fund.

4

(g)    <u>Disbursement of Inclusion Fees</u>.  Depending on the amounts deposited in the Subscription Inclusion Fund or in any Sub-Fund, the Registry may, at any time after the five (5)-year period following the Effective Date and in a manner designed to maximize efficiency, disburse some or all of the Inclusion Fees to eligible Rightsholders.

(h)    <u>Insert Rightsholder Exception</u>.  An eligible Rightsholder of an Insert may receive more than the Inclusion Fee for an Insert, as set forth in Sections 1.2(a) and 1.2(b) above, in accordance with the following:

(i)    The Rightsholder demonstrates to the Registry (or Arbitrator under Article IX (Dispute Resolution) of the <u>Amended</u> Settlement Agreement) that it has a written contract or written permission by which such Rightsholder had authorized a Book Rightsholder to include such Insert in a Book; and

(ii)    Such written contract or written permission specifically provides that the Insert Rightsholder is entitled to a specified amount of monetary compensation, set forth on the face of such contract or written permission, for the Book Rightsholder's use of an Entire Insert or Partial Insert in an online database or method of distribution substantially similar to the Institutional Subscription; and

(iii)    Such amount of such monetary compensation exceeds US $50 (for an Entire Insert) or US $25 (for a Partial Insert); and

(iv)    After notifying the Rightsholder of the Book that contains such Insert, the Registry (or Arbitrator) decides that, in light of such contract or permission and any response thereto, such Rightsholder of the Insert is entitled to receive the specified amount of monetary compensation set forth in such writing; and

(v)    The decision of the Registry (or Arbitrator) will be binding on the Rightsholders of the Book and of the Insert.  Any fees paid to a Rightsholder of the Insert in accordance with such decision will be paid from the Insert Sub-Fund.

**1.3    Consumer Subscriptions**.  If Google is authorized by the Registry to sell Consumer Subscriptions pursuant to Section 4.7(dc) (Consumer Subscription Models) of the <u>Amended</u> Settlement Agreement, the Registry shall pay Rightsholders subscription usage fees using a fair and equitable methodology that is based on the methodology for Subscription Usage Fees implemented for Institutional Subscriptions.

**ARTICLE II.**

**Revenue Models Other Than Subscriptions**

    **2.1**   **Book Use Revenues**. The Registry will, subject to Section 4.2 below, distribute to Rightsholders of Books the revenues earned from Consumer Purchase, Advertising Uses, per-page printing fees from the Public Access Service and commercial public access services and, if agreed, the additional Revenue Models specified in Sections 4.7(a) (Print on Demand), and 4.7(b) (Custom Publishing) and 4.7(c) (PDFFile Download) of the Amended Settlement Agreement, on a Book-by-Book basis according to actual use or purchase by users ("Book Use Revenues").

    **2.2**   **Eligibility**. To claim Book Use Revenues for a Book, a Rightsholder must register with the Registry within fiveten (510) years after the end of the reporting period in which the Book earned such Book Use Revenues.

    **2.3**   **Unclaimed Funds**.

    (a)   Book Use Revenues. The Registry shall distribute all Book Use Revenues paid to the Registry by Google that are not claimed by Rightsholders to a Book use fund ("Book Use Fund"). Five (5) years after the end of the reporting period in which such Book Use Revenues were earned, the Registry shall allocate such unclaimed Book Use Revenues pursuant to clauses (1), (2) and (3) of Section 6.3(a)(i) (Unclaimed Funds-Non-Subscription Revenue Models) of the Settlement Agreement, provided that any payment under Section 6.3 (a)(i)(2) of the Settlement Agreement will be made to a Rightsholder of a Book only if and to the extent that such Book earned Book Use Revenues during such reporting period, and, further, that each such payment, together with all previous Book Use Revenues paid to such Book's Rightsholder for such Book for such reporting period, shall not exceed such Rightsholder's share of the seventy percent (70%) of the Gross Revenues (as defined in Section 6.3(a)(i) (Unclaimed Funds-Non-Subscription Revenue Models) of the Settlement Agreement) earned by such Book during such reporting period. The difference between such previously-paid amounts and such Rightsholder's share of seventy percent (70%) of the Gross Revenues is referred to in this Plan of Allocation as the "Maximum Usage Payment." If the Book Use Fund is insufficient to pay the Maximum Usage Payments to all Rightsholders whose Books earned such Book Use Revenues, the Registry shall allocate the Book Use Fund to each such Rightsholder in proportion to the Maximum Usage Payment owed to each such Rightsholder.

    (b)   Other Revenue Models. If and at such time as Google and the Registry agree to implement a Revenue Model not specified in Part I or Section 2.1 above, the Registry shall at that time determine a fair and equitable methodology for distributing revenues from such Revenue Model that are not claimed by Rightsholders five (5) years after the end of the reporting period in which such revenues were earned.

6

**2.3** ~~2.4~~ **Inserts**.  Rightsholders of Inserts will not be paid from revenues earned in Revenue Models other than Institutional Subscription or Consumer Subscriptions (if implemented), but they will be eligible for Inclusion Fees under Part I above.

# ARTICLE III.

## Cash Payments

**3.1** **Amounts**.  Cash Payments shall be made from the Settlement Fund in accordance with Section 5.1 (Cash Payments to Class Members Whose Books and Inserts Have Been Digitized) of the Amended Settlement Agreement.

**3.2** **Excess Funds**.  If, after Cash Payments have been made to all Rightsholders entitled to receive such payments from the Settlement Fund, excess funds remain from Google's minimum payment of US $45 million pursuant to Section 5.1(b) (Funding of Cash Payments) of the Amended Settlement Agreement, then such excess funds will be paid, on a proportional basis, to all such Rightsholders until all such Book Rightsholders receive an amount no greater than US $300 per claimed Book and until all such Insert Rightsholders receive an amount no greater than US $75 per claimed Entire Insert and US $25 per claimed Partial Insert.  Any funds remaining thereafter shall be paid to the Registry and shall be disposed of as follows:  three (3) years after the Effective Date, the Board of Directors of the Registry shall determine by majority vote whether some or all of such balance shall be deposited into the Subscription Inclusion Fund or be used for the performance by the Registry of the functions described in Section 6.1 (Functions) of the Amended Settlement Agreement.

# ARTICLE IV.

## Miscellaneous

**4.1** **Administrative Efficiency**.  To minimize its administrative costs and in its discretion, the Registry shall determine the length of each reporting period and establish a minimum amount for making payments to Rightsholders; provided, however, that accrued amounts in excess of US $25 or more will be distributed at least every five (5) years; provided, further, that the payment of Cash Payments, irrespective of the amount of such Cash Payment, shall be made promptly after the resolution of all disputes arising out of the final report pursuant to Section 13.5 (Final Report Concerning Cash Payments) of the Amended Settlement Agreement.

**4.2** **Registry Administration Costs**.  The Registry shall pay net revenues to Rightsholders pursuant to Parts I and II above after deducting the Registry's costs of administration and operations, and any taxes payable by the Registry, on a proportionate and equitable basis.

**4.3     Author-Publisher Procedures**.  All payments due under this Plan of Allocation to Author Sub-Class members and to Publisher Sub-Class members shall be made in accordance with the Author-Publisher Procedures.  Multiple Author Rightsholders and multiple Publisher Rightsholders may share their respective payments pursuant to agreements or arrangements between them.

**4.4     Claiming Rightsholders**.  Payments to Rightsholders will be subject to the eligibility requirements set forth in Section 13.1 (Registration and Completing Claims) of the Amended Settlement Agreement and in the official claim forms developed pursuant thereto.

**4.5     No Precedential Effect**.  This Plan of Allocation is for purposes of the Amended Settlement Agreement only, and has no precedential effect.

**4.6     Dispute Resolution for Insert Rightsholders**.  All disputes arising under this Plan of Allocation shall be resolved under the dispute resolution mechanism set forth in Article IX (Dispute Resolution) of the Amended Settlement Agreement.

**4.7     Unclaimed Funds**.  All Unclaimed Funds will be subject to Section 6.3(a) (Unclaimed Funds) of the Amended Settlement Agreement.

# ATTACHMENT D

# SECURITY STANDARD

## Table Of Contents

1 Overview and Definitions ........................................................................1

2 Security Implementation Plans ...............................................................1

3 Minimum Requirements ..........................................................................2
   3.1 Security Management .....................................................................2
      3.1.1 Information Security Policy ...............................................2
      3.1.2 Security Representative .....................................................2
      3.1.3 Security Awareness............................................................2
      3.1.4 Incident Response .............................................................3
   3.2 Identification and Authentication ...................................................3
      3.2.1 User Identification and Authentication..............................3
      3.2.2 Authentication and Password Management.......................3
   3.3 Access Controls ..............................................................................5
      3.3.1 Account Management .........................................................5
      3.3.2 Access Approval Process (System-Level Access)...........5
      3.3.3 Supervision and Review – Access Control ......................6
   3.4 Audit and Accountability................................................................6
      3.4.1 Logging and Audit Requirements for Fully Participating
           Libraries and Host Sites ....................................................7
           3.4.1.1 Auditable Events ....................................................7
           3.4.1.2 Content of Audit Records ......................................7
           3.4.1.3 Protection of Audit Information...........................8
           3.4.1.4 Audit Record Retention ........................................8
      3.4.2 Marking of Image Files.....................................................8
      3.4.3 Forensic Analysis..............................................................9
   3.5 Network Security ............................................................................9
      3.5.1 Electronic Perimeter.........................................................9
      3.5.2 Network Firewall ...........................................................10
      3.5.3 Device Hardening ...........................................................10
      3.5.4 Network Security Testing ...............................................10
      3.5.5 Remote Network Access..................................................11
      3.5.6 Encryption of Digitized Files.........................................11
   3.6 Media Protection...........................................................................12
      3.6.1 Media Access ..................................................................12
      3.6.2 Media Inventory..............................................................12
      3.6.3 Media Storage .................................................................12
      3.6.4 Media Sanitization and Disposal ....................................13
   3.7 Physical and Environmental Protection ........................................13
      3.7.1 Physical Access Authorizations......................................13

|       | 3.7.2 | Physical Access Control ................................................................. | 14 |
|       | 3.7.3 | Visitor Control .............................................................................. | 14 |
|       | 3.7.4 | Access Records ............................................................................. | 14 |
| 3.8   | Risk Assessment ...................................................................................... | | 14 |
|       | 3.8.1 | Risk Assessment ........................................................................... | 14 |
|       | 3.8.2 | Vulnerability Management ........................................................... | 15 |
| 3.9   | Digitized File Content Delivery by Google .............................................. | | 15 |
|       | 3.9.1 | Preview Uses ................................................................................. | 15 |
|       | 3.9.2 | Consumer Purchase ...................................................................... | 16 |
|       | 3.9.3 | Institutional Subscription ............................................................ | 16 |
| 3.10  | Access to Research Corpus by Host Sites .................................................. | | 17 |
| 3.11  | Use of Library Digital Copy by Fully Participating Libraries .................. | | 17 |

**1      Overview and Definitions**

This is the Security Standard required by the Amended Settlement Agreement.

**Definitions:**

"Authorized Personnel" of a Responsible Party means the employees, vendors, contractors and business partners of the Responsible Party who access (i) unencrypted Digitized Files or systems storing unencrypted Digitized Files, and (ii) encrypted Digitized Files or systems storing encrypted Digitized Files to the extent such persons have access to the applicable encryption keys, in both cases, for the purpose of maintenance, support or development.  The term "Authorized Personnel" does not include End Users.

"Digitized Files" refers (i) in the case of Google, to electronic files of Books Digitized by or for Google, or provided to Google and used under the authorizations granted to Google in the Amended Settlement Agreement, (ii) in the case of Fully Participating Libraries, to electronic files that are included in any LDC, or (iii) in the case of Host Sites, to electronic files that are included in the Research Corpus and, for each of the foregoing clauses (i) – (iii), unless otherwise specified, include only the individual image files and the OCR output from such electronic files.  This definition of Digitized Files does not include electronic files to the extent Google uses such files pursuant to then-in-effect agreements directly with individual Rightsholders (e.g., through the Partner Program).

"End Users" means Google's end users and does not include Authorized Personnel.

"Responsible Party" means the Person that is required to comply with this Security Standard in accordance with Article VIII of the Amended Settlement Agreement, the Library-Registry (Fully Participating) Agreement and the Host Site-Registry Agreement and, as the context requires, shall refer to Google, a Fully Participating Library or a Host Site.

All other capitalized terms used, but not defined, in this Security Standard have the same meanings as in the Amended Settlement Agreement.

**2      Security Implementation Plans**

In accordance with Article VIII of the Amended Settlement Agreement, Google, each Fully Participating Library and each Host Site is required to formulate a Security Implementation Plan that meets the requirements of this Security Standard.

**3      Minimum Requirements**

This Section includes the minimum requirements that the Responsible Party shall use in protecting unencrypted Digitized Files.

**3.1      Security Management**

The requirements under this heading pertain to the ability of the Responsible Party to oversee and manage the information security program and associated controls through policies, personnel, training and procedures.

**3.1.1      Information Security Policy**

Establish (if not already in place), publish, maintain and disseminate information security policies that address all of the requirements contained herein and that are disseminated to all relevant Authorized Personnel.  These policies shall be reviewed annually and updated when necessary.  Information security policies are approved annually and after each revision by the appropriate management in the Responsible Party's organization. Maintain appropriate records of such approval.

**3.1.2      Security Representative**

Each Responsible Party that has custody of unencrypted Digitized Files is to have a formally appointed employee ("Information Security Representative" or "ISR") that understands the policies and procedures used to specifically control sensitive areas and information.  The ISR will acknowledge his/her responsibilities and the Responsible Party will keep a record of such acknowledgement.

**3.1.3      Security Awareness**

Implement (if not already in place) a security awareness program for all Authorized Personnel that will include a review upon hire, and retraining at least every three (3) years.  The Responsible Party will keep a record of such retraining and acknowledgements by such Authorized Personnel that they have been retrained.

Authorized Personnel shall be informed that systems contain sensitive copyrighted material and that access to such material is restricted and subject to specific access controls.

2

### 3.1.4 Incident Response

Maintain security incident response plans that will address the response procedures, roles and responsibilities, and communication with contact details.

In accordance with Section 8.3 of the Amended Settlement Agreement, each Responsible Party is required to promptly report to the Registry all breaches of its Security Implementation Plan other than Inconsequential Breaches. Breaches that pose a reasonable risk of exposing unencrypted Digitized Files, and all other breaches that are not Inconsequential Breaches, shall be tracked. All such breaches, as well as Inconsequential Breaches resulting in either disciplinary action or changes to the Responsible Party's information security policies, shall be disclosed by the Responsible Party during an audit.

## 3.2 Identification and Authentication

Requirements under this heading pertain to the controls that require the Responsible Party's Authorized Personnel, management and administrators to have an authorized account on the network and/or systems when accessing unencrypted Digitized Files. To use those accounts, each such user must have a unique identifier and a means of authenticating his/her identity.

### 3.2.1 User Identification and Authentication

Passwords, passphrases, digital keys or other similar methods ("Credentials") are used to authenticate System-level Access to systems storing and processing unencrypted Digitized Files.

### 3.2.2 Authentication and Password Management

Ensure proper user authentication and password management for access to unencrypted Digitized Files and their associated data stores, applications and tool sets.

Authentication and password management controls in this Section should adhere to FIPS 112, Section 4.2 – Password System for Medium Protection Requirements of the National Institute of Standards Technology ("NIST"), with the exception that passwords shall not be transmitted in cleartext. If, however, a Responsible Party does not adhere to FIPS 112 Section 4.2, then it

3

shall implement authentication and password management controls that provide protection equivalent to such standard with respect to protecting the security of the unencrypted Digitized Files and that do not pose an undue risk of a security breach that would result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access.  If the Responsible Party implements authentication and password management controls that provide such equivalent level of protection, then, in its Security Implementation Plan, the Responsible Party shall (i) describe any difference between the requirements of FIPS 112 Section 4.2 and the Responsible Party's actual authentication and password management controls, (ii) provide a business justification for each such difference, and (iii) demonstrate that such implementation provides such an equivalent level of protection and does not pose any such undue risk of a security breach.

- Control the addition, deletion, and modification of user IDs, credentials, and other identifier objects.

- Immediately revoke access for any Authorized Personnel who are terminated.

- Do not permit Authorized Personnel to share their unique accounts.

- Put in password change policies and procedures.  Educate Authorized Personnel about these policies and require that they change their passwords when appropriate.

- Require Authorized Personnel to use passwords that cannot be easily guessed or brute-forced.

- Require idle sessions to be logged out or screens to be locked after a reasonable period of time if they are left unattended.

- Require authentication for access to any data storage containing unencrypted Digitized Files.  This includes access by applications, administrators, and all other support personnel.

### 3.3 Access Controls

The requirements under this heading pertain to the ability of the Responsible Party to control access to unencrypted Digitized Files, to limit that access only to Authorized Personnel, and to further limit what actions Authorized Personnel may take with unencrypted Digitized Files. Access controls should adhere to the Moderate Controls for AC-1, AC-2 and AC-3 of Appendix F of NIST 800-53 – The Security Control Catalog. If, however, a Responsible Party does not adhere to such standard, then it shall implement access controls that provide protection equivalent to such standard with respect to protecting the security of the unencrypted Digitized Files and that do not pose an undue risk of a security breach that would result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access. If the Responsible Party implements access controls that provide such equivalent level of protection, then, in its Security Implementation Plan, the Responsible Party shall (i) describe any difference between the requirements of the Moderate Controls for AC-1, AC-2 and AC-3 of Appendix F of NIST 800-53 and the Responsible Party's actual access controls, (ii) provide a business justification for each such difference, and (iii) demonstrate that such implementation provides such an equivalent level of protection and does not pose any such undue risk of a security breach.

### 3.3.1 Account Management

Access ("System-level Access") for the set-up and maintenance of hardware and software of systems storing and processing unencrypted Digitized Files requires Authorized Personnel to log in.

### 3.3.2 Access Approval Process (System-Level Access)

The Responsible Party will implement a process to manage System-level Access to unencrypted Digitized Files. This process will encompass the following:

- The Responsible Party will select persons ("Access Approvers") who will be responsible for approving System-level Access to systems containing unencrypted Digitized Files.

- No person shall be granted System-level Access to systems where unencrypted Digitized Files are stored unless such access has been approved by an Access Approver.

5

- Access Approvers may only approve System-level Access for personnel who require it for the purpose of providing system maintenance or to perform appropriate job duties.

- Access is removed for Authorized Personnel no longer requiring System-level Access to the systems where unencrypted Digitized Files are stored or processed.

- Authorized Personnel leaving the employment of the Responsible Party have their System-level Access removed at the time of termination.

- The System-level Access rights of any Authorized Personnel will be suspended if the Responsible Party becomes aware of or has reason to believe that such individual is involved in inappropriate access to unencrypted Digitized Files.

- A list ("Authorization List") of Authorized Personnel authorized to have System-level Access to systems storing or processing unencrypted Digitized Files is actively maintained, managed, and available to the ISR or his/her delegate.

### 3.3.3   Supervision and Review – Access Control

The Authorization List is reviewed on a yearly basis, and acknowledged by the ISR or his/her delegate.

### 3.4   Audit and Accountability

The requirements under this heading pertain to the ability of an applicable Responsible Party to (a) record the actions of Authorized Personnel, if required, (b) identify the source of an Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access, as applicable, and (c) conduct forensic analysis regarding any such breach.  If, however, a Responsible Party does not adhere to these requirements, then it shall implement controls that provide protection equivalent to such requirements with respect to protecting the security of the unencrypted Digitized Files and that do not pose an undue risk of a security breach that would result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access.  If the Responsible Party implements controls that provide such equivalent level of protection, then, in its Security Implementation Plan, the Responsible Party shall (i) describe any

6

difference between the requirements of this section and the Responsible Party's actual controls, (ii) provide a business justification for each such difference, and (iii) demonstrate that such implementation provides such an equivalent level of protection and does not pose any such undue risk of a security breach.

### 3.4.1 Logging and Audit Requirements for Fully Participating Libraries and Host Sites

The requirements under this heading pertain to the ability of the Fully Participating Libraries and Host Sites (other than Google) to record the actions of Authorized Personnel described in this Section.

#### 3.4.1.1 Auditable Events

Fully Participating Libraries and Host Sites (other than Google) will record the following events relating to access of unencrypted Digitized Files, and maintain such information in logs:

- Authentication events

- File access events

- Administrative events

#### 3.4.1.2 Content of Audit Records

Audit log records of Fully Participating Libraries and Host Sites (other than Google) relating to access to unencrypted Digitized Files will contain the following:

- Date and time of event

- User responsible for event

- Object of event (file name, database field, etc)

- Type of event

All systems used to support the audit logging function must have the current internal system time accurately reflected and synchronized to a single time source to ensure time is

7

constant across all delivery systems for event logging. Automated methods should be used to ensure time is synchronized.

### 3.4.1.3 Protection of Audit Information

Fully Participating Libraries and Host Sites (other than Google) will ensure that audit files and audit evidence relating to the access to unencrypted Digitized Files are protected from inappropriate modifications.

### 3.4.1.4 Audit Record Retention

Audit logs relating to access to unencrypted Digitized Files are to be maintained and readily available for a period of time reasonably necessary, but, in no event, less than six (6) months, to allow access to be traced in case of an incident. Such logs must also be maintained for at least an additional six (6) months thereafter. Each Security Implementation Plan shall specify the period of time such logs will be maintained.

## 3.4.2 Marking of Image Files

Google will take the following measures to identify the source of a security breach. Google will include an identifying mark on Digitized File images served to End Users through Display Uses that use such Digitized File images. In addition, Google will include on all Digitized File images included (1) in an LDC of a Fully Participating Library, and (2) in a Research Corpus of a Host Site, or of Google, to the extent Google becomes an additional Host Site pursuant to Section 7.2(d)(ii) of the Amended Settlement Agreement, information, in the form of a metadata tag or similar form of identification, identifying the institution to which Google provided such Digitized File images. At any time, the Registry, a Fully Participating Library or a Host Site may provide to Google, or Google may otherwise obtain, Digitized File images that may have been obtained due to an Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access. With respect to any such Digitized File images, Google will analyze such Digitized File images and provide the Registry with information and results of any such analysis. Information provided to the Registry will include, if determinable, the potential source of such images (*i.e.*, whether such images originated from a revenue model authorized

8

under the Amended Settlement Agreement or an internal file of Google, a Participating Library or a Host Site).

Google will include as part of its Security Implementation Plan a description of the processes it will use to identify the source of any Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access that may occur. Such description will include an explanation of Google's processes for responding to any such Unauthorized Access, Prohibited Access or Third Party Unauthorized Access.

### 3.4.3 Forensic Analysis

In the event of an Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access, the Responsible Party identified as the source of such breach will evaluate and analyze all reasonably determinable information to identify (a) the source of such breach (*i.e.*, to determine whether the source of such breach was internal to the Responsible Party or external, such as caused by a third party), (b) how such breach occurred, and (c) ways to prevent any such Unauthorized Access, Prohibited Access or Third Party Unauthorized Access, as applicable, from reoccurring. Each Responsible Party identified as the source for an Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access will meet and confer with the Registry to provide the status of its evaluation and analysis and, upon the Registry's request, any reasonable reports requested by the Registry.

## 3.5 Network Security

The requirements under this heading pertain to the controls that limit the Responsible Party's access to the network on which unencrypted Digitized Files are accessible.

### 3.5.1 Electronic Perimeter

An electronic perimeter is created around systems storing and processing unencrypted Digitized Files as one safeguard against theft. The definition of an electronic perimeter may vary according to the needs of a particular Responsible Party to connect systems and networks to each other.

Systems inside the perimeter are only provided with the ability to communicate with systems outside the perimeter for the purpose of

9

serving data to End Users and for Remote Access as described in Section 3.5.5.

### 3.5.2 Network Firewall

Maintain a network barrier that acts as a firewall to prevent unauthorized traffic from reaching systems that store unencrypted Digitized Files.

### 3.5.3 Device Hardening

Maintain documentation for device hardening of network and computing systems that is consistent with guidelines provided by NIST Section 4.2 of NIST 800-123.  Device hardening of network and computing systems should adhere to Section 4.2 of NIST 800-123 (Hardening and Securely Configuring the OS).  If, however, a Responsible Party does not adhere to Section 4.2 of NIST 800-123, then it shall implement device hardening of network and computing systems that provides protection equivalent to such standard with respect to protecting the security of the unencrypted Digitized Files and that does not pose an undue risk of a security breach that would result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access.  If the Responsible Party implements device hardening of network and computing systems that provides such equivalent level of protection, then, in its Security Implementation Plan, the Responsible Party shall (i) describe any difference between the requirements of such standard and the Responsible Party's actual implementation of device hardening, (ii) provide a business justification for each such difference, and (iii) demonstrate that such implementation provides such an equivalent level of protection and does not pose any such undue risk of a security breach.

### 3.5.4 Network Security Testing

Conduct annual reviews or network vulnerability scans that identify issues that PCI DDS describes as level 3 or higher. Security fixes for identified issues should be addressed as described in Section 3.8.2.  Documentation of compliance shall be maintained and acknowledged by the ISR or his/her delegate.

If, however, a Responsible Party does not conduct annual reviews or network vulnerability scans as required by the preceding

10

paragraph, then it shall conduct network security tests that provide protection equivalent to such reviews or such scans with respect to protecting the security of the unencrypted Digitized Files and that do not pose an undue risk of a security breach that would result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access.  If the Responsible Party conducts network security tests that provide such equivalent level of protection, then, in its Security Implementation Plan, the Responsible Party shall (i) describe any difference between the requirements of the preceding paragraph and the Responsible Party's actual network security tests, (ii) provide a business justification for each such difference, and (iii) demonstrate that the Responsible Party's network security testing provides such an equivalent level of protection and does not pose any such undue risk of a security breach.

Each Responsible Party will maintain documentation describing the findings of the annual reviews, network vulnerability scans or equivalent protection measures required by this Section, as applicable, as well as records relating to the remediation of identified issues.

### 3.5.5    Remote Network Access

When Authorized Personnel require System-level Access (as defined above) to systems within the perimeter from outside the perimeter ("Remote Access"), encryption and reasonable authentication mechanisms are used to establish the identity of such Authorized Personnel.

### 3.5.6    Encryption of Digitized Files

In encrypting Digitized Files, the Responsible Party will use the algorithms and key sizes recommended in NIST SP 800-57 Part 1 – Recommended algorithms and minimum key sizes table.  If, however, a Responsible Party does not adhere to NIST SP 800-57 Part 1 – Recommended algorithms and minimum key sizes table, then, in encrypting Digitized Files, it shall use encryption algorithms and key sizes that provide protection equivalent to such standard with respect to protecting the security of the unencrypted Digitized Files and that do not pose an undue risk of a security breach that would result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access.  If the Responsible Party uses encryption algorithms and key sizes that provide such

11

equivalent level of protection, then, in its Security Implementation Plan, the Responsible Party shall (i) describe any difference between the requirements of such standard and the Responsible Party's actual encryption of Digitized Files, (ii) provide a business justification for each such difference, and (iii) demonstrate that such implementation provides such an equivalent level of protection and does not pose any such undue risk of a security breach.

Encryption keys will only be provided to Authorized Personnel.

### 3.6 Media Protection

The requirements under this heading pertain to the Responsible Party's protection of media containing unencrypted Digitized Files.

#### 3.6.1 Media Access

Access to media containing unencrypted Digitized Files must be limited to authorized individuals only.

#### 3.6.2 Media Inventory

Maintain a media inventory log to verify that periodic media inventories are performed. The ISR or his/her delegate should validate that such a log is maintained.

Digital media, such as hard drives and magnetic tape containing unencrypted Digitized Files, is tracked so that theft or loss of unencrypted Digitized Files can be detected. Media will be labeled in a way that facilitates tracking.

#### 3.6.3 Media Storage

Storage media containing unencrypted Digitized Files are maintained on premises or stored off-site in controlled facilities. Only a limited number of Authorized Personnel are authorized to release or receive tapes containing unencrypted Digitized Files (backup media) from an offsite storage vendor. Documentation of the list of such personnel is maintained and reviewed periodically, but no less frequently than annually, by the ISR or his/her delegate.

12

### 3.6.4   Media Sanitization and Disposal

When digital media are retired or replaced, any Digitized Files that are unencrypted will be deleted or rendered permanently unusable from the digital media.

Maintain an "end of life" disposal process for all media hardware components.  Disposal of media that contains unencrypted Digitized Files must render the data unrecoverable.  This requirement includes, but is not limited to, magnetic tape, CD-ROM, DVD, hard drives, and USB devices.

## 3.7   Physical and Environmental Protection

The requirements under this heading pertain to the Responsible Party's safeguards with respect to physical access to and protection of Digitized Files that are unencrypted.

If, however, a Responsible Party does not adhere to these physical access safeguards with respect to its scanning facilities, then, with respect to such facilities, it shall implement safeguards that provide protection equivalent to the requirements of this Section with respect to protecting the security of the unencrypted Digitized Files and that do not pose an undue risk of a security breach that would result in Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access.  If the Responsible Party implements physical access safeguards that provide such equivalent level of protection for its scanning facilities, then, in its Security Implementation Plan, the Responsible Party shall (i) describe any difference between the requirements of this Section and the Responsible Party's actual safeguards, (ii) provide a business justification for each such difference, and (iii) demonstrate that such implementation provides such an equivalent level of protection and does not pose any such undue risk of a security breach.

### 3.7.1   Physical Access Authorizations

As a safeguard against physical theft, access to facilities where unencrypted Digitized Files are stored or processed is restricted. The level of access varies and depends on the role of the Authorized Personnel accessing such unencrypted Digitized Files and whether such Authorized Personnel are "trusted agents" or certified third parties.

13

Access to the Responsible Party's facilities where unencrypted Digitized Files are stored or accessible and similar sensitive areas are restricted to only the Responsible Party's authorized employees, vendors and contractors, certified third parties, and authorized visitors.

Access to sensitive areas where unencrypted Digitized Files are stored or accessed, such as data center(s) and tape libraries, for all persons requires approval by appropriate facilities managers. The approvals are documented. Access for terminated or transfer employees is revoked on or before the last day of employment.

### 3.7.2    Physical Access Control

The use of entry systems, such as card readers, is used where possible to verify the credentials of Authorized Personnel passing through doors and to provide a method of tracking these individuals.

### 3.7.3    Visitor Control

Visitors to facilities where unencrypted Digitized Files are kept will be individually authorized for access. Responsible Parties will maintain a process for admitting visitors into areas where unencrypted Digitized Files are kept. This process will include controls on who can authorize access and a detailed description of how visitor log records for the facility are kept.

### 3.7.4    Access Records

No less than annually, the ISR or his/her delegate shall review the currency and appropriateness of physical access to the facility where unencrypted Digitized Files are stored and sensitive areas. Logs will be maintained so that discrepancies can be discovered.

## 3.8    Risk Assessment

The requirements under this heading pertain to the auditing and discovery of security vulnerabilities.

### 3.8.1    Risk Assessment

Pursuant to Section 8.2(c) of the Amended Settlement Agreement, the Responsible Party is required to permit a mutually agreeable

14

third party to conduct annual (or, if reasonably necessary, semi-annual) audits of security and usage to verify such Responsible Party's compliance with its then-in-effect Security Implementation Plan.

### 3.8.2    Vulnerability Management

Maintain a program and process to identify newly discovered security vulnerabilities, including as a result of network security testing pursuant to Section 3.5.4.  Security fixes (*e.g.*, patches, mitigating controls) are to be applied as soon as possible when vulnerabilities are deemed critical in order to protect the asset from intrusion vulnerabilities.

If, however, a Responsible Party does not or will not apply a security fix as soon as possible when it discovers a vulnerability deemed critical, then, in its Security Implementation Plan and to the auditor the Responsible Party shall (i) provide a business justification for not doing so and (ii) demonstrate that not fixing such vulnerability does not pose any such undue risk of a security breach.

## 3.9    Digitized File Content Delivery by Google

This Section describes the security requirements applicable to Google in serving the content of Digitized Files to End Users under the terms defined in the Amended Settlement Agreement.

### 3.9.1    Preview Uses

Google shall use commercially reasonable methods to identify unique Access Points from which Books contained within Google Book Search are being accessed for the purposes of Preview Use through signals such as the IP address, cookies and similar signals that may be available.  Google shall monitor and track access to Preview Use pages from unique Access Points.  "Access Point" means a specific computer from which Google Book Search is accessed to the extent such access can be identified through signals such as a cookie, IP address or similar signals.  Different End Users accessing Google Book Search from the same computer will be tracked as a single End User for the sake of monitoring Preview Uses.

For each unique Access Point, Google will track and count unique Preview Use pages viewed for each individual Book. When the number of Preview Use pages from a specific Book accessed from a single Access Point has reached the allowed Preview Use quota, Google will restrict future access to such Book by that End User from the Access Point to the Preview Use pages that that End User already has viewed.

Google shall identify blacklisted pages for each Book and will use commercially reasonable efforts to prevent those pages from being shown to any End User as part of any Preview Use. Google may change the specific pages that will be blacklisted for a given Book from time to time. Google shall use commercially reasonable efforts to keep blacklisted portions of a Book from changing for a period of at least ninety (90) days.

### 3.9.2 Consumer Purchase

Google shall use commercially reasonable efforts to authenticate individual End Users purchasing access to individual Books through the use of account login or other equivalent method. An End User that is logged in will be identified as an Identified User based upon such End User's login account information.

Access to the full contents of a Book through Consumer Purchase will be limited to identified End Users who have purchased access to that Book.

Google will encourage End Users to not share or transfer their accounts by monitoring simultaneous login. If Google determines that an identified End User is simultaneously logged in and accessing books from two computers, then Google shall disable one of the Access Points and require re-authentication from that Access Point.

### 3.9.3 Institutional Subscription

Google shall use commercially reasonable efforts to authenticate individual End Users for access to Books in an Institutional Subscription by verifying that an individual is affiliated with an institution with an active subscription. Google's efforts will be in partnership with the subscribing institutions in a manner consistent with, or otherwise equivalent to, generally accepted industry standards for authentication of use of subscriptions. Techniques

used may include IP address authentication, user login, and/or leveraging authentication systems already in place at an individual institution.

**3.10    Access to Research Corpus by Host Sites**

A Host Site's Security Implementation Plan shall describe the processes and procedures it will employ to comply with the requirement in Section 7.2(d) of the Amended Settlement Agreement, and in the Host Site-Registry Agreement, that only Qualified Users, reviewers and challengers may have access to the Research Corpus.

**3.11    Use of Library Digital Copy by Fully Participating Libraries**

A Fully Participating Library's Security Implementation Plan shall describe the processes and procedures it will employ to comply with the requirements in Section 7.2(b) and Section 7.2(c) of the Amended Settlement Agreement, and in the Library-Registry (Fully Participating) Agreement, that permit and prohibit access to that Fully Participating Library's Library Digital Copy.

17

# ATTACHMENT E

## SAFE HARBOR PUBLIC DOMAIN PROCESS

For purposes of determining whether the safe harbor in Section 3.2(d)(v)(3) of the Amended Settlement Agreement is applicable to Google's use of a work, Google shall apply the factors and rules set forth in this Attachment E. Nothing in the Amended Settlement Agreement requires Google to apply such factors or rules to any work but, if it does not do so, then Google shall not be entitled to such safe harbor for such work. Any determination by Google that a work is a Public Domain Book is solely for the purposes of Section 3.2(d)(v) and is not to be relied on or invoked for any other purposes, including determining whether a work is in fact in the public domain under the Copyright Act.

## 1. FACTORS

### 1.1 Copyright Date
To ascertain a work's copyright date, at least two people shall review at least the title page (and other pages, as appropriate, if the copyright date does not appear on the title page) of a work. If, without communication between two of such reviewers, they each found the same copyright date, then that date is deemed to be the work's "Reviewed Copyright Date." If the reviewers did not find the same copyright date or the reviewers cannot determine a copyright date, Google shall search its own bibliographic and other records, and other records reasonably available to it. If Google determines that records from more than one source indicate the same copyright date, then that date may be deemed to be the work's "Reviewed Copyright Date."

### 1.2 Publication Place
To ascertain a work's place of publication, at least two people shall review at least the title page (and other pages, as appropriate, if the place of publication does not appear on the title page) of a work. If, without communication between two of such reviewers, they each found that either (a) a location within the United States is indicated as the apparent place of publication, or (b) if the place of publication is not apparent, at least one of the places set forth on the title page or elsewhere is within the United States, then the work is deemed to be a "Presumed U.S. Publication." If the reviewers did not find the same place of publication, Google shall search its own bibliographic and other records, and other records reasonably available to it. If Google determines that records from more than one source indicate the same place of publication, and that place is a location within the United States, then the work may be deemed to be a "Presumed U.S. Publication."

### 1.3 Copyright Notice
To ascertain whether a work bears a copyright notice complying with the Copyright Act ("Copyright Notice"), at least two people shall review at least the title page (and the copyright page, if a Copyright Notice is not on the title page) of a work. If, without communication between two of such reviewers, they each found that those pages do not contain a Copyright Notice, then the work is deemed "Presumably Does Not Contain a Copyright Notice." If the reviewers did not agree, and Google determines that the

scanned images of a work do not contain a Copyright Notice, then the work may be deemed "Presumably Does Not Contain a Copyright Notice."

**1.4 Contemporaneous Publication Abroad**

To determine whether a work was first published in a country other than the United States or contemporaneously outside and within the United States, Google shall search its own bibliographic and other records, and other records reasonably available to it (*e.g.*, any online records of the United States Copyright Office or a copy thereof). If Google determines that the work was published in a country other than the United States either (a) prior to the work's Reviewed Copyright Date or (b) within two years of the work's Reviewed Copyright Date, then the work may be deemed "Presumably Contemporaneously Published Abroad."

**1.5 Renewal**

To determine whether a work was renewed with the United States Copyright Office, Google shall search either the United States Copyright Renewal Records or a copy thereof. If such search discloses a renewal record for the work, then the renewal date of such work will be that work's "Presumed Renewal Date." If such search does not disclose a renewal record for such work, then such work is "Presumed Not Renewed."

**1.6 Presumed Government Work**

To determine whether a work was published by the United States Government, at least two people shall review at least the title page (and, if there is a copyright page, the copyright page, if a claim of copyright does not appear on the title page) of the work. If, without communication between two of such reviewers, they each found that those pages indicate that the work was published by the United States Government and do not contain a claim of copyright by a Person other than the United States federal government, then the work is deemed to be a "Presumed Government Work." If the reviewers did not agree with respect to such publication or such claim, Google shall search its own bibliographic and other records, and other records reasonably available to it. If Google determines that records from more than one source indicate that the work was published by the United States Government, then the work is deemed to be a "Presumed Government Work."

**1.7 Registration and Registration Date**

To determine whether a work was registered with the United States Copyright Office and when it was registered, Google shall search either the United States Copyright Registration Records or a copy thereof. If such search discloses a registration record for the work then the registration date of such work will be that work's "Presumed Registration Date." If such search does not disclose a registration record for such work, then such work is "Presumed Not Registered."

## 2. RULES FOR PRESUMED U.S. PUBLICATIONS

**2.1 Copyright Expiration by Copyright Date**
If (a) a work's Reviewed Copyright Date is before January 1, 1923 and (b) the work is a Presumed U.S. Publication, then Google may submit such work to the Registry as a Public Domain Book pursuant to Section 3.2(d)(v)(2).

**2.2 Lack of Copyright Notice**
If a work (a) has a Reviewed Copyright Date before March 1, 1989, (b) is a Presumed U.S. Publication, (c) Presumably Does Not Contain a Copyright Notice, (d) is not Presumably Contemporaneously Published Abroad, and (e) is Presumed Not Registered or has a Presumed Registration Date that is not before or within five (5) years following the Reviewed Copyright Date, then Google may submit such work to the Registry as a Public Domain Book pursuant to Section 3.2(d)(v)(2). If a Reviewed Copyright Date is the year 1989 without a specific date, then it is deemed to be not before March 1, 1989.

**2.3 Lack of Renewal**
If a work (a) has a Reviewed Copyright Date that is before January 1, 1964, (b) is a Presumed U.S. Publication, (c) is not Presumably Contemporaneously Published Abroad, and (d) is Presumed Not Renewed, then Google may submit such work to the Registry as a Public Domain Book pursuant to Section 3.2(d)(v)(2).

**2.4 Government Works**
If a work is a Presumed Government Work, then Google may submit such work to the Registry as a Public Domain Book pursuant to Section 3.2(d)(v)(2).

## 3. RULE FOR PRE-1923 WORKS NOT PRESUMED U.S. PUBLICATIONS

If a work (a) has a Reviewed Copyright Date that is before January 1, 1923, (b) is not a Presumed U.S. Publication, and (c) Presumably Does Not Contain a Copyright Notice, then Google shall search its own bibliographic and other records, and other records reasonably available to it (*e.g.*, any online records of the United States Copyright Office or a copy thereof) to determine if the work was either (i) published in the United States prior to or at the same time as the work's Reviewed Copyright Date ("U.S. Published Work"), (ii) subsequently republished anywhere with a Copyright Notice, or (iii) subsequently registered with the United States Copyright Office. If Google's search reveals that the work either (1) is a U.S. Published Work, (2) was republished with a Copyright Notice and the republished work has a Reviewed Copyright Date that is before January 1, 1923, or (3) was never republished or was republished with a Copyright Notice after January 1, 1923 and is reasonably determined by Google to be in the public domain (*e.g.*, by applying section 302 of the Copyright Act), then Google may submit the work to the Registry as a Public Domain Book pursuant to Section 3.2(d)(v)(2).

### 4. SAFE HARBOR NOTICES TO THE REGISTRY

For each work as to which Google seeks the benefit of the safe harbor in Section 3.2(d)(v)(3) of the Amended Settlement Agreement, Google shall disclose to the Registry (1) the title, author and ISBN code (if available) of such work, (2) the facts ascertained and/or conclusions drawn by Google about the work pursuant to Sections 1.1 through 1.7 above (*e.g.*, the work's Reviewed Copyright Date), (3) the specific rule in Section 2 or Section 3 above upon which Google is relying for its determination that such work is a Public Domain Book and (4) if requested by the Registry, copies of any available supporting documents or records Google relied upon in making its determination, in each case to the extent permitted by Google's agreements with its Metadata providers.

# ATTACHMENT F

## PREVIEW USES

**No Preview**

**\* Anthologies**

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
| --- | --- |
| DRA002000 | Drama / Anthologies (multiple authors) |
| FIC003000 | Fiction / Anthologies (multiple authors) |

**\* Poetry Collections**

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
| --- | --- |
| POE000000 | Poetry / General |
| POE007000 | Poetry / African |
| POE005010 | Poetry / American / General |
| POE005050 | Poetry / American / African American |
| POE001000 | Poetry / Anthologies |
| POE001000 | Poetry / Anthologies (multiple authors) |
| POE009000 | Poetry / Asian |
| POE010000 | Poetry / Australian & Oceanian |
| POE011000 | Poetry / Canadian |
| POE012000 | Poetry / Caribbean & Latin American |
| POE005030 | Poetry / Continental European \* |
| POE005020 | Poetry / English, Irish, Scottish, Welsh \* |
| POE003000 | Poetry / Inspirational & Religious |
| POE013000 | Poetry / Middle Eastern |
| | Poetry / Nursery Rhymes |
| | Poetry / Single Author / General |
| | Poetry / Single Author / Other |
| JNF042000 | Juvenile Nonfiction / Poetry / General |
| JNF042010 | Juvenile Nonfiction / Poetry / Humorous |
| JNF042020 | Juvenile Nonfiction / Poetry / Nursery Rhymes |

**\* Short Stories**

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| FIC042050 | Fiction / Christian / Short Stories |
| FIC009040 | Fiction / Fantasy / Short Stories |
| FIC022050 | Fiction / Mystery & Detective / Short Stories |
| FIC027080 | Fiction / Romance / Short Stories |
| FIC028040 | Fiction / Science Fiction / Short Stories |
| FIC029000 | Fiction / Short Stories |
| FIC029000 | Fiction / Short Stories (single author) |
| JUV038000 | Juvenile Fiction / Short Stories* |

**\* Solutions Manuals**

**Fixed Preview**

**\* Dictionaries**

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| FOR005000 | Foreign Language Study / Multi-Language Dictionaries |
| GAM003040 | Games / Crosswords / Dictionaries |
| JNF048030 | Juvenile Nonfiction / Reference / Dictionaries |
| LAW030000 | Law / Dictionaries & Terminology |
| MED020000 | Medical / Dictionaries & Terminology |
| REF008000 | Reference / Dictionaries |
| REL006670 | Religion / Biblical Reference / Dictionaries & Encyclopedias |

**\* Drug Reference Guides**

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| MED023000 | Medical / Drug Guides |

**\* Encyclopedias**

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| | |

| JNF048040 | Juvenile Nonfiction / Reference / Encyclopedias |
| REF010000 | Reference / Encyclopedias |

## * Price/Buyer's Guides

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| TRA001020 | Transportation / Automotive / Buyer's Guides |
| REF030000 | Reference / Consumer Guides |

## * Quotations

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| REF019000 | Reference / Quotations |
| REL006150 | Religion / Biblical Reference / Quotations |

## * Test Prep/Certification Guides

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| COM055010 | Computers / Certification Guides / A+ |
| COM055000 | Computers / Certification Guides / General |
| COM055020 | Computers / Certification Guides / MCSE |
|  | Juvenile Nonfiction / Study Aids / College Guides |
| STU026000 | Study Aids / Study Guides |

## * Thesauri

**Relevant BISAC codes:**

| Class. Code | Subject Heading |
|---|---|
| JNF048050 | Juvenile Nonfiction / Reference / Thesauri |
| REF022000 | Reference / Thesauri |

3

# ATTACHMENT G

**APPROVED LIBRARIES**

The libraries listed on this Attachment G are participants in the Google Library Project as of the Amended Settlement Agreement Date.

Columbia University
Cornell University
Harvard University
New York Public Library
Princeton University
Stanford University
University of California
University of Michigan
University of Texas
University of Virginia
University of Wisconsin

Committee on Institutional Cooperation (CIC)

- Indiana University
- Michigan State University
- Northwestern University
- Ohio State University
- Penn State University
- Purdue University
- The University of Chicago
- University of Illinois at Chicago
- University of Illinois at Urbana-Champaign
- The University of Iowa
- University of Minnesota

# ATTACHMENT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

The Authors Guild, Inc., Association of American       :
Publishers, Inc., et al.,                                              :
                                                                              :
      Plaintiffs,                                                 :
                                                                              :       Case No. 05 CV 8136 ~~JES~~
           v.                                                     :  (DC)
                                                                              :
Google Inc.,                                                           :
                                                                              :
      Defendant.                                              :
------------------------------------------------------------------------x

## [PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF AMENDED SETTLEMENT ~~APPROVAL~~AGREEMENT

        This matter is before the Court pursuant to the motion of Plaintiffs in the above-captioned class action (the "Action") for preliminary approval of ~~the settlement~~an Amended Settlement Agreement among Plaintiffs ~~reached with~~and defendant Google Inc. ("Google"). ~~Plaintiffs have moved for an order approving the settlement of the Action in accordance with the Settlement Agreement between Plaintiffs and Google.~~ Having read and considered the Amended Settlement Agreement, and based upon familiarity with the files and proceedings in this matter, the Court finds that:

      1.    Plaintiffs filed an initial complaint, and subsequent amended complaints, in the Action alleging, on behalf of themselves and a putative class of others similarly situated, that defendant violated the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.*;

      2.    Defendant has vigorously contested the allegations;

      3.    The parties ~~have~~ entered into a Settlement Agreement that ~~has been~~was filed with the Clerk of the United States District Court for the Southern District of New York on October 28, 2008 and preliminarily approved by the Court on November 14, 2008;

4. In an order dated December 23, 2008, the Court approved the form and content of the paper Claim Form and the online Claim Form;

5. After the conclusion of the notice and opt-out period for the Settlement Agreement, the parties advised the Court that they would not be seeking final approval of the Settlement Agreement, and would instead seek preliminary approval of an Amended Settlement Agreement;

6. The parties have now filed the instant motion seeking preliminary approval of the Amended Settlement Agreement;

7. 4. The Court has reviewed the Amended Settlement Agreement and determined it to be within the range of possible approval; and

8. 5. The Court has reviewed the notice provisions of Article XII of the Amended Settlement Agreement, and the forms form of notice Supplemental Notice attached to the Amended Settlement Agreement as Attachments I and J Attachment N, and the Court has determined that the form, content and manner of dissemination of the notices constitute Supplemental Notice constitutes the best notice practicable under the circumstances.

Accordingly, it is hereby **ORDERED** as follows:

9. 6. The motion is GRANTED. The Amended Settlement Agreement is hereby preliminarily approved. Unless otherwise specified, all defined capitalized terms herein shall have the same meaning as in the Amended Settlement Agreement.

10. 7. The following Amended Settlement Class and two Sub-Classes are provisionally certified for settlement purposes only:

**Amended Settlement Class**

All Persons that, as of January 5, 2009, have a Copyright Interest in one or more Books or Inserts. All Amended Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both. Excluded from the

2

Amended Settlement Class are Google, the members of Google's Board of Directors and its executive officers, and the departments, agencies and instrumentalities of the United States Government, and the Court.

**Author Sub-Class**

Members of the Amended Settlement Class who are authors, and their heirs, successors and assigns, and any other members of the Amended Settlement Class who are not members of the Publisher Sub-Class.

**Publisher Sub-Class**

Members of the Amended Settlement Class that are (a) companies that publish books, and their exclusive licensees, successors and assignees, and (b) companies that publish Periodicals and have a Copyright Interest in one or more Inserts, and their exclusive licensees, successors, and assignees.

11. 8. Plaintiffs Paul Dickson, Joseph Goulden, Daniel Hoffman, Betty Miles, and Herbert Mitgang, Maureen Duffy, Daniel Jay Baum, Margaret Drabble and Robert Pullan are designated as Representative Plaintiffs for the Author Sub-Class. Plaintiffs The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., and John Wiley & Sons, Inc., Macmillan Publishers Limited, Harlequin Enterprises Limited, Melbourne University Publishing Limited and The Text Publishing Company are designated as Representative Plaintiffs for the Publisher Sub-Class.

12. 9. The Court appoints the following law firms as Class Counsel: the firms of Boni & Zack LLC, Milberg LLP, and Kohn, Swift & Graf, PC for the Author Sub-Class ("Author Sub-Class Counsel"), and the firm of Debevoise & Plimpton LLP for the Publisher Sub-Class ("Publisher Sub-Class Counsel"). Author Sub-Class Counsel and Publisher Sub-Class Counsel shall be referred to collectively herein as "Class Counsel."

13. 10. A final settlement/fairness hearing shall be held on _____, 2009,2010, at __:__ (the "Hearing") before the undersigned in Courtroom 14C11A, United States District

3

Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007.  The purpose of the Hearing shall be to determine:  (a) whether the terms and conditions of the ~~proposed~~Amended Settlement Agreement are fair, reasonable, and adequate; (b) whether to certify the Amended Settlement Class and the Sub-Classes for purposes of the settlement; and (c) whether the ~~proposed~~Amended Settlement Agreement should be approved by the Court and judgment entered thereon.  At the Hearing, or such adjourned date as the Court deems appropriate, Class Counsel and any interested person shall be heard on the fairness, reasonableness, and adequacy of the terms of the Amended Settlement Agreement and on Author Sub-Class Counsel's application for an award of attorneys' fees and reimbursement of expenses as set forth in the Amended Settlement Agreement.

14. ~~11.~~ The Court preliminarily approves the ~~proposed~~Amended Settlement Agreement, including the procedures for establishing and administering the settlement funds and procedures for notice, opting out, opting in and ~~objection~~objecting as described therein, as fair, reasonable, and in the best interests of the Amended Settlement Class and the Sub-Classes.

15. ~~12.~~The Court reserves the right to adjourn the Hearing or order any adjournment without further notice other than an oral announcement at or prior to the Hearing.  The Court also reserves the right to approve the ~~proposed~~Amended Settlement Agreement at or after the Hearing with or without modification as consented to by the parties to the Amended Settlement Agreement and without further notice to members of the Amended Settlement Class.  The Court shall retain jurisdiction to consider all applications arising out of or connected with the ~~proposed~~Amended Settlement Agreement.

16. ~~13.~~The Court approves as to form, content, and method of dissemination ~~of~~the Supplemental Notice of Class Action Settlement ("~~Notice") and the Summary Notice of Class~~

4

Action Settlement (the "Summary~~Supplemental~~ Notice") substantially in the ~~forms~~form attached to the Amended Settlement Agreement as ~~Attachments I and J.~~ Attachment N.

~~14.   Before disseminating Notice pursuant to paragraph 16 below, Class Counsel shall submit to the Court for approval as to form and content the Claim Forms to be included with the Notice.~~

17.   ~~15.~~ The Supplemental Notice Commencement Date shall be ~~January 5,~~____, 2009. The Supplemental Opt-Out, Opt-in and Objection Deadline shall be ~~May 5, 2009.~~____, 2010.

18.   Unless withdrawn, all objections timely filed by members of the Amended Settlement Class in connection with the Settlement Agreement will be considered in connection with the Amended Settlement Agreement and should not be refiled.  Objections to the terms of the Amended Settlement Agreement shall be limited to the provisions amended from the Settlement Agreement.

19.   Class Counsel shall assist the Clerk of the Court to assure that the electronic docketing of objections will be conducted in an efficient manner.

20.   ~~16.~~ Beginning on ~~January 5,~~____, 2009, Class Counsel shall cause the Supplemental Notice to be ~~forwarded to identifiable Settlement Class members by e-mail, postal mail, postage prepaid, at the last known mailing address, or other means of dissemination.~~ emailed or sent by postal mail to all persons who provided contact information on the official settlement website or on a Claim Form, who opted out of the original Settlement Agreement, or who filed an objection, amicus position or other statement with the Court.

21.   ~~17.~~ Beginning on ~~January 12, 2009 or earlier,~~____, 2009, Class Counsel shall cause ~~to be published~~ the ~~Summary Notice as set forth in the Settlement Agreement and shall otherwise comply with the Notice program as set forth in Article XII of the Settlement~~

5

~~Agreement.~~Supplemental Notice to be posted on the official Settlement website, www.googlebooksettlement.com.

~~18. All notice required to be disseminated under the Notice program shall be disseminated no later than February 27, 2009.~~

22. ~~19. At least five business days prior to the Hearing,~~On _____, 2010, Class Counsel shall certify compliance with the ~~provisions of paragraphs 16 and 17 of this Order by declaration describing the aforementioned mailings and publications~~Notice programs for the Settlement Agreement and the Amended Settlement Agreement by declaration, and shall file with the Court Plaintiffs' Motion for Final Settlement Approval and supporting papers, and Motion for Approval of Plaintiffs' Attorneys' Fees and Reimbursement of Expenses and supporting papers.

23. ~~20.~~ The form and method of ~~Notice and Summary~~Supplemental Notice specified in the Amended Settlement Agreement are hereby approved and determined to be the best notice practicable under the circumstances, and the Court finds that the Supplemental Notice ~~and Summary Notice comply~~complies with the requirements of Rule 23 of the Federal Rules of Civil Procedure and with applicable standards of due process.

24. ~~21.~~ Members of the Amended Settlement Class who timely opted out of the original Settlement Agreement will be considered to have opted out of the Settlement, unless they opt in by the deadline established in paragraph 17 of this Order. Members of the Amended Settlement Class and Sub-Classes will be excluded from the ~~settlement~~Amended Settlement only if they ~~comply~~have complied with the opt-out procedures set forth in the ~~Notice and~~original Notice and original Settlement Agreement, or the opt-out procedures set forth in the Supplemental Notice and Amended Settlement Agreement, which procedures are hereby

6

approved as fair and reasonable.  Unless they have so excluded themselves, members of the Amended Settlement Class and Sub-Classes shall be bound by all determinations and judgments in this case relating to the proposed Settlement, whether favorable or unfavorable, including the dismissal of the Action with prejudice and the release of Google Releasees, Fully Participating Library Releasees, Cooperating Library Releasees, Public Domain Library Releasees and Other Library Releasees from liability to members of the Amended Settlement Class.  Persons who timely exclude themselves from the Class in accordance with the procedures prescribed in the Notice andAmended Settlement AgreementClass will not be bound by any orders or judgments entered in the Action related to the proposed settlement, and shall not receive any benefits provided for in the proposed Amended Settlement Agreement in the event it is approved by the Court.

25.  22. Persons who are members of the Amended Settlement Class and do not exclude themselves may enter an appearance on their own behalf or through counsel of their own choice at their own expense.  If they do not enter an appearance, they will be represented by Class Counsel.

Any member of the Amended Settlement Class who does not exclude himself or herself but objects to: (i) the proposedAmended Settlement Agreement; (ii) certification of the Amended Settlement Class or one or both of the Sub-Classes for purposes of the settlementSettlement; (iii) dismissal of the Action or the judgment and releases to be entered with respect thereto; and/or (iv) Author Sub-Class Counsel's application for attorneys' fees and reimbursement of expenses in the Action; or who otherwise wishes to be heard, may appear in person or through his or her own attorney at the hearing and present evidence or argument that may be proper and relevant; provided, however, that no Person other than Class Counsel and Google in the Action shall be

7

heard and no papers, briefs, pleadings, or other documents submitted by any such Person shall be received and considered by the Court (unless the Court in its discretion shall thereafter otherwise direct, upon application of such person and for good cause shown), unless, (1) not later than ~~May 5, 2009,~~ ___, 2010, such Person has filed a statement of the objection and the grounds for the objection (objections filed to the Settlement Agreement need not and should not be refiled), together with any supporting papers or briefs, with the Court at the address listed below and served copies of such papers by email or first class mail on the attorneys listed below; and (2) if wishing to appear, not later than ~~May 5, 2009,~~ _____, 2010, such Person has filed a Notice of Intent to Appear, including the Person's name, address, telephone number and signature, as well as the name and address of counsel, if any, with the Court at the address listed below and served copies of such papers by email or first class mail on the attorneys listed below:

**The District Court**

Office of the Clerk
J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

**Author Sub-Class Counsel**

Michael J. Boni, Esquire
Joanne Zack, Esquire
~~Joshua D. Snyder, Esquire~~
Boni & Zack LLC
15 Saint Asaphs Road
Bala Cynwyd, PA 19004
Bookclaims@bonizack.com

**Publisher Sub-Class Counsel**

Jeffrey P. Cunard, Esquire

8

Bruce P. Keller, Esquire
~~James J. Pastore, Esquire~~
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Bookclaims@debevoise.com

**Google Counsel**

Daralyn J. Durie, Esquire
~~David J. Silbert, Esquire~~
Joseph C. Gratz, Esquire
~~Keker & Van Nest~~Durie Tangri LLP
~~710 Sansome~~332 Pine Street, Suite 200
San Francisco, CA ~~94111~~94104
Bookclaims@~~kvn~~durietangri.com

26.    ~~23.~~ Any Amended Settlement Class member who retains an attorney to make objections to the proposed ~~settlement~~Settlement on behalf of the Amended Settlement Class member or otherwise to represent the Amended Settlement Class member in this litigation does so at the Amended Settlement Class member's own expense.  Any such attorney must file a notice of appearance in this litigation with the Clerk of this Court and serve copies of the notice on the attorneys listed in paragraph ~~22~~25 above, no later than ~~May 5, 2009.~~_____, 2010. Any objection not timely made and in the manner provided herein shall be deemed waived and forever barred.

27.    ~~24.~~ Pending final determination of whether the ~~proposed~~Amended Settlement Agreement should be approved, Plaintiffs and all members of the Amended Settlement Class, either individually, directly, representatively, derivatively, or in any other capacity, are barred and enjoined from commencing or prosecuting any action or proceeding asserting any claims whatever on behalf of themselves or the Amended Settlement Class against Google that were

9

brought or could have been brought in the ~~Second~~Third Amended Class Action Complaint, and that relate to or arise out of the claims as described in that complaint.

28. ~~25.~~If the Court does not grant final approval of the Amended Settlement Agreement, or if the settlement does not become effective for any reason whatever, the Amended Settlement Agreement (including any modification thereof made with the consent of the parties as provided therein), any ~~Class~~class certification herein and any actions taken or to be taken in connection therewith (including this Order and any judgment entered herein) shall be terminated and shall become void and have no further force and effect, except as provided in the Amended Settlement Agreement.

29. ~~26.~~The Settlement Agreement and the Amended Settlement Agreement and any proceedings taken pursuant thereto are not, and should not in any event be: (a) offered or received as evidence of a presumption, concession or admission on the part of any of Plaintiffs, Google, Fully Participating Libraries, Cooperating Libraries, Public Domain Libraries, Other Libraries, any member of the Amended Settlement Class, or any other person; or (b) offered or received as evidence of a presumption, concession or admission by any person of any liability, fault, wrongdoing or other dereliction of duty.

30. ~~27.~~The Court reserves jurisdiction over the subject matter and as to each party to the Amended Settlement Agreement with respect to the interpretation, effectuation, and implementation of the Amended Settlement Agreement in accordance with the terms thereof for all purposes, including enforcement of any of the terms thereof at the instance of any party and resolution of any disputes that may arise.

DATED this _____ day of _____, ~~2008.~~2009.

10

_____

Honorable ~~John E. Sprizzo~~<u>Denny Chin</u>,
United States District Judge

11

# ATTACHMENT I

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**Updated Notice:  New Opt-Out/Objection Deadline is September 4, 2009**

---

# If You Are A Book Author, Book Publisher Or Other Person Who Owns A Copyright In Books Or Other Writings,

# Your Rights May Be Affected By A Class Action Settlement Regarding Google's Digitization Of Books And Other Writings.

**Attention Authors And Publishers Outside The United States:**
The Settlement May Affect Your Rights As Well.
Please Read This Notice Carefully.

- A class action lawsuit claims that Google violated the copyrights of authors, publishers and other owners of U.S. copyrights in books and other writings by digitizing (scanning) them, creating an electronic database of books, and displaying short excerpts without the copyright owners' permission.

- A proposed settlement of the lawsuit (referred to in this Notice as the "Settlement") has been reached on behalf of a class of all owners of U.S. copyrights in books and in writings included in books and other works published on or before January 5, 2009.  **Books published after January 5, 2009 are not included in the Settlement.**  (Please see Question 6 below for a description of "Books," as this Notice uses that term.)  There are two sub-classes:

  - The "Author Sub-Class" (authors of Books and other writings, their heirs, successors and assigns, and all other Settlement Class members who are not members of the Publisher Sub-Class), and

  - The "Publisher Sub-Class" (companies that publish Books and periodicals and their successors and assigns)

- The Settlement benefits to the class include:

  - 63% of the revenues earned from Google's sale of subscriptions to an electronic Books database, sale of online access to Books, advertising revenues, and other commercial uses.

  - US $34.5 million paid by Google to establish and maintain a Book Rights Registry ("Registry") to collect revenues from Google and distribute those revenues to copyright owners.

- The right of copyright owners to determine whether and to what extent Google may use their works.

- US $45 million paid by Google to copyright owners whose Books and Inserts Google digitized without permission on or before May 5, 2009.

**NOTE:** To participate in the Settlement, you must complete the **Claim Form**. It is available at http://www.googlebooksettlement.com. If you do not have access to the Internet, you may request a **Claim Form** from the Settlement Administrator. (See Question 24 below for the Settlement Administrator's contact information.)

**Your Rights And Options
– And The Deadlines To Exercise Them –
Are Explained In This Notice**

# WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**     **4**
1. Why did I get this Notice?.................................................................4
2. What is the lawsuit about? ..............................................................4
3. What is a class action?...................................................................4
4. Why is there a Settlement? .............................................................5
5. Who is a Class Member? ................................................................5
6. What are "Books" and "Inserts" as used in the Settlement and this Notice? ......7
7. Who are the Participating Libraries? ...............................................9

**BENEFITS OF THE SETTLEMENT**     **9**
8. Overview of the Settlement Benefits ...............................................9
9. What are Rightsholders' rights regarding their Books and Inserts? ..................11
10. What are Authors' and Publishers' rights under the Author-Publisher Procedures?.................................................................................20

**REMAINING IN THE SETTLEMENT**     **23**
11. What happens if I do nothing? .......................................................23
12. What entities am I releasing? ........................................................23
13. If I remain in the Settlement, what claims am I specifically giving up?.............24

**OPTING OUT OF THE SETTLEMENT**     **25**
14. What do I do if I don't want to be in the Settlement?.........................25
15. How do I opt out of the Settlement?...............................................25

**OBJECTING TO OR COMMENTING ON THE SETTLEMENT**     **25**
16. May I object to or comment on the Settlement?................................25
17. What is the difference between objecting to the Settlement and opting out of the Settlement? ..........................................................................26

**THE LAWYERS REPRESENTING YOU**     **27**
18. Do I have a lawyer representing my interests in these cases? .........................27
19. How will the lawyers be paid? .......................................................27
20. Should I get my own lawyer? ........................................................27

**THE COURT'S FINAL APPROVAL HEARING**     **27**
21. When and where will the Court decide whether to grant final approval of the Settlement? .................................................................................27
22. Must I attend the Fairness Hearing?...............................................28
23. May I speak at the Fairness Hearing? ............................................28

**GETTING MORE INFORMATION**     **28**
24. Where do I obtain more information?...............................................28

**This Notice is only a summary of the Settlement Agreement and of your rights. You are encouraged to review the complete Settlement Agreement carefully. It is available at http://www.googlebooksettlement.com/agreement.html or from the Settlement Administrator. (See Question 24 for the Settlement Administrator's contact information.)**

# BASIC INFORMATION

## 1. Why did I get this Notice?

You received this Notice because the Settlement may affect you. You may be a Book author, publisher, or other person who owns a U.S. copyright interest in Books, or in other writings that are included in Books, public domain works or government works (called "Inserts" in the Settlement), that Google is digitizing without permission.

This Notice explains:

• What the lawsuit and the Settlement are about.

• Who is affected by the Settlement.

• Who represents the Sub-Classes.

• Your legal rights.

• How and by when you need to act.

## 2. What is the lawsuit about?

This lawsuit involves Google's highly publicized Google Library Project ("GLP"). In 2004, Google announced that it had entered into agreements with several libraries to digitize Books and other writings in those libraries' collections. Google has already digitized over seven million books, including millions of Books that are still in copyright in the United States. Google users can search Google's "digital library" and view "snippets," meaning several lines of text, from Books.

GLP is one way in which Google is digitizing Books for its "Google Book Search" program (see http://books.google.com). The Google Partner Program (under which Google gets permission from publishers and authors to use their copyrighted works, see https://books.google.com/partner) also contributes works to Google Book Search. Although the Partner Program is not the subject of this Settlement, this Settlement might affect members of the Partner Program.

## 3. What is a class action?

In a class action lawsuit, one or more "class representatives" sue on behalf of others who have similar claims. All such persons are, together, a "class" and each is a "class member." The Court must determine if it will allow the lawsuit to proceed as a class action. If it does, the Settlement will affect everyone who is a member of the class. To find out if you are a member of the class in this Settlement, see Question 5 below.

In this lawsuit, the persons who sued ("Plaintiffs") and Google Inc. ("Google," the "defendant") have agreed to the Settlement. As part of the Settlement, several libraries that have permitted or will permit Google to digitize Books and other works in their collections may also participate in the Settlement ("Participating Libraries"). The Court has preliminarily approved the Settlement for the Class and the two Sub-Classes of affected persons – the Author Sub-Class and the Publisher Sub-Class.

Five publishers have brought a separate lawsuit against Google involving GLP that raises issues identical to those in this class action lawsuit. The publishers' lawsuit will be dismissed after the date when the Settlement of this lawsuit becomes final (the "Effective Date"). For more information about the publishers' lawsuit, go to Question 19 below.

## 4.    Why is there a Settlement?

After lengthy investigations by the Plaintiffs and Google, including the review of millions of pages of documents produced by the parties, and after more than two years of settlement negotiations, the parties agreed to the Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial. In the settlement of a class action lawsuit, the representatives for the class and their attorneys ask the court to approve the settlement as fair, reasonable and adequate. In this case, if the Court approves the Settlement, then Google will no longer be legally responsible for the claims made in this lawsuit.

Google denies any wrongdoing or liability, and denies that any member of the class is entitled to compensation for damages. The Court has not ruled on any of the parties' claims.

## 5.    Who is a Class Member?

The class consists of all persons (and their heirs, successors and assigns) who, as of January 5, 2009 (the Notice Commencement Date), own a "U.S. copyright interest" in one or more Books or Inserts that is "implicated by a use" authorized by the Settlement (the "Class") (See Question 9 below for a description of such uses).

You own a "U.S. copyright interest" if you own, or have an exclusive license in, a copyright protected by United States copyright law. For example, if you are an author, you own the copyright in your Book (unless you have completely assigned all of your copyright interests to another person or unless you wrote the Book as a "work for hire"). You also own a U.S. copyright in a Book if you have the exclusive right to publish that Book in the United States or if you have the legal right to sue another for infringing your rights in the Book. Several persons may have U.S. copyright interests in the same Book, such as co-authors, an author and a publisher, and heirs of an author.

**ATTENTION: AUTHORS AND PUBLISHERS OUTSIDE THE UNITED STATES:** If you are a rightsholder who is a national of, or is otherwise located in, a country other than the United States, you are likely to own a U.S. copyright interest if (a) your Book was published in the United States, or (b) your Book was not published in the United States, but your country has copyright relations with the United States because it is a member of the Berne Convention, or (c) your country had copyright relations with the United States at the time of the Book's publication. **You should assume that you own a U.S. copyright interest in your Book, unless you are certain that your Book was published in, and that you reside and are located in, one of the few countries that have not had or do not now have copyright relations with the United States. The U.S. Copyright Office has published a list of countries with which the United States has copyright relations, available at http://www.copyright.gov/circs/circ38a.pdf or from the Settlement Administrator. If you own a copyright in a Book or Insert published in a country outside the United States, you are advised to seek advice from an attorney or a Reproduction Rights Organization if you have questions concerning whether to participate in or opt out of the Settlement. You may also call the appropriate telephone number on the list attached to this Notice for further advice.**

**ATTENTION HEIRS OF AUTHORS:**  Because the Settlement involves the digitization and use of Books published many decades ago, it is expected that a sizable portion of the Settlement Class will consist of authors' heirs, successors and assigns.  Wherever this Notice refers to "authors," it is referring as well to all of their heirs, successors and assigns who hold a U.S. copyright interest in the authors' works.

**All Class members** should go to http://www.googlebooksettlement.com to access a searchable database of Books that are covered by this Settlement.  This database also lists government works and public domain books that Google has digitized, which may contain Inserts.  The list attempts to include all in-copyright Books published on or before January 5, 2009.  There will, however, be some Books covered by the Settlement that are not on the list.  Therefore, even if your Book is not on the list, so long as you own a U.S. copyright interest in a Book published on or before January 5, 2009, you should consider yourself a Class member.

- "Books" and "Inserts" are important terms that are defined in Question 6 below.

- A U.S. copyright interest that is "implicated by a use" covered under the Settlement is a copyright interest in the rights to reproduce and display Books and Inserts in Display Uses, Non-Display Uses and the permitted library uses described at Questions 9(F), 9(G) and 9(I) below and in the Settlement Agreement in Article VII.  "Display Uses" and "Non-Display Uses" are defined in Questions 9(F) and 9(G) below.

The Class is divided into two Sub-Classes:  the Author Sub-Class and the Publisher Sub-Class.

*Author Sub-Class*

The Author Sub-Class consists of members of the Class who are authors and their heirs, successors and assigns, as well as all other members of the Class who are neither publishing companies nor their successors or assigns.

The following individuals are serving as the Author Sub-Class Representatives:  Herbert Mitgang, Betty Miles, Daniel Hoffman, Paul Dickson and Joseph Goulden.  The interests of the Author Sub-Class are also represented by The Authors Guild (http://www.authorsguild.org).  All Author Sub-Class Representative Plaintiffs and The Authors Guild endorse the Settlement and recommend that other members of the Author Sub-Class participate in the Settlement.

*Publisher Sub-Class*

The Publisher Sub-Class consists of all members of the Class that are Book publishing companies or are periodical (e.g., newspapers, magazines, journals) publishing companies that own a U.S. copyright interest in an Insert or have published a Book, and their respective successors and assigns.

The following entities are serving as the Publisher Sub-Class Representatives:  The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., and John Wiley & Sons, Inc.  The interests of the Publisher Sub-Class are also represented by the Association of American Publishers (http://www.publishers.org).  All Publisher Sub-Class Representative Plaintiffs and the Association of American Publishers endorse the Settlement and recommend that other members of the Publisher Sub-Class participate in the Settlement.

*Rightsholders*

Members of the Author Sub-Class and Publisher Sub-Class who do not timely and properly opt out of the Settlement (see Question 15 below) are referred to in the Settlement and in this Notice as "Rightsholders."

*Books Containing Pictorial Works*

Photographs, illustrations, maps, paintings and other pictorial works in Books are covered by the Settlement ONLY when either (a) the U.S. copyright interest in the pictorial work is owned by a person who is also a copyright owner of the Book containing the pictorial work or (b) the pictorial work is an illustration in a children's Book (see below). For example, if a copyright owner of a Book on photography is also a copyright owner of photographs in that Book, those photographs are covered by the Settlement. However, the Settlement does not cover any other photographs in the Book whose copyright is owned only by persons who are not copyright owners of the Book. Similarly, if a history Book contains a series of maps where the copyrights to those maps are owned only by persons other than a copyright owner of that history Book, those maps are not covered by the Settlement.

***Children's Book Illustrations***

Children's Book illustrations are covered by the Settlement. If you are a children's Book illustrator and have a copyright interest in a Book containing your illustrations, you should claim your rights for those illustrations on the Claim Form as a Book. If you have a copyright interest in the illustrations to a Book, but do not have a copyright interest in the Book containing those illustrations, then you should claim your rights for those illustrations on the Claim Form as Inserts.

***Excluded from the Class***

Photographs, illustrations, maps, paintings and other pictorial works in Books are not considered Inserts (except for children's Book illustrations). These pictorial works are not covered by the Settlement, **UNLESS** a U.S. copyright interest in these works is held by a Rightsholder of the Book containing these pictorial works (as explained above). Therefore, to the extent that persons only own copyrights in these pictorial works and not in a Book or Insert, they are *not* members of the Class. The Settlement neither authorizes nor prohibits Google from displaying these pictorial works through the Settlement, and no claims are released concerning any use of these pictorial works.

***Author-Publisher Procedures***

Counsel for the Author Sub-Class and Counsel for the Publisher Sub-Class have established Author-Publisher Procedures, which are an important part of the Settlement. Among other things, the Author-Publisher Procedures set forth the authors' and the publishers' respective rights concerning Google's use of – and who is paid for – in-print and out-of-print Books under the Settlement. The Author-Publisher Procedures are summarized in Question 10 below, and you are also encouraged to review the Author-Publisher Procedures in their entirety, available at http://www.googlebooksettlement.com/agreement.html (see Attachment A to the Settlement Agreement) or from the Settlement Administrator.

## 6.    What are "Books" and "Inserts" as used in the Settlement and this Notice?

***Books***

For purposes of the Settlement, a "Book" is a written or printed work on sheets of paper bound together in hard copy form that, on or before January 5, 2009:

•    Was published or distributed to the public or made available for public access under the authorization of the work's U.S. copyright owner(s); and

•    Was registered with the U.S. Copyright Office, UNLESS the work is not a United States work under the U.S. Copyright Act, in which case such registration is not required; and

•    Is subject to a U.S. copyright interest (either through ownership, joint ownership, or an exclusive license) implicated by a use authorized by the Settlement. See Question 9 for such uses.

**EXCLUDED** from the definition of "Book" are the following:

- Periodicals (e.g., newspapers, magazines or journals).  See Section 1.102 of the Settlement Agreement for a full definition of "Periodicals."

- Personal papers (e.g., unpublished diaries or bundles of notes or letters).

- Sheet music and other works that are used primarily for the playing of music.  See Section 1.16 of the Settlement Agreement for a more detailed description of these works.

- Public domain works, meaning works that are in the public domain under the U.S. Copyright Act.

- Government works, meaning written works that are not subject to copyright because they are authored by the U.S. government or that are subject to equivalent treatment under any state's law, as defined in Section 1.64 of the Settlement Agreement.

***Inserts***

For purposes of this Settlement, an "Insert" must:

- Consist either of (1) text, such as forewords, afterwords, prologues, epilogues, poems, quotations, letters, textual excerpts from other Books, periodicals or other works, or song lyrics; or (2) tables, charts, graphs, musical notation (i.e., notes on a staff or tablature); or (3) children's Book illustrations; and

- Be contained in a Book, government work or public domain book published on or before January 5, 2009; and

- Be protected by a U.S. copyright, where the U.S copyright interest in the Insert is held by someone *other than* a Rightsholder of the Book's "Principal Work."  "Principal Work" is further defined in Question 8(C) below.  For example, if you own rights in a poem that is contained in a Book for which you also hold a U.S. copyright interest, then your poem, as it appears in your Book, is not an Insert; however, it would be an Insert if the poem is contained in a Book for which someone else holds the U.S. copyright interest; and

- Be registered, either alone or as part of another work, with the U.S. Copyright Office on or before January 5, 2009, UNLESS the Insert or work is not a United States work under the U.S. Copyright Act, in which case such registration is not required.

**EXCLUDED** from the definition of "Insert" are:

- Pictorial works, such as photographs, illustrations (other than children's Book illustrations), maps and paintings.

- Works that are in the public domain under the U.S. Copyright Act.

For purposes of receiving payments for the use of Inserts, the Settlement identifies two types of Inserts:

"Entire Insert," which is an Insert that is an entire work, e.g., forewords, afterwords, introductions, entire works included in anthologies, entire poems, entire short stories, the entire lyrics of a song, and entire essays.

"Partial Insert," which is any other type of Insert, e.g., excerpts from a Book or magazine article, quotations, stanzas from poems or portions of a song's lyrics.

**To search for or identify your Inserts, go to http://www.googlebooksettlement.com, contact the Settlement Administrator, or call the appropriate number at the end of this Notice (Appendix).**

The Settlement Agreement identifies several categories of Participating Libraries based on their level of participation in the Settlement: Fully Participating Libraries, Cooperating Libraries, Public Domain Libraries and Other Libraries. For further information regarding the rights, obligations and releases of claims against these libraries, see Questions 12 and 13, below, or Article VII of the Settlement Agreement. For the form of the agreements between the Registry and the Fully Participating Libraries, the Cooperating Libraries and the Public Domain Libraries, see Attachment B to the Settlement Agreement or contact the Settlement Administrator. The Settlement Agreement is available at http://www.googlebooksettlement.com/agreement.html.

Fully Participating Libraries are libraries that are allowing Google to digitize Books in their collections and to which Google is providing a "Library Digital Copy" (or "LDC") of those Books. The Settlement Agreement provides that Fully Participating Libraries will be able to make certain uses of their LDCs. To include as many Books as possible in GLP, Google will attempt to expand the list of Participating Libraries, including by adding libraries that are:

- Cooperating Libraries. These libraries receive the same participatory rights and obligations under the Settlement Agreement as a Fully Participating Library, except that they do not receive or have access to a Library Digital Copy, and they agree to delete any digital copies of Books received from Google.

- Public Domain Libraries. These libraries agree to provide only public domain books to Google for digitization, agree to delete any digital copies of Books received from Google, and do not receive or have access to a Library Digital Copy.

- Other Libraries. These libraries agree to provide Books to Google, but do not agree to become a Fully Participating Library, a Cooperating Library or a Public Domain Library. Some of these libraries may have received, or will receive, digital copies of Books from Google. No claims are released with respect to any uses of digital copies by Other Libraries.

- For a list of the libraries that Plaintiffs currently have authorized to become Fully Participating Libraries and Cooperating Libraries, go to http://www.googlebooksettlement.com/agreement.html (see Attachment G of the Settlement Agreement) or contact the Settlement Administrator.

# BENEFITS OF THE SETTLEMENT

> **Key provisions of the Settlement Agreement are summarized below. You are encouraged to review the entire Settlement Agreement at http://www.googlebooksettlement.com/agreement.html. You can download a copy of the Settlement Agreement from that website or you may request a written copy from the Settlement Administrator or by calling the appropriate number at the end of this Notice (Appendix).**

### A.     Google's Use of and Payment for Books

Plaintiffs view the Settlement as an excellent opportunity to breathe new commercial life into potentially tens of millions of out-of-print Books, and to provide an innovative marketing tool for authors and publishers of in-print Books. Under the Settlement, Google is authorized to 1) continue to digitize Books and Inserts, 2) sell to institutions subscriptions to an electronic Books database, 3) sell online access to individual Books, 4) sell advertising on pages from Books, and 5) make other uses, all as further described under "Access Uses" in Question 9(F)(1) below. Google will pay Rightsholders, through the Registry, 63% of all revenues received from

these uses.  The Registry will distribute those revenues to Rightsholders in accordance with the Plan of Allocation and the Author-Publisher Procedures, which are described in Questions 9(K) and 10 below.

Rightsholders can exclude their Books from some or all of these uses, as described in Question 9 below. Rightsholders can also remove their Books altogether from the electronic Books database (if already digitized) so long as the request is made on or before April 5, 2011.  Rightsholders at any time can request Google not to digitize their Books, and Google will honor the request if it has not already digitized the Book.

**B.      The Book Rights Registry**

The Settlement establishes a not-for-profit Book Rights Registry that will maintain a database of Rightsholders, collect their contact information and information regarding their requests with respect to uses of Books and Inserts, and identify, locate and coordinate payments to Rightsholders.  The Registry will represent the interests of the Rightsholders, both in connection with the Settlement as well as in other commercial arrangements, including with companies other than Google (subject to the express approval of the Rightsholders of the Books involved in such other commercial arrangements).

To fund the establishment and initial operations of the Registry, Google has agreed to pay US $34.5 million.  A portion of that payment will be used for the costs of notice to the Class (including the distribution of this Notice), and for claims administration until the Registry is fully operational.

All funds received by the Registry will be for the direct or indirect benefit of the Rightsholders.  After the funding of its initial operations by Google's payment, the Registry will be funded by taking an administrative fee as a percentage of revenues received from Google.

The Registry will be jointly managed by a Board comprising an equal number of representatives of the Author Sub-Class and Publisher Sub-Class – at least four author directors and at least four publisher directors. All decisions of the Board will require a majority of the directors, with such majority to include at least one author director and one publisher director.  Certain matters will require super-majority votes of the Board.

**C.      Payment For Books Already Digitized**

Google has agreed to pay a minimum of US $45 million to make cash payments for all of the Books and Inserts that Google digitized without permission on or before May 5, 2009 ("Cash Payment").  Google will make a Cash Payment of at least US $60 per Principal Work, US $15 per Entire Insert, and US $5 per Partial Insert for which at least one Rightsholder has registered a valid claim on or before January 5, 2010.  Only one Cash Payment will be made for the same content that Google digitized, regardless of the number of Books or Inserts containing such content.  For example, only one Cash Payment will be made for the hard cover and soft cover editions of a Book, even if Google digitized both of them separately, and only one Cash Payment will be made for several digitizations of the same Book or for content that is contained, as Inserts, in multiple Books.  Also, only one US $60 Cash Payment will be made for content that appears both as a Book and also as an Insert in another Book (e.g., because a portion of the first Book was quoted in the second Book).  Each Book contains only a single Principal Work.  For example, a Book of the novel *The Old Man and the Sea* might contain an introduction, footnotes and an afterword.  The novel itself would be that Book's Principal Work; each of the other materials would be an Insert (if the U.S. copyright interest in those other materials is held by someone other than the Rightsholder of the Principal Work).  Similarly, a Book could contain several short stories from a variety of authors (e.g., the *Best Short Stories of 2008*).  The Book's Principal Work would be the entire collective work (the collection of short stories), and each separate short story (as well as any introductory essay) would be considered an Insert (if the U.S. copyright interest in such story is held by a Rightsholder other than the Rightsholder of the Principal Work).  See Section 1.111 of the Settlement Agreement for a full definition of "Principal Work."

- Depending on the number of Principal Works and Inserts claimed by Rightsholders, if the total amount distributed to all such Rightsholders is less than US $45 million, the Registry will distribute the balance to such Rightsholders up to a maximum of US $300 per Principal Work,

US $75 per Entire Insert, and US $25 per Partial Insert. Any remaining funds thereafter will be paid under the Plan of Allocation.

- If more than US $45 million is required to pay all of the eligible claims for Cash Payments, then Google will pay the additional funds necessary to make all such Cash Payments.

Plaintiffs believe that Rightsholders of Books and Inserts that Google digitized on or before May 5, 2009 without authorization are entitled to Cash Payments because they have an additional claim that other Rightsholders do not have, i.e., a claim for copyright infringement for which monetary relief is being sought in this lawsuit. Under the Settlement, other Rightsholders will be able to direct Google not to digitize their Books, but Rightsholders whose Books and Inserts are already digitized had no such opportunity. Plaintiffs believe that the Cash Payments are fair and reasonable consideration for those Rightsholders' release of claims for monetary relief for Google's unauthorized digitization.

**To receive a Cash Payment for already digitized Books and Inserts, you must complete the Claim Form on or before January 5, 2010.**

### D. Hosted Version of Book for Rightsholders

At the Rightsholder's request, Google will provide a hosted version of the Rightsholder's Book(s) for use on the Rightsholder's website. See Section 3.11 of the Settlement Agreement for further details.

### E. Timing of Settlement Benefits

It will take considerable time to implement the commercial uses authorized under the Settlement, implement the elections made by Rightsholders for their Books and Inserts, and make Cash Payments. The commercial uses and other settlement benefits described in this Notice will not occur until after the Effective Date, and further time will be required after that date in order to establish the Registry and clear rights so that the appropriate Rightsholders receive their due and owing benefits. Please be patient, and visit the Settlement Website at http://www.googlebooksettlement.com regularly for updates.

## 9. What are Rightsholders' rights regarding their Books and Inserts?

Under GLP, Google has been digitizing – and will continue to digitize – Books from Participating Libraries and other sources. Google is developing a searchable electronic database of many millions of Books (as well as public domain books and government works). The Settlement provides that Google will sell subscriptions to that database, and online access to individual Books to consumers. In addition, Google will earn revenues from advertising on web pages dedicated to a single Book. As described in Question 8(A) above, all those revenues will be split 63%/37% between the Rightsholders and Google, respectively. The following is a summary of Google's authorization to use Books and Inserts and of Rightsholders' rights with respect to all such uses. **The complete description of all rights and obligations is set out in the Settlement Agreement, available at http://www.googlebooksettlement.com/agreement.html or from the Settlement Administrator.**

### A. Classification of Books as "Commercially Available" or not "Commercially Available" and as "In-Print" or "Out-of-Print"

The Settlement provides that all Books will be initially classified as either "Commercially Available" or not "Commercially Available" as of January 5, 2009. Google will initially classify a Book as "Commercially Available" if Google determines that the Rightsholder, or the Rightsholder's designated agent (e.g., a literary agent or publisher), is currently (i.e., at the time Google makes the initial determination) offering the Book for sale through one or more then-customary channels of trade in the United States.

This classification has two purposes:

- Google will have the right to make Display Uses of all Books that are classified as not Commercially Available. The Rightsholder of a Book, however, has the right to remove the Book from GLP (by request received on or before April 5, 2011) or exclude it at any time from some or all Display Uses. Google does not have the right to make any Display Uses of Books that are classified as Commercially Available unless the Rightsholder authorizes Google to include the Book in one or more Display Uses; the Rightsholder also has the right to remove the Book from all uses by Google (by request received on or before April 5, 2011). Removal requests received after April 5, 2011 will be honored only if the Book for which removal is requested has not been digitized at the time the request is made.

- Under the Author-Publisher Procedures, a Book classified as Commercially Available is presumptively classified as "in-print" and a Book classified as not Commercially Available is presumptively classified as "out-of-print." Classification of a Book as in-print or out-of-print has certain important consequences, as described below. **The use in this section of the Notice of the terms "in-print" and "out-of-print" is only for convenience, only for purposes of the Settlement and for Google's use of and payment for Books, and does not affect how those terms are used in the industry or in author-publisher contracts.** Potentially, two Rightsholders with U.S. copyright interests in the same Book (e.g., both the author and the publisher) may not agree whether a Book is, for purposes of this Settlement, "in-print" or "out-of-print." The Author-Publisher Procedures set forth a process for resolving those disputes, and set forth precise definitions for the terms "In-Print" and "Out-of-Print." See Question 10 below for further details concerning the Author-Publisher Procedures.

Rightsholders and the Registry will have the right to challenge Google's initial classification of a Book as Commercially Available or not Commercially Available. Any disputes with Google over the proper classification of a Book will be resolved through the Settlement's dispute resolution process, described in Question 9(M) below.

**To find out whether your Book has initially been determined to be Commercially Available or not Commercially Available, go to http://www.googlebooksettlement.com or contact the Settlement Administrator.**

### B. Out-Of-Print Books

The Settlement authorizes Google to make Display Uses and Non-Display Uses of each out-of-print Book for the term of the U.S. copyright for that Book, without further action or direction by the Book's Rightsholder, UNLESS the Rightsholder of the Book directs Google not to do so. A Rightsholder who so directs Google can later authorize Google to make such uses of some or all of the Book. Display Uses are described in Question 9(F) below and Non-Display Uses are described in Question 9(G) below. For more information on removing a Book, see Question 9(D) below.

If a Rightsholder excludes a Book that is not Commercially Available from the institutional subscription use (see Question 9(F)(1)(a) below), then that Book will also be excluded from sales to individual consumers. In addition, a Rightsholder who excludes a Book from an institutional subscription use is not eligible to receive an Inclusion Fee (see Question 9(K) below for details).

The Author-Publisher Procedures provide that the author or, for good reason, the publisher of an out-of-print Book (other than a reverted Book, an "author-controlled" Book or a work-for-hire Book) may exclude a Book from one or more Display Uses. See Question 10 below for a summary of the Author-Publisher Procedures.

**In order to participate in the Settlement, receive the benefits for the use of your out-of print-Books in GLP, or to exclude your Books from one or more Display Uses, you must complete the Claim Form. There is no time limit for you to exclude your Books from any Display Uses, and you can change any exclusion decision at any time.**

## C. In-Print Books

The Settlement provides that Google may not make any Display Uses of any in-print Book UNLESS the Rightsholders of that Book authorize Google to include the Book in one or more such uses. If the Rightsholders decide to authorize Display Uses, the Book will be subject to the economic terms provided under the Settlement; however, a Rightsholder may be able to negotiate different terms with Google through the Partner Program. Under the Settlement, Google has the right to make Non-Display Uses of an in-print Book for the term of the U.S. copyright for that Book, UNLESS the Rightsholder timely removes the Book. For information on removing a Book, see Question 9(D) below. For information on Non-Display Uses, see Question 9(G) below.

The Author-Publisher Procedures provide that both the author and publisher of an in-print Book (other than a work-for-hire Book) must agree to authorize any Display Uses. See Question 10 below for a summary of the Author-Publisher Procedures.

**To authorize one or more Display Uses of any of your in-print Books in GLP, you must complete the Claim Form. After Google has been authorized to make Display Uses of any of your in-print Books, you can change those instructions at any time.**

## D. Complete Removal of Books

Rightsholders have the right to remove their Books, that is, to require that all digital copies of those Books be deleted from all servers or sources from which Google or the Fully Participating Libraries could make any uses. Removal requests must be received on or before April 5, 2011. Removal requests received after that date will be honored only if the Book has not been digitized at the time the request is received.

Note that each Fully Participating Library may make certain uses of Books included in its Library Digital Copy (see Question 9(I) below). Rightsholders can only preclude their Books from all such uses if they timely remove their Books.

A removal request will not require Google or a Fully Participating Library to destroy back-up tapes or other back-up storage media that may contain copies of otherwise removed Books. **The only way a Rightsholder can preserve rights to bring claims against Google and the Fully Participating Libraries for maintaining removed Books on back-up tapes or other back-up storage media is to opt out of the Settlement. Question 15 below informs you how to opt out of the Settlement.**

Even if a Rightsholder removes a Book, it may be possible to contact Google subsequently to attempt to negotiate a separate deal for inclusion of the Book in the Partner Program.

**If you want to participate in the Settlement but also want your Books removed, you must fill out the Claim Form on or before April 5, 2011. Thereafter, Google will honor "do not digitize" requests only if a Book has not been digitized as of the date of the request.**

## E. Inserts

Rightsholders of Inserts have the right to exclude Inserts from all – but not less than all – Display Uses. This right is limited to the Insert itself and not any other portion of the Book, government work or public domain book that contains the Insert.

**If you own a U.S. copyright interest in an Insert and wish to register your rights in the Insert, you must complete the Claim Form.**

If the Books, government works or public domain books containing your Insert have not yet been digitized by Google, then Google will search for your content until it completes digitizing Books for GLP. If Google finds what appears to be your content in a Book, government work or public domain book, it will notify you. You will then be asked to confirm that the content contained in the Book, government work or public

domain book is an Insert. After your confirmation, you will (1) be eligible to receive an Inclusion Fee under the Plan of Allocation (see Question 9(K) below); and (2) have the right to exclude your Insert(s) from Display Uses.

You will be eligible for an Inclusion Fee if you do not exclude your Insert from Display Uses and if you otherwise satisfy the eligibility criteria on the Claim Form. If you wish to exclude your Insert from Display Uses after having received your Inclusion Fee, you will have to first return the fee.

**If you want to participate in the Settlement but exclude any of your Inserts from Display Uses, you must complete the Claim Form. There is no time limit for you to exclude any of your Inserts from all – but not less than all – Display Uses, and you can change any exclusion decision at any time.**

The Rightsholder of the Book containing your Insert and, in some cases, Google, can challenge your exclusion request if they believe that they have the legal or contractual right to display your Insert as part of a Book. Any disputes over the exclusion of an Insert from a Book will be resolved through the Settlement's dispute resolution process, described in Question 9(M) below. With respect to Inserts in government works and public domain books, Google may reject your request to exclude your Insert from the government work or public domain book. If that happens, you will have the right either to (1) sue Google or (2) arbitrate against Google pursuant to the Settlement's dispute resolution process.

Under the Settlement, Google has the right to make Non-Display Uses of Inserts for the term of the U.S. copyright for those Inserts. Insert Rightsholders cannot "remove" an Insert. **The only way you can preserve your right to bring claims against Google and the Fully Participating Libraries for Non-Display Uses and for retaining your Inserts on back-up tapes or other back-up storage media is to opt out of the Settlement altogether. Question 15 below informs you how to opt out of the Settlement.**

F.      **Display Uses**

Subject to Rightsholders' exclusion and removal rights discussed above, the Settlement authorizes Google to make the following Display Uses of all out-of-print Books and, upon the express authorization of Rightsholders, in-print Books:

(1)      Access Uses:  Access uses are viewing and annotating the entire Book, and printing and copying/pasting portions of the Book, subject to certain page number limitations. The following are the Access Uses that Google is or may be authorized to make:

(a)      Institutional Subscriptions:  Educational, government and corporate institutions will be able to purchase time-limited subscriptions (e.g., by semester or by year) for their students or employees to access the full contents of the institutional subscription database. Google may also offer subscriptions to discipline-based collections. The pricing of the institutional subscription may vary over time, including to reflect increases in the size of the institutional subscription database. For information on how subscriptions will be priced, see Section 4.1 of the Settlement Agreement.

(b)      Consumer Purchases:  Individual users will be able to purchase the right to access Books online. Rightsholders will have two options for setting the sale price of their Books: they can set the price themselves or they can allow Google to set the price based on a multi-factor formula that is designed to maximize revenues for the sale of the Book (the "Settlement Controlled Price").

(c)      Public Access at Libraries and Elsewhere:  Google will provide, on request, a "Public Access service" for free through a computer terminal at each public library building and through an agreed number of computer terminals at non-profit colleges and universities located in the United States. The Public Access service will provide the same access to Books as Google offers in the institutional subscriptions, except that users will not be able to copy/paste or annotate any portions of a Book. At public libraries that are able to

charge for printing, and at all college and university libraries, users will be able to print pages for a per-page fee. Upon Registry approval, Public Access service terminals may be made available for a viewing and per-page printing fee at commercial businesses, such as copy centers, which will share those fees with Google and the Rightsholders. Revenues from the Public Access service will be based on a per-page charge for printing, with Google collecting the revenues from public and higher education libraries or copy centers and sending 63% of those revenues to the Registry on behalf of Rightsholders.

(d) <u>Other Potential Commercial Uses</u>: In the future, Google and the Registry may agree to develop other Access Uses, including consumer subscriptions (similar in concept to the institutional subscriptions); print on demand Books; custom publishing (per-page pricing of content for course packets or other forms of custom publishing for the educational and professional markets); PDF downloads (consumers would be able to download a PDF version of a Book); and summaries, abstracts or compilations of Books. **Rightsholders will be notified, either directly or through the Registry's website, of all new commercial uses that Google is authorized to make, and will have an opportunity at any time to exclude any of their Books from any or all of these uses.**

(2) <u>Preview Use</u>: In response to a user's search, Google may allow the user to view up to 20% of a Book (no more than five adjacent pages) before making a purchase decision, but not to copy/paste, annotate or print any pages from the Book ("Standard Preview"). For Books of fiction, Google will block the last 5% of the Book (or a minimum of the final fifteen pages of the Book). Also, for Books of fiction, Google may display up to 5% or fifteen pages (whichever is less) adjacent to where a user lands on a given page. Rightsholders may also select another preview option, in which the pages available for preview are fixed (up to 10% of the pages of the Book, as chosen by Google and, if a mechanism to do so is developed, chosen by the Rightsholder) ("Fixed Preview"). The pages presented to the user with Fixed Preview do not depend on the user's search. Rightsholders will have the ability to change the type of Preview available for any of their Books at any time. Preview uses are designed to serve as a marketing tool to sell the Book for Consumer Purchase or otherwise. Rightsholders are also expected to receive advertising revenues from advertisements placed on Preview Use pages for a Book. See Section 4.3 of the Settlement Agreement for a complete description of the Preview Use options available to Rightsholders.

(3) <u>Snippet Displays</u>: In response to a user's search, Google may display about three or four lines of text from a Book (a "snippet"), with up to three snippets per user for that Book. Rightsholders are expected to receive advertising revenues from advertisements placed on web pages that display one or more snippets from, and are devoted to, a single Book.

(4) <u>Display of Bibliographic Pages</u>: Google may display to users a Book's title page, copyright page, table of contents, and index.

**To exclude any of your Books and Inserts from Display Uses, see Question 9(B-E) above.**

**G.   Non-Display Uses**

Subject to Rightsholders' removal rights discussed in Question 9(D) above, Google will be permitted to make Non-Display Uses of the Books and Inserts. Non-Display Uses are uses that do not involve displaying any content from a Book to the public. Examples include display of bibliographic information, full-text indexing (without displaying the text), geographic indexing of Books, algorithmic listings of key terms for chapters of Books, and internal research and development at Google. Rightsholders may not exclude Books or Inserts from Non-Display Uses.

**You may only prevent Google from making Non-Display uses of any of your Books if you make a timely request for removal of your Book. See Question 9(D) above.**

You may only preserve your right to bring claims against Google for its Non-Display Use of any of your Books or Inserts if you opt out of the Settlement altogether. Question 15 below informs you how to opt out of the Settlement.

## H. Advertising Uses

Google may include advertisements on Preview Use pages and on web pages dedicated to a single Book, including pages displaying snippets, bibliographical information, and search results from a user's search performed within a single Book. Rightsholders of Books will earn 63% of the revenues from such advertisements. Google may also place advertisements on other Google products and services (e.g., search result pages, Google Maps), but Rightsholders of Books will not earn revenues from those advertisements.

**Rightsholders of Books will have the right to direct Google not to include any advertising on any pages dedicated to a single Book, but not on pages resulting from a user's search over multiple Books or over other content. In order to preclude advertising on any web pages dedicated to any of your Books, you must complete the Claim Form.**

## I. Uses by Fully Participating Libraries

The Settlement permits Google to provide to each Fully Participating Library a digital copy of all the Books in that library's collection (a "Library Digital Copy" or "LDC"), provided Google digitizes a certain amount of Books at that library. Fully Participating Libraries are authorized to use their LDC: (a) to make copies to preserve, maintain, manage and keep current that LDC; (b) to provide access to Books in the LDC to users who have disabilities that render them unable to use printed versions of Books; (c) to create a print replacement copy of a Book that is damaged, deteriorating, lost or stolen; (d) to use indexes and finding tools, and to display snippets in connection with finding tools (except if a Rightsholder of a Book for which Display Uses are not authorized directs the Fully Participating Libraries not to do so); (e) to permit faculty and staff to use up to five pages of a Book that is not Commercially Available for personal scholarly use and classroom use, if those Books are not in the Institutional Subscription; (f) for Non-Consumptive Research (subject to the limitations described in Question 9(J) below); (g) if the U.S. Copyright Act is amended to allow use of orphan works, to use Books from their LDC in accordance with the amended statute; and (h) for other lawful uses that a Rightsholder or the Registry approves (the Registry may only approve uses that do not impair any rights of the Rightsholders). The Settlement Agreement also prohibits Fully Participating Libraries from making certain uses of their LDC; however, fair uses of Books that are not Commercially Available are not prohibited if no Institutional Subscription is available.

## J. Research Corpus

In addition, digital copies of all Books digitized by Google at libraries will be combined into a "Research Corpus." The Research Corpus may be hosted at up to two separate sites ("Host Sites") at any given time. With the Registry's approval, Google could become an additional Host Site (i.e., a third Host Site if two already exist). The Research Corpus will be made available to "qualified users" solely for engaging in specific types of research, including: (a) computational analysis of the digitized images to either improve the image or extracting textual or structural information from the image; (b) extracting information to understand or develop relationships among or within Books; (c) linguistic analysis, to better understand language, linguistic use, semantics and syntax as they evolve over time and across genres of Books; (d) automated translation (without actually producing translations of Books for display purposes); and (e) developing new indexing and search techniques. For more information regarding the types of research permitted in connection with the Research Corpus, see Section 7.2(d) of the Settlement Agreement. In addition, such research also can be conducted on LDCs at Fully Participating Libraries. **Books will be excluded from the Research Corpus and LDCs if they are removed (see Question 9(D) above).**

**Book or Insert Rightsholders can only preserve their claims against Google and the Fully Participating Libraries for use of Books and Inserts in the Research Corpus by opting out of the Settlement Agreement. See Question 15 for more information regarding how to opt out.**

**For any Books that are Commercially Available as of January 5, 2009, or within two years thereafter, the Rightsholder has the right to withdraw the Books from the Research Corpus as long as they remain Commercially Available. If your Book is Commercially Available, and you would like to withdraw your Book from the Research Corpus, you must complete the Claim Form.**

The Research Corpus and its use are subject to detailed requirements and limitations, all set forth in the Settlement Agreement, available at http://www.googlebooksettlement.com/agreement.html (see section 7.2(d) of the Settlement Agreement) or from the Settlement Administrator, as well as in agreements between the Registry and each Host Site.

K.      **Plan of Allocation/Unclaimed Funds**

(1)     Plan of Allocation

Rightsholders who register with the Registry will be compensated in United States dollars for Google's commercial uses of their Books and Inserts. The principles for compensation are set out in a Plan of Allocation, available at http://www.googlebooksettlement.com/agreement.html (see Attachment C to the Settlement Agreement) or from the Settlement Administrator. Compensation to Rightsholders will be based both on the actual usage of Books ("Usage Fees") and on the inclusion of Books and Inserts in the institutional subscription database ("Inclusion Fees").

(a)     Usage Fees. Usage Fees will be paid to Books Rightsholders for all revenue models. For usage of a Book in subscriptions, the Registry will calculate "usage" based on a number of factors, including the number of times users view the Book, how much of the Book is viewed, and the Book's Settlement Controlled Price, relative to the usage of other Books used in the same reporting period. For other uses, Usage Fees will be based on the price at which the Book is sold, the number of pages printed, or the advertising revenues that it earns. The Registry will calculate Usage Fees on a per-Book basis every reporting period, which reporting period will be determined by the Registry based on efficiency. No Usage Fees are paid for Inserts.

(b)     Inclusion Fees. Inclusion Fees will be paid for eligible Books and Inserts from revenues the Registry receives from sales of subscriptions. The target Inclusion Fee for Books is US $200/Book and the minimum Inclusion Fee for Inserts is US $50/Entire Insert and US $25/Partial Insert. For Inserts, the Inclusion Fees for all content from a single work that appears in other works is capped at US $500, no matter how many Inserts are created from the content and no matter in how many other works the Insert appears. Rightsholders are eligible for an Inclusion Fee so long as their Books or Inserts are not excluded from subscriptions by them or any other Rightsholder of the same Book or Insert. (If Google determines not to include a Book in the subscription database for whatever reason, the Book and Insert Rightsholders of that Book are still eligible to be paid Inclusion Fees.) **Once Rightsholders have received their Inclusion Fees, they will no longer be permitted to exclude their Books or Inserts from subscriptions unless the Inclusion Fees are returned to the Registry.**

Google's sale of subscriptions to a database of Books is a new business model. Accordingly, the compensation for the inclusion and use of Books and Inserts in subscriptions cannot be quantified with any degree of certainty. This is particularly the case with respect to the Inclusion Fees, and it is possible that the Inclusion Fee Fund might not be sufficient after ten years to pay all eligible Rightsholders' full Inclusion Fees. Plaintiffs hope that sales of subscriptions will be robust and that there will be more than enough funding to pay all Inclusion Fees. If that is the case at the end of the ten years after the Registry first receives subscription revenues, then Rightsholders will receive more than the Inclusion Fees specified above. If, at the end of ten years, the

funds are insufficient, however, the Registry Board will determine whether the Rightsholders' overall best interests are served by continuing payment of Inclusion Fees for Books or terminating those fees in favor of payment only of Usage Fees. If a majority of the Board votes to discontinue funding Inclusion Fees for Books before the target Inclusion Fee of US $200/Book is reached, then Books Rightsholders may not receive US $200 for Inclusion Fees, the available funds will be distributed to eligible Rightsholders at that time and, thereafter, Books Rightsholders will only receive Usage Fees. (If the Registry Board does not vote to discontinue funding for Inclusion Fees for Books, then that funding will continue, as described in Question 9(K)(1)(b) and (c) below.) In any event, Inclusion Fees for Inserts will continue to be funded until the Registry pays US $50/Entire Insert and US $25/Partial Insert.

**In order to receive an Inclusion Fee for any of your Books or Inserts, you must register them with the Registry by completing the Claim Form within five years of the Effective Date. The website http://www.googlebooksettlement.com will post the Effective Date when it occurs but, in the meantime, you are encouraged to register your Books and Inserts as soon as possible.**

(c)     <u>Allocation of Subscription Revenues Between Usage and Inclusion</u>. From the net revenues the Registry receives from subscriptions (i.e., after payment of the Registry administrative fees), 75% will be paid into a Usage Fee Fund and 25% will be paid into an Inclusion Fee Fund. The Inclusion Fee Fund itself will be divided into two sub-funds: 80% (of the 25%) will go into a Book Sub-Fund and 20% (of the 25%) will go into an Insert Sub-Fund. If, on or before the tenth anniversary of the date on which the Registry first receives subscription revenues, there are sufficient funds in the Inclusion Fee Fund to pay US $200/Book, US $50/Entire Insert and US $25/Partial Insert, then all Inclusion Fee Funds will be distributed at that time. If there are not enough funds by the tenth anniversary of that date to pay such amounts, then, thereafter, 10% of the net revenues the Registry receives from subscriptions will be paid into the Inclusion Fee Fund for so long as is necessary to pay US $200/Book, US $50/Entire Insert and US $25/Partial Insert, unless, with respect to Books, a majority of the Board of the Registry votes to discontinue paying subscription revenues into the Book Sub-Fund.

The allocation between Usage Fees and Inclusion Fees described above reflects the Plaintiffs' attempt to fairly and equitably balance the following competing considerations: (1) the value of a Book that is actually "used," and (2) the value that a Book or Insert contributes to the overall value of the subscription database by virtue of its being included in the database and made available to users.

(d)     <u>Summary of Other Provisions</u>. (1) No Usage Fees or Inclusion Fees for a particular Book or Insert will be paid until the Registry has cleared disputes among Rightsholders with respect to that Book or Insert. (2) For every registered Rightsholder, the Registry will maintain an account for the Rightsholder's registered Books and Inserts, and will pay Usage Fees and Inclusion Fees, or combinations of such fees, only when the Rightsholder is due an amount (e.g., US $25) below which it would not be efficient for the Registry to issue payments. (3) An Insert Rightsholder can receive a higher Inclusion Fee by demonstrating to the Registry that the contract with the Book Rightsholder provides for payment of an amount greater than the Inclusion Fees for Inserts. (4) All disputes regarding the allocation of revenues among Book Rightsholders will be resolved under the Author-Publisher Procedures (except for disputes between multiple publishers of the same Book or Principal Work), and all disputes regarding the allocation of revenues for Inserts will be resolved in binding arbitration under the rules set forth in Article IX of the Settlement Agreement.

(2)     Unclaimed Funds

The Registry will likely receive revenues from Google that are due to Rightsholders who do not register with the Registry or who do not claim their funds within five years after the Effective Date (for Inclusion Fees), or within five years after their Books are used (for Usage Fees) ("Unclaimed Funds").  Unclaimed Funds will be distributed as follows:  (a) **Unclaimed Funds from Subscription revenues** will first be used to defray operational expenses of the Registry and maintain reserves for the Registry, and any remaining Unclaimed Funds will be paid on a proportional basis to registered Rightsholders whose Books earned Subscription Usage Fees during the reporting period in which the Unclaimed Funds were earned; and (b) **Unclaimed Funds from Book Use revenues** will first be used to defray operational expenses of the Registry and maintain reserves for the Registry; then, any remaining Unclaimed Funds will be paid on a proportional basis to registered Rightsholders whose Books earned Book Use revenues during the reporting period in which the Unclaimed Funds were earned, until Rightsholders of a single Book have received, in total, 70% of the revenues Google received for the Book Use of that Book; and then, for any Unclaimed Funds remaining thereafter, to not-for-profit entities that directly or indirectly benefit the Rightsholders and the reading public.

## L.     Security Provisions

Google and Plaintiffs (including Plaintiffs' experts) developed a security standard to ensure that Books and Inserts are subject to appropriate levels of security (the "Security Standard").  The Security Standard addresses several areas of security:  breaches of security with respect to Books at Google, breaches of security of the Fully Participating Libraries' LDCs, breaches of security at the Research Corpus Host Sites, and efforts to restrict unauthorized access to Books.  The Security Standard requires that Google, each Fully Participating Library and each Host Site develop its own Security Implementation Plan, which must comply with the Security Standard and which is subject to the Registry's approval.  The Security Standard, Attachment D to the Settlement Agreement, may be obtained at http://www.googlebooksettlement.com/agreement.html or from the Settlement Administrator.  In addition, the Settlement Agreement and the Registry's agreements with the Fully Participating Libraries and the Host Sites provide for remedies for security breaches.  Further information on those remedies is set out at Article VIII of the Settlement Agreement, available at http://www.googlebooksettlement.com/agreement.html or from the Settlement Administrator.

## M.     Dispute Resolution

Google, the Registry, Rightsholders, Participating Libraries and the Host Sites will attempt to informally resolve most disputes concerning matters pertaining to the Settlement.  If, after thirty days, they are unsuccessful, then the dispute will go to arbitration, and the arbitrator's decision will be final and binding on the parties to the dispute.  Examples of disputes that will be subject to arbitration are (a) disagreements over pricing and other economic terms; (b) disagreements over claimed security breaches; (c) disagreements over whether a Book is in-print or out-of-print (only if the dispute is between an author and a publisher) or disagreements over whether a Book is in the public domain; and (d) disagreements over whether Google or a Fully Participating Library has made use of a Book that is not authorized under the Settlement.  This is an illustrative, not an exhaustive, list of potential types of disputes subject to arbitration.  You should read Article IX of the Settlement Agreement, the Author-Publisher Procedures (Attachment A to the Settlement Agreement) and the Library-Registry Agreements (Attachment B to the Settlement Agreement), all available at http://www.googlebooksettlement.com/agreement.html or from the Settlement Administrator, for a description of which disputes are subject to binding arbitration or to litigation.

The Court will have continuing jurisdiction to resolve all other disputes concerning the parties' obligations under the Settlement Agreement and the other agreements.  In addition, for expedited relief, or where the breach is repeated, willful or intentional, the parties reserve their right to sue in court for temporary injunctive relief without first going to arbitration.

### N.    Non-Exclusive Rights

Rights granted to Google and the Participating Libraries are non-exclusive only, and Rightsholders have every right to authorize, through the Registry or otherwise, any individual or entity, including direct competitors of Google, to use their works in any way, including ways identical to Google's and the Participating Libraries' authorized uses.  Rights and authorizations granted to Google and the Participating Libraries are not transfers of copyright ownership to those works, and nothing in the Settlement Agreement shall operate to transfer any copyright ownership interests in Rightsholders' works.

---

**10.    What are Authors' and Publishers' rights under the Author-Publisher Procedures?**

Both an author and a publisher may have U.S. copyright interests in the same Book.  The respective rights of members of the Author Sub-Class and the Publisher Sub-Class are addressed in the Author-Publisher Procedures, available at http://www.googlebooksettlement.com/agreement.html (see Attachment A to the Settlement Agreement) or from the Settlement Administrator.  The following is a summary of the Author-Publisher Procedures:

(1)    <u>In-Print Books</u>

In order for Google to make Display Uses of any in-print Book, both the author (other than a work-for-hire author) and the publisher must agree to authorize Google to make Display Uses in accordance with a process set out in the Author-Publisher Procedures.  The Registry will pay revenues earned from Google's use of an in-print Book (including Cash Payments for a Book digitized by Google on or before May 5, 2009) to publishers, who will then pay authors in accordance with the terms of the author-publisher contract for that Book.  If the author is not satisfied with the amount of the payment made by the publisher, then the dispute may be resolved, with the Registry's assistance, in arbitration.  This arbitration right does not apply to authors and publishers of educational Books (i.e., Books that, when published, were intended primarily for sale to educational markets (i.e., K-12, Higher Education, continuing education, vocational, professional, self-study, and similar educational markets) for use in educational programs); disputes between those parties must be resolved under the terms of the individual author-publisher contract for the educational Book.

For any in-print Book for which Google is authorized to make Display Uses, both the author and publisher have the right to request removal of the Book or to exclude the Book from any and all Display Uses.  In those cases, the more restrictive directions (whether received from the author or the publisher) will be controlling.  If the author and publisher agree that Google may make consumer use of an in-print Book, the publisher has the right to control the pricing of the Book.  If, however, the author objects to the price and is unable to persuade the publisher to change the price, the author may exclude the Book from consumer uses.

(2)    <u>Out-of-Print Books</u>

(a)    <u>Removal and Exclusion From Display Uses</u>.  As described above, the Settlement Agreement provides that all out-of-print Books are automatically included in all Display Uses.  Rightsholders can make decisions as to removal, exclusion and pricing of any out-of-print Book as follows:  (a) for Books that are works-for-hire, only the publisher can make the removal, exclusion and pricing decisions; (b) for Books where rights have reverted to the author or where such Books are considered "author controlled" (see the following paragraph), only the author can make removal, exclusion and pricing decisions; and (c) for all other unreverted Books, either the author, or the publisher for good cause articulated, can make removal and exclusion decisions, and either can make pricing

decisions (the more restrictive directions as to level of access, and the higher price, will govern).

For purposes of the Settlement (and only for such purposes), a Book will be considered "author controlled" if the Book is eligible for reversion under the author-publisher contract, the author has sent (or sends) a request for reversion to the publisher and the publisher has not responded to that request for either ninety days or any written response period specified in the author-publisher contract, whichever period is longer.  If those conditions are met, the author may send a request to the Registry (with a copy to the publisher) to treat the Book as "author-controlled."  In that request, the author must affirm that the Book is no longer "in print" as defined in Test 1 (see Question 10(3)(a) below) and that the publisher's response period (i.e., the longer of ninety days or the period set forth in the author-publisher contract) has expired; the request must include a copy of the request for reversion previously sent to the publisher and a copy of the applicable author-publisher contract (if the author has it).

If the publisher does not dispute the request in writing within 120 days, the Registry shall deem the Book to be "author-controlled."  If the publisher timely disputes the request, the parties shall submit the issues in dispute to the Registry for decision.

(b)     Allocation of Cash Payments and Revenues.  The Registry will make all payments with respect to an out-of-print Book separately to the Book's author and publisher, as follows: (a) 100% to the author for any Book that has reverted or is "author controlled"; (b) 100% to the publisher for any Book that is a work-for-hire; and (c) for all other unreverted Books, 65% to the author and 35% to the publisher if the Book was published prior to 1987, and 50% to the author and 50% to the publisher if the Book was published in 1987 or thereafter.

(3)     Determination of Whether a Book is In-Print or Out-Of-Print

For purposes of the Settlement (and only for such purposes), a Book is deemed "in-print" if it meets one of the following two tests:

(a)     Test 1.  The Book is "in-print" under the terms of the author-publisher contract or the contract does not provide for reversion under any circumstances.  For this purpose, the Book may be "in-print" even if the contract does not use the term "in-print."  If the contract measures "in-print" by reference to revenues earned, and more than 50% of the revenues paid to a publisher from exploitation of a Book are generated by Google's exploitation of a Book in the revenue models authorized in the Settlement, then those revenues shall NOT be considered in determining whether this Test 1 has been met.  If the contract measures "in-print" by units sold or some measure other than revenues, then an equivalent principle will be applied in determining whether this Test 1 has been met.  That a Book or information about a Book is included in a database, or that information about a Book is provided in search engine results, does not, by itself, mean that the Book is "in-print."  A Book is not "in-print" if the contract provides for reversion and all of the criteria for reversion have been met (except that the author need not have sent a request for reversion to the publisher even if required by the contract); or

(b)     Test 2.  The publisher, consistent with any rights it may have in the Book under the author-publisher contract, publicly has announced to the trade that it has undertaken concrete steps to publish an existing or new edition of the Book, and that edition is published within twelve months of the announcement.

(4)     Disputes Over Whether a Book is In-Print or Out-Of-Print

Members of the Author Sub-Class and Publisher Sub-Class, or their representatives on the Board of the Registry, may dispute the status of a Book as "in-print" or "out-of print" by notifying the Registry with evidence (such as contracts, royalty statements, trade announcements, or affidavits) sufficient to establish whether or not the Book meets either of the two tests in paragraph (3) above. The other party will have the right to respond, but, if it does not do so within 120 days, the status of the Book will be changed. If both the author and the publisher submit competing evidence and are not able to resolve the matter by agreement, then the Registry, or an arbitrator selected by the Registry, will resolve the dispute by reviewing each party's evidence, as well as any other relevant evidence and arguments submitted by the parties, including the course of dealing between the parties and industry standards and practices. The Registry's (or arbitrator's) decision will be final, although the decision pertains only to the Settlement, and may not be used for any other purpose, such as a precedent in a different, non-Settlement related dispute between the author and publisher of the same Book.

(5)     Other Disputes

All disputes between co-authors, or between an author's heirs, or between multiple other Rightsholders who are members of the Author Sub-Class must be resolved in arbitration. Disputes between multiple Rightsholders that are members of the Publisher Sub-Class may, but are not required to, be resolved in arbitration.

(6)     Allocation of Unclaimed Funds Between Authors and Publishers

Subject to the Unclaimed Funds provision described in Question 9(K)(2) above, all revenues allocated under the Author-Publisher Procedures to Author Sub-Class members that are unclaimed will be distributed to claiming Author Sub-Class members, and all revenues allocated to Publisher Sub-Class members that are unclaimed will be distributed to claiming Publisher Sub-Class members.

(7)     Google Partner Program

A Rightsholder might decide to place a Book in the Partner Program instead of in Display Uses under the Settlement Agreement because it believes it might be able to negotiate better economic terms with Google or for some other reason. The Settlement with Google pertains only to Display Uses under the Settlement Agreement, and not to the Partner Program. The Author-Publisher Procedures provide Rightsholders of an in-print Book with certain rights if another Rightsholder in the same Book places the Book in the Partner Program (or any other Google program similar to the revenue models under the Settlement Agreement) instead of in the revenue models under the Settlement Agreement. These rights pertain only to Books published under an author-publisher contract executed prior to 1992 and that had not been amended thereafter to address electronic rights. They are summarized as follows:

(a)     Removal or Transfer Requests. A Rightsholder who believes Google is using an in-print Book in the Partner Program (or any other Google program with revenue models similar to the Settlement Agreement) without the necessary authorization from the Rightsholder may request that Google either remove the Book from the other Google program or transfer the Book from the other Google program into the Settlement Agreement program. **The request must be made to the Registry and Google using the notification form at http://www.googlebooksettlement.com or from the Settlement Administrator. Google will notify the person or entity that permitted Google to use the Book in the Partner Program or other Google program. If that person or entity objects to the removal or transfer request within thirty days, it must do so by**

notifying the Registry and Google using the notification form at http://www.googlebooksettlement.com or from the Settlement Administrator.

(b) <u>Undisputed Requests</u>.  If the person or entity who permitted Google's use in the Partner Program or other Google program fails to respond to the notification within thirty days, then Google will remove the Book or transfer it to the Settlement Agreement program as requested by the requesting Rightsholder.  If transferred into the Settlement Agreement program, the Book will become subject to the Settlement Agreement and payments will be made in accordance with the Author-Publisher Procedures.

(c) <u>Disputed Removal Requests</u>.  If the request is for Google to remove the Book from the Partner Program or other Google program (as opposed to transferring the Book to the Settlement Agreement program), and if the request is disputed by the other Rightsholder, then Google will decide whether or not to honor the request.  Any party seeking to challenge Google's decision may sue the other party to determine who has the right to authorize Google to use the Book in the Partner Program or other program.  No rights are released against Google with respect to any decision by Google to use or remove the Book.

(d) <u>Disputed Transfer Requests</u>.  If the request is for Google to transfer the Book from the Partner Program or other Google program to the Settlement Agreement program, then Google will stop using the Book in such other Google program until the competing Rightsholders resolve their dispute.  Either Rightsholder may sue the other to determine who has the right to authorize Google to use the Book in the Partner Program or other Google program.  In any event, Google will only include the Book in the Settlement Agreement program if the competing Rightsholders jointly authorize Google to do so, or if one of the competing Rightsholders obtains a court ruling giving it authority to request Google to do so.

> **The above is only a summary of the Author-Publisher Procedures, and you are encouraged to review those procedures, which are available at http://www.googlebooksettlement.com/agreement.html (see Attachment A to the Settlement Agreement) or from the Settlement Administrator.**

## REMAINING IN THE SETTLEMENT

**11.    What happens if I do nothing?**

**If you are a member of the Author Sub-Class or Publisher Sub-Class, you need not do anything at this time if you want to remain in the Settlement.**  If you choose to remain in the Settlement, your rights in this litigation will be represented by the Sub-Class Representatives and by Class Counsel.  You will receive the benefits of the Settlement if approved by the Court (and if you timely submit the applicable forms), and your claims against Google and the Participating Libraries will be released and will be dismissed by the Court.  If you remain in the Settlement, you will be bound by any judgment or determination of the Court in connection with the Settlement, whether favorable or unfavorable.

**12.    What entities am I releasing?**

As of the Effective Date, Rightsholders will release claims against Google and all of the Participating Libraries, and each of their past, present, and future parents, predecessors, successors, subsidiaries, affiliates, and divisions, and each of their respective officers, directors, employees and others listed in Article X of the Settlement Agreement.  For the specific claims being released against each of these entities, see Question 13

below. For more details regarding the entities released, please see the complete text of the releases, contained in Article X of the Settlement Agreement.

## 13. If I remain in the Settlement, what claims am I specifically giving up?

The following is a summary of the claims Rightsholders will release as of the Effective Date. For more details regarding the released claims, please see the complete text of the releases, contained in Article X of the Settlement Agreement.

Rightsholders release all claims against Google and each Participating Library that arise out of certain conduct occurring prior to the Effective Date, including Google's digitization of Books and Inserts; Google's use of digital copies in Google's products and services; each library's provision of Books and Inserts to Google for digitization; Google's provision of digital copies to libraries and the libraries' receipt of those copies (except Google's provision of digital copies to Other Libraries after December 27, 2008); and the libraries' (except for the Other Libraries') uses of those digital copies in a manner consistent with the Settlement Agreement. If, however, an Other Library makes an unlawful use of any digital copies, no claims against such Other Library for its provision of Books to Google, or the receipt of any digital copies, are released.

Rightsholders release all claims against Google, and each Fully Participating Library, Cooperating Library and Public Domain Library that, after the Effective Date, arise out of any act or omission authorized by the Settlement Agreement or by an applicable Library-Registry Agreement. No claims arising after the Effective Date are released against Other Libraries.

**However:**

1. None of the claims of Class members who timely opt out of the Settlement are released or in any way adversely affected by the Settlement.

2. The Settlement provides that Google and the Fully Participating Libraries are authorized to use Books and Inserts only in accordance with the Settlement and any applicable Library-Registry Agreement, and no claims are released that are based on any use of Books and Inserts not authorized by the Settlement Agreement or an applicable Library-Registry Agreement.

3. No claims are released for violations of any of Google's or a Participating Library's obligations under the Settlement Agreement or an applicable Library-Registry Agreement.

4. No claims are released for the unauthorized use by Google of Books and Inserts other than in the Settlement Agreement programs.

5. No claims are released with respect to the use by Google of Inserts in government works and public domain books if Google rejects a Rightsholder's exclusion request. See Section 3.5(b)(vii) of the Settlement Agreement for further details.

6. No claims are released with respect to any acts or omissions after October 28, 2008 that, if occurring after the Effective Date, would not be authorized by the Settlement Agreement.

7. No claims are released with respect to any uses of digital copies by Other Libraries.

8. No claims are released with respect to use of Books and Inserts outside the United States or with respect to any digitization outside the United States.

9. No claims are released with respect to any acts of Google in the United States, in response to a request of a user outside the United States, that results in displaying parts of a Book or Insert, in the user's jurisdiction, unless the display is lawful or Google has obtained permission for that display.

24

# OPTING OUT OF THE SETTLEMENT

## 14.    What do I do if I don't want to be in the Settlement?

If you do not want to be included in the Settlement and you want to retain the right to sue Google and the Participating Libraries, you must take steps to "opt out" of the Settlement.  By opting out, you retain the right to file your own lawsuit or join another lawsuit against Google about the claims in this lawsuit.

If you opt out of the Settlement, you will not be eligible for a Cash Payment or to participate in any of the revenue models under the Settlement.  You will, however, have the right to bring your own lawsuit.  In addition, even if you opt out of the Settlement, you may still be able to contact the Registry or Google at a later date to attempt to negotiate a separate deal for inclusion of your Books in any of the Settlement Agreement programs.

## 15.    How do I opt out of the Settlement?

You may opt out of the Settlement by:

1)    going online at http://www.googlebooksettlement.com and following the instructions to opt out on or before September 4, 2009, or

2)    sending written notice by first class mail, postage prepaid, on or before September 4, 2009, to the Settlement Administrator at:  Google Book Search Settlement Administrator, c/o Rust Consulting, PO Box 9364, Minneapolis, MN 55440-9364, UNITED STATES OF AMERICA.  The postmark will determine the time of mailing.

You need not state your reason for opting out.  However, your opt-out request must be signed or, if submitted online, completed, by an authorized person, must state which Sub-Class you wish to opt out of (either the Author Sub-Class or Publisher Sub-Class), must provide your name and address or, if you are an author's agent, must provide the name of the Author Sub-Class member on whose behalf you are acting (i.e., the person whose name appears as the author of the Book or Insert), and any pseudonym used to author the Books, if applicable.  To ensure that Google clearly understands which Books and/or Inserts may be implicated by a decision to opt out, members of the Publisher Sub-Class must identify all of the imprints under which they publish, or have published, Books in which they hold a U.S. copyright interest.  Google and Plaintiffs request (but do not require) that all members of the Author Sub-Class or Publisher Sub-Class provide the following information with respect to each Book and Insert in which they hold a U.S. copyright interest:  title, author, publisher and ISBN (if the Book has an ISBN).

# OBJECTING TO OR COMMENTING ON THE SETTLEMENT

## 16.    May I object to or comment on the Settlement?

Yes.  If you do not opt out of the Settlement, you have the right to object to or comment on any or all of the Settlement, including the entry of final judgment dismissing the litigation with prejudice, and the request for attorneys' fees and costs of Counsel for the Author Sub-Class.  If you wish to object to the Settlement, you must, on or before September 4, 2009, file with the Court a statement of your objection or position to be asserted and the grounds for your objection, together with copies of any supporting papers or briefs to:

Office of the Clerk
J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007
UNITED STATES OF AMERICA

You must also serve a copy of such papers by email or first class mail on the following attorneys:

| Counsel for the Author Sub-Class: | Counsel for the Publisher Sub-Class: | Counsel for Google: |
|---|---|---|
| Michael J. Boni, Esq. | Jeffrey P. Cunard, Esq. | Daralyn J. Durie, Esq. |
| Joanne Zack, Esq. | Bruce P. Keller, Esq. | Joseph C. Gratz, Esq. |
| Joshua Snyder, Esq. | Debevoise & Plimpton LLP | Durie Tangri Lemley Roberts & |
| Boni & Zack LLC | 919 Third Avenue | Kent LLP |
| 15 St. Asaphs Road | New York, NY 10022 | 332 Pine Street, Suite 200 |
| Bala Cynwyd, PA 19004 | UNITED STATES OF | San Francisco, CA 94104 |
| UNITED STATES OF | AMERICA | UNITED STATES OF |
| AMERICA | bookclaims@debevoise.com | AMERICA |
| bookclaims@bonizack.com | | bookclaims@durietangri.com |

You may appear at the hearing in person or, if you are represented by an attorney, your attorney may appear in person, and state why the Settlement or any part of the Settlement should not be approved. You must give notice of your or your attorney's intent to do so in the statement you file with the Court.

Unless you object as provided in this Notice, you will not be entitled to contest the terms and conditions of the Settlement, including the application by Counsel for the Author Sub-Class for attorneys' fees and costs, and persons who fail to object as provided shall be deemed to have waived and shall be forever foreclosed from raising any such objections.

## 17. What is the difference between objecting to the Settlement and opting out of the Settlement?

You may object to the Settlement if you remain a class member and are subject to the Settlement, if approved, but disagree with some aspect of the Settlement. An objection allows your views to be heard in Court.

In contrast, opting out means that you are no longer a member of the Class and that you do not want to be subject to the terms and conditions of the Settlement. Once you opt out, you lose any right to object to the Settlement, because the Settlement will no longer affect you.

# THE LAWYERS REPRESENTING YOU

## 18. Do I have a lawyer representing my interests in these cases?

Yes. The Court has appointed the following law firms to represent you and other class members:

| Counsel for the Author Sub-Class | Counsel for the Publisher Sub-Class |
|---|---|
| Michael J. Boni, Esq. | Jeffrey P. Cunard, Esq. |
| Joanne Zack, Esq. | Bruce P. Keller, Esq. |
| Joshua Snyder, Esq. | Debevoise & Plimpton LLP |
| Boni & Zack LLC | 919 Third Avenue |
| 15 St. Asaphs Road | New York, NY 10022 |
| Bala Cynwyd, PA 19004 | UNITED STATES OF AMERICA |
| UNITED STATES OF AMERICA | |

## 19. How will the lawyers be paid?

Counsel for the Author Sub-Class will request that the Court award attorneys' fees and expenses of US $30 million. Subject to Court approval, Google will pay those attorneys' fees and expenses. (Counsel for the Author Sub-Class has incurred approximately $140,000 in expenses as of the date of the Settlement Agreement.) Google will pay those fees and expenses in addition to the amounts it has agreed to pay to Sub-Class members and Rightsholders.

Counsel for the Publisher Sub-Class have agreed not to seek attorneys' fees or reimbursement of expenses from the class action settlement funds. Instead, counsel for the Publisher Sub-Class will be paid from the settlement between Google and the publishers in the related case, *The McGraw-Hill Companies, Inc. et al. v. Google Inc.*, Case No. 05 CV 8881 (S.D.N.Y.). The five publisher plaintiffs in that action are Sub-Class Representatives on behalf of the Publisher Sub-Class. Contingent upon the Settlement Agreement becoming final, they will dismiss their separate suit against Google after the Effective Date. Google has agreed to pay US $15.5 million in settlement of that action. Counsel for the Publisher Sub-Class will be paid their attorneys' fees and costs from that amount, and the rest will be used by the Association of American Publishers to establish a fund to serve the interests of both publishers and authors. The use of the remaining funds is subject to prior approval of a majority of the members of the Board of Directors of the Registry, including at least one author director and one publisher director.

## 20. Should I get my own lawyer?

You do not need to hire your own lawyer, but if you want your own lawyer to speak for you or appear in Court, you must file a Notice of Intent to Appear. See Question 23 below to find out how to submit a Notice of Intent to Appear. If you hire a lawyer to appear for you in the lawsuit, you will have to pay for your lawyer.

# THE COURT'S FINAL APPROVAL HEARING

## 21. When and where will the Court decide whether to grant final approval of the Settlement?

The Court will hold a Fairness Hearing on October 7, 2009 at 10:00 a.m. EDT in Courtroom 11A of the United States District Court for the Southern District of New York, United States Courthouse, 500 Pearl Street, New York, NY 10007, to consider whether the Settlement is fair, adequate and reasonable. At or after the Fairness Hearing, the Court will decide whether to approve the Settlement and the motion for attorneys' fees and expenses. If comments or objections have been received, the Court will consider them at that time.

The time and date of the hearing may be rescheduled by the Court without further notice. **If you desire to participate in the Settlement, you are not required to do anything further at present.**

## 22. Must I attend the Fairness Hearing?

No. Attendance is not required. Class Counsel are prepared to answer the Court's questions on your behalf. If you or your own lawyer wants to attend the Fairness Hearing, you may do so at your own expense.

## 23. May I speak at the Fairness Hearing?

Yes. You may speak at the Fairness Hearing or hire your own lawyer to speak for you. If you want to do so, you must file a "Notice of Intent to Appear" with the Court. The Notice of Intent to Appear must include the name and number of this lawsuit (*The Authors Guild, Inc., et al. v. Google Inc.*, No. 05 CV 8136), and state that you wish to enter an appearance at the Fairness Hearing. It also must include your name, address, telephone number and signature as well as the name and address of your lawyer, if one is appearing for you. You cannot speak at the Fairness Hearing if you opt out of the Settlement. Your Notice of Intent to Appear **must** be filed with the Court on or before September 4, 2009, at:

> Office of the Clerk
> J. Michael McMahon
> U.S. District Court for the Southern District of New York
> 500 Pearl Street
> New York, New York 10007
> UNITED STATES OF AMERICA

Copies of the Notice of Intent to Appear must be emailed or sent by postal mail, postmarked on or before September 4, 2009, to**:**

| Counsel for the Author Sub-Class: | Counsel for the Publisher Sub-Class: | Counsel for Google: |
|---|---|---|
| Michael J. Boni, Esq. Joanne Zack, Esq. Joshua Snyder, Esq. Boni & Zack LLC 15 St. Asaphs Road Bala Cynwyd, PA 19004 UNITED STATES OF AMERICA bookclaims@bonizack.com | Jeffrey P. Cunard, Esq. Bruce P. Keller, Esq. Debevoise & Plimpton LLP 919 Third Avenue New York, NY 10022 UNITED STATES OF AMERICA bookclaims@debevoise.com | Daralyn J. Durie, Esq. Joseph C. Gratz, Esq. Durie Tangri Lemley Roberts & Kent LLP 332 Pine Street, Suite 200 San Francisco, CA 94104 UNITED STATES OF AMERICA bookclaims@durietangri.com |

# GETTING MORE INFORMATION

## 24. Where do I obtain more information?

The Settlement Agreement, its attachments and the other legal documents that have been filed with the Court in this lawsuit contain more details about the Settlement. You may look at and copy these legal documents at any time during regular office hours at the Office of the Clerk, J. Michael McMahon, U.S. District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007. These documents are also available on the Settlement website at http://www.googlebooksettlement.com.

In addition, if you have any questions about the lawsuit or this Notice, you may:

- Visit the Settlement website at http://www.googlebooksettlement.com,

- Contact the Authors Guild at http://www.authorsguild.org, or the Association of American Publishers at http://www.publishers.org,

- Call the appropriate number at the end of this Notice (Appendix), or

- Write to:

  > Google Book Search Settlement Administrator
  > c/o Rust Consulting, Inc.
  > PO Box 9364
  > Minneapolis, MN 55440-9364
  > UNITED STATES OF AMERICA

If you change your address or if this Notice was not mailed to your correct address, you should notify the Settlement Administrator. If the Settlement Administrator does not have your correct address, you may not receive your benefits under the Settlement or notice of important developments.

## APPENDIX: SETTLEMENT ADMINISTRATOR TELEPHONE NUMBERS

Complete information about the Settlement, and the Claim Form, are available at http://www.googlebooksettlement.com. Class members may request assistance and ask questions through that website.

For Class Members who are unable to have access to the website or who require additional assistance, please contact the Settlement Administrator using the telephone numbers on the following pages. Where possible, these numbers are toll-free. In countries in which toll-free numbers are not available, please use the international toll number (+1.612.359.8600) and, if you wish, the Settlement Administrator will call you back.

| Country | Phone Number |
|---|---|
| Albania | Toll-Free 00 800 0010 (wait for tone) 888.839.1909 |
| Algeria | 00 1.612.359.8600 |
| Andorra | 00 1.612.359.8600 |
| Angola | Toll-Free 808 000 011 (wait for tone) 888.839.1909 |
| Anguilla | Toll-Free 1.888.839.1909 |
| Antigua and Barbuda | Toll-Free 1.800.988.7132 |
| Argentina | Toll-Free 0800.666.1520 |
| Armenia | Toll-Free 0 800 10 111 (wait for tone) 888.839.1909 (select locations); or 00 1.612.359.8600 |
| Aruba | 00 1.612.359.8600 |
| Australia | Toll-Free 1.800.669.201 |
| Austria | Toll-Free 00 800 8000 3300 |
| Azerbaijan | 00 1.612.359.8600 |
| Bahamas | Toll-Free 1.888.762.3775 |
| Bahrain | Toll-Free 800.19.908 |
| Bangladesh | Toll-Free 157 0011 (wait for tone) 888.839.1909; or 00 1.612.359.8600 |
| Barbados | Toll-Free 1.800.988.7146 |
| Belarus | Toll-Free 8 (wait for tone) 800 101 (wait for tone) 888.839.1909 (select locations); or 8 (wait for tone) 10 1.612.359.8600 |
| Belgium | Toll-Free 00 800 8000 3300 |
| Belize | Toll-Free 811 (wait for tone) 888.839.1909 (select locations); or 00 1.612.359.8600 |
| Benin | Toll-Free 102 (wait for tone) 888.839.1909 |
| Bermuda | Toll-Free 1.800.988.7139 |
| Bolivia | Toll-Free 800.10.0675 |
| Bosnia & Herzegovina | Toll-Free 00 800 0010 (wait for tone) 888.839.1909 (select locations); or 00 1.612.359.8600 |
| Botswana | 00 1.612.359.8600 |
| Brazil | Toll-Free 0800.891.7626 |
| British Virgin Islands | Toll-Free 1.800.988.7149 |
| Brunei | Toll-Free 800 1111(wait for tone) 888.839.1909 |
| Bulgaria | Toll-Free 00 800 8000 3300 |
| Burkina Faso | 00 1.612.359.8600 |
| Burundi | 00 1.612.359.8600 |
| Cambodia | Toll-Free 1 800 881 001 (wait for tone) 888.839.1909 (select locations); or 001 1.612.359.8600 |
| Cameroon | 00 1.612.359.8600 |
| Canada | Toll-Free 1.888.356.0248 |
| Cape Verde | 0 1.612.359.8600 |
| Cayman Islands | Toll-Free 1.800.988.7151 |
| Central African Republic | 00 1.612.359.8600 |
| Chad | 15 1.612.359.8600 |
| Chile | Toll-Free 1230.020.9265 |
| China | Toll-Free 00 800 8000 3300 |

| Country | Phone Number |
|---|---|
| Colombia | Toll-Free 01800.700.2137 |
| Comoros | 00 1.612.359.8600 |
| Cook Islands | Toll-Free 09 111 (wait for tone) 888.839.1909 |
| Costa Rica | Toll-Free 0800.044.0102 |
| Cote d'Ivoire | 00 1.612.359.8600 |
| Croatia | Toll-Free 0800.222.460 |
| Cyprus | Toll-Free 00 800 8000 3300 |
| Czech Republic | Toll-Free 00 800 8000 3300 |
| Democratic Republic of the Congo | 00 1.612.359.8600 |
| Denmark | Toll-Free 00 800 8000 3300 |
| Djibouti | 00 1.612.359.8600 |
| Dominica | Toll-Free 1.800.988.7130 |
| Dominican Republic | Toll-Free 1.888.751.8874 |
| East Timor | 00 1.612.359.8600 |
| Ecuador | Toll-Free 1.800.010.575 |
| Egypt | Toll-Free 2510 0200 (wait for tone) 888.839.1909 (Cairo); Toll-Free 02 2510 0200 (wait for tone) 888.839.1909 |
| El Salvador | Toll-Free 800.6599 |
| Equatorial Guinea | 00 1.612.359.8600 |
| Estonia | Toll-Free 00 800 8000 3300 |
| Falkland Islands | 00 1.612.359.8600 |
| Faroe Islands | 00 1.612.359.8600 |
| Fiji | Toll-Free 004 890 1001 (wait for tone) 888.839.1909 |
| Finland | Toll-Free 00 800 8000 3300 |
| France | Toll-Free 00 800 8000 3300 |
| French Guiana | Toll-Free 0800 99 0011(wait for tone) 888.839.1909 |
| French Polynesia | 00 1.612.359.8600 |
| Gabon | 00 1.612.359.8600 |
| Gambia | 00 1.612.359.8600 |
| Georgia | 8 (wait for tone) 10 1.612.359.8600 |
| Germany | Toll-Free 00 800 8000 3300 |
| Ghana | Toll-Free 0191 (wait for tone) 888.839.1909 |
| Gibraltar | Toll-Free 8800 (wait for tone) 888.839.1909 |
| Greece | Toll-Free 00.8004.414.6186 |
| Greenland | 00 1.612.359.8600 |
| Grenada | Toll-Free 1.800.988.7159 |
| Guadeloupe | 00 1.612.359.8600 |
| Guam | Toll-Free 1.888.356.0248 |
| Guatemala | Toll-Free 138 120 (wait for tone) 888.839.1909; or Toll-Free 999 91 90 (wait for tone) 888.839.1909 |
| Guinea | 00 1.612.359.8600 |
| Guinea-Bissau | 00 1.612.359.8600 |
| Guyana | Toll-Free 159 (wait for tone) 888.839.1909 |

| Country | Phone Number |
|---------|--------------|
| Haiti | Toll-Free 183 (wait for tone) 888.839.1909 (English); or Toll-Free 181 (wait for tone) 888.839.1909 (Creole) |
| Honduras | Toll-Free 800 0123 (wait for tone) 888.839.1909 |
| Hong Kong | Toll-Free 3071.5077 |
| Hungary | Toll-Free 00 800 8000 3300 |
| Iceland | Toll-Free 00 800 8000 3300 |
| India | Toll-Free 000.800.440.1709 |
| Indonesia | Toll-Free 001.803.017.7714 |
| Ireland | Toll-Free 00 800 8000 3300 |
| Isle of Man | +1.612.359.8600 |
| Israel | Toll-Free 00 800 8000 3300 |
| Italy | Toll-Free 00 800 8000 3300 |
| Jamaica | Toll-Free 1.800.988.7135 |
| Japan | Toll-Free 0120.948.079 |
| Jersey & Guernsey | +1.612.359.8600 |
| Jordan | Toll-Free 18 800 000 (wait for tone) 888.839.1909 |
| Kazakhstan | Toll-Free 8 (wait for tone) 800 121 4321 (wait for tone) 888.839.1909 |
| Kenya | 000 1.612.359.8600 |
| Kiribati | 00 1.612.359.8600 |
| Kuwait | 00 1.612.359.8600 |
| Kyrgyzstan | 00 1.612.359.8600 |
| Laos | 00 1.612.359.8600 |
| Latvia | Toll-Free 00 800 8000 3300 |
| Lebanon | 00 1.612.359.8600 |
| Lesotho | 00 1.612.359.8600 |
| Liberia | 00 1.612.359.8600 |
| Libya | 00 1.612.359.8600 |
| Liechtenstein | 00 1.612.359.8600 |
| Lithuania | Toll-Free 00 800 8000 3300 |
| Luxembourg | Toll-Free 00 800 8000 3300 |
| Macau | Toll-Free 0800 111 (wait for tone) 888.839.1909 |
| Macedonia | Toll-Free 0 8000 4288 (wait for tone) 888.839.1909 |
| Madagascar | 00 1.612.359.8600 |
| Malawi | 00 1.612.359.8600 |
| Malaysia | Toll-Free 1.800.88.0895 |
| Maldives | 00 1.612.359.8600 |
| Mali | 00 1.612.359.8600 |
| Malta | Toll-Free 00 800 8000 3300 |
| Marshall Islands | 011 1.612.359.8600 |
| Martinique | Toll-Free 0800 99 0011 (wait for tone) 888.839.1909 |
| Mauritania | 00 1.612.359.8600 |
| Mauritius | Toll-Free 802.044.0053 |
| Mayotte | 00 1.612.359.8600 |
| Mexico | Toll-Free 01.800.681.1853 |
| Micronesia | Toll-Free 288 (wait for tone) 888.839.1909 |
| Moldova | 00 1.612.359.8600 |
| Monaco | Toll-Free 800.93412 |
| Mongolia | 001 1.612.359.8600 |
| Montenegro | 00 1.612.359.8600 |

| Country | Phone Number |
|---------|--------------|
| Montserrat | Toll-Free 1.888.839.1909 |
| Morocco | Toll-Free 002 11 0011 (wait for tone) 888.839.1909 |
| Mozambique | 00 1.612.359.8600 |
| Namibia | 00 1.612.359.8600 |
| Nauru | 00 1.612.359.8600 |
| Netherlands | Toll-Free 00 800 8000 3300 |
| Netherlands Antilles | Toll-Free 1.888.839.1909 |
| New Caledonia | 00 1.612.359.8600 |
| New Zealand | Toll-Free 0800.447.916 |
| Nicaragua | Toll-Free 1 800 0164 (wait for tone) 888.839.1909 |
| Niger | 00 1.612.359.8600 |
| Nigeria | 009 1.612.359.8600 |
| Niue | 00 1.612.359.8600 |
| Northern Mariana Islands | 1.612.359.8600 |
| Norway | Toll-Free 00 800 8000 3300 |
| Oman | 00 1.612.359.8600 |
| Pakistan | Toll-Free 00800.900.44023 |
| Palau | 011 1.612.359.8600 |
| Palestinian Territories | 00 1.612.359.8600 |
| Panama | Toll-Free 00.1.800.203.1978 |
| Papua New Guinea | 05 1.612.359.8600 |
| Paraguay | 002 1.612.359.8600 |
| Peru | Toll-Free 0800.54026 |
| Philippines | Toll-Free 1.800.1.441.0425 |
| Poland | Toll-Free 00 800 8000 3300 |
| Portugal | Toll-Free 00 800 8000 3300 |
| Puerto Rico | Toll-Free 1.888.356.0248 |
| Qatar | 00 1.612.359.8600 |
| Republic of the Congo | 00 1.612.359.8600 |
| Reunion | Toll-Free 0800 99 0011 (wait for tone) 888.839.1909 |
| Romania | Toll-Free 08008.94930 |
| Russia | Toll-Free 8 10 (wait for tone) 800 8000 3300 (Moscow); or 8 (wait for tone) 10 1.612.359.8600 |
| Rwanda | 00 1.612.359.8600 |
| Saint Helena | 00 1.612.359.8600 |
| Saint Kitts and Nevis | Toll-Free 1.800.988.7156 |
| Saint Lucia | 1.612.359.8600 |
| Saint Pierre & Miquelon | Toll-Free 0800 99 0011 (wait for tone) 888.839.1909 |
| Saint Vincent and the Grenadines | Toll-Free 1.800.988.7134 |
| Samoa | 0 1.612.359.8600 |
| Sao Tome and Principe | 00 1.612.359.8600 |
| Saudi Arabia | Toll-Free 800.844.6841 |
| Senegal | Toll-Free 800 103 073 (wait for tone) 888.839.1909 |
| Serbia | 00 1.612.359.8600 |
| Seychelles | 00 1.612.359.8600 |

| Country | Phone Number |
|---|---|
| Sierra Leone | Toll-Free 1100 (wait for tone) 888.839.1909 |
| Singapore | Toll-Free 800.130.1602 |
| Slovakia | Toll-Free 00 800 8000 3300 |
| Slovenia | Toll-Free 0800.80419 |
| Solomon Islands | 00 1.612.359.8600 |
| Somalia | 00 1.612.359.8600 |
| South Africa | Toll-Free 0.800.981.216 |
| South Korea | Toll-Free 00.308.13.1762 |
| Spain | Toll-Free 00 800 8000 3300 |
| Sri Lanka | 00 1.612.359.8600 |
| Sudan | 00 1.612.359.8600 |
| Suriname | Toll-Free 156 (wait for tone) 888.839.1909 (select locations); or 00 1.612.359.8600 |
| Swaziland | 00 1.612.359.8600 |
| Sweden | Toll-Free 00 800 8000 3300 |
| Switzerland | Toll-Free 00 800 8000 3300 |
| Syria | Toll-Free 0 801 (wait for tone) 888.839.1909 |
| Taiwan | Toll-Free 0800666907 |
| Tajikistan | 8 (wait for tone) 10 1.612.359.8600 |
| Tanzania | 000 1.612.359.8600 |
| Thailand | Toll-Free 001.800.13.203.2853 |
| Togo | 00 1.612.359.8600 |
| Tokelau | 00 1.612.359.8600 |
| Tonga | 00 1.612.359.8600 |
| Trinidad and Tobago | Toll-Free 1.800.205.9433 |
| Tunisia | 00 1.612.359.8600 |

| Country | Phone Number |
|---|---|
| Turkey | Toll-Free (90)212.414.2697 |
| Turkmenistan | 8 (wait for tone) 10 1.612.359.8600 |
| Turks & Caicos | Toll-Free 0.1.888.839.1909 |
| Tuvalu | 00 1.612.359.8600 |
| U.S. Virgin Islands | Toll-Free 1.888.356.0248 |
| Uganda | 000 1.612.359.8600 |
| Ukraine | Toll-Free 8 (wait for tone) 100 11 (wait for tone) 888.839.1909 (select locations); or 8 (wait for tone) 10 1.612.359.8600 |
| United Arab Emirates | Toll-Free 8000.441.6842 |
| United Kingdom | Toll-Free 00 800 8000 3300 |
| United States | Toll-Free 1.888.356.0248 |
| Uruguay | Toll-Free 000.401.902.14 |
| Uzbekistan | Toll-Free 8 (wait for tone) 641 7440010 (wait for tone) 888.839.1909 (select locations); or 8 (wait for tone) 10 1.612.359.8600 |
| Vanuatu | 00 1.612.359.8600 |
| Venezuela | Toll-Free 0.800.100.9129 |
| Vietnam | Toll-Free 1 201 0288 (wait for tone) 888.839.1909 (select locations); or 00 1.612.359.8600 |
| Wallis and Futuna | 19 1.612.359.8600 |
| Yemen | 00 1.612.359.8600 |
| Zambia | Toll-Free 00 899 (wait for tone) 888.839.1909 |
| Zimbabwe | Toll-Free 110 989 90 (wait for tone) 888.839.1909; or Toll-Free 00-899 (wait for tone) 888-839-1909 (select locations); or 00 1.612.359.8600 |

# ATTACHMENT J

**Updated Summary Notice: New Opt-Out/Objection Deadline is September 4, 2009**

# If You Are a Book Author, Book Publisher or Other Person Who Owns a Copyright in a Book or Other Writing,

## Your rights may be affected by a class action settlement regarding Google's scanning and use of Books and other writings.

### Persons Outside the United States: This settlement may affect you because it covers U.S. copyright interests in books published outside the United States. If you hold such an interest in a book or other material in a book, this settlement will bind you unless you timely opt out.

Authors and publishers filed a class action lawsuit, claiming Google violated the copyrights of authors, publishers and other copyright holders ("Rightsholders") by scanning in-copyright Books and Inserts, and displaying excerpts, without permission. Google denies the claims. The parties have agreed to a settlement. This summary provides basic information about the settlement. "Books" and "Inserts" are described below.

#### What Does the Settlement Provide?

The settlement, if Court-approved, will authorize Google to scan in-copyright Books and Inserts in the United States, and maintain an electronic database of Books. For out-of-print Books and, if permitted by Rightsholders of in-print Books, Google will be able to sell access to individual Books and institutional subscriptions to the database, place advertisements on any page dedicated to a Book, and make other commercial uses of Books. At any time, Rightsholders can change instructions to Google regarding any of those uses. Through a Book Rights Registry ("Registry") established by the settlement, Google will pay Rightsholders 63% of all revenues from these uses.

Google also will pay $34.5 million to establish and fund the initial operations of the Registry and for notice and settlement administration costs, and at least $45 million for cash payments to Rightsholders of Books and Inserts that Google scans on or before May 5, 2009.

#### Who Is Included?

The settlement class includes all persons worldwide who own a U.S. copyright interest in any Book or Insert. **The meaning of "U.S. copyright interest" is broad. Wherever you are located, please read the full Notice to determine whether you are included in the settlement.**

There are two Sub-Classes:

- The *"Author Sub-Class"* (authors of Books and other writings, and their heirs, successors and assigns), and
- The *"Publisher Sub-Class"* (publishers of Books and periodicals, and their successors and assigns).

#### What Material Is Covered?

"Books" include in-copyright written works, such as novels, textbooks, dissertations, and other writings, that were published or distributed in hard copy format on or before **January 5, 2009**. U.S. works must be registered with the U.S. Copyright Office to be included in the settlement. "Books" do not include periodicals, personal papers, sheet music, and public domain and government works.

"Inserts" include any text and other material, such as forewords, essays, poems, quotations, letters, song lyrics, children's Book illustrations, sheet music, charts, and graphs, if independently protected by U.S. copyright, contained in a Book, a government work or a public domain book published on or before **January 5, 2009** and, if U.S. works, registered (alone or as part of another work) with the U.S. Copyright Office. Inserts do not include pictorial content (except for children's Book illustrations), or any public domain or government works.

**The Notice contains a more detailed description of these terms and other essential information about the settlement.**

#### What Should I do?

Please read the full Notice, which is available at http://www.googlebooksettlement.com. Decide whether you should:

- Remain in the settlement. If you do so, you will be bound by the Court's rulings, including a release of your claims against Google.
- Object to or comment on the settlement. You must object/comment in writing by **September 4, 2009**.
- Opt out of the settlement and keep your right to sue Google individually. You must opt out in writing by **September 4, 2009**.
- File a claim for a cash payment (if you are eligible to do so). You must file your claim by **January 5, 2010**.

The Court has appointed Class Counsel to represent the two Sub-Classes. If the settlement is approved, Class Counsel for the Author Sub-Class will request attorneys' fees and expenses that Google has agreed to pay. You can also hire your own attorney at your own cost.

The Court will determine whether to approve the settlement at a Fairness Hearing on **October 7, 2009 at 10:00 a.m.**

## Get Complete Information, Including the Full Notice:

### Visit: http://www.googlebooksettlement.com    Call: +1.612.359.8600

**Write: Google Book Search Settlement Administrator, c/o Rust Consulting
P.O. Box 9364, Minneapolis, MN 55440-9364 United States of America**

4870522-1

# ATTACHMENT K

# ATTACHMENT K - PAID MEDIA SCHEDULE
## U.S. MEDIA OVERVIEW

### CONSUMER MAGAZINES

| PUBLICATION | CIRCULATION | ISSUE FREQUENCY | UNIT SIZE | PLAN FREQUENCY |
|---|---|---|---|---|
| ATLANTIC MONTHLY | 431,625 | 10X/YR | FULL PG | 1 |
| HARPER'S | 214,840 | MONTHLY | FULL PG | 1 |
| NEW YORK MAGAZINE | 429,116 | WEEKLY | FULL PG | 1 |
| NEW YORKER | 1,062,018 | WEEKLY | FULL PG | 1 |
| NEWSWEEK | 2,600,000 | WEEKLY | FULL PG | 1 |
| PEOPLE | 3,450,000 | WEEKLY | FULL PG | 1 |
| THE ECONOMIST | 672,000 | WEEKLY | FULL PG | 1 |
| TIME | 3,250,000 | WEEKLY | FULL PG | 1 |
| TOTAL | 12,109,599 | | | 8 |

### SUNDAY SUPPLEMENTS

| PUBLICATION | CIRCULATION | FREQUENCY | UNIT SIZE | PLAN FREQUENCY |
|---|---|---|---|---|
| PARADE | 32,400,000 | WEEKLY | 2/5 PG | 1 |
| USA WEEKEND | 23,000,000 | WEEKLY | 2/5 PG | 1 |
| TOTAL | 55,400,000 | | | 2 |

### NATIONAL NEWSPAPERS

| PUBLICATION | CIRCULATION | FREQUENCY | UNIT SIZE | PLAN FREQUENCY |
|---|---|---|---|---|
| WALL STREET JOURNAL | 2,011,882 | MON-FRI | 1/4 PAGE | 1 |
| WASHINGTON POST | 945,393 | SUNDAY | 1/4 PAGE | 1 |
| NEW YORK TIMES | 1,500,394 | SUNDAY | 1/4 PAGE | 1 |
| LOCAL NEWSPAPERS - US TERRITORIES | 555,295 | DAILY | 1/4 PAGE | 1 |
| TOTAL | 5,012,964 | | | 4 |

### INDUSTRY PUBLICATIONS

| PUBLICATION | CIRCULATION | FREQUENCY | UNIT SIZE | PLAN FREQUENCY |
|---|---|---|---|---|
| PUBLISHER'S WEEKLY | 21,737 | WEEKLY | FULL PG | 2 |
| THE NEW YORK REVIEW OF BOOKS | 134,329 | 20X/YEAR | JR PAGE | 2 |
| VARIETY | 28,243 | DAILY | FULL PG | 1 |
| POETS & WRITERS | 56,000 | BI-MONTHLY | FULL PG | 1 |
| THE WRITER | 30,181 | MONTHLY | FULL PG | 1 |
| WRITER'S JOURNAL | 24,100 | BI-MONTHLY | FULL PG | 1 |
| WRITER'S DIGEST | 110,000 | BI-MONTHLY | FULL PG | 1 |
| TOTAL | 404,590 | | | 9 |

### INDUSTRY WEBSITES

| WEBSITE | IMPRESSIONS | FREQUENCY | UNIT SIZE | PLAN FREQUENCY |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| *PUBLISHERSWEEKLY.COM* | 219,859 | 24/7 | BANNER | 1 |
| *WRITERSDIGEST.COM* | 625,000 | 24/7 | BANNER | 1 |
| *LITERARYMARKETPLACE.COM* | VARIES | 24/7 | BANNER | 1 |

## INTERNALTIONAL PRINT MEDIA OVERVIEW

### NATIONAL AND REGIONAL PUBLICATIONS

| PUBLICATION | CIRCULATION | TOTAL # OF PUBS | UNIT DIMENSIONS | TOTAL # OF ADS RUNNING |
|---|---|---|---|---|
| TIER 1 | | | 7" x 9.75" | |
| *UNITED STATES (SEE SEPARATE PLAN)* | 72,927,515 | 21 | 7.25" x 10" | 23 |
| TIER 2 | | | 7" x 9.75" | |
| *47 COUNTRIES* | 106,630,384 | 332 | 7.25" x 10" | 384 |
| TIER 3 | | | 7" x 10" | |
| *34 COUNTRIES* | 8,815,102 | 144 | 6.6875" x 8.8125" | 170 |
| TIER 4 | | | 7" x 10" | |
| *60 COUNTRIES* | 3,331,391 | 159 | 7.125" x 9.75" | 201 |
| TIER 5 | | | | |
| *71 COUNTRIES* | 2,640,626 | 141 | 7" x10" | 141 |
| *TOTAL* | *121,417,503* | | | *896* |

| EXHIBIT: MEDIA DISTRIBUTION BY TIERS | | | | | |
|---|---|---|---|---|---|
| **Tier 1 Territories Media** | | | | | |
| **Country** | **Language** | **Title** | **Distribution** | **Circulation** | **No of Insertions** |
| U.S. | Arabic | Newsweek Bil Logha Al-Arabia | National | 1,800 | 1 |
| U.S. | Spanish | Newsweek en Espanol | National | 9,670 | 1 |
| | | | | | |
| Guam | English | Pacific Daily News | National | 22,451 | 1 |
| | | | | | |
| Puerto Rico | Spanish | El Nuevo Dia | National | 241,129 | 2 |
| Puerto Rico | English | San Juan Star | National | 105,597 | |
| | | | | | |
| U.S. Virgin Islands | English | Virgin Island Daily News | National | 16,362 | 1 |
| | | | | | |
| Northern Mariana Islands | English | Marianas Variety | National | 5,000 | 1 |
| | | | | | |
| Samoa | English | Samoa Observer | National | 5,000 | 1 |
| **Tier 2 Media** | | | | | |
| **Country** | **Language** | **Title** | **Distribution** | **Circulation** | **No of Insertions** |
| Argentina | Spanish | La Nacion | National | 170,000 | 2 |
| Argentina | Spanish | Clarin | National | 670,000 | 2 |
| Argentina | English | Economist | National | 1,724 | 1 |
| Argentina | Spanish | Wall Street Journal | Regional | 140,940 | 1 |
| | | | | | |
| Australia | English | Daily Telegraph and Sunday Telegraph | National | 731,336 | 2 |
| Australia | English | Sydney Morning Herald | Regional | 360,000 | 1 |
| Australia | English | Melbourne Age | Regional | 299,800 | 1 |
| Australia | English | Time | National | 72,000 | 1 |
| Australia | English | Economist | National | 18,920 | 1 |
| Australia | English | International Herald Tribune | National | 87 | 1 |
| Australia | English | Wall Street Journal | Regional | 230 | 1 |
| Australia | English | Newsweek | National | 774 | 1 |
| | | | | | |
| Austria | German | Kurier | National | 171,434 | 1 |
| Austria | German | Neue Kronen Zeitung | National | 944,600 | 2 |
| Austria | English | Time | National | 5,770 | 1 |
| Austria | English | Economist | National | 6,839 | 1 |
| Austria | English | International Herald Tribune | National | 3,657 | 1 |
| Austria | English | Wall Street Journal | Regional | 3,526 | 1 |
| Austria | English | Newsweek | National | 2,006 | 1 |
| | | | | | |
| Belgium | Dutch | Het Nieuwsblad | National | 277,477 | 1 |
| Belgium | French | Le Soir | National | 119,454 | 1 |
| Belgium | Dutch | Het Laatste Nieuwsblad | National | 287,857 | 1 |
| Belgium | English | Time | National | 11,320 | 1 |
| Belgium | English | Economist | National | 13,527 | 1 |
| Belgium | English | International Herald Tribune | National | 3,571 | 1 |
| Belgium | English | Wall Street Journal | Regional | 5,006 | 1 |

| Belgium | English | Newsweek | National | 8,760 | 1 |
|---|---|---|---|---|---|
| | | | | | |
| Brazil | Portuguese | O Globo | Regional | 367,000 | 1 |
| Brazil | Portuguese | Folha de Sao Paolo | Regional | 380,450 | 1 |
| Brazil | Portuguese | Veja (Nationwide) | National | 1,064,172 | 1 |
| Brazil | English | Economist | National | 5,293 | 1 |
| Brazil | Portuguese | Wall Street Journal | Regional | 54,583 | 1 |
| Brazil | English | Newsweek | National | 29,532 | 1 |
| | | | | | |
| Canada | English | Globe and Mail | National | 419,343 | 1 |
| Canada | English | National Post | National | 394,507 | 1 |
| Canada | English | Toronto Star | Regional | 657,722 | 1 |
| Canada | French | Journal de Montreal | Regional | 320,658 | 1 |
| Canada | English | Time | National | 210,000 | 1 |
| | | | | | |
| Chile | Spanish | El Mercurio | National | 340,000 | 2 |
| Chile | Spanish | La Tercera | National | 203,000 | 1 |
| Chile | English | Economist | National | 1,477 | 1 |
| Chile | Spanish | Wall Street Journal | Regional | 143,301 | 1 |
| Chile | English | Newsweek | National | 163 | 1 |
| | | | | | |
| China, People's Republic of | Chinese (Simplified) | Renmin Ribao (People's Daily) | National | 3,000,000 | 3 |
| China, People's Republic of | Chinese (Simplified) | Xinmin Evening News | Regional | 1,700,000 | 1 |
| China, People's Republic of | Chinese (Simplified) | Guangzhou Daily | Regional | 800,000 | 1 |
| China, People's Republic of | English | Economist | National | 4,280 | 1 |
| China, People's Republic of | English | International Herald Tribune | National | 4,198 | 1 |
| China, People's Republic of | English | Wall Street Journal | Regional | 5,133 | 1 |
| China, People's Republic of | English | Newsweek | National | 5,892 | 1 |
| China, People's Republic of | Chinese (Simplified) | Newsweek Select | National | 120,000 | 1 |
| | | | | | |
| Colombia | Spanish | El Tiempo | National | 447,000 | 2 |
| Colombia | Spanish | El Espectador | National | 200,000 | 1 |
| Colombia | English | Economist | National | 500 | 1 |
| Colombia | Spanish | Wall Street Journal | Regional | 227,000 | 1 |
| Colombia | English | Newsweek | National | 1,355 | 1 |
| | | | | | |
| Czech Republic | Czech | Mlada Fronta Dnes | National | 390,000 | 2 |
| Czech Republic | Czech | Lidove Noviny | National | 115,000 | 1 |
| Czech Republic | Czech | Metropolitni Expres | National | 201,000 | 1 |
| Czech Republic | English | Economist | National | 1,784 | 1 |
| Czech Republic | English | International Herald Tribune | National | 2,834 | 1 |
| Czech Republic | English | Wall Street Journal | Regional | 237 | 1 |
| Czech Republic | English | Newsweek | National | 1,339 | 1 |
| | | | | | |
| Denmark | Danish | Politiken | National | 205,000 | 2 |
| Denmark | Danish | Jyllands Posten | National | 207,146 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| Denmark | English | Time | National | 6,491 | 1 |
| Denmark | English | Economist | National | 4,733 | 1 |
| Denmark | English | International Herald Tribune | National | 3,258 | 1 |
| Denmark | English | Wall Street Journal | Regional | 566 | 1 |
| Denmark | English | Newsweek | National | 6,980 | 1 |
| | | | | | |
| Egypt | Arabic | Al Ahram | National | 1,551,400 | 2 |
| Egypt | Arabic | Al Akhbar El Yom | National | 1,157,000 | 2 |
| Egypt | English | Economist | National | 1,062 | 1 |
| Egypt | English | International Herald Tribune | National | 2,084 | 1 |
| Egypt | English | Newsweek | National | 1,599 | 1 |
| Egypt | Arabic | Newsweek Bil Logha Al-Arabia | National | 4,500 | 1 |
| | | | | | |
| Finland | Finnish | Helsingin Sanomat | National | 500,269 | 2 |
| Finland | Finnish | Ilta-Sanomat | National | 201,281 | 1 |
| Finland | English | Time | National | 7,095 | 1 |
| Finland | English | Economist | National | 3,279 | 1 |
| Finland | English | International Herald Tribune | National | 1,472 | 1 |
| Finland | English | Wall Street Journal | Regional | 145 | 1 |
| Finland | English | Newsweek | National | 2,236 | 1 |
| | | | | | |
| France | French | Le Monde | National | 389,249 | 2 |
| France | French | Le Figaro | National | 343,690 | 2 |
| France | French | Group Ouest & Sud Ouest Newspapers (11) | Regional | 1,413,683 | 1 |
| France | English | Time | National | 69,343 | 1 |
| France | English | Economist | National | 43,244 | 1 |
| France | English | International Herald Tribune | National | 29,877 | 1 |
| France | English | Wall Street Journal | Regional | 10,281 | 1 |
| France | English | Newsweek | National | 29,621 | 1 |
| | | | | | |
| Germany | German | Frankfurter Allgemeine Zeitung | Regional | 527,252 | 1 |
| Germany | German | Suddeutsche Zeitung | Regional | 437,124 | 1 |
| Germany | German | Bild | National | 4,499,135 | 1 |
| Germany | German | Kultur Spiegel | National | 918,942 | 1 |
| Germany | German | Stern | National | 1,221,500 | 1 |
| Germany | German | Stern | Regional | 214,966 | 1 |
| Germany | English | Time | National | 95,577 | 1 |
| Germany | English | Economist | National | 43,584 | 1 |
| Germany | English | International Herald Tribune | National | 21,129 | 1 |
| Germany | English | Wall Street Journal | Regional | 16,579 | 1 |
| Germany | English | Newsweek | National | 39,421 | 1 |
| | | | | | |
| Greece | Greek | To Vima | National | 102,342 | 2 |
| Greece | Greek | Ta Nea | National | 98,000 | 1 |
| Greece | Greek | Eleftherotipia | National | 170,000 | 1 |
| Greece | English | Time | National | 7,270 | 1 |
| Greece | English | Economist | National | 3,742 | 1 |
| Greece | English | International Herald Tribune | National | 4,036 | 1 |
| Greece | English | Wall Street Journal | Regional | 353 | 1 |
| Greece | English | Newsweek | National | 1,754 | 1 |
| | | | | | |

| Hong Kong | Chinese (Traditional) | Apple Morning Daily | National | 340,000 | 2 |
|---|---|---|---|---|---|
| Hong Kong | English | South China Morning Post | National | 116,661 | 1 |
| Hong Kong | English | Time | National | 50,500 | 1 |
| Hong Kong | English | Economist | National | 18,148 | 1 |
| Hong Kong | English | International Herald Tribune | National | 9,861 | 1 |
| Hong Kong | English | Wall Street Journal | Regional | 13,488 | 1 |
| Hong Kong | English | Newsweek | National | 27,923 | 1 |
| | | | | | |
| Hungary | Hungarian | Népszabadság | National | 198,000 | 2 |
| Hungary | Hungarian | Metro | National | 380,000 | 2 |
| Hungary | English | Economist | National | 2,176 | 1 |
| Hungary | English | International Herald Tribune | National | 527 | 1 |
| Hungary | English | Wall Street Journal | Regional | 220 | 1 |
| Hungary | English | Newsweek | National | 1,287 | 1 |
| | | | | | |
| India | English | Times Of India | National | 3,200,000 | 2 |
| India | Hindi | Dainik Jagran | National | 733,512 | 1 |
| India | Urdu | Munsif Daily | Regional | 45,000 | 1 |
| India | Bengali | Ananda Bazaar Patrika | Regional | 1,303,000 | 1 |
| India | Tamil | Dinamalar | Regional | 74,000 | 1 |
| India | Marathi | Lokmat Group newspapers | Regional | 910,250 | 1 |
| India | Punjabi | Ajit | Regional | 266,000 | 1 |
| India | Gujarati | Gujarat Samachar | Regional | 972,000 | 1 |
| India | Telagu | Eeanadu | National | 1,100,000 | 1 |
| India | Malayalam | Kerala Kaumudi | Regional | 48,000 | 1 |
| India | Kannada | Vijay karnataka | Regional | 505,000 | 1 |
| India | English | Economist | National | 18,153 | 1 |
| India | English | International Herald Tribune | National | 2,775 | 1 |
| India | English | Wall Street Journal | Regional | 544 | 1 |
| India | English | Newsweek | National | 13,718 | 1 |
| | | | | | |
| Indonesia | Indonesian | Kompas | National | 518,658 | 3 |
| Indonesia | English | Jakarta Post | National | 35,000 | 1 |
| Indonesia | English | Time | National | 4,000 | 1 |
| Indonesia | English | Economist | National | 4,096 | 1 |
| Indonesia | English | International Herald Tribune | National | 3,310 | 1 |
| Indonesia | English | Wall Street Journal | Regional | 5,175 | 1 |
| Indonesia | English | Newsweek | National | 7,206 | 1 |
| | | | | | |
| Ireland | English | Irish Times | National | 117,797 | 1 |
| Ireland | English | Sunday Independent | National | 291,036 | 2 |
| Ireland | English | Economist | National | 9,393 | 1 |
| Ireland | English | Wall Street Journal | Regional | 698 | 1 |
| | | | | | |
| Israel | Hebrew | Ha'aretz (English and Hebrew Editions) | National | 95,000 | 1 |
| Israel | Hebrew | Yedioth Ahronoth | National | 600,000 | 2 |
| Israel | English | Jerusalem Post | National | 145,000 | 1 |
| Israel | English | Economist | National | 2,226 | 1 |
| Israel | English | International Herald Tribune | National | 8,755 | 1 |
| Israel | English | Newsweek | National | 2,399 | 1 |
| Israel | English | Time | National | 8,417 | 1 |
| | | | | | |

| Italy | Italian | La Repubblica | National | 621,148 | 2 |
|-------|---------|---------------|----------|---------|---|
| Italy | Italian | Correire Della Sera | National | 677,543 | 2 |
| Italy | Italian | Quotidiano Nazionale | National | 600,000 | 1 |
| Italy | English | Time | National | 25,405 | 1 |
| Italy | English | Economist | National | 17,384 | 1 |
| Italy | English | International Herald Tribune | National | 14,283 | 1 |
| Italy | English | Wall Street Journal | Regional | 6,397 | 1 |
| Italy | English | Newsweek | National | 6,033 | 1 |
| | | | | | |
| Japan | Japanese | Asahi Shimbun | National | 8,225,032 | 1 |
| Japan | Japanese | Yomiuri Shimbun | National | 10,032,441 | 2 |
| Japan | English | Time | National | 35,000 | 1 |
| Japan | English | Economist | National | 9,950 | 1 |
| Japan | English | International Herald Tribune | National | 25,057 | 1 |
| Japan | English | Wall Street Journal | Regional | 7,854 | 1 |
| Japan | English | Newsweek | National | 17,067 | 1 |
| Japan | Japanese | Newsweek Nihon Ban | National | 87,000 | 1 |
| | | | | | |
| Malaysia | Malay | Mingguan Malaysia | National | 462,927 | 2 |
| Malaysia | Malay | Benta Minggu | National | 305,256 | 1 |
| Malaysia | English | The Star | National | 310,950 | 1 |
| Malaysia | English | Time | National | 20,000 | 1 |
| Malaysia | English | Economist | National | 7,939 | 1 |
| Malaysia | English | International Herald Tribune | National | 2,398 | 1 |
| Malaysia | English | Wall Street Journal | Regional | 6,067 | 1 |
| Malaysia | English | Newsweek | National | 23,973 | 1 |
| | | | | | |
| Mexico | Spanish | Prensa | National | 270,000 | 1 |
| Mexico | Spanish | Reforma | Regional | 128,576 | 1 |
| Mexico | Spanish | Esto | National | 560,000 | 1 |
| Mexico | Spanish | El Universal | Regional | 139,450 | 1 |
| Mexico | English | Economist | National | 2,670 | 1 |
| Mexico | Spanish | Wall Street Journal | Regional | 303,230 | 1 |
| Mexico | English | Newsweek | National | 27,006 | 1 |
| Mexico | Spanish | Newsweek en Espanol | National | 49,000 | 1 |
| | | | | | |
| Netherlands | Dutch | Algameen Dagblad | National | 542,000 | 1 |
| Netherlands | Dutch | De Telegraaf | National | 866,743 | 2 |
| Netherlands | English | Time | National | 11,479 | 1 |
| Netherlands | English | Economist | National | 14,464 | 1 |
| Netherlands | English | International Herald Tribune | National | 7,209 | 1 |
| Netherlands | English | Wall Street Journal | Regional | 6,730 | 1 |
| Netherlands | English | Newsweek | National | 2,936 | 1 |
| | | | | | |
| New Zealand | English | New Zealand Herald | National | 78,000 | 2 |
| New Zealand | English | Time | National | 24,000 | 1 |
| New Zealand | English | Economist | National | 4,548 | 1 |
| New Zealand | English | Newsweek | National | 527 | 1 |
| | | | | | |
| Norway | Bokmal Norweqian | Aftenposten | National | 279,500 | 3 |
| Norway | English | Time | National | 11,365 | 1 |
| Norway | English | Economist | National | 6,388 | 1 |
| Norway | English | International Herald Tribune | National | 1,208 | 1 |

| Norway | English | Wall Street Journal | Regional | 475 | 1 |
|---|---|---|---|---|---|
| Norway | English | Newsweek | National | 2,580 | 1 |
| | | | | | |
| Philippines | English | Manilla Bulletin | National | 275,000 | 2 |
| Philippines | English | Daily Inquirer | National | 200,000 | 1 |
| Philippines | Tagaloq | Pilipino Star | National | 378,000 | 1 |
| Philippines | English | Time | National | 27,000 | 1 |
| Philippines | English | Economist | National | 3,627 | 1 |
| Philippines | English | International Herald Tribune | National | 2,938 | 1 |
| Philippines | English | Wall Street Journal | Regional | 9,990 | 1 |
| Philippines | English | Newsweek | National | 25,529 | 1 |
| | | | | | |
| Poland | Polish | Gazeta Wyborcza | National | 817,400 | 3 |
| Poland | Polish | Rzeczpospolita | National | 251,000 | 1 |
| Poland | English | Economist | National | 2,805 | 1 |
| Poland | English | International Herald Tribune | National | 328 | 1 |
| Poland | English | Wall Street Journal | Regional | 539 | 1 |
| Poland | English | Newsweek | National | 2,157 | 1 |
| Poland | Polish | Newsweek Polska | National | 135,000 | 1 |
| | | | | | |
| Portugal | Portuguese | Diario de Noticias | Regional | 98,000 | 1 |
| Portugal | Portuguese | Expresso | National | 138,527 | 2 |
| Portugal | Portuguese | Jornal De Noticias | Regional | 75,000 | 1 |
| Portugal | English | Time | National | 8,968 | 1 |
| Portugal | English | Economist | National | 3,711 | 1 |
| Portugal | English | International Herald Tribune | National | 815 | 1 |
| Portugal | English | Wall Street Journal | Regional | 276 | 1 |
| Portugal | English | Newsweek | National | 1,190 | 1 |
| | | | | | |
| Romania | Romanian | Romania Libera | National | 57,594 | 1 |
| Romania | Romanian | Libertatea | National | 270,428 | 2 |
| Romania | Romanian | Jurnalul | Regional | 98,905 | 1 |
| Romania | English | Economist | National | 1,191 | 1 |
| Romania | English | International Herald Tribune | National | 93 | 1 |
| | | | | | |
| Russia | Russian | Kommersant | National | 135,000 | 1 |
| Russia | Russian | Argumenti y Facty | National | 3,560,000 | 2 |
| Russia | Russian | Komsomolskaya Pravda | National | 2,300,000 | 1 |
| Russia | Russian | Trud | National | 612,850 | 1 |
| Russia | English | Economist | National | 2,881 | 1 |
| Russia | English | Wall Street Journal | Regional | 171 | 1 |
| Russia | Russian | Newsweek Russky | National | 60,000 | 1 |
| | | | | | |
| Saudi Arabia | Arabic | Al Sharq Al Awsat | National | 200,000 | 1 |
| Saudi Arabia | Arabic | Okaz | National | 85,000 | 1 |
| Saudi Arabia | Arabic | Al Hayat | National | 270,000 | 2 |
| Saudi Arabia | English | Economist | National | 1,115 | 1 |
| Saudi Arabia | English | International Herald Tribune | National | 116 | 1 |
| Saudi Arabia | English | Newsweek | National | 1,294 | 1 |
| Saudi Arabia | Arabic | Newsweek Bil Logha Al-Arabia | National | 6,500 | 1 |
| | | | | | |
| Singapore | Chinese (Simplified) | Lianhe Zaobao | National | 191,300 | 2 |

| | | | | | |
|---|---|---|---|---|---|
| Singapore | English | Sunday Straits Times | National | 399,000 | 1 |
| Singapore | English | Time | National | 37,500 | 1 |
| Singapore | English | Economist | National | 15,503 | 1 |
| Singapore | English | International Herald Tribune | National | 10,351 | 1 |
| Singapore | English | Wall Street Journal | Regional | 11,933 | 1 |
| Singapore | English | Newsweek | National | 31,837 | 1 |
| | | | | | |
| South Africa | English | Sunday Times | National | 503,852 | 2 |
| South Africa | English | Cape Argus | Regional | 313,022 | 1 |
| South Africa | Afrikaans | Rapport | National | 71,081 | 1 |
| South Africa | English | Time | National | 55,187 | 1 |
| South Africa | English | Economist | National | 8,238 | 1 |
| South Africa | English | Newsweek | National | 3,917 | 1 |
| | | | | | |
| South Korea | Korean | Chosun Ilbo | National | 2,668,700 | 1 |
| South Korea | Korean | Joonang Ilbo | National | 2,225,000 | 1 |
| South Korea | Korean | Donga Ilbo | National | 2,310,000 | 1 |
| South Korea | English | Time | National | 31,000 | 1 |
| South Korea | English | Economist | National | 7,260 | 1 |
| South Korea | English | International Herald Tribune | National | 19,729 | 1 |
| South Korea | English | Wall Street Journal | Regional | 7,806 | 1 |
| South Korea | English | Newsweek | National | 7,413 | 1 |
| South Korea | Korean | Newsweek Hankuk Pan | National | 96,000 | 1 |
| | | | | | |
| Spain | Spanish | El Pais | National | 436,444 | 2 |
| Spain | Spanish | El Mundo | National | 336,256 | 1 |
| Spain | Spanish | La Vanguardia | Regional | 212,202 | 1 |
| Spain | Spanish | ABC | National | 302,213 | 1 |
| Spain | English | Time | National | 14,119 | 1 |
| Spain | English | Economist | National | 13,257 | 1 |
| Spain | English | International Herald Tribune | National | 6,229 | 1 |
| Spain | English | Wall Street Journal | Regional | 4,118 | 1 |
| Spain | English | Newsweek | National | 3,058 | 1 |
| | | | | | |
| Sweden | Swedish | Dagens Nyheter | National | 370,500 | 2 |
| Sweden | Swedish | Sydsvenska Dagbladet | Regional | 208,000 | 1 |
| Sweden | English | Time | National | 16,671 | 1 |
| Sweden | English | Economist | National | 9,285 | 1 |
| Sweden | English | International Herald Tribune | National | 2,305 | 1 |
| Sweden | English | Wall Street Journal | Regional | 652 | 1 |
| Sweden | English | Newsweek | National | 2,911 | 1 |
| | | | | | |
| Switzerland | German | Tages Anzeiger | Regional | 235,569 | 1 |
| Switzerland | French | Tribune de Geneve | Regional | 76,085 | 1 |
| Switzerland | Italian | Correire del Ticino | Regional | 39,298 | 1 |
| Switzerland | English | Time | National | 9,470 | 1 |
| Switzerland | English | Economist | National | 16,748 | 1 |
| Switzerland | English | International Herald Tribune | National | 10,278 | 1 |
| Switzerland | English | Wall Street Journal | Regional | 4,357 | 1 |
| Switzerland | English | Newsweek | National | 3,740 | 1 |
| | | | | | |
| Taiwan | Chinese (Traditional) | China Times | National | 1,950,000 | 2 |
| Taiwan | Chinese | United Daily Nation | National | 1,305,000 | 2 |

| Country | Language | Title | Distribution | Circulation | No of Insertions |
|---------|----------|-------|--------------|-------------|------------------|
| | (Traditional) | | | | |
| Taiwan | English | Time | National | 13,000 | 1 |
| Taiwan | English | Economist | National | 4,249 | 1 |
| Taiwan | English | International Herald Tribune | National | 3,015 | 1 |
| Taiwan | English | Wall Street Journal | Regional | 4,271 | 1 |
| Taiwan | English | Newsweek | National | 9,049 | 1 |
| | | | | | |
| Thailand | Thai | Thai Rath | National | 1,000,000 | 2 |
| Thailand | Thai | Khao Sod | National | 800,000 | 1 |
| Thailand | English | Bangkok Post | National | 250,000 | 1 |
| Thailand | English | Time | National | 14,000 | 1 |
| Thailand | English | Economist | National | 6,528 | 1 |
| Thailand | English | International Herald Tribune | National | 6,675 | 1 |
| Thailand | English | Wall Street Journal | Regional | 7,015 | 1 |
| Thailand | English | Newsweek | National | 16,271 | 1 |
| | | | | | |
| Turkey | Turkish | Hurriyet | National | 550,000 | 1 |
| Turkey | Turkish | Milliyet | National | 250,000 | 1 |
| Turkey | Turkish | Sabah | National | 1,000,000 | 2 |
| Turkey | English | Economist | National | 3,427 | 1 |
| Turkey | English | International Herald Tribune | National | 1,376 | 1 |
| Turkey | English | Wall Street Journal | Regional | 702 | 1 |
| Turkey | English | Newsweek | National | 2,026 | 1 |
| | | | | | |
| Ukraine | Ukrainian | Fakty I Komentarii | National | 1,100,000 | 3 |
| Ukraine | English | Economist | National | 455 | 1 |
| | | | | | |
| United Kingdom | English | Sunday Times (London Times) | National | 1,231,153 | 2 |
| United Kingdom | English | Daily Telegraph | National | 904,955 | 1 |
| United Kingdom | English | Daily Mail | National | 2,310,806 | 1 |
| United Kingdom | English | News of the World | National | 3,124,622 | 1 |
| United Kingdom | English | Sunday Mail (Scotland) | National | 468,444 | 1 |
| United Kingdom | English | Economist | National | 182,539 | 1 |
| United Kingdom | English | International Herald Tribune | National | 10,721 | 1 |
| United Kingdom | English | Wall Street Journal | Regional | 17,028 | 1 |
| United Kingdom | English | Newsweek | National | 51,376 | 1 |
| | | | | | |
| Venezuela | Spanish | El Nacional | National | 240,000 | 3 |
| Venezuela | Spanish | El Universal | National | 220,000 | 1 |
| Venezuela | English | Economist | National | 79 | 1 |
| Venezuela | Spanish | Wall Street Journal | Regional | 90,000 | 1 |
| Venezuela | English | Newsweek | National | 351 | 1 |
| **Tier 3 Media** | | | | | |
| **Country** | **Language** | **Title** | **Distribution** | **Circulation** | **No of Insertions** |
| Algeria | Arabic | Al Khabar | National | 400,000 | 3 |
| Algeria | English | Economist | National | 8 | 1 |
| Algeria | Arabic | Newsweek Bil Logha Al-Arabia | National | 750 | 1 |
| | | | | | |
| Belarus | Belarusian | Vecherni Minsk | National | 65,000 | 2 |
| Belarus | Russian | Argumenty i Fakty | National | 95,000 | 1 |
| Belarus | English | Economist | National | 15 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| Bulgaria | Bulgarian | Trud | National | 230,000 | 1 |
| Bulgaria | Bulgarian | 24 Chasa | National | 170,000 | 1 |
| Bulgaria | English | Economist | National | 510 | 1 |
| | | | | | |
| Cameroon | French | Le Mesager | National | 12,000 | 1 |
| Cameroon | English | Cameroon Tribune | National | 45,000 | 2 |
| Cameroon | English | Economist | National | 13 | 1 |
| | | | | | |
| Costa Rica | Spanish | La Nacion | National | 142,366 | 2 |
| Costa Rica | Spanish | Al Dia | National | 35,000 | 1 |
| Costa Rica | English | Economist | National | 522 | 1 |
| Costa Rica | Spanish | Wall Street Journal | Regional | 14,000 | 1 |
| Costa Rica | English | Newsweek | National | 270 | 1 |
| | | | | | |
| Croatia | Croatian | Jutarnji List | National | 110,000 | 1 |
| Croatia | Croatian | Vecernji List | National | 120,000 | 1 |
| Croatia | Croatian | 24 Sata | National | 150,000 | 1 |
| Croatia | English | Economist | National | 846 | 1 |
| Croatia | English | International Herald Tribune | National | 168 | 1 |
| | | | | | |
| Dominican Republic | Spanish | Listin Diario | National | 88,000 | 3 |
| Dominican Republic | English | Economist | National | 16 | 1 |
| Dominican Republic | Spanish | Wall Street Journal | Regional | 90,000 | 1 |
| Dominican Republic | English | Newsweek | National | 26 | 1 |
| | | | | | |
| Ecuador | Spanish | El Universo | National | 250,000 | 3 |
| Ecuador | English | Economist | National | 113 | 1 |
| Ecuador | Spanish | Wall Street Journal | Regional | 93,600 | 1 |
| Ecuador | English | Newsweek | National | 135 | 1 |
| | | | | | |
| El Salvador | Spanish | Prensa Grafica | National | 125,000 | 3 |
| El Salvador | English | Economist | National | 22 | 1 |
| El Salvador | Spanish | Wall Street Journal | Regional | 110,000 | 1 |
| El Salvador | English | Newsweek | National | 25 | 1 |
| | | | | | |
| Estonia | Estonian | Eesti Päevaleht | National | 35,000 | 1 |
| Estonia | Estonian | SL Õhtuleht | National | 65,200 | 1 |
| Estonia | Estonian | Postimees (Estonian edition) | National | 35,000 | 1 |
| Estonia | English | Economist | National | 495 | 1 |
| Estonia | English | International Herald Tribune | National | 172 | 1 |
| | | | | | |
| Guatemala | Spanish | La Prensa Libre | National | 85,000 | 3 |
| Guatemala | English | Economist | National | 70 | 1 |
| Guatemala | Spanish | Wall Street Journal | Regional | 27,000 | 1 |
| Guatemala | English | Newsweek | National | 67 | 1 |
| | | | | | |
| Kazakhstan | Russian | Kazakhstanskaya Pravda | National | 105,000 | 1 |
| Kazakhstan | Kazakh | Karavan | National | 225,000 | 1 |
| Kazakhstan | English | Economist | National | 224 | 1 |

| Kenya | English | Daily Nation | National | 225,000 | 2 |
|-------|---------|--------------|----------|---------|---|
| Kenya | English | Economist | National | 1,704 | 1 |
| Kenya | English | Newsweek | National | 1,781 | 1 |
| | | | | | |
| Kuwait | Arabic | Al Watan | National | 91,726 | 2 |
| Kuwait | Arabic | Al-Rai Al-Aam | National | 80,000 | 1 |
| Kuwait | English | Economist | National | 302 | 1 |
| Kuwait | English | International Herald Tribune | National | 1,758 | 1 |
| Kuwait | Arabic | Newsweek Bil Logha Al-Arabia | National | 15,000 | 1 |
| | | | | | |
| Latvia | Latvian | Latvijas Avize | National | 59,500 | 2 |
| Latvia | Russian | Neatkariga Rita Avize | National | 12,000 | 1 |
| Latvia | English | Economist | National | 486 | 1 |
| | | | | | |
| Lebanon | Arabic | An Nahar | National | 62,000 | 1 |
| Lebanon | French | L'Orient Le Jour | National | 23,000 | 1 |
| Lebanon | English | Economist | National | 650 | 1 |
| Lebanon | English | International Herald Tribune | National | 52 | 1 |
| Lebanon | Arabic | Newsweek Bil Logha Al-Arabia | National | 1,500 | 1 |
| | | | | | |
| Libya | Arabic | Al-Shams | National | 40,000 | 1 |
| Libya | Arabic | Al Fajer Jadeed | National | 40,000 | 1 |
| Libya | English | Economist | National | 127 | 1 |
| Libya | English | International Herald Tribune | National | 74 | 1 |
| Libya | Arabic | Newsweek Bil Logha Al-Arabia | National | 500 | 1 |
| | | | | | |
| Lithuania | Lithuanian | Lietuvos Rytas | National | 157,000 | 2 |
| Lithuania | English | Economist | National | 488 | 1 |
| | | | | | |
| Luxembourg | French | La Voix du Luxembourg | National | 90,000 | 1 |
| Luxembourg | German | Luxemburger Wort | National | 90,000 | 1 |
| Luxembourg | English | Economist | National | 1,671 | 1 |
| Luxembourg | English | International Herald Tribune | National | 669 | 1 |
| Luxembourg | English | Wall Street Journal | Regional | 343 | 1 |
| | | | | | |
| Morocco | Arabic | Al Ahdath Maghribia | National | 95,000 | 1 |
| Morocco | French | Le Matin du Sahara | National | 100,000 | 1 |
| Morocco | English | Economist | National | 298 | 1 |
| Morocco | English | International Herald Tribune | National | 279 | 1 |
| Morocco | English | Newsweek | National | 1,124 | 1 |
| Morocco | Arabic | Newsweek Bil Logha Al-Arabia | National | 1,500 | 1 |
| | | | | | |
| Nigeria | English | Daily Champion | National | 130,000 | 1 |
| Nigeria | English | The Punch | National | 120,000 | 1 |
| Nigeria | English | Economist | National | 2,676 | 1 |
| Nigeria | English | Newsweek | National | 1,194 | 1 |
| | | | | | |
| Oman | Arabic | Al Watan | National | 40,585 | 1 |
| Oman | Arabic | Oman Arabic Daily | National | 41,721 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| Oman | Arabic | Al Shabiba | National | 38,164 | 1 |
| Oman | English | Economist | National | 200 | 1 |
| Oman | English | International Herald Tribune | National | 1,191 | 1 |
| Oman | Arabic | Newsweek Bil Logha Al-Arabia | National | 1,500 | 1 |
| | | | | | |
| Pakistan | English | Dawn | National | 180,000 | 1 |
| Pakistan | Urdu | Daily Jang | National | 820,000 | 2 |
| Pakistan | Punjabi | Daily Bhulekha | National | 12,000 | 1 |
| Pakistan | English | Economist | National | 3,135 | 1 |
| Pakistan | English | International Herald Tribune | National | 120 | 1 |
| Pakistan | English | Wall Street Journal | Regional | 47 | 1 |
| Pakistan | English | Newsweek | National | 7,822 | 1 |
| | | | | | |
| Peru | Spanish | El Comercio | National | 150,000 | 2 |
| Peru | English | Economist | National | 517 | 1 |
| Peru | Spanish | Wall Street Journal | Regional | 165,000 | 1 |
| Peru | English | Newsweek | National | 304 | 1 |
| | | | | | |
| Serbia | Serbian | Blic | National | 200,000 | 1 |
| Serbia | Serbian | Vecernji Novosti | National | 230,000 | 1 |
| Serbia | English | Economist | National | 389 | 1 |
| Serbia | English | International Herald Tribune | National | 80 | 1 |
| | | | | | |
| Slovakia | Slovak | Novy Cas | National | 330,000 | 2 |
| Slovakia | Slovak | Dennik Sme | National | 146,000 | 1 |
| Slovakia | English | Economist | National | 492 | 1 |
| Slovakia | English | International Herald Tribune | National | 64 | 1 |
| Slovakia | English | Wall Street Journal | Regional | 98 | 1 |
| | | | | | |
| Slovenia | Slovenian | Slovenske Novice | National | 101,350 | 1 |
| Slovenia | Slovenian | Nedeljski Dnevnik | National | 150,000 | 1 |
| Slovenia | English | Economist | National | 732 | 1 |
| Slovenia | English | International Herald Tribune | National | 100 | 1 |
| | | | | | |
| Sri Lanka | Sinhala | Sunday Lankadeepa | National | 345,000 | 1 |
| Sri Lanka | English | Sunday Observer | National | 170,000 | 1 |
| Sri Lanka | English | Economist | National | 769 | 1 |
| Sri Lanka | English | International Herald Tribune | National | 85 | 1 |
| Sri Lanka | English | Newsweek | National | 2,254 | 1 |
| | | | | | |
| Sudan | Arabic | Al Rai El Aam | National | 45,000 | 3 |
| Sudan | English | Economist | National | 42 | 1 |
| | | | | | |
| Syria | Arabic | Tishreen | National | 75,000 | 2 |
| Syria | Arabic | Al Thawra | National | 80,000 | 1 |
| Syria | English | Economist | National | 93 | 1 |
| Syria | English | International Herald Tribune | National | 133 | 1 |
| Syria | Arabic | Newsweek Bil Logha Al-Arabia | National | 750 | 1 |
| | | | | | |
| Tunisia | Arabic | Assabah | National | 65,000 | 2 |
| Tunisia | French | Le Temps | National | 45,000 | 1 |
| Tunisia | English | Economist | National | 291 | 1 |

| Country | Language | Title | Distribution | Circulation | No of Insertions |
|---------|----------|-------|--------------|-------------|------------------|
| Tunisia | Arabic | Newsweek Bil Logha Al-Arabia | National | 750 | 1 |
| | | | | | |
| United Arab Emirates | Arabic | Al Khaleej | National | 145,000 | 2 |
| United Arab Emirates | English | Gulf News | National | 105,000 | 1 |
| United Arab Emirates | English | Economist | National | 3,816 | 1 |
| United Arab Emirates | English | Newsweek | National | 1,136 | 1 |
| United Arab Emirates | Arabic | Newsweek Bil Logha Al-Arabia | National | 2,500 | 1 |
| | | | | | |
| Uruguay | Spanish | El Pais | National | 98,000 | 2 |
| Uruguay | English | Economist | National | 234 | 1 |
| Uruguay | English | Newsweek | National | 71 | 1 |
| | | | | | |
| Vietnam | Vietnamese | Tuoi Tre | National | 300,000 | 1 |
| Vietnam | Vietnamese | Thanh Hien | National | 300,000 | 1 |
| Vietnam | English | Vietnam News | National | 30,000 | 1 |
| Vietnam | English | Economist | National | 525 | 1 |
| Vietnam | English | International Herald Tribune | National | 279 | 1 |
| Vietnam | English | Newsweek | National | 728 | 1 |
| **Tier 4 Media** | | | | | |
| **Country** | **Language** | **Title** | **Distribution** | **Circulation** | **No of Insertions** |
| Albania | Albanian | Zeri I Populit | National | 30,000 | 2 |
| Albania | English | Economist | National | 183 | 1 |
| | | | | | |
| Angola | Portuguese | Jornal de Angola | National | 40,000 | 2 |
| Angola | English | Economist | National | 21 | 1 |
| | | | | | |
| Armenia | Armenian | Yerkir | National | 5,000 | 2 |
| Armenia | English | Economist | National | 22 | 1 |
| | | | | | |
| Azerbaijan | Azerbaijani | Yeni Zaman | National | 15,000 | 2 |
| Azerbaijan | English | Economist | National | 31 | 1 |
| | | | | | |
| Bahrain | Arabic | Al Ayam | National | 33,000 | 2 |
| Bahrain | English | Economist | National | 366 | 1 |
| Bahrain | English | International Herald Tribune | National | 58 | 1 |
| Bahrain | Arabic | Newsweek Bil Logha Al-Arabia | National | 1,000 | 1 |
| | | | | | |
| Bangladesh | Bengali | Daily Ittefaq | National | 247,320 | 2 |
| Bangladesh | English | Economist | National | 642 | 1 |
| Bangladesh | English | Newsweek | National | 741 | 1 |
| | | | | | |
| Benin | French | La Nation | National | 5,000 | 2 |
| Benin | English | Economist | National | 12 | 1 |
| | | | | | |
| Bolivia | Spanish | El Diario | National | 57,500 | 2 |
| Bolivia | English | Economist | National | 79 | 1 |

| Bolivia | English | Newsweek | National | 122 | 1 |
|---|---|---|---|---|---|
| | | | | | |
| Bosnia & Herzegovinia | Bosnian | Dnevni Avaz | National | 40,000 | 1 |
| Bosnia & Herzegovinia | Bosnian | Slobodna Bosna | National | 28,000 | 1 |
| Bosnia & Herzegovinia | English | Economist | National | 179 | 1 |
| | | | | | |
| Botswana | English | Botswana Guardian | National | 25,000 | 2 |
| Botswana | English | Economist | National | 150 | 1 |
| | | | | | |
| Burkina Faso | French | L'Observateur Paalga | National | 8,000 | 2 |
| Burkina Faso | English | Economist | National | 3 | 1 |
| | | | | | |
| Burundi | French | Le Renouveau | National | 10,000 | 2 |
| Burundi | English | Economist | National | 9 | 1 |
| | | | | | |
| Cambodia | English | Phnom Penh Post | National | 10,000 | 1 |
| Cambodia | Khmer | Rasmei Kampuchea | National | 15,000 | 1 |
| Cambodia | English | Economist | National | 308 | 1 |
| | | | | | |
| Cent African Rep | French | Le Citoyen | National | 1,500 | 2 |
| Cent African Rep | English | Economist | National | 1 | 1 |
| | | | | | |
| Chad | French | N'Diamena Hebdo | National | 5,000 | 2 |
| | | | | | |
| Congo, Dem Rep of | Arabic | L'Avenir | National | 10,000 | 1 |
| Congo, Dem Rep of | French | Le Potentiel | National | 10,000 | 1 |
| Congo, Dem Rep of | English | Economist | National | 2 | 1 |
| | | | | | |
| Congo, Republic | French | Tam Tam D'Afrique | National | 4,000 | 1 |
| Congo, Republic | French | Le Defi Africain | National | 2,000 | 1 |
| Congo, Republic | English | Economist | National | 2 | 1 |
| | | | | | |
| Cote d'Ivoire | French | Fraternite Matin | National | 40,000 | 2 |
| Cote d'Ivoire | English | Economist | National | 4 | 1 |
| | | | | | |
| Cyprus | Greek | O Phileleftheros | National | 70,000 | 1 |
| Cyprus | English | Economist | National | 842 | 1 |
| Cyprus | English | International Herald Tribune | National | 164 | 1 |
| | | | | | |
| Georgia | Georqian | Georgia Times | National | 10,000 | 1 |
| Georgia | Russian | Sakartvelos Respublika | National | 40,000 | 1 |
| Georgia | English | Economist | National | 34 | 1 |
| | | | | | |
| Ghana | English | Daily Graphic | National | 100,000 | 2 |
| Ghana | English | Economist | National | 511 | 1 |
| | | | | | |
| Guinea | French | Horoya | National | 10,000 | 2 |
| Guinea | English | Economist | National | 3 | 1 |

| Haiti | French | Le Nouvelliste | National | 15,000 | 1 |
|---|---|---|---|---|---|
| Haiti | Creole (Haitian) | Le Nouvelliste | National | 15,000 | 1 |
| Haiti | English | Economist | National | 11 | 1 |
| Haiti | English | Newsweek | National | 55 | 1 |
| | | | | | |
| Honduras | Spanish | La Prensa | National | 60,000 | 2 |
| Honduras | English | Economist | National | 14 | 1 |
| Honduras | Spanish | Wall Street Journal | Regional | 66,000 | 1 |
| Honduras | English | Newsweek | National | 37 | 1 |
| | | | | | |
| Iceland | Icelandic | Morgunbladid | National | 93,000 | 2 |
| Iceland | English | Economist | National | 646 | 1 |
| Iceland | English | International Herald Tribune | National | 114 | 1 |
| | | | | | |
| Jamaica | English | Daily Gleaner | National | 115,000 | 2 |
| Jamaica | English | Economist | National | 337 | 1 |
| Jamaica | English | Newsweek | National | 287 | 1 |
| | | | | | |
| Jordan | Arabic | Al Dustour | National | 90,500 | 1 |
| Jordan | Arabic | Al Rai | National | 100,000 | 1 |
| Jordan | English | Economist | National | 554 | 1 |
| Jordan | English | International Herald Tribune | National | 197 | 1 |
| Jordan | Arabic | Newsweek Bil Logha Al-Arabia | National | 1,500 | 1 |
| | | | | | |
| Kyrgyzstan | Russian | Sovetik Kyrgyzstan | National | 162,297 | 1 |
| Kyrgyzstan | Russian | Slovo Kyrgyzstana | National | 111,000 | 1 |
| Kyrgyzstan | English | Economist | National | 91 | 1 |
| | | | | | |
| Laos | French | Renovateur | National | 1,000 | 1 |
| Laos | Lao | Vientiane Mal | National | 5,000 | 1 |
| Laos | English | Economist | National | 41 | 1 |
| Laos | English | Newsweek | National | 6 | 1 |
| | | | | | |
| Lesotho | English | Public Eye | National | 20,500 | 2 |
| Lesotho | English | Economist | National | 7 | 1 |
| | | | | | |
| Liberia | English | The News | National | 3,500 | 2 |
| Liberia | English | Economist | National | 28 | 1 |
| | | | | | |
| Macedonia | Macedonian | Dnevnik | National | 60,000 | 1 |
| Macedonia | Albanian | Koha | National | 27,000 | 1 |
| Macedonia | English | Economist | National | 170 | 1 |
| | | | | | |
| Madagascar | French | Midi Madagascar (Madagasikara) | National | 35,000 | 1 |
| Madagascar | English | Midi Madagascar (Madagasikara) | National | 35,000 | 1 |
| Madagascar | English | Economist | National | 14 | 1 |
| | | | | | |
| Malawi | English | Malawi News | National | 22,000 | 2 |
| Malawi | English | Economist | National | 71 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| Mali | French | Les Echos | National | 25,000 | 2 |
| Mali | English | Economist | National | 5 | 1 |
| | | | | | |
| Mauritania | Arabic | Horizons | National | 3,000 | 2 |
| Mauritania | English | Economist | National | 2 | 1 |
| | | | | | |
| Moldova | Romanian | Jurnal de Chisinau | National | 5,000 | 1 |
| Moldova | Russian | Moldavskie Vedomosti | National | 5,000 | 1 |
| Moldova | English | Economist | National | 21 | 1 |
| | | | | | |
| Mongolia | Khalkha Mongol | Daily Mirror | National | 20,000 | 2 |
| Mongolia | English | Economist | National | 42 | 1 |
| Mongolia | English | Newsweek | National | 102 | 1 |
| | | | | | |
| Mozambique | Portuguese | Noticias | National | 16,000 | 2 |
| Mozambique | English | Economist | National | 26 | 1 |
| | | | | | |
| Namibia | English | The Namibian | National | 28,000 | 2 |
| Namibia | English | Economist | National | 101 | 1 |
| | | | | | |
| Nicaragua | Spanish | La Prensa | National | 38,000 | 2 |
| Nicaragua | English | Economist | National | 21 | 1 |
| Nicaragua | Spanish | Wall Street Journal | Regional | 40,017 | 1 |
| Nicaragua | English | Newsweek | National | 25 | 1 |
| | | | | | |
| Niger | French | Le Republicain | National | 6,000 | 2 |
| Niger | English | Economist | National | 5 | 1 |
| | | | | | |
| Panama | Spanish | Critica | National | 60,000 | 1 |
| Panama | Spanish | El Siglio | National | 45,000 | 1 |
| Panama | English | Economist | National | 80 | 1 |
| Panama | Spanish | Wall Street Journal | Regional | 41,129 | 1 |
| Panama | English | Newsweek | National | 161 | 1 |
| | | | | | |
| Papua New Guinea | English | Post-Courier | National | 7,000 | 2 |
| Papua New Guinea | English | Economist | National | 61 | 1 |
| | | | | | |
| Paraguay | Spanish | Ultima Hora | National | 120,000 | 2 |
| Paraguay | English | Economist | National | 48 | 1 |
| Paraguay | English | Newsweek | National | 30 | 1 |
| | | | | | |
| Qatar | Arabic | Al Sharq | National | 45,000 | 2 |
| Qatar | English | Economist | National | 359 | 1 |
| Qatar | Arabic | Newsweek Bil Logha Al-Arabia | National | 750 | 1 |
| | | | | | |
| Rwanda | English | New Times | National | 5,000 | 1 |
| Rwanda | Kinyarwanda | Imvaho | National | 8,000 | 1 |
| Rwanda | English | Economist | National | 22 | 1 |
| | | | | | |
| Senegal | French | Le Soleil | National | 40,000 | 2 |
| Senegal | English | Economist | National | 23 | 1 |

| Country | Language | Title | Distribution | Circulation | No of Insertions |
|---|---|---|---|---|---|
| Sierra Leone | English | New Vision | National | 1,500 | 2 |
| Sierra Leone | English | Economist | National | 15 | 1 |
| | | | | | |
| Somalia | English | Somaliland Times | National | 1,000 | 2 |
| | | | | | |
| Tajikistan | Tajik | Turkmenskaya Iskra | National | 62,946 | 2 |
| Tajikistan | English | Economist | National | 12 | 1 |
| | | | | | |
| Tanzania | English | Guardian | National | 25,000 | 1 |
| Tanzania | Swahili | Nipashe | National | 39,000 | 1 |
| Tanzania | English | Economist | National | 466 | 1 |
| | | | | | |
| Togo | French | Togo-Press | National | 10,000 | 2 |
| Togo | English | Economist | National | 5 | 1 |
| | | | | | |
| Trinidad & Tobago | English | Trinidad Express | National | 78,000 | 2 |
| Trinidad & Tobago | English | Economist | National | 222 | 1 |
| Trinidad & Tobago | English | Newsweek | National | 173 | 1 |
| | | | | | |
| Turkmenistan | Turkmen | Adalat | National | 84,051 | 1 |
| Turkmenistan | Turkmen | Turkmenistan | National | 73,170 | 1 |
| Turkmenistan | English | Economist | National | 3 | 1 |
| | | | | | |
| Uganda | English | New Vision | National | 45,000 | 2 |
| Uganda | English | Economist | National | 370 | 1 |
| | | | | | |
| Uzbekistan | Russian | Trud 7 | National | 65,000 | 2 |
| Uzbekistan | English | Economist | National | 7 | 1 |
| | | | | | |
| Yemen | Arabic | Al Thawra | National | 60,000 | 2 |
| Yemen | English | Economist | National | 25 | 1 |
| Yemen | Arabic | Newsweek Bil Logha Al-Arabia | National | 1,500 | 1 |
| | | | | | |
| Zambia | English | Times of Zambia | National | 45,000 | 2 |
| Zambia | English | Economist | National | 264 | 1 |
| | | | | | |
| Zimbabwe | English | Sunday Mail | National | 120,000 | 2 |
| Zimbabwe | English | Economist | National | 190 | 1 |
| **Tier 5 Media** | | | | | |
| **Country** | **Language** | **Title** | **Distribution** | **Circulation** | **No of Insertions** |
| Andorra | Catalan | Diari Bondia | National | 8,000 | 1 |
| Andorra | English | Economist | National | 38 | 1 |
| | | | | | |
| Anguilla | English | The Anguillian | National | 1,800 | 1 |
| | | | | | |
| Antigua and Barbuda | English | The Outlet | National | 5,000 | 1 |
| Antigua and Barbuda | English | Economist | National | 5 | 1 |
| | | | | | |
| Aruba | English | The News | National | 7,500 | 1 |

| Aruba | Papiamento | Bon Dia | National | 19,000 | 1 |
|---|---|---|---|---|---|
| Aruba | English | Economist | National | 6 | 1 |
| Aruba | English | Newsweek | National | 100 | 1 |
| | | | | | |
| Bahamas | English | The Nassau Guardian | National | 12,000 | 1 |
| Bahamas | English | Economist | National | 100 | 1 |
| Bahamas | English | Newsweek | National | 40 | 1 |
| | | | | | |
| Barbados | English | The Daily Nation | National | 27,000 | 1 |
| Barbados | English | Economist | National | 121 | 1 |
| Barbados | English | Newsweek | National | 204 | 1 |
| | | | | | |
| Belize | English | Belize Times | National | 6,000 | 1 |
| Belize | English | Economist | National | 77 | 1 |
| Belize | English | Newsweek | National | 49 | 1 |
| | | | | | |
| Bermuda | English | Royal Gazette | National | 19,500 | 1 |
| Bermuda | English | Economist | National | 232 | 1 |
| Bermuda | English | Newsweek | National | 1 | 1 |
| | | | | | |
| British Virgin Islands | English | BVI Beacon | National | 6,500 | 1 |
| British Virgin Islands | English | Economist | National | 442 | 1 |
| | | | | | |
| Brunei | English | Borneo Bulletin | National | 25,000 | 1 |
| Brunei | Malay | Media Permata | National | 15,000 | 1 |
| Brunei | English | Economist | National | 132 | 1 |
| Brunei | English | Newsweek | National | 933 | 1 |
| | | | | | |
| Cape Verde | Portuguese | Expresso das Ilhas | National | 6,000 | 1 |
| Cape Verde | English | Economist | National | 10 | 1 |
| | | | | | |
| Cayman Islands | English | Caymanian Compass | National | 12,000 | 1 |
| Cayman Islands | English | Economist | National | 85 | 1 |
| | | | | | |
| Comoros | Arabic | Al Watwan | National | 3,000 | 1 |
| | | | | | |
| Cook Islands | English | Cook Island News | National | 2,300 | 1 |
| Cook Islands | English | Economist | National | 3 | 1 |
| | | | | | |
| Djibouti | French | La Nation | National | 4,300 | 1 |
| Djibouti | English | Economist | National | 1 | 1 |
| | | | | | |
| Dominica | English | The Chronicle | National | 5,000 | 1 |
| Dominica | English | Economist | National | 13 | 1 |
| | | | | | |
| East Timor | Indonesian | Suara Timor Lorosae | National | 1,000 | 1 |
| East Timor | English | Economist | National | 7 | 1 |
| | | | | | |
| Equatorial Guinea | Spanish | La Gaceta de Guinea Ecuatorial | National | 7,000 | 1 |
| | | | | | |
| Falkland Islands | English | Penguin News | National | 1,600 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| Falkland Islands | English | Economist | National | 4 | 1 |
| | | | | | |
| Faroe Islands | Faroese | Dimmalaetin | National | 20,000 | 1 |
| Faroe Islands | English | Economist | National | 25 | 1 |
| | | | | | |
| Fiji | English | Fiji Times | National | 31,000 | 1 |
| Fiji | English | Economist | National | 122 | 1 |
| | | | | | |
| French Guiana | French | France Guyane | National | 8,000 | 1 |
| | | | | | |
| French Polynesia | French | La Depeche de Tahiti | National | 18,000 | 1 |
| French Polynesia | English | Economist | National | 14 | 1 |
| | | | | | |
| Gabon | French | L'Union | National | 20,000 | 1 |
| | | | | | |
| Gambia | English | Daily Observer | National | 5,000 | 1 |
| Gambia | English | Economist | National | 61 | 1 |
| | | | | | |
| Gibraltar | English | Gibraltar Chronicle | National | 3,500 | 1 |
| Gibraltar | English | Economist | National | 85 | 1 |
| | | | | | |
| Greenland | Danish | Sermitsiak | National | 4,000 | 1 |
| Greenland | Danish | Atuagagdliutit Gronlansposten | National | 4,500 | 1 |
| Greenland | English | Economist | National | 15 | 1 |
| | | | | | |
| Grenada | English | Grenada Informer | National | 6,000 | 1 |
| Grenada | English | Economist | National | 15 | 1 |
| | | | | | |
| Guadeloupe | French | France Antilles | National | 70,000 | 1 |
| Guadeloupe | English | Economist | National | 1 | 1 |
| | | | | | |
| Guinea-Bissau | Portuguese | Voz da Guine | National | 6,000 | 1 |
| Guinea-Bissau | English | Economist | National | 2 | 1 |
| | | | | | |
| Guyana | English | Guyana Chronicle | National | 24,000 | 1 |
| Guyana | English | Economist | National | 74 | 1 |
| Guyana | English | Newsweek | National | 160 | 1 |
| | | | | | |
| Isle of Man | English | Isle of Man Examiner | National | 15,500 | 1 |
| | | | | | |
| Jersey & Guernsey | English | Guernsey Press and Star | National | 16,000 | 1 |
| | | | | | |
| Kiribati | English | Te Uekera | National | 1,500 | 1 |
| Kiribati | English | Economist | National | 2 | 1 |
| | | | | | |
| Liechtenstein | German | Liechtensteiner Volksbratt | National | 20,000 | 1 |
| Liechtenstein | English | Economist | National | 55 | 1 |
| | | | | | |
| Macau | Chinese (Traditional) | Jornal Va Kio | National | 45,000 | 1 |
| Macau | English | Economist | National | 127 | 1 |
| Macau | English | Wall Street Journal | Regional | 168 | 1 |
| Macau | English | Newsweek | National | 844 | 1 |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Maldives | English | Haveeru(website) | National | na | 1 |
| Maldives | English | Economist | National | 32 | 1 |
| Maldives | English | Newsweek | National | 247 | 1 |
| | | | | | |
| Malta | English | Times | National | 20,000 | 1 |
| Malta | Maltese | L'Orrizont | National | 36,000 | 1 |
| Malta | English | Economist | National | 753 | 1 |
| | | | | | |
| Marshall Islands | English | Marshall Islands Journal | National | 3,700 | 1 |
| Marshall Islands | English | Economist | National | 2 | 1 |
| | | | | | |
| Martinique | French | France Antilles | National | 70,000 | 1 |
| Martinique | English | Economist | National | 7 | 1 |
| | | | | | |
| Mauritius | French | Le Mauricien | National | 45,000 | 1 |
| Mauritius | English | Economist | National | 468 | 1 |
| Mauritius | English | Newsweek | National | 1,306 | 1 |
| | | | | | |
| Mayotte | French | Haraka Info | National | 2,000 | 1 |
| | | | | | |
| Micronesia | English | The Kaselehlie Press | National | 1,000 | 1 |
| | | | | | |
| Monaco | French | Nice-Matin | National | 118,566 | 1 |
| Monaco | English | Economist | National | 184 | 1 |
| | | | | | |
| Montenegro | Serbian | Pobjeda | National | 250,000 | 1 |
| Montenegro | English | Economist | National | 40 | 1 |
| | | | | | |
| Montserrat | English | Monserrat Reporter | National | 1,000 | 1 |
| Montserrat | English | Economist | National | 5 | 1 |
| | | | | | |
| Nauru | English | Nauru Bulletin | National | 700 | 1 |
| | | | | | |
| Netherlands Antilles | Papiamento | Extra | National | 25,000 | 1 |
| Netherlands Antilles | English | Economist | National | 205 | 1 |
| Netherlands Antilles | English | Newsweek | National | 105 | 1 |
| | | | | | |
| New Caledonia | French | Les Nouvelles Caledoniennes | National | 26,000 | 1 |
| New Caledonia | English | Economist | National | 10 | 1 |
| | | | | | |
| Niue | English | Niue Star | National | 500 | 1 |
| | | | | | |
| Palau | English | Palau Horizon | National | 1,500 | 1 |
| | | | | | |
| Palestinian Territories | Arabic | Al Quds (Jerusalem) | National | 65,000 | 1 |
| | | | | | |
| Reunion | French | Le Journal de L'ille de la Reunion | National | 35,000 | 1 |
| Reunion | English | Economist | National | 4 | 1 |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Saint Helena | English | St. Helena Herald | National | 1,200 | 1 |
| Saint Helena | English | Economist | National | 1 | 1 |
| | | | | | |
| Saint Kitts and Nevis | English | Democrat | National | 3,500 | 1 |
| Saint Kitts and Nevis | English | Economist | National | 8 | 1 |
| | | | | | |
| Saint Lucia | English | St Lucia Star | National | 8,000 | 1 |
| Saint Lucia | English | Economist | National | 27 | 1 |
| | | | | | |
| Saint Pierre & Miquelon | French | L'Echo des Caps | National | 1,000 | 1 |
| | | | | | |
| Saint Vincent & the Grenadines | English | The Daily Herald | National | 9,000 | 1 |
| Saint Vincent & the Grenadines | English | Economist | National | 16 | 1 |
| | | | | | |
| Sao Tome and Principe | Portuguese | Vitrina | National | 1,500 | 1 |
| | | | | | |
| Seychelles | English | Seychelles Nation | National | 10,000 | 1 |
| Seychelles | English | Economist | National | 26 | 1 |
| | | | | | |
| Solomon Islands | English | The Soloman Star | National | 1,500 | 1 |
| Solomon Islands | English | Economist | National | 9 | 1 |
| | | | | | |
| Suriname | Dutch | De Ware Tijd | National | 22,000 | 1 |
| Suriname | English | Economist | National | 23 | 1 |
| Suriname | English | Newsweek | National | 1 | 1 |
| | | | | | |
| Swaziland | English | Times of Swaziland | National | 26,000 | 1 |
| Swaziland | English | Economist | National | 127 | 1 |
| | | | | | * |
| Tokelau | English | Le Samoa Post | National | 5,000 | 1 |
| | | | | | |
| Tonga | English | Tonga Chronicle | National | 10,000 | 1 |
| Tonga | English | Economist | National | 8 | 1 |
| | | | | | |
| Turks & Caicos | English | Turks and Caicos Sun | National | TBC | 1 |
| Turks & Caicos | English | Economist | National | 1 | 1 |
| | | | | | |
| Tuvalu | English | Tuvalu Echoes | National | 260 | 1 |
| Tuvalu | English | Economist | National | 1 | 1 |
| | | | | | |
| Vanuatu | English | Daily Post | National | 5,000 | 1 |
| Vanuatu | English | Economist | National | 13 | 1 |
| | | | | | |
| Wallis and Futuna | French | Journal Officiel | National | TBC | 1 |
| Wallis and Futuna | French | Journal Officiel | National | TBC | 1 |

### CONSUMER MAGAZINES

| PUBLICATION | CIRCULATION | ISSUE FREQUENCY | UNIT SIZE | UNIT DIMENSIONS | PLAN FREQUENCY |
|---|---|---|---|---|---|
| TIME (4 INT'L ENGLISH LANGUAGE EDITIONS) | 1,26,000 | WEEKLY | FULL PG | | 1 |
| THE ECONOMIST | 1,260,457 | WEEKLY | FULL PG | | 1 |
| NEWSWEEK (11 ENGLISH LANGUAGE & LOCAL LANGUAGE EDITIONS) | 1,091,000 | WEEKLY | FULL PG | | 1 |
| TOTAL | 3,477,457 | | | | |

### NATIONAL NEWSPAPERS

| PUBLICATION | CIRCULATION | ISSUE FREQUENCY | UNIT SIZE | UNIT DIMENSIONS | PLAN FREQUENCY |
|---|---|---|---|---|---|
| WALL STREET JOURNAL: EUROPE/ASIA, U.S., AMERICAS | 3,542,036 | MON-FRI | 1/4 PAGE | 5.35" X 10.5" | 1 |
| NY TIMES GROUP* | 2,083,124 | MON-THU | 1/4 PAGE | 5-11/16" X 10-1/2" | 1 |

*NYTIMES GROUP INCLUDES: INTERNATIONAL HERALD TRIBUNE, EL PAIS, THE OBSERVER, LA REPUBLICA, SUDDENTSCHE ZEITUNG AND LE MONDE*

| | | | | | |
|---|---|---|---|---|---|
| TOTAL | 5,623,160 | | | | |

### ONLINE

| | # OF LANGUAGES | # OF EST IMPRESSIONS | UNIT SIZE | UNIT DIMENSIONS | PLAN FREQUENCY |
|---|---|---|---|---|---|
| INTERNATIONAL KEYWORD SEARCH | 44 | TBD | 85 CHARACTERS | | MINIMUM 1 MONTH |
| GOOGLE CONTENT NETWORK | 44 | TBD | TEXT & BANNER | | MINIMUM 1 MONTH |

TRADE PUBLICATIONS

| COUNTRY | # OF TOTAL PUBS | UNIT SIZE | UNIT DIMENSIONS | PLAN FREQUENCY |
|---|---|---|---|---|
| AUSTRALIA | 3 | FULL PG B/W | | 1 |
| CHINA | 2 | FULL PG B/W | | 2 |
| FINLAND | 1 | FULL PG B/W | | 1 |
| FRANCE | 1 | FULL PG B/W | | 1 |
| GERMANY | 3 | FULL PG B/W | | 1 |
| MEXICO | 1 | FULL PG B/W | | 1 |
| NETHERLANDS | 1 | FULL PG B/W | | 1 |
| SWEDEN | 1 | FULL PG B/W | | 1 |
| TAIWAN | 1 | FULL PG B/W | | 1 |
| UNITED KINGDOM | 5 | FULL PG B/W | | 1 |
| TOTAL | 19 | | | |

TRADE WEBSITES

| COUNTRY | # OF TOTAL WEBSOTES | UNIT SIZE | UNIT DIMENSIONS | PLAN FREQUENCY |
|---|---|---|---|---|
| AUSTRALIA | 2 | BANNER | | 1 MONTH |
| AUSTRIA | 1 | BANNER | | 1 MONTH |
| FRANCE | 1 | BANNER | | 1 MONTH |
| GERMANY | 3 | BANNER | | 1 MONTH |
| GREECE | 1 | BANNER | | 1 MONTH |
| MEXICO | 1 | BANNER | | 1 MONTH |
| NETHERLANDS | 1 | BANNER | | 1 MONTH |
| POLAND | 1 | BANNER | | 1 MONTH |
| ROMANIA | 1 | BANNER | | 1 MONTH |
| UNITED KINGDOM | 5 | BANNER | | 1 MONTH |
| TOTAL | 17 | | | |

| International Trade Publications | | | |
|---|---|---|---|
| Country | Publication Name | Frequency | Brief Description |
| Australia | *Australian Book Review* | 10 times/year | Australia's oldest and premier literary review, *Australian Book Review* publishes reviews, essays, commentaries, and creative writing. |
| Australia | *Southerly* | Monthly | Australia's oldest literary journal, Southerly publishes a wide range of poetry, essays and commentaries from writers and scholars all over Australia and New Zealand. |
| Australia | *Quadrant* | 10 times/year | *Quadrant* is the leading Australia-based general intellectual journal of ideas, literature, poetry, and historical and political debate. |
| China | *China Author Record* | Monthly | *China Author Record* is distributed to professional and non-professional writers across China. |
| China | *Author's Digest* | 2 times/week | Published by the Authors Association of |

| | | | China, *Author's Digest* is distributed to mostly state-owned enterprises. |
|---|---|---|---|
| Finland | *Parnasso* | 7 times/year | Finland's leading literary magazine, Parmasso is read by professionals in the fields of reading and writing. |
| France | *La Revue Des Livres Pour Enfants* | Monthly | *La Revue Des Livres Pour Enfants* is published for children's book authors, distributors and libraries. |
| Germany | *Buchreport* | Monthly | Published monthly with wide-ranging analysis, *Buchreport* covers book publishing, and book author trends. |
| Germany | *Boersenblatt* | Weekly | The leading trade magazine for the German book industry, *Boersenblatt* targets publishers, book sellers and librarians. |
| Germany | *BuchMarkt* | Monthly | *BuchMarkt* covers ideas, practical tips, background, trends and personalities in the book market. |
| Mexico | *Letras Libres* | Monthly | *Letras Libres* is Mexico's leading literature magazine. |
| Netherlands | *Boekblad* | 23 times/year | *Boekblad* provides information for book publishers in the Netherlands and parts of Belgium. |
| Sweden | *Svensk Bokhandel* | 21 times/year | *Svensk Bokhandel* provides news, features, analysis, debate articles and essays on books and literary subjects. |
| Taiwan | *UNITAS Magazine* | Monthly | *UNITAS Magazine* is a literary magazine introducing works from national and international authors. |
| United Kingdom | *Literary Review* | Monthly | *Literary Review* is a review-based literary magazine. |
| United Kingdom | *London Review of Books* | Bi-weekly | *London Review* of Books is Europe's largest literary magazine. |
| United Kingdom | *Times Literary Supplement* | Weekly | One of the world's leading literary journals, the *Times Literary Supplement* provides reviews of over 2,000 books a year, covering all fields. |
| United Kingdom | *The Bookseller* | Monthly | The number one magazine for the British book trade, *The Bookseller* contains the latest news and analysis and in-depth market data for book publishing and retailing. |
| United Kingdom | *Writers' News* | Monthly | *Writer's News* is a bestselling publication for writers, covering writing competitions. |

| International Trade Websites | | |
|---|---|---|
| **Country** | **Website Name** | **Brief Description** |
| Australia | *Weekly Book Newsletter (WBN)* | The *Weekly Book Newsletter* website contains, among others, local and international book industry news, bestseller charts, publisher announcements, and industry notices. |
| Australia | *The Monthly* | *The Monthly*, the official website of Australia's leading current affairs magazine, publishes first-class writing from the nation's best thinkers. |
| Austria | *Wespennest* | The *Wespennest* is the website of the Austrian Literary Essayist Journal. |
| France | *Livres Hebdo* | The *Livres Hebdo* website provides an overview of the publishing industry in France. |
| Germany | *Buchreport* | The *Buchreport* website, targeting publishers and authors, covers interviews, backgrounds and trends in the book market. |
| Germany | *Boersenblatt* | The *Boersenblatt* website covers developments in the book industry and new book additions in the market. |
| Germany | *BuchJournal* | The *BuchJournal* website covers author interviews and independent editorials of literary works. |
| Greece | *STIGMES* | *STIGMES* is the website for Greece's most important local periodical. |
| Mexico | *Letras Libres* | *Lestras Libres* is the website for Mexico's leading literature magazine. |
| Netherlands | *Boekblad* | The *Boekblad* website provides information for book publishers in the Netherlands and parts of Belgium. |
| Poland | *FA-Art* | *FA-Art* is the official website of Poland's literary magazine, *FA-Art*. |
| Romania | *Dilema Veche* | *Dilema Veche* is the website for the most important cultural newspaper in Romania. |
| United Kingdom | *Writers' & Artists' Yearbook* | The *Writers' & Artists' Yearbook* website provides an extensive resourceful listing, serving writers and artists of all kinds. |
| United Kingdom | *London Review of Books* | The *London Review of Books* is the website for Europe's largest literary magazine. |
| United Kingdom | *Poetry Review* | *Poetry Review* is the website for the Poetry Society's internationally-acclaimed poetry magazine. |
| United Kingdom | *Writers' News* | *Writer's News* is the website for the U.K.'s bestselling publication for writers, covering writing competitions. |
| United Kingdom | *Literary Times Supplement* | The *Literary Times Supplement* website provides reviews of over 2,000 books a year, covering all fields. |

# ATTACHMENT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et al., | : |
| | : |
| | : |
| Plaintiffs, | : |
| | :     Case No. 05 CV 8136-~~JES~~DC |
| v. | : |
| | : |
| Google Inc., | : |
| | : |
| Defendant. | : |

-----------------------------------------------------------------------x

## [PROPOSED] FINAL JUDGMENT AND ORDER OF DISMISSAL

This matter is before the Court pursuant to the motion for final class certification and final approval of a proposed class action settlement of the above-captioned case (the "Action") entered into between, on the one hand, Plaintiffs Paul Dickson, Joseph Goulden, Daniel Hoffman, Betty Miles, ~~and~~ Herbert Mitgang, Maureen Duffy, Daniel Jay Baum, Margaret Drabble and Robert Pullan ("Author Sub-Class Representative Plaintiffs"), and The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., ~~and~~ John Wiley & Sons, Inc., Harlequin Enterprises Limited, Macmillan Publishers Limited, Melbourne University Publishing Limited, and The Text Publishing Company ("Publisher Sub-Class Representative Plaintiffs") (collectively "Representative Plaintiffs"), and, on the other hand, defendant Google Inc. ("Google").  Plaintiffs, through their counsel, the firms of Boni & Zack LLC, Milberg LLP, and Kohn, Swift & Graf, PC for the Author Sub-Class ("Author Sub-Class Counsel"), and the firm of Debevoise & Plimpton LLP for the Publisher Sub-Class ("Publisher Sub-Class Counsel") (collectively "Class Counsel"), have moved for an Order approving the settlement of the Action in accordance with ~~a~~an Amended Settlement

Agreement, dated ~~October 28, 2008,~~ November 13, 2009, between Plaintiffs and Google (the "Amended Settlement Agreement"). Having read and considered the Amended Settlement Agreement and having held a hearing on the fairness of the ~~proposed~~ Settlement, at which objectors to the Settlement could appear, and based upon familiarity with the files and proceedings in this matter, the Court finds that:

1.      Unless otherwise specified, all ~~defined~~ capitalized terms herein shall have the same meaning as in the Amended Settlement Agreement.

2.      The Court preliminarily approved the Settlement Agreement by Order of November 14, 2008 and the Amended Settlement Agreement by Order of _____ (the "Preliminary Approval ~~Order~~ Orders").

3.      Notice of the ~~proposed~~ Settlement has been timely disseminated in accordance with the terms of the Preliminary Approval ~~Order~~ Orders, which authorized such notice. Such notice is the best practicable notice to be provided under the circumstances and satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and applicable standards of due process.

4.      The issues as to liability and remedies in the Action are issues as to which there are substantial grounds for difference of opinion, and the ~~proposed settlement of the Action~~ Settlement constitutes a resolution of those issues that is fair, reasonable and adequate to the members of the Amended Settlement Class and Sub-Classes certified herein.

Accordingly, it is hereby **ORDERED** as follows:

5.      The Amended Settlement Agreement is approved as fair, reasonable, and adequate pursuant to Rule 23 of the Federal Rules of Civil Procedure and in the best interest of

the Amended Settlement Class and Sub-Classes, and the parties are directed to consummate the

Amended Settlement Agreement in accordance with its terms.

6. The following ~~Class~~class (the "Amended Settlement Class") and two

~~Subclasses~~sub-classes, provisionally certified in the Preliminary Approval Order, of _____, 2009, are now finally certified for purposes of the Settlement only:

**Amended Settlement Class**

All Persons that, as of January 5, 2009, have a Copyright Interest in one or more Books or Inserts. All Amended Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both. Excluded from the Amended Settlement Class are Google, the members of Google's Board of Directors and its executive officers, and the departments, agencies and instrumentalities of the United States Government and the Court.

**Author Sub-Class**

Members of the Amended Settlement Class who are authors, and their heirs, successors and assigns, and any other members of the Amended Settlement Class who are not members of the Publisher Sub-Class.

**Publisher Sub-Class**

Members of the Amended Settlement Class that are (a) companies that publish books, and their exclusive licensees, successors and assignees, and (b) companies that publish Periodicals and have a Copyright Interest in one or more Inserts, and their exclusive licensees, successors, and assignees.

7. The Court finds that (a) the Author Sub-Class is so numerous that joinder of all

members is impracticable; (b) there are questions of law and fact common to the Author Sub-

Class; (c) claims of the Author Sub-Class Representative Plaintiffs are typical of the claims of all

members of the Author Sub-Class; (d) the Author Sub-Class Representative Plaintiffs and

Author Sub-Class Counsel have fairly and adequately protected and will fairly and adequately

protect the interests of the Author Sub-Class; (e) Google has acted on grounds generally

applicable to the Author Sub-Class, making final injunctive relief appropriate respecting the

Author Sub-Class as a whole; (f) common questions of law and fact predominate over questions affecting only individual members of the Author Sub-Class; and (g) a class action (with sub-classes) is superior to other available methods for the fair and efficient adjudication of this controversy.

8.    The Court finds that (a) the Publisher Sub-Class is so numerous that joinder of all members is impracticable; (b) there are questions of law and fact common to the Publisher Sub-Class; (c) claims of the Publisher Sub-Class Representative Plaintiffs are typical of the claims of all members of the Publisher Sub-Class; (d) the Publisher Sub-Class Representative Plaintiffs and Publisher Sub-Class Counsel have fairly and adequately protected and will fairly and adequately protect the interests of the Class; (e) Google has acted on grounds generally applicable to the Publisher Sub-Class, making final injunctive relief appropriate respecting the Publisher Sub-Class as a whole; (f) common questions of law and fact predominate over questions affecting only individual members of the Publisher Sub-Class; and (g) a class action (with sub-classes) is superior to other available methods for the fair and efficient adjudication of this controversy.

9.    The Action is hereby dismissed, with prejudice and without costs except as provided in the Amended Settlement Agreement.

10.    This Final Judgment and Order of Dismissal shall forever bar (a) all Rightsholder Releasors from instituting, maintaining, prosecuting, assigning or collecting on any and all (i) Claims against any Google Releasee, Fully Participating Library Releasee, Cooperating Library Releasee, and Public Domain Library Releasee that directly or indirectly relate to, are based upon or arise out of the commencement, prosecution, defense or settlement of the Action, or to the negotiation or execution of this the Settlement Agreement, the Amended Settlement

4

Agreement or the Library-Registry Agreements, (ii) Google Released Claims against any of the Google Releasees, except as provided in Section 3.5(b)(vii) (Government Works and Public Domain Works), (iii) Fully Participating Library Released Claims against any of the Fully Participating Library Releasees, (iv) the Cooperating Library Released Claims against any of the Cooperating Library Releasees, (v) the Public Domain Library Released Claims against any of the Public Domain Library Releasees, and (vi) Other Library Released Claims against any of the Other Library Releasees, provided that no Rightsholder Releasor is barred from instituting, maintaining, prosecuting, assigning or collecting on any Other Library Released Claim against an Other Library Releasee if and to the extent such Other Library Releasee, at any time, makes any infringing use of a Digital Copy, including without limitation, by participating in, or recovering as a result of, any class or representative action, whether under United States federal or state law, in which any such Google Released Claims, Fully Participating Library Released Claims, Cooperating Library Released Claims, Public Domain Library Released Claims, or Other Library Released Claims have been or may be brought, and (b) all Google Releasees, all Cooperating Library Releasees, all Fully Participating Library Releasees, all Public Domain Library Releasees and all Other Library Releasees from instituting, maintaining, prosecuting, assigning or collecting on, any and all Claims against any Rightsholder Releasor or Class Counsel that directly or indirectly relate to, are based upon or arise out of the commencement, prosecution, defense or settlement of the Action, or the negotiation and execution of ~~this~~the Settlement Agreement, the Amended Settlement Agreement or the Library-Registry Agreements.

10.     This Final Judgment and Order of Dismissal shall have the effect of a dismissal with prejudice of all Fully Participating Library Released Claims, Cooperating Library Released Claims, Public Domain Library Released Claims and Other Library Released Claims as though

each Fully Participating Library Releasee, Cooperating Library Releasee, Public Domain Releasee and Other Library Releasee had been named a defendant in the Action, and this Final Judgment and Order of Dismissal shall bar all such Fully Participating Library Released Claims, Cooperating Library Released Claims, Public Domain Library Released Claims and Other Library Released Claims by any Rightsholder Releasor, provided that this Order shall have no such effect with respect to, and shall not bar, any Other Library Released Claims against any Other Library Releasee if and to the extent such Other Library Releasee, at any time, makes any infringing use of a Digital Copy.

11.     There is no just reason for delay and the judgment of dismissal with prejudice as to Google shall be final.

12.     The Settlement Agreement and the Amended Settlement Agreement and any proceedings taken pursuant thereto are not, and should not in any event be: (a) offered or received as evidence of a presumption, concession or admission on the part of Plaintiffs, Google, Fully Participating Libraries, Cooperating Libraries, Public Domain Libraries, Other Libraries, any member of the Class, or any other person; or (b) offered or received as evidence of a presumption, concession or admission of any liability, fault, wrongdoing or other dereliction of duty.

13.     Consummation of the Settlement shall proceed as described in the Amended Settlement Agreement, and the Court hereby reserves jurisdiction over the subject matter and as to each party to the Amended Settlement Agreement with respect to the interpretation and implementation of the Amended Settlement Agreement for all purposes, including enforcement of any of the terms thereof at the instance of any party and resolution of any disputes that may

arise relating in any way to, or arising from, the implementation of the Amended Settlement Agreement or the implementation of this Order.

14.     Attached hereto is a list of Persons who timely excluded themselves from the Settlement.  Those Persons are not bound by any terms in this Order.

15.     Attorneys' fees and reimbursement of expenses to Counsel for the Author Sub-Class in the total amount of _____ are hereby approved and awarded.

16.     At any time after the date of this Final Judgment and Order of Dismissal but prior to the Effective Date, Plaintiffs and Google may, by written agreement, amend the Amended Settlement Agreement without notice to or approval of the Court, but only if such amendment is not materially inconsistent with this Order and does not impair the rights of the Amended Settlement Class under the Amended Settlement Agreement.  After the Effective Date, the Registry and Google may, by written agreement, amend thisthe Amended Settlement Agreement without notice to or approval of the Court, but only if such amendment does not impair the rights of the Amended Settlement Class under the Amended Settlement Agreement.

17.     This Final Judgment and Order of Dismissal is not intended to and does not provide any antitrust immunities to any Persons or parties.

18.     17. Pursuant to the terms hereof, final judgment shall be entered as provided herein.

DATED this _____ day of _____, 2009.2010.

_____
Honorable John E. SprizzoDenny Chin,
United States District Judge

# ATTACHMENT M

## SETTLEMENT AGREEMENT BETWEEN PUBLISHERS AND GOOGLE

This Settlement Agreement (the "Agreement") is made as of ~~October 28, 2008~~November 13, 2009 by and among plaintiffs The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., and John Wiley & Sons, Inc. (collectively, the "Publishers") and defendant Google Inc. ("Google") (each, a "Party" and, collectively, the "Parties").

WHEREAS, on or about October 19, 2005, the Publishers filed a complaint against Google for copyright infringement in the United States District Court for the Southern District of New York captioned *The McGraw-Hill Companies, Inc. v. Google Inc.*, 05 Civ. 8881 (JES) (the "Action") arising out of, *inter alia*, Google's unauthorized reproduction of books in which the Publishers own copyright interests; and

WHEREAS, Google raised various defenses and denials in response to the allegations in the Action; and

WHEREAS, the Publishers also are named as representative plaintiffs in an amended class action complaint against Google for copyright infringement that is being filed contemporaneously herewith in the United States District Court for the Southern District of New York captioned *The Authors Guild v. Google Inc.*, 05 Civ 8136 (~~JES~~DC) (the "Class Action") and is brought on behalf of copyright owners in books reproduced by Google without authorization; and

WHEREAS, Google raised various defenses and denials in response to the allegations in the Class Action; and

WHEREAS, the Parties, and other plaintiffs in the Class Action, entered into a settlement agreement (the "Class Action Settlement"), which was filed in the United States District Court for the Southern District of New York on October 28, 2008, to settle the claims asserted in the Class Action; and

WHEREAS, the Parties filed an amended settlement agreement on November 13, 2009 ("Amended Settlement Agreement"), which is being filed contemporaneously herewith in the United States District Court for the Southern District of New York, to settle the claims asserted in the Class Action; and

WHEREAS, in order to avoid the costs and uncertainties of litigation, the Parties desire to settle all claims asserted in the Action;

NOW, THEREFORE, in consideration of the mutual covenants set forth below, the Parties agree as follows:

1.  Google shall make a settlement payment to the Association of American Publishers, Inc. (the "AAP") in the total amount of fifteen million five hundred thousand United States dollars (U.S. $15,500,000) (the "AAP Payment"), to settle the claims in the Action, to reimburse the AAP for attorneys' fees and costs and to establish a fund to serve the interests of both publishers and authors.  Within ten (10) business days after the Effective Date (as defined in the ~~Class Action~~Amended Settlement Agreement), Google shall make the AAP Payment by wire transfer to the AAP, as the AAP shall direct.

2.  None of the Publishers are entitled to any part of the AAP Payment and the AAP shall pay no part of the AAP Payment to any of the Publishers.

3. The Publishers' releases, as set forth in the ~~Class Action~~Amended Settlement Agreement, shall be effective on the Effective Date, provided that Google pays, and the AAP receives, the AAP Payment in accordance with the terms herein.

4. Notwithstanding anything in this Agreement, the Publishers have and retain all rights that they have under the ~~Class Action~~Amended Settlement Agreement.

5. The Parties shall file with the Court, within five (5) business days after the AAP's receipt of the AAP Payment, a Stipulation and Order of Dismissal with Prejudice in the form attached hereto as Exhibit A.

6. The Parties agree to keep confidential all information received by one Party from any other Party during the course of discovery in the Action, and shall make no disclosure thereof to any third party except as provided in this Agreement.

7. This Agreement supersedes all previous arrangements or understandings, whether written or oral, and contains the entire agreement of the Parties with respect to the manner in which the Action will be dismissed.

8. This Agreement may be modified, varied or otherwise amended only by a writing, of even or subsequent date hereto, signed by the Parties.

9. This Agreement and the settlement incorporated herein is not and shall not be construed as an admission of liability by any Party.

10. This Agreement has been negotiated by the Parties and their respective counsel and shall be interpreted fairly in accordance with its terms and without any strict construction in favor of or against any Party.

11.  Each individual signing this Agreement warrants and represents that s/he is duly authorized to execute this Agreement on behalf of the Party for which s/he signs.

12.  The Parties agree that the Court shall retain jurisdiction over any dispute arising from or relating to this Agreement.

13. This Agreement shall be governed by the laws of the State of New York, exclusive of its conflict of laws principles.

14.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

15.  Executed originals of this Agreement may be delivered by facsimile or by email.  Faxed signatures or signatures transmitted by email shall be considered originals.

IN WITNESS WHEREOF, the Parties hereto have each caused this Agreement to be duly executed by an authorized representative as of the first date written above.

THE MCGRAW-HILL COMPANIES, INC.,
PEARSON EDUCATION, INC.,
PENGUIN GROUP (USA) INC.,
SIMON & SCHUSTER, INC., and
JOHN WILEY & SONS, INC.

By their attorneys,


~~/s/ Jeffrey P. Cunard~~
By: _____
Jeffrey P. Cunard
DEBEVOISE & PLIMPTON LLP



GOOGLE INC.



By: ~~/s/ David Drummond~~ _____
David Drummond
Senior Vice President, Corporate Development and Chief Legal Officer

1600 Amphitheatre Parkway
Mountain View, CA  94043
(650) 253-0000 (phone)
(650) 253-0001 (fax)

Bruce P. Keller ~~(BK 9300)~~
Jeffrey P. Cunard
~~James J. Pastore, Jr. (JP 3176)~~
~~Debevoise & Plimpton LLP~~
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, ~~New York~~NY  10022
(212) 909-6000
~~Attorneys~~ (phone)
(212) 909-6836 (fax)
bpkeller@debevoise.com
jpcunard@debevoise.com
Counsel for Plaintiffs


<u>**EXHIBIT A**</u>


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| THE MCGRAW-HILL COMPANIES, INC., : <br> PEARSON EDUCATION, INC., PENGUIN : <br> GROUP (USA) INC., SIMON & SCHUSTER, : <br> INC., and JOHN WILEY & SONS, INC., : <br> : <br>                               Plaintiffs : <br> : <br>   v. : <br> : <br> GOOGLE INC., : <br> : <br>                          Defendant. : <br> : | **05 Civ. 8881 (**~~**JES**~~**DC)** <br><br> **STIPULATION AND ORDER OF** <br> **DISMISSAL WITH PREJUDICE** <br><br> **FILED ELECTRONICALLY** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


      IT IS HEREBY STIPULATED by and among, on the one hand, The McGraw-Hill

Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster,

Inc., and John Wiley & Sons, Inc. (collectively, the "Publishers"), and, on the other hand,

defendant Google Inc. ("Google"), by their undersigned counsel, as follows:

1. Any and all claims asserted herein by the Publishers shall be dismissed with prejudice pursuant to Rule 41(a) of the Federal Rules of Civil Procedure.

2. This dismissal shall be without costs or fees.

3. This stipulation may be filed without further notice with the Clerk of the Court.

4. The Court shall retain jurisdiction over any disputes relating to the resolution of this matter.

SO ORDERED, this _____ day of _____, ~~2009.~~20___.

_____

~~John E. Sprizzo~~
Denny Chin
United States District Judge

STIPULATED TO BY:

| | |
|---|---|
| THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., PENGUIN GROUP (USA) INC., SIMON & SCHUSTER, INC., and JOHN WILEY & SONS, INC. | GOOGLE INC. |
| By their attorneys, | By its attorneys, |

_____

Bruce P. Keller ~~(BK 9300)~~
Jeffrey P. Cunard
~~James J. Pastore, Jr. (JP 3176)~~
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)
bpkeller@debevoise.com
jpcunard@debevoise.com
~~jjpastor@debevoise.com~~

_____

Daralyn J. Durie, Esq.
~~David J. Silbert, Esq.~~
Joseph C. Gratz, Esq.
~~KEKER & VAN NEST~~DURIE TANGRI LLP
~~710 Sansome~~332 Pine Street, Suite 200
San Francisco, CA ~~94111~~ 94104
(415) ~~391-5400~~362-6666 (phone)

(415) ~~397-7188~~236-6300 (fax)
~~dsilbert@kvn.com~~
ddurie@~~kvn~~durietangri.com
jgratz@~~kvn~~durietangri.com

# ATTACHMENT N

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# Supplemental Notice To Authors, Publishers And Other Book Rightsholders About The Google Book Settlement

The parties in *Authors Guild, et al. v. Google Inc.* announced a settlement of the litigation in October 2008 and sent out a Notice of that settlement (the "Original Settlement"). The parties have now amended the Original Settlement in response to discussions with the United States Department of Justice and objections to the Original Settlement (the "Amended Settlement"). The Amended Settlement Agreement ("ASA"), as well as the original Settlement Agreement and the original Notice, may be found at http://www.googlebooksettlement.com or obtained from the Settlement Administrator, using the contact information on page 6.

This Supplemental Notice is not designed to replace the original Notice, but rather, to supplement that Notice. This Supplemental Notice identifies:

1) The material amendments to the Original Settlement,
2) Your rights under the Amended Settlement (see ASA page 4), and
3) The date of the fairness hearing scheduled to determine whether the Amended Settlement should be granted final approval (see ASA page 5).

---

**IMPORTANT UPDATE**: The deadline to claim Books and Inserts for Cash Payments has been extended from January 5, 2010 to March 31, 2011. The Removal deadline as to Google has been extended from April 5, 2011 to March 9, 2012. (The Removal deadline as to the libraries' digital copies remains April 5, 2011.)

---

## Summary of Amendments to the Original Settlement

**1.     Amended Settlement Class.**  The definition of Books has been narrowed.  As a consequence, many class members under the Original Settlement are no longer class members under the Amended Settlement.

*Rightsholders Who Are Included in the Amended Settlement Class*

- For United States works, the definition of Books remains largely unchanged:  United States works must have been published and registered with the United States Copyright Office by January 5, 2009 to be included in the Amended Settlement.
- Under the Amended Settlement, however, if the works are not United States works, they are only included in the Amended Settlement if they were published by January 5, 2009 and either were registered with the U.S. Copyright Office by that date or their place of publication was in Canada, the United Kingdom ("UK"), or Australia.

As a result of the narrowing of the definition of Books, the scope of Inserts has been narrowed as well.

**Please note that you may be a member of the Amended Settlement Class even if you do not reside in the United States, Canada, the UK or Australia.**  If your work meets the criteria above, then you are a member of the Amended Settlement Class regardless of where you reside and regardless of where else your work may also have been published.  (ASA Section 1.19)

A work will be considered to have a place of publication in Canada, the UK or Australia if its printed copy contains information indicating that the place of publication was in one of those three countries.  Such

information may include, for example, a statement that the book was "Published in [Canada or the UK or Australia]," or the location or address of the publisher in one of those three countries.

*<u>Rightsholders Who Are Not Included in the Amended Settlement Class</u>*

**As a result of these amendments, if the only United States copyright interests you own are in works that were not either (a) published and registered with the United States Copyright Office by January 5, 2009 or (b) published in Canada, the UK, or Australia by that date, you are not a member of the Amended Settlement Class, even if you were a member of the original Settlement Class.**

If you are not a member of the Amended Settlement Class, you will not be eligible to participate in the Amended Settlement and you will not be bound by its terms. You retain all rights to sue Google for its digitization and use of your copyrighted material without your permission. If you wish to sue Google for such digitization and use, you must do so in a separate lawsuit. Your rights may be affected by laws limiting the time within which you may bring such a suit. **If you are interested in bringing a lawsuit against Google, you should consult your own attorney.**

If you were a class member under the Original Settlement, but are not a class member under the Amended Settlement, you should visit http://books.google.com/books-partner-options in order to learn about Google's current policies with respect to the removal of your works from its databases, as well as Google's interest in making your works accessible in models similar to those in the Amended Settlement under similar terms.

**2.      Commercially Available.**  The Amended Settlement clarifies that a Book is Commercially Available if it is being offered for sale new by a seller anywhere in the world to a buyer in the United States, Canada, the UK or Australia. (ASA Section 1.31)

The Amended Settlement now provides that Google will not display any Book it classifies as not Commercially Available for at least 60 days after the date of that classification, or the Effective Date, whichever is later. The Amended Settlement also now provides that, if a Rightsholder asserts that a Book is Commercially Available, Google will not display the Book unless Google successfully challenges that assertion in a dispute. (ASA Sections 3.2(d)(i) and 3.3(a))

**3.      Representation of Canadian, UK and Australian Rightsholders on the Board of the Registry.**  The Amended Settlement provides that the Board of the Book Rights Registry (the "Registry") will, at a minimum, have one author and publisher director each from Canada, the UK and Australia.  (ASA Section 6.2(b)(ii))

**4.      Monitoring for Rightsholders Outside the United States.**  Because the services authorized by the Amended Settlement will be unavailable to users outside the United States, the Registry will, upon request, monitor Google's use of Books and Inserts to ensure that they conform to the requirements of the Amended Settlement and to Rightsholders' instructions, and will attempt to provide a means for such Rightsholders themselves to monitor and verify their claimed Books and Inserts.  (ASA Section 6.1(f))

**5.      Dispute Resolution Optional For Rightsholders.**  The Amended Settlement now provides that Rightsholders may agree not to arbitrate disputes between or among them under the dispute resolution mechanism in the Amended Settlement.  In addition, Rightsholders (but not Google) can elect to participate in any arbitration by teleconference or videoconference in order to save travel costs. (ASA Sections 9.1(a) and 9.3(a))

**6.    Independent Representation For Rightsholders of Unclaimed Books and Inserts.**  The Registry will include a fiduciary who will have the responsibility for representing the interests of Rightsholders with respect to the exploitation of unclaimed Books and Inserts.  (ASA Section 6.2(b)(iii))

**7.    Unclaimed Books and Inserts and Unclaimed Funds.**  The Amended Settlement clarifies that, from its inception, the Registry will use settlement funds to attempt to locate Rightsholders.  The Amended Settlement also now provides that funds owed to Rightsholders of unclaimed Books and Inserts ("Unclaimed Funds") will not be used by the Registry for general operations or reserves and will not be distributed to claiming Rightsholders.  The Amended Settlement makes the following changes to the Original Settlement:  (a) after Unclaimed Funds are held for five years, the Registry, in collaboration with organizations in Canada, the UK and Australia, and in consultation with the fiduciary, may use up to 25% of the funds for the sole purpose of locating Rightsholders; and (b) remaining Unclaimed Funds will be held for the Rightsholders for at least 10 years, after which the Registry, subject to fiduciary approval as to timing, may apply to the Court for permission to distribute Unclaimed Funds to literacy-based charities in the United States, Canada, the UK and Australia, upon notice to Rightsholders, the attorneys general of all states in the United States, and Fully Participating and Cooperating Libraries.  (ASA Section 6.3)

**8.    Commitment to Improving Claiming Process and Website.**  The Amended Settlement provides that the Registry and Google (for as long as Google continues to provide operational support for the Registry) will maintain and improve the Settlement Website to facilitate the claiming of Books and Inserts.  Google will also work to correct errors in the Books Database.  (ASA Section 13.3)

**9.    Additional Revenue Models.**  The Amended Settlement now limits the potential new revenue models to the following three additional Revenue Models, which must be approved by the Registry:
    1) Print-on demand ("POD"),
    2) File download (formerly "PDF Download"), and
    3) Consumer subscription.

The Amended Settlement limits POD, if approved, to Books that are not Commercially Available.  In addition, the Amended Settlement specifies that the revenue split between Google and Rightsholders as to the additional Revenue Models will be the same as for the existing Revenue Models.

Finally, the Amended Settlement provides that Rightsholders of claimed works (and the fiduciary for unclaimed works) will be given timely advance notice before an additional Revenue Model is launched, with an opportunity to exclude works from that model.  (ASA Section 4.7)

**10.    Agreeing to Different Revenue Splits for Commercially Available Books.**  For Commercially Available Books, the Amended Settlement provides that either Google or the Rightsholder will have the ability to request renegotiation of the 63/37 standard revenue split for any or all revenue models.  If they cannot reach an agreement, then neither of the parties is obligated to offer the Rightsholder's Books in the revenue models.  (ASA Section 4.5(a)(iii))

**11.    Discounting off Consumer Purchase List Price.**  Google will now have an unlimited right to discount the List Price of Books for Consumer Purchase, so long as it continues to pay 63% of the undiscounted List Price to the Registry for Rightsholders.  The Registry may also authorize Google to make special offers of Books for Consumer Purchase at reduced prices from the List Price and pay 63% of the discounted List Price to the Registry for Rightsholders.  Claiming Rightsholders (and the fiduciary for unclaimed Books), however, will be notified of this reduced price proposal and can disapprove it for their (or unclaimed) Books.  (ASA Sections 4.5(b)(i) and (ii))

3

**12.    Resale of Consumer Purchase.**  The Amended Settlement requires that Google allow third parties to sell consumer access to Books offered through Consumer Purchase, with the reseller receiving a majority of Google's 37% share of the revenue split.  (ASA Section 4.5(b)(v))

**13.    Non-discrimination Clause (i.e., "Most Favored Nations" clause).**   Section 3.8(a) of the Original Settlement has been eliminated from the Amended Settlement.

**14.    Settlement Controlled Pricing.**  The Amended Settlement clarifies that the Pricing Algorithm used to establish the Settlement Controlled Prices for Consumer Purchase will be developed to simulate the prices in a competitive market and that the price for a Book will be established without regard to changes to the price of any other Book.  The Amended Settlement also clarifies that the Registry will not disclose the Settlement Controlled Price for a Book to anyone other than the Book's Rightsholders.  (ASA Sections 4.2(b)(i)(2), 4.2(c)(ii)(2) and 4.2(c)(iii))

**15.    Modification of Feature Restrictions.**  Rightsholders may authorize Google to modify or remove the Amended Settlement's default restrictions on Revenue Model features, such as copy/paste and print.  (ASA Section 3.3(g))

**16.    Registry Support for Alternative Licenses (Including Creative Commons).**  The Amended Settlement provides that the Registry will facilitate Rightsholders' wishes to allow their works to be made available through alternative licenses for Consumer Purchase, including through a Creative Commons license. For information about Creative Commons licenses, visit http://www.creativecommons.org.  The Amended Settlement also clarifies that Rightsholders are free to set the Consumer Purchase price of their Books at zero. (ASA Sections 1.44, 4.2(a)(i) and 4.2(b)(i)(1))

**17.    Public Access Terminals.**   The Amended Settlement authorizes the Registry to agree to increase the number of public access terminals at a public library building.  (ASA Section 4.8(a)(i)(3))

**18.    Pictorial Works.**  The Amended Settlement no longer includes children's book illustrations in the definition of Inserts.  (ASA Section 1.75)  The Amended Settlement, however, does not change the inclusion of pictorial works, such as graphic novels and children's picture books, in the definition of Books and provides that the Amended Settlement only authorizes Google to display the pictorial images in such Books if a U.S. copyright owner of the pictorial image also is a Rightsholder of the Book.  The Amended Settlement also clarifies that comic books are considered to be Periodicals and that Periodicals (as well as compilations of Periodicals) are not included in the definition of "Books," and thus are not in the Amended Settlement.  (ASA Section 1.104)

**19.    Music Notation.**  The definition of Book was amended in the Amended Settlement to better achieve the parties' goal of excluding books that are primarily used to play music.  (ASA Section 1.19)  Also, "music notation" is no longer included in the definition of Inserts.  (ASA Section 1.75)

**20.    Deadline to Claim Usage and Inclusion Fees.**  Usage Fees will now be held for Rightsholders who have not yet claimed their Books for at least ten years and Rightsholders will now be eligible for Inclusion Fees if they claim their Books or Inserts within ten years of the Effective Date, instead of five years, in both cases as had been provided in the Original Settlement.  (Plan of Allocation Sections 1.1(c), 1.2(c) and 2.2)

# Your Rights Under the Amended Settlement Agreement

Members of the Amended Settlement Class have the following options:

| If you… | Then… | Deadline |
|---|---|---|
| Wish to remain in the Amended Settlement Class (if you did not previously opt out of the Original Settlement) | You need not do anything at this time. | N/A |
| Wish to remain in the Amended Settlement Class and wish to be eligible to receive a Cash Payment for any Book or Insert scanned on or before May 5, 2009 but haven't yet claimed your Books and Inserts | You must submit a claim by using the Claim Form, available at http://www.googlebooksettlement.com or from the Settlement Administrator. | March 31, 2011 |
| Have already claimed Books and Inserts using the Claim Form | You need not take any additional steps at this time with respect to those Books and Inserts. | N/A |
| Opted out of the Original Settlement, and wish to remain opted out of the Amended Settlement | You need not – and should not – opt out again. Your opting out of the Original Settlement will serve as an opt-out of the Amended Settlement as well. | N/A |
| Did not opt out of the Original Settlement but wish to opt out of the Amended Settlement | You may do so by following the instructions in the original Notice and at http://www.googlebooksettlement.com. | _____, 2010 |
| Opted out of the Original Settlement and wish to opt back in to the Amended Settlement | You may do so by notifying the Settlement Administrator or Class Counsel or by filling out the "Opt-Back-In Form" at http://www.googlebooksettlement.com. | _____, 2010 |
| Wish to file an objection to the terms of the Amended Settlement | So long as you remain in the Amended Settlement (that is, you have not opted out), you may file an objection by following the instructions in the original Notice.<br><br>If you are objecting to the terms of the Amended Settlement, however, you may object only to the provisions amending the Original Settlement.<br><br>All objections filed in connection with the Original Settlement are preserved unless withdrawn and should not be refiled. | ____, 2010 |

5

# Rescheduled Date of the Fairness Hearing

The Court will hold a Fairness Hearing on _____, 2010 at ____ in Courtroom ___ of the United States District Court for the Southern District of New York, United States Courthouse, 500 Pearl Street, New York, NY 10007, to consider whether the Amended Settlement, as set forth in ASA, is fair, adequate and reasonable.  Please review the original Notice for further information concerning participation in the Fairness Hearing.

**If you have any questions concerning this Supplemental Notice or the Amended Settlement, please contact Class Counsel, or the Settlement Administrator, whose contact information may be found in the original Notice or at http://www.googlebooksettlement.com.   You may also contact the Settlement Administrator at:**

Google Book Search Settlement Administrator
c/o Rust Consulting, Inc.
PO Box 9364
Minneapolis, MN 55440-9364
+1.612.359.8600 (Tolls may apply.  Toll-free numbers are available at
         http://www.googlebooksettlement.com.)