UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE AUTHORS GUILD, INC.,
ASSOCIATION OF AMERICAN PUBLISHERS, INC.,
ET AL.,

        Plaintiffs,

  v.

GOOGLE INC.,

        Defendant.

Case No. 05-cv-08136-DC

---

## MEMORANDUM OF AMICUS CURIAE THE INTERNET ARCHIVE IN OPPOSITION TO AMENDED SETTLEMENT AGREEMENT

ARNOLD & PORTER LLP

Hadrian R. Katz
Catherine R. Rowland
Brent S. LaBarge
555 12 Street, NW
Washington, DC 20004
Tel.: 202-942-5707
Fax: 202-942-5999
E-mail: hadrian.katz@aporter.com

Anthony Boccanfuso
399 Park Avenue
New York, NY 10022
Tel.: 212-715-1000
Fax: 212-715-1399
E-mail: anthony.boccanfuso@aporter.com

Susan P. Koniak
BOSTON UNIVERSITY SCHOOL OF LAW
Boston, MA 02215

**TABLE OF CONTENTS**

|   |   | PAGE |
|---|---|---|
| I. | The Amendments to the Settlement Agreement Do Not Remedy the Rule 23 Concerns Identified in the Internet Archive's Initial Memorandum | 2 |
|   | a. Class Rules Still Do Not Permit the Inclusion of Orphan Works | 2 |
|   | b. Google's Prior Statements Demonstrate the Inadequacy of the Amended Agreement | 2 |
|   | c. The Amendments Do Not Cure the Anticompetitive Elements of the Original Agreement | 3 |
|   | d. The Amended Agreement Fails To Respect the Rights of Foreign Authors | 4 |
|   | e. The Amended Agreement Continues to Pose Risks to Personal Privacy | 6 |
| II. | Creation of an Unclaimed Works Fiduciary Would Not Materially Reduce the Prejudice to Orphan Works Owners | 7 |
| III. | No Class Settlement Should Authorize Google To Commit Additional Wrongful Acts in the Future | 8 |
| IV. | Conclusion | 10 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE INC., <br><br> Defendant. | Case No. 05-cv-08136-DC |

**MEMORANDUM OF AMICUS CURIAE THE INTERNET ARCHIVE
IN OPPOSITION TO AMENDED SETTLEMENT AGREEMENT**

The Internet Archive ("the Archive") respectfully submits this Memorandum in opposition to the November 13, 2009 Amended Settlement Agreement (the "Amended Agreement") between the plaintiffs and defendant Google Inc. ("Google" and, collectively with the plaintiffs, "the Parties").

The Amended Agreement fails to address the concerns voiced by the Archive, and echoed by numerous other stakeholders, in opposition to the original October 28, 2008 Settlement Agreement (the "Original Agreement"). These concerns involve fundamental issues, including the misappropriation of massive numbers of orphan works, the anticompetitive nature of the agreement, and the failure to fairly address the rights of foreign authors. Instead of remedying these problems, the Parties offered only minor amendments that still allow them to manipulate class procedures to seize rights that copyright law has secured to others.

The Archive submits that approving the Amended Agreement would violate rule 23 and would be an abuse of the class procedure.

I.  **The Amendments to the Settlement Agreement Do Not Remedy the Rule 23 Concerns Identified in the Internet Archive's Initial Memorandum**

The Amended Agreement poses the same significant problems set forth in the Archive's September 8 memorandum in opposition to the Original Agreement.

  a.  **Class Rules Still Do Not Permit the Inclusion of Orphan Works**

The Amended Agreement continues to sweep the large number of orphan works into the settlement, granting Google the right to copy and sell the intellectual property of others. Despite the numerous comments pointing out that orphan works cannot be included consistent with rule 23, Google apparently considers them too valuable to do without. Because orphan works owners are, by definition, unidentifiable, it would be impossible for anyone – including the class representatives – to know how this diverse group would feel about the Amended Agreement's terms.

As discussed in detail in the Archive's September 8 memorandum, because orphan works owners cannot be located, it is difficult to conceive of a proper method of notice. Moreover, it is far from clear that owners of orphan works would have interests consistent with each other, much less with identifiable rights holders. The Amended Agreement does not address these issues. The Amended Agreement thereby continues to violate many of the requirements of rule 23, including rule 23 (a) (2) - (4) (commonality, typicality, and adequacy of representation), rule 23 (b) (3) (predomination and superiority), 23 (c) (2) (B) (lack of notice), and 23 (e) (fairness).

  b.  **Google's Prior Statements Demonstrate the Inadequacy of the Amended Agreement**

Google's own arguments in another class litigation demonstrate the problems inherent in the Amended Agreement. In *Vulcan Golf, LLC v. Google, Inc.*, 254 F.R.D. 521 (N.D. Ill. 2008), the

plaintiffs brought a class infringement action against Google and others on behalf of trademark owners. In opposing certification of the class, Google argued that the typicality and adequacy requirements of rule 23 (a) were not satisfied because some class members had ongoing relationships with the defendant, while others did not, thus presenting a conflict within the class. *Id.* at 526. Google's own argument applies here, against the settlement, because Section 17.9 of the Amended Agreement states that "Google may already have . . . separate agreements directly with individual members of the Amended Settlement Class." Accordingly, some class members here may have an interest in maintaining their preexisting relationship with Google, and thus an interest in minimizing Google's damages to avoid jeopardizing the continuing viability of their own agreements.

Additionally, in *Vulcan*, Google claimed that individual issues precluded class certification because membership in the class required that a potential class member own the trademark at issue, and that the trademark was sufficiently distinctive to give rise to trademark rights, both issues that would need to be assessed on a case-by-case basis. *See id.* at 528-30. As with the question of trademark ownership identified by Google in *Vulcan*, the predicate issue of copyright ownership equally pervades this case. So too do questions of whether works copied by Google are even (or still) eligible for copyright protection in the first instance.

    c.    **The Amendments Do Not Cure the Anticompetitive Elements of the Original Agreement**

Although the Parties apparently made some efforts to amend the Original Agreement to respond to the concerns identified by the Department of Justice in its September 18 Statement of Interest ("DOJ Statement") on behalf of the United States, Google has not resolved the underlying anticompetitive provisions that would harm the Archive and other competitors in their efforts to make electronic books available to the public. Under the settlement, Google

3

would have the right to make complete copies of orphan works and use them for both display and non-display purposes, with no risk of copyright liability. Competitors that attempted to do the same thing, however, would face exposure to statutory damages, which could be as high as $150,000 per work.

The Archive is heavily invested in acting as an online library and would be very interested in making orphan works available to the public at no cost. However, as a non-profit organization, the Archive cannot responsibly accept the risk of liability for infringement. If Google alone is allowed to use orphan works without fear of prosecution, the public will have to rely on Google to access them.

Ultimately, the best way to resolve the orphan rights issue would be through federal copyright legislation, a path strongly endorsed by the Register of Copyrights, and supported by most interested commercial and non-profit companies. Approval of the settlement, however, would undoubtedly diminish any interest in such legislation from Google and the publishers and authors supporting the settlement, and make the enactment of legislation more difficult.

### d. The Amended Agreement Fails To Respect the Rights of Foreign Authors

The Archive's objections to the treatment of foreign authors have not been sufficiently addressed by the Amended Settlement. Noting the objections submitted on behalf of the German and French governments, the Parties have arbitrarily narrowed the class of foreign authors encompassed within the settlement by amending the definition of "Book" to include a work provided that it:

> (1) if a "United States work," as defined in 17 U.S.C. § 101, was registered with the United States Copyright Office, and (2) if not a United States work, either (x) was registered with the United States Copyright Office, or (y) had a place of publication in Canada, the United Kingdom or Australia, as evidenced by information printed in or on a hard copy of the work.

4

*See* Amended Agreement Section 1.19.

The foreign works that remain in the agreement include, among others, all works published in the United Kingdom, Australia, and Canada, which likely constitute the overwhelming majority of English-language copyright-protected works published outside of the United States. The Amended Agreement indiscriminately includes such works without regard to whether these are registered with the United States Copyright Office, or even published in the United States. Legally, the works of United Kingdom, Australian, and Canadian authors enjoy no more or less protection under United States copyright law than their non-English counterparts in France and Germany. Rather, the only explanation advanced by the Parties to account for this seemingly arbitrary division is the fortuitous happenstance of these countries' purportedly "common legal heritage and similar book industry practices." *See* AAP Frequently Asked Questions Regarding Google Book Settlement, *available at* http://publishers.org/main/Copyright/CopyKey/documents/RevisedSettlementFAQ.pdf.

The more transparent explanation, however, is that English language works are the most valuable to Google, and are the most likely to keep Google interested in settling, as opposed to litigating, this dispute. English is the most commonly-spoken language of Internet users worldwide. More importantly, over the course of the past three years Google has derived on average over two thirds of its revenue from the United States and United Kingdom alone. *See* Google's 2008 Annual Report. This number would undoubtedly rise to well above eighty percent if Canada and Australia were included. Indeed, by so structuring the class to include United Kingdom, Australian, and Canadian works, as well as orphan works, class representatives are able to offer for the first time anywhere rights to virtually the entire corpus of English literature for pennies on the dollar.

What the Amended Agreement will not do, however, is satisfy the objections of Germany and France by removing German and French works from those over which Google will obtain rights. Under the Berne Convention, to which the United States is a signatory,[1] the country of origin of a work depends on where the work was first published (including review of simultaneous publication). *See* Berne Convention, Article 5(4).[2] The implementing legislation accordingly defines a "United States work" contingent on the place of first publication or an analysis of unpublished or simultaneously published works. *See* 17 U.S.C. § 101 (2005).[3]

The Amended Agreement, however, limits its treatment of "United States work" in the definition of "Book" to books registered with the United States Copyright Office whether or not the place of first publication is Germany, France, or any other foreign nation. Google's continued inclusion of these foreign works presents the same problems as in the Original Agreement, and will deprive numerous foreign authors of rights otherwise guaranteed by federal and international law. We anticipate further objections along these lines from foreign governments and authors.

e.    **The Amended Agreement Continues to Pose Risks to Personal Privacy**

Although section 6.6 (f) of the Amended Agreement prevents Google from sharing personally identifiable information with the Registry (except as require by law or valid legal process), that language does not address all of the Archive's privacy concerns. Google itself is not limited from creating comprehensive user profiles, which it may be able to use for its own

---

[1] Berne Convention for the Protection of Literary and Artistic Works, Article 5(4), Sept. 9, 1886 (as revised at Paris on July 24, 1971 and amended in 1979, 828 U.N.T.S. 221.

[2] If a work is simultaneously published in numerous countries, or is unpublished, the Berne Convention provides a formula to determine which country should be deemed the country of origin.

[3] Like the Berne Convention, Section 101 also provides a specific analysis for unpublished works.

commercial advantage. For example, Google could compile dossiers on individual users by running their queries against the data base of book contents, either in real time or as a batch operation. This is one of the "non-display" uses of book contents that Google would be permitted to employ even with respect to books that had been withdrawn from use for snippets or display. Such dossiers would allow Google to personalize advertisements to or aim products at specific users. These are just a few examples of the potential for Google's use or personal information. The Archive is concerned that Google will be able to amass a large amount of personal information that could adversely impact user privacy.

## II. Creation of an Unclaimed Works Fiduciary Would Not Materially Reduce the Prejudice to Orphan Works Owners

One of the revisions to the Amended Agreement is the creation of a new entity – the Unclaimed Works Fiduciary ("UWF") – to handle certain aspects of "unclaimed" works. *See* Amended Agreement, section 6.2 (b) (iii). Though the Parties may have thought that this would assuage some concerns about orphan works, the UWF has no real power. The UWF cannot provide orphan works owners with real notice of the proposed agreement, or help them opt out before it is too late. Instead, the UWF's duties are limited to a narrow set of pricing and use restrictions that do not impact the fundamental problems with including orphan works within the scope of the settlement.[4]

Even those powers that are delegated to the UWF are tinged with bias. For example, the UWF will be chosen by the board of directors of the Registry, which has its own interests in the

---

[4] *See* section 6.2 (b) (iii), enumerating the list of relevant powers, including the following: 3.2 (e) (i) (changing classifications of unclaimed books); 3.10 (c) (iii) (excluding certain advertising uses in connection with unclaimed books); 4.2 (c) (i), 4.5 (b) (ii), and 4.7 (approving certain pricing and revenue models for unclaimed books); 4.3 (e) (v) (g) (adjusting Preview Uses for unclaimed books); 6.2 (b) (1) (licensing unclaimed books "to the extent permitted by law"); and sections 3.2 and 3.3 of the Author-Publisher procedures (changing book classifications).

commercialization of books. Moreover, the UWF does not even have the primary role in locating unclaimed works owners. Section 6.3 (a) (i) (2) makes clear that the Registry is the entity that "will determine the how to use . . . Unclaimed Funds to attempt to locate the Rightsholders of unclaimed Books" – the Registry merely has to *consult* with the UWF on this matter.

The addition of the UWF thus does nothing to fix the underlying class action procedural issues, which revolve around the problems with finding orphan works owners and assessing whether those owners would agree with, or be represented by, the current class representatives. A better approach would have been to give the UWF the status of class representative for the owners of orphan works. We assume that the parties avoided that approach out of concern that any such independent representative would promptly opt out of the settlement on the orphan rights owners' behalf.

### III. No Class Settlement Should Authorize Google To Commit Additional Wrongful Acts in the Future

Instead of limiting the settlement to Google's past conduct, the Parties have established terms that allow Google to go much farther than its original acts of copying books. The Amended Agreement not only settles claims against Google for past copying, but authorizes Google to copy anything it likes in the future, and make further uses of works that were not the basis of the lawsuit and have not yet occurred. As noted in the DOJ Statement, these forward looking licenses are "far afield from the facts alleged in the Complaint" and thus problematic under Second Circuit law that allows the release of claims only if they arise out of the "identical factual predicate" as the settled conduct. *See* DOJ Statement at 7; *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005).

We understand that Google has been advancing the assertion that future scanning of other books should be authorized as having the identical factual predicate as its prior scanning. But this is a fundamental mischaracterization of Second Circuit law. A single act of copying might infringe the rights of multiple rights owners, and all of those infringements would stem from the identical predicate. But future copying would be a distinct act requiring distinct analysis. Some future acts of copying might satisfy the fair use test, while others might not. The settlement proposed by Google here would be akin to a polluter settling a class action over a toxic waste site, and later claiming that it has no liability for a different toxic site created in the future because it arose from the same factual predicate.

The unfairness of such an arrangement is underscored by the large numbers of opt-outs and objectors here, including foreign governments. Under rule 23, the Court must ensure that a settlement is "fair, reasonable, and adequate"; and the class's own reaction to the settlement terms, which is frequently measured by both "the number and vociferousness of the objectors," is an invaluable barometer of the sufficiency of the terms. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785, 812 (3d Cir. 1995). Here, *hundreds* of objections were filed on behalf of entities purporting to represent the interests of *millions* of putative class members.[5] Moreover, the objections have been vigorous, asserting the existence of fundamental problems that threaten to strip innumerable rights owners of the ability to decide the fate of their works.

---

[5] As reported by the Parties, these objections "include hundreds of objections from individuals and corporate entities within and from outside of the United States, from the Federal Republic of Germany and the Republic of France, and from the Attorneys General of six states (Connecticut, Kansas, Missouri, Pennsylvania, Texas, and Washington)." *See* Plaintiffs' Memorandum in Support of Unopposed Motion to Adjourn October 7, 2009 Final Fairness Hearing and Schedule Status Conference.

9

The Parties themselves have implicitly recognized the insufficiency of the Original Agreement by attempting to limit its scope to foreign works published in the United Kingdom, Canada, and Australia. The restriction demonstrates that the Parties must have agreed to some degree with the waves of objections to the scope of the agreement.

The Archive submits that many of the Amended Agreement's infirmities could be resolved if the Parties would simply remove orphan rights owners from the scope of the settlement and instead allow them to voluntarily sign up for the Registry if they are so inclined. Such a procedure would ensure that the individuals bound by the settlement were aware of, and consented to, the terms. In light of the unique and precarious nature of orphan works owners, and the massive number of forceful objections, the most prudent approach would be to err on the side of allowing these owners to maintain control of their valuable intellectual property.

### IV.    Conclusion

For the aforementioned reasons, the Archive objects to the terms of the proposed Amended Agreement. This is not properly a class action, and any settlement should apply only to willing participants.

Dated: January 27, 2010                    Respectfully submitted,

  /s/ Hadrian R. Katz
Hadrian R. Katz
Catherine R. Rowland
Brent S. LaBarge
ARNOLD & PORTER LLP
555 12 Street, NW
Washington, DC 20004
Tel.: 202-942-5707
Fax: 202-942-5999
E-mail: hadrian.katz@aporter.com

Anthony Boccanfuso
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
Tel.: 212-715-1000
Fax: 212-715-1399
E-mail: anthony.boccanfuso@aporter.com

Susan P. Koniak
BOSTON UNIVERSITY SCHOOL OF LAW
Boston, MA 02215

11