# EXHIBIT 1



Office of the Clerk

**J. Michael McMahon**

US District Court for the Southern District of New York

500 Pearl Street

New York, New York 10007

Etats-Unis

Paris, January 27, 2010

*Filed electronically & by Express Courrier*

**To the attention of the Honorable Denny Chin**

Re: **The authors Guild Inc., Association of American Publishers, Inc. v. Google (Case No. 05 CV 8136 JES) – Objections of Hachette Livre SA to Proposed Amended Class Settlement Agreement**

Dear Judge Chin:

1. I, Arnaud Nourry, signatory of this letter, am a citizen of France and Chief Executive Officer of Hachette Livre SA, empowered.

2. Hachette Livre SA, having its registered office and principal place of business in Paris, France, objects, as the parent company of a multinational group having many European subsidiaries, to the settlement agreement proposed in the above-captioned matter as transmitted by a representative of the parties to Hachette Livre SA upon several occasions during the month of December 2009 (The "Proposed Amended Settlement Agreement").

- 1 -

3. Hachette Livre SA ("**Hachette**") is a French-based company with consolidated annual revenues of more than € 2.2 billion (approximately USD three billion). It does business in the publishing, distribution, and selling of books encompassing, *inter alia*, literature and general interest, illustrated books, practical guides, textbooks, dictionaries, and children's books, as well as various books on education, in the English, French, and Spanish languages. It also provides interactive educational products and services. Hachette is the largest publisher by sales in France. In Europe, it has a strong presence, particularly in the United Kingdom and in Spain. Hachette encompasses more than 40 publishing houses in Europe. *As a group, Hachette is the world's second biggest publisher.*

4. Hachette has not opted-out and is thus a member of the Publisher Sub-Class.

5. By a submission dated September 3, 2009, Hachette wrote to the Court to object to the original proposed settlement Agreement in this matter (the "Original Settlement Agreement"). As a European Publisher, Hachette set out ten fundamental and material objections to the Original Proposed Settlement as it was before the Court at that time. Various non-US subsidiaries of Hachette also filed, separately, their objections to the Original Proposed Settlement. These additional objections were attached to Hachette's objections as exhibits.

6. On November 5, 2009, Hachette filed with the Court a series of procedural objections, based upon the transcript of the Status Conference, in particular with regard to the schedule proposed by the parties. Hachette can only reiterate its concern -- as expressed in that letter -- according to which acceleration of the procedure would seem to be problematical given the stakes. Indeed, such acceleration of the procedure would be totally incompatible with the novel use of the class action settlement mechanism to organize future new commercial dealings involving economic operators from the entire world (*"forward-looking business arrangements"*). The forward-looking business arrangements provided for under the Proposed Amended Settlement Agreement will have considerable economic consequences on a perpetual worldwide basis.

7. Hachette is also deeply concerned by the fact that the parties have thus far avoided responding to the more than 400 submissions setting out objections which were filed with the Court in

connection with the Original Proposed Settlement Agreement. Expert observers have analyzed all of the various objections set out in those submissions as originally filed and identified 76 issues falling into 11 categories[1]. A careful analysis of the Proposed Amended Settlement Agreement shows that many of these objections have not been dealt with by the parties in the new proposal. In cases where amendments do ostensibly correspond to objections, the parties should also be made to justify their choices and this publicly, since the issues concern the entire world and not just the parties to the instant court case. Hachette believes that the parties have a *public responsibility* to respond to those objections as well as the additional objections to the Proposed Amended Settlement Agreement in a reasoned submission. The entire world is watching this case.

8.  As a European publisher, Hachette objects to the Proposed Amended Settlement Agreement and strenuously urges the Court to reject it due to the significant unfair and inequitable effects that it will have not only on Hachette but on the many other foreign publishers in a similar position[2]. The Proposed Amended Settlement Agreement is purely and simply unacceptable from the point of view of a European publisher.

9.  Although the parties ostensibly attempted to surmount objections to the original Proposed Settlement Agreement by limiting it henceforth to Books published or registered in the four countries specifically designated by the Proposed Amended Settlement Agreement -- the United States, Canada, the United Kingdom or Australia (collectively, the "Designated Anglophone Countries") -- such change did not have as its effect to exclude Hachette from the scope of the Proposed Amended Settlement Agreement. To the contrary, for the reasons explained below, Hachette (as well as, it may be imagined, other publishers from throughout the world who do not publish in the Designated Anglophone Countries) continues to fall within the definition of the Amended Settlement Class and to be a significant member of the Amended Settlement Class.

---

[1] Cf. James Grimmelmann, Associate Professor of Law, the Public-Interest Book Search Initiative, New York Law School, *"Objections to the Google Books Settlement and Responses to the Amended Settlement: A Report"*, December 2009, available at *http://digital-scholarship.org/digitalkoans/2009/12/10/objections-to-the-google-books-settlement-and-responses-in-the-amended-settlement-a-report/*).

[2] In this letter, capitalized terms deriving from the Original Proposed Settlement Agreement and the Proposed Amended Settlement Agreement shall have the same meaning as that used in the Proposed Settlement.

10.      Article 1.13 defines the "Amended Settlement Class" in these terms: "*All Persons, as of January 5, 2009, hav*[ing] *a Copyright Interest in one or more Books or Inserts*". In this respect, without going into the complex language of the Proposed Amended Settlement Agreement itself, the Supplemental Notice (attachment N to the Proposed Amended Settlement Agreement) states the following:

> "*1. Amended Settlement Class. The definition of Books has been narrowed. As a consequence, many class members under the Original Settlement are no longer class members under the Amended Settlement.*

> *Rightsholders Who Are Included in the Amended Settlement Class*

> - *For United States works, the definition of Books remains largely unchanged: United States works must have been published and registered with the United States Copyright Office by January 5, 2009 to be included in the Amended Settlement.*

> - *Under the Amended Settlement, however, if the works are not United States works, they are only included in the Amended Settlement if they were published by January 5, 2009 **and either were registered with the U.S. Copyright Office by that date or their place of publication was in Canada, the United Kingdom ("UK"), or Australia.***

> (…)

> ***Please note that you may be a member of the Amended Settlement Class even if you do not reside in the United States, Canada, the UK or Australia.*** *If your work meets the criteria above, then you are a member of the Amended Settlement Class regardless of where you reside and regardless of where else your work may also have been published.*"

11. It derives from the above definition of the Class, that Hachette is indisputably a significant member of the Amended Settlement Class under the Proposed Amended Settlement Agreement.

12. Indeed, according to statistics held by the French Publishers Association (SNE), between 1930 and 1990, French publishers registered with the United States Copyright Office approximately 200,000 books. Hachette estimates that about 100,000 of these works were registered under the name Hachette as well as other publishing houses belonging to the Hachette group, in particular the following French publishers of the group: Editions Grasset, Fayard, Dunod, Armand Colin, Larousse, Hatier, Calmann-Levy and Stock.

13. Moreover, Hachette has every reason to believe that various non-French publishers belonging to the Hachette Livre group but not publishing in the Designated Anglophone Countries have also registered a fair amount of their works with the US Copyright Office for the same reasons as the French publisher, in particular those Hachette subsidiaries which publish books in the Spanish-speaking world.

14. The vast majority of those Hachette works registered with the US Copyright Office were registered before 1990. In addition, since 1990, US distributors of Hachette have continued to register some French and other non-US books with the US Copyright Office, but only for those books actually imported into the United States.

15. The explanation is very simple. Under the copyright rules in force in the United States of America until 1990, said registration was necessary for copyright protection in the United States, since the Berne Convention had not yet entered into force.

16. Hachette and its subsidiaries throughout the world which publish in non-Designated Anglophone Countries thus continue to be members of the Amended Settlement Class under the Proposed Amended Settlement Agreement.

17.   Given the above, Hachette urges the Court to recognize that its own ability to render justice with regard to the Proposed Amended Settlement Agreement is irremediably compromised on at least one point. The Court's Order of November 19, 2009 states: *"Objections filed to the Settlement Agreement need not and should not be refiled."* Hachette presumes that the Court will carefully analyze the more than 400 submissions of objections originally filed with it. However, in some cases, the Court will be unable to determine whether a specific submission has been validly filed. Indeed, if the author of the submission is not a member of the Amended Settlement Class, then the objections are no longer valid since the concerned person is no longer a member of the Amended Settlement Class.

18.   For each submission by a natural or legal person, not domiciled in the United States, Canada, Australia, or the United Kingdom (such as Hachette), how is the Court to know whether the original submission is still valid? In Hachette's case, the Court knows that the original submission is still valid because Hachette has written to the Court to inform it that it is a member of the Amended Settlement Class. However, the Supplemented Notice itself does not specify that such information be given to the Court. According to the Supplemental Notice (p.5 ), a Rightsholder who did not and still does not wish to opt-out and thus wishes to remain in the Amended Settlement Class and who filed objections to the Original Proposed Settlement Agreement but does not wish to file objections to the Proposed Amended Settlement Agreement, should not refile the Original Objections and *"need not do anything at this time"*. This means that for all original objectors (i) who are not domiciled in the United States, Canada, Australia or the United Kingdom, (ii) who have registered a Book with the United States Copyright Office before May 5, 2009 (this would probably have been done before 1990, for the reasons outlined above) and (iii) who have filed objections to the Original Proposed Settlement Agreement and (iv) who wish to remain in the Amended Settlement Class, but without filing any new objections to the amendments made in the Proposed Amended Settlement Agreement, and thus *"do not do anything at this time"*, the Court has no means of now being able to determine whether the said original objections are still valid as being filed by a member of the Amended Settlement Class.

19. Hachette and its subsidiaries who have objected to the Original Proposed Settlement Agreement maintain, *mutatis mutandis*, those objections in the framework of the procedure before the Court as it continues with regard to the Proposed Amended Settlement Agreement. A summary of all objections originally filed by Hachette and its subsidiaries, and maintained, *mutatis mutandis*, in the framework of the procedure concerning the Proposed Amended Settlement Agreement, is attached hereto as **Exhibit A** (Document n° 270, filed on September 8, 2009).

20. At point 18 of the Court's order of November 19, 2009, it is stated that objections to the terms of the Proposed Amended Settlement Agreement should "*be limited to the provisions amended from the Settlement Agreement*". Hachette has complied with this principle.

21. In this context, Hachette – while maintaining, *mutatis mutandis*, its original objections of September 3, 2009 as filed with the Court -- hereby files on its own behalf and on behalf of its subsidiaries which have published Books in non-Designated Anglophone Countries whose names appear in **Exhibit B**, the following *additional* objections, related exclusively and specifically to the changes brought by the parties to the Original Proposed Settlement Agreement under the Proposed Amended Settlement Agreement, and having an effect on Hachette:

- Amendments do not bring benefits to Hachette
- Inequitable discrimination against Hachette
- Inequitable discrimination within Hachette's body of works
- The amended means by which Hachette may assert its rights is unworkable
- Removal of Hachette's ability to protect certain fundamental rights as guaranteed under the Original Proposed Settlement Agreement
- Unworkable and inequitable indemnification mechanisms to the detriment of Hachette
- Unworkable and harmful pricing mechanisms to the detriment of Hachette
- Unfair representation of Hachette on the Board of Directors of the Books Rights Registry

- Inadequate means of identification of Hachette's Books and other works which have been digitized by Google
- Class representatives (including attorneys) have not adequately represented the interests of Hachette

## II/ OBJECTIONS TO THE PROPOSED AMENDED SETTLEMENT AGREEMENT

### 2.1 Amendments do not bring benefits to Hachette

22. According to the transcript (p. 2), at the status conference of October 7, 2009, one of the attorneys for the Plaintiffs and Authors Sub-Class stated that the Supplemental Notice *"will largely be a notice that states benefits to the class"*. Hachette has examined the Supplemented Notice and finds it lacking any description of such "benefits" in its favor. Indeed, rather than explaining any purported benefits deriving from the changes, from Hachette's point of view, the Supplemented Notice simply sets out (i) a three-page summary of the amendments to the Original Proposed Settlement Agreement and (ii) a one-page summary of the "options" available to members of the Amended Settlement Class without any reference at all to "benefits".

23. *More importantly, the Supplemented Notice does not provide any guidance whatsoever concerning the consequences of the amendments for the members of the Amended Settlement Class.* This means that Hachette has had to do this analysis itself, without relying upon any guidance from the parties. And Hachette has concluded that the said amendments will have as their consequence a degradation of its situation under the Proposed Amended Settlement Agreement as compared to the Original Proposed Settlement Agreement. This is due, inter alia, to (i) the significant reduction in the indemnification due to Hachette, and (ii) a diminution of Hachette's rights. Both are due to the narrowing of the definition of Books. On indemnification, the point is obvious: the narrowing of the definition of Books has excluded many Hachette's works digitized by Google from indemnification. As for its rights, Hachette had the right to remove or exclude *all of its works* published before that date. Under the new, narrow definition of "Books", this right is limited only to those works which it has registered with the US Copyright Office and which thus fall

within the scope of the Proposed Amended Settlement Agreement (as a general principle, before 1990). Given that the Proposed Amended Settlement Agreement does not prohibit Google from continuing to digitize works falling outside of its scope. Hachette loses the contractual rights which it had under the Original Proposed Settlement Agreement for all of these other works (post 1990). Moreover, Hachette believes that the same is true of all Rightsholders deriving their rights from the approximately five million works scanned without authorization by Google which are not in English language.

## 2.2    Inequitable discrimination against Hachette

24.    Hachette objects to the Proposed Amended Settlement Agreement in that, in the indemnification mechanism, it discriminated illogically and inequitably between those member of the Amended Settlement Class who reside in the United States, Canada, the UK or Australia ("Anglophone Members of the Amended Settlement Class") and those members of the Amended Settlement Class who do not "Non-Anglophone Members of Amended Settlement Class").

25.    The discrimination is arbitrary: the criterion used was chosen by the parties, it does not derive from any proper application of Copyright law. Indeed, the arbitrary criterion now used has no connection with valid application of Copyright law.

26.    Indeed, all works -- whether digitized by Google or not -- published in the Designated Anglophone Countries of the United States, Canada, the United Kingdom and Australia are included within the scope of the Proposed Amended Settlement Agreement as "Books" provided that they were published before May 5, 2009, whereas, as a general principle, only some of the total works published by Hachette before May 5, 2009 are included within the scope of the Proposed Amended Settlement Agreement (as a general rule, those books published after 1990 which were not registered with the U.S. Copyright Office are excluded, even if digitized by Google). In concrete terms, this means that the members of the Class who are from the Designated Anglophone Countries will be indemnified for their total injury whereas the non- Anglophone Members of the Amended Settlement Class who do not publish

in the Designated Anglophone Countries will be indemnified for a part of their injury only, or not at all if they have never registered their works with the US Copyright Office. Such discrimination is arbitrary. It is not founded on any sound principles. It is both illogical and inequitable.

## 2.3 Inequitable discrimination within Hachette's body of works

27. The criterion to be used by Hachette to determine which of its works are to be characterized as Books is unfair. Rightsholders undertaking the registration could not imagine more than 20 years ago that their decision to register or not register a work would today have an impact upon their rights under the Proposed Settlement Agreement. Moreover, such a criterion should no longer be used for copyright-related purposes. Article 5 of the Berne Convention prohibits formalities, such as a registration, from interfering with "the enjoyment and the exercise" of a protected right. The criterion of Copyright registration is especially confusing and therefore detrimental to foreign rightsholders, who mostly stopped this practice in 1990 pursuant to Said Article 5 of the Bern Convention.

28. After such a long period twenty years and more, publishing houses may have closed or changed owners and there may no longer be any record of such registration. Given that many of the registered Books are not recent, their related rights may have reverted back to their authors, who certainly have no information at all on this issue.

29. It derives from the above that the scope of the Proposed Amended Settlement Agreement is based upon an arbitrary and unjust criterion.

30. The Proposed Amended Settlement Agreement proffers no means by which an accurate determination could be reached. Electronic records of registration are available only for the period beginning in 1978. For these records from 1978 to present, the online search system, including the Copyright Office History Monograph file (registrations), and the Copyright Office History Documents file (recordations), is available from the Copyright Office's website. However, cataloging information concerning works registered *before 1978* is stored on catalog

cards in the US Copyright Office. This information is not available through any other means. The Card Catalog of pre-1978 records is available for public search in the US Copyright Office solely during business hours. In most cases, foreign Rightsholders which might be included in the Amended Settlement Agreement do not have the financial possibilities to visit the US Copyright Office in person in order to check or verify any related information. The search needs to be done either on the spot or by a Copyright Office bibliographer for a fee of USD 165 per hour. This is a price which would deter Publishers from non-Designated Anglophone Countries from obtaining the information necessary to fully assert their rights under the Proposed Amended Settlement Agreement. Publishers who have no records at all (the relevant timeframe extends backwards in time to Book registered after 1922) would have to submit a search. Depending upon a Publisher's individual circumstances, this could be unaffordable and impracticable.

## 2.4 Removal of Hachette's ability to protect certain fundamental rights as guaranteed under the Original Proposed Settlement Agreement

31. Under the Original Proposed Settlement Agreement, all published works of which Hachette is a Rightsholder were included as Books within the scope of the settlement. Pursuant to Article 3.5(a) of the said Original Proposed Settlement Agreement, Hachette had the right to request removal by April 11, 2011 of all books already scanned by Google, in such way that Google and fully participating libraries would be obliged to stop all uses of theirs digital copies of the Books. Moreover, Hachette had the right to request that Google abstains from scanning any Books published before May 5, 2009 not yet scanned by it. In this way, Hachette had a legal means to protect itself from future unauthorized scanning of its publications by making a removal request before Google had scanned a Book. This right applied to all works published before May 5, 2009. However, a number of Hachette's books published before 1990 and almost all of them published after 1990 are excluded from the scope of the Proposed Amended Settlement Agreement. This is because the criterion applicable to Hachette as a French publisher for determination of whether a specific work is included within the scope of the Proposed Amended Settlement Agreement has been changed to registration with the US Copyright Office before May 5, 2009. This means that for those books Hachette would now lose those

protective rights against Google which it enjoyed under the Original Proposed Settlement Agreement.

## 2.5 Unworkable and inequitable indemnification mechanism to the detriment of Hachette

32. The Proposed Amended Settlement Agreement extends until March 31, 2011 the deadline for rightsholders to file claims for payment for works scanned by Google prior to May 5, 2009. Pursuant to Article 5.1, for every Principal Work falling within the scope of the Proposed Amended Settlement Agreement, Google will make a cash payment of at least USD 60. However, given the complexity of the process of identifying exactly which of its works were both (i) scanned by Google without Hachette's authorization before May 5, 2009 and (ii) registered with the United States Copyright Office (before 1990, in almost all cases), Hachette believes that it will cost much more than USD 60 per Principal Work for it to simply determine which of its works would classify as Books and thus Principal Works under the Proposed Amended Settlement Agreement. It derives therefrom that the amended settlement benefit proposed to Hachette is *economically absurd.*

## 2.6 Unworkable and harmful pricing mechanisms to the detriment of Hachette

33. The Proposed Amended Settlement Agreement grants significant pricing latitude to Google. It removes any time limits on Google's rights to discount the list price for consumer purchase, and Google can discount to any level that it decides, even selling at a token price (Article 4.5(b)).

34. There are many ways that this change could engender significant commercial injury to Hachette's name and reputation and that of its authors. Here is one example. Many of Hachette's more experienced authors would have within their body of work both books falling (i) within the scope of the Proposed Amended Settlement Agreement (published in France before 1990 and then registered with the United States Copyright Office) and (ii) outside the scope of the Proposed Amended Settlement Agreement (published after 1990 and thus never registered in the United States). Although Google will be operating only from the United States

under the Proposed Amended Settlement Agreement, there is no provision of the agreement which prohibits Google from making available to users located outside of the United States the services authorized by the Proposed Amended Settlement Agreement. Thus, for one and the same author, any discounting by Google with regard to Books falling within the scope of the Proposed Amended Settlement Agreement could have significant negative repercussions on the name and reputation of both the author and Hachette with regard to the "saleability" of more recent works falling outside of the scope and currently marketed by Hachette under favorable commercial terms in France or elsewhere.

## 2.7 Unfair representation of Hachette on the Board of Directors of the Books Rights Registry

35. Hachette believes that it is unfairly represented as a significant member of the Amended Settlement Class, under the very terms of the Proposed Amended Settlement Agreement regarding the Registry.

36. Article 6.1 (b) of the Proposed Amended Settlement Agreement sets out new provisions according to which the Registry will be organized to *"represent the interests of Rightsholders"* and adds that the Board of Directors *"will have at least one representative of each of the Publisher and Author Sub-Classes from each of the following countries: the United States, the United Kingdom, Canada and Australia"*.

37. In this regard, and as explained above, Hachette is a significant member of the Amended Settlement Class. Hachette, in its own name and that of other publishing houses which it controls, has published works falling within the scope of the Proposed Amended Settlement Agreement not only in France but in other non-Anglophone countries. It is illogical and inequitable for the four Anglophone countries referred to above to have the guarantee of representation on the Board of Directors and for Publishers and Authors from other countries to not have the same guarantee of representation.

## 2.8 Inadequate means of identification of Hachette's Books and other works which have been digitized by Google

38. Article 3.1 sets out new principles regarding the *"Digitization, Identification and Use of Books"*. Article 3.1 (b) (i) states: *"On November 2, 2009, Google provided Plaintiffs with a final list of all Books, Public Domain Books with a copyright date after 1922 and Government Works that Google Digitized on or before May 5, 2009."*. Article 3.1 (b) (ii) states that members of the Amended Settlement Class may consult the "Books Database".

39. Hachette objects to these provisions. Hachette believes that the only equitable way for Rightsholders to protect their rights would be for Google to be obliged, at a minimum, to provide the complete list of "Digitized Books" provided to Plaintiffs only on November 2, 2009 to *all* members of the Proposed Settlement Class and as well as any third parties having a vested interest. On January 22, 2010 an attorney for the Publishers Sub-Class provided to Hachette spreadsheets of titles printed under the imprint names and ISBN prefixes supplied by Hachette. However, even if individual Rightsholders such as Hachette have been provided with the said list upon their request, this obligation should be enshrined in the Proposed Amended Settlement Agreement for the benefit of all Rightsholders and Google should be made to guarantee its accuracy.

40. Google should also be made to provide a list of works that it digitized after May 5, 2009. Although they are not subject to indemnification, Hachette needs the list to be able to fully exercise its rights in certain cases under the Proposed Amended Settlement Agreement. For instance, for a Book published and registered with the US Copyright Office by Hachette before January 5, 2009 (in Hachette's case, registration was -- in almost all cases -- before 1990, for the reasons explained above), Hachette would need to know (i) whether it was digitized before May 5, 2009 in order to apply for indemnification or (ii) digitized after May 5, 2009, in order to exercise its rights under Article 3.5 ("Right to Remove" / "Right to Exclude")

**2.9    Class representatives (including attorneys) have not adequately represented the interests of Hachette**

41.    Both before the Status Conference of October 7, 2009 and after, class representatives (including attorneys for the two sub-classes) seem to have totally disregarded the rights and interests of Rightsholders who do not reside in the United States, Canada, the UK or Australia. Indeed, this has continued to be the case even after the filing by Hachette and many other class members of the original objections before the September 4, 2009 deadline. This is shown in the attached exchange of correspondence from October 21 and October 23, 2009 between Hachette and representatives of the parties.  Hachette wrote to representatives of the parties (including the attorneys) to state that non-American publishers *"should be helped to participate in the settlement and surrounding arrangements or a contractual equivalent – on our side, we are willing to help with this"*.  To Hachette's great surprise, this good faith proposal met with an unqualified refusal: *"(…) We just do not see how – in the time remaining – we could renegotiate the Settlement Agreement in a way that would address your concerns and remove the objections from European rightsholders and governments"*.  Hachette believes that the Court should be informed of the absence of adequate representation of Hachette in the framework of the procedure.  Adequate representation is manifestly a concern of the Court.  When it preliminarily approved the Proposed Amended Settlement Agreement, said approval was given subject to the proviso that it includes *"the procedures for establishing and administering the settlement funds and procedures for notice, opting out, opting in and objecting as described therein, as fair, reasonable, and in the best interests of the Amended Settlement Class and the Sub-Classes."*  Hachette believes that the representatives of the Amended Settlement Agreement Class have not complied with this directive in its regard.

42.    In reality, members of the Amended Settlement Class who do not reside in the Designated Anglophone Countries of United States, Canada, the UK or Australia do not enjoy any features of representation which would take into account their particular circumstances under the Proposed Amended Settlement Agreement.

43.    The position of the parties to refuse to consider the issues raised by a significant part of the broad Amended Settlement Class (once again, it is important to emphasize that 50% of the

works scanned by Google are non-US works[3]) shows that class representatives (including the attorneys) (i) are not making a good faith effort to treat all Amended Settlement Class members on a fair and equitable basis and (ii) are willing to defy the will of the Court, given that the Court itself has directed the parties toward a fair and equitable solution: *"The current settlement agreement raises significant issues, as demonstrated not only by the number of objections, but also by the fact that the objectors include countries, states, non-profit organizations, and prominent authors and law professors. Clearly, fair concerns have bee raised"*. To summarize: *"Fair concerns have been raised"* by objectors such as Hachette who continue to belong to the Amended Settlement Class and other commentators but the parties continue to refuse to address many of those concerns, at least with Hachette.

44.  Rule 23(a) provides that a class representative may pursue claims of all other potential class members only if, *inter alia*, (i) there are questions of law of fact *"common to the class"*, (ii) the claims of the potential representatives are "typical" of the claims of the rest of the class and (iii) the said representative will *"fairly and adequately protect the interests of the class"*. Hachette believes that there are "questions of law or fact" which are specific to a whole group or Rightsholders outside of the United States, Canada, the UK and Australia, and which do not correspond to any efforts of representation by the representatives of the Amended Settlement Class. The new restrictive definition appears at first view to create a more homogenized Class than under the Original Proposed Settlement Agreement. However, in reality it creates deep, artificial distinctions amongst the original members of the Class as it was defined under the Original Proposed Settlement Agreement. By redefining the putative class in a way which includes only approximately 50% of the actual victims of the acts of unauthorized digitizing committed by Google, (as already noted, approximately 50% of the ten million volumes digitized by Google are foreign works), it may be asked whether the recourse to the class action mechanism is still justified in the instant case. Moreover, the parties should be made to justify publicly such a dramatic revision of the definition of the putative class. The new possibility of Article 9.1(a) of bringing action before *"a court"* of by such other dispute resolution procedures as they may agree" is inadequate to the extent that the other party has an effective veto right over such

---

[3] Cf. Jonathan Band, writing under the names of the Americans Library Associations, the Association of College and Research Libraries, and the Association of Research Libraries, « *A Guide to the Perplexed Part II : the Amended Settlement Agreement* », at p. 2 : « *Perhaps as much as 50% of the titles in the research libraries partening with Google are not in English ; and most of these foreign language titles probably were published outside the US and were not registered with the Copyright Office. The ASA, therefore, likely applies to half as many books as the original settlement.* » (jband@policybankwidth.com).

choice. Moreover, no justification has been preferred for the exclusion of disputes with Google (the new possibility concerns only disputes *"between or among Rightsholders and Claimants"* but not Google).

## III/ CONCLUSION

**45.** In formulating these objections, Hachette has strictly complied with the Court's order of November 19, 2009, according to which objections filed with the Court with regard to the Proposal Amended Settlement Agreement should *"be limited to the provisions amended from the Settlement Agreement"*. With the utmost conviction, Hachette urges the Court to take into account the nine additional objections set out above.

**46.** One final point. There is one very recent international development with regard to Google's violation of French *droits d'auteur* ('moral rights") which it is respectfully requested to the Court to consider. On December 18, 2009, the Paris Court of First Instance (*Tribunal de Grande instance de Paris)* ruled, in application of French law, that Google, by fully digitizing and then rendering snippets of digitized works accessible to the public, had violated the *droits d'auteurs* of various French publishing houses (Editions du Seuil, Delachaux & Nestlé, Harry N. Abrams) and ordered that Google, Inc. pay damages to the plaintiffs. A copy of that judgment is attached as **Exhibit C** along with a copy of press reports on it published by the *Financial Times* (European Edition) ("Ruling by Paris court raises global resistance to Google book scanning"), the *International Herald Tribune* and the *Wall Street Journal Europe*. Thus far, this is the only judgment of its kind. Given this precedent, all French publishers could now bring lawsuits against Google in the same way before the French Courts. For this reason, it should be clearly stated and understood: under the law as it now stands, for all works (i) that were digitized by Google without authorizations of the rightsholders and (ii) that were published in France, Google has violated French Copyright law.

**47.** Given the above, it seems abundantly clear that the Proposed Amended Settlement Agreement is legally problematical under the laws applicable in virtually the entire world outside of the United States. For example, the Proposed Amended Settlement Agreement does not even

address the issue of moral rights -- although they do not exist under US Copyright law -- are specifically guaranteed by Article 6 bis 1 of the Berne Convention which binds the United States: *"The right to claim authorships of the work and to object to any distortion, mutilations or other modification of, or other derogatory actions in relation to the said work which would be prejudicial to [the author's] honor or reputation."* We know that Google has digitized ten million printed works worldwide of which about half were not published in the English language, and thus probably benefitting from the same type of moral rights as those deriving from French Copyright law. Yet the Proposed Amended Settlement Agreement allows Google to run roughshod over the moral rights of authors. Indeed, Google may reproduce digitally the image of the printed work but it has no obligation to abstain from "modifying" "distorting" or even "mutilating" (to take the terms used in the Berne Convention) the original image of a work. Blurred pages, missing pages, cropped pages, folded pages, pages including scanners' hands obscuring the text: it is a well-known fact that Google's digitizing practices suffer from these defects. Google scans works without any system control to ensure that the scanned image is identical in all way with the original Article 17.10 of the Proposed Amended Settlement Agreement allows for such fundamental violations of publishers' and authors' rights as understood not only by French law and the French Courts, but throughout the world, since it states that Google *"makes no guarantees (…) regarding the Digitization quality … of any Books (…).*

*     *
*

For each of the foregoing reasons, Hachette respectfully requests that this Court rejects the Proposed Amended Settlement Agreement.

Respectfully submitted,

**Arnaud Nourry**
Chief Executive Officer, Hachette Livre SA
Done in 4 original copies

Encl. Exhibits A, B & C

COPY TO:

Counsel for the Author-Sub-Class
Michael J. Boni, Esq.
Joanne Zack, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
United States of America
bookclaims@bonizack.com

Counsel for the Pubisher-Sub-Class
Jeffery P. Cunard, Esq.
Bruce P. Keller, Esq
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
United States of America
bookclaims@debevoise.com

Counsel for Google
Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
United States of America
bookclaims@durietangri.com

Exhibit A

### SUMMARY OF THE TEN FUNDAMENTAL AND MATERIAL OBJECTIONS
### ORIGINALLY FILED BY HACHETTE AND ITS SUBSIDIARIES

## I. The negotiations leading to the Proposed Settlement and the Proposed Settlement itself do not take into account non-US interests

- Rule 23 ("Class Actions") of the Federal Rules of Civil Procedure states that a class action may be maintained only if *"the claims or defenses of the representative parties are typical of the claims or defenses of the class (....)"*.

- The Proposed Settlement does not comply with Rule 23 in that it totally ignores the specific features of non-US Rightsholders. It is obvious that the Proposed Settlement will have an impact on non-US Rightsholders. The commercial intent deriving from the Proposed Settlement is to grant to Google the extremely valuable right to exploit digitally, and in perpetuity, every non-public domain Book or Insert published before January 5, 2009 as made available virtually anywhere in the world.

## II. The Proposed Settlement has not been the subject of sufficient notice to non-US Rightsholders

- The Proposed Settlement would impose a commercial arrangement upon Hachette, due to the fact that Hachette has not opted out. The Proposed Settlement constitutes in reality a commercial contract. Nonetheless, this complex contract of 334 pages (including the appendices) was never translated into the world's principal foreign languages for the benefit of Hachette and other non-US Rightsholders.

- Hachette also objects that a significant number of non-US Rightsholders will not have received effective notice of the pending class action as it is acknowledged in the Notice that: *"it is expected that a sizable portion of the Settlement Class will consist of heirs, successors and assignees"*.

- Simple knowledge of the Notice is radically insufficient for non- US Rightsholders. Anyone wanting to fully comprehend the scope of the proposed commercial arrangement must read the Proposed Settlement itself.

- Moreover, it is not reasonable to assume that the Notice will have reached a sufficiently sizeable portion of non-US Authors and Publishers.

- The Court should reasonably assume that the overwhelming majority of non-US Authors and a very significant number of non-US Publishers will not fully appreciate what the opt-out option entails.

- Hachette has reviewed a copy of the French translation of the Notice. It is full of glaring translation errors and false statements.

## III. The Proposed Settlement violates the Bern Convention

- The Proposed Settlement, which seeks to upend the fundamental rights of non-US Rightsholders to control the exploitation of their works, contravenes the US's treaty obligations under the Bern Convention for the Protection of Literary and Artistic Works, of September 9, 1986, as amended ("Bern Convention"). If approved, the Proposed Settlement would (i) grant Google automatic rights to exploit digitally millions of Books and Inserts found throughout the world without requiring Google to obtain any authorization from non-US Rightsholders and (ii) require any non-US Rightsholder to go through an extremely complex and burdensome and largely unworkable procedure simply to exercise a watered-down contractual right to halt such use.

- Such unprecedented usurpation of the rights owned by non-US Rightsholders violates the Bern Convention's most fundamental provisions, including its protection of copyright / *droit d'auteur* owners' exclusive rights and the prohibition against imposing formalities that would impair the exercise of those rights.

## IV. The Proposed Settlement is incompatible with French and continental European principles of *droit d'auteur* / author's rights

- Hachette objects to the Proposed Settlement in that it is totally incompatible with the legal framework within which it publishes in France and the rest of Continental Europe, based upon principles of *droit d'auteur* / author's rights. It is uncontested that the Continental European conception of *droit d'auteur* is substantially different from the meaning of copyright within the US meaning of the term.

## V. The provisions of the Proposed Settlement on "out of print" works would cause Hachette to violate contracts under French law

- The Proposed Settlement allows Authors to maintain control on out of print Books. In the event of disagreement between an Author and Publisher concerning categorization of an individual Book as out of print, the matter is adjudicated by the Registry in conformity with a procedure based upon American legal concepts.

- Under French law, where an author has assigned publication/reproduction rights to a publisher by contract, the publisher remains the holder of the rights for as long as the contract remains in force. This situation is not modified by the fact that a book may be categorized as "out of print". In other words, as a general rule, the publisher, as assignee, remains holder of the assigned rights unless the author has complied with a procedure defined by statute to terminate the contract.

- Disputes between French publishers and their authors are subject to French law.

## VI. The dispute resolution mechanism is unfair to non-US Rightsholders

- Should a dispute arise in connection with any alleged non-performance by Google and any participating library, any non-US Author or Publisher shall be subject to arbitration, in New York, under the rules of the American Arbitration Association (AAA), which arbitration shall be non appealable. Application of the arbitration clause set out in Article 9.3 of the Proposed Settlement to all non-US Authors and Publishers, who would not have expressly opted out, is

highly objectionable, given the imposition of mandatory jurisdiction and the costs which would be incurred by non-US Authors and Publishers in engaging any litigation under the Proposed Settlement in the United States only.

## VII. The Proposed Settlement violates Article 81 EC and is thus automatically null and void within the territory of the European Union

- The commercial arrangement put into place by the Proposed Settlement does not, in any way, prevent Google from selling digitized versions of Books to customers in the entire world.

- As sale of the Books would involve coordinated efforts, including on pricing, between Google - which will immediately obtain a dominant market position worldwide through the Settlement Agreement - and Publishers, the Proposed Settlement infringes Article 81 (1) of the EC Treaty. As a result, pursuant to Article 81 (2) EC, it is automatically null and void within the territory of the EU and Google and the Publishers may be subject to substantial fines for violation of EU law.

## VIII. The Proposed Settlement constitutes *ipso facto* an abuse by Google of its dominant market position and thus a violation of Article 82 EC

- The Proposed Settlement would appear to create and protect a *de facto* monopoly or quasi monopoly in the broad market for digital books on worldwide markets and the Proposed Settlement could constitute, at first view and in conformity with the above-cited case law, a violation of Article 82 EC, since Google would create or reinforce a dominant market position on worldwide markets not through market forces but through contract.

## IX. The concept of "commercial availability" used in the Proposed Settlement does not take into account non-US Rightsholders

- Hachette objects to the fundamental concept of "Commercial Availability" at the heart of the Proposed Settlement, which does not fairly and equitably take into account the interests of non-US Rightsholders.

- The Proposed Settlement, which sets no parameters regarding these channels of trade, thus grants Google wide discretion to *ignore* a book's "Commercial Availability" in a non-US jurisdiction or through a non-US website, opening the door for disparate treatment of non- US Rightsholders. If a US Author is commercially distributing his work in his home country - the United States - and nowhere else, then Google will have limited exploitation rights over that work under the Proposed Settlement. Yet, if a French author is commercially distributing his work in France and nowhere else, including through a foreign on internet site accessible by US citizens, then Google can deem such work not Commercially Available and thus obtain radically expanded exploitation rights over that work. As result of the above definition, non-US Rightsholders who actively exploit their Books in their own country will be deprived of the protection afforded to similarly-situated US Rightsholders under the Proposed Settlement, seriously prejudicing their rights vis-à-vis US Rightsholders.

- In general terms, the concept of Commercial Availability does not take into account the rights of non-US Authors and Publishers, under other laws and other economic and trade realities.

- The Proposed Settlement does not provide sufficient guarantee that the analysis finally retained by Google will be impartial and reasonably meet non-US Authors' and Publishers' interests.

## X. The proposed Book Rights Registry is unfair to non-US Rightsholders

- Although approximately half of the ten million works digitized by Google are non-US works, non-US Rightsholders would be denied any specific representation to represent their own specific interests as distinct from US Rightsholders.

- Hachette strenuously objects to the fact that the Registry be entitled under Article 6.2 (b) of the Proposed Settlement to "license Rightsholders" US copyrights to third party", even if it is to the extent "permitted by law". The granting of such right is unacceptable. The reference to the legality of such right provides no protection whatsoever to non-US Rightsholders, since it does not specify which law is concerned and could be interpreted as meaning US law only.

**Exhibit B**

LIST OF HACHETTE'S SUBSIDIARIES NON-DESIGNATED ANGLOPHONE
COUNTRIES

1. Librairie Arthème Fayard S.A.

2. Dunod Editeur, S.A.

3. Les Editions Hatier, S.N.C.

4. Editions Larousse, S.A.S.

## Exhibit C
## FRENCH RULING OF DECEMBER 18, 2009

- Tribunal de Grande Instance de Paris (Paris Court of First Instance), judgment of December 18, 2009, *Société Editions du Seuil SAS et al (groupe La Martinière) c. Société Google Inc. & Société Google France.*

- Press clippings concerning the ruling of December 18, 2009, published in *the International Herald Tribune*, the *Financial Times* (European edition) and the *Wall Street Journal Europe.*

■

3ème chambre 2ème
section

N° RG :
**09/00540**

N° MINUTE :

Assignation du :
06 Juin 2006

## JUGEMENT
## rendu le 18 Décembre 2009


### DEMANDERESSES

**Société EDITIONS DU SEUIL SAS**
27 rue JACOB
75006 PARIS

représentée par Me Yann COLIN, avocat au barreau de PARIS,
vestiaire P0008

**S.A. DELACHAUX & NIESTLE**
domiciliée : chez Maîtres Yann Colin et Xavier Carbasse
26 Avenue KLEBER
75116 PARIS

représentée par Me Yann COLIN, avocat au barreau de PARIS,
vestiaire P0008

**Société HARRY N. ABRAMS**
domiciliée : chez Maître Yann Colin et Xavier Carbasse
26 Avenue KLEBER
75116 PARIS

représentée par Me Yann COLIN, avocat au barreau de PARIS,
vestiaire P0008

**Expéditions
exécutoires
délivrées le :**

**SYNDICAT NATIONAL DE L'EDITION, représentant légal M. Serge EYROLLES (Conclusions d'intervention volontaire du 26/10/06)**
115 Boulevard Saint-Germain
75006 PARIS

représentée par Me Marie-Anne GALLOT-LE-LORIER, avocat au barreau de PARIS, vestiaire R013

## Intervenant volontaire

**Société DES GENS DE LETTRE DE FRANCE** 38 Rue du Faubourg Saint-Jacques
75014 PARIS

représentée par Me Maïa BENSIMON, avocat au barreau de PARIS, avocat postulant, vestiaire R013

## Intervenant Volontaire

**SYNDICAT NATIONAL DE L'EDITION** 115 Bld Saint-Germain
75006 PARIS

représentée par Me Marie-Anne GALLOT LE LORIER, avocat au barreau de PARIS, vestiaire R 013

## DÉFENDERESSES

**Société GOOGLE INC**
1600 Ampitheatre Parkway Mountain View,
CA 94043
    (U.S.A)

représentée par Me Alexandra NERI, avocat au barreau de PARIS, vestiaire #J0025

**Société GOOGLE FRANCE**
38 Avenue de l'OPERA
75002 PARIS

représentée par Me Alexandra NERI, avocat au barreau de PARIS, vestiaire #J0025

## COMPOSITION DU TRIBUNAL

Véronique RENARD, Vice-Président, *signataire de la décision*
Eric HALPHEN, Vice-Président
Sophie CANAS, Juge

assistés de Jeanine ROSTAL, FF de Greffier, *signataire de la décision*

## DEBATS

A l'audience du 24 Septembre 2009
tenue en audience publique

## JUGEMENT

Prononcé par remise de la décision au greffe
Contradictoire
en premier ressort

---

## FAITS, PROCÉDURE ET PRÉTENTIONS DES PARTIES

La société Editions du Seuil, ci-après le Seuil, est une société d'édition française fondée en 1935.

Elle est titulaire des marques suivantes :

- la marque française "EDITIONS DU SEUIL" déposée le 6 juin 2002 et enregistrée sous le n° 02 3 167 814 en classes 9, 38 et 42.

- la marque française "EDITIONS DU SEUIL"déposée le 22 juillet 1992, renouvelée le 6 juin 2002 et enregistrée sous le n° 92 427 705 en classes 16, 28 et 41.

- la marque communautaire "SEUIL" déposée le 2 décembre 2002 et enregistrée le 25 mai 2004 sous le n° 2 958 544 en classes 9, 16 et 41.

La société DELACHAUX & NIESTLE est une maison d'édition spécialisée dans le domaine des sciences de la nature.

La société de droit américain HARRY N. ABRAMS est spécialisée dans l'édition des livres d'art.

Ces sociétés sont toutes des filiales de la société d'édition la MARTINIERE Groupe.

La société de droit américain GOOGLE Inc exploite dans le monde entier un moteur de recherche dénommé "google". Elle a lancé au cours de l'année 2005 un projet de référencement de livres sur internet dénommé "google print", puis "google book search" ou "google recherche de livres" pour la version française.

Faisant valoir d'une part que la société GOOGLE avait ainsi numérisé, sans leur autorisation et pour les besoins de ce site plus d'une centaine d'ouvrages sur lesquels ils sont titulaires de droits d'auteur, que la société GOOGLE permettait aux utilisateurs du site d'accéder à la reproduction complète des couvertures des ouvrages numérisés et à des extraits des ouvrages apparaissant à l'écran sous forme de bandeaux de papier déchirés, l'affichage desdits extraits s'opérant à l'aide d'une recherche par mot-clé, et d'autre part que ledit site reproduisait les marques susvisées dont le Seuil est titulaire, la société EDITIONS DU SEUIL, la société DELACHAUX & NIESTLE et la société HARRY N. ABRAMS ont, selon acte d'huissier en date du 6 juin 2006, fait assigner la société GOOGLE Inc et la société GOOGLE France sur le

fondement des articles L 122-1, L122-2, L122-3, L 122-4, L 122-5 et L 713-2 du Code de la Propriété Intellectuelle en contrefaçon de droits d'auteur et de marques pour obtenir, outre des mesures d'interdiction sous astreinte et de publication, paiement de dommages-intérêts destinés à réparer leurs préjudices ainsi que d'une indemnité fondée sur l'article 700 du Code de Procédure Civile.

LE SYNDICAT NATIONAL DE L'EDITION, ci-après le SNE, est intervenu volontairement à la procédure par conclusions signifiées le 26 octobre 2006.

La SOCIÉTÉ DES GENS DE LETTRES DE FRANCE, ci-après la SGDL, est intervenue volontairement à la procédure par conclusions signifiées le 1er décembre 2006.

Par ordonnance en date du 16 mars 2007, le juge de la mise en état a rejeté l'exception d'incompétence du Tribunal de Grande Instance au profit du Tribunal de Commerce soulevée par les sociétés GOOGLE Inc et GOOGLE France.

Par ordonnance en date du 5 juin 2008, la procédure a été retirée du rôle à la demande des parties avant d'être rétablie le 15 janvier 2009.

Par dernières écritures signifiées le 21 septembre 2009, la société EDITIONS DU SEUIL, la société DELACHAUX & NIESTLE et la société HARRY N. ABRAMS demandent au tribunal de :

- dire et juger que la société GOOGLE France a participé avec la société GOOGLE Inc. à la mise en place du service *google recherche de livres,* notamment en s'engageant à déréférencer les ouvrages litigieux et de débouter la société GOOGLE France de sa demande de mise hors de cause,

- dire et juger qu'elles bénéficient d'une présomption de titularité des droits d'auteur en l'absence de revendication des auteurs et sont en tout état de cause cessionnaires des droits d'auteur sur les oeuvres en cause et de débouter les défenderesses de leur fin de non-recevoir à ce titre,

- constater que les défenderesses n'ont pas spontanément établi la preuve du contenu de la loi étrangère dont ils réclament l'application, dire et juger que le litige présente davantage de points de contacts avec la France qu'avec les Etats-Unis et que la loi française est applicable de façon exclusive,

- dire et juger qu'en reproduisant intégralement et en rendant accessible des extraits d'ouvrages sur lesquels les demanderesses sont titulaires de droits d'auteur sur leurs sites dont les adresses url sont " *http://books.google. (..)* " sans leur autorisation, les sociétés GOOGLE Inc et GOOGLE France ont commis et commettent des actes de contrefaçon de droits d'auteur,

- dire et juger que la société GOOGLE France a violé ses engagements en ne procédant pas au déréférencement des ouvrages à première demande,

- condamner in solidum les sociétés GOOGLE Inc et GOOGLE France à cesser d'utiliser de quelque manière que ce soit et notamment de diffuser sur le réseau internet tout ouvrage, ou de façon générale tout contenu sur lequel les demanderesses sont titulaires des droits de propriété intellectuelle et d'en justifier sous astreinte de 100.000 euros par jour de retard et par infraction constatée à compter de la signification du jugement à intervenir,

- se réserver de liquider l'astreinte,

- condamner in solidum les sociétés GOOGLE Inc et GOOGLE France à payer aux demanderesses, qui feront leur affaire entre elles de leur répartition, des dommages-intérêts qui ne sauraient être inférieurs à la somme de 15.000.000 euros en réparation du préjudice financier subi du fait de l'atteinte à leurs droits d'auteur et de la violation de l'engagement de la société GOOGLE France de déréférencer les ouvrages en cause,

- dire et juger qu'en reproduisant et en rendant accessible des marques dont le Seuil est titulaire sur leurs sites dont les adresses url sont " http://books.google.(..)" sans son autorisation, les sociétés GOOGLE Inc et GOOGLE France ont commis et commettent des actes de contrefaçon de marque,

- condamner in solidum les sociétés GOOGLE Inc et GOOGLE France à payer à la société EDITIONS DU SEUIL la somme de 1.000.000 euros à titre de dommages et intérêts en réparation du préjudice subi du fait de l'atteinte à ses marques,

- dire et juger que l'exploitation par les sociétés GOOGLE Inc et GOOGLE France du site *google recherche de livres* est constitutif d'agissements parasitaires commis à leur préjudice,

- condamner in solidum les sociétés GOOGLE Inc et GOOGLE France à payer aux demanderesses, qui feront leur affaire entre elles de leur répartition la somme de 1.000.000 euros à titre de dommages et intérêts en réparation des agissements parasitaires,

- condamner in solidum les sociétés GOOGLE Inc et GOOGLE France à payer aux demanderesses, qui feront leur affaire entre elles de leur répartition, la somme de 1.000.000 euros à titre de dommages et intérêts en réparation du préjudice d'image,

- ordonner la publication du jugement à intervenir dans trois journaux ou périodiques de leur choix et aux frais avancés in solidum des sociétés GOOGLE Inc et GOOGLE France, sans que le coût des publications ne dépasse la somme de 30.000 euros,

- ordonner la publication du dispositif du jugement à intervenir sur la page d'accueil du site http://books.google.fr,

- condamner solidairement les sociétés GOOGLE Inc et GOOGLE France à leur payer la somme de 50.000 euros conformément à l'article 700 du Code de Procédure Civile,

- ordonner l'exécution provisoire de la décision à intervenir,

- condamner les sociétés GOOGLE Inc et GOOGLE France aux dépens, lesquels pourront être directement recouvrés par leur conseil en application de l'article 699 du Code de Procédure Civile.

Par dernières écritures signifiées le 22 septembre 2009, le SNE, demande au tribunal de :

- déclarer recevable et bien fondée son action en intervention,

- dire et juger recevable et bien fondée l'action en contrefaçon de droit d'auteur des demandeurs,

- dire et juger que la loi applicable au litige est la loi française,

- dire et juger qu'en numérisant et en diffusant sans autorisation des éditeurs, membres du SNE sur le réseau internet, et notamment sur le site dont l'adresse url est "http://books.google.fr", leurs ouvrages, les sociétés GOOGLE Inc et GOOGLE France ont commis et commettent des actes de contrefaçon de droit d'auteur au sens des articles L. 122-4 et suivants et L. 335-2, L. 335-3 et suivants du Code de la Propriété Intellectuelle au détriment de l'intérêt collectif de la profession,

- dire et juger que les actes de contrefaçon des défenderesses ne constituent pas des courtes citations au sens de l'article L. 122-5 du Code de la Propriété Intellectuelle,

à titre subsidiaire

- dire et juger qu'en application de la loi américaine, les actes de contrefaçon des défenderesses ne sont pas justifiés au titre de l'exception du " fair use",

En conséquence

- débouter les défenderesses de toutes leurs demandes,

- faire droit aux demandes en contrefaçon de droit d'auteur des demanderesses,

- ordonner aux sociétés GOOGLE Inc et GOOGLE France de supprimer de leurs fichiers tous les ouvrages numérisés sans autorisation des éditeurs, membres du SNE, et d'en justifier sous astreinte de 500.000 euros par jour de retard et par infraction constatée à compter de la signification de la décision à intervenir,

- interdire à GOOGLE Inc. et GOOGLE France de numériser sans l'autorisation des éditeurs, membres du SNE, tout nouvel ouvrage pour l'avenir sous astreinte de 500.000 euros par jour de retard et par infraction constatée à compter de la signification de la décision à intervenir,

- interdire aux sociétés GOOGLE Inc et GOOGLE France l'exploitation et la diffusion sans l'autorisation des éditeurs, membres du SNE, sur le réseau internet et notamment sur le site *"http://books.google.fr"* de tout ouvrage déjà numérisé ou, de façon générale, de tout contenu non autorisé, sous astreinte de 500.000 euros par jour de retard et par infraction constatée à compter de la signification de la décision à intervenir,

- condamner les sociétés GOOGLE Inc et GOOGLE France à lui payer solidairement à titre de dommages et intérêts, la somme symbolique de 1 euro,

- dire et juger que la décision à intervenir produira effet à l'égard de l'ensemble des membres adhérents du SNE,

- ordonner la publication du jugement à intervenir (par une apparition claire sur le site internet de GOOGLE, accessible à l'adresse *"www.google.fr"*, dans une forme équivalente à celle de la publication rendue par le tribunal en termes de mise en page, caractères et police) aux frais avancés solidairement des sociétés GOOGLE Inc et GOOGLE France, sans que le coût des publications ne dépasse la somme de 50.000 euros et pour une durée que le tribunal estimera utile, dans quatre journaux ou périodiques de son choix, sur les sites internet de GOOGLE Inc. et de GOOGLE France, du journal du net et du forum des droits sur l'internet,

- condamner solidairement les sociétés GOOGLE Inc. et GOOGLE France lui payer la somme de 70.000 euros au titre de l'article 700 du Code de Procédure Civile,

- ordonner l'exécution provisoire de la décision à intervenir,

- condamner solidairement les sociétés GOOGLE Inc. et GOOGLE France aux dépens de l'instance, lesquels pourront être directement recouvrés en application de l'article 699 du Code de Procédure Civile,

- à titre subsidiaire, et au cas où le tribunal croirait devoir faire application de la loi américaine, ordonner aux sociétés GOOGLE Inc et à GOOGLE France de supprimer de leurs fichiers les ouvrages numérisés sans autorisation, leur interdire la numérisation, l'exploitation et la diffusion de tout contenu non autorisé sur le site *"http://books.google.fr"* et les condamner suivant les conditions et les modalités exposées ci-avant.

Par dernières écritures signifiées le 23 septembre 2009, <u>la société GOOGLE France et la société GOOGLE Inc</u> entendent voir :

- constater que les demandes formulées par les sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE ET HARRY N. ABRAMS à l'encontre de la société GOOGLE France sont mal dirigées dès lors que cette dernière n'est pas responsable de l'exploitation du service *Google Recherche de livres* qu'elles incriminent,

- prononcer la mise hors de cause de la société GOOGLE France,

- déclarer irrecevables les demandes en contrefaçon formulées par les sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLÉ ET HARRY N. ABRAMS faute pour elles de démontrer qu'elles sont cessionnaires des droits d'exploitation internet sur chacun des ouvrages et sur les couvertures de livres qu'elles revendiquent,

- déclarer irrecevables l'intervention volontaire et les demandes du SNE et de la SGDL,

- déclarer la loi française inapplicable au présent litige, tant pour ce qui concerne les actes de numérisation des ouvrages réalisés aux Etats-Unis pour les besoins du service *Google Recherche de Livres* que les actes de représentation par extraits de ces ouvrages dans le cadre de ce service,

- déclarer à tout le moins que la loi française ne s'applique pas aux actes de numérisation des ouvrages qui ont intégralement été réalisés aux Etats-Unis et de façon légale,

- dire et juger qu'en application de la loi américaine, les actes de numérisation des ouvrages réalisés pour les besoins du service *Google Recherche de Livres* et les actes de représentation par extraits de ces ouvrages dans le cadre de ce service répondent aux conditions posées par l'exception dite du *"fair use"* et ne constituent pas par conséquent des actes de contrefaçon,

- à titre subsidiaire, dire et juger que la représentation des titres des ouvrages et des ouvrages sous forme de courts extraits répond aux conditions posées par l'exception de courte citation prévue par l'article L.122-5-3 du Code de la Propriété Intellectuelle et ne constitue pas par conséquent un acte de contrefaçon,

- dire et juger que la numérisation des ouvrages litigieux ne constitue pas en soi une reproduction illicite au sens des dispositions du Code de la Propriété Intellectuelle, dès lors que les conditions d'enregistrement sur les serveurs de GOOGLE ne donnent pas aux internautes la possibilité d'afficher ces ouvrages sur leurs écrans, hormis des courts extraits susvisés qui sont couverts par le droit de courte citation et qu'il ne s'agit donc pas d'une fixation sur un support permettant la communication au public au sens de l'article L. 122-3 du Code de la Propriété Intellectuelle,

- dire et juger qu'aucun acte de parasitisme ne peut leur être reproché,

- dire et juger qu'aucun acte de contrefaçon de marque au sens des articles L.713-2 et L.713-3 du Code de la Propriété Intellectuelle, ni aucune atteinte aux prétendues marques notoires de la société EDITION DU SEUIL au sens de l'article L.713-5 du Code de la Propriété Intellectuelle ne peuvent leur être reprochés,

- prononcer la déchéance pour défaut d'exploitation des droits de la société EDITIONS DU SEUIL sur la marque "EDITIONS DU SEUIL" n° 023167814 déposée le 6 juin 2002 pour désigner les services de *"location de temps d'accès à un centre serveur de bases de données relatives à des oeuvres littéraires, artistiques ou documentaires"*,

- prononcer la déchéance pour défaut d'exploitation des droits de la société EDITIONS DU SEUIL sur la marque "SEUIL" n° 2958544 déposée le 2 décembre 2002 pour désigner les services de *"location de temps d'accès à un centre serveur de bases de données relatives à des*

*oeuvres littéraires, artistiques ou documentaires"*,

- dire que la décision devenue définitive sera transmise par le greffe à l'INPI aux fins d'inscription au registre national des marques,

en tout état de cause,

- constater que les sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS, le SYNDICAT NATIONAL DE L'EDITION et LA SOCIETE DES GENS DE LETTRES n'ont subi aucun préjudice et qu'en toute hypothèse, ces sociétés, ainsi que les membres de ces syndicats et association sont déjà susceptibles d'obtenir une indemnité suffisante dans le cadre d'un règlement transactionnel de classe actuellement en cours d'homologation par la justice américaine,

- dire que la demande tendant au prononcé d'une interdiction n'est pas justifiée et qu'en toute hypothèse, une telle mesure ne pourrait faire obstacle aux autorisations que GOOGLE est susceptible d'obtenir de la part des ayants-droits dans le cadre du règlement transactionnel de classe actuellement en cours d'homologation par la justice américaine,

- dire que la mesure de publication sollicitée sur la page d'accueil "www.books.google.fr" n'est pas nécessaire et en tout état de cause disproportionnée,

- débouter les sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS, le SNE et la SGDL de toutes leurs demandes,

- donner acte à la société GOOGLE Inc qu'elle déréférencera de son service *Google recherche de livres* l'intégralité des ouvrages sur lesquels les sociétés demanderesses revendiquent les droits, sur simple communication par elles de la liste exhaustive de ces ouvrages et que dans ce cas, elle n'affichera plus d'extraits, mais uniquement les références bibliographiques classiques,

- condamner les sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE, HARRY N. ABRAMS, le SNE et la SGDL à leur verser la somme de 100.000 euros au titre de l'article 700 du Code de Procédure Civile.

Par dernières écritures signifiées le 24 septembre 2009, la SGDL demande au tribunal de :

- déclarer recevable et bien fondée son action en intervention,

- dire et juger que la loi applicable au litige est la loi française,

- dire et juger que du fait de la numérisation des oeuvres protégées, de leur diffusion et de leur exploitation sur les sites dont les adresses url sont "http://books.google.com et notamment *"http://books.google.fr"* sans l'autorisation des auteurs membres de la SGDL ou de leurs ayants droit, les sociétés GOOGLE Inc et GOOGLE France portent atteinte aux droits moraux et patrimoniaux des auteurs membres de la SGDL et de leurs ayants droit,

- dire et juger que les agissements des défenderesses ne sont pas des courtes citations au sens de l'article L 122-5 du Code de Propriété Intellectuelle,

- dire et juger que du fait de la numérisation des oeuvres tombées dans le domaine public, de leur diffusion et exploitation sur les sites dont les adresses url sont "http://booksgoogle.com"et notamment *"http://books.google.fr"*, les sociétés GOOGLE Inc et GOOGLE France portent atteinte aux droits moraux des auteurs membres de la SGDL et de leurs ayants droit,

- dire et juger que les actes de GOOGLE décrits ci-avant portent préjudice à la SGDL, association reconnue d'utilité publique dont la mission est d'assurer la protection des intérêts moraux ou matériels de ses membres,

à titre subsidiaire

- dire et juger qu'en application de la loi américaine "copyright act" de 1976, les

agissements des défenderesses ne sont pas justifiés au titre de l'exception du *" fair use"*

En conséquence,

- débouter les défenderesses de toutes leurs demandes,

- faire droit aux demandes en contrefaçon de droit d'auteur des demanderesses,

- ordonner aux sociétés GOOGLE Inc et GOOGLE France de supprimer toutes les oeuvres numérisées sans autorisation de leurs auteurs membres de la SGDL ou de leurs ayants droit et d'en justifier sous astreinte de 500.000 euros par jour de retard et par infraction constatée à compter de la signification de la décision à intervenir,

- interdire aux sociétés GOOGLE Inc et GOOGLE France de numériser sans l'autorisation de leurs auteurs membres de la SGDL ou de leurs ayants droit toute nouvelle oeuvre pour l'avenir, sous astreinte de 500.000 euros par jour de retard et par infraction constatée à compter de la signification de la décision à intervenir,

- interdire aux sociétés GOOGLE Inc et GOOGLE France de diffuser et d'exploiter sans l'autorisation de leurs auteurs membres de la SGDL ou de leurs ayants droit sur le réseau Internet toute oeuvre déjà numérisée, sous astreinte de 500.000 euros par jour de retard et par infraction constatée à compter de la signification de la décision à intervenir,

- condamner les sociétés GOOGLE Inc et GOOGLE France à lui payer solidairement, à titre de dommages et intérêts, la somme symbolique de 1 euro,

- dire et juger que la décision à intervenir produira effet à l'égard de l'ensemble des membres adhérents de la SGDL,

- ordonner la publication du jugement (par une apparition claire sur le site internet "www.google fr" dans une forme équivalente à celle de la publication rendue par le tribunal en termes de mise en page, caractères et police) à intervenir aux frais avancés solidairement des sociétés GOOGLE Inc. et GOOGLE France et sans que le coût des publications ne dépasse la somme de 50.000 euros, dans quatre journaux ou périodiques de son choix , sur les sites internet de GOOGLE Inc et de GOOGLE FRANCE, du journal du net et du forum des droits sur

l'Internet,

- condamner solidairement les sociétés GOOGLE Inc. et GOOGLE France à lui payer la somme de 70.000 euros conformément à l'article 700 du Code de Procédure Civile,

- ordonner l'exécution provisoire de la décision à intervenir,

- condamner solidairement les sociétés GOOGLE Inc. et GOOGLE France aux dépens de l'instance, lesquels pourront être directement recouvrés par leur conseil en application de l'article 699 du Code de Procédure Civile,

à titre subsidiaire et au cas où le tribunal croirait devoir faire application de la loi américaine, ordonner aux sociétés GOOGLE Inc et à GOOGLE France de supprimer de leurs fichiers les ouvrages numérisés sans autorisation, leur interdire la numérisation, l'exploitation et la diffusion de tout contenu non autorisé et les condamner suivant les conditions et les modalités exposées ci-avant.

L'ordonnance de clôture a été prononcée le 24 septembre 2009.

## MOTIFS DE LA DÉCISION :

### Sur la demande de mise hors de cause de la société GOOGLE France

Attendu que la société GOOGLE France sollicite sa mise hors de cause aux motifs qu'elle ne serait qu'un simple sous-traitant de la société GOOGLE Inc en charge exclusivement d'une mission d'assistance auprès de la clientèle française et ne ferait aucune exploitation personnelle des différents services de la société GOOGLE Inc en ce compris le site accessible à l'adresse www.google.fr, le seul exploitant des services en cause étant la société californienne GOOGLE Inc,

Mais attendu que s'il n'est pas contesté que la société GOOGLE Inc est titulaire du nom de domaine "google.fr" et que tous les sites "google" sont hébergés aux Etats Unis ni que la société GOOGLE Inc a conclu avec la société GOOGLE FRANCE, à compter du 16 mai 2002, un contrat de marketing et de prestation de services, lequel ne concerne cependant pas le service *Recherche de Livres* en cause, il n'en demeure pas moins qu'en l'espèce, la société GOOGLE France, sise 38 avenue de l'Opéra à Paris 75002 apparaît sur le site google.fr comme étant le bureau commercial français de la société GOOGLE Inc ;

que par ailleurs, il résulte des pièces versées aux débats que la société GOOGLE France a envoyé le 13 mars 2006 à Monsieur Hervé de la Martinière représentant le Groupe de la Martinière un courrier co-signé par Monsieur Jens Redmer, directeur Google Recherche de Livres Europe et Monsieur John Lewis Needham, responsable des partenaires stratégiques Google France, lui présentant le programme *Google Recherche de Livres* ; que faisant suite à l'assignation, la société GOOGLE France représentée par son directeur Google Recherche de Livres Europe a, par courrier en date du 8 juin 2006, demandé au Groupe de la Martinière communication du constat d'huissier du 5 juin 2006 cité en annexe de l'acte afin *"que la société Google Inc puisse procéder dans les meilleurs délais au déréférencement de ces ouvrages"* lui rappelant *"demeurer à sa disposition afin de faire cesser*

*le référencement reproché à GOOGLE Inc"* ;

que ces éléments, corroborés par l'extrait Kbis de la société GOOGLE qui révèle que celle-ci exerce depuis le 14 août 2002 une activité de *fourniture de services et/ou conseils relatifs aux logiciels, au réseau Internet, aux réseaux télématiques ou en ligne, notamment par l'intermédiation en matière de vente de publicité en ligne, la promotion sous toutes ses formes de la publicité en ligne, la promotion directe de produits et services et la mise en oeuvre de centres de traitement de l'information,* suffisent à rejeter la demande de mise hors de cause de la société GOOGLE France dont l'appréciation de la responsabilité relève en tout état de cause du fond du débat ;

## Sur la recevabilité des demandes des sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS

Attendu que les sociétés défenderesses font valoir que les EDITIONS DU SEUIL, la société DELACHAUX & NIESTLE et la société HARRY N. ABRAMS ne seraient pas recevables à agir sur le fondement du droit d'auteur au motif qu'elles ne justifieraient pas de leur qualité de cessionnaires des droits de numérisation des ouvrages concernés et d'exploitation sur le réseau Internet ainsi que des droits sur les couvertures des ouvrages ;

que toutefois, en l'absence de revendication de ou des auteurs, la personne morale qui exploite sous son nom une oeuvre est présumée, à l'égard des tiers contrefacteurs, être titulaire sur cette oeuvre, quelque soit sa nature et sa qualification, du droit de propriété incorporelle de l'auteur ;

qu'en tout état de cause en l'espèce, les sociétés éditrices ont versé aux débats les contrats d'éditions relatifs aux ouvrages visés dans le procès verbal de constat d'huissier du 5 juin 2006 d'où il résulte, pour les contrats postérieurs à la date d'application de la loi du 11 mars 1958, que les auteurs ont cédé leurs droits pour toute utilisation et pour tout procédé actuel ou à venir ;

qu'il suit que la fin de non-recevoir doit être rejetée ;

## Sur la recevabilité des interventions volontaires et des demandes du SNE

Attendu que les sociétés GOOGLE inc et GOOGLE France contestent la recevabilité à agir du SNE aux motifs que les demandes de ce dernier seraient imprécises et à caractère général, que ses demandes formulées par voie d'intervention ont pour effet d'étendre "de manière considérable" la saisine du tribunal au mépris du principe d'immutabilité du litige, qu'elles sont contraires au principe selon lequel "Nul ne plaide par procureur", que le SNE n'est pas titulaire des droits patrimoniaux et extra patrimoniaux d'auteurs afférents aux ouvrages visés dans ses conclusions, enfin que si le SNE peut être représenté en justice par son Président en vertu de l'article 10 de ses statuts, ce dernier n'est pas habilité lui-même à initier une action en justice au nom du syndicat ;

Attendu cependant que les deux premiers griefs ne constituent pas des fins de non recevoir au sens du Code de Procédure Civile mais relèvent du fond du débat ; que la teneur des écritures des sociétés GOOGLE

démontrent qu'elles ont été à même de comprendre et de répliquer aux écritures du SNE, lequel est intervenu à la procédure, à titre principal et accessoire, en application des dispositions des articles 328 et suivants du Code de Procédure Civile, formulant des demandes qui se rattachent par un lien manifeste à celles des sociétés d'édition demanderesses ; que par ailleurs il appartient au tribunal d'apprécier le bien fondé de l'action dans la limite des demandes qui lui sont formulées et des pouvoirs qui lui sont conférés ;

Attendu enfin et surtout, que l'article L.2132-3 du Code du travail pose, d'une manière générale, le principe selon lequel les syndicats professionnels ont le droit d'agir en justice et peuvent, devant toutes les juridictions, exercer tous les droits réservés à la partie civile concernant les faits portant un préjudice direct ou indirect à l'intérêt collectif de la profession qu'ils représentent ;

que selon l'article L.331-1 alinéa 2 du Code de la Propriété Intellectuelle les organismes de défense professionnelle régulièrement constitués " *ont qualité pour ester en justice pour la défense des droits dont elles ont statutairement la charge* ";

que l'article 1 des statuts du SNE dispose quant à lui que le Syndicat a notamment pour objet "*le soutien de la création et de la recherche par la défense de la liberté de publication, du respect du droit d'auteur et du principe du prix unique du livre*" ;

qu'enfin le SNE est intervenu à la présence instance après une décision de son bureau en date du 7 juin 2006, prise à l'unanimité et confirmée le 16 janvier 2008, conformément à l'article 9 de ses statuts ;

Attendu que les fins de non-recevoir soulevées par les sociétés GOOGLE doivent donc être rejetées ;


### Sur la recevabilité des interventions volontaires et des demandes de la SGDL

Attendu que pour contester la recevabilité à agir de la SGDL, les sociétés défenderesses soutiennent que si leurs statuts le leur permettent, les associations ne peuvent défendre en justice que l'intérêt collectif de leurs seuls membres, qu'en l'espèce la SGDL n'a pu relever cependant que six oeuvres référencées dans le moteur de recherche incriminé et dont les auteurs feraient partie de ses membres, qu'aucun d'entre eux n'est partie au litige, et qu'enfin le président de la SGDL n'a pas la capacité requise pour agir en justice et la SGDL aucun "mobile à agir";

Mais attendu qu'en application de l'article 31 du Code de Procédure Civile, une association déclarée peut réclamer en justice réparation des atteintes portées aux intérêts collectifs de ses membres ;

qu'en l'espèce la SGDL a, aux termes de ses statuts, pour mission d'assurer de façon générale la protection des intérêts moraux ou matériels de ses membres (article 1er) et qualité pour se porter intervenante à tout procès touchant un point de droit professionnel d'intérêt général (article 44 alinéa 4) ;

que la SGDL indique dans ses écritures avoir constaté à la lecture du constat d'huissier du 5 juin 2006 que les oeuvres de six de ses membres sont intégrées au service *Google Recherche de Livres* soit Messieurs

Page 13

Jacques Maritain, Jacques Godbout, Raphaël Pividal, Louis Goudel, ainsi que Mesdames Viviane Forester et Hélène Cixous ;

que ces éléments suffisent à établir la qualité à agir de la SGDL tant pour la défense de l'intérêt collectif des auteurs que pour ceux des membres auteurs identifiés dans le cadre de la présente procédure, le fait que ces derniers ne soient pas dans la cause étant à cet égard indifférent ;

Attendu par ailleurs que la SGDL est intervenue à la présence instance après une décision de son comité en date du 14 novembre 2006 conformément à ses statuts ;

qu'enfin le " mobile à agir" de la SGDL, qui sans doute doit se comprendre comme étant son intérêt à agir, résulte de la nature même du litige ;

Attendu dès lors que les fins de non-recevoir soulevées par les sociétés GOOGLE à son encontre doivent être rejetées ;

Sur l'action en contrefaçon et la loi applicable

Attendu que les demandeurs incriminent l'exploitation contrefaisante par la société GOOGLE Inc et par la société GOOGLE France des ouvrages litigieux de par la numérisation non autorisée des ouvrages sur lesquels ils sont titulaires des droits d'auteur ainsi que la diffusion, sans leur autorisation, sur le réseau Internet de tels ouvrages ;

que pour s'opposer à l'action en contrefaçon les sociétés GOOGLE Inc et GOOGLE France invoquent l'application du droit américain et soutiennent, par référence à l'article 5 § 2 de la Convention de Berne, que la loi applicable en matière de délits complexes commis sur le réseau Internet serait celle de l'Etat sur le territoire duquel se sont produits les agissements litigieux, sauf à établir une proximité particulièrement étroite avec la France, ce qui serait impossible en l'espèce dès lors que le processus de numérisation des ouvrages considérés a été effectué aux Etats-Unis, et qu'en conséquence seules les dispositions du Copyright Act et la notion de "fair use" doivent trouver à s'appliquer au présent litige ; elles font valoir à titre subsidiaire que la représentation des titres des ouvrages en cause et des ouvrages sous forme de courts extraits répond aux conditions posées par l'exception de courte citation prévue par l'article L.122-5-3 du Code de la Propriété Intellectuelle et que la numérisation de ces ouvrages ne constitue pas une reproduction illicite, dès lors que les conditions d'enregistrement sur les serveurs de GOOGLE ne donnent pas aux internautes la possibilité d' afficher ces ouvrages sur leurs écrans ;

qu'il convient de relever que les sociétés défenderesses ne revendiquent l'application de loi américaine que relativement aux actes de numérisation des ouvrages en cause qui lui sont reprochés ;

Or attendu que la loi applicable à la responsabilité extra contractuelle en matière de délit complexe est celle de l'Etat du lieu où le fait dommageable s'est produit ; que ce lieu s'entend aussi bien de celui du fait générateur du dommage que de celui du lieu de réalisation de ce dernier ;

qu'en l'espèce, il n'est pas contesté que le litige concerne des oeuvres

d'auteurs français numérisées pour être accessibles par extraits aux internautes français sur le territoire national; que par ailleurs il convient de relever, outre le fait que le tribunal saisi est le tribunal français, que les sociétés demanderesses sont établies en France pour la société EDITIONS DU SEUIL ou filiales d'une société française pour les deux autres, que de même les intervenants volontaires habilitées à défendre les intérêts des auteurs et des éditeurs français sont de nationalité française, que la société GOOGLE France a son siège en France, que le nom de domaine permettant l'accès au site www.books.google.fr a une extension" .fr" et que ce site est rédigé en langue française ;

qu'il résulte de l'ensemble de ces éléments que la France est le pays qui entretient les liens les plus étroits avec le litige, ce qui justifie l'application de la loi française contrairement à ce que soutiennent les défenderesses ;

Attendu que la responsabilité des sociétés GOOGLE Inc et GOOGLE France est donc susceptible d'être engagée pour les faits illicites commis au travers du site *Google Recherche de Livres* dans les termes du droit commun de la contrefaçon sur le fondement des articles L.335-3 et L.716-1 du Code de la Propriété Intellectuelle ;

<u>Sur les atteintes aux droits d'auteur</u>

Attendu qu'aux termes de l'article L.122-4 du Code de la Propriété Intellectuelle, *"toute représentation ou reproduction intégrale ou partielle faite sans le consentement de l'auteur ou de ses ayants droits ou ayants cause est illicite. Il en va de même pour la traduction, l'adaptation ou la transformation, l'arrangement ou la reproduction par un art ou un procédé quelconque"*;

que pour contester les actes non autorisés de numérisation d'ouvrages et de diffusion sur le site *Google Recherche de Livres* de ces ouvrages, les sociétés défenderesses font valoir qu'elles ne réalisent aucune représentation ni reproduction des ouvrages litigieux dans leur intégralité mais uniquement l'affichage d'extraits "dans des limites convenables" couvertes par l'exception de courte citation à un but d'information ;

qu'elles précisent en substance que la numérisation suppose un acte de manifestation de la volonté de son auteur de communiquer l'oeuvre au public, ce qui ne serait pas le cas d'espèce dans la mesure où le site incriminé ne permettrait pas d'afficher l'intégralité des ouvrages en cause ;

Attendu cependant que la numérisation d'une oeuvre, technique consistant en l'espèce à scanner l'intégralité des ouvrages dans un format informatique donné, constitue une reproduction de l'oeuvre qui requiert en tant que telle, lorsque celle-ci est protégée, l'autorisation préalable de l'auteur ou de ses ayants-droit ;

que les sociétés GOOGLE ne peuvent sérieusement soutenir, sauf à remettre en cause la fonctionnalité même du système *Google Recherche de Livres*, que la constitution d'un fichier numérique ne serait pas un acte de reproduction pour ne pas reproduire en lui-même la forme intelligible de l'oeuvre dès lors que la fixation résultant de la numérisation des ouvrages et leur stockage dans une base de données numérique est toujours apte à communiquer l'oeuvre au public d'une manière indirecte ;

Attendu par ailleurs que les sociétés GOOGLE Inc et GOOGLE France ne contestent pas que le service litigieux permet l'accès, et partant la communication au public, du titre, de la couverture et d'extraits des ouvrages en cause réalisant ainsi des actes de représentation non autorisée des oeuvres concernées ;

qu'elles invoquent cependant l'exception de courte citation prévue par l'article L 122-5 3° pour s'exonérer de toute responsabilité ;

Mais attendu que ces dispositions ne peuvent trouver à s'appliquer en l'espèce dès lors que les couvertures concernées sont communiquées au public dans leur intégralité, même en format réduit, et que l'aspect aléatoire du choix des extraits représentés dénie tout but d'information tel que prévu par l'article L 122-5 3°du Code de la Propriété Intellectuelle ;

Attendu que la contrefaçon des droits patrimoniaux d'auteur est ainsi réalisée au préjudice des sociétés d'édition demanderesses, du SNE et de la SGDL ;

que par ailleurs l'affichage sur le site Internet incriminé d'extraits d'oeuvres que la société GOOGLE Inc reconnaît tronqués de façon aléatoire et sous forme de bandeaux de papier déchirés portent atteinte à l'intégrité des oeuvres dont sont auteurs les six membres de la SGDL identifiés dans le cadre de la présente procédure ;

Attendu en revanche que la SGDL ne saurait invoquer une quelconque atteinte au droit de divulgation des auteurs dès lors que ce droit s'épuise par la première diffusion de l'oeuvre ;

### Sur la contrefaçon de marque

Attendu qu'il a été dit que la société Editions du Seuil est titulaire :

- de la marque française "EDITIONS DU SEUIL" déposée le 6 juin 2002 et enregistrée sous le n° 02 3 167 814 en classes 9, 38 et 42 pour désigner notamment *les communications par terminaux d'ordinateurs ; Transmission de messages et d'images assistée par ordinateur et location de temps d'accès à un centre serveur de bases de données relatives à des oeuvres littéraires, artistiques ou documentaires ;*

- de la marque française "EDITIONS DU SEUIL"déposée le 22 juillet 1992, renouvelée le 6 juin 2002 et enregistrée sous le n° 92 427 705 en classes 16, 28 et 41 pour désigner notamment *les activités sportives et culturelles ; Edition de livres, de revues ; Prêts de livres;*

- de la marque communautaire "SEUIL" déposée le 2 décembre 2002 et enregistrée le 25 mai 2004 sous le n° 2 958 544 en classes 9, 16 et 41 pour désigner notamment les *communications par terminaux d'ordinateurs ; Transmission de messages et d'images assistée par ordinateur, location de temps d'accès à un centre serveur de bases de données relatives à des oeuvres littéraires, artistiques ou documentaires. Activités sportives et culturelles ; Edition de livres, de revues ; Prêts de livres ;*

qu'elle reproche aux sociétés GOOGLE la reproduction et l'utilisation à l'identique sur le site *Google Recherche de Livres* des marques dont elle est titulaire au sens de l'article L 713-1 (en réalité L 713-2) du Code de la Propriété Intellectuelle pour désigner des services de bases

de données relatives à des oeuvres littéraires, artistiques ou documentaires, d'édition de livres, les activités culturelles et le prêt de livres , et incrimine par ailleurs l'atteinte à la marque de renommée EDITIONS DU SEUIL et SEUIL ;

que les défenderesses font valoir qu'elles ne font aucun usage des signes opposés en tant que marque pour désigner une activité d'édition d'ouvrages, qu'en tout état de cause la référence aux marques de l'éditeur est nécessaire dans le cadre du fonctionnement du servie *Google Recherche de Livres,* voire requise par les dispositions légales, et font valoir que les marques française n° 023167814 et communautaire n° 2958544 ne sont pas exploitées pour les services de *"location de temps d'accès à un centre serveur de bases de données relatives à des oeuvres littéraires, artistiques ou documentaires"* pour solliciter la déchéance des droits de ce chef ; elles contestent par ailleurs la notoriété des marques EDITIONS DU SEUIL et SEUIL ainsi qu'une quelconque exploitation injustifiée qui porterait préjudice à la demanderesse ;

Attendu en effet que l'usage d'un signe à titre de marque suppose un usage dans la vie des affaires réalisé par le contrefacteur présumé pour désigner ses propres produits et services, en vue d'une commercialisation effective auprès de la clientèle susceptible de la percevoir comme une indication d'origine desdits produits ou services;

Or en l'espèce, il n'est réalisé au travers le service en cause aucun usage dans la vie des affaires des signes considérés, lesquels n'ont pour vocation que de renseigner l'internaute sur l'identité de l'éditeur de l'ouvrage cité dans les résultats de sa recherche, pour désigner une activité d'édition de livres ou de revues, de prêts de livres ou une activité culturelle ;

qu'il en résulte que l'action en contrefaçon de marque ne peut prospérer de ce chef ;

Attendu s'agissant des services de "base de données relatives à des oeuvres littéraires, artistiques ou documentaires" qui correspondent en réalité, au vu des dépôts considérés, aux services de *"location de temps d'accès à un centre serveur de bases de données relatives à des oeuvres littéraires, artistiques ou documentaires"* visés par les marques n° 02 3 167 814 et n° 2 958 544, que les sociétés GOOGLE font valoir à juste titre qu'il n'est établi par la société demanderesse, à qui incombe la charge de la preuve en la matière, aucun usage des signes EDITIONS DU SEUIL et SEUIL pour désigner de tels services, la production en pièce n° 41, de trois tirages du site Internet accessible à l'adresse www.editionsduseuil.fr, en date du 5 février 2008, n'étant pas de nature à justifier d'un usage sérieux des marques EDTIONS DU SEUIL n° 02 3 167 814 et SEUIL n° 2 958 544 pour les services considérés pendant une période ininterrompue de cinq ans ;

qu'il y a lieu en conséquence de faire droit à la demande de déchéance telle que sollicitée ;

que l'action en contrefaçon ne peut donc pas plus prospérer de ce chef;


Sur l'atteinte à la marque de renommée

Attendu que la société EDITIONS DU SEUIL ajoute qu'en tout état de cause "GOOGLE" porte atteinte aux marques dont elle est titulaire en

ce qu'elles seraient des marques de renommée au sens de l'article L 713-5 du Code de la Propriété Intellectuelle ;

qu'elle indique que les marques "Editions du Seuil " et "Seuil" sont "en effet bien connues depuis les années 1930 en ce qu'elles désignent une maison d'édition prestigieuse, reconnue pour la qualité de ses publications et régulièrement primée à ce titre par de nombreux prix littéraires" ;

Attendu qu'il convient de relever qu'en invoquant les seules dispositions du Code de la Propriété Intellectuelle et la renommée de la marque dont elle est titulaire pour les services d'édition, la demanderesse limite sa demande à la seule marque française "EDITIONS DU SEUIL" n° 92 427 705 déposée le 22 juillet 1992 en classes 16, 28 et 41 pour désigner notamment l'édition de livres et de revues ;

Attendu que les sociétés défenderesses répliquent qu'il n'est versé au débats aucun élément de nature à établir la notoriété des marques revendiquées et que la société GOOGLE Inc ne réalise aucune exploitation injustifiée de ces marques dans le cadre de l'exploitation du service *Google Recherche de Livres* dès lors que la représentation des termes SEUIL ou EDITIONS DU SEUIL est induite par la représentation de la couverture des ouvrages en cause, qu'elle a une vocation purement informative qui est de renseigner l'utilisateur sur l'identité de l'éditeur de l'ouvrage cité dans les résultats de sa recherche et qu'elle est nécessaire à l'information du public et légalement requise dans le cadre de la citation de la source, enfin qu'il n'est démontré aucun préjudice qu'aurait subi la demanderesse du fait de l'usage de ses marques ;

Mais attendu que sont communiqués des copies d'un ouvrage intitulé "Petite Chronologie 1935-2000", une liste des prix littéraires attribués à des ouvrages édités par Le Seuil depuis 1947, de nombreux articles de presse ainsi que le programme d'une exposition intitulée "Les Editions du Seuil : histoire d'une maison" ayant été présentée au Centre Georges Pompidou du 19 février au 29 mars 2008 qui démontrent suffisamment la notoriété de la marque "EDITIONS DU SEUIL" n° 92 427 705 auprès d'une partie significative du public concerné par les services d'éditions de livres et de revues ;

que cependant il ne peut être admis que les sociétés GOOGLE, qui ne font aucun usage de la marque concernée à titre de marque, a indûment tiré profit de la renommée de celle-ci ; qu'aucun élément ne permet par ailleurs de caractériser un quelconque préjudice qui serait porté à la valeur distinctive de la marque ;

que l'atteinte à la marque renommée "EDITIONS DU SEUIL" n° 92 427 705 n'est donc pas constituée ;

Sur le parasitisme

Attendu que les sociétés demanderesses invoquent par ailleurs des actes de parasitisme à l'encontre de GOOGLE sans distinction en faisant valoir que le service *Google Recherche de Livres* incriminé consiste à utiliser, dans un but lucratif, les fruits des travaux des éditeurs sans leur verser de contrepartie, ce qui engendrerait pour eux un trouble commercial important ;

Mais attendu qu'il n'est produit aucun document de nature à corroborer ces prétentions, dès lors que les sociétés EDITIONS DU SEUIL, la société DELACHAUX & NIESTLE et la société HARRY N. ABRAMS ne communiquent aucune information sur les investissements, qu'ils soient financiers ou intellectuels, qu'elles consacrent précisément au service concerné ;

que la demande sera donc rejetée ;

### Sur les responsabilités

Attendu qu'il est constant que les actes de contrefaçon ci-dessus caractérisés sont directement imputables à la société GOOGLE Inc qui procède à la copie numérique des ouvrages considérés et qui est titulaire du nom de domaine "google.fr" permettant l'accès au service "*Google Recherche de Livres*" qu'elle exploite ;

Attendu en revanche qu'il n'est pas démontré en quoi les actes de reproduction et représentation sur Internet des ouvrages concernés seraient directement imputables à la société GOOGLE France, les sociétés demanderesses, ne pouvant sérieusement soutenir au titre de la contrefaçon que la société GOOGLE France est personnellement responsable de tels actes "pour avoir participé, facilité et fourni son assistance et ses moyens à la commission des actes dénoncés et s'être donc rendue complice de la commission de ces actes par GOOGLE Inc";

Attendu par ailleurs que les demandeurs recherchent la responsabilité de la société GOOGLE France pour avoir manqué à ses engagements de retirer les ouvrages à première demande tels que figurant dans ses différents courriers ;

Mais attendu qu'il a été dit que faisant suite à l'assignation qui lui a été délivrée le 6 juin 2006, la société GOOGLE France a sollicité de Monsieur Hervé de La Martinière - Groupe de la Martinière- la communication du constat d'huissier du 5 juin 2006 *"afin que la société Google Inc puisse procéder dans les meilleurs délais au déréférencement de ces ouvrages "* ;

qu'il en résulte que les demanderesses ne peuvent rechercher la responsabilité de la société GOOGLE France pour le motif invoqué ;

### Sur les mesures réparatrices

Attendu qu'il sera fait droit à la demande d'interdiction, sous astreinte compte tenu de la société GOOGLE Inc, dans les termes fixés au dispositif de la présente décision ;

Attendu que les sociétés demanderesses indiquent que GOOGLE utilise aujourd'hui plus de 10.000 ouvrages numérisés "leur appartenant" sur le service *Google Recherche de Livres* et sollicitent paiement de la somme de 15.000.000 euros à titre de dommages-intérêts ;

qu'il résulte du constat d'huissier dressé le 5 juin 2006 par Maître PARKER, huissier de justice associé à Paris que le site incriminé présente 23.900 pages pour l'éditeur Seuil correspondant cependant, comme le relèvent justement les défenderesses, au nombre total de pages pour l'ensemble des ouvrages de cet éditeur référencés par

GOOGLE et non pas au nombre d'ouvrages édités par le Seuil ;

que le constat du 26 septembre 2007 révèle de la même manière selon les demanderesses 9220 références en tapant le mot "Seuil", 5453 références en tapant les mots "Editions du Seuil", 893 références en tapant le mot "Delachaux", 517 références en tapant le mot "Delachaux & Niestlé", 1126 références en tapant le mot "Abrams" et 783 références en tapant les mots "Harry N. Abrams" ;

que cependant selon le procès verbal d'huissier dressé le 10 avril 2008 à la requête de la société GOOGLE Inc, par Maître Jérôme LEGRAIN, huissier de justice associé à Paris, 112 résultats apparaissent pour les ouvrages publiés au Seuil, 147 pour les ouvrages édités par la société ABRAMS et 62 pour les ouvrages édités par la société DELACHAUX & NIESTLE ;

Attendu qu'en considération de ces éléments, il convient d'allouer aux sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS, qui feront leur affaire entre elles de la répartition, la somme de 300.000 euros à titre de dommages-intérêts ;

que la société GOOGLE Inc ne saurait opposer à cet égard un règlement transactionnel de classe avec les éditeurs américains dont l'opposabilité aux demanderesses n'est pas démontrée et qui serait de surcroît en cours de validation par la justice américaine ;

Attendu que le préjudice subi par l'intérêt collectif de la profession qu'ils représentent et par les six membres identifiés de la SGDL sera réparé par l'octroi au SNE et à la SGDL de la somme de 1 (un) euro symbolique chacun à titre de dommages-intérêts ;

qu'il sera en outre fait droit aux mesures de publication sollicitée dans les termes ci-après précisés ;

### Sur les autres demandes

Attendu qu'il y a lieu de condamner la société GOOGLE Inc, partie perdante, aux dépens qui seront recouvrés conformément aux dispositions de l'article 699 du Code de Procédure Civile;

qu'en outre, elle doit être condamnée à verser aux sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS, qui ont dû exposer des frais irrépétibles pour faire valoir leurs droits, une indemnité au titre de l'article 700 du Code de Procédure Civile qu'il est équitable de fixer à la somme globale de 30.000 euros ;

qu'il sera alloué au SNE et à la SGDL la somme de 5.000 euros chacun au même titre ;

Attendu que les circonstances de l'espèce justifient le prononcé de l'exécution provisoire, qui est en outre compatible avec la nature du litige.

## PAR CES MOTIFS

Le Tribunal, statuant publiquement, par mise à disposition au greffe, par jugement contradictoire et rendu en premier ressort,

- Déclare recevables les demandes des sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS.

- Déclare recevables les interventions volontaires du SYNDICAT NATIONAL DE L'EDITION et de la SOCIETE DES GENS DE LETTRES DE FRANCE.

- Dit que la loi applicable au présent litige est la loi française.

- Dit qu'en reproduisant intégralement et en rendant accessibles les extraits d'ouvrages objets du procès verbal d'huissier du 5 juin 2006 et sur lesquels les demanderesses sont titulaires de droits d'auteur sur le site dont l' adresse url est " *http://books.google.fr*", sans leur autorisation, la société GOOGLE Inc a commis des actes de contrefaçon de droits d'auteur au préjudice des sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS.

- Dit que ce faisant la société GOOGLE Inc a également commis des actes de contrefaçon de droits d'auteur au préjudice du SYNDICAT NATIONAL DE L'EDITION, de la SOCIETE DES GENS DE LETTRES DE FRANCE et des six auteurs identifiés comme étant membres de la SGDL.

- Interdit à la société GOOGLE Inc la poursuite de ces agissements, sous astreinte de 10.000 euros par jour de retard passé le délai de trente (30 ) jours après la signification de la présente décision.

- Se réserve la liquidation de l'astreinte.

- Condamne la société GOOGLE Inc à payer aux sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS, qui feront leur affaire entre elles de la répartition, la somme de 300.000 euros à titre de dommages-intérêts en réparation de leur préjudice de ce chef.

- Condamne la société GOOGLE Inc à payer au SYNDICAT NATIONAL DE L'EDITION et à la SOCIETE DES GENS DE LETTRES DE FRANCE la somme de 1 (un) euro chacun à titre de dommages-intérêts.

- Prononce la déchéance pour défaut d'exploitation des droits de la société EDITIONS DU SEUIL sur la marque "EDITIONS DU SEUIL" n° 023167814 et sur la marque "SEUIL"n° 2958544 en ce qu'elles désigner les services de "*location de temps d'accès à un centre serveur de bases de données relatives à des oeuvres littéraires, artistiques ou documentaires*".

- Déboute la société EDITIONS DU SEUIL du surplus de sa demande relative à la contrefaçon de marque.

- Dit que la décision devenue définitive sera transmise par le greffe préalablement requis par la partie la plus diligente, à l'Institut National de la Propriété Industrielle aux fins d'inscription au Registre National des Marques.

- Autorise la publication du dispositif du présent jugement dans trois journaux ou périodiques de leur choix et aux frais avancés de la société GOOGLE Inc, sans que le coût de chacune de ces publications ne dépasse, à la charge de celle-ci, la somme de 3.500 euros HT ainsi que sur la page d'accueil du site http://books.google.fr pendant une durée

de 15 jours.

- Condamne la société GOOGLE Inc à payer aux sociétés EDITIONS DU SEUIL, DELACHAUX & NIESTLE et HARRY N. ABRAMS, ensemble, la somme de 30.000 euros en application de l'article 700 du Code de Procédure Civile.

- Condamne la société GOOGLE Inc à payer au SYNDICAT NATIONAL DE L'EDITION et à la SOCIETE DES GENS DE LETTRES DE FRANCE la somme de 5.000 euros chacun en application de l'article 700 du Code de Procédure Civile.

- Ordonne l'exécution provisoire.

- Rejette toutes demandes plus amples ou contraires.

- Condamne la société GOOGLE Inc aux dépens, lesquels pourront être directement recouvrés conformément à l'article 699 du Code de Procédure Civile.

Fait et jugé à Paris, le 18 décembre 2009.

Le Greffier                             Le Président

# Ruling by Paris court raises global resistance to Google book scanning

## Internet group violated copyright

By Ben Hall in Paris and David Gelles in San Francisco

Google last year reached a settlement with US publishers, but this is still under legal review. "I am a great victory that shows that you can't just trample other people's books," said Serge Eyrolles, head of the SNE French publishers' association. "A Chinese court will this month hear a similar case brought by a Chinese author."

But the Paris ruling could be a Pyrrhic victory for publishers if Google simply eliminates the scanning of foreign titles and destroys the electronic versions. It has attacked removing French versions from what is likely to become the dominant online book search facility.

"French readers now face the threat of losing access to a significant body of knowledge and falling behind the rest of internet users," said Philippe Colombet, head of Google Books France.

French publishers concede that they need to work with Google, but want it to negotiate terms. "I would like Google to acknowledge that verdict, since it now appears that the only way to go forward will be to find a deal, which entails better terms," said Arnaud Nourry, chief executive of Hachette Livre, the world's second-largest book publisher.

The case may have limited implications for US publishers. French law offers more protection to copyright holders because it does not include the "fair use" exception to copyright breaches in US law. Google has often cited the fair use principle to defend its scanning project.

The Paris judgment could encourage legal action in other European countries where copyright law does not contain the fair use exception.

This week the French government earmarked €750m to a programme to digitise French cultural goods, which could include a French book-scanning scheme.

# French court rules against Google on copyrights

PARIS

BY MATTHEW SALTMARSH

A French court ruled Friday that Google was guilty of infringing on copyrights by digitizing books and putting extracts online without authorization, dealing a setback to its embattled book project.

The court in Paris ruled against Google after a publishing group, La Martinière, backed by publishers and authors, argued that the industry was being exploited by Google's Book Search program, which was initiated in 2005.

The court ordered Google to pay over €300,000, or $429,000, in damages and interest and to stop digital reproduction of the material. The company was also ordered to pay €10,000 in fines a day until it removes extracts of some French books from its online database.

Google said it believed that it had complied with French copyright law and said that it planned to appeal the decision.

"We believe that displaying a limited number of short extracts from books complies with copyright legislation both in France and the U.S. — and improves access to books," said Philippe Colombet, who is responsible for Google's book partnerships in France.

Mr. Colombet said he did not know whether the company would immediately remove the excerpts or pay the fine; the company's attorneys were examining the ruling.

He also said there would be no impact on Google's settlement with publishers and authors in the United States, an agreement that would allow the company the right to digitize, catalog and sell millions of books online that are under copyright protection.

La Martinière, based in Paris, first filed the suit against Google in 2006 claiming damages against the publishing houses; Editions du Seuil of France; Delachaux & Niestlé of Switzerland; and Harry N. Abrams of the United States.

Those publishers, supported by the French Publishers' Association and an authors' group, had argued that scanning books was an act of reproduction that should be paid. They had demanded that the U.S. company be fined millions of euros. They accused Google of scanning the books free of charge, letting users browse the content without charge, reaping revenue from advertisers but not adequately compensating the creators and original publishers of the works.

Yann Colin, a lawyer for La Martinière, expressed his satisfaction with the result and said his client hoped that the level of the fine would be increased.

Google has so far scanned 10 million books through partnerships with libraries in its project to put the world's literature online. Over half of those books are in languages other than English.

Those include books under copyright that can only be previewed as extracts without charge. In these cases, Google directs users to where they can buy books, or libraries they can borrow them from. Others books are in the public domain and can be read and downloaded for free.

The project has proved especially controversial in France. Here, politicians including President Nicolas Sarkozy have pushed for a broader public digitization program, apparently wary of offering Google the chance to capitalize on the country's cultural heritage.

Mr. Sarkozy has pledged nearly €750 million toward the computer scanning of French literary works, audiovisual archives and historical documents, an announcement that underscored his government's desire to maintain control over France's cultural heritage.

*John Rofé contributed reporting.*

# Google loses copyright suit

*Web giant plans appeal of French court's ruling over putting book extracts online*

11.12.

By Max Colchester
And Jessica E. Vascellaro

A French court found Google Inc. guilty of copyright infringement for scanning books and putting extracts online without a French publisher's consent, a ruling that could hinder the Internet giant's drive to create a global online library.

Google said it would abide by the Friday ruling for now but appeal. The court ordered the company to pay €300,000 ($430,000) to French publisher La Martinière and to remove online extracts of its books.

Separately, Google is in discussions to buy Yelp Inc., a start-up that provides reviews of local businesses, according to people familiar with the matter. The companies have yet to reach a deal, which could be for at least $500 million, according to one of the people.

The Paris court ruling, which is the first of its kind in France and applies only to that country, could set a legal precedent for any future copyright-infringement cases by French publishers, said Valerie Barthez, head of the legal department at the French publishers' association Société des Gens de Lettres de France, one of the plaintiffs in the case.

Philippe Colombet, head of Google Books in France, said the company "regrets" the Paris court's decision. He added that the ruling only regards La Martinière books and that Google will still continue to offer extracts from books published by companies with which Google has signed partnerships.

Google has been working for several years to make an array of books available online through its search engine. Since 2004, the company has been working with U.S. libraries to digitize millions of books. Google has also signed partnerships with several European publishers to have extracts from their books put online.



Yann Colin, a La Martinière lawyer, after Friday's ruling in Paris.

In 2006 La Martinière, which owns the Abrams publishing house in the U.S., sued Google, saying the search engine should seek authorization and pay to publish its books online. French author and publisher groups later joined the lawsuit.

Société des Gens de Lettres de France and authors' group Syndicat National de L'Édition—which includes France's biggest publisher Hachette Livre—subsequently joined the lawsuit. According to the ruling released on Friday, the parties originally demanded that Google be fined a total of €15 million.

"This wasn't just about money, it was about a moral right," said Tessa Destais, a spokeswoman for La Martinière. "We are not against Google. We are against them stealing our books."

The ruling comes as Google is preparing to defend a settlement it struck with two U.S. author and publisher groups before a federal court early next year. The settlement, which aims to resolve copyright lawsuits the groups filed against Google in 2005, gives Google the right to distribute and sell digital copies of out-of-print books it scanned, in exchange for sharing some revenue with the copyright holders.

Google had originally sought for the settlement to include millions of works by foreign rights holders that it scanned from U.S. libraries, although the settlement only gave Google permission to distribute those works in the U.S. However, it decided to confine the settlement to books registered with the U.S. Copyright Office — or published in the U.K., Canada and Australia — in response to fierce criticism from French and German governments.

Last week, French President Nicolas Sarkozy said that France would spend €2 billion to digitize books and other cultural publications itself.

While the French ruling has little impact in the U.S., it was welcomed by a U.S. group representing authors.

"We agree that this is an infringement. It's a good ruling," said Paul Aiken, executive director of the Authors Guild.

*—Jeffrey A. Trachtenberg and David Gauthier-Villars contributed to this article*