UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| The Authors Guild, Inc., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 05 CV 8136-DC |
| | : | |
| vs. | : | OBJECTION OF AMAZON.COM, |
| | : | INC., TO PROPOSED AMENDED |
| Google, Inc. | : | SETTLEMENT |
| | : | |
| Defendant. | : | *Filed Electronically* |

-------------------------------------------------------------x

AMAZON.COM, INC.
David A. Zapolsky, Esq. (DZ-8058)
davidz@amazon.com
Vice President & Associate General Counsel
Litigation & Regulatory Affairs
1200 12th Avenue South
Suite 1200
Seattle, Washington 98144
Telephone:     (206) 266-1323
Facsimile:     (206) 266-7010

IRELL & MANELLA LLP
David Nimmer
(CA State Bar No. 97170)
(*Pro Hac Vice*)
dnimmer@irell.com
Alexander F. Wiles
(CA State Bar No. 73596)
(*Pro Hac Vice*)
awiles@irell.com
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067-4276
Telephone:     (310) 277-1010
Facsimile:     (310) 203-7199

Counsel for Objector Amazon.com, Inc.

<u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ..........................................................................................2

ARGUMENT ..............................................................................................................5

I.     The PAS Must Be Rejected Because It Improperly Requires This Court to Force Class Members to Release Google and Others From Liability For Actions They May Take in the Future That Are Not at Issue in the Litigation. ...............5

     A.     Second Circuit law prohibits this Court from forcing class members to release claims based on future conduct. ..................5

     B.     The changes in the PAS do not remedy the overly broad scope of the releases at issue. ..................6

     C.     The Resellers provision, one of the amendments in the PAS, actually expands the types of future conduct released. ..................8

II.     The PAS Should be Rejected Because Congress, Not This Court, Is The Proper Body to Establish a Regime for the Digitization and Use of Works Whose Copyright Holders Cannot Be Found. ..................9

III.     The PAS Must Be Rejected Because It Relies Upon Expropriation to Achieve Control Over "Orphan Works" in Violation of the Copyright Act. ..................9

IV.     This Court Cannot Approve the PAS Because It Violates the Antitrust Laws. ..................10

     A.     The claim that the PAS necessarily passes antitrust scrutiny by creating new products completely disregards Congress's policy judgments in enacting copyright legislation. ..................10

     B.     The provisions on consumer purchase pricing remain per se illegal. ..................14

          1.     The Pricing Algorithm remains per se illegal price-fixing. ..................14

          2.     The coordinated discounting provided for by the PAS continues to be per se illegal price-fixing despite the amendments. ..................17

     C.     Even with the amendments to the revenue split provisions, the PAS continues to constitute per se illegal fixing of wholesale prices. ..................18

     D.     Even with the new Resellers provision, the PAS continues to give Google exclusive rights likely to lead to a monopoly. ..................19

Page

E.    Subscription pricing, Google's monopsony power, and inadequate Registry governance rules continue to be antitrust problems in the PAS...........21

V.    The Resellers Program Illustrates the Combination of the Scope of Releases, Copyright, and Antitrust Flaws of the PAS. ....................................................22

A.    There is no legitimate reason to convey the "Resellers" power to Google..................................................................................................................22

B.    Even the parties themselves appear not to believe that a class action settlement can release future claims for future conduct....................................23

C.    The antitrust critique of the Resellers program demonstrates how overreaching the PAS is, despite its changes.......................................................24

CONCLUSION..................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abadir & Co. v. First Mississippi Corp.*,
    651 F.2d 422 (5th Cir. Unit A July 1981) .................................................................. 14

*Arizona v. Maricopa County Medical Society*,
    457 U.S. 332 (1982) ....................................................................................... 16, 17

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980) ....................................................................................... 15, 18

*Citizen Publ'g, Co. v. United States*,
    394 U.S. 131 (1969) ........................................................................................... 15

*Copy-Data Systems, Inc. v. Toshiba America, Inc.*,
    663 F.2d 405 (2d Cir. 1981) ................................................................................ 14

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003) ....................................................................................... 9, 24

*Fox Film Corp. v. Doyal*,
    286 U.S. 123 (1932) ........................................................................................... 12

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ............................................................................... 10

*In re Asbestos Litig.*,
    90 F.3d 963 (5th Cir. 1996), *vacated*, 521 U.S. 1114 (1997) ...................................... 6

*In re Montgomery County Real Estate Antitrust Litig.*,
    83 F.R.D. 305 (D. Md. 1979) ............................................................................... 10

*Nat'l Super Spuds, Inc. v. N. Y. Mercantile Exch.*,
    660 F.2d 9 (2d Cir. 1981) ...................................................................................... 5

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
    157 F. Supp. 2d 561 (E.D. Pa. 2001) ....................................................................... 5

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
    2001 WL 1689714 (E.D. Pa. 2001) .......................................................................... 5

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ........................................................................................... 12

Page(s)

*Stewart v. Abend,*
    495 U.S. 207 (1990)...................................................................................... 12

*Three Rivers Motors Co. v. Ford Motor Co.,*
    522 F.2d 885 (3d Cir. 1975)......................................................................... 5

*Uhl v. Thoroughbred Tech. and Telecomm., Inc.,*
    309 F.3d 978 (7th Cir. 2002) ..................................................................... 5, 8

*UniSuper Ltd. v. News Corp.,*
    898 A.2d 344 (Del. Ch. 2006)...................................................................... 5

*United States v. Am. Soc'y of Composers, Authors & Publishers,*
    2001 U.S. Dist. LEXIS 23707 (S.D.N.Y. June 11, 2001) ......................... 21

*United States v. Broadcast Music, Inc.,*
    1966 U.S. Dist. LEXIS 10449 (S.D.N.Y. Dec. 29, 1966), as amended, 1994
    U.S. Dist. LEXIS 21476 (S.D.N.Y. Nov. 18, 1994)................................... 21

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940)..................................................................................... 15

*United States v. Topco Associates, Inc.,*
    405 U.S. 596 (1972)..................................................................................... 15

*United States v. Trenton Potteries Co.,*
    273 U.S. 392 (1927)..................................................................................... 15

*Va. Excelsior Mills, Inc. v. FTC,*
    256 F. 2d 538 (4th Cir. 1958) ..................................................................... 15

*Varacallo v. Mass. Mut. Life Ins. Co.,*
    226 F.R.D. 207 (D.N.J. 2005)...................................................................... 5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d Cir. 2005)........................................................................... 5

## **Statutes**

15 U.S.C. § 1 .................................................................................................... 14

17 U.S.C. § 106 ................................................................................................ 11

17 U.S.C. § 108(a)(1) (1978) ........................................................................... 24

17 U.S.C. § 108(b)(2) (1998) ........................................................................... 24

Page(s)

17 U.S.C. § 108(i) (2005) ........................................................................ 24

17 U.S.C. § 201(e) .............................................................................. 3, 9

17 U.S.C. § 302 .................................................................................... 11

17 U.S.C. § 303 .................................................................................... 11

17 U.S.C. § 506(a) ................................................................................. 7

21 U.S.C. § 353(b) ............................................................................... 11

U.S. Const. art. I, § 8, cl. 8............................................................... 9, 12, 24

## Other Authorities

7B Wright, *Federal Practice and Procedure* § 1797.3 (3d ed. 2009) ..................................... 6

Andrew Richard Albanese & Jim Milliot, *Richard Sarnoff: PW's Publishing Person of the Year*, Dec. 7, 2009.................................................................... 2

*Competition and Commerce in Digital Books: Hearing Before H. Comm. on the Judiciary*, 111th Cong. (Sept. 10, 2009)............................................. 6, 9, 22

Einer Elhauge, *Why the Google Books Settlement is Procompetitive* (Harvard Law Sch. Law & Econs. Discussion Paper No. 646 and Harvard Law Sch. Pub. Law & Legal Theory Research Paper No. 09-45) ..................................... passim

Fred Vogelstein, *Keyword: Monopoly*, Wired, August 2009 ................................ 16

James Gleick, *How to Publish Without Perishing*, N.Y. Times, Nov. 29, 2008 ......................................................... 3

James Grimmelmann, *GBS: Is the UWF a Blackwater for the Orphans?*, The Laboratorium (Nov. 13, 2009)............................................... 8

Jonathan M. Jacobson, Implications of the Google Book Search Settlement, Presentation to The Federalist Society (Dec. 14, 2009)............................ 11

Miguel Helft, *Google Books Settlement Delayed Indefinitely*, N.Y. Times Bits Blog (Sept. 24, 2009)...................................... 4

Paul Aiken, Press Conference Remarks of Guild Executive Director, The Authors Guild (Oct. 28, 2008)............................................ 3

S. Rep. No. 104-315 (1996) ................................................................... 12

Page(s)

U.S. Dep't of Justice & Fed. Trade Comm'n,
     Horizontal Merger Guidelines § 4 (rev. 1997) ............................................................ 13

Vit Wagner, *Google Case's Final Chapter Seeks Ending*,
     Toronto Star, Jan. 23, 2010 ...................................................................................... 19

**<u>Rules</u>**

Fed. R. Civ. P. 23 ....................................................................................... 1, 23, 25

## INTRODUCTION

Amazon.com, Inc. ("Amazon"), a member of the putative class, objects to the Proposed Amended Settlement ("PAS") and gives notice that it intends to appear at the fairness hearing currently scheduled for February 18, 2010.

In opposing the initial settlement, Amazon wrote:

> The settlement proposed by the parties to this case should not be approved. It is unfair to authors, publishers, and others whose works would be the subject of a compulsory license for the life of the copyright in favor of Google and the newly created Book Rights Registry. It is anticompetitive and violates antitrust laws because it provides Google an effective monopoly in the scanning and exploitation of millions of works whose copyright holders cannot be located or choose not to involve themselves in this class action. It also creates a cartel of authors and publishers—the Books Rights Registry—operating with virtually no restrictions on its actions, with the potential to raise book prices and reduce output to the detriment of consumers and new authors or publishers who would compete with the cartel members. Indeed, the agreement is even arguably unlawful on its face because it constitutes price fixing by horizontal competitors—namely, the Rightsholders, who are agreeing collectively on a mechanism for setting the highest possible prices to be charged for their works. Finally, the proposed settlement improperly seeks to stretch the boundary of this Court's power beyond its lawful limits, using the class action mechanism embodied in Rule 23 of the Federal Rules of Civil Procedure to create a massive and complex business arrangement of perpetual duration among class members, Google and the Registry. The settling parties propose to force this business arrangement upon class members by requiring, in contravention of controlling Second Circuit authority, that, as part of the settlement, they release Google and others from claims of copyright infringement for future uses of copyrighted works, some of which are totally divorced from the current facts and connected to this case only under the guise of being an anticipated project of the business venture created by the Settlement Agreement.

Objection of Amazon.com, Inc., to Proposed Settlement (Dkt. # 206), at 1-2 [hereinafter Amazon's Original Objection].

The changes made by the parties fail to cure any of these fatal defects and, in fact, stretch Rule 23 even further than their original agreement by releasing still more non-parties for actions they may take in the future. Like its predecessor, the PAS also infringes on Congress's constitutionally delegated role to legislate changes to copyright law and improperly relies upon expropriation in violation of the Copyright Act. Further, the antitrust problems of price-fixing,[1]

---

[1] As discussed later, the parties have altered the provision calling for price-fixing on consumer sales but have failed to remove that which makes it per se illegal: It remains an agreement among competitors on a mechanism for setting prices for their competing products.

exclusive dealing and cartel structure persist.  Because the PAS contravenes clear Second Circuit authority governing the permissible scope of releases in settlements of class actions, violates the antitrust and copyright laws, and infringes on Congress's authority over copyright law, it cannot be approved.

## STATEMENT OF FACTS

For the salient factual background, Amazon refers the Court to pages 2-6 of its Original Objection.  The following facts also shed light on the impropriety of the PAS:

From the beginning of their negotiations, and at the behest of the rightsholder plaintiffs, the parties have viewed the possible settlement of this action as a vehicle for implementing a forward-looking business arrangement.  In a recently published interview, Richard Sarnoff, chairman of the Association of American Publishers as well as co-chair of Bertelsmann Inc. and president of Bertelsmann Digital Media Investments, stated that the first step in the settlement process was to sit down with Paul Aiken, executive director of the other associational representative plaintiff, the Authors Guild.  During these discussions, the two considered:

> how we might resolve the lawsuits in a way that actually benefited the publishing industry and authors' interests long-term.  Our concept was that we could use class action as a mechanism to compensate rights holders whose works were being copied by Google by creating opportunities for their books using Google's financial and operational resources.

Andrew Richard Albanese & Jim Milliot, *Richard Sarnoff: PW's Publishing Person of the Year*, Publishers Weekly, Dec. 7, 2009, *available at* http://www.publishersweekly.com/article/CA6710194.html.  Sarnoff also explained that the plaintiffs had become "convinced that neither a victory nor a loss best served the interests of rights holders.  Usually a victory is a good result," but winning the merits of this case would only have stopped Google's scanning and snippet display and would not be "a victory for rights holders of books that are out-of-print and have no market." *Id.*  He also described the settlement process as working across four industries and as "not a cat-herding exercise so much as an entire zoo-herding exercise—you have some animals that don't always get along with each other." *Id.*  Representatives of the Authors Guild likewise have confirmed that the plaintiffs collectively

approached Google with a proposal to settle that involved the right to use millions of copyrighted works in numerous future revenue models—revenue models that Google apparently had no thoughts of implementing.[2]

This history makes clear that the plaintiffs in this case banded together not to settle their actual claims, but to work industry-wide, garnering cooperation among groups that might otherwise be adversaries or competitors, in order to make Google an offer, and then engage it in negotiation, of a business venture that would create new opportunities for all of them.

The result of these negotiations—the original proposed settlement—was announced in October 2008.  On September 1, 2009, Amazon filed its Objection to the original proposed settlement.  Amazon's Original Objection focused on four topics:

- *Institutional Incompetence*:  Congress, not this Court, is the proper body to modify copyright law;

- *Violation of Antitrust Laws*:  The original proposed settlement would restrain competition by creating a cartel of rightsholders that would fix prices, select Google as the exclusive distributor of electronic copies of orphan and other works, and potentially suppress competition from future works;

- *Overbroad Scope of the Releases*:  The Court lacked the power to approve the original settlement because, under clear Second Circuit authority, it cannot force class members to release claims based on future conduct; and

- *Expropriation*:  The settlement expropriates the rights of orphan works rightsholders in violation of 17 U.S.C. § 201(e).

Amazon was far from alone in objecting to the original settlement.  The "majority" of the 400 filings "rais[ed] issues about various parts of the agreement."[3]  Two weeks later, the

---

[2] *See* Paul Aiken, Press Conference Remarks of Guild Executive Director, The Authors Guild (Oct. 28, 2008), http://www.authorsguild.org/advocacy/articles/press-conference-remarks.html ("We first proposed the core terms for this settlement to Google at our general counsel's office 29 months ago . . . . The task before us was to take Google's audacious library digitization project and transform it into something both good for readers and agreeable to the people who write and publish books.  To do that, we found we had to make the project even more audacious."); James Gleick, *How to Publish Without Perishing*, N.Y. Times, Nov. 29, 2008, http://www.nytimes.com/2008/11/30/opinion/30gleick.html (Member of board of the Authors Guild: "[T]he authors persuaded Google to do more than just scan the books for purposes of searching, but go further, by bringing them back to commercial life.").

Department of Justice filed a Statement of Interest, raising serious concerns with the original proposed settlement, including the scope of its releases, the suitability of the class representatives and whether the proposed settlement complied with antitrust law. Statement of Interest of the United States of America Regarding Proposed Class Settlement (Dkt. # 720) [hereinafter DOJ Brief]. Just four days later, the parties withdrew the original proposed settlement, and plaintiffs moved to adjourn the final fairness hearing. Notice of Unopposed Motion to Adjourn October 7, 2009 Final Fairness Hearing and Schedule Status Conference (Dkt. # 728). On November 13, 2009, the parties submitted the Proposed Amended Settlement, along with a memorandum in support of preliminary approval that listed many groups of changes. Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Dkt. # 769), at 3-12.

Despite the parties' list of changes, in all respects important to the issues raised by Amazon, the PAS is the same as the original proposed settlement. For purposes of the issues that concern Amazon, there are only a few changes of note:

- Google is to design the Pricing Algorithm, which sets default prices for Consumer Purchases, to "simulate[]" competitive prices. Boni Decl. Ex. 2 (redlined PAS) §§ 4.2(c)(ii)(2); 4.2(b)(i)(2).

- Registry-authorized discounts can be of any size and are subject to Unclaimed Works Fiduciary (UWF) veto for unclaimed works. *Id.* § 4.5(b)(ii).

- The UWF has powers, matching the Registry's, to collectively control the preview uses for certain categories of books. *Id.* §§ 4.3(g); 4.3(e)(i),(ii),(iii).

- Revenue splits for Commercially Available Books can be renegotiated. *Id.* § 4.5(a)(iii).

- "New Revenue Models" are limited to a shorter list of "Additional" models. *Id.* § 4.7.

---

[3] Miguel Helft, *Google Books Settlement Delayed Indefinitely*, N.Y. Times Bits Blog, http://bits.blogs.nytimes.com/2009/09/24/google-books-settlement-delayed-indefinitely/ (Sept. 24, 2009, 18:34 EDT).

- A "Resellers" provision allows Google to authorize others to sell access to books in its Consumer Purchase program. Google will host the books, while the reseller's cut will be a "majority" of Google's share of the revenue. *Id.* § 4.5(b)(v)(2).

## ARGUMENT

**I.    The PAS Must Be Rejected Because It Improperly Requires This Court to Force Class Members to Release Google and Others From Liability For Actions They May Take in the Future That Are Not at Issue in the Litigation.**

This Court cannot approve the PAS because the releases it grants to Google and others in Article X are overbroad. The parties' amendments do nothing to satisfy clear Second Circuit law that a class action settlement may only release claims that are part of the "identical factual predicate" of the underlying litigation. In fact, one amendment actually expands the scope of the releases by adding releases for non-parties who "resell" access to books.

### A.    Second Circuit law prohibits this Court from forcing class members to release claims based on future conduct.

As discussed in Amazon's Original Objection, and in the Memorandum of Law In Support of Amazon.com's Motion for Reconsideration of Order Granting Preliminary Approval of Amended Settlement Agreement (Dkt. # 775) [hereinafter Motion for Reconsideration], while a class action settlement can release claims that were not specifically alleged in the litigation, a settlement cannot release claims that are not part of the "identical factual predicate" as the class claims, and future claims for future conduct are never part of the same factual predicate as the underlying litigation. *See* Amazon's Original Objection, Sections IV.A - IV.B (discussing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), *Nat'l Super Spuds, Inc. v. N. Y. Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981), *UniSuper Ltd. v. News Corp.*, 898 A.2d 344 (Del. Ch. 2006), *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561 (E.D. Pa. 2001), *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 2001 WL 1689714 (E.D. Pa. 2001), *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005), *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir. 1975), and *Uhl v. Thoroughbred Tech. and Telecomm., Inc.*, 309 F.3d 978 (7th Cir. 2002)); Motion for Reconsideration at 7-12.

The "identical factual predicate" limitation on class action settlements has constitutional origins; judicial resolution of future claims likely implicates Article III "case or controversy"

concerns. *See* Motion for Reconsideration at 8 (discussing Judge Smith's dissent in *In re Asbestos Litig.*, 90 F.3d 963, 1015-1026 (5th Cir. 1996), *vacated*, 521 U.S. 1114 (1997), and quoting 7B Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1797.3 (3d ed. 2009)); Amazon's Original Objection at 36 n.27 (same). The Register of Copyrights, Marybeth Peters, explicitly made this point in her testimony before the House Judiciary Committee. *Competition and Commerce in Digital Books: Hearing Before H. Comm. on the Judiciary*, 111th Cong. (Sept. 10, 2009) [hereinafter *House Hearing*] (written statement of Marybeth Peters, Register of Copyrights) [hereinafter *Register Peters's Testimony*], at 2, 7, *available at* http://judiciary.house.gov/hearings/pdf/Peters090910.pdf ("In the view of the Copyright Office, the settlement proposed by the parties would encroach on responsibility for copyright policy that traditionally has been the domain of Congress. . . . [W]e do wonder whether, as a constitutional matter, a class action settlement could decide issues that were not properly before the Court as part of the case and controversy presented during the litigation. . . . A class action settlement that permits new activities for years to come, and removes the judicial remedies of millions of authors and publishers that are otherwise afforded by the Copyright Act, seems to us to be an excessive exercise of judicial power.").

### B. The changes in the PAS do not remedy the overly broad scope of the releases at issue.

The PAS still improperly releases Google, its library partners, and others from future claims based on future conduct. As in the original proposed settlement, the PAS releases Google, its contractors, licensees, agents and successors "*after the Effective Date*, [for] any act or omission authorized by this Amended Settlement Agreement . . . when that act or omission is undertaken by a Person who is authorized to undertake it under this Amended Settlement Agreement." PAS §§ 10.1(f) (emphasis added); 10.1(g); 10.2(a).[4] Likewise, the PAS also releases Cooperating Libraries, Fully Participating Libraries, Other Libraries and Public Domain

---

[4] The releases are implicated by the parties' amendments not because the release language itself was altered, but because the releases remain phrased as releasing all activities authorized by the settlement—and the business models that are authorized have changed.

Libraries from liability for the same acts or omissions. *Id.* §§ 10.1(b), (d), (h), (j); 10.2(a). The releases are so overbroad that they cover libraries that have not participated in Google's digitization process to date and even libraries that may not currently exist. They further extend to entities that copy or use copyrighted works in reliance on an agreement with the Registry in the event that Google foregoes particular business models. *Id.* §§ 10.1(f); 10.2(a).

Certain authorizations for future conduct remain unchanged in the PAS. The PAS, as before, releases claims against Google and its partners for future acts similar to those in which they are already engaged, like future digitization of books. And, like the original settlement, the PAS provides Google and its partners with releases for future claims against Google for types of infringement expected to be undertaken for the first time after the Effective Date of the Settlement:  providing institutional subscriptions, *id.* § 4.1, and selling books and inserts to consumers through the Consumer Purchase model, *id.* § 4.2.

The most notable change relating to forward-looking releases is that the PAS explicitly allows only three future revenue models—Print on Demand ("POD"), File Download, and Consumer Subscription Models. *Id.* § 4.7. The parties now refer to these as "Additional Revenue Models" instead of "New Revenue Models." *Id.* Additionally, as before, unspecified future amendments are still sanctioned. *Id.* § 17.27.[5]

Providing access to books and inserts via POD, File Download or Consumer Subscription is clearly conduct in which Google has not yet engaged and, because of criminal sanctions, almost certainly would never engage without a clear license to do so. *See* 17 U.S.C. § 506(a) (defining copyright infringement as a criminal offense when undertaken willfully and for commercial advantage). These "additional revenue models" are not at issue in this litigation, as they do not exist and were never threatened by Google. Rather, as set out above, they are

---

[5] It is also possible that the PAS implicitly sanctions even more, unspecified future revenue models, so long as Google, on the one hand, and a Registered Rightsholder, or, if none is available, the UWF, on the other hand, agree to implement them. Section 3.10(a) prohibits Google from displaying books or inserts "[e]xcept as expressly permitted by this Amended Settlement Agreement *or otherwise* by Registered Rightsholders or, for unclaimed works, by the Unclaimed Works Fiduciary." *Id.* § 3.10 (emphasis added).

included in the settlement because the named plaintiffs decided they wanted to use the settlement to create new business opportunities for rightsholders.[6]  Under Second Circuit law, this Court cannot force class members to release claims arising from implementation of these revenue models.  Amazon's Original Objection at 34-40; Motion for Reconsideration at 7-12.

### C. The Resellers provision, one of the amendments in the PAS, actually expands the types of future conduct released.

While the parties have circumscribed the potential future revenue models listed in Section 4.7 of the original proposed settlement, by amending Section 4.5 they have actually expanded the type of conduct and the number of non-parties released.  Section 4.5(b)(v)(2) now provides that, for any books Google makes available through the Consumer Purchase program, Google "will allow resellers to sell access to such Books to their end users."  Although it is not completely apparent from the text of Article X that resellers are to be released from liability for activities included in the Resellers program,[7] it is clear that the parties, if they intended for this provision to have any meaning, must view the settlement as releasing resellers; if resellers were not released, they could very well be exposed to crippling statutory damages for providing access to copyrighted works.  Thus, the Resellers program is another example of the settlement failing to meet the requirements of established Second Circuit law.

The releases in the PAS are far too broad.  The Court simply does not have the power to bar claims arising from future conduct against Google, its partner libraries or unknown third parties.[8]  Because of this flagrant deficiency, the PAS must be rejected.

_____

[6] The history of the settlement negotiations ends any conceivable argument that the releases in this case can by justified by reference to *Uhl*, 309 F.3d 978.  Even read most expansively, *Uhl* covered only arguably legal activities that had actually been undertaken or threatened as of the time of the suit.  Here, the record is clear that Google never threatened to provide access to works through any of the future revenue models listed in the PAS; it was the plaintiffs who came up with the idea to create future business models through a settlement.

[7] Article X provides that the "Google Releasees" include Google, its contractors, licensees, agents and successors.  PAS § 10.1(g).

[8] In fact, the Proposed Amended Settlement's creation of an "Unclaimed Works Fiduciary," further underscores the impropriety of its releases.  *See* James Grimmelmann, *GBS: Is the UWF a Blackwater for the Orphans?*, The Laboratorium,

II.     **The PAS Should be Rejected Because Congress, Not This Court, Is The Proper Body to Establish a Regime for the Digitization and Use of Works Whose Copyright Holders Cannot Be Found.**

The PAS is still private copyright legislation, drafted for the parties' own benefit.  As discussed in Amazon's Original Objection, the history of copyright is one of accommodation to technology achieved through congressional enactments amending the Copyright Act.  *See* Amazon's Original Objection Section I, at 7-12.   The current PAS, like the original proposal, flies squarely in the face of Congress's constitutionally delegated role to legislate changes to copyright law.  *See id.* Section I, at 13-15 (citing U.S. Const. art. I, § 8, cl. 8 and *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003) (upholding the constitutionality of the Copyright Term Extension Act; "[w]e have also stressed . . . that it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives.")); *see also House Hearing* (*Register Peters's Testimony*).  The PAS, therefore, must be rejected.

III.    **The PAS Must Be Rejected Because It Relies Upon Expropriation to Achieve Control Over "Orphan Works" in Violation of the Copyright Act.**

The PAS still expropriates the copyrights of orphan works rightsholders.  As discussed in Amazon's Original Objection, 17 U.S.C. § 201(e) prohibits "any governmental body or other official or organization" from expropriating the rights of orphan works rightsholders who have not previously transferred their copyrights voluntarily and who have not clearly authorized such a transfer.  *See id.* Section III, at 32-34.  Therefore, neither this Court (a "governmental body") nor the new UWF (defined as a "person or entity" under Section 6.2(b)(iii), and thus either an "officer" or "organization" under § 201(e)) can by law expropriate copyright interests belonging to authors who have not previously transferred them.  *See also* Amazon's Original Objection Section III, at 32-34.  This is yet another defect of the original settlement that the changes embodied in the PAS do nothing to cure.

---

http://laboratorium.net/archive/2009/11/14/gbs_is_the_uwf_a_blackwater_for_the_orphans (Nov. 13, 2009, 21:10 EDT) ("What other class action is so dangerous to class members that they need an ongoing guardian, able to act on their behalf without instructions, just to safeguard their interests?  It's precisely because the settlement trades in future claims based in future conduct that these possibilities for abuse arise and must be guarded against.").

**IV.    This Court Cannot Approve the PAS Because It Violates the Antitrust Laws.**

Courts cannot approve class action settlements that violate the federal antitrust laws and are required to ask more than whether the settlement is clearly illegal on its face; courts can and should evaluate a settlement's competitive effects.  *See* Amazon's Original Objection at 16 & n.11 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305, 313-15, 319-20 (D. Md. 1979)).  Although the parties amended the settlement in an attempt to address some of its anticompetitive aspects, their changes are insufficient; they touch, almost exclusively, the program for selling online access to books, leaving unchanged Google's exclusive rights in the subscription models and the future additional business models such as POD and File Download.

**A.    The claim that the PAS necessarily passes antitrust scrutiny by creating new products completely disregards Congress's policy judgments in enacting copyright legislation.**

Over the course of the past several months, and especially since the parties announced the contents of the PAS, the settling parties and their supporters (often funded by Google) have sought to whitewash the antitrust problems created by it with a simple, but fatally flawed argument:  The PAS cannot be criticized as anticompetitive because it brings new products to the marketplace that, without it, would not exist.  If the PAS still involves a cartel that fixes prices on book sales, proponents insist, the Court, the Department of Justice and society at large should accept that price-fixing because consumers will have better access to copyrighted out-of-print books.  If the PAS still gives Google exclusive access to millions of unclaimed works for purposes of selling institutional subscriptions to a book database and hence an almost certain monopoly in that market, proponents claim, everyone should accept that monopoly because, without the settlement, no one would have the ability to offer a comprehensive database.  On and on, the argument goes, knocking down every antitrust complaint, whether raised by the Department of Justice, Google's competitors, authors, consumers or scholars.  *See* Einer Elhauge, *Why the Google Books Settlement is Procompetitive* 40-41 (argument for claimed commercially unavailable books), 46-47 (same for "unclaimable" books), 51-52 (same for

institutional subscriptions) (Harvard Law Sch. Law & Econs. Discussion Paper No. 646 and

Harvard Law Sch. Pub. Law & Legal Theory Research Paper No. 09-45), *available at*

http://ssrn.com/abstract=1459028 [hereinafter Elhauge];[9] Jonathan M. Jacobson, Partner, Wilson

Sonsini Goodrich & Rosati, Implications of the Google Book Search Settlement, Presentation to

The Federalist Society (Dec. 14, 2009), video webcast *available at*

http://fora.tv/2009/12/14/Implications_of_the_Google_Book_Search_Settlement.[10]

     This argument is fundamentally wrong: the reason the products at issue do not now exist

is because they are illegal, not because of the lack of innovation by competitors in the

marketplace.  The proponents' argument is no more an answer to the antitrust problems created

by the settlement than it would be if the products at issue were prescription drugs and the

settlement at issue had devised some kind of "opt out" scheme for marketing them without

requiring a physician to actually issue a prescription.  In both cases, Congress has made a

judgment about what is and what is not required before a product may be offered for sale: in the

case of books, it is illegal to offer them for sale without the express permission of copyright

holders[11] (just as it is illegal to purchase prescription drugs without a prescription issued by a

licensed prescriber[12]).  Avoiding that Congressional judgment is not something the courts can

---

     [9] The Amicus Brief of Antitrust Law and Economics Professors in support of the Settlement (Dkt # 275) [hereinafter Antitrust Professors' Brief], made substantially the same arguments as the August 2009 version of Professor Elhauge's article.  Professor Elhauge, who was one of the professors on whose behalf that brief was filed, has disclosed that he received research support from Wilson Sonsini Goodrich & Rosati (August version) and/or Google, Inc. (December version and filed Professors' brief), although the views expressed are said to be his own.

     [10] In light of the limited scope of the changes made in the PAS to the original proposal, Amazon expects that this argument will form the centerpiece of the parties' attempt to defend it against objections based on the antitrust laws.  Accordingly, we address this argument first before highlighting the specific antitrust problems with the PAS.

     [11] As discussed in Amazon's Original Objection, Congress has seen fit to require express authorization before works are exploited, 17 U.S.C. § 106, and to extend this requirement for such lengthy durations that finding rightsholders to license new technological uses is difficult or, sometimes, impossible, *see* 17 U.S.C. §§ 302, 303.  Amazon's Original Objection at 30-32.

     [12] *See* 21 U.S.C. § 353(b).

view as a "pro-competitive benefit" of the PAS, much less one that "outweighs" the price fixing and monopoly that it creates. *See Stewart v. Abend*, 495 U.S. 207, 230 (1990) ("it is not our role to alter the delicate balance Congress has labored to achieve"); *Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 429 (1984) ("As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product.").[13]

The proponents' argument also ignores the main economic rationale for why Congress has made the judgment it has. The economic rationale, set out in the Constitution, is that such rights are the best way to incentivize creativity so that society can benefit from innovation. *See* U.S. Const. art. I, § 8, cl. 8; *see also* S. Rep. No. 104-315, at 3, 11 (1996). Framing the decision on the PAS as one where consumers will get something versus nothing fails to acknowledge this trade-off—and that Congress currently favors the innovation benefit despite the costs of decreased availability.[14] While Amazon supports the enactment of orphan works legislation to

---

[13] Professor Elhauge advances the astounding argument that the class action mechanism allows a defendant to engage in new means of infringing copyrighted works of rightsholders who do not opt out, in spite of Congress's criminalization of that behavior. Elhauge at 20. He compares it to settlements of claims under antitrust or securities laws which, he says, require express waivers of claims. The difference, of course, is that class settlements of antitrust or securities cases never authorize the defendant to charge supra-competitive prices or disclose less than the necessary information in the future to those who do not opt out of the class. Elsewhere in his article, Professor Elhauge seems to suggest that it would be a perfectly acceptable business model for a publisher to send out a series of contracts to authors announcing that it intended to publish their works under the terms of the contracts and then to do so unless the authors "opted out" of the contracts. Elhauge at 40. Beyond any doubt, such a model could work only if there had been an antecedent express agreement between the author and the publisher to such an opt-out arrangement for future exploitation. *Cf. Fox Film Corp. v. Doyal,* 286 U.S. 123, 127 (1932) ("The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property.") It is precisely that express consent that is absent here.

[14] The Antitrust Professors' Brief quite overtly substitutes the professors' judgment for that of Congress. Section III of that brief ("Procompetitive Effects that Cut Across All Book Categories") lists a number of supposed benefits of the settlement, all of which Google can either already pursue to a limited extent without the settlement through its Partner Program, or cannot pursue because copyright law, in a balancing of incentives, forbids them. *See* Antitrust

afford additional access to certain older copyrighted works,[15] it also recognizes two things that proponents ignore:  the existence of a political and societal trade-off between ready access to copyrighted works and their owners' proprietary rights, and the fact that in our system of government it is up to Congress to decide how to strike that balance.

That the proponents' rationale for avoiding antitrust problems crashes headlong into Congress's policy judgment on economic issues illustrates the wisdom of the conclusion that this Court cannot consider the availability under the PAS of products that are now illegal to be a "pro-competitive benefit" within the antitrust rubric at all.  The types of benefits cognizable in antitrust analysis are those that a court is capable of weighing against harm to competition, not those that a court must weigh against the wisdom of Congress.  The antitrust question is not whether the parties ought to be allowed to create a new market in derogation of the congressional balancing of societal concerns, but rather whether the parties are seeking to alter the markets Congress has sanctioned in an impermissibly anticompetitive manner.  On this question, the PAS fails every bit as much as the original proposed settlement.[16]

---

Professors' Brief at 2-3.  For example, "[a]llowing [o]nline [b]ook [s]earches" is portrayed as a procompetitive benefit since, without the settlement, "Google might have lost the litigation and been unable to digitize any in-copyright books and make them searchable unless it affirmatively secured permission from each rightsholder, which would have imposed prohibitive costs."  *Id.* at 2.  Such an argument amounts to saying that, because Congress was misguided, the fact that the settlement permits Google to avoid conforming to copyright law is one of its advantages.

[15] See fn. 26 *infra*.

[16] Besides ignoring the rationale for Congress's scheme, the proponents' argument also improperly assumes that all anticompetitive aspects of the settlement are essential to the realization of the potential benefits.  Proper antitrust analysis permits only those consumer benefits that could not be attained without anticompetitive effects to be counted in favor of a potentially harmful, collusive deal.  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4 (rev. 1997) ("The Agency will consider only those efficiencies . . . unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects."), *available at* http://www.justice.gov/atr/public/guidelines/hmg.pdf.

**B.     The provisions on consumer purchase pricing remain per se illegal.**

**1.   The Pricing Algorithm remains per se illegal price-fixing.**

The parties have tried to amend the Pricing Algorithm[17] to avoid the charge that the original proposed settlement's algorithm fixed prices for consumer purchases, but the end product is still a per se violation of the antitrust laws. Google must now design the Algorithm "to operate in a manner that simulates how an individual Book would be priced by a Rightsholder of that Book acting in a manner to optimize revenues in respect of such Book in a competitive market, that is, assuming no change in the price of any other Book." PAS § 4.2(c)(ii)(2); *see also id.* § 4.2(b)(i)(2). The hope must be that explicitly forbidding a monopolistic, or oligopolistic, pricing design will suffice. *See* Elhauge at 33-35. This fix fails, however, because a horizontal agreement to use specific means to set prices is a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Some proponents attempt to characterize the PAS's pricing arrangement as multiple vertical offers, Elhauge at 32-33, 40, but when properly viewed in the context of the history of the PAS, it is clearly a horizontal agreement. As summarized in the Statement of Facts above, it was the plaintiffs who hatched the idea of converting this case into an industry-wide business arrangement, and then collectively solicited Google. With the PAS, Google now "offers" the entire class the proposal that plaintiff representatives initially crafted, and if this Court approves, all class members who have not opted-out will have agreed to these default pricing terms. This is a group of competitors—the Rightsholders—putting forward a proposal for a system that all will use for setting prices, to be implemented through Google and enacted for all class members by this Court. It is clearly horizontal. The Department of Justice agrees. DOJ Brief at 18.[18]

---

[17] This is a Google designed algorithm that automatically sets the prices of books available for consumer purchase if a Rightsholder does not specify a price. PAS § 4.2(b).

[18] Citations to the dual-distribution cases of *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2d Cir. 1981), and *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir. Unit A July 1981), are inapposite. These cases dealt with suppliers who also competed downstream with the resellers they supplied, and the courts struggled with whether suppliers' restrictions on the resellers were vertical or horizontal. This fact pattern is inapplicable here; the question is not whether any individual agreement between a Rightsholder and Google constitutes

A horizontal agreement as to the method used to set prices is a per se violation:

> [P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon.

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940); *see also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-48 (1980) ("Indeed, a horizontal agreement among competitors to use a specific method of quoting prices may be unlawful."); DOJ Brief at 21 (citing, among others, *Citizen Publ'g, Co. v. United States*, 394 U.S. 131, 134-35 (1969); *Va. Excelsior Mills, Inc. v. FTC*, 256 F. 2d 538, 540-41 (4th Cir. 1958)).

The claim that this is acceptable or well-intentioned price fixing, because it will supposedly mimic the market, does nothing to save the PAS. *See United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98 (1927) (price-fixing agreements are "unlawful restraints, without the necessity of minute inquiry [into] whether a particular price is reasonable or unreasonable as fixed and without placing on the government . . . the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions"). Per se violations cannot be justified by such an argument. In *United States v. Topco Associates, Inc.*, an association of smaller supermarket chains imposed territorial restraints on where its members could sell the association's private label products, and the defendants argued that this was vital to allow them to compete effectively against larger chains whose size enabled the larger chains to develop private label programs on their own. 405 U.S. 596, 598-606 (1972). The Supreme Court rejected this argument, holding that because the horizontal agreement was a per se violation, it must fall regardless: "In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition." *Id.* at 608-

---

a horizontal agreement between that Rightsholder and Google, but rather whether the fact that Rightsholders have collectively put forth a comprehensive agreement on pricing methodology means that the pricing provisions of the PAS are horizontal.

10, 610; *see also id.* at 612-13 (Blackmun, J., concurring) (stating that applying the per se rule could hamper competition with larger chains but the rule "appears . . . so firmly established" that relief lay with Congress).

Indeed, as "beneficial" as an agreement between competitors to set a maximum price for their products might be in the short run for consumers, it is still per se illegal. In *Arizona v. Maricopa County Medical Society*, a challenge to foundations formed by doctors which set maximum medical fees for foundation-approved insurance plans, the Supreme Court ruled that even fixing maximum prices was per se illegal, over a dissent that emphasized the potential benefits of these arrangements. *Compare* 457 U.S. 332, 332-57 (1982) (majority), *with* 457 U.S. at 357-67 (Powell, J., dissenting); *see also id.* at 348 (majority noting that the Court's precedents "place horizontal agreements to fix maximum prices on the same legal—even if not economic— footing as agreements to fix minimum or uniform prices").

For known Rightsholders, there is no colorable argument for allowing use of the Pricing Algorithm.[19] This clear per se violation requires, on its own, the rejection of the PAS.[20]

---

[19] That known Rightsholders have the option of setting a price instead of using the algorithm is irrelevant; that is simply saying that they can choose to defect from the cartel. This does not placate antitrust concerns. If the ability to withdraw sufficiently policed cartels, Section 1 enforcement would require little more than for courts to refuse to enforce actual price-fixing contracts. Indeed, whether any such "withdrawal" is actually effective is questionable given that Rightholders setting their own prices would know the Algorithm's suggested price. PAS § 4.2(c)(iii).

[20] Under the PAS, Google is to develop the Algorithm alone, with only the Registry—a Rightsholder-controlled entity that benefits from cartel pricing—having audit rights. PAS § 4.2(c)(ii)(2), (3). Because an agreement operated and audited only by entities that have the incentive to increase prices could serve as "a masquerade . . . to fix uniform prices, or . . . may in the future take on that character," *Maricopa County Med. Soc'y*, 457 U.S. at 348, this Court cannot simply assume that the Algorithm will achieve the parties' stated goal of "simulat[ing]" competitive pricing now and for the foreseeable future. *Cf.* Fred Vogelstein, *Keyword: Monopoly*, Wired, August 2009, at 58, 64, *available at* http://www.wired.com/images/press/pdf/googlopoly.pdf (quoting DOJ antitrust chief's comment on Google's defense of its Yahoo! deal, which DOJ ultimately threatened to sue to stop: "Please don't tell me the answer is, 'Because the parties wouldn't do anything wrong.'").

Amazon anticipates that the parties may attempt to justify the Algorithm by pointing to its application to "unclaimed" works. Given the intended use of the Algorithm to price works of known rightsholders, this argument is irrelevant. Even as to "unclaimed" works, however, it is hard to see an exception to the per se rule. A work could be "unclaimed" simply because its rightsholders elected not to come forward, Elhauge at 3 n.2, and the PAS would allow them to enjoy the fruits of price-fixing for years until their unclaimed funds faced erosion under Section 6.3. Even for true "orphan works," while some pricing mechanism must be used, the parties have selected the most dangerous form of collusive action, disdaining all efforts to find pricing solutions that would split the pricing authority among different, independent entities. In addition, Amazon previously explained how lacking the Pricing Algorithm is in comparison to the models of the BMI and ASCAP consent decrees, a charge which is still accurate as the amendments did not impose any similar protections. *See* Amazon's Original Objection at 21. Even as to "unclaimed" or "orphan" works, therefore, the pricing-fixing in the PAS is illegal.

The argument for ignoring the price-fixing inherent in the Pricing Algorithm ultimately boils down to the claim that the PAS offers societal benefits that are worth the cost of the agreed upon price-fixing. Not only is such logic flawed, as shown above, but it is an argument that the Supreme Court has explicitly rejected. *Maricopa County Med. Soc'y*, 457 U.S. at 354-55 ("Our adherence to the *per se* rule [against price-fixing] is grounded not only on economic prediction, judicial convenience, and business certainty, but also on a recognition of the respective roles of the Judiciary and the Congress in regulating the economy. . . . [A]rguments against application of the *per se* rule in this case therefore are better directed to the Legislature.").

### 2. The coordinated discounting provided for by the PAS continues to be per se illegal price-fixing despite the amendments.

The parties amended § 4.5(b)(ii) to remove any limits on the size of discounts that the Registry could authorize, and such authorization is now subject not only to known Rightsholders' disapproval but also that of the UWF. Boni Decl. Ex. 2 (redlined PAS) § 4.5(b)(ii). This amendment fails to address the fact that § 4.5(b)(ii) permits the Registry to

coordinate discounts among competing books—another per se illegal horizontal agreement on price. *See Catalano, Inc.*, 446 U.S. at 648 ("An agreement to terminate . . . giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing."). There is no defense that this is "good" price-fixing because it only enables additional opportunities for discounts. The Registry must necessarily determine when these "special offers" end, thus making collective decisions on revoking a discount across competing books. As with the Pricing Algorithm, the power of known Rightsholders or the UWF to veto the coordinated pricing is irrelevant, as cartels cannot be saved by an option to exit. Indeed, the injection of the UWF to represent all orphan works simply creates yet more collective decision-making as to price.[21] Regardless of whether there are restrictions on the depth of discounts, § 4.5(b)(ii) continues to be per se illegal price-fixing.

### C. Even with the amendments to the revenue split provisions, the PAS continues to constitute per se illegal fixing of wholesale prices.

The parties have tried to address the challenge of the United States to the original proposed settlement's fixing of wholesale prices through the selection of a standard revenue split, DOJ Brief at 19-20, by amending to allow limited renegotiations between Google and Rightsholders of the revenue split. PAS § 4.5(a)(iii). Renegotiation, however, is permitted only over Commercially Available Books. *Id.* Non-Commercially Available Books remain relegated to the fixed split. *Id.* This amendment is wholly insufficient for both categories.

For Commercially Available Books, the amendment merely *permits* renegotiation, rather than *requiring* competing Rightsholders to make individual deals. Inserting a provision for withdrawal from an agreement on pricing does not remedy antitrust concerns. The PAS contains a horizontal agreement on wholesale pricing, and making it easier to exit that arrangement does not solve the problem that it is a per se violation for the arrangement to exist in the first place.

---

[21] The UWF was also granted the same powers as those given the Registry in § 4.3(e)(i), (ii), (iii), to collectively control an aspect of the method of sale, preview uses, of certain categories of books in coordination. § 4.3(g). This is another way in which the PAS permits collective decision-making, either by the Registry or the UWF, over aspects of competition that would otherwise be utilized independently in the marketplace to the benefit of consumers.

The amendment carves out non-Commercially Available Books, so that the existing per se illegal wholesale price-fixing for these books is completely unaddressed. That the carve-out turns on Commercial Availability is particularly indefensible given that non-Commercially Available Books are not the same as orphan works; it cannot be argued that all non-Commercially Available Books require a pre-determined, fixed royalty percentage because there is no known Rightholder with whom Google can negotiate. Although Commercial Availability is a poor criterion from that standpoint, it quite tellingly limits what little beneficial competitive effect the amendment might have. Any potential increase in competition will occur only in what is already likely to be the more competitive part of the market: With Commercially Available Books, Google's consumer purchase and similar services already face some competition from other "then-customary channels of trade," PAS § 1.31, where the author/publisher revenue splits will not be fixed to an industry-wide standard. Sales of non-Commercially Available Books are where Google's purchase services would have less competition, and the amendment has no effect on the wholesale pricing of these books. Excluding non-Commercially Available Books from the renegotiation amendment also means that the amendment is unlikely to alter the scope of wholesale price-fixing for revenues raised through the proposed subscription models, as the majority of the works in the Google Books corpus are out of print books.[22]

In short, the renegotiation amendment is nothing more than window-dressing that leaves the per se illegal wholesale price-fixing virtually intact.

### D. Even with the new Resellers provision, the PAS continues to give Google exclusive rights likely to lead to a monopoly.

The new Resellers provision, PAS § 4.5(b)(v)(2), was apparently inserted to remedy the concern that Google would be the only means of access to orphan and other unclaimed works, but it falls far short of that goal. The most obvious flaw is that it fails to cover all of the ways

---

[22] *See* Vit Wagner, *Google Case's Final Chapter Seeks Ending*, Toronto Star, Jan. 23, 2010, *available at* http://www.thestar.com/entertainment/books/article/754141--google-case-s-final-chapter-seeks-ending (quoting Dan Clancy, Engineering Director for Google Book Search: "The settlement is mostly about books that are out of print today. It has very little to do with books that are in print today and nothing to do with books that are published in the future.").

that Google would be providing access to those works. The provision covers only Consumer Purchases, leaving Google's exclusive arrangement unchanged for institutional and consumer subscriptions, POD, and File Download. Amazon discussed extensively in its Original Objection how this enormous competitive advantage was likely to lead to a Google monopoly over subscription services and possibly even over the sale of books to consumers. Amazon's Original Objection at 24-27 (contrasting proposed settlement to the consent decrees that require BMI and ASCAP to license all comers at non-discriminatory rates).[23] That discussion remains applicable to the PAS, so Amazon will not repeat it here. Amazon does note that the evidence set out in the Statement of Facts above makes crystal clear that Google's exclusive arrangement is not the product of vertical agreements between Google and rightsholders, but rather stems from rightsholder collusion that led to the inclusion of future business arrangements in the PAS.

Even as to the Consumer Purchase model to which it purports to apply, the Resellers provision is inadequate. First, the Resellers provision would not foster competition, but rather install "resellers" as weak sub-distributors of Google. Because only Google hosts the digital copies, Amazon would be effectively referring its customers to Google. Following his first purchase, an Amazon customer would be likely to go directly to the source of the books, Google, for future purchases. Not only does this not create true competition (as Google would still control pricing, selection, and the customer experience of reading books online from its servers), it creates incentives for customers to migrate to Google faster than they otherwise would.

Second, the Resellers program gives Google authority to select resellers and to dictate what proportion of Google's revenues that reseller retains. Although the PAS says that Google "will allow resellers to sell access," PAS § 4.5(b)(v)(2), it does not define the term "reseller." Google thus appears to have the unilateral power to decide qualifications. Moreover, because the

---

[23] Amazon also previously discussed the ongoing evolution of book distribution towards POD and File Download in the context of the price fixing provisions in the original proposed settlement. Amazon's Original Objection at 20. It is in part because of that evolution that Google's exclusive access to those means of distribution threatens the health of the book industry generally.

provision is no more specific than requiring that a reseller retain "a majority of Google's share," *id.*, Google has the power to set the reseller's cut and vary it among different resellers. This is a far cry from the BMI and ASCAP consent decrees that require non-discriminatory licensing of all applicants, backstopped by court review of pricing. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, 2001 U.S. Dist. LEXIS 23707, at *10, *12-*14, *15, *17-*23 (S.D.N.Y. June 11, 2001); *United States v. Broadcast Music, Inc.*, 1966 U.S. Dist. LEXIS 10449, at *7-*8, *10, *11 (S.D.N.Y. Dec. 29, 1966), as amended in 1994, *United States v. Broadcast Music, Inc.*, 1994 U.S. Dist. LEXIS 21476 (S.D.N.Y. Nov. 18, 1994).

The Resellers provision thus does nothing to undermine the concerns expressed by both Amazon and the United States that the initial proposed settlement would be anticompetitive because of the exclusive arrangements it grants to Google. *See* Amazon's Original Objection at 24-27; DOJ Brief at 23-26, 24 ("This de facto exclusivity (at least as to orphan works) appears to create a dangerous probability that only Google would have the ability to market libraries and other institutions a comprehensive digital-book subscription.").

### E. Subscription pricing, Google's monopsony power, and inadequate Registry governance rules continue to be antitrust problems in the PAS.

Many of Amazon's previous antitrust objections still apply. Institutional and consumer subscription pricing were not changed and continue to fail rule-of-reason review as impermissible price-fixing. *See* Amazon's Original Objection at 22-30; *see also id.* at 17 (background on BMI and ASCAP). Furthermore, Google continues to have monopsony power with regard to orphan works. *See id.* at 27-28. This is true for all business models, as the new Resellers provision does not allow the Registry to deal with others over orphan works without Google's involvement. Finally, no amendments address the potential abuse of the Registry to suppress competition from future works. *Id.* at 28-29. These continuing anticompetitive aspects also require this Court to reject the PAS.

**V.    The Resellers Program Illustrates the Combination of the Scope of Releases, Copyright, and Antitrust Flaws of the PAS.**

The "Resellers" program in Section 4.5(b)(v)(2) of the PAS seems to be the settling parties' major effort to answer the antitrust objections of the United States, Amazon and others.[24] As discussed above, that program does not respond at all to those objections. In fact, a more detailed analysis of what the Resellers program does and does not do actually reveals it to serve as a singular example of every one of Amazon's major objections to the PAS.

By explicitly sanctioning the Resellers program, the parties are indicating that they believe that Google can gain the power to allow others to sell access to copyrighted works simply by court approval of the PAS.[25] Assuming the accuracy of this position raises a number of troubling issues that demonstrate that approval of the PAS is impermissible.

**A.    There is no legitimate reason to convey the "Resellers" power to Google.**

As explained above, the Resellers provision gives Google powers over selecting resellers and choosing which will have better or worse terms for access. If this Court has the authority to convey those powers to Google (which Amazon does not believe it does), there is no reason for Google to receive them, rather than the entities created to represent Rightsholders: the Registry and/or the UWF. Unlike the Registry or the UWF, Google is an entity with commercial interests that are adverse to both the future resellers, who will be competing with Google, and to Rightsholders. Similarly, if this Court has the authority to convey the right to license resellers to sell online access to books, there is no reason why this Court could not likewise grant to the Registry or the UWF the right to include those books in a subscription that all competitors could offer. Subjecting these neutral third parties to constraints similar to those found in the ASCAP

---

[24] Google first announced the Resellers program with great fanfare during a hearing before the House Judiciary Committee. *See House Hearing* (oral response of David C. Drummond, Senior Vice President of Corporate Development and Chief Legal Officer, Google Inc. and comments of Congressman John Conyers, Jr.), at 140, *available at* http://judiciary.house.gov/hearings/printers/111th/111-31_51994.pdf.

[25] Other portions of the PAS are likewise premised on the ability of Google to select third parties and allow them to exercise a portion of the rights that the Court confers on it. *See, e.g.*, PAS § 3.9.

and BMI consent decrees that require licensing of *all* resellers on nondiscriminatory terms would then force Google to compete against others as equals—rather than receiving a special status that leaves competitors subject to its whims.  As the Department of Justice stated, when commenting on the Original Proposed Settlement:

> This risk of market foreclosure would be substantially ameliorated if the Proposed Settlement could be amended to provide some mechanism by which Google's competitors' could gain comparable access to orphan works . . . .
>
> *If Rule 23 permits the class to enter into an agreement with Google that extends well beyond the scope of the alleged violation, and to set up an industry-wide arrangement for the licensing of copyrighted works for digital distribution,* that arrangement should conform to the procompetitive mandate of the federal antitrust laws.

DOJ Brief at 25 (emphasis added).  Despite their purported belief that the power to effect such a drastic change does exist under Rule 23, the parties nevertheless did not implement the DOJ's suggestions.  Instead, they opted for a very limited Resellers program that does not threaten the enormous competitive advantages the PAS conveys upon Google.

**B.    Even the parties themselves appear not to believe that a class action settlement can release future claims for future conduct.**

That the parties refused to solve the antitrust problems highlighted by the Department of Justice, Amazon, and others, demonstrates that even the parties do not believe that the Court has the power to grant the future releases necessary to provide competitors of Google with comparable access to orphan and other unclaimed works.  The parties have told the government as much.  *See* DOJ Brief at 23 (the parties represented to the United States that "they believe the Registry would lack the power and ability to license copyrighted books without . . . consent [that] cannot be obtained from the owners of orphan works").

The settling parties are caught on the horns of a dilemma.  Either the Court does not have the power to approve a class action settlement with such broad future releases, and the PAS must be rejected for that reason, or the Court has that power but the parties have chosen to exploit it to illegally benefit Google over all others.  In the latter case, the PAS falls for the reasons stated in the DOJ Brief at 23-26.  *See also* Amazon Original Objection at 24-27.

### C.    The antitrust critique of the Resellers program demonstrates how overreaching the PAS is, despite its changes.

This critique of the Resellers provision reveals the absurdity of the PAS:  If the power to approve these future releases exists and the demands of antitrust law are actually to be met, the parties would wind up creating a new entity with the right to license all rights covered by the settlement to all resellers for all future revenue models.  The parties, and this Court, would be completely reorganizing the entire publishing industry through a class action settlement, all without congressional input or approval, despite the Constitution's explicit delegation to Congress of the exclusive power to "secur[e] for limited times to authors and inventors the exclusive right to their respective writings and discoveries."  U.S. Const. Art. 1, § 8; *see also Eldred v. Ashcroft*, 537 U.S. at 212.  Such a "solution" would ignore the history of Congress's frequent amendments to the Copyright Act in response to technological change.  *See* Amazon's Original Objection Sections I.B, I.C.  Despite some proponents' claims that the PAS is a superior proposal because "[w]aiting for legislative action is like waiting for Godot,"[26] Elhauge at 25, waiting for Congress is an integral part of this country's constitutional system.

---

[26] Not only is that plaint anti-democratic, it is also wildly inaccurate in the domains covered by the PAS:  digital copyright exploitation and solicitude for vast book repositories, in both analog and digital form.  Since the current Copyright Act took effect in 1978, Congress has amended it no fewer than 62 times.  *See* http://www.copyright.gov/title17/92preface.html (Copyright Office's list of original enactment plus 62 amendments).  Thus, Congress has been willing to legislate copyright reform on an average of every six months.

Many of those amendments specifically address digital issues.  They also grapple with the core issues of book collections.  Right from the start, Congress incorporated into the Act special solicitude for libraries acting "without any purpose of direct or indirect commercial advantage."  17 U.S.C. § 108(a)(1) (1978).  Congress later extended that provision, as part of the Digital Millennium Copyright Act, to books "reproduced in digital format."  17 U.S.C. § 108(b)(2) (1998).  Later still, Congress enacted the Preservation of Orphan Works Act, to ensure that the extended 20-year term of copyright added in 1998 would not unduly hamper libraries' exercise of their rights under this provision.  *See* 17 U.S.C. § 108(i) (2005).

The logical extension of those provisions would be orphan works legislation of general applicability, an effort consistently championed by Amazon, Microsoft, the Internet Archive and many others (which has resulted in Senate passage of such a bill).  If the settling parties would devote a small fraction of their efforts at forestalling competition into joining hands with the proponents of orphan works legislation, the issues would largely go away within months, with Congressional implementation of nationwide, non-discriminatory standards applicable to this realm.

The parties' frustration with the lawmaking process does not entitle them to legislate their own solution. Granting the parties the right to implement the Resellers program would have to be premised on the proposition that all default rights of all persons who fail to opt-out of a class action can be rearranged through a settlement, as long as the representative plaintiffs and defendant in a case are engaged in a dispute, even one over a mostly unrelated set of facts. If the dispute involves an alleged violation of the law affecting many people, then, under the Rule 23 regime as envisioned by the parties, the class representatives and the defendant have the power to rewrite that law. This cannot possibly be correct, and it is not. Clear Second Circuit authority prohibits class action settlements from providing releases for future conduct. That controlling doctrine keeps the parties from dragging the book industry into an alternate world where class action settlements are not about past acts but about future conduct that has never been threatened; antitrust worries are soothed by "proper" price-fixing while consumers "benefit" from an exclusive, monopolistic deal; and legislation is written not by elected representatives but instead by Court-approved representative litigants.

The settling parties, to their credit, have identified an opportunity in the digitization of books that society would be well served to develop. Enabling that task, however, is not for this Court. It is for the United States Congress.

## **CONCLUSION**

For the reasons stated herein and in Amazon's Original Objection, the Proposed Amended Settlement cannot be approved.

Dated: January 27, 2010                Respectfully submitted,


IRELL & MANELLA LLP


By:           s/ Alexander F. Wiles
               Alexander F. Wiles
               (CA State Bar No. 73596)
               (*Pro Hac Vice*)

               David Nimmer
               (CA State Bar No. 97170)
               (*Pro Hac Vice*)

IRELL & MANELLA LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199
awiles@irell.com
dnimmer@irell.com

Counsel for Objector Amazon.com, Inc.

AMAZON.COM, INC.

David A. Zapolsky, Esq. (DZ-8058)
Vice President & Associate General Counsel
Litigation & Regulatory Affairs
1200 12th Avenue South
Suite 1200
Seattle, Washington 98144
Telephone:    (206) 266-1323
Facsimile:    (206) 266-7010
davidz@amazon.com