# Albin Michel



January 26, 2010

The Honorable Denny Chin
United States District Judge
Daniel Patrick Moynihan Courthouse,
500 Pearl Street
New York, NY 10007

    Re:    *The Authors Guild, Inc. et al v. Google Inc.*, Case No. 05 CV 8136 (S.D.N.Y.).

Dear Judge Chin:

    My name is Francis Esmenard, and I am the President of Editions Albin Michel, a book publisher located in France. Editions Albin Michel is a member of the settlement class embraced by the proposed Amended settlement agreement that is before this Court in this action (the "Amended Settlement Agreement"), because it owns rights in books registered to the US Copyright Office.

    We write to object to the Amended Settlement Agreement. We do not have the resources to provide this Court with legal briefing regarding our objections nor do we wish to burden this Court with duplicative filings. We therefore object to the Amended Settlement Agreement by reference to the observations of the French Publishers Association (Syndicat National de l'Edition/ SNE) in its amicus curiae letter, which hereby becomes an integral part of our own objections as filed herewith.

    Thank you in advance for your consideration of this letter.

                                        Respectfully yours,

                                        Francis Esménard

cc:  Michael J. Boni, Esq./Joanne Zack, Esq./Jeffrey P. Cunard, Esq./Bruce P. Keller, Esq./Daralyn J. Durie, Esq./Joseph C. Gratz, Esq.

*Enclosed: Amicus curiae letter of French Publishers Association (Syndicat National de l'Edition/ SNE)*



**SYNDICAT NATIONAL DE L'ÉDITION**

Le Président

SE/CB 0522

By Fax and regular mail
+1 212 805 7906

Email copies to:
- Author Sub-Class Counsel: Bookclaims@bonizack.com
- Publisher Sub-Class Counsel: Bookclaims@debevoise.com
- Google Counsel: Bookclaims@durietangri.com

January 26, 2010

The Honorable Denny Chin
United States District Judge
Daniel Patrick Moynihan
Courthouse,
500 Pearl Street
New York, NY 10007

*Re: The Authors Guild Inc. et al. v. Google Inc., No 05 Civ. 8136 (DC)*

Dear Judge Chin:

I, Serge Eyrolles, President of the French Publishers Association (Syndicat National de l'Edition/ SNE), presented objections to this Court regarding the Settlement on September 3, 2009, on behalf of our 530 member companies. I would now like to present you my deep concerns, regarding the proposed Amended Settlement Agreement (ASA).

Although the scope of the Settlement was significantly reduced, many French publishers actually remain members of the ASA Class. However, as the proposed changes do not bring satisfying responses to the criticism we previously expressed and actually create other problems, we would like to respectfully ask this court not to endorse this new version.

We do not agree with the amended scope, which is illogical, unfair and discriminatory. We believe that it would have been far more equitable for the scope of the Amended Settlement Agreement to be limited to US Publishers with publishers from the rest of the world having the right to opt-in should they so wish, provided that at least one of their works was subject to copyright protection in the United States before May 5, 2009 (i.e. all publishers having a U.S. copyright interest before May 5, 2009, as indicated in the initial version of the Settlement agreement).

### I. Unfair treatment of French publishers

#### A. Inclusion of a large number of French publishers in the ASA Class

A large number of SNE's members are indisputably members of the class under the Proposed Revised Settlement Agreement, as defined by the following terms in the ASA:

*"For United States works, the definition of Books remains largely unchanged: United States works must have been published and registered with the United States Copyright Office by January 5, 2009 to be included in the Amended Settlement. Under the Amended Settlement, however, if the works are not United States works.*
*Under the Amended Settlement, however, **if the works are not United States works, they are only included in the Amended Settlement if they were published by January 5, 2009 and either were registered with the U.S. Copyright Office by that date** or their place of publication was in Canada, the United Kingdom ("UK") or Australia."*

According to statistics we undertook in the archives of the SNE, between 1925 and 1990, **French publishers registered with the United States Copyright Office approximately 200,000 books.** These cover many imprints of many publishing houses from different sectors which the SNE represents, such as:

ALBIN MICHEL, ARMAND COLIN, BORDAS, CALMANN LEVY, DENOEL, DESCLEE DE BROUWER, DUNOD, FAYARD, FLAMMARION, GALLIMARD, GRASSET/FASQUELLE, HACHETTE, ROBERT LAFFONT, LAROUSSE, MASSON, MERCURE DE FRANCE, EDITIONS DE MINUIT, PAYOT, PLON, PRESSES DE LA CITE (EDITIS), PRESSES UNIVERSITAIRES DE FRANCE, SEUIL, STOCK, TABLE RONDE...

The explanation is very simple. Under the copyright rules in force in the United States of America until 1990, said registration was necessary for copyright protection in the United States, since the Berne Convention had not yet entered into force in your country.

In addition, since 1990, US importers and distributors have continued to register certain French and other non-US books with the US Copyright Office, but only for those books actually imported into the United States (for various reasons, including the ability to sue for statutory damages).

A large number of French publishers thus continue to be members of the Class under the Proposed Amended Settlement Agreement.

In our objections to the previous Settlement, we expressed our concern regarding the conditions which are to determine whether or not and how French publishers and authors will be parties to the Settlement. As pointed out by the DoJ, the former Settlement raised *"serious concerns about the adequacy of representation with respect to foreign rights-holders. [...It presented] insufficient assurances that absent class members' interested were adequately represented"*. This is why it was important to ensure that in the ASA, non-American rights-holders are not treated in a more unfair way than American rights-holders, notably through some specific measures. However, despite our clear interest in this issue expressed via our objections, we would like to inform this court that **French publishers have clearly not been involved in the negotiations.**

For all these reasons, we believe that French publishers remain entitled to make valid objections to this Court.

Most of our members, however, are not in a position to present objections to this Court individually, given their unfamiliarity with the United States' legal system and the cost and expense that they would incur in doing so themselves. Accordingly, on December 9, 2009, our Executive Committee and General Council formally authorized SNE to present objections to this Court regarding the Settlement.

### B.   A missed goal and an unfair criterion

#### 1.   No real exclusion of foreign rights-holders

In the *Memorandum Of Law In Support Of Plaintiffs' Motion For Preliminary Approval Of Amended Settlement Agreement*, plaintiffs declare:
> "The ASA substantially reduces the scope of the class from the Settlement Agreement. First, and most significantly, the international scope of the class has been reduced by narrowing the definitions of "Book" and "Insert." Only Rightsholders in a "Book" or "Insert," as those terms are defined in the ASA, are members of the Amended Settlement Class."

Although **the plaintiffs seemed to have sought to exclude foreign rights-holders** (apart from British, English-speaking Canadians and Australian ones), the new criteria used based on the registration with the US Copyright Office fails to achieve this goal. The example of books registered by French publishers in the past is by no means isolated and many publishers in Germany, Italy, Spain or the Netherlands also have many books still covered by the ASA.

#### 2.   The focus on U.S. registration is unfair

**The criterion for the new scope obviously unfair as it is related to a purpose which has nothing to do with the Settlement** and which right-holders undertaking the registration could not have imagined, especially if they did so more than 20 years ago.

Moreover, French publishers who had registered their books in 1930 for instance (and then had not renewed the registration) **would not nowadays be entitled to statutory damages and attorney's fees**, unless they would have filed in a "Notice of Intent" in the US Copyright Office to enforce the restored copyright within 2 years after the restoration of the copyright. It is therefore irrelevant to consider the registration of these books many decades ago as a criterion to determine French publishers' ability to obtain statutory damages and attorney's fees in this class action, and consequently to determine whether they are members of the class.

Furthermore, such a criterion should no longer be used nowadays for copyright related purposes, as **Article 5 of the Berne Convention prohibits formalities**, such as a registration, from interfering with "the enjoyment and the exercise" of a protected right.

This criterion is especially **confusing and therefore detrimental to foreign rights-holders, who mostly stopped this practice at least 20 years ago**. After such a long period, publishing houses may have closed or changed owners and there may no longer be any record of such registration. Given that many of these registered books are not recent, their related rights may have reverted back to their authors, who certainly have no information at all on this issue.

Moreover, it is **practically impossible to obtain this information from the Copyright Office for books registered before 1978**. Indeed the search needs to be done either on site or by a

Copyright Office bibliographer for a fee of $165 per hour or fraction thereof (2 hour minimum). Rights-holders who have no record at all would therefore have to submit a search covering all the titles of their catalog published before 1990, which is simply unaffordable and impractical.

The other way to undertake this research is to use the catalogues of the Copyright Office scanned by Google (http://books.google.com/googlebooks/copyrightsearch.html). However a research undertaken on the basis of some of the imprints of the French publishers, such as Flammarion, Gallimard, Hachette or Plon may give 100 to 200 results, whose **examination catalog by catalog and compilation remain extremely burdensome for publishers**, who have to build their own list and then compare it to the list of books scanned by Google.

Google only plans to incorporate the information about registered books in its database when the Settlement is approved. The lack of information easily accessible via a real database therefore **puts foreign rights-holders, and in particular, authors in a very unfair situation.**

### C. Legal insecurity for rights-holders and a too broad safe harbor for Google

**This criterion is also illogical** as it potentially creates two parallel regimes for the books of the same rights-holder, depending on whether they were registered or not. Although the first version of the Settlement required rights-holders to completely opt-in or out for all their books, the ASA now creates a situation where **rights-holders can be both in and out**, which is nonsensical.

While the situation of the Settlement is already very confusing for foreign rights-holders due their unfamiliarity with class action processes, the lack of a proper translation, the poor quality of the database and the fact that they were never involved in the negotiation, this dual regime will add **legal uncertainty for rights-holders who may not know whether their books are covered or not by the Settlement and can't actually properly determine whether to opt-in or out.**

**What is even more unfair is that this dual regime seems intended to excessively limit Google's liability:**

- **For books that were registered and that are thus included in the Settlement**, there is **no penalty** if Google is displaying or even commercially exploiting a book by mistake, i.e. whereas it is actually commercially available.

- **For books that were not registered and which should not be included in the ASA**, the US law severely limits rights-holders' possibility to sue Google if it is displaying or even commercially exploiting a book by mistake, as they **cannot seek statutory damages but must rather prove actual damages.**

As a matter of fact, Google benefits from a **too broad safe harbor which will allow it to use all the scanned books with minor risks in case of mistakes.** This risk of mistakes may be even higher as the ASA does not precisely mention how Google will determine if a book is registered or not.

As a consequence, foreign rights-holders will have to keep on monitoring the Google database to check the status of their books, at their own expense. The only difference with the original

Settlement is that **with the ASA, they will no longer be able to control the uses related to their unregistered works and to obtain the $60 compensation for past uses.**

Finally, books which remain outside of the Settlement end up in an extremely unfair situation as they are not actually excluded at all from Google's uses and are not even removed from Google's and the participating libraries's databases and servers. Indeed, for the removal of those excluded books in the sense of the Settlement, this text provides no legal certainty as it only refers to Google' "current policies", which by definition may change in the future and which may imply for rights-holders to constantly check the Google Book Search website, in particular for their new titles. Accordingly, **even for the books which are now outside of the Settlement, the situation of exclusion is not real and effective.**

### D. Need for a clarification of the scope

- Against this background, the scope of the Settlement should be further reduced in order to fully exclude non US books. For obvious fairness and clarification purposes, **it should be restricted to books published in the US, UK, Canada (English speaking) and Australia.**

- Moreover, **rights-holders who will be excluded should be able to opt-in** the Settlement if they so choose.

- If this full exclusion cannot be obtained, **the scope should be clarified and restricted to registrations that are still valid and in force, i.e. which were the subject of renewal**, otherwise most of the books that enter in the library programmes will be included.

- Furthermore, foreign rights-holders should be better informed of the status of their books, through the provision of a **comprehensive list of registered books.** Practically speaking, this list should immediately be incorporated in the Google online database, so that unregistered books should be removed from the database and only registered books should remain.

- Finally, **the situation of books excluded from the Settlement should be clarified and made equivalent to their complete removal** from Google's and the participating libraries' databases and servers.

### II. A new Settlement which still raises the same fundamental concerns

Although responses to the former Settlement are to be fully considered again by the Court, we would like to stress the following fundamental concerns which have not been resolved, without going into the full details which were developed in our previous contribution.

### A. No opt-in for the forward-looking arrangements.

As pointed out by the US Department of Justice, the forward looking arrangements should not be subject to an opt-out but to an opt-in mechanism (voluntary participation), because they were not part of the complaint and are essentially commercial negotiations. In other words, **the settlement should not address issues beyond Google's past scanning and digitization without permission.**

### B. No modification in terms of respect of copyright

The previous Settlement was strongly condemned for not respecting basic copyright principles. In particular Marybeth Peters, the director of the US Copyright Office said that *"no factors have been demonstrated that would justify creating a system akin to a compulsory license for Google – and only Google – to digitize books for an indefinite period of time"*. However the ASA brings no improvement in this field:

- **For books registered and therefore included, the ASA does not require prior authorisation from a rightsholder to digitise copyright-protected works and make out of print works available.**

The new efforts requested from the Registry to attempt to locate rights-holders of unclaimed works relate only to distributing the funds to them, but not to asking them for permission to use their works. **Further, rightsholders are required to claim their works** before exercising control over them. This runs counter to two of the fundamental principles of international copyright law.

- **For books not registered and for books published after January 5, 2009, Google will continue to digitise them and make them available without prior consent of the rightsholders,** in violation of a principle enshrined in the Berne Convention.

**For the removal of those excluded books, the Settlement provides no legal certainty** as mentioned above.

As stressed in our previous submission, the settlement actually sets up rules that are not only contrary to the US Copyright regime but also to the **international obligations of the US.** This could certainly lead to a dispute at WTO level for infringement of the TRIPS agreement.

Moreover, **the Proposed Settlement Agreement should be made compliant with the recent judgment in the case of La Martinière v. Google.** On December 18, 2009, the Paris Court of First Instance stated that the full reproduction and the making available of copyright protected works, even as extracts, in the framework of the Google Book Search Programme and without publishers' authorization represent acts of copyright violation. The court gave Google one month to comply with the ruling and cease such acts.

On this basis and in order to avoid similar suits in other countries, the ASA should require that **books included in the Settlement cannot be used without prior authorization by rights-holders, and that books excluded can be either opted-in or fully removed depending on the wish of the rights-holders.** In particular, it should stipulate that Google stop scanning and digitizing books published after the cut-off date of January 5, 2009.

6

### C. Too little improvement of the quality of the management system established for the Settlement

#### 1. No list of the scanned books

Before starting any use of the books, Google should provide publishers with a complete **inventory of the 10 million books already scanned,** in order to determine the exact scope of the settlement. The list should include the titles, the authors and publishers of each work together with the status (out of print, orphan, etc) Google is contemplating assigning to the work and should be made available in order to allow publishers, without having to provide justifications, **to claim their rights and correct any errors.** As part of this procedure, publishers should be provided with a copy of the scan for each book, in order to assess the quality, and exercise their control over moral rights issues.

The ASA says that the list of scanned books has been provided to the plaintiffs, according to agreed terms. The alleged reason why Google had not published the list is that they did not have the right to publish the metadata they use, coming from external providers. However, if they are going to match their records with those of the Copyright office (which is the only way to correctly identify a book as "registered"), at that point they will have the records coming from the Copyright office, which is a public domain source, so there are no excuses for not publishing the list.
The only alternative is that they will not have the data, and thus they are going to scan and use all books regardless of whether they are included on not in the Settlement.

#### 2. Unfair treatment of the foreign publishers with registered books

It is not fair that **foreign rights-holders who are still concerned by the Settlement as they have some registered books** do not enjoy the same benefits as the other class members. If the scope of the Settlement is not further reduced, **the benefits provided to British, English-speaking Canadians and Australian rights-holders should be extended to all the rights-holders involved,** in particular:

##### a. For the determination of the commercial availability

All rights-holders whose books are covered by the Settlement should benefit from the same rules to determine the commercial availability of a book. As mentioned in our previous submission the definition and the basis for determination have for consequence that ¾ of European books in average are currently considered as non commercially available, a proportion totally unrealistic. Commercially available should cover **all channels of trade** by being defined as meaning *"for sale new, from sellers anywhere in the world, through one or more then-customary channels of trade to all purchasers"* and not only those within the United States, the United Kindgom, Canada or Australia as it is currently the case".

The practical determination of commercial availability should be done prior to making any display uses under authorizations in the settlement agreement and on the basis of local resources of information. Google thus should commit in the settlement to use non-US – including **European - metadata providers** to ensure that they have correct information regarding whether a book is commercially available or not, and to make publicly available the list of databases and Internet information used.

7

### b.     For the governance of the BRR

The BRR membership should include representatives of all rights-holders concerned, and not only US, UK, English-speaking Canadians and Australians. The Settlement should foresee that **representatives of concerned rights-holders of other countries** may also have a seat on the Board of the BRR.

### c.     Non-distributed funds of unclaimed works should also be given to foreign charities, other than US, UK, Canadian and Australian ones.

### d.     Representation of non-US rights-holders towards Google

In order to ensure a fair representation of non-US-Publishers and authors towards Google, the Settlement **could authorize the national collecting societies or publishers associations in interested countries to negotiate with Google** on behalf of their nation's authors and publishers (thus limiting BRR authority to negotiate on behalf of US works only, unless non-US countries choose to appoint BRR to represent their works). These entities could manage the rights of authors and publishers, receive and distribute payments, handle disputes between authors and publishers, or between publishers.

### 3.     Need for a proven improvement of the database

The operation of the ASA in practical terms depends on accurate metadata detailing ownership and rights information with the Google Settlement database. However **the quality of the metadata we have seen to date has been poor,** a point that has been echoed by US academics. We are concerned that this will result in incorrect determinations of country or origin and commercial availability being made.

Although the ASA includes a provision on Google's commitment to improve the claiming process and the website, such progress should be clearly proven. Moreover, Google should be obliged to either be compliant with the **Onix standard,** providing clear information of the way the tool works, or to stop using this functionality.

### 4.     Lack of proper translation

**Although foreign rights-holders are still concerned by the Settlement, they are treated in an unfair way as they still haven't received proper and understandable translations** of all necessary documents must be provided before the settlement is approved. They should be checked in advance by the publishers associations in the territories concerned for the elimination of material errors.

### D.     Major remaining competition issues

Despite certain changes brought to the Settlement in the field of competition, we consider that it still gives a commercial entity a privileged position which **could lead to a de facto monopoly in the supply of digitised copyright protected works, in particular orphan works.** We consider that this is not desirable and that a competitive market would bring better value to readers. What is even more unacceptable is that the reason why Google will have

8

acquired this position is because for years it ignored authors' and publishers' pleas to cease copying and making their works available without authorization.

### E. Still an excessive power granted to Google

The ASA did not bring any progress regarding the excessive power it grants to Google notably in the areas of:

- **The exclusion of books from "one or more Display uses for editorial or non-editorial reasons" which raises risks of censorship;**

- **the lack of penalties in case Google makes mistakes;**

- **the lack of security measures to prevent fraud via the database provided by Google.**

- **geolocalization tools to prevent display, transmission or distribution outside the USA**

We would appreciate stronger clarification and assurances that **Google will not use any of the rights granted to it under the proposed Settlement or equivalent outside the USA**, whether on its own account or by sub-licensing. To that end, we would appreciate specific technical details relating to the steps that Google proposes to take to ensure that non-USA users will not be able to access the service (e.g. geo-blocking or other protocols).

Respectfully submitted,

Serge Eyrolles

9