

# Presses Universitaires de France

6, avenue Reille, 75685 Paris Cedex 14
Téléphone 01 58 10 31 00



January 26, 2010

LE PRÉSIDENT DU DIRECTOIRE

The Honorable Denny Chin
United States District Judge
Daniel Patrick Moynihan Courthouse,
500 Pearl Street
New York, NY 10007

　　　Re:　*The Authors Guild, Inc. et al v. Google Inc.*, Case No. 05 CV 8136 (S.D.N.Y.).

Dear Judge Chin:

　　　My name is Michel Prigent, and I am CEO of the Presses Universitaires de France, a book publisher located in France. Presses Universitaires de France is a member of the settlement class embraced by the proposed Amended settlement agreement that is before this Court in this action (the "Amended Settlement Agreement"), because it owns rights in books registered to the US Copyright Office.

　　　We write to object to the Amended Settlement Agreement but do not wish to burden this Court with duplicative filings. We therefore object to the Amended Settlement Agreement by reference to the observations of the French Publishers Association (Syndicat National de l'Edition / SNE) in its *amicus curiae letter*, which hereby become an integral part of our own objections as filed herewith.

　　　Thank you in advance for your consideration of this letter.

　　　　　　　　　　　　　　　　　　　　　　　　　　Respectfully yours,

cc:　Michael J. Boni, Esq.
　　 Joanne Zack, Esq.
　　 Jeffrey P. Cunard, Esq.
　　 Bruce P. Keller, Esq.
　　 Daralyn J. Durie, Esq.
　　 Joseph C. Gratz, Esq.

Enclosed: *Amicus curiae letter* of French Publishers Association (Syndicat National de l'Edition / SNE)



**SYNDICAT NATIONAL DE L'ÉDITION**

Le Président

SE/CB 0522

By Fax and regular mail
+1 212 805 7906

Email copies to:
- Author Sub-Class Counsel: Bookclaims@bonizack.com
- Publisher Sub-Class Counsel: Bookclaims@debevoise.com
- Google Counsel: Bookclaims@durietangri.com

January 26, 2010

The Honorable Denny Chin
United States District Judge
Daniel Patrick Moynihan
Courthouse,
500 Pearl Street
New York, NY 10007

<u>Re: *The Authors Guild Inc. et al. v. Google Inc.*, No 05 Civ. 8136 (DC)</u>

Dear Judge Chin:

I, Serge Eyrolles, President of the French Publishers Association (Syndicat National de l'Edition/ SNE), presented objections to this Court regarding the Settlement on September 3, 2009, on behalf of our 530 member companies. I would now like to present you my deep concerns, regarding the proposed Amended Settlement Agreement (ASA).

Although the scope of the Settlement was significantly reduced, many French publishers actually remain members of the ASA Class. However, as the proposed changes do not bring satisfying responses to the criticism we previously expressed and actually create other problems, we would like to respectfully ask this court not to endorse this new version.

We do not agree with the amended scope, which is illogical, unfair and discriminatory. We believe that it would have been far more equitable for the scope of the Amended Settlement Agreement to be limited to US Publishers with publishers from the rest of the world having the right to opt-in should they so wish, provided that at least one of their works was subject to copyright protection in the United States before May 5, 2009 (i.e. all publishers having a U.S. copyright interest before May 5, 2009, as indicated in the initial version of the Settlement agreement).

### I. Unfair treatment of French publishers

#### A. Inclusion of a large number of French publishers in the ASA Class

A large number of SNE's members are indisputably members of the class under the Proposed Revised Settlement Agreement, as defined by the following terms in the ASA:

Most of our members, however, are not in a position to present objections to this Court individually, given their unfamiliarity with the United States' legal system and the cost and expense that they would incur in doing so themselves. Accordingly, on December 9, 2009, our Executive Committee and General Council formally authorized SNE to present objections to this Court regarding the Settlement.

### B. A missed goal and an unfair criterion

#### 1. No real exclusion of foreign rights-holders

In the *Memorandum Of Law In Support Of Plaintiffs' Motion For Preliminary Approval Of Amended Settlement Agreement*, plaintiffs declare:
> *"The ASA substantially reduces the scope of the class from the Settlement Agreement. First, and most significantly, the international scope of the class has been reduced by narrowing the definitions of "Book" and "Insert." Only Rightsholders in a "Book" or "Insert," as those terms are defined in the ASA, are members of the Amended Settlement Class."*

Although **the plaintiffs seemed to have sought to exclude foreign rights-holders** (apart from British, English-speaking Canadians and Australian ones), the new criteria used based on the registration with the US Copyright Office fails to achieve this goal. The example of books registered by French publishers in the past is by no means isolated and many publishers in Germany, Italy, Spain or the Netherlands also have many books still covered by the ASA.

#### 2. The focus on U.S. registration is unfair

**The criterion for the new scope obviously unfair as it is related to a purpose which has nothing to do with the Settlement** and which right-holders undertaking the registration could not have imagined, especially if they did so more than 20 years ago.

Moreover, French publishers who had registered their books in 1930 for instance (and then had not renewed the registration) **would not nowadays be entitled to statutory damages and attorney's fees**, unless they would have filed in a "Notice of Intent" in the US Copyright Office to enforce the restored copyright within 2 years after the restoration of the copyright. It is therefore irrelevant to consider the registration of these books many decades ago as a criterion to determine French publishers' ability to obtain statutory damages and attorney's fees in this class action, and consequently to determine whether they are members of the class.

Furthermore, such a criterion should no longer be used nowadays for copyright related purposes, as **Article 5 of the Berne Convention prohibits formalities**, such as a registration, from interfering with "the enjoyment and the exercise" of a protected right.

This criterion is especially **confusing and therefore detrimental to foreign rights-holders, who mostly stopped this practice at least 20 years ago**. After such a long period, publishing houses may have closed or changed owners and there may no longer be any record of such registration. Given that many of these registered books are not recent, their related rights may have reverted back to their authors, who certainly have no information at all on this issue.

Moreover, it is **practically impossible to obtain this information from the Copyright Office for books registered before 1978**. Indeed the search needs to be done either on site or by a

Settlement is that **with the ASA, they will no longer be able to control the uses related to their unregistered works and to obtain the $60 compensation for past uses.**

Finally, books which remain outside of the Settlement end up in an extremely unfair situation as they are not actually excluded at all from Google's uses and are not even removed from Google's and the participating libraries's databases and servers. Indeed, for the removal of those excluded books in the sense of the Settlement, this text provides no legal certainty as it only refers to Google' "current policies", which by definition may change in the future and which may imply for rights-holders to constantly check the Google Book Search website, in particular for their new titles. Accordingly, **even for the books which are now outside of the Settlement, the situation of exclusion is not real and effective.**

### D.    Need for a clarification of the scope

- Against this background, the scope of the Settlement should be further reduced in order to fully exclude non US books. For obvious fairness and clarification purposes, **it should be restricted to books published in the US, UK, Canada (English speaking) and Australia**.

- Moreover, **rights-holders who will be excluded should be able to opt-in** the Settlement if they so choose.

- If this full exclusion cannot be obtained, **the scope should be clarified and restricted to registrations that are still valid and in force, i.e. which were the subject of renewal**, otherwise most of the books that enter in the library programmes will be included.

- Furthermore, foreign rights-holders should be better informed of the status of their books, through the provision of a **comprehensive list of registered books**. Practically speaking, this list should immediately be incorporated in the Google online database, so that unregistered books should be removed from the database and only registered books should remain.

- Finally, **the situation of books excluded from the Settlement should be clarified and made equivalent to their complete removal** from Google's and the participating libraries' databases and servers.

### II. A new Settlement which still raises the same fundamental concerns

Although responses to the former Settlement are to be fully considered again by the Court, we would like to stress the following fundamental concerns which have not been resolved, without going into the full details which were developed in our previous contribution.

### C. Too little improvement of the quality of the management system established for the Settlement

#### 1. No list of the scanned books

Before starting any use of the books, Google should provide publishers with a complete **inventory of the 10 million books already scanned**, in order to determine the exact scope of the settlement. The list should include the titles, the authors and publishers of each work together with the status (out of print, orphan, etc) Google is contemplating assigning to the work and should be made available in order to allow publishers, without having to provide justifications, **to claim their rights and correct any errors**. As part of this procedure, publishers should be provided with a copy of the scan for each book, in order to assess the quality, and exercise their control over moral rights issues.

The ASA says that the list of scanned books has been provided to the plaintiffs, according to agreed terms. The alleged reason why Google had not published the list is that they did not have the right to publish the metadata they use, coming from external providers. However, if they are going to match their records with those of the Copyright office (which is the only way to correctly identify a book as "registered"), at that point they will have the records coming from the Copyright office, which is a public domain source, so there are no excuses for not publishing the list.
The only alternative is that they will not have the data, and thus they are going to scan and use all books regardless of whether they are included on not in the Settlement.

#### 2. Unfair treatment of the foreign publishers with registered books

It is not fair that **foreign rights-holders who are still concerned by the Settlement as they have some registered books** do not enjoy the same benefits as the other class members. If the scope of the Settlement is not further reduced, **the benefits provided to British, English-speaking Canadians and Australian rights-holders should be extended to all the rights-holders involved,** in particular:

##### a. For the determination of the commercial availability

All rights-holders whose books are covered by the Settlement should benefit from the same rules to determine the commercial availability of a book. As mentioned in our previous submission the definition and the basis for determination have for consequence that ¾ of European books in average are currently considered as non commercially available, a proportion totally unrealistic. Commercially available should cover **all channels of trade** by being defined as meaning *"for sale new, from sellers anywhere in the world, through one or more then-customary channels of trade to all purchasers"* and not only those within the United States, the United Kindgom, Canada or Australia as it is currently the case".

The practical determination of commercial availability should be done prior to making any display uses under authorizations in the settlement agreement and on the basis of local resources of information. Google thus should commit in the settlement to use non-US – including **European - metadata providers** to ensure that they have correct information regarding whether a book is commercially available or not, and to make publicly available the list of databases and Internet information used.

acquired this position is because for years it ignored authors' and publishers' pleas to cease copying and making their works available without authorization.

### E. Still an excessive power granted to Google

The ASA did not bring any progress regarding the excessive power it grants to Google notably in the areas of:

- **The exclusion of books from "one or more Display uses for editorial or non-editorial reasons" which raises risks of censorship;**

- **the lack of penalties in case Google makes mistakes;**

- **the lack of security measures to prevent fraud via the database provided by Google.**

- **geolocalization tools to prevent display, transmission or distribution outside the USA**

We would appreciate stronger clarification and assurances that **Google will not use any of the rights granted to it under the proposed Settlement or equivalent outside the USA**, whether on its own account or by sub-licensing. To that end, we would appreciate specific technical details relating to the steps that Google proposes to take to ensure that non-USA users will not be able to access the service (e.g. geo-blocking or other protocols).

Respectfully submitted,

Serge Eyrolles