UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
The Authors Guild, Inc., *et al.*,                         :
                                                           :
          Plaintiffs,                                      :
                                                           :
                    vs.                                    :
                                                           :
Google, Inc.,                                              :
                                                           :
          Defendant.                    :          Case No. 05 CV 8136-DC
-----------------------------------------------------x

**SUPPLEMENTAL MEMORANDUM OF AMICUS CURIAE OPEN BOOK ALLIANCE
IN OPPOSITION TO THE PROPOSED SETTLEMENT
BETWEEN THE AUTHORS GUILD, INC., ASSOCIATION OF
AMERICAN PUBLISHERS, INC., ET AL., AND GOOGLE INC.**

Gary L. Reback
Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA  94303

Counsel for Amicus Curiae Open Book Alliance

## TABLE OF CONTENTS

A.      Secret Side Deals Among the Parties Actually Control the Settlement's Terms..........1

B.      The Amendments Fail to Resolve Key Antitrust Objections...………………..…………4

C.      The Settlement Fails Even a Rule of Reason Evaluation......…………………..…………11

D.      Google's Anticompetitive Bundling Undermines Competition in Digital Book
        Distribution……………………………………………….......…………………..…………14

E.      Control of the Search Market Is Google's True Goal…........…………………..…………16

## TABLE OF AUTHORITIES

**CASES**

*Am. Soc'y of Internal Med.*,
   105 F.T.C. 505 (1985) ........................................................................................ 7

*Amgen Products, Inc. v. Winsor*,
   521 U.S. 591 (1997) .......................................................................................... 2

*Catalano, Inc. v. Target Sales*,
   446 U.S. 643 (1980) .......................................................................................... 7

*FTC v. Cement Inst.*,
   333 U.S. 683 (1948) .......................................................................................... 7

*FTC v. Superior Court Trial Lawyers Assn.*,
   493 U.S. 411 (1990) .......................................................................................... 8

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) ........................................................................ 12

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ............................................................................ 5

*In re Masters Mates & Pilots Pension Plan and IRAP Litigation*,
   957 F.2d 1020 (2nd Cir. 1992) ......................................................................... 5

*In re Microsoft Corp. Antitrust Litigation*,
   185 F. Supp. 2d 519 (D. Md. 2002) ................................................................. 5

*Sony Corp. v. Universal City Studios*,
   464 U.S. 417 (1984) ........................................................................................ 19

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ............................................................................ 8

*U.S. v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) .......................................................................................... 7

*Va. ExcelSior Mills, Inc. v. FTC*,
   256 F.2d 538 (4th Cir. 1958) ........................................................................ 7,8

## OTHER AUTHORITIES

Amanda Edmonds, *Google Editions: Books in the Cloud with Amanda Edmonds, Google*, Speech at the Digital Book World Conference (January 26, 2010).......................................... 18

*Amended Settlement Filed in Authors Guild v. Google*, THE AUTHOR'S GUILD, November 13, 2009.................................................................................................................................... 10

Ashley Heher, *Wal-Mart vs. Amazon: Price Wars*, THE HUFFINGTON POST, October 16, 2009.... 8

C.A. George, *Exploring the Feasibility of Seeking Copyright Permissions*, Carnegie Mellon Libraries, January 31, 2002.......................................................................................... 9

Cecilia Kang, *Microsoft buster Gary Reback goes after Google on books*, THE WASHINGTON POST, November 6, 2009 .............................................................................................. 15

David Drummond, *New chapter for Google Book Search*, THE OFFICIAL GOOGLE BLOG, October 28, 2008.................................................................................................................. 2

Denise Troll Covey, *Acquiring Copyright Permission to Digitize and Provide Open Access to Books*, Digital Library Federation, October 2006...................................................... 10

Denise Troll, *Becoming an Orphan: What? How? Says Who?*, Carnegie Mellon University, 2007 .................................................................................................................................. 10

Denise Troll, *Copyright Permission: Turning to Dust or Digital*, Future of the Book Conference, April 2003 .................................................................................................................. 9

James Surowiecki, *Priced to Go*, THE NEW YORKER, November 9, 2009 ..................................... 8

Jessica E. Vascellaro, *Google Advertises Its China Position with Search Ads*, THE WALL STREET JOURNAL, January 19, 2010 ..................................................................................... 15

Letter from Denise T. Covey, Principal Librarian for Special Projects, Carnegie Mellon University Libraries, to Jule L. Sigall, Associate Register for Policy & International Affairs, U.S. Copyright Office (March 22, 2005) .................................................................... 9

Miguel Bustillo & Jeffrey A. Trachtenberg, *Wal-Mart Strafes Amazon in Book War*, WALL STREET JOURNAL, October 16, 2009 .......................................................................... 8

*New Google Settlement Not Likely to Draw DOJ Knives – Yet*, WARREN'S WASHINGTON INTERNET DAILY, November 17, 2009....................................................................... 9

Press Release, Debevoise & Plimpton LLP, Debevoise Advises Worldwide Class of Publishers and Association of American Publishers in Landmark Settlement with Google, Nov. 25, 2008 .................................................................................................................................. 12

Rachel Metz, *E-Reader boom kindles a variety of new options*, THE MERCURY NEWS (via the Associated Press), January 7, 2010 .......................................................................................... 11

Sergey Brin, *A Library to Last Forever*, THE NEW YORK TIMES, October 9, 2009 ..................... 13

SHARAD GOEL ET AL., ANATOMY OF THE LONG TAIL: ORDINARY PEOPLE WITH EXTRAORDINARY TASTES (2010) .................................................................................................................... 18

Siva Vaidhyanathan, *Dan Clancy answers a few quick questions about the new Google Book Search settlement*, THE GOOGLIZATION OF EVERYTHING, November 17, 2009 ....................... 19

Videotape: PBS Newshour (Google's Goal: Digitize Every Book Every Printed, December 30, 2009) ................................................................................................................................ 15, 16

The paltry proposals offered by the parties for amending the Settlement – truly, a disdainful response to the vast outpouring of global criticism – change little, but clarify much. What one of Google's founders hailed last Fall in the pages of the *New York Times* as "A Library to Last Forever," a modern day equivalent of the Library at Alexandria, now reveals itself as more likely a sham and a fraud on the public.

In our initial memorandum, we argued that the parties' proposal embodies in greater measure a sordid financial scheme to restructure the publishing industry and to control web commerce than a proposal to construct a repository of scholarly works that will be used to benefit the public. We warned of antitrust violations and of untoward, anticompetitive effects flowing from the proposed Settlement to book publishing, library subscriptions, and the several search markets.

### A.    Secret Side Deals Among the Parties Actually Control the Settlement's Terms.

Using broadly-worded loopholes and carefully-crafted exceptions, the parties have structured the Settlement Agreement to facilitate their own collusion over the future of digital books. Key elements of the settlement remain undisclosed to either the public or to this Court. We direct our arguments in this regard largely to the modifications offered by the parties and to facts and circumstances that have come to light subsequent to the filing of our initial memorandum – with one exception, for which we ask the Court's indulgence. While attempting to reconcile Google's public statements of financial exposure from payments required by the Settlement with the actual wording of the Settlement's provisions, we noted a sentence nestled in § 17.9 (Separate Agreements with Amended Settlement Class Members) that fundamentally

1

alters the legal analysis of the entire settlement proposal.  To our knowledge, no objector has

raised this issue in prior briefing.  The relevant sentence of § 17.9 provides:

> In cases in which Google has, on or after the Amended Settlement Agreement
> Date, a direct agreement with a Rightsholder with respect to that Rightsholder's
> Books (through the Google Partner Program or otherwise), then the payments
> required to be paid the Registry set forth in Article IV (Economic Terms for
> Google's Use of Books) shall not apply to those Books and the payments set forth
> in the applicable direct agreements will apply . . . .

On its face, § 17.9 implicates important issues of adequacy of representation now

pending before this Court.  Article IV of the Amended Settlement (referenced in the quoted

passage from § 17.9) governs the payments Google is to make for sanctioned uses – Institutional

Subscriptions, Consumer Purchases, Preview Uses, and the like – specifically including the so-

called "Standard Revenue Split."

According to press reports, Google has signed "Partner" agreements with thousands of

publishers.[1]  Doubtless, each of the plaintiff publishers in this action has its own Partner

agreement with Google that will govern the payments it receives from Google, in lieu of the

provisions in the Settlement Agreement the plaintiffs negotiated to bind other class members.

The terms of the Partner agreements remain secret.

A number of objectors, including the Department of Justice, relied on the reasoning of

*Amgen Products, Inc. v. Winsor*, 521 U.S. 591 (1997), and similar decisions to question whether

the plaintiffs could adequately represent class members.  The Justice Department, in particular,

expressed "serious reasons to doubt that class representatives who are fully protected from future

uncertainties created by a settlement agreement . . . can adequately represent the interests of

those who are not fully protected, and whose rights might be compromised as a result."  Govt.

---

[1] *See* David Drummond, *New chapter for Google Book Search*, THE OFFICIAL GOOGLE BLOG, October 28, 2008,
*available at* http://googleblog.blogspot.com/2008/10/new-chapter-for-google-book-search.html.

Statement of Interest at 10. The parties made various cosmetic changes in the Amended Settlement, attempting to paper over the Government's concern with adequacy of representation, but § 17.9 remains unchanged.

By releasing the plaintiffs from the economic terms they have negotiated for other Rightsholders' books, § 17.9 undermines the integrity of the Settlement. How is this Court to determine whether the Settlement is fair and adequate to class members without reviewing the terms secretly secured by the putative class representatives? The Settlement grants to Google the rights to commercialize "unclaimed" works and also establishes procedures to facilitate publishers claiming and registering works that might otherwise be claimed by authors (or other publishers). Who knows what monetary benefits the publisher representatives secretly secured for themselves in exchange for tendering to Google not just the works the plaintiffs have the authority to license under the copyright law, but also the works (of unknown authors) the plaintiffs do not own, as well as the works of authors whose rights were compromised and arrogated to the publishers by the settlement procedures? And how can an author whose royalties are governed by the splits established in the Settlement Agreement possibly evaluate the adequacy of the payments without knowing the rest of the economic arrangements between Google and the plaintiff publishers?

The Amended Settlement provides no mechanism for either the Court or the public to review the secret side deals made by the publisher class representatives. Moreover, the express language of § 17.9 permits the parties to negotiate secret side deals to govern the economic terms of books licensed to Google under the Settlement at any time, even after court review of the Amended Agreement, effectively evading judicial and public scrutiny of the Settlement.[2]

---

[2] The Court also needs access to all of the Partner agreements in order to evaluate the extent to which Google gains a competitive advantage from their terms, as required by the rule of reason balancing test. *See* ante at 11.

The secret side deals implicate not only payments for commercial uses of claimed works, but also payments for past infringement. Article V of the Settlement Agreement requires payments of at least $60 for each work that was digitized, but only for those books digitized "without the Rightsholder's authorization." *See* § 5.1(a).  Presumably, the secret side deals "authorize" the digitization, thereby permitting Google to avoid at least some of the payments for past infringement it would otherwise be obligated to make.[3]

This provision also compounds the notice issues already raised by objectors:  Did authors and small publishers who downloaded and signed Google's Partner Agreement understand that they were waiving their $60 payment by doing so?

Beyond adequacy of representation and notice, § 17.9 and the related provisions also implicate antitrust concerns.  These are described below.

## B.  The Amendments Fail to Resolve Key Antitrust Objections.

The Open Book Alliance raised a number of antitrust objections to the proposed settlement, as did several other respondents, including the United States Government.  This Court must assure itself, as part of the fairness evaluation, that the Amended Settlement complies with the antitrust laws.  As we explained in our initial memorandum, courts look to the public

---

[3] Section 3.2 of the Plan of Allocation (Attachment C to the Amended Settlement Agreement) provides that claimants may receive up to $300 for each book, if excess funds remain after payments to rightsholders "entitled to receive such payments from the Settlement Fund."  The accounting treatment of claimants "entitled" to payments under the Amended Agreement, but who "authorize" the digitization through secret side deals is unclear.  On one hand, the combination of § 17.9 with the provisions of the Plan of Allocation might simply eliminate the claims of large numbers of Rightsholders, effectively capping Google's liability for past infringement at $45 million.  On the other hand, if those who "authorize" digitization through Partner agreements continue to count as claimants under the Plan of Allocation, then other claimants who do not "authorize" digitization might be limited to $60, instead of something more (up to $300) they would otherwise receive.

interest as well as the interests of those directly involved in evaluating class settlements.[4]  The
case law teaches that courts do not approve class settlements that violate the federal antitrust
laws.[5]  Nor do courts approve class settlements through which dominant companies disadvantage
their competitors.[6]

      The parties have offered an amendment to the proposed Order of Dismissal, stating that
the Settlement does not provide immunity from the antitrust laws, by virtue of the *Noerr-
Pennington* doctrine or otherwise.  ASA Attachment L ¶17.  We expect the parties to argue that
their proposal should be sufficient to permit the Court's approval of the Settlement forthwith, as
the Government remains free to pursue antitrust violations at a later date.

      But courts insist that settlements conform to the antitrust laws as a condition for approval,
and with good reason.  Restoring consumers and competitors to the positions they would have
had absent anticompetitive conduct is costly and inefficient.  Remedial actions, even where
necessary, sometimes adversely affect third parties and rarely restore the status quo ante in all
respects.  Far better to avoid anticompetitive injury altogether rather than try to correct it after
the fact.

      The Government has already endorsed this view.  The Government's initial Statement of
Interest noted (at footnote 6) that the parties had agreed by the time of the Government's
submission not to raise a *Noerr-Pennington* defense.  Yet the Government registered its antitrust
concerns with the Court, notwithstanding the parties' representation.  The Government refused to
treat the parties' invitation to litigate later as an adequate substitute for obeying the law now.

---

[4] *See e.g., In re Masters Mates & Pilots Pension Plan and IRAP Litigation*, 957 F.2d 1020, 1025-26 (2nd Cir.
1992).
[5] *See e.g., Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975).
[6] *See In re Microsoft Corp. Antitrust Litigation,* 185 F. Supp. 2d 519, 529 (D. Md. 2002).

The Government's approach makes all the more sense in this case, given that the antitrust concerns at issue are neither remote nor hypothetical; they are woven tightly into the fabric of the settlement proposal. The Government noted that the horizontal agreements among authors and publishers incorporated into the Settlement "bear an uncomfortably close resemblance to the kinds of horizontal agreements found to be quintessential per se violations of the Sherman Act." Govt. Statement of Interest at 17. The modifications the parties propose to address antitrust objections come nowhere close to resolving the underlying concerns.

The Government, for example, complained that the Settlement's 70% - 30% revenue split sets a price floor at the wholesale level that diminishes "the incentives of individual authors or publishers to discount or offer other terms more favorable to the purchaser." Govt. Statement of Interest at 20, citing authorities. The parties revised the Settlement Agreement to permit voluntary renegotiation of the revenue split, but only for "Commercially Available Books." ASA § 4.5(a)(iii). The Government's earlier brief has already explained that such a price floor is illegal even if some Rightsholders elect not to use it, Govt. Statement of Interest at 19, so the change amounts to nothing.

Moreover, the proposed change applies only to "Commercially Available Books";  the revenue split in the Settlement still binds commercial uses of out-of-print (not Commercially Available) books. Apparently, the parties believe that such illegal price-fixing can somehow be justified as necessary to create a market in out-of-print books. But publishers and sellers have already digitized some out-of-print books. A robust market already exists for these works. Securing copies of other out-of-print books remains difficult; Google's library scanning produced the only extant digital copies of some works. Provision needs to be made through the Settlement or by Congressional action for competitors to secure their own digital copies. The

6

parties' proposal for industry-wide price fixing damages the public without increasing the availability of out-of-print books.

The Government's initial brief also pointed to the setting of default prices at the retail level through a Google-developed pricing algorithm as yet another per se violation. Govt. Statement of Interest at 21. The parties have tinkered with their formula, but without antitrust effect. The parties now assert that their algorithm "will be designed to simulate how a Rightsholder would unilaterally price its Book in a competitive market," as opposed to setting the same price for all similar books (the earlier formulation). However the industry-wide pricing formula is crafted, it remains per se illegal. The Supreme Court settled the point ages ago:

> [P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be set at a certain level or ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices.[7]

Additional authorities abound.[8]

Nor does the parties' "clarification" that the algorithm will be "developed by Google without . . . Rightsholder involvement" avoid per se condemnation. The Government has already rejected the parties' attempt to characterize their cabal as a unilateral offer by Google to numerous horizontal competitors. Govt. Statement of Interest at 18. Horizontal price-fixing agreements are per se illegal even where a party in a vertical relationship to the other

---

[7] *U.S. v. Socony-Vacuum Oil Co.*, 310 U. S. 150, 222 (1940).

[8] *See e.g.*, *Am. Soc'y of Internal Med.*, 105 F.T.C. 505 (1985) (F.T.C. Advisory Op.); *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 n.10 (1980); *Va. ExcelSior Mills, Inc. v. FTC*, 256 F.2d 538, 540-41 (4th Cir. 1958); *FTC v. Cement Inst.*, 333 U.S. 683, 700, 720-21 (1948).

conspirators coordinates the scheme.[9]  Delegating the setting of prices to a third party does not alter the horizontal nature of a price-fixing agreement.[10]

Recent developments in the book publishing industry confirm the wisdom of a per se prohibition against the proposed industry-wide pricing formula.  Near the end of last year, Walmart roiled the industry by announcing the sale of hotly anticipated new hardback books on its web site for less than $10 each.  Walmart's competitors quickly met the low price. The press reported that Walmart was losing money on each book it sold.[11]  *Wall Street Journal* reporters wondered in print whether Walmart's price cutting, coupled with the low e-book prices, "would force the industry to re-scale its entire business."[12]

As we explained in our initial memorandum, the big publishers are looking to the Book Settlement to dampen price competition and stabilize prices.  They have long feared, now with ample justification, that low prices for digital books will affect the prices charged for conventional books.  Walmart's aggressive price cutting confirmed their worst fears. "Obviously, e-books have gotten this thing going," a well-known author commented.[13]  An industry-wide pricing formula designed to "maximize revenues for the Rightsholders of books," ASA§ 4.2(b)(2), invariably stabilizes prices, even if crafted "to simulate how a Rightsholder would unilaterally price its Book in a competitive market."  In the real world, books are sold by

---

[9] *See e.g.*, *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000).

[10] *See e.g.*, *FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 424 (1990); *Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538, 540 (4th Cir. 1958).

[11] *See* Miguel Bustillo & Jeffrey A. Trachtenberg, *Wal-Mart Strafes Amazon in Book War*, WALL STREET JOURNAL, October 16, 2009, at A1, *available at* http://online.wsj.com/article/SB125565024634288895.html; Ashley Heher, *Wal-Mart vs. Amazon: Price Wars*, THE HUFFINGTON POST, October 16, 2009, *at* http://www.huffingtonpost.com/2009/10/16/wal-mart-vs-amazon-price_n_323643.html; James Surowiecki, *Priced to Go*, THE NEW YORKER, November 9, 2009, *at* http://www.newyorker.com/talk/financial/2009/11/09/091109ta_talk_surowiecki.

[12] Miguel Bustillo & Jeffrey A. Trachtenberg, *Wal-Mart Strafes Amazon in Book War*, WALL STREET JOURNAL, October 16, 2009, at A1, *available at* http://online.wsj.com/article/SB125565024634288895.html.

[13] *Id*.

retailers who also sell a myriad of other products.  Open competition produces unexpected

results, including book sales at prices below the nominally "competitive" market level.  Antitrust

laws guarantee consumers the benefit of real competition in the real marketplace – not Google's

idea of what competition should produce.

Finally, the Government has expressed concern that the proposed settlement might

foreclose competition by granting Google "de facto exclusivity" (the Government's terminology)

with respect to the distribution of certain digital books.  Govt. Statement of Interest at 23.  The

original settlement proposal failed to include any mechanism by which Google's competitors

could secure rights to orphan works.  The parties have not corrected this deficiency.  The

amendments include a provision to appoint a "Fiduciary for Unclaimed Books," but even the

parties concede that the Fiduciary lacks the power to license orphan works to Google's

competitors without statutory authority from Congress.[14]  If the parties cannot even propose a

way to correct the Settlement's deficiencies without the necessity of Congressional action, it

makes far more sense to have Congress address the entire problem of rightsholder registration

and licensing, rather than just the minor details.

In any event, the issue of de facto exclusivity raised by the Government extends far

beyond orphan works.  The vast majority of in-copyright books are unavailable for digital

licensing on the open market, according to an important Carnegie Mellon University study

reported to the Copyright Office in 2005.[15] While the rightsholders for some books cannot be

---

[14]  *New Google Settlement Not Likely to Draw DOJ Knives – Yet*, WARREN'S WASHINGTON INTERNET DAILY, November 17, 2009.

[15] *See* Letter from Denise Troll Covey, Principal Librarian for Special Projects, Carnegie Mellon University Libraries, to Jule L. Sigall, Associate Register for Policy & International Affairs, U.S. Copyright Office (March 22, 2005) (on file with U.S. Copyright Office).  For more complete descriptions of the Carnegie Mellon University study, *see* C.A. George, *Exploring the Feasibility of Seeking Copyright Permissions*, Carnegie Mellon Libraries, January 31, 2002;  Denise Troll, *Copyright Permission: Turning to Dust or Digital*, Future of the Book Conference, April 2003; Denise Troll Covey, *Acquiring Copyright Permission to Digitize and Provide Open Access to Books*,

identified at all, the CMU study showed that various factors preclude the nominal rightsholders'
ability to grant licenses to many of the other in-copyright books, even where the rightsholders are
known – multiple ownership, refusals to respond, etc.

The Settlement's procedures enable Google to avoid these problems and to secure rights
to just about every in-copyright book.  The ability of any Google competitor to acquire remotely
comparable rights from the Registry remains illusory, the Settlement notwithstanding.  The
Registry lacks the power to license orphan works.  Moreover, as we explain below, the Registry
may never acquire the rights to license for display many of the books that eventually get
registered under the Settlement.  And, to the extent the Registry acquires rights to claimed works,
the large publishers who control the Registry have little incentive to create competition that
would undermine the price levels set by Google.  Even if rightsholders (contrary to their own
economic interests) license rights more broadly, they often lack renderings of out-of-print books
to offer Google's competitors.  The parties fully understand what the Settlement portends for
Google in terms of exclusivity.  Right after submitting their proposed amendments to the
Settlement, the Authors Guild advised its members not to withdraw their works from the Google
database, lest they remove themselves "from this market forever."[16]

At bottom, the Settlement bestows upon Google a de facto exclusive license to millions
of books.  Section 17.9 permits Google to "leverage" that advantage more broadly by negotiating
a single contract with each publisher that includes both books from the publisher for which
Google has de facto exclusive rights under the Settlement and books Google licenses from the

---

Digital Library Federation, October 2006; Denise Troll, *Becoming an Orphan: What? How? Says Who?*, Carnegie
Mellon University, 2007.

[16] *See Amended Settlement Filed in Authors Guild v. Google*, THE AUTHOR'S GUILD, November 13, 2009, *at*
http://www.authorsguild.org/advocacy/articles/amended-settlement-filed-in-authors-guild.html.

publisher  outside the Settlement.  Simply put, § 17.9 enables Google to strike comprehensive deals with publishers no other digital bookseller can offer.

The parties responded to concerns that Google's de facto exclusivity skews competition in consumer sales by amending the Settlement to offer other vendors the ability to resell the books Google hosts for consumer purchase.[17]  This "solution" actually fortifies Google's control over the market by turning Google's likely competitors into its sales agents.  Resellers will have but a single source for many books – Google.  The resellers must pay what Google asks and Google's prices to resellers effectively sets the pricing floor for retail sales.

Press reports from last month's Consumer Electronics Show describe an e-book industry bubbling with excitement and brimming with nascent competition.  The market awaits a "cascade" of new, low-priced e-readers, replete with eye-popping video features, along with a variety of other gadgets, from mobile phones to tablet computers, on which consumers can read books.[18]  Left unfettered, the new industry offers endless opportunities for authors and small publishers, and a technological bonanza for consumers.  But forcing all of the new vendors to depend on a single source, Google, for many of the digital books they intend to offer is the surest way to retard what are otherwise boundless prospects.

C.  The Settlement Fails Even a
<u>Rule of Reason Evaluation</u>.

Key provisions of the Settlement continue to warrant per se condemnation.  Doubtless the parties will respond by contending that the rule of reason rather than the per se rule should be employed to evaluate the settlement as a whole.  But publishers' counsel have already conceded

---

[17] *See* § 4.5(b)(v)(2).

[18] Rachel Metz, *E-Reader boom kindles a variety of new options*, THE MERCURY NEWS (via the Associated Press), January 7, 2010 (last updated January 8, 2010), *available at* http://www.mercurynews.com/ci_14143657?source=rss.

that the Settlement represents more a joint venture than anything else.[19]  And the per se rule,

rather than the rule of reason, governs horizontal price fixing schemes embedded into joint

ventures.[20]

      Even if the parties succeeded in purging all per se violations from their proposal

(something they have not even attempted to do), there is little to suggest they would fare better

under the rule of reason.  The parties have yet to lay out the details of their antitrust defense, but

Google hired a law professor last Fall to file an amicus brief supporting the Settlement.[21]  That

brief offered what is at best an unprecedented suggestion:  The brief urged the Court to approve

the Settlement largely because the proposed scheme will increase book output.[22]  The Court will

note the dearth of citations in the brief to case law supporting such a criterion.  A rule of reason

evaluation does not turn solely on increasing output; if it did, every joint venture for the creation

of product would pass antitrust scrutiny.

      Courts apply the rule of reason test to joint ventures by inquiring whether there are less

restrictive alternatives that might produce many of the same beneficial results predicted by the

venture partners.[23]  More generally, the rule of reason requires a court to balance the

anticompetitive consequences of the conduct at issue against the likely benefits.  Here, the

balance tilts decidedly to the negative.

---

[19] Press Release, Debevoise & Plimpton LLP, Debevoise Advises Worldwide Class of Publishers and Association of American Publishers in Landmark Settlement with Google, Nov. 25, 2008, *available at* http://www.debevoise.com/newseventspubs/news/RepresentationDetail.aspx?exp_id=a3dba5c6-7e25-4b70-a9c7-0156917fee0d.

[20] *See e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003).

[21] *See* Dckt No. 275 (Amicus Brief of Antitrust Law and Economic Professors in Support of the Settlement) (filed September 9, 2009).  Signatories to this Amicus brief include professors who received compensation from Google, albeit on other matters.

[22] *See id.* at 1.  Most of the other arguments in the brief have already been rejected in the Government's Statement of Interest.

[23] We explained the application of the rule of reason to joint ventures in some detail in our initial memorandum. *See* Dckt No. 282 (filed September 9, 2009), at pp. 26-31.

The parties have certainly promised enormous benefits from the settlement. They announced their venture with great fanfare, claiming that the Settlement would produce a vast compendium of digital books to be administered by the Registry on an impartial basis. Competitors will surely follow Google's lead, asserted the company's founder, by licensing digital books for various commercial purposes from the Registry.[24] But with the passage of time, the ability to examine the Agreement more closely, and the opportunity to observe the parties' conduct, the creation of a vast digital book corpus anywhere outside of Google's control seems less and less likely. The parties have yet to announce any figures for the number or percentage of books claimed under the Settlement's procedures. Given the uncertainty of the ultimate outcome, publishers can be expected to delay a final decision on which books to claim, making any evaluation on the Court's timetable difficult.

Whatever the ultimate claim rate, the Registry is unlikely to end up exercising licensing control over a large portion of the books to which the Settlement theoretically applies. The Settlement's procedures make it easy for publishers to assert claims of ownership. But, the publishers are obligated to surrender few rights to the Registry over the works they claim. Under § 17.9, the publishers retain the ability to negotiate better economic terms with Google than those provided in the Settlement. Under § 3.5(b)(i), publishers can withhold display rights and rights to any or all Revenue Models for claimed works. So, if the display rights to a book are valuable, the claimant can be expected to retain those rights for its own exploitation.

In short, notwithstanding the millions upon millions of books Google claims it has digitized (more than 12 million at last report), and the millions more it says it will digitize in the future, the Registry may end up with a much smaller set of books – perhaps only a few million –

---

[24] *See* Sergey Brin, *A Library to Last Forever*, THE NEW YORK TIMES, October 9, 2009, at A31, *available at* http://www.nytimes.com/2009/10/09/opinion/09brin.html.

that it can actually commercialize. The principal benefit claimed for the Settlement – a vast corpus of books under the control of a representative entity – appears speculative at very best. The concomitant anticompetitive injuries, on the other hand, are all but certain: broad control of digital book rights vested in a single vendor and a reduction in price-competition for digital books; poor quality and high prices in Institutional Subscription services; and increasing domination by Google of the search markets and related web commerce.

### D.  Google's Anticompetitive Bundling Undermines Competition in Digital Book Distribution.

In our initial memorandum, we predicted that Google would use court approval of the Settlement to justify bundling its book offerings into its general search engine (Google.com). We noted Google's public assertions that it ranks user search results through a mathematically-based neutral algorithm, but we raised concerns that Google would use its market dominance to give preference in search results to its own book offerings over those of competitors. Once Google started offering online maps and driving directions, we noted, it severely damaged the business of its competitor MapQuest by giving preference to its own map results in its dominant search engine. We asked the Court to consider Google's likely conduct in evaluating the consequences of approving the Settlement.

While we correctly discerned Google's intentions, we vastly underestimated the company's willingness to flout legitimate authority as well as the rights of others in pursuit of its corporate goals. Google did not even wait for judicial evaluation of the Settlement before capitalizing on the advantage it has secured through years of secret negotiations with the

14

plaintiffs.  Instead, it has confronted the Justice Department, this Court and its critics (including authors whose works it has copied) with a fait accompli.

Near the end of last month, the head of Google's book project, Daniel Clancy, stated on national television that Google has already bundled its book offerings – including all 12 million volumes it has scanned – into its general search engine.  "Every time you search Google, you're searching 12 million books," Clancy crowed to his PBS interviewer.[25]  Google reports book search results in terms of bibliographic information, snippets, or full text, according to the rights it has secured.

Clancy's revelation followed by only a month the confirmation of an ominous change in Google's policy regarding the neutrality of organic search results.  Last November, Google admitted to the *Washington Post* that only the search results from other sources are listed according to mathematically-based neutral algorithms.  Search results from Google's own properties, like maps, are now listed first, the algorithm notwithstanding.[26]  Even more recently Google admitted that it changes the rank ordering of paid search ads to prioritize company messages it wishes to convey.[27]

Efforts by companies to extend market domination, in this case from organic search to book distribution, by bundling goods and services together raise long-standing antitrust concerns.  Some courts condemn bundling practices under the per se rule; others have applied the rule of reason to determine legality.  Regardless of the appropriate legal standard, our concerns about the untoward consequences to competition in digital book distribution from Google's use of the

---

[25] Videotape: PBS Newshour (Google's Goal: Digitize Every Book Every Printed, December 30, 2009), *video and transcript available at* http://www.pbs.org/newshour/bb/entertainment/july-dec09/google_12-30.html.

[26] Cecilia Kang, *Microsoft buster Gary Reback goes after Google on books*, THE WASHINGTON POST, November 6, 2009, *available at* http://voices.washingtonpost.com/posttech/2009/11/gary_reback_the_microsoft_bust.html.

[27] Jessica E. Vascellaro, *Google Advertises Its China Position with Search Ads*, THE WALL STREET JOURNAL, January 19, 2010, *available at* http://blogs.wsj.com/digits/2010/01/19/google-advertises-its-china-position-with-search-ads/.

advantages secured from the Settlement are no longer merely theoretical. We ask this Court to consider carefully the effect on digital book distribution of augmenting Google's market power through a judicial grant of access to books no other competitor can realistically secure. If the past is any indication, Google will use its dominance in search to skew competition in digital book distribution.

E. Control of the Search Market
Is Google's True Goal.

While traditional antitrust concerns with bundling focused on the extension of a dominant company's market power from one product to another, antitrust scholars have come more recently to understand that dominant companies frequently use bundling techniques as much to fortify their existing monopolies as to create new ones. Daniel Clancy's candid admissions in his PBS interview demonstrate just how closely Google's conduct follows this pattern.

Clancy stated that Google did not undertake its massive book scanning project in order to make money through digital book sales or library subscriptions. In fact, according to Clancy, revenues from these sources will not even cover Google's sunk costs. Nor was the company engaged in an eleemosynary venture to create an eternal library. Google spent hundreds of millions of dollars on the book project, according to Clancy, to bolster its position in the search market, where it already controls a monopoly share.[28] Clancy's explanation bears emphasis. Despite all of the attention from publishers, authors and libraries in this Court, the Google Book Settlement is not just about books. In fact, from Google's perspective, it is not about books revenues at all. It's about search.

---

[28] Videotape: PBS Newshour (Google's Goal: Digitize Every Book Every Printed, December 30, 2009), *video and transcript available at* http://www.pbs.org/newshour/bb/entertainment/july-dec09/google_12-30.html.

Results from scientific studies of web searching explain why Google has spent enormous amounts of money to acquire the de facto exclusive digital rights to vast numbers of old, dusty books. Most search queries are directed to popular subjects – shopping, travel, medical information, etc. Some queries, though, are directed to more obscure subject matter. These are known as "rare," "obscure," "esoteric," or, sometimes, "tail" queries, in reference to the "tailing off" portion of a graph showing the frequency distribution of a population (search queries, in this case) exhibiting the Pareto principle, also known as the 80 – 20 rule. Most queries are directed to a few (relatively speaking) popular subjects and therefore show up in the "fat" part of the frequency curve. The frequency of increasingly obscure queries "tails off" asymptotically, providing a "long tail" to the right of the "fat" part of the curve.

For a time, computer scientists thought that most obscure queries were generated by only a few users (again, speaking relatively), and, hence, search engines could ignore obscure tail queries and still serve the great bulk of the user population. But research has shown that just about everyone makes a rare query from time to time. And, people decide which engine to use for their everyday search needs based on the engine's ability to satisfy these rare queries, just as one would expect in a world that values "one-stop shopping." Stated more formally, satisfying demand in the tail increases consumption in the "head" or fat part of the distribution curve.

Google will get an enormous advantage over its search competitors if it can support (*i.e.,* respond satisfactorily to) tail queries that its competitors cannot. Scientific research shows that supporting tail queries produces a disproportionately large increase in overall user satisfaction – *i.e.,* disproportionately increases the percentage of the user population highly satisfied with the engine's performance. In fact, according to the most recent study, satisfying an additional 1% of

tail queries increases overall user satisfaction with the search engine more than 5% [29] – this, in a market in which companies battle fiercely to wrest even a tenth of a point in market share away from Google's control.

Digital rights to virtually all out-of-print books provide Google with a decisive advantage in responding to tail queries. Google created its book database by scanning the collections of the nation's leading research libraries. These libraries consist largely of academic works on a wide variety of obscure subjects. The books contain information relevant to all kinds of rare queries. Much of the older information in the books might not even be available from other sources, at least on the public web. Whatever the publication value of these books, they provide an enormous advantage in search. Clancy drove home this point in his PBS interview by showing how one of the scanned books satisfied what he called "a very obscure . . . long tail query." And just a couple of days ago at the Digital Book World Conference in New York, Google presenter Amanda Edmonds confirmed that the company expects to use digital books to satisfy many of its users' tail queries.[30] If Google can deny its search rivals the ability to integrate the same corpus of books, Google's lead in search will become insurmountable.

Under appropriate circumstances, Google might be entitled to a competitive advantage it secured through superior foresight. But, as we explained in our initial memorandum, Google's advantage in book scanning followed from the intentional misdirection of its rivals and from the company's willingness to ignore legal claims of copyright ownership, not from aggressive, pro-competitive business conduct for which the company deserves a reward. Both commercial and

---

[29] *See* SHARAD GOEL ET AL., ANATOMY OF THE LONG TAIL: ORDINARY PEOPLE WITH EXTRAORDINARY TASTES (2010), *available at* http://research.yahoo.com/pub/3011. This peer-reviewed study is to be presented the first week in February 2010 at the Third International Conference on Web Searching and Design, sponsored the Association for Computer Machinery (ACM). *See* http://www.wsdm-conference.org/2010/accepted-papers.html.
[30] Amanda Edmonds, *Google Editions: Books in the Cloud with Amanda Edmonds, Google*, Speech at the Digital Book World Conference (January 26, 2010), *schedule available at* http://dbw2010.digitalbookworld.com/schedule/.

18

not-for-profit entities started scanning books before Google did.  Several other rivals started scanning shortly after Google announced its project.  Had the plaintiffs made these entities the same secret offer they made Google, the public would now have the benefit of a more competitive market in digital distribution for out-of-print books.  At a minimum, this Court should prevent Google from using the judicial system to bolster its search monopoly through the acquisition of book rights.

Conclusion

The parties spent almost three years in secret negotiations, and their settlement proposal has been pending almost a year and a half.  All the while, Google has continued its scanning.  The torrent of criticism to the Settlement may have produced amendments to the class definition, but it has not affected Google's conduct one iota.  Under pressure, Google proposed amendments purporting to take foreign authors out of the settlement class, but it refuses to stop scanning their works for inclusion in the company's database.[31]  Neither the lawsuit nor the settlement proposal has resolved the important fair use question at the heart of this controversy.  All in all, little has been accomplished, save from Google's perspective, as it continues to build its lead over competitors.

The Court's procedures are ill-suited for resolution of what is now at stake in this matter – rewriting the copyright law, restructuring the publishing industry, and maintaining a competitive search market.  The deluge of filings has overwhelmed the Court's administrative staff.  The Court has neither a mechanism to weigh what the Supreme Court in the *Sony* case[32] called "the varied permutations of competing interests" implicated by technological change, nor

---

[31] Siva Vaidhyanathan, *Dan Clancy answers a few quick questions about the new Google Book Search settlement*, THE GOOGLIZATION OF EVERYTHING, November 17, 2009, *available at* http://www.googlizationofeverything.com/2009/11/dan_clancy_answers_a_few_quick.php.
[32] *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 431 (1984) .

does the Court employ trained economists to evaluate the market consequences of the Settlement. The objectors and amici have no real means through discovery or otherwise to challenge representations the parties are certain to make in what is the last written submission to this Court. Despite the mounds of paper filed by the parties, how important aspects of the Settlement will actually operate remains largely a mystery.

The parties' initial settlement proposal generated an outpouring of opposition – from authors, small publishers, public interest groups and librarians. Some of these respondents are represented pro se; others, by counsel at reduced rates or pro bono. The parties' amendments brought forth another round of objections. It is simply unfair to expect individual authors, librarians and public interest groups to maintain constant vigilance indefinitely – through a fourth and a fifth and even a sixth round of amendments, as the parties try to squeeze whatever they can from the Court's procedures. The parties either will not or cannot resolve the problems that remain in their proposal. The public interest would be best served if the Court denied the certification motions, rejected the Settlement, and set a trial date for the parties.

Date: January 28, 2010                          Respectfully submitted,

                                                   /s/Gary L. Reback
                                                Gary L. Reback
                                                Carr & Ferrell LLP
                                                2200 Geng Road
                                                Palo Alto, CA  94303

                                                Counsel for Amicus Curiae
                                                Open Book Alliance

20