Daniel J. Fetterman
Peter J. Toren
Charlotte A. Pontillo
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Phone: (212) 506-1700
Fax: (212) 506-1800

Attorneys for *Amicus* Consumer Watchdog

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et al., ) ) ) | |
| Plaintiffs, ) ) | Case No. 05 CV 8136-DC |
| v. ) ) ) | |
| Google, Inc., ) ) | |
| Defendant. ) ) | |

**SECOND BRIEF OF CONSUMER WATCHDOG, *AMICUS CURIAE,* IN**
**OPPOSITION TO THE PROPOSED AMENDED SETTLEMENT AGREEMENT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

I.    THE AMENDED SETTLEMENT CONTINUES TO ABUSE THE CLASS-
      ACTION PROCESS AND IS NOT FAIR, REASONABLE, OR ADEQUATE............... 1

      A.    The Parties Continue To Take From Absent Class Members,  They Just No
            Longer Keep All Of Their Money ......................................................................... 2

      B.    This Court Lacks Jurisdictional Authority To Appoint An Unclaimed Works
            Fiduciary Who, In Any Event, Cannot Adequately Protect The Interests Of
            Absent Class Members ......................................................................................... 3

      C.    The Amended Settlement Continues To Exceed The Bounds Of This Court's
            Jurisdiction And Seeks An Advisory Opinion For Activities That Google Has
            Not Yet Performed.................................................................................................. 5

      D.    A Fair And Reasonable Settlement Would, At A Minimum, Make The
            "Monetization Opportunities" Opt-In For All Rightsholders ................................. 7

II.   THE AMENDED SETTLEMENT CONTINUES TO GIVE GOOGLE AN
      UNLAWFUL AND ANTI-COMPETITIVE MONOPOLY ............................................. 7

III.  THE PROPOSED AMENDED SETTLEMENT IS AN UNCONSTITUTIONAL
      ATTEMPT TO REVISE THE RIGHTS AND REMEDIES OF U.S. COPYRIGHT
      LAW ............................................................................................................................. 9

IV.   THE AMENDED SETTLEMENT CONTINUES TO CONFLICT WITH
      INTERNATIONAL COPYRIGHT LAWS...................................................................... 9

V.    THE AMENDED SETTLEMENT DOES NOT DO ENOUGH TO PROTECT
      READER PRIVACY .................................................................................................... 11

VI.   THE PUBLIC DESERVES A RULING ON THE QUESTION OF FAIR USE ............. 12

CONCLUSION.................................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods. Inc. v. Windsor,*
   521 U.S. 591 (1997)................................................................................. 3

*Harper & Row Publishers, Inc. v. Nation Enters.,*
   471 U.S. 539 (1985)................................................................................. 4

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984)............................................................................. 5, 9

*Stonehill Commc'ns, Inc. v. Martuge,*
   512 F. Supp. 349 (S.D.N.Y. 1981) ......................................................... 5

**Statutes**

17 U.S.C. § 106 ................................................................................... 10, 13

**Rules**

Fed. R. Civ. P. 23(a)(4)........................................................................... 2

**International Agreements**

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886
   (Paris Text 1971, as amended 1979), S. Treaty Doc. No. 99-27 ......................................... 9, 10

## PRELIMINARY STATEMENT

Consumer Watchdog makes a special appearance as *amicus curiae* to ask the Court to reject the proposed amended settlement agreement in this class action, copyright-infringement case.

Established in 1985, Consumer Watchdog is a nationally recognized non-partisan, non-profit organization representing the interests of taxpayers and consumers. Because it has no financial interest in the outcome of the litigation, and no bias, except for the public interest, Consumer Watchdog can provide a credible and independent view of the proposed amended settlement agreement.

The parties' original settlement sparked worldwide outrage and inspired significant objections and commentary. Acknowledging that their proposal had multiple flaws, the parties withdrew the original settlement and entered an amended proposal. But the amendments are insufficient, and the revised settlement suffers from the same fundamental problems as its predecessor. Namely, the settlement still abuses the class-action mechanism and purports to enroll absent class members automatically into new business "opportunities," in violation of current copyright laws. This scheme acts to the disadvantage of absent class members and would result in unfair competitive advantages to Google in the search engine, electronic book sales, and other markets, to the detriment of the public interest. Along the way, the settlement raises significant international law and privacy concerns. For all of these reasons, Consumer Watchdog urges this Court to reject the proposed amended settlement agreement.

## I.    THE AMENDED SETTLEMENT CONTINUES TO ABUSE THE CLASS-ACTION PROCESS AND IS NOT FAIR, REASONABLE, OR ADEQUATE

In its first *amicus* brief, Consumer Watchdog argued that the original proposed settlement should not be approved because it was fundamentally unfair to millions of absent class members.

In fact, the aspect of the settlement that was most unfair—the establishment of the new "monetization opportunities" in which many absent class members would be automatically enrolled—was beyond the scope of the parties' original dispute, and accordingly raised significant jurisdictional concerns.  (*See* Consumer Watchdog *Amicus* Brief, D.I. 263 at 2-7.)

In an apparent effort to address these fairness and jurisdictional problems, the parties adjusted how unclaimed funds are distributed, added an "Unclaimed Works Fiduciary," and narrowed the scope of the future monetization opportunities.  Despite these changes, however, the proposed settlement remains fundamentally unfair to absent class members and continues to invite the Court to overstep its Article III jurisdiction.

### A.    The Parties Continue To Take From Absent Class Members, They Just No Longer Keep All Of Their Money

The original settlement was unfair because it purported to sell the works of absent class members without their permission and, should an absent class member fail to step forward and claim the sale proceeds, distribute those proceeds to Google and to the remaining Rightsholders. This scheme created an insurmountable conflict, in violation of Rule 23(a)(4), between the named class members who would potentially profit and the absent class members who would have their works stolen.  (*See* D.I. 263 at 2-7.)

The parties still plan to sell the works of absent class members—without their permission and in violation of current copyright law.  (*See* A.S.A. §§ 4.1, 4.2, 4.7.)[1]  Now, however, in the likely event that an absent Rightsholder fails to step forward to claim the relevant sale proceeds, those proceeds would be donated to charity rather than distributed to the other Rightsholders. (*See* A.S.A. § 6.3(a)(i).)

---

[1]  Capitalized terms herein are used as defined in the Amended Settlement Agreement ("A.S.A."), unless otherwise specified, and references to the Amended Settlement Agreement, which is Exhibit 1 to D.I. 770, appear herein as "A.S.A. § __."

This revised plan is still nothing more than a private business arrangement, masquerading as a settlement, that would steal from unsuspecting absent class members while benefiting Google. Notably, it is only the Rightsholders' share of the proceeds that will be donated to charity, and Google would still make a profit from these sales. (*See* A.S.A. § 4.5.) Like the original settlement, therefore, the present proposal cannot be considered "fair, reasonable, and adequate." (*See* D.I. 263 at 3-5.)

The parties also will likely argue that because the proceeds are given to charity instead of distributed to the other Rightsholders, the named class members no longer have an insurmountable conflict with the absent class members in violation of Rule 23(a)(4). But this argument does not withstand scrutiny. By monetizing the works of absent class members, the Representative class members continue to steal from absent class members—they just donate the proceeds to charity. While charitable donations are usually laudable, it is up to any individual person or organization to choose where, how, and under what circumstances such donations will be made. The Plaintiffs attempt to play Robin Hood at the expense of absent class members, which demonstrates that they cannot "fairly and adequately protect the interests of the class." *See Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 625-27 (1997) (instructing that class certification should be denied where class representatives do not possess the same interests and suffer the same injury as the absent class members).

**B.    This Court Lacks Jurisdictional Authority To Appoint An Unclaimed Works Fiduciary Who, In Any Event, Cannot Adequately Protect The Interests Of Absent Class Members**

The parties also propose the creation of an "Unclaimed Works Fiduciary," who would be "delegated the responsibility to represent the interests of" the Rightsholders of "Unclaimed Works" (or "orphan" works). (D.I. 769 at 9, A.S.A. §§ 1.60, 6.2(b)(iii).) Presumably, the parties

will argue that the presence of this Fiduciary somehow makes the settlement fair to absentee class members.  It does not.

The Unclaimed Works Fiduciary would have only limited authority to act in place of absentee Rightsholders, and mostly to <u>increase</u> the exploitation of individual unclaimed works. For example, the Fiduciary may authorize "Display Uses" for a book previously categorized as "No Display," approve the price at which unclaimed Books may be sold under the "Consumer Purchase" Program, authorize a Book's enrollment in the "Additional Revenue Models," and authorize "Preview" uses.  (A.S.A. §§ 3.2(e)(i), 4.2(c)(i), 4.7, 4.3(g).)  But the Fiduciary cannot do much to <u>protect</u> a work from exploitation.  The Fiduciary would not have the authority, for example, to protect an absentee Rightsholder by prohibiting a Book from being Displayed because such an instruction "must be initiated by the Rightsholder" him or herself.  (A.S.A. §3.2(e)(i).)  Nor could the Fiduciary renegotiate how sale proceeds are split between Google and the Rightsholder (A.S.A. § 4.5(a)(iii)), and it is unclear whether the Fiduciary would actually have authority to withdraw a Book from the Consumer Purchase or Additional Revenue Models.[2] In fact, because the Fiduciary could increase Google's ability to exploit the copyrighted works of absent class members, the Fiduciary's presence seems to benefit Google more than the absent class members.

The amended settlement still proposes to strip exclusive copyrights from Rightsholders, only now instead of granting them to Google, it proposes to grant them to Google in conjunction with an unnamed third party.  This scheme is just as improper as the original.  *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 570 (1985) ("Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory [copyright] license' [via

---

[2] The ability to withdraw from these programs is defined by § 3.5(b), which gives a Rightsholder—but not the Fiduciary—the right to withdraw works.

application of the fair use doctrine].").

Not only does the agreement remain unfair to absent class members, but it is unlikely that the Court has the jurisdictional authority to appoint this Fiduciary in the first place. Under current copyright law, the owners of the "Unclaimed Books" have the exclusive right to copy, distribute, and publicly display their works. 17 U.S.C. §§ 106 (1), (3), (5). As explained in more detail in Consumer Watchdog's opening brief (D.I. 263 at 7-11), this Court does not have the constitutional authority to re-define those rights. "As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors to give the public appropriate access to their work product." *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). There is no precedent suggesting that this Court may appoint a third-party to reallocate the scope of copyright protection when this Court itself may not do so. *See id.* at 431 ("The judiciary's reluctance to expand the protections afforded by the copyright [law] without explicit legislative guidance is a recurring theme."); *Stonehill Commc'ns, Inc. v. Martuge*, 512 F. Supp. 349, 351 (S.D.N.Y. 1981) (failure to enforce a section of the copyright statute "would be tantamount to repeal by judicial decision"). Just as it "is not the role of the courts to tell copyright holders the best way for them to exploit their copyrights," *Sony* at 447 n.28, it is not the role of the Court to appoint a third party to exploit the copyrights of absent class members.

**C.    The Amended Settlement Continues To Exceed The Bounds Of This Court's Jurisdiction And Seeks An Advisory Opinion For Activities That Google Has Not Yet Performed**

The amended settlement also raises significant jurisdictional concerns because it purports to release Google for torts it has not committed nor, apparently, has any current plans to commit.

The original dispute concerned the fact that Google has copied (and continues to copy)

millions of copyrighted books into an electronic "book-search" database, and is displaying some or all of those books online in response to search requests. But the amended settlement, like the original, goes far beyond the book-search activities, and purports to enroll millions of absent class members in various "monetization opportunities" such as the Consumer Purchase program, Institutional Subscriptions, File Download, and Print on Demand. (*See* A.S.A. §§ 3.7(a), 4.1, 4.2, 4.5, 4.7.) These programs involve selling outright copies of Rightsholders' works, and many works will be automatically enrolled unless a Rightsholder opts out of the settlement entirely, or opts out of the new business ventures. (A.S.A. §§ 1.31, 3.2, 4.2, 4.7; A.S.A. attachment A.) Selling copies of Books was <u>not</u> part of the original complaint and <u>not</u> part of Google's advertised Book Search program. Even now, Google has not initiated any such programs and apparently has no immediate plans to do so. (*See, e.g*, A.S.A. § 4.7 (describing how Google and the Registry "<u>may</u>" agree to implement "additional Revenue Models" such as Print on Demand, File Download, or Consumer Subscription Models.[3]) As Consumer Watchdog argued in its original *amicus* brief, whether Google may distribute Books (individually or as part of a subscription program) is not an issue properly before the Court, and any grant of rights to these "monetization opportunities" is an improper request for an advisory opinion. (*See* D.I. 263 at 5 n.4.)

The settlement has been amended to restrict the future "monetization opportunities" to File Download and Print On Demand, whereas previously the future opportunities were more open-ended. (A.S.A. §§ 1.133, 4.7.) (The Institutional Subscription program remains essentially unchanged. (A.S.A. §§ 1.133.)) This amendment serves to narrow the "future" impact of the

---

[3] *See also* http://googlepublicpolicy.blogspot.com/2009/07/google-books-settlement-and-privacy.html (posted July 23, 2009), explaining that the "the services authorized by the agreement haven't been built or even designed yet"; http://books.google.com/googlebooks/privacy.html (copyright 2010), stating that the "additional services have not yet been designed." *Both cites visited* Jan. 25, 2010.

settlement and reduces some of the uncertainty involved, but does not solve the jurisdictional problem. The dispute between the parties never involved Google's plans to outright sell copies of the class members' Books, and therefore the Court simply lacks jurisdiction to advise the parties concerning the Consumer Purchase, Institutional Subscriptions, File Download, and Print on Demand programs.

> ### D.    A Fair And Reasonable Settlement Would, At A Minimum, Make The "Monetization Opportunities" Opt-In For All Rightsholders

The jurisdictional and fairness problems with the settlement are intertwined—the settlement proposes mandatory and unfair "monetization opportunities" that are unnecessary for a fair and reasonable settlement of the actual dispute between the parties. Any fair settlement that was within the Court's jurisdiction would remove these unnecessary provisions or, at an absolute minimum, make participation in these programs optional for all Rightsholders. But the parties appear unwilling to restrict their settlement to the actual issue before the Court. Accordingly the settlement should be rejected because it continues to invite this Court to overstep its jurisdiction and remains fundamentally unfair to absent class members.

## II.    THE AMENDED SETTLEMENT CONTINUES TO GIVE GOOGLE AN UNLAWFUL AND ANTI-COMPETITIVE MONOPOLY

Another fundamental problem not redressed by the amendments is that the settlement will provide Google with an unlawful monopoly. If Google is permitted to obtain the rights to millions of books through the class-action settlement mechanism, it will be the <u>only</u> player realistically able to market a book-search database or a book-subscription program, and practically the only player able to commercialize orphan works, because significant practical and legal barriers will prevent others from entering these markets.

In effect, the agreement temporarily suspends the copyright laws for Google, giving it the

rights to copy, distribute, and publicly display millions of copyrighted books—including "orphan" works for which Rightsholders cannot be easily located. By utilizing the class action settlement mechanism to obtain these rights, Google avoids the transaction costs that any potential competitor would have to incur. These transaction costs combined with the existing copyright laws would prevent any competitor from obtaining a similarly broad scope of rights. As a result, Google can create digital book collections, such as the book-search database and the Institutional Subscription database, that are more valuable because of the sheer number of included books, and which no competitor could possibly hope to replicate because no other company offering such programs could amass the legal rights to such a body of works absent a guarantee of an agreement as favorable as Google's. Accordingly, in its *amicus* brief opposing the settlement, Consumer Watchdog argued that the proposed class action settlement should not be approved because it would create a monopoly that violates Section 2 of the Sherman Act. (D.I. 263 at 18-24.)

The parties have eliminated the "most favored nations" clause, which provided that the Registry could not extend economic terms to other entities that were more favorable to the terms extended to Google, for ten years. (*See* S.A. § 3.8(a).) While this change seems designed to address some antitrust arguments, in fact its removal is not significant because the Registry is limited in what sort of licenses it may grant. The Registry may not license a complete body of "Books" to a competing subscription program, for example, because the Registry may not license "orphan" works. (*See* A.S.A. § 6.2 (allowing licenses only "to the extent permitted by law," which by definition excludes licensing "orphan" works without the Rightsholders' permission.) Even with this amendment, Google would still be the only player realistically able to market a book-subscription program or book-search database.

Thus, where it matters, the agreement remains unchanged, and the amended settlement suffers from the same fundamental monopolization problem as the original. Accordingly, Consumer Watchdog renews its argument that the settlement should be rejected because it would give Google an unlawful and anti-competitive monopoly. (D.I. 263 at 18-24.)

## III.   THE PROPOSED AMENDED SETTLEMENT IS AN UNCONSTITUTIONAL ATTEMPT TO REVISE THE RIGHTS AND REMEDIES OF U.S. COPYRIGHT LAW

In its original *amicus* brief, Consumer Watchdog urged this Court to resist the parties' invitation to overstep its jurisdictional authority and usurp Congress's constitutional mandate to enact copyright laws for the public's interest. (D.I. 263 at 7-14.) Consumer Watchdog renews this argument in its entirety, as none of the amendments solve the copyright concerns. In essence, the parties ask the Court to strip copyright protection from millions of books, putting the onus back on the copyright holders to step forward and reclaim their works. But this Court may not rewrite copyright law. Only Congress has "the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests" that must be balanced when amending the Copyright Act. *See Sony,* 464 U.S. at 429. The parties' proposed amended settlement ignores this Court's jurisdiction, and attempts to rewrite the existing statutory regime for the benefit of a single player—Google—and accordingly should be rejected.

## IV.   THE AMENDED SETTLEMENT CONTINUES TO CONFLICT WITH INTERNATIONAL COPYRIGHT LAWS

Consumer Watchdog and numerous other objectors argued that the original settlement proposed a scheme that is in clear violation of the international obligations of the United States under the Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886. (Paris Text 1971, as amended 1979), S. Treaty Doc. No. 99-27 (hereinafter "Berne Convention" or "Berne")). In particular, the Berne Convention specifically prohibits conditioning the

"enjoyment and the exercise" of copyright protection on compliance with formalities. Berne Art. 5(2). The settlement, however, attempted to impose requirements on international Authors and Publishers that are directly contrary to these anti-formality provisions. (*See* D.I. 263 at 14-18.)

One of the most significant revisions to the proposed settlement is that many international Authors and Publishers are now excluded from this settlement through the revised definition of "Book." (A.S.A. § 1.19.) But Rightsholders from Australia, Canada, and the United Kingdom— all countries that are signatories to the Berne Convention—are still included.[4] And authors from these countries would be subjected to the identical, and impermissible, "formalities" that were found in the original settlement. These foreign Rightsholders must still register with the Book Rights Registry, maintain contact with the Registry on an ongoing basis, and choose whether or not to participate in new (and future) "monetization opportunities," or otherwise appear in this Court to opt out of the agreement. (*See* A.S.A. § 3.5.) If foreign Authors or Publishers of "out-of-print" books fail to step forward, their works will be "monetized" by default—copied, distributed, and publicly displayed, in contrast to their current exclusive rights under 17 U.S.C. § 106—with the proceeds going to Google and various charities. (A.S.A. § 6.3(a).) Plainly, the failure to register with this Court (to opt out), or the Books Rights Registry (to claim profits) would continue to negatively impacts the foreign Rightsholders' "enjoyment" of their copyrights. Thus, while the worldwide scope of the settlement has been dampened, the settlement continues to raise significant and troubling international concerns.

Accordingly, the Court should not approve private legislation that would violate an international agreement and jeopardize the public's interest in international copyright relations

---

[4] *See* D.I. 769 at 4 ( "A work is now included in the settlement only if, by January 5, 2009, it has been registered with the United States Copyright Office, or published in Canada, the United Kingdom, or Australia.")

for the reasons set forth in Consumer Watchdog's original *amicus* brief. (D.I. 263 at 14-18.)

## V. THE AMENDED SETTLEMENT DOES NOT DO ENOUGH TO PROTECT READER PRIVACY

The parties added a provision that was apparently intended to assuage the privacy concerns of various objectors: "In no event will Google provide personally identifiable information about end users to the Registry other than as required by law or valid legal process." (A.S.A. § 6.6(f).) But this meager provision does not go far enough to protect the public's privacy.

As several objectors and commenters have noted, Google has the ability to collect nearly unlimited data about the activities of users of its Book Search and other programs, including users' search queries, the identity of books a particular user reads, how long that reader spends on each book, and even what particular pages were read. (*See, e.g.,* D.I. 281, D.I. 748.) This ability, combined with the very real possibility that the settlement will grant Google monopolistic control over the book-search and institutional-subscription markets, raises a very real threat to the privacy of "readers"—namely, the users of Google's book-search program and other book-related services. Other objectors previously argued that due to the lack of privacy protection, the proposed settlement threatened to create a chilling effect on readers in conflict with principles of free speech and in conflict with longstanding Federal precedent and many State laws protecting readers' privacy in libraries. (*See* D.I. 281, D.I. 748.)

The settlement still contains no restrictions on what data could be gathered, and contained only limited restrictions on how that data could be shared. Indeed, the current amendment merely restricts what data could be shared with the <u>Registry</u>, but otherwise remains silent about whether, and to what extent, the public's reading preferences could be shared with other organizations such as news outlets or governmental authorities acting without a search warrant.

And, while Google has publicly asserted that its current privacy policy will apply to its book activities,[5] that policy is voluntary by nature and subject to change at Google's whim.  If Google is to be granted a government-sanctioned monopoly in the book-search and book-subscription markets, its commitment to protecting reader privacy should be an explicit part of the settlement agreement.

## VI.    THE PUBLIC DESERVES A RULING ON THE QUESTION OF FAIR USE

Although courts typically favor settlements, this particular class-action case—which directly affects a significant portion of the public and has the potential to indirectly impact the entire public—might present the rare situation where the dispute should be adjudicated.

The parties appear unwilling to restrict the scope of the settlement to just Google's book-search program, and have included unnecessary "monetization opportunities" (such as the Institutional Subscription and Consumer Purchase programs) that raise significant fairness, jurisdictional, antitrust, and copyright concerns.  But even if those additional programs were eliminated, and the amended settlement were restricted to the actual conflict between the parties, Google would still be granted the exclusive right to create a monumental book-search database. This grant creates an impossible conflict between antitrust and copyright law.  If Google is given rights to include millions of books in its book-search database (save for the few written by authors that opted-out), it is essentially given a monopoly with which no competitor could hope to compete.  On the other hand, if Google or the Registry were (for example) given the ability to license a "book search" database to Google's competitors, this might solve the antitrust problem but it would only amplify copyright abuses and the harms done to owners of unclaimed works. Either way, a private settlement of this issue—at least as drafted by the parties—risks harming

---

[5] *See* http://books.google.com/googlebooks/privacy.html.

either the entire public or many of the class members.

Considering that parties seem unwilling to address these concerns, a better solution might be to resolve the underlying litigation dispute. The Plaintiffs contend that Google's copying and displaying copyrighted Books violates 17 U.S.C. § 106, while Google argues that such use is permitted under the fair-use doctrine. If, as Google claims, its search-engine activities are protected by fair use, a ruling on this matter would not only resolve the parties' conflict, but would (if resolved in Google's favor) allow the creation of a <u>competitive</u> book-search market, not one controlled solely by Google, who is already the market leader in on-line search engines. And as the facts do not appear to be in dispute, the question of fair use can likely be resolved through summary judgment, minimizing the impact on the parties. If the choice is between resolving the underlying fair-use question or instituting a monumental piece of private legislation, the former option is certainly in the best interests of the public.

As for the larger orphan-works problem, and whether any organization may offer a book-subscription database that includes unclaimed Books, this question is simply outside this Court's jurisdiction, and indeed cannot be solved through a class-action settlement. It is up to Congress to create a solution to the orphan-works problem that would allow all potential users to benefit, while protecting the copyright holders as well as international interests. If Google wants to offer subscriptions to a books-database, or wants to sell copies of individual books, it should have to go out and obtain the Rights from Rightsholders, just like any other potential market player. Any other solution would not serve the public's best interest.

<u>CONCLUSION</u>

The proposed Settlement Agreement would strip rights from millions of absent class members, in violation of national and international copyright law, for the sole benefit of Google. If, as Google claims, its "limited" search-engine activities are protected by fair use, the public

13

deserves an adjudication on this matter, to allow the creation of a competitive book-search

market.  And it is up to Congress to create a solution to the orphan-works problem that would

allow all potential users to benefit, while protecting the copyright holders as well as international

interests.  The parties simply cannot justify this "solution" which does not adequately protect the

Rightsholders and unfairly benefits a single party.  Accordingly, Consumer Watchdog

respectfully asks that the Court not approve the settlement.


Dated:   January 28, 2010          Respectfully submitted,

                                    /s/ Daniel J. Fetterman
                                   _____
                                   Daniel J. Fetterman
                                   Peter J. Toren
                                   Charlotte A. Pontillo
                                   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                   1633 Broadway
                                   New York, NY 10019
                                   Phone: (212) 506-1700
                                   Fax: (212) 506-1800

                                   *Attorneys for Amicus Consumer Watchdog*