Yasuhiro Saito, Esq.
Rose Auslander, Esq.
Pamela Shelinsky, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for Amicus Curiae the Japan P.E.N. Club*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
The Authors Guild, Inc., et al.,

               Plaintiffs,

               v.                          Case No. 05 CV 8136 (DC)

Google, Inc.,

               Defendant.
-----------------------------------------------------------x

# JAPAN P.E.N. CLUB'S *AMICUS CURIAE* BRIEF
# IN OPPOSITION TO AMENDED PROPOSED SETTLEMENT AGREEMENT

6559103.1

## INTRODUCTION

The last time we had an opportunity to be heard by this Court, the writers in Japan and elsewhere in the world were being suddenly forced into a commercial arrangement agreed among Google and other settlement proponents. Many writers raised their voices in opposition. Now, Google and the proponents of the settlement apparently want these voices quieted. Just as abruptly as they were forced in, the majority of the foreign writers and rightsholders originally included in the settlement class, have now been dropped from the settlement unceremoniously.

Dropping the majority of the foreign writers and rightsholders, however, does not solve the settlement's fundamental flaws. It simply adds another layer of complexity. Even with the narrowing of the settlement class, a great number of foreign writers and rightsholders are still left within the settlement. As applied to them directly, and to others indirectly, the Amended Proposed Settlement still fails to address the fundamental issues the writers worldwide are gravely concerned about.

This *amicus* brief will point out some of the key fundamental problems in the Amended Proposed Settlement -- as seen from the perspective of the writers and rightsholders in Japan especially and also elsewhere in the world.

## INTEREST OF *AMICUS CURIAE*

Founded in 1935, the Japan P.E.N. Club is a gathering of poets, playwrights, essayists, editors and novelists, who subscribe to the philosophy of seeking peace and opposing all forms of suppression of freedom of expression. The Japan P.E.N. Club has been a leader in Japanese literature and press throughout its history, carrying out all its activities based on the principles of independence and self-reliance. The leadership roles of the Japan

P.E.N. Club have been filled by some of the most influential and well-known novelists and writers of the era.

On September 8, 2009, twenty-two Japanese authors, who are the leaders and key committee members of the Japan P.E.N. Club filed an objection to the original proposed settlement.[1] That objection still stands. As a technical matter, that is so because the objecting writers include those whose works have been published in English and are covered by the Amended Settlement. And, as a matter of substance, the objection still stands because the Amended Settlement fails to address any of the fundamental concerns of the writers in Japan and elsewhere in the world.

The Japan P.E.N. Club has chosen to submit its position as an *amicus curiae* to call the Court's attention to some of current concerns of the writers and rightsholders in Japan -- including those who are newly cut out of the immediate impact of the settlement but will likely suffer long-term consequences from it, in addition to those still covered by the settlement.

## ARGUMENT

### I.
### THE AMENDED PROPOSED SETTLEMENT FAILS TO ADDRESS THE KEY CONCERNS OF WRITERS WORLDWIDE

**A.   Failure to Address Issues Raised in the Objection**

The Amended Settlement fails to address the key concerns raised by Japanese and other foreign rightsholders.

---

[1] Those who joined the September 8, 2009 objection include some of the most-respected and best-known authors in Japan, and are prominent names in Japan's publishing world. They are: Takashi Atouda (President, the Japan P.E.N. Club); Susumu Nakanishi (Vice President); Akiko Shimojyu (Vice President); Jiro Asada (Managing Director); Takeaki Hori (Executive Director); Yuko Matsumoto (Executive Director); Chihaya Takahashi (Executive Director); Shinobu Yoshioka (Executive Director); Kenta Yamada (Director; Chairperson, Freedom of Expression Committee); Tomotsuyo Aizawa (Director); Yu Ohara (Director); Yasumasa Kiyohara (Director); Takashi Tsujii (Director); Akira Nogami (Director); Hiroyuki Shinoda (Member, Freedom of Expression Committee); Toshihiko Yuasa (same); Koichi Kato (same); Masahiko Motoki (same); Hidehiko Nakanishi (same); Yashio Uemura (same); Nobuo Uda (same); and Tsukasa Yoshida (same).

For instance, the notice remains inadequate and defective. Instead of attempting to repair and redress the woefully defective notice given for the proposed original settlement, the settlement proponent simply added on a new notice limited to the amendment using the method similar to the one used before. To date, no Japanese translation of the settlement agreement has been provided, and the inaccurate and incomprehensible translation of the notice documents has never been corrected. As a result, many Japanese writers can still be swept into the settlement mechanism without knowledge. And it continues to be well-nigh impossible for a Japanese writer to understand the terms of the agreement -- written in a foreign language in legal jargon from a foreign land. It is unfathomable how Google and the other settlement proponents can expect each individual Japanese writer receiving the notice to translate the approximately 350-page settlement agreement and attachments for themselves, when the proponents -- despite their formidable resources -- find it too bothersome to translate it for the benefit of a large portion of writers and rightsholders in an entire nation. This is simply unacceptable.

Further, the class remains ill-defined and unmanageable. Many Japanese authors and publishers are struggling to find out whether they are covered under the terms of the Amended Settlement at a great expense of time and sometimes money to themselves.

As further noted below, adequacy of representation for the absentee foreign rightsholders also continues to be lacking. Rather than address the foreign writers' concerns regarding the lack of adequate representation, Google and the settlement proponents decided to remove a large majority of foreign writers from coverage under the settlement, as if to say, "Now you cannot complain." By taking this approach, and ignoring the concerns of a large number of foreign rightsholders who remain covered by the proposed settlement, Google and the settlement proponents' have demonstrated, once again, their callow attitude toward the affected rightsholders worldwide.

B.  **Continued Scanning of Foreign Copyrighted Materials**

While Google has taken a large section of Japanese writers out of the settlement, they have never indicated that they will stop scanning their books. To the contrary, it appears that Google is intent on going forward with scanning foreign copyrighted materials without respecting the essential principle of prior consent by authors and publishers. This is particularly troubling in the context of the potential monopoly Google is poised to obtain as a result of the settlement in the English-speaking world, and the vast market advantage Google will gain as a result in the rest of the world in digital book publishing.

C.  **Fundamental Problem Remains**

Most importantly, the Amended Settlement is unchanged in fundamental respects from the original settlement. It continues to make perverse use of the class action mechanism to impose a privately negotiated commercial arrangement on the rest of the world. And, by insisting on the "opt-out" regime, it continues to disregard the principle of prior consent in contravention of the Berne Convention and the laws of the various countries where these foreign writers are located.

Moreover, the settlement remains unchanged in that it creates a single point of control for books and other written materials on the web. This poses a significant threat to the freedom of expression. Google has already shown that it is willing to engage in censorship when asked by a governmental entity, such as the government of China. There can be no real assurance that Google or the Registry would not turn the control of the data or the process over to a government in the names of supposed national security or other critical national concerns.

## II.
## THE IMPACT OF THE SETTLEMENT WILL BE FELT IN THE REST OF THE WORLD, DESPITE THE ATTEMPT TO CARVE IT OUT

Seen from the rest of the world, the current proposed arrangement brings to mind an old Arabian proverb: "If the camel once gets his nose in the tent, his body will soon follow." While the proposed arrangement stops a step short of creating a world monopoly on digital books, it still gives Google an almost insurmountable market advantage worldwide in the world of digital book publishing, while granting it a monopoly at home in the United States and other English-speaking countries.

At least, the current proposed arrangement will give Google an enormous advantage – a footstep to forcing a similar "deal" – in foreign markets. How many foreign authors/publishers can realistically refuse, if Google comes to them (armed with approval of the current settlement) and says, "We are the biggest search engine and gateway into digital books in the world and in your country, and we already are the established 'standard' in the English-speaking world"? As things stand now, Google might also add, "Oh, by the way, we've already scanned all your books."

## III.
## THE AMENDED SETTLEMENT FURTHER DEMONSTRATES GOOGLE'S LACK OF RESPECT FOR THE RIGHTS OF JAPANESE AND OTHER FOREIGN WRITERS

In considering the overall fairness of the Amended Settlement, one cannot ignore the consistent and continuing lack of respect shown by Google and the settlement proponents (including the class counsel) toward Japanese and other foreign writers and rightsholders.

One day they claim they represent us -- and attempt to force all writers in Japan and in the world into a prearranged commercial arrangement. The next day the majority of us are cut out of the process -- in a transparent attempt to silence the most vocal voices in opposition to the settlement. And they still claim they represent the interest of many of us.

What is remarkable is that, through all this, no real attempt was ever made by Google or other proponents of the settlement to listen to the voices and discuss the concerns of the writers and publishers in Japan and in the rest of world. Instead of talking and working together with Japanese and other foreign rightsholders toward improving their position, the settlement proponents -- including the class counsel -- appear to have simply tried to force their own private agenda onto them and, when that failed, attempted to shut off their voices.

Such display of the callous handling of the interests of the rightsholders and the class members worldwide is obviously significant in considering the adequacy of representation. Furthermore, this pattern of conduct has a far more disturbing implication, when one considers that it has come from the very group that has asked to be and is attempting to be the single digital deposit of and gateway to all the books ever written in the world.

## IV.
## THE JAPAN P.E.N. CLUB'S BASE POSITION

The Amended Settlement poses a significant potential threat to freedom of speech worldwide, and threatens to undermine the fundamental rights of the writers and other rightsholders residing all over the world in one bold stroke. These fundamental problems -- as well as other concerns raised by Japanese and other foreign rightsholders -- must be addressed before the settlement can be approved.

The resolution of these fundamental issues cannot be attained without a transparent and frank discussion of the issues among all the stakeholders globally. From the perspective of Japanese writers, such discussion must start, at a minimum, with Google and/or the settlement proponents performing the following:

1) Translate the original and amended settlement agreements into Japanese, and present them to Japanese rightsholders;

2) Admit that the scanning of the books violated Japan's copyright law and the Berne Convention, and apologize to Japanese writers and rightsholders;

3) Destroy and delete the data from the books already scanned without prior consent, and confirm the destruction/deletion in writing -- and further address whether the scanned data can/should be returned to Japanese rightsholders without charge;

4) Promise never to scan books without prior consent;

5) Compensate Japanese rightsholders for the legal and other costs and expenses incurred in order to appear, respond or negotiate in connection with this action; and

6) Publish the minutes of discussions and decisions at the Registry, and provide Japanese translations of such minutes promptly, in light of the grave impact the Registry's decisions have on Japanese rightsholders.

## CONCLUSION

For each of the foregoing reasons, the Japan P.E.N. Club respectfully request that this Court reject the Amended Proposed Settlement.

Dated: New York, New York
January 28, 2010

                                      Respectfully submitted,

                                      CARTER LEDYARD & MILBURN LLP

                                      By: _____
                                            Yasuhiro Saito, Esq.
                                            Rose Auslander, Esq.
                                            Pamela Shelinsky, Esq.
2 Wall Street
New York, New York 10005
Tel: (212) 238-8614
Fax: (212) 732-3232
*Attorneys for amicus curiae the Japan P.E.N. Club*