UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

THE AUTHORS GUILD, INC., ASSOCIATION    :
OF AMERICAN PUBLISHERS, INC., et al.,    :
   :
   :
          Plaintiffs,    :
   :       No. 05 Civ. 8136 (DC)
        v.    :
   :
GOOGLE INC.,    :
          Defendant.    :
   :

------------------------------------------------------------- X

## OBJECTIONS OF ARLO GUTHRIE, JULIA WRIGHT, CATHERINE RYAN HYDE, AND EUGENE LINDEN TO PROPOSED CLASS ACTION SETTLEMENT AGREEMENT

DEVORE & DEMARCO LLP
Andrew C. DeVore (AD - 3511)
Amin Kassam (AK - 7860)
99 Park Avenue, 16th floor
New York, New York 10016
(212) 922-9499

*Attorneys for Class Members Arlo Guthrie,
Julia Wright, Catherine Ryan Hyde, and
Eugene Linden*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

I.   THE COMPLAINT ............................................................................................................ 2

II.  THE PARTIES ................................................................................................................... 3

III. THE SETTLEMENT AGREEMENT ............................................................................... 4

   A.   The Revenue Provisions ............................................................................................ 4

   B.   The Release of Trademark and Other Non-Copyright Claims ........................................ 5

   C.   The Release of Future Claims ...................................................................................... 7

   D.   The Exclusion of Authors from any Control Over or Revenue from Google's
       Exploitation of Non-Display Uses of Their Works ........................................................ 7

   E.   The Settlement Agreement Deprives Authors of Rights In and Control Over Inserts ...... 9

OBJECTIONS ......................................................................................................................... 10

I.   THE REPRESENTATIVE PLAINTIFF AUTHORS FAILED TO REPRESENT
     ADEQUATELY CRITICAL INTERESTS OF THE AUTHOR SUB-CLASS .................. 10

II.  THE AGREEMENT IMPERMISSIBLY RELEASES BOTH CLAIMS NOT ASSERTED
     IN THE COMPLAINT AND CLAIMS AS TO FUTURE CONDUCT .............................. 13

III. CERTAIN ASPECTS OF THE AGREEMENT ARE UNFAIR TO AUTHORS AND
     SHOULD BE CORRECTED BEFORE THE AGREEMENT IS APPROVED ................... 16

   A.   The Agreement Strips Authors of Control Over Non-Display Uses of Their Works And
       Unfairly Deprives Them of Any Revenue From Such Exploitations ............................... 18

   B.   The Agreement Strips Authors of Control Over Display Uses of Their Works ............... 21

   C.   The Agreement is Unfair to Authors of Inserts ............................................................ 21

   D.   The Agreement's Lack of External Controls Fails to Protect Authors from Potentially
       Discriminatory Practices by Google ............................................................................. 22

   E.   Defects in the Database Should Be Corrected Before the Agreement Is Approved ......... 23

   F.   The Agreement's Grant of an Irrevocable Perpetual License is Unfair to Authors .......... 24

**CONCLUSION** ..................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. v. Windsor,*
521 U.S. 591 (1997) ................................................................................................ 11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985) ................................................................................................ 24

*Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
504 F.3d 229 (2d Cir. 2007) .................................................................................. 10

*City of Detroit* v. *Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974) ............................................................................ 17, 18

*County of Suffolk v. Long Island Lighting Co.,*
907 F.2d 1295 (2d Cir. 1990) ................................................................................ 19

*D'Amato v. Deutsche Bank,*
236 F.3d 78 (2d Cir. 2001) .................................................................................... 17

*FPX, LLC v. Google, Inc. et al.,*
No. 05 Civ. 00142 (E.D. Tex. filed May 11, 2009) .............................................. 14

*In re Auction Houses Antitrust Litig.,*
No. 00 Civ. 0648, 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) .................. 16, 18, 19

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3d Cir. 1995) ............................................................................. passim

*Karvaly v. Ebay, Inc.,*
245 F.R.D. 71 (E.D.N.Y. 2007) ............................................................................. 14

*Malchman v. Davis,*
706 F.2d 426 (2d Cir. 1983) .................................................................................. 17

*National Super Spuds v. New York Mercantile Exch.,*
660 F.2d 9 (2d Cir. 1981) ............................................................................... passim

*Otter Tail Power Co. v. United States,*
410 U.S. 366 (1973) ............................................................................................... 24

*Rescuecom Corp. v. Google, Inc.,*
562 F.3d 123 (2d Cir. 2009) ............................................................................. 4, 14

*Schwartz v. Dallas Cowboys Football Club, Ltd.,*
157 F.Supp.2d 561 (E.D. Pa. 2001) ...................................................................... 15

*The Authors Guild, Inc., et. al. v. Google, Inc.*,
  No. 05 Civ. 8136 (DC) ........................................................................................................... 1

*UniSuper Ltd. v. News Corp.*,
  898 A.2d 344 (Del. Ch. 2006) ............................................................................................. 15

Class members Arlo Guthrie, Julia Wright, Catherine Ryan Hyde, and Eugene Linden (the "Objecting Authors"), by their attorneys DeVore & DeMarco LLP, respectfully submit these Objections to the proposed class action settlement reached in *The Authors Guild, Inc., et. al. v. Google, Inc*., No. 05 Civ. 8136 (DC) (the "Objections"), and to give notice that counsel will appear on their behalf at the October 7, 2009, fairness hearing.

## PRELIMINARY STATEMENT

The Settlement Agreement[1] would effect an extraordinarily complex allocation of rights and remedies in a digital marketplace that is inarguably in its infancy, strikingly fluid, and enormously valuable. The Agreement would grant Google alone rights in an unequaled repository of some substantial portion of recorded human knowledge, and substantial corresponding rights to exploit and generate revenue from those works. The Objecting Authors do not dispute that the Agreement would provide a public good by making a vast digital library publicly available. But they are gravely concerned that such potential good would come at a disproportionate and unfair cost to authors, and would unacceptably grant Google perpetual, irrevocable rights in their works.

The Objecting Authors are therefore compelled to raise the following objections to the Agreement: *First*, the Representative Plaintiff authors failed to represent adequately core interests of other members of the Author Sub-Class, releasing trademark and other valuable claims, undervaluing Inserts, and stripping authors of both control over and any revenue from Non-Display Uses of their works. *Second*, the Agreement impermissibly releases claims and authorizes future uses of authors' works that were not asserted in any complaint in this action. And, *third*, certain aspects of the Agreement – including provisions relating to Non-Display Uses, Display Uses, and Inserts, as well as the absence of controls on potential discrimination

---

[1]    Capitalized terms not otherwise defined have the meanings set forth in the Settlement Agreement.

against authors, gross defects in the Google Books Database, and the Agreement's grant to Google of an irrevocable, perpetual license – are so unfair to authors that the Agreement should not be approved unless and until they are corrected.

The Objecting Authors submit these objections for the Court's consideration as it deliberates the parties' motion for approval and class certification. The Objecting Authors also offer eight Proposed Solutions, listed in Appendix A to this memorandum, that if adopted would substantially ameliorate the concerns the Objecting Authors have identified.

## STATEMENT OF FACTS

I.      THE COMPLAINT

On September 20, 2005, plaintiffs the Author's Guild, Herbert Mitgang, Betty Miles, and Daniel Hoffman filed a complaint alleging copyright infringement arising out of Google's unauthorized scanning of millions of copyrighted books, inserts, and lyrics. Google continued to scan copyrighted works without authorization, had scanned approximately seven million works as of October 28, 2008, and projects that it will scan millions more over the coming years. (DeVore Decl. ¶ 2, Ex. A.) A Second Amended Complaint ("SAC") was filed on October 31, 2008, by the original plaintiffs and the Association of American Publishers, Inc., The McGraw-Hill Companies, Inc., Pearson Education, Inc., Simon & Schuster, Inc., John Wiley & Sons, Inc., Paul Dickson, and Joseph Goulden. Like the original complaint, the SAC is grounded solely in copyright infringement and seeks injunctive, declaratory, and monetary relief relating only to copyright infringement. (SAC ¶¶ 55-71.) Nowhere, in either complaint, did the plaintiffs allege claims for trademark infringement, other Lanham Act violations, state law publicity rights, tortious interference with contract, *prima facie* tort, or unfair competition.

II.    THE PARTIES

In addition to the publishing houses and associations, the plaintiffs include five individual authors (the "Named Plaintiffs").  The Named Plaintiffs have published approximately 160 works in total, the great majority of which appear to be out of print.  (DeVore Decl. ¶ 3, Exs. B1-5.)  They do not include any author who writes principally adult novels or short stories. (*See* SAC ¶¶ 12-17.)  Yet the Author Sub-Class includes every author in the world who has a U.S. copyright interest in a Book or Insert as of January 5, 2009, (Settlement Agreement ("SA") ¶¶ 1.38, 1.42), including such prolific and widely-known authors as Catherine Ryan Hyde, Richard Wright, and Phillip K. Dick.  (*See* Declarations of Catherine Ryan Hyde, Julia Wright, and Laura Leslie.) [2]  The handful of Named Plaintiffs thus represent a mere fraction of the millions of authors whose works Google has already scanned.

Google operates the most popular search engine in the United States.  (DeVore Decl. ¶ 4, Ex. C.)  Over the last twelve months, Americans used Google for more than 78 percent of all web searches.  (*Id*.)  Google's primary source of revenue is online advertising, which accounted for 97 percent of its $5.5 billion in revenue in the second quarter of 2009.  (*Id*. ¶ 5, Ex. D at 31.)  Google has a dominant position in the market for both search engine advertising (accounting for approximately 76 percent of all such revenue), and the overall market for online advertisements.  (*Id*. ¶ 6, Ex. E.)

Google derives much of its substantial revenue from its "AdWords" program for online advertising.  Under AdWords, advertisers buy "keywords" as well as advertising space from Google to be displayed alongside Google search results.  (*Id*. ¶ 7, Ex. F.)  When a user searches for one of the purchased keywords, the purchaser's advertisement is displayed as a

---

[2]    The Estates of Philip K. Dick and Richard Wright have opted out of the Agreement.  Their Declarations are offered only to provide the Court with additional facts relating to the Agreement and its effects.

"Sponsored Link" on the same page as the search results. (*Id.* ¶ 8, Ex. G.) The purchased keyword may not appear in the text of the advertisement, and its use thus may not be apparent to the user. (*Id.* ¶ 9, Ex. H.) Although the Second Circuit has recently held that the use of AdWords in precisely this manner constitutes a "use in commerce" under the Lanham Act, *see Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127-31 (2d Cir. 2009), Google's policy is to allow trademarks to be purchased and used as keywords by entities other than the trademark owner. (DeVore Decl. ¶ 9, Ex. H.)

## III.    THE SETTLEMENT AGREEMENT

Since the case was filed, the parties have devoted themselves largely to settlement. (*Id.* ¶ 10.) The Objecting Authors are particularly concerned about the provisions of the Settlement Agreement described below.

### A.    The Revenue Provisions

The Agreement will compensate authors in three ways for Google's past infringement and all future uses of their works in Google Book Search ("GBS"). (SA § 2.1; *see generally* Art. IV; Attach. C.) *First*, in compensation for its past infringements, Google will pay each author a one-time payment of $60 per Book, $15 per Insert, and $5 per Partial Insert. (SA § 5.1(a).) These amounts are strikingly small, particularly given the extraordinarily wide range of works covered by the Agreement.

*Second*, Google will pay the Books Rights Registry ("Registry") 63% of gross revenue for certain future exploitations of authors' works, including among other things, Institutional Subscriptions, limited Advertising Uses, and other Revenue Models. (SA § 4.5, 4.7.) From that 63%, the Registry will further deduct an administrative fee, estimated to be between 10% and 20%. (*See* Notice, question 8.) At 20%, that fee would leave authors with 50.4% to share with their agents and publishers. Insert authors *do not share in that revenue*, but

instead are consigned to accept a small fee, solely for inclusion of their works in Institutional Subscriptions, of "no less than US $50 per Entire Insert and US $25 per Partial Insert" subject to a lifetime cap of $500. (SA, Attach. C § 1.2(a), (b), (h).) This amount is woefully inadequate for authors such as Catherine Ryan Hyde and Eugene Linden, who may be paid as much as $1,000 or $1,500 for the inclusion of just one of their works in a larger work, vastly more than the amount they would get for Google's past infringement and all future uses of their works. (Hyde Decl. ¶ 4(d); Linden Decl. ¶ 3(d).)

*Third*, the Agreement uses this same formula to distribute the revenue Book authors will receive for certain limited Advertising Uses of their works. (SA § 3.14.)

These payment provisions are far more limited than they might appear. Book Authors will receive no revenue whatsoever for advertising run alongside their works unless that advertising appears on an Online Book Page, meaning one Web page dedicated to a single Book. (SA §§ 1.97, 2.1(a), 3.14.) Thus, unless the ads appear on Online Book Pages, Book authors can expect no revenue from advertising against untold numbers of Snippet views of their works, *including Snippet views licensed by Google to appear on untold numbers of third-party Web sites*. (SA §§ 1.97, 2.1(a), 3.9, 3.14.) Insert authors can expect *no revenue at all* from advertising against their works. (*Id.*) Moreover, no author will derive any revenue whatsoever from what may be extremely lucrative Non-Display Uses of their works. (SA § IV.) Thus, for example, despite the demonstrated value of Google's AdWords program, authors will get no revenue from advertisements run against Google search results relating to searches for their works, even if their works are the sole result of such searches. (SA § 3.14.)

B.  The Release of Trademark and Other Non-Copyright Claims

Although this has always been exclusively a copyright case, the Agreement purports to release "each and every Claim of every Rightsholder that has been or could have

been asserted in the Action against any Google Releasee (including all Claims of copyright infringement, trademark infringement, or moral rights violation)" that arise out of all future uses of authors' works. (SA §§ 10.1 (b), (d), (f), (h), (j), 10.2(a).) As a result, the Agreement strips authors of any ability to protect against damaging future uses of their intellectual property through claims such as trademark, right of publicity, non-disparagement, and tortious interference.

This broad release raises substantial concerns for all authors, and particularly for those who have a large and popular body of in-print works and may have trademark rights in their names and titles. For instance, Catherine Ryan Hyde's novel *Pay it Forward* was adapted and released as a major Hollywood movie, and a film adaptation of another of her novels, *Electric God*, is currently in development. (Hyde Decl. ¶ 3.) Hyde also has trademark rights in her non-profit Pay it Forward Foundation, which provides grants to schools, churches, and community groups for projects designed to provide learning opportunities for young adults. (Hyde Decl. ¶ 4(f).) In addition, the Estate of Philip K. Dick has worked hard to register and protect its trademark rights in the Estate's works. (Leslie Decl. ¶ 4(d).)

Because it is so broad and untethered from the underlying dispute, the release effectively bars authors from preventing objectionable uses of their works and names in connection with GBS. (SA §§ 10.1 (b), (d), (f), (h), (j), 10.2(a).) For example, Google may allow advertisements to appear alongside works that are harmful to an author's reputation or contrary to their core philosophical or political principles; bury an author's own web site far down in search results in response to a search for that author's works; allow *third-party websites* to run Snippets against objectionable content on those sites, (SA §3.9); or make other objectionable uses of authors' works. (SA §§ 1.63, 2.2 (authorizing Google to use works

"*directly or indirectly through third parties*") (emphasis supplied).) Stripped of independent

legal rights, authors' only recourse would be to Remove or Exclude their works, (SA, §§ 3.5(a),

(b)), but exercise of that limited right would deprive authors of both the unequaled exposure that

Google search offers and potential revenue from Google's digital exploitation of their works.[3]

(Guthrie Decl. ¶ 4(b), Hyde Decl. 4(g), Linden Decl. ¶ 3(c), Wright Decl. ¶ 3(e).)

  C. <u>The Release of Future Claims</u>

    The Settlement Agreement also provides unfettered discretion to Google to make

additional exploitations of authors' works, many unknown and undefined, (*see, e.g.*, SA

§§ 3.7(c) ("Additional Contemplated Rightsholder Services Provider"), 4.1(a)(ix) ("Adjunct

Products"), 4.7 ("New Revenue Models")), yet releases Google from any claims based on such

future exploitations. It also releases non-parties from future claims. (SA § 3.7(c), 3.9.)

Moreover, with the consent of the Registry alone, Google may proceed with those unknown

future New Revenue Models even without authors' consent. (*Id.*) For Inserts, Google is not

required to obtain any consent whatsoever. (*Id.*) The SAC did not allege infringement for any of

these uses – nor could it – because they all are future exploitations, many still unknown today.

(*See* SAC ¶ 4.)

  D. The Exclusion of Authors from any Control Over or Revenue from
    <u>Google's Exploitation of Non-Display Uses of Their Works</u>

    The Agreement affords authors no control whatsoever over Non-Display Uses of

their works, and no compensation for such uses. (*See* SA, Attach. C.) Instead, authors' only

option is to attempt to prevent Non-Display Uses of their works completely through "Removal."

(SA §§ 1.124, 3.5(a).) But that option is not available at all to authors of Inserts, (SA §§ 3.5(a)),

and even Book authors lose that right after April 5, 2011. (SA § 3.5(a)(iii).) Moreover, for

---

[3] These harms would be compounded dramatically if, as widely expected, approval of the
Agreement made Google the universal digital marketplace for literary works. (*See* Section III.D below.)

authors who believe that GBS offers a real opportunity to give wide exposure to their works, both "Removal" and "Exclusion" eliminate entirely that potential benefit. (Linden Decl. ¶ 3, Hyde Decl. ¶ 4.)

Non-Display Uses are uses that do not involve the display of content from a Book to the public. (SA § 1.91.) Examples in the Agreement include the display of bibliographic information, full-text indexing (without displaying text), geographic indexing of Books, algorithmic listings of key terms for chapters of Books, *and internal research and development at Google*. (SA § 1.91.) Those examples are non-exclusive, however, and the Agreement leaves Google free to develop and exploit additional, undisclosed Non-Display Uses, all without compensation to authors. Indeed, the only limitation on Non-Display exploitations is that they "do not display Expression from Digital Copies of Books or Inserts to the public." (SA § 1.91.)

One obvious example of an undisclosed Non-Display Use might well be sales of book titles, key lines or portions of text, or authors' names in Google's AdWords program. Additional examples might include personalized advertising, which has been described as the "holy grail" of the search industry. (DeVore Decl. ¶ 11, Ex. I.) Google's CEO Eric Schmidt has acknowledged that using data such as this vast database of written works to "get better at personalization" is key to Google's continued growth. (*Id*.) The Agreement contains no restrictions on Google's ability to do just that through Non-Display Uses of authors' works, or even on the sale of information derived directly from these works. (*See* Section III.A below.) Google has explicitly acknowledged the value of the Database for such purposes.[4] (DeVore

---

[4]    Other tech-savvy industry commentators have also concluded that Non-Display Uses likely "will end up being far more important than anything else in the agreement. Imagine the kinds of things that data mining all the world's books might let Google's engineers build: automated translation, optical character recognition, voice recognition algorithms. And those are just the things we can think of today." (Devore Decl. ¶ 12, Ex. J.)

Decl. ¶ 13, Ex. K ("We're not scanning all those books to be read by people. We're scanning them to be read by [our] AI [Artificial Intelligence].").)

      E.      **The Settlement Agreement Deprives Authors of**
                    <u>**Rights In and Control Over Inserts**</u>

The Settlement Agreement raises particular problems with regard to the treatment of Inserts and Partial Inserts. Inserts include, for example, contributions to books, works in collections, and privately and self-published works. (SA § 1.72.)

Serious problems with the Google Books Database (the "Database") make it difficult to determine which Works are included as Inserts and Partial Inserts, and nearly impossible for Authors with many Inserts even to make the initial determination of how much money they will receive for past infringement under the Agreement. (Hyde Decl. ¶ 4(b); Linden Decl. ¶ 3(e); Leslie Decl. ¶ 4(e).) For example, when Catherine Ryan Hyde first searched the Database, she found her works and claimed them per the instructions. (Hyde Decl. ¶ 4(c).) When she went back to the Database a week later, she found *nine additional works identified as unclaimed.* (*Id.*) *Subsequent efforts revealed between forty-two and sixty-nine works in the Database.* (*Id.*) She has found the Database to include so much inaccurate and incomprehensible information as to be "remarkably burdensome, time-consuming and frustrating." (*Id.*) Eugene Linden has had similar problems. (Linden Decl. ¶ 3(e).) He has written hundreds of articles and essays which would take him days to identify in the Database and, to the extent he has been able to identify his works, he too has found significant errors.[5] (*Id.*) Representatives of The Authors Guild and the Association of American Publishers have admitted that the Database is badly and unacceptably flawed. (Hyde Decl. ¶ 4(c).)

---

[5]      Rightsholders for other authors of numerous Books and Inserts, such as the Estates of Phillip K. Dick and Richard Wright, have found the Database so unusable that it contributed to their decision to opt-out. (Leslie Decl. ¶ 4(e); Wright Decl. ¶ 3(g).)

Moreover, unlike Book authors, Insert authors may only Exclude their works from all, but not less than all, Display Uses, (SA § 3.5(b)(i)), and may not exclude their works from further sales by Google if the author of the Book containing those works agrees to such sales.  (SA § 1.131.)

## **OBJECTIONS**

I.    THE REPRESENTATIVE PLAINTIFF AUTHORS FAILED TO REPRESENT ADEQUATELY CRITICAL INTERESTS OF THE AUTHOR SUB-CLASS

The Objecting Authors are critically concerned that the Named Plaintiffs failed to represent adequately core interests of other members of the Author Sub-Class, and consequently agreed to terms that unnecessarily and unfairly impair authors' rights and interests.  Specifically, the Agreement (a) improperly releases trademark and other claims the Named Plaintiffs did not have, (b) dramatically undervalues the past infringement and future uses of Inserts, and (c) strips authors completely of control over, or participation in the potentially significant revenue Google will derive from, Non-DisplayUses of their works.

Federal Rule of Civil Procedure 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class."  In considering adequacy, one concern is whether a representative has an interest that conflicts with the rest of the class.  *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007).  Such conflicts are most easily identified in the proposed settlement itself.  *National Super Spuds v. New York Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981) ("The inadequacy of the representation provided by the named plaintiffs is apparent from the examination of the settlement itself.").

In *National Super Spuds*, the Second Circuit reversed the district court's class certification decision because the named plaintiffs had not adequately represented the interests of

all class members.  This inadequacy was apparent on the face of the settlement agreement's release of claims, which related to unliquidated contracts that were not, and could not have been, identified in the complaint because the named plaintiffs did not have such claims.  *See also Amchem Prods. v. Windsor*, 521 U.S. 591, 604 (1997) (upholding denial of class certification due to inadequate representation of class members exposed to asbestos but not yet suffering apparent injury, ruling that the interests of the class were not aligned because, as for the currently injured, "the critical goal is generous immediate payments," but the interests of the exposure-only plaintiffs is "in ensuring an ample, inflation protected fund for the future"); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) (reversing class certification because named plaintiffs "had no incentive to maximize the recovery" of other class members as reflected in disparity in settlement benefits).

While none of the Named Plaintiffs appear to have a demonstrable trademark interest in any of their works, that is not true for many other authors, particularly those who have licensed their works for movies, television programming, charities, and other uses.  For example, Catherine Ryan Hyde's novel *Pay It Forward* was adapted and released as a major Hollywood movie, *Electric God* has been adapted for film and is currently in development, and she has protectable trademark rights in her non-profit Pay It Forward Foundation.  (Hyde Decl. ¶ 4(f).) The Estate of Philip K. Dick similarly has protectable trademark rights in its works.  (Leslie Decl. ¶ 4(d).)  Yet the Agreement purports to release any and all claims of any rightsholder relating to any use of their work pursuant to the Agreement, including but not limited to trademark claims.  (SA, Art. X.)  The substantial overbreadth of this release alone demonstrates that the Named Plaintiffs "had no incentive to maximize the recovery" for those claims, *In re*

*General Motors Corp.*, 55 F.3d at 801, and failed to represent those claims adequately on behalf of the Objecting Authors and other class members absent from the negotiations.

The Named Plaintiffs also failed to attach meaningful value to the exploitation of Inserts.  Under the Agreement, Insert authors are consigned to accept $15 for Google's past infringement of their works, and a small Inclusion Fee of "no less than US $50 per Entire Insert and US $25 per Partial Insert" solely for future subscription uses of those works and *subject to a cap of $500 for all uses ever*.  (SA, Attach. C § 1.2(a), (b), (h).)  Yet authors like Catherine Ryan Hyde and Eugene Linden may command as much as $1,000 or $1,500 for the inclusion of just one of their works in a larger work.  (Hyde Decl. ¶ 4(d); Linden Decl. ¶ 3(d).)  Moreover, Insert authors are afforded merely the right to Exclude their works from all – but not less than all – Display Uses, and have no right to Remove or Exclude them from Revenue Models.  (SA §§ 3.5(a)(i), 3.5(b)(i).)  Because the Named Plaintiffs do not include an author who writes principally short stories, they lacked the incentive to maximize either the recovery for or control over uses of Inserts, and did not adequately represent the interests of absent class members in this respect.

The Named Plaintiffs also appear to have ignored both the critical issue of control over Non-Display Uses of their works and the potentially enormous value of such uses.  Such uses are at the very core of Google's powerful revenue engine, which produced $5.5 billion in total revenue in the first quarter of 2009, 97% of which was derived from advertising, much of that through the lucrative *but "non-display"* AdWords program.  (DeVore Decl. ¶ 5.)

Under the Agreement, authors' only recourse as to Non-Display Uses is to Remove their works entirely from GBS, (SA §§ 2.1, 3.5(a)), an option not available at all to Insert authors, (*id.*), and as demonstrated in Section III.A below, *an option that does not appear*

*to prevent Google from making Non-Display Uses of their works*.  Moreover, the Agreement carefully carves authors out from any participation whatsoever in the proceeds derived from such uses through advertising and other exploitations.  (SA § 1.131, Attach. C.)  It is a certainty that not only such well-known titles as *Pay It Forward* but portions of an untold number of other works will be purchased by advertisers for use in the AdWords program.[6]  Google can be expected to make many other undisclosed but extremely valuable Non-Display Uses of authors' works as well.  (*See* Section III.A below).)  The absence of any compensation to authors for such uses demonstrates that the Named Plaintiffs did not adequately represent the interests of the Objecting Authors and other absent class members in this respect.

II.    THE AGREEMENT IMPERMISSIBLY RELEASES BOTH CLAIMS NOT
       ASSERTED IN THE COMPLAINT AND CLAIMS AS TO FUTURE CONDUCT

The overbroad release of claims in the Agreement not only threatens serious harm to the Objecting Authors and other absent class members, but is contrary to the well-established principle that a class action settlement may not release claims not asserted in the complaint.  "If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." *National Super Spuds*, 660 F.2d at 18.  "An advantage to a class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the claims asserted by the class."  *Id*; *see also Karvaly v. Ebay, Inc.*, 245 F.R.D. 71, 83 (E.D.N.Y. 2007) (refusing to certify class action where "expansive general release would extinguish many claims unrelated to the claims alleged in the . . . . Complaint").

The Agreement here requires the release of "each and every Claim of every

---

[6]    Indeed, a search for "*Pay It Forward*" produces several "Sponsored Links" for movie sales websites, demonstrating that Google is already selling that title as a keyword.  (DeVore Decl. ¶ 14, Ex. L.)

Rightsholder that has been or could have been asserted in the Action against any Google Releasee (including all Claims of copyright infringement, trademark infringement, or moral rights violation)" that arises out of uses of authors' works. (SA § 10.1(f).) This expansive release bars class members from protecting their most fundamental intellectual property rights, including for example the trademark interests of Catherine Ryan Hyde.[7] Such claims simply were not asserted in the SAC. Moreover, the release would preclude authors from pursuing any number of other claims commonly associated with full protection of their intellectual property rights – including for example right of publicity, disparagement, and tortious interference claims – that also were not alleged. This release unfairly limits the Objecting Authors' rights relating not only to the potential uses of their works disclosed in the Agreement, but the unforeseen and undisclosed future uses available to Google and the Registry under the Agreement.[8]

The Agreement compounds the harm of releasing *claims* not asserted in the complaint by further explicitly releasing claims based on unalleged *future conduct*. Such a release is likewise impermissible. *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F.Supp.2d 561, 578 (E.D. Pa. 2001) (release is impermissibly broad if it "bars later claims based on future conduct"; rejecting proposed agreement releasing defendant from all claims relating to broadcasting NFL games by any means where complaint alleged misconduct relating only to satellite broadcasts); *see also*, *National Super Spuds*, 660 F.2d at 17-18; *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006).

Here, the Agreement releases defendants from any claims based on future sales by Google of Institutional Subscriptions or to individual consumers. (SA §§ 3.7(c), 4.1, 4.2.) It

---

[7]     It would also remarkably immunize Google from trademark claims by authors of the type currently being litigated against it in this Circuit and other courts. *See, e.g., Rescuecom*, 562 F.3d at 127-31; *FPX, LLC v. Google, Inc. et al.*, No. 05 Civ. 00142 (E.D. Tex. filed May 11, 2009).

[8]     *See* App. A ¶ 1 (Proposed Solution 1).

also remarkably expands that release to free Google from any liability for future infringements or other harms relating to New Revenue Models such as Print on Demand, Custom Publishing, PDF Download, and Consumer Subscription Models. (*See* SA § 4.7.) Not one of these exploitations of authors' valuable intellectual property was alleged in the SAC, nor could they have been; they are exclusively *future exploitations* not at issue and not properly subject to disposition in this case. *Schwartz*, 157 F.Supp.2d at 578.

The Objecting Authors' concern about releasing unalleged future conduct is particularly acute here because the Agreement also *purports to allow Google to license certain displays of authors' works for third-party use* and *contains no limitation whatsoever on the right to develop New Revenue Models*. Section 3.9 provides that when Google has the right to make any Snippet Display under the Agreement, it "may also allow third parties that have entered into agreements with Google . . . to display snippets served by Google on their websites in response to user interactions on their websites and . . . for future display on their websites in response to user interactions." (*See also* SA §§ 1.63, 2.2 (authorizing Google to use works "directly or indirectly through third parties").) While Section 4.7 lists the future New Revenue Models set forth above, that list is non-exhaustive, and plainly contemplates that Google may offer any other New Revenue Models with the authority of the Registry *or* Rightsholders. [9] (*See* SA § 4.7(e).) Because this consent requirement is written in the disjunctive, such that the Registry may consent to future exploitations even without Rightsholder consent, it offers little comfort to the authors whose works will be exploited.

---

[9] This is another compelling example of the severe disadvantages the Agreement would impose on Insert authors. With respect to *Books*, Section 4.7 would at least constrain Google to obtain the consent of either the Registry or the author to exploit brand-new, undisclosed New Revenue Models. (*See* SA § 4.7.) That Section contains no comparable limitation with regard to *Inserts*, effectively leaving Google free to pursue such exploitations unilaterally without consent.

The Objecting Authors believe that these wide releases as to future conduct – as articulated in the Agreement and as yet undisclosed – would severely prejudice their rights to control their works in this massive but largely unexplored area of electronic commerce.[10]

III.  CERTAIN ASPECTS OF THE AGREEMENT ARE UNFAIR TO AUTHORS
      AND SHOULD BE CORRECTED BEFORE THE AGREEMENT IS APPROVED

The critical judgment a court called upon to approve or disapprove a class action settlement must make "is whether the settlement is fair, adequate, and reasonable to class members, a standard that includes both procedural and substantive components." *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648, 2001 WL 170792, at *5-6 (S.D.N.Y. Feb. 22, 2001) (citing *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983) and *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85-86 (2d Cir. 2001)).  In making this judgment, the Court "must eschew any rubber stamp approval in favor of an independent evaluation, yet . . . stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit* v. *Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir. 1974).  Because class actions typically involve monetary compensation for *past* harms, *Grinnell* directs the Court to perform that independent evaluation relative to nine factors focusing on the potential risks of the underlying litigation and the sufficiency of the settlement fund to provide fair compensation.[11]  *Grinnell*, 495 F.2d at 462-63.

Because this Agreement effects a perpetual *future* license to allow a dizzying array of *future* exploitations of authors' works, however, the Objecting Authors believe that the

---

[10]     *See* App. A ¶ 2 (Proposed Solution 2).
[11]     The nine *Grinnell* factors are:  "(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation."  *Grinnell*, 495 F.2d at 463 (internal citations omitted).

eighth *Grinnell* factor also easily encompasses their core concern in this case: the fairness of the *settlement itself* in light of the best possible recovery.[12]  *Id.*  Indeed, such essential but non-monetary factors may well be sufficiently unfair to justify rejection of the agreement.  *See, e.g.*, *In re General Motors*, 55 F.3d at 808-10 (reversing lower court's approval of class settlement because proposed agreement was unfair to certain segments of class).  In *General Motors*, a products liability action based on alleged defects in truck fuel tanks, the proposed settlement offered a $500 coupon and other compensation to each class member to purchase a new truck within fifteen months of the settlement.  *Id.*  The Third Circuit reversed in part because the lower court failed to consider that certain class members, such as those who did not have $10,000 on hand to buy a new truck within fifteen months, would be unable to use those coupons.  *Id.* at 808, 810 (ruling that the coupons "simply do not address the safety defect that formed the central basis of the amended complaint").  The court thus concluded that the fact that settlement "benefits certain groups of the class more than others suggests that the district court did not adequately discharge its duties to safeguard the interests of the absentees."  *Id.* at 808.

Moreover, in addition to analysis of the *Grinnell* factors, a court confronted with specific objections to a proposed class action settlement must evaluate the merits of those objections.  *See, e.g.*, *In re Auction Houses.*, 2001 WL 170792, at *18 (modifying proposed settlement to address objections); *National Super Spuds*, 660 F.2d at 19; *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir. 1990).

The Objecting Authors believe that, if not corrected, the following aspects of the proposed Agreement would violate Federal Rule of Civil Procedure 23, the Due Process clause

---

[12]  In the typical class action settlement involving payment for past harms, the inquiry into this element measures the *value* of the settlement "to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case."  *In re General Motors*, 55 F.3d at 806 (*citing Grinnell*, 495 F.2d at 463).

of the U.S. Constitution, and the fundamental requirement that the Agreement must be "fair, adequate, and reasonable to class members."  *In re General Motors*, 55 F.3d at 806-10; *In re Auction Houses*, 2001 WL 170792, at *5-6; *see also National Super Spuds*, 660 F.2d at 19.

A.    The Agreement Strips Authors of Control Over Non-Display Uses of Their Works <u>And Unfairly Deprives Them of Any Revenue From Such Exploitations</u>

The Agreement grants Google almost unfettered rights to exploit and profit from Non-Display Uses of authors' works.[13]  Authors' only recourse to Non-Display exploitations is to remove their works entirely from GBS.  (SA § 3.5(a).)  As noted above, however, that option is not available at all to Insert authors, (*id.*), and likely is illusory for Book authors as well because (a) the option terminates even for Book authors as of April 5, 2011, and (b) *nothing in the Agreement dictates that removal shall prevent Google from making Non-Display Uses of an author's Book*.  "Removed" is defined as a process by which "Digital Copies" of a book are rendered inaccessible.  (SA § 1.124.)  That definition contains no prohibition on Google making Non-Display Uses.  To the contrary, since "Digital Copy" refers only to a particular set of "electronic files created by or for Google or provided to Google in connection with GBS," (SA § 1.44), Removal would not prevent Google from generating additional electronic records relating to Books or Inserts (such as word or content analysis or even selected portions of text), and using such records to make Non-Display Uses of those works.  Google would never need to access a "Digital Copy" in order to exploit the content of such files.  Moreover, because the examples of Non-Display Uses set forth in the Agreement are non-exclusive, (SA § 1.91), the Agreement places no limit on the nature or quantity of such uses Google may exploit.

---

[13]    As noted in Section I above, the Named Plaintiff authors appear to have missed the issues regarding Non-Display Uses entirely.  Regrettably, these issues may have largely escaped public scrutiny as well, perhaps due to the fact that "Non-Display Use" – a term meaningless to all but those steeped in the language of the Agreement – is once defined but never analyzed in the Notice.

The risk of unchecked and uncompensated Non-Display Uses has enormous consequences for authors. In perhaps the most obvious example, the Agreement places no limit on Non-Display Uses of authors' works in Google's lucrative AdWords program, and affords authors no compensation for such uses. Given the fact that AdWords generated some substantial portion of $5.5 billion in total revenue for Google in the first quarter of 2009 alone, that omission is plainly to authors' substantial financial detriment. But the real harm of such uses may be even greater, as the absence of any right to control such uses might well result in advertisements being positioned next to or associated with authors' works in ways that are objectionable, offensive, or harmful to the author. For example, Catherine Ryan Hyde's non-profit Pay It Forward Foundation would be substantially harmed if advertisements for groups alleging charity fraud appeared alongside Snippets or any other displays of her book *Pay It Forward*. (Hyde Decl. ¶ 4(g).) Or authors and estates associated with issues of racial equality such as Julia and Richard Wright would be harmed if advertisements for groups expressing contrary views, or for groups attempting to create a false appearance of endorsement, appeared alongside their works. (Wright Decl. ¶ 3(e).)

There are numerous other powerful examples of Non-Display Uses that could cause substantial harms to authors. Personalized advertising has been characterized as the "holy grail" for the search industry, and Google's CEO has confirmed that improving personalization is essential to Google's continued expansion. (DeVore Decl. ¶ 11.) Absent any constraint on Non-Display Uses, nothing in the Agreement could stop Google from analyzing the entire works of a particular author then selling those analytical results to third-party behavioral advertisers so that they could direct ads to people running searches for that author's works. Nor could anything stop Google from analyzing all books in the database and selling the right to advertisers or others

to run searches for authors associated with particular topics or points of view. Or, more chilling, Google could analyze and sell data regarding who is reading which works by what authors or relating to which subjects.[14] The risk that authors' works might be put to such uses is not speculative, but real; as another Google employee has acknowledged: "We're not scanning all those books to be read by people. We're scanning them to be read by [our] AI [Artificial Intelligence]." (DeVore Decl. ¶ 13.) Google may well maintain that it would not engage in any one of these objectionable uses; if so, it should not object to making that commitment binding in the Agreement.

The Agreement also deprives authors of any compensation for Non-Display Uses, even for plainly compensable and easily tracked uses such as AdWords. Worse, the Agreement dangerously compounds each of these serious potential harms by stripping authors of any right to sue Google for any reason in connection with such uses. (*See* SA §§ 10.1, 10.2.) In short, granting Google an irrevocable license to exploit such uses – particularly in a market that is in its infancy with regard to both how authors' creative works will be exploited and how authors will be compensated for those uses – is grossly unfair to authors.[15] (*See* Hyde Decl. ¶ 4(h).)

Moreover, "opting out" is not a meaningful response to this or the other Objections. Opting out deprives authors – who typically simply do not have the resources to take Google on in independent litigation – from participating in any of the potential benefits of having their works appear in Google's dominant search engine, including increased exposure and potential revenue. Indeed, were the Settlement approved, Google may well become the only place to go for digital book search. In any event, the right to opt out "does not relieve the court

---

[14]     Given the substantial risks such privacy concerns pose, the Objecting Authors join in, and hereby incorporate by reference, the objections filed by the Electronic Frontier Foundation addressing these concerns.

[15]     *See* App. A ¶ 3 (Proposed Solution 3).

of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class." *In re General Motors,* 55 F.3d at 809.

B.    The Agreement Strips Authors of Control Over Display Uses of Their Works

In a related concern, the Objecting Authors further object because the Agreement would allow Google to sell advertising objectionable to authors against Display Uses of their works. (*See* SA § 1.48.) Other than a limitation on pop-up and pop-under advertisements, (SA § 3.10(c)(iii)), the Agreement places no limits on the kinds of advertisements run next to authors' works. As demonstrated above, such advertising might be offensive to authors and damaging to their rights and reputations. Unlike Non-Display Uses, authors can prevent *all* advertising against particular works by Removing or Excluding those works from Display Uses. (SA § 3.5(a)(i), (b)(I).) As discussed above, however, doing so would eviscerate the principal benefits of remaining in the Settlement, including increased exposure through Display Uses of an authors' works – the demonstrated power of Google search – and sharing in revenue generated from associated advertising.[16] (*See* Linden Decl. ¶ 3.)

C.    The Agreement is Unfair to Authors of Inserts

As demonstrated in Section I above, the Agreement is unfair to authors of Inserts such as Catherine Ryan Hyde and Eugene Linden. The $15 for Google's past infringement of Inserts, and the small "Inclusion Fee" of "no less than US $50 per Entire Insert and US $25 per Partial Insert" in subscriptions, (SA Attach. C, § 1.2(a), (b), (h)), are mere fractions of the more than $1,000 or $1,500 such authors may be paid for their works. (Hyde Decl. ¶ 4(d); Linden Decl. ¶ 3(d).) And there is no justification – other than the further devaluation of Insert authors' works – for allowing Book authors to Exclude their works from "any one or more, or all"

---

[16]    *See* App. A ¶ 4 (Proposed Solution 4).

Display Uses, Revenue Models, or the Book Annotation feature, while denying comparable rights to Insert authors.[17]  (*See* SA § 3.5(b)(1).)

      D.      The Agreement's Lack of External Controls Fails to
                  Protect Authors from Potentially Discriminatory Practices by Google

      Google currently dominates the market for Internet search.  It controls 78% of the web search market and receives 76% of all Internet search advertising revenue.  (DeVore Decl. ¶¶ 4, 6.)  Given that dominance, and the fact that the Agreement would grant Google an exclusive license to the world's orphan works in which there is a U.S. copyright interest, the Agreement would secure dominance for Google in the market for book search as well.  Yet the Agreement includes no constraint on Google's potential abuse of that monopoly power in ways that might cause serious harm to authors.  For example, many authors promote their works directly through their own websites or other on-line sources.  (*See, e.g.*, Hyde Decl. ¶ 2; Linden Decl. ¶ 2; Guthrie Decl. ¶ 2.)  Because Google exclusively controls its search algorithms and AdWords prices, however, it could, for example, discriminate against those authors by dropping their sites from the first page to the fifth or eighth page of Internet search results produced in response to a search for them or their works.  Doing so would effectively make such sites "disappear" from Google's search rankings and eliminate the chance that a user might click on or buy a work through such sites.  (Wright Decl. ¶ 3(f).)  Or, if an author sought to purchase Keywords in Google's AdWords program to promote such alternative sites, nothing in the Agreement would prevent Google from arbitrarily increasing the price for those Keywords.

      While in most circumstances a private firm is free to deal with its customers and competitors as it sees fit, under certain conditions a refusal to cooperate with rivals can constitute anticompetitive conduct prohibited under Section 2 of the Sherman Act.  *Aspen Skiing Co. v.*

---

[17]      *See* App. A ¶ 5 (Proposed Solution 5).

*Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985).  Such a circumstance occurs where a company uses its market power to discriminate against competitors in an effort to further monopoly power.  *Aspen Skiing at* 605 ("If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) ("Use of monopoly power 'to destroy threatened competition' is a violation of the 'attempt to monopolize' clause of § 2.").  The Objecting Authors thus are concerned that the Agreement would leave Google free to discriminate against authors who elect to opt-out, Remove, or Exclude their works – or for any other reason – by altering its web search or AdWords algorithms in a manner that harms them and their ability to promote their works through alternative channels.  Either action would impose a severe disadvantage on authors in the Internet marketplace.[18]

      E.     <u>Defects in the Database Should Be Corrected Before the Agreement Is Approved</u>

      Persistent defects in the Database also unfairly prejudice authors as they attempt to analyze the Settlement and its potential impacts on their rights.  For example, when Catherine Ryan Hyde first searched the Database she identified and claimed all of her works she could find.  (Hyde Decl. ¶ 4(c).)  When she went back into the Database a week later, however, she discovered *nine additional works* identified as unclaimed.  (*Id.*)  Upon repeatedly accessing the database over the past several months, she has found anywhere from *forty-two to sixty-nine* of her works listed and, compounding that confounding variability, has found those listings to reflect little decipherable information about how those works have been categorized and significant inaccuracies in the information that is available.[19]  (*Id.*; *see also* Linden Decl. ¶ 3(e).)

---

[18]     *See* App. A ¶ 6 (Proposed Solution 6).

[19]     For authors with large numbers of Books and/or Inserts, these problems have rendered the Database effectively useless as a tool to attempt to manage their works, contributing to their determination that they must opt-out of the Settlement.  (Leslie Decl. ¶ 4(e); Wright Decl. ¶ 3(g).)

Because authors consistently have found their attempts to use the Database to be "remarkably burdensome, time-consuming, and frustrating," (Hyde Decl. ¶ 4(b); Linden Decl. ¶ 3(e); Wright Decl. ¶ 3(g); Leslie Decl. ¶ 4(e)), the Database at present provides an inadequate foundation for authors to enter into, and attempt to manage their rights under, the Settlement. Indeed, even representatives of The Authors Guild and the Association of American Publishers have admitted that the Database is badly and unacceptably flawed.[20]  (Hyde Decl. ¶ 4(c).)

F. <u>The Agreement's Grant of an Irrevocable Perpetual License is Unfair to Authors</u>

Against the backdrop of each of the foregoing concerns, it is both unfair and unacceptable to the Objecting Authors that the Agreement grants Google an irrevocable, perpetual license to exploit their works in the digital world.  The digital marketplace is inarguably immature, enormously fluid, and extremely valuable.  Yet the Agreement leaves authors with the sole remedy of Removing or Excluding their works in response to future exploitations – known and unknown – that they may disagree with, that harm their substantial intellectual property and other rights, and for which they should receive compensation but will receive none.  Moreover, as demonstrated above, the Removal option will terminate forever as of April 5, 2011, leaving both Book and Insert authors only the Exclusion right to attempt to address all future exploitations of their work.  (*See* SA§ 3.5(a)(iii).)  But Exclusion is a limited right, and affords authors *no control whatsoever* over undefined, undisclosed, yet potentially lucrative Non-Display Uses of their works.  (*See* Section III.A above).)  And, again, both Removal and Exclusion effectively eliminate the principal benefits of staying in the Settlement at all.[21]

---

[20]      *See* App. A ¶ 7 (Proposed Solution 7).
[21]      *See* App. A ¶ 8 (Proposed Solution 8).

## CONCLUSION

For the foregoing reasons, the Objecting Authors object to the Agreement and

respectfully request that the Court revise the Agreement to address those objections.

New York, New York
Dated:  September  2, 2009

Respectfully submitted,

DEVORE & DEMARCO LLP


By:  /s/ Andrew C. DeVore
     Andrew C. DeVore (AD – 3511)
     Amin Kassam (AK - 7860)
     99 Park Avenue, 16th floor
     New York, New York 10016
     (212) 922-9499

     *Attorneys for Class Members Arlo*
     *Guthrie, Julia Wright, Catherine Ryan*
     *Hyde, and Eugene Linden*

# APPENDIX A – PROPOSED SOLUTIONS

(1) Narrowly tailor the releases in Article X to include only copyright claims and trademark claims relating to trademarks apparent on any work as seen in any Display Use, (*see* Objections §§ I, II);

(2) Require both Book and Insert authors to consent to future exploitations of their works by Google or any third party, (*see id.* § II);

(3)(i) Obligate Google to notify authors of all Non-Display Uses made of their works, (ii) require their affirmative consent to such uses, and (iii) fairly compensate them for uses as to which they do consent, (*see id.* §§ I, III.A);

(4) Provide a mechanism for authors to object to advertising run against Display Uses of their works, (*see id.* § III.B);

(5) Grant Insert authors control equal to that of Book authors to Remove and Exclude their works, and allow them to negotiate Inclusion Fees individually, (*see id.* §§ I, III.C);

(6) Include an express undertaking in the Agreement that Google shall not discriminate in any way against authors, including specifically in search and AdWords, and provide for ongoing antitrust oversight by appropriate government agencies with recourse to the Court, (*see id.* § III.D);

(7) Obligate Google to correct and improve the Database as a mandatory pre-condition to approval of the Settlement, (*see id.* § III.E); and

(8) Provide that the rights and obligations contained in the Agreement relating to all works claimed pursuant to the claiming process shall terminate after a fixed five-year period, subject to renewal for subsequent five-year periods by the affirmative consent of the authors of those works.  (*See id.* § III.F).