USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _1_/28/10_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| The Authors Guild, Inc., et al.,        ) <br> ) <br> Plaintiffs,        ) <br> ) <br> ) <br> v.        ) <br> ) <br> Google, Inc.,        ) <br> ) <br> Defendant.        ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 05 CV 8136 (DC) <br><br> **SUPPLEMENTAL OBJECTION OF** <br> **SCOTT E. GANT TO PROPOSED** <br> **SETTLEMENT, AND TO THE** <br> **CERTIFICATION OF THE** <br> **PROPOSED SETTLEMENT CLASS** <br> **AND SUB-CLASSES** <br><br> JAN 2 7 2010 |

## INTRODUCTION

This is a supplement to my previously filed Objection (Dkt. 141, 143), which is attached hereto as Exhibit A, and fully incorporated in this Supplemental Objection.

As explained in my Objection, the proposed settlement presented to the Court: (1) is a predominantly commercial transaction which would result in a sweeping transfer of intellectual property rights from current owners to Google, and cannot be imposed through the use of Federal Rule of Civil Procedure 23; (2) fails to satisfy the notice requirements imposed by Rule 23 and the Fifth Amendment's Due Process Clause; (3) fails to provide putative class members with adequate compensation; (4) fails to satisfy the typicality and adequacy requirements of Rule 23(a); and (5) would vest Google with significant market power which it could not acquire without the settlement, and raises serious antitrust issues which must be considered as part of this Court's review of the proposed settlement. Unfortunately, the amendments to the Original

Proposed Settlement fall far short of resolving its numerous deficiencies.[1] In fact, instead of curing the Original Proposed Settlement's defects, the New Proposed Settlement exacerbates some already-existing problems while creating additional ones.

Because the New Proposed Settlement fails in several important respects to satisfy the requirements of Rule 23, and also fails to safeguard the due process rights of absent class members, I continue to urge the Court to reject the proposal of the settling parties, and to deny the request for certification of the proposed settlement class and sub-classes.

Submitted with this Supplemental Objection is a Notice of Intent to Appear at the Fairness Hearing, currently scheduled for February 18, 2010.

### DISCUSSION OF THE NEW PROPOSED SETTLEMENT

Below I discuss several problems with the New Proposed Settlement which, along with those discussed in my Objection, are grounds for rejecting the proposal of the settling parties, and for denying the request for certification of the proposed settlement class and sub-classes.

#### 1.    Notice Issues

As explained in my Objection, the efforts to notify absent putative class members about the Original Proposed Settlement did not conform to the requirements of Rule 23 and due process. *See* Exhibit A at 13-24. The supplemental notice program undertaken in connection with the New Proposed Settlement not only failed to remedy the shortcomings in the initial notice program,[2] but compounded already significant notice problems.

---

[1] For purposes of this Supplemental Objection, I will refer to the prior version of the proposed settlement as the "Original Proposed Settlement," and the current version as the "New Proposed Settlement."

[2] As the Supplemental Notice itself observes, it was "not designed to replace the original Notice." Therefore, receipt of the Supplemental Notice by an absent putative class member would not remedy the failure to have provided individual notice to that person during the Original Notice Program.

The settling parties proposed to the Court that they send a Supplemental Notice by email or postal mail to "all persons who provided contact information on the official settlement website or on a Claim Form, who opted out of the original Settlement Agreement, or who filed an objection, amicus position or other statement with the Court." *See* Proposed Order Granting Preliminary Approval of Amended Settlement Agreement (Dkt. 772) at ¶ 20.[3]   The settling parties acknowledge "[t]he notice program for the original settlement was broader [than for the New Proposed Settlement] and included an extensive publication campaign as well as more broadly disseminated direct notice."[4]

The settling parties attempt to justify circumscribed notice efforts regarding the New Proposed Settlement because "the core terms . . . are the same" as in the Original Proposed Settlement, and because the amendments "do not *materially* impair" the rights of absent putative class members and "in *many* respects confer enhanced benefits" on absent putative class members.[5]   This rationale for a Supplemental Notice Program even less comprehensive than the Original Notice Program does not withstand scrutiny.

Even if we indulge the dubious claim that in the context of this agreement there are "core" terms (presumably distinguished from "non-core" terms, which one would imagine the settling parties consider relatively unimportant), the assertion that no "core" terms have been amended is demonstrably false. The proposed amendments – which apparently took at least two

---

[3] For purposes of this Supplemental Objection, I will refer to the notice program concerning the Original Proposed Settlement as the "Original Notice Program," and the notice program concerning the New Proposed Settlement as the "Supplemental Notice Program."

[4] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Dkt. 769) at 25.

[5] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Dkt. 769) at 25 (emphasis added); *see also id*. at 1 (claiming that amendments to the Original Proposed Settlement "generally benefit" members of the putative class).

3

months to negotiate – include substantial alterations to the definitions of "Book"[6] and "Insert"[7] (which the settling parties called "important terms" in the Original Notice),[8] modifications to the description of how Google will determine whether a Book is "Commercially Available,"[9] and numerous other substantive changes which affect the meaning and operation of the New Proposed Settlement (including several discussed below).

Truncated notice of the *actual* proposed settlement terms also cannot be justified here on the grounds that all differences between the Original Proposed Settlement and the New Proposed Settlement are solely beneficial to every absent putative class member. Such a claim could not be supported factually – and the settling parties do not appear to even make it. Instead, the settling parties contend the changes do not "materially" impair the rights of absent putative class members, and that "in *many* respects confer enhanced benefits" on absent putative class members. Thus, even if Rule 23 and the Due Process Clause permit relaxed supplemental notice in rare cases where amendments to a settlement agreement are limited to unquestionably beneficial changes, this is not such a case.[10] Moreover, given the extraordinary nature of this proposed settlement – including its breadth, its predominantly commercial nature, the compelled transfer to Google and others of intellectual property rights owned by class members, and the contemplated release of Google and others from liability for future conduct which would otherwise constitute copyright infringement – in this case, *all* putative class members are entitled

---

[6] *See* Amended Settlement Agreement § 1.19.

[7] *See* Amended Settlement Agreement § 1.75.

[8] *See* Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 6.

[9] *See* Amended Settlement Agreement § 3.2(d)(i).

[10] This case shares little in common with the few district court cases cited by the settling parties as support for the notion that truncated supplemental notice is adequate here. *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Dkt. 769) at 25-26.

4

to be notified about *all* changes to the Original Proposed Settlement, so each can decide for himself or herself how those changes might affect the decision whether to opt out or become subject to the terms of the New Proposed Settlement.[11] In this case, Rule 23 and due process requirements do not permit otherwise.

## 2.    The Proposed "Unclaimed Works Fiduciary" and "Unclaimed Funds"

The New Proposed Settlement contemplates the appointment of an "independent fiduciary" with responsibility to "represent the interests of Rightsholders of unclaimed Books and Inserts with respect to exploitation of their works." Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Dkt. 769) at 9; *see* Amended Settlement Agreement § 6.2(b)(iii).

As explained in my Objection, owners of orphan works have materially distinct interests from other members of the author sub-class, and they should have had their own class

---

[11]  In this case, even receipt of the Original Notice was insufficient for an absent putative class member to understand the nature of the proposed settlement and its implications. As University of Chicago law professor Richard Epstein recently observed: "Any mortal who reads the Google settlement, as I have, will be defeated by its obscurity and complexity." Richard A. Epstein, *Google-itis: Beware of Class Action Settlements*, Financial Times (Jan. 4, 2010); *see also* Statement of Marybeth Peters, Hearing on Competition and Commerce in Digital Books: The Proposed Google Book Settlement (Sept. 10, 2009) (attached hereto as Exhibit B) (observing that, for the United States Copyright Office, "absorb[ing] the many terms and conditions of the settlement" was "a process that took several months due to the length and complexity of the documents"). My experience is similar to Professor Epstein, the Copyright Office, and others who have focused attention on this proposed settlement. Despite being an attorney with considerable background in class actions and complex litigation, it took me at least 15 hours to read and understand even the basic provisions and structure of the proposed settlement. It is simply implausible that more than a handful of authors without a legal background could understand the settlement, *let alone appreciate its implications for their own rights and interests*, without spending considerable time and/or without hiring an attorney. It should be no surprise that relatively few non-corporate putative class members have submitted detailed objections concerning the legality of the proposed settlement. If one or more authors had hired me to prepare the Objection I submitted to the Court in August 2009, the cost for my time spent on this matter would have been over $100,000. Even providing basic counseling to an author about the proposed settlement and its implications for a given author would cost that author thousands of dollars in attorney's fees.

5

representatives and counsel. *See* Exhibit A at 31-35.[12]  Revision of the settlement agreement to include an "Unclaimed Works Fiduciary" appears to be an acknowledgement of the distinct interests of owners of orphan works.[13]  It does nothing, however, to rectify the problem that owners of orphan works were not adequately represented during settlement negotiations, which were undertaken by class representatives who are not owners of orphan works, and by the same counsel representing owners of non-orphan works. *Ex post* representation by a "Fiduciary" after a settlement becomes final and binding cannot cure inadequate representation leading up to that point, or the failure to satisfy the requirements of Rule 23 during litigation and the settlement process.

Moreover, notwithstanding the addition of a Fiduciary, the New Proposed Settlement still permits "unclaimed funds" to be used for administrative costs of the Registry related to locating owners of unclaimed works, and provides for distribution of those funds to third-party organizations after ten years. *See* Amended Settlement Agreement § 6.3.  As noted in my Objection, provisions permitting the allocation to third-parties of revenues owed to a class member which go unclaimed for a period of time are likely to have a disproportionately adverse affect on owners of orphan works. *See* Exhibit A at 33.  The provisions concerning "unclaimed

---

[12]  I maintain my view that the proposed settlement affects the rights of *at least* four groups of authors, each with distinct interests, and each requiring representation by separate counsel. *See* Exhibit A at 31-35.  Other objectors have made compelling arguments which suggest that separate sub-classes might be required to represent the interests of non-U.S. putative class members.

[13]  Although the Unclaimed Works Fiduciary would have responsibility for all "unclaimed works," whether or not they are "orphans," it appears this amendment was made in response to many objections and concerns related to the rights of owners of "orphan works." *See, e.g.*, Brad Stone & Miguel Helft, *Terms of Digital Book Deal With Google Revised*, New York Times (Nov. 14, 2009) ("The revisions to the settlement primarily address the handling of so-called orphan works, the millions of books whose rights holders are unknown or cannot be found. The changes call for the appointment of an independent fiduciary, or trustee, who will be solely responsible for the decisions regarding orphan works.").

funds" not only raise serious Rule 23 problems, but may constitute a "taking" prohibited by the U.S. Constitution's Fifth Amendment. *Cf.* Exhibit A at 13 n.25.

### 3.    The Author-Publisher Dispute Resolution Procedures

My Objection explained that the Original Proposed Settlement failed to satisfy the requirements of Rule 23(e)(2) because it would complicate and/or frustrate existing contractual agreements between authors and publishers. *See* Exhibit A at 29-31. My Objection specifically explained that the Author-Publisher Procedures set out in Attachment A, purporting to "establish procedures for determining the[] respective rights" of authors and publishers, conflicts with the Rules Enabling Act, 28 U.S.C. 2072(b), and raises due process concerns, by seeking to superimpose the Author-Publisher Procedures over existing contractual relationships, thereby modifying or displacing existing contract rights of authors and/or publishers. *See* Exhibit A at 30-31.

My Objection also observed that even though the settling parties described the Author-Publisher Procedures as "an important part of the Settlement," those Procedures failed to account for situations where an author or the author's publisher opts out, *but the other does not. See* Exhibit A at 31.

Apparently acknowledging that the Author-Publisher Procedures cannot be made to apply to someone who opts out, the New Proposed Agreement modifies the Author-Publisher Procedures to state: "Nothing in these Author-Publisher Procedures shall create any rights in favor of, or impose any obligation upon or with respect to, anyone who opted out of the Amended Settlement Class." *See* Amended Settlement Agreement, Attachment A, § 11.7. This amendment highlights at least two significant problems with the New Proposed Settlement – but does not resolve either.

First, this amendment reveals a material defect in the notice provided to (some) absent putative class members, which renders it inadequate. Those absent putative class members who received the Original Notice were told that the Author-Publisher Procedures are "an important part of the Settlement." *See* Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 7. However, absent putative class members were not informed that these Procedures *would not apply* unless both the author and publisher involved in a given relationship *both* become bound by the settlement – and absent putative class members were compelled to decide whether to opt out of the settlement without the benefit of this knowledge.[14] As for the Supplemental Notice, it does not mention the issue, or even make reference to the new language in the Author-Publisher Procedures.

Second, this amendment to the Author-Publisher Procedures highlights a structural problem with the proposed settlement. While it is now clear the "important" Author-Publisher Procedures *do not apply at all* if either an author or the author's publisher have opted out of the settlement, the New Proposed Settlement provides no alternative mechanism for resolving author-publisher disputes in situations where either an author or publisher are not participating in the settlement. This leaves an enormous gap in the operation of the proposed settlement – a gap about which absent putative class members have not been informed.

---

[14] Absent putative class members were also compelled to decide whether to opt out of the settlement without knowing whether the Author-Publisher Procedures would in fact apply to them, because a given putative class member would not know what his or her counterparty had decided until after the deadline for his or her own decision.

### 4. Competition Issues

The settling parties have made several amendments to the Original Proposed Settlement which they identify as "addressing competition concerns."[15]   While these amendments are improvements, they are far from sufficient to prevent the significant anticompetitive effects which would result from approval of the New Proposed Settlement.[16]

What these amendments fail to address is the fundamental fact that approval effectively would vest Google with certain exclusive rights over numerous works – rights which potential competitors have no prospect of obtaining in the marketplace. *See* Statement of Interest of the United States of America Regarding Proposed Class Settlement (Dkt. 720) at 23 (observing the proposed settlement would "grant Google de facto exclusive rights for the digital distribution of orphan works," and "Google's competitors are unlikely to be able to obtain comparable rights independently."). This would put Google at a significant and enduring competitive advantage

---

[15]   *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Dkt. 769) at 6-8.

[16]   One of the amendments intended to address competition concerns is a provision in the Proposed Final Judgment and Order of Dismissal, which states: "This Final Judgment and Order of Dismissal is not intended to and does not provide any antitrust immunities to any Persons or parties." *See* Amended Settlement Agreement, Attachment L at ¶ 17; *see also* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Dkt. 769) at 8. While the disclaimer of antitrust immunity is welcome, it raises further questions that warrant consideration by the Court. For instance, if the settlement were approved, but parts of the settlement or the arrangements for which it provides were later challenged successfully under the antitrust laws, how would that affect the validity of the rest of the settlement? Furthermore, if we indulge the fiction that all absent putative class members have received proper notice of the settlement, those who elect not to opt out will have done so after taking into account the proposal as a whole. Yet, if the New Proposed Settlement is approved, the commercial arrangements it would establish will be subject to credible antitrust lawsuits. If those commercial arrangements are subsequently altered as a result of government or private antitrust lawsuits, the comprehensive agreement to which absent class members became bound shall cease to exist, and class members may then wish to withdraw from the settlement.    The uncertain future of the New Proposed Settlement, even after Rule 23 proceedings are complete, is yet another reason for the Court to reject it.

9

over any potential competitor for the distribution of the works covered by the settlement. *See id.* at 24-25.[17]

While the Rule 23 and due process considerations discussed above provide ample grounds for rejecting the New Proposed Settlement, the Court should decline the settling parties' invitation to remake the competitive landscape by judicial fiat under the guise of resolving a class action lawsuit.[18]  Changes of the nature sought here should result from competition in the marketplace or through the legislative process.[19]

---

[17] When examining competitive issues, the Court should also consider the impact the settlement might have on Google's power in other markets, such as Internet Search, in which Google already has a dominant position.

[18] My Objection explained that not only Rule 23, but also Article III of the U.S. Constitution and Federal Rule of Civil Procedure 82, preclude the Court from approving the commercial component of the settlement. *See* Exhibit A at 11. In its September 2009 submission, the Department of Justice observed that, "[a]s a *theoretical* matter, a properly defined and adequately represented class of copyright holders *may* be able to settle a lawsuit over past conduct by licensing a broader range of conduct to obtain global 'copyright peace.'" *See* Statement of Interest of the United States of America Regarding Proposed Class Settlement (Dkt. 720) at 6 (emphasis added). The Department of Justice also observed that "[a]t least one federal court of appeals has approved a class action settlement with a forward-looking licensing component covering claims that had not yet accrued," citing *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002). *See id.* Even if the Department of Justice is correct about the theoretical outer bounds of Rule 23 and the authority of federal courts to approve class action settlements including "forward-looking" releases, *Uhl* – which involved the release of the Defendant's liability for conduct which was already planned at the time the lawsuit was filed, and was the subject of Plaintiffs' requests for relief – bears little resemblance to this case. *See Uhl*, 309 F.3d at 984-85 (discussing "ripeness" argument "raised at oral argument" by an objector). Moreover, *Uhl* itself does not appear to have been relied on or cited by any other federal court of appeals in support of the proposition identified by the Department of Justice, or by any district court outside of the Seventh Circuit, where *Uhl* is controlling law. If *Uhl* is the best authority supposedly supporting the release of future claims for future conduct proposed here, that fact itself demonstrates the unprecedented nature of this proposed settlement.

[19] *See* Statement of Marybeth Peters, Hearing on Competition and Commerce in Digital Books: The Proposed Google Book Settlement (Sept. 10, 2009) (attached hereto as Exhibit B) ("In the view of the Copyright Office, the settlement proposed by the parties would encroach on responsibility for copyright policy that traditionally has been the domain of Congress . . . . We are greatly concerned by the parties' end run around legislative process and prerogatives.").

10

January 2010                                Respectfully submitted,

                                            Scott E. Gant
                                            5301 Wisconsin Avenue, NW
                                            Suite 800
                                            Washington, DC  20015
                                            gbsobj@hotmail.com

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| The Authors Guild, Inc., et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Google, Inc.,<br><br>                    Defendant. | Case No. 05 CV 8136 (DC)<br><br>**OBJECTION OF SCOTT E. GANT**<br>**TO PROPOSED SETTLEMENT,**<br>**AND TO CERTIFICATION OF THE**<br>**PROPOSED SETTLEMENT CLASS**<br>**AND SUB-CLASSES** |

## INTRODUCTION

I am a graduate of Harvard Law School, and a Partner at a national law firm.[1]  My law

practice consists primarily of complex commercial litigation, with particular emphasis on class

actions. In my class action work, I have been lead counsel for both Plaintiffs and Defendants.

While in private practice, I have written numerous scholarly articles published in law

journals. In 2007, Simon & Schuster's Free Press published my first book, *We're All Journalists*

*Now: The Transformation of the Press and Reshaping of the Law in the Internet Age*.[2]  To the

best of my knowledge, I am a member of the proposed "Author Sub-Class" in this litigation.[3]

---

[1]     My law firm is Boies, Schiller & Flexner LLP. A copy of my biography from the Firm's
website is attached as Exhibit A.  I am filing this Objection in my individual capacity, not as a
Partner at Boies, Schiller & Flexner, or on behalf of the Firm or any client.

[2]     Attached    as    Exhibit    B    is    a    printout    from    the    Settlement    Website,
www.googlebooksettlement.com, which lists the results of a search for my works.    The
Copyright Registration Number for *We're All Journalists Now* is TX 6-838-539.

[3]     References herein to the "class" or "class members" are to the Author Sub-Class and its
members, unless otherwise specified.

As explained in detail below, the Proposed Settlement: (1) is a predominantly commercial transaction which would result in a sweeping transfer of intellectual property rights from current owners to Google, and cannot be imposed through the use of Federal Rule of Civil Procedure 23 (hereinafter "Rule 23"); (2) fails to satisfy the notice requirements imposed by Rule 23 and the Fifth Amendment's Due Process Clause; (3) fails to provide putative class members with adequate compensation; (4) fails to satisfy the typicality and adequacy requirements of Rule 23(a); and (5) would vest Google with significant market power which it could not acquire without the settlement, and raises serious antitrust issues which must be considered as part of this Court's review of the Proposed Settlement.

Because the Proposed Settlement fails in several important respects to satisfy the requirements of Rule 23, and also fails to safeguard the due process rights of absent class members, I urge the Court to reject the Proposed Settlement, and to deny the request for certification of the proposed settlement class and sub-classes. Submitted with this Objection is a Notice of Intent to Appear at the Fairness Hearing, currently scheduled for October 7, 2009.[4]

## ARGUMENT

The Proposed Settlement comes to this Court after, what its sponsors describe as, more than two years of negotiations, involving parties to the underlying litigation as well as third-parties. While settlement negotiations obviously have been extensive, this Proposed Settlement comes relatively early in the life of a complex lawsuit – here, after only limited discovery, before

---

[4]  Because I plan to appear in my capacity as an objecting class member, I do not interpret this Court's Rules as requiring that I move for admission *pro hac vice*.  If directed by the Court, I will file promptly an application for admission *pro hac vice*.

2

any motions for class certification were filed or adjudicated, and before any motions directed to the merits of the parties' claims.[5]

As the Supreme Court has explained, when a district court "certifies for class action settlement only, the moment of certification requires 'heightened attention' to the justification for binding the class members." *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 849 (1999) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *see also* Manual for Complex Litigation, Fourth, § 21.61 at 309 ("Judicial review [of a proposed settlement] must be exacting and thorough. The task is demanding because the adversariness of the litigation is often lost after the agreement to settle.").

When applying "heightened attention" to this Proposed Settlement it is apparent the Proposed Settlement clearly fails to satisfy the requirements of Rule 23, and to safeguard the due process rights of absent class members.[6] *See Amchem*, 521 U.S. at 629 (Rule 23 must be "applied with the interests of absent class members in close view"); *cf.* Manual for Complex

---

[5]   Because most information about the status of the case before settlement is not public, my conclusions are based on a review of the Docket Report for the case and of case filings. These conclusions are supported, however, by the Notice of Class Action Settlement. For instance, the section entitled "Why is there a Settlement?," summarizes the work that preceded the settlement and describes "review of millions of pages of documents produced by the parties," but makes no mention of any depositions or work by experts. *See* Settlement Agreement, Attachment I, at 5. The Notice also states counsel for the Author Sub-Class "incurred approximately $140,000 in expenses as of the date of the Settlement Agreement" (*id.* at 27) – a tiny amount for a complex case or a large class action – further suggesting no significant discovery or expert work occurred.

[6]   On November 14, 2008, Judge Sprizzo signed a proposed order granting preliminary approval of the Settlement. The proposed order was entered without any contested briefing and without a hearing. *Cf.* Manual for Complex Litigation, Fourth, § 21.632 at 320 ("Review of a proposed class action settlement generally involves two hearings."). Any class certification ruling is interlocutory, and may be revised at any time before judgment. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Given that, and given preliminary approval was granted without a hearing or adversarial briefing, that Order should not be granted any deference. *Cf.* Dkt. 57 at 30-31 (Plaintiffs' counsel acknowledging "[p]rovisional certification is not final or binding, and is reviewed in connection with the final fairness hearing. Plaintiffs must then establish that the Settlement Class satisfied the requirements of Rule 23 ....").

Litigation, Fourth, § 21.61 at 310 ("[T]he judge must adopt the role of a skeptical client, and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation.").

## I. THE PROPOSED SETTLEMENT SEEKS TO IMPLEMENT THROUGH RULE 23 A PREDOMINANTLY COMMERCIAL TRANSACTION WHICH WOULD EFFECT A SWEEPING REALLOCATION OF INTELLECTUAL PROPERTY RIGHTS

The Proposed Settlement has two distinct parts. One part would release Google and others from liability for *past* copyright infringement in exchange for approximately $45 million – with payments to individual copyright owners in the amount of $15 per insert ($5 for partial inserts) or $60 per book, with the possibility of higher payments if less than the full $45 million is claimed by other class members.[7]  The other part is considerably more complicated (accounting for the vast majority of the text of the Settlement Agreement) and, in the words of one of its sponsors, is "audacious."[8]

At its most basic level, this latter part of the Proposed Settlement would transfer to Google (and others)[9] certain intellectual property rights owned and under the exclusive control of class members – in effect, a license permitting specific uses of copyrighted works – in exchange for Google's payment of approximately $25 million to establish an entirely new organization, called the Book Rights Registry (hereinafter "Registry"), and for Google's promise to share

---

[7]   *See* Settlement Agreement §§ 2.1(b), 5.1; Settlement Agreement, Attachment C (Plan of Allocation) § 3.2.

[8]   *See infra* note 13.

[9]   The Proposed Settlement releases from both past *and future* liability numerous partners in Google's Book Search business, even through those partners are not parties in the case, and have not contributed to the settlement's financial terms. *See, e.g.*, Settlement Agreement §§ 10.1, 10.2.

4

future proceeds from its uses of the authors' works.[10] As part of this transfer of rights to Google and others, the Proposed Settlement would preclude class members from suing Google and its partners for the array of uses of authors' works permitted by the Proposed Agreement, thereby releasing Google and others from liability for *future* conduct which would otherwise constitute copyright infringement.

This part of the settlement is fundamentally a commercial transaction, which the settling parties are improperly attempting to impose through the judicial process and the procedural device of Rule 23, rather than through the normal commercial process of negotiation and informed consent. *See* Farnsworth on Contracts, at § 1.2, p. 8 (3d ed. 2004) ("In a market economy the terms of [] bilateral exchanges are arrived at voluntarily by the parties themselves through the process of bargaining.").[11]

---

[10] Under the Settlement Agreement, Google has agreed to provide $34.5 million "to fund the launch and initial operations of the Registry and to fund other Administrative Costs." Settlement Agreement § 2.1(c); *see also id.* § 5.2. The "Administrative Costs" for which this amount is to be used include expenses "preparing and providing notice to the Settlement Class." *Id.* § 1.6. While the amount spent on notice is not public at this time, a reasonable estimate is that the amount left to fund the "launch and initial operations of the Registry" will be approximately $25 million. *See* James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 14 (Apr. 2009) ("Google has spent $7 million on print ads") (Exhibit C). The Notice of Class Action Settlement (Settlement Agreement, Attachment I), incorrectly states on its cover page that the Settlement benefits include "US $34.5 million paid by Google to establish and maintain a Book Rights Registry [] to collect revenues from Google and distribute those revenues to copyright owners." As explained above, the amount remaining for these purposes after paying "Administrative Costs" will be substantially less.

[11] *See also* Lynn Chu, *Google's Book Settlement Is a Ripoff for Authors*, Wall Street Journal (Mar. 28, 2009) ("We already have a good system. It's called the system of private property and free contract, designed for dispersed, autonomous individuals – not command-and-control centers. The U.S. Constitution grants authors small monopolies in their own copyrights . . . . This class action seeks to wipe all of this out – just for Google. But U.S. law does not grant any single publisher monopoly power to herd all of us into its list. For private gain, the Google parties now seek to destroy the health in the system that individual bargaining preserves.") (Exhibit D).

5

A.      **The Proposed Settlement is Predominantly a Commercial Transaction Being Imposed on Class Members Through the Procedural Device of Rule 23**

The bulk of the 134-page Settlement Agreement is directed to establishing a complex commercial arrangement, potentially affecting millions of copyrighted works and the owners of the intellectually property rights in those works.[12] Among other things, the Settlement Agreement provides for the establishment and charter of the "Book Rights Registry" (Article VI), outlines the role of Google's library partners in the commercial venture (Article VII), addresses security issues related to the commercial venture (Article VIII), adopts a protocol for the resolution of disputes arising between parties to the commercial arrangement (Article IX), and sets out the economic terms for Google's use of class members' intellectual property (Article IV). Several "Attachments" to the Settlement Agreement provide additional details relevant to the proposed commercial arrangement. *See, e.g.,* Settlement Agreement, Attachment A ("Procedures Governing Author Sub-Class and Publisher Sub-Class Under the Settlement Agreement"); Settlement Agreement, Attachment C (Plan of Allocation).

While the text of the Settlement Agreement itself demonstrates the unmistakable commercial character of the Proposed Settlement, the settling parties and others involved in the settlement negotiations have themselves emphasized the commercial nature of the transaction – with several having acknowledged the commercial arrangement could not have been achieved

---

[12]   *See* Settlement Website, FAQs, FAQ 4 ("The class consists of all persons and entities that, as of January 5, 2009, own a U.S. copyright interest in one or more Books or Inserts that are 'implicated by a use' authorized by the Settlement."); Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 9 (describing the Proposed Settlement as "an excellent opportunity to breathe new commercial life into potentially tens of millions of out-of-print Books"); *see also* Anna Stolley Persky, *Paper or Plastic?: Google's Plan to Digitize Books Pits Book Lovers v. Book Innovators,* Washington Lawyer (June 2009) ("The most amazing thing about the Google settlement is its breadth, experts say . . . .   The agreement makes Google's prior efforts seem like a baby step in comparison and worries some scholars.").

6

either in the marketplace or through legal resolution of the lawsuit on its merits. The following

sample of quotations makes this clear:

- o Authors Guild Executive Director, Paul Aiken, at the press conference announcing the Settlement:

  - ▪ "It's a pleasure to be here to jointly announce what may be the **biggest book deal is U.S. history**."

  - ▪ "The task before us was to take Google's **audacious library digitization project** and transform it into something both good for readers and agreeable to the people who write and publish books. **To do that, we found we had to make the project even more audacious. We succeeded at that**."[13]

- o Authors Guild President, Roy Blount, Jr., describing the Authors Guild's initial proposal to Google in May 2006:

  - ▪ "[I]f you're willing to do **something far more ambitious and useful**, and you're willing to cut authors in for their fair share, then it would be our pleasure to work with you."[14]

- o Joint Public FAQs, issued with announcement of the Settlement:

  - ▪ "**This Agreement will enable us to do more together than copyright owners and Google could have done alone or through a court ruling**."[15]

- o Joint Statement by Google Library Partners, the University of California, the University of Michigan and Stanford University:

  - ▪ "The Settlement agreement provides an unprecedented and extraordinarily valuable service . . . that libraries, because of copyright protection, could not offer on their own and **goes well beyond what would have been possible, even if Google had prevailed in defending the lawsuits**."[16]

---

[13] Exhibit E.

[14] Exhibit F.

[15] Exhibit G.

[16] Exhibit H. *See* Settlement Agreement, Attachment G (List of Library Partners).

- o  Allan Adler, Vice President of the Association of American Publishers:

  - "[T]his proposed settlement is really unprecedented in its scope and nature . . . . **[W]hat we have here is not only a settlement agreement that will resolve the pending litigation**, but it's **designed deliberately to establish and create a going forward model** for publishers and authors and other rightsholders in books to work with one of the giants of the online world to move books online for purposes of providing access to a new readership."[17]

In fact, Google's own accounting treatment of its payments under the settlement explicitly characterizes the Proposed Settlement as having two distinct components: "the settlement portion of the agreement" and the "commercial arrangement." According to Google's 10-Q issued immediately after the settlement: "For accounting purposes, $95.1 million was determined to be the fair market value of the settlement portion of the agreement . . . , and $29.9 million was determined to be the fair market value of the *commercial portion of the agreement* and will amortize over an estimated useful life of seven years beginning with the commencement of the *commercial arrangement*." Google Inc., Form 10-Q at p. 20, Sept. 30, 2008 (Exhibit J) (emphasis added).

To change the case from an important yet discrete lawsuit about alleged mass copyright infringement to an unprecedented commercial arrangement, the settling parties had to dramatically revise the definition of the putative classes from the operative complaint preceding settlement to the complaint filed with the settlement documents:[18]

---

[17]  *See* Transcript of July 15, 2009 Interview with Copyright Clearance Center at 6 (Exhibit I).

[18]  "The court faced with a request for an expanded class definition should require the parties to explain in detail what new facts, changed circumstances, or earlier errors support the alteration of the original definition." *See* Manual for Complex Litigation, Fourth, § 21.62 at 318.

8

| First Amended Complaint (July 24, 2006) | Second Amended Complaint (Oct. 28, 2008) |
| --- | --- |
| "[A]ll persons or entities that hold the copyright in a work that is contained in the library of the University of Michigan." (¶ 22) | "[A]ll persons or entities that have a United States copyright interest in one or more Books [] or Inserts []." (¶ 34) |
| | "'Author Sub-Class' means members of the Class who are authors, their heirs, successors and assignees, and other owners of a United States copyright interest in one or more Books or Inserts, but who are not members of the Publisher Sub-Class." |

## B.    The Transfer of Intellectual Property Rights Integral to the Settlement Cannot Be Imposed Through the Procedural Device of Rule 23

A central feature of the Proposed Settlement's commercial arrangement is the sweeping transfer of intellectual property rights from class members to Google and its partners.

Under the terms of the Settlement Agreement, Google will obtain from class members the right to use class members' intellectual property in ways that would otherwise be proscribed by copyright law. Thus, as many commentators on the settlement have correctly observed, the Proposed Settlement will vest Google (and its partners) with a license from each class member. *See, e.g.*, Pamela Samuelson, *Legally Speaking: The Dead Souls of the Google Book Settlement*, 52 Communication of the ACM, 28-30 (July 2009) ("[T]he proposed settlement of this lawsuit is a privately negotiated compulsory license . . . . By acceding to the certification of these classes through this settlement, Google will get a license from all authors and publishers of books covered by the agreement (which is to say nearly every in-copyright book ever published in the U.S.) so that it can commercialize them through Book Search.") (Exhibit K); James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 1 (Apr. 2009) (The settlement "would give Google a license not only to scan books, but to sell them.") (Exhibit C); Statement of the National Writers Union (announcing NWU opposition to the Proposed Settlement, based in part on the fact "it would give Google a license to reproduce a

9

writer's copyrighted work . . . .") (Exhibit L); *cf. Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent.") (quoting *Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930)). Even the Authors Guild's description of the settlement describes "the *licensing* [it] would enable."[19]

The use of Rule 23 to transfer class members' intellectual property rights to Google and its partners is improper, and would violate the Rules Enabling Act's express mandate that the Rules of procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

"Copyright, of course, is a federal grant of a property interest . . . ." *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007). Federal copyright statutes establish the contours of each class member's substantive rights as they relate to their creative works protected by federal law. Here, the Proposed Settlement seeks to alter the substantive rights of class members in their intellectual property, by allocating some of their "bundle of rights" to Google and its partners. *See id.* ("Like other forms of property ownership, copyright ownership is a 'bundle of rights' regarding the owner's ability to use his property."). The invitation to use Rule 23 to "abridge" and "modify" substantive rights of class members, created by Congress pursuant to its authority under Article I, Section 8 of the Constitution, is impermissible and should be rejected.[20]

---

[19] Authors Guild, A Brief Guide to the Benefits of the Authors Guild v. Google Settlement (Feb. 25, 2009) (Exhibit M) (emphasis added).

[20] Allowing Google to use Rule 23 to put in place a "commercial arrangement" it could not achieve in the marketplace would also reward it for engaging in mass copyright infringement, and thereby run "directly counter to the intent of Congress . . . to 'prevent the infringer from unfairly benefiting from a wrongful act." *Davis*, 505 F.3d at 106 (quoting *Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470 (2d Cir. 1985)).

10

## C.    The Court Lacks Jurisdiction to Approve the Commercial Component of the Settlement

The impropriety of using Rule 23 to effect the commercial transaction contemplated by the Proposed Settlement is confirmed by looking to the "case or controversy" requirement of Article III of the U.S. Constitution, as well as Federal Rule of Civil Procedure 82, which provides that the Rules of Civil Procedure "do not extend . . . the jurisdiction of the district courts."

As noted, the commercial component of the Proposed Settlement is distinct from the part of the settlement governing the resolution of claims for *past* infringement with those class members whose works were actually copied by Google. The commercial arrangement, in contrast, concerns not past behavior by Google, but possible *future* conduct and potential *future* claims.

Because the commercial arrangement does not relate to or resolve claims for damages, the only conceivable basis for the Court to exercise jurisdiction in a manner that would encompass approval of the commercial component of the Proposed Settlement would be to view the commercial arrangement as a form of "injunctive relief." But the notion that the commercial component of the Proposed Settlement is a form of injunctive relief could not withstand scrutiny. The Second Amended Complaint, filed contemporaneously with the Proposed Settlement, seeks injunctive relief "barring Google from continued infringement of the copyrights of plaintiffs."[21] The Complaint also seeks a declaration "that Google infringed and continues to infringe . . . the Class's copyrights in violation of the Copyright Act."[22] The Proposed Settlement contains nothing resembling the requested injunctive or declaratory relief.    To the contrary, the

---

[21]  Second Amended Class Action Complaint at ¶ 68.

[22]  Second Amended Class Action Complaint at ¶ 71.

11

commercial transaction proposed by the settling parties would allow Google to make even more extensive use of class members' works than it did prior to reaching a settlement, and the Proposed Settlement does not require Google to forbear from copying works owners by the class members. This cannot reasonably be described as injunctive relief.[23]

Because the commercial component of the Proposed Settlement neither resolves damages claims nor plausibly can be construed as injunctive relief, it is obviously untethered to any genuine "case or controversy" between members of the putative class and Google. As such, the entire commercial arrangement falls outside the bounds of the Court's jurisdiction, and the Court lacks the authority to approve it as part of any settlement of this case under Rule 23.[24]  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints"); *see also* Wright, Miller & Kane, Federal

---

[23] The Order Granting Preliminary Approval (Dkt. 64), signed by Judge Sprizzo (as submitted in the form of a proposed order), provisionally certified the Settlement Class and two sub-classes, but did not specify which provision of Rule 23(b) the provisional certification was based upon. Plaintiffs' memorandum in support of preliminary approval (Dkt. 57) stated they sought certification under Rule 23(b)(2) *and* 23(b)(3), but the memorandum failed to identify the "final injunctive relief or corresponding declaratory relief" secured by the Proposed Settlement which would warrant certification under Rule 23(b)(2). *See* Dkt. 57 at 34. Instead, the memorandum observed "[n]umerous plaintiffs would reasonably seek to enjoin Google from reproducing their copyright-protected works, and injunctive relief would be the necessary and appropriate outcome of a trial on the merits." This, however, is not the relevant inquiry for certification of the proposed *settlement* class – and the cases cited by Plaintiffs' counsel for support on this issue did not involve the certification of settlement classes.   The Proposed Settlement affords class members *no injunctive or declaratory relief*, and certification under Rule 23(b)(2) would be improper for that reason alone, as well as other reasons discussed in this Objection. *Cf. Nken v. Holder*, 129 S.Ct. 1749, 1757 (2009) (an injunction is an "extraordinary remedy" which, when employed, "directs the conduct of a party and does so with the backing of its full coercive power"); *Zaldivar v. T-Mobile USA, Inc.*, 2009 WL 2029965, at *5 (W.D. Wash. Jul. 10, 2009) (rejecting argument for settlement class under Rule 23(b)(2), in part, because "there is no suggestion that [defendant] has agreed to have an injunction imposed against it").

[24] Because the Proposed Settlement and certification of the Class should be rejected for the other reasons specified in this Objection, the Court need not reach the jurisdictional issue.  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997) (because class certification issues are "logically antecedent to the existence of any Article III issues, it is appropriate to reach them first"); *see also Ortiz v. Fireboard Corp.*, 527 U.S. 815, 830-31 (1999).

12

Practice and Procedure: Civil 3d § 1797.3 at 164 (In *Amchem*, the Supreme Court "expressed

serious doubt about the viability of settlements containing future claims."); Fed. R. Civ. P. 82.[25]

## II.    NOTIFICATION TO CLASS MEMBERS OF THE SETTLEMENT AND THEIR RIGHT TO OPT-OUT FAILED TO SATISFY THE REQUIREMENTS OF RULE 23 AND THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

Because Plaintiffs' counsel seek class certification under Rule 23(b)(3), the mandatory

notice requirements of Rule 23 apply.[26]  Rule 23(c)(2)(B) provides:

> For any class certified under Rule 23(b)(3), the court must direct to class members
> the best notice that is practicable under the circumstances, including individual
> notice to all members who can be identified through reasonable effort.

As the Supreme Court has observed: "We think the import of this language is unmistakable.

Individual notice *must* be sent to *all* class members whose names and addresses may be

ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974)

(emphasis added); *see also id.* at 175 ("[T]he express language and intent of Rule 23(c)(2) leave

no doubt that individual notice must be provided to those class members who are identifiable

through reasonable effort."); *id.* at 176 ("[I]ndividual notice to identifiable class members is not a

discretionary consideration to be waived in a particular case. It is an unambiguous requirement

---

[25]  If the commercial component of the settlement were approved in an effort to advance the
interests of the public (as opposed to the parties to the litigation) this would raise an additional
constitutional problem. *Cf.* Dkt. 57 at 3 (Plaintiffs' counsel describing purported benefits of the
Proposed Settlement to "the general public"). Because the Settlement would result in a transfer
of intellectual property rights from class members to Google without adequate compensation,
with respect to those class members who were not *actually* notified about the settlement and able
to opt-out, a court order effecting the transfer to Google of rights owned by class members for
the sake of advancing interests of the general public would result in the taking of "private
property . . . for public use without just compensation." U.S. Const., Amend. V.

[26]  As noted above, *supra* note 23, Plaintiffs' memorandum in support of preliminary approval
(Dkt. 57) stated they seek certification under both Rule 23(b)(2) and Rule 23(b)(3), but there is
no basis for certification of a class under Rule 23(b)(2). Any assessment of the notice program
should be evaluated under the standards set out in Rule 23(c)(2)(B) and (e)(1).

13

of Rule 23."); Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1786 at 492 ("Notice is crucial to the entire scheme of Rule 23(b)(3).").

## A.    Efforts to Provide Individual Notice to Class Members Were Inadequate

The Order Granting Preliminary Approval of Settlement directed Plaintiffs' counsel to "cause the Notice to be forwarded to identifiable Settlement Class members by email, postal mail, postage prepaid, at the last known mailing address, or other means of dissemination," and that all notice required "be disseminated no later than February 27, 2009." Dkt. 64 at ¶¶ 16, 18. The Order further directed Plaintiffs' counsel to file, at least five business days before the [Fairness] Hearing, certification of compliance with the notice provisions of the Order "by declaration describing the aforementioned mailings and publications." *Id.* at ¶ 19.

Because Plaintiffs' counsel have not yet filed with the Court any information describing notification to class members of the Proposed Settlement, including details of efforts to identify, locate and contact individual class members, no class member is yet in a position to comment on the details on that aspect of the notice program.[27] Nevertheless, information from media reports and other publicly available sources made clear that the efforts to provide individual notice in this case have been inadequate, and fail to satisfy Rule 23, the standards described by the Supreme Court, or due process requirements.

While the Second Amended Complaint states "plaintiffs reasonably estimate there are at least thousands of Author Sub-Class members" (¶ 40), in reality there are millions, if not tens of

---

[27] On July 28, 2009, I spoke by telephone with lead Plaintiffs' counsel, Michael Boni. At the beginning of the conversation I identified myself as a class member, indicated I was evaluating potential objections to the Proposed Settlement, and requested information about the efforts to provide individual notice to class members. Mr. Boni said he would confer with co-counsel, consider my requests, and get back to me. As of the date of this filing, I have not heard back from Mr. Boni.

millions.[28] "The settlement covers essentially all in-copyright books that were published by January 5, 2009."[29] Google appears to have already copied more than 10 million books, about 1.5 million of which it asserts are public domain, leaving more than 8.5 million in-copyright books copied by Google.[30] Many millions more books (and inserts) not yet copied are covered by the Proposed Settlement.

It is apparent that hundreds of thousands, if not millions, of the class members have not received individual notice of the Proposed Settlement.

### 1.    Efforts to Provide Individual Notice to Class Members in This Case Would Be Inadequate Even If This Were an Ordinary Settlement

"Individual notice *must* be sent to *all* class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (emphasis added). "[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is an unambiguous requirement of Rule 23." *Id.* at 176.

---

[28]    The Second Amended Complaint states there are "at least hundreds of Publisher Sub-Class members." This too seems low compared with the likely actual number. Some of the reasons for rejecting certification of the proposed Author Sub-class also apply to the Publisher Sub-class. Because I am objecting as a member of Author Sub-class, I have limited the scope of this filing to the issues affecting the Author Sub-Class.

[29]    Authors Guild, A Brief Guide to the Benefits of the Authors Guild v. Google Settlement (Feb. 25, 2009) (Exhibit M); *see also* Transcript, Copyright Clearance Center Interview of Michael Healy, at 2 ("many millions of books . . . are covered by the terms of the settlement agreement") (Exhibit N).

[30]    *See* Thomas Claburn, *Google Readies Its Book Business*, Information Week (July 30, 2009) ("To date Google has scanned over 10 million books, including 1.5 million public domain books"); Google 2008 Annual Report (Exhibit O) ("Today, we are able to search the full text of almost 10 million books.").

All available information suggests the notice program in this case was predominantly based on publication of the Summary Notice, and that individual notice was provided to only a fraction of class members.[31]

There is every reason to believe that many, if not most, class members could be contacted and provided with individual notice through reasonable efforts. In understanding why, it is important to note that the Author Sub-class is comprised of owners of works registered with the Copyright Office. *See* Settlement Agreement § 1.16. Therefore, with the exception of anonymous works, all of the authors of the works at issue in this case are known or knowable. And Google certainly knows the identity of the authors of the millions of books it has already copied.

There are substantial sources of public and private information that could be used to locate class members, for the purpose of sending individual notice. For instance, enormous amounts of information about copyright records are available through the United States Copyright Office. *See* 17 U.S.C. §§ 705 & 706; United States Copyright Office, Circular 6: Obtaining Access to and Copies of Copyright Office Records and Deposits; *see also* U.S. Copyright Office, Report on Orphan Works, at 29-30 (Jan. 2006) (noting the Copyright Office "maintains extensive records related to copyright registrations and ownership, and describing publicly available records and resources").

---

[31] I never received individual notice, even though my book was recently published, and my contact information can be obtained readily and inexpensively. I also never observed a paid media publication of the Summary Notice, in print or electronic form. I learned about the settlement from news reports, and then did my own research to obtain the Settlement Agreement and other information about the Proposed Settlement. *Cf.* April 27, 2009 Letter to Hon. Denny Chin from Academic Authors: "We have spoken with many colleagues in the past few weeks who are author subclass members, some of whom have been unaware of the Agreement . . . . Based on our conversations with academic colleagues, we are convinced that there remains widespread ignorance about the agreement.").

16

Several surveys also suggest that millions of putative class members are both identifiable and able to be located. For instance, Carnegie Mellon University Libraries conducted a study involving requests to digitize the books in its collection and found that copyright owners could be located for more than 75% of the books in the sample. *See* U.S. Copyright Office, Report on Orphan Works, at 92 n.345 (Jan. 2006); Carnegie Mellon Response to U.S. Copyright Office Notice of Inquiry About Orphan Works at 3 (Mar. 22, 2005) (Exhibit P). The Authors Guild itself reported to the Copyright Office, based on its own survey, "the overwhelming majority of published writers – 85% – have 'never' or 'rarely failed to reach a rightsholder to request permission."[32]

As the Authors Guild President recently observed: "Some people have the impression that most out-of-print books are orphans. That is not true. Most authors I know have written some books that are out of print. Me too. *We are all findable.* So are most of the authors I don't know."[33]

There is no doubt that a notice program which fulfilled the individual notice requirement of Rule 23 would have been time consuming and expensive. However, the Supreme Court has made clear that Rule 23's individual notice requirement "may not be relaxed based on high cost." *Amchem*, 521 U.S. at 617; *see also* Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1786 at 506-07 ("[I]t is clearly settled that in Rule 23(b)(3) actions all identifiable class members must be given individual notice *despite the cost that may be involved.*") (emphasis

---

[32] Authors Guild, Notice of Inquiry Concerning "Orphan Works" – Reply Comments, at 2 (May 9, 2005) ("A rightsholder who is temporarily unfindable by a particular method of diligent search should not face the penalty of having her work consigned to the quasi-public domain . . . which may well drain the work of all other licensing value.") (Exhibit Q); *see also id.* at 3 ("The law should not establish artificial licensing schemes.").

[33] Exhibit R; *see also* U.S. Copyright Office, Report on Orphan Works, at 92 (Jan. 2006) ("exactly how frequently the orphan works situation occurs is not entirely clear").

17

added). The fact that there are millions of class members does not excuse the settling parties from their individual notice obligations. *Cf. Wal-Mart Stores, Inc. v. Visa U.S.A.. Inc.*, 396 F.3d 96, 105 (2d Cir. 2005) (describing "direct notice via first class mail to 8,148,236 class members").

It is also important to note that the settling parties have designed the Registry, and touted its virtues, assuming the Registry will be able to locate and contact class members. *See* Settlement Agreement § 2.1(c) ("The Registry will be responsible for locating and collecting information from Rightsholders"); *id.* § 6.1(c) (The Registry "will attempt to locate Rightsholders with respect to Books and Inserts); *id.* § 6.1(d) (The Registry will "receive payments from Google . . . and distribute those payments to Registered Rightsholders"); *see also* Dkt. 57 at 2, 28 (Plaintiffs' counsel explaining the Registry "will locate Rightsholders" and "maintain their contact information.").[34]  All steps which might be taken by the Registry to locate and make contact with class members *after* the settlement should have been taken *during the notice process.* Rule 23 and the Due Process Clause require these efforts while class members have an opportunity to opt out, not after.

The settling parties have the burden of establishing that all applicable requirements of Rule 23 have been satisfied, including those imposed by Rule 23(c)(2)(B) concerning individual notice. Because it appears the individual notice requirements have not been met here. the Court should carefully scrutinize submissions by Plaintiffs' counsel and, absent a clear record demonstrating otherwise, reject the Proposed Settlement on this ground.[35]

---

[34] *See also* Settlement Website, FAQs, FAQ 29 ("Google will pay $34.5 million to establish and maintain a Book Rights Registry, to locate rightsholders and create a database of their contact information . . . .").

[35] The settling parties should be required to provide the Court with detailed information describing (1) everything done to identify all of the class members, and (2) each of the steps

18

### 2.      The Notice Program Must Be Evaluated in the Context of this Case and the Class Member Rights Affected by the Proposed Settlement

"Under both the Federal Rules of Civil Procedure and due process norms, the adequacy of notice to the class members depends on the particular circumstances of each case." *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 448 (S.D.N.Y. 2004); *see also Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 484 (1988) ("[W]hether a particular method of notice is reasonable depends on the particular circumstances."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 & n.3 (1985) (suggesting the procedural protections owed to absent class members required by due process may vary depending on the claims and interests at issue); *In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 167-70 (2d Cir. 1987) (finding adequate "under the circumstances" a notice protocol which included mailings to more than 100,000 potential claimants, which the district court determined were all "class members who could be identified and located through reasonable effort").

Although it appears the individual notice efforts in this case failed to satisfy the requirements of Rule 23 and due process under even ordinary circumstances, the individual notice obligations are especially significant here given class members would: (1) be bound to the terms of a complex commercial transaction under which some of their intellectual property rights are being transferred to Google and its partners; (2) release claims for *future* acts of infringement; and (3) release economically valuable claims for statutory damages, available

---

taken to transmit individual notice to all identifiable class members. The Court might also conduct an evidentiary hearing concerning issues related to the notice program. "[T]he judge must ensure that there is a sufficient record as to the basis and justification for the settlement. Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements." Manual for Complex Litigation, Fourth, § 21.635 at 322.

19

based on past infringement, for a small fraction of the amount that might be recovered at trial. Individual notice is also particularly important here because the intellectual property rights in question are, for many, deeply personal and have value beyond mere dollars and cents. Most authors invest considerable energy and resources into creating their works, and they deserve to make informed and conscious choices about the allocation and disposition of their intellectual property rights in their own works.

### 3.  Scrutiny of Notice to Absent Class Members Must Be Exacting Here, Where Class Members' Property Rights Are Altered if They Fail to Opt-Out

The mandatory notice requirements for classes certified pursuant to Rule 23(b)(3) were designed with the requirements of due process in mind. *See* Fed. R. Civ. P. 23, Adv. Comm. Notes to 1966 Amendments ("mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill the requirements of due process to which the class action procedure is of course subject"); Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1786 at 492 ("Without the notice requirement it would be constitutionally impermissible to give the judgment binding effect against the absent class members."). While Rule 23 may be adapted and interpreted to provide *more* protection for absent class member than is afforded by the due process provisions of the Constitution, the Rule does not authorize *less* protection than the Constitution provides.

It is well-established that "[a]n interest in a copyright is a property right protected by the due process and just compensation clauses of the Constitution." *Roth v. Pritikin*, 710 F.2d 934, 939 (2d Cir. 1983); *see also United States v. Martignon*, 492 F.3d 140, 151-52 (2d Cir. 2007) ("[T]he principal purpose of the Copyright Act is to encourage the origination of creative works by attaching enforceable property rights to them . . . .") (citation omitted).

20

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth and Fourteenth Amendments." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). And the Supreme Court's "precedents establish the general rule that individuals must *receive* notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993) (emphasis added); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (to bind absent plaintiff, the plaintiff "must *receive* notice") (emphasis added); *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 548 (1974) ("[I]n Rule 23 actions the judgment shall include all those found to be members of the class who have *received* notice and who have not requested exclusion.") (emphasis added).

Because the Proposed Settlement would result in a compulsory transfer of intellectual property rights from class members to Google and others, due process in *this case* requires *actual notice* to each class member. *Cf. Madera v. Board of Education*, 386 F.2d 778 (2d Cir. 1967) ("What constitutes due process under any given set of circumstances must depend upon the nature of the proceeding involved and the rights that may possibly be affected by that proceeding."); *see also Mathews*, 424 U.S. at 334 (due process "calls for such procedural protections as the particular situation demands").

In a typical settlement, the failure to opt out due to lack of notice results in a lost opportunity to submit a claim for a share of a settlement fund. In such cases, the absent class member has been deprived of some (usually small) amount of money, but is no worse off than if there had been no lawsuit at all. *This case is different.* Here, an absent class member who does not receive actual notice, and is thereby deprived of the ability to opt-out, would be *worse off* than if no lawsuit has been brought, because Rule 23 and court orders will compel a transfer of

21

the absent class member's intellectual property rights to Google and others, without the class member's knowledge or consent.

The necessity for stringent notice requirements in this case is confirmed by the Rules Enabling Act's mandate that the Rules of procedure "not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). As discussed above, copyright owners have a substantive right – indeed, a property right – conferred by statute. Any use of Rule 23 to "abridge" or "modify" that right without the *actual* consent of the copyright owners would be inconsistent with 28 U.S.C. § 2072(b) – and therefore, any such use of Rule 23 is prohibited. Thus, at least with respect to those copyright owners who *do not actually receive a properly designed notice* apprising them of the Proposed Settlement and its affect on their intellectual property rights, the Rules Enabling Act forecloses the use of Rule 23 to "abridge" or "modify" those rights. *Cf. Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999) ("[A]n absent plaintiff *must* be provided with an opportunity to remove himself from the class.") (emphasis added; quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).[36]

---

[36] Plaintiffs' memorandum in support of preliminary approval contended: "Each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members." Dkt. 57 at 36. The one case cited by Plaintiffs' counsel does not support the notion that the notice program here satisfied the requirements of due process. In *Weigner*, the Second Circuit held, in the circumstances of that case, the "notice sent by ordinary mail of the pendency of the tax lien foreclosure is all that the constitution requires." *Weigner v. City of New York*, 852 F.2d 646, 648 (2d Cir. 1988). While the Court did recognize in *Weigner* that fulfilling the requirements of due process "does not mean that all risk of non-receipt must be eliminated," *id.* at 649, nothing in the Court's opinion suggests that the notice program here satisfies the Constitution's requirements. To the contrary, the Court's observation that "[t]he Supreme Court has frequently said . . . under most circumstances, notice sent by ordinary mail is deemed reasonably calculated to inform interested parties that their property rights are in jeopardy," *id.* at 650, highlights the marked contrast with notice efforts in this case, where a small fraction of the millions of class members were directly contacted through individual notice.

22

**B.      The Summary Notice is Likely to Have Resulted in Class Member Confusion or Misunderstanding About the Proposed Settlement**

While the defects in the Summary Notice[37] pale in comparison to the other infirmities of the Proposed Settlement, they too are significant and render the Proposed Settlement objectionable.

One significant problem with the Summary Notice flows from its introductory paragraph:

Authors and publishers filed a class action lawsuit claiming Google violated the copyrights of authors, publishers and other copyright holders ("Rightsholders") by scanning in-copyright Books and Inserts, and displaying excerpts, without permission. Google denies the claims. The parties have agreed to a settlement. This summary provides basic information about the settlement.

It would be reasonable for a reader to infer from this language that the settlement resolved a lawsuit about claims based on *past* "scanning [of] in-copyright Books and Inserts, and displaying excerpts, without permission." An author whose work had not been scanned and displayed by Google at the time the notice was read, might reasonably conclude the lawsuit did not involve them, and stop reading. If the Proposed Settlement only involved the resolution of claims for *past* copyright infringement, this paragraph might not be particularly problematic. However, because the Proposed Settlement also has the additional commercial component, which significantly affects the rights of all owners of in-copyright works, and releases claims for *future* infringement, the introductory paragraph constitutes a substantive and material defect in the notice, which renders it inadequate under Rule 23 and due process standards. *Cf. Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 628 (1997) (rejecting proposed class settlement and observing that even if a putative class member receives notice "those without current afflictions

---

[37]      *See* Settlement Agreement, Attachment J (and the final version of the Summary Notice, available at the Settlement Website).

23

may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out").[38]

A further defect in the Summary Notice is the material and misleading statement that ". . . Google will pay *Rightsholders* 63% of all revenues" generated by its uses of the class members' copyrighted works. *See* Settlement Agreement, Attachment J (emphasis added). This statement is incorrect.[39] Instead, under the terms of the Proposed Settlement, Google will pay the Registry 63% of revenues, but the Registry will retain a portion of that revenue. *See* Settlement Agreement, Attachment C (Plan of Allocation) § 4.2 ("The Registry shall pay net revenues to Rightsholders . . . after deducting the Registry's costs of administration and operations").[40] Contrary to the information conveyed in the Summary Notice, Rightsholders will receive less (perhaps significantly less) than 63% of the revenues generated by Google's use of class members' works.[41]

---

[38]  Even among authors generally aware of the Settlement, there is considerable uncertainty about its sweep and implications. *See, e.g.*, Authors Guild, A Brief Guide to the Benefits of the Authors Guild v. Google Settlement (Feb. 25, 2009) ("Some authors told us that they think of the settlement as covering only books for adults or nonfiction books.") (Exhibit M).

[39]  The Notice of Class Action Settlement contains a similar misstatement. *See* Settlement Agreement, Attachment I, at 1 ("Settlement benefits to the class include: 63% of the revenues earned by Google's sales . . . .").

[40]  The Registry is not a "Rightsholder." *See* Settlement Agreement § 1.132 ("Rightsholder means a member of the Settlement Class who does not opt out of the Settlement by the Opt-Out Deadline.").

[41]  The defects in the Summary Notice are especially problematic because the notice efforts in this case relied heavily on notice by publication (rather than individual notice), which used the Summary Notice to describe the Proposed Settlement. *See* Settlement Agreement, Article XII at 117 (describing the "Paid Media" component of the notice program as "publishing the Summary Notice" in the publications listed on the Paid Media Schedule, Settlement Agreement, Attachment K).

24

## III. THE PROPOSED SETTLEMENT FAILS TO PROVIDE CLASS MEMBERS WITH ADEQUATE COMPENSATION AND FAILS TO SATISFY THE REQUIREMENTS OF RULE 23(e)(2)

The Court may approve the Proposed Settlement only upon finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "Counsel for the class and the other settling parties bear the burden of persuasion" to establish these requirements are met. *See* Manual for Complex Litigation, Fourth, § 21.631 at 318.

The Proposed Settlement must be rejected because the compensation to class members is plainly inadequate, and because it will interfere with existing contractual arrangements between authors and publishers.

### A. The Compensation for Past Copyright Infringement is Inadequate

The Proposed Settlement would release Google and others from liability for *past* copyright infringement in exchange for approximately $45 million – with payments to individual authors in the amount of $15 per insert ($5 for partial inserts) or $60 per book, with the possibility of higher payments if less than the full $45 million is claimed by other class members.[42] These payments substantially undervalue the claims being released, and render this aspect of the Proposed Settlement unfair, unreasonable and inadequate.

Again, it is important to recall that this case concerns only works registered with the Copyright Office. *See* Settlement Agreement § 1.16. This point is significant in evaluating the adequacy of the payment to class members for releasing claims for past copyright infringement, because statutory damages are available to copyright owners whose works are infringed. If a defendant is found to have infringed a work registered with the Copyright Office, the *minimum* statutory damages award is $750. *See* 17 U.S.C. § 504(c)(1) (providing for statutory damages "in a sum of not less than $750 or more than $ 30,000"). Statutory damages may be increased

---

[42] *See* Settlement Agreement §§ 2,1(b), 5.1; Settlement Attachment C (Plan of Allocation) § 3.2.

25

substantially for acts of willful infringement. *See* 17 U.S.C. § 504(c)(2) ("the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000").

Plaintiffs' counsel offer no meaningful justification for accepting nominal damages payments ($5, $15, or $60) to release class members' valuable statutory damages claims. To the contrary, Plaintiffs' Second Amended Complaint asserts "Plaintiffs and the Class are likely to succeed on the merits of their copyright infringement claim" (Dkt. 59 at ¶ 66), and their memorandum in support of preliminary approval similarly asserts "Plaintiffs are confident that they could prevail at trial on their copyright infringement claims against Google" (Dkt. 57 at 29). These representations to the Court cannot be reconciled with the compensation terms agreed to in the Proposed Settlement.[43]    *See* Manual for Complex Litigation, Fourth, § 21.62 at 315 ("Adequacy of the settlement involves a comparison of the relief granted relative to what class members might have obtained without using the class action device."). As the National Writers Union appropriately observed when announcing its opposition to the Proposed Settlement: "Compared to the number and seriousness of violations, the amount being offered by Google is ridiculously low."[44]

While any experienced litigator recognizes no case is without risk, Plaintiffs' counsel have failed to substantiate that payments of $5, $15 or $60 to class members for each copied work is "adequate" compensation for the release of their claims – a release that covers not only Google, but non-defendant libraries (which have made no monetary contribution to the

---

[43] Plaintiffs' counsel nevertheless assert in their motion for preliminary approval: "[t]he Settlement is an excellent result in light of the risks of the litigation." Dkt 57 at 30. This conclusory assertion is made without any support except the observation that Google successfully asserted a fair use defense in another case.

[44] Exhibit L.

26

settlement in exchange for the releases they would obtain).[45]  *Cf.* Manual for Complex Litigation, Fourth, § 21.635 at 322 ("[T]he judge must ensure that there is a sufficient record as to the basis and justification for the settlement.").

The failure to substantiate the adequacy of the settlement amount is exemplified by the fact that the two pages dedicated to the issue in the memorandum seeking preliminary approval never mentions the issue of statutory damages, or the risk to Google that it will be deemed to have engaged in willful copyright infringement given the unassailable fact that Google consciously and systematically copied millions of in-copyright works without permission as part of a commercial enterprise (and continued to do so after it was sued for copyright infringement).[46]  The failure of the Summary Notice and Notice of Class Action Settlement to address these issues was also a material omission, which renders them objectionable.

## B.      The "Benefits" to Class Members of the Proposed Settlement's Commercial Component are Too Contingent and Uncertain to Warrant Approval

In addition to the other problems associated with the commercial component of the Proposed Settlement discussed in this Objection, that part of the settlement should also be rejected because the "compensation" to class members for transferring rights to Google and

---

[45]  Among the "recurring potential abuses in class action litigation" is "releasing claims against parties who did not contribute to the class settlement."  *See* Manual for Complex Litigation, Fourth, § 21.61 at 310-11.

[46]  Because the settling parties bear the burden of persuasion, the Court should reject the Proposed Settlement based on the failure to carry that burden.  The Court has the authority to order counsel for the settling parties to provide additional information about the amount of the settlement payment, order discovery on the issue, and/or conduct a hearing.  *See* Manual for Complex Litigation, Fourth, § 21.631 at 320 (describing additional information that might be sought to provide "complete and detailed information about the factors that indicate the value of the settlement"); *see also* Manual for Complex Litigation, Fourth, § 21.612 at 314 (If "the case is filed as a settlement class action or certified for settlement with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims and defenses, to determine the appropriate definition of the class, and to consider how class members will actually benefit from the proposed settlement.").

27

others, and for releasing claims for future copyright infringement, is too speculative, contingent and uncertain to satisfy the requirements of Rule 23(e)(2).

For instance, all of the purported benefits to class members under the Proposed Settlement's commercial arrangement depend on the successful establishment and operation of the as-of-now non-existent Book Rights Registry. While the Proposed Settlement requires Google to make a monetary contribution to establish the Registry, the Agreement does not guarantee the Registry will operate as planned, or that future funding will be sufficient to ensure it can fulfill the functions described in the Proposed Settlement. In fact, the person widely expected to be the first Executive Director of the Registry if the Proposed Settlement is approved has acknowledged there is no assurance the Registry will not fail.[47]  What happens to class members if the Registry does not operate as planned? If the Registry does not make timely payments? If the Registry runs out of money?[48]  It appears that under the terms of the Proposed Settlement Google would retain all of the rights obtained from copyright owners by virtue of the Settlement Agreement, while copyright owners would have no apparent mechanism for redress or ability to rescind the transfer of their rights to Google.

Moreover, even if the Registry operates as planned, some of the purported financial benefits to class members are uncertain. For instance, as noted earlier, while Google will pay the Registry 63% of revenues generated through the use of class members' intellectual property, it is unknown how much of that money class members will receive because the Registry will retain a

---

[47] *See* Transcript, Copyright Clearance Center Interview of Michael Healy, at 2 ("[T]o a great extent, [the Registry's] success or failure will depend on its ability to manage very complicated, very volatile data in the interests of rights holders") (Exhibit N).

[48] For instance, there are questions about the status of the Registry itself under the antitrust laws. *See infra* note 78. If the Registry were sued for alleged violations of the antitrust laws, it might lack sufficient funds to defend itself against lawsuits, let alone pay any judgments entered against it – and, in any event, the money spent on such cases would diminish the economic value of the commercial arrangement to class members.

share of that revenue to fund its operations.[49] Neither the Settlement Agreement, nor the motion

in support of preliminary approval provide any information that would allow the Court (or class

members) to reasonably determine how much money they are likely to receive for participating

in the commercial component of the Proposed Settlement – or when class members are likely to

start receiving payments for the various uses of their intellectual property.[50]

## C.    The Commercial Component of the Proposed Settlement Interferes With Existing Contractual Arrangements Between Authors and Publishers

The commercial component of the Proposed Settlement also fails to satisfy the

requirements of Rule 23(e)(2) because it will complicate and/or frustrate existing contractual

agreements between authors and publishers.[51]

A threshold problem is that existing author-publisher contracts may *preclude* one or both

parties from conferring upon Google and its partners the rights they would obtain under the

Proposed Settlement.  For example, an author-publisher contract may provide a publisher with

exclusive rights to all uses of an author's work for a period of time.  This would foreclose an

author from conveying even non-exclusive rights to Google.    The Proposed Settlement

disregards the prospect of such contracts, presupposing there are no contractual impediments to

the transfer of intellectual property rights which would be effected if approval is granted.  The

---

[49]  *See* Settlement Agreement, Attachment C (Plan of Allocation) § 4.2 ("The Registry shall pay net revenues to Riightsholders . . . after deducting the Registry's costs of administration and operations").

[50]  *See* Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 11 ("It will take considerable time to implement the commercial uses authorized under the Settlement."); *see also* Settlement Agreement § 3.7(a) ("Google shall implement both of the Contemplated Rightsholder Services . . . within *five (5) years* after the Effective Date.") (emphasis added).

[51]  As the National Writers Union's observed in opposing the Proposed Settlement, "it interferes or might interfere with the relationship writers have with their publishers . . . . The settlement makes assumptions about electronic rights that writers may or may not have assigned to publishers and it sets up an unfair binding arbitration process to resolve disputes between writers and publishers." Exhibit L.

29

failure of the Proposed Settlement to address this important set of circumstances is further reason for rejecting the Proposed Settlement.

Another set of problems relates to the "Author-Publisher Procedures" in the Proposed Settlement. As the settling parties apparently recognize, the interests of authors and publishers diverge with respect to many issues.[52] In light of this fact, the settling parties drafted rules to govern disputes between authors and publishers arising from implementation of the Proposed Settlement. *See* Settlement Agreement, Attachment A. These procedures are "an important part of the Settlement." *See* Notice of Class Action Settlement, Settlement Agreement, Attachment I, at 7. And it is because of their importance to the Proposed Settlement that these Procedures are particularly troubling.

Specifically, the Author-Publisher Procedures purport to "*establish* procedures for determining the[] *respective rights*" of authors and publishers. *See* Settlement Agreement, Attachment A, at 1 (emphasis added). Yet the "respective rights" of authors and publishers are, in most cases, already "established" by contract law. The provisions of these contracts will sometimes differ in material respects from the protocol governing author-publisher relationships set out in the Settlement Agreement. The Proposed Settlement nevertheless seeks to superimpose its Author-Publisher Procedures over existing contractual relationships, thereby modifying or displacing existing contract rights of authors and/or publishers. Is so doing, the Proposed Settlement once again conflicts with the Rules Enabling Act. *See* 28 U.S.C. 2072(b).[53]

---

[52] *See, e.g.,* Dkt. 57 at 33 (Plaintiffs' counsel observing that "authors and publishers have divergent interests").

[53] The modification of contract rights through the Proposed Settlement also raises due process issues with respect to those class members – authors and publishers – who do not receive actual notice of the Proposed Settlement. *See* Section II above.

30

In addition to the conflict between the "Author-Publisher Procedures" and Rules Enabling Act, the Procedures fail to account for situations where an author or the author's publisher opts out, *but the other does not.* In such cases, these "important" Procedures seemingly will be a nullity, because either the author or publisher will not be bound by the terms of the Settlement. This, and similar problems related to the Author-Publisher Procedures in the Proposed Settlement, are additional grounds for rejecting it.

## IV.  THE PROPOSED SETTLEMENT FAILS TO SATISFY RULE 23(a)

Rule 23(a) provides that a putative class representative may pursue claims on behalf of all other putative class members only if the claims of the potential representative are "typical" of the claims of the rest of the putative class, and if the potential representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3) & (4). The Proposed Settlement should be rejected because these requirements are not satisfied here.

### A.  The Proposed Settlement Affects the Rights of At Least Four Groups of Authors, Each With Distinct Interests, and Each Requiring Representation by Separate Counsel

The Proposed Settlement seeks certification of a single Author Sub-Class, and the appointment of class counsel to represent that entire Sub-Class. This should be rejected because there are at least four author Sub-Classes with materially distinct interests, which may diverge from one another. Each of those Sub-Classes should have separate class representatives and separate counsel.

As explained above, the Proposed Settlement has two distinct parts – a cash payment for past copyright infringement, and a commercial component whereby class members would transfer certain rights to Google and other entities, in exchange for a share of potential future revenues from the sale of parts of class members' works. The Proposed Settlement proposes to

31

combine *in a single class* persons both (1) those whose works have been copied by Google before the Opt-Out Deadline (and are therefore eligible for a nominal cash payment),[54] and (2) those whose works have not been copied (and therefore have no damages claims). Yet the interests of these two groups are not necessarily aligned. Those whose works have been copied may want to settle their claims for past infringement for the greatest amount of money obtainable, and have little or no interest in the commercial component of the settlement. Meanwhile, those whose works were not copied are likely to have much more interest in securing beneficial terms for the commercial arrangement, and relatively limited interest in maximizing the cash component of the settlement payable to those who allege past copyright infringement of their works.

Another readily identifiable divergence of interests is between owners of orphan works and owners of non-orphan works. The very basis for categorizing a work as an "orphan" is that its owner is exceedingly difficult or impossible to identify.[55] The viability, and ostensible desirability, of the Proposed Settlement, however, depends in (at least) two ways on being able to identify and locate the owners of the works in question.

First, as discussed above, both Rule 23 and due process require a notice program designed to inform class members of the proposed settlement, its effects on their rights, and the opportunity to opt out. Because orphan works' owners are − by definition − very difficult to identity and/or locate, there will be special problems associated with trying to provide them the

---

[54] *See* Settlement Agreement § 5.1(a).

[55] Although there in no objective test to discern whether a work is an "orphan," the concept generally refers to a situation "where the owner of a copyrighted work cannot be identified and located by someone who wishes to make use of the work in a manner that requires permission of the copyright owner." U.S. Copyright Office, Report on Orphan Works, at 1 (Jan. 2006).

required notice.[56]  This point seemingly was acknowledged by the Authors Guild President when he observed "[t]he Settlement will allow Google to make these [orphan works] available to readers without tracking down the books' rightsholders."[57]

Second, one of the supposed "benefits" of the settlement for class members is the ability to earn profits from their works through the commercial ventures of Google and their partners. Under the terms of the Proposed Settlement, the Registry will locate and contact class members so they can receive these payments.[58]  Yet, the potential benefits of the commercial component of the settlement for owners of orphan works may be illusory since they are unlikely to receive those payments because they cannot be located.[59]  In fact, under the terms of the Proposed Settlement the revenues owed to a class member which go unclaimed for a period of time would be reallocated to other authors or the Registry[60] – a provision likely to have a disproportionately adverse affect on owners of orphan works.[61]

---

[56]  There is, of course, the additional problem of finding a class representative for an orphan works sub-class, since owners of orphan works are supposed to be impossible to find.

[57]  Exhibit R.

[58]  *See* Settlement Agreement §§ 2.1(c), 6.1(b), (c) & (d).

[59]  As the Author's Guild President acknowledged: "The Settlement will allow Google to make these [orphan works] available to readers without tracking down the books' rightsholders." Exhibit R. *See also* Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 3 (July 2009) ("The orphan holders cannot act and the settlement agreement neatly sweeps them up to give Google releases for the ongoing use of their works.") (Exhibit S); Anna Stolley Persky, *Paper or Plastic?: Google's Plan to Digitize Books Pits Book Lovers v. Book Innovators*, Washington Lawyer, 37 (June 2009) ("Critics say the settlement allows Google to skirt copyright law governing orphan works and eclipse recent legislative efforts to gain the exclusive right to digitize and display orphan works.")

[60]  *See* Settlement Agreement § 6.3(a); Settlement Agreement, Attachment C at §§ 1.1(e), 2.3.

[61]  James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 15 (Apr. 2009) ("This reallocation illustrates a clear conflict of interest between non-orphan owners (including, by definition, all of the named plaintiffs) and the orphan members of the plaintiff class.") (Exhibit C).

33

Considering these two bases for delineating members of the omnibus Author Sub-Class, it is apparent there are four potential sub-classes which might be formed, each with distinct interests and potential goals in resolving this litigation.

|  | **Copied Without Permission** | **Not Copied/Copied With Permission** |
|---|---|---|
| **Orphan** | Owner of Copyright in Orphan Work Copied by Google Without Permission | Owner of Copyright in Orphan Work Not Copied by Google or Copied With Permission |
| **Not Orphan** | Owner of Copyright in Non-Orphan Work Copied by Google Without Permission | Owner of Copyright in Non-Orphan Work Not Copied by Google or Copied With Permission |

Supreme Court and Second Circuit case law make clear that Rule 23(a) precludes certification of a single Author Sub-Class. *See, e.g., Ortiz v. Fireboard Corp.*, 527 U.S. 815, 856 (1999) ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel."); *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care. L.L.C.*, 504 F3d 229, 246 (2d Cir. 2007) (remanding for certification of subclass "[b]ecause the antagonistic interests apparent in the class should be adequately and independently represented"); *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 17 (2d Cir. 1981) ("The named plaintiffs in a class action 'cannot represent a class of whom they are not a part,' and can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class.") (quoting *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962); citation omitted); *see also* Rule 23, 2003 Adv. Comm. Notes ("Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or

34

designate subclasses. Redefinition of a certified class under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B).").

## B. The Authors Guild Has Not Fairly and Adequately Represented the Interests of the Author Sub-Class

The Proposed Settlement should also be rejected for several reasons having to do with the adequacy of the class representatives – and in particular the Authors Guild.

The formal status of the Authors Guild is this case is a matter of some confusion. In the original Complaint the Authors Guild was described as an "Associational Plaintiff" and sought only to "pursue claims for injunctive and declaratory relief on behalf of its members." *See* Dkt. 1 at 4-5. The same is true in the Second Amended Complaint, filed by consent contemporaneously with the Settlement Agreement and motion for preliminary approval of the settlement and class certification. *See* Dkt. 59 at ¶¶ 27, 28. However, the Second Amended Complaint, as well as the motion for preliminary approval and Order granting preliminary approval, do not appear to advance the Authors Guild as a class representative for purposes of Rule 23.

For instance, the memorandum submitted by Plaintiffs' counsel states "[t]he Associational Plaintiffs participated in the litigation in order to advance the rights and interests of their members, and served as consultants to Class Counsel during the litigation and negotiations." Dkt. 57 at 8. It later asserts the "Representative Plaintiffs" (which does not include the Authors Guild) "are adequate representatives, and fairly and adequately represent the interests of the Sub-Classes." *Id.* at 33-34. The Order Granting Preliminary Approval, prepared by the settling parties, lists five individuals "designated as Representative Plaintiffs for the Author Sub-Class," and makes no mention of the Authors Guild. Dkt. 64 at ¶ 8. The Second Amended Complaint likewise only mentions the individual "Author Plaintiffs" (which does not

35

include the Authors Guild) when alleging that the typicality and adequacy requirements of Rule 23(a) are met. *See* Dkt. 59 at ¶¶ 42, 43.[62]

In contrast with the confusion regarding the formal role of the Authors Guild in this case, the Guild's significant role in the two-year negotiation leading to the Proposed Settlement is not in doubt. Publicly available information demonstrates the Authors Guild was effectively the lead plaintiff for the proposed Author Sub-Class during the litigation – and, more importantly, during the extensive negotiation process.[63] Google has repeatedly stated it reached a settlement *with the Authors Guild.*[64] This raises several concerns with respect to the requirements of Rule 23(a).

As a threshold matter, the Authors Guild never asserted it had standing to pursue damages claims against Google for copyright infringement – as reflected in the Complaints, where it sought to pursue only injunctive or declaratory relief. It is therefore apparent that the Authors Guild did not – and never could have – served as an appropriate class representative with respect to the litigation of damages claim, or the negotiation of a potential resolution of those claims. Yet it appears the Authors Guild was intimately involved in negotiating the compromise of class members' damages claims, culminating in the Proposed Settlement.

---

[62] Because the Authors Guild could only serve as a class representative for purposes of pursing injunctive or declaratory relief, and because the Proposed Settlement does not involve either (see *supra* note 23), the Guild cannot serve as a representative of the proposed Author Sub-Class. Thus, it is not surprising that the Guild is not listed as a Plaintiff in the Order granting preliminary approval and provisional certification.

[63] *See, e.g.*, Exhibits E, F and G.

[64] *See, e.g.*, Google Inc., Form 10-Q at p. 20, Sept. 30, 2008 (Exhibit J) ("On October 28, 2008, we announced a settlement agreement with the Authors Guild and AAP."); Google Inc., Form 10-Q at p. 45, Mar. 31, 2009 (Exhibit T) ("In the U.S. we announced a settlement agreement with the Authors Guild and Association of American Publishers"); Google 2008 Annual Report (Exhibit O) ("In October 2008, we reached a settlement with the Authors Guild and the Association of American Publishers . . . .").

36

Moreover, public statements by the Authors Guild make clear it viewed the litigation as a means of securing an agreement with Google and its partners which extended well beyond the specific controversy at issue in the original Complaint. Early on in the litigation, the Authors Guild seemingly previewed its desire to use the lawsuit to effectuate a massive licensing scheme, publicly stating:

> Authors (and the Guild) aren't opposed to making their works searchable online with a proper license. With a proper license, in fact, far more than 'snipets' could be made available to users. The opportunities are boundless, but it all starts with a valid license.

The Authors Guild apparently pursued this vision with zest in this case, but in so doing failed to adequately represent the interests of *all* class members.

For instance, despite that many class members had economically valuable claims for past copyright infringement – which the Proposed Settlement seeks to settle for what amounts to nuisance value given Google's business interests and potential liability – at the press conference announcing the settlement, Authors Guild Executive Director, Paul Aiken, acknowledged: "Money was never our chief concern ...."[65] Authors Guild President, Roy Blount, similarly noted that a "small share" of $45 million would go to each class member, acknowledging "[f]ar more interesting for most of us . . . is the prospect for future revenues."[66]

Other statements by the Authors Guild cast doubt on the adequacy of that organization to represent any absent class member authors – let alone *all* authors.[67] For instance, when recently defending the Proposed Settlement the Authors Guild President described so-called "out of print"

---

[65] Exhibit E.

[66] Exhibit F.

[67] Even if all of the Author Guild's 8,000 members are class members, they are a tiny fraction of the millions of class members, and there is no reason to think the Guild's views reflect those of most other authors. In fact, the National Writers Union recently announced its strong opposition to the Proposed Settlement (Exhibit L), as did the American Society of Journalists and Authors.

37

books as having "no market" because they are deemed "unfit for continued commerce by traditional print publishers."[68] This view ignores the present and future impact of technological developments, such as "Print on-demand," which may render antiquated the very idea of an "out of print" book.[69] The Authors Guild nevertheless appears to have played a central role in negotiating the Proposed Settlement propelled in part by this dubious premise, and the idea that a commercial venture with Google was necessary to revive books with "no market."[70]

The apparent effort to convert the Authors Guild from a class representative to a "consultant" in the settlement filings (Dkt. 57 at 8) does not curse the Rule 23(a) problems flowing from the deep involvement of the Authors Guild in the case – and in particular, in the negotiation of the Proposed Settlement.[71] Moreover, while it is clear the Authors Guild was not an adequate representative of the Author Sub-Class, there is also nothing before the Court establishing that any of the other named plaintiffs played any meaningful role in the case or the settlement negotiations, or were otherwise adequate class representatives. *See* Dkt. 57 at 33-34 (conclusory assertions concerning satisfaction of Rule 23(a)'s requirements).

---

[68] Exhibit R.

[69] *See* Exhibit U (Statement by William Morris Endeavor agency regarding the Proposed Settlement, observing "most major publishers will take the position that none of their backlist is commercially unavailable . . . because of the availability of on-demand and other electronic editions . . . ."). Of course, the Proposed Settlement would confer Google and its partners with a significant competitive advantage over other on-demand publishers.

[70] The Authors Guild expressed a different view after it sued Google, but before the settlement. *See* Authors Guild, *Is Google a charity?: Some handy talking points for the Google Class-Action Lawsuit* ("Out of print books are valuable. Out of print books are republished every day, bringing welcome new advances to authors and the prospect of new royalty income.") (Exhibit V).

[71] Plaintiffs' counsel should be required to disclose the nature of the consultant role, and the details on any arrangement, including compensation, paid to the Authors Guild for this "consulting" work.

38

Both Rule 23 and due process require "that the named plaintiff *at all times* adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (emphasis added). And class action judgments rendered where absent parties were not adequately represented are subject to collateral attack. *See Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 171 (2d Cir. 2006) ("This Circuit, and many others, have allowed such collateral attacks in recent years."). Based on the present record, it appears the adequacy requirement of Rule 23 has not been satisfied in this case, and certification of the Author Sub-Class cannot be granted.

## V. THE SETTLEMENT CANNOT BE APPROVED UNDER RULE 23 BECAUSE IT WOULD HAVE SIGNIFICANT ANTICOMPETITIVE EFFECTS AND FACILITATE ANTICOMPETITIVE CONDUCT

The Proposed Settlement should be rejected for the reasons explained in Sections I – IV of this Objection. An additional set of reasons for rejecting the Proposed Settlement relate to its impact on competition, and to the possibility that the Agreement may itself violate the antitrust laws.[72]

### A. The Proposed Settlement Would Have Significant Anticompetitive Effects and Facilitate Anticompetitive Conduct

Many of the comments and objections received by the Court have focused, and will focus, on the competitive implications of the Proposed Settlement.[73] This is unsurprising since the Proposed Settlement is predominantly a massive commercial transaction that could never be

---

[72] The Court should consider that the Settlement Agreement itself may violate the antitrust laws – specifically Section 1 of the Sherman Act and/or the attempted monopolization provision of Section 2 of the Sherman Act. Among other things, the Agreement can be viewed as seeking to restrain trade through coordination and concerted action between horizontal competitors.

[73] The Department of Justice has informed the Court it is conducting an antitrust investigation into the Proposed Settlement itself, as well as its competitive impact. *See* July 2, 2009 Letter from William F. Cavanaugh, Deputy Assistant Attorney General (Dkt 120). The Court has given the Department of Justice until September 18, 2009, to submit its views in writing. *Id.*

obtained in the marketplace. This transaction will put Google and its partners at a significant competitive advantage compared with actual and potential competitors in a number of different markets.[74]

Many of these competitive advantages will flow directly from the fact that the commercial arrangement is being implemented by virtue of Rule 23 and its ostensibly binding effect on all class members who do not affirmatively opt out of the settlement. Another party seeking to obtain for itself the same licenses obtained by Google and Google's partners through the force of Rule 23 would find the task impossible – facing what antitrust law describes as a "barrier to entry," which can only be overcome with a class action settlement enforced through Rule 23.[75] The Engineering Director of Google Books, Don Clancy, seemingly acknowledged this point when he observed: "The settlement is valuable because comprehensiveness is valuable."[76] Thus, despite the formality that Google licenses from class members are non-exclusive, "[t]his is really a Google-only deal."[77]

---

[74] *See, e.g.*, Miguel Helft, *Google's Plans for Out-of-Print Books Is Challenged*, New York Times (Apr. 4, 2009) (quoting Michael Boni, lead counsel for the named Plaintiffs, as conceding "Google will always have the advantage of having access to 100 percent of orphan works."); *see also* Exhibit R (Authors Guild President: the Settlement would give Google a license to intellectual property rights in orphan works while "no one else will have this option."

[75] *See* Pamela Samuelson, *Legally Speaking: The Dead Souls of the Google Book Settlement*, 52 Communication of the ACM, 28-30 (Jul. 2009) (noting the only way for an aspiring competitor to obtain the breath of licenses that would be secured by Google through the Settlement, would be through its own litigation and settlement, and observing such a strategy for a potential Google competitor "would be very costly and very risk . . . [and] [c]hances are slim that the plaintiffs in such a lawsuit would be willing or able to settle on equivalent of even similar terms" to those obtained by Google) (Exhibit K).

[76] D.C. Denison, *Google Books causes concern: Digital library's growth has some worried it may be building a monopoly*, Boston Globe (July 24, 2009).

[77] James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 10 (Apr. 2009) (Exhibit C).

The competitive concerns presented by the Proposed Settlement are too extensive to comprehensively address here. However, several scholarly analyses of the Proposed Settlement already published provide instructive discussions of the some of the antitrust problems. *See, e.g.*, Eric Fraser, *Antitrust and the Google Books Settlement: The Problem of Simultaneity*, at 2 (June 2009) ("The Google Books Settlement Agreement probably violates federal antitrust law.") (Exhibit W); Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 3 (July 2009) (The proposed agreement "is not the result that would emerge under pure competition between authors/rightsholders and seems likely to run afoul of Section 1 of the Sherman Act.") (Exhibit S); James Grimmelmann, *How to Fix the Google Book Settlement*, Journal of Internet Law, at 13 (Apr. 2009) (arguing the proposed Book Registry "walks and quacks like a cartel," and asserting that with the Settlement both the registry and Google pose "antitrust threat[s]"); *see also* Robert Darnton, *Google & the Future of Books*, New York Review of Books (Feb. 12, 2009) ("[T]he settlement creates a fundamental change in the digital world by consolidating power in the hands of one company.").[78] Some initial submissions to the Court have also raised important points about the competitive implications of the Proposed Settlement,[79] and others will certainly be filed by the September 4, 2009 deadlines for objections to the Proposed Settlement. And, of course, the Department of Justice, and possibly other

---

[78] The Registry may also be viewed as a joint venture – a term generally applied in the antitrust context to "any collaborative activity, short of full merger, by which independent firms [or persons] pool resources to produce or sell a common product or service, to obtain needed inputs, or to pursue some other common objective." ABA Section of Antitrust Law, Antitrust Law Developments, at 433 (6th ed. 2007). Because joint ventures can reduce or eliminate competition among competitors, they are subject to antitrust scrutiny. *See id.* at 434-40.

[79] *See, e.g.*, Library Association Comments on the Proposed Settlement at 9-11 (Dkt. 100) (discussing possible effects on libraries other than those partnering with Google).

government agencies, will soon present their views about some of the competitive issues raised by the Proposed Settlement.[80]

## B.     The Anticompetitive Effects of the Proposed Settlement Must be Considered as Part of the Court's Rule 23 Inquiry

Although Rule 23 makes no specific reference to considering the competitive implications of a Proposed Settlement, examination of Rule 23 and the Rules Enabling Act makes clear the decision whether to approve this Proposed Settlement must include a rigorous assessment of the antitrust issues it raises.

As discussed earlier in the context of other grounds for this Objection, the Rules Enabling Act provides that Rules of procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Here, if there is merit to the argument that the Proposed Settlement would facilitate or permit (or constitutes) conduct proscribed by the antitrust laws outside of the

---

[80] It is evident the settling parties, and some of the Settlement's proponents, applaud it as a solution to a "problem" with "orphan works." Two things are clear, however. One is this problem – however it is defined – is a matter of public policy, which should be resolved by the political branches of the government, not the judicial branch through the vehicle of Rule 23. *See* James Grimmelmann, *The Google Book Search Settlement: Ends, Means and the Future of Books*, at 2, 12 (Apr. 2009) ("Laundering orphan works legislation through a class action lawsuit is both a brilliant response to legislative inaction and a dangerous use of the judicial power"; the Proposed Settlement "is a judicial solution to a legislative problem") (Exhibit C); U.S. Copyright Office, Report on Orphan Works, at 93 (Jan. 2006) (After a year-long ambitious study of the orphan works issue, the U.S. Copyright Office acknowledged it lacks "any regulatory authority to address the orphan works issue in any meaningful way, and thus legislation is necessary to help resolve the problems inherent in orphan works."). The second is that this "solution" is no solution at all. The settlement would "solve" this problem by giving one private company (and its partners) rights that no one else will possess, or is likely to possess. Indeed, the "problem" has been so vexing, and the source of debate in Congress and elsewhere, precisely because it cannot be solved in the marketplace. The Proposed Settlement would only "solve" the problem of orphan works by changing it, in a way that raises a host of new problems, including many under the antitrust laws. *See* Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 4 (July 2009) ("[T]he lawsuit is the device by which the initial orphan works monopoly is created: without the lawsuit, Google would acquire *no* rights to use the orphan works.") (emphasis in original) (Exhibit S).

42

context of the settlement, then the settlement itself cannot be approved under Rule 23 because doing so would "enlarge" substantive rights beyond those that exist under the antitrust laws. Simply put, if conduct would be proscribed by the antitrust laws absent the settlement, Rule 23 cannot be used to render that conduct permissible.

The Court is also obligated to carefully examine the competitive implications of the Proposed Settlement in connection with the Court's inquiry under Rule 23(e)(2), to ensure that it is "fair, reasonable, and adequate." As the Second Circuit has explained, while "[i]n a class action settlement, the normal focus is on the fairness, reasonableness and adequacy of the settlement to the plaintiff class[,] [w]here the rights of third parties are affected, however, their interests too must be considered." *In re Masters Mates & Pilots Pension Plan and Irap Litigation*, 957 F.2d 1020, 1025-26 (2d Cir. 1992) (citations omitted). Because the Proposed Settlement would dramatically alter the competitive landscape, and tilt the "playing field" decidedly in the direction of Google and its partners, the Court must consider the possible adverse effects on actual and potential competitors when it decides whether to approve the settlement.

## C.    The Settling Parties Might Use Approval of the Settlement to Immunize Their Use of Market Power Conferred by the Settlement From Challenge Under the Antitrust Laws

The Court should also carefully consider the competitive implications of the Proposed Settlement because, were the settlement approved, the settling parties – in particular Google – might attempt to use the litigation process, and any Court approval of the settlement, as a shield against challenges to future anticompetitive conduct.

For instance, Google might resist a future antitrust lawsuit concerning its Book Search business by invoking the *Noerr-Pennington* doctrine, named for two Supreme Court decisions

43

giving rise to it. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). At its most general level the doctrine is "a judicially-created policy that shields an antitrust defendant from liability for competitive injuries resulting from individual or concerted petitioning conduct that is reasonably calculated or genuinely intended to petition government decision-makers for redress." ABA Section of Antitrust Law, Monograph 25, The *Noerr-Pennington* Doctrine, at 1-2 (2009). Were the Proposed Settlement approved, Google could seek immunity from lawsuits predicated on activities related to the settlement, on the ground they are authorized by a court-approved settlement obtained through petitioning activity shielded from liability under *Noerr-Pennington*.[81]

While I believe any such argument by Google should be rejected for a variety of reasons, there is some danger that a court presented with the issue might confer immunity on Google based on judicial approval of the Proposed Settlement. *See* ABA Section of Antitrust Law, Monograph 25, The *Noerr-Pennington* Doctrine, at 63 (2009) ("In certain circumstances, settlement of litigation also can be protected under *Noerr-Pennington*."); ABA Section of Antitrust Law, Intellectual Property and Antitrust Law Handbook, at 271 (2007) ("[L]itigants obtaining court approval of their settlement, more than just a dismissal, may be within the immunity afforded by *Noerr*."); Randal C. Picker, *The Google Book Search Settlement: A New Orphan-Works Monopoly?*, at 26 n.86 (July 2009) ("[T]he caselaw is not clear on whether *Noerr-Pennington* immunity would attach to the court's approval of the settlement agreement.")

---

[81] A similar argument might be made on the basis of the so-called "state action" doctrine, under which immunity may attach to conduct required or actively supervised by the government. *See generally* ABA Section of Antitrust Law, Antitrust Law Developments, at 1273-84 (6th ed. 2007).

44

(Exhibit S); *see also* Herbert Hovenkamp, Mark D. Janis & Mark A. Lemley, IP and Antitrust:
An Analysis of Antitrust Principles Applied to Intellectual Property § 7.2(c) (examining
application of *Noerr-Pennington* immunity to settlement agreements, and arguing for settlements
approved by courts that "immunity should attach only if a court exercises supervisory authority
over the settlement of the sort it would under the Tunney Act."); *cf. Sanders v. Brown*, 504 F.3d
903, 913 n.8 (9th Cir. 2007) ("We do not address whether *Noerr-Pennington* immunity may
protect an anticompetitive settlement agreement between two *private* entities, who conceivably
could claim that the act of petitioning the court to accept their agreement immunizes the
agreement itself.") (emphasis in original).

The risk that approval of the Proposed Settlement may shield Google and others from
liability for conduct that would otherwise be actionable under the antitrust laws is further reason
for the Court to carefully analyze the Proposed Settlement's competitive implications.[82]

## CONCLUSION

Rule 23 was adopted to resolve genuine cases and controversies filed in the federal
courts. The parties to this Proposed Settlement are asking the Court to use the Federal Rules of
Civil Procedure to implement a predominantly commercial transaction that Google could not
achieve in the marketplace without considerably more effort and expense, if it could be achieved

---

[82] If the Court decides to approve the Proposed Settlement, or any revised proposed settlement,
the Court might consider making clear that approval rendered in the context of Rule 23 is not
intended to confer Google or any of its partners with immunity under the antitrust laws for any
liability to which they would otherwise be subject, including liability based upon the negotiation
or implementation of the Settlement Agreement, or the use of any market power created by or
flowing from the Settlement Agreement. In this regard, the Court should scrutinize the "Bar
Order" in the Settlement Agreement which, among other things, seemingly attempts to preclude
class members from bringing future antitrust actions against Google and others if the claims
"directly or indirectly relate to, are based upon or arise out of the commencement, prosecution,
defense or *settlement* of the Action, or to the *negotiation or execution of this Settlement
Agreement or the Library-Registry Agreements*." Settlement Agreement § 10.2(d) (emphasis
added).

45

at all. The Court should decline this invitation to turn Rule 23 into a policymaking tool. *Cf.* *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (The text of Rule 23 "limits judicial inventiveness.").[83] The Court should also decline the request to dramatically reshape the digital commerce landscape through the power of the federal judiciary. But, most importantly, the Court should reject the Proposed Settlement because it is inconsistent with federal law – failing to satisfy the requirements of Rule 23, the Rules Enabling Act, and the due process guarantee of the Constitution's Fifth Amendment.

The members of the putative class have meritorious claims against Google (and perhaps others). Those claims should be pursued, and their injuries redressed. It may be that some of those claims could properly be resolved through a class settlement. Yet this is not such a settlement. For the reasons explained above, this Proposed Settlement is so flawed that the class members are truly better off with no settlement at all.[84] With regret, I request that the Court reject the Proposed Settlement, and that the Court order the putative Author Sub-Class be broken

---

[83] Like in *Amchem*, the settling parties here seek to use Rule 23 to remedy perceived shortcomings in existing law by using the judicial system to implement changes which have not materialized through the political process. But, like in *Amchem*, Rule 23 "must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 629 (1997). And this case, like *Amchem*, reminds us that "the rulemakers' prescriptions for class actions may be engendered by 'those who embrace Rule 23 too enthusiastically just as they are by those who approach the Rule with distaste.'" *Id.* (citation omitted).

[84] I take no position at this time about specific provisions of an alternative agreement which I might support. The issue before the Court is whether or not to approve this particular agreement. It is not the responsibility of the Court, or objectors, to rewrite the agreement. *See* Manual for Complex Litigation, Fourth, § 21.61 at 309 ("The judicial role in reviewing a proposed settlement is critical, but limited to approving the settlement, disapproving it, or imposing conditions on it. The judge cannot rewrite the agreement."). However, the Court might instruct the settling parties to decouple the two components of the Proposed Settlement – the resolution of claims for past infringement, and the commercial transaction involving the transfer of rights from copyright owners to Google and others. If the settling parties believe the terms of the commercial component of the Proposed Settlement are attractive, they are free to implement them outside of the context of a Rule 23 proceeding, and invite copyright owners to participate.

46

into sub-classes, so the distinct interests of each group can be advanced by separate counsel and separate class representatives as this case proceeds.[85]

August 2009                          Respectfully submitted,

                                     Scott E. Gant
                                     5301 Wisconsin Avenue, NW
                                     Suite 800
                                     Washington, DC 20015
                                     gbsobj@hotmail.com

---

[85] In light of the substantial problems with the Proposed Settlement discussed in this Objection, the award of fees requested by Plaintiffs' counsel is unwarranted. *See* Settlement Agreement § 5.5. If the Court decides to approve the Settlement, in part or in whole, some of the $30 million set aside as fees for counsel to the proposed Author Sub-Class should be redirected to the author class members themselves.

# EXHIBIT B

**Statement of Marybeth Peters**
**The Register of Copyrights**
**before the Committee on the Judiciary**

United States House of Representatives
111th Congress 1st Session

September 10, 2009

**Hearing on Competition and Commerce in Digital Books: The Proposed Google Book Settlement**

Chairman Conyers, Ranking Member Smith, and Members of the Subcommittee, I appreciate the opportunity to appear before you today to testify about the impact of the proposed Google Book Settlement Agreement on U.S. copyright law and policy as part of this hearing on Competition and Commerce in Digital Books.

**Summary**

The Copyright Office has been following the Google Library Project since 2003 with great interest. We first learned about it when Google approached the Library of Congress, seeking to scan all of the Library's books. At that time, we advised the Library on the copyright issues relevant to mass scanning, and the Library offered Google the more limited ability to scan books that are in the public domain. An agreement did not come to fruition because Google could not accept the terms.

In 2005, we followed very closely the class action filed by The Authors Guild and its members and the infringement suit filed by book publishers shortly thereafter. The facts of the underlying lawsuits are simple. Google was reproducing millions of protected books in their entirety, without permission of the copyright owners, through systematic scanning operations set up with large research libraries. Once scanned, the books were indexed electronically, allowing end-users to search by title and other bibliographic information. Google returned hits to its customers that included the option of browsing "snippets" (e.g. several lines of the book), except for public domain books, which could be viewed and downloaded in their entirety. Google's search engine is free to users, but the company collects substantial revenue from the advertising that appears on web pages, including those pages on which images of, and information from, copyrighted books appear. The lawsuits raised complex and sometimes competing legal questions, including questions about intermediate copying, future markets, book digitization goals and fair use. Members of the legal community and the public debated the issues vigorously and anticipated what a Court decision on the merits might look like.

When the parties announced last fall that they had reached a settlement in what was becoming a long and protracted litigation, our initial reaction was that this was a positive development. But as we met with the parties, conversed with lawyers, scholars and other experts, and began to absorb the many terms and conditions of the settlement—

- 2 -

a process that took several months due to the length and complexity of the documents—
we grew increasingly concerned. We realized that the settlement was not really a
settlement at all, in as much as settlements resolve acts that have happened in the past and
were at issue in the underlying infringement suits. Instead, the so-called settlement
would create mechanisms by which Google could continue to scan with impunity, well
into the future, and to our great surprise, create yet additional commercial products
without the prior consent of rights holders. For example, the settlement allows Google to
reproduce, display and distribute the books of copyright owners without prior consent,
provided Google and the plaintiffs deem the works to be "out-of-print" through a
definition negotiated by them for purposes of the settlement documents. Although
Google is a commercial entity, acting for a primary purpose of commercial gain, the
settlement absolves Google of the need to search for the rights holders or obtain their
prior consent and provides a complete release from liability. In contrast to the scanning
and snippets originally at issue, none of these new acts could be reasonably alleged to be
fair use.

        In the view of the Copyright Office, the settlement proposed by the parties would
encroach on responsibility for copyright policy that traditionally has been the domain of
Congress. The settlement is not merely a compromise of existing claims, or an
agreement to compensate past copying and snippet display. Rather, it could affect the
exclusive rights of millions of copyright owners, in the United States and abroad, with
respect to their abilities to control new products and new markets, for years and years to
come. We are greatly concerned by the parties' end run around legislative process and
prerogatives, and we submit that this Committee should be equally concerned.

        As outlined below, the Copyright Office also believes that some of the settlement
terms have merit and should be encouraged under separate circumstances. For example,
the creation of a rights registry for book authors, publishers and potential licensees is a
positive development that could offer the copyright community, the technology sector
and the public a framework for licensing works in digital form and collecting micro-
payments in an efficient and cost-effective manner. Likewise, the promise to offer
millions of titles through libraries in formats accessible by persons who are blind and
print disabled is not only responsible and laudable, but should be the baseline practice for
those who venture into digital publishing. The ability of copyright owners and
technology companies to share advertising revenue and other potential income streams is
a worthy and symbiotic business goal that makes a lot of sense when the terms are
mutually determined. And the increased abilities of libraries to offer on-line access to
books and other copyrighted works is a development that is both necessary and possible
in the digital age. However, none of these possibilities should require Google to have
immediate, unfettered, and risk-free access to the copyrighted works of other people.
They are not a reason to throw out fundamental copyright principles; they are a pretext to
do so.

        In the testimony below, we will address three specific points. First, we will
explain why allowing Google to continue to scan millions of books into the future, on a
rolling schedule with no deadline, is tantamount to creating a private compulsory license

- 3 -

through the judiciary. This is not to say that a compulsory license or collective license for book digitization projects may or may not be an interesting idea. Rather, our point is that such decisions are the domain of Congress and must be weighed openly and deliberately, and with a clear sense of both the beneficiaries and the public objective.

Second, we will explain why certain provisions of the proposed settlement dramatically compromise the legal rights of authors, publishers and other persons who own out-of-print books. Under copyright law, out-of-print works enjoy the same legal protection as in-print works.[1] To allow a commercial entity to sell such works without consent is an end-run around copyright law as we know it. Moreover, the settlement would inappropriately interfere with the on-going efforts of Congress to enact orphan works legislation in a manner that takes into account the concerns of all stakeholders as well as the United States' international obligations.

Finally, we will explain that foreign rights holders and foreign governments have raised concerns about the potential impact of the proposed settlement on their exclusive rights and national, digitization projects. The settlement, in its present form, presents a possibility that the United States will be subjected to diplomatic stress.

**Factual and Procedural Background**

The proposed settlement, announced by the parties on October 28, 2008, would resolve claims that stem from Google's highly publicized Google Library Project. It is currently pending before the Honorable Denny Chin, United States District Court, Southern District of New York. Settlement Agreement, *The Authors Guild, Inc. et al. v. Google Inc.*, No. 06-CV-8136 (S.D.N.Y. Oct. 28, 2008). The proceeding combines the unresolved claims of authors and book publishers as initially filed in two underlying actions: *The Authors Guild, Inc. v. Google Inc.*, No. 05 Civ. 8136 (S.D.N.Y Sep. 20, 2005) (a class action filed by representative authors and the Guild) and *The McGraw-Hill Companies, Inc. v. Google Inc.*, No. 05 Civ. 8881 (S.D.N.Y Oct. 19, 2005) (an action filed on behalf of five publishing companies).

By way of background, as of 2008 Google had digitized about 7 million books and other materials obtained through agreements with library collections at the University of Michigan, Stanford University, Oxford University, Harvard University and the New York Public Library, among others.[2] At a hearing convened by the European Commission in Brussels on September 7, 2009, Google announced that it has now scanned approximately 10 million books. Of these, Google estimates that about 1.5

---

[1] Under certain narrow circumstances, libraries and archives may make use of works that are in their last 20 years of copyright protection, provided that the use is for purposes of preservation, scholarship, or research and that the library or archives has first determined, on the basis of a reasonable investigation that certain conditions apply. *See* 17 U.S.C. §108(h)(i).

[2] Google Books Settlement Agreement, http://books.google.com/googlebooks/agreement (last visited Sept. 4, 2009).

- 4 -

million of these works are in the public domain. Many more may be works that are protected by copyright but have no identifiable or locatable copyright owner.[3]

### 1. Judicial Compulsory License

Class action lawsuits typically seek compensation for a class of similarly-situated persons who have suffered harm, or will suffer harm imminently, due to the defendant's past acts. The proposed settlement in fact resolves Google's past conduct by requiring Google to pay at least $60 for each book and $15 for each insert that was digitized prior to the opt-out deadline.[4] Proposed Settlement Agreement at 61, ¶ 5.1(a). But the class is overbroad and the settlement terms do not stop here.

Under the proposed settlement, the parties have crafted a class that is not anchored to past or imminent scanning, but instead turns on the much broader question of whether a work was *published* by January 5, 2009. As defined, the class would allow Google to continue to scan entire libraries, for commercial gain, into the indefinite future. The settlement would bind authors, publishers, and successors to these rules, even though Google has not yet scanned, and may never scan, their works.

We do not know the parties' reasons for defining the class according to whether a book was or was not published by January 5, 2009, but the result is to give Google control of a body of works that is many times larger than the 7 million works that were originally at issue. As defined, the class would bring into the settlement tent not only works that were published in the United States, and are therefore directly subject to U.S. law, but works published in most other countries in the world that have treaty relations with the United States.[5] While no one really knows how many works would be affected, Dan Clancy, the Engineering Director for the Google Book Search project, has been quoted as estimating that there are between 80 and 100 million books in the world.[6] As a practical matter, this means that the settlement would create for Google a private

---

[3] Google Books Settlement, orphan works, and foreign works, http://blog.librarylaw.com/librarylaw/2009/04/google-book-settlement-orphan-works-and-foreign-works.html (last visited Sept. 4, 2009).

[4] The settlement also addresses and resolves other issues such as the conduct of libraries, but the Office will not address those provisions for purposes of this preliminary assessment of issues with the Proposed Settlement Agreement.

[5] The United States enjoys international copyright relations with all but a small number of countries. *See* U.S. Copyright Office, Circular 38a: International Copyright Relations of the United States (rev. July 2009) (available at http://www.copyright.gov/circs/circ38a.pdf (last visited Aug. 25, 2009)).

[6] *See* "The Audacity of the Google Book Search Settlement," Pamela Samuelson, http://www.huffingtonpost.com/pamela-samuelson/the-audacity-of-the-googl_b_255490.html (last visited Aug. 12, 2009).

- 5 -

structure that is very similar to a compulsory license, allowing it to continuously scan copyrighted books and "inserts."[7]

Compulsory licenses in the context of copyright law have traditionally been the domain of Congress.[8] They are scrutinized very strictly because by their nature they impinge upon the exclusive rights of copyright holders. A compulsory license (also known as a "statutory license") is "a codified licensing scheme whereby copyright owners are required to license their works to a specified class of users at a government-fixed price and under government-set terms and conditions." Satellite Home Viewer Extension Act: Hearing Before the S. Committee on the Judiciary,108th Cong. (2004) (statement of David O. Carson, General Counsel, U.S. Copyright Office) (May 12, 2004). "[C]ompulsory licensing . . . break[s] from the traditional copyright regime of individual contracts enforced in individual lawsuits." See Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc., 836 F.2d 599, 608 (D.C. Cir. 1988) (describing limited license for cable operators under 17 U.S.C. § 111). By its nature, a compulsory license "is a limited exception to the copyright holder's exclusive right . . . As such, it must be construed narrowly. . . ." Fame Publishing Co. v. Alabama Custom Tape, Inc., 507 F.2d 667, 670 (5th Cir. 1975) (referring to compulsory licenses in the Copyright Act of 1909). Congress is the proper forum to legislate compulsory licenses when they are found necessary. See Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.07 (2009) (Congress has authority to grant exclusivity and "may properly invoke . . . [n]onexclusivity under a compulsory license"); cf. Cablevision at 602 (citing Teleprompter Corp. v. Columbia Broadcasting Sys., 415 U.S. 394, 414 (1974) (stating that it was Congress's role to address the issue of secondary transmissions if the Copyright Act of 1909 was inadequate). Compulsory licenses are generally adopted by Congress only reluctantly, in the face of a marketplace failure. For example, Congress adopted the Section 111 cable compulsory license "to address a market imperfection" due to "transaction costs accompanying the usual scheme of private negotiation. . . ." Cablevision at 602. "Congress' broad purpose was thus to approximate ideal market conditions more closely . . . the compulsory license would allow the retransmission of signals for which cable systems would not negotiate because of high transaction costs." Id. at 603.

As a matter of copyright policy, courts should be reluctant to create or endorse settlements that come so close to encroaching on the legislative function. Congress generally adopts compulsory licenses only reluctantly in the face of a failure of the marketplace, after open and public deliberations that involve all affected stakeholders, and after ensuring that they are appropriately tailored. Here, no factors have been demonstrated that would justify creating a system akin to a compulsory license for Google – and only Google – to digitize books for an indefinite period of time.

---

[7] The term "insert" is broad. It includes (i) text, such as forewords, afterwords, prologues, epilogues, essays, poems, quotations, letters, song lyrics, or excerpts from other Books, Periodicals or other works; (ii) children's Book illustrations; (iii) music notation (i.e., notes on a staff or tablature); and (iv) tables, charts and graphs. Proposed Settlement Agreement at 9, ¶ 1.72.

[8] See, e.g., 17 U.S.C §§ 111, 112, 114, 115, 118 and 119.

- 6 -

At very least, a compulsory license for the systematic scanning of books on a mass scale is an interesting proposition that might merit Congressional consideration. As stated above, various compulsory licenses have been carefully crafted over the years after extensive deliberation and consideration of the viewpoints of all affected stakeholders, though none apply to books or text. Among the issues Congress would want to consider are the pros and cons of allowing copyright users, rather than copyright owners, to initiate the digitization of copyrighted works; the rate of compensation that should be paid to copyright owners; and whether the same license terms should apply to mass digitization activities undertaken for the public interest by non profit organizations such as libraries, and for profit purposes by commercial actors. Congress also would want to consider whether all books merit the same attention, or whether differences can be drawn from the date of publication, the type of publication, or such facts as whether the rights holder is likely to be alive or deceased. Congress would need to consider the treaty obligations that may apply.

### 2. The Sale of Copyrighted Books without Consent of Rights Holders

The Copyright Office strongly objects to the treatment of out-of-print works under the proposed settlement. The question of whether a work is in-print (generally, in circulation commercially) or out-of-print (generally, no longer commercially available) is completely inconsequential as to whether the work is entitled to copyright protection under the law.

The Google Book Settlement gives Google *carte blanche* permission to use out-of-print works by operation of the default rules. If a work is out-of-print, Google need not obtain permission before incorporating it into new "book store" products. These include on-line displays (up to 20% of a work), full-text purchases, and subscription products for institutional subscribers and library patrons. There are mechanisms by which the rights holder may stop Google after the fact and prospectively collect royalties that are predetermined by the Book Rights Registry ("BRR"). In summary, the out-of-print default rules would allow Google to operate under reverse principles of copyright law, and enjoy immunity from lawsuits, statutory damages, and actual damages.

The activities that prompted the plaintiffs to file suit against Google – the wholesale scanning of books, electronic indexing and snippet display – are activities as to which reasonable minds might differ when considering whether such activities are acts of infringement or are, for example, fair use. However, the same cannot be said of the new uses that the settlement agreement permits Google to make of out-of-print works. We do not believe that even Google has asserted that, in the absence of this class action settlement, it would be fair use to undertake the new activities that Google would enjoy risk-free as a result of the settlement. In essence, the proposed settlement would give Google a license to infringe first and ask questions later, under the imprimatur of the court.

- 7 -

We are not experts on the proper scope of class action settlements, but we do wonder whether, as a constitutional matter, a class action settlement could decide issues that were not properly before the Court as part of the case and controversy presented during the litigation.[9] At the very least, within the context of copyright litigation, the class action mechanism has been used sparingly in recent years and has never resulted in the broad adoption of a settlement permitting extensive future uses of copyrighted products that were not the subject of the original infringement action.[10] A class action settlement that permits new activities for years to come, and removes the judicial remedies of millions of authors and publishers that are otherwise afforded by the Copyright Act, seems to us to be an excessive exercise of judicial power. The default rules for out-of-print books are not a small issue in the settlement because the *substantial majority* of books covered are out-of-print works—millions and millions of books. To be clear, the Office does not dispute the goal of creating new markets for out-of-print books – copyright duration has always been longer than the first print-run of a book and it has always been obvious that works will come in and out of favor, and in and out of print, during the term of protection. But copyright law has always left it to the copyright owner to determine whether and how an out-of-print work should be exploited.

Apart from its interest in ensuring the proper application of law and policy, Congress should be particularly concerned about the settlement since it would interfere with the longstanding efforts of Congress and many other parties to address the issue of orphan works. The broad scope of the out-of-print provisions and the large class of copyright owners they would affect will dramatically impinge on the exclusive rights of authors, publishers, their heirs and successors. Such alteration should be undertaken by Congress if it is undertaken at all. Indeed, this Committee has already invested significant time in evaluating the orphan works problem and weighing possible solutions. That process is not over. The Google Book Settlement would frustrate the Committee's efforts and make it exceedingly difficult for Congress to move forward. A much more

---

[9] As Judge Friendly stated in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 18 (2d Cir. 1981), "If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." In *National Super Spuds*, a settlement purported to release the claims of class members who held both liquidated and unliquidated contracts when the original complaint only concerned persons who held liquidated contracts during a specific period of time. The Court held that the harm done by the unclear release of parties outweighed the benefits of settlement and reversed the settlement approval. *Id.*

[10] One of these class actions, *In re Literary Works in Electronic Databases Copyright Litigation,* MDL No. 1379 (S.D.N.Y.), is the remedies phase of an infringement suit brought by members of the National Writers Union, in which the writer-plaintiffs successfully challenged the sale of their newspaper and magazine articles in commercial databases. *See New York Times v. Tasini,* 533 U.S. 483 (2001). A settlement agreement has been proposed by the parties to the consolidated cases.[10] However, the proposed settlement, if finally adopted, would speak only to the activities originally at issue in the suit: the reproduction, display and distribution of copyrighted articles in electronic databases. Settlement Agreement, *In re Literary Works* (2005), ¶ 1(f). In contrast with the proposed settlement agreement, the *In Re Literary Works* settlement does not authorize the publisher and database defendants to further copy, package, and sell the copyrighted articles as part of new products such as subscriptions, books, or compilations, for example. Nor does it lock in licensing terms, including payment, for future kinds of activity.

- 8 -

productive path would be for Google to engage with this Committee and with other stakeholders to discuss whether and to what degree a diligent search for the rights holder should be a precondition of a user receiving the benefits of orphan works legislation, or whether a solution is more like a compulsory license may make sense for those engaged in mass scanning. Whatever, the outcome, Congress is much better situated than the judiciary to consider such important and far-reaching changes to the copyright system.

As a side note, the Copyright Office would like to underscore for the Committee that out-of-print works and orphan works are not coextensive. Orphan works are works that are protected by copyright but for which a potential user cannot identify or locate the copyright owner for the purpose of securing permission. They do not include works that are in the public domain; works for which a copyright owner is findable but refuses permission; or works for which no permission is necessary, i.e. the use is within the parameters of an exception or limitation such as fair use. Many out-of-print works have rights holders who are both identifiable and locatable through a search. In fact, the U.S. works covered by the proposed settlement would all be searchable, at a minimum, through Copyright Office records because the settlement includes U.S. works only *if* they are registered. Proposed Settlement at 3, 9, ¶¶ 1.16, 1.72. Certainly, rights information may not be current and there may be disputes about rights between publishers and authors. However, these are the realities of the copyright system and the reason that Congress, the EU and other foreign governments have been working on a solution, with all of the deliberation and fine tuning that is appropriate. Until there is a legislative solution, it is our strong view that Google should conduct itself according to the same options available to other users of copyrighted works: secure permission; forego the use; use the work subject to risk of liability; or use the work in accordance with fair use or another limitation or exception.

The Office also notes that while the BRR might well provide a place for rights owners to come forward with contact information, it is also likely to have the unfortunate effect of creating a *false* database of orphan works, because in practice any work that is not claimed will be deemed an orphan. Many rights holders of out-of-print books may fail or refuse to register with the BRR for very good reasons, whether due to lack of notice, disagreement with the Registry's mission or operations, fear (*e.g.* privacy concerns) or confusion. The fact that the rights holder is missing from the BRR may also mean that he has no interest in licensing his work.

### 3. International Concerns

We are troubled by the fact that the proposed settlement implicates so many foreign works even when they have not taken steps to enter the United States market. While it would be appropriate to allow foreign nationals to participate voluntarily in licensing programs that may be developed by the BRR or other collectives, they should not be automatically included in the terms of the settlement. Moreover, we are aware that some foreign governments have noted the possible impact of the proposed settlement on the exclusive rights of their citizens. Indeed, many foreign works have been digitized by

- 9 -

Google and swept into the settlement because one copy was in an academic research library in the United States. As a matter of policy, foreign rights holders should not be swept into a class action settlement unknowingly, and they should retain exclusive control of their U.S. markets.

The settlement imposes a requirement that all "U.S. works" be registered with the Copyright Office. U.S. works are, in relevant part, works that are first published on U.S. soil or published simultaneously in the United States and a treaty partner. *See* 17 U.S.C. § 101. That the parties would apply a registration requirement in this manner comes as no surprise in and of itself, especially since the issue is pending before the Supreme Court in another case. *See Muchnick v. Thomson (In re Literary Works in Elec. Databases Copyright Litig.)*, 509 F.3d 116, 122 (2nd Cir. 2007), *cert. granted sub nom. Reed Elsevier Inc. v. Muchnick*, 129 S.Ct. 1523 (2009). But in our view, this rule should be applied to all works in the class, i.e. to the extent foreign works are implicated at all, they should have been published in the United States and registered with the U.S. Copyright Office.[11]

For the past few months, we have closely followed views of the proposed settlement as expressed by foreign governments, foreign authors and foreign publishers. We have read numerous press accounts[12] and spoken with foreign experts. We know that some foreign governments have suggested that the settlement could implicate certain international obligations of the United States.[13] As the Committee is aware, the

---

[11] Article 5.1 of the Berne Convention provides for national treatment of authors by requiring that authors enjoy, in other Union countries, the rights provided to nationals of such Union countries. Berne Convention, 102 Stat. 2853 (1988). TRIPS also provides for national treatment in article 3.1; it requires Members to "accord to nationals of other Members treatment no less favorable than that it accords to its own nationals with regard to the protection of intellectual property." TRIPS Agreement, art. 3.1, 33 I.L.M. 81 (1994).

[12] *See, e.g., Google Books Leaves Japan in Legal Limbo*, The Japan Times Online; *Germany Wants EU to Fight Google Books Project*, The Local, June 2, 2009 (quoting Foreign Minister Frank-Walter Steinmeiser); *Politicians Back Heidelberg Appeal: German Authors Outraged at Google Book Search*, Spiegel Online, Apr. 27, 2009 ("German politicians have voiced their support for an appeal by 1,300 German authors…known as the Heidelberg Appeal"—sent last week to German President Horst Kohler, Chancellor Angela Merkel and the heads of Germany's 16 federal states); Letter to the European Commission from the Federation of European Publishers and Presidents of National Publisher Associations, June 16, 2009 (available at http://www.danskeforlag.dk/download/pdf/323absb035.pdf last visited Aug. 26, 2009)); Federal Ministry of Justice, *Zypries urges European action against Google Books, Press Release of the German Minister of Justice*; ("In Brussels today, Federal Minister Zypries stressed that…Brussels must take further steps that may be necessary to protect rights holders."); *"EU to study how Google Books impact authors*, Reuters, May 28, 2009 ("'The commission will carefully study the whole issue and, if need be, to take steps,'" Vladimir Tosovsky industry minister for the Czech EU presidency, told a news conference."); *Agreement concerning Google Book Search is a Trojan Horse*, Boersenverin des Deutschen Buchhandels, Nov. 11, 2008 ("[T]he American precedent model is out of the question for Europe…Germany and Europe have already implemented legal provisions and models which allow wide access to digital content while respecting the rules of copyright").

[13] By way of background, the United States is a party to important copyright treaties and bilateral agreements which impose minimum obligations for copyright protection and enforcement, on the one hand, and confine the scope of permissible exceptions and limitations on exclusive rights, on the other hand. These include the Berne Convention for the Protection of Literary and Artistic Works (Paris 1971), the

- 10 -

governments of Germany and France have filed objections with the Court. Memorandum of Law in Opposition to the Settlement Proposal on Behalf of the Federal Republic of Germany, *The Authors Guild, Inc., et al. v. Google Inc.*, No. 05 Civ. 8136 (DC) (S.D.N.Y. Aug. 31, 2009); Memorandum of Law in Opposition to the Settlement Proposal on Behalf of the French Republic, *The Authors Guild, Inc., et al. v. Google Inc.*, 05 Civ. 8136 (DC) (S.D.N.Y. Sep. 8, 2009). Numerous foreign authors and publishers have raised concerns as well, including concerns about navigating the settlement from a distance. Indeed, the inherent difficulties of doing business internationally is one reason that typical collective management organizations work through counterparts in foreign countries, making it easier and more efficient for rights holders to protect their works on foreign soil, in foreign languages, under foreign laws, and using foreign currencies.

Some foreign governments have raised questions about the compatibility of the proposed settlement with Article 5 of the Berne convention, which requires that copyright be made available to foreign authors on a no less favorable basis than to domestic authors,[14] and that the "enjoyment and exercise of these rights shall not be subject to any formality."[15] For example, the Federal Republic of Germany has asserted that "[T]he proposed settlement is contrary to both the Berne Convention and WCT." Memorandum of Law in Opposition to the Settlement Proposal on Behalf of the Federal Republic of Germany at 4.

For purposes of this hearing, we are not suggesting that international obligations of the United States are at issue or necessarily would be compromised. However, it is a cause for concern when foreign governments and other foreign stakeholders make these types of assertions.

**Conclusion**

Mr. Chairman, thank you again for inviting me here today to present my observations and concerns. The Copyright Office welcomes any questions that the Committee has about the copyright implications of this unprecedented settlement agreement. To summarize, it is our view that the proposed settlement inappropriately creates something similar to a compulsory license for works, unfairly alters the property interests of millions of rights holders of out-of-print works without any Congressional oversight, and has the capacity to create diplomatic stress for the United States. As always, we stand ready to assist you as the Committee considers the issues that are the subject of this hearing.

---

World Trade Organization Agreement on the Trade-Related Aspects of Intellectual Property Rights ("TRIPS"), and the World Intellectual Property Organization Copyright Treaty, as well as many bilateral agreements that address copyright issues. *See, e.g.,* US-Peru Trade Promotion Agreement, Dec. 14, 2007, 121 Stat. 1454. Under Berne,[13] copyright protection is afforded to works published in any country that is party to one of the copyright treaties and agreements to which the United States is a party or by any national of that country.

[14] Berne Convention art. 5(1).

[15] Berne Convention art. 5(2).