# NEW YORK LAW SCHOOL

Institute for Information Law & Policy

185 West Broadway, New York, NY 10013-2921
T 212.431.2360   F 212.791.2144
E infolaw@nyls.edu
www.nyls.edu/iilp

January 28, 2010

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/28/10
```

**BY FAX**

Hon. Denny Chin
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:    **The Authors Guild Inc., et al. v. Google Inc.**
             **Case No. 05 CV 8136 (S.D.N.Y.)(DC)**

Dear Judge Chin:

    The Institute for Information Law and Policy at New York Law School submits these comments as an addendum to its earlier brief *amicus curiae* (IILP Brief). The IILP's overriding concern is that the settlement tries to solve a legislative problem through the judicial system. The initial IILP Brief explained how this mismatch created dangers for class members and the reading public. It recommended that the Court insist on the modification of troubling provisions, seek additional sources of advice, and appoint separate counsel to represent the owners of orphan book copyrights. These recommendations were designed to repair substantive defects in the Settlement Agreement and to make the process fairer and more legitimate.

    The Amended Settlement Agreement does not adequately address the IILP's concerns. While it fixes some dangerous provisions of the Settlement Agreement, many remain ambiguous. Others are entirely untouched. It continues to pose real risks of unfairness to class members and the public. Procedurally, this haphazard response confirms the inappropriateness of using a class action settlement in this fashion. Even though the individual defects in the Amended Settlement Agreement all remain fixable in theory, their presence at this late date demonstrates that the process is flawed beyond repair.

    Accordingly, this Court should reject the Amended Settlement Agreement. While the orphan works problem is serious, this massive class action settlement does not address it in a fair, just, and legitimate way. Approving the Amended Settlement Agreement would set a dangerous precedent for future cases and undermine democratic political processes.



Institute for
INFORMATION
LAW & POLICY
at New York Law School

## I. FAIRNESS TO ORPHAN WORK OWNERS

The central danger in any class action settlement is that it will treat class members unfairly.[1] The IILP Brief identified provisions in the Settlement Agreement that could treat the many owners of orphan works differently than the prominent authors and major publishers who negotiated the settlement.[2] The Amended Settlement Agreement improves on the Settlement Agreement, but not enough to protect the owners of orphan works from substantial risk.

### A. Handling of Unclaimed Funds

Under the Settlement Agreement, unclaimed funds could be reallocated to copyright owners who had claimed their works. This provision "structured [the Registry] to disadvantage the orphan work book copyright owner members of the Settlement Agreement Class for the benefit of active members."[3] In addition to taking money from one group of copyright owners and giving it to another, it also created a conflict of interest at the Registry. Copyright owners who had claimed their works would have a financial interest in keeping the owners of unclaimed works from stepping forward. As a result, the owners of unclaimed and orphan works could not trust the Registry to act in their interests.

The Amended Settlement Agreement's introduction of an Unclaimed Works Fiduciary ("UWF") does reduce the conflict between class members. The UWF, which would administer the unclaimed funds, would be unable to distribute them to other copyright owners.[4] Those funds could be used after five years to search for owners of unclaimed works,[5] and distributed to literary charities after ten years.[6]

Unfortunately, the UWF does not appear to be a "fiduciary" in the usual sense of the term. A "fiduciary" in law is typically held to duties of loyalty, diligence, and prudence and is subject to personal liability for breach of these duties. The Amended Settlement Agreement, however, is silent on the standard of care owed by the UWF to the class members it supposedly represents. The settlement neither imposes standard fiduciary duties on the UWF, nor requires the plaintiffs to insert them in the Registry's Charter. As for oversight, while the choice of UWF[7] and distribution of unclaimed funds to charity[8] are subject to judicial approval, most decisions of the UWF (as part of the Registry) would be subject only to the severely limited arbitration provided by Article IX. The UWF appears to lack the basic accountability required of any true fiduciary.

### B. Powers of the Unclaimed Works Fiduciary

Under the Settlement Agreement, the owners of unclaimed works were at a disadvantage in dealing with Google. Active copyright owners could opt out, Remove, or Exclude their books if Google's payments, policies, or terms were disappointing, leaving only unclaimed books (often orphaned ones) in the new and unfair programs.[9] Thus, for example, if large publishers were to

---

[1] See Fed. R. Civ. P. 23(e)(2) ("[T]he court may approve [a proposed settlement] only after a hearing and on finding that it is fair, reasonable, and adequate.")
[2] IILP Brief at 16, 22-25.
[3] IILP Brief at 16.
[4] Amended Settlement Agreement § 6.3(a)(i)(1).
[5] Amended Settlement Agreement § 6.3(a)(i)(2).
[6] Amended Settlement Agreement § 6.3(a)(i)(3).
[7] Amended Settlement Agreement § 6.2(b)(iii).
[8] Amended Settlement Agreement § 6.3(a)(i)(3).
[9] See IILP Brief at 24.

2

find that their extensive catalogs enabled them to negotiate greater Revenue Splits from Google, they could Exclude their books from Consumer Purchase and the Institutional Subscription, leaving mainly unclaimed works with the inferior Revenue Split from the settlement. These rules were also too conservative, as well as too liberal. Even where unclaimed books were academic titles whose authors would likely prefer access over revenue, they too would be governed by terms their copyright owners would find undesirable.

The Amended Settlement Agreement shares this structural deficiency. Although the UWF is vested with some powers to negotiate on behalf of the owners of unclaimed works, it lacks other crucial powers it would need to fully protect them. Thus, for example, it may opt unclaimed works *in* to Display Uses, but it may not remove them *from* Display Uses.[10] Similarly, it may not move unclaimed works from Settlement Controlled Pricing to a Specified Price, even if Settlement Controlled Pricing proves to be seriously defective in practice.[11] Nor may it place unclaimed books under a Creative Commons license, the way that a claiming Rightsholder can.[12] Despite being the single largest stakeholder at the Registry, the UWF has no voice in making critical Registry decisions, such as the availability of additional Public Access terminals[13] and the pricing of the Institutional Subscription.[14]

No clear principle links these missing powers. The UWF is unable to allow uses of unclaimed works in cases where that power would be in the public interest and likely to advance the interests of many copyright owners. For example, it cannot issue licenses to Google competitors.[15] But it is also unable to prevent uses of unclaimed works in cases where that power would be necessary to protect copyright owners. For example, it would be forced to stand idly by as Google priced an unclaimed work so low as to destroy its entire market. If it is a "fiduciary" without true duties, it is also an agent without true authority.

C. *Secret Termination Clause*

The Settlement Agreement provided that it could be terminated by the parties under conditions set out in a secret Supplemental Agreement Regarding Right to Terminate, giving the settling parties unknown and potentially unfair leverage over class members.[16] The Amended Settlement Agreement omits this troubling provision. Under the plain meaning of the amended integration clause, which now states that the Amended Settlement Agreement is "not subject to any condition not provided for in this Amended Settlement Agreement,"[17] the Supplemental Agreement now appears to be legally inoperative to bind class members.

Unfortunately, rather than explicitly stating that the Supplemental Agreement has been withdrawn, this article of the Amended Settlement Agreement merely reads, "INTENTIONALLY OMITTED." It is now unclear whether the Supplemental Agreement has truly been withdrawn, whether it remains operative between the parties to the settlement, or whether the parties might at some future date attempt to enforce it notwithstanding the

---

[10] Amended Settlement Agreement § 3.2(c)(i).
[11] Amended Settlement Agreement § 4.2(b).
[12] Amended Settlement Agreement § 4.2(a)(i).
[13] Amended Settlement Agreement § 4.8(a)(i)(3).
[14] Amended Settlement Agreement § 4.1(a)(ii).
[15] *See infra* Part II.A.
[16] Settlement Agreement Article XVI.
[17] Amended Settlement Agreement § 17.26.

3

integration clause. If the Supplemental Agreement has not been fully withdrawn, the parties would be in violation of their obligations under Federal Rule of Civil Procedure 23(e)(3).[18]

## II. COMPETITION

A second danger in any class action is that class counsel will use judicial authority to create a dangerous concentration of power.[19] The Settlement Agreement would have given Google and the Registry "substantially exclusive control over the distribution of orphan work books."[20] The Amended Settlement Agreement does not change this essential fact. None of the amendments to the settlement provides a meaningful opportunity for Google's competitors to obtain access to unclaimed books on comparable terms. The Amended Settlement Agreement contains mechanisms to prevent abuse of this power in the Consumer Purchase program—but not in the Institutional Subscription or other Revenue Models.

### A. Exclusive Access to Orphan Books

The Amended Settlement Agreement contains two provisions that might appear to ease these exclusivity concerns, but which in fact do not. The first such ineffective change is the addition of a Reseller program. Although this program will allow Resellers to "retain a majority of Google's share of Net Purchase Revenues,"[21] it applies only to Consumer Purchase, and not to the Institutional Subscription or to any Additional Revenue Models. As the settlement contains no provisions authorizing these Resellers to set their own prices or access policies, they will be little more than franchisees, operating strictly according to Google's rules. They do not create any structural competition of the sort currently present in physical and electronic book distribution and retail.

The second inapposite change is the provision that, "[I]n the case of unclaimed Books and Inserts, the Unclaimed Works Fiduciary may license to third parties the Copyright Interests of Rightsholders of unclaimed Books and Inserts to the extent permitted by law."[22] This provision merely reflects the scope of permissible activities under the Registry's corporate charter, rather than vesting the UWF with actual power to license third parties. None of the settlement's license grants[23] or releases of liability[24] operate in favor of any non-parties to the settlement, nor is the Registry or UWF given any copyright ownership or any power to issue licenses.[25]

The parties have presented the Unclaimed Works Fiduciary as a device to ease the orphan works problem by creating an institution that Congress could choose to vest with the power to license orphan works to third parties.[26] That argument is an affront to the institutional roles played by this Court and Congress. This Court is charged with the task of approving or rejecting

---

[18] "The parties seeking approval must file a statement identifying any agreement made in connection with the proposal."
[19] *See generally* Susan P. Koniak & George M. Cohen, *Under Cloak of Settlement*, 82 VA. L. REV. 1051, 1181–1270 (1996) (discussing antitrust dangers of class action settlements).
[20] ILP Brief at 5.
[21] Amended Settlement Agreement § 4.5(b)(v)(2).
[22] Amended Settlement Agreement § 6.2(b)(i).
[23] Amended Settlement Agreement §§ 3.1(a), 2.2, 7.1, Attachment B-1 § 2(a), Attachment B-2 § 2(b).
[24] Amended Settlement Agreement § 10.2(a).
[25] Amended Settlement Agreement § 3.1(a).
[26] *See* Brad Stone & Miguel Helft, *Terms of Digital Book Deal With Google Revised*, N.Y. TIMES, Nov. 13, 2009, at B2 (reporting, based in part on official conference call by parties announcing the Amended Settlement Agreement, that "[the UWF], *with Congressional approval*, can grant licenses to other companies who also want to sell these books." (emphasis added)).

the Amended Settlement Agreement on the basis of the law as it currently stands, not as it might be amended in some hypothetical future. For its part, Congress is not dependent on a private settlement to do its work for it: if and when Congress legislates on orphan works, it could easily create such an entity if one were needed.

### B. Settlement Agreement Controlled Pricing

Under one possible interpretation of the Settlement Agreement, Settlement Controlled Pricing for Consumer Purchases might have required Google to implement a program of collusively raising prices.[27] The Amended Settlement Agreement eliminates this possible interpretation, specifying instead that Settlement Controlled Pricing "will be designed to operate in a manner that simulates how an individual Book would be priced by a Rightsholder of that Book acting in a manner to optimize revenues in respect of such Book in a competitive market."[28] If followed, this revised formulation would substantially eliminate the risk that Google and copyright owners will use Settlement Controlled Pricing to institute excessive cartel pricing.

Worryingly, however, this competitive-pricing rule appears to conflict with the Amended Settlement Agreement's treatment of Pricing Bins, which specify not just the possible price points for Settlement Controlled Pricing[29] but also the initial fraction of books to be placed in each pricing bin.[30] No algorithm could both "find the optimal price for *each* such Book"[31] and also force overall prices to follow a specified distribution. Barring extreme coincidence, these two conditions are mathematically incompatible.

### C. Institutional Subscription Pricing

Under the Settlement Agreement, Institutional Subscriptions would have resembled the blanket licenses offered by the musical performance rights organizations.[32] BMI and ASCAP, however, have withstood antitrust scrutiny only because they have been subject to consent decrees and ongoing oversight from the Department of Justice and the courts—unlike the Registry and Institutional Subscription. The Amended Settlement Agreement leaves these concerns substantially unaddressed. The Registry and the Institutional Subscription are not required to deal evenhandedly with all comers, nor are their prices subject to judicial review.

### III. USE OF A CLASS ACTION

The heart of the Amended Settlement Agreement is that it would give Google a license to sell complete copies of out-of-print books unless their copyright owners object. It is all but certain that many orphan copyright owners will be unable to object. This sweeping default license will operate only in Google's favor, instantly giving it a dominant market position. Such a move poses serious risks for copyright owners, for competing distributors of books, for the reading public, and for democratic values.

Encouraging the distribution of books is a worthy goal. Congress could and should legislate along the general lines of the settlement, creating programs by which orphaned books could be

---

[27] IILP Brief at 11.
[28] Amended Settlement Agreement § 4.2(c)(ii)(2); *see also* Amended Settlement Agreement § 4.2(b)(i)(2) ("find the optimal price for each such Book in order to maximize revenues for the Rightsholder for such Book and without regard to changes to the price of any other Book").
[29] Amended Settlement Agreement § 4.2(c)(i).
[30] Amended Settlement Agreement § 4.2(c)(ii)(1).
[31] Amended Settlement Agreement § 4.2(b)(i)(2) (emphasis added).
[32] IILP Brief at 11-12.

5

returned to circulation. But this Court is not Congress, and shoehorning legislation into the shape of a class action settlement mutilates it. An adversarial litigation process and secretive settlement negotiations are the antithesis of participatory democracy. Here, they have produced drafting errors, disregarded the interests of nonparties, and undermined the actual political process. Instead of balanced copyright legislation, the Amended Settlement Agreement is the equivalent of a private bill for Google's benefit—but an actual private bill would at least be subject to the normal constraints of Congressional negotiation and oversight.

The Amended Settlement Agreement also sets a dangerous precedent for other class actions. By releasing Google from liability for its future conduct, the Amended Settlement Agreement pushes past Rule 23, jurisdictional, and justiciability limits on the use of class actions. These limits prevent improvidently overreaching settlements, ensure that class members and courts can predict the consequences of settlements, and keep class action law tethered to the fair resolution of real controversies.

The settlement of future claims based in future conduct is a Pandora's box. In cases with fewer objectors and less judicial scrutiny, it will lead to a new breed of abusive class action settlements that impose fresh and ongoing harms on class members. This Court should not open the box.

CONCLUSION

The parties have had ample time to negotiate and present their best attempt at a fair, reasonable, and lawful settlement. Their latest offering, although an improvement on the Settlement Agreement, remains structurally defective and legally problematic. This is not a healthy way to make copyright law. The wrong turns of the past four months provide ample evidence that this unprecedented use of a class action cannot and will not produce a solution in the interests of class members, the reading public, and the rule of law.

The IILP Brief advised additional consultation and procedural safeguards to improve the quality and legitimacy of the settlement process. It is now clear that these recommendations were overly optimistic. The settlement process cannot be an adequate substitute for legislation, and the Court should not attempt to make it into one. The Court should reject the proposed Amended Settlement Agreement.

Respectfully yours,

*James Grimmelmann*

James Grimmelmann
Associate Professor of Law
New York Law School

6