UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                                                                  x
The Authors Guild, Inc., *et al.*,                               x
                                                                  x
                                Plaintiffs,                       x
                                                                  x
                v.                                                x    Case No. 05 CV 8136 DC
                                                                  x
Google Inc.,                                                      x
                                                                  x
                                Defendant.                        x
---------------------------------------------------------------- x

## OBJECTIONS TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR

## ON BEHALF OF

## WRITERS' REPRESENTATIVES LLC

## AND

## RICHARD A. EPSTEIN

Class member Writers' Representatives LLC, a well-known literary agency, and Richard A. Epstein, James Parker Hall Distinguished Service Professor of Law at the University of Chicago, hereby objects to the proposed class action Amended Settlement Agreement ("GBS") in the above-captioned matter.

Writers' Representatives LLC is an agency with an interest in many books with United States Copyrights registered prior to January 5, 2009, including Eric Jager's The Last Duel, Harold Bloom's The Western Canon, Sherwin Nuland's How We Die, Jacques Barzun's From Dawn To Decadence, Clarence Thomas's My Grandfather's Son, and hundreds of others, a list of which is available at www.writersreps.com/catalog. The agency's principals including myself, Lynn Chu, have more than 30 years of experience in the book industry. I file this objection to give an industry perspective on GBS overall and on many of its details.

GBS is malstructured, malnegotiated, and a dreadful "deal" that would be deeply wrong to impose either as a "contract" or as "law" on all of authordom.

Literary agents were not represented in this lawsuit as a subclass, but they might have been. Many if not most literary agencies have a minority interest as "agencies with an interest" in all rights in the copyrighted works that they launch for clients. Thus, literary agents are "rightsholders" as well. The literary agent perspective is critical, but lacking in this discussion. Their reticence is unsurprising. It is so much easier for an agent, or publisher, to collect their Cash Payment aggregation lump sum on years of sales and remain silent.

**This business contract is an individual matter, has nothing to do with the claim, and the plaintiffs have no authority to deal in the class's property.** This case was about *damages* for copyright infringing *acts* of scanning of literary works prior to 2009—not about licensing to the thief the exclusive[1] possession of the property it stole, subject to a promise of royalty payment on limited rights.

These plaintiffs have no agency authority by virtue of this litigation to "deal" in this property. That authority is conferred person to person. They are also just not competent to perpetrate this complicated scheme upon everyone. This is an end run around Congress and a violation of law. It is a textbook example of what economists term the "agency problem," well known to be a malignant tendency of class action.[2]

This license cannot be "deemed." It is unreasonable and unfair to "deem" a collectivization of online rights upon all authors (and those publishers who control this aspect of their copyrights through their licenses), for failing to "opt out" by a deadline. Authors do not and cannot fully understand this document. Even the representatives for the authors, I believe, do not. The "deal" it sets out is in my professional view unequivocally a rip-off and an adhesion contract of the worst variety. The class action process cannot upend copyright. Copyright has if anything a higher—not lower—level of formalities for consent than other contracts (a writing individually signed, by a person with valid authority for the purpose; and specificity of the grant), precisely because of the ubiquity in the entertainment industry of frauds perpetrated on creative people.

Litigation is the wrong forum for a big business deal. To shift control over copyrights to a private organization requires either individual consent, in writing, to the terms of that contract, or Congress's forum, where there is sufficient space for disclosure and debate—and some accountability (in theory) for those who perpetrate unworkable centralization schemes.

2

The traditional signing formalities of copyright exist for a reason. Deals exchange value for value *specified* in the individual contract. Copyright recognizes how delicate and individual such negotiations are. This cannot be performed en masse.

It is not a court's job to serve as the business counsel to a class on a "deal." For these parties to propose to lay this complicated a "deal" document upon a court, to read and vet on "behalf" of all owners of rights, is an imposition.

Copyright licensing deals between one publisher and one owner, or one owner and one agent, are *personal.* They are partnerships in which fiduciary duties are owed, upon which these relationships depend. This deal serves only the private interests and agendas of *these litigants, not* the interests of the members of the class, or the larger public interest. The public interest in fair and open markets, individual property rights, and competition is harmed by this. The litigants have been appointed by no one to conduct any business for them whatsoever. In their lust to control and commission the property of others, they simply wish to end copyright for online rights.

To choose a literary agent, or union, or a publisher, or to waive technical infringements by a library, are separate matters. These plaintiffs cannot conduct these business affairs even individually, much less collectively, without the informed consent of both sides of each transaction. The plaintiffs are naïve and well-meaning, perhaps, but profoundly misguided. For Google's part, self-interest prevents its putting a stop to any of this, on grounds of mere ethics.

**There is no orphan problem, and if there is, only Congress can solve it, not these plaintiffs.** The so called orphan problem is an invented crisis. When online publishers have lobbied for this type of new law in the past, Congress has declined to act on it.[3] Rights acquisition is just part of the business of publishing. Following the rules and obtaining permission to "turn on" a scan is extraordinarily easy for Google to do online. If its license is not simple or cannot be understood, then it will get few turn-ons. That is the wise system of copyright. GBS is the opposite. It is unwise.

Authors, publishers and their heirs or successors can always be found. Only a handful would ever be unlocatable and the risks of being sued for infringement on those titles are also the lowest. Google took the risk of stealing the scans with its eyes wide open. It can handle ordinary, minor risks of suit from individual owners (though the ill will generated by this episode may shift those risks), and comply with the copyright law.[4]

Infringement suits are a business risk of publishing shared by all publishers.  Anyone who licenses in good faith from someone with plausible authority has a defense to infringement and there are few ambiguous situations that will not be easily and privately settled. Permission seekers are ubiquitous and efficient and they work for relatively low wages, $35/hr or less.[5]  All who want to be online will have ample opportunity to do so in the future; there is no necessity for this to be in the hands of one single online publisher.

Until there is individual owner permission, there should be no text search. "Search rights"[6] for the most part are retained exclusively by authors and are potentially a very valuable component of a deal. This value has *not* been reflected in the compensation in GBS. Social action should arise not by fiat, but individual contracting. Copyright infringement risks are taken every day by publishers and users, to no ill effect. That is because individual owners generally do not bring ridiculous lawsuits, or make federal cases out of a pea under a princess's mattress.

The "orphan problem" is really a clever propaganda term of lobbyists, to make palatable online publishers' request that Congress relieve them from the inconvenience of rights acquisition in doing their new publishing businesses. Wealthy online companies just want Congress to shift all of the costs and risks of publishing off themselves, and onto rights owners—even though these risks and costs are rather trivial for them, since they command online click-button licensing.

GBS accomplishes orphan legislation—but just for Google. It hands Google a better result than Google could ever have dreamed. If it is to be handed exclusive possession after stealing the scans to begin with, then it should be required to *share* those scans.[7] Orphan legislation would have benefitted all online publishers equally, not only Google and the plaintiffs trade groups' private interests. Those agendas have nothing to do with those of the individuals they purport to represent.

Mass "deemed consent" is an unfair process that strips owners of their right to control their works under terms and conditions of their own. Such a collectivization destroys value for everyone and the whole emerging competitive market of online publishing.

The display uses paid for by GBS are only a small portion of the value the plaintiffs propose to hand to Google. None of that value has been properly assessed by these representatives.

This deal equates the value of mere aggregation to that of real work. Congress made authors's literary works their property; only Congress can write "social contracts."

**The plaintiffs are not competent to act for any owner in business matters.** The plaintiffs are trade groups, with non-profit[8] fiefdom-building agendas, unfamiliar with competitive dealmaking transactions, assessments of property value, or economic valuation of complex transactions. They are unskilled in business affairs. They are not professionally engaged in literary agenting, nor in licensing relevant to this kind of mass asset. They also know nothing of the affairs of any individual owner, much less all of them.

Publishing contracts are individual. There are preferences of the parties, their other obligations, plans for the future, the nature of the individual work, market timing, and competition to consider. This requires direct bargaining between the parties. Each poses separate issues, separate evaluations of pros, cons, trade-offs, and, most importantly, costs, for parties to be bound.

A contract of agency, or of publishing, or terms and conditions for a waiver of library liabilities for minor infringements, not to mention a litigation settlement waiver and release, which are all balled up together in this, are separate transactions. These cannot be done on a single instrument. They then can't be aggregated into one single contract for all copyrights and handled the same way one small individual publishing contract is, which is how the plaintiffs have handled this.

This is quite simply a mass adhesion contract, in which the enormous financial value of the many waivers, releases, burdens, promises, and insurance schemes, as to matters past and future, are hidden from all of the people whose rights are at stake here. The Authors' Guild seems to have no understanding of the corporate structure or economics involved in this document.[9] They are now just excited to be partnering with Google to form its "Registry." This is a scam, in my view, being hawked as the best and only path to digital utopia.

And they are using the federal court as their marketing platform and branding opportunity. People are grievously misled by this entire process.

Even to suggest a court should impose so overcomplicated and costly a scheme, forcibly, upon everyone, which promises in so many respects to end individual discretion over their valuable copyrights and tax away approximately 50% of all owners' proceeds, purporting to "determine" whether an author owns his rights, is an abuse. This fixed price placed on everyone's online rights has been set in no valid market process. These terms have no price integrity.

GBS is unwise. It hurts all parties—but it hurts those who create literary works, at the foundation of our society, the most.

Only competition by individual trial and error can allow fair standards and practices to evolve in this new business of online publishing. No static scheme cooked up in a litigation hothouse will produce wise legislation.  These litigants are incompetent to represent the public interest, much less all owners' business affairs.

**Broad grant, limited payout.**  GBS is a broad implicit grant of rights of exclusive possession to Google of a very valuable asset—world literature in English, to date. It is a classically overreaching entertainment contract in which nothing is paid for the most valuable rights transferred—Google's exclusive possession of the scans coupled with search, which it originally brazenly stole, plus all the data on hits, views, and sales it yields, moment by moment and page by page (which I consider to be owner accounting data), nor for the exclusive option granted to perform research and development on all derivative works (Products and Services) that Google may make out of the scans and their data in the future, much less any terms—economic, editorial, or otherwise—for any of the above. As for discussing any of this in the future, one would be helpless before a monopolist in sole and exclusive possession of the scans.

**No need for a costly, controlling Registry.**  On top of this, a "Registry" is now in large part expected to control all of those rights in lieu of their owners.[10] This is nothing but Google's special purpose entity (SPE), formed to cost its contracts and claims department to owners.[11] Both it and the terms of this document shield Google from all liability.

Professional permission seekers are cheap and efficient; there is no need for a Registry to reinvent that wheel—particularly not by making it square and then demanding it be pushed forward. Distributing proceeds that are due to owners is a *publisher* function—not an *owner* function, yet under this "deal," owners must pay all the costs of this Registry.

Even if owners individually authorize the Registry to act for them, it can do nothing under this, because all owner rights to enforce copyright (and trademark, and droit moral) against Google are waived in Article X. Google thus has no obligation to account to them about anything it does with their works again. Google agrees only to pay "net"[12] on sales of specified, limited display rights, if it decides to implement those programs. This is the familiar entertainment industry trick of a subtle grant[13] (and subtle waivers) of valuable but unpaid-for rights through the deceptive use of vague but all-inclusive grant language, which the seller assumes refers to something more narrow, like, the rights for which he is actually being paid.[14] Google's exclusive possession and use of the scans, and all data derived from users use of search is implicit, but *unpaid for* in GBS. The value to Google is much more in that for which it has *not* agreed to pay.

The scans as a whole are a derivative work, analogous to a large anthology. Even contributors to a book anthology regulate and limit a grant of rights to an anthologist more carefully than GBS does. The licensor to an anthology typically bargains for the use of a contribution based on

*all value* calculated from *all specified uses* of that anthology (based on number of copies, price per copy, per format, in the territory and term specified).[15] The precise uses of the publication are stated, or are clear in context, and the license states the terms and payment, per use. Under copyright, all rights not *specifically* granted are reserved.

But that is under copyright. Under Article X, GBS *waives* all owners' copyrights so far as Google is concerned. It is absolutely unconscionable, and incompetent of the dealmakers, for any business deal to be affixed to such a clause. The document then proceeds to turns owner accounting data into Google's property and in all practical respects to make it its trade secret. None of this value subtly handed to Google in GBS has been reflected in this "deal."

Under GBS, owners no longer have the right to delete their works from Google's scan set after April 5, 2011[16] even if they successfully "remove" or turn them off from display. That means, all works not "removed" before that date will continue to produce hit and view data for Google, and this valuable use of works, and all derivative works from them by Google can never be ended, or blocked from use in new products and services. This search data, along with ad revenue,[17] is the main value of the scans to Google—not so much display rights. This needed to have been assessed and paid for. It was not.

The class representatives apparently delegated all IP related negotiation to the publishers' attorney, Debevoise, Plimpton. This had predictable results.[18] Only display rights were paid for in GBS because those are the only rights book publishers control. Their interests and agenda dominated authors' in this "deal."

**No professional valuation of the rights and assets conveyed to Google's exclusive possession has been conducted.** The plaintiffs had a limited mandate—damages for past acts of scanning. They made no economic assessment either of those damages or the world literature asset being conveyed to Google and certainly not of any the enormous values shifted to Google under this contract: Google liability caps; owner waivers and releases of rights; owner assumptions of liabilities—all of which, absent this document, law and industry custom would clearly require Google to take full responsibility for.

The plaintiffs seem to have simply engaged in an off the cuff ballpark "deal" for "all rights" in exchange for a contingent royalty on the least valuable rights in the asset conveyed. Google's uses of the aggregate hit and view type data derived from the scans alone may well exceed the value of online display rights.

One investment banker[19] estimates the net present value of the world's existing literary intellectual property assets, in the U.S. alone, to be between $6-$7 billion, and between $14-$21 billion for such assets throughout the world—not counting the value of search rights, or the transfer of an exclusive option on research and development rights, or other digitally based products and services to be developed from out of both owner accounting data, and the scans, nor the other financial values contained within the GBS document. Using the U.S. assets only figure, the $125 Million settlement represents about 2% of the asset's value (this valuation excludes UK, Canadian, and Australian assets; however, it may include some assets excluded from GBS). $34.5 Million of that sum goes to run the Registry, so it is not compensation to owners, just Google's capital cost of its own royalty, or contracts and claims, department, in spin-off form. $45.5 Million or .7% of the asset value, goes to the lawyers, and $45 Million is to be given to those who, by a deadline, "opt in."[20]

On January 20, 2010, at a panel[21] held by the authors' groups NWU and AJSA I participated in, Paul Aiken, a former litigator, admitted that the only corporate counsel to vet this document on

behalf of authors were he and his staff—his Executive Director having once worked for the News Corp TV division. That is not adequate background to deal with Google on behalf of all authors, or to evaluate the economics of this document. Lawyers often aren't MBA's, accountants or economists. The Authors' Guild does not see the three-way negotiation that has occurred in this, to the detriment of authors and the benefit of publishers. Boni & Zack is not a copyright firm. They appear to be class action men, out for a fee award and little more, in my estimation.

**This is a firesale, at gunpoint, on the heels of a theft—at the worst possible market timing.** The plaintiffs have chosen to sell now, just before the asset's expected rise in value, at the very start of the digital era, on terms that delete all owners' rights under copyright law as to anything Google might do in the future. This is irresponsible.

Display rights and "Non-Display" rights—that is, "search rights,"[22] including the right to extract hit and view data from it by user number or location, and make derivative works based on that data, such as listings of keywords and bibliographies and other analytics, as well as exclusive research and development rights—may be the most valuable rights in literary works in history. GBS forces recognition and sale of this now, with no decent ability of owners to evaluate any of the risks of this transaction, or its value.

Market timing of sale is an individual owner's prerogative. It is one of the most crucial factors in any deal.  To strip an owner of that prerogative strips them not only of control, but of value.

**GBS takes 50% off the top for all owners of pre-2009 works.** GBS turns all owners into nothing but contingent third level net residuaries of a Google-Registry publishing joint venture that can be expected to take in toto around 50% off the top, including the Registry's uncapped off the top entitlement,[23] with all owners' ownership and control and rights to accounting, *backended* and functionally eliminated. All owners, in copyright, have a right to accounting and payment *first* in line, not last.

Owners personally choose publishers and agents, who owe them fiduciary responsibilities, on a basis of trust. This separates owners from duties properly owed directly from Google to them.

To agree to anything this inadvisable would require a party's *personal informed consent* with full disclosure and right to negotiate, and walk, in signature, in writing, with full contract formalities. The class action has been used by these parties to evade this.

**The display rights split is not competitive.**  Between Google and the Registry, 50% will come off the top. This is *wrong*. It is totally excessive for digital display. Historically, author and publisher share print publishing profits 50/50 with the author contributing his creation, and the publisher contributing its production and sales. Print publishing is high labor, high cost, and high risk: editorial acquisition, editing, design, production, manufacturing, warehousing, scheduling, promotion and marketing, distribution and sales and this is the only justification for the publisher's 50%. The costs here are a $10-$30 scan,[24] an online merchant cart, copy-protection software, and beyond that, passivity. Over time, and with competition among online publishers, this online publisher share for this type of online publication, might drop down to something like 2%—not 37%-50%—like a Visa card merchant fee—which, by the way, also comes with the regular, detailed individual accounting that GBS is careful to omit. Online bears no economic relationship to print book publishing, or to any other "old media" product.

**There should be no Cash Payments.**  All "opt ins" are to be paid a Cash Payment; the validity of any of these claims cannot possibly be ascertained in this settlement process.[25] The payments

are a lure to feed a database with claims data, for a reward. Such a payoff invites fraud, and publisher and agent opportunism (since aggregate lists will pay them well) however dubious or time bound such claim(s). It is an alternate claimant database. The future purpose of such a database would be to sell its data to any publishers who want to evade true owners, and game alternate claimant prices against them to get the owner's price down. The parties already anticipate plenty of fraudulent and incorrect payments, for they have fully indemnified everyone connected with this litigation against any and all suits over these payouts.[26] The court settlement process is being exploited by these parties, to jump-start these business enterprises, plus legitimize all future Google publishing activities in the future. The Court should order that no use of this alternate claimant database be made by anyone, after this litigation.

**No Registry.** The Registry gathers and, according to GBS, "owns"[27] claimant data and "maintains" it. The "data" referred to, apparently, is the claims data collected by the settlement administrator. The Registry expects to keep this asset and develop it, after this litigation.[28] The duty of "locating and collecting information from Rightsholders" is an information business to be operated at owner expense. But determining whom to pay should be solely a *publisher* duty and liability, of *Google's*. Under GBS, all those costs (along with, in other clauses discussed below, enormous liabilities for damages arising from *Google's* publishing activities) is shoved off onto owners. "Coordinating payments" refers to operations resembling those of Authors' Guild affiliate, the Authors' Registry.[29]

Google will publish anything[30] it believes to be not commercially available among pre-2009 works. The Registry "determines"[31] whom to pay, subject to its review and arbitration of people's contracts.

On the free market, an owner would ask this Registry entity, first, excuse me, what do you do, and second, what's your price?  Hearing "we decide whether to pay you, or your publisher, or somebody else in our sole discretion, based on how we read your contract, to be binding against you and arbitrated on rules rigged against you," and "we get our unlimited overhead and costs in our sole discretion," most owners would politely decline. There is no owner consent to this entity or its costs.

Direct contracting between an online publisher and the purported owner, coupled with a warranty and an indemnity for breach of that warranty, *entirely eliminates all need for any Registry* costed to owners.

The agency of these "class representatives" in a litigation that, at best, raised an issue of fair use in which they suddenly lost interest, cannot become a galloping metaphor for their agency of everything.

Making this entity privy to all details of the business affairs of everyone, is also unwise. We have no idea what this Registry intends to do in the future with the data it accumulates, or that data's accuracy. Any designations of agency for a purpose must be an open market transaction with full opportunity of disclosure and a right to set conditions on any use of data, prior notice, limits, payments, etc.

The Registry is an unaccountable entity in a conflict of interest. Its economic loyalties are likely to be first to Google, since it receives all its revenues from it (see related issues below).

**Copyright works best.**  Copyright law's rules quell contention by placing the burden on the infringed individual to complain, work out a compromise, then sue over infringement if necessary. Copyright wisely sets high barriers to suit on small, individual matters: keeping such

squabbles individual relieves courts of clutter. The copyright statute of limitation is short: 3 years either from the infringing act, or its discovery. The per infringement statutory damages cap, $150,000, is not very high. Accidental infringers have numerous defenses, including any license obtained in good faith. Credible licensors for any work are often numerous.

On the flip side, copyright law's rules also prevent contention from arising by placing the burden on the user of a copyright to ask permission. The owner may set any terms he wants concerning the use requested, if the circumstances of that request inspires sufficient trust.

Reading or drafting and negotiating and signing an actual license not only winnows real owners out from fraudsters, and copyright thieves out from honest publishers, it focuses the grantor's (and the grantee's) mind on who is giving whom what for what. The information derived from the permissions acquisitions exercise is solid, a true bargain about something specific between party A and party B. A Registry soliciting multiple "claimants of rights" over the internet, in place of this sane, thoughtful, and balanced system, only massively increases transactions costs, potential for fraud and error, and invades privacy.

The internet is powerful, but it is also a limited, and distorting, source of data.[32] The knowledgeable seeker of permission is still needed to sift such data.

Copyright is a simple rule (for a complex world, in Prof. Epstein's euphonious title) that minimizes and channels social conflict and related costs properly. Fair use is a clear and simple rule of reason that permits doctrine to evolve. GBS by contrast seeks to press the business affairs of everybody into a static regulatory monopoly manned by clueless intermediaries. Not only is it a rip-off, it doesn't work.

**Informed individual consent creates market integrity and checks monopoly.** GBS is three contracts rolled into one, and collectivized on top of that: a publishing license, an agency appointment, and a library waiver, plus a vast amount of tedious boilerplate regulation to no effect except rigidification. Market diversity and competition is protected when individuals act for themselves to choose to sign, or not to sign, a contract. These activities must remain personal and individual.

Individuals manage their affairs best, because only they fully understand their affairs. These range from "I want to give it away to all for free, including to this publisher's competitors," to "I need the maximum to pay off my sick mother's medical bills."

Scott Gant, of Boies, Schiller,[33] has filed an objection based on Rule 23's provision that some matters are too inherently individual for class action. That is absolutely correct. It goes to the root of the matter. Rule 23 states policy limits on class action when individuals' rights are affected. A person's interest in a literary work is not "typical" and cannot be collectivized for disposition in one contract.

**The Registry benefits only Google and publishers, and hurts authors.** The Registry entity benefits Google first, publishers second, and positively damages authors.

Authors always already know the status of their works. They do not need a Registry to tell them their work is out of print and other publishing options might be sought. The Registry's function will in fact be to alert *publishers* as to what *authors* are doing, so that publishers can enforce what they believe their grant clauses or out of print clauses entitle them to, that is, receive all first proceeds from Google. Some publishers will claim Google publication extends their license forever, leading directly to stealing from authors by publishers. Many contracts are

written, in some cases overreachingly, but in some high advance situations, not necessarily, to characterize a publisher's essentially passive receipt of electronic licensing revenues as a "publishing" operation, allowing the publisher to take the lion's share while paying the author a low "net royalty." The other effect that is bad for authors is the implication that a publisher's license can last forever, since the condition for reversion ("out of print") can never take place, now that the publisher cost threshhold for digital availability is zero.

GBS purports to "determine" all such disputes by amending all contracts retroactively. Attachment A sets royalty splits for books published before 1987 entitling publishers to take 35% of Google proceeds and 50% on books published after 1987.[34] These are arbitrary numbers confiscating the author's proceeds if the publisher under its contract in fact is entitled to nothing at all. The litigants seem to think GBS is to be new "law." These other contracts have *absolutely nothing to do* with these plaintiffs' suit.

Authors are naturally most proactive about ensuring that their rights get resold. Authors would relicense first. The publisher may sue, if they think their contract warrants it. Few publishers would when the stakes are low, or their contracts too ambiguous or overreaching. It is also bad business for publishers to sue authors.

Under GBS, authors will find it hard to prevail in Registry arbitration. Its rules have been rigged to eliminate authors' access to federal court and all common law equitable rules[35] of construction, replacing these with the requirement that publisher-written contracts prevail as written and that side evidence inadmissible in court be allowed.[36] These rules rig the decks against unsophisticated authors, who often say polite things to a publisher "approving" in principle of a new publication, while failing to ask probing questions about business details that require negotiation.

Interestingly, *publishers* with claims disputes are entirely exempt from the Registry arbitration requirement. Unlike authors, all *publishers* preserve their access to federal court to construe the meaning of *their* contracts.[37]

Authors must have access to the courts, not be sandbagged in an arbitration process. This arbitration pretends to be cheap[38] but owners collectively pay for it. Some book publishers believe their contracts entitle them to permanent ownership and the lion's share of electronic collections; many authors would disagree.

Authors are also harmed because the Registry starts a time clock running on statutes of limitations to their claims for copyright infringement, or breach of contract. Without the Registry, an author's infringement claim might have been tolled to the date they discovered the infringement, or pilfering of money due 100% to the author.

GBS destroys authors' natural power in a new digital era to act for themselves. In concert with publishers, Google has sloped the playing field steeply against authors. The Registry is nothing but a cat's paw for book publishers' concerted effort in this litigation, to grab digital rights away from authors that under their contracts, many, perhaps most[39] have no right to.[40]

The need for the simple and flexible rules of equity and access to federal court has never been more needed by authors than now, as they face the new digital age. GBS seeks to destroy that.

**A Registry to "determine" who to pay is inefficient, invades privacy, and is subject to fraud.** Ownership is not a mystery. The author and the publisher of every work or selection is plainly stated in or on every book. A script—and Google is the master of this—could extract all

authors and titles from the scan set automatically; after that, proper permissions are easy to get. This is the business Google signed up for, then tried via GBS to load the costs and responsibilities of, onto owners.

Web solicitation of all "claimants," is a process ripe for fraud. The Registry aggregates people's ownership data, with no protection of owner privacy, nor any protection against re-use or monetization of this data. Rather, GBS implies the opposite, for the Registry is to "own" the database. Contacting claimants to communicate to them about others' claims to "determine" the correct owner to pay, risks disseminating owner private data to the wrong hands, such as fraudsters. This process is positively dangerous to people. Standard contracting and permissioning with standard warranties and indemnities of ownership, is far superior.

Individual transactions on the market are inherently more private, because all that information is dispersed among multiple parties.

**There is no accounting to owners even on authorized display rights, much less non-display rights.** Coupled with the waivers and releases of Article X, Google no longer has any duty of accounting to owners; the effect of GBS is to convert all owner accounting data into Google's exclusive property and trade secret. This is fundamentally at odds with copyright, which permits an owner to negotiate for full ongoing disclosure and payment with respect to each and every use, including any and all derivative works, in detail: sales, per specific use type, per author, per work, hits, views, viewtimes, and other analytic data based on various criteria such as time-frame. Data, and obligations, flow mostly one way in GBS, *to* Google, or to the Registry (and from the Registry to Google), particularly those of confidentiality. [41] Google's copyright obligations to owners are now only the option to speak, if it cares to, with the Registry entity, should the Registry raise an issue.[42] The *Registry*, in its turn, has no obligation to account in any detail *to owners* under GBS, nor any enforceable right to get any particular data out of Google. Coupled with the global waivers and releases of Article X of all rights of copyright, owners have no rights left, viz Google.

Google gives only limited information to the Registry (§6.6(a)(ii)).[43] Information is to be given only such that Registry can *pay* owners.[44] Copyright law by contrast imposes a duty of *full accounting* to the owner, per specific category of use, with all that is not specifically bargained for, reserved. What GBS means is that accounting to owners is reduced to an unenforceable agreement by Google possibly to cooperate with its crony, the Registry, later, and, under §6.6(a)(vii), only to the extent the Registry requires any particular information to satisfy some pesky owner so as to get him off its back.

Google should have an affirmative, regular duty to account directly *to owners*, which is precisely what the common law that GBS tries to expunge, provides. GBS extinguishes all owners' legal rights to their properties, and along with it, all need to disclose how it is using and profiting from its use of their works. In fact, now Google gets to probe just how little data it ever needs to give to anyone, courtesy of its trusty, the Registry.

If you have no recourse at law, as, under GBS's global waiver and release provision of Article X, you do not, then you have nothing. Google is entirely free to do whatever it wants and it can never be sued to account for any use it makes of pre-2009 literature (save by those few who "opted out"), by anyone, ever again. Except of course by the Registry, on a claim of breach of a contract that obligates Google to next to nothing.

**No right to audit Google by an owner.** Had Google signed all authors online up itself, each would have had a right of audit, either expressly or impliedly. People power is destroyed by the GBS structure.

To omit the right of *audit*, is unacceptable in any publishing contract. Audit rights are all the more important the more distant and less personal contract relations become. GBS in effect tries to securitize, that is, to aggregate the publishing relationship, which can only be a personal, fiduciary one. Only the Registry may audit Google, on behalf of all owners (and thus no one) once a year—but under the strictest confidentiality to Google.[45] Owner information under GBS is treated as Google's exclusive property and *its* trade secret; Google is very jealous of this data, clearly fearful that anyone should ever benefit from it but itself—even its owner.

No competent agent, attorney, or manager would ever permit a contract omitting these critical obligations to owners, particularly since so much data is being auto-generated and is massively available[46] to Google. Not an ounce of attention has been paid in this document to anything of legal or financial importance to owners.

Real agent and author dealings with Google are the true "hive mind" that would have brought far more fairness to individual owners.[47]

**The effects of Article X.** Nothing is "presumed" or "deemed" in copyright; in copyright, rights must be *specified*. All rights not specifically granted, in writing, are reserved to the owner. But Article X waives and releases all owners' rights of copyright, trademark, and droit moral, as to anything[48] that Google ever does[49] with any covered work. Copyright is nothing *but* a legal right to sue to enjoin,[50] and for an accounting for wrongful use.

So, Article X waives and releases all claims GBS "authorizes," and GBS authorizes all uses[51] in any and all Google Products and Services.[52] But with no right to sue under copyright, owners no longer have any rights at all when it comes to Google. Thus, Article X coupled with the use authorizations of Article III means GBS is in fact a non-attribution Creative Commons license—just for Google. (Non-attribution because trademark and droit moral are also waived.) Gluing Article X's releases and waivers to a "deal" make all pre-2009 works into Google's. Google no longer has a speck of obligation to ask anyone's permission for anything it ever does, for Article X has wiped out all its liability to anyone, for any way in which it uses their works.

This means owners no longer have any *legal* right under copyright to require anything of Google. A costly intermediary, the Registry, may ask master Google to be kind, and that is all; but with its principals stripped of all *their* rights, any such talks will be toothless.[53]

Owner abrogation of all of law of copyright, trademark, and of droit moral, is a feature of no decently negotiated publishing license, which by definition reserves, not abrogates, all rights and remedies concerning rights not granted.

The right to sue in federal court is the foundation and protector of all rights, including copyright. It is the basis of all fair and reasonable treatment by others. These rights cannot be waived without individuals' informed consent.

To paste all of Google's future operations exploiting people's copyrights to a waiver and release of all their claims of copyright, trademark, and droit moral rights under Article X, can only be described as a sleazy manuever—and it takes a lot of flipping back and forth through this document to see it. Article X explains why there is no owner accounting obligation. Since they

12

no longer have any rights against Google anyway, don't remind them of all the rights of which they've just been stripped.

This gives Google a *permanent* edge over all other online publishing competitors, a matter that goes far beyond whether Google would be a monopoly on the Effective Date. The class representatives have rewarded Google's theft with a gift of the stolen property, subject to a kickback to themselves.

Article X's elimination of copyright, trademark, and droit moral for all of pre-2009 literature for the benefit of Google alone gives Google an insuperable advantage over all other online publishers. And for their owners, it is effectively *exclusive* possession and control of all their digital rights in pre-1/5/09 copyrighted[54] works.

GBS must be read more for its omissions and bizarre structural pairings, than for what it directly says.[55]

**The asset value of Article X was not accounted for in this "deal."** This constitutes an enormous, but unvalued, asset transfer to Google that the class representatives failed to assess. This is economically illiterate. No prudent agent or attorney[56] would ever proceed in such a fashion. Owners here assume all risk and liability of Article X's waiver and release of all copyright claims concerning all uses of their property going forward.

**The Registry is in a conflict of interest.** No individual owner has negotiated any terms of agency with this Registry. There is no way to terminate it without terminating Google too. The two entities are tied. The Registry is, in essence, Google's contracts and claims department. Yet, simultaneously, it purports to act as owners' non-terminable agent. This is a terrible conflict of interest.

In economic reality, the Registry is *only* Google's agent, not the owners'. The Registry's only function is to receive money from Google and distribute it by a scheme unrelated to individual use accounting.[57] It has no real ability to negotiate or renegotiate anything. It owes multiple duties[58] to Google, including confidentiality to Google,[59] but not to owners. It is to be regularly audited by Google and to share its information with Google.[60]

No prudent attorney could ever advise a client to have their rights completely controlled by an entity bound so tightly to Google. The Registry cannot operate both sides of the fence. Its loyalties are due to only one side of the owner-online publisher transaction. For a court to inflict such an entity on all owners would be unfair and unreasonable.

The Registry does not yet exist, has no track record, and is Google' mere department to perform publisher duties, at owners' cost.[61] To it, Google represents their payday, while owners represent only costs. Its ultimate attitude toward owners, who cannot terminate it, is easy to predict.

**The Registry is incorrectly structured to grant too much control to publishers.** The corporate control structure of the Registry is totally incorrect. It grants publishers 50% board control. Authors own by far the lions' share of the rights being granted. Most book publishers do not control "all" rights granted in GBS to Google. Publishers mostly control only text display rights,[62] not "search rights," commercial "research and development rights" nor any derivative works or uses of owner accounting data such as hits or viewtime analytics if Google uses them in any Products or Services it develops.[63] Such rights are nearly always exclusively

reserved to authors.[64] 50% control of the Registry by publishers is thus far too much. This is unfair and unreasonable to authors.

**There is no market integrity to this "deal."** This litigation is a non-market negotiation, which has produced a false price in the form of this contract—an owner monopoly handing off to a theft-facilitated monopsony, enabled solely by this artifice of the class action. GBS's entire economics is wrong. There has been no market process in this, and there is thus no price integrity to this deal.

**The Registry has large unauthorized power over owners, yet little function.** Once in, the Registry can't be terminated. After five years it can dispose of other rights or bind one to new online publishers, and to agreements with libraries[65]—all again with no negotiation from, explanation to, or prior ("opt in") consent of owners.[66] It is a costly, conflict-provoking entity that owes most of its duties and its economic loyalties to Google. It does little more than receive Google nets, in commingled pools, then follow GBS's byzantine procedures for paying owners—made byzantine precisely because of GBS's elimination of simple, straightforward copyright and contract law, and owner use accounting.  No one has appointed this entity to act as their agent or negotiated its terms—commission, extent of authority, termination, owner approvals over costs, etc. It doesn't yet exist, and has no known competence. It functions entirely to relieve Google of publisher functions. Other companies in the market perform rights tasks far better, more expeditiously, and cheaply, than it can be expected to.

The Registry substitutes for owners, whenever this suits Google, but Google is free to end run it whenever it prefers, to owners. (see discussion re: §17.9 below).

**The Registry is a money laundry and a security and its pay scheme is unworkable.** As mentioned, the Registry receives all funds from Google in net, commingled pools.[67]  It then has the right to take all operating costs, including its taxes, off the top.[68] There is no cap. The accounting period on which revenues are to be paid out to owners is "to be determined," but may be as long as 5 years.[69] Some tranching, i.e., differential treatment of unclaimed funds, whereby specific groups of owners, such as orphans, or revenue types due to orphans, suffered greater, or more rapid, Registry cost draws on their revenues than other owner groups, was eliminated by the DOJ[70]—but because Registry costs under Attachment C §4.2 still come off the top, it is still unclear how payments can possibly be related to per work sales and use, and which Registry costs are to apply, or how. The Registry's expenses might vary greatly from year to year, say, 5% in one year, 15% in the next, to over 100%, the next. Just after Google's $34.5 million plus excess Cash Payment budget funding runs out perhaps, or new security implementation plans have to be drafted, or library and host site training programs conducted,[71] or a major hacking event leads to a rush of claims and lawsuits against Google and the Registry. Which Registry costs, as of when, apply to what owner sums accrued? As a theoretical matter, the Registry is a security that owners take shares in, because nowhere in GBS is there any straightforward assurance of direct, per owner, per work, per use type sales accounting[72]; rather, GBS leaves open that what is to be paid to owners will be just a *share*, after total Registry costs (as all corporate shareholders are subordinated), adjusted by some means allegedly related to hits, views, copies and download sales,[73] that has yet to be determined or disclosed. Registry costs are continuous, but in the amended settlement, no Registry costs may be taken out of Unclaimed Works for five years, at which time 25% of accumulated receipts can be used—not for Registry costs, but "for the purpose of attempting to locate the Rightsholders of unclaimed Books."[74] Nothing is said about accrued interest. All that is for certain is that the Registry is an owner cost, not a Google cost. This is unfair and unreasonable. The deal provided no compensation at all for this liability shift from the publisher to owners.

It is unfair to ask a staff of litigators at the DOJ and a court to vet the corporate economics of this structure. Contracting on the open market with caveat emptor and in competition is the only place in which individuals are to make mistakes such as this.

The Registry's power over owners is excessive. It expects to be a quasi-judicial, quasi-executive, quasi-administrative agency governing owners.[75] No court should put a Good Housekeeping Seal of Approval on this effort to commandeer and commission all of literature. It would be to grant a no-bid contract to a non-existent, malstructured entity with no track record or even any clear function. It is merely a request that a court order a guaranteed, permanent clientele for Google's exclusive sales rep.

This proposed Registry can go hang up its shingle and solicit clients to represent in the market, *not* ask a court to hand it one. The litigants may not use a court as their sales platform. Any contract binding all owners to this entity must be by direct consent, and signature on the dotted line, preferably with advice of counsel.

**Article 7 is useless bureaucracy with just two purposes: spying on Google competitors, and casting liability and big costs onto owners.** GBS supplants all protections of the common law, and the law of publishing, with complicated and costly bureaucratic procedures costed to owners in the form of Registry costs. These procedures bear little connection to the harms they pretend to address; actually, they are a device to shield Google from liability from damages it would ordinarily incur that arise from its conduct of its business. Article 7 is presented as if it protects owners' rights against unauthorized uses by library patrons. Few owners care to regulate library patrons' use of their works. Article 7 does nothing but force libraries to spy on their patrons, collecting paperwork to spell out all their Research Agendas, inflicting multiple high-level signed approvals on all who wish to study the libraries' copies of scans as data—even, absurdly, forbidding users engaged in data research from reading the scans while they study them as data, except as reasonable. In which case, it is unclear why the provision exists, since a mandate on users won't bind anyone, pronounced from GBS; but perhaps they will have to sign contracts for their access approvals that make them liable for breach for reading scans excessively.[76] This is just madness and silliness in the form of a "sophisticated" piece of pseudo-legislation which no one should ever be forced to read. It is clear that all the data here gathered on users is being gathered only so that Google can get a bead on whatever competitors or academic researchers might be up to.

There is a serious but unaddressed issue here, whether online availability of works from libraries will kill owners' sales. One of my clients, an academic translator of the classics named Sarah Ruden (whom Garry Wills called the best thing since Dryden for her rendering of Lysistrata) has discovered that her works are available now in toto to her largely college market, via higher ed library access, meaning that none of her students have any need to buy a copy again. This will surely afflict all authors of books with a largely college market. The micromanagement set out in Article 7 does not address this problem. It only pretends to, with an enormous blob of costly bureaucracy, costed to owners. In reality this contract does nothing but free Google from nearly all liability for all damage it ever wreaks in exploiting these works, so long as various rulebook protocols are mechanically followed. If Google remains fully on the hook for all harms under ordinary common law as it should, eliminating all this pseudo-regulatory mumbo-jumbo, then all costs and harms to owners and to society will be minimized, because then Google will take the care that it should.

Overreaching details abound. The Registry and Google split costs of security 50/50—but Google has a $200,000 annual cap.[77] So, owners in truth bear most of the cost of security, if costs are high, which they are sure to be.[78] The required security is elaborate and

bureaucratic—regular security audits of libraries, 3 year library security training programs, special employees and officers in charge of the task at libraries, the churning out of regular written security plan documents that have to be regularly updated (Art. 7, Att. D).[79] None of this whirring machinery will prevent hacking or misuse or damages in the unknown future. All it does is shift all liability, and all of its cost, onto owners, immunizing Google against nearly all future harms, even those it negligently inflicts, whatever the future might hold. (And, Article 8 generally implies, only if there is an egregious breach of protocol will there be any Google liability at all,[80] subject to liability caps,[81] with the claims of all diluting any one.)  The value of this shift to owners is also unseen, and unpaid for in this deal.

The standard common law rule is far better for owners: Google should insure against *all* harms arising from its and all its library licensees' uses of their works, within reason. All of this apparatus hurts owners tremendously, and to have hawked it as a benefit is a simple scam. We are dealing with future unknowns here, new technology—and serious danger, if the example of the music industry is to be heeded. If Google is in breach, then it should be sued and be liable for those damages, and whatever else is warranted at law.

**The liability cap of Article 8 turns owners into Google's insurer—another value transfer unpaid for.**  In the event of "security breaches," liability[82] is capped at remarkably low sums: $15-$25 million tops, if it is Google's fault, and $2-5 million if it is a library's or host site's, for hacking coming from outside[83]—and for there to be any liability all it must be the proximate result of a reckless, willful or intentional default in the rulebook, compliant with Attachment D, which details actions taken by authorized individuals,[84] so events connected by proven screw-ups nevertheless un-pinnable on higher level individuals' actions, apparently exonerates everything. The caps themselves are far too low to compensate against any serious hacking event, and the reference to "actual damages" soon proves misleading because there is a further cap—the statutory damages of the Copyright Act.[85] It is an outrage to use statutory copyright damages numbers as a cap of serious tort claims. Copyright infringement is about individual piracies—not about large multi-party torts. An outside hack might mean total apocalyptic loss of value of a person's property forever. Infringements are individual act oriented and can be multiple. These passages largely exonerate Google, libraries or host sites in niggling fashion.[86] They seem to be entirely unnegotiated, totally written by Google. No contract at all is far better for owners. Furthermore, any individual claim may be merged, at the Registry's say so, into a group to be diluted with claims or suspected damages to any other people whom the Registry deems similar to anyone. The Registry "determines" if your fate remains your own, or is to be collectivized, even if you are J.K. Rowling, and not Joe Blow.[87]

The Registry's unbridled power to deem and collectivize gives this entity more power than an executive branch administrative agency—but authorized and accountable to no one. Suing it would be as hard as suing Google. And hugely complicated by the pseudo-"law"/ "deemed contract" status of GBS.

For owners, the common law is far preferable. The common law would place the incentive to insure where it should be, on Google to fend off all hacking. Having brazenly stolen the scans to begin with, one might think Google would owe us a simple decent contract that reserves all owner rights and remedies most especially copyright, even assume *strict liability* for all damages from any of their "innovative" exploitations of others' property.

Libraries should access their "scan sets" direct from Google with Google fully responsible for security.  Again, this huge shift in liability *to owners* was totally unpaid for in the "deal."

**The consent of "opt ins" to GBS is questionable.** The "deemed" consent of those who "opt in" or "register" by click-button online, has been impaired by the use of the mantle of the court process. This has been very misleading to the public. To sell this settlement, the parties have exploited the misimpression that a federal court's A-okay and automatic imprimatur is waiting just around the corner.

**Attachment C's treatment of Inserts.** To have graciously contributed to an anthology in the past is a good deed that does not go unpunished, since online-all-the-time, means anthologies will compete head to head with an author's own edition in search returns. Few permissions to anthologists seriously anticipate online republication from book scanning, even though many permissions passed out for contributors to sign are adhesion contracts. This will hurt poets, essayists and journalists whose work is collected most, the most. [88]

**The plaintiffs rushed to certify for settlement, having lost interest in the fair use question.** This suggests collusion to settle for the settlement pot, with no effort made to litigate the issues they had raised. Resolving that issue to achieve clarity in the law might have served the public interest, but the public interest did not interest; settlement with a wealthy deep pockets did. The scanning issue would have been either fair use or penny-ante in damages. They targeted the richest racket they could find: controlling and commissioning all works going forward.

Rushing to settle in this way is at best unseemly and at worst collusion and a breach of fiduciary duty to the class. The class has no interest in preserving the viability of future tendentious copyright-maximalist constructions of fair use. [89]

**The plaintiffs Authors' Guild is already planning to control the Registry.** The Authors' Guild has been forming the Registry entity and has already selected a crony to run it. At a 1/20/10 National Writers Union panel, Authors' Guild President Paul Aiken introduced one Michael Healy seated with the Authors' Guild group, formerly of Copyright Clearance Center, as hand-picked by the Authors' Guild to be the Registry's interim Executive Director (Healy was seated in the audience with the group from the Author's Guild). If this entity has not yet been court approved, and the plaintiffs have no interest in it, how is it that the plaintiffs are already selecting and planning its direction? The plaintiffs make their enthusiasm for forming and running the lucrative Registry plain. [90] It seems clear that they intend the Registry to be another in their non-governmental-organization interlocking directorates. [91]

**Google is free after GBS is approved to make contracts that are even worse for owners, holding GBS's overreaching terms as its minimum baseline. §17.9** Google is free to end run Registry intermediation to contract with owners whenever it is able to get terms out of anyone, including covered rightsholders, more favorable to itself even than GBS provides. GBS thus would be Google's legal baseline minimum, leaving Google free to gouge people more, to the extent they can get away with that, since it will never be clear to anyone what GBS provides. Once anointed with court sanctification Google will appear "court blessed" and be able to entrench its monopoly even further. Other online publishers will copycat Google's "deal," raising their off-the-tops to just under Google's 37%; demanding bulky cram-down licenses just like Google's new "standard," that make owners assume all liability for all damage to their work Google's exploitations caused; to make owners pay elaborately for their own "security" and forcing them to feed all their contract and rights data to themselves, to sell as they wish.

The intrusion of this collusive, non-market transaction of GBS does nothing but destroy the operation of the market for online works and all ethical assumptions of common law.

**Should easily hackable world literature be in The Cloud? The public has barely had a chance to consider this.** As publishers know, widespread availability creates saturation of the market for a work. The value of any new re-released edition can be sapped. These are important matters for owners to control when managing their affairs. Control cannot mean: subject to all of the overriding terms and implications of a 335 page document no-one can comprehend. Ubiquitous availability on Google hurts many authors' chance of a fruitful re-release and simple, ordinary control over how their work is sold.

Full display online, always on and everywhere, conditions readers away from owning copies. If most works are on Google and 10%-20% can be read at a sitting, then it may be more a substitute than useful marketing. In this new situation, most owners prefer to go slow and consider, to let those who wish to experiment and "early adopt" do their dabbling, wait, and see what happens, first. Meaning, individual consent is key.

**GBS amounts to an extortion threat.** GBS was presented as a threat. If you opt out, this deal will be gone and there will never be any better. If in the future you change your mind, you'll be sorry, and have to sign whatever bottom of the barrel contract Google cares to give you. The Authors' Guild, in their sales pitches in telephone call-in conferences, and at the Columbia University seminar in March, made this threat to everyone directly. Not only is this unreasonable and unfair, it is essentially a mafiosi-like offer you can't refuse. I believe anyone "opting in" is essentially simply intimidated by this velvet-gloved veiled threat. Google, and the Registry ought to have made its offer in the marketplace honestly for people to accept—or not. It can introduce the Registry as its exclusive sales representative and see for itself if people like the arrangement.

**The Fiduciary for orphans doesn't solve the problem. The Registry has no real economic incentive to find true owners.** The internal new Fiduciary makes little sense. The Registry may have an implied fiduciary duty to owners for which it can be made liable, though there are some disturbing suggestions that somewhere hidden in this document are Registry waivers, too. The Fiduciary's fees are paid from the same pot, so it is as likely to take the same view of its costs off the top as the Registry—maximizing them. This added warm body does nothing but increase costs, in my view.

The Registry's "commercially reasonable" duty to find owners is as meaningless as the original agreement's weak reference to "attempt" to find them. Such clauses are hard to litigate as breach of contract. It still has a real economic interest *not* to find owners. If it doesn't, then it gets to keep their money, or give it to charity. This is close in power and influence to keeping it. Charities often return such favors in non-monetary equivalents. No added Fiduciary will erase this basic incentive.

**Owners are burdened to conduct endless removal operations on endless new copies of editions scanned in from any library forever, going forward.** Finding out a use is occurring on Google is not a one-time operation. Every *copy* of every *edition* of a pre-2009 book ever scanned in from multiple libraries at *any time*, forever into the future must incessantly be checked for, by their owners. That includes multiple copies from multiple libraries of the same edition, each edition in multiple formats such as US hardcover, trade paperback and mass market paperback, repeated again for the UK, and for Canada, then multiple editions published by multiple publishers in each of the foregoing territories, as well as every selection from a work published in *any* of the above-listed types of volume, of works *by third parties* that were ever granted reprint permission. Thus, an author, or publisher, will have to perpetually log on and search for every work that might, at any time in the future, appear online, to see what was scanned in in the interim since his last check. See, §3.1(a).

**GBS is deliberate fraud directed at the unsophisticated.**  There has been too much politesse in this essentially political discussion, that has sadly served to deceive the public. I believe this has been actively gamed and manipulated by these actors. There has been a systematic failure to read this document or peg it for what it is. The ordeal of reading it cannot be shunted off to pro bono, delegated to young associates or clerks without business experience, journalists, or ill paid, freelance attorney objectors, lacking as all of us must be, in one critical subspecialty or another. Outside a courtroom, in the real world, simple common sense caution before anything of this bulk and convolution kicks in. Too often people think what is "complex" must be "sophisticated," with the A students often the least willing to admit what they don't know.[92] And the young always put much too much trust in the good faith, not to mention competence, of grown-ups.

GBS is the deconstructivist witticism long threatened by the netizen and the critical legal studies crowd. GBS flips the law of copyright on its head, releasing and waiving everything "authorized," which, weaving back, everything is, as Google "Products and Services." GBS flips the bird at all individual rights, and at the free market property system itself.

GBS violates basic ethics—informed consent, fiduciary responsibilities of transparency, honesty, and disclosure, prohibitions on conflicts of interest. It disrespects the privacy, liberty, and property of others. This is not fair, and it is not reasonable.

To rubberstamp this document would stifle the emerging industry of online publishing in its infancy and reward collusion. GBS makes a great show of sophistication, or at least, of length, but in my view it was "structured by cows." It was designed to trample the unsophisticated underfoot.[93]

**The circumstances of this settlement should not be waived and released.**  There is considerable evidence that this settlement was collusive.  The agents involved have a massive agency problem. They are obviously overcome by their will to believe—in whatever redounds to glory and maximum profit for themselves.

There is nothing new about unsophisticated authors being overjoyed to sign on the dotted line of a dubious publishing contract with devils in the details. Authors Guild is much the same. The excitement of partnership with Google blinded them to the "deal" itself, and all its conflicts, and they had no competence in the area to begin with. The AAP worked its agenda to snatch digital back from authors by exploiting the Registry SPE. Google manipulated both without any ethical restraint whatsoever, solely to serve itself, and with maximum venality.

**GBS disallows owners from organizing interest groups within the Registry. (§6.2(b)(v))**
This is amusing, considering how the publishers gamed the authors in this.

**Libraries and the Registry are immunized from lost profits, special or punitive damages.**[94]
Only an individual can sign off on such a thing, for himself. The Registry's "services," and Google's "publishing deal" need to be disentangled and presented to the public as all other contracts are: "opt in" with no misleading federal-court-and-government-imprimatur trade dress.

**Share the scans.**  This is theft[95] and DOJ should replevin the scans to a public authority for Congress to determine fair processes of access by all online publishers, on simple terms that place all responsibilities of publishing on them, not owners.  Only this will preserve the operation of the free market and solve all antitrust issues. The scans exist. Any online publisher

who wants to develop an interface to them after receiving permission from owners should be able to do so.

**Please do not sanction the manipulation of the class action.** To approve this "deal" would be to declare open season for rich corporations to rewrite whatever laws they choose by manipulating class actions to "deem" contracts on society, exploiting plaintiffs hand-picked for their weaknesses. Then follow up with strategic boredom (courtesy of obfuscation experts on a time clock). Please curb the rubberstamping of class action settlements. The class action has an intrinsic "agency problem" that needs scrutiny.

As I have made perhaps too plain here, I see this as a concerted effort by a rich, powerful, and clever corporation to exploit the class action device and the federal court settlement administration process, both as its data-feed and a marketing platform for a business venture that threatens to cheat all authors out of their valuable digital rights.

**Reduce attorneys fees and dismiss.** The attorneys have wasted a tremendous amount of time doing business planning, and drafting legislation. It was totally outside the subject matter of this case. I urge the Court to send a message, and reduce their fees greatly.

---

[1] While one may remove a work from display, one may not after April 5, 2011, delete the work from the scan set entirely, and thus it is impossible to remove oneself from any of the other uses of one's work within the scan set.

[2] Susan P. Koniak and George M. Cohen, Under Cloak of Settlement, Univ. Va. L. Rev., October, 1996

[3] "You can't solve this problem without something like a class action," Authors' Guild Executive Director Paul Aiken said to the Wall Street Journal. "We weren't going to sit around and wait for a legislative solution." http://blogs.wsj.com/law/2009/11/17/the-google-books-settlement-a-lawsuit-ripe-for-congress. It is a sentiment repeated recently by Google lawyer Jonathan M. Jacobson at a debate sponsored by the Federalist Society, in an effort to tap into its members' presumed anti-Congress sentiment. But previously, the Authors' Guild testified to the ease, backed up by survey data, of obtaining permissions. This data remains on its website and if currently removed, it is also archived on the website of the Copyright Office. www.copyright.gov/orphan/comments/reply/OWR0135-AuthorsGuild.pdf. Congress might choose to price-fix online display rights, but even Congress commandeers individuals' business affairs only with caution and after much deliberation.

[4] Licensing first and paying later is fine if owners authorize it, as with ASCAP, which was organized by individuals who sought that service and who attracts clientele on the market. But rights collection groups often license without any authority. They do it either mistakenly or to "phish" for new market share. Then they say to the owner, we have money for you. And now, sign here, to get it, on the dotted line—of a difficult to terminate broad agency authorization to collect anything they find with your name on it, as it likes, into the future. They often charge incorrect fees with no knowledge of a work or its author. Entities abroad (and here, such as Copyright Clearance Center ("CCC")) stir up problems for me as an agent. I have often had the experience of having money urgently pressed upon me by CCC for anthologies (where we represent the anthologist) where it is obvious that it is contributor money, not my client's money. They do not keep information on the contributor name and title, or the page numbers photocopied, though I would be happy to help them out and tell them who that person is from my shelf copy of the book, had they bothered to record the proper information. This pressing of incorrect money upon agents and publishers creates corrupt incentives to simply pocket it, with no one being the wiser. CCC's fees also have risen outlandishly, from an initial 5% in the 80s I believe, to 9% in the 90s, to a full 15% now, in my observation. How 15% is justified by a mere aggregator who does next to nothing is beyond me. Multiple intermediaries vastly increase the risk of pilfering. Errors and corruption are maximized in this entire process, and the true owner may never get his money. The collecting organizations foster this by seeking yet more middlemen, to convenience themselves, who then try to charge authors still more layers of commission. And many, I would say most, writers are not interested in burdening private or academic photocopying with fees, anyway. It is a bad process, in my personal, professional observation and opinion.

[5] Discussions with several of them. I deal with many in the course of my business. Frederick Courtright of The Permissions Company, formerly of the WW Norton permissions department, can be contacted for confirmation.

[6] Random House's boilerplate contract, the basic idea of which is implied, probably, in all book publishers' contracts, defines author-reserved Electronic Version rights as "a digital or electronic product or service that is derived or adapted from the Work or portions of the Work, which may include incidental portions of the text of the Work and enhancements such as sound, images, animation or interactivity." Searching through a text is "interactivity." Search is

an important functionality that makes online display potentially more attractive than other forms of text display. This is of great concern to owners, who have the right to set terms and conditions for any grant of rights to one of the richest companies in America. Searchable displays also compete with other unsearchable renderings of text. GBS implicitly grants interactive search rights to Google. It is a specific valuable right, not properly paid for in the GBS "deal." GBS does not even compensate well for display rights, depending of course on whose display rights you are talking about. Yet GBS, once "signed," by "deemed consent," would likely destroy any individual owner's right to sue Google on this point, ever again.

[7] Perhaps they should be replevined by the Department of Justice to the custody of a public authority such as the Library of Congress and the Copyright Office jointly, thence to be fairly licensed for access by all.

[8] Not for profit does not mean not self-interested.

[9] I say this based on my brief conversation with an extremely defensive Paul Aiken at a recent NWU panel, who clearly has none of the corporate background necessary to evaluate any such document as this. This group is now trapped within vainglory and a will to believe.

[10] Permeating the original Settlement were efforts by the plaintiffs to substitute their personal decisions and preferences that the Registry decide all matters, in place of *owner* control over publishing matters. Owner discretion was overrun by that of the Registry, e.g., in discussions about fees for new uses, or the finding of a "new Google" if Google fails after 5 years to publish as promised at all. The DOJ has corrected for some of this Registry arrogation of owner prerogatives, but by no means all. Most of the feature specifications and price controls in GBS of Articles 3 and 4 are simply recitations of the bare minimum of what Google already plans. It is not the class representatives' bold vision conferring any favor upon us all. This bulky contract language only *interferes* with Google's reasonable conduct of its business and future flexibility, and that of owners. The features and pricing apparatus throughout Articles 3 and 4 have the terrible effect of rigidifying Google's operations to deprive owners themselves of their *own* exercise of publishing options with respect to their works, which, absent GBS, Google would be easily able to provide them directly. Only *owners* should have power over publishing details. Owners exercise power when they cut their license themselves, *by selecting among publishers*. No power will come from Registry and Google caucusing. These are strictly personal decisions between Google the owner of the work. All the bureaucracy spelled out in GBS is nothing but a gross, unnecessary interference with owner and Google discretion. No good literary agent puts their own agenda before their author's, as GBS seeks to.

[11] Attachment C §4.2

[12] §4.5(b), (c). The "net" also allows many write-offs.

[13] Avoiding references to "grant" or "license," Google's use "authorizations" are contained in §2.1(a) and §2.2, and the Registry's in §6.7. The proviso of §2.2 also contains a waiver of any right to an injunction for breach.

[14] The entire media industry is now beset by a drove of trolls seeking to implant broad, sweeping rights grants into every contract or permission form, being laid upon unsophisticated authors and their sometimes just as unsophisticated agents, who have been conditioned to an unwarranted level of trust from the traditional "gentleman's business" nature of the industry in the past. I cannot forget once requesting a written reversion of rights from a publisher that had been acquired by another company, to receive back, by FedEx, a document labelled a reversion of rights, which nevertheless had implanted within it, a second regrant to itself of far more rights in that work than the license had originally granted. Luckily it was one of those rare situations in which I had been able to implant a self-executing termination clause in the original contract, so it was possible to simply ignore it. The reality is that, just as in the gym membership or consumer credit situation, there is a lot of nonsensical paperwork out there plunked under authors' noses that they feel forced to sign, to no great effect later—unless it is, in which case people have full need of their access to federal court and to rules of equity. Frankly, I regard GBS as precisely one of this species of adhesion contracts, and that the plaintiffs for the authors are just too unsophisticated to recognize it. Or too caught up in their big game.

[15] A licensee such as an anthologist, or periodical, might also be permitted—though if the licensor were well represented, that licensee probably would not be—to re-license the contributed work for specified other types of publications. If granted, authority to relicense that work (as opposed to licensing by the anthologist of their anthology, which is a separate copyright) is always in an agency, fiduciary capacity to the original licensor, and a negotiated percentage of net proceeds received by the licensee on the re-license would be paid to the licensor, usually within 30 days of receipt by the licensee, with all issues arising in the future referred back to the licensor.

[16] See 3.5(a) and 1.126 (a), (b). Apparently for another year, until March 9, 2012, Google will delete the work from its scan set if requested, but not from library digital copies.

[17] The public has been misled to think that 63% of all ad revenues will come to them. The fine print (§3.14) reveals that ad revenues accrue only if a page from the book is viewed after a search from the Google Books subdomain search bar. If searched via the main Google search bar, owners are paid nothing. Nor do ads on index listings pay. The main search bar, and index listing ads, are obviously far more numerous and lucrative.

[18] Anita Fore email, March 20, 2009. I have email correspondence in which the Legal Director of the Authors' Guild, whom I considered a friendly acquaintance, insisted that my concerns about inattention to audit rights and accounting duties from Google in the GBS document were risible, because Jeffrey Cunard of Debevoise was too redoubtable an

attorney for her to entertain any notion that there might be any serious corporate problems with the terms of the document. My impression from this conversation was that she considered Cunard to be working in behalf of authors. She made clear subsequently that the Authors' Guild was not open to further discussion about GBS, and that I should address to Boni & Zack with any further issues I might raise about the terms of the contract.

[19] Rich Mgrdechian, Prometheus Partners LLC, letter dated 11/3/09, "Prometheus Partners LLC Preliminary Asset Valuation."

[20] "Opt ins" who sign before January 28, 2010, are to be paid a small sum per claimed work in exchange for their "claimant" data, and for "signing" onto the terms of GBS.

[21] http://www.isoc-ny.org/?p=1282

[22] Search rights are the exclusive property of authors, rarely specifically granted to any publisher, but often reasonably used by publishers with author acquiescence in connection with marketing of their editions. Publishers control only display rights, by and large.

[23] Attachment C. §4.2

[24] Internet Archive, source for $10-$30 per copy scan cost.

[25] Many "permissions" and other "licenses" are unwittingly signed, or fraudulently obtained, from authors, and sometimes from unwitting literary agents, the vast majority of whom have no legal training. These persons all would be considered "claimants" under GBS and to the Registry, eligible for a Cash Payment, and to register as a Rightsholder.

[26] §13.7 exonerates everyone as to all errors, fraud, breach of fiduciary duty, negligence, claims, expenses, or damages, arising from any and all causes of action in law or equity whatsoever relating to the Cash Payments.

[27] §6.1(b)

[28] §2.1 (c): "The Registry will be responsible for locating and collecting information from Rightsholders, identifying and coordinating payments to Rightsholders, and otherwise representing the interests of Rightsholders under this Amended Settlement Agreement."

[29] The Registry bears a curious resemblance to an entity already in existence, affilated with the plaintiffs, called the "Authors' Registry," which operates at 31 East 32nd Street, 7th Fl., New York, NY  10016 and is staffed by members of the plaintiff, the Authors' Guild.  The Authors' Registry collects hand-offs from rights collecting organizations abroad, such as The Authors' Licensing and Collecting Society in the UK, to locate owners of funds those organizations wish to pay to them. The Authors' Registry then proceeds to condition payment on payment of a commission to themselves, and also upon the appointment of indefinite agency in themselves by that owner, to continue to conduct such activities as an intermediary, although they will waive it if the payee is an agent themselves. Many people have no idea what they sign, only that they are asked to sign a paper to get the money that others say, and they believe, is due them. Such organizations also collect float on the delay between any receipt of funds and payment to the payee. This entire operation resembles "phishing" operations. Their entire business model is outmoded because direct individual authority is possible by computer as never before, with agents needed only who provide real services. The organizations are sometimes set up as non-profits, sometimes posing as pseudo-governmental authorities.

[30] This determination is subject to "methodology" approval by the Registry (§3.2(d)(i)) but is generally Google's choice.  There is no need for a Registry to pass on Google's metholgy of selecting what to publish.  Google should simply contact the person and ask permission and negotiate that permission.  For Google to be able itself to choose what it thinks is "not commercially available" as it likes, in itself turns copyright on its head, and creates all the difficulties created by this document that need not be.

[31] Attachment A.  "Determinations" abound in a rigid bureaucratic procedure that rests on whether an author has managed to extract a reversion letter from a publisher. This is often difficult to do as publishers often sit on such requests, and receipt of any trickle of funds often extends their right to not revert, putting many authors into unfair Catch-22's that they could not have anticipated.

[32] The netizenry like to clamour for "new law" but often have little understanding of how copyright licensing works, including how well it inherently favors new uses with simple and flexible rules of reason. "Orphan" works are all in the low-risk category. Google can afford to get permissions and sweat the few really unobtainable ones, which are rare anyway, just as all its competitors do. Unobtainable also often means, withheld by the owner advisedly—for reasons an owner has no duty to broadcast, or to justify before anyone.

[33] (which law firm is not involved in his objection)

[34] §6.2(c)(i), (ii)

[35] Common law equitable rules of contract construction include taking the totality of the circumstances into account—e.g., advance size; the failure of a meeting of the minds; specificity of the publications to be published, or products to be produced; implied author control, notice and approval; the unenforceability of agreements to agree; the greater bargaining power of publishers over authors; conditions of duress to which one party was subjected by the other; change of circumstances, etc.

[36] Attachment A. §6.4 and GBS §8.4.

[37] Attachment A §6.4. Perhaps this leaves open the possibility that one could style oneself a "publisher" of one's own work and get out of forced arbitration.

[38] Attachment A. §7.3(a)

[39] Publishing law has doctrines of fairness about publisher overreaching and bargaining advantage over authors in contracting that have allowed them to find some publishing contracts adhesive and unenforceable when publishers try to eliminate the out of print clause, for example, or overreach in other ways. The plain common law is best able to handle issues of technological change and make appropriate distinctions between digital and print products.

[40] Since online is a medium uncontemplated by most unit sales structures set forth in most book contracts, online rights, as opposed to e-book rights, may be completely retained by authors. Search rights can be assumed to be retained by all authors as well (save work for hire authors), as noted above. Depending of course, on the contract.

[41] Google has a blank check to impose any confidentiality on the Registry and its auditor, in any audit of Google. §4.6(e). The Registry's audit of Google is constrained to whether money (ie, the Registry's net pooled receipts) are due: §6.3(d): "The accounting firm may only disclose to Google whether or not the Registry is in compliance with its payment obligations under Section 6.3(a) (Unclaimed Funds) and Section 6.3(b) (Public Domain Funds) and, if the Registry is not in compliance, the amount of any underpayment and supporting calculations."

[42] There was passing reference to futures discussions with the Registry in the pre-amended GBS document under §4.7, but I have not been able to locate any explicit obligation of Google to engage with the Registry in renegotiations on terms of any uses, new or old, of owners' works, in the amended settlement; the silver lining to this is that only owners should control any such discussions anyway. But what then, is the function of the Registry, other than to serve Google as its contracts and claims department and publishers as a tool to direct Google revenues to themselves?

[43] One darkly amusing feature of this provision that Google must furnish lists of its scans to the Registry, is the fact that it is subject to licensing fees, payable by the Registry for all the list data in it, like author, publisher, or title, should Google get that information from third parties. So, Google reserves the right to charge the Registry, that is, owners, to list for them what it is currently stealing. It is like a witty commentary from Google on the plaintiffs' own class action copyright-maximalist extremism. Copyright? I'll give you copyright! So owners are to be gouged by third party Google service providers even to give the Registry lists of the books scanned; Google isn't even paying for *that*, we have to. Nice.

[44] §6.6(a)(vii)

[45] §6.3(d)

[46] Rather than becoming Google's closely guarded property, aggregate data might be best held in public trust, for open, public use, by a government authority like the Bureau of Labor Statistics, not proprietized by private actors such as Google and the Registry.

[47] Individual owners cannot audit Google, but Google may audit the Registry which will have access to all owner data. §4.6(e)

[48] "any act or omission" §10.1(b)(B), §10.1(d)(B), §10.1(f)(B), §10.1(j)(B)

[49] "authorized by this Amended Settlement Agreement or the Library-Registry (x) Agreement." The language also requires that whatever is authorized must be by a person with authority under the agreement. §10.1(b)(B), §10.1(d)(B), §10.1(f)(B), §10.1(j)(B)

[50] §2.2 deletes all owners' rights to enjoin Google from using a work arising from a claim of breach of the GBS contract: "the remedy for any breach of a term or condition of this Amended Settlement Agreement or a Library-Registry Agreement shall not be termination of such authorizations except as provided in Section 3.7(b) (Failure to Provide Contemplated Rightsholder Services)." §3.7(b) provides that in case Google never actually exploits the display rights granted the Registry has a right to terminate and go on to try to find another online publisher.

[51] Under §2.2 GBS states that Rightsholders "authorize (a) Google to make Display Uses and Non-Display Uses of their Books and Inserts in Google Book Search and other Google Products and Services" as well as library uses authorized by the Registry under contracts." Non-Display rights includes search rights and R&D rights, as well as derivative works from that data (this is where owners' missing accounting data went to—into the rights granted via this "authorization," to Google).

[52] Even the Registry's right to discuss new fees with Google for any clear new uses is extremely truncated. §4.1(a)(ix)(3) provides that Google "will inform" the Registry of any new fee-bearing Product or Service it provides in connection with Institutional Subscriptions, and that the Registry will renegotiate Institutional Subscription pricing, subject to arbitration—but Google can do what it likes when it likes, and any new fee will be "prospective" only, so Google will profit, while paying no one any bit of that new exploitation, as squabbling in arbitration proceeds, perhaps for years. This also shows GBS's elimination of copyright, with copyright law's clear requirement of a full retrospective accounting for all profits from a use.

[53] This is the situation experienced, of course, by anyone who chooses the wrong publisher today, and fails to negotiate a limited licensing term or a strong right of reversion when the services provided by the publisher decline to nothing, but it is far worse when that anyone is everyone.

[54] As a side note, it is hard to tell what will be covered. Only Copyright Office registered copyrights are covered but are copyrights unregistered at the Copyright Office that are not scanned before 1/5/09 then opted out automatically? Google is entitled under §3.1 to scanning any new copies of any new editions forever into the future. That means, it

would seem, that the owner would have to keep taking those new scans off perpetually, as more libraries are wholesale scanned. What happens if you register a Copyright Office unregistered work with the Registry? Is that work then "signed" to the contract terms of GBS voluntarily as an individual contract? What if you register an unregistered work scanned before 1/5/09 with the Copyright Office, after 1/5/09. Can you then sue Google over it? Or does the later Copyright Office registration backdate to sweep that work in to GBS? The simplest questions about nearly anything to do with this contraption lead to puzzlements that force one to wander aimlessly through the GBS document.

[55] I think it bespeaks the essentially deceitful and fraudulent character of this document.

[56] Some authors positively want their works to be owned by a particular publisher on the equivalent of a work for hire basis retaining no control or much interest in the accuracy of any further revenues they are paid even on new uses. But they are not the only ones for whom the copyright law was built—even though they are accommodated beautifully by it, by being permitted to sign whatever they want. Those whose works seem to have little economic value, and, should lightning strike, don't care if their heirs lose out, can sign anything they wish for the benefit of a publisher. (They differ from Creative Commons authors, as permanent 100% control in the hands of a profit-maximizing entity like a publisher would not achieve a Creative Commons "free for all" goal. Tax exempt not-for-profits, it should be noted, also tend to profit-maximize, sometimes even more graspingly than for-profit firms. Tax-exemption does not preclude self-interested behavior.)

[57] The parties may connect the distribution of funds to individual uses and sales in the future but exactly how they will do so is yet to be determined and unclear, given possible Registry cost pressures and uncertain Google net revenues. Attachment C. §1.1(a), §2.1

[58] §6.5(a), §6.5(b). These clauses provide that, as "reasonably necessary," the Registry must give Google any data it needs to perform its obligations under GBS, that the Registry must give Google any Registry data relating to obligations libraries have under their agreements with the Registry, and that Google is entitled to share any of this Registry data with libraries. The document is written to channel maximum data into Google and give it maximum freedom to do what it wants with it.

[59] Even the Registry's auditor in its annual audit of Google (§4.6(e)) is to be under a duty of confidentiality to Google and "may only disclose to the Registry whether or not Google is in compliance with its payment obligations … and, if Google is not in compliance, the amount of any underpayment or overpayment and supporting calculations." So, the Registry can get no detailed accounting information per work that is relevant to owners, because all the Registry is due are net pooled sums. See also §15.1.

[60] In §3.7(e) Google agrees to "notify" the Registry what books Google takes down for editorial or noneditorial reasons "and of any information Google has that is pertinent to the Registry's use of such Book" other than any information that Google deems Confidential Information (under §15.1), or that any third party has revealed to Google under any obligation of confidentiality. §15.1 is very expansive and includes proprietary data, anything reasonably confidential, all negotiations, "sales, cost and other unpublished financial information, product and business plans, projections and marketing data or pricing" and any information obtained in any audit, excluding only their own information and anything connected with the lawsuit that they have a right to know.

In a request I recently made of HarperCollins for hit and view data by pages, to date, on behalf of certain clients, I was told that the data was confidential, and was asked to sign a confidentiality agreement with Google. I explained that this would be a breach of my fiduciary duty to my author and that for Harper to be demanding this was a breach of their fiduciary duty to their partner in publishing, the author. I eventually won this argument but the point is that Google should be openly and regularly providing plenty of data and analytics about hits, views and uses—when where and how in the aggregate, of their works—to every author, just as every web host does for website owners, rather than deeming it to be "their" confidential trade secret.

[61] Attachment C. §4.2

[62] Even if no other reference to an exclusive grant to the book publisher of electronic display rights is contained in the book contract, a license by an author of electronic text display rights would be subject to book publisher approval under the non-compete clause of an author's book contract.

[63] Say, for example, Google sells a service called a "Plagiarism Tracker" in which all 25 word text strings in a work searches all scans, to pull out a list of all other books in which any text string in that work, is repeated.

[64] Most authors not working on a "work for hire" basis reserve all such rights, in my 30 years of professional experience, unless the author was not represented, or was very ill-represented.

[65] §3.7(b), (c), (f); §4.7

[66] Authors are permitted in §4.7 a 60-day "opt out" right, inserted by the DOJ for possible new publishing programs: furnishing data to third party Print On Demand services, consumer downloads of books, and consumer subscription access. But these are yet more contracts the terms to which no one has reviewed or agreed, to be "deemed" upon owners without their informed consent. 60 days may not be enough time to review this and it is the prerogative of an owner to choose his moment, to agree to anything.

[67] §4.5(a)(i), (ii); §4.6(a)

---

[68] Attachment C §4.2

[69] Attachment C §4.1

[70] (pre-amendment Attachment C §1.1(e), §2.3)

[71] Attachment D and GBS §8.2

[72] For this, you need to know the price of the unit sold, received by Google, and the number it sold in those specific units by Google. Per use type. Then you need to know the Registry's costs off the top. It cannot be, as in Attachment C, we'll get back to you with a "fair and equitable" formula, we promise.

[73] Attachment C. §1.1(a), §2.1

[74] §6.3(a)(i)(2)

[75] Despite DOJ's purge of many provisions providing for the Registry rather than owners to decide various future matters, many arrogations of owner authority are left, in particular, what costs the Registry are to take off the top and precisely *how* it is to pay per unit of sale; the terms of contracts with future providers should Google fail to publish as promised; the terms of future Registry-Library contracts; and the terms of any new contracts relating to new uses of the works, with Google. Despite its clottedness and length, none of these critical matters are addressed by GBS. All is a large can kicked down the road "to be agreed" later, after Google has locked up all the rights having placed the Registry in the driver's seat as its stand in for all owners.

[76] §7.2(c)(ii)

[77] §6.2(c)

[78] A reading of Article 7, and Appendix D, reveal elaborate procedures, paperwork, approvals, 3 year training programs, rulebook formulations and maintenance, administrative personnel, etc., for libraries and host sites given custody of library copies of the scans.

[79] Authors' Guild President Paul Aiken mentioned at the 1/20/10 NWU panel, that the litigants had hired no investment banking professionals to value the asset, but had hired a security consultant. This consultant appears to have written Appendix D quite to its own benefit. It requires the creation of dedicated staff for security at all libraries and host sites for any scan sets, and the regular creation and updating of Security Implementation Plans, plus every-3-year training programs to be conducted for all personnel, into the GBS contract. These regular, ongoing, exercises in bureaucratic rulebook draftsmanship and retraining, will, at least, generate lots of future security consultancy business. The connection to actual anti-hack security, however, cannot be known. Liability for all harm that results from use, is a much more effective rule.

[80] The interplay between §1.73's definition of "Inconsequential Breach" and §8.4, as I read this rather difficult to parse defined term, seems to exempt Google (and libraries and host sites) from liability should its mere negligence lead nevertheless to grave damage to an owner, excluding hacking, so long as security protocol was roughly followed.

[81] Google's liability is capped at $40-$50 million and libraries' at $5-$7.5 million for reckless willful or intentional misconduct at the maximum, for damages resulting from harms it is solely responsible for with no third party hacker involved. Outrageously, if hacking occurs, this amount is much less. See below.

[82] §8.4, §8.5, §8.6

[83] It makes no sense that large tort damage should carry these damage caps varying by which party caused it.

[84] Attachment D's Security Standard has precise rules regarding the behavior of a Responsible Person at Google, a library, or a host site. A breach in rules must be the "proximate result" of that person's behavior under §8.6. This makes it much less likely for breach to trigger any capped damages at all.

[85] And, just for kickers, §8.6(c) reduces any award against Google, a library, or host site by the amount by which the hacker himself is held liable.

[86] In situations where there is no outside hacking (described in §8.4), there is no liability if Inconsequential, as follows:§1.73. "Inconsequential Breach" means a breach that (a) is not the result of reckless, willful or intentional misconduct by Google, a Host Site or a Fully Participating Library, (b) does not lead to, or present an immediate risk of, any Unauthorized Access, Prohibited Access or Third-Party Unauthorized Access, (c) does not represent an extensive or systematic failure to comply with the Security Standard or the applicable then-current Security Implementation Plan and (d) when identified, is promptly corrected or cured." So, all negligence is excused.

[87] §8.3

[88] Attachment C:  If I read this correctly, and it is devilishly tangled, 25% of Institutional Subscription revenues will for the first 10 years go to fund a minimum sum to be paid to all owners in the scan set, whether author or publisher, $200 per book, plus $50 for every author and publisher whose full work (such as a poem or essay or book, if the book it is in is an omnibus volume) is reprinted in another book, and $25 for every author and publisher whose work is quoted or selected from, in another book—up to a maximum of $500 for uses of material in other books.  After 10 years, they will review the situation, and if there isn't enough to fund payment of those fees, might divide everything up pro rata, pay it out, and call it a day.  If after 10 years they don't do this and decide to keep going, the portion of Institutional Subscription revenues funding this fund will be reduced to 10% to fund this objective until it is met.  During these first 10 years, the remaining 75% of Institutional Subscription revenues, and during the next 10 years 90% of them, will go

to a different fund that pays owners of works based on actual use by readers, on an as yet unknown "fair and equitable" formula based on their book's price online, its hits, viewtimes, pages sold for copy/pasting, and page printouts that are sold.  Only Registered Rightsholders will be paid these funds (§1.1(d)) which seems an exception to the Registry's duty to find the owner and pay him for all uses online of his work. If you had a written contract with the anthologist that stated that you were to get more for any online use than $25 or $50, depending on whether it is a selection from your full work, or a full work of yours, used in an anthology, and show it to the Registry, then the Registry will pay that to you after checking with the anthologist to validate your honesty.  For funds from all other sources, §2.2 requires that one register within 10 years of the quarter in which it was earned. Overages from the Cash Payments will be used to top off or slightly increase the flat fee, or, if the board so votes, be simply consumed to pay Registry costs. (§3.2). The fact is, all of this is off the cuff and arbitrary. No owner can audit Google, nor the Registry, so whatever they do will be totally hidden from view, essentially, money laundered into some opaque (and trivial) "net."

[89] Paul Aiken at the 1/20/10 NWU panel suggested that he considered it a bad idea to proceed to trial and lose on the scanning alone as fair use issue.  I disagree.  Clarity in the law is only a good thing.

[90] Revealed by Paul Aiken at 1/20/10 Google panel discussion at NWU headquarters. Mr. Healy was in the audience.

[91] This is nothing but non-profit racketeering, non-profit meaning "taxpayer-subsidized"—not "pure of heart."

[92] A habit that can extend well into middle age.

[93] http://online.wsj.com/article/SB122506810764970701.html

[94] Attachment B-1 §5(c). "In no event will Library or the Registry be liable for lost profits or any form of indirect, special, incidental, consequential or punitive damages of any character from any claims arising out of this Library Agreement, whether based on breach of contract (including, without limitation, breach of the Security Standard referred to in Exhibit E (Security and Breach)), tort (including negligence), or otherwise, and whether or not such Party has been advised of the possibility of such damage."

[95] I have to wonder why it is that Google should not be as subject to the criminal law as the tiny hole in the wall hip-hop joint down the street from our agency, on 14th St., which once provided a funky neighborhood vibe, and gainfully employed a collection of colorful characters—now sadly shut entirely down for selling some pirated merchandise. As in the case of Google, the artist-owners of the music themselves might well have shrugged and racked up *its* sins to mere "publicity." No author is being given any such options here by these class-action racketeers who are simply trying to rob our property from us.