UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------- x
                                                   x
The Authors Guild, Inc., *et al.*,                 x
                                                   x
                         Plaintiffs,               x
                                                   x
      v.                                           x    Case No. 05 CV 8136 DC
                                                   x
Google Inc.,                                       x
                                                   x
                         Defendant.                x
------------------------------------------------- x
```

## OBJECTIONS TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR ON BEHALF OF CLASS MEMBERS AT&T CORP. AND AFFILIATES

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................................... 2

ARGUMENTS IN OPPOSITION TO THE AMENDED SETTLEMENT ................................... 3

I.  The Forced-License Model Abuses Rule 23 by Forcing Rightsholders into
    an Ongoing Business Relationship with Google Unless They Opt Out ............................. 5

    A.  The Forced-Licensing Scheme Contradicts Well-Established
        Copyright Law .......................................................................................................... 5

    B.  The Amended Settlement Creates an Ongoing Business
        Relationship That the Court Would Have No Power to Order If the
        Case Were Litigated to Judgment ............................................................................ 7

II. The Amended Settlement Raises Serious Antitrust Concerns .......................................... 12

    A.  The Pricing Mechanisms of the Amended Settlement Raise Serious
        Concerns Under Section 1 of the Sherman Act .................................................... 13

    B.  The Amended Settlement Will Effectively Preclude Other
        Distributors of Digital Library Products from Competing with
        Google and Further Entrench Google's Monopoly Power in
        Relevant Search Markets ...................................................................................... 17

        1.  The Amended Settlement Confers an Unjustifiable
            Monopoly in Digital Library Products on Google .................................... 17

        2.  The Amended Settlement Will Entrench Google's Market
            Power .......................................................................................................... 19

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) ..................................... 16

*Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824 (9th Cir. 1997) ..................................... 5

*Citizen Publ'g, Co. v. United States*, 394 U.S. 131 (1969) ........................................................... 15

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007) .................................................................................... 6

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) ............................ 20

*Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189 (2d Cir. 1985) ...................................... 6

*Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999)................................................................................... 22

*Maurel v. Smith*, 271 F. 211 (2d Cir. 1921) .................................................................................... 6

*National Football League v. Primetime 24 Joint Venture*, No. 98 Civ. 3778 LMM,
  1999 WL 760130 (S.D.N.Y. Sept. 27, 1999)............................................................................ 10

*National Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981) ......................... 7

*Schwartz v. Dallas Cowboys Football* Club, 157 F. Supp. 2d 561 (E.D. Pa 2001)..................... 8-9

*Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77 (2d Cir. 2004) .................................................. 6

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002)........................... 10

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).................................................... 16

*Virginia Excelsior Mills, Inc. v. FTC*, 256 F.2d 538 (4th Cir. 1958)....................................... 15-16

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ..................................... 4, 7

**STATUTES AND RULES**

17 U.S.C. § 106.................................................................................................................................. 5

17 U.S.C. § 115(a) ............................................................................................................................ 5

17 U.S.C. § 504(c)(1)...................................................................................................................... 11

17 U.S.C. § 504(c)(2)...................................................................................................................... 11

Fed. R. Civ. P. 23 ............................................................................................ 4, 5, 12, 19

**OTHER AUTHORITIES**

Andrew Richard Albanese & Norman Oder, *Corner Office: Google's Dan Clancy*,
    Library Journal, May 1, 2009, http://www.libraryjournal.com/article/CA6652445.htm ......... 8

Jonathan Galassi, *There's More to Publishing than Meets the Screen*, N.Y. Times, Jan. 3,
    2010, *available at* http://www.nytimes.com/2010/01/03/opinion/03galassi.html .................. 14

Google Inc., Form 10-Q (filed Nov. 7, 2008) ............................................................................ 8

John Letzing, *Google Expands Lead in U.S. Search: Hitwise*, MarketWatch.com, Mar.
    10, 2009, http://www.marketwatch.com/story/google-expands-lead-us-search-hitwise ........ 20

Motoko Rich, *Google Gives Out-of-Print Books a New Life Online*, N.Y. Times, Jan 5.
    2009, *available at* http://www.nytimes.com/2009/01/05/technology/05iht-
    05google.19082002.html ...................................................................................................... 14

6 William F. Patry, *Patry on Copyright* (2009) ............................................................................ 6

Ian Paul, *Google Lets You Search for What's "Near Me Now,"* PCWorld.com, Jan. 8,
    2010, http://www.pcworld.com/article/186338/google_lets_you_search_for_whats
    _near_me_now.html .............................................................................................................. 21

*Research Tips from Google Books*, http://books.google.com/googlebooks/_midterms.html
    (last accessed on Jan. 25, 2010) ............................................................................................ 2

Brad Shore and Motoko Rich, *Top Author Shifts E-Book Rights to Amazon.com*, N.Y.
    Times, Dec. 15, 2009, *available at*
    http://www.nytimes.com/2009/12/15/technology/companies/15amazon.html?_r=1 ............. 13

Aiofe White, *Microsoft: Google likely to face questions on ads*, Associated Press, Jan.
    26, 2010, *available at*
    http://hosted.ap.org/dynamic/stories/E/EU_EU_MICROSOFT_GOOGLE?SITE=FL
    PEJ&SECTION=HOME&TEMPLATE=DEFAULT ......................................................... 20

Class members AT&T Corp. and affiliates ("AT&T")[1] hereby object to the proposed

amended class action Settlement Agreement ("Amended Settlement") in the above-captioned

matter and give notice of their intent to appear through counsel at the fairness hearing scheduled

for February 18, 2010 at 10:00 a.m. AT&T is a member of the putative Authors' sub-class as

defined in Section 1.13 of the Amended Settlement because AT&T owns the rights to thousands

of copyrighted works registered before January 5, 2009.

In addition to its status as a class member, AT&T has a substantial and unique interest in

this proceeding because AT&T buys, sells, and creates copyrighted digital content. Although

AT&T is best known as a communications company with subsidiaries and affiliates that provide

one of the world's most advanced IP-based business communications services and the nation's

leading wireless, high-speed Internet access and voice service, AT&T also has several affiliates

that create and provide copyrighted content, purchase and sell online advertising, and compete in

the Internet search market. AT&T's YELLOWPAGES.COM ("YellowPages"), for example, is

a leading Internet Yellow Pages and search directory. YellowPages offers searchable directory

listings and provides local business information. Its goal is to provide the most comprehensive

local information available anywhere on the Internet. The YellowPages's distribution network

provides consumers with access to a wide variety of information, including content covered by

copyright. AT&T also provides online content through other business entities, including its

mobile business. As a leading provider of both wired and wireless broadband Internet access,

including network services widely used to distribute eBooks and other digitized content, AT&T

---

[1] AT&T Corp. is a subsidiary of AT&T Inc., a holding company that owns multiple operating
company subsidiaries. AT&T Corp. holds copyrights in its own name, as do other affiliates of
AT&T Corp., which are direct or indirect subsidiaries of AT&T Inc.

also has a strong interest in having vigorous competition among the various Internet search engines that serve as primary gateways to content on the Internet and promote Internet usage.

## BACKGROUND

The Amended Settlement arises from a suit filed on behalf of authors and book publishing companies against Google Inc. ("Google") for digitally copying books that are under United States Copyright protection. *See* Third Am. Compl. ("Complaint" or "Compl.") ¶¶ 1-8. In December 2004, Google announced an ambitious plan to scan millions of copyrighted books to make these books searchable for users worldwide. *See id.* ¶ 55. In addition to digitizing these books, Google planned to make the search results and some portion (often referred to as snippets) of the books available on its commercial website. *See id.* ¶ 58. In 2005, Google began wholesale scanning and digitizing of books from the collections of several prominent libraries. As a result of its scanning and digitization endeavor, to date Google has enabled users to search the full text of over 10 million books.[2]

On or about September 20, 2005, several authors and The Authors Guild[3] brought a putative class-action complaint on behalf of a broad group of authors, alleging that Google's actions constitute copyright infringement. Plaintiffs further alleged that Google's program impairs the value of, and their ability to license, books and inserts; causes lost profits and opportunities for authors; and damages the goodwill and reputation of the copyright holders. *See id.* ¶ 60. One month later, in a separately filed lawsuit, several publishing companies similarly alleged that Google's actions constituted copyright infringement. On October 12, 2006, the two

---

[2] *See Research Tips from Google Books*, http://books.google.com/googlebooks/midterms.html (last accessed on Jan. 25, 2010) (attached as Ex. A).

[3] The Authors Guild is an association of authors that provides resources and guidance to its membership of approximately 8000 individuals.

cases were consolidated for pre-trial purposes, even though the interests of authors and publishers may significantly diverge.

Very few of the issues raised in the complaints have been litigated thus far. Discovery to date appears to have been cursory. No dispositive motions have been brought, and plaintiffs have not moved for class certification, except in connection with approval of the proposed settlement.

The slow pace of litigation appears to result from the parties' focus on settlement. In the fall of 2008, the parties announced that they had reached a settlement after several years of negotiation. The plaintiffs filed a motion for preliminary approval of a settlement agreement ("Original Proposed Settlement") on October 28, 2008, which this Court granted.

After notice of the Original Proposed Settlement, hundreds of members of the putative class filed timely objections raising a variety of issues. The United States also filed a statement of interest opposing the Original Proposed Settlement.

In response to the unprecedented opposition to the Original Proposed Settlement, the parties withdrew it from consideration and informed the Court and the United States that they planned to submit a revised agreement in an attempt to address some of the criticisms raised. On November 13, 2009, Plaintiffs filed a Third Amended Complaint and submitted an Amended Settlement to the Court, asking for preliminary approval of the new agreement. This Court granted preliminary approval of the Amended Settlement on November 19, 2009.

## ARGUMENTS IN OPPOSITION TO THE AMENDED SETTLEMENT

The Amended Settlement remains fundamentally unchanged from the Original Proposed Settlement. Although the parties removed some of the features from the Original Proposed Settlement that attracted significant criticism – e.g., by narrowing the definition of the class to eliminate many of the issues associated with trying to bind millions of foreign authors, by

appointing a fiduciary to look after "orphaned" works, and by dropping the most-favored nation clause – the essence of the deal remains unchanged. By virtue of the Amended Settlement, Google retains the right to continue with its bulk digitizing activities and receives an extraordinary release for past and future activities. As before, upon approval, class members who have not affirmatively opted out will be deemed to have granted Google a broad, perpetual license to use their copyrighted works as part of an ongoing series of commercial activities, including searches, associated advertising, online institutional subscriptions to all or part of the collection, and online sales of all or parts of individual books.

A class action settlement should be approved only if it is "fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation marks omitted). At least two broad deficiencies make the Amended Settlement so unfair, inadequate, and unreasonable that approval should not be granted. First, the Amended Settlement takes congressionally granted property rights from putative class members unless they opt out. This unprecedented structure uses Federal Rule of Civil Procedure 23 in a manner contrary to well-established copyright law: after approval, members of the putative class will be deemed to have granted a perpetual, non-exclusive license to Google for their works simply by doing nothing. Second, the Amended Settlement raises serious antitrust concerns in two distinct respects. First, the Amended Settlement's creation of a "Book Rights Registry" ("Registry") to price Institutional Subscriptions and consumer offerings in cooperation with Google has the effect of eliminating price competition among authors and publishers to the detriment of consumers. Second, by granting Google unique access to a vast library of valuable books on terms that are not available to competitors, the Amended Settlement

4

will entrench Google's market power in Internet search, with potentially serious impact on the competitiveness and dynamism of the Internet ecosystem.

## I. The Forced-License Model Abuses Rule 23 by Forcing Rightsholders into an Ongoing Business Relationship with Google Unless They Opt Out

### A. The Forced-Licensing Scheme Contradicts Well-Established Copyright Law

By operation of Federal Rule of Civil Procedure 23, the Amended Settlement effectively grants a broad license in the works of all class members, unless they take affirmative action to opt out.[4] This is contrary to established copyright law and the settled expectations of Rightsholders. The Copyright Act vests copyright owners with the *exclusive* right to authorize the making and distribution of copies of their works. *See* 17 U.S.C. § 106 (providing that the "owner of a copyright under this title has the exclusive rights," *inter alia*, "to reproduce the copyrighted work in copies," "to prepare derivative works," "to distribute copies," and "to display the copyrighted work publicly"). Apart from a few limited exceptions – all of which were created explicitly by Congress, *see, e.g.*, 17 U.S.C. § 115(a) (requiring compulsory licenses for phonorecords of a non-dramatic musical work) – rightsholders have complete control over their works such that they can license them broadly or not at all.

Courts have accordingly adopted a policy against forcing copyright owners to provide licenses for their work. Courts routinely issue injunctions in copyright infringement cases so as to avoid making the plaintiff an involuntary licensor of its copyrighted works. *See Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 828 n.8 (9th Cir. 1997). As William Patry, Google's Senior Copyright Counsel, has elsewhere explained, failure to enjoin continuing infringement is tantamount to creation of a compulsory license with future damages becoming a

---

[4] In the case of orphan works, there is not even the protection of a meaningful opt-out: although the Amended Settlement provides for a fiduciary for orphan works, the members of that sub-class, by definition, have no ability to opt out of the Amended Settlement.

royalty, a regime that is antithetical to the law of copyright. *See* 6 William F. Patry, *Patry on Copyright* § 22:75, at n.7 (2009). The Second Circuit has noted that "[i]n the copyright realm" there are numerous cases that support the proposition that "an injunction should be granted if denial would amount to a forced license to use the creative work of another." *See, e.g., Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004) (citing authorities).[5] Indeed, this Circuit has long held that "irreparable harm may ordinarily be presumed from copyright infringement." *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985) (Friendly, J.).

Absent Rightsholders should not be stripped of exclusive control of their copyrights as a condition of the Amended Settlement. Copyright is a federal grant of a property interest in certain classes of original works of authorship. *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007). As the Second Circuit made clear almost 90 years ago, the "right to sell and transfer personal property is an inseparable incident of the property. An author or proprietor of a literary work or manuscript [or other work protected by the Copyright Act] possesses such a right of sale as fully and to the same extent as does the owner of any other piece of personal property. It is an incident of ownership." *Maurel v. Smith*, 271 F. 211, 214 (2d Cir. 1921). Given that each copyright is unique property, copyright law does not contemplate the negotiation of a *de facto* mass license by a small set of self-proclaimed representatives under the guise of a class settlement.

---

[5] *Silverstein* is instructive because the Second Circuit decided *not* to issue an injunction in that case. There, the plaintiff sued to enjoin the publication of a collection in which he did not own any of the copyrights in the underlying works and his only copyright was in the organization and selection of the poems in the collection. In denying the plaintiff's claim for an injunction, the court explained that an injunction would negatively impact the value of the underlying poems and that the plaintiff's copyright interest in the collection was too trivial to warrant such drastic relief. *See* 368 F.3d at 84-85.

**B.** **The Amended Settlement Creates an Ongoing Business Relationship That the Court Would Have No Power to Order If the Case Were Litigated to Judgment**

The Amended Settlement creates a prospective and perpetual commercial relationship between class members and Google. The essence of the deal allows Google to make commercial use of all of the digitized works (except for express opt-outs) in exchange for paying the class members a share of the revenues derived from subscription sales, consumer offerings, and book sales. In this regard, the forced-license scheme created by the Amended Settlement is the opposite of a more traditional injunction or agreement to end the allegedly infringing conduct. The ongoing payments from Google to class members cannot be characterized as damages for infringement because they are payments for a variety of potential future uses by Google of the copyrighted works.

In assessing whether a settlement is fair, adequate, and reasonable, courts have reviewed the breadth of the settlement to ensure that it bears an appropriate relationship to the dispute between the parties. *See, e.g.*, *Wal-Mart Stores, Inc.*, 396 F.3d at 109 (holding that the scope of release was proper because all released claims in the settlement agreement were closely related to the claims in the complaint); *National Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16-18 (2d Cir. 1981) (Friendly, J.) (reversing approval of a class action settlement because the release extended to claims that were outside the specific period for which harm was alleged). These cases cast serious doubt on the fairness of the Amended Settlement, which creates a perpetual commercial relationship much broader than the Complaint that principally alleges copyright violations from past acts.

If this case were litigated further, presumably Google would continue to assert a fair-use defense, arguing that scanning, searching, and publishing snippets of a copyrighted work are protected uses. If Google were to prevail on that argument, it would have vindicated its ability to

scan, search, and publish small pieces of the copyrighted works.[6] Google, however, would still

not be able to engage in conduct that was clearly outside the scope of fair use. For example,

Google would not be able to permit purchasers to obtain a print copy of a copyrighted book,

download a copy of a copyrighted book, or view books online by subscribing to a Subscription

Database. Moreover, Google would not be able to make derivative uses of copyrighted works.

Yet, the Amended Settlement provides Google all of these opportunities. *See e.g.*, Amended

Settlement § 4.7. The Amended Settlement allows Google to exploit and monetize copyrighted

works going forward in a manner that would not be possible even if it prevailed in the litigation.

The Amended Settlement creates a detailed and ongoing commercial relationship

between Google and class members. The Amended Settlement is 165 pages long with an

additional 16 attachments totaling more than 300 pages. It reads more like a contract

memorializing a complex commercial transaction than the settlement and release of claims that

Google purports it to be.[7]

Courts have appropriately rejected proposed settlements like this one that create an

ongoing commercial relationship with the defendant with scant relationship to the underlying

conduct at issue in the complaint. In *Schwartz v. Dallas Cowboys Football Club*, for example,

the court rejected a proposed settlement of a class action under the Sherman and Clayton Acts,

challenging the National Football League's requirement that satellite-television viewers purchase

---

[6] Dan Clancy, Engineering Director for Google Book Search, has admitted that if the case were
litigated, the most Google could win in litigation would be to provide snippets of copyrighted
materials to its users. *See* Andrew Richard Albanese & Norman Oder, *Corner Office: Google's
Dan Clancy*, Library Journal, May 1, 2009, http://www.libraryjournal.com/article/
CA6652445.html (attached as Ex. B) ("We strongly believe in our fair use position, but we
didn't start this project to win a court case on fair use. . . . We assume we would have gone
through the courts and won. But once we won, we still would've had snippets.").

[7] *See* Google Inc., Form 10-Q at 20 (filed Nov. 7, 2008) (disclosing and valuing the "commercial
portion" of the Amended Settlement) (attached as Ex. C).

a bundle of all regular season Sunday afternoon games. *See* 157 F. Supp. 2d 561, 577 (E.D. Pa. 2001). Even though the court had preliminarily approved the settlement, it refused to grant final approval and outlined three main concerns about the breadth of the proposed settlement. First, the settlement's release provision included issues that were not clearly specified in the complaint. *See id.* at 577. Second, the court disagreed with the settlement's release of liability for future conduct that was not litigated in the case. *Id.* at 578. Third, the court was concerned that the defendant would receive a very broad release in return for a modest outlay of cash and small benefits to the class members. *Id.*

These same issues are all present in this case. First, the Amended Settlement is dramatically broader and more future oriented than the infringing facts alleged in the Complaint. The Amended Settlement creates a broad, perpetual license in favor of Google for a variety of commercial uses. Then, the Amended Settlement purports to allow the Registry to re-license Rightsholders' copyrights to third parties. *See* Amended Settlement § 6.2(b)(i) (stating that the "Registry will be organized on a basis that allows the Registry, among other things . . . (iii) to the extent permitted by law license Rightsholders' U.S. copyrights to third parties (in the case of unclaimed Books and Inserts, the Unclaimed Works Fiduciary may license to third parties the Copyright Interests of Rightsholders of unclaimed Books and Inserts to the extent permitted by law.")). The purported ability to re-license to third parties bears no relation whatsoever to the alleged harm arising from Google's actions in creating a digital copy of a book or displaying that copy on its website. *See* Compl. ¶ 58. Moreover, the ability of the Registry (or the Unclaimed Works Fiduciary) to license class members' copyrights to third parties would (if effective) foreclose a class member from instituting legal action against those who are not even parties to this lawsuit.

Second, and related, the Amended Settlement does not confine itself to a straightforward release of legal claims arising from past damage, but rather creates a complex scheme that releases Google from liability for future conduct. As explained above, even if Google were successful in litigation and were vindicated in its fair-use rights to scan, digitize, and display snippets or portions of the copyrighted works at issue, Google still would not be able to engage in many of the activities and services itemized in the Amended Settlement. For example, the fair-use defense would not allow Google to sell institutional subscriptions to the database of digitized books and inserts (Amended Settlement § 4.1), sell books and inserts to consumers (*id.* § 4.2), or provide additional revenue models such as print on demand or file downloads (*id.* § 4.7). This Court should not approve this settlement, which largely provides future compensation for future infringement. *Cf. National Football League v. Primetime 24 Joint Venture*, No. 98 Civ. 3778 LMM, 1999 WL 760130, at *4 (S.D.N.Y. Sept. 27, 1999) (refusing to create a compulsory license that would turn future damages into a royalty stream).[8]

Third, even if the broad future release in the Amended Settlement were appropriate (and it is not), the consideration paid by Google to the class as a whole is insufficient. The Amended Settlement provides Google with the right to "[d]igitize all Books and Inserts." Amended Settlement § 3.1(a). To put that in perspective, the Amended Settlement, while covering fewer

---

[8] *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002) is not to the contrary. There, the district court approved a class action settlement that provided compensation for class members as a result of, *inter alia*, the defendant's future plan to trespass and lay cable on class members' property. When the district court approved the settlement it was not known which members of the class would be significantly injured because the defendant had not yet decided where to locate its cable. On appeal, the court held that this uncertainty was not fatal to approval because the scope of the claim and amount of compensation were determined. *See id.* at 981-82. The only uncertainty related to which class members would receive non-trivial compensation from the defendant. Thus, *Uhl* stands only for the unremarkable proposition that class action settlements can apply to future conduct so long as the release of liability applies to the conduct raised in the complaint, and that conduct is well-defined.

books than the Original Proposed Settlement, still covers an enormous number of works that were registered prior to January 5, 2009. Google will pay, *at most*, $45 million directly to class members for control over their copyrights. Class members who allege that they have already had their rights violated by Google will receive $60 per Principal Work, $15 per Entire Insert, or $5 per Partial Insert. *See* Amended Settlement § 5.1(a). By contrast, these same copyright holders would be able to collect up to $150,000 per violation if they were to sue Google individually. *See* 17 U.S.C. § 504(c)(2). At a minimum, they would be able to collect $750 for each work, *see id.* § 504(c)(1), which is substantially more than the $60 offered in the Amended Settlement, even after discounting for the inherent risk of litigation. Moreover, Google will not share with Rightsholders the advertising revenue generated by Google's use of their works, with one minor exception. *See* Amended Settlement § 3.14.[9] Advertising revenue will likely be the major source of revenue from the display of books online since advertising currently constitutes the lion's share of Google's revenue. And non-display uses may also generate substantial revenue in the future. For example, Google is permitted to develop countless derivative works or services that use the "corpus" (i.e., the set of works within the scope of the Amended Settlement) without providing any revenue to Rightsholders.

The parties have put no evidence in the record that explains the basis for the $60, $15, or $5 cash payments – much less any valuation study that substantiates the adequacy of those payments. Similarly, the parties have not offered estimates attempting to quantify the revenue potentially generated from the display and non-display[10] uses that Google will have the right to

---

[9] The Amended Settlement does provide Rightsholders with access to revenue derived from "Advertising Uses," which is defined as advertisements displayed on "Preview Use and other Online Book Pages." *Id.* § 3.14. But all other advertising revenue is excluded.

[10] If, for example, the majority of revenue derives from the non-display uses, Rightsholders are entitled to a share.

engage in upon approval of the Amended Settlement. On this record, the parties have not carried their burden to demonstrate that the settlement consideration is fair, reasonable, or adequate.

## II.      The Amended Settlement Raises Serious Antitrust Concerns

In its earlier comments, the Department of Justice explained why the Original Proposed Settlement raised two serious antitrust concerns. "First, through collective action, the Proposed Settlement appears to give book publishers the power to restrict price competition. Second, as a result of the Proposed Settlement, other digital distributors may be effectively precluded from competing with Google in the sale of digital library products and other derivative products to come." Statement of Interest of the United States of America Regarding Proposed Class Settlement at 16 (filed Sept. 18, 2009) (Dkt. No. 720) ("U.S. Statement of Interest").

The Amended Settlement does nothing to allay these two concerns. First, the Amended Settlement still aggregates a vast number of copyrighted works through the class mechanism, including all works of non-opt-out Rightsholders and orphan works, which then will be priced on a collective basis. Google and the Registry will collaborate to set prices for Institutional Subscriptions, and Google will create an algorithm to set default prices for Consumer Offerings, and other specified Revenue Models, such as print-on-demand, file downloads, and consumer subscriptions to those digital materials. Second, the Amended Settlement will confer on Google the equivalent of a judicially approved monopoly over searchable books. By operation of Rule 23, Google will have control over and access to millions of copyrighted works that its competitors have no hope of duplicating. This will allow Google to garner monopoly rents, which Google will then share with Rightsholders in accordance with the settlement terms, discouraging them from dealing with competing digital providers. This monopoly in digital searchable books will also further entrench Google's existing monopoly power in the various markets (including search advertising markets), however defined, in which Internet search

12

providers now compete. These antitrust concerns provide another reason to deny approval of the Amended Settlement as contrary to the public interest.[11]

### A. The Pricing Mechanisms of the Amended Settlement Raise Serious Concerns Under Section 1 of the Sherman Act

The Amended Settlement eliminates competition among Rightsholders by jointly establishing the terms of the wholesale license provided to Google and the downstream price for the retail products contemplated by the Amended Settlement. At present, copyright holders compete with one another to sell publication rights; publishers compete with one another to buy such rights and compete with both authors[12] and other publishers to sell distribution rights to

---

[11] The parties also included in their Proposed Final Judgment, but not in the Amended Settlement, a provision stating that the "Final Judgment and Order of Dismissal is not intended to and does not provide any antitrust immunities to Persons or parties." [Proposed] Final Judgment and Orders of Dismissal ¶ 17 (filed as Attachment L to Amended Settlement). By this provision, they apparently intend to waive a *Noerr-Pennington* defense in the event of antitrust litigation. This provision does not alleviate the need for a careful review of the antitrust concerns raised by the United States and objectors in connection with approval of the Amended Settlement. Absent further changes to the Amended Settlement, parties claiming antitrust injury will be forced to challenge a well-funded and powerful defendant that will no doubt claim that all of the antitrust issues were carefully and publicly vetted in connection with certification and approval.

[12] Authors may bypass publishers altogether to distribute their works through electronic distribution outlets. Indeed, the divergence of interests between authors and publishers is clearly reflected in recent news events.

> Ever since electronic books emerged as a major growth market, New York's largest publishing houses have worried that big-name authors might sign deals directly with e-book retailers or other new ventures, bypassing traditional publishers entirely.

> Now, one well-known author is doing just that.

> Stephen R. Covey, one of the most successful business authors of the last two decades, has moved e-book rights for two of his best-selling books from his print publisher, Simon & Schuster, a division of the CBS Corporation, to a digital publisher that will sell the e-books to Amazon.com for one year.

Brad Shore and Motoko Rich, *Top Author Shifts E-Book Rights to Amazon.com*, N.Y. Times, Dec. 15, 2009, *available at* http://www.nytimes.com/2009/12/15/technology/companies/15amazon.html?_r=1 (attached as Ex. D). The dispute between authors and publishers over ownership of the rights to license e-book publication is further reflected in the dispute between the heirs of author William Styron and Random House over the right to license

conventional and e-commerce outlets; and distributors compete with one another both as buyers and sellers. The Amended Settlement would largely replace these market mechanisms with joint price-setting among competitors. As the United States has explained, given the rapid and varied development of distribution mechanisms for copyrighted works – including works that are otherwise commercially available – there is no justification for allowing the cartelization and centralization of these markets. *See* U.S. Statement of Interest at 20.

The Amended Settlement effectively displaces competitive market pricing by individual Rightsholders, whether authors or publishers. Instead, there is a blanket royalty rate, pursuant to which Rightsholders will receive 63% of all revenues earned by Google under the Amended Settlement, less the expenses of the Registry. *See* Amended Settlement § 2.1(a) & 4.5(a). Although the Amended Settlement, unlike the Original Proposed Settlement, ostensibly provides that Rightsholders for Commercially Available books may attempt to renegotiate the default split with Google, this change does little to address the effect of the joint price-setting mechanism because Commercially Available books represent the minority of works covered by the Amended Settlement.[13] Rightsholders for books that are not Commercially Available have no ability under the Amended Settlement to negotiate a different revenue split with Google.

---

such works as "Sophie's Choice" and "The Confessions of Nat Turner." *See* Jonathan Galassi, *There's More to Publishing than Meets the Screen*, N.Y. Times, Jan. 3, 2010, *available at* http://www.nytimes.com/2010/01/03/opinion/03galassi.html (op-ed piece by the president of publisher Farrar, Straus & Giroux explaining the many contributions publishers make that distinguish them from ebook distributors such as Amazon) (attached as Ex. E). Whatever the ultimate resolution of these issues, it is clear that if authors and publishers come together in a settlement of this nature, it can have a huge impact on competition for the rights to license and distribute the vast collection of works, such as those by the author Styron, and will foreclose competition with respect to all authors who do not elect to opt-out of the Amended Settlement.

[13] *See* Motoko Rich, *Google Gives Out-of-Print Books a New Life Online*, N.Y. Times, Jan. 5, 2009, *available at* http://www.nytimes.com/2009/01/05/technology/05iht-05google.19082002.html (stating that "[o]f the seven million books Google has scanned so far, about five million are [out of commercial circulation]") (attached as Ex. F).

Moreover, Google has no obligation to agree to any revenue changes proposed by an individual Rightsholder. If Google rejects renegotiation of the revenue split, then the default split remains. *Id.* § 4.5(a)(iii).

The Amended Settlement likewise eliminates price competition with regard to the works Google distributes. With regard to Institutional Subscriptions, the Amended Settlement requires Google and the Registry to agree on appropriate price levels and pricing strategies. *See generally id.* § 4.1(a)(vi)(3) & (4)(i) ("[T]he initial pricing strategy must be agreed upon by Google and the Registry before Google sells any Institutional Subscriptions;" "Google and the Registry shall agree as to the periods for which subsequent Pricing Strategies will be in effect."). Similarly, Google must notify the Registry of the prices for any products Google offers as an adjunct to Institutional Subscriptions – i.e., any product that exploits access to the books included in the subscription. If the Registry does not agree with Google's pricing, then the Registry may demand immediate renegotiation of the price of the applicable Institutional Subscription. *See id.* § 4.1(a)(ix)(3). With regard to Consumer Purchase offerings, the Amended Settlement sets the so-called "Settlement Controlled Pricing" as the default option. This means that Google will assign Books to one of twelve "pricing bins" ranging from $1.99 to $29.99 pursuant to a proprietary algorithm that "simulates how an individual Book would be priced by a Rightsholder of that Book acting in a manner to optimize revenues in respect of such Book in a competitive market." *See id.* § 4.2(b)(i)(2) & (c)(ii)(2). After three years, however, the Registry has the right to seek modification of the pricing bin structure. *See id.* § 4.2(c)(i).

Collaborative price setting among competitors generally has been found per se illegal. *See, e.g., Citizen Publ'g, Co. v. United States*, 394 U.S. 131, 134-35 (1969); *Virginia Excelsior Mills, Inc. v. FTC*, 256 F.2d 538, 540-41 (4th Cir. 1958). This is true whether the prices are set

by explicit agreement or by formula. *See, e.g.*, *Virginia Excelsior Mills*, 256 F.2d at 540-41. While the Amended Settlement states that pricing will be driven by the twin objectives of realization of revenue at market rates and realization of broad access to the Books by the public in the case of institutional subscriptions, attempting to mimic market prices is not the same as allowing the market to set prices. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-22 (1940) (stating "good intentions of the members of the combination" are not sufficient because price fixing is per se illegal).[14]

The parties will undoubtedly seek to justify the antitrust harms from the Amended Settlement by arguing that such pricing mechanisms are reasonably ancillary to a joint venture, akin to the pooling of rights at issue in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979). Such an attempt to justify the Amended Settlement underlines the fundamental disconnect between the subject of the Complaint (past infringement), Google's potential defense (fair use), and the Amended Settlement, which creates a complex commercial arrangement among Rightsholders. But even leaving that important objection aside, the parties cannot meet their burden of demonstrating either that the Amended Settlement cannot be

---

[14] The United States and many objectors criticized the pricing mechanisms of the Original Proposed Settlement as potential price fixing. In the Amended Settlement, the parties made only limited and insufficient attempts to mitigate the issue. For Consumer Purchase offerings, for example, the Amended Settlement purports to remove the Registry and Rightsholders from the development of the algorithm. *See* Amended Settlement § 4.2(c)(ii)(2) ("Google will develop the Pricing Algorithm unilaterally, with no involvement of or control by the Registry or any Rightsholder."). The Amended Settlement also states that the algorithm will simulate how a Book would be priced in a competitive market. *See id.* ("The Pricing Algorithm . . . will be designed to operate in a manner that simulates how an individual Book would be priced by a Rightsholder of that Book acting in a manner to optimize revenues in respect of such Book in a competitive market, that is, assuming no change in the price of any other Book."). Neither provision solves the essential problem, which is that the Amended Settlement collectivizes authors and their works to the detriment of competitive pricing. Moreover, the parties did not alter the collaborative pricing for Institutional Subscriptions. And with regard to Consumer Purchase offerings, Google's algorithm becomes the default pricing mechanism for every work where the Rightsholder does not proactively request a specific price.

structured in a way that would have less impact on price competition, or that the purported competitive benefits of the Amended Settlement outweigh the competitive costs. As the United States recognized in its filing opposing the Original Proposed Settlement, "[m]illions of digital books are already available for purchase, including growing numbers of out-of-print books [*e.g.,* non-commercially available], as a result of bilateral negotiations between distributors and individual rightsholders." U.S. Statement of Interest at 20. The Amended Settlement will effectively eliminate this burgeoning competition. Consumers will suffer from the loss of price competition and, as discussed further below, loss of innovation as well.

**B.     The Amended Settlement Will Effectively Preclude Other Distributors of Digital Library Products from Competing with Google and Further Entrench Google's Monopoly Power in Relevant Search Markets**

The Amended Settlement should be disapproved for the additional reason that it awards Google a valuable monopoly over a library of digital content that cannot be duplicated – a perverse reward for years of alleged copyright infringement. Such a monopoly grant to a single commercial competitor demands an extraordinary justification, which has not been proffered. This is of particular concern here because Google is already a dominant Internet presence, especially in the Internet search market. By awarding Google a monopoly over searchable digital works, the Amended Settlement will further solidify Google's dominant position.

**1.     The Amended Settlement Confers an Unjustifiable Monopoly in Digital Library Products on Google**

Google plunged headlong into its digitization program with little apparent concern for the copyrights of the Rightsholders. After class representatives sued Google on behalf of all Rightsholders, Google persuaded the class representatives to accept a settlement that cartelizes Rightsholders and provides Google with a broad and forward-looking license in copyrighted works. As a remedy for Google's allegedly unlawful conduct, the Amended Settlement imposes

no meaningful sanctions, but instead rewards Google with an extraordinary economic benefit. Indeed, Google's market power with respect to digitized searchable works results directly from the Amended Settlement.

No competitor can effectively challenge Google's position as a virtual blanket licensee, the scope of which is likely only to expand with time. The Amended Settlement does not permit competitors to access Google's digitized scans at any price or on any terms, except under very limited circumstances. *See* Amended Settlement § 6.6(b). Although Google and the plaintiffs seek the approval of the Amended Settlement in large part by touting a long list of its claimed public benefits, Google steadfastly refuses to share access to the digitized works.

Furthermore, it is unrealistic to believe that any competitor can duplicate the digital library that Google has – allegedly unlawfully – assembled. Even assuming that a competitor could gain access to works (or scans of works) in order to assemble a competing digital library, would-be competitors will need to acquire clear legal rights to use these works in competition with Google. If the Amended Settlement is approved in its present form, the only way to do so would be to start copying books, get sued, and settle on near-identical terms as Google. U.S. Statement of Interest at 23-24. This is obviously an unlikely route to success. The probability that a subsequent infringement action could be settled for substantially identical consideration is essentially zero. Additionally, those authors who are sharing in the benefits of monopoly pricing have little incentive to settle with a Google competitor on better terms.

It is no answer to argue that the Registry and Unclaimed Works Fiduciary may have the nominal ability to license rights to third parties under the Amended Settlement. First, the provision states that the Registry and the Unclaimed Works Fiduciary can only license to third parties "to the extent permitted by law." Amended Settlement § 6.2(b). Google and the

representative plaintiffs have already conceded that, at least with respect to orphan works, it will not be possible to license their rights to third parties. *See* U.S. Statement of Interest at 23 ("[T]he parties have represented to the United States that they believe the Registry would lack the power and ability to license copyrighted books without the consent of the copyright owner – which consent cannot be obtained from owners of orphan works.").[15] With respect to known Rightsholders, the barrier to entry for competitors remains very high. By requiring affirmative consent before licensing to third parties, the Amended Settlement ensures that competitors must gather permissions individually, which Google has not done. The inequality of access creates a scenario where competitors are doggedly seeking individual consents at great expense while Google continues to enjoy the fruits of access to content granted by the class action process. Second, to the extent that certain Rightsholders benefit from monopoly prices, there is no incentive for those Rightsholders to give consent to a third party competitor whose actions may ultimately decrease their revenue through genuine price competition. Finally, as a monopolist, Google has no incentive to license any content to third parties unless Google can reap its full monopoly rent from the transaction. Thus, even if licensing can be done efficiently, the high cost of access will raise downstream prices, discourage innovation, and harm consumers.

### 2. The Amended Settlement Will Entrench Google's Market Power

The use of the Rule 23 process to create a significant commercial monopoly would in any circumstance require the strongest of justifications to negate the presumption of public interest

---

[15] It is important to note that *after* the parties represented to the United States that it was not possible to license orphan works' rights to third parties, the parties added language to the Amended Settlement that purports to allow just such an activity. *See* Amended Settlement § 6.2(b)(i) ("[T]he Unclaimed Works Fiduciary may license to third parties . . . to the extent permitted by law."). At the very least this disingenuous provision is misleading to any putative class members attempting to understand the scope of the Amended Settlement in an effort to determine whether to opt out, object, or consent to it.

harm. Here, the establishment of a monopoly is of particular concern, because of the impact such a monopoly will have on Google's already dominant position in the Internet ecosystem, a position anchored by Google's monopoly position in the Internet search market.[16]

With respect to search markets in particular, the Amended Settlement will harm Google's competitors by making it nearly impossible for them to offer a complete set of comparable services and products. With unique access to important digital content, Google's search offerings will be more comprehensive than those of competitors. The ability to find more complete content in only one place assures that those looking will search in the only location where it can be found. Thus, Google's dominant position in generalized search will be enhanced and Google's dominant position in the market for searchable digital works will not be subject to serious challenge. *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 508-09 (2d Cir. 2004) (finding that exclusive dealings between an input supplier and drug maker form the basis of a Section 1 claim and "is of particular concern" where the input was in short supply and difficult to obtain elsewhere).

The lack of competition in this market will have direct, negative effects on AT&T in other markets in which it competes with Google, including in selling on-line advertising. For example, AT&T's YellowPages strives to provide the most comprehensive local search data available. But YellowPages must negotiate rights to copyrighted content on an individual basis to ensure that it respects copyright laws in the process. By contrast, the Amended Settlement

---

[16] Google currently controls approximately 72% of the U.S. Internet search market measured by number of searches. *See* John Letzing, *Google Expands Lead in U.S. Search: Hitwise*, MarketWatch.com, Mar. 10, 2009, http://www.marketwatch.com/story/google-expands-lead-us-search-hitwise (attached as Ex. G). *See also* Aiofe White, *Microsoft: Google likely to face questions on ads*, Associated Press, Jan. 26, 2010, *available at* http://hosted.ap.org/dynamic/stories/E/EU_EU_MICROSOFT_GOOGLE?SITE=FLPEJ&SECTI ON=HOME&TEMPLATE=DEFAULT (attached as Ex. H).

gives Google preferred access to local content from travel guides, restaurant review books, and other sources on an aggregate basis, which makes it that much harder for YellowPages to compete.[17]

Relatedly, Google recently announced a new application for cell phones called "Near Me Now," which allows consumers to find businesses, restaurants, ATMs, and other points of interest within the immediate vicinity of the consumer.[18] If Google is granted unlimited access to copyrighted local content – a critical "ingredient" for this type of mobile application – it will gain a significant and perhaps insurmountable advantage over competitors.

More generally, by giving Google the unique ability to exploit its proprietary digital library, the Amended Settlement may foreclose competition and innovation for products and services that have yet to be even conceived. Giving Google exclusive control over one of the commanding heights of the Internet ecosystem – not as a result of any technical innovation or superior product but instead by rewarding Google with what amounts to a judicially mandated blanket license – will inevitably harm competition and consumers. The burden must be on the parties to further modify the Amended Settlement to ensure that those interests are fully protected.

---

[17] Google's agreement not to make display uses of commercially available (in print) books does not fully mitigate this problem. Even without making display use of a travel guide, for example, Google can still use the information to supply locations, phone numbers and the like. And Google can also include these works as part of its Consumer Purchase offerings and Additional Revenue Models.

[18] *See* Ian Paul, *Google Lets You Search for What's "Near Me Now,"* PCWorld.com, Jan. 8, 2010, http://www.pcworld.com/article/186338/google_lets_you_search_for_whats_near_me_now.html (attached as Ex. I).

## CONCLUSION

For the foregoing reasons the Court should not approve the Amended Settlement.[19]

AT&T further gives notice of its request to appear at the fairness hearing through counsel.

Respectfully submitted,

*/s/ Michael J. Guzman*
Michael K. Kellogg (pro hac pending)
Michael J. Guzman (admitted pro hac)
Kiran S. Raj (pro hac pending)
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036-3209
Tel: (202) 326-7900
Fax: (202) 326-7999
mguzman@khhte.com

January 28, 2010           *Counsel for AT&T Corp. and affiliates*

---

[19] Under *Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999), an objector need not file a motion to intervene in a class action case to preserve his rights to appeal so long as he has an "interest that is affected" by the district court's judgment. *Id.* at 66-67. To the extent that AT&T must file a motion to intervene to preserve appellate rights, AT&T asks the Court to construe this brief as a motion to intervene and an objection to the Amended Settlement.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on January 28, 2010. Any other counsel of record will be served via electronic and first class mail.

<div style="margin-left: 50%;">

*/s/ Michael J. Guzman*

Michael J. Guzman (admitted pro hac)
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036-3209
Tel: (202) 326-7900
Fax: (202) 326-7999
mguzman@khhte.com

*Counsel for AT&T Corp. and affiliates*

</div>