# Exhibit A



Search Books

Or start browsing books by category:

Philosophy

Mathematics

Economics

Physics

Political
Science

Chemistry

**Missing a great quote for your cover page or conclusion?**

"

No two countries that have a McDonalds have ever fought a war against each other."
- Thomas L. Friedman

## Need 5 sources for your paper at 3am?

Can't remember where you found that quote? Did someone grab the last copy of the book you needed from the library? Google Books can help!

With term paper deadlines coming up we wanted to share tips on how Google Books can help with your research.

## Search the full text of over 10 million books

On Google Books, you can search the full text of over 10 million books in 40 languages, right from your dorm room. Start your search with a title or author, or use Advanced Search to browse by language, subject, or date published.

## Browse books online

When you click a book result, you'll be able to see anything from a few short excerpts to the [entire book](). If a book is out of copyright, you can read the whole title, download it, and print a full copy.

## Dig deeper - Useful information to help your search

When you're on a book, click the "[About this book]()" tab on the top left of the page to find a table of contents, related books, references to the book from the Web and academic sources, and even a map of places mentioned in the book.

## Keep track of all your sources

With [My library](), create a personalized set of books that you can search and label. Labeling is a great way to keep track of sources. You can have one label for your History paper and another for that Spanish essay due last week. To start, click "Add to my shared library" under a book result or on the right-hand column when viewing a book.

## Find books in your college library

For every title in Google Books, you'll see a link to [find the book in a library](). If you're connected from campus, we'll show you where you can find the book right in the stacks of your university library.

[                    ] [Search Books]

© 2009 Google

# Exhibit B



Economic Survival Series

Tuesday, February 9 at 3 – 4 PM EST
**Gadgets and Tools and Apps, Oh My!**

Click Here for More Information on This Free Webinar!

LIBRARY JOURNAL    POLARIS

« **Back** | **Print**

# Corner Office: Google's Dan Clancy

### As the Google Book Search settlement deadline looms, the company's point man talks about pricing, orphan works, and the role of libraries

*By Andrew Richard Albanese & Norman Oder -- Library Journal, 5/1/2009*



If you thought Google had a strong presence on the web, you should see its playful, spacious New York digs. The first impression is to wonder how anyone works there. But the coffee bars, café tables with board games, Legos, and artful displays of old technology all help keep the Google engine running.

Google director of content partnerships Tom Turvey introduces us (via a video link from California) to Dan Clancy, engineering director for Google Book Search. Turvey first points out that Google Book Search involves two spheres, libraries and more than 20,000 publishing partners, a separate track that has already contributed more than one million scanned book titles.

Then the talk turns to the pending Google Book Search settlement, involving millions of volumes digitized from libraries, which drew a lawsuit from the Association of American Publishers and the Authors Guild. With a court hearing to resolve the settlement looming in June (and amicus briefs filed by library groups and others), *LJ*'s wide-ranging discussion with Clancy focuses on the decision and its implications for libraries, users, and the future of books on the web.

(See LibraryJournal.com/GoogleSettlement for comprehensive links to documents and news coverage, including increasing concerns over pricing and orphan works.)

*LJ*: **To start, a simple question. Why settle?**

**DC:**  The settlement was driven by what we felt was, in the end, better for everyone and better for users in particular. We strongly believe in our fair use position, but we didn't start this project to win a court case on fair use. We started it to provide discovery tools. This settlement is an opportunity to do what, I think, from a user perspective is far better. The snippets we've been showing are a far cry from what the user wants, and really the only solution was a partnership. We assume we would have gone through the courts and won. But once we won, we still would've had snippets.

**Some say the settlement favors expediency over a more optimal solution.**

[Harvard University librarian] Bob Darnton wrote his piece, and he talked about an ideal solution. We just never saw that future coming to bear. Certainly we feel there will be progress in terms of cleaning up the public domain. And we would like to see progress on the orphan works issue. We just didn't see that this government, or any government, would be doing something that would waive copyright for books out of print.

**Can this plan quickly go into practice?**

I think many of the biggest challenges are behind us. Obviously, overseeing this whole activity takes a lot of commitment on Google's part. Assuming the court approves the settlement, we don't think it will be long before some of the products and services will be available to users. We were already thinking through some of the issues and products and decisions.

**What kinds of products and services?**

A couple of years ago we publicly discussed what's called consumer purchase [as part of] our partner program. Plans slowed down because we were talking to publishers, and others, about specific aspects of product development, like engineering. And part of this is because we would be selling content. We view our core mission as search and discovery.

**Pricing is certainly a big concern for libraries.**

Pricing needs to be driven by two mutually compatible goals: broad access and revenue on behalf of the rights holder. This type of database isn't something that's going to flourish by exclusivity. If this is not priced accordingly, universities can choose not to subscribe. [A library patron] can always preview a book and then get it through [interlibrary loan]. This is where the existence of a robust consumer model really helps. What we see in consumer markets, in general, is that it drives price to a reasonable level.

**How will the Registry work? Will it have a librarian on it?**

Sometimes there's been confusion that it's Google's registry. It isn't. The Registry is designed as an organization to represent rights holders. The idea of Google having an advisory board of people we're partnering with is interesting. I think, as with any product, there's lots of ways to get input. Right now, there's the class action settlement. Once that's authorized, we'd be very interested in creative ideas about an advisory board.

**One free terminal for public libraries sounds archaic.**

There's been a lot of misunderstanding about that. If we took out the stuff about the one free public access terminal, everyone would just be looking at the value proposition. The settlement agreement says at least one public access terminal, but the Registry has the ability to authorize additional access points. The settlement currently does not give us authorization for remote access for public libraries. We talked about that with authors and publishers, but they were not necessarily comfortable with the interplay between public library remote access and the consumer model. What's the right model for the public library? People say you haven't necessarily gotten it right, but it's not like we knew. This is a very different resource.

**Will you administer subscriptions yourselves or use vendors?**

That hasn't been determined yet. It's our job to sell the content, whether we use third-party vendors or not, and, in this market, there are a number of entities that do that. But we're still evaluating that space and have a lot to learn.

**Critics, like Brewster Kahle of the Internet Archive, say you place unnecessary restrictions on public domain books.**

There are many people involved in digitizing public domain content, then selling it back to libraries. We've talked with Brewster, and sometimes people believe we are more different than we are similar. The reality is we are very close. We think the public domain should be free. We do have what are effectively two "netiquette" requests—that users don't rehost or redistribute. The reason for that is because we are investing a large amount of money in digitizing public domain books and giving them back to libraries and users. If it was such a great business, I think a lot more people would be digitizing public domain books and giving them away for free.

**Books you scan don't surface in other search engines. Would you lift that restriction for public domain books?**

In all of these things, we're looking at what's the right balance. The idea of crawl is something we might do in the future.

**Harvard's Darnton warned of a potential monopoly on book content. What might be the competition?**

I can break the book world down into four sectors: one, books where publishers have a digital copy, which is almost every new book and many published in the last ten to 15 years. Two is the backlist and out-of-print books, where publishers and rights holders come forward. There are lots of out-of-print books where publishers still have rights, and those books will be claimed, and the Registry will be able to do deals with whomever it wants. Third, we have the public domain, to which we offer full, free access. And four, the area the settlement doesn't solve more broadly: truly orphaned works—works where no one comes forward. That was a limitation of the class action lawsuit, and I think that's an important area.

This agreement doesn't do anything for books published after January 5, 2009. In my view, the broader marketplace is still going to be dominated by new books. There are many questions there, like, what's the right model for libraries in an electronic age when publishers sell electronic content? I don't think this settlement agreement gives an answer to that for new books. It just opens up a database for books that many libraries have decided they would not buy.

**How might the settlement help ease the orphan works problem?**

This settlement obviously is not a solution to the orphan works problem. What it does is address one of the questions in that area, like what does it mean to do an "adequate search." In this agreement, the information about what books have been claimed will be public. The Registry has the job of trying to find rights holders—and Google has put money toward trying to get rights holders to come forward through the notice of settlement. With respect to others who wish to use orphan works, that isn't addressed in the settlement, but we support broader orphan works legislation.

**Why not make orphan works you've scanned open to all?**

We aren't authorized to do that. A class action lawsuit has limitations. Legislation could potentially address that, but, right now, the settlement has the limitations of class action law. Under this agreement, it's the libraries' and Google's job to determine what we consider is in the public domain, and there's a provision where we can get a safe harbor, if we happen to screw up.

**Librarians are concerned they have no formal voice in all this.**

There are two aspects to library interest. One is from a partner perspective—they are providing these books, so what will they get out of it. The other is their interest as consumers of the content. This market is challenging, because libraries have a lot of options. We feel libraries are going to have a very strong voice in terms of the product. Some of their concerns are really about the product, and the settlement agreement isn't where we define that. This legal document talks about everything we can't do. It doesn't say anything about what we will do.

---

### Author Information

*Andrew Richard Albanese is Features Editor,* Publishers Weekly, *and formerly Editor,* LJ Academic Newswire. *Norman Oder is Editor, News,* LJ

**« Back | Print**

© 2010, Reed Business Information, a division of Reed Elsevier Inc. All Rights Reserved.

Advertisement



# Exhibit C

10-Q 1 d10q.htm FORM 10-Q

**Table of Contents**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2008

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 000-50726

# Google Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **77-0493581** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**1600 Amphitheatre Parkway**
**Mountain View, CA 94043**
**(Address of principal executive offices)**
**(Zip Code)**

**(650) 253-0000**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐

Non-accelerated filer (Do not check if a smaller reporting company) ☐    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

Table of Contents

Revenues by geography are based on the billing addresses of the advertisers. The following table sets forth revenues and long-lived assets by geographic area (in thousands):

|  | Three Months Ended | | | Nine Months Ended | |
| --- | --- | --- | --- | --- | --- |
|  | September 30, 2007 | June 30, 2008 | September 30, 2008 | September 30, 2007 | September 30, 2008 |
|  | | | (unaudited) | | |
| Revenues: | | | | | |
| United States | $2,205,809 | $2,567,024 | $2,695,012 | $ 6,192,133 | $ 7,797,510 |
| United Kingdom | 661,016 | 773,958 | 776,160 | 1,838,889 | 2,353,091 |
| Rest of the world | 1,364,526 | 2,026,230 | 2,070,219 | 3,736,285 | 5,944,045 |
| Total revenues | $4,231,351 | $5,367,212 | $5,541,391 | $11,767,307 | $16,094,646 |

|  | As of December 31, 2007 | As of September 30, 2008 |
| --- | --- | --- |
|  | | (unaudited) |
| Long-lived assets: | | |
| United States | $7,334,877 | $11,505,909 |
| International | 711,791 | 1,299,343 |
| Total long-lived assets | $8,046,668 | $12,805,252 |

## Note 15. Subsequent Event

On October 28, 2008, we announced a settlement agreement with the Authors Guild and AAP. If approved, the agreement will resolve a class-action lawsuit brought by book authors and the Authors Guild, as well as a separate lawsuit filed by five large publishers as representatives of the AAP's membership. In addition, the agreement enables them to receive compensation for online access to their works through a revenue sharing commercial arrangement. The class action is subject to approval by the U.S. District Court for the Southern District of New York.

Under the agreement, we will make payments totaling approximately $125 million, which will be used to establish the Book Rights Registry (a non-profit organization that will administer licensing rights and disburse payments to authors and publishers), to resolve existing claims by authors and publishers and to cover legal fees. This obligation was accrued as of September 30, 2008. For accounting purposes, $95.1 million was determined to be the fair value of the settlement portion of the agreement and was expensed in the quarter ended September 30, 2008, and $29.9 million was determined to be the fair value of the commercial portion of the agreement and will be amortized over an estimated useful life of seven years beginning with the commencement of the commercial arrangement. The tax benefit related to the settlement portion of the agreement was $38.9 million and was recognized in the quarter ended September 30, 2008.

20

Exhibit D

**The New York Times**

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

PRINTER-FRIENDLY FORMAT
SPONSORED BY



December 15, 2009

# Top Author Shifts E-Book Rights to Amazon.com

By **BRAD STONE** and **MOTOKO RICH**

Ever since electronic books emerged as a major growth market, New York's largest publishing houses have worried that big-name authors might sign deals directly with e-book retailers or other new ventures, bypassing traditional publishers entirely.

Now, one well-known author is doing just that.

Stephen R. Covey, one of the most successful business authors of the last two decades, has moved e-book rights for two of his best-selling books from his print publisher, Simon & Schuster, a division of the CBS Corporation, to a digital publisher that will sell the e-books to Amazon.com for one year.

Amazon, maker of the popular Kindle e-reader and one of the biggest book retailers in the country, will have the exclusive rights to sell electronic editions of "The 7 Habits of Highly Effective People," and a later work, "Principle-Centered Leadership." Mr. Covey also plans to gradually make other e-books available exclusively to Amazon, which will promote them on its Web site.

The move promises to raise the already high anxiety level among publishers about the economics of digital publishing and could offer authors a way to earn more profits from their works than they do under the traditional system.

Mr. Covey is making his books available to Amazon through RosettaBooks, an electronic book publisher that primarily traffics in the older works of authors like Kurt Vonnegut and Virginia Woolf.

Arthur Klebanoff, chief executive of RosettaBooks, said that Mr. Covey would receive more than half of the net proceeds that RosettaBooks took in from Amazon on these e-book sales. In contrast, the standard digital royalty from mainstream publishers is 25 percent of net proceeds.

"There are superstars, and superstars are entitled to more," Mr. Klebanoff said.

Sean Covey, a son of Mr. Covey and chief innovation officer for Franklin Covey, a training and consulting firm that also publishes business books, said that the higher royalty rate was "a factor" in the decision to switch to RosettaBooks.

The elder Mr. Covey was also particularly attracted by Amazon's plans to heavily promote the e-book editions of both "7 Habits" and "Principle-Centered Leadership."

His move comes as publishers ratchet up their efforts to secure the digital rights to so-called backlist titles —

books published many years, if not decades, ago. These books can be vitally important to publishing houses because they are reprinted year after year and provide a stream of guaranteed revenue without much extra marketing effort.

"The 7 Habits of Highly Effective People," originally published in hardcover in 1989, is a steady seller for Simon & Schuster. This year alone, it has sold 136,000 copies in paperback, according to Nielsen BookScan, which generally tracks about 70 percent of sales.

Many authors and agents say that because the contracts for older books do not explicitly spell out electronic rights, they reside with the author. Big publishing houses argue that clauses like "in book form" or phrases that prohibit "competitive editions" preclude authors from publishing e-books through other parties.

Adam Rothberg, a spokesman for Simon & Schuster, declined to comment directly on Mr. Covey's moves, but said, "Our position is that electronic editions of our backlist titles belong in the Simon & Schuster catalog, and we intend to protect our interests in those publications."

Other publishers have moved to stake their claim on e-book rights for older titles. On Friday, Random House sent a letter to dozens of literary agents stating that on all backlist books, it retained "the exclusive right to publish in electronic book publishing formats."

Sean Covey said the decision to publish the e-book editions of the two older titles through RosettaBooks and Amazon was not a result of dissatisfaction with Simon & Schuster. He noted that both he and his father had continued to publish books through Simon & Schuster and would do so in the future.

But the younger Mr. Covey noted that Franklin Covey was also experimenting with self-publishing new books, another way of cutting out the traditional print publisher. In August, the company published "Predictable Results in Unpredictable Times" by Stephen R. Covey, Bob Whitman and Breck England. It released an e-book edition through RosettaBooks and exclusively for the Kindle.

Sean Covey said that his father was co-author of another book, "Great Work, Great Career" that Franklin Covey was self-publishing. Amazon is taking pre-orders for it. That book will also be released in an exclusive Kindle e-book edition.

The skirmish over e-books is part of a larger multidimensional chess match being played among publishers, authors, agents and book retailers. The big publishing houses hate the uniform e-book price of $9.99 that Amazon and others have set for newer titles. Although the retailers are subsidizing that price, executives say they believe that such pricing harms the market for more expensive hardcovers, and some publishers have reacted by announcing they will delay the publication of certain e-books by several months after they are made available in hardcover.

Last week, Simon & Schuster said it would delay by four months the e-book versions of 35 titles being published in hardcover from January to April. Both the Hachette Book Group and HarperCollins Publishers Worldwide have also indicated they will delay e-book editions.

Reacting to that move, Drew Herdener, an Amazon spokesman, directly criticized Simon & Schuster and its chief executive, Carolyn Reidy.

"Simon & Schuster is backward-leaning," Mr. Herdener said. "Carolyn wants to corral readers, force them to buy what they wouldn't buy if they had a choice. It won't work. The better approach is to embrace the evolution of the book and give customers what they want. Forward-leaning publishers are going to clean up."

Mr. Rothberg, the Simon & Schuster spokesman, said that his company wasn't trying to upset anyone. "The notion that we have done anything other than wholeheartedly embrace the digital revolution, whether it be for e-books, new formats, reaching out to our readers wherever they may be, and every other opportunity provided in the new digital era, is patently absurd," he said.

He added, however, "We understand that there's a lot at stake and we look forward to further discussions with Amazon about how to grow this business without making our discussions of a personal nature."

Mike Shatzkin, the chief executive of Idea Logical, which advises publishers on digital strategy, said that publishers were trying to minimize Amazon's outsize influence in the book business and preserve their own. "Publishers are trying to herd Amazon back into their corner and keep it there," he said. "But I think that this is going to be a very difficult situation for the big publishers to control."

Copyright 2009 The New York Times Company

-

# Exhibit E

**The New York Times**



PRINTER-FRIENDLY FORMAT
SPONSORED BY

---

**January 3, 2010**

OP-ED CONTRIBUTOR

# There's More to Publishing Than Meets the Screen

**By JONATHAN GALASSI**

Correction Appended

WHAT is an e-book?

News that the heirs of William Styron, the author of "Sophie's Choice," are licensing the electronic-publishing rights for some of his Random House books to Open Road Integrated Media got me to pondering: Are e-books a new frontier in publishing, a fresh version of the author's work? Or are they simply the latest editions of the books produced by publishers like Random House?

It was an old-fashioned book publisher who decided that William Styron's work was worth reading in the first place. Hiram Haydn signed him up and edited his debut novel, "Lie Down in Darkness," which Random House published in 1951. As Mr. Styron himself later said, both Mr. Haydn and his subsequent Random House editor, Robert Loomis, had a "genius for catching me out in my weakest or most slipshod moments, but never tried to impose their ideas on mine. It's the moral support that's been so valuable."

In the course of his career, Mr. Styron published nine other books with Random House, each of which received the scrupulous line-by-line attention of one of the great editors of the time. Each was also copy-edited through several stages of proof that were passed back and forth among the copy editor, Mr. Styron and Mr. Loomis.

The appropriate typeface was chosen and submitted to the author for approval by Random House's designers, and a binding was selected. A dust jacket — often involving art specially commissioned by Random House to represent and advertise the book — was designed, and copy intended to induce reviewers and readers to pick the book up and pay attention to it was written.

Employees of the Random House publicity department then talked about the books with anyone who would listen and submitted bound proofs to newspapers and magazines for review, while the Random House sales department obtained advance orders from booksellers. The Random House rights department, working in concert with Mr. Styron's agent, pitched the books to magazine editors, movie agents and foreign publishers.

Large-print versions for the reading-impaired and audio versions were produced, marketed and sold by Random House or licensed to others, and, after a suitable period, cheaper paperback versions were also published.

For each book, Random House exploited its edition in every then-conceivable format. And through it all, Mr. Loomis and his colleagues kept in touch with Mr. Styron, monitoring the life of the book through its various permutations.

Recently, a new, previously unimagined version of the work became a possibility: Mr. Styron's books can now be reproduced and distributed electronically.

The author's heirs hold the copyright to his work. But should another company be able to issue e-book versions of Random House's editions without its involvement? An e-book version of Mr. Styron's "The Confessions of Nat Turner" will contain more than the author's original words. It will also comprise Mr. Loomis's editing, as well as all the labor of copy editing, designing and producing, not to mention marketing and sales, that went into making it a desirable candidate for e-book distribution. Mr. Styron's books took the form they have, are what they are today, not only because of his remarkable genius but also, as he himself acknowledged, because of the dedicated work of those at Random House.

In this increasingly virtual age of open access and universal availability, it's important for readers to keep in mind what it is that a publisher does for an author. A publisher — and I write as one — does far more than print and sell a book. It selects, nurtures, positions and promotes the writer's work.

An e-book distributor is not a publisher, but rather a purveyor of work that has already been created. In this way, e-books are no different from large-print or paperback or audio versions. They are simply the latest link in an unbroken editorial chain, the newest format for one of man's greatest inventions: the constantly evolving, imperishable book — given its definitive form by a publisher.

Even if someday, God forbid, books are no longer printed, they will still need the thought and care and dedication that Mr. Loomis and his colleagues put into producing William Styron's work for nearly 60 years. Some things never change.

*Jonathan Galassi is the president of Farrar, Straus & Giroux.*

Correction: January 6, 2010
An Op-Ed article on Sunday, about e-books, incorrectly described the publishing history of William Styron's "Lie Down in Darkness." It was first published in 1951 by Bobbs-Merrill, not Random House.

Copyright 2010 The New York Times Company

Privacy Policy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

-

Exhibit F

**The New York Times**



PRINTER-FRIENDLY FORMAT
SPONSORED BY

**MOUNTAIN VIEW, California —** Ben Zimmer, executive producer of a Web site and software package called the Visual Thesaurus, was seeking the earliest use of the phrase "you're not the boss of me." Using a newspaper database, he had found a reference from 1953.

But while using Google's book search recently, he found the phrase in a short story contained in "The Church," a periodical published in 1883 and scanned from the Bodleian Library at Oxford.

Ever since Google began scanning printed books four years ago, scholars and others with specialized interests have been able to tap a trove of information that had been locked away on the dusty shelves of libraries and in antiquarian bookstores.

According to Dan Clancy, the engineering director for Google book search, every month users view at least 10 pages of more than half of the one million out-of-copyright books that Google has scanned into its servers.

Google's book search "allows you to look for things that would be very difficult to search for otherwise," said Zimmer, whose site is visualthesaurus.com.

A settlement in October with authors and publishers who had brought two copyright lawsuits against Google will make it possible for users to read a far greater collection of books, including many still under copyright protection.

The agreement, pending approval by a judge this year, also paved the way for both sides to make profits from digital versions of books. Just what kind of commercial opportunity the settlement represents is unknown, but few expect it to generate significant profits for any individual author. Even Google does not necessarily expect the book program to contribute significantly to its bottom line.

"We did not think necessarily we could make money," said Sergey Brin, a Google founder and its president of technology, in a brief interview at the company's headquarters. "We just feel this is part of our core mission. There is fantastic information in books. Often when I do a search, what is in a book is miles ahead of what I find on a Web site."

Revenue will be generated through advertising sales on pages where previews of scanned books appear, through subscriptions by libraries and others to a database of all the scanned books in Google's collection, and through sales to consumers of digital access to copyrighted books.

Google will take 37 percent of this revenue, leaving 63 percent for publishers and authors.

The settlement may give new life to copyrighted out-of-print books in a digital form and allow writers to make money from titles that had been out of commercial circulation for years. Of the seven million books Google has scanned so far, about five million are in this category.

Even if Google had gone to trial and won the suits, said Alexander Macgillivray, associate general counsel for products and intellectual property at the company, it would have won the right to show only previews of these books' contents. "What people want to do is read the book," Macgillivray said.

Users are already taking advantage of out-of-print books that have been scanned and are available for free download. Clancy was monitoring search queries recently when one for "concrete fountain molds" caught his attention. The search turned up a digital version of an obscure 1910 book, and the user had spent four hours perusing 350 pages of it.

For scholars and others researching topics not satisfied by a Wikipedia entry, the settlement will provide access to millions of books at the click of a mouse. "More students in small towns around America are going to have a lot more stuff at their fingertips," said Michael Keller, the university librarian at Stanford. "That is really important."

When the agreement was announced in October, all sides hailed it as a landmark settlement that permitted Google to proceed with its scanning project while protecting the rights and financial interests of authors and publishers. Both sides agreed to disagree on whether the book scanning itself violated authors' and publishers' copyrights.

In the months since, all parties to the lawsuits — as well as those, like librarians, who will be affected by it — have had the opportunity to examine the 303-page settlement document and try to digest its likely effects.

Some librarians privately expressed fears that Google might charge high prices for subscriptions to the book database as it grows. Although nonprofit groups like the Open Content Alliance are building their own digital collections, no other significant private-sector competitors are in the business. In May, Microsoft ended its book scanning project, effectively leaving Google as a monopoly corporate player.

David Drummond, Google's chief legal officer, said the company wanted to push the book database to as many libraries as possible. "If the price gets too high," he said, "we are simply not going to have libraries that can afford to purchase it."

For readers who might want to buy digital access to an individual scanned book, Clancy said,

Google was likely to sell at least half of the books for $5.99 or less. Students and faculty at universities who subscribe to the database will be able to get the full contents of all the books free.

For the average author, "this is not a game changer" in an economic sense, said Richard Sarnoff, chairman of the Association of American Publishers and president of the digital media investments group at Bertelsmann, the parent company of Random House, the world's largest publisher of consumer books.

"They will get paid for the use of their book, but whether they will get paid so much that they can start living large — I think that's just a fantasy," Sarnoff said. "I think there will be a few authors who do see significant dollars out of this, but there will be a vast number of authors who see insignificant dollars out of this."

But, he added, "a few hundred dollars for an individual author can equate to a considerable sum for a publisher with rights to 10,000 books."

So far, publishers that have permitted Google to offer searchable digital versions of their new in-print books have seen a small payoff. Macmillan, the company that owns publishing houses including Farrar, Straus & Giroux and St. Martin's Press and represents authors including Jonathan Franzen and Janet Evanovich, offers 11,000 titles for search on Google. In 2007, Macmillan estimated that Google helped sell about 16,400 copies.

Authors view the possibility of readers finding their out-of-print books as a cultural victory more than a financial one.

"Our culture is not just Stephen King's latest novel or the new Harry Potter book," said James Gleick, a member of the board of the Authors Guild. "It is also 1,000 completely obscure books that appeal not to the one million people who bought the Harry Potter book but to 100 people at a time."

Some scholars worry that Google users are more likely to search for narrow information than to read at length. "I have to say that I think pedagogically and in terms of the advancement of scholarship, I have a concern that people will be encouraged to use books in this very fragmentary way," said Alice Prochaska, university librarian at Yale.

Others said they thought readers would continue to appreciate long texts and that Google's book search would simply help readers find them.

"There is no short way to appreciate Jane Austen, and I hope I'm right about that," said Paul Courant, university librarian at the University of Michigan. "But a lot of reading is going to

happen on screens. One of the important things about this settlement is that it brings the literature of the 20th century back into a form that the students of the 21st century will be able to find it."

Google's book search has already entered the popular culture, in the film version of "Twilight," based on the novel by Stephenie Meyer about a teenage girl who falls in love with a vampire. Bella, one of the main characters, uses Google to find information about a local American Indian tribe. When the search leads her to a book, what does she do?

She goes to a bookstore and buys it.

- -

Exhibit G



**March 10, 2009, 2:30 p.m. EDT**

## Google expands lead in U.S. search: Hitwise

SAN FRANCISCO (MarketWatch) -- Google Inc. expanded its lead in the U.S. Internet search market in February at the expense of rivals Yahoo Inc., Microsoft Corp. and Ask.com, according to data published Tuesday by Hitwise Pty. Ltd. Google (NASDAQ:GOOG) captured 72.1% of U.S. searches in February, compared to 66.5% in the same period a year earlier. Meanwhile Yahoo (NASDAQ:YHOO) captured 17% compared to 20.6% a year earlier, according to Hitwise. Microsoft (NASDAQ:MSFT) captured 5.6% of searches compared 7% a year earlier, while Ask.com (NASDAQ:IACI) captured 3.7% compared to 4.1%. Ask.com is a division of IAC/InterActiveCorp.

Copyright © 2009 MarketWatch, Inc. All rights reserved.
By using this site, you agree to the Terms of Service and Privacy Policy.

Intraday data provided by Interactive Data Real Time Services, a division of Interactive Data Corp. and subject to terms of use. Historical and current end-of-day data provided by Interactive Data Pricing and Reference Data. More information on NASDAQ traded symbols and their current financial status. Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Dow Jones Indexes(SM) from Dow Jones & Company, Inc. SEHK intraday data is provided by Comstock and is at least 60-minutes delayed. All quotes are in local exchange time. Real-time last sale data provided by NASDAQ.

Exhibit H

Jan 26, 11:48 AM EST

Microsoft: Google likely to face questions on ads

By AOIFE WHITE
AP Business Writer

**BRUSSELS (AP) -- Microsoft Corp.'s top lawyer said Monday that Google will inevitably have to answer questions about its huge market share in selling advertisements linked to results from its search engine.**

**Microsoft's general counsel Brad Smith said the search advertising market has become "the fundamental economic engine for content online" and "the gateway to content on the Internet."**

**"Whenever you have a company that has more than a 90 percent market share in a key market, it is inevitable that people will have questions to ask. We say that with some experience," he said after giving a speech in Brussels.**

**Unlike Microsoft, Google Inc. has never been formally investigated by the European Union executive and the only EU scrutiny of its advertising business came when it asked regulators to approve its $3.1 billion purchase of online ad tracker DoubleClick. The EU waved through the deal in March 2008.**

**French President Nicolas Sarkozy said earlier this month that French antitrust regulators should look at Google's dominant position in the online ad sector.**

**However, the European Commission, which would deal with any Europe-wide competition problem, has said it sees no issue with Google's dominant position in advertising unless there is "any implication or suspicion" that it is abusing its near-monopoly to hike prices or squeeze rivals and suppliers.**

**Smith confirmed that Microsoft sees Google as a direct rival, saying they were both active in some of the same product markets.**

**Microsoft trails Google in search, with a European market share of 2 percent. But Microsoft provides the most-used Web browser, Internet Explorer, which competes with Google's Chrome and others.**

**Smith laid out his vision of what regulatory changes are needed to keep pace with a shift toward cloud computing - where software services are used online, on-demand, instead of stored on a user's computer.**

He said that calls for new thinking on data privacy, saying ultimately a global treaty on data protection or free trade agreements may be needed to govern the constant data transfers across the world that will be part of cloud computing.

He said Europe's 27 governments should set an EU-wide deadline on how long companies should store data - Smith suggested 12 months - to replace the current patchwork of limits between six months and two years.

Microsoft also advocates a federal privacy law in the United States, he said, and is concerned about different laws emerging at state level.

Smith said security concerns may require giving the right to cloud service providers - such as Microsoft - to take legal action to sue hackers or others who try to hack into data hosted in "the cloud."

He said Microsoft's vision of cloud computing saw its own proprietary software in use alongside open source programs - with both using "open formats" to allow different software to work smoothly together.

EU regulators fined Microsoft in 2004 for not providing technical information to rivals that wanted to make software compatible with Microsoft's servers. The company last year promised changes to share some data on its products with others.

© 2010 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed. Learn more about our Privacy Policy.

 **Click here for copyright permissions!**
Copyright 2008 Associated Press

# Exhibit I



See the latest PCWorld Windows 7 product coverage

Search PC World | Search | Browse All

Sign in | Join US | Newsletters |

News | Reviews | How-To | Downloads | Shop & Compare | Forums | Business Center

**PCWorld** Magazine
Subscribe & Get a Bonus CD
Customer Service

**PC Advisor has detected Windows XP**
Your PC is ready for a 2 minute system check and tune up.
Click 'Next' to begin
Next >> | More Info

Find a Review
Select a Category

**Everything About:**

CES 2010
iPhone App Reviews
Business Center
Cameras
Camcorders
Cell Phones & PDAs
Consumer Advice
Desktop PCs
NEW E-Readers
Gadgets
Gaming
HDTV
Home Theater
Laptops
Macs & iPods
Monitors
Printers
Software
Spyware & Security
Storage
Tech Industry
Tech Events
Upgrading
Windows 7

**Resource Centers**

Shop Acer Products
Dell Shopping Center
Discover HP Printing Solutions
Save 50% Per Color Print
World's First Web-Connected Home Printer
Shop Lenovo Laptops
Shop Samsung HDTVs

**Free Newsletters**

Receive the latest reviews, how-to's, news, and more.

☐ Hassle-Free PC
☐ The Best of PC World
☐ Security & Privacy

Enter e-mail address | Go

See All Newsletters

**RSS Feeds**

Get our latest content via convenient RSS feeds.

Latest News
Today @ PC World
See All RSS Feeds

# Blogs

PC World » Blogs » Today @ PC World

### Today @ PC World
News, opinion, and links from the PC World staff.

Subscribe to this blog

Digg submit

# Google Lets You Search for What's "Near Me Now"

**Ian Paul**
Jan 8, 2010 8:19 am

Google's latest location-based feature for mobile devices, which went live recently, will make it easier to find restaurants, bars, ATMs and more when you're in an unfamiliar area. The feature, called "Near Me Now," is available on the Google homepage on your iPhone (OS 3.0 or later) and Android (OS 2.0.1 or later) devices. Near Me Now is currently available only for United States users, and was first announced in December, alongside other new mobile search features including Google Goggles.

Web  Images  Local  News  more ▾

Google

Google Search

◉ Mountain View  Near me now

### How It Works

Before you can use Near Me Now, you must allow Google to identify your location;, Google is not entirely clear on what this means, but I assume the search giant is talking about enabling its My Location feature. Once that's done, you will see your location and a "Near Me Now" link under the search box on the Google mobile homepage. If you click on the link, you'll see an expanded list of five categories: Explore Right Here (more about this later), Restaurants, Coffee Shops, Bars, and ATMs and Banks.

Then, you simply select the category to find a hotspot for lunch, the closest ATM, or the nearest place to grab a latte. With Near Me Now you can also drill deeper to find restaurant reviews, hours of operation, and contact information just as you can with Google Maps.

### Local Search and Explore Right Here

If you're looking for something in your vicinity that's not a restaurant, bar, or bank, Near Me Now has more options

## Full Windows 7 coverage

Read our review, see performance results, get installation tips, and more.
Visit our Windows 7 center.

## Save on Printing Costs

How a print management strategy can benefit your bottom line.
Read more here.

**Product Spotlight**

**HP Officejet Pro 8500**
Wireless All-in-One Printer

★★★★☆
4 / 5 - PCWorld, Nov 24, 2009

**Bottom Line:**
A small office that wants it all can get it here: features galore, including really cheap inks.

Shop For HP Printers

PARTNER CENTER

### Lenovo Laptop Deals

**Save over $400 on Lenovo Thinkpad T400 Models!**
Performance meets portability in T400's lightweight design, switchable graphics and superior power management. .

**Save over $400 on Lenovo Thinkpad X200 Models!**
Engineered to deliver improved mobility, performance, connectivity, energy efficiency, and comfort

### People who read this also read:

Carry Cash as Well as a Card, Says German Bank Association

iRiver Unveils 1/3-inch Thick E-Book

Google Service Uses Cell Towers to Locate Users

Bing for iPhone

Google Latitude Service Lets You Track Your Friends, Here's How It Works
53,451 people viewed this

Nexus One is Google's Chance to Succeed Beyond Search

Recommendations by loomia

**Become a PCW Member**

Join the community and start enjoying the benefits:

Get tech advice from thousands of PC World Members

Rate and recommend the latest tech products

Share your thoughts in blog and article comments

Get free excerpts and exclusive discounts on Super Guides

Signing up is free and easy.









### Today @ PC World

Most Recent        Most Recommended

**Will 2010 be the Year of Spam?**
Facebook needs to join the battle and sweep spammers from its site or users will flee.

**Firm Claims Proof of 50 Apple Test Tablets**
Apple has been testing a tablet computer on an advanced version of the iPhone operating system, firm claims.

**Search Engine Usage Soared in 2009**
The number of searches grew 46 percent in 2009 compared to the previous year.

**Google Enhances Two Search Tools**
Google Squared and Rich Snippets provide a peek at search tools that will likely become common in the near future.

### Best Prices on LCD Monitors

Most Popular        All Categories

**T260HD 25.5" Widescreen LCD Monitor**
Price: $299.00

**T240HD Black 24" Widescreen LCD Monitor**
Price: $249.00

**2494SW Black 24" Widescreen LCD Monitor**
Price: $209.99

**S2209W Black 22" Widescreen LCD Monitor**
Price: $139.00

**VX2433wm Black 24" Widescreen LCD Monitor**
Price: $169.99

**Professional P2310H Black 23" Widescreen LCD Monitor**
Price: $209.00

See all Best Prices on LCD Monitors
See also: Best Prices on Laptops, Best Prices on TVs, Best Prices on Cameras, Best Prices on Printers

### All PC World Blogs

Most Recent        Most Recommended

**Control the User Account Control**
Alex Diluzio wants a say in when those annoying User Account Control messages pop up

**Will 2010 be the Year of Spam?**
Facebook needs to join the battle and sweep spammers from its site or users will flee.

**R.I.P. iPhone Exclusivity**
Among the rumors for Apple's big press event this Wednesday is one that Apple may also take the opportunity to announce the end of iPhone exclusivity for AT&T.

**Firm Claims Proof of 50 Apple Test Tablets**
Apple has been testing a tablet computer on an advanced version of the iPhone operating system, firm claims.

**15 Minutes to a Secure Business**
Get the Secure in 15 toolkit starting with the "15 Minutes Month-at-a-Glance" calendar. McAfee will send you additional tools and tricks to stay protected around the clock.

**A Buyer's Guide to Data Protection**
Implementing data protection products and processes can be daunting. Make the right decisions by exploring what is available and what makes sense for your organization. Use this simple guide to evaluate different vendor offerings.

---

to help you find what you're looking for. You can click on the "Browse More Categories" option, which will enable the local search feature Google launched last fall. Local search gives you more categories, so you can find other places like shopping centers, gas stations, hotels, and movie theaters.

Your second option is to select the "Explore Right Here" category. This will give you a list of what Google believes are the most popular locations and attractions around you--an ideal tool when you have some time to kill, but aren't sure what's in your immediate vicinity. Google says Explore Right Here will only work if your "phone provides location accuracy within approximately a city block."

**What About The Rest of Us?**

While Near Me Now looks like it could be a helpful product, it won't be nearly as helpful until it expands its offerings. Google has not said whether it plans to introduce Near Me Now for Blackberry, Nokia, and Windows Mobile users. That's a massive chunk of the mobile user base, not to mention the fact that Near Me Now is an ideal tool for traveling executives--many of whom favor Blackberry and Windows Mobile.

Google should also consider integrating Near Me Now onto the PC, since the search giant also offers location-aware applications like My Location and Latitude for the desktop. Google may be reluctant to violate the sanctity of the Google homepage, but Near Me Now could be integrated into Google Maps just like My Location is.

Near Me Now looks like a great feature, and once it's launched on more platforms (not to mention other countries), it could be a threat to other location-based business finder apps like Yelp and Urban Spoon.