UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

The Author's Guild Inc., Association of
American Publishers, Inc., et al.,

                           Plaintiffs,

          -against-

Google Inc.,

                           Defendant.

Case No. 05-CV-8136 (DC)

---

**OBJECTIONS OF SCIENCE FICTION AND FANTASY WRITERS
OF AMERICA, INC., AND AMERICAN SOCIETY OF JOURNALISTS
AND AUTHORS INC., TO THE AMENDED SETTLEMENT AGREEMENT**

Lincoln Square Legal Services, Inc.
Samuelson-Glushko Intellectual
Property & Information Law Clinic
Fordham Law School
33 West 60th Street, 3rd Floor
New York, New York 10023
Phone: (212) 636-6934
Fax: (212) 636-6923
rlazebnik@law.fordham.edu

*Attorneys for Science Fiction and
Fantasy Writers of America, Inc., and
American Society of Journalists and
Authors, Inc.*

Ron Lazebnik

    Of Counsel

January 28, 2010

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 2

ARGUMENT ........................................................................................................ 3

  I.  THE CLASS SHOULD NOT BE CERTIFIED BECAUSE IT DOES NOT MEET THE
      REQUIREMENTS OF THE FEDERAL RULES OF CIVIL PROCEDURE ...................... 4

   A. The Author Sub-Class is too Large and too Diverse to Have its Interests
      Represented by a Single Sub-Class ............................................................. 4

   B. The Class is too Large to Have Been Given Sufficient Notice of the PASA. ........... 7

   C. The Procedural Posture of the PASA Frustrates Meaningful Discussion of its Terms ....... 8

  II. THE PROPOSED AMENDED SETTLEMENT AGREEMENT IS IMPROPER UNDER
      THE FEDERAL RULES OF CIVIL PROCEDURE .......................................... 12

   A. The Registry Created by the Amendments to the PASA is Still Deficient in Important
      Respects. .................................................................................. 13

   B. The Fiduciary for Unclaimed Works Contemplated by the PASA is Insufficiently
      Contemplated in the PASA. ................................................................ 14

   C. The PASA's Dispute Resolution Mechanics are Unfair to Authors ................................ 16

      1.  The Article IX Dispute Resolution Provision is Ambiguous ................................... 17

      2.  The Article IX Dispute Resolution Procedures are Overly Complicated and
          Unduly Interfere With Preexisting Relationships Between Author and Publisher .... 18

   D. The PASA Does Not Clearly Delineate Between Authors and Publishers as
      Rightsholders and Ignores Their Preexisting Contractual Relationships ........................ 19

   CONCLUSION ................................................................................................. 23

i

# TABLE OF AUTHORITIES

<u>Federal Cases</u>:                                                                                          <u>Page</u>

*Amchem Prods v. Windsor,*
   521 U.S. 591 (1997)...........................................................................................4, 11

*Churchill Village, LLC v. General Elec.,*
   361 F.3d 566 (9th Cir. 2004) ...........................................................................10-11

*Demint v. NationsBank Corp.,*
   208 F.R.D. 639 (M.D. Fla. 2002).............................................................................8

*Denny v. Deutsche Bank, A.G.,*
   443 F.3d 253 (2d Cir. 2006).....................................................................................4

*Devlin v. Scardaletti,*
   536 U.S. 1 (2002)......................................................................................................8

*In re Healthsouth Corp. Secs. Litig.,*
   213 F.R.D. 447 (N.D. Ala. 2003) ............................................................................6

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983)................................................................................................17-18

*New York Times Co. v. Tasini,*
   533 U.S. 483 (2001)...............................................................................................21

*Ortiz v. Fireboard Corp.,*
   527 U.S. 815 (1999)...........................................................................................12-13

*Petroleum Co. v. Shutts,*
   472 U.S. 797 (1985)..................................................................................................8

*Random House v. Rosetta Books LLC,*
   283 F.3d 490 (2d Cir. 2002)...................................................................................21

*Sayers v Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,*
   7 F.3d 1091 (2d Cir. 1993).....................................................................................17

<u>Statutes and Rules</u>:

17 U.S.C. § 106 ................................................................................................................ 20

17 U.S.C. § 504(c)(1) ........................................................................................................ 9

28 U.S.C. § 2072(b) .......................................................................................................... 19

Fed. R. Civ. P. 23 ...................................................................................................... 2, 5, 12

Fed. R. Civ. P. 23(a) .......................................................................................................... 4

Fed. R. Civ. P. 23 (a)(2) ..................................................................................................... 4

Fed. R. Civ. P. 23 (a)(4) ..................................................................................................... 4

Fed. R. Civ. P. 23(b) .......................................................................................................... 4

Fed R. Civ. P. 23(b)(1)-(3) ................................................................................................ 4

Fed. R. Civ. P. 23(e)(1)(C) ................................................................................................ 12

Fed. R. Civ. P. 23(e)(2) ...................................................................................................... 22

<u>Other Authorities</u>:

*Manual for Complex Litigation* § 21.61 (4th ed. 2004) ................................................... 13

*Manual for Complex Litigation* § 21.62 (4th ed. 2004) ................................................... 12

Putative class members Science Fiction and Fantasy Writers of America, Inc. and the American Society of Journalists and Authors, Inc. (collectively the "Objecting Organizations") respectfully submit this memorandum in opposition to the Proposed Amended Settlement Agreement of the named parties in this action. National Writers Union (United Auto Workers Local 1981, AFL/CIO) ("NWU") joins in this objection as amicus.[1]

Science Fiction and Fantasy Writers of America, Inc. ("SFWA") is a national non-profit professional organization for authors of science fiction, fantasy and related genres. To be eligible to join SFWA as an active member, a writer must have three qualifying short story sales, one qualifying novel sale, or one professionally produced full-length dramatic script. Authors must be professionally published in the English language to qualify for eligibility. SFWA has approximately 1,500 members. SFWA holds over 40 copyright registrations, and is therefore a member of the Author Sub-Class.

The American Society of Journalists and Authors, Inc. ("ASJA") is the professional association of nonfiction writers. ASJA membership consists of more than 1,400 freelance writers including, among others, writers of magazine articles and trade books. Eligibility for membership in the ASJA requires that a writer has written a minimum of two nonfiction books or six, full-length articles in a national magazine. The ASJA is additionally the publisher and author of several works and is therefore a member of the Author Sub-Class and potentially may be a member of the Publisher Sub-Class.

The National Writers Union is a national labor union and advocacy organization for freelance and contract writers. The NWU is organized into 15 local chapters nationwide. The NWU works to advance the economic conditions of writers in all genres, media, and formats. NWU membership is approximately 1,400 and includes, among others, book authors, journalists,

---

[1] The Objecting Organizations and the NWU also join in the previous objections made to the proposed settlement agreement.

business and technical writers, website and e-mail newsletter content providers, bloggers, poets, playwrights, editors, and academic writers.

## PRELIMINARY STATEMENT

Before this Court is an unprecedented settlement proposal that goes far beyond what is typically contemplated in a class action lawsuit. The Objecting Organizations believe that the Representative Plaintiffs have failed to represent the interests of the entire class by going beyond compensation for those harmed by Google's actions and proposing a complex, unproven venture that overrides existing author-publisher contracts and stands copyright law on its head. Moreover, this proposed settlement, if approved, will dictate how millions of books, many written decades before the advent of the Internet, are distributed in this new medium and will define how rights never envisioned in the original publishing contracts are allocated. The Representative Plaintiffs who have submitted this proposed agreement have failed to protect or even address the interests of a large number of class members, and cannot be considered to have met their burdens under Fed. R. Civ. P. 23.

The proposed agreement establishes a system permitting the Defendant to create, enter, and control a new market sphere in the publishing industry, an industry already in turmoil over the future of books and the role of authors and publishers as digital technologies advance. The interests of these two groups continue to diverge. Authors see "e-books," works of authorship delivered in digital form, as an opportunity to connect more directly with readers without intermediaries. Meanwhile, publishers foresee the potential loss of their role between author and reader, and are doing their best to blur long-established methods of defining rights in order to claim e-books and other new forms of publication for their own benefit.

It is on this battlefield that the current litigation resides. Defendant Google, Inc. started its "Google Book Search," a revolutionary mass digitization project by scanning millions of books both in and out of copyright and making "snippets" of copyrighted text - short phrases only a few words long - available via a keyword search. Google was able to begin such a

complex task because it neither sought nor obtained permission from any publishers, authors, or owners of the electronic rights to the books scanned into the Google database.  When the Authors Guild and the Association of American Publishers sued Google for copyright infringement, they had the support of many authors, including the Objecting Organizations. What resulted, however, was an enormously complex settlement that no one could have anticipated.  The Objecting Organizations do not support the creation of a commercial enterprise that would imperil the intellectual property rights of their members and millions of other authors, as well as many publishers.

The Objecting Organizations have chosen to remain in this class, thereby putting their copyright interests at peril, so that they may share with this Court the serious concerns of their author members, many of whom are threatened by the economic and legal consequences of remaining in the class should the proposed settlement be approved.  For the reasons stated in detail below, the Proposed Amended Settlement Agreement remains inequitable to a great many members of the prospective class, and should not be approved.

## ARGUMENT

The Proposed Amended Settlement Agreement ("PASA") should not be finally approved because, as discussed in Part I, the class contemplated by the PASA does not meet the requirements of the Federal Rules of Civil Procedure for the following reasons: (1) the handful of representative plaintiffs fail to adequately represent the interests of the numerous affected parties; (2) class members were not provided with sufficient notice of the settlement; and (3) dissatisfied class members cannot effectively challenge the provisions of the settlement while protecting their own interests.  As discussed in Part II, the amendments to the PASA fail to resolve many of the issues raised in previous objections, and instead create new problems, including: (1) creating an Unclaimed Works Fiduciary without providing effective oversight; (2) mandating a convoluted dispute resolution model that complicates rather than facilitates the

resolution of disputes; and (3) redistributing rights among classes of "Rightsholders" without consideration for preexisting contractual relationships.

## I.    THE CLASS SHOULD NOT BE CERTIFIED BECAUSE IT DOES NOT MEET THE REQUIREMENTS OF THE FEDERAL RULES OF CIVIL PROCEDURE

The PASA class and sub-classes should not be certified because they do not satisfy the requirements of Rule 23(a) and (b) of the Federal Rules of Civil Procedure. The Rule 23(a) threshold requirements in putative class actions are numerosity, commonality, typicality and adequacy of representation. *See Denny v. Deutsche Bank, A.G.*, 443 F.3d 253, 267, 270 (2d Cir. 2006). If the Representative Plaintiffs[2] do not adequately represent the interests of all members in the class, certification is inappropriate. *See Amchem Prods v. Windsor*, 521 U.S. 591 (1997). Under Rule 23(b), plaintiffs must also show that the class is "maintainable," that common questions "predominate over any questions affecting only individual members," and that class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(1)-(3).

### A.    The Author Sub-Class is too Large and too Diverse to Have its Interests Represented by a Single Sub-Class

While the class as currently defined is undoubtedly numerous, it is too broad in size and scope to satisfy the requirements for a putative class. The scope of the class places authors with varying interests and skills into a single sub-class represented by nine individuals whose interests are not sufficiently aligned with the diverse interests of all affected parties. As such, the PASA fails to comply with the Rule 23 commonality and adequacy requirements. *See* Fed. R. Civ. P. 23 (a)(2), (a)(4).

Although the PASA attempted to narrow the class by excluding many foreign authors, it still contains what are likely millions of U.S. authors. The scope of U.S. authors included in the original Complaint was already broad – all persons or entities that held a copyright to a literary

---

[2] All capitalized terms not defined herein have the same definition given to them in the Proposed Amended Settlement Agreement.

4

work contained in the library of the University of Michigan – and included copyright interests related to almost 8 million books.[3]  *See* Complaint ¶ 20.   The PASA goes further to encompass all U.S. persons holding a Copyright Interest in a Book or Insert as of January 5, 2009, thus including all authors who more than four years after commencement of this action have only recently been published and obtained a registered copyright in their works.  These authors do not all meet the commonality requirement of Rule 23 because not all books with copyright registrations as of January 5, 2009, have been scanned.  The class should have been limited to those authors actually affected by the complained of conduct – a large but finite set of authors and publishers that could be discerned from the defendant's records of books already scanned.

The enormous scope and diverse interests of the class are not adequately represented by the Representative Plaintiffs, who are eminently successful authors and large publishers with far more bargaining power than most of the authors and smaller publishers making up the bulk of the class.  These representatives bring to the settlement negotiations the opinions and viewpoints of extraordinarily successful authors and publishers like themselves.  For instance, all the Representative Plaintiffs of the Authors Sub-Class are members of the Author's Guild and generally hold book contracts expected to include a significant advance and are published by large American publishers.[4]  The Representative Plaintiff authors therefore fail to bring the views of the much larger group of authors in the sub-class, many of whom do not receive significant advances for their work and are published by smaller presses.  Had the Authors Guild, the original plaintiff in this action, desired a truly representative solution, Representative Plaintiffs of the Author Sub-Class could easily have been drawn from the Authors Coalition, an association of twenty independent authors' groups that includes the Authors Guild, NWU, SFWA, ASJA, and other organizations.  Drawing representatives from a narrow group of commercially known

---

[3] *See* http://www.umich.edu/~oapainfo/TABLES/PDF/Libraries.pdf
[4] *See* Authors Guild, https://www.authorsguild.org/join/eligibility (last visited Jan. 28, 2010).  In fact, with the exception of small literary presses of national reputation, authors are precluded from being members of the Author's Guild if they are not published by a large American publisher.  *Id*.

authors only serves to leave thousands of authors inadequately represented due to differences in the scope of their writing and notoriety.

The PASA's attempt to exclude most foreign authors is similarly insufficient.  Omitting all authors and publishers in foreign countries except those residing in the United Kingdom, Canada or Australia and adding a representative plaintiff from each of those countries does not address the problem of inadequate representation.  The Representative Plaintiffs apparently believe that one or two authors from each of the foreign countries can somehow represent the interests of all the authors in that country.  These countries, however, have the same diversity of authors as the United States, and the settlement therefore cannot rely on such a small sample to be truly representative.  The province of Quebec, for example, is home to a thriving book industry in which books are written and published in French.  The Canadian Author Sub-Class Representative, however, only writes books that are published in English.  While the PASA tries to remove foreign language works from the scope of the settlement, it has neglected to do so in regards to this fairly large group.

Moreover, these patently inadequate Sub-Class Representatives cannot resolve the inherent conflict in the PASA class which includes both authors and publishers.  The interests of authors and publishers are frequently adverse in the negotiation of critical contractual issues, such as the rights to certain works and the division of revenue.  These conflicts are particularly acute in the context of e-books, as authors and publishers battle to determine who controls the lion's share of such rights and revenues.  Courts have consistently refused to certify classes – such as this one – where there is antagonism among the interests of class members and between class representatives.  *See, e.g., In re Healthsouth, Corp. Secs. Litig.,* 213 F.R.D. 447, 461-62 (N.D. Ala. 2003) ("Antagonistic interests are not only those which directly oppose one another, but also those which may be hostile to one another or unharmonious such that one party's interest may be sacrificed for another's.").

6

### B. The Class is too Large to Have Been Given Sufficient Notice of the PASA

Given the size and scope of the class, the proponents of the PASA have not provided sufficient notice to satisfy due process concerns. The notice procedure approved by this Court for the original settlement did not require a diligent effort to locate class members, and the notice for the PASA was limited to those who had responded, clearly a small subset of class members. There were, however, other relatively simple means available to the named parties to notify a broader cohort of those affected by the PASA. As discussed in previous objections, the parties could have sought assistance from the Copyright Office to generate a mailing list of affected authors and send them notice of the PASA.[5] At a minimum, the Publisher Sub-Class Representatives should have notified the authors of those books in which the Publisher Representatives currently hold Copyright Interests and which they are willing to include in the PASA, to obtain the informed consent of all their authors with a Copyright Interest. Generally, publishers must maintain contact information for the authors whose works they have published to pay royalties. While the plaintiffs advertised the original settlement in newspapers and magazines, there is no evidence suggesting the same was done for the PASA.[6] Instead, the named parties only explicitly contacted those authors who previously had opted-out or registered with the administrator of this action and/or made claims.

The approved notice procedure additionally assumes that all affected authors are on-line and that authors are either already registered with the database related to this action or have their e-mail addresses readily available. The Supplemental Notice is primarily disseminated electronically through the dedicated settlement website, www.googlebooksettlement.com, the websites of Google and the Associational Plaintiffs, and via e-mail.[7] Posting notice procedures

---

[5] *See* Objection of Scott E. Gant to Proposed Settlement Agreement, and to Certification of the Proposed Settlement Class and Sub-Classes (Docket No. 141) at 16, dated Aug. 19, 2009.

[6] Class Counsel does not have to file any certification of the notification procedures until February 11, 2010, so the Objecting Organizations cannot determine whether the steps taken have adequately notified class members.

[7] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement (Docket No. 769) at 24-25, dated Nov. 13, 2009.

7

in this manner potentially precludes authors of older works, who may not be on-line, from becoming fully informed of their options in this suit and how their rights might be affected. Although the Order Granting Preliminary Approval of Settlement directed Plaintiffs' counsel to forward the Notice to identifiable Settlement Class members by postal mail, there is no evidence suggesting that any physical mailing has taken place.  Moreover, even if the affected authors were on-line, the authors still may not have received notice of the PASA if they are not registered with the relevant litigation database, their e-mail addresses are unknown, or they have e-mail filters blocking messages from unknown senders.

### C.  The Procedural Posture of the PASA Frustrates Meaningful Discussion of its Terms

Authors who are unhappy with the deal struck by Google and the class representatives are faced with an impossible dilemma: they must opt-out to protect their own copyright and economic interests, but in doing so, lose any opportunity to meaningfully challenge the settlement now and in the future.  While affording dissatisfied class members with an opportunity to either opt-out or object may provide adequate procedural safeguards in the typical class action,[8] here, given the far-ranging and ultimately unquantifiable impact of the PASA, requiring class members to make such a choice is fundamentally prejudicial and inequitable.

The Court's November 19, 2009 Order requires class members to opt-out if they do not want to participate in the PASA, or remain in the class and file an objection if they want to challenge aspects of the PASA at the final approval hearing.  In addition, should the Court approve the PASA, those class members who opted-out would have no ability to challenge the PASA on appeal.  Only a class member who files an objection – and remains a party to the action – has standing to appeal the Court's order approving the PASA.  *Devlin v. Scardaletti,* 536 U.S. 1, 10-14 (2002).  It is thus impossible for a potential class member who believes she is

---

[8] *Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *Demint v. NationsBank Corp.*, 208 F.R.D. 639, 643-44 (M.D. Fla. 2002).

substantially harmed by the PASA to opt-out to protect her own interests, while simultaneously expressing her legitimate concerns about the PASA's impact on herself and other class members.

This dilemma is perfectly illustrated by the on-line petition of author, Ursula K. Le Guin.[9]  Ms. Le Guin has published twenty-one novels, eleven volumes of short stories, three collections of essays, twelve books for children, six volumes of poetry and four of translation, and has received many awards, including the National Book Award and the PEN-Malamud award.[10]  Ms. Le Guin is a vociferous critic of the PASA and has opted-out of the class, believing that the PASA seriously compromises her economic interests and property rights. Many authors agree with Ms. Le Guin and have signed onto a petition posted on her website as well as a letter submitted to this Court setting forth their concerns with the PASA.  However, because these authors needed to opt out of the settlement in order to protect their economic and other interests, they have no right to be heard at the final approval hearing or in any subsequent appeal.

By choosing to remain in the class in order to object to the PASA, class members surrender significant rights.  Not only do class members whose copyrights were violated through Google's unauthorized copying compromise their right to damages for past infringement,[11] but more importantly, they surrender an enormous and *ultimately indeterminate* range of future rights and related compensation.  Proponents of the PASA contend that the amendments reflected in the PASA purportedly enhance the subjects upon which an author can negotiate terms with Google and the Book Registry.[12]  Notwithstanding those amendments, authors

---

[9] Ursula K. Le Guin, *Petition Letter to the Judge of the Google Book Settlement*, *available at* http://www.ursulakLe Guin.com/UKL_info.html (last visited Jan. 22, 2010) (Also included in the accompanying Declaration of Ron Lazebnik, sworn to January 28, 2010, ¶ 3 & Ex. A.)
[10] Ms. Le Guin is also a member of the NWU and SFWA.
[11] This, in its own right, is a significant concession because the statute provides a minimum penalty of $750 per violation, and damages could be far higher if class members established "willful" infringement, as alleged in the Third Amended Complaint.  17 U.S.C. § 504(c)(1).
[12] For example, in their brief in support of Final Approval, the class representatives tout the right to renegotiate the revenue split for Commercially Available books and to reject or approve different Non-Price Features.  It is highly unlikely, however, that the majority of class members

participating in the PASA still have to release their right to assert future claims based on all conduct that Google contends is authorized by the PASA, and must adhere to the mechanisms and pricing structures that Google develops to exploit certain significant (but as yet unrealized) future Revenue Models, including Print on Demand, File Download of Books and Consumer Subscriptions.

Moreover, those who remain in the class – even under the amended Dispute Resolution Procedures – give up their right to a jury trial in any future dispute with Google or the Book Registry over such substantive questions as the categorization of their works, the amount of compensation to be paid under included Revenue Models, and whether future uses of copyrighted material are within the intended scope of the PASA.   Today's news illustrates why this is a problem:  at least five new software applications allow anyone accessing full book displays on Google Books to automatically capture the entire book as a PDF.[13]  These PDFs can then be freely copied and distributed worldwide over the internet.  Authors will not receive revenue from these copies.  When the case inevitably arises, Google will undoubtedly claim that it is insulated from any liability due to the scope of the PASA.  *See* § 10.2(a).

The alternative – opting out of the class – unfortunately does not protect the rights of most authors.  Their limited monetary claims for past infringement would not warrant hiring independent counsel and more importantly, they have little leverage in independently negotiating changes to the forward-looking arrangements that comprise the bulk of the PASA.  Courts have acknowledged that the "ostensible independence" afforded by opting-out is often an "essential impracticability."  "Because each objector's claim is too small to justify individual litigation, a class action is the only feasible means of obtaining relief.  By terminating all class actions

---

will have sufficient leverage to meaningfully negotiate more favorable revenue splits or to seek changes to the Non-Price Features that Google already has promised its institutional subscribers.
[13] *See* Declaration of Ron Lazebnik, sworn to January 28, 2010, ¶¶ 4,5 & Ex. B,C.

relating to the [claimed injury], the settlement will effectively bind the objectors." *Churchill Village, LLC v. General Elec.,* 361 F.3d 566, 572 (9th Cir. 2004).[14]

The essential impracticability of obtaining any meaningful relief by opting-out is only magnified here, given the scope and transformative nature of the PASA. Both Google and the Publisher and Author class representatives have acknowledged that the breadth of the digital library created by the PASA will revolutionize the public's access to Books and other copyrighted material. Members of the proposed class cannot adequately protect their interests by opting-out because approval of the PASA, even without their participation, will fundamentally alter the universe in which these authors create new works and exploit their copyright interests in existing works.

- First, a class member who opts out will not be included in Google's digital library which, given Google's market dominance, is likely to be the first resort for persons searching for books in both research and public libraries, or for purchase through the Internet.

- Second, it is likely that persons who opt-out will be at a disadvantage even with respect to whether and how their works and information are displayed and captured on Google's standard search engine pages, the dominant search service.[15] Google's own published technology descriptions[16] and the basic Google patent,[17] which is based on citation analysis, begin with the fundamental premise that a document must be "present" (*i.e.*, findable on the Internet – in this case within Google's display right) in order to be ranked in "importance." Therefore, it is profoundly likely that persons who seek books, articles or authors through conventional searches on Google's search engine will be first directed to authors and works that are part of Google's digital library.

- Third, most of the members of the NWU, SFWA, and ASJA – should they wish to subsequently participate in Google's digital library – will have no leverage to meaningfully negotiate the terms of their participation. As described above, many of the

---

[14] "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

[15] Nick Wilson, Ed., *Global Search Report 2007, available at* http://www.e3internet.com/downloads/global-search-report-2007.pdf (last visited Jan. 22, 2010).

[16] *See, e.g.*, http://www.google.com/corporate/tech.html.

[17] *See* http://www.google.com/patents?vid=6285999.

members of NWU, SFWA and ASJA are authors with limited, but important audiences that do not sell books or articles on a large scale. Thus, these authors are likely to be given a "take it or leave it" offer that is no different than the terms of the PASA.

In short, the Court's order places authors in the untenable and unfair position of either opting out now, thereby preserving some as yet unforeseen rights in their works and losing their voice in the matter, or remaining class members – giving them the right to object but thereby agreeing to a set of terms that will surely result in some measure of economic harm in the future.

In order to resolve this problem, the Court should adopt an opt-in procedure for all aspects of the PASA other than those provisions establishing a monetary remedy and claims process for past acts of infringement. As the United States has suggested, making the "forward-looking provisions" of the PASA effective only as to those individual class members who affirmatively opt-in would address many of the Rule 23 problems with the scope of the class and nature of the proposed relief without "work[ing] a significant hardship for a broad category of affected works." Statement of Interest of the United States of America Regarding Proposed Class Settlement (Docket No. 720) at 11, dated Sept. 18, 2009.

## II.   THE PROPOSED AMENDED SETTLEMENT AGREEMENT IS IMPROPER UNDER THE FEDERAL RULES OF CIVIL PROCEDURE

In approving a settlement in a class action, the court must conclude that "the settlement terms are fair, adequate, and reasonable" as established by Fed. R. Civ. P. 23(e)(1)(C). *Manual for Complex Litigation* § 21.62 (4th ed. 2004). In determining fairness, the judge must compare "the treatment of class members vis-'a-vis each other and vis-'a-vis similar individuals with similar claims who are not in the class." *Id.* The reasonableness of the settlement is based on "the class allegations and claims and the *responsiveness of the settlement to those claims*." *Id.* (emphasis added). The analysis of the adequacy prong entails "a comparison of the relief granted relative to what class members might have obtained" outside the settlement. *Id.*

Certification of a class settlement by a district court "requires 'heightened attention' to the justification for binding class members." *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 849 (1999) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). The rationale for the

heightened attention standard is that "the adversariness of the litigation is often lost after the agreement to settle." *Manual for Complex Litigation* § 21.61 (4th ed. 2004).  In reviewing the proposed settlement, the "judge must adopt the role of a skeptical client, and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." *Id*.

The amendments contained in the PASA do not redress the problems with the originally proposed settlement agreement that prevented it from meeting the requirements of the Federal Rules of Civil Procedure.  Both entities that the PASA creates, the Registry and the Unclaimed Works Fiduciary, are insufficient and leave numerous important questions about their operations and functions unanswered.  Article IX's modified dispute resolution mechanism remains an ambiguous system that is unfair to authors and distorts their existing relationships with their publishers.  Finally, the ambiguity created by the use of the term "Rightsholders" further exacerbates the confusion created by the PASA.  These issues, and others previously raised and unattended to in the PASA, make it an unreasonable settlement of this action.

## A.  The Registry Created by the Amendments to the PASA is Still Deficient in Important Respects.

Many of the objections to the initially proposed settlement agreement surrounded the creation of a Registry to oversee the implementation of key aspects of the agreement as well as the parameters and viability of the "as-of-now non-existent registry."  *See e.g.,* Objection of Scott E. Gant to Proposed Settlement Agreement, and to Certification of the Proposed Settlement Class and Sub-Classes (Docket No. 141) (the "Gant Objection Brief") at 28, dated Aug. 19, 2009.  The amendments to the PASA do not include any terms to insure that the Registry will be accountable for its actions, nor do they assign responsibility for maintaining the Registry should the Registry prove to be under-funded.  *Id.*

The PASA's failure to specifically delineate the structure and assign responsibility for the Registry will severely hurt the class members whose rights and interests the Registry is supposed to safeguard under the terms of the PASA.  *See* Statement of Interest of the United States of

America Regarding Proposed Settlement Agreement (Docket No. 720) at 12, dated Sept. 18, 2009 (arguing that the Registry in the previously proposed settlement agreement "[was] largely controlled by Publishers."). Moreover, the PASA's creation of an as-of-now non-existent Registry undermines the existing and well-established Authors Registry. The "Authors Registry" is a not-for-profit organization created to serve as a clearinghouse for authors receiving royalty payments. It has distributed over $8,000,000 to authors in its fifteen year existence and is a more independent and well-equipped entity devoted to the protection of authors.[18]

### B. The Fiduciary for Unclaimed Works Contemplated by the PASA is Insufficiently Defined in the PASA.

While the PASA creates an Unclaimed Works Fiduciary (the "Fiduciary") to address concerns about the protection of those with rights in orphan works, it fails to clearly set forth the parameters and obligations of that Fiduciary. Section 6.2(b)(iii) of the PASA defines the Fiduciary as:

> a person or entity that is not a published book author or book publisher (or an officer director or employee of a book publisher) [The Fiduciary] (and any successor) will be chosen by a supermajority vote of the Board of Directors of the Registry and will be subject to Court approval.

§ 6.2(b)(iii). The PASA does not specify the Fiduciary's compensation, but presumably this new role will be paid from the monies the Registry would receive from Google, perhaps even those funds specifically paid for the inclusion of Unclaimed Works.

While the PASA includes the method by which the Fiduciary and any successors are chosen and decisions reserved for the Fiduciary to make on behalf of Unclaimed Works, it does not outline a method by which owners of Unclaimed Works can later hold the Fiduciary accountable for their performance. *See, e.g.*, §§ 3.2(e)(i), 3.10, 4.2(c)(i). Owners of Unclaimed Works who are displeased with the Fiduciary's performance or decisions with regard to their works would be forced to commence costly litigation against the Fiduciary and the Registry, but

---

[18] *See* The Authors Registry, *About the Authors Registry*, http://www.authorsregistry.org/index.htm (last visited January 22, 2010).

this would only divert the Fiduciary's time and waste limited funds reserved for the Unclaimed Works of others. Additionally, many of the owners whose works fall within the Unclaimed Works designation may not have the financial means to maintain litigation against the Fiduciary.

Likewise, the Board of Directors of the Registry, which is responsible for selecting the Fiduciary, may be without recourse if it decides the Fiduciary has not properly represented Unclaimed Works. Section 6.2(b)(iii) does not specify whether the Board of Directors of the Registry votes on choosing a Fiduciary at the conclusion of each year, five years, ten years or only once the current Fiduciary has chosen to step down. Under the PASA, it would be difficult for owners of Unclaimed Works, as well as the Board of Directors of the Registry, to hold the Fiduciary accountable for his or her administration of Unclaimed Works.

The PASA severely disadvantages owners of Unclaimed Works by not only assigning the Fiduciary the responsibilities of seeking out Rightsholders and managing funds, but also for maintaining the integrity of Unclaimed Works. The agreement does not include any standards to govern how the Fiduciary determines whether Google has displayed the work of an unknown Rightsholder in an objectionable manner. Furthermore, the default rules under the PASA favor Google over Rightsholders of Unclaimed Works. For example, Section 3.10(c)(iii) requires the Fiduciary to contact Google to remove any "audio or video advertisements in conjunction with [Unclaimed] Books and the Registry determines that exclusion from such Advertising Uses is in the best interests of Rightsholders of such unclaimed Books." § 3.10(c)(iii). But, how would the Fiduciary decide that Google's profit-driven advertisements are objectionable? Will the Fiduciary have to affirmatively challenge each work that he or she believes would not be best served by Google displaying profit driven advertisements? By asking the Fiduciary to maintain the integrity of Unclaimed Works, the PASA unfairly usurps the protections afforded under copyright law to Rightsholders for the simple reason that they remain unknown. Furthermore, the power afforded to the Fiduciary in this regard is limited because "chang[ing] the classification of a Book to a No Display Book … must be *initiated* by the Rightsholder of the Book." *Id.* (emphasis added). The Fiduciary is not awarded the power to initiate a change of

15

status of an unclaimed Book from "Display Book" to "No Display Book" on his or her own accord, thus severely disadvantaging Rightsholders of Unclaimed Works.

More distressing is the fact that the Fiduciary would have a duty to represent the interests of members of either sub-class: authors who have not claimed their works, and publishers who have not claimed their works. Those interests are inherently opposed. Most of the publishers represented by the Fiduciary will be entities that no longer exist or are out of business. By definition then, these defunct former publishers can no longer exploit any rights they hold. For the successor entities, any revenue from the settlement will be incremental revenue from a new distribution channel that does not compete with their existing business. Their interest, and the responsibility of the Fiduciary to the publisher sub-class, is likely to be in allowing all uses and revenue models.

Many authors find that once a book goes out of print, they receive substantial income from licenses and from selling it themselves. Authors who have not claimed their works could have significant income streams from them, and almost all of these licenses and sales generate a higher revenue share for the author than would the PASA's revenue models. Therefore the PASA revenue models would compete with, and undercut, the authors' own existing commercial exploitation of their rights. Faced with this conflict, the Fiduciary's duty to the author sub-class is likely to be interpreted as one that will result in prohibiting most or all of these uses and revenue models.

The Fiduciary would be a two-headed monster embodying opposing interests of the author and publisher sub-classes, unable to faithfully serve as a fiduciary to either. The PASA provides no guidance as to which interests – those of authors or publishers – should be given priority by the Fiduciary, or how to resolve conflicts between the two sub-classes.

### C. The PASA's Dispute Resolution Mechanics are Unfair to Authors

Article IX (Dispute Resolution) of the PASA fails to adequately represent authors' interests and may substantially prejudice authors in future disputes with their publishers. First,

16

the amended provision discussing authors' recourse in disputes with publishers is ambiguous. Second, the agreement permits Google to interfere with negotiations and disputes arising exclusively between authors and publishers.

### 1.  The Article IX Dispute Resolution Provision is Ambiguous

The ambiguity of the language in Article IX alone should prevent the Court's approval of the PASA.  The relevant language reads as follows: "With respect to any dispute between or among Rightsholders and Claimants, the parties to such dispute may elect to resolve such dispute in court or by such other dispute resolution procedure as they may agree."  § 9.1.  This provision is capable of multiple interpretations and is thus, as both a practical and a legal matter, unenforceable.  Under a first interpretation, the sentence contains two separate clauses so that parties could either, (1) sue in court or, (2) agree to settle the matter in a dispute resolution procedure.  As such, in any dispute, litigation in court would be an option for an aggrieved party.  Alternatively, the language may reasonably be interpreted as one clause, requiring both parties to agree to resolve a dispute in court before such a remedy is available.  Under this approach, an author would be forced into a binding arbitration process unless his publisher consented to being sued in court.  Such a result is both unfair and unlikely.

Ambiguous contract terms are not enforceable.  "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." *Sayers v Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation omitted).  Contract terms are not ambiguous if they "have a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion."  *Id.*  Here, a troubling ambiguity exists as to when litigation is available to authors given the courts' inclination to favor arbitrations.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, [including] whether the problem at

17

hand is the construction of the contract language itself….").  As such, the clause should not be approved.

### 2. *The Article IX Dispute Resolution Procedures are Overly Complicated and Unduly Interfere With Preexisting Relationships Between Author and Publisher*

Even if the contract terms were reasonably precise, Article IX unduly interferes with the already complex contractual relationships between authors and publishers.  Contracts between authors and publishers are often based on factors like the size of the publishing house, the relative fame of the author, and the author's previous sales history.  The PASA, however, both makes assumptions concerning what rights each party holds, particularly electronic rights, and then applies uniformly regardless of substantial differences in the standing of authors and publishers that may be reflected in their contracts.  The PASA additionally allows Google to influence matters that have never and continue to have little, if anything, to do with Google.  Attachment A of the PASA, for example, allows the Registry to determine the classification of books if the authors and publishers disagree.  Authors and publishers must submit the dispute to the Registry for resolution, and if unsatisfied with the decision may resolve the dispute under Article IX.  Att. A §6.4.  This structure begs the question, why are the plaintiffs and Google establishing procedures for resolving contractual disputes between authors and publishers?  The procedure for handling most contractual disputes is already set out in preexisting contracts between the two parties and need not be modified or displaced by Google.  The overreaching dispute resolution procedure was problematic under the original settlement agreement and the PASA fails to correct this problem.

Moreover, the procedures in place under the PASA are unnecessarily complicated – some disputes are handled by the Registry while others are to be resolved under Article IX.  The Author-Publisher procedures require resolution through the Registry of the following disputes: classification of a book, reversion to the Author of rights in a Book, removal of In-Print Books, and pricing of Out-of-Print Books.  *See* Att. A §§3.3(d), 4.1(e), 5.3, 6.4.  Article IX, however,

explicitly covers disputes concerning whether a Book is an Educational Book.  Att. A §7.1(a).  It is unclear whether all future disputes between an author and publisher may be submitted to dispute resolution pursuant to Article IX of the PASA.   For example, while the PASA recognizes that a disappointed party may seek relief under Article IX if he or she disagrees with the Registry's classification of a book, no such relief is explicitly provided for with respect to whether an Author's rights in a Book have reverted.  As written, authors and publishers may be forced to resolve related disputes in a piecemeal fashion.  Such scattered procedures for resolution will likely lead to inconsistent results.  These problematic procedures were a feature of the original proposed settlement agreement and were reinforced, instead of corrected by the PASA.

The issue in the present action is whether Google infringed author and publisher copyrights – not what rights are held by the author and publisher respectively and where potential disputes that arise between the parties should be adjudicated or settled.  Authors are already negotiating across a lopsided table in which the balance of power firmly lies with the publishers.  If Google or other electronic publishers may now also participate in dispute resolution, authors' ability to defend their contractual rights will be significantly curtailed.

### D. The PASA Does Not Clearly Delineate Between Authors and Publishers as Rightsholders and Ignores Their Preexisting Contractual Relationships

One of the principal objections to the original settlement was that it interfered with the substantive rights of authors and thus violated the Rules Enabling Act, which specifically mandates that no rule of procedure shall "abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(b).  This issue has not been rectified by the PASA.  To the contrary, the amended provisions referring to "Rightsholders" further modify the intellectual property rights of authors.

Several amendments contained in the PASA confer additional rights and obligations on "Rightsholders" – a vague term that does not distinguish among the various rights of authors and publishers.  Copyright is a *bundle* of rights, each of which is set forth at 17 U.S.C. § 106, and in employing the general term "Rightsholder" the PASA does not specify to which particular right

19

it is referring in its various provisions.  The rights that affect publishers and authors and which are frequently subject to dispute are, among others, subsidiary rights, electronic rights, the right to control various aspects of the work, the right to revision and the right of the author to terminate the grant of the copyright to the publisher.  The PASA seems to confer these rights to either or both the publisher and author where one party may already have exclusive possession of those rights under a preexisting contract.  For example, many authors retain the electronic rights to a book, but the PASA does not make provision for book contracts that separate print and electronic rights.  The PASA would thus frustrate and override preexisting contractual relationships between authors and publishers common to this industry which has different contractual terms for ownership, control, and/or revenue sharing.

Consider the scenario that would ensue in the case of an out of print book where the rights have not yet reverted, and the author opts out of the settlement but the publisher of her book does not.  In that case, the publisher becomes the sole "Rightsholder" as defined by the PASA.  *See, e.g.,* amended sections §§ 4.2(a)(i), 4.2(b)(i)(2), 4.2(c)(1), Att. A § 5.3, Att. A § 6.4.  "Rightsholder" only includes members of the class, and excludes those who opt out of the PASA.  *See* § 1.134.  As such, when the author opts out of the PASA, she cedes control of the work to the publisher who remains a Rightsholder under the PASA.  The publisher may therefore be able to include the author's book and make decisions about it without the author's consent.  This is likely to happen quite often, because the PASA thus presents publishers with an opportunity to profit from the aggregation of all the books in which they have an interest, just by making "keep every book in the settlement" their default position.  On the other hand, individual authors have much more to lose by inclusion, because they are endangering the potential profit they would receive from licensing their digital distribution rights outside the PASA.

The problematic reference to a "Rightsholder" is further amplified when both author and publisher choose to remain in the class.  In areas of the PASA which do not specify how conflicting directions are resolved, if a Rightsholder disagrees with a decision that has been made, he or she must submit the dispute to the Registry first, and only afterwards might be able

20

to appeal that decision according to Article IX.  *See* Att. A § 6.4.  Many of the amended provisions referring to a Rightsholder are about the pricing of books, a topic on which authors and publishers will undoubtedly disagree.  *See, e.g.,* §§ 4.2(a)(i) (alternative licensing terms); 4.2(b)(i)(2) (settlement controlled pricing of books); 4.2(c)(1) (pricing bins).  Without knowing who controls pricing under the PASA, the party that feels inadequately compensated by the price chosen by the other will submit the issue to the PASA's convoluted dispute resolution procedure, despite pricing of books being a right typically set out under most author-publisher contracts. Publishers and authors have different interests as Rightsholders, and referring to them collectively as "Rightsholders" presents a fundamental problem in the way the PASA will routinely play out.

More distressingly, the use of "Rightsholder" allows for the transfer of rights previously only held by authors.  Contracts created before around 1992 do not include provisions that mention digital distribution rights.  Because rights granted in a book contract are limited, authors retain rights not expressly granted to publishers.  *See New York Times Co. v. Tasini*, 533 U.S. 483, 509 (2001).  As such, publishers have no rights to e-books under these earlier contracts. This fundamental principle of publishing contracts has been supported by recent case law.  In *Random House v. Rosetta Books LLC*, the court indicated that "the law of New York . . . has arguably adopted a restrictive view of the kinds of 'new uses' to which an exclusive license may apply when the contracting parties do not expressly provide for coverage of such future forms." 283 F.3d 490, 491 (2d Cir. 2002) (affirming denial of a preliminary injunction because the right to "print, publish and sell the works in book form" is a "limited right" which does not include the right to publish the works digitally).  Under this line of reasoning authors, not publishers, retain the rights to e-books.  Consequently, by allowing publishers to exercise control over or receive revenue from these books as Rightsholders, the PASA contravenes existing contract law governing author-publisher agreements and further confuses an already heated area of dispute.[19]

---

[19] *See, e.g.*, Motoko Rich, *Legal Battles Over E-book Rights to Older Books,* N. Y. TIMES, Dec. 13, 2009, *available at* http://www.nytimes.com/2009/12/13/business/media/13ebooks.html.

The lack of clarity inherent in the PASA with respect to Rightsholders is not limited only to the amended sections, but is an overarching problem in the PASA that prevents class members from understanding and being able to predict the extent of their rights.  The PASA therefore does not fully enable the class members to make an informed decision regarding the consequences of opting in.  As a result, the PASA violates Rule 23(e)(2)'s requirement that a settlement be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Accordingly, the Court should reject the PASA.

Instead of having Google, the Authors Guild,  the Association of American Publishers and the "Representative Plaintiffs" force a solution on all affected parties, the authors and publishers should be given time to come up with a market-driven solution.  This sentiment was suggested by the Authors Guild itself.  On December 15, 2009, months after the PASA was submitted to the Court, members of the Authors Guild wrote the following in response to a publisher's mass assertion of e-book rights:  "If you have an old book contract in which you haven't granted e-book rights, patience is likely to pay off.  The e-book industry is still young -- there's no need to jump in."[20]  The named parties and the Court should heed the Authors Guild's advice and refrain from making decisions that will have long-lasting impact on millions of authors.

---

[20] AuthorsGuild.org, Random House's Retroactive Rights Grab,
http://www.authorsguild.org/advocacy/articles/random-houses-retroactive-rights.html (last visited January 22, 2010).

## CONCLUSION

For the foregoing reasons, the Court should not approve the Proposed Amended Settlement Agreement, or any version of an agreement that goes beyond compensating the plaintiff class for the past conduct of the defendant stated in the Complaint.

Dated: January 28, 2009
          New York, New York

Respectfully submitted,

LINCOLN SQUARE LEGAL SERVICES, INC.

By:   /s/ Ron Lazebnik
          Ron Lazebnik
          Supervising Attorney

Marissa Tillem, Legal Intern
Sean Williams, Legal Intern
Amanda Agati, Legal Intern
Jeremy Boczko, Legal Intern

Samuelson-Glushko Intellectual
Property & Information Law Clinic
Fordham Law School
33 West 60th Street, 3rd Floor
New York, New York 10023
Phone: (212) 636-6934
Fax: (212) 636-6923
rlazebnik@law.fordham.edu

*Attorneys for Science Fiction and
Fantasy Writers of America, Inc.,
and American Society of Journalists
and Authors, Inc.*

23

## CERTIFICATE OF SERVICE

I, Ron Lazebnik, do hereby certify that on January 28, 2010, I caused a true and correct copy of the foregoing document, in The Authors Guild et al. v. Google, Inc., Case No. 05 CV 8136-DC, to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification to all CM/ECF subscribers, including:

> Michael J. Boni, Esq.
> Joanne Zack, Esq.
> Joshua Snyder, Esq.
> Boni & Zack LLC
> 15 St. Asaphs Road
> Bala Cynwyd, PA 19004
> bookclaims@bonizack.com

> Jeffrey P. Cunard, Esq.
> Bruce P. Keller, Esq.
> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, NY 10022
> bookclaims@debevoise.com

> Daralyn J. Durie, Esq.
> Joseph C. Gratz, Esq.
> Durie Tangri Lemley Roberts & Kent LLP
> 332 Pine Street, Suite 200
> San Francisco, CA 94104
> bookclaims@durietangri.com

Any persons identified in the Notice of Electronic Filing as having appeared in the case and who are not registered ECF users will be served by United States Postal Service, first class mail.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: January 28, 2010
      New York, New York

                                        */s/ Ron Lazebnik*
                                        Ron Lazebnik