**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

The Authors Guild, Inc., Association
of American Publishers, et. al.,

     Plaintiffs,

       v.

Google Inc.,

     Defendant.

Case No. 05 CV 8136-DC (ECF)

---

**OBJECTIONS OF CARL HANSER VERLAG AND DR. LYNLEY HOOD AND BRIEF OF AMICI CURIAE BÖRSENVEREIN DES DEUTSCHEN BUCHHANDELS, SCHWEIZER BUCHHÄNDLER – UND VERLEGER–VERBAND SBVV, HAUPTVERBAND DES ÖSTERREICHISCHEN BUCHHANDELS, ASSOCIAZIONE ITALIANA EDITORI, AND THE NEW ZEALAND SOCIETY OF AUTHORS (PEN NZ INC.)**

MACHT, SHAPIRO, ARATO &
   ISSERLES LLP
Cynthia S. Arato (CA 8350)
Alexandra A.E. Shapiro (AS 4816)
1114 Avenue of the Americas
45th Floor
New York, New York 10036
Phone:  (212) 479-6724
Fax:  (212) 202-6417

*Attorneys for Carl Hanser Verlag, Dr. Lynley Hood, Börsenverein des Deutschen Buchhandels, Schweizer Buchhändler – und Verleger–Verband SBVV, Hauptverband des Österreichischen Buchhandels, Associazione Italiana Editori, and the New Zealand Society of Authors (PEN NZ Inc.)*

**Table of Contents**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

THE OBJECTING PARTIES...........................................................................4

ARGUMENT ..................................................................................................... 5

I.  THE ASA'S VAGUE DEFINITION OF BOOKS FAILS TO CREATE A DEFINITE
    CLASS ..................................................................................................... 5

II. THE ASA CONTINUES TO CONFLICT WITH U.S. TREATY
    OBLIGATIONS  ..................................................................................... 10

    A.  The Definition of Books Imposes Additional Burdens and Formalities on Foreign
        Rightsholders ................................................................................... 10

    B.  The Publication Requirement Discriminates Between Nationals of the Chosen
        Countries and Nationals of Other Foreign Countries In Conflict With TRIPs..... 13

III. THE NAMED PLAINTIFFS ARE ALL FROM THE U.S. OR THE CHOSEN
     COUNTRIES AND THUS ARE NOT ADEQUATE REPRESENTATIVES ......... 14

IV. NOTICE TO FOREIGN RIGHTSHOLDERS REMAINS INADEQUATE ............. 17

    A.  Foreign Rightsholders Did Not Receive Adequate Notice Of The ASA.............. 17

    B.  Notice to Foreign Rightsholders In Non-English Speaking Countries Remains
        Inadequate Because Neither the Settlement Nor The ASA Has Ever Been
        Translated Into Any Foreign Language and the Supplemental Notice Was Not
        Properly Translated ........................................................................... 22

V.  THE ASA IS NOT FAIR, REASONABLE OR ADEQUATE ................................. 23

CONCLUSION.................................................................................................... 24

# Table of Authorities

## Cases

*Adashunas v. Negley*, 626 F.2d 600 (7th Cir. 1980) ............................................................ 6

*Daniels v. City of New York*, 198 F.R.D. 409 (S.D.N.Y. 2001) ........................................... 6

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974) ................................................... 18, 21

*Fears v. Wilhelmina Model Agency, Inc.*,
    2003 WL 21659373 (S.D.N.Y. Jul. 15, 2003) ................................................................ 6

*Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 942 (N.D. Ohio 2009) ........... 6

*Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985) ............................................. 18, 19

*In re A.H. Robins Co., Inc.*, 880 F.2d 709 (4th Cir. 1989) ................................................. 6

*In re Auction Houses Antitrust Litig.*, 138 F. Supp. 2d 548 (S.D.N.Y. 2001) ............ 18, 19

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    292 F. Supp. 2d 184 (D. Me. 2003) ............................................................................. 19

*In re Copper Antitrust Litig.*, 196 F.R.D. 348 (W.D. Wis. 2000) ....................................... 6

*In re Diet Drugs Prods. Liab. Litig.*,
    2002 U.S. Dist. LEXIS 24771 (E.D. Pa. Dec. 10, 2002) ........................................ 19, 20

*In re Diet Drugs Prods. Liab. Litig.*, 226 F.R.D. 498 (E.D. Pa. 2005) ............................. 20

*In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004) ........................................... 6

*In re New York City Mun. Sec. Litig.*, 87 F.R.D. 572 (S.D.N.Y. 1980) ............................ 21

*Mueller v. CBS, Inc.,* 200 F.R.D. 227 (W.D. Pa. 2001) ..................................................... 6

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) ................................................... 5

*Park v. Thomson Corp.*, 2008 WL 4684232 (S.D.N.Y. 2008) ......................................... 18

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .................................................... 21

## Statutes and Legislative Materials

17 U.S.C. § 101 ............................................................................................................ 7, 9

Berne Convention Implementation Act of 1988,
  Pub. L. 100-568, 102 Stat. 2853 ("Berne Act") ................................................ 10, 11, 13

Uruguay Round Agreements Act of 1994, Pub. L. 103-465, 108 Stat. 4809 .................. 10

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

**Other Authorities**

American Association of Publishers,
  *Questions About the Revised Google Books Settlement* .................................. 1, 2, 8, 15

*Google lässt Auslandstitel aus Buchvergleich fallen [Google Drops Foreign Titles Out of
  Book Settlement]*, Frankfurter Allgemeine Zeitung, Nov. 16, 2009 .............................. 1

J. Moore, 5 *Moore's Fed. Practice* § 23.21[1] (3d ed. 2009) ............................................ 5

L. Clayton, *Latest on Google Settlement, Patent Case Transfers, Dilution,*
  N.Y.L.J., Jan. 13 2010 ................................................................................................. 1

Lyndsey Layton, *(c)2009?  Wishful Thinking, Perhaps, as Backlog Mounts*,
  Washington Post, May 19, 2009 ................................................................................. 12

*Nuovo patto tra Google e gli editori Usa per i diritti d' autore dei libri su Internet* [*New
  agreement between Google and U.S. publishers about copyright on books in the
  Internet*], La Repubblica, Nov. 15, 2009 ...................................................................... 1

Public-Interest Book Seach Initiative, *Objections to Google Books Settlement and
  Responses in the Amended Settlement:  A Report* ......................................................... 1

Webster's Third New International Dictionary (3rd ed. 2002) .......................................... 8

William F. Patry, *Patry on Copyright* ............................................................................. 11

Wright, Miller & Kane, *Fed. Practice and Proc*. § 1760 (2009) ...................................... 6

# INTRODUCTION

The original Settlement Agreement ("Settlement") purported to cover every book ever published virtually anywhere in the world.  As this Court knows, the Settlement's vast, worldwide reach provoked an outcry from foreign governments and foreign rightsholders.  Seeking to quell those protests, the parties devised an Amended Settlement Agreement ("ASA") that covers only those Books that have been registered with the U.S. Copyright Office or which had a "place of publication" in the United Kingdom, Canada or Australia (the "Chosen Countries").  The parties have suggested, and as a result many people seem to believe, that this change has somehow narrowed the international scope of the class.[1]

---

[1] *See* American Association of Publishers, *Questions About the Revised Google Books Settlement* (hereinafter "AAP FAQs,") *available at* http://www.publishers.org/main/PressCenter/Archicves/2009_November/documents/RevisedSettlementFAQ.pdf (Q:  "Why did you narrow the class? Why are books from the U.K., Australia, and Canada still included?"  A:  "After hearing feedback from foreign rightsholders, the plaintiffs decided to *narrow the class to include countries* with a common legal heritage and similar book industry practices.") (emphasis added); Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement ("Pls. Mem."), p. 3 ("most significantly, the international scope of the class has been reduced by narrowing the definitions of 'Books'"); see *also* L. Clayton, *Latest on Google Settlement, Patent Case Transfers, Dilution,* N.Y.L.J., Jan. 13 2010, at 3 (explaining that "[m]any of the most vocal detractors . . . were from overseas, as the original settlement agreement would have covered foreign works in addition to those protected by U.S. copyright law.  The revised agreement is limited to American, British, Canadian, and Australian works"); Public-Interest Book Seach Initiative, *Objections to Google Books Settlement and Responses in the Amended Settlement:  A Report*, p. 16, *available at* http://thepublicindex.org/docs/commentary/objections-responses.pdf (The "Third Amended Complaint adds representative plaintiffs from the United Kingdom, Canada and Australia.  All other foreign works are excluded from the settlement."); *Nuovo patto tra Google e gli editori Usa per i diritti d' autore dei libri su Internet* [*New agreement between Google and U.S. publishers about copyright on books in the Internet*], La Repubblica, Nov. 15, 2009, at 26 ("The [ASA] applies to books registered in the United States, Great Britain and Canada.  Europe and the rest of the world are out of the agreement."); *Google lässt Auslandstitel aus Buchvergleich fallen [Google Drops Foreign Titles Out of Book Settlement]*, Frankfurter Allgemeine Zeitung, Nov. 16, 2009, at 15.

That is false.  The ASA's registration and "place of publication" limitations do *nothing* to limit the geographic scope of this proposed settlement.  Just like the original Settlement, the ASA continues to embrace rightsholders from *anywhere in the world*.  Under the ASA, a German publisher of a work that was published only in Germany and Australia, who has no connection to the U.S., would still be subject to this settlement.  The ASA is simply *not* limited to works from just the U.S. and the "Chosen Countries."  It covers any book from virtually any country from around the world, so long as, at some point in time, the work was either registered with the U.S. Copyright Office or had a "place of publication" in one of the Chosen Countries.

The ASA's "registration" and "place of publication" provisions are not only illusory – they are arbitrary and lack any coherent justification.  Why, for example, should a book written in Nigeria that has no connection to the U.S. be included in the ASA simply because it had a "place of publication" in the U.K.?  The parties purport to have included books published in the Chosen Countries because those countries share a "common legal heritage and similar book industry practices" with the U.S.  *See* AAP FAQ; *The Revised Google Books Settlement Agreement*, *available at* http://books.google.com/googlebooks/agreement/press.html).  But then why did the parties exclude New Zealand and the Republic of Ireland from this list?  More importantly, what possible bearing does the "common legal heritage" of the Chosen Countries, or their similar "book industry practices" have on the connection between the *work* and the U.S. – especially if that work was created in (or its rightsholders are from) a country with a very *different* legal heritage?  The parties provide no answers to these

2

vexing questions.  Instead, it appears that they inserted the "Chosen Countries" requirement into the ASA to create the illusion of a limited settlement confined to a handful of English-speaking countries – when in fact the ASA continues to sweep in books from diverse countries all over the world.

The ASA's "registration" hook, as applied to non-U.S. works, also makes little sense from a copyright perspective.  For the past two decades foreigners who hold rights to non-U.S. works had little reason to monitor the prior registration of these works in the U.S.  Now, however, U.S. copyright registration can determine whether these non-U.S. works are covered by the ASA.  But why should an Italian work published only in Italy be included in the ASA just because the rightsholder's predecessor-in-interest happened to register the book with the U.S. Copyright Office 80 years ago – even if that registration has essentially no legal significance from a copyright perspective, and even though the work has had no other connection to the U.S. since?  The ASA elevates the importance of U.S. copyright registration in a way that is completely at odds with the Copyright Act itself, and with the reasonable expectations of foreign rightsholders, who otherwise have correctly understood that U.S. copyright registration has little, if any, effect on their rights under U.S. copyright law.

The ASA's proposed class misleadingly signals to the world that the ASA only covers works from the U.S. and the Chosen Countries, when in fact it potentially covers works from almost every country in the world.  Even for foreign rightsholders careful enough to read the fine print, the ASA's definition of Books rests on arbitrary and irrational distinctions that make a mockery of its purported geographic limitations, and undermines the rationality of the entire settlement as it relates to foreign rightsholders.

For these reasons, the ASA is not "fair, reasonable [or] adequate" as required under Federal Rule of Civil Procedure 23(e)(2).

The ASA also fails to meet the fairness standard of Rule 23(e)(2) and is otherwise improper under Rule 23 for the following reasons because:

(1) the ASA's new definition of Books is amorphous and administratively unmanageable, and the ASA therefore fails to include a definite or ascertainable class;

(2) this same definition imposes unreasonable burdens on foreign rightsholders residing outside the Chosen Countries, in contravention of the Berne Convention ("Berne") and the World Trade Organization's Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPs");

(3) the Representative Plaintiffs are all from the U.S. or the Chosen Countries, and they cannot adequately represent, and have not adequately represented, foreign class members from other countries; and

(4) the parties failed to provide adequate notice of the ASA.

### THE OBJECTING PARTIES

These objections are brought on behalf of class members Carl Hanser Verlag and Dr. Lynley Hood, as well as foreign publishing and authors' associations for the Federal Republic of Germany (Börsenverein des Deutschen Buchhandels), Switzerland (Schweizer Buchhändler – und Verleger–Verband SBVV), Austria (Hauptverband des Österreichischen Buchhandels), Italy (Associazione Italiana Editori), and New Zealand (New Zealand Society of Authors (PEN NZ Inc.)) (collectively, the "Foreign Associations").

Carl Hanser Verlag is a preeminent book publisher located in Germany that has

published thousands of books since 1922.  Carl Hanser Verlag is a member of the

putative Settlement Class, because it has registered certain of its works with the U.S.

Copyright Office and, based on its understanding of the definition of Books, has

published others in at least one of the Chosen Countries.  *See* Declaration of Stephan D.

Joß, sworn to on January 28, 2010 ("Joß Decl.") ¶ 4.  Dr. Lynley Hood is a noted New

Zealand author and, based on her understanding of the definition, the author of at least

one Book.

Each of the Foreign Associations is the leading and largest advocate for book

publishers or authors in its respective nation and represents the public policy interests of

numerous book publishers and authors who are members of the putative Settlement

Class.[2]  Accordingly, the Foreign Associations are uniquely positioned to advise this

Court about how the ASA will prejudice their members and foreign rightsholders.

## ARGUMENT

### I.   THE ASA'S VAGUE DEFINITION OF BOOKS FAILS TO CREATE A DEFINITE CLASS

It is well established that "[t]he class must be susceptible of precise definition.

There can be no class action if the proposed class is 'amorphous' or 'imprecise.'"  J.

Moore, 5 *Moore's Fed. Practice* § 23.21[1] at 23-44 (3d ed. 2009); *accord, e.g; Oshana*

*v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (in addition to demonstrating

---

[2] *See* Declaration of Dr. Christian Sprang, sworn to on August 31, 2009, ¶¶ 2-3; Declaration of
Inge Kralupper, sworn to on August 27, 2009, ¶¶ 2-3; and Declaration of Dani Landolf, sworn to
on August 28, 2009, ¶¶ 2-3.  *See also* Declaration of Pierfrancesco Attanasio, sworn to on
January 28, 2010 ("Attanasio Decl."), Ex. A (Sept. 2, 2009 Objections of Associazione Italiana
Editori ("AIE Obj.")) pp.1-2; http://www.authors.org.nz/wawcs0137444/idDetails=191/a-short-
history.  The first three declarations cited above were previously filed with this Court on August
31, 2009, at Docket Entry Nos. 175-177.  Although the Foreign Associations are not Objecting
Class Members, they respectfully request leave to join this brief as *amici curiae*.

compliance with Fed. R. 23(a) and (b), "[t]he plaintiff must also show . . . that the class is indeed identifiable as a class"); *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989) ("Though not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class."), *abrogated on other grounds by Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (the proposed class may not be excessively "amorphous and diverse"); *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001) ("the proposed class must be clearly defined").

A precise class definition is "necessary to properly identify those entitled to relief, those bound by the judgment, and those entitled to notice." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413-14 (5th Cir. 2004); 5 *Moore's Fed. Practice* § 23.21. For this reason, the class definition must convey "sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent." *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 359 (W.D. Wis. 2000). In addition, "[w]here extensive factual inquiries are required to determine whether an individual is a member of a class, certification is improper." *Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 942, 952 (N.D. Ohio 2009); *see also* Wright, Miller & Kane, *Fed. Practice and Proc.* § 1760 at p. 140 (2009) (a class must be defined so that it is "administratively feasible" for the Court to determine who is a member).[3]

---

[3] *See also Fears v. Wilhelmina Model Agency, Inc.*, 2003 WL 21659373, at *2 (S.D.N.Y. Jul. 15, 2003) (court must be able to make membership determination "without having to answer numerous fact-intensive inquiries") (internal quotation marks omitted); *Mueller v. CBS, Inc.*, 200 F.R.D. 227, 233 (W.D. Pa. 2001) (class should not be certified if it is not "administratively feasible to determine whether a given individual is a member of the class").

The ASA's definition of Books, and thus its definition of the class, fails this bedrock requirement. *First*, the definition is inherently vague and uncertain on its face. The ASA now purports to cover only those Books that:

> (a) had been published or distributed to the public or made available for public access as a set of written or printed sheets of paper bound together in hard copy form under the authorization of the work's U.S. copyright owner, (b) was subject to a Copyright Interest, and (c) (1) if a "United States work," as defined in 17 U.S.C. § 101, was registered with the U.S. Copyright Office;[4] and (2) if not a United States work either (x) was registered with the U.S. Copyright Office, or (y) had a place of publication in Canada, the United Kingdom or Australia, as evidenced by information printed in or on a hard copy of the work. Relevant information printed in or on a hard copy of the work may include, for example, a statement that the book was "Published in [Canada] or [the U.K.] or [Australia]," or the location or address of the publisher in one of those three countries.

ASA §1.19.

These three requirements are separated by the word "and," which clearly indicates that a work must satisfy all of them in order to be covered by the ASA. Thus, that a work is published in a Chosen Country is apparently not sufficient to qualify that work as a Book. Rather, that work *also* must be distributed or made available under the authority of a "U.S. copyright owner," and subject to a "Copyright Interest." But what do those additional requirements mean, and how do they possibly apply, to a foreign rightsholder with no connection to the U.S.? The ASA provides no guidance on these critical points. The term "U.S. copyright owner" is undefined, and the term "Copyright Interest" is defined in a circular fashion to include a "United States copyright interest" (ASA § 1.41), which is itself undefined.

---

[4]  Under the Copyright Act, a "United States work" is a work that is (1) "first" published only in the United States or simultaneously in the United States and elsewhere (subject to certain qualifications) or (2) if not published, authored only by U.S. nationals, domiciliaries, etc. 17 U.S.C. § 101. Thus, a German work first published in Germany and later (but not simultaneously) published in the United States is not a "United States work."

7

Thus, consider an Italian rightsholder whose work was published only in Italy and Canada, and whose work has had no connection to the U.S. at any time.  If that rightsholder were to read this definition of Book, he might reasonably question whether the work is even covered by the ASA because of the other requirements.  Who in that scenario is the "U.S. copyright owner," and what exactly is the U.S. "Copyright Interest"?  At the same time, the parties have made clear their view that a work published in one of the Chosen Countries is, without more, covered by the ASA.  *See* AAP FAQ ("Anyone . . . who published their book in the U.K., Australia, or Canada by January 5, 2009 is a member of the class.").  But the definition of Books that the parties drafted does not say that; in fact, it implies that publication in one of the Chosen Countries is *not* sufficient on its own.[5]

The requirement that a work be published under the "authority" of such a U.S. copyright owner also renders the class indefinite under Rule 23.  There is no administratively feasible way to determine which of the millions of works at issue were published in an authorized manner.  *See supra* p. 6 & n.3.

The ASA also fails to define what it means for a work to have its "place of publication" in one of the Chosen Countries.  The word "publish" has many accepted definitions, including "to make generally known," "to place before the public," "to produce for publication," or "to have one's work accepted for publication."  Webster's Third New International Dictionary (3rd ed. 2002).  Yet the ASA fails to specify which of these meanings it intends to embrace.  By contrast, the Copyright Act has its own, much more limited, definition of publication, which provides that "[p]ublication is the

---

[5]Even more vexing ambiguities arise for translated works.  For example, if an original work was not published in one of the Chosen Countries, but an English translation of the same was, are both works in the putative class, or only the translated work?

distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending" and includes "the offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. §101. But the ASA does not reference this definition in any way.

At the end of the day, it is entirely unclear what acts of "publishing" a work in a Chosen Country are sufficient to make that country a "place of publication" under the ASA. Is it enough to print the book in a Chosen Country? Or must it actually be sold or otherwise made available to the public in the particular ways specified by the Copyright Act? And what if the rightsholder simply makes its work "generally known" or "places it before the public" in some other, less formal, way? The ASA is silent on these critical questions, leaving its "place of publication" class definition inherently uncertain.

The ASA apparently tries to fix these definitional problems by providing that the "place of publication" standard is to be "*evidenced by* information printed in or on a hard copy of the work," and that "[r]elevant information printed in or on a hard copy of the work may include, *for example*, a statement that the book was 'Published in [Canada] or [the UK] or [Australia],' or the location or address of the publisher in one of those three countries." ASA §1.19 (emphasis added). This merely compounds the ASA's indefiniteness. Critically, although the ASA makes clear that the "place of publication" standard is to be evidenced by printed information on or in a book, it fails to establish what that printed information must say to meet that standard.[6] To the contrary, it merely

---

[6] In any event, it makes little sense to rely on "the location or address of the publisher" as "printed in or on a hard copy of the work." ASA § 1.19. As the recent amicus submission of VG Wort demonstrates, book publishers often list the location of all of their offices on a book's title page and these office locations often bear no relation to the work in question. *See* Amicus curiae

provides two illustrative examples, leaving putative class members and the court to guess at what other "printed information" might suffice. For this reason as well, the class as defined in the ASA is indefinite and administratively unfeasible and fails under Rule 23.

## II.    THE ASA CONTINUES TO CONFLICT WITH U.S. TREATY OBLIGATIONS

The ASA also should not be approved because it would impair the rights of foreign copyright holders in conflict with the U.S.'s international treaty obligations under Berne and TRIPs, for each of the reasons set forth in our prior objections. Objections of Harrassowitz *et al.* to Proposed Settlement ("Objections"), pp. 17-21 (Docket Entry No. 167); *see also* Berne Convention Implementation Act of 1988 § 3(a)(1), Pub. L. 100-568, 102 Stat. 2853 ("Berne Act"); Uruguay Round Agreements Act of 1994, Pub. L. 103-465, 108 Stat. 4809. Nothing in the ASA alleviates these problems. Instead, the ASA raises new and additional concerns under both Berne and TRIPs.

### A.    The Definition of Books Imposes Additional Burdens and Formalities on Foreign Rightsholders

The ASA requires foreign rightsholders – at least those from outside the Chosen Countries –  to engage in a book-by-book analysis to determine whether any, and/or how many, of their works were either registered in the U.S. or had a "place of publication" (whatever that means) in any of the Chosen Countries. This painstaking task, which the ASA requires foreign rightsholders to undertake in a remarkably short, inconvenient time-period – plainly imposes burdens that conflict with Berne and TRIPs.[7]

---

submission of VG Wort, dated January 21, 2010, p. 5. Thus, if the relevant inquiry is where a particular work was, in fact, distributed to the public (and that remains unclear), printed information regarding a book publisher's offices is an inherently unreliable source.

[7]  The ASA gave rightsholders only six weeks over the Christmas and New Year's holidays to perform this burdensome task. *See* Order Granting Preliminary Approval of Amended Settlement

With respect to the registration requirement, one might suppose that a foreign rightsholder need only examine its own records to determine if the work had been registered with the U.S. Copyright Office at any point in time.  But it is common in the book industry for authors and publishers to transfer and re-transfer publication rights. Accordingly, current rightsholders of Books governed by the ASA are not necessarily the original rightsholders, and the ASA purports to govern works going to back to 1922 – almost a century ago.  Current rightsholders therefore may not have available the registration information necessary to determine if they are members of the Settlement Class under the ASA.  *See* Declaration of Dr. Christian Sprang, sworn to on January 28, 2010 ("Sprang Decl.") ¶ 4; Attanasio Decl. ¶ 4; Declaration of Inge Kralupper, sworn to on January 28, 2010 ("Kralupper Decl.") ¶ 4; Joß Decl. ¶ 6.[8]  Nor would foreign rightsholders have had much incentive to maintain these U.S. copyright registration records in the first place.  That is because the significance of registration has fluctuated dramatically over time and has been of almost *no importance* for foreign rightsholders for several decades.[9]

---

Agreement ¶ 17 (noting Supplemental Notice Commencement date of  Dec. 14, 2009 and Supplemental Opt-out and Objection date of January 28, 2010)

[8] Numerous historical events also have caused record keeping gaps for many foreign rightsholders.  For example, certain European rightsholders likely will not have adequate records of registration from before 1945, given the disruption caused by World War II.   Sprang Decl. ¶ 4; Attanasio Decl. ¶ 4; Kralupper Decl. ¶ 4; Joß Decl. ¶ 6.

[9] For example, as of 1988, foreign rightsholders of non-U.S. works no longer need to register those works in order to prosecute claims for infringement in a United States Court.  *See* Berne Act §9(b)(1)(B) (excluding "Berne Convention works whose country of origin is not the United States" from the registration requirement of 17 U.S.C. § 411).  In addition, foreign rightsholders who had registered non-U.S. works before 1964, but who failed to timely renew those registrations, would have lost those works to the public domain.  William F. Patry, 3 *Patry on Copyright* § 7.50.  However, the 1994 Uruguay Round Agreements Acts generally restored the copyrights to such non-U.S. works, and, since 1994, those works are protected by U.S. copyright law until as late as 2058.  *Id.* § 24:36.  All of these works are now impacted by the ASA, simply

But couldn't a foreign rightsholder simply search the records of the Copyright Office to find out if its work had been registered?  That might be a good answer for works registered after 1978 because the Copyright Office maintains an on-line directory of registered works.  *See* http://www.copyright.gov/records/.  But that directory does not include any registrations before 1978.  Accordingly, the only way foreign rightsholders could search those records would be to (1) do so in person, in Washington DC, or at select universities in the U.S.; or (2) commission the Office's staff to perform that search, for a minimum fee of $330 and with no guarantee that it could be completed in time.  *See* http://www.copyright.gov/docs/fees.html; Lyndsey Layton, *(c)2009?  Wishful Thinking, Perhaps, as Backlog Mounts*, Washington Post, May 19, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/05/18/ AR2009051803171.html (documenting exploding backlog in registration processing). These options are plainly burdensome, excessive and cost-prohibitive in relation to the nominal projected per-work recovery provided for in the ASA.  ASA, Attachment C (Plan of Allocation) § 3.2.

Google has apparently recognized this problem, for it has made available on-line, scanned, text-searchable copies of the Copyright Office's "Catalog of Copyright Entries," which lists the Office's registration records from before 1978.  Attanasio Decl. ¶ 7.  But this is simply too little, too late.  Google did not make a complete version of these records available until about January 13, 2010 – only two weeks before the January 28 deadline to opt-out of, or object to, the ASA.  Google has not made these records available on the Settlement Website, nor has it notified class members of the existence of Google's

---

through the ASA's registration hook, even though their registration has had no practical significance to foreign rightsholders for many of the past several decades.

scanned volumes.  Furthermore, these records cannot be automatically cross-referenced with a publisher's catalogue of works; and the entries include problematic spelling errors. Attanasio Decl. ¶ 7.  And, in any event, Google concedes that its scanned records are difficult to use and may not provide accurate search results:

> *You should note that the lack of results for a search of these volumes does not necessarily mean the work for which you are searching was not registered with the Copyright Office*.  Works may have been registered later than the year of publication (including registration after 1977, which would then be accessible through the Copyright Office's online database), and they may have been registered under other titles or as part of a larger work. In addition, because the current technology available to scan books is not perfect, it is possible that a search of these digital copies might not detect particular words that appeared in the original volumes.

http://books.google.com/googlebooks/copyrightsearch.html (emphasis added).

The "place of publication" prong of the definition of Books places similar and unreasonable burdens on foreign rightsholders from outside the Chosen Countries, because it requires these rightsholders to scour all of their records from 1922 forward to determine whether their works have "printed information" evidencing a place of publication in the U.K., Canada or Australia.

For each of these reasons, and for the reasons set forth in our original Objections, the burdens imposed upon foreign rightsholders by the ASA contravene Berne and TRIPs.  *See* Berne art. 5(1) and TRIPs art. 41(2) ("Procedures concerning the enforcement of intellectual property rights shall be fair and equitable.  They shall not be unnecessarily complicated or costly, or entail unreasonable time-limits . . . .").

**B.    The Publication Requirement Discriminates Between Nationals of the Chosen Countries and Nationals of Other Foreign Countries In Conflict With TRIPs**

Under Article 4 of TRIPs, "any advantage, favour, privilege or immunity granted by a Member to the nationals of any other country shall be accorded immediately and

13

unconditionally to the nationals of all other Members." The ASA violates this provision because nationals of the Chosen Countries are largely spared the burdens of the ASA's cumbersome registration inquiry and ambiguous publication requirement and because they otherwise receive favorable treatment under the ASA.

It is overwhelmingly likely that, to the extent nationals of the Chosen Countries have published their works anywhere in the world, they have done so in their country of origin. As a result, it is relatively simple for nationals of these countries to determine whether, and the extent to which, they are in the Settlement Class. For this reason, unlike other foreign rightsholders, nationals of the Chosen Countries do not have to determine whether their works have been registered with the U.S. Copyright Office in order to ascertain whether they are members of the Settlement Class.

Although it is hardly an "advantage" to be included in this Settlement Class by virtue of one's citizenship, it is clearly better to *know* that you are included than not to know at all. Denying this certainty to foreign rightsholders who are not nationals of the Chosen Countries – and thus forcing them to jump through hoops to ascertain their class status – is discriminatory under TRIPs. Furthermore, regardless of one's views of the ASA itself, arbitrarily including certain foreign countries within, and excluding others from, its reach is itself discriminatory. The ASA further favors the Chosen Countries by guaranteeing them representation on the Book Rights Registry's Board of Directors and expanding the definition of Commercially Available to include channels of trade related to the U.S. and their countries only. ASA §§ 6.2(b)(ii) and 3.2(d)(i).

## III.  THE NAMED PLAINTIFFS ARE ALL FROM THE U.S. OR THE CHOSEN COUNTRIES AND THUS ARE NOT ADEQUATE REPRESENTATIVES

As the U.S. Department of Justice recognized, the Settlement raised "concerns

about the adequacy of representation with respect to foreign rightsholders," because, among other things, foreigners "are not required to register in the same manner as U.S. rightsholders;" "many of [them] have never published works in the United States and are not members of the Authors Guild or the [AAP], which exclude many foreign copyright holders from membership;" and their interests "likely differ from those of the class representatives." Statement of Interest of the United States of America Regarding Proposed Class Settlement ("U.S. Stmt.") p.11. All of these concerns remain present with the ASA and prevent the named Plaintiffs from "fairly and adequately protect[ing] the interests of the class," as required under Rule 23. Fed. R. Civ. P. 23(a)(4).

The parties' recent conduct proves the point. In connection with the ASA, the parties added new authors and publishers as Representative Plaintiffs who reside or are located, and have authored or published Books, in the Chosen Countries. *See* Pls. Mem., p.3 n.2. The parties thus conceded that the former domestic Representatives could not adequately represent the interests of any foreign rightsholders, not even those that reside in the Chosen Countries and are thus ostensibly united by a "common legal heritage and similar book industry practices." AAP FAQ. Plainly, neither the original, domestic Representative Plaintiffs, nor the new ones from the Chosen Countries, can adequately represent foreign rightsholders from elsewhere in the world, who do not share this common heritage.

Indeed, as explained above, foreign rightsholders from outside the U.S. and the Chosen Countries face unique burdens under the ASA that citizens within these countries are spared and which representative plaintiffs from other foreign countries would never have allowed. These disparities, though unfair, are hardly surprising given that class

counsel, in negotiating the ASA, were advised by publishing societies from the Chose

Countries only "with respect to issues affecting Canadian, U.K., and Australian

publishers and authors."  Pls. Mem., p. 15.

In addition, the structure of the ASA pits the interests of one part of the class

(rightsholders residing in the U.S. or in the Chosen Countries) against the interests of

another part of the class (rightsholders residing elsewhere).  By limiting the number of

Books that foreign rightsholders outside the U.S. or in the Chosen Countries are likely to

have, the ASA enriches rightsholders from the U.S. and the Chosen Countries at the

expense of rightsholders from the rest of the world.  For example, under the ASA, the

owner of a single book scanned by Google is guaranteed a $60 payment for Google's past

infringement, but can receive up to five times that amount if only a small number of

Books are claimed.  *See* ASA, Attachment C (Plan of Allocation) § 3.2.  The exclusion

from the settlement of books published outside the Chosen Countries increases the

likelihood that class members residing in the U.S. and the Chosen Countries will receive

larger settlement payments, both because class members residing elsewhere in the world

likely have fewer books to claim and because the new definition of Books makes it

exceedingly difficult for these class members to identify themselves as class members in

the first place.

The Representative Plaintiffs have abdicated their duty to ensure that the

Settlement and the ASA were made available in translated form just as they did with the

original Settlement.   They have failed to correct problems in the original Notice that

disproportionately affected rightsholders who are not proficient in English and, as set

forth below, exacerbated these problems with insufficient Supplemental Notice.  What is

more, Representative Plaintiffs negotiated representation on the Board of Directors of the
BRR only for their countries.  They cannot adequately represent, and have not adequately
represented, the unnamed foreign class members from outside the U.S. and the Chosen
Countries.

## IV.    NOTICE TO FOREIGN RIGHTSHOLDERS REMAINS INADEQUATE

### A.  Foreign Rightsholders Did Not Receive Adequate Notice Of The ASA

The U.S. Department of Justice has raised serious questions about whether
Plaintiffs provided class members with sufficient notice of the original Settlement, and
numerous parties have presented this Court with compelling evidence that Plaintiffs did
not, in fact, provide adequate notice.  *See, e.g.*, U.S. Stmt., pp. 12-13; Objections, pp. 6-
13; Objection of Scott E. Gant to Proposed Settlement ("Gant Obj."), pp. 19-24.  The
U.S. urged this Court to "not hesitate to require the parties to undertake *further* efforts to
notify the class," to ensure "both that a sufficient number of class members will be
reached and that the notice provided gives a complete picture of the broad scope of the
Proposed Settlement."  U.S. Stmt., p. 13 (emphasis added).

Despite these objections and concerns, Plaintiffs dramatically *scaled back* their
notice efforts regarding the ASA.  Plaintiffs failed to send individual notice of the ASA to
*any* member of the putative class except for those who, by December 14, 2009, had
affirmatively responded to the initial Settlement by "provid[ing] contact information on
the Settlement Website or on a Claim Form," "opt[ing] out of the original Settlement
Agreement," or "fil[ing] an objection, amicus position or other statement with the Court."
Order Granting Preliminary Approval of Amended Settlement Agreement ¶20; *accord*
Pls. Mem., p. 25.  Plaintiffs also provided no publication notice of the ASA anywhere in

the world and conducted virtually no public outreach in any foreign country outside the Chosen Countries. ASA §12.2.

There is no good justification for restricting the Supplemental Notice to this small universe of potential class members. Plaintiffs claim to have sent the original Notice to multitudes of potential class members and could have sent the Supplemental Notice to this same larger group. They did not. Instead, they have attempted to justify their admittedly "limited notice program" by claiming that: (1) their original notice efforts were "substantial;" (2) the amendments to the original agreement "do not materially impair Amended Settlement Class members' rights," and, instead, merely "clarify original provisions" and provide "enhanced benefits;" and (3) they expected news coverage of the ASA. Pls. Mem., p. 25.

Plaintiffs' "limited notice" concept contravenes the face of Rule 23 and the Due Process Clause, which require that more robust notice be sent to "*all* class members whose names and addresses can be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173 (1974). Plaintiffs' "limited notice" view has never been accepted by the U.S. Supreme Court or any U.S. Court of Appeals. The district court cases upon which Plaintiffs rely give this concept only cursory treatment, if any, and are otherwise unavailing.[10]

---

[10] *See, e.g., Park v. Thomson Corp.*, 2008 WL 4684232, at *2 (S.D.N.Y. 2008) (noting, without discussion, that "[f]ollowing final approval, the Class Members will receive notification of the Amended Settlement;" amendment merely provided that greater portion of the settlement fund would be distributed to the class members, rather than by *cy pres*); *In re Auction Houses Antitrust Litig.*, 138 F. Supp. 2d 548, 549 & n.3 (S.D.N.Y. 2001) (noting, without discussion, that "[t]he Court did not require the sending of a new notice to the class" with respect to amendment that merely "maximize[d]" transferability of discount certificates); *Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985) ("extremely narrow" amendment that affected only a single objecting member of a defendant class and "in no way impaired" the interests of the plaintiff class); *In re*

Moreover, even if limited notice of an amended class action settlement could ever be proper, Plaintiff's justifications for adopting it here fall short, at least with respect to the foreign rightsholders outside of the Chosen Countries.

*First*, it is irrelevant whether the original Notice program was "substantial" from Plaintiffs' perspective. As set forth in the prior objections lodged with this Court, Plaintiff's original notice program was insufficient in both scope and substance, especially under the circumstances of this sweeping, worldwide class action, to satisfy the bedrock requirements of Rule 23 and due process, particularly with respect to foreign rightsholders from non-English speaking countries. *See, e.g.,* Objections, pp. 6-13; Gant Obj., pp. 19-24. Accordingly, Plaintiffs' attempt to bootstrap their most recent, and admittedly "limited," notice efforts regarding the ASA on their earlier, plainly insufficient notice program for the original Settlement must fail. *Cf. In re Compact Disc*, 292 F. Supp. 2d at 186 (approving limited notice of amendments in part because Court found original notice highly successful in scope and substance).

*Second*, the ASA does not merely provide additional "benefits" to the class or "clarify" original Settlement provisions. To the contrary, the ASA *reduces* the financial benefits previously afforded certain members of the putative class. Whereas the Settlement provided that revenues generated from unclaimed or "orphan" works would be distributed to claiming rightsholders, Settlement § 6.3, the ASA takes that revenue stream away. Pls. Mem., p. 9 (under the ASA, "no unclaimed funds will be distributed to claiming rightsholders."). This revenue loss constitutes a significant, adverse change for

---

*Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F. Supp. 2d 184, 186 (D. Me. 2003) (relying solely on *Harris* and *In re Auction Houses* regarding amendments that merely increased financial benefit to the class); *In re Diet Drugs Prods. Liab. Litig.*, 2002 U.S. Dist. LEXIS 24771, at *19-20 (E.D. Pa. Dec. 10, 2002) (finding that each of the proposed changes conferred "an additional benefit on the members of the class").

claiming rightsholders, of which they must be informed.  Other important changes are described in the Supplemental Objections of Scott E. Gant, pp. 5-11.

Because the ASA materially and detrimentally affects putative class members' rights, the "limited notice" doctrine does not apply.  *In re Diet Drugs*, cited by Plaintiffs, proves the point.  Although the court there permitted limited notice of a settlement amendment, it did so only because the amendment provided a uniform *benefit* to the class.  2002 U.S. Dist. LEXIS 24771, at *19-20.  Indeed, in a later decision in that same case, the court required full and complete notice of a new set of amendments because, in addition to providing some benefits to the class, the amendments also made "material changes" that "reduce[d] payment amounts to certain eligible class members and extinguishe[d] certain opt-out rights."  *In re Diet Drugs Prods. Liab. Litig.* ("*Diet Drugs II*"), 226 F.R.D. 498, 518 (E.D. Pa. 2005).

*Third*, the ASA dramatically alters the scope of the agreement for foreign rightsholders residing outside of the Chosen Countries.  The Settlement originally embraced every book ever made available to the public in any Berne country.  Accordingly, to the extent foreign rightsholders previously chose to remain in the class (or were still considering whether to do so), they likely understood that the Settlement offered them the chance to be paid for Google's past infringement and future use of *all* of their works.  Similarly, they would have understood that the other provisions of the Settlement – including the mechanisms to direct Google not to use their books – extended to *all* of their works.  The ASA, however, now likely excludes a number of these rightsholders' works from the class.  Excluding former class members from the Settlement without notice can prejudice them in a variety of ways, as they may

mistakenly rely on their membership to forego bringing claims against Google.  For this reason as well, more robust notice of the ASA is required.  *See In re New York City Mun. Sec. Litig.*, 87 F.R.D. 572, 581 (S.D.N.Y. 1980).

*Fourth,* press reports about the ASA are no substitute for required notice, even if those reports had accurately described the ASA.  Here, they have not.  Rather, press reports have contained confusing and inaccurate information regarding the new definition of Books and its impact on foreign rightsholders from outside the Chosen Countries.  *See supra* n. 1; *see also* Sprang Decl. ¶ 14; Attanasio Decl. ¶ 13.

Finally, even if there were some legal basis under the "limited notice" doctrine to send notice only to a limited subset of individual putative class members, Google's decision to restrict notice to only those putative class members who had formally responded to the Settlement as of December 14, 2009 cannot survive scrutiny under Rule 23.  Most obviously, Google knows which works it has copied, and the parties easily could have determined whether printed information in these works evidenced a "place of publication" (as they purport to understand that phrase) in any of the Chosen Countries and/or had been registered with the U.S. Copyright Office.  Plaintiffs' failure to use this information to identify and notify affected rightsholders falls far short of Rule 23's individual notice requirements.  *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *Eisen*, 417 U.S. at 173.

In any case, Google's decision to restrict the universe of individual notice to those putative class members who had lodged a formal response is blatantly unfair and smacks of gamesmanship.  Under the Settlement, putative class members had until January 5, 2010 to file a claim form to receive payment for Google's past infringement.  And

putative class members could have registered "at any time," and "[e]xclude[d]" their works up until April 4, 2011, with respect to Google's future use. Settlement §§ 13.3-4. None of these deadlines had passed as of December 14, 2009, the last date for Plaintiffs to have sent notice of the ASA to those putative class members who had responded in some formal way to the original Settlement. Accordingly, there is no reason to believe that all class members who had intended to submit a claim form or to otherwise respond to the Settlement had done so by December 14, 2009. Indeed, many class members may have halted their efforts to respond in late September 2009, when the parties upended the entire settlement process by publicly informing this Court that they were abandoning the original Settlement. *See* Pls.' Mem. in Support of Mot. to Adjourn October 7, 2009 Fairness Hr'g, p.3.

### B. Notice to Foreign Rightsholders In Non-English Speaking Countries Remains Inadequate Because Neither the Settlement Nor The ASA Has Ever Been Translated Into Any Foreign Language and the Supplemental Notice Was Not Properly Translated

In seeking, and obtaining, preliminary approval of the ASA, Plaintiffs represented to this Court that "Notice has been given in accordance with the Court's Order" granting preliminary approval of the original Settlement. Pls. Mem., p. 2. That is not true. Despite promising this Court that they would make translated versions of the Settlement available to the countless number of foreign rightsholders impacted by this action, and contrary to this Court's Order directing them to do just that, Plaintiffs have never made any translation of the Settlement available on the Settlement Website. *See* Order Granting Preliminary Settlement Approval ¶17; Objections, pp. 6-11. The parties have compounded this fundamental error with the ASA. Plaintiffs have again failed to translate this critical document, even though the ASA continues to impact significantly

the rights of *all* foreign rightsholders from around the world (not just those residing in the English-speaking Chosen Countries).  Accordingly, this Court should not approve the ASA, at least with respect to foreign rightsholders residing in non-English speaking countries.  *See* Objections pp. 6-11.

In addition, as with the original Notices, the Supplemental Notices again contained translation errors, which Plaintiffs took inadequate and ineffective half-measures to correct, and thus fail to satisfy the requirements of Rule 23(c) and the Due Process Clause that notice be provided "in plain, easily understood language" and in the manner needed "as reasonably to convey the required information."  Objections p. 11; AIE Obj. pp. 5-9; Sprang Decl. ¶¶ 6-13; Attanasio Decl. ¶¶ 8-12; Kralupper Decl. ¶¶ 6-9.)

## V.    THE ASA IS NOT FAIR, REASONABLE OR ADEQUATE

The ASA is not fair, reasonable or adequate with respect to foreign rightsholders, as required by Rule 23(e)(2), for each of the reasons set forth above, in our prior Objections, and in the Objections that have and will be filed with this Court by other class members and interested parties.

## CONCLUSION

For each of the foregoing reasons, Carl Hanser Verlag, Dr. Lynley Hood, and the Foreign Associations respectfully request that this Court reject the ASA and/or decline to certify the class with respect to foreign rightsholders.

Dated:      January 28, 2010
           New York, New York

                          MACHT, SHAPIRO, ARATO &
                           ISSERLES LLP


                          _____s/_____
                          By:  Cynthia S. Arato (CA 8350)
                               Alexandra A.E. Shapiro (AS 4816)
                               1114 Avenue of the Americas
                               45th Floor
                               New York, New York 10036
                               Phone:  (212) 479-6724
                               Fax:  (212) 202-6417
                               carato@machtshapiro.com
                               ashapiro@machtshapiro.com

                          *Attorneys for Carl Hanser Verlag, Dr. Lynley
                          Hood, Börsenverein des Deutschen
                          Buchhandels, Schweizer Buchhändler – und
                          Verleger–Verband SBVV, Hauptverband des
                          Österreichischen Buchhandels, Associazione
                          Italiana Editori, and the New Zealand Society of
                          Authors (PEN NZ Inc.)*