**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, et. al., | Case No. 05 CV 8136-DC |
| Plaintiffs, | DECLARATION OF PIERFRANCESCO ATTANASIO |
| v. | |
| Google Inc., | |
| Defendant. | |

1.      I, Pierfrancesco Attanasio, am a citizen of Italy and Head of International Relations of the Associazione Italiana Editori (Italian Publishers Association) ("AIE") the leading association of book publishers in my country.  Except as otherwise stated, I have personal knowledge of the matters I discuss below.

2.      AIE previously submitted objections with this Court on or about September 2, 2009.  Those objections provide information about AIE and its members and address various problems associated with the original settlement agreement that was presented to this Court in this case.  The problems addressed in those earlier objections persist under the proposed Amended Settlement Agreement ("ASA").  I submit this additional declaration to supplement those objections and to address certain additional problems with the ASA.  As set forth in a prior letter to the Court, AIE's courier service mishandled the delivery of our initial objections to the Court, and while we resubmitted the objections several months ago, it is our understanding that they are not available on the Court's ECF system.  I accordingly attach them here as Exhibit A.

**The Vague and Unmanagable Definition of Books**

3. It is my understanding that a number of AIE's members are putative members of the settlement class, as defined in the ASA, as I believe that they own or control one or more Books, under any of the possible meanings of the term as used in the ASA. For example, it is my understanding that from the 1950s to the early 1970s, many Italian publishers routinely registered all of their works with the U.S. Copyright Office. I also understand that a number of publishers also did the same in previous decades. Today, this is not a common practice, although various publishers discontinued this practice at varying times—some stopped registering in the 1960s, while others continued well into the 1980s. Nevertheless, I understand that AIE's members have had substantial difficulties determining whether, and how many of, the numerous works that they own or control may be a Book under the ASA, either because such work was registered with the United States Copyright Office or had a "place of publication" in the United Kingdom, Australia or Canada.

4. It is very difficult for our members to determine whether and/or which of their works were registered with the United States Copyright Office, at least for works that were registered before 1978 (as this information is not available on the Copyright Office's website). For example, it is common in the book industry for publication rights to be transferred and re-transferred between authors and publishers. This phenomenon is particularly common in Italy because our copyright laws provide that contracts between authors and publishers cannot last beyond 20 years, although such contracts are renewable upon termination. Accordingly, current rightsholders of Books governed by the ASA are not necessarily the original rightsholders. In addition, as explained in our accompanying submission, the significance of registration has fluctuated dramatically over time and has

been of almost no importance for foreign rightsholders for several decades, making it less important for foreign rightsholders to maintain accurate historic records since 1922 of their works' registration status. It is my understanding that our members also have a difficult time accessing records for events in the past, given the disruptions caused by World War II, which resulted in records being lost or destroyed. AIE's own archives were ruined or lost during World War II. None of the publishers I have spoken to possess records that enable them to determine the registration status of all of the works they have published in the ninety-year span covered by the Amended Settlement.

5.      In addition, as set forth in our Objections, the "place of publication standard" in the ASA is indefinite. Even if it were definite and clear (and it is not), it would require our members to review all of the hard copy printings of all of their works published since 1922. To the extent our members currently possess all such copies, such a review would be immensely burdensome.

6.      Although AIE does not currently register its own publications with the U.S. Copyright Office, it is entirely possible that it did so in the distant past. Given the temporal scope of the ASA, however, we have been unable to ascertain whether AIE itself remains a member of the class, and have thus joined these objections as an *amicus curiae* out of caution.

7.      For many weeks, AIE and other organizations informed the parties of the difficulties imposed on our members in determining the registration status of their works. These complaints were not addressed until just two weeks ago, when, on or around January 13, 2010, Google posted text-searchable copies of the Copyright Office's "Catalog of Copyright Entries," which lists registration records, spanning the years 1923

to 1978, at http://books.google.com/googlebooks/copyrightsearch.html. Google has not

made these records available on the Settlement Website; Google has not notified class

members of the existence of Google's scanned volumes; the records cannot be

automatically cross-referenced with a publisher's catalogue of works; and the records

include problematic spelling errors.

Problems With The Supplemental Notice

8.      On or about December 1, 2009, AIE was asked by Kinsella/Novak

Communications LLC to transmit a Supplemental Notice regarding the ASA to our

members. At that time, the Supplemental Notice was available only in English. We sent

the English version of the Notice to our members on or about December 15, 2009, as a

matter of courtesy. We do not, however, represent all publishers that operate in our

country and we represent no authors. I am aware that Kinsella/Novak also asked another

organization (the SIAE, an authors and publishers collecting society) to send the

Supplemental Notice to its members registered with that organization and whose mailing

addresses were available. I was informed that SIAE did not send the Notice to its

members (because it understood that it would not have been reimbursed for its mailing

costs), although it posted the Supplemental Notice on its website. That organization,

however, represents only a minority of Italian rightsholders in the literary world, since its

core business is in the music sector.

9.      When AIE received the first Italian version of the Supplemental Notice, on

December 14, 2009, I found the translation to be poor. My impression upon reading it

was that it was written by a non-native speaker who did not understand Italian very well.

We communicated to Kinsella that we would not circulate the Italian version, because "the

Italian translation you sent us was quite poor and some time it could create some misunderstanding." A true and accurate copy of the email we received containing the first Italian version of the Supplemental Notice is attached as Exhibit B.

10.     Late on December 28, 2009, I received an email from Rust Consulting, Inc., stating that the Supplemental Notice distributed on December 14, 2009 contained translation errors. This email, which was classified as spam by my email program, contained a link to the settlement website containing a corrected translation.

11.     Even the revised version of the Supplemental Notice, a copy of which is attached as Exhibit C, contains significant errors. For instance, in the original Notice and in the website FAQs, the critical term "work" was alternatively translated as "lavoro" and "opera." These terms are not interchangeable: in Italian, "lavoro" generally refers to a job, and "opera" is the proper term to describe the product of an author, such as a book or a musical composition. Oddly, in the Supplemental Notice, only the incorrect term "lavoro" is used. The term "fairness hearing" is translated as "udienza sull'equità," a term that has no commonly understood meaning in Italian. It is evident that to make the concept understandable to an Italian readers, who are not familiar with the U.S. class action procedure, a more comprehensive description – and not a mere translation – was necessary. In addition, the Supplemental Notice uses the term "Comitato" when referring to the "board" of directors of the Registry, although in Italian this word means an advisory or consulting committee rather than a governing body. The use of this term makes it unclear that the reference is to the governing body of the registry.

Inaccurate Press Reports Regarding the ASA

12.     A number of news articles have been published in Italy regarding the ASA.  Those reports mistakenly reported or suggested that the ASA no longer impacted the rights of citizens of this country.  For example, La Repubblica, Italy's second best-selling newspaper, reported on November 15, 2009 that "[l]'intesa vale per i libri registrati negli Stati Uniti, in Gran Bretagna e Canada.  Restano fuori Europa e resto del mondo" or "the [ASA] applies to books registered in the United States, Great Britain and Canada. Europe and the rest of the world are out of the agreement."  Similarly, ITespresso, a well-regarded online newspaper, reported that "Il patteggiamento con gli editori, è stato rivisto con alcuni paletti (limiti geografici e di business).  Innanzitutto, il Settlement vale solo per Usa, Canada e Uk, paesi con legislazioni affini," or "The Settlement with the publishers has been amended fixing precise (geographic and business) boundaries. First of all, the Settlement applies only to the U.S., Canada and the U.K., countries with similar legislations."  True and correct copies of these articles are attached here as Exhibit D.

13.     For each of the foregoing reasons, and for the reasons set forth in the Objections, AIE objects to the Amended Settlement Agreement and respectfully urges the Court not to approve it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 28, 2010

Pierfrancesco Attanasio

# Exhibit A

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, et. al., <br><br> Plaintiffs, <br><br> v. <br><br> Google Inc., <br><br> Defendant. | Case No. 05 CV 8136-DC |

## INTRODUCTION

I, Marco Polillo, am a citizen of Italy and President of the Associazione Italiana Editori ("AIE"), the leading association of book publishers in my country. AIE represents Italian publishers – and foreign publishers operating in Italy – producing books, scholarly journals, digital publishing products and, in general, any form of publishing content regardless of its format or distribution channel. AIE currently has 400 members, corresponding to over 90 percent of the Italian book market. AIE advocates the public policy interests of its members, including the protection of intellectual property rights in all media, the free dissemination of the written word, and the promotion of literacy and reading.

AIE is itself a member of the putative Settlement Class, as defined in the Settlement Agreement that has been presented to this Court in this action (hereinafter the "Settlement"), as it owns a US copyright interest to a number of books that are not in the public domain. A number of these works have been digitized by Google, as noted on the Books Database that Google has published in connection with this Settlement. The Books Database contains over 500 records identifying the AIE as either an author or publisher, of which 128 are identified as having been scanned.

The vast majority, if not all, of AIE's members are putative members of the Settlement class, as defined in the Settlement, as they own or control the copyrights to Books or Inserts, as also defined in that document. AIE's members are astonished over and oppose the unprecedented

settlement that the parties have asked this Court to adopt and impose upon them. Our members, however, are not in a position to present objections to this Court individually, given their unfamiliarity with the United States' legal system and the cost and expense that they would incur in doing so themselves. Accordingly, on July 16, 2009, our Executive Committee and General Council formally and unanimously authorized AIE to present objections to this Court regarding the Settlement. As such, AIE is uniquely positioned to provide this Court with information about how the Settlement will prejudice our members and Italian rightsholders.

The Settlement is affront to copyright holders throughout the world and AIE thus respectfully requests that this Court not approve the Settlement, with respect to foreign rightsholders at a minimum, for the reasons set forth below.

*First*, we join in the objections and the arguments that have been presented to this Court by Scott E. Gant and the group of foreign publishers and publishing associations that includes the Börsenverein des Deutchen Buchhandels (hereinafter Börsenverein et al.).

In particular, as for the Gant objection, we would like to emphasise the argument I ("The Proposed Settlement Seeks To Implement Through Rule 23 A Predominantly Commercial Transaction Which Would Effect A Sweeping Reallocation Of Intellectual Property Rights") and II ("Notification To Class Members Of The Settlement And Their Right To Opt-out Failed To Satisfy The Requirements Of Rule 23 And The Due Process Clause Of The Fifth Amendment").

As for the Börsenverein et al. objection, we join in the argument I ("Notice To Foreign Rightsholders Was Inadequate"), II.A ("This Country's Longstanding Commitment To Honouring Its International Obligations Under Berne"), II.B.1 ("The Settlement Eviscerates Exclusive Rights"), II.B.2 ("The Settlement Imposes Formalities That Impair Copyright"), III ("The Settlement Is Not Fair, Reasonable Or Adequate"), and IV ("The Named Plaintiffs, All Of Whom Are Domestic Entities Or Authors, Have Not Adequately Represented The Class"). We add some additional factual backgrounds for the Italian case to further support those arguments.

*Second*: an additional argument we respectfully propose to the attention of the Court is the consequences of the technical mechanism set up by the proposed Settlement. The whole system is based on the assumption of a perfect functioning of the Google databases and the Book Rights

Registry. However, the Settlement creates an evident conflict of interest: the quality of databases is under the responsibility of Google and partners that however gain from any error, since if a Book is erroneously qualified as non Commercially Available, then rights are granted to Google and partners; at the same time a broad safe harbor is guaranteed to Google in case of error. As a consequence, Google and partners are asked to invest money and efforts to reduce their revenues, which is highly unrealistic.

*Third*, the excessive market power provided to Google by the Settlement, well described by the Gant objection (Argument V) also includes great risks to moral rights and to freedom to publish, in particular for the rules provided in section 3.7(e) of the Settlement.

## ARGUMENTS

### I. THE SETTLEMENT DISREGARDS FUNDAMENTAL PRINCIPLES OF INTERNATIONAL COPYRIGHT

### A. The Settlement Violates A Number Of Articles Of The Berne Convention

The Settlement deprives the author and the publisher of their crowning right to be able to decide for themselves the use of their works, in particular as non Commercially Available Books may be digitized and displayed without prior authorization.

By letting Google reproduce works, by legitimizing the "opt-out" principle for "non Commercially Available works", by compelling rightsholders to register to a one-stop-shop (the Books Rights Registry) in order to be able to assert their rights and by ignoring authors' moral rights, this system goes against international copyright regime established by the Berne Convention, which is the only enabler for the development of a sustainable and diversified offer of digital contents.

The Börsenverein et al. objection already provides important arguments, which we join in (see section II. - The Settlement Conflicts With U.S. Treaty Obligations Under The Berne Convention), focusing in particular the violation of Art. 5, which mandates that the "enjoyment and exercise of these rights shall not be subject to any formality" and of Art. 9(1) stating that "[a]uthors

of literary and artistic works protected by this Convention shall have the exclusive right of authorizing the reproduction of these works, in any manner or form."

The proposed Settlement violates a number of further articles of the Berne Convention:

(i) Art. 11-bis (1) "Authors of literary and artistic works shall enjoy the exclusive right of authorizing: [...] the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images", since the Settlement instead authorizes Google to disseminate protected works via the Internet in different forms without rightsholders authorization.

(ii) Art. 12: "Authors of literary or artistic works shall enjoy the exclusive right of authorizing adaptations, arrangements and other alterations of their works" since the Settlement instead, with provisions about the illustrations, not only may undermine the integrity of works (see paragraph below about effects on moral rights) that are conceived as a mix of text and images but also the exclusive right to make adaptations or modifications of the work.

(iii) Art. 9(2): "It shall be *a matter for legislation* in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does *not conflict with* a *normal exploitation* of the work and does not *unreasonably prejudice* the legitimate interests of the author" (emphasis added), since the Settlement instead introduces such limitations through a class action procedure. In any case limitations to exclusive rights of authors and publishers must always fully respect the principle of "tree-step-test" (expresses by Art. 9(2) of Berne Convention; see also Article 13 of the TRIPS agreement). The different reasons to consider *unreasonable* the prejudice for authors and publishers of the limitations to their rights proposed by the Settlement are described by the Gant and Börsenverein et al objections and here below in next paragraphs.

**B. The Settlement Does Not Consider At All Moral Rights**

One of the key principle of the international copyright regime is the protection of moral rights, which include (i) the right of the author not to publish, or retire from publication, or not to publish in a certain context his or her works, (ii) the respect of the integrity of the works, (iii) the rights to be recognized and correctly cited as the author.

Though this aspect is prevalently a concern of the authors' class members, publishers are also interested in, for two reasons: because in the usual relations with the authors they have an obligation to defend their moral rights and because there may be cases, as described below, where also publishers receive moral prejudice from non authorized scanning and display of their Books. The Settlement does not consider moral rights on different respects.

*First*, since the default display is provided for out of print works, it includes all the cases where the out of print status has been determined by the decision of the authors to retire from commerce the work, for any reason, as it is in their fundamental right.

*Second*, when the use of the work is not authorized, neither authors nor publishers have the capacity to check or influence the quality of the scanning, and thus the quality of the display of their works.

*Third*, the provisions about the illustrations may undermine the integrity of works that are conceived as a mix of text and images: to scan only the text, without asking the rightholders consent, may create prejudice to their moral right.

*Fourth*, the bad quality of the database may create prejudice to the rights of being correctly recognized and mentioned as author (and/or publisher) of a certain work. For example, the Settlement database offensively identifies AIE as the publisher of the "Giornale della Libreria" for the 1982 and 1984 editions with the qualification "Fascist Federation of Publishers," as translated. Book metadata are displayed in the entry page of the Google BookSearch, so that users access to our magazine from a page that qualify us as Fascist (see http://books.google.it/books?q=giornale+della+libreria). Notably, outside the US users will not be allowed to access the full text, hence European users will access only this offensive page. Of course, such inappropriate notations would never exist if Google has worked with AIE to obtain our authorization for its acts.

## II. THE NOTICE TO RIGHTHOLDERS WAS INADEQUATE AND MISLEADING

### A) Lack Of Individual Notice To Italian Class Members

Both the Börsenverein et al and Gant objections emphasise the need of "individual notice to all members who can be identified through reasonable effort", provided by the Rule

23(c)(2)(B)[1]. In Italy this was not the case. According to my best knowledge, the Parties of the Settlement did not notify directly Italian publishers, in spite of the fact that direct notification was, for the publishing class members, easy and not expensive, since good publishers addresses directories exist in our country[2].

The AIE as publisher was in a particular position, since we joined with our publications the Google BookSearch partner program. As a consequence of that, on October 28, 2008, we received an email from Google informing us about the Settlement Agreement (see Exhibit A). However, the information was completely misleading, and only focused on the potential future benefits. The email invited the partner not to do anything[3] but just wait for exploiting in the future the new opportunities[4], so ignoring the possibility of opting out from the Class or managing books within the Settlement "removing" or excluding some Display uses of own Books. The email was silent on one key aspect: that the Settlement is referred to Books scanned in the Book Library Project, so that any publisher who is also partner in the BookSearch Partner Program might have Books scanned without authorisation that should be claimed. Not surprisingly, based on discussions I have had, publishers who participate in the partner program with Google, whereby they have authorized Google to make certain uses of their works, do not understand that the Settlement can grant rights to Google outside of their partnership arrangement.

### B) Failure To Translate The Settlement Agreement

The parties have never made the Settlement available for review in the Italian language, in spite of their promise (in the memorandum in Support of Motion for Preliminary Settlement Approval) and of Court's Order Granting Preliminary Settlement Approval. This has prevented our members and other Italian class members from understanding this document. The vast majority of

---

[1] See Gant's objection - argument I and Börsenverein objection - argument I(C).

[2] Both the Italian ISBN Agency and the company Informazioni Editoriali produce such directory. It is worth to mention that the data of the ISBN national agency are annually passed to the International ISBN Agency, who produce the PIID, the Publishing ISBN International Directory, where addresses of publishers from all over the world are collected. If the parties had acquired such directory, also Italian publishers were included.

[3] The Italian text was: "Siccome la transazione è in attesa dell'approvazione preliminare del tribunale, da parte sua non deve intraprendere alcuna azione specifica", which may be translated as: "Since the Settlement is still pending for Court approval, you have not to undertake any specific action".

[4] "[La Transazione p]resenta inoltre nuove opportunità per tutti: autori, editori, biblioteche, Google e lettori", i.e.: "The Settlement provides new opportunities for all: authors, publishers, libraries, Google and readers"

AIE's members lack the proficiency in the English language (and particularly on technical-juridical English language) necessary to understand the complex terms of this 300-plus page document (which is in fact full of legalese), and to ascertain their rights under it.

It is simply inconceivable to us that a United States Court would allow our members to be bound by a settlement agreement that has not been made available to them in their native tongue. Indeed, it would impose substantial burden on our members to commission their own translated version of the document. Based on inquiries that have been made by my office, I have been told that it would cost approximately $15,000 at today's exchange rate to have the Settlement Agreement translated into Italian.

### C) The Failure To Give Proper Notice

AIE was asked by Kinsella/Novak Communications LLC to transmit a Final Notice of Class Action Settlement (the "Notice") to our members. We did so as a matter of courtesy, accompanying it with our own explanations, since we realised that the Notice was insufficient. We disseminated the Notice to our members only in the English version, since the Italian version was simply useless (see below).

We do not, however, represent all publishers that operate in our country and we represent no authors. I am aware that Kinsella/Novak also asked another organization (the SIAE, a collecting management organisation) to send the Notice to its members registered with that organization and whose mailing addresses were available, including authors and publishers. That organization, however, represents only a minority of Italian rightsholders.

It is my understanding that this Notice and its summary form (the "Summary Notice") was also posted on a website regarding the Settlement , at www.googlebooksettlement.com, although I do not know when that occurred. A true and correct copy of the Italian version of the Notice and Summary Notice is attached here as Exhibit B1-B2, downloaded from the Settlement website on August 25, 2009..

The Notice, as translated into Italian, was seriously deficient to the point of being unintelligible. The translation was misleading and/or meaningless in numerous ways relating to

both terminology and grammar. The translation was so poor that it appears it was done by a computer program, with no human being taking the care to ensure that it was correct or understandable. As a result, the Notice is very difficult to read or understand. Although, as I explained above, I am not a native English speaker, I am proficient enough in the language to have identified these errors.

For instance, in Question 6 of the Notice, the phrase "you own a 'U.S. copyright interest' if you own, or have an exclusive license in, a copyright protected by U.S. copyright," is translated as "Lei possiede un 'interesse in copyright USA' se è titolare, o ha licenza esclusiva, di un copyright protetto dalla legge USA sui copyright." As incorrectly written in Italian, the first part of this sentence means "you are interested in US copyright if ...".

Information in the Notice regarding the requirement for opting-out is also incorrectly translated. Thus, the phrase stating that, in order to opt-out, members of the "Publisher Sub-Class must identify all of the imprints under which they publish," has been translated as "i membri della Sottoclasse degli Autori devono fornire il nome di tutte le case editrici," which incorrectly means that *authors* must identify their *publisher's* names.

The phrase at the beginning of the Notice stating that "[a] class action lawsuit claims that Google violated the copyrights of authors," is translated as "[u]na azione legale di categoria allega che Google avrebbe violato i diritti di autore di autori," Yet the term "azione legale di categoria" has little meaning in Italian, and translates to something like "category lawsuit." While exact equivalent of US class actions do not occur in the Italian legal system, something similar to a class action in Italy was, at the moment of the translation[5], the "azione risarcitoria collettiva," a phrase that is known and understood in this country, yet is not used in the Notice. Furthermore, in this same sentence, the translation of the noun "claims" into "allega" is nonsensical, as "allegare" means "to attach."

The term "opt-out" in the Notice is translated as "rinuncia," which means "to waive" or "to renounce" and, in context, suggests that one who opt-outs will simply forego benefits to be given to

---

[5] A very recent law (Aug 2009) introduced in Italy a procedure called "azione di classe", thus directly recalling the English term "class action". However this term was not in use at the moment of the translation.

him under the Settlement Agreement. Similarly, the phrase in Question 15 of the Notice saying "[h]owever, your opt-out request [...] must state which Sub-Class you wish to opt out of…" is translated as "[l]a Sue richiesta di rinuncia [...] deve dichiarare a quale Sottoclasse vuole rinunciare," which results in the disjointed phrase "your request of renouncing must declare which sub-class you want to renounce."

Inexplicably, the Summary Notice repeats the same errors only in part. For example "class action" is more properly translated as "azione collettiva". However, there are other and different errors. For example, the term "In print book" is erroneously translated as "libri stampati" (*printed books*), so that the phrase "For out-of-print Books and, if permitted by Rightsholders of in-print Books, Google will be able to sell…", is translated into "Per i Libri fuori catalogo e se permesso dagli Aventi diritto di Libri stampati, Google potrà vendere…", which sounds like "for out of print Books and if permitted by Rightholders for printed books Google will be able to sell…" (where the deletion of the commas makes it definitively meaningless). The incredible lack of accuracy is also shown by the fact that terms emphasised with capital letters are improperly quoted. "Rightsholders" is in the first paragraph correctly translated as "Aventi diritto" but later in the text less precisely translated as "Possessori di diritto", again with capital letter, but without having defined before. The term "aventi diritto" is instead erroneously used as translation of "assigns", which instead should be translated as "aventi causa".

Given the above translation errors, I believe that large numbers of putative class members in Italy (to the extent they received notice of this action) misunderstand the scope of the Settlement Agreement and their need to take action with this Court to either object or opt-out of the Settlement Agreement if they do not wish to be bound by it.

### III. THE BAD QUALITY OF THE SETTLEMENT DATABASE IS A DIRECT CONSEQUENCE OF THE CONTRACTUAL MECHANISM CREATED BY THE SETTLEMENT AGREEMENT

### A. A Combination of Clauses Is Designed to Provide Google with Unfair and Unjustifiable Privilege

The Gant objection (see Argument I) perfectly describes a fundamental criticism perceived by the Italian rightholders. Within the original lawsuit the discussion was about non authorised scanning of Books, with very limited use, since Google showed only small snippets of copyrighted

Books. The proposed Settlement dramatically broaden the scope of the lawsuit, granting Google licenses for several uses of Books, thus bounding Italian publishers to undesired licensing agreement, unless they remove their books through a very complex and burdensome mechanism.

Therefore, it is important to analyse the practical consequences of the mechanisms regulating the licensing agreement created by the Settlement. A number of clauses interact to create unfair treatment of authors and publishers rights, in particular when they are non US rightsholders.

(i) Google has the initial responsibility to classify a Book as Commercially Available or not, through combining different sources, on the basis of "analysis of multiple third-party databases as well as an analysis of the Book's retail availability based on information that is publicly available on the Internet" (Settlement, 3.2 (d)(i)).

(ii) This determination is crucial to define the use Google can do of that Book: "Google will initially classify a Book as No Display if it is determined to be Commercially Available as of the Notice Commencement Date, and Display if it is determined not to be Commercially Available as of the Notice Commencement Date" (Settlement, 3.2(b)). So, when a Book is not Commercially Available, Google is granted with a broad licence to use that Book in own business.

(iii) The determination of Commercial Availability remains up to Google also after the Registry will be established: "Google shall provide the Registry with the determination as to whether a Book is Commercially Available as of the Notice Commencement Date and thereafter from time to time" (Settlement, 3.2(d)(ii)). The Registry or individual Rightsholders can challenge this determination. In this case, an incredible asymmetric rule is established: "If the Registry re-classifies a Book as Out-Of-Print, the Registry will direct Google to change the classification of the Book to a Display Book […] unless the Rightsholder of the Book […] expressly requests that the Book be treated as a No Display Book. If the Registry reclassifies a Book as In-Print, the Registry will direct Google to change the classification of the Book to a No Display Book only upon the express request of the Rightsholder of the Book […]" (*Id*). Notably, there is a clear preference for Books to be classified as non Commercially Available.

(iv) The determination can be wrong. "If a Book was mistakenly determined by Google not to be Commercially Available, then the Rightsholder of the Book may notify Google, or may authorize the Registry to notify Google, of such mistaken determination" (Settlement, 3.2(d)(iii)). However, the Rightsholder notification is not sufficient, since non Commercial Availability must be demonstrated through evidence: "To verify the claim, the Registry will provide, upon Google's reasonable request, information supporting any assertion by the Rightsholder of the Book that the Book is Commercially Available" (*Id*). So, Google is not asked to demonstrate in any way and to any one its determination, which is opaquely derived from multiple resources by its miraculous algorithm. Instead, Rightsholders – who instead certainly knows the status of own Books much better – are asked to provide evidence of their assertions.

(v) If the Rightsholder finally succeed in what is obvious, that his or her voice is taken into account when dealing with his or her rights, he or she will face further frustration: "If the Rightsholder demonstrates that the Book is Commercially Available, then, as *Google's sole obligation and the Rightsholder's sole remedy* […], Google shall correct the determination as to whether the Book is Commercially Available *within thirty (30) days*" (*Id*, emphasis added).

In synthesis: the combination of such rules assign to Google the task to first determine the Commercial Availability of each Book; when Google erroneously determines a Book as non Commercial Available, it grants a broad license to use that Book; Rightsholders are obliged to control, at own expenses, that the determination is correct, through a complex procedure; when a mistake is discovered, the *sole remedy* is the change of the determination within 30 days, which is, in the Internet age, a geological era. Since the correct determination of Commercial Availability is a difficult job (as we describe below), which requires significant investments, the Settlement is based on the expectation that Google will invest money with the objective to reduce its revenues.

### B. The Quality of the Settlement Database is Far to be Acceptable

The quality of the Settlement database is currently very bad. Before commenting on technical aspects of the database, it may be useful for this honourable Court to know that AIE is particularly qualified on this aspect, because we coordinate the European project called ARROW (Accessible

Registry of Rights information and Orphan Works toward Europeana: www.arrow-net.eu), which have the task to support the European digital library initiative to diligent search for rightsholders information *before* scanning any copyrighted Book. Because of this expertise the AIE has been called to chair a technical working group established in April 2009 by the Federation of European Publishers, Google and the Plaintiffs, so we had the opportunity to analyse in depth the technicalities of the database. I have been supported by the AIE technical team responsible for the ARROW project in preparing this note.

Data quality is determined by three factors: (i) the reliability of resources used; (ii) the methods used to combine information coming from different resources; (iii) the capacity of grouping different editions of the same Principal Work, which is necessary for the correct determination of Commercial Availability[6].

(i) Google recently committed to incorporate into its process for determining which Books are Commercially Available information from providers of bibliographic databases included in a list provided by the Federation of European Publishers (FEP). Google and the Plaintiffs anticipated that they will send a letter – the content of which has been also fully anticipated – that will contain such commitment ("Commitment Letter"). This is surely a step forward, solving some problems related to the *definition* of Commercial Availability, and a first recognition from the Parties of the proposed Settlement that such delicate issues cannot adequately taken care of without full involvement of all the stakeholders.

(ii) Nevertheless, the Commitment Letter does not deal with the problem of how the different resources are combined to obtain the final result. Metadata databases have different level of reliabilities, and may contain errors themselves. There are three issues that are still unsolved:

(1) Metadata fields to be used to determine commercial availability: Section 3.2(d)(i) of the Settlement provides that "Google will use the *publishing status*, *product availability* and/or *availability codes*" (emphasis added) to determine the Commercial Availability at title

---

[6] "If a Book's Principal Work is not in the public domain under the Copyright Act in the United States and that Book is Commercially Available, then any other Book that has the same Principal Work (such as a previous edition) is also deemed to be Commercially Available, whether or not such other Book is at the time in question also Commercially Available" (Settlement, 3.2(d)(i)(1)).

level. The metadata fields mentioned in this phrase have different meaning and thus may carry different information. There is no clarity on how such conflicts will be solved. "Publishing status" is the code – defined as such in the ONIX standard – that carries the information about the publisher declaration of a book as out of print, i.e. not commercialized anymore by that publisher. The "Product availability" and "Availability code" can contain, instead, different information conceived for serving the physical book supply chain, so to inform booksellers of temporary out of stock (e.g. when a book is under reprint, or lack of copies in one particular distributor or wholesaler). The rule of Section 3.2(d)(i) leaves to Google complete discretion on the method for selecting the information they prefer.

(2) Two different metadata sources may have conflicting information for the same Book about Commercial Availability. Also in this case is up to the Google discretion to solve such conflicts.

(3) Finally, and above all, the use of any metadata source depends on the capacity of Google to correctly identify the Book concerned from an initial metadata record. Any mass digitisation program starts from the processing of a list of metadata records for Books candidate for scanning, usually coming from the library catalogue. Every record ideally should match one (and only one) record within an authoritative database, which provides the information if that Book is or is not Commercially Available. However, such matching is not trivial at all, since the original records may contain misspelling or errors of different genres. If the matching fails, the Book is not recognised, and the record will be considered as a new one. Since the Settlement (3.2(d)(i)) provides that "All Books for which Google does not have information from the sources identified above *will be determined to be not Commercially Available*" (emphasis added), the Book will be scanned and displayed until the Rightsholder identifies the mistake and tells Google, obtaining the usual "sole remedy" of late removal of the Book from the database. Notably, the probability of such mistake is higher for metadata records compiled times ago (when

bibliographic criteria were different than that characterising current resources), and for non in-English titles, for records created by English speaking librarians.

(iii) The determination of Commercial Availability should be done at Principal Work level, while all the existing metadata sources provide data at Book level. Therefore, it is necessary to group together, *ex novo*, all the different books that have been published containing the same Principal Work. From a technical viewpoint, this is a big challenge, never afforded before. It is incredible that so important consequence derives from the guess that it will be solved at worldwide level, within a framework – as seen – where the company asked to find a solution has instead big incentive to not find it.

On these bases, the bad quality of the database is not a surprise, and the problems here described are all evident for the Italian Books we analysed. Attached here as Exhibit C is an analysis that the AIE did which highlights fundamental problems with the Settlement Agreement and Books Database's treatment of Commercially Available works. The analysis of Italian titles is particularly relevant since Google declared that is already using the most reliable Italian books in print database (ALICE, produced by Informazioni Editoriali) in its process for determining which Books are Commercially Available, thus showing errors that will remain even after the implementation of the mentioned Commitment Letter.

Our analysis covered 274 Italian language works written by 18 noted Italian authors contained in the Books Database. The Books Database contains 3,628 individual records, or separate entries, for these 274 books, since they have been published in more than one edition, often by more than one publisher. However, this is also because the Books Database includes duplicate entries for the same edition of many of these books, with these entries often containing inconsistent or conflicting information.

As set forth on the attached Exhibit C, our analysis reveals that Google has classified 1,468 (over 40 percent), of these 3,628 records as not Commercially Available. In fact, each of the works represented by these 1,468 records is being actively commercialized and in-print in Italy, so we can say that for this sample we found an error rate "at record level" higher than 40%.

The problems caused by Google's erroneous classification are magnified when these Books Database records are grouped by Principal Work (regardless of how many times the work appears as a separate "record"). For example, for 222 (or 80 percent) of the 274 Italian language works discussed above, the database identifies at least one "record" of such work as not Commercially Available. In this case, we can see an error rate "at work level" over 80%, which indicates that in more than 80% of the cases such noted Italian authors cannot be sure that their Commercially Available works will not be scanned without authorisation.

As a consequence, if just one of the "records" related to a particular work is not actively claimed by a Rightsholder who directs Google not to use the underlying work, Google will be free to digitize and use the work with impunity. This is so even if the relevant Rightsholder has properly claimed the same work under a different "record", but mistakenly fails to find all "records" of his or her work in the Books Database, which is bound to happen given the duplication that exists in the Books Database.

This is likely to occur with frequency given that the current and main source of Books for Google is library collections, and libraries usually do not have the last edition of a book but an early one that is more likely truly out of print. It is thus highly probable that any particular book entering the Google regime is one that Google will be able to define as non Commercially Available.

Similar results emerge looking at the Books for which AIE owns a direct US copyright interest. The information on the Books Database for the "Catalogo dei libri in commercio" (Books in print catalogue), co-authored and/or co-published by AIE over the time, is atrocious, making it impossible for AIE to determine what scanning Google has done with this work, how many different versions and volumes of this work Google is using and how Google intends to value these different versions and volumes when computing settlement payments for its past scanning activity, should the Settlement be approved (given that the Settlement states that multiple versions of a particular work will be deemed a single "Principal Work" for settlement payment purposes).

Since 1970, 37 different editions of this catalogue have been published. Yet the Books Database lists the catalogue 207 times. The listings contain inconsistent publisher information (sometime AIE is identified, other times AIE is not); identify a mere distributor (KG Saur) as an

"author" or "contributor": include erroneous author information (incorrectly identifying Vittorio Russo, Biagio Scognamiglio and Giancarlo Mazzacurati as authors); and fails to explain whether Google treats the separate volumes of the work as one or more separate Books.

Google has classified 30 of those 207 records as relating to works that are Commercially Available. This classification appears completely random, in that old editions are deemed available and recent ones are not. Very frequently, the same yearly edition is deemed Commercially Available in one record and not so in a different record. 38 of the entries reflect that Google has scanned the work, and for 37 of these 38 entries, Google has classified the work as not Commerically Available, which, of course, will give Google greater rights to use these already scanned works under the Settlement as drafted.

Another ground of inconsistency emerge when analysing the titles of the series "Quaderni del Giornale della Libreria". This is a series of studies about the publishing industry we commercialize through our company Ediser S.r.l. in electronic form and thus not included in the Italian books-in-print catalogue, which is meant to serve the physical supply chain. As said, we joined the Google BookSearch partner program with some of those Books. However, also in this case Google lists a number of these Books as not Commercially Available, even though the Google's GBS program includes links to websites that are actively and currently selling these works. So, apparently, in considering different sources of information Google is not using Google Book!

The Books Database includes numerous listings of a magazine currently published by AIE through our company Ediser S.r.l. called "Giornale della Libreria", even though magazines are not covered by the Settlement Agreement. The Books Database includes 163 records erroneously classifying this work as a Book. 48 of these records state that such "Books" for various years has been scanned, leaving AIE confused as to whether Google has improperly scanned every monthly issue of this publication for certain annual periods.

## IV. THE SETTLEMENT IS NOT FAIR, REASONABLE OR ADEQUATE

### A. Lack Of Consideration Of Typographic Arrangements

In some European countries (e.g. in Germany, Spain or UK) typographic arrangements made by publishers are specifically protected by the copyright law. In such cases, copyright subsists both

in the content of a work and also in the typographical arrangement and design elements of the work. Typographical arrangement covers the style, composition, layout and general appearance of a page of a published work. The content of a work can therefore be in the public domain, but not the typographical arrangement.

In the US, as well as in some other European countries, including Italy, typographic arrangement does not enjoy copyright protection. However, typographical arrangement is always treated in the book business within the framework of fair competition dealing. Anytime a publisher (or any commercial company) wishes to use the arrangements made by another publisher (e.g. when an author moves from one house to another), the common business practice all over the world is that he or she asks the previous publisher the permission to use its typographic arrangement and pays for it, so to recognize the investments made.

In the Settlement, this is not considered at all, and Google will use for its commercial benefit the investments made by others. This is particularly evident in the case of public domain work.

**B. The Financial Compensation Proposed For Past Uses Is Not Adequate**

In joining in the Gant objections on this argument (Gant Objection, III.A, pp. 25-27) we desire to emphasize further elements.

First, such compensation does not consider at all the cost that rightsholders must sustain to claim their works. As described above, such cost is very high, because of the bad quality of the database and the burdensome work rightsholders should do to protect themselves from illegitimate use of Books. As matter of fact, very often the financial compensation will just not cover such claiming costs.

Second, it is particularly unfair that one payment is provided when several editions of a Principal Work have been scanned, although these editions are actually different products, with different typographic arrangements, and thus different look and feel in the Internet. New editions also contains differences in the content, which required investments. This is evident also from the fact that in the Google BookSearch programme the different editions of the same work remain as different items accessible by the users.

Third, a lump sum provided for every Book does not consider the value of the individual Book. An encyclopedia and a short novel are paid with the same sum, which never happens in any ordinary business. This also implies a paradox: the same work can be paid differently. If a novel is scanned from a Book containing only that novel, it is paid 60$, if the same novel is scanned from a volume containing, for example, the complete works of that author, it is treated as Insert, and thus merits only a 15$ payment.

Our direct experience as publisher of the already mentioned "Catalogo dei libri in commercio" illustrates the actual results of this approach. The "Catalogo" is a typical reference book counting more than 1,000 pages. As said, it has been scanned 38 times. If the different edition, as it seems to be, should be considered as referable to the same Principal Work, we should expect to receive 60$ to be shared with Editrice Bibliografica, our publishing partner, for the digitization of around 40,000 pages, which results in a payment of 0,00075$ per page, a figure that is simply offensive.

### C. The Deadline For Claiming The Financial Compensation Is Too Short

The deadline for claiming the financial compensation is fixed at January 5, 2010, so very close to the date of the final decision of this honorable Court. Given the characteristics of the information processing required and the bad quality of the database described above, it is just impossible for rightsholders to claim properly their Books for cash payment within such a short timeframe.

### D. The Dispute Resolution Are Unfair For Non-US Rightsholders

The dispute resolution mechanism set up by the Settlement tends to favor Google, particularly as it concerns claims outside the US.

In 9.1(b)(v), it should be the publisher's election whether to arbitrate claims over Google's attempt to use the agreement as a defense to foreign claims (under 10.2(b)). If the Agreement does not pertain to foreign claims, then its mandatory arbitration provision should not apply in this situation.

In 9.3(a), if the publisher elects to arbitrate, the forum and choice of law should not be New York if the dispute concerns a "legal claim outside the U.S."

In 9.7, judgment should be capable of entry outside the Southern District of New York, in any court having jurisdiction over the parties (as is the case in 9.11, which deals with injunctive relief).

Under 8.6(b), the publishers should not have to arbitrate if there is willful failure of a Security Implementation Plan, and damages should not be capped. These limits might be acceptable for non-willful breaches, but a willful security failure should not be shielded from greater liability.

## THE SETTLEMENT AGREEMENT GRANTS GOOGLE TOO MUCH POWER

### A. The Google Power To Exclude A Book For Editorial Reason Gives Rise To Great Concern For Potential Censorship Abuse

Section 3.7(e) (Google's Exclusion of Books) provides that "Google may, *at its discretion, exclude particular Books* from one or more Display Uses *for editorial or non-editorial reasons*" (emphasis added). The Parties recognize that "Google's right to exclude Books for editorial reasons (i.e., not for quality, user experience, legal or other non-editorial reasons) is an issue of great sensitivity", and declare that 'Plaintiffs, Google and the libraries all value the principle of freedom of expression". However, the only remedy provided is that 'Google agrees to notify the Registry of any such *exclusion of a Book for editorial reasons* and of any information Google has that is pertinent to the Registry's use of such Book *other than Confidential Information of Google* and other than information that Google received from a third party under an obligation of confidentiality" (emphasis added).

It is very evident that this leaves room for censorship and restrictions to intellectual freedom for sexual, religious, political or any other reason. One can imagine that Google may find itself under pressure from governments or interest groups to censor books that discuss topic such as alternative lifestyles or that may be seen as politically offensive. For instance, China has demanded the removal of links to sites promoting free speech and civil liberties in Tibet. Google may also proactively suppress entire categories of books, just to pre-empt anticipated complaints.

In principle, Google is bounded to notify the Registry of the reasons of any exclusion, but it can easily bypass this provision simply saying that the reasons are "confidential information of Google", which they usually are when the actual origin for censorship is really serious.

This power given to Google is even more unacceptable for the *de facto* monopolistic license granted to Google on non claimed out of print Books (see below). The result is that Google will have a monopolistic license accompanied by quasi-unlimited power to censor any Book.

## B. The Settlement Has Many Anti-Competitive Aspects Which Will Affect Also Non-US Market

The Gant objection well describes the anti-competitive effect o the Settlement in its Argument V (Gant Objection, pp. 39-45), which we join in. In Europe, a similar concern characterized the very first reactions to the Settlement Agreement.

The Federation of European Publishers and all its member associations, representing publishers in 25 European Countries unanimously approved a resolution at the General Assembly in Brussels on November 14, 2008 where expressed this preoccupation (attached here as Exhibit D). "European publishers firmly support the essential principle of Europeana[7] that all solutions should be *based on open standards and must be market neutral* so as to avoid the creation of de-facto monopolies. In coherence with this principle, in analysing the impact of the Settlement, European publishers will consider the risk of a de facto monopoly for distribution of books that is contrary to the interest of consumers and society at large and which could endanger the European book industry and cultural diversity" (FEP Resolution on the AAP - AG - Google Settlement, Nov 2008, available at http://www.fep-fee.be/documents/FEPResolutionontheAAP14-11final.pdf).

Even though the Settlement Agreement applies only to the US territory, the monopolistic risks go far beyond this country, thus touching also the European market. Any Internet business is in its nature a global business, based on network effects. "Comprehensiveness is a value", as the Engineering Director of Google Books Dan Clancy recognized[8], which creates a competitive advantage against any new competitor wishing the enter the market.

Such "comprehensiveness" is reached through broadening the scope of usage of work to many forms of Display use after an initial violation of copyright. For orphan works this advantage is simply untouchable, since the Registry will not have the capacity to license to third parties Books

---

[7] Europeana (www.europeana.eu) is the initiative that created a network of the European digital library initiative promoted by the different European institutions.

[8] Quoted by the Gant Objection, p. 40, note 76.

for which it will not have the mandate (which is impossible to have if the rightsholder is unknown). However, the *de facto* exclusive license is also granted for all the non claimed works. As illustrated above, these will comprehend out of print Books that Rightsholders were not able to claim since they have not been properly identified, in print Books erroneously identified as non Commercially Available, and even Books that Rightsholders claimed while Google did not recognize because of mistakes in the matching with the database relevant records.

Other provisions of the Settlement further strengthen the competitive advantage provided to Google.

(i) Section 3.8(a) of the Settlement grants Google a "most favored nation" clause, which guarantees that the Registry or other organizations set by the parties cannot offer any other party – whether for profit or non for profit firms – a deal that is better than the one that Google is getting.

(ii) In the definition of Commercial Availability the copies of Books derived from "library scan" are explicitly excluded (Settlement Agreement, 1.28 - Commercially Available[9]). The notion of a Library scan can cover many different acts undertaken by a Library on many different grounds, including a partnership with a publisher. Indeed one of the possible models to offer a Book is to reach an agreement with a library to make the scanned version of the Book available online. This may be decided for any reason: because of the remuneration provided, to promote the publisher brand, to test the attractiveness of the Book in view of a possible new edition, etc. There are no reasons why the decision to offer the Book through such a collaboration with a library should be discriminated in comparison with other models. It is to be noted that this clause discriminates in particular European publishers and authors at the moment of the launch of Europeana, the digital library initiative promoted by the European institutions. This initiative is based on the respect of copyright, and therefore on prior consent of the rightholders. When a copyrighted Book is offered via such a model in Europeana this should be considered as in competition with the possible exploitation within the Google BookSearch initiative. Also this provision seems to be tailored to the objective of creating competitive advantage to Google.

---

[9] "1.28 "Commercially Available" means, with respect to a Book, that the Rightsholder of such Book, or such Rightsholder's designated agent, is, at the time in question, offering the Book (*other than as derived from a Library Scan*) for sale new through one or more then-customary channels of trade in the United States". (emphasis added)

(iii) Similarly, the definition of Commercial Availability is conditioned by the fact that the rightholder or his or her agent "is, at the time in question, offering the Book (…) for sale new…". Therefore, the only business model that is considered is the one based on sales. However, alternative models exist. In particular, a book can be offered by a rightholder for free on the web according to a model based on advertising revenues. The parties should be aware of this, since they are setting up exactly a business that includes models other than direct sales. The provision seems to be designed again to strengthen the Google competitiveness through ignoring the Books offered by direct competitors exactly through the same model way Google is going to offer.

(iv) Also from the cost side the Settlement creates an unfair advantage in favor of one operator in the sector of digitization projects. In fact, all other projects around the world are based on full respect of copyright, so asking prior consent of rights-holders. The process of actively searching for rightholders takes more time and thus generates higher costs. For this reasons the competition will be fully unbalanced.

Today, Google already enjoys a dominant position as a search engine on the European market (95,6 % of Internet searches in Europe). The system created by the settlement would allow Google to undertake wide uses of 7 million already digitized books and possibly much more in the future, which would solidify Google's dominant position by making it biggest digital library in the world.

By making Google a leader as a search engine, a bookseller, a publisher and a library, the Settlement will have a dramatic impact on the concentration of media ownership and on cultural diversity. This situation will increase the pressure on publishers dependant on Google to gain visibility and thus will generate further network effects and a vicious circle that will simply prevent any other digitization projects to compete. This will happen not only in the US but a global level.

## CONCLUSION

For each of the foregoing reasons, AIE respectfully request that this Court reject the Settlement and/or decline to certify the class, with respect to foreign rightsholders.

| September 2, 2009 | Marco Polillo<br>President<br>AIE - Associazione Italiana Editori<br>Corso di Porta Romana 108<br>20122 Milan (MI), Italy<br>Phone: (+39) 0289280800<br>Fax: (+39) 0289280860<br>marco.polillo@aie.it |
|---|---|

**TO**

Office of the Clerk
J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007
UNITED STATES OF AMERICA

**COPY TO**

COUNSEL FOR THE AUTHOR SUB-CLASS
Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
UNITED STATES OF AMERICA
bookclaims@bonizack.com

COUNSEL FOR THE PUBLISHER SUB-CLASS
Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
UNITED STATES OF AMERICA
bookclaims@debevoise.com

COUNSEL FOR GOOGLE
Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts &
Kent LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
UNITED STATES OF AMERICA
bookclaims@durietangri.com

Exhibit A – email received from Google BookSearch team

---

**Da:** Google Ricerca Libri [mailto:books-noreply@google.com]
**Inviato:** mar 28/10/2008 20.00
**A:** Paola Mazzucchi
**Oggetto:** Accordo di transazione di Google Ricerca Libri

Gentile Partner di Google,

Oggi Google e il gruppo di autori ed editori che rappresentavano l'accusa nelle cause legali di Google Ricerca Libri negli USA hanno annunciato di aver raggiunto un accordo di transazione senza precedenti. Questa transazione, valida solo negli Stati Uniti, si applica a un'ampia classe di detentori di copyright. Presenta inoltre nuove opportunità per tutti: autori, editori, biblioteche, Google e lettori. Per ulteriori informazioni in merito alla transazione e al suo possibile effetto su di lei e i suoi autori, visiti il sito della transazione sul copyright (
http://books.google.com/booksrightsholders/). Siccome la transazione è in attesa dell'approvazione del tribunale, possiamo parlarne limitatamente con il pubblico. La invitiamo tuttavia a utilizzare le informazioni presenti sul sito web della transazione per contattare il Curatore della transazione o l'Avvocato della Categoria e ricevere ulteriore assistenza. Forse le interesserà leggere anche il nostro messaggio agli utenti sul blog (
http://googleblog.blogspot.com/2008/10/new-chapter-for-google-book-search.html).

La proposta di transazione riguarda i libri digitalizzati nell'ambito del Progetto Biblioteche di Google Ricerca Libri (
http://books.google.it/googlebooks/library.html). Il rapporto che abbiamo con lei in conformità con il Programma Partner di Google Libri non cambia, benché potrà godere dei vantaggi a lei conferiti dalla transazione se e quando quest'ultima verrà approvata dal tribunale. Potrà continuare a commercializzare i suoi libri attraverso il Programma Partner proprio come fa oggi, e noi ci terremo in contatto per avvertirla delle nuove funzioni e opportunità per massimizzare i vantaggi del Programma Partner in relazione ai suoi libri.

Siccome la transazione è in attesa dell'approvazione preliminare del tribunale, da parte sua non deve intraprendere alcuna azione specifica, ma la invitiamo a visitare il sito della transazione sul copyright (
http://books.google.com/booksrightsholders/) e a leggere il materiale lì presentato. Potrà inoltre registrarsi sul sito per essere avvisato quando saranno disponibili ulteriori informazioni sulla transazione.

Naturalmente, per qualsiasi domanda in merito al Programma Partner di Google Libri, non esiti a contattarci (
http://books.google.com/support/partner/bin/request.py).

Cordiali saluti,

Il team di Google Ricerca Libri

Unofficial translation
The following translation is not in "perfect English", also to provide the feeling that the original is not in "perfect Italian".

---

**Da:** Google Ricerca Libri [mailto:books-noreply@google.com]
**Inviato:** mar 28/10/2008 20.00
**A:** Paola Mazzucchi
**Oggetto:** Accordo di transazione di Google Ricerca Libri

Dear Google partner

Today Google and the authors and publishers group who were plaintiffs in the lawsuit in USA about Google BookSearch, announced that they reach an unprecedented settlement agreement. This settlement, valid only in the US, applies to a broad class of rightholders. Furthermore, it provides new opportunities for all: authors, publishers, libraries, Google and readers. For further information on the Settlement and on its possible consequence on you or your author, please visit the Settlement website ( http://books.google.com/booksrightsholders/). Since the Settlement is still pending for approval by the Court, we cannot speak too much publicly. However, we invite you to use the information posted in the Settlement website to contact the Settlement manager or the Lawyer of the Class and receive further assistance. May be you are also interested in reading the message we posted in the blog ( http://googleblog.blogspot.com/2008/10/new-chapter-for-google-book-search.html)

The Settlement proposal concerns books scanned within the library project of GBS. The relationship we have with you within the partner programme does not change, though you can enjoy the benefit reserved to you in the Settlement if and when this will be approved by the Court. You can continue to commercialise your books through the partner programme just like you are doing today, and we will keep in contact with you to inform about the new functionalities and opportunities to maximise the benefit of the partner programme for your books

Since the Settlement is still pending for approval, you should not do undertake any action in particular, but we invite you to visit the Settlement website ( http://books.google.com/booksrightsholders/) and to read the material there posted. You can also register in the site to be informed as soon as there will be further information

Obviously, for every question on the partner program, do not exitate to contact us ( http://books.google.com/support/partner/bin/request.py)

Best regards

The Google BookSearch team

---

**Avviso aggiornato: la nuova scadenza per la rinuncia/obiezione è 4 settembre 2009**

---

## Se Lei è l'autore di un Libro, un editore, o una persona che possiede copyright su un Libro o su altri scritti,

## i Suoi diritti potrebbero essere interessati da una Transazione riguardante una azione di categoria avente ad oggetto la digitalizzazione da parte di Google di Libri e altri scritti.

---

**Attenzione Autori ed Editori al di fuori degli Stati Uniti:**
**questa transazione potrebbe coinvolgere anche i vostri diritti.**
**Si prega di leggere questa notifica attentamente.**

---

- Una azione legale di categoria allega che Google avrebbe violato i diritti di autore di autori, editori ed altri titolari di copyright negli Stati Uniti su libri ed altri scritti digitalizzandoli (scannerizzandoli), creando un database elettronico di libri, e pubblicandone dei brevi estratti senza il permesso dei titolari dei copyright.

- La transazione proposta nella predetta causa ( cui si fa riferimento in questa Notifica con "Transazione") è stata raggiunta negli Stati Uniti per conto di una claszse di titolari di copyright su libri, scritti inclusi in libri ed altre opere pubblicate entro e non oltre il 5 gennaio 2009. **Libri pubblicati dopo il 5 gennaio 2009 non sono inclusi in questa Transazione** (si prega di fare riferimento alla Domanda 6 per una descrizione di "Libri" cosi' come intesi in questa Notifica). Esistono due sottoclassi:

  - la "Sottoclasse degli Autori" (autori di libri ed altri scritti, i loro eredi, successori e aventi causa, e tutti gli altri membri della azione di categoria della Transazione che non fanno parte de "la Sottoclasse degli Editori") e

  - la "Sottoclasse degli Editori" (compagnie che pubblicano libri e periodici ed i loro successori e aventi causa).

- I benefici derivanti dalla Transazione per la classe includono:

  - il 63% delle entrate conseguenti dalla vendita da parte di Google di abbonamenti ad un database elettronico di Libri, dalle vendite di accesso online ai Libri, dalle entrate derivate da pubblicità, e da altri usi commerciali;

- US$34,5 milioni pagati da Google per creare e mantenere un Registro dei Diritti sui Libri ("Registro") al fine di riscuotere le entrate di Google e distribuire tali entrate ai rispettivi titolari dei copyright;

- il diritto dei titolari del copyright di determinare se e fino a che punto Google possa utilizzare le loro opere;

- US $45 milioni pagati da Google ai titolari dei copyright i cui libri ed inserti Google ha digitalizzato senza permesso entro e non oltre il 5 maggio 2009.

**NOTA**: per partecipare alla Transazione Lei deve compilare il **Modulo per Ricorsi**. Il modulo è disponibile su http://www.googlebooksettlement.com/intl/it/. Se non ha accesso a Internet, può richiedere un **Modulo per Ricorsi** all'Amministratore della Transazione (vedere Domanda 24 per come contattare l'Amministratore della Transazione).

**I Suoi diritti e le Sue opzioni
- ed i termini entro cui esercitarli -
sono spiegati in questa Notifica.**

# CHE COSA INCLUDE QUESTA NOTIFICA

**INFORMAZIONI BASE**      **4**
1. PERCHÉ HO RICEVUTO QUESTA NOTIFICA? ...................................................4
2. IN COSA CONSISTE LA AZIONE LEGALE? ......................................................4
3. CHE COS'È UN'AZIONE DI CATEGORIA? ........................................................4
4. PERCHÉ C'È UNA TRANSAZIONE? ...............................................................5
5. CHI È UN MEMBRO DELLA CLASSE? .............................................................5
6. COSA SONO I "LIBRI" E GLI "INSERTI" COSÌ COME SPECIFICATI NELLA TRANSAZIONE E IN QUESTA NOTIFICA? ...................................................................................8
7. QUALI SONO LE BIBLIOTECHE ADERENTI? ...................................................10

**BENEFICI DELLA TRANSAZIONE**      **11**
8. PANORAMICA DEI BENEFICI DELLA TRANSAZIONE ........................................11
9. QUALI SONO I DIRITTI DEGLI AVENTI DIRITTO RIGUARDO AI LORO LIBRI ED INSERTI? ..13
10. QUALI SONO I DIRITTI DEGLI AUTORI ED EDITORI IN CONFORMITÀ CON LE NORMATIVE AUTORE-EDITORE? ...................................................................................24

**PARTECIPAZIONE ALLA TRANSAZIONE**      **28**
11. COSA SUCCEDE SE NON FACCIO NIENTE? ..................................................28
12. NEI CONFRONTI DI QUALI SOGGETTI RINUNCIO AI DIRITTI? ...........................28
13. SE PARTECIPO ALLA TRANSAZIONE, A QUALI DIRITTI RINUNCIO ESATTAMENTE? ........28

**RINUNCIA ALLA TRANSAZIONE**      **30**
14. CHE COSA DEVO FARE SE NON VOGLIO PARTECIPARE ALLA TRANSAZIONE? .............30
15. COME RINUNCIO ALLA TRANSAZIONE? ........................................................30

**OPPORSI O COMMENTARE LA TRANSAZIONE**      **30**
16. POSSO OPPORMI ALLA TRANSAZIONE O PRESENTARE COMMENTI SU DI ESSA? ........30
17. QUAL'È LA DIFFERENZA TRA OPPORSI ALLA TRANSAZIONE E RINUNCIARE ALLA TRANSAZIONE? ........................................................................................31

**GLI AVVOCATI CHE LA RAPPRESENTANO**      **32**
18. AVRÒ UN AVVOCATO CHE RAPPRESENTERÀ I MIEI INTERESSI IN QUESTE CAUSE? .....32
19. COME SARANNO PAGATI GLI AVVOCATI? .....................................................32
20. DOVREI AVERE UN MIO AVVOCATO PERSONALE? ..........................................32

**UDIENZA CONCLUSIVA DI AUTORIZZAZIONE DEL TRIBUNALE**      **33**
21. DOVE E QUANDO IL TRIBUNALE DECIDERÀ SE CONCEDERE L'AUTORIZZAZIONE CONCLUSIVA ALLA TRANSAZIONE? ...............................................................33
22. DEVO ASSISTERE ALL'UDIENZA SULL'EQUITÀ DELLA TRANSAZIONE? .....................33
23. POSSO INTERVENIRE ALL'UDIENZA SULL'EQUITÀ DELLA TRANSAZIONE? .................33

**ULTERIORI INFORMAZIONI**      **34**
24. DOVE POSSO OTTENERE ULTERIORI INFORMAZIONI? .....................................34

**Questa Notifica è solo una sintesi dell'Accordo della Transazione e dei Suoi diritti. La preghiamo di rivedere attentamente l'Accordo completo della Transazione. L'Accordo è disponibile su http://www.googlebooksettlement.com/intl/it/agreement.html o direttamente presso l'Amministratore della Transazione (vedere Domanda 24 su come contattare l'Amministratore della Transazione).**

## INFORMAZIONI BASE

### 1.        Perché ho ricevuto questa Notifica?

Lei ha ricevuto questa Notifica perché la Transazione potrebbe coinvolgerLa. Forse Lei è l'autore di un Libro o un editore o una persona che ha interessi in copyright USA in Libri o altri scritti inclusi in Libri, lavori di dominio pubblico o opere governative (chiamati "Inserti" in questo Accordo) che Google sta digitalizzando senza permesso.

Questa Notifica Le spiega:

- in cosa consistono la azione legale e la Transazione

- chi è coinvolto nella Transazione

- chi rappresenta le Sottoclassi

- i Suoi diritti legali

- come agire ed entro quali limiti di tempo

### 2.        In cosa consiste la azione legale?

Questa azione coinvolge il vastamente pubblicizzato progetto di Google chiamato Google Library Project ("GLP"). Nel 2004 Google ha annunciato di aver fatto un accordo con diverse biblioteche per digitalizzare Libri ed altri scritti presenti nelle collezioni di tali biblioteche. Google ha già digitalizzato più di sette milioni di Libri, inclusi milioni di libri che sono tuttora soggetti a copyright negli Stati Uniti. Gli utenti di Google possono effettuare una ricerca nella "biblioteca digitale" di Google e vedere "frammenti" di Libri, cioè diverse righe di un testo.

Il Google Library Project è uno dei modi in cui Google sta digitalizzando Libri per il suo programma "Ricerca Libri su Google" ("Google Book Search", vedere http://books.google.com). Anche il Google Partner Program (tramite il quale Google ha il permesso dagli editori ed autori di usare le loro opere tuttora soggette a copyright, vedere https://books.google.com/partner) è un modo per aggiungere Libri al programma "Ricerca Libri su Google". Anche se il Partner Program non è incluso in questa Transazione, questa Transazione potrebbe coinvolgere membri del Partner Program.

### 3.        Che cos'è un'azione di categoria?

In una azione legale di categoria, uno o più "membri della classe" fanno causa rappresentando anche altri che hanno simili reclami. Tutte queste persone nell'insieme sono "una classe" ed ognuno e' un "membro della classe". Il Tribunale deve determinare se permettere o meno che la causa diventi un'azione

di categoria. Se così avviene, la Transazione coinvolgerà chiunque sia un membro della classe. Per determinare se Lei è un membro della classe in questa Transazione, faccia riferimento alla Domanda 5.

In questa causa, le persone che presentano l'istanza ("Attori") e Google Inc. ("Google", "Convenuto") si sono trovati d'accordo a procedere alla Transazione. Come parte della Transazione, anche diverse biblioteche che hanno permesso o permetteranno a Google di digitalizzare Libri ed altri scritti delle loro collezioni possono partecipare alla Transazione ("Biblioteche Partecipanti"). Il Tribunale ha approvato in fase preliminare la Transazione per la classe e le due sottoclassi di persone coinvolte - la Sottoclasse degli Autori e la Sottoclasse degli Editori.

Cinque editori hanno presentato una causa separata contro Google concernenti il Google Library Project che mostra problematiche identiche a quelle in questa azione di categoria. La causa degli editori sarà archiviata dopo la data in cui la Transazione diventerà definitiva ("Data Effettiva"). Per ulteriori informazioni sulla causa degli editori, vedere sotto la Domanda 19.

## 4.        Perché c'è una Transazione?

Dopo lunghe ricerche da parte dell' Attore e di Google, inclusa la revisione di milioni di pagine di documenti presentati da entrambe le parti, e dopo più di due anni di negoziazioni, le parti si sono trovate d'accordo a procedere alla Transazione.

Una transazione è un accordo tra un attore e parte citata per risolvere una causa. Le transazioni concludono controversie legali senza l'intervento del Tribunale o di una giuria che decida in favore di una delle parti. Una transazione permette alle parti di evitare i costi ed i rischi di un processo. Nella transazione di un'azione di categoria, i rappresentanti della classe ed i loro avvocati chiedono al Tribunale di considerare la transazione come giusta, ragionevole ed adeguata. In questo caso, se il Tribunale approva la Transazione, Google non sarà più legalmente responsabile per le richieste presentate in questa causa.

Google nega qualsiasi azione illecita o responsabilità e nega che qualsiasi membro della classe abbia diritto a compenso monetario per danni. Il Tribunale non ha ancora emesso una decisione su nessuna delle richieste delle due parti in causa.

## 5.        Chi è un membro della classe?

La classe comprende tutte le  persone (ed i  loro eredi, successori e aventi causa) che, al 5 gennaio 2009 (Data Inizio Validità della Notifica), fossero titolari di "un interesse in copyright USA" su uno o più Libri o Inserti  "coinvolti dall'uso" autorizzato dalla Transazione (la "Classe") (vedere Domanda 9 per una descrizione di questi usi).

Lei possiede  un "interesse in copyright USA" se è titolare, o ha una licenza esclusiva, di un copyright protetto dalla legge USA sui copyright. Per esempio, se Lei è un autore, Lei ha il copyright sul Suo Libro (a meno che Lei non abbia trasferito completamente i suoi interessi sul copyright a terzi o a meno che Lei non abbia scritto quel Libro come "work for hire" [lavoro prodotto da un dipendente i cui copyright appartengono al committente e non allo scrittore]). Lei ha anche copyright su un Libro negli Stati Uniti se ha il diritto esclusivo di pubblicare quel Libro negli Stati Uniti o se ha il diritto legale di fare causa a terzi per aver violato i Suoi diritti su quel Libro. Diverse persone possono avere interessi in copyright USA sullo stesso Libro, come per esempio nel caso di due o più autori, un autore ed un editore, e gli eredi di un autore.

**ATTENZIONE: AUTORI ED EDITORI AL DI FUORI DEGLI STATI UNITI**: Se siete titolari di diritti e siete cittadini o residenti in un paese diverso dagli Stati Uniti, probabilmente avete interessi in copyright USA se (a) il vostro Libro è stato pubblicato negli Stati Uniti o se (b) il vostro Libro non è stato pubblicato negli Stati Uniti ma il vostro paese ha relazioni di copyright con gli Stati Uniti grazie alla Convenzione di Berna o se (c) il vostro paese aveva relazioni di copyright con gli Stati Uniti al tempo della pubblicazione del vostro Libro. **Lei dovrebbe ritenere di possedere un interesse nei copyright USA sul Suo Libro, a meno che non sia certo che il paese in cui il Libro è stato pubblicato, e in cui ha la residenza o vive, sia uno dei pochi paesi che non ha avuto nel passato o non ha tuttora relazioni di copyright con gli Stati Uniti. Lo U.S. Copyright Office ha pubblicato una lista di paesi con cui gli Stati Uniti hanno una relazione di copyright. La lista è disponibile su http://www.copyright.gov/circs/circ38a.pdf o presso l'Amministratore della Transazione. Se Lei ha copyright su un Libro o un Inserto pubblicato in un paese al di fuori degli Stati Uniti e ha domande sulla possibilità di partecipare o meno alla Transazione, Le consigliamo di consultare un avvocato o un'Organizzazione per i Diritti di Riproduzione. Può anche chiamare il numero di telefono dedicato che trova sulla lista allegata a questa Notifica.**

**ATTENZIONE EREDI DI AUTORI:** Poiché la Transazione coinvolge la digitalizzazione e l'uso di Libri pubblicati molti decenni fa, ci si aspetta che una grande parte della Classe della Transazione sia formata da eredi, successori e aventi causa degli autori stessi. Anche se questa Notifica è riferita agli "autori", si intende anche includere i loro eredi, successori e aventi causa che hanno un interesse nei copyright USA sulle opere degli autori in questione.

**Tutti i membri della Classe** dovrebbero accedere al seguente sito per consultare il database di ricerca dei Libri che sono inclusi in questa Transazione: **http://www.googlebooksettlement.com/intl/it/.** Questo database mostra anche opere governative e libri di dominio pubblico che Google ha digitalizzato e che possono contenere Inserti. La lista tenta di includere tutti i Libri con copyright pubblicati entro e non oltre il 5 gennaio 2009. Ci sono, comunque, dei Libri inclusi nella Transazione che non compaiono nella lista. Di conseguenza, anche se il vostro Libro non è nella lista, fintantoché avete interessi nei copyright USA su un Libro pubblicato entro e non oltre il 5 gennaio 2009 dovreste considerarvi membro della classe.

- "Libri" e "Inserti" sono termini importanti che saranno definiti nella Domanda 6.

- Un interesse nei copyright USA che sia "coinvolto dall'uso" descritto nella Transazione è un interesse nei diritti a riprodurre e presentare Libri ed Inserti ad Uso di Visualizzazione ed Uso di non Visualizzazione e usi autorizzati presso le biblioteche come descritti nelle Domande 9(F), 9(G) e 9(I) e nell'Accordo della Transazione, Articolo VII. Gli "Usi di Visualizzazione" e gli Usi di "Non Visualizzazione" sono definiti nelle Domande 9(F) e 9(G).

La Classe è divisa in due sottoclassi: la Sottoclasse degli Autori e la Sottoclasse degli Editori.

*La Sottoclasse degli Autori*

La Sottoclasse degli Autori è formata da membri della classe che sono autori o i loro eredi, successori e aventi causa così come tutti gli altri membri della Classe che non siano né case editrici né loro successori e aventi causa.

I seguenti individui sono attualmente i rappresentanti della Sottoclasse degli Autori. Herbert Mitgang, Betty Miles, Daniel Hoffman, Paul Dickson e Joseph Goulden. Gli interessi della Sottoclasse degli Autori sono anche rappresentati dall' "Associazione degli Autori" (The Authors Guild,

6

http://www.authorsguild.org). Tutti gli Attori rappresentanti della Sottoclasse degli Autori e l'Associazione degli Autori appoggiano la Transazione e raccomandano che anche altri membri della Sottoclasse degli Autori vi partecipino.

### La Sottoclasse degli Editori

La Sottoclasse degli Editori è formata da tutti i membri della classe che sono case editrici di Libri o di periodici (per esempio, giornali, riviste, fascicoli) che abbiano interessi in copyright USA su Inserti o che abbiano pubblicato un Libro ed i loro rispettivi successori e aventi causa.

Le seguenti compagnie sono attualmente i rappresentanti della Sottoclasse degli Editori: The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., e John Wiley & Sons, Inc. Gli interessi della Sottoclasse degli Editori sono anche rappresentati dall'Associazione degli Editori Americani (Association of American Publishers, http://www.publishers.org). Tutti gli Attori rappresentanti la Sottoclasse degli Editori e l'Associazione degli Editori Americani appoggiano la Transazione e raccomandano che anche altri membri della Sottoclasse degli Editori vi partecipino.

### Gli Aventi diritto

I membri della Sottoclasse degli Autori e della Sottoclasse degli Editori che non segnalano la loro rinuncia alla Transazione entro i limiti di tempo e nei modi stabiliti (vedere Domanda 15) sono chiamati nella Transazione e in questa Notifica "gli Aventi diritto".

### Libri contenenti illustrazioni

Fotografie, immagini, mappe, dipinti ed altre opere visive che si trovano in Libri sono coperti dalla Transazione SOLO quando (a) l'interesse di copyright USA nell'opera illustrata è nelle mani della persona che è anche il titolare dei copyright del Libro in cui è inserita la parte illustrata o (b) la parte grafica è un'illustrazione in un Libro per bambini (vedere definizione di seguito). Per esempio, se il titolare dei copyright di un Libro sulla fotografia è anche il titolare dei copyright delle fotografie in quel Libro, allora quelle fotografie sono incluse nella Transazione. D'altra parte, la Transazione non comprende nessuna altra fotografia del Libro il cui copyright appartenga esclusivamente a persone che non siano anche titolari dei copyright del Libro stesso. Allo stesso modo, se un Libro di storia contiene una serie di mappe i cui copyright appartengono solo a persone diverse dal titolare dei copyright su quel Libro di storia, allora quelle mappe non sono ricomprese nella Transazione.

### Illustrazioni nei Libri per bambini

Le illustrazioni nei Libri per bambini sono incluse nella Transazione. Se Lei è un disegnatore di illustrazioni per Libri per bambini e ha interesse di copyright in un Libro contenente le Sue illustrazioni, allora sul Modulo di Richiesta dovrebbe reclamare i Suoi diritti per quelle illustrazioni come Libro. Se invece ha un interesse di copyright sulle illustrazioni di un Libro ma non è titolare di un interesse sui copyright del Libro contenente quelle illustrazioni, allora sul Modulo di Richiesta dovrebbe reclamare i Suoi diritti per quelle illustrazioni come Inserti.

### Esclusi dalla Classe

Fotografie, immagini, mappe, dipinti ed altre opere visive che si trovano in Libri non sono considerati Inserti (eccetto le illustrazioni di Libri per bambini). Queste opere visive non sono coperte dalla Transazione, **A MENO CHE** un interesse in copyright USA su queste opere non appartenga a un Avente

diritto del Libro che contenga tali opere visive (come spiegato sopra). Di conseguenza, nella misura in cui quelle persone sono titolari di copyright solo delle opere visive e non del Libro o dell'Inserto, esse *non* sono membri della classe. La Transazione non autorizza né proibisce a Google di pubblicare questi materiali per effetto del la Transazione ne' si decade da nessuna azione riguardo all'uso di suddetti materiali.

### *Normative Autore-Editore*

Consulenti per la Sottoclasse degli Autori e consulenti per la Sottoclasse degli Editori hanno creato delle Normative Autore-Editore che sono una parte importante della Transazione. Tra le altre funzioni, le Normative Autore-Editore stabiliscono i diritti reciproci degli autori e degli editori riguardo all'uso da parte di Google di Libri in commercio e fuori stampa - e chi ne percepisce i guadagni - che rientrano nella Transazione. Le Normative Autore-Editore sono riassunte nella Domanda 10, sotto. La preghiamo, inoltre, di consultare le Normative Autore-Editore disponibili nella loro interezza su http://www.googlebooksettlement.com/intl/it/agreement.html (vedere Allegato A all'Accordo della Transazione) o a richiederle all'Amministratore della Transazione.

## 6. Cosa sono i "Libri" e gli "Inserti" cosi' come specificati nella Transazione e in questa Notifica?

### *Libri*

Al fine della Transazione, un "Libro" è un' opera, scritta o stampata, su fogli di carta rilegati insieme come copia cartacea che, entro e non oltre il 5 gennaio 2009:

- sia stato pubblicato o distribuito al pubblico o reso disponibile all'accesso pubblico con l'autorizzazione del titolare (o titolari) dei copyright dell' opera in questione negli Stati Uniti; e

- sia stato registrato presso l'U.S. Copyright Office, a meno che l' opera non sia un' opera negli Stati Uniti secondo l'U.S. Copyright Act, nel qual caso tale registrazione non è richiesta; e

- sia soggetto all'interesse di copyright USA (o attraverso la proprietà o proprietà congiunta o attraverso una licenza esclusiva) come da uso autorizzato dalla Transazione. Vedere Domanda 9 per tali usi.

**ESCLUSI** dalla definizione di "Libro" sono i seguenti materiali:

- periodici (per esempio, giornali, riviste, gazzettini) vedere Sezione 1.102 dell'Accordo della Transazione per una definizione completa di "Periodici"

- scritti privati (per esempio, diari non pubblicati o insiemi di biglietti o lettere)

- fogli di musica ed altri scritti usati principalmente per suonare musica. Vedere Sezione 1.16 dell'Accordo della Transazione per una definizione più dettagliata di questi materiali

- opere di dominio pubblico, vale a dire opere che sono di dominio pubblico secondo l'U.S. Copyright Act

- opere governative, vale a dire opere che non sono soggette a copyright in quanto pubblicate dal governo degli Stati Uniti o che sono soggette a uguale trattamento giuridicosecondo la legge di un altro stato, come definito nella Sezione 1.64 dell'Accordo della Transazione

*Inserti*

Al fine di questa Transazione, un "Inserto" deve:

- essere o (1) un testo, quale un' introduzione, postfazione, prologo, epilogo, poesia, citazione, lettera, estratto testuale da altri Libri, periodici o altre opereo testi di canzoni; oppure (2) tabelle, diagrammi, grafici, note musicali (per esempio note su un pentagramma o un'intavolatura); o (3) illustrazioni su Libri per bambini; e

- essere incluso in un "Libro", testo governativo o di dominio pubblico pubblicato entro e non oltre il 5 gennaio 2009; e

- essere protetto dal copyright degli Stati Uniti, dove l'interesse del copyright degli Stati Uniti nell'Inserto sia posseduto da qualcuno che non sia un Avente diritto del "Corpo Principale" del Libro. Il "Corpo Principale" è definito nella Domanda 8(C), vedi sotto. Per esempio, se Lei ha diritti su una poesia che è inclusa in un Libro per il quale ha anche interesse di copyright USA, allora la Sua poesia, cosi'come appare nel Suo Libro, non è un Inserto. Sarebbe, però, un Inserto se la poesia fosse inclusa in un Libro su cui qualcun altro possiede un interesse di copyright degli Stati Uniti; e

- essere registrato, o da solo o come parte di un' altra opera, presso l'U.S. Copyright Office entro e non oltre il 5 gennaio 2009, **A MENO CHE** l'Inserto o l' opera non sia un' opera degli Stati Uniti inclusa nell'U.S. Copyright Act, nel qual caso tale registrazione non è richiesta.

**ESCLUSI** dalla definizione di "Inserto" sono i seguenti oggetti:

- opere visive, come fotografie, illustrazioni (escluse le illustrazioni dei Libri per bambini), mappe e dipinti

- opere che sono di dominio pubblico ai sensi dell'U.S. Copyright Act.

Al fine di ricevere pagamenti per l'uso degli Inserti, la Transazione identifica due tipi di Inserti:

"Inserto Integrale", un Inserto che è un' opera completa, per esempio prefazioni, postfazioni, introduzioni, opere complete incluse in antologie, poesie integrali, racconti brevi integrali, testi completi di canzoni e saggi integrali.

"Inserto Parziale", un Inserto che è un qualsiasi altro tipo di Inserto, per esempio l'estratto di un Libro o l'Articolo di una rivista, citazioni, versi di poesie o parti di testi di canzoni.

**Per cercare od identificare il Suo Inserto, vada su http://www.googlebooksettlement.com/intl/it/, oppure contatti l'Amministratore della Transazione o chiami il numero dedicato alla fine di questa Notifica (Appendice).**

# 7. Quali sono le Biblioteche Aderenti?

L'Accordo della Transazione identifica diverse categorie di Biblioteche Aderenti basate sul loro livello di partecipazione alla Transazione: Biblioteche Aderenti in Pieno, Biblioteche Partecipanti, Biblioteche di Dominio Pubblico ed Altre Biblioteche. Per ulteriori informazioni riguardo ai diritti, obblighi e dichiarazioni di responsabilità verso queste biblioteche, vedere Domande 12 e 13 o l'Articolo VII dell'Accordo della Transazione. Per la forma di Accordo tra il Registro e le Biblioteche Aderenti in Pieno, le Biblioteche Partecipanti e le Biblioteche di Dominio Pubblico, vedere Allegato B all'Accordo della Transazione o contattare l'Amministratore della Transazione. L'Accordo della Transazione è disponibile su http://www.googlebooksettlement.com/intl/it/agreement.html.

Le Biblioteche Aderenti in Pieno sono biblioteche che permettono a Google di digitalizzare Libri delle loro collezioni e a cui Google fornisce una Copia Digitale di quei Libri. L'Accordo della Transazione fa sì che le Biblioteche Aderenti in Pieno siano in grado di fare un certo uso delle loro copie digitali. Per includere quanti più Libri possibili nel Google Library Project, Google proverà ad espandere la lista delle Biblioteche Aderenti, includendo biblioteche che sono:

- Biblioteche Partecipanti. Queste biblioteche ricevono, secondo l'Accordo della Transazione, gli stessi diritti ed obblighi di partecipazione delle Biblioteche Aderenti in Pieno, eccetto per il fatto che non riceveranno o avranno accesso alla Copia Digitale della Biblioteca e per il fatto che dovranno accettare di cancellare qualsiasi Copia Digitale di Libri ricevuta da Google.

- Biblioteche di Dominio Pubblico. Queste biblioteche accettano di dare a Google solo libri di dominio pubblico per la digitalizzazione, di cancellare qualsiasi Copia Digitale di Libri ricevuta da Google e di non ricevere o avere accesso alla Copia Digitale della Biblioteca.

- Altre Biblioteche. Queste biblioteche accettano di dare Libri a Google ma non accettano di diventare una Biblioteca Aderente in Pieno, una Biblioteca Contribuente o una Biblioteca di Dominio Pubblico. Alcune di queste biblioteche hanno ricevuto o riceveranno copie digitali di Libri da Google. Non vi e' rinuncia a nessun dirittoriguardo all'uso delle copie digitali da parte delle Altre Biblioteche.

- Per una lista delle Biblioteche che i correnti Attori hanno autorizzato a diventare Biblioteche Aderenti in Pieno e Biblioteche Partecipanti riferirsi al  sito http://www.googlebooksettlement.com/intl/it/agreement.html (vedere Allegato G dell'Accordo della Transazione) o contattare l'Amministratore della Transazione.

# BENEFICI DELLA TRANSAZIONE

| 8. | Panoramica dei benefici della Transazione |
| --- | --- |

**Le clausole chiave dell'Accordo della Transazione sono riassunte qui di seguito. La preghiamo di rivedere l'intero Accordo della Transazione su http://www.googlebooksettlement.com/intl/it/agreement.html. Può scaricare una copia dell'Accordo della Transazione dal sito web, richiedere una copia scritta all'Amministratore della Transazione o chiamare il numero di telefono dedicato che si trova alla fine di questa Notifica (Appendice).**

### A. Uso e metodo di pagamento dei Libri da parte di Google

Gli Attori considerano la Transazione un'ottima opportunità per rivitalizzare, da un punto di vista commerciale, decine di milioni di Libri fuori stampa e per mettere a disposizione uno strumento di marketing innovativo per autori ed editori di Libri attualmente in commercio. Ai sensi della Transazione, Google è autorizzata a 1) continuare a digitalizzare Libri ed Inserti, 2) vendere abbonamenti per il database di Libri elettronici a istituzioni, 3) vendere l'accesso online a singoli Libri, 4) vendere pubblicità sulle pagine dei Libri e 5) altri usi come descritti in "Usi di Accesso" nella Domanda 9(F)(1). Google pagherà agli Aventi diritto, attraverso il Registro, il 63% di tutte le entrate ricevute da tali usi. Il Registro distribuirà queste entrate agli Aventi diritto in conformità con il Piano di Allocazione e le Normative Autore-Editore come descritto nelle Domande 9(K) e 10.

Gli Aventi diritto possono escludere i loro Libri da alcuni o tutti i suddetti usi, come descritto nella Domanda 9. Gli Aventi diritto possono anche rimuovere del tutto i loro Libri dal database elettronico di Libri (se già digitalizzato) a condizione che la richiesta sia presentata entro e non oltre il 5 aprile 2011. Gli Aventi diritto possono richiedere a Google in qualsiasi momento di non digitalizzare i loro Libri e Google accetterà la richiesta se il Libro non è già stato digitalizzato.

### B. Il Registro dei Diritti di un Libro

La Transazione stabilisce la creazione di un Registro dei Diritti di un Libro, non a scopo di lucro, che si occuperà del mantenimento di un database degli Aventi diritto, creerà una lista di informazioni su come contattarli ed informazioni contenenti le loro richieste a proposito degli usi dei Libri ed Inserti ed individuerà, stabilirà e coordinerà i pagamenti agli Aventi diritto. Il Registro rappresenterà gli interessi degli Aventi diritto, sia riguardo alla Transazione che riguardo ad altri accordi commerciali, inclusi accordi con altre compagnie oltre a Google (previa approvazione espressa degli Aventi diritto sui Libri coinvolti in tali accordi commerciali).

Per avviare la creazione e le operazioni iniziali del Registro, Google ha accettato di pagare US $34,5 milioni. Una parte dei pagamenti sarà usata per i costi di Notifica alla classe (inclusa la distribuzione di questa Notifica) e per l'amministrazione delle richieste fino a che il Registro non sarà completamente operativo.

Tutti i fondi ricevuti dal Registro saranno utilizzati a beneficio diretto o indiretto degli Aventi diritto. Dopo il finanziamento delle operazioni iniziali tramite il pagamento di Google, il Registro sarà finanziato per mezzo di una piccola tassa amministrativa calcolata come percentuale delle entrate ricevute da Google.

Il Registro sarà amministrato congiuntamente da un Consiglio di Amministrazione formato da un numero pari di rappresentanti della Sottoclasse degli Autori e della Sottoclasse degli Editori –per un minimo di quattro consiglieri autori e di quattro consiglieri editori. Tutte le decisioni del Consiglio richiederanno la maggioranza dei consiglieri. Tale maggioranza deve includere almeno un consigliere autore ed un consigliere editore. Alcune questioni richiederanno una  maggioranza qualificata del Consiglio.

### C.        Pagamenti per i Libri già digitalizzati

Google ha accettato di pagare un minimo di US $45 milioni per effettuare Pagamenti in Contanti per tutti i Libri ed Inserti che Google ha digitalizzato senza permesso fino al 5 maggio 2009 ("Pagamenti in Contanti"). Google effettuerà un Pagamento in Contanti per un  minimo di US $60 per ogni Opera Principale, US $15 per ogni Inserto Integrale e US $5 per ogni Inserto Parziale per cui almeno un Avente diritto abbia presentato una richiesta valida entro e non oltre il 5 gennaio 2010. Un singolo Pagamento in Contanti sarà effettuato per lo stesso contenuto che Google ha digitalizzato, senza riguardo al numero dei Libri o Inserti in cui compare tale contenuto. Per esempio, solo un pagamento sarà effettuato per l'edizione  con copertina rigida o in versione tascabile di uno stesso Libro , anche se Google ha digitalizzato entrambi come unità separate, e solo un pagamento sarà effettuato per diverse digitalizzazioni dello stesso Libro o dello stesso contenuto inserito, come Inserto, in differenti Libri. Inoltre, solo un Pagamento in Contanti pari a US $60 sarà effettuato per contenuti che siano sia sotto forma di Libro che di Inserto in un altro Libro (per esempio perché una parte del primo Libro era stato citato nel secondo Libro.) Ogni Libro contiene solo un Opera Principale. Per esempio, un' edizione del romanzo"Il vecchio e il mare"  potrebbe includere un'introduzione, nota a piè di pagina e una postfazione. Il romanzo è l' Opera Principale di quel Libro; ciascun materiale aggiuntivo (introduzione, note e postfazione) è considerato un Inserto (se l'interesse di copyright in quei materiali è posseduto da individui diversi dall'Avente diritto dell' Opera Principale). Di pari passo, un Libro potrebbe includere diversi racconti brevi di una varietà di autori (per esempio, "I migliori racconti brevi del 2008" ). L'Opera Principale del Libro è l'intera opera collettiva (la raccolta di racconti brevi) e ciascun racconto brevepreso separatamente (così come qualsiasi saggio introduttivo) sarebbe considerato un Inserto (se l'interesse di copyright in quei racconti è nelle mani di un Avente diritto diverso dall'Avente diritto dell' Opera Principale). Vedere Sezione 1.111 dell'Accordo della Transazione per una definizione completa di "Opera Principale".

- A seconda del numero di Opere Principalied Inserti rivendicati dagli Aventi diritto, se la cifra totale distribuita a tutti i suddetti Aventi diritto sarà' inferiore a  US $45 milioni, il Registro distribuirà il saldo ai suddetti Aventi diritto fino ad un massimo di US $300 per ogni Opera Principale, US $75 per ogni Inserto Integrale e US $25 per ogni Inserto Parziale. Qualsiasi fondo in eccesso dopo questa operazione sarà pagato conformemente al Piano di Allocazione.

- Se saranno necessari più di US $45 milioni per pagare tutte le pretese legittime di Pagamenti in Contanti, allora Google si farà carico di integrare i fondi necessari per effettuare tali pagamenti.

Gli Attori ritengono che gli Aventi diritto sui Libri ed Inserti che Google ha digitalizzato senza autorizzazione prima del 5 maggio 2009 abbiano diritto a Pagamenti in Contanti perché hanno una pretesasuperiore a quella degli altrii Aventi diritto, cioè la azione per violazione di copyright in ordine alla quale, in questa causa, è stata richiesta una riparazione monetaria. In conformità con la Transazione, altri Aventi diritto saranno in grado di inibire  Google   la digitalizzazione de i loro Libri, ma gli Aventi diritto i cui Libri ed Inserti sono già stati digitalizzati non hanno avuto tale opportunità. Gli Attori ritengono che i Pagamenti in Contanti siano un compenso giusto e ragionevole per la rinuncia alle  pretese

azionate dagli Aventi diritto per una riparazione monetaria conseguente alla digitalizzazione non autorizzata da parte di Google.

**Per ricevere un Pagamento in Contanti per Libri ed Inserti già digitalizzati, si prega di compilare il Modulo di Richiesta entro e non oltre il 5 gennaio 2010.**

D. **Versione del Libro soggetta a hosting per gli Aventi diritto**

Su richiesta degli Aventi diritto, Google concederà sul suo server una versione soggetta ad hosting del Libro (o Libri) dell'Avente diritto per uso sul sito web del suddetto richiedente. Vedere Sezione 3.11 dell'Accordo della Transazione per ulteriori dettagli.

E. **Tempi per ottenere i benefici della Transazione**

Ci vorrà diverso tempo per implementare gli usi commerciali autorizzati in conformità con la Transazione, per implementare le scelte fatte dagli Aventi diritto per i loro Libri ed Inserti e per onorare i Pagamenti in Contanti. Gli usi commerciali e gli altri benefici della Transazione descritti in questa Notifica non saranno realizzati fino a dopo la Data Effettiva, e ci vorrà altro tempo dopo tale data per creare il Registro e verificare i diritti cosicché i legittimi Aventi diritto possano ricevere la loro quota ed i benefici dovuti. Si prega di essere pazienti e visitare regolarmente il sito web della Transazione per aggiornamenti su http://www.googlebooksettlement.com/intl/it/.

---

## 9.     Quali sono i diritti degli Aventi diritto riguardo ai loro Libri ed Inserti?

In conformità con il Google Library Project, Google sta digitalizzando e continuerà a digitalizzare Libri dalle Biblioteche Aderenti ed altre fonti. Google sta sviluppando un database elettronico di ricerca di molti milioni di Libri (compresi libri di dominio pubblico e opere governativi). La Transazione prevede che Google venderà ai consumatori abbonamenti a quel database e accesso online a singoli Libri. In aggiunta, Google avrà entrate dalla pubblicità sulle pagine web dedicate a un Libro singolo. Come precedentemente descritto nella Domanda 8(A), tutte le entrate saranno divise come segue: 63% agli Aventi diritto e 37% a Google. Quanto segue è un sintesi dell'autorizzazione di Google ad usare Libri ed Inserti e dei diritti degli Aventi diritto in relazione a tali usi. **La descrizione completa di tutti i diritti ed obblighi è presentata nell'Accordo della Transazione disponibile su http://www.googlebooksettlement.com/intl/it/agreement.html o presso l'Amministratore della Transazione.**

A. **Classificazione dei Libri in "Disponibili sul Mercato" o non "Disponibili sul Mercato" e "In commercio" o "Fuori stampa"**

La Transazione prevede che tutti i Libri, a partire dal 5 gennaio 2009, saranno inizialmente classificati come o "Disponibili sul Mercato" o non "Disponibili sul Mercato". Google inizialmente classificherà un Libro come "Disponibili sul Mercato" se Google stesso determina che l'Avente diritto, o gli agenti scelti dell'Avente diritto (vale a dire un agente letterario o un editore), stia offrendo in quel momento (cioè al tempo in cui Google effettua la determinazione iniziale) il Libro in vendita attraverso uno o più dei canali commerciali consuetudinari negli Stati Uniti.

Questa classificazione ha due scopi:

- Google avrà il diritto agli Usi di Visualizzazione di tutti i Libri che sono classificati come non Disponibili sul Mercato. L'Avente diritto di un Libro, comunque, ha il diritto di rimuovere il Libro dal Google Library Project (su richiesta presentata entro e non oltre il

5 aprile 2011) o di escluderlo in qualsiasi momento da alcuni o tutti gli Usi di Visualizzazione. Google non ha il diritto di fare Uso di Visualizzazione di nessun Libro classificato come Disponibile sul Mercato a meno che l'Avente diritto autorizzi Google stesso ad includere il Libro in uno o più degli Usi di Visualizzazione; l'Avente diritto ha anche il diritto di rimuovere il Libro da tutti gli usi da parte di Google (su richiesta presentata entro e non oltre il 5 aprile 2011). Se la richiesta di rimuovere un Libro arriva dopo il 5 aprile 2011, essa sarà accettata solo se il Libro per cui è stata presentata tale richiesta non è stato ancora digitalizzato a tale data.

- In conformità con le Normative Autore-Editore, un Libro classificato come Disponibile sul Mercato è presumibilmente classificato come "in commercio" ed un Libro classificato come non Disponibile sul Mercato è presumibilmente classificato come "fuori stampa". Come descritte sotto, la divisione tra Libri "in commercio" o "fuori stampa" ha importanti conseguenze. **L'uso in questa sezione della Notifica dei termini "in commercio" e "fuori stampa" è solo per convenienza e solo ai fini della Transazione e per l'uso da parte di Google dei Libri e i relativi pagamenti e non influenza l'uso di questi termini nell'industria o in contratti tra autori ed editori.** Potenzialmente due Aventi diritto con interessi di copyright USA sullo stesso Libro (per esempio, entrambi l'autore e l'editore) potrebbero non essere d'accordo sul fatto che un Libro possa essere, al fine dei questa Transazione, "in commercio" o "fuori stampa". Le Normative Autore-Editore prevedono una procedura per risolvere queste dispute e stabiliscono anche definizioni precise dei termini "in commercio" e "fuori stampa". Vedere Domanda 10 per ulteriori dettagli sulle Normative Autore-Editore.

Gli Aventi diritto ed il Registro avranno il diritto di contestare la classificazione iniziale di Google di un Libro come Disponibile sul Mercato o non Disponibile sul Mercato . Qualsiasi disputa con Google sulla corretta classificazione di un Libro sarà risolta attraverso la procedura di risoluzione previsto dalla Transazione, descritto nella Domanda 9(M).

**Per sapere se il Suo Libro è stato inizialmente classificato come Disponibile sul Mercato o non Disponibile sul Mercato , vedere il sito http://www.googlebooksettlement.com/intl/it/ o contattare l'Amministratore della Transazione.**

### B.        Libri fuori stampa

La Transazione autorizza Google agli Usi di Visualizzazione e agli Usi di non Visualizzazione di ciascun Libro fuori stampa per il termine di copyright USA per quel Libro, senza ulteriore azione o direzione da parte dell'Avente diritto sul Libro, A MENO CHE l'Avente diritto del Libro non istruisca esplicitamente Google di non farlo. Un Avente diritto che così istruisca Google può successivamente autorizzare Google a fare tali usi di parte o di tutto il Liboi. Gli Usi di Visualizzazione sono descritti nella Domanda 9(F) e gli Usi di non Visualizzazione sono descritti nella Domanda 9(G), sotto. Per ulteriori informazioni su come rimuovere un Libro, vedere Domanda 9(D).

Se un Avente diritto esclude un Libro che non è Disponibile sul Mercato dall'uso tramite abbonamento di un'Istituzione (vedere Domanda 9(F)(1)(a)), allora quel Libro sarà anche escluso dalle vendite a consumatori individuali. In aggiunta, un Avente diritto che esclude un Libro dall'uso con abbonamento di un'Istituzione non ha i requisiti per ricevere una Quota di Inclusione (vedere Domanda 9(K) per dettagli).

Le Normative Autore-Editore prevedono che l'autore o, per buone ragioni, l'editore di un Libro fuori stampa (che non sia un Libro restituito all'autore o ai suoi eredi, un Libro "controllato dall'autore" o

un Libro scritto come "work for hire" [lavoro prodotto da un dipendente i cui copyright appartengono al committente e non allo scrittore]) possano escludere un Libro da uno o più Usi di Visualizzazione. Vedere Domanda 10 per una sintesi delle Normative Autore-Editore.

**Per partecipare alla Transazione, ricevere i benefici per l'uso del Suo Libro fuori stampa nel Google Library Project o per escludere i Suoi Libri da uno o più Usi di Visualizzazione, si prega di compilare il Modulo di Richiesta. Non ci sono limiti di tempo per escludere il Suo Libro da uno qualsiasi degli Usi di Visualizzazione. È anche possibile cambiare una decisione di esclusione in qualsiasi momento.**

### C.        Libri in commercio

La Transazione prevede che Google non possa fare Uso di Visualizzazione di qualsiasi Libro in commercio A MENO CHE gli Aventi diritto sul Libro non autorizzino Google ad includere il Libro in uno o più di questi usi. Se gli Aventi diritto decidono di autorizzare gli Usi di Visualizzazione, il Libro sarà soggetto a trattamento economico conforme a quanto descritto nella Transazione; un Avente diritto ha comunque la possibilità di negoziare con Google termini diversi attraverso il Partner Program. In conformità con la Transazione, Google ha il diritto di procedere con gli Usi di non Visualizzazione di un Libro in commercio per il termine dei copyright USA di quel Libro, A MENO CHE l'Avente diritto non rimuova il Libro entro i limiti di tempo consentiti. Per informazioni su come rimuovere il Libro, vedere Domanda 9(D). Per informazioni sugli Usi di non Visualizzazione, vedere Domanda 9(G).

Le Normative Autore-Editore prevedono che sia l'autore che l'editore di un Libro in commercio (eccetto nel caso di opera"work for hire" [lavoro prodotto da un dipendente i cui copyright appartengono al committente e non allo scrittore]) devono autorizzare qualsiasi Uso di Visualizzazione. Vedere Domanda 10 per una sintesi delle Normative Autore-Editore.

**Per autorizzare uno o più Usi di Visualizzazione di uno qualsiasi dei Suoi Libri in commercio sul Google Library Project, si prega di compilare il Modulo di Richiesta. Dopo che Google è stato autorizzato agli Usi di Visualizzazione di uno qualsiasi dei Suoi Libri in commercio, Lei può cambiare quelle istruzioni in qualsiasi momento.**

### D.        Rimozione completa dei Libri

Gli Aventi diritto possono rimuovere i loro Libri, cioè richiedere che tutte le copie digitali di tali Libri siano cancellate da tutti i server o fonti che Google o le Biblioteche Aderenti in Pieno possano utilizzare. Le richieste di rimozione devono pervenire entro e non oltre il 5 aprile 2011. Le richieste di rimozione ricevute dopo questa data saranno accettate se il Libro non è stato ancora digitalizzato al tempo della richiesta.

Notare che ogni Biblioteca Aderente in Pieno può procedere a certi usi dei Libri inclusi nella sua Library Digital Copy (vedere Domanda 9(I)). Gli Aventi diritto possono solo escludere i loro Libri da tutti i suddetti usi se li rimuovono entro i limiti di tempo consentiti.

Una richiesta di rimozione non significa che Google o una Biblioteca Aderente in Pieno devono distruggere le copie su nastri o altri media che possano contenere copie di Libri rimossi. **L'unico modo in cui un Avente diritto può mantenere il diritto a fare causa contro Google e le Biblioteche Aderenti in Pieno nel caso in cui questi mantengano Libri rimossi su nastri o altri media è quello di rinunciare alla Transazione. La Domanda 15 descrive come rinunciare alla Transazione.**

Anche se un Avente diritto rimuove un Libro, è sempre possibile contattare Google in un secondo tempo e provare a rinegoziare separatamente un accordo per includere il Libro nel Partner Program.

**Se vuole partecipare alla Transazione ma vuole anche rimuovere i Libri, si prega di compilare il Modulo di Richiesta entro e non oltre il 5 aprile 2011. Dopo il termine di scadenza, Google acconsentirà alle richieste di "non digitalizzare" solo se il Libro non è già stato digitalizzato al tempo della richiesta.**

### E.        Inserti

Gli Aventi diritto sugli Inserti possono escludere Inserti da tutti  ma non meno di tutti  gli Usi di Visualizzazione. Questo diritto è limitato all'Inserto stesso e a nessun'altra parte del Libro, opera governativa o libro di dominio pubblico che contenga l'Inserto.

**Se Lei ha un interesse di copyright USA in un Inserto e desidera registrare i Suoi diritti sull'Inserto, si prega di compilare il Modulo di Richiesta.**

Se i Libri, opere governative o  libri di dominio pubblico che contengono il Suo Inserto non sono ancora stati digitalizzati da Google, allora Google cercherà il Suo contenuto fino a quando la digitalizzazione dei Libri per il Google Library Project sia completa. Se Google trova quello che sembra essere il Suo contenuto in un Libro, opera governativa o libro di dominio pubblico, Le manderà un avviso. A quel punto Le sarà richiesto di confermare che il contenuto del Libro, opera governativa o libro di dominio pubblico è un Inserto. Dopo la Sua conferma, Lei (1) avrà la possibilità di ricevere una Quota di Inclusione in conformità con il Piano di Allocazione (vedere Domanda 9(K)) e (2) avrà il diritto di escludere il Suo Inserto (o Inserti) da Usi di Visualizzazione.

Avrà la possibilità di ricevere una Quota di Inclusione se non esclude il Suo Inserto da Usi di Visualizzazione e se soddisfa i requisiti necessari elencati nel Modulo di Richiesta. Se desidera escludere il Suo Inserto da Usi di Visualizzazione dopo aver ricevuto la Sua Quota di Inclusione, prima dovrà restituire la quota ricevuta.

**Se vuole partecipare alla Transazione ma anche escludere uno qualsiasi dei Suoi Inserti da Usi di Visualizzazione, si prega di compilare il Modulo di Richiesta. Non c'è un limite di tempo per escludere un Suo Inserto da tutti - ma non meno di tutti - gli Usi di Visualizzazione e può anche cambiare la sua decisione di esclusione in qualsiasi momento.**

L'Avente diritto di un Libro contenente il Suo Inserto e, in alcuni casi, Google possono contestare la Sua richiesta di esclusione se essi ritengono di avere il diritto legale o contrattuale di mostrare il Suo Inserto come parte di un Libro. Qualsiasi controversia sull'esclusione di un Inserto da un Libro sarà risolta attraverso la procedura di risoluzione controversie descritta nella Transazione, descritta nella Domanda 9(M). Riguardo agli Inserti in lavori governativi e libri di dominio pubblico, Google può rifiutare di escludere il Suo Inserto da lavori governativi o libri di dominio pubblico. Se questo fosse il caso, Lei ha il diritto di (1) fare causa a Google o (2) sottoporre la disputa nei confronti di Google ad arbitrato in conformità con la procedura di risoluzione controversie descritto nella Transazione.

In conformità con la Transazione, Google ha il diritto agli Usi di non Visualizzazione degli Inserti per il termine consentito dai copyright USA per quegli Inserti. Gli Aventi diritto su un Inserto non possono "rimuovere" un Inserto. **L'unico modo in cui Lei possa preservare il Suo diritto di azionare pretese contro Google e le Biblioteche Aderenti in Pieno per Usi di non Visualizzazione e per aver mantenuto i Suoi Inserti su nastri ed altri sistemi di back-up è di rinunciare del tutto alla Transazione. La Domanda 15 Le spiega come rinunciare alla Transazione.**

**F.     Usi di Visualizzazione**

In base ai sopramenzionati diritti di rimozione ed esclusione da parte degli Aventi diritto, la Transazione autorizza Google ai seguenti Usi di Visualizzazione di tutti i Libri fuori stampa e, su espressa autorizzazione degli Aventi diritto, Libri in stampa.

(1) <u>Usi di Accesso:</u> Gli Usi di Accesso permettono di vedere e commentare l'intero Libro e di stampare e copiare/incollare parti del Libro, con certe limitazioni relative al numero delle pagine. Quanto segue elenca gli Usi di Accesso che Google è o potrebbe essere autorizzato a fare.

    (a)    <u>Abbonamenti di Istituzioni:</u> istituzioni educative, governative o aziendali saranno in grado di acquistare abbonamenti a tempo limitato (per esempio, semestrali o annuali) per i loro studenti o impiegati per accedere al contenuto completo del database accessibile tramite suddetto abbonamento. Google può anche offrire abbonamenti validi per materie specifiche. I prezzi dell'abbonamento delle istituzioni può variare nel tempo anche in base all'aumento del volume del database a cui l'abbonamento dà accesso. Per informazioni su come saranno determinati i prezzi degli abbonamenti, vedere Sezione 4.1 dell'Accordo della Transazione.

    (b)    <u>Acquisti del consumatore</u>: utenti individuali potranno acquistare il diritto all'accesso ai Libri online. Gli Aventi diritto avranno due opzioni per determinare il prezzo di vendita dei loro Libri: possono decidere il prezzo autonomamente oppure possono permettere a Google di determinare tale prezzo tramite una formula che tiene in considerazione diversi fattori e che è stata studiata per massimizzare il profitto della vendita del Libro ("Prezzi controllati dalla Transazione").

    (c)    <u>Pubblico accesso presso biblioteche e altri siti</u>: su richiesta Google concederà un "Servizio di Accesso Pubblico" gratuito attraverso il terminale di un computer situato in ciascuna Biblioteca pubblica e attraverso un numero concordato di terminali in college ed università che operano non a scopo di lucro negli Stati Uniti. Il Servizio di Accesso Pubblico permetterà lo stesso accesso ai Libri che Google offre con gli abbonamenti alle istituzioni, con la differenza che gli utenti non potranno copiare/incollare o commentare nessuna sezione del Libro. Gli utenti potranno stampare pagine a un certo costo per pagina presso le biblioteche pubbliche che sono in grado di offrire il servizio di stampa a pagamento e presso le biblioteche di tutti i college e tutte le università. Su approvazione del Registro, i terminali di Servizio di Accesso Pubblico possono essere resi disponibili a pagamento per vedere e stampare pagine presso ditte commerciali, per esempio negozi che offrono servizi di fotocopiatura. Tali centri divideranno le entrate di questi pagamenti con Google e con gli Aventi diritto. Le entrate derivanti dal Servizio di Accesso Pubblico saranno basate sul costo di stampa di pagine individuali. Google incasserà tali entrate da biblioteche pubbliche ed accademiche o centri di fotocopiatura e poi trasferira' il 63% di esse al Registro per conto  degli Aventi diritto.

    (d)    <u>Possibili usi commerciali supplementari</u>: nel futuro, Google ed il Registro potrebbero mettersi d'accordo per sviluppare altri Usi di Accesso, inclusi abbonamenti per altri clienti (simili nell'idea agli abbonamenti per le istituzioni); stampa di libri a domanda; pubblicazioni personalizzate (prezzo  per pagina di

contenuti di pacchetti didattici o altre forme di pubblicazione a domanda ad uso dei mercati scolastici e professionali); documenti scaricabili in formato PDF (i clienti sarebbero in grado di scaricare una versione PDF di un Libro); e riassunti, estratti o raccolte di Libri. **Gli Aventi diritto saranno avvertiti, o direttamente o attraverso il sito web del Registro, di tutti i nuovi usi commerciali che Google è autorizzato a fare e, in qualsiasi momento, avranno l'opportunità di escludere uno dei loro Libri da uno o più di questi usi.**

(2) <u>Uso dell'Anteprima:</u> in risposta alla ricerca di un utente, Google potrebbe permette all'utente stesso di vedere fino al 20% di un Libro (non più di cinque pagine consecutive) prima di decidere di acquistare. All'utente non sarà permesso, però, di copiare/incollare o stampare nessuna pagina del Libro ("Anteprima Standard"). Per opere di narrativa, Google bloccherà l'ultimo 5% del Libro (o un minimo di 15 pagine alla fine del Libro). Inoltre, sempre per opere di narrativa, Google può decidere di mostrare fino al 5% o quindici pagine (l'opzione tra le due che mostra meno pagine) adiacenti alla pagina a cui l'utente arriva. Gli Aventi diritto possono anche selezionare un'altra Opzione di Anteprima con cui le pagine disponibili sono fisse (fino al 10% delle pagine di un Libro, cosi' come scelte da Google o, se un tale meccanismo sara' inventato, scelte dagli Aventi diritto) ("Anteprima Fissa"). Le pagine presentate all'utente con l'Anteprima Fissa non dipendono dalla ricerca dell'utente stesso. In qualunque momento, gli Aventi diritto avranno la possibilità di cambiare il tipo di anteprima disponibile per i loro Libri. Gli Usi dell'Anteprima sono studiati in modo da servire come strumenti di vendita di Libri tramite acquisto diretto del consumatore o in altro modo. Gli Aventi diritto possono anche prevedere di ricevere entrate da pubblicità inserite fra le pagine di un Libro in Anteprima. Vedere la Sezione 4.3 dell'Accordo della Transazione per una descrizione completa delle opzioni disponibili per gli Aventi diritto riguardo al l'Uso dell'Anteprima

(3) <u>Visualizzazione dei frammenti</u>: in risposta alla ricerca di un utente, Google puo' mostrare tre o quattro righe del testo di un Libro (un "frammento") fino ad un massimo di tre frammenti per utente per un determinato Libro. Gli Aventi diritto possono aspettarsi di ricevere entrate da pubblicità inserite sui siti web che mostrano uno o più frammenti provenienti da, o dedicati a, un singolo Libro.

(4) <u>Visualizzazione delle pagine di bibliografia</u>: Google può mostrare agli utenti il titolo di un Libro, la pagina dei copyright, il sommario e l'indice.

**Per escludere uno qualunque dei Suoi Libri ed Inserti dagli Usi di Visualizzazione, vedere Domanda 9(B-E).**

### G.        Usi di non Visualizzazione

In accordo con i diritti di rimozione da parte degli Aventi diritto, Google ha la possibilità di procedere con gli Usi di non Visualizzazione dei Libri ed Inserti. Gli Usi di non Visualizzazione sono usi che non implicano la visualizzazione di alcun contenuto di un Libro al pubblico. Esempi includono visualizzazione delle informazioni bibliografiche, l'indice completo (senza visualizzazione del testo), indici geografici dei Libri, liste algoritmiche dei termini chiave dei capitoli dei Libri e ricerche interne e sviluppo presso Google. Gli Aventi diritto non possono escludere Libri o Inserti da Usi di non Visualizzazione.

**Lei può impedire a Google di procedere con Usi di non Visualizzazione per un Suo Libro solo tramite una richiesta di rimozione del Suo Libro entro i limiti di tempo consentiti. Vedere Domanda 9(D).**

È possibile mantenere il Suo diritto di avanzare pretese contro Google per i suoi Usi di non Visualizzazione per qualsiasi Suo Libro o Inserto solo se Lei decide di rinunciare del tutto alla Transazione. La Domanda 15 spiega come rinunciare alla Transazione.

### H. Usi della pubblicità

Google può includere pubblicità sulle pagine con l'Uso di Anteprima o le pagine web dedicate a un singolo Libro, incluse pagine che mostrano frammenti, informazioni bibliografiche e risultati di ricerca derivanti dalla ricerca di un utente su un singolo Libro. Gli Aventi diritto sui Libri guadagneranno il 63% delle entrate derivanti da queste pubblicità. Google può anche inserire pubblicità su altri prodotti e servizi Google (per esempio, pagine di risultati di ricerca, Google Maps), ma gli Aventi diritto su Libri non otterranno guadagni da tali pubblicità.

Gli Aventi diritto su Libri avranno il diritto di pretendere che Google non includa nessuna pubblicità su pagine dedicate a un singolo Libro, ma non su pagine che risultano dalla ricerca di un utente su diversi Libri o su altri contenuti. Per impedire pubblicità sulle pagine web dedicate ad uno dei Suoi Libri, si prega di compilare il Modulo di Richiesta.

### I. Usi per le Biblioteche Aderenti in Pieno

La Transazione permette a Google di fornire a ciascuna Biblioteca Partecipante in Pieno una Copia Digitale di tutti i Libri presenti nella collezione di quella Biblioteca ("Copia Digitale della Biblioteca"), a condizione che Google digitalizzi un certo numero di Libri presso quella biblioteca. Le Biblioteche Aderenti in Pieno sono autorizzate all'uso della loro copia digitale (a) per fare copie al fine di conservare, mantenere utilizzare e aggiornare quella copia digitale; (b) per fornire accesso ai Libri nella Copia Digitale agli utenti disabili che hanno problemi che impediscono loro di usare versioni stampate dei Libri; (c) per creare una copia stampata sostitutiva di un Libro danneggiato, deteriorato, perso o rubato; (d) per usare indici e trovare strumenti e per mostrare frammenti in connessione con strumenti di ricerca (eccetto il caso in cui l'Avente diritto di un Libro per cui gli Usi di Visualizzazione non sono autorizzati dia un'autorizzazione esplicita alle Biblioteche Aderenti in Pieno di non procedere in questo senso); (e) per permettere al corpo docente ed allo staff di usare fino a cinque pagine di un Libro che non sia Disponibile sul Mercato per uso accademico personale e per uso nelle classi, se quei Libri non sono accessibili tramite l'abbonamento dell'istituzione; (f) per ricerca che non comporti deterioramento (soggetta alle limitazioni descritte nella Domanda 9(J); (g) se l'Atto di Copyright USA è rettificato per permettere l'uso di opere orfane, per usare Libri dalla loro Copia Digitale in conformità con la leggerettificato e (h) per altri usi concessi dalla legge che un Avente diritto o il Registro approvano (il Registro puo' approvare solo usi che non compromettano i diritti degli Aventi diritto). Inoltre l'Accordo della Transazione impedisce alle Biblioteche Aderenti in Pieno di procedere con certi usi della loro copia digitale; usi accettabili dei Libri che non siano Disponibili sul Mercato non sono proibiti dove non esista un abbonamento per le istituzioni.

### J. Corpo di Ricerca

In aggiunta, copie digitali di tutti i Libri digitalizzati da Google presso le biblioteche saranno combinate in un "Corpo di Ricerca". In qualsiasi momento il Corpo di Ricerca può essere ospitato in un massimo di due diversi siti ("siti hosting"). Con l'approvazione del Registro, Google potrebbe diventare un ulteriore sito hosting (il che vuol dire un terzo sito hosting se ne esistono già due). Il Corpo di Ricerca sarà reso disponibile per "utenti qualificati" solo per tipi specifici di ricerca, inclusi (a) analisi computazionale delle immagini digitalizzate o per migliorare l'immagine o per ricavare informazioni strutturali o testuali dall'immagine stessa; (b) ottenere informazioni per capire o sviluppare relazioni tra o all'interno di Libri; (c) analisi linguistica per capire meglio la lingua, l'uso linguistico, la semantica e la

sintassi nella loro evoluzione nel tempo ed nel contesto di Libri di diverso genere; (d) traduzione automatizzata (senza in realtà fornire la traduzione dei Libri a scopo di visualizzazione) e (e) sviluppare nuovi indici e tecniche di ricerca. Per ulteriori informazioni sui tipi di ricerca permesse in connessione con il Corpo di Ricerca, vedere Sezione 7.2 (d) dell'Accordo della Transazione. In aggiunta, tale ricerca può anche essere condotta sulla Copia Digitale della Biblioteca presso le Biblioteche Aderenti in Pieno. **I Libri saranno esclusi dal Corpo di Ricerca e dalla Copia Digitale della Biblioteca ove essi siano rimossi (vedere Domanda 9(d)).**

**Gli Aventi diritto su un Libro o un Inserto possono mantenere il loro diritto di avanzare pretese contro Google e le Biblioteche Aderenti in Pieno per l'uso di Libri ed Inserti nel Corpo di Ricerca solo se decidono di rinunciare all'Accordo della Transazione. Vedere Domanda 15 per ulteriori informazioni su come rinunciare.**

**Per qualsiasi Libro che sia Disponibile sul Mercato al 5 gennaio 2009, o entro due anni da questa data, l'Avente diritto può ritirare i Libri dal Corpo di Ricerca a condizione che essi rimangano Disponibili sul Mercato. Se il Suo Libro è Disponibile sul Mercato e se Lei desidera ritirare questo Libro dal Corpo di Ricerca, si prega di compilare il Modulo di Richiesta.**

Il Corpo di Ricerca ed il suo uso sono soggetti a specifici requisiti e limitazioni, tutti ben chiariti nell'Accordo della Transazione disponibile su http://www.googlebooksettlement.com/intl/it/agreement.html (vedere sezione 7.2(d) dell'Accordo della Transazione) oppure presso l'Amministratore della Transazione, cosi' come anche nell'accordo tra il Registro e ciascun sito hosting.

### K. Piano di Allocazione/Fondi non Reclamati

(1) Piano di Allocazione

Gli Aventi diritto che si registrano presso il Registro saranno compensati in dollari U.S.A. per gli usi commerciali di Google dei loro Libri ed Inserti. I principi di risarcimento sono precisati nel Piano di Allocazione disponibile su http://www.googlebooksettlement.com/intl/it/agreement.html (vedere Allegato C all'Accordo della Transazione) o presso l'Amministratore della Transazione. Il compenso agli Aventi diritto sarà basato sull'uso effettivo dei Libri ("Quote di Utilizzo") e sull'inserimento dei Libri ed Inserti nel database accessibile tramite abbonamento delle istituzioni.

(a) Quote di Utilizzo. I Quote di Utilizzo saranno pagati agli Aventi diritto sui Libri per tutti i modelli di entrate. Per l'utilizzo di un Libro incluso nell'abbonamento, il Registro calcolerà l'"utilizzo" in base a diversi fattori, incluso il numero di volte che gli utenti hanno visto quel Libro, quanta parte del Libro e' stata vista ed il prezzo del Libro controllato dalla Transazione. Il calcolo sarà anche relativo all'utilizzo di altri Libri usati nello stesso periodo. Per altri usi, i Quote di Utilizzo saranno basati sul prezzo al quale il Libro è venduto, il numero delle pagine stampate o le entrate derivanti dalla pubblicità. Il Registro calcolerà i Costi di Utilizzo su una base individuale per libro al momento del resoconto periodico, il quale sarà determinato dal Registro in base all'efficienza. Non saranno corrisposti Quote di Utilizzo per gli Inserti.

(b) Quote di Inclusione. Le Quote di Inclusione saranno pagate per specifici Libri ed Inserti dalle entrate che il Registro riceve dalle vendite degli abbonamenti.

L'obiettivo della Quota di Inclusione per Libri è di US$200/Libro e la Quota minima di Inclusione per Inserti è US $50/Inserto Integrale e US $25/Inserto Parziale. Per gli Inserti, la Quota di Inclusione per tutto il contenuto da una singola opera che appare in altri lavori ha un massimo di US $500, indipendentemente da quanti Inserti sono generati dal contenuto e indipendentemente dal numero di altri lavori in cui si trova l'Inserto. Gli Aventi diritto hanno diritto ad una Quota di Inclusione a condizione che i loro Libri ed Inserti non siano esclusi dagli abbonamenti da loro stessi o da un altro Avente diritto sullo stesso Libro o Inserto. (Se per qualsiasi motivo Google decide di non includere un Libro nel database degli abbonamenti, gli Aventi diritto su quel Libro o Inserto hanno comunque diritto ad ottenere una Quota di Inclusione).**Una volta che gli Aventi diritto hanno ricevuto la loro Quota di Inclusione, non hanno più la possibilità di escludere i loro Libri o Inserti dagli abbonamenti a meno che le Quote di Inclusione non siano restituite al Registro.**

La vendita da parte di Google di abbonamenti ad un database di Libri è un nuovo modello commerciale. Di conseguenza, il compenso per l'inclusione e l'uso di Libri ed Inserti in abbonamenti non può essere quantificato con nessun grado di certezza. Questo è vero in particolare quando si parla di Quote di Inclusione ed è possibile che il fondo per le Quote di Inclusione non sia sufficiente dopo dieci anni a pagare le Quote di Inclusione totali agli Aventi diritto qualificati. Gli Attori sperano che le vendite degli abbonamenti siano notevoli e che ci saranno fondi più che sufficienti per pagare tutte le quote di inclusione. Se questo è il caso alla fine dei dieci anni quando il Registro riceverà' le entrate dagli abbonamenti, gli Aventi diritto riceveranno un ammontare superiore alle Quote di Inclusione sopra specificate. In ogni caso, se alla fine dei dieci anni i fondi non saranno sufficienti, il Consiglio di Amministrazione del Registro determinerà se gli interessi generali degli Aventi diritto siano meglio serviti tramite pagamenti continui di Quote di Inclusione per Libri o interrompendo quelle Quote in favore dei soli pagamenti dei Quote di Utilizzo. Se la maggioranza del Consiglio vota per interrompere i fondi diretti alle Quote di Inclusione per i Libri prima di raggiungere l'obiettivo della Quota di Inclusione di US $200/Libro, allora gli Aventi diritto sui Libri potrebbero non ricevere US $200 come quote di inclusione, ed i fondi disponibili sarebbero distribuiti agli Aventi diritto qualificati a ricevere là quota a quella data e gli Aventi diritto sui Libri riceverebbero solo le entrate derivanti dai Quote di Utilizzo. (Se il Consiglio di Amministrazione del Registro non vota per interrompere i fondi delle Quote di Inclusione per i Libri, allora quei fondi continueranno, come descritto nella Domanda 9(K)(1)(b) e (c)). In ogni modo, le Quote di Inclusione per Inserti continueranno ad essere finanziate finché il Registro non paghi US $50/Inserto Integrale e US $25/Inserto Parziale.

**Per ricevere una Quota di Inclusione per qualsiasi dei Suoi Libri o Inserti, li deve registrare presso il Registro completando il Modulo di Richiesta entro cinque anni dalla Data Effettiva. La Data Effettiva sarà registrata su http://www.googlebooksettlement.com/intl/it/ una volta che sarà determinata, ma nel frattempo La incoraggiamo a registrare i Suoi Libri ed Inserti il prima possibile.**

(c)    <u>Allocazione delle entrate da abbonamenti tra utilizzo ed inclusione</u>. Delle entrate nette che il Registro riceve dagli abbonamenti (per esempio, dopo aver pagato le

spese amministrative del Registro), il 75% andrà nel fondo dei Quote di Utilizzo e il 25% andrà nel fondo delle Quote di Inclusione. Il fondo delle Quote di Inclusione sarà a sua volta suddiviso in due fondi: l'80% (del 25%) andrà in un fondo per i Libri ed il 20% (del 25%) andrà in un fondo per gli Inserti. Se entro dieci anni dalla data in cui il Registro riceve per la prima volta entrate da vendite di abbonamenti ci saranno fondi sufficienti nel fondo delle Quote di Inclusione per pagare US $200/Libro, US $50/Inserto Integrale e US $25/Inserto Parziale, allora tutti i fondi delle Quote di Inclusione saranno pagati in quel momento. Se non ci saranno fondi sufficienti entro dieci anni dalla data del primo pagamento, allora il 10% delle entrate nette che il Registro riceve dagli abbonamenti sarà depositato nel fondo delle Quote di Inclusione per tutto il tempo necessario a raggiungere le somme di US $200/Libro, US $50/Inserto Integrale e US $25/Inserto Parziale, a meno che, per quanto riguarda i Libri, la maggioranza del Consiglio di Amministrazione del Registro non voti per interrompere il trasferimento delle entrate da abbonamento nel Fondo dei Libri.

L'allocazione tra Quote di Utilizzo e Quote di Inclusione sopra descritte riflette il tentativo degli Attori di bilanciare in modo equo e giusto le seguenti contrastanti considerazioni: (1) il valore di un Libro che sia effettivamente "usato" e (2) il valore con cui un Libro o Inserto contribuisce al valore generale del database degli abbonamenti in virtù del suo essere incluso nel database ed essere usato dagli utenti.

(d)    <u>Sintesi di altre clausole</u>. (1) Le Quote di Utilizzo o Quote di Inclusione per un Libro o Inserto particolare non saranno pagate fino a quando il Registro non abbia risolto le controversie tra gli Aventi diritto riguardo a quel Libro o Inserto. (2) Per ogni Avente diritto registrato, il Registro manterrà un conto per i Libri ed Inserti registrati dell'Avente diritto e pagherà le Quote di Utilizzo e le Quote di Inclusione, o una combinazione delle due, solo quando si deve all'Avente diritto una cifra (per esempio, US $25) al di sotto della quale non sarebbe efficiente per il Registro emettere un pagamento. (3) Un Avente diritto su un Inserto può ricevere una Quota di Inclusione più alta se dimostra al Registro che il contratto con l'Avente diritto sul Libro fornisce un pagamento più alto delle Quote di Inclusione per Inserti. (4) Tutte le controversie sull'allocazione delle entrate tra Aventi diritto sul Libro saranno risolte in conformità con le Normative Autore-Editore (eccetto per controversie tra più editori dello stesso Libro o Opera Principale) e tutte le controversie sull'allocazione delle entrate per gli Inserti saranno risolte con arbitrato vincolante in conformità con le regole stabilite nell'Articolo IX dell'Accordo della Transazione.

(2) <u>Fondi non Reclamati</u>

In tutta probabilità, il Registro riceverà delle entrate da Google che dovrebbero andare ad Aventi diritto che non si sono registrati presso il Registro oppure che non richiedono i loro fondi entro cinque anni dalla Data Effettiva (per le Quote di Inclusione) e entro cinque anni dopo che il loro Libro è stato usato (per le Quote di Utilizzo) ("Fondi non Reclamati"). I Fondi non Reclamati saranno distribuiti come segue: (a) **Fondi non Reclamati derivanti dalle entrate degli abbonamenti** saranno usati prima per coprire costi operativi del Registro e mantenere le riserve di capitale per il Registro. Il resto dei Fondi non Reclamati saranno usati per pagare in base proporzionale gli Aventi diritto registrati i cui Libri hanno prodotto entrate tramite i Quote di Utilizzo degli abbonamenti

durante il periodo in cui i suddetti fondi non sono stati reclamati. (b) **Fondi non Reclamati derivanti dall'uso dei Libri** saranno usati prima per coprire costi operativi del Registro e mantenere le riserve di capitale per il Registro. Il resto dei Fondi non Reclamati saranno usati per pagare in base proporzionale gli Aventi diritto registrati i cui Libri hanno prodotto entrate tramite l'uso dei Libri durante il periodo in cui i suddetti fondi non sono stati reclamati. Questo fino a quando gli Aventi diritto su un singolo Libro avranno ricevuto, in totale, il 70% delle entrate che Google ha guadagnato dall'uso di quel Libro. Infine, se dopo queste distribuzioni ancora sussistono Fondi non Reclamati essi andranno ad organizzazioni che operano non a scopo di lucro e che, direttamente o indirettamente, beneficiano gli Aventi diritto e gli utenti.

L.        **Clausole di garanzia**

Google e gli Attori (inclusi gli esperti che lavorano per conto degli Attori) hanno sviluppano un livello Standard di Sicurezza per assicurare che i Libri e gli Inserti siano soggetti a livelli di sicurezza adeguati ("Standard di Sicurezza "). Lo Standard di Sicurezza copre diverse aree di sicurezza: inosservanza delle regole di sicurezza per i Libri presso Google, inosservanza delle regole di sicurezza per le Copia Digitale delle Biblioteche Aderenti in Pieno, inosservanza delle regole di sicurezza dei siti hosting il Corpo di Ricerca e sforzi per limitare l'accesso non autorizzato ai Libri. Lo Standard di Sicurezza esige che Google, ogni Biblioteca Aderente in Pieno ed ogni sito hosting sviluppi il proprio piano di Attuazione di Sicurezza che deve conformarsi allo Standard di Sicurezza e che sia oggetto di approvazione da parte del  Registro. Lo Standard di Sicurezza, Allegato D all'Accordo della Transazione, può essere ottenuto su http://www.googlebooksettlement.com/intl/it/agreement.html o presso l'Amministratore della Transazione. In aggiunta, l'Accordo della Transazione e gli accordi tra il Registro, le Biblioteche Aderenti in Pieno e i siti hosting assicurano soluzioni a situazioni di inosservanza delle regole di sicurezza. Ulteriori informazioni sulle suddette soluzioni sono descritte nell'Articolo VIII dell'Accordo della Transazione disponibile su http://www.googlebooksettlement.com/intl/it/agreement.html o presso l'Amministratore della Transazione.

M.        **Risoluzione delle controversie**

Google, il Registro, gli Aventi diritto, le Biblioteche Aderenti e i siti hosting proveranno a risolvere informalmente la maggior parte delle controversie relative alla Transazione. Se, dopo trenta giorni, non sono arrivati ad un accordo, allora la controversia sara' sottoposta ad arbitrato e la decisione dell'arbitrato sarà finale e vincolante per le parti in causa. Esempi di controversie che saranno soggette ad arbitrato sono (a) diverbi sui prezzi o termini economici; (b) diverbi su presunta inosservanza delle regole di sicurezza; (c) diverbi sul fatto che un Libro sia in commercio o fuori stampa (solo se la controversia è tra un autore ed un editore) o diverbi sul fatto che un Libro sia di dominio pubblico; (d) diverbi sul fatto che Google o una Biblioteca Aderente in Pieno abbiano fatto un uso del Libro non autorizzato in conformità con la Transazione. Questa è una lista illustrativa ma non esaustiva di possibili tipi di controversie soggette ad arbitrato. Per una descrizione più completa di quali controversie sono soggette ad arbitrato o azione legale, si prega di fare riferimento all'Articolo IX dell'Accordo della Transazione, le Normative Autore-Editore (allegato A dell'Accordo della Transazione) e gli accordi Biblioteca- Registro (Allegato B all'Accordo della Transazione), tutti disponibili su http://www.googlebooksettlement.com/intl/it/agreement.html o presso l'Amministratore della Transazione.

Il Tribunale avrà permanente giurisdizione sulla risoluzione di altre controversie relative agli obblighi delle parti in conformità con la Transazione ed altri accordi. In aggiunta, per facilitare e rendere più veloce la salvaguardia, o nel caso in cui l'inosservanza sia ripetuta, volontariamente o

intenzionalmente, le parti si riservano il diritto di fare causa in Tribunale per misure ingiuntivetemporanee senza prima passare dall'arbitrato.

### N.        Diritti non esclusivi

I diritti accordati a Google ed alle Biblioteche Aderenti sono solo non esclusivi e gli Aventi diritto hanno la facoltà di autorizzare, attraverso il Registro o in altri modi, qualsiasi individuo o entità, inclusi concorrenti diretti di Google, ad usare i loro lavori in qualsiasi modo, compresi modi identici agli usi di Google e delle Biblioteche Aderenti. Diritti ed autorizzazioni rilasciati a Google ed alle Biblioteche Aderenti non sono trasferimenti di proprietà di copyright su quei lavori e niente nell'Accordo della Transazione deve permettere di trasferire interessi sulla proprietà di copyright sui lavori degli Aventi diritto.

## 10.        Quali sono i diritti degli autori ed editori in conformità con le Normative Autore-Editore?

Sia l'autore che l'editore possono avere interessi nel copyright USA sullo stesso Libro. I diritti rispettivi dei membri della Sottoclasse degli Autori e della Sottoclasse degli Editori sono elencati nelle Normative Autore-Editore, disponibile su http://www.googlebooksettlement.com/intl/it/agreement.html (vedere allegato A all'Accordo della Transazione) o presso l'Amministratore della Transazione. Quanto segue è una sintesi delle Normative Autore-Editore:

(1)    Libri in commercio

Perché Google possa fare Usi di Visualizzazione di qualsiasi Libro in commercio, sia l'autore (eccetto nel caso di autore"work for hire" [lavoro prodotto da un dipendente i cui copyright appartengono al committente e non allo scrittore] ) che l'editore devono accordarsi per autorizzare Google a fare Usi di Visualizzazione in conformità con la procedura, come spiegato nelle Normative Autore-Editore. Il Registro pagherà agli editori le entrate ricavate dall'uso di Google di Libri in commercio (inclusi Pagamenti in Contanti per Libri digitalizzati da Google entro e non oltre il 5 maggio 2009) ed essi pagheranno poi gli autori in conformità con i termini del contratto autore-editore per quel Libro. Se l'autore non è soddisfatto dell'ammontare del pagamento ricevuto dall'editore, allora la controversia può essere risolta in arbitrato, con l'assistenza del Registro. Questo diritto all'arbitrato non è applicabile ad autori ed editori di Libri a scopo educativo (vale a dire Libri che, quando pubblicati, erano diretti principalmente ai mercati dell'educazione (scuole elementari e medie, scuole superiori e specializzazioni, università della terza età, scuole professionali, studi indipendenti e mercati simili) per uso in programmi educativi); controversie tra queste parti devono essere risolte in conformità con i termini di contratti individuali tra autore ed editori di Libri educativi.

Per qualsiasi Libro in commercio per cui Google sia autorizzato a fare Usi di Visualizzazione, sia l'autore che l'editore hanno il diritto di richiedere la rimozione del Libro o l'esclusione del Libro da uno o più' Usi di Visualizzazione. In questi casi, le decisioni più restrittive (sia da parte dell'autore che dell'editore) saranno decisive. Se l'autore e l'editore si trovano d'accordo sul fatto che Google possa usare per gli utenti un Libro in commercio, l'editore ha il diritto di controllare il prezzo del Libro. Se, al contrario, l'autore è contrario al prezzo ed è incapace di persuadere l'editore a cambiare il suddetto prezzo, allora l'autore ha il diritto di escludere il Libro dall'uso da parte degli utenti.

(2)    <u>Libri fuori stampa</u>

    (a)    <u>Rimozione ed esclusione dagli Usi di Visualizzazione</u>. Come sopra descritto, l'Accordo della Transazione assicura che tutti i Libri fuori stampa siano automaticamente inclusi negli Usi di Visualizzazione. Gli Aventi diritto possono decidere di rimuovere, escludere o determinare il prezzo di qualsiasi Libro fuori stampa come segue: (a) per i Libri che sono prodotti di "work for hire" [lavoro prodotto da un dipendente i cui copyright appartengono al committente e non allo scrittore] solo l'editore può decidere di rimuoverli, escluderli o determinarne il prezzo; (b) per i Libri i cui diritti sono restituiti all'autore o Libri che sono considerati "controllati dall'autore" (vedere paragrafo successivo), solo l'autore può decidere di rimuoverli, escluderli o determinarne il prezzo; (c) per tutti i Libri i cui diritti non sono stati restituiti, sia l'autore che l'editore, con un buon motivo, possono decidere di rimuoverli, escluderli o determinarne il prezzo (saranno applicati le direzioni più restrittive per quanto riguarda il livello di accesso ed il prezzo più alto).

        Ai fini della Transazione (e solo a tali fini) un Libro sarà considerato "controllato dall'autore" se il Libro può essere sottoposto a restituzione in conformità con il contratto autore-editore nel caso in cui l'autore abbia inoltrato (o inoltri) una richiesta di restituzione all'editore e l'editore non abbia risposto a quella richiesta né entro novanta giorni né entro il periodo previsto per una risposta scritta così' come specificato nel contratto autore-editore, a seconda di quale periodo è più lungo. Se sussistono queste condizioni, l'autore può richiedere al Registro (con copia all'editore) di considerare il Libro come "controllato dall'autore". In tale richiesta l'autore deve dichiarare che il Libro non è più in commercio come definito nel Requisito 1 (vedere Domanda 10(3)(a)) e che il periodo per la risposta da parte dell'editore (vale a dire novanta giorni o quanto specificato nel contratto autore-editore) è scaduto. La richiesta deve anche includere una copia della richiesta di restituzione precedentemente mandata all'editore ed una copia del relativo contratto autore-editore (se l'autore ne è in possesso).

        Se l'editore non contesta la richiesta per iscritto entro 120 giorni, il Registro considererà il Libro come "controllato dall'autore". Se l'editore contesta la richiesta entro i limiti di tempo previsti, le parti presenteranno la disputa al Registro per ottenere una decisione in merito.

    (b)    <u>Allocazione dei Pagamenti in Contanti e delle Entrate</u>. Il Registro effettuerà i pagamenti di un Libro fuori stampa separatamente all'autore e all'editore di quel Libro in conformità con i seguenti criteri: (a) 100% all'autore di un Libro i cui diritti gli sono stati restituiti o nel caso di Libro "controllato dall'autore"; (b) 100% all'editore di un Libro se il Libro è il risultato di "work for hire"[ lavoro prodotto da un dipendente i cui copyright appartengono al committente e non allo scrittore]; (c) per tutti gli altri Libri i cui diritti non sono restituiti all'autore, 65% all'autore e 35% all'editore se il Libro è stato pubblicato prima del 1987 e 50% all'autore e 50% all'editore se il Libro è stato pubblicato nel 1987 o dopo questa data.

(3)     Come determinare se un Libro è in commercio o fuori stampa

Ai fini della Transazione (e solo per questi fini), un Libro è considerato in commercio se ha uno dei due seguenti requisiti:

(a)   Requisito 1. Il Libro è in commercio in conformità con i termini del contratto autore-editore o se il contratto non prevede restituzione sotto nessuna circostanza. A questo fine, il Libro può essere "in commercio" anche se il contratto non usa il termine "in commercio". Se il contratto determina il concetto di "in commercio" facendo riferimento alle entrate guadagnate e se più del 50% delle entrate pagate all'editore provenienti dall'utilizzo del Libro sono generate dall'utilizzo di Google di quel Libro, allora tali entrate NON possono essere considerate nel determinare se il Requisito 1 è stato soddisfatto. Se il contratto determina il concetto di "in commercio" facendo riferimento alle copie vendute o un altro parametro diverso dalle entrate generate da quel Libro, allora un principio equivalente sarà applicato nel determinare se questo Requisito 1 sia stato soddisfatto o meno. Che un Libro o informazioni su quel Libro siano incluse in un database o che informazioni su quel Libro siano disponibili tra i risultati di un motore di ricerca non sono criteri di per se' sufficienti a definire quel Libro come "in commercio". Un Libro non è "in commercio" se il contratto prevede la possibilità di restituzione e tutti i criteri per la restituzione sono stati soddisfatti (eccetto il fatto che l'autore non deve aver mandato una richiesta di restituzione all'editore anche se richiesto dal contratto);

(b)   Requisito 2. L'editore, compatibilmente con i diritti che può avere sul Libro in conformità con il contratto autore-editore, ha annunciato pubblicamente al mercato di avere intrapreso i passi necessari per pubblicare una versione nuova o già esistente del Libro e l'edizione viene pubblicata entro dodici mesi dall'annuncio.

(4)     Controversie sul fatto che un Libro sia in commercio o fuori stampa

I membri della Sottoclasse degli Autori e della Sottoclasse degli Editori, o i loro rappresentanti nel Consiglio di Amministrazione del Registro, possono contestare lo status di un Libro ("in commercio" o "fuori stampa") presentando prove sufficienti al Registro (per esempio, contratti, documenti che provino i diritti, annunci di mercato o un affidavit) per stabilire se un Libro soddisfi o meno i requisiti descritti nel paragrafo (3), sopra. L'altra parte avrà il diritto di rispondere ma, se questo non è fatto entro 120 giorni, lo status del Libro sarà cambiato. Se sia l'autore che l'editore presentano prove contrastanti e non sono in grado di risolvere la questione mettendosi d'accordo, allora il Registro, o un arbitro scelto dal Registro, risolverà la controversia analizzando le prove di ciascuna parte ed altre prove e testimonianze rilevanti presentate dalle due parti, incluse le trattative tra le due parti e gli standard e la prassi del settore. La decisione del Registro (o dell'arbitro) è definitiva, anche se la decisione è relativa solo alla Transazione e non può essere usata a nessun altro scopo, come per esempio come precedente in un'altra controversia tra autore ed editore dello stesso Libro in un contesto diverso dalla Transazione.

(5)     Altre controversie

Tutte le controversie tra coautori, o tre eredi di un autore, o tra diversi altri Aventi diritto che sono membri della Sottoclasse degli Autori devono essere risolte in arbitrato. Controversie tra più Aventi diritto che sono membri della Sottoclasse degli Editori possono, ma non devono, essere risolte in arbitrato.

(6)     Allocazione dei Fondi non Reclamati tra autori ed editori

In conformità con le clausole relative ai Fondi non Reclamati descritte nella Domanda 9(K)(2), tutte le entrate stanziate per i membri della Sottoclasse degli Autori secondo le Normative Autore-Editore e non reclamate saranno distribuite ai membri della Sottoclasse degli Autori che le richiedono e tutte le entrate stanziate per i membri della Sottoclasse degli Editori e non reclamate saranno distribuite ai membri della Sottoclasse degli Editori che le richiedono.

(7)     Il Google Partner Program

Un Avente diritto può decidere di inserire un Libro nel Partner Program invece che negli Usi di Visualizzazione in conformità con la Transazione perché ritiene di poter negoziare termini economici migliori con Google o per altre ragioni. La Transazione con Google è relativa solo agli Usi di Visualizzazione in conformità con la Transazione, non al Partner Program. Le Normative Autore-Editore offrono agli Aventi diritto di un Libro in commercio certi diritti se un altro Avente diritto sullo stesso Libro inserisce il Libro nel Partner Program (o in qualsiasi altro programma di Google che ha modelli di entrate simili all'Accordo della Transazione) invece dei modelli di entrate conformi con l'Accordo della Transazione. Questi diritti sono relativi solo ai Libri pubblicati in conformità con un contratto autore-editore realizzato prima del 1992 e che non sia stato rettificato in tempi successivi per tenere conto dei diritti elettronici. Tali diritti sono riepilogati qui di seguito:

(a)   Richieste di rimozione o trasferimento. Un Avente diritto che ritiene che Google stia usando un Libro in commercio nel Partner Program (o qualsiasi altro programma di Google con modelli di entrate simili all'Accordo della Transazione) senza la necessaria autorizzazione da parte dell'Avente diritto stesso può richiedere che Google o rimuova il Libro dall'altro programma Google o trasferisca il Libro nel programma dell'Accordo della Transazione. **La richiesta deve essere presentata al Registro e a Google seguendo il modulo di Notifica che si trova su http://www.googlebooksettlement.com/intl/it oppure presso l'Amministratore della Transazione. Google informerà la persona o l'entità che gli ha permesso di usare il Libro nel Partner Program o in altri programmi. Se quella persona o entità decide di contestare la richiesta di rimozione o di trasferimento entro trenta giorni, deve Notificare Google ed il Registro usando il modulo di Notifica che si trova su http://www.googlebooksettlement.com/intl/it/ o presso l'Amministratore della Transazione.**

(b)   Richieste non contestate. Se la persona o entità che ha concesso a Google l'uso del Partner Program o altri programmi non risponde alla Notifica entro trenta giorni, allora Google rimuoverà o trasferirà il Libro al programma dell'Accordo della Transazione come reclamato dall'Avente diritto richiedente. Se trasferito al programma dell'Accordo della Transazione, il Libro sarà soggetto all'Accordo della Transazione e i pagamenti saranno effettuati in conformità con le Normative Autore-Editore.

(c)   Richieste di rimozione contestate. Se la richiesta è che Google rimuova il Libro dal Partner Program o altri programmi (invece di trasferire il suddetto Libro al programma dell'Accordo della Transazione) e se la richiesta è contestata dall'altro Avente diritto, allora Google deciderà se onorare o meno tale richiesta. Se una parte vuole contestare la decisione di Google può fare causa all'altra parte per determinare chi ha il diritto di autorizzare Google ad usare il Libro nel Partner Program o in altri programmi. Non si rinuncia a nessun diritto nei confronti di Google in connessione con una qualsiasi decisione presa da Google sull'uso o la rimozione del Libro.

(d) Richieste di trasferimento contestate. Se la richiesta è che Google trasferisca il Libro dal Partner Program o un altro programma al programma dell'Accordo della Transazione, allora Google smetterà di usare il Libro nel suddetto programma fino a quando i due Aventi diritto in causa risolveranno la loro controversia. Uno qualsiasi dei due Aventi diritto può fare causa all'altro per determinare chi ha il diritto di autorizzare Google ad usare il Libro nel Partner Program o in altri programmi. In ogni caso, Google includerà il Libro nel programma dell'Accordo della Transazione solo se gli Aventi diritto in questione autorizzano congiuntamente Google a procedere o se uno degli Aventi diritto in questione ottiene un decreto del Tribunale che lo autorizzi a presentare tale richiesta.

---

**Quanto sopra è solo una sintesi delle Normative Autore-Editore e La preghiamo di rivedere attentamente tali procedure disponibili su http://www.googlebooksettlement.com/intl/it/agreement.html (vedere Allegato A all'Accordo della Transazione) o presso l'Amministratore della Transazione.**

## PARTECIPAZIONE ALLA TRANSAZIONE

## 11.        Cosa succede se non faccio niente?

**Se Lei è un membro della Sottoclasse degli Autori o della Sottoclasse degli Editori, non ha bisogno di fare niente a questo punto se vuole partecipare alla Transazione.** Se sceglie di partecipare alla Transazione, i Suoi diritti in questa causa saranno difesi dai rappresentanti della Sottoclasse e dalla Difesa della Classe. Riceverà i benefici della Transazione se approvati dal Tribunale (e se presenta la richiesta entro i termini stabiliti) e le Sue richieste contro Google e le Biblioteche Aderenti saranno annullate ed archiviate dal Tribunale. Se partecipa alla Transazione, sarà tenuto per legge a conformarsi a qualsiasi sentenza o decisione emessa dal Tribunale riguardo alla Transazione, che sia in Suo favore o no.

## 12.        Nei confronti di quali soggetti rinuncio ai diritti?

A partire dalla Data Effettiva, gli Aventi diritto rinunceranno alle pretese contro Google e tutte le Biblioteche Aderenti e ogni passato, presente e futuro genitore, predecessore, successore, sussidiario, affiliato e divisioni e ciascuno dei rispettivi amministratori, consiglieri, impiegati ed altri elencati nell'Articolo X della Transazione. Per le specifiche pretesea cui si rinuncia contro ciascuno di questi soggetti, vedere Domanda 13. Per ulteriori informazioni sui soggettiin questione, si prega di leggere il testo completo nell'Articolo X dell'Accordo della Transazione.

## 13.        Se partecipo alla Transazione, a quali diritti rinuncio esattamente?

Quanto segue è una sintesi delle pretesea cui gli Aventi diritto rinunceranno al maturarsi della Data Effettiva. Per ulteriori informazioni sulle pretese a cui si rinuncia, si prega di vedere il testo completo nell'Articolo X dell'Accordo della Transazione.

Gli Aventi diritto rinunceranno a tutti le pretese contro Google e ciascuna Biblioteca Aderente che derivano da un certa condotta verificatosi prima della Data Effettiva, inclusa la digitalizzazione di Google di Libri ed Inserti; l'uso da parte di Google di copie digitali in loro prodotti e servizi; la messa a disposizione alle biblioteche da parte di Google di copie digitali e il ricevimento delle biblioteche di tali copie (eccetto la messa a disposizione a Altre Biblioteche da parte di Google di copie digitali dopo il 27 dicembre 2008) e l'uso da parte delle biblioteche (eccetto per le Altre Biblioteche) di tali copie digitali in modo conforme all' l'Accordo della Transazione. Se però un'Altra Biblioteca usa le copie digitali in

modo illegale, non si rinuncia a nessun diritto contro tale Altra Biblioteca per la sua messa a disposizione di Libri a Google o il ricevimento di qualsiasi copia digitale.

Gli Aventi diritto rinunceranno a qualsiasi pretesa contro Google e ciascuna Biblioteca Aderente in Pieno, ciascuna Biblioteca Partecipante o Biblioteca di Dominio Pubblico che, dopo la Data Effettiva, scaturisca da atti o omissioni autorizzati dall'Accordo della Transazione o da un pertinente Accordo Biblioteca-Registro. Non si rinuncia a nessun diritto maturato dopo la Data Effettiva contro Altre Biblioteche.

**Però:**

1. Non si rinuncia a nessun diritto da parte dei membri della classe che hanno rinunciato alla Transazione entro i limiti di tempo consentiti. Le relative pretese non saranno affette in modo avverso dalla Transazione.

2. La Transazione prevede che Google e le Biblioteche Aderenti in Pieno siano autorizzate ad usare Libri ed Inserti solo in conformità con la Transazione e qualsiasi pertinente Accordo Biblioteca-Registro, e non si rinuncia a nessun diritto basato su un uso qualsiasi di Libri ed Inserti se non autorizzato dall'Accordo della Transazione o da un pertinente Accordo Biblioteca-Registro.

3. Non si rinuncia a nessun diritto per violazioni di uno qualsiasi degli obblighi di Google o della Biblioteca Contribuente in conformità con la Transazione o con un pertinente Accordo Biblioteca-Registro.

4. Non si rinuncia a nessun diritto per l'uso non autorizzato da parte di Google di Libri ed Inserti in programmi diversi da quelli nell'Accordo della Transazione.

5. Non si rinuncia a nessun diritto riguardo all'uso da parte di Google di Inserti in lavori governativi e Libri di dominio pubblico se Google respinge la richiesta di esclusione di un Avente diritto. Vedere Sezione 3.5(b)(vii) dell'Accordo della Transazione per ulteriori dettagli.

6. Non si rinuncia a nessun diritto riguardo a qualsiasi atto o omissione successivi al 28 ottobre 2008 che, se verificatisi dopo la Data Effettiva, non sarebberostati autorizzati dall'Accordo della Transazione.

7. Non si rinuncia a nessun diritto riguardo a un qualsiasi uso di copie digitali da parte di Altre Biblioteche.

8. Non si rinuncia a nessun diritto riguardo all'uso di Libri ed Inserti al di fuori degli Stati Uniti o riguardo a qualsiasi digitalizzazione al di fuori degli Stati Uniti.

9. Non si rinuncia a nessun diritto riguardo a un qualsiasi atto di Google negli Stati Uniti in risposta ad una richiesta di un utente al di fuori degli Stati Uniti che risulti nella visualizzazione di parti di un Libro o un Inserto nella giurisdizione dell'utente, a meno che la visualizzazione non sia legale o a meno che Google non abbia ottenuto il permesso per tale visualizzazione.

# RINUNCIA ALLA TRANSAZIONE

## 14. Che cosa devo fare se non voglio partecipare alla Transazione?

Se Lei non desidera essere incluso nella Transazione ma vuole comunque mantenere il diritto di fare causa a Google ed alle Biblioteche Aderenti, deve procedere con la rinuncia alla Transazione. Rinunciando, mantiene il diritto di fare causa individualmente o di unirsi ad un'altra causa contro Google riguardo alle richieste presentate in questa causa.

Se decide di rinunciare alla Transazione, non avrà diritto al Pagamento in Contanti o a partecipare a nessun modello di entrate in conformità con la Transazione. Avrà comunque il diritto di fare causa indipendentemente. In aggiunta, anche se decide di rinunciare alla Transazione, potrà sempre contattare il Registro o Google in un secondo momento per provare a rinegoziare un accordo separato per l'inclusione dei Suoi Libri in uno qualsiasi dei programmi dell'Accordo della Transazione.

## 15. Come rinuncio alla Transazione?

Può rinunciare alla Transazione in questi modi:

1) vada online su http://www.googlebooksettlement.com/intl/it/ e segua le istruzioni per rinunciare entro e non oltre il 4 settembre 2009, oppure

2) mandi una Notifica scritta all'Amministratore della Transazione per posta prioritaria, con spese di spedizione prepagate, entro e non oltre il 4 settembre 2009 a questo indirizzo: Google Book Search Settlement Administrator, c/o Rust Consulting, PO Box 9364, Minneapolis, MN 55440-9364, UNITED STATES OF AMERICA. Il timbro postale determinerà la data di spedizione.

Non c'è bisogno di specificare le Sue ragioni per la rinuncia. La Sua richiesta di rinuncia deve però essere firmata o, se mandata online, presentata da una persona autorizzata, deve dichiarare a quale Sottoclasse vuole rinunciare (Sottoclasse degli Autori o Sottoclasse degli Editori), deve fornire il Suo nome ed indirizzo o, se Lei è un agente per un autore, il nome del membro della Sottoclasse degli Autori che rappresenta (vale a dire la persona il cui nome appare come autore del Libro o Inserto), e, se questo è il caso, qualsiasi pseudonimo usato come nome dall'autore dei Libri. Per essere sicuri che Google capisca chiaramente quali Libri e/o Inserti sono coinvolti nella decisione di rinuncia i membri della Sottoclasse degli Autori devono fornire il nome di tutte le case editrici con cui stanno pubblicando, o hanno pubblicato, Libri in cui hanno un interesse di copyright USA. Google e gli Attori chiedono (ma non richiedono) che tutti i membri della Sottoclasse degli Autori o Sottoclasse degli Editori diano le seguenti informazioni su ogni Libro o Inserto in cui hanno un interesse di copyright USA: titolo, autore, editore e ISBN (se il Libro ne ha uno).

# OPPORSI O COMMENTARE LA TRANSAZIONE

## 16. Posso oppormi alla Transazione o presentare commenti su di essa?

Sì. Se non rinuncia alla Transazione, ha il diritto di opporsi o presentare commenti su parte o tutta la Transazione, inclusa la voce sul giudizio finale che respinge la causa con pregiudizio e la richiesta di onorari degli avvocati e costi del Consiglio per la Sottoclasse degli Autori. Se decide di rinunciare alla Transazione, deve, entro e non oltre il 4 settembre 2009, fare Domanda al Tribunale descrivendo la Sua

opposizione o posizione da rivendicare e le basi per tale opposizione, insieme alle copie di qualsiasi documento o informazione probante. Invii il tutto a:

Office of the Clerk
J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007
UNITED STATES OF AMERICA

Deve anche fornire una copia di tali documenti tramite email o posta prioritaria ai seguenti avvocati:

| Consulenti Legali per la Sottoclasse degli Autori: | Consulenti Legali per la Sottoclasse degli Editori: | Consulenti Legali per Google: |
|---|---|---|
| Michael J. Boni, Esq. Joanne Zack, Esq. Joshua Snyder, Esq. Boni & Zack LLC 15 St. Asaphs Road Bala Cynwyd, PA 19004 UNITED STATES OF AMERICA bookclaims@bonizack.com | Jeffrey P. Cunard, Esq. Bruce P. Keller, Esq. Debevoise & Plimpton LLP 919 Third Avenue New York, NY 10022 UNITED STATES OF AMERICA bookclaims@debevoise.com | Daralyn J. Durie, Esq. Joseph C. Gratz, Esq. Durie Tangri Lemley Roberts & Kent LLP 332 Pine Street, Suite 200 San Francisco, CA 94104 UNITED STATES OF AMERICA bookclaims@durietangri.com |

Può presentarsi all'udienza di persona o, se ha un avvocato che La rappresenta, il Suo avvocato può presentarsi di persona e dichiarare perché la Transazione o una qualsiasi parte della Transazione non dovrebbe essere approvata. Il documento presentato al tribunale deve anche includere la Notifica al tribunale che Lei o il Suo avvocato intendete procedere come sopra descritto.

A meno che Lei non si opponga come previsto in questa Notifica, non avrà il diritto di contestare i termini e le condizioni della Transazione, compresa la Domanda tramite Consulente Legale della Sottoclasse degli Autori per gli onorari ed i costo dell'avvocato, e le persone che non si oppongono secondo i termini dati saranno considerate rinunciatarie e saranno precluse dal sollevare tali opposizioni nel futuro.

## 17. Qual'è la differenza tra opporsi alla Transazione e rinunciare alla Transazione?

Può fare opposizione alla Transazione mentre allo stesso tempo rimane un membro della classe e rimane soggetto alla Transazione, se approvata, ma non è d'accordo su alcuni aspetti della Transazione stessa. Un'opposizione Le permette di presentare al Tribunale il Suo punto di vista.

Al contrario, rinunciare significa che Lei non sarà più un membro della classe e che non vuole essere soggetto ai termini e le condizioni della Transazione. Una volta che rinuncia, perde ogni diritto ad opporsi alla Transazione perché la Transazione non La riguarderà più.

## GLI AVVOCATI CHE LA RAPPRESENTANO

## 18. Avrò un avvocato che rappresenterà i miei interessi in queste cause?

Sì. Il Tribunale ha nominato i seguenti studi legali per rappresentare Lei e gli altri membri della classe:

| Consulenti Legali per la Sottoclasse degli Autori | Consulenti Legali per la Sottoclasse degli Editori |
|---|---|
| Michael J. Boni, Esq. | Jeffrey P. Cunard, Esq. |
| Joanne Zack, Esq. | Bruce P. Keller, Esq. |
| Joshua Snyder, Esq. | Debevoise & Plimpton LLP |
| Boni & Zack LLC | 919 Third Avenue |
| 15 St. Asaphs Road | New York, NY 10022 |
| Bala Cynwyd, PA 19004 | UNITED STATES OF AMERICA |
| UNITED STATES OF AMERICA | |

## 19. Come saranno pagati gli avvocati?

I Consulenti Legali della Sottoclasse degli Autori richiederà al Tribunale di accordare il rimborso dei costi e delle spese degli avvocati perl'ammontare di US $30 milioni. Su approvazione del Tribunale, Google pagherà i suddetti costi e spese legali. (i Consulenti Legali della Sottoclasse degli Autori hanno sostenuto spese pari a circa US $140.000 dalla data dell'Accordo della Transazione). Google pagherà tali costi e spese in aggiunta all'ammontare che ha già acconsentito di pagare ai membri della Sottoclasse e agli Aventi diritto.

I Consulenti Legali per la Sottoclasse degli Editori hanno acconsentito a non richiedere il rimborso degli onorari degli avvocati o delle spese dai fondi della Transazione dell'azione di categoria. Al contrario, i Consulenti Legali della Sottoclasse degli Editori saranno pagati dall'accordo tra Google e le case editrici in casi relativi, The McGraw-Hill Companies, Inc. et al. v. Google Inc., Caso No. 05 CV 8881 (S.D.N.Y.). I cinque editori attori in questa azione sono rappresentanti della Sottoclasse per conto della Sottoclasse degli Editori. Ammesso che l'Accordo della Transazione sia finalizzato, dopo la Data Effettiva essi rinunceranno a ciascuna delle loro cause contro Google. Google ha acconsentito a pagare US $15.5 milioni come transazione in quell'azione legale. Da questa cifra saranno pagati le spese ed i costi dei Consulenti Legali per la Sottoclasse degli Editori e il resto sarà usato dall'Association of American Publishers per creare un fondo che serva gli interessi sia degli editori che degli autori. L'uso dei restanti fondi è soggetto ad approvazione dalla maggioranza dei membri del Consiglio di Amministrazione del Registro, che includa l'approvazione di almeno un autore consigliere e di un editore consigliere.

## 20. Dovrei avere un mio avvocato personale?

Non c'è bisogno di assumere un avvocato personale, ma se Lei desidera averne uno che parli per Lei o che venga in Tribunale, deve compilare un Avviso di Intento di Comparizione. Vedere Domanda 23 per capire come presentare una Notifica di intento a comparire. Se decide di assumere un avvocato che la rappresenti nella azione legale, Lei dovrà sostenere tutte le spese relative.

# UDIENZA CONCLUSIVA DI AUTORIZZAZIONE DEL TRIBUNALE

## 21. Dove e quando il Tribunale deciderà se concedere l'autorizzazione conclusiva alla Transazione?

Il tribunale condurrà un'Udienza sull'Equità della Transazione il 7 ottobre 2009 alle ore 10:00 (GMT-05:00) nell'aula di Tribunale 11A presso United States District Court for the Southern District of New York, United States Courthouse, 500 Pearl Street, New York, NY 10007, per considerare se la Transazione è corretta, giusta e ragionevole. All'Udienza, o dopo l'Udienza, il Tribunale deciderà se approvare o meno l'accordo e la mozione per le spese ed i costi degli avvocati. Se sono stati presentati commenti o obiezioni, il Tribunale li considererà in quel momento.

L'ora e il giorno dell'udienza potrebbero essere cambiati dal tribunale senza ulteriore avviso. **Se desidera partecipare alla Transazione, al momento non deve fare nient'altro.**

## 22. Devo assistere all'Udienza sull'Equità della Transazione?

No. La partecipazione non è obbligatoria. I Consulenti Legali della classe sono pronti a rispondere alle Domande del Tribunale a nome suo. Se Lei o il Suo avvocato volete partecipare all'Udienza sull'equità della Transazione potete farlo a vostre spese.

## 23. Posso intervenire all'Udienza sull'Equità della Transazione?

Sì. Lei può parlare all'Udienza sull'Equità della Transazione o assumere un avvocato che lo faccia per Lei. Se vuole procedere, deve compilare un "Avviso di Intento di Comparizione" preso il Tribunale. L'Avviso di Intento di Comparizione deve includere il nome ed il numero di questa causa (The Authors Guild, Inc., et al. v. Google Inc., No. 05 CV 8136) e deve dichiarare che desidera partecipare all'Udienza sull'Equità della Transazione. Deve anche includere il Suo nome, indirizzo, numero di telefono e firma così come il nome e l'indirizzo dell'avvocato, se ne ha uno che viene con Lei. Non Le è possibile partecipare all'Udienza sull'Equità della Transazione se decide di rinunciare alla Transazione. Il Suo Avviso di Intento di Comparizione deve essere registrato presso il Tribunale entro e non oltre il 4 settembre 2009 e mandato a:

> Office of the Clerk
> J. Michael McMahon
> U.S. District Court for the Southern District of New York
> 500 Pearl Street
> New York, New York 10007
> UNITED STATES OF AMERICA

Copie dell'avviso di intento di comparizione devono essere spedite per email o posta, in questo caso timbrata entro e non oltre il 4 settembre 2009, a:

| Consulenti Legali per la Sottoclasse degli Autori: | Consulenti Legali per la Sottoclasse degli Editori: | Consulenti Legali per Google: |
|---|---|---|
| Michael J. Boni, Esq. Joanne Zack, Esq. Joshua Snyder, Esq. Boni & Zack LLC 15 St. Asaphs Road Bala Cynwyd, PA 19004 UNITED STATES OF AMERICA bookclaims@bonizack.com | Jeffrey P. Cunard, Esq. Bruce P. Keller, Esq. Debevoise & Plimpton LLP 919 Third Avenue New York, NY 10022 UNITED STATES OF AMERICA bookclaims@debevoise.com | Daralyn J. Durie, Esq. Joseph C. Gratz, Esq. Durie Tangri Lemley Roberts & Kent LLP 332 Pine Street, Suite 200 San Francisco, CA 94104 UNITED STATES OF AMERICA bookclaims@durietangri.com |

## ULTERIORI INFORMAZIONI

## 24. Dove posso ottenere ulteriori informazioni?

L'Accordo della Transazione, gli allegati ed altri documenti legali che sono stati presentati al Tribunale riguardo a questa causa contengono i dettagli di questa Transazione. Se lo desidera, può guardare e copiare i suddetti documenti legali in qualsiasi momento durante l'orario di apertura regolare presso l'Office of the Clerk, J. Michael McMahon, U.S. District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007. Questi documenti sono anche disponibili sul sito web della Transazione http://www.googlebooksettlement.com/intl/it/.

Inoltre, se ha domande sulla azione legale o su questa Notifica, Lei può:

- visitare il sito web http://www.googlebooksettlement.com/intl/it/,

- contattare l'Associazione degli Autori su http://www.authorsguild.org, o l'Associazione degli Editori Americani su http://www.publishers.org,

- telefonare al numero di telefono specifico che si trova alla fine di questa Notifica (in Appendice), o

- scrivere a:

    Google Book Search Settlement Administrator
    c/o Rust Consulting, Inc.
    PO Box 9364
    Minneapolis, MN 55440-9364
    UNITED STATES OF AMERICA

Se cambia indirizzo o se questa Notifica non è stata mandata all'indirizzo giusto, si prega di avvertire l'Amministratore della Transazione. Se l'Amministratore della Transazione non ha il Suo indirizzo corretto, lei non può ricevere i benefici in conformità con la Transazione o l'avviso di importanti sviluppi.

## APPENDICE:
## NUMERI DI TELEFONO DELL'AMMINISTRATORE DELLA TRANSAZIONE

Informazioni complete sulla Transazione ed il Modulo di Richiesta sono disponibili su http://www.googlebooksettlement.com/intl/it/. I membri della classe possono richiedere assistenza e fare domande attraverso questo sito web.

Per i membri della classe che non sono in grado di accedere al sito web o di richiedere ulteriore assistenza, l'Amministratore della Transazione è raggiungibile ai numeri di telefono alla pagina seguente. Dove possibile, questi numeri sono numeri verdi. In paesi in cui non sono disponibili numeri verdi, si prega di usare il numero internazionale in teleselezione (+1.612.359.8600) e, se lo desidera, l'Amministratore della Transazione La richiamerà.

| Paese | Numero di telefono |
|---|---|
| Africa del Sud | Numero Verde 0.800.981.216 |
| Albania | Numero Verde 00 800 0010 (aspettare il segnale acustico) 888.839.1909 |
| Algeria | 00 1.612.359.8600 |
| Andorra | 00 1.612.359.8600 |
| Angola | Numero Verde 808 000 011 (aspettare il segnale acustico) 888.839.1909 |
| Anguilla | Numero Verde 1.888.839.1909 |
| Antigua e Barbuda | Numero Verde 1.800.988.7132 |
| Antille Paesi Bassi | Numero Verde 1.888.839.1909 |
| Arabia Saudita | Numero Verde 800.844.6841 |
| Argentina | Numero Verde 0800.666.1520 |
| Armenia | Numero Verde 0 800 10 111 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 00 1.612.359.8600 |
| Aruba | 00 1.612.359.8600 |
| Australia | Numero Verde 1.800.669.201 |
| Austria | Numero Verde 00 800 8000 3300 |
| Azerbaijan | 00 1.612.359.8600 |
| Bahamas | Numero Verde 1.888.762.3775 |
| Bahrain | Numero Verde 800.19.908 |
| Bangladesh | Numero Verde 157 0011 (aspettare il segnale acustico) 888.839.1909; or 00 1.612.359.8600 |
| Barbados | Numero Verde 1.800.988.7146 |
| Belarus | Numero Verde 8 (aspettare il segnale acustico) 800 101 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 8 (aspettare il segnale acustico) 10 1.612.359.8600 |
| Belgio | Numero Verde 00 800 8000 3300 |
| Belize | Numero Verde 811 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 00 1.612.359.8600 |
| Benin | Numero Verde 102 (aspettare il segnale acustico) 888.839.1909 |
| Bermuda | Numero Verde 1.800.988.7139 |
| Bolivia | Numero Verde 800.10.0675 |
| Bosnia e Erzegovina | Numero Verde 00 800 0010 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 00 1.612.359.8600 |
| Botswana | 00 1.612.359.8600 |
| Brasile | Numero Verde 0800.891.7626 |
| Brunei | Numero Verde 800 1111(aspettare il segnale acustico) 888.839.1909 |
| Bulgaria | Numero Verde 00 800 8000 3300 |
| Burkina Faso | 00 1.612.359.8600 |
| Burundi | 00 1.612.359.8600 |
| Cambodia | Numero Verde 1 800 881 001 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 001 1.612.359.8600 |

| Paese | Numero di telefono |
|---|---|
| Camerun | 00 1.612.359.8600 |
| Canada | Numero Verde 1.888.356.0248 |
| Capo Verde | 0 1.612.359.8600 |
| Chad | 15 1.612.359.8600 |
| Cile | Numero Verde 1230.020.9265 |
| Cina | Numero Verde 00 800 8000 3300 |
| Cipro | Numero Verde 00 800 8000 3300 |
| Colombia | Numero Verde 01800.700.2137 |
| Comore | 00 1.612.359.8600 |
| Corea del Sud | Numero Verde 00.308.13.1762 |
| Costa d'Avorio | 00 1.612.359.8600 |
| Costa Rica | Numero Verde 0800.044.0102 |
| Croazia | Numero Verde 0800.222.460 |
| Danimarca | Numero Verde 00 800 8000 3300 |
| Dominica | Numero Verde 1.800.988.7130 |
| Ecuador | Numero Verde 1.800.010.575 |
| Egitto | Numero Verde 2510 0200 (aspettare il segnale acustico) 888.839.1909 (Cairo); Numero Verde 02 2510 0200 (aspettare il segnale acustico) 888.839.1909 |
| El Salvador | Numero Verde 800.6599 |
| Emirati Arabi Uniti | Numero Verde 8000.441.6842 |
| Estonia | Numero Verde 00 800 8000 3300 |
| Fiji | Numero Verde 004 890 1001 (aspettare il segnale acustico) 888.839.1909 |
| Filippine | Numero Verde 1.800.1.441.0425 |
| Finlandia | Numero Verde 00 800 8000 3300 |
| Francia | Numero Verde 00 800 8000 3300 |
| Gabon | 00 1.612.359.8600 |
| Gambia | 00 1.612.359.8600 |
| Georgia | 8 (aspettare il segnale acustico) 10 1.612.359.8600 |
| Germania | Numero Verde 00 800 8000 3300 |
| Ghana | Numero Verde 0191 (aspettare il segnale acustico) 888.839.1909 |
| Giamaica | Numero Verde 1.800.988.7135 |
| Giappone | Numero Verde 0120.948.079 |
| Gibilterra | Numero Verde 8800 (aspettare il segnale acustico) 888.839.1909 |
| Gibuti | 00 1.612.359.8600 |
| Giordania | Numero Verde 18 800 000 (aspettare il segnale acustico) 888.839.1909 |
| Grecia | Numero Verde 00.8004.414.6186 |
| Grenada | Numero Verde 1.800.988.7159 |
| Groenlandia | 00 1.612.359.8600 |
| Guadalupa | 00 1.612.359.8600 |
| Guam | Numero Verde 1.888.356.0248 |
| Guatemala | Numero Verde 138 120 (aspettare il segnale acustico) 888.839.1909; or Numero Verde 999 91 90 (aspettare il segnale acustico) 888.839.1909 |
| Guiana Francese | Numero Verde 0800 99 0011(aspettare il segnale acustico) 888.839.1909 |

| Paese | Numero di telefono |
|---|---|
| Guinea | 00 1.612.359.8600 |
| Guinea Equatoriale | 00 1.612.359.8600 |
| Guinea-Bissau | 00 1.612.359.8600 |
| Guyana | Numero Verde 159 (aspettare il segnale acustico) 888.839.1909 |
| Haiti | Numero Verde 183 (aspettare il segnale acustico) 888.839.1909 (English); o Numero Verde 181 (aspettare il segnale acustico) 888.839.1909 (Creolo) |
| Honduras | Numero Verde 800 0123 (aspettare il segnale acustico) 888.839.1909 |
| Hong Kong | Numero Verde 3071.5077 |
| India | Numero Verde 000.800.440.1709 |
| Indonesia | Numero Verde 001.803.017.7714 |
| Irlanda | Numero Verde 00 800 8000 3300 |
| Islanda | Numero Verde 00 800 8000 3300 |
| Isola di Man | +1.612.359.8600 |
| Isole Cayman | Numero Verde 1.800.988.7151 |
| Isole Cook | Numero Verde 09 111 (aspettare il segnale acustico) 888.839.1909 |
| Isole Falkland | 00 1.612.359.8600 |
| Isole Faroe | 00 1.612.359.8600 |
| Isole Mariana del Nord | 1.612.359.8600 |
| Isole Marshall | 011 1.612.359.8600 |
| Isole Solomon | 00 1.612.359.8600 |
| Isole Vergini Americane | Numero Verde 1.888.356.0248 |
| Isole Vergini Britanniche | Numero Verde 1.800.988.7149 |
| Israele | Numero Verde 00 800 8000 3300 |
| Italia | Numero Verde 00 800 8000 3300 |
| Jersey e Guernsey | +1.612.359.8600 |
| Kazakhstan | Numero Verde 8 (aspettare il segnale acustico) 800 121 4321 (aspettare il segnale acustico) 888.839.1909 |
| Kenia | 000 1.612.359.8600 |
| Kiribati | 00 1.612.359.8600 |
| Kuwait | 00 1.612.359.8600 |
| Kyrgyzstan | 00 1.612.359.8600 |
| Laos | 00 1.612.359.8600 |
| Latvia | Numero Verde 00 800 8000 3300 |
| Lesotho | 00 1.612.359.8600 |
| Libano | 00 1.612.359.8600 |
| Liberia | 00 1.612.359.8600 |
| Libia | 00 1.612.359.8600 |
| Liechtenstein | 00 1.612.359.8600 |
| Lituania | Numero Verde 00 800 8000 3300 |
| Lussemburgo | Numero Verde 00 800 8000 3300 |
| Macau | Numero Verde 0800 111 (aspettare il segnale acustico) 888.839.1909 |
| Macedonia | Numero Verde 0 8000 4288 (aspettare il segnale acustico) 888.839.1909 |

| Paese | Numero di telefono |
|---|---|
| Madagascar | 00 1.612.359.8600 |
| Malawi | 00 1.612.359.8600 |
| Maldive | 00 1.612.359.8600 |
| Malesia | Numero Verde 1.800.88.0895 |
| Mali | 00 1.612.359.8600 |
| Malta | Numero Verde 00 800 8000 3300 |
| Marocco | Numero Verde 002 11 0011 (aspettare il segnale acustico) 888.839.1909 |
| Martinica | Numero Verde 0800 99 0011 (aspettare il segnale acustico) 888.839.1909 |
| Mauritania | 00 1.612.359.8600 |
| Mauritius | Numero Verde 802.044.0053 |
| Mayotte | 00 1.612.359.8600 |
| Messico | Numero Verde 01.800.681.1853 |
| Micronesia | Numero Verde 288 (aspettare il segnale acustico) 888.839.1909 |
| Moldova | 00 1.612.359.8600 |
| Monaco | Numero Verde 800.93412 |
| Mongolia | 001 1.612.359.8600 |
| Montenegro | 00 1.612.359.8600 |
| Montserrat | Numero Verde 1.888.839.1909 |
| Mozambico | 00 1.612.359.8600 |
| Namibia | 00 1.612.359.8600 |
| Nauru | 00 1.612.359.8600 |
| Nicaragua | Numero Verde 1 800 0164 (aspettare il segnale acustico) 888.839.1909 |
| Niger | 00 1.612.359.8600 |
| Nigeria | 009 1.612.359.8600 |
| Niue | 00 1.612.359.8600 |
| Norvegia | Numero Verde 00 800 8000 3300 |
| Nuova Caledonia | 00 1.612.359.8600 |
| Nuova Zelanda | Numero Verde 0800.447.916 |
| Oman | 00 1.612.359.8600 |
| Paesi Bassi | Numero Verde 00 800 8000 3300 |
| Pakistan | Numero Verde 00800.900.44023 |
| Palau | 011 1.612.359.8600 |
| Panama | Numero Verde 00.1.800.203.1978 |
| Papua Nuova Guinea | 05 1.612.359.8600 |
| Paraguai | 002 1.612.359.8600 |
| Peru | Numero Verde 0800.54026 |
| Polinesia francese | 00 1.612.359.8600 |
| Polonia | Numero Verde 00 800 8000 3300 |
| Porto Rico | Numero Verde 1.888.356.0248 |
| Portogallo | Numero Verde 00 800 8000 3300 |
| Qatar | 00 1.612.359.8600 |
| Regno Unito | Numero Verde 00 800 8000 3300 |
| Repubblica Ceca | Numero Verde 00 800 8000 3300 |
| Repubblica del Congo | 00 1.612.359.8600 |
| Repubblica dell'Africa Centrale | 00 1.612.359.8600 |
| Repubblica Democratica del Congo | 00 1.612.359.8600 |

| Paese | Numero di telefono |
|---|---|
| Repubblica Dominicana | Numero Verde 1.888.751.8874 |
| Riunione | Numero Verde 0800 99 0011 (aspettare il segnale acustico) 888.839.1909 |
| Romania | Numero Verde 08008.94930 |
| Russia | Numero Verde 8 10 (aspettare il segnale acustico) 800 8000 3300 (Mosca); o 8 (aspettare il segnale acustico) 10 1.612.359.8600 |
| Rwanda | 00 1.612.359.8600 |
| Saint Pierre e Miquelon | Numero Verde 0800 99 0011 (aspettare il segnale acustico) 888.839.1909 |
| Saint Vincent e Grenadine | Numero Verde 1.800.988.7134 |
| Samoa | 0 1.612.359.8600 |
| San Kitts e Nevis | Numero Verde 1.800.988.7156 |
| Santa Lucia | 1.612.359.8600 |
| Sant'Elena | 00 1.612.359.8600 |
| Sao Tome e Principe | 00 1.612.359.8600 |
| Senegal | Numero Verde 800 103 073 (aspettare il segnale acustico) 888.839.1909 |
| Serbia | 00 1.612.359.8600 |
| Seychelles | 00 1.612.359.8600 |
| Sierra Leone | Numero Verde 1100 (aspettare il segnale acustico) 888.839.1909 |
| Singapore | Numero Verde 800.130.1602 |
| Siria | Numero Verde 0 801 (aspettare il segnale acustico) 888.839.1909 |
| Slovacchia | Numero Verde 00 800 8000 3300 |
| Slovenia | Numero Verde 0800.80419 |
| Somalia | 00 1.612.359.8600 |
| Spagna | Numero Verde 00 800 8000 3300 |
| Sri Lanka | 00 1.612.359.8600 |
| Stati Uniti | Numero Verde 1.888.356.0248 |
| Sudan | 00 1.612.359.8600 |
| Suriname | Numero Verde 156 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 00 1.612.359.8600 |
| Svezia | Numero Verde 00 800 8000 3300 |
| Svizzera | Numero Verde 00 800 8000 3300 |
| Swaziland | 00 1.612.359.8600 |

| Paese | Numero di telefono |
|---|---|
| Tailandia | Numero Verde 001.800.13.203.2853 |
| Taiwan | Numero Verde 0800666907 |
| Tajikistan | 8 (aspettare il segnale acustico) 10 1.612.359.8600 |
| Tanzania | 000 1.612.359.8600 |
| Territori palestinesi | 00 1.612.359.8600 |
| Timor Est | 00 1.612.359.8600 |
| Togo | 00 1.612.359.8600 |
| Tokelau | 00 1.612.359.8600 |
| Tonga | 00 1.612.359.8600 |
| Trinidad e Tobago | Numero Verde 1.800.205.9433 |
| Tunisia | 00 1.612.359.8600 |
| Turchia | Numero Verde (90)212.414.2697 |
| Turkmenistan | 8 (aspettare il segnale acustico) 10 1.612.359.8600 |
| Turks e Caicos | Numero Verde 0.1.888.839.1909 |
| Tuvalu | 00 1.612.359.8600 |
| Ucraina | Numero Verde 8 (aspettare il segnale acustico) 100 11 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 8 (aspettare il segnale acustico) 10 1.612.359.8600 |
| Uganda | 000 1.612.359.8600 |
| Ungheria | Numero Verde 00 800 8000 3300 |
| Uruguay | Numero Verde 000.401.902.14 |
| Uzbekistan | Numero Verde 8 (aspettare il segnale acustico) 641 7440010 (aspettare il segnale acustico) 888.839.1909 (selezionare area); o 8 (aspettare il segnale acustico) 10 1.612.359.8600 |
| Vanuatu | 00 1.612.359.8600 |
| Venezuela | Numero Verde 0.800.100.9129 |
| Vietnam | Numero Verde 1 201 0288 (aspettare il segnale acustico) 888.839.1909 (selezionare area); or 00 1.612.359.8600 |
| Wallis e Futuna | 19 1.612.359.8600 |
| Yemen | 00 1.612.359.8600 |
| Zambia | Numero Verde 00 899 (aspettare il segnale acustico) 888.839.1909 |
| Zimbabwe | Numero Verde 110 989 90 (aspettare il segnale acustico) 888.839.1909; o Numero Verde 00-899 (aspettare il segnale acustico) 888-839-1909 (selezionare area); o 00 1.612.359.8600 |

## Avviso aggiornato: la nuova scadenza per la rinuncia/obiezione è 4 settembre 2009

# Se siete autori o editori di un libro o un terzo proprietario di Copyright di un libro o altri scritti,

### I vostri diritti potrebbero essere interessati da una "class action" riguardante la scansione e l'uso di libri e altri scritti da parte di Google.

**Persone all'esterno degli Stati Uniti: la presente transazione può riguardarvi, in quanto copre gli interessi di copyright USA nei libri pubblicati all'esterno degli Stati Uniti. Nel caso deteneste un interesse di tale tipo in un libro o in altro materiale contenuto in un libro, la presente transazione sarà vincolante per voi, salvo rinuncia segnalata per tempo.**

Gli autori e gli editori hanno instaurato un'azione legale collettiva ("class action"), rivendicando il fatto che Google ha violato i copyright di autori, editori e altri possessori di copyright ("Aventi diritto") eseguendo la scansione di Libri e Contenuti di libri protetti da copyright, nonché visualizzando estratti di libri, senza permesso. Google nega tali rivendicazioni. Le parti hanno concordato una transazione. Il presente riepilogo fornisce le informazioni di base sulla transazione. "Libri" e "Contenuti" sono descritti qui di seguito.

### Che cosa stabilisce la transazione?

La presente transazione, se approvata dal Tribunale, autorizzerà Google ad eseguire la scansione di Libri e Contenuti di libri protetti da copyright negli Stati Uniti e a gestire un database elettronico di Libri. Per i Libri fuori catalogo e se permesso dagli Aventi diritto di Libri stampati, Google potrà vendere l'accesso a singoli Libri e abbonamenti istituzionali al database, inserire pubblicità in qualsiasi pagina dedicata a un Libro e fare altri usi commerciali dei Libri. In qualsiasi momento, i Possessori dei diritti possono modificare le disposizioni date a Google riguardanti qualsiasi di tali usi. Tramite un Registro dei diritti dei libri ("Registro") stabilito dalla presente transazione, Google pagherà ai Possessori dei diritti il 63% di tutti i guadagni provenienti da tali usi.

Google pagherà inoltre 34,5 milioni di dollari per costituire e finanziare le operazioni iniziali del Registro e per i costi di amministrazione della notifica e della transazione, nonché un minimo di 45 milioni di dollari per i pagamenti in contanti agli Aventi diritto di Libri e dei Contenuti che Google sottopone a scansione il o prima del 5 maggio 2009.

### Chi è incluso?

La classe di transazione include tutte le persone, in tutto il mondo, che possiedono un interesse di copyright USA su qualsiasi Libro o Contenuto. **Il significato di "interesse di copyright USA" è ampio. Ovunque vi troviate, vi preghiamo di leggere la Notifica completa per determinare se siete inclusi o meno nella transazione.**

Esistono due sottoclass:
- La *Sottoclasse degli Autori* (autori di Libri e di altri scritti nonché i loro eredi, successori e aventi diritto), e
- La *Sottoclasse degli editori* (editori di libri e periodici, nonché i loro successori e aventi diritto).

### Quale materiale è coperto?

I "Libri" includono le opere scritte protette da copyright, quali novelle, manuali, dissertazioni e altri scritti, che sono stati pubblicati o distribuiti in forma cartacea entro il 5 gennaio 2009. Le opere USA devono essere registrate con l'Ufficio di copyright USA per essere incluse nella transazione. I "Libri" non includono periodici, scritti personali, spartiti e opere di pubblico dominio o governative.

I "Contenuti" includono qualsiasi testo e altro materiale – quali prefazioni, saggi, poemi, citazioni, lettere, testi di canzoni, illustrazioni di libri per l'infanzia, spartiti, diagrammi e grafici, se protetti individualmente da copyright USA – contenuti in un Libro, un'opera di pubblico dominio o governativa pubblicati entro il 5 gennaio 2009 e, in caso di opere USA, registrati (da soli o come parte di un'altra opera) con l'Ufficio di copyright USA. I "Contenuti" non includono le illustrazioni (ad eccezione di quelle nei libri per l'infanzia) o qualsiasi opera di pubblico dominio o governativa.

**La Notifica contiene una descrizione più dettagliata di questi termini e altre informazioni fondamentali riguardanti la transazione.**

### Che cosa devo fare?

Si prega di leggere la Notifica nella sua interezza all'indirizzo http://www.googlebooksettlement.com. In base ad essa, potete decidere se:
- Restare nell'ambito della transazione. In tal caso, sareste vincolati dalle regole stabilite dal Tribunale, incluso l'abbandono delle vostre rivendicazioni contro Google.
- Opporsi alla transazione o commentarla. L'opposizione o i commenti devono essere formulati per iscritto entro il **4 settembre 2009**.
- Rinunciare alla transazione e mantenere così il diritto di citare in giudizio Google individualmente. La rinuncia deve essere formulata per iscritto entro il **4 settembre 2009**.
- Presentare una rivendicazione per un pagamento in contanti (qualora idonei a farlo). La rivendicazione deve essere presentata entro il **5 gennaio 2010**.

Il Tribunale ha nominato un avvocato nell'ambito dell'azione collettiva che rappresenta le due Sottoclassi. Se la transazione viene approvata, l'avvocato per la Sottoclasse degli autori richiederà la parcella e le spese legali che Google ha accettato di pagare. È inoltre possibile assumere un avvocato personale, a proprie spese.

Il Tribunale determinerà se approvare o meno la transazione in un'udienza imparziale che avrà luogo il **7 ottobre 2009 alle ore 10:00**.

### Per ricevere le informazioni complete, inclusa la notifica nella sua interezza:
### Visitate: http://www.googlebooksettlement.com
### Telefonate a: +1.612.359.8600
**Scrivete a: Google Book Search Settlement Administrator, c/o Rust Consulting
P.O. Box 9364, Minneapolis, MN 55440-9364 UNITED STATES OF AMERICA**

# Exhibit C

# Analysis of commercial availability of important Italian authors' works in the Settlement Database

## *The methodology*

The purpose of the analysis was to check the ability of the Settlement database to identify correctly multiple editions of the same work and thus determine correctly the commercial availability associated to individual records in the database.

Commercial availability in the Settlement should be determined at work level, so that if one edition of a work is on trade, all the records referred to the same work must be filled in with "yes" in the "commercial availability" field.

We selected a sample of important Italian authors who published mainly from 40ies to 90ies of the XX century, though some are still active. The criterion was to select best sellers and long sellers authors, possibly with a vast production. Typically, they wrote books that had many editions over the time, so the ground for the test was broader.

We searched the Google database at the website www.googlebooksettlement.com and downloaded the resulting data in the spreadsheet form. We search through the form "Name Surname", so probably we missed some records, if the author name was misspelled or incomplete. This will produce an under-evaluation of the errors rate, since the incomplete or misspelled records increase the errors.

For any author, we checked if the works concerned are still on trade, through checking the leading Italian internet bookshop: www.ibs.it. We thus considered only books that are commercially available for the US readers. This check also produce under-evaluation of error rates, since books that are not available through such Internet bookseller may be available from other sources, and in particular library distributors or online offer.

We manually selected only the Italian versions of the works (so deleting translations) and clustered the records referable to the same work. The two processes are time consuming but highly reliable having worked with very famous authors and well known novels. Since the purpose was to check the capacity of clustering different records of the same work, we considered only works with more than 3 records. In theory, all the records of the same group should have the same commercial availability status. Having worked only with in print books, any time a record is filled in with "no" in the commercially availability field there is an error.

The test was done in two folds. A first set of authors data has been downloaded on July 21st, a second set on August 6th, 2009.

The results of the test are shown in the Table 1. We analysed 274 in print works of 18 Italian authors. Almost all (91%) have been digitised, very frequently more than once. The digitisation for those works are 582, i.e. an average of 2,1 per title. Some authors are

particularly significant. The 26 works of Italo Calvino, the 15 of Cesare Pavese, the 10 of Giorgio Bassani, the 8 novels of Elsa Morante have been all digitised; that of Cesare Pavese with an astonishing average of 4.5 times per title. Cesare Pavese's *La luna e i falò* is the title digitised more times (10); *Il Gattopardo* by Tomasi di Lampedusa and *Se questo è un uomo* by Primo Levi have been digitised 9 times from different library collections.

The first finding is that when we analyse important authors *almost all* their books have been already digitised without authorisation regardless the fact that such digitisation directly enter into competition with existing commercial offer.

**Table 1**

| Author | N. of works considered | N. records | n. scanned books | scanned book per title | % of scanned works | at least 1 scanned | N. records "non CA" | at least 1 record non CA | CA error rate at work level | CA error rate at record level |
|---|---|---|---|---|---|---|---|---|---|---|
| Giorgio Bassani | 10 | 169 | 24 | 2,4 | 90,0 | 9 | 96 | 10 | 100,0 | 56,8 |
| Stefano Benni | 14 | 109 | 10 | 0,7 | 64,3 | 9 | 66 | 10 | 71,4 | 60,6 |
| Dino Buzzati | 19 | 267 | 36 | 1,9 | 84,2 | 16 | 99 | 17 | 89,5 | 37,1 |
| Italo Calvino | 26 | 474 | 70 | 2,7 | 100,0 | 26 | 165 | 23 | 88,5 | 34,8 |
| Andrea Camilleri | 17 | 109 | 17 | 1,0 | 82,4 | 14 | 36 | 10 | 58,8 | 33,0 |
| Umberto Eco | 17 | 195 | 30 | 1,8 | 94,1 | 16 | 69 | 13 | 76,5 | 35,4 |
| Oriana Fallaci | 8 | 111 | 12 | 1,5 | 87,5 | 7 | 15 | 6 | 75,0 | 13,5 |
| Dario Fo | 10 | 125 | 31 | 3,1 | 80,0 | 8 | 87 | 10 | 100,0 | 69,6 |
| Carlo Emilio Gadda | 15 | 153 | 35 | 2,3 | 100,0 | 15 | 66 | 13 | 86,7 | 43,1 |
| Primo Levi | 12 | 151 | 29 | 2,4 | 91,7 | 11 | 73 | 10 | 83,3 | 48,3 |
| Valerio Manfredi | 7 | 44 | 6 | 0,9 | 85,7 | 6 | 8 | 3 | 42,9 | 18,2 |
| Elsa Morante | 8 | 88 | 15 | 1,9 | 100,0 | 8 | 18 | 5 | 62,5 | 20,5 |
| Alberto Moravia | 34 | 547 | 80 | 2,4 | 94,1 | 32 | 256 | 29 | 85,3 | 46,8 |
| Pier Paolo Pasolini | 23 | 224 | 40 | 1,7 | 87,0 | 20 | 67 | 17 | 73,9 | 29,9 |
| Cesare Pavese | 15 | 403 | 68 | 4,5 | 100,0 | 15 | 156 | 14 | 93,3 | 38,7 |
| Leonardo Sciascia | 25 | 278 | 39 | 1,6 | 92,0 | 23 | 112 | 18 | 72,0 | 40,3 |
| Mario Soldati | 12 | 98 | 28 | 2,3 | 100,0 | 12 | 36 | 12 | 100,0 | 36,7 |
| G. Tomasi di Lampedusa | 2 | 83 | 12 | 6,0 | 100,0 | 2 | 43 | 2 | 100,0 | 51,8 |
| **Total** | **274** | **3.628** | **582** | **2,1** | **90,9** | **249** | **1.468** | **222** | **81,0** | **40,5** |

The number of records that carry the information "non commercially available" is 1,468, so 40.5% of the total, which can be assumed as the error rate at record level.

If we consider the error rate at "work level", it reaches the unbelievable level of 81%. The meaning of this value is that for 222 out of the 274 works we analysed *there is at least one edition of the work that is considered non commercially available*, and thus can be scanned by Google without authorisation in the future, if not properly claimed.

Because of the lack of capacity to cluster the records for the same work, also if the publisher (or directly the author) will claim one title, there is no guarantee that this avoids non-authorised scanning. With the current quality of the database (beginning of August 2009) only through retrieving all the records referred to that book and *claiming all such records* rightholders can be sure that their titles will not be digitised. It is important to notice that this

means that rightholders have not to claim "*books*", they have to claim "*book records*", since the claiming system is not doing properly its job.

The error rate is higher for authors who wrote most of their novels decades ago, but is still high also for current best sellers authors. An error rate at work level of 100% (sic!) is registered for Bassani (1916-2000), Soldati (1906-1999) and Tomasi di Lampedusa (1896-1957), but also for the Nobel Prize Dario Fo (1926-), who is still active.

Error rates higher than 80% characterise Pavese (1908-1950), Buzzati (1906-1972), Calvino (1923-1985), Gadda (1893-1973), Moravia (1907-1990), and Primo Levi, all key authors of Italian literature, who wrote some of the most important and best sold Italian books from end of 20ies (*Gli indifferenti*, by Moravia, 1929) to 80ies and 90ies of the past century. Many of their books still represent important assets in the back list of Italian publishers.

Authors like Umberto Eco (1932-), Oriana Fallaci (1929-2006), Stefano Benni (1947-), among others, i.e. current leaders in the best sellers lists, present error rates between 70 to 80%, and only three authors in the list have error rates lower than 70%, only one under 50%. In particular, two out of those three – Manfredi (1943-) and Camilleri (1925-) – are writers of best sellers of the very last years.

Another aspect that should be considered is illustrated in table 2.

Because of the type of authors we selected, for many of them (15 out of 18) books containing collections of works have been published and thus recorded in the database. They may be "complete works", collection of novels, theatre, poems, short stories, etc. so the records are quite heterogeneous. However, very frequently, the books referred by those records include the same works analysed above. So, if rightholders do not claim properly also all these records (again, not the books per se) they risk to find unauthorised copies of their works included in the Google commercial offer.

It is possible to estimate how probable this is – in case of relevant authors – looking at the third column of the table, reporting the number of scanned books of this type. 113 books including multiple works have been already digitised without permission. Furthermore, the percentage of those books considered as "non commercially available" is impressive: 72,4%. Since those books are collections of different works – which, by the way, are products very appreciated by university libraries and thus very probable candidate to enter a digitisation programme – for the authors we analysed, the probability that any work will be scanned without authorisation if not properly claimed is very close to 1.

The correct commercial categorisation of these books is very complex, since it cannot be done without the book in hand, or at least without a reliable "table of content". This is particular complex from the publishers' point of view. Let imagine that the novel X is currently commercialised by the publisher A and also included in a "collective works" Y publication of the publisher B. To avoid digitisation of that novel, the publisher A should claim all the records referred to the novel X in its catalogue and also claim it as an insert of the book Y, which is a book of another publisher.

If one considers the number of cases when this situation can apply, it is clear how much the claiming process can become a nightmare from the rightholders viewpoint. The only solutions seems to be that at least for such category of books Google would accept to

include in their digitisation programme only after acquiring explicit consent from the rightholders.

**Table 2**

| Author | N. of records for collective works | n. scanned books | N. records "non CA" | % of "non CA" |
|---|---|---|---|---|
| Giorgio Bassani | 3 | 0 | 1 | 33,3 |
| Dino Buzzati | 35 | 5 | 29 | 82,9 |
| Italo Calvino | 29 | 2 | 12 | 41,4 |
| Andrea Camilleri | 1 | - | 1 | 100,0 |
| Oriana Fallaci | 1 | - | 1 | 100,0 |
| Dario Fo | 46 | 20 | 30 | 65,2 |
| Carlo Emilio Gadda | 44 | 3 | 17 | 38,6 |
| Primo Levi | 13 | 5 | 6 | 46,2 |
| Elsa Morante | 13 | 2 | 4 | 30,8 |
| Alberto Moravia | 219 | 35 | 183 | 83,6 |
| Pier Paolo Pasolini | 51 | 12 | 31 | 60,8 |
| Cesare Pavese | 162 | 21 | 137 | 84,6 |
| Leonardo Sciascia | 26 | 2 | 7 | 26,9 |
| Mario Soldati | 23 | 3 | 22 | 95,7 |
| Giuseppe Tomasi di Lampedusa | 11 | 3 | 9 | 81,8 |
| **Total** | **677** | **113** | **490** | **72,4** |

**Fédération des Editeurs Européens**
**Federation of European Publishers**

### *FEP Resolution on the AAP – AG – Google Settlement*

FEP and its member associations, meeting for their General Assembly in Brussels on 14th November, have agreed to the following resolution concerning the Association of American Publishers, Authors' Guild and Google settlement announced on the 28th October and which is about to be notified to all rights holders involved in the agreement:

The settlement to this long-running litigation is a significant step. In particular, we understand that in signing this settlement, Google de facto recognises that digitisation and making available are not covered by fair use. However, it must be acknowledged that the introduction of the opt-out principle in the agreement significantly weakens existing copyright regimes and stands in sharp contrast to European solutions, in particular to the Europeana project.

We look forward to the official launch of Europeana next week in the presence of the Culture Ministers of all EU Member States, which builds on the work of European publishers to digitise and make content available online and on the dialogue that we have had within the High Level Experts Group on digital libraries under the auspices of Commissioner Viviane Reding.

FEP has been always supportive of the Europeana initiative which underlines that *since intellectual property rights are a key tool to stimulate creativity, Europe's cultural material should be digitised, made available and preserved in full respect of copyright and related rights.*(1) European copyright laws have allowed the development of a highly successful publishing industry, consisting of many SMEs, worth more than 22 billion euros and publishing 600.000 new books on a yearly basis, thus contributing to European cultural diversity.

Europeana recognises that in order to digitise and to provide access to copyright works, even to "snippets", it is necessary to previously obtain the consent of rights holders. European publishers note that the US settlement provides for a different opt-out solution which may be appropriate for the US but which effectively runs counter to the essential principle of prior consent which forms the basis of the European copyright legislation and of the Europeana project. It also de facto runs counter to the essential condition of the Berne Convention that registration should not be a prerequisite of copyright protection.

European publishers firmly support the essential principle of Europeana that all solutions should be based on open standards and must be market neutral so as to avoid the creation of de-facto monopolies. In coherence with this principle, in analysing the impact of the agreement, European publishers will consider the risk of a de facto monopoly for distribution of books that is contrary to the interest of consumers and society at large and which could endanger the European book industry and cultural diversity.

Europeana, by working in partnership and constant dialogue with all stakeholders, secures the integrity of works and high quality of authenticated digitisation. This way, European consumers can choose freely from the full, diverse range of works digitised with full respect for authors' moral rights.

FEP looks forward continuing working with the European Commission and the other European institutions to build together a truly multilingual and diversified European digital library, reflecting our common cultural heritage and values.

(1) Commission Recommendation of 24 August 2006 on the digitisation and online accessibility of cultural material and digital preservation

# Exhibit B

**Da:** booksettlement_it@rustconsulting.com [mailto:booksettlement_it@rustconsulting.com]
**Inviato:** martedì 15 dicembre 2009 3.03
**A:** c.mussinelli@360publishing.it
**Oggetto:** Aggiornamento approvato dal tribunale sulla Transazione Google relativa alla ricerca dei libri

## CORTE DISTRETTUALE DEGLI STATI UNITI DEL DISTRETTO SUD DI NEW YORK

## Notifica supplementare ad Autori, Editori e altri Aventi diritto ai Libri in merito alla Transazione Google sui Libri

Le parti definite *Corporazione degli Autori e altri contro Google Inc* . nell'ottobre 2008 hanno annunciato una transazione relativa alla controversia e hanno inviato una Comunicazione relativa a tale transazione (la "Transazione originale"). Le parti hanno ora modificato la Transazione originale in seguito ai colloqui intercorsi con l'United States Department of Justice e alle eccezioni sollevate in relazione alla Transazione originale stessa (la "Transazione modificata"). L'Accordo relativo alla transazione modificata (ASA - Amended Settlement Agreement), l'Accordo relativo alla transazione originale e la Notifica originale sono reperibili sul sito http://www.googlebooksettlement.com/intl/it/ o possono essere ottenuti dall'Amministratore della transazione.

La presente Notifica supplementare non sostituisce ma integra la Notifica originale. La presente Notifica supplementare individua:

1. le modifiche sostanziali apportate alla Transazione originale,
2. I diritti dell'utente ai sensi della Transazione modificata e
3. La data dell'udienza sull'equità, programmata per stabilire se la Transazione modificata deve ricevere l'approvazione finale.

**AGGIORNAMENTO IMPORTANTE:** La scadenza per effettuare il reclamo in relazione a Libri e Inserti per Pagamenti in Contanti è stata prorogata dal 5 gennaio 2010 al 31 marzo 2011. La scadenza della Rimozione per quanto riguarda Google è stata prorogata dal 5 aprile 2011 al 9 marzo 2012. (La scadenza della Rimozione per quanto riguarda le copie digitali delle biblioteche rimane il 5 aprile 2011).

### Riepilogo delle Modifiche apportate alla Transazione originale

**1. Classe coperta dalla Transazione modificata.** La definizione di Libri è stata ristretta. Di

conseguenza, molti dei Libri inclusi nella classe ai sensi della Transazione originale non sono più inclusi ai sensi dell'Accordo relativo alla Transazione modificata.

### *Gli Aventi diritto rientranti nella Classe coperta dalla Transazione modificata*

- Per i lavori negli Stati Uniti, la definizione di Libri rimane in gran parte invariata: per poter essere inclusi nella Transazione modificata, i lavori negli Stati Uniti devono essere stati pubblicati e registrati presso l'United States Copyright Office degli Stati Uniti entro il 5 gennaio 2009.
- Ai sensi della Transazione modificata, tuttavia, in caso di lavori fuori degli Stati Uniti, tali lavori sono inclusi nella Transazione modificata soltanto se sono stati pubblicati entro il 5 gennaio 2009 e se sono stati registrati presso l'United States Copyright Office entro tale data o se sono stati pubblicati in Canada, nel Regno Unito (UK) o in Australia.

In seguito alla restrizione della definizione di Libri, è stata ristretta anche la definizione del termine Inserti.

**L'utente potrà fare parte della Classe coperta dalla Transazione modificata anche se non risiede negli Stati Uniti, in Canada, nel Regno Unito (UK) o in Australia.** Se il lavoro dell'utente soddisfa i criteri di cui sopra, l'utente fa parte della Classe coperta dalla Transazione modificata, indipendentemente dal luogo di residenza e dagli altri luoghi in cui può essere stato pubblicato il lavoro. (Sezione 1.19 dell'ASA)

Si ritiene che il luogo di pubblicazione di un lavoro sia il Canada, il Regno Unito o l'Australia se la relativa copia stampata contiene informazioni da cui si evinca che il lavoro sia stato pubblicato in uno di questi tre paesi. Tra tali informazioni vi può essere, ad esempio, una dichiarazione per cui il libro è stato "Pubblicato in [Canada o nel Regno Unito o in Australia]", o una dichiarazione per cui la sede o l'indirizzo dell'editore è in uno di questi tre paesi.

### *Gli Aventi diritto esclusi dalla Classe coperta dalla Transazione modificata*

**In conseguenza di tali modifiche, se gli unici interessi in relazione al copyright negli Stati Uniti detenuti dall'utente sono relativi a lavori che non sono stati (a) pubblicati e registrati presso l'United States Copyright Office entro il 5 gennaio 2009, oppure (b) non sono stati pubblicati in Canada, nel Regno Unito o in Australia entro tale data, l'utente non fa parte della Classe coperta dalla Transazione modificata, anche se faceva parte della Transazione originale.**

Se l'utente non fa parte della Classe coperta dalla Transazione modificata, non potrà partecipare alla Transazione modificata e, di conseguenza, non sarà vincolato dalla stessa. L'utente conserva il diritto di intentare una causa nei confronti di Google in relazione alla digitalizzazione e all'uso del proprio materiale coperto da copyright senza il suo consenso. Se l'utente intende intentare una causa nei confronti di Google per tali digitalizzazione e utilizzo del proprio materiale, dovrà farlo con una azione legale separata. I diritti dell'utente possono essere disciplinati da leggi che limitano il periodo di tempo in cui l'utente può intentare la causa. **Se l'utente è interessato ad intentare causa nei confronti di Google, è tenuto a consultare il proprio legale.**

Se l'utente faceva parte della Classe ai sensi della Transazione originale, ma non vi rientra più ai sensi della Transazione modificata, è pregato di consultare il sito http://books.google.com/books-partner-options per leggere le attuali politiche di Google in merito alla rimozione dei suoi lavori dai propri database e all'interesse di Google di rendere i suoi lavori accessibili in modelli simili a quelli contemplati dalla Transazione modificata in base a condizioni simili.

**2. Disponibilità sul Mercato.** La Transazione modificata chiarisce che un Libro è Disponibile sul Mercato se viene offerto per la vendita, nuovo, da parte di un rivenditore in qualsiasi luogo del mondo ad un acquirente che si trova negli Stati Uniti, in Canada, nel Regno Unito o in Australia. (Sezione 1.31 dell'ASA)

La Transazione modificata prevede che Google non possa visualizzare alcun Libro classificato come Non Disponibile sul Mercato per almeno 60 giorni dalla data di tale classificazione, o dalla Data di Efficacia, a seconda di quale delle due è posteriore. La Transazione modificata prevede inoltre che, qualora un Avente diritto affermi che un Libro è Disponibile sul Mercato, Google non lo potrà visualizzare, a meno che non contesti con successo tale affermazione in una controversia. (Sezioni 3.2(d)(i) e 3.3(a) dell'ASA)

**3. Rappresentanza di Aventi diritto canadesi, britannici e australiani presso il Comitato del Registro.** La Transazione modificata prevede che nel Comitato del Registro dei Diritti sui Libri (il "Registro") debbano essere presenti almeno un autore e un direttore editore proveniente da ciascuno dei seguenti paesi: Canada, Regno Unito e Australia. (Sezione 6.2(b)(ii) dell'ASA)

**4. Monitoraggio per gli Aventi diritto fuori degli Stati Uniti.** Dal momento che i servizi autorizzati dalla Transazione modificata non saranno disponibili per gli utenti che si trovino fuori degli Stati Uniti, il Registro, ove richiesto, monitorerà l'utilizzo di Libri e Inserti da parte di Google per verificarne la conformità con le disposizioni della Transazione modificata e con le istruzioni degli Aventi diritto e cercherà di fornire uno strumento agli stessi Aventi diritto per monitorare e verificare i Libri e gli Inserti da loro reclamati. (Sezione 6.1(f) dell'ASA)

**5. Risoluzione delle dispute facoltativa per gli Aventi diritto.** La Transazione modificata prevede che gli Aventi diritto possano concordare di non sottoporre ad arbitrato controversie esistenti tra di loro in base al meccanismo di risoluzione delle dispute previsto dalla Transazione modificata. Inoltre, gli Aventi diritto (ma non Google) possono scegliere di partecipare ad eventuali arbitrati per teleconferenza o videoconferenza, al fine di risparmiare i costi di viaggio. (Sezioni 9.1(a) e 9.3(a) dell'ASA)

**6. Rappresentanza indipendente per gli Aventi diritto di Libri e Inserti non reclamati.** Il Registro prevede la presenza di un fiduciario che sarà tenuto a rappresentare gli interessi degli Aventi diritto in merito allo sfruttamento di Libri e Inserti non reclamati. (Sezione 6.2(b)(iii) dell'ASA)

**7. Libri e Inserti non reclamati e Fondi non reclamati.** La Transazione modificata chiarisce che, fin dall'inizio, il Registro si avvarrà dei fondi della transazione per tentare di individuare gli Aventi diritto. La Transazione modificata prevede inoltre che i Fondi dovuti agli Aventi diritto di Libri e Inserti non reclamati ("Fondi non reclamati") non possano essere utilizzati dal Registro per operazioni generali o riserve e non vengano distribuiti agli Aventi diritto che li reclamano. La Transazione modificata apporta le seguenti modifiche alla Transazione originale: (a) dopo che i Fondi non reclamati sono stati conservati per cinque anni, il Registro, in collaborazione con organizzazioni in Canada, Regno Unito e Australia e in consultazione con il fiduciario, può utilizzare fino al 25% dei fondi al solo scopo di individuare gli Aventi diritto; e (b) i restanti Fondi non reclamati verranno conservati per gli Aventi diritto per almeno 10 anni, trascorsi i quali il Registro, previa approvazione del fiduciario per quanto riguarda le tempistiche, potrà richiedere al Tribunale l'autorizzazione a distribuire i Fondi non reclamati ad associazioni culturali di beneficenza presenti negli Stati Uniti, in Canada, nel Regno Unito e in Australia, dandone comunicazione agli Aventi diritto, ai procuratori di tutti gli stati degli Stati Uniti e alle Biblioteche pienamente partecipanti e

cooperanti. (Sezione 6.3 dell'ASA)

**8. Impegno a migliorare la Procedura di reclamo e il Sito web.** La Transazione modificata prevede che il Registro e Google (per tutto il periodo in cui Google continuerà a fornire supporto operativo al Registro) devono mantenere e migliorare il Sito web della Transazione, al fine di facilitare il reclamo di Libri e Inserti. Google dovrà inoltre provvedere a correggere gli errori presenti nel Database dei Libri. (Sezione 13.3 dell'ASA)

**9. Modelli di proventi aggiuntivi.** La Transazione modificata limita i modelli di nuovi potenziali proventi ai seguenti tre Modelli di proventi aggiuntivi, che devono essere approvati dal Registro:

1. stampa on demand ("POD"),
2. scaricamento di file (in precedenza "Scaricamento di PDF") e
3. abbonamento consumatori.

La Transazione modificata limita la POD, se approvata, ai Libri che non sono Disponibili sul Mercato. Inoltre, la Transazione modificata specifica che la suddivisione dei proventi tra Google e gli Aventi diritto relativamente ai Modelli di proventi aggiuntivi sarà la stessa valida per i Modelli di proventi esistenti.

Infine, la Transazione modificata prevede che agli Aventi diritto dei lavori reclamati (e al fiduciario per quelli non reclamati) verrà comunicato con adeguato preavviso il lancio di un Modello di proventi aggiuntivo, con la possibilità di escludere lavori da tale modello. (Sezione 4.7 dell'ASA)

**10. Accordo su diverse Suddivisioni di proventi per i Libri disponibili sul Mercato.** Per quanto riguarda i Libri disponibili sul Mercato, la Transazione modificata prevede che Google o l'Avente diritto abbiano la possibilità di richiedere la rinegoziazione della suddivisione dei proventi secondo lo standard 63/37 per ogni e qualsiasi modello di proventi. Se essi non raggiungono un accordo, nessuna delle parti è obbligata a offrire i Libri dell'Avente diritto nei modelli di proventi. (Sezione 4.5(a)(iii) dell'ASA)

**11. Sconto sul Prezzo di listino per il consumatore.** Google ora gode del diritto illimitato di scontare il Prezzo di listino del consumatore per l'Acquisto dei libri nella misura in cui continua a corrispondere al Registro per gli Aventi diritto il 63% del Prezzo di listino non scontato. Il Registro può inoltre autorizzare Google a fare offerte speciali di Libri per l'Acquisto da parte dei consumatori a prezzi ridotti rispetto al Prezzo di listino e a corrispondere al Registro per gli Aventi diritto il 63% del Prezzo di listino scontato. Tuttavia, agli Aventi diritto che presentano reclamo (e al fiduciario per i Libri non reclamati), verrà notificata tale proposta di prezzo ridotto ed essi potranno non accettarla per i loro Libri (o per i Libri non reclamati). (Sezioni 4.5(b)(i) e (ii) dell'ASA)

**12. Rivendita dell'Acquisto dei consumatori.** La Transazione modificata prevede che Google consenta a terzi di vendere l'accesso dei consumatori a Libri offerti attraverso l'Acquisto dei consumatori e il rivenditore riceverà la maggioranza della parte del 37% della suddivisione dei proventi di Google. (Sezione 4.5(b)(v) dell'ASA)

**13. Clausola non discriminatoria (o clausola delle "Nazioni più favorite").** La Sezione 3.8(a) della Transazione originale è stata eliminata dalla Transazione modificata.

**14. Prezzi controllati dalla Transazione.** La Transazione modificata chiarisce che l'Algoritmo per la determinazione dei prezzi usato per fissare i Prezzi controllati dalla Transazione per l'Acquisto dei consumatori verrà sviluppato per simulare i prezzi in un mercato competitivo e che il prezzo di

ciascun Libro verrà stabilito indipendentemente dalle modifiche di prezzo di qualsiasi altro Libro. La Transazione modificata chiarisce inoltre che il Registro non comunicherà a nessuno eccetto agli Aventi diritto del Libro, il Prezzo controllato dalla Transazione. (Sezioni 4.2(b)(i)(2), 4.2(c)(ii)(2) e 4.2(c)(iii) dell'ASA)

**15. Modifica delle limitazioni delle funzioni.** Gli Aventi diritto possono autorizzare Google a modificare o a eliminare le limitazioni predefinite delle funzioni dei Modelli di proventi, di cui alla Transazione modificata, come copia/incolla e stampa. (Sezione 3.3(g) dell'ASA)

**16. Supporto al Registro per Licenze alternative (compresa la Creative Commons).** La Transazione modificata prevede che il Registro vada incontro alle esigenze degli Aventi diritto per consentire che i loro lavori vengano messi a disposizione attraverso licenze alternative per l'Acquisto dei consumatori, compresa la licenza Creative Commons. Per informazioni sulle licenze Creative Commons, l'utente è pregato di visitare il sito http://www.creativecommons.org. La Transazione modificata chiarisce inoltre che gli Aventi diritto sono liberi di fissare il prezzo di Acquisto dei consumatori dei loro Libri a zero. (Sezioni 1.44, 4.2(a)(i) e 4.2(b)(i)(1) dell'ASA)

**17. Terminal di accesso pubblico.** La Transazione modificata autorizza il Registro ad accettare l'aumento del numero dei terminal di accesso pubblico presso le biblioteche pubbliche. (Sezione 4.8(a)(i)(3) dell'ASA)

**18. Immagini.** La Transazione modificata non include più le illustrazioni dei libri per bambini nella definizione di Inserti. (Sezione 1.75 dell'ASA). Tuttavia, la Transazione modificata non modifica l'inserimento di immagini, quali graphic novel e libri illustrati per bambini, nella definizione di Libri e prevede che la Transazione modificata autorizzi unicamente Google alla visualizzazione delle immagini in tali Libri se un titolare di copyright USA dell'immagine è anche un Avente diritto del Libro. La Transazione modificata chiarisce inoltre che i fumetti sono considerati Periodici e che i Periodici (come pure le collezioni di Periodici) non sono inclusi nella definizione di "Libri" e pertanto non rientrano nella Transazione modificata. (Sezione 1.104 dell'ASA)

**19. Spartito musicale.** Nella Transazione modificata, la definizione di Libro è stata modificata per realizzare meglio l'obiettivo delle parti di escludere i libri principalmente usati per suonare musica. (Sezione 1.19 dell'ASA). Inoltre, lo "spartito musicale" non è più inserito nella definizione di Inserti. (Sezione 1.75 dell'ASA)

**20. Scadenza per reclamare le Commissioni di utilizzo e inclusione.** Verranno trattenute Commissioni di utilizzo per gli Aventi diritto che non abbiano ancora reclamato i loro Libri da almeno dieci anni e gli Aventi diritto ora saranno idonei alle Commissioni di inclusione se reclamano i loro Libri o Inserti entro dieci anni dalla Data di efficacia, anziché entro cinque anni, in entrambi i casi come già disposto nella Transazione originale. (Sezioni 1.1(c), 1.2(c) e 2.2 del Piano di allocazione)

## Diritti dell'utente secondo l'Accordo relativo alla Transazione modificata

I soggetti facenti parte della Classe di cui alla Transazione modificata hanno le seguenti opzioni:

| Se il soggetto | Allora | Scadenza |
|---|---|---|
| Desidera rimanere nella | In questo momento non dovrà compiere alcuna | N/A |

| | | |
|---|---|---|
| Classe coperta dalla Transazione modificata (se non ha rinunciato in precedenza alla Transazione originale) | azione. | |
| Desidera rimanere nella Classe coperta dalla Transazione modificata e desidera essere idoneo a ricevere un Pagamento in Contanti per eventuali Libri o Inserti scannerizzati il, o prima del, 5 maggio 2009, ma non ha ancora reclamato i Suoi Libri e Inserti | Deve presentare un reclamo utilizzando il Modulo di Reclamo, disponibile sul sito http://www.googlebooksettlement.com/intl/it/ o richiedibile all'Amministratore della Transazione. | 31 marzo 2011 |
| Ha già reclamato Libri e Inserti utilizzando il Modulo di Reclamo | In questo momento non deve adottare ulteriori provvedimenti relativamente a tali Libri e Inserti. | N/A |
| Ha rinunciato alla Transazione originale e desidera rimanere fuori della Transazione modificata | Non dovrà - e non dovrebbe - rinunciare di nuovo. La sua rinuncia alla Transazione originale fungerà anche da rinuncia alla Transazione modificata. | N/A |
| Non ha rinunciato alla Transazione originale ma desidera rinunciare alla Transazione modificata | Può farlo seguendo le istruzioni della Notifica originale e presenti sul sito http://www.googlebooksettlement.com/intl/it/. | 28 gennaio 2010 |
| Ha rinunciato alla Transazione originale e desidera rientrare nella Transazione modificata | Può farlo comunicandolo all'Amministratore della Transazione o al Legale della Classe oppure compilando il "Modulo di rientro" disponibile all'indirizzo http://www.googlebooksettlement.com/intl/it/. | 28 gennaio 2010 |
| Desidera presentare un'obiezione ai termini della Transazione modificata | Se non ha rinunciato, può presentare un'obiezione seguendo le istruzioni della Notifica originale e presenti sul sito http://www.googlebooksettlement.com/intl/it/. Al momento, è possibile obiettare esclusivamente le disposizioni che modificano la Transazione originale. Tutte le obiezioni presentate relativamente alla Transazione originale sono conservate a meno che non siano ritirate e non devono essere presentate nuovamente. | 28 gennaio 2010 |

| Desidera essere presente e partecipare all'Udienza sull'Equità e non ha ancora depositato la Notifica di Intenzione a Partecipare | Deve presentare una Notifica di Intenzione a Partecipare seguendo le istruzioni riportate nella Notifica originale e presenti sul sito http://www.googlebooksettlement.com/intl/it/. | 4 febbraio 2010 |
|---|---|---|

## Cambiamento della data dell'Udienza sull'Equità della Transazione

Il Tribunale terrà un'Udienza sull'Equità della Transazione il giorno 18 febbraio 2010 alle ore 10.00 nella sala delle udienze 11A della Corte Distrettuale degli Stati Uniti del Distretto Sud di New York, United States Courthouse, 500 Pearl Street, New York, NY 10007, per valutare se la Transazione modificata, come stabilito nell'ASA, è equa, adeguata e ragionevole. L'utente è invitato a prendere visione della Notifica originale per ulteriori informazioni riguardo la partecipazione all'Udienza sull'Equità della Transazione.

Nel **caso in cui l'utente avesse domande sulla Notifica supplementare o sulla Transazione modificata, è pregato di contattare il Legale della Classe o l'Amministratore della Transazione, le cui informazioni di contatto sono rinvenibili nella Notifica originale o all'indirizzo http://www.googlebooksettlement.com/intl/it/. Può contattare l'Amministratore della Transazione anche presso i seguenti recapiti:**

Google Book Search Settlement Administrator
c/o Rust Consulting, Inc.
PO Box 9364
Minneapolis, MN 55440-9364
+1.612.359.8600 (Chiamata a pagamento. Per i numeri gratuiti, visitare il sito http://www.googlebooksettlement.com/intl/it/.)



# Exhibit C

# Notifica supplementare ad Autori, Editori e altri soggetti aventi diritti sui Libri in merito alla Transazione Google sui Libri

Le parti definite "*Corporazione degli Autori e altri contro Google Inc.*" nell'ottobre 2008 hanno annunciato una transazione relativa alla controversia e hanno inviato una Comunicazione relativa a tale transazione (la "Transazione originale"). Le parti hanno ora modificato la Transazione originale in seguito ai colloqui intercorsi con il United States Department of Justice e alle eccezioni sollevate in relazione alla Transazione originale stessa (la "Transazione modificata"). L'Accordo relativo alla Transazione modificata("ASA"), nonché l'accordo relativo alla Transazione originale e la Notifica originale, sono rinvenibili all'indirizzo http://www.googlebooksettlement.com/intl/it/ o richiedibili all'Amministratore Transazione, mediante le informazioni di contatto presenti a pagina 7.

La presente Notifica supplementare non sostituisce ma integra la Notifica originale. La presente Notifica supplementare individua:
1) le modifiche sostanziali apportate alla Transazione originale,
2) i diritti degli utenti ai sensi dell'Accordo relativo alla Transazione modificata (cfr. pag. 6 della presente Notifica supplementare ), e
3) la data dell'udienza sull'equità della transazione per stabilire se l'Accordo relativo alla Transazione modificata può essere definitivamente approvato (cfr. pag. 7 della presente Notifica supplementare).

**AGGIORNAMENTO IMPORTANTE**: La scadenza per effettuare il reclamo in relazione a Libri ed Inserti per Pagamenti in Contanti è stata prorogata dal 5 gennaio 2010 al 31 marzo 2011. La scadenza della Rimozione per quanto riguarda Google è stata prorogata dal 5 aprile 2011 al 9 marzo 2012. (La scadenza della Rimozione per quanto riguarda le copie digitali della biblioteca rimane il 5 aprile 2011).

## Riepilogo delle Modifiche apportate alla Transazione originale

**1.     Classe coperta dall'Accordo relativo alla Transazione modificata.** La definizione di Libri è stata ristretta. Di conseguenza, molti dei Libri inclusi nella classe ai sensi della Transazione originale non sono più inclusi ai sensi dell'Accordo relativo alla Transazione modificata.

### *Soggetti aventi diritto rientranti nella Classe coperta dalla Transazione modificata*

- Per i lavori negli Stati Uniti, la definizione di Libri rimane in gran parte invariata: per poter essere inclusi nella Transazione modificata, i lavori negli Stati Uniti devono essere stati pubblicati e registrati presso il United States Copyright Office degli Stati Uniti entro il 5 gennaio 2009.
- Ai sensi della Transazione modificata, tuttavia, in caso di lavori fuori dagli Stati Uniti, tali lavori sono inclusi nella Transazione modificata soltanto se sono stati pubblicati entro il 5 gennaio 2009 e se sono stati registrati presso il United States Copyright Office entro tale data o se sono stati pubblicati in Canada, nel Regno Unito ("UK") o in Australia.

In seguito alla restrizione della definizione di Libri, è stato ristretta anche la definizione del termine Inserti.

**L'utente potrà far parte della Classe coperta dalla Transazione modificata anche se non risiede negli Stati Uniti, in Canada, nel Regno Unito o in Australia.** Se il lavoro dell'utente soddisfa i criteri di cui

sopra, l'utente fa parte della Classe coperta dalla Transazione modifica indipendentemente dal luogo di residenza e dagli altri luoghi in cui può essere stato pubblicato il lavoro. (Sezione 1.19 dell'ASA).

Si ritiene che il luogo di pubblicazione di un lavoro sia il Canada, il Regno Unito o l'Australia se la relativa copia stampata contiene informazioni da cui si evinca che il lavoro sia stato pubblicato in uno di questi tre paesi. Tra tali informazioni vi può essere, ad esempio, una dichiarazione per cui il libro è stato "Pubblicato in [Canada] o [Regno Unito] o [Australia]", o una dichiarazione per cui la sede o l'indirizzo dell'editore è in uno di questi tre paesi.

### *Soggetti aventi diritto esclusi dalla Classe coperta dalla Transazione modificata*

**In conseguenza di tali modifiche, se gli unici interessi in relazione al copyright negli Stati Uniti detenuti dall'utente sono relativi ad opere che non sono state (a) pubblicate e registrate presso il United States Copyright Office entro il 5 gennaio 2009 oppure (b) non sono state pubblicate in Canada, nel Regno Unito o in Australia entro tale data, l'utente non fa parte della Classe coperta dalla Transazione modificata, anche se faceva parte della Transazione originale.**

Se l'utente non fa parte della Classe coperta dalla Transazione modificata, non potrà partecipare alla Transazione modificata e, di conseguenza, non sarà vincolato dalla stessa. L'utente conserva il diritto di intentare una causa nei confronti di Google in relazione alla digitalizzazione e all'uso del proprio materiale coperto da copyright senza il suo consenso. Se l'utente intende intentare una causa nei confronti di Google per tali digitalizzazione e utilizzo del proprio materiale, dovrà farlo con una azione legale separata. I diritti dell'utente possono essere disciplinati da leggi che limitano il periodo di tempo in cui l'utente può intentare la causa. **Se l'utente è interessato ad intentare causa nei confronti di Google, è tenuto a consultare il proprio legale.**

Se l'utente faceva parte della classe ai sensi della Transazione originale, ma non lo è più ai sensi della Transazione modificata, è pregato di consultare il sito http://books.google.com/books-partner-options per leggere le attuali politiche di Google in merito alla rimozione dei suoi lavori dai propri database e all'interesse di Google di rendere i suoi lavori accessibili in modelli simili a quelli contemplati dalla Transazione modificata in base a condizioni simili.

2.      **Disponibilità sul Mercato.** La Transazione modificata chiarisce che un Libro è Disponibile sul Mercato se viene offerto per la vendita nuovo da parte di un rivenditore in qualsiasi luogo del mondo ad un acquirente che si trova negli Stati Uniti, in Canada, nel Regno Unito o in Australia (Sezione 1.31 dell'ASA).

La Transazione modificata prevede che Google non possa visualizzare alcun Libro classificato come Non Disponibile sul Mercato per almeno 60 giorni dalla data di tale classificazione, o dalla Data di Efficacia, a seconda di quale delle due è posteriore. La Transazione modificata prevede inoltre che, qualora un Avente diritto affermi che un Libro è Disponibile sul Mercato, Google non lo potrà visualizzare, a meno che non contesti con successo tale affermazione in una controversia (Sezioni 3.2(d)(i) e 3.3(a) dell'ASA).

3.      **Rappresentanza di Aventi diritto canadesi, britannici e australiani presso il Comitato del Registro.** La Transazione modificata prevede che nel Comitato del Registro dei Diritti sui Libri (il "Registro") debbano essere presenti almeno un autore e un direttore editore proveniente da ciascuno dei seguenti paesi: Canada, Regno Unito e Australia. (Sezione 6.2(b)(ii) dell'ASA).

4.      **Monitoraggio per gli Aventi diritto fuori dagli Stati Uniti.** Dal momento che i servizi autorizzati dalla Transazione modificata non saranno disponibili per gli utenti che si trovino fuori dagli Stati Uniti, il Registro, ove richiesto, monitorerà l'utilizzo di Libri e Inserti di Google per verificarne la conformità con le disposizioni della Transazione modificata e con le istruzioni degli Aventi diritto, e cercherà di fornire uno

strumento agli stessi Aventi diritto per monitorare e verificare i Libri e gli Inserti da loro reclamati. (Sezione 6.1(f) dell'ASA).

**5.     Risoluzione delle dispute facoltativa per gli Aventi diritto.** La Transazione modificata prevede che gli Aventi diritto possano concordare di non sottoporre ad arbitrato controversie esistenti tra di loro in base al meccanismo di risoluzione delle dispute previsto dalla Transazione modificata. Inoltre, gli Aventi diritto (ma non Google) possono scegliere di partecipare ad eventuali arbitrati per teleconferenza o videoconferenza, al fine di risparmiare i costi di viaggio (Sezioni 9.1(a) e 9.3(a) dell'ASA).

**6.     Rappresentanza indipendente per gli Aventi diritto di Libri e Inserti non reclamati.** Il Registro prevede la presenza di un fiduciario che sarà tenuto a rappresentare gli interessi degli Aventi diritto in merito allo sfruttamento di Libri e Inserti non reclamati. (Sezione 6.2(b)(iii) dell'ASA).

**7.     Libri e Inserti non reclamati e Fondi non reclamati.** La Transazione modificata chiarisce che, fin dall'inizio, il Registro si avvarrà dei fondi della transazione per tentare di individuare gli Aventi diritto. La Transazione modificata prevede inoltre che i Fondi dovuti agli Aventi diritto di Libri e Inserti non reclamati ("Fondi non reclamati") non possano essere utilizzati dal Registro per operazioni generali o riserve e non vengano distribuiti agli Aventi diritto che li reclamano. La Transazione modificata apporta le seguenti modifiche alla Transazione originale: (a) dopo che i Fondi non reclamati sono stati conservati per cinque anni, il Registro, in collaborazione con organizzazioni in Canada, Regno Unito e Australia, e in consultazione con il fiduciario, può utilizzare fino al 25% dei fondi al solo scopo di individuare gli Aventi diritto; (b) i restanti Fondi non reclamati verranno conservati per gli Aventi diritto per almeno 10 anni, trascorsi i quali il Registro, previa approvazione del fiduciario per quanto riguarda le tempistiche, potrà richiedere al Tribunale l'autorizzazione a distribuire i Fondi non reclamati ad associazioni culturali di beneficenza presenti negli Stati Uniti, Canada, Regno Unito e Australia, dandone comunicazione agli Aventi diritto, ai procuratori di tutti gli stati degli Stati Uniti e alle Biblioteche pienamente partecipanti e cooperanti. (Sezione 6.3 dell'ASA).

**8.     Impegno a migliorare la Procedura di reclamo e il Sito web.** La Transazione modificata prevede che il Registro e Google (per tutto il periodo in cui Google continuerà a fornire supporto operativo al Registro) devono mantenere e migliorare il Sito web della Transazione, al fine di facilitare il reclamo di Libri e Inserti. Google dovrà inoltre provvedere a correggere gli errori presenti nel Database dei Libri (Sezione 13.3 dell'ASA).

**9.     Modelli di proventi aggiuntivi.** La Transazione modificata limita i modelli di nuovi potenziali proventi ai seguenti tre Modelli di proventi aggiuntivi, che devono essere approvati dal Registro:
1)  Stampa on demand ("POD"),
2)  Scaricamento di file (in precedenza "Scaricamento di PDF"), e
3)  Abbonamento consumatori.

La Transazione modificata limita la POD, se approvata, ai Libri che non sono Disponibili sul Mercato. Inoltre, la Transazione modificata specifica che la suddivisione dei proventi tra Google e gli Aventi diritto relativamente ai Modelli di proventi aggiuntivi sarà la stessa valida per i Modelli di proventi esistenti.

Infine, la Transazione modificata prevede che agli Aventi diritto dei lavori reclamati (e al fiduciario per quelli non reclamati) verrà comunicato con adeguato preavviso il lancio di un Modello di proventi aggiuntivo, con la possibilità di escludere lavori da tale modello (Sezione 4.7 dell'ASA).

**10.     Accordo su diverse Suddivisioni di proventi per i Libri disponibili sul Mercato.** Per quanto riguarda i Libri disponibili sul Mercato, la Transazione modificata prevede che Google o l'Avente diritto abbiano la possibilità di richiedere la rinegoziazione della suddivisione dei proventi secondo lo standard 63/37 per ogni e qualsiasi modello di proventi. Se essi non raggiungono un accordo, nessuna delle parti è obbligata a offrire i Libri dell'Avente diritto nei modelli di proventi. (Sezione 4.5(a)(iii) dell'ASA).

**11.**     **Sconto sul Prezzo di listino per il consumatore.** Google ora gode del ha  diritto illimitato di scontare il Prezzo di listino del consumatore per l'Acquisto dei libri nella misura in cui continua a corrispondere al Registro per gli Aventi diritto il 63% del Prezzo di listino non scontato . Il Registro può inoltre autorizzare Google a fare offerte speciali di Libri per l'Acquisto da parte dei consumatori a prezzi ridotti rispetto al Prezzo di listino e a corrispondere al Registro per gli Aventi diritto il 63% del Prezzo di listino non scontato. Tuttavia, agli Aventi diritto che presentano reclamo (e al fiduciario per i Libri non reclamati), verrà notificata tale proposta di prezzo ridotto ed essi potranno non accettarla per i loro Libri (o per i Libri non reclamati). (Sezioni 4.5(b)(i) e (ii) dell'ASA).

**12.**     **Rivendita dell'Acquisto dei consumatori.** La Transazione modificata prevede che Google consenta a terzi di vendere l'accesso dei consumatori a Libri offerti attraverso l'Acquisto dei consumatori, e il rivenditore riceverà la maggioranza della parte del 37% della suddivisione dei proventi di Google. (Sezione 4.5(b)(v) dell'ASA).

**13.**     **Clausola non discriminatoria (o clausola delle "Nazioni più favorite").** La Sezione 3.8(a) della Transazione originale è stata eliminata dalla Transazione modificata.

**14.**     **Prezzi controllati dalla Transazione.** La Transazione  modificata chiarisce che l'Algoritmo per la determinazione dei prezzi usato per fissare i Prezzi controllati dalla Transazione per l'Acquisto dei consumatori verrà sviluppato per simulare i prezzi in un mercato competitivo e che il prezzo di ciascun Libro verrà stabilito indipendentemente dalle modifiche di prezzo di qualsiasi altro Libro. La Transazione modificata chiarisce inoltre che il Registro non comunicherà a nessuno, eccetto agli Aventi diritto del Libro, il Prezzo controllato dalla Transazione (Sezioni 4.2(b)(i)(2), 4.2(c)(ii)(2) e 4.2(c)(iii) dell'ASA).

**15.**     **Modifica delle limitazioni delle funzioni.** Gli Aventi diritto possono autorizzare Google a modificare o a eliminare le limitazioni predefinite delle funzioni dei Modelli di proventi, di cui alla Transazione modificata, come copia/incolla e stampa. (Sezione 3.3(g) dell'ASA).

**16.**     **Supporto al Registro per Licenze alternative (compresa la Creative Commons).** La Transazione modificata prevede che il Registro vada incontro alle esigenze degli Aventi diritto per consentire che i loro lavori vengano messi a disposizione attraverso licenze alternative per l'Acquisto dei consumatori, compresa la licenza Creative Commons. Per informazioni sulle licenze Creative Commons, l'utente è pregato di visitare il sito http://www.creativecommons.org. La Transazione modificata chiarisce inoltre che gli Aventi diritto sono liberi di fissare il prezzo di Acquisto dei consumatori dei loro Libri a zero (Sezioni 1.44, 4.2(a)(i) e 4.2(b)(i)(1) dell'ASA).

**17.**     **Terminal di accesso pubblico.** La Transazione modificata autorizza il Registro ad accettare l'aumento del numero dei terminal di accesso pubblico presso le biblioteche pubbliche (Sezione 4.8(a)(i)(3) dell'ASA).

**18.**     **Immagini.** La Transazione modificata non include più le illustrazioni dei libri per bambini nella definizione di Inserti (Sezione 1.75 dell'ASA). Tuttavia, la Transazione modificata non modifica l'inserimento di immagini, quali *graphic novel* e libri illustrati per bambini, nella definizione di Libri e prevede che la Transazione modificata autorizzi unicamente Google alla visualizzazione delle immagini in tali Libri se un titolare di copyright USA dell'immagine è anche un Avente diritto del Libro. La Transazione modificata chiarisce inoltre che i fumetti sono considerati Periodici e che i Periodici (come pure le collezioni di Periodici) non sono inclusi nella definizione di "Libri", e pertanto non rientrano nella Transazione modificata (Sezione dell'ASA 1.104).

**19.**     **Spartito musicale.** Nella Transazione  modificata, la definizione di Libro è stata modificata per realizzare meglio l'obiettivo delle parti di escludere i libri principalmente usati per suonare musica (Sezione 1.19 dell'ASA). Inoltre, lo "spartito musicale" non è più inserito nella definizione di Inserti. (Sezione dell'ASA 1.75).

**20.     Scadenza per reclamare le Commissioni di utilizzo e inclusione.** Verranno trattenute Commissioni di utilizzo per gli Aventi diritto che non hanno ancora reclamato i loro Libri da almeno dieci anni, e gli Aventi diritto ora saranno idonei alle Commissioni di inclusione se reclamano i loro Libri o Inserti entro dieci anni dalla Data di decorrenza, anziché entro cinque anni, in entrambi i casi come già disposto nella Transazione originale. (Sezioni 1.1(c), 1.2(c) e 2.2 del Piano di allocazione).

# Diritti ai sensi dell'Accordo relativo alla Transazione modificata

I soggetti facenti parte della categoria di cui alla Transazione  modificata hanno le seguenti opzioni:

| Se il soggetto… | Allora… | Scadenza |
|---|---|---|
| Desidera rimanere nella Categoria coperta dalla Transazione modificata (se non ha rinunciato in precedenza alla Transazione originale) | In questo momento non dovrà compiere alcuna azione. | N/A |
| Desidera rimanere nella Categoria coperta dallaTransazione  modificata e desidera essere idoneo a ricevere un Pagamento in Contanti per eventuali Libri o Inserti scannerizzati il, o prima del, 5 maggio 2009, ma non ha ancora reclamato i Suoi Libri e Inserti | Deve presentare un reclamo utilizzando il Modulo di Richiesta, disponibile sul sito http://www.googlebooksettlement.com/intl/it/ o richiedibile all'Amministratore della Transazione. | 31 marzo 2011 |
| Ha già reclamato Libri o Inserti utilizzando il Modulo di Richiesta | In questo momento non deve adottare ulteriori provvedimenti relativamente a tali Libri e Inserti. | N/A |
| Ha rinunciato alla Transazione originale e desidera rimanere fuori dalla Transazione modificata | Non è necessario, e non deve, rinunciare nuovamente. La sua rinuncia alla Transazione originale fungerà anche da rinuncia alla' Transazione modificata. | N/A |
| Non ha rinunciato alla Transazione originale ma desidera rinunciare alla Transazione modificata | Può farlo seguendo le istruzioni della Notifica originale e presenti sul sito http://www.googlebooksettlement.com/intl/it/. | 28 gennaio 2010 |
| Ha rinunciato alla Transazione originale e desidera rientrare nella Transazione modificata | Può farlo comunicandolo all'Amministratore Transazione o al Legale della categoria oppure compilando il "Modulo di rientro" disponibile all'indirizzo http://www.googlebooksettlement.com/intl/it/. | 28 gennaio 2010 |
| Desidera presentare un'eccezione ai termini della Transazionemodificata | Se ancora non ha rinunciato, può presentare un'eccezione seguendo le istruzioni nella Notifica originale e all'indirizzo http://www.googlebooksettlement.com/intl/it/.<br><br>In questo momento, è possibile presentare eccezioni unicamente alle nuove condizioni che modificano la Transazione originale.<br><br>Tutte le eccezioni presentate in relazione alla Transazione originale verranno conservate, a meno che non vengano ritirate, e non devono essere ripresentate. | 28 gennaio 2010 |
| Desidera essere presente e partecipare all'Udienza sull'Equità e non ha ancora depositato la Notifica di Intenzione a Partecipare | Segua le istruzioni riportate nella Notifica originale e sul sito http://www.googlebooksettlement.com/intl/it/. | 4 febbraio 2010 |

# Cambiamento della data dell'Udienza sull'Equità della Transazione

Il Tribunale terrà un'Udienza sull'Equità della Transazione il giorno 18 febbraio 2010 alle ore 10.00 nella sala delle udienze 11A della Corte Distrettuale degli Stati Uniti del Distretto Sud di New York, United States Courthouse, 500 Pearl Street, New York, NY 10007, per valutare se la Transazione modificata, come stabilito nell'ASA, è equa, adeguata e ragionevole. L'utente è invitato a prendere visione della Notifica originale per ulteriori informazioni riguardo la partecipazione all'Udienza sull'Equità della Transazione.

**Nel caso in cui l'utente avesse domande sulla Notifica supplementare o sulla Transazione modificata, è pregato di contattare il Legale della categoria o l'Amministratore Transazione, le cui informazioni di contatto sono rinvenibili nella Notifica originale o all'indirizzo http://www.googlebooksettlement.com/intl/it/. Può contattare l'Amministratore Transazione anche presso i seguenti recapiti:**

Google Book Search Settlement Administrator
c/o Rust Consulting, Inc.
PO Box 9364
Minneapolis, MN 55440-9364, USA
+1.612.359.8600 (linea non gratuita. Per i numeri gratuiti, visitare il sito
http://www.googlebooksettlement.com/intl/it/).

# Exhibit D

# la Repubblica.it

**ARCHIVIO LA REPUBBLICA DAL 1984**

# Nuovo patto tra Google e gli editori Usa per i diritti d' autore dei libri su Internet

Repubblica — 15 novembre 2009   pagina 26   sezione: ECONOMIA

NUOVO accordo tra Google e gli autori ed editori americani sulla libreria online che il colosso dei provider sta per lanciare. L' intesa è stata presentata a un giudice federale. In base all' accordo, che dovrebbe risolvere le questioni di diritti d' autore e di Antitrust sollevate dal Dipartimento di Giustizia, Google accetta di pagare 125 milioni di dollari per risolvere tutte le cause ancora aperte e viene creato un Book Rights Registry indipendente che garantirebbe una percentuale sulle vendite e la pubblicità agli autori e agli editori che accettano di digitalizzare i loro libri. L' intesa vale per i libri registrati negli Stati Uniti, in Gran Bretagna e Canada. Restano fuori Europa e resto del mondo.

La url di questa pagina è http://ricerca.repubblica.it/repubblica/archivio/repubblica/2009/11/15/nuovo-patto-tra-google-gli-editori-usa.html

Abbonati a Repubblica a questo indirizzo
http://www.servizioclienti.repubblica.it/index.php?page=abbonamenti_page

# Google Books, l'accordo per il nuovo patteggiamento

16-11-2009

ITespresso.it

Il patteggiamento da 125 milioni di dollari è stato rivisto con alcuni limiti: i libri orfani finiscono in un trust, mentre viene istituito un registro per gli addetti ai lavori, pagati ogni volta in cui un'opera viene consultata. I termini dell'intesa

**Google Books** si avvia verso il **Patteggiamento** definitivo. Il patteggiamento con gli editori, è stato rivisto con alcuni paletti (**limiti geografici e di business**). Innanzitutto, il *Settlement* vale solo per Usa, Canada e Uk, paesi con legislazioni affini; quinbdi, i libri **orfani** finiscono in un **trust**; invece viene istituito un **registro** per gli addetti ai **lavori**, pagati ogni volta in cui un'opera viene **consultata**.

Google ha pubblicato le FAQ del nuovo patteggiamento da **125 milioni di dollari**.

Il **Book Rights Registry** sarà un board no profit responsabile del pagamento di autori ed editori.

I lettori potranno **vedere in anteprima e acquistare i libri**, mentre le istituzioni potranno comprare **abbonamenti**, e le **biblioteche** avranno acceso libero a determinati terminali. Il nuovo settlement limita il fuuturo business model di Google che punta agli abbonamenti individuali, **stampa su richiesta** (print-on-demand) e **download digitali**. Google dovrà ottenere l'approvalazione dal board del registro e fornire notizie ai detentori di copyright prima di implementare altri modelli di business.

I detentori di Copyright riceveranno il **63%** di ogni ricavo, mentre i **retailer** terranno la maggior parte del **37%** restante.

Autori ed editori avranno fino al **31 marzo 2011**, per fare richiesta del pagamento da 60 a 300 dollari per-libro-digitializzato; e fino al **l 9 marzo 2012 per rimuovere le opere dal database di Google.**

Google Books ha illustrato i nuovi termini dell'accordo.

© **Copyright 2007** tutti i diritti riservati | *part of* **NetMediaEurope**