UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

The Authors Guild, Inc., Association of American     :
Publishers, Inc., Associational Plaintiffs, and       :
                                                      :
Herbert Mitgang, Betty Miles, Daniel Hoffman,         :     Case No. 05 CV 8136 (DC)
Paul Dickson, Joseph Goulden, The McGraw-Hill         :
Companies, Inc., Pearson Education, Inc., Penguin      :
Group (USA) Inc., Simon & Schuster, Inc., and         :
John Wiley & Sons, Inc., individually and on          :     **OBJECTIONS OF MICROSOFT**
behalf of all others similarly situated,              :     **CORPORATION TO**
                                                      :     **PROPOSED AMENDED**
        Plaintiffs,                                   :     **SETTLEMENT AND**
                                                      :     **CERTIFICATION OF**
v.                                                    :     **PROPOSED SETTLEMENT**
                                                      :     **CLASS AND SUB-CLASSES**
                                                      :
Google Inc.,                                          :
                                                      :
        Defendant.                                    :
                                                      :
---------------------------------------------------------------x


**MICROSOFT CORPORATION**                    **MONTGOMERY, McCRACKEN,**
                                                **WALKER & RHOADS, LLP**

Thomas C. Rubin (TR8845)                     Charles B. Casper
Chief Counsel for Intellectual Property Strategy    123 South Broad Street
*tom.rubin@microsoft.com*                    Philadelphia, PA  19109
                                             (215) 772-1500
Jule L. Sigall                               *ccasper@mmwr.com*
Senior Copyright Counsel
*jsigall@microsoft.com*                      R. Montgomery Donaldson
                                             1105 N. Market Street
Legal and Corporate Affairs                  Suite 1500
One Microsoft Way                            Wilmington, DE  19801
Redmond, WA  98052                           (302) 504-7800
(425) 882-8080                               *rdonaldson@mmwr.com*


                                             *Attorneys for Microsoft Corporation*


Dated:  January 28, 2010

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.    The Amended Settlement Agreement Would Still Usurp Congress's Exclusive
      Constitutional Role to Define and Alter the Rights and Remedies of Copyright
      Owners ................................................................................................................... 2

II.   The Amended Settlement Agreement Still Does Not Meet the Requirements of
      Rule 23 .................................................................................................................. 7

III.  The Amended Settlement Agreement Still Violates Article III, Due Process, and
      the Rules Enabling Act By Creating a Joint Venture That Would Authorize
      Copyright Infringement Not Alleged in the Complaints or Litigated............................ 13

IV.   The Court Should Disapprove the Amended Settlement Agreement Because it is
      An Exclusionary Agreement that will Maintain Google's Search Advertising
      Monopoly ............................................................................................................... 15

      A.    The Amended Settlement Agreement Would Deny Rival Search Platforms
            the Ability to Compete ...................................................................................... 15

      B.    Access to Content is Critical to Improving Users' Search Experience .............. 18

      C.    The Antitrust Laws Prohibit a Monopolist's Exercise of its Dominance to
            Exclude Rivals from Competing......................................................................... 20

      D.    No Procompetitive Justification Matches or Outweighs the
            Anticompetitive Effect of the Amended Settlement Agreement ........................ 21

      E.    No Settlement Can Be Approved Unless it Eliminates Google's Control
            Over Third Parties' Ability to Crawl, Index, Display Snippets, and Engage
            in Non-Display Uses ......................................................................................... 24

CONCLUSION.................................................................................................................. 25

## INTRODUCTION

"The ASA [Amended Settlement Agreement] leaves the material terms – indeed the overwhelming majority of the terms – of the original Settlement Agreement unchanged."

-- Plaintiffs' Memorandum of Law, Nov. 13, 2009[1]

Despite hundreds of objections filed by a host of diverse interests including Author Sub-Class members worldwide, Publisher Sub-Class members worldwide, non-profit organizations, academic authors and scholars, competing online services, advocacy groups, several states, and even three nations, the parties have seen fit to quickly file the Amended Settlement Agreement ("ASA") that left "the material terms – indeed the overwhelming majority of the terms – of the original Settlement Agreement unchanged."  The few amendments to the proposed settlement do almost nothing to resolve the copyright, class action, and antitrust problems that led these diverse interests, including the United States of America, the French Republic, and the Federal Republic of Germany, to conclude that this Court should reject it.[2]  Although the settling parties now seek to downplay the massive impact of the proposed settlement,[3] it remains (in the words of plaintiff Association of American Publishers) "breathtaking in scope, ground breaking for publishers and authors and trail blazing for intellectual property in general," and (in the words of plaintiff Authors Guild) "the biggest book deal in US publishing history."[4]  With admittedly only

---

[1]  Mem. in Support of Pls.' Mot. for Prelim. Approval of Am. Settlement Agreement, Nov. 13, 2009 (Doc. No. 769) at 16.

[2]  Statement of Interest of the United States of America Regarding Proposed Class Settlement ("DOJ Statement of Interest"), Sept. 18, 2009 (Doc. No. 720) at 2; *see* Mem. of Law in Opp'n to the Settlement Proposal on Behalf of the Federal Republic of Germany (Doc. No. 179) at 1, 9-11; Mem. of Law in Opp'n to the Settlement Proposal on Behalf of the French Republic (Doc. No. 287) at 1.

[3]  Michael Oliveira, *Canadian writers not sold on Google book plan*, *The Star,* Nov. 16, 2009, *available at* http://www.thestar.com/business/companies/google/article/726471 ("[T]he Google deal is not about 'setting up the digital future of publishing.'") (quoting Richard Sarnoff, co-chairman of Bertelsmann, owner of Random House publisher).

[4]  Chloe Albanesius, *Online Book Repository Gets Go-Ahead*, PC Magazine, Oct. 28, 2008, *available at* http://www.pcmag.com/article2/0,2817,2333443,00.asp (quoting Richard Sarnoff); *Opponents throw the book at Google over digital publishing plan*, The Star Ledger, Nov. 9, 2009, *available at*

Continued…

immaterial changes to the proposed settlement, the parties still seek to conscript copyright

holders worldwide into their private joint venture in defiance of Congress's exclusive

Constitutional responsibility to set copyright owners' rights and remedies and seek to do so by

means of a judicially approved settlement that exceeds the Court's authority under Articles I and

III of the Constitution and violates Due Process, the Rules Enabling Act, Rule 23, and the

antitrust laws.

## ARGUMENT

**I.    THE AMENDED SETTLEMENT AGREEMENT WOULD STILL USURP CONGRESS'S EXCLUSIVE CONSTITUTIONAL ROLE TO DEFINE AND ALTER THE RIGHTS AND REMEDIES OF COPYRIGHT OWNERS**

The Constitution empowers Congress to "promote the progress of science … by securing

for limited times to authors … the exclusive right to their respective writings … ."  U.S. Const.,

art. I, § 8.  "[I]t is Congress that has been assigned the task of defining the scope of the limited

monopoly that should be granted to authors … to give the public appropriate access to their work

product."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).  When

new technology arises, as here, "Congress has the constitutional authority and the institutional

ability to accommodate fully the varied permutations of competing interests that are inevitably

implicated by such new technology."  *Id.* at 430-31 (footnotes and citations omitted).

After hundreds objected to the original settlement agreement, two important events

occurred that underscore the gravity of the Constitutional issues that are implicated:  the U.S.

House of Representatives Committee on the Judiciary held a hearing on the proposed settlement

and then the U.S. Department of Justice filed a Statement of Interest with the Court.  Both the

---

….Continued
http://www.nj.com/business/index.ssf/2009/11/opponents_throw_the_book_at_go.html (quoting Dan Clancy);
Kenneth Li, *Google Strikes Deal Over Online Library*, Financial Times, Oct 28, 2008, *available at*
http://www.ft.com/cms/s/0/93574d3e-a52d-11dd-b4f5-000077b07658.html?nclick_check=1 (quoting Paul Aiken).

Department of Justice, in its filing, and the U.S. Copyright Office, in testimony, agreed that Congress, not the courts, has the authority to make the sweeping changes to copyrights that the settlement proposes. With its "material terms … unchanged," nothing in the ASA cures this fatal defect.

The Department of Justice told the Court that the settlement agreement seeks to make the kind of policy change typically implemented through legislation, and as a private judicial settlement does not meet the legal standards this Court must apply:

> As a threshold matter, the central difficulty that the Proposed Settlement seeks to overcome – the inaccessibility of many works due to the lack of clarity about copyright ownership and copyright status – is a matter of public, not merely private, concern. A global disposition of the rights to millions of copyrighted works is typically the kind of policy change implemented through legislation, not through a private judicial settlement. If such a significant (and potentially beneficial) policy change is to be made through the mechanism of a class action settlement (as opposed to legislation), the United States respectfully submits that this Court should undertake a particularly searching analysis to ensure that the requirements of Federal Rule of Civil Procedure 23 ("Rule 23") are met and that the settlement is consistent with copyright law and antitrust law. As presently drafted, the Proposed Settlement does not meet the legal standards this Court must apply.[5]

Similarly, the U.S. Copyright Office expressed its great concern about the parties' "end run around the legislative process":

> In the view of the Copyright Office, the settlement proposed by the parties would encroach on responsibility for copyright policy that traditionally has been the domain of Congress. The settlement is not merely a compromise of existing claims, or an agreement to compensate past copying and snippet display. Rather, it could affect the exclusive rights of millions of copyright owners, in the United States and abroad, with respect to their abilities to control new products and new markets, for years and years to come. We are greatly concerned by the parties' end run around legislative process and prerogatives … ."[6]

---

[5] DOJ Statement of Interest at 2.

[6] *Competition and Commerce in Digital Books: The Proposed Google Books Settlement, Hearing Before the House Committee on the Judiciary*, 111th Cong. (Sept. 10, 2009) (Statement of Marybeth Peters) at 67, *available at* http://judiciary.house.gov/hearings/printers/111th/111-31_51994.PDF.

Giving Google "immediate, unfettered, and risk-free access to the copyrighted works of other people" would "throw out fundamental copyright principles … ."[7]  At the hearing, Representative Hank Johnson, Chairman of the Subcommittee on Courts and Competition Policy, pointedly agreed:  "The treatment of orphan works rightsholders who did not opt out is a matter that should be decided by Congress, not a group of plaintiffs in a private litigation format."[8]

The settling parties persist in seeking to force rightsholders who do not want their works to be included in the parties' "joint venture" to affirmatively opt out of the business arrangement – contrary to the Department of Justice's recommendation that the settlement be restructured so that rightsholders who wish to be included opt in.[9]  As a result, the ASA would still give Google a *de facto* exclusive license to commercialize vast numbers of orphan and unclaimed works without their owners' consent.  It also would still "reverse principles of copyright law."[10]  The expropriation of unclaimed works, including orphan works, lies at the heart of the settlement's usurpation of Congressional authority.  The U.S. Copyright Office advised Congress that the far-reaching settlement would dramatically impinge on authors' and publishers' rights, frustrate Congress's long-standing efforts to enact legislation addressing orphan works, and make it exceedingly difficult for Congress to move forward:

> Congress should be particularly concerned about the settlement since it would interfere with the longstanding efforts of Congress and many other parties to address the issue of orphan works.  The broad scope of the out-of-print provisions and the large class of copyright owners they would affect will dramatically impinge on the exclusive rights of

---

[7]  *Id.*

[8]  *Competition and Commerce in Digital Books: The Proposed Google Books Settlement, Hearing Before the House Committee on the Judiciary*, 111th Cong. (Sept. 10, 2009) (Statement of Rep. Hank Johnson) at 161, *available at* http://judiciary.house.gov/hearings/printers/111th/111-31_51994.PDF.

[9]  DOJ Statement of Interest at 13-14, 18.

[10]  Statement of Marybeth Peters at 71.

> authors, publishers, their heirs and successors. Such alteration should be undertaken by Congress if it is undertaken at all. Indeed, this Committee has already invested significant time in evaluating the orphan works problem and weighing possible solutions. That process is not over. The Google Book Settlement would frustrate the Committee's efforts and make it exceedingly difficult for Congress to move forward.[11]

The Court should let Congress perform its exclusive Constitutional role to set copyright policy and alter rights. "Congress is much better situated than the judiciary to consider such important and far-reaching changes to the copyright system."[12] Indeed, many settlement objectors – including Microsoft – strongly support Congressional efforts to provide a fair legislative solution to the very issues that the parties have co-opted in their "end run around the legislative process."

The few changes in the ASA fail to resolve the usurpation of Congress's Constitutional authority. They also fail to prevent the *de facto* exclusive license that the ASA would give Google over these works, which the U.S. Copyright Office called "tantamount to creating a private compulsory license through the judiciary."[13] Although the ASA adds an Unclaimed Works Fiduciary who would be delegated some of the Registry's responsibility for administering unclaimed works, including orphan works,[14] empowering that fiduciary to help implement the ASA's opt-out scheme still usurps Congress's exclusive authority. Nor would the fiduciary have the power to prevent Google's *de facto* monopoly over all unclaimed works, for the ASA does not authorize the fiduciary to license unclaimed works to anyone other than Google. Rather, the fiduciary may only license unclaimed works "to the extent permitted by law."[15] Because no law permits licensing these copyrighted works without the owner's consent, Congress would have to

---

[11] *Id.* at 72.

[12] *Id.* at 73.

[13] *Id.* at 67.

[14] Amended Settlement Agreement ("ASA") § 6.2(b)(iii).

[15] ASA § 6.2(b)(i).

amend the Copyright Act before the fiduciary could license orphan works to any Google competitor. This makes the amendment meaningless from both a practical and legal standpoint.

Nor did the settling parties address international copyright concerns raised by France, Germany, the Department of Justice, the U.S. Copyright Office, and hundreds of foreign authors and publishers.[16] While the ASA includes only books published in Australia, Canada, and the United Kingdom and books registered with the U.S. Copyright Office in its definition of "Book," that definition still sweeps in foreign rightsholders from everywhere in the world.[17] And nowhere in the ASA does Google agree to stop scanning any foreign books or to remove the foreign books it has already scanned.[18] As the U.S. Copyright Office testified, "foreign rights holders should not be swept into a class action settlement unknowingly and they should retain exclusive control of their U.S. markets."[19]

In sum, Congress has exclusive authority to "decide how best to pursue the Copyright Clause's objectives … ." *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003). Congress, the U.S. Copyright Office, a Section 108 Study Committee,[20] rightsholders, online services, libraries, and a host of others have invested years in the legislative process on reforming copyright law for the

---

[16] *See* Mem. of Law in Opp'n to the Settlement Proposal on Behalf of the French Republic, *supra* n.2, at 1; Mem. of Law in Opp'n to the Settlement Proposal on Behalf of the Federal Republic of Germany, *supra* n.2, at 1, 9-11.

[17] ASA § 1.19. Note that the proposed settlement would include books published *both* in one of the four identified countries and any other country, and also includes authors and publisher from any country so long as their books were published in the United Kingdom, Canada or Australia or registered in the U.S. Copyright Office. For example, an author from France who publishes a book in Quebec, Canada, is included in the Amended Settlement Class.

[18] *See* Prof. Pamela Samuelson, *New Google Book Settlement Aims Only to Placate Governments*, Huffington Post, Nov. 17, 2009, *available at* http://www.huffingtonpost.com/pamela-samuelson/new-google-book-settlemen_b_358544.html.

[19] Statement of Marybeth Peters at 74.

[20] The ASA also continues to usurp Congress's role to establish copyright rights and remedies with respect to library use of copyrighted materials, as it made no substantive change to the provisions regarding library use. *See* Objections of Microsoft Corp. to Proposed Settlement and Certification of Proposed Settlement Class and Sub-Classes ("Microsoft's Objection"), Sept. 8, 2009 (Doc. No. 276) at 13-15.

digital age.  The amendments to the settlement agreement, like the original, offer no grounds for preempting this process.  Congress alone, not private parties furthering their commercial interests, has the authority to alter copyright law as the ASA proposes.

## II.    THE AMENDED SETTLEMENT AGREEMENT STILL DOES NOT MEET THE REQUIREMENTS OF RULE 23

The Department of Justice rightly called the original settlement "a forward-looking business arrangement rather than a settlement of past conduct …" and concluded that it did not satisfy Rule 23's requirements, most notably that the named plaintiffs adequately represent absent class members.[21]  Although the ASA makes a few changes the Department of Justice recommended, the parties rejected the key amendment that would have addressed one of the settlement's most fundamental problems:  changing the settlement from opt-out to opt-in. "[C]hanging the forward-looking provisions of the current Proposed Settlement applicable to out-of-print rightsholders from an opt-out to an opt-in would address the bulk of the Rule 23 issues raised by the United States."[22]  Nor did the parties adopt other important changes that could have helped, such as reducing the scope of the license to one "that simply authorized Google to engage in scanning and snippet displays in the future …" rather than selling entire copyrighted books without the owners' consent.[23]

The Supreme Court has made it clear that courts must rigorously analyze a proposed class to ensure it meets Rule 23(a)'s tests of numerosity, commonality, typicality, and adequacy of

---

[21]  DOJ Statement of Interest at 4-5.

[22]  *Id.* at 14.

[23]  *Id.* at 15.  While the amended settlement agreement provides some more definition of the future business models than the original proposal, those changes fail to address the concerns because the still-permitted business models of "File Download," "Print on Demand," and "Consumer Subscription" are well outside the conduct alleged in the complaint and would be clearly infringing.  Moreover, those three uses constitute the most prominent future digital book business models, demonstrating that the new definition is hardly limiting at all.

representation, and that a class proposed to be certified for settlement purposes only, as here, "requires 'heightened attention' to the justifications for binding the class members." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997)); *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.  To satisfy Rule 23(a)(4), plaintiffs must "'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citing *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974)). Here, the amended settlement falls far short of Rule 23(a)'s requirement of adequate representation because the named plaintiffs' interests conflict with those of a great many class members, including most absent class members.

The amendments resolve none of the conflicts of interest Microsoft identified in its objection to the original settlement:[24]

*First*, the publisher plaintiffs can hardly be said to represent absent class members when they plan to exclude their own books from the settlement they negotiated for others.  The Department of Justice highlighted this fundamental conflict:

> It is noteworthy that the parties have indicated their belief that the largest publisher plaintiffs are likely to choose to negotiate their own separate agreements with Google (*i.e.*, they will not opt in to the future provisions of the settlement), while benefitting from the out-of-print works that will be exploited by Google due to the effect of the opt-out requirement for those works.  There are serious reasons to doubt that class representatives who are fully protected from future uncertainties created by a settlement agreement and who will benefit in the future from the works of others can adequately represent the

---

[24]  Microsoft's Objections at 17-20.

interests of those who are not fully protected, and whose rights may be compromised as a result.[25]

The ASA does nothing to forbid, or even discourage, the named plaintiffs from withdrawing their books from the settlement and negotiating separate deals with Google for themselves. The named plaintiffs have not even disclosed the existence or terms of their separate deals with Google to the absent class members they purport to represent.

*Second*, the amendments purport to remove the most egregious financial conflict between the named plaintiffs and rightsholders of unclaimed works by removing the provision that redistributed unclaimed royalties to identified class members. Instead, after six years, the Registry, in consultation with the fiduciary for unclaimed works, *may* use up to 25% of unclaimed royalties to locate orphan rightsholders, and must pay the balance to charity after ten years.[26] But the named plaintiffs and other identified owners will still profit from unclaimed works because Google's exclusive access to the vast number of unclaimed works under the ASA would give Google a *de facto* monopoly in the sale of digitized books and institutional subscriptions, and Google will share some of its monopoly profits with the named plaintiffs and other identified rightsholders through royalties. *See* Section IV *infra*. The conflict between the named plaintiffs and rightsholders in unclaimed works also persists because the amendment does not require the Registry to attempt to locate orphan owners, does not require that funds be expended for that purpose, and does not provide any incentive to locate them. To the contrary, the Registry's Board of Directors would be made up of identified rightsholders, who have no such incentive.[27]

---

[25] DOJ Statement of Interest at 10.

[26] ASA §§ 6.2(b)(ii), 6.3(a)(i)(2)-(3).

[27] ASA § 6.2(b)(ii).

*Third*, the ASA does nothing to resolve the inherent conflicts between the named plaintiffs who seek to maximize royalties, other rightsholders such as academic authors and technical publishers who might prefer lower royalties, and orphan works owners who will never come forward to collect anything and therefore have no reason to seek anything other than wide availability with low or no royalties.

The ASA, attempting to soften the conflicts between the named plaintiffs and rightsholders in unclaimed works, adds an Unclaimed Works Fiduciary to carry out some of the Registry's administrative authority for unclaimed works.[28]  Rather than resolving the conflicts, the addition of a fiduciary highlights them.  If the conflicts were not severe, there would be no need for a fiduciary.  The need for one confirms that the interests of orphan rightsholders conflict with the named plaintiffs who negotiated the settlement, and this belated addition does not eliminate that fundamental infirmity.  In fact, the fiduciary could not resolve the conflicts between the named plaintiffs and rightsholders in unclaimed works:

- The fiduciary would not be appointed until after the settlement's approval.  Rule 23(a)(4) requires that absent class members be adequately represented *during* the litigation, not after it ends.  When a class action is settled, they must be adequately represented during the settlement negotiations.  *Amchem*, 521 U.S. at 623-24.  The post-settlement fiduciary contemplated here cannot cure the failure to comply with Rule 23(a)(4).

- The fiduciary would not have the power to set lower prices for orphan works to provide for wider availability at lower revenue.  An amendment to the settlement agreement

---

[28]  ASA § 6.2(b)(iii).

permits named plaintiffs and identified rightsholders to specify a price as low as zero for their works[29] but withholds this power from the fiduciary.[30]

- The fiduciary would not be responsible to orphan rightsholders. Rather, he or she would be appointed by the Registry's Board of Directors, subject to the Court's approval, and be responsible to the Board. The Board would be made up of representatives of the Author and Publisher Sub-Classes – identified parties who would receive royalties and whose interests conflict with those of orphan rightsholders in the ways identified above.

- The fiduciary would not be authorized to license copyrights in orphan and other unclaimed works to Google's competitors without an Act of Congress, as noted above.

*Fourth*, the conflicts of interest between the class representatives and foreign rightsholders, highlighted by the hundreds of copyright owners from outside the United States who objected to the original settlement, have only grown since the first round of objections. In December, a French court ruled that Google's scanning of books was copyright infringement under French law, which directly impacts the litigation calculus for those rightsholders and substantiates their concerns about being involuntarily drawn into the proposed settlement.[31]

*Fifth,* the conflict between the named plaintiffs whose books have already been scanned and others whose books will be scanned in the future persists. The former want immediate payment; the latter want future payments that depend on the long-term success of the forward-looking business arrangement the ASA would create. This conflict is akin to that of the

---

[29]  ASA § 4.2(b)(i)(1).

[30]  ASA § 4.2(b)(iii), (c)(ii)(2).

[31]  *See* Greg Keller, *Google fined $14,300 a day in France over book copyright issues,* USA Today, Dec. 18, 2009, *available at* http://www.usatoday.com/money/industries/technology/2009-12-18-google-fined-in-france_N.htm.

overbroad class of asbestos victims with present and future claims that led the Supreme Court to reverse the *Amchem* settlement. *Amchem*, 521 U.S. at 626.

Nor does *Uhl v. Thoroughbred Technology & Telecommunications, Inc.*, 309 F.3d 978, 984-87 (7th Cir. 2002), support the ASA, as the settling parties have suggested. Even if *Uhl* were binding, it would not warrant approval of the ASA. Rather, *Uhl* involved (i) a *known* and *discrete* class of individuals (real property owners along a specific railway), (ii) all of whom had been *actually harmed* (through slander of their title, a tort that had already occurred at the time of suit), (iii) all of whom faced the *same* risk and type of future harm (from further slander of title and trespass), (iv) all of whom received the *same ex ante treatment* in the negotiated settlement, (v) which resolved an extremely *limited* and *defined* set of future conduct by the defendant. In sharp contrast, the ASA here applies to an amorphous and undefined global class of authors and publishers with divergent backgrounds and preferences, some of whom have ripe infringement claims because their works have already been copied, while others do not; some of whom are known, while others (e.g., authors of orphan works) are not; some of whom will be included in the settlement's compensation structure, while others (e.g., authors of orphan works) will not; some of whom authored only book inserts, while others authored entire books; some of whom have books that are commercially available, while others do not; some of whom seek high royalties, while others do not; etc.[32] These profoundly diverse rightsholder interests are far removed from the homogeneous class in *Uhl*, rendering that case inapposite to the facts here.

---

[32] In addition, in *Uhl*, the class representative was similarly situated to the other class members: his title had been slandered and he did not know *ex ante* to which subgroup (owners on one side of the tracks where the cable would be installed at a particular location, or owners on the other side) he would ultimately belong. *See Uhl*, 309 F.3d at 986. In contrast, here, the Publisher Sub-Class representatives plan to exclude their books from the settlement and make private deals with Google instead. *See* DOJ Statement of Interest at 10.

**III.    THE AMENDED SETTLEMENT AGREEMENT STILL VIOLATES ARTICLE III, DUE PROCESS, AND THE RULES ENABLING ACT BY CREATING A JOINT VENTURE THAT WOULD AUTHORIZE COPYRIGHT INFRINGEMENT NOT ALLEGED IN THE COMPLAINTS OR LITIGATED**

Whether the original settlement agreement would have created a "complex license … that resembles a joint venture …"[33] or a "forward-looking business arrangement rather than a settlement of past conduct … ,"[34] it goes far beyond the claims at issue in this lawsuit – a case challenging Google's scanning of books and the display of snippets.  The release of so many parties *other than Google*, the only defendant in this case, including "Fully Participating Library Releasees," "Cooperating Library Releasees," "Public Domain Releasees," and "Other Library Releasees," shows how far the settlement exceeds the case's scope.[35]  Even the *plaintiffs* would be released from liability arising from disputes about who owns the rights in books subject to this agreement.[36]

The ASA's departure from the plaintiffs' claims makes clear that the case and the settlement are worlds apart.  The case's main question was whether Google's scanning and snippet display constitutes fair use under the Copyright Act.  No one contends that selling entire books without permission (whether in print, by download, or subscription), as the ASA would

---

[33]  Debevoise & Plimpton LLP, *Debevoise advises worldwide class of publishers and Association of American Publishers in landmark settlement with Google*, Nov. 25, 2008, *available at* http://www.debevoise.com/newseventspubs/news/RepresentationDetail.aspx?exp_id=a3dba5c6-7e25-4b70-a9c7-0156917fee0d.

[34]  DOJ Statement of Interest at 2.

[35]  *See* ASA § 10.

[36]  *See* ASA §§ 10.2(f), 10.1(m) (including "Plaintiffs" in the definition of "Rightsholder Releasors").  As several authors noted in their initial objections, the settlement would fundamentally and impermissibly restructure contracts between authors and publishers that allocate copyright rights to electronic versions of books.  *See, e.g.,* Objection of Scott E. Gant to Proposed Settlement and to Certification of the Proposed Settlement Sub-Class, Aug. 20, 2009 (Doc. No. 143) at 4-5 *and* Objection of Harold Bloom *et al.*, Sept. 8, 2009 (Doc. No. 273) at 31.  These are long-standing and far-reaching issues that have no place in and go far beyond this litigation, as even the Executive Director of the Authors' Guild has admitted:  "We didn't see eye to eye with publishers on book contracting law, and I guarantee we never will."  *See* Albanesius, *supra* n.4.

authorize in multiple ways, is anything but infringement.  Consequently, the ASA runs afoul of Article III and Due Process because it seeks to settle claims by authorizing conduct about which there was no case or controversy, and it violates the Rules Enabling Act, 28 U.S.C. § 2072(b), and Due Process by misusing Rule 23 to "abridge, enlarge or modify any substantive right." *Amchem*, 521 U.S. at 613.[37]

When considering class action settlements, courts employ the "identical factual predicate" test to enforce Article III and the Rules Enabling Act, and thereby restrict Rule 23 to its proper scope.  In a class action settlement, released claims must "arise out of the 'identical factual predicate' as the settled conduct."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 107 (2d Cir. 2005) (quoting *TBK Partners, Ltd. v. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).  The original settlement agreement failed this test because it would have released claims for books not yet scanned, for types of infringement not yet implemented (e.g., sales of books and subscriptions), for new revenue models not yet conceived, and for sales of entire copyrighted books when only scanning for electronic searching and displaying snippets was alleged in the complaints.[38]

The only amendment to nod toward rescuing the settlement from failing the "identical factual predicate" test is a limitation on new revenue models that Google and the Registry could implement to Print on Demand (allowing *entire* copies of printed books to be sold), File Download (allowing *entire* copies of electronic books to be sold) and Consumer Subscription (allowing consumer access to the massive database of *entire* books).[39]  But this amendment does not help.  Not only do these permitted future uses remain sweepingly broad, they would

---

[37] *See* Microsoft's Objections at 20-22.

[38] *See* Microsoft's Objection at 23-25.

[39] ASA § 4.7(a)-(c).

constitute new types of infringement that have never occurred and would allow the sale of *entire* books – which are indisputably infringing and for which there is no case or controversy. The ASA still fails the test.

**IV.    THE COURT SHOULD DISAPPROVE THE AMENDED SETTLEMENT AGREEMENT BECAUSE IT IS AN EXCLUSIONARY AGREEMENT THAT WILL MAINTAIN GOOGLE'S SEARCH ADVERTISING MONOPOLY**

**A.    The Amended Settlement Agreement Would Deny Rival Search Platforms the Ability to Compete**

The ASA also violates the antitrust laws. In addition to the significant antitrust concerns raised by the Department of Justice, the ASA contains explicit provisions that would exclude Google's search engine competitors from accessing critical content. The antitrust laws are clear: exclusionary agreements entered into by monopolists that deny rivals the ability to compete are illegal. Google could not enter into such an agreement in the absence of a settlement, and it should not be permitted to enter into the same agreement under the guise of one. An otherwise unlawful agreement does not become lawful simply by being tucked into a settlement agreement.[40]

There is no doubt that Google is the dominant search provider and that it possesses monopoly power in the market for search advertising. Both the Federal Trade Commission and the Department of Justice reached that conclusion after separate extensive investigations of the company.[41]  Because the ASA would give Google exclusive control over a critical source of

---

[40] Microsoft, like the Department of Justice, "respectfully submits that this Court should undertake a particularly searching analysis to ensure ... that the settlement is consistent with ... antitrust law." DOJ Statement of Interest at 2. While this section focuses on the harm to search markets, the amendments also fail to address the other antitrust problems previously identified by the Department of Justice and other objectors.

[41] *See* United States Department of Justice Press Release, *Yahoo! Inc. and Google Inc. Abandon Their Advertising Agreement*, Nov. 5, 2008, http://www.justice.gov/opa/pr/2008/November/08-at-981.html ("The Department's investigation revealed that Internet search advertising and Internet search syndication are each relevant antitrust markets and that Google is by far the largest provider of such services, with shares of more than 70 percent in both
Continued…

-15-

information on the Internet, the ASA would entrench its monopoly position and exclude

competition, in violation of the antitrust laws.[42]

      Although the ASA envisions that third parties would be able to crawl, index, and return

snippets of the scanned books, the agreement is structured such that it would prevent Google's

search competitors from doing so.  Section 3.9 of the ASA would allow third parties to display

snippets from the scanned books.[43]  However, the agreement would allow Google to control

which third parties may do this and which snippets they may receive.  Similarly, § 1.93 would

allow third parties to "index and search" the scanned books.[44]  However, the agreement would

restrict this right to "non-commercial" entities or entities that have Google's "prior written

consent."[45]  Finally, § 7.2(d)(viii) contains a catch-all prohibition that would disallow any

"commercial use of information extracted from" the scanned books unless Google decided to

---

….Continued

markets"); Statement of the Federal Trade Commission Concerning Google/DoubleClick, FTC File No. 071-0170, Dec. 20, 2007, *available at* http://www.ftc.gov/os/caselist/0710170/071220statement. pdf ("Google, through its AdWords business, is the dominant provider of sponsored search advertising.").

[42]  Search engines function by "crawling" Internet content and indexing the information they have gathered.  When a user types a search query into a search engine, the search engine searches its index and returns results relevant to the query.  However, if a search engine's index does not contain the content that the user is looking for, the results are unlikely to be relevant.  Users value and are drawn to superior content, and advertisers are drawn to increased audiences of users.

[43]  ASA § 3.9 ("Distribution Arrangement.  When Google may make any Snippet Display of a Book under this Amended Settlement Agreement, Google may also allow third parties that have entered into agreements with Google (a) to display snippets served by Google on their websites in response to user interactions on their websites and (b) to cache temporarily snippets transmitted by Google as described in the foregoing clause (a) for future display on their websites in response to user interactions on their websites.").

[44]  ASA § 1.93(e) (permitting "Non-Consumptive Research" related to "Indexing and Search – Research on different techniques for indexing and search of textual content").

[45]  ASA § 7.2(b) ("Upon notice to the Registry ... the Fully Participating Library may allow *Qualified Users* to conduct Non-Consumptive Research") (emphasis added); § 1.123 ("A for-profit entity may only be a 'Qualified User' if both the Registry and Google give their prior written consent.").

give its "express permission."[46]  Taken together, these provisions would prevent Google's search

rivals from crawling, indexing, and displaying snippets from the scanned books unless Google

were to allow it.[47]  There is no procompetitive justification for giving the search monopolist the

ability to decide which, if any, of its rivals may crawl, index, and display snippets from the

scanned books.

Because Google derives nearly all of its revenue from paid search advertising – and

presently none of it from the sale of digitized books – Google's motivation for its book scanning

project must derive from its impact on search advertising even more than from potential book

sales.  As recently as last month, the Engineering Director of Google's Book Search admitted

this when discussing the forthcoming amendments:

> Google hopes to benefit from [Google Books] by improving our search.  And we expect
> that we will make some money as we sell the books.  But the motivation is not the
> money we're going to make from selling books, because, if you look at what we're
> investing, it's far greater than that.[48]

Thus, Google acknowledges that its investment in Google Books cannot be supported by the *de

facto* monopoly the ASA would give it in the sale of digitized books and institutional

subscriptions alone.  Google also seeks to use its control over the millions of books it has copied

to exclude search rivals in order to protect its dominant position in and monopoly profits from

search advertising.

---

[46] ASA § 7.2(d)(viii) ("No Commercial Use.  Except with the express permission of the Registry and Google, direct, for profit, commercial use of information extracted from Books in the Research Corpus is prohibited.").

[47] As discussed below, permitting other search engines to crawl, index and return snippets from the scanned books would only increase the number of readers finding scanned books.  The additional readers would bring additional revenue to the rightsholders and Google.

[48] *Google's Goal: Digitize Every Book Ever Printed*, PBS NewsHour, Dec. 30, 2009, *available at* http://www.pbs.org/newshour/bb/entertainment/july-dec09/google_12-30.html (quoting Dan Clancy).

Similarly – and again with no procompetitive purpose – the ASA would provide Google alone among commercial providers of search and search advertising with the ability to improve its search algorithm through non-display uses such as research on the scanned books, unless Google itself grants that right to a rival.[49]  There is no procompetitive explanation for maintaining veto power over rivals' innovations; the only reason for such a veto power is to enable Google to foreclose competitors and competition.  The intent, and the likely result, is to deny rivals the ability to compete effectively against Google's search advertising monopoly.

Other class members noted the anticompetitive impact that the original settlement would have had on the search advertising market.[50]  The parties made no credible effort to address these concerns.  In fact, the only amendment that arguably touches upon these issues is the "reseller" provision in § 4.5(b)(v)(2).  Amazon and others have effectively explained why this amendment does nothing to promote competition in the sale of digital books.  Similarly, it does not in any way address antitrust concerns related to search and search advertising because third parties would still be prohibited from crawling, indexing, or displaying snippets of the scanned books in general search results or making other non-display uses.

### B.     Access to Content is Critical to Improving Users' Search Experience

The need for a search competitor to crawl, index, and display snippets of content in search results is beyond question.  Google Vice President of Search Products, Marissa Mayer, emphasized this point in remarking about Google's recent agreement with Twitter:  "Whenever there's new data that's emerging, and growing as fast as we're seeing with Twitter, it's really

---

[49]  *See supra* n.45.

[50]  *See, e.g.,* Objection of Yahoo! Inc. to Final Approval of the Proposed Class Action Settlement (Doc. No. 288) at 25-26; Mem. of Amicus Curiae Open Book Alliance in Opp'n to the Proposed Settlement (Doc. No. 282) at 11-14.

about making sure that we have the content so we can search for it and find it for our users."[51] Without access to critical content for the purpose of responding to a user's search queries, a search platform will be severely disadvantaged in providing a desirable search experience and will have little chance of pulling users away from Google's dominant search platform. This can be seen in the so-called "rare" search queries or "tail" queries, such as searches of friends, old songs, or obscure movies that users routinely make.[52] These "rare" queries are rare only to those not searching them – indeed some of the most valued queries a user may enter would be considered "rare" by most other people. If a search platform fails to provide the correct name, book excerpt, song title, or movie, it is likely the user will conclude that the platform's overall search capabilities are inferior regardless of the platform's strength in other areas.

Book content contains the type of crucial "tail" information that enables Google to enhance a user's experience in a way that rivals may not – and under the ASA would never – be able to replicate. In fact, the Engineering Director in charge of Google Books has admitted as much in explaining the importance of books to search: "Every time you search Google, you're searching 12 million books. [For example, if someone] were looking for this arcane [result] – it's called 'Court of Admiralty.' So, this is a very obscure, you know, [a] long tail query that this person was looking for something, OK? And now, when you click through, you see this

---

[51] Alexei Oreskovic, *Microsoft, Google Seal Twitter Search Deals*, Reuters, Oct. 21, 2009, http://www.reuters.com/article/idUSTRE59K58N20091022. The Google engineers "driving the underlying research" also recognize that as a matter of systems engineering, "the more documents you have, the better your results will be." *Google Technology RoundTable: Search Infrastructure & Search Quality*, Interview with Jeff Dean and Amit Singhal, at 1:36, http://www.youtube.com/watch?v=4SGRKPpIMwc.

[52] Indeed, Google's CEO Eric Schmidt recently acknowledged that "when we look at what people are looking for, they're often looking for the tail information. You would think that, based on popular culture, that everyone cares about the stuff that's popular. But our data shows that people are looking deeper and deeper into the Web for even more specialized information." Molly Wood, *Transcript of CNET Conversations with Eric Schmidt*, CNET News, Nov. 13, 2009, *available at* http://news.cnet.com/8301-30966_3-10397482-262.html.

-19-

book … ."[53]  While a search result for a query may now link to the online encyclopedia

Wikipedia, it is easy to foresee that many users would prefer search results that link to

professionally vetted and sourced books on the subject.

It is worth noting that, historically, Google has been vocal in calling for Internet content

to be open to search engine crawlers.  Indeed, Google's success has depended upon its access

and ability to crawl, index, and display the Web's vast content.  Google CEO Eric Schmidt has

repeatedly called for social networks such as Facebook to open their content to Google's

crawlers, claiming:  "If it's not searchable by Google, it's not open, and open is best for the

consumer."[54]  Similarly, in pushing for news sites to remain open to Google's crawlers, Google

has claimed that "[t]he theory – which seems to work in practice – is that if we make it easier to

read articles, people will read more of them."[55]  Tellingly, Google has taken the opposite position

on the benefits of openness of the book content at issue here, which can only be attributed to the

fact that the ASA vests that content in Google's exclusive control and would enable Google to

disadvantage its search rivals.

### C.    The Antitrust Laws Prohibit a Monopolist's Exercise of its Dominance to Exclude Rivals from Competing.

Long-standing Supreme Court precedent establishes that a monopolist's attempt to

exclude competitors from a market by, for example, denying them access to a key input (here,

---

[53]  *Google's Goal: Digitize Every Book Ever Printed*, *supra* n.48.

[54]  Dan Farber, Google CEO Eric Schmidt, *Social Networks are Still Too Closed*, CNET News, May 1, 2008, *available at* http://news.cnet.com/8301-13953_3-9933627-80.html (clarifying that "searchable by Google" means also searchable by other search engines, such as Yahoo).

[55]  Eric Schmidt, *How Google Can Help Newspapers*, Op-ed, Wall Street Journal, Dec. 3, 2009, *available at* http://online.wsj.com/article/SB10001424052748704107104574569570797550520.html.

searchable content) violates Section 2 of the Sherman Act.[56]  In *United States v. Griffith*, 334 U.S. 100, 101-03, 109 (1948), the Supreme Court held that it was unlawful for the operator of numerous motion-picture theaters to deny competitors access to first-run films in an attempt to establish a monopoly over movie theaters in certain towns.  *See also Schine Chain Theaters v. United States*, 334 U.S. 110, 113-14, 117-18 (1948) (same).  Likewise, a monopolist cannot agree to bar rivals from accessing an essential input (*i.e.*, content) in order to maintain its dominant position.  This is precisely why Lorain Journal violated Section 2 when it required that advertisers boycott a rival radio station lest they lose the ability to continue advertising in Lorain Journal's dominant newspaper.  *See Lorain Journal v. United States*, 342 U.S. 143, 154 (1951) ("a single newspaper, already enjoying a substantial monopoly in its area, violates ... § 2 when it uses its monopoly to destroy threatened competition").

Courts may not approve an agreement that constitutes a violation of the antitrust laws.  *See, e.g., Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) ("a court cannot lend its approval to any contract or agreement that violates the antitrust laws").  Consequently, the Court should disapprove the ASA because, as shown above, it contains provisions that serve the purpose of excluding search rivals from content necessary to compete against Google's search advertising monopoly.

### D.     No Procompetitive Justification Matches or Outweighs the Anticompetitive Effect of the Amended Settlement Agreement

The ASA, if approved, would undermine rival search engines' ability to compete for general search queries and, as a result, search advertising.  Google's search competitors would be

---

[56]  The two elements of a violation of Section 2 of the Sherman Act are well established: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563 (1966).

disadvantaged in their ability to respond to queries relating (in any manner) to books.  If users come to believe that there is a significant category of content for which only Google can return results, then competing search engines will be foreclosed from being able to offer a truly general search experience to rival Google's.  This would not be due to competition on the merits but rather to Google exercising its monopoly power to exclude rivals, through a massive, judicially approved agreement negotiated with a small handful of book publishers and authors.

The plain economics of Google's immense search advertising monopoly – and resulting profits – reveal that the purpose of foreclosing rivals' access to content must be to deprive them of the ability to compete.  This is seen, for example, by Google's sacrifice of profits under the ASA without any procompetitive reason.  Google plainly would be sacrificing its own and class members' profits by denying search competitors the ability to crawl, index, and display snippets of the scanned books.[57]  Allowing third parties to crawl, index, and display such snippets would direct more people to the books and would thereby generate additional revenue from Google's monetization of books.  As Google has noted in other contexts, "[t]he theory – which seems to work in practice – is that if we make it easier to read [books], people will read more of them."[58] Google is willing to sacrifice profits because it realizes that foreclosing search advertising rivals from the ability to access the scanned books will undermine the ability of those rivals to offer a comprehensive search experience and thus make those rival search engines a less attractive option to users.

---

[57]  Under the ASA, Google has the right to display snippets of the works covered by the settlement in general search results that include other content without any obligation to share with copyright holders the search advertising revenue that Google earns from returning those general search results.  ASA §§ 3.14, 4.4.  This clearly reflects Google's and the plaintiffs' understanding that display of book snippets in general search results drives traffic that the copyright holders can monetize.

[58]  Eric Schmidt, *supra* n.55.

It is no surprise that a monopolist's exclusionary agreements rarely have an efficiency justification or procompetitive explanation that offsets the anticompetitive harm.  *See Eastman Kodak Co. v. Image Tech. Svcs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) ("[b]ehavior that might otherwise not be of concern to the antitrust laws – or that might even be viewed as procompetitive – can take on exclusionary connotations when practiced by a monopolist.").  It has been suggested by Google itself (and in Google-funded articles and briefs in defense of the settlement) that the agreement would bring to the market new quantities of books that would not otherwise be available and, in any event, that any rival may simply duplicate Google's efforts by incurring the "significant legal risk" of violating copyright laws in order to negotiate a similar settlement.  Under Google's view, courts should not only countenance but should encourage potentially unlawful activity.  Similarly, Google would have the Court subscribe to the position that encouraging nascent competitors to incur significant legal risk is an "efficiency justification."  As the Department of Justice noted in its brief, it would be contrary to public policy to require rivals to incur significant legal uncertainty (and the legal costs of such uncertainty) merely to compete in a market.[59]  Aside from the fact that requiring litigation in this manner in order to reach a "competitive" outcome is, in the Department of Justice's words, "scarcely … sound policy," it would be for all practical purposes impossible for rivals to duplicate Google's feat if the Court approves the ASA.[60]

---

[59]  DOJ Statement of Interest at 24 ("it would scarcely be sound policy to encourage deliberate copyright violations and additional litigation as a means of obtaining approval for licensing provisions that could not otherwise be negotiated lawfully").

[60]  DOJ Statement of Interest at 24 (acknowledging that the settlement provides "de facto exclusivity" as to at least orphan works).

E.    **No Settlement Can Be Approved Unless it Eliminates Google's Control Over Third Parties' Ability to Crawl, Index, Display Snippets, and Engage in Non-Display Uses**

Microsoft and many others have demonstrated that the Court should reject the ASA because it conflicts with the antitrust laws, and approving it would violate Articles I and III of the Constitution, Due Process, the Rules Enabling Act, and Rule 23.  If the settling parties were to make substantial changes to the proposed settlement, they might be able to meet class action requirements and comply with the antitrust laws.  However, this Court should not approve any new amended settlement unless the agreement removes the self-serving provisions that enable Google to prevent rival search engines from crawling, indexing, displaying snippets, and engaging in other non-display uses from the scanned books.  If the Court were to approve a settlement that allows Google to do so but deprives rival search engines of similar ability, it would harm competition in search and search advertising.

As noted above, the ASA already envisions allowing certain third parties to display snippets (ASA § 3.9) and to crawl and index the scanned books (ASA §1.93).  Thus, the settling parties have implicitly asserted that third-party crawling and indexing of the scanned books, displaying of snippets, and non-display uses fall within the claims alleged in this suit.  It would be unreasonable, and unnecessary to protect the class of copyright holders, to grant Google control over *who* can do so.  So long as this conduct comports with the limitations imposed upon Google (such as by limiting snippets to three or four lines of text, ASA § 1.147), then the third parties uses could fall within claims alleged and copyright holders would not be deprived of any additional rights.  Under the ASA, Google would have a right to display snippets in general search results without any obligation to share with the copyright holders any of the search

advertising revenue derived from those general search results.[61]  Giving third parties the ability to display snippets in the same manner therefore would not deprive the copyright holders of one cent of compensation; to the contrary, by incrementally increasing traffic to the scanned books, enabling third parties to crawl, index, conduct research, and display snippets of the books could only *increase* the return to copyright holders.  At the same time, an aspect of the ASA that violates the antitrust laws would be mitigated to some degree.

## CONCLUSION

Plaintiffs admit that the ASA "leaves the material terms – indeed the overwhelming majority of the terms – of the original Settlement Agreement unchanged."[62]  The revisions are barely a gloss, not a sincere attempt to address the deep concerns raised by hundreds of objectors.  Like the original, the ASA would usurp Congress's exclusive role to alter copyright law; violate Articles I and III, Due Process, the Rules Enabling Act, Rule 23, and the antitrust laws; and hand Google a *de facto* monopoly.  For these reasons, the ASA must be rejected.

Respectfully submitted,

Dated:  January 28, 2010

**MICROSOFT CORPORATION**

/s/ Thomas C. Rubin
Thomas C. Rubin (TR8845)
Chief Counsel for Intellectual Property Strategy
*tom.rubin@microsoft.com*

Jule L. Sigall
Senior Copyright Counsel
 *jsigall@microsoft.com*

Legal and Corporate Affairs
One Microsoft Way
Redmond, WA  98052

---

[61] ASA §§ 3.14, 4.4.

[62]  Mem. in Support of Pls.' Mot. for Prelim. Approval of Am. Settlement Agreement, *supra* n.1, at 16.

(425) 882-8080

**MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP**

Charles B. Casper
123 South Broad Street
Philadelphia, PA  19109
(215) 772-1500
*ccasper@mmwr.com*
*Admitted pro hac vice*


R. Montgomery Donaldson
1105 N. Market Street
Suite 1500
Wilmington, DE  19801
(302) 504-7800
*rdonaldson@mmwr.com*
*Admitted pro hac vice*


Attorneys for Microsoft Corporation