

**BerkeleyLaw**
UNIVERSITY OF CALIFORNIA

January 27, 2010

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/29/10

**PAMELA SAMUELSON**
Richard M. Sherman Distinguished
Professor of Law

University of California, Berkeley
School of Law
434 Boalt Hall NA
Berkeley, CA 94720
Tel: 510-642-6775
Fax: 510-643-5814
psamuelson@law.berkeley.edu

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street                                    JAN 2 6 2010
New York NY 10007

Attention: The Honorable Denny Chin

Re: Academic Author Objections to the Google Book Search Settlement,
    Case No. 1:05-CV-8136-DC (S.D.N.Y.)


Dear Judge Chin:

I am writing to express my intent to appear at the Fairness Hearing for the above-cited case,
currently scheduled for February 18th, 2010 pursuant to the Order of this Court of November 19th,
2009 (Document 772).

I believe I am a member of the Author Subclass. I have submitted two letters expressing objections
to the court about the settlement on behalf of academic authors, one submitted today, and the other
dated September 3rd, 2009. I also wrote to you on behalf of sixteen academic authors on April 27th,
2009, asking for a several month extension of deadlines for the Google Book Settlement responses
owing to ignorance about the proposed settlement among academic authors.

The Author's Guild et al v. Google Inc.                                                    Doc. 893

With this, I respectfully submit my notice of intent.

Sincerely,

Pamela Samuelson
Richard M. Sherman Distinguished Professor of Law

cc:
Michael J. Boni, Esq., Counsel for the Author Subclass
Joanne Zack, Esq., Counsel for the Author Subclass
Joshua Snyder, Esq., Counsel for the Author Subclass
Jeffrey P. Cunard, Esq., Counsel for the Publisher Subclass
Bruce P. Keller, Esq., Counsel for the Publisher Subclass
Daralyn J. Durie, Esq., Counsel for Google





**PAMELA SAMUELSON**
Richard M. Sherman Distinguished
Professor of Law

University of California, Berkeley
School of Law
434 Boalt Hall NA
Berkeley, CA 94720
Tel: 510-642-6775
Fax: 510-643-5814

27 January 2010

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York NY 10007                    JAN 2 9 2010

Attention: The Honorable Denny Chin

Re: Supplemental Academic Author Objections to the Google Book Search Settlement, Authors Guild, Inc. v. Google, Inc., No. 1:05-CV-8136 (S.D.N.Y.)

Dear Judge Chin:

The vision of a universal digital library containing the accumulated knowledge embodied in books from the collections of major research libraries—a library that would last forever—is unquestionably an inspiring one.[1]  The academic author signatories of this letter understand the appeal of this vision and heartily hope that it will come to pass. However, for reasons explained in this letter, we do not believe that approval of the Proposed Amended Settlement Agreement (PASA) in the *Authors Guild v. Google* case will fulfill this lofty ambition.

The Google Book Search (GBS) initiative envisioned in the PASA is not a library.[2]  It is instead a complex and large-scale commercial enterprise in which Google—and Google alone—will obtain a license to sell millions of books for decades to come. If the PASA is approved, millions of rights holders will be forced to join the Book Rights Registry (BRR) or the Google Partner Program to exercise any control over Google's use of their books. The litigants who spent two and a half years negotiating the initial Proposed Settlement Agreement (PSA) and now the PASA have interests and preferences that dramatically diverge from those of many rights holders who were not at the negotiating table, including academic authors. It is thus unsurprising that hundreds of authors and other rights holders have objected to the settlement and even more, we believe, have opted out. Nor is it surprising that several public interest organizations have expressed opposition to the settlement,[3] for there were no consumer or public interest advocates at the negotiating table either. Because of this, the PASA is fundamentally tainted.

---

[1] *See* Sergey Brin, *A Library to Last Forever*, N.Y. TIMES, Oct. 8, 2009, at A31, *available at*, http://www.nytimes.com/2009/10/09/opinion/09brin.html.

[2] *See* Pamela Samuelson, *Google Books Is Not a Library*, HUFF. POST, Oct. 13, 2009, available at http://www.huffingtonpost.com/pamela-samuelson/google-books-is-not-a-lib_b_317518.html. Nor will GBS be "universal," given the narrowing of the class, the opt-out, exclusion and removal requests, and directions from some rights holders not to scan their books. *See* Part IV of this letter. *See also* Lawrence Lessig, *For the Love of Culture*, THE NEW REPUBLIC, Jan. 26, 2010, *available at* http://www.tnr.com/article/the-love-culture.

[3] *See, e.g.*, Brief Amicus Curiae of Consumer Watchdog in Opposition to the Settlement, *Authors Guild Inc. v. Google Inc.*, No. 1:05-CV-8136 (S.D.N.Y. Sept. 8, 2009), *available at* http://thepublicindex.org/docs/letters/cw.pdf; Brief of Amicus Curiae Public Knowledge in Opposition to the Settlement, *Authors Guild Inc. v. Google Inc.*, No. 1:05-CV-8136 (S.D.N.Y. Sept. 8, 2009), *available at* http://thepublicindex.org/docs/letters/pk.pdf.

This letter supplements one submitted to this Court on September 3, 2009, on behalf of sixty-five academic authors and researchers, which set forth numerous objections to the PSA.[4] Among other things, that letter expressed concerns about the lack of meaningful constraints on price increases for the Institutional Subscription Database (ISD), the de facto monopoly that Google would obtain to orphan books, inadequate user privacy protections, and excessive restrictions on non-consumptive research.

The present letter reaffirms the earlier academic author objections to the PSA because the PASA does not adequately respond to objections set forth in that letter.[5] It states some new objections because certain amendments to the PASA are contrary to the interests of academic authors who are members of the Author Subclass.

Our continued and new objections are rooted in the same fundamental flaw in the GBS settlement process: the Authors Guild and the named author plaintiffs have not fairly and adequately represented the interests of academic authors in negotiating either the PSA or the PASA.[6] Simply put, the Authors Guild and its members do not share the interests, professional commitments or values of academic authors.[7] Only a small fraction of Authors Guild members are scholars, and few write books of the sort likely to be found in major research libraries.[8] Nor does the Association of American Publishers (AAP)

---

[4] Letter of Pamela Samuelson to Judge Denny Chin on behalf of academic authors, *Authors Guild, Inc. v. Google, Inc.*, No. 05 CV 8136 (S.D.N.Y. Sept. 3, 2009) ("Academic Author Letter"). For a more complete discussion of the possible benefits and risks of the proposed GBS settlement, *see* Pamela Samuelson, Google Book Search and the Future of Books in Cyberspace, 95 MINN. L. REV. (forthcoming 2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1535067.

[5] An exception is a provision of the PASA that now expressly recognizes that some rights holders may want to make books and inserts available on an open access basis, such as by Creative Commons licenses. See PASA, § 4.2 (a)(i). However, we remain concerned that the Book Rights Registry (BRR) will not welcome and might even discourage academic authors' exercise of this option because the BRR will collect no revenues from Google if books are available on open access terms. BRR will find it difficult to have sufficient revenues to sustain its operations if academic authors exercise this option with any frequency.

[6] While our letters have concentrated on our substantive objections to the PSA and the PASA, we have been enlightened by our study of Scott Gant's objections to the PSA as to class action notice deficiencies and other Rule 23 problems with the PSA. *See* Objection of Scott E. Gant to Proposed Settlement, and to Certification of the Class and Subclasses, *Authors Guild, Inc. v. Google, Inc.*, No. 05 CV 8136 (S.D.N.Y. Aug. 19, 2009), *available at* http://thepublicindex.org/docs/objections/gant.pdf. We agree with him that the Guild did not adequately represent the interests of the Author Subclass and that notice of the settlement has been inadequate. Signatory Pamela Samuelson, for instance, did not receive a copy of the initial notice of the PSA, and regards the supplemental notice that she did receive as seriously incomplete in explaining the PASA and its implications, especially as to the unclaimed works fiduciary provisions.

[7] The Authors Guild, for instance, generally limits its membership to authors who have contracts with established American publishers that include a "royalty clause and a significant advance." *See* Authors Guild Membership Guidelines, *available at* http://www.authorsguild.org/join/eligiblity.html. Few academic authors would meet these criteria. The interests of professional writer-members of the Authors Guild in maximizing revenues are reflected in the PSA and the PASA. An example is PASA, § 4.8(a)(ii), which requires paying fees for pages printed out at public access terminals. Academic authors would regard printing a few pages from an out-of-print book to be fair use. See Academic Author Letter, *supra* note 4, at 2-7.

[8] The Authors Guild website links to approximately 3000 of their member's websites. A review of those websites reveals that slightly over 10 per cent of these Guild members have written books of the sort likely to be found in major research libraries whose collections Google has scanned. So far as we can tell from these websites, the Guild's members primarily write works aimed at non-scholarly audiences. They write, for instance, romance

share the commitments and values of scholarly authors, as is evident from its recent efforts to thwart open access policies for government-funded academic research,[9] policies which scholars generally support.[10] Academic authors, almost by definition, are committed to maximizing access to knowledge. The Guild and the AAP, by contrast, are institutionally committed to maximizing profits.

Nor does the Guild have the same legal perspective as most academic authors on the central issue in litigation in the *Authors Guild* case, to wit, whether scanning books in order to index their contents and make snippets available constitutes copyright infringement. (This issue necessarily forms the basis on which any settlement must be based.) Academic authors are more likely than Guild members to consider scanning books for information-locating purposes to be a non-infringing use because indexes and snippets advance scholarly research and improve access to knowledge, especially when, as with GBS, searches yield links to libraries from which the relevant books can be obtained.[11]

Rule 23 of the Federal Rules of Civil Procedure requires courts to consider whether there is sufficient commonality of interest and typicality of claims among those who are within a putative class before certifying it or approving a class-binding settlement. While this letter focuses on academic author objections to the PASA, we are aware that we are not the only rights holders who believe the Guild and the AAP had interests quite different from and/or in conflict with theirs. Indeed, when we consider the diverse complaints about the settlement expressed in the hundreds of objections already filed in this matter, we question whether the Rule 23 standards have been or can be met for a class consisting of all persons owning U.S. copyright interest in one or more books or inserts published in the U.S., UK, Canada, or Australia.

That said, we believe that the perspectives of academic authors on the PSA and the PASA should be given particular weight in this court's determination about whether the PASA is fair and worthy of approval. The overwhelming majority of books in the GBS corpus are from the collections of major research libraries, such as the University of Michigan and the University of California.[12] Not

---

novels, erotica, travelogues, magazine articles, and magic books. They may be accomplished writers, but they are unrepresentative of the interests of academic authors whose books constitute most of the GBS corpus.

[9] Ass'n of Research Libraries, *Issue Brief: AAP PR Campaign Against Open Access and Public Access to Federally Funded Research*, available at http://www.arl.org/bm~doc/issue-brief-aap-pr.pdf.

[10] The negotiating party whose interests most closely align with the values of scholarly communities is, ironically enough, Google. However, that firm cannot be an adequate representative of the interests of scholarly authors in negotiating a class action settlement.

[11] Most academic commentary on Google's fair use defense supports it. *See, e.g.*, *See, e.g.*, Hannibal Travis, *Google Book Search and Fair Use: iTunes for Authors or Napster for Books?*, 61 U. MIAMI L. REV. 601 (2006) (arguing that scanning books to index them is fair use); Matthew Sag, *The Google Book Settlement and the Fair Use Counterfactual* (Working paper Series, Aug. 2009) at 11-25, *available at* http://ssrn.com/abstract=1437812 (comparing the proposed GBS settlement to fair use outcome). *See also* Frank Pasquale, *Copyright in an Era of Information Overload*, 60 VAND. L. REV. 135 (2007) (discussing the need for broad fair use for search engines to help people find information).

[12] *See, e.g., Competition and Commerce in Digital Books: Hearing Before the H. Comm. on the Judiciary*, 110th Cong. 1-3 (2009) ["Hearing"] (Prepared Statement of David Drummond, Senior Vice President of Corporate Development and Chief Legal Officer of Google, Inc.) (estimating that 2 million of the 10 million books then in the GBS corpus are books in the Google Partner Program, while 8 million were obtained from research library partners). A transcript of this hearing is available at http://judiciary.house.gov/hearings/printers/111th/111-31_51994.PDF.

surprisingly, a large majority of those books were written by scholars for scholarly audiences.[13] Academic authors also far outnumber the members of the Authors Guild. There are about 800,000 full-time academics working at colleges and universities in the U.S.,[14] for many of whom publication of books, book chapters, and the like is a career requirement, as well as a source of deep satisfaction. The books and inserts we write are also of the sort likely to be found in the collections of major research libraries.

We acknowledge that academic authors sometimes assign their copyrights to publishers of their books, but this does not necessarily change the calculus. Rights to authorize electronic editions of these books, we believe, may well be new and unforeseen uses of their works, rights in which would seem to reside in authors under Random House, Inc. v. Rosetta Books L.L.C., 283 F.3d 490 (2d Cir. 2002). This case held that authors of literary works have the right to authorize third parties to make e-books of them, even though they had assigned rights to publishers to make and distribute print versions.[15] Many publishing contracts also provide that copyrights revert to authors when their books go out of print (which millions of books in the GBS corpus are). For these reasons, we believe that academic authors hold a relevant copyright interest in many books and inserts in the GBS corpus.

We recognize that approval of the GBS settlement would bring about some public benefits, chiefly by providing significantly improved access to books. But the Court should be careful to recognize and give appropriate weight to the substantial risks that the proposed settlement poses. These risks can be avoided or ameliorated in one of two ways. The Court can either reject the settlement altogether or condition approval on the parties' willingness to make changes to the PASA that address meritorious objections.

Part I discusses our objections to new provisions in the PASA as to anticipated uses of funds from unclaimed works and to certain powers that the "fiduciary" for unclaimed works has and some it lacks.

---

[13] See, e.g., Brian Lavoie & Lorcan Dempsey, Beyond 1923: Characteristics of Potentially In-copyright Print Books in Library Collections, D-LIB MAG., Nov.-Dec. 2009, at 14, available at http://www.dlib.org/dlib/november09/lavoie/11lavoie.html (reporting that 78% of the non-fiction books in the collections of three of Google's research library partners are scholarly books and that non-fiction books constitute more than 90% of library collections).

[14] Data from the U.S. Dept. of Labor, Bureau of Labor Statistics indicates that there are more than 800,000 post-secondary educators in the United States.

[15] The court considered the widely used contractual language in book publishing contracts—"to publish the work in book form"—as a limited grant, not a grant of all copyright interests. Random House, 283 F.3d at 491. It is worth noting that the Authors Guild submitted an amicus curiae brief in support of Rosetta in that case, while the AAP submitted one in support of Random House. Hidden underneath the surface of the proposed GBS settlement is a set of compromises, set forth in Appendix A, that address serious conflicts that exist between authors and publishers over rights to control and be compensated for e-book publications. This is reflected in testimony that Paul Aiken, Executive Director of the Authors Guild, gave before Congress: "One of the reasons this thing [the PSA] took 30 months to negotiate was that we weren't just negotiating with Google. It was authors negotiating with publishers, and we rarely see eye to eye. So we had months and months and months of negotiations, trying to work out our differences." Transcript of Hearing, supra note 12, at 143. Had Random House tried to resolve this e-book rights issue by bringing a class action lawsuit on behalf of a class of publishers against a class of authors in order to negotiate a settlement along the lines of Appendix A, the case would have been dismissed because the dispute would have involved both varying contract language and different state laws so that Rule 23 requirements could not have been satisfied. Appendix A takes advantage of the settlement on other issues as to which Google is the antagonist to bring about a new allocation of copyright ownership, licensing, and reversion rights and procedures that, but for the settlement, could only have been accomplished through legislative action.

Part II discusses an amendment to the proposed settlement that is susceptible to an interpretation that would disadvantage academic authors of what the PSA and PASA designate as "inserts" (e.g., book chapters).

Part III objects to amendments that omit reference to a termination agreement negotiated by the litigants. If there is a termination agreement that is still in force, it ought to be disclosed to members of the class, as well as to the Court. If not, the litigants should explicitly abjure it.

Part IV raises concerns about whether the parties' professed aspirations for GBS to be a universal digital library are being undermined by their own withdrawals of books from the regime the settlement would establish, as well as by actions of other rights holders who have opted out of the settlement because they find its terms unacceptable. Information has come to light since our last letter, sent on September 3, 2009, that undermines our confidence that the settlement will bring about the public benefits the litigants say they intend.

Part V offers a list of changes that should be made to the PASA to make the settlement fair and adequate as to academic authors. Even with these modifications, however, we recognize that serious questions remain about whether the class defined in the PASA can be certified consistent with Rule 23, whether the settlement is otherwise compliant with Rule 23, whether the settlement is consistent with the public interest, and whether approval of this settlement is an appropriate exercise of judicial power. These questions have been addressed in numerous other submissions, and while our supplemental objection does not discuss them, we do share the misgivings that others have expressed.

I.    We Object to the Unclaimed Work Provisions of the PASA.

The PSA would have created a blatant conflict of interest between those class members who had registered their books with the BRR, as the Guild expects its members to do, and those who had not.[16] Funds from unclaimed books would have been held in escrow for five years, after which revenues from Google's commercialization of them would have been paid out to BRR-registered rights holders.[17] This would not only have given BRR-registrants a windfall from books in which they owned no rights, but it also would have created structural disincentives for BRR to search for owners of unclaimed books. Not surprisingly, the Department of Justice objected to this as inconsistent with Rule 23.[18]

Amendments in the PASA seemingly acknowledge the existence of this intra-class conflict, but do not resolve it in a manner that is fair, reasonable, or adequate to class members or consistent with the public interest.

The PASA calls for the appointment of an unclaimed work fiduciary (UWF) to make certain decisions about Google's exploitation of unclaimed works and to act as a gatekeeper for funds owed to rights

---

[16] Statement of Interest by the U.S. Dept. of Justice Regarding the Proposed Settlement at 9, *Authors Guild, Inc. v. Google, Inc.*, No. 05 CV 8136 (S.D.N.Y. Sept. 18, 2009) (DOJ Statement).

[17] PSA, § 6.2(a).

[18] DOJ Statement, *supra* note 16, at 9-10. The initial willingness of the class representatives to negotiate such a provision reflects considerable insensitivity to the interests of unclaimed work rights holders. It should not have required an objection from DOJ to get fair treatment for these rights holders.

holders of unclaimed works.[19] It also directs that funds generated by Google's commercialization of unclaimed works should be held in escrow for ten years, that these funds are to be used to search for rights holders, and that after ten years, unclaimed work funds can be paid out to charities or otherwise allocated in a manner consistent with state laws.[20]

The academic signatories of this letter object to these provisions for several reasons.

First, there are no meaningful guarantees of independence for this so-called fiduciary, and insufficient criteria for how he/she should perform a fiduciary role in respect of the unclaimed books. The UWF is, for example, to be chosen by a supermajority of the BRR Board,[21] and will apparently be housed in the BRR offices. The BRR, not the fiduciary, will hold onto the unclaimed funds; after five years, BRR is authorized to use a significant portion of the unclaimed work funds to search for rights holders, although this is subject to the UWF's approval.[22]

Second, the powers the PASA grants to the UWF are in some respects too limited and in at least one respect too broad. The UWF can, for instance, choose to change the default setting for an unclaimed in-print book from "no display" to "display," but not the reverse.[23] The UWF also has the power to approve changes in pricing bins for unclaimed books available through the consumer purchase model,[24] but seemingly no power to set prices for individual unclaimed books nor to provide input about price-setting of institutional subscriptions. This seems strange to us because all or virtually all of the unclaimed books will be in the ISD and revenues derived from the ISD are likely to be substantial. The UWF also has the power to disapprove of Google's plan to discount prices of unclaimed books,[25] but apparently not to recommend discounts.

Of particular importance to academic authors, the UWF lacks power to make unclaimed books available on an open access basis.[26] While divining the preferences of unclaimed rights holders may be challenging as to many others, we believe that most unclaimed books in the GBS corpus will prove to be books written by scholars for scholars, and that most such authors would prefer that their out-of-print books be available on an open access basis, especially insofar as Google is making these books available to institutions of higher learning.[27] We object to this limit on the UWF's powers.

---

[19] PASA, § 6.2(b)(iii). The only qualification PASA provides for this position is a negative one: he/she cannot be a book author or publisher. *Id.*

[20] *Id.*, §§ 6.2(b)(iv), 6.3(a).

[21] *Id.*, § 6.2(b)(iii).

[22] *Id.*, § 6.3(a)(i).

[23] *Id.*, §§ 6.2(b)(iii), 3.2(e)(i). The UWF would have structural incentives to exercise the power to switch the default for unclaimed in-print books from "no display" to "display uses" in order to generate revenues that could be used to search for their rights holders to encourage them to claim the books.

[24] *Id.*, § 4.2(c)(i).

[25] *Id.*, § 4.5(b)(ii). We worry also that there will be little incentive for the UWF to agree to discounts as it would reduce the revenues over which he will have some control; BRR may also not want unclaimed works to be discounted, as these books will compete with those of registered rights holders.

[26] Nor apparently can the UWF direct Google to exclude unclaimed books from any newly approved revenue models or to remove them from the GBS corpus. Most of the UWF's powers are directed to revenue-enhancement.

[27] *See Random House*, 283 F.3d 490 (2d Cir. 2002), discussion, *supra* note 15.

One power the PASA grants to the UWF to which we strongly object is the power to authorize Google to alter the texts of unclaimed books.[28] We can imagine no circumstance under which changes to the historical record embodied in books from major research libraries would be justifiable. Granting the UWF the power to authorize alteration of texts poses risks of censorship.

Third, if books remain unclaimed after ten years during which the UWF and BRR have made a reasonably diligent search to find their rights holders, the books should be deemed to be "orphans," a term which is typically defined to include works whose rights holders could not be found after a reasonably diligent search.[29] The PASA should contain a provision requiring the UWF to disclose which unclaimed books it has concluded are, in fact, orphans so that others could decide whether to make them available.[30] (We discuss below how we think orphan books should be treated.)

Fourth, the PASA would intrude upon Congressional prerogatives in respect of its consideration of orphan works legislation in a post-settlement world. The PASA gives the UWF authority to license copyright interests in unclaimed books to third parties "to the extent permitted by law."[31] Existing law does not allow *any* licensing of in-copyright books to third parties without the rights holders' permission. The only way that the UWF could get the legal authority to issue such licenses would be from Congress, presumably through the passage of orphan works legislation.

By establishing a private escrow regime for collecting and distributing revenues Google may earn from its commercialization of orphan books, the PASA seems to be setting up the UWF as an intermediary for the licensing of orphan books to third parties. It also establishes a regime through which revenues from these books are to be distributed (e.g., to the UWF's favorite charities). The UWF would have a financial stake in the continuation and extension of the escrow regime and in persuading Congress that escrowing was the best solution to the problem posed by unclaimed works.

It is, however, for Congress to decide what should be done with orphan works, not for those who negotiated the PSA and PASA, nor for this Court. A substantial restructuring of rights under copyright law is the constitutionally mandated domain of the U.S. Congress.[32] The orphan works legislation that Congress has considered up in recent years has not adopted the escrow model.[33] Indeed, these bills are

---

[28] PASA, § 3.10(c)(i).

[29] *See* U.S. COPYRIGHT OFFICE, REPORT ON ORPHAN WORKS (2006), *available at* http://www.copyright.gov/orphan/orphan-report.pdf ("Orphan Work Report").

[30] The settlement agreement should also require the UWF, as well as the BRR and Google, to make publicly available any information they possess about books they discover to be in the public domain (owing, for instance, to the author's failure to renew copyright). We are concerned that these actors will have financial incentives to withhold this information because they may benefit from Google's commercialization of public domain books. The PASA even allows registered rights holders to share in revenues mistakenly earned by Google from the sale or licensing of public domain books. PASA, § 6.3(b).

[31] *Id.*, § 6.2(b)(i).

[32] *Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003).

[33] *See, e.g.,* Shawn Bently Orphan Works Act of 2008, S. 2913, 110th Cong., 2d Sess. (2008); Public Domain Enhancement Act, H.R. 2408, 109th Cong., 1st Sess. (2005).

more closely modeled on the recommendations of the U.S. Copyright Office which concluded that orphan works should be freely usable if rights holders cannot be found.[34]

The treatment of orphan books is no small matter. No one knows how many books will ultimately be unclaimed in the aftermath of a GBS settlement.[35] Google spokesmen have tended to offer fairly conservative estimates about the proportion of books in the GBS corpus that will be orphans. David Drummond, chief legal officer of Google, estimated in his testimony before Congress that about 20% of the out-of-print books in GBS would likely be orphans.[36] With approximately 8 million such books now in the GBS corpus, Drummond's estimate would yield 1.6 million orphan books; if GBS grows to 50 million books, as some expect,[37] and the proportion of out-of-print and orphan books remained stable, that would mean that about 7.5 million books would be orphans.[38]

The proportion of orphan books may, however, be higher than Mr. Drummond estimated, perhaps even much higher. "Older" books, especially books published before the 1980s,[39] are especially likely to be unclaimed. In the 30 years or more since the publication of these books, the publishers may have gone out of business and authors may have passed away (and heirs may be ignorant about rights in their forebearers' books or too numerous or dispersed to track down), be suffering from debilitating states, or otherwise uninterested in overtures from the BRR.

Orphan books will likely be sold through the consumer purchase model at prices ranging from $1.99 to $29.99.[40] The goal of the PASA pricing algorithm is to maximize revenues for each book.[41] Google also plans to license these books as part of the ISD to thousands of universities, public libraries, and other entities. ISD subscription prices are supposed to approximate market returns for a multi-million book database,[42] and as we have noted before, we are deeply worried that prices for the ISD will rise over time to astronomical levels.[43]

---

[34] *See* Orphan Works Report, *supra* note 29, at 11. The Office recommended that if a rights holder later came forward to claim the work, the person who reasonably believed the work was an orphan might continue the use for future compensation. *Id.* at 115.

[35] See Statement of William Morris Endeavor Entertainment, Aug. 2009, *available at* http://thepublicindex.org/docs/commentary/wme.pdf (noting a Financial Times estimate that between 2.8 and 5 million of the 32 million books protected by copyright in the U.S. are likely to be orphans).

[36] Hearing, *supra* note 12, at 6.

[37] *See, e.g.,* Letter from Paul Courant to Judge Denny Chin at 1, *Authors Guild, Inc. v. Google, Inc.*, No. 05 CV 8136 (S.D.N.Y. Sept. 4, 2009), *available at* http://thepublicindex.org/docs/letters/Courant.pdf (estimating that Google will scan 50 million unique books for GBS).

[38] There is reason to believe that the proportion of orphans and of out-of-print books would be substantially higher as the number of books in the GBS corpus approaches 50 million, for there is a limited number of in-print books, and Google may be scanning most of them through its partner program.

[39] Roughly half of the books in U.S. library collections were published before 1977 and one-third before 1964. Lavoie & Dempsey, *supra* note 13, at 4-5. Moreover, research library collections tend to include a higher percentage of older books. *Id.* at 12.

[40] PASA, § 4.2 (setting percentages for algorithmic pricing bins).

[41] *Id.* at § 4.2(c)(ii)(2).

[42] *Id.*, § 4.1.

[43] Academic Author Letter, *supra* note 4, at 3-5.

The PASA provides that after 10 years of collecting profit-maximizing revenues for orphan books, the UWF would become a philanthropist,[44] distributing these funds to charities in various countries that promote literacy, freedom of expression, and education. The PASA also authorizes the UWF to continue to collect funds for orphan books for the remainder of their copyright terms, and to continue paying orphan funds to these charities. With all due respect to the eleemosynary impulse underlying these provisions, we think the PASA takes the wrong approach to making orphan books available.

While we believe that Congress is the proper governing body for decisions about what to do about orphan works, we also believe that if books are true orphans, they should be freely available for use by all, including non-profit institutions such as the colleges and universities with which we are affiliated. Treating unclaimed orphan books as public domain works would be more consistent with the utilitarian purpose of U.S. copyright law, insofar as unclaimed works lack an author or publisher in need of exclusive rights to recoup investments in creating and disseminating these works.[45]

In contradiction of this utilitarian purpose, the PASA contemplates that the UWF will continue to collect funds from Google for its commercial exploitations of orphan books until their copyrights expire and that these funds should be distributed to charities selected by the UWF. We object to this treatment for orphan works.

Finally, we note that the economics of digital publishing and digital networks have made it possible for unclaimed/orphan books to draw readers online, even though their publishers could not justify keeping the books in print. A high quality digital copy of a print book can be made for $30; reproduction and distribution of digital copies of the same book are essentially costless. Digital networks make it easier for people with niche interests to communicate about their preferences, so books written long ago on seemingly esoteric subjects may reach audiences in the digital world that would be economically unviable in the print realm. The public interest would be better served by making these books widely available to all, either as public domain works or through licenses to other firms so that the public's interest in access to these books would be subject to the rigors of competition and not to Google's de facto monopoly.

II.   The Apparent Exclusion of Unregistered Inserts Is Unfair, and the Exclusion of Unregistered Books May Be Unfair Under a Pending Supreme Court Case.

Many academic authors have contributed chapters for edited volumes or written book forewords, which fall within the PASA's definition of "inserts."[46] Under the PSA, academic authors had reason to believe that they were in the settlement class as to these inserts as long as the books in which their writings

---

[44] PASA, § 6.3(a)(i)(3).

[45] It is disheartening that Google Books sometimes provides links to sites where books can be purchased, but not to sites where the same books are available for free. An example is JAMES GOSLING & BILL JOY, THE JAVA LANGUAGE SPECIFICATION, a free copy of which is available at http://java.sun.com/docs/books/jls/. Google Books points only to sites where copies of this book can be purchased for prices ranging from $1.99 to $999.99, see http://books.google.com/books?id=Ww1B9O_yVGsC&sitesec=buy&source=gbs_navlinks_s. This book is widely used by Java programmers.

[46] PASA, § 1.75 (defining "insert").

appeared had been registered with the U.S. Copyright Office.[47] The PASA has amended the definition of inserts in a manner that can be construed to exclude inserts that have not been separately registered with the U.S. Copyright Office.[48] If this interpretation of the PASA is correct, we object to this change.

Newly published books are commonly registered with the U.S. Copyright Office because of certain benefits of registration.[49] Chapters in edited volumes and other individually authored contributions to books are much less likely to be registered separately from the book, for there is little perceived need to do so. If the book as a whole is registered and infringed, authors of chapters in an edited volume may expect that the editor would be able to vindicate the interests of contributing authors. Should the need for separate registration arise—for example, because someone republished one chapter of a book without permission—it is a simple matter for its author to register the copyright at a later time. The Copyright Act of 1976 makes clear that copyright protection is available to authors from the moment their works are first fixed in a tangible medium.[50] Copyright protection does not depend on registration under current law.[51]

We surmise that the litigants may have restricted the class of rights holders eligible to participate in (or opt out of) the settlement to those who had registered their books with the Copyright Office in deference to a Second Circuit Court of Appeals decision, *In re: Literary Works in Electronic Databases Litigation.*[52] That case ruled that unregistered rights holders were ineligible to participate in the settlement of a class action lawsuit alleging copyright infringement because U.S. copyright law requires registration as a precondition of suing infringers of U.S. works.[53]

Restricting the GBS settlement class to registered U.S. rights holders may have been understandable because of the Second Circuit's ruling. However, the Supreme Court has decided to review that ruling. If the Supreme Court reverses the Second Circuit in *Reed Elsevier v. Muchnick*, it would become possible for owners of copyrights in unregistered books and inserts to participate in class action settlements of copyright lawsuits; indeed, it would then probably be unreasonable to exclude them. The PASA inelegantly defines the settlement class in a gerrymandered manner so that books owned by Australian, Canadian, and UK rights holders automatically are within the settlement, but those owned by American rights holders are ineligible unless registered. This definition of the settlement class would be unreasonable but for the Second Circuit's ruling.

This Court should withhold its decision about whether to approve the settlement until the Supreme Court has resolved this issue. If the Supreme Court decides that unregistered rights holders can participate in copyright class action settlements, this Court should ask the litigants to renegotiate the PASA to address

---

[47] PSA, § 1.72. This definition suggested that inserts were within the settlement if the book in which they appeared had been registered with the U.S. Copyright Office.

[48] *See, e.g.*, Kenneth Crews, *Google Books: Dude, Where're My Inserts?*, Columbia University Libraries, Copyright Advisory Office, Dec. 17, 2009, *available at* http://copyright.columbia.edu/copyright/2009/12/17/google-books-dude-wherere-my-inserts/.

[49] 17 U.S.C. § 412. Prompt registration allows owners to be eligible to be awarded attorney fees and statutory damages.

[50] *Id.*, § 102(a).

[51] *Id.*, § 4.08(a).

[52] 509 F.3d 116 (2d Cir. 2007), *cert. granted, sub nom.* Reed Elsevier, Inc. v. Muchnick, 129 S.Ct. 1523 (2009).

[53] 17 U.S.C. § 411(a).

the unregistered rights holders issue. Indeed, the lawyers for the Author Subclass should *sua sponte* make a request for reconsideration of the settlement terms if the Supreme Court reverses the Second Circuit ruling. However, if they do not do so, this Court should refuse to approve the settlement until the class is redefined, as it would be unfair to deny unregistered copyright owners an ability to decide whether they wish to participate in the PASA (or to opt out) if the *Reed Elsevier* case allows their inclusion.

It is unclear to us what uses Google plans to make of inserts (or for that matter, unregistered books, such as doctoral dissertations on the shelves of many research libraries) that have not been separately registered with the Copyright Office, assuming that these works are not within the settlement and their rights holders are ineligible for compensation for Google's uses of them. The Court should ask the litigants to clarify this matter.

While many academic authors may be pleased for their inserts to be freely available through a digital database such as GBS, we would prefer to have the right to control the dedication of our works to the public domain or making our works available under a Creative Commons license rather than being treated as though we have no right to control Google's commercialization of our works merely because we didn't separately register our copyright claims in them.

Finally, we note that the Authors Guild did nothing, so far as we can tell, to encourage book or insert rights holders to register their claims of copyright before the Jan. 5, 2009, cut-off date for inclusion in the settlement class. Because the notice to class members did not commence until after the cut-off date, there was no opportunity for those who had not already registered their works to do so in order to participate in the settlement. As explained above, insert authors had reason to believe that their inserts would be within the settlement as long as the books in which the works appeared were registered. We object to any change in the PASA that alters our rights in our inserts.

III.    The Court Must Require Disclosure of Any Termination Agreement That Pertains to the GBS Settlement.

Article XVI of the PSA referred to the existence of a supplemental agreement negotiated by the litigants to terminate the PSA if certain unnamed conditions were met. The PSA indicated that the terms of that supplemental agreement were confidential and that the parties did not intend to file it with the Court.

Rule 23(e)(3) of the Federal Rules of Civil Procedure requires disclosure of any agreement among the litigants made in connection with a proposed settlement of a class action lawsuit. We believe that it is impossible for this Court to determine if the PASA is fair, reasonable, and adequate without having access to the whole agreement, which necessarily includes terms highly relevant to the pending settlement agreement insofar as it sets forth termination conditions and consequences. We cannot accept that a separate termination agreement which so deeply affects the interests of class members would not be revealed to us, or to the Court.

The existence of a termination agreement is especially important to academic authors because an important reason many of us are staying in the settlement and not opting out is because we expect our books and inserts, as well as those of other scholars, to be available through GBS for decades to come. We also care about our institutions having the access to books in GBS through the ISD. That the

settlement agreement could terminate at some point in time without our knowing on what basis this could occur is deeply troubling.

The PASA has "intentionally omitted" Article XVI. We are puzzled about what this means. If the termination agreement referred to in the PSA is still in existence and in force, its terms should be revealed not only to the court, but also to members of the class, including academic authors, as it has a bearing on the benefits and risks posed by the settlement. If the termination agreement is no longer in force, the litigants who negotiated it should be required to explain why the termination agreement was itself terminated.

IV. The Publisher Plaintiffs May Be Undermining the PASA.

In testimony before Congress, as well as in other public statements, Google and representatives of the Authors Guild and the AAP have waxed eloquent about the broad public access to the knowledge embodied in books that would be enabled if the GBS settlement is approved.[54]

While academics were not expecting approval of the settlement to mean that in-print books would be available through ISD subscriptions to our universities, we were given reason to believe that the ISD would include digital copies of many millions of out-of-print books from the collections of major research libraries. Our research would benefit from the broader availability of these books.

The PASA allows rights holders of out-of-print books to withhold their books from "display uses" such as inclusion of the books in the ISD.[55] However, GBS proponents have suggested that rights holders are unlikely to withhold out-of-print books from the ISD because allowing display uses would bring new commercial life to their books.[56]

The DOJ Statement of Interest, filed on September 18, 2009, alerted us to the possibility that the aspiration that GBS would be a universal digital library of virtually all out-of-print books, as Google's co-founder has predicted,[57] may be undermined by the publishers who negotiated this settlement. DOJ observed:

It is noteworthy that the parties have indicated their belief that the largest publisher plaintiffs are likely to choose to negotiate their own separate agreements with Google..., while benefiting from the out-of-print works that will be exploited by Google due to the effect of the opt-out requirement for those works. There are serious reasons to doubt that the class representatives who are fully protected from future uncertainties created by the settlement agreement and who will benefit in the future from the works of others can adequately

---

[54] *See, e.g.*, Hearing, *supra* note 12, at 4, n.3 (Statement of Paul Aiken, Executive Director of the Authors Guild: "[W]e expect the settlement to make at least 10 million out-of-print books available").
[55] PASA, § 3.2.
[56] *See, e.g.*, Hearing, *supra* note 12, at 5, 14-24 (Statement of Paul Aiken, Executive Director of the Authors Guild). The PASA requires rights holders who want to sell individual books through the consumer purchase model to make the same books available through the ISD. PASA, § 3.5(b)(iii).
[57] *See* Brin, *supra* note 1.

represent the interests of those who are not fully protected and whose rights may be compromised as a result.[58]

This suggests that the parties to this settlement have negotiated a deal that they expect to bind millions of other right holders, including academic authors, but not themselves.[59] The PASA does nothing to rectify this problem. If the GBS settlement is really a fair resolution of the litigation and a fair allocation of rights among all stakeholders, one might expect the named plaintiffs to keep at least their out-of-print in the settlement and participate in what they hail as its benefits. Instead, the DOJ Statement suggests they do not intend to include their books in the regime that would be established by the settlement.

Equally important, the aspiration for GBS to be a universal library of out-of-print books may also be undermined by other rights holders' decisions to exclude their books from display uses in GBS, to opt out of the settlement, to insist that Google not scan their out-of-print books, and to demand that Google remove books already scanned.[60] We do not know at this point how many books have already been removed, excluded, or opted out, but this Court should require the parties to make information of this sort available before the fairness hearing. If the opt-out rates among sophisticated parties are high, that might suggest that the GBS settlement is not as fair and adequate as Google, AAP and Guild spokesmen proclaim.[61]

The Publisher Plaintiffs seem not to be the only ones excluding their books from the settlement.[62] Most authors and author groups that have spoken out about GBS have urged authors to oppose or opt-out of

---

[58] DOJ Statement, *supra* note 16, at 10. One important benefit of the Google Partner Program as compared with the commercial regime to be established by the PASA is that partners can negotiate with Google to reduce the risks of uncertainty about the future for their books and tailor the agreements to meet their concerns. The future of the revenue models in the PASA is much more uncertain.

[59] *See also* Statement of William Morris Endeavor Entertainment, Aug. 2009, *available at* http://thepublicindex.org/docs/commentary/wme.pdf ("Few if any major publishers currently intend to make their in print books available for sale through the Settlement Program....It appears that most major publishers will not allow their out of print books to be sold through the Settlement Program either.")

[60] *See* PASA, § 3.5. The corpus of books eligible for inclusion in the ISD has already shrunk by about half because the PASA no longer includes most of the non-Anglophone foreign books scanned from major research library collections. *See, e.g.*, Lavoie & Dempsey, *supra* note 13, at 8 (estimating that half of the books in major research library collections are foreign-language books). Some librarians mourn this loss. *See, e.g.,* Kenneth Crews, *GBS 2.0: The New Google Book (Proposed) Settlement*, Columbia University Libraries, Copyright Advisory Office, Nov. 17, 2009, *available at* http://copyright.columbia.edu/copyright/2009/11/17/gbs-20-the-new-google-books-proposed-settlement/ ("Because the settlement is now tightly limited [by the exclusion of foreign books], so will be the ISD [Institutional Subscription Database]. The big and (probably) expensive database is no longer so exciting").

[61] The BRR may not be able to sustain its operations if a very large number of rights holders for out-of-print books opt out of the PASA or take their books out of the regime it would establish by signing up as a Google Partner. This would undermine another benefit that the settlement was supposed to accomplish. Only the UWF is guaranteed to have a stable revenue source in the first decade post-settlement.

[62] Authors Guild Executive Director Paul Aiken testified before Congress on Sept. 10, 2009, about his expectation that publishers would not to want to participate in the settlement. Hearing Transcript, *supra* note 12, at 143. We understand, for instance, that Reed Elsevier and Warner Books are among the major publishers that have opted their books out of the settlement.

the GBS settlement because they regard it as unfair.[63] It is noteworthy that not a single U.S. author group, apart from the Authors Guild, has come out publicly in support of the GBS settlement.[64]

The more numerous are the requests to exclude books from the ISD or the settlement, the less likely it is that the public benefit of the promised 10 million book database will materialize.

V. Conclusion

Melding together the grounds for our objections to the PSA and PASA, we reiterate:

1) We object to provisions of the PASA which do not create true independence for the fiduciary for unclaimed works, nor criteria for accomplishing the fiduciary responsibilities and objectives for this role. In particular, we think this fiduciary should have the explicit authority to set prices for unclaimed books at $0 or make them available under Creative Commons licenses or other open access terms insofar as there is reason to think that their academic authors would prefer for them to be made available on these terms. The UWF should not have the power to authorize Google to alter the texts of books.

2) We object to provisions in the PASA that would continue to monetize books unclaimed after ten years. If the BRR and the unclaimed works fiduciary are unable to locate an appropriate rights holder by then, these books should be deemed orphans and made freely available to all. It is for Congress, not for the litigants or the Court, to address orphan work issues.

3) We object to the PASA's seemingly narrowed definition of "inserts," and more generally to the narrow definition of "book" in both PSA and PASA. This court should withhold approval of the PASA until after the Supreme Court decides the *Reed Elsevier v. Muchnick* case. If the Supreme Court rules that owners of copyrights in unregistered works are eligible to participate in copyright class action settlements, the court should direct the parties to renegotiate the agreement to offer unregistered rights holders of books and inserts the opportunity to participate in the

---

[63] *See, e.g.*, Motoko Rich, *Writers Groups Oppose Google Settlement,* N.Y. TIMES, Jan. 6, 2010, *available at* http://mediadecoder.blogs.nytimes.com/2010/01/06/writers-groups-oppose-google-settlement.html (reporting that the National Writers Union, the American Society of Journalists and Authors, and the Science Fiction and Fantasy Writers of America oppose the Google settlement as unfair to authors and are urging authors to opt out); Motoko Rich, *William Morris Advises Clients To Say No to Google*, N.Y. TIMES, Aug. 9, 2009, *available at* http://mediadecoder.blogs.nytimes.com/2009/08/07/william-morris-advises-clients-to-say-no-to-google-settlement/; Lynn Chu, *Very Important Notice to Writers' Rep Clients*, WritersRep.com, Jan. 2010, *available at* http://www.writersreps.com/ ("We urge all of our clients, indeed all authors, to take advantage of this new opportunity to opt themselves out."); Ursula LeGuin, LeGuin on the Google Settlement, Book View Café Blog, Jan. 7, 2010, *available at* http://blog.bookviewcafe.com/2010/01/07/le-guin-on-the-google-settlement/#comments (explaining LeGuin's objections to the Google settlement, supplemented with comments by authors who are joining her opposition to the settlement).
[64] *See, e.g.*, Objections of Harold Bloom, et al. to Settlement Agreement, *Authors Guild, Inc. v. Google, Inc.*, No. 1:05-CV-8136 (S.D.N.Y. Sept. 8, 2009).

settlement.

4) We object to the failure of the litigating parties to provide this court and members of the class with access to the termination agreement which they negotiated amongst themselves, which was referred to in the PSA.

5) We object to the PASA because it, like the PSA, contains no meaningful limits on ISD price increases, especially as to higher educational institutions such as those with which we are affiliated. Because approval of the agreement will give Google a license to tens of millions of out-of-print books—a license that no competitor can feasibly get—the settlement agreement should contain some constraint on price increases. The Authors Guild did not adequately represent the interests of academic authors in negotiations with Google and the Publisher Plaintiffs on this important issue because their members have the same interests as the AAP publishers in prices being as high as possible.[65]

6) We object to the insufficient privacy protections for GBS users.[66]

7) We object to the fee that the PSA and PASA requires public libraries and other institutions with public access terminals to pay for user print-outs of pages from out-of-print books, which would undermine fair use.[67]

8) We object to the PSA and PASA restrictions on annotation-sharing and non-consumptive research,[68] and the weakness of Google's commitment to improve the quality of GBS book scans and metadata associated with them.

9) We object to the PASA for its grant of power to Google to exclude books from the corpus for editorial reasons and for its grant of power to exclude up to 15% of books eligible for the ISD from that database.[69]

10) We object to the PASA because it, like the PSA, contains no back-up plan to preserve university access to books in the ISD in the event that Google chooses to discontinue as a provider of required library services under the agreement and no third party provider steps forward to take over this role.[70] The PASA should be amended so that fully participating library partners in the GBS enterprise have the authority to take

---

[65] Academic Author Letter, *supra* note 4, at 2-5.

[66] *Id.* at 6-7. We endorse the Privacy Authors' Objection and its specific recommendations about the privacy protections that should be part of any GBS settlement agreement. *See* Privacy Authors and Publishers' Objection to Proposed Settlement at 1, *Authors Guild Inc. v. Google Inc.*, No. 1:05-CV-8136 (S.D.N.Y. Sept. 4, 2009), *available at* http://thepublicindex.org/objections/privacy_authors.pdf. We acknowledge that the PASA is better than the PSA in providing that Google will not give personally identifiable data about users to the BRR without legal process. PASA, § 6.6(f). But more user privacy protections are needed.

[67] *Id.*, § 4.8(a)(ii). Academic Author Letter, *supra* note 4, at 7.

[68] *Id.* at 6, 8.

[69] *Id.* at 9-10.

[70] *Id.* at 10-11.

> over or reassemble from their library digital copies a corpus of books for continuing
> to provide the ISD to university research communities.[71]

We conclude this letter, as we did our earlier letter, with the thought that whatever the outcome of the fairness hearing, we believe strongly that the public good is served by the existence of digital repositories of books, such as the GBS corpus. We feel equally strongly that it would be better for Google not to have a monopoly on a digital database of these books. The future of public access to the cultural heritage of mankind embodied in books is too important to leave in the hands of one company and one registry that will have a de facto monopoly over a huge corpus of digital books and rights in them. We do not believe that the settlement of a class action lawsuit is a proper way to make such a profound set of changes in rights of authors and publishers, in markets for books, and procedures for resolving disputes as the PASA would bring about.

Respectfully submitted,

Pamela Samuelson, Richard M. Sherman Professor of Law & Information, UC Berkeley
on behalf of the following academic author signatories (whose institutional affiliations are listed only for purposes of identification):


Keith Aoki, Professor of Law, University of California, Davis

Timothy K. Armstrong, Associate Professor of Law, University of Cincinnati

David M. Auslander, Professor of Mechanical Engineering, University of California, Berkeley

Amin Azzam, Health Sciences Assistant Clinical Professor, University of California, Berkeley and University of California, San Francisco

Margo Bagley, Professor of Law, University of Virginia

Stuart Banner, Professor of Law, UCLA

Ann Bartow, Professor of Law, University of South Carolina

Lisa García Bedolla, Associate Professor of Education and Political Science, University of California, Berkeley

Steven Bellovin, Professor of Computer Science, Columbia University

---

[71] The HathiTrust would seem to be an appropriate entity to take on this responsibility for the nonprofit research library community. *See* HathiTrust, Welcome to the Shared Digital Future, http://www.hathitrust.org/ (last visited Jan. 25, 2010).

Paul Schiff Berman, Dean and Professor of Law, Arizona State University

Robert C. Berring, Professor of Law, University of California, Berkeley

Christine L. Borgman, Professor of Information Studies, UCLA

Geoffrey C. Bowker, Professor of Information Sciences, University of Pittsburgh

Warigia Bowman, Assistant Professor, University of Mississippi

Ann Bridy, Associate Professor of Law, University of Idaho

Shane Butler, Professor of Classics and Associate Dean of the Humanities, UCLA

Margaret Chon, Professor of Law, Seattle University

Danielle Citron, Professor of Law, University of Maryland

Ronald C. Cohen, Professor of Chemistry and of Earth and Planetary Science, University of California, Berkeley

Julie E. Cohen, Professor of Law, Georgetown University

Michael Cole, University Professor of Communication, Psychology, and Human Development, University of California, San Diego

Kevin Collins, Associate Professor of Law, Indiana University

Lorrie Faith Cranor, Associate Professor of Computer Science and Engineering and Public Policy, Carnegie Mellon University

Kenneth D. Crews, Director, Copyright Advisory Office, Columbia University Lecturer, Columbia Law School

Dana Cuff, Professor, Architecture and Urban Design, School of the Arts and Architecture, UCLA

David L. Dill, Professor of Computer Science, Stanford University

Holly Doremus, Professor of Law, University of California, Berkeley

Johanna Drucker, Professor of Information Studies, UCLA

Paul Duguid, Adjunct Professor, School of Information, University of California, Berkeley

Christopher Edley, Jr., Dean of the School of Law, University of California, Berkeley

Robin Einhorn, Professor of History, University of California, Berkeley

Jeffrey Elman, Professor of Cognitive Science and Dean of Social Sciences, University of California, San Diego

Steven Evans, Professor of Statistics and Mathematics, University of California, Berkeley

Cynthia Farina, Professor of Law, Cornell University

Malcolm M. Feeley, Professor of Law, University of California, Berkeley

Edward Felten, Professor of Computer Science, Princeton University

David Franklyn, Professor of Law, University of San Francisco

William Gallagher, Associate Professor of Law, Golden Gate University

Elizabeth Townsend Gard, Associate Professor of Law, Tulane University

Laura Gasaway, Professor of Law and Associate Dean, University of North Carolina

Shubha Ghosh, Professor of Law, University of Wisconsin

Dorothy Glancy, Professor of Law, Santa Clara University School of Law

Robert J. Glushko, Adjunct Professor, School of Information, University of California, Berkeley

Eric Goldman, Associate Professor of Law, Santa Clara University

Marc Greenberg, Professor of Law, Golden Gate University

Leah C. Grinvald, Assistant Professor of Law, Saint Louis University

Ramon Grosfoguel, Professor of Ethnic Studies, University of California, Berkeley

J. Alex Halderman, Assistant Professor of Computer Science, University of Michigan

Bronwyn H. Hall, Professor of the Graduate School, University of California, Berkeley

Sheldon Halpern, Professor of Law, Albany Law School

Paul Heald, Professor of Law, University of Georgia

Joe Hellerstein, Professor of Computer Science, University of California, Berkeley

Thomas Henderson, Professor of Computer Science, University of Utah

Steven A. Hetcher, Professor of Law, Vanderbilt University

Eric von Hippel, Professor or Technological Innovation, Sloan School of Management, Massachusetts Institute of Technology

Harry Hochheiser, Professor of Biomedical Informatics, University of Pittsburgh

Kinch Hoekstra, Assistant Professor of Law and Political Science, University of California, Berkeley

Lee Hollaar, Professor of Computer Science, University of Utah

Judith E. Innes, Professor of City and Regional Planning, University of California, Berkeley

Mary Jane Irwin, Professor of Computer Science and Engineering, Pennsylvania State University

Douglas W. Jones, Associate Professor of Computer Science, University of Iowa

Russell Jones, Professor of Plant and Microbial Biology, University of California, Berkeley

Steven Justice, Professor of English, University of California, Berkeley

Cem Kaner, Professor of Software Engineering, Florida Institute of Technology

Jerry Kang, Professor of Law, UCLA

Eric Kansa, Adjunct Professor, School of Information, University of California, Berkeley

Amy Kapczynski, Assistant Professor of Law, University of California, Berkeley

S. Blair Kauffman, Law Librarian and Professor of Law, Yale University

Ian Kerr, Professor of Law, University of Ottawa

Jay Kesan, Professor of Law, University of Illinois

Jeffrey Knapp, Professor of English, University of California, Berkeley

Raymond Ku, Professor of Law, Case Western Reserve University

Sapna Kumar, Assistant Law Professor, University of Houston

John Kuriyan, Professor of Molecular and Cell Biology, University of California, Berkeley

Michael Landau, Professor of Law, Georgia State University

James A. Landay, Associate Professor of Computer Science and Engineering, University of Washington

Marshall Leaffer, Professor of Law, Indiana University

Peter Lee, Professor of Law, University of California, Davis

Jeff A. Lefstein, Professor of Law, University of California, Hastings

Lawrence Lessig, Professor of Law, Harvard University

Jessica D. Litman, Professor of Law, University of Michigan

Joseph Liu, Professor of Law, Boston College

Lydia Pallas Loren, Professor of Law, Lewis & Clark

Lesa Mae Lorenzen-Huber, Clinical Assistant Professor, Indiana University

Glynn Lunney, Professor of Law, Tulane University

Robert J. MacCoun, Professor of Public Policy and of Law, University of California, Berkeley

John MacFarlane, Associate Professor of Philosophy, University of California, Berkeley

Michael Madison, Professor of Law, University of Pittsburgh

Solangel Maldonado, Professor of Law, Seton Hall University

Peter Martin, Professor of Law, Cornell University

Donald Mastronarde, Professor of Classics, University of California, Berkeley

Maria Mavroudi, Professor of History, University of California, Berkeley

Patrick McDaniel, Professor of Computer Science, Pennsylvania State University

Jerome McGann, Professor, University of Virginia

Stephen McJohn, Professor of Law, Suffolk University

Christopher F. McKee, Professor of Physics and of Astronomy, University of California, Berkeley

Donald A. McQuade, Professor of English, University of California, Berkeley

Maureen C. Miller, Professor of History, University of California, Berkeley

Pablo G. Molina, Adjunct Professor of Ethics and Technology Management, and Information Security Management, Georgetown University

Anthony Newcomb, Dean of Arts and Humanities and Professor of Music and Italian Studies, University of California, Berkeley

Joanna Nichols, Professor of the Graduate School, University of California, Berkeley

Raymond T. Nimmer, Professor and Dean of the Law School, University of Houston

Helen Nissenbaum, Professor of Media, Culture, and Communication, New York University

Geoffrey Nunberg, Adjunct Professor, School of Information, University of California, Berkeley

G. Ugo Nwokeji, Professor of African American Studies, University of California, Berkeley

Michael Nylan, Professor of History, University of California, Berkeley

Anne J. O'Connell, Assistant Professor of Law, University of California, Berkeley

Michael Olivas, Professor of Law, University of Houston

Kent Olson, Clinical Professor of Medicine and Pharmacy, University of California, San Francisco and Clinical Professor of Health & Medical Sciences, University of California, Berkeley

Nicholas Paige, Associate Professor of French, University of California, Berkeley

Frank A. Pasquale III, Professor of Law, Seton Hall University

Jim Pitman, Professor of Statistics and Mathematics, University of California, Berkeley

Thomas Pogge, Professor of Philosophy and International Affairs, Yale University

Kenneth Port, Professor of Law, William Mitchell College of Law

R. Anthony Reese, Professor of Law, University of California, Irvine

Jerome Reichman, Professor of Law, Duke University

Michael Risch, Associate Professor of Law, West Virginia University

John C. Roberts, Professor of Law and Dean Emeritus, DePaul University

Gene Rochlin, Professor of Energy and Resources, University of California, Berkeley

George Roussos, Professor of Computer Science and Information Systems, Birkbeck College

Sharon Sandeen, Professor of Law, Hamline University

Annalee Saxenian, Professor and Dean of the School of Information, University of California, Berkeley

Neils Schaumann, Professor of Law, William Mitchell College of Law

Rich Schneider, Director of the Molecular & Cell Biology Laboratory, University of California at San Francisco

David Shipley, Professor of Law, University of Georgia

Jessica Silbey, Professor of Law, Suffolk University

Lionel Sobel, Professor of Law, Southwestern Law School

Daniel Solove, Professor of Law, George Washington University

Sarah Song, Professor of Political Science and Law, University of California, Berkeley

Eugene H. Spafford, Professor of Computer Science, Purdue University

Philip B. Stark, Professor of Statistics, University of California, Berkeley

Andrew Stauffer, Associate Professor of Nineteenth-Century British Literature, University of Virginia

Katherine Strandburg, Professor of Law, New York University

Madhavi Sunder, Professor of Law, University of California, Davis

Stefan Tanaka, Professor of History, University of California, San Diego

Ula Taylor, Associate Professor of African American Studies, University of California, Berkeley

D. Paul Thomas, Professor of Political Science, University of California, Berkeley

David Touretzky, Research Professor of Computer Science, Carnegie Mellon University

Siva Vaidhyanathan, Associate Professor of Media Studies, University of Virginia

Ivonne del Valle, Assistant Professor of Spanish & Portuguese, University of California, Berkeley

Jon Van Dyke, Professor of Law, University of Hawaii

Kathleen Vanden Heuvel, Adjunct Professor and Director of the Law Library, University of California, Berkeley

David Wagner, Professor of Computer Science, University of California, Berkeley

Dan Wallach, Associate Professor of Computer Science, Rice University

Jonathan Weinberg, Professor of Law, Wayne State University

Jane Winn, Professor of Law, University of Washington

David S. Wise, Professor Emeritus of Computer Science, Indiana University

Alec Yasinsac, Professor and Dean of the School of Computer and Information Sciences, University of South Alabama

Julie Cromer Young, Associate Professor of Law, Thomas Jefferson School of Law

Michael Zimmer, Assistant Professor of Information Studies, University of Wisconsin-Milwaukee

cc:
Michael J. Boni, Esq., Counsel for the Author Subclass
Joanne Zack, Esq., Counsel for the Author Subclass
Joshua Snyder, Esq., Counsel for the Author Subclass
Jeffrey P. Cunard, Esq., Counsel for the Publisher Subclass
Bruce P. Keller, Esq., Counsel for the Publisher Subclass
Daralyn J. Durie, Esq., Counsel for Google
Joseph C. Gratz, Esq., Counsel for Google