UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, Associational Plaintiff, and HERBERT MITGANG, BETTY MILES, DANIEL HOFFMAN, PAUL DICKSON, and JOSEPH GOULDEN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE, INC., <br><br> Defendant. | JAN 28 2010 <br><br> Case No. 05 CV 8136-DC |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/29/10

**BRIEF OF *AMICUS CURIAE*
PUBLIC KNOWLEDGE
IN OPPOSITION TO THE AMENDED PROPOSED SETTLEMENT**

The Author's Guild et al v. Google Inc.                                                        Doc. 895

Jef Pearlman
Sherwin Siy
Michael Weinberg
Public Knowledge
1818 N St., NW
Suite 410
Washington, DC 20036
(202) 861-0020

Jan. 27, 2010

## I. INTRODUCTION

Public Knowledge remains gravely concerned that this settlement, if approved, will result in Google possessing a monopoly in the market for orphan books. While the amendments to the proposed settlement do address a limited number of the problems raised in Public Knowledge's earlier brief, none of the proposed changes substantially alleviate our primary concerns with the agreement.

Public Knowledge is a Washington, D.C. based non-profit public interest organization devoted to preserving the free flow of information in the digital age. Through day-to-day policy advocacy, public education, and legal action, Public Knowledge works for a balanced copyright regime that promotes creativity, innovation, competition, and civic discourse, and limits corporate control over the flow of knowledge. Such a regime should ensure that the rights of the artist are protected while providing both artists and users with the most open, competitive artistic marketplace possible. One key issue for Public Knowledge is the fate of orphan works—works whose authors cannot be located.

Public Knowledge continues to believe that Google Books is an invaluable tool for making knowledge and creative works available to the general public, and that the uses Google has made thus far in creating and offering Google Books are already lawful and do not require licenses or permission.

However, public access to orphan works must be open to all comers on a level playing field. Such access will require changes to the operation of copyright law itself – changes that are rightfully made by the legislature, not a judicial process involving two parties, both of whom stand to gain from licensing the rights of absentees.

## II. REMOVING THE MOST FAVORED NATION CLAUSE FROM THE SETTLEMENT DOES NOT ELIMINATE ANTITRUST CONCERNS

### A. Removal of the Most Favored Nation Clause from the Settlement is a Positive Development

The Most Favored Nation (MFN) clause in the original settlement acted as a restraint of trade in violation of Section 1 of the Sherman Act and attempted monopolization in violation of Section 2 of the Sherman Act. *See* Brief of Amicus Curiae Public Knowledge in Opposition to the Proposed Settlement (Sept. 8, 2009) ("*Public Knowledge Brief*"). The original settlement's MFN clause allowed Google to preserve its first mover advantage for ten years while simultaneously removing a major incentive for the Book Rights Registry (BRR) to seek out alternative digital distribution partners.

Public Knowledge therefore is pleased to see that the parties have removed the MFN clause from the revised settlement. However, while the MFN was certainly the most glaring source of competitive concerns, it was hardly the only or even the most significant one.

### B. The Revised Settlement Continues to Raise Antitrust Concerns

#### 1. *The Revised Settlement Creates a De Jure Monopoly By Applying Only to Google*

The revised settlement agreement continues to constitute a contract that effectively grants Google the sole right to license the full display of orphan works. Thus, when combined with copyright law, the agreement restrains trade by unfairly maintaining Google's monopoly position. *See Public Knowledge Brief* at 6-10.

There has been no change in the amended settlement agreement that would allow Google or the BRR to license orphan works to other parties.[1] As with the original settlement, the

---

[1] While Google has made statements that other parties would be able to license from Google the right to display works, this arrangement would simply consist of other parties reselling access to Google's own database. This is a far cry from other parties gaining the comparable right to themselves scan and display orphan works. *See, e.g.*,

3

amended settlement does allow the BRR to license the works to third parties. *Amended Proposed Settlement* § 6.2 (b)(1). However, this power is significantly limited by the clause "to the extent permitted by law." *Amended Proposed Settlement* § 6.2 (b)(1). As the revised settlement is simply an agreement between the parties directly involved in this action, even if the orphan works were licensed to a third party by the BRR the agreement will not prevent that third party from suit by an orphan work author. *See* Brief of U.S. Department of Justice, Antitrust Division, as Amici Curiae Respondents at 23 (Sept. 18, 2009) ("*DOJ Brief*"); Brief of Open Book Alliance, as Amici Curiae Opposing Respondents at 23-24 (Sept. 4, 2009) ("*OBA Brief*").

A potential competitor that wished to license orphan works is therefore left in no better position than before the amended agreement. It would still have to induce a class action lawsuit against itself and arrange a comparable settlement. *See Public Knowledge Brief* at 8. The problems flowing from such an attempt are numerous: it is unlikely that orphan works authors can effectively be represented by class counsel in this or any future proceeding, plaintiffs have little incentive to supplement their existing license to Google with an additional license, and if plaintiffs do wish to supplement their existing license they are likely to request higher compensation for such a license (thus making any attempt to become a second licensee less attractive to a the potential competitor). *See Public Knowledge Brief* at 8-9, 25-29; Objection of Scott E. Gant to Proposed Settlement and to Certification of the Proposed Settlement Class and Sub-Classes at 31-39 (Aug. 2009) ("*Gant Brief*"). Furthermore, any attempt by a potential competitor to substantially mirror the proposed settlement with rightsholders by way of a second class action would suggest improper collusion between the parties. This Court should be wary of creating a market that can only be entered through mass litigation. *See DOJ Brief* at 23-24.

---

Diane Bartz, *Google to Share Scanned Books with Rivals*, Reuters, Sept. 10, 2009, *available at* http://www.reuters.com/article/idUSN1040263020090910?pageNumber=2&virtualBrandChannel=0.

4

Unlike monopolies created through creative invention or legislative action, Google's monopoly would be the product of judicial decisionmaking. There will be none of the experimentation and open-market negotiation that traditionally accompanies the development of new markets. Instead, Google will dominate a market of one, closed to all who would wish to enter and compete.

### 2. The Revised Settlement Creates a De Facto Monopoly Through the Default Options of the Amended Settlement

In addition to the *de jure* monopoly that would be created by approval of the amended settlement, the amended settlement would create a *de facto* monopoly. The opt-out nature of the amended settlement will enable Google to license the full display and sale of the vast majority of published works with this single action. *Amended Proposed Settlement* § 3.5. As described above, a potential competitor will not have a similar opportunity for such sweeping, one time licensing.

In the absence of a class action or legislative changes, a potential competitor will be forced to individually license each work the competitor wishes to use. By its very nature, an opt-in licensing mechanism will be less inclusive than an opt-out mechanism. Besides orphan works, whose authors by definition cannot opt in, since they are unknown, it is likely that a large number of works will simply be beyond a competitor's capacity to identify and license.[2]

Even if a potential competitor were able to effectively license a corpus of significant size, the comparatively higher transaction costs of assembling the corpus from multiple opt-in licenses would all but guarantee that it would be a far smaller, less useful, and more expensive corpus than would be available to Google. If the defaults control, as is likely, then Google's corpus would occupy an entirely different market than a potential competitors, since Google would be

---

[2] For more on challenges that would face a potential competitor to this settlement, *see OBA Brief* at 25-26.

5

able to license a far more complete set of works to institutions that draw value not just from the individual works amassed, but from the completeness of the collection. There is therefore no way for a competitor to acquire the rights to a corpus that would allow it to compete with Google under the terms of the amended settlement agreement.

## III. THE UNCLAIMED WORKS FIDUCIARY DOES NOT ALLEVIATE CLASS ACTION CONCERNS

### A. The Unclaimed Works Fiduciary Creates Limited Representation for the Authors of Orphan Works

Public Knowledge is encouraged that the parties to the amended settlement agreement recognize that the interests of orphan authors are separate from and potentially in conflict with the interests of claiming authors. However, merely creating an Unclaimed Works Fiduciary (UWF) within the structure of the BRR is inadequate to protect those interests. *See Amended Proposed Settlement* § 6.2(b)(iii).

The UWF does not currently exist. As a result, no party to the amended settlement agreement itself represents the interests of unclaimed authors. *See Gant Brief* at 31-39. It is precisely at this stage – when the settlement is being negotiated, structured, and created – that representation is critical. This is why F.R.C.P. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interest of the class" *before* a class may be certified. *See Public Knowledge Brief* at 25-29.

The amended settlement's restructuring of the allocation of revenues from unclaimed works, along with the creation of the UWF, do help prevent the negotiating parties from using the class action process to directly profit from orphan works. However, this direct profiting was never the most significant risk posed by the settlement.

A more important risk, unaddressed by the amended settlement agreement, is that the negotiating parties can use the settlement not to misappropriate the funds owed to orphan

6

authors, but to appropriate their right to opt into a licensing agreement. No matter how many works are added to the corpus through the inclusion of orphan works, the nature of orphan works (especially the inability of potential competitors to similarly license them) makes them a disproportionately valuable element. As it is in the interests of all negotiating parties, but not necessarily the interests of the rightsholders of orphan works, to include orphan works in the corpus, it is critical that these rightsholders are represented during the creation of the BRR. *See Gant Brief* at 32-35. Without adequate representation at this stage of negotiation, it is improper to certify plaintiffs as class representatives. *See Gant Brief* at 34.

### B. Class Action Concerns Remain Despite the Existence of the UWF

In addition to the above-discussed deficiencies of the amended settlement agreement, additional class action concerns remain unaddressed by the amended settlement.

> *1. The Proposed Settlement Exceeds the Scope of a Permissible Class Action Release Because It Releases New, Future Activities Which That Were Not Part of the Underlying Suit*

The amended settlement agreement grants Google the authority to provide access to the entire text of included works. *See, e.g. Amended Proposed Settlement* § 3.3(a). However, Google has never and does not currently provide the full text of works without first acquiring a full display license from the rightsholder. The complaint recognizes this by contemplating only the "public display of portions of such Books or Inserts on its commercial website." Third Amended Complaint at 17 (Dec. 13, 2009).

As a result, it is improper for the Court to allow a release of claims of future activities that are not part of "the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 107 (2d Cir. 2005). Plaintiffs did not bring a claim for the offering of full books because they could not – such activity simply is not happening at this time. Because the full display offering is a substantially different factual predicate from the past

7

scanning, the Court cannot look into the future and release Google from liability flowing from speculative claims. *See Public Knowledge Brief* at 22-24.

There is good reason for this prohibition. Were this suit pursued to completion, the only questions settled would be whether Google's previous activities of scanning, indexing, and displaying "short excerpts" were infringing. A suit alleging infringement flowing from full display and sale of online book access would raise wholly different legal questions and rely on different factual circumstances. These factual circumstances do not and may never exist, and are certainly well beyond the scope of the complaint. *See Gant Brief* at 11-13. This Court therefore may not approve the release of those additional claims, licensing future uses of orphan works that were never described in the complaint, precisely because they had never occurred. *See DOJ Brief* at 6-7.

### 2. The Settlement is Unnecessary and Incompatible with the Purpose of Class Actions

This class action is not necessary to allow rightsholders to collectively redress past copyright harms because no such harms have occurred. None of the proposed full-text display uses proposed for licensing in the settlement agreement have been made. This class action is also not necessary to enable future uses of identifiable rightsholders' works. Google, or any potential competitor, could fund a BRR and license use of works starting today by contacting authors, publishers, and other rightsholders. This class action is only necessary to license the future uses of works belonging to rightsholders not present to defend their rights.

Class action is not designed to license works from parties who have not been harmed and are not present to defend their rights. *See Public Knowledge Brief* at 30-31. Instead, class action is designed to aggregate claims which, individually, would not provide an incentive to bring suit. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619 (1997). The proposed class's

8

inclusion of orphan works rightsholders thus distorts the purpose of the law. There has been no harm as of yet, and if future harm occurs, copyright law grants rightsholders ample incentive to bring suit in the event of infringement.

## IV. CONCLUSION

While the amended settlement agreement does address some of the concerns raised in Public Knowledge's original brief, it does not resolve the fundamental problems that would result from its approval. The amended proposed settlement agreement, including the structures flowing from it, grants Google both *de facto* and *de jure* monopolies on orphan works. Additionally, it stands as a stark example of misuse of the class action process. The Court should therefore not approve the settlement as it currently exists.

Respectfully submitted,

_____
Jef Pearlman

_____
Sherwin Siy

_____
Michael Weinberg

Public Knowledge
1818 N St. NW
Suite 410
Washington, DC 20036
(202) 861-0020

Jan. 27, 2010