

www.caut.ca　　2705, promenade Queensview Drive　　Tel\Tél. 613·820·2270
acppu@caut.ca　　Ottawa (Ontario) K2B 8K2　　Fax\Téléc. 613·820·7244

Canadian Association of University Teachers
Association canadienne des professeures et professeurs d'université

FEB 01 2010

28 January 2010

Office of the Clerk
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York NY 10007

Attention: The Honorable Denny Chin



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/2/10

Dear Judge Chin:

Re: **Objections of the Canadian Association of University Teachers to the Google Book Search Settlement,**
*Authors Guild* v. *Google, Inc.*, **Case No. 1:05-CV-8136 (S.D.N.Y.)**

The Canadian Association of University Teachers ("CAUT") is the national voice for academic staff members of Canadian post-secondary educational institutions. Founded in 1951, CAUT today represents more than 65,000 teachers, librarians, researchers and other academic professionals and general staff. CAUT is an outspoken defender of academic freedom and works actively in the public interest to improve the quality and accessibility of post-secondary education in Canada. CAUT has always counted notable figures among its members. Former CAUT presidents and activists include past Supreme Court Chief Justice Bora Laskin, Members of Parliament Pauline Jewett and Howard McCurdy, and Manitoba Premier Howard Pawley.

CAUT writes to you today to register its objection to the Proposed Amended Settlement Agreement[1] (the "PASA") in the above-noted civil action. Our fundamental objections are, first, that the Authors Guild and the named author plaintiffs do not fairly and adequately represent the interests of CAUT members, and second, that the Author Sub-Class as defined by the PASA improperly includes Canadians as mandatory class members.

CAUT members are, above all, academics. CAUT counts among its members many tens of thousands of authors, authors who come from all provinces and territories of Canada. By definition, such Canadian authors are members of the class and bound by the PASA.

---

[1] Amended Settlement Agreement, *Authors Guild* v. *Google, Inc.*, Case No. 1:05-CV-8136 (S.D.N.Y.), online: <http://www.googlebooksettlement.com/> ["PASA"].

The PASA – a private commercial documented negotiated between a commercial actor (Google) and American commercial writers' and publishers' representatives (the Authors Guild and the American Association of Publishers) – reflects the commercial interests of its negotiating parties. These interests are commercial – not academic – and American – not Canadian.

CAUT advances five arguments in support of these objections:

1. The PASA puts the United States in violation of international intellectual property law and specifically in violation of trade agreements among Canada, the United States, and other parties as those agreements relate to copyright.

2. The PASA wrongly singles out Canadians for inclusion amongst the Author sub-class. The Canadian copyright regime is distinct from American copyright law in ways that will implicate Google and potentially the Book Registry in liability for copyright infringement in Canada, particularly with respect to Canada's legislative provisions in respect of moral rights and its licensing scheme for unlocatable copyright owners (what Americans call "orphan works"), neither of which have correlatives in US law.

3. The PASA's inclusion of Canadians in the Author sub-class is wrong for a second reason: the PASA does not account for the reality of Québecois and Canadian French-language authors among the Author sub-class. Québec, unlike the other Provinces and Territories of Canada, is a civil law jurisdiction, and commercial dealings with copyrighted works reflect what we might call a civilian view of the author. The PASA has generated a great deal of discontent among French language authors and CAUT's Québec members.

4. The Authors Guild and the representative plaintiffs do not fairly and adequately represent the interests of Canadian academic authors in negotiating the PASA. Simply, many Canadian academics would not likely select a mechanism resembling that articulated in the PASA for distributing digital books. Academic authors in general place a higher premium on access than is reflected in the PASA.

5. The PASA includes minimal privacy protections. The PASA's inconsiderate treatment of privacy interests is inconsistent with Canadian academic values. More troublingly, the PASA's failure to require privacy guarantees puts the PASA at odds with Canadian privacy legislation and values more generally.

CAUT urges the Court to reject the Proposed Amended Settlement Agreement and to deny certification of the proposed class and sub-classes.

* * *

I    THE PROPOSED AMENDED SETTLEMENT AGREEMENT SHOULD BE REJECTED BECAUSE IT PLACES THE UNITED STATES OF AMERICA IN VIOLATION OF INTERNATIONAL CONVENTIONS AND TRADE AGREEMENTS GUARANTEEING CERTAIN EXCLUSIVE RIGHTS TO CANADIAN COPYRIGHT OWNERS

The PASA transforms the nature of the exclusive right of reproduction of literary works authors enjoy under American copyright law. The PASA effectively transforms this right into a right to remuneration. Others have written to this Court about the profound manner in which this changes American copyright law.[2] Others have also written to this Court objecting to the manner in which the PASA violates international copyright law. Those objections were apparently sufficient to convince this Court to recast the nature of the class, from all authors virtually anywhere in the world to American authors and those who have published in "Canada, the United Kingdom, or Australia".[3] In so doing, the Court has also transformed the manner in which it treats Canadian subjects. In effect, the Court has singled out Canadians (along with subjects of the U.K. and Australia) for "special" treatment. However, there is no basis for such special treatment.

Canadians enjoy the same rights under international copyright law that subjects of Germany and France do: Canada, France, Germany and the United States are all parties to the Berne Convention, Article 9.1 of which states that "Authors of literary and artistic works protected by this Convention shall have the exclusive right of authorizing the reproduction of these works, in any manner or form".[4] Berne provides that the right is not absolute; Article 9.2 states that:

> It shall be a matter for legislation in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author.[5]

The conditions for exceptions and limitations to the exclusive right to apply are known as the "three-step test". No case has been made out that the PASA complies with or even relies upon the "three-step test" to justify its treatment of Canadian copyright owners. Indeed, given the forward-looking sweep of the PASA, it is difficult to see how it could since it is not on its text limited to "special cases", and in fact open-ended in its reach for exploitation mechanisms. The breadth of objections to the PASA and the original Proposed Settlement Agreement speak for themselves in respect of prejudicing the legitimate interests of Canadian authors.

---

[2] Letter of Pamela Samuelson to Judge Denny Chin on behalf of academic authors, *Authors Guild, Inc. v. Google, Inc.*, No. 05 CV 8136 (S.D.N.Y. Sept. 3, 2009), online:
<http://www.scribd.com/doc/19409346/Academic-Author-Letter-090309>.
[3] See the definitions of "Books" and "Amended Settlement Class" in PASA, p. 4.
[4] *Berne Convention for the Protection of Literary and Artistic Works*, 9 Sept 1886, 168 Cons. T.S. 185, Paris text 1971, Article 9.1 [*Berne*].
[5] *Ibid.*, Article 9.2.

CAUT concludes that the PASA, on its face, violates the obligations of Berne. However, this violation is not that of Google, or of the PASA. Rather, it is the Court's approval of the PASA that would amount to a violation of Berne by the United States of America: a state is responsible for the internationally wrongful acts of its courts.[6] CAUT concludes that the PASA places the United States in violation of Berne.

However, the violation does not stop with Berne: Berne's obligations and the three-step test in respect of limitations and exceptions are restated in other international instruments, including Article 10 of the WIPO Copyright Treaty of 1996.[7] More troublingly, Berne is also incorporated into a number of Trade Agreements that include Canada and the United States among their signatories, including the TRIPS Agreement[8] and the North American Free Trade Agreement ("NAFTA").[9] NAFTA, in particular, speaks to the unique guarantee the United States has made to Canadians in respect of their Berne rights. Under international law, the actions of this Court, including approval of this Settlement, will be attributable to the United States.[10] The PASA's special inclusion of Canadians among class members, accordingly, has consequences, including the potential to subject American businesses to trade sanctions under the remedial provisions of NAFTA.[11]

## II   THE PROPOSED AMENDED SETTLEMENT AGREEMENT SHOULD BE REJECTED BECAUSE IT WRONGLY INCLUDES CANADIANS AMONG THE AUTHOR SUB-CLASS AND SO DANGEROUSLY IGNORES DIFFERENCES BETWEEN CANADIAN AND AMERICAN COPYRIGHT LAW

The PASA specifically includes Canadians and select nationals (Australia and the United Kingdom) among class members. The rest of the world was dropped from the class between the first Proposed Settlement Agreement and the PASA. CAUT infers that an assumption was made that Canada's copyright system is sufficiently similar to that of the American *Copyright Act*[12] to justify extending the burdens of the PASA to Canadian nationals.[13] A presumption was also made that the PASA could insulate Google and the

---

[6] International Law Commission, *Report of the International Law Commission on the work of its fifty-third session*, GAOR, 56th Sess., UN Doc. A/56/10 (2001) 43, at Article 4(1).

[7] WIPO Copyright Treaty, 20 December 1996, (entered into force 6 March 2002).

[8] Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization (hereinafter WTO Agreement), Annex 1C, Legal Instruments-Results of the Uruguay Round, vol. 31, 33 I.L.M. 81 (1994) [TRIPS Agreement].

[9] North American Free Trade Agreement Between the Government of Canada, the Government of Mexico, and the Government of the United States, 17 December 1992, 32 I.L.M. 289 (entered into force 1 January 1994) [NAFTA].

[10] International Law Commission, *Report of the International Law Commission on the work of its fifty-third session*, GAOR, 56th Sess., UN Doc. A/56/10 (2001) 43 at Article 4(1).

[11] *Ibid.*, Chapter 20.

[12] 17 U.S.C.

[13] This is more that a presumption – the Google Public Policy Blog has stated that Canada, the UK, Australia and the United States share "a common legal heritage and similar book industry practices.", see Google Public Policy Blog, "Revised Settlement FAQ" (13 November, 2009) <https://sites.google.com/a/pressatgoogle.com/googlebookssettlement/revised-settlement-faq/RevisedSettlementFAQ.pdf>.

Book Registry against liability under foreign copyright laws, including Canada's *Copyright Act*.[14] These are dangerous presumptions.

First, with respect to the question of jurisdiction, the Supreme Court of Canada considered this question in the context of online activities relating to a copyright protected work in the seminal case of *SOCAN* v. *CAIP*.[15] The Court found that a Canadian tribunal may take jurisdiction over a matter where "real and substantial connections" connect Canada and the communication in question, consistent with "principles of order and fairness . . . that ensure security of [cross-border] transactions with justice".[16] Internet communications that originate or terminate in Canada are both "here and there", and have been found sufficient to constitute a sufficiently "real and substantial connection" to Canada to bestow jurisdiction over a copyright transmission on a Canadian court.[17] Simply, Google will have to implement an enormous firewall around the United States of America to insulate itself from liability in Canada for actions taken in respect of the works of Canadian nationals pursuant to the PASA, if approved by this Court.

Even putting aside cross-border communications, many other factors may well prove real and substantial connections to Canada sufficient for a Canadian court to take jurisdiction over a dispute between a Canadian and the parties to the PASA. Financial transactions and communications to a Canadian resident, advertisements directed at Canadians, and other dealings taking place partially on Canadian soil may well ground liability in Canada. CAUT has difficulty envisioning any *bona fide* settlement to this litigation that purports to bind anyone other than Americans.

Turning to the second presumption, of similarities between Canadian copyright law and American copyright law, CAUT argues there is no basis for such a presumption apart from Berne, TRIPS and NAFTA – and, as argued above, those international guarantees work *against* the PASA, not for it. Canadian copyright law is different from US law. Material differences range from the differences between fair use and its Canadian counterpart, fair dealing,[18] differences in the role of collective societies in commercializing copyright,[19] to differences in the definition of "originality" under the two statutes.[20] While a detailed discussion of these differences lies beyond the scope of this Objection, CAUT will focus on two fundamental differences between the statutes:

---

[14] *Copyright Act*, R.S.C. 1985, c. C-32 (as amended) ["*Copyright Act*"].

[15] *Society of Composers, Authors and Music Publishers of Canada* v. *Canadian Assn. of Internet Providers*, 2004 SCC 45, [2004] 2 S.C.R. 427, 2004 SCC 45.

[16] *Ibid.*, para. 57.

[17] *Ibid.*

[18] *Copyright Act*, supra note 14, s. 29-29.2. Fair dealing applies only for five specific dealings: research, private study, criticism, review, and news reporting, and applies with respect to these last three dealings only if the source and author (if given in the source) are mentioned. Fair use includes no such limitations.

[19] See *Copyright Act*, supra note 14, Parts VII ("Copyright Board and Collective Administration of Copyright") and VIII.("Private Copying").

[20] Compare *Feist Publications, Inc.* v. *Rural Telephone Service Co.*, 99 U.S. 340 (originality on a creativity standard) and *CCH Canadian Ltd.* v. *Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13 (originality requiring exercise of "skill and judgement").

5

Canada's extensive protection of moral rights, and Canada's unlocatable copyright owners licensing system.

The PASA potentially violates CAUT members' moral rights in their works. Under Canadian law, all authors enjoy a series of moral rights in their works. These rights include the right to be associated with a work by name or pseudonym (or to remain anonymous if that is their choice), and the right to the integrity of the work.[21] The integrity of the work may be compromised merely by association of the work with "a product, service, cause or institution" to the prejudice of the honour or reputation of the author.[22] The PASA explicitly contemplates commercial advertising in association with class members' works. This potentially violates Canadian authors' moral rights, as they will have no choice but to be affiliated with commercial services (Google and its licensees and partners, including advertising partners) with whom they might otherwise object. It is not enough to say that authors may opt out of the PASA, which is, after all, merely a product of a civil proceeding in another jurisdiction. It is entirely conceivable that an author may first learn of this litigation and the PASA and Google's Book Search services after the harm has already occurred.

The PASA also includes extensive provisions in respect of what in the United States is called "orphan works". In Canada, the challenge posed by dealing with these works is referenced by another name – the "unlocatable copyright owner" problem. Canada has put in place its own unique statutory solution to this problem.[23] Under the Canadian solution, a party seeking to use a work whose copyright owner cannot be located may approach the Copyright Board of Canada for a license. If "satisfied that the applicant has made reasonable efforts to locate the owner of the copyright and that the owner cannot be located," the Board may issue a non-exclusive license to the applicant.[24] The system offers the Board a great deal of flexibility in implementation.

The PASA bypasses Canada's unlocatable copyright owner regime entirely, even in respect of Canadian authors. It replaces it with a process that profits a commercial entity – Google – and a layer of administration – the Book Registry. The better approach, in CAUT's view, in respect of unlocatable copyright owners who are known or suspected to be Canadian is to use the Canadian Copyright Board's mechanism for granting a digitization license. This mechanism is flexible, likelier to identify and compensate the Canadian author and is consistent with Canadian law.

### III THE PROPOSED AMENDED SETTLEMENT AGREEMENT SHOULD BE REJECTED BECAUSE IT IS IGNORES THE DISTINCTIVENESS OF CANADA'S QUÉBÉCOIS AUTHORS

Related to the previous point, but worthy of its own discussion, is the reality of the make-up of the sub-class of Class Members who are Canadian. CAUT drew from the

---

[21] *Copyright Act*, supra note 14, s. 14.1(1).

[22] *Ibid.*, s.28.2(1)(b).

[23] *Ibid.*, s. 77(1).

[24] *Ibid.*

deliberate selection and inclusion of Canadians among class members the inference that the PASA deems Canadian and American authors are "alike". Having observed that this presumption ignores the differences between Canadian and American copyright law, we now turn to the observation that such a presumption ignores the diversity of authorship in Canada itself. CAUT members are drawn from all walks of Canada, including from the province of Québec and from the Québécois population of Canada more broadly. This population, we suggest, is what is often referred to as a "distinct society" within Canada. The contours of this "distinct society" are defined by far more than simply language (although the French language does serve to distinguish Québec and Québécois from the rest of Canada), and extend to culture, law and other aspects of cultural identity. Indeed, as recently as November 22, 2006, the House of Commons tabled and approved a motion that read (in English) "That this House recognizes that the Québécois form a nation within a united Canada."[25]

This distinctiveness reaches across into Canadian copyright law. While copyright in Québec is governed by the Canadian *Copyright Act*, commercial dealings with copyright – licensing, purchase and sale, civil proceedings, etc. – is governed by the Civil Code of Québec.[26] However, even within copyright law proper, Québec might be said to afford authorship and author's rights an esteemed place as an aspect of cultural identity. Simply, Québec takes its authors rights, including moral rights, very seriously.

It is a mistake to say that American authors are *like* Québec authors or Canadian authors. It is a mistake to include them by default within the class.

IV    THE PROPOSED AMENDED SETTLEMENT AGREEMENT SHOULD BE REJECTED BECAUSE THE AUTHORS GUILD AND THE REPRESENTATIVE PLAINTIFFS DO NOT FAIRLY AND ADEQUATELY REPRESENT THE INTERESTS OF CANADIAN ACADEMIC AUTHORS

Google co-founder and technology president Sergey Brin has characterized Google Book Search as creating "a library to last forever".[27] But Google Book Search is not a library. The PASA is a commercial arrangement negotiated by the Authors Guild and the American Publishers Association, on the one hand, and Google, on the other; the PASA cannot help but reflect the commercial orientation of its authors. Nor could it avoid bestowing the benefits of digital distribution on one distribution party – Google. But as a result of this commercial orientation, the Authors Guild and the representative plaintiffs cannot fairly and adequately represent the interests of Canadian academic authors. Simply, many Canadian academics would not likely select a mechanism resembling that articulated in the PASA for distributing digital books. Academics authors in general place a higher premium on access than is reflected in the PASA.

---

[25] Hansard; 39th Parliament, 1st Session; No. 087; November 27, 2006.
[26] S.Q., 1991, c. 64.
[27] Sergey Brin, "A Library to Last Forever", N.Y.Times (8 Oct., 2009) at A31, online: <http://www.nytimes.com/2009/10/09/opinion/09brin.html>.

The unique perspectives of academic authors have already been presented to the Court.[28] CAUT endorses the position of academic authors presented in this correspondence and its objections to the Proposed Settlement Agreement. These objections continue to have merit in respect of the PASA. However, in light of the PASA's specific inclusion of Canadian authors in the Author Sub-class, and by extension many CAUT members, CAUT argues that the reality of authorship in Canadian academic environment dictates that any settlement to this litigation should include special provision for academic authorship.

First, the reality is that Canada has provided extensive state support for academic writing. This has produced an academic environment that is incredibly open to publishing alternatives to the traditional for-profit commercial arrangements that is the default upon which the PASA is built. Canada's tri-council agencies – the Social Sciences and Humanities Research Council (SSHRC), the Natural Sciences and Engineering Research Council (NSERC) and the Canadian Institutes of Health Research (CIHR) – combined boast annual budgets in excess of 2 billion dollars.[29] The vast majority of this funding goes to Canadian researchers and leads to thousands of publications annually. The focus of this program is on enhancing access to knowledge. It is not on obtaining a commercially defensible return on investment – although CAUT members will attest to the return the Canadian people obtain on its investment in Canadian academia. Note also the distinct nature of Canadian post-secondary institutions. The American post-secondary environment is characterized by a mix of private and state institutions. Many of the most prestigious American institutions are entirely private. The Canadian environment, in contrast, is different: while there are wholly private post-secondary institutions, these tend to be smaller and less well-known. The large majority of Canadian post-secondary institutions receive most of their funding from government sources. Again, this different emphasis on the role of the public in the post-secondary educational environment speaks to a Canadian academic culture that sees little of its values and preferences reflected in the PASA.

CAUT members share a commitment to enhancing access to knowledge. However, it is impossible to state that CAUT members share a single preference in how to provide access to their publications. While some members might prefer a commercial publishing model in respect of publication of some of their works, others undoubtedly prefer a more open publishing model, preferring to emphasize access over exclusivity. Indeed, Canada is a world leader in promoting open publishing models. The University of Ottawa, one of Canada's leading research institutes, recently became the first Canadian University to adopt a comprehensive open access program supporting free and unrestricted access to

---

[28] See Letter of Prof. Pamela Samuelson to Judge Denny Chin on behalf of academic authors, *Authors Guild, Inc. v. Google, Inc.*, No. 05 CV 8136 (S.D.N.Y.) (3 Sept., 2009), online: <http://www.scribd.com/doc/14744864/Samuelson-Letter-to-Judge-Chin-42709>.

[29] See, *e.g.*, , the Natural Sciences and Engineering Research Council, "Facts and Figures 2007-08", online: <http://www.nserc-crsng.gc.ca/_doc/FactsFigures-TableauxDetailles/2007-2008Figures_e.pdf>; Social Sciences and Humanities Research Council, "Annual Budget", online: <http://www.sshrc.ca/site/about-crsh/stats-statistiques/budget-eng.aspx>; Canadian Institutes of Health Research, "Facts and Figures", online: < http://www.cihr-irsc.gc.ca/e/38008.html>.

scholarly research.[30] Other Canadian academic researchers might prefer open licensing models such as Creative Commons licensing. The point is that the commercial model imposed on Canadian academic researchers by the PASA is not necessarily consonant with the preferences of these Canadians, and is dissonant with a culture that values access to knowledge in an environment supported by state funding.

CAUT places a special emphasis on the value of academic freedom.[31] CAUT actively promotes and defends academic freedom, undertaking investigations of alleged violations and monitoring cases across Canada. Where violations are established, CAUT intervenes to bring about appropriate changes.

Academic freedom is the right to teach, learn, study and publish free of orthodoxy or threat of reprisal or discrimination. Academic freedom is the life blood of the modern Canadian university. Given this description, the threat the PASA poses to academic freedom should be obvious: the Google Book Search settlement threatens to impose an orthodoxy of digital publication on Canadian academic authors. It undermines choice of publication venue. CAUT cannot accept any settlement to this litigation that does not include enhanced measures to protect choice of publication venue for Canadian academic authors.

Finally, CAUT shares the competition concerns raised in other submissions to this Court.[32] Canadian academic libraries are particularly vulnerable to anti-competitive pricing tactics given Canadian public post-secondary institutional reliance on state funding for operational funding. Nothing in the PASA addresses this concern.

## V    THE PROPOSED AMENDED SETTLEMENT AGREEMENT SHOULD BE REJECTED BECAUSE IT LACKS PRIVACY GUARANTEES CONSISTENT WITH CANADIAN LAW AND VALUES

The corpus of Google Book Search is predominantly research material.[33] This should not be surprising given the source material for Google's digitization initiative: academic research libraries. This reality suggests that the concerns of CAUT members around

---

[30] See University of Ottawa, "Media Release: University of Ottawa among North American leaders as it launches open access program", (8 December, 2009), online:
<http://www.medias.uottawa.ca/salledesmedias/news-details_1824.html>.

[31] See, e.g., CAUT, "Policy Statement on Academic Freedom", online:
<http://www.caut.ca/pages.asp?page=247&lang=1>.

[32] See, e.g., Statement of Interest by the U.S. Dept. of Justice Regarding the Proposed Settlement, *Authors Guild, Inc.* v. *Google, Inc.*, No. 05 CV 8136 (S.D.N.Y.)(18 September, 2009), online:
<http://www.justice.gov/atr/cases/f250100/250180.pdf>.

[33] Brian Lavoie & Lorcan Dempsey of the OCLC Online Computer Library Center report that 93% of post-1923 U.S.-published print books in the combined print book collection of three academic research library participants in Google Book Search project are non-fiction, and that of these, 78% could be characterized as "scholarly": Brian Lavoie & Lorcan Dempsey, "Beyond 1923: Characteristics of Potentially In-copyright Print Books in Library Collections", 15(11/12) D-Lib Magazine, (November-December 2009), online: <http://www.dlib.org/dlib/november09/lavoie/11lavoie.html>.

research activities in research libraries are equally applicable to research activities involving Google's digital library. Privacy values lie at the heart of these concerns.

Privacy values underlie academic freedom. If academic freedom is, as noted above, the right to teach, learn, study and publish free of orthodoxy or threat of reprisal or discrimination, then the right to undertake these activities free of observation or surveillance acts as their guarantee. And the services envisioned and enabled by the PASA enable observation and surveillance – indeed, they are directed at commercializing this very activity.

The services enabled by the PASA give Google unprecedented power to observe and record reading practices in a manner that has never before been possible. Google owns the hardware its corpus occupies, and will control the software researchers will use to access that corpus. Accordingly, Google will be able to observe who reads what parts of what book for how long, and what books researchers access in what sequence. Google neither offers any guarantees about limits on how this information will be collected and used, nor any commitments on limiting disclosure of such information to third parties – including law enforcement agencies. No Canadian academic researcher has ever had to operate under this degree of surveillance; this state of affairs cannot help but undermine freedom on inquiry. Harm to freedom of inquiry necessarily undermines academic freedom.

CAUT endorses the privacy-based objections already communicated to this Court by others and their recommendations for mandating privacy protections in any settlement to this litigation.[34] While CAUT acknowledges that some amendments to the Proposed Settlement Agreement were directed at privacy concerns, these changes are wholly inadequate to the problem. Similarly, while Google has announced a Privacy Policy[35] for Google Book Search, the document is not a part of the PASA and is subject to change at any time. Regardless, the Privacy Policy substantiates CAUT's concerns, rather than address them, as it provides for collection and retention of research data such as "log information" that includes "the query term or page request (which may include specific pages within a book you are browsing), Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser." It is unclear whether Google will treat "IP addresses" as "personally identifiable information" – their main Privacy Policy is silent on the subject.[36] A Google Policy Blog posting on the subject – "Are IP Addresses Personal?" – doesn't answer its own question.[37]

---

[34] Privacy Authors and Publishers' Objection to Proposed Settlement, *Authors Guild Inc. v. Google Inc.*, No. 1:05-CV-8136 (S.D.N.Y.) (4 September, 2009), online:
<http://thepublicindex.org/docs/letters/privacy_authors.pdf> [Privacy Authors and Publishers' Objection].
[35] "Google Books Privacy Policy", (3 September, 2009) online:
<http://books.google.com/googlebooks/privacy.html>.
[36] Google, "Privacy FAQ", online: <http://www.google.com/privacy_faq.html#toc-terms-aggregated-info>. Google states that "Every computer connected to the Internet is assigned a unique number known as an Internet protocol (IP) address. Since these numbers are usually assigned in country-based blocks, an IP address can often be used to identify the country from which a computer is connecting to the Internet." An IP address can, in some circumstances, be used to identify the street address from which a computer is

The question of whether IP addresses should be treated as personal information under Canadian law has been answered, however, by the Privacy Commissioner of Canada. The Privacy Commissioner has found that IP addresses can lead to discovery of an individual's identity and so must be treated in most cases as personal information.[38] This means that collection of information associated with an IP address may also be associated with an individual and should accordingly be treated as personal information under the law. And Canada does have a privacy law: the *Personal Information Protection and Electronic Documents Act*, or PIPEDA.[39]

The general rule under PIPEDA is that an organization must obtain the consent of an individual to the collection, use and disclosure of personal information about that individual. The standard of consent must be appropriate to the circumstances, with more sensitive information requiring a more active form of consent (such as opt-in instead of opt-out, for example). Given the importance of anonymous research to academic freedom, CAUT suggests that the passive consent system built into Google's series of Privacy Policies will not meet PIPEDA's standard of consent. CAUT concludes that Google and its partners in Google Book Search undertakings will encounter PIPEDA difficulties whenever Google deals with individuals or digital content that has a real and substantial connection to Canada.

One might object to PIPEDA's application to Google Book Search undertakings on jurisdictional grounds. However, as detailed above in respect of the application of Canadian copyright law to Google's Book Search activities, Canadian courts do not hesitate to take jurisdiction over matters sufficiently connected to Canada. So it is with the jurisdictional reach of PIPEDA. In a 2005 decision, the Federal Court of Canada ruled that the Privacy Commissioner has jurisdiction to investigate foreign, including American, organizations:

> It would be most regrettable indeed if Parliament gave the Commissioner jurisdiction to investigate foreigners who have Canadian sources of information only if those organizations voluntarily name names. Furthermore, even if an order against a non-resident might be ineffective, the Commissioner could target the Canadian sources of information.[40]

---

connecting to the Internet, and so also may permit identification of an individual who has used that computer.
[37] Alma Whitten, "Are IP Addresses Personal?" Google Policy Blog (22 February, 2008) <http://googlepublicpolicy.blogspot.com/2008/02/are-ip-addresses-personal.html>.
[38] See, *e.g.*, PIPEDA Case Summary #2005-315, "Web-centred company's safeguards and handling of access request and privacy complaint questioned", (31 August, 2005), online: <http://www.priv.gc.ca/cf-dc/2005/315_20050809_03_e.cfm>. See also Office of the Privacy Commissioner of Canada, "Protecting Your Privacy on the Internet", (25 July 2004), online: <http://www.priv.gc.ca/fs-fi/02_05_d_13_e.cfm>.
[39] S.C. 2000, c. 5.
[40] *Lawson* v. *Accusearch*, 2007 FC 125 at para. 42, online: <http://decisions.fct-cf.gc.ca/en/2007/2007fc125/2007fc125.html>.

Indeed, the Privacy Commissioner has gone on to investigate and issue findings against large American corporations offering services involving Canadians.[41] CAUT concludes that a PIPEDA complaint against Google in respect of its treatment of Canadian authors and Canadian users of Google Book Search services might well be received by the Privacy Commissioner and result the Commissioner requiring Google to treat Canadian authors other than as contemplated by the PASA. In the circumstances, CAUT concludes that Google Book Search services must offer much, much more robust privacy protections than contemplated by the PASA. Those protections articulated by the Privacy Authors and Publishers offer a sound starting point.[42]

* * *

In this letter, CAUT has expressed its deep concern with the ambitiousness and reach of the PASA. However, CAUT does not wish to appear to be an opponent of Google's ultimate ambitions. Digitization of book libraries enhances access to knowledge and so is consistent with academics' *rasion d'etre*. However the manner in which this is carried out is important. Digitization and the creation of digital libraries must be consistent with international law and the rights of authors, be those rights copyright or academic freedom. Similarly, Google's corpus is a tremendous resource, but it is dangerous to permit monopolization of this resource.

Ironically, were Google to go to trial on the original issue of scanning and digitization and the question of fair use, CAUT could well have sought to intervene in favour of Google's actions as facilitating access to knowledge. However, through the mechanism of a class action settlement, Google, the Authors Guild and the publishers have transformed the litigation. The original issue of fair use has fallen by the wayside, to be replaced by much larger issues. The PASA – a privately negotiated settlement to private litigation in a foreign country – transforms the exclusive right of Canadian authors, guaranteed by American copyright law, international treaty and global and continental trade agreements, into a simple right to remuneration. In CAUT's view, such a transformation could and should only be undertaken by the American Congress pursuant to lawful agreement with the Canadian government.

Respectfully submitted,

*[signature]*

James L. Turk
Executive Director
Canadian Association of University Teachers

---

[41] See, *e.g.*, PIPEDA Case Summary #2009-008, "Report of Findings into the Complaint Filed by the Canadian Internet Policy and Public Interest Clinic (CIPPIC) Against Facebook Inc. Under the Personal Information Protection and Electronic Documents Act", (16 July, 2009), online: <http://www.priv.gc.ca/cf-dc/2009/2009_008_0716_e.cfm>.
[42] Privacy Authors and Publishers' Objection, *supra* note 34.

Cc: Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
bookclaims@durietangri.com