UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC. *et al.*,

       Plaintiffs,

          v.

GOOGLE INC.,

       Defendant.

05 Civ. 8136 (DC)

**ECF CASE**


**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA
REGARDING PROPOSED AMENDED SETTLEMENT AGREEMENT**


WILLIAM F. CAVANAUGH
U.S. Department of Justice
Deputy Assistant Attorney General
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Tel.: (202) 353-1535

PREET BHARARA
United States Attorney for the
Southern District of New York

JOHN D. CLOPPER
Assistant United States Attorney
86 Chambers Street, 5th Floor
New York, New York 10007
Tel.: (212) 637-2716

# TABLE OF CONTENTS

I.   Aspects of the ASA Exceed the Proper Bounds of a Class Action Settlement ..................... 4

    A.   Class Representatives Lack the Authority Under Rule 23 to Grant Google the Broad Rights that the ASA Contemplates ............................................................................. 4

    B.   Issues Remain Regarding Whether the Class Representatives Adequately Represent Absent Class Members ............................................................................................... 12

    C.   As Written, the ASA Requires Robust Notice, and the Record Requires Further Development of Whether Such Notice Has Been Provided ....................................... 13

    D.   "Attachment A" to the ASA Requires Careful Rule 23(e) Scrutiny.......................... 14

II.  The ASA Continues to Raise Antitrust Concerns................................................................ 16

    A.   Horizontal Agreements Among Authors and Publishers............................................ 16

    B.   Google's *de facto* Exclusivity................................................................................... 21

III. If the Court Concludes that Class Representatives May Grant to Google Wide-Ranging Rights for Forward-Looking Business Arrangements of the Entire Class, the Court Should Consider Some Additional Safeguards ................................................................................. 23

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...................................................... 3, 5-6, 15

*Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982) ................................... 18

*Ayers v. Thompson*, 358 F.3d 356 (5th Cir. 2004) ........................................................ 8

*Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995) ............................................. 14

*Catalano, Inc v. Target Sales*, 446 U.S. 643 (1980) (per curiam) ................................ 18

*Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969) ........................................... 19

*Cohen v. Paramount*, 845 F.2d 851 (9th Cir. 1988) ..................................................... 14

*Duran v. Carruthers*, 885 F.2d 1485 (10th Cir. 1989) ................................................ 8

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) .......................................... 9

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ............................................................ 9

*Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932) ........................................................... 9

*Gen. Cinema Corp. v. Buena Vista Distrib. Co.*, 532 F. Supp. 1244 (C.D. Cal. 1982) ............... 18

*Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975) .......................................................... 18

*Harper & Row, Publishers, Inc. v. Nation Enter.,* 471 U.S. 539 (1985) ....................... 9

*Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001) .................................................. 5

*Jeff D. v. Kempthorne*, 365 F.3d 844 (9th Cir. 2004) ................................................. 8

*Kozlowski v. Coughlin*, 871 F.2d 241 (2d Cir. 1989) .................................................. 8

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986) ............ 5-9, 11

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981) ............... 11

*New York v. St. Francis Hosp.*, 94 F. Supp. 2d 399 (S.D.N.Y. 2000) ......................... 19

*Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001),
     *aff'd*, 283 F.3d 490 (2d Cir. 2002) ..................................................................... 14

*Stewart v. Abend*, 495 U.S. 207 (1990) ....................................................................... 9

*TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456 (2d Cir. 1982)............................................. 6

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002).......................... 4-5

*United States v. Kerr-McGee Corp.*, 2008 WL 863975 (D. Colo. March 26, 2008)..................... 8

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).................................................. 18

*Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538 (4th Cir. 1958) .................................................. 19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ................................... 6, 11

**Other Authorities**

17 U.S.C § 101.................................................................................................................... 24

17 U.S.C. §§ 101-810 ............................................................................................................. 9

17 U.S.C § 201(d)(1)-(2) ...................................................................................................... 15

28 U.S.C. § 2072(b) ................................................................................................................ 3

Federal Rule of Civil Procedure 23 .................................................................................. *passim*

U.S. Const., art. I, § 8, cl. 8.................................................................................................. 9

The United States of America, by and through counsel, submits this statement of its views concerning the amended proposed class action settlement (the "Amended Settlement Agreement" or "ASA") between the Authors Guild, Inc. and the Association of American Publishers, Inc. ("AAP"), et al. (the "Class Plaintiffs") and Google Inc. ("Google").

As the United States noted in its September 18, 2009 Statement of Interest (D.E. 720) ("U.S. SOI"), widespread lawful electronic distribution and use of copyrighted works, including in-print, out-of-print, and so-called "orphan" works, holds vast promise. Breathing life into millions of works that are now effectively dormant, allowing users to search the text of millions of books at no cost, creating a rights registry, and enhancing the accessibility of such works for the disabled and others are all worthy objectives.

It was with those objectives in mind that the United States encouraged discussions among the parties regarding possible modifications of the original Proposed Settlement ("Proposed Settlement" or "PS") to address the many concerns raised by various commenters and the United States. In response, the parties made a number of substantial changes to the Proposed Settlement. For example, the ASA: eliminates the open-ended provisions that would have conveyed to Google the rights to engage in unspecified future uses of the works covered by the ASA (*compare* PS § 4.7 *with* ASA § 4.7); calls for an Unclaimed Works Fiduciary ("Fiduciary" or "UWF") subject to court approval to protect owners of unclaimed works (ASA § 6.2(b)(iii)); provides that, after five years, 25 percent of unclaimed funds from unclaimed works may be used to locate the respective rightsholders (rather than be redistributed to other members of the Book Rights Registry) (ASA § 6.3(a)(i)(2)); reduces the number of foreign works in the settlement class (*compare* PS § 1.19 *with* ASA § 1.19); and eliminates the most-favored-nation provision (PS § 3.8(a)) that would have guaranteed Google optimal license terms into the future.

Despite this substantial progress, substantial issues remain. Although the United States believes the parties have approached this effort in good faith and the ASA is more circumscribed in its sweep than the original Proposed Settlement, the ASA suffers from the same core problem as the original agreement: it is an attempt to use the class action mechanism to implement forward-looking business arrangements that go far beyond the dispute before the Court in this litigation. As a consequence, the ASA purports to grant legal rights that are difficult to square with the core principle of the Copyright Act that copyright owners generally control whether and how to exploit their works during the term of copyright. Those rights, in turn, confer significant and possibly anticompetitive advantages on a single entity – Google. Under the ASA as proposed, Google would remain the only competitor in the digital marketplace with the rights to distribute and otherwise exploit a vast array of works in multiple formats. Google also would have the exclusive ability to exploit unclaimed works (including so-called "orphan works"[1]) without risk of liability. The ASA's pricing mechanisms, though in some respects much improved, also continue to raise antitrust concerns.

The United States recognizes that the parties to the ASA are seeking to use the class action mechanism to overcome legal and structural challenges to the emergence of a robust and diverse marketplace for digital books, including through the adoption of an "opt-out" system to address the complexity of managing millions of third-party copyrights. Under existing law, copyrighted works typically cannot be exploited in all of the ways the ASA contemplates without the prior permission of the rightsholders. But for many works, especially out-of-print works, rights clearance may not be possible as a practical matter. Even if the rightsholders can be

---

[1] The United States notes that, as a general matter, "orphan works" refers to the subset of works whose rightsholders cannot be identified or located after a diligent search. In the context of the settlement, many additional works will be "unclaimed works," *i.e.*, their copyright owners are findable but they choose not to affirmatively engage with the Registry.

located, it may not be clear (as between author and publisher, or as among many competing claims to rights in the work) who "owns" or controls the digital licensing of particular works. This is especially likely where publication predated, and contracts did not anticipate, the digital era. Finally, there are no major licensing systems in place by which good faith users can efficiently secure permission from, and render payment to, authors, publishers, and the other rightsholders implicated by the ASA. These realities make it difficult if not impossible to engage in lawful large-scale book digitization projects, thereby denying the public the full corpus of 20th century books and, perhaps, unknown benefits of future creativity and economic innovation. The parties to the ASA should be commended for their efforts to find a solution to these challenges.

Despite this worthy goal, the United States has reluctantly concluded that use of the class action mechanism in the manner proposed by the ASA is a bridge too far. The Supreme Court has cautioned that "Rule 23, which must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load" of restructuring legal regimes in the absence of congressional action – however sensible that restructuring might be. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 629 (1997).[2] That caution should be heeded here. Indeed, it applies with particular force because the legal and structural changes the parties seek to accomplish would confer on one entity a level of market dominance that other competitors without access to the ASA's special rules and procedures will be hard pressed to challenge for the foreseeable future. For these reasons, the ASA is not the appropriate way to achieve the laudable goals the parties seek.

---

[2]  *See also id.* at 628-29 ("The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution."); *id.* at 613 ("Rules Enabling Act … instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'  28 U.S.C. § 2072(b).").

At this time, in the view of the United States, the public interest would best be served by direction from the Court encouraging the continuation of settlement discussions between the parties and, if the Court so chooses, guidance as to those aspects of the ASA that need to be addressed. The United States is committed to working constructively with all stakeholders on the scope and content of an appropriate settlement of this matter, and on legislative or market-based solutions to ensure a robust marketplace for digital works.

## I. Aspects of the ASA Exceed the Proper Bounds of a Class Action Settlement

### A. Class Representatives Lack the Authority Under Rule 23 to Grant Google the Broad Rights that the ASA Contemplates

In response to concerns expressed by many, the ASA eliminates the open-ended ability of Google and the Registry to agree in the future to unspecified business models. *Compare* PS § 4.7 *with* ASA § 4.7. Yet, what remains is nevertheless quite broad and well beyond what the class representatives sought to litigate or could have litigated. The ASA retains Google's ability to sell full access to books in a variety of ways: to libraries, as online access to the complete corpus ("Institutional Subscriptions," ASA § 4.1); to consumers, one online book at a time ("Consumer Purchases," ASA § 4.2); and, pending Registry approval, to consumers, as individually printed volumes ("Print on Demand," ASA § 4.7(a)), to consumers, as ebooks they can read offline ("File Download," ASA § 4.7(b)), and to consumers, as online access to the complete database of digitized works ("Consumer Subscription," ASA § 4.7(c)). These rights alone grant Google sweeping control over the digital commercialization of millions and millions of books.

The United States accepts the proposition that a properly defined and adequately represented class of copyright holders may be able to settle a lawsuit over past conduct by licensing a somewhat broader range of conduct. *See Uhl v. Thoroughbred Tech. & Telecomms.,*

*Inc.*, 309 F.3d 978, 982-83 (7th Cir. 2002) (affirming class settlement that resolved trespass and slander of title claims by granting easements in railroad rights-of-way). *But cf. Isaacs v. Sprint Corp.*, 261 F.3d 679, 682 (7th Cir. 2001) (reversing class certification where "different conveyances by and to different parties made at different times over a period of more than a century" rendered class action treatment "decidedly inappropriate"). Nevertheless, class action settlements must be subject to reasonable limits to ensure that they are used to resolve actual controversies between litigants, and not to abridge or enlarge substantive rights.

The proper legal rubric for analyzing this issue has been the subject of prior submissions by the United States (and other interested parties). The parties have contended in recent discussions with the United States that the ASA should be evaluated under *Local Number 93, International Association of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986), and its progeny, which set forth standards for assessing the scope of a federal court's remedial authority to enter orders settling cases on terms that exceed the relief a plaintiff could obtain had the case been litigated to a final judgment. Under this line of cases, the Court may approve a settlement that (1) "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction"; (2) "com[es] within the general scope of the case made by the pleadings"; and (3) "further[s] the objectives of the law upon which the complaint was based." *Id.* at 525. If a proposed settlement is within the scope of a court's remedial authority under this test, the parties contend, the only remaining question is whether the proposed settlement meets the standard requirements of Federal Rule of Civil Procedure 23 ("Rule 23").

In previous submissions to this Court, the United States (and other interested parties) discussed the Rule 23 limitations expressed in *Amchem*, 521 U.S. at 620, 628-29, *see, e.g.*, U.S. SOI at 6-8 (D.E. 720), which suggests that absent class members cannot be adequately

represented as to uncertain injuries or rights that are far removed from the facts underlying the complaint. The United States (and other interested parties) also identified the "identical factual predicate" doctrine as a limitation on the breadth of a class action settlement. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (holding that "class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct"); *see also TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982); U.S. SOI at 6-7 (D.E. 720).

Although the analytical frameworks set forth in *Firefighters*, on the one hand, and *Amchem* and *Wal-Mart*, on the other hand, differ in certain respects and in their underlying purpose,[3] they converge in recognizing that, while courts must have some flexibility to approve enforceable settlements, this flexibility must not be used to usurp the legislative function, or to permit parties to use the courts as mere "recorders" of private contractual arrangements. As discussed below, however, even under the *Firefighters* rubric preferred by the parties, the ASA falls short.

*Does the settlement resolve a dispute within the Court's subject matter jurisdiction?* The provisions that settle the specific allegations of infringement in the Class Complaint – those that allow Google to scan millions of copyrighted works and to make available small portions of such works in response to search requests – address disputes within the Court's subject matter jurisdiction. Those aspects of the ASA are based on specific conduct that falls squarely within the scope of the case made through the pleadings. There are strong arguments that an

_____

[3] Although *Firefighters* was a class action, its settlement approval standard is very rarely applied by courts approving class settlements, as the case primarily concerns the authority of a court to award extra-statutory remedies.

appropriate set of publisher and author class representatives can adequately represent all members of the class with respect to reaching a settlement as to the uses of their works challenged in the litigation.

The broader aspects of the ASA stand on a somewhat different footing. There has not been – and simply could not be – any allegation in this litigation that Google has sold full access to works for which it lacks the right to do so, or even that such activity was threatened. Indeed, selling such access would have been legally indefensible, and thus would have been at odds with Google's entire pre-settlement book search strategy, which was premised upon staying within colorable "fair use" grounds. With very good reason, therefore, Google consciously avoided creating precisely the factual predicate that might support the settlement of book- and subscription-selling claims. The business models that the ASA authorizes therefore relate to activities in which Google never engaged or threatened to engage, and thus claims of copyright infringement that could not have been brought. Although Rule 23 does not require the Court to survey the claims of every class member to determine if they are ripe, there are serious questions about whether a settlement that resolves future claims by absent class members for activities well beyond the facts underlying the complaint can meet the first prong of the *Firefighters* test.

*Does the ASA come within the general scope of the case made by the pleadings?* For similar reasons, it is difficult to conclude that the book- and subscription-selling provisions of the ASA are within the scope of the case made by the pleadings. To the extent the consent decrees in the *Firefighters* progeny resolved claims not set forth in the pleadings, they were claims that presumably "could have" been brought at that time by those plaintiffs. In the present case, the parties are not in the same position. The forward-looking business ventures permitted by the ASA would not resolve any judicially cognizable claim.

Moreover, insofar as the *Firefighters* analysis permits courts to grant relief that extends beyond the scope of the conduct alleged in the complaint, it does so as an exercise of a federal court's *remedial* authority. *See Firefighters*, 478 U.S. at 526 (Court's three-part test seeks to define the limits of "the *remedial* authority of a federal court") (emphasis added); *see also, e.g.*, *United States v. Kerr-McGee Corp.*, 2008 WL 863975, at *6 (D. Colo. March 26, 2008) (awarding relief to remedy a violation of the Clean Air Act); *Jeff D. v. Kempthorne*, 365 F.3d 844, 846, 851-52 (9th Cir. 2004) (awarding relief to remedy constitutional and statutory violations for services to mentally disabled children); *Duran v. Carruthers*, 885 F.2d 1485 (10th Cir. 1989) (awarding relief to remedy unconstitutional prison conditions); *Kozlowski v. Coughlin*, 871 F.2d 241, 244-45 (2d Cir. 1989) (same); *Ayers v. Thompson*, 358 F.3d 356, 359 (5th Cir. 2004) (awarding relief to remedy segregation in institutions of higher learning).

The ASA is also quite different from the consent decrees described above in that the more extensive forms of relief provided in those cases are designed to benefit the party harmed by imposing additional burdens on the defendant(s). The additional concessions made by the defendants generally are acts they could have undertaken voluntarily.[4] Here, in contrast, the ASA authorizes future activities beyond the scope of the conduct alleged in the complaint that do not remedy injuries plaintiffs suffered in the past, nor do they seek to prevent future injuries. Rather, these provisions provide the defendant with benefits it could not have secured either through trial or even through normal private negotiations.

*Does the ASA further the objectives of the law upon which the complaint was based*? The non-remedial character of the ASA's authorization of Google to undertake book sales and other

---

[4] *See, e.g.*, *Firefighters*, 478 U.S. at 507-08 (describing "minority promotion" goals defendant city could have adopted without court order); *Kozlowski*, 871 F.2d at 242 (prison visitation procedures); *Kerr-McGee*, 2008 WL 863975, at *2 (air pollutants emission reduction).

commercial activities also raises difficulties under the third part of the *Firefighters* analysis.  In this case, that "law upon which the complaint was based" is the Copyright Act, 17 U.S.C. §§ 101-810, a primary objective of which is to encourage creation by granting to authors the exclusive right to their works for a period of time.[5]  To be sure, the Copyright Clause of the Constitution, U.S. Const., art. I, § 8, cl. 8., and the Copyright Act seek to further the free flow of information and advance the First Amendment's interest in dissemination of expression.  *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 545 (1985) ("copyright is intended to increase and not to impede the harvest of knowledge"); *accord Stewart v. Abend*, 495 U.S. 207, 228 (1990) ("[T]he Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works.").  But they do so in a precise way, defined by Congress, in the form of the Copyright Act's specific delineation of exclusive rights to authors and the many restrictions thereon.  *Harper & Row*, 471 U.S. at 546-47 & nn.1-2 (discussing the Act's grant of "a bundle of exclusive rights" to the copyright owner and the accompanying restrictions).

In its current form, the ASA is inconsistent with the policy of the Copyright Act, as established by Congress, making the argument that the ASA furthers the purposes of the Act a difficult one.  The ASA seeks to carve out an exception from the Act's normal rules and presumptions, which require a rightsholder to affirmatively grant permission for the kinds of uses contemplated by the ASA.  The parties claim that creating an opt-out exception would better serve the purposes of the Constitution's Copyright Clause by promoting the progress of science

---

[5] *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 (1994) ("The primary objective of the Copyright Act is to encourage the production of original literary, artistic, and musical expression for the good of the public."); *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006) ("a copyright holder possesses 'the right to exclude others from using his property'" (quoting *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932))).

and the useful arts.  That, however, is a judgment better suited for legislative consideration, rather than one for courts to make in the context of approving a settlement under Rule 23.

The ASA provisions that afford class members an on-going ability to decline to participate in these various business opportunities reduce, but do not eliminate, the conflict between the ASA's broad grant of rights to Google and the Copyright Act's default rule barring use of copyrighted works without the copyright holder's permission.  Rightsholders that have not already opted out by the January 28, 2010 deadline are bound by the terms of the ASA.  *See* Nov. 19, 2009 Order at 5 (D.E. 772).  Thereafter, to stop Google from utilizing their works in any of its business ventures, rightsholders must list their works with the Registry and direct which revenue models should be extinguished on a work-by-work basis.  After March 9, 2012, rightsholders cannot have a previously-scanned book deleted from the research corpus.  ASA §§ 1.126, 3.5(a)(iii).  Consequently, rightsholders that have not already opted out will have released Google for any copyright infringement liability arising out of Google's use up to the time each rightsholder registers and instructs Google to discontinue use.  ASA § 10.2(a), (b). Those rightsholders also are subject to the ASA's provisions that provide Google with certain protections, including mandatory ADR to resolve disputes over its use of a copyrighted work. ASA § 9.1(a).

The United States recognizes that it is the ASA's broad grant of rights to Google, coupled with the settlement's opt-out requirements, that allows for the use of the largest possible universe of digital works.  The United States also recognizes that, although Google's activities are commercially motivated, its business plan would generate numerous public benefits.  The ASA would achieve these benefits, however, in spite of and not in furtherance of the basic premises of

the Copyright Act.  As a consequence, these aspects of the ASA are in some tension with the third prong of the *Firefighters* test.

* * *

In the end, the analysis under *Firefighters*, if applicable, leads to the same conclusion as the Second Circuit's governing "identical factual predicate" doctrine.  This is unsurprising, as the latter doctrine closely parallels the *Firefighters*' scope-of-the-pleadings prong.  *See Wal-Mart*, 396 F.3d at 108 (a settlement may release claims alleged in the complaint and those which could have been alleged "by reason of or in connection with *any matter or fact set forth or referred to in the complaint*") (emphasis added; quotation and citations omitted).  Thus, for the same reasons that the ASA's grant of broad rights cannot be said to "come within the general scope of the case made by the pleadings," *Firefighters*, 478 U.S. at 525 (quotation omitted), those same provisions cannot be said to release claims for conduct that arises out of the "identical factual predicate," or that "share[s] the same integral facts as," the conduct that gave rise to this suit.  *Wal-Mart*, 396 F.3d at 106 (internal quotation omitted).[6]  Thus, regardless of whether the Court applies the identical factual predicate doctrine or the *Firefighters* test that the parties propose, the United States believes that the Court lacks authority to approve the ASA.

---

[6]  The parties have suggested that the "identical factual predicate" doctrine is intended only to prevent class representatives from releasing claims that they do not share in common with other class members, and that the doctrine does not otherwise limit the permissible scope of a class settlement.  Although it may have first originated from such concerns, *see Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16-19 (2d Cir. 1981), the identical factual predicate doctrine operates as an additional limitation on approval of a class settlement, not as a substitute for Rule 23's "adequacy of representation" requirement.  *See Wal-Mart*, 396 F.3d at 106 ("Plaintiffs' authority to release claims is *limited by* the 'identical factual predicate' *and* 'adequacy of representation' doctrines.") (emphases added); *id.* at 106-113 (analyzing issues separately, and discussing *Super Spuds* only in connection with the latter).

### B. Issues Remain Regarding Whether the Class Representatives Adequately Represent Absent Class Members

Even apart from the overarching question whether the ASA exceeds the permissible bounds of a Rule 23 settlement, several specific concerns remain regarding the ASA's compliance with traditional Rule 23 factors. One such concern relates to whether foreign rightsholders are adequately represented. The ASA is now limited to books published in Canada, the United Kingdom, or Australia, or registered with the U.S. Copyright Office.[7] ASA § 1.19. In addition, new associational plaintiffs from Canada, the UK, and Australia represented their fellow national rightsholders in negotiating the ASA.[8] Mem. in Supp. of Pls.' Mot. for Prelim. Approval ("Mem. in Supp.") at 15 (D.E. 769). Nonetheless, there are significant numbers of foreign authors from outside Canada, the UK, and Australia whose works were published in one of those countries or registered in the United States, and thus are subject to the ASA, even though the rightsholders may not have been represented by the new associational plaintiffs. This point is made clear by foreign governments, which object to the settlement. *See, e.g.*, Fed. Rep. of Germany Obj. at 2-8 (D.E. 852); French Rep. Obj. at 1-2 (D.E. 853).

Although the parties recognized that (i) foreign rightsholders needed representation at the settlement renegotiation, and (ii) absent rightsholders need an "Unclaimed Works Fiduciary" to make some future business decisions on their behalf, the parties did not put these two pieces together and offer absent rightsholders a seat at the renegotiation table.[9]

---

[7] As several objectors point out, the ASA's definition of "Book" has caused confusion about the scope of the class. *See, e.g.*, Literar-Mechana Obj.at 2-4 (D.E. 797); Carl Hanser Verlag, *et. al* Objs., at 5-10 (D.E. 868); The New Zealand Soc'y of Authors Obj. at 2-3 (D.E. 890).

[8] Some authors in Canada, the UK, and Australia continue to oppose the settlement. *See, e.g.*, Can. Ass'n of Univ. Teachers Obj. at 3 (D.E. 900).

[9] Another adequacy of representation issue may be presented if, as has been suggested by some of the plaintiffs, class representatives will opt-out of the forward-looking aspects of the agreement. ASA § 17.9 contemplates that Google has already or will soon reach bilateral deals

With respect to the owners of orphaned and other unclaimed works, the parties added the Fiduciary and also addressed the direct financial conflict by eliminating the diversion to claiming rightsholders of revenues earned on unclaimed book sales. *See* Mem. in Supp. at 9-10 (D.E. 769). While these are both steps in the right direction, it is unclear how independent the Fiduciary truly will be from the Registry. ASA § 6.2(b)(iii). Such questions should be answered expressly by the Registry's charter and other organizational documents, which should be submitted before the Court completes its scrutiny of the ASA.

### C. As Written, the ASA Requires Robust Notice, and the Record Requires Further Development of Whether Such Notice Has Been Provided

The parties have claimed that the notice provided to date is among the most extensive ever provided in a class action. The United States is not in a position to opine on whether the class settlement notice has met the strictures of Rule 23. As many parties have noted, the original settlement was an extremely complicated document, and the ASA, a no less complicated document, renders important changes thereto. What might be sufficient for notice in the garden-variety class action, however, is not sufficient here.

Accordingly, for the same reasons explained earlier, *see* U.S. SOI at 12-13 (D.E. 720), the United States believes the Court should undertake a searching inquiry to ensure both that a sufficient number of class members have been or will be reached and that the notice provided gives a complete picture of the broad scope of the ASA, which would not just extinguish class

---

with individual rightsholders that largely will supersede the ASA as to those rightsholders. To the extent those agreements involve representative plaintiffs, it raises concerns of potential conflicts of interest. *See also* U.S. SOI at 9-10 (noting that the parties believe that the largest publisher plaintiffs are likely to choose to negotiate their own separate agreements with Google, rather than being bound by the forward-looking provisions of the settlement).

members' current claims but also alter their rights in an ongoing manner for their full term of copyright protection. Special attention should be paid to foreign rightsholders.[10]

### D. "Attachment A" to the ASA Requires Careful Rule 23(e) Scrutiny

Further analysis of the ASA raises an additional concern not noted in the U.S. SOI, although it is discussed in a number of the comments filed by interested parties. Gant Obj. at 29-31 (D.E. 143); Gant Supp. Obj. at 7-8 (D.E. 855); Sci. Fiction & Fantasy Writers of Am. Obj. at 18-22 (D.E. 864). Under the ASA, highly individualized disputes between author class members and publisher class members will be addressed and resolved to allow Google, and no other entity, to use the digital rights to particular copyrighted works. Outside of this litigation, authors and publishers have disputed who owns the digital rights to particular works.[11] Such disputes typically turn on the interpretation of the specific publishing contract. They are a well-known consequence of the constant evolution of, and inherent tension between, copyright law, new technology, and new markets, and have been addressed by numerous courts often inconsistently over the years.[12]

Because the ASA implicates works that were first published between 1923 and 2009, it comes as no surprise that in many instances digital rights were not even contemplated, let alone addressed, by publishing contracts. Depending on the contract terms and applicable legal

---

[10] *See, e.g.*, Japan P.E.N. Club Obj. at 3-4 (complaining of defective notice and failure to provide Japanese translation of the ASA) (D.E. 848-2); Carl Hanser Verlag, *et al*. Objs. at 4, 17-23 (publishing and authors' associations from Germany, Switzerland, Austria, Italy, and New Zealand contending that ASA notice to foreign rightsholders was inadequate) (D.E. 868).

[11] *See, e.g.*, *Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 490 (2d Cir. 2002); Motoko Rich, *Legal Battles Over E-Book Rights to Older Books*, N.Y. Times, Dec. 12, 2009, at A1.

[12] *Compare, e.g.*, *Bourne v. Walt Disney Co.*, 68 F.3d 621, 630 (2d Cir. 1995) (grant to synchronize musical compositions to celluloid motion pictures includes video cassettes), *with Cohen v. Paramount*, 845 F.2d 851, 853-55 (9th Cir. 1988) (video cassette rights were unknown at time of original contract and thus composer had no opportunity to bargain for them).

precedent, the digital rights may have been (1) expressly reserved by the author, (2) expressly transferred to the publisher, (3) transferred in part to the publisher, or (4) completely unclear from the face of the contract, *i.e.*, subject to interpretation. Moreover, digital rights are not a monolith. It is quite conceivable that an author retained some such rights, *e.g.*, distribution of reprints to on-line book stores such as Amazon, and transferred others, *e.g.*, electronic database rights. Some rights may apply to both digital and non-digital media and may be addressed under more general labels in the contracts, *e.g.*, publication of excerpts or serializations. While such distinctions may make it more difficult to determine ownership of new rights and new markets, the fact remains that copyrights are divisible property. 17 U.S.C § 201(d)(1)-(2).

Under the ASA, Attachment A would settle globally, at least in the first instance, such disputes by "establish[ing] procedures for determining [authors' and publishers'] respective rights" to the books and revenues in question, to allow Google alone to use those copyrighted works. Attach. A at 1. To take just one example, § 6.2(c) of Attachment A sets author-publisher revenue splits for most out-of-print books. For books first published during or after 1987, publishers and authors split 50-50 the rightsholders' share of Google Books revenues. For books published prior to 1987, publishers retain 35 percent and authors 65 percent of the rightsholders' share of the revenues.

Attachment A is not analogous to an allocation of past damages in a class action setting. Attachment A seeks to resolve rights prospectively, vesting in certain authors and publishers proceeds from a copyright interest where no such interest may exist. This suggests a possible conflict of interests among these various subclasses of authors and publishers as to the terms of Attachment A, which raises serious questions concerning Rule 23(a)(4)'s adequacy requirements. *Amchem*, 521 U.S. at 625-26; *see also* Supp. Academic Author Objections at 4

n.15.  In addition, because Attachment A – even in the context of non-orphan works – will, in some circumstances, give Google the ability to use works that other competitors may not be able to use due to legal disputes over ownership and rights, it exacerbates the market dominance concerns discussed below.  Consequently, Attachment A should be subject to searching scrutiny under Rule 23(e).

## II.  The ASA Continues to Raise Antitrust Concerns

The Department of Justice continues to investigate the competitive impact of the ASA. In response to some of the concerns expressed in the U.S. SOI, the parties have made constructive revisions.  *See supra* at 1.  Despite these revisions, the ASA's collectively agreed-upon constraints on the rightsholders' relationships with Google continue to raise concerns.  In addition, Google's *de facto* exclusive access to orphan and rights-uncertain works remains unaddressed, producing a less than optimal result from a competition standpoint.

### A.  Horizontal Agreements Among Authors and Publishers

In at least three respects, the initial Proposed Settlement restricted price competition among authors and publishers:  (1) by the creation of an industry-wide revenue-sharing formula at the wholesale level applicable to all works; (2) by the setting of default prices and the effective prohibition on discounting by Google at the retail level; and (3) by the control of prices for orphan books by known publishers and authors with whose books the orphan books likely compete.  The ASA seeks to address some, but not all, of these issues.

*Industry-wide wholesale revenue sharing formula.*  The parties amended ASA § 4.5(a)(iii) to give Google the right to renegotiate the wholesale revenue split on a bilateral basis with rightsholders and to provide Google with the ability to remove rightsholders' books if those

negotiations fail.[13]  This is a positive development which should lessen the effects of problematic horizontality as to the wholesale revenue split agreement between the rightsholder collective and Google.

But this "fix" is limited in two important respects.  First, Google's ability to force a price renegotiation applies only to "Commercially Available" works.  Authors and publishers have kept in place the horizontal agreement not to compete as to price terms for works that are not "Commercially Available."[14]  This fix as to commercially available works may also be of limited impact if class-representative publishers intend to withhold many of their commercially available works from the ASA's revenue models in order to negotiate their own deals with Google as to those works.  If they do so, the result would be a corpus of works governed by the ASA comprised largely of non-commercially available works as to which authors and publishers have agreed not to compete on price.  On this point, the United States agrees with a number of commenters that the Court should inquire of the class representatives concerning their intent to be bound by the provisions of the ASA or to separately negotiate terms with Google.

The parties contend that permitting Google to renegotiate price on non-commercially available works would impose too great a burden on class members and put individual authors and small publishers at a disadvantage in potential negotiations with Google.  These concerns,

_____

[13]  Previously, the right to renegotiate price rested only with the rightsholders, most of whom are unlikely to choose to depart from the price negotiated by representatives with the bargaining power of an entire class of authors and publishers.

[14]  The breadth of "Commercially Available" works subject to a right of renegotiation might be surprisingly narrow.  The majority of "Books" covered by the settlement are not currently "Commercially Available" as defined under the agreement.  ASA § 1.31.  In addition, while the parties have represented to the United States that works available as e-books, but no longer available as new hardcopy books, would be considered "Commercially Available" for purposes of the Amended Settlement Agreement, the ASA seems ambiguous on this point.  The definition of "Commercially Available" in § 1.31 refers to a "Book," which is defined in § 1.19 as material "published . . . as a set of written or printed sheets of paper bound together in hard copy form."

while perhaps well-intentioned, do not merit antitrust protections. As discussed in the U.S. SOI, horizontal agreements of this type can be deemed *per se* unlawful. *See Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-82 (1975) (holding that price floor for legal services is illegal price fixing); *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 349 (1982) (agreement among doctors to set maximum fee they would accept for purposes of contracting with health insurers is *per se* illegal); *Catalano v. Target Sales*, 446 U.S. 643, 646-50 (1980) (per curiam) (fixing price related terms in wholesale agreements is *per se* illegal). Even under a rule of reason standard, concerns remain because Google is already negotiating bilaterally with the publishers of many of the "commercially available" works that Google will sell. Granting Google the right to include non-commercially available books in those negotiations hardly seems onerous. Moreover, it is questionable whether there are significant efficiency justifications for allowing these publishers to bring their unavailable (*i.e.*, not "commercially available") works back into commerce collectively through the ASA and its collectively set price terms, rather than allowing Google to expand its bilateral deals with authors and publishers to cover such works.

The United States recognizes the class representatives' legitimate interests under Rule 23's adequacy prong to protect the more commercially vulnerable members of the class from price negotiations with a powerful buyer such as Google. However, reliance on a classwide-negotiated price raises equally important antitrust concerns. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, at 218, 221-22 (1940) ("good intentions" of members of price-fixing combination are no legal justification for lessening price competition); *Gen. Cinema Corp. v. Buena Vista Distrib. Co.*, 532 F. Supp. 1244, 1273-74 (C.D. Cal. 1982) (protecting small, independent movie exhibitors is not a justification for horizontal agreement on price).

The second troubling limitation on § 4.5(a)(iii) is that Google's right to renegotiate as to any work is limited to the price of the works. From an antitrust perspective, price and quality (in this case, digital rights management and usage restrictions, for example) typically are two sides of the same coin – by excluding non-price terms from § 4.5(a)(iii)'s renegotiation right, rightsholders have collectively agreed not to compete against one another on quality. The parties have argued to the United States that this limitation is of no concern because § 3.7(e) of the ASA permits Google to stop distributing any work for any non-editorial reason. If § 3.7(e) in fact gives Google the power to stop distributing works in order to force a bilateral negotiation as to the non-price terms governing Google's access to any work (including "non-commercially available" works), then this argument carries force. But the ASA on its face appears to limit Google's use of § 3.7(e) to "Commercially Available" works under § 4.5(a)(iii) and it does not appear that the authors and publishers have publicly adopted the broader reading.

*Setting of default prices and the effective prohibition on discounting.* The United States does not object to Google's unilateral use of a pricing algorithm. The concern is the horizontal agreement among authors and publishers to have Google price their works that way. It is unlawful for competitors to agree with one another to delegate to a common agent pricing authority for all of their wares. *See Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-35 (1969); *Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538, 540-41 (4th Cir. 1958); *New York v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412-14 (S.D.N.Y. 2000). The United States' concerns are not addressed by "mak[ing] clear that the Pricing Algorithm will be designed to simulate how a Rightsholder would unilaterally price its Book in a competitive market." Mem. in Supp. at 6 (D.E. 769). Actual bilateral negotiations – at least where the author and/or publisher can be identified – would be far preferable from a competition standpoint.

The parties have made more progress addressing prohibitions on discounting terms, § 4.5(b)(i) & (ii), but have retained the ability of authors and publishers collectively – through the Registry – to act as a gatekeeper blocking Google and individual rightsholders from agreeing to jointly fund discounts of the rightsholder's work(s). ASA § 4.5(b)(ii). There is no apparent procompetitive rationale for this restraint.

*Control of prices for orphan works by known publishers and authors.* The initial Proposed Settlement raised antitrust concerns that the Registry's board, consisting primarily of commercial publishers and authors, would have the ability and incentive to limit competition from unclaimed works. U.S. SOI at 22 (D.E. 720). In response, the parties amended the settlement to create an "Unclaimed Works Fiduciary" vested with some management authority over unclaimed works. *See, e.g.*, ASA § 6.2. While this is a meaningful move in the right direction, concerns remain. For example, the independence of a Fiduciary serving under the Registry's board remains unclear, particularly as the Registry's charter and organizational documents were not included as part of the ASA (and have not otherwise been disclosed). In addition, the parties withheld from the Fiduciary many powers that may be necessary to protect the interests of absent rightsholders, such as the ability to renegotiate the 63:37 revenue split, § 4.5(a)(iii), the ability to set prices for works, § 4.2(b)(i)(1), and the ability to turn off the display of a work, § 3.2(e)(i) – all powers granted only to registered rightsholders. Without so empowering the Fiduciary, the defaults set and controlled by the Registry largely dictate those terms for unclaimed works.[15]

---

[15] Having a single fiduciary with power to control all unclaimed works – works that may comprise the majority of books in the settlement – also raises competitive concerns and suggests that this power should be disaggregated to some degree in order to ensure competition among unclaimed books in the future.

The United States recognizes that the purpose behind the creation of the UWF is a worthy one. The United States agrees, however, with various interested parties that additional detail and authority is needed.

**B. Google's *de facto* Exclusivity**

A core issue that arises out of the parties' effort to resolve this matter is the ability of Google, and no other entity, to compete in a marketplace that the parties seek to create. Nothing in the ASA addresses this concern.[16] The issues raised by the United States in its initial submission remain, and the Court is directed to that discussion. *See* U.S. SOI at 23-26 (D.E. 720).

There is no serious contention that Google's competitors are likely to obtain comparable rights independently. For example, Amazon – Google's likely chief rival digital book distributor were the ASA to be approved – began scanning copyright-protected books in 2002, after first securing permission of the works' rightsholder(s). To date, Amazon has amassed a library of approximately three million digital titles. *See* Amazon.com, Inc. Obj. at 1 (D.E. 206). This impressive number pales in comparison to the tens of millions of books Google has scanned or is poised to scan if the ASA is approved. The suggestion that a competitor should follow Google's lead by copying books *en masse* without permission in the hope of prompting a class action suit to be settled on terms comparable to the ASA is poor public policy and not something the antitrust laws require a competitor to do.

Attachment A to the ASA, discussed on pages 14-16, *supra*, also may provide Google with an even greater blanket of security as to its exclusivity. Other distributors cannot benefit from the accord reached in Attachment A (resolving globally author/publisher disputes as to

---

[16] The removal of the "most favored nation" clause from the settlement agreement is a positive step, although it does not mitigate Google's *de facto* exclusive rights.

digital rights). Thus, Google's rivals risk a copyright infringement suit if they try to exploit such works without resolving uncertainties about digital rights, which may be a cost-prohibitive undertaking on a work-by-work basis.

The parties suggest that Google's market power could be constrained by Google Book resellers. *See* Mem. in Supp. at 8 (D.E. 769). Under the ASA, however, Google retains its upstream monopoly (*i.e.*, ultimate control of the digital books) with the resellers providing only additional retail channels to reach more customers and thus increasing the total sales of Google Books, but without driving down their prices. Simply put, the reseller clause cannot create new competitors to Google. Moreover, the reseller program is limited to individual book sales and does not address Google's exclusivity over orphan and rights-uncertain works for purposes of the other business ventures envisioned by the ASA.

Finally, wholly apart from the new business ventures contemplated by the ASA, Google's exclusive access to millions and millions of books may well benefit Google's existing online search business.[17] Google already holds a relatively dominant market share in that market.[18] That dominance may be further entrenched by its exclusive access to content through the ASA. Content that can be discovered by only one search engine offers that search engine at least some protection from competition. This outcome has not been achieved by a technological advance in search or by operation of normal market forces; rather, it is the direct product of scanning

---

[17] The United States notes complaints raised by objectors related to the potential impact the ASA may have on search. *See, e.g.*, Open Book Alliance Obj. at 14-19 (D.E. 840); Guthrie et al. Obj. at 12 (D.E. 849); Microsoft Obj. at 15-25 (D.E. 874); AT&T Obj. at 19-21 (D.E. 863).

[18] *See* Press Release, U.S. Dep't of Justice, *Yahoo! Inc. and Google Inc. Abandon Their Advertising Agreement*, Nov. 5, 2008 (discussing Department's finding that Internet search advertising and Internet search syndication are each relevant antitrust markets and that Google is the largest provider of such services, with shares of more than 70 percent in both markets), *available at* http://www.justice.gov/opa/pr/2008/November/08-at-981.html.

millions of books without the copyright holders' consent and then using Rule 23 to achieve results not otherwise obtainable in the market.

### III. If the Court Concludes that Class Representatives May Grant to Google Wide-Ranging Rights for Forward-Looking Business Arrangements of the Entire Class, the Court Should Consider Some Additional Safeguards

Assuming resolution of antitrust issues, the United States continues to believe that an approvable settlement may be achievable here, for example, by requiring rightsholders to "opt-in" to the settlement or by narrowing both the scope of the plaintiff class and the relief, to better align with the actual dispute underlying the case. With respect to the current ASA, if the Court disagrees with the United States, and believes that the ASA's forward-looking sweep is consistent with the Court's Rule 23 authority, the United States recommends that the Court consider the following additional steps, which would mitigate the risks to rightsholders of out-of-print, unclaimed, and orphan works, and reduce some of the tension between the ASA's approach and the core principles of copyright law[19]:

First, as noted previously, an opt-in regime for the forward-looking aspects of the settlement would address many concerns.

Second, to the extent the Court believes an "opt-out" or partial "opt-out" settlement structure may be possible under Rule 23 and copyright law, the United States believes there would be real value in creating a meaningful waiting period before Google may commercially exploit out-of-print works without the permission of the rightsholder (*e.g.*, two years from the time the title is publicly listed in the Registry). Such a waiting period, combined with efforts of the Registry to locate rightsholders, may reduce the number of rightsholders whose works would be exploited without their knowledge and lessen the concerns about the impact of the settlement

---

[19] These alternatives primarily address the Rule 23 and copyright issues discussed above; we believe that the parties should also address the antitrust issues discussed in Section II.

on absent class members.  Such a waiting period, combined with a diligent search for rightsholders, would more closely align with the sorts of protections that regularly have been proposed in orphan works legislation.

Third, the Court could delay or condition acceptance of the ASA, subject to work by the UWF and the Registry to set standards designed to further reduce the volume of unclaimed works after expiration of the waiting period.  This exercise would be an ongoing process that would build on evolving practices and technological tools.

Fourth, at the expiration of the mandatory waiting period, a modified version of the ASA could require a reasonably diligent search for the rightsholder by either Google or the Registry, and public disclosure of the results of that search, before the opt-out provisions of the ASA can apply to exploitation of new commercial products with respect to out-of-print works.

Fifth, the definition of "Book" in ASA § 1.19 could be qualified with respect to foreign rightsholders to capture those books that are (1) "United States work[s]" as defined in 17 U.S.C. § 101 and registered with the U.S. Copyright Office, or (2) if first published in Canada, the UK, or Australia, were also published in the United States at a later date or registered with the U.S. Copyright Office.  This would provide greater clarity as to which copyright holders would be subject to the modified ASA and would mitigate some of the foreign authors and publishers' continuing objections.

Sixth, assuming the Court is inclined to permit Google to commercially exploit the unclaimed works of rightsholders who have not opted in to the settlement, the Court should consider limiting that exploitation to a defined term, such as five or ten years, after which period the marketplace could be reassessed.  At the end of this limited license term, renewal of the license could be negotiated by the Registry.  Alternatively, the Court could retain jurisdiction

over the case for the sole purpose of reviewing whether the term should be extended or revised upon its expiration.

Seventh, a modified version of the ASA could reflect the parties' agreement to comply with the terms of any copyright legislation enacted in the future governing areas addressed by the modified ASA and assurances that the ASA itself does not become an impediment to future legislation addressing orphan works.

Finally, the United States recognizes that if, as discussed *supra*, class representatives lack the power under Rule 23 to grant Google the power to exploit broadly the digital rights of class members to sell books, create subscription libraries, etc., then neither the class representatives nor Google possesses the power to authorize such activity by third parties. However, if the Court determines that the class representatives possess such rights as to Google, then the Court should carefully examine whether there exists a means for rival distributors to access orphan and rights-uncertain works consistent with Rule 23.

## CONCLUSION

Despite the commendable efforts of the parties to improve upon the initial Proposed Settlement, many of the problems previously identified with respect to the original settlement remain in the ASA. The United States remains committed to working with the parties on the settlement's scope and content.

Respectfully submitted,


WILLIAM F. CAVANAUGH                    PREET BHARARA
U.S. Department of Justice                    United States Attorney
Deputy Assistant Attorney General,
Antitrust Division                        By:     /s/  John D. Clopper
950 Pennsylvania Avenue, NW              JOHN D. CLOPPER
Washington, DC 20530                  Assistant United States Attorney
Telephone: (202) 353-1535               86 Chambers Street
                                     New York, NY 10007
                                     Telephone: (212) 637-2716
                                     Facsimile: (212) 637-0033
                                     john.clopper@usdoj.gov


Dated:  February 4, 2010

CERTIFICATE OF SERVICE

I, John D. Clopper, do hereby certify that on the 4th day of February, 2010, I caused a

true and correct copy of the foregoing STATEMENT OF INTEREST OF THE UNITED

STATES OF AMERICA REGARDING PROPOSED AMENDED SETTLEMENT

AGREEMENT to be served electronically via the CM/ECF system on the lead attorneys to be

noticed in this matter, including those counsel of record identified below.


        /s/ John D. Clopper
        JOHN D. CLOPPER


Michael J. Boni, Esq.
Joanne Zack, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004


Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022


Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri Lemley Roberts & Kent LLP
332 Pine Street, Suite 200
San Francisco, CA 94104