USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/4/10

26 January 2010

JAN 29

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

05 civ 8136 (DC)

Dear Sir:

As literary agents whose clients are impacted by The Amended Google Book Settlement, we submitted separate objections to the Original Settlement. Our initial objections were the result of intensive study of the settlement, countless hours of reading, web seminars offered by the Authors Guild and The Copyright Clearance Center, and discussions with clients and colleagues in the publishing industry.

Since its filing, we have spent more than one hundred additional hours actively scrutinizing the Amended Settlement Agreement, consulted directly with representatives of the Authors Guild and Google, read a majority of the other objections filed with the court, re-familiarized ourselves with current copyright law and considered the commentary and criticism issued by parties on all sides of the issues under review.

While we were pleased to find that our concerns were shared by many other parties, including members of the legal profession and other experts who have studied class action law, we are disappointed that the amendments to the settlement do not address most of the objections and seem primarily designed to appease foreign entities and to address anti-trust concerns. We have left the final decision about opting out of the settlement to our clients, some of whom have decided to stay in and have us administer/claim their books and inserts on their behalf. However, our overall recommendation to our clients is to opt out of the settlement. Following are our reasons why.

None of the legal issues that seriously question whether the settlement is an appropriate use of the class action mechanism or, in fact, a complicated business arrangement in place of one, have been addressed. Moreover, the amended settlement's concessions to foreign copyright holders, which effectively exclude them from the settlement unless they choose to opt in, have not been extended to the U.S. and other English language territories, as suggested by numerous objections, including that of the U.S. Justice Department. The argument that an opt-in solution would be unworkable strikes us as ridiculous. A thriving publishing business and a quickly expanding digital publishing market is already growing without having abandoned the opt-in model that protects authors' rights and maintains standards of copyright protection, not to mention contract law. The only market that would be

restrained by an opt-in arrangement would be Google's. They would be forced to follow the same rules as any other publisher.

Despite our thorough education about the terms of the settlement, we remain unsettled and unconvinced that remaining a member of the class is the best option. The long settlement document, which combines incomprehensible legalese with vaguely and undefined terms, is too complex to be understood by copyright holders and their representatives, especially because until now, copyright holders were not required to defend their rights from what amounts to a hostile appropriation of those rights—in effect a non-negotiable contract, an arbitrary deadline, and only a choice to be in or out. Over and over, we hear confusion from our colleagues and peers in the industry, who don't feel confident enough in their understanding of the agreement to choose between remaining a member of the class and the "negative option"—opting out. Another huge group of authors have never even heard about the settlement and don't even know it applies to them. Many others have relied on incomplete or inaccurate press reports for their understanding of the Amended Settlement. With a class so large, proper notification may be impossible, or at least financially unfeasible.

We believe that more time is needed for this crucial decision. The deadline for opting out still seems to occur far in advance of a finalized settlement. It's like asking our clients to sign a contract that isn't quite finished. Likewise, though there seems to have been an attempt at a simplification of the claiming process, the very nature of the task that needs to be accomplished—identifying copyrighted material in books and as inserts—will defy most methods of simplification and remains a gargantuan task for anyone with a full publishing history and a history of reprints in anthologies and textbooks. It will still require hours and hours of policing by authors, publishers and agents and will create conflicts between those parties.

The settlement is based on an oversimplified understanding of a business that is a tangled web of carefully customized licenses and agreements. We provided the parties (via the Authors Guild) with a spreadsheet containing records of over five thousand Insert licenses for selections from our authors' works in textbooks, scholarly books and anthologies, all of which will need to be identified and claimed, not in pursuit of the $15 compensation, but to keep them from easy public view, where their value would be greatly diminished. These records represent only a portion of the licenses issued since our offices were computerized. We have not even begun to cull the paper licenses that preceded them. No matter how much the process of claiming is simplified, it will always be an undue burden on the copyright holder. And there has been no serious attempt to warn the editors and publishers of those textbooks, scholarly books and anthologies about the risk of displaying pages containing third-party licensed material for which they may not control electronic rights. Presumably we must either find them and claim them as they appear in the Google Book Search or issue DMCA complaints for each one.

We have come to believe that the settlement is worse than the problem it purports to correct. As fierce protectors of our authors' copyrights, we remain outraged that Google is scanning books without copyright holders' permission, posting "snippets" and using them as bait for advertising. But in its overreach, the Amended Settlement, by forcing our clients to negotiate a limited and ill-defined set of variables in a de facto license to their work, puts them in a vastly more complicated and onerous situation and exposes their work to greatly increased risk of devaluation. And, most importantly, the settlement does nothing to restrict Google's continued scanning and commercial use of copyrighted material. That, one assumes, will be the subject of a future settlement.

The parties to the settlement have been quick to point out the harsh legal realities and the uncertain outcomes that might have resulted from the litigation of this case. And we would welcome a settlement that set right the wrongs of the past, adequately compensated authors for the infringements of their copyrights and set a secure course for the future. Unfortunately, the Amended Google Book Search Settlement accomplishes none of these things. What it does, in fact, is exempt Google from the restrictions imposed by decades of copyright law, invalidates carefully negotiated contracts and licenses and leaves authors and creators of copyrighted work in an extremely vulnerable position. A simpler settlement—and one that could be understood by a majority of rights holders—was possible. We might also have appreciated the result of a completed litigation of this case—a legal decision that once and for all defined fair use, which is perhaps the most misunderstood aspect of copyright protection.

By far, one of the most troubling aspects of the settlement terms is the vague and uncertain future for those who opt out. Will Google respect their wishes to keep their books and inserts from display and out of the revenue models? Have they given adequate warning to members of the Author and Publisher Sub-Classes about the use of third-party licensed inserts in the books they will be displaying? Why hasn't the simplified claiming process been extended to those rights holders who opt out? Will rights holders who opt out have access to the Rights Registry in order to resolve disputes between members of the class and those who have opted out?

As literary agents, we felt that it was our responsibility to fully investigate the terms and issues surrounding the settlement so that we would be able to inform and advise our clients, but in the end, even though we are likely among the best-educated about the settlement, we are still at a loss for a decision we can feel fully confident is the right one.

By accepting this settlement, the court will be setting a highly questionable precedent, usurping the role of the legislature by creating a legal loophole for one corporation and reversing the very foundation of copyright protection. We who have devoted our lives to assisting the work of creative individuals are left with a sense of moral indignation. We have pledged, in our contracts with clients, to sell or license their

rights to ethically and financially sound purchasers and licensees. And for many years we have toiled over agreements and contracts in order to accomplish this, aided by the protections of the law. The situation we find ourselves in now is one of dismay and powerlessness, with only the weak ability to "object" or opt out. We beseech you to give authors back their rights. Force Google to negotiate like any other publisher. And let us get back to work.

Sincerely,

Stuart Bernstein
Representation for Artists
63 Carmine Street, 3D
New York, NY 10014

Susan Bergholz
Susan Bergholz Literary Services
17 West 10th Street
New York, NY 10011

cc via email to:
Counsel for the Author Sub-Class: bookclaims@bonizack.com
Counsel for the Publisher Sub-Class: bookclaims@debevoise.com
Counsel for Google: bookclaims@durietangri.com