UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et al.,<br><br>                    Plaintiffs,<br><br>      v.<br><br>Google Inc.<br><br>                    Defendant. | Case No. 05 CV 8136 (DC) |

**BRIEF OF GOOGLE INC. IN SUPPORT OF
MOTION FOR FINAL APPROVAL
OF AMENDED SETTLEMENT AGREEMENT**

Daralyn J. Durie (*pro hac vice*)
Joseph C. Gratz (*pro hac vice*)
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666
Facsimile: (415) 236-6300
ddurie@durietangri.com
jgratz@durietangri.com

*Attorneys for Defendant Google Inc.*

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   ARGUMENT ........................................................................................................ 2

A.  The negotiated terms of the settlement reflect a reasonable compromise. ............................. 2

B.  There is widespread support for settlement approval among class members. ........................ 3

C.  This Court has the power to approve the ASA. ................................................. 5

  1.  Settlement approval is a proper exercise of judicial power, and does not interfere with legislative prerogatives. .......................................................... 5

  2.  The ASA properly resolves claims relating to activities that will continue in the future. ....................................................................................................... 7

    a.  Courts routinely approve settlements affording prospective relief. ........................... 8

    b.  The ASA meets the *Firefighters* criteria. .................................................. 14

      (i)   The ASA springs from and serves to resolve a dispute within the court's subject-matter jurisdiction. ............................................... 15

      (ii)  The ASA comes within the general scope of the case made by the pleadings. ............................................................................ 17

      (iii) The ASA furthers the objectives of the Copyright Act ..................................... 18

    c.  The identical factual predicate doctrine does not defeat approval here. .................. 20

D.  The ASA enhances consumer welfare and is consistent with the antitrust laws. ................. 28

  1.  The ASA expands output and reduces entry barriers for every category of books. ...................................................................................................... 32

    a.  Books for individual purchase. ......................................................... 32

    b.  Institutional subscriptions. ............................................................ 35

  2.  The ASA does not violate Section 1 of the Sherman Act ........................................ 36

    a.  *Per se* treatment is inappropriate because there is no horizontal agreement that eliminates competition among competitors. .................................... 36

    b.  Even if there were a horizontal agreement, under *BMI* these provisions should be analyzed under the rule of reason. ........................................... 39

    c.  The ASA's individual purchase provisions are reasonably related to the settlement's procompetitive purposes and lack anticompetitive effects. ................. 42

      (i)   Revenue split ....................................................................... 42

      (ii)  Pricing algorithm ................................................................... 44

      (iii) Discounting ......................................................................... 46

    d.  The institutional subscription pricing provisions are lawful under the rule of reason. ............................................................................ 47

  3.  The ASA does not violate Section 2 of the Sherman Act ........................................ 49

TABLE OF CONTENTS (CON'T)

PAGE NO.

E.  The ASA is fair to third parties.............................................................................51

    1.  The ASA does not harm libraries or other digitization efforts. ...................52

    2.  The objections relating to user privacy have no merit.................................53

F.  The remaining objections raised by class members are addressed in the ASA. ..................57

    1.  Google's database of information about Books is already comprehensive and will be improved. ...................................................................................57

    2.  Rightsholders can reasonably determine whether they registered their pre-1978 Books with the Copyright Office. ..................................................60

    3.  Google is taking appropriate steps to safeguard the security of Rightsholders' Books. ...............................................................................63

        a.  Digital copies of books are protected from unauthorized access............................64

        b.  The services authorized in the ASA will not be available to users outside the United States. ..............................................................64

    4.  The amended Removal provisions provide control to class members and certainty to libraries. ...............................................................................65

    5.  The Settlement properly provides access to old and outdated books. ...........................66

III.  CONCLUSION ......................................................................................... 66

TABLE OF AUTHORITIES

PAGE NO.

## Cases

*Alvarado v. Memphis-Shelby County Airport Authority*,
  No. 99-5159, 2000 WL 1182446 (6th Cir. Aug. 15, 2000)................................13, 14
*Am. Med. Ass'n v. United Healthcare Corp.*,
  No. 00-Civ-2800 (LMM), 2009 WL 4403185 (S.D.N.Y. Dec. 1, 2009) ..................28
*Arizona v. Maricopa County Medical Society*,
  457 U.S. 332 (1982) ...............................................................................................40
*Ass'n for Disabled Americans v. Amoco Oil*,
  211 F.R.D. 457 (S.D. Fla. 2002) ............................................................................28
*Authors Guild v. Google Inc.*,
  92 U.S.P.Q.2d 1952 (S.D.N.Y. 2009) .....................................................................25
*Barkema v. Williams Pipeline Co.*,
  666 N.W.2d 612 (Iowa 2003)..................................................................................12
*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ............................................................................................45
*BMI v. CBS*,
  441 U.S. 1 (1979) ............................................................................................ *passim*
*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
  441 U.S. 1 (1979)....................................................................................................30
*Catalano, Stores Inc. v. Target Sales*,
  446 U.S. 643 (1980) ..........................................................................................40, 46
*Cent. States S.E. & S.W. Areas Health and Welfare Fund v. Merck-Medco Managed
  Care, L.L.C.*,
  504 F.3d 229 (2d Cir. 2007)......................................................................................3
*Citizen Publ'g Co. v. United States*,
  394 U.S. 131 (1969) ................................................................................................45
*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)......................................................................................2
*Columbia Broadcasting Sys., Inc. v. Am. Soc. Of Composers, Authors & Publishers*,
  620 F.2d 930 (2d Cir. 1980).....................................................................................47
*Coregis Ins. Co. v. American Health Found., Inc.*,
  241 F.3d 123 (2d Cir. 2001).....................................................................................26
*Denney v. Deutsche Bank AG*,
  443 F.2d 253 (2d Cir. 2006)....................................................................................28
*Denney v. Jenkens & Gilchrist*,
  230 F.R.D. 317 (S.D.N.Y. 2005)..............................................................................28

TABLE OF AUTHORITIES (CON'T)

PAGE NO.

*Duran v. Carruthers*,
  885 F.2d 1485 (10th Cir. 1989)..................................................................9

*E.E.O.C. v. Bell Atl. Corp.*,
  No. 97 Civ. 6723(DC), 2002 WL 31260290 (S.D.N.Y. Oct. 9, 2002) .....................3

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) ..........................................................................18

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
  499 U.S. 340 (1991) ..........................................................................18

*Fox Film Corp. v. Doyal*,
  286 U.S. 123 (1932) ......................................................................18-19

*Frew v. Hawkins*,
  540 U.S. 431 (2004)............................................................................9

*General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
  744 F.2d 588 (7th Cir. 1984)................................................................39

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975) ..........................................................................40

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975)................................................................31

*In re "Agent Orange" Prod. Liab. Litig.*,
  818 F.2d 179 (2d Cir. 1987)..................................................................9

*In re Adelphia Communications Corp. Securities & Derivative Litigation*,
  272 Fed. Appx. 9 (2d Cir. 2008) ..........................................................27

*In re Auction Houses Antitrust Litig.*,
  138 F. Supp. 2d 548 (S.D.N.Y. 2001)....................................................22

*In re Auction Houses Antitrust Litig.*,
  164 F. Supp. 2d 345 (S.D.N.Y. 2001)....................................................22

*In re Auction Houses Antitrust Litigation*,
  No. 00 Civ. 0648 (LAK), 2001 WL 170792 (S.D.N.Y. 2001),
    *aff'd*, 42 Fed. Appx. 511 (2d Cir. 2002)...................................21, 22, 24

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981)................................................................20

*In re Currency Conversion Fee Antitrust Litig.*,
  No. 01 MDL 1409, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) ......................28

*In re Gen. Am. Life Ins. Co. Sales Practices Litig.*,
  357 F.3d 800 (8th Cir. 2004)................................................................20

*In re Holocaust Victim Assets Litig.*,
  105 F. Supp. 2d 139 (E.D.N.Y. 2000)......................................................6

TABLE OF AUTHORITIES (CON'T)

PAGE NO.

*In re Initial Public Offering Sec. Litig.*,
 260 F.R.D. 81 (S.D.N.Y. 2009)......................................................................28

*In re Insurance Brokerage Antitrust Litigation*,
 No. 04-5184 (GEB), 2007 WL 2589950 (D.N.J. Sep. 4, 2007)................................63

*In re Joint Briefing of Issues on Appeal from Trans-Alaska Pipeline Liability Fund*,
 No. 94-35219, 1995 WL 138573 (9th Cir. March 24, 1995) ....................................62

*In re Literary Works in Elec. Databases Copyright Litig.*,
 509 F.3d 116 (2d Cir. 2007)........................................................................61

*In re Metro Life Derivative Litig.*,
 935 F. Supp. 286 (S.D.N.Y.1996).................................................................2-3

*In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.*,
 718 F. Supp. 1099 (S.D.N.Y. 1989)..................................................................3

*In re WorldCom, Inc. Sec. Litig.*,
 No. 02 Civ. 3288(DLC), 2007 WL 1946685 (S.D.N.Y. July 5, 2007) ....................26

*In re WorldCom, Inc. Sec. Litig.*,
 No. 02Civ3288 (DLC), 2007 WL 2994395 (S.D.N.Y. Oct. 16, 2007) ....................27

*In the Matter of GeoCities*,
 FTC Docket No. C-3850 ...........................................................................55

*Ingles v. Toro*,
 438 F. Supp. 2d 203 (S.D.N.Y. 2006)...............................................................2

*Jeff D. v. Kempthorne*,
 365 F.3d 844 (9th Cir. 2004)..........................................................................9

*Kozlowski v. Coughlin*,
 871 F.2d 241 (2d Cir. 1989).........................................................................10

*Learner v. Marvin Lumber & Cedar Co.*,
 No. 08-CV-177 JL, 2008 WL 5285028 (D.N.H. Dec. 19, 2008).............................27

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
 551 U.S. 877 (2007) ........................................................................30, 39, 45

*Levin v. Miss. River Corp.*,
 59 F.R.D. 353 (S.D.N.Y. 1973)....................................................................10

*Local Number 93, International Association of Firefighters v. City of Cleveland*,
 478 U.S. 501 (1986) ........................................................................... *passim*

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
 542 F.3d 290 (2d Cir. 2008) .................................................................. *passim*

*Martens v. Smith Barney, Inc.*,
 181 F.R.D. 243 (S.D.N.Y. 1998)...................................................................21

TABLE OF AUTHORITIES (CON'T)

PAGE NO.

*Matthew Bender & Co., Inc. v. West Publ'g Co.*,
   Case No. 94 Civ 0589, 1996 WL 223917 (S.D.N.Y. May 2, 1996),
   *aff'd*, 158 F.3d 674, 678-79 (2d Cir. 1998) ........................................................15, 16

*Miller v. Woodmoor Corp.*,
   No. 74-F-988, 1978 WL 1146 (D. Colo. Sept. 28, 1978) ........................................10

*National Super Spuds, Inc. v. New York Mercantile Exchange*,
   660 F.2d 9 (2d Cir. 1981) ........................................................................ *passim*

*NCAA v. Board of Regents*,
   468 U.S. 85 (1984) ........................................................................28, 30

*New York v. St. Francis Hosp.*,
   94 F. Supp. 2d 399 (S.D.N.Y. 2000) ................................................................45

*Pacific R.R. v. Ketchum*,
   101 U.S. 289 (1880) ........................................................................9

*Patterson v. Stovall*,
   528 F.2d 108 (7th Cir. 1976)................................................................20

*Phillips v. Audio Active Ltd.*,
   494 F.3d 378 (2d Cir. 2007)................................................................26

*Random House v. Rosetta Books, LLC*,
   150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd per curiam*, 283 F.3d 490 (2d Cir. 2002)............33

*Reed Elsevier, Inc. v. Muchnick*,
   129 S. Ct. 1523 (2009) ........................................................................61

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ........................................................................28-29

*Robertson v. Nat'l Basketball Ass'n*,
   72 F.R.D. 64 (S.D.N.Y. 1976)................................................................10

*Robertson v. Nat'l Basketball Assoc.*,
   556 F.2d 682 (2d Cir. 1977) ................................................................31

*Sansom Comm. v. Lynn*,
   735 F.2d 1535 (3d Cir. 1984)................................................................9

*Smith v. Sprint Commc'n Co. L.P.*,
   No. 99C3844, 2003 WL 103010 (N.D. Ill. Jan. 10, 2003)........................................13

*Spark v. MBNA Corp.*,
   48 Fed. Appx. 385 (3d Cir. 2002) ................................................................62

*Spectrum Sports, Inc. v. McQuillan*,
   504 U.S. 447 (1993) ........................................................................31

*Starter Corp. v. Converse, Inc.*,
   84 F.3d 592 (2d Cir. 1996)................................................................15

TABLE OF AUTHORITIES (CON'T)

PAGE NO.

*State Oil Co. v. Khan*,
 522 U.S. 3 (1997) ........................................................................................................39
*Taft v. Ackermans*,
 No. 02Civ7951 (PKL), 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ........................28
*Tattered Cover, Inc. v. City of Thornton*,
 44 P.3d 1044 (Colo. 2002) .........................................................................................56
*TBK Partners, Ltd. v. Western Union Corp.*,
 675 F.2d 456 (2d Cir. 1982) ...........................................................................22, 23, 24
*Texaco Inc. v. Dagher*,
 547 U.S. 1 (2006) ........................................................................................................30
*Toys "R" Us, Inc. v. FTC*,
 221 F.3d 928 (7th Cir. 2000) ......................................................................................44
*Uhl v. Thoroughbred Technology and Telecommunications, Inc.*,
 309 F.3d 978 (7th Cir. 2002) ......................................................................................12
*UniSuper Ltd. v. News Corp.*,
 898 A.2d 344 (Del. Ch. 2006) ....................................................................................26
*United States v. BP Exploration & Oil Co.*,
 No. 96-cv-00095 (N.D. Ind. filed Sept. 18, 2009) ....................................................11
*United States v. Charles George Trucking*,
 34 F.3d 1081 (1st Cir. 1994) ......................................................................................17
*United States v. Cinergy Corp.*,
 No. 199-cv-01693 (S.D. Ind. filed Dec. 22, 2009) ....................................................11
*United States v. First United Security Bank*,
 No. 09-0644 (S.D. Ala. filed Nov. 18, 2009) .............................................................11
*United States v. Grinnell Corp.*,
 384 U.S. 563 (1966) ....................................................................................................31
*United States v. Kerr-McGee Corp.*,
 No. 07-CV-01034, 2008 WL 863975 (D. Colo. March 26, 2008) .............................17
*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) ................................................................................30, 49
*United States v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940) ....................................................................................................40
*Va. Excelsior Mills, Inc. v. FTC*,
 256 F.2d 538 (4th Cir. 1958) ......................................................................................45
*Verizon Communications v. Law Offices of Curtis V. Trinko*,
 540 U.S. 398 (2008) ....................................................................................................50

TABLE OF AUTHORITIES (CON'T)

PAGE NO.

*W. Va. v. Chas. Pfizer & Co.*,
  440 F. 2d 1079 (2d Cir. 1971).................................................................31
*Wal-Mart Stores, Inc. v. Visa U.S.A, Inc.*,
  396 F.3d 96 (2nd Cir. 2005)..........................................................6, 25, 26
*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)...........................................................22, 23
*Wellman v. Dickinson*,
  497 F. Supp. 824 (S.D.N.Y. 1980),
  *aff'd by order*, 647 F.2d 163 (2d Cir. 1981)................................21
*Wembley, Inc. v. Superba Cravats, Inc.*,
  315 F.2d 87 (2d Cir. 1963)...........................................................15
*White v. Nat'l Football League*,
  822 F. Supp. 1389 (D. Minn. 1993) ..............................................10
*Wright v. Stern*,
  553 F. Supp. 2d 337 (S.D.N.Y. 2008)...........................................2

**Statutes, Rules, and Constitutional Provisions**

5 U.S.C. § 45.................................................................................55
Fed. R. Civ. P. 23..........................................................................3
U.S. CONST. Art. I.........................................................................18

**Other Authorities**

3 PHILIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
  ¶ 651 (3d. ed. 2009)....................................................................49
4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS
  § 13:69 (4th ed. 2002) ................................................................3
7 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
  ¶ 1462 (2d ed. 2003) ..................................................................36
Barbara Ringer,
  Study No. 31: Renewal of Copyright (1960) ................................29
Brief for the United States as *Amicus Curiae* in *American Needle, Inc. v. NFL,*
  No. 08-661 (September 25, 2009)...............................................36
Dep. Asst. Atty. Gen. Philip J. Weiser, *Innovation, Entrepreneurship, and the*
  *Information Age* (Jan. 31, 2010), *available at*
  http://www.justice.gov/atr/public/speeches/254806.htm ........................31

TABLE OF AUTHORITIES (CON'T)

PAGE NO.

Einer Elhauge, *Why the Google Books Settlement is Procompetitive*
   18-25 (Harvard Law Sch. Law & Econs. Discussion Paper No. 646 and Harvard Law
   Sch. Pub. Law & Legal Theory Research Paper No. 09-45) (Dec. 30, 2009), *available*
   *at* http://ssrn.com/abstract=1459028 ..................................................................29, 44, 45, 51
Erik Brynjolfsson et al., *Consumer Surplus in the Digital Economy: Estimating the*
   *Value of Increased Product Variety at Online Booksellers,*
   49 Mgmt. Sci. 1580 (2003) ........................................................................................................33
*Response to Notice of Inquiry Regarding Orphan Works,*
   *at* http://www.copyright.gov/orphan/comments/OW0681-Google.pdf (March 25, 2005) ..........6
United States Copyright Office,
   *Circular 22: How to Investigate the Copyright Status of a Work, at*
   http://www.copyright.gov/circs/circ22.pdf ..............................................................................61

I.       INTRODUCTION

The purpose of copyright law is to promote the creation and distribution of expressive works.  The Amended Settlement Agreement (ASA) advances this purpose as much as any case or agreement in copyright history.  Google will make available to the reading public books that otherwise would be available only to those with access to the most rarefied university collections.  It has negotiated the terms of that access with representatives of authors and publishers.  The ASA embodies the reasoned agreement of these parties as to the best way for authors and publishers to make their books available to the public and to profit from the distribution of their works.

The purpose of the class action device is to aggregate large numbers of claims and to resolve them fairly and efficiently.  The ASA furthers these purposes as well.  Any author who does not like the ASA's terms going forward does not have to live with them.  A simple notice at any time restores such authors substantially to their present position, with the settlement proceeds in their pocket.

No one seriously disputes that the ASA advances these dual purposes.  No one seriously disputes that approval of the settlement will open the virtual doors to the greatest library in history, without costing authors a dime they now receive or are likely to receive if the settlement is not approved.  Nor does anyone seriously dispute, though few objectors admit, that to deny the settlement will keep those library doors locked while inviting costly, fragmented litigation that could clog dockets around the country for years.

The objectors raise anxieties about the ASA but do not identify harms it will cause.  They raise anxieties about the scope of the ASA but fail to ground them in pertinent doctrine and offer no practical alternatives.  Competitors such as Amazon raise anxieties about Google's potential

1

market position, but ignore their own entrenched market dominance.  Anxieties about what might be best for a particular objector should not become fatal to what is undoubtedly extraordinarily good for all class members and for the general public.  The ASA should be approved because it complies with the letter of the relevant laws and advances their purposes beyond measure.  The benefits of approval are bounded only by the limits of human creativity and imagination.  The costs of disapproval are equally large.

II.    **ARGUMENT**

      **A.    The negotiated terms of the settlement reflect a reasonable compromise.**

    "A settlement is a compromise; it achieves a measure of success for both sides, and it eliminates the risks that accompany continued litigation, including the risk that a trial would result in no recovery at all."  *Wright v. Stern*, 553 F. Supp. 2d 337, 339 (S.D.N.Y. 2008).  The objectors to the ASA have lost sight of this basic fact.  Some objectors hypothesize that different settlement terms could provide greater benefits to a particular constituency.  No doubt that is true. Nothing follows from the point, which is always true when parties settle.

    The ASA reflects the results of two years of heavily debated, arms-length negotiation by the parties best suited to resolve the relevant issues, including further negotiations after the settlement was initially presented for approval. In deciding whether to approve the ASA, "the court is not to substitute its judgment for that of the parties, nor is it to turn consideration of the adequacy of the settlement 'into a trial or a rehearsal of the trial.'"  *Ingles v. Toro*, 438 F. Supp. 2d 203, 211 (S.D.N.Y. 2006) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974)).  "Rather, the Court's responsibility is to reach an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated and to form an educated estimate of the complexity, expense and likely duration of such litigation and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  *In re Metro.*

*Life Derivative Litig.*, 935 F. Supp. 286, 292 (S.D.N.Y. 1996) (internal quotations and modifications omitted).[1] As we show below, these considerations overwhelmingly favor approval of the ASA.

> ### B.      There is widespread support for settlement approval among class members.

This settlement contains benefits for libraries, schools, academic researchers, disadvantaged populations, and disabled people that would be impossible to achieve by any other means.[2] But approval does not require or turn on these benefits; the class members' interests are paramount. If the settlement is "fair, reasonable, and adequate" in its treatment of class members, it should be approved. Fed. R. Civ. P. 23.

The best representatives of authors and publishers support the ASA. In addition to the support of associational plaintiffs the Authors Guild and the Association of American Publishers, the settlement has garnered support from numerous groups of class members worldwide. The Society of Authors in the United Kingdom supports the ASA, because "at a time when the

---

[1] Many of those complaining about the settlement's terms are not themselves class members, and are thus not parties to this case. "Nonparties to a settlement generally do not have standing to object to a settlement of a class action." *Cent. States S.E. & S.W. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 13:69 (4th ed. 2002)). Only class members have standing to object, because "[o]nly class members and the defendants will be bound by these proceedings and only they have a financial interest in the outcome of this litigation." *In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1108 (S.D.N.Y. 1989). *See E.E.O.C. v. Bell Atl. Corp.*, No. 97 Civ. 6723(DC), 2002 WL 31260290, at *5 (S.D.N.Y. Oct. 9, 2002) ("These objectors are not members of the class, and have no legal standing to object."). Others, such as Amazon, Microsoft, and AT&T, may technically be class members but object based on other business interests unrelated to their status as Rightsholders in Books or Inserts.

[2] Letters of support were filed by a broad and diverse array of organizations collectively representing tens of millions of Americans, including the Leadership Conference on Civil Rights, Docket Item ("D.I.") 342, the League of United Latin American Citizens, D.I. 130, the National Federation for the Blind, D.I. 858, the American Association for People with Disabilities, D.I. 125, the United States Students' Association, D.I. 138, the National Association for Federally Impacted Schools, D.I. 128, the National Association for Equal Opportunity in Higher Education, D.I. 350, the Howard University Institute for Intellectual Property and Social Justice, D.I. 353, and the National Grange, D.I. 359.

creative industries are struggling to find 'new models' for the digital age which can satisfy both rights holders and users, the Google Book Settlement offers a reasonable and practical way forward."  D.I. 876 at 2.  The Authors' Licensing and Collecting Society in the United Kingdom, which administers royalty payments to British authors, explained that "UK Writers overwhelmingly support the proposed Settlement because it offers a new opportunity to advance authors' rights and interests, providing them with a new channel of revenue and giving them control over how their works are used online."  D.I. 457 at 2.[3]

Individual class members, too, have expressed their support for the settlement.  Author Sub-Class member Gregory Crane, Chair of the Department of Classics at Tufts University, wrote to the Court from several perspectives: as a Classicist, for whom "the Google collection can be for us comparable to historic projects such as the Human Genome and the Sloan Sky Survey;" as a Professor, for whom "the Google Collection can be a foundation for the reinvention of our field, as we explore larger, more challenging research projects than were ever feasible before and as we teach our students to think critically about thousands of years of scholarship;" as a humanist, for whom "[a]ccess to Google's collection would be an extraordinary step forward;" and "as a father of two children now in college," writing "with a particular sense of urgency, for I have a profound sense of what the Google Books Collection

---

[3] Similarly, The Publishers Association in the United Kingdom supports the ASA, because it provides that "Rightsholders can assert a level of control over their works for which they otherwise might have had to bring a costly and time-consuming suit against Google in the US."  D.I. 825 at 2.  The Australian Publishers' Association "supports the inclusion of its members' books in the Amended Settlement" and "asks the court to accept and approve the Amended Settlement in the form in which it currently appears."  D.I. 830 at 1-2.  The members of the Canadian Publishers' Council, representing Canada's large publishers, "are supportive of the Amended Settlement and unanimously voted so at a meeting of member CEOs in December, 2009."  D.I. 826 at 2.  The members of the Association of Canadian Publishers, representing Canada's independent publishers, also "consider the amended Settlement to be in the best interest of the majority of [its] members[.]"  D.I. 877.

means for intellectual life and for the intellectual development of our students." D.I. 383 at 1-2.

Professor Crane wrote that the settlement is "is a watershed event and can serve as a catalyst for the reinvention of education, research and intellectual life." *Id.* at 1. Author Sub-Class member Dr. Seuss Enterprises, L.P. noted that "[t]he settlement may offer a new opportunity for authors of out-of print works to find new audiences and new sources of income for their works," thereby providing "an important benefit for the authors' community, for readers and for researchers." D.I. 379 at 1. And a group of fifteen members of the Stanford University Computer Science Department wrote to support the settlement because "[i]f the settlement dissolves because of the dissident voices that have commented to the Court—from a minority, some of whom speak from narrow motives of self-interest—then our cultural and societal future will have suffered a severe blow." D.I. 302 at 3.

These voices are entitled to far greater weight than the hypothetical concerns of objectors with their own individual agendas. They state fundamental truths the objectors ignore. Authors are also readers, and authors, as consumers as well as producers of literary works, benefit from the radical increase in available books made possible by the ASA. And, as the Society of Authors' comments make clear, authors have been struggling to find a way to make the digitization of their works inure to their benefit. There is no higher praise for the ASA than that it offers a "reasonable and practical way forward" for authors and publishers in the digital age.

### C.    This Court has the power to approve the ASA.

#### 1.    Settlement approval is a proper exercise of judicial power, and does not interfere with legislative prerogatives.

Some objectors have argued that the ASA should be rejected because approval would be an improper exercise of judicial power, usurping Congress's role in developing copyright legislation. Some objectors go so far as to say that approval of the settlement would be

unconstitutional, on the theory that because passing copyright legislation is among Congress's

enumerated powers, courts may play no role in shaping copyright law.

These objections are unsound.  Factually they are wrong because the ASA does not

change the law: Any author who dislikes the ASA's terms may decline them and go his or her

own way.  Legally they are wrong because cases may be decided and settlements approved even

if Congress has the power to achieve the same result (or a different one) through legislation.

Many class actions have influenced the law and established substantive policy in ways much

more fundamental and far-reaching than the ASA.  *See, e.g.*, *In re Holocaust Victim Assets Litig.*,

105 F. Supp. 2d 139 (E.D.N.Y. 2000) (approving a settlement providing restitution for millions

of victims of the Holocaust), *aff'd*, 413 F.3d 183 (2d Cir. 2005); *Wal-Mart Stores, Inc. v. Visa*

*U.S.A, Inc.*, 396 F.3d 96 (2nd Cir. 2005) (reshaping the consumer credit industry and awarding

more than $3 billion in damages).  This Court has the power and the responsibility to decide the

motion before it.[4]

Nor does the ASA interfere with orphan works legislation, as some objectors allege.

Congress remains free to legislate in this area, and Google has long supported such legislation.[5]

_____

[4] Notably, in a hearing before the House Judiciary Committee, objectors to the settlement argued that Congress, and not this Court, should decide the issues of copyright and digital books access presented in this case.  *Competition and Commerce in Digital Books: Hearing before the H. Comm. on the Judiciary*, 111th Cong. 21, *available at* http://judiciary.house.gov/hearings/printers/111th/111-31_51994.PDF (2009) (statement of Paul Misener, Vice President of Global Policy, Amazon.com) ("Indeed, the novel copyright (and competition and class action litigation) policy matters at issue in the proposed settlement should be addressed in Congress, the appropriate venue for national policymaking.").  But as Representative Mel Watt responded in that Hearing, "It seems to me that a lot of what we are talking about today is appropriately before the judicial branch of our government."  *Id.* at 144 (statement of Rep. Watt).

[5] *See* Google Inc., *Response to Notice of Inquiry Regarding Orphan Works*, *at* http://www.copyright.gov/orphan/comments/OW0681-Google.pdf (March 25, 2005) (expressing strong support for orphan works legislation); Derek Slater, *Google Book Search Settlement and Access to Out of Print Books*, Google Public Policy Blog, *at*

Indeed, at a recent House Judiciary Committee hearing, Google expressed support for the possibility of legislation opening up access for other companies to use works under the same or similar terms Google would receive under the ASA.[6]  Notably, when legislators asked a representative for objector Amazon.com whether that company would support such a proposal, the representative demurred.[7]

      2.      **The ASA properly resolves claims relating to activities that will continue in the future.**

Rule 23 aims to protect the interests of absent class members.  The ASA does exactly that.  Books that have been published (by authors and publishers eager to present them to the world) but are now out of print receive the possibility of a new birth, with new compensation to their Rightsholders.  As the Department of Justice acknowledges, the arrangements for this are beneficial and protective of Rightsholders (and include provisions the Department of Justice itself suggested, including a fiduciary to act on behalf of Rightsholders not yet identified).  D.I. 922 at 1.[8]  Rightsholders do not limit their freedom in return for these benefits.  They may at any time terminate essentially all Google uses of books, and – perhaps most important – any Rightsholder remains entirely free to exploit such books in any other way.[9]

---

http://googlepublicpolicy.blogspot.com/2009/06/google-book-search-settlement-and.html (June 2, 2009) (reiterating that support in the context of the settlement).

    [6] *See Competition and Commerce in Digital Books*, *supra*, at 141 (statement of David Drummond, Chief Legal Officer, Google Inc.) ("We have no problem whatsoever with Congress expanding or providing a similar structure legislatively that would apply to everyone, no problem at all.").

    [7] *Id.* at 157 (testimony of Paul Misener, Vice President of Global Policy, Amazon.com) (Amazon.com would "[c]ertainly not" support legislation "in addition to" the settlement).

    [8] With only one significant exception, the parties sought to implement every suggestion the United States made in its September submission.  (The lone exception is that the parties declined to change the default rule for authorized display of out-of-print works from opt-out to opt-in, which would eviscerate the purposes of the ASA.)

    [9] Indeed, there is a rapidly-developing, dynamic, and vibrant market in electronic books. *See, e.g.*, Gabriel Madway and Alexei Oreskovic, *Apple Pitches $499 iPad, Takes on Amazon*, Reuters Jan, 28, 2010, *available at* http://www.reuters.com/article/idUSTRE60Q0BY20100128;

The only supposed *dis*advantage of this arrangement with respect to Rightsholders in out-of-print works is that Google might display some such works (and accumulate compensation to the Rightsholder) for some period before the Rightsholder notifies Google that it wants out. The opt-out feature of the settlement is of vital importance because that feature makes it possible for the plaintiffs and Google to establish a market for out-of-print books that otherwise simply could not exist in light of the prohibitive transaction costs of identifying and locating individual Rightsholders of these largely older, out-of-print books. But the notion that this method of proceeding — which has huge advantages for the world of potential readers, scholars, and other users — is a disadvantage to the Rightsholders themselves is certainly wrong. The Rightsholders, by definition, once offered these books to the world; there is not the slightest reason to suppose, *a priori*, that they now want the works they published to remain unavailable, or would not benefit from a process that makes them available, helps identify the Rightsholders, helps resolve disputes over ownership, and collects money on Rightsholders' behalf.

### a.    Courts routinely approve settlements affording prospective relief.

The United States' search for a new, generally applicable "rubric" governing permissible settlements is misplaced. When a federal court entertaining a class action is presented with a proposed settlement of the controversy before it, the questions bearing on approval are whether the court has jurisdiction over the controversy and whether the settlement satisfies the requirements of Rule 23. The Supreme Court's decision in *Local Number 93, International*

---

Motoko Rich, *Books on iPad Offer Publishers a Pricing Edge*, N.Y. Times Jan. 27, 2010, at B6, *available at* http://www.nytimes.com/2010/01/28/business/media/28media.html; Rob Pegoraro, *With the Nook e-Book Reader, Barnes & Noble Challenge Amazon's Kindle*, Washington Post Jan. 17, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/01/15/AR2010011501623.html; Rich Jarlovsky, *Sony Catches Kindle, Trails iPad with New Reader*, BusinessWeek Feb. 8, 2010, *available at* http://www.businessweek.com/globalbiz/content/feb2010/gb2010028_124846.htm.

*Association of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("*Firefighters*")
established that district courts have the authority to approve forward-looking settlements within
very broad limits designed to ensure that there is jurisdiction over the dispute and that the
settlement is appropriate to the controversy before the court.  The Supreme Court in *Firefighters*,
like many other courts, approved forward-looking relief, and the settlement proposed here is well
within the capacious standards of that case.  Indeed, *Firefighters* expressly permits a federal
court to approve a settlement that "provides broader relief than the court could have awarded
after a trial."  478 U.S. at 525.  *See also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179,
185 (2d Cir. 1987) (approving in part a class action settlement creating and funding an assistance
program to support projects and services for Vietnam veterans and their families); *Sansom
Comm. v. Lynn*, 735 F.2d 1535, 1538-39 (3d Cir. 1984) (prior to *Firefighters* but applying
"general scope" criterion from same earlier authority, *Pacific R.R. v. Ketchum*, 101 U.S. 289, 297
(1880), to find jurisdiction to enforce consent decree prescribing details for rehabilitation of a
block in West Philadelphia, down to the type of stone and wood to be used in construction and
"acceptable letter styles on signs," 735 F.2d at 1543 n.4 (Becker, J., concurring)).

Many courts have approved settlements that included detailed structural arrangements
addressing matters well beyond the generalized allegations of the complaint.  *See, e.g.*, *Frew v.
Hawkins*, 540 U.S. 431, 437-39 (2004) (finding jurisdiction to enforce detailed 80-page decree
mandating specific requirements for implementing Medicaid Act); *Jeff D. v. Kempthorne*, 365
F.3d 844, 852-53 & n.7 (9th Cir. 2004) (enforcing consent decree with "extensive" structural
provisions to benefit a class of mentally disabled children as within the general scope of the
relief sought "in general terms" by the complaint); *Duran v. Carruthers*, 885 F.2d 1485, 1488,
1490-91 (10th Cir. 1989) (finding jurisdiction to enforce "elaborate" class action consent decree

prescribing extensive regulations for prison's operation, even assuming certain provisions of the decree did not "bear directly on federal rights"); *Kozlowski v. Coughlin*, 871 F.2d 241, 244-45 (2d Cir. 1989) (finding jurisdiction to enforce portions of consent decree regulating prison visitation sanctions even if provisions were not constitutionally required).

The Department of Justice asserts that the ASA "attempt[s] to use the class action mechanism to implement forward-looking business arrangements that go far beyond the dispute before the Court in this litigation." D.I. 922, at 2-3. But it cites *no* case disapproving a settlement on that ground. Nor does any other objector. On the contrary, courts have approved class settlements in a variety of contexts that could be called "business deals" insofar as they could *not* have resulted from litigation to judgment. *See, e.g.*, *Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 69-70 (S.D.N.Y. 1976) (approving settlement prescribing, *inter alia*, specific rules governing compensation for, and exclusive team rights in, *future* NBA draftees) *aff'd* 556 F.2d 682 (2d Cir. 1977); *White v. Nat'l Football League,* 822 F. Supp. 1389, 1407-08 (D. Minn. 1993) (approving settlement addressing "NFL 'structural' rules that will govern players in future years"); *Miller v. Woodmoor Corp.*, No. 74-F-988, 1978 WL 1146, at *4 (D. Colo. Sept. 28, 1978) (awarding attorneys' fees related to approval of securities class action settlement in which settlement proceeds were placed in real estate trusts to develop the properties at issue, for the future benefit of class members); *Levin v. Miss. River Corp.*, 59 F.R.D. 353, 360-62 (S.D.N.Y. 1973) (approving settlement of class action shareholder litigation providing for recapitalization of the subject corporation).

The United States' cramped view of this Court's jurisdiction to approve the ASA is inconsistent with its own views in the many cases in which it has invoked the jurisdiction of the federal courts to approve broad consent decree settlements that obligated private parties to

undertake activities not comprised within the legal claims on which the United States' complaint was based. *See, e.g.*, *United States v. Cinergy Corp.*, No. 199-cv-01693 (S.D. Ind. filed Dec. 22, 2009) (proposed partial consent decree in Clean Air Act litigation that would require defendant energy company to implement additional "environmental mitigation projects" that it is "not otherwise required by law to perform," including creating a fleet of hybrid or electric vehicles to reduce emissions from its motor vehicles); *United States v. First United Security Bank*, No. 09-0644 (S.D. Ala. filed Nov. 18, 2009) (entering agreed order in fair lending case requiring defendant bank to undertake specifically defined advertising campaigns and consumer education programs to identify and develop qualified minority loan applicants); *United States v. BP Exploration & Oil Co.*, No. 96-cv-00095 (N.D. Ind. filed Sept. 18, 2009) (approving consent decree settling Clean Air Act suit involving a Texas refinery that required refinery operator to convert at least 100 cars, trucks, or buses "owned and/or operated by the City of Texas City, Texas and the Texas City Independent School District" to natural gas vehicles).

Even more to the point, all of these cases involved negotiated settlements, not adjudicated remedies. Every settlement is a deal, in which each side gains something and gives up something, and that is just as true in this case as in those cited above: plaintiffs are giving up their right to sue to challenge a range of potential future Google activities, in return for compensation and other arrangements beneficial to them. In return, Google is giving up defenses it advanced in good faith and is providing substantial tangible benefits to Rightsholders that they might never have received if Google had prevailed. The central point of *Firefighters* is that a court may approve a settlement precisely because it is "the parties' *consent*," not the scope of the court's remedial power, that "animates the legal force of a consent decree." 478 U.S. at 525 (emphasis added). It is that consent that allows the court to approve a settlement that "provides

broader relief than the court could have awarded after a trial." *Id.*

The Department of Justice seeks to distinguish these cases on the ground that they involved the courts' "remedial" authority and were "designed to benefit the party harmed by imposing additional burdens on the defendant(s)." D.I. 922 at 8. That attempted distinction fails both for the reasons set forth above, and because it ignores cases where the courts have approved settlements that confer future rights on the defendants in exchange for an additional benefit to the plaintiffs. In each case, as here, courts adopted practical solutions to problems created by high transaction costs that threatened to undermine economic activity that would benefit both the plaintiffs and the general public.

In *Uhl v. Thoroughbred Technology and Telecommunications, Inc.*, 309 F.3d 978 (7th Cir. 2002), for example, a class of 58,000 landowners who owned property along several thousand miles of railroad track brought a trespass and slander of title suit against a cable company that was installing telecommunications cable along the track without their permission. The settlement agreement provided that "[a]ll class members" "will transfer easements." *Id.* at 982. The settlement terms contained no provision for any class members to refuse the easement—transfer of the right was mandatory. *Id.* at 982, 984-95. Certain class members also received monetary compensation (depending on where their property was located), and the defendant was to pay "a percentage of its revenue from the sale, lease, and license of the conduits it installs along the corridors" made available to it under the settlement. *Id.* at 982. The Seventh Circuit affirmed approval of this settlement, which provided for the release of plaintiffs' potential claims and bound all class members to a grant of easement in return for compensation. *Id.* at 987;[10] *see also Barkema v. Williams Pipeline Co.*, 666 N.W.2d 612 (Iowa 2003) (similar

---

[10] Objector Microsoft attempts to distinguish *Uhl* on the grounds that "*Uhl* involved (i) a

facts and ruling).  *See also Smith v. Sprint Commc'n Co. L.P.*, No. 99C3844, 2003 WL 103010, at *2 (N.D. Ill. Jan. 10, 2003) (approving over objection settlement in which defendants received a future, perpetual easement for which class members received money, on the ground that the settlement eliminated class members' rights to be free from future conduct that would be tortious absent the settlement), *vacated on other grounds*, 387 F.3d 612 (7th Cir. 2004).

Similarly, in *Alvarado v. Memphis-Shelby County Airport Authority*, No. 99-5159, 2000 WL 1182446 (6th Cir. Aug. 15, 2000), owners of land adjacent to an airport filed a class action over noise and other pollution and sought both past damages and future abatement.  The case settled on behalf of the owners of more than 12,000 parcels of property near the airport.  Defendants paid $22 million to settle past claims, to be distributed to those class members who submitted claims.  The authority received an easement from all class members allowing the future use of airspace over those parcels in a lawful manner.  The payments to those class members who filed claims represented compensation for both the release of past claims and the easement.  *Id.* at *3.  Those class members who neither opted out nor filed claims received

---

known and discrete class of individuals (real property owners along a specific railway), (ii) all of whom had been actually harmed (through slander of their title, a tort that had already occurred at the time of suit), (iii) all of whom faced the same risk and type of future harm (from further slander of title and trespass), (iv) all of whom received the same *ex ante* treatment in the negotiated settlement, (v) which resolved an extremely limited and defined set of future conduct by the defendant"  D.I. 874 at 12 (emphasis omitted).

All these points raise distinctions that make no difference.  None of these supposed bases for distinguishing *Uhl* has anything to do with the scope of the Court's power under Rule 23; they all boil down to arguments that there is no justiciable case or controversy (points (i) and (ii)) or that the named plaintiffs are not adequate representatives of the class (points (iii) through (v)).  As discussed below, the Second Circuit has held that there is a justiciable case or controversy where, as here, the defendant has begun scanning all available Books and has stated its intention to continue doing so.  And as discussed at length in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Final Settlement Approval, Rule 23's "adequacy of representation" requirement is amply met here: all of the class members share ripe claims arising from Google's stated intention to scan every available Book, and all class members receive the same opportunity for settlement consideration and payment for ongoing uses of their Books.

13

nothing.  Nevertheless, they were deemed to have granted the airport authority an easement for their property.  The Sixth Circuit, upholding the settlement, rejected the contention that the "easement provisions of the settlement are unfair and unreasonable" and held that "there is no public policy problem with an anticipatory release."  *Id.* at *7.

The logic of these cases applies directly to the authorizations contained in the ASA.  At bottom, each case dealt with transaction costs arising from the risk of holdout always present when the consent of large numbers of persons is necessary to some project.  Google and the copyright holders who benefit from this settlement face a different sort of transaction cost—the unquestionably prohibitive cost of finding and contracting individually with owners of largely old, out-of-print books—but the basic problem is the same and the solution is appropriately the same as well: Where unanimous consent is infeasible, anticipatory releases can make everyone better off and are well within the court's power to approve.[11]

### b.  The ASA meets the *Firefighters* criteria.

*Firefighters* held that a court may approve a forward-looking settlement, even if the result could not have been achieved by litigation to judgment, where the settlement (i) "spring[s] from and serve to resolve a dispute within the court's subject-matter jurisdiction"; (ii) "come[s] within the general scope of the case made by the pleadings"; and (iii) "further[s] the objectives of the law upon which the complaint was based."  *Id.* at 525 (internal citation omitted).  The ASA falls well within those standards.

---

[11] In this regard, the ASA authorizes Google to undertake certain acts, such as offering Consumer Purchase of and Institutional Subscriptions to Rightsholders' Books.  As a result, when Google acts pursuant to those authorizations, there will be, as the *Smith* court observed, "no 'future tort' to compromise."  *Smith* at *5.  The Settlement's authorizations, like the grants of easements in *Uhl* and *Smith*, permit Google to offer products that will generate revenue for class members.  The agreement to grant those authorizations in return for settlement payments and revenue sharing is a fair, reasonable, and adequate compromise of Plaintiffs' claims.

### (i)     The ASA springs from and serves to resolve a dispute within the court's subject-matter jurisdiction.

The first criterion means, by its plain language, only that the court must have jurisdiction over the dispute and the settlement must serve to resolve it. There is no serious dispute that the Court has Article III jurisdiction over this case, and therefore jurisdiction to approve a settlement of it. Plaintiffs alleged that Google exercised plaintiffs' exclusive right to reproduce their works and to make them available to the public. This reproduction, if infringing, represented a concrete incursion on the rights of every member of the class. For its part, Google asserted substantial defenses of its actions. If these defenses prevailed they would establish tangible limits on the scope of the rights of every member of the class. The parties' conflict was and is quite real.

Nor does it matter that Google has not yet scanned the works of each and every class member. In the Second Circuit, a "case or controversy" exists where an alleged infringer has made adequate preparations for the allegedly infringing activity. *See Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 89 (2d Cir. 1963) (in the patent context, the alleged infringer must "either be engaged in manufacturing, using or selling the invention, or [state] that he has the immediate intention and ability to do so"); *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595 (2d Cir. 1996) (applying *Wembley* to future trademark infringement and finding there was a "case or controversy" where the alleged infringer had "invested a significant amount of time and money in this project; designed styles and prepared prototype shoes; conducted a consumer survey; made strategic decisions regarding who should manufacture the shows; hired an external licensing agent; and attempted to find a manufacturing partner"); *Matthew Bender & Co., Inc. v. West Publ'g Co.*, Case No. 94 Civ 0589, 1996 WL 223917 (S.D.N.Y. May 2, 1996), *aff'd*, 158 F.3d 674, 678-79 (2d Cir. 1998) (applying *Wembley* to future copyright infringement).

The plaintiff in *Matthew Bender* had announced a project to digitize the entirety of West

15

Publishing's National Reporter System.  Matthew Bender then sued West for a declaratory

judgment that its copying was not infringing.  West moved to dismiss on the ground that there

was no case or controversy because Matthew Bender had not yet completed its scanning project

or launched its commercial product.  Applying *Wembley*, this Court held that there was a "case

or controversy" because the alleged infringer had "detail[ed] its substantial and meaningful

preparations" to digitize a large number of books, although the defendant had only just begun its

digitization project.  *Bender* at *4.

Just so here.  The Third Amended Complaint ("TAC") (D.I. 782) (like the original

Complaint) alleges that Google is engaged in a project to scan the entire collections of numerous

libraries.  TAC ¶ 4.  It alleges that Google is proceeding with this project "by reproducing for

itself a digital copy of the Books, and by distributing and publicly displaying those Books," TAC

¶ 5, and that "Google plans to reproduce the Books for use on its website."  TAC ¶ 6.  It is of no

moment that Google has not yet scanned or made public display of each of the class members'

Books.  Google has announced its intention to do so, has made substantial and meaningful

preparations to do so, and has demonstrated its ability to do so.  Nothing more is required.

The Department of Justice suggests (D.I. 922, at 7) that, under *Firefighters*, the Court

should scrutinize the ASA to determine whether a live litigation controversy exists with respect

to *each* provision of the settlement.  But *Firefighters* requires no such thing, and if it did far

fewer class settlements (and none of those cited above) could be approved:  the court must have

jurisdiction over the dispute being settled; but not every provision of a settlement needs to be a

point being litigated.  The United States cites no case in which a court has applied *Firefighters* in

this bizarre fashion (which would have prevented the settlement in *Firefighters* itself), and its

argument is belied by the many cases in which courts have found no *Firefighters* obstacle to

approving extensive settlements that address matters not encompassed in the claims at issue. *See, e.g.*, *United States v. Charles George Trucking*, 34 F.3d 1081, 1090-91 (1st Cir. 1994) (approving consent decree in a CERCLA action that resolved the settling defendants' liability for damages to natural resources although the United States' complaint did not make such claims); *United States v. Kerr-McGee Corp.*, No. 07-CV-01034, 2008 WL 863975, at *2, 6 (D. Colo. March 26, 2008) (approving broad consent decree in Clean Air Act suit that required the defendant to complete "supplemental environmental projects" to reduce "road dust" in a particular region and to address "air pollution in the Denver metropolitan area by providing $150,000 to support a 'cash for clunkers' program").

### (ii)     The ASA comes within the general scope of the case made by the pleadings.

The ASA comes within the "general scope" of what is at issue in this litigation.  The very words "general scope" suggest a broad view of what can be covered.  While Google's display of scanned copyrighted books at the time of suit was generally limited to snippets of text, broader uses were possible and at issue in this case.  For example, Google asserted the right to (and did) deliver complete scanned copies of class members' copyrighted books to libraries.  In addition, Google itself displays the full text of scanned library books in some potentially disputable cases based, for example, on its unilateral determination that a book is in the public domain.

Plaintiffs quite naturally have always sought more than merely barring the specific actions on the part of the Google that prompted this lawsuit.  The initial Complaint stated that "Google's acts have caused, and unless restrained, will continue to cause damages and irreparable injury to the Named Plaintiffs and the Class through … continued copyright infringement of the Works and/or the effectuation of *new and further infringements*."  Complaint ¶ 34 (emphasis added).  The complaint sought, from the beginning, to enjoin Google from,

among other things, "plac[ing] the unlawfully copied Works . . . on its website," an injunction that would have halted all the activities covered by the ASA. *Id.* ¶¶ 45, 46. The Complaint was thus directed at the very existence of the digitized copies and all uses to which Google might put those copies. The settlement is certainly within the "general scope" of these claims.

Indeed, perhaps most fundamentally, this suit necessarily involved plaintiffs' broader concerns about how best to protect their copyright interests in connection with the migration of books from print to digital media, including ensuring the security of digital copies and preventing additional unauthorized uses of their works. Declaration of Richard Sarnoff in Support of Plaintiffs' Motion to Find Approval of Amended Settlement Agreement ("Sarnoff Decl.") ¶¶ 6-7. Had the class representatives not addressed the vital question of what happens next to the millions of books Google has scanned, the class members justifiably could have complained that their representatives had ignored their most important interests and their most pressing concerns. It is perverse to fault fiduciaries for diligence, yet that is precisely what the objectors here do.

### (iii)    The ASA furthers the objectives of the Copyright Act.

Finally, the ASA "further[s] the objectives of the law upon which the complaint was based." *Firefighters*, 478 U.S. at 525. "[C]opyright's purpose is to promote the creation and publication of free expression." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (emphasis added). As the Supreme Court held in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349 (1991), the "primary objective of copyright" is set forth in the Constitution: "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their respective Writings[.]" U.S. CONST. Art. I, § 8, cl. 8. "The sole interest of the United States and the primary object in conferring [copyrights] lie in the general benefits derived by the public from the labors of authors." *Fox Film Corp. v. Doyal*, 286 U.S.

123, 127 (1932).

The settlement serves this most fundamental purpose of copyright law by making published books widely available to the reading public, including many books that might otherwise be hard to find or difficult to access, and providing a mechanism for Rightsholders to profit from the distribution of their works. At the same time, the ASA permits Rightsholders to retain control over the use of their works ("the exclusive right to their respective Writings"), leaving them free to license or exploit their works in any other way they wish, including prohibiting or restricting Google's display or distribution of the works. Millions of works which are now unavailable will be made available. Works which are available will find a greater audience. And Rightsholders will have a new way (in many cases, the only way) to profit from their works.

The Department of Justice nevertheless argues that certain aspects of the ASA—in particular, the opt-out feature for display of out-of-print books and time limits on the deletion of digital copies—are "in some tension" with the third *Firefighters* test because they alter the "Copyright Act's specific delineation of exclusive rights to authors and the many restrictions thereon." D.I. 922 at 9. Not so. The opt-out feature of the settlement results from the class action mechanism; the complaint that rights are being restricted on an opt-out basis applies equally to *any* opt-out class action settlement. Nor does the ASA alter the law; it proposes a resolution of claims. A settlement is a compromise; that is why class action settlements rarely if ever simply recite the law *in haec verba*. The Copyright Act grants rights, but Rightsholders may negotiate to allow others to use their works in a manner not otherwise permitted by the Act. Indeed, *any* settlement that permitted even limited use of plaintiff class members' works would represent a compromise based on, but not limited to, the rights established by the Copyright Act.

The Court's authority to approve a settlement cannot evaporate simply because the parties agree to allow specified uses that the Copyright Act would not permit absent that agreement.

### c.    The identical factual predicate doctrine does not defeat approval here.

Many courts have held that releases made as part of a settlement may go beyond claims specifically pleaded in a class action complaint.  "There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this.'' *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) (approving a release of "all claims against [the defendant insurance company] known or unknown with respect to your policy") (internal quotation omitted).  "The weight of authority establishes that in such a case, a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint.'' *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (quoting *Patterson v. Stovall*, 528 F.2d 108, 110 n.2 (7th Cir. 1976)), *cited with approval in Wal-Mart*, 396 F.3d at 108.

Notwithstanding this general rule and common practice, several objectors point to *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981), as justifying rejection of the ASA.  The claims in that case arose from defaults on potato futures contracts.  The named plaintiffs had taken long positions in such contracts and liquidated those positions following the default.  The complaint pleaded no claims other than those based on liquidated long positions, and the class certification notice referred only to such contracts.  The named plaintiffs never sought to represent the interests of persons holding unliquidated contracts; they could not have done so had they tried, for the named plaintiffs held no such contracts and

could not represent a class of which they were not members. 660 F.2d at 16-18.  The putative

class members were forced to release their claims as to these unliquidated contracts without any

notice or opportunity to opt out.[12]

A footnote in the *Super Spuds* opinion also faulted the settlement for resolving claims

that would require proof of facts not alleged in the complaint, *id.* at 18 n.7.  But these comments

were made in the context of noting that the class representatives "were never authorized to

represent such members with respect to unliquidated contracts."  *Id*. at 18.  The court's

comments noted a limitation on the power of the class representatives, not on the power of courts

generally.

*In re Auction Houses Antitrust Litigation*, No. 00 Civ. 0648 (LAK), 2001 WL 170792

(S.D.N.Y. 2001), *aff'd*, 42 Fed. Appx. 511 (2d Cir. 2002), upon which objectors also rely, is to

similar effect.  That class action dealt with allegations of price fixing against Christie's and

Sotheby's with respect to auctions in the United States.  The case settled, and the settlement

released all claims with respect to the United States auctions that were at issue in the complaint.

The settlement also provided that class members could not sue in the United States for claims

arising out of foreign auctions (though they could continue to bring those claims in foreign

courts).

Foreign auctions were not placed at issue in the Complaint or when the class was

---

[12] Indeed, the *National Super Spuds* court distinguished an earlier case which approved a release of "claims arising out of the transaction that were, could have been or should have been pleaded" on the ground that, unlike *National Super Spuds*, it was not a "settlement that **forces** class members to release claims not asserted in the class action" because the prior case had provided class members with an opportunity to opt out. *National Super Spuds*, 660 F.2d at 19 (citing *Wellman v. Dickinson*, 497 F. Supp. 824 (S.D.N.Y. 1980), *aff'd by order*, 647 F.2d 163 (2d Cir. 1981)) (emphasis added).  *See also Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 265-67 (S.D.N.Y. 1998) (distinguishing *National Super Spuds* on the ground that class members in that case had no opportunity to opt out).

certified, however, and the named plaintiffs did not claim damages from foreign auctions. In this respect the named plaintiffs were similar to the named plaintiffs in *Super Spuds*, who held no unliquidated contracts. And, as in *Super Spuds*, class members who had participated in foreign auctions received no extra compensation for relinquishing the right to sue in the United States. The court held these unpleaded and uncompensated claims regarding foreign auctions did not "rest upon 'the identical factual predicate'" as the pleaded claims. *Id.* at *13 n.69. Again, given the divergence of interest between the named plaintiffs and those who suffered harm as a consequence foreign auctions, the rejection of the settlement was not surprising.[13]

This is why, in *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982), this court understood *Super Spuds* as being grounded in classic Rule 23 concerns about notice and adequacy of representation. As the Second Circuit explained, at "the heart of" the Court's concern in *National Super Spuds* was "the danger that a class representative not sharing common interests with other class members would endeavor to obtain a better settlement by sacrificing the claims of others at no cost to [himself] by throwing the others' claims to the winds." *TBK*

---

[13] If anything, *In re Auction Houses* supports approval of the settlement here insofar as it explicitly recognized that the "identical factual predicate" doctrine is a procedural safeguard of fairness and adequate representation, not a substantive outer bound on a court's power: "The Court's objection to the scope of the 'release' was that the Mixed Class Members were being asked to surrender something of value, however modest, in order to benefit the other class members. Perhaps if the claims pursued on behalf of the class that was certified had included the foreign auction issues and the deal had been structured from the outset to allocate part of the consideration to compensate Mixed Class Members in this way, it would not have been objectionable." *In re Auction Houses Antitrust Litig.*, 138 F. Supp. 2d 548, 550-51 (S.D.N.Y. 2001). In considering the impact of its decision on later cases, the Court reiterated this point, observing: "[A]ny uncertainty [as to whether releases will be approved] may be avoided by careful definition of the class or classes and appropriate allocation of settlement proceeds." *In re Auction Houses Antitrust Litig.*, 164 F. Supp. 2d 345, 348 (S.D.N.Y. 2001). In support of this point, the Court cited *Weinberger* for the proposition that it is proper for a "class expanded prior to certification to include added claims, which then were released upon payment of part of settlement proceeds." *In re Auction Houses*, at 551 n.9 (citing *Weinberger v. Kendrick*, 698 F.2d 61, 77 (2d Cir. 1982)).

*Partners*, 675 F.2d at 462 (internal quotation and modification omitted).

*TBK Partners* involved a variety of state and federal claims brought by minority shareholders whose interests were extinguished in a short-form merger.  Even though the complaint alleged a claim for failure to register under the Investment Company Act, the court concluded the case was basically a dispute over the value of the shares.  It found the class settlement could extinguish even state law claims for appraisal that could not have been brought in federal court, largely because "[o]bjectors were fairly apprised and should have been able to anticipate . . . that the class action would adjudicate the value of" their stock.  *Id.* at 461.  The "identical factual predicate" language in *TBK Partners* related to the court's concern (expressed in the same sentence) that class members have adequate notice of the scope of the release of claims.  Thus, as the court noted, "where there is a realistic identity of issues between the settled class action and the subsequent suit, and where the relationship between the suits is at the time of the class action foreseeably obvious to notified class members, the situation is analogous to the barring of claims that could have been asserted in the class action. Under such circumstances the paramount policy of encouraging settlements takes precedence."  *TBK Partners*, 675 F.2d at 461.

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1983), illustrates this point.  In that case, the Second Circuit affirmed the approval of a class action settlement releasing state law claims which were "almost identical" to the factual predicate underlying plaintiffs' federal claims.[14] 698 F.2d at 68.  Objectors had argued that such a release was barred by *Super Spuds*, *Weinberger* at 77, but the Second Circuit disagreed because the settlement provided for additional compensation to holders of the additional claims, and holders of those claims were given notice

---

[14] The additional claims in *Weinberger* were not "unpleaded," because they were added to an amended complaint at the time settlement approval was sought.  But for purposes of determining whether the addition of claims for purposes of settlement is permissible, it is immaterial whether the claims are included in a contemporaneously-filed amended complaint.

of the scope of the releases and an opportunity to opt out. *Id.* The court explained "there is no rigid rule against the addition of new claims shortly before submission of a proposed settlement provided that proper notice and opportunity for opting out are afforded, and that the settlement fairly and adequately provides for the new claims." *Id.* (internal citations omitted).

The ASA suffers from none of the deficiencies that led to rejection of the releases in *National Super Spuds* and *In re Auction Houses*. No one could seriously question that plaintiffs are adequate representatives of the class members' interests. Plaintiffs are in fact the best representatives of those interests; they are far better representatives than most objectors, whose own agendas vary discernibly from the interests of authors. As to notice, this case could not be further removed from the facts of *Super Spuds*. The over 42,000 authors and publishers who have already submitted claims demonstrate that fact. The structure of the ASA confirms it as well. Unlike the case in *Super Spuds* and *In re Auction Houses*, the class members' claims regarding continuing uses are amply compensated: they receive the lion's share of all ongoing revenues from Google's uses of their Books in the Revenue Models, and the identity of interests between the class representatives and the other class members provides a structural guarantee of the fairness of that compensation. And the ASA coerces no one; class members have had ample notice and an opportunity to opt out. Because the releases are fair, reasonable, and adequate, and the class has been given compensation, notice, and an opportunity to opt out, it is well within this Court's power to approve the releases negotiated by the parties.

Even if *TBK Partners*' "identical factual predicate" language were wrenched from the context in which it was written and treated as a stand-alone test, it would represent no bar to approval of the ASA. The claims released in the ASA arise from the same factual predicate of the pleaded claims and Google's past conduct because the released claims are inextricably tied to

the claims pleaded and, as the Society of Authors comments reveal, class members understand this fact. Rightsholders were and are keenly focused on what happens to their books after those books are digitized. They understood the complaint to raise precisely this question. The ASA provides an answer to it.

As this Court has observed, plaintiffs' complaint alleges that Google "infringed plaintiffs' copyrights when it scanned copyrighted materials without permission, and made plans to provide those materials to the public through an online searchable database." *Authors Guild v. Google Inc.*, 92 U.S.P.Q.2d 1952 (S.D.N.Y. 2009). All of the released claims arise out of the plaintiffs' broad allegations against Google's scanning and use of their works. In particular, the TAC broadly alleges that "[b]y creating for these and other libraries a digital copy of those books that are not in the public domain . . . , by reproducing for itself a digital copy of the Books, and by distributing and publicly displaying those Books, Google is engaging in massive copyright infringement. It has infringed, and continues to infringe, the electronic and other rights of the copyright holders of the Books." TAC ¶ 5. Indeed, the Complaint does not merely allege the past acts that caused the released future conduct; the Complaint specifically alleges that Google plans to undertake additional allegedly infringing conduct in the future. According to the Complaint, "Google plans to reproduce the Books for use on its website." *Id.* ¶ 6 (emphasis added). The Complaint alleges that "Google has unlawfully reproduced, distributed and publicly displayed the Books, and intends to continue to do so, without the copyright holders' authorization." *Id.* ¶ 7. And it seeks "declaratory and injunctive relief with respect to Google's planned unauthorized commercial and other use of the Books." *Id.* ¶ 8.

As the court explained in *Wal-Mart*, "[t]he law is well established in this Circuit and others that class action releases may include claims not presented and even those which could

not have been presented as long as the released *conduct* arises out of the 'identical factual predicate' as the settled *conduct*."  *Wal-Mart*, 396 F.3d at 107 (emphasis added).  Indeed, it is ironic that many of the objectors rely on *Wal-Mart*, which approved releases extending to claims and parties not present before the court.  *See also In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2007 WL 1946685, at *6 (S.D.N.Y. July 5, 2007) (approving the release of unpleaded claims resulting from an investment strategy which "generally reflects a belief that the prices of the underlying securities will rise or remain stable.  This belief would be based on the same publicly disclosed information about WorldCom on which the class action proceeded.").[15]

Here, all of the released conduct "arises out of" the conduct alleged.[16]  Google's scanning, snippet display, and distribution of entire copies of copyrighted works to libraries was the foundation for a wide range of activities and consequences that the Rightsholders and Google were faced with in negotiating a resolution of this case.  The complaint unequivocally asserts that Google plans to scan and use all Books, and has already begun its project to do so. Conversely, had Plaintiffs received the relief they requested in the complaint—including an injunction against scanning and impoundment and destruction of all extant scans—any implementation of the services contemplated in the ASA would have been rendered impossible.  There is therefore a

---

[15] In order to find a case which supports their exceedingly narrow view of the scope of the "identical factual predicate" test, objectors resort to repeated citation to *UniSuper Ltd. v. News Corp.*, 898 A.2d 344 (Del. Ch. 2006), a four-page memorandum opinion issued by a state trial court in Delaware.  But, of course, that case was decided under the Delaware Court of Chancery Rules, not the Federal Rules of Civil Procedure.  It does not cite, and has not been cited by, any court within the Second Circuit.

[16] The Second Circuit has repeatedly held that for a claim to "arise out of" a particular set of facts means that there is a "causal" connection between the two.  *See, e.g.*, *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) ("To 'arise out of' means to originate from a specified source, and generally indicates a causal connection") (internal citations and quotations omitted); *Coregis Ins. Co. v. American Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) ("The phrase 'arising out of' is usually interpreted as indicating a causal connection.") (internal quotation and modification omitted).

clear and close connection between the ongoing scanning and distribution program alleged in the complaint and all of the past and future conduct released by the Settlement Agreement. Because all of the released claims arise out of the same facts as those underlying the Complaint's claims for scanning and display, and the class received compensation, notice, and an opportunity to opt out, the scope of the release is proper.

The identical factual predicate doctrine cannot be read more narrowly to limit the Court's authority to approve a settlement that releases conduct beyond the specific factual allegations of the complaint. For one, many class settlements that have been approved by courts simply could not have passed muster under such a cramped view of the doctrine. For example, in *In re Adelphia Communications Corp. Securities & Derivative Litigation*, 272 Fed. Appx. 9, 13 (2d Cir. 2008), the Second Circuit approved a settlement of claims against defendant banks for complicity in "financial irregularities" involving Adelphia. The Court of Appeals held that the identical factual predicate doctrine did not bar the settlement from releasing the objectors' claims that a particular bank had issued a false fairness opinion to the objectors' company when it was sold to Adelphia. However the various plaintiffs were misled, the Court reasoned, "the fact remains that the investment losses suffered by all class members share a common factual predicate, even if the particular losses were the result of reliance on different documents." *Id.* at 13. *See also Learner v. Marvin Lumber & Cedar Co.*, No. 08-CV-177 JL, 2008 WL 5285028, at *5 (D.N.H. Dec. 19, 2008) (settlement in suit based on use of a particular wood preservative in defendant's products properly released *all* claims alleging that such products were defective, even if claims alleging a defect other than the preservative); *In re WorldCom, Inc. Sec. Litig.*, No. 02Civ3288 (DLC), 2007 WL 2994395, at *2 (S.D.N.Y. Oct. 16, 2007) (settlement release properly barred all claims seeking to recover losses from investments in WorldCom stock, even

claims challenging a particular trading strategy as "too risky whatever the underlying stock");

*Ass'n for Disabled Americans v. Amoco Oil*, 211 F.R.D. 457, 470-71 (S.D. Fla. 2002) (settlement

prescribing accessibility modifications to defendant's gas stations properly released all related

accessibility claims seeking injunctive relief or statutory damages); *Am. Med. Ass'n v. United*

*Healthcare Corp.*, No. 00-Civ-2800 (LMM), 2009 WL 4403185, at *2 (S.D.N.Y. Dec. 1, 2009)

(approving a class action settlement over an objection on "identical factual predicate" grounds);

*In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 119 n.341 (S.D.N.Y. 2009) (same); *Taft*

*v. Ackermans*, No. 02Civ7951 (PKL), 2007 WL 414493, at *8 (S.D.N.Y. Jan. 31, 2007) (same);

*In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *4

(S.D.N.Y. Nov. 8, 2006) (same); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 341 (S.D.N.Y.

2005) (same), *rev'd on other grounds sub nom. Denney v. Deutsche Bank AG*, 443 F.2d 253 (2d

Cir. 2006).

In sum, the Department of Justice and the other objectors have failed to articulate a

meaningful principle on which the Court could reject the ASA. That the ASA contains forward-

looking elements, or that it represents in some sense a "deal" between the parties, provides no

basis for the Court to reject it. The ASA is not "a bridge too far." It is a remarkably creative

settlement, beneficial to the parties and absent class members and the public, but it is also a

settlement of the case the Court has before it.

### D.    The ASA enhances consumer welfare and is consistent with the antitrust laws.

The ASA will enable the parties to make available to people throughout the country

millions of out-of-print books that are now generally available only in research libraries. This is

precisely the kind of beneficial innovation that the antitrust laws are intended to encourage, not

to frustrate. *See NCAA v. Board of Regents,* 468 U.S. 85, 107 (1984) (quoting *Reiter v. Sonotone*

*Corp.*, 442 U.S. 330, 343 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription'")).

The basic antitrust question is whether the ASA decreases or increases consumer welfare compared to a "but for" world in which the settlement does not exist.[17]  Here, the ASA increases output, and consequently consumer welfare, in *every* category of books.  That includes the books covered by the ASA, as well as out-of-copyright books that are not covered by the settlement.[18]  And, the ASA, which is strictly non-exclusive, does not increase (and if anything reduces) the entry barriers to other firms that wish to provide the same services.

Because the ASA expands output and imposes no impediments to the ability of rivals to compete, the ASA does not violate either Section 1 or Section 2 of the Sherman Act.  Under Section 1 of the Sherman Act, "Congress intended to outlaw only *unreasonable* restraints," and the courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must

---

[17] *See, e.g.*, Einer Elhauge, *Why the Google Books Settlement is Procompetitive* 18-25 (Harvard Law Sch. Law & Econs. Discussion Paper No. 646 and Harvard Law Sch. Pub. Law & Legal Theory Research Paper No. 09-45) (Dec. 30, 2009), *available at* http://ssrn.com/abstract=1459028 (hereinafter "Elhauge") (explaining the appropriate "but for" baseline).

[18] Although the ASA does not govern out-of-copyright books, it significantly expands consumers' access to such books and enhances competition by creating and funding a process that clarifies which books actually are out of copyright.  For example, books published in the United States between 1923 and 1963 are in copyright only if the copyright was both noticed in the publication and properly renewed. The great majority of these books are out of copyright, and hence should be searchable and freely accessible to all readers.  Elhauge at 8 (citing Barbara Ringer, Study No. 31: Renewal of Copyright (1960)) (fewer than 7% of registered book copyrights were renewed).  In practice, however, they are not, because the transaction costs and risks are so high that neither Google nor any of its rivals has made digitized versions of these books generally available.  The ASA overcomes these barriers by creating a process for determining which books are out of copyright that is funded by Google and the Registry and binding on Rightsholders.  Google's rivals also benefit from this process because the ASA makes the information publicly available.  Unlike the "but for" world, where these books are likely to remain available only through library loan programs or in used bookstores, under the ASA, they are likely to be available through multiple sources, and to expand supply and put downward pricing pressure on in-copyright books with which they compete.

demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)) (emphasis in original). This analysis applies to the ASA, which involves vertical distribution arrangements between Google and Rightsholders, which are subject to the rule of reason, *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 889-890, 899 (2007), and, in the case of the institutional subscription, a joint selling arrangement that is "so efficient that it will increase sellers' aggregate output and thus be procompetitive." *NCAA*, 468 U.S. at 103.

The objectors' Section 1 complaints hinge on the formalistic application of *per se* rules, but the Supreme Court has expressly rejected the use of *per se* rules unless experience has shown that a restraint is so "pernicious" and "lack[ing in] any redeeming virtue," that its anticompetitive effect is "immediately obvious," *Major League Baseball*, 542 F.3d at 315-16; *see Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19-23 (1979).

No such experience condemns the ASA, which establishes new and innovative mechanisms to resolve vexing problems created by new technologies. Indeed, many objectors (including the Department of Justice) claim in substance that the ASA is simply too innovative to be approved by a court. The *per se* doctrine is designed to promote efficient adjudication by allowing courts to apply their experience; it would be perverse to use the doctrine to foreclose courts from getting that experience in the first place. Rule of reason analysis therefore applies here. *Cf. United States v. Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir. 2001) (declining to apply *per se* doctrine to a form of tying arrangement with which courts had little experience). Even apart from this lack of the experience needed to invoke *per se* analysis, the provisions challenged by objectors plainly do not have any such pernicious effect, but are reasonably related to the

clearly procompetitive purposes of the ASA.[19]

The ASA also does not violate Section 2 of the Sherman Act. Section 2 requires proof not only of monopoly power in a relevant product market, but "the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Google is a new entrant and currently has 0% share in any book market.[20] It does not have monopoly power and there is no "dangerous probability" that it will acquire such power.[21] *Spectrum Sports, Inc. v. McQuillan,* 504 U.S. 447, 459 (1993). Most objectors' Section 2 arguments assume some unique value of so-called "orphan works" in the new institutional subscription product, but this argument is pure speculation. It assumes there will be some

---

[19] When reviewing a class action settlement for compatibility with the antitrust laws, the Second Circuit has repeatedly held that courts may approve settlements even where the settlement implicates "unsettled legal questions" about the application of antitrust law to the settlement. *Robertson v. Nat'l Basketball Assoc.*, 556 F.2d 682, 686 (2d Cir. 1977). *See W. Va. v. Chas. Pfizer & Co.*, 440 F. 2d 1079, 1086 (2d Cir. 1971) (in reviewing a settlement for compatibility with antitrust laws, "this court need not and should not reach any dispositive conclusions on the admittedly unsettled legal issues which the case raises"). *See also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975) (approving a class action settlement over antitrust objections where "the alleged illegality of the settlement agreement is not a legal certainty.").

[20] As the Department of Justice acknowledges, it is likely that many Rightsholders will withhold Commercially Available books from the ASA revenue models, so that books governed by the ASA will be "comprised largely of non-Commercially Available books." D.I. 922 at 17. These commercially unavailable books were taken out of print by their publishers because of insufficient consumer demand, and currently account for less than 3% of regular book sales (the total sales volume of all used books). Elhauge at 39-40. Google's ostensible "exclusivity" under the ASA thus relates to a minute fraction of a market in which it currently has no share at all.

[21] As a disruptive new entrant, Google threatens the entrenched dominant position of Amazon, the market leader. It is therefore not surprising that Amazon seeks to impede Google's ability to enter the market, including by organizing opposition to this settlement. *Cf.* Dep. Asst. Atty. Gen. Philip J. Weiser, *Innovation, Entrepreneurship, and the Information Age* (Jan. 31, 2010), *available at* http://www.justice.gov/atr/public/speeches/254806.htm ("When confronted with disruptive entry, one tempting response for incumbents is to ask the regulator for protection. . . . This dynamic makes it enormously important for regulators to adhere to competition policy principles and to resist the claims of incumbent industry players that they should be protected against entry").

substantial percentage of books that remain unclaimed; that these books will have significant

value to institutional customers—despite the fact that they are out-of-print today; and, critically,

that no competitor will be able to provide a competitive alternative even though the ASA lowers

the costs of doing so relative to the costs Google incurred.[22]  None is supported.

Even more glaring is the absence of any exclusionary act, as required under Section 2.

The ASA is explicitly nonexclusive in every possible aspect.  Settlement critics cannot identify a

single barrier to entry that the ASA creates or raises for rivals.  All of the entry barriers about

which objectors complain exist independent of the ASA, and many are actually lowered because

of the ASA.  To pass muster under Section 2, the ASA need not maximize consumer welfare to

the fullest conceivable extent; it need only avoid placing new, unwarranted obstacles in a

competitor's path.  By systematically reducing entry barriers that exist in the but-for world, the

ASA easily surpasses that standard.

> **1.    The ASA expands output and reduces entry barriers for every
> category of books.**

The ASA expands output and reduces barriers to rivals with respect to both types of

books available for individual purchase (Commercially Available and not Commercially

Available), as well as books available through the newly created institutional subscription.

> **a.    Books for individual purchase.**

*Commercially Available books:*  Under the ASA, "Commercially Available" books are

books that are in copyright and that are being offered for sale new through customary

distribution channels.  *See* ASA § 1.31. That a book is offered for sale in hard copy does not

---

[22] Indeed, amicus Internet Archive (founding member of amicus Open Book Alliance)
has already begun operation of a competitive alternative, through which "libraries can scan and
electronically lend their orphans," and has set aside $45 million to spend on the project.  *See*
Quentin Hardy, *Lend Ho!*, Forbes (Nov. 16, 2009), *available at*
http://www.forbes.com/forbes/2009/1116/opinions-brewster-kahle-google-ideas-opinions.html.

mean that the book currently is available in *digital* form.  It is unclear in some instances whether

contractual language found in publishing contracts conveyed the right to make digital copies to

the publisher, or whether that right was retained by the author.  *See, e.g.*, *Random House v.*

*Rosetta Books, LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd per curiam*, 283 F.3d 490 (2d

Cir. 2002).

The ASA facilitates the digital licensing of these books by providing a process for

Google to make these books available for sale despite the legal uncertainty.[23]  This outcome

benefits consumers (and Rightsholders) by making it easier to search for these books and buy

them (in either hard copy or digital form) once they are found.[24]  At the same time, the ASA

makes it easier for other firms to offer similar services by providing additional information

regarding the commercial value of these digital books, and reducing transaction costs through the

creation of a licensing agent (the Registry).

*Commercially unavailable books:*  The ASA defines commercially unavailable Books as

those that are not offered for sale new, either in digital or print form (absent the ASA).  If the

ASA is not approved, therefore, output of these books is zero, and there is no reason to believe

that will change.

The ASA's increase in consumer welfare, and reduction in barriers to entry, is greatest

for these books.  For commercially unavailable books, the cost of locating Rightsholders and

resolving rights claims is particularly great (*See, e.g.*, D.I. 922 at 2-3 (discussing difficulties of

---

[23] ASA Attachment A, Articles V-VI.

[24] One economic study estimated that websites like Amazon.com that made it easier to
search online for a greater variety of books led to an annual increase in consumer welfare of
$700 million to $1 billion.  Erik Brynjolfsson et al., *Consumer Surplus in the Digital Economy:*
*Estimating the Value of Increased Product Variety at Online Booksellers*, 49 Mgmt. Sci. 1580
(2003).  The ASA, by dramatically expanding the number of books searchable online, will likely
result in an increase in consumer welfare many times that amount.

"rights clearance")), while the expected financial benefit is correspondingly low (reflected in the fact that these books fell out of print). The ASA not only enables Google to offer these books for sale, but it dramatically reduces barriers to entry for others, by creating and funding a Registry to locate these Rightsholders; by creating significant financial incentives for Rightsholders to self-identify, and establishing a public database where they can do so;[25] and by authorizing the Registry, through whom these books may be licensed.

As for any commercially unavailable books that might remain unclaimed, the ASA does not increase entry barriers that distributors face in the but-for world, and in several respects it lowers them. In the but-for world, a distributor wishing to offer a commercially unavailable book online has three choices. It can invest resources trying to locate the Rightsholder of the book; it can take the risk of litigation by scanning the book and making its entire contents available online; or it can scan the book but only make limited portions of the text available under the "fair use" exception.

If the ASA is approved, all of these options remain available to any other firm. With respect to the first option, a distributor will benefit substantially from the ASA because it will know which books remain unclaimed, not only after efforts by the Registry, but also by the Unclaimed Works Fiduciary.[26] A distributor therefore will be able to assess much more efficiently which books warrant additional efforts to locate Rightsholders, and any book where the likely benefits exceed the potential costs is much *more likely* to be brought to market by distributors than in the but-for world. As to a distributor's second option – digitize the book and make it entirely available – the ASA does nothing to prevent the distributor from that course.

---

[25] ASA § 6.6(d).
[26] ASA § 6.2(b)(i) (providing Unclaimed Works Fiduciary with additional power to locate Rightsholders of unclaimed works).

Finally, as to the third option, the ASA increases certainty regarding the possibility and potential costs of a subsequent settlement, and it also creates a licensing entity that could act as an "agent" for Rightsholders.  Under the ASA, the Registry is not prevented from licensing the entire corpus of unclaimed books in any future settlement on terms more favorable than the terms provided to Google.[27]

### b.    Institutional subscriptions.

The ASA also increases output by facilitating the creation and offering of an entirely new product: the institutional subscription.  The institutional subscription enables those at participating institutions to fully view all commercially unavailable books that are available for purchase under the settlement, and all Commercially Available books whose Rightsholders elect to be included in the subscription.  An institutional subscription of this scope would not exist without the ASA.  The addition of a market option that otherwise would not exist is not merely procompetitive; it is a significant advance in making information available to people throughout the country who do not have access to major university research libraries.

The ASA lowers barriers to entry for other potential distributors of similar products.  By clarifying which books are out of copyright, the ASA lowers the costs of digitizing these books and offering them as part of an institutional subscription.  As for in-copyright books, by creating agents (the Registry and Unclaimed Works Fiduciary) to aggregate and license rights, and by funding a process for locating Rightsholders who can authorize such licensing (and creating a financial incentive for them to do so), the ASA dramatically lowers the cost to rivals of obtaining licenses that will enable them to offer their own subscription products.[28]

---

[27] Section 3.8(a) of the Original Settlement, the "most favored nations" clause, has been eliminated from the ASA.

[28] ASA § 6.2(b)(i) (The Registry "will be organized on a basis that allows the Registry" to "the extent permitted by law, license Rightsholders' U.S. copyrights to third parties").

2.      **The ASA does not violate Section 1 of the Sherman Act**

Under the ASA, Google has offered Rightsholders a 63% revenue split on any commercial exploitation of their book, and the option to use Google's pricing algorithm, which mimics competitive pricing. Some critics contend that the default revenue split amounts to *per se* horizontal price-fixing at the wholesale level, and the default use of the algorithm and certain discount provisions amount to *per se* horizontal price-fixing at the retail level. Some also have challenged the pricing of the institutional subscription product, usually on rule of reason grounds.

These arguments fail for several reasons. First, there is no horizontal agreement that eliminates competition that otherwise would exist, which is the touchstone of Section 1. Second, this agreement is squarely governed by *BMI v. CBS*, 441 U.S. 1 (1979), because the provisions here, as in that case, lower transaction costs and expand output. Third, these provisions have none of the customary "pernicious" effects that would warrant *per se* condemnation, and indeed are reasonably related to the settlement's procompetitive purposes. Finally, with respect to the subscription product, there has been no showing that the challenged provisions will have any anticompetitive effects.

a.      ***Per se* treatment is inappropriate because there is no horizontal agreement that eliminates competition among competitors.**

In a recent *amicus* brief filed by the Justice Department with the Supreme Court, the Justice Department noted that "the 'central evil addressed by Sherman Act Section 1' is the 'elimination of competition that would otherwise exist.'" Brief for the United States as *Amicus Curiae* in *American Needle, Inc. v. NFL,* No. 08-661, at 13 (September 25, 2009) (quoting 7 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1462(b) (2d ed. 2003)), *available at* http://www.justice.gov/atr/cases/f250300/250316.pdf. Nothing in the ASA

"eliminates competition that would otherwise exist," and so the central concern of Section 1 is not raised here.

To begin with, as a factual matter, the ASA does not eliminate any competition because the ASA represents a nonexclusive *offer* by Google. It is no more a horizontal agreement than any other standard offer to multiple suppliers. Each Rightsholder is free to decide whether to accept the offer, or to try to negotiate separate terms on its own with Google. Indeed, the Department of Justice states that it expects many Rightsholders to withdraw their books from the ASA and negotiate their own deals with Google,[29] highlighting the fact that the ASA does not dampen competition between Rightsholders in negotiating such deals.

For this reason anxieties expressed by some critics (notably those worried about *increased* competition, such as Amazon) make no sense. The principal "victim" of a horizontal agreement among Rightsholders would be Google. Not surprisingly, there is no such agreement —only multiple vertical agreements on price and royalties.[30]

The ASA does not "eliminate competition that otherwise would exist" for other reasons. First, with respect to Commercially Available books, the class-wide relief as to such Books is *not* to display them unless the author and publisher expressly authorize Google do to so—in other

---

[29] D.I. 922 at 17.

[30] The Department of Justice has advocated for additional renegotiation rights for Google, *see* D.I. 922 at 17-19, but these changes are neither legally required by Section 1 nor practicably necessary or feasible. Google's unilateral offer is not converted into a "horizontal" agreement simply because Google has made the offer irrevocable. Moreover, as a practical matter, Google has, as the Department of Justice notes, the right under ASA § 3.7(e) not to distribute an individual book for non-editorial reasons, as well as the right under § 4.5(a)(iii) to extend subsequent offers on Commercially Available books based on a different revenue split. The Department focused especially on renegotiation of terms for commercially unavailable books, but for the books in this category that are unclaimed, there is literally no one with whom to negotiate; and for the books that are claimed, as discussed in detail below, it is precisely this category of books for which the transaction costs of individual negotiation are especially infeasible.

words, the default is to *reject* Google's offered terms. Just as would be the case for any standard

offer made by Google in the marketplace, the Rightsholder is free to adopt any course: it can

accept Google's offered terms; it can reject those terms and negotiate different ones with another

distributor; it can reject those terms and negotiate different ones with Google; or it can pursue

some combination of these alternatives, as the Google offer is strictly non-exclusive. For any

Commercially Available book, therefore, as Professor Einer Elhauge of Harvard Law School has

observed, "it is hard to see how an agreement not to horizontally agree on something can amount

to a horizontal agreement."[31]

Second, the ASA also does not "eliminate competition that otherwise would exist" in

commercially unavailable books. New copies of those books are not currently offered for sale

from any source. There is, in other words, no "competition" to "eliminate." If another

distributor such as Amazon makes the book available for sale, the book becomes "Commercially

Available" and subject to the ASA default rule that rejects the terms of Google's offer.[32] A book

is and remains "commercially unavailable" *only* if the transaction costs of individual negotiations

are prohibitively high, so that, in the "but for" world in which the ASA is not approved, neither

Amazon nor any other distributor will bring these books to market. "Commercially unavailable"

books therefore are not and will not be available in the market but for the reduced transaction

---

[31] Elhauge at 33.

[32] The Department of Justice suggests that an out-of-print book that a rival offers in e-book form might not be deemed a commercially available book because the Department of Justice reads the settlement to provide that a book must be in print to be a "Book." D.I. 922 at 17 n.14. But the ASA defines a "Book" as "a written or printed work that as of January 5, 2009 ... had been published ... in hard copy form under the authorization of the work's U.S. copyright owner." ASA § 1.19 (emphasis added). Thus, as long as the book was ever in print before January 5, 2009, then it would be a "Book" even if it has fallen out of print, and would count as a "commercially available book" during any future time when it is commercially distributed in e-book form. The Department of Justice argument is also internally inconsistent because if out-of-print books were not "Books," then none of the settlement terms would apply to them, including the provisions on commercially unavailable "Books" to which the Department of Justice objects.

costs that the ASA enables, and there is no "competition that otherwise would exist" with respect to these books.

Finally, as even many objectors concede, it would be impossible as a practical matter for Google to offer a subscription product absent the proffer of standard terms. In accepting these terms, Rightsholders have not eliminated competition that would otherwise exist, because no Rightsholder can offer this product on its own.

> **b.    Even if there were a horizontal agreement, under *BMI* these provisions should be analyzed under the rule of reason.**

The Second Circuit has emphasized that a "departure from the rule-of-reason standard must be based upon *demonstrable economic effect* rather than upon formalistic line drawing." *Major League Baseball,* 542 F.3d at 316 (quoting *Leegin*, 551 U.S. at 886) (emphasis in original). *Per se* treatment "is not appropriate" where "the economic and competitive effects of the challenged practice are unclear." *Id.* To justify *per se* prohibition, "a restraint must have manifestly anticompetitive effects, and lack any redeeming virtue." *Id.* (quoting *Leegin*, 551 U.S. at 886). Accordingly, the Supreme Court "has repeatedly expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious." *Major League Baseball*, 542 F.3d at 316 (citations and quotations omitted). As noted above, *per se* treatment is appropriate only after "experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Id.* at 315 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).[33]

---

[33] *See BMI*, at 19-20 (restraints subject to *per se* rule "always or almost always tend to restrict competition and decrease output"); *see also General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-595 (7th Cir. 1984) ("If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too – in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects").

The *per se* cases cited by objectors bear no resemblance to this case.  In each of the cases cited by objectors, horizontal competitors agreed on the prices they would charge their customers, for the purpose of suppressing output and restricting competition, in ways that lacked any procompetitive justification.[34]  The dissimilarity between such cases and the ASA serves to highlight the lack of any experience that would enable the Court to "predict with confidence" an anticompetitive effect from the challenged provisions.

In economic substance, this case is governed by *BMI v. CBS*, 441 U.S. 1 (1979).  In *BMI,* the Court considered a blanket licensing arrangement challenged by the plaintiff as *per se* horizontal price fixing.  Although the arrangement did set horizontal prices, the Court held that *per se* analysis was inappropriate because the agreement furthered the procompetitive purposes of lowering the transaction costs required to identify and negotiate with thousands of individual rightsholders, and creating a new product (the blanket license) that otherwise would not be possible.

Indeed, the ASA creates even greater procompetitive benefits than those found sufficient to justify rule-of-reason treatment in *BMI* while creating fewer restrictions than were present in that case.[35]  Like the blanket license in *BMI,* the ASA reduces transaction costs that made direct licensing with many Rightsholders costly.  Also like *BMI,* the ASA creates an intermediary that offers a blanket license (the institutional subscription product), and music purchasers in *BMI* had

---

[34] In *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150 (1940), for example, competitors agreed to buy oil on the spot market, for no purpose other than to prop up retail oil prices.  In *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982), the medical association fixed prices for all doctors for each particular type of service, in the absence of any integration of services or other procompetitive benefits.  *See also Catalano Stores. Inc. v. Target Sales*, 446 U.S. 643 (1980) (per curiam) (competitors agreed not to offer credit, a kind of discount, to customers); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-82 (1975) (adoption of price floor for legal services).

[35] Elhauge at 54-60.

the continued ability to make direct purchases from individual Rightsholders without going through the intermediary, just as book purchasers, under the ASA, can make direct purchases from individual Rightsholders without going through Google.

In addition to these similarities, there are also differences that make the ASA even more procompetitive than the arrangement in *BMI*.  In *BMI*, the intermediary offered only a blanket license, not the ability to purchase individual songs.  It was this failure to offer anything less than a blanket license that the *BMI* plaintiff challenged.  Here, by contrast, the ASA obligates Google to offer books on both a blanket and individual basis, providing from the outset the remedy that the *BMI* plaintiff sought.  The *BMI* rightsholders also could not set their own prices for sales through the intermediary, as Rightsholders can do under the ASA.  Perhaps most importantly, the *BMI* rightsholders could not license the same song through a rival intermediary, whereas the ASA is completely non-exclusive.

Objectors' attempts to distinguish *BMI* are unpersuasive.  The Department of Justice, for example, distinguishes *BMI* on the ground that the association there offered only uniform blanket licenses, and was unable to license individual works.[36]  That is true, but it weighs in favor of the ASA.  It makes no economic sense to say that mandatory uniform pricing within the blanket license is better for competition than choice in pricing, and there is no hint in the Court's opinion that it would have been competitively problematic if BMI had offered the licenses sought by CBS.  The Department of Justice likewise distinguishes *BMI* on the ground that the associations there engaged in separate revenue split negotiations with Rightsholders.  This purported fact, however, nowhere appears in the Court's decision, and certainly was not central to its reasoning.

Finally, the Department of Justice's argument that "book authors and publishers have not

---

[36] D.I. 720 at 18-19.

shown that they lack a practical means to be paid for uses of their works in the absence of collectively negotiated pricing mechanisms," *id.* at 19, is, with respect to commercially unavailable books (the only books that even arguably involve collectively negotiated terms), belied by the very existence of this category of books. The Department of Justice cannot explain how these books can be "brought back to life" without the cost-lowering provisions of the ASA, or that they would be made available for sale except through the ASA.

If, as the Department of Justice contends, the books profitably can be offered for sale based on individual negotiations, then firms in addition to Google will offer these books, they will be "Commercially Available" under the ASA, and therefore will not be offered for sale through the ASA unless the Rightsholder affirmatively so chooses pursuant to a vertical agreement with Google. If, on the other hand, some books remain for sale only through the ASA (that is, they are "commercially unavailable"), the cost-reducing provisions of the ASA that enable these books to be offered are precisely what *BMI* held should be encouraged under the antitrust laws. *See BMI*, 441 U.S. at 23 ("joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all"); *see also Major League Baseball*, 542 F.3d at 323 (the arrangement in *BMI* "facilitated competition" by facilitating "dealings between copyright owners and those who desired to use their music").

        **c.**    **The ASA's individual purchase provisions are reasonably related to the settlement's procompetitive purposes and lack anticompetitive effects.**

        **(i)**    **Revenue split**

In *Major League Baseball*, the Second Circuit rejected a *per se* challenge to a revenue split arrangement. In that case, the plaintiffs challenged a profit-sharing arrangement and called it an agreement on "price," as objectors do here. The plaintiffs in that case also argued that the

agreement to split revenues proportionately should be condemned as *per se* price-fixing, notwithstanding evidence showing that the arrangement had led to an increase rather than decrease in output. 542 F.3d at 320-321.

In rejecting plaintiffs' *per se* argument, the Second Circuit expressed skepticism whether a revenue-split arrangement constituted an agreement on price. *See* 542 F.3d at 320 ("the so-called 'price' restriction is not in fact an agreement on 'price' but rather an agreement for the sharing of profits"). The court also emphasized the output expansion that had occurred under the arrangement. *Id.* at 319, 322-323. Then-Judge Sotomayor, in her concurrence, agreed that the restraint was permissible under Section 1. She observed that joint ventures normally should be evaluated under the rule of reason and that the proper standard for evaluating the profit-sharing provision was whether it was reasonably related to the efficiency-enhancing benefits of the joint venture or served only as a naked restraint on competition and had "manifestly anticompetitive effects." *Id.* at 337-338.

Under *Major League Baseball*, the revenue split is reasonably related to the ASA's procompetitive purpose. By offering a single uniform split, Google is able to lower transaction costs for its institutional product and for commercially unavailable books that otherwise are not sufficiently profitable to support individual negotiations (otherwise they would not still be, or would not remain, commercially unavailable). At the same time, the uniform revenue split enables these books to begin earning revenues, which creates the incentive for Rightsholders to come forward and claim the books (which in turn lowers the transaction costs of negotiating with specific rightsholders with respect to these out-of-print books and increases the odds that they will become Commercially Available and thus removed from the scope of the provision).

No anticompetitive effect flows from the 63% revenue split.[37]  Under the ASA, either party can reject the 63% split.  If Google's share ends up being too high, a Rightsholder can simply decline to sell its book through Google (without even permitting Google any display promotion).  If the distribution markup is too low, the ASA clarifies that Google can decline to carry any individual book that is Commercially Available.[38]

The revenue split also does not alter Google's incentives in setting the revenue-maximizing price for each individual book—just as in a competitive marketplace.  As reflected by the fact that the revenue split is not taken into consideration in Google's pricing algorithm, the incentive to maximize revenue for each individual book remains the same, regardless of how the revenues are split.[39]  The split between Rightsholders and Google thus does not affect retail prices charged to consumers, and, even if the revenue split is unfair, either to Google or to Rightsholders, it still has no affect on third parties.[40]

Because the revenue split is reasonably related to the ASA's procompetitive purposes, and it has no manifestly anticompetitive effects, it should be sustained under *Major League Baseball.*

### (ii)    Pricing algorithm

As with the royalty split, there is no horizontal agreement among Rightsholders that they will accept Google's algorithm price.  Rather, the ASA enables each Rightsholder to decide whether to accept Google's offer at all, and, if it does, to decide to set its own price (which can

---

[37] *See also* Elhauge at 36-38.

[38] ASA § 3.7(e).

[39] D.I. 275 (Amicus Brief of Antitrust Law and Economics Professors in Support of the Settlement) at 11-12.

[40] Unlike *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), where Toys "R" Us pressured toy manufacturers to harm "club" stores and the public by selling less favorable toy packages to those "club" stores, the royalty split, no matter what it is, does not affect third parties to the agreement.

be any price, including zero), or to allow Google to set the price through its pricing algorithm.

For those Rightsholders who choose to accept the Google-determined price, the ASA provides for the *exact opposite* of an agreement between competitors on retail price.[41]  Rather, each supplier has agreed with Google that *Google* will set the price, according to an algorithm that Google will unilaterally design and maintain.  The only constraint on Google's pricing is that Google has stated that its pricing algorithm will simulate competitive prices—in other words, precisely the opposite of the supracompetitive prices that are the hallmark of illegal horizontal agreements.  (Indeed, if the ASA were considered to be a horizontal agreement, it would be an agreement to price competitively, not to fix prices.)

Objectors have not cited any case (nor can they) explaining how such competitive pricing—especially by a new entrant whose current market share is zero—possibly could be "manifestly anticompetitive" or a restraint "that would always or almost always tend to restrict competition and decrease output."  *Leegin*, 551 U.S. at 886 (citations omitted).  If anything, use of a price algorithm that simulates competitive prices is more competitive than if Rightsholders set their own prices while taking their rivals prices into account—a classic form of oligopolistic competition, or "conscious parallelism," which the antitrust laws do not make unlawful but that can sometimes raise prices above perfectly competitive levels.[42]

At a minimum, the lack of any anticompetitive effects precludes *per se* condemnation. Beyond that, however, the provision clearly is reasonably related to the ASA's procompetitive

---

[41] *Compare Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-35 (1969) (two competing newspapers agree to fix prices for sales and advertising); *Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538, 540-41 (4th Cir. 1958) (competing excelsior manufacturers fix prices through a third party and all manufacturers are bound to charge the agreed upon price); *New York v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412-14 (S.D.N.Y. 2000) (only two competing hospitals appoint third party to negotiate the *same* rates with insurers, eliminating all competition between the two).

[42] *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007); Elhauge at 34-35.

purposes.  Until such time as commercially unavailable books (the only books that by default are subject to the pricing algorithm) are offered for sale, and begin to collect the revenues that will induce Rightsholders to step forward, typically it will not be clear who the Rightsholders are, or who controls the right to price the books.  By enabling Google to price these books at the price that a rational Rightsholder would price them, if the Rightsholder were known, the algorithmic pricing provision enables Google to lower significantly the transaction costs of offering these books, which in the absence of the ASA have been unprofitable to commercialize.

### (iii)    Discounting

The ASA provides that Google will have an *unlimited* right to discount the list price of books for consumer purchase, so long as it continues to pay 63% of the undiscounted list price to the Registry. Google may also make special offers for books at reduced prices from the list price, in which case Google only must pay 63% of the discounted price to the Registry; but Rightsholders (and the Unclaimed Works Fiduciary) will be notified of this reduced price proposal and can disapprove it for their books.[43]

The provision enabling special offers under which Google pays a revenue split off the discounted rather than retail price is one that Google sought and that benefits Google, by reducing Google's transaction costs in seeking to obtain Rightsholder participation in discounting.  Concerns expressed by objectors, most of them Google competitors, that this provision is anticompetitive—all of which are predicated on the view that the provision harms Google—therefore ring hollow.

Under the ASA, Google's ability to discount prices is entirely unrestricted.  This provision bears not the slightest resemblance to cases such as *Catalano Stores, Inc. v. Target Sales*, 446 U.S. 643 (1980), on which critics such as Amazon rely.  In *Catalano*, the defendants

---

[43] ASA §§ 4.5(b)(i), 4.5(b)(i)(ii).

horizontally agreed to restrictions on credit terms, which the Court held was akin to *prohibiting* a kind of discount.  *Id.* at 648-50.  Here, by contrast, the ASA simply *permits* the Registry to agree to discounts.  The provision thus facilitates discounting, rather than restricting it; and it does nothing to limit the right of Rightsholders to set their own list prices, or Google to discount as much as it chooses from the retail level.

> **d.    The institutional subscription pricing provisions are lawful under the rule of reason.**

As noted earlier, the ASA makes possible an entirely new product, an institutional subscription service that could not exist absent the settlement.  Creation of a new product that could not exist but for the ASA is unquestionably procompetitive, and, as in *BMI*, uniform pricing is reasonably ancillary to the creation of this product by avoiding the necessity of conducting thousands of individual negotiations.  *See BMI*, 441 U.S. at 20 ("a middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided").

Under *BMI*, the Registry's involvement in approving prices set by Google is not unlawful. In *BMI,* neither the Supreme Court nor the appellate court on remand found collective price-setting for a blanket license problematic.  *BMI*, 441 U.S. 1 (1979); *Columbia Broadcasting Sys., Inc. v. Am. Soc. Of Composers, Authors & Publishers*, 620 F.2d 930 (2d Cir. 1980).  At both levels of review, the *BMI* courts relied on the ability of customers to purchase individual licenses from Rightsholders as sufficient to offset any concerns regarding competitive effects.  *BMI*, 441 U.S. at 24; *Columbia Broadcasting*, 620 F.2d at 936.  That was so even though the agreement in *BMI* was exclusive in that rightsholders could not also license their works through another intermediary (thereby preventing any other blanket license from including those works), and the intermediary did not provide the option of licensing the works on an individual basis.

*See BMI*, 441 U.S. at 10-11.

Under the ASA, by contrast, there are substantially fewer, if any, potential anticompetitive effects, because the arrangements are entirely non-exclusive.  The Registry as well as individual Rightsholders can license books to Google's rivals on any terms they choose, thereby permitting other distributors to include these books in their own blanket licenses; and Google enables customers (if permitted by Rightsholders) to purchase books individually as well as through the institutional subscription.

There are, moreover, additional checks on any potential competitive effects.  To begin with, the Registry, not Rightsholders themselves, is involved in reviewing and approving the blanket price.  The ASA specifically creates a fiduciary responsibility of the Registry to each Rightsholder,[44] and prohibits the Registry from "coordinating Rightsholders for purposes of representing them as a subgroup regarding any matter under this agreement."[45]  This means the Registry could not, for example, represent the interests of large publishers where they are inconsistent with interests of other Rightsholders.

Google will be setting the institutional subscription price, subject to review and approval by the Registry.[46]  Finally, Google has now signed agreements with its library partners, such as the University of Michigan, which allow those universities to challenge through arbitration whether the institutional subscription price tiers meet the "broad access" objectives.[47]

---

[44] ASA § 6.2(b)(i).

[45] ASA § 6.2(b).

[46] ASA §§ 4.1(a)(iv), 4.1(a)(vi)(2).

[47] Amendment to Cooperative Agreement (Between Google and the University of Michigan) Attachment A (May 19, 2009), at § 1(d) (defining an "interested institution" to include any fully participating or cooperating library); § 3(c) (allowing any "interested institution" to challenge university subscription rates), *available at* http://www.lib.umich.edu/files/services/mdp/Amendment-to-Cooperative-Agreement.pdf; *see* Miguel Helft, *Google Book-Scanning Pact to Give Libraries Input on Price*, The New York

### 3.     The ASA does not violate Section 2 of the Sherman Act

The ASA does not violate Section 2 of the Sherman Act.  Most fundamentally, Section 2 requires, *inter alia,* some exclusionary act – that is, conduct that tends to impair the opportunities of rivals, and that does not further competition on the merits or does so in an unnecessarily restrictive way.[48]

Settlement critics have failed entirely to identify any such provision in the ASA, because the ASA makes it easier, not harder, for potential rivals to offer similar services.  Instead, they have fallen back on claims that the ASA does not completely eradicate *pre-existing* barriers to entry.  For example, they complain that the ASA provision that allows the Registry to license claimed books, and the Unclaimed Works Fiduciary to license unclaimed books, "to the extent permitted by law,"[49] is not sufficient to enable Google's rivals to obtain a license as comprehensive as Google's.  They also claim that the provision authorizing Google to designate resellers for books offered through consumer purchase[50] does not offer competitors more than the opportunity to be Google "franchisees."  On that basis, they complain that the settlement creates a *de facto* exclusive license that constitutes illegal monopolization under Section 2.

These claims seek to create an outsized "duty to assist rivals" that would deter innovation and that is the antithesis of existing law.  For example, critics complain that unless Google ensures through the ASA that its rivals are able to obtain a license to unclaimed books, Google

---

Times, May 20, 2009, *available at* http://www.nytimes.com/2009/05/21/technology/companies/21google.html?_r=1 ("The new agreement. . . lets the University of Michigan object if it thinks the prices Google charges libraries for access to its digital collection are too high . . . Any pricing dispute would be resolved through arbitration.").

[48] 3 Philip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651g (3d. ed. 2009); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ("Having a monopoly does not by itself violate § 2. A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct.").

[49] ASA § 6.2(b)(i).

[50] ASA § 4.5(b)(V).

should not be permitted to offer the innovative services permitted under the agreement because it will allegedly gain an "unfair" advantage in search advertising.[51]  Google, however, undertook to scan a large number of books at an enormous cost.  Well-funded competitors such as Microsoft and Yahoo! had their own book scanning projects, but later chose to exit the market.  In Microsoft's case, it exited in May 2008 after having scanned some 750,000 books (including both in-print and public domain books) and indexed 80 million journal articles.

In announcing the termination of its program, Microsoft stated that it had not developed "an underlying, sustainable business model" in connection with its book search program, and instead it was going to "focus on verticals with high commercial intent, such as travel."[52]  This announcement shows that book search was not integral to Microsoft's search strategy. Nonetheless, it is obviously well within Microsoft's reach to resume scanning books if it so chooses.  There are hundreds of thousands of in-print books, and millions of public domain books, that Microsoft could scan; and, as noted earlier, the ASA reduces the costs of identifying public domain books, and obtaining a license to books that are still under copyright.

In sum, nothing in the ASA prevents Microsoft or any other entity from taking the same steps Google did.  As noted earlier, the ASA has made it easier for them to do so in numerous ways.  But even if the ASA did not lower barriers to entry at all, the antitrust laws do not require Google to share any advantage it gains by creating a searchable index of unclaimed works, particularly to the benefit of competitors that decided such efforts were not worth the cost. *Verizon Communications v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407-411 (2008) (refusal to cooperate with rivals violates Section 2 only in extremely limited circumstances).

---

[51] *See, e.g.*, D.I. 840 at 16-18; D.I. 874 at 15-24.

[52] Microsoft Blog, *Book Search Winding Down* (May 23, 2008), *available at* http://www.bing.com/community/blogs/search/archive/2008/05/23/book-search-winding-down.aspx.

There are numerous additional flaws with these "*de facto* exclusivity" claims. For example, there is no reason to believe that the ASA would give Google the power to set monopoly prices over any set of digital books, even if Google is the only licensee to the unclaimed books remaining after the Registry and Unclaimed Works Fiduciary have expended every effort to find these Rightsholders.[53] Potential rivals will be able to digitize out-of-copyright books, and to license many in-copyright books; the combination of such books with other differentiated works, such as exclusive licenses to unique foreign collections or professional periodicals, is likely to be competitive with a set of books that is differentiated only by the relatively small residual of unclaimed books that would remain after the location efforts of the Registry and Unclaimed Works Fiduciary.

Even without these additional flaws, however, the fundamental premise of objectors is that, absent the ASA, no one will provide consumers with access to these books—because, they contend, no one besides Google will offer them, even with the reduced entry barriers under the ASA. In the upside-down world of Google's competitors, consumers also should be denied access to these books through Google. That is, however, not a result sanctioned under the antitrust laws. The antitrust laws have at their core the goal of encouraging innovation and expanding consumer welfare. They provide no basis for seeking, as these competitors do, to reduce them.

### E.    The ASA is fair to third parties.

A number of third parties who are not members of the class have objected or filed amicus briefs arguing that the settlement is unfair to third parties. Setting to one side antitrust concerns, we are aware of no court that has ever disapproved a class action settlement on the ground that it is not "fair, adequate, and reasonable" to strangers to the litigation, as opposed to class members,

---

[53] Elhauge 48-52.

and the Court should not do so here.  At any rate, as discussed below, the ASA does not harm

libraries or other digitization efforts, as some objectors have alleged, and the objections which

have been raised with respect to privacy are addressed by commitments Google has made in the

ASA and elsewhere.

**1.    The ASA does not harm libraries or other digitization efforts.**

Some objectors argue that approval of the Settlement Agreement will harm libraries,

some even contending that "there will be little need of libraries in the future" if the settlement is

approved.  D.I. 465 at 14.  This could not be farther from the truth, as is reflected by the

outpouring of support from libraries large and small.  Anne Kenney, University Librarian of

Cornell University, explains that "most of the Library's holdings, most of which have been out

of print for decades and are of little commercial value, will not just be indexed, but will also be

available to readers across the country," and that "[t]he potential benefit of this to researchers is

inestimable."  D.I. 241 at 1.  Ms. Kenney further notes that the Cornell University Library's

collections have been opened for scanning both to Google and to competing scanning projects

run by objectors Microsoft, the Internet Archive, and Amazon.com.  *Id.*

Smaller libraries, too, support settlement approval: Abilene Christian University, a

university whose library offers 1.6 million volumes (to Cornell's more than seven million),

supports settlement approval because "[u]nfettered access to information is the cornerstone of

higher education, and the new access models created by the settlement will be of extraordinary

value to research at our institutions, lessening inequalities among educational institutions as

information becomes available to all students everywhere."  D.I. 159 at 1.  The National

Association for Equal Opportunity in Higher Education, representing the nation's Historically

Black Colleges and Universities, looks forward to the day when its members "will be able to

provide electronic access to a corpus of books on par with" the largest academic libraries.  D.I.

52

350 at 2.  And, while they urge Court oversight following approval, settlement approval is supported by the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries, representing over 139,000 libraries in the United States.  D.I. 100 at 1-2.  As discussed in Plaintiffs' briefs, far from harming libraries, the ASA provides substantial benefits for libraries large and small through the free Public Access Service and the offering of Institutional Subscriptions.  ASA §§ 4.8 & 4.1.

Nor would other digitization efforts be in any way hampered by approval of the ASA. All of the authorizations contained in the ASA are entirely nonexclusive; no Rightsholder sacrifices any right to authorize scanning and display by Microsoft, the Internet Archive, or Amazon.com by virtue of participation in the ASA's Revenue Models.  The ASA does not preclude anyone else from digitizing books.  In one signal respect, the Amended Settlement facilitates digitization efforts because it will create a Registry, which will maintain a database of Books that are claimed.  The Registry can communicate directly with claiming Rightsholders, on behalf of third parties, to ask them whether they would authorize the Registry to license third parties.

### 2.    The objections relating to user privacy have no merit.

Objections have been raised on the ground that the ASA does not contain more extensive provisions regarding the privacy of information collected about users of Google Book Search. First, the question is whether the ASA is "fair, reasonable, and adequate" as a settlement of class members' copyright claims, not whether this Court should make it more difficult for law enforcement agencies or civil litigants to obtain information about usage of books.  This Court is being asked to approve a settlement agreement creating a resource through which users may exercise their First Amendment rights, but that does not mean that the ASA is a form of state action subject to First Amendment scrutiny.  A municipal government does not

unconstitutionally chill speech when it approves a building permit for a bookstore without first reviewing the bookstore's privacy policy.  Likewise, this Court should approve the ASA because it is fair, reasonable, and adequate in its treatment of class members, and should view the privacy objections through that lens.

Second, the ASA reflects a reasonable judgment that Google should not be required to make detailed privacy commitments in the ASA for services that have not even been designed yet.  As Dan Clancy, Engineering Director for Google Books, explained in a post on the Google Public Policy Blog on July 23, 2009:

> We have a strong privacy policy in place now for Google Books and for all Google products. But our settlement agreement hasn't yet been approved by the court, and the services authorized by the agreement haven't been built or even designed yet. That means it's very difficult (if not impossible) to draft a detailed privacy policy. While we know that our eventual product will build in privacy protections—like always giving users clear information about privacy, and choices about what if any data they share when they use our services—we don't yet know exactly how this all will work. We do know that whatever we ultimately build will protect readers' privacy rights, upholding the standards set long ago by booksellers and by the libraries whose collections are being opened to the public through this settlement.

Declaration of David Clancy in Support of Motion for Final Approval of Amended Settlement Agreement ("Clancy Decl.") ¶ 21.

Third, and to be clear, Google takes user privacy very seriously and has taken additional steps to address the objectors' concerns.  After the submission of the original Settlement Agreement, Google was approached by counsel representing the "Privacy Authors and Publishers" who later objected in Docket Item 281.  Declaration of Daphne Keller in Support of Motion for Final Approval of Settlement Agreement ("Keller Decl.") ¶ 2.  Counsel stated that they were considering objecting to the Settlement Agreement on the ground that it did not contain what they considered to be sufficient protections for user privacy.  *Id.*  Counsel explained their concerns, and Google responded by making clear that the services contemplated by the

ASA would be covered by the overall Google Privacy Policy, as well as a written Policy or

Policies specific to Google Book Search and to the services contemplated by the ASA.  Keller

Decl. ¶ 4.  Counsel for the Privacy Authors and Publishers pressed Google for enforceable

written commitments regarding user privacy for the services contemplated by the ASA even

before those services are made available to consumers, in a departure from Google's regular

practice.  Keller Decl. ¶ 5.  After lengthy discussions, Google made meaningful commitments in

the form of its Books Privacy Policy, a document that is enforceable under the Federal Trade

Commission Act.  *See* 5 U.S.C. § 45(a); *In the Matter of GeoCities*, FTC Docket No. C-3850.  In

addition to the current privacy commitments in place for the entire Google Book Search

program, Google has committed to additional safeguards for the services authorized under the

ASA, which are described in further detail in the Google Books Privacy Policy itself:[54]

- Google commits that the privacy policy for any publicly available product authorized by the settlement will uphold the significant privacy commitments listed in the current Books Privacy Policy, which are at least as protective as those in place today for other Google products and services.

- No individual registration will be required for Preview Uses, Institutional Subscription, or the Public Access Service.

- Registration is necessary for the Consumer Purchase service, because Google needs to keep track of who has purchased which Book.  However, Google plans to build protections to limit the information (such as book titles) available to credit card companies about book purchases, and to enable users to delete or disassociate the titles of books purchased from their Google Accounts.

---

[54] *See* Keller Decl. ¶ 6 & Ex. A (Google Books Privacy Policy), *available at* http://books.google.com/googlebooks/privacy.html.

- With respect to personally identifiable information about users, the Registry will have no easier access to such information than any other third party.

In their brief, the Privacy Authors and Publishers demand that Google adopt seventeen different proposed policies which those objectors contend would protect user privacy to an even greater extent.  D.I. 281 at 21-24.  As their brief notes, eight of those seventeen demands have already been met by the privacy policy discussed above.  Implementation of the remaining demands would be unnecessary, unwise, or infeasible at this time.

For example, the objectors would have the ASA require Google to refuse to respond to every civil subpoena seeking user information, and produce such information only if ordered to do so by a Court.  D.I. 281 at 22.  Google has already committed to raise such objections in jurisdictions where there are applicable legal protections for information about books, and to continue its history of fighting for high standards to protect users against overreaching information requests where the law may be unclear.  *See* Keller Decl. Ex. A (Google Books Privacy Policy) ("Where these 'books laws' exist and apply to Google Books, we will raise them.").  But the Privacy Authors and Publishers would have Google commit in advance to assert these protections regardless of context or applicable law.  While it may represent good policy, the Colorado Supreme Court's opinion in *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044 (Colo. 2002), cited by objectors, is not the law throughout the United States and may not provide viable arguments against information disclosure in every possible case.  Adopting objectors' proposal would require Google to commit to litigation in unforeseeable, and perhaps inappropriate, circumstances in areas of law unrelated to the subject of the settlement.

The Privacy Authors and Publishers also demand that Google "[p]urge all logging or other information related to individual uses of Google Book Search no later than 30 days after

the use." D.I. 281 at 22. This proposal would bar Google from identifying to a user the books he

or she has browsed more than 30 days before, hampering any research project lasting for more

than a month. It would also prevent Google from recommending Books to users on the basis of

an analysis of their long-term preferences, and could hamper Google's ability to maintain logs

for security purposes to meet its obligations under the ASA. The Court should not force Google

to make its products work less well on the basis of unsupported speculation that these features

could chill free speech.

### F.    The remaining objections raised by class members are addressed in the ASA.

#### 1.    Google's database of information about Books is already comprehensive and will be improved.

A number of Rightsholders, particularly European Rightsholders, have expressed concern

about the accuracy of Google's determination of whether a Book is Commercially Available. No

Display Uses will be made of a Book that is Commercially Available unless a Rightsholder

chooses to enable those uses. The ASA authorizes Display Uses for Books that are not

Commercially Available unless a Rightsholder chooses to disable those uses—unless, of course,

the Rightsholder has Removed the Book, or has opted out.

Under the ASA, a Book is Commercially Available if it is offered "for sale new, from

sellers anywhere in the world, through one or more then-customary channels of trade to

purchasers within the United States, Canada, the United Kingdom or Australia." ASA § 1.31.

The ASA contains stringent requirements for how this determination is to be made. ASA §

3.2(d)(i). In determining whether a Book is Commercially Available, Google must use "multiple

third-party databases as well as its analysis of the Book's retail availability based on information

that is publicly available to it on the Internet," including "databases from a range of United

States, Canadian, United Kingdom, and Australian sources." *Id.*

"Each of these sources may contain errors; Google, however, shall use commercially reasonable efforts to determine whether a Book is Commercially Available or is not Commercially Available using a methodology reasonably agreed to by Google and the Registry that is designed to minimize the overall error rate." *Id.* For Books which are not listed in these databases of books in print and are not available new from Internet retailers, the Books are regarded as not Commercially Available. *Id.* If any edition is listed as Commercially Available, all other editions—that is, all other Books sharing the same Principal Work—are designated Commercially Available. ASA § 3.2(d)(i)(1).

Google is using the best available data about Books, known as "metadata," to assist Rightsholders in identifying and managing their Books. It is using metadata from 48 libraries and pays approximately $2.5 million per year to license metadata from 21 commercial databases of information about books. Clancy Decl. ¶¶ 9-10. Google has gathered 3.27 billion records about books, and analyzed them to identify more than 174 million unique works. *Id.* ¶ 11. It has developed algorithms to compare these numerous sources of metadata and identify the most accurate data about each book. *Id.* ¶ 12.

But, like every library catalog ever created, Google's database of information about books is not perfect. Despite the assiduous efforts of generations of catalogers and commercial aggregators of book data, even the best available information about books is sometimes incomplete, incorrect, or simply nonexistent. This is not a problem Google created, but it is a problem Google has every incentive to remedy, and Google has committed to remedy such errors as they are found. ASA § 13.3 ("Google will also use reasonable commercial efforts to correct errors in the Books Database as Google discovers such errors or as they are identified to Google."). Indeed, many of the criticisms raised by objectors relate to Books that have not yet

been Digitized.  Once these works are Digitized, Google will have additional information with

which to discover and correct metadata errors.

The ASA contains a number of provisions intended to ensure that class members are not

prejudiced by any remaining inaccuracies.  Google commits in the ASA that it "will strive to

detect and eliminate errors in the Digitization quality or Metadata."  ASA § 17.10.  Rightsholders

may inform the Registry of any metadata errors, and the ASA provides that the Registry will

notify Google of any metadata errors of which it is aware.  ASA § 6.6(c)(ii). And for any Books

missing from the database, "Google will also allow members of the Amended Settlement Class

to submit bibliographic information (e.g., title, author, and publication date) for Books not in the

Books Database."  ASA § 3.1(b)(iii).  The interests of Rightsholders and Google are aligned:

Google must, and will, expend resources in order to improve the metadata so that Google can

accurately keep track of, and users can find, the books they are looking for; Rightsholders have

every incentive to make Google aware of any remaining inaccuracies so that they may be

corrected.

With respect to Commercial Availability, "Rightsholders may provide information

directly to Google that a Book is Commercially Available when they submit their Claim Forms,

through the Books Database or, at any time after such submission, to Google or the Registry."

ASA § 3.2(d)(i).  And if there are mistakes, "then the Rightsholder of the Book may notify

Google, or may authorize the Registry to notify Google, of such mistaken determination."  ASA

§ 3.2(d)(iii).  Google may dispute such a notification, but only at its peril: if arbitration ensues

and the arbitrator finds in favor of the Rightsholder, Google must pay the Rightsholder's

attorney's fees and costs.  ASA § 3.2(d)(iv).

The ASA provides a further structural safeguard against any prejudice to class members

arising out of remaining Commercial Availability errors.  Before making any Display Uses of a Book based on a determination that the Book is not Commercially Available, Google must give 60 days' notice to the Registry.  ASA § 3.3(a).  This period is intended to allow time for the Registry and any affected Rightsholder to correct any Commercial Availability errors or to raise a dispute about the Commercial Availability of the Book.  *Id.*  If such a dispute is raised, Google is not permitted to make any Display Use of the Book until the dispute is resolved, even after the expiration of the 60-day waiting period.  *Id.*

Similarly, some objectors take issue with the fact that some provisions of the ASA do not impose liability on Google if Google makes an honest mistake with respect to a determination regarding Commercial Availability.  *See, e.g.*, D.I. 836 at 4.  But honest mistakes should not give rise to liability for damages, particularly because Rightsholders have notice and an opportunity to correct those mistakes before any Books are displayed.  The ASA requires Google to work to avoid Commercial Availability errors, but where they occur and where a Rightsholder has not corrected them, the appropriate remedy is correction of the errors, not liability for Google.

> **2.    Rightsholders can reasonably determine whether they registered their pre-1978 Books with the Copyright Office.**

Some class members have objected on the ground that, for books not published in Canada, the United Kingdom, or Australia, inclusion in the settlement hinges on whether the book was registered with the United States Copyright Office.  Objectors allege that it is too burdensome for them to ascertain whether their books were registered.

With respect to books published in the United States, the scope of the class reflects a limit on this Court's subject matter jurisdiction imposed by Congress in 17 U.S.C. § 411(a), at least as of the time of the negotiation of the Settlement Agreement.  The Second Circuit has ruled that those who have not registered their copyrights in United States Works may not be included

in a class of copyright infringement plaintiffs.  *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116 (2d Cir. 2007), *cert. granted sub nom., Reed Elsevier, Inc. v. Muchnick*, 129 S. Ct. 1523 (2009).  With respect to foreign works, registration is not required in order to bring suit; the ASA reflects the reasonable judgment that, where Rightsholders have registered their Books with the United States Copyright Office, they have signified their intent to avail themselves of the protections of United States law, and as a consequence, it is appropriate to include those works within the scope of the settlement.  ASA § 1.19.[55]

For Books registered since 1978, registration records are easily searchable on the website of the United States Copyright Office, www.copyright.gov.  For Books registered before 1978 but not yet in the public domain, the Copyright Office maintains records on paper, and lists those records in a publication called the *Catalog of Copyright Records*.  Historically, in order to search those records, one has had to travel to one of the libraries with a complete set of the *Catalog of Copyright Entries*, visit the Copyright Office in Washington, D.C., or pay someone in one of those places to perform the search.  *See* United States Copyright Office, *Circular 22: How to Investigate the Copyright Status of a Work*, *at* http://www.copyright.gov/circs/circ22.pdf.

In order to facilitate Rightsholders' investigations of the copyright status of their books, however, Google put its technical resources to work on the problem.  After discussions with Rightsholders and Class Counsel, Google scanned the entirety of the *Catalog of Copyright Entries* from 1923 (before which any books listed in the registry records are in the public

---

[55] The scope of works covered by the settlement was broader in the original Settlement Agreement, covering all foreign works whether or not registered and whether or not published in any particular country.  It was narrowed in response to objections from many of the same foreign Rightsholders who now object to the fact that the scope has been narrowed.  *Compare* D.I. 167 at 21 & n.13 (opposition of Börsenverein des Deutschen Buchhandels on the ground that unregistered German books are covered by the settlement) *with* D.I. 868 at 13-14 (opposition of Börsenverein des Deutschen Buchhandels on the ground that unregistered German books are not covered by the settlement).

domain) to 1978 (after which registrations are listed on the Copyright Office website) and made

it freely available for searching through Google Book Search.  *See Searching Google's Scans of*

*the Catalog of Copyright Entries*, *at* http://books.google.com/googlebooks/copyrightsearch.html.

Thus anyone—both Rightsholders and members of the public—can research the registration

status of a pre-1978 book electronically.

　　　If a potential class member has failed to maintain records of whether or not he has

registered his copyright—and failed even to retain the registration certificate sent by the United

States Copyright Office—then he can use either www.copyright.gov or Google's scans of the

*Catalog of Copyright Entries* to research whether his copyright was registered.  This is not an

undue burden, because "[n]either Rule 23 nor the Due Process Clause requires that the notice of

settlement provide each member of the class with the kind of individualized information that

would be found in a class member's personal records."  *Spark v. MBNA Corp.*, 48 Fed. Appx.

385, 391 (3d Cir. 2002).

　　　The claiming process in this case compares favorably with that in previous class actions

settlements which have received court approval.  In *In re Joint Briefing of Issues on Appeal from*

*Trans-Alaska Pipeline Liability Fund*, No. 94-35219, 1995 WL 138573 (9th Cir. March 24,

1995), the Ninth Circuit Court of Appeals rejected objections brought on the ground that the

claims process in a case dealing with the Exxon *Valdez* oil spill "imposed an unlawfully onerous

burden on them by requiring each claimant to fill out a form listing individual losses."  *Id*. at *2.

"Moreover," the Court explained, "the argument that this requirement was onerous is belied by

the fact that everyone else who sought money from the Fund, including thousands of other

Native Alaskans, many of whom proceeded without benefit of counsel, submitted the forms."  *Id.*

Here, as in the *Exxon Valdez* case, claims of burden are belied by the tens of thousands of class

62

members who have thus far successfully claimed more than a million Books.

In *In re Insurance Brokerage Antitrust Litigation*, No. 04-5184 (GEB), 2007 WL 2589950 (D.N.J. Sep. 4, 2007), the court rejected an objection that gathering the necessary information to make a claim was burdensome.  The court found that although "[t]he Claim Form requires commercial insurance claimants to provide the insurance company from which it purchased a policy, the policy number, the year of the policy's inception or renewal, and the premium paid," "Settlement Class Members have a full six months to gather this data, and that assistance is available to potential Settlement Class Members."  *Id.* at *8.  Here, as in the *Insurance Brokerage* case, class members have ample time to gather the necessary information and are receiving assistance in doing so.

That particular class members failed to maintain records and must resort to other means to ascertain their copyright registration status would be no basis to reject the ASA.  Moreover, in this case, the copyright registration status of a particular work can be readily researched using the Copyright Office website or Google's scans of the *Catalog of Copyright Entries*.  These tools are not perfect—they suffer from the same challenges as any electronic record which was previously in paper form, such as errors in "optical character recognition."  But they are the best and most comprehensive tools to make available to copyright holders who did not maintain records of their own copyright registrations.

### 3. Google is taking appropriate steps to safeguard the security of Rightsholders' Books.

Some objectors express concern that Google will inadequately safeguard Rightsholders' Books, either from hackers or from those outside the United States who seek to access the Consumer Purchase or Institutional Subscription products, access to which is limited to users within the United States.  Both concerns are directly addressed by the terms of the ASA.

### a.     Digital copies of books are protected from unauthorized access.

Article VIII of the ASA focuses directly on the security of Rightsholders' materials and their protection from unauthorized access and copying. The provisions of that Article impose stringent requirements on Google, as well as on the Fully Participating Libraries receiving Library Digital Copies pursuant to the ASA, and on the Research Corpus Host Sites. The Security Standard that they must meet is set forth in Attachment D to the ASA. It sets forth detailed requirements for, *inter alia*:

- user authentication in compliance with the National Institute of Standards and Technology (NIST) Federal Information Processing Standards (FIPS) Section 4.2;

- access control in compliance with the Moderate Controls for AC-1, AC-2 and AC-3 of Appendix F of NIST 800-53;

- logging of all accesses to the image files;

- marking of image files so that any breach can be traced to its source;

- device hardening in compliance with Section 4.2 of NIST 800-123;

- encryption of stored digital files.

Compliance with these requirements is enforced by the Registry through periodic security audits described in ASA § 8.2(c). They meet or exceed industry standards for security of information of this type. None of the objectors plausibly explains how adherence to these security provisions will not reasonably protect digital files from unauthorized access.

### b.     The services authorized in the ASA will not be available to users outside the United States.

Some Rightsholders have expressed concern that, despite the fact that the ASA "does not authorize the Digitization or any other form of copying, Display Use, Non-Display Use, or any other use of Books and Inserts, outside the United States," ASA § 17.7(a)(i), Books may be

available to users outside the United States.  Google intends to use technical measures to prevent

access from outside the United States, and has every incentive to do so: Section 10.2(b)(v) of the

ASA provides that no claims are released for unauthorized copying, transmission or distribution

of a Book or Insert outside of the United States unless the display is lawful in such non-U.S.

jurisdiction.

> **4.     The amended Removal provisions provide control to class members and certainty to libraries.**

The French Syndicat National de L'Edition objects that "it is not clear whether the

removal procedure is really definitive."  D.I. 401 § 15.  But the ASA is clear about the

consequences of Removal requests, which vary only depending on the date of the request.  In

amending the Settlement Agreement, the parties extended the date by which Rightsholders could

request Removals with respect to Google, but did not change the deadline with respect to uses

authorized for libraries and the Research Corpus under the Agreement.  Thus, for requests made

by the original deadline of April 5, 2011, "Removed" means that "Digital Copies of the Book are

not accessible to Google or Fully Participating Libraries."  ASA § 1.126(a).  Requests received

later, until March 9, 2012, will not affect the rights of Fully Participating Libraries, but will

require Google to terminate its access to any copies except those needed to honor obligations to

libraries and Research Corpus Host Sites under the Settlement.  ASA § 1.126(b).  The ASA

further requires that, if any backup tape or other medium containing Digital Copies of Books that

have been Removed is restored, the Removed Books will be deleted from the restored copy.

ASA § 3.5(a)(ii).  In short, the removal procedure is "really definitive."

While some objectors have argued that there should be no removal deadline, these dates

provide certainty for Google and for libraries, so that they do not expend resources only to have

the rug pulled out from under them.  The Removal provisions represent a reasonable compromise

of Rightsholders' desire for control of their Books on the one hand, and Google's and the Libraries' desire for certainty about the corpus of Books covered by the settlement on the other hand.

### 5.     The Settlement properly provides access to old and outdated books.

Some objectors argue that the ASA should not be approved because it could result in the availability of old, outdated, or inaccurate Books.  But the same objection could be made to libraries or used book stores.  There is no law that forces libraries or bookstores to remove outdated books from their shelves.  Indeed, old, outdated, and inaccurate Books are frequent subjects of academic research, and those researchers should not be denied access to those materials.

To be sure, some Rightsholders have special reasons for wishing to limit access to older versions of their Books—for example, because they include information that could cause injury, or material that has been adjudged defamatory or otherwise unlawful.  The ASA provides multiple avenues for those Rightsholders to prevent their Books from being accessed, either by exercising the Removal right or by Excluding the Books from Display Uses.  ASA § 3.5.

## III.     CONCLUSION

In 47 B.C., Julius Caesar set fire to the ships in the harbor at Alexandria.  The fire spread ashore, destroying the more than 700,000 volumes in the Library of Alexandria.

In 1952, Edward Alexander Parsons published the definitive work on the Library of Alexandria, titled *The Alexandrian Library, Glory of the Hellenic World: Its Rise, Antiquities, and Destructions.*  That book has been out of print since the mid-1960s.

Today, Plutarch's account of the destruction of the Library at Alexandria can be read by

any internet user through Google Book Search, either in English[56] or in the original Greek.[57]  But

Parsons' book cannot; his work is not available for sale, and those who wish to read it must

travel to a major research library.[58]  At issue in this case is whether out-of-print books like *The*

*Alexandrian Library* will be made accessible to readers and profitable to their authors, or

whether they will be effectively lost forever.

The ASA cannot claim to create a Library of Alexandria, and no settlement can bring

back the works lost to Caesar's fire.  But it is hoped that this compromise between authors,

publishers, libraries, and a company willing to spend hundreds of millions of dollars to digitize

so much of the printed history of humanity will be another small step toward the vision that the

Alexandrian Library represents.

The ASA is fair, reasonable, and adequate.  The Court should grant the motion for final

settlement approval.

Dated: February 11, 2010                          DURIE TANGRI LLP


By: _____/s/_____

Daralyn J. Durie (*pro hac vice*)
Joseph C. Gratz (*pro hac vice*)
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:  (415) 362-6666
Facsimile:  (415) 236-6300
ddurie@durietangri.com
jgratz@durietangri.com

*Attorneys for Defendant Google Inc.*

---

[56] http://books.google.com/books?id=NXYMAAAAYAAJ (reflecting full view).
[57] http://books.google.com/books?id=qUcMAAAAYAAJ (reflecting full view).
[58] http://books.google.com/books?id=rG4sAAAAYAAJ (reflecting snippet view only).