UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

The Authors Guild, Inc., Association of American :
Publishers, Inc., et al., :
 :
  Plaintiffs, :
 : Case No. 05 CV 8136 (DC)
   v. :
 : **FILED**
Google Inc., : **ELECTRONICALLY**
 :
  Defendant. :

----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL

Michael J. Boni (pro hac vice)
Joanne Zack
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
(610) 822-0200 (phone)
(610) 822-0206 (fax)
MBoni@bonizack.com
JZack@bonizack.com
*Attorneys for Plaintiffs The Authors Guild,*
*Inc., Herbert Mitgang, Betty Miles, Daniel*
*Hoffman, Paul Dickson, Joseph Goulden,*
*Maureen Duffy, Daniel Jay Baum,*
*Margaret Drabble, Robert Pullan, and the*
*Author Sub-Class*

Bruce P. Keller
Jeffrey P. Cunard
Richard S. Lee
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)
bpkeller@debevoise.com
jpcunard@debevoise.com
rslee@debevoise.com
*Attorneys for Plaintiffs The McGraw-Hill*
*Companies, Inc., Pearson Education, Inc.,*
*Penguin Group (USA) Inc., Simon &*
*Schuster, Inc., John Wiley & Sons, Inc,.*
*Association of American Publishers, Inc.,*
*Harlequin Enterprises Limited, Macmillan*
*Publishers Limited, Melbourne University*
*Publishing Limited, The Text Publishing*
*Company, and the Publisher Sub-Class*

# TABLE OF CONTENTS

I.   Introduction. ........................................................................................................ 1

II.  The Material Terms Of The ASA. ...................................................................... 8

  A.  Specific Definitions And Provisions. .............................................................. 8

    1.  Class Definitions. .................................................................................... 8

    2.  Related Definitions. ................................................................................ 9

  B.  Details of Benefits To The Class. ................................................................. 10

    1.  Revenues From And Restrictions On Google's Commercial Use Of
    Books And Inserts. ................................................................................ 10

    2.  The Book Rights Registry. .................................................................... 15

    3.  Cash Payment For Already Digitized Books and Inserts. ..................... 16

    4.  Hosted Version Of Books To Rightsholders. ........................................ 17

    5.  Rightsholders' Consumer Subscription Discount. ................................ 17

  C.  Author-Publisher Procedures. ...................................................................... 18

    1.  In-Print Books. ...................................................................................... 18

    2.  Out-Of-Print Books. .............................................................................. 19

    3.  Procedures To Re-Classify Books. ....................................................... 20

  D.  Plan Of Allocation. ...................................................................................... 20

    1.  Institutional Subscriptions. ................................................................... 20

    2.  Consumer Purchases. ............................................................................ 21

  E.  Other Provisions. ......................................................................................... 22

    1.  Participating Libraries. .......................................................................... 22

    2.  Public Access Service. .......................................................................... 25

    3.  Non-Display Uses. ................................................................................ 25

    4.  Security Provisions. .............................................................................. 26

    5.  Dispute Resolution. ............................................................................... 26

    6.  Non-Exclusive Rights. .......................................................................... 26

    7.  Release. ................................................................................................. 27

  F.  Class Notice. ................................................................................................ 27

  G.  Amendments To Settlement Agreement. ...................................................... 28

III.    Argument. ................................................................................................ 28

  A.  Standards. ........................................................................................... 28

    1.    Class Action Settlements Are A Favored Means Of Resolving Large, Complex Disputes. ................................................................................. 28

    2.    The Purpose And Benefits Of Rule 23. ........................................... 29

  B.  The History Of This Settlement Enjoys The Presumption of Fairness. ................ 30

    1.    The ASA Is The Product Of Vigorous, Arm's-Length Negotiations. .............. 31

    2.    Experienced Class Counsel Effectively Represented The Class. .................. 31

  C.  The Terms Of The ASA Are Fair, Reasonable, And Adequate. ........................... 32

    1.    Litigation Would Have Been Complex, Expensive And Protracted. ................ 33

    2.    The Reaction Of The Class To The ASA. ......................................... 36

    3.    The Stage Of The Proceedings And The Amount Of Discovery Completed. ........................................................................................ 39

    4.    The Risks Of Establishing Liability. ................................................. 40

    5.    The Risks Of Establishing Damages. ................................................ 45

    6.    The Risks Of Maintaining The Class Action Through Trial. ..................... 46

    7.    The Ability Of Defendant To Withstand A Greater Judgment. .................... 47

    8.    The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery. .................................................................... 48

    9.    The Range Of Reasonableness Of The ASA Compared To A Possible Recovery In Light Of The Risks Of Litigation. ...................................... 50

  D.  The Class Certification Requirements Are Met. ............................................. 51

    1.    Rule 23(a) Requirements Are Satisfied. ........................................... 51

    2.    The Rule 23(b)(2) And 23(b)(3) Requirements Are Satisfied. .................. 53

  E.  The Class Received The Best Notice Practicable Under The Circumstances. ............................................................................................ 55

    1.    Notice Of The Original Settlement Agreement. .................................. 55

    2.    Notice Of The ASA. ...................................................................... 59

    3.    The Notice Program Met All Requirements. ...................................... 61

IV.    CONCLUSION. .................................................................................... 65

# TABLE OF AUTHORITIES

**CASES**

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1995).............................41, 44

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ....................................... *passim*

*A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009*)* ..................................41

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52
  (2d Cir. 2000)................................................................................................................52

*Banyai v. Mazur*, No. 00-CV-9806, 2008 WL 4921351 (S.D.N.Y. Nov. 18, 2008) ...................33

*Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605 (2d Cir. 2006) .........................41

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ...................................................41, 43, 44

*Blank v. Talley Industries, Inc.*, 64 F.R.D. 125 (S.D.N.Y. 1974) ....................................32

*Boucher v. Syracuse University*, 164 F.3d 113 (2d Cir. 1999) ........................................51

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979)...........................................36

*Browning v. Yahoo! Inc.,* No. C04-01463, 2007 WL 4105971
  (N.D. Cal. Nov. 16, 2007)................................................................................................62

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)................................41, 42, 44

*Carlough v. Amchem Products, Inc.,* 158 F.R.D. 314 (E.D. Pa. 1993) ........................................62

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) ....................................... *passim*

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ............................................30, 33, 38, 46

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)......................................................62

*Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003).........................42

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006).........................................42

*Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932) ...............................................................5

*Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) ........................................36

*Harper & Row Publishers v. Nation Enterprises*, 471 U.S. 539 (1985)........................................43

*Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985)................................................................63

*In re American Bank Note Holographics, Inc. Securities Litigation*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)........................................................................................40

*In re AOL Time Warner ERISA Litigation*, No. 02-CV-8853, 2006 WL 2789862
    (S.D.N.Y. Sept. 27, 2006).................................................................................................35, 40

*In re Auction Houses Antitrust Litigation*, 138 F. Supp. 2d 548 (S.D.N.Y. 2001)........................63

*In re Austrian & German Bank Holocaust Litigation*, 80 F. Supp. 2d 164
    (S.D.N.Y. 2000).......................................................................................................................51

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*,
    292 F. Supp. 2d 184 (D. Me. 2003) .....................................................................................64, 65

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*,
    410 F. Supp. 659 (D. Minn. 1974)............................................................................................32

*In re Diet Drugs Products Liability Litigation*, MDL No. 1203, 2002 U.S. Dist.
    LEXIS 24771 (E.D. Pa. Dec. 10, 2002) ...................................................................................63

*In re Global Crossing Securities & ERISA Litigation*, 225 F.R.D. 436
    (S.D.N.Y. 2004).............................................................................................................33, 52, 62

*In re Holocaust Victim Assets Litigation*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000)........................50

*In re Initial Public Offering Securities Litigation*, No. 21-MC-92,
    2009 WL 3397238 (S.D.N.Y. Oct. 5, 2009)..............................................................................36

*In re International Murex Technologies Corp. Securities Litigation*,
    No. 93-CV-336, 1996 WL 1088899 (E.D.N.Y. Dec. 4, 1996)..................................................30

*In re LG/Zenith Rear Projection Television Class Action Litigation*,
    No. 06-CV-5609, 2009 WL 455513 (D.N.J. Feb. 18, 2009) ....................................................63

*In re Metropolitan Life Insurance Co. Sales Practices Litigation*, No. 96-179,
    1999 WL 33957871 ..................................................................................................................64

*In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493
    (S.D.N.Y. 1996)....................................................................................................................53, 54

*In re Nasdaq Market-Makers Antitrust Litigation,* 176 F.R.D. 99
 (S.D.N.Y. 1997) ................................................................................................31

*In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465
 (S.D.N.Y. 1998)........................................................................................28,  47

*In re NASDAQ Market-Makers Antitrust Litigation*, No. 94-CV-3996,
 1999 WL 395407 (S.D.N.Y. June 15, 1999) .................................................62

*In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) .......................54

*In re PaineWebber Ltd. Partnerships Litigation*, 147 F.3d 132 (2d Cir. 1998) ...........28

*In re Remeron End-Payor Antitrust Litigation*, Nos. Civ. 02-2007, 04-5126,
 2005 WL 2230314 (D.N.J. Sept. 13, 2005) ..................................................63

*In re Sumitomo Copper Litigation*, 189 F.R.D. 274 (S.D.N.Y. 1999)....................................28, 51

*In re Telik, Inc. Securities Litigation*, 576 F. Supp. 2d 570 (S.D.N.Y. 2008) .........................33, 36

*In re Toys "R" Us Antitrust Litigation*, 191 F.R.D. 347 (E.D.N.Y. 2000)....................................51

*In re Warner Chilcott Ltd. Securities Litigation*, No. 06-CV-11515,
 2008 WL 5110904 ...........................................................................................30

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)...............................................42

*Jones v. Goord*, 435 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................................51

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ........................................................42, 44

*Lake v. First Nationwide Bank*, 900 F. Supp. 726 (E.D. Pa. 1995) ..............................................32

*Malchman v. Davis*, 706 F.2d 426 (2d Cir. 1983) ................................................................30, 33

*Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................40, 50

*Manners v. American General Life Insurance Co.*, No. Civ.A. 3-98-0266,
 1999 WL 33581944 (M.D. Tenn. Aug. 11, 2009) .....................................64

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) ................................................................51

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972)........................................................................50

*Park v. The Thomson Corp.*, No. 05 Civ. 2931, 2008 WL 4684232
 (S.D.N.Y. Oct. 22, 2008) ...............................................................................64

*Parker v. Time Warner Entertainment Co.*, 239 F.R.D. 318 (E.D.N.Y. 2007) ............................28

*Parker v. Time Warner Entertainment Co.*, 331 F.3d 13 (2d Cir. 2003).......................................53

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ......................................41, 42

*Perry v. FleetBoston Financial Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005).....................................32

*Peters v. National Railroad Passenger Corp.*, 966 F.2d 1483 (D.C. Cir. 1992)..........................61

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .................................................................29

*Princeton University Press v. Michigan Document Services*, 99 F.3d 1381
    (6th Cir. 1996)........................................................................................................................44

*Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997)...........................42

*Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147 (2d Cir. 2001) .......................53

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) ............................................................................46

*Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34 (S.D.N.Y. 1977).....................54

*Sheppard v. Consolidated Edison Co. of New York, Inc.*, No. 94-CV-0403,
    2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002)..........................................................................47

*Slomovics v. All For A Dollar, Inc.*, 906 F. Supp. 146 (E.D.N.Y. 1995) .....................................30

*Snapp v. Topps Co.*, No. 93-CV-0347, 1997 WL 1068687
    (E.D.N.Y. Feb. 12, 1997)........................................................................................................30

*Sony Corp. v. Universal City Studios*, 464 U.S. 417 (1984).........................................................44

*Stoetzner v. United States Steel Corp.*, 897 F.2d 115 (3d Cir. 1990) ..........................................36

*Thomas v. NCO Financial Systems, Inc.*, No. 00-CV-05118, 2004 WL 727071
    (E.D. Pa. Mar. 31, 2004)........................................................................................................62

*Thompson v. Metropolitan Life Insurance Co.*, 216 F.R.D. 55 (S.D.N.Y. 2003)...................28, 33

*Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277 (S.D.N.Y. 1993)...........................................30

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ......................................................5

*UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000).........................43

*Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Foundation*,
No. 04-CV-5332, 2005 WL 2875327 (S.D.N.Y. Nov. 2, 2005)...............................................43

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ............................... *passim*

*Weigner v. City of New York*, 852 F.2d 646 (2d Cir. 1988)........................................................62

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) .................................................28, 30, 33, 61

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991)........................................................34

*Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86
(3d Cir. 1985).............................................................................................................................63

## STATUTES AND RULES

17 U.S.C. § 101 ............................................................................................................................10

17 U.S.C. § 107 ..........................................................................................................................2, 33

17 U.S.C. § 504 ................................................................................................................45, 46, 49

Federal Rule of Civil Procedure 23 ..................................................................................... *passim*

United States Constitution, art. I, § 8, cl. 8.................................................................................5

## OTHER AUTHORITIES

Keller & Cunard, *Copyright Law: A Practitioner's Guide* § 8.1 (Release No. 10,
November 2009) ........................................................................................................................34

*Newberg on Class Actions* ..................................................................................................... *passim*

*Manual for Complex Litigation* ...................................................................................................30

*Moore's Federal Practice* ............................................................................................................54

# I.      INTRODUCTION.[1]

Plaintiffs submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 23(e), for final approval of the Amended Settlement Agreement ("ASA") preliminarily approved by the Court on November 19, 2009.  The ASA is fair, reasonable and in the best interests of the Amended Settlement Class (the "Class") of authors, heirs and publishers of Books and Inserts.

Although carefully negotiated to provide comprehensive rights to the Class, the ASA is simple in concept.  The ASA:

- Compensates Rightsholders whose works have been infringed.

- Allows Rightsholders to "turn on" or "turn off" Google's display of their work as often as they please.

- Gives Rightsholders the freedom to set prices for their works and change those prices as often as they want.

- Provides a fair default revenue split between a Rightsholder and Google.

- Guarantees Google will comply with any requests by Rightsholders to remove or exclude their works.

- Limits library uses of digital copies of Rightsholders' works.

- Creates a new centralized clearinghouse for works covered under the ASA.

These, along with other provisions described below, are enormous benefits for the Class.

---

[1]      Except as set forth in this memorandum, capitalized terms have the meaning ascribed to them in the Amended Settlement Agreement.

**Background.**

      This litigation arose out of Google's 2004 announcement that it planned to create an online database of all of the world's books, beginning with agreements with major university research libraries in the United States. Since then, Google has spent hundreds of millions of dollars researching, developing, patenting and implementing cutting edge digital scanning technology, entered into agreements with the Universities of Michigan, Stanford, California, Wisconsin and many others, copied the entirety of over ten million books, delivered digital copies to the contributing libraries, stored other digital copies on Google's servers and, since 2005, displayed text online in response to search requests. Declaration of Daniel Clancy, Feb. 11, 2010 ("Clancy Decl.") ¶ 4. All of this has occurred without any copyright holder's authorization. Google never has denied that the Google Library Project ("GLP") was implemented for its commercial benefit.

      In September 2005, several authors brought a class action alleging actual copyright infringement (1) seeking damages for the books Google had scanned, and (2) seeking injunctive relief as to the books Google announced it would, but had not yet, scanned and displayed. Shortly thereafter, five publishing companies also sued Google, seeking injunctive relief. Google's principal defense to the allegation of infringement was to assert fair use under Section 107 of the United States Copyright Act.

      The two actions were coordinated for pre-trial purposes. Plaintiffs reviewed millions of pages of documents related to Google's activities; the author plaintiffs also reviewed thousands of publisher documents relevant to the authors' and publishers' respective copyright and contractual interests in the books digitized by Google. Although

the parties were able to avoid bringing most of their discovery disputes to the Court, discovery was protracted, expensive and pockmarked with disagreements.  Declaration of Jeffrey P. Cunard, Feb. 11, 2010 ("Cunard Decl.") ¶ 5.

In the fall of 2006, the parties began settlement negotiations.  These proved to be uniquely complex and difficult given the competing interests of the parties involved (authors, publishers, Google, and libraries) and the necessity of resolving issues relating not only to monetary compensation for past infringement, but also to the uses that Google and the libraries could and could not make of the millions of digital copies already created, and that Google stated it would continue to create, as part of the GLP.

At stake, for all parties, were unusually dire consequences of an "up or down" decision after trial.  Had the authors and publishers lost, Google (and others following in its wake) would have been able to scan and display portions of every in-copyright book, with no assurances of sufficient security.  This result would have been devastating to authors, heirs and publishers.  Had Google been found liable, its enormous investment and its dream of a universal digital library would have been destroyed.

After more than two years of intense negotiations, on October 28, 2008, the parties, with several libraries having contributed their views, reached a settlement of this class action, which was filed with this Court.[2]

---

[2]    Contemporaneously with the filing of the motion for preliminary approval of the Settlement Agreement, plaintiffs filed a Second Amended Class Action Complaint in the *Authors Guild, et al. v. Google* action, adding as Associational Plaintiffs the Association of American Publishers, Inc. ("AAP") and as Representative Plaintiffs the individual publisher plaintiffs in the publishers' action.  Those publishers serve as class representatives of the Publisher Sub-Class, while the author plaintiffs serve

The notice of the original Settlement Agreement, disseminated around the world, triggered a number of objections.  In addition, the United States Department of Justice ("DOJ") filed a "Statement of Interest" lauding the aims of the settlement, but expressing certain concerns.  After considering the Statement of Interest and the objections, the parties entered into further negotiations and held good faith discussions with the DOJ. As a result, on November 13, 2009, the parties executed the ASA and filed a motion seeking its preliminary approval.  This Court granted that motion on November 19, 2009.

**Summary Of Benefits.**

The ASA provides extraordinary benefits to authors, heirs and publishers in the Class, as well as to the public, and easily meets the fair, reasonable and adequate standard required by Rule 23(e).  If approved, the ASA provides the following material benefits to the Class:

- Google will pay to the Class 63% of the revenues earned from specific, circumscribed uses, in the United States, of certain copyrighted works for which Google receives non-exclusive authorizations.  ASA §§ 2.2, 2.4, 4.5.

---

as representatives of the Author Sub-Class, sub-classes that were alleged for the first time in the Second Amended Class Action Complaint.  *See infra* p. 9 (sub-class definitions).  As part of the settlement of this action, the publishers' action will be dismissed with prejudice if and when this Amended Settlement is finally approved and all appeals from the Court's final approval order have been exhausted.  ASA, Attachment M.

Contemporaneously with the filing of the motion for preliminary approval of the ASA, plaintiffs filed a Third Amended Class Action Complaint, adding representative plaintiffs from Canada, the United Kingdom and Australia.

- Rightsholders will retain control over their works.  They can tell Google not to scan their Books, to remove their Books from Google's databases if already scanned, to display or not display their Books (and Inserts), to set the sale price of their Books, as well as a number of other ways of controlling their Books.  Because Google's rights are non-exclusive, rightsholders can license the same works to others, including Google's competitors.  ASA Art. III.

- Google will pay $34.5 million to fund a Book Rights Registry (the "Registry") and provide class notice and claims administration, managed jointly by authors and publishers, that will locate rightsholders, maintain a database of their contact information, collect and pay revenues to the rightsholders for Google's use of works through the settlement, and otherwise protect and represent rightsholders' interests.  ASA § 2.1(c); Art. VI.

- Google will pay a minimum of $45 million (with no cap) to Rightsholders in consideration for the release of plaintiffs' claims for actual copyright infringement.  ASA § 2.1(b).

In these and other ways, the ASA provides another fundamental benefit to the Class:  it directly furthers the primary constitutional purpose of copyright law, to "[P]romote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their respective Writings . . . ."  *See* U.S. Constitution, art. I, § 8, cl. 8.  The copyright clause "reflects a balance of competing claims upon the public interest:  Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music and the other arts. . . .  But, the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good."  *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The sole

interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.").

The ASA is entirely consistent with that "ultimate aim."  It firmly establishes the principle that copyright owners have the right to exercise control over the use of their works, but does so in a way that creates the opportunity for access to copyrighted works, most of which are otherwise not readily available.

The ASA allows Rightsholders of out-of-print Books to find a new audience for their Books and earn new revenues from the sale of online access to their Books.  By creating a new and easily accessed marketplace, there now is a renewed commercial and academic life for books that are otherwise hard to find.  The ASA offers innovative ways to promote the sale of in-print Books.  The ASA also allows all Rightsholders to earn advertising revenues in connection with the display of preview pages of those Books.

More broadly, the ASA enhances copyright owners' ability to take advantage of their remedies under the Copyright Act.  The Register of Copyrights and some in Congress – as well as some copyright owners – have for years expressed concerns about the ability, resources and incentives of small copyright owners to vindicate their rights by bringing a copyright infringement action in federal court.[3]  The ASA addresses these concerns by relieving individual members of the Class of the obligation to litigate, one-by-one, whether Google's conduct constitutes fair use.  Such suits would be costly and

---

[3]    *See* Plaintiffs' Supplemental Memorandum Responding to Specific Objections at n.47 and accompanying text.

the monetary awards to a successful plaintiff might well be meager, particularly if only actual (as opposed to statutory) damages are available.

The ASA also provides a clear, uniform and inexpensive avenue by which the Rightsholders can convey their explicit "use/don't use" instructions to Google.  The ASA *requires* that Google act in conformity with those instructions.  If it does not, Rightsholders have a simple dispute resolution procedure, which provides the possibility of obtaining damages without having to prove that Google's conduct is infringing.  Additionally, Rightsholders can seek injunctive relief should Google willfully or repeatedly violate those instructions.

The ASA benefits not only the Class, but the general public.  It makes universally accessible millions of out-of-print Books that generally can be found only in the stacks of a few leading university libraries, accessible mostly to students, faculty and alumni.  The ASA allows anyone in the United States to search for and access these Books; they will be able to read substantial segments of Books through the Preview Use feature and, if they choose, purchase online access to the Books.  End users of Institutional Subscriptions will be able to read these Books in their entirety.  People who have access to the Books will be able to read them, print them, annotate them and share annotations with colleagues.

This level of public access to books is without precedent.  As the American Library Association stated in its amicus brief, the value of a searchable database of millions of books to the reading and researching public is undeniable and the demand by libraries for subscriptions to such a database would be extremely high.  D.I. 100 at 4-5.

The benefit to society of enabling anyone, anywhere in America, from the inner city to a rural village, to walk into a public library, sit at a computer terminal and have full Internet access to a multi-million book database is inestimable.  No longer would the world's great literature and vast research resources be kept from the public, accessible only to certain students, faculty and alumni.  The ASA also brings tremendous benefits to blind and reading disabled Americans, who will have access to the database.  ASA § 7.2(g).

This Memorandum discusses the Settlement's compliance with the requirements of Rule 23.  Objections to the Settlement Agreement and the ASA are addressed in detail in Plaintiffs' Supplemental Memorandum Responding to Specific Objections ("Supp. Br.") and in Google's Brief in Support of Motion for Final Approval of Amended Settlement Agreement.  For the reasons set forth in both documents, when the ASA is measured against the applicable Second Circuit standards, Plaintiffs' motion for Final Approval of the Settlement should be granted.

## II.    THE MATERIAL TERMS OF THE ASA.

### A.    Specific Definitions And Provisions.

Certain key definitions of the ASA are summarized below:

#### 1.    Class Definitions.

##### a.    The Class.

All Persons that, as of January 5, 2009, have a Copyright Interest in one or more Books or Inserts.  All Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both.  Excluded from the Class

8

are Google, the members of Google's Board of Directors and its executive officers, and the departments, agencies and instrumentalities of the United States Government, and the Court.  ASA § 1.13.

### b.    Author Sub-Class.

Members of the Class who are authors, and their heirs, successors, and assigns, and any other members of the Class who are not members of the Publisher Sub-Class. ASA § 1.17.

### c.    Publisher Sub-Class.

Members of the Class that are (a) companies that publish books, and their exclusive licensees, successors, and assignees, and (b) companies that publish Periodicals and have a Copyright Interest in one or more Inserts, and their exclusive licensees, successors, and assignees.  ASA § 1.122.

## 2.    Related Definitions.

### a.    Copyright Interest.

Ownership (including joint ownership), or an exclusive license, of a U.S. copyright interest, to the extent the interest is implicated under the ASA.  ASA § 1.41.  Uses implicated under the ASA include Google's scanning of Books and the Display Uses and Non-Display Uses permitted to Google under the ASA (described below).

### b.    Book.

A written or printed work that, as of January 5, 2009, (a) had been published or distributed to the public or made available for public access as a set of written or printed sheets of paper bound together in hard copy form under the authorization of the work's U.S. copyright owner; (b) was subject to a Copyright Interest; and (c) was either registered

9

with the United States Copyright Office or published in Canada, the United Kingdom or Australia.[4]  ASA § 1.19.

###### c.      Insert.

Content protected by the Copyright Act that, as of January 5, 2009, meets the following requirements: (a) consists either of text (such as forewords, afterwords, prologues, epilogues, poems, quotations, letters, song lyrics, or excerpts from other Books, Periodicals or other works); or tables, charts and graphs; (b) is contained in a Book, a Government Work, or a book that is in the public domain; (c) is not owned by any Rightsholder in the Book in which the content is contained; and (d) if it is a "United States work" (as defined in 17 U.S.C. § 101), the content is registered with the U.S. Copyright Office, either as a stand-alone work or as part of another, registered work from which it has been excerpted.  ASA § 1.75.[5]

###### d.      Rightsholder.

A member of the Class who does not opt out of the Settlement.  ASA § 1.134.

### B.      Details of Benefits To The Class.

#### 1.      Revenues From And Restrictions On Google's Commercial Use Of Books And Inserts.

The ASA authorizes Google to digitize and develop a searchable database of

Books and Inserts and to display the Books and Inserts in ways that earn revenues to be

---

[4]    The definition of "Book" does not include (1) Periodicals (*e.g.*, newspapers, magazines, comic books, journals); personal papers (*e.g.*, unpublished diaries or bundles of notes or letters); (2) books used to play music; (3) works in the public domain under the Copyright Act; (4) Government Works; or (5) calendars.  ASA § 1.19.

[5]    The definition of "Insert" does not include (1) pictorial works, such as photographs, illustrations, maps and paintings, and (2) works that are in the public domain.  ASA § 1.75.

split 63/37 in favor of the Rightsholders. As explained below, the ASA narrowly circumscribes Google's rights to display works, and accords Rightsholders the right to control their uses by Google.

### a. Display Uses.

Subject to Rightsholders' perpetual right to exclude their works, Google may:

- sell institutional subscriptions to universities, corporations, and government offices (Institutional Subscriptions) (ASA § 4.1);

- sell online access to Books (Consumer Purchases) (ASA § 4.2);

- display Previews (up to 20% of a Book (ASA § 4.3)) and Snippets (several lines of the Book (ASA § 1.149)) in order to spur Book sales and earn advertising revenues;

- place Advertisements on web pages devoted to a single Book (ASA § 4.4);

- provide full access to the Institutional Subscription database on at least one computer terminal in every public and higher education library building in the United States (ASA § 4.8)[6]; and

- if agreed between Google and the Registry, provide print on demand Books, file downloads, and consumer subscriptions (ASA § 4.7).[7]

---

[6]    In addition, Rightsholders will be able to earn fees from printing, which will be charged to users at these terminals. *See infra* p. 25. The Books database may also be made available through computer terminals at commercial copy centers and other facilities and Rightsholders also may earn per-page printing fees from those services. ASA § 4.8(b).

[7]    The uses in these bullet points are referred to in the Settlement as "Display Uses." The other Display Use is Front Matter Display (*i.e.*, display to users of the title page, copyright page, table of contents and indexes). ASA § 1.61.

For in-print Books, either the Rightsholder or Google may seek to negotiate a different royalty arrangement than the default 63/37 split. If no agreement is reached, Google may choose not to display the Book. ASA § 4.5. All Rightsholders have the right to insist that Google not display their Books under the ASA and then seek to negotiate a different revenue split outside the ASA. The revenues to Rightsholders will be allocated pursuant to the Author-Publisher Procedures and the Plan of Allocation, described below. ASA § 5.4, Attachments A and C.

### b.    Classification Of Books.

The ASA treats in-print and out-of-print Books differently. ASA §§ 3.2-3.3. Google may not display in-print Books at all unless and until it receives prior express authorization from the Books' Rightsholders. *Id.*[8] Google may display out-of-print Books without the prior express authorization of the Books' Rightsholders, but its right to do so ceases when and if the Rightsholder directs Google to stop. *Id.*

The ASA requires Google to make an initial determination whether a Book is presumptively "in-print" ("Commercially Available") based on whether the Book is being offered for sale new through one or more customary channels of trade from a seller anywhere in the world to a purchaser in the United States, Canada, the United Kingdom or Australia. ASA § 3.2(d).

---

[8]    Google does, however, have the right to make Non-Display Uses, *see infra* p. 25, of in-print Books. ASA § 3.4(a).

For Books that Google classifies as not Commercially Available (*i.e.*, out-of-print), Google must notify the Registry of the classification and wait to make any Display Uses of the Book until the later of the Effective Date or 60 days after such classification; this waiting period gives the Book's Rightsholder a window of time to determine whether to direct Google not to display the Book at all.  In addition, any Rightsholders can advise Google (through the Registry) that it has misclassified Books as not Commercially Available, in which case Google must promptly stop displaying the Book.  The Book cannot be displayed unless and until Google challenges the Rightsholder's assertion and the dispute is resolved in Google's favor.  ASA § 3.2(d)(iv).  (In addition, the Rightsholder can at any time exercise its "exclusion" right and direct Google not to display the Book at all, thereby effectively mooting Google's determination that a Book is not Commercially Available.)

### c.     Rightsholders' Do-Not-Scan/Removal Rights.

Google must honor any Rightsholder direction not to scan a Book or, if the Book already was scanned, to remove the Book from Google's database and from the Library Digital Copies that Google provides to Fully Participating Libraries.  If a Rightsholder requests removal, Google and the Fully Participating Libraries must delete the Book from all servers or sources from which they could make any uses of the Book.  ASA §§ 1.124, 3.5(a)(i).[9]

---

[9]     A removal request, however, will not require deletion of the Book from back-up tapes or other electronic back-up storage media that may contain copies of the removed Books.  ASA § 3.5(a)(ii).

Any removal requests received by April 5, 2011 – more than a year from now – will require removal from all Google servers and from the Library Digital Copies. Removal requests received thereafter, until March 9, 2012, require removal from Google servers. Thereafter, do-not-scan requests will be honored only if the Books have not already been digitized. ASA § 3.5(a)(iii).

### d. Rightsholders' Exclusion Rights.

In addition to the do-not-scan/removal right, Rightsholders have broad exclusion rights that they may exercise and, as they desire, change at any time. ASA § 3.2(e)(i). Rightsholders can exclude their Books (or portions thereof) from any or all of the Display Uses and Book Annotation features of the ASA. ASA § 3.5(b). Insert Rightsholders are entitled to exclude Inserts (or portions thereof) from all (but not less than all)[10] Display Uses. ASA § 3.5(b).[11]

---

[10] This limitation is driven by practical technical considerations: it would be extremely burdensome for Google to have to maintain numerous different versions of each Book, such that a given Insert would be displayed as part of, say, the Institutional Subscription, but not on a free Public Access Service terminal. Inconsistencies in the content of a particular Book across different Revenue Models would frustrate and annoy users. Clancy Decl. ¶ 8.

[11] There are two qualifications to the exclusion rights. First, if the Rightsholder wants an out-of-print Book to be available for Consumer Purchases, the Book must be included in the Institutional Subscription and the Public Access Service. ASA § 3.5(b)(iii). Second, a Rightsholder is not entitled to an Inclusion Fee if he or she excludes the Book or Insert from Institutional Subscriptions. *See* Plan of Allocation § 1.2(e). These qualifications are designed to encourage Rightsholders to include their Books in the Institutional Subscription Database in order to make it as comprehensive as possible; the inclusion of more Books will enhance its value for all Rightsholders and the public.

### e.    Rightsholders' Pricing Rights For Consumer Purchase.

Each Rightsholder has two options for setting the sale price of Books sold for Consumer Purchase:  he or she (1) can set the price (ASA § 4.2(b)(i)(1)), or (2) rely on a "Settlement-Controlled Price" developed by Google (ASA § 4.2(b)(i)(2)).  Settlement-Controlled Prices will be set algorithmically by Google to find the market price for each Book.  ASA §§ 4.2(b)(i)(2) & (c).

### 2.    The Book Rights Registry.

Google has agreed to pay $34.5 million to fund the creation of a Book Rights Registry (and provide class notice and claims administration).  ASA § 2.1(c).  The Registry will be a not-for-profit entity and all of the funds it receives will be for the benefit of Rightsholders.  ASA § 6.2(a).  The Registry's Board of Directors will have an equal number of Author Sub-Class and Publisher Sub-Class representatives and include at least one author and one publisher director from each of the United States, Canada, the United Kingdom and Australia.  ASA § 6.2(b).

The ASA requires the Registry to delegate to an independent fiduciary (the "Unclaimed Works Fiduciary") the responsibility for representing the interests of Rightsholders who have not yet claimed their Books and Inserts.  The Unclaimed Works Fiduciary will be chosen by a supermajority vote of the Board and subject to Court approval.  ASA § 6.2.

The Registry will establish and maintain a database of Rightsholders' contact information and information regarding Rightsholders' works.  It will locate

15

Rightsholders, identify and coordinate payments to Rightsholders, and otherwise represent the interests of Rightsholders under the ASA.  ASA § 6.1(b).

After Google's initial payments, the Registry will be funded by an administrative fee determined as a percentage of Rightsholders' revenues.  ASA, Attachment C (Plan of Allocation) § 4.2.  The fee will be the minimum necessary for the Registry to effectively meet its obligations to the Rightsholders.  Declaration of Paul Aiken, Feb. 11, 2010 ("Aiken Decl.") ¶ 47.

### 3.    Cash Payment For Already Digitized Books and Inserts.

Google has agreed to pay Rightsholders a minimum of $45 million for Books and Inserts digitized without permission as of the original Opt-Out Deadline of May 5, 2009.  ASA §§ 2.1(b), 5.1.  (This Cash Payment is not available for Rightsholders of works digitized after May 5, 2009 because those Rightsholders did not have a ripe claim for actual, as opposed to imminent, infringement as of that date (the original Opt-Out Deadline)).

For Books and Inserts digitized without permission as of May 5, 2009:

- Google will make a Cash Payment of at least $60 per Principal Work,[12] $15 per Entire Insert, and $5 per Partial Insert for which at least one Rightsholder has registered a valid claim by March 31, 2011.  Entire Inserts are complete works, such as complete short stories, essays, song lyrics, introductions, and forewords.  Partial Inserts are all other content that meets the definition of an Insert, such as

---

[12]    By way of example, under the Settlement, two different Books, each having a different foreword or annotations, can contain the same Principal Work, *e.g.*, *To Kill a Mockingbird*.

16

excerpts from other Books.[13]

- If more than US $45 million is required to pay all of the eligible claims for Cash Payments, Google must pay the necessary additional funds.  ASA § 5.1(b).

- If the total amount owed to all claiming Rightsholders is less than $45 million, the Registry will distribute the balance to such Rightsholders up to a maximum of $300 per Principal Work, $75 per Entire Insert, and $25 per Partial Insert.  Any funds remaining from the $45 million will be distributed under § 3.2 of the Plan of Allocation.

### 4.    Hosted Version Of Books To Rightsholders.

At a Rightsholder's request, Google will provide a hosted copy of the

Rightsholder's Book(s) for use on the Rightsholder's website.  Rightsholders are free to

use the hosted copy as they see fit; they can sell the right to view it online, display it for

free, show preview pages, etc.  ASA § 3.11.

### 5.    Rightsholders' Consumer Subscription Discount.

If Google sells consumer subscriptions to the Institutional Subscription Database,

then Rightsholders are entitled to negotiate a discount from the standard consumer

---

[13]    Only one Cash Payment will be made for the same content that Google digitized, regardless of the number of Books or Inserts digitized by Google that contain the same content.  For example, only one Cash Payment will be made for the hard cover and soft cover editions of a Book, even if Google digitized both of them separately, and only one Cash Payment will be made for several digitizations of the same Book or for content that is contained as an Insert in multiple Books.  Also, only one "Book" Cash Payment will be made for content that appears both as a Book and also as an Insert in another Book (*e.g.*, because a portion of the first Book was quoted in the second Book).  ASA § 5.1(a).

subscription rate.  Google and the Registry will negotiate the amount of the discount if and when consumer subscriptions are offered for sale.  ASA § 4.5(b)(vii).

### C.    Author-Publisher Procedures.

Members of both the Author Sub-Class and Publisher Sub-Class have U.S. copyright interests in many of the same Books.  Their respective interests are addressed in the Author-Publisher Procedures ("A-P Procedures"), which is Attachment A to the ASA.  Among other things, the A-P Procedures set forth the rights of author and publisher Rightsholders concerning in-print and out-of-print Books under the ASA.

### 1.    In-Print Books.

With respect to in-print books (other than works-for-hire), both the author and the publisher must agree to include the Book in the Display Uses available under the Settlement or it will not be included.  A-P Procedures § 5.1.  Cash Payments for in-print Books digitized on or before May 5, 2009, as well as all revenues earned from Google's future uses of all in-print Books, will be paid to the publishers of those Books, who will then pay the authors in accordance with the terms of the author-publisher contract for each Book.  A-P Procedures § 5.5.  If an author believes he or she is entitled to more than the amount paid by a publisher, the dispute may be resolved in the ASA's arbitration process.  *Id.*[14]   The A-P Procedures also set forth the respective rights of authors and

---

[14]    This right of arbitration does not apply to disputes relating to Educational Books (Books that, when published, were intended primarily for sale to educational markets (*i.e.*, K-12, higher education, continuing education, vocational, professional, self-study, and similar educational markets) for use in educational programs) due to the more complex contractual arrangements among multiple authors relating to such

publishers as to exclusion, removal, control of pricing, and changes in Display Uses of in-print Books.  A-P Procedures §§ 5.2-5.4.

## 2.    Out-Of-Print Books.

The A-P Procedures include provisions concerning exclusion, removal, control of pricing, changes in Display Uses of, and revenues earned by, out-of-print Books.  These vary depending on whether the Book is (1) a work-for-hire (control by, and 100% of revenues to, the publisher), or (2) reverted under the author-publisher contract or "author controlled" under the Settlement (control by, and 100% of revenues to, the author).  A-P Procedures § 6.1.  For unreverted, not "author-controlled" and not work-for-hire out-of-print Books, both the author and the publisher may exercise control over the Books; Cash Payments and the Rightsholders' 63% share of revenues earned by Google will be split between the author and publisher as follows: (a) for Books first published prior to 1987, 65/35 in favor of the author, and (b) for Books first published during or after 1987, 50/50. A-P Procedures § 6.2(c).[15]

---

books.  Declaration of Richard Sarnoff, Feb. 11, 2010 ("Sarnoff Decl.") ¶ 14.  Such disputes must be resolved under the terms of the individual author-publisher contract for those books.  A-P Procedures §§ 1.4 and 5.5.

[15]    Based on discovery, most form book publishing contracts in the late 1980s began to include express electronic rights grants to the publisher.  Counsel for the Author Sub-Class and the Publisher Sub-Class agreed that authors would receive a greater revenue split for books published prior to 1987 than those published thereafter. Declaration of Michael Boni, Feb. 11, 2010 ("Boni Decl.") ¶ 5; Sarnoff Decl. ¶ 12; Aiken Decl. ¶32.

3.    **Procedures To Re-Classify Books.**

The A-P Procedures also provide procedures to reclassify a Book as in-print or out-of-print based on the terms of the specific author-publisher contract for the Book. If the status of a Book changes over time, *e.g.*, it either goes out-of-print or is put back into print, the Book can also be reclassified under the A-P Procedures.

D.    **Plan Of Allocation.**

1.    **Institutional Subscriptions.**

Rightsholders who register their Books with the Registry will be compensated both for the actual usage of their Books (Usage Fees) as well as the inclusion of their Books in the Institutional Subscription Database (Inclusion Fees).

a.    **Usage Fees.**

The Registry will calculate "usage," based on a number of factors, including the number of times users view the Book, how much of the Book is viewed, and the Settlement Controlled Price of the Book. Plan of Allocation § 1.1(a). Although there will be no Usage Fees for Inserts, Rightsholders of Inserts will be eligible for Inclusion Fees. *Id.* § 1.1(f).

b.    **Inclusion Fees.**

Inclusion Fees will be paid to Rightsholders from Institutional Subscription revenues; the amounts are targeted at $200 per Book and shall be a minimum of $50 per Entire Insert and $25 per Partial Insert (with a $500 maximum Inclusion Fee for all Inserts that consist of content from a single work). *Id.* §§ 1.2(a) and (b). In order to

20

receive an Inclusion Fee, Rightsholders are required to register Books and Inserts with the Registry within ten years of the Effective Date. *Id.* § 1.2(c)(i). Books and Inserts are eligible for an Inclusion Fee so long as their Rightsholders do not exclude their works from the Institutional Subscription as of five years after the Effective Date. (For example, if a Rightsholder initially excludes a Book from all Display Uses, the Rightsholder will still be entitled to the Inclusion Fee as long as he or she includes the Book in the Institutional Subscription by the date five years after the Effective Date.) *Id.* § 1.2(e).[16]

### 2.    Consumer Purchases.

Revenues from Consumer Purchases and uses other than Institutional Subscriptions (or Consumer Subscriptions, if implemented) will be usage-based, and determined on a Book-by-Book basis according to actual consumer purchases. *Id.* § 2.1. Rightsholders of Inserts will not be paid from revenues earned in Revenue Models other than the Inclusion Fee for subscriptions. *Id.* § 2.4. This is because Inserts generally are included in Books pursuant to one-time permission fees paid by the Book Rightsholder to the Insert Rightsholder. Aiken Decl. ¶ 41; Sarnoff Decl. ¶ 13. To account for Insert Rightsholders who may have other royalty arrangements with a Book Rightsholder, the

---

[16]    Inclusion Fees for Inserts are minimum amounts. Inclusion Fees for Books are targets, and depend on the revenues from Institutional Subscription during the first ten years. The Plan of Allocation describes the apportionment of subscription into funds for Usage Fees and for Inclusion Fees. *See* Plan of Allocation § 1.2(f).

Plan of Allocation provides that the Insert Rightsholder can claim more than an Inclusion Fee. *Id.* § 1.2 (h).

### a. Unclaimed Funds.

Unclaimed Funds (*i.e.*, revenues owed to Rightsholders who do not claim their works under the ASA) will be held for at least ten years after they are earned. Beginning six years after the year in which the revenues were earned, in consultation with the Unclaimed Works Fiduciary, the Registry may use up to 25% of those Unclaimed Funds to locate Rightsholders who have not yet claimed their Books and Inserts. After ten years, upon approval of the Unclaimed Works Fiduciary, the Registry may make *cy pres* motions seeking Court approval to distribute Unclaimed Funds to not-for-profit entities that directly or indirectly benefit Rightsholders and the reading public in the United States, Canada, the United Kingdom and Australia. Such *cy pres* motions must be made on notice to all claiming Rightsholders, the attorneys general of all states, and the Fully Participating and Cooperating Libraries. ASA § 6.3.

### E. Other Provisions.

#### 1. Participating Libraries.

Libraries that sign a Library-Registry Agreement may contribute to the Google Library Project and to the benefits of the ASA by building and maintaining their collections and by making them available to Google to be digitized. In return, the ASA provides consideration to the libraries, including releases relating to their participation in the GLP. To date, three libraries – those of Stanford University, the University of

Virginia and the University of Wisconsin – have signed Library-Registry Agreements, thereby agreeing that all the digital copies they have received from Google will be subject to the terms of the ASA and its security protections.[17]

The ASA identifies several categories of Participating Libraries based on the level of their participation in the GLP and the ASA.

**Fully Participating Libraries** allow Google to digitize Books in their collections and Google, in return, provides them with a Library Digital Copy ("LDC") of those Books. ASA §§ 1.62, 7.2. As discussed below, the ASA provides that Fully Participating Libraries will be able to make certain non-commercial uses of their LDCs and have certain third-party beneficiary rights;

**Cooperating Libraries** do not receive or have access to a LDC, but they have the same rights as a Fully Participating Library (ASA § 1.39);

**Public Domain Libraries** only are providing public domain books to Google for digitization (ASA § 1.120); and

**Other Libraries** will provide Books to Google for digitization, but do not agree to become a Fully Participating Library, Cooperating Library, or Public Domain Library. ASA § 1.101. Because these libraries have not agreed to sign a Library-Registry Agreement, they receive no releases for any uses of any LDCs.

Fully Participating Libraries may make the following uses of their LDCs, if they sign a Library-Registry Agreement:

---

[17]    Clancy Decl. at ¶ 6.

- make copies as necessary to preserve, maintain, manage and keep current the LDC;

- provide access to Books in the LDC to users with physical impairments who are unable to use printed versions of Books;

- create a print replacement copy of a Book that is damaged, deteriorating, lost or stolen (but only after the library has attempted unsuccessfully to obtain a print replacement at a fair price);

- develop, obtain and use indexes and finding tools (without displaying content from Books, other than Snippets for the purpose of verifying that a Book has been identified);

- if the Copyright Act is amended to allow use of orphan works, use eligible Books from their LDC in accordance with the statute;

- engage in Non-Consumptive Research using the LDC;

- if a Book is not available through an Institutional Subscription, use, by faculty members and research staff of higher educational institutions, of up to five pages of out-of-print Books from that institution's LDC for scholarly and classroom use; and

- make other uses that a Participating Library requests of the Registry and are approved by the Registry or the Rightsholder of a Book pursuant to the ASA.

ASA § 7.2(b).

In addition, a Research Corpus – *i.e.*, a database of all of the Fully Participating Libraries' digital copies – will be created and made available for use by eligible persons for Non-Consumptive Research purposes (*i.e.*, linguistic analysis, the development of new indexing and search techniques, and other research that does not involve reading the text of the Books for its inherent, narrative content). ASA §§ 1.132, 7.2(d), 1.93. Non-Consumptive Research by Fully Participating Libraries and use of the Research Corpus

are subject to detailed requirements designed to ensure that use is only for research purposes. *See id.*

Providing digital copies of Books to Fully Participating Libraries will also serve the public interest by (a) facilitating the preservation of Books, (b) providing access to Books to persons with disabilities, and (c) facilitating Non-Consumptive Research.

### 2.    Public Access Service.

Google will provide at least one "Public Access Service" license for free to each requesting not-for-profit higher educational institution and public library in the United States. ASA §§ 1.117, 1.69, 1.21, 4.8. These licenses will provide the same content as offered in Institutional Subscriptions, except that readers will not be able to download or copy and paste any portions of a Book (although libraries equipped to charge for printing may do so, with the printing fees collected by Google and split 63/37 between Rightsholders and Google). ASA § 4.8.

### 3.    Non-Display Uses.

In addition to the Display Uses, Google will be permitted to make "Non-Display Uses" of Books, including full-text indexing (without displaying the text), geographic indexing of Books, algorithmic listings of key terms for chapters of Books, and other internal research. ASA §§ 1.94, 3.4.[18]

---

[18]    Google's right to make Non-Display and Display Uses under the Settlement terminates if Google fails to timely implement or continue the Institutional Subscription or Consumer Purchases revenue model. ASA § 3.7.

### 4.    Security Provisions.

To safeguard Rightsholders' intellectual property, Google and Plaintiffs (with the assistance of plaintiffs' security experts), developed security standards to prevent security breaches and unauthorized use of Google's Books Database, the libraries' LDCs and the Research Corpus.  ASA §§ 8.1, Attachment D.  The ASA provides remedies to Rightsholders for security breaches and unauthorized access to and use of Books and Inserts.  ASA §§ 8.3-8.7.

### 5.    Dispute Resolution.

To level the playing field between Rightsholders and Google, and between authors and publishers, certain core disputes under the ASA will be resolved informally or by arbitration (unless the Rightsholders agree otherwise).  Examples of potential disputes relate to pricing and other economic terms, claimed security breaches, whether a Book is in-print, out-of-print, or in the public domain, and whether Google or a Participating Library has made an authorized use of a Book.  *See generally* ASA Article IX.  The ASA also provides that this Court will have continuing jurisdiction over other disputes concerning the ASA.  ASA § 17.23.

### 6.    Non-Exclusive Rights.

The authorizations granted to Google and the Participating Libraries under the ASA are non-exclusive only.  Rightsholders retain the right to authorize, through the Registry or otherwise, any individual or entity, including direct competitors of Google, to use their Books in any way, including identical ways as those used by Google.  Google's

26

and the Participating Libraries' authorizations under the ASA are not transfers of copyright ownership to any Books or Inserts. ASA §§ 2.4, 3.1(a).

### 7. Release.

In exchange for the benefits conferred on the Class by Google, and also by the Participating Libraries, Rightsholders release claims against Google and each Participating Library arising out of the following conduct occurring prior to the Effective Date: Google's digitization and use of Books and Inserts provided by libraries; each library's provision of Books and Inserts to Google for digitization; Google's provision of digital copies to libraries and the libraries' receipt of those copies; and the libraries' (except Other Libraries') uses of those digital copies in a manner consistent with the Settlement. If, however, an Other Library makes an unlawful use of any digital copy, no claims against that Other Library for its provision of Books to Google, or the receipt of any digital copies, are released.

Rightsholders also release all claims against Google, and each Fully Participating Library, Cooperating Library and Public Domain Library that, after the Effective Date, arise out of any act or omission authorized by the ASA or by an applicable Library-Registry Agreement. No claims arising after the Effective Date are released against Other Libraries. *See* ASA, Article X.

### F. Class Notice.

Section III.E, *infra*, shows that the Class was given the best notice practicable under the circumstances of this action.

G.    **Amendments To Settlement Agreement.**

A range of objections, as well as concerns expressed by the DOJ, were filed in response to the Settlement Agreement.  In response, the parties made certain amendments, which are reflected in the ASA.  The Supplemental Notice summarizes the principal amendments.

III.    **ARGUMENT.**

A.    **Standards.**

1.    **Class Action Settlements Are A Favored Means Of Resolving Large, Complex Disputes.**

There is a "strong judicial policy in favor of settlements, particularly in the class action context."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)); *see also In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) ("'Federal courts look with great favor upon the voluntary resolution of litigation through settlement. . . . This rule has particular force regarding class action lawsuits.'") (citation omitted).  "The decision to grant or deny [Rule 23(e)] approval lies within the discretion of the trial court . . . ."  *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 473 (S.D.N.Y. 1998); *Parker v. Time Warner Entm't Co.*, 239 F.R.D. 318, 336 (E.D.N.Y. 2007).  This discretion "should be exercised in light of the general policy favoring settlement."  *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)).

## 2.      The Purpose And Benefits Of Rule 23.

Rule 23 "stems from equity practice[.]"  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  It provides procedural and substantive protections to ensure that class action settlements are fair, adequate and reasonable to the absent members of the class.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (for class action damage claims, due process requires that absent class members receive adequate notice, an opportunity to be heard, an opportunity to opt out, and adequate representation by the named plaintiffs).   Equally important to these equitable considerations, which govern Rule 23 as a whole, is the particular purpose behind Rule 23(b)(3), which applies to this case:  "[T]he Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  *Amchem,* 521 U.S. at 617 (internal quotations omitted)*.*

Although many have expressed outrage at Google's copying and now object that the ASA rewards Google for its unilateral conduct, it is worth noting that no individual copyright owner – other than Plaintiffs – has litigated a U.S. copyright law claim against Google with respect to the GLP.  There is a reason for this – such a litigation is costly and difficult for lone plaintiffs.  This litigation, therefore, provides a textbook example of how the class action device levels the playing field.  Its resolution, on behalf of a class of authors and publishers, is one of the most appropriate uses of the class action device since the enactment of Rule 23.

**B.      The History Of This Settlement Enjoys The Presumption of Fairness.**

A class settlement "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery" is entitled to a presumption of fairness, adequacy and reasonableness.  *Wal-Mart,* 396 F.3d at 116 (2d Cir. 2005) (quoting *Manual for Complex Litigation*, *Third*, § 30.42 (1995)); *In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-CV-11515, 2008 WL 5110904, at *1.  *Accord Weinberger*, 698 F.2d at 74 (citing *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463-66 (2d Cir. 1974)); *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 280-81 (S.D.N.Y. 1993).

"The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms."  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *see also Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983) ("The trial judge determines fairness, reasonableness, and adequacy of a proposed settlement by considering (1) the substantive terms of the settlement compared to the likely result at trial, and (2) the negotiating process, examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion that may have marred the negotiations themselves.") (internal citations omitted); *Snapp v. Topps Co.*, No. 93-CV-0347, 1997 WL 1068687, at *2 (E.D.N.Y. Feb. 12, 1997); *In re Int'l Murex Techs. Corp. Sec. Litig.*, No. 93-CV-336, 1996 WL 1088899, at *3 (E.D.N.Y. Dec. 4, 1996); *Slomovics v. All For A Dollar, Inc.*, 906 F. Supp. 146, 149 (E.D.N.Y. 1995).

For the reasons described below, the ASA, plainly the product of intense and protracted arm's-length negotiation by experienced and effective counsel for Plaintiffs, is presumptively fair.

### 1. The ASA Is The Product Of Vigorous, Arm's-Length Negotiations.

The Settlement Agreement was negotiated between the parties over a period of more than two years. The amendments to the Settlement Agreement that resulted in the ASA were negotiated over a period of several additional months. All of these negotiations were arm's-length, adversarial, and often contentious. No deal was reached until Class Counsel thoroughly investigated and researched the relevant facts and law, including reviewing substantial amounts of discovery produced by Google.

Of particular significance is that the Class's interests were protected not only by the Representative Plaintiffs and counsel for the Author Sub-Class and the Publisher Sub-Class, but also by the Associational Plaintiffs. The Authors Guild assisted counsel for the Author Sub-Class and the American Association of Publishers assisted counsel for the Publisher Sub-Class. These entities were active participants in the negotiations. Aiken Decl. ¶¶ 49, 56; Sarnoff Decl. ¶ 10.

### 2. Experienced Class Counsel Effectively Represented The Class.

In determining whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations," *In re Nasdaq Market-Makers Antitrust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y. 1997), courts give substantial weight to the

31

experience and reputation of the counsel who prosecuted the case and negotiated the settlement.  *See Blank v. Talley Indus., Inc.*, 64 F.R.D. 125, 132 (S.D.N.Y. 1974) ("Another factor favoring the settlement, and one entitled to substantial weight, is that it bears the imprimatur of seasoned and experienced counsel . . . ."); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'") (citation omitted); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 667 (D. Minn. 1974) ("The recommendation of experienced . . . counsel is entitled to great weight."); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005).

Here, the Sub-Classes were separately represented by counsel with substantial experience in both litigating class actions and copyright claims.  Boni Decl. ¶ 1, Ex. E; Cunard Decl. ¶ 24, Exs. E, F.  When their interests were aligned against Google, the authors' and publishers' representatives negotiated in a cooperative, unified manner. Where author and publisher interests were in conflict, particularly in connection with negotiating the A-P Procedures, the discussion between the authors and publishers were adversarial and contentious.

###     C.     The Terms Of The ASA Are Fair, Reasonable, And Adequate.

Courts consider nine factors ("*Grinnell* factors") when determining whether the provisions of a settlement agreement are fair, reasonable and adequate:  (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to

the settlement; (3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of

maintaining the class action through the trial; (7) the ability of the defendants to

withstand a greater judgment; (8) the range of reasonableness of the settlement fund in

light of the best possible recovery; and (9) the range of reasonableness of the settlement

fund to a possible recovery in light of all the attendant risks of litigation. *Wal-Mart*, 396

F.3d at 117 (citing *Grinnell*, 495 F.2d at 463). "All nine factors need not be satisfied,

rather, the court should consider the totality of these factors in light of the particular

circumstances." *Thompson*, 216 F.R.D. at 61 (citing *D'Amato*, 236 F.3d at 86); *In re*

*Global Crossing Sec. & ERISA Litig*., 225 F.R.D. 436, 456 (S.D.N.Y. 2004); *In re Telik,*

*Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008).

Whether the terms of a proposed class action settlement are substantively fair is

an inherently "limited" analysis. *Weinberger*, 698 F.2d at 74. The court's primary focus

is on the "substantive terms of the settlement compared to the likely result of a trial."

*Banyai v. Mazur*, No. 00-CV-9806, 2008 WL 4921351, at *3 (S.D.N.Y. Nov. 18, 2008)

(quoting *Malchman*, 706 F.2d at 433).

### 1. Litigation Would Have Been Complex, Expensive And Protracted.

Google's defense in this action was the fair use provision of Section 107 of the

Copyright Act. 17 U.S.C. § 107. ("[T]he fair use of a copyrighted work . . . for purposes

such as criticism, comment, news reporting, teaching (including multiple copies for

classroom use), scholarship, or research, is not an infringement of copyright."). The

success or failure of that defense would turn on an examination of at least the following four factors set out in the statute:  (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the original work.  *Id.*

Litigation over fair use is extremely fact-intensive.  Whether a use is fair or not comes down to a case-by-case determination.[19]  The following issues, therefore, would have been among those requiring both factual and legal development by both Plaintiffs and Google:

- To what extent is Google's use of books that it digitized and displayed "commercial?"

- Are Google's uses of the books transformative?

- Given that Google is copying entire books and users can search for and retrieve any part of such books, is the amount of text that Google displays relevant?

- To what extent does the availability of these books in libraries, or in other locations, assist either Google's or the plaintiffs' fair use arguments?

- Would the Google Library Project, or other unauthorized digitization activities, individually or cumulatively, have impaired the plaintiffs' markets for their works?

---

[19]    Keller & Cunard, *Copyright Law: A Practitioner's Guide* § 8.1, at 8-2 (Release No. 10, Nov. 2009) (citing *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991) (noting "fact-driven" nature of a fair use determination)).

These would not have been the only complicated issues to be litigated.  Assuming Plaintiffs had prevailed at the liability stage by overcoming Google's fair use defense, the parties would then have litigated the questions of the damages to which members of the Class would have been entitled for books already scanned and displayed by Google.  Those issues would have been complicated and time-consuming.

Had Plaintiffs been successful, a further complex issue would have remained as to the disposition of the digital copies in Google's possession as well as those delivered by Google to the libraries.  The libraries are not parties to the actions, so further steps would need to have been taken to secure those copies or have them destroyed.  This critical issue would have further added to the complexity, expense and duration of the litigation.

Accordingly, had this case been litigated, it would have involved a tremendous number of material facts.  Many of the legal issues would have been ones of first impression.  The damages phase of the case, should Plaintiffs have prevailed, would have been costly.

For both Plaintiffs and Google, the stakes in this case have been high.  After trial (or even summary judgment), extended appellate litigation would have followed.  Even had Plaintiffs prevailed before this Court and at the Court of Appeals, they likely would have had to wait until the denial of the Supreme Court's petition for certiorari (or, had the petition been granted, a decision affirming the trial court's decision) to obtain relief for the Class.

These factors strongly support approval of the ASA.  *See In re AOL Time Warner ERISA Litig.*, No. 02-CV-8853, 2006 WL 2789862, at *6 (S.D.N.Y. Sept. 27, 2006)

(settlement approved where it "would grant relief to all class members without subjecting them to the risks, complexity, duration and expense of continuing litigation"); *Telik*, 576 F. Supp. 2d at 577 ("Given the uncertain prospects of success at trial . . . the settlement is highly beneficial to the Class. . . . Settlement will provide tangible and certain relief to the Class now, and 'without subjecting them to the risks, complexity, duration, and expense of continuing litigation.'").

## 2.    The Reaction Of The Class To The ASA.

"[O]bjections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members."  4 *Newberg on Class Actions* § 11:41, at 108 (2002).  *See Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) ("We perceive no reason why a settlement cannot be considered fair despite opposition from all who responded when the responding class members were significantly less than half of the class."); *In re Initial Pub. Offering Sec. Litig.*, No. 21-MC-92, 2009 WL 3397238, at *11 (S.D.N.Y. Oct. 5, 2009) (settlement approved where approximately 140 class members, of some 7 million noticed, filed objections); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (approval warranted even where 10% of class objected); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (approval warranted even where 16% of class objected).

Here, more than 1.2 million individual notices of the Settlement Agreement were sent directly to copyright owners worldwide, potential members of the Class, and to associations representing authors, publishers and agents.  Declaration of Katherine

36

Kinsella, Feb. 10, 2010 ("Kinsella Decl.") ¶¶ 18, 46.  Many more received notice through

the worldwide publication of the Summary Notice, the extensive worldwide news

coverage of the Settlement Agreement and the intensive debates regarding the Settlement

in news articles, commentaries, blogs, conferences and trade publications.  Kinsella Decl.

¶¶ 117-26; Sarnoff Decl. ¶ 26.  The Settlement Agreement and the Notice, along with

extensive "frequently asked questions," were posted on the Settlement Website.

After the filing of the ASA, the Supplemental Notice was sent directly to persons

who had been in contact with the Settlement Administrator (including those who had

opted out or filed claims), as well as to the rightsholder organizations worldwide that had

received the Notice.  The Supplemental Notice and the ASA both were posted on the

Settlement Website, with frequently asked questions relating to the effect of the

amendments.  Again, the worldwide news coverage of the ASA, as well as debate in

articles and blogs, was extensive.  Kinsella Decl. ¶¶ 18, 121; Sarnoff Decl. ¶ 26.

Although several hundred objections were filed in response to the Settlement

Agreement and the ASA, these represent a very small fraction of the members of the

class who received individual notice, read the Summary Notice or otherwise were made

aware of the Settlement.  This is so notwithstanding that a number of such objections

were filed on behalf of multiple purported class members.  Moreover, only about 6,800

(out of hundreds of thousands, if not a million or more members of the Amended

Settlement Class) decided to opt out of the Settlement.  Declaration of Tiffaney Allen,

Feb. 10, 2010 ("Allen Decl.") ¶ 9.  Further, to date, over 1.1 million books have been

claimed by more than 42,000 authors, heirs, agents and publishers.  Allen Decl. ¶ 10.

Taken together, this is evidence of a favorable reaction from the Class.

In addition to the support from the two Associational Plaintiffs, the Authors Guild

and the Association of American Publishers (whose missions are to promote the interests

and to protect the rights of, respectively, authors and publishers[20]), other rights groups,

representing members of the Amended Settlement Class in the United Kingdom,

Australia and Canada, have supported the ASA.[21]

The ASA has sparked a great deal of public comment, both pro and con, not only

from authors and publishers but also from Google's competitors and its many detractors.

This *Grinnell* factor, however, examines the reaction of the absent class members as a

whole.  In that context, it is clear that the reaction of the Class to the ASA is very

positive.

---

[20]   *See* Aiken Decl. ¶¶ 5-6, 57-58; Sarnoff Decl. ¶¶ 2, 24.

[21]   *See* D.I. 127 (Australian Society of Authors) (welcoming the Settlement); D.I. 457
(Authors' Licensing Collecting Society) at 2 ("UK writers overwhelmingly support
the proposed Settlement because it offers new opportunity to advance author's rights
and interests"); D.I. 826 (Canadian Publishers' Council) at 2 (Council unanimously
voted in support of the Amended Settlement); D.I. 830 (Australian Publishers
Association) at 2 (Australian Publishers Association, representing 90% of the
Australian book publishing market, asks the court to approve the Amended
Settlement); D.I. 877 (Association of Canadian Publishers) at 1 (the Association of
Canadian Publishers "consider the amended Settlement to be in the best interest of
the majority of our members"); *see also* Declaration of Owen Atkinson, Feb. 11,
2010 ("Atkinson Decl.") ¶¶ 13-15 (noting many authors in the U.K. acknowledge
benefits of ASA).

### 3.     The Stage Of The Proceedings And The Amount Of Discovery Completed.

Class Counsel agreed to settle based on a thorough understanding of their case. *See Wal-Mart*, 396 F.3d at 118. The determination to settle was reached by Class Counsel only after serious investigation of the relevant factual issues, discovery, a continuing analysis of the relevant legal questions and extensive negotiation. Class Counsel reviewed documents pertaining to Google's digitization plans and strategies, Google's relationship with participating universities and libraries, authors' and publishers' respective copyright and contractual interests in the digitized books, and market studies of the electronic book industry. Class Counsel for the publishers analyzed developments in the e-book market, publisher Plaintiffs' own digitization strategies and the effect of Google's digitization program on publishers' present and future plans. Class Counsel for the authors analyzed the publisher contracts produced by both Google and the publishers to understand the rights of authors and publishers with respect to digital copying and use.

Plaintiffs reviewed over four million pages of documents produced by Google and the publisher Plaintiffs. These documents were culled from the files of over one hundred individuals, many of whom hold or held executive or senior level management titles at Google or at one of the plaintiff publishing houses. In addition, the Representative Plaintiffs prepared and issued over twenty third-party subpoenas to libraries and universities, resulting in thousands of additional pages of documents that were reviewed and analyzed. Cunard Decl. ¶ 5.

That is a more than ample record to support an informed decision to settle.  *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 363 (S.D.N.Y. 2002) ("To approve a settlement, . . . 'the Court need not find that the parties have engaged in extensive discovery.'") (quoting *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 425-26 (S.D.N.Y. 2001)); 4 *Newberg on Class Actions* § 11:45, at 127 (a court must have "sufficient evidence to enable [it] to analyze intelligently the contested questions of fact[,] . . . [but] need not possess evidence to decide the merits of the issue"); *AOL Time Warner*, 2006 WL 2789862, at *21 ("The parties need not 'have engaged in extensive discovery' as long as 'they have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement.") (citations omitted).

### 4.     The Risks Of Establishing Liability.

The ASA provides an extraordinary result to members of the Class, both in the abstract and even more so when weighed against the risk of protracted litigation before the trial and appellate courts on what all concede to be a novel issue of copyright law.

The principal dispute would have been over fair use, a doctrine that is heavily fact intensive and, as applied to digital uses and the Internet, continues to evolve rapidly.[22] Accordingly, and as discussed below, Plaintiffs faced a risk that they would not have prevailed.

---

[22]     *See supra* note 19 and accompanying text.

During the pendency of this case, the Second Circuit issued at least two significant fair use decisions, both of which might have been relevant to the legal questions in this case. *See Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) (artist's copying of advertisement's photographic depiction of female legs a transformative fair use); *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605 (2d Cir. 2006) ("thumbnail" sized reproductions of concert posters in illustrated biography of Grateful Dead was fair use). Novel fair use decisions have been rendered in other circuits and those too would have been invoked by the parties in support of their respective positions. *See, e.g., A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) (use of student essays for plagiarism checking is fair use, because it served a different purpose than original); *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) (image search use of thumbnails is a "highly transformative" fair use).

Plaintiffs believe that, as to the first fair use factor, the intensely commercial nature of Google's use of the copyrighted material of members of the Class would cut in their favor. Google is an enormous and successful commercial enterprise. Its activities of scanning books and making them searchable, as well as integrating book content into search results, would enhance the attractiveness of its search engine to users and advertisers. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1995).

Nonetheless, the commercial nature of a use is not determinative. Courts increasingly focus on whether a work is "transformative," *i.e.*, whether it "adds something new, with a further purpose or different character, altering the first with new

expression, meaning or message." *See Campbell*, 510 U.S. at 579. Google would have relied on several recent cases to argue that its copying was "transformative" because it served a different function or purpose than the original books. At the time that the action was brought, Google could have relied on *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818, 822 (9th Cir. 2003), which held that the defendant's use of copyrighted "thumbnail" images constituted fair use in part because it "improve[ed] access to information on the internet."

In addition, just before the October 2008 announcement of the original Settlement, the Ninth Circuit handed down its decision in *Perfect 10*. That court concluded that Google's creation and use of copyrighted "thumbnail" images in image search was "highly transformative." *See Perfect 10*, 487 F.3d at 721. Google undoubtedly would have noted, as the appellate court did, the district court's acknowledgement that image search provided a "great value to the public," *id.* at 722¸ to justify its digital copying of library books for the Google Library Project. *See also Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1117-23 (D. Nev. 2006) (commercial gain from Google's practice of caching websites was outweighed by transformative purpose, and made inaccessible sites available).

By contrast, a number of courts have rejected claims of transformative use where the defendant's use took advantage of the same inherent value represented by the work in the first place, underscoring the uncertainty of the outcome of this factor. *See, e.g., Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 628-29 (9th Cir. 2003); *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108-12 (2d Cir. 1998); *Ringgold v. Black*

*Entm't Television, Inc.*, 126 F.3d 70, 78-79 (2d Cir. 1997); *Video-Cinema Films, Inc. v.*

*Lloyd E. Rigler-Lawrence E. Deutsch Found.*, No. 04-CV-5332, 2005 WL 2875327, at *7

(S.D.N.Y. Nov. 2, 2005); *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349,

351 (S.D.N.Y. 2000).

As to the second factor, the nature of the work being copied, Plaintiffs would have

argued that the works being copied were, in general, highly creative original works of

authorships.  That would have weighed in Plaintiffs' favor, but some courts have

concluded that where the copying is "transformative," less weight may be accorded to a

finding that the copied work is "creative."  *See, e.g.*, *Blanch*, 467 F.3d at 257.

As to the third factor, the amount of the work being used, Google's copying of

entire works militates against "fair use."  *See Campbell*, 510 U.S. at 587 (discussing

whether a "substantial portion of the infringing work was copied verbatim from the

copyrighted work" as relevant to the application of the fair use defense) (citation

omitted).  In addition, the entire work is available to be searched and, depending on the

searches made, could be presented to multiple users.  Moreover, even as to the display of

snippets, display of just a small portion of a work may be deemed unfair if that portion

constitutes the qualitative "heart" of the work.  *See Harper & Row Publishers v. Nation*

*Enters.*, 471 U.S. 539, 564-65 (1985).  Plaintiffs would have argued that the "heart" of

the work, at least from the perspective of a searcher, may well have been the portion of

the work, no matter how small, that is retrieved and displayed in response to the user's

specific search terms.  Nevertheless, the amount of copying permitted under this factor

will depend on whether the amount taken is "reasonable" or "justified" in relation to the

purpose of the copying.  *See Blanch*, 467 F.3d at 257; *Kelly*, 336 F.3d at 820-21 (for

purposes of visual search, it was "necessary" to copy entire image).  Google would have

argued that it needed to copy entire books for purposes of indexing them and making

them available for book search.

      The fourth factor, the effect of Google's use on the existing and potential markets

for, or value of, the works being copied and displayed, would have cut against fair use.

Google's use adversely affected the actual and future retail and licensing markets for in-

print books, as well as potential markets for out-of-print books.  *See Campbell*, 510 U.S.

592 (market includes those that creators would themselves develop or license others to

develop); *Texaco*, 60 F.3d at 929-30 (copyright owner entitled to demand a royalty for

licensing others to use work; potential licensing revenues include "traditional, reasonable,

or likely to be developed markets").  Moreover, Plaintiffs would have asserted that,

should Google's use be permitted and, as a result, digitization become "widespread, it

would adversely affect the potential market for the copyrighted work."  *See Sony Corp. v.*

*Universal City Studios*, 464 U.S. 417, 451 (1984); *Princeton Univ. Press v. Michigan*

*Document Servs.*, 99 F.3d 1381, 1386-87 (6th Cir. 1996) (applying *Sony* test to book

copying by copy shops).  Google likely would have argued, in response, that digital

display did not affect any of the markets of the Plaintiffs, including digital book licensing

arrangements, or that copyright owners did not intend to enter the search market.

      The ASA is an excellent result in light of the risk that Plaintiffs would not have

succeeded in establishing Google's liability at trial.  Without having to incur that risk, the

ASA affords Rightsholders control over their works, compensates them for Google's

unauthorized digitization, and creates a potentially lucrative commercial market for Rightsholders, including a new platform on which to market in-print Books and commercialize out-of-print Books that have not earned any income for years or decades, and provides rights and compensation to Rightsholders of Inserts.

### 5.    The Risks Of Establishing Damages.

Establishing copyright infringement damages would have been challenging.  As to works that were timely registered so as to be entitled to statutory damages, legal issues would have been raised as to whether Google's actions were willful or innocent or, even if neither, where on the range of $750 to $30,000 a damage award should lie.  *See* 17 U.S.C. § 504(c).

As to works that were not timely registered, only actual damages and disgorgement of Google's profits from the infringing activity would have been recoverable.  *See* 17 U.S.C. § 504(b).  Plaintiffs would have had to establish the licensing fees (if any) to which they would have been entitled for digitization and snippet display, as well as for Google's internal "non-display" uses.  Although Plaintiffs also would have been entitled to their lost profits, if any, demonstrating lost profits from Google's activities, especially on a class-wide basis, would have presented complex issues. Google might have argued that, on balance, including book content in the Google Library Project would have actually spurred sales in books through links to online bookstores.

Finally, the parties would have had to litigate whether Google earned any profits arising out of the infringement, and if so, their sources (*e.g.*, from advertising revenues

earned by Google).  Plaintiffs would have had the burden of proving the gross revenues

attributable to the infringement.  Google would have had the burden of providing its own

deductible costs, to arrive at its profits, if any.   Plaintiffs would not have been able to

recover profits attributable to Google's good will, fame, skill or the intrinsic value of the

noninfringing aspects of Google's search products.  *See, e.g.*, *Rogers v. Koons*, 960 F.2d

301, 313 (2d Cir. 1992) (plaintiff not allowed to recover profits derived from defendant's

"own position in the art world"); 17 U.S.C. § 504(b) (recovery not authorized for

"elements of profit attributable to factors other than the copyrighted work").  Given the

novelty of these issues and the difficulty of apportioning Google's profits as between the

infringing and noninfringing features of its products, efforts to recover Google's profits

would have been difficult and protracted and the profits recovered could have been

minimal.

### 6.      The Risks Of Maintaining The Class Action Through Trial.

That a motion for class certification might be denied is another factor favoring

approval.  Class action litigations, unlike settlements, need to satisfy the manageability

requirement under Rule 23(b)(3)(1).[23]  The additional risk that the Class might not have

been certified, or that it might be decertified before trial, supports approval.  *See*

---

[23]   In a settlement context, the requirements of Rules 23(a) and (b) must be satisfied,
except that the "manageability" requirement under Rule 23(b)(3)(D) need not be
addressed.  *Amchem,* 521 U.S. at 620 ("Confronted with a request for settlement-only
class certification, a district court need not inquire whether the case, if tried, would
present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for
the proposal is that there be no trial.").

*NASDAQ Market-Makers*, 187 F.R.D. at 476 (settlement approved where "there is no guarantee that this class would not be decertified before or during trial").

### 7.    The Ability Of Defendant To Withstand A Greater Judgment.

Google's capacity to pay a judgment greater than that achieved in the ASA, does not, standing alone, warrant disapproval of the ASA.  In *D'Amato*, 236 F.3d at 86, objectors argued that a settlement concerning reparations to Holocaust victims should not be approved because the Austrian bank defendants could have withstood a greater judgment.  In affirming the district court's approval of that settlement, the Second Circuit held:

> The District Court explicitly acknowledged that the defendants' ability to withstand a higher judgment weighed against the settlement, but explained that this factor, standing alone, does not suggest that the settlement is unfair.  This conclusion cannot be considered an abuse of discretion, given that other *Grinnell* factors weigh heavily in favor of settlement.

*Id.* (citations omitted).  *See also Sheppard v. Consol. Edison Co. of N.Y., Inc.*, No. 94-CV-0403, 2002 WL 2003206, at *5 (E.D.N.Y. Aug. 1, 2002) (settlement approved even though defendant "concedes that it is able to withstand a greater judgment"); *NASDAQ Market-Makers*, 187 F.R.D. at 477-78 (ability to pay a "very substantial judgment . . . does not militate against settlement").

8.      **The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery.**

A class action "settlement may be approved if it is clear that it secures *some adequate advantage* for the class.  The settlement does not have to be a brilliant one in order to secure judicial approval."  4 *Newberg on Class Actions* § 11:46, at 143-45. (emphasis added).  Viewed either on its own, or in comparison to many other class action settlements, the ASA confers far more than an "adequate advantage" on the Class and creatively anticipates and resolves the difficult issues presented.

The ASA gives Class members "injunctive" rights that may be exercised at any time.  Rightsholders have the ability to direct Google not to display their Books and Inserts, to "turn off" advertising on their Book's pages, and to set the sale price of their Books.  Rightsholders can exclude the Books from one or more commercial products, or remove their Books altogether from the database.

Google has agreed to pay at least $45 million in damages for past infringement to Rightsholders whose Books and Inserts Google digitized without authorization.  Every Rightsholder who makes a valid claim will receive a payment of at least $60 and up to $300 per Book ($15-$75 per Entire Insert, and $5-$25 per Partial Insert).  Depending on the number of claims received, Google could pay more than $45 million, as all valid claims will be paid at least the minimum amounts.

Although the Cash Payments are below the minimum statutory damages of $750 available under the Copyright Act, 17 U.S.C. § 504(c)(2), they are available for all Books and Inserts that were digitized without authorization by May 5, 2009, without regard to

48

whether the works were timely registered and, therefore, would be eligible for statutory damages.  If not timely registered, the works would be eligible only for actual damages and defendant's profits, 17 U.S.C. § 504(b), and, as such, subject to the litigation risks noted above.  The negotiated amounts of the Cash Payments also reflect the possibility that Plaintiffs might not have established liability at trial.  That Plaintiffs succeeded in obtaining Google's agreement to pay a minimum of $45 million to members of the Class (with no cap) without having to establish copyright infringement renders that relief well within the range of reasonableness.

The ASA also gives Rightsholders the opportunity to earn potentially substantial additional revenue.  It provides new exposure to and breathes new commercial life into the millions of Books in United States libraries that are out-of-print and have ceased earning any income at all for their Rightsholders.  Further, it provides an innovative and potentially lucrative marketing platform for in-print Books.  The Institutional Subscriptions is a new product – a searchable digital library of millions of Books – that is unparalleled in the marketplace for books.

The revenue split of 63/37 in favor of Rightsholders gives primary consideration to the value of the copyrighted works.

The ASA gives birth to the Registry, for which Google will pay $34.5 million (less notice and administrative costs) to establish and maintain.  The Registry will locate Rightsholders, maintain their contact information, collect revenues from Google and pay Rightsholders for Google's use of their copyrighted works.  It will protect Rightsholders' interests in works covered by the Settlement and, potentially, other opportunities.

In most class actions settlements, the class obtains less than the full relief to which it believes it is entitled, particularly in terms of compensation. Here, the ASA compares favorably to what the Class could have received through litigation on both a monetary and injunctive relief basis. The ASA also confirms the fundamental principle of copyright that a copyright owner has the right to authorize, or not, the use of any or all of the copyrighted works, which the Representative Plaintiffs sued Google to establish. Third Amended Complaint ("Compl.") ¶ 7. This factor strongly favors approval.

> **9.      The Range Of Reasonableness Of The ASA Compared To A Possible Recovery In Light Of The Risks Of Litigation.**

Class action settlements should be approved when "[t]he unpredictability of a lengthy and complex trial, and the appellate process that would follow, with the risk of reversal, make the fairness of [a] substantial settlement readily apparent." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 366 (S.D.N.Y. 2002); *accord In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 148 (E.D.N.Y. 2000) (court approves settlement when measuring adequacy and reasonableness of settlement "against the practical alternative to the settlement in the real world"). "There is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion – and the judge will not be reversed if the appellate court concludes that the settlement lies within that range." *Wal-Mart*, 396 F.3d at 119 (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). The ASA offers

substantial benefits to the Class *now*, as opposed to the risk and delay offered by further litigation.

### D.    The Class Certification Requirements Are Met.

In connection with the final approval of a class action settlement under Rule 23(e), plaintiffs must show that the settlement class satisfies the class certification requirements of Rule 23.  *See In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 172-73 (S.D.N.Y. 2000) (citing *Amchem,* 521 U.S. at 619), *aff'd sub nom. D'Amato*, 236 F.3d 78 (2d Cir. 2001); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000); *Sumitomo Copper Litig.*, 189 F.R.D. at 278.  In connection with the ASA, both the Author Sub-Class and Publisher Sub-Class meet those requirements.[24]

### 1.    Rule 23(a) Requirements Are Satisfied.

Numerosity (Fed. R. Civ. P. 23(a)(1)).  Each sub-class is sufficiently numerous. The Author Sub-Class numbers in the hundreds of thousands, at least.  The Publisher Sub-Class has thousands of members.  Direct notice of the Settlement Agreement was sent to more than 1.2 million members of the class.  Kinsella Decl. ¶ 46.  The numerosity requirement is satisfied.

---

[24] "Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class."  Fed. R. Civ. P. 23(c)(4) advisory committee's note (1966 amendments); *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118-19 (2d Cir. 1999).  "[E]ach subclass must separately and independently satisfy the requirements of Rule 23 for class certification."  *Jones v. Goord*, 435 F. Supp. 2d 221, 232 (S.D.N.Y. 2006); *accord Marisol A. v. Giuliani*, 126 F.3d 372, 378-79 (2d Cir. 1997).

Commonality (Fed. R. Civ. P. 23(a)(2)).  This requirement is met if there exists even a single common question of law or fact.  *See* 1 *Newberg on Class Actions* § 3:10, at 273-74; *Global Crossing*, 225 F.R.D. at 451.  Here, the common questions included whether Google reproduced and disseminated for its own commercial use copies of the works of members of the Class; whether Google's public display of those works infringes their copyrights; whether Google's copying and display of those works on its website is a "fair use"; whether Google's infringement was willful and continuing; the appropriate injunctive relief under the Copyright Act; the factors to be used in determining statutory damages, where available; and the procedure and factors to be used in determining actual damages and defendant's profits.

Typicality (Fed. R. Civ. P. 23(a)(3)).  Each of the Representative Plaintiffs owns one or more copyright interests in Books, and each owns a copyright interest in a work that has been copied, and/or faces an imminent threat of being copied, by Google without authorization.  The claims of the Representative Plaintiffs for each Sub-Class are typical of those of the rest of the Sub-Class.

Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).  This asks whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  Plaintiffs here have no interest antagonistic to the rest of the members of their respective sub-classes, and have retained counsel who are highly experienced in class action and copyright litigation.  Because the authors and publishers had divergent interests as to

some issues relating to the respective rights of authors and publishers under the ASA, the Author Sub-Class and Publisher Sub-Class are represented by separate Representative Plaintiffs and separate Class Counsel.

### 2. The Rule 23(b)(2) And 23(b)(3) Requirements Are Satisfied.

Plaintiffs seek certification under Rule 23(b)(2) and 23(b)(3). *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 515-16 (S.D.N.Y. 1996) ("[W]here injunctive relief and damages are both important components of the relief requested, courts have regularly certified an injunctive class under Rule 23(b)(2) and damages class under Rule 23(b)(3) in the same action.") (citation and block quotation omitted).

Certification of an injunctive relief class under Rule 23(b)(2) is warranted, as Plaintiffs sought to enjoin Google's alleged massive infringement of Class members' copyrights. Certification pursuant to Rule 23(b)(2) is appropriate where the court finds that "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 20 (2d Cir. 2003) (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001)). Both conditions are met here. Numerous plaintiffs would reasonably seek to enjoin Google from reproducing their copyright-protected works, and injunctive relief would be the necessary and appropriate outcome of a trial on the merits.

In addition, the Rule 23(b)(3) requirements – predominance and superiority – are satisfied. The purpose of the predominance inquiry is to allow the court to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "The predominance requirement calls only for predominance, not exclusivity, of common questions." *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y. 1977).

Here, common questions predominate over any issues affecting only individual Class members. The Class members all share the same interest in resolving such common questions as whether Google's digitization of Books in libraries without permission infringed their copyrights, whether such infringement was willful and continuing, and the appropriate measure of damages and appropriate scope of an injunction under the Copyright Act. These and related issues predominate over any issues affecting only individual Class members, thereby satisfying the predominance requirement. *See* Fed. R. Civ. P. 23(b)(3); *see also NASDAQ Market-Makers*, 169 F.R.D. at 517 (explaining the predominance requirement is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless").

With respect to "superiority," Rule 23(b)(3) requires that a class action be the "most 'fair and efficient' method of resolving" the case. *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006). That is plainly the case with respect to this action. The litigation was brought to stop Google's digital copying program, a program that has an adverse effect on millions of in-copyright works. By combining the

claims of individual members of the Class into a single action, claims that they could not

as a practical matter effectively assert alone against Google, those claims are presented

far more fairly and efficiently than they would be in individual actions, which would

require the same issues to be litigated multiple times.  *See* 5-23 *Moore's Federal Practice*

*- Civil* § 23.46[1] ("In determining superiority, courts must consider alternative methods

of adjudicating the dispute.  Superiority is determined by comparing the efficiency and

fairness of all available methods of adjudicating the matter.").

Accordingly, for the reasons set forth above and in Plaintiffs' Supplemental Brief,

the Class merits final class certification.

### E.     The Class Received The Best Notice Practicable Under The Circumstances.

#### 1.     Notice Of The Original Settlement Agreement.

Plaintiffs retained the nation's leading expert on class action notice, Kinsella

Media, to serve as the Notice Provider.  With its assistance, Plaintiffs provided one of the

most ambitious, widespread notice programs in U.S. class action history.  Kinsella Decl.

¶¶ 14, 149.

##### a.     Content Of Notice And Summary Notice.

The Notice provides, in plain language, information about the lawsuit and the

original settlement, including the definition of the original settlement class, benefits to the

class and other salient terms, as required under Rule 23(c)(2)(B).  It explains the legal

rights and options of members of that class, including the right to participate in, opt-out

of, or object to the settlement and exactly how to exercise each such right.  It makes clear

that members of the class have the right to appear at the fairness hearing, themselves or through counsel, and provides the date, time and place of the hearing. The Notice provides contact information and toll-free numbers for members of the class to seek further information about the settlement.

The Summary Notice provides important information regarding the subject of the original settlement, the definition of the class and the legal rights available to members of the class. The Summary Notice also provides multiple options to obtain complete information about the settlement, prominently featuring the toll-free telephone number for each country (or, if a toll-free number was not available for that country, the international toll number), the Settlement Website address, and a mailing address to request or access the Notice.

Kinsella Media provided substantial assistance with the drafting of the Notice and Summary Notice. It is the opinion of Ms. Kinsella that the contents of the Notice and Summary Notice meet the requirements of Rule 23(c)(2)(B). Kinsella Decl. ¶¶ 14, 25.

### b.     Dissemination Of Notice And Summary Notice.

Kinsella Media designed and implemented a comprehensive notice dissemination program, using the following five primary components:

(i) **Direct Notice.** After extensive research and outreach to organizations worldwide whose members were likely to be members of the class, direct notice of the original settlement was sent to more than 500 organizations and at least 1.26 million persons or entities who are or would be likely to be members of the class. Notice was

sent in 36 languages, accounting for languages read by 96% of the class. Kinsella Decl. ¶¶ 37, 46.

**(ii) Paid Media.** Because the Direct Notice program could not deliver notice to 100% of the class, Kinsella Media designed a massive program of notice by publication of the Summary Notice (translated, as appropriate) in domestic and international print and online media (including global publications, online ads (banner ads, text ads, and keyword searches), and in-country media including newspapers, consumer magazines, and trade publications). The Summary Notice was published in 71 languages in hundreds of newspapers and magazines worldwide. *See* Kinsella Decl. Exs. 34, 37-39, 41 (paid media placements).

**(iii) Earned Media.** The Notice Program also publicized the original settlement through earned media (*i.e.*, public relations) principally in three ways. The parties issued a joint press release and convened a press conference announcing the settlement and providing the press with the address of the Settlement Website. The parties issued a second press release during the Notice Period. Plaintiffs also engaged an independent firm specializing in international media analysis to review and analyze the overall contribution of the earned media coverage to the Notice Program. Earned media appearances related to the settlement generated at least 636 million gross impressions worldwide. Kinsella Decl. ¶ 121.

**(iv) Outreach.** Kinsella Media and Class Counsel communicated with scores of copyright and author and publisher rights organizations. In connection with its outreach (and direct notice) programs, Kinsella Media and Class Counsel sought the assistance of

Reproduction Rights Organizations ("RROs") around the world to disseminate notice. RROs are organizations that license the reproduction of copyright-protected material, often in circumstances where it is impractical for rightsholders to act individually. Outreach materials also were provided to over 400 other organizations and outlets worldwide with a focus on the interests of authors and publishers, in an effort to encourage them to publicize the settlement and direct likely members of the class to the Settlement Website (see below).  Kinsella Decl. ¶¶ 70-71, 130-35.

(v) **Settlement Website.**  Kinsella Media, Class Counsel, and the Settlement Administrator, Rust Consulting (with the assistance of Google), established an informational Internet website, www.googlebooksettlement.com ("Settlement Website"), which Kinsella Media listed with major search engines.  The Settlement Website contains the original settlement agreement, and, in 36 languages, the Notice, Summary Notice, Supplemental Notice, a Help Center with a Glossary, Frequently Asked Questions and information to assist with the Claim Form, an opt-out form, and other relevant information.  The Settlement Website also contains a Claim Form, where Class members can submit claims online, as well as a downloadable hard copy version of the Claim Form.  The Settlement Website allows for email inquiries to request assistance in multiple languages.  Kinsella Decl. ¶ 145.

In addition, the Notice, Summary Notice and Supplemental Notice all provided toll-free numbers to call the Settlement Administrator for information, as well as the address of the Settlement Website.  Allen Decl. ¶¶ 5-7.  Further, the Notice contained

contact information for Class Counsel, who responded directly, by email and telephone, to many hundreds of inquiries.  Boni Decl. ¶ 14; Cunard Decl. ¶ 9.

The Notice Program included many additional programs, including dozens of telephone and videoconferences that Class Counsel conducted with rights groups, in-person meetings and conferences that Class Counsel and members of the Associational Plaintiffs participated in around the world, participation at the annual meeting of the International Federation of Reproduction Rights Organisations (the RROs' umbrella organization), and other programs as described in detail in the Kinsella Declaration. Kinsella Decl. ¶¶ 65-68, 136.

### 2.    Notice Of The ASA.

Plaintiffs disseminated a Supplemental Notice to inform the Class of the ASA.  In plain language, it identified the substantive amendments to the original settlement agreement, provided information to persons who are no longer within the Class, and highlighted the new fairness hearing date and deadlines.  Declaration of Belinda Bulger, Feb. 10, 2010 ¶¶ 6, Ex. 1.

The Supplemental Notice was disseminated pursuant to the Court's Order dated November 19, 2009.  It was posted prominently on the Settlement Website and the websites of Google and the Associational Plaintiffs.  It was mailed or emailed to all members of the original class who had provided their contact information, submitted claims, opted out of or objected to the Settlement Agreement, or filed comments.  It was sent by email to RROs and other rightsholder organizations, such as national author and

publisher associations that had participated in the original Notice Program, with a request that they disseminate it to their members. In addition, the Settlement Administrator continued its informational toll-free telephone service.

This more limited notice was appropriate for the ASA because its principal terms are the same as the those of the original settlement, many of the amendments, as described in the Supplemental Notice, enhanced the benefits to the Class, none impaired those benefits, and all members of the Class were in the original settlement class, which received the notice described above. A more limited notice program also was appropriate given the extraordinary scope of the original Notice Program, the widespread coverage of the original settlement in the general and trade press from the time that it was announced and the substantial discussion of the settlement worldwide in the general and trade press, on blogs and within author, publisher and agent communities.

At the same time, given the additional benefits obtained for the Class, Plaintiffs had every reason to make sure that there was broad understanding of the changes included in the ASA. Also, it was important to communicate to copyright owners outside the United States that the Amended Settlement Class is narrower than the original settlement class. To the extent that members of the original settlement class outside the United States are no longer included in the Class as a result of the more limited definitions of Books and Inserts, Plaintiffs wanted to let them know that they would no longer have rights, or be granting releases under, the ASA. For this reason, Plaintiffs distributed the Supplemental Notice to author and publisher associations worldwide, as well as to RROs.

### 3.    The Notice Program Met All Requirements.

Both the content and manner of dissemination of the Notice, Summary Notice and Supplemental Notice were more than adequate.  Written in plain terms, the Notice provided sufficient information about the action, the settlement and the Class members' legal rights thereunder, and it was disseminated in an extremely comprehensive and robust manner.

The content of the Notice, Summary Notice and Supplemental Notice easily pass muster.  "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."  *Wal-Mart,* 396 F.3d at 113-14.  "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'"  *Id.* (quoting *Weinberger,* 698 F.2d at 70).  "Notice is 'adequate if it may be understood by the average class member.'"  *Id.* (quoting 4 *Newberg on Class Actions* § 11:53, at 167).  These requirements were more than met here.

As to the manner of dissemination of the Notice, Rule 23 requires that notice be given in a "reasonable manner to all class members who would be bound" by the ASA.  Fed. R. Civ. P. 23(e)(1).  The purpose of notice is to "afford members of the class due process which, in the context of the Rule 23(b)(3) class action, guarantees them the opportunity to be excluded from the class action and not be bound by any subsequent judgment."  *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992)

61

(citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974)); *Global Crossing*, 225 F.R.D. at 448.

Each class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members. *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988); *see also Global Crossing*, 225 F.R.D. at 448 (citing *In re NASDAQ Market-Makers Antitrust Litig.*, No. 94-CV-3996, 1999 WL 395407, at *2 n.3 (S.D.N.Y. June 15, 1999) (no requirement to notify each and every class member individually); *Carlough v. Amchem Prods. Inc.,* 158 F.R.D. 314, 327-38 (E.D. Pa. 1993) (individualized notice to class members not required where parties had proposed extensive alternative notice plan);

 "[T]he absence of individual notice is not fatal to class certification or settlement. If the members of a putative class may not be determined by reasonable means, then constructive notice by publication may satisfy the requirements of Rule 23(c)(2)." *Thomas v. NCO Fin. Sys.,* No. 00-CV-05118, 2004 WL 727071, at *3 (E.D. Pa. Mar. 31, 2004) (putative class would be notified by publications in *USA Today*, with a circulation of 5.6 million, and through PR Newswire's National Newsline, reaching 3,000 newspapers, magazines, national wire services) (citing *Carlough,* 158 F.R.D. at 325). *See also Browning v. Yahoo! Inc.,* No. C04-01463 , 2007 WL 4105971, at *4 (N.D. Cal. Nov. 16, 2007) (notice apprising putative settlement class via email, regular mail and settlement website was reasonable; direct notice to each of the 14 million class members not necessary).

"Publication notice is considered a sufficient means to reach class members whose identities and addresses are not known."  *In re LG/Zenith Rear Projection Television Class Action Litig.*, No. 06-CV-5609, 2009 WL 455513, at *2 (D.N.J. Feb. 18, 2009); *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirements of both Fed. R. Civ. P. 23 and the due process clause."); *In re Remeron End-Payor Antitrust Litig.*, Nos. Civ. 02-2007, 04-5126, 2005 WL 2230314, at *15 (D.N.J. Sept. 13, 2005) ("[T]he law requires reasonably feasible notice by publication coupled with such mailed notice.").

The program of disseminating the Supplemental Notice also fully met the applicable standards.  It is well-settled that limited, or even no, supplemental notice is required where the amended provisions benefit or do not materially impair the interests of class.  *See, e.g.*, *In re Auction Houses Antitrust Litig.*, 138 F. Supp. 2d 548, 549 & n.3 (S.D.N.Y. 2001) (court granted final approval of settlement conditioned on certain amendments to settlement documents, but did not require sending of new notice to class, although parties' ensuing submissions were served on objectors who had already come forward); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2002 U.S. Dist. LEXIS 24771, at *19-20 (E.D. Pa. Dec. 10, 2002) (notice of amended settlement agreement sent to individually represented claimants and posted on the settlement website was sufficient where proposed changes benefited the class and conformed "to the purposes of the underlying Settlement Agreement"); *Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985) ("Under these limited circumstances where the amendment [to the consent

63

decree] is narrow and it is clearly apparent that the interests of the classes are not substantially impaired, the court is of the opinion that the notice already given is adequate and that additional notice is not required pursuant to Rule 23(e)."); *In re Metro. Life Ins. Co. Sales Practices Litig.*, No. 96-179, 1999 WL 33957871, at \*13 (W.D. Pa. Dec. 28, 1999)  ("[M]odifications add to the benefits provided to Class Members under the original Settlement Agreement, which were described in the Notice to the Class. Thus, additional notice to the Class of these modifications is unnecessary."); *Manners v. Am. General Life Ins. Co.*, No. Civ.A. 3-98-0266, 1999 WL 33581944, at \*13 (M.D. Tenn. Aug. 11, 2009) ("Because these amendments enhance the relief provided to Class Members, the Court finds that additional notice was and is not necessary."); *cf. Park v. The Thomson Corp.*, No. 05-CV-2931, 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008) (granting final approval to an amended settlement agreement and ordering notice of the amendments to be disseminated following final approval).

The decision in *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 292 F. Supp. 2d 184 (D. Me. 2003), is instructive.  There, the court denied final approval of a proposed settlement after a program of individual and publication notice to the class.  The parties then proposed an amended settlement.  The court granted preliminary approval and approved a supplemental notice program under which defendants' informational websites were continuously updated and maintained to reflect the terms of the amended settlement; an informational toll-free number was continued; and objectors and opt-outs were sent written notice of the amended settlement.  The court concluded that "such notice was sufficient because it would be too burdensome and

costly to repeat a mailing to the over eight million class members informing them of favorable changes in the proposed amendment, especially to those who never objected to the first proposed settlement." *Id.* at 186. "The relevant case law supports limited notice to non-objectors when the class members have already received an earlier form of notice." *Id*. Accordingly, Plaintiffs' dissemination of the Supplemental Notice, *see supra* p. 56, was far more than required under the circumstances.

For the reasons set forth above and in Plaintiffs' Supplemental Brief, the Notice Program meets all applicable standards.

## IV.    CONCLUSION.

For the foregoing reasons and those set forth in Plaintiffs' Supplemental Brief, Plaintiffs respectfully request that the Court grant the motion for certification of the

Class, approve the Notice Program, and grant Plaintiffs' motion for final settlement

approval.


DATED:  February 11, 2010                    Respectfully submitted,

/s/ Bruce P. Keller                          /s/ Michael J. Boni
Bruce P. Keller                              Michael J. Boni (pro hac vice)
Jeffrey P. Cunard                            Joanne Zack
Richard S. Lee                               BONI & ZACK LLC
DEBEVOISE & PLIMPTON LLP                     15 St. Asaphs Rd.
919 Third Avenue                             Bala Cynwyd, PA  19004
New York, NY  10022                          (610) 822-0200 (phone)
(212) 909-6000 (phone)                       (610) 822-0206 (fax)
(212) 909-6836 (fax)                         MBoni@bonizack.com
bpkeller@debevoise.com                       JZack@bonizack.com
jpcunard@debevoise.com
rslee@debevoise.com                          Robert J. LaRocca
                                             KOHN SWIFT & GRAF, P.C.
*Attorneys for Plaintiffs The McGraw-Hill*   One South Broad Street, Suite 2100
*Companies, Inc., Pearson Education, Inc.,*  Philadelphia, PA 19107
*Penguin Group (USA) Inc., Simon &*          (215) 238-1700 (phone)
*Schuster, Inc., John Wiley & Sons, Inc.,*   (215) 238-1968 (fax)
*Association of American Publishers, Inc.,*  rlarocca@kohnswift.com
*Harlequin Enterprises Limited, Macmillan*
*Publishers Limited,  Melbourne University*  Sanford P. Dumain
*Publishing Limited, The Text Publishing*    MILBERG LLP
*Company, and the Publisher Sub-Class*       One Pennsylvania Plaza
                                             New York, NY 10119
                                             (212) 594-5300 (phone)
                                             (212) 868-1229 (fax)
                                             sdumain@milberg.com

                                             *Attorneys for Plaintiffs The Authors Guild,*
                                             *Inc., Herbert Mitgang, Betty Miles, Daniel*
                                             *Hoffman, Paul Dickson, Joseph Goulden,*
                                             *Maureen Duffy, Daniel Jay Baum,*
                                             *Margaret Drabble, Robert Pullan, and the*
                                             *Author Sub-Class*