UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
The Authors Guild, Inc., Association of American :
Publishers, Inc., et al., :
 :
    Plaintiffs, :
 : Case No. 05 CV 8136 (DC)
    v. :
 : **FILED**
Google Inc., : **ELECTRONICALLY**
 :
    Defendant. :
------------------------------------------------------------------------x

## DECLARATION OF RICHARD SARNOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF AMENDED SETTLEMENT AGREEMENT

Richard Sarnoff hereby declares as follows:

1. I am the Co-Chairman of Bertelsmann, Inc., the U.S. holding company of a portfolio of businesses including Random House, Inc. My experience in the book publishing industry is extensive. I joined the industry in 1987 and have held a number of managerial and executive roles, including Chief Financial Officer, at Bantam Doubleday Dell and subsequently at Random House. I have led both companies' activities in digital and corporate development for much of that time. From 2007 to 2009, I served as Chairman of the Board of the Association of American Publishers, after having served as Vice Chair for the previous two years. I have been a member of that Board since 2001 and continue as a member today. This declaration is submitted in support of Plaintiffs' Motion for Final Settlement Approval.

2. The AAP is the national trade association of the U.S. book publishing industry. AAP's more than 300 members include most of the major commercial publishers in the United States, as well as smaller and non-profit publishers, university presses and scholarly societies. The protection of intellectual property rights in all media, the defense of the freedom to read and the freedom to publish (at home and abroad), and the promotion of reading and literacy are among AAP's top priorities.

3. In 2004, Google announced that it planned to create an online database of all of the world's books, beginning with agreements with major university research libraries in the United States. Under these agreements, libraries would provide books from their collections to Google so that Google could scan them in their entirety, return to those libraries digital copies of those books, store other digital copies on Google's servers and use the copies on Google's servers to display copyright text from those books in response to Internet searches (the "Google Library Project" or "GLP"). The majority of the books Google proposed to scan, and was scanning, were protected by copyright.

4. It immediately became clear to the entire AAP Board, of which I was a member at the time, that millions of books whose copyrights were owned by AAP's members would be part of the GLP, all without authorization by the copyright owners. Google would be retaining those copies in digital format and displaying content from those copyrighted books without permission and additional digital copies of those books would be returned to the libraries which provided them.

5. The GLP alarmed AAP's Board and its members. As a publisher, I was concerned that Google's making of digital copies of entire books would have significant

adverse consequences for potential new uses and markets for our books and their content. Although Google announced that it initially intended only to make "snippet" portions of copyrighted book content available to web users, none of us had any assurance (or belief) that Google's uses always would be confined to that use, or that the size of a "snippet" could be adequately controlled. We were concerned that Google would provide access to book content (perhaps under a liberal interpretation of "fair use" by providing extensive page access to educational institutions, or facilitating inter-library e-loans) and would generate usage fees or annual subscription fees as the hosting and/or service provider  Many scenarios were discussed in which Google might exploit publishers' copyrighted material in a variety of ways with nominal or even no compensation to the rightsholders.

6.     We also had significant concerns with respect to the digital copies that Google was providing to libraries. Libraries might use significant portions, or all, of the contents of books on such copies for a range of purposes that publishers would not regard as permitted by the Copyright Act, including uses in classroom, "e-reserve" access to students and faculty via institutional servers and lending digital copies to other libraries. Libraries might have raised fair use defenses in an attempt to justify such activities. We might also have been faced with sovereign immunity defenses by state institutions. In addition, we were concerned about how the libraries could maintain the security of these digital copies. Security breaches might result in broad copying, uploading, downloading, and display of copyrighted works.

7. We were also concerned with respect to the precedent that the GLP, if left unchallenged, might set. If Google were perceived as being able to scan books and display book content based on its assertions of fair use, then others might be emboldened to engage in digital scanning projects harmful to the interests of rightsholders. In short, GLP represented an unprecedented loss of control over publishers' copyrighted books.

8. The AAP retained Debevoise & Plimpton LLP ("Debevoise") in order to evaluate the legality of the GLP and the courses of action available to us. The AAP determined to initiate litigation against Google to stop Google's project of scanning books, displaying book content and distributing digital copies to libraries. On October 19, 2005, five of AAP's members, with the support and assistance of the AAP, individually filed a lawsuit in this Court, alleging copyright infringement and seeking injunctive relief against Google. *The McGraw-Hill Companies, Inc., et al. v. Google Inc.*, No. 05 CV 8881 (the "*McGraw-Hill* action").

9. In the fall of 2006, the authors, the publishers and Google began discussions regarding whether they could settle the *McGraw-Hill* action and the companion class action case brought by the Authors Guild, *The Authors Guild, Inc. v. Google, Inc.*, Case No. 05 CV 8136 (DC) (S.D.N.Y.) (the "*Authors Guild* action"). We were aware that the *Authors Guild* action, brought on behalf of a class of copyright owners, also included publishers. We also understood that settlement discussions with Google would need to take place in the context of settling the *Authors Guild* action.

10. The five publisher plaintiffs in the *McGraw-Hill* action and the AAP, with Debevoise, led the settlement negotiations for the publishers. Once we and the authors

agreed to establish two sub-classes, the five publisher plaintiffs, advised by Debevoise, represented the Publisher Sub-Class. As Chairman of the AAP's Board, I was deeply involved in the settlement negotiations, from their commencement through their conclusion (resulting in the original Settlement Agreement). These included negotiations with Google and negotiations with the authors' representatives over the Author-Publisher Procedures. Although I was no longer Chairman of AAP's Board after March 2009, I remained involved in discussions regarding the amendments to the original Settlement Agreement, which ultimately resulted in the Amended Settlement Agreement, along with Will Ethridge, who was then and still is the Chairman of AAP's Board.

11. The AAP provided advice throughout the negotiations as to common practices within the book publishing industry and as to the interests of publisher rightsholders across the spectrum of trade, educational, and academic publishers; small medium and large publishers; and U.S. and non-U.S. publishers – all of which are represented in the AAP Board and all of which were consulted during the negotiations.

12. With respect to the Author-Publisher Procedures, the basic principle on which we agreed was that both the author and the publisher would have a right to manage books in which they owned a copyright interest. One of the most significant issues that we discussed with the authors was the appropriate allocation, as between the author and the publisher, of an out-of-print book, of the Rightsholders' share of revenues earned by Google for Display Uses of those books. In this regard, we were informed by historic practices in the book publishing industry. Generally speaking, although practices varied from publisher to publisher, author-publisher contracts in the late 1980s began to include

an express grant of electronic or digital rights (or all rights) to the publisher. As a matter of negotiation, we agreed with the authors that the Author-Publisher Procedures should reflect these practices. It is for this reason that the Author-Publisher Procedures provide that authors would receive a larger percentage of the revenues earned under the settlement for books published prior to 1987 (65%) than for books published in 1987 and thereafter (50%).

13. We also discussed the compensation for Rightsholders of Inserts. In general, publishers of books include third-party textual material pursuant to the payment of a one-time permission fee to the copyright owner of the Insert. Alternatively, where the amount used is minimal, a publisher may determine to use the Insert on the basis of fair use. For this reason, the ASA provides that Rightsholders of Inserts would be entitled to an Inclusion Fee, but would not be entitled to continuing revenues earned by Book Rightsholders pursuant to the Revenue Models.

14. Another issue that we discussed with the authors in the context of the Author-Publisher Procedures was the application of the revenue sharing procedures for in-print commercially available books. Under the Author-Publisher Procedures, the payments made through the Book Rights Registry ("the Registry") for commercially available books would flow through the publisher's royalty statements and payments would be made to the author per the publishing contract. If the author disputes the allocation of such proceeds between the author and the publisher, the author has the right to arbitrate that royalty split, with such arbitration to be based on the publishing contract for that title. As set out in the A/P procedures, the outcome of any such arbitration would

apply to amounts of the Registry's payments paid through the publishers to the authors. We agreed to exclude Educational Books (*i.e.*, K-12, higher education, continuing education, vocational, professional, self-study, and similar educational markets) for use in educational programs) from this right of arbitration because such books typically are subject to more complex contractual arrangements among multiple authors and multiple editions relating to such books. It is reasonable to require such disputes to be resolved under the terms of the individual publishing contracts for those books.

15. One of the principal benefits of the ASA is that it establishes the Registry. The AAP was involved in negotiations over the form and structure of the Registry.

16. The Registry will have numerous functions. Among these are administering claims filed by Rightsholders; establishing and maintaining a database of contact information for authors and publishers; locating Rightsholders; collecting revenues received from Google and paying them out to Rightsholders; assisting in the resolution of disputes between Rightsholders; monitoring Google's display and pricing of Books for Rightsholders located outside of the United States; and, through carefully crafted governance mechanisms, otherwise protecting and representing the interests of Rightsholders. Given the importance of these functions and the need and desire to take account of the interests of all members of the Publisher Sub-Class, it is important that the Registry's Board be representative of the range of interests of members of the Publisher Sub-Class.

17. The ASA provides that the Registry's Board will include no fewer than six representatives from outside the United States, including two from each of the United

Kingdom, Australia and Canada. In addition, we anticipate that the Registry will develop governance mechanisms by which it can solicit the views of Rightsholders from outside the United States.

18. The Registry will play a role in determining whether a Book is Commercially Available. As its Board deems appropriate, the Registry may acquire access to the databases and other resources necessary to classifying Books.

19. As a publisher, I am strongly interested in seeing a competitive market for all of the books that Google is authorized to exploit under the terms of the ASA to maximize the outlets for distribution. For this reason, it would be beneficial for the Registry to be able to license the digital use of books to entities other than Google. In this respect, the Registry will want authorizations from Rightsholders so that their books could be included in such arrangements.

20. The AAP Board had and has many publishers with significant non-U.S. publishing operations. In fact, some major U.S. publishers are owned by companies located outside the United States. My employer, Bertelsmann AG, is a German company that owns Random House, Inc. Pearson Education, Inc. and Penguin Group (USA) Inc. are owned by Pearson plc, a U.K. company.

21. At every step in the Settlement negotiations, the interests of Rightsholders outside the United States were considered. With the guidance of the Plaintiff publishers and others involved in the negotiation, who have significant non-US publishing relationships, we concluded that those Rightsholders would want to take advantage of the

same rights and benefits under the Settlement as U.S. publishers, particularly because only their U.S. rights were involved, leaving them unaffected in any other country.

22. We therefore were surprised by the level and nature of the objections by various non-US publishers and rights groups. For the ASA we negotiated a reduced scope in order to respect those views. As a result, the scope of the ASA now includes only registered U.S. works and books published in the United Kingdom, Canada and Australia, where it enjoys broad support from publisher Rightsholder groups.

23. I am aware that the Publishers Association, in the United Kingdom, the Canadian Publishers' Council and the Association of Canadian Publishers, in Canada, and the Australian Publishers Association, in Australia, which are the national publisher associations in each of those countries, are broadly supportive of the ASA.

24. The original Settlement and the ASA were discussed with the AAP Board. The Board fully supports and endorses the original Settlement and the ASA.

25. The GLP has attracted media attention around the world, both at its inception in 2004 and during the ensuing years. *See, e.g.,* John Markoff & Edward Wyatt, *Google Is Adding Major Libraries To Its Database*, N.Y. Times (Dec. 14, 2004); David A. Vise, *Google To Digitize Some Library Collections; Harvard, Stanford, New York Public Library Among Project Participants*, Wash. Post. (Dec. 14, 2004); Carolyn Said, *Revolutionary chapter; Google's Ambitious Book-Scanning Plan Seen As Key Shift In Paper-Based Culture*, S.F. Chron. (Dec. 20, 2004); Michael Liedtke, *Novel Proposal*, The Mercury (Australia) (Jan. 8, 2005); Steve Johnson, *How Google Will Scan The World, 1 book at a time*, Chi. Trib. (Feb. 25, 2005); Stephen Castle, *Google Book Project*

9

*Angers France*, The Independent (London) (May 6, 2005); Edward Wyatt, *Google Library Database Is Delayed*, N.Y. Times (Aug. 13, 2005); Motoko Rich, *Google Snags Another Library*, N.Y. Times (Aug. 9, 2006); *Google To Offer Versions Of Out-Of-Copyright Books: Principia, Inferno Among Titles*, The Gazette (Montreal) (Aug. 31, 2006); *A New Chapter At Google*, The Irish Times (Nov. 10, 2006); Mark Johnson, *Will Googling Books Be Page In History Or Footnote?*, Milwaukee Journal Sentinel (May 11, 2007); Lisa M. Krieger, *UC Library Books Are Being Turned Into Bits*, San Jose Mercury News (Feb. 10, 2008); Miguel Helft, *Google Book-Scanning Pact To Give Libraries Input On Price,* N.Y. Times (May 21, 2009).

26. Similarly, the initial filings of the *McGraw-Hill* and *Authors Guild* actions, and all the pleadings in this litigation, have also been subject to global media scrutiny. *See, e.g.,* Edward Wyatt, *Major Publishers Sue Google*, N.Y. Times (Oct. 20, 2005); David A. Vise, *Publishers Sue Google To Stop Scanning; Book Copyrights Violated, They Say,* Wash. Post. (Oct. 20, 2005); Bob Thompson, *Search Me?; Google Wants To Digitize Every Book. Publishers Say Read The Fine Print First*, Wash. Post (Aug. 13, 2006); Stephen Foley, *Google Seeks To Defuse Row Over Copyright*, The Independent (London) (Oct. 11, 2006); Jessica Guynn, *Google Settles Copyright Dispute; The Deal With Authors And Book Publishers Would Make Millions Of Titles Available Online*, L.A. Times (Oct. 29, 2008); Bobbie Johnson et al., *Breakthrough US Deal By Google To Sell Book Content Online: Authors And Publishers Agree After Legal Action: Transformation Likened To iTunes Revolution*, The Guardian (London) (Oct. 29, 2008); Alex Pham, *Authors Defend Deal With Google; A Book-Scanning Suit Settlement Will*

*Help Find Writers Of 'Orphan Works,' Group Says*, L.A. Times (June 26, 2009); Rachael Bolton, *Local Publishers Mull Google Settlement*, The Australian Financial Review (Sept. 22, 2009); Cecilia Kang, *Google Relents With Revised Digital Books Settlement*, Wash. Post. (Nov. 15, 2009); Vit Wagner, *Google Case's Final Chapter Seeks Ending; 'Final Fairness Hearing' Is Set For Next Month, Canadian Group Among Settlement Petitioners*, Toronto Star (Jan. 23, 2010); Matt Buchanan, *Chapter Closing In Google Book Row*, Sydney Morning Herald (Jan. 28, 2010); Diane Bartz, *Justice Dept Says Google Books Deal Troubled*, Wash. Post. (Feb. 4, 2010).

       I declare under penalty of perjury that the foregoing is true and correct.

                                                */s/ Richard Sarnoff*
                                                Richard Sarnoff

Dated:   New York, New York
           February 11, 2010