IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**The Authors Guild et al. v. Google, Inc. Case No. 1:05 CV 8138 (S.D.N.Y)**

**<u>DECLARATION OF OWEN ATKINSON</u>**

I, Owen Atkinson, hereby declare as follows:

1. I am the Chief Executive Officer of the Authors' Licensing and Collecting Society (ALCS) and have served in this capacity since 2006. I joined the ALCS in 1997 and was named Head of Operations in 2000 and Deputy CEO in 2004. Prior to joining the ALCS, I spent 10 years in Hong Kong as an IT consultant developing customized solutions for the publishing and book retail industry.

2. During my tenure at ALCS, I have been responsible for developing and implementing the ALCS royalty payment system and have overseen the doubling of royalties collected and paid to authors over the past 7 years. In addition, I have been involved in the process of further developing ALCS as an advocate for authors' rights with a particular focus on scenarios involving the secondary use of their works.

3. ALCS is the UK collecting society for authors of all genres of literary and dramatic copyright works including fiction, journalism, plays, poetry, academic texts, TV and radio scripts and story-lines, dramatisations, translations, abridgements and adaptations. ALCS represents over 75,000 authors and currently has over 53,500 book author members.

4. It is my belief that, amongst collective rights management societies, ALCS represents by far the largest body of English-language authors (and English-language book authors) throughout the world.

5. Established in 1977 and wholly-owned and governed by the authors it represents, ALCS is a not-for-profit, non-union organisation. Its governing body, the Board of Directors, is composed of elected and co-opted authors. Since its foundation, ALCS has paid authors over £220 million in fees and today it continues to identify and develop new sources of income. Last year ALCS distributed £22 million in fees to authors and we forecast this figure will rise to £23.5M for the 2009/10 financial year.

6. ALCS serves two core purposes. First, we collect secondary royalties on behalf of authors across the UK and abroad and pay them, twice yearly. Second, we campaign and lobby on issues of importance to authors both at a national and international level, ensuring that authors' rights are both recognized and rewarded.

7. Approximately two thirds of ALCS revenue relates to the licensed copying (photocopying, scanning and digital copying) of books, magazines and academic journals. In 1985 together with the Publishers Licensing Society, ALCS helped to establish the Copyright Licensing Agency (CLA). The aim was to provide a licensing body governed jointly by authors and publishers to offer photocopying licences to academic institutions (schools, colleges and universities), businesses and local government. Licences typically allow for limited copying of up to 5% or one chapter of a book, or one article from a magazine or academic journal. The

scheme has been very successful over the years with over £300M collected and paid to rightsholders.

8. The mandates for UK works that are given to CLA by authors (through ALCS) operate on an opt-out basis. Although ALCS is a member society, the mandate that ALCS provides to CLA effectively extends to all UK publications. This approach reflects the reality of the way in which these publications are re-used. The licensed sectors secure copyright compliance by taking out a CLA licence to cover their day to day copying activities in accordance with terms and conditions within the licences. Given the vast number of individual works held by the licensed bodies it is clearly impractical to consult a list of individual licensed works prior to each act of copying. CLA reports – through surveys and sampling – are used to capture the works copied and provide the necessary data to enable ALCS to distribute fees to individual authors. Through this process some authors who are not members of ALCS are identified, contacted by ALCS, and then join as members to receive these fees. ALCS has a dedicated author research team who undertake this task. I can only recall 3 authors refusing to join ALCS over the course of the last 12 years that I have worked with the organisation. Essentially the system is a pragmatic response to the question of how to secure copyright compliance in respect of vast numbers of uses of hundreds of thousands of works across disparate user groups. Authors, artists and publishers receive a fair return for this re-use of their copyright works.

9. Approximately 85% of fees collected by ALCS are paid out within 15 months of receipt. Whilst it can be difficult to trace and locate authors or their estates in

relation to older works, ALCS has been successful in paying out more than 97.5% of the overall fees it has collected for authors.

10. The average age of books copied under CLA licences is approximately 10 years old and ALCS research shows that about half of all the books copied in any one year are out of print.  As a consequence, as part of the normal course of ALCS operations, we seek to identify and pay the authors of out-of-print works.  These efforts have been quite successful.  Our analysis shows that over a ten year period ALCS identified, contacted and paid the contributors to more than 95% of the most commonly copied out-of-print books.

11. The proposed Google settlement agreement is an important issue for ALCS members. It is my understanding that more UK books were digitised by Google and are included in the settlement agreement than books published in any other country with the exception of the United States itself.  Through working with the Authors Guild, we have identified more than 18,000 of our members and 37,000 of their works as having been digitized under the Google Library Programme.

12. In relation to the settlement ALCS has from the outset taken the stance of informing our book and article author members about the agreement, its implications and the options available without giving advice on what action members should take.  This position reflects our realization that authors will have individual views on the proposed settlement.  As a result of this sharing of information on the proposed agreement a number of members contacted ALCS to query whether ALCS might offer a new service making claims on their behalf.  We subsequently wrote to all of our book author members asking whether they

would be interested in such a service and received an initial positive response from over 2,000 members. Others have contacted ALCS to notify us of their intention to register directly through the website made available by Google. To the best of my knowledge only three authors have contacted ALCS to inform us that they intended to opt out of the settlement agreement.

13. In talking to individual authors and to author organisations in the UK the impression I have gained is that many UK authors see the potential offered by the settlement agreement to establish new uses for out of print works within an environment in which authors and publishers would have an equal stake in its governance.

14. It is also my understanding that the not-for-profit Book Rights Registry will operate as a collecting society having a similar governance structure to that of CLA with an equal board representation of authors and publishers. As well as ALCS and CLA, there are many well established collecting societies throughout the UK, Europe and indeed the rest of the world. These societies offer effective low-cost rights clearance for the benefit of rightsholders ranging from performers, artists and musicians to directors, publishers and producers. In an increasingly global marketplace, collecting societies employ reciprocal agreements to administer global repertoires and help markets work efficiently thus creating significant value for both rightsholders and consumers within a legal licensed framework.

15. It is my belief that the settlement agreement and the subsequent formation of the Book Rights Registry in the United States could offer similar benefits to UK authors.

I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 11th day of February, 2010 in London, England.

_____
**Owen Atkinson**