**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et al., | : | |
| Plaintiffs, | : | |
| v. | : | Case No. 05 CV 8136 (DC) |
| Google Inc., | : | **FILED ELECTRONICALLY** |
| Defendant. | : | |

**DECLARATION OF JEFFREY P. CUNARD IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF AMENDED SETTLEMENT AGREEMENT**

Jeffrey P. Cunard hereby declares as follows:

1. I am a member of the law firm Debevoise & Plimpton LLP ("Debevoise"), Class Counsel to the Publisher Sub-Class in this action. I am admitted to the bar of this Court. This declaration is submitted in support of Plaintiffs' Motion for Final Settlement Approval.

2. In 2004, Google announced that it had entered into agreements with several university and other libraries to digitize books and other writings contained in those libraries (the "Google Library Project"). In mid-2005, we were retained by the Association of American Publishers ("AAP") to advise it in connection with copyright issues raised by the GLP.

3. On October 19, 2005, five publishers, represented by Debevoise, brought a lawsuit in this Court. *The McGraw-Hill Companies, Inc., et al. v. Google Inc.*, No. 05-

CV-8881 (the "*McGraw-Hill* action"). The *McGraw-Hill* action alleged that Google's unauthorized copying of books and subsequent use of those copies was copyright infringement. It sought injunctive relief against Google. The AAP has supported the *McGraw-Hill* action from its inception.

4. The *McGraw-Hill* action was soon coordinated, for discovery and other related purposes, with a class action lawsuit that the Authors Guild had filed a month earlier on behalf of a class of copyright owners of books. *The Authors Guild, Inc., et al. v. Google Inc.*, No. 05-CV-8136 (the "*Authors Guild* action"). The class alleged in the *Authors Guild* action included both authors and publishers.

5. For approximately one year, Debevoise undertook extensive, and at times contentious, discovery. Debevoise and Google had numerous exchanges negotiating the scope of discovery. Combined, the parties exchanged nearly 5 million pages of documents, culled from the files of over one hundred individuals, many of whom hold or held executive or senior level management titles at Google or at one of the plaintiff publishing houses. Over 20 third-party subpoenas were issued to libraries and universities. Plaintiffs reviewed over four million pages of documents produced by Google and the publisher Plaintiffs.

6. In the fall of 2006, the parties began settlement negotiations. The negotiations lasted for more than two years, often full-time. The parties directly involved in the negotiations included Counsel for the Author Sub-Class (Boni & Zack LLP), Debevoise, as Counsel for the Publisher Sub-Class, the five plaintiff publishers, representatives of the AAP (including Richard Sarnoff, Chairman of the AAP Board, and

John Sargent, AAP Treasurer), the Authors Guild and Google. In addition to negotiating with Google, publishers and authors negotiated certain issues between them, which resulted in the Author-Publisher Procedures. The parties also negotiated certain terms of the settlement with certain university libraries.

7. On October 28, 2008, Google, Counsel for the Author Sub-Class and Debevoise, for the Publisher Sub-Class, reached a settlement agreement ("the original Settlement") in the *Authors Guild* action. On that day, the parties filed the original Settlement with the Court along with a motion for preliminary approval. Contemporaneously with the filing of that motion, plaintiffs in the *Authors Guild* action filed an amended complaint, adding as an Associational Plaintiff the AAP and adding, as publisher plaintiffs representing the Publisher Sub-Class, the five publishing companies that are plaintiffs in the *McGraw-Hill* action. Concurrently, Google and the five publishers agreed to settle the *McGraw-Hill* action, contingent on the original Settlement of the *Authors Guild* action becoming final.

8. The original Settlement received preliminary approval by Order dated November 14, 2008. Notice to the Class was then disseminated in accordance with the Court's Order.

9. From the date on which the original Settlement was announced through the Notice Period and until the present, we have participated in innumerable efforts at informing members of the original Settlement class (as well as the Amended Settlement Class, after the filing of the Amended Settlement Agreement ("ASA")) about the Settlement. These included participation in multiple telephone and videoconferences

with individual publishers and rights groups worldwide (including with groups in Latin America, Europe and Asia) and in-person meetings and conferences, including in New York, Washington, Japan, Belgium, and France. We have responded to hundreds of individual email and telephone inquiries regarding the Settlement from publishers in the United States and around the world. We also have answered publishers' questions related to claiming and have assisted publishers in claiming their books.

10. We have worked with Boni & Zack, Rust Consulting (the Settlement Administrator) and Kinsella Media Inc. on issues relating to the Notice Program, including the scope of Notice and media placements, among many other matters described in the declarations of Tiffaney Allen, Rust Consulting, and Kathy Kinsella and Belinda Bulger, of Kinsella Media. To the extent any errors, however small, in the translations of the Notice and the Supplemental Notice were brought to our attention, we considered them and worked with lawyers and others in the preparation of amended translations.

11. The parties filed the ASA with the Court on November 13, 2009. Contemporaneously, the parties filed a Third Amended Complaint that added, as new representative plaintiffs, authors and publishers from the United Kingdom, Canada and Australia. Google and the five publishers agreed to settle the *McGraw-Hill* action, contingent on the ASA becoming final.

12. During the Supplemental Notice Period, Debevoise responded to questions from publishers and participated in meetings regarding the ASA.

13. I have been involved in working with Google, the Settlement Administrator, publishers, Boni & Zack and, since he was engaged, Michael Healy, the proposed Executive Director of the Book Rights Registry (the "Registry") once it is formed, to improve the Settlement Website and facilitate the claiming process. As of the end of December 2009, members of the Class can initiate the claiming process simply by sending lists of their books to the Settlement Administrator; submitting these lists will count for purposes of meeting the deadline for filing claims for Cash Payments. In addition, a Rightsholder shortly will be able to file claims by providing data about books without any need to have that data "match" any of the metadata records in the Settlement Website database; once this enhancement is available, the Rightsholder's claim is complete once submitted.

14. The parties also are committed to introducing in the near future other improvements to simplify the claiming process. First, using the claiming spreadsheet, Rightsholders will be able to assert that they have an interest in books, without "claiming" them. In this way, information about the Rightsholders and those books will be on file with the Registry. Under the ASA, once Google has digitized a Book and classified it as not Commercially Available, it must inform the Registry which will, in turn, be able to notify the Rightsholder who has registered an interest in the book. Having received such notification, the Rightsholder will know that the book has been classified as a "Book" and may then elect to claim it and exercise rights under the Settlement. Second, Rightsholders will be able to claim all "editions" of a Book by

supplying the title of the Book. This will avoid the need to identify and claim multiple editions of a Book, each of which might have a separate metadata record in the database.

15. In the course of the negotiations, the Revenue Split (70%-30%) was proposed by Google. The publisher plaintiffs were aware that was the same split for advertising revenues that Google offers in its Partner Program.

16. When the original Settlement was announced, the Federation of European Publishers ("FEP"), the umbrella group for a number of national publisher associations in Europe, contacted Google and us, as Counsel for the Publisher Sub-Class, with respect to the Settlement. The FEP expressed concerns regarding the definition of "Commercially Available" and how that term would be applied to books published and sold outside the United States. To address this and other matters, the FEP and the parties to the Settlement negotiated the terms of a letter that the parties sent to certain national associations of publishers that are members of the FEP. That letter is attached as Exhibit A (the "FEP Letter").

17. In accordance with the FEP Letter and to respond to objections, Section 1.31 of the ASA clarifies the definition of Commercially Available.

18. In addition, as the FEP Letter describes, to determine whether a book published in Europe is Commercially Available, Google has agreed to take account of European sources of metadata regarding the in-print status of books. The FEP provided a list of such sources for most European jurisdictions (list redacted, for commercial reasons, from Exhibit A). The FEP Letter also includes a commitment to attempt to obtain access to the book metadata databases (to the extent possible, on fair and

commercially reasonable terms) and to use of the identified online retail websites for so long as those websites are publicly accessible for crawl. To the extent that there are conflicts among these sources (with respect to whether books are in print or out of print), the FEP Letter provides for working with national publisher associations to establish hierarchies or preferences with respect to which sources should be used for which types of books.

19. The FEP Letter provides that, beyond those sources already identified, the national publisher associations are able to supplement the sources of data to be used to determine whether or not Books published in Europe are Commercially Available. The FEP Letter provides that Google will not make books available in Consumer Purchase, Institutional Subscription, and Preview Use models until information regarding Commercial Availability is obtained from the identified sources (on the terms described above) and is integrated into the database of books covered by the Settlement.

20. We discussed with the FEP its members' desire to have non-U.S. based representation on the Board of the Registry. The FEP Letter commits that the Registry Board will have at least one representative of non-U.S.-based publishers and at least one representative of non-U.S.-based authors. The ASA provides that, in addition to Board members from the United States, the Registry's Board will have at least six representatives, two (one representing each of the two Sub-Classes) from each of the United Kingdom, Canada and Australia.

21. The charter documents for the Registry, which will be a not-for-profit corporation, are being drafted in consultation with counsel having expertise in tax and

issues arising under not-for-profit corporation law. These documents, which will be fully consistent with the ASA, are not yet final, but will be submitted to the Court as soon as they are.

22. Two court-approved class action settlements have included the formation of corporations that were managed and operated by the class counsel as trustees, and that awarded class members shares of stock in the corporations. *See Uhl v. Thoroughbred Tech. & Telecomms.*, 309 F.3d 978 (7th Cir. 2002); *In re Fiber Optic Cable Installation Litig.*, No. 1:99-ML-9313, MDL Docket No. 1313 (Indiana Active Lines) ("*Hinshaw*"), Final Order and Judgment (S.D. Ind. Feb. 2, 2007). Attached as Exhibits B and C are the relevant settlement documents in *Uhl* and *Hinshaw* that describe these structures.

23. None of the Settlement Funds will be used to pay the fees of Debevoise or to reimburse the firm for expenses incurred in connection with its work on the settlement of the *Authors Guild* matter. Contingent upon the ASA becoming final, the *McGraw-Hill* action will be dismissed and, in consideration for that dismissal, Google will pay $15.5 million to the AAP. Debevoise's fees and costs for the *Authors Guild* and *McGraw-Hill* matters will be paid by the AAP, with any remaining funds to be used by the AAP to serve the interests of both publishers and authors.

24. Debevoise has both substantial intellectual property and class action experience. Attached as Exhibit D are the biographies of the litigation partners who represent the Publisher Sub-Class. Attached as Exhibit E is a summary of Debevoise's class action expertise. Attached as Exhibit F is a summary of Debevoise's intellectual property expertise.

25. In addition to substantial class action experience generally, Debevoise has significant experience in copyright and related class actions.

26. In 1991, the firm represented Sony Corporation in a copyright class action involving liability for the manufacture and importation of digital audio tape recorders. *Cahn v. Sony*, No. 90-CV-4537 (S.D.N.Y.)

27. In 1995, the firm represented CompuServe in a copyright class action involving uploads of MIDI music files to its service. *Frank Music Corp. v. CompuServe, Inc.*, No. 93-CV-8153 (S.D.N.Y.).

28. In 2006, the firm represented SONY BMG Music Entertainment in a multidistrict class action alleging that its music CDs contained flawed anti-piracy software. *In re Sony BMG CD Technologies Litig.*, No. 1:05-CV-09575 (S.D.N.Y.).

29. In 2009, it represented Amazon.com in connection with a complaint, purportedly filed on behalf of a class of individuals, alleging that the company improperly deleted copyrighted works from Kindle devices. *Gawronski v. Amazon.com, Inc.*, No. 09-CV-01084 (W.D. Wash. Sept. 25, 2009).

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Jeffrey P. Cunard
Jeffery P. Cunard

Dated: New York, New York
February 11, 2010