UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

The Authors Guild, Inc., Association of American
Publishers, Inc., et al.,

    Plaintiffs,

             v.

Google Inc.,

    Defendant.
------------------------------------------------------------------- x

Case No. 05 CV 8136 (DC)

**FILED ELECTRONICALLY**

## DECLARATION OF PAUL AIKEN IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF AMENDED SETTLEMENT AGREEMENT

I, Paul Aiken, hereby declare as follows:

1.    I am the Executive Director of the Authors Guild, Inc. I have been employed by the Authors Guild since April 1993, first as a staff attorney, then as Assistant Director, and finally at my current position since 1996. I am a 1985 graduate of Cornell Law School and an attorney licensed to practice in New York.

2.    I submit this declaration in support of Plaintiffs' Motion for Final Settlement Approval. I have personal knowledge of the facts set forth in this Declaration and could testify competently at a hearing if called upon to do so.

### The Authors Guild, Its Council and Legal Staff

3.    The Authors Guild is the largest society of published authors in the U.S., representing more than 8,500 book authors and freelance writers, more than 8,250 of

1

whom have published books. Our members represent the broad sweep of American authorship, including literary and genre fiction, nonfiction, trade, academic, and children's book authors, textbook authors, freelance journalists and poets. Guild members have won countless honors and all major literary awards. (Every American winner of the Nobel Prize for Literature was an Authors Guild member.) Our members include published authors living in 38 countries, including Australia, Canada and the United Kingdom.

4. The Guild had its beginnings as the Authors League of America, which was founded in 1912 by a group of book authors (including Theodore Roosevelt, who served as the League's founding vice president), short story writers, freelance journalists and a smattering of dramatists. In the 1920s, the Authors League broke into two groups: the Authors Guild and the Dramatists Guild of America.

5. Almost since the day it was founded, the Guild has been the leading advocate for published authors in the United States, pursuing its mission of promoting fair book and freelance journalism contracts, effective copyright protection and freedom of expression. As part of that mission, the Guild has participated in litigation, generally as amicus curiae, but occasionally as a direct party to legal actions.

6. Also in furtherance of its core mission, the Authors Guild educates its members regarding book contract terms and copyright law. The Authors Guild has for decades provided its members with a model trade book contract explaining industry standards for book contracts and describing ways in which authors can improve boilerplate contracts.

7. The Authors Guild is governed by a board of directors known as its Council. The Council represents the diversity of U.S. publishing, counting prominent fiction and nonfiction authors among its members. Roy Blount Jr. is the President of the Guild; Judy Blume is the Vice President.

8. The Guild's four staff attorneys, including three attorneys under my supervision and myself, have a combined 85 years of legal experience, including more than 50 years of legal experience in media law, with a particular emphasis on book contracts and copyright law. To my knowledge, we are the only book authors' organization in the U.S. with attorneys on staff to advise its members and authors generally on these matters.

9. Our attorneys regularly conduct book contract and copyright law seminars for members and send alerts to members on developments in the book publishing industry. Our attorneys also routinely appear at public forums to discuss writers' legal rights and interests and are frequently invited to discuss contractual and copyright matters before groups of authors covering, quite literally, every category of book publishing, from textbook and academic authors, to romance, mystery and Western authors, to biographers and authors who specialize in "For Dummies" books.

10. Currently our staff attorneys provide individual legal and contractual advice to approximately 1,200 members each year. Since 1996, we've handled more than 13,000 legal inquires from our members. One of the most popular services we provide is a review of members' book contracts. We also frequently assist members with obtaining reversions of rights when their books go out of print.

11. In the course of this and other work, we have gathered and maintain in our offices a substantial catalog of book publishing contracts, totaling more than 2,000 contracts covering every category of book publishing.

### Google's Library Project

12. Because of its potential effects on our members' copyright interests, the Guild's Council and legal staff followed Google's announcement of its Library Project in 2004 with great interest.

13. Google's announcement on December 14, 2004, that it would expand its Library Project to encompass millions of books still protected by copyright raised immediate concerns among the Guild's Council and legal staff members. Google said that it believed that copyright's fair use doctrine would permit it to display portions (Google used the term "snippets") of those copyright-protected books to the users of its search engine.

14. In July of 2005, Google's agreement with the University of Michigan became public through a Michigan Freedom of Information Act request. That agreement confirmed that the University of Michigan was receiving a digital scan of each book in its library, including each book still protected by copyright, from Google.

15. The agreement had few specific restrictions on Michigan's use of these scans. It specifically, and alarmingly, permitted Michigan to share those scans with several other academic libraries.

16. At about that time, the Authors Guild retained Michael Boni, then with the firm Kohn, Swift & Graf, P.C., to discuss legal strategy with respect to Google's conduct.

4

17. Our concerns intensified on August 12, 2005, when Google announced that it would resume scanning of copyright-protected books on November 1, 2005.

18. In September 2005, the Authors Guild Council unanimously voted to commence a copyright infringement lawsuit against Google. Guild members and published book authors Daniel Hoffman, Herbert Mitgang and Betty Miles agreed to serve as class representatives, and the Authors Guild would serve as an associational plaintiff.

19. On September 20, 2005, the Authors Guild and representative plaintiffs filed this lawsuit.

### Settlement Negotiations: Authors and Publishers v. Google

20. In the fall of 2006, settlement negotiations formally began between and among Google, the publishers and the authors group.

21. On many of the issues we had to resolve, we had common cause with the publishers: we wanted maximum rightsholder control of Google's scans, including the right for either the author or publisher to insist that Google (and any library that had received scans from Google) remove all scans of their books from all active databases.

22. Further, we and the publishers both wanted the perpetual right for an author or publisher to compel Google to turn off all displays of their works.

23. We and the publishers also wanted to create a new commercial market for out-of-print books through the settlement. Gaining control of the digital scans of out-of-print books would not be especially useful to authors and publishers if they had no means of making those scans available to readers through a commercial market.

24. To establish a new and meaningful commercial market for out-of-print books, we believed we would have to make the works available, especially, to the research market. For the research market to find these works attractive – particularly the higher education and public library markets – a critical mass of works would have to be available. Moreover, we believed and continue to believe that there are genuine synergies in providing a large database of works, that a database of 5,000,000 books is far more than ten times as valuable as a database of 500,000 works. The more out-of-print works available to researchers, the more valuable the database, and the more each individual rightsholder would benefit.

25. Critically, we also worked with the publishers to assure that the settlement would not disrupt existing commercial markets for books. We accomplished these two goals of creating the necessary critical mass of books to provide a valuable research tool and avoiding disrupting existing commercial markets by setting polar opposite defaults: (1) out-of-print books would by default be displayed through the various business models described by the settlement (the author or – if rights had not yet reverted – the author or publisher could insist that Google turn off these default displays at any time); (2) in-print books, on the other hand, would by default not be displayed through the various business models described in the settlement (both the author and the publisher would have to agree to display an in-print book for it to be displayed through the settlement's revenue models).

26. These defaults were carefully constructed to avoid any possibility of imposing a compulsory license on any party: the author and the publisher (where rights had not reverted to the author) would each have the perpetual and unilateral right to not

6

participate in the markets the settlement would create. Furthermore, rightsholders of "inserts" (third-party copyrighted material such as a poem or excerpt that appears in a novel) would similarly have the perpetual and unilateral right to hide all displays of their works.

### The Critical – and Unending – Right of Non-Participation

27. At any time, under the settlement, an author can choose to deny Google the right to display the author's work, and, if the rights to the work have reverted to the author, sign a new publishing agreement with any publisher, licensing a bundle of exclusive or nonexclusive rights to that publisher.

28. *By crafting the settlement in this way, we made sure there would be no downside for an author to remain in the settlement.* If at any time any author found any term to be disagreeable, the author could simply refuse to further participate in the settlement. All reasonable concerns of objecting authors or authors' groups pertaining to the authors' economic interests – arguments that the division of revenues are not fair, that arbitration may not yield a satisfactory result, that a work may remain in-print through operation of the settlement, all colorable economic concerns – are effectively answered by this non-participation option: an author can at any time choose not to participate in the new markets and terminate any perceived harm. The author is then free (assuming rights to the work have reverted to the author), to negotiate any agreement the author would like – under any terms the author can obtain – with any publisher. And, because the terms with Google are non-exclusive, such authors can both participate in the settlement, if they choose, and also license their works to other publishers at the same time.

## Settlement Negotiations: Authors v. Publishers

29. Many of the negotiations did not directly involve Google. Authors and publishers had several issues to work out among themselves. These issues centered on author-publisher contracts.

30. A key goal for authors and publishers in the negotiations was to set up a clear set of rules that would govern nearly all book contracts. Where distinctions were made we would, whenever possible, make these distinctions by objective and readily obtainable characteristics, such as the date of publication of the book, to minimize the need to consult the original book contracts. Keeping the administrative costs of the Book Rights Registry (described later) as low as possible while remaining fair to rightsholders was our objective.

31. The result is a detailed but clear set of procedures regarding rightsholder control over books and inserts, payments to rightsholders, and dispute resolution.

32. Among the issues we had to work out were knotty issues regarding the treatment of older contracts. Under many older contracts, authors did not grant electronic rights to publishers. Under some older contracts, according to counsel for the Author Sub-Class (who had access to tens of thousands of book contracts through discovery that were not available to staff of the Authors Guild), authors had, however, granted "storage and retrieval" rights to publishers. Counsel also advised me from their review of such contracts that in the late 1980s many of the major publishing houses' form contracts began to include electronic rights grants to the publisher.

33. This ambiguity under older contracts, along with our need for administrative efficiency, led us to negotiate the following compromise for the division

8

of proceeds between authors and publishers for older out-of-print books where rights have not reverted to authors: for works first published before 1987, the author will receive 65% of the rightsholders' proceeds, and the publisher will receive 35%.

34. For more recent books, for which authors frequently granted electronic rights to publishers, the division for proceeds for out-of-print books where rights have not reverted will be even: 50% to the author, 50% to the publisher. This tracks the standard division of electronic rights licensing fees in the industry under modern contracts.

35. For out-of-print works where the rights have reverted to the author, the author of course receives 100% of the rightsholders' revenues for the book.

36. We negotiated for critical protections for authors. In our experience, authors can rarely afford to commence litigation to assert their rights under their contracts with publishers. We did not want this to impede any author's ability to realize the benefits of the settlement, so we provided for arbitration, under standard rules, for most disputes under the settlement. In this way, the authors were able to level the playing field in disputes with Google or the publisher.

37. We also provided a means for an expedited, quasi-reversion of rights. Typical publishing contracts permit authors to demand a reversion of rights (effectively, a termination of the author-publisher contract) when their books go out of print. In the experience of the Guild, however, publishers are often quite slow to respond to reversion demands. Again, we did not want this to impede the ability of an author to fully realize the benefits under the settlement. So we negotiated a means for a book to be deemed "author controlled" that would not require any response from the publisher. Once a book is deemed "author controlled," the author is entitled to solely determine whether a book is

displayed or not (the publisher loses its right to veto the display of the book) and the author is entitled to 100% of the rightsholder revenue for the book. As with the arbitration rulings, however, this quasi-reversion only has meaning within the boundaries of settlement uses. Outside of the settlement, an author would have to seek a traditional reversion of rights.

38. These divisions of proceeds between author and publisher and the additional rights for authors to pursue arbitration and expedited reversions of rights have been deemed amendments to author-publisher contracts by some objectors. They aren't. Instead, they spell out a special set of rules for the uses contemplated by the settlement. Those who choose to participate in the new markets the settlement creates do so under these set of rules. Authors and publishers can avoid these rules at any time by simply not participating in the settlement's markets by exercising their perpetual right under the settlement to "turn off" the displays of their books.

### Insert Rightsholders

39. "Inserts," under the settlement, are essentially third-party copyrighted textual matter that appears in books covered by the settlement. The Authors Guild counts thousands of insert rightsholders among its members. Members who are poets and short-story writers are insert rightsholders. So are members who are the authors of novels and narrative nonfiction: their works are frequently excerpted in other books. It was a pressing concern for us that insert rightsholders be treated fairly.

40. We wanted to be sure that authors of inserts would have the right of non-participation under the settlement. We achieved that: rightsholders of inserts can at any time order that their inserts not be displayed in all display uses.

41. We also wanted to be sure that authors of inserts were proportionately compensated for their work. The Authors Guild has extensive experience with how rights are acquired to include an insert in a published book. Insert rights are sometimes acquired for free by the author (or the publisher, but it's often the author's contractual duty to clear rights to inserts). In other cases, the author (or sometimes the publisher) pays a fee for the right to display the insert. That fee is usually a relatively modest sum. It is invariably, in our experience, a one-time fee: the rightsholder is paid a flat fee for permission to include the insert in the book.

42. The settlement provides, apart from the digitization fee for unauthorized scans of inserts, a one-time inclusion fee for insert rightsholders. This inclusion fee, which will be paid from a pool of funds diverted from the stream of revenues collected for institutional subscriptions, will be $25 for a partial insert (a portion of a poem or short story or other work) and $50 for a full insert. If the same insert appears in several books, its author can receive an inclusion fee as high as $500 for it.

43. This compares well, but proportionately, to the target inclusion fee of $200 for a book that's included in the institutional subscription.

44. The settlement also includes a provision that allows insert owners to prove that they are entitled to more than these amounts.

### The Book Rights Registry

45. The settlement provides for the establishment of a Book Rights Registry, which will play a key role in overseeing the settlement on behalf of rightsholders. Half of the members of the Book Rights Registry's board will be comprised of authors' representatives; half will be publishers' representatives. At least one authors'

representative will be from each of Australia, Canada, the United Kingdom and the United States, and in addition, the views of non-U.S. authors and authors' groups will be solicited. We intend to develop governance mechanisms that will allow authors to play an active role in selecting their board members.

46. The Authors Guild intends to support the creation of advisory committees of libraries and potentially other appropriate user groups to consult with the board of the Book Rights Registry.

47. The Guild intends to do everything it can to keep the Book Rights Registry's administrative fee minimal, consistent with the need to responsibly run the organization. It is in the strong interest of authors that the administrative fee be small. The Authors Guild has experience in this matter, as it helped found and helps run the Authors Registry (no relation to the Book Rights Registry), a rights payment agency for photocopy and other uses. The Authors Registry charges a 5% administrative fee, among the lowest of any such society.

48. The Authors Registry, incidentally, provides a good example of how a rights payment agency can address unclaimed works issues. The Authors Registry, among other functions, receives photocopy license fees from photocopying in the U.K. of U.S. works; these fees are paid to American authors. Many of the photocopied books are out of print. The Authors Registry has been increasingly successful at locating and paying authors of out-of-print books. Last year, based on a sample of 1000 out-of-print books for which it received fees, the Authors Registry located and paid 87% of the authors of out-of-print books. Similarly, in a survey of members the Guild conducted in 2005 in response to a Notice of Inquiry from the Copyright Office on "orphan" works,

85% of authors reported that they had "never" or "rarely" failed to reach a rightsholder to request permission.

## The Authors Guild's Role as Associational Plaintiff

49.  The Authors Guild is an associational plaintiff to this litigation, which means that our role has been to advise the attorneys for the sub-class on what is in the best interests of authors under the settlement.

50.  In the negotiations we adhered to some basic principles. We know that nearly all authors published their books to have them commercially available to the public at market prices. Authors, like most people, prefer commercial success to its alternative: it's the exceedingly rare author that would prefer to have his or her work out of print. Also, authors prefer to have control of their works. Nearly all decisions regarding the settlement pertaining to authors could be determined by relying on these basic principles.

51.  We were also keenly aware that the settlement had to be fair, reasonable and adequate for authors outside of the U.S. and kept this in mind throughout the negotiations. The Authors Guild has over the years has had extensive contacts with organizations of foreign authors and counts many authors living outside the U.S. among its members. I have attended meetings of foreign authors around the world, and have always been impressed that their concerns are congruent with U.S. authors, and that the same basic principles – the desire for their works to be commercially available at market prices but always under the author's control – reflect equally the desires of authors outside the U.S.

52. The objections of some foreign authors' groups to the settlement were unexpected. It soon became clear that fear and anger at Google and mistaken rumors about the settlement (discussed later) were if anything more intense overseas than in the U.S. Leaders of authors' groups would privately note the wisdom of the settlement, but express their concerns that some of their members – always a small minority – were too angry or misled about the settlement for the authors to support it. We reluctantly (because we believe the settlement is beneficial to authors worldwide) agreed to limit the scope of the settlement to works registered in the United States or published in Australia, Canada, or the U.K.

53. We are gratified that the Authors' Licensing and Collecting Society of the U.K., with its deep experience in collective licensing of authors work and representing the largest body of English-language authors in the world, has submitted statements supporting the settlement. The success of the ALCS, which distributed the equivalent of $34 million to authors in its most recent year in country with an economy about one-fifth the size of the U.S., was one of our guideposts in negotiating this settlement. It suggests the enormous benefits that authors may annually gain from the settlement. We are also encouraged and gratified by the supportive statement from the Society of Authors (the leading book authors' society in the U.K.) and that the president of the Australian Society of Authors (the leading book authors' society in Australia) has agreed to serve as a class representative.

54. Even the interests of academic authors who believe that their information was meant to be free are accommodated: the settlement permits such authors (so long as they control the rights) to make their works available to the public at no cost. Such

14

authors' interests are also addressed as consumers of information: the settlement will make millions of out-of-print books freely available in full-text form at up to 16,500 public library buildings and up to 4,000 higher education institutions.

55. The Guild took its role as advisor to the attorneys for the authors seriously. The Guild's leadership, in particular President Roy Blount, Treasurer Peter Petre and Guild Council member James Gleick, was closely involved in the negotiations that led to the proposed settlement. Former Guild president (and Council member) Scott Turow was also regularly consulted regarding the negotiations as were former Guild president (and Council member) Mary Pope Osborne and Council member Jennifer Egan. Other Council members who were consulted and kept apprised of negotiations from time to time included Vice President Judy Blume, Secretary Pat Cummings, former Guild president (and Council member) Nick Taylor, and Council members James Shapiro, Rachel Vail and Sarah Vowell. All of these Council members were authorized under our non-disclosure agreement with the publishers and Google to receive all information regarding the settlement. (Other members of the Authors Guild Council were on a separate list under the non-disclosure agreement. They were informed that negotiations were proceeding and that progress was being made.)

56. The Guild also assembled a team of senior staff members to address issues that arose during settlement negotiations. These staff members included:

    a. General Counsel Jan Constantine, a 1973 graduate of The National Law Center, George Washington University, who oversaw the settlement on behalf of the Guild. Ms. Constantine brought deep legal and business experience to this task. Ms. Constantine had been

employed as an attorney with the federal government for 10 years at the Federal Trade Commission and as an Assistant U.S. Attorney in the Eastern District of New York, before taking a position with publishing conglomerate Macmillan, Inc., where she worked for 10 years, rising to the position of Deputy General Counsel. Ms. Constantine then work for 14 years as Executive Vice President and Senior Deputy General Counsel of News America, the U.S. subsidiary of News Corporation, where she was in charge of U.S. litigation, First Amendment matters, and intellectual property mergers and acquisitions, among other responsibilities.

b. Director of Legal Services Anita Fore, a 1996 graduate of the Duke University School of Law, who has reviewed hundreds of book contracts and advised members on countless business, book contract issues, book, and on-line publishing contracts and copyright matters since joining the Guild's staff in 2000, contributed her extensive knowledge of book contracts, copyright and electronic rights issues during our negotiations.

c. Simon Marcus, who consults with the Guild, has extensive knowledge of book databases and database technology as the chief operating officer of The Library Corporation, a library database services provider. Mr. Marcus played a particularly significant role in consulting on database security issues.

    d. Sandy Long, Marketing Director for the Guild, has 25 years of experience in the book industry, including work with major booksellers and as senior vice president of Spier New York, a leading book marketing company. Ms. Long consulted on all matters pertaining to the marketing of books under the settlement.

    e. Terry King, a former librarian at State University of New York, New Paltz, who was awarded a Master of Library Science Degree from Columbia University in 1988, contributed his expertise both as to library systems and – in his capacity as Operations Manager of the Authors Registry -- to the operations of royalty payment systems.

    f. Michael Gross, a 1999 graduate of New York Law School and staff attorney for the Guild since 1999, who has assisted hundreds of authors in contractual and copyright matters and speaks regularly to writers groups on book contract issues, provided additional legal support for the negotiating team.

### Reaction to the Settlement and Amended Settlement

57. Authors Guild attorneys conducted 38 conference-call discussions with authors to discuss the settlement and the amended settlement from December 2008 through January 2010. More than 1,500 participants signed up for these phone calls, many of which were open to all authors. Authors Guild attorneys also appeared at numerous meetings of authors and literary agents in the United States, the United Kingdom and Canada about the settlement as well. We have, almost certainly, spoken directly to more authors about this settlement than anyone else has.

58. The reaction of participants in these meetings was overwhelmingly positive. Authors are generally very grateful that their out-of-print books will be commercially available again and that they'll be in control, with the ability to choose not to participate at any time.

59. Among the minority of authors who raised concerns with us about the settlement, however, the top issue, by far, arose from their belief that Google is already making their in-print books available online in full-text. Since Google is already boldly violating their rights, these authors frequently argue, how can we trust it to abide by the settlement? When we investigated these charges, however, we learned that the books in question had been made available through a program independent of the settlement, Google's Partner Program. Under that program, the publisher permits Google to display previews of the book to help promote sales of the book. Also, many authors are of the mistaken belief that Google is displaying the entire book, because when one scrolls quickly through the book on a computer screen, it gives the appearance that every page is included. However, in every instance we have checked, only 20% of the pages of the book are actually displayed. This concern with Google persisted as recently as the last few weeks and influenced attitudes about the settlement.

60. Another common complaint, among the minority of writers who have concerns about the settlement, is that the settlement amounts to a compulsory license to Google, including a compulsory license of in-print books. This is also a misconception (but it's a misconception spread widely and fervently online), since the settlement always permits rightsholders to block displays by Google. These concerns, no doubt, have led to author opt-outs.

61. Another concern we have frequently heard has nothing to do with the merits of the settlement, except that Google is a party to it: a vocal minority of authors dislikes or fears Google. Many have not gotten over their initial anger at Google for beginning to scan in-copyright books in the first place.

62. Finally, we know that many of the authors who opted out of the settlement and some who object to the settlement would have preferred that we not settle with Google at all, that we prove that Google's digitization of books and display of "snippets" from them was not a fair use. We and counsel for the Author Sub-Class considered that to be too risky a strategy for authors, given the benefits of the settlement we were able to negotiate.

**The Bigger Picture**

63. The Authors Guild Council members and senior Guild staff members involved in these negotiations were acutely aware of the risks of litigation. We knew that we could lose our case, and we considered that outcome to be potentially catastrophic. All one would need is a scanner and a friend with a little bit of technical knowledge to start displaying "snippets" at your science fiction, humor, Civil War, or Harry Potter website. All perfectly legal; all without obligation to authors to properly secure those scans. Nothing gets illegal file-sharing going quite so much as millions of unsecured digital works floating around the Internet.

64. Our Council knows that the stakes are even higher for authors than they've been for musicians in their struggles with online piracy. The ace in the hole for musicians is that they're not as dependent on copyright as book authors are. Music is a performing art: people buy tickets to see musicians. Writing is decidedly not a

19

performing art. Nearly all authors give away their performances, through book tours and readings, and are glad for any audience they can find. For most authors, markets created by copyright are all we've got.

65. Cognizant of these technological and legal challenges, and fully aware of the overwhelming benefits of the proposed settlement, the Authors Guild Council unanimously approved of the original settlement and the amended settlement.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Paul Aiken

Dated: New York, New York
       February 11, 2009