UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

The Authors Guild, Inc., Association of American      :
Publishers, Inc., et al.,                                           :
                                                                            :
        Plaintiffs,                                                    :
                                                                            :      Case No. 05 CV 8136 (DC)
                  v.                                                    :
                                                                            :      **FILED**
Google Inc.,                                                         :      **ELECTRONICALLY**
                                                                            :
        Defendant.                                                  :

------------------------------------------------------------------------x

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
## RESPONDING TO SPECIFIC OBJECTIONS

Michael J. Boni (pro hac vice)
Joanne Zack
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
(610) 822-0200 (phone)
(610) 822-0206 (fax)
MBoni@bonizack.com
JZack@bonizack.com
*Attorneys for Plaintiffs The Authors Guild,*
*Inc., Herbert Mitgang, Betty Miles, Daniel*
*Hoffman, Paul Dickson, Joseph Goulden,*
*Maureen Duffy, Daniel Jay Baum,*
*Margaret Drabble, Robert Pullan, and the*
*Author Sub-Class*

Bruce P. Keller
Jeffrey P. Cunard
Richard S. Lee
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)
bpkeller@debevoise.com
jpcunard@debevoise.com
rslee@debevoise.com
*Attorneys for Plaintiffs The McGraw-Hill*
*Companies, Inc., Pearson Education, Inc.,*
*Penguin Group (USA) Inc., Simon &*
*Schuster, Inc., John Wiley & Sons, Inc,.*
*Association of American Publishers, Inc.,*
*Harlequin Enterprises Limited, Macmillan*
*Publishers Limited, Melbourne University*
*Publishing Limited, The Text Publishing*
*Company, and the Publisher Sub-Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. .......................................................................... vi

I.    INTRODUCTION. ........................................................................... 1

II.   The Objections Based on Fairness to the Class are Meritless. .................... 4

   A.   The Objections To Class Certification Are Meritless. ........................... 4

      1.   The Class Definition Is Not Overly Broad. ................................. 4

         a.   The Class Is Bounded And Ascertainable. ......................... 4

         b.   The Class May Properly Include Class Members Whose Books Have Not Yet Been Scanned, May Not Be Scanned Imminently, Or May Never Be Scanned. ......................................................................... 7

      2.   The Class Is Adequately Represented. ...................................... 12

         a.   Class Members Eligible/Not Eligible For Cash Payments. .......... 14

         b.   Class Members With In-Print/Out-Of-Print Books. .................. 15

         c.   Class Members Who Claim/Do Not Claim Their Works. ............. 17

         d.   The Sub-Classes Have Been Adequately Represented. ............... 23

         e.   Possible Future Exercise Of Rights Under ASA Does Not Render Plaintiffs Inadequate Representatives. ................................................. 26

      3.   Miscellaneous Concerns. ................................................... 27

   B.   The ASA Is Permissible Under Rule 23 And Substantially Furthers The Purpose And Interests Of The U.S. Copyright Act. ............................... 28

      1.   A Settlement Can Provide Broad Relief, Beyond The Remedies Available After Trial. ........................................................................... 29

         a.   The ASA Springs From And Resolves A Dispute Within the Court's Subject Matter Jurisdiction. ................................................. 31

         b.   The ASA Comes Within The General Scope Of The Case Made By The Pleadings. ................................................................ 32

         c.   The ASA Furthers The Objectives Of The Law Upon Which The Complaint Was Based. ...................................................... 36

      2.   A Class Action Settlement Can Authorize Future Uses And May Include Future Relief That Is Commercial in Nature. ............................. 45

      3.   The Settlement Satisfies The Identical Factual Predicate Doctrine. ......... 51

   C.   The Notice Program Comports With Rule 23. ................................... 54

1.    Original Notice..................................................................... 55

2.    Supplemental Notice............................................................ 57

3.    The Notice And Supplemental Notices Were Adequately Translated............ 58

4.    Failure To Translate The Settlement Agreement Or The ASA Does Not Impose An Impermissible Burden On The Class...................................... 60

5.    Notice Was Sufficient To Exercise Personal Jurisdiction Over Foreign Class Members................................................................ 61

D.   The Book Rights Registry Is A Substantial Classwide Benefit........................... 63

  1.    The Need For A Registry........................................................ 64

  2.    The Registry Will Fairly Represent the Interests of the Class........................ 65

  3.    The Registry Will Be Wholly Independent From Google. ............... 67

  4.    The Registry Will Not Charge Excessive Administrative Fees. ...................... 67

  5.    The Registry Will Not Require Ongoing Oversight. ...................... 68

  6.    Authorizations To The Registry........................................................ 69

  7.    Miscellaneous Concerns. ................................................................ 69

E.   The Claiming Process Is Improving And The Registry Will Not Impose Undue Burdens On Class Members Or RROs................................................ 70

F.   The Definitions Of "Book" And "Insert" Are Clear And Narrow The Scope Of The Class.................................................................. 76

G.   Objections To The Definition And Determination Of Commercial Availability Are Without Merit. ................................................. 80

  1.    Miscellaneous Concerns. ................................................................ 84

H.   The Cash Payment Amounts Are A Fair and Reasonable Compromise. ............. 85

  1.    Miscellaneous Concerns. ................................................................ 87

I.    The Revenue Split Is Fair And Reasonable. ....................................... 88

  1.    Miscellaneous Concerns. ................................................................ 91

J.    Objections To The ASA's Pricing Provisions Are Without Merit. ..................... 92

  1.    Miscellaneous Concerns. ................................................................ 94

K.   The Author-Publisher Procedures Are A Fair And Reasonable Accommodation Of Rightsholders' Interests In A Work. ........................... 95

  1.    Miscellaneous Concerns. ................................................................ 99

L.   The Dispute Resolution Procedures Benefit The Class. ................................... 101

1.    Miscellaneous Concerns. ................................................................ 103

M.    The Treatment Of Inserts Is Fair. .................................................... 105

N.    The Releases Are Specifically Tailored And Appropriate For The Settlement. .............................................................................................. 107

O.    The ASA Provides For Meaningful Enforcement Against Google. ................. 111

P.    The ASA Does Not Violate Section 201(e) Of The Copyright Act. ................. 112

Q.    The ASA Is Consistent With The Rules Enabling Act. ..................................... 114

R.    The ASA Is Consistent With Foreign Law And Approval Would Not Violate International Law. ........................................................................... 116

    1.    The ASA Is Consistent With Foreign Law. ..................................... 116

    2.    The ASA Does Not Violate International Law. ................................ 118

        a.    Treaties Are Not Self-Executing. .......................................... 119

        b.    The Settlement Does Not Impose Prohibited Formalities. ......... 124

        c.    The ASA Does Not Impair An Author's Exclusive Rights. ......... 128

        d.    The ASA Is A Legitimate Limitation And Exception To The Author's Rights. ........................................................................ 129

        e.    The ASA Does Not Discriminate Against Foreign Rightsholders. ............ 135

    3.    Miscellaneous Concerns. ................................................................ 136

S.    Hosted Copies. ................................................................................. 137

III.    OBJECTIONS NOT RELATED TO FAIRNESS TO THE CLASS ARE WITHOUT MERIT. ........................................................................... 138

A.    The ASA Is Not Anti-Competitive. .................................................... 138

    1.    Overview Of The Relevant Law. ..................................................... 140

        a.    Section 1. .............................................................................. 140

            i.    *Per se* Treatment. ........................................................ 140

            ii.    The Rule Of Reason. ................................................... 141

        b.    Section 2. .............................................................................. 142

    2.    The ASA Does Not Violate Section 1. ............................................. 143

        a.    The 63-37% Revenue Split Does Not Violate Section 1. ............ 143

        b.    Rightsholders Will Not Collectively Set Book Prices. ............... 147

    3.    The ASA Does Not Violate Section 2. ............................................. 149

iv

B.   The Amended Settlement Does Not Violate State Escheat Or Abandoned Property Laws. ................................................................................ 154

   1.   The State AGs Lack Standing. ........................................................ 154

   2.   Rule 23 Governs The Disposition Of Unclaimed Settlement Funds. ............. 155

   3.   The ASA Adequately Addresses Objections Raised By The State AGs. ........ 158

   4.   The Remaining State Objection Lacks Merit. ................................... 161

   5.   States Can Be Included In The Class. ............................................ 162

C.   Censorship. ......................................................................... 163

D.   Privacy. ............................................................................. 164

E.   Display Limits/Usage Restrictions. .............................................. 165

F.   Objections Relating To Libraries. ............................................... 166

G.   Research Corpus. ................................................................... 168

H.   Procedural Objections. ............................................................ 169

IV.   OPT-OUTS LACK STANDING TO OBJECT. ............................................. 170

V.   CONCLUSION. ......................................................................... 171

# TABLE OF AUTHORITIES

**FEDERAL AND STATE CASES**

*Advance Magazine Pubs. Inc. v. Leach*, 466 F. Supp. 2d 628 (D. Md. 2006)............................113

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)....................................................................7

*Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505 (E.D. Tex. 1995) ....................................................62

*Allied-Bruce Terminix Cos, Inc. v. Dobson*, 513 U.S. 265 (1995) .............................................101

*Alvarado v. Memphis-Shelby County Airport Authority*, 229 F.3d 1150 (6th Cir.
    2000) .....................................................................................................................................45, 46

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1995)............................................40

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................12, 114

*American Basketball Association Players Association v. National Basketball
    Association*, 72 F.R.D. 594 (S.D.N.Y. 1976)............................................................................48

*Armco Inc. v. N. Atl. Ins. Co.*, No. 98 Civ. 6084, 1999 U.S. Dist. LEXIS 3954
    (S.D.N.Y. Mar. 29, 1999) .......................................................................................................170

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).........................142, 150

*Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457
     (S.D. Fla. 2002)........................................................................................................................49

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)...........................................140

*Barcia v. Sitkin*, 367 F.3d 87 (2d Cir. 2004)................................................................................30

*Barkema v. Williams Pipeline Co.*, 666 N.W.2d 612 (Iowa 2003)...............................................47

*Beatty v. Tribune Media Services, Inc.*, No. 05 CV 03938, 2005 WL 6132339
    (C.D. Cal. Aug. 10, 2005)........................................................................................................11

*Beecher v. Able,* 575 F.2d 1010 (2d Cir. 1978) ........................................................................157

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)...................................142

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 248 F.R.D. 408 (S.D.N.Y. 2008)...................39

*Broadcast Music, Inc. v. CBS*, 441 U.S. 1 (1979)..............................141, 145, 146, 148

*Brooks v. Bates*, 781 F. Supp. 202 (S.D.N.Y. 1991)..................................................113

*Business Elecs Corp. v. Sharp Elecs Corp.*, 485 U.S. 717 (1988)............................140

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537
    (2d Cir. 1993)..........................................................................................................141

*Capitol Records, Inc. v. Thomas,* 579 F. Supp. 2d 1210 (D. Minn. 2008) ................121

*Cent. Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002) ..................10

*Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117 (D.C. Cir. 1983) ..........36

*Com. v. O'Neill*, 100 F.R.D. 354 (E.D. Pa. 1983) .......................................................49

*Creative Tech. v. Aztec Sys. PTE*, 61 F.3d 696 (9th Cir. 1995)..................................117

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) ....................................49

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) .................................8, 10

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)...................................................60

*Elsevier B.V. v. UnitedHealth Group Inc.*, 2010 U.S. Dist. LEXIS 3261 (S.D.N.Y.
    Jan. 14, 2010)..........................................................................................................120

*Ersler v. Toshiba America, Inc.*, 2009 U.S. Dist. LEXIS 14374 (E.D.N.Y. Feb. 24,
    2009) .........................................................................................................................55

*Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91 (2d Cir. 1981) ........................117

*Folkways Music Publishers v. Weiss*, 989 F.2d 108 (2d Cir. 1993) ..........................102

*Foster v. Neilson*, 27 U.S. 253, 314 (1829) ..............................................................120

*Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932) ...........................................................37

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th
    Cir. 2000) (en banc)..................................................................................................10

*FTC v. Indiana Fed'n of Dentists*, 141 U.S. 447 (1986) ...........................................141

*Gaskin v. Pennsylvania*, 389 F. Supp. 2d 628 (E.D. Pa. 2005) ..................................49

*Goodwin v. Shapiro*, 545 F. Supp. 826 (D.N.J. 1982)..................................................49

*Graham v. James*, 144 F.3d 229 (2d Cir. 1998) ......................................................40

*Harris v. Reeves*, 761 F. Supp. 382 (E.D. Pa. 1991)...............................................49

*Heckler v. Mathews*, 465 U.S. 728 (1984) ..............................................................8

*Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336 (Fed. Cir. 2001) ........................40

*Hoepker v. Kruger*, 2001 U.S. Dist. LEXIS 13043 (S.D.N.Y. 2001)........................117

*Horton v. Leading Edge Marketing Inc.*, 2007 U.S. Dist. LEXIS 63533 (D. Colo. Aug. 28, 2007) .........................................................................................................55

*Igartua-De La Rosa v. United States*, 417 F.3d 145 (1st Cir. 2005) (en banc) .........................122

*In re "Agent Orange" Prod. Liab. Litigation*, 818 F.2d 179 (2d Cir. 1987)..........................30, 31

*In re "Agent Orange" Prod. Liab. Litigation,* 689 F. Supp. 1250 (E.D.N.Y. 1988)..................157

*In re Alstom SA Securities Litigation*, 253 F.R.D. 266 (S.D.N.Y. 2008) ....................................62

*In re Auction Houses Antitrust Litigation*, 2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. 2001) ...............................................................................................................................53

*In re Auction Houses Antitrust Litigation*, 2002 U.S. App. LEXIS 15327 (2d Cir. 2002).................................................................................................................52

*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir. 1981) .........................54

*In re Dr. Matthias Rath*, 402 F.3d 1207 (Fed. Cir. 2005)............................................................121

*In re Fiber Optic Cable Installation Litigation*, No. 1:99-ML-9313-DFH-TAB (S.D. Ind. Feb. 2, 2007) ..............................................................................................46

*In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29 (2d Cir. 2009) ........................................................................................................................13

*In re Holocaust Victim Asset Litigation*, 225 F.3d 191 (2d Cir. 2000).......................................80

*In re Holocaust Victim Asset Litigation,* 413 F.3d 183 (2d Cir. 2001).......................................157

*In re Holocaust Victim Asset Litigation*, 424 F.3d 132 (2d Cir. 2005).......................................157

*In re Holocaust Victim Asset Litigation,* 424 F.3d 158 (2d Cir. 2005).......................................157

*In re Holocaust Victim Asset Litigation,* 424 F.3d 169 (2d Cir. 2005)........................................157

*In re Holocaust Victim Assets Litigation*, No. 96 Civ. 4849, 2000 WL 33241660
(E.D.N.Y. Nov. 22, 2000) ...................................................................................................61, 62

*In re Initial Pub. Offering Securities Litigation*, No. 21-MC-92, 2009 WL
3397238 (S.D.N.Y. Oct. 5, 2009) .......................................................................................74, 78

*In re Ins. Brokerage Antitrust Litigation*, 579 F.3d 241 (3d Cir. 2009) .......................................14

*In re Interpublic Securities Litigation*, Nos. 02-CV-6527, 03-CV-1194, 2004 WL
2397190 (S.D.N.Y. Oct. 26, 2004) ............................................................................74, 75, 78

*In re Lease Oil Antitrust Litigation,* 2009 WL 5195977 (S.D. Tex. Dec. 22, 2009)...........154, 155

*In re Literary Works in Electronic Databases Copyright Litigation*, 509 F.3d 116
(2d Cir. 2007)............................................................................................................... *passim*

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litigation*, 209 F.R.D.
323 (S.D.N.Y. 2002) ...........................................................................................................4, 7

*In re Montgomery Co. Real Estate Antitrust Litigation*, 83 F.R.D. 305
(D. Md. 1979) .....................................................................................................................139

*In re Peregrine Entm't, Ltd.*, 116 B.R. 194 (C.D. Cal. 1990).......................................................113

*In re Prudential Ins. Co. Am. Sales Practice Litigation Agent Actions v.
Prudential Ins. Co. of Am*, 148 F.3d 283 (3d Cir. 1998) .......................................................115

*In re Prudential Securities Ltd. P'ships Litig,* No. 1005, 1995 U.S. Dist. LEXIS
22103, (S.D.N.Y. Nov. 20, 1995). .......................................................................................170

*In re Royal Ahold N.V. Securities & ERISA Litigation*,  2007 WL 3128594
(D. Md. Sept. 26, 2007) .........................................................................................................62

*In re Sony SXRD Rear Projection Television Class Action Litigation*, 2008 U.S.
Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008).........................................................................55

*In re Tamoxifen Citrate Antitrust Litigation* 466 F.3d 187 (2d Cir. 2006)................................141

*In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503
(E.D.N.Y. 2003).............................................................................................................55, 58

*In re Vivendi Universal, S.A. Securities Litigation*, No. 02 Civ. 5571, 2009 WL
855799 (S.D.N.Y. Mar. 31, 2009) .........................................................................................62

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 427 (1984)................................39

*ITC v. Punchgini*, 482 F.3d 135 (2d Cir. 2007) ........................................121

*Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000) ........................................14

*Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096
  (10th Cir. 2004)..........................................................................49

*Jones v. National Distillers,* 56 F. Supp. 2d 355 (S.D.N.Y. 1999)............................157

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123
  (2d Cir. 1995)..............................................................141, 162, 163

*Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir. 1984 )............143

*Kellman v. Coca-Cola Co.*, 280 F. Supp. 2d 670 (E.D. Mich. 2003) ...........................39

*Leeds Music Ltd. v. Robin*, 358 F. Supp. 650 (S.D. Ohio 1973)................................11

*Leegin Creative Leather Prods. v. PSKS, Inc.,* 127 S. Ct. 2705 (2007) .....................140

*Local Number 93, Int'l Assoc. of Firefighters v. City of Cleveland*,
  478 U.S. 501 (1986)....................................................30, 31, 32, 43

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................8

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993)........................10

*Major League Baseball Properties, Inc. v. Salvino*, 542 F.3d 290 (2d Cir. 2008)...........145

*Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d Cir. 2007) ..........17, 156, 159

*Masters v. Wilhelmina Model Agency, Inc.,* 2007 WL 1944343
  (S.D.N.Y. July 5, 2007) ..............................................................156

*Matthew Bender & Co., Inc. v. West Pub'g Co.*, 1996 WL 223917 (S.D.N.Y.
  May 2, 1996)...........................................................................12

*McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252 (11th Cir. 2001).................49

*Medellin v. Texas*, 552 U.S. 431 (2008) .......................................120, 122

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)..........................7, 11, 12

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982) ....................................36

*Micron Tech., Inc. v. Mosaid Tech., Inc.*, 518 F.3d 897 (Fed. Cir. 2008) ....................11

*Morris v. Business Concepts*, 259 F.3d 65 (2d Cir. 2001)..........................................105

*National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981)................................................................................................. *passim*

*Pacific R.R. Co. v. Ketchum*, 101 U.S. 289 (1879).....................................................31

*Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003)...........141, 142

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ......................................................140

*Paterson v. State of Texas*, 308 F.3d 448 (5th Cir. 2002)..........................................154

*Patterson v. Stovall*, 528 F.2d 108 (7th Cir. 1976) ....................................................54

*Pedrosillo Music, Inc. v. Radio Musical, Inc.*, 815 F. Supp. 511 (D.P.R. 1993)..........40

*Pisciotta v. Old National Bancorp*, 499 F.3d 629 (7th Cir. 2007)................................10

*Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982)............................................30

*Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108 (S.D.N.Y. 1999)................4, 63

*Repp v. Webber*, 914 F. Supp. 80 (S.D.N.Y. 1994) .....................................................40

*Robertson v. National Basketball Association,* 72 F.R.D. 64 (S.D.N.Y. 1976) .....49, 102

*Rodrigue v. Rodrigue*, 55 F. Supp. 2d 534 (E.D. La. 1999) ......................................113

*Ryan v. Carl*, 1999 U.S. Dist. LEXIS 366 (N.D. Cal. 1999) ......................................43

*Sansom Comm. v. Lynn*, 735 F.2d 1535 (3d Cir. 1984)................................................32

*Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F.2d 561 (E.D. Pa. 2001)........52

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976 )............................................8

*Smith v. Sprint Communications Co. L.P.*, 2003 U.S. Dist. LEXIS 325 (N.D. Ill. 2003)................................................................................................46

*Society for Good Will to Retarded Children v. Cuomo*, 745 F. Supp. 879 (E.D.N.Y. 1990)............................................................................................49

*Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ..........................................138

*Spark v. MBNA Corp.*, 48 Fed. App'x 385 (3d Cir. 2002) ............................................7

*Starter Corp. v. Converse, Inc.*, 84 F.3d 592 (2d Cir. 1996) ...........................................11

*TBK Partners Ltd. v. W. Union Corp.*, 675 F.2d 456 (2d Cir. 1982)................................13, 52, 53

*The Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 633 F. Supp. 2d 159
     (S.D.N.Y. 2009) ............................................................................120

*Turner v. Orr*, 759 F.2d 817 (8th Cir. 1985)...............................................................32

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ....................................37

*U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)................................................149

*Uhl v. Thoroughbred Tech. & Telecomms.*, 309 F.2d 978 (7th Cir. 2002)................35, 46, 47, 48

*United States v. Armour & Co.*, 402 U.S. 673 (1971) ..................................................30

*United States v. Brown Univ.*, 5 F.3d 658 (3d Cir. 1993)...................................141, 142

*United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ...................142

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)................................................142

*Van Gemert v. Boeing*, 739 F.2d 730 (2d Cir. 1984)..........................................156, 157

*Vancouver Women's Health Collective Soc. v. A.H. Robins Co.*, 820 F.2d 1359
     (4th Cir. 1987)..........................................................................59, 62

*Verizon Comm'ns, Inc. v. Trinko*, 540 U.S. 398 (2004) .....................................149, 150

*Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328 (7th Cir. 1993).................................10

*Vulcan Golf, LLC v. Google, Inc.*, 254 F.R.D. 521 (N.D. Ill. 2008).........................5, 28

*Vulcan Society of Westchester County, Inc. v. Fire Dept. of City of White Plains*,
     505 F. Supp. 955 (S.D.N.Y. 1981) ......................................................49

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) .............. *passim*

*Walker v. Liggett Group, Inc.*, 982 F. Supp. 1208 (D. W.Va. 1997)............................162

*Wembley v. Superba Cravats, Inc.*, 315 F.2d 87 (2d Cir. 1963)...................................11

*West Virginia v. Pfizer*, 440 F.2d 1079 (2d Cir. 1971) ...............................................157

*White v. Nat'l Football League,* 822 F. Supp. 1389, 836 F. Supp. 1458
(D. Minn. 1993) ...................................................................................................48

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ...............................................................8

*Whitney v. Robertson*, 124 U.S. 190 (1888) ............................................................122

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983) ..................................................30

*Wolson v. Elsevier Inc.*, No. 09-CV-4040 (DC), 2010 WL 334919 (S.D.N.Y.
Jan. 29, 2010) ................................................................................................43, 50

## FEDERAL AND STATE RULES AND STATUTES

17 U.S.C. § 101 ...........................................................................................................40

17 U.S.C. § 104 .........................................................................................................120

17 U.S.C. § 106 .........................................................................................37, 40, 128

17 U.S.C. § 108 .........................................................................................................167

17 U.S.C. § 201 .........................................................................................112, 113, 114

17 U.S.C. § 411 ............................................................................................................5

17 U.S.C. § 504 ....................................................................................................85, 87

19 U.S.C. § 3312 .......................................................................................................122

19 U.S.C. § 3512 .......................................................................................................121

28 U.S.C. § 1338 .........................................................................................................31

28 U.S.C. § 2072 .......................................................................................................114

Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998) ......121

Federal Rule of Civil Procedure 23 ................................................................. *passim*

United States Constitution ............................................................................... *passim*

Conn. Gen Stat. § 3-56a *et seq.* ................................................................................158

Conn. Gen Stat. §§ 3-65a and 3-66a ...................................................................159

72 Pa. Stat. § 1301 ...........................................................................................158

Texas Property Code § 72.001(a) .....................................................................158

Texas Property Code §§ 74.201-205 .................................................................158

WIPO Copyright and Performances and Phonogram Treaties Implementation Act
    of 1998 ........................................................................................................121

OTHER AUTHORITIES

The "Orphan Works" Problem and Proposed Legislation:  Hearing Before the
    Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm.
    on the Judiciary, 110th Congress, 2d Sess. (Mar. 13, 2008) (statement of
    Marybeth Peters, Register of Copyrights) .............................................41

Competition and Commerce in Digital Books:  Hearing Before the H. Comm. on
    the Judiciary, 111th Cong., 1st Sess. (Sept. 10, 2009) (statement of Marc
    Maurer, President, National Federation of the Blind)........................21, 39

Berne Convention, art. 36 (1) Sept. 9, 1886, S. Treaty Doc. No. 99-27, 828
    U.N.T.S. 221 ...................................................................................... passim

Éditions du Seuil SAS et al. v. Google Inc. and Google France, 118 No. RG:
    09/00540 (Dec. 18, 2009) ...........................................................116, 118

WIPO Copyright Treaty, art. 14(1), Dec. 20, 1996, S. Treaty Doc. No. 105-17,
    2186 U.N.T.S. 152 ............................................................................. passim

Keller & Cunard, Copyright Law (Release No. 10, November 2009) .........................40

C.A. Wright et al., Federal. Prac. & Proc. 3d (2005)......................................... passim

B. Kaplan, An Unhurried View of Copyright (1967) ...............................................39

C. Masouyé, Guide to the Berne Convention for the Protection of Literary and
    Artistic Works at 33 (1978)......................................................................124

D. Gervais, Application of an extended licensing regime in Canada:  principles
    and issues relating to implementation, Study prepared for the Department of
    Canadian Heritage 19 (June 2003).............................................................126

D. Gervais, *The TRIPS Agreement:  Drafting History and Analysis* 442 (3d ed. 2008) ................................................................................................................127

Deborah Solomon, *Book Learning: Questions for Jeffrey P. Bezos*, N.Y. Times, Dec. 6, 2009 ..........................................................................................................89

Einer Elhauge, *Why the Google Books Settlement is Procompetitive*, Harvard Law and Economics Discussion Paper No. 646 ........................................................153

H.R. Rep. No. 100-609, 100th Cong., 2d Sess. (1988)..............................................124

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976).......................................112, 113

Jane C. Ginsburg, "Towards a Supranational Copyright Law?  The WTO Panel and the 'Three-Step Test' for Copyright Exceptions," (2001) ...............................131

Jane C. Ginsburg, "The US Experience with Copyright Formalities: A Love/Hate Relationship," 33 Columbia J'l of Law and the Arts (forthcoming), ...................124

Jeffrey A. Trachtenburg & Shira Ovide, *For Media Industry, A Mixed Bag in iPad*, Wall St. J., Jan. 28, 2010.........................................................................89

Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* (2000) ............................................................................................144

Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.2 (Apr. 6, 1995) .................................................140, 141

Matthew Murray, *Books Plot Thickens; Google Project Gets Capitol Hill Attention*, Roll Call, Jan. 20, 2010...................................................................2

United States Copyright Office*, Report on Orphan Works: A Report of the Register of Copyrights* 1 (January 2006) .....................................................19, 22

Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong., 2d Sess (2008)...............19, 42

Orphan Works Act of 2006, H.R. 5439, 109th Cong., 2d Sess. (2006)...................19, 42

Orphan Works Act of 2008, H.R. 5889, 110th Cong., 2d Sess (2008)...................19, 42

Thomas Riis and Jens Schovsbo, Extended Collective Licenses and the Nordic Experience – It's a Hybrid but is it a VOLVO or a Lemon?," 33 *Columbia J'l of Law and the Arts* (forthcoming) .............................................................. *passim*

S. Rep. No. 105-190 (1998)......................................................................................121

S. Ricketson and J. Ginsburg, 1 *International Copyright and Neighbouring Rights: The Berne Convention and Beyond* ........................................................ 126

S. Ricketson, "Memorandum of Advice, The Compatibility of the Proposed Google Book Settlement With the Provisions of the Berne Convention" (Sept. 9, 2009) ................................................................................................................. 121

S. Ricketson, "WIPO Study on Limitations and Exceptions of Copyright and Related Rights in the Digital Environment," ........................................................ 130

S. Treaty Doc. No. 105-17, 2186 ............................................................................ 120

Sergey Brin, *A Library to Last Forever,* N.Y. Times (Oct. 8, 2009) ............................................ 8

WTO Panel Report, *United States-Section 110(5) of the US Copyright Act* ............................ 130

## I.    INTRODUCTION.

This Supplemental Memorandum responds to objections to the Amended

Settlement Agreement ("ASA") and further supports Plaintiffs' Memorandum of Law in

Support of Motion for Final Settlement Approval ("Final Approval Brief" (cited as "Final

App. Br.")).

About 500 submissions commenting on the Settlement Agreement and the ASA

have been docketed.  Class action settlements usually do not generate such interest.  This

litigation, however, involves Google's plan to digitize all of the world's books.  It has

always generated this level of attention.[1]  The interest expressed in the Settlement,

therefore, comes as no surprise, regardless of the specific terms.  Even before settlement

negotiations began, any proposed resolution was destined to be controversial.

The Department of Justice ("DOJ"), several state attorneys general, non-

governmental organizations, and various members of the Amended Settlement Class

("Class"), all have their own perspectives on the ASA.  Even so, with all the attention

given to the Settlement Agreement and the ASA, the number of objections filed

represents a tiny fraction of the members of the Class.  In fact, given the comprehensive

Notice Program (*See* Final App. Br., Section III.E.) and the enormous worldwide

publicity surrounding the Settlement, that only about 500 submissions have been

---

[1]    Declaration of Richard Sarnoff, Feb. 11, 2010 ("Sarnoff Decl.") ¶ 25 (citing a sampling of the extensive media coverage about Google's plans); ¶ 26 (same *re* stories about this litigation).

docketed – including many statements of support for the ASA – reflects a high degree of satisfaction with the Settlement.  *See* Final App. Br. at Section III.C.2.[2]

Plaintiffs take seriously their obligations as class representatives and have carefully reviewed all of these filings.  As explained below, however, none of the concerns expressed by class members demonstrates that the ASA does not satisfy Rule 23.  Whether the focus is on the grant of permission to Google automatically to display out-of-print Books unless Rightsholders direct it not to do so, consumer privacy, book pricing or other issues, the ASA withstands scrutiny as a fair, reasonable and more than adequate result for all Rightsholders.  Moreover, the principle that underlies the ASA, that Rightsholders – not unauthorized parties – should benefit from and control their works, is consistent with, and furthers, the same principle that underlies U.S. copyright law and the Copyright Act itself.  Because it provides a tremendous benefit to all Rightsholders, especially those who own rights in out-of-print Books, the ASA should be approved.

Many objections, however, were not filed by authors, heirs or publishers, but, rather, by Google competitors[3] and detractors.[4]  It is clear on the face of these objections

---

[2]    Although some argue that the number of objections the Court has received indicates that the Settlement is unfair, *see, e.g.,* D.I. 811 at 9, their number must be viewed in light of the size of the Class, which numbers in the hundreds of thousands, or millions.

[3]    *See, e.g.*, D.I. 276 (Microsoft); D.I. 206 (Amazon); D.I. 288 (Yahoo!)

[4]    *See, e.g.*, D.I. 291 (Internet Archive); D.I. 282 (Open Book Alliance).  *See also* Matthew Murray, *Books Plot Thickens; Google Project Gets Capitol Hill Attention*, Roll Call, Jan. 20, 2010 ("A coalition well-stacked with Google's  corporate enemies

that, even if expressed by nominal Class members, they advance competitive and other parochial self-interests that are not genuinely aligned, but in fact conflict, with the interests of the Class.

Prime examples are those that advocate "open access," *i.e.*, the notion that the copyright laws are anachronistic and that the Internet age demands revisiting of copyright's basic principles.  To further that agenda, many of these objectors have latched onto the Settlement's disposition of works they incorrectly refer to as "orphans" (*i.e.*, works for which the rightsholders are unidentifiable or unfindable).  They complain that the ASA does not make those works available to everyone.[5]

The "orphan works" issue is grossly overstated and misused by objectors from all quarters.  Although some works, *e.g.,* photographs found on the Internet, utterly lack identifying information and are, therefore, truly "orphans," a great deal of information almost always is available about the source of any published book.  Based on the experiences of photocopy collecting societies in the U.S. and the U.K., copyright owners of out-of-print works can be located at a rate of over 85% when revenues are available to be claimed.

In any event, "orphan works" do not present unique issues under Rule 23.  In virtually every class action settlement, a percentage (often a high percentage) of class members does not file claims or otherwise participate but, nevertheless, their claims are

---

[including Open Book Alliance, Microsoft, Yahoo!, and Amazon.com] is building a case on Capitol Hill" against the ASA).

[5]    *See, e.g.*, D.I. 299 (Open Access Trust); D.I. 291 (Internet Archive)*.*

3

released.  From a Rule 23 perspective, there is no more an "orphan" problem here than in any other class action settlement in which less than 100% of the class participates.

Other objections contend that, although the ASA provides benefits both to the Class and to society, it should have been structured differently.[6]  Whether the ASA could have dealt differently with some issues, or even whether others would have preferred a different settlement, is not relevant to whether the ASA is fair, reasonable and adequate. *See Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 114 (S.D.N.Y. 1999) ("The Court's role is not to ensure that the class gets the best settlement possible; it is to ensure that the settlement is fair and reasonable.").  Plaintiffs have negotiated an extremely fair and reasonable settlement for Class members.

## II.    THE OBJECTIONS BASED ON FAIRNESS TO THE CLASS ARE MERITLESS.

### A.    The Objections To Class Certification Are Meritless.

#### 1.    The Class Definition Is Not Overly Broad.

##### a.    The Class Is Bounded And Ascertainable.

The legal standard for determining whether a class definition is ascertainable is whether it uses "objective criteria" that allow the court to ascertain the general boundaries of the proposed class.  *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002) ("identifiable class exists" if members can be ascertained by reference to "objective criteria" and it is "administratively

---

[6]    *See, e.g.*, D.I. 401 at 15 (each edition of a Book should receive a separate cash payment); D.I. 134 at 3 (unclaimed funds should go toward reducing the price of institutional subscriptions).

feasible" for a court to determine). The definition of the Class meets that test because whether Books and Inserts (and, therefore, their Rightsholders) are covered by the Settlement turns on objective criteria with respect to registration and place of publication.

Contrary to some objections,[7] the Class definition is definite and objective: It includes all owners of U.S. copyrights of all books published on or before January 5, 2009 and either registered with the United States Copyright Office (required for United States works) or published in Australia, Canada or the United Kingdom by that date ("Books"). Also included are all persons who have a separate copyright interest (registered if the material is a United States work)[8] in textual material included in Books, government works and public domain books ("Inserts").[9] Whether a copyright owner is

---

[7]    D.I. 264 at 17 (class definition is "amorphous" and "indefinite" because "the number and scope of the class members" is "ambiguous"). Others object to the purported difficulty of determining whether they are members of the Amended Settlement Class, which is addressed in Section II.F, *infra.*

[8]    The registration requirement for United States works is included in the Class definition because the Second Circuit, in *In re Literary Works in Electronic Databases Copyright Litigation*, 509 F.3d 116 (2d Cir. 2007), *cert. granted sub nom. Reed Elsevier Inc. v. Muchnick*, 129 S. Ct. 1523 (2009), held that, under 17 U.S.C. § 411(a), courts do not have jurisdiction to approve a class action settlement that provides relief for unregistered United States works. This disposes of the objections to the registration requirement. *See, e.g.,* Caleb Crain Obj., Mar. 28, 2009 (undocketed).

[9]    Based on *Vulcan Golf, LLC v. Google, Inc.*, 254 F.R.D. 521 (N.D. Ill. 2008), one objector argues that class certification is precluded here. D.I. 811 at 3 (citing predicate questions of copyright ownership, and eligibility for copyright protection, of works copied by Google). Unlike the trademarks at issue in *Vulcan Golf*, the definition of Books and Inserts does not require the Court first to determine ownership (copyright ownership of books is readily determined) as a basis for inclusion in the Class.

in or out of the Class therefore turns on two objective facts as of a date certain, January 5, 2009: whether the book was registered with the United States Copyright Office and the book's place of publication.  Both of these facts are within the direct knowledge of the Class member or can be objectively and presently determined.  In the case of books published in the United Kingdom, Canada or Australia, authors and publishers have direct knowledge of the countries in which authorized publication occurred; if not, they can determine that from looking at the copyright pages of the books themselves.  In the case of registration, members of the Class may have the applications that they filed or the certificates of registration issued by the Copyright Office; if not, whether a book is registered is available from the records of the Copyright Office, whether searched online (through the Copyright Office's own website or through Google Book Search) or in person.[10]

Some non-U.S. Rightsholders argue the "place of publication" for works published in the United Kingdom, Canada and Australia may be "indefinite" or "undeterminable."[11]  This is incorrect because the definition of a "Book" refers to "place of publication," as "evidenced by information printed in or on a hard copy of the work." ASA § 1.19.  Relevant information may include a statement that it was published in one

---

[10]  Responses to the objections relating to the difficulty of determining the registration status of Books are set out in more detail *infra* Section II.F.

[11]  D.I. 893 at 13-14 ("place of publication standard" in the ASA is indefinite); D.I. 797 at 4 (criteria for determining whether book was published in Canada, UK or Australia is so vague that "there will be innumerable cases of doubt in which Google and the rightsholder may argue either way"); D.I. 872 at 3.

of those three countries, or the name of a location or address of a publisher in one of those three countries. *Id*. These are "objective criteria" sufficient to identify whether a Book is included in the ASA. In any event, copyright owners know, or should know, the status of their intellectual property, including where their books have been published. *See Spark v. MBNA Corp.*, 48 Fed. App'x 385, 391 (3d Cir. 2002) ("Neither Rule 23 nor the Due Process Clause requires that the notice of settlement provide each member of the class with the kind of individualized information that would be found in a class member's personal records.").

> **b.** **The Class May Properly Include Class Members Whose Books Have Not Yet Been Scanned, May Not Be Scanned Imminently, Or May Never Be Scanned.**

Some objectors suggest that, because the Class includes members whose Books have not yet been scanned by Google (or may not be scanned imminently or ever by Google), the class definition is inconsistent with the justiciable "case or controversy" requirement of Article III of the United States Constitution.[12] To be justiciable as a "case or controversy" a dispute "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (quoted in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Although the concept of justiciability involves three inter-related concepts – standing, mootness, and ripeness – the only issue here is one of standing.

---

[12] *See, e.g.,* D.I. 276 at 23; D.I. 143 at 11; D.I. 625 at 4.

To meet the Article III standing requirement, a plaintiff actually must have suffered, or be threatened with, an "injury in fact." *See Heckler v. Mathews*, 465 U.S. 728, 738 (1984); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976 ) ("plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action"). That "injury" must be "'distinct and palpable'," "fairly traceable to the challenged action" and "be likely redressable by a favorable decision." *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The requirement of "actual or imminent" injury, by definition, includes harm "future harm." *Id*. at 264 (quoting 7A C.A. Wright et. al*., Fed. Prac. & Proc. 3d* § 1785.1 at 390 (2005) ("If plaintiff can show that there is a possibility that defendant's conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied.")).

All members of the Class satisfy this standing requirement. Google's founders repeatedly have stated that digitization of all of the books in the world has long been the company's goal. *See, e.g.*, Sergey Brin, *A Library to Last Forever*, N.Y. Times (Oct. 8, 2009) ("Because books are such an important part of the world's collective knowledge and cultural heritage, Larry Page, the co-founder of Google, first proposed that we digitize all books a decade ago, when we were a fledgling startup.").

Moreover, Google has the financial means, technology, library partners, business purpose and intent to accomplish its goal of digitizing the world's books. Since its December 2004 announcement, Google has now spent hundreds of millions of dollars

researching, developing, patenting and employing cutting edge book scanning technology.  It has entered into over twenty agreements with libraries across the country, by which Google is being supplied with books to scan.  Google is also acquiring books from sources other than libraries.  To date, five years into its massive digitization effort, Google has scanned over twelve million books, and it intends to continue its scanning into the future.  Declaration of Daniel Clancy, Feb. 11, 2010 ("Clancy Decl.") ¶ 4.

Google thus has actually harmed or threatened to harm an enormous number of copyright owners of books in the United States by scanning their books without their authorization.  This actual or threatened harm satisfies the requirement that Plaintiffs and the Class suffer an "injury in fact."  Each member of the Class meets the standing requirement because there is "almost certain injury, probable injury and possible injury," and this injury is not conjectural or hypothetical.  *See* 13A C.A. Wright et al., *Fed. Prac. & Proc. 3d* § 3531.4, at 268 (2008).

Plaintiffs alleged, in the initial Complaint and in all amendments thereto, that "Google's acts have caused, and unless restrained, will continue to cause damages and irreparable injury to plaintiffs and the Class through . . . continued copyright infringement of the Books and Inserts and/or the effectuation of new and further infringements."  Third Amended Compl. ¶ 59 ("Compl.))  To sue Google individually or be a member of a class that sues Google, a copyright owner need not wait until Google has scanned his or her book or, even assuming it were knowable (which it is not), wait until Google was within days, weeks or months of scanning his or her book.  Nor should the courts be required to

entertain multiple suits to challenge Google's conduct, when Google has announced and acted on its intention to digitize as many books as possible as quickly as possible.

The risk or probability of injury has been the basis of multiple class actions brought on the basis of future harm.  In *Pisciotta v. Old National Bancorp*, 499 F.3d 629 (7th Cir. 2007), for example, a hacker had obtained information about tens of thousands of users of a bank's website.  There was no allegation that any particular class member, including the named plaintiffs, actually had suffered identity theft as a result. Nonetheless, the Seventh Circuit held that the "injury-in-fact" requirement was satisfied "by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions."  *Id*. at 634 n.3 (citing *Denney*, 443 F.3d at 264-65).  *See also Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947-48 (9th Cir. 2002) ("possibility of future injury may be sufficient to confer standing on plaintiffs") (cited in *Pisciotta*); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc) ("Threats or increased risk thus constitutes cognizable harm.") (cited in *Pisciotta*); *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) ("[E]ven a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability.") (cited in *Pisciotta*).

It is also common, in copyright and other intellectual property infringement cases, for litigation to commence and relief be awarded, without actual infringement, as long as there is a likelihood of future infringement.  *See, e.g., MAI Sys. Corp. v. Peak Computer,*

10

*Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) ("While there has been no showing that Peak has

actually loaned out any MAI software, the threat of a violation is clear as Peak has MAI

computers in its loaner inventory.  The permanent injunction is upheld as it relates to this

issue."); *Beatty v. Tribune Media Services, Inc.*, No. 05 Civ. 03938 (DDP), 2005 WL

6132339, at *5 (C.D. Cal. Aug. 10, 2005) (prospective "[i]njunctive relief is available in

copyright actions, even where there has been no past infringement"); *Leeds Music Ltd. v.

Robin*, 358 F. Supp. 650 (S.D. Ohio 1973) (permanently enjoining defendant who was

only at the planning stage of an infringing production of plaintiff's work).

      That members of the Class whose books have yet to be scanned also satisfy the

justiciability requirement is clear from the analogous declaratory judgment context.

There, Article III is satisfied if "the facts alleged under all the circumstances show that

there is a substantial controversy between parties having adverse legal interests of

sufficient immediacy and reality."  *Micron Tech., Inc. v. Mosaid Tech., Inc.*, 518 F.3d

897, 901 (Fed. Cir. 2008) (quoting *MedImmune Inc. v. Genentech Inc.*, 549 U.S. 118, 127

(2007)).  *See also Wembley v. Superba Cravats, Inc.*, 315 F.2d 87, 89 (2d. Cir. 1963)

(alleged patent infringer must "either be engaged in manufacturing, using or selling the

invention, or … [have] the immediate intention and ability to do so"); *Starter Corp. v.

Converse, Inc.*, 84 F.3d 592, 595-96 (2d Cir. 1996) (applying *Wembley* to future

trademark infringement).

      As the Supreme Court has stated, "[t]he rule that a plaintiff must destroy a large

building, bet the farm, or . . .  risk treble damages and the loss of 80 percent of its

business, before seeking a declaration of its actively contested legal rights finds no

support in Article III." *MedImmune*, 549 U.S. at 134. *See also Matthew Bender & Co., Inc. v. West Pub'g Co.*, 1996 WL 223917 (S.D.N.Y. May 2, 1996), *aff'd*, 158 F.3d 674, 678-79 (2d Cir. 1998) (copyright plaintiff had standing to bring a declaratory judgment action where it had "detail[ed] its substantial and meaningful preparations" to digitize a large number of books, but had not yet actually infringed any works).

Unlike plaintiffs who are denied standing because the harm that they allege is too remote and speculative, each member of the Class here either has had one of his or her Books or Inserts scanned, or today confronts, the real risk or possibility that Google will scan his or her Book (or an Insert in a Book or other work). That Google might not, in fact, scan the work for several years (or never) does not render this litigation hypothetical and, for this reason, the injury-in-fact – and, therefore, the case and controversy – requirements are fully satisfied.

### 2. The Class Is Adequately Represented.

Some perceive intra-Class conflicts and question whether there was adequate representation.[13] These concerns are premised on a misunderstanding of the ASA and the law. The focus in adequacy of representation analyses is on uncovering "conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.,*

---

[13] *See, e.g.*, D.I. 710 at 10-11 ("plaintiffs cannot possibly represent "divergent interests" of "absent class members at the same time"); D.I. 625 at 5 ("interests of these disparate groups within a single subclass as not aligned"); D.I. 864 at 5-4 (named Plaintiffs consist only of enormously successful authors or large publishers); D.I. 864 at 6 ("authors in each of these countries are diverse and cannot be truly represented by such a small sample of British, Australian, and Canadian authors"); D.I. 276 at 17-20; D.I. 288; D.I. 291 at 15; D.I. 143 at 31-34.

*Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Any such conflict "must be fundamental" in order to render class treatment impermissible under Rule 23.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35, 37 (2d Cir. 2009) (internal quotation omitted) (affirming certification of a class over an adequacy of representation objection where proving some class members' claims required disproving other class members' claims).

Indeed, although it "is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented . . . only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  7A C.A. Wright et al*., Fed. Prac. & Proc. 3d* § 1768, at 389-90 (2005).[14]

---

[14]    Some objectors invoke *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981), to make this point.  That case clearly is distinguishable from the ASA.  In *Super Spuds*, the named plaintiffs sued on behalf of a class of persons who had liquidated net long positions in potato futures contracts.  The parties then settled on terms that included a release of claims for both *unliquidated* as well as liquidated contracts.  The settlement, however, did not provide any consideration for the releases given with respect to the unliquidated contracts.  *Id*. at 11-14.  The "heart of" the court's concern in *Super Spuds* was "the danger that a class representative not sharing common interests with other class members would endeavor to obtain a better settlement by sacrificing the claims of others at no cost to [himself] by throwing the others' claims to the winds."  *TBK Partners Ltd. v. W. Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982) (internal quotation and modification omitted).

In direct contrast to *Super Spuds*, the Representative Plaintiffs here share the same claims as the Class and have "common interests with other class members."  They have asserted damage claims for works already scanned and injunction claims prohibiting Google's scanning and use of their works in the future.  These are the same claims asserted and settled on behalf of the Class, for substantial consideration.

The Second Circuit has stated that "a subset of a class" does not "lack adequate representation when the lead plaintiffs of that class possess the claims of that subset." *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 111 (2d Cir. 2005) (construing *Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000)). That is the case here. The Representative Plaintiffs, who are authors and publishers, possess the same claims as the rest of the Class. Compl. ¶¶ 12-21. The Representative Plaintiffs, as is true of other members of the Class, are Rightsholders of works that Google has already scanned and works that Google has not yet scanned, and are rightsholders of in-print and out-of-print books. Like the Class as a whole, they assert claims for damages and injunctive relief. Compl. ¶¶ 63-79.

### a. Class Members Eligible/Not Eligible For Cash Payments.

Because only those members of the Class whose Books and Inserts were copied by Google have a ripe claim for *actual* copyright infringement and, therefore, damages, Cash Payments are available for Books digitized by, but not after, May 5, 2009 (the Original Opt-Out Deadline). Far from reflecting a conflict,[15] this distinction is justified by the facts and law. It is based on the objective fact that, as of May 5, 2009, certain Class members had a damage claim for copying and use of their Books. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271-74 (3d Cir. 2009) (plan of allocation fair

---

[15] *See, e.g.*, D.I. 710 at 10 ("financial interests of those whose works have been copied diverge from the interests of class members whose works have not been copied"); D.I. 276 at 19 (conflict between class members whose works have already been scanned and those whose works have yet to be scanned).

and reasonable and sub-classes not required where plan created a structure for ensuring that settlement payments were tied to the extent of damages incurred by plaintiffs).

The Representative Plaintiffs are identically situated with the rest of the Class on this issue:  They own copyright interests in some Books digitized by Google by May 5, 2009 and in some Books not yet digitized by Google by that date.  *See* Clancy Decl. ¶¶ 13-20.  Plaintiffs did not treat themselves any differently on this point than other members of the Class.

### b.    Class Members With In-Print/Out-Of-Print Books.

Concerns[16] as to whether Representative Plaintiffs adequately can represent both members of the Class who hold rights in in-print books and those who hold rights in out-of-print books rest on a false premise.  It is not the Books that are the members of the Class but, rather, the Rightsholders of those Books.  Virtually all books go out of print at some point, and Plaintiffs – like vast numbers of the rest of the Class – are authors or publishers of both in-print as well as out-of-print Books.  Indeed, publishers generally hold more interests in out-of-print books than in in-print books.  More fundamentally, the ASA was carefully negotiated to protect and advance the value of both in-print and out-of-print Books, in a way that does not advance the interests of one category over the other.

---

[16]    *See, e.g.,* D.I. 291 at 8 (ASA unfair to owners of out-of-print books because Books that are not Commercially Available can be initially displayed without authorization).

The Settlement has a built-in default mechanism. It authorizes Google to display out-of-print Books unless the Rightsholder tells Google not to do so. Google, however, can display in-print Books only if the Rightsholders say it may do so. This distinction is not only fair and reasonable, but also highly beneficial to the Class. It is a reflection and by-product of the nature of book publishing. There is an existing market for works that are in-print, but no market exists for works that are out-of-print. Thus, although Display Uses could displace sales of in-print Books, Display Uses cannot possibly displace sales of Books for which there is no market.[17]

No conflict exists between any members of the Class on this issue. Commercial Availability (or being in-print or out-of-print) is neither an inherent nor an immutable property of a Book. Indeed, a number of the Books of the Representative Plaintiffs were in-print when the initial complaint was filed, but are no longer in-print today. There was no reason for the Representative Plaintiffs to disfavor, and they did not, either in-print or out-of-print books under the ASA. Their own books either now are or will at some future point be in each category.

---

[17] At least there is no market that benefits the copyright owner of a book. Although Amazon and niche booksellers sell used books, none of the proceeds go to copyright owners, only to the owner of the physical copy of the book and the bookseller.

    **c.**  **Class Members Who Claim/Do Not Claim Their Works.**

No conflict exists between Rightsholders of unclaimed works and Rightsholders of claimed works.[18]  The claims of infringement that Rightsholders have against Google do not turn on whether the copyright owner has filed a claim or can be identified or located.  Although it is true that some Books may not be claimed in the settlement claiming process, that is no different from virtually every other class action, where less than all class members file a claim.  A less than 100% claim rate, or even one that is significantly less, does not signify inadequate representation.  Few, if any, class action settlements would ever be approved if it did.

If anything, the protections the ASA affords Rightsholders merit a finding of superior representation by Representative Plaintiffs.  Under the ASA, Rightsholders can come forward ***at any time*** to claim and control their Books.  Insofar as one of the core missions of the Registry will be to find Rightsholders and because the ASA contains no deadline for Rightsholders to come forward and claim their Books, the ASA will actually likely have a much higher claim rate over time than the average class action.

The original Settlement Agreement provided that monies unclaimed by Rightsholders after five years could be redistributed to other Rightsholders and to charities.  This provision was consistent with law.  *See Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir. 2007) (citing with approval Section 3.07 of the

---

[18] D.I. 710 at 10 (named plaintiffs cannot adequately represent the interests of absent class members, including owners of orphan works)

*Restatement of Aggregate Litig.).*  Nonetheless, it was perceived by some as creating a

conflict between Rightsholders of claimed works and those who had not yet claimed their

works.[19]  To avoid even the appearance of a conflict, the ASA provides that Unclaimed

Funds will not be redistributed to other Rightsholders or to the Registry (except to find

Rightsholders).  ASA § 6.3.  Instead, Unclaimed Funds will be held for at least 10 years

before the Registry, upon the consent of the Unclaimed Works Fiduciary, may file a *cy*

*pres* motion to ask the Court to authorize the distribution of unclaimed funds to literacy-

based charities in the United States, Australia, Canada and the United Kingdom.  Up to

25% of unclaimed funds held at least five years may be used by the Registry, subject to

the approval of the Unclaimed Works Fiduciary, to find Rightsholders of unclaimed

works.

   **The So-Called "Orphan Works" Issue.**  Some have framed the adequacy of

representation argument in terms of "orphan works."[20]  They suggest that the unidentified

owners of rights in these works were not considered and may have different interests.  No

facts support these contentions.

   First, as stated above, that all Class members may not file claims is not an issue

unique to this class action nor any indication of insufficient notice.

   Second, this litigation was brought under the United States Copyright Act.  The

term "orphan works" has no meaning under the Act, which recognizes only two

---

[19]   *See, e.g.*, D.I. 263 at 6-7.

[20]   *See, e.g.,* D.I. 239; D.I. 811; D.I. 206.

categories:  in-copyright or not in-copyright (*i.e.*, in the public domain).  Although the Copyright Office and others have used the term "orphan work" to refer to works like unattributed photographs where the copyright owner cannot be identified or found,[21] that term does not readily apply to the Settlement, which involves published books.  There is an abundance of information, including that the authors and publishers of books are identified on their covers and in their pages.  The Registry will have numerous means of identifying and locating Rightsholders.[22]

Third, the ASA's detractors mistakenly equate "orphan works" with works that remain "unclaimed" under the Settlement.  As a result, claims by some objectors that 50% to 80% of the Books covered by the Settlement are "orphan works" are grossly inflated.  Some Books may be unclaimed for some period of time, but that does not mean that their owners are not known and cannot be located.  Nonetheless, many objectors

---

[21]  *See, e.g.,* United States Copyright Office, *Report on Orphan Works:  A Report of the Register of Copyrights* 1 (January 2006) (term is used to describe situation where the "owner of copyrighted work cannot be identified and located by someone who wishes to make use of the work in a manner that requires permission of the copyright owner") ["*Orphan Works Report*"]; Letter from Hon. Howard L. Berman to Hon. Marybeth Peters, Jan. 10, 2005 (referring to "so-called 'orphan works, or copyrighted works the owners of which cannot be located"), *reprinted in Orphan Works Report*; Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong., 2d Sess. (bill to establish limitation on remedies for orphan works, *i.e.*, works for which the owners cannot be identified or located after user's due diligence search); Orphan Works Act of 2008, H.R. 5889, 110th  Cong., 2d Sess. (same); Orphan Works Act of 2006, H.R. 5439, 109th Cong., 2d Sess. (same).

[22]  Further, the redefined Class now consists of rightsholders significantly from the U.S. and likely to be located in three highly-developed countries, which will make the process of locating rightsholders considerably easier than before.

baldly assert that Class members are "unfindable" and will *never* come forward to file claims, even though they have an economic incentive to do so.

Prior to the Settlement, no real efforts have been made to locate the authors and publishers of out-of-print books, because there has been no commercial market for a collection of such books, and no incentives for their Rightsholders to come forward. The Settlement provides just such a collection and, with it, incentives for Rightsholders of out-of-print Books to participate. For the first time, meaningful, ambitious efforts have and will continue to be made to locate these Rightsholders.

As a start, the Settlement produced an unprecedented Notice Program that was designed to reach as many Rightsholders as practicable. As a result of the Notice Program, tens of thousands of claimants have claimed hundreds of thousands of out-of-print Books.[23] That copyright owners of "orphan works" are unknown to others does not mean they are otherwise cut off from the world at large or the exceptional Notice Program in this case. None of the objectors has provided any evidence that those owners are incapable of receiving mail, reading the news, surfing the Internet, watching television, reading the Summary Notice and taking steps to protect their interests in their intellectual property.

---

[23]    To date, over 1.1 million books have been claimed by more than 42,000 authors, heirs, agents and publishers. Plaintiffs believe that 72% of the claimants are from the U.S., the United Kingdom, Canada, and Australia and that 83% of the books that have already been claimed were claimed by persons from those four countries. Declaration of Tiffaney Allen, Feb. 10, 2010 ("Allen Decl.") ¶ 10.

Further, one of the Registry's core missions is to locate Rightsholders of unclaimed out-of-print Books, to have the Registry help them claim their works and to pay the revenues due them under the Settlement's revenue models.  The Registry will strive to locate the Rightsholders of unclaimed Books both because the ASA requires it to do so under its charter and also because the Registry will seek to license the digital use of Books to entities other than Google, and will want Rightsholders to come forward and authorize the Registry to include their Books in those deals.  The value of those licenses will depend in large part on the size of the Books database the Registry will be authorized to license.

Therefore, because there is no deadline to claim one's Books through the Settlement and given the Registry's mission to locate Rightsholders, it is reasonable to expect that the numbers of claimed out-of-print Books will grow exponentially.

In other contexts, the experience of licensing and collecting societies in finding rightsholders of out-of-print works, in order to pay photocopy revenues, has proven highly successful.  Such societies are able to locate 85% or more of such authors.[24]

---

[24] *See Competition and Commerce in Digital Books:  Hearing Before the H. Comm. on the Judiciary*, 111th Cong., 1st Sess. (Sept. 10, 2009) (statement of Paul Aiken, Executive Director, Authors Guild, On the Google Book Settlement) ("A sample of our success in paying authors of out-of-print works last year suggests that we reach 85% of such authors.  The success rate of larger, more developed systems – such as that of the Authors' Licensing and Collecting Society (ALCS) in the U.K. – demonstrates that even higher success rates are possible.  (The ALCS, representing more than 30,000 published writers, is an enthusiastic supporter of the settlement, for good reason.  They know it can work, because they've achieved great success finding and paying photocopy revenues to authors of out of print books.)"), *available at* http://www.judiciary.house.gov/hearings/pdf/aiken090910.pdf.  *See also*

Finally, and perhaps most responsive to the argument that the very existence of "orphan works" poses an inherent intra-class conflict, it simply is not true that the owners of copyrights in "orphan works" – *i.e.*, copyright owners who have not yet been found – have interests, or claims against Google, that diverge from those of the other members of the Class or from the Representative Plaintiffs. There is nothing about the status of being a copyright owner of an "orphan work" that renders one less interested in, or capable of, obtaining redress for the use of one's work than copyright owners who have claimed their works.[25] None of the objectors has provided any evidence to the contrary.

Given that there is absolutely no support for the view that the interests of owners of so-called "orphan works" depart in any way from those of the Representative Plaintiffs, it is worth asking why the issue has been so vigorously asserted. Many of those objecting to the Settlement, particularly advocates for free, open access to in-copyright books on the Internet, choose to ignore these facts.[26] Unfortunately, others, who may be more well-meaning, simply reiterate the objections of the open access

---

Declaration of Owen Atkinson, Feb. 11, 2010 ¶ 9 (ALCS successful in paying out more than 97.5% of overall fees collected for authors).

[25]  To the contrary, numerous comments from copyright owner groups in response to the Copyright Office's Notice of Inquiry that culminated in the *Orphan Works Report* demonstrate their considerable concern with respect to any use of works (including "orphaned" works) absent authorization and compensation. *See, e.g.*, Comments of the American Society of Media Photographers, OW0668-ASMP (Mar. 25, 2005); Letter of Graphic Artists Guild to J. Sigall, Copyright Office, OW0547-GAG (Mar. 22, 2005); Letter of Illustrators' Partnership to J. Sigall, Copyright Office, OW0661-Illustrators' Partnership (Mar. 24, 2005).

[26]  *See, e.g.*, D.I. 299 (Open Access Trust); D.I. 291 (Internet Archive).

objectors without understanding that such objectors are not really advocating in the interests of Rightsholders.  To the contrary, the agenda of these objectors is to have books that are in-copyright declared to be "orphans" precisely so that the exclusive rights of the copyright owners will no longer apply to such books and such books can thus be displayed without compensating their copyright owners.[27]

These objections do not advance the interests of the Rightsholders of so-called "orphan works" – they seek to strip Rightsholders of these works of the protection of the copyright laws, so they can freely use their books without compensation.  This is not an agenda that furthers the interests of the members of the Class, whether they own interests in "orphan works," unclaimed works or claimed works.  The interests of "open access" advocates, many of who initially shared Google's expansive notions of fair use, plainly are *inimical* to the Class.  They should not be allowed to derail a settlement that is of such clear benefit to copyright holders (particularly, but not limited to, authors and heirs of out-of-print books) as well as to the U.S. reading public and research community.

### d.    The Sub-Classes Have Been Adequately Represented.

Some objectors allege that certain groups within the Author Sub-Class and the Publisher Sub-Class have not been adequately represented.  These include perceived

---

[27]    *See* D.I. 300 at 10 (proceeds from orphan works should go to a fund for the public domain); Open Access Trust website ("truly orphaned works should be thought of as a part of the public domain"), *available at* http://openaccesstrust.org/, last visited February 11, 2010; D.I. 893 at 9 ("we also believe that if books are true orphans, they should be freely available for use by all").

conflicts between U.S. and non-U.S. Rightsholders,[28] among owners of different genres of Books,[29] or among authors from different ethnic or professional backgrounds.[30]

To begin, differences in views or characteristics between class members do not mean the Class has not been adequately represented. The issue is whether there is an "alignment of interests between class members." *Wal-Mart*, 396 F.3d at 106-07.

Here, the interests of all members of the Class are aligned with respect to Google's unauthorized scanning of works. All Class members have a claim with respect to infringement of their works. These claims make no distinction as to the genre of the underlying work, nor as to the background or location of the Rightsholder. The same is equally true of the ASA: it does not differentiate in any respect among Books and Inserts based on the purported differences among Class members.

Objectors who claim they were not adequately represented do not, in fact, argue that their interests were unaligned with the Representative Plaintiffs. Instead, they only

---

[28]   *See, e.g.*, D.I. 922 at 12 ("significant numbers" of foreign authors outside U.S., Canada, U.K. and Australia who "may not have been represented by the new associational plaintiffs"); D.I. 179 at 20-22 (German authors and publishers not adequately represented by class, since they are generally excluded from Authors Guild and Association of American Publishers); D.I. 287 at 7-8 (Authors Guild and AAP "cannot adequately and fairly represent French interests" because of their membership limitations).

[29]   *See, e.g.,* D.I. 456 at 5 (named class representatives do not adequately represent members of Science Fiction and Fantasy Writers of America as none are authors of "adult trade fiction").

[30]   *See, e.g.,* D.I. 211 at 5 ("[n]one of the named authors represent the particular interests of authors of color"); D.I. 336 at 2 (specific interests of academic authors and publishers are not adequately represented by the class).

argue that they would have "pushed harder" for certain provisions over others,[31] or that their specific interests were not "adequately voiced."[32]  These are not adequacy of representation concerns, but objections about the fairness of the Settlement.  *See Wal-Mart*, 396 F.3d at 113 (where plaintiffs' challenge to adequacy of representation is grounded in the notion that class recovery was somehow deficient, that argument is "more appropriately cast as a challenge to the Settlement's fairness than as a due process claim").  Accordingly, these concerns should be treated as part of the broader question of whether the ASA as a whole is fair, adequate, and reasonable to the Class.

Finally, the Statement of Interest filed by the DOJ on February 4, 2010 ("SOI") speculates that many authors and publishers outside the United States who remain in the Class "may not have been represented by the new associational plaintiffs."[33]  This statement misses the point.  First, it confuses the Associational Plaintiffs, who do not "represent" any members of the Class,  with the Representative Plaintiffs.  Second, the ASA has six non-U.S. based Representative Plaintiffs who fairly and adequately represent the interests of Class members whose Books and Inserts were published in the U.K., Canada or Australia.  Third, if those Class members are included in the ASA because their works were registered with the Copyright Office, they are identically

---

[31]   D.I. 366 at 2 (academic authors would have "insisted on much different terms" with respect to pricing of institutional subscriptions, open access, annotation sharing and would have "pushed harder" for more researcher-friendly provisions).

[32]   D.I. 456 at 5 ("SFWA believes that its interests, and those of many of its members, are not being adequately voiced in the Settlement and negotiation process.").

[33]   D.I. 922 at 12.

situated with respect to authors and publishers of United States works, who also are only in the Class to the extent that they had registered their works. There is no fundamental conflict between the Representative Plaintiffs and owners of U.S. copyright interests located outside the United States.

> **e.     Possible Future Exercise Of Rights Under ASA Does Not Render Plaintiffs Inadequate Representatives.**

Some objectors argue the Representative Plaintiffs do not adequately represent the Class because they plan to exclude their own books from the ASA.[34] First, each Rightsholder is free to make his, her or its own decision of whether to remove or exclude any, some or all Books from the ASA. This is an essential benefit of the ASA. Declaration of Paul Aiken, Feb. 11, 2010 ("Aiken Decl.") ¶ 28. Because each Rightsholder has these rights, Representative Plaintiffs are identically situated to all other members of the Class and, in this respect, there is no intra-class conflict between them and other members of the Class. Accordingly, the possibility that they, or any other Class members, would choose to exercise their rights under the ASA after the Effective Date does not render them inadequate as representatives during the litigation and the settlement negotiations.

---

[34]     *See, e.g.,* D.I. 874 at 8-9.

Second, no one knows any Class member's present intentions, which, of course, can change over time. Given that the ASA is not effective, it is premature to speculate on the future plans of any Rightsholder.[35]

### 3.    Miscellaneous Concerns.

Some objectors argue the named publisher Plaintiffs do not adequately represent the Class because they are also members of Google's Partner Program, which is a non-settlement, contractual agreement under which Google displays books of participating copyright owners.[36] Participation in the Partner Program is available to all Rightsholders and Google currently has tens of thousands of partners from all over the world. The ASA does not treat those who participate in the Partner Program more favorably than those who do not. Indeed, the Plaintiffs negotiated for a provision that specifically contemplates the possibility that *any* Rightsholders could enter into a separate agreement with Google if they so wished. *See* ASA § 17.9. This is one of the ways in which the ASA is a "non-exclusive" arrangement. At any time, any Rightsholder is free to withdraw its works from the Settlement and attempt to negotiate with Google a set of terms different than those set out in the ASA.

---

[35]    *See* D.I. 922 at 12 n.9 ("Another adequacy of representation issue may be presented if . . . class representatives opt-out of the forward-looking aspects of the agreement.").

[36]    *See, e.g.,* D.I. 276 at 18 (lead publisher plaintiffs have their own separate deals with Google, and therefore cannot represent class members who have no preexisting deals); D.I. 874 at 8-9; D.I. 840 at 1-4; D.I. 811 at 2.

One objector argues that Google took the position, in a prior unrelated litigation, that members of a putative class who had an "ongoing business relationships with Google" were "at odds with other class members."  D.I. 811 at 3 (citing *Vulcan Golf, LLC v. Google, Inc.*, 254 F.R.D. 521 (N.D. Ill. 2008)).  Whatever Google's prior position in that unrelated litigation may have been, *Vulcan Golf* did not even rule on the merits of this argument.  In fact, the putative class in that cases was determined to meet the typicality and adequacy requirements of Rule 23 (but was rejected on other grounds).

### B.     The ASA Is Permissible Under Rule 23 And Substantially Furthers The Purpose And Interests Of The U.S. Copyright Act.

The ASA represents a carefully negotiated, permissible compromise of the claims of Plaintiffs and the Class.  A number of objectors, however, have made several inter-related arguments with respect to the scope and breadth of the ASA:

- It impermissibly provides broader relief to the Class than the Court could have ordered after a trial in the absence of a settlement.[37]

- It impermissibly establishes forward-looking licenses running from class members to Google in what amounts to a commercial arrangement or joint venture.[38]

- The authorizations impermissibly extend beyond the conduct that gave rise to the litigation.[39]

---

[37]  *See, e.g.*, D.I. 209 at 13-15.

[38]  *See, e.g.*, D.I. 143 at 11.

[39]  *See, e.g.*, D.I. 733 at 22.

Each of these contentions reflects a misunderstanding of the law and the ASA. Rule 23 and the cases applying it provide the basis for whether or not the ASA should be finally approved. *See* Final App. Br. Section III. If this Court, under that substantial jurisprudence, determines that the ASA is fair, adequate and reasonable to the Class as a whole, it need not further determine that the ASA is perfect, or that the ASA represents a settlement that others might have achieved had they spent the last four years litigating the case.

This goes to a central point: Many of the objectors and amici, and even the DOJ, mistakenly *assume* that because their view of Rule 23 and related issues might have led to a different settlement, the ASA should not be approved. They cite no authority to support their position. Instead, the DOJ simply declares that the settlement "is a bridge too far." SOI at 3. When, however, the ASA is analyzed under the applicable authorities and is based on the actual record, as opposed to rhetoric, the ASA is shown to be a fair, adequate and reasonable compromise of the issues raised in Plaintiffs' pleadings.

### 1. A Settlement Can Provide Broad Relief, Beyond The Remedies Available After Trial.

Some suggest this Court does not have the authority to approve this Settlement because it provides relief to the Class that goes beyond that which the Court could have ordered after trial.[40] That ignores well-settled law, which holds that a district court may "provide[] broader relief [in a class action that is resolved before trial] than the court

---

[40] *See, e.g.* D.I. 276 at 20-23 (ASA "launch[es] 'a joint venture' involving the sale of entire books that could not be accomplished after a trial of the claims alleged").

could have awarded after a trial." *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179, 185 (2d Cir. 1987) (quoting *Local Number 93, Int'l Assoc. of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986)) ("*Agent Orange*").  In *Agent Orange*, the Second Circuit relied on the Supreme Court's decision in *Firefighters*, an employment discrimination class action.  There, the Supreme Court approved a consent decree that provided benefits to individuals who were not the actual victims of employment discrimination by the city, even though the district court could not have ordered that relief without the consent of the parties.  *See Firefighters*, 478 U.S. at 514.  The Supreme Court reasoned that consent decrees are simply a form of settlement "entered into by parties after careful negotiation has produced agreement on their precise terms," *id.* at 522 (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)).  "[I]t is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." *Id.* at 522.[41]

---

[41]  Consent decrees are a "hybrid" form of judgment having elements of both a contract and a judicial decree. *See Firefighters*, 478 U.S. 519; *Barcia v. Sitkin*, 367 F.3d 87, 90 (2d Cir. 2004).  They can arise in a number of contexts, including violations of the antitrust laws, environmental laws and Title VII of the Civil Rights Act, and are a type of "voluntary settlement agreement," subject to "continued judicial policing," but which "could be fully effective without judicial intervention." *See Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).  Both the order and the "prospective provisions of the consent decree operate as an injunction." *See id.* (citing *Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir. 1982) (affirming order denying application for approval of a Title VII "settlement decree")).  Whether a class action settlement includes a consent decree or not, courts use the same approval procedure – preliminary approval, notice to the class and a determination as to whether the settlement is fair, adequate and reasonable after a hearing. *See Williams*, 720 F.2d at 920-24 (describing procedure).

In *Firefighters*, the Supreme Court stated that a "federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded" following trial if a three-part test is met: the consent decree must (1) "spring from and serve to resolve a dispute within the court's subject matter jurisdiction"; (2) "com[e] within the general scope of the case made by the pleadings" (citing *Pacific R.R. Co. v. Ketchum*, 101 U.S. 289, 297 (1879)); and (3) "further the objectives of the law upon which the complaint was based." *Id.* at 525.

*Firefighters* and *Agent Orange* establish that this Court plainly has the power to approve a settlement that includes relief broader than the Court could have ordered had the case gone to trial. Although Plaintiffs do not believe that this Court must review the ASA under *Firefighters*, it nonetheless passes muster under each of the three *Firefighters* elements. The DOJ is wrong when it suggests otherwise.

As discussed below, the ASA satisfies the three elements set out by the Supreme Court in *Firefighters*.

> **a.    The ASA Springs From And Resolves A Dispute Within the Court's Subject Matter Jurisdiction.**

As to the first *Firefighters* element, the ASA springs from and resolves claims against Google that indisputably are within this Court's subject matter jurisdiction under 28 U.S.C. § 1338. This case is about Google's (and the libraries') creation, possession and future use of unauthorized copies, and the ASA resolves this copyright dispute.

The DOJ asserts this prong has not been satisfied because the ASA allegedly resolves claims "for activities well beyond the facts underlying the complaint." SOI at 7.

That is wrong. *Firefighters*, as well as legions of other judicial decisions, approve remediation schemes that include relief beyond that which a court, acting within the four corners of the pleaded claims, could have ordered absent a settlement.[42]   Accordingly, the Court is not barred from approving the settlement agreement based on the fact that it is beyond the remedies the Court could award under the Copyright Act.  *See Turner v. Orr*, 759 F.2d 817, 825 (8th Cir. 1985) (citing *Sansom Comm. v. Lynn*, 735 F.2d 1535, 1538 (3d Cir. 1984) ("Consent decrees need not be limited to the relief that a court could provide on the merits.")).

> **b.    The ASA Comes Within The General Scope Of The Case Made By The Pleadings.**

As to the second *Firefighters* element, the ASA comes within the general scope of the case made by the pleadings and, further, the relief negotiated by the parties is readily encompassed by the allegations of the complaint.  Courts that have interpreted this prong of the test are generous in its application, reading the complaint liberally to encompass the relief that defendant has agreed to provide in the settlement, generally with regard to whether the settlement advances the objectives of the law on which the complaint is based.  The ASA plainly fits within the scope of the issues framed by the current complaint and its predecessors.

---

[42]    *See* Br. of Google Inc. in Sup. Mot. Final Approval of Am. Settlement. ("Google Br.") at 9-10 (citing consent decree cases in which settlement relief extends beyond the claims in the complaint).  To the extent that the DOJ suggests that this prong of *Firefighters* raises a question of justiciability, a justiciable copyright claim between members of the Class and Google exists and this Court has jurisdiction over it.  *See supra* Section II.A.1.b.

The DOJ acknowledges that an action challenging digitization and the display of snippets would be within the Court's subject matter jurisdiction. It then argues, however, that Google's exploitation of access to books in other ways was not or could not have been alleged in the present litigation. SOI at 7-8. The plain language of the Third Amended Complaint's allegations and Plaintiffs' understanding of Google's plans at the time they filed the initial complaint show that to be totally incorrect:

- Google "owns and operates a major Internet search engine that, among other things, provides access to commercial and other sites on the Internet" Compl. ¶ 4;

- "Google has contracted with several public and university libraries to create digital 'archives' of the libraries' collections of books. . ." Compl. ¶ 4;

- "By creating for these and other libraries a digital copy of those books that are not in the public domain . . . by reproducing for itself a digital copy of the Books, and by distributing and publicly displaying those Books, Google is engaging in massive copyright infringement." Compl. ¶ 5;

- "Google plans to reproduce the Books for use on its website in order to, among other things, attract visitors to its web site and generate advertising revenues thereby." Compl. ¶ 6;

- "Google has unlawfully reproduced, distributed and publicly displayed the Books, and intends to continue to do so. . ." Compl. ¶ 7;

- Relief is requested with respect to all of "Google's planned unauthorized commercial and other use of the Books." Compl. ¶ 8; and

- "Google's acts have caused, and unless restrained, will continue to cause damages and irreparable injury to plaintiffs and the Class through . . . continued copyright infringement of the Books and Inserts and/or the effectuation of new and further infringements. . ." Compl. ¶ 60.

Count I of the Complaint seeks damages for Google's copyright infringement. Count II seeks injunctive relief.  The prayer for relief of the Third Amended Complaint seeks "an award of statutory damages, plaintiffs' actual damages, and/or defendant's profits;" "an injunction (a) barring Google from continued infringement of the copyrights of the Author Sub-Class and Publisher Sub-Class, and/or (b) other equitable relief to redress any continuing violations of the [Copyright] Act"; and "(a) permanent injunctive and declaratory relief barring Google from continued infringement of the copyrights of the Author Plaintiffs, the Publisher Plaintiffs and the Class, and/or (b) other equitable relief to redress any continuing violations of the Act." *See* Compl., Prayer for Relief.

The factual and legal scope of the pleadings are therefore broad and inclusive of a range of infringing conduct.  There is no basis for the DOJ or others to re-characterize the infringing acts challenged by Plaintiffs as limited to the display of snippets.

This case is about Google's extensive copyright infringement:  Google has copied millions of books from end-to-end, has placed the entire contents of those books on its servers, has provided digital copies of millions of these entire books to numerous libraries – some of them state institutions protected by sovereign immunity – and has made available for display these books in response to search requests (even though, to preserve some argument of fair use, it only displays "snippets" in response to each individual search request).  Plaintiffs were concerned from the outset that Google would make uses of scanned books beyond snippets, that Google could sell subscriptions to book content or "snippets", that libraries would use digital copies of entire books based on assertions

34

of fair use or other exceptions and that copies of books might be made freely available and displayed as a result of security breaches or otherwise. *See* Sarnoff Decl. ¶¶ 5-7.

The DOJ seeks to distinguish the consent decree cases by arguing that they "benefit the party harmed by imposing additional burdens on the defendant(s)." SOI at 8. That is, however, just what the ASA does. Under the ASA, Google has agreed to refrain from (a) digitizing books that Rightsholders tell Google not to digitize, (b) displaying snippets of in-print books without express Rightsholder authorization, and (c) making any displays on request of Rightsholders.

Google has done so notwithstanding that its position has been that it would have been entitled to digitize and display snippets, perhaps more, all under the rubric of fair use. To the extent the DOJ's position is that a settlement cannot include broad, forward-looking relief that both benefits plaintiffs, confers rights on defendants and limits defendants' conduct, that position is inconsistent with the DOJ's stance that a lawsuit can settle "past conduct by licensing a somewhat broader range of conduct." SOI at 4 (citing *Uhl v. Thoroughbred Tech. & Telecomms.*, 309 F.2d 978, 982-983 (7th Cir. 2002). Finally, the DOJ is again wrong in stating that the ASA provides Google "with benefits it could not have secured either through trial or even through normal private negotiations." SOI at 8. Assuming that, by using the word "normal," the DOJ is referring to suits that arise in a non-class context, it is frequently the case that "private negotiations" lead to settling an intellectual property dispute with a license that authorizes conduct beyond the practices that gave rise to the litigation. *See infra* p. 39.

Fundamentally, the DOJ's disquiet appears to arise from its premise – unsupported by any cases or other legal authority – that it is improper for Plaintiffs to enter into a class action settlement that addresses a broad range of conduct and provides benefits to all Class members and to Google.  That view, of course, is completely contrary to the well-established rule that the power to exclude completely, as in the form of either the injunction or destruction of copies remedies that are available under the Copyright Act, necessarily includes the power to place conditions upon use.  *See, e.g.*, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982) (Indian tribe's power to exclude nonmembers from tribal lands "necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation").

The ASA thus plainly comes within the general scope of the case as framed by the pleadings.

### c. The ASA Furthers The Objectives Of The Law Upon Which The Complaint Was Based.

The ASA advances "the purposes which the statute [the Copyright Act] is intended to serve."  *See Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1125 (D.C. Cir. 1983), *cert. denied sub nom. Union Carbide Corp. v. Natural Resources Defense Council, Inc.*, 467 U.S. 1219 (1984).

The primary purpose of copyright law is to "Promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their respective Writings . . . ."  *See* U.S. Constitution, art. I, § 8, cl. 8.  The Supreme Court has

instructed that the Copyright Act and the Constitutional provision "reflects a balance of competing claims upon the public interest:  Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music and the other arts . . . .  But, the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good."  *See Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).  *See also Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.").  To further this purpose by creating incentives and stimulating creativity, the Copyright Act sets out the exclusive rights of authors in Section 106.

The ASA fairly reflects the balance between the rights of authors and the public's enhanced access to their works that is embedded in the Copyright Act and its constitutionally-grounded purposes.  First, it establishes the principle that the copyright owners, not Google, have control over the use of their works.  Absent the ASA, the authors and publishers would have needed a victory at trial to avoid a fate similar to that suffered by the music publishing industry in the face of digital music copying and sharing.  Were Google permitted to digitize books in their entirety, and to display portions of those books on the Internet, nothing would stop other entities from doing the same thing, but with fewer security measures in place.  It is not an exaggeration to conclude that such a holding by the Court would have been devastating to the intellectual property rights of authors and publishers.

The ASA preserves for every member of the Class a full range of options for exercising its rights under the copyright laws. A Rightsholder has the right to direct Google not to digitize his Book, or, if Google has already done so, to remove that Book from Google's databases. Alternatively, Rightsholders of out-of-print Books can use the ASA to find a new audience for their Books and earn new revenues from the sale of those Books. Never before has there been a program this beneficial to the interests of copyright holders of out-of-print books – a brand new marketplace that could breathe new commercial and academic life into these works. As for Rightsholders of in-print Books, the ASA is unassailable. Had Plaintiffs lost on the fair use issue, Google – and anyone else – could have copied and displayed snippets of in-print books with impunity. Under the ASA, authors and publishers of in-print Books will be able to participate in the revenue models and display uses, but only if they wish to do so; otherwise, their Books will not be displayed at all, not even in snippet form. In this regard, the ASA is superior to countless other approved settlements in that those who do not formally opt-out can, at any time thereafter, "just say no" to Google. Aiken Decl. ¶¶ 27-28. The ASA offers highly innovative ways to promote the sale of in-print Books, and to earn advertising revenues in connection with the display of preview pages of those Books, with no economic downside for Rightsholders. *Id*. at ¶ 28.

Second, the ASA makes accessible to the public millions of out-of-print Books that otherwise can be found only on the shelves of a few leading university libraries accessible just to their students, faculty and perhaps alumni. These works are, by definition, no longer available commercially. The ASA allows, for the first time, anyone

in the United States to discover these Books. Users of institutional subscriptions will be able to read these Books in their entirety. Others will be able to read segments of Books through the Preview Use feature and, if they choose, to purchase online access to the Books for a charge. People who have access to the Books will be able to read them, print them out, annotate them and share annotations with colleagues.

This level of access to Books is without precedent. For some groups, such as the blind and reading disabled, the ASA represents a quantum leap in the number of books to which they will have access.[43] Further, access at dedicated library terminals throughout the country will exponentially expand the public's ability to find and read millions of books. Thus, the ASA substantially furthers the "interest of society in the untrammeled dissemination of ideas." *See* B. Kaplan, *An Unhurried View of Copyright* vii-viii (1967), *quoted in Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 427, 430 n.12 (1984).

Settlement of the dispute with Google in the form of a license also furthers the objectives and purposes of the Copyright Act. Settlements of intellectual property infringement claims frequently contain licenses to the defendant.[44] In fact, the plain

---

[43]  *See, e.g., Competition and Commerce in Digital Books: Hearing Before the H. Comm. on the Judiciary*, 111th Cong., 1st Sess. (Sept. 10, 2009) (statement of Marc Maurer, President, National Federation of the Blind) ("If this settlement is approved blind people will have greater access to books than we have ever had in human history."), *available at* http://www.judiciary.house.gov/hearings/hear_090910.html.

[44]  *See, e.g., Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 248 F.R.D. 408, 411 (S.D.N.Y. 2008) (noting settlement agreement that licensed copyrights to musical compositions); *Kellman v. Coca-Cola Co.*, 280 F. Supp. 2d 670, 672-73 (E.D. Mich. 2003) (noting settlement agreement granting NHL team license to use trademark in exchange for royalties); *Pedrosillo Music, Inc. v. Radio Musical, Inc.*, 815 F. Supp.

language of the Copyright Act itself expressly contemplates that a copyright owner may

"authorize" others to exercise any of its rights under Section 106.  17 U.S.C. § 106.[45]

There is no basis for the arguments of some objectors that the Settlement upends

copyright law because it transfers intellectual property rights from copyright owners to

Google.  Google's authorizations are non-exclusive only and are not transfers of

copyright ownership.  ASA §§ 2.4 and 3.1(a).  The Copyright Act provides that "a

nonexclusive license" is not a "transfer of copyright ownership."  17 U.S.C. § 101

(defining the term "transfer of copyright ownership").[46]  Thus, the Settlement does not

transfer any copyright ownership interests to Google.

Google's rights under the ASA are specifically prescribed.  The ASA does not

authorize Google to make any Display Uses (not even "Snippet" display) of in-print

Books unless expressly authorized by the Rightsholder of such Books.  The ASA instead

---

511, 517 (D.P.R. 1993) (noting court approved settlements between ASCAP and
radio station providing for license in exchange for future and lump sum payment).

[45]  *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 (2d Cir. 1995) (under
the "to authorize" language in § 106, "a copyright holder is entitled to demand a
royalty for licensing others to use its copyrighted work"); *Repp v. Webber*, 914 F.
Supp. 80, 83 (S.D.N.Y. 1996) ("the granting of licenses" is protected by the "to
authorize" language in § 106).

[46]  *See, e.g., Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) (copyright owner who
grants non-exclusive license waives right to sue licensee for infringement);
*Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1346 (Fed. Cir. 2001) ("licenses
are considered as nothing more than a promise by the licensor not to sue the
licensee"); s*ee also* Keller & Cunard, *Copyright Law,* § 3:6.3, at 3-46 (Release No.
10, November 2009) ("[A] non-exclusive license does not involve a property right.
Instead, it is an authorization to exploit the copyright in a particular way, which
implicitly includes a covenant . . . not to sue . . . ."); Goldstein, *Copyright*, Second
Edition, 2005 Supplement at 4:66.

prohibits Google from displaying any content from any such Books. As to Books that are out-of-print, Google's non-exclusive license is subject, at all times, to each Rightsholder's express right to "turn off" any one or all Display Uses of his or her Book.

Furthermore, as noted, all Rightsholders have the right to remove their Books from all Google and library servers and thus prohibit all display and non-display uses of their Books. Removal is tantamount to a targeted injunction, on a Book-by-Book, Rightsholder-by-Rightsholder basis. Thus, the ASA makes available to each member of the Class the remedies that are available to successful plaintiffs under the Copyright Act – the impoundment and destruction of Google's copies – but copyright owners need not bring their own suit against Google to obtain these remedies (and need not exercise these rights if they choose instead to allow Google to display their Books).

More broadly, the ASA enhances Rightsholders' ability to take advantage of the remedies that are available to them under the Copyright Act. For several years, the Register of Copyrights and some in Congress – as well as some copyright owners – have expressed concerns with the ability, resources and incentives of small copyright owners to vindicate their copyright rights by bringing a copyright infringement action in federal court.[47] The ASA directly responds to these concerns because members of the Class do

---

[47] *See The "Orphan Works" Problem and Proposed Legislation: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary,* 110th Congress, 2d Sess. at 18 (Mar. 13, 2008) (statement of Marybeth Peters, Register of Copyrights) (Copyright Office "considering possible new enforcement issues related to small claims of copyright owners"); Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong., 2d Sess. § 5 (requiring Register of Copyrights to "conduct a study with respect to remedies for copyright infringement claims seeking small amounts of monetary relief, including consideration of

not each have to file a federal action against Google to assert their rights under the Copyright Act. They do not have to litigate the question of whether any or all of Google's copying of books, its storage of those copies on its servers, its non-display uses and its display of snippets would constitute fair use. Such suits would be costly, and the monetary awards, even to the successful plaintiff, might well be comparatively meager, particularly if only actual damages are available.

By contrast, the ASA provides the avenue by which Rightsholders can convey their explicit instructions to Google. The ASA then requires that Google act in conformity with those instructions. If it does not do so, Rightsholders have a simple and straightforward dispute resolution procedure to which Google has agreed, and the possibility of obtaining damages if Google has failed to honor their instructions (and without having to prove that Google's conduct is infringing); or, if Google willfully or repeatedly violates those instructions, Rightsholders can seek injunctive relief in court.

It has also been suggested that the opt-out mechanism of Rule 23(b)(3) is inconsistent with the Copyright Act because the law (absent a statutory exception, such as fair use) requires that the express permission from the copyright owner must precede an otherwise unauthorized use. The ASA is consistent with this "prior permission" regime of the Copyright Act, however, because, by virtue of the final order approving the ASA, each member of the Class will be deemed to have authorized Google (and the libraries) to

---

alternatives to disputes currently heard in the United States district courts"); Orphan Works Act of 2008, H.R. 5889, 110th Cong., 2d Sess. § 6 (same); Orphan Works Act of 2006, H.R. 5439, 109th Cong., 2d Sess. § 4 (2006) (same).

engage in carefully negotiated and particularly circumscribed activities. Consistent with a non-exclusive license, moreover, each copyright owner has the right to enter into separate arrangements, whether with Google or others, and, as noted, has the right to terminate Google's license to one or more activities at any time.

In this regard, the DOJ's unsupported suggestion that the use of Rule 23(b)(3) is incompatible with the Copyright Act is essentially the assertion that the Copyright Act proscribes settlements of class actions for claims of copyright infringement. Nothing in the Act, the history of Rule 23 or case law supports that view.

In fact, other copyright class actions have resulted in settlements that released the defendant from claims arising out of its prior conduct, but without individuated prior authorizations from class members, who could opt out.[48] So long as the elements of Rule 23 are satisfied in accordance with constitutional due process, and the *Firefighters* elements are otherwise satisfied, nothing in the language or structure of the Copyright Act suggests a fundamental incompatibility between the Act and Rule 23.

Finally, the DOJ contends that whether the opt-out terms of the settlement are appropriate is "better suited for legislative consideration, rather than one for courts to

---

[48] *In re Literary Works in Electronic Databases Copyright Litig.,* Order for Final Approval of Settlement and Final Judgment, MDL No. 1379 (S.D.N.Y. Sept. 27, 2005), *rev'd on other grounds*, 509 F.3d 116 (2d Cir. 2007), *cert. granted sub nom. Reed Elsevier Inc. v. Muchnick,* 129 S. Ct. 1523 (2009); *Ryan v. Carl*, 1999 U.S. Dist. LEXIS 366 (N.D. Cal. 1999) (order granting certification of class of plaintiff authors of copyrighted articles in suit against owners of on-line document retrieval and delivery business; case subsequently settled); *see also Wolson v. Elsevier Inc.*, No. 09-CV-4040 (DC), 2010 WL 334919 (S.D.N.Y. Jan. 29, 2010) (citing *In re Literary Works*).

make in the context of approving a settlement under Rule 23." SOI at 10.[49]  Here, the

DOJ and, presumably, the Copyright Office, are expressing policy predilections or,

perhaps, institutional views on the allocation of authority between the legislative and

judicial branches.  It is not unusual, however, that issues being litigated, including those

addressed in the settlements of class actions or consent decrees, also are within Congress'

powers.  That does not, however, divest the judicial branch of its power and authority to

decide cases on the record and under the standards that control their resolution.  A policy

preference that some of the matters encompassed in the ASA be handled by the

legislature, rather than this Court, does not nullify this Court's task of determining

whether the settlement that is properly before it is fair, reasonable and adequate.[50]

---

[49]    *See also* D.I. 720 (Statement of Interest of the Department of Justice, filed Sept. 18, 2009) at 2 ("A global disposition of the rights to millions of copyrighted works is typically the kind of policy change implemented through legislation, not through a private judicial settlement.").

[50]    Similar to the suggestion of the DOJ, some objectors argue that the ASA includes relief that should only be available if legislatively enacted.  *See, e.g.*, D.I. 276 at 7 ("A class action cannot restructure copyright rights, remedies, immunities and defenses . . .[s]uch changes can only come from Congress"); D.I. 206 at 21 (ASA "invades the prerogatives of Congress and attempts to legislate a private solution" to a copyright problem); D.I. 143 at 46.  These objections are not well founded and are, in essence, a restatement of the objection that class action settlements cannot include future relief.  Ample precedent exists for the settlement of class actions with terms circumscribing a defendant's future actions and no authority prohibits such settlements in copyright class actions, or provides that class action settlements of copyright claims with forward-looking relief are within the exclusive province of Congress.  *See infra* Section II.B.2.

>       2.    A Class Action Settlement Can Authorize Future Uses
>             And May Include Future Relief That Is Commercial in
>             Nature.

Some objectors argue that class action settlements cannot settle claims for "future use," but only claims for "past damages," or that class actions cannot establish commercial arrangements between class members and a defendant.[51]  Neither argument has any support.  In several class action settlements, forward-looking authorizations – including those with a significant commercial component – have been approved.  Moreover, federal appellate courts have ruled that class actions can be settled with forward relief and with the transfer of real property interests.

In *Alvarado v. Memphis-Shelby County Airport Authority*, 229 F.3d 1150, 2000 U.S. App. LEXIS 21259 (6th Cir. 2000) (unpublished), owners of land adjacent to an airport filed a class action over noise and other pollution and sought both past damages and future abatement.  The case settled on behalf of persons who owned parcels of property near the airport.  The defendants paid $22 million to settle past claims, to be distributed to those class members who submitted claims.  The authority received an easement from all class members allowing the future use of airspace over those parcels in a lawful manner.  The payments to those class members who filed claims represented compensation for both the release of past claims and the ongoing easement.  *See Alvarado*, 2000 U.S. App. LEXIS 21259, at *8.  Those class members who neither opted out nor filed claims received nothing.  Nevertheless, they were deemed to have granted

---

[51]   *See, e.g.,* D.I. 276 at 1 ("The purpose of class action is to resolve a legal dispute, not launch a 'joint venture.'").

the airport authority an easement on their property.  The Sixth Circuit, upholding the

settlement, rejected the contention that the "easement provisions of the settlement were

unfair and unreasonable." *Id.* at *20-*21.  The Court held that "there is no public policy

problem with an anticipatory release." *Id.* at *21.

In *Uhl v. Thoroughbred Technology and Telecommunications, Inc.*, 309 F.3d 978

(7th Cir. 2002), a class of landowners who owned property along several thousand miles

of railroad track sued a cable company that was installing telecommunications cable

along the track without their permission, claiming trespass and slander of title.  The

settlement agreement provided that "all class members" "will transfer easements." *Id.* at

982.  The settlement terms contained no provision for class members to refuse the

easement, *i.e.*, transfer of the right was mandatory. *Id.* at 982, 984-95.  Certain class

members also received monetary compensation (depending on where their property was

located).  As with *Alvarado,* there was payment for use of a future right (airspace and

land, respectively), and a "transfer" of property rights (easements in both cases).  The

Seventh Circuit affirmed this settlement, which provided for the release of plaintiffs'

potential claims and bound all class members to a grant of easement in return for

compensation. *Id.* at 987.[52]  *See also In re Fiber Optic Cable Installation Litig.*, No.

---

[52]    *Accord Smith v. Sprint Communications Co. L.P.*, 99-CV-3844, 2003 U.S. Dist.
LEXIS 325, at *5  (N.D. Ill. Jan. 9, 2003) (approving class action settlement of
railway easement case with releases to defendants and future, perpetual easement for
the cable; settlement did not compromise "future tort claims" because exercise of
rights consistent with easement will not be a tort, and class preserves rights to seek
remedies for acts that are inconsistent with the easement)*, vacated on other grounds*,
387 F.3d 612 (7th Cir. 2004) (settling plaintiffs, representing a nationwide class,

1:99-ML-9313-DFH-TAB, MDL Docket No. 1313 (Indiana Active Lines) (*Hinshaw*),

Final Order and Judgment (S.D. Ind. Feb. 2, 2007) (easement owners relinquish claims

and are required to transfer their easements to Corridor Enterprises Inc. for use by

telecommunications companies and non-railroad purposes); *Barkema v. Williams*

*Pipeline Co.*, 666 N.W.2d 612 (Iowa 2003) (similar facts, involving settlement of claims

arising out of installation of fiber optic cables in underground oil and gas pipelines).[53]

    *Uhl* and *Hinshaw* are especially noteworthy in the context of considering the ASA

because those settlements included the formation of corporations that were managed and

operated by the class counsel as trustees, and that awarded class members shares of stock

in the corporations, with no guarantee of how much the stock was worth or whether the

stock would ever be worth anything.  These "going forward" business arrangements were

approved as fair, reasonable and adequate.[54]  *See* Declaration of Jeffrey P. Cunard, Feb.

---

inadequately represented interests of litigation classes already certified in other
states).

[53]  The cases cited above are particularly instructive in that the courts in those cases
approved class action settlements that permitted the defendants to continue the
conduct for which they were sued (trespass, nuisance, etc.) and that required the
class members to grant easements to the defendants.  The Settlement, by contrast,
does not go nearly so far.  It involves no transfer of any property rights to Google;
instead, all authorized uses are non-exclusive.

[54]  One objector argues that *Uhl* is distinguishable from the ASA in a number of ways
and implicitly suggests that those differences meant that approval of that settlement
was straightforward and assured. D.I. 874 at 12. To the contrary, *Uhl* involved a
class of over 58,000 individuals who did not yet even know if fiber optic cable
would ever be laid on their property because, when the settlement was negotiated,
the defendant had not yet decided where to lay the cable.  The settlement created two
compensation groups: (1) those individuals on whose property such cable would
eventually be laid and (2) those on whose property it would not be laid, with those in

11, 2010 ("Cunard Decl.") Exs. B & C (relevant *Uhl* and *Hinshaw* settlement documents).

Other courts also have approved settlements that include forward-looking, commercial transaction-based relief that is quite multi-faceted.  In *White v. Nat'l Football League,* 822 F. Supp. 1389, 836 F. Supp. 1458 (D. Minn. 1993), a class of professional football players settled claims for both damages and future structural relief, which included, for example, the designation of categories of players who were subject to a right of first refusal by their existing teams, provisions relating to the college draft, player pools, salary caps, and the like.  *See* 822 F. Supp. at 1412-13 and 836 F. Supp. at 1473-75, 1480-82.  One facet of the settlement provided for the transfer of "global licensing rights."  822 F. Supp. at 1415-16 and 836 F. Supp. at 1495.  The beneficiaries of that licensing agreement were the class members.  822 F. Supp. at 1416.  The court approved that settlement as fair, adequate, and reasonable.  *Id*. at 1417-36 and 836 F. Supp. at 1477-96.

---

the first receiving substantially more compensation than those in the second. Objections were filed to the settlement on the grounds, among others, that the claims were not justiciable, the class representative did not adequately represent the class, notice was inadequate and the two compensation classes were unfair. Nevertheless, the District Court and the Seventh Circuit carefully analyzed the terms of the settlement and found that the settlement was fair, adequate and reasonable to the class as a whole.  *See Uhl v. Thoroughbred Tech. & Telecomms.*, 2001 U.S. Dist. LEXIS 13115 (S.D. Ind. 2001), *aff'd,* 309 F.2d 978 (7th Cir. 2002).  Here, given the known and justiciable harms to the members of the carefully drawn and discrete class, and the ASA's circumscribed authorizations to Google and the libraries, the ASA similarly should be approved after careful scrutiny by this Court.

Another sports league case, *American Basketball Association Players Association v. National Basketball Association*, 72 F.R.D. 594 (S.D.N.Y. 1976), began as an antitrust suit by individual basketball players. The settlement, however, was on behalf of a class and involved wide-ranging changes to the NBA, including the creation of numerous expansion teams. In *Robertson v. National Basketball Association,* 72 F.R.D. 64 (S.D.N.Y. 1976), *aff'd,* 556 F.2d 682 (2d Cir. 1977), the Second Circuit approved an antitrust class settlement involving substantial modifications in the procedures for the college basketball draft, options for future service, phasing out of reserve compensation rules and other structural relief.[55] *See also Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 470-73 (S.D. Fla. 2002) (in class action alleging accessibility violations under the Americans with Disability Act settlement approved with release of federal and state accessibility law claims for statutory damages and injunctive relief arising during the term of the settlement); *McClendon v. Georgia Dep't of Cmty. Health*,

---

[55] In a wide variety of other contexts, courts have approved class action settlements that include broad, structural, forward-looking relief. *See, e.g.*, *Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096 (10th Cir. 2004) (hiring practices of police department); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) (change in criteria for insurance rates); *Gaskin v. Pennsylvania*, 389 F. Supp. 2d 628 (E.D. Pa. 2005) (children with disabilities); *Harris v. Reeves*, 761 F. Supp. 382 (E.D. Pa. 1991) (overcrowding of county prisons); *Society for Good Will to Retarded Children v. Cuomo*, 745 F. Supp. 879 (E.D.N.Y. 1990) (conditions in state mental institutions); *Com. v. O'Neill*, 100 F.R.D. 354 (E.D. Pa. 1983), *aff'd*, 746 F.2d 1465 (3d Cir. 1984) (police department hiring); *Goodwin v. Shapiro*, 545 F. Supp. 826 (D.N.J. 1982) (psychiatric hospital conditions); *Vulcan Society of Westchester County, Inc. v. Fire Dept. of City of White Plains*, 505 F. Supp. 955 (S.D.N.Y. 1981) (hiring ratios for city fire department).

261 F.3d 1252, 1254 (11th Cir. 2001) (approving release by Georgia of future claims in tobacco litigation).

There is nothing unique to copyright class actions that distinguishes them in this regard and would prevent forward-looking relief that include licenses running from class members to the defendant.  Intellectual property lawsuits of all types frequently are settled with long-term licensing arrangements that authorize the defendant to engage in the conduct that was the subject of the litigation, without the complaint demanding that remedy.[56]  Contrary to the suggestions of the DOJ, nothing in the Copyright Act or Rule 23 or any decisional law interpreting either precludes judicial approval of that relief here.

In fact, authorizations for future uses have previously been approved in at least one other copyright class action settlement.  In *In re Literary Works in Electronic Databases Copyright Litigation*, Judge Daniels approved a settlement that awarded compensation to the class of freelance authors for past infringement of their works by the defendant electronic databases (*e.g.*, Lexis-Nexis, West, ProQuest); *see also Wolson v. Elsevier Inc.*, No. 09-CV-4040 (DC), 2010 WL 334919 (S.D.N.Y. Jan. 29, 2010) (citing *In re Literary Works*).  That settlement also granted defendants a non-exclusive right to the continuing and future use of the works in their databases.  *In re Literary Works in Elec. Databases Copyright Litig.*, Order for Final Approval of Settlement and Final Judgment, MDL No. 1379 (S.D.N.Y. Sept. 27, 2005), *rev'd on other grounds*, 509 F.3d

---

[56]    *See, e.g.*, Press Release, Time Warner, Warner Music Group Settles Copyright Infringement Suit With MP3.COM (June 9, 2000) (settling record label's suit against MP3.com with a North American license for use of recordings), *available at* http://www.timewarner.com/corp/newsroom/pr/0,20812,667721,00.html.

116 (2d Cir. 2007), *cert. granted sub nom. Reed Elsevier Inc. v. Muchnick,* 129 S. Ct. 1523 (2009).  Like the class members in the ASA, the freelance authors in *Literary Works* had the option of receiving payment for past infringement as well as a "removal" right, preventing the defendants from using their works in the future.

> **3.      The Settlement Satisfies The Identical Factual Predicate Doctrine.**

Some objectors attack the ASA on the ground that the ASA purportedly does not satisfy the "identical factual predicate" doctrine.[57]  The SOI makes similar assertions.[58] They are incorrect.

The identical factual predicate doctrine has a very practical purpose.  It ensures that class settlements are fairly structured and that claims are released for appropriate consideration.  It is fully met here.  Every claim released in the ASA is released for fair consideration:  the claims for past infringement are released in exchange for the Cash Payments and the injunction claims are released in exchange for the right to control the use by Google and the libraries of one's Books and the right to receive revenues for their use.

The "identical factual predicate" doctrine has its genesis in *Super Spuds*, where the Second Circuit rejected as unfair a class action settlement that included the release of

---

[57]      *See, e.g.* D.I. 874 at 14 (original settlement fails identical factual predicate test "because it would have released claims for books not yet scanned, for types of infringement not yet implemented . . . for new revenue models not yet conceived, and for sales of entire copyrighted books when only scanning for electronic searching and displaying snippets was alleged in the complaints").

[58]      D.I. 922 at 11.

claims neither possessed nor pleaded by the class representative. Worse still, the class

representative released those claims with no consideration being received by those who

did hold them. The "heart of" the court's concern in S*uper Spuds* was "the danger that a

class representative not sharing common interests with other class members would

endeavor to obtain a better settlement by sacrificing the claims of others at no cost to

himself by throwing the others' claims to the winds." *TBK Partners*, 675 F.2d at 462

(internal quotation and modification omitted).

The holding of *Super Spuds* is that class representatives cannot, during settlement

negotiations, obtain a better settlement for their own claims, by "throwing" into the

release the claims of others, which they do not share, for no consideration.[59] In *Super*

*Spuds*, the Second Circuit "declined to permit the *uncompensated* release of claims

resting on a separate factual predicate from that settled in the class action." *See TBK*

*Partners,* 675 F.2d at 462 (emphasis supplied). In *Wal-Mart*, the Second Circuit

explained that "we have never affirmed the approval of a class action settlement which

---

[59]   Some objectors, *see, e.g.,* D.I. 276 at 24, cite *Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F.2d 561 (E.D. Pa. 2001), in support of their view that, like the settlement in that case, the ASA cannot be approved. *Schwartz*, in which the court disapproved a proposed settlement of an antitrust case challenging the bundling of football games on satellite television, is inapposite. The basis for the court's rejection was that the short duration of injunctive relief was inadequate, the merchandise discounts were inappropriate because they did nothing to ameliorate the antitrust violation at issue, compensation to the class was otherwise too low and the release to the class was overbroad because it included distribution through media different than satellite television. By direct contrast, the ASA binds Google for an extended period, specifically addresses and ameliorates the infringing conduct that gave rise to the dispute and includes releases carefully tailored to such conduct. *See infra* Section II.N.

included the *uncompensated* impairment of non-class claims *unless* the non-class claims were *based on the identical factual predicate* as the class claims." *See In re Auction Houses Antitrust Litigation*, 2002 U.S. App. LEXIS 15327 (2d Cir. 2002) (emphasis supplied).

Accordingly, after *Super Spuds*, the Second Circuit has approved class actions settlements releasing non-pleaded claims of some class members for no extra consideration *only if* the claims are based on the "identical factual predicate of the pleaded claims." *See, e.g.*, *TBK Partners*, 675 F.2d at 462. In *Wal-Mart*, the Second Circuit explained: "'The key point is that an expanded release requires the allocation of at least some of the settlement consideration to the holders of the claims prejudiced by the expansion unless the class action judgment would bar the released claims by application of principles of former adjudication.'" *Wal-Mart*, 396 F.3d at 112 (citing *In re Auction Houses Antitrust Litigation*, 2001 U.S. Dist. LEXIS 1713 at *13 (S.D.N.Y. 2001).[60]

---

[60] Some objectors assert that the ASA's releases in favor of the Participating Libraries should not be approved. *See, e.g.*, D.I. 874 at 13. Such releases are plainly proper under the identical factual predicate doctrine. The Participating Libraries are those libraries which have in the past, or will in the future, provide Books to Google for digitization and display. The libraries are providing consideration for their releases: it would be impossible for Google to offer the Revenue Models under the ASA without the cooperation and participation of these libraries. The releases provided to the Participating Libraries in the ASA are limited. The libraries are released only for past acts involving the provision of books to Google for digitization and only for future acts consistent with the authorizations granted to the libraries by the ASA. Such authorizations require that the libraries sign a Library-Registry Agreement with the Registry and use Books and Inserts in carefully circumscribed ways with substantial security measures. The released claims against these libraries arise out of the identical factual predicate as Plaintiffs' claims against Google. As in *Wal-Mart*, where releases against non-party banks that provided settlement consideration were approved, the releases in favor of the non-party libraries, in exchange for their

Plaintiffs' and the Class' damage and injunction claims are released for fair and adequate consideration. The objectors and the DOJ have cited no decision invoking or applying the "identical factual predicate" doctrine to preclude the release of pleaded claims for fair consideration. Further, their suggestion that the ASA addresses issues outside Plaintiffs' pleadings is strained, at best. The ASA clearly addresses the facts and law that were and are at issue in this suit and were plainly set forth in the Complaint – whether Google's digitization and display of books copied in libraries and the distribution of digital copies to libraries without the authorization of copyright owners – infringes their copyright. *See Wal-Mart*, 396 F.3d at 107 n.13 (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (court "may release not only those claims alleged in the complaint . . . but also claims which 'could have been alleged by reason of or in connection with any mater or fact set forth or referred to in' the complaint" (quoting *Patterson v. Stovall*, 528 F.2d 108, 110 n.2 (7th Cir. 1976))).

### C.    The Notice Program Comports With Rule 23.

The Notice Program was extremely comprehensive and fully met all applicable standards. Objections as to the adequacy of the Notice Program are unfounded.

---

agreement to use the LDCs in circumscribed ways, also represent a reasonable compromise of potential claims. *See Wal-Mart*, 396 F.3d at 109.

1.    **Original Notice.**

Some objectors have argued that not enough members of the class received Direct Notice.[61]   More specifically, some have stated that more members of the class should have received notice by mail,[62] while others have objected to the use of e-mail notice.[63]

The "basic standard [for notice] is one of reasonableness." *See In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. 2d at 516; Fed. R. Civ. P. 23(c)(2). Here, all members of the original settlement class who could be identified with reasonable effort were individually notified.  The notice program was comprehensive, robust and exhaustive, let alone reasonable.  *See* Final App. Br. Section III.E (describing Direct Notice program); Declaration of Katherine Kinsella, Feb. 10, 2010 ("Kinsella Decl.") ¶ 12 (same).

Direct notice included email notice, as approved by the Court in its Orders dated November 13, 2008 and November 19, 2009.  Email notice has been approved in other cases as well.  *See, e.g., Ersler v. Toshiba America, Inc.*, 2009 U.S. Dist. LEXIS 14374 (E.D.N.Y. Feb. 24, 2009); *In re Sony SXRD Rear Projection Television Class Action*

---

[61]   D.I. 456 at 4 (settlement fails to satisfy the notice requirements of Fed. R. Civ. P. 23(c)(2)(B) because "notice has not been effected to all individual class members").

[62]   D.I. 710 at 8 (Google should have sent a "letter to every person listed with the United States Copyright Office"); D.I. 263 at 14 n.12 ("Especially with a proposed Settlement Agreement of this magnitude, reasonable measures [to serve notice] should include comprehensive steps to identify, and individually send notice to, each Rightsholder.").

[63]   *See, e.g.*, D.I. 710 at 8 (Settlement Agreement's "preference for email over postal mail is directly contrary to [ ] due process requirements . . . .  Email may be less expensive than postal mail, but it is far less likely to be read by recipients, and the notice requirements 'may not be relaxed based on high cost.'" (citations omitted)).

*Litigation*, 2008 U.S. Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008); *Horton v. Leading*

*Edge Marketing Inc.*, 2007 U.S. Dist. LEXIS 63533 (D. Colo. Aug. 28, 2007).

Some have argued the parties should have relied on other sources of information

to locate members of the settlement class, such as Copyright Registry records, or that

Google should have used its search engine to locate likely members of the class.[64]  With

respect to the Copyright Office electronic database, for the vast majority of pre-August

2007 records, it appears that claimant addresses are not available online.  *See* Declaration

of Daphne Keller, Feb. 11, 2010 ("Keller Decl.") ¶ 8.  As to more recent registrations,

where contact information is available online, it was reasonable for the parties to assume

that the copyright owners of those books are currently active and, as such, would have

been reached through other means, including author and publisher rightsholder

organizations and Reproduction Rights Organizations ("RRO").

Moreover, because of "optical character recognition" errors, any attempt to try to

automatically derive class member contact information from Google's scans of individual

books would have been error prone and would have required extensive human hours to

correct.  Nor would it have been feasible to attempt to use the Google search engine to

generate a list of addresses for authors and publishers to whom notice was to be sent,

because searching on names would, depending on the name, result in many incorrect

results.  Clancy Decl. ¶ 22.

---

[64]   *See* D.I. 710 at 8 (sending a letter to "every person listed with the United States
       Copyright Office" is the most constitutionally acceptable method of notice); D.I. 400
       at 3 (Google should have posted notice of settlement on their UK homepage).

### 2.     Supplemental Notice.

The Supplemental Notice was sent by email and postal mail directly to all persons who had communicated with the Settlement Administrate or class counsel and to all persons who had filed claims.  It was also sent to the RROs and authors' and publishers' rights groups that had received the original Notice.

Some objectors have argued that the scope of the Supplemental Notice Program should have been the same as the Direct Notice Program.[65]  The Final Approval Brief discussed why this was not required.  *See* Final App. Br. Section III.E.2.

One objector has asserted that notice of the narrowed class definition should have been given to persons who were included in the original settlement class but not in the Amended Settlement Class.[66]  This was, in fact, done.  The Supplemental Notice notifies "Rightsholders Who Are Not Included in the Amended Settlement Class" that:

> **As a result of these amendments, if the only United States copyright interests you own are in works that were not either (a) published and registered with the United States Copyright Office by January 5, 2009 or (b) published in Canada, the UK or Australia by that date, you are not a**

---

[65]   *See, e.g.*, D.I. 868 at 21 ("Google's decision to restrict the universe of individual notice to those putative class members who had lodged a formal response is blatantly unfair and smacks of gamesmanship."); D.I. 855 at 3-4 ("[The] rationale for a Supplemental Notice Program even less comprehensive than the Original Notice Program does not withstand scrutiny.").

[66]   D.I. 868 at 20-21 ("The ASA . . . now likely excludes a number of [ ] rightsholders' works from the class.  Excluding former class members from the Settlement without notice can prejudice them in a variety of ways, as they may mistakenly rely on their membership to forego bringing claims against Google.  For this reason . . . more robust notice of the ASA is required.").

**member of the Amended Settlement Class, even if you were a member of the original Settlement Class.**

If you are not a member of the Amended Settlement Class, you will not be eligible to participate in the Amended Settlement and you will not be bound by its terms. You retain all rights to sue Google for its digitization and use of your copyrighted material without your permission. If you wish to sue Google for such digitization and use, you must do so in a separate lawsuit. Your rights may be affected by laws limiting the time within which you may bring such a suit. If you are interested in bringing a lawsuit against Google, you should consult your own attorney.

If you were a class member under the Original Settlement, but are not a class member under the Amended Settlement, you should visit http://books.google.com/books-partner-options in order to learn about Google's current policies with respect to the removal of your works from its databases, as well as Google's interest in making your works accessible in models similar to those in the Amended Settlement under similar terms.

In addition, the Notice Provider issued a press release in 31 languages. *See* Declaration of Belinda Bulger, Feb. 10, 2010 ("Bulger Decl.") ¶ 24, Ex. 4. With the enormous amount of worldwide coverage of the original settlement and the ASA, and the careful attention being paid to it by objectors (including national publisher associations), it is likely that those who wanted to determine whether they might be members of the Amended Settlement Class could to do so readily through the Settlement Website and news coverage.

### 3.    The Notice And Supplemental Notices Were Adequately Translated.

Although some have argued that the Notice and Supplemental Notice were poorly translated, at most they criticize the precision with which some words were translated

into a few of the languages.[67]  None has raised a serious issue indicating that the

recipients of the translated notices were unable to understand the notices or their rights.

*See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 517 (E.D.N.Y.

2003) (although class notice was not provided in Spanish, and the class included Spanish

merchants, the "objectors have failed to demonstrate that there is a sizable group of

merchants in the Class who could not comprehend the notice"), *aff'd sub nom. Wal-Mart

Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005).  *See also Vancouver Women's

Health Collective Soc. v. A.H. Robins Co.*, 820 F.2d 1359, 1364 (4th Cir. 1987) (noting

the "many imponderables in dealing with notification of potential claimants on a

worldwide basis" and that "the right to adequate notice simply requires that the proposed

form of notification be reasonably certain to inform those affected").

The Notice Provider and Settlement Administrator engaged experienced

translators to make these translations and applied quality control to those translations.

Kinsella Decl. ¶¶ 148-49; Bulger Decl. ¶¶ 7-18.  The translated notices were

disseminated through individual direct notice, publications of the Summary Notice and

posting on the Settlement Website.  The Settlement Administrator provided telephone

support in 67 languages for persons with questions about the original settlement as well

as the ASA.  Allen Decl. ¶¶ 4-5.  When some errors in the translations were brought to

the attention of Class Counsel and the Settlement Administrator, amended translations

---

[67]    *See, e.g.*, *See, e.g.,* 167 at 2 (Notice was "unintelligible to non-English speakers due
to numerous translation errors"); D.I. 496 at 2; D.I. 522 at 10; D.I. 872 at 3; D.I. 868
at 23; 869 at 5; 401 at 10.

were prepared and disseminated.  Kinsella Decl. ¶ 149; Bulger Decl. ¶¶ 12-17; Cunard Decl. ¶ 10.

        **4.       Failure To Translate The Settlement Agreement Or The ASA Does Not Impose An Impermissible Burden On The Class.**

Some argue that notice was defective or that class members cannot be bound because neither the original Settlement Agreement nor the ASA were translated into other languages.[68]  Objections have been made that the ASA places an especially high burden on members of the Class who are not familiar with U.S. law.[69]

The reason for not requiring translations of a settlement agreement is that class action settlement agreements are legal contracts, often addressing reasonably complicated legal matters.  They may not be readily understood by the average member of any settlement class.  The official notice serves the function of apprising the class of a settlement's terms.  Due process requires, therefore, the dissemination of notices to the class, not of the settlement agreement itself.  *Manual For Complex Litigation (4th)* 21.31 ("Counsel should discuss with the court whether class members are likely to require ***notice*** in a language other than English or delivery by a means other than mail.") (emphasis added).

In fact, before class action settlement websites became routine, settlement class members rarely, if ever, even saw the settlement agreement, as the agreement itself was

---

[68]   *See, e.g.*, 264 at 14; D.I. 496 at 2; D.I. 797 at 4; 878 at 4 .

[69]   *See, e.g.,* D.I. 264 at 9-10; D.I. 471 at 5-7.

generally only available by visiting the courthouse and reviewing the case file in the clerk's office, or by specific inquiry to plaintiffs' counsel. Declaration of Michael Boni, Feb. 11, 2010 ("Boni Decl.") ¶ 3. Because it is the notice that is intended to apprise class members of their rights, all of the jurisprudence on adequate class notice requires that the notice itself (and not the settlement agreement) be written in plain language. *See, e.g.,* Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974); *Wal-Mart*, 396 F.3d at 113-14. Courts have routinely approved global settlements where only the notice was translated. *See, e.g., In re Holocaust Victim Assets Litig.*, No. 96 Civ. 4849, 2000 WL 33241660 (E.D.N.Y. Nov. 22, 2000) (approving worldwide settlement where notice, but not settlement agreement, was translated into different languages).

Here, the Notice, Summary Notice and Supplemental Notice adequately describe in plain language the key settlement terms and all required information.[70] *See* Final App. Br. Section E. The Notice and Supplemental Notice were translated into the 36 languages that are read by 96% of the Class. Kinsella Decl. ¶ 37. The Summary Notice was translated into 72 languages. *Id.* at ¶ 24.

### 5. Notice Was Sufficient To Exercise Personal Jurisdiction Over Foreign Class Members.

Some have argued the ASA cannot bind members of the Class located outside the United States because the U.S. class action system is fundamentally at odds with the laws

---

[70] There is no requirement that Plaintiffs provide a list of every work covered under the ASA anymore than there is a requirement that a settlement agreement identify every class member or, for example, in the settlement of a securities class action, every specific transaction that might be covered by that settlement.

of other countries[71] and because the Court lacks personal jurisdiction over those members of the Class.[72]

It is worth reiterating that the ASA resolves only those claims that were, or could have been, brought against Google under United States law and only authorizes Google to exploit works in the United States, subject to United States law.  The ASA does not extinguish any claims under any laws other than those of the United States and, as to United States law claims, the class action is superior to other forms of litigation.  *Cf. In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008).  *See also In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571, 2009 WL 855799, at *14 (S.D.N.Y. Mar. 31, 2009) ("[I]t is in the interest of the United States to provide a forum for individuals . . . who are alleged to have been injured by the managers of a company operating directly from the United States.").

So long as notice meets the requirements of Rule 23, members of a class who are located outside the United States may be properly bound by a settlement approved by U.S. courts.  *See Vivendi Universal*, 2009 WL 855799 at *14 ("The challenges of providing direct and published notice have been met in numerous cases involving foreign class members."); *In re Holocaust Victim Assets Litig.*, 2000 WL 33241660, at *1-2, *4 (approving settlement where notice was given in 21 different languages on a rolling basis); *Vancouver Women's Health*, 820 F.2d at 1362 (approving worldwide notice

---

[71]   *See, e.g.*, D.I. 471 at 6.

[72]   *See, e.g.*, D.I. 264 at 8-9; D.I. 420 at 1 (court does not have jurisdiction over New Zealand authors because Berne does not bring them within settlement).

program that included materials translated into 29 languages); *In re Royal Ahold N.V.*

*Sec. & ERISA Litig.*, No 1:03-MD-01539, 2007 WL 3128594 (D. Md. Sept. 26, 2007)

(approving worldwide class action settlement and notice program that disseminated

materials in 16 languages); *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505 (E.D. Tex.

1995) (approving worldwide settlement and notice program that included newspaper

notice translated into 10 languages and published in 57 newspapers in 21 countries).  As

explained in the Final Approval Brief, Direct Notice of the original settlement agreement

was robust and fully complied with applicable legal standards.[73]  Accordingly, from the

standpoint of U.S. due process requirements, members of the Class, including those

located outside the United States, may be bound.

### D.     The Book Rights Registry Is A Substantial Classwide Benefit.

Some objectors argue that the Registry is unnecessary, suggesting that the

Registry's functions could be adequately performed by the government, Google, or

another preexisting organization.[74]  This objection does not go to the fairness to the class,

or the reasonableness or adequacy of the Settlement, but to whether the Settlement could

have been structured differently or, in the views of the objectors, better.  As noted, that is

not the correct standard.  *See Polar*, 187 F.R.D. at 114 (role of court is to ensure that the

settlement is "fair and reasonable").

---

[73]     *See* Final App. Br. Section III.E.

[74]     *See* D.I. 282 at 30 ("no need to create a new registry"); D.I. 649 ("should be the
responsibility of government to control copyright"); D.I. 464 at 5 (Registry
unnecessary because "Google has already established systems"); D.I. 415 at 1-2
("writers already have . . . the Authors Registry").

1.    **The Need For A Registry.**

The ASA contemplates the Registry undertaking a number of functions, including administering claims filed by Rightsholders; establishing and maintaining a database of contact information for authors and publishers; locating Rightsholders; collecting revenues received from Google and paying them out to Rightsholders; assisting in the resolution of disputes between Rightsholders; monitoring Google's display and pricing of Books for Rightsholders located outside of the United States; and, through carefully crafted governance mechanisms, otherwise protecting and representing the interests of Rightsholders.  ASA § 6.1.  Today, no organization exists that has the responsibility for performing, or even the incentive to perform, these tasks.[75]  The creation of a new, not-for-profit entity is important to the administration and implementation of the Settlement.[76]

---

[75]    The absence of any remotely similar organization is one of the main reasons why organizations like the Internet Archive and Open Book Alliance claim (in their self-interest) to be put at a disadvantage by the Settlement.  That, as noted, is not an objection that goes to the fairness of the Settlement to the Class.

[76]    Plaintiffs presently are working on the charter for the Registry, which is being drafted in consultation with counsel having expertise in tax and non-profit corporation issues.  The charter documents, which will be fully consistent with the ASA, are not yet final, and will be submitted to the Court when they are.  *See* Cunard Decl. ¶ 21.

2.      **The Registry Will Fairly Represent the Interests of the Class.**

Some objectors claim that the governance of the Registry may not sufficiently represent the interests of certain sub-sets of the Class, *e.g.*, academic authors,[77] Rightsholders in so-called "orphan works,"[78] non-U.S. Rightsholders.[79]  These concerns are unfounded.  The Registry will serve the Rightsholders' best interests, will favor no subset over another and will have a fiduciary duty to each and every Rightsholder.  This means, for example, carrying out an academic author's request to give her Book away for free, enter into a Creative Commons license and permit limitless annotation sharing.[80]  Moreover, all Rightsholders are entirely free to direct the Registry as to how, if at all, they want their Books and Inserts used under the Settlement.  That right is a fundamental benefit of the Settlement.  As to unclaimed works, the ASA provides for an Unclaimed

---

[77]  *See, e.g.,* D.I. 336 at 5 (insufficient representation of authors who prize open access over monetary value); D.I. 519 at 3 (without academic author representation, "an independent and non-commercial voice concerned with the public's interest in open access principles . . . may be lost"); D.I. 134 at 3 (requesting academic authors be represented on Registry Board).

[78]  *See, e.g.,* D.I. 465 at 13 ("no representative" on Board with "responsibility" for orphan works).

[79]   *See, e.g.,* D.I. 797 at 4 (objection to lack of representation on Registry from countries other than U.S., Canada, U.K. and Australia); D.I. 827 at 4 (objection to "no proper representation of non-English speaking Rightsholders" on Registry Board).

[80]  It would not have been appropriate for the Registry or the parties to presume that academic authors have different views with respect to copyright infringement or their rights to control their books.  Similarly, the views of some academic authors as to the presumed desires of others should not result in determining how all academic authors might choose to use their works.  Each such author has the right and ability, under the Amended Settlement, to make that choice for herself or himself.

Works Fiduciary, whose responsibility is to act in the best interests of the Rightsholders of unclaimed works.

As to non-U.S. Rightsholders, the Settlement expressly commits that no fewer than six members of the Board will be from outside the United States. ASA § 6.2(a)(ii). Plaintiffs also anticipate that the Registry may also solicit the views of other Rightsholders from outside the United States.[81]  It may also solicit additional views, including those of Google's customers, through advisory committees or working groups.

Others assert that the Registry's Board must include representation of non-Class members, such as libraries,[82] consumer protection interests, and the general public.[83]  The Registry's purpose, however, is to represent the interests of Rightsholders as their fiduciary, not the general public.  It would be inappropriate to include in the Registry governance structure representatives of those on the other side of prospective transactions, such as libraries and consumers.

---

[81]    Sarnoff Decl. ¶ 17; Cunard Decl. ¶ 20; Aiken Decl. ¶ 44.

[82]    *See, e.g.*, D.I. 100 at 18 (Registry board may not reflect library associations' interest in "advancement of knowledge" over license fees); D.I. 466 at 11-12 (requesting Court oversee Registry Board to ensure that the Board protects interests of libraries); D.I. 480 at 3 (objecting to lack of representation of libraries on Registry Board).

[83]    *See, e.g.*, D.I. 480 at 3 (objecting to lack of representation of public interest on Registry Board).

### 3.    The Registry Will Be Wholly Independent From Google.

Some objectors have questioned whether the Registry will be independent of Google.[84]  The Amended Settlement obligates Google to pay $34.5 million to establish the Registry (and pay notice and settlement administration costs).   ASA § 5.2.  Registry independence is critical to the ASA because its function is to negotiate at arm's length with Google and potential third-party licensees, to ensure that Google abides by the terms of the ASA and to hold Google accountable if it does not.

The Registry's independence is ensured by its funding and structure.  Google has no control whatsoever over how Plaintiffs or the Registry use the settlement funds paid by Google to establish the Registry.  Going forward, the Registry's cost of administration and operations will be paid out of the initial settlement fund and then by Rightsholders' share of net revenues; Google will have no control over the Registry's use of those funds.

Similarly, Google will have no control over the Registry's operations or strategy. Google will not have any ownership, membership or any other stake in the Registry, nor will it have any seats on the Registry's Board of Directors.

### 4.    The Registry Will Not Charge Excessive Administrative Fees.

Some objectors have expressed concern that the Registry will charge excessive administrative fees.[85]  The Registry, a not-for-profit corporation, will be governed by directors with fiduciary duties to Rightsholders, who will want administrative fees

---

[84]   *See* D.I. 291 at 9 (dependence on Google creates "potential conflict"); D.I. 273 at 15 (no "real independence" from Google).

[85]   *See* D.I. 280 at 8; D.I. 273 at 12.

minimized.  To that end, as is the case with other collecting societies (*e.g.*, ASCAP, BMI, the Authors Registry, the UK Authors Licensing and Collecting Society), the Registry will take the minimum amount necessary for its ongoing operations and a prudent reserve.  Aiken Decl. ¶ 47.  Although some have urged that the Registry's fees, as a percentage of revenues, should be capped, that would not be financially prudent given uncertainties as to the size of revenues and the Registry's operating costs.

### 5.    The Registry Will Not Require Ongoing Oversight.

Some objectors have called for the Registry to be subject to ongoing oversight.[86] The basis of some of these objections has been that the Registry would not act as a true fiduciary for Rightsholders.[87]  Others have called for the Registry's decisions to be subject to outside review.[88]

As a not-for-profit corporation incorporated in the State of New York, the Registry will be subject to the oversight of the New York Secretary of State.  Also, as it is typical of class action settlements, the Court will exercise continuing jurisdiction over the

---

[86]  *See, e.g.*, D.I. 644 at 3 (obligated to report to Court or special master).

[87]  *See* D.I. 273 at 15 (settlement does not require Registry to act in best interests of Rightsholders).

[88]  *See, e.g.,* D.I. 466 at 11-13 (policies and licensing decisions should be subject to outside review); D.I. 422 at 4 (Registry should be "monitored by a neutral international organization").

ASA.  For this reason, the Registry need not be separately subject to a consent decree, similar to that under which ASCPA and BMI operate, as some have suggested.[89]

### 6.    Authorizations To The Registry.

Some objectors claim that the establishment of the Registry will preclude Rightsholders from negotiating or entering into separate third-party licenses.[90]  This is simply incorrect.  The authorizations to Google and the Participating Libraries are non-exclusive, and Rightsholders can enter into separate arrangements with Google or any other person.  One Rightsholder objects that the ASA grants the Registry powers to negotiate on behalf of Rightsholders.[91]  The ASA authorizes the Registry to negotiate with third parties on behalf of Rightsholders, but, only to the extent a Rightsholder has expressly authorized the Registry to do so.  The Registry cannot enter into third-party licenses on behalf of Rightsholders of unclaimed works.

### 7.    Miscellaneous Concerns.

One objector has confused the Registry's responsibility to locate Rightsholders with Plaintiffs' responsibility to notify class members.[92]  The function of class action

---

[89]   *See, e.g.*, D.I. 206 at 24 (settlement "lacks any comparable safeguards" to ASCAP and BMI consent decrees, giving the Registry "unfettered power" to set prices); D.I. 313 at 23-24 (comparing Registry to ASCAP and BMI).

[90]   *See, e.g.,* D.I. 456 at 3 (creation of Registry limits authors' ability to shop books to others and secure better deals for out-of-print books).

[91]   *See, e.g.*, D.I. 649 (objecting to Registry having authority to negotiate on behalf of Rightsholders).

[92]   *See* D.I. 291 at 9 (Registry task "appears to overlap" with litigants' obligation to notify).

notice is to notify class members of a settlement and inform class members of their rights. The Registry's charge will be to locate Rightsholders to have them claim works in order to take advantage of the ASA's benefits.  There is no deadline to do so.  In short, the Registry's mission is continuing, and distinct from the class action notice procedure.

One non-U.S. objector expresses confusion as to the Registry's ability to license Rightsholders' works to third parties, to the extent "permitted by law."[93]  The phrase "extent permitted by law" in Section 6.2(b) refers to U.S. law.  It describes a Registry function, if authorized by members of the Class to do so on their behalf.  Because the ASA does not contain any authorization to allow for such licensing, the Registry may only do so with respect to Rightsholders who have expressly authorized the Registry. The provision does not discriminate between U.S. and non-U.S. Rightsholders.

### E.    The Claiming Process Is Improving And The Registry Will Not Impose Undue Burdens On Class Members Or RROs.

The entire claiming process is fair, user-friendly, and reasonable.  The deadlines are very favorable and not at all prejudicial to Rightsholders:

- There is *no* deadline to assert display preferences, including directing that Google not display a work at all.

- Usage Fees can be claimed at any time, and Usage Fees earned by unclaimed Books will be held for at least 10 years from when earned[94]

---

[93]   *See* D.I. 471 at 14 (granting of right to Registry to license a third party is "unacceptable" because it gives no protection to non-U.S. Rightsholders; it does not specify which law is concerned).

[94]   Minus 25% that may be used after five years to locate Rightsholders.

before the Registry may make a motion for *cy pres* distribution of such funds.

- All removal/do not digitize requests made before a Book is scanned will be honored.  To remove already scanned Books from Library Digital Copies, the request must be made by April 5, 2011; to remove already scanned Books from Google's servers, the request must be made by March 9, 2012.

- To be eligible for an Inclusion Fee, claims do not need to be filed until 10 years after the Effective Date.

- To be eligible for Cash Payments, claims do not need to be filed until March 31, 2011.

Rightsholders either may claim their works online, at the official Settlement Website, or may file paper claim forms.  The online claiming process allows Rightsholders to either (1) search a database to locate and claim their works and indicate on the "Manage Books" page how their Books may or may not be displayed, or (2) upload a list of their Books on a spreadsheet and manage all of their preferences on the spreadsheet.  Rightsholders can also add Books to the database.  The paper claim form allows Rightsholders to list their works and manage display preferences on a pre-printed form.

 Numerous objections assert that the claiming process is difficult to navigate or unduly burdensome,[95] or that the database has errors.[96]  Plaintiffs and Google have been

---

[95]    *See, e.g.*, D.I. 395 at 2 (complaining about "cumbersome process for claiming our books"); D.I. 807 at 7 (complaining that claiming requires "continuous monitoring of the database"); D.I 849 at 14 (claiming process "remains deeply and unfairly flawed").

working diligently throughout 2009 and into this year to improve the claiming process. Recognizing the importance of the claiming process and the need for ongoing improvements, the ASA contains a commitment to improve the database and the claiming process. ASA § 13.3.

Several improvements have been, or shortly will be, made to the claiming process and to the Settlement Website. First, Google has obtained additional metadata sources and incorporated them into the database, so that there are fewer misclassifications of books as not Commercially Available.[97] Google has committed to continuing this process of obtaining metadata sources.[98] Second, a claim soon will be registered successfully even if there is no "match" between the data provided by the Rightsholder and the database records. Cunard Decl. ¶ 13.

Further, in December 2009, Plaintiffs introduced a simplified procedure for initiating the claiming process. Using this procedure, announced on the Settlement Website, Rightsholders need only send a list of the titles and authors of their Books and Inserts to the Settlement Administrator; the date on which the list is sent will be considered the date of the claim (for purposes of meeting the deadline for claiming to receive Cash Payments). *Id.* The Settlement Administrator and Registry will then assist

---

[96]    *See, e.g.*, D.I. 408 at 2-3 (complaining about "[b]ad quality of database"); D.I. 889 at 2 ("troubled by reports of inconsistencies, errors and duplication in Google's database").

[97]    Google Br. at 56-59.

[98]    Cunard Decl. ¶ 18, Ex. A.

Rightsholders in completing the claim for these works.  This process will be relatively

burden-free for Rightsholders and will not require them to use the claiming website at all.

In addition, Google will not display such Books and Inserts under the Settlement until

these claimants have indicated their display preferences (and, in any event, not before the

Effective Date of the Settlement).

The parties also are committed to introducing other improvements that will

substantially facilitate claiming.  Using the spreadsheet, Rightsholders will be able to

assert an interest in Books, without "claiming them."  In this way, they may be informed

by the Registry once Google has digitized a Book and classified it as not Commercially

Available and, therefore, available to be displayed under the Settlement's default rule.

Upon receipt of such notice, Rightsholders may then decide to claim their Books and

exercise their rights under the Settlement to authorize or exclude them from Display

Uses.  Cunard Decl. ¶ 14.

In addition, Rightsholders will be able to claim all "editions" of a Book by

supplying the title of the Book.  This will avoid the need to identify and claim multiple

editions of a Book, each of which might have a separate metadata record in the database.

Cunard Decl. ¶ 14.

Some objectors have argued that the Amended Settlement unfairly imposes on

Rightsholders (and on RROs and rights groups) burdens of "administering" the Google

Library Project.[99]  These objections are without foundation.

---

[99]  *See, e.g.,* D.I. 488 at 2-3 (settlement forces "rights holders to *work* for Google by
correcting" records); D.I. 339 at 4.

First, the Registry will shoulder the burden of locating Rightsholders, maintaining an accurate rights database, disbursing payments and assisting Rightsholders in completing their claims.  Second, the Registry will cooperate with national RROs and rights groups to facilitate the claiming process,[100] including working with them to obtain complete and accurate information about the Rightsholders' works.  Plaintiffs envision the Registry as part of a network of RROs around the world, to facilitate the claiming and exploitation of books.  Furthermore, to the extent permitted under laws of other countries, the Registry may be able to accommodate the claiming and management of works, on a collective basis, by RROs on behalf of their members.  The precise details of any such arrangement would be for the Registry to decide on a case-by-case basis.[101]  If so, this will further reduce the burden on individual Rightsholders, as well as administrative costs as a whole.  Accordingly, although Rightsholders will have to complete claim forms (not unlike any class action claim process), the burden will **not** fall on Rightsholders to correct errors in the database.

---

[100]  The Settlement Administrator already has established a relationship, for example, with the Authors' Licensing and Collecting Society ("ALCS") in the United Kingdom.

[101]  Note that the extent to which RROs may participate in the Settlement will depend on the extent to which they are authorized to do so by their constituents, the authors and publishers in their countries.  RROs may be authorized by their authors and publishers to act as their agent in filing claims on their behalf and otherwise managing their rights in the United States.  Whether an RRO can represent its authors and publishers in the claiming process under the Settlement, or whether the RRO might itself be the Rightsholder, depends on the specific right or action under the Settlement and the rights granted from the members to the RRO, in each case according to national law.

The claiming process implemented by the parties meets the standards applied in previous class actions. *See In re Initial Pub. Offering Sec. Litig.*, No. 21-MC-92, 2009 WL 3397238 at *14 (S.D.N.Y. Oct. 5, 2009); *In re Interpublic Sec. Litig.*, Nos. 02-CV-6527, 03-CV-1194, 2004 WL 2397190 at *8 (S.D.N.Y. Oct. 26, 2004). In *In re Initial Pub. Offering Sec. Litig.*, objectors argued that the burden of claiming was too great because class members did not always maintain records supporting their claims. That court overruled the objections, directing the settlement administrator to accept whatever information about the claims class members are able to provide – just as the simplified claiming procedure permits here. In *In re Interpublic Sec. Litig.*, objectors argued that the claim form made the process of filing a claim too burdensome. The court overruled the objections, noting that "both the Court and the parties expended significant effort to create a minimally taxing claims process and a thorough yet intelligible Joint Notice." 2004 WL 2397190 at *8. Similarly, here, the parties and the Settlement Administrator have worked continually and assiduously to design, implement and improve a claiming process that minimizes the burden on members of the Class.

The most persuasive evidence of the adequacy of the claiming process is that tens of thousands of members of the Class, ranging from multinational publishers to individual authors, have made claims. That, plus the substantial efforts and expense of Google and the Settlement Administrator to facilitate claiming, shows that these types of objections are not substantial. To the extent Class members need help with the claiming process, the remedy is to seek assistance from the Settlement Administrator, not rejection of the Settlement.

### F.     The Definitions Of "Book" And "Insert" Are Clear And Narrow The Scope Of The Class.

A large number of objections were received from non-U.S. rightsholders and rightsholder organizations opposing the inclusion of their works in the original settlement.[102]   Direct discussions with a number of organizations representing authors and publishers outside the United States confirmed that they desired to be excluded from the settlement.

The ASA's new definition of "Book" greatly reduces the international scope of the Class.  A book is now included in the Settlement only if, by January 5, 2009, it has been registered with the United States Copyright Office or was published in Canada, the United Kingdom, or Australia.  ASA §§ 1.19, 1.75.  This geographical limitation also limits the number of persons who are members of the Class on the basis that they own a Copyright Interest in an Insert.

A number of non-U.S. authors, publishers and associations have objected to the new definition on various grounds:  a) that, to the extent that the definition is based on registration with the Copyright Office, it is unfair, because registration was required to obtain the protection of U.S. copyright law and that it was not reasonable to anticipate that registration would result in their being included in a class action settlement;[103] b) that

---

[102]   *See, e.g.*, D.I. 179; D.I. 287; D.I. 401; D.I. 646.

[103]   *See, e.g.*, D.I. 820 at 10 ("Rightsholders undertaking the registration could not imagine more than 20 years ago that their decision to register or not register a work would today have an impact upon their rights under the Proposed Settlement Agreement.")

foreign authors and publishers do not know whether they registered their works;[104] c) determining whether a book has been registered with the Copyright Office is unfairly or excessively burdensome;[105] and d) the decision to retain in the Settlement Books published in the United Kingdom, Canada or Australia was arbitrary.[106]

Books that were registered with the Copyright Office were included because the affirmative act of registration indicated that their copyright owners had decided to invoke the protection of the U.S. copyright laws.[107]  Google is infringing those copyright owners' U.S. copyrights and the ASA resolves that suit for infringement.  Books published in the United Kingdom, Canada or Australia remain in the Settlement because rightsholder organizations in those countries generally were supportive of the Settlement

---

[104]  *See, e.g.* D.I. 891 at 3 (no information "as to whether a work was registered with the Copyright Office or not"); D.I. 792 at 1 ("very difficult or nearly impossible" to "ascertain beyond a doubt" whether books have been registered).

[105]  *See, e.g.* D.I. 836 at 3 ("practically impossible to obtain information from the Copyright Office for books registered before 1978"); D.I. 878 at 3 (no link from of Copyright Entries to any database of digitized books; not possible to run automated searches in the database and automatically match search results with any other database).

[106]  *See, e.g.,* D.I. 820 at 9 (amended Class definition is "arbitrary"); D.I. 868 at 2 (questioning why New Zealand and Republic of Ireland were not included as countries sharing "common legal heritage and similar book industry practices" with the U.S.); D.I. 900 at 6 (ASA does not account for differences between Anglophone and Quebecois and Canadian French-language authors).

[107]  One objector argues that the term "Copyright Interest" is defined in a circular fashion, because it references a "United States copyright interest," which itself is an undefined.  D.I. 868 at 7.  This term, however, refers to a copyright interest under the United States Copyright Act.  An author or publisher may, by applying Section 104 of the U.S. Copyright Act – which looks to the nationality of the author or the place of publication, as well as to the international copyright relationships of the United States – know whether he, she or it has a U.S. copyright interest in a work.

Agreement and, in general, those countries have common practices with respect to book publishing.[108]

That copyright owners might need to determine whether they have registered their works – as a condition of coverage under the Settlement and, therefore, of being able to take advantage of the benefits of the ASA – is fully consistent with the principle that proof of claims procedures are required. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 2009 WL 3397238 at *14 (approving process for submitting claim information); *In re Interpublic Sec. Litig.*, 2004 WL 2397190 at *8 (same).

To the extent that objections have been raised with respect to the difficulty of determining, in an automated way, whether copyright owners have registered their Books and Inserts, Class members do not need to know which particular books are covered by the ASA to determine whether to opt out. Indeed, some of the objectors assert that they know that they habitually did register their works with the Copyright Office up until the late 1980s, so they know that they are members of the Class.[109]  In any event, although there was no obligation to provide an automated tool to allow copyright owners to confirm that they registered their works, Google has provided a means to assist them in determining whether they had registered their pre-1978 Books:  the digitization of the

---

[108]  Final App. Br. at 38 n.21.

[109]  *See* D.I. 852 at 7 (prior to 1978, German publishing association recommended registration of German books with Copyright Office); D.I. 836 at 2 (French publishers registered approximately 200,000 books with the US Copyright Office between 1925 and 1990).

entire Copyright Office *Catalog of Copyright Entries* from 1923 until 1978, which is

made freely available to the public through Google Book Search.[110]

In response to other objections, the ASA made other changes to the definitions of

"Book" and "Insert."  Music notation and book illustrations are excluded from the

definition of "Insert."[111]  The ASA excludes from the definition of Book works for which

20% of pages contain more than 20% music notation.[112]  The ASA also clarifies that

comic books and compilations of Periodicals are Periodicals and therefore not Books.[113]

The ASA, like the original settlement agreement, excludes pictorial works,

including photographs[114] and visual works, from the definition of Inserts, and excludes

Periodicals, journals, and unpublished personal papers from the definition of Books.

Some objectors have argued that the exclusions of these works unfairly prejudice their

---

[110]    *See* Google Br. at 60-63.  To the extent that objectors argue that the Copyright
Office's official *Catalog* contains misspelling or typographic errors, or is not
presented in a readily searchable database, *see, e.g.*, D.I. 868 at 13, that is a function
of the way the *Catalog* was maintained.

[111]    *See* D.I. 705; D.I. 706; D.I. 711; D.I. 712; D.I. 713.

[112]    The amendments with respect to music notation were achieved with the guidance
and assistance of the Songwriters Guild of America, which has withdrawn its
objection (D.I. 297).  The ASA also now precludes Google from digitizing from
microform versions of Books and, as a result, the objection to that effect has been
withdrawn.  D.I. 924.

[113]    *See* D.I. 238 at 4 (expressing uncertainty about comic books and collected comic
book editions).  This objector expressed concern about whether original graphic
novels are covered by the settlement.  They are and, therefore, the definition of Book
was not amended.

[114]    *See* D.I. 84 at 1 (incorrectly assuming wildlife photographs covered by settlement).

copyright owners.[115]  First, no such prejudice exists because copyright owners of these

excluded works preserve all rights they have against Google for scanning any of these

materials if and as included in Books.  Second, the parties were under no obligation to

negotiate a global settlement that would settle and extinguish the claims of rightsholders

of every form of copyrightable work.  *See In re Holocaust Victim Asset Litig.*, 225 F.3d

191, 202 (2d Cir. 2000) (even a broadly drafted "complaint in a class action lawsuit does

not vest in putative class members a right to be part of the class ultimately certified by the

District Court").[116]

### G.    Objections To The Definition And Determination Of Commercial Availability Are Without Merit.

Some objections are raised with respect to the clarity of the definition of

Commercial Availability, the methods of determining whether Books are Commercially

Available, and the process for challenging a determination whether a Book is or is not

Commercially Available.[117]  Others have argued that Google will unfairly rely on

databases that are incomplete or U.S.-centric.[118]

---

[115]   D.I. 218 (visual works); D.I. 627 at 5-6 (journals and periodicals).

[116]   *See also* D.I. 765 at 8 (Order Denying Motion for Reconsideration) (on photographers' motion for reconsideration of order denying them intervention in this case, "class members are not under an obligation to resolve every conceivable controversy under the auspices of this litigation").

[117]   *See, e.g.,* D.I. 403 at 10-11 (settlement allows Google "to arbitrarily determine" what constitutes commercial availability).

[118]   *See, e.g.,* D.I. 291 at 26 ("commercially available" which "focuses exclusively on United States use"); D.I. 401 at 6 (Google to commit to using non-U.S. metadata providers); D.I. 471 at 13; D.I. 117 at 4; D.I. 291 at 26.

These objectors overstate the significance of the Commercial Availability determination. The initial Commercial Availability classification will determine the default treatment of a Book by Google (*i.e.*, whether it is displayed by default or not) **only until the Book is claimed**. Once a Rightsholder claims a Book, the Rightsholder has the right (no matter how the Book is classified by Google) to timely remove the Book or to exclude the Book from all Display Uses at any time. The "Commercial Availability" classification of a claimed Book is only relevant to claiming Rightsholders in two respects under the Settlement: (1) Books that are not Commercially Available must be included by Rightsholders in the Institutional Subscription revenue model if they are included in the Consumer Purchase revenue model (ASA § 3.5(b)(iii)); and (2) Books that are not Commercially Available may not be withdrawn by Rightsholders from the Research Corpus (ASA § 7.2(d)(iv)). Both of these provisions were included in the Settlement at the request of the libraries, and no objection or comment has been received with respect to either of these two provisions.

To the extent that these provisions are of a concern,[119] the ASA now provides that, when a Rightsholder simply asserts that a Book is Commercially Available, Google must change the classification of that Book and cease displaying it. ASA § 3.2(d)(i). Some Rightsholders had expressed concerns that they did not want to be burdened with claiming and managing Books not yet digitized by Google, and also did not want to

---

[119] *See, e.g.*, D.I. 188 at 6 (process of rebutting determinations is "too restricted and too costly"); D.I. 471 at 13 ("unreasonable" for Hachette to have to review database references to verify correctness of determinations).

continually check the Books database to see if their Books had yet been digitized. To address this and to assure Rightsholders they will receive notice before Google displays any Book by default based on a classification of "not Commercially Available," the ASA adds a new procedural protection in the Amended Settlement: Google will not display any Book under the Settlement before giving the Registry 60 days' notice that Google has scanned the Book and classified it as a Book that is not Commercially Available (and thus eligible for default display). ASA § 3.3(a). The Registry will pass this information on to a claiming Rightsholder (or someone who had asserted an interest in the Book), to inform the Rightsholder that Google has determined that the book is a "Book," assure the Rightsholder that it will have ample opportunity to claim the Book (if it has not done so already) and exercise removal and exclusion rights before the Book is ever displayed (and, if it chooses, also challenge Google's designation of the Book as not "Commercially Available").[120]  Cunard Decl. ¶ 14.

Several objections with respect to the "Commercial Availability" determination focus on the definition in the original Settlement Agreement. The definition in the ASA now makes clear that a Book will be considered Commercially Available (and thus cannot be displayed by Google by default) if the Book is offered for sale "new, from sellers anywhere in the world . . . ." to purchasers in the United States, Canada, the

---

[120]  This procedure also answers objectors who are uncertain as to whether one of their books is a Book because they are unable to determine whether it was registered with the Copyright Office. If Google classifies a book as a "Book," and so informs the Registry, then the claiming Rightsholder, upon being so informed, will be made aware that the work is a Book covered by the Settlement.

United Kingdom, or Australia. ASA § 1.31. This broad definition is protective of

Rightsholders because, as a practical matter, purchasers in one of those four countries are

likely to be able to purchase any Books offered for sale anywhere in the world from

online retailers, wholesalers or directly from book stores. Such Books will not, therefore,

be subject to default display by Google under the ASA. As explained above, even if a

Book is classified by Google as not Commercially Available (and thus is eligible for

default display by Google), the Rightsholders can prevent Google's display of such Book

by removing it or excluding it from display uses. Rightsholders need not assert, show or

prove that the Book is Commercially Available to exercise these removal and exclusion

rights, which are independent rights under the Settlement.

Some Rightsholders from outside the United States have objected that the

determination of Commercially Available discriminates against them to the extent that,

they contend, non-U.S. sources of information will not be used (or are not available) for

determining whether books published outside the United States meet the definition of

Commercially Available.[121] Some objectors have argued that it is only Google that

arbitrarily makes the determination of whether a Book is Commercially Available or

not.[122] Neither one of these contentions is correct.

---

[121] *See, e.g.*, D.I. 291 at 26 ("foreign copyright owners' works are at a higher risk of being classified" as not commercially available); D.I. 401 at 6 (concern that Google will not use "European resources of information on commercial availability"); D.I. 408 at 2 ("European books are currently considered as non commercially available (while they are still commercially available in Europe).").

[122] D.I. 401 at 6; D.I. 471 at 13.

First, consistent with Section 3.2(d)(i), which describes the basis for an initial determination of whether a Book is Commercially Available, Google is using a range of sources to make the determination.  Google is acquiring access to databases of metadata about books, which includes information as to whether the books are "in print."  Google also is using data from online retailers.[123]

Second, the parties are fully committed to using sources of information from outside the United States in making the determination as to whether Books are Commercially Available.[124]  The sources of metadata used by Google and the Registry will change over time, and it was neither anticipated nor would it be prudent for the ASA to list the individual sources that will be utilized.  The Registry and Google will work with Rightsholder groups to improve the metadata.  The determination of whether or not a Book is properly classified as Commercially Available is not only for Google to make. The Registry will play a central role in making this determination.  ASA § 3.2(e)(ii).[125]

### 1.    Miscellaneous Concerns.

Questions have been raised whether a Book available through on-demand or electronic formats might be Commercially Available.[126]  As long as a book has been

---

[123]    *See* Cunard Decl. ¶ 18-19, Ex. A.

[124]    *Id*.

[125]    *See* Sarnoff Decl. ¶ 18.

[126]    *See, e.g.,* D.I. 465 at 11 (confusion as to whether on demand or electronic editions are commercially available); D.I. 568 at 2 (agreement does not state that digital files available for sale are commercially available); D.I. 477 at 89 (criteria for classifying print-on-demand books as commercially available undefined).

published in hard copy and otherwise meets the elements of the definition of a Book, then it will be covered by the Settlement.  If the work, once published as a Book, also now is, or in the future will be, available for commercial sale in print-on-demand or digital or other electronic formats, it remains or will be classified as Commercially Available, even if it is no longer available for sale in a new hard copy edition.

### H.    The Cash Payment Amounts Are A Fair and Reasonable Compromise.

Eligibility for Cash Payments turns on whether a Book was scanned without permission from a library on or before May 5, 2009, without regard to whether that Book also is in the Partner Program.  Some objectors argue that the Cash Payments inadequately compensate individual Rightsholders, citing to the statutory damages provision of the Copyright Act.[127]  The amount of the Cash Payments reflects a compromise among the parties.  The compromise reflects the parties' valuation of the prospects of recovery and includes a discount to account for the possibility that plaintiffs might have lost the case, as well as the cost of recovery.  *See* Final App. Br. Section III.C.1, 4-6 (discussing risks of losing at trial).

First, Google might have argued that its infringement was innocent, given its fair use defense, in which case it could have asked the Court to remit the amount of any statutory damages recovery to $200 per work.  Discounting from that amount based on litigation risk to the negotiated amounts is fair and reasonable.  Moreover, because many

---

[127]  *See, e.g.*, D.I. 401 at 15; D.I. 420 at 3; D.I. 464 at 8; D.I. 471 at 2; D.I. 477 at 9; D.I. 568 at 2; D.I. 627 at 2; D.I. 540 at 1; D.I. 143 at 25; D.I. 625 at 9.

of the works included in the ASA were not timely registered pursuant to Section 412, they would not have been entitled to statutory damages but only provable actual damages and defendant's profits, *see* 17 U.S.C. § 504(b), which might have been less than the amounts of the Cash Payments. Such works could include United States works that were registered (but not timely) and works covered by the ASA because they were published in the United Kingdom, Canada and Australia, but were never registered.

Objectors also have argued that the Cash Payment amounts are insufficient to deter future copyright infringement.[128] This objection again presupposes that Google would have been liable for copyright infringement. It also ignores the fact that the ASA is a settlement, or compromise. Here, the purpose of the Cash Payments is to provide fair and reasonable consideration to Rightsholders, in exchange for the release of those Rightsholders' claims of past actual infringement.

Some objectors suggest that each edition of a Book should receive a separate Cash Payment.[129] Others complain that only one payment will be made for each Insert no matter how many times it appears in one or more Books.[130] These objections

---

[128]   *See e.g.*, D.I. 540 at 1 (Cash Payments are "little more than a tap on the wrist" and not "high enough to act as a deterrent").

[129]   *See* D.I. 401 at 15 (Cash Payment amount is "especially unfair since there is only one payment in case there are several editions of a book, although the existence of different ISBNs makes each of these books a different product"); D.I. 869 at 17 ("unfair that one payment is provided when several editions of a Principal Work have been scanned").

[130]   *See* D.I. 395 at 2 ("insert that has appeared in one hundred books – amounting to one hundred cases of infringement – results in only one compensatory payment"); D.I. 488 at 3 (same).

misunderstand U.S. copyright law, which governed the range of possible monetary damages. A plaintiff in a copyright case is entitled to only a single award per work, regardless of the number of acts of infringement relating to that work or to the number of copies that the infringer made of that work. *See* 17 U.S.C. § 504(c)(1). Moreover, multiple editions of the same work could not be separately registered as different works unless they contained new copyrightable material. For these reasons, the ASA does not provide for a separate Cash Payment for each edition of each Book or for each location in which an Insert is found, even if in multiple Principal Works.

## 1.    Miscellaneous Concerns.

Objectors have questioned why the ASA provides for lump sum payments for all Books or Inserts without accounting for the value of each individual work.[131]  Although the value of individual works might vary, it would not have been practical or feasible to develop a range of Cash Payments to take into account the multiple and subjective factors that affect the value of each individual work. Indeed, this would have complicated the process of claiming and paying Cash Payments significantly, exacerbating the concerns expressed by these and other objectors. The amount of each of the Cash Payments reflects a negotiated compromise among the parties, in light of other benefits available to

---

[131]    *See, e.g.*, D.I. 390 at 4 (Cash Payment "makes no distinction among the different works in terms of market value"); D.I. 209 at 12.

members of the Class.  It is not a judgment on the absolute or comparative value of any Books or Inserts entitled to Cash Payments.[132]

Several objectors refer to the lack of a specific date by which Cash Payments must be made.[133]  The Registry will issue a final report with respect to Cash Payments.  ASA § 13.6.  It will make the Cash Payments after it processes claims and resolves conflicts, if any, regarding the appropriate recipients of Cash Payments.  *See* Plan of Allocation § 4.1.  It is difficult to estimate how long that process will take, as is true in any class action settlement claims process.  Similarly, although most class actions in which settled claims are to be paid to class members contemplate claims processing after the settlement's effective date, seldom, if ever, does the settlement agreement include a hard deadline for disbursing payment.

## I.    The Revenue Split Is Fair And Reasonable.

Some argue that the 70/30 revenue split (63/37 net of 10% to cover Google's costs) is too low.[134]  Some believe that a predetermined revenue split cannot fairly compensate individual Rightsholders.[135]  Plaintiffs disagree.

---

[132]    For this reason, the separate objection that Cash Payments should be increased to cover Rightsholders' costs in claiming their works (*see* D.I. 869 at 17) also is without merit.

[133]    *See* D.I. 395 at 2 (settlement offers no deadline by which payments will be made); D.I. 464 at 8; D.I. 488 at 2.

[134]    *See, e.g.*, D.I. 273 at 12 (Google "lock up" of 37% is much higher than current market allocation); D.I. 78 at 2 (63% is not sufficient); D.I. 162 at 1.

[135]    *See, e.g.*, D.I. 273 at 12 (payments to class "should not be calculated on an *ex ante* basis and codified into a skewed allocation of pooled revenues. . . . Google will make

The revenue split gives primary consideration to the value of the copyrighted works, but also rewards Google's marketing and technological contributions (and takes into account Google's future operating expenses).  This split is the same split that Google offers to Rightsholders in its Partner Program.[136]  For Rightsholders, this royalty split also compares favorably to that offered by Amazon, which reportedly gives authors who provide their books to Amazon for sale only 35% of the book's sales revenues.[137] It is also well within the range of other arrangements in the market.[138]

Second, for in-print Books, the ASA provides that either the Rightsholder or Google can seek to negotiate a different revenue split and, if they are unable to come to agreement, either the Rightsholder or Google can choose not to include the Book in the Settlement's revenue models.  ASA § 4.5(a)(iii).  Because in-print Books have a current market value and their Rightsholders usually include a publisher with experience in negotiating terms, Plaintiffs concluded that adding this provision to the Amended Settlement (at the request of the DOJ) was fair to Rightsholders and reasonable under the circumstances.

---

no attempt to pay individualized royalties to any Rightsholder"); 652 at 1 ("We also object most strongly to any language or clause in the settlement that pre-determines the split of revenues, or the terms under which such splits shall be governed").

[136]  *See* Cunard Decl. ¶ 15.

[137]  *See* Deborah Solomon, *Book Learning: Questions for Jeffrey P. Bezos*, N.Y. Times, Dec. 6, 2009, at MM18 ("[Y]ou submit the book, you set the price for it, we charge the customer and then we give you 35 percent of the revenue.").

[138]  *See* Jeffrey A. Trachtenburg & Shira Ovide, *For Media Industry, A Mixed Bag in iPad*, Wall St. J., Jan. 28, 2010, at B7 ("Book publishers will receive 70% of the revenue, with Apple taking the remainder.").

For Books that are out-of-print, by contrast, given the transaction costs of individualized negotiation and that many Rightsholders would have little, if any, experience in negotiating revenue splits for out-of-print works, the ASA requires Google to honor the split.  The transaction costs of negotiating separate royalty splits for Books that are not Commercially Available would far exceed any benefit from any such renegotiation, making individual negotiation of such splits unwarranted.  *See infra* Section III.A.

For all Books, Rightsholders who are dissatisfied with the revenue split have the right to remove or exclude Books from the revenue models.  In doing so, they may choose to negotiate a separate deal with Google outside the Settlement.

Some complain that the ASA does not compensate Rightsholders for Google's Non-Display Uses of their works. [139]  Such uses arguably are more like indices and concordances, and require a different fair use analysis.  To the extent they are fair uses, they would be non-compensable.  In any event, valuing such uses would have been almost impossible.  Most importantly, the revenue sharing provisions of the ASA with respect to Display Uses – the uses for which books are written and published – are extremely fair to Rightsholders.

---

[139]   *See* D.I. 287 at 15 n.11 (possibly most valuable revenue stream is non display uses); D.I. 209 at 18 (Google has unfettered right to exploit and profit from non display uses).

## 1.    Miscellaneous Concerns.

One objector argues that the revenue provisions of the ASA unfairly disadvantage small non-profit publishers because revenue received from Google is likely to be "considerably less" than the revenues from the direct sale and licensing of their books.[140] Revenues earned through the ASA, however, supplement (rather than replace) the revenues a Rightsholder could otherwise earn through other channels. If Rightsholders believe that the Revenue Models are "cannibalizing" other sales, they can limit or turn off Display Uses, or remove their Books.

Some objectors contend that the ASA does not describe how revenues will be split among Rightsholders, including translators and editors.[141] Authors, translators and editors with U.S. Copyright Interests in Books and Inserts are all members of the Author Sub-Class, ASA §§ 1.13, 1.17 and 1.41, and the Author-Publisher Procedures ("A-P Procedures") specify payment procedures between authors and publishers. ASA §§ 5.5, 6.2. Payments will be allocated between co-authors and co-publishers based on their agreements with each other.

One objector argues the ASA places no limit on Non-Display Uses of works in Google's AdWords program, and that this somehow harms the Rightsholder both "financially and ideologically."[142] The ASA pertains to Google's use of the Class's works for the purpose in which those works were intended: to be read and to earn

---

[140]   D.I. 188 at 5.

[141]   *See, e.g.*, D.I. 456 at 6; D.I. 479 at 2; D.I. 489 at 3.

[142]   *See, e.g.*,  D.I. 209 at 19.

revenues from book sales.  Plaintiffs bargained hard to obtain Google's agreement to

negotiate revenue models in connection with Non-Display Uses.  Boni Decl. ¶ 7.  In the

end, Google would not agree.  Plaintiffs evaluated the Settlement and its significant

benefits to the Class, particularly as it affects Rightsholders of out-of-print Books and

concluded that it was not worth scuttling the Settlement over this provision.

One objector complains that authors have no ability to control which ads appear

next to their works.[143]  In fact, authors have the right at any time to turn off all ads next to

their Book if they do not like the content of the ads.  ASA § 3.5(b)(i).

### J.    Objections To The ASA's Pricing Provisions Are Without Merit.

The parties recognized that, under any settlement, Rightsholders should have the

ability to set the prices of their works.  Notwithstanding the claims of some objectors to

the contrary,[144] the pricing provisions of the ASA do not undermine, in any way, the

ability of Rightsholders to set their own prices.

First, the pricing provisions of the ASA only affect the sale of Books through the

Revenue Models; they have no effect on the prices of works sold through any other retail

---

[143]    *See* D.I. 210 at 3.

[144]    *See, e.g.*, D.I. 652 at 1 (right to set price, terms of sale or commercial value is
copyright owner's sole right); D.I. 134 at 5 (original settlement "does not explicitly
acknowledge that academic authors might want to make their books, particularly out-
of-print books, freely available . . . under a Creative Commons or other open access
license").  The original Settlement Agreement did not preclude a Rightsholder from
setting the sale price at zero, although it did not make this explicit.  The ASA does
just that.  ASA § 4.2(b)(i)(1).  Rightsholders may also choose to allow their Books to
be made available at no charge under alternative licensing schemes, such as Creative
Commons licenses.  ASA § 4.2(a)(i).  More information about the Creative
Commons licenses is available at http://creativecommons.org/.

channels.  Second, under the ASA, Rightsholders will at all times have the option of

setting the price of their Books sold through the Consumer Purchase model.  ASA § 4.2.

Rightsholders may also allow Google to set the Settlement Controlled Price for a Book in

the Consumer Purchase model.

Even if Google discounts the price of a Book, Google will pay 63% of that

Settlement Controlled Price to the Registry.  ASA § 4.5(b)(i).  Google may also make

special offers of Books for Consumer Purchase at reduced prices, subject to notification

to Registered Rightsholders.  Registered Rightsholders, contrary to the views of some

objectors, will have the right not to approve the reduced prices.  If the Registered

Rightsholder or, in the case of unclaimed works, the Unclaimed Works Fiduciary, does

not object to the reduced price suggested by Google, 63% of the discounted price will be

paid to Rightsholders.  ASA § 4.5(b)(ii).

Some object to the entire ASA because it does not ensure that scientific or

academic works are freely accessible under "Open Access" principles.[145]  They have

claimed that if those works remain unclaimed, then they should be freely made available

for use.  These arguments run counter to the economic interests of members of the

---

[145]    D.I. 893 at 9 ("we also believe that if books are true orphans, they should be freely
available for use by all, including non-profit institutions such as the colleges and
universities with which we are affiliated"); D.I. 893 at 6 ("[w]e believe that most
unclaimed books in the GBS corpus will prove to be books written by scholars for
scholars, and that most such authors would prefer that their out-of-print books be
available on an open access basis").

Class.[146]  That the reading public may wish to have free access to scientific and other

academic works covered by the ASA, or that some academic authors may not want to

exploit their works through the Revenue Models, should not supersede the economic

interests of members of the Class.

### 1. Miscellaneous Concerns.

One objector has suggested that unclaimed funds should go toward reducing the

price of institutional subscriptions.[147]  This does not consider the best interests of the

Class, but rather the interests of those on the other side of transactions with the Class.

For this reason alone, this objection should be rejected.  Using any revenues that are

owed to particular Rightsholders prior to the expiration of the ten-year period during

which the Registry must hold those funds for claiming Rightsholder would, of course, be

contrary to the interests of those Rightsholders.  Using unclaimed funds after that period

would benefit the institutional subscribers rather than the literacy-oriented charities to

which such Unclaimed Funds will be distributed under the principles of *cy pres*.

---

[146]   That the interests motivating these objections runs contrary to the interests of the
Class is best illustrated by their preference that Google should prevail on the merits
of this litigation.  *See, e.g.,* D.I. 336 at 2-3 ("we believe . . . that scanning books to
index them and make snippets available is likely and should be considered fair use").

[147]   D.I. 134 at 3 (excessive institutional subscriptions could be guarded against by
amending the Settlement Agreement "so that 'unclaimed' funds from public domain
and orphan books and books whose owners have not registered with BRR would be
used to reduce institutional subscription prices rather than being given to BRR
registrants and to nonprofit organizations for purposes of promoting literacy").

### K.    The Author-Publisher Procedures Are A Fair And Reasonable Accommodation Of Rightsholders' Interests In A Work.

Some objectors argue that the Settlement improperly preempts or interferes with existing contractual relationships between authors and publishers.[148]  In this context, the DOJ asks the Court to carefully scrutinize the A-P Procedures.[149]  Plaintiffs are confident that the Court will scrutinize all aspects of the ASA, including the A-P Procedures and will find that they all  confer an extremely fair and reasonable benefit on the Class.

The A-P Procedures are part of a fair and reasonable plan of allocation for the ASA, and reflect a carefully negotiated compromise between the Author Sub-Class and the Publisher Sub-Class in order to facilitate rights clearance under the ASA.  As such, the A-P Procedures apply *only* to the ASA and have *no* precedential effect for any other purpose.  A-P Procedures § 9.3.

Recognizing that the ASA covers many Books that have more than one Rightsholder (often an author and a publisher), the A-P Procedures establish procedures for these Rightsholders to manage their Books and receive revenue earned under the

---

[148]    *See, e.g.*, D.I. 420 at 3 (settlement overrides contractual relationship); D.I. 301 at 3 (settlement complicates contractual agreements); D.I. 143 at 29; D.I. 477 at 6; D.I. 301 at 3 (settlement will "complicate existing contractual agreements between authors and publishers"); D.I. 143 at 29 (author-publisher contracts may preclude author or publisher giving rights to Google under settlement); D.I. 471 at 9 (settlement would cause Hachette to violate contracts under French law); D.I. 922 at 15 (DOJ believes A-P Procedures would "settle globally" author publisher contractual disputes, and "seeks to resolve rights prospectively").

[149]    D.I. 922 at 16.

ASA. With respect to the management of Books, the A-P Procedures elaborate on the

ASA's fundamental principle that Rightsholders control their works.

Where both an author and a publisher are Rightsholders of a Book, each has the

right to control whether the Book is displayed by Google under the ASA. Accordingly,

the most restrictive directions govern. If the author wants to exclude a Book from a

Revenue Model, but the publisher wants to include it, the Book will be excluded (and

vice versa). *Id.* §§ 5.1-5.3 and 6.1. Conversely, if a Book has only one Rightsholder, his

or her directions control.

With respect to revenues, if a Book has only one Rightsholder, all revenues go to

such Rightsholder. *Id.* §§ 3.1, 6.1(a) and (b). For in-print Books with a publisher,

revenues are distributed to the publisher under the ASA, to be split with the author in

accordance with the author-publisher contract for the Book. *Id.* § 5.5. Because many

older author-publisher contracts do not make clear who owns the digital rights to a Book,

the A-P Procedures include an allocation plan for unreverted out-of-print Books (*i.e.*,

Books where an author and a publisher both have a U.S. copyright interest) of 65%/35%

(in the author's favor) for Books published before 1987 (because, in general, such

contracts are silent with respect to ownership of electronic rights) and 50%/50% for

Books published in and after 1987 (because, around that time, contracts included grants

of electronic rights to the publisher and contain this split). *Id.* § 6.2; *see* Final App. Br. at

19 n.15.

Contrary to the objections,[150] these procedures work no injustice on any Rightsholder.  Any Rightsholder can exercise its right to remove or exclude a Book from the ASA.  Any Rightsholder can, if it has the electronic rights for the Book, enter into a direct arrangement with Google.  In such case, the A-P Procedures will not apply at all, and any rights to license the Book would be based solely on the terms of the author-publisher contract for that Book.  For Books where both the author and the publisher are the Rightsholder, the A-P Procedures will apply only if both Rightsholders have determined to exercise their rights under the ASA.

Alternatively, Rightsholders are free to agree with each other for separate splits of revenues earned by their Books or to agree among themselves, for example, that only one will manage a Book under the ASA.

As for determining who are the Rightsholders for a Book, the A-P Procedures appropriately provide that the terms of the existing author-publisher contract are controlling.  A-P Procedures § 3.2.  If the Book, for example, is a work-for-hire, the publisher but not the author will be a Rightsholder.  If a Book has reverted to the author under the terms of the existing author-publisher contract for the Book, the author but not the publisher will be a Rightsholder.

The A-P Procedures also provide that if a Book should have been reverted under the terms of the author-publisher contract, but has not been, then, consistent with the contract and upon the author's request, the Book will be deemed reverted to the author,

---

[150]    *See supra* note 148.

***but solely for purposes of the ASA***, if the publisher does not timely respond to the request. *Id.* § 4.1.  This is a particularly useful benefit for the Author Sub-Class.

One objector argues that the A-P Procedures do not adequately address the scenario where the rights for one jurisdiction are held by the publisher and the rights for another jurisdiction are held by the author.[151]  This objection is misplaced: the Class includes only copyright owners with the right to exploit a Book in the United States.  If, for example, an author holds all the exclusive rights to exploit a Book in the United States, then the Book will be 100% controlled by the author.  *Id.* § 3.1.

Some objectors argue that the A-P Procedures do not adequately address conflicting instructions from joint Rightsholders regarding the management of Books if one, but not the other, opts out.[152]  This is incorrect.  If one copyright owner opts out of the ASA and one does not opt out, then the owner that remains in the ASA has all rights to manage the Book and receive revenues under the ASA.  The copyright owner who has opted out retains all legal rights against Google (and against any other copyright owner).  The A-P Procedures apply to the Rightsholder who remains in the ASA, but impose no obligations on the copyright owner that opted out.[153]  *See* A-P Procedures §11.7.

---

[151]  *See, e.g.,* D.I. 420 at 3 ("For example, what happens where a New Zealand author has granted New Zealand rights to the publisher but has retained or reverted to them the non NZ rights?").

[152]  D.I. 420 at 3; D.I. 238 at 10.

[153]  *See* D.I. 855 at 8 (complaining that ASA provides no alternative mechanism for dispute resolution in case where either author or publisher is not participating in the settlement).

In short, the A-P Procedures do not rewrite author-publisher contracts. The procedures assist in determining who has the rights under the ASA to exercise rights and receive payments and fairly and equitably allocate those rights among Rightsholders, ***but only under and for the purposes of the ASA***.

### 1.    Miscellaneous Concerns.

One publisher expresses the concern that the Settlement would cause it to violate its authors' contracts under prevailing law because that publisher would enjoy a right to which it is not entitled under those contracts.[154]  That concern is without foundation because such publisher can waive whatever rights it may have under the ASA; for example, it may choose not to claim certain Books, not control Books in a manner that would override decisions made by its authors and agree that the author should be paid 100% of the revenues of a Book.

As to authors, to the extent that they own all rights in their Books – that is, they have never conveyed any publication rights or all rights have reverted to them (whether by contract, operation of law or otherwise) – the A-P Procedures have been amended to provide that they retain 100% control of those Books under the ASA (because such Books are treated as "Author-Controlled" under the Procedures).[155]  A-P Procedures §3.1.

---

[154]  D.I. 471 at 9 (settlement would cause Hachette to violate contracts under French law).

[155]  This provision, as amended, now fully responds to the objection that the original Settlement Agreement had not provided that where applicable law effects a reversion of rights to the author the Book should be regarded as Author-Controlled.  *See* D.I. 669 at 1 (requesting that Book be classified as "in print" if author-publisher contract is governed by foreign law, which provides for automatic reversion to author).

The ASA, therefore, does not, as one objector has suggested, modify or displace any existing contractual rights of authors or publishers.[156]

Nor, as one objector has argued, does the ASA ignore potential rights that authors or publishers may have under their pre-existing contracts to preclude authorizing Google to exercise rights on a non-exclusive basis.[157]  First, the A-P Procedures only specify who, as between the author and the publisher, has the right to include or exclude Books in which they are both Rightsholders.  Second, the ASA, not author-publisher contracts (or the A-P Procedures), authorizes Google to undertake certain activities.  If a Rightsholder feels that it is contractually obligated to preclude Google from exploiting its Book, it has the right under the ASA to instruct Google to remove a Book or turn off Non-Display Uses.

One objector noted that many pre-electronic era agreements between authors and publishers permit the author to regain publication rights to his or her book once that book is no longer "available for sale."  This objector has argued that the Settlement will make it more difficult for authors to regain publication rights because some publishers will use Google's making books available through the Settlement to trigger the "available for sale" provisions of such contracts.[158]  This fails to consider that, under the A-P Procedures, an author may at any time remove or exclude his or her out-of-print Books,

---

[156]  *See* D.I. 143 at 30.

[157]  *See* D.I. 143 at 29 (author-publisher contracts may preclude author or publisher giving rights to Google under settlement).

[158]  *See* D.I. 550 at 1-2.

or alternatively, turn off all Display Uses for those Books, or veto the inclusion of an in-print Book, in which case the Book will, of course, not be sold by Google.

### L.    The Dispute Resolution Procedures Benefit The Class.

Objectors to Article IX challenge the neutrality of the dispute resolution procedures.  Some question the impartiality of the Registry, as an entity "funded by Google," in a dispute between a Rightsholder and Google.[159]  (Objections as to the independence of the Registry are addressed *supra* Section II.D)  Some Rightsholders outside the United States argue that the procedures in Article IX use the "U.S. system"[160] and "favor Google,"[161] leaving non-U.S. Rightsholders without appropriate relief.  Some objectors dispute the choice of law provisions and the applicability of Article IX to claims arising under non-U.S. law,[162] and question the enforceability of a decision by the Registry.[163]

Article IX was driven by Plaintiffs' desire to level the playing field with an adversary the size of Google, and to create simple, inexpensive and uniform procedures

---

[159]    *See, e.g.,* D.I. 568 at 2  ("What reason [do Rightsholders] have to trust that the Google Books Registry will be neutral in any controversy between Google and a copyright owner . . . ?").

[160]    D.I. 464 at 5.

[161]    D.I. 869 at 18; D.I. 401 at 12.

[162]    *See* D.I. 869 at 18; D.I. 401 at 12.

[163]    *See, e.g.*, D.I. 471 at 9 (a decision by the Registry would "probably not be enforceable in France" since disputes between French publishers and authors are subject to French law).

for the resolution of author-publisher disputes under the Settlement.  This provision is a significant benefit to the entire Class because it ensures that Google cannot hale Rightsholders into a U.S. court over any minor dispute and establishes procedures to ensure that disputes are resolved efficiently, quickly and with a minimal burden placed on Rightsholders.  *See Allied-Bruce Terminix Cos, Inc. v. Dobson*, 513 U.S. 265, 280 (1995) (recognizing that arbitration is less expensive alternative to litigation); *Folkways Music Publishers v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993) (identifying "the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation").  Class action settlement agreements may contain arbitration provisions.  *See, e.g.*, *Robertson v. National Basketball Ass'n*, 72 F.R.D. 64, 69 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 682 (2d Cir. 1977) (providing for "arbitration of disputes" arising out of the settlement).

     The arbitration procedures are fair, inexpensive and equitable.  Arbitrations will be conducted by the American Arbitration Association ("AAA"), a neutral body with no affiliation with, or funding from, Google.  The AAA rules are widely used and recognized around the world.  There is no difference between the procedures available to U.S. and non-U.S. Rightsholders.  The parties can agree on the language of the arbitration (should they not want to arbitrate in English) and the place of the arbitration (should they not want to arbitrate in New York).  Moreover, the ASA specifically provides that Rightsholders can participate in any arbitration by telephone.  ASA § 9.3(a).  Furthermore, most disputes in which individual Rightsholders would be involved will be resolved by the Expedited Procedures of the AAA Commercial Arbitration Rules.  *See*

ASA § 9.3(d).   Objections concerning the application of U.S. law to "claim[s] outside the U.S."[164] are misplaced because the ASA's dispute resolution procedures are only applicable to the legal claims arising under United States law that are settled by the ASA. As to enforceability, Section 9.7 reflects the parties' judgment that it was sensible for any arbitral awards to be enforceable in the Court, which has continuing jurisdiction over the Settlement.   Some objectors express concern that the arbitral decisions are "non appealable."[165]   The dispute resolution procedures will rely on arbitration by a pool of arbitrators who, over time, will develop expertise in the issues that might arise under the ASA, and, further, as is the case with respect to most arbitrations, arbitral awards rendered under the ASA will be Court-enforced.  *See* ASA § 9.7.

Some objectors argue that Rightsholders "should not have to arbitrate if there is a willful failure of a Security Implementation Plan, and that damages should not be capped."[166]   In the case of willful breaches, a party is not restricted to arbitration but can have recourse directly to a court for injunctive relief.  *See* ASA § 9.11.  As to money damages, the parties intensively negotiated the provisions of Article VIII and believe that the terms represent a fair balance of a number of competing concerns.

### 1.    Miscellaneous Concerns.

One objector urges that arbitration should not be mandatory with respect to Google's "obligation not to make certain assertions in any proceeding outside the United

---

[164]   *See, e.g.,* D.I. 869 at 18-19; 401 at 12; D.I. 405 at 27; D.I. 410 at 9.

[165]   *See, e.g.,* D.I. 471 at 10; D.I. 296 at 10.

[166]   *See, e.g.*, D.I. 869 at 19; D.I. 401 at 12.

States pursuant to the last sentence of Section 10.2(b)."  ASA § 9.1(b)(v).[167]  Section

9.1(b)(v) already excepts from arbitration any Rightsholder's claim that Google has

breached this obligation; in this way, a Rightsholder would have a contract-based

remedy, controlled by New York law, against Google in case Google breaches this

provision.  Furthermore, nothing in the ASA prevents a publisher outside the United

States from quoting and relying on Section 10.2(b) in any proceeding or court outside the

United States to urge the tribunal to give effect to the language of that provision.

One objector has commented that Article IX may contravene contractual

obligations of publishers and authors located in the European Union under European

Union law.[168]  To the extent certain author-publisher disputes relating to the exploitation

of Books under the ASA are subject to mandatory arbitration (*e.g.*, with respect to royalty

splits for in-print Books), they are intended to facilitate Rightsholders' ability to exercise

their rights under the Settlement.  If an author invokes a different dispute resolution

procedure, specified by its contract with the publisher, then, as now specified in Section

9.1(a) of the ASA, the affected publisher is not precluded from agreeing with the author

to use that procedure if it wishes to do so, notwithstanding Article IX.

One objector alleges a lack of transparency in the dispute resolution procedures,

pointing specifically to terms requiring confidentiality of arbitral rulings, which, it

---

[167]  *See* D.I. 869 at 18 (publisher should be able to elect whether to arbitrate claims over Google's attempt to use the agreement as a defense to foreign claims); *see also* D.I. 401 at 12; D.I. 167 at 27.

[168]  *See* D.I. 471 at 9 (settlement's dispute resolution procedures may contravene contractual obligations under French law).

contends, could impede effective oversight, consistency, and accountability.[169]  This

misreads the ASA.  Although the arbitration proceedings themselves will be kept

confidential, the ASA specifically provides that Rightsholders will enjoy complete access

to prior arbitration decisions, with only the names and other confidential information kept

confidential.  *See* ASA § 9.8.  Rightsholders may use these prior decisions in their own

arbitrations.  All parties, including arbitrators, will have access to a database of decisions

rendered pursuant to Article IX, and the arbitrators may rely on this precedent as

necessary.  *See* ASA § 9.6.

### M.    The Treatment Of Inserts Is Fair.

Some object that the definition of Inserts should be expanded to include all textual

material included in a Book, whether or not the material is subject to a Copyright Office

registration.[170]  *See* ASA § 1.75.  As noted above, the registration requirement for United

States works included in the ASA for both Books and Inserts, however, was compelled

by *In re Literary Works in Electronic Databases Copyright Litigation*, 509 F.3d 116 (2d

Cir. 2007), *cert. granted sub nom. Reed Elsevier Inc. v. Muchnick,* 129 S.Ct. 1523 (2009).

*See supra* n.8 (discussing registration requirement for United States works).  Many

Inserts may be covered by the registration of the Book in which they appear.  The Second

---

[169]    *See* D.I. 188 at 7 (asserting that arbitration rulings will be kept confidential and
known only to the "immediate parties").

[170]    *See, e.g.,* D.I. 893 at 9 (objecting to exclusion of Inserts "that have not been
separately registered with the U.S. Copyright Office"); D.I. 849 at 4 (narrowed
definition of Inserts "may have dramatic consequences for authors who have
numerous unregistered Inserts").

Circuit's decision in *Morris v. Business Concepts*, 259 F.3d 65 (2d Cir. 2001), however, holds that an unregistered contribution to a collective work (such as a short story in an anthology) will not be covered by a registration of the collective work if the copyright owners of the two works are different.  *Id.* at 71-72.

Some objectors claim that Rightsholders of Inserts should have the right to remove their Inserts and to exclude them from less than all Display Uses.[171]  Google would not agree, contending that removal of Inserts, and the exclusion of Inserts on a piecemeal basis, would be too burdensome technologically, inasmuch as Inserts are not whole works, but subsets of works.  Boni Decl. ¶ 8.  Plaintiffs concluded that, because Insert Rightsholders have the right to exclude their Inserts (or portions of their Inserts) from all Display Uses, the treatment of Inserts under the ASA is fair, adequate and reasonable.[172]

Other objectors state that Insert Rightsholders are unfairly compensated under the ASA.[173]  That is unfounded.  An Insert Rightsholder is entitled to a minimum Cash Payment of $5 per Partial Insert and $15 per Entire Insert, as well as to an Inclusion Fee

---

[171]  *See, e.g.,* D.I. 209 at 21 (no justification for denying comparable removal and exclusion rights to Insert Rightsholders); D.I 889 at 1 ("not possible for an author to arrange for the removal from Google's database any short story or poem of theirs that has been published in an anthology").

[172]  Some objectors claim that, since Inserts cannot be removed, Google is unfairly obtaining the benefit of non-display uses of Inserts.  D.I. 209 at 18-19.  This objection is discussed *supra* Section II.I.

[173]  *See, e.g.,* D.I. 209 at 12 ("[Insert authors] may command as much as $1,000 or $1,500 for the inclusion of just one of their works in a larger work.").

of $25 per Partial Insert and $50 per Entire Insert (if the Rightsholder does not exclude

the Insert from the Institutional Subscription, subject to a cap for Inclusion Fees of $500

for all Inserts from the same work).   Plan of Allocation § 1.2.  Plaintiffs believe that, in

the aggregate, this compensation is fair because Inserts are generally included in other

works either without compensation (as a "fair use") or, for larger works (such as

forewords, essays, and short stories) through a one-time permission payment covering all

uses.  Aiken Decl. ¶ 41; Sarnoff Decl. ¶ 13.  Moreover, the Plan of Allocation does

provide for exceptions: if any Insert Rightsholder can establish that it has a royalty

arrangement or other contractual entitlement to additional compensation for the online

use of its Insert in excess of the Inclusion Fee to which it is entitled under the ASA, it

will receive additional compensation from the Inclusion Fund.  Plan of Allocation §

1.2(h).

> **N.    The Releases Are Specifically Tailored And Appropriate For The
> Settlement.**

Some objectors assert that the releases are overbroad.[174]  These objections are

misplaced.  The releases included in the ASA, in Article X, are fair, adequate, and

reasonable.  Article X does not contain a general release of Google or the libraries, but

---

[174]  *See, e.g.,* D.I. 874 at 13 ("The release of so many parties *other than* Google, the only
defendant in this case, including "Fully Participating Library Releasees,"
"Cooperating Library Releasees," "Public Domain Releasees," and "Other Library
Releasees," shows how far the settlement exceeds the case's scope.") (emphasis in
original).

only releases past conduct in connection with the Google Library Project and future conduct authorized by the ASA.

Article X defines "claim" as claims under United States law, ASA § 10.1(a), including claims for copyright infringement, trademark infringement and moral rights violations, ASA § 10.1(g), but the ASA releases such "claims" *only* when they "arise" from specifically enumerated actions.  ASA §§ 10.1 (b), (d), (f), (h), (j), 10.2 (a).

Claims against Google and the Participating Libraries under United States law are released only when they arise from the following actions taken on or before the Effective Date:

- the provision of Books and Inserts by Participating Libraries to  Google for digitization and use in Google Products and Services;

- Google's digitization of Books and Inserts and use of digital copies thereof in Google Products and Services;

- the distribution by Google to Fully Participating, Cooperating and Public Domain Libraries of digital copies of Books and Inserts provided by such libraries, and such libraries' receipt from Google of such copies;

- the use of digital copies of Books and Inserts by Fully Participating, Cooperating or Public Domain Libraries, if the use is allowed under Section 7.2(b) or the Library-Registry Agreement; and

- the use of digital copies of Books and Inserts for non-consumptive research by Fully Participating, Cooperating and Public Domain Libraries.

ASA §§ 10.1 (b), (d), (f), (h), (j), 10.2 (a).

Claims against Google, Fully Participating Libraries and Cooperating Libraries under United States law are released when they arise from actions after the Effective Date *only* when such actions are authorized by the ASA.  *Id.*

Section 10.2(b) also limits the release, providing expressly that:

- nothing in the ASA releases or adversely affects any claims of any Class members who timely opt out;

- no claims are released with respect to any digitization or any other form of copying or use of Books or Inserts outside the United States;

- no claims are released with respect to any acts or omissions after November 13, 2009 (the date the ASA was signed) that, if occurring after the Effective Date, would not be authorized by the ASA;

- no claims are released with respect to breaches of the ASA after the Effective Date; and

- no claims under non-United States law are impaired.[175]

The release is thus specifically tailored to the activity at issue. One objector asserts that the ASA includes a release of all trademark claims.[176] That is an incorrect reading of Article X. The only trademark claims released are those that arise from the specific actions enumerated above. Thus, for instance, if Google digitizes a Random House Book that includes a Random House trademark, Random House releases all claims

---

[175] In this regard, the ASA provides that no claims "are released with respect to any acts of copying, transmission or distribution of a Book or Insert that Google undertakes in response to a search or other request of a user outside of the United States that results in displaying parts or all of such Book or Insert in such user's jurisdiction, except if such display is lawful in such jurisdiction or Google has the appropriate permission for such display in such jurisdiction. Google agrees that, in asserting or responding to any legal claim outside the United States for copyright infringement arising from any use of Books or Inserts outside the United States, it will not in any way assert, including by way of defense, that, based on the fact that this [ASA] or the Final Judgment and Order of Dismissal authorizes, or releases Claims relating to, the making of copies or uses of Books and Inserts in the United States, either applicable non-United States law or a Rightsholder authorized such use of Books or Inserts outside the United States." ASA § 10.2(b).

[176] D.I. 209 at 5; D.I. 849 at 6.

that might otherwise be asserted for display of that trademark, after the Effective Date, but solely in connection with the specific actions otherwise authorized by the ASA.  No other trademark claims are released, *i.e.*, if Google displayed Random House's trademark on its home page or if Random House wishes to sue Google for uses of its trademark in connection with AdWords, Random House's right to bring trademark claims has not been released or otherwise impaired by the ASA.

In general, "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country[,]" *Wal-Mart*, 396 F.3d at 106, and "[p]ractically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability." *Id.* (internal quotation marks and citation omitted). Nevertheless, Plaintiffs were careful to craft the releases in Article X so that they release only claims arising under United States law from specified actions in exchange for consideration.[177]

---

[177] This objector also argues that the Plaintiffs failed to adequately represent the interests of authors who have licensed their works for movies, television, charities, or have otherwise developed substantial trademark rights. D.I. 849 at 9. This objection is not germane to the Settlement because the ASA does not contain any releases for licenses that go beyond the specific authorizations granted to Google, none of which have anything to with these additional means of exploitation.

**O.    The ASA Provides For Meaningful Enforcement Against Google.**

Some objectors argue that the Amended Settlement does not contain adequate provisions to prevent or remedy Google's violations of the Amended Settlement.[178]  To the contrary, Article VIII of the ASA provides extremely robust protections against unauthorized uses of Rightsholders' works and against security breaches.  It addresses various categories of violations by Google and others.  The parties spent considerable time negotiating these provisions, which set forth specific remedies with meaningful damages for broad-scale breaches.

The caps on aggregate liability are sufficiently high to meaningfully deter Google and the Participating Libraries from engaging in unauthorized use and to motivate them to adhere rigidly to the security standards the parties negotiated.  *See* ASA, Attachment D (Security Standard).  For example, were Google to breach the Settlement inadvertently or negligently by displaying Books or Inserts contrary to the default rules in the ASA or the instructions of the Rightsholders, Google could be liable for damages up to $10 million (subject to adjustments pursuant to ASA § 8.7).

To further ensure compliance, Rightsholders and the Registry have the right to pursue injunctive relief in court against Google if the circumstances warrant it.  *See* ASA § 9.11.  Moreover, the Settlement gives Rightsholders remedies that are more efficient than any forms of relief available under the copyright laws:  the rights of removal and exclusion.  Finally, Google and the Participating Libraries have the same intrinsic

---

[178]    *See, e.g.*, D.I. 115 at 2 (settlement provides minimal consequences for Google's non-compliance).

interests as the Rightsholders in ensuring adherence to strict security protocols and in preventing piracy, hacking and other unauthorized uses.

Some objectors argue that Rightsholders outside the United States will be unable to monitor whether Google is complying with the ASA with respect to their works, because the Settlement only authorizes Google to offer products to persons located within the United States.[179]  The parties considered this objection and accommodated it with an amendment to the Settlement.  The ASA now provides that the Registry's mission includes allowing Rightsholders to request that the Registry monitor Google's usage of their Books and, further, that the Registry must provide a means for them to undertake such monitoring themselves.  ASA 6.1(f).

Some objectors inaccurately assert that Google's payment obligations to the Registry will go unchecked.[180]  In fact, Google has regular reporting obligations (ASA §§ 6.6(a)(iii) and (v)), and the Registry has the right to audit Google's reports for accuracy, and its payments to confirm that they, too, are accurate.  *See* ASA §4.6(e).

### P.    The ASA Does Not Violate Section 201(e) Of The Copyright Act.

Amazon, an online bookseller with an obvious competitive interest, claims that the ASA violates Section 201(e) of the Copyright Act.[181]  That is incorrect.

Section 201(e) provides:

---

[179]  *See* D.I. 400 at 2.

[180]  *See, e.g.*, D.I. 415 at 2.

[181]  *See, e.g.,* D.I. 206 at 32; D.I. 823 at 9.

> Involuntary transfer.  When an individual author's
> ownership of a copyright, or of any of the exclusive rights
> under a copyright, has not previously been transferred
> voluntarily by that individual author, no action by any
> governmental body or other official or organization
> purporting to seize, expropriate, transfer, or exercise rights
> of ownership with respect to the copyright, or any of the
> exclusive rights under a copyright, shall be given effect
> under this title, except as provided under title 11.
> 17 U.S.C. § 201(e).

Section 201(e) was enacted to prevent the Soviet Union from squelching

dissidents by confiscating their copyrights.[182]  That is why it expressly prohibits any

"governmental body" or organization from the seizure, expropriation, transfer, or

exercise of ownership rights of any copyright.  It does not apply to actions by private

parties nor is there any support for the proposition that it would apply to the ASA or to

the Registry, as a private organization.[183]

---

[182]  *See* H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 124 (1976) (purpose of 201(e) was
to "protect foreign authors against laws and decrees purporting to divest them of
their rights under the United States copyright statute, and would protect authors
within the foreign country who choose to resist such covert pressures").

[183]  *See In re Peregrine Entm't, Ltd.*, 116 B.R. 194, 206, n.16 (C.D. Cal. 1990) ("[I]t
appears that the section [Section 201(e)] was intended to prevent expropriations of
copyrights by foreign governments in their efforts to suppress the works of dissident
authors. . . . this section has no application to governmental actions taken in the
sphere of private law where the government is merely enforcing private rights and is
not the ultimate beneficiary."); *Rodrigue v. Rodrigue*, 55 F. Supp. 2d 534, 543 (E.D.
La. 1999), *rev'd on other grounds*, 218 F.3d 432 (5th Cir. 2000), *cert. denied*, 532
U.S. 905 (2001) (reading 201(e) broadly under a plain reading, but noting "[t]he
reasoning of the *Peregrine* court is somewhat persuasive in light of the
acknowledged original legislative intent to prevent totalitarian governments from
expropriating dissidents' copyrights.  Also compelling are [academic] criticisms of §
201(e) as ill advised and unnecessary.").  *See also* H.R. Rep. No. 94-1476, at 143,
*supra* note 182, at 123 (subsection's intent is that author be entitled "despite any
purported expropriation or involuntary transfer, to continue exercising all rights

Furthermore, the argument that the ASA violates Section 201(e) because it

"allows the Registry to expropriate copyrights in 'orphan works' whose authors have not

previously transferred their copyright interests voluntarily"[184] relies on several incorrect

assumptions.  Section 201(e) only has been applied to "transfers" of rights.[185]  The ASA,

however, provides only non-exclusive rights and does not seize, expropriate or "transfer"

any rights in any works, whether claimed or unclaimed.  *See supra* note 46.  No court has

construed Section 201(e) to apply to grants of non-exclusive licenses, and the Registry

does not have any ability to grant any "additional rights" beyond those set forth in the

ASA itself.[186]  Accordingly, Section 201(e) poses no "defect" that "cannot be

remedied."[187]

### Q.    The ASA Is Consistent With The Rules Enabling Act.

Some objectors argue that provisions of the ASA violate the Rules Enabling Act

("REA"), which confers on the Supreme Court the "the power to prescribe general rules

of practice and procedure[.]"  28 U.S.C. § 2072(a).  The REA also provides that "[s]uch

---

under the United States statute, and that the ***governmental body or organization*** may
not enforce or exercise any rights" (emphasis supplied)).

[184]    *See* D.I. 206 at 33.

[185]    *See, e.g.*, *Brooks v. Bates*, 781 F. Supp. 202, 204 (S.D.N.Y. 1991); *Advance Magazine Pubs. Inc. v. Leach*, 466 F. Supp. 2d 628, 636 (D. Md. 2006).

[186]    D.I. 206 at 33 (objection that, under original settlement agreement, Registry would have right to grant "additional rights" in orphan works to implement "new revenue models").

[187]    D.I. 206 at 33.

rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

This objection is incorrect as a matter of law.

Like any class action settlement, the ASA affects the substantive rights of class

members and the defendant, but it does so within the framework of the Federal Rules of

Civil Procedure. It is completely consistent with the REA because none of its provisions

attempts to prescribe or alter the Federal Rules of Civil Procedure, nor does the

application of Rule 23 modify anyone's "substantive rights." The present motion does

not request that the Court amend Rule 23. *Cf. Amchem*, 521 U.S. at 620 ("Courts are not

free to amend a rule outside the process Congress ordered, a process properly tuned to the

instruction that rules of procedure 'shall not abridge … any substantive right.'").

The ASA is consistent with the leading case interpreting the REA in the class

action context. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions v.

Prudential Ins. Co. of Am*, 148 F.3d 283 (3d Cir. 1998). It was alleged there "the district

court's fairness determination violated . . . the Rules Enabling Act by altering the

substantive contractual and statutory insurance rights of the class." *Id*. at 318. The Third

Circuit held that "approval of a settlement under Rule 23 'merely recognizes the parties'

voluntary compromise of their rights' and does not itself affect their substantive state law

rights." *Id*. at 324. The ASA is just such a "voluntary compromise" and does not transfer

any rights under copyright law.

To the extent that specific objections have been made that particular aspects of the

ASA violate the REA, they are addressed in the Final Approval Brief and other sections

of this Supplemental Memorandum. None of the copyrights of members of the Class are

transferred by the Settlement.[188]  The Notice Program was comprehensive.[189]  The

Settlement does not supersede or inappropriately displace author-publisher contracts,[190]

nor does it violate antitrust law.[191]  It is a Settlement that is well within Supreme Court

precedent and Rule 23 in including future relief that has commercial components.[192]

### R.    The ASA Is Consistent With Foreign Law And Approval Would Not Violate International Law.

#### 1.    The ASA Is Consistent With Foreign Law.

Objectors from France, Germany, India and elsewhere claim the ASA should be

disapproved because it violates their national copyright laws.[193]  That objection,

---

[188]  D.I. 143 at 10; D.I. 625 at 5-8; D.I. 288 at 19.

[189]  D.I. 143 at 21.

[190]  D.I. 143 at 30.

[191]  D.I. 143 at 42-43.

[192]  D.I. 276 at 20, 22-23; D.I. 263 at 3-5; D.I. 288 at 19.

[193]  *See, e.g.,* D.I. 471 at 8 (settlement deprives Hachette of fundamental rights under French law); D.I. 179 at 2, 4 (settlement runs afoul of German law); D.I. 464 at 1 (scanning works without permission and making them available on the Internet violates the copyright laws of Japan); D.I. 408 at 1 (European Copyright law forbids Google from digitizing and making works available to the public without consent of the rightsholders); D.I. 119 at 1 (scanning texts and books for use on the internet violates German and European copyright laws); D.I. 490 at 1 (European copyright law requires consent of the rightsholder before a copy is made); D.I. 287 at 6, 11 (Google's digitizing and displaying of copyrighted works, as well as the opt-out provision of the settlement, violate French law); D.I. 852 at 11 (settlement is "anathema" to German and European copyright law); D.I. 900 at 5 (settlement violates Canadian moral rights and bypasses Canada's orphan works regime); D.I. 807 at 5 (no fair use exceptions for scanning and copying of entire works under Indian law); D.I. 836 at 6 and D.I. 820 at 17 (settlement does not comply with

regardless of the particular country or provision of law on which it is based, is incorrect.[194]

All of these objections suffer from the same flaws. Copyright law is territorial and has no application to acts of infringement that take place entirely outside a country's borders.[195] United States courts do not apply foreign copyright laws to infringements of the Copyright Act.

In this case, Google is scanning books in the United States and is providing copies to libraries in the United States. For that reason, and in recognition of the principle that copyright law is territorial, Plaintiffs only alleged violations of United States copyright law,[196] and the ASA addresses and settles only those claims arising under United States law. *See* ASA §§ 10.2(b)(ii); 10.2(h); and 17.7(a)(i). Anyone, Rightsholder or not, is

---

French law and the French court's decision in *La Martinière v. Google* (cited *infra* note 197).

[194] Asserted violations include non-recognition of the "fair use" exception of the U.S. Copyright Act, other prohibitions on unauthorized scanning or digitization or that the ASA violates an author's moral rights. *See* D.I. 471 at 4, 8 (protection of moral rights as "fundamental principle" of international copyright; author holds "inalienable right" to stop unintended uses of works); D.I. 869 at 4; D.I. 542 at 1 (copyright holders have moral right); D.I. 900 at 6 (violates Canadian authors' moral rights). In acceding to the Berne Convention, including Article 6*bis* (providing for moral rights), the United States concluded that it was in full compliance with that term. Still others assert the ASA does not adequately protect ownership interests in typographic arrangements. *See, e.g.*, D.I. 471 at 7-8; D.I. 869 at 4-5.

[195] *See Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir. 1981) ("[C]opyright laws do not have extraterritorial application."); *Hoepker v. Kruger*, 2001 U.S. Dist. LEXIS 13043, at * 4 (S.D.N.Y. 2001) ("Copyright law is territorial.") (citing *Creative Tech. v. Aztec Sys. PTE*, 61 F.3d 696, 700 (9th Cir. 1995)).

[196] *See* Third Am. Class Action Compl. ¶ 7.

free to sue Google, under any other country's laws, for scanning books and displaying book content, whether those activities take place in the United States or elsewhere.[197]

## 2.    The ASA Does Not Violate International Law.

Objectors have complained that the ASA violates United States international copyright conventions and treaties,[198] including the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"),[199] the World Intellectual Property Organization Copyright Treaty ("WCT"),[200] the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"),[201] and the North American Free Trade Agreement ("NAFTA").[202]    Several objectors invoke Article 5,[203] Article 9(1),[204] Article

---

[197]    In December 2009, in a case brought by several French publishers, a Paris court concluded that it should apply French law to Google's unauthorized scanning in the United States of French-language books published in France and the display in France of snippets of those books.  The court held that Google violated French law and, for that reason, did not apply or invoke the fair use doctrine of United States law.  *See Éditions du Seuil SAS et al. v. Google Inc. and Google France*, Trib. de Grande Instance de Paris (3ᵉ ch.), No. RG: 09/00540 (Dec. 18, 2009).  The ASA leaves untrammeled the right to continue to prosecute that action and is unaffected by that decision, which was rendered under French law.  *Cf.* D.I. 836 at 6 (asking that ASA should be made to comply with that decision).  Based on this decision, Hachette specifically acknowledges that copyright owners can pursue litigation in their national courts.  *See* D.I. 820 at 17 (all French publishers could now sue Google in French courts).

[198]    *See, e.g.,* D.I. 395 at 3 (class action "subverts" international copyright conventions).

[199]    *See, e.g.,* D.I. 471 at 7; D.I. 179 at 2; D.I. 496 at 3; D.I. 542 at 1.

[200]    *See, e.g.,* D.I. 179 at 2; D.I. 287 at 15.

[201]    *See, e.g.,* D.I. 287 at 12; D.I. 401 at 3; D.I. 868 at 13-14; D.I. 869 at 4; D.I. 807 at 4-5.

[202]    *See, e.g.,* D.I. 900 at 4 (ASA puts U.S. in violation of international intellectual property laws and NAFTA).

9(2),[205] Article 11,[206] and Article 12[207] of the Berne Convention.  Others rely on Articles 4,[208] 13[209] and 41(2)[210] of TRIPS and Article 17[211] of NAFTA.  These objections have no more merit than the national law objections.

a.        <strong>Treaties Are Not Self-Executing.</strong>

These objectors misunderstand the legal effect of treaties in the United States and how it implements its international treaty obligations.[212]  None of the treaties invoked by

---

[203]  *See, e.g.,* D.I. 471 at 7 (violates Berne, including prohibition against formalities); D.I. 276 at 13, 17 (same);  D.I. 402 at 3 (Registry is a prohibited formality); D.I. 287 at 10, 14 (same); D.I. 852 at 8 (opt-in, opt-out, registration is a formality); D.I. 868 at 10 (burden of determining which books are in ASA conflicts with Berne).

[204]  D.I. 471 at 7 (Article 9(1) provides that author has sole and exclusive right to authorize reproduction); *see also* D.I. 401 at 3; D.I. 869 (Exh. A. to Decl. of P. Attanasio at 4); D.I. 544 at 3; D.I. 467 at 1-2.

[205]  D.I. 869, Exh. A. to Decl. of P. Attanasio at 4 (limitations to exclusive rights must respect three-step-test of Berne Article 9(2))).

[206]  D.I. 869, Exh. A. to Decl. of P. Attanasio at 4 (authors to enjoy exclusive right of authorizing communication to the public)).

[207]  D.I. 869, Exh. A. to Decl. of P. Attanasio at 4 (authors to enjoy exclusive right of authorizing adaptations, arrangements and other alterations)).

[208]  D.I. 869, Exh. A. to Decl. of P. Attanasio at 13-14 (violates non-discrimination provision of TRIPS)

[209]  D.I. 807 at 4-5.

[210]  D.I. 869, Exh. A. to Decl. of P. Attanasio at 13 (burden imposed on foreign rightsholders contravenes TRIPS).

[211]  D.I. 900 at 4 (Canadians guaranteed Berne rights).

[212]  *See, e.g.,* D.I. 471 at 7 (settlement contravenes obligations under the Berne Convention), D.I. 276 at 13 (treaties guarantee fair treatment of foreign works);D.I. 465 at 10 (removes the rights of foreign authors and publishers enshrined in the

objectors are self-executing in the United States, *i.e.*, none can be invoked as law in any United States court.[213]  Accordingly, each treaty required federal legislation to implement the United States' international obligations.[214]

     With respect to the Berne Convention, the Copyright Act expressly states that no copyright owner has any rights "by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto."  17 U.S.C. § 104(c). All rights in works protected by the federal copyright law derive solely and exclusively from the Copyright Act itself, and "shall not be expanded or reduced by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto."  *Id*.  Accordingly, any argument that members of the Class have rights

---

    Berne Convention); D.I. 401 at 3 (settlement sets up rules that are contrary to the international obligations of the United States); D.I. 291 at 25 (inclusion of foreign works is troubling in light of complex international legal obligations); D.I. 544 at 3 (settlement targets Berne principle that permission is required for publication); D.I. 467 at 1-2 (settlement circumvents prevailing international treaties).

[213]  Self-executing treaties are those that have "automatic domestic effect as federal law upon ratification."  *See Medellin v. Texas*, 552 U.S. 431, 505 n.2 (2008); *see also id.* at 1363 (the "point of a non-self-executing treaty is that it 'addresses itself to the political, *not* the judicial department'") (quoting *Foster v. Neilson*, 27 U.S. 253, 314 (1829)).

[214]  *See, e.g.*, Berne Convention, art. 36 (1) Sept. 9, 1886, S. Treaty Doc. No. 99-27, 828 U.N.T.S. 221 ("Any country party to this Convention undertakes to adopt, in accordance with its constitution, the measures necessary to ensure the application of this Convention."); WIPO Copyright Treaty, art. 14(1), Dec. 20, 1996, S. Treaty Doc. No. 105-17, 2186 U.N.T.S. 152  ("Contracting parties undertake to adopt, in accordance with their legal systems, the measures necessary to ensure the application of this Treaty.").

under the Berne Convention to challenge any provision of the ASA, independently of whether the ASA is consistent with the Copyright Act, is incorrect.[215]

Similarly, the WCT is not self-executing but, instead, was implemented through the WIPO Copyright and Performances and Phonogram Treaties Implementation Act of 1998, which was enacted as Title 1 of the Digital Millennium Copyright Act.[216]  As one of the world's leading international copyright scholars put it, the Settlement "is purely a matter for US law involving US rights and rights holders (whether local or foreign) and therefore outside the purview of Berne . . . ."[217]

---

[215]  *See Elsevier B.V. v. UnitedHealth Group Inc*., 2010 U.S. Dist. LEXIS 3261 at *4-5; (S.D.N.Y. Jan. 14, 2010) (in Berne Convention Implementation Act, Congress declared Berne not "self-executing," with U.S. obligations under "performed only pursuant to domestic law"); *The Football Ass'n Premier League Ltd. v. YouTube, Inc*., 633 F. Supp. 2d 159, 164 (S.D.N.Y. 2009) (Berne has "no effect on U.S. law unless Congress so provides").

[216]  *See Capitol Records, Inc. v. Thomas,* 579 F. Supp. 2d 1210, 1226 (D. Minn. 2008) (holding that the WIPO Treaties are not self-executing and "lack any binding legal authority separate from their implementation through the Copyright Act"); Digital Millennium Copyright Act, Pub. L. No. 105-304, preamble, 112 Stat. 2860 (1998) (act to amend Title 17, to implement the World Intellectual Property Organization Copyright Treaty and Performances and Phonograms Treaty); S. Rep. No. 105-190, at 11 (1998) (two treaties update and supplement the Berne Convention; "in order to adhere to the WIPO treaties, legislation is necessary in two primary areas").

[217]  *See* S. Ricketson, "Memorandum of Advice, The Compatibility of the Proposed Google Book Settlement With the Provisions of the Berne Convention," at 4 (Sept. 9, 2009), *available at* http://thepublicindex.org/docs/commentary/Ricketson.pdf [hereinafter "*Ricketson*"].

Neither the TRIPS Agreement (part of the Uruguay Round trade negotiations), implemented by the Uruguay Round Agreements Act,[218] nor NAFTA,[219] implemented by the North American Free Trade Agreement Implementation Act, are self-executing.[220] Furthermore, their implementing statutes specifically preclude any challenges based on the Settlement's alleged purported inconsistencies with either of those two treaties: "No person other than the United States – ... (2) may challenge, in any action brought under any provision of law, any action or inaction by any . . . instrumentality of the United States . . . on the ground that such action or inaction is inconsistent with" any of the Uruguay Round Agreements or NAFTA.[221]

For the foregoing reasons, the treaties themselves have no direct legal application in the United States and, therefore, to the ASA.[222]  With respect to their implementing

---

[218]  *See* 19 U.S.C. § 3512(a)(1) ("No provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with the law of the United States shall have any effect."); *ITC v. Punchgini*, 482 F.3d 135, 151 (2d Cir. 2007) ("TRIPS is plainly not a self-executing treaty"); *In re Dr. Matthias Rath*, 402 F.3d 1207, 1210 n.2 (Fed. Cir. 2005) (Congress has "specifically precluded any person other than the United States from using TRIPS as a cause of action or a defense, and from challenging government action on the ground that such action is inconsistent with TRIPS," citing § 3512(a)(i)).

[219]  North American Free Trade Agreement, U.S.-Can.-Mex., Dec. 17, 1992, 32 I.L.M. 289 (1993).

[220]  *See* 19 U.S.C. § 3312(a)(1) ("No provision of the [North American Free Trade] Agreement, nor the application of any such provision to any person or circumstance, which is inconsistent with the law of the United States shall have any effect.").

[221]  *See* 19 U.S.C. §§ 3312(c) (NAFTA) and 3512(c) (Uruguay Round Agreements).

[222]  *See Medellín*, 128 S. Ct. at 1356 ("when . . . '[treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into

legislation, no objector cited to any provision in any federal law – either in Title 17,

which implements the Berne Convention and the WCT, or in the Uruguay Round

Agreements Act or the NAFTA Implementation Act – that would be violated by either

the ASA or its approval by the Court.  Even were approval of the ASA to violate any of

the treaties (and, as described below, the parties believe that the ASA is entirely

consistent with the treaty of obligations of the United States), the treaties may be

enforced only by an action taken by the government of one treaty party (*i.e.*, a signatory

country) directly against the United States pursuant to the treaties' own self-contained

remedies and dispute resolution procedures.[223]

     Simply put, the United States has not agreed to any means of direct enforcement

of any of these treaty obligations in U.S. courts.  Because no federal statute implementing

those treaties precludes approval of the ASA, the treaty-based arguments must be

rejected.  For the sake of completeness however, and to put to rest any lingering doubts

that the ASA upsets any international treaty, Plaintiffs briefly describe below why each of

---

effect,'" quoting *Whitney v. Robertson*, 124 U.S. 190 (1888); treaties "'are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms,'" quoting *Igartua-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc)).

[223] *See* Berne Convention, *supra* note 214, art. 33(1) (unless otherwise agreed, any dispute between two countries concerning "application of the Convention" to be brought before the International Court of Justice); TRIPS art. 64(1), Apr. 15, 1994, 1869 U.N.T.S. 299 (exclusive remedy for settlement of disputes is specified in Articles XXII and XXIII of GATT 1994; Article 23(2)(a) of GATT Annex 2 (Understanding on Rules and Procedures Governing the Settlement of Disputes) provides that the sole remedy for a dispute between Members is "recourse to dispute resolution" in accordance with the Understanding)).

assertions that the ASA violates a particular treaty provision also is substantively incorrect.

### b. The Settlement Does Not Impose Prohibited Formalities.

Article 5(2) of Berne prohibits formalities in the exercise of copyright rights.[224] Some objectors argue that the opt-out feature of Rule 23, the claiming process by which Rightsholders can assert their interest in Books and Inserts and manage them under the ASA, and the use of the Registry for this purpose are prohibited "formalities." That is not correct.

Formalities are conditions that are necessary for the "right to exist" and include "administrative obligations laid down by national law" that would lead to a "loss of copyright." *See* C. Masouyé, *Guide to the Berne Convention for the Protection of Literary and Artistic Works* at 33 (1978).[225] Accordingly, only those rights that are statutory prerequisites for obtaining, maintaining or exercising a copyright right are prohibited formalities.

Legal or administrative rules of general application, as distinct from preconditions on obtaining or exercising copyrights, are not formalities prohibited by the Berne

---

[224] *See* Berne Convention, *supra* note 214, art. 5(2) ("The enjoyment and the exercise of these rights shall not be subject to any formality.").

[225] At the time that the United States acceded to Berne, the Report of the House Committee on the Judiciary relied on the *Guide* to describe a formality as "a condition necessary for a right to exist." *See* H.R. Rep. No. 100-609, 100th Cong., 2d Sess., at 40 (1988).

Convention.[226]  Thus, the requirement that unless class members exercise their right to opt out pursuant to Rule 23(b)(3) they will be bound by a class action settlement (which is not unique to the Copyright Act) is not a formality.[227]  In addition, the ASA does not negatively affect the exercise of rights by copyright owners because they are, in fact, "exercising" their rights when they decide to opt out and preserve their rights to sue Google for infringement.  Finally, Article 5(2) of Berne specifically provides that the "means of redress" afforded to each author to protect his rights is governed "exclusively" by each country.  In the United States, copyright class actions, which include a class member's rights under Rule 23, are one such means of enforcement.[228]

As to the claiming process, that arises out of the parties' settlement of the class action litigation itself.  The concept that class members file claims in connection with a settlement is standard practice in class actions; it is not unique to the ASA.  The claiming

---

[226]  *See* Jane C. Ginsburg, "The US Experience with Copyright Formalities: A Love/Hate Relationship," 33 *Columbia J'l of Law and the Arts* at 5 (forthcoming), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1537247 ("Not every record-keeping or even litigation-related obligation a State imposes should be considered a Berne-banned 'formality'. Berne does not require the suspension of local rules of evidence or procedure applicable to all judicial proceedings; it targets only copyright-specific measures.")

[227]  *See Ricketson*, *supra* note 217, at 12 ("[Rule 23] is nonetheless a rule of general application that is not directed to any specific form of dispute, and certainly not to copyright disputes.").

[228]  *See id*., *supra* note 217, at 14 ("Rule 23 is unimpeachable as it falls squarely within the scope of the principle of national treatment in art 5(1) of Berne, as amplified by art 5(2)"; matters of "procedure and enforcement" are for the protecting country (*i.e.*, the United States)).

process here is not a precondition for obtaining or exercising a copyright right required as a matter of positive law.[229]

Further proof of this is evident from a comparison of the ASA with national collecting societies in Europe. In accordance with national law, those societies are the exclusive licensors of their rightsholder members' rights at prices not controlled by the members, have registration requirements and often offer no opportunity for an author to opt out of the arrangement. None of these legal arrangements, however, are considered formalities in violation of Berne.[230] Nor has any challenge been made to them, because

---

[229] *See id.* at 7 (claims requirement is no different than registration requirements that apply in case of national collecting societies, to obtain remuneration from exploitation of works).

[230] *See* S. Ricketson and J. Ginsburg, 1 *International Copyright and Neighbouring Rights: The Berne Convention and Beyond*" at 327 n.322 (2d ed. 2006) ("national law requirements that copyright licensing be carried out exclusively by a collecting society (with little freedom for the author to resist this) should not be deemed to conflict with article 5(2)) [hereinafter "*Ricketson and Ginsburg*"]. In Scandinavia, for example, national collecting societies are given mandatory rights to administer copyrights, unless an author opts out; the opt out requirement has not been considered to be, or challenged as, a formality that violates Article 5(2) of Berne. *See* "Thomas Riis and Jens Schovsbo, Extended Collective Licenses and the Nordic Experience – It's a Hybrid but is it a VOLVO or a Lemon?," 33 *Columbia J'l of Law and the Arts* at 14 (forthcoming) (not a formality if, outside licensing scheme, individual permission from rightsholder is still required and rights holders have claims against users who do not respect usage limitations in agreement), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1535230 [hereinafter "*Riis and Schovsbo*"]; *Ricketson*, *supra* note 217, at 7 n.2 (noting that "similar view" is taken by Professor Gervais with respect to the "opt out provisions in extended collective licence schemes," as in Scandinavia, citing D. Gervais, *Application of an extended licensing regime in Canada:  principles and issues relating to implementation*, Study prepared for the Department of Canadian Heritage 19 (June 2003)).

they are arrangements made to assist in collecting and disbursing funds to authors.[231]
The ASA, by comparison to the collecting societies, is far more protective of copyright
owners.  It allows a class member to opt out of the settlement entirely, is a non-exclusive
arrangement, permits copyright owners to turn off the license at will at any time and
allows Rightsholders of Books to set their own sales prices.

       For these same reasons, the opt-out requirement and the process of filing claims
do not violate TRIPS Article 41(2).[232]  These procedures are features of the U.S. class
action system and are not unduly burdensome.[233]  In fact, (1) claiming a work under the
ASA, (2) instructing Google not to scan it or to refrain from displaying it, and (3) the
receipt of revenues from Google's use of the works without having to negotiate a direct
license, all are far less complicated or costly than an individual copyright owner being
required to bring, successfully prosecute or settle a lawsuit against Google.  Nor does the
ASA establish "unreasonable time-limits":  Rightsholders have no deadline to claim their
works and can direct Google to change display uses at any time.

---

[231]  *Ricketson*, *supra* note 217, at 7 (observing that these arrangements are private and
       that registration is required to enable claimants to "register their entitlements").

[232]  Article 42(2) provides that "Procedures concerning the enforcement of intellectual
       property rights shall be fair and equitable.  They shall not be unnecessarily
       complicated or costly, or entail unreasonable time limits . . . ."  TRIPs, *supra* note
       224.

[233]  *See* D. Gervais, *The TRIPS Agreement:  Drafting History and Analysis* 442 (3d ed.
       2008) ("enforcement procedures involving intellectual property violations . . . should
       not be subject to any procedure that would complicate the enforcement of rights
       beyond what is customary (for other procedures) in the country concerned").

c.    **The ASA Does Not Impair An Author's Exclusive Rights.**

Objectors have argued that the ASA conflicts with Article 9(1) of Berne, which provides that "[a]uthors . . . shall have the exclusive right of authorizing the reproduction of these works, in any manner or form."[234]  The ASA, however, is most closely analogized to national collecting societies, which are common in Europe and elsewhere. Commentators have pointed out that the establishment of such societies, which then exploit authors' rights, does not constitute a limitation or exception to the exclusive rights of the author.  As long as the author's "exclusive economic right" is left "intact" and is still subject to enforcement by the collecting society, then Article 9(2) (described below) does not even apply.[235]

The provisions of the ASA operate the same way.  First, the litigation was brought to vindicate exclusive rights under Section 106 of the Copyright Act, which grants authors the right to sue.  Second, in connection with the suit's settlement, all Class members can exercise their exclusive rights by deciding to opt out.  Third, the ASA,

---

[234]    *See* Berne Convention, *supra* note 214, art. 9(1).  Similar arguments are made with respect to Art. 11-*bis*, with respect to the exclusive right of "communication thereof to the public by any other means of wireless diffusion" and Art. 12 (exclusive right of adaptations) of Berne, as well as to Art. 9(1) of TRIPS and Arts. 1701(2)(b) and 1705 of NAFTA, to the extent that they incorporate Berne minimum standards of protection.  *See, e.g.*, D.I. 900 at 4.

[235]    *See Riis and Schovsbo*, *supra* note 230, at 14-15 (citing P. B. Hugenholtz & R.L. Okediji, "*Conceiving an international instrument on limitations and exceptions to copyright*" at 19 (Mar 6, 2008)*, available at* www.ivir.nl/publicaties/hugenholtz/finalreport2008.pdf (no limitation or exception where right is subject to mandatory licensing to a collecting society, which can enforce right) [hereinafter "*Hugenholtz & Okediji*"].

consistent with the exclusive rights set out in the Copyright Act, gives Rightsholders

control over their works, including the right of removal (to prevent scanning or to require

that Google and the libraries delete digitized copies) and the right to turn off all display

uses (including those that Google argued were fair uses).  Fourth, the Registry, like a

collecting society, will be able to enforce Google's compliance with the terms of the

authorizations that the ASA grants to Google.

If national collecting societies, which generally mandate participation, (subject, in

some cases, to the right to opt out) do not encroach upon exclusive rights, then the non-

exclusive arrangements of the ASA plainly do not impair Class members' exclusive

rights.

### d.      The ASA Is A Legitimate Limitation And Exception To The Author's Rights.

As indicated above, the ASA complies with Article 9(1) of Berne.  Some

objectors argue, however, that, insofar as it does not, then the ASA also does not comply

with Article 9(2) of Berne, Article 10 of the WCT, and their counterpart in TRIPS,

Article 13, all of which authorize countries to establish limitations and exceptions to the

exclusive rights of the author.  Because the ASA does not limit the exclusive rights of the

author, those provisions are not applicable.  Nonetheless, given some of the objections

with respect to the ASA's alleged non-compliance with Article 9(2), Plaintiffs describe

below how the ASA fully satisfies that Article and its counterparts.

Article 9(2) of Berne provides that:

> It shall be a matter for legislation in the countries of the
> Union to permit the reproduction of such works in [1]
> certain special cases, provided that such reproduction [2]
> does not conflict with a normal exploitation of the work
> and [3] does not unreasonably prejudice the legitimate
> interests of the author.[236]

This "three-step" test has been the subject of much analysis and comment[237] as well as a single international adjudicative decision, which was rendered by a WTO dispute resolution panel.[238]  As two international copyright scholars have put it, the test is satisfied, and the limitation or exception will pass muster, if it is "not overly broad," does "not rob right holders of a real or potential source of income that is substantive," and does "not do disproportional harm to right holders."[239]

---

[236]  The counterpart provisions in the WCT and TRIPS are similar, but not identical, to Article 9(2).  *See* Art. 10, WCT ("Contracting Parties may, in their national legislation, provide for limitations of or exceptions to the rights granted to authors of literary and artistic works under this Treaty in certain special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author."); TRIPS, *supra* note 223, art. 13  ("Members shall confine limitations and exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the rights holder.").  These differences are immaterial and it is generally accepted that, as a practical matter, there is no meaningful difference between these texts, *see Ricketson and Ginsburg, supra* note 230 at 852 ("differences are more apparent than real"), and none that would matter for purposes of the ASA.

[237]  *See, e.g.,* S. Ricketson¸ "WIPO Study on Limitations and Exceptions of Copyright and Related Rights in the Digital Environment," WIPO Standing Comm. on Copyright and Related Rights (April 5, 2003), *available at* http://www.wipo.int/meetings/en/doc_details.jsp?doc_id=16805 [hereinafter "*WIPO Study*"].

[238]  *See* WTO Panel Report, *United States-Section 110(5) of the US Copyright Act*, WTO Doc. WT/DS160/R (June 15, 2000) [hereinafter "*WTO Decision*"].

[239]  *See Hugenholtz & Okediji*, *supra* note 235, at 15.

Finally, in an Agreed Statement to the most recent international treaty that embodies the three-step test – the WCT – it was agreed that treaty parties could devise new exceptions and limitations that are appropriate in the digital environment.[240] Accordingly, even if Article 9(2) is applicable to the ASA, because the ASA addresses how Google is authorized to digitize and make available, in digital form, Rightsholders' works, an even more flexible approach is in order.[241]  Under any standard, therefore, the ASA meets each of these three steps.

As to the first step, the ASA qualifies as a "special case."  This element of the step requires that the "exception or limitation" must be "clearly defined" and must be "limited in its field of application or exceptional in scope.  In other words, an exception or limitation should be narrow in quantitative as well as in a qualitative sense."[242]  It also

---

[240]  *See* Agreed Statement Concerning Article 10 of the WIPO Copyright Treaty, WIPO Doc. CRNR/DC/96 (Dec. 23, 1996), *available at* http://www.wipo.int/treaties/en/ip/wct/statements.html ("It is understood that the provisions of Article 10 permit Contracting Parties to carry forward and appropriately extend into the digital environment limitations and exceptions in their national laws which have been considered acceptable under the Berne Convention. Similarly, these provisions should be understood to permit Contracting Parties to devise *new* exceptions and limitations that are appropriate in the digital network environment." (emphasis supplied))

[241]  *Riis and Schovsbo*, *supra* note 230, at 18 (agreed statement indicates decision to postpone addressing issue of exceptions to the digital network environment; noting that agreed statement, as part of WCT, a treaty subsequent to Berne, represents countries' interpretation of three-step test).

[242]  *See WTO Decision*, *supra* note 238, at 33; *WIPO Study, supra* note 237, at 22.

has been argued that the phrase "certain special cases" does not require a special purpose, but only that the exception be measured against the second and third steps.[243]

The ASA satisfies the first step because it arises out of the settlement of a particular lawsuit against Google; that lawsuit and its settlement is specific to Google and does not establish a rule of broad application, such as a statute, that would authorize mass digitization projects more generally.  Furthermore, the ASA's authorizations to Google are specific, narrowly circumscribed and clearly defined, and are limited solely to Google.  Finally, neither the ASA, in general, nor the A-P Procedures, in particular, have any effect as precedent.

As to the second step, the ASA does not "conflict with the normal exploitation of the work."  The WTO Panel indicated that "not every use of a work . . . necessarily conflicts with a normal exploitation of that work" and, further, that a conflict arises where the exempted uses "enter into economic competition with the ways that right-holders normally extract economic value from that right to the work . . . and thereby deprive them of significant or tangible economic gains."[244]  Commentators also have suggested that application of the second step involves balancing the non-economic purposes of the exception with the author's rights, rejecting the view that only economic considerations

---

[243]   *See Ricketson and Ginsburg*, *supra* 230, at 766-67 (no "special purpose" required, so long as exceptions are "finite and limited in scope"); J. Ginsburg, "Towards a Supranational Copyright Law?  The WTO Panel and the 'Three-Step Test' for Copyright Exceptions," [2001] *Revue internationale du droit d'auteur* 11-12 (Jan. 2001), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=253867 (no "normative dimension" to first step; exception must be "sufficiently narrow").

[244]   *See WTO Decision*, *supra* note 238, at 48; *WIPO Study*, *supra* note 237,  at 24.

should be taken into account;[245] the justification for the exception may require a "clear public interest character that goes beyond the purely individual interests of copyright users."[246] The ASA satisfies the second step because it establishes economic models, principally for out- of-print works, that do not compete with the ways in which authors and publishers extract "economic value" from those works.  Indeed, there is no "normal" – *i.e.*, existing – market for the exploitation of out-of-print books: they are not sold commercially and, for many of them, there is no feasible way to exploit digital rights because the cost of digitization (borne by authors, publishers and others) might well outweigh any expected revenues.  In some cases, the rights are unclear or no one would step forward to exploit the works independently.  Furthermore, because the ASA's authorizations are neither exclusive nor mandatory, a Rightsholder who believes that Google's authorizations interfere with his independent right to exploit his work economically simply can exercise his rights under the ASA to stop Google from doing so.  Finally, by making millions of out-of-print books broadly available to the public, including snippets and Preview Use pages for free, and by enhancing the revenue opportunities for Rightsholders, it is clear that the ASA substantially furthers the public interest.

---

[245]  *See Ricketson and Ginsburg, supra* note 230, at 772 (balancing exercise is implicit in second step and is consistent with preparatory work for Stockholm Conference, which introduced Article 9(2) and assists in interpreting provision).

[246]  *See WIPO Study, supra* note 237, at 26.

As to the third step, the rights granted to Google and the libraries under the ASA do not "unreasonably prejudice the legitimate interests of the author."  Although each of these words has been the subject of considerable comment, a key phrase is "unreasonably prejudice," which is taken to mean that the limitation is proportionate, that is, that "the usage should be done subject to certain conditions or within certain guidelines."[247] Furthermore, prejudice is not "unreasonable" if payment is made for the use.[248]  As described by the WTO Panel, prejudice to the author is tolerable if the exception provides compensation, but if, however, even if there is a "serious loss of profit for the copyright owner," then he should be provided "with some form of compensation (a system of compulsory license with equitable remuneration)."[249]  Collecting societies have concluded that their exploitation of members' rights meets this test if, for example, the economic terms are reasonable for authors and the author has the right to forbid copying and, in some cases, even if they do not have any permission from rights owners.[250]

---

[247]  *See WIPO Study*, *supra* note 237, at 27.

[248]  *See Ricketson and Ginsburg*, *supra* note 230, at 776.

[249]  *See WTO Decision*, *supra* note 238, at 59 n. 205.

[250]  *See, e.g.*, *Riis and Schovsbo*, *supra* note 230, at 17 & n. 65 (remuneration provided under collective licensing; quoting evaluation of collecting licensing under Article 9(2) by Finnish Committee on Copyright).  Notably, the German collecting society for authors and publishers, VG Wort, which has objected to the ASA, D.I. 30, grants digital licenses to so-called orphan works without authorization and without any legal mandate on the basis of the "high cultural-political importance of retrodigitisation," justifying this as "indemnification" of licensees.  *See* R. Staats, "How best to recognise "orphan status," EU Public Hearing on Orphan Works, at 3 (Oct. 26, 2009), *available at* http://ec.europa.eu/internal_market/copyright/docs/copyright-

The ASA does not unreasonably prejudice Class members because it is subject to specified conditions, there is no "serious loss of profit" for the copyright owner  and the ASA specifically provides for compensation to both authors and publishers.

For the foregoing reasons, even if the three-step test of Article 9(2) of Berne and Article 13 of TRIPS were applicable to the ASA, that test is fully satisfied.

### e.    The ASA Does Not Discriminate Against Foreign Rightsholders.

One objector argues that the differential treatment of foreign Rightsholders from the United Kingdom, Australia and Canada, as compared with Rightsholders from other countries, is a violation of the most favored nations provision of Article 4 of TRIPS.  It provides:  "With regard to the protection of intellectual property, any advantage, favour, privilege or immunity granted by a Member to the nationals of any other country shall be accorded immediately and unconditionally to the nationals of all other Members."[251] There is no merit to this objection.

First, the objection confuses the definition of covered works – Books and Inserts – with the nationality of Class members.  The ASA does not discriminate among groups of Rightsholders.  Any Rightsholder, no matter where he or she resides or is located,

---

infso/orphanworks/Staats_en.pdf.  The ASA, by contrast, obtains the authorization of Class members by virtue of Court approval.  Accordingly, it is puzzling why the Federal Republic of Germany objects to the ASA's granting Google an exclusive license with respect to orphan works, *see* D.I. 852 at 3, when the ASA – in contrast with what appears to be the practice in Germany – does so based on legal authorizations.

[251]    *See* TRIPS, *supra* note 223, art. 4.

whether in the United States or the other three countries, may have works that are covered by the ASA based on the place of publication of Books or on whether the work was registered with the United States Copyright Office.[252]

Second, and most significantly, those who are now objecting also objected to the inclusion of their members' works in the original Settlement. The Börsenverein and the Association of Italian Publishers specifically requested to Class Counsel that their publisher members' works be excluded.[253] It is, at the least, ironic that they now argue that Rightsholders whose works are included now are actually somehow "advantaged," as compared to copyright owners whose works are excluded from the Settlement because the works were only published in, *e.g.*, Germany and Italy. Since the parties excluded such copyright owners from the Settlement based on their specific request, little credence should be given to this objection.

### 3. Miscellaneous Concerns.

Hachette objects on the grounds that European publishers that participate in the ASA are likely to expose themselves to liability under Article 81 of the Treaty

---

[252] That the ASA does not discriminate among Rightsholders is acknowledged by, for example, the Federal Republic of Germany, which notes that a German author will be covered by the ASA if the Book was registered in the Copyright Office or was published in one of the three countries. D.I. 852 at 4.

[253] D.I. 175 at 2 ("The Settlement Agreement is an affront to copyright holders throughout the world and the Börsenverein thus respectfully requests that this Court not approve it, with respect to foreign rightsholders at a minimum, for the reasons set forth in our accompanying Objections and below").

Establishing the European Community.[254]  The ASA, however, only applies in the United States; it contemplates the possibility of granting a non-exclusive license to Google to exploit works solely in the United States.  The ASA cannot implicate Article 81(1) of the EC Treaty, which prohibits "all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the common market."[255]  The ASA was negotiated by Plaintiffs in the context of the settlement of a U.S.-based litigation; Hachette was not involved in that negotiation.  Nor does the ASA implicate or sanction any "agreements" among publishers; each publisher is and will be able to make its own decisions with respect to whether it authorizes Display Uses for its Books and, if it allows Consumer Purchase, the price at which its Books will be sold.  As noted *supra* Section III.A, the ASA is neither collusive nor anticompetitive.

## S.    Hosted Copies.

Some objectors argue that the ASA should not be approved because Google is not required to provide each member of the Class with a digital copy of his, her or its Book.[256]  The ASA instead provides that Google will provide a "hosted version" of the

---

[254]  D.I. 471 at 10 (settlement infringes Article 81(1) of the EC Treaty; pursuant to Article 81(2), it is null and void within the EU).

[255]  Treaty on the Functioning of the European Union, art. 101(1), May 9, 2008, 2008 O.J. (C 115) 88 (as of December 1, 2009, replacing the Treaty Establishing the European Community, art. 81(1)).

[256]  *See, e.g.,* D.I. 90 at 1; D.I. 94 at 1; D.I. 123 at 5.

Rightsholder's Book, available on the website of the Rightsholder (with minimal Google branding, which may be tailored by the Rightsholder on request). ASA § 3.11. This is fair, adequate and reasonable.

## III. OBJECTIONS NOT RELATED TO FAIRNESS TO THE CLASS ARE WITHOUT MERIT.

In addition to the objections addressed above, a number of objections and other comments filed, including the SOI, raise issues that are unrelated to whether the ASA represents a fair, adequate and reasonable settlement of the claims of the Class. Plaintiffs nonetheless address these comments below.

### A. The ASA Is Not Anti-Competitive.

The ASA has been challenged as (i) implementing an unlawful horizontal combination of Rightsholders, in violation of Section 1 of the Sherman Act, or (ii) giving Google a monopoly with respect to the exploitation of unclaimed works or orphan works, in violation of Section 2 of the Sherman Act. These objections are voiced most forcefully by entities (*e.g.*, Microsoft, Amazon.com, Yahoo!) that are not objecting to the Settlement's fairness to the class of Rightsholders, but to their potential disadvantage as competitors of Google.[257]

---

[257] Perhaps the most strident objections come from the Open Book Alliance ("OBA"), which includes these principal competitors and was formed specifically to oppose the Settlement. Its objections to what it calls a "sordid financial scheme," D.I. 840 at 1, simply do not withstand scrutiny. For example, OBA asserts that the Settlement allows Google to engage in anticompetitive bundling of "its book offerings into its general search engine." *Id.* at 14. "Bundling," in the antitrust context, involves requiring customers to buy multiple goods or services in a package, which may disadvantage rivals unable to offer the full package. *See, e.g.*, Cascade Health

These objections require the Court to speculate as to currently unknowable facts, such as the number of Books that will remain unclaimed, the future development of the market(s) for electronic access to books and possible future anticompetitive effects of the ASA. It would be improper and unnecessary for this Court to engage in such speculation, particularly when the parties have agreed not to claim that the Court's approval provides immunity under the *Noerr-Pennington* doctrine. The DOJ (which "continues to investigate the competitive impact," SOI at 16, a Google competitor or any other private plaintiff will have a full opportunity down the road to challenge any aspect of the ASA on a concrete factual record.[258]

In any event, the existing record shows that the ASA is a classic pro-competitive intellectual property agreement, because it is a non-exclusive grant that will increase the availability of electronic versions of in-print books and make available millions of out-of-

---

*Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008). But there is no suggestion that Google will require consumers to purchase books and search engine services as a package. Rather, the OBA is complaining that Google is incorporating the text of scanned books into the data base for its search engine. That does not constitute the "bundling" that "[s]ome courts condemn . . . under the per se rule," as OBA asserts. D.I. 840 at 15.

[258] It would be inappropriate to transform the fairness hearing into a trial to as to all of the possible market effects of the ASA. The decision in *In re Montgomery Co. Real Estate Antitrust Litig.*, 83 F.R.D. 305 (D. Md. 1979), cited in the objection of Amazon.com, Inc., D.I. 206 at 16, holds exactly that. *Montgomery Co.* was an antitrust class action in which the legality of pricing arrangements in the real estate broker business was being litigated. Consequently, a settlement that sanctioned anticompetitive conduct would have been unfair to the class. Even then, the court had no "responsibility of 'trying' the case" to determine the legality of the proposed settlement. *Id.* at 319. Rather, it reviewed limited information, obtained from public sources and the parties, to conclude that the settlement did not "appear" to have an unreasonable anticompetitive effect. *Id.* at 320.

print books to individual consumers and institutional subscribers.  It creates no antitrust

violation.

## 1.    Overview Of The Relevant Law.

### a.    Section 1.

#### i.    *Per se* Treatment.

Section 1 of the Sherman Act prohibits agreements that unreasonably restrict

competition.  Most agreements are analyzed under the rule of reason to determine

whether their "anticompetitive effects outweigh [the] procompetitive effects."  *Atlantic*

*Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990).  Courts apply *per se*

treatment only to naked restraints on competition (such as horizontal price-fixing

agreements) "that would always or almost always tend to restrict competition and

decrease output," *Leegin Creative Leather Prods. v. PSKS, Inc.,* 127 S. Ct. 2705, 2725

(2007) (*quoting Business Elecs Corp. v. Sharp Elecs Corp*., 485 U.S. 717, 723 (1988)),

and are not ancillary to potentially pro-competitive cooperative conduct.  *See Business*

*Elecs. Corp.*, 485 U.S. at 723.

Agreements like the ASA, between parties in a vertical distribution relationship,

are scrutinized under the rule of reason, not a *per se* analysis.  *Leegin,* 127 S. Ct. at 2714-

15 (contrasting vertical and horizontal restraints).  This is so even where the venture

involves the setting of prices.  *See Leegin*, 127 S. Ct. at 2712; *Palmer v. BRG of Ga., Inc.*,

498 U.S. 46, 49-50 (1990) (per curiam)).

The DOJ and FTC guidelines for the licensing of intellectual property state that

in "[i]n the vast majority of cases, restraints in intellectual property licensing

arrangements are evaluated under the rule of reason." Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.2 (April 6, 1995) (*available at* www.usdoj.gov/atr/public/guidelines/0558.htm) ("IP Guidelines"). The IP Guidelines recognize that (i) intellectual property licensing is "generally pro-competitive" because it "allows firms to combine complementary factors of production," IP Guidelines, §2.0 (General Principles), and (ii) non-exclusive licenses generally do not "present antitrust concerns even if the parties to the license are in a horizontal relationship, because the non-exclusive license normally does not diminish competition that would occur in its absence." *Id.* § 4.1.2.

### ii.    The Rule Of Reason.

Under the rule of reason, courts generally conduct a three-step analysis. First, a plaintiff must demonstrate that the challenged action has had an actual adverse effect on competition in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993). Second, if the plaintiff does so, "the burden shifts to the defendant to establish the pro-competitive redeeming virtues of the action." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (internal quotation marks and citation omitted). Third, if the defendant meets its burden, the plaintiff then must show "that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of competition." *Id.*; *accord In re Tamoxifen Citrate Antitrust Litig.* 466 F.3d 187, 202 n.13 (2d Cir. 2006).

Courts have accepted various pro-competitive justifications to overcome a plaintiff's initial showing of an adverse effect on competition:

- Creating a new product (*see, e.g., Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979) ("*BMI*"));

- Increasing output (*see, e.g., id.*);

- Creating operating efficiencies, such as reducing transaction costs (*see, e.g., FTC v. Indiana Fed'n of Dentists*, 476. U.S. 447, 459 (1986)); *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003);

- Enhancing product quality (*see, e.g., United States v. Brown Univ.*, 5 F.3d 658, 674-75 (3d Cir. 1993));

- Enhancing product availability (*see, e.g., id.*); and

- Enhancing consumer choice (*see, e.g., Paladin Assocs.*, 328 F.3d at 1157).

Approval of the ASA will result in every one of those pro-competitive effects.

###### b.    Section 2

A Section 2 monopolization claim requires proof of not only (i) "possession of monopoly power in the relevant market," but also (ii) the "willful acquisition or maintenance of that power" as opposed to, for example, "growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (emphasis added); *accord Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.19 (U.S. 1985); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 n.14 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093 (1980). "[M]onopoly power" is the "power to control prices or exclude competition." *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

## 2.    The ASA Does Not Violate Section 1.

Google has agreed to pay Rightsholders 63% of its revenue from all commercial exploitation of the Rightsholder's book[s] through one or more Revenue Models, keeping 37% for itself (the "Revenue Split").  A Rightsholder, however, always can seek to negotiate a different revenue split, and Google can do so in the case of Commercially Available books.  Some objectors assert that this arrangement is the result of a horizontal agreement among Rightsholders and thus is either *per se* unlawful or should be found anticompetitive under the rule of reason.[259]  The DOJ says that it "raise[s] concerns." SOI at 17-18.  Some objectors also assert that the ASA establishes an unlawful horizontal agreement as to the prices that Google will charge for individual books or institutional subscriptions.[260]  None of these objections has merit.

### a.    The 63-37% Revenue Split Does Not Violate Section 1.

The Revenue Split is a vertical agreement between Google and Rightsholders.  It is not unlawful price-fixing and cannot constitute a *per se* violation:

- The Revenue Split is not the result of a horizontal agreement that Rightsholders imposed on Google.  Google itself proposed the Revenue Split, which is the same as the 70-30% split for advertising revenues (after deducting estimated costs of 10%) that Google offers outside the ASA in its Partner Program.  Cunard Decl. ¶ 15.  Neither the DOJ nor any objector cites any case prohibiting a single purchaser, such as Google, from

---

[259]    *See, e.g.*, D.I. 823 at 18, D.I. 863 at 14.

[260]    *See, e.g.*, D.I.823 at 14-17.

agreeing voluntarily to deal with multiple competing suppliers, such as the Rightsholders, on the same terms.[261]

- There is no agreement among Rightsholders, or by Rightsholders collectively with Google, to adhere to the Revenue Split. Each Rightsholder is free to decide whether, and to what extent, to participate in the ASA, or to negotiate its own arrangement with Google. A Rightsholder may terminate its participation in the ASA programs at any time, whether for one Book or all of its Books, and for whatever reason. Moreover, the ASA allows Google to decide not to offer the 63-37% split for any Commercially Available book.[262]

Moreover, the Revenue Split is ancillary to the pro-competitive settlement of this copyright litigation, which will substantially increase the output of books through the Consumer Purchase, Institutional Subscription and the Public Access Service models. Such ancillary restraints are subject to review under the rule of reason. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* (2000), §1.2. Applying that test, the pro-competitive benefits of allowing readers to access these Books, and Rightsholders to earn revenue from them, far outweigh any alleged anti-competitive effect.

---

[261] Each case cited to support the DOJ's assertion that "horizontal agreements of this type can be deemed *per se* unlawful," SOI at 18, involved an agreement among competitors on the prices to be charged their customers at large. Those are not the facts here, where a single purchaser has voluntarily agreed to pay the same price to multiple sellers. *Cf. Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922, 925, 929 (1st Cir. 1984) (Breyer, J.) (insurer's insistence on uniform terms in transactions with all sellers of medical services was not an unreasonable restraint of trade).

[262] Objections that the ASA will impose "a ceiling on the amount of money authors may make on the sale of their works," D.I. 456 at 3-4, or conversely that it imposes a "price floor" at the wholesale level, D.I. 840 at 6, are both wrong. Authors will be free to negotiate their own deals with Google and other distributors. Although the DOJ refers to "the horizontal agreement not to compete as to price terms for works that are not 'Commercially Available,'" SOI at 17, the ASA contains no such agreement.

This is especially so because the Revenue Split will not reduce output and will not affect the prices paid by consumers, the hallmarks of an unlawful cartel or other anticompetitive arrangement.  Even if some Rightsholders receive a higher share of revenues from Google than they would get individually (which is not the case because Google offers the same terms outside the ASA), that increased share of revenues will not result in any decrease in output of Books.  The pricing algorithm that Google will use to determine the prices it charges for books will not take account of Google's costs (including the share of revenue paid to Rightsholders).  Therefore, Google's prices to consumers will not be affected by the Revenue Split.  Because the Revenue Split will not increase prices to consumers, it will not reduce their purchases of Books.  Any "injury" that might result from Google's purported payment of a supra-competitive share of revenues to some Rightsholders will affect only Google, which is agreeing voluntarily to pay that 63% share.[263]

The absence of decreased output was crucial to the result in *BMI*; *see also Major League Baseball Properties, Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008) (absence of "any reduction of or agreement to reduce 'output'" supports dismissal of antitrust claim challenging joint marketing arrangement in which rights holders shared royalties).

In *BMI*, the Supreme Court held that a performing rights society's offering of a blanket license to the musical works of all participating copyright owners should be

---

[263]   Because this purported "per se illegal wholesale price-fixing" could only harm Google, the objection of Google's competitors plainly reflects only their desire to derail the Settlement.  *See, e.g.*, D.I. 823 at 19.

judged under the rule of reason, because conduct is only subject to *per se* rule where it "always or almost always tends to restrict competition and reduce output."  441 U.S. at 19-20.  The Court noted that "composers have numerous incentives to produce, so the blanket license is unlikely to cause decreased output, one of the normal undesirable effects of a cartel."  *Id.* at 22 n. 40.[264]

As also was true in *BMI*, the uniform Revenue Split reduces transaction costs, "which is of course potentially beneficial to both sellers and buyers" and thus is pro-competitive.  *Id.* at 21.  This reduction of transaction costs is one of the key benefits to the Class, without which it could be difficult, if not impossible, to market many of the Books (especially those which are out of print and unclaimed).  The Revenue Split is pro-competitive because it allows these Books to earn revenue, incentivizing Rightsholders to come forward and claim their Books.  Even as to Books for which the rights are already claimed, requiring individual authors or small publishers to negotiate separate revenue share agreements with Google would impose transaction costs that could exceed – or consume a prohibitive portion of – any revenues they might anticipate through Google's exploitation of their books.

---

[264]  The argument that the reasoning in *BMI* is inapplicable, because BMI and ASCAP were already subject to consent orders, is illogical at best.  Those consent orders were the result of prior DOJ litigation alleging specific antitrust violations.  If the DOJ concludes that any aspect of the ASA violates the antitrust laws, it will remain free to seek an appropriate remedy.

b.    **Rightsholders Will Not Collectively Set Book Prices.**

Arguments that the ASA violates Section 1 by allowing competing Rightsholders to act together in setting prices to consumers, or for Institutional Subscriptions, are based on misunderstandings or mischaracterizations of the settlement.[265]

First, with respect to consumer purchasers, Rightsholders will not collectively set any prices, nor is there any "horizontal agreement among authors and publishers to have Google price their works" using the pricing algorithm. SOI at 19. A Rightsholder always is free to set the price for its Book(s) (a "Specified Price"), which can even be zero. § 4.1(b)(i)(1). If the Rightsholder does not set a Specified Price, or if the Book is unclaimed, then the price will be set unilaterally by Google, using the pricing algorithm that it develops.[266] There is no basis for the assertion that "the Books Rights Registry will be empowered to negotiate the price to be charged to consumers for all of the publishers who give it consent to do so."[267] In no circumstances will Rightsholders

---

[265]  *See, e.g.,* D.I. 273 at 16; D.I. 239 at 11.

[266]  The DOJ, which "does not object to Google's unilateral use of a pricing algorithm," offers no support for characterizing Google as a "common agent" given pricing authority by a group of competitors, SOI at 19, rather than a retailer who sets the prices at which it sells goods supplied by competing producers. Indeed, until the Supreme Court recently loosened restrictions on vertical price fixing, the "bilateral negotiations" that the DOJ suggests each Rightsholder should have with Google over the retail price would have been *per se* illegal; even now, a supplier is free to let a retailer unilaterally determine the price at which it will sell the supplier's goods.

[267]  D.I. 206 at 30.

acting collectively (nor the Book Rights Registry or the Unclaimed Works Fiduciary) determine prices charged to consumers.[268]

Second, Rightsholders will not set the price of Institutional Subscriptions.  The Registry will have only a limited role in reviewing Institutional Subscription prices proposed by Google to ensure that they satisfy the dual objectives of "(1) the realization of revenue at market rates for each Book and license on behalf of Rightsholders and (2) the realization of broad access to the Books by the public, including institutions of higher education."  ASA, § 4.1(a)(1).  This limited role is essential to protect the interests of Rightsholders, because Google's self-interest could lead it to reduce the prices of Institutional Subscriptions well below the equilibrium market price to maximize revenue from other Google services (*e.g.*, Section 4.1(a)(ix)), which it is not required to share with Rightsholders.  The Registry can only propose modifications to Google's proposed pricing strategies; it cannot impose prices.  If Google and the Registry disagree, an arbitrator will decide on a strategy that is consistent with the dual objectives quoted above.  ASA § 4.1(a)(vii)(2).

As in *BMI*, the pricing of the Institutional Subscription should be subject to review under the rule of reason, not the *per se* rule, because it is ancillary to the creation

---

[268]  In response to alleged ambiguities, the parties revised Section 4.2(b)(i)(2) of the ASA to make clearer that Google will unilaterally set the Settlement Controlled Price at a level that simulates how a Rightsholder would unilaterally price the Book in a competitive market.  Google is developing the algorithm without Registry or Rightsholder involvement (although the Registry may use a third-party expert solely to confirm that the algorithm is designed to accomplish its goal).  ASA § 4.2(c)(ii)(2).

of a desirable new product that Rightsholders could not individually create.[269]  The

creation of the Institutional Subscription will increase consumer welfare, and the

Registry's ability to monitor Google's pricing strategies is a reasonable safeguard to

induce Rightsholders to allow their intellectual property to be used in the Institutional

Subscription.  Thus, those provisions are not anticompetitive.  *See BMI*, 441 U.S. at 19.

("[W]e would not expect that any market arrangements reasonably necessary to

effectuate the rights that are granted [by copyright law] would be deemed a *per se*

violation of the Sherman Act.")

### 3.    The ASA Does Not Violate Section 2.

Most of the remaining antitrust objections are based on the unsupported

assumption that because the Institutional Subscription will include so-called "orphan

works," it will constitute a separate market in which Google will face no competitors.[270]

This argument relies on unsupported and illogical speculation that the subset of out of

print books whose Rightsholders cannot be located by the Registry, and never come

forward to claim their share of whatever revenue is generated, is so uniquely valuable and

desired that other subscription products will be unable to compete with the Institutional

Subscription.[271]

---

[269]  Objectors generally concede that the *per se* rule does not apply to Institutional Subscriptions.  *See, e.g.*, D.I. 206 at 23.

[270]  *See, e.g.,* D.I. 300 at 11-12; D.I. 733 at 6-10; SOI at 22 (Google's "upstream monopoly").

[271]  Even if Google would have a monopoly, objections that it would engage in "price-gouging," *see, e.g.*, D.I. 336 at 3-4,  ignore Google's strong incentives to keep the

Moreover, "[h]aving a monopoly does not by itself violate § 2. A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct." *U.S. v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Nothing in the ASA excludes Google's potential rivals from attempting to obtain the right to sell any Books, whether claimed or unclaimed, individually or collectively as part of a subscription. Nor does it make it more difficult for them to do so.[272] Rather, the ASA simply authorizes Google to sell Books that no one has previously been able to sell because the transaction costs involved in finding copyright owners and clearing the rights are too high. Any inability of others to sell "orphan works" or subscription products that include "orphan works" is completely independent of any terms of the ASA.

Through the ASA, class members will authorize Google to make available their works, both claimed and unclaimed. That plainly is pro-competitive, as most objectors concede, because it enables individual consumers and institutions to acquire or have access to numerous Books that are not now commercially available and thus can be obtained only from a limited number of libraries or through purchase of used books. This

---

price of the Institutional Subscription low. Separately, these objections have no basis in antitrust law, because Section 2 does not prohibit a monopolist from charging a high price. *See Verizon Comm'ns, Inc. v. Trinko*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system.").

[272] *See* D.I. 874 at 21 (ASA also does not "bar Google's rivals from access to a key input [(*i.e.*, content)]" for use with their search engines). *See* Google Brief at 50 (addressing objections relating to search market).

authorization will increase output (of access to Books) and enhance consumer welfare, two primary goals of the antitrust laws.

The ASA does not grant third parties the same rights that Google is obtaining from the members of the class. It is not anticompetitive, however, to create a single new competitor in a market, or to create an entirely new market, unless the purported monopolist achieves or maintains that position by exclusionary behavior. Even *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985), relied on by several objections, only prohibited conduct that both "(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."[273] Neither of these factors is present here.

The ASA imposes no entry barriers to potential licensees of unclaimed works, and thus it is not exclusionary.[274] To the contrary, the ASA will facilitate the ability of competitors to Google to provide electronic access to Books. The ASA provides that the Registry (or, in the case of unclaimed Books, the Unclaimed Works Fiduciary) will be authorized, "to the extent permitted by law, to license Rightsholders' U.S. copyrights to third parties." ASA § 6.2(b)(1). Thus, not only are all rights licensed to Google

---

[273] The Supreme Court has described *Aspen Skiing* as "at or near the outer boundary of § 2 liability." *Verizon*, 540 U.S. at 409.

[274] Because numerous objectors complained that Section 3.8(a) of the original settlement, which gave Google "Most Favored Nation" status under certain circumstances, created a potential barrier or disincentive to entry, *e.g.*, D.I. 273 at 18-19; D.I. 733 at 16-18, the parties eliminated that provision from the ASA.

expressly non-exclusive, ASA § 2.4, but the ASA allows the Registry to grant additional licenses if Rightsholders authorize it to do so.

Even if Rightsholders do not authorize the Registry to grant licenses to other sellers, the ASA will still strongly assist competitors' efforts.  First, the Registry is required to disclose whether there is a Registered Rightsholder for a Book and, except if the Rightsholder expresses reasonable privacy concerns, the identity of the Registered Rightsholder.  ASA § 6.6(d).  This will enable a potential distributor to contact a Registered Rightsholder directly, if it has contact information, or to ask the Registry to communicate its interest to the Rightsholder.  Thus, the ASA reduces the substantial transaction costs for third parties in identifying and contacting Rightsholders of claimed Books.

In addition, the Registry is required to attempt to locate Rightsholders in order to allow them to claim their books,  ASA § 6.1(c), and will use initial Settlement Funds, operating funds and a designated percentage of Unclaimed Funds to pursue that responsibility.  ASA § 6.2(iv).  Notice of the ASA has already induced many Rightsholders to come forward to claim their Books, and the Registry's efforts to locate additional Rightsholders will further reduce the number of unclaimed Books.[275]  This will

---

[275]   The Registry will have incentives to locate Rightsholders, and to have them claim their Books, in order to allow a larger number of Books to be potentially available for licensing to competitors of Google.  Other efforts to locate unknown rights holders in the United Kingdom have had success rates greater than 85%.  *See supra* note 24.

enable other distributors to contact previously unknown Rightsholders to license their Books.

Lastly, the ASA may incentivize interested groups and Congress to enact legislation that could enable other distributors to obtain rights to use unclaimed works. A number of objectors have argued that such legislation, rather than the ASA, is the best way to address the licensing of such works. Unfortunately, previous efforts to enact orphan works legislation have been unsuccessful, and future efforts seem, at present, no more likely to succeed. With the ASA as a model, and the desire to allow other distributors to compete with Google as an added incentive, the prospects for enactment of appropriate legislation may well be improved by approval of the ASA.

In sum, granting Google the right to include unclaimed works in the Institutional Subscription serves the pro-competitive goal of making a desirable new product available to libraries, universities and other institutions and has no anticompetitive exclusionary effects on other potential competitors. It is indisputably more pro-competitive and output-enhancing to have one seller rather than none.[276]

Lastly, it is worth emphasizing that even accepting the DOJ's "concern" that the Settlement produces a "less than optimal result from a competition standpoint," SOI at 16, the antitrust laws do not require that the ASA create perfect competition where no market existed. Rather, they prohibit only exclusionary conduct that would impede the

---

[276] *See, e.g.,* E. Elhauge, *Why the Google Books Settlement is Procompetitive,* Harvard Law and Economics Discussion Paper No. 646, at 15-20, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1459028.

development of competition.  Because the ASA does not impose barriers to competition in the sale of Books (including orphan works), it does not violate the antitrust laws.

### B. The Amended Settlement Does Not Violate State Escheat Or Abandoned Property Laws.

The Attorneys General from five states (collectively, the "State AGs")[277] have objected to the ASA, arguing that the distribution of unclaimed funds under Section 6.3 violates their respective custodial escheat or abandoned property statutes.  These objections are misplaced.  Section 6.3 satisfies all applicable law.

### 1. The State AGs Lack Standing.

As a threshold matter, no "unclaimed funds" presently exist.  The ASA has not yet been approved, the Registry has not yet been formed, Google has not yet sold any Books under the ASA, and no revenues have yet been earned.  Thus, none of the State AGs presently have standing to object because there are no funds to which they arguably might be entitled.  *See Paterson v. State of Texas*, 308 F.3d  448, 451 (5th Cir. 2002).

In *Paterson*, the class action settlement provided that any settlement check or money order not negotiated within 18 months of mailing would become null and void, and all rights to that compensation would revert back to the defendant, not be deposited with the states.  When Texas challenged that provision on appeal, the Fifth Circuit dismissed the appeal, stating that the issue had been prematurely raised:  "[w]e can ascertain no legal claim that the State has standing to make."  *Id*. at 451.  Texas'

---

[277] The states are Connecticut, Massachusetts, Pennsylvania, Texas, and Washington. (The state of Missouri objected to the original settlement, but has not objected to amended Section 6.3.)

purported harm was not "concrete and particularized" and not "actual or imminent" as opposed to "conjectural or hypothetical." *Id*. "[T]he State has not itself suffered an actual or imminent injury and can demonstrate no present interest in settlement funds." *Id*. The same is true here, with respect to any funds to which one of the states represented by any of the State AGs might be entitled.

### 2. Rule 23 Governs The Disposition Of Unclaimed Settlement Funds.

Even in cases where a state claims that its escheat laws entitle it to settlement funds and such claim might have been ripe for adjudication, federal courts have rejected the application of such laws to class action settlements. *See, e.g., In re Lease Oil Antitrust Litigation,* 2009 WL 5195977 (S.D. Tex. Dec. 22, 2009). In *Lease Oil*, the federal court considered a settlement that resulted in $4.6 million in uncashed checks to claimants who had last-known Texas addresses. *Id.* at *5 n.4. Although the settlement provided for the federal court to make a *cy pres* distribution of these funds, Texas asserted that it should instead receive these funds under its custodial escheat law. *Id.* at *3-4.

The court considered at length the purpose of state escheat laws, and ruled that those laws conflicted with the court's "broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds" under Rule 23, and that, in the exercise of such discretion, "courts have utilized *cy pres* distributions where class members are difficult to identify . . . or where there are unclaimed funds." 2009 WL 5195977 *8 (extensive citations omitted). The court further found that Rule 23(e), which

governs federal court approval of a class action settlement, is "in direct collision with the

Texas Unclaimed Property Statute":

> Thus, because Rule 23(e) prescribes a discretionary mode
> of operation for approving a class action settlement,
> including proposals for the distribution of unclaimed funds,
> and the Texas Act provides a mandatory procedure to be
> followed when dealing with unclaimed property, the two
> are in direction collision, and **the Federal Rule controls.**

*Id.* at *9 (emphasis added).  Alternatively, even if there were not such a direct conflict,

the court held that *cy pres* distribution would be used in place of the state escheat laws in

the exercise of its discretion.  *Id.* at *11-*15.[278]

---

[278]    Among many other reasons for holding that *cy pres* distribution takes precedence
over state escheat laws, the court found that it would be inappropriate to administer
the multiplicity of such laws in the context of a national settlement of federal
question claims:

> Moreover, if the State [of Texas] is correct, the Court would not only be
> required to follow the Texas Act, but indeed could be called upon to
> follow the various procedures described in the abandoned property laws of
> every state – forty-six states plus the District of Columbia – in which class
> members who failed to claim their settlement funds were last known to
> have resided.  Stated differently, the Court's discretion would be
> constrained not only by one state statute, but potentially by a total of forty-
> seven such statutes.  Such a constraint on the Court's discretion might be
> more understandable if this were a simple diversity action, where the
> plaintiffs were Texas citizens suing under Texas law.  This case, however,
> is a nationwide class action based primarily on federal antitrust law.  State
> law should not play a significant role in the settlement administration
> process in this case.  Finally, the State's argument, if accepted, may
> negatively affect the ability of parties to settle future class actions . . . .
> Not only could reference to numerous unclaimed property statutes
> increase administration costs, but could in many circumstances constrain
> the flexibility that parties enjoy in shaping a settlement.

*Id.* at *10.

The Second Circuit also rejected the application of state escheat laws to a federal class action settlement in *Van Gemert v. Boeing*, 739 F.2d 730 (2d Cir. 1984). In *Van Gemert*, where a surplus of $6 million remained after all settlement claims were paid, New York and other states argued that the surplus should be treated as a deposit, so that the various states could assert claims under state abandoned property laws. *Id.* at 736. The Second Circuit affirmed the settlement's distribution plan, noting "the fact that certain private plaintiffs had failed to come forward to collect on their judgment ***should not entitle the states to a windfall*** [under their various escheat laws]." *Id.* at 738 (emphasis supplied).

The Second Circuit and other district courts in this Circuit uniformly have upheld the right of courts to exercise their equitable discretion in fashioning *cy pres* distributions. *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007), *on remand*, 2007 WL 1944343, *3 (S.D.N.Y. July 5, 2007), *aff'd*, 315 Fed. Appx. 333, 2009 WL 690048 (2d Cir. March 16, 2009) (approving district court's award to medical programs that benefited models indirectly); *In re Holocaust Victim Asset Litig.*, 413 F.3d 183 (2d Cir. 2001), 424 F.3d 132 (2d Cir. 2005), 424 F.3d 158 (2d Cir. 2005), 424 F.3d 169 (2d Cir. 2005) (upholding distribution of over $100 million for programs that provided "food, medicine, shelter and similar assistance" to survivors of Holocaust victims); *Beecher v. Able*, 575 F.2d 1010 (2d Cir. 1978) (upholding allocation of surplus to provide extra compensation to three classes of claimants); *West Virginia v. Pfizer*, 440 F.2d 1079 (2d Cir. 1971) (upholding $20.5 million allocation of surplus to benefit consumers indirectly); *Jones v. National Distillers*, 56 F. Supp. 2d 355 (S.D.N.Y. 1999) (awarding

surplus to Legal Aid Society); *In re Agent Orange, on remand*, 689 F. Supp. 1250, 1270 (E.D.N.Y. 1988) (distributing $40 million surplus to programs for children with birth defects, genetic counseling, programs for treating substance abuse, post traumatic stress disorder, and local community assistance grants).

"Equitable remedies are a special blend of what is necessary, what is fair, and what is workable. . . . [T]his principle should apply to equitable decrees involving the distribution of any unclaimed class action fund." *Van Gemert,* 739 F.2d at 737.

### 3. The ASA Adequately Addresses Objections Raised By The State AGs.

Aside from the State AGs' lack of standing and this Court's ability to exercise its equitable powers under Rule 23 with respect to the disposition of *cy pres* funds, the ASA substantially addresses the objections raised by the State AGs.

Section 6.3(a)(ii) of the ASA covers abandoned funds for claimed Books; it provides that, if a Rightsholder has registered an address with the Registry, claimed Books, and then disappeared, the Registry will distribute that "abandoned" property to the appropriate governmental authority in accordance with applicable law. This, according to the State AGs, is the procedure followed by other licensing societies, such as ASCAP and BMI, for Rightsholders who register an address but then disappear, abandoning funds they are owed (*e.g.*, if payment checks are returned "addressee unknown").

The ASA's approach is entirely consistent with the requirements under state laws that, in order for custodial escheat to apply, a state must be able to prove that (1) the

holder of the funds (here, the Registry) has, on its records, a last known address of an

apparent property owner in a particular state; (2) the property owner owns (or is owed)

defined property; and (3) the property owner has not claimed it for a period of time, so

that it is legally considered to be "abandoned." *See* Conn. Gen Stat. § 3-56a *et seq.*,

Mass. G.L. c. 200A; 72 Pa. Stat. § 1301.2 and 1301.6; Texas Property Code § 72.001(a);

Rev. Code Wash. § 63.29.010 *et seq.*[279]

Accordingly, reading these state statutes literally, the State AGs simply have no

statutory entitlement to funds that are unclaimed by any Rightsholder. As to such funds,

there will, by definition, be no "owner" of record on the books of the Registry.

Therefore, the Registry will not have any "last known address" of the unclaimed funds'

owners on its records. In such event, the state escheat laws plainly are inapplicable. Nor,

contrary to the suggestion of the State AGs, do the state escheat laws impose any

affirmative obligation on holders to take measures to find "last known addresses."

Furthermore, it would be inappropriate to assume, as the State AGs assume, that any

addresses once associated with a copyright owner (*e.g.,* in Copyright Office registration

---

[279] One of the missions of the Registry will be to take affirmative steps to find the Rightsholders of Books and Inserts who have not yet claimed their property. In contrast, state escheat laws do not require that the states take such steps. When funds are escheated to the Texas Comptroller, for example, the Comptroller's obligation is to publish a notice of the unclaimed property once a year in the county where the property was located (*i.e.*, the last known address of the Rightsholder, which will not be known when a Rightsholder has not yet registered an interest in a Book). Texas Property Code §§ 74.201-205. For "de minimis" amounts of property below $100, the Comptroller has no requirement to publish notice. *Id.* All notice costs are charged against the property. *Id.* Connecticut need not publish notice of unclaimed funds in the amounts of $10 to $50 that are reported in the aggregate by their holder. Conn. Gen Stat. §§ 3-65a and 3-66a.

records) necessarily indicates the current address of the present rightsholder of the work. In such case, payment of unclaimed funds – even if they were subject to the state escheat laws – to particular states would be arbitrary, at best. The filings of the State AGs do not support their claim, in light of the language of the controlling statutes.

Section 6.3(a)(i) of the ASA covers "Unclaimed Funds for Unclaimed Books," that is, Books not yet claimed by Rightsholders, where the Registry does not yet have a last known address of record for such Rightsholder. Funds earned by such unclaimed Books will never be redistributed to other claiming Rightsholders.[280] ASA § 6.3(a)(i)(1). Instead, starting with the sixth year after such funds are earned, the Registry (subject to the approval of the Unclaimed Works Fiduciary) may use up to 25% of these unclaimed funds to locate the Rightsholders who have not yet claimed their Books and Inserts. ASA § 6.3(a)(i)(2). (The Registry will also use initial Settlement Funds, paid by Google, for such purpose.)

After funds earned by unclaimed Books have remained unclaimed for 10 years, the Registry (with the approval of the Unclaimed Works Fiduciary) may move this Court for *cy pres* distribution of such funds to "literacy-based charities in [the United States,

---

[280]  The original settlement agreement's provision that unclaimed funds could be redistributed after five years to claiming Rightsholders was consistent with the American Law Institute's provision on cy pres, §3.07 of the Restatement of Aggregate Litigation, which was cited with approval by the Second Circuit in *Masters*, 473 F.3d at 436. Nevertheless, at the request of the Department of Justice and the State Attorneys General, and to avoid any objection that this redistribution presented a "conflict" between Rightsholders of claimed and unclaimed Books, plaintiffs eliminated this provision in the Amended Settlement.

Canada, Australia and the United Kingdom] that directly or indirectly benefit the

Rightsholders and the reading public" by advancing "literacy, freedom of expression,

and/or education."  ASA § 6.3(a)(i)(3).

These *cy pres* motions must be made with notice to, and an opportunity to be

heard by, all claiming Rightsholders, the state Attorneys General, and the Fully

Participating and Cooperating Libraries.  At that time, the State AGs may assert their

position as to the disposition of such funds.

### 4.        The Remaining State Objection Lacks Merit.

Objectors also assert that unclaimed funds owed to charities in their states must be

redistributed to similar charities.[281]  Leaving aside that this objection is completely

speculative and premature – the State AGs presently cannot identify any charity that

owns a copyright but has not claimed funds it is owed under the ASA – this issue is

directly addressed by the law, discussed above, that gives Rule 23 primacy.  This Court is

entitled to exercise its discretion under Rule 23 as to the *cy pres* distribution of unclaimed

funds in this national settlement, which settles a federal copyright claim, and not be

forced to apply the charitable trust laws of all of the states as to various state charities.

Under the logic of this objection, for example, this Court could presumably not aggregate

unclaimed funds to make a *cy pres* distribution that would be meaningful, but would have

to balkanize the amounts attributable to each separate charity's unclaimed funds in each

state and then try to make a *cy pres* distribution only according to the specific charter and

---

[281]    *See* D.I. 851 at 8-9; D.I. 860 at 5-7; D.I. 887 at 2.

bylaws of that charity.  Furthermore, if, as they assert, the State AGs are, indeed, the appropriate custodians of funds that the ASA might generate for charities in their states, then nothing would prevent them from filing a claim with the Registry, on behalf of those charities (or from urging those charities to file themselves), such that the funds would never be unclaimed.

### 5.    States Can Be Included In The Class.

Connecticut objects to being included in the Class on the basis that this Court does not have jurisdiction over it.[282]  In support, Connecticut makes two arguments.

First, asserting Eleventh Amendment jurisprudence, Connecticut somehow claims to be immune from the Settlement.  Connecticut, however, is in the plaintiff Class.  It is not being sued as a defendant.  The Eleventh Amendment precedents are entirely irrelevant.  *See* U.S. Const. amend. XI ("Judicial power of the United States shall not be construed to extent to any suit in law or equity, commenced or prosecuted *against* one of the United States" (emphasis supplied)).

Second, Connecticut cites *Walker v. Liggett Group, Inc.*, 982 F. Supp. 1208 (D. W.Va. 1997), for the proposition that a state, in its capacity as a potential plaintiff, cannot be bound by a class action settlement.  In *Walker*, however, the state would have been bound, and its claims would have been released, by a private class action settlement of a lawsuit against defendant tobacco companies.  Given their traditional role in health and welfare matters, the court concluded that states could not be bound to a settlement that

---

[282]  D.I. 278 at 13-18.

would effectively release those claims against their will.  In this case, however, unlike the *Walker* situation, the State of Connecticut is not objecting in its capacity as a governmental entity, with police or other regulatory powers that might be affected by the releases in the Settlement.  Instead, its copyright claims are indistinguishable from those of any other member of the Class.  It therefore stands in exactly the same position as every other member of the Class and can be bound in the same way.  Aside from the unique circumstances of *Walker*, there does not appear to be any authority that prohibits including states in consumer, antitrust or other types of class actions where their claims do not differ from those of any other class member.

### C.    Censorship.

Some objectors complain that the ASA permits Google to engage in "censorship."[283]  This objection has no merit whatsover.  Plaintiffs and the libraries involved in the negotiations insisted on, and secured, a highly-effective anti-censorship measure.  The ASA expressly provides that if Google excludes a Book from one or more Display Uses for editorial reasons (*i.e.*, not for quality, user experience, legal or other non-editorial reasons), Google must notify the Registry and provide it with a digital copy of the Book, and the Registry may engage another provider to make comparable Display

---

[283]    *See, e.g.*, D.I. 102 at 2 (Google's discretion to exclude books from Display Uses "leaves room for censorship for sexual, religious, political or any other reason."); D.I. 100 at 14-15 (Google may be pressured by governments or interest groups to exclude books from the ISD); D.I. 401 at 11 (ASA allows Google to "unilaterally" exclude books, leaving room for "censorship and restrictions to intellectual freedom").

Uses available for the Book (subject to approval of the library(ies) where the Book was scanned).  ASA § 3.7 (e).

Plaintiffs have no basis for believing that Google has any interest in "censorship."  All evidence is to the contrary.  *See* Clancy Decl. ¶ 7.  Even so, because the possibility of "censoring" books was so important to the author and publisher representatives, Plaintiffs negotiated for and obtained this beneficial anti-censorship provision.  Boni Decl. ¶ 6.

### D.    Privacy.

Some objectors argue that the Settlement should not be approved because it does not contain terms that adequately protect the privacy of users of Google Book Search.[284]  Plaintiffs agree that maintaining the privacy of sensitive user information is important with respect to consumer products available on the Internet, particularly information about the reading habits and preferences of users.  Plaintiffs support the efforts of privacy advocates to improve privacy policies for web users.

The determination whether the Settlement should be approved, however, turns on whether the Settlement is fair, adequate and reasonable to members of the Class as copyright owners, not as users of Internet-based products.[285]  Moreover, the issue of user privacy is not unique to this Settlement.  To the contrary, anyone who has purchased

---

[284]  *See* D.I. 841 at 11 (The Settlement "does not go far enough to protect the public's privacy."); D.I. 885 at 2 ("[T]here aren't anywhere near adequate privacy protections" in the ASA); D.I. 893 at 15 ("We object to the insufficient privacy protections for GBS users.").

[285]   *See* D.I. 300 at 1 (claiming plaintiffs did not adequately represent them "either as authors or readers").

books on Amazon's website is familiar with Amazon's practice of suggesting other books to that purchaser based on past purchasing history.

With respect to the privacy of Rightsholders, the Settlement provides that contact information supplied by members of the Class to the Registry will not be disclosed to Google or to the public if a Class member so requests, ASA § 6.6(c)(iii) and (d), and that Google shall maintain in strict confidence any Rightsholder's personally identifiable information that it receives in connection with the Settlement. ASA § 15.3.

With respect to the privacy of information regarding the users of Google's products, the Settlement provides that Google shall not provide personally identifiable information about its end users to the Registry unless required by law. ASA § 6.6(f). Google explains in its brief its privacy policies in further detail. Google Br. at 53-57.

### E.    Display Limits/Usage Restrictions.

Some objectors suggest that cut-and-paste and page printout restrictions on "display" books are unreasonably narrow and would have the effect of impeding academic research.[286] As is the case with the numerous other objections filed on behalf of interests other than those of the Class, this objection should be rejected as irrelevant to the fairness, reasonableness and adequacy of the Settlement to members of the Class, in their capacity as copyright owners.[287]

---

[286]    *See* D.I. 336 at 7; D.I. 544 at 2; D.I. 393 at 1; D.I. 123 at 6-7.

[287]    Some author objectors base their objection on the grounds that they are also "readers" and "researchers" and, in that capacity, are interested in enjoying flexible access to Books made available through the Settlement. *See, e.g.,* D.I. 336 at 1; D.I.

From the standpoint of the members of the Class, rather than that of the user-oriented interests that are articulated in these objections, the copy/page restrictions were designed appropriately to protect Rightsholders' interests against unlimited copying of their works. In any event, to the extent that academic authors, as Rightsholders, would prefer that more liberal copying and pasting restrictions be applicable to Consumer Purchases of their Books, they are free to adopt alternative licensing schemes, as permitted by Section 4.2(a)(i) of the ASA. Moreover, the Settlement specifically allows any Rightsholder to direct Google to permit more liberal uses of their Books, in both the Consumer Purchase and Institutional Subscription Revenue Models. ASA § 3.3(g).

### F.     Objections Relating To Libraries.

One objector has argued that public libraries and non-profit higher educational institutions should pay a licensing fee to have a terminal available for public access.[288] The parties, however, negotiated for this important benefit to the public, colleges and universities and libraries. Section 4.8 represents a fair compromise of the claims and is a

---

300 at 3; D.I. 393 at 1. These bases for those objections are disingenuous because they know full well that the claims brought and settled were on behalf of a class bound together by their common interest in preventing Google's alleged copyright infringement. The Settlement was negotiated to protect those copyright interests and to settle the copyright claims; it need not and should not address the disparate concerns of those who may have different and larger policy or legal agendas. Moreover, if these objectors were to have their way in having the Settlement be disapproved, then the result would be that they would not have ready digital access to the millions of Books that the Settlement will authorize Google to make available, in which case their stated concerns about the ability to cut, paste and print will become moot.

[288]     D.I. 646 at 2.

limited license to Google to make available the Public Access Service. The license is limited to one or a small number of terminals at each location. Plaintiffs determined that this would not meaningfully impair the viability of the Institutional Subscriptions and, indeed, would create incentives for the public to become familiar with the Books available through Google and, ultimately, to read, enjoy and, perhaps, purchase online access to them.

In response to objections under the original Settlement Agreement that one public access terminal per Library Building was insufficient,[289] the parties amended Section 4.8 to allow the Registry to authorize additional terminals in any Library Building "under such further conditions at it may establish, acting in its sole discretion and in furtherance of the interests of all Rightsholders." ASA § 4.8(a)(iii).

One objector has argued that libraries should not be entitled to use their digital copies to create print replacement copies of a Book that is damaged, deteriorating, lost or stolen, if the Book is still commercially available.[290] Section 7.2(b)(iii) enables a Fully Participating Library to make a replacement copy from its Library Digital Copy, but only if it "has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price." This provision is modeled on Section 108(c)(1) of the Copyright Act, 17 U.S.C. § 108(c)(1). If a Book is Commercially Available, the Fully Participating Library should, with "reasonable effort," be able to find an "unused replacement" copy.

---

[289] *See* D.I. 685.

[290] D.I. 646 at 2.

The parties do not expect, therefore, that Fully Participating Libraries ordinarily will be able to use their Library Digital Copies to make replacement copies of Books that are, at the time, Commercially Available.

### G. Research Corpus.

With respect to access by Qualified Users to the Research Corpus, one objector argues that the definition of Qualified Users unfairly excludes academic researchers who engage in joint research projects with researchers from for-profit companies.[291]  This is far afield from the Court's charge to determine whether the ASA is fair, adequate and reasonable to the Class.  Even on the merits, the objection is baseless.  The definition does not exclude researchers on the basis that they are engaging in such collaborations. The definition only stipulates that a for-profit entity itself receive prior written consent from both the Registry and Google in order become a Qualified User.  ASA § 1.123.

One objector has criticized the ban on commercial uses of information extracted from Books in the Research Corpus.[292]  The purpose of this restriction is to ensure that the Research Corpus is used for academic and research purposes, rather than to compete directly with the Rightsholders' copyright interests.  The legal basis for the restriction is contractual, not copyright-based, and the ASA does not itself take the position that the Research Corpus is a separate copyrightable work.

---

[291]  D.I. 336 at 8.

[292]  *See* ASA § 7.2(d)(viii).  D.I. 336 at 8 (copyright in books does not include information; questioning restrictions on access to information obtained through non-consumptive research).

H.    Procedural Objections.

Some argue that the amendment of the original settlement agreement is an admission that the original Settlement was flawed,[293] or that the amendments are too minor or insignificant.[294]  The parties elected to amend the Settlement in response to some of the objections and in the context with discussions with the DOJ.  The parties believe that the ASA is an improvement on the original settlement, particularly for members of the Class, but that does not make the original Settlement flawed.  In any event, the only relevant issue is the ASA, the settlement that the Plaintiffs are moving the Court to approve.

One objector has argued that the termination provision in Article XVI unfairly prevents class members from making an informed decision as to whether to opt out.[295]  Another submission contends that class members should have a right to see the agreement referenced in that Article and that the ASA ought not to be approved until it

---

[293]  D.I. 811 at 10 (parties "have implicitly recognized the insufficiency of the Original Settlement by attempting to limit its scope").

[294]  D.I. 863 at 3 ("Amended Settlement remains fundamentally unchanged from the Original Proposed Settlement."); D.I. 811 at 1 ("Parties offered only minor amendments that still allow them to manipulate class procedures to seize rights that copyright law has secured to others"); D.I. 874 at 1 ("Despite hundreds of objections . . . parties have seen fit to quickly file the [ASA] that left 'the material terms – indeed the overwhelming majority of the terms – of the original Settlement Agreement unchanged.'").

[295]  D.I. 239 at 23-24 (settlement has "secret termination clause" that "gives Google and the named plaintiffs the right to revoke the Settlement under undisclosed conditions and using undisclosed procedures").

has been disclosed.[296]  That provision, however, has been deleted from the ASA and has

no operative effect.[297]

## IV.    OPT-OUTS LACK STANDING TO OBJECT.

A number of persons who opted-out also lodged objections to the Settlement.[298]

Opt outs, however, have no standing to object, and their arguments are entitled to no

consideration.  *See In re Prudential Sec. Ltd. P'ships Litig.*, MDL No. 1005, 1995 U.S.

Dist. LEXIS 22103, at *39-40 (S.D.N.Y. Nov. 20, 1995) ("[T]he Hutman objectors have

each filed exclusion requests and lack standing to object here."); *see also Armco Inc. v.

N. Atl. Ins. Co.*, No. 98 Civ. 6084 (AGS), 1999 U.S. Dist. LEXIS 3954, at *3 (S.D.N.Y.

Mar. 29, 1999) ("A settlement that does not divest non-settling parties of their legal

claims or prevent the assertion of those claims does not constitute legal prejudice to the

non-settling parties.").  The law clearly gives class members the right to opt themselves

out of the Class, so they can avoid being bound by the Amended Settlement and pursue

their individual claims, and they have availed themselves of that right.  The law is also

clear that, once they have done so, they have no right to object to the terms on which the

Class is settling.

---

[296]  D.I. 893 at 12 (requesting disclosure of the termination agreement "if still in force").

[297]  *See* D.I.  856 at 3 ("unclear whether the Supplemental Agreement has truly been withdrawn, whether it remains operative between parties to the settlement, or whether the parties might at some future date attempt to enforce it"); D.I. 893 at 11-12 ("If the termination agreement is no longer in force, the litigants who negotiated it should be required to explain why the termination agreement was itself terminated.")

[298]  *See, e.g.*, D.I. 787, 789, 790, 801.

## V.    CONCLUSION.

For the reasons set forth herein and in Plaintiffs' Final Approval Brief, Plaintiffs

respectfully request that the Court grant Plaintiffs' motion for final settlement approval.

DATED:  February 11, 2010                    Respectfully submitted,

/s/ Bruce P. Keller                    /s/ Michael J. Boni
Bruce P. Keller                        Michael J. Boni (pro hac vice)
Jeffrey P. Cunard                      Joanne Zack
Richard S. Lee                         BONI & ZACK LLC
DEBEVOISE & PLIMPTON LLP               15 St. Asaphs Rd.
919 Third Avenue                       Bala Cynwyd, PA  19004
New York, NY  10022                    (610) 822-0200 (phone)
(212) 909-6000 (phone)                 (610) 822-0206 (fax)
(212) 909-6836 (fax)                   MBoni@bonizack.com
bpkeller@debevoise.com                 JZack@bonizack.com
jpcunard@debevoise.com
rslee@debevoise.com                    Robert J. LaRocca
                                       KOHN SWIFT & GRAF, P.C.
*Attorneys for Plaintiffs The McGraw-Hill*   One South Broad Street, Suite 2100
*Companies, Inc., Pearson Education, Inc.,*  Philadelphia, PA 19107
*Penguin Group (USA) Inc., Simon & Schuster,*  (215) 238-1700 (phone)
*Inc., John Wiley & Sons, Inc., Association of*  (215) 238-1968 (fax)
*American Publishers, Inc., Harlequin*   rlarocca@kohnswift.com
*Enterprises Limited, Macmillan Publishers*
*Limited,  Melbourne University Publishing*   Sanford P. Dumain
*Limited, The Text Publishing Company, and the*   MILBERG LLP
*Publisher Sub-Class*                  One Pennsylvania Plaza
                                       New York, NY 10119
                                       (212) 594-5300 (phone)
                                       (212) 868-1229 (fax)
                                       sdumain@milberg.com

                                       *Attorneys for Plaintiffs The Authors Guild, Inc.,*
                                       *Herbert Mitgang, Betty Miles, Daniel Hoffman,*
                                       *Paul Dickson, Joseph Goulden,  Maureen*
                                       *Duffy, Daniel Jay Baum, Margaret Drabble,*
                                       *Robert Pullan, and the Author Sub-Class*