# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Authors Guild, Inc., Association of American Publishers, Inc., et al., | No. 05 CV 8136-DC |
| Plaintiff, | **DECLARATION OF KATHERINE KINSELLA** |
| v. | |
| Google Inc., | |
| Defendant. | |

## DECLARATION OF KATHERINE KINSELLA
## REGARDING IMPLEMENTATION OF NOTICE PROGRAM

## TABLE OF CONTENTS

PAGE #

I. Qualifications and Expertise ................................................................& & & .5

II. Notice Program Overview ................................................................& & & .6

    A.   Summary of Program

    B.   Summary of Program Results

    C.   Notice Materials

III. Direct Notice................................................................................& & ...16

    A. Recipients – Publicly Available Lists

    B. Recipients – Members of Reproduction Rights Organizations

    C. Recipients – Plaintiffs' Lists and Members of Additional Rightsholder Organizations

    D. Recipients – By Request

IV. Paid Media................................................................................& & ...27

    A. Methodology

    B. Results

    C. Extension Program

    D. Changes from Plan as Approved by Court

    E. Countries With No Paid Media Placements

V. Earned Media................................................................................& ...& 36

    A. Press Release Distribution

    B. Earned Media Results Tracking

    C. Blogs

VI.   Additional Outreach& & & & & & & & & & & & & & & & & & & & & & & & & .41

     A.  Outreach to Encourage Direct Notice Distribution

     B.  Presentations and Conferences

     C.  Select Foreign College and University Outreach

     D.  LinkedInWriters' Groups Postings

     E. Cairo Book Fair

VII.  Settlement Website& & & & & & & & & & & & & & & & & & & & & & & & & .48

VIII.  Telephone and Email Support for Class Members& & & & & & & & & & & & & ....48

VII.  Translation ............................................................................................& & ...49

VIII.  Conclusion  ...........................................................................................& & ...50

Exhibit Index ...............................................................................................& & ...52

I, Katherine Kinsella, hereby declare as follows:

1.  I am President of Kinsella Media, LLC ("KM"), an advertising and legal notification firm in Washington, D.C. that specializes in the design and implementation of class action and bankruptcy notification programs to reach putative class members. My business address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037.  My telephone number is (202) 686-4111.

2.  I submit this declaration in connection with the program by which notice of the original settlement was provided in the above-captioned case (the "Notice Program"), which KM designed to provide likely members of the original class with the best notice that was practicable under the circumstances.  The Settling Parties presented this Notice Program in Article XII of the Settlement Agreement submitted on October 28, 2008.  The Court preliminarily approved the Settlement ("Settlement"), including the Notice Program, on November 17, 2008.  This declaration outlines the implementation of that Notice Program. Accompanying this declaration is a declaration of Belinda Bulger, Esq, KM's Vice President, Projects and Legal Research, who will describe the efforts of KM with respect to the Supplemental Notice Program implemented in accordance with the Court's Order dated November 19, 2009 granting preliminary approval of the Amended Settlement Agreement and approval of the Supplemental Notice Program.

3.  This declaration is based upon my personal knowledge and upon information provided by Class Counsel, the Defendant (Google Inc.), my staff, the Settlement Administrator, and groups participating in the Direct Notice Program (as defined below) worldwide.  The information is of a type reasonably relied upon in the fields of advertising, media, and communications.

## <u>Qualifications and Expertise</u>

4.    I have developed and directed some of the largest and most complex notification programs for class action settlements and other cases (such as bankruptcies), a number of which included notice outside the United States.  The scope of my work includes notification programs in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation.  Specific cases have involved, among other claims, the Holocaust claims, asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, and tobacco.  KM has developed or consulted on over 500 notification programs and has placed over $205 million in media notice.  A list of selected cases is attached as Exhibit 1.

5.    With respect to effectuating notice outside the United States, I have been retained as a consultant on notice programs, as well as provided paid media notice, in more than 120 countries for at least nine class action settlements and bankruptcies.

6.    In particular, I was one of four administrators in *In re Holocaust Victims Assets Litigation*, No. CV 96-4849 (E.D.N.Y. 2003) and had responsibility for designing and implementing a) paid media to reach Holocaust victims (primarily Jewish) in the United States, b) a grassroots-based in-country notification to Roma (gypsies) in 23 countries, and c) press outreach and activities in 40 countries.  I also coordinated the notification program, including the earned and paid media, undertaken to reach affected persons for the International Commission for Holocaust Era Insurance Claims (ICHEIC).

7.    Most recently, I designed and executed the notice in *In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal. settlement approved Oct. 3, 2008).  The judge presiding over that case spoke highly of KM's work in designing and implementing an international notice program, calling the program "the best

notice I've seen since I've been on the bench. . . I mean, I was just extraordinarily impressed. Extraordinarily impressed."

8.   Numerous other judges also have commented favorably regarding the effectiveness of notice programs KM and/or I prepared.  Selected judicial comments are attached as Exhibit 2.

9.   I have been deposed or testified as an expert at trial in numerous cases.  A list of those cases is attached as Exhibit 3.

10.   I also write and speak frequently on class action notice issues, including as a regular panelist at American Bar Association functions, including multiple presentations at the ABA Class Action Institute and the ABA's The Future of Class Action Litigation.

11.   I am the author of *The Plain Language Tool Kit for Class Action Notice* published in the October 25, 2002 issue of <u>Class Action Litigation Report</u> and the author of *Quantifying Notice Results in Class Actions – the Daubert/Kumho Mandate* published in the July 27, 2001 issue of <u>Class Action Litigation Report</u> and the August 7, 2001 issue of <u>United States Law Week</u>, both publications of the Bureau of National Affairs, Inc.  In addition, I am author of *The Ten Commandments of Class Action Notice* published in the September 24, 1997 issue of the <u>Toxics Law Reporter</u> and co-author of *How Viable Is the Internet for Class Action Notice* published in the March 25, 2005 issue of <u>Class Action Litigation Report</u>, both also publications of the Bureau of National Affairs, Inc.

## <u>Notice Program Overview</u>

12.   Based on the definition of the class in the original Settlement Agreement, KM did not have a single list of "readily identifiable" potential members of the class, or any combination of pre-existing lists, that would allow direct notice to all members of the class.  KM therefore developed a multi-faceted notice approach, using the best efforts practicable under the

circumstances, to reach likely class members directly, where possible, supplementing that direct notice with a robust and extensive paid and earned media program.

13. The Notice Program included a wide variety of integrated components, including:

   a) An intensive program to identify and communicate, in 41 languages, with publisher and author groups in the nearly 100 countries identified by analysis of economic, social, and book publishing data as being most likely to have class members, in order to be able to provide direct notice by mail to as many class members as possible;

   b) Publication of notice in virtually every country in the world, in multiple languages, in numerous media, that were specially selected, through analysis, to ensure that the media selected would have a broad reach among the target audience and would be most likely to reach likely class members; and

   c) Outreach in native languages to the press in numerous countries, in order to generate news articles and other earned media discussions of the settlement.

14. In my opinion, this comprehensive Notice Program, unprecedented in reach and scope, provided the best notice practicable under the circumstances, and satisfied both Fed. R. Civ. P. 23 and due process requirements of the U.S. Constitution.

**Summary of Program**

15. The objective of the Notice Program was to provide notice of the Settlement to likely class members in two Sub-Classes that are defined as follows in the Settlement Agreement:

   a) "Settlement Class" means all Persons that, as of the Notice Commencement Date, have a Copyright Interest in one or more Books or Inserts.  All Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both.  Excluded from the Settlement Class are Google, the members of Google's Board of Directors and its executive officers.

b) "Author Sub-Class" means members of the Settlement Class who are authors, and their heirs, successors and assigns, and any other members of the Settlement Class who are not members of the Publisher Sub-Class.

c) "Publisher Sub-Class" means members of the Settlement Class that are (a) companies that publish books, and their exclusive licensees, successors and assignees, and (b) companies that publish Periodicals and have a Copyright Interest in one or more Inserts, and their exclusive licensees, successors, and assignees.

16. KM designed and implemented a Notice Program with the following five primary components:

a) **Direct Notice.** KM provided direct notice to authors and publishers worldwide ("Direct Notice"), either by mailing notice ourselves or by acting through membership organizations (such as national and local organizations representing authors and publishers) that agreed to forward the Notice to their members;

b) **Paid Media.** Because the Direct Notice program could not deliver notice to 100% of the Class, KM designed a massive program of notice by publication of the Summary Notice (translated, as appropriate) in domestic and international print and online media (including global publications, online ads (banner ads, text ads, and keyword searches), and in-country media including newspapers, consumer magazines, and trade publications);

c) **Earned Media.** KM issued press releases in 41 languages, leading to extensive press coverage (i.e., "earned media") in many of the countries we sought to reach;

d) **Outreach.** KM communicated with scores of organizations whose members are likely class members; and

e) **Settlement Website.** KM cooperated with the parties, Class Counsel, and the Settlement Administrator to create an informational website (the "Settlement Website"), which included detailed information about the Settlement and the process of claiming works.

**Summary of Program Results**

17. The Notice Program was worldwide, comprehensive, and the best practicable under the circumstances.

18. The Notice Program resulted in:

a) Distribution of more than 1.3 million pieces of direct mail;

b) 677 appearances of the Summary Notice in worldwide media;

c) At least 5,683 print and online articles globally about the Settlement; and

d) At least 1,208,752 unique visitors (1,463,869 total visits) to the Settlement Website.

19. These are only the indicia of notice of which KM and the parties are themselves aware. I believe the distribution of both Court-approved materials and general information about the Settlement was even more expansive, beyond what we were able to measure. For example, except for the information in Paragraphs 71 and 74 below, this declaration does not discuss the possibility that notice sent to thousands of publishers worldwide was further distributed by those publishers to their authors, which I believe likely did occur in many cases. (See Paragraph 74 for information verifying certain publishers' distribution.) This declaration also does not capture all notice by author and publisher groups to their members, discussion within author and publisher communities, and online blogs and message board coverage, among other means, all of which I believe occurred during the notice period.

**Notice Materials**

20.    Fed. R. Civ. P. 23(c)(2)(B) requires that class action notices be written in "plain, easily understood language."  KM applies the plain language requirement in drafting and reviewing notices in federal and state class actions.  The firm maintains a strong commitment to adhering to the plain language requirement while transmitting the necessary information to potential class members.  In this case, my staff and I participated in the drafting and editing of the notice materials, and in my opinion they are appropriate for class members.

*Notice*

21.    The English language version of the long-form Notice ("Notice") for this case is attached in English as Exhibit 4.  The Notice was available in 36 languages, which, in total, account for languages spoken by up to 96% of the residents of the Notice Program countries, as detailed in Paragraph 37 below.

22.    The Notice complies with the substantive requirements of Rule 23(c)(2)(B), by including, among other information, all of the following information required by the Rule:

a)    The nature of the action;

b)    The definition of the class certified;

c)    The class claims, issues or defenses;

d)    That a class member may enter an appearance through an attorney if the member so desires;

e)    That the Court will exclude from the class any member who requests exclusion;

f)    The time and manner for requesting exclusion; and

g)    The binding effect of a class judgment on members under Rule 23 (c)(3).

23.    When this Court extended the Notice Period, opt-out/objection deadline, and fairness hearing date, KM coordinated and Class Counsel approved updates to the Notice to reflect the new dates.  The Updated Notice in English is attached as Exhibit 5.

*Summary Notice*

24.    The plain language published form of summary notice ("Summary Notice") was designed as a black and white advertisement with a headline to attract the attention of class members. The text, published in 214 countries in 72 languages, provided important information regarding the subject of the Settlement, the definition of the class, and the legal rights available to class members. The Summary Notice also provided multiple options to access complete information about the Settlement, prominently featuring the relevant toll-free telephone number for that country (or, if a toll-free number was not available for that country, the international toll number), the Settlement Website address, and a mailing address for class members to request or access the Notice. The Summary Notice in English is attached as Exhibit 6.

25.    The Summary Notice complies with the substantive requirements of Rule 23(c)(2)(B), by including in summary form all of the required information, as follows:

h)  The nature of the action;

i)  The definition of the class certified;

j)  The class claims, issues or defenses;

k)  That a class member may enter an appearance through an attorney if the member so desires;

l)  That the Court will exclude from the class any member who requests exclusion;

m) The time and manner for requesting exclusion; and

n)  The binding effect of a class judgment on members under Rule 23 (c)(3).

26.    When this Court extended the Notice Period, opt-out/objection deadline, and Fairness Hearing date ("Extension" or "Extended Notice Period"), KM coordinated and Class Counsel approved updates to the Summary Notice to reflect the new dates. The Updated Summary Notice in English is attached as Exhibit 7.

*Press Releases*

27.   As part of an extensive Earned Media campaign, detailed in Paragraphs 112 through 126

below, three international press releases were distributed, in appropriate translations, to reach

likely class members through non-paid media placements.

a)   The initial press release from the parties announcing the Settlement, distributed on

October 28, 2008, is attached as Exhibit 8.

b)   The Notice Press Release announcing the notice period, distributed on February 11,

2009, is attached as Exhibit 9.

c)   The Extension Press Release announcing the Court's extension of the Notice Period,

distributed on April 28, 2009, is attached as Exhibit 10.

28.   All releases contained information for class members and contact details to obtain further

information.  The Notice Press Release and Extension Press Release were exclusively focused

on prompting media articles that would make likely class members aware of the Settlement

and of the URL of the Settlement Website.

29.   Details about the distribution of these releases appear below in the Earned Media section.

*Online Ads*

30.   The Notice Program included a variety of online advertisements.  To provide Class Members

with millions of opportunities to view ads alerting them to the Settlement, KM used banner

advertisements and text advertisements.  These advertisements appeared 587 million times on

websites worldwide.

a)   Banner advertisements are graphical web advertising units.  In this case, the banner

advertisement was designed to alert class members to the Settlement through the use of

a short, simple headline (in English, "If You Hold a Copyright in a Book or Other

Writing") enabling Class Members to quickly learn of the Settlement.  Clicking on the

banner advertisement connected users directly to the Settlement Website. Examples of

banner ads used in this case are attached as Exhibit 11.

b) Text ads are web advertisements that use text-based hyperlinks. Examples of the text

ad language used in this case are attached in English as Exhibit 12. Clicking on the text

advertisement connected users directly to the Settlement Website.

31. Details about the placement of banner and text ads appear below in the Paid Media section.

32. The Notice Program also included keyword search ads, which appeared when users entered

specified search terms – such as "Google book settlement," "Google copyright lawsuit," and

"Google authors settlement," among many others – into most popular search engines

worldwide. The ads linked users to the Settlement Website. KM contracted with several

search engines to have sponsored links appear on the results page of keyword/phrase searches,

including the list of phrases (or approximations as translation allowed and warranted) attached

as Exhibit 13. Sample screen captures of how these keyword search ads appear to users are

attached as Exhibit 14. Additional details about keyword search ads appear below in the Paid

Media section.

*Settlement Website*

33. A comprehensive Settlement Website was designed and implemented in 36 languages to

provide class members with information about the Settlement, including the Notice and

Summary Notice. This regularly updated site also gave class members the ability to opt out of

the Settlement (or opt back in), create a Registry account to claim and manage their works,

and file claims under the Settlement. Selected screen captures from the Settlement Website

are attached as Exhibit 15.

34. Additional details about the Settlement Website, including visitor statistics and components,

are included in the declaration of Tiffaney Allen, Senior Vice President of Rust Consulting,

Inc. ("Rust"), KM's parent company and the Settlement Administrator in this case.

*Languages*

35. The Notice was initially translated into 36 languages ("Notice Languages"): Arabic, Bahasa Indonesian, Bulgarian, Chinese (Simplified), Chinese (Traditional), Croatian, Czech, Danish, Dutch, English, Finnish, French, German, Greek, Hebrew, Hindi, Hungarian, Italian, Japanese, Korean, Lithuanian, Malay, Norwegian, Polish, Portuguese (Brazilian), Portuguese (Continental), Romanian, Russian, Serbian, Slovak, Slovenian, Spanish, Swedish, Thai, Turkish, and Vietnamese. Upon request by the Pan African Writers' Association, the Notice was also translated into Swahili. Swahili is not included in subsequent references to "Notice Languages" in this declaration.

36. KM carefully selected the Notice Languages. With respect to every country in Tiers 1, 2 and 3 (the tiering process is discussed in Paragraphs 85 through 87, below), the Notice and the Summary Notice were translated into either the primary or a widely spoken and written secondary language.

37. To verify that the Notice Languages provided sufficient coverage of potential class members, KM began with the world's population (US Census at www.census.gov/ipc/www/idb/, and if unavailable, then from alternate source(s); details on file with KM), and subtracted the population of countries in which KM would not be placing any media, due to either political conditions or a lack of reciprocal copyright relationships with the United States (see Paragraphs 109 and 110 for those countries). That remaining population is 6,344,114,373. The population of the countries in which KM did place media in which one of the Notice Languages is considered a "major" language is 6,105,810,521. Therefore, the Notice Languages are the languages of as much as 96% of reachable populations.

38. The Summary Notice was translated into all the Notice Languages, plus 36 additional languages, mostly those spoken in smaller countries or by relatively fewer Class Members.

These 36 additional languages are: Afrikaans, Albanian, Armenian, Azerbaijani, Belarusian, Bengali, Bosnian, Catalan, Creole (Haitian), Estonian, Faroese, Georgian, Gujarati, Icelandic, Kannada, Kazakh, Khalkha Mongol, Khmer, Kinyarwanda, Lao, Latvian, Macedonian, Malayalam, Maltese, Marathi, Papiamento, Punjabi, Sinhala, Swahili, Tagalog, Tajik, Tamil, Telugu, Turkmen, Ukrainian, and Urdu.

39.  The Extension-related changes made to the Notice resulting in the Updated Notice were made in all the Notice Language versions.  The Extension-related changes made to the Summary Notice resulting in the Updated Summary Notice were made in all the Notice Language versions, and Swahili.

40.  The Settlement Website, including claiming functions, is available in the Notice Languages. Details about translation of the Settlement Website appear in the declaration of Tiffaney Allen.

41.  In order to ensure smooth operation of the Settlement Website and the settlement administration process, as well as to accommodate engineering needs to launch certain languages (e.g., those that read right-to-left) at different times, KM designed a roll-out schedule for the translated versions of the Settlement Website and notice materials.  The schedule was carefully coordinated to ensure that the Settlement Website was live in advance of any direct mail being received or advertisements being run in a particular language.  The language roll-out schedule is attached as Exhibit 16.

42.  Sponsored search results were places on search engines in the following languages: Arabic, Bulgarian, Chinese (Simplified), Chinese (Traditional), Croatian, Czech, Danish, Dutch, English, Finnish, French, German, Greek, Hebrew, Hindi, Hungarian, Indonesian, Italian, Japanese, Korean, Lithuanian, Norwegian, Polish, Portuguese (Brazilian), Portuguese (Continental), Romanian, Russian, Serbian, Slovak, Slovenian, Spanish, Swedish, Thai, Turkish, and Vietnamese.

43. Contextually targeted text ads appeared in the following languages:  Arabic, Bulgarian, Chinese (Simplified), Chinese (Traditional), Croatian, Czech, Danish, Dutch, English, Finnish, French, German, Greek, Hebrew, Hungarian, Indonesian, Italian, Japanese, Korean, Lithuanian, Norwegian, Polish, Portuguese (Brazilian), Portuguese (Continental), Romanian, Russian, Serbian, Slovak, Slovenian, Spanish, Swedish, Thai, Turkish, and Vietnamese.

44. Banner ads appeared in the following languages:  Croatian, Dutch, English, French, German, Greek, Hungarian, Italian, Korean, Polish, Romanian, Russian, Spanish, and Turkish.

## Direct Notice

45. The purpose of the Direct Notice Program was to provide personal notice to as many *likely* class members as possible.

46. After extensive research and outreach to organizations worldwide whose members were likely to be class members, direct notice of the Settlement was sent to more than 500 organizations and at least 1.26 million persons or entities who are or would be likely to be class members.

47. Direct notice recipients were sent either the Notice or Summary Notice, by postal mail; by email, with either the Notice or the Summary Notice attached; or by email that included links to the Settlement Website, where the Notice and Summary Notice were available for review and downloading.  (A few exceptions are noted in Exhibit 17, as referenced below.)

48. A significant portion of the direct notice in this case was sent by organizations that agreed to participate in the Direct Notice Program, as discussed below.

49. The remaining direct notice in this case was sent by Rust.  Rust sent notice by email when it had an email address for a contact, and postal mail when no email address was available or when an email was undeliverable and a physical address was available.

50. Direct notice was sent in the Notice Languages appropriate to the recipients.

51.    A list of organizations whose members received direct notice of the Settlement is attached as Exhibit 17, the Direct Notice Report.  An organization that is listed:

    a)  Provided direct notice to its members and subsequently confirmed that distribution to KM, Rust, or an associated entity;

    b)  Had Rust provide direct notice to a list of its members that the organization provided; or

    c)  Had a membership list available online to which KM, Rust, or an associated entity sent notice or arranged for notice to be sent.

52.    Other entries in the Direct Notice Report are pre-existing mailing lists deemed by KM as likely to contain high concentrations of class members or likely class members.

53.    Due to cross-membership by individuals, and overlap of publicly available lists with membership lists of organizations that themselves provided direct notice to their members, among other factors, there is bound to be duplication in terms of direct notice recipients.  In some cases, authors and publishers may have been notified twice, or even more times, depending on their memberships and affiliations.  In my opinion, however, this duplication is helpful; more opportunities to read the Notice or Summary Notice can only benefit a class member.  The numbers of recipients detailed below and in attached exhibits do not take this potential duplication into account.

**Recipients – Publicly Available Lists**

54.    The parties recommended that KM obtain publisher mailing lists from Literary Market Place (LMP).  LMP and International Literary Market Place (ILMP) are the directories of publishing data for more than 180 countries around the world, including the United States.  Considered the "information experts for the book publishing industry," the site has more than 30,000 listings, including publishers, literary agents, and other related companies.  Each new listing in

LMP/ILMP is thoroughly researched before it is included in the database and must meet certain standards.[1]

55.     KM retrieved the listings of every publisher, small press, and literary agent available on the LMP/ILMP website.  KM then cleaned up the listings so that in virtually all cases, one company did not receive more than two mailings, to different contacts in the organization.  As a general rule, KM sent the notice to mid-level personnel, where available and where the individual, based on the job title, seemed more likely to read and disseminate as appropriate the Notice.  KM did not send the Notice to individuals listed whose responsibilities were in film and TV, marketing, office management, or were "editors," as opposed to "publishers," or were "directors," as opposed to "managing directors."  The resulting lists are attached as Exhibits 18 and 19.

56.     The publishers, small presses, and literary agents that received direct notice as a result of KM's LMP/ILMP research are listed on Exhibits 18 (publishers and small presses) and 19 (literary agents).   In total, the LMP/ILMP lists yielded nearly 15,000 names (approximately 14,000 publisher contacts and 945 literary agent contacts) to whom direct notice was sent.

57.     Exhibit 18 varies slightly from the list submitted to this Court with the initial Notice Program.  Reproduction Rights Organizations ("RROs"; see Paragraph 61 for more information) participating in the Notice Program were given the option of removing their members from these lists LMP/ILMP-generated lists, so that the member would not receive multiple information packets from different sources about the Settlement.  A handful of RROs did ask that some of their members be removed from the original LMP/ILMP-generated lists.

---

[1] Literary Market Place, Frequently Asked Questions, *available at* http://www.literarymarketplace.com/lmp/us/faqs.asp.

58.     Some author and publisher organizations make their membership lists available on their websites.  KM, Rust, and associated entities identified at least 238 such lists.  Based on those lists, KM created mailing lists of individuals and entities to which direct notice was sent.

**Recipients – Members of Reproduction Rights Organizations**

59.     The most important source for identifying potential class members in most countries was RROs.  These national organizations, which manage copyright works for authors and publishers, were ideally suited to assist with the provision of notice in this case.

60.     In order to efficiently reach RROs, the parties and KM worked extensively with the RROs' international umbrella organization, the International Federation of Reproduction Rights Organisations (IFRRO).

61.     IFFRO **"**works to increase on an international basis the lawful use of text and image based copyright works and to eliminate unauthorised copying by promoting efficient Collective Management of rights through RROs to complement creators' and publishers' own activities."[2] IFRRO has 56 RRO member organizations.  RROs that are IFRRO members are "legal entities lawfully constituted according to the laws and usages of their country of origin, who manage reproduction rights and other relevant rights in copyright works, in the interest of authors and publishers."[3]     (Individual RROs themselves have members that are organizations or individuals, or both.)     IFRRO also has 61 Associates Members, which typically are organizations focused exclusively on authors, publishers, songwriters, graphic artists, etc., or are RROs that have not satisfied the criteria for IFRRO RRO membership.  (Class Counsel and KM determined that 42 of IFRRO's Associates Members had memberships that were

---

[2] IFRRO Mission Statement, *available at* http://www.ifrro.org/show.aspx?pageid=about/mission&culture=en.
[3] IFRRO Membership Categories, *available at* http://www.ifrro.org/show.aspx?pageid=about/becomemember/categories&culture=en.

relevant to the Settlement; those are the Associates Members whose participation in the Notice Program was sought.)

62. Based on the views of the parties and outside experts, KM determined that IFFRO's RRO members would be the primary targets for participation in the Direct Notice Program. As noted, certain of IFRRO's Associates Members also were included.

63. Andrew Martin is an independent consultant with expertise about RROs whose experience includes an executive director position at ACCESS Copyright, The Canadian Copyright Licensing Agency, a large IFRRO-member RRO. A more detailed listing of Mr. Martin's qualifications and experience is attached as Exhibit 20.

64. Class Counsel retained Andrew Martin to provide expertise about the structure and function of IFRRO and RROs, information that would assist in KM's creation of the Notice Program. His expertise helped me form my opinion that RROs were the appropriate primary target of the Notice Program. At my request, he prepared a report for the Court summarizing relevant information about RROs and their relevance for providing notice in this case. Mr. Martin's report is attached as Exhibit 21.

65. IFRRO's 2008 annual meeting of its members was held in Montego Bay, Jamaica, from October 27 to 31, 2008. One of my senior staff members and I attended the meeting, as did IFRRO's staff members and 146 delegates from 41 RROs and 23 Associates Members. My staff member or I met personally with virtually all of the organizations represented at the meeting; explained the Notice Program, materials available, and the cooperation that we were seeking with respect to participation in the Notice Program; and secured agreement by most of those either to participate in the Direct Notice program or take the issue of participation back to decision-makers in their organizations.

66.     My staff member and I were part of a panel presentation to a general session of the IFRRO meeting.  Other panelists included  Patricia Schroeder, who was President of the Association of American Publishers (AAP) at that time, Authors Guild Executive Director Paul Aiken, and Authors Guild Director of Legal Services Anita Fore.  A copy of the PowerPoint presentation we presented to the attendees is attached as Exhibit 22.  We shared this presentation with several of the IFRRO-member attendees for their use or adaptation, which they could then use with their boards of directors, members, or others.

67.     After the IFRRO annual meeting in Jamaica and throughout the Notice Period and Extended Notice Period, IFRRO's staff provided extensive and invaluable assistance contacting IFRRO's member organizations, securing members' participation in the Direct Notice program, and confirming distribution of notice materials. A letter prepared by IFRRO's Chief Executive and General Counsel providing more detail about IFRRO's efforts with respect to the Notice Program is attached as Exhibit 23.

68.     Building on IFRRO's initial and continuing contacts with its members about the Notice Program, KM contacted the RROs directly and repeatedly to attempt to maximize their participation in the Direct Notice program:

   a)   KM sent an initial group email, attached as Exhibit 24, to IFRRO's RRO members.

   b)   KM then sent a memo, attached as Exhibit 25, outlining the steps involved in participating in the Direct Notice program, to IFRRO's RRO members.  This memo was modified several times during the Notice Period and Extended Notice Period to reflect new deadlines and clarify the steps involved.

   c)   As indicated in the "next steps" memo, organizations wishing to participate in the Direct Notice program were directed to complete a brief online survey to confirm their intention to participate, request materials in the appropriate language(s), and request additional Settlement-related materials that would be useful to them.  A copy of the

original participation survey is attached as Exhibit 26.  This survey was modified during the Notice Period and Extended Notice Period to reflect new deadlines and edit or remove some options.

d)   Organizations that completed the online survey received an email with all the relevant notice materials for distribution.  A sample of one such email is attached as Exhibit 27.

e)   KM and/or IFRRO offered organizations the opportunity to speak directly with Class Counsel and/or KM to learn more about the Settlement and/or the Notice Program.  In some circumstances, KM requested conference calls with particular organizations to attempt to secure their participation in the Direct Notice program or to answer any questions they had about the Settlement and how it could affect their members.  Conference calls resulting from these contacts included:

| Organization | Country | Date(s) |
|---|---|---|
| CEDRO | Spain | 12/10/08 |
| ACCESS Copyright | Canada | 12/10/08 |
| Copyright Clearance Center, Inc. | US | 12/10/08 |
| VG WORT, Literar-Mechana, ProLitteris | Germany, Austria, Switzerland | 12/10/08 |
| SIAE | Italy | 3/4/09 |
| Reprobel | Belgium | 3/27/09 |
| CopyRus | Russia | 5/4/09 |
| Brazilian Chamber of Books | Brazil | 6/4/09 |
| CeMPro | Mexico | 7/14/09 |
| Vietnam Literary Copyright Center | Vietnam | 04/29/09 & 05/07/09 |
| Korea Society of Authors | Korea | 06/09/09 & 07/09/09 |

f)   KM sent follow-up emails and made follow-up calls to RROs and their member organizations, sometimes repeatedly, totaling hundreds of contacts.

g)   During the Extended Notice Period, native-language speakers contacted IFRRO member organizations, as well as their member organizations, if they had not yet agreed

to participate in the Direct Notice program to ensure maximum participation by those organizations.

69. Efforts by IFFRO, KM, and Class Counsel resulted in excellent participation levels by IFRRO's RRO and Associates Members. A list of participating IFRRO RRO members is attached as Exhibit 28. Forty-two of IFRRO's 56 RRO members participated in the Notice Program. KM and others made repeated efforts to secure the participation of the remaining RROs, including telephone and email contacts by native-language speakers.

70. The 42 IFFRO Associates Members whose memberships were likely to contain class members (see Paragraph 61) received multiple contacts and requests for participation in the Direct Notice program. KM initially emailed the IFRRO Associates Members selected for participation in the Notice Program, requesting their participation in the Notice Program. From that initial email and other contacts, a number of those Associates Members agreed to participate in the Notice Program. For those that did not, KM attempted to secure their participation by sending a number of emails to each individual member, making phone calls and working with IFRRO personnel. Ultimately, 35 of the 42 Associates Members whose memberships were deemed relevant to the Settlement (because they included likely class members) participated in the Notice Program. A list of participating IFRRO Associates Members is attached as Exhibit 29.

**Recipients – Parties' Lists and Members of Additional Rightsholder Organizations**

71. The five initial publisher plaintiffs (The McGraw-Hill Companies, Inc.; Pearson Education, Inc.; Penguin Group (USA) Inc.; Simon & Schuster, Inc.; and John Wiley & Sons, Inc.) each provided a list of its authors to Rust. In addition, more than 400 rightsholder organizations that are not IFRRO members either provided direct notice to their members or had publicly

available mailing lists to which KM and Rust provided direct notice.  These direct mailings

contributed to the overall comprehensiveness of the Direct Notice program.

72.     In February 2009, the Authors Guild provided notice to a total of 13,126 recipients:  7,496

members, 2,037 former members, and 3,593 Authors Registry members (the Authors Registry

is the licensing and collecting society arm of the Authors Guild).  The three lists contain no

overlap.  The Authors Guild also included the Summary Notice in its Winter Quarterly

Bulletin, which it mailed in March 2009 to 8,698 recipients (some of whom had already

received direct notice).

73.     The AAP also provided its list of 329 members to Rust.  Rust sent the Notice to those

publishers on January 29, 2009.  The list of AAP members is attached as Exhibit 30.  The

cover letter included with the Notice to AAP members requested that the publisher-recipients

themselves provide notice of the Settlement to their authors.

74.     Either the Notice or the Summary Notice was sent to the 174,880 individuals on the lists

provided by the five publisher plaintiffs.  Several other large publishers (which are not

plaintiffs) also provided lists of their authors to Rust.  Rust sent the Notice to those authors.

This additional mailing resulted in at least 65,756 authors (in addition to the 174,880 authors

who were sent notice based on the lists provided by the five initial publisher plaintiffs)

receiving direct notice – as indicated in the Direct Notice Report (Exhibit 17).  Because the

Notices sent to publishers (such as AAP members) included an insert asking them to send

information about the Settlement to their authors, it also is likely that additional publishers

notified their authors about the Settlement.   The number of authors who received notice from

those publishers directly is not reflected in the total number of direct notice recipients

referenced in this declaration or in the Direct Notice Report.

75.     The Google Books Partner Program is a free marketing program that enables publishers and

authors to promote their books online, through Google Books.  Google provided notice

materials by email to more than 30,000 Partner Program members in 38 languages in February and March.  Google also posted a link to its page about the Settlement (http://books.google.com/googlebooks/agreement/) from the Google Books home page (http://books.google.com/) below the search box.  That message and link also appear on the Partner Program home page (http://books.google.com/googlebooks/publisher.html).  The links on the Google Books and Google Books Partner Program home page connect users to Google's page about the Settlement, which at the top has a clear message to likely class members and a link to the Settlement Website.  Screen captures of these three pages are attached in Exhibit 31.

76.    During the original Notice Period, KM identified numerous rightsholder organizations beyond IFRRO-member RROs and their members.  These included local, regional, and national author and publisher groups.  Those organizations that agreed to send direct notice to their members are included in the Direct Notice Report.  If KM could not make contact with an organization or an organization was not willing to send direct notice to its members, but the organization had a list of members' contact information on its website, KM and/or Rust sent notice to the listed members.  Those organizations also appear in the Direct Notice Report; KM/Rust research, including that of native language contract linguists, located at least 242 direct mail lists to which notice was provided.  (Some of these organizations are covered in the Additional Outreach section below.)

77.    During the Extended Notice Period, KM focused on maximizing the participation of RROs and their members, and on identifying additional smaller rightsholder organizations – particularly outside the U.S. – to include in the Direct Notice program.

78.    During the Extended Notice Period, native-language researchers performed research and follow-up in 41 languages covering 92 countries.  (In order to use resources most efficiently, KM targeted additional research to countries most likely to have higher concentrations of

likely class members, based on the previously established Tiers.)  A list of these languages and

countries is attached as Exhibit 32.

79.    KM provided the native-language researchers, who were fluent in both English and their

native language, with a brief that included detailed directions about:

    a)  Placing follow-up calls to organizations that had previously been contacted about

       providing direct notice to their members,

    b)  Researching additional trade publications in their assigned countries,

    c)  Researching additional author and publisher organizations in their assigned countries,

    d)  Calling any identified author and publisher organizations or creating a mailing list of

       members if the membership list was available online, and

    e)  Locating any blog posts about the Settlement.

The brief also contained instructions about reporting back on these findings to KM.

80.    As a result of the native-language researcher efforts, dozens of additional organizations and

tens of thousands of additional direct notice recipients were added to the Direct Notice

program; these are included in the Direct Notice Report.  These research efforts and results

furthered my opinion that the Direct Notice program was extraordinarily thorough, more than

satisfied any reasonableness standard, and was the best practicable under the circumstances.

**Recipients – By Request**

81.    A number of people contacted Rust and asked to receive notice materials.

82.    A total of 4,490 people provided their contact information to Rust before the Notice Program

began and asked to receive notice as soon as it became available.  During the notice period,

another 2,652 people requested notice materials and/or claim forms.  Rust fulfilled all of these

requests in the appropriate languages.

## Paid Media

### Methodology

83.  KM reasonably assumed that likely class members, because they are authors, authors' heirs and publishers, read print media and use online search engines.  Newspaper circulation is growing in Asia, Africa, South America and elsewhere,[4] and studies have shown newspaper advertising to be the most trusted of all media.[5]  KM researched a variety of relevant data points, as discussed in more detail below, and confirmed that highly industrialized countries would contain the highest percentage of class members.  However, KM further determined that worldwide notice – including beyond highly industrialized countries – would be necessary to ensure the Notice Program's comprehensiveness.

84.  KM arranged to have the Summary Notice be published in virtually every country in the world.  Each country was categorized into a Tier, by concentration of likely class members, as explained below.  These Tiers allowed KM to distribute Paid Media resources to target the densest concentrations of likely class members most heavily, while also ensuring notice in all relevant countries.

85.  To create the Tiers, KM used the following information. No single criterion was given primary importance, and every country was considered individually.

   a)  The United Nations ("UN") Human Development Index rankings.[6]  The UN states: "The HDI – human development index – is a summary composite index that measures a country's average achievements in three basic aspects of human development: health, knowledge, and a decent standard of living.  Health is measured by life expectancy at birth; knowledge is measured by a combination of the adult literacy rate and the

---

[4] World Association of Newspapers and Zenith Media, *World Press Trends 2009*.
[5] emarketer/The Nielsen Company, *Online Global Consumer Study*, October 2007.
[6] United Nations, Statistics of the Human Development Report, *available at* http://hdr.undp.org/en/statistics/.

combined primary, secondary, and tertiary gross enrolment ratio; and standard of living by GDP per capita (PPP US$)."  (More details are available at http://hdr.undp.org/en/media/hdr_20072008_tech_note_1.pdf.  For those countries without a UN HDI ranking, KM applied other criteria for Tier assignments.)

    b)  Population[7]

    c)  Gross National Product ("GNP")[8]

    d)  Books published per year or total number of books in print by language and country (where available)[9]

    e)  Literacy rates[10]

    f)  Internet usage[11]

86.    A list of all countries included in the Notice Program, sorted by Tier, is attached as Exhibit 33.

87.    Those countries with large populations, large economies, and high literacy rates fall into higher Tiers, while the smallest countries, or those with lower literacy rates, fall into lower Tiers.  Generally speaking, the countries in each Tier shared the following characteristics:

---

[7] US Census Bureau, International Data Base (IDB), available at www.census.gov/ipc/www/idb. If country-specific information was unavailable at IDB then KM obtained it from an alternate source and those country-specific resources are on file with KM.

[8] Countries of the World Gross National Product (GNP) distribution – 2003, then available at www.studentsoftheworld.info/infopays/rank/PNB1.html (2005 data has since replaced 2003 data).  If country-specific information was unavailable then KM obtained it from an alternate source, or substituted GDP for GNP, and those country-specific resources are on file with KM.

[9] See Center for Publishing Development, The Results of Publishing Surveys in 1996, 1998 & 1999, *available at* http://www.osi.hu/cpd/resources/practicalguides.html#survey; Wikipedia, Books published per country per year, *available at* http://en.wikipedia.org/wiki/Books_published_per_country_per_year; hard-copy information provided by Google and on file with KM.

[10] Central Intelligence Agency, The CIA World Factbook 2008 (2007).

[11] Central Intelligence Agency, The CIA World Factbook 2008 (2007).

| Tier | General Characteristics of Countries |
|------|--------------------------------------|
| 1 | United States and its territories only. |
| 2 | The majority of Tier 2 countries have:<br>▪ High HDI,<br>▪ GNP greater than $100 billion,<br>▪ Literacy rate above 70%, and<br>▪ High number of books published (if data available). |
| 3 | Tier 3 countries have:<br>▪ High and Medium HDI,<br>▪ Literacy rate of 60% and above, and<br>▪ GNP greater than $15 billion. |
| 4 | Tier 4 countries with populations less than 2,000,000 have:<br>▪ GNP between $9 and $15 billion, and<br>▪ Literacy rate of 60% or more.<br>Tier 4 countries with populations greater than 2,000,000 have:<br>▪ GNP less than $15 billion, or<br>▪ Literacy rate of less than 60%. |
| 5 | Tier 5 countries have:<br>▪ GNP below $9 billion; and<br>▪ Population less than 2,000,000. |

88.    The publication of the Summary Notice in print media was country-specific.  The media were selected based on the print options available, their circulation nationally and the languages spoken by sizeable percentages of the national population (additional publications for multiple languages).  The Summary Notice was published more frequently in a country in the higher Tiers, where it is likely that a larger number of likely class members are located.  The Summary Notice was published less frequently in a country in the lower Tiers, which include countries where it is less likely that sizable numbers of likely class members are located.

**Results**

89.    Paid Media complemented the Direct Notice, Earned Media, and Additional Outreach components.  Paid media placements appeared in:

  a)  National in-country consumer print media,

  b)  Global magazines and newspapers with distribution throughout the world,

  c)  Trade publications and websites targeting the book industry,

    d)  Sponsored links on search engines, and

    e)  Internet banners and text ads on sites contextually topical to publishing, writing, and copyright matters.

### U.S. Program

90.    Tier 1 comprised the U.S. only because the U.S. was deemed likely to contain the highest concentration of class members. Accordingly, the U.S. received the heaviest concentration of media.

91.    The Notice Program in the U.S. included placement of the Summary Notice in publications that are likely to be read by authors and publishers, including national newspapers, leading industry magazines and literary websites that target the publishing/literary sector. In addition, to reach heirs of deceased authors and to provide even wider coverage to the author population, the Summary Notice was published in publications aimed at a wider audience, including general interest magazines and newspaper supplements.[12]

92.    A list of all U.S. paid media placements, sorted by type, is attached as Exhibit 34. KM reviewed and retained tearsheets[13] for all these publications and can file them with the Court upon request.

### International Program

93.    The Summary Notice appeared in a broad range of media, including global publications, in-country trade publications, in-country newspapers, and an in-country magazine. An online advertising campaign complimented the print program.

---

[12] *Parade* and *USA Weekend,* publications known as newspaper supplements, are inserted into weekend or Sunday editions of 1,124 newspapers (40 newspapers carry both), reaching every major media market in the country. A complete listing of newspapers that carry *Parade* and *USA Weekend* is attached as Exhibit 35.

[13] A tearsheet is a paper or electronic copy of an advertisement as it ran in a publication, provided by the publication to KM (or its media-buying associates) as proof of publication.

94.     The Summary Notice appeared in the following publications with international circulation

("global publications"):  *Time, Newsweek, The Economist*, *Wall Street Journal* (Europe/Asia,

U.S., and the Americas), and *New York Times* Media Group (*International Herald Tribune,*

*LeMonde, Suddeutsche Zeitung, La Repubblica,* and *El Pais*).

    a)  A detailed list of these global publications is attached as Exhibit 36.  The Summary

        Notice was published 38 times in global publications.

    b)  KM reviewed and retained tearsheets for all these publications and can file them with

        the Court upon request.

95.     Trade publications are magazines or newspapers with content specifically tailored to people

and entities in a particular industry.

    a)  The Summary Notice (as a full-page ad) appeared in 21 international trade publications

        in 10 countries, serving the publishing trade and literary markets.

    b)  Trade publications frequently also have websites with shared or exclusively online

        content.  KM placed banner ads on 16 such sites as part of the Notice Program.

    c)  A list of all the trade publication print and online placements included in this Notice

        Program is attached as Exhibit 37.

    d)  KM reviewed and retained tearsheets for all these publications and can file them with

        the Court upon request.

96.     In-country newspapers were the primary form of print media internationally, selected because

of their usage by likely class members.  Leading newspapers were used in all countries and

territories in the world with which the United States had copyright relations at the time the

Notice Program was designed and approved, according to materials made available by the

U.S. Copyright Office at the time (except Cuba, Myanmar and North Korea, see Paragraph

109 below).  As summarized by Tier, insertions in general newspapers appeared as follows:

| Tier | Newspaper Insertions |
|---|---|
| 2 | An average of three to five insertions in leading national and/or regional print media. |
| 3 | Two or three insertions in a combination of leading native language print media.[14] |
| 4 | Two insertions in leading national newspapers. |
| 5 | One insertion in a leading national newspaper. |

97.    The Summary Notice was published 586 times in in-country newspapers and a magazine.  A

list of all in-country newspaper and magazine placements by country is attached as Exhibit 38.

KM reviewed and retained tearsheets for all these publications and can file them with the

Court upon request.

98.    Other than trade websites, the appearance of online text and banner ads was determined by

selected keywords related to the settlement or to authors and publishers more generally.  For

sponsored search results, text ads in the corresponding language appeared on the results page

of the search engines whenever users entered any of the sponsored keywords as search terms.

KM purchased these sponsored search results on Google in 35 of the Notice Languages.

(Malay is the only Notice Language in which sponsored keywords were not purchased,

because they were not available through Google.)  Yahoo was used in English and Japanese

throughout the world and Yandex was used in Russia.

99.    KM chose the search engines on which to purchase sponsored keyword ads based on market

share. KM subscribed to and consulted Netmarketshare.com and comScore to determine

---

[14] The Notice Program approved by the Court contained an error in indicating that Tier 3 countries would receive three or four insertions.  The correlating exhibit accurately listed the publications and number of insertions planned in each country, and, at a minimum, those insertions did occur.

search engine usage by country.[15]  Netmarketshare.com lists Google as the leading search

engine in the world with a global market share in October 2008 of 81.9% and market shares of

greater than 50% in all of the 220 countries reported.  Yahoo, the second-ranked global search

engine, had a global market share of 8.68% with in-country shares greater than 30% in the

Philippines, Hong Kong, and Japan.  ComScore's data agrees with Netmarketshare.com's

overall, except in Russia where Google's share was reported as 34% and Yandex, the Russian

search engine, is reporting as having a share of 47%.  The search engine Baidu, in the People's

Republic of China, is listed as the third most widely used search engine in the world with

3.79% global market share and a market share of 30.6% in China.  However, despite repeated

efforts, Baidu rejected KM's request to purchase sponsored keyword search ads.

100.  Between 30 and 125 keywords were sponsored in each of the 35 languages.  Maximum bid

suggestions from the search engines were accepted to capitalize on all search opportunities and

to keep ads prominent.

101.  The keywords also determined on which websites text and/or banner ads would appear.  Ads

appeared on search-engine-partner websites (e.g., the Google Content Network) whose content

was appropriate and related to the sponsored keywords and which were therefore more likely

to be visited by likely class members.  These contextually targeted text and/or banner

campaigns were activated in (a) 34 of the Notice Languages through the Google Content

Network, (b) English and Japanese through Yahoo, and (c) Russian through Yandex.  Ads

appeared for a minimum of 30 days after the Settlement Website was made available in a

given language (as noted above, Google did not offer the Malay language, and there is no

---

[15] Netmarketshare.com is one of several companies that track website activity using server-centric methodology.  For this analysis KM chose to cite Netmarketshare.com because it provided the level of country detail KM needed in a format that was useful for analysis and comparison.   KM used comScore to confirm data from Netmarketshare.com.  See footnote 18 for more information about comScore.

content network available through Google for Hindi). All campaigns were activated to run in all countries and territories. Ads were permitted on all devices, all days of the week and hours of the day.

102. Contextually targeted text ads were used in (a) the 34 available Notice Languages in the Google Content Network, (b) English and Japanese through Yahoo's network, and (c) Russian through Yandex's network. In addition, contextually targeted banner ads were used in the Notice Languages KM found to have a significant number of relevant Google Content Network sites that accept banner ads: Croatian, English, French, German, Greek, Hungarian, Italian, Korean, Romanian, Russian, Spanish, and Turkish

103. A summary of impressions and clicks generated by these online ads is attached as Exhibit 39. The delivery statistics are summarized by language and type of advertisement.

**Extension Program**

104. KM recommended and Class Counsel agreed that the Notice Program should include additional paid media placements to supplement earned media and direct notice in certain countries. KM analyzed RRO cooperation and earned media coverage in Tier 2 and Tier 3 countries to determine which countries could benefit from additional paid media. Supplemental media choices were identified to complement and extend the initial paid media plan.

105. A list of additional paid media placements executed during the Extended Notice Period is attached as Exhibit 40. KM reviewed and retained tearsheets for all these publications and can file them with the Court upon request.

**Changes from Plan as Approved by Court**

106. In addition to the Extension Program, the parties made certain changes to the Notice Program (as approved by this Court) as became necessary due to logistical or business reasons, including, for example, refusal by certain publications to accept the Summary Notice as a paid

advertisement.  KM selected appropriate substitutions to replace placements in publications that refused to publish the Summary Notice.  A list of substitutions and replacements is attached as Exhibit 41.

107.   When a substitution for a publication was required, that substitution appears in Exhibit 41 as well as in the appropriate paid media exhibit.  For example, if a newspaper in China refused to run the Summary Notice and, instead, the Summary Notice was published in two other newspapers, that substitution is explained in Exhibit 41 and the Summary Notice advertisements that were published are reflected in Exhibit 38.

108.   During the Notice Period and Extended Notice Period, several opportunities arose to provide additional notice.  Because they were cost-effective and likely to reach additional Class Members, KM executed four additional banner ad and e-newsletter placements, a list and copies of which are attached as Exhibit 42.  These placements are also included in Exhibit 34.

**Countries With No Paid Media Placements**

109.   As indicated in the Notice Program approved by this Court, due to U.S. trade sanctions against Cuba, Myanmar, and North Korea, KM did not attempt to publish the Summary Notice in media in those countries.

110.   KM also researched the countries with which the U.S. had copyright relations in order to determine where publication of the Summary Notice would not be necessary.  KM used the U.S. Copyright Office's *Annual Report of the Register of Copyrights* (September 2006), then available at http://www.copyright.gov/reports/annual/2006/index.html, to complete that research.  As a result, due to a lack of copyright relations (according to the then-current *Annual Report of the Register of Copyrights*) between the U.S. and the countries of Afghanistan, Bhutan, Eritrea, Ethiopia, Iran, Iraq, Nepal, and San Marino, KM did not publish the Summary Notice in any media in those countries.

111.    After the original Notice Period had concluded, in March 2009, the U.S. Copyright Office

issued *Circular 38A*, titled "International Copyright Relations of the United States, which

updated information from the 2006 report. *Circular 38A* is available at

http://www.copyright.gov/circs/circ38a.pdf. Among other changes, *Circular 38A* indicates

that the United States now has copyright relations with Nepal and Bhutan.[16]

## Earned Media

112.    The Notice Program featured an earned media program to augment the direct and published

notice. Press releases are commonplace in class action notice programs, designed to attract

non-paid media coverage of the litigation. In this case, three widely distributed press releases

significantly broadened media coverage of the Settlement and the Notice Program, given

Google's profile and the nature of the lawsuit. KM measured the efficacy of the campaign

using tracking results provided by an independent firm that specializes in media tracking.

Overall, press releases and outreach relating to the Settlement case generated at least 636

million gross impressions.[17]

113.    The Initial Press Release, Notice Press Release, and Extension Press Release – as discussed in

Paragraph 27 above – are attached as Exhibits 8, 9, and 10, respectively.

### Press Release Distribution

114.    The initial press release prepared by the parties and reviewed and edited by KM provided

information about the Settlement for likely class members as well as the broader public. The

---

[16] Other changes to countries' statuses mean that some countries received paid media placements of the Summary Notice but that they may not actually include any likely class members, because the status of their copyright relations with the United States is now unknown, or that they had copyright relations with the United States when KM created the Notice Program but do not have any noted now. These countries are Kiribati, Nauru, Palau, S„o Tomé and Principe, Seychelles, Somalia, Turkmenistan, Tuvalu, and Vanuatu.

[17] Gross impressions are the sum of the audiences to all the vehicles carrying the message. For purposes of this report, the circulation of each newspaper in which the story appeared is added to the average daily visitors to the websites on which the story appeared. Actual audience can be expected to be higher due to pass along readership of the newspaper and stories being available online for longer than one day.

release included a link to the pre-notice website – located at
http://books.google.com/booksrightsholders.  In early November, that address began to
redirect to the permanent Settlement Website address of www.googlebooksettlement.com (and
all language versions).  The content of the pre-notice website did not change.

    a)  The initial press release was distributed on PR Newswire's US1 and Premier Global wires, as well as to a list of media contacts maintained by Google.  A list of media outlets included on PR Newswire's US1 wire is attached as Exhibit 43, and a list of media outlets included on PR Newswire's Premier Global wire is attached as Exhibit 44.  A total of at least 24,183 media outlets worldwide received the press release through those wire distributions.  The initial press release was also distributed to non-media entities, such as organizations participating in or considering participating in the Direct Notice Program.

    b)  For distribution on the Premier Global wire, PR Newswire translated the initial press release into the following languages:  Arabic, Chinese (Simplified), Chinese (Traditional), Czech, Dutch, English (Asia), English (Europe), Estonian, French (Canada), French (Europe), German, Greek, Hebrew, Hindi, Indonesian, Italian, Japanese, Korean, Latvian, Lithuanian, Malay, Polish, Portuguese (Brazilian), Portuguese (Continental), Russian, Slovak, Spanish (Europe), Spanish (Latin America), Thai, and Urdu.

115.  A second press release was targeted specifically to likely class members, designed to make authors, their heirs, agents and publishers aware of the Settlement, the Notice Program, and that claiming functions were available.

    a)  Usually this type of release, targeted to members of a settlement class, is issued at the beginning of the Notice Period.  In this case, KM and Class Counsel opted to wait and issue the release once the Settlement Website and notice materials were live and

available in all the Notice Languages, so that no class member would see the release or a media appearance resulting from the release and go to the Settlement Website, only to discover it was not yet fully operational. Therefore, KM issued the notice press release on February 11, 2009. The notice press release in English is attached as Exhibit 9.

b) The notice press release was distributed on PR Newswire's US1 and Premier Global wires, as well as to a list of media contacts maintained by Google (the same distribution list as the initial press release).

c) KM also distributed the notice press release to 476 trade publications targeting authors and publishers worldwide, from a list generated by a search on Literary Market Place. The list of these trade publication recipients is attached as Exhibit 45.

d) KM also distributed the Notice Press Release to blogs that had previously covered the Settlement, as detailed in Paragraph 125 below. The list of these blog recipients is attached as Exhibit 46.

e) For distribution on the Premier Global wire, PR Newswire translated the notice press release into the same languages as it did for the initial press release, as identified in Paragraph 114 above.

116. When this Court granted an extension of the opt-out/objection deadline and Fairness Hearing dates on April 28, 2009, KM distributed a press release announcing the extension.

a) The extension press release was distributed on PR Newswire's US1 and Premier Global wires, as well as to a list of media contacts maintained by Google (the same distribution list as the initial press release).

b) For distribution on the Premier Global wire, PR Newswire translated the extension press release into the same languages as it did for the initial and notice press releases.

**Earned Media Results Tracking**

117.    The Settlement and Notice Program generated extensive news coverage around the world.  In order to capture and then quantify that coverage to illustrate as best as possible the likely additional opportunities to learn about the Settlement that this earned media coverage provided, KM employed a two-step process.  First, KM retained a respected media-tracking firm, CARMA International ("CARMA"), to capture and report on the earned media coverage.  Second, KM used subscription research data to measure the gross impressions generated by the media stories that CARMA detailed in its report to KM.

118.    Details about CARMA and its qualifications are attached as Exhibit 47.

119.    The methodology CARMA used for tracking media is attached as Exhibit 48.

120.    CARMA provided a detailed report of the stories its researchers located using the agreed-upon search methods.  KM submitted applicable entries on that report to comScore,[18] a KM vendor that measures Internet visitors to particular sites.  KM then integrated comScore's data into CARMA's report to provide as comprehensive a picture as possible of the worldwide earned media coverage of the Settlement.

121.    The report with both CARMA and comScore data, detailing media coverage of the Settlement through May 31, 2009, is attached as Exhibit 49.  As detailed in that exhibit, earned media appearances related to the Settlement generated at least 636 million gross impressions worldwide.

---

[18] ComScore Media Metrix is a preferred source of Internet audience measurement for advertising agencies, publishers, marketers and financial analysts.  It uses proprietary data collection technology and online recruitment methodology.  It offers comprehensive metrics detailing online media usage for home, work and university audiences; complete online visitor demographic analysis; and online buying power metrics to segment audiences based on actual consumer purchases.

The comScore Global Network is the largest continuously measured consumer panel of its kind. This information network delivers one of the highest quality, most comprehensive views of Internet viewing, buying and other activity – both online and offline. With more than 2 million participants under continuous measurement, the comScore Global Network delivers one of the most comprehensive views available of consumer activity – both online and offline.

122.    The circulation/gross impression numbers in this report are estimates.  The numbers are not precise because, for example, audience counts to specific articles are not available.  In an effort to estimate the number of people who may have been exposed to an article about the Settlement, the report includes estimates of the average daily visitors to the sites on which the articles appeared, where that data is measured and reportable by major measurement services. Quantcast was used for reporting audience from the United States; comScore was used for international sites.[19]  Average daily data is used to illustrate the potential number of people exposed to the story.

**Blogs**

123.    Blogs are a rapidly expanding news source to readers who self-select to follow particular blogs, which often provide information about a single topic.

124.    The announcement of the Settlement and subsequent discussions generated extensive coverage by blogs.  To amplify that coverage and to attempt to ensure that blog readers who were also likely class members would have access to the official notice materials, KM conducted a blog outreach campaign to reach bloggers who had written about the Settlement.

125.    In late January 2009, KM sent an email to blogs that had discussed or otherwise posted information about the Settlement.  The list of these blog recipients is attached as Exhibit 46. The email notified bloggers that the process of notifying authors and publishers had begun and asked them to update their readers with the Court-approved Notice by directing readers to the Settlement Website.  In mid-February, KM sent a follow-up email to the same blogs that has

---

[19] Quantcast conducts direct-measurement of website traffic through HTML code inserted into participating websites. Using this mechanism and demographic modeling Quantcast reports counts of the site's U.S.-based traffic, audience impressions and other audience characteristics. Quantcast can provide data for any participating website regardless of size.

ComScore measures Internet usage and other activity through monitoring software installed on the computers of a panel of approximately 2,000,000 people.  Active in 170 countries, comScore tracks more than 3 million unique websites. Panel-based surveys are subject to minimum reporting standards and not all surveyed websites will meet these minimums.

received the first email.  The follow-up email notified recipients that a press release regarding

the Settlement had been issued and included a link to the press release on PR Newswire.  In

early June, KM sent an email to the operators of certain higher-traffic blogs likely to be read

by authors, asking them to provide information about the Settlement (in particular the new opt-

out/objection deadline and Fairness Hearing dates) to their readers.  Based on emailed replies

and KM's tracking of blog posts, I believe this outreach to bloggers contributed to the number

of blog posts about the Settlement.

126.    KM tracked English-language blogs and used native-language speakers to report back on blog

coverage in 41 other languages.  In total, at least 2,108 blog postings about the Settlement

appeared, likely providing significant numbers of likely Class Members with information

about the Settlement.  A report on blog postings related to the Settlement, tracked through

September 4, 2009, is attached as Exhibit 50.

## Additional Outreach

### Outreach to Encourage Direct Notice Distribution

127.    Other than IFRRO member organizations and lists from the parties, KM and the parties

identified several other possible organizations or entities that could contact likely class

members.  These outreach targets included:

   a)  Literary agencies and agents

   b)  International Publishers Association (IPA) member organizations

   c)  Federation of European Publishers (FEP) member organizations

   d)  International Confederation of Societies of Authors and Composers (CISAC) member

   organizations

   e)  European Writers Congress (EWC) member organizations

   f)  Authors Coalition member organizations

g) In the U.S., additional author/writing-related organizations (mostly local and state) and websites

128.   These outreach targets were contacted multiple times as detailed below.[20]

### Literary Agencies and Agents

129.   As noted above, KM used the listings of literary agents worldwide on the LMP website; Rust sent direct mail to these literary agents (945 pieces).  In March, KM placed calls to the twenty largest domestic literary agencies (which were included on the LMP list), as identified by the Authors Guild.  The goal of these calls was to determine whether or not the agencies had sent notice to their authors, and if not, to ask them to do so.  The Authors Guild then took the full list of literary agents that KM had, and further prioritized an additional 71 agencies, which KM then called.  After the extension was granted, Rust called 204 literary agencies to find out if Notice had been sent, and to request that they send notice.  As a result of these calls and the Notice Program generally, we are aware that at least 10,673 authors received notice of the Settlement from their agents.  It is also important to note that the Association of Authors' Representatives participated in the Notice Program and distributed notice materials to its 430 members (literary agents); with this distribution the literary agents were asked to share the information with their authors.

### Publisher Associations

130.   The members of IPA and FEP are national publisher associations (including, in the case of IPA, AAP in the U.S.).  Those national publisher associations' memberships are made up of individual publishing houses/publishers.  IPA has 64 members (not including FEP), FEP has 26 members; 19 publisher associations are members of both IPA and FEP.

---

[20] There is some overlap among IFRRO, CISAC, EWC, IPA, and FEP members.  It is not uncommon for an organization to belong to more than one of those umbrella groups.

131.    KM emailed IPA and FEP members several times beginning in December, asking the
        organizations to distribute notice materials to their publisher members.  Based on my staff's
        communication with staff at IPA and FEP, I believe both organizations were also in repeated
        contact with their members about the Settlement and the Notice Program.

132.    Beginning in March, KM, Rust, and/or native-language speakers acting under our direction
        repeatedly contacted publisher associations that had not yet agreed to participate in the Notice
        Program individually and encouraged their participation.  Ultimately, 57 of the 71 publisher
        associations that are FEP and/or IPA members either sent notice materials to their members or
        have a list of members that is publicly available and to which Rust sent notice materials.

133.    A list of the members of IPA and FEP and their level of participation in the Notice Program is
        attached as Exhibit 51.  Participating organizations are also included in the Direct Notice
        Report.

### Other Outreach Organizations

134.    Initially, CISAC, EWC, and the additional U.S. author organizations received at least two
        emails requesting their participation in the Notice Program.  These organizations are listed in
        Exhibit 52.  During the Extended Notice Program, these groups received multiple calls and
        individual emails (from native-language speakers as appropriate) requesting their
        participation.  Organizations that opted to participate are included in the Direct Notice Report.

135.    The Authors Coalition of America (ACA), of which the Authors Guild is a member, is a
        collection of membership organizations that represent authors and others (such as songwriters
        and photographers).  KM determined that 17 members of ACA were relevant for the
        Settlement. KM and the Authors Guild contacted ACA members on several occasions.  KM
        continued to follow up with each ACA member individually until participation was secured

and confirmed for all of the 17 relevant members of ACA.  ACA members that participated in

the Direct Notice Program are included in the Direct Notice Report.

**Presentations and Conferences**

136. The parties shared information about the Settlement at various conferences and meetings

during the Notice Period and Extended Notice Period.  Those conferences and meetings

included:

a) On January 21, 2009, Jan Constantine, General Counsel for the Authors Guild, and Dan

Clancy, Engineering Director for Google, attended and presented at *Academic*

*Publishing in Europe: "The Impact of Publishing."*  The more than three-hour

presentation to approximately 250 attendees included information about the Settlement

and the Notice Program.  A copy of the agenda for the event is attached as Exhibit 53.

b) Presentations by Michael Boni and Michael Healy at a conference of European

publishers' groups in Munich, Germany; presentations by Michael Boni, Jeffrey Cunard,

and Paul Aiken at meetings with numerous authors and publisher rights groups, and

with the Japanese Parliament, in Tokyo, Japan; countless meetings and telephone

conferences between Jeffrey Cunard and the Federation of European Publishers; a

meeting in Paris, France among Jeffrey Cunard, Richard Sarnoff, and the SNE (a

society of French publishers); a videoconference Jeffrey Cunard held with a group of

Polish publishers; a videoconference Mr. Cunard held with Latin American publishers

in Columbia; a videoconference Mr. Cunard

held with Argentinean publishers; a videoconference Messrs. Cunard and Boni held

with the Belgian RRO; a meeting Messrs. Boni, Cunard, Healy, Clancy, and Orwant

held in Italy with AIE (the Italian society of publishers), SNE, and CEDRO (the

Spanish RRO); a videoconference Messrs. Boni and Cunard, and Ms. Zack held with

the Greek RRO.

137.   Several organizations that participated in the Direct Notice Program complemented their email and postal mail notice with meetings and conferences to further explain the Settlement to their members.  Examples of such events include:

   a)   Access Copyright, one of two RROs in Canada, held seminars about the Settlement that were attended by more than 700 rightsholders.  The seminars occurred on a regular basis from January to March of 2009 and included:

      i.   Nine online seminars:  January 22, 26, and 28; February 5, 6, and 11; and March 4, 9, and 25), and

      ii.   Four in-person seminars (February 19; March 2 and 13; and June 6).

   b)   The Publishers Association in the United Kingdom held two seminars to inform its members about the Settlement:

      i.   In April of 2009, and

      ii.   In early December of 2009, focused on the Amended Settlement.

   c)   Copyright Agency Limited, the Australian RRO, provided information about the Settlement to its members at its annual member seminars in May of 2009.

   d)   ICLA, the RRO in Ireland, held or spoke at several seminars, including:

      i.   For publishers at the Dublin Book Festival (attended by approximately 30 publishers),

      ii.   For authors at the Irish Writers' Union Annual General Meeting (attended by approximately 60 authors), and

      iii.   At the Copyright Association of Ireland to a mixed audience of lawyers, authors, and librarians.

   ICLA also had a stand at the Dublin Book Festival for three days that included information about the Settlement.

e)  CEDRO, the RRO in Spain, gave numerous presentations regarding the Settlement and implications for Spanish publishers and authors, including:

   i.  In Madrid on January 15, 2009, to leading Spanish publishing houses,

   ii.  In Barcelona on January 28, 2009, to publishers and authors' associations,

   iii.  In Madrid on January 29, 2009, to publishers and authors' associations, and

   iv.  In Madrid on March 16, 2009, to leading Spanish publishing houses.

f)  The Japan Book Publishers Association held a meeting for member publishers about the Settlement on March 31, 2009, which was attended by 180 people.

g)  AIE, the Italian Publishers Association, conducted two public meetings targeted at top executives of publishing and literary agents.  The meetings included briefings on the Settlement and the claims process, as well as distribution of slides and other materials to all participants.  The meetings were held:

   i.  On April 27, 2009, in Milan, and

   ii.  On July 21, 2009, in Rome.

h)  The Swedish Writers' Union hosted a seminar about the Settlement in Stockholm on March 13, 2009.  The seminar included presentations from the Authors Guild and Google. The 112 attendees consisted of members of the Swedish Writers' Union, representatives from its sister organizations in Sweden and other Nordic countries, representatives from other interested parties (such as publishers), and media.

i)  KOPIOSTO, the RRO in Finland, gave a PowerPoint presentation to its members on several occasions during the Notice Period.

j)  The Norwegian Publishers Association gave a presentation at its office to approximately 15 publishers.

k)  OSDEL, the RRO in Greece, gave in-person presentations about the Settlement to its members in November of 2008 and April of 2009.

l)    The director of FJØLRIT, the RRO in the Faroe Islands, personally briefed member

organizations about the Settlement and provided guidance about the claims process in

March of 2009.

**Select Foreign College and University Outreach**

138.    In certain countries in which direct notice opportunities were limited by the lack of author or

publisher associations and/or that had limited earned media coverage of the Settlement, KM

sent emails to local colleges and universities.  The email, which was directed to professors

and/or faculty who may be published authors, contained an overview of the Settlement, and

included the Summary Notice as an attachment.  If an email address was not available for a

college or university, KM submitted the information via an online submission form on the

institution's website.

139.    Emails were sent to colleges and universities in the following countries, in the language

indicated:  Colombia (Spanish), Egypt (Arabic), Indonesia (Bahasa Indonesian), Philippines

(English), Saudi Arabia (Arabic), South Korea (Korean), Taiwan (Simplified Chinese), and

Turkey (Turkish).  The list of individual colleges and universities that received this email

request from KM is attached as Exhibit 54.

**Cairo Book Fair**

140.    The Cairo Book Fair is the oldest and largest book fair in the Arab world[21] and is considered

the second most important annual book fair globally, after the Frankfurt Book Fair.[22]  Given

the Fair's prominence and that the Fair took place during the Notice Period (January 22-

February 5, 2009), KM and Class Counsel opted to place an ad in the Fair's newspaper, which

has a circulation of 50,000.  The Summary Notice appeared as a full-page ad on the back page

---

[21] Maya Jaggi, *'They let the dogs yap': Maya Jaggi reports from the Cairo book fair on the struggle for freedom of expression*, Feb. 9, 2008, *available at* http://www.guardian.co.uk/books/2008/feb/09/featuresreviews.guardianreview1.
[22] Egypt State Information Service, Cairo International Book Fair: The 40th Session 23/1 – 4/2/2008, *available at* http://www.sis.gov.eg/VR/book2008/intro.htm.

of the paper, in Arabic and English.  KM reviewed and retained the tearsheet for this publication and can file it with the Court upon request.

## Settlement Website

141.    In my opinion, the Settlement Website in this case used plain language that is appropriate for the demographics of the Class, was easy to navigate, and was a key component of the Notice Program.

142.    The Settlement Website received at least 1,463,869 total visits and 1,208,752 unique visitors, significant totals that further demonstrate the efficacy of the dissemination of notice in this case.

143.    More details about the Settlement Website are contained in the declaration of Tiffaney Allen.

## Telephone and Email Support for Class Members

144.    In cooperation with KM, Rust designed a comprehensive automated and live-operator telephone support program to complement the Notice Program and ensure that likely class members had additional resources by which to inquire about the Settlement and to receive additional information and assistance.  A country-specific (when available) toll-free telephone number, or the international toll number, appeared prominently in the Summary Notice.  Telephone support was available in 67 languages.  Rust logged more than 13,900 calls through the telephone support program.

145.    Class members also contacted Rust by email for assistance.  Rust's email addresses, available in all the Notice Languages, were posted on the Settlement Website and were included in materials distributed to rightsholder groups internationally.  Rust received and resolved a total of 10,143 emails in 36 languages through February 8, 2010.

146.    Please see the declaration of Tiffaney Allen for more details about telephone and email support available to and utilized by Class Members.

## Translation

147.    KM selected several translation firms to translate the notice materials, including the Notice,

Summary Notice, Settlement Website text, and cover letters and emails to Class Members.

KM either had prior experience with these translation firms or carefully selected new

translation firms based on their experience, references, and/or client lists.  KM used the

following translation firms:  Applied Language Solutions, ASTA-USA, Language Innovations,

and TransPerfect.  Information about each of the firm's qualifications and experience, as well

as sample client lists, is attached as Exhibit 55.  Certifications from each firm about the

translation projects for which they have been engaged are attached as Exhibit 56.

148.    KM took several steps to ensure consistent and quality translations of the Settlement materials,

including:

a)    KM worked with Class Counsel to create a glossary of important and frequently used

Settlement-related terms.  That list was translated into all the Notice Languages and

then distributed to the translation firms KM and Rust used, as well as Google's

linguists, to attempt to ensure consistency of all translations of those terms across all

materials that were translated.  When the different translators involved inquired about

the translation of those terms, KM coordinated discussions among them and updated

materials to reflect the agreed-upon translation of the term.

b)    When KM or Rust received suggestions from outside sources – including native-

language speakers at organizations participating in the Notice Program – about

translations, those suggestions were routed to the translation firm that had translated the

document into the relevant languages.  Changes that enhanced the accuracy of the

document were incorporated as deemed appropriate.  In some instances, translations

were edited or redone by another translation firm, to enhance the quality of the

translation. (Examples include the Norwegian and Swedish translations of the Notice, which was retranslated in its entirety into those two languages and then re-distributed to groups participating in the Direct Notice program. Rust's distribution of direct notice in those languages was postponed in order to wait for the final, retranslated Notice.)

c) When a rightsholder group brought to KM's attention concerns with respect to the translation of a particular term, after coordinating updates to the translation or retranslation of the relevant material, KM provided that group with the opportunity to review and provide comments on the updated translation.

## Conclusion

149. Of the hundreds of notice programs that I have been involved with or am aware of, the notice program of the Settlement is the most global, complex, and multi-faceted. Detailed scrutiny of available options led to the selection of appropriate languages, media, organizations for direct notice, earned media options, and other program components that were all then interwoven to ensure the best notice practicable.

150. The parties, KM, and Rust made every effort to ensure that notice materials were available in appropriate languages, and that those materials and others were available on an informative and easy-to-navigate website, or by calling or emailing the Settlement Administrator.

151. KM employed a well-researched and in-depth methodology to focus notice efforts in the countries where we were most likely to reach likely class members, and media was scaled appropriately to ensure the most effective and efficient media program. All appropriate, readily accessible media that the likely members of the class were most likely to consume were used. These efforts ensured wide publication of the Summary Notice.

152. Beyond the Notice Program results documented in this declaration, it is important to note that significant notice to class members occurred that cannot be specifically identified or

quantified.  Word-of-mouth in the author and publisher communities, aided by components of this Notice Program and widespread international earned media coverage of the Settlement, was extensive and, undoubtedly, informed class members of the Settlement.

153.   It is my opinion that the notice of the Settlement is the best notice that is practicable under the circumstances.  Based on the diversity of delivery mechanisms, and the concentrated and intensive efforts to reach class members, the Notice Program was extraordinary.  This Notice Program is consistent with the standards employed by KM in notification programs designed to reach members of settlement and certification classes, and is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.

I declare under penalty of perjury that the foregoing is true and correct.   Executed this 10th day of February, 2010 in Paris, France.

_____

Katherine Kinsella