January 28, 2010

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/9/10

Office of the Clerk, J. Michael McMahon
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

*This letter is accepted as a filing as a timely objection. So ordered. [signature] USDJ 3/9/10*

Attention: The Honorable Denny Chin

RE: *The Authors Guild, Inc., et al. v. Google Inc.*, No. 05 CV 8136

Dear Judge Chin,

We are a group comprising hundreds of Canadian authors who are part of the proposed Author Sub-Class in this proceeding. We write to register our objections to the Amended Settlement in the Google Book Search Copyright Class Action ("the Amended Settlement"). The Amended Settlement is a bargain between a single American company and a minority of American commercial authors and publishers. It is a settlement that our members do not accept. In sum, we ask that the Amended Settlement be rejected because it fails to:

1. honour America's international obligations, as codified in the North American Free Trade Agreement ("NAFTA")[1] and the *Berne Convention* ("*Berne*")[2];

2. respect Canadian authors' moral rights;

3. address the serious competition concerns raised by granting what amounts to a mechanical license, to a single American company, over millions of the world's books;

4. provide privacy protection to online readers that is at least as robust as that provided in Canadian libraries and traditional book stores;

---

[1] North American Free Trade Agreement Between the Government of Canada, the Government of Mexico, and the Government of the United States, 17 December 1992, 32 I.L.M. 289 (entered into force 1 January 1994) [NAFTA].

[2] *Berne Convention for the Protection of Literary and Artistic Works*, 9 Sept 1886, 168 Cons. T.S. 185, Paris text 1971 [*Berne*].

1

5. respect Canadian provisions for addressing orphan works; and
6. recognize that Canada, a bilingual and bi-juridical country, has a cultural heritage and legal tradition that is dissimilar to the those of the United States, the United Kingdom or Australia.

We therefore ask that the Court remove Canadian copyright holders from the proposed settlement class, and reject the Amended Settlement until these objections can be resolved.

### 1. *Honouring America's International Obligations*

As a state party to NAFTA, the U.S. is required to provide national treatment to foreign investors,[3] and to comply with substantive copyright policy provisions of the Berne Convention such as refraining from the imposition of formalities.[4] The terms of the Amended Settlement, described in detail below, would rob Canadian class members of these protections.

Court approval of the Amended Settlement would violate American treaty obligations to protect Canadian copyright holders. If the U.S. does not meet these obligations, remedies will be available to both the Canadian government and Canadian authors and publishers under the enforcement provisions of NAFTA. We object to any settlement that would violate international protections for Canadian authors and publishers, and we hope that the Court will consider the following obligations when evaluating the settlement.

####    a. NAFTA

Approval of the Amended Settlement may subject the U.S. to trade sanctions under NAFTA. A book falls within the definition of "investment" provided in NAFTA, which includes "real estate and other property, tangible or intangible, acquired in the

---

[3] NAFTA, *supra* note 1 at Article 1102(1).

[4] *Ibid.* at Chapter 17 (requiring that parties comply, at a minimum, with the substantive copyright provisions of *Berne*).

expectation or used for the purpose of economic benefit."[5] Canadian authors and publishers who relied on U.S. copyright law to protect their intellectual property would therefore meet the definition of "foreign investors" for the purposes of NAFTA.

The Amended Settlement may violate NAFTA's substantive provisions in Article 1102, which requires that each Party provide to investors of another Party "treatment no less favorable than that it accords, in like circumstances, to its own investors."[6] That provision obliges the United States to provide national treatment to Canadian writers and publishers.

The Amended Settlement does no such thing. The rights of American authors are modified by the settlement *only if* their books were registered with the copyright office before 5 January 2009; publication is not enough. In contrast, Canadian authors' rights are changed by the settlement if their books were merely published in the U.S. before 5 January 2009. In other words, the Amended Settlement treats Canadian authors differently than it treats American authors. And while such inequity can be excused by a rational state policy objective,[7] none has emerged. In fact, the Amended Settlement compounds the differential treatment of Canadian authors by inexplicably providing yet another version of the settlement for authors from France, Germany, New Zealand, much of Europe, and elsewhere. These are not distinctions based on principle or an overriding state interest; they are distinctions of convenience that cannot excuse a clear violation of NAFTA's national treatment requirements.

Moreover, this violation would be attributable to the U.S. government, and would not be saved because it is an arrangement between "private" litigants. A state is responsible for the internationally wrongful acts of its courts.[8] As an apparatus of the

---

[5] *Ibid.* at Article 1139(g).

[6] *Ibid.* at Article 1102(1).

[7] See *e.g. S.D. Myers Inc. v. Canada* (2001), 40 I.L.M. 1408 at ¶250 (North American Free Trade Agreement, Chapter 11).

[8] See *e.g.* International Law Commission, *Report of the International Law Commission on the work of its fifty-third session*, GAOR, 56th Sess., UN Doc. A/56/10 (2001) 43 at Article 4(1).

state, the Court's actions and omissions will be attributed to the U.S. Therefore, a court-approved settlement violating America's international obligations would trigger responsibility of the U.S. at international law.

### b. BERNE

In 1971, formalities were abolished in the Paris text of *Berne*.[9] As a ratifying party of *Berne*, the U.S. is obliged to allow foreign copyright holders from other countries to enjoy their copyrights without being "subject to any formality."[10] The Amended Settlement violates this requirement: Canadian author must comply with the terms of the Amended Settlement in order to *prevent* Google from copying, indexing, and potentially profiting from his or her copyrighted work. These requirements amount to formalities, contrary to *Berne*. For the reasons described above, approving the Amended Settlement will put the U.S. in breach of its international obligations.

The solution to this is simple. If foreign authors are allowed to opt-in to the Amended Settlement instead of being forced to opt-out, the U.S. will remain in compliance with its Berne commitments.

The requirements of *Berne* are incorporated into NAFTA.[11] A violation of the former will give rise to remedial procedures under the latter. In other words, Canada, or a Canadian investor, may have a cause of action against the U.S. We strongly object to any settlement that would violate Canadian authors' rights of protection in the U.S.

### 2. *Respecting Canadian Authors' Moral Rights*

In addition to violating international law, the Amended Settlement unfairly infringes rights allotted to Canadian authors under Canadian copyright law. Canadian authors enjoy legal protection for moral rights in the work they create.[12] When copyright owners authorize the reproduction of their works, as is their right, they may consider

---

[9] *Berne, supra* note 2 at Article 5(2).

[10] *Ibid.*

[11] NAFTA, *supra* note 1 at Chapter 17.

[12] *Copyright Act*, R.S.C. 1985, c. C-42, s. 14.1 [*Canadian Copyright Act*].

4

whether their work will be associated with commercial services. If such an association is objectionable to the author, they have the right to withhold a license to reproduce, perform, or otherwise exploit the copyright. The Amended Settlement violates our moral rights in two ways.

First, by lumping all Canadian authors into the class, they have no choice but to be associated with Google until they successfully remove themselves from the class. Such a removal would require an author to learn of the settlement, understand that their work is implicated, ascertain the procedures for removing him or herself, and then undertake those procedures.

Second, while a Canadian author's work is included in the Google project, it will likely be displayed alongside advertisements that will be selected from Google's corpus of keyword-triggered ads. Juxtaposing a literary work with any number of advertisements, none of which are approved or even approvable by the author, will effectively vitiate the author's moral rights to be associated—or to decline association—with a particular commercial message. Where an author objects to the commercial message, such association may prejudice the honour of the author.

One might argue that the solution to these moral rights concerns is to opt-out of the settlement. This kind of burden-shifting should not be permitted. Canadian authors have rights under Canadian law, and those rights are protected by international instruments that the U.S. has ratified. It is no answer to tell a Canadian author, whose rights are about to be infringed by an American corporation implementing a court-approved settlement, that they must undertake their own protection. Such a rule flies in the face of the formality-free, national treatment regime that the U.S. has agreed to provide for *Berne*-country authors, including those from Canada.

### 3. Addressing Competition Concerns

We also object to the Amended Settlement because a monopoly, even one piloted by Google, in the electronic publishing industry will be bad for all authors and consumers. Google's breathless intentions to grant access to the entirety of human knowledge are laudable. But in matters of copyright, the negotiation of a license is a necessary, important, and proper step in bringing an entire commercial work to the

public. If Google can simply skip that step, paying a one-size-fits-all fee for its uses, it will enjoy a near-insurmountable advantage over any other competitor in the electronic book market. As the Department of Justice wrote about the original settlement, it is unlikely that:

> *"a competitor could enter the market by copying books en masse without permission in the hope of prompting a class action suit that could then be settled on terms comparable to the Proposed Settlement. Even if there were reasons to think that history could repeat itself in this unlikely fashion, it would scarcely be sound policy to encourage deliberate copyright violations and additional litigation as a means of obtaining approval for licensing provisions that could otherwise not be negotiated lawfully."*[13]

Without the corrective influence of competition, there will be insufficient checks on any anticompetitive behaviour that Google begins to exhibit. Condoning such a monopoly position would be irresponsible, and would damage the interests of all users and authors of copyrighted books.

### 4. Providing Privacy Protections to Online Readers

We also object to being included in the Amended Settlement because it fails to protect the privacy of our readers. The right to read anonymously is crucial to a healthy democracy. In the offline world, that right has been protected by the physical characteristics of books, legal protections for reader privacy, and the norms of the book-selling industry. It was easy to take for granted the high level of privacy afforded by reading a physical book.

That may change when most of the world's books are available, and perhaps eventually read, on services like Google Book Search. In contrast to the privacy-respecting nature of reading offline, Google's business model is based on monitoring and monetizing its users' browsing habits. To minimize the privacy risks associated with this new reality, we call on Google to adopt the privacy-enhancing principles that have

---

[13] U.S. Dept. of Justice, "Statement of Interest Regarding the Proposed Settlement" (18 September 2009) at 22-23, online: <http://www.justice.gov/atr/cases/f250100/250180.pdf>.

already been outlined by the Electronic Frontier Foundation and the American Civil Liberties Union.[14] Specifically, we support their call for Google to:

1. Promise not to disclose reader data unless compelled to do so by court order;
2. Limit tracking of its users, thereby reducing the amount of information that can be disclosed;
3. Provide user control over their privacy settings, and to allow users to "gift" books anonymously; and
4. Undertake to make its privacy decisions—including privacy policies and reports on information shared with law enforcement—transparent and publicly ascertainable.

We believe that the Proposed Settlement should be modified to reflect these privacy protections.

### 5. Respecting the Unlocatable Copyright Owners System in Canada

With respect to the problem of licensing the work of unlocatable copyright holders, we prefer the existing Canadian approach to a Google-run monopoly. An oft-repeated claim about the Amended Settlement is that it will allow the legal dissemination of copyrighted material for which an author cannot be found. The dissemination of these "orphan works" is indeed an important issue. However, Canadian copyright law already contains a mechanism for obtaining a license to disseminate works that have been orphaned by Canadian authors.[15] As such, the Amended Settlement is a duplicative and unjustified end-run around our domestic regime.

### 6. Recognizing Canada's unique cultural and juridical landscape

Books from Canada, the UK and Australia have been swept into the Amended Settlement because they apparently share "a common legal heritage and similar book

---

[14] Electronic Frontier Foundation, "Google Book Search Settlement and Reader Privacy" (July 2009), online: <http://www.eff.org/issues/privacy/google-book-search-settlement>.

[15] *Canada Copyright Act, supra* note 9 at s. 77.

7

industry practices."[16] In actual fact, Canada has unique cultural, linguistic, and juridical characteristics that differentiate Canadians from other members of the Author Sub-Class.

Canada is a bilingual country whose two official languages, French and English, are used by Canadians across the country. Canada is also a bi-juridical country where two legal systems exist side by side: civil law in Québec and common law in other Canadian provinces. The differences between the two traditions that Canada was built on are so profound that the Province of Québec is recognized as a distinct society within Canada.

The effects of being a bilingual and bi-juridical country are evident not only in Canada's rich cultural heritage but also in Canada's legal tradition. Copyright law is not immune from the influence of Québec. The close connection between copyright and culture has created in Québec an ethos that values the authors' rights, including moral rights, in a way that is unique in Canada and is almost unrecognizable to American copyright experts. Notably, Canada was the first among its peer copyright countries to enact moral rights provisions pursuant to Article 6bis of the *Berne Convention*.[17]

Authors of French language books in Québec and elsewhere in Canada represent a vibrant cultural heritage that enriches the lives of Canadians, the value of which Google's algorithms and aggregate results will fail to recognize. The Amended Settlement, in lumping Canadian and Québec authors in with Americans into a common Author sub-Class, pays a disservice to Québécois, French-language authors, and Canadians.

It should be pointed out that UNEQ, the union of Quebec French-language writers, has more than 1400 members. TWUC (the Writers Union of Canada) has 1850. The French literary presence in Canada is enormous.

In addition, it should be pointed out that most notifications and the settlement document itself were in English. While Canada is called a bilingual country, most English Canadians do not speak French, and many Quebec writers do not speak English,

---

[16] Google Public Policy Blog, "Revised Settlement FAQ" (13 November, 2009) <https://sites.google.com/a/pressatgoogle.com/googlebookssettlement/revised-settlement-faq/RevisedSettlementFAQ.pdf>.

[17] Ysolde, Gendreau, "Moral Rights", in Gordon F. Henderson, ed., *Copyright and Confidential Information Law of Canada*, (Scarborough: Carswell, 1994) at 161.

8

or if they speak it, not very well. Certainly, not well enough to comprehend a complex document such as the GBS. This English-only communication proved extremely frustrating for Quebec's publishers and authors. Several European countries objected strongly on this basis, and Quebec is entitled to object as well.

*Conclusion*

Today, the electronic publishing industry features online publishers who must negotiate separate contracts with rightsholders. These publishers' collections are necessarily fragmented and partial. Even Amazon.com's sale of electronic books for the Kindle, the world's most popular e-reader, is constrained by its need to obtain individual licenses for the books that it sells. This must be frustrating for Google, as indeed it is frustrating for many authors and readers

A petition has been circulating among Canadian writers since New Year's Day. The petition asks for the Amended Settlement to be rejected. While the more than 500 names on this petition are a mix of copyright holders who have both stayed in and opted out, it is fair to say that the settlement has become increasingly unpopular among Canada's writers.

We have no opposition to using the Internet to make books more widely available. We do, however, object to a company and a minor collective crafting a "settlement" that will upend American, and, by specific inclusion, Canadian copyright norms. These public policy choices should not be left to private litigants, nor should they be foisted on Canadian authors. Such far-reaching changes should be taken up by domestic legislatures, debated between the users and authors whose legal rights will be affected, and implemented with the legitimacy that comes only from democratic decision-making.

Respectfully,

*David Bolt*

David Bolt
On behalf of the following Canadian authors:
    Kathy Page
    George Payerle
    Lyn Hancock

Lyn Hancock
Peter Levitt
Penn Kemp
Chris Turner
Sandy Shreve
Patricia Pearson
Ann Diamond
Mary Soderstrom
Blanche Howard
Joe Rosenblatt
Bill Schermbrucker
Maureen Hunter
Heidi Greco
Debra Ann March
Margaret Dragu
Chris Banner
Gwenneth Steward
Judy D. Ivanda
Carol Matas
Farideh Kheradmand
Jacques Pauwels
Christine Foster
Patrick O'Flaherty
Nancy Holmes
Daniel Wood
Daniel Bratton
Ed Overstreet
Barbara Florio Graham
Susan McCaslin
Marnie Parsons
Lou Allin
Susan Crean
A. Mary Murphy
Alex Binkley
Liza Potvin
Clea Roberts
Fred Kerner
Guylaine Beaudry
Christopher Levenson
Doug Symons
Margie Taylor
Robin Harlick
Rachna Gilmore
Liv Kennedy
Robert Thistle
Julie Keith

Carol Shaben
Jennifer Mitton
Wendy Priesnitz
Heather Robertson
Leslie Hall Pinder
Jamie Reid
Gordon A. Bailey
Eva Tihanyi
Erin Sullivan
Betty L. Dyck
Sharyn Heagle
Ron Smith
Monique Proulx
Terri Perrin
K. Louise Vincent
Patricia A. Donahue
Dr. Roy Jensen
Paul Vasey
Richard Paris
Susan Olding
David N. Docherty
Shauna Paull
Mary Lou Dickinson
Katrin Horowitz
Rick Blechta
Duane Radford
Edward Loyst
Sharon McKay
Allan Briesmaster
Ted Johns
Chris Brookes
E. Russell Smith
Andrew Scott
Darryl McMahon
Gordon Freeman
Michael MacLennan
Dr. Maxine Ruvinsky
Andrew Brown
Gwendolyn Southin
Barbara Murray
Joyce Nelson
Joseph Jones.
Peter Grauer
Carolyn M. Gossage
Graham Baugh
Susan Lyons

Heather Kellerhals-Stewart
Carole Giangrande
Ursula Vaira
Anthony Dalton
Ron Johnson
Jo Walton
Andrew Robulack
Barbara Lambert
Virginia Dansereau
Judith Fitzgerald
Rex Deverell
Tedde Moore
David S. Young
Robert Graham
Linda L. Richards
Star Weiss
Rod MacIntyre
Jane Goodwin
Maury Breslow
Charlotte Gray
Liz Clark
Candace Savage
Robin McGrath
Michael Shepherd
Pam Blackstone
Sean Horlor
Leona Gom
Noel Meyer
Glen Sorestad
Dawn Service
Stella East
Darlene Maynard
Shirley Skidmore
Thomas Philp
Barry Grills
Beverley Cooper
Joanne Arnott
Bethany B. Keddy
Di Brandt
Karsten Heuer
Joanna Lilley
Cynthia Flood
Mary Alice Downie
Robin Mathews
Margaret Slavin Dyment
Sandra Campbell

Richard Pound
Vanessa Winn
Ahava Shira
Sandra Janssen
Nelofer Pazira
Sandra Alland
Suzette Mayr
Judy Fong Bates
Nicole Markotic
Allan Fotheringham
Connie Marchand
Annie Fisher
Martha Roth
Tom Handford
Claire Eamer
Maggie Paquet
Joseph Nieforth
Nadine Shelly
Danda Humphreys
Derek Lundy
Barbara Scott
Michael Mitchell
Patrick Lane
Lorna Crozier
Derk Wynand
Erling Friis-Bastaad
Dennis Reid
Leslie Gadallah
Joanne Bealy
Roger Brunt
Katy Hutchison
Silvia Ivanova
Hayden Trenholm
Carl Johanson
Mathew Johnson
Paula Johanson
Virginia O'Dine

Cc.   Michael J. Boni, Esq.
Joanne Zack, Esq.
Joshua Snyder, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
bookclaims@bonizack.com

13

Jeffrey P. Cunard, Esq.
Bruce P. Keller, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
bookclaims@debevoise.com

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri LLP
332 Pine Street, Suite 200
San Francisco, CA 94104
bookclaims@durietangri.com