UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-22-11

THE AUTHORS GUILD et al.,                    :

                Plaintiffs,    :

      - against -                       :                **OPINION**

GOOGLE INC.,                                 :                05 Civ. 8136 (DC)

             Defendant.       :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    (See last page)

**CHIN, Circuit Judge**

      Before the Court is plaintiffs' motion pursuant to Rule 23 of the Federal Rules of Civil Procedure for final approval of the proposed settlement of this class action on the terms set forth in the Amended Settlement Agreement (the "ASA").  The question presented is whether the ASA is fair, adequate, and reasonable.  I conclude that it is not.

      While the digitization of books and the creation of a universal digital library would benefit many, the ASA would simply go too far.  It would permit this class action -- which was brought against defendant Google Inc. ("Google") to challenge its scanning of books and display of "snippets" for on-line searching -- to implement a forward-looking business arrangement that would grant Google significant rights to exploit entire

books, without permission of the copyright owners.  Indeed, the ASA would give Google a significant advantage over competitors, rewarding it for engaging in wholesale copying of copyrighted works without permission, while releasing claims well beyond those presented in the case.

Accordingly, and for the reasons more fully discussed below, the motion for final approval of the ASA is denied.  The accompanying motion for attorneys' fees and costs is denied, without prejudice.

<u>**BACKGROUND**</u>

A.     <u>**The Facts and Prior Proceedings**</u>

In 2004, Google announced that it had entered into agreements with several major research libraries to digitally copy books and other writings in their collections.  Since then, Google has scanned more than 12 million books.  It has delivered digital copies to the participating libraries, created an electronic database of books, and made text available for online searching.  <u>See generally</u> Emily Anne Proskine, <u>Google's Technicolor Dreamcoat: A Copyright Analysis of the Google Book Search Library Project</u>, 21 Berkeley Tech. L.J. 213, 220-21 (2006) (describing project).  Google users can search its "digital

library" and view excerpts -- "snippets" -- from books in its digital collection.[1]

The benefits of Google's book project are many.  Books will become more accessible.  Libraries, schools, researchers, and disadvantaged populations will gain access to far more books.  Digitization will facilitate the conversion of books to Braille and audio formats, increasing access for individuals with disabilities.  Authors and publishers will benefit as well, as new audiences will be generated and new sources of income created.  Older books -- particularly out-of-print books, many of which are falling apart buried in library stacks -- will be preserved and given new life.[2]

_____

[1]   The term "digital library" apparently first appeared in the 1980s, see Mary Murrell, Digital + Library: Mass Book Digitization as Collective Inquiry, 55 N.Y.L. Sch. L. Rev. 221, 230 (2010), although the notion of a "universal library -- the utopian dream of gathering [] all human knowledge and, especially, all the books ever written in one place" -- has been with us for many centuries, id. at 226; see also id. at 226-36 (detailing that history).  It is estimated that there are 174 million unique books.  (Clancy Decl. ¶ 11, ECF No. 946).  The Republic of Germany reports that certain "European nations have taken affirmative steps to create a European Digital Library ('Europeana') that balances the needs of authors and publishers with those of users in a way that meets the interests of both." (Mem. in Opp'n to ASA of Republic of Germany 2, ECF No. 852 ("Germany Mem.")).

[2]   See, e.g., Matthew Sag, The Google Book Settlement & the Fair Use Counterfactual, 55 N.Y.L. Sch. L. Rev. 19, 73 (2010)

Millions of the books scanned by Google, however, were still under copyright, and Google did not obtain copyright permission to scan the books.[3]  As a consequence, in 2005, certain authors and publishers brought this class action and the related case, respectively, charging Google with copyright infringement.  The authors seek both damages and injunctive relief, and the publishers seek injunctive relief.  Google's principal defense is fair use under § 107 of the Copyright Act, 17 U.S.C. § 107.

The parties engaged in document discovery and, in the fall of 2006, began settlement negotiations.  On October 28,

_____

("There is no doubt that approval of the settlement will yield enormous cultural, intellectual, and educational benefits.  It will expand access to millions of out-of-print books for all readers; it will also facilitate a revolution in access for print-disabled persons and users in remote locations without immediate geographic access to the nation's marquee research libraries. . . .  From the perspective of authors and publishers, the GBS [Google Book Search] settlement promises new ways to profit from out-of-print works, as well as the possibility that increased access will draw in new readers and open up new niche markets.").

[3]  "Google proceeded to scan, digitize, and copy books . . . without attempting to contract with rightsholders beforehand to obtain rights and licenses to copy in-copyright books and display portions of them on its website.  In doing so, Google reversed the default copyright arrangement by shifting the burden to rightsholders to assert their rights."  Alessandra Glorioso, Google Books: An Orphan Works Solution, 38 Hofstra L. Rev. 971, 992 (2010) (footnotes omitted).

2008, after extended discussions, the parties filed a proposed settlement agreement.  The proposed settlement was preliminarily approved by Judge John E. Sprizzo by order entered November 17, 2008 (ECF No. 64).  Notice of the proposed settlement triggered hundreds of objections.  As a consequence, the parties began discussing possible modifications to the proposed settlement to address at least some of the concerns raised by objectors and others.  On November 13, 2009, the parties executed the ASA and filed a motion for final approval of the ASA pursuant to Federal Rule of Civil Procedure 23(e) (ECF No. 768).  I entered an order preliminarily approving the ASA on November 19, 2009 (ECF No. 772).

Notice of the ASA was disseminated.  As was the case with the original proposed settlement, hundreds of class members objected to the ASA.  A few wrote in its favor.  The Department of Justice ("DOJ") filed a statement of interest raising certain concerns (ECF No. 922).  Amici curiae weighed in, both for and against the proposed settlement.  The Court conducted a fairness hearing on February 18, 2010.

**B.   <u>The ASA</u>**

The ASA is a complex document.  It is 166 pages long, not including attachments.  Article I sets forth 162 definitions,

including the capitalized terms discussed below.  I will not describe the ASA in detail, but will summarize its principal provisions.

The Class consists of all persons (and their heirs, successors, and assigns) who, as of January 5, 2009, own a U.S. copyright interest in one or more Books or Inserts[4] implicated by a use authorized by the ASA.  Certain individuals and entities are excluded.  (ASA § 1.13).  The Author Sub-Class consists principally of members of the Class who are authors and their heirs, successors, and assigns.  (ASA § 1.17).  The Publisher Sub-Class consists of all members of the Class that are publishing companies that own a U.S. copyright interest in an Insert or have published a Book.  (ASA § 1.122).

Under the ASA, Google is authorized to (1) continue to digitize Books and Inserts, (2) sell subscriptions to an electronic Books database, (3) sell online access to individual Books, (4) sell advertising on pages from Books, and (5) make certain other prescribed uses.  (ASA §§ 3.1, 4.1-4.8; see also ASA § 1.149).  The rights granted to Google are non-exclusive;

---

[4]   An Insert includes, for example, a foreword, prologue, or essay that is independently copyrighted, if certain other requirements are met.  (ASA § 1.75).

Rightsholders retain the right to authorize others, including competitors of Google, to use their Books in any way. (ASA §§ 2.4, 3.1(a)). Google will pay to Rightsholders 63% of all revenues received from these uses, and revenues will be distributed in accordance with a Plan of Allocation and Author-Publisher Procedures. (ASA §§ 2.1-2.4, 4.5, 5.4 & Attachs. A, C).

The ASA will establish a Book Rights Registry (the "Registry") that will maintain a database of Rightsholders, and the Registry will administer distributions of revenues. (ASA § 6.1(b)). Google will fund the establishment and initial operations of the Registry with a payment of $34.5 million (which will also cover the costs of notice to the Class). (ASA § 2.1(c)). The Registry will be managed by a Board consisting of an equal number of Author Sub-Class and Publisher Sub-Class representatives (at least four each). (ASA § 6.2(b)). The ASA will also create an "independent" Unclaimed Works Fiduciary to represent interests with respect to, and assume responsibility for certain decisions pertaining to, unclaimed works, including pricing and book classification. (ASA §§ 3.2(e)(i), 3.3, 3.10, 4.2(c)(i), 4.3, 4.5(b)(ii), 4.7, 6.2(b)(ii)).

Rightsholders can exclude their Books from some or all of the uses listed above, and they can remove their Books altogether from the database.  At any time Rightsholders can ask Google not to digitize any Books not yet digitized, and Google will use "reasonable efforts" not to digitize any such Books. (ASA §§ 1.124, 3.5(a)(i)).  A Rightsholder may also request removal from the Registry of a Book already digitized, and Google is obligated to remove the Book "as soon as reasonably practicable, but it any event no later than thirty (30) days." (ASA § 3.5(a)(i)).

As for Books and Inserts digitized before May 5, 2009, Google will pay $45 million into a Settlement Fund to make Cash Payments to Rightsholders -- at least $60 per Principal Work, $15 per Entire Insert, and $5 per Partial Insert, for which at least one Rightsholder has registered a valid claim on or before the agreed-upon deadline.  (ASA §§ 2.1(b), 13.4; see also Stip. & Order to Extend Cash Payment Deadline 1-2, Feb. 18, 2011, ECF No. 970).  These are minimum amounts, and if more than $45 million becomes necessary to pay all eligible claims, Google will provide additional funds.  If payment of all eligible claims requires less than $45 million, the Registry will distribute greater amounts up to a maximum of $300 per Principal Work, $75 per Entire Insert, and $25 per Partial Insert.  (ASA § 5.1).

-8-

Going forward, the ASA provides for Google to split revenues with Rightsholders.  For works covered by the ASA, Google will pay to the Registry, on behalf of Rightsholders, 70% of net revenues from sales and advertising; net revenues reflect a 10% deduction for Google's operating costs.  (ASA §§ 1.89, 1.90, 4.5(a)(i)-(ii)).  Revenue splits can be renegotiated by individual Rightsholders.  (ASA § 4.5(a)(iii)).

The ASA obligates the Registry to use "commercially reasonable efforts" to locate Rightsholders.  (ASA § 6.1(c)). The Registry will receive payments from Google on behalf of Rightsholders and will in turn distribute them to registered Rightsholders.  (ASA § 6.1(d)).  Funds unclaimed after five years may be used, in part, to cover the expense of locating owners of unclaimed works.  (ASA § 6.3(a)(i)(2)).  After ten years, unclaimed funds may be distributed to literary-based charities. (ASA § 6.3(a)(i)(3)).[5]

---

[5]     The States of Connecticut, Massachusetts, Pennsylvania, Texas, and Washington objected specifically to provisions of the ASA dealing with unclaimed funds.  (See Objection to ASA of Massachusetts, Pennsylvania & Washington, ECF No. 860; Objection of Connecticut to ASA, ECF No. 851; Letter from Att'y Gen. of Tex. to Court (Jan. 27, 2010) (ECF No. 887)).  I need not rule on these objections at this time, as no unclaimed funds yet exist (see Pls.' Suppl. Mem. Responding to Specific Objections 154-55,

The ASA distinguishes between in-print (Commercially Available) and out-of-print (not Commercially Available) Books. (ASA §§ 1.31, 3.2, 3.3).  Google may not display in-print Books at all unless and until it receives prior express authorization from the Books' Rightsholders.  The ASA does give Google the right to make Non-Display Uses of in-print Books.  (ASA § 3.4). Google may display out-of-print Books without the prior express authorization of the Books' Rightsholders, but its right to do so ceases when and if the Rightsholder directs Google to stop.

## C.   **The Objections**

Approximately 500 submissions were filed commenting on the ASA and the original proposed settlement.  The vast majority objected to the ASA.[6]  Some 6800 class members opted out.

───────────

ECF No. 955 ("Pls.' Suppl. Mem.")), and in light of my rulings below.

[6]     Plaintiffs argue that the number of objections received is small when "viewed in light of the size of the Class, which numbers in the hundreds of thousands, or millions." (Pls.' Suppl. Mem. 1-2 & n.2, ECF No. 955).  Some wrote in support of the ASA.  (See, e.g., Letter from Gregory Crane to Court 1 (Aug. 7, 2009) (ECF No. 898) ("I am writing to support making the millions of books that Google has digitized reach the widest possible audience as quickly as possible. . . .  This is a watershed event and can serve as a catalyst for the reinvention of education, research and intellectual life."); Letter from Nat'l Fed'n of the Blind to Court 2 (Jan. 19, 2010) (ECF No. 858) ("[I]f this Court approves the settlement, the NFB and its members, as well as the estimated thirty million Americans who

(Fairness Hr'g Tr. 166, Feb. 18, 2010 (Michael J. Boni)).  The major objections are as follows:

1.  **Adequacy of Class Notice**

Certain objectors contend that class members were given inadequate notice of the original proposed settlement as well as of the ASA.  For example, the Science Fiction and Fantasy Writers of America, Inc., the American Society of Journalists and Authors, Inc., and certain foreign publisher and authors associations object to the adequacy of notice.

2.  **Adequacy of Class Representation**

Certain objectors, including some foreign authors, academic authors, Insert authors, and others object to the adequacy of representation, contending that their interests are at odds with the interests of the representative plaintiffs.

3.  **Scope of Relief Under Rule 23**

Certain objectors as well as the United States argue that the ASA will improperly use Rule 23 to shape a "forward-looking" business arrangement that would release claims not

─────────────────────

cannot read print due to other disabilities, will benefit from unprecedented access to information."); Letter from Publishers Ass'n to Court 1-2 (Jan. 27, 2010) (ECF No. 825); Letter from Canadian Publishers' Council to Court (Jan. 27, 2010) (ECF No. 826)).

before the Court.  They contend that the case is about the
scanning of books and the display of "snippets," while the ASA
will release claims regarding the display and sale of entire
books.

### 4.   Copyright Concerns

Certain objectors, including two of Google's major
competitors, Amazon.com, Inc. ("Amazon") and Microsoft Corp.
("Microsoft"), object to the ASA on the grounds it would violate
existing copyright law.  They contend, for example, that judicial
approval of the ASA would infringe on Congress's constitutional
authority over copyright law.  They contend further that the
provisions of the ASA pertaining to "orphan works" would result
in the involuntary transfer of copyrights in violation of the
Copyright Act, as copyrighted works would be licensed without the
owners' consent.  See 17 U.S.C. § 201(e).

### 5.   Antitrust Concerns

Certain objectors oppose the ASA on antitrust grounds,
arguing that (1) certain pricing mechanisms would constitute
horizontal agreements that would violate the Sherman Act; (2) the
ASA would effectively grant Google a monopoly over digital books,
and, in particular, orphan books; and (3) such a monopoly would

further entrench Google's dominant position in the online search business.

6.    **Privacy Concerns**

Certain objectors, including the Center for Democracy and Technology and the Electronic Privacy Information Center, contend that the ASA raises significant privacy issues, as the digitization of books would enable Google to amass a huge collection of information, including private information about identifiable users, without providing adequate protections regarding the use of such information.

7.    **International Law Concerns**

Certain foreign authors and entities contend that the ASA, even with its narrowed coverage of non-U.S. works, would violate international law by, for example, requiring foreign rightsholders to determine whether they are covered and therefore must "opt out," and also by favoring rightsholders from certain nations.

The parties have submitted detailed responses to all of the objections.

**DISCUSSION**

A.   **Applicable Law**

Under Rule 23(e) of the Federal Rules of Civil
Procedure, a settlement of a class action requires approval of
the court.  Fed. R. Civ. P. 23(e).  The court may approve a
settlement that is binding on the class only if it determines
that the settlement is "fair, adequate, and reasonable, and not a
product of collusion."  Joel A. v. Giuliani, 218 F.3d 132, 138
(2d Cir. 2000); see Fed. R. Civ. P. 23(e)(2).  This analysis
requires the court to consider both "the settlement's terms and
the negotiating process leading to settlement."  Wal-Mart Stores,
Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir.), cert.
denied, 125 S. Ct. 2277 (2005).  "A 'presumption of fairness,
adequacy, and reasonableness may attach to a class settlement
reached in arm's-length negotiations between experienced, capable
counsel after meaningful discovery.'"  Id. (quoting Manual for
Complex Litigation (Third) § 30.42 (1995)).

Rule 23(e) does not set forth the factors a court is to
consider in determining whether an agreement is fair, reasonable,
and adequate.  In this Circuit, courts traditionally consider the
following factors, commonly referred to as the Grinnell factors:
(1) the complexity, expense, and likely duration of the

-14-

litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of defendants to withstand greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of the attendant risks of litigation. City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000); see also Wal-Mart Stores, 396 F.3d at 117-19 (applying Grinnell factors in considering approval of settlement).  The weight given to any particular factor varies based on the facts and circumstances of the case. 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil § 1797.1, at 77 (3d ed. 2005).

Public policy, of course, favors settlement.  Wal-Mart Stores, 396 F.3d at 116-17; accord Williams v. First Nat'l Bank, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts."); TBK Partners, Ltd. v. W. Union Corp., 675 F.2d 456, 461 (2d Cir. 1982) (noting "the paramount policy of

encouraging settlements").  Consequently, when evaluating a
settlement agreement, the court is not to substitute its judgment
for that of the parties, nor is it to turn consideration of the
adequacy of the settlement "into a trial or a rehearsal of the
trial."  Grinnell, 495 F.2d at 462.  "Rather, the Court's
responsibility is to reach an intelligent and objective opinion
of the probabilities of ultimate success should the claims be
litigated and to form an educated estimate of the complexity,
expense and likely duration of such litigation and all other
factors relevant to a full and fair assessment of the wisdom of
the proposed compromise."  In re Met. Life Derivative Litig., 935
F. Supp. 286, 292 (S.D.N.Y. 1996) (quoting Lewis v. Newman, 59
F.R.D. 525, 527-28 (S.D.N.Y. 1973) (internal quotation marks and
ellipsis omitted)).

        In this case, the fairness and reasonableness of the
ASA has been challenged on the basis that it would release claims
not properly before the Court.  The Second Circuit has observed
that "[b]road class action settlements are common," and that
consequently "[p]laintiffs in a class action may release claims
that were or could have been pled in exchange for settlement
relief."  Wal-Mart Stores, 396 F.3d at 106.  But the Second
Circuit has recognized that there are limits.  First, "class

-16-

action releases may include claims not presented and even those
which could not have been presented as long as the released
conduct arises out of the 'identical factual predicate' as the
settled conduct."  Id. at 107 (quoting TBK Partners, 675 F.2d at
460).  Second, the released claims must be adequately represented
prior to settlement, in the sense that "[c]laims arising from a
shared set of facts will not be precluded where class plaintiffs
have not adequately represented the interests of class members."
Id. at 106-07, 110.[7]

B.   **Application**

        I consider the "settlement's terms" and the
"negotiating process" in the context of discussing the Grinnell

---

        [7]      In the context of a consent decree resolving a race
discrimination class action, the Supreme Court has identified
similar concerns while addressing the scope of a federal court's
remedial authority.  In Local No. 93, Int'l Ass'n of
Firefighters, AFL-CIO C.L.C. v. City of Cleveland (Firefighters),
it held that a consent decree must (1) "spring from and serve to
resolve a dispute within the court's subject-matter
jurisdiction"; (2) "com[e] within the general scope of the case
made by the pleadings"; and (3) "further the objectives of the
law upon which the complaint was based."  478 U.S. 501, 525
(1986) (alteration in original) (internal quotation marks
omitted).  Although the consent decree in Firefighters permitted
forward-looking conduct, the conduct was remedial in nature and
was intended to address the harm that was the subject of the
lawsuit, i.e., the past discrimination.  The consent decree did
not create new and independent forward-looking business
arrangements.

factors.  As the Second Circuit did in <u>Wal-Mart Stores</u>, I combine

certain of the factors and discuss them together.  <u>See</u> 396 F.3d

at 118 (combining fourth, fifth, and sixth factors), 119

(combining eighth and ninth factors).  Of course, I consider also

the objections to the ASA.

          As a preliminary matter, I conclude that most of the

<u>Grinnell</u> factors favor approval of the settlement.  The ASA was

the product of arm's length negotiations between experienced,

capable counsel, with assistance from DOJ.  Further litigation

would be complex, expensive, and time-consuming.  Although the

parties have conducted only limited discovery, the case has been

pending for some years.  The legal and factual issues are

complex, and there is a risk that if plaintiffs were to proceed

to trial, they would be unable to establish liability or prove

damages.  As discussed further below, substantial questions exist

as to whether the case could be maintained as a class action, in

its present form, through trial.  In light of the attendant

risks, the financial aspects of the ASA fall well within the

range of reasonableness.

          Only two of the <u>Grinnell</u> factors weigh against approval

of the settlement:  the reaction of the class and defendant's

ability to withstand judgment.  As for the latter, there is no

real risk that a judgment following trial would render Google insolvent, and thus the avoidance of insolvency is not an issue. The former, however, is important.  Not only are the objections great in number, some of the concerns are significant.  Further, an extremely high number of class members -- some 6800 -- opted out.  See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785, 812 (3d Cir. 1995) (noting that "the number and vociferousness of the objectors" is a factor to consider in weighing reasonableness of proposed settlement).  I turn to the objections now.

### 1.   **Adequacy of Class Notice**

The objections to the adequacy of the class notice are rejected.  I am satisfied that the class received adequate notice.  More than 1.26 million individual notices in thirty-six languages were sent directly to copyright owners, potential class members, and publisher and author associations worldwide.  (Pls.' Suppl. Mem. 36-37, 54-60, ECF No. 955).  Plaintiffs also established a website to provide information about the case, the original proposed settlement, and the ASA.  Of course, the case has received enormous publicity, and it is hard to imagine that many class members were unaware of the lawsuit.  (But see

-19-

Objections of Wash. Legal Found. to ASA & Class Certification,
ECF No. 901 (objecting to notice)).

> ### 2.   **Adequacy of Class Representation**

The adequacy of representation inquiry considers
whether "1) plaintiff's interests are antagonistic to the
interest of other members of the class and 2) plaintiff's
attorneys are qualified, experienced and able to conduct the
litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,
222 F.3d 52, 60 (2d Cir. 2000). Here, representative plaintiffs
are represented by counsel highly experienced in class action and
copyright litigation. I am confident that they are qualified,
experienced, and able to conduct the litigation.

As to the first prong of the analysis, however, as
discussed below, I conclude that there is a substantial question
as to the existence of antagonistic interests between named
plaintiffs and certain members of the class. See Amchem Prods.,
Inc. v. Windsor, 521 U.S. 591, 595 (1997) ("[T]he settling
parties achieved a global compromise with no structural assurance
of fair and adequate representation for the diverse groups and
individuals affected."). While it is true, as plaintiffs argue,
that "differences in views or characteristics between class
members do not mean the Class has not been adequately

-20-

represented" (Pls.' Suppl. Mem. 24, ECF No. 955), the differences

here are troubling.

### 3.   **Scope of Relief Under Rule 23**

The ASA can be divided into two distinct parts.  The

first is a settlement of past conduct and would release Google

from liability for past copyright infringement.  The second would

transfer to Google certain rights in exchange for future and

ongoing arrangements, including the sharing of future proceeds,

and it would release Google (and others) from liability for

certain <u>future</u> acts.  (<u>See, e.g.</u>, ASA §§ 10.1(f), 10.1(g),

10.2(a)).[8]  I conclude that this second part of the ASA

contemplates an arrangement that exceeds what the Court may

permit under Rule 23.  As articulated by the United States, the

ASA "is an attempt to use the class action mechanism to implement

forward-looking business arrangements that go far beyond the

dispute before the Court in this litigation."  (DOJ Statement of

---

[8]      The United States is of the view that the first part of
the settlement -- settling claims for past infringement based on
digitization for use of snippets -- is a matter that is
appropriately settled in this case, while the second part -- the
series of forward-looking commercial arrangements -- is not.
(Hr'g Tr. 117-18 (William Cavanaugh)).

Interest 2, Feb. 4, 2010, ECF No. 922 ("DOJ SOI")).[9]  Moreover,
the Rules Enabling Act provides that the rules of procedure
"shall not abridge, enlarge or modify any substantive right."  28
U.S.C. § 2072(b).  As the Supreme Court noted in Amchem:  "Rule
23 . . . must be interpreted with fidelity to the Rules Enabling
Act and applied with the interests of absent class members in
close view."  521 U.S. at 629.

     Although I am persuaded that the parties are seeking in
good faith to use this class action to create an effective and
beneficial marketplace for digital books, I am troubled in
several respects.

### a.   A Matter for Congress

     First, the establishment of a mechanism for exploiting
unclaimed books is a matter more suited for Congress than this
Court.  The ASA would create, for example, the Registry and the
Fiduciary.  Together, they would represent -- purportedly on an
independent basis -- the interests of Rightsholders, including
those who have not registered but are covered merely because they
did not opt out.

---

    [9]   But see Uhl v. Thoroughbred Tech. & Telecomm., Inc.,
309 F.3d 978 (7th Cir. 2002) (affirming approval of settlement of
class action based on forward-looking business arrangement).

The questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties. Indeed, the Supreme Court has held that "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." Eldred v. Ashcroft, 537 U.S. 186, 212 (2003); accord Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984) ("[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product.").[10]  In Sony, the Supreme Court noted that it was Congress's responsibility to adapt the copyright laws in response to changes in technology:

> From its beginning, the law of copyright has developed in response to significant changes in technology.  Indeed, it was the invention of a new form of copying equipment -- the printing press -- that gave rise to the original need for copyright protection.

---

[10]    See also Amchem Prods., 521 U.S. at 628-29 ("The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution.").

> Repeatedly, as new developments have occurred
> in this country, it has been the Congress
> that has fashioned new rules that new
> technology made necessary.

464 U.S. at 430-31 (footnotes omitted).

In fact, Congress has made "longstanding efforts" to enact legislation to address the issue of orphan works. (Objections of Microsoft to ASA & Certification of Class 4-5 & nn.10-11, ECF No. 874 (quoting Statement of Marybeth Peters)). "Orphan Books" legislation was proposed in Congress in 2006 and 2008, but the proposed laws were not enacted. See Glorioso, supra n.3, at 980 (reviewing proposed legislation).

As discussed below, the ASA would also raise international concerns, and foreign countries, authors, and publishers have asserted that the ASA would violate international law. For this reason as well, the matter is better left for Congress.

### b.    The Scope of the Pleadings

Second, the ASA would release claims well beyond those contemplated by the pleadings. This case was brought to challenge Google's use of "snippets," as plaintiffs alleged that Google's scanning of books and display of snippets for online searching constituted copyright infringement. Google defended by

arguing that it was permitted by the fair use doctrine to make available small portions of such works in response to search requests.  There was no allegation that Google was making full books available online, and the case was not about full access to copyrighted works.  The case was about the use of an indexing and searching tool, not the sale of complete copyrighted works.

The parties argue that the pleadings are not limited to plaintiffs' claims with respect to the display of snippets, citing the Third Amended Complaint.  (Pls.' Suppl. Mem. 33-34, ECF No. 955 (quoting Third Am. Compl. ¶¶ 4-8, 60, ECF No. 782)).  While it is true that the pleadings refer to broader conduct (including the creation of "digital copies" of books (Third Am. Compl. ¶ 4, ECF No. 782; see also Hr'g Tr. 158-59 ("When the publishers sued, they sued for the intial act of scanning our books without permission, cover to cover.  We were not so concerned about what uses were made.") (Bruce P. Keller))), the copying and display of copyrighted material occurred in the context of "Google Book Search," which "is designed to allow users to search the text of books online.  The digital archiving of the Books that are the subject of this lawsuit was undertaken by Google as part of Google Book Search."  (Third Am. Compl. ¶ 41, ECF No. 782; see also id. ¶ 55 (describing Google's

-25-

agreements with four university libraries and one public library
"to 'digitally scan books from their collections so that users
worldwide can search them in Google'"")).

Google did not scan the books to make them available
for purchase, and, indeed, Google would have no colorable defense
to a claim of infringement based on the unauthorized copying and
selling or other exploitation of entire copyrighted books.[11]
Yet, the ASA would grant Google the right to sell full access to
copyrighted works that it otherwise would have no right to
exploit.[12]  The ASA would grant Google control over the digital
commercialization of millions of books, including orphan books

---

[11]    Counsel for Google acknowledged at the fairness hearing
that Google would not have tried to defend digitizing and selling
entire books.  (Hr'g Tr. 150 (Daralyn J. Durie)).

[12]    Certain authors note, for example, that the ASA would
release other intellectual property claims that were never
asserted in the case.  (Objections of Arlo Guthrie et al. to
Proposed Class Action Settlement Agreement 14, ECF Nos. 209,
849-2 ("This expansive release [ASA § 10.1(f)] bars class members
from protecting their most fundamental intellectual property
rights, including for example the trademark interests of
Catherine Ryan Hyde [to the mark Pay It Forward]. . . .
Moreover, the release would preclude authors from pursuing any
number of other claims commonly associated with full protection
of their intellectual property rights -- including for example
right of publicity, disparagement, and tortious interference
claims -- that also were not alleged.")).

and other unclaimed works.[13]  And it would do so even though Google engaged in wholesale, blatant copying, without first obtaining copyright permissions.  While its competitors went through the "painstaking" and "costly" process of obtaining permissions before scanning copyrighted books, "Google by comparison took a shortcut by copying anything and everything regardless of copyright status."  (Hr'g Tr. 43 (Thomas Rubin, counsel for Microsoft)).  As one objector put it:  "Google pursued its copyright project in calculated disregard of authors' rights.  Its business plan was:  'So, sue me.'"  (Objection of Robert M. Kunstadt to Proposed Settlement 3, ECF No. 74).[14]

---

[13]    As articulated by the academic authors objecting to the ASA:  "The Google Book Search (GBS) initiative envisioned in the [ASA] is not a library.  It is instead a complex and large-scale commercial enterprise in which Google -- and Google alone -- will obtain a license to sell millions of books for decades to come." (Letter from Pamela Samuelson to Court (Jan. 27, 2010) (ECF No. 893) ("Samuelson Letter")).

[14]    Some objectors accused Google of engaging in piracy. (See, e.g., Letter from Erika Faith Larsen to Court 1 (Jan. 27, 2010) (ECF No. 818) ("I am opting out because I believe this to be a copyright infringement and a form of pirating."); Letter from William Ash to Court 1 (Jan. 12, 2010) (ECF No. 884) ("Google . . . is trying to benefit by weakening copyright.  It seems to first want to do this with 'orphaned' works based on the shady practice of stealing by finding. . . . Google is trying to legalize piracy.")).

Applying <u>Firefighters</u>, I conclude that the released claims would not come within "the general scope of the case made by the pleadings."  478 U.S. at 525.[15]  Applying <u>Wal-Mart Stores</u>, I conclude that the released conduct would not arise out of the "identical factual predicate" as the conduct that is the subject of the settled claims.  396 F.3d at 107 (citation omitted).

### c.   **The Interests of Class Members**

Third, the class plaintiffs have not adequately represented the interests of at least certain class members.  <u>See</u> <u>Wal-Mart Stores</u>, 396 F.3d at 106-07, 110.  The academic author objectors, for example, note that their interests and values differ from those of the named plaintiffs:  "Academic authors, almost by definition, are committed to maximizing access to

---

[15]   As for the third prong of the <u>Firefighters</u> test, supporters of the proposed settlement argue that it would "serve[] copyright law's central purpose of advancing knowledge and culture by furthering copyright's social utility and social justice goals through inclusion of those who have been excluded. The Google Books Project furthers these goals by using an accepted copyright mechanism (i.e., a private, court-supervised settlement) to address the novel copyright problems presented by the new technologies, while still preserving the rights of copyright holders."  Lateef Mtima & Steven D. Jamar, <u>Fulfilling the Copyright Social Justice Promise: Digitizing Textual Information</u>, 55 N.Y.L. Sch. L. Rev. 77, 79-80 (2010); <u>see Harper & Row Pubs., Inc. v. Nation Enters.</u>, 471 U.S. 539, 545 (1985) ("[C]opyright is intended to increase and not to impede the harvest of knowledge.").  As discussed below, however, the ASA raises significant copyright concerns as well.

knowledge.  The [Authors] Guild and the [Association of American Publishers], by contrast, are institutionally committed to maximizing profits."  (Samuelson Letter 3 (ECF No. 893)).[16]  In addition, the class representatives have interests that may be at odds, at least in part, with interests of foreign Rightsholders, as discussed below.  Likewise, the named plaintiffs have interests different from Rightsholders who do not come forward to register.  The parties have little incentive to identify and locate the owners of unclaimed works, as fewer opt-outs will mean more unclaimed works for Google to exploit.[17]

Plaintiffs argue that in "virtually every class action settlement, a percentage (often a high percentage) of class members does not file claims or otherwise participate but, nevertheless, their claims are released.  From a Rule 23 perspective, there is no more an 'orphan' problem here than in any other class action settlement in which less than 100% of the

---

[16]    Many academic authors, for example, would prefer that orphan books be treated on an "open access" or "free use" basis rather than one where they would be controlled by one private entity.  (See Hr'g Tr. 55-57 (Pamela Samuelson)).

[17]    Plaintiffs contend that "one of the Registry's core missions is to locate Rightsholders of unclaimed out-of-print books . . . .  The Registry will strive to locate the Rightsholders of unclaimed Books."  (Pls.' Suppl. Mem. 21, ECF No. 955).

class participates." (Pls.' Suppl. Mem. 3-4, ECF No. 955). I disagree. While it is true that in virtually every class action many class members are never heard from, the difference is that in other class actions class members are merely releasing "claims" for damages for purported past aggrievements. In contrast, here class members would be giving up certain property rights in their creative works, and they would be deemed -- by their silence -- to have granted to Google a license to future use of their copyrighted works.

### 4.   Copyright Concerns

As alluded to above, the Copyright Clause of the Constitution grants Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The Supreme Court has recognized that courts should encroach only reluctantly on Congress's legislative prerogative to address copyright issues presented by technological developments: "Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials." Sony, 464 U.S. at 431.

The ASA raises statutory concerns as well.  Certain objectors contend that the ASA's opt-out provisions would grant Google the ability to expropriate the rights of copyright owners who have not agreed to transfer those rights.  (See, e.g., Objection of Amazon to ASA 9, ECF No. 823).  The argument may have merit.  The Copyright Act provides:

> When an individual author's ownership of a copyright, or any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under the copyright, shall be given effect under this title, except as provided under title 11.

17 U.S.C. § 201(e).  Yet, the ASA proposes to expropriate rights of individuals involuntarily.

Plaintiffs argue that § 201(e) was enacted to prevent governmental suppression of copyrights and that it does not apply to private parties.  (Pls.' Suppl. Mem. 113, ECF No. 955 (citing, e.g., In re Peregrine Entm't, Ltd., 116 B.R. 194, 206 n.16 (C.D. Cal. 1990))).  The statute, however, refers to "any governmental body or other official or organization," and at a minimum a fair question exists as to whether this Court or the Registry or the

Fiduciary would be expropriating copyright interests belonging to
authors who have not voluntarily transferred them.  As Professor
Nimmer has written:  "By its terms Section 201(e) is not limited
to acts by governmental bodies and officials.  It includes acts
of seizure, etc., by any 'organization' as well."  3 Melville B.
Nimmer & David Nimmer, Nimmer on Copyright § 10.04 (Rev. Ed.
2010) (footnote omitted).  In any event, I need not decide the
precise question of whether the ASA would in fact violate
§ 201(e); the notion that a court-approved settlement agreement
can release the copyright interests of individual rights owners
who have not voluntarily consented to transfer is a troubling
one.  See also 17 U.S.C. § 106(1), (3) ("[T]he owner of copyright
under this title has the exclusive rights to do and to authorize
any of the following: . . . reproduce the copyrighted work . . .
[and] distribute copies . . . of the copyrighted work to the
public by sale or other transfer of ownership.") (emphasis
added).

        A copyright owner's right to exclude others from using
his property is fundamental and beyond dispute.  See Fox Film
Corp. v. Doyal, 286 U.S. 123, 127 (1932) ("The owner of the
copyright, if he pleases, may refrain from vending or licensing
and content himself with simply exercising the right to exclude

-32-

others from using his property.").  As counsel for Amazon argued:
"[T]he law of the United States is a copyright owner may sit
back, do nothing and enjoy his property rights untrammeled by
others exploiting his works without permission."  (Hr'g Tr. 46-47
(David Nimmer)).  Under the ASA, however, if copyright owners sit
back and do nothing, they lose their rights.  (See id. at 47).
Absent class members who fail to opt out will be deemed to have
released their rights even as to future infringing conduct.
"Copyright owners who are not aware that the [ASA] affects their
interest unknowingly leave Google to decide how their books are
used."  Glorioso, supra n.3, at 992.

       Many objectors highlighted this concern in their
submissions to the Court.  An author from the United Kingdom
states, very simply:  "I do not want my books to be digitized."
(Letter from Tony Peake to Settlement Administrator 1 (Dec. 24,
2009) (ECF No. 821)).  A 79-year old nature writer and author of
23 books illustrated with photographs of animals in the wild
worries that the loss of control over her works could result in
their being used to "vilif[y] the wildlife I spent my life trying
to help the public come to understand and protect."  (Letter from
Hope Ryden to Court 1 (Apr. 17, 2009) (ECF No. 84)).  An author
from Canada writes:  "I am opting out because I believe in the

-33-

integrity of copyright.  I believe that only I, myself, should
have the right to determine how my work can be used."  (Letter
from Dina E. Cox to Court 1 (Jan. 19, 2010) (ECF No. 783)).
Finally, an author from Texas gives the example of her
grandfather.  He self-published a memoir, Dust and Snow, in 1988.
He passed away in the 1990s, and the copyright to the book passed
to his three daughters.  The author observes:

> From Google's point of view, Dust and
> Snow is an "orphaned" book.  If and when
> Google scans it, the company is likely to be
> unsuccessful in trying to locate the
> publisher, since the book was self-published
> and my grandfather is now deceased.  In
> essence, the way the settlement is written,
> such "orphaned" titles are automatically
> handed to Google free of charge to do with as
> it will.
>
> From my family's point of view, Dust and
> Snow is not orphaned at all.  It is very
> clear who owns the copyright.  So why is
> Google being granted the automatic right to
> take over the copyright of books like my
> grandfather's?

(Letter from Margaret Jane Ross to Court 2 (Jan. 20, 2010) (ECF
No. 787)).

While the named plaintiffs and Google would argue that
these authors can simply opt out (see Hr'g Tr. 144 (Daralyn J.
Durie)), the comments underscore certain points.  First, many
authors of unclaimed works undoubtedly share similar concerns.

Second, it is incongruous with the purpose of the copyright laws
to place the onus on copyright owners to come forward to protect
their rights when Google copied their works without first seeking
their permission.[18]  Third, there are likely to be many authors
-- including those whose works will not be scanned by Google

---

[18]    In one submission, two literary agents expressed this
concern eloquently:

> By accepting this settlement, the court will
> be setting a highly questionable precedent,
> usurping the role of the legislature by
> creating a legal loophole for one corporation
> and reversing the very foundation of
> copyright protection.  We who have devoted
> our lives to assisting the work of creative
> individuals are left with a sense of moral
> indignation.  We have pledged, in our
> contracts with clients, to sell or license
> their rights to ethically and financially
> sound purchasers and licensees.  And for many
> years we have toiled over agreements and
> contracts to accomplish this, aided by the
> protections of the law.  The situation we
> find ourselves in now is one of dismay and
> powerlessness, with only the weak ability to
> "object" or opt out.  We beseech you to give
> authors back their rights.  Force Google to
> negotiate like any other publisher.  And let
> us get back to work.

(Letter from Stuart Bernstein & Susan Bergholz to Court 3-4 (Jan.
26, 2010) (ECF No. 888)).

until some years in the future -- who will simply not know to

come forward.[19]

### 5.   __Antitrust Concerns__

The United States, Amazon, and Microsoft, among others,

raise a number of antitrust concerns presented by the ASA.

The ASA would give Google a de facto monopoly over

unclaimed works.  Only Google has engaged in the copying of books

en masse without copyright permission.  (See DOJ SOI 21, ECF No.

922; Hr'g Tr. 43 (Thomas Rubin)).  As the United States observed

in its original statement of interest:

> This de facto exclusivity (at least as to
> orphan works) appears to create a dangerous
> probability that only Google would have the
> ability to market to libraries and other
> institutions a comprehensive digital-book
> subscription.  The seller of an incomplete
> database -- i.e., one that does not include
> the millions of orphan works -- cannot
> compete effectively with the seller of a
> comprehensive product.

(DOJ Statement of Interest 24, Sept. 18, 2009, ECF No. 720).  And

as counsel for the Internet Archive noted, the ASA would give

Google "a right, which no one else in the world would have, . . .

---

[19]   Google notes that under the ASA -- and unlike in other
class actions -- class members retain "the right to change their
mind.  They can pull their books from the program at any point in
time in the future."  (Hr'g Tr. 152 (Daralyn J. Durie)).

-36-

to digitize works with impunity, without any risk of statutory liability, for something like 150 years."  (Hr'g Tr. 95 (Hadrian Katz)).

The ASA would arguably give Google control over the search market.  (See, e.g., Suppl. Mem. of Open Book Alliance in Opp'n to ASA 14-19, ECF No. 840).  The ASA would permit third parties to display snippets from books scanned by Google, but only if they "have entered into agreements with Google."  (ASA § 3.9).  Likewise, the ASA would permit third parties to "index and search" scanned books only if they are non-commercial entities or they otherwise have Google's prior written consent.  (ASA §§ 1.123, 1.93(e), 7.2(b)).  The ASA would broadly bar "direct, for profit, commercial use of information extracted from Books in the Research Corpus" except with the express permission of the Registry and Google.  (ASA § 7.2(d)(viii)).  Google's ability to deny competitors the ability to search orphan books would further entrench Google's market power in the online search market.  Cf. United States v. Griffith, 334 U.S. 100, 109 (1948) (holding that owners of movie theaters with monopoly power in certain towns violated § 2 of Sherman Act by obtaining exclusive licensing agreements for first-run films, allowing them to

-37-

foreclose competition and establish monopolies in more towns).[20]
(See Mem. of Internet Archive in Opp'n to ASA 3-4, ECF No. 811
("Internet Archive Mem.") ("Google would have the right to make
complete copies of orphan works and use them for both display and
non-display purposes, with no risk of copyright liability.
Competitors that attempted to do the same thing, however, would
face exposure to statutory damages.")).

---

[20]    Nor is it merely Google's competitors that have raised
antitrust concerns.  For example, amicus curiae Public Knowledge,
a non-profit public interest organization "devoted to preserving
the free flow of information in the digital age," objects that
the ASA would grant Google "a monopoly in the market for orphan
books."  (Br. of Pub. Knowledge in Opp'n to ASA 2, ECF No. 895).
It argues that "public access to orphan books must be open to all
comers on a level playing field."  (Id.).  In addition, the
Institute for Information Law and Policy at New York Law School
argues:

> The heart of the [ASA] is that it would give
> Google a license to sell complete copies of
> out-of-print books unless their copyright
> owners object.  It is all but certain that
> many orphan copyright owners will be unable
> to object.  This sweeping default license
> will operate only in Google's favor,
> instantly giving it a dominant market
> position.

(Letter from Inst. for Info. Law & Policy to Court 5 (Jan. 28,
2010) (ECF No. 856)).

6.    **Privacy Concerns**

The Consumer Watchdog, Privacy Authors and Publishers, and others raise privacy concerns.  The Consumer Watchdog argues that the ASA would give Google "the ability to collect nearly unlimited data about the activities of users of its Book Search and other programs, including users' search queries, the identity of books a particular user reads, how long that reader spends on each book, and even what particular pages were read."  (Second Br. of Consumer Watchdog in Opp'n to ASA 11, ECF No. 841).  These objectors contend that the ASA fails to provide adequate protections for users of Google Book Search.  (Id. at 11-12; Privacy Authors & Publishers' Objection to Proposed Settlement 16, ECF No. 281).  They contend that the ASA fails to follow established law that protects reader privacy by limiting the disclosure of reader information.  (Privacy Authors & Publishers' Objection to Proposed Settlement 16-20, ECF No. 281 (citing case law and state statutes)).

The privacy concerns are real.  Yet, I do not believe that they are a basis in themselves to reject the proposed settlement.  The ASA provides that contact information provided by Class members to the Registry will not be disclosed to Google or the public if the Class member so requests.  (ASA

-39-

§ 6.6(c)(iii), (d)).  It also provides that Google shall maintain in confidence any Rightsholder's personally identifiable information received in connection with the settlement.  (ASA § 6.6(f)).  Google has "committed" to certain safeguards (Def.'s Br. in Supp. of Approval of ASA 55-56, ECF No. 941), although these are voluntary undertakings only.  I would think that certain additional privacy protections could be incorporated, while still accommodating Google's marketing efforts.

### 7.  <u>International Law Concerns</u>

The original settlement included any book subject to a U.S. copyright interest as of the Notice Commencement Date.  That definition would have included <u>all</u> books published after 1989 in <u>any</u> country that is a signatory to the Berne Convention because the Berne Convention guarantees that foreign authors be given the same rights and privileges for their works as domestic authors. As the United States signed onto the Berne Convention in 1988, and it became effective in 1989, foreign books are covered by U.S. copyright protection (regardless of formal registration) after the effective date.

The ASA narrowed the definition so that any non-"United States work," <u>see</u> 17 U.S.C. § 101, is covered only if the copyright was affirmatively registered in Washington, D.C. <u>or</u> if

-40-

the Book was published in Canada, the United Kingdom, or
Australia, on or before January 5, 2009 (ASA § 1.19).  Plaintiffs
also added "six non-U.S. based Representative Plaintiffs who
fairly and adequately represent the interests of Class members
whose Books and Inserts were published in the U.K., Canada or
Australia."  (Pls.' Suppl. Mem. 25, ECF No. 955).

        Foreign rightsholders remain concerned, however,
because many foreign books were registered in the United States
to ensure coverage under U.S. law, especially those registered
before 1989.  (See, e.g., Germany Mem. 2-3, ECF No. 852; Suppl.
Decl. of French Republic 2, ECF No. 853; Objections of Carl
Hanser Verlag et al. 1-2, ECF No. 868 (publishing and author
associations in Germany, Switzerland, Austria, Italy, and New
Zealand); Letter from Literar Mechana to Court 1 (Jan. 18, 2010)
(ECF No. 797)).  VG Wort, a German "collecting society"
representing authors and publishers of literary works and the
fiduciary owner of some 380,000 German authors and 9000 German
publishers, notes that many foreign copyright owners remain
members of the class because they registered their works with the
U.S. Copyright Office.  (Letter from VG Wort to Court 3-4 (Jan.
21, 2010) (ECF No. 857)).  Indeed, France and Germany, as well as
many authors and publishers from countries such as Austria,

-41-

Belgium, India, Israel, Italy, Japan, New Zealand, Spain, Sweden, Switzerland, and the United Kingdom continue to object to the ASA, even with the revisions.

Many foreign objectors express concern as to whether the ASA would violate international law, including the Berne Convention and the Agreement on Trade-Related Aspects of Intellectual Property Rights.  Indian authors and publishers, for example, object that the ASA "continues to provide Google with sweeping rights to exploit works of Indian authors/publishers under copyright protection without their express permission/consent, a violation of international and Indian copyright laws."  (Objections of Niyogi Books et al. 1, ECF No. 807).  An association of Canadian university teachers asserts that the ASA would "put[] the United States in violation of international intellectual property law and specifically in violation of trade agreements among Canada, the United States, and other parties as those agreements relate to copyright." (Letter from Canadian Ass'n of Univ. Teachers to Court 2 (Jan. 28, 2010) (ECF No. 900)).  The Japan P.E.N. Club, an organization consisting of poets, playwrights, essayists, editors, and novelists in Japan, also opposes approval of the ASA, arguing that the settlement would give Google "an almost insurmountable

-42-

market advantage worldwide in the world of digital book

publishing, while granting it a monopoly at home in the United

States and other English-speaking countries."  (Japan P.E.N. Club

Amicus Curiae Br. in Opp'n to ASA 6, ECF No. 848-2).

          Google responds that "this case is about United States

copyright interests.  It's about uses of works in the United

States."  (Hr'g Tr. 157-58 (Daralyn J. Durie)).  This argument,

however, ignores the impact the ASA would have on foreign

rightsholders.  In any event, I need not decide whether the ASA

would violate international law.  In light of all the

circumstances, it is significant that foreign authors,

publishers, and, indeed, nations would raise the issue.

          A number of foreign objectors also complain that it was

difficult for foreign authors to determine whether they were

covered by the ASA.  (See, e.g., Germany Mem. 6-7, ECF No. 852;

Letter from Centro Español de Derechos Reprográficos to Court 1

(Jan. 22, 2010) (ECF No. 827); Letter from Irish Copyright

Licensing Agency Ltd. to Court 1 (Jan. 26, 2010) (ECF No. 881);

Letter from Assucopie to Court 1 (Jan. 22, 2010) (ECF No.

882)).[21]  Works registered in the Copyright Office before 1978,

_____

          [21]     There was some support for approval of the ASA from
Australia, Canada, and the United Kingdom (see, e.g., Letter from
Publishers Ass'n to Court 1 (Jan. 27, 2010) (ECF No. 825) (United

-43-

for example, are not included in the online directory, and until recently the only way such foreign rightsholders could search the Copyright Office records was to do so in person in Washington, D.C., or by commissioning a member of the Copyright Office staff to conduct a search for a fee of $330.  (Objections of Carl Hanser Verlag et al. 12, ECF No. 868).

In addition, certain foreign objectors emphasize that the problem of orphan books is a global one.  As Germany notes: "Courts and class action settlements are not the proper province for creating a cutting edge copyright . . . framework to bind future generations and impact global competition for the future of digital libraries."  (Germany Mem. 11, ECF No. 852). Likewise, France argues:

> Concerning «Unclaimed books», national laws on «orphan» or «unclaimed» books in the digital age are now being elaborated in many countries.  Each nation, pursuant to its own governing laws and structure, is the only actor with sufficient legitimacy to make

---

Kingdom); Letter from Canadian Publishers' Council to Court 1 (Jan. 27, 2010) (ECF No. 826); Letter from Australian Publishers Ass'n to Court 1 (Jan. 28, 2010) (ECF No. 830); Letter from Soc'y of Authors to Court 1-2 (Jan. 22, 2010) (ECF No. 876) (United Kingdom)), although not everyone from those countries agreed (see, e.g., Letter from Diana Kimpton to Court 1 (Jan. 10, 2010) (ECF No. 817) (United Kingdom); Letter from Jenny Darling & Assocs. to Court 1 (Jan. 22, 2010) (ECF No. 886) (Australia); Letter from Canadian Ass'n of Univ. Teachers to Court 1 (Jan. 28, 2010) (ECF No. 900)).

> decisions that affect Copyright.  France
> considers that, in the meantime, any digital
> exploitation of books must abide by the
> international principles of copyright and, in
> particular, the prior consent of the rights
> holders.

(Suppl. Decl. of French Republic 2, ECF No. 853).  The fact that

other nations object to the ASA, contending that it would violate

international principles and treaties, is yet another reason why

the matter is best left to Congress.[22]

## CONCLUSION

In the end, I conclude that the ASA is not fair,

adequate, and reasonable.  As the United States and other

---

[22]    Germany further argues as follows:

> The [ASA] still rewards Google -- a serial
> scanning infringer -- with a de facto
> exclusive license regarding copyrights held
> by authors for books published in the United
> States, Canada, Australia, and United
> Kingdom, as well as over German and other
> international authors whose books have been
> registered in the United States.  Competing
> digital libraries in Germany ("Deutsche
> Digitale Bibliothek") and throughout the
> world do not enjoy rights to such authors or
> "Orphan Works" because Germany requires
> licensing of rights prior to the usage of
> Orphan Works.  Such a sweeping de facto
> compulsory license system would require
> legislative action (equivalent to
> Congressional action) in Germany.

(Germany Mem. 8, ECF No. 852).

-45-

objectors have noted, many of the concerns raised in the objections would be ameliorated if the ASA were converted from an "opt-out" settlement to an "opt-in" settlement. (See, e.g., DOJ SOI 23, ECF No. 922; Internet Archive Mem. 10, ECF No. 811). I urge the parties to consider revising the ASA accordingly.

The motion for final approval of the ASA is denied, without prejudice to renewal in the event the parties negotiate a revised settlement agreement. The motion for an award of attorneys' fees and costs is denied, without prejudice.

The Court will hold a status conference on April 25, 2011, at 4:30 p.m., in Courtroom 11A of the Daniel Patrick Moynihan Courthouse.

SO ORDERED.

Dated:   March 22, 2011
         New York, New York


DENNY CHIN
United States Circuit Judge
Sitting By Designation

**<u>APPEARANCES</u>**

For Author Plaintiffs:

        BONI & ZACK LLC
            By:  Michael J. Boni, Esq,
                Joanne Zack, Esq.
        15 St. Asaphs Road
        Bala Cynwyd, PA  19004


For Publisher Plaintiffs:

        DEBEVOISE & PLIMPTON LLP
            By:  Bruce P. Keller, Esq.
                Jeffrey P. Cunard
                Richard S. Lee, Esq.
        919 Third Avenue
        New York, NY  10022


For Defendant Google Inc.

        DURIE TANGRI LLP
            By:  Daralyn J. Durie, Esq.
                Joseph C. Gratz, Esq.
        217 Leidesdorff Street
        San Francisco, CA  94111


For United States of America:

        PREET BHARARA, Esq.
        United States Attorney
          for the Southern District of New York
            By:  John D. Clopper, Esq.
                Owen Knedler, Esq.
                Assistant United States Attorneys
        86 Chambers Street, 5th Floor
        New York, NY  10007

                - and -

```
WILLIAM F. CAVANAUGH, Esq.
Deputy Assistant Attorney General
Antitrust Division, U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530-0001
```