# EXHIBIT 13



HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS        Subscribe: Home Delivery / Digital | Log In · Register Now

The New York Times

# Technology

○ Technology  ○ All NYT   [Search]

ING DIRECT

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS

Search Tech News & 8,000+ Products          Browse Products          Personal Tech »
[Go]                                        — Select a Product Category —  [Go]   Cellphones, Cameras, Computers and more.

BORDEAUX
Bordeaux wines, your style.
Discover the essence of Bordeaux ▶

# Microsoft Will Shut Down Book Search Program

By MIGUEL HELFT
Published: May 24, 2008

SAN FRANCISCO — Microsoft said Friday that it was ending a project to scan millions of books and scholarly articles and make them available on the Web, a sign that it is retrenching in some areas of Internet search in the face of competition from Google, the industry leader.

**Related**

Times Topics: Microsoft Corporation

The announcement, made on a company blog, comes two days after Microsoft said it would focus its Internet search efforts on certain areas where it sees an opportunity to compete against Google. On Wednesday, Microsoft unveiled a program offering rebates to users who buy items that they find using the company's search engine.

TWITTER
LINKEDIN
SIGN IN TO E-MAIL OR SAVE THIS
PRINT
REPRINTS
SHARE


From
ALEXANDER PAYNE
Director of
SIDEWAYS

Some search experts said Microsoft's decision to end its book-scanning effort suggested that the company, whose search engine has lagged far behind those of Google and Yahoo, was giving up on efforts to be comprehensive.

"It makes you wonder what else is likely to go," said Danny Sullivan, editor in chief of the blog Search Engine Land. "One of the reasons people turn to Google is that it tries to be a search player in all aspects of search."

Mr. Sullivan said that the number of people using book search services from Microsoft and Google was relatively small, but it included librarians, researchers and other so-called early adopters who often influence others. These users are now likely to turn to Google with increasing frequency, he said.

Both Microsoft and Google have been scanning older books that have fallen into the public domain, as well as copyright-protected books under agreements with some publishers. Google also scans copyrighted works without permission so it can show short excerpts to searchers, an approach that has drawn fire from publishers.

Microsoft's decision also leaves the Internet Archive, the nonprofit digital archive that was paid by Microsoft to scan books, looking for new sources of support. Several major

### More Articles in Technology »

## Latest Technology Headlines

### Get DealBook by E-Mail

Sign up for the latest financial news delivered before the opening bell and after the market close.
[Sign Up]
See Sample | Privacy Policy



## MOST POPULAR - TECHNOLOGY

E-MAILED | BLOGGED | VIEWED

1. As Kindle Fire Faces Critics, Remedies Are Promised
2. A Leader in the Cloud Gains Rivals
3. One Million Mobile Apps, and Counting at a Fast Pace
4. Bits: Where Are the Women Executives in Silicon Valley?
5. State of the Art: Big Screen, Powered by iPhone
6. Bits: Privacy Fades in Facebook Era
7. Grading the Digital School: Online Learning, Personalized
8. Raw data: Bill Shock Without Leaving Home
9. 12 Things You Didn't Know Facebook Could Do
10. State of the Art: Cameras Are Small, Quality Is Big

Go to Complete List »

libraries said that they had chosen to work with the Internet Archive rather than with Google, because of restrictions Google placed on the use of the new digital files.

"We're disappointed," said Brewster Kahle, chairman of the Internet Archive. Mr. Kahle said, however, that his organization recognized that the project, which has been scanning about 1,000 books each day, would not receive corporate support indefinitely. Mr. Kahle said that Microsoft was reducing its support slowly and that the Internet Archive had enough money to keep the project "going for a while."

"Eventually funding will come from the public sphere," Mr. Kahle said.

Some libraries that work with the Internet Archive and Microsoft also said they planned to continue their book-scanning projects.

"We certainly expect to go on with this," said Carole Moore, chief librarian at the University of Toronto. "Corporate sponsors are interested in whatever works for their commercial interests and their shareholders. Long-term preservation is not something you can look to the commercial sector to provide. It is what research libraries have always done."

Microsoft acknowledged on its blog that commercial considerations played a part in its decision to end the program.

"Given the evolution of the Web and our strategy, we believe the next generation of search is about the development of an underlying, sustainable business model for the search engine, consumer and content partner," Satya Nadella, Microsoft's senior vice president for search, portal and advertising, wrote on the blog.

Microsoft said it had digitized 750,000 books and indexed 80 million journal articles.

Google, which works with libraries like the New York Public Library and those at Harvard, Stanford, the University of Michigan and Oxford, said it had scanned more than a million books. It plans to scan 15 million in the next decade. Google makes the books it scans freely available through its search engine but does not allow other search engines to use its database.

"We are extremely committed to Google Book Search, Google Scholar and other initiatives to bring more content online," said Adam Smith, product management director at Google.

*John Markoff contributed reporting.*

More Articles in Technology »

 › Get 50% Off The New York Times & Free All Digital Access.



**The year's best performers**

Also on NYTimes.com
The year in movies
Vamps, crooks & killers

**nytimes.com**

ADVERTISEMENTS

 T Magazine: The Holiday Issue

**50% OFF HOME DELIVERY**
+ FREE ALL DIGITAL ACCESS
SUBSCRIBE NOW ▸ The New York Times

Ads by Google                    what's this?

**Advent Financial**
Affordable Alternative For Your Tax
Business. Call 1 (866) 655.2340.
www.AdventTax.com

Ads by Google                    what's this?

**Chromebooks are here**
Built for the web - 8 hour battery.
Instant resume & 8 second startup.
google.com/chromebook

Tips
To find reference information about the words used in this article, double-click on any word, phrase or name. A new window will open with a dictionary definition or encyclopedia entry.

**Related Articles**

FROM THE NEW YORK TIMES

Taking Play Seriously at the Public Library With
Young Video Gamers
(March 22, 2008)

LIBRARIES SHUN DEALS TO PLACE BOOKS ON
WEB
(October 22, 2007)

THE WAY WE LIVE NOW: 7-23-06: QUESTIONS
FOR JOHN WOOD; Read All About It
(July 23, 2006)

THE BUSINESS WORLD; Mexico Embraces
Microsoft, Stirring a Debate
(May 19, 2002)

FROM AROUND THE WEB
What's This?

THE ASSOCIATED PRESS
Microsoft to shut down book scanning operations

CNET
What Ballmer really meant to say in Moscow

EPICENTER
Microsoft Gives Up on Book Search

TECHDIRT
Microsoft Gets Out Of Book Search, But Hands Tools
Over To Libraries

BETANEWS
Fahrenheit 451: Microsoft burns its Live Search Books
effort

100 Related Articles »

Powered by Blogrunner

INSIDE NYTIMES.COM 



| BOOKS » | OPINION » | DANCE » | TELEVISION » | OPINION » | SPORTS » |
|---|---|---|---|---|---|

   

Are All Bloggers
Journalists?
A Room for Debate on
how judges decide
protection under shield
laws.



Anita Desai on Longing and
Striving

The Stone: Of Home and
Bondage

Visionary Offered Surprises
Till the End

It's Back, and Even More
Disgusting

Summit Still Inspires, Often in
Silence

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2008 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT 14

+You  Web  Images  Videos  Maps  News  Gmail  More ▾                    **Sign in**



## Researching a topic?

Search the latest index of the world's books. Find millions of great
books you can preview or read for free.

|                                         | Search Books |

Browse books and magazines »

## New! Shop at the Google eBookstore

Go to the Google eBookstore for over 3 million eBooks to read
on the Web, Android, iPhone, iPad, Sony and Nook.

**Go to the Google eBookstore now »**

## My library

About Google Books - Privacy Policy - Terms of Service - Blog - Information for Publishers - Report an issue - Help -
Sitemap - Google Home

©2011 Google

# EXHIBIT 15

Page 1

# Application for Registration of a Claim to Copyright
## In a published book manufactured in the United States of America

| CLASS | REGISTRATION NO. |
|---|---|
| **A** A | **173097** |
| FORM A | DO NOT WRITE HERE |

**Instructions:** Make sure that all applicable spaces have been completed before you submit the form. The application must be SIGNED at line 10 and the AFFIDAVIT (line 11) must be COMPLETED AND NOTARIZED. The application should not be submitted until after the date of publication given in line 4, and should state the facts which existed on that date. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies. Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C. 20540, together with 2 copies of the best edition of the work and the registration fee of $6. Make your remittance payable to the Register of Copyrights.

**1. Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). Ordinarily the name(s) should be the same as in the notice of copyright on the copies deposited.

Name ...... Jim Bouton
            c/o Theron Raines
Address ... 244 Madison Avenue, New York, New York  10016

Name ......

Address ...

**2. Title:** BALL FOUR: My Life and Hard Times Throwing the Knuckleball in the
(Give the title of the book as it appears on the title page) **Big Leagues**

**3. Authors:** Citizenship and domicile information must be given. Where a work was made for hire, the employer is the author. The citizenship of organizations formed under U.S. Federal or State law should be stated as U.S.A. Authors may be editors, compilers.

translators, illustrators, etc., as well as authors of original text. If the copyright claim is based on new matter (see line 5) give requested information about the author of the new matter.

Name ... Jim Bouton                                    Citizenship ... U.S.A.
(Give legal name followed by pseudonym if latter appears on the copies)        (Name of country)
Domiciled in U.S.A. Yes .... X .... No ........ Address ... see above

Name ... Leonard Shecter - Editor                      Citizenship ... U.S.A.
(Give legal name followed by pseudonym if latter appears on the copies)        (Name of country)
Domiciled in U.S.A. Yes .... X .... No ........ Address ... c/o Theron Raines, address see above

Name ......                                             Citizenship ........
(Give legal name followed by pseudonym if latter appears on the copies)        (Name of country)
Domiciled in U.S.A. Yes ........ No ........ Address ........

**4. Date of Publication of This Edition:** Give the complete date when copies of this particular edition were first placed on sale, sold, or publicly distributed. The date when copies were made or printed should not be confused with the date of publication. NOTE: The full date (month, day, and year) must be given. For further information, see page 4.

June 15, 1970
(Month)    (Day)    (Year)

➤➤ {NOTE: Leave line 5 blank unless the following instructions apply to this work.} ◄◄

**5. New Matter in This Version:** If any substantial part of this work has been previously published anywhere, give a brief, general statement of the nature of the new matter published for the first time in this version. New matter may consist of compilation, translation, abridgment, editorial revision, and the like, as well as additional text or pictorial matter.

Extensive additional text

➤ NOTE: [Leave line 6 blank unless there has been a PREVIOUS FOREIGN EDITION in the English language.] ◄

**6. Book in English Previously Manufactured and Published Abroad:** If all or a substantial part of the text of this edition was previously manufactured and published abroad in the English language, complete the following spaces:

Date of first publication of foreign edition ........................
(Year)

Was registration for the foreign edition made in the U.S. Copyright Office? Yes ........ No ........

If your answer is "Yes," give registration number ........................

| EXAMINER |
|---|
| P |

*Complete all applicable spaces on next page*

**7.** If registration fee is to be charged to a deposit account established in the Copyright Office, give name of account:

The World Publishing Company

**8.** Name and address of person or organization to whom correspondence or refund, if any, should be sent:

Name Phoebe McKay                    Address

**9.** Send certificate to:

(Type or print name and address)

Name

Address

Miss Phoebe McKay
The World Publishing Company
110 East 59th Street
(Number and street)
New York, New York  10022
(City)        (State)        (ZIP code)

**10. Certification:** (NOTE: Application not acceptable unless signed)

I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.

*Phoebe McKay*
(Signature of claimant or duly authorized agent)

**11. Affidavit (required by law.)** Instructions: (1) Fill in the blank spaces with special attention to those marked "(X)." (2) Sign the affidavit before an officer authorized to administer oaths within the United States, such as a notary public. (3) Have the officer fill in and seal the affidavit and fill in the date of execution.

NOTE: The affidavit must be signed and notarized only *on or after* the date of publication or completion of printing which it states. The affidavit *must* be signed by an individual.

STATE OF _____New York_____

COUNTY OF _____New York_____   ss.

I, the undersigned, depose and say that I am the:
☐ Person claiming copyright in the book described in this application;
☒ Duly authorized agent of the person or organization claiming copyright in the book described in this application;
☐ Printer of the book described in this application.

That the book was published or the printing was completed on: **(X)** _____June 15, 1970_____
(Give month, day, and year)

That, of the various processes employed in the production of the copies deposited, the setting of the type was performed within the limits of the United States or the making of the plates was performed within the limits of the United States from type set therein; the lithographic or photoengraving processes used in producing the text were wholly performed within the limits of the United States; and that the printing of the text and the binding (if any) were also performed within the limits of the United States. That such setting, platemaking, lithographic or photoengraving process, printing, and binding were performed by the following establishments and individuals at the following addresses:

**(GIVE THE NAMES AND ADDRESSES OF THE PERSONS OR ORGANIZATIONS WHO PERFORMED SUCH TYPESETTING OR PLATEMAKING OR LITHOGRAPHIC PROCESS OR PHOTOENGRAVING PROCESS OR PRINTING AND BINDING.)**

Names **(X)** _____The Book Press_____        Addresses **(X)** _____New York, New York_____

*Phoebe McKay*
(Signature of affiant)

**(Sign and notarize only on or after date given above)**

Subscribed and ~~sworn to~~ affirmed before me this _____seventh_____

PLACE NOTARIAL SEAL HERE

EDITH MENRAD
Notary Public, State of New York
No. 03-7888480
Qualified in Bronx County
Commission Expires March 30, 1972

day of _____August_____, 19 70

*Edith Menrad*
(Signature of notary)

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application and affidavit received | |
| Two copies received | |
| Fee received | |
| Renewal | |

U.S. GOVERNMENT PRINTING OFFICE: 1968—O—326-772

Page 1

Application

in a publish

Instructions: A completed befor be SIGNED at l COMPLETED A submitted until should state the information, see p

**1.** Copyright Cl should be the sam

Name

Address

Name

Address

**2.** Title:

**3.** Authors Citiz Where a work wa citizenship of org law should be stat

Name

Domiciled in U.S.A.

Name

Domiciled in U.S.A.

Name

Domiciled in U.S.A.

**4.** Date of Publica when copies of this sold, or publicly dis

**5.** New Matter in work has been previo statement of the nat

**NOTE:** Le

**6.** Book in English Previously manufactu

Date of first publicati

If your answer is "Ye

# EXHIBIT 16

FORM
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

TX   338-84

EFFECTIVE DATE OF REGISTRATION

Sep.   17   79

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE CONTINUATION SHEET (FORM TX/CON)

**TITLE OF THIS WORK**
THE TROUBLE WITH THIRTEEN

PREVIOUS OR ALTERNATIVE TITLES

PUBLICATION AS A CONTRIBUTION (If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.)

**IMPORTANT:** Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). If any part of this work was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates blank.

NAME OF AUTHOR

Was this author's contribution to the work a "work made for hire"?   Yes ......   No X....

AUTHOR'S NATIONALITY OR DOMICILE
Citizen of ......   or   Domiciled in ......

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED:   Year   1978

DATE AND NATION OF FIRST PUBLICATION:
Date   August 15, 1979
Nation   United States

NAME AND ADDRESS OF COPYRIGHT CLAIMANT(S):
111 Avenue
New York   10963

Complete all applicable spaces 5-11 on the reverse side of this page
• Sign the form at line 10

| | EXAMINED BY | APPLICATION RECEIVED: 17 SEP 1979 | FOR COPYRIGHT OFFICE USE ONLY |
|---|---|---|---|
| TX  338-841 | CHECKED BY | | |
| | CORRESPONDENCE: ☐ Yes | DEPOSIT RECEIVED: 17 SEP 1979   17 SEP 1979 | |
| | DEPOSIT ACCOUNT FUNDS USED: ☑ | REMITTANCE NUMBER AND DATE: | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM TX/CON)**

**PREVIOUS REGISTRATION**

- Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?   Yes.   No **X**
- If your answer is "Yes," why is another registration being sought? (Check appropriate box)
  ☐ This is the first published edition of a work previously registered in unpublished form.
  ☐ This is the first application submitted by this author as copyright claimant.
  ☐ This is a changed version of the work, as shown by line 6 of this application.
- If your answer is "Yes," give: Previous Registration Number ............ Year of Registration ............

**COMPILATION OR DERIVATIVE WORK** (See instructions)

PREEXISTING MATERIAL (Identify any preexisting work or works that this work is based on or incorporates.)
none

MATERIAL ADDED TO THIS WORK (Give a brief, general statement of the material that has been added to this work and in which copyright is claimed.)

**MANUFACTURERS AND LOCATIONS** If this is a published work consisting preponderantly of nondramatic literary material in English, the law may require that the copies be manufactured in the United States or Canada for full protection. If so, the names of the manufacturers who performed certain processes, and the places where these processes were performed must be given. See instructions for details.

NAMES OF MANUFACTURERS | PLACES OF MANUFACTURE
Brattleboro, Vermont

**REPRODUCTION FOR USE OF BLIND OR PHYSICALLY-HANDICAPPED PERSONS** (See instructions)

Signature on this form at space 10, and a check in one of the boxes here in space 8, constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols); or (2) phonorecords embodying a fixation of a reading of that work; or both.

☐ a □ Copies and phonorecords   ☐ b □ Copies Only   ☐ c □ Phonorecords Only

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name: Alfred A. Knopf, Inc.
Account Number: 108020

**CORRESPONDENCE** (Give name and address to which correspondence about this application should be sent.)
Name: Alfred A. Knopf, Inc.
Address: 201 East 50th Street
New York, New York 10022

**CERTIFICATION** * I, the undersigned, hereby certify that I am the (Check one)
☐ author ☐ other copyright claimant ☐ owner of exclusive right(s) ☐ authorized agent of: Alfred A. Knopf, Inc.
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature (X): Mary Lou Thomas
Typed or printed name: Mary Lou Thomas   Date: 9/18/79

**MAIL CERTIFICATE TO**
Mary Lou Thomas, Alfred A. Knopf, Inc.
(Name)
201 East 50th Street
(Number, Street and Apartment Number)
New York, New York  10022
(City)  (State)  (ZIP code)

OCT 26 1979

* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

☆ U.S. GOVERNMENT PRINTING OFFICE: 1979-281-462/25

Sept. 1979

# EXHIBIT 17

**FORM A**

| CLASS | REGISTRATION NO. |
|---|---|
| **A** A | **346254** |
| | DO NOT WRITE HERE |

## Application for Registration of a Claim to Copyright
### in a published book manufactured in the United States of America

**Instructions:** Make sure that all applicable spaces have been filled before you submit the form. The application must be SIGNED at line 10 and the AFFIDAVIT (line 11) must be COMPLETED AND NOTARIZED. The application should not be signed until after the date of publication given in line 4, and should state the facts which existed on that date. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies. Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C. 20540, together with 2 copies of the best edition of the work and the registration fee of $6. Make your remittance payable to the Register of Copyrights.

**1 Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). Ordinarily the name(s) will be the same as in the notice of copyright on the copies deposited.

Joseph C. Goulden

6416 22nd Road, No. Arlington, Virginia 22205

**2 Title:** THE SUPERLAWYERS
*(Give the title of the book as it appears on the title page)*

The Small and Powerful World of the Great Washington Law Firms

**3 Authors:** Citizenship and domicile information must be given. If the work was made for hire, the employer is the author. The names of organizations formed under U.S. Federal or State law may be stated as U.S.A. Authors may be editors, compilers,

translators, illustrators, etc., as well as authors of original text. If the copyright claim is based on new matter (see line 5) give requested information about the author of the new matter.

Joseph C. Goulden   Citizenship U.S.A.
*(Give legal name followed by pseudonym if latter appears on the copies)*   *(Name of country)*

Was this author's contribution to the work "made for hire"? Yes X No   Address 6416 22nd Road, No. Arlington, Virginia 22205

*(Give legal name followed by pseudonym if latter appears on the copies)*   Citizenship _____ *(Name of country)*

Yes ___ No ___   Address _____

*(Give legal name followed by pseudonym if latter appears on the copies)*   Citizenship _____ *(Name of country)*

Yes ___ No ___   Address _____

**4 Date of Publication of This Edition:** Give the complete date when copies of this particular edition were first placed on sale, sold, or publicly distributed. The date when copies were made or printed should not be confused with the date of publication. NOTE: The full date (month, day, and year) must be given. For further information, see page 4.

April 13 1972
*(Month)* *(Day)* *(Year)*

**5** (NOTE: Leave line 5 blank unless the following instructions apply to this work.) ◄

**New Version:** If any substantial part of this work has been previously published anywhere, give a brief, general nature of the new matter published for the first time in this version. New matter may consist of compilation, translation, abridgment, editorial revision, and the like, as well as additional text or pictorial matter.

All new material with the exception of one article which appeared in WASHINGTONIAN, October 1971, Vol.7, No.1 (copyright reg. no. B722513) "The Superlawyers"

**6** Leave line 6 blank unless there has been a PREVIOUS FOREIGN EDITION in the English language. ◄

**English Previously Manufactured and Published Abroad:** If all or a substantial part of the text of this edition was manufactured and published abroad in the English language, complete the following spaces:

Date of publication of foreign edition _____ *(Year)*   Was registration for the foreign edition made in the U.S. Copyright Office? Yes ___ No ___

If "Yes," give registration number _____

| EXAMINER |
|---|
| T.P. |

*Complete all applicable spaces on next page*

---

*[left margin, partially visible]*

e, give name of account:

ould be sent:
Illinois  61701

edge.

ed agent
o those marked "(X)." (2) State
public. (3) Have the officer

pletion of printing which it was

that I am the
in the book described in

e person or organization described
ed in this application;
in this application.

2

th, day, and year)

he type was performed within the
ed States from type set therein
in the limits of the United States
the United States. That such work
by the following establishment.

PERFORMED SUCH TYPESETTING,
PRINTING AND BINDING, IN

gton, Illinois

(claimant)

after date given above?
20th

is _____

_____, 1972

*(notary)*

Complete all applicable spaces on next page

7. If registration fee is to be charged to a deposit account established in the Copyright Office, give name of

**David McKay Company, Inc.**

8. Name and address of person or organization to whom correspondence or refund, if any, should be sent:

Name **Marguerite Gaignat**     Address **c/o David McKay Company, I**
                                        **750 Third Avenue, New York**

9. Send certificate to:

(Type or     Name     **DAVID McKAY COMPANY, INC.**
print
name and     Address  **750 THIRD AVENUE**
address)                        (Number and street)

             **NEW YORK, N. Y. 10017**
                (City)      (State)    (Zip code)

10. **Certification:**  (NOTE: Application not acceptable unless signed)

   I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.

*Marguerite Gaignat*
(Signature of copyright claimant or duly authorized agent)

11. **Affidavit (required by law.)** Instructions: (1) Fill in the blank spaces with special attention to those marked "[
the affidavit before an officer authorized to administer oaths within the United States, such as a notary public. (3) Have
and seal the affidavit and fill in the date of execution.

   NOTE: The affidavit must be signed and notarized only *on or after* the date of publication or completion of printing
The affidavit *must* be signed by an individual.

STATE OF ...New York...

COUNTY OF ..New York...

I, the undersigned, depose and say that I am the
☐ Person claiming copyright in the book de
    application;
☒ Duly authorized agent of the person or organi
    copyright in the book described in this applic
☐ Printer of the book described in this application

That the book was published ~~or the printing was completed on~~: (X) ...........April 13, 1972....
                                                                  (Give month, day, and year

That, of the various processes employed in the production of the copies deposited, the setting of the type was perfo
~~limits of the United States or the making of the plates was performed within the limits of the United States from~~
the lithographic or photoengraving processes used in producing the text were wholly performed within the limits of
and that the printing of the text and the binding (if any) were also performed within the limits of the United States
setting, platemaking, lithographic or photoengraving process, printing, and binding were performed by the following
individuals at the following addresses:
(GIVE THE NAMES AND ADDRESSES OF THE PERSONS OR ORGANIZATIONS WHO PERFORMED SUCH
OR PLATEMAKING OR LITHOGRAPHIC PROCESS OR PHOTOENGRAVING PROCESS OR PRINTING AND B
                                      Offset Plates
Names (X) Van Rees Book Comp.Co.(Comp.& Repro.   Addresses (X) 304 Hudson St., N.Y
         Van Rees Press (Printer)
         Van Rees Bookbinding Corp.(Binder)

*Marguerite Gaignat*
(Signature of affiant)

[Sign and notarize only on or after date given a

Subscribed and {sworn to / affirmed} before me this   23rd

PLACE
NOTARIAL SEAL
HERE

day of ....June....  N. JAMES GUTTILLA 19 72
                     Notary Public, State of New York
                     No. 30-1697700
                     Qualified in Queens County
                     Certificate filed in New York County
                     Commission Expires March 30, 197

FOR COPYRIGHT OFFICE USE ONLY

Application and affidavit received

JUN 29 1972

Two copies received

JUN 29 1972

Fee received

Renewal

U.S. GOVERNMENT PRINTING OFFICE : 1970 O—380-872

**Application for T**
**in a published book i**

*Page 1*

Instructions: Make sure i
...... before you subr
.. SIGNED at line 10 and
COMPLETED AND NOTAR
...mitted until after the da
...should state the facts whit
...information, see page 4.

1. Copyright Claimant(s)
should be the same as in the t
Name ........ Barba

Address ..... 17 Ea

2. Title ........ TH

3. Authors Citizenship and
Where a work was made for
citizenship of organizations
...ay should be stated) as U.S./

........ Barbara W
                 (Give legal

Domiciled in U.S.A. Yes .. X ..
........................................
                 (Give legal

Domiciled in U.S.A. Yes .......
........................................
                 (Give legal

Domiciled in U.S.A. Yes .......

4. Date of Publication of T
...the copies of this particula
...sold or publicly distributed.

➤➤ [NOTE:

5. New Matter in This Ver
...work has been previously publi
...statement of the nature of the

➤➤ NOTE: Leave line

6. Book in English Previous
previously manufactured and i

Date of first publication of for

If your answer is "Yes," give

# EXHIBIT 18

The trouble with thirteen - Betty Miles - Google Books

Web   Images   Videos   Maps   News   Shopping   Gmail   More ▾

Sign in

Google books        betty miles                                        Advanced Book Search

## The trouble with thirteen



Betty Miles

9 Reviews

Avon, Sep 1, 1980 - Family & Relationships - 108 pages

Twelve-year-old Annie is unwilling to face some major changes in her life.



New! Shop for Google eBooks

Go to the Google eBookstore for over 3 million eBooks to read on the Web, Android, iPhone, iPad, Sony and Nook.

**Shop for eBooks now »**

Add to My Library ▾

## From inside the book

annie                          [ Search ]

33 pages matching annie in this book

Page 97

**Annie. Denny and Clay's marriage wasn't a waste!**
They had a lot of good years and a lot of love. And they

Page 106

The book was upside down. I can't ever wrap a book so
the title comes out on top.

Rachel turned it over. Then she gasped. "Oh,
*Annie!* Oh, wow, that's so neat! *Thanks!*" She opened

Page 110

Annie and her best friend Rachel wish they could stay
twelve forever. Everything is perfect . . . until unex-
pected changes begin pulling Annie and Rachel apart
just when they need each other the most. But through
it all Annie and Rachel learn a lot about independence

Where's the rest of this book?

## What people are saying - Write a review

### Review: The Trouble with Thirteen

User Review           - Carolyn - Goodreads
wide reading for CI 546 grade level: middle school
genre: realistic fiction, pseudo contemporary
(came out in the 70s but not a book where time is
a signficant part of the setting) themes:
friendship ... Read full review

| User ratings | | |
|---|---|---|
| 5 stars | 1 | |
| 4 stars | | 5 |
| 3 stars | 1 | |
| 2 stars | 1 | |
| 1 star | 0 | |

### Review: The Trouble with Thirteen

User Review              - Geralyn St Joseph - Goodreads
I read this book when I was 12. It was touching and accurate. I cried. Read full review

All 9 reviews »

## Related books



The Secret Life of the Und     Hey! I am reading!                Around and around—love
Betty Miles                    Betty Miles, Sylvie Wicksln        Betty Miles

## Contents

| Section 1 | 67 | Section 3 | 101 |
|---|---|---|---|
| Section 2 | 93 | Copyright | |

## Common terms and phrases

Angela Annie Anyway Aunt Sylvia Barclay beautiful best friend Bruce camera chair
Coke couch Cowboy beans Cuba Dairy Queen dance Debbie
doll house door doughnut dresses driveway ears pierced Erica everything eyes
feel felt fourposter front funny girls glad going grabbed guess hugged Janie jumped
Kate Kate's Kenny kids kitchen knew laughed leaned back lettuce lilacs little
looked Madison Marvin minute miss Mom's move neat nice nightgown Nora
Nora's old dog pajamas party Peter James photo booth picture porch pretty
probably pulled Rach Rachel asked Rachel looked Rachel put Rachel took rack seemed

♪  shouted  sleeping  smiled  sorry  sort  stared  started  steps  stopped  stuff  stupid  suddenly  sure  talk  tell

Thanks  things  thought  trying  turned  walked  wearing  Weiss  What's  wheezing  wish  wondered  worry

Yeah  yelled  York City

## Bibliographic information

| | | |
|---|---|---|
| Title | The trouble with thirteen *Avon Camelot Book* | |
| Author | Betty Miles | |
| Publisher | Avon, 1980 | |
| ISBN | 0380511363, 9780380511365 | |
| Length | 108 pages | |
| Subjects | Juvenile Fiction › Social Issues › Friendship | |



Death
Family & Relationships / Death, Grief,
Bereavement
Fiction
Friendship
Juvenile Fiction / General
Juvenile Fiction / Social Issues / Friendship
Social Science / Death & Dying

Export
Citation           BiBTeX        EndNote        RefMan

About Google Books - Privacy Policy - Terms of Service - Blog - Information for Publishers - Report an Issue - Help - Sitemap - Google Home
©2011 Google

+You  Web  Images  Videos  Maps  News  Gmail  More ·                                              **Sign In**

Google books                              Submit Q    Advanced Book Search
                                                       Amazon.cc
                                                       Barnes&N
                                                       Books-A-N
## The trouble with thirteen                          IndieBound
                                                       Find in a lil
                                                       All sellers :
                                        New! Shop for Google eBooks

                          0
                  Betty Miles                Go to the Google eBookstore for
                        9 Reviews            over 3 million eBooks to read on
                  Avon, Sep 1, 1980 - Family & Relationships - 108 pages   the Web, Android, iPhone, iPad,
                  Twelve-year-old Annie is unwilling to face some major    Sony and Nook.
                  changes in her life.
                                             **Shop for eBooks now »**


                                             Add to My Library ▾


## From inside the book

nora                        [ Search ]

34 pages matching nora in this book

Page 4

      Our best article idea so far was "You *Can* Teach an
Old Dog New Tricks." I thought it up. Nora was
perfect for the article because she's ten years old and

Page 5

laps, panting.
    I scratched her behind the ear. "You're a dumb old
dog, that's what you are."
    Nora wriggled appreciatively. In the sun, her fur

Page 65

I tried to squash the feeling down. I started to look for Nora in her favorite sleeping places: the chair she wasn't supposed to lie in, the hall rug, the foot of my

Where's the rest of this book?

Get this bo
Amazon.cd
Barnes&Nd
Books-A-M
IndieBound

Find in a lil
All sellers :

## What people are saying - Write a review

**Review: The Trouble with Thirteen**

User Review          – Carolyn - Goodreads
wide reading for CI 546 grade level: middle school
genre: realistic fiction, pseudo contemporary (came
out in the 70s but not a book where time is a
signifcant part of the setting) themes: friendship ...
Read full review

**User ratings**

| | |
|---|---|
| 5 stars | 1 |
| 4 stars | |
| 3 stars | 1 |
| 2 stars | 1 |
| 1 star | 0 |

5

**Review: The Trouble with Thirteen**

User Review          - Geralyn St Joseph - Goodreads
I read this book when i was 12. It was touching and accurate. I cried. Read full review

All 9 reviews »

## Related books







<
>

The Secret Life of the Und
Betty Miles

Hey! I am reading!
Betty Miles, Sylvie Wickstn

Around and around--love
Betty Miles

## Contents

| | | | |
|---|---|---|---|
| Section 1 | 67 | Section 3 | 101 |
| Section 2 | 93 | Copyright | |

Snippet vie

Get this bo
Amazon.cc
Barnes&N
Books-A-N
IndieBound

Find in a li
All sellers

## Common terms and phrases

Angela **Annie** Anyway **Aunt Sylvia** Barclay beautiful best friend Bruce camera chair
**Coke** couch **Cowboy beans** Cuba **Dairy Queen** dance **Debbie**
**doll house** door doughnut dresses driveway **ears pierced** Erica everything eyes
feel felt **fourposter** front funny girls glad **going** grabbed guess hugged Janie jumped
**Kate** Kate's **Kenny** kids kitchen knew laughed leaned back **lettuce** lilacs little
looked Madison Marvin minute miss Mom's move neat nice **nightgown Nora**
Nora's old dog **pajamas** party Peter James **photo booth** picture porch pretty
probably pulled **Rach** Rachel asked **Rachel looked** Rachel put Rachel took rack seemed
shouted sleeping smiled sorry son stared started steps stopped stuff stupid suddenly sure talk
tell Thanks things thought trying turned walked wearing Weiss What's wheezing wish wondered
worry Yeah yelled York City

## Bibliographic information

| | |
|---|---|
| Title | The trouble with thirteen<br>*Avon Camelot Book* |
| Author | Betty Miles |
| Publisher | Avon, 1980 |
| ISBN | 0380511363, 9780380511365 |
| Length | 108 pages |
| Subjects | Juvenile Fiction › Social Issues › Friendship |
| | |
| | Death<br>Family & Relationships / Death, Grief,<br>Bereavement<br>Fiction<br>Friendship<br>Juvenile Fiction / General<br>Juvenile Fiction / Social Issues / Friendship<br>Social Science / Death & Dying |



Export
Citation       BiBTeX      EndNote      RefMan

he trouble with thirteen - Betty Miles - Google Books                    Page 1 of
/

Google books                      [Submit Q]   Advanced Book Search

# The trouble with thirteen



0
Betty Miles
        9 Reviews
Avon, Sep 1, 1980 - Family & Relationships - 108 pages
Twelve-year-old Annie is unwilling to face some major
changes in her life.



New! Shop for Google eBooks

Go to the Google eBookstore for
over 3 million eBooks to read on
the Web, Android, iPhone, iPad,
Sony and Nook.

**Shop for eBooks now »**

Add to My Library ▾

## From inside the book

Snippet view

[ pajamas          ]   [ Search ]

6 pages matching **pajamas** in this book

Get this book
Amazon.com
Barnes&Noble.com
Books-A-Million
IndieBound

Find in a library
All sellers »

Page 23

Kate's mother.
  "Mom! It's a *sleep*-over party. We'll wear pajamas
the whole time!"
  "You should have some new pajamas, too," Mom

Page 32

better. I knew Kate would like it.
  Bamberger's pajama department is called Night
Life. They had racks and racks of nylon pajamas with
bikini pants and smock tops. I would never wear



Page 36

Where's the rest of this book?

## What people are saying - Write a review

**Review: The Trouble with Thirteen**

User Review          - Carolyn - Goodreads

wide reading for CI 546 grade level: middle school
genre: realistic fiction, pseudo contemporary (came
out in the 70s but not a book where time is a
signficant part of the setting) themes: friendship ...
Read full review

**User ratings**

| | |
|---|---|
| 5 stars | 1 |
| 4 stars | |
| 3 stars | 1 |
| 2 stars | 1 |
| 1 star | 0 |

5

**Review: The Trouble with Thirteen**

User Review          - Geralyn St Joseph - Goodreads

I read this book when i was 12. It was touching and accurate. I cried. Read full review

All 9 reviews »

## Related books







The Secret Life of the Und
Betty Miles

Hey! I am reading!
Betty Miles, Sylvie Wickstr

Around and around—love
Betty Miles

## Contents

| | | | |
|---|---|---|---|
| Section 1 | 67 | Section 3 | 101 |
| Section 2 | 93 | Copyright | |

he'trouble with thirteen - Betty Miles - Google Books                    Page 3 of

## Common terms and phrases

Angela Annie Anyway Aunt Sylvia Barclay beautiful best friend Bruce camera chair
Coke couch Cowboy beans Cuba Dairy Queen dance Debbie
doll house door doughnut dresses driveway ears pierced Erica everything eyes
feel felt fourposter front funny girls glad going grabbed guess hugged Janie jumped
Kate Kate's Kenny kids kitchen knew laughed leaned back lettuce lilacs little
looked Madison Marvin minute miss Mom's move neat nice nightgown Nora
Nora's old dog pajamas party Peter James photo booth picture porch pretty
probably pulled Rach Rachel asked Rachel looked Rachel put Rachel took rack seemed
shouted sleeping smiled sorry sort stared started steps stopped stuff stupid suddenly sure talk
tell Thanks things thought trying turned walked wearing Weiss What's wheezing wish wondered
worry Yeah yelled York City

## Bibliographic information

| | |
|---|---|
| Title | The trouble with thirteen |
| | *Avon Camelot Book* |
| Author | Betty Miles |
| Publisher | Avon, 1980 |
| ISBN | 0380511363, 9780380511365 |
| Length | 108 pages |
| Subjects | Juvenile Fiction › Social Issues › Friendship |



Death
Family & Relationships / Death, Grief,
Bereavement
Fiction
Friendship
Juvenile Fiction / General
Juvenile Fiction / Social Issues / Friendship
Social Science / Death & Dying

Export
Citation          BiBTeX      EndNote      RefMan

About Google Books - Privacy Policy - Terms of Service - Blog - Information for Publishers - Report an issue - Help - Sitemap - Google Home
©2011 Google

# EXHIBIT 19

Web   Images   Videos   Maps   News   Shopping   Gmail   More ▾                                        Sign In

Google books       the super lawyers                               Advanced Book Search

# The super-lawyers: the small and powerful world of the great Washington law firms



Joseph C. Goulden
0 Reviews
Weybright and Talley, 1972 - Law - 408 pages

🖥 ▢  ▢   ▭   ▢

**New! Shop for Google eBooks**

Go to the Google eBookstore for
over 3 million eBooks to read on
the Web, Android, iPhone, iPad,
Sony and Nook.

**Shop for eBooks now »**

Add to My Library ▾

## From inside the book

Snippet view

wall street                    [ Search ]

21 pages matching wall street in this book

## Get this book

AbeBooks
Amazon

a library
ers »

### Page 228

the $10 billion in bonds it was authorized to sell. USPS intended
to sell the bonds through private Wall Street houses. Even so,
James Hargrove, a senior assistant postmaster general, was confi-
dent USPS could hire a law firm directly for legal work on the
issue if it so desired—"one of the Wall Street legal firms that

### Page 236

absorbed Dorr, Hand, Whittaker & Watson, a Wall Street office
that did a thriving railroad business. In 1964 it added Becker &
Greenwald, Washington admiralty law specialists. In 1966 came
Caldwell, Trimble, & Mitchell, also of Wall Street, which did a
thriving—and extraordinarily technical—business of advising

### Page 246

Steeped as he was in the workings of Wall Street, Guthrie was
keenly aware of the consequences of a Penn Central bank-
ruptcy. The company was a major American institution, vital to
the transportation system. "You also have to think about the
conditions existent at the time this was happening. The country

Where's the rest of this book?

## What people are saying - Write a review

We haven't found any reviews in the usual places.

## Related books



Winston and Strawn
Winston & Strawn

Cleary, Gottlieb, Steen & H
Leo Gottlieb

The other government
Mark J. Green

## Other editions - View all



1972
Snippet view

1972
Snippet view

## Common terms and phrases

Abe Fortas  Acheson  Administration  airline  American  antitrust  argued  Arnold
and Porter  asked  attorney  Austern  auto  bank  Banzhaf  bill  called  chairman
Clark Clifford  client  Commission  Commissioner  Committee  Congress
Congressional  Corcoran  corporate  counsel  Covington and
Burling  Dean Acheson  decision  Defense  Democratic  Dobrivir  drug  Federal
government  fees  filed  foreign  former  Fortas and Porter  hearings  hired  industry  legton  Johnson
Justice Department  Karasik  Kennedy  Laylin  legislation  Lloyd Cutler
loan  lobbyists  matter  ment  million  Mudge Rose  Nader  Nixon  Panalba
partner  Patman  Penn Central  percent  political  practice  President  railroad
Ralph Nader  Randolph Guthrie  regulatory agencies  Representative  Republican  says

Secretary Senator Smathers someone staff Stuart Symington subcommittee sugar
Supreme Court talk Temko thing Thurman Arnold tion told Tommy Tommy
Corcoran Truman Unimed wanted Washington Law Washington
Lawyer White House wrote York

## References to this book

**From Google Scholar**

Pursuing Regulatory Relief: Strategic Participation and
Litigation ...
Patrick Schmidt

Socializing The Legal Profession: Can Redistributing
Lawyers ...
RICHARD L ABEL - 1979 - Law & Policy

Lobbying by Law Firms: A Study of Lobbying by
National Law Firms ...
Matthew Darke - 1997 - Australian Journal of Public
Administration

## Bibliographic information

| | |
|---|---|
| Title | The super-lawyers: the small and powerful world of the great Washington law firms *Dell book* |
| Author | Joseph C. Goulden |
| Publisher | Weybright and Talley, 1972 |
| Original from | the University of California |
| Digitized | Oct 1, 2008 |
| Length | 408 pages |
| Subjects | Law › General Practice |
| | Law / General Practice Law / Legal Profession Law firms Law partnership Practice of law |



Export
Citation     BIBTeX     EndNote     RefMan

About Google Books - Privacy Policy - Terms of Service - Blog - Information for Publishers - Report an Issue - Help - Google Home
©2011 Google

The super-lawyers: the small and ... - Joseph C. Goulden - Google Books     Page 1 of 3

Google books          the super lawyers                        Advanced Book Search

## The super-lawyers: the small and powerful world of the great Washington law firms



Joseph C. Goulden

0 Reviews

Weybright and Talley, 1972 – Law – 408 pages

New! Shop for Google eBooks

Go to the Google eBookstore for over 3 million eBooks to read on the Web, Android, iPhone, iPad, Sony and Nook.

**Shop for eBooks now »**

Add to My Library ▾

## From inside the book

congress     [ Search ]

80 pages matching congress in this book

Page 287

### The Corridors of Congress:
### Looking Down on Capitol Hill

Page 293

*The Corridors of Congress: Looking Down on Capitol Hill*   293

Page 374

United States shall be a member of either house during his con-
tinuance in office." When a Kansas Senator named James Henry
Lane accepted a brigadier's commission in the Civil War, the
Senate promptly ejected him from Congress. Nor would the Jus-
tice Department permit Lyndon Johnson or Warren Magnuson

Where's the rest of this book?

## What people are saying - Write a review

We haven't found any reviews in the usual places.

## Related books



Winston and Strawn
Winston & Strawn

Cleary, Gottlieb, Steen & H
Leo Gottlieb

The other government
Mark J. Green

## Other editions - View all



1972
Snippet view

1972
Snippet view

## Common terms and phrases

Abe Fortas  Acheson  Administration  airline  American  antitrust  argued  Arnold and Porter  asked  attorney  Austern  auto  bank  Banzhaf  bill  called  chairman  Clark Clifford  client  Commission  Commissioner  Committee  Congress  Congressional Corcoran  corporate  counsel  Covington and Burling  Dean Acheson  decision  Defense  Democratic  Dobrivir  drug  Federal government  fees  filed  foreign  former  Fortas and Porter  hearings  hired  industry  Ington  Johnson  Justice Department  Karasik  Kennedy  law firm  Laylin  legislation  Lloyd Cutler  loan  lobbyists  matter  ment  million  Mudge Rose  Nader  Nixon  Panalba  partner  Patman  Penn Central  percent  political  practice  President  railroad  Ralph Nader  Randolph Guthrie  regulatory agencies  Representative  Republican  says  Secretary  Senator  Smathers  someone  staff  Stuart Symington

♪ subcommittee sugar Supreme Court talk Temko thing Thurman Arnold tion told Tommy
**Tommy Corcoran** Truman Unimed wanted Washington Law **Washington Lawyer** White House wrote York

## References to this book

**From Google Scholar**

Pursuing Regulatory Relief: Strategic Participation and
Litigation ...
Patrick Schmidt

Socializing The Legal Profession: Can Redistributing
Lawyers ...
RICHARD L ABEL - 1979 - Law & Policy

Lobbying by Law Firms: A Study of Lobbying by
National Law Firms ...
Matthew Darke - 1997 - Australian Journal of Public
Administration

## Bibliographic information

| | |
|---|---|
| Title | The super-lawyers: the small and powerful world of the great Washington law firms *Dell book* |
| Author | Joseph C. Goulden |
| Publisher | Weybright and Talley, 1972 |
| Original from | the University of California |
| Digitized | Oct 1, 2008 |
| Length | 408 pages |
| Subjects | Law › General Practice |
| | Law / General Practice Law / Legal Profession Law firms Law partnership Practice of law |

Export
Citation          BIBTeX      EndNote      RefMan

About Google Books - Privacy Policy - Terms of Service - Blog - Information for Publishers - Report an issue - Help - Sitemap - Google Home
©2011 Google

Web   Images   Videos   Maps   News   Shopping   Gmail   More ▾                                Sign In

Google books       the super lawyers                       Advanced Book Search

# The super-lawyers: the small and powerful world of the great Washington law firms



Joseph C. Goulden

0 Reviews

Weybright and Talley, 1972 - Law - 408 pages



**New!** Shop for Google eBooks

Go to the Google eBookstore for over 3 million eBooks to read on the Web, Android, iPhone, iPad, Sony and Nook.

**Shop for eBooks now »**

Add to My Library ▾

## From inside the book

government                [ Search ]

100 pages matching **government** in this book

.Page 40

> ment: The government has not charged and does not claim that any member of the General Electric board of directors, includ-ing Mr. Ralph J. Cordiner and Mr. Robert Paxton [board chairman and president, respectively] had knowledge of the conspiracies pleaded to in the indictments, nor does the gov-

Page 48

> 48                    *The Superlawyers*
>
> August 1959, to aid the Venezuelan government in its success-

Page 117

> try is taking on oppressive size.   You young for promotion to a Cabinet position, too poorly paid to truly enjoy Washington—why stay in government? And, when you leave, why not take something along with you?
>
> Something like the government of Puerto Rico, a United

Where's the rest of this book?

ƒ

## What people are saying - Write a review

We haven't found any reviews in the usual places.

## Related books



Winston and Strawn
Winston & Strawn

Cleary, Gottlieb, Steen & H
Leo Gottlieb

The other government
Mark J. Green

## Other editions - View all



1972
Snippet view

1972
Snippet view

## Common terms and phrases

Abe Fortas  Acheson  Administration  airline  American  antitrust  argued  Arnold and
Porter  asked  attorney  Austern  auto  bank  Banzhaf  bill  called  chairman  Clark
Clifford  client  Commission  Commissioner  Committee  Congress  Congressional
Corcoran  corporate  counsel  Covington and Burling  Dean Acheson
decision  Defense  Democratic  Dobrivir  drug  Federal government  fees  filed  foreign  former  Fortas and
Porter  hearings  hired  industry  Inglon  Johnson  Justice Department  Karasik  Kennedy  law firm
Laylin  legislation  Lloyd Cutler  loan  lobbyists  matter  ment  million  Mudge Rose
Nader  Nixon  Panalba  partner  Patman  Penn Central  percent  political  practice
President  railroad  Ralph Nader  Randolph Guthrie  regulatory agencies  Representative
Republican  says  Secretary  Senator  Smathers  someone  staff  Stuart Symington

*f* subcommittee sugar Supreme Court talk Temko thing Thurman Arnold tion told Tommy Tommy Corcoran Truman Unimed wanted Washington Law Washington Lawyer White House wrote York

## References to this book

**From Google Scholar**

Pursuing Regulatory Relief: Strategic Participation and Litigation ...
Patrick Schmidt

Socializing The Legal Profession: Can Redistributing Lawyers ...
RICHARD L ABEL - 1979 - Law & Policy

Lobbying by Law Firms: A Study of Lobbying by National Law Firms ...
Matthew Darke - 1997 – Australian Journal of Public Administration

## Bibliographic information

| | |
|---|---|
| Title | The super-lawyers: the small and powerful world of the great Washington law firms *Dell book* |
| Author | Joseph C. Goulden |
| Publisher | Weybright and Talley, 1972 |
| Original from | the University of California |
| Digitized | Oct 1, 2008 |
| Length | 408 pages |
| Subjects | Law › General Practice |
| | Law / General Practice<br>Law / Legal Profession<br>Law firms<br>Law partnership<br>Practice of law |
| Export Citation | BiBTeX     EndNote     RefMan |

About Google Books – Privacy Policy – Terms of Service - Blog – Information for Publishers – Report an issue – Help – Sitemap – Google Home
©2011 Google

# EXHIBIT 20

+You  Gmail  Calendar  Documents  Photos  Sites  Web  More ⌄                **Sign in**

## Google

# Why can't I read the entire book?
### Books Help

Many of the books in Google Books come from authors and publishers who participate in our Partner Program. For these books, our partners decide how much of the book is browsable — anywhere from a few sample pages to the whole book. Some partners offer the entire book in a digital edition through Google eBooks, in which case you can purchase the book.

For books that enter Google Books through the Library Project, what you see depends on the book's copyright status. We respect copyright law and the tremendous creative effort authors put into their work. If the book is in the public domain and therefore out of copyright, you can page through the entire book and even download it and read it offline. But if the book is under copyright, and the publisher or author is not part of the Partner Program, we only show basic information about the book, similar to a card catalog, and, in some cases, a few snippets — sentences of your search terms in context. The aim of Google Books is to help you discover books and assist you with buying them or finding a copy at a local library. It's like going to a bookstore and browsing — with a Google twist.

**Was this information helpful?**          ○ Yes  ○ No

1

Books - Contacting Us - Help with other Google products - Change language: | English (US) |

©2011 Google - Google Home - Privacy Policy - Terms of Service

# EXHIBIT 21

## BONI & ZACK LLC
### Firm Resume

Boni & Zack LLC is a law firm in Bala Cynwyd, Pennsylvania, founded in March 2007. Boni & Zack focuses on class action and complex litigation under antitrust, intellectual property, consumer and securities laws.

Boni & Zack currently serves as lead counsel or on plaintiffs' Executive Committee in the following cases: *In re Freelance Works in Literary Databases Copyright Litig.*, MDL No. 1379 (S.D.N.Y.); *The Authors Guild, et al. v. Google Inc.*, No. 05-cv-8136 (S.D.N.Y.); *In re Apple In-App Purchase Litig.*, No. 11-cv-01758 (N.D. Cal.); and *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, MDL No. 1720.

In addition, Boni & Zack is currently representing plaintiffs in the following actions: *In re Chocolate Confectionary Antitrust Litig.*, MDL No. 1935 (M.D. Pa.); *In re Replacement Filter Antitrust Litig.*, MDL 1957 (D. Conn.); *In re Flat Glass Antitrust Litig.*, MDL No. 1942 (W.D. Pa.); *In re Packaged Ice Antitrust Litig.*, MDL No. 1952 (E.D. Mich.); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869 (D.D.C.); *In re Fasteners Antitrust Litig.*, MDL No. 1912 (E.D. Pa.); *In re Urethane Antitrust Litig. (Polyether Polyols)*, MDL No. 1616 (D. Kan.); *In re Refrigerant Compressors Antitrust Litig.*, MDL No. 2042 (E.D. Mich.); *In re Blood Reagents Antitrust Litig.*, MDL No. 2081; *In re Pre-filled Propane Tank Marketing & Sales Practices Litig.*, MDL No. 2086; *In re Chase Bank USA, N.A., "Check Loan" Contract Litig*, MDL No. 2032 (N.D. Cal.); *In re Wellbutrin XL Antitrust Litig.*, 08-CV-2433 (E.D. Pa.); *Standard Iron Works v. Arcelormittal, et al.*, 08-CV-5214 (N.D. Ill.); *In re Puerto Rican Cabotage Antitrust Litig.*, MDL No. 1960 (D.P.R.).

**Michael J. Boni** founded Boni & Zack LLC in March 2007 after practicing complex commercial litigation for nearly 20 years. He specializes in antitrust, copyright, consumer, shareholder and class action litigation.

Mr. Boni graduated from the University of Pennsylvania School of Law, received an M.A. degree in psychology from the University of Connecticut, and received an A.B. degree from Albright College. Mr. Boni is admitted to practice in Pennsylvania, the Supreme Court of the United States, the United States Courts of Appeals for the Second, Third, Sixth and Ninth Circuits, and the United States District Courts for the Eastern District of Pennsylvania, Northern District of California and Eastern District of Michigan.

Mr. Boni has served as lead counsel in a number of complex matters, including *The Authors Guild, et al. v. Google Inc.*, No. 05-CV-8136-JES (S.D.N.Y.) (copyright infringement class action settlement pending concerning the Google Book Search program); *In re Literary Works in Electronic Databases Copyright Litig.*, MDL No. 1379 (S.D.N.Y.) (copyright class action); *Random House, Inc. v. Rosetta Books, LLC, et al.*, No. 01-Civ-1728 (S.D.N.Y.) (successful defense against copyright infringement claims

brought by Random House against e-book publisher Rosetta Books); *In re Apple In-App Purchase Litig.*, No. 11-cv-01758 (N.D. Cal.) (consumer class action); *In re Pillar Point Partners Antitrust and Patent Litig.*, MDL No. 1202 (D. Ariz.) (antitrust class action settlement); *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566 (D. Nev.) (antitrust class action settlement); *Mikhail, et al. v. Toshiba America Information Systems, Inc.*, No. BC 278163 (Superior Ct. Cal.) (consumer class action settlement); *Anderson v. Toshiba America Information Systems, Inc.*, BC 299977 (Cal. Sup. Ct., L.A. County) (consumer class action settled); *In re Yahoo! Litig.*, CV06-2737-CAS (C.D. Cal.) (class action settlement on behalf of Yahoo's advertising customers for alleged unfair business practices); *Next Proteins International v. Radonsky, et al.*, No. BC 304799 (Superior Ct. Cal.) (consumer class action settled); *In re RF Tags Antitrust Litig.*, No. 02-CV-3730 (D.N.J.) (antitrust class action settlement); *Pilkington, et al. v. U.S.Search.com*, No. BC 234858 (Superior Ct. Cal.) (consumer class action settlement); *True Communication, Inc., d/b/a Metrodate.com v. The Gator Corporation*, No. CIV 430620 (Superior Ct. Cal.) (unfair competition class action settled); *Miller v. Pep Boys, Inc.*, et al., No. 0201-41489 (C.C.P. Phila. Cy.) (consumer class action settled); *Kleeman v. Verizon Communications Inc., et al.* (consumer class action settled); *In re Rio Hair Naturalizer Products Liability Litig.*, MDL No. 1055 (E.D. Mich.) (product liability class action settlement); *In re AMC Shareholder Derivative Litig.*, No. 12855 (Del. Chancery) (settlement); *Winigrad v. Franklin Electronics*, (Superior Ct. N.J.) (consumer class action settled); *Pacillo v. Philips Electronics*, (Superior Ct. N.J.) (consumer class action settled).

In its opinion granting final settlement approval in *Rio*, the court stated that "the work of [lead counsel] and the manner in which they conducted themselves exhibited the very highest level of professionalism and competence in our legal system." 1996 U.S. Dist. LEXIS 20440, *57 (E.D. Mich. December 20, 1996).

Mr. Boni recently served on the Executive Committee in *In re OSB Antitrust Litig.*, Master File No. 06-CV-00826 (E.D. Pa.) (antitrust class action settlement), and on Plaintiff's Executive Committee in *In re Sovereign Bancorp, Inc. Shareholders Litig.*, Nov. Term 2008, Case 2587 (Phila. C.C.P.) (shareholder class and derivative action settlement pending approval). He presently serves on the Executive Committee of *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720 (E.D.N.Y.)

In addition, Mr. Boni has played an integral role in the presentation of other complex matters, including: *In re Relafen Antitrust Litig.*, Master File No. 01-12239 (D. Mass.) (antitrust class action settlement); *In re Disposable Contact Lens Antitrust Litig.*, MDL Docket No. 1030 (M.D. Fla.) (antitrust class action settlement); *Schwab v. America Online, Inc.*, No. 96 CH 13732 (Cook County, Ill.) (consumer class action settlement); *In re Intelligent Electronics, Inc. Securities Litig.*, Master File No. 92-CV-1905 (E.D. Pa.) (securities class action settlement); *In re Lockheed Securities Litig.*, Master File No. CV89-6745-TJH (Bx) (C.D. Ca.) (securities class action settlement); *In re Orion Securities Litig.*, Civil Action No. 91-3304 DT (JRx) (E.D.N.Y.); *In re Budd Pension Plan Litig.*, Master File No. 91-4082 (E.D. Pa.) (ERISA class action settled); *In re Toys "R" Us Antitrust Litig.*, MDL Docket No. 1211 (E.D.N.Y.) (antitrust class action

settlement); *First Eastern Corporation, et al. v. Mainwaring, et al.*, Civil Action No. 92-CV-1176 (RLB) (E.D. Pa.).

Mr. Boni was named one of Pennsylvania's "Super Lawyers" in 2005, 2006, 2007, 2008, 2009, 2010, and 2011.

Mr. Boni is a past Chair of the Board of Directors of the Anti-Defamation League (Metropolitan Philadelphia Board), and is a member of the Board of Directors of Community Legal Services in Philadelphia and serves on that Board's Leadership Council.

<u>Joanne Zack</u> represents clients in complex litigation in a variety of areas, including antitrust, copyright, ERISA, securities, breach of contract, and breach of fiduciary duty. She has tried cases and argued appeals in both federal and state court.

Ms. Zack was a shareholder at Kohn, Swift and Graf from 1988 to 2004, and was associated with Cleary, Gottlieb, Steen and Hamilton in New York from 1981 to 1986. She also served as Law Clerk to the Honorable Charles L. Brieant of the United States District Court for the Southern District of New York. She graduated from Carleton College and N.Y.U. Law School, where she was elected to Order of the Coif and served as Research Editor of the Law Review.

Ms. Zack is admitted to practice in the courts of Pennsylvania and New York, the Second, Third and Federal Circuit Courts of Appeals, the Eastern District of Pennsylvania, and the Southern and Eastern Districts of New York. She has served on the boards and executive committees of Community Legal Services of Philadelphia and Philadelphia VIP, and as a sponsor in Philadelphia Futures Sponsor a Scholar program. In 2001, she received the Champion of Justice Award from CLS.

Representative cases include: *The Authors Guild, et al. v. Google, Inc.* (S.D.N.Y.) (copyright class action challenging Google's digitization of books); *In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56584 (E.D. Pa. 2007)(price-fixing class action in the paper industry); *In re Linerboard Antitrust*, 305 F.3d 145 (3d Cir. 2002) and 203 F.R.D. 199 (E.D. Pa. 2001)(output restriction class action involving corrugated containers); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998)(refusal to deal in the roofing industry); *Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995)(alleged civil RICO); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994)(refusal to deal in the wallpaper industry); *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685 (3d Cir. 1993)(City's violation of civil rights through abuse of police power); *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414 and 425 (3d Cir. 1993) (price fixing in the business jet industry); *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142 (2d Cir. 1991)(securities fraud tax shelter); *Ellis National Bank of Jacksonville v. Irving Trust Co.*, 786 F.2d 466 (2d Cir. 1986)(ERISA action); *In re Assicurazioni Generali S.P.A. Holocaust Insurance Litig.*, 228 F. Supp. 2d 348 (S.D.N.Y. 2002)(class action against life insurers for breach of contract); *Random House, Inc. v. Rosetta Books, LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 490 (2d Cir. 2002) (alleged copyright violation);

3

*Milandco Ltd., Inc. v. Washington Capital Corp.*, 2001 U.S. Dist. LEXIS (E.D. Pa. 2001)(alleged breach of contract for real estate); *Borkon v. Saidel*, 1995 U.S. Dist. LEXIS 11707 (E.D. Pa. 1995)(alleged securities fraud); *Goldberg v. Hankin*, 835 F. Supp. 815 (E.D. Pa. 1993)(alleged securities fraud); *Schutte v. Maleski, et al.*, 1993 U.S. Dist. Lexis 8332 (E.D. Pa. 1993) and 1993 U.S. Dist. Lexis 6980 (E.D. Pa. 1993) (ERISA class action); *Bloch v. SmithKline Beckman Corp.*, 1988 U.S. Dist. LEXIS 12397 (E.D. Pa. 1988)(monopolization in the pharmaceutical industry); *Rosefielde v. Falcon Jet Corp.*, 701 F. Supp. 1053 (D. N.J. 1988)(price fixing in the business jet industry); *EGW Partners, L.P. v. Prudential Insurance Co.*, 2003 Phila. Ct. Com. Pl. Lexis 29 (Commerce 2003)(breach of contract and misrepresentation); *Desert Equities v. Morgan Stanley Leveraged Equity Fund*, 624 A.2d 1199 (Del. Supreme 1993)(breach of contract).

**Joshua D. Snyder** has been with Boni & Zack LLC since it opened in 2007 and became a partner in 2008. His practice focuses on complex litigation, including antitrust, consumer protection, copyright, ERISA, and securities class actions.

Mr. Snyder is participating or has participated in the following cases, among others: *In re Apple In-App Purchase Litig.*, No. 11-cv-01758 (N.D. Cal.)*The Authors Guild, et al. v. Google Inc.*, No. 05-CV-8136 (S.D.N.Y.); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL Docket No. 1426 (E.D. Pa.); *In re Freelance Works in Literary Databases Copyright Litig.*, MDL No. 1379 (S.D.N.Y.); *In re OSB Antitrust Litig.*, Civ. A. No. 06-0826 (E.D. Pa.); *In re Urethane Antitrust Litig. (Polyether Polyols)*, MDL No. 1616 (D. Kan.); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720 (E.D.N.Y.); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869 (D.D.C.); *In re Refrigerant Compressors Antitrust Litig.*, MDL No. 2042 (E.D. Mich.); *In re Sovereign Bancorp Inc. Shareholders Litig.*, Nov. Term, 2008, No. 2587 (Phila. Cty. Ct. Common Pleas); *Standard Iron Works v. Arcelormittal, et al.*, 08-CV-5214 (N.D. Ill.); *Webster v. Hercules, Inc.*, Civ. A. No. 05-6404 (E.D. Pa.); *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566 (D. Nev.); and *In re Yahoo! Litig.*, No. 06-2737 (C.D. Cal).

Prior to joining Boni & Zack, Mr. Snyder was an associate with Kohn, Swift & Graf, P.C., where his practice also focused on complex litigation. Following law school, he served as a law clerk to the Honorable Berle M. Schiller of the United States District Court for the Eastern District of Pennsylvania and to the Honorable Thomas L. Ambro of the United States Court of Appeals for the Third Circuit.

Mr. Snyder is a graduate of the Pennsylvania State University (B.A., History, B.A. Philosophy 1998) and the Harvard Law School (J.D. 2001), where he was a member of the Harvard Legal Aid Bureau. He has handled a variety of pro bono matters.

Mr. Snyder was named one of Pennsylvania's "Super Lawyers Rising Stars" in 2008 and 2010.

**Joanne G. Noble** is an associate of the firm.  Prior to joining Boni & Zack, Ms. Noble was an associate at Schnader Harrison Segal & Lewis, LLP, as well as its Director of Pro Bono Services.  She has extensive experience in complex litigation at both the trial and appellate levels.

At Boni & Zack, Ms. Noble has participated in the following cases: *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869 (D.D.C.); *In re Urethane Antitrust Litig. (Polyether Polyols)*, MDL No. 1616 (D. Kan.); *The Authors Guild, et al. v. Google Inc.*, No. 05-CV-8136 (S.D.N.Y.); and *In re Yahoo Litig.*, No. 06-2737-CAS (C.D. Cal.).

Ms. Noble is a graduate of Cornell University (with distinction in all areas) and Georgetown University Law Center (*cum laude*), where she was a member of The Tax Lawyer.  She is admitted to practice in the courts of Pennsylvania, the Eastern and Western District of Pennsylvania, and the Third Circuit Court of Appeals.
Ms. Noble was named one of Pennsylvania's "Super Lawyers Rising Stars" in 2006 and 2007.

# EXHIBIT 22



NEW YORK
LOS ANGELES
TAMPA
DETROIT

## EXHIBIT C

## THE FIRM'S PRACTICE AND ACHIEVEMENTS

Milberg LLP, founded in 1965, was one of the first law firms to prosecute class actions in federal courts on behalf of investors and consumers. The Firm pioneered this type of litigation and is widely recognized as a leader in defending the rights of victims of corporate and other large-scale wrongdoing. The Firm's practice focuses on the prosecution of class and complex actions in many fields of commercial litigation, including securities, corporate fiduciary, ERISA, consumer, insurance, antitrust, bankruptcy, mass tort, and human rights litigation. The Firm has offices in New York City, Los Angeles, Tampa, and Detroit.

In the Firm's early years, its founding partners built a new area of legal practice in representing shareholder interests under the then recently amended Rule 23 of the Federal Rules of Civil Procedure, which allowed securities fraud cases, among others, to proceed as class actions. In the following decades, the Firm obtained important legal precedents in many of its areas of practice and prosecuted cases that set benchmarks in terms of case theories, organization, discovery, trial results, methods of settlement, and amounts recovered and distributed to clients and class members.

Important milestones in the Firm's early years include the Firm's involvement in the *U.S. Financial* litigation in the early 1970s, one of the earliest large class actions, which resulted in a $50 million recovery for purchasers of the securities of a failed real estate development company; the Ninth Circuit decision in *Blackie v. Barrack* in 1975, which established the fraud-on-the-market doctrine for securities fraud actions; the Firm's co-lead counsel position in the *In re Washington Public Power Supply System* ("*WPPSS*") *Securities Litigation*, a seminal securities fraud action in the 1980s in terms of complexity and amounts recovered; the representation of the Federal Deposit Insurance Corporation in a year-long trial to recover banking losses from a major accounting firm, leading to a precedent-setting global settlement; attacking the Drexel-Milken "daisy chain" of illicit junk-bond financing arrangements with numerous cases that resulted in substantial recoveries for investors; representing life insurance policyholders defrauded by "vanishing premium" and other improper sales tactics and obtaining large recoveries from industry participants; and ground-breaking roles in the multi-front attack on deception and other improper activities in the tobacco industry.

Milberg remains at the forefront in its areas of practice. Significant litigation results include: *Tyco International Ltd. Securities Litigation* ($3.2 billion settlement); *Nortel Networks Litigation* (settlement for cash and stock valued at $1.142 billion); *Lucent Technologies Securities Litigation* ($600 million recovery); *Raytheon Co. Securities Litigation* ($460 million recovery); *Managed Care Litigation* (recoveries over $1 billion and major changes in HMO practices); the *WPPSS Securities Litigation* (settlements totaling $775 million), and the *NASDAQ Market Makers Antitrust Litigation* ($1 billion in recoveries). Milberg has been responsible for recoveries valued at approximately $55 billion during the life of the Firm.

Milberg is consistently active in *pro bono* litigation, highlighted by its leadership role in the *Swiss Bank Litigation*, which led to the recovery of $1.25 billion from Swiss banks to benefit victims of the Holocaust, and the Firm's efforts representing claimants of the September 11 Victim Compensation Fund.



The Firm's lawyers come from many different professional backgrounds. They include former judges, professors, prosecutors, private defense attorneys, and government lawyers. The Firm's ability to pursue claims against defendants is augmented by its team of investigators, headed by a 27-year veteran of the Federal Bureau of Investigation, a full-time staff of forensic accountants and financial analysts, and an in-house litigation support department with data hosting capabilities, staffed by electronic discovery specialists.

For more information, please visit www.milberg.com.

### *Judicial Commendations*

Milberg has been commended by countless judges throughout the country for the quality of its representation. In approving a $3.2 billion securities fraud settlement, one of the largest in history, in *In re Tyco International, Ltd. Securities Litigation*, No. 02-1335 (D.N.H. Dec. 19, 2007), Judge Barbadoro lauded Milberg's efforts as co-lead counsel:

> This was an extraordinarily complex and hard-fought case. Co-Lead Counsel put massive resources and effort into the case for five long years, accumulating [millions of dollars in expenses] and expending [hundreds of thousands of hours] on a wholly contingent basis. But for Co-Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. . . . Lead Counsel's continued, dogged effort over the past five years is a major reason for the magnitude of the recovery. . . .

In *Simon v. KPMG LLP*, No. 05-3189, 2006 U.S. Dist. LEXIS 35943, at *18, 30-31 (D.N.J. June 2, 2006), a case in which Milberg served as class counsel, Judge Cavanaugh, in approving the $153 million settlement, found that "Plaintiffs . . . retained highly competent and qualified attorneys" and that "[t]he Initial Complaint . . . demonstrates that [Milberg] expended considerable time and effort with the underlying factual and legal issues in this case before even filing this lawsuit. . . . Settlement discussions were conducted over a period of some fourteen months with the supervision and guidance of Judges Politan and Weinstein, and are evidence of [Milberg's] appreciation of the merits and complexity of this litigation."

In *In re Lucent Technologies, Inc. Securities Litigation*, No. 00-621, slip op. at 14-15, 26 (D.N.J. Feb. 24, 2004), Judge Pisano issued an opinion approving the $600 million settlement and complimenting Milberg's work as co-lead counsel for the class as follows:

> [T]he attorneys representing the Plaintiffs are highly experienced in securities class action litigation and have successfully prosecuted numerous class actions throughout the United States. They are more than competent to conduct this action. Co-Lead Counsel diligently and aggressively represented the Plaintiffs before this Court and in the negotiations that resulted in the Settlement. . . . [T]he efforts and ingenuity of Lead Plaintiffs and Lead Counsel resulted in an extremely valuable Settlement for the Benefit of the Class.



In *In re Rite Aid Corp. Securities Litigation*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003), Judge Dalzell commented on the skill and efficiency of the Milberg attorneys litigating this complex case:

> At the risk of belaboring the obvious, we pause to say a specific word about . . . the skill and efficiency of the attorneys involved. [Milberg was] extraordinarily deft and efficient in handling this most complex matter. [T]hey were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings. . . . In short, it would be hard to equal the skill class counsel demonstrated here.

In *In re IKON Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 195 (E.D. Pa. 2000), Judge Katz commented on Milberg's skill and professionalism as one of plaintiffs' co-lead counsel:

> First, class counsel is of high caliber and has extensive experience in similar class action litigation. . . . Each of the co-lead counsel firms has a national reputation for advocacy in securities class actions, and there is no doubt that this standing enhanced their ability both to prosecute the case effectively and to negotiate credibly. . . .
>
> Of particular note in assessing the quality of representation is the professionalism with which all parties comported themselves. The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines. This professionalism was also displayed in class counsel's willingness to cooperate with other counsel when appropriate. . . . This cooperation enabled the parties to focus their disputes on the issues that mattered most and to avoid pointless bickering over more minor matters.

In *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998), in an opinion approving settlements totaling over $1.027 billion, Judge Sweet commented:

> Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

Judicial recognition of Milberg's excellence is not limited to courts within the United States. In *In re Flag Telecom Holdings, Ltd. Securities Litigation*, No. 02-3400 (S.D.N.Y. 2009), Milberg litigated a discovery dispute before the English Royal High Court of Justice, Queens Bench Division, which recognized the Milberg attorney handling the matter as a "Grade A" lawyer and a "vital cog in the machine." Likewise, in *Sharma v. Timminco Ltd.*, 09-378701 (Can. Ont. Sup. Ct. 2009), Canada's Ontario Superior Court of Justice recognized Milberg's "fine reputation and excellent credentials" in connection with Milberg's representation in a securities case pending in Canada.



Milberg has also been recognized for its commitment to public service. In lauding Milberg's work representing victims of the September 11th attack on the World Trade Center in connection with the September 11 Victims Compensation Fund, Special Master Kenneth R. Feinberg stated the following:

> Once again, as I have learned over the years here in New York, the [Milberg] firm steps up to the
> plate in the public interest time and time again. The social conscience of the [Milberg] firm,
> acting through its excellent associates and partners, help deal with crises that confront the
> American people and others, and I am personally in the debt of Milberg . . . for the work that it is
> doing . . . . [T]hey are second among none in terms of the public interest, and I'm very, very grateful, not only to you guys for doing this, but . . . for the firm's willingness to help out. I wanted to let everybody know that.

*In re September 11 Victim Compensation Fund,* Preliminary Hearing, Claim No. 212-003658 (Dec. 9 2003).

### Noteworthy Results

The quality of Milberg's representation is further evidenced by the Firm's numerous significant recoveries, some of which are described below.

- *In re Initial Public Offering Securities Litigation,* No. 21-92 (S.D.N.Y.). Milberg represented investors in 310 consolidated securities actions arising from an alleged market manipulation scheme. Plaintiffs alleged, among other things, that approximately 55 defendant investment banks, in dealing with certain of their clients, conditioned certain allocations of shares in initial public offerings on the subsequent purchase of more shares in the aftermarket, thus artificially boosting the prices of the subject securities. This fraudulent scheme, plaintiffs alleged, was a major contributing factor in the now infamous technology "bubble" of the late 1990s and early 2000s. As a member of the court-appointed Plaintiffs' Executive Committee, and with certain partners appointed by the court as liaison counsel, Milberg oversaw the efforts of approximately 60 plaintiffs' firms in combating some of the most well-respected defense firms in the nation. In granting final approval to a

$586 million settlement on October 6, 2009, the court described the law firms comprising the Plaintiffs' Executive Committee as the "cream of the crop."

- *Carlson v. Xerox,* No. 00-1621 (D. Conn). Milberg served as co-lead counsel in this lawsuit, which consolidated 21 related cases alleging violations of the federal securities laws. Plaintiffs alleged that Xerox and several of its top officers reported false financial results during the class period and failed to adhere to the standard accounting practices the company claimed to have followed. In the course of litigating plaintiffs' claims, Milberg engaged in arduous and exhaustive factual discovery, including review and analysis of more than four million pages of complex accounting and auditing documents and thousands of pages of SEC deposition transcripts. Plaintiffs' claims survived three motions to dismiss and a motion for summary judgment, ultimately resulting in a

 **MILBERG** LLP

NEW YORK
LOS ANGELES
TAMPA
DETROIT

$750 million settlement, which received final approval on January 14, 2009.

- *In re Tyco International Ltd., Securities Litigation*, MDL Docket No. 02-1335 (D.N.H.). Milberg served as co-lead counsel in this litigation, which involved claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 against Tyco and its former CEO, CFO, general counsel, and certain former directors arising out of allegations of Tyco's $5.8 billion overstatement of income and $900 million in insider trading, plus hundreds of millions of dollars looted by insiders motivated to commit the fraud. Plaintiffs also asserted claims under the 1933 and 1934 Acts against PricewaterhouseCoopers LLP for allegedly publishing false audit opinions on Tyco's financial statements during the class period and failing to audit Tyco properly, despite knowledge of the fraud. On December 19, 2007, the court approved a $3.2 billion settlement of the plaintiffs' claims and praised the work of co-lead counsel.

- *In re Sears, Roebuck and Co. Securities Litigation*, No. 02-7527 (N.D. Ill.). This case involved allegations that Sears concealed material adverse information concerning the financial condition, performance, and prospects of Sears' credit card operations, resulting in an artificially inflated stock price. The approved settlement provided $215 million to compensate class members.

- *In re General Electric Co. ERISA Litigation*, No. 04-1398 (N.D.N.Y.). This ERISA class action was brought on behalf of current and former participants and beneficiaries of the General Electric ("G.E.") 401(k) Plan. Milberg, serving as co-lead counsel, achieved a $40 million settlement on behalf of current and former G.E. employees who claimed that the company's 401(k) Plan fiduciaries imprudently invested more than two-thirds of the Plan's assets in company stock. The settlement included important structural changes to G.E.'s 401(k) plan valued at more than $100 million.

- *In re Biovail Corp. Securities Litigation*, No. 03-8917 (S.D.N.Y.). Milberg, representing Local 282 Welfare Trust Fund and serving as co-lead counsel, litigated this complex securities class action brought on behalf of a class of defrauded investors, alleging that defendants made a series of materially false and misleading statements concerning Canadian company Biovail's publicly reported financial results and the company's then new hypertension/blood pressure drug, Cardizem LA. This was a highly complex case in which counsel took numerous depositions across the U.S. and Canada and obtained documents from defendants and several third-parties, including, among others, UBS, McKinsey & Co., and Merrill Lynch. Milberg obtained a $138 million settlement for the class, and Biovail agreed to institute significant corporate governance changes.

- *In re Nortel Networks Corp. Securities Litigation*, No. 01-1855 (S.D.N.Y.). In this federal securities fraud class action, Milberg served as lead counsel for the class and the court-appointed lead plaintiff, the Trustees of the Ontario Public Service Employees' Union Pension Plan Trust Fund. In certifying the class, the court specifically rejected the defendants' argument that those who traded in Nortel securities on the Toronto Stock Exchange (and not the New York Stock Exchange) should be excluded from the class. The Second Circuit denied the defendants' attempted appeal. On January 29, 2007, the court approved a settlement valued at $1.142 billion.

- *In re American Express Financial Advisors Securities Litigation*, No. 04-1773 (S.D.N.Y.). This case involved allegations that American Express Financial Advisors violated securities laws by representing to class members that the company would provide tailored financial advice, when the company actually provided "canned" financial plans and advice designed to steer clients into American Express and certain nonproprietary mutual funds. The case settled for $100 million, with the settlement agreement requiring that the company institute remedial measures.

- *In re Lucent Technologies, Inc. Securities Litigation*, No. 00-621 (D.N.J.). In this federal securities fraud action in which Milberg served as co-lead counsel, plaintiffs alleged, *inter alia*, that Lucent and its senior officers misrepresented the demand for

 **MILBERG** LLP

NEW YORK
LOS ANGELES
TAMPA
DETROIT

Lucent's optical networking products and improperly recognized hundreds of millions of dollars in revenues. The settlement provided compensation of $600 million to aggrieved shareholders who purchased Lucent stock between October 1999 and December 2000.

- *In re Raytheon Securities Litigation*, No. 99-12142 (D. Mass.). This case, in which Milberg served as lead counsel, concerned claims that a major defense contractor failed to write down assets adequately on long term construction contracts. In May 2004, Raytheon and its auditor, PricewaterhouseCoopers LLP, settled for a total of $460 million.

- In *In re Rite Aid Securities Litigation*, No. 99-1349 (E.D. Pa.), in which Milberg served as co-lead counsel, the plaintiffs asserted federal securities fraud claims arising out of allegations that Rite Aid failed to disclose material problems with its store expansion and modernization program, resulting in artificially inflated earnings. Judge Dalzell approved class action settlements totaling $334 million against Rite Aid ($207 million), KPMG ($125 million), and certain former executives of Rite Aid ($1.6 million).

- In *In re CMS Energy Corp. Securities Litigation*, No. 02-72004 (E.D. Mich.), a federal securities fraud case arising out of alleged round-trip trading practices by CMS Energy Corporation, Judge Stech approved a cash settlement of more than $200 million. Milberg served as co-lead counsel in this litigation.

- *In re Deutsche Telekom AG Securities Litigation*, No. 00-9475 (S.D.N.Y.). Milberg served as co-lead counsel in this securities class action alleging that Deutsche Telekom issued a false and misleading registration statement, which improperly failed to disclose its plans to acquire VoiceStream Wireless Corporation and materially overstated the value of the company's real estate assets. On June 14, 2005, Judge Buchwald approved a $120 million cash settlement.

- *In re CVS Corp. Securities Litigation*, No. 01-11464 (D. Mass). Milberg served as co-lead counsel in this class action alleging that defendants engaged in a series of accounting improprieties and issued false and misleading statements which artificially inflated the price of CVS stock. On September 7, 2005, Judge Tauro approved a $110 million cash settlement for shareholders who acquired CVS stock between February 6, 2001 and October 30, 2001.

- *Scheiner v. i2 Technologies, Inc.*, No. 01-418 (N.D. Tex.). Milberg served as lead counsel in this securities fraud case, filed on behalf of certain purchasers of i2 common stock. The plaintiffs alleged that certain of the company's senior executives made materially false and misleading statements and omissions in i2's public statements and other public documents regarding i2's software, thereby artificially inflating the price of i2's common stock. In May 2004, Milberg recovered a settlement of $84.85 million.

- *In re Royal Dutch/Shell Transport ERISA Litigation*, No. 04-1398 (D.N.J.). This was an ERISA breach of fiduciary duty class action against the Royal Dutch/Shell Oil Group of Companies on behalf of certain of the companies' U.S. employee investment plan participants. Notably, the $90 million settlement included important provisions regarding the monitoring and training of individuals appointed to be ERISA fiduciaries.

- Milberg served as co-lead counsel in *Irvine v. ImClone Systems*, Inc., No. 02-0109 (S.D.N.Y.), in which a $75 million cash settlement was approved by the court in July 2005. Plaintiffs alleged that ImClone issued a number of misrepresentations and fraudulent statements to the market regarding the likelihood of approval of the drug Erbitux, thereby artificially inflating the price of ImClone stock.

- In *In re W.R. Grace & Co. (Official Committee of Asbestos Personal Injury Claimants v. Sealed Air. Corp. and Official Committee of Asbestos Personal Injury Claimants v. Fresenius Medical Care Holdings, Inc.)*, Nos. 02-2210 and 02-2211 (D. Del.), Milberg acted as lead counsel for the asbestos personal injury and property damage committees in two separate fraudulent conveyance actions within the W.R. Grace bankruptcy. The actions sought to return the assets of Sealed Air Corporation

One Pennsylvania Plaza · New York, New York 10119 · T 212.594.5300 · F 212.868.1229 · milberg.com



and Fresenius Medical Care Holdings (each of which had been Grace subsidiaries pre-bankruptcy) to the W.R. Grace bankruptcy estate. Complaints in both cases were filed in mid-March 2002, and agreements in principle in both cases were reached on November 27, 2002, the last business day before trial was set to begin in the Sealed Air matter. The two settlements, which consisted of both cash and stock, were valued at approximately $1 billion.

- *Nelson v. Pacific Life Insurance Co.*, No. 03-131 (S.D. Ga.). Milberg served as lead counsel in this securities fraud class action arising from allegations of deceptive sales of deferred annuity tax shelters to investors for placement in retirement plans that are already tax-qualified. The court approved a $60 million settlement of claims arising from such deception.

- The Firm was lead counsel in *In re Prudential Insurance Co. Sales Practice Litigation*, No. 95-4704 (D.N.J.), a landmark securities case that resulted in a recovery exceeding $4 billion for certain Prudential policyholders. The settlement was approved in a comprehensive Third Circuit decision.

- In *In re NASDAQ Market-Makers Antitrust Litigation*, No. 94-3996 (S.D.N.Y.), Milberg served as co-lead counsel for a class of investors. The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry-wide conspiracy in one of the largest and most important antitrust cases in recent history. After more than three years of intense litigation, the case settled for a total of $1.027 billion, one of the largest antitrust settlements at that time.

- *In re Washington Public Power Supply System Securities Litigation*, MDL 551 (D. Ariz.) was a massive securities fraud litigation in which Milberg served as co-lead counsel for a class that obtained settlements totaling $775 million, the largest-ever securities fraud settlement at that time, after several months of trial.

- *In re Exxon Valdez*, No. 89-095 (D. Ak.) and *In re Exxon Valdez Oil Spill Litigation*, 3 AN-89-2533 (Ak. Sup. Ct. 3d Jud. Dist.). Milberg is a member of the Plaintiffs' Coordinating Committee and co-chair of the Plaintiffs' Law Committee in the massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. Plaintiffs obtained a jury verdict of $5 billion, which, after years of appeals by Exxon, was reduced to approximately $500 million by the United States Supreme Court. Recently the United States Court of Appeals for the Ninth Circuit held that plaintiffs are entitled to post judgment interest on the award in the amount of approximately $470 million. Exxon is presently seeking a rehearing in the Ninth Circuit on an issue involving the award of costs.

- In *In re Managed Care Litigation*, MDL 1334 (S.D. Fla.). Final approval of a settlement between a nationwide class of physicians and defendant CIGNA Healthcare, valued in excess of $500 million, was granted on April 22, 2004. A similar settlement valued in excess of $400 million involving a nationwide class of physicians and Aetna was approved by the court on November 6, 2003. The settlements stem from a series of lawsuits filed in both state and federal courts by physicians and medical associations against many of the nation's largest health insurers arising from allegations that the insurers engaged in a fraudulent scheme to systematically obstruct, reduce, delay, and deny payments and reimbursements to health care providers. These settlements brought sweeping changes to the health care industry and significant improvements to physician-related business practices.

- *In re Sunbeam Securities Litigation*, No. 98-8258 (S.D. Fla). Milberg acted as co-lead counsel for the class. Plaintiffs alleged that Sunbeam, its auditor, and its management engaged in a massive accounting fraud which led to a restatement of over three years of previously reported financial results. The court approved a combined settlement of more than $140 million, including a $110 million settlement with Arthur Andersen LLP, Sunbeam's auditor. At that time, the Andersen settlement was one of the largest amounts ever paid by a public accounting firm to settle federal securities claims. The settlement with the individuals was achieved on the eve of trial, and ended almost four years of litigation against Andersen and Sunbeam's insiders, including Albert Dunlap, Sunbeam's former Chairman

✦ **MILBERG**LLP

and CEO. The settlement included a personal contribution from Dunlap of $15 million.

- *In re Triton Energy Limited Securities Litigation*, No. 98-256 (E.D. Tex.). Plaintiffs alleged that defendants misrepresented, among other things, the nature, quality, classification, and quantity of Triton's Southeast Asia oil and gas reserves during the period March 30, 1998 through July 17, 1998. The case settled for $42 million.

- In *In re Thomas & Betts Securities Litigation*, No. 00- 2127 (W.D. Tenn), the plaintiffs, represented by Milberg as co-lead counsel, alleged that Thomas & Betts engaged in a series of accounting improprieties while publicly representing that its financial statements were in compliance with GAAP, and failed to disclose known trends and uncertainties regarding its internal control system and computer and information systems. The case settled for $46.5 million dollars in cash from the company and $4.65 in cash from its outside auditor, KPMG.

- *In re MTC Electronic Technologies Shareholder Litigation*, No. 93-0876 (E.D.N.Y.). Plaintiffs alleged that defendants issued false and misleading statements concerning, among other things, purported joint venture agreements to establish telecommunications systems and manufacture telecommunications equipment in China. The court approved a settlement of $70 million, including $65 million in cash and $5 million worth of MTC Class A shares with "put" rights.

- In *In re PaineWebber Limited Partnerships Litigation*, No. 94-8547 (S.D.N.Y.). Milberg represented investors alleging that PaineWebber developed, marketed, and operated numerous investment partnerships as part of an ongoing conspiracy to defraud investors and enrich itself through excessive fees and commissions over a twelve-year period. On March 20, 1997, Judge Sidney Stein approved a $200 million settlement, consisting of $125 million in cash and $75 million worth of guarantees and fee waivers.

- In *Andrews v. AT&T*, No. 91-175 (S.D. Ga.) the Firm represented a class of persons who paid for premium-billed "900-number" calls that involved allegedly deceptive games of chance,

starting in 1993. Defendants included major long-distance companies, which approved the call programs and billed for the calls. Defendant MCI settled for $60 million in benefits. The class against AT&T was decertified on appeal and the Firm prosecuted the individual plaintiffs' claims, obtaining a jury verdict in 2003 for compensatory and punitive damages.

In the context of shareholder derivative actions, Milberg has protected shareholder investments by effectuating important changes in corporate governance as part of the global settlement of such cases. Cases in which such changes were made include:

- *In re Topps Co., Inc. Shareholder Litig.*, No. 600715/2007 (N.Y. Sup. Ct. N.Y. County Apr. 17, 2007). Milberg served as co-lead counsel in this transactional case, which led to a 2007 decision vindicating the rights of shareholders under the rules of comity and the doctrine of *forum non conveniens* to pursue claims in the most relevant forum, notwithstanding the fact that jurisdiction might also exist in the state of incorporation. This case was settled in late 2007 in exchange for a number of valuable disclosures for the class.

- *In re Marketspan Corporate Shareholder Litigation*, No. 98-15884 (N.Y. Sup. Ct.). The settlement agreement in this derivative case required modifications of corporate governance structure, changes to the audit committee, and changes in compensation awards and to the nominating committee.

- *In re Trump Hotels Shareholder Derivative Litigation*, No. 96-7820 (S.D.N.Y.). In this case, the plaintiff shareholders asserted various derivative claims on behalf of the company against certain Trump entities and senior Trump executives in connection with the self-serving sale of a failing casino to the company in which the plaintiffs held stock. Milberg negotiated a settlement on behalf of the plaintiffs that required Donald Trump to contribute a substantial portion of his personal interest in a pageant he co-owned. In addition, the settlement required the company to increase the number of directors on its board, and certain future transactions had to be reviewed by a special committee.



### *Precedent-Setting Decisions*

Milberg has consistently been a leader in developing the federal securities, antitrust, and consumer protection laws for the benefit of investors and consumers. The Firm has represented individual and institutional plaintiffs in hundreds of class action litigations in federal and state courts throughout the country. In most of those cases, Milberg has served as lead or co-lead counsel. The Firm has also been responsible for establishing many important precedents, including the following:

- *In re Lord Abbett Mutual Funds Fee Litigation*, 553 F.3d 248 (3d Cir. 2009). This important decision set significant precedent regarding the scope of preemption under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). In reversing the District Court's dismissal of the plaintiffs' claims, the Third Circuit held that "SLUSA does not mandate dismissal of an action in its entirety where the action includes only some pre-empted claims." In so holding, the court explained that "nothing in the language, legislative history, or relevant case law mandates the dismissal of an entire action that includes both claims that do not offend SLUSA's prohibition on state law securities class actions and claims that do . . . ."

- *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 170 (2d Cir. 2009). In this matter, the plaintiffs, Nigerian children and their families, asserted claims under the Alien Tort Statute ("ATS") in connection with Pfizer's clinical trial of the drug, Trovan, without their knowledge. In January 2009, the Second Circuit reversed the District Court's dismissal for lack of jurisdiction. The court held that the plaintiffs pled facts sufficient to state a cause of action under the ATS for a violation of international law prohibiting medical experimentation on human subjects without their consent. Pfizer's petition for review of the Second Circuit's ruling by the United States Supreme Court is currently pending.

- *In re Comverse Technology, Inc.*, 866 N.Y.S.2d 10 (App. Div. 1st Dep't 2008). In this

derivative case in which Milberg serves as co-lead counsel, plaintiff shareholders sued certain of the company's officers and directors based on allegations of illegal options backdating. The lower court dismissed the plaintiffs' claims, holding that the plaintiffs failed to make a pre-suit demand on the company's board, and that in any event, the board had already formed a special committee to investigate the misconduct. In this significant opinion reversing the lower court's dismissal, the Appellate Division clarified the standards of demand futility and held that a board of directors loses the protection of the business judgment rule where there is evidence of the directors' self-dealing and poor judgment. The court noted that the mere creation of a special committee did not justify a stay of the action and did not demonstrate that the board took appropriate steps. Rather, "the picture presented in the complaint is that of a special committee taking a tepid rather than a vigorous approach to the misconduct and the resultant harm. Under such circumstances, the board should not be provided with any special protection."

- *South Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). The important opinion issued by the Ninth Circuit in this securities fraud class action clarified, in the post-*Tellabs* environment, whether a theory of scienter based on the "core operations" inference satisfies the PSLRA's heightened pleading standard. In siding with the plaintiffs, represented by Milberg, the Ninth Circuit held that "[a]llegations that rely on the core operations inference are among the allegations that may be considered in the complete PSLRA analysis." The court explained that under the "holistic" approach required by *Tellabs*, all allegations must be "read as a whole" in considering whether plaintiffs adequately plead scienter. After remand, the District Court found that the plaintiffs sufficiently alleged scienter under the Ninth Circuit's analysis.

- *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049 (9th Cir. 2008). In this securities fraud class action in which Milberg represents



the plaintiffs, the Ninth Circuit reversed the District Court's dismissal of the complaint in this opinion clarifying loss causation pleading requirements. In ruling that the plaintiffs adequately pled loss causation, the Ninth Circuit held that the plaintiffs' complaint identified a "specific economic loss" following the issuance of a specific press release, along with allegations of misrepresentations that were described in "abundant detail." The opinion established that plaintiffs in a securities fraud action adequately plead loss causation where they provide sufficient detail of their loss causation theory and some assurance that the theory has a basis in fact. Based on this analysis, the dismissal was reversed, and the case was remanded to the District Court for further proceedings.

- In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), in which Milberg is lead counsel for the class, the United States Supreme Court announced a uniform standard for evaluating the sufficiency of a complaint under the PSLRA. The court held that on a motion to dismiss, a court "must consider the complaint in its entirety," accepting "all factual allegations in the complaint as true," as well as "tak[ing] into account plausible opposing inferences." On remand, the Seventh Circuit concluded that "the plaintiffs have succeeded, with regard to the statements identified in our previous opinion as having been adequately alleged to be false and material, in pleading scienter in conformity with the requirements of the PSLRA. We therefore adhere to our decision to reverse the judgment of the district court dismissing the suit." The unanimous decision was written by Judge Richard A. Posner.

- *Asher v. Baxter International, Inc.*, 377 F.3d 727 (7th Cir. 2004). In reversing and remanding the District Court's dismissal, the Seventh Circuit resolved in plaintiffs' favor an important issue involving the PSLRA's "safe harbor" for forward-looking statements. The court held that whether a cautionary statement is meaningful is an issue of fact, because whether a statement is meaningful or not depends in part on what the defendant knew when the statement was made as well as other issues of fact. Thus,

this issue is not appropriately resolved on a motion to dismiss.

- In *In re Vivendi Universal, S.A. Securities Litigation*, No. 05-5571, 2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003), the court upheld plaintiffs' claims, under Section 10(b) of the Securities Exchange Act of 1934, arising from allegations that Vivendi and two of its former executives (CEO Jean-Marie Messier and CFO Guillaume Hannezo) did not disclose to investors that: (1) Vivendi's corporate acquisition programs had brought Vivendi to the brink of a potentially catastrophic liquidity crisis; (2) although it consolidated the financial results of several majority-owned subsidiaries, Vivendi did not have access to the cash flows of these entities; (3) Vivendi failed to write down billions of dollars of impaired goodwill from prior acquisitions; and (4) one of Vivendi's U.S. subsidiaries improperly recognized revenue "up front" on the full value of long term contracts. The case is particularly notable because the court held that defendants' activities in New York promoting Vivendi stock was more than "merely preparatory" to the alleged fraudulent scheme, and thus the court had jurisdiction not only over purchasers of Vivendi ADRs on the NYSE, but also over the claims of foreign purchasers who purchased Vivendi ordinary shares on foreign exchanges. The District Court later certified a class of purchasers from the United States, France, England, and the Netherlands, and denied defendants' motions for summary judgment. The case is currently being tried.

- *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003). This important decision strongly reaffirmed the principle that whether an undisclosed fact would have been material to investors cannot ordinarily be decided on a motion to dismiss. The Eighth Circuit, stressing that "[t]he question of materiality hinges on the particular circumstances of the company in question," observed that even relatively small errors in financial statements might be material if they concern areas of particular importance to investors and raise questions about management integrity.

- *In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002). In this opinion, the First Circuit

joined the Second Circuit in allowing a complaint to be based on confidential sources. The court also accepted the argument made by plaintiffs, represented by Milberg, that courts should consider the amount of discovery taken place prior to deciding a motion to dismiss, with a lack of discovery resulting in a correspondingly less stringent standard for pleading securities fraud claims with particularity.

- In *Puckett v. Sony Music Entertainment*, No. 108802/98 (N.Y. Sup. Ct. N.Y. Cty. 2002), a class action was certified against Sony Music Entertainment on behalf of a class of recording artists who were parties to standard Sony recording or production agreements entered into during the class period. The complaint alleged that Sony had a policy of treating the value added tax on foreign sales of recordings improperly thereby impermissibly reducing the royalties paid or credited to the class members. Justice DeGrasse of the New York State Supreme Court determined that class certification was appropriate and that Gary Puckett (of Gary Puckett & the Union Gap) and jazz musician and composer Robert Watson were appropriate class representatives to represent the class of artists and producers to whom Sony accounts for foreign record royalties.

- *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). The Firm was lead counsel in this seminal securities fraud case in which the Second Circuit undertook an extensive analysis of the statutory text and the legislative history of the PSLRA and pre-existing Second Circuit case law. Among other things, the Second Circuit held that the PSLRA's pleading standard for scienter was largely equivalent to the pre-existing Second Circuit standard and vacated the District Court's dismissal which sought to impose a higher standard for pleading scienter under the PSLRA. The Second Circuit also rejected any general requirement that plaintiffs' confidential sources must be disclosed to satisfy the PSLRA's newly-enacted particularity requirements.

- *In re Advanta Corp. Securities Litigation*, 180 F.3d 525 (3d Cir. 1999). Here, the plaintiffs, represented by Milberg, successfully argued that

under the PSLRA, scienter is sufficiently pled by making an adequate showing that the defendants acted knowingly or with reckless disregard for the consequences of their actions. The Third Circuit specifically adopted the Second Circuit's scienter pleading standard for pleading fraud under the PSLRA.

- In *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), the Second Circuit reversed the District Court's ruling, which denied plaintiffs leave to amend to assert a cause of action against defendants for failing to disclose that the defendant Trust was unable to utilize proper "hedging" techniques to insure against risk of loss. In the court's view, taken together and in context, the Trust's representations would have misled a reasonable investor.

- In *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996), the First Circuit remanded plaintiffs' action after affirming, in part, Milbergs' position that in association with the filing of a prospectus related to the issuance of securities, a corporate-issuer must disclose intra-quarter, materially adverse changes in its business, if such adverse changes constitute "material changes" the disclosure of which is required pursuant to the Securities Act of 1933.

- *In re Salomon, Inc. Shareholders Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995). The Second Circuit affirmed the District Court's holding that derivative federal securities claims against defendants would not be referred to arbitration pursuant to the arbitration provisions of the Rules of the New York Stock Exchange, but would be tried in District Court. Shortly thereafter, the case settled for $40 million.

- *Kamen v. Kemper Financial Services*, 500 U.S. 90 (1991). The Supreme Court upheld the right of a stockholder of a mutual fund to bring a derivative suit without first making a pre-suit demand. Specifically, the Court held that "where a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate state law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute. . . . Because a futility exception to demand does not impede

**❋ MILBERG** LLP

the regulatory objectives of the [Investment Company Act], a court that is entertaining a derivative action under that statute must apply the demand futility exception as it is defined by the law of the State of incorporation."

- *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873 (9th Cir. 1984), *cert. denied,* 469 U.S. 932 (1984). The Ninth Circuit upheld an investor's right to pursue a class action against an accounting firm, adopting statute of limitation rules for Section 10(b) suits that are favorable to investors.

- *Hasan v. CleveTrust Realty Investors,* 729 F.2d 372 (6th Cir. 1984). The Sixth Circuit very strictly construed, and thus narrowed, the ability of a "special litigation committee" of the board of a public company to terminate a derivative action brought by a shareholder.

- *Fox v. Reich & Tang, Inc.,* 692 F.2d 250 (2d Cir. 1982), *aff'd sub nom, Daily Income Fund, Inc. v. Fox,* 464 U.S. 523 (1984). The court held that a Rule 23.1 demand is not required in a shareholder suit brought pursuant to Section 36(b) of the Investment Company Act.

- *Rifkin v. Crow,* 574 F.2d 256 (5th Cir. 1978). The Fifth Circuit reversed an order granting summary judgment for defendants in a Section 10(b) case, paving the way for future acceptance of the "fraud-on-the-market" rationale in the Fifth Circuit.

- *Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976). This is the seminal appellate decision on the use of the "fraud-on-the-market" theory of reliance, allowing investors who purchase stock at artificially inflated prices to recover even if they were personally unaware of the false and misleading statements reflected in the stock's price. In so holding, the court noted that class actions are necessary to protect the rights of defrauded purchasers of securities.

- *Bershad v. McDonough,* 300 F. Supp. 1051 (N.D. Ill. 1969), *aff'd,* 428 F.2d 693 (7th Cir. 1970). In this case, the plaintiff, represented by Milberg, obtained summary judgment on a claim for violation of Section 16(b) of the Securities Exchange Act, where the transaction at issue was structured by the defendants to look like a lawful option. The decision has been cited frequently in discussions as to the scope and purpose of Section 16(b).

- *Heit v. Weitzen,* 402 F.2d 909 (2d Cir. 1968). The court held that liability under Section 10(b) of the Securities Exchange Act extends to defendants, such as auditors, who were not in privity with the named plaintiffs or the class represented by the named plaintiffs.

## MILBERG LLP ATTORNEYS PRINCIPALLY INVOLVED IN THIS LITIGATION

SANFORD P. DUMAIN attended Columbia University where he received his B.A. degree in 1978. He graduated *cum laude* from Benjamin N. Cardozo School of Law of Yeshiva University in 1981.

Mr. Dumain represents plaintiffs in cases involving securities fraud, consumer fraud, insurance fraud, and violations of the antitrust laws.

Mr. Dumain was co-lead counsel in the *Tyco Securities Litigation* in which $3.2 billion was recovered for investors. Mr. Dumain also served as lead counsel in the securities class actions against Nortel and Biovail, which are the highest and third highest recoveries ever in cases involving Canadian companies. The *Nortel* settlement was valued at over $1 billion and *Biovail* settled for over $138 million in cash. Mr. Dumain successfully represented the City of San Jose, California against 13 of the City's broker-dealers and its outside accountants in connection with major losses in unauthorized bond trading.

Mr. Dumain began his career as a law clerk to Judge Warren W. Eginton, United States District Court for the District of Connecticut 1981-1982. During the early years of his practice, he also served as an Adjunct Instructor in Legal Writing and Moot Court at Benjamin N. Cardozo School of Law.

Mr. Dumain has lectured for ALI-ABA concerning accountants' liability and has prosecuted several actions against accounting firms.

Mr. Dumain served on the trial team for a six-month trial in which the Firm represented the City of San Jose, California, that resulted in a verdict for the City against the defendants for violations of the securities laws. More recently, he was Co-Lead Counsel in the Tyco Securities Litigation in which a $3.2 billion settlement was recovered for investors.

Judge Janet C. Hall of the District of Connecticut made the following comment in *In re: Fine Host Securities Litigation*, (No. 97-2619): "The court also finds that the plaintiff class received excellent counseling, particularly from the Chair of the Plaintiffs' Executive Committee, Attorney Dumain."

Mr. Dumain is admitted to practice in the State of New York, United States District Court for the Southern and Eastern Districts of New York, District of Colorado, and District of Connecticut, and United States Courts of Appeals for the First, Second, Third, Sixth, Seventh, and Eighth Circuits.

Mr. Dumain is the Chair of the Firm's Executive Committee.

ARTHUR R. MILLER heads the Firm's appellate practice. He is the nation's leading scholar in the field of civil procedure, a subject about which he has authored or co-authored numerous articles and more than 40 books. These include his treatise, Federal Practice and Procedure, which is relied upon by federal judges throughout the country as the principal authority on federal practice. He also wrote Civil Procedure, the casebook used by most U.S. law schools.

Professor Miller is currently a University Professor at New York University School of Law. This professorship is conferred on outstanding scholars in recognition of the interdisciplinary dimension and breadth of their work. Previously, Professor Miller was the Bruce Bromley Professor of Law at Harvard, where he earned his law degree and taught for 36 years.

In recent years, Professor Miller has actively participated in numerous cases, particularly in federal appellate courts. He has argued in all of the U.S. Courts of Appeal and in the U.S. Supreme Court, most recently in *Tellabs Inc. v. Makor Issues & Rights Ltd.*

Professor Miller is the recipient of numerous awards, including five honorary doctorates, three American Bar Association Gavel Awards and a Special Recognition Gavel Award for promoting public understanding of the law. A renowned commentator on law and society, he won an Emmy award for his work on "The Constitution: That Delicate Balance," an acclaimed PBS series he moderated. Professor Miller also served for two decades as the legal editor for ABC's Good Morning America. In addition, he

hosted the weekly television show Miller's Court for eight years and has commented regularly on legal matters for Court TV.

Professor Miller was appointed by two Chief Justices of the U.S. Supreme Court to serve as a member and reporter on the Advisory Committee on Civil Rules of the Judicial Conference of the United States. He has additionally served as reporter and advisor to the American Law Institute, and as a member of various American Bar Association committees, among others. In addition, Professor Miller was appointed by President Ford to serve on the United States Commission on New Technological Uses of Copyrighted Work.

JENNIFER S. CZEISLER graduated from Hofstra University in 1994 with a B.A. degree in psychology. After completing graduate degree work at Hunter School of Social Work (1994-95), she pursued a J.D. degree, which she earned in 1999 from the University of Miami School of Law, where she graduated *cum laude*. Ms. Czeisler was on the editorial board of the *Law Review of Psychology, Public Policy & Law* and earned numerous awards, including the CALI excellence for the Future Award, Dean's Certificate of Achievement Award, and membership in the Phi Delta Phi National Honor Society.

Ms. Czeisler is admitted to practice in the State of New York and is a member of the American Bar Association, where she is committed to her *pro bono* work with the American Bar Association Commission on Legal Problems of the Elderly.

# EXHIBIT 23

## KOHN, SWIFT & GRAF, P.C.

Since its founding in 1969, the firm of Kohn, Swift & Graf, P.C., has been a national leader in the prosecution of antitrust class actions and other complex commercial litigation. Kohn, Swift & Graf, P.C. and its attorneys have been selected by courts and co-counsel to be lead counsel, or members of the executive committee of counsel, in scores of class actions throughout the country in the antitrust, securities fraud, tort and consumer protection fields.

Recently, the firm has been co-lead counsel in the Holocaust Era cases and other ground breaking international human rights litigation which have resulted in settlements totaling billions of dollars for plaintiff classes from Swiss banks and German and Austrian industries. The firm also maintains a general business litigation practice representing plaintiffs and defendants, including Fortune 500 and other publicly traded corporations, in state and federal courts.

The firm and its partners have been recognized for their excellence in antitrust and business litigation by numerous publications, including the Best Lawyers in America, Chambers USA America's Leading Business Lawyers and Pennsylvania Super Lawyers.

The Kohn firm has been a leader in the prosecution of antitrust class actions for the past 40 years. The firm has served as lead or co-lead counsel in the following antitrust class actions, among others: In re Automotive Refinishing Paint Antitrust Litigation, MDL No. 1426 (E.D. Pa.) (settlements totaling $105.75 million); In re Compact Disc Minimum Advertised Price Antitrust Litigation, MDL No. 1361 (D. Me.) (settlements totaling $143 million approved); In re Graphite Electrodes Antitrust Litigation, MDL No. 1244 (E.D. Pa.) (over $133 million in settlements obtained for the class); In re Plastics Additives Antitrust Litigation, MDL No. 1684 (E.D. Pa.) (settlements of $46 million with seven defendants; litigation continuing against other defendants); In re Stock Exchanges Options Antitrust Litigation, MDL No. 1283 (S.D.N.Y.) (settlements reached with over 40 defendants for $44 million); In re Pillar Point Partners Antitrust Litigation, MDL No. 1202 (D. Arizona) (settlements of $50 million); In re Amino Acid Lysine Antitrust Litigation, 918 F.Supp. 1190 (N.D. Ill. 1996) (settlements in excess of $50 million); In re Toys "R" Us, Inc., Antitrust Litigation, MDL 1211 (E.D.N.Y.) ($55 million settlement value); In re Residential Doors Antitrust Litigation, MDL 1039 (E.D. Pa.) ($18 million in settlements); In re Chlorine and Caustic Soda Antitrust Litigation, 116 F.R.D. 622 (E.D. Pa. 1987) (settled on eve of trial for $51 million); Cumberland Farms, Inc. v. Browning Ferris Indus., Inc., 120 F.R.D. 642 (E.D. Pa. 1988) (class action alleging price fixing in waste hauling industry-case settled shortly before trial for $50 million); In re Plywood Antitrust Litigation, MDL 159, (D. La.) (tried to verdict for plaintiffs; affirmed by Fifth Circuit; total settlements of approximately $173 million).

In addition, the Kohn firm is and has been a member of a steering committee or executive committee of counsel in dozens of antitrust class actions, including: In re Currency Conversion Fee Antitrust Litigation, (S.D.N.Y.); In re Carbon Fiber Antitrust Litigation (C.D. Cal.); In re Extruded Graphite Antitrust Litigation (D.N.J.); In re Linerboard Antitrust Litigation (E.D.Pa.); In re Relafen Antitrust Litigation (D.Mass.); In re Brand Name Prescription Drugs Antitrust Litigation (N.D. Ill.); In re Commercial Explosives Antitrust Litigation (D. Utah); In re Catfish Antitrust Litigation (N.D. Miss.); In re Commercial Paper Antitrust Litigation (M.D.Fla.); In re Glassine and Greaseproof Paper Antitrust Litigation (E.D. Pa.); In re Corrugated Container

Antitrust Litigation, (S.D. Tex.); In re Sugar Industry Antitrust Litigation (E.D. Pa.).

The Kohn firm also has maintained a business litigation practice and represented private clients as plaintiffs in antitrust cases where it was the sole counsel, or assisted by a few co-counsel. These cases were hard fought and several have proceeded through trial and appeals: Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996 (3d Cir. 1994), cert. denied, 514 U.S. 1063 (1995) (summary judgment in favor of defendants reversed by Third Circuit; certiorari denied by the Supreme Court; case tried to conclusion before a jury and settled after trial); Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425 (3d Cir. 1993) (jury verdict in favor of plaintiff; case settled); Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (summary judgment in favor of defendant reversed by Third Circuit; case settled prior to trial).

In addition to its antitrust practice, the Kohn firm has been retained by pension funds, including several multi-billion dollar funds, to monitor the fund's investments and to commence litigation when appropriate. The firm has brought litigation on behalf of the Retirement System of the City of Philadelphia, the Police and Fire Retirement System of the City of Detroit and has been lead or co-lead counsel in the following securities class actions among others: In re KLA-Tencor Corp. Securities Litigation, Master File No. 06-cv-04065-MJJ, (N.D. Cal); In re Marvell Technology Group, Ltd. Securities Litigation, Master File No. 06-06286-RMW (N.D. Cal.); The Police and Fire Retirement System of the City of Detroit v. The Bear Stearns Companies, Inc., et al., Civil Action No. 3638-VCP (Del. Chancery); In re Calpine Corporation Securities Litigation, Master File No. C-02-1200 (N.D. Cal); In re Schulman Partnerships Securities Litigation, MDL 753-AAH (C.D. Ca.); Goldenberg, et al. v. Marriott PLP Corp., et al., No. PJM 95-3461 (D. Md.); In re Intelligent Electronics, Inc. Securities Litigation, Master File No. 92-CV-1905 (E.D. Pa.); WEBBCO v. Tele-Communications, Inc., et al., No. 94-WM-2254 (D. Colo.); The Carter Revocable Trust v. Tele-Communications, Inc., et al., No. 94-WM-2253 (D. Colo.); Rabin v. Concord Assets Group, Inc., et al., 89 Civ. 6130 (LBS) (S.D.N.Y.); Sadler v. Stonehenge Capital Corp., et al., 89 Civ. 6512 (KC); Ramos, et al. v. Patrician Equities Corp., et al., 89 Civ. 5370 (TPG) (S.D.N.Y.); In re Advacare Securities Litigation, (E.D. Pa. 1993); Solo, et al. v. Duval County Housing Finance Authority, et al., No. 94-1952-CA (Duval Cty. Fla.); In re Clinton Oil Securities Litigation, (D. Kan. 1982).

The firm also has litigated numerous consumer and mass tort class actions, such as: In re Synthroid Marketing Litigation, MDL No. 1182 (N.D. Ill.); In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation, MDL No. 1001 (D. Minn.); In re Bolar Pharmaceutical Co., Inc. Generic Drug Consumer Litigation, MDL No. 849 (E.D.Pa.); In re General Motors Corporation Pickup Truck Fuel Tank Products Liability Litigation, MDL No. 961 and Master File No. 92-6450 (E.D.Pa.); In re Factor VIII or Factor IX Concentrate Blood Products Litigation, Civil Action No. 93-5969 and MDL No. 986 (N.D.Ill.); In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation, MDL Docket No. 94-140-1013 (D. Wyo.).

Courts throughout the country have praised the firm's ability to handle complex class litigation:

2

53479_1

*In re Automotive Refinishing Paint Antitrust Litigation*, MDL No. 1426 (E.D. Pa.). Judge Surrick stated: "I want to commend counsel on both sides of this litigation. I think the representation on both sides of this litigation is as good as I've ever seen in my entire professional career," transcript of hearing, August 9, 2007, pp. 18-19.

*In re Graphite Electrodes Antitrust Litigation*, Master File No. 97-CV-4182, MDL No. 1244 (E.D. Pa.). Judge Weiner wrote that "[c]lass counsel exhibited the highest level of skill and professionalism in their conduct of this litigation." Order of September 8, 2003.

*In re Compact Disc Minimum Advertising Price Antitrust Litigation*, MDL No. 1361 (D. Me.). In selecting the firm as lead counsel, Judge Hornby stated that "I have concluded that the firm Kohn, Swift & Graf has the experience, skill, resources, and expertise best able to move this matter forward, and I hereby designate that firm as lead counsel." Order of January 26, 2001, p. 2.

*In re Amino Acid Lysine Antitrust Litigation*, MDL No. 1083 (N.D. Ill.). After selecting Kohn Swift as sole lead counsel, at the conclusion of the case Judge Shadur praised the firm's "extraordinarily professional handling" of the matter, which justified the selection of the firm *ab initio*. Transcript of hearing, February 27, 1998, pp. 3 & 4.

*In re: Rio Hair Naturalizer Products Liability Litigation*, MDL 1055 (E.D. Mich.). Judge Rosen stated that "the work of [lead counsel] and the manner in which they conducted themselves exhibited the very highest level of professionalism and competence in our legal system." 1996 U.S. Dist. LEXIS 20440, *57 (E.D. Mich., December 20, 1996).

*In re: Montgomery Ward Catalog Sales Litigation*, Master File No. 85-5094, MDL No. 685 (E.D. Pa). Judge Green praised "the efficient and excellent quality of the attorneys' work." Memorandum and Order, August 24, 1988.

3

53479_1

## ROBERT JOSEPH LAROCCA

Robert J. LaRocca is a director and shareholder in the firm of Kohn, Swift & Graf, P.C. Mr. LaRocca graduated from Rutgers (Newark) Law School in 1977, with High Honors, where he was the Research and Topics Editor, Rutgers Law Review. Mr. LaRocca is a *Magna Cum Laude* graduate of Harvard College (1968), and a member of Phi Beta Kappa.

Mr. LaRocca clerked for the Honorable Edward R. Becker, United States District Court, Eastern District of Pennsylvania (August 1977-August 1978), after which he became associated with the Kohn firm. He has appeared in the Courts of Appeals for the Second, Third, Fifth, Eighth, Eleventh and Federal Circuits. He has an "av" rating from Martindale-Hubbell, and has been elected to the American Law Institute.

Representative cases include, in alphabetical order: *Barnes v. American Tobacco*, 161 F.3d 127 (3d Cir. 1999) (claim for medical monitoring against tobacco companies); *Big Apple BMW v. BMW*, 974 F.2d 1358 (3d Cir. 1992); (group boycott antitrust case); *Bloch v. SmithKline* (E.D.Pa.) 1988 U.S. Dist. Lexis 12397 (E.D.Pa. 1988) and 1987 U.S. Dist. Lexis 2795 (E.D.Pa. 1987) (monopolization and patent abuse in market for prescription drug); *Breard v. Sachnoff*, 941 F.2d 142 (2d Cir. 1991) (securities fraud tax shelter); *Creative Copier Services v. Xerox*, 114 F.Supp.2d 1070 (D. Kan. 2000) (antitrust, patent, copyright claims); *ELSCO v. Motorola*, (E.D. Pa.) 782 F.Supp. 1016 (E.D. Pa. 1991), 785 F.Supp. 17 (E.D. Pa. 1992) (Lanham Act trade disparagement case involving semiconductor industry); *Golden Valley v. Weaver Popcorn*, 837 F.Supp. 1444 (N.D. Ind.), *aff'd*, 11 F.3d 1072 (Fed. Cir. 1993) (patent fraud case in microwave popcorn industry); *Gulfstream v, Gulfstream Aerospace*, 995 F.2d 425 and 995 F.2d 414 (3d Cir. 1993) (trial of price fixing of aircraft); *In re Linerboard Antitrust*, 305 F.3d 145 (3d Cir. 2002) and 203 F.R.D. 199 (E.D.Pa. 2001) (national class output restriction case involving corrugated containers); *In re Waste Haulers Antitrust*, Civil 87-3717 (E.D. Pa.) (Bechtle, J.) (national price fixing class action case involving waste hauling industry); *In re Chlorine and Caustic Soda Antitrust Litigation*, Civil 86-5428 (E.D.Pa.)(Bechtle, J.) (national price fixing class action case involving manufacturers of chlorine); *Mike's Train House v. Lionel*, (No. 00-CV-71729 E.D. Mich.) 472 F.3d 398 (6th Cir. 2006) (theft of trade secrets in model train industry); *Parkway v. City of Philadelphia*, 980 F.2d 724 (3d Cir. 1992) and 590 A.2d 79 (Commonwealth Ct 1991) (abuse of city police power to obtain private property); *Roberts Filter v. CPC*, 1993 U.S. Dist. Lexis 15119 (E.D. Pa.)(Lanham Act unfair trade practices, misrepresentation, commercial defamation, involving water purification systems); *Schutte v. Maleski*, et al, 1993 U.S. Dist. Lexis 8332 (E.D. Pa. 1993) and 1993 U.S. Dist. Lexis 6980 (E.D.Pa. 1993) (ERISA class action concerning State of Pennsylvania's deprivation of pension rights); *Sulfuric Acid Antitrust Litigation* (MDL 1536, N.D. Ill, 2003) (collusive conduct in sulfuric acid production); *Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995) (civil RICO); *TMJ Implant v. Dow Chemical*, 113 F.3d 1484 (8th Cir. 1997) (product liability class action); *Webster v. Hercules*, 05-6404 (E.D.Pa. 2005) (ERISA class action).

Mr. LaRocca is past chair of the Lawyers' Advisory Committee for the Third Circuit. He serves on the board of directors of the Settlement Music School (MLC Branch). He has recently given guest lectures on the interface between antitrust and patent law at the University of Pennsylvania Law School.

3509_2