EXHIBIT 2

"IT BELONGS ON EVERY WRITER'S BOOKSHELF."
—SCOTT TUROW

# THE WRITER'S LEGAL GUIDE

## AN AUTHORS GUILD DESK REFERENCE

### TAD CRAWFORD & KAY MURRAY

THIRD EDITION

# THE
# WRITER'S
# LEGAL GUIDE

## AN AUTHORS GUILD DESK REFERENCE

THIRD EDITION

**TAD CRAWFORD** and **KAY MURRAY**



**ALLWORTH PRESS**
N E W   Y O R K



AUTHORS GUILD

© 2002 by Tad Crawford and The Authors Guild, Inc

All rights reserved. Copyright under Berne Copyright Convention, Universal Copyright Convention,
and Pan American Copyright Convention. No part of this book may be reproduced, stored in a
retrieval system, or transmitted in any form, or by any means, electronic, mechanical, photocopying,
recording or otherwise, without prior permission of the publisher.

Copublished with The Authors Guild, Inc.

Published by Allworth Press, an imprint of Allworth Communications, Inc.,
10 East 23rd Street, New York, NY 10010.

Cover design by Leah Lococo

Book design/typography by Jennifer Moore, Leah Lococo Ltd.
Page composition by SR Desktop Services, Ridge, NY
Printed in Canada

Library of Congress Cataloging-in-Publication Data
Crawford, Tad, 1946–
The writer's legal guide : an authors guild desk reference /
Tad Crawford and Kay Murray.—3rd ed.
p.     cm
Includes bibliographical references and index
ISBN 1-58115-230-2
1  Authors—Legal status, laws, etc.—United States—Popular works.
2. Copyright—United States—Popular works    I. Murray, Kay.    II. Title.
KF390.A96 C734 2002
346.7304′82—dc21
2002002450

08  07  06  05  04  03     6  5  4  3  2

CHAPTER 11

# NEGOTIATING A

# BOOK CONTRACT

If you have received an offer from a book publisher, congratulations! For most authors, it is a mark of great distinction (unless the publisher is a subsidy, or vanity, publisher—see chapter 18). It means that editorial and publishing professionals have reviewed your submission, prepared a statement of projected profit and loss from publishing your work, and have concluded either that the publisher can make a profit from investing in your book, or that it is so remarkably good that it demands to be published, even at a loss. To publish a book is to make a large investment, so the receipt of an offer to publish proves that the publisher has a lot of faith in your work.

Do not panic when you receive the publisher's form contract in the mail. It will be very long and appear to be written in a foreign language—known to some as "legalese." You will see some provisions you recognize—the proposed title of the book, the advance payment you might have previously agreed to—but you will be very tempted to sign on the bottom line without trying to decipher the rest of the document. To protect your interests and your work, you *must* resist that urge.

It is a rookie mistake to believe that your negotiation with the publisher ends when you receive the form contract in the mail, with the major financial terms previously negotiated filled in. In fact, the

negotiation is just beginning. Many other critical terms governing your
publishing relationship appear in the contract, and your agreement on
the advance and royalties has not obligated you to accept these other
terms. No matter how many or how few books you have previously
published, many of these provisions can be negotiated successfully. If
you sign the form contract as you received it, you might well regret it
later because the terms you ultimately accept will govern your rela-
tionship with the publisher for years after the contract is signed.

At the same time, there is always tension between the ideal pub-
lishing contract (for authors) and the attainable one. You will undoubt-
edly find that some of the recommendations here differ significantly
from what your publisher is offering. Select those issues most impor-
tant to your particular needs and concentrate on negotiating the cor-
responding contract clauses in order of priority. Consider a successful
negotiation of your high-priority clauses a significant accomplishment
in today's publishing environment. If you have an agent, he or she
should be knowledgeable about and practiced in successful negotia-
tions, although you owe it to yourself to discuss the negotiation with
your agent while it is ongoing.

Members of the Authors Guild receive a Recommended
Tradebook Contract and Guide and may have attorneys review and
advise them about their contracts at no charge. If you need help
understanding or negotiating provisions and you do not have a liter-
ary agent, you should join the Guild and take advantage of these valu-
able products and services. Any author who has received an offer to
publish his or her book in exchange for an advance and royalties is eli-
gible to join.

Most publishing contracts appear on printed forms called "boiler-
plate," prepared by the publishers and supplied to authors. The terms
of the boilerplate can be changed in each individual agreement simply
by deleting, adding, and revising the language according to the result
of negotiations. *Make sure both parties initial all revisions, additions to, and
deletions from the printed form contract,* or the legal effectiveness of those
changes might be at risk.

This chapter discusses the typical provisions of book publishing
contracts in the order in which they usually appear, not necessarily in
the order of importance (to you), and it suggests some helpful changes.

NEGOTIATING A BOOK CONTRACT **153**

## PREAMBLE

If a contract is offered at an early stage of the project, the publisher might identify the work by describing the proposed content, format, length, and/or market. If the publisher has not seen a draft of the complete work, make sure the description is consistent with your proposal and what you plan to deliver. You might also want to leave yourself some room to maneuver, by not characterizing the point of view of the book, and with descriptions of length in terms of the number of book pages (which can be adjusted by a typesetter) rather than words or manuscript pages.

## GRANT OF RIGHTS

In any publishing contract, the main transaction involves the author's grant of parts of her copyright to the publisher to exploit in exchange for compensation. The grant of rights clause details those rights granted. The rights you grant can be limited as to the media or formats the publisher intends to exploit (e.g., the right to publish and sell paperback editions), territory (e.g., the right to sell in North America), language(s), and duration (e.g. length of the copyright). Because these rights are so valuable, the basic dynamic in the negotiation is that the author seeks to limit the scope of the grant to those rights the publisher can effectively exploit and reserve other rights to herself, while the publisher seeks control of (and a share of the income earned from) the broadest rights possible. The final allocations of control and income will depend on the parties' bargaining strength and ability.

It is certainly necessary to grant the right to print, publish, and sell the work in book formats. Other formats related to print publishing, including abridgments, book clubs, reprints by another publisher, first and second serial rights (magazine excerpts before and after book publication), and sometimes audio books, are usually appropriate to grant, even though the publisher will probably license the right to exploit those formats to a third party. Rights that are not directly exploited by your publisher, but are instead licensed to third parties to use, are known as subsidiary rights, or "sub rights." The grant of rights clause or a separate "Subsidiary Rights" clause will address the allocation of

these rights. By definition, it costs your publisher very little to allow another licensee (called the "sublicensee") to exploit a subsidiary right. For that reason, the publishing contract typically gives the author a large share of the publisher's proceeds from sublicenses. Nonetheless, retaining certain sub rights is useful if you can sell those rights yourself or through your literary agent. Subsidiary rights can include syndication, merchandising uses, films, television, multimedia, and e-books. Foreign territory and translation rights might also be subsidiary rights, unless included in the main grant of rights or reserved entirely to the writer.

The duration of the grant set forth in most publishers' contracts is "the whole term of copyright and any renewals and extensions thereof." A publisher is likely to oppose a shorter term of grant, but the Copyright Act's inalienable right to terminate a grant after thirty-five years makes changing this clause somewhat less important.

### FOREIGN RIGHTS

With publishing conglomerates increasingly going international, many publishers routinely demand exclusive English-language rights in non–English-speaking countries, or "world" rights. Before you grant these rights, scrutinize the royalties the publisher offers for sales in foreign countries. If you grant your U.S. publisher the right to license British Commonwealth or foreign-language editions, consider requiring the publisher first to obtain and match or top the best offer available on the open market, or to allow you to bring in a better offer for these licenses. For all foreign rights, consider requesting a provision that reverts the rights if they are not exploited within a year or two after U.S. publication.

If you have an agent, he or she ought to reserve the rights to sell the work in any language in foreign nations, including Canada, the United Kingdom, Ireland, South Africa, New Zealand, and Australia. If you do not have an agent, then it is acceptable to grant these rights to the U.S. publisher, with the division of income usually approximating 75 to 85 percent to the author and 15 to 25 percent to the U.S. publisher. Be aware that the publisher will typically subtract its expenses, including a foreign agent's commission, from this income before splitting it with the author. Keep in mind that having your agent market

these rights allows you to receive the income without having it applied against your advance. Agents will usually take a 15 to 20 percent commission on foreign rights income to cover both their commission and the foreign agent's commission.

### SUBSIDIARY RIGHTS

Your agent usually places first serial (prepublication magazine excerpt) rights, so reserving them is appropriate. If the publisher takes and places first serial rights, it customarily takes the equivalent of an agent's 10 to 15 percent commission of the income from their sale. Other subsidiary rights publishers can reasonably expect to exploit, whether or not you have an agent, are second serial, book club, reprint, and audio book rights. The division of income for these rights is usually one-half to the author, one-half to the publisher. It is unreasonable for the publisher to take more than a one-half share for *any* subsidiary right.

Most publishers' contracts permit publishers to license publication of selections from the work in anthologies or other publications without your consent. Many authors want to be informed about and to retain approval over where their work will be reprinted, how much will be used, and the reprint fee charged. If this is the case, try to add this provision to your contract.

### NON–PRINT-RELATED SUBSIDIARY RIGHTS

Because of the large amounts that can be earned, established authors and those with agents typically reserve motion picture, stage, television, merchandising, and related rights and receive all the income from them. If you have an agent, he or she will hold on to these rights on your behalf. If you have no agent, the publisher might insist on these rights and it is reasonable to grant them, at least on a nonexclusive basis, but the publisher will probably not ask for (and should not receive) more than 10 to 15 percent (or 25 percent for foreign sales of these rights) of generated income as its share. Some children's book publishers seek up to 50 percent of the income for these rights. Any attempt to take more than that is unusual and unreasonable.

If you authorize the publisher to license these rights, try to retain the right to prior approval of all licenses (especially of those for dra-

matic and merchandising rights; without approval, you might not be happy about who gets these rights and what is done with them), a limit to the number of years the publisher has authority to license the rights, and the royalty accounting provisions of the appendix at the end of this chapter on any licenses granted.

### ELECTRONIC RIGHTS

Because of the rapid development of new media technologies, electronic rights are a potentially valuable source of current and future income for publishers and for those authors who are able to retain and exploit them. The Authors Guild recommends that you negotiate the disposition of electronic rights at the time you negotiate your advance. A furious struggle over electronic rights has been waged the past several years, and most publishers routinely ask for very broad grants of electronic rights. If yours requires you to grant these rights, at least negotiate for some safeguards. Retain the right of approval of any abridgment or anthologizing of the work and over any illustrations, sound, text, or computerized effects added to the work. Because of the ease with which pirates can digitally copy and distribute huge numbers of the work, obtain assurance from the publisher that the work will be protected from unauthorized copying. Licensees should be required to display copyright warnings prominently and to use the best available means to prevent unauthorized copying. Insert a reversion of rights clause for unexploited electronic rights so that if the publisher fails to exploit the rights in electronic formats for a specified period of time, they will revert to you.

Many publishers' contracts provide that royalties for electronic exploitations will mirror hardcover royalties (that is, 10 percent of the retail price, up to 15 percent); this amount does not take into account prevailing market conditions and could damage the economic value to you of the work in other formats. The sale price of e-books is low and the unit costs of production and distribution are dramatically lower than the costs for printed copies. For these reasons, most publishers can be persuaded to follow the lead of Random House, the largest English-language publisher in the world, and pay 50 percent of its net income from sales of e-books.

### RESERVATION OF RIGHTS TO AUTHOR

A reservation of rights clause states that any right not specifically granted in the contract will belong to you and not to the publisher. In connection with this possibility, make sure that any noncompetition clause in the contract does not defeat the purpose of the reservation of rights by limiting your use of a new, or newly popular, method of exploiting the work.

### DELIVERY OF MANUSCRIPT

Be sure to give yourself enough time to deliver the finished manuscript. If your book depends on future events, availability of information, or similar contingencies, it is prudent to add a clause permitting you to extend the delivery date by written notice where circumstances prevent completion within the specified time period. Above all else, remove any words to the effect that the time of delivery "is of the essence." Most courts allow a reasonable grace period for contract performance, unless the deadline is stated in the contract to be "of the essence." In that case, if you fail to deliver by the due date, you have breached. After the contract is signed, if you agree to extend the delivery deadline for any reason, make sure that you get the extension in writing and signed by the publisher.

Beware of clauses requiring the author to provide "all" additional materials deemed necessary "in the publisher's discretion." This leaves you vulnerable to demands for work—an index, illustrations, appendices, for example—that you did not consider when you agreed to the advance. It is much safer to specify in the contract as precisely as possible the materials you have agreed to provide. If you are providing illustrations, consider inserting a clause requiring the publisher to provide insurance against loss or damage to the original artwork and to return it to you when no longer needed. The publisher might require that illustrations be delivered at the same time as the manuscript for art books, children's books, and similar works. Otherwise, allow yourself a reasonable time and grace period to prepare the other materials you have agreed to provide.

Most contracts make the author responsible for obtaining—and paying for—permissions to use others' work in your book. You might

argue that the publisher is better able to pay for permissions, but consider that this might lead to a smaller advance. For anthologies, textbooks, and similar works, publishers often pay part or all the cost of permissions. For more information about obtaining permissions, see chapter 5.

### SATISFACTORY MANUSCRIPT

Almost all publishers' boilerplates contain "satisfactory manuscript" clauses that allow them to reject a delivered manuscript and terminate the contract, despite the work's actual fitness for publication and professional competence. Should this occur, the author will be obliged to repay the advance received. The Authors Guild opposes "satisfactory manuscript" clauses that give publishers complete discretion to reject an objectively competent work after submission. When the publisher agrees to publish a book, it is accepting at least some risk along with the writer. The advance should not be turned into a repayable loan, and the contract should not be treated as an option, by allowing the publisher complete discretion to reject manuscript creates. If the clause requires that the manuscript be "satisfactory to the publisher," the publisher's subjective judgment that the manuscript is not "satisfactory" will not be set aside, unless it can be proven that the publisher acted in bad faith. Publishers know that proving "bad faith" is difficult. Thus, your editor's departure from the publisher, a competing work by another author, a decrease in the general interest in the subject, or a change in the publisher's financial plans could lead the publisher to reject a publishable manuscript. As a realistic compromise, state that the manuscript must be "acceptable to the publisher in form and content" or "satisfactory in the publisher's editorial discretion" as opposed to "sole discretion." You can also protect yourself against the specter of contract termination under the "satisfactory manuscript" clause with provisions such as limitations on your advance repayment obligation, a requirement that the publisher must give you written editorial assistance and the opportunity to submit revisions before rejecting, and an accurate, specific description of the work envisioned in the preamble and delivery clauses.

If the publisher made you an offer on the basis of an entire manuscript draft rather than a proposal, indicate that the satisfactory man-

uscript "has been delivered," or that it will be deemed satisfactory after minor editorial changes have been made. Consider stipulating that you may submit portions of the work in progress, and the publisher shall indicate whether each portion is satisfactory within a reasonable time after receipt. Stipulate that if any portion of the advance must be repaid upon rejection, it will be paid only from proceeds of a subsequent publishing contract with another publisher for the same book (a "first proceeds" clause). Some contracts provide that repayment shall be made from proceeds of subsequent contracts or by a specified date, whichever occurs first, but that does not limit the author's obligation to repay if no new contract has been obtained by the deadline, or if the proceeds received from a new contact do not equal the advance to be repaid. At least try to delete the requirement to repay by a specified date.

Some contracts have been terminated by publishers in recent years because of the financial prospects of a manuscript; changes in a publisher's management, business policies, or financial condition; or because the publisher feared that intervening events had diminished the appeal of the work. None of these circumstances justify termination under a clause requiring that the manuscript be "in form and content satisfactory to the publisher." Nevertheless, if you can keep the entire advance and quickly end the contract, thus freeing you to negotiate with another publisher for the work, you might be better off allowing termination instead of having the book remain "in limbo."

Finally, provide that if the contract is terminated despite your delivery of a satisfactory manuscript, you will be entitled to receive and retain the entire advance, as well as automatic reversion of all rights.

### WARRANTIES AND INDEMNITIES

This provision is your promise to the publisher that you own the work and that the work does not infringe on anyone else's rights or cause harm to anyone. If you fear any such accusation arising out of publication of the work, you should discuss it with your publisher and try to work together to eliminate the risks of suit. Many publishers' contracts require the author to indemnify them not only against judgments resulting from the author's breach of warranties, but also against any "claims and demands." Try to limit your obligation to damages recovered in a suit against the publisher resulting only from an actual

breach of your warranties. Be advised, however, that most publishers are stubborn about changing their warranty and indemnity clauses. You must evaluate the legal risks of your project when weighing the importance of this clause. If you are writing on a controversial subject or person, you have good reason to ask the publisher to eliminate the indemnity clause completely with respect to libel and invasion of privacy suits. If the book contains material written by others, for example, if it includes an introduction or substantial quotations, consider adding language that excludes this material from your representations and warranties. Indemnity clauses should never apply to parts of the book that were added as a result of suggestions, corrections, or additions made by an editor or other employee of the publisher.

Most publishers extend insurance coverage to their authors under their own media liability policies. Particularly if your work might offend a potential plaintiff, be sure to raise this issue during contract negotiations. If the publisher agrees to add you as an insured to its policy, make sure that promise appears in your contract and try to limit your share of the deductible to a portion of the first $3,000 in damages, or a percentage of the advance, whichever is lower. If the publisher will not provide libel insurance, or if it requires you to pay the entire deductible, which is usually quite high, consider obtaining your own liability insurance. In practice, publishers often pay for legal expenses, settlements, and judgments resulting from suits, especially meritless suits. Publishers might choose to collect some of their expenses when the author is highly successful. In close cases, some publishers might seek to recoup their costs from royalties earned.

## COPYEDITING, PROOFREADING, AND CORRECTION OF PROOFS

Copyediting changes can range from punctuation, grammar, spelling, and capitalization to correcting errors of fact or manuscript inconsistencies. Because changes might be substantial, copyediting should be subject to your review. You should have the right to approve any substantive changes to the manuscript, although the publisher might insist that approval not be "unreasonably withheld." Most publishers will ask you to pay the cost of "author's alterations" to page proofs that exceed 10 percent of the cost of composition of the proofs.

## PUBLICATION

Most contracts require the publisher to *publish* (that is, print and distribute) the work within twelve to eighteen months of acceptance of the manuscript, or up to twenty-four months for smaller publishers or children's picture books. Any period longer than that is unreasonable. If you can, provide that if the publisher fails to publish the trade edition within the applicable time period, you may terminate the contract, recover all rights granted, and keep the advance without prejudice to your right to sue for additional damages. Art books and children's picture books are especially vulnerable to open-ended publication clauses that depend on the selection of the artist and completion of the artwork, two details that fall outside the author's control. Negotiate deadlines for these events; otherwise you could wait many years for publication.

Most contracts allow the publisher to publish the work "in a style, manner, and price" that they determine unilaterally. The author's right to consult on retail price and print runs is likely out of the question for all but the most powerful authors. However, title, design, and artwork can be crucial elements of the book, making your right to consult over or even approve of these elements important, and publishers will often agree to change the title only with the author's consent, and to consult with the author about the format and style of the text, graphic material, and cover.

Marketing and promotion are the areas in which most publishers almost universally frustrate their authors. If your contract contains no specific provisions for promotion, author's travel and tour, and publicity, you can expect very little from the publisher beyond a listing in its catalog, and perhaps the mailing of promotional copies. If the advance offered is more than $25,000, it is worth discussing an advertising budget and promotional plans. The Guild recommends that you add as much about publicity as possible into the contract and that you plan on making your own publicity efforts. If a tour is promised, insert it into the contract, including the number and names of cities and the proposed travel budget and timetable.

### *COPYRIGHT REGISTRATION*

The contract should require the publisher to register the copyright with the Copyright Office in your name within three months of pub-

lication. This requirement is very important for full copyright protection. Registration filed later than three months after publication (unless you previously registered the manuscript) would bar the recovery of statutory damages and attorneys' fees in cases of copyright infringement. Do not allow the publisher to take your copyright or to publish the copyright notice in any name other than yours. Except in very unusual circumstances, this practice is not standard in the industry and harms your economic interests. No reputable publisher should expect you to agree.

## PAYMENT

### ADVANCE

The *advance* is a sum of money paid to the author before the book is published that is then deducted from the book's earnings. No royalties are paid until the publisher recoups the full amount of the advance. Advances vary considerably, depending on such factors as your reputation as an author, the success of your last book, the subject matter, the audience, the illustrator's reputation (for children's books), and the likelihood of book club and paperback licenses. Try to learn from your editor the publisher's projected first year's sales and expected retail list price, both of which the publisher calculates before making you an offer. The advance normally reflects royalties on projected first year sales, at least. Sometimes the author's share of projected first year subsidiary rights income is included in the advance. Frequently, the publisher determines the amount of the advance after assessing whether licenses can be sold, or even after completing deals for them. Again, it is worth your while to try to find that out from your editor before you agree to the advance.

Negotiate for as large an advance as possible. The advance is your only hedge against the risk that your years of work might produce a commercial failure. Through the advance, the publisher shares this risk. The higher the advance, the greater the publisher's incentive to increase the size of the first printing and the advertising and promotion budgets. Generally, publishers promise to pay one-half of the advance on signing and the balance on acceptance of the manuscript. To avoid long payment delays, it is important to limit the publisher's

time to accept the manuscript or respond with specific comments after delivery. Avoid agreeing to wait for publication to receive any payment (if the advance is large, however, the publisher might insist on this). Never agree to return an unearned advance except for failure to deliver a satisfactory manuscript.

### ROYALTIES—HARDCOVER TRADE BOOKS

For adult trade hardcover books, publishers typically offer 10 percent of the retail price for the first 5,000 copies sold, 12.5 percent on the next 5,000 copies, and 15 percent on all copies sold in excess of 10,000. Established authors can often obtain better terms, such as 10 percent on the first 5,000 copies and 15 percent thereafter. The primary royalty rates in most trade book contracts are based on suggested retail (or "list") price of each book sold. Avoid royalties that are based on "net" (or wholesale) price, or increase the rate accordingly over those recommended here. "Net receipts" means the amount the bookseller or wholesaler actually pays to the publisher, so net-based royalties usually are 40 to 50 percent lower than list-based royalties computed on the same percentage rate. For example, when a book is sold at a 43 percent discount, a 15 percent royalty on the list price is equivalent to a 26.3 percent royalty on the net price.

### ROYALTIES—CHILDREN'S BOOKS

Royalty rates for children's books are often the same as those for adult trade books. The author of young-adult books should negotiate for the same royalties as for adult trade hardcover, trade paperbacks, and mass-market paperbacks. The royalty escalations for books for younger children (up to about eight years old) are sometimes set at higher numbers sold, for example 10 percent on the first 10,000 copies, 12.5 percent on the next 10,000 copies, and 15 percent on all copies in excess of 20,000. When illustrations represent a significant portion of the work (in which case the book is referred to as a "picture book"), the illustrator usually receives half the advance and half the royalties and has a separate contract with the publisher comparable to the text author's. Some children's book contracts provide that the royalty for library editions is based on "net receipts" (the wholesale price), rather than on retail list price. Authors should try to delete such a provision and match

the royalty for the library-bound edition with that of the trade edition, because a substantial part of the book's total sales could easily be in this category.

## ROYALTIES—TEXT AND EDUCATIONAL BOOKS

Royalties for professional, scientific, and technical books are customarily based on the net price instead of retail price. The publisher's discount to distributors and retailers for textbooks is in the range of 25 to 33⅓ percent, so the effect of a net-based royalty is not as bad as it would be for trade books. A typical royalty rate might be 15 percent, but keep in mind that a substantial part of the sales are likely to be mail order, library, or export, so try to increase the rates for such sales. For college textbooks, the royalties are also based on net price, and the standard discount to bookstores is 20 percent (although some publishers offer as much as 33 percent). On a hardcover textbook, try for 15 percent of net on sales up to a specified number of copies (perhaps between 7,500 and 15,000), and 18 percent thereafter. Textbooks often have their best sales in the first few years after publication, so escalations for sales over a given number of copies in each calendar year are another possibility. An original paperback textbook might have royalties in the range of 10 percent to 15 percent of the net price.

## TRADE PAPERBACK ROYALTIES

The typical initial royalty rate for "quality" trade paperback editions (as distinct from "mass market" paperbacks) is at least 6 percent, with an escalation to at least 7.5 percent at 10,000 copies (or fewer, if the first printing is less than 10,000 copies). Sometimes, a flat rate of 8 percent is offered. Some authors are able to do better. For example, one might receive 7.5 percent up to 20,000 copies and 10 percent thereafter, or a three-tiered escalation. The advantage of permitting the hardcover publisher to issue its own paperback edition, as opposed to sublicensing it, is that you do not share the royalties received from the paperback publisher; the disadvantage is that you are not paid a separate advance for the paperback edition. In negotiating the grant of rights provision, request an addition to your advance if the publisher prints the paperback edition.

### MASS-MARKET ROYALTIES

Mass-market books are the cheaper paperbacks you find for sale at newsstands, airports, and grocery stores. So-called genre fiction titles, such as category romances, westerns, and science fiction, are often published in this format only, while bestsellers are often published in this format after hardcover publication. Most publishers agree to pay an initial royalty of at least 6 to 8 percent on sales of up to 150,000 copies and 10 percent thereafter. Established authors sometimes negotiate rates of 8 or 10 percent up to 10 or 12 percent, or more, or receive a three-tiered escalation.

### "DEEP DISCOUNT" ROYALTY RATES

Most contracts provide that when a discount of more than 50 percent or so is given to a distributor or retailer, royalties on those copies are reduced to 10 percent of the publisher's *net* receipts. This "deep discount" provision could sharply decrease your royalties and puts far too much control over your royalties in the publisher's hands. An unscrupulous publisher could actually increase its profit, and give the bookstore a better deal, by selling at just enough of a discount to cut your royalties by more than half.

Larger bookstore chains now demand discounts of up to 55 percent or higher. Try to specify that the decreased royalty rate applies only when the deep discount is given "to a purchaser not ordinarily engaged in the business of bookselling" (this is known in the industry as a "special sale"). This might not be easy to accomplish, since publishers want to slash royalties for both special and deep discount sales. If the publisher resists, find out the publisher's standard discount to the big chains for books like yours and push to increase the triggering discount percentage beyond that standard by at least a few percentage points. Another important—and realistic—change you could make is to reduce your royalty rate by one-half of 1 percent for each 1 percent that the publisher increases the discount over the triggering percentage. Many authors have successfully negotiated this kind of "shared-loss" royalty provision. See the Authors Guild Recommended Tradebook Contract and Guide for the appropriate wording if your publisher cannot provide it. Publishers' contracts vary in their provisions for royalties on mail order, book club, export, and other sales out-

side normal trade channels. The publisher's standard rates could be increased through negotiation, and it is certainly worth attempting, especially if your book is likely to sell many copies through these channels. Finally, if you grant the publisher world rights, strive to avoid reductions in royalties for exports.

## REMAINDERS

*Remaindered* books are overstock copies that are sold to special remainder houses and resold to consumers for one-tenth to one-half the retail list price. Most contracts offer to pay the author 10 percent of the gross price received for the sale of remainders, a scant amount. An alternative would be to require the remainder purchaser to pay you the hardcover royalty on the "new" retail price it sets on the book, or to renegotiate percentages with the publisher prior to overstock sales. Because income from such sales is usually minuscule, you might prefer to purchase the copies to be remaindered and arrange for their distribution via the Authors Guild's Backinprint.com *(www.backinprint.com)* online bookstore, or on your own. If so, require the publisher to notify you before it remainders the work and to allow you to purchase the remaining copies at cost or at the remainder price. If you grant the publisher the right to publish mass market or trade paperback editions, make sure any favorable revision of the remainder clause covers each edition.

## ACCOUNTING AND STATEMENTS

Most trade publishers send semiannual statements and payments accounting for your book's sales and royalties and license fees owed to you. Some smaller presses offer quarterly accounting and payment, and this is a good goal to work toward. In no event should you accept accountings and payment less frequently than twice a year. Otherwise, it is the publisher—not you—that is earning interest on your money. Accounting periods might depend on your publisher's fiscal year. It is not uncommon for publishers to send statements and payments two or even three months after the end of the accounting period. Some publishers will agree to disclose the number of copies of the work that were printed, bound, and given away, as well as the number of copies on hand at the end of the accounting period, either in the statements themselves, or upon your request. Indeed, that information will cer-

tainly have to be revealed if you exercise your right to audit the publishers' records. In any event, review your royalty statements carefully and do not hesitate to ask your publisher for any information needed to verify the statement's accuracy. Royalty statements should include the subsidiary rights income received in each rights category as well as the name of the licensee.

Virtually every publisher's contract permits it to withhold a reserve against returns, that is, to retain some of the money otherwise owed the author in order to avoid overpayment for returned books. Royalties are not due on returns, because almost every publisher refunds retailers and distributors in full for returned books. If the reserve is too high, or if it is held for too long, authors lose the use of money actually owed to them for an unacceptable period of time. Amounts withheld often far exceed any reasonable estimate of future returns or the amount of copies actually returned. The Guild's recommended reserve against returns for hardcover books is no more than 15 percent of reported sales in a given accounting period. This percentage reflects the general industry reserve for hardcover trade editions, and you should try to negotiate this ceiling into the clause. The reserve percentage is higher—30 percent or more—for paperback editions. You might find that the publisher will argue for a higher or even unlimited percentage. If the publisher's boilerplate states merely "reasonable reserve," you are somewhat protected, though not as well as if you negotiate a specific percentage limit. The Guild's recommendation also limits reserves to the first three accounting periods or eighteen months after initial publication, whichever is shorter. After that, publishers have no reason to be receiving significant returns.

### JOINT ACCOUNTING

Some publishers' form contracts provide that amounts the author owes the publisher under contracts for other books may be deducted from payments due the author under the current agreement. Some publishers might even claim this clause entitles them to deduct unearned advances on other books (though this is not a reasonable claim if the advances were deemed "nonrefundable"). Even reasonable readings of such "cross-collateralization" or "joint accounting" clauses would allow the publisher to deduct from this book's earnings amounts owed by

you for page-proof alterations, permissions payments, copies of books purchased, or other obligations associated with different books.

Joint accounting provisions are unfair and should be stricken from contracts wherever they appear. If a publisher refuses to delete the clause, modify it to exclude withholding of any portion of the current advance, or any portion of the advances or royalties paid by paperback or book club publishers for rights in the current book. Finally, specify that unearned advances from other contracts will not constitute indebtedness to be repaid out of earnings from the current contract.

### SUBSIDIARY RIGHTS PAYMENTS AND ACCOUNTS

The complexities of subsidiary rights accounting have plagued publishers for years. The result has been grossly inadequate and undocumented payments to authors for their income share for licenses such as book clubs, foreign publishing, and audiotapes. Publishers have revealed—under pressure—that their licensees routinely issue inadequate and inconsistent reports with their payments to the publisher.

In response to this problem, a committee of the Book Industry Study Group, which included publishers, royalty accountants, authors, and authors groups representatives, drafted the Subsidiary Rights Payment Form that appears as the appendix at the end of this chapter. Try to provide that the publisher will require sublicensees of your work to include this form with their payments. Publishers endorse this system because while simple, it allows them to collect previously unpaid dollars in subsidiary rights income, and to keep accurate accounts of what they owe to their authors.

### EXAMINATION OF THE PUBLISHER'S RECORDS

Most publishers' contracts give the author the right to audit its records regarding the book's financial performance; if yours does not, it is very important to add a right to audit to the agreement. Take care to ensure that the audit clause allows either you or your representative to conduct the examination and that it does not limit whom your representative may be. The obligation of the publisher to pay your examiner's fee if the audit reveals that it erred to your detriment by more than 5 percent is typical. Insist on it. Finally, do not let the publisher limit the time you have to examine the records for a given period. You should

be able to detect and object to a discrepancy on your statements for as long as the discrepancy exists.

## FREE COPIES AND AUTHOR'S DISCOUNT

At least twenty-five free copies and a 40 percent discount rate is common for hardcover trade editions. This clause in publishers' boilerplates often requires that copies purchased must be for the author's "own use, and not for resale." If you anticipate situations in which you will want to have copies on hand for resale, negotiate that use into the contract.

## REVISED EDITIONS

Publishers' contracts for textbooks, technical books, and some children's books often contain a provision requiring the author to make revisions for a new edition at the publisher's request, sometimes without further payment (beyond continued payment of royalties, of course). They do not belong in contracts for novels and the like, so strike a revised editions clause, unless it is appropriate for the kind of book you are publishing. The typical boilerplate version states that if the author will not or cannot make the revisions, the publisher can retain the services of another author and charge that person's payment (on a flat fee or royalty basis) against your royalties. To protect yourself from losing control of your work and the money owed you, try to ensure that the publisher's requests for revisions shall be subject to your approval; that if revisions are made by another author, the selection of the second author shall be subject to your approval; that in no event shall your compensation be reduced below a specified minimum; that the credit to be given to you and to the subsequent author in connection with the revised edition shall be subject to your approval; and that you shall have the right to remove your name from the later edition if you wish.

## OUT-OF-PRINT PROVISION

Any reasonable publisher will include in its boilerplate an *out-of-print clause* (also called a "reversion of rights" clause). The out-of-print clause

is designed to encourage your publisher to keep the work selling
for as long as it is profitable—for both parties—by providing for
reversion to you of the rights granted when the work is no longer
in print. When the publisher no longer chooses to invest in print-
ing, distributing, and marketing the work, then it should no longer
have the right to profit from it (except the right to profit from
third-party licenses already made). Your book should therefore be
deemed "in print" only while copies of an English-language hard-
cover or paperback edition are readily available and offered for sale
in the United States through regular trade channels and are listed
in the publisher's catalog. It is important to make the definition of
"in print" as close to this description as possible. Many publishers'
contracts do not define "in print" at all, and the publisher could use
that obscurity to argue that the existence of a foreign edition or
nonprint version makes the work "in print" and prevents you from
reclaiming U. S. rights. If digital formats (including "print-on-
demand") can make your book "in print," then stipulate that the
author must earn at least a certain amount in royalty payments (say,
$300 to $500) each accounting period from these formats to pre-
vent reversion of rights.

Try to provide that rights will revert automatically if the publish-
er fails to place the work back into print upon request. This is better
than having to rely on the publisher to prepare and mail a confirma-
tion of reversion.

## BANKRUPTCY

Once a bankruptcy petition is filed, control over the publisher and its
assets are in the hands of the bankruptcy court. All rights in the work
held by the bankrupt publisher are considered assets, and no bank-
ruptcy clause in a contract can override the court's control over those
assets. For that reason, do not expend too much capital over negotiat-
ing a bankruptcy clause. Other kinds of financial calamity for a pub-
lisher do not lead to court control, however, so it is worthwhile to
provide that your rights will revert upon the publisher's insolvency or
failure to remit royalties due for a specified period of time.

## TERMINATION

Unless you provide for this right in the contract, you may not terminate the contract, even if the publisher breaches important obligations—such as the duty to pay you. Your remedy under the law for a breach is limited to money damages, and you might need to sue or threaten suit to receive them. Therefore, it is a good idea to get a right to terminate if the publisher fails to provide statements of account, make required payments, or publish within its deadline.

## AGENCY CLAUSE

If an agent represents you, he or she will likely make sure that an agency clause is added to the publishing contract. The usual clause authorizes the publisher to make all payments to the agent for the author's account and allows the agent to keep his or her commission from the payment for the author. You should negotiate the material terms of this clause with your agent *before* the agent negotiates the publishing contract for you. The publisher will probably not argue the terms of a typical agency clause. The clause must confirm any separate agency agreement you have, so read it carefully before signing the contract.

## ADJUDICATION OF DISPUTES

The Authors Guild recommends that a publishing contract provide that disputes arising out of the publishing agreement be determined by arbitration instead of litigation. Arbitration is cheaper, simpler, and quicker than litigation; for simple cases, lawyers are not needed. For that reason, large publishers will often strenuously resist arbitration clauses, because they can afford the cost and delays of litigation better than authors. Smaller publishers, however, might agree more readily.

## OPTION CLAUSE

Do not be fooled by the glamorous sound of the word. Options favor publishers only, not authors. An option clause gives the publisher the

THE WRITER'S LEGAL GUIDE **172**

privilege of publishing your next book or books—but only if it chooses to do so. No option clause obligates the publisher to do anything in your favor—not even to read your next book. Options bind you to the publisher for your subsequent works, even if the current publishing relationship proves unsatisfactory to you, or the publisher's performance is inadequate, or your editor leaves, or better terms can be obtained elsewhere, or the publisher falls into a perilous financial position. Options prevent you from considering other publishing opportunities for a period of time that is often wholly dependent on the first publisher. This could impede or injure the progress of your career. From the publisher's perspective, investing in the first book of an unknown writer is very risky, but if it stands to gain from publishing future works of the writer, the investment is less risky. Even so, many publishers are willing to delete the entire option clause upon request. If your publisher refuses to strike it entirely, it is very important that you negotiate some revisions to the boilerplate option provision to eliminate the more damaging features of these arrangements.

You might encounter different kinds of option clauses: same terms and conditions, terms to be mutually agreed upon, right of first refusal, no less favorable terms, or right of last refusal. Options to publish your next work on the "same terms" as the previous contract and "last refusal rights" (allowing the publisher to acquire the work by matching other offers the author has received) eliminate your ability to negotiate terms of your next publishing contract. Change such terms to permit the publisher a limited-time "right of first refusal," on terms "to be mutually agreed upon" at the time the second contract is negotiated. Provide that the author must submit only a summary or proposal of the optioned work, not a complete manuscript. The latter requirement would require you to write an entire manuscript without an advance or a guarantee of publication. You should be allowed to submit the proposal or summary of the next work, and the publisher should have to decide whether or not to make an offer for the work, within a short time after submission or acceptance, not publication, of the current manuscript. Try to limit the option to cover only books specifically similar to the current work (e.g. "biography for children" or "computer industry study").

## NONCOMPETE CLAUSES

Publishers' boilerplate contracts often contain clauses restricting the author from publishing another book based on the material in the current work, or from publishing material competing with the sale of the current work. A broadly worded noncompetition clause can cause considerable harm. Depending on the scope of the subject matter forbidden to you, the publisher might claim that the characters in a novel or children's story may not be used in sequels and prequels, or that the author of a textbook may not write other works on the same subject, or that one cookbook or other specialized work is all that an author may write without the publisher's release from the noncompetition clause. Though such claims might be held unenforceable in court because judges require that these terms be reasonable in scope and not unduly restrictive, it is obviously better to limit the publisher's ability to make such a claim.

The type of work to which the clause applies should be described as specifically as possible as to subject matter, market, and format. Do not give the publisher the discretion to decide whether a work will compete with the contracted book—limit the restriction to works that will actually compete with the primary work. In addition, adding the following sentence to the noncompetition clause may provide helpful qualification:

> It is understood that the author will continue to write and publish _____ books in the field of _____ . This provision is in no way intended to prohibit or limit such publications.

THE WRITER'S LEGAL GUIDE **174**

## APPENDIX

(To be sent by Publisher to licensees)

## SUBSIDIARY RIGHTS PAYMENT ADVICE FORM

This form must be completed and attached to your check or faxed to this number: _____ when you send payment pursuant to licenses granted by us to you.

Failure to do so may result in our inability to record your payments and prevent us from determining that you are in compliance with the terms of your license(s).

◆ Amount remitted: _____

◆ Check or wire transfer number: _____

◆ Check or wire transfer date: _____

◆ (for wire transfers) Bank and account number for which moneys were deposited: _____

◆ Publisher/agent payor's name _____

◆ Title of the work for which payment is being made: _____

◆ Author(s) of the work: _____

◆ Our Unique Identifying Number for the work as it appears in the Appendix to the relevant contract. If none, the original publisher's ISBN number of the work: _____

◆ The period covered by the payment: _____

The following information will be very helpful, so we ask that you also provide it:

◆ Reason for payment (guarantee earned royalty, fee, etc ): _____
_____

◆ Payment's currency: _____

NEGOTIATING A BOOK CONTRACT **175**

◆ Type of right (book club, reprint, translation, etc.): _____

_____

_____

◆ Summary justification of your payment:

Gross amount due: _____

Taxes:                  _____

Commissions:       _____

Bank charges:       _____

Net amount paid:  _____