# EXHIBIT 3



Case 1:05-cv-08136-DC   Document 994-3   Filed 12/22/11   Page 3 of 12

 **Professional Business Practices in Photography**

SEVENTH EDITION

*American Society of Media Photographers*


Allworth Press


AMERICAN SOCIETY OF
MEDIA PHOTOGRAPHERS

© 2008 ASMP

All rights reserved. Copyright under Berne Copyright Convention, Universal Copyright Convention, and Pan-American Copyright Convention. No part of this book may be reproduced, stored in a retrieval system, or transmitted in any form, or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior permission of the publisher.

12  11  10  09        5  4  3

Published by Allworth Press
An imprint of Allworth Communications, Inc.
10 East 23rd Street, New York, NY 10010

Cover design by Derek Bacchus
Interior design by Kristina Critchlow
Page composition/typography by Sharp Des!gns, Lansing, MI
Cover photograph by Arnold Newman. Photo courtesy of Getty Images.
          *"We don't take pictures with our cameras, we take them with
          our hearts and our minds."* —Arnold Newman
Arnold Newman, ASMP Member #181, was a unique and visionary master of the art of photography. He created and took to its highest form the genre of the environmental portrait. We are all in his debt not simply for his creative genius but also for his good business sense and courage.

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA
ASMP professional business practices in photography / by the American Society of Media Photographers ; [edited by Susan Carr]. — 7th ed.
     p. cm.
Includes bibliographical references and index.
ISBN-13: 978-1-58115-497-9
ISBN-10: 1-58115-497-6
1. Photography—Business methods. 2. Commercial photography. I. Carr, Susan.
II. American Society of Media Photographers.
TR581.A86 2008
770.68—dc22
                        2008021021

Printed in the United States of America

Case 1:05-cv-08136-DC   Document 994-3   Filed 12/22/11   Page 5 of 12

CHAPTER 3

# How to Write a License

**by Jeff Sedlik**

ASMP member Jeff Sedlik is a commercial photographer of twenty-five years experience. Clients include Nike, FedEx, Sony, AT&T, Blue Cross, Paramount Pictures, Microsoft, Toyota, MTV, Bank of America, and many others. Sedlik recently served as president of the Advertising Photographers of America and now serves as president of the PLUS Coalition. Sedlik also provides expert witness and consulting services in matters related to professional photography. A recipient of the 2005 International Photography Council's Industry Leadership Award, Sedlik was named 2006 Photography Person of the Year by PhotoMedia and 2007 Photography Industry Advocate of the Year by APA. *www.sedlik.com.*

———————————•———————————

LICENSE DESCRIPTIONS ARE USED IN ESTIMATES, INVOICES, PROPOSALS, CORRE-spondence, and other documents to communicate the scope of usage allowed for a particular image or group of images. An image license typically defines a grant of one or more of your exclusive rights under copyright law: to reproduce, distribute, transform, display, and/or perform your photographs. In granting a license, you are the "licensor" and your client is the "licensee."

In describing a license, the goal is to:

- Grant (or offer to grant) your clients an agreed scope of usage, permitting only specified usages, while constraining all other usages.
- Ensure that your clients and others reading the license will precisely understand what they can (or cannot) do with your photographs.
- Protect your photographs from unlicensed usage.

A license description should include the parties, permissions, constraints, requirements, conditions, image information and other relevant information. The wording should be clear and concise. If you are not an attorney, don't try to write like one. Just state the information in simple terms, to communicate the image usages that you are offering to grant to your client.

While it is common to write a license description in paragraph form, the accuracy of such descriptions relies entirely on a photographer's ability to structure sentences in such a way as to permit only certain usages. This might seem easy, but accurately representing a license in paragraph form can be challenging. In such descriptions, misplaced punctuation or swapping *and* for *or* can have a very significant effect on the rights granted. The interpretation of such paragraphs by clients is highly subjective and can lead to misunderstandings that can destroy client relationships and even result in unintentional infringement.

To address this issue, the ASMP and other associations representing photographers, illustrators, ad agencies, designers, publishers, museums, libraries, and educational institutions formed the PLUS (Picture Licensing Universal System) Coalition to develop international standards for the communication of image licenses. By using PLUS terminology to describe your licenses, you will allow your clients to rely on standard definitions approved for use by all industries.

We recommend that you write your license in list form, rather than in paragraph form. This method will minimize misunderstandings, allowing anyone to easily read and understand the allowed usages of your images. The PLUS standards define numerous fields for your use in writing image licenses. We provide examples and recommendations below.

**THE PARTIES**

When defining a license, it is important to establish the names of the relevant parties. These typically include the licensor (the party offering the license), the licensee (the party receiving the license), and the end user (the party that will ultimately use the image).

**MEDIA PERMISSIONS**

This is the central element of the license description. It is an accurate description of the media in/on which you will permit your client to use the image, and the extent to which your client may use your image in that media.

- **Media:** Describe the category/type of media in which your image may be reproduced. Example 1: *Consumer magazine advertisement.*

- **Distribution format:** State the format in which the specified media may be distributed. Example 1: *Printed.* Example 2: *Electronic download.*
- **Placement:** State the locations/positions at which your image may appear in/on the specified media, and state the maximum number of placements permitted in each instance of that media. Example 1: *Single placement on the front cover.* Example 2: *Multiple placements on cover and interior.*
- **Size:** State the "image size"—the maximum size at which the image may be reproduced in/on the specified media. Example 1: *up to one-half page.* Example 2: *up to 8½" × 5½".* Where applicable, also state the "media size"—the maximum size of the media on which the image may be reproduced or the maximum size of the reproduction of the design in/on which the photograph is reproduced in/on the specified media. Example 1: *full page.* Example 2: *8½" × 11".*
- **Versions:** State the maximum number of design versions, editions, or issues in/on which your image may be reproduced. Example: *First edition only.*
- **Quantity:** State the maximum number of reproductions of your image that may be distributed or displayed in the specified media. This may be stated as the total copies distributed or displayed. Example 1: *10,000 brochures.* For magazine or newspaper advertising, multiply the number of insertions of the advertisement times the circulation of each magazine in which the advertisement will be inserted. Example 2: *Total circulation of 850,000.*
- **Duration:** State the scope of the time period during which your client may exercise the license. Example: *Six months.*
  Region: State the geographic locations in/to which your image may be distributed or displayed in/on the specified media. Example: *Philadelphia only.*
- **Language:** State the language/s of text that may be reproduced in the specified media in/on which your photograph is reproduced. Example: *English only.*
- **Exclusivity:** State the exclusivity provided. Example: *Non-exclusive.*

**CONSTRAINTS**

In addition to listing the media permissions, also describe any limitations that further constrain your client's right to use the image within the stated media.

- **License start date:** The date on which the license commences. This is different than the duration and must be stated separately. It is among the most important and critical elements of your license description.

- **License end date:** The date on which granted rights expire. The license start date plus the duration equals the license end date. It should be stated separately from the duration and license start date, leaving no ambiguity.
- **Media constraints, region constraints, product/service constraints, if applicable:** Specific limitations on or exceptions to the licensed media. Media example 1: Sports Illustrated *only*. Media example 2: *Only at the following URL: www.acmedeoderant.com/specialoffer*. Region example: *Only in South Pasadena*. Product/service example: *Only for Acme Deodorant*.

### REQUIREMENTS

State any requirements or obligations that are placed on your client under the license. Examples include a credit line requirement and the credit line text.

### CONDITIONS

State any additional terms and conditions applying to the license. We suggest that you copy the ASMP terms and conditions onto the back of your estimate or invoice documents, or include them as an additional page in electronic versions of those documents.

### IMAGE INFORMATION

One of the most critical elements of any license description is the description of the image or images that are associated with the license. Without a stated quantity of images, your client may assume that the license allows usage of all images captured. The license description should precisely define or identify the quantity of images that may be used under the license. When you are generating a license description for a stock image invoice, this is a simple matter. However, describing a proposed license on an estimate for commissioned work that has not yet been created can be more challenging. Under some instances, a client may not know the exact quantity of images that might be used. In that case, determine an approximate and mutually acceptable maximum quantity of images, and state that maximum in your license description. If you then proceed to create additional images that the client finds valuable, he may later license those images separately. In the image information of your license description, describe the quantity of images included in the license, and where applicable describe the images by image title and/or image file name.

### LICENSE INFORMATION

It is often helpful to note the transaction date, the client's purchase order number, and other relevant information on your invoice.

**ADDITIONAL TIPS**

ABOUT DURATION

The duration of your license is a window of opportunity during which your client has the right to make use of your image under the license. The extent to which your client elects to make use of the licensed rights during that period is entirely up to him. When the license expires on the end date, your client cannot continue to reproduce, distribute, display, transform, or perform your images, unless he acquires additional licensed rights. If during the license period your client elects not to make use of the images or elects to make use of only a portion of the rights granted, this is his choice, and has no bearing on the license fees paid by your client to you. For this reason and others, it is essential that you state a duration, start date, and end date in every license. Example: Client licenses the right to print 10,000 brochures and to distribute the brochures for one year. If after one year, the client has mailed out only 8,000 brochures, the remaining 2,000 brochures cannot be distributed without an additional license.

ABOUT SIZE

It is important to clearly define not only the size at which your image may be reproduced, but the size of the media in/on which your image may be reproduced. The sizes may be relative (percentages/fractions) or absolute (specific maximum measurements). License fees are typically based on the scope of usage granted under the license. It follows, then, that smaller usages are associated with a lesser fee than larger usages. Stating the media size alone is not fair to your client, as your image may occupy only a portion of that media size. For example, if there are two photographs reproduced on a large billboard, one of which is full bleed and the other of which is a smaller insert, basing the fee for each image on the size of the billboard alone would be unfair to the client. For this reason and others, it is appropriate to state both a media size and an image size in your license description, where applicable.

Because Flynn employs a usage licensing system and protects his copyright, he generates income with relicensing: "Somewhere between 40 percent to 50 percent of my clients relicense work that they have previously commissioned. I don't release my assignments to stock because models and their agents are [usually] unwilling to sign models releases allowing us to do so."

His last piece of advice for photographers transcends his specialty:

> In my specialty and any other specialty for that matter, if you want to be in business for a long time you need to be more than just a talented photographer. It is essential to be a good businessperson because photography is a business first and taking pictures second. I tell all my emerging assistants that the most important purchase they will ever make is not an expensive camera or new souped-up computer but a good accountant who will help keep their business and finances in healthy, compliant order.

**PHOTO-JOURNALISM**

Jeff Pflueger is a freelance photo-journalist who shoots primarily for magazines and the *New York Times* from his base in the San Francisco Bay Area. His main focus is travel-related imagery and he has been shooting professionally, and always as freelance, for five years.

One of the first things he mentioned as important for anyone interested in following in his specialty was very practical: have "a backup system that will work for you in the field, light and fast, and a good camera bag."

Perhaps less pragmatic but certainly no less important was his second piece of advice:

> Working with magazines and newspapers makes you a journalist. And as a journalist, there are ethics you need to be aware of behind how to tell your visual story and maintain journalistic integrity. Publications will have different guidelines around issues such as what to do when offered a free room. Just be up front and ask the publications about their policies. Ultimately you are representing the publication, so be sure that you do nothing that will make the publication look disreputable.

Because of travel and the demands of digital processing, Pfleuger notes that he needs to schedule and financially cover both for pre- and postproduction. For example, he may need a day to make the travel arrangements and another to do basic image processing and make a rough edit. Yet rates are often set by the publications themselves, and this can make things financially complex. "If I have room for negotiation it is in the numbers of days that I am

working. Sometimes a magazine will only have a certain amount budgeted for the story, period, and the number of days that the assignment itself will take might make the day rate look pretty sad." He does add, however, "I have been able to negotiate more of a day rate based on the difficulty of the shoot and the equipment required."

Contracts are always important in commercial and editorial photography, but as most of the contracts in editorial originate with the client (as opposed to the photographer), each is quite different and requires individual attention. Pflueger explains that he goes through each "carefully and if I have questions I call them and discuss them. It takes time and is a pain, but it is really important. Often the editors don't know the answers." While many photographers have had success with contract cross-outs and modifications, he has not been so lucky: "I've tried, and they can't do it because there is no practical way that they can have individual agreements with all the photogs that they work for." However, he does point out, "Often, when pressed, I have found that there is an alternative photog-friendly contract that they can produce when they absolutely have to."

Though model and property releases aren't usually needed for editorial work, Pflueger does try to get them signed as often as he can, noting, "Having [a release] is vital if I intend to relicense an image later." He estimates about half of his assignments result in images he later licenses as stock, and adds that it could even be a higher percentage if he spent even more time and attention to marketing and selling his stock images.

As is typical for editorial, advances are rare and occasionally frustrating. Pflueger says, "Many publications can do the travel arrangements for me—so that helps. But ultimately, getting reimbursed in a timely manner can be really exasperating. And I've gotten in finicky disputes when the client hasn't liked the receipts I produced. Lesson: Bring a receipt book and write your own receipts for those occasions when you pay for something and can't get a receipt."

When asked what he would most like to share with anyone thinking of becoming a photo-journalist today, Pflueger has a lot to offer, starting with this comment: "I see the freelance editorial work rather as a means to other more sustainable types of work in photography." In other words, for Pflueger editorial work is a means of marketing, of getting one's name and vision out to people with deeper pockets. While photographers in the past made their livings entirely from editorial/photo-journalism, that is happening less frequently now.

He continues:

> I think that we should look at the present facts: The magazine and newspaper
> industry is imploding. What this means is that the magazines are getting

Case 1:05-cv-08136-DC   Document 994-3   Filed 12/22/11   Page 12 of 12

thinner, there are less assignments out there, contracts are getting bad, and there is less money [and] the photographers are feeling the squeeze. Additionally, the ever-increasing use of the ubiquitous digital camera combined with the massive "sharing" and access to photography over the Web means that there is a huge supply of images out there. What happens to the value of the photograph is simple supply and demand at that point.

Pflueger is also concerned, however, about photographers not standing up for the value of their images in editorial new media:

As an example, most contracts now from magazines and newspapers have added unlimited Web use, but there is no additional compensation to represent this—and the Web may now in fact represent a huge chunk of their audience and indeed even income. The Web is sort of assumed by them as a sort of a "we don't pay for content" zone, and photographers go along with this because they have to until they can start to collectively negotiate for something reasonable.

In the past this was because the Web was a losing operation for the newspapers and magazines. They knew that they had to be there on the Web but didn't know how to make it profitable. This is changing now. I was just talking with the *New York Times* [and their online Web revenue is increasing double-digits]. So now that the *Times* is starting to make money on the Web, photogs need to begin to make money on the Web too.

### PRODUCT PHOTOGRAPHY

Lon Atkinson is primarily a product photographer for advertising agencies. He also does some client direct (corporate) work, including catalogues, out of his San Diego–based studio. When asked what one thing he would like to share with emerging photographers in his field, one thing that he never thought he needed to know ahead of time, he replied, "Dealing with the varied personalities of the clients." This is something not often taught in school but which can make a significant difference in business. Atkinson went on to say, "You have to realize and act on the fact that you are a service. Service is the key to success. I have [direct] clients that have been working with me for fifteen to eighteen years. Ad agencies also this long, because we treat them with respect and provide tremendous service."

Estimating in his specialty generally requires including the following items: photography, usage, product stylist, digital image [capture] fee, purchased props and backgrounds, and set building. While each project is different, of course, these are the usual core items.