**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| The Authors Guild, Inc., Associational Plaintiff, Betty Miles, Joseph Goulden, and Jim Bouton, individually and on behalf of all others similarly situated, | : : : : |
| Plaintiffs, | Case No. 05 CV 8136-DC |
| v. | **FILED ELECTRONICALLY** |
| Google Inc., | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
### DEFENDANT GOOGLE INC.'S MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

PARTIES AND PROCEDURAL BACKGROUND.........................................................2

ARGUMENT ...........................................................................................................4

    A.    The Third Prong Of *Hunt*'s Associational Standing Test Is Prudential......4

    B.    Claims For Declaratory and Injunctive Relief Generally Satisfy *Hunt* ......5

    C.    The Case Law Supports Plaintiffs' Position.................................................8

    D.    This Case Presents No Difficult Individualized Issues Requiring the
        Participation of Every Authors Guild Member........................................13

        1.    Ownership and Contract Interpretation Issues Do Not Require the
            Participation of Every Copyright Owner ......................................13

        2.    Google's Fair Use Defense Does Not Require the Individual
            Participation of Every Authors Guild Member............................16

    E.    The Authors Guild Should Be Granted Leave to Replead, If Necessary.. 20

CONCLUSION........................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*A & M Records v. Napster,*
   No. C 99-05183 MHP, 2001 U.S. Dist. LEXIS 2186 (C.D. Cal. March 5, 2001)........ 10

*Alliance for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.,*
   651 F.3d 218 (2d Cir. 2011).......................................................................... 5, 6, 13, 21

*Am. Booksellers Ass'n v. Random House, Inc.,*
   No. 96 Civ. 0030 (JFK), 1996 U.S. Dist. LEXIS 12775 (S.D.N.Y. Sept. 4, 1996)........ 7

*Am. Booksellers Ass'n. v. Houghton Mifflin Co.,*
   No. 94 Civ. 8566 (JFK), 1995 U.S. Dist. LEXIS 2522 (S.D.N.Y. March 3, 1995) ....... 7

*Am. Geophysical Union, v. Texaco Inc.,*
   60 F.3d 913 (2d Cir. 1994)........................................................................... 18

*Ass'n for Information Media and Equipment v. Regents of the Univ. of California,* No.
   CV 10-9378 CBM (MANx) (C.D. Cal. Oct. 3, 2011) .................................... 12

*Atl. States Legal Found., Inc. v. Hamelin,*
   182 F. Supp.2d 235 (N.D.N.Y 2001)................................................................ 21

*Aurecchione v. Schoolman Transp. Sys.,*
   426 F.3d 635 (2d Cir. 2005)........................................................................... 20

*A.V. v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009) ........................................................................ 17

*Baker v. Carr,*
   369 U.S. 186 (1962).......................................................................................... 6

*Basic Books, Inc. v. Harper & Row Publishers, Inc.,*
   758 F. Supp. 1522 (S.D.N.Y. 1991)................................................................ 17, 18

*Block v. First Blood Assocs.,*
   988 F.2d 344 (2d Cir. 1993)........................................................................... 21

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)............................................................................... 17, 19, 20

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998)........................................................................ 19

*CBS Broad., Inc. v. Echostar Commc'ns Corp.*,
  450 F.3d 505 (11th Cir. 2006) ................................................................... 10

*Ctr. for Reproductive Law & Policy v. Bush*,
  304 F.3d 183 (2d Cir. 2002)..................................................................... 4, 5

*Cortner v. Israel*,
  732 F.2d 267 (2d Cir. 1984)....................................................................... 14

*Eastern Paralyzed Veterans Ass'n, Inc. v. Lazarus-Burman Assocs.*,
  133 F. Supp. 2d 203 (E.D.N.Y. 2001) ....................................................... 21

*Foman v. Davis*,
  371 U.S. 178 (1962)..................................................................................... 21

*Harlem Valley Transp. Ass'n v. Stafford*,
  360 F. Supp. 1057 (S.D.N.Y. 1973)............................................................. 6

*Harper & Row v. Nation Enters.*,
  471 U.S. 539 (1985)..................................................................................... 18

*Harris v. Simon & Schuster, Inc.*,
  646 F. Supp. 2d 622 (S.D.N.Y. 2009)......................................................... 15

*Hunt v. Washington State Apple Advertising Comm'n*,
  432 U.S. 333 (1977)............................................................................. passim

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998)................................................................. 16, 17

*Int'l Union, United Auto., Aerospace and Aqric. Implement Workers of Am. v. Brock*,
  477 U.S. 274 (1986)....................................................................................... 6

*Island Software & Computer Serv. v. Microsoft Corp.*,
  413 F.3d 257 (2d Cir. 2005)........................................................................ 15

*Itar-Tass Russian News Agency v. Russian Kurier*,
  No. 95 Civ. 2144 (JGK), 1997 U.S. Dist. LEXIS 2717 (S.D.N.Y. March 10, 1997),
  *rev'd in part on other grounds*, 153 F.3d 82 (2d Cir. 1998)..................... 8, 9

*Itar-Tass Russian News Agency v. Russian Kurier*,
  153 F.3d 82 (2d Cir. 1998)................................................................. 8, 9, 10

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ..................................................................... 17

*Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*,
    990 F. Supp. 245 (S.D.N.Y. 1997).......................................................... 6, 19

*Nat'l Ass'n of Freelance Photographers v. Assoc. Press*,
    No. 97 Civ. 2267 (DLC), 1997 U.S. Dist. LEXIS 19568
    (S.D.N.Y. Dec. 10, 1997) ....................................................................... 11, 12

*Nat'l Ass'n of Letter Carriers v. USPS*,
    604 F. Supp. 2d 665 (S.D.N.Y. 2009)............................................... 7, 11, 20

*New Era Publ'ns Int'l v. Carol Publ'g Group*,
    904 F.2d 152 (2d Cir.), *cert. denied*, 498 U.S. 921 (1990)........................ 18

*New York State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)....................................................................... 6

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999)..................................................................... 17, 18

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
    558 F.2d 1090 (2d Cir. 1977)...................................................................... 15

*Olan Mills, Inc. v. Linn Photo Co.*,
    795 F. Supp. 1423 (N.D. Iowa),
    *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994) ........................... 10, 11

*Perfect 10, Inc. v. Amazon, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .................................................................... 17

*Random House, Inc. v. Rosetta Books LLC*,
    150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd,* 282 F.3d 490 (2d Cir. 2002)................. 14

*Rent Stabilization Ass'n v. Dinkins*,
    5 F.3d 591, 596 (2d Cir. 1993)...................................................................... 8

*Reyher v. Children's Television Workshop*,
    533 F.2d 87 (2d Cir. 1976)......................................................................... 18

*Rosemont Enters. v. Random House Inc.*,
    366 F.2d 303 (2d Cir. 1966)....................................................................... 18

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000).................................................... 16, 17

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996)...........................................................................................4, 5

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    342 F.3d 191 (3d Cir. 2003)..............................................................................17

*Warth v. Seldin*,
    422 U.S. 490 (1975)...........................................................................................4, 6

**Statutes**

17 U.S.C. § 107......................................................................................................16, 17

17 U.S.C. § 201(a)..........................................................................................................14

17 U.S.C. § 209...............................................................................................................15

17 U.S.C. § 410(c)..........................................................................................................15

17 U.S.C. § 501(b)....................................................................................................14, 16

17 U.S.C. § 502(a)..........................................................................................................10

**Rules**

Fed. R. Civ. P. 15............................................................................................................21

Fed. R. Civ. P. 23..............................................................................................................2

**Legislative History**

H.R. Rep. No. 94-1476 (1976).......................................................................................16

**Treatises**

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright
§ 13.05 [A][4] (1993).....................................................................................................19

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright
§ 13.05 [A][2][a] (2009).................................................................................................18

6 William F. Patry, Patry on Copyright § 21:25 (2011).........................................14

William F. Patry, Patry on Fair Use § 4:1 (2011) ...................................................18

Plaintiffs submit this memorandum of law in opposition to defendant Google Inc.'s ("Google") motion to dismiss the claims of associational plaintiff The Authors Guild, Inc. ("Authors Guild") on the ground of lack of standing.

Google argues that this Court should dismiss the claims of the Authors Guild in an exercise of its discretion under the "prudential" third prong of the applicable associational plaintiff standing test. As shown below, no "prudential" considerations compel the dismissal of the Authors Guild. The Authors Guild has actively participated in this case as associational plaintiff for over six years, including in multi-year settlement discussions with Google. Its participation presents no administrative difficulties – indeed, it would further the interests of judicial economy – and is in the best interests of its members.

Google turns fairness on its head when it argues that every individual copyright owner must sue here, rather than the Authors Guild on behalf of its 8,500 members. In its Library Project (the name it gave its digital copying campaign), Google has copied in their entirety millions of books of every category and type (e.g., public domain and in-copyright, fiction and non-fiction, in-print and out-of-print, United States works and foreign works). Google did not make a book-by-book determination as to whether it would copy each book, distribute a digital copy of each book to a library, or display expression from each book in response to search queries. Instead, Google made a business decision to (a) copy massive quantities of printed in-copyright books that were not yet online, (b) make deals with libraries to provide them with digital copies of these books in exchange for Google's access to the printed books in the stacks of the libraries, and (c) display verbatim protected expression from these books online in response to

queries by users of Google's search engine, all without permission from the books' copyright owners.

Google's defense of "fair use" has never been applied to such a factual scenario. The "fairness" of Google's uses of these books can only be judged in the context of the Library Project as a whole, and not in an artificial construct where each individual book is analyzed as if the merits of Google's uses differed from book to book. Indeed, it would be manifestly unjust if Google were to evade effective judicial scrutiny of its Library Project by requiring every individual copyright owner to sue it separately. Instead, those collectively affected by Google's massive copying project should be permitted to seek collective relief.

Google's attempt to dismiss the Authors Guild as a plaintiff is without merit, and its motion should be denied.

## PARTIES AND PROCEDURAL BACKGROUND

Plaintiff Authors Guild is the nation's oldest and largest organization of authors. Its primary mission is to advocate for and support the copyright and contractual interests of published writers. (Fourth Amended Class Action Complaint ("Complaint"), ECF No. 985 ¶¶ 2, 18). The Authors Guild's members, authors of books, would have standing to sue in their own right for Google's digitization, distribution, and public display of their copyrighted books without their consent. (*Id*. ¶¶ 2, 18, 19).[1]

_____

[1] Jim Bouton, Joseph Goulden and Betty Miles are representative plaintiffs here, who seek certification of a plaintiff class under Fed. R. Civ. P. 23. The participation of the Authors Guild as associational plaintiff (but not Rule 23 plaintiff) is nevertheless beneficial and appropriate here also. The Authors Guild – a trade association of authors with a century of history of protecting authors' rights – possesses a collective, institutional knowledge of matters at issue in this lawsuit that is greater than any individual plaintiff or class member. (*See* page 5 *infra*.)

Defendant Google owns and operates the largest Internet search engine in the United States. (*Id*. ¶ 20). As part of its Library Project, Google has scanned, distributed and displayed millions of copyrighted books, without the permission of the books' copyright owners. (*Id*. ¶¶ 30-55).

Plaintiffs, including the Authors Guild as associational plaintiff, filed this case for copyright infringement in September 2005, and filed a First Amended Class Action Complaint on June 19, 2006, which Google answered on July 26, 2006. In September 2006, the Authors Guild produced documents to Google in response to its first discovery request.

Over several years, Google conducted extensive settlement negotiations with plaintiffs, including frequent telephone conferences and in-person meetings in New York and Mountain View, California. The Authors Guild was a critical participant throughout those negotiations.

Following this Court's denial of final settlement approval, plaintiffs, including the Authors Guild as associational plaintiff, filed the Fourth Amended Complaint. In December 2011, the Authors Guild produced additional documents to Google in response to its second document request.

Notwithstanding, and inconsistently with, its engagement with the Authors Guild in multi-year settlement discussions (and its imposition of document requests on the Authors Guild), Google filed this motion on December 22, 2011 to dismiss the Authors Guild for lack of standing.

ARGUMENT

A.      The Third Prong Of *Hunt*'s Associational Standing Test Is Prudential

In *Warth v. Seldin*, 422 U.S. 490, 511 (1975), the United States Supreme Court

stated that, "[e]ven in the absence of injury to itself, an association may have standing

solely as the representative of its members." The Supreme Court elaborated on this in

*Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343 (1977),

holding that an association has standing to bring suit on behalf of its members when: "(a)

its members would otherwise have standing to sue in their own right; (b) the interests it

seeks to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in the

lawsuit."

In explaining the *Hunt* test, the Supreme Court has stated that, "once an

association has satisfied *Hunt*'s first and second prongs assuring adversarial vigor in

pursuing a claim for which member Article III standing exists, it is difficult to see a

constitutional necessity for anything more." *United Food & Commercial Workers Union

Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 556-7 (1996).

Here, Google argues only that the Authors Guild does not satisfy *Hunt*'s third

prong. (*See* Google Brief at 5.) With respect to prudential standing, now-Justice

Sotomayor explained in *Center for Reproductive Law & Policy v. Bush*, 304 F.3d 183,

196 (2d Cir. 2002), that "the prudential requirements of standing have been developed by

the Supreme Court on its own accord and applied in a more discretionary fashion as rules

of judicial self-restraint further to protect, to the extent necessary under the

circumstances, the purpose of Article III." *Id.* (internal quotation marks omitted).

4

Thus, the "third prong of the associational standing test is best seen as focusing on … administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food*, 517 U.S. at 556. As a result, "district courts possess a degree of discretion in applying it." *Alliance for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 651 F.3d 218, 229-230 (2d Cir. 2011) (citing *Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002)(Sotomayor, J.)).

B.    Claims For Declaratory and Injunctive Relief Generally Satisfy *Hunt*

The Authors Guild seeks no damages here. Its claims, for injunctive and declaratory relief, present overriding legal and factual issues for the Court to address. The facts underlying Google's digitization project are in its possession, and will be determined from common proof obtained from Google's records. (*See* Plaintiffs' Brief in Support of Their Motion for Class Certification ("Plaintiffs' Class Certification Brief"), ECF No. 990, at pages 9-21.)

Whether Google has the right to copy, distribute and display copyrighted books is an issue that the Authors Guild is well-suited to challenge on behalf of its members. The Authors Guild and its predecessor organization, the Authors League of America, have been leading advocates for authors' copyright and contractual interests since the League's founding in 1912. The activities of the Authors Guild include reviewing members' publishing and agency contracts; intervening in disputes involving authors' rights; providing advice to members regarding developments in the law and in the publishing industry that affect their rights; and supporting legislation in matters affecting copyright, freedom of expression, taxation and other issues affecting professional writers. The

protection of authors' copyrights is germane, indeed central, to the purpose of the Authors Guild. (Complaint ¶¶ 18-19.)

"The primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986). As this Court has recognized, the "interest and expertise" of an associational plaintiff, "when exerted on behalf of its directly affected members, assure 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'" *Harlem Valley Transp. Ass'n v. Stafford,* 360 F. Supp. 1057, 1065 (S.D.N.Y. 1973)(quoting *Baker v. Carr,* 369 U.S. 186, 204 (1962). If an association seeks prospective relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth,* 422 U.S. at 515.

Google's argument that associational standing is permissible *only* when plaintiffs present pure issues of law or when association-wide facts *alone* are required to prove plaintiff's claim is incorrect. (Google Brief at 6.)  Instead, courts take a more pragmatic approach in determining the propriety of associational standing, finding it appropriate even if  "a limited amount of individuated proof may be necessary." *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press,* 990 F. Supp. 245, 250 (S.D.N.Y. 1997) (associational standing present in Robinson-Patman Act case although evidence from some individual members was required)(citing *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989); *see also Alliance for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 651 F.3d  218, 229-230 (2d Cir. 2011)(finding associational

standing even when plaintiffs' claim would "require a more thorough factual development" of the burdens on the association's members to comply with the guideline at issue); *Am. Booksellers Ass'n v. Random House, Inc.*, No. 96 Civ. 0030 (JFK), 1996 U.S. Dist. LEXIS 12775, at *19 (S.D.N.Y. Sept. 4, 1996)(granting standing to association on behalf of members' Robinson-Patman claims, holding that proof of member injuries could be supplied by the named plaintiffs); *Am. Booksellers Ass'n. v. Houghton Mifflin Co.*, No. 94 Civ. 8566 (JFK), 1995 U.S. Dist. LEXIS 2522, at *16 (S.D.N.Y. March 3, 1995)(the "Court can see no reason why proof of each and every impact is required to enjoin unlawful practices").[2]

Also contrary to Google's contention (Google Brief at 11), legal claims subject to factual defenses are proper claims for associational standing purposes. For example, in *National Ass'n of Letter Carriers v. USPS*, 604 F. Supp. 2d 665, 669 (S.D.N.Y. 2009), two labor union plaintiffs alleged that the USPS's policy authorizing its agents to obtain medical information about postal employees without their knowledge or consent violated statutory privacy acts, as well as employees' rights to privacy and against unreasonable searches and seizures. This Court held that the associational plaintiffs' claim raised overriding legal questions, despite the defendant's assertion that statutory exceptions to HIPAA and the Privacy Act of 1974 would need to be individually evaluated as to every member of the unions asserting associational standing. *Id*. at 672. With respect to the associational plaintiffs' Fourth Amendment claim, this Court similarly rejected the

---

[2] This case law is particularly apt here where plaintiffs can prove Google's copyright infringement with common proof obtained from Google's records. (*See* Plaintiffs' Class Certification Brief, at pages 9-21.)

defendant's argument that "the Court may only determine the reasonableness of the Government's intrusion on a case-by-case basis." *Id*. at 676.

Here, relying on its tortured notion of "fair use," Google has admittedly copied millions of in-copyright works without permission of the copyright owners. Google has records of the books it copied, the authors of these books, and the copyright status of these books. The determination of the legality of Google's actions can be made from this common proof. No individualized issues require the participation of every Authors Guild member. [3]

C.      The Case Law Supports Plaintiffs' Position

There is no authority for Google's conclusory assertion that associational standing can be granted in copyright cases only in the "rarest of circumstances." (Google Brief at 10.)  To the contrary, a number of courts, including in this Circuit, have found associational standing to be proper in copyright cases.

In a case that is analogous to this case, a professional writers union was granted associational standing in a copyright case. *See Itar-Tass Russian News Agency v. Russian Kurier*, No. 95 Civ. 2144 (JGK), 1997 U.S. Dist. LEXIS 2717 (S.D.N.Y. March 10, 1997), *rev'd in part on other grounds*, 153 F.3d 82, 84 (2d Cir. 1998). In *Itar-Tass,* as

---

[3] *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993), is distinguishable. There, an organization representing city building owners alleged that New York City's rent stabilization scheme violated the takings clause of the Fifth Amendment. The Second Circuit denied associational standing because proof of a "takings" claim would require the court to assess the particular financial return of each landlord "based on a host of individualized financial data, and we would have to investigate the reasons for any failure to obtain an adequate return, because the Constitution certainly cannot be read to guarantee a profit to an inefficient or incompetent landlord." *Id.* at 595. The "takings" element of the claim thus required proof akin to an individualized damage assessment. Such an assessment is not in issue here. The Authors Guild seeks equitable relief only, and the plaintiff class seeks statutory damages in the amount of $750 per book. (*See* Plaintiffs' Class Certification Brief, at page 17.)

here, the defendants had engaged in wholesale copying of copyrighted material, without receiving authorization from the copyright holders. The plaintiffs were Russian news organizations and publishers, their related U.S. companies, and an Israeli newspaper, who sued publishers of Russian newspapers for the wholesale unauthorized copying of their copyrighted articles. *Id*. at *1-2. Plaintiff Union of Journalists of Russia ("UJR") was a professional writers union whose membership consists of Russian journalists, and whose mission was to protect the rights of its members, including their copyright interests. *Id*. at *6. The case proceeded to a bench trial.

In its post-trial findings of fact and law, the court held that UJR had associational standing under *Hunt* because it met the first two prongs, and, critically, because the "*lawsuit has been litigated without the need for the participation of UJR's members*." *Id*. at *30 (emphasis added). Thus, member participation – as to copyright ownership or anything else – was not required for UJR to litigate its copyright claim.

Although it ruled that UJR had standing, the court originally denied injunctive relief to the association because it was unwilling to provide a list of its members whose copyrights the defendant would be barred from infringing. *Id*. On appeal, the Second Circuit gave UJR a second chance to seek relief on behalf of its author members. *Itar-Tass*, 153 F.3d at 94. The court remanded the issue of relief for UJR's claims to the district court, with the suggestion that UJR disclose its author members to allow for proper injunctive relief. The court also permitted UJR to amend its prayer for relief to state claims for damages for the benefit of the members whose articles had been infringed. *Id*. Finally, the court recommended that the district court consider a notice program to advise authors of their right to intervene in the lawsuit. *Id.* The Second Circuit

thus exercised its discretion to allow, even encourage, associational standing and to fashion an equitable remedy appropriate to the circumstances of the established infringement.[4]

In *CBS Broadcasting, Inc. v. Echostar Communications Corp.*, 450 F.3d 505, 518 (11th Cir. 2006), the Eleventh Circuit Court of Appeals held that trade associations comprised of member network television stations had associational standing to raise claims that defendant DISH Network was retransmitting their members' programming in violation of the Copyright Act. Noting that the members of the trade associations would have standing to raise the copyright claims at issue, the Court affirmed the district court's holding that the trade associations met the *Hunt* requirements for associational standing.

Associational standing was also found in *Olan Mills, Inc. v. Linn Photo Co.* on behalf of a professional society, Professional Photographers of America, Inc. ("PPA"), that raised copyright infringement claims against a photograph company for unlawfully enlarging copyrighted photographs. 795 F. Supp. 1423, 1427 (N.D. Iowa), *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994). Although the plaintiff association had not alleged

---

[4] The Copyright Act gives courts the authority to award injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The Second Circuit exercised this authority in *Itar-Tass* by fashioning appropriate injunctive relief for the author members of the plaintiff trade association there. *Itar-Tass*, 153 F.3d at 94. Another example of tailored relief is found in *A & M Records v. Napster*, No. C 99-05183 MHP, 2001 U.S. Dist. LEXIS 2186, at *4 (C.D. Cal. March 5, 2001), where the court ordered the plaintiffs to provide Napster, which was enjoined from infringing all works owned by the plaintiffs, a list of infringed works and a certification of ownership of the copyrights to those works. The court stated further that, because the transitory nature of the Napster file-sharing system might make it difficult for the plaintiffs to identify each infringed song, the court would consider if necessary an alternative method of identifying the infringed works, where Napster would search files included in its system against lists of copyrighted works provided by the plaintiffs. *Id.* at *5. As these cases show, if Google's Library Project is found to unlawfully infringe copyrights, the Court can fashion appropriate injunctive relief that includes an identification of all works covered by the injunction.

10

that all its members had registered their photographs, the Court denied defendant's
motion to dismiss the association for lack of standing. *Id.* The Court held that individual
plaintiff Olan Mills, a member of PPA, had registered its photographs, so a reasonable
inference could be drawn that other members had similarly registered their photographs
as well. *Id*. at 1428.

The cases Google relies on where associational standing was not granted are
distinguishable on their facts. In *National Ass'n of Freelance Photographers v.
Associated Press*, No. 97 Civ. 2267 (DLC), 1997 U.S. Dist. LEXIS 19568 (S.D.N.Y.
Dec. 10, 1997), the plaintiffs alleged that defendant Associated Press ("AP") had paid
photographers with checks that included a legend purporting to transfer copyright
ownership of the photographs to the AP upon the photographer's endorsement of the
check. The plaintiffs were not challenging the general enforceability of the legend; to the
contrary, they were challenging whether their copyright interests had been transferred to
the AP via the endorsement of the checks for payment of the photographs. *Id*. at *5-7.

The court held that the plaintiff organization of freelance photographers did not
have associational standing. *Id*. at *13. The court cited several factors underlying its
determination that individualized participation by the photographer members of the
associational plaintiff would be required to determine whether each had transferred
copyright ownership in their photographs to the AP by their endorsements, including
each photographers' prior dealings with the AP, each photographers' understanding of
the endorsement practice, any side-agreements that might govern a particular transaction,
and allegations that the photographers misunderstood or were defrauded by the AP. *Id*. at
*14. Thus, in the *Associated Press* case, the individualized issues of ownership stemmed

from the ambiguous transfer of copyright interests between the associational plaintiff's

members and the defendant AP, and what the AP and each copyright owner understood

the endorsement to represent.

In stark contrast to *Associated Press,* this case involves no individual transactions

or negotiations between Google and the copyright owners of the books in issue. Google

does not assert any copyright ownership of the books copied in its Library Project, only

that its copying and display of the books are a fair use. Thus, no fact-intensive analysis of

transactions between authors and Google is required here.

In *Ass'n for Information Media and Equipment v. Regents of the University of

California*, No. CV 10-9378 CBM (MANx) (C.D. Cal. Oct. 3, 2011), defendant UCLA

copied the content of DVDs licensed by plaintiff AVP and other video producers, and

then placed the content of the DVDs on the school's website for students to stream. The

court dismissed each of AVP's claims on grounds of sovereign immunity and failure to

state a claim, and dismissed associational plaintiff AIME's claim for "lack of sufficient

allegations to support standing." *Id*. at 13. AIME had failed to allege that any of its

members other than AVP owned a copyright at issue in AIME's claims, and the AVP had

no claims. *Id*. at 7. In contrast, here, the Authors Guild has pleaded in satisfaction of the

first *Hunt* prong that its members would have standing to sue Google in their own right,

and Google has not contested this in its motion.[5]

---

[5] Google relies on the *AIME* court's conclusory assertion that, "because having the rights
over a copyright is essential to establishing a copyright infringement claim," individual
participation is necessary and associational standing must be denied in a copyright case.
*Id*. at 7. As shown above, however, other courts have held to the contrary, and permitted
associational standing in copyright cases. (*See* pages 8-11, *supra*.)

D.  This Case Presents No Difficult Individualized Issues Requiring the
Participation of Every Authors Guild Member

Google has copied, distributed and displayed millions of copyrighted works

without permission. Google undertook these actions unilaterally, on an enormous scale,

without separately analyzing each book. Google now argues that, although it allegedly

had a fair use privilege to copy millions of books on a wholesale basis, the authors of

such books cannot challenge Google's actions unless they each individually sue Google.

Google contends that an association-wide litigation is inappropriate for two purported

reasons: (1) due to allegedly "difficult questions of ownership and interpretation of

individual contractual terms," Google Brief at 11, and (2) due to allegedly individual

issues raised by Google's fair use defense, *id.*

Google's position has no merit. There are no issues here requiring the individual

participation of every Authors Guild member whose books Google scanned. *Hunt's*

prudential third prong does not require such a result. To the contrary, administrative

convenience and judicial efficiency will be fostered, not hindered, if the legality of

Google's Library Project is adjudicated on an association-wide (and class action-wide)

case, rather than in a multitude of individual actions. *See Alliance for Open Soc'y Int'l,*

*Inc. v. United States Agency for Int'l Dev.*, 651 F.3d 218, 229-230 (2d Cir. 2011).

1.  Ownership and Contract Interpretation Issues Do Not Require the
Participation of Every Copyright Owner

Google sprinkles its brief with references to alleged ownership and contract

interpretation issues in publishing contracts, but fails to explain how these issues have

any relevance to the issue of Google's infringement.

The Copyright Act provides that "[c]opyright in a work protected under this title vests initially in the author or authors of the work." 17 U.S.C. § 201(a). While authors then customarily enter into publishing contracts for their copyrighted works in which they grant publishers one or more exclusive rights in exchange for royalty payments, these authors maintain the right to sue infringers like Google. Section 501(b) of the Copyright Act specifically provides that "the legal or beneficial owner of an exclusive right under a copyright" has standing to sue for infringement." Indeed, "[t]he classic beneficial owner is an author who transfers exclusive rights (that is, parts with legal title to that right) to a purchaser in exchange for royalty payments from sales of copies of the work or from other forms of exploitation." 6 WILLIAM F. PATRY,  PATRY ON COPYRIGHT § 21:25, p. 21-35 (2011). [6]

In *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984), the Second Circuit held that a composer who had assigned his copyright to his publisher in exchange for the payment of royalties retained standing to sue an alleged infringer as a beneficial owner of the copyright. *Id.* ("When a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two

---

[6]*Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd,* 282 F.3d 490 (2d Cir. 2002), cited by Google, is inapposite here. That case addressed whether Random House or certain authors possessed the exclusive rights under various publishing contracts to sell electronic books. The Court held that the authors had not transferred electronic rights to the publishers. *Id.* at 624.  However, even if the authors had transferred legal title to those exclusive rights to the publisher, this would mean only that they were "beneficial" rather than "legal" owners of the electronic rights to their books. As beneficial owners, under Section 501(b) of the Copyright Act, the authors could still sue an infringer like Google, which is neither the legal or beneficial owner of the copyright. Issues between or among authors and publishers (such as whether legal title to an exclusive right has or has not yet "reverted" back from a publisher to an author because a book is no longer in print), do not undermine an author's beneficial ownership status, nor give Google license to infringe copyrights.

parties which gives the composer standing to sue for infringement of that copyright"); *see also Harris v. Simon & Schuster, Inc.*, 646 F. Supp. 2d 622, 632 (S.D.N.Y. 2009)(author who granted rights in a work in exchange for the payment of royalties "qualifies as a 'beneficial owner,' and retains standing to sue").

Moreover, Google itself has records of every book it copied. The identity of the authors of these books can be ascertained from the copyright pages of the copies made by Google, and copyright ownership for the books can also be determined from copyright records, which are publicly available. Under the Copyright Act, copyright registrations constitute *prima facie* evidence of copyright ownership. *See* 17 U.S.C. § 410(c)("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 n.1 (2d Cir. 1977)(citing former 17 U.S.C. § 209). Courts are entitled to take judicial notice of federal copyright registrations, as published in the Copyright Office's registry. *Island Software & Computer Serv. v. Microsoft Corp*., 413 F.3d 257, 261 (2d Cir. 2005).[7]

Google ignores these important principles – namely, that legal **and** beneficial copyright owners have standing to sue for infringement and that copyrights are a matter of public record. Its position that this Court must dismiss the Authors Guild as associational plaintiff under *Hunt*'s third prong and require each member of the Authors Guild to sue individually is meritless. When Google copied books in its Library Project

---

[7]Copyright registration records are publicly available and the indices from 1978 forward are available online at http://www.copyright.gov/records/. Indices from the period before 1978 are available online at http://books.google.com/googlebooks/copyrightsearch.html.

without the permission of any copyright owner (i.e., the legal or the beneficial owner), it

risked lawsuits under 17 U.S.C. § 501(b) by these owners.

      2.      Google's Fair Use Defense Does Not Require the Individual
              Participation of Every Authors Guild Member

Google next argues that its "fair use" defense precludes associational standing.

*See* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . for purposes such as

criticism, comment, news reporting, teaching (including multiple copies for classroom

use), scholarship, or research, is not an infringement of copyright."). Because it is an

affirmative defense, Google has the burden to prove that its uses of the books are

protected by the "fair use" doctrine. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104,

107 (2d Cir. 1998).

On the facts of this case, Google's fair use defense cannot be adjudicated as if

Google made an individual determination as to the uses it would make of each one of

millions of individual books. On the contrary, the question here is whether Google's

Library Project is a "fair use" of the books Google collectively copied, distributed and

displayed. *See, e.g.*, *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350-51

(S.D.N.Y. 2000)(granting summary judgment to plaintiffs after applying fair use factors

to entire website that permitted users to download "tens of thousands of popular CDs").

Indeed, due to "the endless variety of situations and combinations of

circumstances that can rise in a particular case . . . especially during a period of rapid

technological change," Congress intended the fair use analysis to be malleable, leaving

courts "free to adapt the doctrine to particular situations on a case-by-case basis." H.R.

REP. NO. 94-1476, at 66 (1976).

16

As for Google's arguments about the four non-exhaustive fair use factors included in Section 107, Google concedes that it will not present any individualized evidence as to the first fair use factor ("the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"). Google Brief at 12 n.3.[8] Google ignores the third fair use factor ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole'), implicitly conceding, as it must, that it has copied, distributed and displayed books in a uniform manner.

---

[8] Contrary to Google's assertions as to this first factor, its uses of the books in the Library Project are not "transformative." The Supreme Court stated in *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578 (1994), that a use is transformative when the "new work" alters the first work with "new expression, meaning, or message." Google's Library Project adds no expression, meaning or message to the books copied. Instead, the Library Project involves verbatim copying and display. Merely changing the format or medium of a work, or extracting verbatim excerpts from a work, as Google has done here, is not "transformative" within the meaning of Section 107 of the Copyright Act. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 72 (2d Cir. 1999) (abstracts of news articles that directly translate plaintiffs' news articles were not protected as a fair use); *Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 108-09 (2d Cir. 1998)(service allowing subscribers to listen over the telephone in remote cities to copyrighted radio broadcasts was not a fair use, where the rebroadcast merely changed the format of the copyrighted material and added no new expression, meaning or message); *UMG Recordings, Inc. v. MP3.Com, Inc.,* 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (mere retransmission of unauthorized copies in another medium is not by itself a fair use); *Basic Books, Inc. v. Harper & Row Publishers, Inc.,* 758 F. Supp. 1522 (S.D.N.Y. 1991) (sale of course packets to college students not a fair use).

Google's reliance on *Perfect 10, Inc. v. Amazon, Inc*., 508 F.3d 1146 (9th Cir. 2007), and *Kelly v. Arriba Soft Corp*., 336 F.3d 811 (9th Cir. 2003), is misplaced. Each of those cases involved the defendant's indexing of materials already available on the Internet. In neither case did the defendant digitally copy millions of offline works without permission of the rightsholders, place such works on the Internet for search, and distribute unauthorized digital copies to third parties, such as libraries, as Google has done in its Library Project. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc*., 342 F.3d 191, 199 (3d Cir. 2003)(holding that Internet display of two-minute movie clip previews was not transformative; distinguishing *Kelly* because the defendant's action did not improve access to authorized material on other websites, but instead "indexes and displays unauthorized copies of copyrighted works"). *A.V. v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009), is similarly distinguishable. There, the defendant did not make unauthorized copies of offline materials, but instead indexed papers that high school students were required by their teachers to submit online for plagiarism review.

Google erroneously contends that the individual participation of every Authors

Guild member is necessary to assess the second and fourth fair use factors ("the nature of

the copyrighted work " and "the effect of the use upon the potential market for or value

of the original work"). (Google Brief at 12.) As to the nature of the copyrighted work,

cases in the Second Circuit state, generally, that "the scope of fair use is greater with

respect to factual than non-factual works." *New Era Publ'ns Int'l v. Carol Publ'g Group*,

904 F.2d 152, 157 (2d Cir.), *cert. denied*, 498 U.S. 921 (1990). [9]  This does not mean,

however, that the Court must separately analyze every book, any more than Google did

when it copied them *en masse*. To the contrary, even to the extent the Court deemed it

necessary to assess this factor differently for fiction as opposed to non-fiction books

---

[9] As a practical matter, the second fair use factor – the nature of the work – plays little
role in the ultimate fair use determination. *See* 4 MELVILLE B. NIMMER & DAVID
NIMMER, NIMMER ON COPYRIGHT § 13.05 [A][2][a], p. 13-186 (2009) ("this second
factor more typically recedes into insignificance in the greater fair use calculus");
WILLIAM F. PATRY, PATRY ON FAIR USE § 4:1, p. 413 (2011)("Outside of unpublished
works, the [second] factor typically receives little attention."). Courts often find that
factual works have been used unfairly. *See, e.g., Harper & Row v. Nation Enters.*, 471
U.S. 539, 569 (1985)(Gerald Ford's memoirs); *Nihon Keizai Shimbun, Inc. v. Comline
Bus. Data, Inc.*, 166 F.3d 65, 72-73 (2d Cir. 1999)(abstracts of news articles); *Am.
Geophysical Union, v. Texaco Inc*., 60 F.3d 913, 925, 931 (2d Cir. 1994)(scientific
articles); *Basic Books, Inc. v. Kinko's Graphics Corp*., 758 F. Supp. 1522, 1533, 1547
(S.D.N.Y. 1991)(course packets).

The Copyright Act does not protect "facts" themselves, but it does protect an author's
manner of expressing those facts. It is not "fair use" to appropriate an author's "particular
expression." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976).
That is, of course, what Google does in its Library Project, since it allows users to
perform multiple search queries to see multiple verbatim snippets of an author's
"particular expression," regardless of whether the book searched is a work of fiction or
nonfiction. *See* Zack Decl., Exhibit 10 (ECF No. 991-1). *See also Rosemont Enters. v.
Random House Inc*., 366 F.2d 303, 310 (2d Cir. 1966)("The fair use privilege is based on
the concept of reasonableness and extensive verbatim copying or paraphrasing of
material set down by another cannot satisfy that standard."); *Harper & Row,* 471 U.S. at
546 (1985)( the purpose of copyright – to reward individual authors in order to benefit
the public – "applies equally to works of fiction and nonfiction").

(given Google's wholesale copying and display of verbatim expression), the Court can apply the relevant legal standard across large quantities of books. *See Nat'l Ass'n of Letter Carriers,* 604 F. Supp. 2d at 676 (although the court might "indeed have to categorize plaintiffs' members into large groups – *e.g.*, investigations related to criminal conduct and those not related to criminal conduct," this would not "require individualized proof, nor the participation of individual members"); *see also Am. Geophysical Union.*, 60 F.3d at 915 ( in a class action copyright suit, a sampling of works was reviewed to analyze whether a defendant's institutional, systematic reproduction of copyrighted material for archival purposes constituted copyright infringement or fair use).

The fourth fair use factor ("the effect of the use upon the potential market for or value of the original work") considers "'whether unrestricted and widespread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market'" for the original. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)(citing 3 MELVILLE B. NIMMER & DAVID NIMMER, Nimmer on Copyright § 13.05[A][4], p. 13-102.61 (1993)). This factor takes into account "'harm to the market for derivative works,' . . . defined as those markets 'that creators of original works would in general develop or license others to develop.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 145 (2d Cir. 1998)(citations omitted)(citing *Campbell, supra*, 510 U.S. at 592); *Am. Geophysical Union*, 60 F.3d at 930 (courts should consider "traditional, reasonable or likely to be developed markets" when assessing the fourth fair use factor). Here, where Google has copied millions of books in their entirety, distributed digital copies of these books to libraries, and displayed verbatim expression from these

books in its online search engine, it is "likely that cognizable harm to the original will

occur" from such commercial use. *See Campbell*, 510 U.S. at 591.

Evidence bearing on the fourth factor will be common to the members of the

Authors Guild (indeed, to the members of the class in this action). For instance, if

Google's actions are sanctioned as fair use, its uses can be replicated by others with

impunity. This means, for example, that numerous website operators could create online

books databases with insufficient security to prevent widespread piracy of copyrighted

books. If Google's uses are held to be fair uses, the potential market for and value of all

in-copyright books will be subject to substantial potential adverse effects, including (a)

exposure of copyrighted works to Internet piracy; (b) loss of control over the digital

reproduction, distribution, and display of copyrighted works; (c) loss of revenue from

sale of hardcopies and digital copies of works to libraries and other parties; and (d) loss

of revenue from licensing digital copies of works (and derivative works) to parties such

as search engines, websites and mobile content providers.[10]

Thus, the issues raised by Google's Library Project can be efficiently and fairly

adjudicated without the individual participation of every copyright owner whose book

has been appropriated.

E.     The Authors Guild Should Be Granted Leave to Replead, If Necessary

As demonstrated above, the Authors Guild is a proper associational plaintiff.

However, if the Court determines that there are any deficiencies in the Authors Guild's

---

[10] To the extent Google were to present evidence that in-print books are affected
differently by Google's Library Project than out-of-print books (*see* Google's Brief at
13), the Court can apply the relevant legal standards to these categories of books. *See
Nat'l Ass'n of Letter Carriers,* 604 F. Supp. 2d at 676. Again, individual participation by
all Authors Guild members is not necessary.

pleadings under *Hunt,* the Authors Guild should be granted leave to replead. *See, e.g.*, *Aurecchione v. Schoolman Transp. Sys.*, 426 F.3d 635, 639 (2d Cir. 2005); *Eastern Paralyzed Veterans Ass'n, Inc. v. Lazarus-Burman Assocs.*, 133 F. Supp. 2d 203, 210 (E.D.N.Y. 2001); *Atl. States Legal Found., Inc. v. Hamelin*, 182 F. Supp. 2d 235, 240 (N.D.N.Y 2001); *see also* Fed. R. Civ. P. 15; *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

Further, since "the District Court has leeway as to the procedure it wishes to follow" after a challenge to a plaintiff's standing, including proceeding with the litigation and leaving the jurisdictional decision until the close of evidence, *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co*., 436 F.3d 82, 87-88 (2d Cir. 2006), this Court could also resolve this issue at a later stage of the litigation as the Court deems appropriate.

CONCLUSION

For the foregoing reasons, Google's motion to dismiss should be denied.

Dated: February 6, 2012

/s/ Joanne Zack
Joanne Zack
Michael J. Boni
Joshua D. Snyder
Joanne G. Noble
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA  19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206
jzack@bonizack.com
mboni@bonizack.com
jsnyder@bonizack.com
jnoble@bonizack.com

Robert J. LaRocca
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
rlarocca@kohnswift.com

Sanford P. Dumain
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
sdumain@milberg.com

*Counsel for Plaintiffs*

22