DURIE TANGRI LLP
DARALYN J. DURIE *(Pro Hac Vice)*
ddurie@durietangri.com
JOSEPH C. GRATZ *(Pro Hac Vice)*
jgratz@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:      415-362-6666
Facsimile:      415-236-6300

Attorneys for Defendant
Google Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES, JOSEPH GOULDEN, and JIM BOUTON, on behalf of themselves and all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE INC., <br><br> Defendant. | Civil Action No. 05 CV 8136 (DC) <br><br> **ECF Case** |

## DEFENDANT GOOGLE INC.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND................................................................................ 1

    A.    Google Books.................................................................................................1

    B.    Effect on Authors of Inclusion in "Snippet View" .................................3

    C.    The Plaintiffs................................................................................................5

    D.    Publishing Industry Practices.....................................................................6

III.   ARGUMENT ....................................................................................................... 7

    A.    Legal Standard .............................................................................................7

    B.    The Individual Plaintiffs Do Not Adequately Represent All Absent Class Members. ...........................................................................7

    C.    Individual Issues Predominate Over Common Issues as to Copyright Ownership. ................................................................................10

          1.    Whether an author is a legal owner of the asserted exclusive right depends on the reversion terms of the publishing contract, and whether its requirements have been fulfilled. .............................................11

          2.    Whether an author is a beneficial owner of the asserted exclusive right depends on the terms of the publishing contract, which vary widely within the class.............................................................13

          3.    Whether an author is either a legal or a beneficial owner of the asserted exclusive right depends on the circumstances under which the work was created, independent of the terms of the publishing contract...............................................................15

    D.    Individual Issues Predominate Over Common Issues as to Fair Use. ..................17

          1.    The nature of the work varies widely. ......................................19

          2.    The amount and substantiality of the portion used is an individualized question. ............................................................20

          3.    The effect on the market is an individualized question. ...........................21

    E.    The Class Action Copyright Cases Do Not Support Certification Here...............23

    F.    Class Membership Depends on the Timing of Each Copyright Registration............................................................................................26

    G.    The Class Action Mechanism is Not Superior to Individual Actions...................27

IV.   CONCLUSION.................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009) ............................................ 18

*Allen v. Dairy Farmers of Am., Inc.,*
   No. 5:09-cv-230, 2011 WL 6148678 (D. Vt. Dec. 9, 2011) .................................. 8

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,*
   247 F.R.D. 156 (C.D. Cal. 2007) ......................................... 8

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
   222 F.3d 52 (2d Cir. 2000) ............................................... 7, 8

*Bakalar v. Vavra,*
   237 F.R.D. 59 (S.D.N.Y. 2006) .......................................... 7

*Baydale v. Am. Express Co.,*
   No. 09 Civ. 3016 (WHP), 2009 WL 2603140 (S.D.N.Y. Aug. 14, 2009) .............. 8

*Bieneman v. City of Chicago,*
   864 F.2d 463 (7th Cir. 1988) ............................................ 8

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
   448 F.3d 605 (2d Cir. 2006) ............................................. 21, 22

*Brattleboro Publ'g Co. v. Winmill Publ'g Corp.,*
   369 F.2d 565 (2d Cir. 1966) ............................................. 17

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994) ..................................................... 18, 19

*Castano v. Am. Tobacco Co.,*
   84 F.3d 734 (5th Cir. 1996) ............................................. 28

*Cmty. for Creative Non-Violence v. Reid,*
   490 U.S. 730 (1989) ..................................................... 16

*Cortner v. Israel,*
   732 F.2d 267 (2d Cir. 1984) ............................................. 13

*Crasto v. Estate of Kaskel,*
   63 F.R.D. 18 (S.D.N.Y. 1974) ........................................... 28, 29

*Daniels v. City of New York,*
   198 F.R.D. 409 (S.D.N.Y. 2001) ........................................ 10, 26

*Davis v. Blige,*
   505 F.3d 90 (2d Cir. 2007) .............................................. 11

*Dresser v. William Morrow & Co.*,
105 N.Y.S.2d 706 (1st Dep't 1951),
*aff'd*, 107 N.E.2d 89 (N.Y. 1952) ...................................................................................... 13

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*,
697 F.2d 27 (2d Cir. 1982)........................................................................................... 11

*Estate of Berlin v. Stash Records, Inc.*,
No. 95 Civ. No. 6575 (PKL), 1996 WL 374176 (S.D.N.Y. Jul. 2, 1996) ............................ 23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)...................................................................................................... 20

*Field v. Google Inc.*,
412 F. Supp. 2d 1106 (D. Nev. 2006) ................................................................................ 18

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ...................................................................................... 10

*Garcia v. Freedom Mortg. Corp.*,
274 F.R.D. 513 (D.N.J. 2011)........................................................................................... 29

*Gardner v. Equifax Info. Servs., LLC*,
No. Civ. 06-3102 ADM/AJB, 2007 WL 2261688 (D. Minn. Aug. 6, 2007)........................ 28

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)................................................................................................. 19, 22

*Hearn v. Meyer*,
664 F. Supp. 832 (S.D.N.Y. 1987)...................................................................................... 13

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006)............................................................................................. 7, 26

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)............................................................................................ 8, 23

*In re Napster, Inc. Copyright Litigation*,
No. C MDL-00-1369 MHP, 2005 WL 1287611 (N.D. Cal. June 1, 2005) ............... 23, 24, 25

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
153 F.3d 82 (2d Cir. 1998)............................................................................................... 16

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ..................................................................................... 18, 20

*Maxtone-Graham v. Burtchaell*,
631 F. Supp. 1432 (S.D.N.Y.),
*aff'd*, 803 F.2d 1253 (2d Cir. 1986)............................................................................. 19, 20

*MCA, Inc. v. Wilson*,
677 F.2d 180 (2d Cir. 1981)........................................................................................... 21

*Mid Am. Title Co. v. Kirk*,
   59 F.3d 719 (7th Cir. 1995) ............................................................................. 12

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002) ........................................................................... 10

*Morangelli v. Chemed Corp.*,
   275 F.R.D. 99 (E.D.N.Y. 2011) ....................................................................... 10

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010) ............................................................................. 17

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
   558 F.2d 1090 (2d Cir. 1977) ........................................................................... 12

*Núñez v. Caribbean Int'l News Corp.*,
   235 F.3d 18 (1st Cir. 2000) ............................................................................... 20

*Oboler v. Goldin*,
   714 F.2d 211 (2d Cir. 1983) ............................................................................. 28

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .......................................................................... 18

*Phillips v. Klassen*,
   502 F.2d 362 (D.C. Cir. 1974) ........................................................................... 9

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) .......................................................................... 8

*Quinto v. Legal Times of Washington, Inc.*,
   511 F. Supp. 579 (D.D.C. 1981) ...................................................................... 28

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
   161 F.2d 406 (2d Cir. 1946) ............................................................................. 27

*Silberman v. Innovation Luggage, Inc.*,
   No. 01 Civ. 7109 (GEL), 2003 WL 1787123 (S.D.N.Y. Apr. 3, 2003) .............. 14

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008) ............................................................................... 7

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ............................................................................ 18

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ................................................................ 22

*Utopia Entm't, Inc. v. Claiborne Parish*,
   No. CIV.A. 03-1355, ECF No. 256 (W.D. La. Jan. 10, 2006),
   *report and recommendation adopted*, 2006 WL 548476 (W.D. La. Mar. 6, 2006) .............. 23

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ................................................................... 8, 10

*Vulcan Golf, LLC v. Google Inc.*,
   254 F.R.D. 521 (N.D. Ill. 2008) ................................................................................. 25

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .................................................................................... 1, 10

*Ward v. Nat'l Geographic Soc'y*,
   208 F. Supp. 2d 429 (S.D.N.Y. 2002) ......................................................................... 17

*Warren v. Fox Family Worldwide, Inc.*,
   328 F.3d 1136 (9th Cir. 2003) ................................................................................. 15

*Washingtonian Pub. Co. v. Pearson*,
   306 U.S. 30 (1939) ........................................................................................... 27

*WB Music Corp. v. Rykodisc, Inc.*,
   No. Civ.A.94-2902, 1995 WL 631690 (E.D. Pa. Oct. 26, 1995) ........................................... 23

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ................................................................................. 19

*Wu v. Pearson Education, Inc.*,
   No. 09 CIV. 6557 RJH, 2011 WL 4526078 (S.D.N.Y. Sept. 30, 2011) ................................ 23, 24

**Statutes**

17 U.S.C. § 101 ................................................................................................ 11, 16

17 U.S.C. § 107 ................................................................................................... 19

17 U.S.C. § 107(1) ................................................................................................ 18

17 U.S.C. § 107(2) ............................................................................................ 18, 19

17 U.S.C. § 107(3) ................................................................................................ 18

17 U.S.C. § 107(4) ............................................................................................ 18, 21

17 U.S.C. § 201(a) ................................................................................................ 11

17 U.S.C. § 201(b) ................................................................................................ 11

17 U.S.C. § 410(d) ................................................................................................ 26

17 U.S.C. § 501(b) ....................................................................................... 10, 11, 13

**Rules**

Fed. R. Civ. P. 23 ................................................................................................. 7

Fed. R. Civ. P. 23(b)(2) .......................................................................................... 10

Fed. R. Civ. P. 23(b)(3) ................................................................................. 10, 15, 23, 29

Fed. R. Civ. P. 23(b)(3)(A) ...................................................................................... 27

v

**Other Authorities**

3 William F. Patry, *Patry on Copyright* § 7:11 (Aug. 2011) .......................................................... 12

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 67 (1976) ............................................................. 19

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) ......... 18, 21

S. Rep. No. 94-473, 94th Cong., 1st Sess. 64 (1965) .................................................................. 19

United States Copyright Office, Circular 23.............................................................................. 26

## I.      INTRODUCTION

Plaintiffs seek to certify a proposed class of authors of millions of different books targeting different readers, with different content and varying degrees of commercial success, of different levels of current interest and availability, published at different times and pursuant to different contracts with different publishers.  Each of these facts is relevant to the outcome of each class member's claims, and each can be evaluated only following an individualized, book-by-book analysis.  As a result, a classwide proceeding will not "generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2565 (2011) (emphasis in original) (citation omitted).

Moreover, there is a direct and fundamental conflict within the class.  As became apparent during the settlement approval process, authors differ in their views about Google Books.  New survey evidence shows that many authors directly benefit from the program, and affirmatively approve of the way in which Google has made books easier to find.  These authors have a conflict with the class representatives, who are suing to enjoin Google's scanning, indexing, and snippet display.

As set forth below, there is a conflict of interest between the named plaintiffs and class members; individual issues predominate over common ones; and class treatment is not clearly superior to individual actions.  For these reasons, class certification should be denied, and the individual plaintiffs should proceed with their individual claims.

## II.     FACTUAL BACKGROUND

### A.      Google Books

In 2004, Google began scanning book collections belonging to the University of Michigan, Harvard, Stanford, Oxford, and the New York Public Library.  As described on the Google blog in 2005:

> We think you should be able to search through every word of every book ever
> written, and come away with a list of relevant books to buy or find at your local

library.  We aim to make that happen, but to do so we'll need to build and maintain an index containing all this information.[1]

As part of the Google Books program, Google scans books in certain library collections, indexes them, and returns information about those books, including short "snippets" of text—about an eighth of a page—so that users can search for and find books they may wish to purchase or check out from a library.  Declaration of Daniel Clancy in Support of Google Inc.'s Opposition to Plaintiffs' Motion for Class Certification ("Clancy Decl.") ¶ 2.  On each page that shows snippets, Google provides links to buy the book on various online bookstores such as Amazon.com, and to find it in a nearby library.  Clancy Decl. ¶ 3.  There are no advertisements on these pages, and Google does not receive payments from the bookstores in connection with the "buy the book" links.  *Id.*  A portion of such a page, showing a book authored by one of the plaintiffs, is reproduced below:



Declaration of Joseph C. Gratz in Support of Google Inc.'s Opposition to Plaintiffs' Motion for Class Certification ("Gratz Decl."),  Ex. 1.

Google has scanned more than twenty million books as part of this program.  Clancy Decl. ¶ 4.  Users of Google Books can see search results that include snippets of text in English ("snippet view") for more than four million of these books.  *Id.*  Almost every conceivable type of book is included within Google Books, from novels to instruction manuals to historical works

---

[1] David Drummond, *Why We Believe in Google Print*, *at* http://googleblog.blogspot.com/2005/10/why-we-believe-in-google-print.html.

to children's picture books.  Clancy Decl. ¶ 5.  Google's service enables these books to be found—and bought in bookstores or located in libraries—in a way that would otherwise be impossible.  Clancy Decl. ¶ 5.  Google Books has also been used for a wide array of research and scholarly activities, from research on the development of the English language, published last year in the journal *Science*, to uncovering plagiarism in popular spy novels, as recounted in this week's *New Yorker*.[2]

Google also has a Partner Program, through which publishers provide Google with authorization to display much larger excerpts of works.  Clancy Decl. ¶ 6.  Through the Partner Program, Google displays full pages from books in response to users' search queries.  *Id.*  More than 45,000 publishers have chosen to participate in the Partner Program in order to make their works easier to find and purchase, and over 2.5 million books are included within the Partner Program.  *Id.*

### B.    Effect on Authors of Inclusion in "Snippet View"

Many authors perceive a benefit from, and affirmatively approve of, inclusion of their books in "snippet view" in Google Books.  Filed concurrently herewith is the Declaration of Hal Poret in Support of Google's Opposition to Plaintiffs' Motion for Class Certification ("Poret Decl.").  Mr. Poret, Senior Vice President at ORC International, conducted a survey of 880 authors randomly selected from *Contemporary Authors*, a standard reference work published by Gale Group listing biographical information regarding more than 100,000 living published authors.  Poret Decl. Ex. 1 at 3, 15.  Authors were contacted by telephone or email, and were asked questions regarding their view of Google's scanning, indexing, and snippet display of

---

[2] *See* Jean-Baptiste Michel et al., *Quantitative Analysis of Culture Using Millions of Digitized Books*, 331 Science 176 (2011), *available at* http://www.sciencemag.org/content/early/2010/ 12/15/science.1199644; Lizzie Widdicombe, *The Plagiarist's Tale*, The New Yorker, Feb. 13 & 20, 2012, at 52 ("Like a spy hiding in plain sight, 'Assassin of Secrets' appeared to be a bizarre aberration: an homage to James Bond that plagiarized Bond. The writer Jeremy Duns, alerted by a James Bond forum, began checking the text, plugging phrases into Google Books. He found a sentence from the American spy writer Charles McCarry, and another from Robert Ludlum.").

books. *Id.* at 3, 6-12. The survey shows that fifty-eight percent of authors affirmatively approve of the inclusion of their books in snippet view; fourteen percent affirmatively oppose that inclusion; and twenty-eight percent neither approve nor disapprove. *Id.* at 14. Forty-five percent believe inclusion in snippet view helps sales of their books; four percent believe it harms those sales; and fifty-one percent believe it has no effect one way or the other. *Id.* Nineteen percent believe inclusion in snippet view advances their economic interests more generally; eight percent believe it harms those interests; and seventy-four percent believe it has no effect one way or the other. *Id.* The reasons given by survey respondents for this perceived economic benefit are straightforward: "Because it is a different method for people to be aware of my books;" "Because people might come across it in an online search, [who] might, otherwise, never have heard of it. This is my experience[:] when I come across books in a Google search, I click on it, read the excerpt and in some cases, I've gone out and bought the books, one or two cases;" "If they read the excerpts[,] they might like the book." Poret Decl. Appendix F at 22-23 (respondents 100262, 100411, and 100525). In short, as one respondent said, inclusion in snippet view in Google Books is seen by many authors as "[t]he equivalent of advertising." *Id.* at 24 (respondent 100652). Some respondents also noted that the availability of Google Books assists in their own research. *See, e.g.*, *id.* at 1-6 (respondents 123, 127, 238, 246, 100101, 100233, 100271, 100305, 100440, 100489, and 100572). But some authors disagree, stating, for example, that "no one has the right to scan anything and benefit from it [without soliciting the] author[']s opinion," that they "mistrust corporate motives," or that they simply "[d]on't know enough about it." *Id.* at 15, 17 (respondents 100894, 100781, and 100812). Mr. Poret's report sets forth his methodology and these results in greater detail. Poret Decl. Ex. 1.

Although Google believes that Google Books provides benefits to all authors and publishers, Google recognizes that not all authors and publishers want their books included in Google Books. For this reason, Google has a policy of removing books from snippet view upon

request, and provides a simple web form for making such a request.[3]  Clancy Decl. ¶ 7.  None of

the named plaintiffs has made such a request to remove his or her book from snippet view.  *Id.*;

December 15, 2011 Deposition of Jim Bouton ("Bouton Dep."), Gratz Decl. Ex. 2, at 30:14-

32:13; January 6, 2012 Deposition of Joseph Goulden ("Goulden Dep."), Gratz Decl. Ex. 3, at

54:5-14; January 4, 2012 Deposition of Betty Miles ("Miles Dep."), Gratz Decl. Ex. 5,  at 57:18-

58:14.

 Google puts in place many safeguards to ensure that Google Books is used as an aid to

finding books, rather than as a replacement for sales of a book (or for any use which is

traditionally licensed).  Most importantly, Google only displays snippets, and displays only up to

three snippets in response to a given search query, even if the search term appears on dozens of

pages in the book.  Clancy Decl. ¶ 8.  The snippets are intended to provide enough context to

determine whether the book contains information of interest to the searcher, but not to act as a

replacement for the book itself.  *Id.*  Because reference works like dictionaries and cookbooks

are sometimes more useful in small snippets, and thus even the display of a snippet might in

some cases be a substitute for purchasing those books, Google does not display snippets of

reference works.  Clancy Decl. ¶ 9.  And Google puts numerous safeguards in place to ensure

that no user, and indeed no combination of users acting in concert, is able to view a full page, or

even to view several contiguous snippets—for example, by making the placement of snippets in

a page fixed, by displaying only one snippet per page in response to a given search, and by

"blacklisting" one snippet per page and one out of ten pages in a book.  Clancy Decl. ¶ 10.

 **C.** **The Plaintiffs**

 The three named plaintiffs are authors whose books have been published by major United

States publishers.  Joseph Goulden has written nonfiction works, primarily regarding 20th-

century history.  Goulden Dep., Gratz Ex. 3 at 59:19-60:4.  Two of Mr. Goulden's books are in

---

[3] *See* https://books.google.com/partner/exclusion-signup.

print.  *Id.* at 73:15-21.  Jim Bouton has written several memoirs and a book of fiction.  One of Mr. Bouton's books, *Ball Four*, is in print; the rest are not.  Bouton Dep., Gratz Ex. 2, at 74:22-75:9.  Betty Miles has written children's picture books and young adult novels.  Miles Dep., Gratz Decl. Ex. 5, at 42:13-22, 68:21-69:4.  Ms. Miles does not think that any of her books are in print, but does not know for sure.  *Id.* at 14:21-15:10.  The three named plaintiffs produced a few of the publishing contracts relating to their books, but more than half of the publishing contracts for the named plaintiffs' books are lost.  Gratz Decl. ¶¶ 3-6.

### D.    Publishing Industry Practices

When a publisher agrees to publish an author's book, the author and publisher execute a contract governing their relationship and their respective rights and responsibilities with respect to that book.  Publishing contracts transfer some rights to the publisher and reserve others to the author.   Declaration of E. Gabriel Perle in Support of Google Inc.'s Opposition to Plaintiffs' Motion for Class Certification ("Perle Decl.") ¶ 12.[4]  The publisher frequently receives the exclusive right to print and sell copies of the book, in exchange for a promise to pay royalties to the author for the copies sold.  *See* Perle Decl. ¶ 16.  Some publishing contracts transfer the right to make promotional use of book excerpts to the publisher, without requiring payment of a royalty to the author; others do not, reserving that right to the author in its entirety.  *Id.* ¶¶ 20-21.  The publishing contract may provide for reversion of those transferred rights to the author upon occurrence of some event—usually that the book has gone "out of print," a status that is defined differently for different books.  *Id.* ¶ 12-13.  Some editions of a book may be out of print, while others remain in print.  *Id.* ¶ 14.  A book from a small press which has not sold a copy in years may nonetheless be "in print," while a moderately successful book from a large press may go "out of print" even if it sells several copies a year; these choices, and how they are implemented,

---

[4] E. Gabriel Perle is a recognized expert on the structure and practices of the book publishing industry, with more than 50 years of publishing experience.  His qualifications are set forth in detail in his declaration.  Perle Decl. ¶¶ 4-11.

depend on the judgment of the publishers, and may not be communicated to either the author or to any centralized database of books in print.  Perle Decl. ¶ 14.  Many publishing contracts require, in order for rights to revert to the author, that the author submit a request for reversion some number of months after the work goes out of print.  *Id.* ¶ 15.  There is no central repository of requests for reversion or of publishers' responses thereto.  *Id.* ¶ 18.  Authors do not necessarily maintain records of whether rights have reverted; indeed, even the named plaintiffs in this case were unable to locate reversion correspondence for many of their books, and with respect to many of their books do not know what rights, if any, they own.  Perle Decl. ¶ 19; Goulden Dep., Gratz Decl. Ex. 3, at 60:12-73:14; Miles Dep., Gratz Decl. Ex. 5, at 76:17-83:16; Gratz Decl. ¶ 3.

## III.   ARGUMENT

### A.   Legal Standard

Plaintiffs bear the burden of showing that they meet the requirements of Federal Rule of Civil Procedure 23.  *Bakalar v. Vavra*, 237 F.R.D. 59, 63 (S.D.N.Y. 2006).  It is not sufficient that plaintiffs make "some showing" suggesting facts satisfying the Rule 23 requirements.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).  Instead, the Second Circuit has held that "a district judge may certify a class" only after "the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established[.]"  *Id.* at 41.  "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

### B.   The Individual Plaintiffs Do Not Adequately Represent All Absent Class Members.

The adequacy of representation inquiry considers whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  Google concurs with this Court's previous conclusion that Plaintiffs' attorneys "are qualified, experienced, and able to conduct the litigation."  Opinion

dated March 22, 2011, ECF No. 971 at 20.  But as this Court also noted, "there is a substantial question as to the existence of antagonistic interests between named plaintiffs and certain members of the class."  *Id.*  Indeed, the factual record now developed shows that there is empirical evidence of a fundamental conflict between the interests the named plaintiffs seek to advance and the interests of absent class members.  Simply put, the majority of class members do not object to the activities which the named plaintiffs are suing to enjoin, in many cases because they perceive those activities to help, rather than harm, the market demand for their books and their economic interests.

    "Not every conflict among subgroups of a class will prevent class certification—the conflict must be 'fundamental' to violate Rule 23(a)(4)."  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249, 254 (2d Cir. 2011) (finding fundamental conflict).  "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003); *see Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) ("to this Court's knowledge, no circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class").[5]  In other words, where the challenged conduct "may be taken as conferring economic

---

[5] *See also, e.g.*, *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2011 WL 6148678, at *16-17 (D. Vt. Dec. 9, 2011) (denying class certification on the ground that the relief sought by the named plaintiffs would harm some absent class members); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("Thus, a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class."), *cited with approval in Allen*, 2011 WL 6148678 at *16; *Baydale v. Am. Express Co.*, No. 09 Civ. 3016 (WHP), 2009 WL 2603140, at *4 (S.D.N.Y. Aug. 14, 2009) (rejecting a proposed class representative on adequacy of representation grounds, citing *Pickett*); *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988) (affirming denial of class certification in an airport noise case because some class members derived an economic benefit from the challenged conduct).

benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined," and this problem "cannot be avoided merely by saying that it is always open to members of a class to 'opt out' of any relief to which they are held entitled." *Phillips v. Klassen*, 502 F.2d 362, 367 (D.C. Cir. 1974).

Here, the named plaintiffs are suing to stop Google from scanning their books and displaying snippets of those books in response to searches by Google Books users. Fourth Amended Class Action Complaint ("Fourth Amended Compl."), ECF No. 985 at ¶¶ 45-52. The named plaintiffs claim that this practice harms their interests. Goulden Dep., Gratz Decl. Ex. 3, at 38:2-20; Miles Dep., Gratz Decl. Ex. 5, at 5:16-6:16, 13:1-14:4; Fourth Amended Compl. ¶¶ 36, 49. Only eight percent of the members of the proposed class agree. Poret Decl. Ex. 1 at 14. More than twice as many disagree, and believe that the requested relief would adversely affect their economic interests. *Id.*

Authors also understand themselves to receive non-economic benefits from Google Books. Most authors affirmatively approve of the inclusion of their books in snippet view. *Id.* Academic authors, in particular, say that they receive other benefits from Google Books, both individual and communal. A group of sixty-four academic authors, for example, has previously expressed their view, in a letter submitted by Professor Pamela Samuelson, that "indexes and snippets advance scholarly research and improve access to knowledge, especially when, as with [Google Book Search], searches yield links to libraries from which the relevant books can be obtained" and therefore directly advance the interests of academic authors in their scholarly pursuits. Samuelson letter dated Jan. 27, 2010, ECF No. 893 at 3.

The named plaintiffs are suing to take away something that most absent class members perceive as a benefit. They are acting in the interests only of those who believe that they suffer harm, and contrary to the interests of the majority of authors. This fundamental conflict between

the interests pursued by the named plaintiffs and the interest of absent class members renders representation inadequate. *Valley Drug Co.*, 350 F.3d at 1189.[6]

## C.   Individual Issues Predominate Over Common Issues as to Copyright Ownership.

Plaintiffs seek class certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  Plaintiffs bear the burden of showing that the "legal or factual questions that qualify each class member's case as a genuine controversy" that can be resolved "through generalized proof" are "more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002); *accord Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 124 (E.D.N.Y. 2011).  *See also Wal-Mart Stores, Inc.*, 131 S. Ct. at 2565.

Section 501(b) of the Copyright Act limits standing to sue to "[t]he legal or beneficial owner of an exclusive right under a copyright."  17 U.S.C. § 501(b).  Showing ownership (be it legal or beneficial) is a statutory requirement; without such a showing, a plaintiff lacks standing to sue.[7]  Determining whether each class member has standing will require three individualized

---

[6] In *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 141 (S.D.N.Y. 2006), the court rejected an argument that benefits flowing from the challenged conduct preclude class certification.  But in *Freeland*, there was "no reason to believe that the named plaintiffs' interests are any different from those of the class members they represent," because the record showed that each of the named plaintiffs, too, "appear[ed] to value" the challenged conduct.  *Id*. at 141-42.  Here, by contrast, all three named plaintiffs testified that they do not benefit from the challenged conduct, and survey evidence shows that they are at odds with most of the absent class members. Bouton Dep., Gratz Decl. Ex. 2, at 20:2-9; Goulden Dep., Gratz Decl. Ex. 3, at 39:2-8; Miles Dep., Gratz Decl. Ex. 5, at 11:20-13:3; *see* Poret Decl. Ex. 1 at 14.

[7] This is, strictly speaking, not only a Rule 23(b)(2) predominance problem, but also creates ascertainability and manageability problems. "[A] proposed class must be clearly defined so that it is administratively feasible for a court to determine whether a particular individual is a member," and "[t]he court must be able to make this determination without having to answer numerous fact-intensive questions." *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001) (internal quotations omitted).

inquiries, as set forth below: looking to the publishing contract to determine whether the author is a "legal owner;" looking to the publishing contract to determine whether the author is a "beneficial owner;" and looking to the circumstances of the work's creation to determine whether the work was "made for hire," thus rendering the author neither a legal nor a beneficial owner.

> ### 1.  Whether an author is a legal owner of the asserted exclusive right depends on the reversion terms of the publishing contract, and whether its requirements have been fulfilled.

One way an author could have standing to sue is by being a "legal" owner.  17 U.S.C. § 501(b).  The author of a work is its initial legal owner.  17 U.S.C. § 201(a).[8]  However, publishing contracts frequently contain an exclusive license from the author to the publisher as to some or all of the exclusive rights under a copyright.  Perle Decl. ¶ 16.  Those exclusive licenses act as a transfer of copyright ownership, divesting the author of legal ownership of those exclusive rights.  *Davis v. Blige*, 505 F.3d 90, 100 n.10 (2d Cir. 2007) ("Under current copyright law, exclusive licenses are recognized as a type of an ownership interest, conveying a particular exclusive right of copyright."); 17 U.S.C. § 101 (an "exclusive license" is one type of "transfer of copyright ownership"); *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir. 1982) ("An exclusive licensee of a right under a copyright is entitled to bring suit for infringement of that particular right.") (citations and internal quotation marks omitted).

Plaintiffs argue that "ownership is susceptible of proof through public records"— specifically, certificates of copyright registration.  Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Class Cert. Mot."), ECF No. 990 at 16.  While certificates of copyright registration are indeed, as plaintiffs, argue, "prima facie evidence of the facts stated

---

[8] In the case of a "work made for hire," discussed below in part III-C-3, the employer is considered the "author" for ownership purposes, 17 U.S.C. § 201(b), but corporate authors are excluded from the class definition.  Fourth Amended Compl., ECF No. 985 at ¶ 22.  The rules are different, and more complex, in the case of works published before the enactment of the Copyright Act of 1976.  *See infra* part III-C-3.

therein," *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 n.1 (2d Cir. 1977), the "facts stated therein" are not particularly helpful in determining whether an author was a legal or beneficial owner of a particular exclusive right at the time of an alleged infringement of that right.  A fact stated in a certificate of copyright registration is presumed to be true, but that presumption is rebuttable, and "the burden of proof in the sense of the risk of nonpersuasion . . . remains throughout the trial upon the party on whom it was originally cast"— here, the plaintiff.  *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (internal quotation omitted). [9]  And in many cases contrary evidence will show that these facts are no longer true, if they ever were.  At the simplest level, many publishing contracts provide that the copyright registration will be made in the author's name even when the publisher is the legal owner of the relevant exclusive rights.  Perle Decl. ¶ 25.  Conversely, many other publishing contracts provide that the copyright registration will be made in the publisher's name, and the publisher's name remains on the registration even if rights have reverted to the author, or if the author has become, by contract, a beneficial owner of exclusive rights under the copyright.  Perle Decl. ¶ 26.  In short, copyright certificates are not conclusive as to whether a particular author is "[t]he legal or beneficial owner of an exclusive right under a copyright"—a fact that every copyright plaintiff must prove.

After transferring rights to the publisher, the author may later regain legal ownership of those exclusive rights if the publishing contract provides for reversion of rights upon occurrence of some event, usually linked to the work going "out of print."  Perle Decl. ¶ 12.  But many publishing contracts require, in order for rights to revert to the author, that the author submit a

---

[9] Of course, the presumption of the validity of the copyright is also rebuttable, and may give rise to further individualized inquiries.  In the case of works whose copyright term began before January 1, 1964, for example, the work fell into the public domain if a renewal was not filed within a strictly-enforced one-year window.  *See, e.g.*, 3 William F. Patry, *Patry on Copyright* § 7:11 (Aug. 2011) (describing the renewal provision of the Copyright Act of 1909 and uncertainties associated with its interpretation).  Determining whether pre-1964 works were timely renewed is yet another uncertain and fact-intensive inquiry.

request for reversion some number of months after the work goes out of print.  Perle Decl. ¶ 15.

Although the author can thereafter show legal ownership of copyright by reference to the

publisher's letter acknowledging reversion, there is no central repository of such letters, so in

order to determine whether the author is the legal owner of any exclusive rights, one must ask the

author to search his files for letters that may have been received decades before.  Some authors

(including the three named plaintiffs here) do not maintain records showing whether rights have

reverted with respect to all of their books.  Perle Decl. ¶ 19; Goulden Dep., Gratz Decl. Ex. 3, at

60:12-73:14; Miles Dep., Gratz Decl. Ex. 5, at 76:17-83:16; Gratz Decl. ¶ 3.  Thus, determining

whether the author is a legal owner of a particular book is a fact-intensive, individualized inquiry

that must be undertaken on a book-by-book basis, and which may depend on testimony and

contested recollections rather than documents.

> ### 2. Whether an author is a beneficial owner of the asserted exclusive right depends on the terms of the publishing contract, which vary widely within the class.

"[A]n author who had parted with legal title to the copyright in exchange for percentage

royalties based on sales or license fees" is a beneficial owner.  *Cortner v. Israel*, 732 F.2d 267,

271 (2d Cir. 1984) (citation omitted).  An author with a mere reversionary interest—that is, the

copyright may someday revert to him upon the occurrence of some event, but he does not have

the right to receive royalties until the occurrence of that event—is not a "beneficial owner."

*Hearn v. Meyer*, 664 F. Supp. 832, 840-41 (S.D.N.Y. 1987).  *See also, e.g.*, *Dresser v. William*

*Morrow & Co.*, 105 N.Y.S.2d 706 (1st Dep't 1951), *aff'd*, 107 N.E.2d 89 (N.Y. 1952)

(adjudicating a dispute regarding a book contract which provided for a transfer of copyright in

exchange for an "outright fixed payment").  Thus, only those authors who have the right to

receive royalties under their publishing contracts can be beneficial owners, and the terms of the

publishing contract must be examined to determine whether the author has that right.

The right to receive royalties with respect to *some* use is not enough to have standing

with respect to the conduct at issue here.  The Copyright Act confers standing on "[t]he legal or

beneficial owner of *an exclusive right* under a copyright" to sue for "infringement *of that*

*particular right* committed while he or she is the owner of it."  17 U.S.C. § 501(b) (emphasis added).  Exclusive rights are infinitely divisible; one who is the legal owner of some exclusive rights under a particular copyright may be the beneficial owner of other exclusive rights under that copyright, and may not be an owner at all with respect to yet other exclusive rights under that copyright.  *See, e.g.*, *Silberman v. Innovation Luggage, Inc.*, No. 01 Civ. 7109 (GEL), 2003 WL 1787123, at *6-7 (S.D.N.Y. Apr. 3, 2003) (holding, based on contractual terms, that the plaintiff had transferred away the exclusive right to reproduce his photograph in its entirety as a poster of one size, but retained legal ownership of the exclusive right to reproduce it as a poster of a different size).

The question here is whether each author is the beneficial owner of the *particular* exclusive right implicated by Google's scanning and display of snippets.  Some publishing contracts transfer all relevant exclusive rights to the publisher and provide that no royalty is to be paid for uses that facilitate book sales, referred to as "promotional" uses.  *See* Perle Decl. ¶¶ 20-22.  Under such contracts, the author has given the publisher legal ownership, but the author does not have the right to receive royalties for those promotional uses.  Thus, under such contracts, the author is not a legal or beneficial owner of the exclusive rights implicated in making promotional use, since the publisher is the legal owner and has no obligation to pay royalties in connection with that use.  If anyone has standing to sue in connection with promotional uses under such contracts, it is the publisher, not the author.

These contractual terms are relevant here because Google's use directly facilitates sales of copies of the book.  Thus, in order to separate those authors who have standing from those who do not, the court must inquire into whether each author is either the legal or beneficial owner of the exclusive right to make promotional use of excerpts of the book.

That analysis cannot be done on a mass basis, since each publishing contract is different.  As noted, some publishing contracts provide for royalty-free promotional uses.  Perle Decl. ¶ 20; *see, e.g.*, Gratz Decl. Ex. 10A at AG100081 ¶ 12.  Some expressly prohibit such uses, reserving all electronic distribution rights to the author.  Bouton Dep., Gratz Decl. Ex. 2, at 57:22-58:20

(discussing Gratz Decl. Ex. 7 at 17 (Rider A)); Perle Decl. ¶ 21.  And some publishing contracts do not discuss promotional use of excerpts at all.  Perle Decl. ¶ 21; *see, e.g.*, Gratz Decl. Ex. 10B at AG100186-91.  Review of each publishing contract will be required to sort out which is which.

Even if the court were to attempt to undertake the task of inquiring individually into the terms of each publishing contract, the unavailability of the contracts themselves would render that task almost impossible.  Many authors do not have copies of the contracts governing the rights to their books.  Even the named plaintiffs in this action have not been able, after years of litigation and substantial efforts, to produce even *half* of the publishing contracts for their books. Gratz Decl. ¶¶ 3-6.  Any effort to reconstruct the terms of those contracts would require testimony and other various sources of proof, leading to an even more individualized inquiry.  As a result, the complexity and uncertainty involved in determining which class members have standing with respect to which books defeats the predominance requirement of Rule 23(b)(3).

> **3.      Whether an author is either a legal or a beneficial owner of the asserted exclusive right depends on the circumstances under which the work was created, independent of the terms of the publishing contract.**

If an author is neither a legal nor a beneficial owner, he lacks standing to bring a claim. A person who created a "work made for hire," even if he has a right to receive royalties, is neither a legal nor a beneficial owner, as all rights under the copyright vested in the employer. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003).  Those who wrote books as "works made for hire" thus lack standing to sue.

Determining whether a work is made for hire is not a simple matter and cannot be done based on simple objective evidence.  In order to meet their burden to show ownership of the copyright, and to ascertain whether each author falls within the class definition, plaintiffs must undertake an intensive factual inquiry.  For example, Joseph Goulden appears to own the copyright in some of his books (*e.g.*, *The Money Lawyers*), but at least one other such book is a work made for hire (*The News Manipulators*).  Goulden Dep., Gratz Decl. Ex. 3, at 58:6-59:3.

15

Under the Copyright Act of 1976, the analysis to be applied in determining whether a work is "made for hire" differs based on the nature of the work.  With respect to textbooks and other instructional texts, a work is "made for hire" if there is an agreement saying that the work is considered a work made for hire.  *See* 17 U.S.C. § 101 (including "an instructional text" among categories of works which may be regarded as works made for hire pursuant to the agreement of the parties).  But for most other books, a work is made for hire only if it is prepared by an employee within the scope of his or her employment.  *See* 17 U.S.C. § 101.  With respect to any particular work, making that determination is extremely fact-intensive.  The Supreme Court has held that in order to determine whether a particular work was created within the scope of employment under the Copyright Act of 1976, "we consider the hiring party's right to control the manner and means by which the product is accomplished," identifying twelve common-law factors that must be considered in determining whether a work is "made for hire."  These factors include "the location of the work," "whether the hiring party has the right to assign additional projects to the hired party," and "the tax treatment of the hired party."  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989).  No shortcuts can be taken, because "[n]o one of these factors is determinative."  *Id*. at 752.

These issues will be even thornier with respect to books written before the Copyright Act of 1976, which made significant changes to the law of copyright ownership, went into effect.[10] Under the previous statute, the Copyright Act of 1909, determining whether copyright arose in the writer or in someone else as a "work for hire" turns on whether the work was created at the

---

[10] If the author was not a United States national at the time of the work's creation, neither the Copyright Act of 1976 nor the Copyright Act of 1909 determines the ownership of rights. Instead, the Court would need to apply the copyright law of the country where the work was created in order to determine who owns which rights.  *See, e.g.*, *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90 (2d Cir. 1998) ("Since the works at issue were created by Russian nationals and first published in Russia, Russian law is the appropriate source of law to determine issues of ownership of rights.").  This would be necessary, for example, in the case of an author who wrote a book abroad and then moved to the United States.

"instance and expense" of another who had "the right to exercise control over the manner in which the artist executed the work" and whether there exists a later written or oral agreement reserving copyright in the writer. *Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d 429, 435, 438 (S.D.N.Y. 2002) (applying the 1909 Act and denying summary judgment on the "work for hire" question due to "a genuine issue of fact regarding the existence of an implied-in-fact agreement that he would retain copyright in his work"); *Brattleboro Publ'g Co. v. Winmill Publ'g Corp.*, 369 F.2d 565, 567 (2d Cir. 1966) (under the 1909 Act, "copyright shall be in the person at whose instance and expense the work is done").  The fact-intensive inquiries necessary for plaintiffs to prove that they are legal or beneficial owners of copyright will be a major part of the litigation of this case.

### D.   Individual Issues Predominate Over Common Issues as to Fair Use.

Google's fair use defense lies at the heart of this case.  Plaintiffs' brief lists "Whether Google's actions constitute a 'fair use' of the Books" as one of the alleged "Questions of law or fact common to the Class."  Class Cert. Mot. at 10.  Google believes that its conduct in scanning works and displaying snippets of them is fair for all works included within Google Books.  But that does not mean that the evidence proving fair use is the same in all cases.  Litigating the fair use question will require individualized evidence, as discussed below. [11]

Although Google bears the burden at trial of proving the facts underlying its fair use defense, Plaintiffs bear the burden at this stage of demonstrating that common questions predominate as to all issues in the case, including the question whether Google's uses are fair. *See Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010) ("While [defendant] will ultimately bear the burden of proving the merits of" its affirmative defense, the burden remained on plaintiffs to support their motion for class certification by showing "that more 'substantial'

---

[11] The question before the court, of course, is not the outcome of the fair use analysis, which will be briefed fully at the appropriate stage, but whether the fair use analysis involves numerous book-by-book factual inquiries.

aspects of this litigation will be susceptible to generalized proof for all class members than any individual issues"); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 322 (4th Cir. 2006) ("the standard justifications for allocating the burden of proving an affirmative defense to the defendant—efficiency and fairness—disappear when the thing to be proved is no longer the merit of the defense but compliance with Rule 23.").

The first fair use factor is "the purpose and character of the use."  17 U.S.C. § 107(1). Use of a work is transformative, and therefore likely to be found fair, when it "adds something new [to the original work], with a further purpose or different character," rather than "merely supersed[ing] the objects of the original creation."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal quotations omitted) (citing Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).  This is the only factor that could be resolved on a class-wide basis.[12]

But the fact that the purpose and character of the use raises common questions is not enough.  In order for plaintiffs to prevail, evidence must be presented regarding the second, third, and fourth fair use factors: "the nature of the copyrighted work," "the amount and substantiality of the portion used," and "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(2)-(4).  "All are to be explored, and the results weighed

---

[12] Google's use—scanning, indexing, and the display of short "snippets" in response to search queries—is highly transformative, because it does not supersede the works themselves, but instead provides a new way for interested parties to learn about those works.  *See, e.g.*, *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) (holding that copying of entire works for the purpose of indexing a large corpus of copyrighted papers was fair use due in large part to its transformativeness); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165, 1169-70 (9th Cir. 2007) (holding that copying of entire works for the purpose of rendering searchable a large corpus of copyrighted photographs was fair use in large part due to its "highly transformative" nature, since "a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool" which "may be more transformative than a parody"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (same); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1118 (D. Nev. 2006) (holding that copying of entire works for the purpose of making more reliably available a large corpus of copyrighted web pages was fair use due in large part to its transformativeness).

together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.  The presence of those issues, and the necessity of exploring and weighing each on a work-by-work basis, defeats the predominance requirement.

### 1.    The nature of the work varies widely.

The second fair use factor looks to "the nature of the copyrighted work."  17 U.S.C. § 107(2).  It "calls for recognition that some works are closer to the core of intended copyright protection than others[.]"  *Campbell*, 510 U.S. at 586.  The diverse array of books at issue in this case are not all of a single "nature"; indeed, the books at issue are of every conceivable "nature," from Michael Crichton's *Jurassic Park* to Henry Melville Dowsett's *Handbook of Technical Instruction for Wireless Telegraphists* to Volume 2 of the 1960 edition of *Federal Practice and Procedure*.  *See* Gratz Decl. Ex. 11 (reflecting snippet view).

Some of these works are in print and some are not.  "Although going out of print does not terminate a copyright, it is an appropriate element to consider when assessing the impact on a copyrighted work's potential market."  *Maxtone-Graham v. Burtchaell*, 631 F. Supp. 1432, 1438 (S.D.N.Y.), *aff'd*, 803 F.2d 1253 (2d Cir. 1986).  In discussing the impact of the nature of the work on the fair use analysis, the legislative history of Section 107 of the Copyright Act states that "whether or not the work is available to the potential user" is "[a] key, though not necessarily determinative, factor in fair use."  S. Rep. No. 94-473, 94th Cong., 1st Sess. 64 (1965); H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 67 (1976), *cited with approval in Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 553-54 (1985).  *See also Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1123 (9th Cir. 2000) ("Moreover, the fact that MOA had been out of print for nine years at the time of PCG's publication and could only be obtained through some libraries and used bookstores also supports a finding of fair use under the first factor.").

Further, determining whether a book is "in print" or "out of print" may seem like a straightforward or mechanical inquiry, but it can be a complex and fact-intensive one.  Some editions of a book may be out of print, while others remain in print, and a book's status may not

be communicated to either the author or to any centralized database of books in print.   Perle

Decl. ¶ 14.   Even one of the named plaintiffs does not know whether books she wrote are in

print.   Miles Dep., Gratz Decl. Ex. 5, at 14:21-15:10.   The nature of each particular work must

be examined, further demonstrating that individual issues predominate over common ones.

>    2.    **The amount and substantiality of the portion used is an individualized
>          question.**

The third fair use factor is "the amount and substantiality of the portion used."   That the

entirety of each work must be scanned and indexed in order to facilitate the display of short

excerpts in response to search queries does not affect the third factor, since copying of the whole

does not weigh against fair use when that copying is necessary to the fair use purpose.   *See, e.g.*,

*Kelly*, 336 F.3d at 820-21 (holding that where copying only a portion would have defeated the

usefulness of the search engine, the third factor favored neither party, finding fair use); *Núñez v.

Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) (the amount used was "of little

consequence" where the defendant "admittedly copied the entire picture; however, to copy any

less than that would have made the picture useless to the story").   With respect to the display of

snippets, this factor varies from work to work in two important ways.

*First*, the amount used varies from book to book.   An eighth of a page of Joseph

Goulden's 428-page *The Money Lawyers* is a much smaller percentage of the work than an

eighth of a page of Betty Miles' 32-page *Goldilocks and the Three Bears*.

*Second*, the "substantiality" of the portion used varies from snippet to snippet and book to

book.   The second factor, in other words, "may turn on qualitative assessments."   *Maxtone-

Graham*, 803 F.2d at 1263.   For example, the portion used is not at all "substantial" when it

consists of material that is not copyrightable.   Plaintiffs cannot rest their claim on the display of

snippets that are purely informational in nature, since those snippets contain no copyrightable

authorship, and their display cannot constitute copyright infringement.   *See Feist Publ'ns, Inc. v.

Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991).   Some entire works—and some portions of many

works—are purely informational in nature.  *See, e.g.*, Samuel M. Selby, *Standard Mathematical Tables* (1974), Gratz Decl. Ex. 12 (consisting almost entirely of standard mathematical tables).

As a result, unless this factor were found to favor fair use as to all works, the Court would be required to assess the length of the work and the quantitative amount and qualitative substantiality of that work which snippets displayed from that work represent.  Such an individualized inquiry, which must be undertaken in order for plaintiffs to prevail not just for each class member but for each book (and, perhaps, for each snippet) further demonstrates that common issues do not predominate.

### 3.    The effect on the market is an individualized question.

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  "This analysis requires a balancing of 'the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.'"  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981)).  "The fourth factor disfavors a finding of fair use only when the market is impaired because the . . . material serves the consumer as a substitute, or . . . supersedes the use of the original."  Leval at 1125, *cited with approval in Dorling Kindersley*, 448 F.3d at 614.  The fourth factor also takes into account any positive effect on the market as a result of the challenged use.  *See Dorling Kindersley*, 448 F.3d at 615 n.5 ("To the contrary, had the book been commercially successful— which it was not—it might have garnered interest in the original images in full size because the reduced images have such minimal expressive impact.  An aficionado might seek more than a 'peek.'").

Plaintiffs contend that the economic interests of authors are harmed by the display of snippets of their works.  In order to prove that point, Plaintiffs would be required to put in evidence in support of that proposition.  For example, a plaintiff might demonstrate a dip in book sales for a book that was included in snippet view, and argue that the dip was the result of

Google's conduct, rather than other factors such as diminishing interest in the subject matter of the book. This requires an individualized inquiry.

Plaintiffs would also need to show that the harm results from snippets substituting for sales or licenses of the content of the book, rather than resulting from Google's transformative creation of an index that renders works searchable and findable—a type of harm that is not cognizable under the fourth factor. *See Dorling Kindersley*, 448 F.3d at 614 (only "impairment to a traditional, as opposed to a transformative market" is cognizable). Any author claiming harm will need to come forward and identify the harm to the market for his book, and Google must be given the opportunity to ascertain whether the claimed harm results from Google's conduct or from other factors, and to what extent countervailing benefits to the author ameliorate any claimed harm. That is the type of evidence courts consider in adjudicating the fourth factor, and it is the type of evidence that will need to be presented at trial in this action. *See, e.g.*, *Harper & Row*, 471 U.S. at 567 (looking to evidence of another magazine's cancellation of its projected serialization of the copied work and its refusal to pay $12,500 as direct evidence of market harm).

The views of the authors—who are at least competent witnesses as to whether they themselves have suffered economic injury—bear out the individualized nature of this inquiry. Mr. Poret's survey shows that only eight percent of authors believe that they have been harmed economically from Google Books; nineteen percent believe that they have received an economic benefit from Google Books; and seventy-four percent believe that there is no effect on their economic interests one way or the other. Poret Decl. Ex. 1 at 14. Determining what, if anything, separates the eight percent of authors who claim harm from the other authors who do not claim harm requires case-by-case analysis.[13]

---

[13] *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) is not to the contrary. In *MP3.com*, the defendant chose to present its fair use arguments as to all factors in an across-the-board manner as to all of the works at issue, which were popular CDs owned by the nine defendants. *See* MP3.com's Consolidated Opposition to Plaintiffs' Motions for Partial

### E.     The Class Action Copyright Cases Do Not Support Certification Here.

Class action copyright cases are few and far between.  In several such cases, contested class certification motions have led to denial of class certification.  *See Estate of Berlin v. Stash Records, Inc.*, No. 95 Civ. No. 6575 (PKL), 1996 WL 374176, at *2 (S.D.N.Y. Jul. 2, 1996) (plaintiffs failed to prove typicality); *WB Music Corp. v. Rykodisc, Inc.*, No. Civ.A.94-2902, 1995 WL 631690, at *6 (E.D. Pa. Oct. 26, 1995) (plaintiffs failed to prove predominance); *Utopia Entm't, Inc. v. Claiborne Parish*, No. CIV.A. 03-1355, ECF No. 256 (W.D. La. Jan. 10, 2006) (plaintiffs failed to prove predominance or superiority, in part due to fair use issues) (attached to the Gratz Decl. as Ex. 16), *report and recommendation adopted*, 2006 WL 548476, at *1 (W.D. La. Mar. 6, 2006).  In other such cases, proposed class action settlements have been rejected for failure to meet class certification requirements.  *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 254-55 ("We therefore hold that the district court abused its discretion in certifying the class based on its finding that class representation was adequate.").

Rule 23(b)(3) classes have been certified in only two copyright cases—*Wu v. Pearson Education, Inc.*, No. 09 CIV. 6557 RJH, 2011 WL 4526078 (S.D.N.Y. Sept. 30, 2011) and *In re Napster, Inc. Copyright Litigation*, No. C MDL-00-1369 MHP, 2005 WL 1287611 (N.D. Cal. June 1, 2005).  Neither supports plaintiffs' request for class certification.

In *Wu*, class certification was granted as to one of two related cases (*Wu I*) and denied as to the other (*Wu II*).  Both *Wu* cases involved claims as to a single type of book from a single publisher.  In both, the plaintiff alleged that the defendant infringed copyright by printing certain photographs in textbooks without the necessary license.  In *Wu I*, the claim was that the defendant had a license permitting it to print a certain number of copies, and the defendant printed more than the permissible number.  The resolution of this issue depended on the

---

Summary Judgment, *available at* 2000 WL 34474983.  But, as discussed in this section, consideration of the fair use factors in this case requires book-by-book analysis.

interpretation of "a single provision that varies little in its form from contract to contract, specifically that Pearson is authorized to print no more than a specified number of books." *Wu* at *6. Because those contracts were in the possession of the defendant and each "licensing agreement lists a print run, and Pearson has printed a number of copies of a textbook that is either greater or less than that number," the court regarded the contract interpretation question as "a fairly mechanical inquiry." *Wu* at *16. Here, by contrast, class members' publishing contracts are not readily available (if copies exist at all), and those contracts are needed to determine whether a particular class member is a "legal or beneficial owner of an exclusive right under a copyright" with standing to sue. Without the contracts in hand, the court must rely on class members' recollections about the terms of contracts sometimes signed decades ago. Evaluating the credibility of each class member's testimony as to contractual terms will be far from the sort of "mechanical inquiry" that the court found permissible in *Wu I*.

In fact, this case is much more like *Wu II* than like *Wu I*. In *Wu II*, the claim was that the defendant included photographs in textbooks and secured the necessary licenses only after printing had already begun. The question whether copies printed before the execution of the contract were licensed is one which depended on varying terms of the contract at issue, and in some cases depended on oral representations. *Wu* at *16. The court thus denied class certification on the ground that common issues did not predominate. *Wu* at *19. Here, as in *Wu II*, there are thousands of different contracts at issue which may have different terms, and determining what those terms are will require more than simply reading a handful of form contracts. The facts regarding copyright ownership in this case are far murkier than the interpretive questions in *Wu II*, since in *Wu II* the court at least had written contracts before it as a starting point. Here, by contrast, with respect to many class members' books (and indeed with respect to most of the *named plaintiffs'* books), the contract necessary to determine whether the plaintiff has a claim has been lost forever. *See* Gratz Decl. ¶¶ 3-6.

In *Napster*, the plaintiffs sought certification of a class consisting of all of the music publishers who had delegated licensing rights in their musical works to the Harry Fox Agency,

which administers mechanical reproduction rights for most music publishers in the United States. *Napster*, 2005 WL 1287611, at *1. Each member of the class had evidently already satisfied the Fox agency as to his ownership of copyright, and each member had designated the Fox agency to license mechanical reproduction rights to all comers. *Id.* As such, there was no reason to think that individual class members wanted to individually control their own claims: "the fact that all of the class members have retained the Fox Agency to license their copyrighted works and collect royalties on their behalf suggests a preference for delegating copyright licensing and enforcement duties that is inconsistent with a widespread desire on the part of absent class members to prosecute their claims in individual actions." *Id.* at *8. But there is no Harry Fox Agency for books; there is no central group to whom all class members have delegated their licensing rights. No central group has aggregated the ownership information for book authors; that is why the missing publishing contracts present such a problem here, and why determining ownership cannot be assisted here by a central group which maintains all of the records, as it was in *Napster*. *Cf. Napster* at *9 (the Fox agency's "offer to work closely with the class representatives and class counsel in shouldering the administrative burden associated with maintaining the class action should reduce, if not eliminate, any complications that may arise from adjudicating the individual aspects of the class members' claims"). *See also Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 537 (N.D. Ill. 2008) (distinguishing *Napster* and denying class certification on predominance and superiority grounds in a trademark action in view of "the possibility of hundreds if not thousands of individual hearings related to ownership, distinctiveness and the applicability of affirmative defenses"). And unlike the music publishers in *Napster*, the authors here have not chosen to delegate their decisionmaking power to a single central organization, and hold widely varying views on whether their books should be included in Google Books, with many approving of and benefiting from the challenged conduct. Poret Decl. Ex. 1 at 14. The factors that led the *Napster* court to find predominance and superiority are absent here.

**F.      Class Membership Depends on the Timing of Each Copyright Registration.**

"Although ascertainability of the class is an issue distinct from the predominance requirement for a (b)(3) class," the need for "numerous individualized determinations of class membership" provides "further support for our basic conclusion that individual questions will permeate this litigation." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 45. *See Daniels*, 198 F.R.D. at 414 ("The court must be able to [determine class membership] without having to answer numerous fact-intensive questions.") (internal quotation omitted). The class definition is limited to those who own a book the copyright in which was "registered with the United States Copyright Office within three months after its first publication." Fourth Amended Compl., ECF No. 985 ¶ 22. Thus, in order to determine class membership, the court must determine, with respect to each book, the publication date and the effective date of the registration.

"Registrations for all works dating from January 1, 1978, to the present are searchable in the online catalog,"[14] and that catalog includes information regarding both registration and publication date. Registrations for the millions of works dating from before January 1, 1978, however, are not available on the Copyright Office's online catalog. Instead, they are recorded in the Catalog of Copyright Entries published by the Copyright Office. That Catalog (which Google has scanned and made available in the Books product) can be used, with a bit of work, to determine the date of publication.

Then one must determine the effective date of registration. "The effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office." 17 U.S.C. § 410(d). The Catalog of Copyright Entries does not record the effective date of registration, and that date does not appear on copyright registration certificates issued before January 1, 1978. *See* Gratz Decl.

---

[14] United States Copyright Office, Circular 23, *at* http://www.copyright.gov/circs/circ23.pdf, Gratz Decl. Ex. 13.

Ex. 14 at viii (reflecting only date of publication in Catalog of Copyright Entries) & Ex. 15 (pre-1978 registration certificates produced by plaintiff Miles).

Thus, in order to determine class membership under the proposed class definition, each class member claiming infringement of a pre-1978 book would need to present documentary evidence or testimony regarding events taking place more than thirty years ago.  In many cases, that information does not exist.  *See, e.g.*, Bouton Dep., Gratz Decl. Ex. 2, at 80:2-7.  Many pre-1978 books were not registered within three months of publication.  Perle Decl. ¶ 23.  This comes as no surprise, since under the previous copyright law (the Copyright Act of 1909), no consequences flowed from failure to register within three months of publication.  *See, e.g.*, *Washingtonian Pub. Co. v. Pearson*, 306 U.S. 30, 31 (1939) (14-month delay between publication and copyright registration did not affect remedies); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 408 (2d Cir. 1946) (27-year delay between publication and copyright registration did not affect remedies).

Even if the publishing contracts were available, reviewing each one would be of little assistance in determining the date of registration.  Some recent publishing contracts require the publisher to register the copyright within 90 days.  Perle Decl. ¶ 27(c); *see, e.g.*, Gratz Decl. Ex. 10A at AG100013 ¶ 4(A).  But this requirement is not a guarantee that registration was timely accomplished, and many other contracts do not provide that the copyright will be registered within a certain time.  Perle Decl. ¶¶ 24, 27; *see, e.g.*, Gratz Decl. Ex. 10B at AG100193 ¶ 6(a).  And with some books, the copyright is not registered until long after publication.  For example, Jim Bouton's 2003 book *Foul Ball* was not registered until after the lack of registration was pointed out to him during his deposition in this case this past December.  Bouton Dep., Gratz Decl. Ex. 2, at 87:22-88:4.

### G.    The Class Action Mechanism is Not Superior to Individual Actions.

The class mechanism is not "superior" to individual actions because there is strong evidence of authors' interest in "individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).

*First*, class members have ample financial incentive and ability to pursue their claims individually given the availability of costs and attorneys' fees under the Copyright Act.  The availability of attorneys' fees is a "common basis for finding non-superiority."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).  *See also Gardner v. Equifax Info. Servs., LLC*, No. Civ. 06-3102 ADM/AJB, 2007 WL 2261688, at *6 (D. Minn. Aug. 6, 2007) ("The attorney's fees provision [of the Fair Credit Reporting Act], allowing harmed individuals to pursue meritorious claims without incurring financial detriment, weighs against a finding of class action superiority over other litigation mechanisms.").

The Copyright Act's allowance for the recovery of statutory damages and attorneys' fees is intended to encourage and make possible individual lawsuits.  As the court explained in *Quinto v. Legal Times of Washington, Inc.*, 511 F. Supp. 579, 581 (D.D.C. 1981), "[a]n award of attorney's fees . . . prevents copyright infringements from going unchallenged where the commercial value of the infringed work is small and there is no economic incentive to challenge an infringement through expensive litigation."  *See also Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir. 1983) (the attorney fee provision of the Copyright Act "assures equal access to courts, provides an economic incentive to challenge infringements, and penalizes the losing party").  That Congress provided an incentive for individual copyright suits by by making costs and attorneys' fees available weighs against the need for class enforcement.

*Second,* disagreement within the class as to the goals of the litigation and its desired outcome confirms that class members have an interest in individually controlling their claims.  In *Crasto v. Estate of Kaskel*, 63 F.R.D. 18 (S.D.N.Y. 1974), intra-class disagreement similar to that seen here persuaded the court that a class action was not the superior vehicle for bringing securities claims against a co-op by its current and former residents.  The court explained that superiority was lacking "primarily because [the Court] believe[s] that the members of the class have a strong interest in individually controlling the prosecution of their claims."  *Id.* at 24.  In reaching this conclusion, the court considered the fact that the "basic interest of all the class members [was] not necessarily in recovering their investments or damages."  *Id.*  Some of the co-

op plaintiffs may have preferred "not to litigate at all but to attempt to reach an amicable agreement with defendants" and stay in the co-op, whereas others preferred "to move out of the building, sell their shares and attempt to collect damages from defendants." *Id.*

Here, too, the evidence of disagreement within the class is overwhelming. The results of the survey of authors and the submissions of authors in opposition to class certification show that the "ends sought or the strategy adopted by the class representatives" are not "shared by all members of the class whose individual monetary interests may be transcended by other considerations." *Crasto*, 63 F.R.D. at 24; *see* Poret Decl. Ex. 1 at 14.

Moreover, the "extremely high number of class members" who opted out of the Amended Settlement Agreement—approximately 6,800—is further evidence that class members wish to retain control over their individual claims. Opinion, ECF No. 971 at 19. *Accord Garcia v. Freedom Mortg. Corp.*, 274 F.R.D. 513, 517 (D.N.J. 2011) (finding that it was "clear that a large number of [] putative class members have an interest in the individual control of the prosecution of their [Fair Labor Standards Act] claims" based on large number of opt-outs; thus, certification of substantively identical state law claims pursuant to Rule 23(b)(3) was held improper).

## IV.   CONCLUSION

Because class members benefit from the conduct that the named plaintiffs are suing to stop, because individual issues predominate over common ones as to copyright ownership and fair use, and because individual authors have the desire and incentive to pursue their own actions against Google if they so choose, class certification should be denied.

Dated:  February 8, 2012                    Respectfully submitted,


                                    By:    */s/ Joseph C. Gratz*
                                    _____
                                           Daralyn J. Durie *(pro hac vice)*
                                           ddurie@durietangri.com
                                           Joseph C. Gratz *(pro hac vice)*
                                           jgratz@durietangri.com
                                           DURIE TANGRI LLP
                                           217 Leidesdorff Street
                                           San Francisco, CA  94111
                                           Telephone:     415-362-6666
                                           Facsimile:     415-236-6300

                                           Attorneys for Defendant Google Inc.