# EXHIBIT 1

**EXPERT REPORT OF HAL PORET**

**SURVEY OF PUBLISHED AUTHORS REGARDING
GOOGLE BOOKS**

REPORT PREPARED FOR:
Durie Tangri L.L.P.
217 Leidesdorff Street
San Francisco, CA 94111
Attorneys for Google Inc.

PREPARED BY:
Hal Poret
ORC International
625 Avenue of the Americas
New York, NY   10011

January, 2012

# *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE ------------------------------------------------- 1
STUDY AUTHORSHIP AND QUALIFICATIONS --------------------------- 2
STUDY DESIGN ------------------------------------------------------------------------ 3
SUMMARY OF KEY FINDINGS---------------------------------------------------- 14
METHODOLOGY ---------------------------------------------------------------------- 15
     THE RELEVANT UNIVERSE OF INTEREST-------------------------- 15
     SAMPLING PLAN ----------------------------------------------------------- 17
     DOUBLE-BLIND INTERVIEWING ------------------------------------ 19
     INTERVIEWING PROCEDURES---------------------------------------- 19
     DATA PROCESSING ------------------------------------------------------- 20
     INTERVIEWING PERIOD-------------------------------------------------- 20
DETAILED FINDINGS---------------------------------------------------------------- 21
    I.     Results Among All Authors Surveyed------------------------- 21
    II.    Results by Age---------------------------------------------------------- 23
    III.   Results Based on Prior Familiarity with Google Books---- 25
    IV.   Results for the No Contact Information Sub-sample ------ 28
    V.    Other Variables------------------------------------------------------- 31

APPENDICES
     APPENDIX A:    CURRICULUM VITAE OF STUDY'S AUTHOR
     APPENDIX B:    INSTRUCTIONS/QUESTIONNAIRES
     APPENDIX C:    MATERIALS REVIEWED/FEES CHARGED
     APPENDIX D:    DATA FILE (to be provided electronically)
     APPENDIX E:    CROSS-TAB ANALYSIS OF DATA
     APPENDIX F:    VERBATIM RESPONSES

## *BACKGROUND AND PURPOSE*

In connection with its Google Books program, Google, Inc. ("Google") scans books so that their content can be searched online and results displayed in Google Books searches. If Google does not have the permission of the copyright owner of a book, at most short excerpts of the book are viewable in Google Books search results.

A group of published authors, Betty Miles, Joseph Goulden, and Jim Bouton, along with The Authors Guild, Inc. (collectively "plaintiffs") have filed a lawsuit against Google with respect to Google's scanning of books and display of short excerpts in Google Books search results without permission of the copyright owner. Miles, Goulden and Bouton seek to represent a class of published authors who own a copyright interest in one or more books that were registered with the U.S. Copyright Office within three months of first publication.

Through its attorneys, Durie Tangri LLP, Google retained me to design and conduct a survey among published authors. The purpose of the survey was to determine the extent to which members of the proposed class object to Google's scanning of books and display of short excerpts in Google Books search results and the extent to which they believe they have been negatively impacted by these actions. This report details the methodology and results of the survey.

## STUDY AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented by ORC International under the supervision of Hal L. Poret, Senior Vice President.

I have personally designed, supervised, and implemented over 400 surveys measuring perception, opinion, and behavior. I have personally designed numerous studies that have been admitted as evidence in legal proceedings, and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School. Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

Hal Poret

Dated:  February 6, 2012

2

## STUDY DESIGN

-   A total of 880 published U.S. authors were interviewed in this study. [1] Among these:

-   756 were interviewed via telephone

-   124 were interviewed via an email invitation to an online survey.

The telephone and online interviews both served the same central objectives -- to determine the extent to which published authors: (1) object to or approve of Google's scanning of books so that short excerpts of content can be displayed in Google Book search results; and (2) believe that they are financially impacted or that the market/demand for their books is impacted by this aspect of Google Books.[2]

### Telephone Interviews

A total of 756 respondents participated in the telephone interviews.

Telephone interviewers began each call by asking for a specific author by name and, whenever a title of one of their books was known, the interviewer included a book title:

> Hello, is [INSERT AUTHOR'S NAME] the author of [INSERT BOOK TITLE, IF AVAILABLE] available?
>
> I am calling on behalf of ORC International, a market research firm. We're conducting a study among authors and I'd like to include the opinions of [INSERT AUTHOR'S NAME], author of [INSERT BOOK TITLE, IF AVAILABLE].

Authors were first asked a few questions for screening and classification.

> First, we have just a few questions for classification reasons. In what state do you currently reside?

---

[1] See Relevant Universe and Sampling sections below for more specific information on how respondents were identified and selected for participation in the survey.

[2] See Relevant Universe and Sampling section below for more specific information on the telephone and online methodology.

3

Respondents who do not reside in the U.S. were thanked and terminated. Next, respondent were asked:

>    For classification purposes, please tell us your age?

Then, respondents were prompted:

>    Thank you for answering those classification questions.
>    How many books have you had published?

Respondents who did not have any published books were thanked and terminated.

If they had one or more published books respondents were asked either:

>    What is the name of your published book?
>    Or,
>    What is the name of your most recently published book?

Then, depending on how many published books they have, respondents were asked either:

>    Is your published book currently in print?
>    Or,
>    Are any of your published books currently in print?

Next, depending on how many published books they have, respondents were asked:

>    Is your published book currently available as an electronic book, also called an E-Book?
>    Or,
>    Are any of your published books currently available as an electronic book, also called an E-Book?

Respondents were then asked one of the following, again depending on whether they have one or more than one published book:

We'd like to ask you a few brief questions about the copyrights to your published book.  If for any question you are not sure of the answer, its okay to say so.

Do you receive, or are you entitled to receive royalties from your published book?

Or,

We'd like to ask you a few brief questions about the copyrights to your published books.  If for any question you are not sure of the answer, it's okay to say so.

Do you receive, or are you entitled to receive royalties from any of your published books?

Respondents who have more than one published book and answered "yes," to receiving royalties were then asked:

For how many of your published books do you receive or are you entitled to receive royalties?

All respondents were next asked either:

Do you personally own the copyrights to your published book?

Or,

Do you personally own the copyrights to any of your published books?

Respondents who have more than one published book and answered, "Yes" to owning the copyrights were then asked:

How many of your published books do you own copyrights to?

The next section of the interview addressed the main issue of the survey – respondents' perceptions of and opinions regarding the relevant aspect of Google Books.

All respondents were then instructed:

> Now we would like to ask you a few questions about something called Google Books.

Followed by:

> Have you ever heard of Google Books?

All respondents who answered, "Yes," they have heard of Google Books were then asked:

> How familiar are you with Google Books?

Respondents were provided a familiarity scale: not at all familiar, somewhat familiar, very familiar, and extremely familiar. The order of the scale from increasing familiarity to decreasing familiarity was randomized so that half of respondents were presented a scale starting with "not at all familiar," and ending with "extremely familiar," and half of respondents were presented a scale starting with "extremely familiar," and ending with "not at all familiar."

Respondents who indicated they were at least somewhat familiar with Google Books were then asked:

> What, if anything, can you tell us about Google Books?

To ensure that all respondents had a basic understanding of the aspect of Google Books that is relevant to the survey (scanning of books and display of short excerpts in search results), all respondents were then given the following description of Google Books:

> As you may or may not know, Google scans books so that their content can be searched online and results displayed in Google Books.
>
> We'd like to ask your opinion about one particular aspect of Google Books.
>
> For some books, short excerpts of a book – about one-eighth of a page each -- are viewable in Google Books search results.  A user who performs a search can see up to three short excerpts of the book containing the relevant search terms.  A user can also click on a link to find the book in a bookstore or library.  This scanning of books and displaying of short excerpts in search results is what we would like to ask you about.

This description was followed with:

> For some <u>other</u> books, the <u>full</u> book or longer portions of a book are viewable in response to searching Google Books, with special permission from the publisher or author. Our questions are <u>not</u> about the display of full books or longer portions.

Then respondents were asked if they understood this description:

> Again, we would <u>only</u> like to ask you specifically about the display of short excerpts about one-eighth of a page – as search results.
>
> Do you understand that explanation or would you like to hear it again?

Respondents who indicated they would like to hear it again were read the description one more time and then asked again if they understood it. Respondents who did not understand the description after it was read a second time were thanked and terminated.

Then, all respondents were instructed:

> Now we would like to ask you your opinions regarding Google scanning copyrighted books so that they can be searched online and short excerpts displayed in search results.  Again, our questions are <u>only</u> about the display of short excerpts – about one-eighth of a page -- as search results.

All respondents were then asked:

> To your knowledge, are any of your books searchable in Google Books and the results available <u>only in short excerpts</u>?  If you don't know, please say so.

Followed by:

> We'd like to know the extent to which you approve of or object to Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results.

> Using the following scale, please tell us how strongly you approve of or object to Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

> Strongly object

> Somewhat object

> Neither approve nor object

> Somewhat approve

> Strongly approve

The order in which "object" came before "approved" was randomized in both the question text and in the order of the response options, so that half of respondents were always presented with "approve" first and half of respondents were always presented with "object" first.

All respondents were then asked two series of questions to determine their opinion on how, if at all, they believe the relevant aspect of Google Books has impacted them (or would impact them.)  Respondents who previously answered that their books are searchable in Google Books and available only in short excerpts and respondents who answered that their books are not searchable or don't know were asked slightly different versions of these questions, befitting their differing situations.

Respondents who had previously answered that their books are searchable in Google Books and available only in short excerpts were asked:

> Which of the following best represents your opinion as to how, if at all, you have been financially impacted by Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?
>
> 1. I feel I have financially benefitted
> 2. I feel I have been financially harmed
> 3. I feel I have not been financially impacted one way or the other

The order of the first two response options was randomized so that half of respondents were presented with "financially benefitted" first and half of respondents were presented with "financially harmed" first.

Respondents who had previously answered that their books were not searchable in Google Books or that they did not know if they were searchable, were instead asked the following alternate version:

9

Which of the following best represents your opinion as to how, if at all, you would be financially impacted by Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

1.  I feel I would financially benefit

2.  I feel I would be financially harmed

3.  I feel I would not be financially impacted one way or the other

The order of these first two response options was also randomized so that half of respondents were presented with "financially benefit" first and half were presented with "financially harmed" first.

All respondents who answered that they have financially benefitted or would financially benefit were then asked either:

What makes you feel you have financially benefitted from Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

Or,

What makes you feel you would financially benefit from Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

Meanwhile, all respondents who answered that they have been or would be "financially harmed" were asked either:

What makes you feel you have been financially harmed from Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

Or,

What makes you feel you would be financially harmed from Google scanning
your copyrighted books so that they can be searched online and short excerpts
displayed in search results?

Next, respondents who had previously answered that their books <u>are</u> searchable in
Google Books and available only in short excerpts were asked:

Which of the following best represents your opinion as to how, if at all, the
demand for your book has been impacted by Google scanning your copyrighted
books so that they can be searched online and short excerpts displayed in search
results?

1. I feel the demand for my book has improved
2. I feel the demand for my book has been harmed
3. I feel the demand for my book has not been impacted one way or the other

The order of these first two response options was randomized so that half of
respondents were presented with "improved" first and half of respondents were
presented with "harmed" first.

Respondents who previously answered that their books were <u>not</u> searchable in Google
Books or that they did not know, were instead asked:

Which of the following best represents your opinion as to how, if at all, the
demand for your book would be impacted by Google scanning your copyrighted
books so that they can be searched online and short excerpts displayed in search
results?

1. I feel the demand for my book would improve
2. I feel the demand for my book would be harmed
3. I feel the demand for my book would not be impacted one way or the
   other

11

The order of these first two response options was also randomized.

All respondents who answered that the demand for their book has improved or would improve were then asked either:

> What makes you feel the demand for your book has improved from Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

> Or,

> What makes you feel the demand for your book would improve from Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

Meanwhile, all respondents who answered that the demand for their book has been or would be "harmed" were then asked either:

> What makes you feel the demand for your book has been harmed from Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

> Or,

> What makes you feel the demand for your book would be harmed from Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results?

Lastly, all respondents were asked:

> To your knowledge, was a copyright registration filed within 3 months of the publication of <u>any</u> of your books?  If you are not sure, it's okay to say so.

Followed by:

12

Do you believe you would know how to find out whether or not a copyright registration was filed within 3 months of the publication of <u>any</u> of your books?

## Online Interviews

A total of 124 respondents were interviewed online after clicking a link included in a survey invitation sent to their email address.

Respondents taking the online survey were provided the same instructions and asked the same questions as the telephone respondents, described above.  The survey was identical except for minor adjustments in the wording of instructions where appropriate to accommodate the different format. For example:

1. The introduction to the online survey was adjusted to read as follows:

   We are conducting a short survey among authors. If you have published a book then we would like to ask you a few questions. The survey will take less than 5 minutes of your time. Please select "continue" to move on to the survey.

2. In the online survey, gender was asked in the screening section, whereas in the telephone survey the interviewer merely recorded the gender without asking.

<u>See</u> Appendix B for the full questionnaire used in the survey.

## *SUMMARY OF KEY FINDINGS*

1.  More than half of authors, 58%, approve of Google scanning their copyrighted books so that they can be searched online and short excerpts displayed in search results.  An additional 28% neither approve nor object.  Fourteen percent of authors object.

2.  Regarding the perceived benefit versus harm from Google scanning their copyrighted books so they can be searched online and short excerpts displayed in search results:

    a.  74% of authors do not believe they have been (or would be) financially impacted one way or the other; 19% believe they have financially benefitted or would financially benefit; and 8% believe they have been or would be financially harmed.

    b.  51% of authors do not believe the demand for their books has been (or would be) impacted one way or the other; 45% believe the demand for their books has improved or would improve; and 4% believe demand for their books has been or would be harmed.

See Detailed Findings section below for additional information on results.  The full data will be provided in electronic form.

14

## *METHODOLOGY*

### THE RELEVANT UNIVERSE OF INTEREST

The relevant universe for the survey was defined as any published author within the United States.[3]  A list of published authors was obtained from Gale, "a leader in e-research and education publishing for libraries, schools and businesses.  The company creates and maintains more than 600 databases."[4]   The list consisted of living authors from the Gale Contemporary Authors database.  It included over 142,000 authors.

Many of the authors on the list had mailing addresses which allowed us to determine that they reside within the U.S.  All authors whose contact information indicated they did not reside in the U.S. were removed from the list before dialing.  Additionally, to ensure authors were based in the U.S. and for other classification reasons, the following screening questions were asked:

>       In what state do you reside?

Respondents who did not answer with a U.S. state were thanked and terminated. All other respondents were then asked their age, followed by:

>       How many books have you had published?

Respondents with zero published books were thanked and terminated from the survey. Others continued on to the main survey questions.

---

[3] The proposed class is limited to published authors who registered a book with the US Copyright Office within three months of publication.  While the results among all authors interviewed are included in this report, the survey did attempt to determine whether the respondent had registered a book within three months of publication so that the results among those that had could be specifically examined.

[4] http://www.gale.cengage.com/about/

It is common to screen out respondents who might have special knowledge due to their employment, such as respondents who may work at Google.  No such screening questions were included at the beginning of the survey.  Instead, the following question was asked at the end of the survey:

> Do you or does anyone in your household work in any of the following?

1. Google
2. US Government
3. Any Local, State or Federal Courts
4. None of these

This question was asked at the end of the survey instead of the beginning in order to avoid biasing the respondents prior to answering the survey questions.[5]

The actual wording of all screening and classification questions used is shown in Appendix B.

---

[5] Out of the total 880 respondents, 1 indicated they or someone in their household works for Google, 16 indicated they or someone in their household works for the US Government, and 5 indicated that they or someone in their household works for either a Local, State or Federal Court.  Removing these respondents would not change the survey findings.

## SAMPLING PLAN

The sampling plan involved reaching as many published U.S. authors from the Gale list as possible. As mentioned in the Relevant Universe section of this report, the list of authors used in the survey was provided by Gale, and contained the names of over 142,000 authors. Of these records:

- 50,496 included a physical address for the author's home and/or office
- 4,135 included an email address
- 2,503 included the title of at least one book, but had no physical or email address
- 69,427 included a name and usually a birthdate, but no contact information

In order to reach as many and as representative a group of authors as possible, the survey was conducted by both telephone and online.

Both telephone and online surveys are well-accepted in the field of survey research as standard, reliable methodologies.  Indeed, online surveys are now among the most common methods of conducting market research among consumers.  Businesses and other organizations routinely make decisions of importance based on the results of telephone and online survey research, and both types of surveys have been accepted in evidence in numerous U.S. District Court proceedings.

Opinion America, a professional telephone/online interviewing organization, conducted a clerical search to obtain phone numbers or additional email addresses for as many U.S. authors on the list as possible.  Multiple attempts were made to reach all U.S. Authors for whom a phone number or email address was obtainable.

Ultimately 756 respondents were interviewed via telephone and 124 participated in the online version of the survey by clicking on a link in the email invitation that brought them to a website where the online survey was hosted.

17

Since it is typically far more feasible to obtain a phone number or email address for individuals for whom some contact information (such as a mailing address) was provided, the majority of respondents included in the study are authors whose mailing or email address was included in the Gale database. To determine whether the focus on members of the list with contact information could bias the results, efforts were made to ensure that a sizable sub-sample of authors from the list who had no contact information in the Gale database was also included in the survey. Opinion America performed additional clerical searches to attempt to obtain phone numbers or email addresses for authors for whom no contact information was provided in the Gale database. In total, 109 of the total 880 respondents were from this sub-sample of authors with no contact information (all contacted via telephone). This sub-sample will be referred to herein as the No Contact Info Group. As discussed in more detail below, the survey results among the No Contact Info Group were generally consistent with the results among the majority of respondents for whom contact information was provided in the Gale database.

The list of authors from the Gale Contemporary Authors database included more older authors than younger authors. In addition, it was possible to obtain contact information for and reach more older authors, whereas younger authors were less likely to have available contact information and be reachable to participate in the survey. Accordingly, the final age distribution of respondents in the survey tends to be older, reflecting the actual population of authors in the list compiled by Gale. The final age distribution of respondents, in total and broken out by methodology, is as follows:

18

| AGE | Total (Telephone & Online) | Telephone (Contact Information Group) | Telephone -- No Contact Information Sub-sample | Online |
|---|---|---|---|---|
| BASE: | 880 | 647 | 109 | 124 |
| Under 60 | 112 (13%) | 49 (8%) | 33 (30%) | 30 (24%) |
| 60-69 | 166 (19%) | 100 (16%) | 29 (27%) | 37 (30%) |
| 70 and older | 537 (61%) | 461 (71%) | 43 (39%) | 33 (27%) |
| Refused | 65 (7%) | 37 (6%) | 4 (4%) | 24 (19%) |

While the set of authors surveyed more heavily represents older authors, the survey results were reasonably consistent among authors of various ages. As discussed in more detail below, the results among those under age 60 did not differ significantly from the results among those 60 and above. Accordingly, there is no reason to believe the survey results would have been meaningfully different if the demographics had been different.

## DOUBLE-BLIND INTERVIEWING

The study was administered under "double-blind" conditions. That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the service (Opinion America Group) involved in providing the sample and administering the online interviews was similarly "blind" with respect to the study's purpose and sponsorship.

## INTERVIEWING PROCEDURES

For the telephone survey, screenings for eligibility and interviews were conducted from a central location telephone facility run by Opinion America Group. Respondents were screened and interviewed by well-trained and experienced professional telephone

19

interviewers.  All interviewers were briefed on the study by a supervisor and required to conduct practice interviews before beginning the survey.  Throughout the assignment, tight control and supervision was maintained over all aspects of the interviewing.  The survey instructions and questions were provided to Opinion America Group and programmed for CATI-Web interviewing.  This means that all the questions and instructions automatically appeared on the interviewers' monitors and respondents' answers were recorded directly into the computer.  My staff and I thoroughly checked the computer program before the launch of the study to determine that all the instructions and questions functioned properly.  A member of my staff also listened in on interviews to ensure quality and validity of the survey.  A portion of each interviewer's work was also monitored by an Opinion America supervisor.

Additionally, a representative from the interviewing facility regularly contacted an ORC International representative with progress reports and data updates.  This allowed us to closely monitor and supervise the progress of the study.

Opinion America Group also programed and administered the online surveys.  My staff and I thoroughly tested the programmed survey prior to any potential respondents receiving the invitation to participate in the survey.

## DATA PROCESSING

Data was collected by Opinion America Group and made available to ORC International in Excel and SPSS format.  The data set showing each respondent's answers to all questions will be provided in electronic form.

## INTERVIEWING PERIOD

Telephone interviewing was conducted from December 9, 2011 through January 22, 2012.

Online interviewing was conducted from December 15, 2011 through January 16, 2012.

## DETAILED FINDINGS

**I.**     **Results Among All Authors Surveyed**

*Approve vs. Object to Google Scanning Books and Displaying Short Excerpts*

More than half of the authors interviewed (58%) approve of Google scanning their copyrighted books so that they can be searched online and short excerpts displayed in search results, compared to 14% who object. The remaining 28% neither approve nor object.

This table shows the detailed results of how strongly authors approve or object:

| Q245 – Approve or Object | % of Authors | Margin of Error[6] |
|---|---|---|
| BASE: | 880 | |
| Strongly approve | 31% | 3.1% |
| Somewhat approve | 27% | 2.9% |
| **Approve total** | **58**% | **3.3**% |
| Neither approve nor object | 28% | 3.0% |
| Somewhat object | 6% | 1.6% |
| Strongly object | 9% | 1.9% |
| **Object total** | **14**% | **2.3**% |

*Perceived Financial Impact*

Most authors (74%) do not believe they have been or would be financially impacted one way or the other by the relevant aspect of Google Books. Of the remaining authors, more believe they have financially benefitted or would financially benefit (19%) than believe they have been or would be harmed (8%) from Google scanning their copyrighted books so they can be searched online and short excerpts displayed.

---

[6] All margins of error are at the 95% confidence level.

| Q260/Q280 – Financial Impact | Total | Margin of Error |
|---|---|---|
| BASE: | 880 | |
| Financially benefitted | 19% | 2.6% |
| Financially harmed | 8% | 1.8% |
| Not impacted one way or the other | 74% | 2.9% |

The following table separately shows the results among authors whose books are currently searchable in Google Books and available in short excerpts compared to the authors whose books are either not available or who do not know if their books are available (and were therefore asked how they "would be" impacted rather than how they have been impacted):

| Q260/Q280 – Financial Impact | Authors Whose Books Are Available | Authors Whose Books Are Not Available or Don't Know | Total |
|---|---|---|---|
| BASE: | 121 | 759 | 880 |
| Financially benefitted | 13% | 19% | 19% |
| Financially harmed | 7% | 8% | 8% |
| Not impacted one way or the other | 80% | 73% | 74% |

*Perceived Impact of Demand for Books*

Approximately half of authors (51%) do not believe the demand for their books has been or would be impacted one way or the other by Google Books' short excerpts.  In total, 45% of authors believe Google scanning their books and making them available in short excerpts has improved or would improve the demand for their books, compared to only 4% who believe the demand for their books has been or would be harmed.

22

| Q270/Q290 – Impact of Demand on Books | Total | Margin of Error |
|---|---|---|
| BASE: | 880 | |
| Demand improved | 45% | 3.3% |
| Demand harmed | 4% | 1.3% |
| Not impacted one way or the other | 51% | 3.3% |

The following table shows separately shows the results among authors whose books are currently searchable in Google Books and available in short excerpts compared to the authors whose books are either not available or who do not know if their books are available:

| Q270/Q290 – Impact of Demand on Books | Authors Whose Books Are Available | Authors Whose Books Are Not Available or Don't Know | Total |
|---|---|---|---|
| BASE: | 121 | 759 | 880 |
| Demand improved | 28% | 48% | 45% |
| Demand harmed | 6% | 4% | 4% |
| Not impacted one way or the other | 66% | 48% | 51% |

II.   **Results by Age**

*Approve vs. Object to Google Scanning Books and Displaying Short Excerpts*

Results for how strongly authors approve or object to Google scanning their books and showing short excerpts in search results are generally consistent by age of respondents.

The below table shows the percentage of authors, by age range, who approve or object to Google scanning their books so that they can be searched online and short excerpts displayed in search results:

23

| Q245 – How Strongly You Approve or Object | Under Age 60 | Age 60 to 69 | Age 70 and Older | Total[7] |
|---|---|---|---|---|
| BASE: | 112 | 166 | 537 | 880 |
| Strongly approve | 29% | 33% | 34% | 31% |
| Somewhat approve | 30% | 28% | 26% | 27% |
| **Approve total** | **58%** | **60%** | **60%** | **58%** |
| Neither approve nor object | 27% | 25% | 28% | 28% |
| Somewhat object | 7% | 5% | 5% | 6% |
| Strongly object | 8% | 10% | 7% | 9% |
| **Object total** | **15%** | **15%** | **12%** | **15%** |

More than half (58%) of authors under age 60 approve of Google scanning their books and displaying short excerpts in Google Book search results.

*Perceived Financial Impact*

Results for the perceived financial impact of Google scanning books and displaying short excerpts in search results are also generally consistent across age of authors.

The following table shows detailed results on their perceived financial impact by age range:

| Q260/Q280 – Financial Impact | Under Age 60 | Age 60 to 69 | Age 70 and Older | Total[8] |
|---|---|---|---|---|
| BASE: | 112 | 166 | 537 | 880 |
| Financially benefitted | 19% | 26% | 16% | 19% |
| Financially harmed | 9% | 10% | 5% | 8% |
| Not impacted one way or the other | 72% | 64% | 79% | 74% |

---

[7] Individual columns do not add up to the total column, because some respondents refused their age.

[8] Individual columns do not add up to the total column, because some respondents refused their age.

*Perceived Impact of Demand For Books*

Results for authors' perceived impact on the demand of their books because of Google scanning books and displaying short excerpts in search results are also consistent across age.

The following table shows detailed results on the perceived impact on the demand for their books by age range:

| Q270/Q290 – Impact of Demand on Books | Under Age 60 | Age 60 to 69 | Age 70 and Older | Total[9] |
|---|---|---|---|---|
| BASE: | 112 | 166 | 537 | 880 |
| Demand improved | 44% | 49% | 45% | 45% |
| Demand harmed | 5% | 5% | 3% | 4% |
| Not impacted one way or the other | 51% | 45% | 52% | 51% |

## III.   Results Based on Prior Familiarity with Google Books

Results are also generally consistent depending on respondents' level of prior familiarity with Google Books.

*Approve vs. Object to Google Scanning Books and Displaying Short Excerpts*

Results for how strongly authors approve or object to Google scanning their books and showing short excerpts in search results are mostly consistent across level of familiarity with Google Books.

---

[9] Individual columns do not add up to the total column, because some respondents refused their age.

The below table shows the percent of authors, by level of familiarity with Google Books, who approve or object to Google scanning their books so that they can be searched online and short excerpts displayed in search results:

| Q245 – How Strongly You Approve or Object | Top 2 Box (Very/Extremely Familiar) | Somewhat Familiar | Not at all Familiar/Not Heard Of | Total |
|---|---|---|---|---|
| BASE: | 99 | 273 | 508 | 880 |
| Strongly approve | 42% | 30% | 30% | 31% |
| Somewhat approve | 26% | 27% | 26% | 27% |
| **Approve total** | **69%** | **56%** | **56%** | **58%** |
| Neither approve nor object | 15% | 30% | 29% | 28% |
| Somewhat object | 6% | 7% | 5% | 6% |
| Strongly object | 10% | 7% | 10% | 9% |
| **Object total** | **16%** | **14%** | **14%** | **14%** |

While more than half (58%) of all respondents approve of Google scanning books and showing short excerpts in search results, approval is somewhat higher among authors who were already extremely or very familiar with Google Books (68%) than it is among authors who were less familiar. Rates of objecting to Google scanning books and showing search excerpts in search results were nearly identical among those who were more and less familiar with Google Books.

These figures indicate that the survey's description of Google Books was consistent with pre-existing perceptions of Google Books among authors who were already familiar with it, and that the description provided in the survey did not bias respondents one way or the other.[10]

---

[10] If the survey's description of Google Books had been skewed to make it sound less objectionable, the set of respondents with little or no previous familiarity would have had higher rates of approval and lower rates of objection. This did not happen. If anything, there was a slight tendency toward the opposite, in that those who had the least familiarity with Google Books had slightly lower rates of approval. Since these were the respondents who were most reliant on the survey's description of Google Books, this indicates that the survey description of Google Books did not bias the results toward approval.

*Perceived Financial Impact*

Results regarding the perceived financial impact of Google scanning books and displaying short excerpts in search results are also consistent across varying levels of familiarity with Google.

The following table shows detailed results on their perceived financial impact by level of familiarity with Google:

| Q260/Q280 – Financial Impact | Top 2 Box (Very/Extremely Familiar) | Somewhat Familiar | Not at all Familiar/Not Heard Of | Total |
|---|---|---|---|---|
| BASE: | 99 | 273 | 508 | 880 |
| Financially benefitted | 13% | 22% | 18% | 19% |
| Financially harmed | 12% | 8% | 7% | 8% |
| Not impacted one way or the other | 75% | 71% | 75% | 74% |

As this table shows, the percentage of authors who believed they had been or would be financially harmed did not vary significantly based on prior familiarity with Google Books.

*Perceived Impact of Demand For Books*

Results regarding authors' perceived impact on the demand for their books because of Google scanning books and displaying short excerpts in search results are also consistent across varying levels of familiarity with Google.

The following table shows detailed results on their perceived impact on the demand for their books by authors' level of familiarity with Google Books:

| Q270/Q290 – Impact of Demand on Books | Top 2 Box (Very/Extremely Familiar) | Somewhat Familiar | Not at all Familiar/Not Heard Of | Total |
|---|---|---|---|---|
| BASE: | 99 | 273 | 508 | 880 |
| Demand improved | 40% | 49% | 44% | 45% |
| Demand harmed | 10% | 4% | 3% | 4% |
| Not impacted one way or the other | 50% | 47% | 53% | 51% |

As this table shows, the percentage of authors who believed the demand for their books had been or would be harmed did not vary significantly based on prior familiarity with Google Books.

## IV.   Results for the No Contact Information Sub-sample

*Approve vs. Object to Google Scanning Books and Displaying Short Excerpts*

Within the sub-sample of respondents for which the Gale database did not include contact information in the sample file, results for how strongly authors approve or object to Google scanning their books and showing short excerpts in search results are reasonably similar to the rest of the sample.

The below table shows the percentage of authors in the No Contact Information sub-sample compared to all other respondents, who approve or object to Google scanning their books so that they can be searched online and short excerpts displayed in search results:

28

| **Q245 – How Strongly You Approve or Object** | **No Contact Information Sub-sample** | **Respondents With Contact Information** |
|---|---|---|
| BASE: | 109 | 771 |
| Strongly approve | 29% | 32% |
| Somewhat approve | 27% | 27% |
| **Approve total** | **56%** | **58%** |
| Neither approve nor object | 22% | 29% |
| Somewhat object | 9% | 5% |
| Strongly object | 13% | 8% |
| **Object total** | **22%** | **13%** |

 As this table shows, levels of approval far exceeded levels of objection in the No Contact Information group, as they did in the overall sample.  This confirms that the overall results were not meaningfully biased by over-representing authors who had contact information in the Gale database.

While the "Approval" levels are nearly identical in both groups, the Objection level was higher in the No Contact Information Sub-Sample by a statistically significant margin.  The overall objection rate among all respondents was 14%.  If this number were adjusted to reflect the fact that authors with no contact information composed approximately 55% of the list (as compared to only 12% of the survey), the overall objection level would go from 14% to 18%.

*Perceived Financial Impact*

Results regarding the perceived financial impact of Google scanning books and displaying short excerpts in search results are also reasonably consistent with the rest of the sample.

The following table shows detailed results on perceived financial impact for the No Contact Information Sub-Sample compared to all other respondents:

| Q260/Q280 – Financial Impact | No Contact Information Sub-sample | Total (excluding No Contact Information Sub-sample) |
|---|---|---|
| BASE: | 109 | 771 |
| Financially benefitted | 26% | 18% |
| Financially harmed | 9% | 8% |
| Not impacted one way or the other | 65% | 75% |

The differences between the percentages in each group who felt they were financially benefitted or harmed are small, and not statistically significant at the 95% confidence level.

*Perceived Impact of Demand For Books*

Similarly, results regarding authors' perceived impact on the demand for their books because of Google scanning and books and displaying short excerpts in search results are also consistent with the rest of the sample.

The following table shows detailed results on the perceived impact on the demand for their books for the No Contact Information Sub-Sample compared to all other respondents:

| Q270/Q290 – Impact of Demand on Books | No Contact Information Sub-sample | Total (excluding No Contact Information Sub-sample) |
|---|---|---|
| BASE: | 109 | 771 |
| Demand improved | 52% | 44% |
| Demand harmed | 4% | 4% |
| Not impacted one way or the other | 44% | 52% |

30

The differences between the percentages in each group who felt demand was improved or harmed are small, and not statistically significant at the 95% confidence level.

V.    <u>Other Variables</u>

The data was also examined based on a number of other variables in order to determine if there were significant differences based on answers to various classification questions. Results were generally consistent between groups broken out by each of these variables:

- Authors with one published book versus those with more than one published book
- Authors whose published book is currently in print versus those whose books are not currently in print or who do not know
- Authors who receive royalties from their book versus those who do not receive royalties or who are not sure
- Authors who own the copyrights to their published book versus those who do not own copyrights or who are not sure
- Authors whose books are available as an E-Book versus those whose books are not available in E-Book or who do not know

<u>See</u> Appendix E for data analyzed based on these variables.