DURIE TANGRI LLP
DARALYN J. DURIE (*Pro Hac Vice*)
ddurie@durietangri.com
JOSEPH C. GRATZ (*Pro Hac Vice*)
jgratz@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     415-362-6666
Facsimile:     415-236-6300

Attorneys for Defendant
Google Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES, JOSEPH GOULDEN, and JIM BOUTON, on behalf of themselves and all other similarly situated,<br><br>                     Plaintiffs,<br><br>          v.<br><br>GOOGLE INC.,<br><br>                     Defendant. | Civil Action No. 05 CV 8136 (DC)<br><br>**ECF Case** |

**DECLARATION OF E. GABRIEL PERLE
IN SUPPORT OF GOOGLE INC.'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, E. Gabriel Perle, declare as follows:

I am Senior Counsel with the law firm Ohlandt Greeley Ruggiero & Perle in Stamford, Connecticut which specializes in intellectual property law. I have personal knowledge of the facts stated in this declaration, and could and would testify to these facts under oath if called upon to do so. As set forth below, I have more than 50 years of experience in the publishing industry, and am a recognized expert on the structure and practices of the book publishing industry.

1.  I have been retained by counsel for Google Inc. to provide my expert knowledge and opinions concerning the structure and practices of the book publishing industry. I have not been asked to, and do not herein, render any opinions regarding issues of substantive copyright law.

2.  In preparing this declaration I have reviewed the Fourth Amended Class Action Complaint, publishing contracts produced by the named plaintiffs, and a set of publishing contracts produced by the Authors Guild (which I understand are being filed as exhibits to the concurrently-filed Declaration of Joseph C. Gratz). The opinions I render herein are based on my knowledge of and experience in the publishing industry, as well as my review of the documents identified in this paragraph. Except where a specific document is cited, the opinions stated herein are based on my knowledge of and experience in the publishing industry.

3.  I am being compensated at my normal consulting rate of $750 per hour or, in the event I am called upon to testify in deposition or in court, at my normal rate of $1,000 per hour for testimony. I have no personal financial interest in any of the entities involved in this litigation and my compensation does not depend in any way on my testimony, my conclusions or the outcome of my analysis.

**I.    QUALIFICATIONS**

4.   I have testified as an expert on the structure and practices of the publishing industry in a number of cases.  Three have been reported:

a.   *Playboy Enters., Inc. v. Dumas*, 831 F. Supp. 295 (S.D.N.Y. 1993) ("Defendants presented the testimony on E. Gabriel Perle. . . . The court finds that Perle is eminently qualified to testify in the area of magazine copyright and gives his testimony great weight.");

b.   *Jim Henson Prods., Inc. v. John T. Brady & Assocs.*, 16 F. Supp. 2d 259, 272 (S.D.N.Y. 1997) ("Mr. Perle is one of the recognized experts in the book and periodical publishing fields");

c.   *Ty Inc. v. Publications Int'l, Ltd.*, 99 C 5565, 2004 WL 5025744 (N.D. Ill. June 30, 2004) (qualifying me as an expert in publishing industry practices regarding the valuation of photographs).

5.   For thirty years, I oversaw the magazine activities of Time Incorporated, including *Time, LIFE, Fortune, Sports Illustrated, People, Money, House & Home* and *Architectural Digest*.  I participated in virtually every aspect of the business of the publication of those magazines.  I was also the attorney for and a key participant in the management of the book publishing activities of Time Incorporated beginning with the "big act" books taken from or based upon the contents of *LIFE* Magazine and subsequently with respect to all of the multitude of *Time-Life Books*.  I was part of the management of what was the largest book publisher in the world, serving as a key member of its management team.

6.   I have also served as counsel and advisor to Silver Burdett, a leading textbook publisher, Little Brown and Company, the trade publisher, and The Book-of-the-Month Club, all of which were owned by Time Inc.

7.     I have served as Time-Life Books representative to the Association of American Publishers; served as a member of the Board of Directors of *Time-Life Books* and during my last decade of tenure at Time Inc.; and was an member of the Management Committee of Time Inc.

8.     Since retiring from Time Inc., I have continued to be active in the book publishing world and in that capacity have consulted and advised publishing companies including negotiating and consummating transactions on their behalf.

9.     Over the course of my career, I have served in various relevant roles. I was Chair of the Copyright Division of the American Bar Association from 1970-71 and again from 1986-87. I served as Commissioner, National Commission on New Technological Uses of Copyrighted Works from 1975-77 and Director of American Arbitration Association from 1979-84. Finally, I acted as Director, United States Trademark Association from 1969-1972, 1974-77, and as Vice President from1972-73.

10.    I am also co-author of *Perle & Williams on Publishing Law* and have published a number of journal articles, the most recent of which is E. Gabriel Perle, *Copyright Law and the Copyright Society of the U.S.A., 1950-2000*, 47 J. COPYRIGHT SOC'Y U.S.A. 397 (2000). Additional publications of potential interest include articles titled *Tributes to David Goldberg*, *Tributes to Stanley Rothenberg* and *Tributes to Irwin Karp* all published at 54 J. COPYRIGHT SOC'Y U.S.A. (Winter/Spring 2000).

11.    I have not testified as an expert at trial or by deposition in the past four years.

## II.    PUBLISHING CONTRACTS

12.    Publishing contracts govern the allocation of rights between author and publisher, transferring some rights to the publisher and reserving some to the author. For example, some publishing contracts provide for royalty-free promotional use of book excerpts; others do not.

The publishing contract may provide for reversion of those transferred rights to the author upon occurrence of some event—usually that the book has gone out of print.

13. The term "out of print" is sometimes defined in the publishing contract, and the definition of that term varies from contract to contract. Many publishing contracts do not define the term.

14. Determining whether a book is "in print" or "out of print" is not a mechanical inquiry. Some editions of a book may be out of print, while others remain in print. A book from a small press which has not sold a copy in years may nonetheless be "in print," while a book from a large press may go "out of print" even if it has continued to sell a small number of copies each year; these choices, and how they are implemented, depend on the judgment of the publishers, and may not be communicated either to the author or to any centralized database of books in print. Some publishers may not know whether a book is "in print" or "out of print" until they check their stockrooms and find no remaining copies. At root, one cannot be certain that a book is "in print" unless one has been successful in purchasing or successfully ordering a new copy from the publisher.

15. Many publishing contracts require, in order for rights to revert to the author, that the author submit a request for reversion some number of months after the work goes out of print.

16. Publishing contracts frequently include an exclusive license from the author to the publisher as to some or all of the exclusive rights under a copyright.

17. My review of the contracts produced by the Authors Guild in this case provides further support for my conclusion that many publishing contracts provide for reversion of rights to the author upon occurrence of some event, usually linked to the work going "out of print," but

that many publishing contracts require, in order for rights to revert to the author, that the author submit a request for reversion some number of months after the work goes out of print.  Of the twenty-four representative contracts produced by the Authors Guild, nineteen provide for reversion following notice from the author after the work has gone out of print: AG100001, AG100004, AG100008, AG100024, AG100044, AG100059, AG100063, AG100087, AG100099, AG100102, AG100108, AG100125, AG100129, AG100143, AG100159, AG100186, AG100192, AG100202, and AG100221. None of these provide that the publisher must notify the author if the work has gone out of print.  The remaining five contracts do not provide for reversion or are ambiguous in their reversion provisions.

18. There is no central repository of requests for reversion or of publishers' responses thereto.

19. Some authors do not maintain records of whether rights have reverted.

20. Some publishing contracts provide for royalty-free promotional uses.  Under such contracts, the author has given up legal ownership of the copyright, but does not have the right to receive royalties for promotional uses.

21. Some contracts expressly prohibit royalty-free promotional use, reserving all electronic distribution rights to the author.  Some publishing contracts do not discuss promotional use of excerpts at all.

22. My review of the contracts produced by the Authors Guild in this case provides further support for my conclusion that some publishing contract provide for royalty-free promotional use of excerpts, and others are silent as to the promotional use of excerpts.  Of the 24 representative contracts produced by the Authors Guild:

      a.      Fourteen provide for royalty-free use of excerpts for promotional purposes: AG100008, AG100017, AG100024, AG100063, AG100080, AG100087, AG100102, AG100108, AG100111, AG100129, AG100143, AG100159, AG100192, AG100202.

      b.      Ten are silent as to the promotional use of excerpts: AG100001, AG100004, AG100044, AG100059, AG100099, AG100118, AG100125, AG100186, AG100216, AG100221.

### III.    COPYRIGHT REGISTRATION

23.    In my experience in the publishing industry, both before and after the enactment of the Copyright Act of 1976, it has always been true that many books are not registered within three months of publication.

24.    One cannot determine the date of copyright registration with certainty by reviewing the publishing contract.  While many (though not all) publishing contracts call for the publisher to register the copyright, most do not provide a particular time period in which the publisher is to do so.  In addition, in my experience it is uncommon for authors or publishers to regard the date of registration as an important element of the publishing contract, or for authors to know whether copyright registration occurred within 90 days of publication.  This conclusion is based on my experience in the publishing industry, my knowledge of publishing contracts, and my review of the publishing contracts produced by the Authors Guild in this case.

25.    Many publishing contracts provide that the copyright registration will be made in the author's name even when the publisher is the legal owner of the relevant exclusive rights.  This conclusion is based on my experience in the publishing industry, my knowledge of publishing contracts, and my review of the publishing contracts produced by the Authors Guild in this case.

26. Many other publishing contracts provide that the copyright registration will be made in the publisher's name, and the publisher's name remains on the registration even if rights have reverted to the author, or if the author has become, by contract, a beneficial owner of exclusive rights under the copyright. This conclusion is based on my experience in the publishing industry, my knowledge of publishing contracts, and my review of the publishing contracts produced by the Authors Guild in this case.

27. My review of the contracts produced by the Authors Guild in this case provides further support for my conclusion that registration within 90 days of publication is not required by all, or even most, publishing contracts, and for my conclusion that some publishing contracts provide for registration in the name of the author and others call for registration in the name of the publisher. Of the 24 representative contracts produced by the Authors Guild:

    a. The following thirteen contracts provide for copyright registration in the name of the author, but do not provide any time period in which that registration is to occur: AG100001, AG100004, AG100044, AG100063, AG100080, AG100099, AG100102, AG100108, AG100111, AG100118, AG100186, AG100192, AG100202. These contracts do not differ materially in the allocation of rights between author and publisher from contracts which provide for copyright registration in the name of the publisher.

    b. The following six contracts provide for copyright registration in the name of the publisher, but do not provide any time period in which that registration is to occur: AG100017, AG100059, AG100125, AG100143, AG100216, AG100221. These contracts do not differ materially in the allocation of rights between author and publisher from contracts which provide for copyright registration in the name of the author.

    c. The following four contracts provide for copyright registration in the name of the author within 90 days of publication: AG100008, AG100024, AG100087, AG100159. These contracts do not differ materially in the allocation of rights between author and publisher from contracts which provide for copyright registration in the name of the publisher.

    d. The following contract provides for copyright registration in the name of the author "promptly" following publication: AG100129. This contract does not differ materially in the allocation of rights between author and publisher from contracts which provide for copyright registration in the name of the publisher.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 7, 2012, in  Palm Beach, FL.

_____
E. Gabriel Perle