# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
THE AUTHORS GUILD, INC., et al.,

            PLAINTIFFS,

  -against-    Case No:
            05CV8136 (DC)

GOOGLE INC.,
            DEFENDANT.
------------------------------------------X

    DATE: December 15, 2011
    TIME: 1:00 P.M.

    DEPOSITION of a Witness, JIM BOUTON, on behalf of the Plaintiffs, taken by the Defendants, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at the offices of MILBERG, LLP, One Pennsylvania Plaza, New York, New York 10119, before Deborah Garzaniti, a Notary Public of the State of New York.

Page 2

1  A P P E A R A N C E S:
2
3  MILBERG, LLP.
    Attorneys for the Plaintiffs
4      One Pennsylvania Plaza
    New York, New York 10119
5      BY: SANFORD P. DUMAIN, ESQ.
6
7  BONI & ZACK, LLC.
    Attorneys for the Plaintiffs
8      15 St. Asaphs Road
    Bala Cynwyd, Pennsylvania 19004
9      BY: MICHAEL J. BONI, ESQ.
10
11 DURIE TANGRI, LLP.
    Attorneys for the Defendant
12     217 Leidesdorff Street
    San Francisco, California 94111
13     BY: DARALYN J. DURIE, ESQ.
    BY: JOSEPH C. GRATZ, ESQ.

    *    *    *

Page 3

1  JIM BOUTON, called as a witness, having been
2  first duly sworn by a Notary Public of the State of New
3  York, was examined and testified as follows:
4  EXAMINATION BY
5  MS. DURIE:
6      Q. Please state your name for the record.
7      A. Jim Bouton.
8      Q. What is your address?
9      A. Care of Boni & Zack, LLC, 15 St. Asaphs
10 Road, Bala Cynwyd, Pennsylvania 19004.
11     Q. Good afternoon.
12     A. Good afternoon.
13     Q. You understand that you are here giving a
14 deposition in a case that has been brought against
15 Google?
16     A. Yes.
17     Q. What is that case about?
18     A. It is about whether Google has the right
19 to copy and disseminate copyrighted books.
20     Q. When you say "whether Google has the
21 right to disseminate copyrighted books," what do you
22 mean by disseminate?
23     A. Well, I am not sure. Let's leave it that
24 they are violating copyrights.
25     Q. Do you have an understanding as to how it

Page 4

1  is that Google is violating copyrights, in your opinion?
2      A. Well, they are simply copying them. They
3  don't have the right to copy copyrighted materials.
4      Q. So is your primary contention in this
5  case that Google is violating copyright laws by making
6  electronic copyright works?
7      MR. BONI: Objection to the form. If you can
8  answer, answer the question.
9      A. Repeat it again.
10     Q. Sure.
11     Is your primary contention in this case that
12 Google is violating the copyright laws by making an
13 electronic copy of copyright works?
14     A. That is certainly one of them.
15     Q. What else is it about Google's conduct
16 that you believe is violating the copyright laws, in
17 addition to making electronic copy?
18     A. That they are using this material, making
19 it available for other people, making digital copies for
20 libraries, putting pieces of it on the Internet, using
21 excerpts from the book in order to make advertising
22 money. They never called me and asked if they could do
23 that, never offered me any money to use my books in a
24 way that allowed them to make money.
25     Q. I want to ask you about each of those

Page 17

1  all of the ways that they could possibly be making
2  money.  They do not have the right to do that and they
3  did not get the right from me to do that.  So I don't
4  know what is possible.  I don't know what is possible
5  down the road.
6      Q.  In terms of the conduct by Google of
7  which you are actually aware, is there any conduct that
8  you are challenging, again, other than making and
9  retaining the digital copy, giving a digital copy to the
10 library and displaying the cover of the book and quotes
11 from the book in response to searches?
12     A.  Do I have any other complaint beyond
13 that?
14     Q.  Yes.
15     A.  Yes.  The larger issue of them having it
16 in the first place.
17     Q.  That is?
18     A.  And the potential for that, I can't
19 imagine.
20     Q.  That is what I intended to cover in the
21 first of my three things.  The first thing was making
22 and retaining the digital copy, having a digital copy in
23 the first place, giving that digital copy to the library
24 and then displaying the cover and quotes of the book in
25 the response search results, other than those three

Page 18

1  things, is there anything else that you challenge?
2      A.  Well, I am challenging on behalf of the
3  class that I am a member of.
4      Q.  Understood.
5      A.  Okay.
6      Q.  But as a representative of the class that
7  you are here on behalf of, is there any other conduct
8  that you are challenging?
9      A.  I don't think so.
10     Q.  Now, what is it that you want the Court
11 to do in response to this lawsuit?
12     A.  I want the Court to realize that these
13 are copyrighted materials and that Google has violated
14 that copyright by making copies of these books, that is
15 one.
16     Q.  Are you asking the Court for money on
17 behalf of the class?
18     A.  Yes.
19     Q.  Do you have an understanding as to how
20 much money you are asking?
21     A.  Yes, $750 per book.
22     Q.  Are you also asking the Court to order
23 Google to shut down the portion of Google Books that
24 shows quotes from those books in response to a search?
25     A.  I don't know if that is the proper remedy

Page 19

1  for that, so.
2      Q.  Would you want the Court to shut down
3  that feature in Google Books?
4      A.  If it is part of what Google needs to do
5  in order to avoid copyright violations, yes.
6      Q.  Do you have a view that Google would need
7  to shut down the part of Google Books that allows for
8  quotes from books to be displayed in order not to be
9  violating copyright?
10     A.  As far as I am concerned, they violated
11 the copyright if they have done nothing with it.
12     Q.  I understand that.
13     A.  So then it would follow that.  I am also
14 against them using that digital copy in any way that
15 they want.  So I am against them using it in the way
16 they used it.  I am against them using, having a copy in
17 the first place.
18     Q.  Do you think first it would benefit you
19 personally for the portion of Google Books that displays
20 quotes from the books in response to search results to
21 be shut down?
22         MR. BONI:  Object to the form.
23     A.  I don't know if that is the best
24 solution.  I don't know.
25     Q.  Do you have any other solution?

Page 20

1      A.  No.
2      Q.  Do you think it would impose any cost on
3  you if Google were to shut down the portion of Google
4  Books that displays quotes in response to search
5  results?
6          MR. BONI:  Objection to the form.
7      A.  Would it have?
8      Q.  Would that impose any cost on you?
9      A.  I don't think so.
10     Q.  Do you think that would impose any cost
11 on any member of the class?
12         MR. BONI:  I am sorry.  What would impose?
13     Q.  Do you think it would impose a cost on
14 any member of the class for Google to shut down the
15 portion of Google Books that displays quotes in response
16 to search requests?
17         MR. BONI:  Objection to form.
18     A.  It might, but I think in the larger issue
19 of copyright protection, I think the most important
20 thing is to establish the fact that authors have written
21 these books have protected them for -- protected these
22 through copyright and if Google wants to do something,
23 like display the cover or something, that they need to
24 get the permission of the copyright holders.
25     Q.  Do you believe that Google does need to

Page 21

1  get the permission of the copyright holder in order to
2  display the cover of the books?
3       A. I am not sure how I feel about that, but
4  I do believe that they do not have the right to make a
5  digital copy and then use that in a way for them to make
6  money.
7       Q. Now, you referenced the fact that maybe
8  some members of the class would incur costs if Google
9  shut down the portion of Google Books that displays
10 quotes in response to search results; is that right?
11      MR. BONI: Object to the form.  It
12 mischaracterizes the testimony.
13      Q. Is that right?
14      A. I am sorry.  Would you repeat it again.
15      Q. Did you testify that some members of the
16 class might incur costs if Google were required to shut
17 down the portion of Google Books that displays quotes in
18 response to search requests?
19      A. I have no idea.
20      Q. Have you done anything to ascertain the
21 views of other class members on that question?
22      A. On that question?
23      Q. Yes.
24      A. No, but I am very aware from speaking
25 with other authors that they are against making digital

Page 22

1  copies of their work.
2       Q. Do you think that all authors are against
3  Google making digital copies of their works?
4       A. I would guess that.
5       MR. BONI: Don't guess.  Just say what you
6  know, Jim.  She doesn't want your guesses.
7       A. I don't know all of the authors.
8       Q. Have you ever spoken with anyone who
9  expressed the view that it was to their benefit as an
10 author to have their books and quotes from those books
11 included in Google search results?
12      A. No.
13      Q. Do you sometimes use Google to search for
14 products that you want to buy?
15      A. Yes.
16      Q. Do you know whether some people use
17 Google Books to search for books that they want to buy?
18      A. I don't know that for a fact.
19      Q. Would you expect that that is the case?
20      A. That they search Google to find out where
21 they can find a book?
22      Q. Yes.
23      A. Yes.
24      Q. Do you know whether anyone has ever used
25 Google Books to search for and purchase one of your

Page 23

1  books?
2       A. I don't know if anyone has done that, no.
3       Q. You don't know one way or the other?
4       A. I don't know one way or the other.
5       Q. Do you know whether you derived any
6  economic benefit from purchasers of your book using the
7  Google book service in order to find copies of your
8  books that they can buy?
9       A. I am not aware of any of that.
10      MR. BONI: Can I put something on the record?
11 I just completely forgot to put something on the record.
12      MS. DURIE: Sure.
13      MR. BONI: We request and hope to stipulate
14 that the entirety of the transcript for the 30-day
15 period in which we have to review it be on the
16 confidential record.
17      MS. DURIE: That's fine.
18      MR. BONI: We appreciate it.  That's fine.
19      Q. When did you first learn about this
20 lawsuit?
21      A. I know there are several lawsuits.  I
22 know that from simply reading the newspapers.
23      Q. In how many of those lawsuits are you
24 involved?
25      A. I am involved in this one.

Page 24

1       Q. Do you have any involvement in any other
2  lawsuits relating to Google?
3       A. No.
4       Q. Let's focus --
5       A. Other than being part of a group.
6       Q. Other than being a potential member of a
7  class, is that what you are saying?
8       A. Yes.
9       Q. All of my questions in this case are
10 going to be directed to this lawsuit, unless I specify a
11 different lawsuit.
12      A. Okay.
13      Q. That the questions relate to.  So when
14 did you first learn about this lawsuit?
15      A. I learned about it from Mike Boni, who
16 was an agent for a digital or electronic version,
17 audible version of my books, and he was helping me as an
18 agent for the best way to market that and we were
19 talking about the lawsuits, the lawsuit by the Authors
20 Guild and that there was a separate, but part of that
21 lawsuit, and would I be interested in being part of it.
22      Q. I want to focus my question on the period
23 of time before you decided to become a Plaintiff in this
24 case.  What did Mr. Boni tell you about the lawsuit
25 during that period of time?

Page 29

1   Do you think that you have suffered any
2  economic harm from the display of any quotes from your
3  books in Google Books?
4       A.  I don't know.
5       Q.  Do you know whether any other members of
6  the class have suffered any economic harm as a result of
7  the display of quotes from their books in Goggle Books?
8       A.  I don't know if they have or not.
9       Q.  Let me just caution you.  We are speaking
10 over each other a little bit, which is a normal thing to
11 do in every day conversation.  It makes it hard for the
12 Court Reporter because she is trying to take it down.
13 Even though you may know what I am going to say and what
14 my question is, it will help her out a lot if you wait
15 for me to finish speaking before you give your answer.
16      A.  Got it.
17      Q.  Very good.
18      Do you have an understanding that some
19 members of the class are academics who are also authors?
20      A.  I assume some of them are.
21      Q.  Do you have a view as to whether the
22 ability to use Google Books to conduct searches is a
23 benefit to those academic authors?
24      MR. BONI:  Object to the form.  Can we get a
25 working definition of academics and then can we get some

Page 30

1  understanding of whether you mean as class member or as
2  researchers using Google.
3       Q.  Let me ask you this question.
4       You have a general understanding that there
5  are academic authors who may be professors, for example,
6  who are members of the class; right?
7       A.  Yes.
8       Q.  Let's take those professors as our
9  working example.  Do you have a view as to whether
10 professors, who are themselves are also authors and,
11 therefore, members of the class, derive a benefit from
12 the use of Google Books?
13      A.  I don't know if they do or not.
14      Q.  Have you asked Google to remove any of
15 your books from Google Books?
16      A.  No.
17      Q.  Why not?
18      A.  It just seemed like a lone futile
19 objection and I couldn't do it by myself.
20      Q.  What is it that you couldn't do by
21 yourself?
22      A.  Get the attention of somebody at Google
23 to listen to my concerns.
24      Q.  So is it fair to say that one of your
25 objectives in bringing this lawsuit is to send a message

Page 31

1  to Google?
2       MR. BONI:  I object to the form.
3       A.  My goal here is to be part of and
4  represent a group of authors who may not want to make
5  that phone call that you were talking about by
6  themselves.
7       Q.  Why is it that someone would not want to
8  make that phone call by themselves?
9       MR. BONI:  Object to the form.
10      A.  Time consuming, the odds of getting any
11 relief can be pretty remote.
12      Q.  When you say the odds of getting relief
13 would be pretty remote, do you think if you were to make
14 a request to Goggle to remove your work from Google
15 Books that they would not comply?
16      A.  Do you mean, when you say "Google Books,"
17 you mean destroy the copy that they have made and
18 retrieve the copy that they have given to libraries?
19      Q.  Let me break it down for you.
20      First of all, have you ever asked Google to
21 stop displaying quotations from your books?
22      A.  No.
23      Q.  Do you think if you were to ask Google to
24 stop displaying quotations from your books, that it
25 would comply?

Page 32

1       A.  I have no idea.
2       Q.  Do you have a view as to how time
3  consuming it would be to make that request?
4       A.  Do I have an idea how time consuming it
5  would be to have me make the request or get a response?
6       Q.  No, make the request.
7       A.  I don't know how time consuming it would
8  be.  I am not even sure what the procedure would be to
9  do that.
10      Q.  Have you ever investigated how to make a
11 request to Google to remove the display of quotes from
12 any of your books from Google Books?
13      A.  I haven't investigated how to do that.
14      Q.  What do you understand your role in this
15 case to be as a class representative?
16      A.  Simply to represent the class.
17      Q.  Do you have an understanding as to what
18 your job is in representing the class?
19      A.  Yes, to be an example of the group.
20      Q.  What have you done so far in your
21 capacity as a class representative in this case?
22      A.  I have read all of the materials and if a
23 class member were to question me, I think I can give
24 pretty good answers about the lawsuit, what it is about,
25 so I see my role here as, at this stage, an educator.

Page 33

1   Q. An educator of the class members?
2   A. No, an educator as to what is being
3   sought here for the benefit of other class members when
4   they want to know what the lawsuit is about.
5   Q. When you say your role here as an
6   educator, who are you educating?
7   A. Other class members.
8   Q. So you see part of your role as educating
9   other class members about what the lawsuit is about?
10  A. Yes, if they were to call me up,
11  contacted me.
12  Q. You said that you have reviewed all of
13  the materials. What are the materials that you
14  reviewed?
15  A. Well, of course all of the documents that
16  come from my own files for one thing and I reviewed the
17  Complaint.
18  Q. Are there any other materials that you
19  reviewed?
20  A. There may be, but I might not know
21  offhand the legal term for the document. I have seen a
22  number of documents.
23  Q. Are they documents that were filed with
24  the Court?
25  A. I think so, yes.

Page 34

1   Q. To your understanding, who is responsible
2   for making decisions about the case?
3   A. The lawyers.
4   Q. Do you have any role in that process?
5   A. In terms of crafting the case? Would you
6   repeat the question.
7   Q. Do you have any role in making any
8   decisions about the case?
9   A. I might have. I might have inadvertently
10  in conversations about it. I don't know to what extent
11  the case was shaped or reshaped based upon my thoughts.
12  Probably not much. I don't know.
13  MR. BONI: I think she is asking in the
14  present tense.
15  Q. Let me ask. Other than comments that you
16  may have made inadvertently, as you put it, do you
17  understand yourself to have any other role with respect
18  to decision-making in the case?
19  A. I can't think of any at the moment.
20  Q. Do you have, and this a yes or no
21  question at the moment, do you have a written agreement
22  with the Boni & Zack law firm regarding your
23  participation in the case?
24  A. No.
25  Q. Do you have any understanding as to

Page 35

1   whether you will receive any payment as a result of your
2   participation in the case, other than your share of the
3   payments that are made to other class members?
4   A. No, I don't think so. Maybe travel
5   expenses, but I am not sure. I am not in it for that.
6   Q. You mentioned that Mr. Boni is your
7   agent, your literary agent for at least some purposes;
8   is that right?
9   A. Yes.
10  Q. How long have you and Mr. Boni known each
11  other?
12  A. I would say Mike might know a little
13  better than I do. At least a year, about that.
14  Q. How was it that you came to retain them
15  as a literary agent?
16  A. I am not sure what the initial contact,
17  what the subject was.
18  Q. Do you have any recollection as to how he
19  was introduced to you?
20  A. See, I am trying to think. I can't
21  recall whether somebody made the recommendation or
22  whether it came inadvertently in some other matter.
23  MR. BONI: It is very simple. We can get it
24  on the record. It is not a memory test, but it is your
25  deposition. It has to do with the claims process, okay.

Page 36

1   He called me to help with the claims process in the
2   settlement.
3   MS. DURIE: Okay.
4   Q. Is that consistent with your
5   recollection?
6   A. Yes, that's right.
7   MS. DURIE: Let me have marked as Bouton
8   Exhibit 1 a copy of an agreement dated September 1,
9   2011, signed by Jim Bouton and Michael Boni.
10  (Whereupon, the aforementioned document was
11  marked as Bouton Exhibit 1 for identification as of this
12  date by the Reporter.)
13  MR. BONI: Off the record.
14  (Whereupon, an off-the-record discussion was
15  held.)
16  (Whereupon, a short recess was taken.)
17  Q. Mr. Bouton, do you recognize what has
18  been marked as Exhibit 1?
19  A. Yes.
20  Q. Is Exhibit 1 an agreement that you
21  entered into with RosettaBooks regarding an e-book
22  version of two of your works?
23  A. Yes.
24  Q. And Mr. Boni acted as your literary agent
25  in connection with the execution of this agreement; is

Page 37

1  that right?
2       A. Right, right.
3       Q. And in consideration for that work, there
4  is a split of payments that will be received from
5  RosettaBooks for any sales of your works; is that right?
6       A. Yes.
7       Q. You get 90 percent and Mr. Boni gets ten
8  percent; is that right?
9       A. Right.
10      Q. Are any of your works currently available
11 in e-book format?
12      A. No.
13      Q. Why is that?
14      A. It is a relatively new thing. The
15 thinking was to wait and see what happened in the e-book
16 market, whether it was -- I have other things going on
17 in my life besides my books, so this wasn't a top
18 priority.
19      Q. Is there any reason that e-book versions
20 of your works are not currently available, other than
21 that it has not been a priority of yours?
22      A. No. Speaking of agreements, I think
23 there is also an agreement that we got on retention,
24 whether I get any money from this. Didn't you ask that
25 question earlier?

Page 38

1       Q. Can you explain?
2       MR. BONI: He is correcting the record about
3  the retention agreement.
4       Q. I see. So I asked you a question about
5  whether you were getting any payment in your capacity as
6  a class representative separate and apart from
7  distributions that would be made to the class as a
8  whole. Did you want to supplement that answer?
9       A. As I understand, there is no contract in
10 terms of the amounts, but as I understand it, the judge
11 could decide that my role here is worth some kind of
12 compensation, but as I understand it, it is nominal.
13      MR. BONI: You asked the question whether
14 there was a written retention agreement. We don't want
15 the record to be left unsaid. There is a written
16 retention agreement. You can ask about that. The
17 Witness didn't remember it.
18      MS. DURIE: Okay.
19      Q. Have you signed a written retainer
20 agreement with the Boni & Zack firm?
21      A. I think so.
22      Q. Do you have any recollection of signing
23 that?
24      A. Yes.
25      Q. Do you know when you signed it?

Page 39

1       A. I would say probably about a month ago,
2  give or take a couple of weeks.
3       MR. BONI: Longer than that.
4       MS. DURIE: You are not the witness.
5       MR. BONI: If you can't remember --
6       A. The retention agreement to serve as the
7  class Plaintiff.
8       MR. BONI: If you don't know, you say you
9  don't know or you don't recall when.
10      A. I don't recall when.
11      Q. Is it your best recollection that it was
12 within the last few weeks?
13      A. Further back than that.
14      Q. Mr. Boni negotiated this contract with
15 RosettaBooks on your behalf; is that right?
16      A. Yes.
17      Q. In addition to negotiating this contract,
18 has Mr. Boni assisted you with launch promotion-type
19 activities?
20      MR. BONI: I am sorry. With what?
21      Q. Launch professional activities?
22      A. No.
23      Q. Or with the publicizing of any of your
24 works?
25      A. No.

Page 40

1       MS. DURIE: Let me have marked as the next
2  exhibit an e-mail string, at the top of which is dated
3  Monday, September 19, 2011.
4       (Whereupon, the aforementioned document was
5  marked as Bouton Exhibit 2 for identification as of this
6  date by the Reporter.)
7       Q. Is your personal e-mail address
8  bout56@aol.com?
9       A. Yes.
10      Q. This e-mail string, as most e-mail
11 strings, actually starts at the bottom and works its way
12 up. If you turn to the second page, you will see there
13 is a Google alert that was e-mailed to you on
14 September 19th.
15      A. Yes.
16      Q. Have you signed up for a Google service
17 that alerts you whenever something pops up with your
18 name on it?
19      A. Yes.
20      Q. Why have you done that?
21      A. Just to be aware of what people are
22 saying about me, thinking about me.
23      Q. Have you found it helpful to be able to
24 get this type of digest with a little bit of text around
25 your name?

Page 41

1    A. Yes.
2    Q. And the little quote that appeared here
3  in this Google alert that was sent to you was from
4  something on NPR; is that right?
5    A. Yes.
6    Q. Then if you look at the first page of
7  what has been marked as Exhibit 2, you see there is the
8  e-mail at the top makes a reference to doing things as
9  part of Ball Four launch promotion?
10   A. Yes.
11   Q. This is the launch promotion for the
12 launch of an e-book version of Ball Four?
13   A. Yes.
14   Q. Was Mr. Boni involved in working with
15 RosettaBooks on that launch promotion?
16   A. No. This is really -- this is between
17 Arthur Klebanoff and myself. I don't think Mike was
18 involved in this at all, except for the fact that I
19 copied him on it just to keep him up-to-date.
20   MS. DURIE: Let me have marked as the next
21 exhibit another e-mail string also dated September 19,
22 2011.
23       (Whereupon, the aforementioned document was
24 marked as Bouton Exhibit 3 for identification as of this
25 date by the Reporter.)

Page 42

1    Q. You will see, Mr. Bouton, the string
2  starts with the Google alert, but there is not a
3  different e-mail chain that follows from that. Do you
4  see that?
5    A. Yes.
6    Q. In the middle on the first page there is
7  an e-mail exchange between Mr. Boni and yourself about
8  the possibility of your writing a foreword regarding
9  Ball Four; is that right?
10   A. Yes.
11   Q. Does that refresh your recollection that
12 Mr. Boni had some involvement in working with you on
13 publicizing the intended e-book launch of Ball Four?
14   MR. BONI: Object to the form. It
15 mischaracterizes the earlier testimony. If you can
16 answer.
17   A. Yes, but even here, I am really
18 communicating with Klebanoff through Mike, but this
19 issue is dealing with the launch of the book and had to
20 do with a conversation between Klebanoff and myself.
21 Mike Boni was not involved in launching the book or
22 promoting it. He is saying "Art asked me to request
23 that you write a foreword."
24   Q. Was Mr. Boni involved in the
25 conversations about trying to determine what the likely

Page 43

1  revenue stream from an e-book version of Ball Four would
2  be?
3    A. He was involved in the extent that some
4  of my questions for Art Klebanoff went through Mike
5  Boni, that they were really not questions being asked of
6  Mike Boni, they were being asked of Klebanoff. Mike
7  Boni was simply, at that stage, forwarding my request
8  for revenue information.
9    Q. Was Mr. Boni acting as a go-between
10 between yourself and Mr. Klebanoff and representing your
11 interests in those conversations?
12   A. He was doing what an agent does.
13   Q. Did you ever have any conversations with
14 Mr. Boni regarding the e-book versions of your book,
15 other than in his capacity as your agent?
16   I will ask it again. Did you ever have any
17 conversations with Mr. Boni relating to e-book versions
18 of your books where Mr. Boni was not acting in his
19 capacity as your literary agent?
20   A. No.
21   MS. DURIE: Let me have marked as the next
22 exhibit an e-mail dated November 10, 2011.
23       (Whereupon, the aforementioned document was
24 marked as Bouton Exhibit 4 for identification as of this
25 date by the Reporter.)

Page 44

1    Q. The Court Reporter has put in front of
2  you what has been marked as Exhibit 4. Do you recognize
3  this as an e-mail between yourself and Fran Janosco that
4  was then forwarded to Mr. Boni?
5    A. Yes, I see that.
6    Q. And the e-mail exchange that you had with
7  Fran Janosco related to costs associated with the e-book
8  project; is that right?
9    A. Yes.
10   Q. The cost was relating to what the cover
11 would look like?
12   A. No.
13   Q. What were they relating to?
14   A. They were relating to the cost of getting
15 digital or a -- I am trying to figure out what the word
16 is. Something that would allow a hard copy to be
17 transferred in a state that could then make it a digital
18 copy.
19   Q. You forwarded this e-mail exchange to Mr.
20 Boni; is that right?
21   A. Yes, it looks like it.
22   Q. Were you sending it to Mr. Boni in his
23 capacity as your literary agent?
24   A. Yes.
25   Q. What was it that you told Mr. Boni in

Page 53

1  litigation?
2      A. No.
3      Q. Why not?
4      A. I couldn't find it.
5      Q. How many different publishing contracts
6  have you signed for Ball Four?
7      A. Well, there is the original version which
8  was published by World Publishing and they went out of
9  business in a few years, and that was in 1970. In 1980,
10 I wanted to do an update to the book and I signed a
11 contract with Stein & Day, then they went out of
12 business. In 1990, I wanted to do an update to the book
13 again and that was this one here, with Macmillan. So
14 the two previous contracts were with companies that both
15 went out of business.
16     Q. Are those the only three editions of your
17 book of Ball Four that have been published?
18     A. No. Then the fourth edition, which came
19 out in 2000, called Ball Four The Final Pitch, that was
20 originally published by -- I can't think of the name of
21 the publisher. A very small publisher. Sports
22 Publishing, something like that, then I retained the
23 rights to that, then published Ball Four The Final Pitch
24 under my own imprint, Bulldog Publishing. So I was the
25 publisher of the Ball Four The Final Pitch.

Page 54

1      Q. You no longer have a copy of the first
2  publishing contract that you entered into for Ball Four;
3  is that correct?
4      A. Yes.
5      Q. Is it likewise the case that you no
6  longer have a copy of the second publishing contract
7  that you entered into for Ball Four?
8      A. Yes.
9      Q. Now, with respect to the fourth edition
10 of Ball Four, Ball Four The Final Pitch, did you
11 originally enter into a publishing contract for that?
12     A. Yes.
13     Q. Do you have a copy of that publishing
14 contract?
15     A. No.
16     Q. Have you made any effort to locate those
17 publishing contracts?
18     A. Yes.
19     Q. What have you done as part of that
20 effort?
21     A. Turned my basement upside down.
22     Q. So I take it we can conclude that they
23 are well and truly lost?
24     A. Yes.
25     Q. Have you made any effort to determine

Page 55

1  whether any of those publishing contracts are available
2  from other sources, recognizing that some of the
3  publishing companies are no longer in existence?
4      A. I have no idea whether anybody has got
5  those contracts.
6      Q. When you negotiated the original
7  publishing contract for Ball Four, were you provided
8  with a form contract from the publishing company at the
9  outset of those negotiations?
10     MR. BONI: Do you know what a form contract
11 is?
12     THE WITNESS: A standard contract.
13     MR. BONI: Yes.
14     A. Yes.
15     Q. Did you negotiate any changes to that
16 standard contract with respect to the original edition
17 of Ball Four?
18     A. I don't recall.
19     Q. Do you recall any of the provisions of
20 that original publishing contract for Ball Four?
21     A. Beyond their right to publish a book?
22     Q. Correct.
23     A. I can't think of any specific provisions
24 one way or the other.
25     Q. Turning to the second contract that you

Page 56

1  entered into, when you negotiated that second contract
2  for Ball Four, did those negotiations likewise start
3  with your being provided a standard contract by the
4  publishing house?
5      A. I don't recall, but probably.
6      Q. Is it possible that the negotiations
7  started with your providing the draft publishing
8  agreement?
9      A. I don't think so.
10     Q. Do you know whether you negotiated any
11 changes to the standard publishing contract in
12 connection with your negotiations over the second
13 edition of Ball Four?
14     A. I don't recall. I may have.
15     Q. Do you recall any of the terms of that
16 second contract?
17     A. No.
18     Q. Let us turn now to what I understand to
19 be the third edition of Ball Four. That relates to the
20 publishing contract of Exhibit 6?
21     A. Yes.
22     Q. With respect to Exhibit 6, these
23 negotiations began with you being provided a copy of the
24 standard Macmillan Publishing Company contract; is that
25 correct?

Page 57

1    A.  Yes.
2    Q.  In this case, you did negotiate some
3 change or editions to that standard contract; is that
4 right?
5    A.  Yes.
6    Q.  By the time that you were negotiating
7 this contract in September of 1989, you were a very
8 well-known author; correct?
9    A.  Yes.
10   Q.  Do you think that you had an easier time
11 getting Macmillan Publishing Company to alter some of
12 its standard terms by virtue of the fact that you were a
13 well-known author with a track record in publishing?
14   A.  I don't know what considerations they
15 valued.  My sense of it is it had to do whether they can
16 make money selling the book and a lot less to do with
17 whether they can get an autograph, or some other.
18   Q.  And Macmillan Publishing Company had good
19 reasons to think that they were going to be able to make
20 money from the book given the success of the --
21   A.  Yes.
22   Q.  If you take a look at the last page of
23 what has been marked as Exhibit 6, you see that there is
24 a Rider A?
25   A.  Yes.

Page 58

1    Q.  Is Rider A something that you
2 individually negotiated with Macmillan?
3    A.  Yes.
4    Q.  Rider A is not something that formed part
5 of the standard Macmillan Publishing Agreement; is that
6 correct?
7    A.  Right.
8    Q.  Now, as part of Rider A, the first
9 provision in Rider A was that "It is understood and
10 agreed that the Author retains the electronic
11 reproduction rights (including audio cassette tapes)";
12 is that correct?
13   A.  Yes.
14   Q.  And you negotiated that provision
15 specifically with Macmillan; is that right?
16   A.  Yes.
17   Q.  Why did you negotiate that provision?
18   A.  Because I wanted to limit them to printed
19 hard cover, printed version of the book, and leave the
20 other rights to me.
21   Q.  Why was it important to you in 1989 to
22 limit Macmillan to the printed hard cover edition of the
23 book, as you put it?
24   A.  Because I came to understand that there
25 were more opportunities for selling the book than simply

Page 59

1 a printed copy, printed copy of the book.
2    Q.  What opportunities, what other
3 opportunities did you understand that there would be in
4 1989?
5    A.  I didn't know.  I didn't know, but from
6 things I read in the newspaper, I could see that there
7 was going to be more different ways in which a book can
8 be published and I wasn't sure what those were.  I know
9 they would have something to do with electronics, that
10 is why I chose that word, but I just wanted to make sure
11 that I would retain those rights, whatever those rights
12 turned out to be.  I didn't even have anything in mind
13 at the time.
14   Q.  Do you remember when it was that you had
15 seen these articles or whatever else that may have been
16 that sparked this thought that you should try to retain
17 electronic rights for yourself?
18   A.  Well, it would have been about the time
19 probably shortly before this contract was signed in
20 1989.
21   Q.  When did you sign the original first
22 publishing contract?
23   A.  In 1969.
24   Q.  Do you recall whether that contract said
25 anything about electronic reproduction rights?

Page 60

1    A.  I don't recall whether it did or not.
2    Q.  Do you remember negotiating any provision
3 similar to Rider A that would have retained electronic
4 reproduction rights for yourself in that original
5 publishing contract?
6    A.  I don't recall that.
7    Q.  The same question with respect to the
8 second contract that you signed, what was the date of
9 the second contract that you signed for Ball Four?
10   A.  It was ten years after the first one,
11 which was 1969, so that would have been 1979.
12   Q.  Do you recall whether the 1979 contract
13 contained any reference to electronic reproduction
14 rights?
15   A.  I don't recall whether it did or not.
16   Q.  Do you remember whether you negotiated
17 any rider retaining those rights for yourself?
18   A.  I don't recall whether I did that then.
19 I don't know whether this was the first time or whether
20 it occurred ten years earlier, I just simply don't know.
21   Q.  When you proposed Rider A, including the
22 revision that you would retain the electronic
23 reproduction rights to Macmillan, do you remember what
24 Macmillan's reaction was?
25   A.  They were reluctant to let me do this.

Page 69

1    A. I don't recall.
2    Q. Would the same be true for the second
3 contract that you entered into?
4    A. Yes.
5    Q. Would the same be true for the fourth
6 contract that you entered into?
7    A. The fourth one being?
8    Q. The one that came after Macmillan then
9 ultimately resulted in your self-publishing?
10   A. I don't recall any verbal.
11   Q. Are you continuing to self-publish the
12 fourth edition of Ball Four?
13   A. Yes.
14   Q. Let me turn now to your book Strike Zone.
15   A. Okay.
16   Q. That book was published by Viking; is
17 that right?
18   A. Yes.
19   Q. In 1994?
20   A. Yes.
21   Q. Was there a publishing contract for this
22 book?
23   A. Yes.
24   Q. Do you have a copy of that publishing
25 contract?

Page 70

1    A. If I do, I wasn't able to find it.
2    Q. You had a co-author on Strike Zone; is
3 that right?
4    A. Yes.
5    Q. Does your co-author have a copy of your
6 publishing contract, so to speak?
7    A. I don't know. He has passed away.
8    Q. Do you have any recollection as to what
9 the terms of the publishing contract for Strike Zone
10 were?
11   A. No.
12   Q. Is Strike Zone currently in print?
13   A. I believe so.
14   Q. Do you know whether excerpts or quotes
15 from Strike Zone appear in Google Books?
16   A. I don't know.
17   Q. Was the copyright for Strike Zone
18 registered?
19   A. I believe so.
20   Q. What is your basis for that belief?
21   A. That all of the books I've written, had
22 been part of, were copyrighted.
23   Q. Was there a copyright registration for
24 Strike Zone within three months of its publication date?
25   A. I believe so.

Page 71

1    Q. What is your basis for that belief?
2    A. That it is standard practice.
3    Q. Standard practice on the part of the
4 publisher?
5    A. Yes, and on my part too.
6    Q. Do you know whether the contract, the
7 publishing contract for Strike Zone, included any
8 provision not regarding ownership of digital rights?
9    A. I don't recall.
10   Q. There is also a book called I Managed
11 Good But Boy Did They Play Bad; is that correct?
12   A. Yes.
13   Q. Do you have a copy of the publishing
14 contract for this book?
15   A. I don't think so.
16   Q. Have you searched for it?
17   A. Yes.
18   Q. You weren't able to find it?
19   A. No, I wasn't.
20   Q. Do you recollect what any of the terms of
21 that publishing contract were?
22   A. No.
23   Q. Do you know whether it included any carve
24 out publishing rights, carve out for digital rights?
25   A. Yes.

Page 72

1    Q. How much of this book, I Managed Good But
2 Boy Did They Play Bad, did you write?
3    A. I think one chapter.
4    Q. Are you the author of this book?
5    A. No. It is a collection of pieces written
6 by other authors.
7    Q. Is there a copyright registration on I
8 Managed Good But Boy Did They Play Bad?
9    A. You know, I don't know.
10   Q. Do you hold the copyright in this book, I
11 Managed Good But Boy Did They Play Bad?
12   A. I don't know.
13   Q. Did you receive copyright assignments
14 from the other contributors to this book?
15   A. Yes, I believe so.
16   Q. Who received royalties on the sale of
17 this book?
18   A. Myself and Neil Offen, O-F-F-E-N.
19   Q. What was the royalty split between the
20 two of you?
21   A. I forget.
22   Q. Do you, and I apologize if I asked you
23 this before, do you have any recollection of any of the
24 terms in the publishing contract for I Managed Good But
25 Boy Did They Play Bad?

Page 73

```
 1        A. No.
 2        Q. There also is a book called I'm Glad You
 3   Didn't Take It Personally; is that right?
 4        A. Yes.
 5        Q. Is there a copyright registration for
 6   this book?
 7        A. I believe so.
 8        Q. Who holds the copyright in this book?
 9        A. I do.
10        Q. How much of I'm Glad You Didn't Take It
11   Personally did you write?
12        A. Actually all of it.
13        Q. How much did Leonard Shecter write?
14        A. He was my editor.
15        Q. When you say he was your editor, he is
16   indicated on the cover of the book as having been the
17   editor. Is that somewhat unusual, to identify the
18   editor as identified on the cover of the book?
19        A. It is fairly common.
20        Q. The copyright in I'm Glad You Didn't Take
21   It Personally, is held by both yourself and Mr. Shecter;
22   is that right?
23        A. If that is what it says.
24        Q. Do you have any reason to believe that
25   this is not the case?
```

Page 74

```
 1        A. No.
 2        Q. Why does Mr. Shecter hold the copyright
 3   in I'm Glad You Didn't Take It Personally along with
 4   yourself?
 5        A. I don't recall.
 6        Q. Do you have any recollection of any of
 7   the terms of the publishing contract for I'm Glad You
 8   Didn't Take It Personally?
 9        A. No.
10        Q. I take it you searched for the publishing
11   contract as well?
12        A. Yes.
13        Q. Do you have any recollection as to
14   whether you engaged in any negotiations regarding the
15   digital rights for this work?
16        A. I don't recall.
17        Q. Let me turn now to Foul Ball. Foul Ball
18   is a book that you wrote; correct?
19        A. Yes.
20        Q. Is Foul Ball in print?
21        A. Yes.
22        Q. Is Foul Ball available?
23        A. Well, wait a second. When you say "in
24   print," I am selling copies on my website, so if that
25   qualifies in print, it is no longer being printed by the
```

Page 75

```
 1   original publisher.
 2        Q. You are self-publishing Foul Ball?
 3        A. Yes. I am sorry. The original book was
 4   Foul Ball. Now it is a self-published book. This is a
 5   follow-up to the self-published book that was published
 6   by Globe Pequot, The Lyons Press, and I have a reversion
 7   of rights. The rights have reverted to me now. I am
 8   selling this book on my website. It is the only place
 9   that it is available.
10        Q. Do you sell only physical copies of the
11   book on your website?
12        A. Yes.
13        Q. Is it the case that you only entered into
14   one publishing contract for Foul Ball?
15        A. Yes.
16        Q. Are pages from Foul Ball viewable on the
17   web?
18        A. I don't know.
19        Q. Do you know whether the publisher, The
20   Lyons Press, has given permission for any pages of your
21   book to be displayed on the web?
22        A. I don't know.
23        MS. DURIE: Let me have marked as the next
24   exhibit in order a multi-page document captioned The
25   Lyons Press.
```

Page 76

```
 1        (Whereupon, the aforementioned document was
 2   marked as Bouton Exhibit 7 for identification as of this
 3   date by the Reporter.)
 4        Q. Do you recognize what has been marked as
 5   Exhibit 7 as a part of the publishing contract that you
 6   entered into with The Lyons Press for Foul Ball?
 7        A. Yes.
 8        Q. In negotiating that contract, did those
 9   negotiations begin with The Lyons Press providing you
10   with their standard form contract?
11        A. I believe so.
12        Q. Did you negotiate changes to that
13   standard form contract?
14        A. I don't recall.
15        Q. Turn to the last page of what has been
16   marked as Exhibit 7. You see paragraph 21 says, "The
17   Work, as used throughout the above agreement, shall
18   include printed books only."
19        A. Yes.
20        Q. Do you know whether that is a provision
21   that you requested?
22        A. I don't recall.
23        Q. After that, there is a paragraph 22 that
24   states that "The Author reserves all rights not
25   expressly granted to the Publisher in this Agreement,"
```

19 (Pages 73 to 76)

Page 77

1  then continues with some additional language.
2      Do you know whether paragraph 22 is a
3  provision that you requested be included within
4  Exhibit 7?
5      A. Whether paragraph 21 or 22 is something
6  that I requested?
7      Q. Right.
8      A. You know, I don't remember. I don't
9  remember on that.
10     Q. I take it that you do not know whether
11 full pages of Foul Ball are viewable on Google with the
12 permission of your publisher?
13     A. I don't know if they are on Google.
14     Q. Are you receiving any royalties from your
15 publisher relating to the display of any individual
16 pages from the book?
17     MR. BONI: From this book?
18     MS. DURIE: Yes.
19     A. Royalties from who?
20     Q. From your publisher or from anyone?
21     A. Well, I got a reversion of rights on this
22 book. This book is no longer in print.
23     Q. You are no longer receiving any royalties
24 relating to Foul Ball; is that correct?
25     A. Yes.

Page 78

1      MS. DURIE: Let me have marked as the next
2  exhibit in order a screen shot.
3      (Whereupon, the aforementioned document was
4  marked as Bouton Exhibit 8 for identification as of this
5  date by the Reporter.)
6      A. I am familiar with this.
7      Q. How are you familiar with this?
8      A. I got it in front of me.
9      Q. Fair enough.
10     A. Generally an author can remember
11 something that he has written if placed in front of him.
12     Q. You are familiar with the excerpt that
13 appears from your book?
14     A. Yes.
15     Q. You see what has been marked as Exhibit 8
16 has a screen shot from Google Books. Do you see the
17 reference to Google Books on the upper left-hand side?
18     A. Yes, I see it.
19     Q. I will represent to you that there is a
20 search box with your name that has been put in it.
21     A. Yes.
22     Q. On the left-hand side there is a
23 reference to your book Foul Ball?
24     A. Yes.
25     Q. There is a button that one can click on

Page 79

1  to get a print copy of your book. Do you see that?
2      A. Yes.
3      Q. In the main body of the image you see
4  that there is an excerpt from your book?
5      A. Yes.
6      Q. Do you have an understanding as to
7  whether your publisher has authorized the inclusion of
8  Foul Ball with this preview as part of Google Books?
9      MR. BONI: Objection to form.
10     A. Whether the publisher?
11     Q. Correct.
12     A. Has?
13     Q. Authorized?
14     A. Authorized Google?
15     Q. The inclusion of Foul Ball with this
16 preview?
17     A. I don't know whether they have or not.
18     Q. Are you making a claim in this lawsuit
19 for the inclusion of Foul Ball within Google Books?
20     A. As one of the books?
21     Q. Yes.
22     A. Yes.
23     Q. Were you aware today that Google was
24 displaying full pages from Foul Ball as part of Google
25 Books?

Page 80

1      A. No.
2      Q. Was the copyright in Foul Ball registered
3  within three months of its publication?
4      A. I believe so.
5      Q. Do you have any basis for that belief,
6  other than your understanding, as to standard practice?
7      A. No.
8      Q. You understand that in this case you are
9  representing a class of authors; is that right?
10     A. Yes.
11     Q. Included within that class are the
12 authors of various different kinds of works; correct?
13     A. Yes.
14     Q. Included within the class are academics
15 who write books as part of their academic
16 responsibilities; is that correct?
17     A. Yes, I am assuming so.
18     Q. For example, included within the class
19 might be a professor who writes books in an effort to
20 get tenure; correct?
21     A. Yes.
22     Q. Do you feel that you are qualified to
23 represent the perspectives of those academic authors?
24     A. Generally speaking, with respect to the
25 Complaint, yes.

Page 89

```
 1        MS. DURIE:  I have a couple of follow-up
 2   questions.
 3   CONTINUED EXAMINATION BY
 4   MS. DURIE:
 5        Q.  To date, have you played any role in
 6   relationship to any potential settlement of this matter?
 7        A.  No.
 8        Q.  To date, have you played any role with
 9   respect to the direction of the lawsuit?
10        A.  No.
11        Q.  The testimony that you just gave you gave
12   following a break during which you had the opportunity
13   to consult with your Counsel regarding the substance of
14   your testimony; is that right?
15        A.  Yes.
16
17        (Continues on next page to include jurat.)
18
19
20
21
22
23
24
25
```

Page 90

```
 1        MS. DURIE:  No further questions.
 2        MR. BONI:  We are done.  Thanks.
 3        (Whereupon, at 3:50 P.M., the Examination of
 4   this Witness was concluded.)
 5
 6
         _____
 7             JIM BOUTON
 8
 9   Subscribed and sworn to before me
10   this _____ day of _____ 2011.
11
     _____
12          NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 91

```
 1                    E X H I B I T S
 2
 3   BOUTON EXHIBITS:
 4
 5   EXHIBIT       EXHIBIT                       PAGE
 6   NUMBER        DESCRIPTION
 7   1             Agreement                      36
 8   2             E-mail string
 9                 dated 9/19/2011                40
10   3             E-mail string
11                 dated 9/19/2011                41
12   4             E-mail dated 11/10/2011        43
13   5             Image from a screen
14                 from Amazon.com                47
15   6             Contract from Macmillan
16                 Publishing Company             52
17   7             Multi-page document
18                 captioned The Lyons Press      76
19   8             Screen shot from
20                 Google Books                   78
21   9             One-page document bearing
22                 a fax line                     81
23   10            Request For Payment Of
24                 Permissions Fees               83
25
```

Page 92

```
 1                    I N D E X
 2
 3   EXAMINATION BY                             PAGE
 4   MS. DURIE                                  3/89
 5   MR. BONI                                   88
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

J. BOUTON

1               C E R T I F I C A T E
2
3   STATE OF NEW YORK       )
                            : SS.:
4   COUNTY OF RICHMOND      )
5
6
7           I, DEBORAH GARZANITI, a Notary Public for and
8   within the State of New York, do hereby certify:
9           That the witness whose examination is
10  hereinbefore set forth was duly sworn and that such
11  examination is a true record of the testimony given by
12  that witness.
13          I further certify that I am not related to any
14  of the parties to this action by blood or by marriage
15  and that I am in no way interested in the outcome of
16  this matter.
17          IN WITNESS WHEREOF, I have hereunto set my hand this 19th
18  day of December 2011.
19
20              _____
21                  DEBORAH GARZANITI
22
23
24
25

### Errata Sheet for Jim Bouton's Deposition Transcript (December 15, 2011)

Page 5, line 7, change "paperclip" to "pay-per-click."

Page 6, line 5, change "I seen it" to "I've seen it," and line 21, change "I seen" to "I've seen."

Page 9, line 25, change "I think I seen it" to "I think I've seen it."

Page 10, line 11, change "I seen" to "I've seen," and line 16, change "they" to "they've."

Page 34, line 24, change "No" to "Yes" (having subsequently reviewed the agreement I signed in September 2011).

Page 47, line 8, change "in" to "on," and line 16, change "they" to "they've."

Page 51, line 23, change "trademark" to "copyright."

Page 57, line 17, delete "or some other."

Page 82, line 2, change "the" to "their."


Dated: January 16, 2012

_____
Jim Bouton