# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, et al.

Plaintiffs                    Civil Action No.

vs.                                        1:2005cv08136

GOOGLE, INC.

Defendant

___________________________/

The Deposition of JOSEPH GOULDEN was held on Friday, January 6, 2012, commencing at 12:57 p.m., at the Offices of Gore Brothers Reporting & Videoconferencing, 1025 Connecticut Avenue, N.W., Suite 1000, Farragut Square, Washington, D.C. 20036, before Christine A. Gonzalez, CSR, RPR, a Notary Public.

REPORTED BY: Christine A. Gonzalez, CSR, RPR

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

MICHAEL J. BONI, ESQUIRE
Boni & Zack, LLC
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania 19004
Telephone: 610.822.0200
Facsimile: 610.822.0206
Email: mboni@bonizack.com

ON BEHALF OF THE DEFENDANT:

JOSEPH C. GRATZ, ESQUIRE
Durie Tangri, LLP
217 Leidesdorff Street
San Francisco, California 94111
Telephone: 415.362.6666
Facsimile: 415.236.6300
Email: jgratz@durietangri.com

and

AMY KEATING, ESQUIRE
Google, Inc., General Counsel
1600 Amphitheatre Parkway
Mountain View, California 94043
Telephone: 650.253.1428
Email: amykeating@google.com

INDEX

Deposition of JOSEPH GOULDEN

January 6, 2011

| Examination By: | | Page |
|---|---|---|
| Mr. Gratz | | 5 |

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 5 |
| Exhibit 2 | Books by Joseph C. Goulden | 57 |
| Exhibit 3 | The Money Lawyers - Excerpt #4 | 79 |
| Exhibit 4 | Google books Screenshot | 82 |
| Exhibit 5 | Google books - Document 991-2 | 85 |

PROCEEDINGS

Whereupon,

JOSEPH GOULDEN,

called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION BY MR. GRATZ:

Q. Good morning, Mr. Goulden.

A. Morning, sir.

Q. Can you state your name and address for the record, please?

A. Joseph C. Goulden, spelled G-o-u-l-d-e-n. My address is 1534 29th Street, Northwest, Washington, D.C., 20007.

MR. GRATZ: We can mark this as Goulden Exhibit 1.

(Goulden Exhibit 1 was marked for purposes of identification.)

BY MR. GRATZ:

Q. Mr. Goulden, you're here today because you're the plaintiff in a lawsuit; is that right?

A. Correct.

Q. You're here today pursuant to what's placed in front of you and marked as Exhibit 1, which is a deposition notice; is that right?

A. Correct. Correct.

Q. What is this lawsuit go?

A. About Google's unlawful infringement of the copyright in books written by me and many, many other writers.

Q. Anything else?

A. I think that fairly well covers it.

Q. What are you asking the Court to do?

A. To require Google to obey the law, receive a permanent injunction against further digitalization of books and whatever relief the Court might decide upon.

Q. Are you asking for money?

A. $750.

Q. Why are you asking for that amount of money?

A. That is the amount that was recommended by Mr. Boni.

Q. Do you think that's an appropriate amount?

A. Because I'm trying to establish a principle, yes. Pardon me. Make that, defend a principle, yes. I'm not in this for the money.

Q. Are you asking the Court to order Google to shut down the snippet view portion of the Google books Website?

A. Yes, because they're violating copyright and putting them up there using material that is mine and

BY MR. GRATZ:
Q. Have you been harmed by Google's program of scanning books?
A. I have no way of knowing.
Q. So you don't know one way or the other?
A. No. Let me make an addition to that. I am harmed by the fact that Google sold my material, put it in digital form, and gave this to other libraries. That is something that took away something I owned, without my permission, and gave it away for their profit.
Q. How has that harmed you?
MR. BONI: Object to form.
A. One must protect copyrights. That is a rule of publishing. A couple times I had occasion to go to the Court and defend my own copyrights.
BY MR. GRATZ:
Q. So it's a matter of principle?
MR. BONI: Object to form.
A. It's a matter primarily of principle and, secondarily, a matter of financial protection.
BY MR. GRATZ:
Q. Have you been financially harmed by Google's actions?
A. As I said, I do not know, as of yet. But with the existence of this digital library, I'm nervous about

it.
Q. Have you been financially benefited by Google's action?
A. I don't know. Have no way of knowing.
Q. Have you sold additional books as a result of the existence of Google books?
MR. BONI: Object to form.
A. Not that I know of.
BY MR. GRATZ:
Q. You said that you have gone to court to defend your copyrights in the past?
A. Yes.
Q. What were those situations?
A. First was a book, my book, "The Money Lawyers." Soon thereafter, an acquaintance who had reviewed that book for the Washington Post told me he just read a book called "The Harvard Mystique" by a man named Enrico Hank Lopez, which argued, essentially, people who graduated from Harvard were superior to the rest of us, and he picked up -- you're a Harvard graduate?
Q. I am not.
A. He picked up large chunks of "The Superlawyers" without our permission. On the advice of my agent, I retained a lawyer in New York who specialized in literary affairs, and we collected settlement from the

author.
Second was a book called "Korea: The Untold Story of the War." I knew a woman, a Korean-American woman, in Washington who professed to have connections with the South Korean publishers. And through Brandt, we commissioned her to go to Seoul and try and sell Korean rights to the book.
She gets into Seoul. The first day she's there she sees leading dailies in the country having large chunks of the book, even my picture in there, checks, they're not a member of the Copyright Convention, game over.
She flies back to L.A. Going through the airport, she sees on a kiosk English language editions of the same paper, same material. Okay. I retain a lawyer in Virginia, where I resided at the time, and we sued.
One of the first people we deposed was one of the Korean publishers, and he was asked, "Mr. So-and-So, do the words 'copyright' mean anything to you?" He said, "Yes, yes. If you copy, you must copy right, not copy wrong."
And shall we say the settlement talks progressed fairly rapidly after that.
Q. Let me first ask a question about the situation

with respect to "The Money Lawyers." This was a situation where another book copied substantial portions of your book "The Money Lawyers"?
A. No, "The Superlawyers."
Q. I'm sorry. "The Superlawyers."
MR. BONI: He mentioned both books in the earlier response.
MR. GRATZ: Understood. Okay.
BY MR. GRATZ:
Q. So your first response with respect to the book "The Harvard Mystique" related to your book "The Superlawyers"?
A. Yes, correct.
Q. And the book "The Harvard Mystique" copied substantial portions?
A. Yes.
Q. Was the copying verbatim?
A. It's a long time ago. In some instances, it was. Some was just changed a word here or there, paraphrase.
Q. About how much of "The Superlawyers" was copied?
A. At this late date, I couldn't tell you.
Q. More than about a page?
A. Oh, yeah, far more than a page.

A. No.
Q. Why not?
A. Because one writer against a multi-billion dollar corporation.
Q. What efforts have you undertaken to request that your books be removed from Google books?
MR. BONI: Object to form. He said he didn't.
A. I was advised by Brandt when this first started brewing, "Wait, there's going to be litigation by people that can afford it, Authors Guild and perhaps publishers."
BY MR. GRATZ:
Q. Do you know whether Google removes books from Google books upon requests from authors?
A. I have not the slightest idea.
Q. If Google were to remove books from Google books upon requests from authors, would that change your view of Google's activities?
MR. BONI: Object to form.
A. No.
BY MR. GRATZ:
Q. Why not?
A. Because there's still a mass of books they've already stolen that are in the digital base, and they're there.

Q. And that objection would continue even though Google -- strike that.
In 2011 what were your sources of income?
A. My what?
Q. Sources of income.
A. Reviews and occasional lecture.
Q. What do you mean by "reviews"?
A. Book reviews for the Washington Times, Washington Lawyer magazine. And I had unearned income.
Q. What unearned income is that?
A. Keyhole, Social Security.
Q. Anything else?
A. Some occasional stock dividends.
Q. Did you receive any royalty or licensing income from your books in 2011?
A. No. Let me strike that. A professor in some college in the Midwest -- can't recall the name -- for years has paid an annual fee for reproduction of the portion of "The Best Years" pertaining to soap operas. I think we got a check from that guy in 2011. I think we did.
Q. Is that portion of "The Best Years" titled "Birth of the Tube"?
A. Yes.
Q. Do you know how much was paid?

A. Several hundred dollars. 250, 300, something of that nature.
Q. I want to turn back for a moment to the terms of your agreement with your attorneys.
A. With who?
Q. With your attorneys.
A. Yes, sir.
Q. Do you have the independent ability to reject a proposed settlement that your attorneys believe is in the interest of the class?
MR. BONI: Object to form.
A. I don't know.
BY MR. GRATZ:
Q. Does your -- who paid your -- actually, strike that.
You wouldn't have had any travel expenses coming.
A. He bought lunch.
MR. BONI: Subway.
MR. GRATZ: We'll mark as Exhibit 2 a multi-page document titled "Books by Joseph C. Goulden, in chronological order."
(Goulden Exhibit 2 was marked for purposes of identification.)
BY MR. GRATZ:

Q. Mr. Goulden, you have before you what's been marked as Goulden Exhibit 2. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. A list I prepared of books I published. I misspelled "Superlawyers." The word -- the spell checker misspelled it for me. Should be one word "Superlawyers."
Q. In addition to the books listed on Exhibit 2, did you write a book called "Guatemala"?
A. No.
Q. Did you write or contribute to a book called "The Search for the Gold of Tutankhamen"? T-u-t-a-n-k-h-a-m-u-n (sic).
A. I wrote an article for The Daily Texan at University of Texas about a man who was involved in the expedition. So far as I know, that's the only time I've written about King Tut.
Q. Have you written a book called "It's Better to Know the Judge Than the Law"?
A. No.
Q. Have you had any involvement in a book called "Whose Who Among American High School Students"?
A. Who?

Q. A book called "Whose Who Among American High School Students."
A. No.
MR. BONI: Could be there's another Joe Goulden out there.
BY MR. GRATZ:
Q. Just gotta run it down, you know.
And are you listed as the author of a book called "The News Manipulators"?
A. I was co-author with two other persons.
Q. Is "The News Manipulators" one of the books about which you are making claims in this lawsuit?
A. No. I think the copyright's in the name of Accuracy in Media.
Q. How did -- strike that.
So it's your understanding that the material that you contributed as a co-author to "The News Manipulators" is not material in which you own copyright?
A. No, I do not.
Q. How did Accuracy in Media come to own the copyright in that material?
A. I was involved at the time as director of media analysis for Accuracy in Media.
Q. And was the material that you contributed as

co-author "The News Manipulators" contributed within the scope of your employment at Accuracy in Media?
A. Yes, it was.
Q. Are all of your books nonfiction?
A. Yes.
Q. What is the purpose for which you wrote your books?
MR. BONI: Object to form.
A. To make a living and to satisfy my long-time desire to be a writer.
BY MR. GRATZ:
Q. Are your books works of journalism?
MR. BONI: Object to form.
A. No.
BY MR. GRATZ:
Q. You have written works of journalism; is that right?
A. I was a newspaperman for ten years.
Q. What is the difference between your books and what you consider journalism?
A. Journalism seems to be sort of -- it's not the in-depth research that you would do for a book. There's a difference between what I write and what is called journalism.
Q. Because the depth of research, for example,

that goes into your book is deeper than a typical journalistic --
A. Trying to put things in historical context, explain why things happen the way they do.
Q. With respect to the book in which you're listed for an author, other than "The News Manipulators," do you own copyright in each of those books?
A. Yes, I do.
Q. Were each of those books published pursuant to a publishing contract?
A. Yes.
Q. Other than the republication contract with Dover for "The Dictionary of Espionage" and the translation publication contract with respect to the Chinese edition of the book "Korea," are you in possession of any of the publishing contracts for your books?
A. No, I'm not.
Q. Do you know whether copies of your publishing contracts for those books exist?
A. The only other place they would be, would be in the files of the individual publishers of our agent Brandt & Hochman. They made a record search, and they could not come up with any.
Q. So Brandt & Hochman, the literary agency with

whom you're affiliated and with whom you were affiliated at the time of the publication of each of these books, searched their records and were unable to find publishing contracts with respect to any of your books other than the republication contract for "The Dictionary of Espionage" and the Chinese translation publication contract for the book on the Korean War?
A. Correct.
Q. Turning your attention to Exhibit 2, which is in front of you, your first book was titled "The Curtis Caper"; is that right?
A. Correct.
Q. That was published in 1965 by G.P. Putnam's Sons?
A. '65, yes.
Q. Your second book was titled "Monopoly," and published in 1968; is that right?
A. Right.
Q. Did the publication contract that you had with G.P. Putnam with respect to "Monopoly" provide for reversion of rights to you under certain circumstances?
A. Standard publishing contract calls for reversion under certain conditions. I do not recall what it was for "Monopoly."
Q. Do you know whether those conditions were

satisfied with respect to "Monopoly"?
A. I don't know.
Q. So sitting here today, do you know whether or not the rights to "Monopoly" have reverted to you?
A. We hold the copyright.
Q. How do you know that?
A. Copyright's in my name.
Q. As part of the publication contract for "Monopoly," did you transfer copyright to your publisher?
MR. BONI: Object to form.
A. I don't have the contract. I'm not gonna guess.
BY MR. GRATZ:
Q. In order to answer my question, you would need to look at the terms of the contract?
A. Yeah.
Q. The next book on the list is titled "Truth is the First Casualty." Do you see that?
A. Yes.
Q. Was there a publishing contract with respect to "Truth is the First Casualty"?
A. Yes, there was.
Q. Did it provide for reversion of rights to you under certain circumstances?

A. I don't know. I do know that the rights were reverted to us.
Q. How do you know that?
A. Brandt told me. We were discussing a deal for a movie, and he assured me we had the copyright in our hands.
Q. When was your discussion with Mr. Brandt regarding the rights for "Truth is the First Casualty" that you referred to in your previous --
A. A couple years after the publication of the book.
Q. So that would be in the mid-1970s?
A. Yes.
Q. Other than your conversations with Mr. Brandt in the mid-1970s, do you have any other information regarding whether -- or whether you own the rights to "Truth is the First Casualty"?
A. I now own it totally, yeah.
Q. And you know that because Mr. Brandt told you during that conversation in the mid-1970s?
A. Yes. And the movie never materialized, but...
Q. Do you have any documentation regarding the facts that Mr. Brandt told you about the conversation in the mid-1970s?
A. No, I do not.

Q. The next book on the list is titled "The Money Givers" published in 1970 by Random House. Was there a publishing contract with respect to "The Money Givers"?
A. Yes, sir, there was.
Q. Did it provide for reversion of rights to you upon occurrence of --
A. Same answer. I don't recall because I don't have the contract.
Q. And do you currently own the rights to "The Money Givers"?
A. I don't know.
Q. The next book on the list is "The Superlawyers." Was there a publishing contract with respect to "The Superlawyers"?
A. Yes, there was.
Q. Did it provide for reversion?
A. Yes.
Q. Do you currently own the copyright to "The Superlawyers"?
A. Yes, I do.
Q. How do you know that?
A. Reversion.
Q. On what do you base your belief that the rights have reverted to you?
A. My recollection.

MR. BONI: Object to form. You can answer.
A. My recollection is that Brandt & Hochman recently furnished me a letter of the reversion from Weybright & Talley.
BY MR. GRATZ:
Q. Have you -- about when did Brandt furnish you that letter?
A. He gave me a copy of it immediately after it was issued some time ago, and he gave me a copy of it in the last month when we were trying to get the documentation in response to your request.
Q. Did you provide that letter to Mr. Boni?
A. Yes, I did.
Q. You'll see near the bottom of the page there's a reference to a book published in 1982 called "Korea: The Untold Story of the War."
A. Yes.
Q. And that was published by the Times Book Company; is that right?
A. Right.
Q. Is that the book company of the New York Times?
A. At one time it was affiliated with them. I don't think it's part of the Times anymore.
Q. Was there a publishing contract with respect to the book "Korea"?

A. Yes, there was.
Q. Did it provide for reversion of the rights to you under certain circumstances?
A. I presume it did because we have the rights back.
Q. How do you know you have the rights back?
A. 'Cause we signed the contract with the Chinese publisher which gave him rights for the Chinese language publication.
Q. Do you possess any documents other than the contract in which you licensed those rights to the Chinese publisher reflecting that you have a reversion of the rights in "Korea"?
A. I do not remember all the letters that we furnished to you from Brandt through Mr. Boni. I'm sorry. I should have reviewed them before I came over.
Q. Is it your belief that you possess a reversion letter with respect to Korea?
A. It's my belief I think we got one from Brandt, I think. I'm relying on memory now. I should have made a list of these.
MR. BONI: Do you not have those?
MR. GRATZ: I don't have one for "Korea."
MR. BONI: Whatever I got, I sent to you so...
BY MR. GRATZ:

Q. In 1982 you published a book about Jerry Wurf; is that right?
A. Right.
Q. And that was published by Atheneum, A-t-h-e-n-e-u-m?
A. Right.
Q. Is that right?
A. Correct.
Q. Was there a publication contract with respect to the book on Jerry Wurf?
A. Yes, there was.
Q. Did it provide for reversion under certain circumstances?
A. I presume it did. I don't know. I don't have the contract.
Q. And have you received the letter acknowledging the reversion of rights in the book on Jerry Wurf?
A. I don't have one in my possession.
Q. Do you know whether one ever existed?
A. I do not know.
Q. Do you know whether the rights have, in fact, reverted to you on the book on Jerry Wurf?
A. I do not know.
Q. The next book on the list is titled "There are Alligators in Our Sewers." Do you see that?

A. Yes.
Q. And that was published by Dell; is that right?
A. Whatever is on the title page.
MR. BONI: The witness is looking at the book that is in Joe Gratz' hand when he made that comment.
BY MR. GRATZ:
Q. I'm holding the book in my hand and looking at the copyright page to see if it's anyone other than Dell. We'll set that question aside for now.
You co-authored that book with Paul Dickson?
A. Yes, sir.
Q. Are you co-owners of the copyright with Paul Dickson?
A. Yes.
Q. You were co-authors?
A. Yes.
Q. Do you have an agreement with Paul Dickson governing the rights to "There are Alligators in Our Sewers"?
A. Do I have an agreement?
Q. Yes, with Paul Dickson.
A. Well, we have the copyright, yes. And whatever we get, we share equally.
Q. Was there a publication contract with respect to "There are Alligators in Our Sewers"?

A. Yes, there was.
Q. Did it provide for reversion of rights in certain circumstances?
A. I don't recall.
Q. Have the rights reverted?
A. I don't recall.
Q. Do you know whether today you own any rights in "There Are Alligators in Our Sewers"?
A. Never assume anything. I understand I do.
Q. On what do you base that understanding?
A. Common industry practice.
Q. What common industry practice is that?
A. The writer owns the book. When it goes out of print, it's yours.
Q. Do you understand that under some circumstances a writer has to take certain action in order to cause a reversion of the rights?
MR. BONI: Object to form.
A. No, I did not know that.
BY MR. GRATZ:
Q. Do you know whether the publication contract for "There Are Alligators in Our Sewers" required you to send in a request for reversion of rights?
A. I do not know.
Q. In order to know that, you would need to look

at the contract and see what it says?
A. Yes.
Q. The third from the bottom of the page, you'll see a book called "Fit to Print," published in 1988.
A. Yes.
Q. By Lyle Stuart, S-t-u-a-r-t. Was there a publishing contract with respect to "Fit to Print"?
A. Yes, there was.
Q. Did it provide for reversion of rights under certain circumstances?
A. Yes, it does.
Q. Have those rights reverted to you?
A. Yes.
Q. And under what do you base your answer?
A. Because Lyle's widow, Carol Stuart, sent me a crate of 50 books saying "This is yours. We're out of business."
Q. Do you base your answer on anything else?
A. No. When Lyle died, the publishing company went up in the air.
Q. Do you know whether the -- strike that.
Do you know whether the Lyle Stuart publishing company took any action to transfer rights to you?
A. I don't know.
Q. Sitting here today, do you know whether or not

the rights have, in fact, transferred to you or whether they remain in whatever remains of Lyle Stuart?
MR. BONI: Object to form.
BY MR. GRATZ:
Q. The publishing company, obviously.
A. I have not the slightest idea.
Q. The next book on the list is titled "Myth-Informed." Do you see that?
A. Yes, I do.
Q. And that was also co-authored with Paul Dickson?
A. Yes, it was.
Q. You share equally in your respective rights?
A. Correct.
Q. Was there a publishing contract with respect to "Myth-Informed"?
A. Yes.
Q. Did it provide for reversion of rights upon occurrences of certain events?
A. I presume so.
Q. Have the rights in "Myth-Informed" reverted to you?
A. I don't know.
Q. So sitting here today, you don't know whether or not you possess rights in "Myth-Informed" or whether

they were remain in the publishing company?
A. No, I do not.
Q. The next and last book on the list is "The Money Lawyers." Do you see that?
A. Yes, I do.
Q. Published by Talley, St. Martin's Press?
A. Yes.
Q. Was -- and that book was published in 2006; is that right?
A. Yeah.
Q. That's after the commencement of this litigation; is that right?
A. This, yeah. Okay. You consider it new litigation after the first settlement was rejected?
Q. Let me withdraw the question. Litigation started when the litigation started.
Was there a publishing contract with respect to "The Money Lawyers"?
A. Yes, there was.
Q. Did it provide for reversion of rights upon the occurrence of certain events?
A. I presume it did.
Q. Have those rights reverted to you?
A. I have not seen formal reversion.
Q. So is it your belief that the rights have not

yet reverted to you?
A. Again, this is another publisher out of business who sent me a crate of books, and there may have been a letter saying "It's Yours."
Q. Did you retain that letter?
A. No.
Q. Did you keep it?
Do you have a recollection of there being such a letter or was your previous answer based on sort of thinking there might have been such a letter?
A. There might have been.
Q. But you don't recall one way or another whether there was?
A. No.
Q. All of your books are out of print; is that right?
A. With two exceptions we noted earlier.
Q. And those two exceptions are "The Dictionary of Espionage" being reprinted by Dover and the Chinese version of "Korea"?
A. Correct.
Q. Have you had any e-mail correspondence regarding this litigation with anyone other than your lawyers?
A. I notified Paul Dickson last week that this

Q. When this case began, was the firm of Milberg Weiss involved?
MR. BONI: Object to form.
A. I don't recall.
BY MR. GRATZ:
Q. When this case began, was Bill Lerach a lawyer at Milberg Weiss?
A. Yes.
Q. When this case began, was Mel Weiss a lawyer at Milberg Weiss?
MR. BONI: Object to form, and the previous question. You can answer.
A. Yes, he was.
BY MR. GRATZ:
Q. In a previous answer, you referred to a time when this suit came to life again. Do you recall that?
A. Yes.
Q. What time are you referring to?
A. Oh, I can't recall.
Q. Was it in the last two years?
A. It probably was.
Q. And is it right that, at that time, you made inquiries regarding the reputation of the Milberg lawyer listed as counsel in this case?
MR. BONI: Object to form. That

mischaracterizes his previous testimony. It does.
A. I asked two lawyers in New York that I respect quite a bit on an off-the-record basis to let me know, tell me, what their view was on the Milberg lawyer involved in this case.
BY MR. GRATZ:
Q. And was that Milberg lawyer Sanford Dumain?
A. Whatever his name is listed. My memory's late in the day. Whoever's listed on the pleadings.
Q. Before that inquiry, what led to that inquiry? What led you to ask those questions?
A. When I saw this piece of paper that had something on it, had his name on there, Milberg, I never associated him with Milberg Weiss. Just never dawned on me.
Q. So before the case came back to life in the last two years or around the time you made this inquiry, were you aware that Milberg was involved in the case?
A. I might have been vaguely aware, but it wasn't at the top of my mind.
Q. When you were writing "The Money Lawyers," were you aware that Milberg Weiss was counsel in a case in which you were a class action plaintiff?
MR. BONI: Object to form.
A. No, I was not.

MR. GRATZ: Let me go through my stuff. I'm not sure if I have anything further.
MR. BONI: Great. Thanks.
MR. GRATZ: We'll go off.
(Whereupon, recess was held.)
MR. GRATZ: Nothing further.
MR. BONI: I have nothing. Thank you.
(Deposition was concluded at 3:24 p.m.)

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the within transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will write on a separate sheet of paper to the original transcript.

____________________________
JOSEPH GOULDEN

District of Columbia

I, Christine A. Gonzalez, CSR, RPR, a Notary Public of the District of Columbia, do hereby certify that the within-named proceedings took place before me at the time and place herein set out.

I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witnessed my hand this 10th day of January, 2012.

Christine A. Gonzalez

Christine A. Gonzalez, CSR, RPR

Notary Public

My commission expires:

February 28, 2014

Errata Sheet

Joseph C.  Goulden Deposition


Page 5, Line 2

"What is this lawsuit ABOUT?"


Page 8, Line 22

"...these digital books WERE it not for Google."


Page 9, Line 25

"ilegally against WHICH is the core of it."


Page 11, Liine 23

"...going to put every book In some libraries ON line and..."


Page 15, Line 16

MILBERG  rather than Middleberg


Page 19, Line 9

Google's motion against certifying class action,  instead of "Google's response"

Page 19, line 10

BOUTON, instead of Booten

Page 24, line 13

Make it read, "Because OF serious medical CONDITIONS of two very..."

Page 29, Line 13

Make it read, "...essentially it was striking A business deal between"

Page 39, Line 14

"First was a book, my book, THE SUPERLAWYERS,"....

Page 48, Line 8

Make it "lo" rather than "low"

Page 48, Line 10

Make it "permissions" rather than "permission's"

Page 55, Line 11

Make it "Keogh," rather than "keyhole"

Page 60, Line 22

"the files of the individual publishers OR of our agent"

-----------------------------------------------------

Joseph C. Goulden

January 13, 2012

-