# EXHIBIT 5

```
                                                           1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
THE AUTHORS GUILD, INC., et al.,

                       PLAINTIFFS,

         -against-         Case No:
                           05CV8136 (DC)

GOOGLE INC.,
                       DEFENDANT.
----------------------------------------X

            DATE: January 4, 2012
            TIME: 1:05 P.M.



            DEPOSITION of a Plaintiff, BETTY MILES, taken
by the Defendants, pursuant to a Notice and to the
Federal Rules of Civil Procedure, held at the offices of
MILBERG, LLP, One Pennsylvania Plaza, New York, New York
10119, before Deborah Garzaniti, a Notary Public of the
State of New York.
```

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200

---

**Page 2**

A P P E A R A N C E S:

MILBERG, LLP.
 Attorneys for the Plaintiffs
 One Pennsylvania Plaza
 New York, New York 10119
 BY: (NOT PRESENT)

BONI & ZACK, LLC.
 Attorneys for the Plaintiffs
 15 St. Asaphs Road
 Bala Cynwyd, Pennsylvania 19004
 BY: MICHAEL J. BONI, ESQ.

DURIE TANGRI, LLP.
 Attorneys for the Defendant
 217 Leidesdorff Street
 San Francisco, California 94111
 BY: JOSEPH C. GRATZ, ESQ.

ALSO PRESENT:
 Anita Fore from The Authors Guild

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200

---

**Page 3**

F E D E R A L   S T I P U L A T I O N S

   IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

   IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

                  *    *    *    *

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200

---

**Page 4**

B E T T Y  M I L E S, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:
EXAMINATION BY
MR. GRATZ:
        MR. GRATZ:  Mark this as Miles Exhibit 1, please.
        (Whereupon, the aforementioned document was marked as Miles Exhibit 1 for identification as of this date by the Reporter.)
     Q. Please state your name for the record.
     **A. Betty Miles.**
     Q. What is your address?
     **A. 3306 Wake Robin Drive, Shelburne, Vermont 05482.**
     Q. Good afternoon, Ms. Miles.
     **A. Good afternoon.**
     Q. How are you?
     **A. Fine.  Thank you.**
     Q. So what has been placed in front of you is marked as Exhibit 1.
        MR. BONI:  Let's put that before her so it is official.
     Q. Ms. Miles, are you appearing here today as a result of your Counsel getting this notice?

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200

5

 1  A. Yes.
 2  Q. So I will ask while we are here today, I
 3  want to have a conversation with you, but she also has
 4  to write down everything that we are saying. We should
 5  not talk over each other. We should say yes and no
 6  rather than nodding.
 7  A. Okay, yes.
 8  Q. And it is a little warm in here and it is
 9  a cold day. I know you have come a long way. If you
10  need to take a break at any point, let me know.
11  A. Thank you.
12  Q. You are here because you are a Plaintiff
13  in a lawsuit against Google; is that right?
14  A. That's right.
15  Q. What is the lawsuit about?
16  A. The lawsuit is about whether or not
17  Google has the right to have control of my copyrighted
18  books and those of all of the other authors that I
19  represent.
20  Q. What do you mean by control?
21  A. I mean being able to do what I want with
22  my own copyrighted books, that is to earn money from
23  them, to sell rights to them.
24  Q. What is Google doing that is interfering
25  with those rights?

6

 1  A. It is taking control of those rights
 2  without asking me whether it has permission to do so.
 3  Q. What are you asking the Court to do about
 4  that?
 5  A. To ask permission of me and all of the
 6  other authors that I represent before doing something
 7  with the books, which have their own copyright, and also
 8  to pay damages for the books that they have already
 9  taken over, $750.
10  Q. What is Google doing that you object to?
11  A. It is not asking my permission as a
12  copyright holder for anything that it is doing,
13  specifically putting quote snippets from the books on
14  the website and sending a copy of a digitized book back
15  to the libraries from which they are cooperating with it
16  in this time.
17  Q. You mentioned the objection to Google not
18  having asked permission?
19  A. Yes.
20  Q. If Google had asked your permission
21  before scanning your book and displaying snippets, what
22  would your response have been?
23  MR. BONI: Objection to the form. You can
24  answer. I am placing an objection into the record.
25  THE WITNESS: Okay.

7

 1  A. My objection would be that Google
 2  shouldn't do that, to me or to any other author.
 3  Q. Do you think that that is true of all
 4  authors?
 5  A. I do.
 6  Q. What makes you think that?
 7  A. Well, I want to say common knowledge.
 8  Q. Do you base that common knowledge on
 9  anything in particular?
10  A. Well, I for one don't want my rights
11  taken away from me unless -- I assume other people who
12  are authors as well don't want their rights taken away.
13  I guess I would call that common knowledge.
14  Q. Are you asking for the Court to order
15  Google to shut down the snippet view portion of Google
16  Books?
17  A. Among other things.
18  Q. Other than the $750 payment, what things
19  are those?
20  A. Digitizing full copies of books.
21  Q. Your books or those of others?
22  A. All.
23  Q. Why do you want the Court to order that
24  Google shut down the snippet view portion of Google
25  Books?

8

 1  A. Because --
 2  MR. BONI: Let me object to form. There is a
 3  lot in that question for which there is a lacking of
 4  foundation, Google Books, for example. It hasn't been
 5  established if she knows what that is and all of that,
 6  so you can do whatever you want. I am objecting to the
 7  form of the question.
 8  MR. GRATZ: Sure. Let me go back a little
 9  bit.
10  Q. Are you familiar with a website called
11  Google Books?
12  A. Yes.
13  Q. What is Google Books?
14  A. I don't know enough to tell you.
15  Q. Do you know anything about Google Books?
16  A. Google Books is the site on which one can
17  see snippets displayed.
18  Q. How does one come to see snippets
19  displayed using Google Books?
20  A. By calling up and reading it, I suppose.
21  Q. How does one call it up?
22  A. By searching for Google Books.
23  Q. Have you used Google Books?
24  A. Yes.
25  Q. What have you used Google Books for?

**Page 9**

1  A. To look up my own books.
2  Q. Have you used Google Books for anything
3  else?
4  A. No.
5  Q. What did you find when you looked up your
6  own books on Google Books?
7  A. I found lists of some of my books.
8  Q. Did you find anything other than lists?
9  A. I didn't find anything other.
10  Q. Did you find any of your books having
11  snippets displayed from them?
12  A. I have seen snippets displayed.
13  Q. Under what circumstances did you see
14  snippets displayed?
15  MR. BONI: You can answer.
16  A. He showed me this morning. I seen.
17  Q. Before this morning, did you see snippets
18  of your books displayed?
19  A. No.
20  Q. When was the most recent time that you
21  used Google Books?
22  A. I don't know.
23  Q. Was it in the last year?
24  A. Yes.
25  Q. About how many times have you used Google

**Page 10**

1  Books?
2  A. Very infrequently.
3  Q. Less than ten times?
4  A. Yes.
5  Q. Less than five times?
6  A. Yes.
7  Q. Less than three times?
8  A. Once or twice.
9  Q. Each time it was looking to see whether
10  your books were there?
11  A. Just general interest, yes.
12  Q. I used the word snippet in an earlier
13  question. I just want to make sure we have a common
14  understanding of what that means. What is a snippet?
15  A. I want to ask you what you call a
16  snippet, but what I call a snippet is a piece taken from
17  a book or from a blurb about a book, but specifically
18  from the content of the book from which you can get an
19  idea of what the book is about, how it is written. It
20  depends on which snippet.
21  Q. Why does it depend on which snippet?
22  A. Because there could be more than one
23  snippet about any given book.
24  Q. So I am going to go back to a question
25  that I asked earlier now that we got all of the terms in

**Page 11**

1  place. Is one of the things you are asking the Court to
2  do is to stop Google from displaying snippets of books
3  on Google Books?
4  A. Yes.
5  Q. Why do you want the Court to do that?
6  MR. BONI: Object to the form.
7  A. I want the Court to do that because the
8  snippet comes from a whole book which belongs to me by
9  copyright.
10  Q. What is the relevance of the snippet
11  coming from a whole book?
12  A. The snippet is a reference to a book that
13  exists and has been digitized by Google.
14  Q. Why do you want the Court to stop that?
15  A. Because I don't want people to read the
16  books that they search via the snippet without my
17  control or my permission.
18  Q. Any other reason?
19  A. That will do.
20  Q. If the snippet view feature of Google
21  Books were shut down, as you are asking the Court to do,
22  would that benefit you?
23  MR. BONI: Object to the form.
24  A. Yes, it would make it less easier for
25  potential readers to read something that I feel is

**Page 12**

1  unauthorized.
2  Q. In any other way would it benefit you?
3  A. It would benefit me by knowing this was
4  true for all other authors.
5  Q. Do you think that shutting down the
6  snippet view feature of Google Books would benefit all
7  of the other members of the class?
8  A. I do.
9  Q. Do you think that there are any whom it
10  would harm?
11  A. I don't know if there is a neutral
12  between benefit and harm.
13  Q. Do you think that it would be neutral as
14  to some authors?
15  A. No, I think it would be harmful if the
16  authors, myself included, didn't get the benefit.
17  Q. What benefit of that?
18  A. Of not having our books, as I said.
19  Q. So you don't think there are any authors
20  whom Google Books benefits; is that right?
21  MR. BONI: Object to the form.
22  Q. It is all right. Let me ask the question
23  in a clearer way.
24  Do you think there are any authors who are
25  benefited by the snippet view feature of Google Books?

**Page 13**

1  A. No. I already said that I think that all
2  authors are harmed by having their copyright used in
3  this way.
4  Q. Do you think there are any countervailing
5  benefits?
6  A. In this circumstance, no.
7  Q. Are there any circumstances in which
8  there would be countervailing benefits?
9  MR. BONI: I think you are getting --
10 A. Google is digitizing the books, that
11 means that they are available without a financial
12 benefit to me.
13 Q. To whom are they available?
14 A. They are available to anyone who uses a
15 library that has received a copy of the digitized book.
16 Q. If they weren't available to library
17 patrons as a result of Google's digitization, would you
18 have the same objection?
19 A. Yes.
20 Q. Why?
21 A. Because that is only one instance of
22 harm.
23 Q. What other instances are there?
24 A. The very fact that an author doesn't have
25 control of the book, which he or she has copyrighted,

**Page 14**

1  owns the rights to, that's my right and that's the right
2  of every author, so.
3  Q. Do you consider that an economic right?
4  A. Among others.
5  Q. Have you lost any sales of books as a
6  result of Google Books?
7  A. I have no way of knowing that.
8  Q. Do you think that Google scanning and a
9  snippet display of your out of print books has resulted
10 in lost sales?
11 MR. BONI: Objection to form. You can
12 answer.
13 A. I don't know.
14 Q. Do you think that Google scanning and a
15 snippet display of your out of print books has resulted
16 in economic harm to you in the form of lost sales?
17 A. No.
18 Q. Have you done anything to try to find out
19 whether there have been any lost sales?
20 A. No.
21 Q. Are any of your books currently in print?
22 A. It is a little unclear. Most of them are
23 out of print. Some of them are in print in certain
24 versions and not in ours, and publishers hold on to the
25 category in print as long as they possibly can.

**Page 15**

1  Q. Why do they do that?
2  A. So that they can continue to or out of
3  print so that they can -- you know, they call them out
4  of print when, in fact, they don't intend to make
5  another printing immediately, but might in the future
6  and they can keep you thus from selling the rights to
7  some other publishers.
8  Q. Is that true of any of your books right
9  now?
10 A. I don't know.
11 Q. Do you know whether anyone has bought a
12 copy of one of your books after finding it through
13 Google Books?
14 A. No, I don't know that.
15 Q. You don't know one way or the other
16 whether it has happened?
17 A. I don't know.
18 Q. If that happened, would that be an
19 economic benefit to you?
20 A. No.
21 MR. BONI: Object to the form. You've
22 answered.
23 A. I have answered.
24 Q. Why not?
25 A. Because I wouldn't be getting the royalty

**Page 16**

1  as I otherwise should.
2  Q. Let me clarify my question.
3  Well, let me ask a different question. Do
4  you know whether Google is selling copies of your books
5  on Google Books?
6  A. No.
7  Q. Do you know whether Google is selling or
8  making available full pages from your books on Google
9  Books?
10 A. I don't know.
11 Q. Is part of your objection based on a
12 belief that Google is selling copies of your books on
13 Google Books?
14 MR. BONI: Objection to form.
15 A. I guess you have to say it again.
16 Q. Is part of your objection as part of this
17 lawsuit to what Google is doing based on your
18 understanding that Google may be selling copies of your
19 books?
20 MR. BONI: Before you answer, Betty, I want
21 to interpose an objection. Joe, to clarify when you say
22 part of your objection, are you referring to the
23 allegations set forth in the Complaint or the Witness's
24 personal belief or what? That is very unclear.
25 MR. GRATZ: Sure.

**Page 41**

1 book committee?
2 **A. I don't remember. I don't know.**
3 Q. Do you currently hold a position of
4 leadership?
5 **A. No.**
6 Q. About when did you last hold a position
7 of leadership in the Authors Guild?
8 **A. Eight to ten years ago.**
9 Q. Other than being chair of the children's
10 book committee, have you ever held any other position in
11 the Authors Guild, other than member?
12 **A. No.**
13 Q. Did anyone from the Authors Guild
14 approach you specifically about including your books in
15 the Back In Print program?
16 **A. Not me specifically.**
17 Q. How did you come to learn of the program?
18 **A. Through written materials from the**
19 **Authors Guild.**
20 Q. Like a newsletter?
21 **A. Informational material on this, yes.**
22 Q. Do you know if the Authors Guild receives
23 revenues from the sales of Backinprint.com editions?
24 **A. No.**
25 Q. Do you know the nature of the deal

**Page 42**

1 between the Authors Guild and iUniverse with respect to
2 the Authors Guild Backinprint.com program?
3 MR. BONI: Object to the form.
4 **A. I don't know.**
5 Q. You said "I don't know"; is that right?
6 **A. I did.**
7 MR. GRATZ: Let's mark as Exhibit 7, this
8 book.
9 (Whereupon, the aforementioned book was
10 marked as Miles Exhibit 7 for identification as of this
11 date by the Reporter.)
12 Q. I handed you what has been marked as
13 Exhibit 7. Do you recognize Exhibit 7?
14 **A. Certainly do.**
15 Q. What is Exhibit 7?
16 **A. A book called The Trouble With Thirteen.**
17 Q. What is The Trouble With Thirteen?
18 **A. This is a paperback book.**
19 Q. Is it a novel?
20 **A. Yes.**
21 Q. A young adult novel?
22 **A. Yes, it is.**
23 Q. What is it about?
24 **A. Do you really want to know?**
25 Q. Briefly?

**Page 43**

1 MR. BONI: Joe, my God.
2 **A. I could read it to you.**
3 Q. I will withdraw the question.
4 It tells a story; is that right?
5 **A. Yes.**
6 Q. It is not a reference book?
7 **A. It is not a reference book.**
8 Q. To learn what happens in the story, you
9 have to read the book; is that right?
10 **A. That's right.**
11 Q. And the reason someone would buy The
12 Trouble With Thirteen is that they can read the book and
13 it tells the story; is that right?
14 **A. Yes.**
15 MR. GRATZ: We will mark this as Exhibit 8,
16 this document.
17 (Whereupon, the aforementioned document was
18 marked as Miles Exhibit 8 for identification as of this
19 date by the Reporter.)
20 Q. I am handing you what has been marked as
21 Exhibit 8. Do you recognize Exhibit 8?
22 **A. How do you mean recognize? I've never**
23 **seen it before.**
24 Q. What is Exhibit 8, if you know?
25 **A. So far it is bits and pieces from -- oh,**

**Page 44**

1 **The Trouble With Thirteen, Hey! I am reading! and**
2 **another The Trouble With Thirteen.**
3 Q. Turning your attention to the first three
4 pages of Exhibit 8.
5 **A. Just a minute.**
6 Q. Sorry.
7 **A. Okay. The first three pages.**
8 Q. Yes. In the upper left-hand corner, do
9 you see that it says Google Books?
10 **A. Yes.**
11 Q. Does this appear to be a page from Google
12 Books?
13 **A. I don't know.**
14 Q. You will see an image under where it says
15 The Trouble With Thirteen in the upper left-hand corner?
16 **A. Yes.**
17 Q. Is that the title page of The Trouble
18 With Thirteen in the box?
19 **A. Yes.**
20 Q. Below that it says "from inside of the
21 book," do you see that?
22 **A. Yes.**
23 Q. Underneath that, it is a little hard to
24 see on this copy, there is the word Annie in a box with
25 a button "search" next to it?

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
11 of 37 sheets                Page 41 to 44 of 111                01/09/2012 11:33:45 AM

**53**

1  Do you understand the Complaint in this case
2  to be seeking a remedy for the display of a list of
3  common terms and phrases in the manner in which you see
4  here on the second page of Exhibit 8?
5     A. You will have to start that question
6  again.
7     Q. Do you understand The Complaint in this
8  case?
9     A. Yes, I do.
10    Q. To be seeking a remedy for the display of
11 terms and phrases?
12    A. For this kind of -- not for these
13 specific words.
14    Q. But for the practice of developing and
15 displaying lists of common terms and phrases?
16    A. You are still not asking it the way that
17 I want you to ask it.
18    MR. BONI: You can answer it however you want
19 to answer it. If you don't understand the question,
20 have him ask it again.
21    A. Well, you are asking if I object to these
22 words being shown?
23    MR. BONI: He is asking if The Complaint says
24 it.
25    A. The Complaint does not say anything about

**54**

1  these words. The Complaint says all authors do not want
2  the text to be so available by so many snippets without
3  the permission of the authors.
4     Q. Your understanding is the Complaint
5  doesn't deal specifically with lists of common words and
6  phrases; is that right?
7     A. Not specifically with my books, that is
8  why it has been hard to answer all of these questions.
9     Q. Do you personally object to the display
10 of a list of common terms and phrases from your books?
11    A. I do.
12    Q. Why?
13    A. Because it implies that there is a
14 scanned book which is then going to be available to
15 libraries. This is proof of it.
16    Q. So it is not the list itself. It is that
17 it implies the copies that would need to be made to make
18 this list; is that right?
19    A. It implies, yes, copying the book without
20 authorization.
21    Q. Is The Trouble With Thirteen in print?
22    A. The Trouble With Thirteen has been
23 printed in many editions, so many that I can't tell you
24 whether overall it is considered by my publisher in
25 print or not.

**55**

1     MR. GRATZ: I will mark as Exhibit 9 a
2  two-page document, the heading Betty Miles Out-Of-Print
3  Titles and In-Print Status Unknown.
4     (Whereupon, the aforementioned document was
5  marked as Miles Exhibit 9 for identification as of this
6  date by the Reporter.)
7     Q. Do you recognize what has been marked as
8  Exhibit 9?
9     A. Yes. It is a list of books of mine that
10 are now out of print.
11    Q. What is the second page of Exhibit 9?
12    A. Status unknown of my books, whether they
13 are in print or out of print.
14    Q. Between the first and second pages of
15 Exhibit 9, is this a complete list of your books?
16    A. Oh, I think I have about 35. We can
17 count.
18    Q. Let me ask a different question then.
19 Did you prepare Exhibit 9?
20    A. Yes, I did.
21    Q. Do you know of any books that aren't
22 listed on Exhibit 9?
23    A. No. I would hope it was a comprehensive
24 list.
25    Q. I think I have come up with five that are

**56**

1  not on Exhibit 9.
2     MR. BONI: The Trouble With Thirteen.
3     A. Is not on this.
4     Q. We will be referring to this list a
5  couple of times. I want to confirm just a couple of
6  things. In addition to the books listed here, you wrote
7  a book called The Trouble With Thirteen?
8     A. Yes.
9     Q. That was first published by Knopf?
10    A. Yes.
11    Q. You wrote a book called I Would If I
12 Could?
13    A. Yes.
14    Q. That was first published by Knopf?
15    A. Yes.
16    Q. That is currently available as An Authors
17 Guild Back In Print; right?
18    A. Yes.
19    Q. You also published a book called Maudie
20 And Me?
21    A. Yes.
22    Q. It was first published by Knopf?
23    A. Yes.
24    Q. You also published a book called The
25 Secret Life Of The Underwear Champ?

57

1   A. Yes.
2   Q. Which I recall fondly.
3   A. Oh, how nice.
4   Q. That was first published by Knopf?
5   A. Yes.
6   Q. You also published a book called Sink Or
7 Swim?
8   A. Yes.
9   Q. That was first published by Knopf as
10 well?
11   A. Yes.
12   Q. And you also wrote the other books that
13 are listed here?
14   A. Yes.
15   Q. Do you know how many of your books have
16 been scanned by Google?
17   A. No, I don't.
18   Q. Have you asked Google to remove any of
19 your books from Google Books?
20   A. No, not as an individual.
21   Q. Why not?
22   A. Because this is part of the claim and I
23 am acting with respect to that.
24   Q. Do you want Google to remove any of your
25 books from Google Books?

58

1   A. It is not the problem of my books. It is
2 the problem of the principle of doing this for all
3 books.
4   Q. So apart from your desire that Google
5 Books be changed with respect to all books, you don't
6 have a particular desire to have your own books removed?
7   MR. BONI: It mischaracterizes the testimony.
8 I object to the form.
9   A. I mean I care about -- this is something
10 that I care about. I care about it for my own books, of
11 course they are my own books, I care about it for all
12 authors' books.
13   Q. But you haven't asked Google to remove?
14   A. No, well, except as this claim is asking.
15   Q. Do you want Google to remove your books
16 from Google Books?
17   A. Yes.
18   Q. What is your role in this litigation?
19   A. My role is to stand for all other authors
20 and to be aware of the gist of the claim and to approve
21 of that, yes.
22   Q. When did your involvement in this
23 litigation begin?
24   A. Back when the original -- I guess that
25 was 2005.

59

1   Q. When did you first learn that the Authors
2 Guild was considering bringing a lawsuit against Google?
3   A. Probably the year before.
4   Q. From whom did you learn that?
5   A. From the Authors Guild.
6   Q. A particular person at the Authors Guild?
7   A. I can't tell you. Certainly from the
8 Authors Guild's bulletin. I can't tell you because I
9 can't remember.
10   Q. So you learned from the Authors Guild's
11 bulletin that the Authors Guild was considering bringing
12 a lawsuit against Google?
13   A. Yes.
14   Q. What happened next?
15   A. It did.
16   Q. Did the Authors Guild contact you
17 specifically about becoming a named Plaintiff?
18   A. Yes, and I don't know how soon that must
19 have been.
20   Q. Do you remember who at the Authors Guild
21 contacted you?
22   A. It probably was Paul.
23   Q. By Paul you mean Paul Akin?
24   A. Yes, Paul Akin as director.
25   Q. Do you know why he contacted you

60

1 specifically?
2   A. Because I have been involved in the Guild
3 in part and because one of my books was in the
4 University of Michigan library which was one of the
5 libraries that is a part of this program.
6   Q. You are in this case as in your status as
7 a member of the Guild?
8   A. Partly, in my status as an author, in my
9 work as an author.
10   Q. What was your involvement in the case
11 before it was filed? Paul Akin talked to you, you read
12 this in the bulletin, Paul Akin talked to you, what
13 happened next?
14   A. I can't tell you in sequence. I know I
15 talked to Anita about the case over time and read a lot
16 about it.
17   Q. Before the case was filed, did you talk
18 to Anita about it?
19   A. Probably not.
20   Q. Before the case was filed, did you talk
21 to anyone other than Paul Akin about it?
22   A. Not that I remember.
23   Q. Did you talk to Mike Boni about it before
24 it was filed?
25   A. No.

**Page 65**

1 the proposed settlement were fair?
2  **A.** Yes.
3  **Q.** But the authors are now asking for a
4 different amount of money than was in the settlement, is
5 that your understanding?
6  **A.** I don't know.
7  **Q.** Thinking back to the proposed settlement,
8 were you in charge of deciding what its terms should be?
9  **A.** No.
10  **Q.** Who was?
11  **A.** That's a group of people, not whom I am
12 one.
13  **Q.** Did you have the independent ability to
14 reject the settlement?
15  **A.** No. I am not a lawyer.
16  **Q.** Turning to a different topic in 2011,
17 just by category, what were your sources of income?
18  **A.** Royalties. Well, Social Security, right,
19 pension, TIAA. Do you know that?
20  **Q.** Yes.
21  **A.** And royalties from my own books and
22 royalties from my late husband's books.
23  **Q.** What is your late husband's name?
24  **A.** Matthew B. Miles.
25  **Q.** Is your pension related to your work at

**Page 66**

1 Bank Street?
2  **A.** No, no, that was not full-time teaching.
3  **Q.** About how much, just not in terms of
4 dollars?
5  MR. BONI: This is personal information. Can
6 you profer a reason why you are asking for her income
7 right now?
8  MR. GRATZ: I am not asking for any number of
9 dollars.
10  MR. BONI: Well, why are you asking these
11 questions? They seem so far afield in her role as a
12 class representative.
13  **Q.** What percentage of your income came from
14 royalties last year?
15  **A.** Last year?
16  **Q.** Yes.
17  **A.** In 2011?
18  **Q.** Yes.
19  **A.** Is that a legitimate question there?
20  MR. BONI: I object to the propriety of the
21 question. I will allow her to answer. It doesn't
22 violate a privilege, but I think we are far afield of
23 the subject matter of the deposition.
24  **A.** 15 to 20 percent.
25  **Q.** About how much of that was from your

**Page 67**

1 books versus your late husband's?
2  **A. More of it was from my late husband.**
3  **Q.** Turning now to a different topic, The
4 Trouble With Thirteen, as we said, is a young adult
5 novel; is that right?
6  **A.** Yes. That classification is vague. This
7 is a young, young adult novel.
8  **Q.** In that it is aimed as a younger age
9 group?
10  **A.** Yes. Well, 13.
11  **Q.** What is the purpose of a young adult
12 novel?
13  MR. BONI: Object to the form.
14  **A.** A young adult novel in general?
15  **Q.** Yes.
16  **A.** I could talk for a half an hour about
17 that. I don't know how to sum it up, but it is to
18 entertain, edify, amuse, instruct, all of the purposes
19 of reading, younger people, concentrating mostly --
20 focusing on their age, their age range, rather than the
21 adults that surround them.
22  **Q.** Is it right that The Secret Life Of The
23 Underwear Champ is also an adult novel?
24  **A.** Yes, that is really young, young adult.
25  **Q.** How about Looking On?

**Page 68**

1  **A.** Yes, I would call that a young adult
2 novel.
3  **Q.** Sink Or Swim?
4  **A. Around 12 say.**
5  **Q.** Likewise, Maudie And Me And The Dirty
6 Book is a young adult novel of some description?
7  **A.** Yes.
8  **Q.** All It Takes Is Practice as well?
9  **A.** Yes.
10  **Q.** As well as I Would If I Could?
11  **A. A little younger.**
12  **Q.** The Real Me?
13  **A.** Yes.
14  **Q.** And Just The Beginning is also a young
15 adult novel?
16  **A.** Yes.
17  **Q.** All of those have the purposes that you
18 described earlier with respect to The Trouble With
19 Thirteen?
20  **A.** Yes.
21  **Q.** Not all of your books are young adult
22 novels?
23  **A.** Right.
24  **Q.** Others are children's picture books?
25  **A.** Yes. Some of those are children's

69

1  picture books.  There is one and one revised copy of a
2  book about the environment which is really more used by
3  middle school, even high school kids, older elementary
4  kids.
5       **Q.** Is the book that you are describing Save
6  The Earth?
7       **A.** Yes.
8       **Q.** So other than Save The Earth, are the
9  remainder of your books children's picture books?
10      **A.** Yes.  There is another one called Hey! I
11 Am Reading! which is a book that it is a picture book,
12 but it is really -- do you have it there?
13      **Q.** I do.
14      **A.** Okay, so then you can look at it and see.
15 It is focused on the act of reading for kids starting to
16 do that, but it is not what I would call a picture book
17 in the traditional form.
18      **Q.** Is that because it is instructive rather
19 than telling a story?
20      **A.** It is not a story, it is non-fiction,
21 actually as many picture books are.
22      **Q.** Save The Earth doesn't tell a story; is
23 that right?
24      **A.** That's right.
25      **Q.** A House For Everyone does tell a story;

70

1  is that right?
2       **A.** No.
3       **Q.** What is A House For Everyone?
4       **A.** It uses the framework of a day to show
5  children in different sorts of communities or places or
6  families.
7       **Q.** Is A House For Everyone a children's
8  picture book?
9       **A.** Yes, it is.
10      **Q.** Likewise, is The Cooking Book a
11 children's picture book?
12      **A.** Yes.
13      **Q.** And The Feast On Sullivan Street?
14      **A.** Yes, that is a little older than a
15 picture book.  You see that it has a lot of text.
16      **Q.** A Day of Autumn, Summer, Winter and
17 Spring?
18      **A.** Those are picture books.
19      **Q.** Mr. Turtle's Mystery?
20      **A.** A little more text, but it is a picture
21 book.
22      **Q.** Having A Friend?
23      **A.** Picture book.
24      **Q.** And Goldilocks And The Three Bears, The
25 Sky Is Falling and the Tortoise And The Hare?

71

1       **A.** These are really easy to read retellings
2  of old tales.
3       **Q.** What is the purpose of a children's
4  picture book?
5       **A.** Oh, I could not tell you that, that
6  varies as children's pictures books vary.
7       **Q.** What is the purpose of A House For
8  Everyone?
9            MR. BONI:  Object to the form.
10      **A.** The purpose is not --
11           MR. BONI:  Purpose for whom, Joe?
12      **Q.** For what purpose did you write A House
13 For Everyone?
14      **A.** Well, that's a hard question to ask any
15 writer.  To talk about the different ways that people
16 live, in a way that a young child could comprehend, and
17 to be a nice story to read before bedtime and on and on.
18      **Q.** With respect to each of the children's
19 picture books that you've written, we discussed earlier
20 whether short snippets from The Trouble With Thirteen
21 could obviate the need for purchasing the book?
22      **A.** Yes.
23      **Q.** Is that likewise true of your picture
24 books?
25      **A.** Of course a snippet of a picture book

72

1  would encompass more of a book, there is pagewise,
2  textwise.
3       **Q.** Would it obviate the need to purchase the
4  book?
5       **A.** No.  A picture book by definition has
6  pictures in it.
7       **Q.** And a picture book isn't much good if you
8  just have that much of it?
9       **A.** Yes.
10           MR. BONI:  Are we wrapping up soon?
11           MR. GRATZ:  Yes, we are getting there.  I
12 don't think we will go another hour.
13           MR. BONI:  Let's take a short break.
14           (Whereupon, a short recess was taken.
15           MR. GRATZ:  We have just come back from a
16 break in the deposition that Mr. Boni requested and the
17 Witness.
18      **A.** I have just been reminded that I did, in
19 fact, read the Complaint and that I did sign an
20 agreement and had not put that on to your record.
21      **Q.** Turning to the question of publishing
22 contracts, with respect to each of your published books,
23 was there a written publishing contract?
24      **A.** Yes.
25      **Q.** Do you currently have in your possession

**73**

1  any of those publishing contracts?
2      **A.** Oh, yes.
3      **Q.** Which ones?
4      **A. I can't tell you.**
5      **Q.** Have you provided any of those publishing
6  contracts?
7      **A. Maybe not.**
8      MR. BONI: Do you want me to check? Whatever
9  we have we produced. I don't recall.
10     **A. I don't think I have all of them in my**
11 **files, but I do have some.**
12     **Q.** Have you provided any of them to Mr.
13 Boni?
14     **A. I guess not.**
15     MR. BONI: I turned over everything that we
16 had, Joe.
17     **Q.** But you know you have some of them in
18 your possession?
19     **A. I do.**
20     **Q.** But not all of them?
21     **A. Not all of them.**
22     **Q.** With respect to A House For Everyone, do
23 you have the publishing contract?
24     **A. I doubt it. That was my very first book**
25 **that was published in 1958.**

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
73

**74**

1      **Q.** What were the terms of the publishing
2  contract for A House For Everyone?
3      **A. I couldn't possibly tell you.**
4      **Q.** Sitting here today, can you tell me the
5  terms of any of the publishing contracts for your books
6  or would you need to --
7      **A. By terms, do you mean financial terms, do**
8  **you mean contract terms?**
9      MR. BONI: You mean the paragraphs?
10     **Q.** I mean contractual terms. I mean what
11 agreements are written down in the contracts?
12     **A. I don't know. If you see a random**
13 **contract which can give a branch of, you know, they are**
14 **legalized paper, five or six pages, small type.**
15     **Q.** You would need to see the contracts
16 themselves to tell me?
17     **A. Oh, yes.**
18     **Q.** Did the terms of the contracts differ
19 from book to book at all?
20     **A. Of course.**
21     **Q.** To tell me what the differences are, you
22 would need to see the contract; is that right?
23     **A. I could tell you I was paid more money as**
24 **I became a more published author and I had more say in**
25 **the terms, like under what, you know, selling of rights**

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
74

**75**

1  and rising of royalties and a whole lot of things.
2      **Q.** Including non-monetary terms?
3      **A. Right, including non-monetary terms.**
4      **Q.** Do you know whether any of the publishing
5  contracts for your books provided that you would retain
6  the digital publication rights?
7      **A. I could tell you that they did not. I**
8  **mean that I did, yes, they did not give -- they did not**
9  **discuss digitalization.**
10     **Q.** They didn't discuss digitization one way
11 or the other?
12     **A. That's right.**
13     **Q.** And that's true of all of the contracts,
14 including the ones with Aladdin in the 1990s, or would
15 you need to see the contracts?
16     **A. I would need to see the Simon & Schuster**
17 **contracts. The Simon & Schuster contracts are the four**
18 **easy to read books. All of the others were published**
19 **before the question of electronic rights became an**
20 **issue.**
21     **Q.** Does that include Hey! I Am Reading?
22     **A. Yes, it does. It was the last book**
23 **published by Random before contracts discussed**
24 **digitization, right.**
25     **Q.** How do you know that?

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
75

**76**

1      **A. I know that because I saw the sign above**
2  **my editor's desk from Mr. Vitale saying from now on, and**
3  **it was dated, and I had just signed my contract. From**
4  **now on we will not let a contract out of this house**
5  **without.**
6      **Q.** Without discussing digital rights?
7      **A. Yes.**
8      **Q.** Did any of the contracts for your books
9  discuss promotional uses of excerpts from the publisher?
10     **A. No. I think you asked me that before and**
11 **I said I don't think that is a contractual use.**
12     **Q.** With respect to any of your books, were
13 there any oral rather than written agreements --
14     **A. No.**
15     **Q.** -- after the contract was signed?
16     **A. No.**
17     **Q.** Did any of the contracts provide for
18 reversion of rights to you?
19     **A. Yes.**
20     **Q.** Upon occurrence of what event?
21     **A. It is murky and I would have to look that**
22 **up. I do have, as you saw, some reversion of right**
23 **statements.**
24     **Q.** Were you required to submit a reversion
25 request?

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
76

77

1 **A.** Yes.
2 **Q.** With respect to all of them?
3 **A.** Each of them.
4 **Q.** Did you submit those reversion requests?
5 **A. As they seemed to be going out of print,**
6 **yes.  Some of them are still ambiguous.**
7 **Q.** The ambiguous ones are listed on the
8 second page of exhibit --
9 **A. Yes, as you saw not complete.**
10 **Q.** Exhibit 9?
11 **A.** Yes.
12 **Q.** With respect to the titles on the first
13 page of Exhibit 9.
14 **A.** Yes.
15 **Q.** Have you submitted reversion request
16 letters with respect to each of those titles?
17 **A. Most of them, yes, but I can't say for**
18 **sure.**
19         MR. GRATZ:  We will mark as Exhibit 10 a
20 letter dated December 5, 1995 to Betty Miles from Alfred
21 A. Knopf, Inc.
22         (Whereupon, the aforementioned document was
23 marked as Miles Exhibit 10 for identification as of this
24 date by the Reporter.)
25 **Q.** Do you recognize what has been marked as

78

1 Exhibit 10?
2 **A.** Yes.
3 **Q.** What is Exhibit 10?
4 **A. It is a reversion of rights agreement.**
5 **Q.** It is with respect to the book Just
6 Think; is that right?
7 **A.** Yes.
8 **Q.** It is cced to McIntosh and Otis, Inc.?
9 **A.** Yes.
10 **Q.** What is McIntosh and Otis, Inc.?
11 **A. That was my agent.**
12 **Q.** Was that your agent in 1995, your agent
13 in 1970 or both?
14 **A. I can't remember.  Let's see.  I think I**
15 **wrote that down somewhere.  No, I don't have it.  I**
16 **forget when I left my agent.  It was from the beginning**
17 **until I --**
18 **Q.** If it refreshes your recollection, here
19 are the books back.
20         MR. BONI:  You either remember or you don't.
21 **A. I don't remember.  I think it was**
22 **probably in the early '90s that I left my agent.**
23 **Q.** Why did you leave your agent?
24 **A. I left my agent because she was not doing**
25 **well with selling foreign rights and I had been**

79

1 **selling -- I mean my editor wanted my books.  I didn't**
2 **need her for sales.  She was not doing well on the**
3 **rights and I was about to make a big sale of rights to**
4 **paperback rights for a lot of the novels to Knopf, my**
5 **publisher, and it seemed a good time to be realistic and**
6 **say that to her and leave her.**
7 **Q.** And Exhibit 10 here is an acknowledgement
8 that the rights are reverting to you in Just Think; is
9 that right?
10 **A.** Yes.
11 **Q.** So with respect to Just Think, after this
12 letter was sent, you owned all of the rights; is that
13 right?
14 **A.** Yes.
15 **Q.** Do you still own all of the rights in
16 Just Think?
17 **A. Sure, this is forever.**
18 **Q.** You haven't transferred any to anyone
19 since this?
20 **A. No.**
21         MR. GRATZ:  Let's mark as Exhibit 11 a letter
22 from Amy Nathanson from Random House to Betty Miles
23 dated July 24, 1995.
24         (Whereupon, the aforementioned document was
25 marked as Miles Exhibit 11 for identification as of this

80

1 date by the Reporter.)
2 **Q.** Do you recognize what has been marked as
3 Exhibit 11?
4 **A.** Yes.
5 **Q.** What is it?
6 **A. It is a remainder notice of one addition**
7 **of The Trouble With Thirteen being remaindered.  That**
8 **means that there will be no more of that printed, in**
9 **that form.**
10 **Q.** Does Exhibit 11 indicate who owns the
11 rights with The Trouble With Thirteen?
12 **A. No.  It is only one edition of a book to**
13 **which I still own the rights.**
14 **Q.** Do you own all rights with The Trouble
15 With Thirteen?
16 **A. Yes.  Well, no, that is one of the**
17 **ambiguous ones, whether they reverted or not.**
18 **Q.** When it is reverted or not depends on the
19 terms of the publishing contract; is that right?
20 **A. It depends on the number on whether each**
21 **edition of the book has been remaindered.**
22 **Q.** Has each edition with The Trouble With
23 Thirteen been remaindered?
24 **A. I don't know.**
25 **Q.** Sitting here today, can you tell me

## Page 81

1 whether or not you own all of the rights to The Trouble
2 With Thirteen?
3     A. I don't have a formal acknowledge of the
4 reversion of rights.
5     Q. So some rights may remain with Knopf?
6     A. If they -- yes, yes.
7     Q. Depending on whether there is an edition
8 out there that hasn't been remaindered?
9     A. Rights don't depend on editions. It is
10 the rights go with the title.
11     Q. With respect to that title, it is unclear
12 whether all of the conditions have occurred for there to
13 be?
14     A. Each edition has been remaindered, in
15 that case I could legitimately ask for a reversion of
16 rights.
17     Q. And you haven't asked for a reversion of
18 rights with The Trouble With Thirteen?
19     A. No.
20     Q. That is likely true with respect to
21 Maudie And Me And The Dirty Book; is that right?
22     A. I think so.
23     MR. GRATZ: Let's mark as Exhibit 12 a letter
24 dated February 28, 1996 to Betty Miles from Random
25 House.

## Page 82

1     (Whereupon, the aforementioned document was
2 marked as Miles Exhibit 12 for identification as of this
3 date by the Reporter.)
4     Q. Do you recognize Exhibit 12?
5     A. Yes.
6     Q. What is it?
7     A. It is, again, another remainder notice
8 for a particular edition of the book, in this case
9 Maudie And Me And The Dirty Book.
10     Q. Is Maudie And Me And The Dirty Book
11 similarly situated as The Trouble With Thirteen?
12     A. Yes.
13     Q. You haven't sent a reversion request with
14 respect to Maudie And Me And The Dirty Book?
15     A. That's right.
16     Q. Have you sent a reversion request with
17 respect to A Day Of Spring?
18     A. I don't know.
19     Q. Have you sent a reversion request with
20 respect to A Day of Autumn?
21     A. I don't know.
22     Q. Other than the reversion acknowledgment
23 letters that you provided to your Counsel, do you have
24 any other reversion acknowledgment letters?
25     A. I may have, but I am not sure.

## Page 83

1     Q. What would you need to do to find out?
2     A. Contact the publisher.
3     Q. Do you possess any other reversion
4 acknowledgment letters other than the ones that you
5 provided to your Counsel?
6     A. You just asked me. I said I wasn't sure.
7     Q. Are there any books for which you had
8 sent a reversion request letter but not received a
9 reversion acknowledgment letter?
10     A. At this moment, no.
11     Q. Is it consistent with your recollection
12 that all of your out of print titles from the beginning
13 through A Day Of Spring published in 1970 are ones for
14 which you don't have a reversion acknowledgment letter?
15     A. I am not sure which of those. You have
16 them here, but I don't know which ones they are.
17     MR. GRATZ: We will have this marked as
18 Exhibit 13, a document bearing Bates number P-Miles-025.
19     (Whereupon, the aforementioned document was
20 marked as Miles Exhibit 13 for identification as of this
21 date by the Reporter.)
22     Q. You have been handed what has been marked
23 as Exhibit 13. Do you recognize this document?
24     A. This is Mr.-- oh, no. Yes, I mean I have
25 been following these articles in the Times, yes.

## Page 84

1     Q. This is an article by Katie Hafner,
2 headlined At Harvard, a Man, a Plan and a Scanner; is
3 that right?
4     A. Yes.
5     Q. This is an article that you clipped from
6 the newspaper; is that right?
7     MR. BONI: We produced this in the first
8 production six years ago, five or six years ago.
9     A. I intend to clip things, yes.
10     Q. Do you maintain clipping files of
11 interesting articles?
12     A. Yes, I do.
13     Q. What led you to clip this article?
14     A. I have been clipping articles about the
15 Google case from the beginning because I am very
16 invested in this. My opinion on this has been sought
17 and given and I feel that my role in this case is to
18 weigh in on issues around it, so it is important to me
19 to keep up with. I mean this is an early one, but I
20 read it, not just in the Times, in the New York review
21 of books. This is important to me because I feel I am
22 really representing authors who want to control their
23 rights and I am concerned that I will weigh in sensibly
24 and be aware and my opinion bears some weight.
25     Q. Turning to the second page of Exhibit 13.

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
21 of 37 sheets    Page 81 to 84 of 111    01/09/2012 11:33:45 AM

## Page 93

1  **A.** In the Author Guild's bulletin?
2  **Q.** Yes.
3  **A.** Yes, there were.
4  **Q.** Were those articles provided to your
5  Counsel as part of discovery in this case?
6  **A.** I have no idea.
7  MR. BONI: We are not maintaining privilege
8  as to those, Joe.
9  MR. GRATZ: But they haven't been produced?
10 MR. BONI: No.
11 MR. GRATZ: Nothing further.
12 MR. BONI: I just have a question or two.
13 EXAMINATION BY
14 MR. BONI:
15 **Q.** You were just asked among the documents
16 you were shown was the notice with respect to the
17 settlement agreement in the case; is that correct?
18 **A.** Yes.
19 **Q.** Did you weigh in with respect to the
20 settlement agreement?
21 **A.** Yes, I did.
22 **Q.** You testified earlier about royalty
23 income with respect to your late husband. What type of
24 author was your husband?
25 **A.** He was an academic author. He wrote

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
93

## Page 94

1  textbooks.
2  **Q.** You were asked earlier about academic
3  authors and whether you can fairly represent or I think
4  the word was adequately represent academic authors. Do
5  you believe that you can?
6  **A.** Very much so.
7  **Q.** Why is that?
8  **A.** Well, not only in my husband's case, but
9  many of his colleagues. I know a great many academics,
10 as I know a great many plain authors and I know that no
11 matter what kind of book they are writing, they are all
12 concerned about their copyright and the rights of
13 holders of copyright to control their books.
14 MR. BONI: I have no further questions.
15 Thank you.
16 CONTINUED EXAMINATION BY
17 MR. GRATZ:
18 **Q.** One or two questions.
19 With respect to your husband's books, were
20 they all textbooks?
21 **A.** Yes, they were published by Sage
22 Publications, which is essentially a text house in the
23 social sciences essentially, yes.
24 **Q.** The publishing contracts with respect to
25 those textbooks, did they provide for that your late

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
94

## Page 95

1  husband could receive a reversion of rights upon
2  occurrence of some event or were they a different kind
3  of contract?
4  MR. BONI: Object to the form. You can
5  answer.
6  **A.** Yes, I don't know what different kind of
7  contract. They were pretty thorough contracts. I am
8  not sure about the specific reversion of rights clause.
9  **Q.** Do you own the copyright in your
10 husband's books?
11 **A.** Yes, I do.
12 **Q.** And Sage does not; is that right?
13 **A.** I own them.
14 **Q.** Is that as a result of reversion or
15 because your husband retained ownership?
16 **A.** Because he retained ownership.
17 **Q.** Do you have any of the publishing
18 contracts between your husband and Sage Publishing?
19 **A.** I am sure I do.
20 **Q.** Have those been provided to your Counsel
21 in this case?
22 **A.** No.
23 **Q.** But you know where they are roughly?
24 **A.** Yes.
25 **Q.** You would be able to provide them?

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
95

## Page 96

1  **A.** Yes.
2  **Q.** But sitting here today, you can't tell me
3  exactly what the terms of those contracts were without
4  looking at them; is that right?
5  **A.** I could tell you that they are contracts
6  that any academic would be pleased to have.
7  MR. GRATZ: No further questions.
8  THE WITNESS: Thank you.
9  (Whereupon, 3:55 P.M. the Examination of this
10 Witness was concluded.)

_____
BETTY MILES

Subscribed and sworn to before me

this \_\_\_\_\_ day of _____ 2012.

_____
NOTARY PUBLIC

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200
96

97

EXHIBITS

MILES EXHIBITS:

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 4 |
| 2 | A page from the book called The Real Me | 23 |
| 3 | A page from the book called Goldilocks And The Three Bears | 27 |
| 4 | A description of the book Goldilocks And The Three Bears | 29 |
| 5 | A display of a partial page from Just The Beginning | 35 |
| 6 | The book titled Just The Beginning | 37 |
| 7 | The book titled The Trouble With Thirteen | 42 |
| 8 | Web pages consisting of nine pages | 43 |
| 9 | Two-page document titled Betty Miles - Out-Of-Print Titles and In-Print Status Unknown | 55 |
| 10 | Letter dated December 5, 1995 to Betty Miles from Alfred A. Knopf | 77 |
| 11 | Letter from Amy Nathanson from Random House to Betty Miles dated July 24, 1995 | 79 |

(Exhibits continue on next page)

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200

98

MILES EXHIBITS:

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 12 | Letter dated February 28, 1996 to Betty Miles from Random House | 82 |
| 13 | An article bearing Bates number P-Miles-025 | 83 |
| 14 | E-Mail from the Authors Guild to Betty Miles of September 23, 2005 | 87 |

INDEX

| EXAMINATION BY | PAGE |
|---|---|
| MR. GRATZ | 3, 94 |
| MR. BONI | 93 |

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200

99

CERTIFICATE

STATE OF NEW YORK    )
                     : SS.:
COUNTY OF RICHMOND   )

I, DEBORAH GARZANITI, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of January 2012.

_____
DEBORAH GARZANITI

DIAMOND REPORTING, INC. - info@diamondreporting.com
718.624.7200

B. MILES

1              C E R T I F I C A T E
2
3    STATE OF NEW YORK     )
                           : SS.:
4    COUNTY OF RICHMOND    )
5
6
7         I, DEBORAH GARZANITI, a Notary Public for and
8    within the State of New York, do hereby certify:
9         That the witness whose examination is
10   hereinbefore set forth was duly sworn and that such
11   examination is a true record of the testimony given by
12   that witness.
13        I further certify that I am not related to any
14   of the parties to this action by blood or by marriage
15   and that I am in no way interested in the outcome of
16   this matter.
17        IN WITNESS WHEREOF, I have hereunto set my hand
18   this 6th day of January 2012.
19
20              _____Deborah Garzaniti_____
21                     DEBORAH GARZANITI
22
23
24
25