# EXHIBIT 10

## PART B



# HarperCollins*Publishers*

**AGREEMENT** ("Agreement") made this ▮▮▮▮▮▮▮, 2011.

## PARTIES

A.   ▮▮▮▮▮▮▮▮ ("Author"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮, Attn: ▮

B.   HarperCollins Publishers LLC ("Publisher"), 10 East 53rd Street, New York, NY 10022.

## RECITALS

A.   Author and Publisher desire to enter into this Agreement with respect to the development and publication of the following work, provisionally titled: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

B.   This Agreement consists of Part 1: Deal Terms; Part 2: Standard Terms and Conditions; Part 3: Defined Terms; and any attached schedules and exhibits referred to herein.

▮▮▮▮▮▮▮▮                  HARPERCOLLINS PUBLISHERS L.L.C.

By: _____        By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
                                         ▮▮▮▮▮▮▮▮▮▮
                                         ▮▮▮▮▮▮▮▮▮▮

Date: _____      Date: _____

Agent's Tax Id. #: _____

Author's Citizenship: _____
Author's Date of Birth: _____
(This information is required for copyright registration
with the United States Copyright Office)

ISBNs: ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

AG100129

**Part 1: DEAL TERMS**

| | |
|---|---|
| *"Manuscript"* | The text of a work of fiction as written by Author and delivered to Publisher, consisting of approximately ▮▮▮ words on the subject of ▮▮▮ ▮▮▮ ▮▮▮ together with any supplemental or other additional materials that Author provides for use in or in connection with publication of the Work. |
| *"Advance"* and *Payment Schedule* | A total Advance of ▮▮▮ payable as follows:<br>1. ▮▮▮ on execution of this Agreement;<br>2. ▮▮▮ on Acceptance. |
| *"Delivery Date"* | ▮▮▮ 2011 |
| *"Territory"* | United States, its territories, possessions and dependencies, Canada and the Philippines exclusively, and non-exclusively throughout the remainder of the world (including Malaysia, Singapore and the Caribbean Commonwealth Countries) with the exception of the Commonwealth of Nations (other than as set forth herein) and the Republic of Ireland. |
| *"Languages"* | English |
| *"Reserved Rights"* retained by Author | All rights in the Work other than the Rights including all dramatic adaptation rights, (i.e., motion picture, television, live-stage, and dramatic audiovisual adaptations), multimedia adaptation rights, commercial tie-in and merchandising rights, first serial, and foreign language. |
| *"Publication Date"* | The date on which Publisher initially publishes the Work, which shall be within 18 months of Acceptance. |
| *"Promotional Services"* | Intentionally left blank |
| *"Royalties"* due to Author for Publisher's Physical and Digital Versions | 1.  Copies of Physical Versions:<br>    A.  On Regular Sales, these percentages of Suggested Retail Price:<br>    (1) Hardcover: 10% to 5,000 copies; 12.5% from 5,001 to 10,000 copies; and 15% thereafter<br>    (2) Trade-paperback: 7.5%<br>    (3) Mass market paperback: 8% to 150,000 copies; 10% thereafter<br>    (4) Large-print hardcover: 10%<br>    (5) Large-print paperback: 7.5%<br><br>    B.  On Special Sales and Export Sales, these percentages of Amounts Received:<br>    (1) Hardcover (including large-print): 10%<br>    (2) Trade paperback (including large-print): 7.5%<br>    (3) Mass market paperback: 8%<br><br>    C.  On sales made directly to consumers by Publisher:<br>    (1) sales from Publisher's web sites or solicited solely by e-mail: the applicable royalty set forth above for Regular Sales of the Physical Version;<br>    (2) in response to direct mail solicitations: 5% of Amounts Received<br><br>    D.  On sales of Physical Versions of sound recordings, the following percentages of Amounts Received: 8% to 25,000 copies, and 10% thereafter (but 10% and 12%, respectively, if Author reads the Work) |

AG100130

| | 2. On sales of Digital Versions, 25% of Amounts Received |
|---|---|
| *"Rights Payments" due to Author for Licensed Versions* | The following percentages of Amounts Received:<br>    All other grants of Rights to third parties not otherwise provided for herein, including book club, abridgement, and reprint, 50% |
| *Royalties and Rights Payments due to Author from online advertising revenues* | Where ads are displayed on the same page view as the content of the Work—25% of Amounts Received, payable after Publisher's total Amounts Received from such advertising exceeds $1,000, it being agreed that Author shall not share in amounts received from sponsorship or similar arrangements unless such arrangements relate solely to the Work. |
| *"Option"* | Author grants to Publisher an option on Author's next book-length work of adult fiction, to be exercised as follows. Author will submit to Publisher a detailed proposal and two sample chapters for such work before offering rights in it to any other party. Publisher will have 30 days from its receipt of such work to advise Author whether it wishes to publish it and upon what financial terms, such 30-day period to commence no earlier than 90 days after Acceptance. If within such 30-day period Publisher does not advise Author that it wishes to publish such work, Author may offer it to other parties without further obligation to Publisher. If within such 30-day period Publisher advises Author that it wishes to publish such work but within 30 days of Publisher so advising Author, Author and Publisher have not agreed on financial terms for such publication, Author may offer such work to other parties. |
| *"Competing Work(s)" and "Non-Competition Period"* | A "Competing Work" shall be any book on the same or similar subject matter (e.g., characters and world) as that of the Work hereunder.<br>Author shall not without Publisher's consent publish, or cause or permit to be published, a Competing Work prior to Publisher's initial publication of the Work, and for a period of three years after Publisher's initial publication of the Work (the "Non-Competition Period"). |
| *"Special Provisions"* | Publisher shall meaningfully consult Author regarding the cover/jacket design and copy, interior design, and catalog copy of Publisher's Physical Versions of the Work.<br><br>Author or Author's agent will advise Publisher in writing, within ten (10) days from execution of an agreement, when Author has entered into a deal with a U.K. publisher for publication of the Work.<br><br>In connection with Author's exercise of reserved U.S. first serial rights, Author will consult with Publisher on the timing of U.S. first serial publication and will not, without Publisher's prior written consent, not to be unreasonably withheld or delayed, permit publication before the Publication Date of more than 10% of the Work, nor any condensation of the Work. Author will require any licensee of U.S. first serial rights to carry an announcement about the publication of the Work by Publisher. Publisher may license first serial rights outside the U. S. notwithstanding Author's reservation of U.S. first serial rights. |

In the event of any inconsistency between Part 1, on the one hand, and Part 2 of the Agreement or any Schedules, on the other, the provisions of Part 1 shall be deemed controlling.

AG100131

## Part 2: STANDARD TERMS AND CONDITIONS

### 1.   DEVELOPMENT OF THE WORK

(a)   Author must deliver to Publisher a Manuscript that is satisfactory to Publisher, as further provided below in this Section 1. Author will deliver to Publisher by the Delivery Date one digital copy of the Manuscript that accommodates Publisher's production requirements, and, upon request, one hard copy. Publisher will notify Author whether the Manuscript is satisfactory. If it is not, Publisher will notify Author and will provide suggestions for possible revisions. Author will then have 40 business days from Author's receipt of such suggestions to deliver a revised and satisfactory Manuscript to Publisher.

(b)   If Author does not receive any response from Publisher within the later of 30 business days after (i) the Delivery Date or (ii) Publisher's receipt of the Manuscript in accordance with Section 1(a) or 1(d), Author may make written demand for notice from Publisher as to whether the Manuscript is satisfactory. If Author receives no response within 20 business days of Publisher's receipt of such demand, Publisher will be required to pay that portion of the Advance, if any, due on Acceptance, but such payment will not constitute Acceptance, and Author will still be bound by Sections 1(a) and 1(c)-(g).

(c)   If Author fails to (i) deliver the Manuscript by the Delivery Date (unless the parties have mutually agreed to revise the delivery date as memorialized in an amendment to this Agreement), or (ii) deliver a revised Manuscript by the time provided in Section 1(a) or 1(d); or (iii) comply with Author's obligations under Section 1(f) or 1(g), then Publisher may either elect to keep this Agreement in effect or, upon written notice to Author, recover from Author the portion of the Advance paid prior to such notice, and when repayment is received this Agreement will terminate and Rights to the Manuscript will revert to Author.

(d)   If after delivery of the Manuscript Publisher requests revisions and Author delivers a revised Manuscript within 40 business days of such request that is still not satisfactory to Publisher, Publisher may (i) terminate this Agreement with respect to the Manuscript on written notice, or (ii) request further revisions. If Publisher requests further revisions, Author will have 20 business days from receipt of the request to deliver a revised Manuscript that is satisfactory to Publisher, and if Author fails to do so, Publisher may terminate this Agreement. If Publisher exercises its right to terminate this Agreement pursuant to this Section 1(d), Author may offer rights in the Manuscript to other publishers and, if Author submits to Publisher a copy of an agreement granting any of the Rights to a third party that provides for payment to Publisher of all monies payable thereunder until all portions of the Advance previously paid to Author have been repaid, Publisher shall relinquish Rights covered by such agreement conditioned upon Author's entering into such agreement with such third party. If within three years from the date of such notice, Author has not repaid all portions of the Advance previously paid, Author will repay the unpaid balance, and this Agreement will remain in effect until such repayment has been made in full. Upon full repayment, Rights to the Manuscript will revert to Author.

(e)   If Publisher has acquired more than one Work pursuant to this Agreement, in the event Publisher issues notice in accordance with the terms set forth in Sections 1(c) or 1(d), Publisher shall have the further right to terminate this Agreement in its entirety with respect to any Work due to be delivered thereafter under the terms of this Agreement, in which case Author shall repay within 20 business days of such notice the portion of the Advance paid to Author for any such Work terminated pursuant to this section.

4

AG100132

(f)      Author will on the Delivery Date identify any Third Party Material, and will at the same time deliver written agreements required by Publisher granting permission for use of all Third Party Material in exercising all Rights in all licensed formats in the Territory for the Term. Author will make all payments due under such agreements. If Author has not entered into such agreements and/or made such payments, Publisher may do so, and collect such payments from Author or deduct them from amounts due to Author under this Agreement.

(g)      Publisher may have the Manuscript reviewed by Publisher's counsel at the Publisher's expense. Author will respond promptly to counsel's requests for information and documentation and will make such changes in the Manuscript as may be recommended by Publisher's counsel.

(h)      After Acceptance, no change may be made in the editorial content of the Manuscript without Author's approval except that Publisher may copyedit the Manuscript in accordance with its standards of punctuation, spelling, capitalization and usage. Publisher will send the copyedited Manuscript to Author, and Author will within 10 business days of receipt return it to Publisher with Author's comments, and with any revisions and responses to any queries. Any differences between the copyeditor and Author, other than differences relating to errors in spelling, capitalization, usage and punctuation, will be resolved as Author directs so long as such resolution does not render the Manuscript unsatisfactory to Publisher.

(i)      Author shall review and return within 10 business days of receipt proofs or other production materials submitted by Publisher.

(j)      If Publisher wants to publish an index as part of the Work, Publisher will inform Author and Author shall have the first opportunity to prepare one for the Work. However, if Author does not want to prepare an index for the Work, or if Author elects to do so but does not prepare an index for the Work in a timely or satisfactory manner, Publisher may have an index prepared for the Work and deduct such cost from amounts due to Author under this Agreement. Such costs to Author shall not exceed $1,500.00.

## 2.    GRANT OF RIGHTS; NON-COMPETITION

(a)      Author licenses the Rights in the Languages exclusively to Publisher in the Territory for the Term.

(b)      Publisher and its licensees and customers may use Author's name, approved likeness and approved biographical information for promotional purposes. Author will deliver to Publisher a photograph of Author satisfactory to Publisher and will at Author's expense obtain written permission satisfactory to Publisher for such use of the photograph in connection with the exercise of all Rights and such promotion, and if Author fails to do so, Publisher may do so and recover the cost of such permission from Author.

(c)      The Work will be Author's next book-length work. Author represents that Author is not subject to any commitment for initial publication by a third party of another book-length work written or co-written by Author. Author will not offer rights to another book-length work written or co-written by Author, or accept an offer for such a work, until Acceptance and until Author has complied with the Option. In any event, Author will not permit the publication of another such work anywhere in Publisher's exclusive Territory until 12 months after Publisher's first publication of the Work.

(d)      During the Non-Competition Period, Author will neither publish nor authorize the publication anywhere in Publisher's exclusive Territory of any Competing Work, including any Competing Work co-written by Author, in any form equivalent to a Physical Version or Digital Version.

AG100133

3.   **PUBLICATION; PROMOTION; AUTHOR COPIES**

(a)   After Acceptance, Publisher will publish the Work by the Publication Date. All details of publications of Physical Versions and Digital Versions, including manufacturing, format and design, distribution, pricing, advertising and promotion and dissemination of free copies, will be determined by Publisher.

(b)   Author will perform Promotional Services at the times provided in Part 1 or at such other times as Publisher may reasonably request and, if requested, as part of the Promotional Services, will sit for video- and audio-recorded interviews, which Publisher may reproduce, distribute, display, perform and adapt for promotional purposes. All reasonable expenses incurred by Author in performing Promotional Services will be paid by Publisher. If Author is not available to perform Promotional Services at the time of the Publication Date, Publisher may delay the Publication Date until such time as Author is available. Author will inform Publisher of any appearances Author may plan to make and will cooperate with Publisher to take advantage of any promotional opportunities that such appearances may offer.

(c)   Publisher will give Author 25 copies of each Physical Version published by Publisher after initial publication of each and will give 15 copies to Author's agent. Author may purchase additional copies thereof at a discount of 50% off the Suggested Retail Price for personal use, but not for resale on a non-returnable basis.

4.   **PUBLISHER'S ACCOUNTING AND AUTHOR'S RIGHT TO AUDIT**

(a)   After the Work is published, Publisher will render an accounting of all of Author's earnings no less often than semi-annually for such periods as Publisher may from time to time specify (currently, periods ending June 30 and December 31), and will make any payments due, within 90 days after the end of each period. Royalties and Rights Payments will be paid to Author as set forth in Part 1, and Royalties will be paid on sales, less returns. Publisher may retain a reasonable reserve against returns on any accounting statement, provided that the amount of the reserve is stated and the subsequent statement states how such reserve has been applied. Any reserve will be related to sales and returns during the applicable accounting period and to Publisher's reasonable expectation of future sales and returns. On request, Publisher will provide a written explanation of any reserve.

(b)   Unless otherwise stated, any escalation in any Royalty for a specific format or channel of distribution will apply separately to each version sold in such format or channel. No Royalties will be payable on copies given or sold to Author, given away, made accessible gratis via the Internet for promotional purposes, given to charitable organizations, sold at or below the cost of manufacture or damaged or destroyed.

(c)   If Author receives an overpayment because of copies sold but later returned, Publisher may deduct the overpayment from any other payments due from Publisher to Author. If any such overpayment is not recouped in two accounting periods, within 60 business days of Publisher's request Author will pay Publisher the unrecouped balance. An unearned Advance shall not be considered an overpayment for purposes of the foregoing.

(d)   No Royalties or Rights Payments will be paid until the Advance and other permitted charges to Author's royalty account have been fully recouped by Publisher from Royalties and Rights Payments credited to Author's royalty account from all Works.

AG100134

(e)    If a Physical Version or a Digital Version is included in a Combined Work by Publisher or a distributor, agent or licensee of Publisher: (i) if the Combined Work is distributed as a discrete product, Royalties and Rights Payments shall be prorated based on the percentage of the Combined Work that is comprised by such version (calculated based on the number of works included in the Combined Work); and (ii) if the Combined Work is made available through a subscription or similar service, Royalties and Rights Payments shall be prorated based on the use made of such version by the subscriber or other end-user, as reasonably estimated by Publisher, as a percentage of such person's use of the entire Combined Work during each of Publisher's semi-annual accounting periods, which in the case of Digital Versions will when practicable be calculated on a page-view basis; provided, however, that if payments for such use cover periods longer than a single semi-annual accounting period, such payments will be divided equally across all covered accounting periods for the purpose of making this calculation, and prorated as if received and effective during an accounting period.

(f)    Upon written request from Author, Publisher will provide the following information for each Physical Version and Digital Version: the date of each printing and the number printed of any Physical Version; the number of copies distributed by Publisher; and the cumulative number of copies sold, returned, distributed free of charge, remaindered, destroyed or lost. Publisher will also on request provide copies of any licenses of Rights made by Publisher, and any other information Author may reasonably request in order to ascertain the accuracy of accountings rendered.

(g)    Author may, upon written notice, but not more than once in any 12-month period, audit Publisher's records insofar as they relate to the Work. Any audit must be conducted during normal business hours, at the locations where Publisher maintains its records and under such conditions as Publisher may reasonably prescribe. If an error is discovered, the party in whose favor the error was made will pay the other the amount of the error, or Publisher may credit any error in its favor to any unearned portion of the Advance. Any audit will be at Author's expense, unless errors in Publisher's favor amount to more than 5% of the total amounts paid to Author under this Agreement, in which case Publisher will contribute to the cost of the audit up to the amount of the error.

(h)    All sums of money due the Author under this Agreement shall be paid in the name of the Author's Agent, ▮▮▮▮▮▮▮▮▮▮▮ and the receipt by the said ▮▮▮▮▮▮▮▮▮▮ shall be a good and valid discharge of all such indebtedness, and the said agent is hereby empowered to act on the Author's behalf in all matters arising from and pertaining to this Agreement. For services rendered and to be rendered, it is agreed between the Author and the Author's agent that the Author does hereby irrevocably assign and transfer to said agent and said agent shall retain for the life of the Work a sum equal to fifteen percent (15%) as an agency coupled with an interest of the gross monies accruing to the account of the Author under this Agreement and any subsequent agreements for the life of the Work in all its editions, revisions and adaptations, prior to deductions from or charges against such monies for any reason whatsoever.

## 5.   COPYRIGHT

(a)    Publisher will place a copyright notice in the name of Author in each copy of the Physical Versions distributed by Publisher and will require its licensees to do the same. Publisher will register copyright in the first Physical Version of the Work with the U.S. Copyright Office promptly after first publication. Both parties will execute such documents as may be necessary to effectuate copyright in the Work.

(b)    Copyright in any materials created by Author for use in the Physical Versions and Digital Versions or in connection with their publication or promotion will belong to Author and the grants of Rights,

AG100135

representations, warranties and termination rights in this Agreement will apply to all such materials, and compensation payable hereunder will be deemed to include compensation for use of any such materials.

(c)    Copyright in the Harper Material will belong to Publisher.  Author may not reproduce or use the Harper Material without Publisher's written consent.

(d)    In the event of any infringement of any of the Rights, Publisher may seek such remedies as it deems advisable and may name Author a co-plaintiff in any infringement litigation Publisher may commence. Publisher will bear the cost of any such litigation. Any recovery will be applied first to reimburse Publisher for its costs and the balance, if any, will be divided equally between Author and Publisher. If Publisher elects not to commence litigation, Publisher will notify Author and Author may then seek such remedies as Author deems advisable at Author's sole expense, and any recovery shall belong to Author.

6.    **WARRANTIES AND INDEMNITIES**

(a)    Author represents and warrants to Publisher that:

(1)    except for Third Party Material and Harper Material, Author is the sole author of the Work, and the Work is original;

(2)    except for Third Party Material and Harper Material, the Work has never been published in whole or in part in any form and is not in the public domain in any country in the Territory;

(3)    Author has the right, power and authority to enter this Agreement, and is the sole owner of the Rights free and clear of all liens, claims and encumbrances;

(4)    the Work contains no material that (i) infringes any copyright or other proprietary right, (ii) is libelous or a violation of any right of privacy or publicity, or (iii) would otherwise subject Publisher to legal liability;

(5)    the Work contains no instruction or regimen that, if followed as presented in the Work, will be harmful to the user or others; and

(6)    if the Work is a work of non-fiction, except for incidental and immaterial changes made solely to protect the privacy of individuals depicted in the Work, and which are disclosed to Publisher prior to Publisher's first publication of the Work, all factual statements in the Work are either true, if they purport to be based on Author's personal knowledge, or, if they are not based on Author's personal knowledge, are based on Author's reasonable and adequate research and are believed by Author to be true.

(b)    Author will indemnify and hold harmless Publisher from any loss, damage, expense (including reasonable defense costs), recovery or judgment that Publisher may incur ("Costs") as a result of any claim made against either which, if sustained, would constitute a breach of a representation or warranty made by Author in this Agreement (each, a "Claim"), subject to the following:

(1)    Each party will promptly inform the other of any Claim.  Publisher will defend any Claim made against Publisher with counsel of Publisher's selection and Author will cooperate fully with Publisher and its counsel in such defense.

8

AG100136

(2)    If Author has been truthful and forthcoming with Publisher with respect to the material giving rise to the Claim, and Author has cooperated with Publisher in defending the Claim, then Author will be responsible to Publisher for only half of all Costs.

(3)    Author will be named an additional insured under the terms of any insurance policy that Publisher may carry which covers the Costs of Claims, subject to the terms and conditions of such policy, and Author shall not be obliged to pay any of the premiums for such policy. Author may join in the defense of any Claim with counsel of Author's selection at Author's expense.

(c)    Author will be responsible for any Claims made against any purchaser or end-user of any Physical Version or Digital Version, and against Publisher's licensees of Rights and such licensees' purchasers and end-users, to the same extent as Author is responsible to Publisher under Section 6(b).

(d)    If a Claim is made, Publisher may withhold payments due to Author under this Agreement in an amount equal to the anticipated Costs of the Claim as reasonably estimated by Publisher; provided that if a Claim is asserted that does not result in a litigation being filed against Publisher within one year of its assertion, Publisher shall cease withholding such payments unless Publisher is in active negotiations with the claimant regarding settlement of the Claim. Publisher will deposit such monies in an interest-bearing account. Monies withheld and accrued interest will be first applied to satisfy Author's indemnity obligation, and the balance will be promptly remitted to Author after the Claim has been disposed or, in Publisher's opinion, has been abandoned.

(e)    Publisher will defend and hold harmless Author from any claim made against Author that relates solely to Harper Material included in any Physical Version or Digital Version, or in any advertising and promotion of the same, provided that Author has given Publisher prompt written notice of any such claim.

(f)    The warranties, representations and indemnities made by Author in this Agreement will survive any termination of this Agreement.

## 7.    AUTHOR'S RIGHTS OF TERMINATION

This Agreement may be terminated by Author as further provided in Sections 7(a), 7(b) and 7(d), subject to Section 7(c), provided that Author is not then in breach of any of Author's obligations hereunder.

(a)    If Publisher fails to publish the Work by the Publication Date, and if Publisher receives written notice from Author demanding publication, Publisher will, within 90 days of Publisher's receipt of such notice, either (i) agree to publish the Work within one year of receipt of such notice (and if Publisher fails to publish within one year the Rights will automatically revert to Author); or (ii) revert the Rights to Author, in which case Author may retain any portion of the Advance paid prior to such reversion as full liquidated damages for Publisher's failure to publish.

(b)    The Work shall be deemed out of print if either no Physical Version is in Publisher's inventory and available for purchase, or if only a Digital Version is available for purchase or paid access, or a Physical Version is manufactured only upon a purchase by a third party through some form of print-on-demand technology, and in any 12-month period (measured from the beginning of an accounting period) fewer than 250 units of the Work have been sold, or the Work has generated less than $250 in revenues for Author.  If the Work is out of print and Publisher receives from Author a written request for reversion of the Rights, Publisher shall within four months of Publisher's receipt of such request either: (i) revert the Rights to Author in writing, (ii) confirm that it will make a Physical Version available in Publisher's inventory, or a Digital Version available for purchase or paid access or a

AG100137

Physical Version that is manufactured only upon purchase by a third party through some form of print-on-demand technology, within one year from the date of such receipt, and if Publisher does so then Author may not again request reversion until two full accounting periods after a version has been made available, it being agreed, however, that the Rights will automatically revert to Author if Publisher then fails to do any of the foregoing within such one-year period; or (iii) enter a license providing for the publication of a Licensed Version in the U.S. within one year from the date of the license.

(c)   Any termination of this Agreement will be subject to the following: (i) grants of Rights previously made by Publisher to third parties will remain in effect (but will not be renewed or extended by Publisher), and Author and Publisher will participate in Rights Payments from such grants as provided herein; (ii) Publisher will have the right to sell off any inventory of Physical Versions and physical copies of Digital Versions then on hand or in process of manufacture and will pay Royalties due on such sales; (iii) Publisher will cease distribution and display of Digital Versions, but Digital Versions initially purchased before the date of termination may continue to be accessed by their purchasers; and (iv) Publisher will retain ownership of plates, films, digital files and other production and manufacturing materials related to the Physical Versions and Digital Versions.

(d)   In the event of Publisher's filing for bankruptcy, or in the event involuntary bankruptcy proceedings are filed against Publisher and are not stayed or dismissed within 60 days, this Agreement shall terminate and all Rights shall revert to Author automatically and without the necessity of any demand or notification, subject, however, to Section 7(c).

(e)   Any notices or demands to be given by Author to Publisher pursuant to this Section 7 or Section 1(b) will be addressed and delivered to Publisher's General Counsel, with a copy to the publisher of the imprint of Publisher that initially published or anticipates publishing the Work.

## 8.   PUBLISHER'S RIGHTS OF TERMINATION

If (i) Publisher determines that any of the representations and warranties of Author set forth in Section 6(a) is false, or (ii) Author breaches the covenants set forth in Sections 1(f), 1(g), 2(c), or 2(d), or (iii) Author commits a breach of any covenant contained in the Special Provisions section of Part 1 above for which Publisher is given a right of termination, or (iv) Author's conduct evidences a lack of due regard for public conventions and morals, or Author commits a crime or any other act that will tend to bring Author into serious contempt, and such behavior would materially damage the Work's reputation or sales, Publisher may terminate this Agreement and, in addition to Publisher's other legal remedies, Author will promptly repay the portion of the Advance previously paid to Author, or, if such breach occurred following publication of the Work, Author will promptly repay the portion of the Advance which has not yet been recouped by Publisher.

## 9.   RESERVED RIGHTS

(a)   Author reserves the Reserved Rights for Author's own benefit. However, in exercising the Reserved Rights, Author will reserve the Rights for Publisher's benefit, and will not authorize the production of any products that include any of the text of the Work; however, Author may reproduce up to 5% of the text of the Work on Author's web site and for similar promotional, but not commercial, purposes.

(b)   In connection with Author's exercise of motion picture, live stage and similar rights, (i) Author will promptly inform Publisher in writing when Author enters into any agreement optioning or transferring any such rights, and will promptly respond to Publisher's requests for information regarding the same; and (ii) Author will not make any grant of any rights to publish books (including novelizations,

10

AG100138

photonovels, making-of-the-movie books, graphic novels, comic books, board books, picture books, chapter books and novelty books) based on the Work in any media, provided that a purchaser of Author's motion picture rights may reproduce up to the lesser of 7,500 words or 10% of the text from the Work to promote any motion picture based on the Work provided that such materials are not offered for sale. Author will use best efforts to include in any grant of such rights a requirement that a credit to Publisher be included in the main credits and in the advertising and promotion for any such adaptation of the Work.

(c)   Author reserves multimedia adaptation rights which for purposes of this Agreement means audiovisual products that derive from the Work, and utilize the Work as a source for development of such multimedia adaptations, including video games and online games, but which do not in any event reproduce the contents of the Work, whether in whole or in part.

## 10.   GENERAL PROVISIONS

(a)   Publisher's failure to perform any of its obligations hereunder will not be a breach of this Agreement or give rise to any right of termination, if caused by events of force majeure such as war, restrictions of governmental agencies, labor disputes, inability to obtain materials or any other reason beyond Publisher's control; in such event, the Publication Date and other relevant dates will be postponed for a period reasonably related to such cause.

(b)   Author will keep one copy of the Manuscript.  Publisher will not be responsible for the loss of or damage to any materials submitted by Author.

(c)   If Publisher is required by law to withhold and pay to any government taxing authority any portion of amounts due under this Agreement, such payments will be deducted from the amounts due Author hereunder.  If any bank charges are imposed on any payments due Publisher from the exercise or license of any Rights, the allocation of Amounts Received between Publisher and Author from such exercise will be made on Amounts Received after such charges have been deducted.

(d)   This Agreement will bind and will inure to the benefit of the heirs, executors or administrators and assigns of Author and the successors and assigns of Publisher.  This Agreement may not be assigned by either party without the written consent of the other, with the following exceptions: (i) Author may assign Author's right to receive payment under this Agreement upon written notice to Publisher; and (ii) Publisher may assign this Agreement to any company that acquires or succeeds to all or a substantial portion of the assets of Publisher or an imprint of Publisher.

(e)   Author will respond promptly to any request for approval required under this Agreement.  If Publisher fails to receive a response from Author within such time as Publisher may reasonably designate, the approval requested will be deemed granted.

(f)   This Agreement contains the entire understanding of Author and Publisher with reference to the Work; there are no representations or warranties other than those expressly stated in this Agreement. No waiver or modification of any provision of this Agreement will be valid unless in writing and signed by both parties. No waiver of any breach will be deemed a waiver of any subsequent breach. If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions will not be affected.

(g)   This Agreement will be construed according to, and the rights and liabilities of the parties will be governed by, the internal, substantive laws of the State of New York without reference to such state's choice of law principles, and by the U.S. Copyright Act.  All references to copyright in this Agreement

11

AG100139

will reflect any amendment made during the Term in the copyright laws of any country in the Territory. Author and Publisher submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York, or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York, New York County, for the purposes of any action or other proceeding arising out of this Agreement.

(h)     The caption headings of this Agreement are inserted for convenience only and are without substantive effect.

12

AG100140

## Part 3: DEFINED TERMS

(a)   "Acceptance" means that Publisher has notified Author that the Manuscript is satisfactory to Publisher in content and form as further described in Section 1, and that Author has complied with Sections 1(f) and 1(g).

(b)   "Amounts Received" means, with respect to (i) Physical Versions, the amounts billed to Publisher's customers for copies of the Physical Versions; (ii) Digital Versions, all amounts collected by Publisher from the purchasers, distributors or end users of such Digital Versions; and (iii) Licensed Versions, all amounts collected by Publisher from Publisher's licensees on account of the Licensed Versions. Amounts Received shall exclude (i) all costs paid by customers, such as sales taxes or charges for shipping and handling, and (ii) commissions or other expenses resulting from the transaction, which Publisher incurs, and less reimbursement and credits to customers for returns.

(c)   "Combined Work" means any product or service in which a Physical Version or a Digital Version and at least one other independent work are assembled or combined into, or presented as part of, a collective whole, and where the income received by Publisher is not reported on an individual-title basis or otherwise allocable to the individual works contained therein. An omnibus edition and a subscription service that includes the Work with other works are examples of a Combined Work. Author will have approval over any product that utilizes the Physical Version in a Combined Work.

(d)   "Digital Version(s)" means any digitized or other non-print reproduction of the Work, or portions or abridgements of the Work (it being agreed that abridgements of the Work will be subject to Author's prior approval), including in Combined Works, that is made accessible, transmitted or distributed by a device, machine or process whereby text, images or other content are received by and read, listened to or viewed from a device (including but not limited to a computer, e-book reader, mobile phone or personal digital assistant); and shall include e-books sold in the form of discs, cards or the like. E-books, sound recordings downloaded from the Internet, and portions of the Work posted on the Internet, an intraweb or other similar private network are examples of Digital Versions.

(e)   "Export Sales" means copies of Physical Versions sold for export outside the United States.

(f)   "Harper Material" means any supplemental materials created by or for Publisher for use in, or in connection with the publication, or advertising and promotion of, Physical Versions and Digital Versions (but not including materials created by Author or by third parties commissioned and compensated by Author), and includes jacket, cover and interior art and photographs, cover design, cover copy, forewords, afterwords, questionnaires, reader's guides, translations, sound recordings of the Work, and promotional materials. For Digital Versions in which the Work, or portions of the Work, is the principal component, Harper Material also includes ancillary features such as links to web sites; sound recordings; and literary, pictorial, graphic, and audiovisual works, in each instance whether or not based on the Work, provided that no audiovisual work will constitute a motion picture dramatization of substantially the entire Work, and further provided Author shall have approval over any of the foregoing material to be added to any Digital Version.

(g)   "Licensed Version(s)" means Physical Versions and Digital Versions of the Work or portions and abridgements of the Work, that are produced by third parties pursuant to licenses of Rights granted by Publisher, and that are published under the imprint(s) of such third parties, or that are purchased from Publisher in connection with such licenses.

(h)   "Physical Version(s)" means copies of the Work, or portions and abridgements of the Work (it being agreed that abridgements of the Work will be subject to Authors' prior approval), including in Combined Works, that are distributed to end users in the form of printed or other tangible copies (other

13

AG100141

than Digital Versions sold in the form of discs, cards and the like). Hardcover books, paperback books, board books, phonorecords and books that are printed by Publisher, Publisher's customers, licensees or consumers are examples of Physical Versions.

(i) "Regular Sales" means sales of Physical Versions in the United States under Publisher's standard retail and wholesale discount schedules for customers in the book trade.

(j) "Rights" means the right of Publisher and licensees of Publisher to create, reproduce, distribute, transmit and display Physical Versions and Digital Versions, and to publicly perform phonorecords of Physical Versions.

(k) "Special Sales" means Physical Versions that are (i) comprised of the entire Work and are specially created for particular customers, such as customized, proprietary and co-branded versions; or that are (ii) sold in the United States at discounts greater than discounts under Publisher's standard retail and wholesale schedules for customers in the book trade, either on a non-returnable basis, or to catalog accounts, book fairs, book clubs, school suppliers and other customers outside of the book trade, or as premium sales.

(l) "Suggested Retail Price" means the price shown on Publisher's invoices from which discounts are deducted to calculate the amounts payable to Publisher.

(m) "Term" means the full term of copyright available to the Work in the Territory.

(n) "Third Party Material" means any supplemental and other material entitled to copyright protection in any country in the Territory included in the Manuscript by Author, but excluding material in which Author owns or controls the copyright. Photographs, illustrations and quotations from other works are examples of Third Party Material.

(o) "Work(s)" means the Manuscript in the form accepted by Publisher, with any Third Party Material, Harper Material, or other material, as published by Publisher. Throughout this Agreement, except as otherwise specified, the term "Work" shall pertain to each Work acquired hereunder as though the rights granted herein were covered by separate agreements for each Work.

14

AG100142



# OXFORD
### UNIVERSITY PRESS

## PUBLISHING AGREEMENT

**AGREEMENT**, dated as of _____ between OXFORD UNIVERSITY PRESS, INC. of 198 Madison Avenue, New York, New York 10016 ("the Publisher"); and

██████████████████████

("the Author").

**WHEREAS** the Author has prepared or is preparing material for publication as described in Schedule I, which is provisionally titled ████████████████████████████████████████████ ██████████████████████ ("the Work") ; and

**WHEREAS** the Author has agreed to complete and deliver the Work to the Publisher and the Publisher has agreed to publish the Work on the terms of this Agreement.

**NOW IT IS HEREBY AGREED** that the Publisher and the Author hereby accept and agree to the terms of this Agreement, which incorporates the following Schedules, which are attached:

> SCHEDULE I: Manuscript and Delivery Specifications
> SCHEDULE II: Payments by the Publisher
> SCHEDULE III: Standard Terms and Conditions

SIGNED by: _____ Citizen Of: _____
**Larry Batiste**

SIGNED by: _____

██████████████████████████████

for and on behalf of OXFORD UNIVERSITY PRESS, INC.

For Internal Use: OUP Inc. Editor's Name: ███████████

██████████████████

1

AG100143



**SCHEDULE I**
**MANUSCRIPT AND DELIVERY SPECIFICATIONS**

1. **DETAILED SPECIFICATION OF THE MATERIALS TO BE SUBMITTED**

   The Author will prepare a text that complies with the Publisher's Manuscript Submission Guidelines and any other author guidelines and instructions that have been supplied to the Author on or before signing this Agreement. In addition, the manuscript will meet the following specific requirements:

   **1.1. Subject Matter and Treatment**

   ██████████████████████

   **1.2. Length**
   The manuscript to be delivered by the Author will consist of approximately ████ words and 40 illustrations (the completed text is to make a book of approximately ██ pages). This word count includes all apparatus, including notes, references, bibliography, appendices, etc.

   **1.3. Text**
   As further specified in the Publisher's Manuscript Submission Guidelines, the Author will deliver one complete copy of the final text of the manuscript in hard copy form (double-spaced), printed on one side only, and one in an electronic format approved by the Publisher, formatted in accordance with a template provided by the Publisher.

   **1.4. Illustrations**
   - The Author will deliver the illustrations as camera-ready artwork on disk (separate from the disk on which the text is delivered)]

   The Author will supply the illustrations in accordance with the Publisher's Manuscript Submission Guidelines.

   **1.5. Integral Material**
   The Author will supply, or, as provided below, will bear the cost of preparation of, the following materials ("Integral Materials"):
   - Preface
   - Introduction
   - Table of Contents
   - Captions
   - End-of-Chapter Materials
   - Notes
   - Index
   - Appendices
   - Chapter abstracts
   - Book abstract
   - Bibliography

   If the Author does not supply any of these Integral Materials, the Publisher may arrange for the provision of the relevant items by others and may charge the reasonable cost thereof against any sums due or to become due to the Author, or, at the Publisher's discretion, such costs may be payable by the Author in cash, in which event the Author will pay such costs thirty (30) days following receipt of invoice delivered by the Publisher.



### 1.6. Index and Tables
The Author will be responsible for providing an index. The index will not be required until the Author has received the Manuscript proofs. If the Author requests, or is unable to provide an index by the delivery date in paragraph 2 below, the Publisher will prepare, or commission a third party to prepare, the index and any amounts paid by the Publisher for the costs payable to such third party will be deducted from monies due or to become due from the Publisher to the Author. If so requested by the Publisher, the Author will review (and, to the extent necessary, correct) the index by a deadline set by the Publisher.

### 1.7. Abstract and Keywords
The Author will be responsible for providing an abstract and keywords.

OR

### 1.8. Abstract and Keywords
The Publisher will prepare or commission a third party to prepare, the abstract and keywords and any amounts paid by the Publisher for the costs payable to such third party will be deducted from monies due or to become due from the Publisher to the Author. If so requested by the Publisher, the Author will review (and, to the extent necessary, correct) the index by a deadline set by the Publisher.

## 2. DELIVERY SCHEDULE
The Author will deliver to the Publisher no later than ▮▮▮▮▮▮ 2013 the material as listed in Paragraph 1 above together with:
A note of the exact number of words and illustrations in the delivered manuscript;
- A completed Author Questionnaire as supplied by the Publisher;
- A complete list of any textual or illustrative copyright material the copyright in which is not owned by the Author, with full details of the ownership or source of such material;
- Originals of permissions granted as needed for use of all third party copyright material included in the delivered manuscript
- One photocopy of each illustration;
- Electronic file correlation table

The Author agrees to keep at least one (1) copy of all materials delivered to the Publisher and will ensure that all copies of illustrative and other materials are kept in a safe environment.

3

**SCHEDULE II**
**PAYMENTS BY THE PUBLISHER**

For the purpose of this Schedule the expression "Net Receipts" means the amounts actually earned and received in the United States by the Publisher from the sale or exploitation of the Work. "OUP UK" means the Publisher's UK affiliate Oxford University Press, and "OPL" means Oxford Publishing Limited, a wholly owned subsidiary of OUP UK.

If the Publisher exercises a particular right for which a royalty or other compensation due to the Author is not otherwise provided in this Agreement, the Publisher will pay the Author compensation equal to its good faith determination of the fair market value to the Author of any such exercise of rights by the Publisher.

## A. ROYALTIES
The Publisher will pay to the Author the following royalties:

### 1. PRINT SALES
On regular sales of the print edition of the Work:

**Hardcover**

(i)   On all copies sold in the United States, except as provided in subpart (ii) below, 5% of Net Receipts stepped to 7.5% on sales over 2,500 copies stepped further to 10% on sales over 5,000 copies.

(ii)  On all copies sold for purposes of export 5% of Net Receipts

**Paperback**

(i)   On all copies sold in the United States 5% of Net Receipts stepped to 7.5% on sales over 2,500 copies stepped further to 10% on sales over 5,000 copies

(ii)  On all copies sold for purposes of export 5% of Net Receipts

Stepped royalty rates apply to worldwide sales on each format separately and the royalty rate payable on sales of any new edition of the Work will revert to the originally specified rate.

### 2. ELECTRONIC PUBLICATION (except e-books)
For the exploitation by the Publisher (including OUP UK and OPL) of all or part of the Work in any electronic form or medium, whether now known or hereafter devised, excluding e-books, but including (but not limited to):
   (i)   publication on CD-ROM
   (ii)  inclusion of all or part of the Work in any online service or electronic information storage or retrieval system
   (iii) the sale of all or any part of the Publisher's electronic publication of the Work to a third party for inclusion in that third party's own electronic publication:
5% of Net Receipts

### 3. E-BOOKS
On sales of e-books (i.e. the individual publication of the entire verbatim text of the Work on a stand-alone basis in any electronic form or medium, whether now known or hereafter devised), whether

4

AG100146



published or sold by the Publisher or by a third party under license by, or grant of rights from, the Publisher:
5% of Net Receipts

**4.  CO-PUBLISHING**

    (i)  **Royalty-inclusive co-published editions:** on all copies manufactured by the Publisher on a royalty-inclusive basis for sale to any overseas publisher a royalty of **10%** of Net Receipts

    (ii)  **Royalty-exclusive co-published editions** Royalty rates for Translation Rights will apply to royalties received from all royalty-exclusive co-published editions (i.e. licensed co-published editions).

**5.  OTHER EDITIONS**

**5.1.  Book Club**

    (i)  On all copies sold to a book club at a price inclusive of royalty **10%** of Net Receipts.
    (ii)  On all copies sold by a Book Club where the Book Club either manufactures copies itself or buys copies from the Publisher at a price exclusive of royalty (i.e. licensed book club rights) **50%** of Net Receipts, after deduction of the costs of any necessary plate manufacture, transportation or other expenses arising from the licensing of such rights.

**5.2.  Audio**

    (i)  On all audio editions sold in the United States **10%** of Net Receipts.
    (ii)  On all audio editions sold for the purposes of export **10%** of Net Receipts.

**Custom Publishing**
**5.3.** On all copies of custom editions of the Work or material from the Work in print or electronic media created primarily for a particular institution **5%** of Net Receipts (such royalty will be proportionately based on the amount of material included in the product compared to the total amount of material in such product as provided in Paragraph A6 of this Schedule). In the event that the Publisher utilizes only small portions or quotes from the Work, a permission fee equal to the Author's share of the standard fee for permissions (as provided in B1.10 below) will be paid to the Author.

**5.4.  Special Sales**
On special sales, i.e. copies sold in the United States at a discount of sixty percent (60%) or more off of the Net Receipts, including, without limitation, sales outside the ordinary channels of trade 5% of Net Receipts.

Sales of "other editions" of the Work as above in this Paragraph A5 will not be included in the number of total sales for the purpose of calculating entitlement to an increased royalty rate under Paragraph A1 of this Schedule.

**6.  COMPOSITE WORKS**
If the Work or part of the Work is exploited as part of any larger composite work, collection or anthology in any format whether print or electronic and whether by the Publisher or by a third party with the agreement of the Publisher, the Publisher will determine in good faith what proportion of the larger work the Work represents and calculate royalties due to the Author under the above paragraphs in accordance with that proportion by using one of the following methods, to be selected by it:

    (i)  the ratio of the number of words from the Work to the total number of words in what was sold;



5



(ii) the ratio of the number of pages from the Work to the total number of pages in what was sold;
(iii) sampling;
(iv) the ratio of the value of the Work when sold separately to the overall value of what was sold, as determined by the Publisher in good faith; or
(v) any other method determined by the Publisher in good faith to be fair and equitable.

Notwithstanding anything to the contrary in the foregoing, if the Publisher receives from a third party an allocation of the amount received by the Publisher from the sale or licensing of the Work and other work(s), the Publisher may use that allocation.

**7. REMAINDERS**
No royalties will be payable on remaindered copies (i.e. copies sold for less than the manufacturing cost thereof plus ten percent (10%).

**8. LOST, DAMAGED, SAMPLE OR REVIEW COPIES**
No royalties will be payable on any sample or review copies of the Work (or part thereof) supplied in any media by the Publisher for promotional, publicity, or similar purposes that the Publisher deems appropriate; or on any copies that may at any time be lost, damaged or destroyed by any cause.

**B. SUBSIDIARY RIGHTS**
1. For the licensing of subsidiary rights in the Work, the Publisher will pay to the Author as follows:

| | Rights | Payment due to Author as % of Net Receipts |
|---|---|---|
| 1.1 | Translation Rights (in all formats) | 40% |
| 1.2 | Electronic Publishing Rights (except e-books), i.e. the right for a third party other than the Publisher, OUP UK or OPL to publish all or part of the Work in any electronic form or medium, whether now known or hereafter devised, including but not limited to publication on CD-ROM or inclusion of all or part of the Work in any online service, electronic information storage, or retrieval system provided by the third party (but excluding e-books, as to which Schedule II Paragraph A3 above applies) | 50% |
| 1.3 | Licensed Reprint Rights: | |
| | Hardcover: on all English language hardcover copies of the Work sold by another publisher reprinted under license from the Publisher, after deduction of the costs of any necessary plate manufacture, transportation or other expenses arising from the licensing of such rights | 50% |
| | Paperback: on all English language paperback copies sold by another publisher reprinted under license from the Publisher, after deduction of the costs of any necessary plate manufacture, transportation or other expenses arising from the licensing of such rights | 50% |

6

AG100148

| | | |
|---|---|---|
| 1.4 | First serialization, i.e. the right for a third party to use all or any portion of the Work in the English language in any format in newspapers, magazines and other periodicals (whether in one or more parts and whether or not also including the electronic edition of such periodical) before the date the Work is first available for sale to the public in book form, including the right to create for such use abridged, adapted and condensed versions of the Work | 90% |
| 1.5 | Second serialization i.e. the right for a third party to use all or any portion of the Work in the English language in any format in newspapers, magazines and other periodicals (whether in one or more parts and whether or not also including the electronic edition of such periodical) on or after the date the Work is first available for sale to the public in book form, including the right to create for such use abridged, adapted and condensed versions of the Work | 50% |
| 1.8 | Sound reproduction, i.e. the rights to create and to use nondramatic English language readings of all or any portion of the Work (including condensed, adapted and abridged versions), whether in the form of records, tape recordings, sound cassettes, compact discs, electronic media or other technologies now known or hereafter devised | 50% |
| 1.9 | Braille, large-type and other editions for the visually impaired or for the disabled or as required by law, unless such rights are granted by the Publisher without charge | 50% |
| 1.10 | All Other Subsidiary Rights not mentioned above (including without limitation Anthology, Quotation, Syndication, Mechanical Reproduction, Permissions, Broadcasting, Television, Dramatic, Film, Video, Microform, Digest, Abridgement, Condensation, Strip Cartoon Picturization, and Merchandising Rights) | 50% |

2. All subsidiary rights not mentioned above will be controlled by the Publisher but the Author will be entitled to a fair percentage of the Net Receipts in line with publishing practices at the relevant time, as determined in good faith by the Publisher.

3. The Author will refer to the Publisher any inquiries s/he may receive regarding the exploitation of subsidiary rights in the Work.

4. For purposes of clarity, it is hereby acknowledged that the Publisher has the right for publicity and promotional purposes to permit without charge the publication or broadcast in any medium of such selections from the Work as may, in the opinion of the Publisher, benefit the sale of the Work.

5. In addition to the exclusive right to sell or license the subsidiary rights, the Publisher will be entitled to exercise such subsidiary rights itself. Except in respect of electronic publishing rights dealt with in Schedule II Paragraph A3 above, in the event that the Publisher itself exercises such rights, "Net Receipts" shall be the amounts actually received by the Publisher, less all reasonable internal and external costs incurred by the Publisher in exercising such rights.

7

AG100149



C.    **ADVANCE PAYMENTS.**

The Publisher agrees to pay the Author an advance against all amounts accruing under this Agreement of ▮▮▮▮▮ payable as follows:

(a)    ▮▮▮▮ on full execution of this Agreement;
(b)    ▮▮▮▮ on acceptance of the Work by the Publisher in accordance with Paragraph 4 of Schedule III of the Agreement;

The terms of this paragraph will not apply to any revised edition of the Work.

8

AG100150



**SCHEDULE III (AMENDED)**
**REVISIONS TO STANDARD TERMS AND CONDITIONS**

The following clauses are in addition to, or replace, in whole or in part, the clauses in Schedule III:

Paragraphs 11.1 and 11.2 are hereby deleted in their entirety.

9

AG100151



**SCHEDULE III**
**STANDARD TERMS AND CONDITIONS**

### 1. GRANT AND COPYRIGHT

1.1. The Author hereby grants and assigns to the Publisher for the legal term of copyright (including any renewals, extensions, reversions and continuations thereof) all rights and interests in the Work and any new or revised, adapted or abridged editions thereof, including without limitation the exclusive rights, by itself and/or with others, to print, publish, republish, transmit, display, sell and distribute the Work and to prepare, publish and distribute derivative works based thereon, in all languages throughout the world, in any form or media of expression whatsoever now known or hereafter developed or invented (including without limitation any form of electronic publication distribution or transmission that the Publisher may wish); and to license such rights to others as set forth in Schedule II Paragraphs A3 and B on such terms as the Publisher may determine.

1.2. The copyright in the Work will belong to the Publisher. The Publisher will cause the copyright notice authorized by U.S. copyright law to be imprinted in each copy of the Work issued by it. The grant in Paragraph 1.1 above includes a grant to the Publisher of the right to secure registration of copyright in the Work in the Publisher's name or any other name the Publisher elects in such countries as the Publisher may deem expedient; the Author agrees to take all steps necessary to effect such registration or any renewal thereof. The Author agrees to execute and deliver to the Publisher any and all documents in proper or customary form necessary or helpful to record in the United States or other copyright office the Publisher's ownership of the copyright in the Work.

1.3. The Author also hereby grants to the Publisher, for the same term as specified in Paragraph 1.1, the right in any medium (whether now known or hereafter devised) to display the Author's name, likeness and biographical information in and on the Work or any portion thereof, in and on any derivative work based thereon and in any advertising, publicity and promotional materials used to market the Work, any portion thereof and/or any such derivative work.

### 2. DELIVERY OF THE WORK

2.1. Time will be of the essence in respect of the delivery date(s) specified in Schedule I.

2.2. Should the Author fail to deliver all the materials specified in Paragraph 1 of Schedule I in form and content satisfactory to the Publisher and/or fail to deliver on the delivery date(s) stated in Schedule I (or on such other date(s) as may be agreed in writing), then the Publisher, after giving the Author thirty (30) days' written notice, may decline to publish the Work. If the Publisher so declines by notice in writing, the Author will refund any part of any amounts paid by the Publisher to the Author under this Agreement within thirty (30) days of a request in writing from the Publisher to do so, upon which repayment this Agreement will terminate.

### 3. PERMISSIONS

3.1. If releases or permission are required for any material contained in the Work (including without limitation textual extracts or illustrations, photographs, maps, diagrams, tables, artwork and/or

Aca(Author)(Net Receipts)                                                                                                    10

AG100152



software), then the Author will obtain satisfactory permissions or releases as needed to reproduce the same in the Work as directed by the Publisher. The Author will forward the originals of the permissions to the Publisher as soon as possible after signing this Agreement and in any event no later than the date agreed with the Publisher for delivery of materials. The costs of permissions will be paid by the Author.

3.2. If the Author fails to clear and/or pay for permissions as stated above, the Publisher has the right to obtain or engage another person or entity to obtain the necessary clearances and/or make the necessary payments to third parties. Any costs incurred by the Publisher in obtaining such clearances will be charged against any amounts due to the Author from the Publisher, unless such amount is insufficient to cover the permission fees, in which case the Author will repay the amounts so paid by the Publisher within thirty (30) days of receipt from Publisher of an invoice therefor.

3.3. If the Work contains a substantial portion of material from documents prepared by a U.S. government employee within the scope of his/her employment and not subject to copyright, the Author will notify the Publisher in writing of the existence and location of such material in the Work.

4.  **ACCEPTANCE OF THE WORK**

4.1. The Work must be satisfactory to the Publisher, in its sole discretion, in organization, content and form. Subject to the foregoing, the Publisher is not obliged to accept the Work for publication unless, in the Publisher's opinion, it is fit for publication and also conforms in all material respects with the specification of the Work in Paragraph 1 of Schedule I, regardless of whether the Publisher may have accepted any partial submissions prior to submission of the final materials or paid any portion of any amounts due as a result thereof. Without limiting the foregoing, the Publisher may conform the manuscript of the Work to its standard style in punctuation, spelling, capitalization and usage. If the Author delivers a manuscript for the Work exceeding the word/page count specified in Paragraph 1 of Schedule I, the Publisher may, at its sole discretion, choose to exercise the rights specified in Paragraphs 2.2 and 4.2 hereof or to accept the manuscript on the condition that the royalty rates specified in Paragraph A1 of Schedule II will be reduced on all editions commensurate to the increase in length.

4.2. If the Publisher does not accept the Work, the Publisher will notify the Author in writing within one hundred twenty (120) days of the Author's delivery of the materials for the Work, giving reasons for not accepting the Work, and the Publisher will, at its option:

    (i)    ask the Author (in writing) to amend the Work by a revised deadline and Schedule I will be deemed amended accordingly. All references in this Agreement to Schedule I will thereafter be deemed to be references to Schedule I as amended; or

    (ii)    terminate this Agreement, in which event the Author will promptly repay to the Publisher any part of any amounts that have already been paid to the Author by the Publisher under this Agreement and neither party will then have any liability to the other in respect of such termination.

5.  **PROOFING AND PREPUBLICATION REVIEW.**
The Author will read, check, and correct the copyedited manuscript and the final proofs of the Work in proof and return them promptly to the Publisher according to a schedule reasonably set by the Publisher, failing which the Publisher may consider the Work as approved for press by the Author and may make the changes it deems necessary and proceed with the publication of the Work. The

AG100153



Publisher will determine which stage of the proofs the Author will read in accordance with the requirements of the Publisher's publication schedule. Apart from errors introduced by the printer or Publisher, all costs of making the Author's corrections, additions or deletions to the proofs or to the preparation and reproduction of artwork in the Work exceeding 10% of the costs of composition of proofs and preparation of such artwork, respectively, will be borne by the Author and will be deductible from payments due to the Author by the Publisher, except that, if the Publisher so requests, payments therefore will be made in cash.

6. **PUBLISHER'S OBLIGATIONS**

6.1. Subject to its acceptance of the finished material (it being acknowledged that the Publisher has the right to make editorial changes to the Work to prepare it for publication), the Publisher will publish the Work at its own expense and in such a form as it considers, in its sole discretion, to be appropriate (including print on demand), and will have the final decision over all matters relating to the production, publication, promotion, advertising, sale and distribution of the Work, including but not limited to the format, imprint, trademark, logo or other identification, title, paper, type, printing, binding, jacket or cover, design, illustration, number and distribution of free copies, print number, price, distribution and terms of sale of the Work and any of subsequent edition or printing.

6.2. All materials supplied by the Author will be returned to the Author if the Author so requests in writing, provided that they are no longer required by the Publisher. If the Author has not requested the return of any materials supplied by the Author within six (6) months after publication of the Work, then the Publisher will have the right to dispose of the said materials as the Publisher wishes.

7. **CONFLICTING WORKS**
During the continuance of this Agreement, the Author will not write, edit, print or publish or cause to be written, edited, printed or published any work that may reasonably be regarded by the Publisher as likely to compete with or prejudicially affect the sale of the Work or the exploitation of any rights in the Work granted to the Publisher under this Agreement.

8. **AUTHOR'S COPIES**
Upon initial publication of the Work, the Author will receive ten (10) copies of the Work free of charge and (subject to availability in inventory) will be entitled to purchase at sixty percent (60%) of the U.S. recommended retail price any further copies of the Work required for the Author's personal use and not for resale.

9. **PAYMENTS AND ACCOUNTING**
Subject to the terms of this Agreement, the Publisher will make to the Author the payments shown in Schedule II.

9.1. The Publisher will compile statements of sales of the Work and of earnings from the sale or licensing of subsidiary rights as of the 31st day of March and the 30th day of September in each year following the initial publication of the Work, and, on or before the 1st day of July and the 2nd day of January following, will deliver such statements together with payments for the amount shown due to the Author. The Publisher reserves the right not to pay sums otherwise due to the Author if the amount due is less than fifty dollars ($50.00), in which case the sum will be carried forward to the next statement period in which the cumulative balance has reached fifty dollars ($50.00).

9.2. In the event the Publisher makes any payment to the Author prior to the first accounting date, such payment will be treated as an advance on royalties, unless otherwise agreed in writing.

Aca(Author)(Net Receipts)                                                                                                12

9.3. For the avoidance of doubt, notwithstanding that the Publisher will generally account to the Author for royalties on the sale of the Work at the time when the sale in question is invoiced to the Publisher's customer, the royalties on such sale are not actually due to the Author until such time as the monies relating to such sale are earned and received by the Publisher in full. All royalties paid to the Author by the Publisher before such monies are earned and received are a returnable advance against royalties due. Any such returnable advance, as well as any overpayment made by the Publisher to the Author in respect of the Work (whether due to bad debts, credits given on returns or otherwise) may be deducted from any sums subsequently due to the Author from the Publisher under this or any other Agreement with the Publisher; provided that if any such overpayment is not recouped by the Publisher within three (3) accounting periods, the Author, upon written request by the Publisher, will pay the Publisher such overpayment. In rendering any statement of sales and earnings and in making any payments hereunder, the Publisher may deduct and withhold a reserve against returns of copies of the Work in a reasonable amount related to the Publisher's expectations at the time the relevant accounting statement is prepared of sales and returns of the Work For the further avoidance of doubt, the Author will be entitled to receive monies earned by the Author under this Agreement only to the extent such monies earned by the Author exceed the total of any advance paid under this Agreement.

9.4. In making any payments to the Author under any provision of this Agreement, the Publisher will have the right to deduct any sums due to the Publisher from the Author and to withhold any amounts required by applicable tax or other law or regulation.

## 10. AUTHOR'S REPRESENTATIONS, WARRANTIES AND INDEMNITY

10.1.   The Author represents and warrants to the Publisher and its assignees and licensees that: the Author owns and has the right to convey all of the rights conveyed herein to the Publisher and has the unencumbered right to enter into this Agreement; the Author is the sole author of the Work (or of the Author's contribution to the Work, as the case may be);  the Work or the Author's contribution to the Work is original and has not previously been published in any form (except for material of others included in the manuscript with the Publisher's written consent and the written permission of the copyright proprietor or written confirmation of the Publisher's determination that permission is not needed); the Work is in no way whatsoever a violation or infringement of any existing copyright or license or duty of confidence or duty to respect privacy or any other right of any person or party; neither the Work nor any material portion thereof is, or will be during the statutory term(s) of copyright, in the public domain; the Work contains nothing that violates any right of privacy, is defamatory or otherwise violates any other right of any kind of any person or entity, nor does the Work contain anything that is obscene or in any other way unlawful or misleading; the Author has not misrepresented to the Publisher the Author's academic or other credentials; and all statements in the Work purporting to be facts are true and any recipe, formula, diagram, table, recommended treatment, dosage or instruction contained therein, whether textual or illustrative, and whether intended to be informative or instructional, is based on the best information currently available.

10.2.   The Author agrees to indemnify and hold harmless the Publisher, its affiliates, assignees, and licensees and its and their respective directors, officers, members, managers, employees, agents, distributors and customers (each, an "Indemnitee") against any damage, loss, liability, injury, or cost or expense (including without limitation reasonable attorneys' fees and costs), settlement or judgment arising out of any claim (a "claim") by third parties that any of the above representations or warranties has been breached. If a claim is brought against an Indemnitee, the Publisher will have the right to defend with counsel of its own choice. The Author agrees to cooperate in the defense and will have the right to participate in the defense at the Author's own expense. The Publisher may withhold payments due or to become due to the Author under this Agreement pending the final

Aca(Author)(Net Receipts)                                                                                                                13

AG100155

resolution of the claim and/or apply any such payments to the reduction of the obligations of the Author to the Indemnitees described in this Paragraph 10.2.

10.3.    All representations, warranties and indemnities contained in this Agreement will survive the expiration or termination of this Agreement.

## 11. NEW EDITIONS

11.1.    The Author will, if called upon to do so by the Publisher and without additional charge to the Publisher, prepare new editions of the Work as may be needed to keep the Work up to date on a schedule the Publisher reasonably requests.

11.2.    In the event that agreement is not reached within a reasonable time (not exceeding three [3] months) on the terms for the preparation of a new edition or if, for any reason, the Author does not or cannot timely prepare a new edition in form and content satisfactory to the Publisher after a reasonable opportunity has been provided for doing so, the Publisher may employ an alternative person or persons to prepare that and any subsequent edition of the Work in such a manner as the Publisher may consider appropriate. In such event, the Publisher will be entitled to deduct all or part of the remuneration payable to such person(s) from any royalties payable to the Author on such edition(s), provided that the Author will be paid no more than 50% of the royalties otherwise due or to become due to the Author under the terms of this Agreement for the first such edition of the Work in which the Author does not participate; no more than 25% of such royalties for the second edition of the Work in which the Author does not participate; and no royalties for the third and subsequent edition of the Work in which the Author does not participate. Also in such event, the Publisher may (but will not be obligated to) publish the Work in the joint names of the Author and such person(s) or under such names and in such style as the Publisher may (at its sole discretion) consider appropriate in the circumstances.

## 12. DEATH OR DISABILITY OF AUTHOR

12.1.    In addition to the rights granted to the Publisher pursuant to Paragraph 4.2 above, if the Author be prevented by disability or death from completing the Work, the Publisher may, at its option, either:

   (i)    purchase from the Author's executors administrators or assigns (as the case may be) such writings the Author has done in respect of the Work and a grant and assignment of the copyright therein at a price to be agreed in lieu of any monies that would otherwise be owing pursuant to this Agreement if the Author had completed the Work, and entrust the completion of the Work to another party; or

   (ii)   terminate the Agreement by notice in writing, without liability for any payment to the Author's executors administrators or assigns.

## 13. WASTING AND REMAINDERING
If, in the Publisher's opinion, the Work has ceased to have a sufficiently remunerative sale, the Publisher may remainder and/or waste any remaining stock, but will not do so within twelve (12) months after first publication of the Work, unless otherwise agreed with the Author.

## 14. REVERSION OF RIGHTS

14.1.    If, at any time after five (5) years from Publisher's initial publication of the Work, the Work becomes "unavailable for sale" (as defined below), the Publisher will, within six (6) months after

AG100156

receipt of a written request from the Author for reversion of rights in the Work, either (a) arrange for the reprinting or reissuing of the Work by the Publisher or a licensee, or (b) terminate this Agreement and, upon payment to the Publisher of any sums owed by the Author to the Publisher, revert all rights in the Work to the Author, subject to the provisions of the remainder of this Paragraph. For purposes hereof, the Work will be considered "unavailable for sale" if there is no edition of the Work published or licensed by the Publisher available for sale in any English language edition and there is no agreement in place between the Publisher and a third party for the publication within a reasonable period of a sublicensed edition in the English language; the Work will not be considered "unavailable for sale" if it is available via regular retail channels. Notwithstanding the foregoing, if it is not possible for the Publisher to reprint or reissue the Work for reasons connected with any war, strikes, lockouts, or other circumstances beyond the Publisher's reasonable control, the Work will not be considered "unavailable for sale."

14.2.   Any agreement entered into before the termination of the Publisher's rights in the Work (whether under Paragraph 14.1 or any other provision of this Agreement) will continue in force for the duration of its term and the Publisher will continue to receive and retain the proceeds therefrom (paying the Author the Author's royalties or other earnings on such proceeds). The Publisher may, following termination, sell or otherwise dispose of any remaining stock on hand at the date of termination and any copies returned thereafter and may print and sell additional copies to the extent necessary to meet the above-described pre-existing contractual commitments.

## 15. OPTION

The Publisher will have the first opportunity to read and consider for publication the Author's next work. If the Publisher and Author are unable to agree to terms for its publication within a reasonable period, the Author may enter into an agreement with another publisher, provided that the Author will not subsequently accept from anyone else terms equivalent to or less favorable than those offered by the Publisher.

## 16. JURISDICTION AND CHOICE OF LAW

This Agreement will be governed and interpreted according to the laws of the State of New York as if executed and fully performed in New York, but without regard to the State's principles of conflicts of laws. The Federal and State courts located in New York county will have exclusive jurisdiction over any disputes arising in connection with this Agreement and each of the parties hereby consents to the jurisdiction of such courts.

## 17. GENERAL

17.1.   This Agreement may not be amended, varied, or supplemented except by a writing signed by the parties or their duly authorized representatives. This Agreement sets forth the entire agreement between the parties regarding its subject matter and supersedes and replaces all prior discussions, arrangements, and agreements (whether written or oral) relating thereto. In the event of any conflict between this Schedule III and either or both of Schedule I and Schedule II, the provisions of Schedule I and/or Schedule II (as relevant) will control.

17.2.   The invalidity or unenforceability of any provisions of this Agreement will not affect the validity or enforceability of any other provisions, which will remain in full force and effect. The parties will use their best efforts to achieve the purpose of any invalid provision by a new, legally valid stipulation. No failure or delay on the part of either party to exercise any right or remedy under this Agreement or any single or partial exercise of such right or remedy will be construed as a waiver thereof.

AG100157

17.3.   The Publisher may assign this Agreement or any of its interests in it and may delegate its duties. Because this Agreement is a personal service contract, the Author may not assign it nor may the Author delegate its duties without the Publisher's prior, written consent; provided, however, that the Author may assign any monies due or to become due to the Author under this Agreement upon giving the Publisher written notice of such assignment. Any assignment in contravention of this Paragraph will be null and void and of no force or effect. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Publisher and the successors, heirs and estate of the Author.

17.4.   Any notice required or permitted to be given under this Agreement will be sufficient if sent to the address for each of the parties set forth at the beginning of this Agreement (unless the relevant party has specified different contact details by thirty (30) days' notice to the other) by regular or first class mail, overnight delivery or by personal delivery (unless the provision regarding such notice calls for another type of dispatch, in which case such type of dispatch will be required). Such notices will be deemed given: three (3) business days following the date of posting if sent by mail; one (1) business day following the date of posting by overnight delivery or by personal delivery (provided that receipt of such delivery is evidenced by signature for and on behalf of the addressee).

AG100158



**MM**

## ST. MARTIN'S PRESS, LLC
### AUTHOR CONTRACT

This Agreement is made as of ▬▬▬▬, **2011** (the "Effective Date") between ▬▬▬▬▬▬ (the "Author") and St. Martin's Press, LLC, 175 Fifth Avenue, New York, NY 10010 (the "Publisher").

The Author and the Publisher mutually agree to the following:

### THE WORK, THE GRANT OF RIGHTS, TERRITORY AND DURATION

1.  (a)  This Agreement concerns **two** individual works provisionally entitled

▬▬▬▬▬▬▬▬

**#2) UNTITLED #2**

to be written by ▬▬▬▬▬▬ which will be works of **fiction**, each approximately ▬▬▬ in length, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (each work hereinafter referred to individually as a "Book" and collectively as the "Work").]

(b)  The Author grants to the Publisher the sole and exclusive right to exercise and license (i) the right to reproduce, publish, distribute and sell ("publish") the full length Work in the English language in a product reproduced in print-on-paper or other physical media ("book form"), (ii) the right to use the full length content of the Work in the English language in electronic media, and (iii) the additional and subsidiary rights in the Work specified in paragraph 4 below, in the following territory: **throughout the World (the "Exclusive Territory").**

~~Notwithstanding the foregoing, for any country listed on Exhibit A whose copyright laws require publication or distribution of a book in that country within a specified period of time from original publication in order to secure or maintain full copyright protection, if the Work is not published in that country within that specified period of time then the Publisher will have the non-exclusive right to ship its editions of the Work into that country.~~

If the Work consists of more than one Book, the rights granted in this Agreement will apply to each Book separately.

(c)  Each of the rights granted in this Agreement is granted for the full period(s) of copyright protection (including all renewals and extensions) provided under any copyright laws now or hereafter in force in each country included within the territory granted to the Publisher.

### ADVANCE

2.  The Publisher will pay the Author, or the Author's duly authorized representative, as an advance against the Author's earnings from all sources under this Agreement, the sum of ▬▬▬ ▬▬▬▬▬▬▬ (the "Author Advance"), payable as follows:

AG100159





███████████ on signing of this Agreement; ███████████ upon the Author's delivery and the Publisher's acceptance of the complete and final manuscript of #1) ███████████; and ███████████ upon the Author's delivery and the Publisher's acceptance of the complete and final manuscript of #2) UNTITLED.

If the Work consists of more than one Book, unless otherwise specified in this Agreement, for the purposes of paragraphs 9, 11 and 12 only, amounts paid on signing will be "attributable" in equal proportions to each Book comprising the Work and amounts due on delivery and acceptance or publication in any form of a particular Book, or within a specified period of time after delivery and acceptance or publication of a particular Book, will be "attributable" to that Book. However, for all other purposes, all amounts paid as advances under this Agreement will be treated as a single advance against earnings from all sources with respect to all the Books.

**ROYALTIES**
3.      So long as copyright protection subsists in the Work, the Author will earn the following royalties:

(a)      *Hardcover Editions.*  On sales by the Publisher of copies of its hardcover editions of the Work, except as specified in subparagraphs (h) through (n) below, ten percent (10%) of the list price on the first five thousand (5,000) copies sold, twelve and one-half percent (12½%) of the list price on the next five thousand (5,000) copies sold and fifteen percent (15%) of the list price on all copies sold thereafter.

(b)      *Paperback Editions.*  On sales by the Publisher of copies of its paperback and paper-over-board editions of the Work (other than mass-market paperback editions, which are covered in the next subparagraph), except as specified in subparagraphs (h) through (n) below, seven and one-half percent (7 ½%) of the list price on all copies sold.

(c)      *Mass-Market Paperback Editions.*  On sales by the Publisher of copies of its mass-market (i.e., rack size) paperback editions of the Work, except as specified in subparagraphs (h) through (n) below, eight percent (8%) of the list price on the first one hundred and fifty thousand (150,000) copies sold, and ten percent (10%) of the list price on all copies sold thereafter.

(d)      *Electronic Editions.*  With respect to any exploitation of all or any portion of the Work in electronic media by or on behalf of the Publisher or a licensee of the Publisher, except as specified in subparagraphs (e) through (g) below, a royalty equal to twenty-five percent (25%) of the amount received by the Publisher (except that if the exploitation is pursuant to a license of rights in both print and electronic media, the Author will earn a share under paragraph 5 in connection with such license and no royalty will be payable under this paragraph 3(d) in connection with such license).

If, at any time after the effective date of this Agreement, either (i) the Publisher's standard royalty with respect to exploitation of all or any portion of the Work in electronic media is a higher percentage of the amount received by the Publisher than the percentage specified in this

2

AG10016C

subparagraph 3(d), or (ii) the Publisher and the Author, agree, for future agreements with the Author, upon a standard royalty with respect to exploitation of all or any portion of the Work in electronic media that is a higher percentage of the amount received by the Publisher than the percentage specified in this subparagraph 3(d), then the Publisher agrees that, upon its receipt of a written request from the Author, this subparagraph will automatically be deemed to be amended, effective as of the beginning of the first full royalty accounting period commencing after the Publisher's receipt of such written request, to substitute such higher percentage royalty with respect to such exploitation in electronic media for the percentage now set forth in this subparagraph.

(e)       *Graphic Books.*  On sales by the Publisher of copies of its print-on-paper editions of Graphic Books, except as specified in subparagraphs (h) through (n) below, six percent (6%) of the list price. With respect to any exploitation of the Publisher's editions of Graphic Books in electronic media by or on behalf of the Publisher or a licensee of the Publisher, a royalty equal to ten percent (10%) of the amount received by the Publisher.

(f)       *Audio Editions.*  With respect to any exploitation of the Publisher's Audio Editions by or on behalf of the Publisher or a licensee of the Publisher's edition in physical media form, except as specified in subparagraphs (h) through (m) below, a royalty equal to ten percent (10%) of the amount received by the Publisher.  With respect to any exploitation of the Publisher's Audio Editions by or on behalf of the Publisher or a licensee of the Publisher's edition in electronic media by means of transmission, uploading, downloading, broadcast or similar means or methods (but excluding delivery of the Audio Edition in physical media form, such as on a CD) ("digital downloads"), a royalty equal to twenty percent (20%) of the amount received by the Publisher.

(g)       *Multimedia Rights and Game Rights.*  With respect to any exploitation of Multimedia Rights, and any use of Games in electronic media by or on behalf of the Publisher or a licensee of the Publisher, a royalty equal to ten percent (10%) of the amount received by the Publisher (except that if the exploitation is of a work created by a licensee pursuant to a license of Motion Picture and Television Rights or Game Rights, the Author will earn a share under paragraph 5 in connection with such license and no royalty will be payable under this paragraph 3(g) in connection with such license).

(h)       *High Discount, Special Sales and Remainder Sales.*  On sales by the Publisher of copies of its editions of the Work in book form, and copies of its Audio Editions and Graphic Books in physical media form, except as specified in subparagraphs 3(i) through (n) below:

(i)       *Hardcovers.*

(1)       when sold at discounts from 48% through 54% (inclusive) from the Publisher's list price, a royalty equal to the prevailing royalty rate in subparagraph (a) above less two and a half percentage points (2 ½%); and

3

AG100161



(2)     when sold at discounts greater than fifty-four percent (54%) and less than seventy-five percent (75%) from the Publisher's list price, a royalty equal to ten percent (10%) of the amount received by the Publisher.

(ii)     *Paperbacks.*

(1)     with respect to all paperbacks and paper-over-board editions (but excluding mass market paperback editions), when sold at discounts greater than or equal to fifty percent (50%) but less than seventy-five percent (75%) from the Publisher's list price, a royalty equal to ten percent (10%) of the amount received by the Publisher; and

(2)     with respect to mass market paperback editions, when sold at discounts greater than or equal to fifty-five percent (55%) but less than seventy-five percent (75%) from the Publisher's list price, a royalty equal to ten percent (10%) of the amount received by the Publisher.

(iii)     *Hardcovers, Paperbacks, and Audio Editions* ~~*and Graphic Books*~~ *in physical media form.*

when sold at discounts of seventy-five percent (75%) of list price or more, a royalty equal to ten percent (10%) of the amount determined by deducting all manufacturing costs of the copies so sold from the amount received by the Publisher.

(i)     *Export.* On sales by the Publisher of copies of its hardcover and mass market editions of the Work, and copies of its Audio Editions ~~and Graphic Books~~ in physical media form, except as specified in subparagraph (k) below, when sold by the Publisher for resale outside of the United States, a royalty equal to ten percent (10%) of the amount received by the Publisher, except that if the Author will be entitled to a share under paragraph 5 in conjunction with such sales, then no royalty will be payable under this paragraph 3(i). On sales by the Publisher of copies of its trade paperback and paper-over-board editions, except as specified in subparagraph (k) below, a royalty equal to seven and one-half percent (7 ½%) of the amount received by the Publisher, except if the Author will be entitled to a share under paragraph 5 in conjunction with such sales, then no royalty will be payable under this paragraph 3(i).

(j)     *Direct Consumer Sales.* On sales by the Publisher of copies of its editions of the Work in book form, and copies of its Audio Editions ~~and Graphic Books~~ in physical media form, when sold by the Publisher or a U.S. affiliate of the Publisher directly to the consumer, whether by mail order solicitation, coupon or direct mail, from a website, through solicitation by radio or television or over any digital or cellular network, or otherwise, a royalty equal to ten percent (10%) of the amount received by the Publisher on the first 10,000 copies sold directly to the consumer and fifteen percent (15%)of the amount received by the Publisher on all copies sold directly to the consumer thereafter.

(k)     *Premium Sales.* On sales by the Publisher of copies of its editions of the Work in book form, and copies of its Audio Editions ~~and Graphic Books~~ in physical media form, when

4

AG100162



sold by the Publisher in a premium sale or sold to companies or organizations for usage or distribution by them in connection with their own activities or with the sale of their own products or services, a royalty equal to five percent (5%) of the amount received by the Publisher.

(l)     *Short-run Printings.*  On sales by the Publisher of copies of its editions of the Work in book form, and copies of its Audio Editions ~~and Graphic Books~~ in physical media form, when sold by the Publisher from any reprinting of 1500 copies or less (excluding individual copies printed on a print-on-demand basis) made at least twelve (12) months after initial publication of that edition, provided the regular sales of that edition of the Work during the royalty period immediately preceding the royalty period in which such a reprinting occurs have not exceeded five hundred (500) copies, a royalty equal to one-half (1/2) of the royalty rate that would otherwise apply to that sale under this paragraph 3.

(m)     *Collections.*  On sales by the Publisher of copies of its editions of any collection, omnibus volume, anthology or other compilation (a "Collection") in physical media form that includes the English language text of the Work (as well as any artwork included in the Work) and/or of any Audio Editions ~~or Graphic Books~~, except as specified in subparagraph (n), a royalty equal to the otherwise applicable royalty as provided herein prorated based on the number of works in the Collection.

(n)     *Free Copies.*  With respect to copies given away free for publicity or promotional purposes, or to induce additional sales, and with respect to copies destroyed or given or sold to the Author, no royalty will be payable.

(o)     *Definition of Amount Received by the Publisher.*  When used in this Agreement, except as provided below, "amount received by the Publisher" means sums of money actually received by the Publisher.In the case of use of the Work or any Derivative Work in electronic media:

(i)     "amount received by the Publisher" means sums of money actually received by the Publisher from any third party in exchange for the right to use (or authorize the usage of) all or any portion of the Work or the Derivative Work, whether for a copy delivered on physical media or a copy delivered digitally, or for access to (or the right to grant access to), all or any portion of the Work or the Derivative Work in any electronic media; and

(ii)     if any amount received by the Publisher is attributable to the use in electronic media of the Work or the Derivative Work and any other works, the Publisher will determine the portion of such amount that is attributable to the Work as follows:  (1) if the Publisher receives from a third party an allocation of the amount it receives among the works used, the Publisher will utilize such allocation; and (2) in the absence of any such third-party allocation, the Publisher may utilize a determination of end user access to or unique page views of the Work or the Derivative Work (in each case including an estimate determined by sampling) or the ratio of the list price of the Work or the Derivative Work to the total of the list prices of all of the works to which the amount is

5

AG100163



attributable or, if none of the foregoing methods is applicable, the Publisher may utilize any other method of allocation it determines in good faith to be equitable.

Taxes included in the amount received; any insurance, shipping, mailing, freight, duties, customs clearance or other similar charges included in the amount received; any payment made to reimburse the Publisher for manufacturing costs; any charges for use of a digital delivery service included in the amount received; any foreign tax withholdings; and any fees or commissions paid by the Publisher to finders or third-party sales or licensing agents in connection with the transaction will be deducted from the sums of money actually received.  All references to the Work in subparts (i) and (ii) in this subparagraph (o) will include Derivative Works.

~~(p)——If the Publisher or a U.S. affiliate of the Publisher creates or commissions the creation of text and/or art for a Graphic Book edition by a writer and/or artist (or writer/artist team) ("Commissioned Graphic Book Material"), then the Publisher will recoup the amounts paid or to be paid to such writer and/or artist (or writer/artist team) in connection with the creation of the Commissioned Graphic Book Material as follows: (1) any royalty payable to the Author under paragraph 3 from sales by the Publisher of a Graphic Book edition that uses Commissioned Graphic Book Material will be reduced by any royalty paid or to be paid on such sales to the writer and/or artist (or writer/artist team) of the Commissioned Graphic Book Material; and (2) the Author's share under paragraph 5 of any amounts received by the Publisher from any license to a third party granting the right to use Commissioned Graphic Book Material will be calculated based on the difference between the amount received by the Publisher from such license less the amount paid or payable by the Publisher or its U.S. affiliate to such writer and/or artist (or writer/artist team) with respect to the Commissioned Graphic Book Material.~~

(q)     In all cases in subparagraphs (a) through (m) above, the computation of the number of copies sold will be net of returns. Notwithstanding anything to the contrary contained herein, (i) if any royalty rate specified in this paragraph 3 is to escalate by reason of the number of copies sold, then no sales at discounts of fifty-four percent (54%) of list price or any higher discounts will be taken into account for the purpose of determining the rate to be applied, and sales made by the Publisher or a U.S. affiliate of the Publisher direct to the consumer will only be taken into account for the purpose of determining the royalty rate to be applied under subparagraph 3(j); (ii) if the list price of an edition is reduced by the Publisher for the purposes of any sale so that the reduced list price is at least forty percent (40%) lower than the list price of that edition when initially published then, for the purposes of calculating the amount of any discount upon such sale only, the list price of that edition will be deemed to be the initial list price; and (iii) if by arrangement with any customer of the Publisher the discount applicable to a sale is increased in exchange for a waiver by the customer of the right to return copies previously sold to that customer at a lower discount, then the higher discount will be used for purposes of determining the royalty rate applicable to the sale of those copies.  If the Work consists of more than one Book or a Book or the Work is published in more than one edition, the applicable royalty set forth in the various subparts of this paragraph 3 will apply separately to each Book and each edition; accordingly, in determining whether particular sales levels have been reached for the purposes of fixing the applicable royalty rate, only sales of the Book in the edition for which the calculation is being made will be included. In any case in which the Author would otherwise be entitled both to earn a royalty under this paragraph 3 and to earn a percentage of the

6

AG100164



amount received by the Publisher under paragraph 5 on the same sale or receipts, the Author will earn a royalty in accordance with this paragraph 3 (but will not also be entitled to payment under paragraph 5), except where this paragraph 3 provides that no royalty will be due (in which case the Author will receive no royalty) or expressly states that the Author will be entitled to a payment under paragraph 5 (in which case the Author will receive the share specified in paragraph 5 of the amount received by the Publisher). If a U.S. affiliate of the Publisher publishes any edition of the Work or a Derivative Work, its edition will be treated as the Publisher's (and sales by the affiliate will be treated as sales by the Publisher) for the purposes of this Agreement.

**ADDITIONAL AND SUBSIDIARY RIGHTS**

4.      The following additional and subsidiary rights in the Work are included in the grant of rights and defined as follows:

(a)      "First Serial Rights," meaning the rights to use all or any portion of the Work in the English language in newspapers, magazines and other periodicals (whether in one or more issues) before the date the Work is first available for sale to the public in book form, including the right to create for such usage abridged, adapted and condensed versions of the Work.

(b)      "Second Serial Rights," meaning the rights to use all or any portion of the Work in the English language in newspapers, magazines and other periodicals (whether in one or more issues) on or after the date the Work is first available for sale to the public in book form, including the right to create for such usage abridged, adapted and condensed versions of the Work.

(c)      "Selection Rights," meaning the rights (i) to create condensed, adapted and abridged English language versions of the Work, to publish and to use those versions; (ii) to use any portion of the English language text of the Work (as well as any artwork included in the Work) in electronic media; (iii) to use all or any portion of the English language text of the Work (as well as any artwork included in the Work) as part of a Collection in any media granted to the Publisher by this Agreement, and (iv) to grant permissions to use all or any portion of the Work in print and other media granted to the Publisher by this Agreement (including but not limited to reprographic and other image processing technologies for storage, display and printing of images of the printed page).

(d)      ~~Graphic Book Rights," meaning the rights: (i) to create (or have created) Graphic Books in the English language based on the Work and to publish those Graphic Books in book form; (ii) to publish and to use those Graphic Books (as well as text, art or other excerpts from those Graphic Books) in electronic media and in any other form or media, and to exercise and exploit in connection with those Graphic Books the same additional and subsidiary rights that are granted to the Publisher by this Agreement in the Work; and (iii) to use the title of the Work in connection with, and in the advertising, promotion and publicity for, those Graphic Books. A "Graphic Book" as used anywhere in this Agreement means a work derived from the Work consisting of sequential art with captions, boxes and/or bubbles of text (which text may be original, adapted from the Work and/or taken verbatim from the Work, and will include any Alt-text). Graphic Book Rights include, without limitation, the right to incorporate plot elements, characters, fanciful places, situations, facts, ideas and events taken or derived from the Work into a Graphic Book.~~

AG100165



(e)    "Sound Reproduction Rights," meaning the rights to create, to publish and to use in electronic media, non-dramatic English language readings of all or any portion of the Work (including condensed, adapted and abridged versions), together with introductory, concluding, transitional and narrative material, as well as background music and/or other incidental or background sounds, whether in the form of records, tape recordings, sound cassettes, compact discs, electronic media or other technologies now known or hereafter devised ("Audio Editions").

(f)    "Non-dramatic Reading Rights," meaning the rights to perform non-dramatic human voice readings of the Work (including, but not limited to, non-dramatic readings broadcast or transmitted by television or other electronic media, whether live or pre-recorded) with the right to accompany the readings with display of text and/or artwork from the Work.  The Publisher may authorize the use of the Work in such forms without royalty or other fee.

(g)    "Translation Rights," meaning the rights to translate the Work into languages other than English, to publish full length translations in book form and to use full length translations in electronic media, and to grant First Serial Rights, Second Serial Rights, Selection Rights, Graphic Book Rights and Sound Reproduction Rights in languages other than English.

(h)    ~~"Multimedia Rights," meaning the rights to create, to publish and to use in electronic media, works in any language based on the Work (including the rights to create, and to incorporate into those works, text, dialogue, sounds, music, artwork, video, animation, moving images, interactive elements, and other matter whether or not taken or derived from the Work or from the plot elements, characters, fanciful places, situations, facts, ideas and events portrayed in the Work), provided, however, that if Motion Picture and Television Rights are not also granted to the Publisher by this Agreement, Multimedia Rights do not include the right to create and use dramatic versions of the Work in electronic media.~~

(i)    ~~"Motion Picture and Television Rights," meaning the rights to exploit the Work and the Author's name (as the author of the Work) in motion pictures (including without limitation made-for-television movies), television series and mini-series ("Motion Pictures"), and in prequels and sequels to such Motion Pictures, together with those allied rights customarily granted to motion picture producers, production companies or studios, and the rights to distribute and sell such Motion Pictures and prequels and sequels by all mechanical or electronic visual reproduction, display and performance, transmission and broadcast methods and technologies now known or hereafter devised (including by means of cassettes, DVDs, and other devices for home play and the right to use such Motion Pictures and prequels and sequels in electronic media).~~

(j)    ~~"Game Rights," meaning the rights to create games of any type, including without limitation board games, video games, electronic games and games to be played over the internet or other digital networks, in any language based on or derived from the Work and/or text, artwork, plot elements, characters, fanciful places, situations, facts, ideas, and events in the Work ("Games"), and to use Games in any manner or media.~~

8

AG100166

(k)     ~~"Dramatic Rights," meaning the rights to create, perform and use live theatrical stage productions and dramatic radio productions based on the Work, and productions that set the Work to music.~~

(l)     ~~"Merchandising and Commercial Rights," meaning the rights to exploit the Work and the Author's name (as the author of the Work), and/or to use material taken or derived from the Work or from the plot elements, characters, fanciful places, situations, facts, ideas and events in the Work, in connection with merchandise, services or other commercial uses.~~

(m)     "Rights to enable access," meaning the rights to reproduce and publish the Work in Braille and to use and authorize the use of the Work or any Derivative Works in any other form and on any devices that enable or facilitate access to the Work for individuals who are blind, who have vision impairments, or who have physical or learning disabilities. The Publisher may authorize the use of any edition of the Work or any Derivative Work in such forms and on such devices without royalty or other fee. Should any amount be received by the Publisher in connection with the exploitation of such rights, the Author will earn the royalty or percentage of the amount received otherwise applicable to the use that resulted in such receipts.

(n)     The following terms will have the following meanings when used in this Agreement:

(i)     "electronic media" means all electronic, magnetic, digital, optical, laser-based and other media, devices and systems for the storage, manipulation, display, retrieval, publication, distribution, broadcast and/or transmission of text, data, images, sounds and/or other information in any electronic form, whether now known or hereafter devised, including, without limitation, disk, CD-ROM, Cdi, DVD, integrated circuit card or chip, cellular device, and the Internet or other digital network, service or database or cellular or other transmission, whether interactive or not;

(ii)     "use" (and its variants), when referring to the rights granted in this Agreement, includes, without limitation, copying or otherwise reproducing, publishing, distributing, selling, displaying, performing, transmitting, uploading, downloading and broadcasting;

(iii)     "periodical" means a newspaper, magazine or similar publication that is published as issues distributed at fixed intervals primarily in print-on-paper formats, and any electronic media versions of those issues (such as a periodical's online digital archive, website or database that makes available the periodical's issues); and

(iv)     "artwork" means photographs, illustrations, paintings and other images (whether created by hand or through means of a camera, computer or other device now known or hereafter devised).

(o)     If any rights granted to the Publisher are not granted to it on a worldwide basis, it may nevertheless exercise or authorize others to exercise the rights granted by means of the internet or any other digital network, service or database or by cellular or other transmission (i) if the network, service, database or transmission is targeted primarily to customers or users within the

9

AG100167



territory granted or (ii) through any third-party distributor or service provider primarily serving customers within the territory granted, in each case even if some persons outside such territory may have access to such network, service, database or transmission. If the Publisher is granted rights under multiple subparts above (e.g., both Selection Rights and Sound Reproduction Rights), it may combine or authorize the combination of such rights into single products or services.

## LICENSING – SHARING OF RECEIPTS

5.     The Author will earn amounts equal to the percentages indicated below of the amount received by the Publisher from licenses to others by the Publisher of the following rights:

| | | | |
|---|---|---|---|
| (a) | English language Book Publication Rights (including book club or similar organizations) when licensed for exercise in the United States, its territories and dependencies and Canada (regardless of any additional territory granted) | | 50% |
| (b) | English language Book Publication Rights (including book club or similar organizations) when licensed for exercise solely outside the United States, its territories and dependencies and Canada | | 75% |
| (c) | First Serial | | 90% |
| (d) | Second Serial | | 50% |
| (e) | Selection (excluding book club and similar organizations) | | 50% |
| (f) | ~~Graphic Book~~ | | ~~50%~~ |
| (g) | Sound Reproduction | | 50% |
| (h) | Non-dramatic Reading | | 50% |
| (i) | Translation | | 75% |
| (j) | ~~Motion Picture and Television~~ | | ~~75%~~ |
| (k) | ~~Game~~ | | ~~75%~~ |
| (l) | ~~Dramatic~~ | | ~~75%~~ |
| (m) | ~~Merchandising and Commercial~~ | | ~~75%~~ |

"Book Publication Rights" as used herein means the right to publish the Work in book form (whether or not other rights are also granted as part of the license).

If the Publisher elects to itself exercise any of the above rights for which a royalty is not provided elsewhere in this Agreement, the Author will earn royalties with respect to the

10

AG100168





exercised rights in amounts consistent with applicable industry standards as reasonably determined by the Publisher.

## INTELLECTUAL PROPERTY OWNERSHIP

6.     (a)     *Copyright in the Work.* The copyright in the Work will belong to the Author. The Publisher agrees to imprint the copyright notice authorized by the United States copyright laws in each copy of the Work distributed by the Publisher. The Publisher is hereby authorized to register the copyright in the Work in the United States copyright office in the name of the Author, and the Publisher agrees to register the copyright of the Work in the name of the Author in the United States within three months of the Publisher's initial publication of the Work (provided, however, that the Publisher will not be obligated to register the copyright if, prior to the time of publication, the U.S. copyright law is amended so that registration is no longer a prerequisite to the recovery of attorneys' fees and statutory damages in an infringement action). If the Work consists of more than one Book, the provisions of this subparagraph (a) will apply separately to each Book comprising the Work. With respect to any rights reserved to the Author hereunder, the Author agrees to take all steps necessary to protect the copyright in the Work.

    (b)     *Copyright in Derivative Works.* The copyrights in any derivative works based on the Work that this Agreement authorizes the Publisher to create or to authorize others to create ("Derivative Works"), including without limitation the performance copyright in any sound recordings this Agreement authorizes the Publisher to create or authorize others to create, will, at the Publisher's option, be owned by the Publisher or a U.S. affiliate of the Publisher and/or any licensee of the Publisher and the Publisher may register or authorize its U.S. affiliate or its licensee to register any such copyright in its own name, it being understood that such registration does not affect the ownership of the copyright in the Work.

    (c)     *The Publisher's Intellectual Property.* The Author acknowledges that the Publisher has sole and exclusive ownership of the Publisher's trademarks, trade names, logos, series names, imprints and any other source identification now or hereafter used by the Publisher on and/or in connection with the Work or its exercise of the rights granted in this Agreement, as well as any trade dress,an y graphic art or designs, and such advertisements and promotional materials as may be created or commissioned by the Publisher for usage on, in and in connection with its publication of the Work and its exercise of such rights (the "Publisher's Intellectual Property"). Nothing in this Agreement (including, but not limited to, the right of the Author to purchase copies of the Publisher's editions on termination), and no reversion of rights in the Work, will permit the Author to use the Publisher's Intellectual Property during the term of this Agreement or thereafter, without first obtaining the Publisher's consent in writing.

## RIGHTS RESERVED TO THE AUTHOR

7.     All rights in the Work now existing, or which may hereafter come into existence, except those specifically granted to the Publisher in this Agreement, are reserved to and by the Author (the "Reserved Rights"). The Author may exercise and grant licenses for the exploitation of any Reserved Rights subject to the following limitations: the Author agrees that during the term of this Agreement (a) the Author will not exercise or authorize others to exercise the Reserved Rights in competition with or to the detriment of the Publisher; (b) the Author will not authorize or arrange for the publication, in book form or electronic form primarily intended to be read (or

11

AG100169



other form or media granted to the Publisher), of a novelization, tie-in, adaptation or other version of (i) the Work or (ii) a work in another medium based on the Work or from which the Work was derived (and the Author represents, warrants and covenants that the Author has not previously authorized or arranged for any such publication).

**COMPETITIVE WORKS**
8.      (a)      The Author will not authorize or arrange for the publication, distribution or sale in the Exclusive Territory, otherwise than by the Publisher, of any work by the Author (or anyone who receives an author's credit on the Work) that will directly compete with the Work or diminish the value of any rights granted to the Publisher by this Agreement where such publication, distribution or sale will take place at any time during the term of this Agreement. If the Work consists of more than one Book, all references to the Work in subparagraphs (a) above and (f) and (g) below will be deemed to refer to each of the Books comprising the Work considered separately.

        (b)      Except as otherwise disclosed by the Author in writing to the Publisher prior to the execution of this Agreement, and excluding other books that may already be under separate contract to the Publisher, the Author will complete the Work and deliver it to the Publisher prior to commencing the writing of any other book.

        (c)      If the Work consists of one or more books in a series, the Author agrees that additional books in the series will not be written until all the book(s) in the series in which the Publisher has been granted rights have been completed and delivered to the Publisher, and the Author will not authorize or arrange for the publication of any additional book in the series prior to the first to occur of: (i) the first anniversary of the Publisher's first publication in book form of the last book under contract to the Publisher in the series or (ii) six months after the publication by the Publisher of a paperback edition of the last book under contract to the Publisher in the series.

        (d)      If the Work is a work of fiction, the Author will not authorize publication of any other novel in hardcover or paperback book format within the Exclusive Territory to be published prior to the end of six (6) months after the Publisher's first publication of the Work in book form (excluding a novel for which the Author is already under contract to another publisher and reprint editions of previously published novels).

        (e)      If, under the terms of this Agreement, the Author has retained First Serial Rights in the Work, the Author will obtain the prior approval of the Publisher before licensing such rights to a third party. The Author will in no event authorize the licensee to distribute, sell, anthologize or sublicense the serialization individually.

        (f)      If, under the terms of this Agreement, the Author has retained any publication rights in the Work in the English language, the Author will obtain the prior approval of the Publisher of any arrangement made for publication of the Work in the English language where such publication would precede the Publisher's initial publication of the Work in the United States in book form.

12

AG100170





(g)     If, under the terms of this Agreement, the Author has retained any Sound Reproduction Rights, the Author will ensure that no Audio Edition of the Work is published where such publication would precede the Publisher's initial publication of the Work in the United States in book form.

**THE AUTHOR'S DELIVERABLES**

9.      (a)     The Author will deliver the Books comprising the Work, in form and content satisfactory to the Publisher, on the dates specified for each Book (the "Due Date(s)"), as follows:

▬▬▬▬▬▬▬▬▬▬▬▬▬▬ 2012
**#2) UNTITLED**                         2013

To this end, the Author will deliver: (i) the text of the Work (the "Text"), complete and ready for the copyeditor, in digital file format and in conformity with the Publisher's "Author Guidelines" that are current as of the time of delivery, plus a clean printout of the complete digital file containing the Text, double spaced, on sequentially numbered pages; and (ii) all photographs, charts, maps, illustrations and other artwork described in paragraph 1(a) or otherwise to be included in the Work (collectively, the "Illustrative Materials"), all in a form suitable for reproduction.

(b)     The Author agrees to obtain, and, upon request, to provide to the Publisher, all permissions, releases, licenses and consents (collectively, the "Clearances"), in form acceptable to the Publisher, and sufficient to allow the Publisher to exercise and license all of the rights in the Work granted to the Publisher by this Agreement. If any such Clearances are missing or unsatisfactory, the Publisher may obtain them and the reasonable cost of such Clearances will be deducted from monies otherwise payable to the Author under this Agreement. If the Work is a work of nonfiction and the Publisher concludes that an index is necessary or desirable, the Publisher may have one prepared and the reasonable cost of preparing the index will be deducted from monies otherwise payable to the Author under this Agreement.

(c)     If the Author has not delivered the Work to the Publisher by the end of thirty (30) days after the Due Date, then at any time thereafter the Publisher may, at its option, terminate this Agreement by written notice of termination to the Author. Upon the Publisher's written notice of termination, the Author will repay to the Publisher all sums of money previously paid to or on behalf of the Author under this Agreement and, upon receipt of such sums of money in full, the Publisher will revert to the Author all rights in the Work granted to the Publisher by this Agreement.

(d)     If the Work is delivered to the Publisher and the Publisher concludes that the Work, or any portion thereof, is unsatisfactory but can be revised to the Publisher's satisfaction within a reasonable time, the Publisher will provide the Author with its editorial comments and the Author will deliver a revised manuscript of the Work (in the forms required by subparagraph (a) above) by a deadline reasonably set by the Publisher. If the Publisher concludes that the Work, or any portion thereof, as first submitted cannot be revised to its satisfaction within a reasonable time or if the Author fails to deliver a revised manuscript of the Work by the Publisher's deadline or if the Author delivers a revised manuscript but the Publisher determines that the revised manuscript is still unsatisfactory, the Publisher may reject the Work by written notice to the Author.

13

(e)     If the Work is rejected as provided in subparagraph (d) above, the Publisher will be relieved of all further obligations under this Agreement (including, but not limited to, all obligations to make any further payments for the Work), and the Author will be obligated to repay to the Publisher all monies paid to or on behalf of the Author under this Agreement. If the Author has used best professional efforts to produce a satisfactory manuscript, the Author's obligation to repay such monies to the Publisher will be delayed until the Author has made arrangements with any third party for exploitation of rights in any version of the Work or of any other work on a similar topic; repayment will be made to the Publisher out of the first and, to the extent necessary, all subsequent monies received from any third parties with respect to any version of the Work or of any other work on a similar topic until the Publisher is repaid in full. Upon the Author's receipt of notice that the Work has been rejected, the Author may elect to offer any rights in the Work that were granted to the Publisher by this Agreement to third parties and may enter into contracts granting rights to such third parties if and only if such contracts provide for payment directly to the Publisher of the first and subsequent monies to be paid by such third parties until the Publisher is repaid all monies paid to or on behalf of the Author under this Agreement. If within one year following rejection the Publisher has not been repaid at least fifty percent (50%) of all monies paid to or on behalf of the Author under this Agreement, the Author will promptly pay to the Publisher an amount sufficient to bring the total repaid up to fifty percent (50%) of such sums. Thereafter, the Author will continue to be obligated to repay the Publisher the outstanding balance out of the first and, to the extent necessary, all subsequent monies received from any third parties with respect to any version of the Work or of any other work on a similar topic. Upon the Publisher's receipt of such monies in full, the Publisher will revert to the Author all rights in the Work granted to the Publisher by this Agreement and this Agreement will be deemed terminated in its entirety.

(f)     If the Work consists of more than one Book then, except as otherwise specified herein, subparagraphs (a) through (e) above will apply separately to each Book comprising the Work. Notwithstanding the above, any termination under this paragraph 9, whether by reason of the Author's failure to deliver or the Author's delivery of an unsatisfactory manuscript, will apply only to the particular Book concerned (unless the Publisher otherwise elects), in which case: (i) all rights in the terminated Book will revert to the Author in accordance with subparagraph (c) or (e) above (whichever is applicable), but this Agreement (including, but not limited to, this paragraph 9) will remain in full force and effect with respect to the other Book(s) comprising the Work; (ii) the total Author Advance provided for in paragraph 2 will be reduced to exclude the portion attributable to the terminated Book; and (iii) the Author's obligation to repay amounts advanced will be limited to the portion of the Author Advance paid that is attributable to the terminated Book. The Publisher may elect to have its termination apply also to any other Book(s) comprising the Work that are unpublished at the time of termination (in which case the consequences of termination specified in the preceding sentence as to the terminated Book,a nd the portion of the Author Advance paid that is attributable to it, will also apply to those other Book(s) and the portions of the Author Advance paid that are attributable to them). If the termination of a Book under this paragraph 9 is by reason of the Author's delivery of an unsatisfactory manuscript, and the Author has used best professional efforts to produce a satisfactory manuscript for that Book, the Author's obligation to repay to the Publisher the portion

14

AG100172

of the Author Advance attributable to the rejected Book (and any other Books to which the Publisher elects to have the termination apply) will be governed by subparagraph (e) above.

## EDITING AND CORRECTION OF PROOFS

10.    The Author authorizes the Publisher to make the Work conform to the Publisher's standard style of punctuation, spelling, capitalization and usage and to make other customary copy editing changes, at the Publisher's own expense. The Author will read, revise, correct and return to the Publisher any proofs of the Work furnished by the Publisher by the deadline specified by the Publisher. If the Author fails to return the proofs by that deadline, the Publisher will have the right to proceed to publication without the Author's alterations/corrections. The cost of the Author's alterations in the proofs in excess of ten percent (10%) of the initial setting cost will be charged against the Author's royalty account, except that the Author will not be charged for corrections arising from the typesetter's failure to accurately reproduce the copy-edited manuscript.

## PUBLICATION

11.    (a)    Within eighteen (18) months after the later of its acceptance of the Work (i.e., the Text, the Illustrative Materials and, if so requested by the Publisher, the Clearances) or the Due Date specified in paragraph 9, the Publisher will publish the Work at its own expense, in a format, style, manner and at a price it deems best suited to the sale of the Work. If the Work consists of more than one Book, the Publisher will not be required to publish the second and each subsequent Book comprising the Work prior to twelve (12) months after the Publisher's publication of the immediately preceding Book. Such period(s) will be extended by an amount of time equal to any delay caused by the Author or by circumstances beyond the Publisher's reasonable control (including, but not limited to, those described in paragraph 27). It is understood that the extent and manner of advertising, promotion and publicity, imprint, trademark, logo, cover presentation, quantity printed, list price, number and destination of free copies and all other decisions regarding publication, design, manufacture, distribution, marketing and sale will be at the sole discretion of the Publisher.

(b)    If the Publisher has not published the Work within the time period set forth in subparagraph (a) above, the Author may, at any time thereafter while the Publisher's failure to publish continues, serve a written demand upon the Publisher by certified mail, return receipt requested, requiring the Publisher to publish the Work. If the Publisher's failure to publish persists for six months after the receipt by the Publisher of such a written demand, the Author may terminate this Agreement by written notice of termination sent by the Author by certified mail, return receipt requested, and received by the Publisher prior to publication or commencement of printing. Immediately upon the Publisher's receipt of such notice of termination, this Agreement will terminate and all rights in the Work granted in this Agreement to the Publisher will revert to the Author. In the event of such a termination, such payments as have already been made to the Author under this Agreement as advances will be the Author's to keep in full discharge of all of the Publisher's obligations to the Author under or in connection with this Agreement. No other claims, damages or remedies (whether legal or equitable, and whether founded on breach of contract, tort or otherwise) may be pursued against the Publisher by the Author or the Author's agents, heirs or assigns for the Publisher's failure or refusal under

15

AG100173

any circumstances to publish the Work or to perform any duty owed to the Author where the alleged harm or damage arising therefrom is a failure to publish the Work.

(c)     If the Work consists of more than one Book, subparagraphs (a) and (b) of this paragraph 11 will apply separately to each Book comprising the Work. Any termination pursuant to subparagraph (b) will apply only to the particular Book concerned and the reference to advances contained therein will be deemed to mean the portion of the Author Advance paid that is attributable to that Book; this Agreement will continue in full force and effect with respect to the other Book(s) comprising the Work.

12.     The Publisher will not be obligated to publish or continue to publish the Work if, in the Publisher's judgment, the Work may lead to legal liability. If the Publisher concludes that there appears to be a substantial legal risk on account of the Work, or if a legal claim is asserted against the Work, the Publisher may delay publication or cease publication pending further investigation or the resolution of any such risk or claim. The Publisher may request such revisions to or deletions from the Work as will be necessary in the opinion of the Publisher or the Publisher's legal counsel to remove any such risk or resolve any such claim. If the Publisher submits the Work for legal or other professional review, then the Work will not be deemed accepted until all issues raised by such review have been resolved to the Publisher's satisfaction, regardless of whether any advance installment otherwise payable to the Author on acceptance of the Work has been paid. In any case, no revisions to or deletions from the Work or request for substantiation made by the Publisher or its legal counsel will be deemed to impose on the Publisher any obligation of verification or to affect in any way the Author's warranties, representations, or duty of indemnification under paragraph 21 of this Agreement, which will continue to apply to the Work, whether or not changed at the request of the Publisher or the Publisher's legal counsel. If the Publisher makes the decision to cancel the publication of the Work or to cease distributing the Work as provided for in this paragraph 12, then the Publisher may terminate this Agreement in writing at any time and/or may exercise any other remedies available to it under the circumstances. In the event of such termination of this Agreement, all amounts paid by the Publisher to the Author pursuant to this Agreement will be repaid promptly by the Author to the Publisher. If the Work consists of more than one Book, this paragraph 12 will apply separately to each Book comprising the Work. Any termination pursuant to this paragraph 12 will apply only to the particular Book concerned (unless the Publisher otherwise elects) and the reference to amounts paid by the Publisher to the Author will be deemed to mean those amounts paid that are attributable to that Book. This Agreement will continue in full force and effect with respect to the other Book(s) comprising the Work, except that the Publisher may elect to have its termination apply also to any other Book(s) comprising the Work that are unpublished at the time of termination (in which case the consequences of termination specified in the preceding sentence as to the terminated Book, and the portion of the Author Advance paid that is attributable to it, will also apply to those other Book(s) and the portions of the Author Advance paid that is attributable to them).

**PROMOTION**
13.     (a)     The Publisher and its licensees may use the Author's name, biography, and likeness and any additional material that the Author may deliver to the Publisher in connection with promoting the Work (i) in all editions of the Work and in any Derivative Works, and (ii) in

16

AG100174

connection with the advertising, publicity and promotion of the Work and Derivative Works (including without limitation promotional uses described in subparagraph 13(c) and the exploitation of all rights granted to the Publisher under this Agreement.

(b)    The Author will cooperate with the Publisher in promoting the Work. Upon the Publisher's request, the Author will make himself/herself available to the Publisher to participate in Author tours and other promotional activities (such as, for example, Author blogs, podcasts and online chats) and will prepare and deliver to the Publisher such additional material as the Publisher may reasonably request for the Publisher to use in connection with publicity and promotion of the Work. If, at the Publisher's request, the Author participates in a tour set up by the Publisher, the Publisher will pay for the Author's reasonable travel expenses in accordance with its standard practices for Authors' tours and will consult with the Author concerning the scheduling of the tour.

(c)    To promote the Work and any Derivative Works, the Publisher may (i) distribute copies (such as review copies and advance reading copies) of the Work and any Derivative Works, (ii) use or grant permission to use jackets, covers and/or extracts of the Work and any Derivative Works, and (iii) permit the Work (including early versions of the Work) and any Derivative Works to be included in content search programs in electronic media (and the Publisher may authorize its licensees to do all of the foregoing); promotional uses may be in any print or electronic media or any other media granted to the Publisher by this Agreement. The Publisher may also, to promote the Work and Derivative Works, create and disseminate in any media advertisements and other promotional materials, including without limitation advertisements and promotional materials that utilize dialogue, sounds, music, artwork, video, animation, moving images and/or interactive elements based on the Work or Derivative Works and/or on the plot elements, characters, fanciful places, situations, facts, ideas and events portrayed in the Work or Derivative Works (and the Publisher may authorize its licensees to do all of the foregoing). The Publisher may also distribute or license distribution of products containing a reproduction of the jacket or cover of any edition of the Work and any Derivative Works with the Author's name visible thereon, provided, however, that if any such products are offered for sale by the Publisher or its licensees, the Author will earn thirty-three and one-third percent (33⅓%) of the amount received by the Publisher after deduction of any costs incurred by the Publisher in connection therewith (including, but not limited to, production costs and any fees or royalties paid for use of cover art in the products).

**AUTHOR'S COPIES**
14.    Upon the Publisher's first publication of the Work in book form, the Publisher will give ten (10) free copies to the Author. The Author will also be entitled to five (5) free copies of any paperback reprint edition of the Work published by the Publisher and five (5) free copies of Audio Editions ~~and Graphic Books~~ published by the Publisher in physical media form. If the Work consists of more than one Book, the Author will receive the specified number of copies of each Book comprising the Work. Should the Author desire more copies for personal use, the Author may place pre-paid orders to purchase such copies at one-half the list price, plus shipping charges (subject to availability in inventory). Copies given to or purchased by the Author hereunder are non-returnable, and may not be sold by the Author.

17

AG100175

## SUBSEQUENT EDITIONS

15.     If the Author delivers additional material for inclusion in a subsequent edition of the Work or in any Derivative Works, or delivers any additional material for promotion of any edition of the Work or Derivative Works, the Publisher will have all rights in that subsequent edition of the Work, those Derivative Works and in such additional material as the Publisher has in the Work under this Agreement.

## AUTHOR'S PROPERTY

16.     The Publisher will not be responsible for any greater degree of care of any of the Author's materials in its custody than it takes of its own materials. In addition, except in the case of the Publisher's own gross negligence or intentional misconduct, the Publisher will not be responsible for loss or damage to any materials furnished by the Author. The Author will retain copies of any such materials furnished (or, in the case of photographs, the negative or duplicate positive of each photo) and the Publisher will in no event have any liability with respect to any materials for which the Author fails to do so.

## ACCOUNTING AND PAYMENTS

17.     (a)     Except as otherwise provided herein, the Publisher agrees to send, on its then regular royalty payment schedule for the imprint under which the Work is initially published, semi-annual statements of account following publication. The Publisher will make payment of the amount due, as shown on the statement, at the time the statement is rendered. Notwithstanding any other provision of this Agreement, no earnings will be due or payable to the Author unless and until the Author's earnings under this Agreement exceed the total Author Advance (paid and to be paid in the future) under the terms of this Agreement; once the Author Advance is earned out, the excess of the Author's earnings above the Author Advance will be paid as provided above. In rendering any statements and in making any payments hereunder, the Publisher may deduct and withhold reserves against returns in reasonable amounts. The Publisher may also make any tax or other deductions required by law. If the balance to the credit of the Author at the time any semi-annual statement is prepared is less than fifty dollars ($50.00), no payment will be made to the Author and the amount due will be carried forward; if in any succeeding accounting periods the total balance to the credit of the Author is less than fifty dollars ($50.00), the Publisher may discontinue providing statements until such credit balance totals fifty dollars ($50.00) or more, but the Publisher will send statements and make payments at the written request of the Author.

        (b)     The Author understands that the Publisher may ask the Author to provide certain documentation concerning the Author's taxpayer status, and that unless the Author promptly provides such documentation the Publisher may be required to withhold a percentage of amounts payable to the Author hereunder in accordance with United States tax laws.

        (c)     Whenever the Author has received an overpayment of monies for any reason whatsoever under the terms of this Agreement or owes the Publisher any money under this Agreement or otherwise, it is agreed that the Publisher may deduct the amount of such overpayment and/or the amount owed from any sums that may accrue to the Author, whether under this Agreement or under any other agreements the Author may have with the Publisher, or

18

AG100176

may bill the Author for such overpayment or amount owed.  An unearned portion of the Author Advance, however, will not be considered an overpayment or an amount owed by the Author.

18.     The Author will have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work and the Publisher's exercise and/or license of the rights granted to the Publisher herein; such examination will be at the sole expense of the Author unless errors of accounting amounting to five percent (5%) or more of the total sums paid to the Author pursuant to this Agreement are found to the Author's disadvantage, in which case, the reasonable cost of such examination will be borne by the Publisher.  Statements rendered under this Agreement will be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within one year after the date the statement was rendered.

**REMAINDERS**
19.     The Publisher will make reasonable efforts to inform the Author if it plans to remainder its entire inventory of copies of the Work and to offer to sell to the Author all of the copies of the Work to be remaindered at a price equal to the price the Publisher reasonably anticipates receiving in the remainder sale (but the Publisher's failure to do so will not constitute a breach of this Agreement).

**TERMINATION/UNAVAILABLE FOR SALE**
20.     (a)     If the Publisher determines, in its sole discretion, that the Work or any edition thereof has ceased to have a remunerative sale, the Publisher may discontinue publication.  If, at any time after five years from its initial publication by the Publisher, the Work is "Unavailable for Sale" (as defined below), the Publisher will, within six months after the Publisher's receipt of a written request from the Author for reversion of rights in the Work, do one of the following to be selected by the Publisher in its sole discretion: (i) arrange for an edition of the Work published by the Publisher or a licensee to be available for sale in the United States; or (ii) upon payment to the Publisher of any sums owed by the Author to the Publisher (which does not include any unearned portion of the Author Advance), terminate this Agreement and revert all rights in the Work to the Author (subject to subparagraph (b) below).  For the purposes of this Agreement, the Work will be considered "Unavailable for Sale" if (and only if) there is no edition of the Work or any Derivative Works published or licensed by the Publisher available for sale anywhere in the world.  Notwithstanding the foregoing, if the Work consists of more than one Book, this subparagraph 20 (a) will apply separately to each Book; any termination pursuant to this subparagraph 20(a) will apply only to the Book(s) that are Unavailable for Sale and are terminated through the procedure provided for above; and this Agreement will continue in full force and effect with respect to any other Book(s) comprising the Work.

        (b)     Termination of this Agreement for any reason, whether or not pursuant to subparagraph 20(a), is subject to the continuation of any options, grants or licenses or other third party uses and rights arising from the Publisher's pre-termination exercise of the rights granted herein, and to the continuing receipt and retention by the Publisher of its share of the proceeds from such options, grants or licenses or other third party rights. The Publisher will also retain the right to thereafter dispose of remaining copies and any copies returned, as well as the right to itself continue to use the Work and/or Derivative Works in electronic media for six months after

19

AG100177

the effective date of any termination (subject to payment of any applicable royalties to the Author), and to permit previous purchasers of copies of the Work and/or Derivative Works in electronic media to download replacement copies. The provisions of paragraph 22 will survive the termination of this Agreement pursuant to subparagraph 20(a). The provisions of paragraphs 16, 17, 21, 23, 25 through 27, and 29 through 33 will survive any termination of this Agreement, whether pursuant to subparagraph 20(a) or otherwise. The provisions of paragraph 6 that specify the parties' respective ownership of copyrights in the Work and in any Derivative Works and the parties' respective ownership of any other intellectual property rights (including without limitation trademark rights) will survive the termination of this Agreement for any reason.

## AUTHOR'S WARRANTY AND INDEMNITY

21.    (a)    The Author hereby warrants and represents:

(i)    that the Author is the sole author of the Work and the sole owner of the rights herein granted and that the Author has not assigned, pledged or encumbered such rights or entered into any agreement that would derogate or conflict with the rights granted to Publisher herein or that is inconsistent with the Author's covenants herein and will not do any of the above;

(ii)    that the Author has the full right, power and authority to enter into this Agreement and to grant the rights herein granted;

(iii)    that except for materials of others, permission for usage of which has or will be obtained by the Author, the Work is original, previously unpublished and neither the Work nor any material portion thereof is in the public domain;

(iv)    that the Work does not contain any material that violates any right of privacy, that is libelous or that violates any personal or other right of any kind of any person or entity;

(v)    that the Work contains no material that would violate any contract of the Author, express or implied, or that would disclose any information given to the Author on the understanding that it would not be published or disclosed, and that the Author has not given any third party any right of approval over any of the contents of the Work or over the publication of the Work or the exploitation of any of the rights granted herein to the Publisher;

(vi)    that no material in the Work plagiarizes or pirates any other work or infringes any copyright, trademark or other proprietary right;

(vii)    that no recipe, formula or instruction contained in the Work is injurious to the user or others; and

(viii)    that the Work does not contain any statements about the Author or his or her background or life story that are materially inaccurate and neither the Author nor any

20

AG100178

representative of the Author has materially misrepresented the Work or the Author's background, life story or credentials to the Publisher.

The warranties and representations contained in this Agreement also apply with equal force and effect to any additional material prepared or delivered by the Author for inclusion in a subsequent edition of the Work or in any Derivative Works and to any statements and materials provided by the Author to the Publisher for usage in promoting the Work or Derivative Works or made, created, utilized and/or disseminated by the Author in the Author's own promotion of the Work or Derivative Works, including, without limitation, statements made in appearances (whether arranged by the Publisher, the Author or another person or entity), and statements and materials appearing on a website (including without limitation in blogs or online chats). The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

(b)    (i)    The Author will indemnify and hold the Publisher and its affiliates, licensees, successors and assigns, and its and their distributors, customers, officers, directors, members, employees and agents, (collectively, the "indemnitees") harmless against any expense (including, but not limited to, reasonable attorneys' fees and disbursements) or judgment, settlement or other liability (collectively, "expenses") arising out of any claim or legal proceeding asserting claims inconsistent with or contrary to any warranty or representation made by the Author in this Agreement (a "lawsuit"), except as otherwise provided in subpart (iv) below and except that the Publisher will look first to the insurance policy described in subpart (ii) below for fulfillment of the Author's indemnity obligations under this subpart (i) with respect to any lawsuit covered by that policy.

(ii)    The Publisher will, at its sole cost and expense, cover the Author with respect to lawsuits arising from publication of the Work and/or any Derivative Works under any publishers' liability insurance policy carried by the Publisher (i.e., a policy covering such risks as defamation, invasion of privacy and copyright and trademark infringement) that covers the lawsuit (the "Policy"). Coverage will extend only to such publication of the Work or Derivative Works and will be subject to the terms and conditions of the Policy and to the Policy's deductible and coverage limits (which may be reduced or exhausted by claims relating to other works).

(iii)    The Publisher will have the right to select counsel to represent any or all of the defendants in any lawsuit and to control the defense. The Author agrees to cooperate fully with the counsel selected by the Publisher in the defense of the lawsuit. Failure to cooperate will be a material breach of this Agreement and may result in loss of insurance coverage.

(iv)    In the event of a lawsuit covered by the Policy, the Author's indemnification obligation under this paragraph 21 with respect to the lawsuit will be limited to one-half of the expenses incurred by the indemnitees up to the amount of the applicable deductible under the Policy, provided, however, that this limitation will not apply to expenses incurred in connection with causes of action that are not asserted

21

AG100179

against any of the indemnitees (or to expenses incurred with respect to any causes of action after such causes of action have been dismissed as against all of the indemnitees) or are not covered by the Policy and provided, further, that if in such a lawsuit the Author is found by the Court to have committed a copyright infringement, the Author will be responsible for the entire deductible.

(c)     Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in paragraph 21(a), the Publisher will have the right to withhold any sums payable to the Author in reasonable amounts as security for the payment of the Author's potential obligations pursuant to the indemnity contained in paragraph 21(b). It is intended that the right granted by this subparagraph (c) will not be unreasonably or frivolously exercised by the Publisher.

**OPTION**

22.     (a)     The Author will offer to the Publisher the Author's next work **of fiction** before submitting the same to, or soliciting or entertaining any offers from, any other publisher. The Publisher will have a period of thirty (30) days after the later of: (i) the Publisher's receipt of a complete manuscript; or (ii) the Publisher's initial publication of the Work in which to make an offer for the Author's next work. If the Publisher makes an offer, the Author will negotiate exclusively with the Publisher for a period of thirty (30) days following the Publisher's offer (the "Exclusive Negotiation Period"). If the Work consists of more than one Book, then the reference to the initial publication of the Work in the second sentence will refer instead to the initial publication of the last Book to be published under this Agreement. If the Publisher declines to make an offer for the next work by the above deadline or if the Exclusive Negotiation Period ends without agreement, then (but not before then) the Author may submit the next work to one or more other publishers or solicit or entertain offers from other publishers, provided, however, that (i) the Author will not enter into a contract for publication of the next work upon financial terms less favorable to the Author than those offered by the Publisher; (ii) the Author will provide the Publisher with the details of the material financial terms offered by another publisher prior to entering into any agreement with such publisher, and the Publisher will have the right to acquire rights in the next work by matching all the material financial terms offered by such other publisher by written notice to the Author given no later than ten (10) days after the Publisher's receipt of such details.

(b)     If the rights granted to the Publisher in this Agreement do not include a grant of Graphic Book Rights, the Author will offer those rights to the Publisher before soliciting or entertaining offers from any other publisher.  The Publisher will have thirty (30) days after receipt of notice from the Author that s/he intends to license the Graphic Book Rights in which to make an offer for such rights. If the Publisher makes an offer, the Author will negotiate exclusively with the Publisher for a period of thirty (30) days following the Publisher's offer (the "Exclusive Graphic Book Rights Negotiation Period"). If the Publisher declines to make an offer for such rights by the above deadline or if the Exclusive Graphic Book Rights Negotiation Period ends without agreement, then (but not before then) the Author may solicit or entertain offers for such rights from other publishers, provided, however, that (i) the Author will not enter into a contract for such rights upon financial terms less favorable to the Author than those offered by

22

AG100180

the Publisher; (ii) the Author will provide the Publisher with the details of the material financial terms offered by another publisher prior to entering into any agreement with such publisher for such rights, and the Publisher will have the right to acquire such rights by matching all the material financial terms offered by such other publisher by written notice to the Author given no later than ten (10) days after the Publisher's receipt of such details.

(c) ~~If the rights granted to the Publisher in this Agreement do not include a grant of Sound Reproduction Rights, the Author will offer those rights to the Publisher before soliciting or entertaining offers from any other publisher. The Publisher will have thirty (30) days after receipt of notice from the Author that s/he intends to license the Sound Reproduction Rights in which to make an offer for such rights. If the Publisher makes an offer, the Author will negotiate exclusively with the Publisher for a period of thirty (30) days following the Publisher's offer (the "Exclusive Sound Reproduction Rights Negotiation Period"). If the Publisher declines to make an offer for such rights by the above deadline or if the Exclusive Sound Reproduction Rights Negotiation Period ends without agreement, then (but not before then) the Author may solicit or entertain offers for such rights from other publishers, provided, however, that (i) the Author will not enter into a contract for such rights upon financial terms less favorable to the Author than those offered by the Publisher; (ii) the Author will provide the Publisher with the details of the material financial terms offered by another publisher prior to entering into any agreement with such publisher for such rights, and the Publisher will have the right to acquire such rights by matching all the material financial terms offered by such other publisher by written notice to the Author given no later than ten (10) days after the Publisher's receipt of such details.~~

(d) If the rights granted to the Publisher in this Agreement do not include a grant of Multimedia Rights, the Author will offer those rights to the Publisher before soliciting or entertaining offers from any other publisher. The Publisher will have thirty (30) days after receipt of notice from the Author that s/he intends to license the Multimedia Rights in which to make an offer for such rights. If the Publisher makes an offer, the Author will negotiate exclusively with the Publisher for a period of thirty (30) days following the Publisher's offer (the "Exclusive Multimedia Rights Negotiation Period"). If the Publisher declines to make an offer for such rights by the above deadline or if the Exclusive Multimedia Rights Negotiation Period ends without agreement, then (but not before then) the Author may solicit or entertain offers for such rights from other publishers, provided, however, that (i) the Author will not enter into a contract for such rights upon financial terms less favorable to the Author than those offered by the Publisher; (ii) the Author will provide the Publisher with the details of the material financial terms offered by another publisher prior to entering into any agreement with such publisher for such rights, and the Publisher will have the right to acquire such rights by matching all the material financial terms offered by such other publisher by written notice to the Author given no later than ten (10) days after the Publisher's receipt of such details.

**AGENCY**

23. ~~The Author hereby authorizes the Author's agent, < > (the "Agent") to collect and receive all sums of money payable to the Author pursuant to any of the provisions of this Agreement. The Agent is fully authorized and empowered to act on behalf of the Author in all matters in any way arising out of this Agreement. The Publisher may pay all sums hereunder to the Agent and may rely on the Agent in all matters arising out of this Agreement, including, without limitation,~~

AG100181

~~amendment of this Agreement or settlement of any controversies arising out of this Agreement, until the Publisher has received written notice from the Author of the termination of such agency. Upon the receipt of such notice, the Publisher may pay all further sums payable pursuant to this Agreement directly to the Author or to such other persons as the Author will direct in writing.~~

## INSERT OF ADVERTISEMENTS

24.    Advertisements other than for other books may not be printed in any edition of the Work, whether issued by the Publisher or its licensee, without the Author's written consent. The Author may require that a share of the advertising proceeds, if any, be paid to the Author as a condition for the Author's consent, if the Author so elects. Nothing herein will preclude the Publisher from authorizing a book club to include notices of availability of other products from the book club within the book club's edition of the Work.

## ASSIGNMENT

25.    This Agreement will be binding upon and inure to the benefit of the successor and assigns of the Publisher. This Agreement will be binding upon the successors, heirs and estate of the Author. The Publisher may assign this Agreement and the rights granted to it hereunder.  The Author may assign any net sums due to the Author hereunder, but may not otherwise assign any of the Author's rights under this Agreement or delegate any of the Author's duties or obligations under this Agreement.

## FURTHER DOCUMENTS

26.    The Author agrees to execute and deliver to the Publisher any and all documents in proper or customary form necessary or helpful to the exercise, sale, license or other disposition of any or all rights granted to the Publisher herein, or for more fully carrying out the purposes and intent of this Agreement. The Author hereby irrevocably appoints the Publisher as the Author's attorney-in-fact to execute any such documents.

## FORCE MAJEURE

27.    The Publisher will not be liable for delays in its performance caused by wars, civil riots, terrorism, strikes, fires, acts of nature, governmental restrictions, unavailability of materials, supplies or press time or other circumstances beyond its reasonable control.

## PUBLISHER'S DEFAULT

28.    If the Publisher commits a material breach of this Agreement (including, without limitation, a material default in its obligation to pay royalties) and neglects or refuses (other than by reason of Force Majeure) for a period of 30 days after receiving written notice specifying such default sent by the Author by certified or registered mail, return receipt requested, to cure such default (or, if such default is of a nature that it cannot reasonably be completely cured during such 30 days, neglects or refuses, other than by reason of Force Majeure, to commence to cure such default before the end of such 30 days or thereafter to diligently continue to cure such default), the Author may terminate this Agreement by promptly sending a written notice of termination to the Publisher by certified or registered mail, return receipt requested.  However, the Author will have no right to terminate this Agreement in the event of a bona fide dispute over whether or not the Publisher has committed a material breach of this Agreement, unless and until the Publisher neglects or refuses to cure such default for a period of 30 days after a court of

AG100182

competent jurisdiction finally determines that the Publisher has in fact committed such a material breach.

## REMEDIES

29.     All remedies granted to the Publisher pursuant to any provisions of this Agreement are cumulative and neither the availability nor exercise of any such remedy will prevent the Publisher from exercising any other remedy which it would otherwise have under this Agreement or by law. In no event will the Publisher be liable to the Author for any consequential or incidental (as opposed to direct) damages or for any exemplary or punitive damages. No person or entity is intended to be a third-party beneficiary of any of the Publisher's obligations hereunder. If the Author is more than one person, all payments due to the Author will be split equally among the persons comprising the Author (provided that each such person may assign all or part of any sums due to such person hereunder), and the liabilities and obligations of the persons comprising the Author will be joint and several.

## NOTICES

30.     All notices, bills, requests, demands or other written communications required or permitted to be given by any of the provisions of this Agreement will be sufficient if sent by regular first class mail (unless the provision permitting or requiring such notice, bill, request, demand or other communication calls for another type of mail, in which case such other type of mail will be required) and will be deemed given when mailed (unless the provision permitting or requiring such notice, bill, demand or other communication will otherwise provide). All such notices, bills, requests, demands or other communications will be addressed to the Author at the address set forth at the beginning of this Agreement and to the Publisher at the then current address for the Publisher's main offices (or to such other address for a party as that party will have designated by thirty (30) days' prior written notice to the other party).

## ENTIRE AGREEMENT

31.     This Agreement constitutes the entire agreement between the Publisher and the Author. This Agreement may not be amended or modified, and no rights or obligations of any party to this Agreement may be modified, extended or waived, except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification, extension or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or the Author is given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and the Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by the Publisher or the Author) at any time will be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement does not create, and will not be construed as creating, a partnership or joint venture or employment relationship between the Author and the Publisher. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the Chairman, President, Chief Operating Officer, a Vice-President or General Counsel of the Publisher.

## APPLICABLE LAW

32.     This Agreement, and the rights and remedies of the parties with respect to it, will be governed by the internal laws of the State of New York. Each party hereby submits to the sole

25

AG100183

and exclusive in personam jurisdiction of the courts of the State of New York located in New York County, or, if subject matter jurisdictional prerequisites exist at the time, to the sole and exclusive in personam jurisdiction of the federal courts located in New York, with venue to be in the Southern District of New York, for the resolution of all disputes between them arising out of or related to this Agreement (including, but not limited to, any alleged breach thereof). Each party agrees not to contest venue in New York County or the Southern District of New York, as the case may be, not to seek transfer of any action or proceeding to any other county or district and not to bring any action or proceeding relating to any such dispute in any other court or forum (except to enforce a judgment obtained in one of such courts). The parties each hereby waive trial by jury in any action or proceeding between them arising out of or related to this Agreement or any alleged breach thereof.

## CAPTIONS

33.    The captions of the various paragraphs and subparagraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and will not be deemed, in any manner, to modify, explain, enlarge or restrict any of the provisions of this Agreement.

## MISCELLANEOUS

34.    *Additional Definitions.* For the purposes of this Agreement, the following terms will have the following meanings:

(a)    "Graphic Book Rights," means the rights:  (i) to create (or have created) Graphic Books in the English language based on the Work and to publish those Graphic Books in book form; (ii) to publish and to use those Graphic Books (as well as text, art or other excerpts from those Graphic Books) in electronic media and in any other form or media, and to exercise and exploit in connection with those Graphic Books the same additional and subsidiary rights that are granted to the Publisher by this Agreement in the Work; and (iii) to use the title of the Work in connection with, and in the advertising, promotion and publicity for, those Graphic Books. A "Graphic Book" as used anywhere in this Agreement means a work derived from the Work consisting of sequential art with captions, boxes and/or bubbles of text (which text may ~~be original, adapted from the Work and/or taken verbatim from the Work, and will~~ include any Alt-text). Graphic Book Rights include, without limitation, the right to incorporate plot elements, characters, fanciful places, situations, facts, ideas and events taken or derived from the Work into a Graphic Book, provided however that any text that is included in a Graphic Book that is taken from the Work will only be included with the prior written permission of the Publisher.

26

AG100184

    (b)    "Multimedia Rights," means the rights to create, to publish and to use in electronic media, works in any language based on the Work (including the rights to create, and to incorporate into those works, ~~text,~~ dialogue, sounds, music, artwork, video, animation, moving images, interactive elements, and other matter whether or not ~~taken or~~ derived from the Work or from the plot elements, characters, fanciful places, situations, facts, ideas and events portrayed in the Work).

*In witness whereof*, the parties hereto have duly executed this Agreement.

27

AG100185

THIS AGREEMENT, made this ▮▮▮ day of ▮▮▮ by 1961
and between THE NEW AMERICAN LIBRARY OF WORLD LITERATURE, INC., a
New York corporation having its office at 501 Madison Avenue,
New York 22, New York, hereinafter termed "NAL" and
▮▮▮▮▮

hereinafter ~~(jointly)~~ termed the "Proprietor".

## W I T N E S S E T H

WHEREAS, the Proprietor has delivered to NAL the
manuscript of a novel tentatively entitled ▮▮▮

hereinafter termed the "Work", and

WHEREAS, NAL agrees to publish or to arrange for
publication of the Work on the terms and conditions specified
hereinafter,

NOW, THEREFORE, in consideration of the mutual promises
and covenants herein set forth, the parties covenant and agree with
each other as follows:

### PROPRIETOR'S UNDERTAKINGS

1. WARRANTY AND INDEMNIFICATION

(a) The Proprietor warrants, with respect to the Work
and every part thereof, that he is the legal proprietor of all
rights herein granted and has the full power to enter into this
agreement, that the Work is original, free of any lien, claim or
debt of any kind, and not in violation of any statutory or common
law copyright or any other right of third parties, and that it
contains nothing libelous or illegal.

(b) The Proprietor shall indemnify NAL against any
loss, expense or damage, including reasonable fees of NAL's
attorneys, occasioned by any claim, demand, suit or recovery
arising out of the breach or alleged breach of any of the fore-
going warranties, but shall not be liable for any matter inserted
in the Work by NAL or its licensees.

2. GRANT OF RIGHTS

(a) The Proprietor grants to NAL and its licensees, for
the full term of the copyright available in each country included
within the territory covered by this agreement, including renewals
and extensions,

(i) the right to publish and sell the Work in
volume form in all languages, together with

(ii) the following subsidiary publication rights:
publi___tion or sale by book clubs; condensations; publication in
maga___es or newspapers (whether in one or more installments);
publication of the complete Work or selections therefrom in
anthologies, compilations and digests; quotation in other works;
publication in volume form of dramatic versions or motion picture
scripts based on the Work; mechanical recordings; picturized book
versions; and microprint and microfilm versions.

INITIAL

~~(iii) the right having performances rights restricted xxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxx dramatic xxxxxxxxxxx.~~

(b) Such grant shall be exclusive throughout the world.

(c)  All rights not specifically granted herein are reserved to the Proprietor.  During the terms of this agreement, however, the Proprietor will not exercise or dispose of any of such reserved rights in such a way as to affect adversely the value of any of the rights granted to NAL hereunder.

3.  TITLE, ~~LENGTH, DESCRIPTION~~

(a)  The title of the Work shall be determined by mutual agreement between the Proprietor and NAL.

~~(b)  The length of the Work shall be not less than~~ words nor more than ~~words.~~

INITIAL


(c)  ~~The~~ organization and content of the Work shall ~~conform in general to the outline attached hereto.~~

~~4.  MANUSCRIPT DELIVERY~~

(a)  The Proprietor agrees to deliver to NAL two complete copies of the manuscript of the Work, satisfactory in form and content to NAL and ready for the printer, together with written authorizations by all third party proprietors of copyrighted text and illustrative material contained in the Work, together with the proper forms of copyright notice for such material, and with all necessary illustrations suitable for reproduction, or authorization for NAL to acquire such illustrations, at the Proprietor's own expense, on or before

INITIAL


(b)  If the Proprietor fails to make complete delivery as above specified, NAL may give written notice requiring such delivery within sixty (60) days from the date of such notice.  If the Proprietor thereafter fails to make delivery as required, then NAL may elect in writing to terminate this agreement; upon receipt of notice of such termination the Proprietor shall, without prejudice to any other claims of NAL, repay to NAL all monies advanced to the Proprietor.  Upon such termination and repayment, all rights hereby granted to NAL shall revert to the Proprietor.

(c)  If the Proprietor fails to deliver the required number of manuscript copies, or if the physical condition of the copies delivered is unsatisfactory for NAL's and the printer's use, NAL shall have the right, after giving the Proprietor a reasonable opportunity to rectify the deficiency, to have all or a portion of the manuscript retyped or duplicated and to charge ~~the cost thereof to the Proprietor's royalty account.~~

5.  PROPRIETOR'S ALTERATIONS

NAL agrees that printer's proofs shall be submitted to the Proprietor, and such proofs shall be corrected and returned by the Proprietor within fourteen (14) days after receipt thereof. Any sums due the Proprietor under this agreement shall be charged with the cost of Proprietor's (or Author's) changes (other than corrections of errors made by the printer or by NAL or its licensees) in excess of ten percent (10%) of the original cost of composition. An itemized statement of such charges shall be forwarded to the Proprietor within sixty (60) days after the date of publication, and the corrected proofs shall be made available for the Proprietor's inspection at NAL's office upon request.

-2-

AG10018'

6. AUTHOR'S NEXT BOOK

The Proprietor agrees to offer to NAL in good faith such of the same exclusive rights contained herein as he controls in the next book-length work by the author of this Work before offering such rights to any other publisher directly or indirectly.

## PUBLISHER'S UNDERTAKINGS

7. AGREEMENT TO PUBLISH

(a) NAL shall publish the Work in the United States in the English language at its own expense (or arrange for publication by its licensee), in such form and manner as NAL deems best suited to advance its sale, within twelve (12) months after the delivery of the final manuscript as provided in paragraph 4, except that in case of delay caused by strikes, fires, shortages of labor or material, mechanical difficulties, governmental restrictions, the breakdown of market distribution facilities or any other circumstances beyond its control, whether similar or dissimilar to those enumerated, NAL may defer the publication date to the extent reasonable and necessary. If the Work is not published in the United States within the time hereinbefore specified, due allowance being made for circumstances beyond the control of NAL as set forth above, the Proprietor may terminate this agreement by written notice, which shall become effective six (6) months after receipt thereof by NAL, unless the Work is published before the expiration of that period. Upon such termination all rights granted hereunder shall revert to the Proprietor.

(b) If first publication hereunder shall be in a hardcover edition, then NAL shall publish a softcover edition not later than two years after hardcover publication.

(c) In exercising rights granted hereunder or in permitting third parties to exercise portions of such rights, NAL shall use its best efforts to advance the overall sale of the Work. To that end, NAL shall publish or license English language hardcover editions in territories other than the United States, and foreign language editions, and shall grant subsidiary rights, whenever in its judgment such publication, license or grant will serve to advance such overall sale; NAL shall also use its best efforts to collect all sums which may be or become due under all licenses granted hereunder, and to procure due and timely performance of all obligations contained in licenses and agreements entered into pursuant hereto.

8. AGREEMENT TO COPYRIGHT

NAL shall make (or cause its licensees to make) application in the name of the Proprietor, or such other appropriate name as the Proprietor may authorize, for copyright in the United States in compliance with the Universal Copyright Convention, and in such other countries covered by this agreement as NAL may elect. NAL and its licensees shall have the right but not the obligation to obtain renewals of such copyrights when permitted by law. NAL and its licensees shall affix to each published copy of the Work the appropriate form of United States copyright notice prescribed by law.

9. ROYALTY ADVANCE

(a) NAL shall pay to the Proprietor, as a guaranteed advance against all royalties and other payments to be earned under paragraph 10, the sum of ▇▇▇▇▇▇▇▇ dollars ($ ▇▇▇▇ ), payable as follows:

INITIAL

▇▇▇▇ on the signing of this agreement, and ▇▇▇▇ on publication of the first edition of the Book

(b) See verso        -3-

AG100188

10.  ROYALTIES AND OTHER PAYMENTS

NAL shall credit the Proprietor with the following royalties:

(a)  FOR ENGLISH LANGUAGE SOFTCOVER EDITIONS:

(i)   On net copies sold by NAL in the United States and territories under its administration, except as provided in subparagraph (ii), a royalty of   four percent (4%) of the United States retail list price per copy on the first one hundred and fifty thousand (150,000) copies and a royalty of  six percent (6%)             of the United States retail list price per copy thereafter.

(ii)  On net copies sold by NAL outside the United States and territories under its administration, or within the United States for export, or by special direct mail campaign, or at a price lower than the regular wholesale price through special arrangements with book clubs, charitable, fraternal or professional associations or similar organizations, a royalty of four percent (4%)     of the United States retail list price per copy.

(iii) On copies destroyed, given away, or sold at or below cost, no royalties shall be paid.  On overstocks or damaged copies, NAL may at its option dispose of all or a part of the stock at the best prices it can secure and will pay a royalty of ten percent (10%) of the net amount received in excess of manufacturing cost.

(iv)  On editions licensed by NAL to other publishers for publication outside the United States and Canada, seventy-five percent (75%) of the net payments received by NAL.

(b)  FOR ENGLISH LANGUAGE HARDCOVER EDITIONS AND FOREIGN LANGUAGE EDITIONS:

(i)   On editions licensed by NAL ninety percent (90%) of net payments received by NAL with respect to English language publication and seventy-five percent (75%) of net payments received by NAL with respect to foreign language publication.

(ii)  In the event that NAL licenses the Work to another United States publisher for English language hardcover publication, the Proprietor hereby authorizes NAL to assign and to pay directly to such publisher on the Proprietor's behalf a share of the Proprietor's royalty earnings on the NAL paperbound edition and a share of the Proprietor's advance hereunder, such shares to be determined by NAL but not to exceed one-half of the amounts specified in paragraphs 9(a), 10(a)(i) and 10(a)(ii).  The Proprietor hereby consents that NAL shall charge against the Proprietor's royalty account any sums becoming due to such hardcover publisher hereunder; provided, however, that in no event shall the guaranteed advance payments to the Proprietor against all earnings under this agreement be less than the amount specified in paragraph 9(a).

(iii) On editions published by NAL, royalty terms to be mutually agreed upon at the time of such publication.

(c)  FOR SUBSIDIARY RIGHTS

(i)   On all subsidiary publication rights granted in paragraph 2(a)(ii), the Proprietor shall receive fifty percent (50%) of the net payments received by NAL; except in the event of the assignment of such rights by NAL as part of a license granted under paragraph 10(b)(i), with respect to which rights the Proprietor's share of all net payments received by NAL shall be as provided in paragraph 10(b)(i).

-4-

AG100189

~~(ii) On all performance rights granted in paragraph~~
2(a)(iii), the Proprietor shall receive
~~of the net payments received by NAL.~~

(d)  NAL shall render to the Proprietor on or before
March 31st and September 30th of each year statements of net sales
up to the preceding December 31st and June 30th respectively, and
shall make simultaneous settlement in cash.  In making accountings,
NAL shall have the right to allow for a reasonable reserve against
returns.  If royalties in excess of the guaranteed advance payment
have been paid on copies which are thereafter returned, NAL shall
have the right to deduct the royalties on such returned copies from
future payments under this agreement.

~~11.  PROPRIETOR'S AGENT~~

NAL shall pay all sums due the Proprietor under this
agreement to the Proprietor's agent,

who is authorized to collect and receive such sums, and such payment
shall be a full and valid discharge to NAL.  The agent is authorized
to act in the Proprietor's behalf on all matters arising out of
~~this agreement.~~

12.  PROPRIETOR'S COPIES

NAL shall deliver to the Proprietor without charge ten
(10) copies of NAL's edition of the Work, and shall permit the
Proprietor to purchase additional copies at a discount of forty
percent (40%) from the retail price, provided that such copies are
not resold.

13.  EXHAUSTION OF EDITION

(a)  If the Work goes out of print in all United States
editions and if NAL fails either to reprint or alternatively to
cause a licensee to reprint a United States edition within six (6)
months after receipt of a written demand from the Proprietor, the
Proprietor may terminate this agreement by written notice.  Except
as hereinafter provided, such notice shall become effective thirty
(30) days after receipt thereof by NAL.  Upon such termination all
rights granted hereunder, except the right to dispose of existing
stock, shall revert to the Proprietor.  NAL shall be under no
further obligation or liability to the Proprietor except that
Proprietor's share of earnings hereunder shall be paid when and
as due.  If NAL (or its licensee) shall have been prevented from
reprinting by strikes, fires, shortages of labor or material,
mechanical difficulties, governmental restrictions, the breakdown of
market distribution facilities or any other circumstances beyond its
control whether similar or dissimilar to those enumerated, notice
of termination shall be effective only after NAL shall have continued
its failure to reprint for a period of three (3) months after the
termination of the situation which prevented compliance with the
Proprietor's demand.

(b)  The Work shall not be deemed "out of print" within
the meaning of this paragraph as long as it is available for sale
either from stock in the Publisher's warehouse, in the field, or
in regular sales channels.

JOINT UNDERTAKINGS OF PROPRIETOR AND PUBLISHER

14.  INFRINGEMENT ACTIONS

If during the existence of this agreement the copyright
shall be infringed, NAL may, at its own cost and expense, take
such legal action, in the name of the Proprietor or of the author
of the Work if necessary, as may be required to restrain such
infringement or to seek damages therefor.  NAL shall not be
liable to the Proprietor for NAL's failure to take such legal
steps.  If NAL does not take such action within a reasonable time,

-5-

AG100190

the Proprietor may do so, in his name and at his own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Proprietor and NAL.

### 15. RIGHTS SURVIVING TERMINATION

In the event of the termination of this agreement as elsewhere herein provided, any rights reverting to the Proprietor shall be subject to all licenses and other grants of rights theretofore made by NAL to third parties, and to the rights of NAL to the proceeds of such agreements.

### 16. DELIVERY OF DOCUMENTS

The parties shall take any and all steps and execute and deliver any and all documents necessary to effectuate the terms and the intent of this agreement.

### 17. CONSTRUCTION

This agreement shall in all respects be interpreted, construed and governed by the laws of the State of New York.

### 18. ARBITRATION

Any controversy or claim arising out of, or relating to this agreement or the breach thereof, shall be settled by arbitration held in the city of New York, in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.

### 19. PARTIES AFFECTED

The provisions of this agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives and/or assigns. NAL shall not assign this agreement in its entirety without the written consent of the Proprietor, except that no consent shall be required if such assignment is made in connection with the transfer of all or a substantial part of the business of NAL.

IN WITNESS WHEREOF the parties hereto have executed and duly attested this agreement as of the day and year first above written.

WITNESS to the signature of



WITNESS to the signature of



THE NEW AMERICAN LIBRARY
OF WORLD LITERATURE, INC.



Victor Weybright
Chairman and Editor

PROPRIETOR



-6-

AG100191

## AGREEMENT

AGREEMENT made this ███████████, 2008 (the "Agreement") between **Chronicle Books LLC of 680** Second Street, San Francisco, California 94107 (the "Publisher") and ███████████ of ████████ ████████████ (the "Author") with respect to the text for ███████████ ████████ currently entitled ████████ ██████████ (hereinafter referred to as the "Text" and, when combined with the illustrations for the book, the "Work").

In consideration of the parties' promises and obligations as set forth below, the parties agree as follows:

1. RIGHTS GRANTED.   The Author hereby grants and assigns to the Publisher for the full term of copyright, and renewals or extensions thereof, the sole and exclusive right to: (a) print, publish, promote, advertise, distribute and sell the Text in connection with the Work in the **English language and all other languages throughout the world**; and (b) to exercise or authorize the exercise of any of the other rights with regard to the Work or the Text in any other form as provided herein.

If the Author is entitled to terminate the grant of any of these rights under the copyright laws of the United States or any other jurisdiction, all other rights transferred or granted hereunder shall remain unaffected by such termination.

## 2. DELIVERY OF THE TEXT

2.1. Deliverables. The Author shall deliver to the Publisher approximately ████ words ████████ ████████████. The Author shall prepare and deliver the completed manuscript, together with any permissions or clearances and other necessary material, to the Publisher not later than ███████, 2008 (the "Final Delivery Date").  Further, if the Publisher deems an afterword, glossary or some other type of backmatter material necessary for publication of the Work, the Author shall prepare and deliver the requested material by a mutually determined date.

2.2. Acceptable Delivery. (a) The Author shall prepare and deliver the Text and any other materials or information required by this Agreement at the Author's own expense, in form and content satisfactory to the Publisher in accordance with the Text Submission Requirements and the Guidelines for Electronic Manuscripts, attached hereto and made a part hereof.  Any costs incurred by the Publisher as a result of the Author's failure to meet the specified delivery deadlines or to fulfill the submission requirements shall be charged to the Author.

(b) If permission from others is required for publication of any material contained in the Text or if permission is required for the exercise of any other right granted under this Agreement (including without limitation the right to promote the Work), the Author shall secure written permission to reproduce the material throughout the territory in all editions and adaptations of the Work and in any other form provided for herein, whether published by the Publisher or its licensees.  The Author shall secure such permissions at Author's own expense and shall submit them, satisfactory to the Publisher in form and content, on the Final Delivery Date specified in Paragraph 2.1.  The Author shall consult and cooperate with the Publisher in performing Author's obligations hereunder.

2.3. Failure to deliver. If the Author fails to deliver the complete and finished manuscript and any permissions or clearances required by the Final Delivery Date, the Publisher may, in its sole discretion, terminate this Agreement upon written notice to the Author, and upon receipt of such notice the Author shall repay to the Publisher all amounts which may have been advanced under this Agreement within thirty (30) days of receipt of such notice.

2.4. Right to edit.  The Publisher reserves the right to edit the Text submitted by the Author and to request substituted or additional materials before publication. If the Author fails to supply any of the materials specified

AG100192

CHRONICLE BOOKS                                                                    PAGE 2

by this Agreement, or if any of the materials supplied by the Author are unacceptable to the Publisher, the Publisher shall have the right to supply such materials and charge the cost therefor to the Author.

2.5. Unacceptable delivery. The Publisher will review the Text and shall notify the Author within sixty (60) days following receipt of the Text whether the material is acceptable or in need of revision. If the Publisher concludes that the Text is unacceptable but could be revised to the Publisher's satisfaction in a timely fashion, the Publisher and the Author shall agree upon an appropriate period of time for the revision process. Should the Publisher determine that the Text as delivered cannot be revised to its satisfaction within a reasonable time period, or if the Publisher determines, in its sole discretion, that the revised manuscript is unacceptable, the Publisher may reject the Text. Upon such rejection, the Author shall repay to the Publisher any and all sums previously received from the Publisher under this Agreement within thirty (30) days following the Author's receipt of the Publisher's rejection notice. Upon the Publisher's receipt of repayment, this Agreement shall be deemed terminated.

3. CORRECTIONS. The Author shall read, revise, correct, and return all proofs within the reasonable time stipulated by the Publisher. If alterations in the proofs are made at the Author's request (or because of the Author's failure to deliver accurate copy for the printer) which cost more than ten percent (10%) of the cost of composition, exclusive of the cost of correcting printers' errors, the Author shall be charged for such excess. The Author shall pay any and all such costs when billed by the Publisher.

4. PUBLICATION. (a) The Author acknowledges that since the Work is an illustrated book, the Publisher will hire an artist to prepare the illustrations and that the artist may not begin preparation of such illustrations until the manuscript is completed; therefore, it is understood and agreed that the Publisher shall publish or cause publication of the Work in book form, at the Publisher's own expense, within twenty-four (24) months following the Publisher's acceptance and approval of the complete and final artwork for the Work. The Publisher shall not be responsible for delays caused by force majeure or the act or neglect of a supplier, printer, or shipper. In no event shall the Publisher be obligated to publish or cause publication of the Work if, in the Publisher's opinion, the Work violates the common law or statutory copyright, or the rights of privacy, publicity, or any other right of any third party or contains libelous or other unlawful matter.

(b) Decisions regarding the title, format, interior design, and cover for the Work, and all other design, production, and publishing decisions are within the Publisher's sole discretion. It is specifically understood and agreed that the Publisher shall own and control any and all rights to any design for the Work created or commissioned by the Publisher, and the Author may not duplicate such design without the Publisher's express prior written consent.

5. FAILURE TO PUBLISH. Provided the Author delivers the Text in accordance with the delivery dates and requirements specified herein, if the Publisher has not hired an artist to prepare the illustrations for the Work within twenty-four (24) months following acceptance of the manuscript, or if the Publisher has accepted the illustrations, but then fails to publish or cause publication of the Work within the time specified in Paragraph 4(a), unless publication has been delayed as the result of force majeure, the Author may give the Publisher written notice of his desire to terminate this Agreement, and if the Publisher then fails to publish the Work within six (6) months following receipt of such notice, this Agreement shall terminate, and the Author shall retain any advances previously received under this Agreement in full settlement of all claims against the Publisher.

6. COPYRIGHT. (a) The Publisher shall register copyright in the text of the Work with the United States Copyright Office in the name of ███████████████ and shall ensure that each copy of the Work published by the Publisher contains a copyright notice in such names pursuant to the United States Copyright Act and the Universal Copyright Convention, together with such other notices as the Author may request in writing.



CHRONICLE BOOKS                                                                                              PAGE 3

(b) Upon the Publisher's request, the Author shall execute any such papers and documents which the Publisher may deem advisable to protect, assign, record, renew, or otherwise perfect or enforce the rights in and to the Text granted to the Publisher hereunder.

7. ADVANCE. Subject to the terms and conditions of this Agreement, the Publisher shall pay to the Author, as a non-returnable advance against and on account of all monies accruing to the Author under this Agreement, the sum of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), payable as follows:

▮▮▮▮ within thirty (30) days following execution of this Agreement;
▮▮▮▮ within thirty (30) days following the Publisher's acceptance of the final manuscript and any additional materials; and
▮▮▮▮ within thirty (30) days following the initial publication of the Work.

8. ROYALTIES. Royalties on the Publisher's editions of the Work shall be based upon net retail sales, less a reasonable reserve for returnable copies, and paid at the following rates:

(a) On copies of a hardcover edition sold in the United States, except as described in subparagraphs (e) through (j) below: **10%** of the suggested retail price on all copies sold.

(b) On copies of a paperback edition sold in the United States, except as described in subparagraphs (e) through (j) below: **6%** of the suggested retail price on all copies sold.

(c) On copies of a board book edition sold in the United States, except as described in subparagraphs (e) through (j) below: **2½%** of the suggested retail price on all copies sold.

(d) On all copies of any edition sold outside the United States, except as described in subparagraphs (e) through (j) below: one-half (1/2) of the prevailing U.S. rate for that edition based upon cover price.

(e) On all copies sold at a discount of 51% or higher, and on all copies sold for special or premium use sales: **5%** of the amount received by the Publisher.

(f) On all copies sold as a result of the Publisher's mail-order efforts, through couponed advertising, or circulation direct to the customer: **2½%** of the amount received by the Publisher.

(g) On copies of any edition sold by the Publisher from any reprinting of five thousand (5,000) copies or less made at least one (1) year after the date of initial publication of the Work: one-half (1/2) of the prevailing rate for that edition based upon cover price.

(h) On any Ancillary Product (as defined in Paragraph 9) developed and sold by the Publisher: a royalty subject to mutual agreement.

(j) No royalties shall be payable on copies or adaptations of the Work or on Ancillary Products which are distributed for purposes of promotion or advertising; on copies sold below the Publisher's cost; on portions of the Work sublicensed for publicity use without compensation; or on copies provided to the Author free of charge.

9. SUBSIDIARY RIGHTS. Pursuant to Paragraph 1, the Author's grant to the Publisher includes the sole and exclusive right to sell or license the Work and the Text from the Work for use as follows in any language



AG100194

throughout the world upon such terms as the Publisher deems advisable. It is understood and agreed that the shares listed below are in effect for licenses of the Text from the Work only.  If both the Text and artwork are included in any license of rights, the Author shall receive one-half of the listed share.  If a license is for artwork only, the Author shall not receive a share of the proceeds for such license.  Subject, therefore, to the terms above, the net proceeds of such sales or licenses shall be divided between the Author and the Publisher as follows:

|  | Publisher's Share | Author's Share |
| --- | --- | --- |
| Book Club (whether in full length, condensed, or abridged version) | 50% | 50% |
| Foreign publication (which may include the right of such licensee to sublicense certain subsidiary rights in that market) | 50% | 50% |
| Translation (which may include the right of such licensee to sub-license certain subsidiary rights in that market) | 50% | 50% |
| Serial (use of serializations, condensations, excerpts, digests, etc. of text and/or images in news-papers, magazines, other periodicals, books or pamphlets) | 50% | 50% |
| Reprint (whether in full length, condensed, or abridged version) | 50% | 50% |
| Other Book Publication (including, but not limited to, deluxe editions, large print and direct mail editions) | 50% | 50% |
| Storage, retrieval, microfilm, microfiche, other forms of elec-tronic reproduction | 50% | 50% |

Ancillary Products (i.e., book- or stationery-related product, including without limitation journals (e.g., blank or guided journals), notepads, kits, decks, calendars, stationery, boxed notecards and notecard collections, boxed postcards and postcard collections, boxed labels, sticky notes, boxed enclosures or gift tags, organizers, address books, birthday books, gift wrap, scrapbooks, coaster sets, photo albums, and photo frames) that use text

AG100195

CHRONICLE BOOKS                                                              PAGE 5

| | | |
|---|---|---|
| and/or images from the Work | 50% | 50% |
| Merchandising: including but not limited to the use of title, text, character(s) and/or images to create or promote commercial products | 50% | 50% |
| Performance: TV, radio, sight and sound, and allied rights, visual reproduction, motion picture, dramatic and non-dramatic | 50% | 50% |

If the Publisher exercises any of the foregoing rights itself instead of licensing others to do so, the royalty rates, where not otherwise specified in Paragraph 8 above, shall be subject to mutual agreement between the parties.

10. AUTHOR'S COPIES. The Publisher shall give to the Author, on first publication, ten (10) free copies of each edition of the Work published by the Publisher, and the Publisher agrees to ship such copies at the Publisher's expense . In addition, the Author shall have the right to purchase copies of the Work at the following discounts for prepaid orders:  forty percent (40%) on orders of 1 to 24 copies; fifty percent (50%) on orders of 25 copies or more.  All such discounted copies shall be shipped at the Author's expense.  Copies of the Work provided to the Author under the terms of this Paragraph shall not be resold.  All sales of books by the Publisher to the Author are subject to applicable sales tax.

11. PUBLICITY. (a) The Publisher, and any of its licensees or assigns hereunder, shall have the right to use the Author's name, image, likeness, and biography in connection with the exercise of any of such rights, and in advertising and publicity in connection therewith. The Publisher shall provide the Author with an Author Questionnaire, which the Author shall complete and return by a date to be specified by the Publisher. It is understood and agreed that the Author shall provide at the Author's expense a reproducible photograph of the Author that the Publisher may use in connection with the Work and in advertising and promotion of the Work. Any photograph provided by the Author will be deemed approved by the Author. The Author shall cooperate, at the Publisher's expense, in advertising and promotional activities as reasonably requested by the Publisher. The Author shall not compete with the Publisher in promotion and sale of the Work.

        (b) For publicity or promotion purposes, the Publisher may permit the broadcast (but not dramatization) by radio or television or on-line, without charge, such selections from the Work as in the opinion of the Publisher may benefit the sale of the Work.

12. ACCOUNTING AND PAYMENT. (a) The Publisher shall render semi-annual statements of account to December 31 and June 30 of each year, on or before March 31 and September 30 following, and shall send such statements, together with payment of the amounts due thereon.  For each royalty period, the Publisher may withhold a reasonable reserve against returns of books.  After two (2) years following the original publication date, if the accumulated earnings from all sources for the Work do not exceed twenty-five dollars ($25), the Publisher may defer a statement and payment until such time as the accumulated earnings for the Work total twenty-five dollars ($25) or more; however, upon the Author's request, the Publisher shall render a statement, regardless of amount due.  Should the Author receive an overpayment, it is understood and agreed that the Publisher may deduct such amount from any further earnings of the Work.



(b) The Publisher shall pay the Author's share of proceeds from the sale or license of subsidiary rights as provided in Paragraph 9, less any unearned advances or other debits to the Author's royalty account, within sixty (60) days following the Publisher's receipt of such monies.

(c) The Author may, upon written request, examine or cause to be examined through certified public accountants or the Author's qualified representative the Publisher's books of account to the extent that they relate to the sale or licensing of the Work, provided such examinations are limited to one (1) per year and take place during regular business hours. Such examination shall be at the Author's expense.

13. AUTHOR'S WARRANTIES. (a) The Author represents, warrants and covenants that (i) the Author is the sole author of the Text and any other material provided by the Author for the Work; (ii) the Author is the sole owner of all rights granted hereunder; (iii) the Author has not sold, licensed, assigned, or otherwise encumbered the Text or any other material provided by the Author for the Work, and will not sell, license, assign, or otherwise encumber, any of such rights; (iv) the Author has full power to enter into and to perform this Agreement; (v) except for material expressly permitted or cleared pursuant to the provisions of Paragraph 2.2(b), all Text, and any other material provided by the Author for the Work is original, previously unpublished, and is not in the public domain, whether as defined under the United States Copyright Act or otherwise; and (vi) the Text or any other material provided by the Author for the Work in no way violates any copyright or proprietary or contract or personal right of others, including the right of privacy and that it contains nothing unlawful or libelous. The foregoing warranties shall be in effect throughout the term of this Agreement and shall survive its termination.

(b) Publisher's verification of warranties. The Publisher shall have no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true, and any such investigation by or for the Publisher shall not constitute a defense to the Author in any action based upon a breach or alleged breach of any of the foregoing representations or warranties of the Author. However, if in the Publisher's reasonable opinion there appears to be a substantial risk of liability to third persons or entities or of governmental action against the Work, the Publisher with the Author's agreement may undertake an investigation, verification and analysis of the Work and implement such revisions of the Work with the approval of the Author which the Publisher believes may eliminate or lessen such risk. Notwithstanding anything to the contrary contained herein, in no event shall the Publisher be obliged to publish the Work or any Text or other material provided by the Author for the Work if in its judgment such material contains libelous material, or its publication would violate the rights of privacy, copyright, or any other rights of any person or entity.

14. INDEMNITY. (a) In the event of any claim, demand, suit, action or proceeding ("Claim") based upon an alleged breach of the Author's warranties, the Publisher shall have the right to select counsel to defend itself and the Author, and the Author shall indemnify and hold harmless the Publisher, any seller of the Work, any licensee of a subsidiary right in the Work, and any other person to whom the Publisher or its licensees may extend the representations and warranties contained herein in connection with the production or distribution of the Work or the exercise of any rights therein or derived therefrom, against any losses, damages and expenses (including reasonable legal fees and expenses) arising or resulting from or in connection with any such Claim. The Author shall cooperate fully in the defense of any such Claim, and acknowledges that failure to cooperate in the defense of any Claim shall be deemed a breach of this Agreement. If the Author so chooses, the Author may join in the defense of any Claim with an attorney of his own choosing at his own expense. The Publisher may settle any such Claim against it or waive any appeal of any judgment of a trial court against it. If such Claim is successfully defended or is settled, the Author's indemnity hereunder shall be limited to fifty percent (50%) of the cost of defense and the amount of settlement (if any).

(b) If a Claim is instituted, the party receiving notice of the Claim shall promptly notify the other in writing and shall give the fullest information obtainable at the time of such Claim. Upon receipt of any Claim

which would obligate the Author under the above indemnity, the Publisher reserves the right to withhold amounts otherwise payable to the Author and to apply such amounts (as required) in satisfaction of the foregoing indemnities. In addition to any other rights in law and equity, in the event of any breach by the Author of the Author's warranties, the Publisher may as a final remedy terminate this Agreement and recover any monies advanced to the Author under this Agreement.  The foregoing indemnities shall survive the termination of this Agreement.

15. DEFENSE OF COPYRIGHT.  In case of any infringement of the copyright of the Text or any other material provided by the Author for the Work by others, the Publisher may in its discretion sue or employ such remedies as it deems expedient, and all such suits or proceedings shall be at the joint expense of the Author and the Publisher, and the net proceeds of any recovery shall be divided equally between them, but the Author shall not be liable for any expenditure for such purposes in excess of one thousand dollars ($1,000) undertaken by the Publisher without the Author's previous consent in writing. If the Author does not consent to all expenditures for such purposes, any recovery shall be divided between the Publisher and the Author in the ratio of their respective expenditures for such purposes. The Author authorizes the Publisher to join the Author as plaintiff or co-plaintiff in any litigation against one or more third parties for infringement of the copyright in the Text or any other material provided by the Author for the Work, without cost to the Author, except as provided by this Paragraph.

16. COMPETITIVE MATERIAL. During the term of this Agreement, (i) the Author shall not, without the Publisher's prior written consent, publish or authorize publication by anyone other than the Publisher of any edition or adaptation, abridgment or condensation of the Text or of any derivative of the Text (including without limitation, any screenplay, television script, or novelization based on the Work); and (ii) the Author will not publish or authorize publication of any similar material in book, article or pamphlet form, or Ancillary Product which is likely to compete with the sale of the Work.

17. AUTHOR'S PROPERTY. The Author shall retain complete copies of all materials provided by the Author to the Publisher for the Work.  In the event of loss or damage to the copies delivered to the Publisher, the Publisher's liability shall be limited to the cost of making an additional set of copies of such materials from the set retained by the Author. Except for loss or damage caused by the Publisher's negligent acts or omissions, the Publisher shall not be responsible for loss of or damage to any of the Author's property.

18. OPTION.  The Author shall offer the Publisher the opportunity to acquire the same rights as are herein granted with respect to the Author's next book-length work, before submitting it to any other publisher, whether directly or indirectly.  The Publisher shall be entitled to a period of six (6) weeks after submission of such next work within which to notify the Author of the Publisher's decision, which period shall in no event commence to run prior to one (1) month after the Publisher's initial publication of the Work hereunder.  If within that period the Publisher shall notify the Author of its desire to publish the manuscript, the Publisher shall thereupon negotiate with the Author with respect to the terms of such publication.  If the parties are unable to agree upon terms within thirty (30) business days after the Author's receipt of the Publisher's offer, the Author shall be free to submit the manuscript elsewhere, provided, however, that the Author does not accept an offer on terms less than or equal to those offered by the Publisher, and that the Author offers the Publisher the opportunity to acquire such next work on the same terms as are offered by another publisher for a period of ten (10) business days following the Publisher's receipt of notice of such other offer.

19. TERMINATION OF THIS AGREEMENT. (a) Out of print. If the Work is out of print, and the Publisher does not agree to bring out a new printing or has not entered into a sublicense for a reprint edition within six (6) months following receipt of the Author's written notice (unless delayed by circumstances beyond the Publisher's control), this Agreement shall terminate and all rights granted to the Publisher shall revert to the Author upon written request, subject to the Publisher's continued participation in any licenses granted by the Publisher.



(b) Discontinuance. If at any time after first publication, the Publisher wishes to discontinue publication for any reason, the Publisher may do so upon written notice to the Author, in which event this Agreement shall terminate and all rights granted hereunder shall revert to the Author upon the termination date set forth in such notice from the Publisher.

(c) Remainders. The Publisher may, in its sole discretion, offer copies of the Work for sale as "remainders" at any price it sees fit. The royalty payable upon copies sold as remainders shall be five percent (5%) of the amount received, less manufacturing costs, and shall not exceed any other royalty rate set forth in this Agreement. The Publisher shall notify the Author prior to such remaindering and shall offer the Author the opportunity to purchase copies at the estimated remainder price, plus shipping and handling; however, any inadvertent failure to do so shall not be deemed a breach of this Agreement.

20. TERMINATION UNDER U.S. COPYRIGHT LAW. If, pursuant to the United States Copyright Act, the Author (or, if deceased, the successor of the Author) has the right to terminate the rights granted hereunder, and elects to exercise such rights as provided pursuant to such Act, after such termination, the Author shall not exercise or dispose of such rights except in accordance with the following procedure: commencing with the date of such termination, the Author and the Publisher shall negotiate in good faith for a period of not less than sixty (60) days with respect to mutually agreeable terms and conditions. If the parties are unable in good faith to arrive at a mutually satisfactory agreement for such publication, the Author shall be free to offer the rights terminated elsewhere, provided, however, that prior to entering into any agreement with any such third party, the Author shall first give the Publisher the opportunity to agree, within ten (10) business days, to match the terms offered by such third party which the Author is willing to accept.

21. GOVERNING LAW. Regardless of the place of its actual execution and performance, this Agreement shall be treated as though executed and performed within the State of California, and shall be governed by and interpreted under the laws of the State of California.

22. COMPLETE AGREEMENT, MODIFICATION, AND INTERPRETATION. This Agreement constitutes the complete understanding of the parties, and no waivers or modifications of any provision shall be valid unless in writing, signed by the Author and the Publisher. This Agreement supersedes any prior agreements between the parties with regard to its subject matter, whether oral or written. The waiver of a breach or of a default under any provision hereof shall not be deemed a waiver of any subsequent breach or default. The payment of any advances or royalties hereunder shall not be deemed a waiver by the Publisher of any rights and/or claims that it may have with respect to nonperformance by the Author of the Author's obligations hereunder. The language of this Agreement shall in all cases be construed in accordance with its full and fair meaning.

23. ASSIGNMENT. This Agreement shall be binding upon and shall inure to the benefit of the respective parties, their heirs, executors, administrators, successors and assigns, and may not be assigned by either party without the other's written consent, except that the Publisher may, without the Author's consent, assign this Agreement to its parent, or any subsidiary or affiliated company, or to any company which acquires all or substantially all of its assets.

24. NOTICES. Any and all notices or other communications required or permitted by this Agreement shall be in writing and shall be deemed delivered when personally delivered to the party to whom it is addressed, or in lieu of such personal delivery, five (5) business days after deposit in the United States mail, first class, postage prepaid, addressed to such party at the appropriate address as set forth in this Agreement. Either party may change its address by written notice of such change delivered in accordance with this Paragraph.

25. AGENCY CLAUSE. The Author authorizes and directs the Publisher to make all payments payable to and in the name of @ as the Author's sole and exclusive agent in connection with this Agreement and in connection

CHRONICLE BOOKS                                                                          PAGE 9

with any matters arising hereunder.  The Author acknowledges and agrees that the payments made to the foregoing agent constitute complete and fully satisfactory performance of the Publisher's obligation to the Author with respect to payment under this Agreement.  All statements and payments hereunder shall be sent to such agent, whose receipt shall be deemed receipt by the Author.



AG100200

CHRONICLE BOOKS                                                    PAGE 10

IN WITNESS WHEREOF, the parties have duly executed this Agreement the day and year last written below.

AUTHOR                                    CHRONICLE BOOKS LLC

_____                 _____

_____                 _____
Date                                      Date

_____
Social Security Number



AG100201



**RANDOM HOUSE**

AGREEMENT made this \_\_\_\_\_ day of _____, 201\_\_, between ~~_____~~ (the "Author") ~~_____~~ and The Random House Publishing Group, a division of Random House, Inc. of 1745 Broadway, New York, New York 10019 ("Random House");

The parties to this Agreement wish to publish and have published **two (2)** separate works (collectively, the "Work" and, individually, "Work #1" and "Work #2") provisionally entitled, respectively:

**Work #1 – UNTITLED #1**
**Work #2 – UNTITLED #2**

In consideration of the mutual promises in this Agreement, the parties agree as follows:

**1. The Work.** The Author shall deliver to Random House a new and original **fiction** manuscript of each Work containing approximately ▇▇▇ words.

**2. Description of the Work.** Each Work shall be ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**3. Grant of Rights; Territories.** The Author grants to Random House, during the full term of copyright available to each Work in each country covered by this Agreement, the exclusive right to print, publish, distribute, sell and license any and all editions and/or formats of each Work, in whole or in part, throughout the **world (the "Exclusive Territories")**.

~~If the Grant of Rights herein does not include the right to sell any Work in Australia/New Zealand, Random House may nevertheless arrange for non-exclusive distribution of that Work in Australia/New Zealand if the Author has not entered into a publishing agreement with an Australian or British Commonwealth publisher for publication of that Work in Australia/New Zealand within thirty (30) days of Random House's first publication of that Work.~~

**4. Advance Against Royalties.** Random House shall pay to the Author, as an advance against and on account of all moneys accruing to the Author under this Agreement, the sum of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, representing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ for each Work, payable as follows:

▇▇▇▇▇▇ upon execution of this Agreement by both parties (of which ▇▇▇▇▇ shall be attributable to Work #1 and ▇▇▇▇▇ shall be attributable to Work #2);

▇▇▇▇▇ on Random House's acceptance of the complete manuscript of Work #1;

AG100202



██████ on Random House's publication of the initial edition of Work #1, but no later than twelve (12) months after Random House's acceptance of the complete manuscript of Work #1;

██████ twelve (12) months after Random House's publication of the initial edition of Work #1, but no later than twenty-four (24) months after Random House's acceptance of the complete manuscript of Work #1;

██████ on Random House's acceptance of Progress Materials for Work #2* [as defined in Paragraph 5(a)], but such payment shall not be made prior to Random House's acceptance of the complete manuscript of Work #1;

██████ on Random House's acceptance of the complete manuscript of Work #2;

██████ on Random House's publication of the initial edition of Work #2, but no later than twelve (12) months after Random House's acceptance of the complete manuscript of Work #2; and

██████ twelve (12) months after Random House's publication of the initial edition of Work #2, but no later than twenty-four (24) months after Random House's acceptance of the complete manuscript of Work #2.

*Random House's rendering of such payment shall not be considered acceptance of the complete manuscript of that Work.

It is understood that for accounting purposes both Works which comprise this Agreement shall be jointly accounted and cross-collateralized, and no royalties or subsidiary rights income for an individual Work shall be payable to the Author until the total advances specified above have been earned out.

5. <u>Delivery and Acceptance of Manuscript.</u> (a) One (1) original of each complete Work in print form and one electronic copy, as described in Paragraphs 1 and 2 and in the following Subparagraphs of this Paragraph 5, shall be delivered to Random House not later than ████ ██ 2011 for Work #1 and not later than ██████ 2012 for Work #2.

Prior to the delivery of the complete manuscript of Work #2, the Author shall deliver Progress Materials as follows: a detailed proposal not later than ██████ 2011.

(i) If the Author fails to deliver any complete Work by the applicable due date set forth above, after a thirty (30) day grace period **or by a later date as may be mutually agreed in writing by the parties**, Random House may demand, in writing, that the Author return all sums in full paid to the Author by Random House in connection with that Work. Upon receipt of these sums, this Agreement shall terminate for that Work. Further, in the event of non-delivery of a Work, Random House may, at its option, terminate this Agreement for any subsequent Works as well, and the Author shall repay to Random House all sums already advanced for such subsequent Work(s). The Author may not, for a period of ~~three (3)~~ two (2) years after termination for any Work, submit any partial or complete manuscript or proposal for that Work or for a similar work to any publisher before offering it to Random House under the same terms contained in this Agreement for that Work.

(ii) If Random House determines that any published Work requires materials such as photographs, illustrations, an appendix, a bibliography, or other supplementary matter ("Related Materials"), the Author shall furnish these to Random House in reproducible form at a time mutually agreed; if the Author does not do so, Random House may supply them at the Author's expense.

(iii) If permission from others is required for publication of any material contained in any Work, including any visual material, or for the exercise of any other right in that Work conferred by this Agreement (including the right to promote that Work), the Author shall be responsible for obtaining such permissions at Author's own expense and shall submit them, in form satisfactory to Random House, with the complete manuscript of that Work, but Random House may, if Random House deems it necessary, assist the Author in obtaining the necessary permissions. Such permissions shall permit the exercise by Random House and its sublicensees of all the rights licensed to Random House for that Work.

2

AG100203

~~(iv) Random House shall have the right to commission the preparation of an index for any Work, reasonable to the size and scope of that Work, at the expense of the Author, unless the Author provides an acceptable index for that Work within a mutually agreeable time period in accordance with Random House's production requirements.~~

(v) Any sums that Random House has paid on the Author's behalf for any Work by reason of Subparagraphs 5(a)(ii-~~iii~~) may be deducted from any portion of the advance payable to the Author for that or any other Work pursuant to Paragraph 4; if the total advance allocated to all Works has already been paid, however, any such sums will be billed to the Author directly, or, at Random House's discretion, charged to the Author's royalty account.

(b) Random House will inform the Author in writing whether the manuscript of any Work or Progress Materials for Work #2 which are delivered pursuant to Paragraph 5(a) are acceptable within ~~ninety (90)~~ sixty (60) days of receipt of such complete manuscript that Work or Progress Materials for Work #2. Acceptance of the Progress Materials for Work #2 shall not be deemed acceptance of the complete manuscript of that Work.

(i) If Random House concludes that the manuscript for any Work or Progress Materials for Work #2 delivered are **editorially** unacceptable but could be revised to Random House's satisfaction in a timely fashion, Random House and the Author shall agree on an appropriate period of time for the revision process and Random House will provide written editorial comments to the Author for the revisions required. Should Random House, in its sole judgment, conclude that the manuscript for any Work or Progress Materials for Work #2 as first submitted cannot be revised to its satisfaction within a timely period, or after the agreed revision period, should Random House find that the revised manuscript for any Work or the revised Progress Materials for Work #2 are still **editorially** unacceptable for any reason, Random House may reject that Work by written notice to the Author.

(ii) If any of the manuscript(s) for either Work is rejected, the Author may retain fifty percent (50%) of any amounts advanced to the Author for that Work pursuant to Paragraph 4 and shall repay Random House fifty percent (50%) of the amount so advanced within twelve (12) months, (the "Repayable Sum") and Random House shall not be obligated to make any further payment under this Agreement with respect to that Work. The Author will be authorized to negotiate the sale or license of rights in that Work to any third party on the condition that the Author will be obligated to repay to Random House the amounts retained from the portion of the advance allocated to that Work pursuant to this Subparagraph 5(b)(ii) from all proceeds from any sale or license by the Author of rights of any nature in that Work to a third party (the "First Proceeds"). The Author agrees to use best efforts to license or sell the rights in that Work on terms most likely to result in the repayment in full to Random House. The Author agrees to notify Random House of the financial terms of any agreement with any third party involving rights in that Work and the Author will ensure that any agreement with any third party provides that Random House will be paid directly First Proceeds until amounts retained by the Author for that Work under this Agreement have been fully recouped by Random House. Further, in the event of rejection of any Work, Random House may, at its option, terminate this Agreement for any subsequent Works as well, and the Author shall repay to Random House all sums already advanced for such subsequent Works. This Agreement shall thereafter continue in effect for any previously published Works under this Agreement. If the Author is obligated to repay Random House any sums under this Paragraph 5, it is specifically understood that Random House has a first security interest in any and all proceeds received from the sale or license of any Work up to the amount owed Random House.

(iii) Further, if the Repayable Sum for any Work is not paid in full by the Author within twelve (12) months of the termination of this Agreement with respect to such Work, Random House shall have the right to continue to treat the Repayable Sum as combined with the advance against royalties and all other earnings on the other Work(s) included in this Agreement, and Random House may deduct the Repayable Sum from any advances payable to the Author for the other Work(s).

3

AG100204



(c) If Random House requires that either Work receive a legal vetting, the completed, revised manuscript of that Work will be submitted to Random House's attorneys. The Author will cooperate with the attorneys in the legal vetting process. If Random House's attorneys conclude that publication of that Work may lead to legal liability, Random House and the Author will cooperate for a period of sixty (60) days to make it legally acceptable to Random House's attorneys. If they are unable to do so, the Author shall return to Random House any amounts advanced for that Work and, when Random House has received this repayment, this Agreement shall terminate for that Work. If Random House finds any Work is legally acceptable for publication in the United States but changes are advisable for publication in other territories, and/or if Random House's attorneys deem changes advisable after the first publication of that Work, the Author shall agree to make the changes. Each Work may be deemed acceptable only when it is legally acceptable. In no event shall Random House be obligated to publish or continue to publish a work which, in the judgment of its attorneys, may lead to legal liability. No changes or revisions made pursuant to this paragraph shall be deemed to alter or affect the warranties and indemnities contained in Paragraph 15 of this Agreement.

6. **Proofreading and Author's Corrections.** Following acceptance of any Work, no changes other than copyediting shall be made by Random House without the consent of the Author. The Author shall cooperate in making any required corrections, approving the copyedited manuscript of that Work, and reading, correcting, and returning promptly all galley proofs and dummys. The cost of the Author's alterations, in type or plates, other than those that are due to printer's errors, in excess of ten percent (10%) of the cost of composition, shall be paid by the Author. The Author shall be entitled to see the typesetter's bill for such charges. ~~Upon Random House's reasonable request, in order to keep any Work topical, the Author shall revise/update that Work from time to time following first publication.~~

7. **Publication.** Random House may publish and distribute each Work in any format, style, and manner, and under any of its imprints, and with a jacket, cover or package and at a cover price as it shall determine; however, **Random House shall consult with the Author regarding the cover presentation and cover copy for its edition(s) of each Work. It is Random House's current intention to initially publish each Work in hardcover format; however, final determination as to initial format for each Work shall be at Random House's sole discretion.** The final title of each Work shall be mutually agreed between Random House and the Author. Random House shall publish each Work within eighteen (18) months of its acceptance of the complete manuscript of that Work and Related Materials for that Work, as described in Paragraphs 1, 2 and 5 **(with reasonable efforts to do so within twelve (12) months of such acceptance)**, it being agreed that Random House shall not be obligated to publish any Work earlier than one (1) year following the first publication of the preceding Work under this Agreement. If Random House has not commenced production of that Work in the English language within such time, other than for reasons beyond its control, such as strikes, wars, government restrictions, or Acts of God, or because of a business decision made ~~in consultation~~ with **the reasonable approval of** the Author, then the Author shall have, as a sole remedy, either of the following options: (i) Upon written notice to Random House, the Author may grant the rights to that Work to another publisher provided that the Author repay Random House all sums advanced for that Work under this Agreement out of First Proceeds received from the grant of rights to another publisher; or (ii) the Author shall grant Random House an extension of six (6) months from the date of Random House's receipt of written notice in which to publish that Work, with the understanding that if Random House should fail to publish that Work within this additional six (6) month period, this Agreement will terminate for that Work, all rights in that Work will revert to the Author, and the Author shall have the right to retain all sums already received by the Author for that Work pursuant to Paragraph 4 as liquidated damages for Random House's failure to publish that Work.

8. **Promotional Materials/Promotion by Author.** (a) The Author shall cooperate with Random House in obtaining, at Author's expense, a photograph of the Author of quality acceptable to Random House to be used in connection with the publication of the Work.

4

AG100205



(b) Random House may use, or permit others to use, the Author's name and the **pre-approved** likeness of the Author obtained pursuant to Paragraph 8(a), the title of each Work, and selections from that Work in advertising, promotion and publicity related to the publication and/or licensing of that Work, including broadcast, without charge, by radio, television or cable, or distribution via any form of electronic transmission, including on-line or satellite-based data transmission. In addition, the Author may post on the Author's website the same portions of the text of each Work that Random House makes available for promotional use, provided that the site carry the current copyright notice, a credit line to Random House, and a link to Random House's website. Use of any additional material from any Work for online posting shall be subject to Random House's approval.

(c) All details of the advertising and promotion of the Work shall be determined by Random House, except that **Random House shall consult with the Author in regard to the press release, catalog copy and major advertising copy.** If Random House, upon reasonable advance notice, requests the Author's cooperation in promoting any Work, the Author shall be available for such promotional activities. **Random House shall pay the Author's reasonable travel expenses (i.e., transportation, lodging and food) incurred in connection with any such promotional activities arranged by Random House.**

**9. Author Copies.** Upon Random House's publication, it shall give ~~twenty (20)~~ **fifty (50)** hardcover and ~~twenty-four (24)~~ **seventy-five (75)** paperback copies of its edition(s) of each Work to the Author **which shall be sent directly to the Author at an address to be provided by the Author and Random House shall give the Author's agent five (5) hardcover and ten (10) paperback copies of each Work.** The Author may purchase additional copies of each Work for personal use and not for re-sale at one-half (½) the cover price of that Work. The Author will be billed for these copies and payment shall be made prior to shipping of that Work unless the Author's royalty account has sufficient excess royalties accrued over and above the advance paid to the Author so that these charges can be recouped from the Author's royalty account.

**10. Copyright.** Notice of copyright in each Work shall appear in each copy of each Work printed by Random House and be in the following name:



**Random House agrees to register the copyright in each Work in the Author's name in the United States provided, however, that Random House will not be obligated to register the copyright if, prior to the time of Random House's initial publication of that Work, the U.S. copyright law is amended so that registration is no longer a prerequisite to the recovery of attorneys' fees and statutory damages in an infringement action.**

**11. Royalties.** Royalties on Random House's editions of each Work shall be based upon sales less actual returns and less a reasonable reserve\* for returnable copies, at the following rates: **\*(After three full accounting periods following publication of each edition of each Work, the reserve held for that edition shall be based upon the actual returns of that edition during the previous accounting period.)**

(a) Hardcover. (i) On copies of a hardcover edition sold in the U.S., except as described in subparagraphs (k) through (p) below: **10% of the U.S. cover price on the first 5,000 copies sold; 12½% of the U.S. cover price on the next 5,000 copies sold; and 15% of the U.S. cover price on all copies sold thereafter.**

(ii) On copies of a hardcover edition sold by any affiliate of Random House in the British Home Market (defined as the United Kingdom, Republic of Ireland, and the Channel Islands), except as described in (j) through (p) below: **10% of the U.K. cover price on the first 3,000 copies sold; 12½% of the U.K. cover price on the next 3,000 copies sold; and 15% of the U.K. cover price on all copies sold thereafter.**

5

AG100206



(b) <u>Trade Paperback.</u> (i) On copies of a trade paperback edition sold in the U.S., except as described in (k) through (p) below: **7½% of the U.S. cover price.**

(ii) On copies of a trade paperback edition sold by any affiliate of Random House in the British Home Market, except as described in (j) through (p) below: **7½% of the U.K. cover price on the first 10,000 copies sold; and 10% of the U.K. cover price on all copies sold thereafter.**

(c) <u>Mass-Market Paperback.</u> (i) On copies of a mass-market paperback edition sold in the U.S., except as described in (k) through (p) below: **8% of the U.S. cover price on the first 150,000 copies sold; and 10% of the U.S. cover price on all copies sold thereafter.**

(ii) On copies of a mass-market paperback edition sold by any affiliate of Random House in the British Home market, except as described in (j) through (p) below: **7½% of the U.K. cover price on the first 50,000 copies sold; and 10% of the U.K. cover price on all copies sold thereafter.**

~~The royalties set forth in Paragraphs 11(a), (b) and (c) for any Spanish-language edition shall be reduced by 1%.~~

~~(d) Paper Products. On all copies of paper products based on the Work (including, without limitation, journals, note cards, note pads, postcards, calendars, coasters, organizers): 5% of the amount received by Random House.~~

(e) <u>Modern Library/Everyman's Library.</u> On all copies of any edition sold in the Modern Library (regular or giant) or in Everyman's Library: 5% of the cover price except as described in (h) through (p) below. **Any such edition shall not be published earlier than three (3) years from Random House's initial publication except with the approval of the Author.**

(f) <u>Large Print.</u> On all copies of a large-type edition of any Work sold in the U.S., except as described in (h) through (p) below: 5% of the cover price on the first 5,000 copies sold, and 7½% of the cover price on all copies sold thereafter with respect to a hardcover edition of a Work and 5% of the cover price with respect to a paperback edition of a Work.

(g) <u>Omnibus.</u> On all copies sold of any omnibus volume containing any Work and other works by the Author **(publication of such an edition shall be subject to the Author's prior reasonable approval):** ~~10% of the amount received by Random House for the omnibus as a whole except as provided in (j) through (p) below.~~ **A royalty to be negotiated if such an edition is planned.**

(h) <u>Canadian Sales.</u> On all copies of any edition published by Random House and sold in Canada by any affiliate of Random House, except as described in (k) through (p) below: two-thirds (2/3) of the prevailing U.S. rate for that edition based on cover price.

(i) <u>Australia.</u> On all copies of any edition sold in Australia and New Zealand, except as described in (k) through (p) below: two thirds of the prevailing U.S. rate for that edition based on cover price.

(j) <u>Other Export Sales.</u> (i) On all copies of any edition sold outside the United States of America and its military bases, other than those countries specified in (h) and (i) above: 10% of the amount received by Random House for the hardcover edition; and 5% of the amount received for any paperback or other lower-priced edition.

(ii) On all copies sold on a royalty-inclusive basis to licensees outside the U.S.: 8% of the amount received by Random House.

(k) <u>High Discount Sales.</u> On all copies of any paperback edition sold at a discount of 60% or more and on all copies of the hardcover edition sold at a discount of 55% or more: 10% of the amount received by Random House. **[Such royalty shall not apply to copies sold through**

6

normal trade channels (including chains), except for special sales such as bulk or corporate sales to specific customers.]

(l) Premiums.  On all copies of any edition sold for premium use:  5% of the amount received by Random House.

(m) Mail Order Continuity Sales.  On all copies of any edition sold to direct marketers or as part of a direct marketing continuity program:  5% of the amount received by Random House.

(n) Educational Book Clubs and Book Fairs.  On all copies of any edition sold to book clubs or book fairs supplying the educational market:  6% 8% of the amount received by Random House.

(o) Proprietary Editions.  On all copies sold of any proprietary edition specifically produced for a retail outlet (subject to the Author's approval over the retail outlet only, such approval not to be unreasonably withheld or delayed): 5% of the amount received by Random House.

(p) Adult Book Clubs.  On all copies of any edition sold to an adult book club on a royalty inclusive basis:  10% of the amount received by Random House.

(q) Audio.  (i) Except as provided below, on all copies sold of any audio recording developed from any Work (the "Audio Works") and sold by an audio publishing imprint of Random House, Inc. through regular wholesale, retail and library channels:  10% of the amount received by Random House;

(ii)  on copies of the Audio Works sold through special markets such as mail order and premium or on copies of the Audio Works sold at a discount of 60% or greater:  5% of the amount received by Random House;

(iii) on all copies of the Audio Works sold and delivered by means of digital distribution: 25% of the amount received by Random House; and

(iv) on all sublicensing of audio recording rights in any Work to publishers of abridged or unabridged recordings, book and record clubs, continuity programs, mail order marketers, British and translation publishers and other third parties such as electronic publishers, or for broadcast: 50% of the advance and/or royalties received by Random House.

For purposes of this Agreement, the Audio Works may constitute single and multiple audio cassettes, phonograph records, audio discs of any speed or size, magnetic recording tape, and any other medium for sound reproduction or transmission known today or which may hereafter become known and which may include verbatim selections from any Work, connecting narrative passages, background music and sounds supplied by Random House.

During the term of this Agreement, the Author shall not, without Random House's prior written consent, create or authorize or participate in the creation of any other audio program based on any Work.  Notwithstanding the foregoing, in the event the Author has reserved Performance Rights in any Work, the Author shall have the right to convey to the licensee of motion picture or stage rights the right to produce an audio recording  derived from the soundtrack of a motion picture or play based on that Work.

If more than one work of the Author is recorded on the audio recording, the royalty paid to the Author shall be in proportion to the amounts from each work used on the audio recording.

The Author shall be given the opportunity to approve the script for any Audio Work based on an abridgment of a Work, provided that such approval shall not be unreasonably withheld or delayed.  If the Author has not approved or disapproved the script within ten (10) business days from the Author's receipt thereof, the script shall be deemed approved.

(r) Electronic.  On all copies of a Work sold as an "Electronic Book" or "Electronic Version" as defined herein below:  25% of the amount received by Random House.

AG100208



As used in this Agreement, Electronic Book means the text of a Work in complete, condensed, adapted or abridged form by any means of distribution or transmission, whether now or hereafter known or developed, intended to make the text and any illustrations or photographs contained in that Work available in visual form for reading.

**Notwithstanding the foregoing, if, during the term of this Agreement, the Electronic Book royalty in the Random House, Inc. contract boilerplate reflects a change to the Author's advantage, Random House will amend this Agreement to reflect that new royalty.**

Electronic Version means a digital or electronic product or service that is derived or adapted from a Work or portions of a Work, which may include incidental portions of the text of that Work and enhancements such as sound, images, animation or interactivity. **It is understood that Electronic Version rights are reserved to the Author.**

(s) <u>On-Line Sales.</u> (i) For sales through on-line bookstores or internet bookstores (e.g., amazon.com), including sales made via Random House's proprietary website, the applicable royalty specified above will be paid on such sales, based on the format and territory that apply to the sale.

(ii) For sales of returned or hurt books made by Random House through on-line used bookstores: 10% of the amount received by Random House. Random House shall not make returned or hurt copies available for sale in this manner until one (1) year following initial publication of each format. For the purposes of this Paragraph 11(s)(ii), "returned" or "hurt" books means copies of books returned to Random House from wholesalers or retailers for credit.

(t) <u>No Royalty Copies.</u> No royalties shall be paid on copies of any Work sold to any party below or at cost (including shipping and handling costs) or given away for review, advertising, sample, sales promotions, or like purposes, or on portions of that Work appearing as previews in other books published by Random House or on portions of that Work used or sublicensed for advertising or publicity without compensation.

12. **Subsidiary Rights.** The Author grants to Random House the exclusive right to sublicense other rights in each Work as specified in this Agreement in the Exclusive Territories ~~and the non-exclusive right to sublicense other rights in each Work in the Open Market~~ upon terms as Random House deems advisable. The net proceeds of these sublicenses shall be divided as set forth below and paid (less the amount of any advances then unearned) at the time of the next accounting. **However, upon the Author's written request not to occur more than twice per royalty statement period and provided Random House has recouped all advances and any other sums due under this Agreement, Random House shall flow through to the Author the Author's share of any subsidiary rights income received by Random House pursuant to this Paragraph 12 where the Author's share equals One Thousand Dollars ($1,000.00) or more within thirty (30) days after Random House's receipt of such subsidiary rights income.** Upon Author's written request, Random House will provide the Author with copies of executed licenses in which the Author's share of the proceeds is Five Hundred Dollars ($500.00) or more.

|  | Random House's Share | Author's Share |
|---|---|---|
| First Serial (use of serializations, condensations, excerpts, digests, etc., in newspapers, magazines or other periodicals <u>before</u> publication of any Work in book form) | 10% | 90% |
| Second Serial (use of serializations, condensations, excerpts, digests, etc., in newspapers, magazines, other periodicals or books after publication of any Work in book form) | 50% | 50% |

8

AG100209

| | | |
|---|---|---|
| Book Club | 50% | 50% |
| Permissions | 50% | 50% |
| Trade or Mass-Market Paperback (Such licensing to be subject to the Author's approval, such approval not to be unreasonably withheld or delayed) | 50% | 50% |
| Other Book Publication (including, but not limited to, hardcover, large-type editions, mail order, premium and other special editions and schoolbook and book fair editions licenses) | 50% | 50% |
| British Commonwealth Hardcover and/or Paperback (which may include the right of Random House's licensee to further sublicense any of the rights granted elsewhere in this Agreement, including first serial) | 20% | 80% |
| Translation (which may include the right of the licensee to sublicense any of the rights granted elsewhere in this Agreement, including first serial) | 25% | 75% |
| Electronic Book and storage and retrieval of the text (including any visual material) in whole or in part in complete, condensed or abridged form, including microfilm, microfiche, digital media or other electronic text format | 50% | 50% |
| ~~Electronic Versions~~ | ~~50%~~ | ~~50%~~ |
| Audio Recording See subparagraph 11(q) | 50% | 50% |
| ~~Videocassettes (not dramatized)~~ | ~~50%~~ | ~~50%~~ |
| ~~Paper products (such as journals, note cards and calendars)~~ | ~~50%~~ | ~~50%~~ |
| ~~Commercial and Merchandising (derivative products such as the use of a title or character for clothing or toys)~~ | ~~50%~~ | ~~50%~~ |
| ~~Performance (television, radio, dramatic, musical, motion picture and video rights and allied merchandising rights derived therefrom), subject to the Author's prior consent~~ | ~~10%~~ | ~~90%~~ |

Random House shall have the right to  grant transcription or publication rights in any Work in Braille or other non-book formats specifically for the visually impaired without charge.

If Random House exercises any of the rights specified above itself in lieu of sublicensing them, the royalty rates, unless specified in Paragraph 11, shall be subject to agreement between the parties.  Further, if any right specified in Paragraph 12 is sublicensed by Random House to a company that is affiliated with Random House, Inc., it is understood that such license will be negotiated at arm's length and on terms similar to the terms of current agreements for similar licenses between Random House and unaffiliated companies.

AG100210

~~If the Author has retained Audio Recording rights in any Work the Author shall give Random House the right of first opportunity for the acquisition of these rights before licensing them elsewhere. If Random House does not exercise such option and the Author retains Audio Recording rights in a Work, the Author will not authorize publication of an audio recording of that Work earlier than Random House's first publication of that Work.~~

~~If the Author has retained first serial rights in a Work, the Author will not license such rights without consulting Random House to coordinate publication of the first serial and Random House's edition of that Work.~~

If the Author disposes of Performance rights in a Work, Random House shall grant the purchaser of those rights the privilege to publish excerpts and summaries of that Work in the aggregate not to exceed 7,500 words (or ten percent [10%] of the total text of that Work, whichever is less), for advertising, publicizing and promoting such rights, provided, however, that the Author's grant shall require the purchaser to take all steps necessary to protect the copyright of that Work. The Author will use ~~best~~ **reasonable** efforts to secure the agreement of the purchaser of performance rights in a Work to grant Random House the right to use photographic stills and the title of the performance in connection with any Random House tie-in edition of that Work in any format.

**13. Statements of Account.** Random House shall prepare a statement of account semi-annually as of the 31st day of March and the 30th day of September for all six-month periods during which copies are sold, and shall send these statements, together with payment of the amount due, if any, within four (4) months following the end of the period. The Author's share of amounts received from the disposition of licenses granted under this Agreement shall be computed after deduction of any foreign taxes withheld, bank charges and any of Random House's sub-agent commissions. If the Author has received any overpayment or is otherwise indebted to Random House, Random House may deduct the amount due from any sum due or to become due to the Author under this or any other agreement between the parties.

The Author shall have the right, upon reasonable written notice, to examine the books and records of Random House as available insofar as they relate to the Work at Author's own expense, and provided that the examination is conducted during usual business hours and in accordance with customary accounting procedures, and occurs no more than once a year and not later than two (2) years from the Author's receipt of the statement in question. **If errors of accounting amounting to five percent (5%) or more of the total amount due the Author hereunder are found and agreed to be to the Author's disadvantage, Random House shall pay the reasonable cost of said audit, up to the amount of the discrepancy.**

**Upon the Author's written request but not more than once per accounting period, Random House shall provide information about the number of copies of a Work printed, shipped and returned, the current inventory and the actual reserve against returns held by Random House.**

**14. Competitive Works.** (i) The Author will not, without Random House's prior written consent, publish or authorize publication by anyone other than Random House of any text-based edition, adaptation, abridgment or condensation of a Work, or of any text-based derivative work (including, but not limited to, any dramatic play, screenplay, television script, novelization or photonovel) based on that Work or bearing a like title; ~~(ii) the Author shall not license or otherwise authorize the publication of any other English language edition of any Work in the Open Market earlier than the date of first publication of Random House's edition of that Work in the same format (e.g., hardcover, trade paperback, mass market paperback or audio);~~ and (iii) the Author will not publish or authorize publication of any other novel by the Author within six (6) months of first publication of any Work.

**15. Warranties and Indemnities.** (a) The Author warrants and represents with respect to each Work (i) that the Author is the sole author of the Work; that the Author has the full power to enter into this Agreement; that the Author is the sole owner of all rights granted to Random

10

AG100211



House; that if a Work is one of non-fiction, all statements asserted as facts are based on the Author's careful investigation and research for accuracy; that no material in the Work violates any contract of the Author express or implied; that the Author has not previously assigned, pledged or otherwise encumbered the Work; that no material in the Work discloses any information given to the Author in confidence or on the understanding that it would not be disclosed or published; and (ii) that except for any previously published or unpublished materials created by others and Related Materials for which permissions have been granted, the Work is original, has not been published before, and is not in the public domain; that it does not contain any unlawful matter and that all information in the Work has been lawfully obtained, that the Work does not contain any libelous matter, does not invade any right of privacy nor infringe upon any trademark, right of publicity, statutory or common law copyright and that any recipe, formula, or instruction contained in the Work is accurate and is not injurious to the user.

(b)  In the event of any asserted claim or legal proceeding ("Claims") based on an alleged violation of any of these warranties, Random House shall have the right to defend the Claims by counsel of its own choosing.  The Author shall indemnify Random House and any seller or licensee of rights in any Work against any damages or losses incurred including any amounts paid in settlement, as well as against the cost of defending any Claims (collectively "Losses").

(c)  Random House shall include the Author as an "insured" in any publishing liability insurance that is in effect and that is applicable to each Work (the "Policy").  Random House shall look to the proceeds of that insurance, subject to the terms and conditions of the Policy (which may or may not include defense costs) for payment of Losses that may become due from the Author by reason of third party claims alleging violations of the warranties in subparagraph 15(a)(ii) above. The parties agree that:

    (i) the Author shall not be responsible for any premiums due under the Policy;

    (ii) the Author shall be an insured only with respect to the Work which is the subject of this Agreement;

    (iii) insurance coverage is for amounts in excess of the deductible but not greater than the Policy limits; and

    (iv) The Author shall be responsible for the deductible in an amount equal to twenty percent (20%) of the total advance payable under this Agreement for that Work, provided, however that if a claim is successfully defended, the Author's responsibility for the deductible will be twenty percent (20%) of the total advance payable under this Agreement for that Work or fifty percent (50%) of the defense costs, whichever is less.

(d) If any Claims are received by Random House or the Author, the recipient shall promptly notify the other party.  The Author and Random House shall fully cooperate with each other in the defense of any Claims.  Random House may, in addition to any other remedies, withhold payments due the Author under this or any other agreement between the parties to cover the Author's indemnity obligations under this Paragraph 15.  The Author's failure to cooperate with Random House in the defense of any Claims shall be deemed a breach of this Agreement and could result in the loss of the insurance coverage and shall entitle Random House to terminate the liability limitations set forth in Paragraph 15(c)(iv) above.  The Author's warranties and indemnities shall survive the termination of this Agreement.

**16.  Original Work.**  The Author shall retain an original copy of each Work and Random House shall not be responsible for the loss of or damage to any Work or any materials supplied by the Author except in the event of Random House's negligence.  Random House shall, upon the Author's written request, made within the first three (3) months after first publication of each Work, return the original manuscript of that Work and any original visual material for that Work supplied by the Author in its then "as-is" condition.  Random House shall not be required to retain the original manuscript of any Work or visual material after three (3) months and may dispose of the original manuscript of any Work after that time.

AG100212

**17. Inserts, Back-of-Book Advertising.** No advertising shall appear in Random House's editions of any Work except that, with respect to the hardcover edition of that Work, Random House or its licensees may publish a listing of the Author's other titles. With respect to the softcover, electronic or audio edition of that Work, Random House or its licensees may publish their own "house ads". Other advertisements will not be inserted or printed in any edition of any Work without the Author's prior written consent, such consent not to be unreasonably withheld or delayed.

**18. Next Publication of Author's Work.** The Works will be the Author's next published works **of fiction in book form** (whether under the Author's own name or under a pseudonym or in collaboration with anyone else) and the Author will not, prior to delivery of the complete manuscript of the last Work under this Agreement, write or contract with any other publisher to write any other work for publication in book form **that would interfere with delivery of the complete manuscript of each Work hereunder** without the written permission of Random House.

**19. Option.** The Author grants Random House the exclusive option to acquire ~~the same rights as have been granted in this Agreement~~ to the next full-length work **of fiction** to be written by the Author. Random House shall be entitled to a period of ~~sixty (60)~~ **forty-five (45)** days after submission of a **detailed proposal** for the next work in which to make an offer for that work, during which time the Author agrees not to solicit any third party offers, directly or indirectly. If Random House wishes to acquire the next work, the Author and Random House will attempt to reach an agreement as to terms during a reasonable period of exclusive negotiation. If they cannot reach an agreement, the Author shall be free to submit **the detailed proposal for** the next work elsewhere, but the Author may not accept an offer from any other publisher on terms equal to or less favorable than those offered by Random House. Random House shall not be required to consider the Author's **detailed proposal for the** next work until ~~publication~~ **sixty (60) days after Random House's acceptance of the complete manuscript for** the last Work under this Agreement. ~~The Random House option shall also apply to the next book-length work by each party to this Agreement included in the term "Author", whether such manuscript is written alone or together with another co-author.~~

**20. Remainders.** At any time after one year of initial publication of a Work, if, in the opinion of Random House, the continued sale of that Work is no longer profitable, Random House may dispose of any copies of that Work remaining on hand as "remainders" at any price as it may see fit. The royalty payable on all copies sold as "remainders" shall be ten percent (10%) of the amount received less manufacturing costs, not to exceed any other royalty rate specified in this Agreement and subject to Paragraph 11(t). Random House shall notify the Author before any Work is remaindered and shall offer the Author the opportunity to purchase copies of that Work at the remainder price; any inadvertent failure by Random House to do so, however, shall not be deemed a breach of this Agreement.

**21. Out-of-Print.** If, after the expiration of three (3) years from the date of Random House's first publication of a Work, that Work is out-of-print, the Author may make written demand to Random House to reissue or license rights in that Work (**in either case, for a full-length edition of that Work for sale through normal trade channels in the United States**). Random House shall notify the Author in writing within ninety (90) days after its receipt of a demand whether it intends to comply. If Random House does not respond or if, within six (6) months of its notice that it intends to comply, Random House has not complied by reissuing that Work **in a full-length edition for sale through normal trade channels in the United States** or entering into a sublicense for a new **full-length** edition of that Work **for sale through normal trade channels in the United States**, then this Agreement shall terminate for that Work and all rights granted to Random House for that Work shall revert to the Author.

12

AG100213



Upon termination of this Agreement for any Work, the Author shall have the right for thirty (30) days to purchase the plates or film for that Work, if any, at one-fourth (¼) of the cost (including typesetting). For the purposes of this paragraph, each Work shall be considered in print if it is available for sale in the United States in a full-length English language edition **and has generated at least three hundred (300) aggregate sales in any format over the two (2) successive accounting periods immediately preceding the Author's notice to Random House** or if a contract for its publication within ~~eighteen (18)~~ twelve (12) months by a sublicensee of Random House is outstanding.

**22.  Governing Law.**  Regardless of the place of its actual execution and performance, this Agreement shall be treated as though executed within the State of New York, and shall be governed by New York laws.  Any action or proceeding regarding this Agreement or any Work shall be brought solely in the New York courts (state or federal) in New York County.

**23.  Assignment.**  This Agreement, including the provisions of Paragraph 24, is binding upon the assigns, heirs, executors, or administrators of the Author and upon the successors and assigns of Random House but no assignment shall be binding upon either of the parties without the written consent of the other, except that Random House shall have the right to authorize or sublicense publication or use of any Work to its parent or any subsidiary or affiliated company, or to any company which acquires all or substantially all of its business or the business of one of its divisions.  If there is more than one party constituting "the Author", each party shall be jointly and severally liable for the Author's obligations under this Agreement.

**24.  Agency.  The Author hereby appoints the** ▓▓▓▓▓▓▓▓▓▓▓ **irrevocably as the Agent in all matters pertaining to or arising from this Agreement, and all sums of money due the Author under this agreement shall be paid to and in the name of said Agent, whose receipt thereof shall constitute full and valid discharge thereof.  The Author does also irrevocably assign and transfer to the** ▓▓▓▓▓▓▓ **and the** ▓▓▓▓▓▓ **shall retain a sum equal to fifteen percent (15%) out of all gross monies due and payable to the account of the Author under this Agreement.**

**If the Author notifies Random House in writing that his agreement with the** ▓▓▓▓ **has terminated, Random House will thereafter pay the Author and the** ▓▓▓▓▓ **separately and directly.**

**25.  Reserved Rights.**  All rights not expressly granted to Random House pursuant to this Agreement are reserved to the Author, provided that the Author will neither exercise nor authorize others to exploit any of such reserved rights in a manner that will impair the value of any of the rights granted to Random House under this Agreement.

13

AG100214

**26. Full Agreement.** This Agreement contains Paragraphs 1-26 which constitute the full understanding of the parties and supersedes all prior agreements, understandings and proposals whether written or oral. No modification of this Agreement shall be binding unless in writing and signed by all parties.

**AUTHOR**                    **THE RANDOM HOUSE PUBLISHING GROUP, a division of RANDOM HOUSE, INC.**

AG100215

# Agreement

made this ▓▓▓▓▓ day of ▓▓▓▓▓▓▓▓▓▓ 1955 , by and between

whose post office address is ▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓ hereinafter called the "Author," party of the first part, and THE CITADEL PRESS, of New York, hereinafter called the "Publisher," party of the second part.

IN CONSIDERATION OF the stipulations and the covenants hereinafter set forth, and for valuable consideration by each to the other passed, receipt whereof is by both of them acknowledged, the said parties do hereby agree to and with each other as follows:

I. The Author hereby grants and assigns to the Publisher the sole and exclusive rights of publication, in the United States of America and its dependencies, Canada, the Republic of the Philippines and Mexico, in a certain work now entitled ▓▓▓▓▓▓▓▓▓▓▓▓▓

(hereinafter referred to as the "Work"), and in such other territory and including such further subsidiary and additional rights as are hereinafter set forth. Such rights so granted shall inure to the Publisher during the term or terms of copyright and any renewals thereof.

II. (A) The Publisher shall have the exclusive right to take out copyright, and is hereby authorized to take all steps required to procure such copyright in the United States of America and in such countries as may be covered by this agreement. Copyright in the United States of America shall be taken in the name of **The Citadel Press**

(B) The Author agrees to make due and timely renewal of the copyrights to be secured for the said Work and to execute any other or further papers which may be necessary therefor, and the Author does hereby irrevocably, so long as this contract shall remain in force, constitute the Publisher the agent of the Author on behalf of the Author to apply for renewal or extension of such copyrights in any and all countries covered by this agreement, and to that end to execute, acknowledge, deliver, and file all such papers and documents as shall be necessary or convenient to effectuate such extension.

(C) The Author hereby grants to the Publisher the right, if copyright be in the Author's name, to bring in the name of the Author, as plaintiff or complainant, any action or proceeding for the enjoining of any infringement of the copyright in the said Work and for any damages resulting therefrom, and the net amount recovered after deducting expenses of suit shall be divided equally between the Author and Publisher.

III. (A) The Author warrants and covenants that the said Work is original and he is the sole owner of the Work and has full power and authority to copyright the same and to enter into this Agreement; that said Work has not heretofore been published; that it is innocent and contains no matter which, if published, will be libelous or otherwise injurious or which will infringe upon any proprietary right at common law or any statutory copyright or any Penal Law, and that he will hold harmless and defend the Publisher against any suit, claim, demand, or recovery by reason of any violation of any of the representations, warranties, and covenants hereinabove contained or by reason of any violation of proprietary right or copyright or any injurious or libelous matter in said Work, actual or claimed, and to act promptly with regard to such defense or with regard to any action which may be brought based upon any assertion of infringement, violation, libel, or unlawfulness, and if the Publisher shall give the Author notice of any claim, demand, or suit, and give to the Author such time as the exigencies of the situation permit in which to undertake such defense, then if default shall be made by the Author in the respects aforesaid or if any proceeding or action is taken by governmental authority, the Publisher is hereby granted the right to make such defense as may be advised by counsel, and the costs and counsel fees therefor, together with any damages sustained, shall be charged to and paid by the Author.

(B) If in the Publisher's sole and uncontrolled opinion, the Work shall contain any matter which, if published, would be libelous or otherwise injurious or would infringe on any right at common law or any statutory copyright, then the Publisher shall be under no obligation to publish the book.

IV. (A) All details as to the manner of publication, production, distribution and advertising, including the number of and distribution of free copies, shall be left to the Publisher, who shall bear all the expense of publication, distribution, manufacture, and advertising. The Publisher agrees to publish the said Work, at its own expense, in such style as it deems best suited for the sale thereof, provided the manuscript shall be delivered within the time herein stipulated, within ▓▓**four**▓▓▓▓▓ months thereafter, and if not so published (except on account of strikes, fires, or other contingencies beyond the control of the Publisher or his suppliers, in which event publication shall be postponed until the next immediately succeeding Spring or Fall season) then the Author shall have the right to terminate this agreement and the rights hereby granted shall revert to the Author, provided that the Author shall give written notice to the Publisher within twenty (20) days after the end of the season set for the publication of the said Work, otherwise the Publisher shall have the right to postpone publication until the next immediately succeeding Spring or Fall season.

[1]

AG100216

(B)  The Author agrees to deliver to the Publisher not later than the ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ 19 **55** , a complete, legible, finally revised copy of the manuscript acceptable to the Publisher in content and form. The provisions as to content, form, and time of receipt of such copy are material terms of this agreement, and upon the Author's failure to comply with such provisions, or any of them, the Publisher may, at its option, by written notice to the Author terminate this agreement, whereupon the Author shall return to the Publisher all amounts which it may have advanced to him, and upon making such payment all rights granted by the Author shall revert to the Author.

Such manuscript shall include all drawings, photographs, and designs which are a part of or necessary to the text. If the Author fails to supply such necessary drawings, charts, photographs, designs within the time specified and in satisfactory form, the Publisher may have them made and charge the expense of making them against the Author. If requested by the Publisher, the Author shall deliver an index as soon as possible after proof is available for the making of such index. If the Author fails to deliver the index within the time specified and in satisfactory form, the Publisher may have it made and charge the expense thereof to the Author.

(C)  The Author agrees that should he incorporate in the manuscript or Work any writings or composition previously published, either of his own or of any other writer or artist, to obtain and deliver to the Publisher proper and complete written permission and authorization to reprint same from the owner of the copyright thereof.

(D)  The Author agrees to read if or when submitted, and within fourteen (14) days of the receipt thereof to return to the Publisher, the galley and page proofs of the said Work, and in the event of the failure by the Author to return said proofs within the period aforesaid, then the Publisher shall have the right to publish the said Work as submitted. The Author shall pay, or at the Publisher's option have charged against the Author, the amount of expense incurred by the Publisher because of changes and/or additions other than corrections of printer's errors made in and to the text provided by the Author in excess of ten percent (10%) of the original cost of composition; and the Author shall pay in full for any corrections in the plates which he requires or which are necessary for the correction of actual errors (excluding printer's errors) after the plates have been made in conformity with the last page proof as corrected by the Author.

(E)  So long as this agreement shall be in force and effect, the author will not, without the written consent of the publisher, write, print or publish, or permit or cause to be written or published, any revised, corrected, enlarged or abridged version of the said Work, or in any way assist or be interested in any such version, or in any Work of any character that might interfere with, or directly or indirectly compete with the sale of the Work, or intend to lessen the sale or value of the Work.

V.  The Publisher agrees to pay to the Author the following royalties according to the following schedule: **ten(10¢) cents per copy on each copy of the paper edition**

(A)**sold which shall retail up to $1.50; on copies of the paper edition that retail for more than $1.50, the royalty shall be ten (10%) percent of the list price on all copies sold.**

**On the clothbound edition, the royalty shall be 10% of the list price on all copies sold up to 5,000; twelve(12½%) and one half percent of the list price on all copies sold between 5,000 and 10,000 and fifteen (15%) percent of the list price on all copies sold there-**

(B)  Where sheets are sold, the percentage of royalty shall be the same as for bound books and **after.** shall be calculated on the net amount received by the Publisher.

(C)  On copies sold for export or at a wholesale trade discount of 50% or more, the percentage of royalty shall be calculated on net amount received.  The Publisher shall have the right to export copies of its edition for sale throughout the world.

(D)  No royalties shall be paid on copies furnished gratis to the Author. No royalties shall be paid on copies for review, bonus, advertising, sample or like purpose. When copies are sold through mail order, and not through the regular trade channels, the royalty shall be 5% of the retail price. The Author shall receive 10% of any net sums received by the Publisher from the sale of school editions; or from the sale of any edition at a discount of 40% or more from the list retail price through School Book Depositories, or to Reading Circles or Educational Associations.

(E)  (1)  All payments made by the Publisher to the Author, whether under this agreement or not, shall be chargeable against and recoverable from any or all monies payable to the Author under this agreement, including the sale, lease, license or other disposition of all subsidiary rights herein referred to, and/or all other contracts between the parties or their assigns. However, the advance provided for in Paragraph V. (A) of this agreement shall be recoverable only from earnings under this agreement.

(2)  Royalties shall be paid only on actual sales. Where any statement received by the Author shows an overpayment of royalties, it is agreed that the Publisher may deduct the amount of such overpayment from any further royalties or other sums, whether payable on this or other books by the Author.

[ 2 ]

AG100217

(F) If the Publisher shall issue his own reprint edition at a retail price of two-thirds or less of the original retail price, the Author shall receive a royalty of 10% calculated on the net amount received by the Publisher.

(G) On all copies sold from a reprinting of Twenty-five hundred (2500) copies or less made after one year from the date of first publication or whenever the semi-annual sales shall fall below 150 copies, the Publisher shall pay the Author royalties at one-half of the prevailing rates herein provided for.

(H) It is mutually agreed that State, Federal and Foreign taxes on the Author's earnings, when paid by the Publisher, are proper charges against the Author's earnings due under this agreement, and may be withheld by the Publisher.

(I) If in the Publisher's opinion the Work ought to be remaindered, the Publisher may sell the remaining copies or any part thereof as remainders. If the amount secured for such remainders be less than the cost of production, no royalty shall be paid on remainder sales; but if the price exceeds the cost of production, the Publisher shall pay, in lieu of the percentage heretofore specified, ten percent (10%) of the amount secured over the cost of production. A sale or sales at a discount of 70% or more shall be deemed remainder sales.

(J) The Publisher may at its discretion grant permission to publish and produce, by any means including mechanical, extracts from the Work to benefit its sale. In the event that such permission is gratuitously granted, no payment shall be made by the Publisher to the Author in respect thereof. The Publisher shall pay to the Author one-half of any compensation received by the Publisher for granting such permission.

VI. (A) The Publisher shall submit to the Author royalty statements during February and August of each year as of December 31st and June 30th, and payable April 30th and October 31st. Whenever the semi-annual sales fall below fifty (50) copies, no accounting shall be made until after the sales aggregate fifty (50) copies; and such accounting shall be included in the semi-annual settlement immediately succeeding that in which the sales shall aggregate fifty (50) copies or more.

(B) The Author shall be entitled to receive on publication six presentation copies of the said Work and shall have the right to purchase further copies, for personal use, at the wholesale price of 40% off list.

(C) The Publisher agrees to and does grant to the Author the right upon his/her written request to examine or cause to be examined through certified public accountants the books of account of the Publisher insofar as the same relate to the said Work; provided that if such examination shall divulge errors of accounting (arising otherwise than from an interpretation of this contract) amounting to One Hundred Dollars ($100.) or more to the Author's disadvantage, the cost of such examination shall be borne by the Publisher, otherwise it shall be borne by the Author.

VII. (A) The further subsidiary and additional rights referred to in paragraph "I" are hereby defined to include the rights enumerated below for use throughout the world and are to be shared by the author and publisher in the percentages indicated, less only direct expenses incurred by the publisher, including agents' commissions, in disposing of such rights:

|  | To Author | To Publisher |
|---|---|---|
| (1) Abridgment and anthology ...................... | 50% | 50% |
| (2) Second serial and syndication (including reproduction in compilations—magazines, newspapers, or books) .... | 50% | 50% |
| (3) Book clubs or similar organizations................ | 50% | 50% |
| (4) Reprint ...................................... | 50% | 50% |
| (5) Dramatic rights ............................... | 75% | 25% |
| (6) Motion picture rights .......................... | 75% | 25% |
| (7) Radio and television rights...................... | 75% | 25% |
| (8) Mechanical reproduction rights ................... | 75% | 25% |
| (9) First serial .................................. | 75% | 25% |
| (10) Sole and exclusive rights of publication in | | |
| (a) The United Kingdom ................... | ~~XXX~~ 60% | ~~XXX~~ 40% |
| (b) The British Empire and/or the British Commonwealth of Nations ................ | ~~XXX~~ 60% | ~~XXX~~ 40% |
| (c) Other foreign countries including dependencies of the United States, the Republic of the Philippines and Mexico ..................... | ~~XXX~~ 60% | ~~XXX~~ 40% |
| (d) Translation .......................... | ~~XXX~~ 60% | ~~XXX~~ 40% |

(B) All revenue derived from the sale of rights not specifically herein enumerated, whether now in existence or hereafter coming into existence, shall be shared equally by the Author and Publisher.

[ 3 ]

AG100218



## SPECIAL CLAUSES

The author shall receive an advance against royalties of ▮▮▮▮
to be paid in the following manner:

    a. ▮▮▮▮▮▮▮▮▮▮ on the signing of the contract
    b. ▮▮▮▮▮▮ on the delivery by the author to the publisher
of a completed, acceptable manuscript.

2.   The publisher agrees to pay for the permission costs for the photographs
to be used in the book, which sum shall not exceed ▮▮▮▮. To the
extent that the publisher shall pay for the permission costs less than
▮▮▮▮ the publisher shall advance this money as an additional advance
against royalties to the author within 45 days following the publication
of the book. The monies to be paid by the publisher for permission
costs for the use of the photographs shall be considered as an additional
advance against royalties. This also applies to the money adavanced
by the publisher for material obtained from the New York Public Library
for use in the book.

3.   All sums of money due to the author shall be payable to the author's
representative, ▮▮▮▮▮▮▮▮▮▮▮▮, and
his receipt shall be considered good and valid discharge of all
payments due hereunder.

[ 34 ]

AG100219

(C) All such rights shall be disposed of by the sale, lease, license, or otherwise by the Publisher who for that purpose is constituted the attorney-in-fact of the Author. The Author agrees to sign, make, execute, deliver, and acknowledge all such papers, documents, and agreements as may be necessary to effectuate the grants hereinabove contemplated. In the event that the author shall fail to sign, make, execute, deliver, and acknowledge such papers, they may be signed, executed, delivered, acknowledged by the publisher as the attorney-in-fact of the Author with the same full force and effect as if signed by the Author. The Author shall not dispose of first serial rights after the date of this agreement without the consent of the Publisher.

VIII. In the event of bankruptcy or receivership of the Publisher, or assignment for the benefit of creditors, the rights granted under this Agreement shall, at his option to be exercised within 60 days, revert to the Author, who shall have the right to purchase from the Publisher at a fair market price, as determined by consent or arbitration, the Publisher's remaining stock on hand of bound copies and sheets as well as letterpress plates if they shall exist. However, no reversion of rights under this clause shall take place until after the Author shall have repaid to the Publisher any indebtedness (other than an advance against royalties) incurred by him and still outstanding under this Agreement. If this Agreement contains a clause of option on future books by the Author, such clause shall become null and void in the event of the Publisher's bankruptcy or receivership.

IX. This agreement regardless of the place of its physical execution shall be treated by the parties hereto as though executed within the State of New York and shall be interpreted within the purview of the laws and statutes of the State of New York.

X. For the considerations expressed herein and the publication of the book hereunder by the Publisher, the Author hereby grants to the Publisher the irrevocable option to accept for publication the next ======= two ========= works written by the Author on terms herein contained unless the parties shall agree on other terms. The option, however, shall not apply to the second of such two works if not exercised by the Publisher with respect to the first. The Author agrees not to enter into any contract subsequent to the date hereof for the publication of the subsequent books provided for herein until he shall have first offered the same in complete publishable form to the Publisher hereunder, who shall have sixty days after the submission of the manuscript thereof for the exercise of its option.

XI. Any notice to be given hereunder shall be deemed to have been given if deposited in any United States Post Office in a sealed envelope, with registered postage prepaid, addressed, as the case may be to the Author at the address above given unless changed by registered mail.

XII. No assignment by the Author of this Contract or any part thereof shall be valid as against The Publisher, unless and until the same shall have been filed with it.

This agreement shall be binding upon and inure to the benefit of the executors, administrators, legal representatives, and assigns of the Author and the successors and assigns of the Publisher.

IN WITNESS WHEREOF, the Author has hereunto placed his hand and seal and the Publisher has caused this agreement to be executed by its officer thereunto duly authorized, on the day and year hereinabove written.

In the Presence of:



THE CITADEL PRESS

By ........

AUTHOR

[ 4 ]

ASTOR - HONOR, INC.

## Agreement made this _____ day of _____ 1967

between _____

(hereinafter called the Author) and ASTOR — HONOR, INC., a New York Corporation (hereinafter called the Publishers).

**The Grant and the Territory**

1. *AUTHOR'S GRANT.* Being the sole proprietor of an unpublished work the tentative title of which is _____ the Author hereby grants and assigns solely and exclusively to the Publisher on the terms herein set forth the book and volume publishing rights in the English language in the said work and other rights therein as follows: abridgment, selection, anthology, digest, first and second serial, syndication, radio broadcasting, television, mechanical recording and rendition, projection, braille, microfilm, translation, dramatic, and motion picture; together with the right to grant licenses for the exercise of, and/or to dispose of, any or all of the rights herein granted. Such grant shall include all adaptations, treatments and modified versions of the work.

**The Warranty**

2. The Author warrants and guarantees that he is the sole owner of the Work and has full power and authority to copyright the same and to enter into this agreement; that the Work has not heretofore been published in book form in any language , that the Work does not, in whole or in part, infringe any copyright or violate any personal or property rights, or contain any scandalous or libelous matter.

The Author shall indemnify and hold harmless the Publishers from any decree or judgment, finally sustained against them, based upon any and all manner of claims, demands, actions, and proceedings that may be asserted or instituted against the Publishers on the ground that said Work violates any copyright or any proprietary right of any person, or that it contains any matter that is libelous or scandalous or invades any person's right to privacy or other personal right; and the Author agrees promptly, at the Author's own expense, to defend and continue the defense of any such claim, demand, action or proceeding that may be brought against the Publishers, provided that the Publishers shall promptly notify the Author with respect thereto and provided further that the Publishers shall give to the Author such reasonable time as the exigencies of the situation may permit in which to undertake and continue the defense thereof; and if the Author shall fail to retain counsel and to undertake and continue said defense as aforesaid, then the Publishers are hereby granted the right to make such defense thereto as may to them seem appropriate and the expenses, costs, and counsel fees thereof, including the cost of any appeal, together with the amount of any judgment rendered against the Publishers, shall be paid by the Author. In the event that a decree or judgment shall be entered in any court against the Publishers based upon any such claim or demand, and the Author shall desire to appeal, then the Author shall indemnify and hold the Publishers harmless from all costs and expenses of such appeal, and shall furnish and file all bonds necessary to perfect said appeal and to stay execution of any such judgment or decree. Nothing herein before stated shall prevent the Publishers from defending any such action or proceeding at their own expense through their own counsel, notwithstanding that the defense may have been undertaken by the Author.

If the Publishers shall notify the Author that the Work includes matter which is libelous or obscene or which infringes any copyright or other property right or invades any person's right to privacy or other personal right the Author, within _____ days after receipt of such notice, shall make such changes or deletions as may be necessary, in the opinion of the Publishers, to make the Work fit and acceptable for publication. If the Author fails to make or authorize the Publishers to make such changes or deletions as are, in the Publishers' opinion, necessary, within the time specified, this agreement shall terminate and all amounts advanced by the Publishers to the Author shall be repaid by the Author to the Publishers.

**The Copyright**

A. 3. The Author authorizes and empowers the Publishers to and the Publishers shall apply for copyright in the name of the Publisher, or, if the Author so elects, in his own name, and for renewal of such copyright in the United States of America and the Dominion of Canada.

The Author, his heirs, executors, and administrators shall render any reasonable assistance that the Publishers may require to secure such copyright or any renewals thereof and shall execute to the Publishers any legally recordable assignments necessary for the purpose, including assignments of copyright or copyrights covering the Work, or any part or parts thereof which have been published prior to the book publication of the Work; and where the prior publication is in serial form the Author shall secure appropriate assignments from the prior publisher of the Work in serial form.

**The Manuscript**

4. The Author shall deliver to the Publishers a legible and finally revised copy of the manuscript, approximately _____ words in length, including all drawings, charts, photographs, and designs which are to be a part of the Work; in proper shape for the press, not later than _____, 1967 and, if requested by the Publishers, an index as soon as possible after the proof is available for making an index. Such copy shall be satisfactory to the Publishers in contents and form. If, in the opinion of the Publishers, the manuscript as they receive it is not in a fit condition to be composed by the printer or requires adjustments and corrections in punctuation, grammatical structure, or spelling, or requires verification of names, dates, and other matters, or if the Author has failed to supply the necessary drawings, charts, photographs, designs or index, then the Publishers may call upon the Author to have the manuscript made complete and ready for the printer and, if the Author does not exceed in so doing within a period of _____ days from the date of such request by the Publishers, the latter may have the necessary work done upon the manuscript; if necessary employing outside editorial assistance, and inform the Author of the cost thereof, which cost shall be charged against all earnings accruing to him under any of the provisions of this agreement. In the absence of written instructions to the contrary, it is understood that, in the ordinary course of preparing the manuscript for the press, the Publishers have authorization to make the manuscript conform to their standard style in punctuation, spelling, capitalization, and usage. The provisions as to content, length, form, and time of receipt of the Work are essential items of this agreement; and, upon the Author's failure to comply with such provisions or any of them, the Publishers may at their option by written notice to the Author terminate this agreement; thereupon the Author shall return to the Publishers all amounts which they may have advanced to him and all rights granted by the Author shall hereby revert to the Author.

**Publication of the Work**

5. The Publishers shall print and publish the Work, at their own expense in such style or styles as they deem best suited to its sale, at a retail catalogue price of not less than one dollar ($ 1.00 per copy on or before _____ 36 months after the delivery of the completed manuscript. In case of first serialization, book publication shall be delayed until serial publication is completed, but for a period not to exceed 36 months after the date specified for the delivery of the manuscript unless otherwise mutually agreed. If the Publishers shall fail to publish the Work within the time specified herein the Author, subject, however, to the provisions of clause 17 hereof, at his option, may, by written notice to the Publisher, terminate this agreement by tendering the advances made to the author by the publisher.

AG100221

**Printer's Proofs**

6.   The cost of all alterations, in excess of fifty dollars ($50.00) of the cost of the typesetting, which the Author or his representative makes in proof (or which, in the opinion of the Publishers, are essential if by mutual consent the Author or his representative deems correct proof) after the type has been set up in conformity with the manuscript as finally prepared for the printer shall be borne by the Author. The Author shall pay in full for all corrections in the type, plates, or in the printed Work which he requires or which are required for the correction of actual errors (excluding printer's errors) after the plates have been made or the Work printed in conformity with the final corrected proof.

7.   The Publishers shall pay to the Author and his duly authorized representatives the following royalties:

(a)   Except as hereinafter provided, a royalty upon the regular trade edition and upon any special library edition sold in the United States of America of **two** and **one half** per cent ( **2½**%) on copies sold in regular edition.

(b)   A royalty of **two** and **one half** per cent ( **2½**%) of the amount received by the Publishers on all such to Canada of copies of any edition published by the Publishers.

(c)   A royalty of **2½** per cent (**2½**%) of the amount received by the Publishers on sales of copies or unbound sheets of any edition of the Work published by the Publishers, sold outside the continental limits of the United States of America and Canada, and on sales at a discount of sixty per cent (60%) or more from the retail price: on special editions, to reading circles, to recognized book clubs, and to organizations outside the regular book-selling channels.

(d)   A royalty of **2½** per cent (**2½**%) of the retail price of each copy sold within the continental limits of the United States of any cheap edition issued by the Publishers at a retail price not more than two-thirds (⅔) of the original retail price.

(e)   Fifty per cent (50%) of any license fee or royalty charge for the right granted another publisher to issue and distribute a cheap edition or visual reproduction (microfilm) of the Work.

(f)   Fifty per cent (50%) of the gross amount paid by a book club as royalty for the right to publish the Work in whole or in part for distribution to its members. In the event that, by the terms of such license for the right to publish an edition by a book club, the Publishers are required to provide the book club with more than one complete set of plates and binder's dies, the cost of such extra sets of plates and binder's dies shall be borne equally by the Author and the Publishers.

(g)   Fifty per cent (50%) of the amount actually received by the Publishers for permission to publish extracts from the Work.

(h)   Ten per cent (10%) of the amount received by the Publishers on sales of copies of overstock which the Publishers deem expedient to sell at a discount of seventy per cent (70%) or more; provided that if such sale is made at or below the cost of manufacture, no royalty shall be paid.

(i)   One-half (½) of the royalty stipulated in clause 7(a) hereof on all copies sold from a reprinting of twenty-five hundred (2,500) copies or less made after two (2) years from the date of the first publication hereunder and provided that the regular sales in the six-month period preceding such reprinting did not exceed three hundred and fifty (350) copies; the reduction of royalties provided for in this paragraph is to enable the Publishers to keep the Work in print and in circulation as long as possible.

(j)   Where the discount to jobbers or to wholesale distributors or booksellers (except as provided for in clauses 7(d) and 7(l) hereof) on copies of any edition published by the Publishers is forty-eight per cent (48%) or more, the Publishers shall pay to the Author the prevailing rate of royalty less one-half (½) the difference between a forty-four per cent (44%) discount and the discount granted (it being understood that in no event shall the amount paid to the Author be less than one-half (½) the stipulated royalty).

(k)   A royalty of one-half of the aforesaid royalty on sales made as a direct result of mail order efforts through couponed advertising or circularization direct to the consumer.

No royalties shall be payable on copies furnished gratis to the Author or for review, advertising, sample, publicity, promotion, or like purposes, or on copies destroyed by fire or water, or on copies sold at or below the cost of manufacture.

No cheap edition in any category may be published earlier than six months from the date of original publication except by mutual consent.

**Examination of Accounts**

8.   Upon his written request, but not more than once in eighteen (18) months, the Author may examine or cause to be examined through certified public accountants the books of account of the Publisher in so far as they relate to the work.

**Contracts with others**

9.   The Publishers agree to make contracts available to the Author or his representative at the office of the Publishers, and a copy thereof shall be furnished the Author upon his written request.

**Statements and Payments**

10.   The Publishers shall mail to the Author, ninety (90) days after the first of May and the first of November in each year, semiannual statements of account of all earnings accruing to him, covering the six (6) months preceding the said dates. The balance shown on such statements to be due to the Author shall be paid by the Publishers to the Author at the time of rendering such statement, except as follows: When the balance to the credit of the Author at any May 1st or November 1st shall be more than five thousand dollars ($5000), the sum of five thousand dollars ($5000) shall be paid to the Author at the time of rendering the statement, and the unpaid balance of all earnings accruing to the Author shall be paid him on succeeding semiannual payment dates in amounts not to exceed five thousand dollars ($5000) per payment unless the Publishers shall in their absolute discretion choose to increase the amount of such payment or payments.

**Overpayment**

11.   Whenever the Author has received an overpayment, or has any unearned advance from another Work, it is agreed that the Publishers may deduct the amount of such sums from any further earnings accruing to the Author on account of the Work or on account of any other works of the Author which may be published by the Publishers. In all cases royalties paid on copies subsequently returned shall be treated as overpayment.

**Revision**

12.   If it shall be mutually agreed by the Publishers and the Author that a revision of the Work is desirable, the Author shall either make the revision himself or instruct the Publishers to hire an editor to do the work for him, charging such editor's fee against any earnings which have accrued or shall accrue to the Author from the publication of either the original edition or the revised edition. It is further agreed that for the purpose of royalty computation, the revised edition shall be considered a new Work and the same scale of royalties shall apply to it as applied to the original edition as specified in clause 7.




AG100222



**Free Copies**

13.   The Publishers shall present to the Author ten (10) free copies of the Work upon publication and shall permit the Author to purchase further copies for his own personal use at a forty per cent (40%) discount from the retail catalogue price.

**Termination Reversion of Rights**

14.   (a)   If at any time the Work shall be out of print and the Author shall notify the Publishers to this effect, all rights granted hereunder shall terminate and revert to the Author unless the Publishers shall (1) within six months of receipt of such notice, declare their intention to publish a new edition of the Work and (2) within nine (9) months of receipt of such notice (subject, however, to the provisions of clause 17 hereof) publish such new edition, except that the Publishers shall retain the right to recoup any amounts which may be thereafter shall become due in accordance with the provisions of clauses 7, 22, and 23 hereof from any sale or license of subsidiary rights which shall have been made at any time during the effective period of this contract or prior to the expiration of nine (9) months from the date of receipt of such notice.

(b)   If at any time after the expiration of two (2) years from the date of publication the Publishers shall determine that there is not sufficient sale for the said Work to enable them to continue its publication and sale profitably, they may give the Author three (3) months' notice in writing of their intention to discontinue publication, and then this agreement shall terminate at the expiration of the three (3) months' period, except that the Publishers shall retain the right to recover any amounts which may be or thereafter become due in accordance with the provisions of clauses 7, 22, and 23 hereof from any sale or license of subsidiary rights which shall have been made at any time during the effective period of this contract or prior to the expiration of three (3) months from the date of receipt by the Author of such notice.

The Work shall not be considered to be out of print if it is on sale in a cheap edition or in any other edition in the United States or if there shall be in existence a contract for cheap-edition publication.

(c)   Upon the termination of this agreement for any cause, all rights granted to the Publishers shall revert to the Author for his use at any time, and the Publishers shall return to the Author all property originally furnished by the Author; the Author shall have the right in such instance to purchase the plates from the Publishers at one-third (⅓) of their original cost of production, and any or all of the remaining sheets or copies at the cost of manufacture. If the Author shall not have acquired such plates, sheets, or copies within thirty (30) days of the effective date of such termination, the Publishers shall have the right to sell such remaining copies as they deem best, subject to the provisions with regard to royalty set forth in clause 7(i) of this agreement, and to melt the plates. No such sale by the Publishers shall transfer the right of publication of the Work to any purchaser of the remaining copies or sheets.

**Competitive Works**

15.   So long as this agreement shall be in force and effect, the Author will not publish or permit to be published any other material written or edited by him which would directly or indirectly interfere with the sale, or tend to lessen the sale, of the Work. Any Work based on this Work or incorporating parts of this Work shall be deemed a part of the grant as set forth in paragraph 1.

**Notices**

16.   Any notice or statement to be given or mailed hereunder shall be given or mailed by depositing it in any United States Post Office box in a sealed envelope, with registered postage prepaid, addressed, as the case may be, to the Author at _____ or at such other address as the Author may from time to time designate by written notice received by the Publishers, or to the Publishers at 119 West 57th Street, New York 18, New York.

**Failure to Publish**

17.   The failure of the Publishers to publish or republish the Work shall not be deemed to be a violation of this agreement if such failure to publish is caused by restrictions of governmental agencies, labor disputes, or inability to have the book manufactured or to obtain the materials necessary for its manufacture, or for any other reason beyond the control of the Publishers; and in the event of delay from such causes the publication date may be postponed accordingly.

**Arbitration**

18.   Any controversy or claim arising out of this agreement or the breach thereof shall be settled by arbitration in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award may be entered in the highest court of the forum, State or Federal, having jurisdiction. Such arbitration shall be held in the City of New York unless otherwise agreed by the parties.

**Waiver**

19.   A waiver of any breach of this agreement or of any of the terms or conditions by either party hereto, shall not be deemed a waiver of any repetition of such breach or in any wise affect any other terms or conditions hereof; no waiver shall be valid or binding unless it shall be in writing and signed by the party making the waiver.

**Assignment**

20.   This agreement shall be binding upon the assigns, heirs, executors, and administrators of the Author, and upon the assigns and successors of the Publishers. This agreement may be assigned by either party as a whole, and the assignee thereof shall have all the rights and remedies of the assignor, but neither party may assign any partial interest herein except as herein expressly provided. No assignment of this agreement shall be binding upon either of the parties without the written consent of the other; provided, however, that either party may assign or transfer any monies due or to become due under this agreement.

**Option**

21.   The Author hereby grants to the Publishers the irrevocable option to accept for publication the next SIX Work(s) to be written by the Author at the same terms and conditions as hereunder.

**Subsidiary Rights**

22.   The Publishers shall in their absolute discretion have the right to sell, license, or otherwise arrange for:

(a) _____ Canada, colonies, dependencies, mandated territories, Ireland, and throughout the British Commonwealth; and the Publishers shall pay to the Author 50 per cent (50%) of any amount received by them on account of such publication.

(b) Distribution of an edition of the Work manufactured in the United States, by a publisher or other person in Great Britain, the British Dominions (other than Canada), colonies, dependencies, mandated territories, Ireland, and throughout the British Commonwealth; and the Publishers shall pay to the Author ____ per cent (__%) of any amount received by them on account of any such distribution.

(c) Publication of foreign-language editions of the Work throughout the world; and the Publishers shall pay to the Author ____ per cent (50%) of any amount received by them on account of such publication.

23.    In the event that the Author shall sell, license, or otherwise dispose of any of the below-specified rights, the Author shall pay to the Publishers the following percentages of the amount actually received by the Author:

(a)   **Fifty**     per cent ( 50%) for first serialization.

(b)   **Fifty**     per cent ( 50%) for motion picture.

(c)              per cent ( 50%) for dramatization, including the motion picture rights if not **previously sold** or licensed.

(d)              per cent  50% for television adaptation and presentation, if not included in the sale or license of the motion picture rights.

(e)              per cent (     ) for

(f)              per cent ( 50%) for mechanical renditions, reproductions, or recordations.

(g)              per cent ( 50%) for graphic or plastic representations of a character or characters.

(h)              per cent ( 50%) for permissions, digest, second serialization.

24.

The publisher shall, at its discretion, arrange for illustration at its own cost and expense which shall not be chargeable against the royalties due the author hereunder.

Regardless of the place of its physical execution, this agreement shall be interpreted under the laws of the State of New York and of the United States of America.

IN WITNESS WHEREOF the parties hereto have duly executed this agreement the day and year first above written.

Witnesses:

.......................................     .........................................     .......................     ....    .......          ............................................
                                                                                                                                                                           **Author**

ASTOR – HONOR, INC.

.......................................     ..   ...    ....    ....    ..............    ..    ....          By          ............ ...     .................. ...........

AG100224