# EXHIBIT 4

```
1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   -----------------------------------------X
    THE AUTHORS GUILD, INC., et al.,
4
                                    PLAINTIFFS,
5
6          -against-               Case No:
                                   05CV8136 (DC)
7
8   GOOGLE INC.,
9                                   DEFENDANT.
    -----------------------------------------X
10
11                 DATE: December 15, 2011
12                 TIME: 1:00 P.M.
13
14
15          DEPOSITION of a Witness, JIM BOUTON, on
16   behalf of the Plaintiffs, taken by the Defendants,
17   pursuant to a Notice and to the Federal Rules of Civil
18   Procedure, held at the offices of MILBERG, LLP, One
19   Pennsylvania Plaza, New York, New York 10119, before
20   Deborah Garzaniti, a Notary Public of the State of New
21   York.
22
23
24
25
```

3

J. BOUTON

1  J I M  B O U T O N, called as a witness, having been

2  first duly sworn by a Notary Public of the State of New

3  York, was examined and testified as follows:

4  EXAMINATION BY

5  MS. DURIE:

6          Q.  Please state your name for the record.

7          A.  Jim Bouton.

8          Q.  What is your address?

9          A.  Care of Boni & Zack, LLC, 15 St. Asaphs

10 Road, Bala Cynwyd, Pennsylvania 19004.

11         Q.  Good afternoon.

12         A.  Good afternoon.

13         Q.  You understand that you are here giving a

14 deposition in a case that has been brought against

15 Google?

16         A.  Yes.

17         Q.  What is that case about?

18         A.  It is about whether Google has the right

19 to copy and disseminate copyrighted books.

20         Q.  When you say "whether Google has the

21 right to disseminate copyrighted books," what do you

22 mean by disseminate?

23         A.  Well, I am not sure.  Let's leave it that

24 they are violating copyrights.

25         Q.  Do you have an understanding as to how it

J. BOUTON

1  is that Google is violating copyrights, in your opinion?

2          A.  Well, they are simply copying them.  They

3  don't have the right to copy copyrighted materials.

4          Q.  So is your primary contention in this

5  case that Google is violating copyright laws by making

6  electronic copyright works?

7          MR. BONI:  Objection to the form.  If you can

8  answer, answer the question.

9          A.  Repeat it again.

10         Q.  Sure.

11             Is your primary contention in this case that

12  Google is violating the copyright laws by making an

13  electronic copy of copyright works?

14         A.  That is certainly one of them.

15         Q.  What else is it about Google's conduct

16  that you believe is violating the copyright laws, in

17  addition to making electronic copy?

18         A.  That they are using this material, making

19  it available for other people, making digital copies for

20  libraries, putting pieces of it on the Internet, using

21  excerpts from the book in order to make advertising

22  money.  They never called me and asked if they could do

23  that, never offered me any money to use my books in a

24  way that allowed them to make money.

25         Q.  I want to ask you about each of those

J. BOUTON

```
 1          Q.  Where have you read that?
 2          A.  Newspapers.
 3          Q.  Have you read anything else, to your
 4  recollection, that says that Google sells advertising in
 5  conjunction with the display of excerpts of books?
 6          A.  I don't know what other sources.  I am
 7  just aware of the fact that they do that.
 8          Q.  You said that you've seen this as well.
 9  Can you describe to me the circumstance under which
10  you've seen that?
11          A.  I seen the advertising.  I don't recall.
12          Q.  Is one of the facts that gives you
13  concern in this case your belief that Google is
14  profiting from advertising revenue in conjunction with
15  displaying excerpts of books?
16          A.  Either because they already done it or
17  they would have the potential to do it.  My point is, my
18  feeling is that they should not have the right to
19  reproduce the book or any portion of the book without
20  getting my permission.
21          Q.  Let's go back to the various reasons that
22  you gave for being concerned about Google's conduct.  We
23  talked about in connection with Ball Four, the display
24  of the cover and excerpts of your book.  You also made
25  reference to giving copies of works to libraries; is
```

J. BOUTON

1  that right?

2          A.  Yes.

3          Q.  Is that a claim that you understand as

4  being made in this lawsuit?

5          A.  Yes.

6          Q.  How is it that you come to have that

7  understanding?

8          A.  How did I come to have that

9  understanding?

10         Q.  Yes.

11         A.  I have read that in the newspapers, I am

12 aware of the lawsuits against Google.  I can't tell you

13 the exact source of it.

14         Q.  Have you read the Complaint in this case?

15         A.  Yes.

16         Q.  Does the Complaint in this case make

17 reference to the return of digital copies to libraries?

18         A.  Yes, so I am aware of it there also.

19         Q.  Do you have an understanding as to what,

20 if anything, libraries are doing with digital copies

21 that have been returned to them?

22         A.  No, I don't know what they are doing with

23 them.  I don't want them to have the right to do

24 whatever they want also.

25         Q.  Why is that?

J. BOUTON

1          A.  Because it is protected by copyright and
2     they would need to ask my permission to use that digital
3     copy in any way that they choose.
4          Q.  Do you think that libraries would need to
5     ask your permission in order to use the digital copies
6     particularly to index your work in their collection?
7          MR. BONI:  Objection to the form.
8          A.  In other words, if you are saying that a
9     library uses a digital list to list all of the books
10    that they have in their library, that would certainly be
11    an acceptable use of it, but to have a digitized copy of
12    my book, no, they don't have the right to do that.
13         Q.  My question assumes that libraries are
14    using digital copies of books for the purpose of
15    generating electronic indexes.
16         A.  Why would they need to make a copy of the
17    book if they are just indexing the books in their
18    library?  Why would they need to make a copy of the
19    book?
20         Q.  First let me ask the question.  Is it
21    your view that using an electronic copy of a book to
22    generate an index of works in a library collection is
23    something that you would not consent to?
24         A.  I would not consent to that.  I don't
25    think they need a digitized copy of the book in order to

J. BOUTON

1  things, is there anything else that you challenge?

2              A.  Well, I am challenging on behalf of the

3  class that I am a member of.

4              Q.  Understood.

5              A.  Okay.

6              Q.  But as a representative of the class that

7  you are here on behalf of, is there any other conduct

8  that you are challenging?

9              A.  I don't think so.

10             Q.  Now, what is it that you want the Court

11 to do in response to this lawsuit?

12             A.  I want the Court to realize that these

13 are copyrighted materials and that Google has violated

14 that copyright by making copies of these books, that is

15 one.

16             Q.  Are you asking the Court for money on

17 behalf of the class?

18             A.  Yes.

19             Q.  Do you have an understanding as to how

20 much money you are asking?

21             A.  Yes, $750 per book.

22             Q.  Are you also asking the Court to order

23 Google to shut down the portion of Google Books that

24 shows quotes from those books in response to a search?

25             A.  I don't know if that is the proper remedy

J. BOUTON

1  for that, so.

2                  Q.  Would you want the Court to shut down

3  that feature in Google Books?

4                  A.  If it is part of what Google needs to do

5  in order to avoid copyright violations, yes.

6                  Q.  Do you have a view that Google would need

7  to shut down the part of Google Books that allows for

8  quotes from books to be displayed in order not to be

9  violating copyright?

10                  A.  As far as I am concerned, they violated

11  the copyright if they have done nothing with it.

12                  Q.  I understand that.

13                  A.  So then it would follow that.  I am also

14  against them using that digital copy in any way that

15  they want.  So I am against them using it in the way

16  they used it.  I am against them using, having a copy in

17  the first place.

18                  Q.  Do you think first it would benefit you

19  personally for the portion of Google Books that displays

20  quotes from the books in response to search results to

21  be shut down?

22                  MR. BONI:  Object to the form.

23                  A.  I don't know if that is the best

24  solution.  I don't know.

25                  Q.  Do you have any other solution?

J. BOUTON

1          MR. BONI:  I object to the form.  I also

2  object to the extent that any part of that question

3  calls for the substance of any discussions we had in the

4  attorney-client relationship, Jim.  So Daralyn's

5  question clearly asks for discussions prior to the time

6  that we formed an attorney-client relationship, but do

7  not recite any substance of discussions that we had once

8  we formed the attorney-client relationship.  Okay?

9          THE WITNESS:  Yes.

10          A.  So now repeat the question.

11          Q.  What did Mr. Boni tell you about the

12  lawsuit when you agreed to become a Plaintiff?

13          A.  I don't recall.

14          Q.  Do you remember anything that you had

15  learned about the case prior to the time that you agreed

16  to become a Plaintiff?

17          A.  Nothing more than -- nothing more than

18  the fact that there was such a lawsuit being formed or

19  organized.

20          Q.  Why was it that you agreed to be one of

21  the named class representatives in this case?

22          A.  Because I believe in collective action

23  sometimes to get things done.  I was a baseball player

24  and required collective action on the part of the

25  players to get rights in that industry.

J. BOUTON

1          A.  I have no idea.

2          Q.  Do you have a view as to how time

3   consuming it would be to make that request?

4          A.  Do I have an idea how time consuming it

5   would be to have me make the request or get a response?

6          Q.  No, make the request.

7          A.  I don't know how time consuming it would

8   be.  I am not even sure what the procedure would be to

9   do that.

10          Q.  Have you ever investigated how to make a

11   request to Google to remove the display of quotes from

12   any of your books from Google Books?

13          A.  I haven't investigated how to do that.

14          Q.  What do you understand your role in this

15   case to be as a class representative?

16          A.  Simply to represent the class.

17          Q.  Do you have an understanding as to what

18   your job is in representing the class?

19          A.  Yes, to be an example of the group.

20          Q.  What have you done so far in your

21   capacity as a class representative in this case?

22          A.  I have read all of the materials and if a

23   class member were to question me, I think I can give

24   pretty good answers about the lawsuit, what it is about,

25   so I see my role here as, at this stage, an educator.

J. BOUTON

1          Q.  An educator of the class members?

2          A.  No, an educator as to what is being

3    sought here for the benefit of other class members when

4    they want to know what the lawsuit is about.

5          Q.  When you say your role here as an

6    educator, who are you educating?

7          A.  Other class members.

8          Q.  So you see part of your role as educating

9    other class members about what the lawsuit is about?

10          A.  Yes, if they were to call me up,

11    contacted me.

12          Q.  You said that you have reviewed all of

13    the materials.  What are the materials that you

14    reviewed?

15          A.  Well, of course all of the documents that

16    come from my own files for one thing and I reviewed the

17    Complaint.

18          Q.  Are there any other materials that you

19    reviewed?

20          A.  There may be, but I might not know

21    offhand the legal term for the document.  I have seen a

22    number of documents.

23          Q.  Are they documents that were filed with

24    the Court?

25          A.  I think so, yes.

80

J. BOUTON

1          A.  No.

2          Q.  Was the copyright in Foul Ball registered

3  within three months of its publication?

4          A.  I believe so.

5          Q.  Do you have any basis for that belief,

6  other than your understanding, as to standard practice?

7          A.  No.

8          Q.  You understand that in this case you are

9  representing a class of authors; is that right?

10         A.  Yes.

11         Q.  Included within that class are the

12  authors of various different kinds of works; correct?

13         A.  Yes.

14         Q.  Included within the class are academics

15  who write books as part of their academic

16  responsibilities; is that correct?

17         A.  Yes, I am assuming so.

18         Q.  For example, included within the class

19  might be a professor who writes books in an effort to

20  get tenure; correct?

21         A.  Yes.

22         Q.  Do you feel that you are qualified to

23  represent the perspectives of those academic authors?

24         A.  Generally speaking, with respect to the

25  Complaint, yes.

J. BOUTON

1         Q.  Why is that?

2         A.  Because their books are copyrighted, my

3  books are copyrighted, that is the commonality here.

4  Whether it is a gardening book or a history book or

5  academic textbook or a baseball book, we are all

6  protected by copyrights.

7         Q.  Do you know whether academic authors

8  might have different interests in the dissemination of

9  their books?

10         MR. BONI:  Object to the form.

11         A.  I don't know whether they have different

12  interests or not.  They might have.

13         MS. DURIE:  Let me have marked as the next

14  exhibit a one-page document bearing a fax line of

15  July 16, 2003.

16         (Whereupon, the aforementioned document was

17  marked as Bouton Exhibit 9 for identification as of this

18  date by the Reporter.)

19         Q.  Do you recognize what has been marked as

20  Exhibit 9?

21         A.  Yes.

22         Q.  Can you tell me what it is?

23         A.  Yes.  Somebody is asking permission to

24  use -- I am trying to figure out what book is involved

25  here.  Yes, they want to use -- they have asked

J. BOUTON

1 but it is something that I probably did.

2          Q.  Have you checked to see whether there is

3 a copyright registration?

4          A.  No.  I will check when I get home.

5          MS. DURIE:  No further questions.

6          MR. BONI:  I have a couple.

7 EXAMINATION BY

8 MR. BONI:

9          Q.  You testified earlier about your role as

10 a class representative.  Do you recall that testimony?

11         A.  Yes.

12         Q.  Do you have anything that you want to

13 amplify with respect to your response to that question?

14         A.  As to my duties you mean?

15         Q.  Yes.

16         A.  Yes, I see myself as educating other

17 class members who I expect will be, you know, calling me

18 once in a while to see how things are going or explain

19 this or that to them.  Also I expect to have some say in

20 the direction of the Complaint of the lawsuit, major

21 developments I expect to be apprised of and as to my

22 thoughts, anything to do with the settlement I would

23 think would be part of my duties to evaluate and give my

24 opinion.

25         MR. BONI:  No further questions.

# EXHIBIT 5

1

1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF NEW YORK

3

4

5   THE AUTHORS GUILD, et al.

6           Plaintiffs        Civil Action No.

7   vs.                       1:2005cv08136

8   GOOGLE, INC.

9           Defendant

10   _____/

11

12

13

14        The Deposition of JOSEPH GOULDEN was held on

15   Friday, January 6, 2012, commencing at 12:57 p.m., at

16   the Offices of Gore Brothers Reporting &

17   Videoconferencing, 1025 Connecticut Avenue, N.W., Suite

18   1000, Farragut Square, Washington, D.C. 20036, before

19   Christine A. Gonzalez, CSR, RPR, a Notary Public.

20

21

22

23

24

25   REPORTED BY:  Christine A. Gonzalez, CSR, RPR

5

1    A.   Correct.   Correct.

2    Q.   What is this lawsuit go?

3    A.   About Google's unlawful infringement of the

4  copyright in books written by me and many, many other

5  writers.

6    Q.   Anything else?

7    A.   I think that fairly well covers it.

8    Q.   What are you asking the Court to do?

9    A.   To require Google to obey the law, receive a

10 permanent injunction against further digitalization of

11 books and whatever relief the Court might decide upon.

12   Q.   Are you asking for money?

13   A.   $750.

14   Q.   Why are you asking for that amount of money?

15   A.   That is the amount that was recommended by

16 Mr. Boni.

17   Q.   Do you think that's an appropriate amount?

18   A.   Because I'm trying to establish a principle,

19 yes.  Pardon me.  Make that, defend a principle, yes.

20 I'm not in this for the money.

21   Q.   Are you asking the Court to order Google to

22 shut down the snippet view portion of the Google books

23 Website?

24   A.   Yes, because they're violating copyright and

25 putting them up there using material that is mine and

6

1   other authors without permission.

2       Q.   If the Court were to order Google to shut down

3   the snippet view portion of the Google books Website,

4   would that benefit you personally?

5       A.   I have no way of knowing.

6       Q.   Why is that?

7       A.   Because the way Google distributes it to

8   libraries is wide use elsewhere.  Google has given our

9   property to other libraries without permission.

10      Q.   Other than giving copies of books to libraries,

11  what other conduct do you understand to be at issue in

12  this case?

13      A.   I think that's it.  Well, the snippets and the

14  -- giving the books to libraries.  Thirdly, the physical

15  act of making these books in digital form.

16      Q.   And you understand if I refer to the process of

17  taking a physical book and turning it into digital form

18  as "scanning."  Is that a term you're familiar with?

19      A.   Yes, I am.

20      Q.   Other than scanning books, providing copies to

21  libraries and displaying snippets, do you understand any

22  other conduct to be at issue in this litigation?

23      A.   I think there's a severe security issue

24  involved here.

25      Q.   What security issue is that?

7

1      A.   Google professes to have safeguards against

2  invasion of these libraries.   I view that with a great

3  deal of suspicion.

4      Q.   Why do you view that with suspicion?

5      A.   'Cause I read almost daily in the interest of

6  hacking in supposedly secure databases, including those

7  run by the United States Government, the military and

8  intelligence organizations.

9      Q.   So your concern is that through hacking copies

10 of your books could be disclosed?

11     A.   Yes.

12          MR. BONI:   Object to form.

13     BY MR. GRATZ:

14     Q.   Other than your concern about hacking, are

15 there other security concerns that you understand to be

16 the subject of this lawsuit?

17          MR. BONI:   Object to form.   Your original

18 question, Joe, was directed to him and what he thought.

19 Now you're talking about the lawsuit.   You can answer

20 the question.   Joe, I just want it to be clear that you

21 shifted gears.

22     A.   Well, what particularly strikes me about Google

23 pilfering of our property and putting into digital form

24 is that these digital books are gonna be put in

25 university libraries; I think eight or ten of them by

8

1   now.   From what I read in the press, there are students

2   who consider a closed archive a challenge to which they

3   can hack.   And putting digital books on a college

4   library is -- makes about as much sense as having an

5   open bar in an AA meeting.

6        BY MR. GRATZ:

7        Q.   And why is that?

8        A.   It's there.   They're gonna try to get in there,

9   and they'll do it.

10        Q.   And what would their goal be?

11             MR. BONI:   Object to form.   Who's "they"?

12        A.   I don't know.   I can probably sit around and

13   make up something.   The fact that they're doing it is

14   violation enough.

15        BY MR. GRATZ:

16        Q.   And in your -- when you say "the fact that

17   they're doing it," do you mean the libraries or Google?

18             MR. BONI:   Object to form.

19        A.   Google has created the libraries to pass on to

20   the -- the digital library to pass on to the

21   universities.   The universities would not have this --

22   these digital books for it not for Google.

23        BY MR. GRATZ:

24        Q.   And do you personally object to the possession

25   of digital books by university libraries?

19

1  times had you spoken to Mr. Boni?

2      A.  I wouldn't estimate.

3      Q.  What documents have you reviewed in relation to

4  this case?

5           MR. BONI:  Let me object to the form of the

6  question.  You can answer if you can.

7      A.  This might be slow.  The final amended pleading

8  by the plaintiffs.  The plaintiffs' motion for

9  certification of class action, Google's response, your

10  request for documents, the deposition of the Jim Booten.

11  A paper called the declaration of Joanne Zack.  The

12  judge's refusal of the first class action settlement.

13  And I've also, online, reviewed various things that

14  Google had to say about its library project.

15      BY MR. GRATZ:

16      Q.  Anything else?

17      A.  Not that I recall.

18      Q.  And the documents that you referred to in your

19  previous answer, when did you -- when did you review

20  those documents?

21      A.  In the last month or the last six weeks.

22      Q.  Other than the documents you have reviewed in

23  the last six weeks, are there any other documents that

24  you've reviewed in connection with this case?

25      A.  I reviewed the original copyright for "The

20

1    Superlawyers," also reviewed various letters that

2    publishers sent to my agent, Carl Brandt, reverting

3    rights to me.

4         Q.   And those were documents that you provided to

5    Mr. Boni to be produced in discovery; is that right?

6         A.   Yes.  The chain went from Brandt to me to

7    Mr. Boni.

8         Q.   Out of the documents that Mr. Brandt sent to

9    you in relation to this matter, were there any that you

10   withheld and did not send to Mr. Boni?

11        A.   No.

12        Q.   Other than the documents that you've reviewed

13   in the last six weeks and the documents that you

14   provided to Mr. Boni for production, are there any other

15   documents that you've reviewed in connection with this

16   lawsuit?

17        A.   Yes.  Thinking back, before the settlement was

18   proposed, I was sent by Authors Guild a draft of the

19   proposed settlement, and I reviewed that, and I was

20   asked to comment on that.

21        Q.   Did you comment on that?

22        A.   I don't recall.  I remember reading it and may

23   have made a suggestion, but what it was, I don't

24   remember at this date.

25        Q.   Did you have any meetings regarding the

21

1   settlement agreement?

2        A.   No, all done telephone.

3        Q.   Did you have any telephone conversations

4   regarding the settlement agreement?

5        A.   With the Authors Guild, yes.

6        Q.   How many?

7        A.   Three, four, five.

8        Q.   About how long did each one last?

9            MR. BONI:   Object to form.   You can answer.

10       A.   I'd say anywhere from five minutes to 15, 20

11  minutes.

12           BY MR. GRATZ:

13       Q.   Who was on those phone calls?

14       A.   A woman lawyer from Authors Guild.

15       Q.   Do you recall the name of that lawyer?

16       A.   No, I do not.

17       Q.   Anyone else?

18       A.   Memory tells me I discussed it with Mr. Dickson

19  at the time.

20       Q.   And was that on the same phone call as with the

21  Authors Guild?

22       A.   No.   This is independent.

23       Q.   And the phone call with the Authors Guild, was

24  it just you and a lawyer with the -- from the Authors

25  Guild?

22

1       A.  It was someone from the Authors Guild.  I'm not

2   gonna assume it was a lawyer, but it was someone from

3   Authors Guild.  It was familiar with the -- pardon me.

4   Let me get a drink of this.  It was someone familiar

5   with the terms.

6       Q.  Do you remember if it was a man or a woman?

7       A.  My recollection it was a man.  Pardon me.  A

8   woman.

9       Q.  Was it the same person during each

10  conversation?

11      A.  No.

12      Q.  You said there were between three and five of

13  these conversations?

14      A.  I would estimate.  That's a long time ago.

15      Q.  Other than those conversations and reviewing

16  the documents that you have reviewed in the last six

17  weeks and reviewing the documents that were provided to

18  Mr. Boni to be produced during discovery, have you had

19  any other involvement in the progress of the litigation?

20      A.  Yes, I have.

21          MR. BONI:  Object to the form of the question.

22  You can answer.

23      A.  Yes.

24      BY MR. GRATZ:

25      Q.  What's that?

23

1        A.  Mr. Dickson has been intimately involved in

2    this, talking to the Authors Guild and being sort of

3    central point to gather information.  I talked to him on

4    an ongoing basis about it.

5        Q.  Was anyone else on these calls?

6        A.  No.  These were person-to-person calls.  We're

7    good friends, have been since 1967.  We talk a lot.

8        Q.  About how many times would you estimate you've

9    discussed the litigation with Mr. Dickson?

10       A.  I cannot even give you a ballpark figure.  We

11   see one another frequently, and it came up sometimes and

12   sometimes it didn't.  No way I can answer that.

13       Q.  Do you understand Mr. Dickson is no longer a

14   plaintiff in this case?

15       A.  I'm aware of that.

16       Q.  Do you know why?

17           MR. BONI:  I'll caution you.  You can give a

18   general response without getting into detail, and the

19   reason I say that, Joe, is because it does involve an

20   element of attorney work product, and so it's for that

21   reason I'm cautioning the witness to be guided by that.

22   I will let the witness give a --

23           THE WITNESS:  Go off the record?

24           MR. BONI:  -- general response.

25           MR. GRATZ:  Sure.

24

```
 1              (Whereupon, discussion was held off the
 2    record.)
 3              THE WITNESS:  Give me your question again.
 4              MR. GRATZ:  Sure.  I just want to note a
 5    discussion was had between counsel off the record
 6    regarding the level of detail necessary for the
 7    witness's answer.
 8         BY MR. GRATZ:
 9         Q.  So my question, again, was:  Do you know why
10    Mr. Dickson is no longer a plaintiff in this case?
11         A.  Yes, I do know.
12         Q.  Why is that?
13         A.  Because serious medical condition of two very
14    close members of his family.
15         Q.  Do you know if there's any other reason?
16         A.  I don't know.  I think that's damn well
17    sufficient.
18         Q.  Not saying that it isn't.
19              Would you say you got most of your information
20    about the progress of the litigation from Mr. Dickson?
21         A.  Most -- yeah, probably say I kept current on
22    it, like a current bulletin.
23         Q.  Do you know whether Mr. Dickson had similar
24    conversations with others?
25              MR. BONI:  Object to form.  You mean other
```

25

1  named plaintiffs?

2       BY MR. GRATZ:

3       Q.  Anyone else?

4       A.  I have been in situations where he discussed

5  that with other writers.

6       Q.  Do you know whether Mr. Dickson had similar

7  discussions with other named plaintiffs?

8       A.  I'm sorry?

9       Q.  Do you know whether Mr. Dickson had similar

10  discussions with other named plaintiffs?

11      A.  I don't know.

12      Q.  What's your role in this litigation?

13      A.  Representative of the class plaintiffs.

14      Q.  Are you also in this litigation to represent

15  your own interests?

16      A.  Yes.

17      Q.  Did you review the Complaint in this case

18  before it was originally filed?

19      A.  Yes, I did.

20      Q.  Did you make any comments on it?

21      A.  Not that I recall.

22      Q.  Are you a lawyer, Mr. Goulden?

23      A.  No, I'm not.

24      Q.  Who makes decisions about the direction of the

25  litigation?

26

1           MR. BONI:  Object to form.  You can answer.

2      A.   I think the lawyers do with input considered --

3   by the lawyers with input -- pardon me.  I'm tongue tied

4   today.  From the lawyers with input requested by the

5   lawyers who are handling the case.

6      BY MR. GRATZ:

7      Q.   Who decides what positions to take in

8   litigation?

9           MR. BONI:  Object to form.

10     A.   I think ultimately the lawyers do, guided by

11  the wishes of the lead plaintiffs.

12     BY MR. GRATZ:

13     Q.   What do you base your understanding of that on?

14          MR. BONI:  Object to form of his previous

15  response.

16     BY MR. GRATZ:

17     Q.   What do you base your -- on what do you base

18  your previous response?

19     A.   Watching the way the litigation has progressed.

20     Q.   Have you provided -- strike that.

21          Are you being paid for your participation in

22  this case?

23     A.   I'm sorry.  I can't...

24     Q.   Are you being paid for your participation in

25  this case?

27

1      A.   No.

2      Q.   What do you understand Mr. Boni's role to be in

3  the litigation?

4      A.   From what I've observed, he's lead counsel in

5  this case along with Ms. Zack.

6      Q.   And Mr. Boni and Ms. Zack make the decisions

7  about when -- what to say in their papers, for example?

8           MR. BONI:   Object to form.

9      A.   To get into that, would have to get into the

10 conversation between me and Mr. Boni.  I'm not gonna go

11 into lawyer discussions.

12          BY MR. GRATZ:

13     Q.   Do you know whether any of the other named

14 plaintiffs have provided input to Mr. Boni regarding how

15 the litigation should be conducted?

16          MR. BONI:   Object to form.

17     A.   The only litigant I know personally is

18 Mr. Dickson, and I understand he was talking to Mr. Boni

19 before his problems arose.

20          BY MR. GRATZ:

21     Q.   Anyone else?

22     A.   Not that I know of.

23     Q.   Have you provided input to Mr. Boni regarding

24 how he should litigate this case?

25     A.   I think you're getting into conversations of my

28

1   attorney there.

2       Q.   Are you withholding information based on the

3   attorney-client privilege?

4       A.   Yes.

5            MR. BONI:   I think you can answer that

6   question.   Joe, repeat the question.   I think it can be

7   answered with a "yes" or "no."

8            MR. GRATZ:   Sure.

9       BY MR. GRATZ:

10      Q.   Have you provided input to Mr. Boni regarding

11  how he should litigate this case?

12           MR. BONI:   Object to the form of that question.

13  I will let you answer the question with a "yes" or --

14      A.   Yes.

15      BY MR. GRATZ:

16      Q.   About how many times?

17           MR. BONI:   Joe, we've really gone over this.

18  From 2006 until today, you want to know how many times

19  what?   I mean --

20      A.   I cannot begin to answer that.

21      BY MR. GRATZ:

22      Q.   Why not?

23      A.   I simply don't jot down on my calendar

24  everybody I talked to every day.   My memory at age 77 is

25  not all that keen, as you might discover in another 50

29

1   years.

2       Q.   What was your involvement with respect to the

3   proposed settlement?   Strike that.

4           Do you recall there was a settlement proposed

5   in this litigation?

6       A.   You mean the earlier settlement?

7       Q.   Yes.

8       A.   Yes, I was aware of it.

9       Q.   What were, in rough terms, the terms of this

10  settlement?

11      A.   It was so complex that I'm still having trouble

12  figuring it out.   I read it again the other night, and

13  essentially it was striking the business deal between

14  the authors and Google for the authors' share

15  financially in any proceeds that Google earned, and also

16  I think it had a proposal that Google would get

17  copyright permission before they would digitize books.

18          Now, again, though, this all happened a long

19  time ago, and I'd say it was very confusing to me, the

20  settlement.

21      Q.   Would you say that you fully understand the --

22  all the terms of the settlement agreement?

23          MR. BONI:   Object to form.   You can answer.

24      A.   The current one, no.

25          BY MR. GRATZ:

34

1      BY MR. GRATZ:

2      Q.  Anything else?

3      A.  I perhaps discussed that with Mr. Dickson.

4      Q.  Anything else?

5      A.  That's all I recall.

6      Q.  Did you read the text of the settlement

7  agreement itself?

8      A.  Yes, I did.

9      Q.  Did you think that it was a fair settlement?

10     A.  No, I did not.  Settlement, yes.  I thought the

11  settlement was very fair.

12     Q.  In your previous answer, you said that you

13  thought something wasn't fair.  What were you referring

14  to?

15         MR. BONI:  Object to form.  You can answer.

16     A.  I'm trying to think what it was I thought was

17  unfair.  I think I thought some of the opinion was

18  unfair, not the settlement itself.

19     BY MR. GRATZ:

20     Q.  The Judge Chin opinion?

21     A.  Yes, I do.

22     Q.  And what parts were those?

23     A.  I think he was overly concerned with authors

24  not being represented, whereas I felt then and I still

25  feel that any author who seeks protection of the

35

1  copyright laws is covered.  If he wants to get out of

2  the case at a later point, he can always opt out.

3      Q.  Anything else?

4      A.  I think that's it.

5      Q.  Why do you think that Judge Chin was overly

6  concerned with authors not being represented?

7          MR. BONI:  Object to form.

8      A.  I don't know.  I don't try to read the minds of

9  federal judges.

10     BY MR. GRATZ:

11     Q.  Did you agree with all of the terms of the

12 settlement that was rejected by Judge Chin?

13     A.  As far as I remember them, I do.

14     Q.  Do you know there were objections to the

15 settlement from some authors?

16     A.  I read that.

17     Q.  Have you reviewed any of those objections?

18     A.  No, I have not.  I read about it in general

19 terms.  I've not looked at any specific filings with the

20 Court.

21     Q.  Read about it in the newspaper, for example?

22     A.  Yeah.

23     Q.  What were the grounds of those objections?

24         MR. BONI:  Object to form.

25     A.  From what I read in the press, seems to be that

36

1    academics who wanted to make wide use of the Google

2    holdings.

3         BY MR. GRATZ:

4         Q.   Anything else?

5         A.   That's all that -- that's the main point I

6    recall.

7         Q.   Do you think that you agreeing to the

8    settlement adequately represented those authors who

9    objected?

10        A.   Yes.

11        Q.   Why is that?

12        A.   Because anyone who enjoys the protection of the

13   copyright laws sought that out, that was a voluntary

14   submission of their rights, for approval of their

15   rights, so, therefore, they should be included with

16   everybody else as a class.

17            Now, if they do not like the settlement, they

18   can always opt out of it.

19        Q.   Do you think their objections were sincerely

20   held?

21            MR. BONI:   Object to form.

22        A.   I can't read the mind of an academic either.

23        BY MR. GRATZ:

24        Q.   Have you spoken with any of the authors who

25   objected to the settlement?

37

1        A.   I'm trying to put this when and where this

2    happened.   I was at a conference down at Virginia

3    Military Institute.   I talked to a professor there of

4    another college who was attending and somehow the

5    conversation got around to the Google suit, and he said

6    simply that he felt that anything in print should be

7    available for general public without resort to things

8    like copyright.

9            In other words, if it existed, he should be

10   able to download it and use it.   Needless to say, I

11   disagreed with him.

12       Q.   Do you remember who that was?

13       A.   A man from Western Kentucky University.   His

14   name, I do not recall.   He was a political science

15   teacher.

16       Q.   Other than the political science professor from

17   Western Kentucky University, have you spoken with any of

18   the other authors who objected to the settlement?

19       A.   Not that I recall.

20       Q.   Do you know why the objectors who objected to

21   the settlement took the view that they did?

22           MR. BONI:   Object to form.

23       A.   As I said before, they want the unlimited use

24   of the Internet or material on the Internet regardless

25   of who owns it.

49

1    knowing.

2          BY MR. GRATZ:

3          Q.  Do you think it's likely or unlikely?

4          MR. BONI:  Object to form.

5          A.  As I said, I have no way of knowing.

6          BY MR. GRATZ:

7          Q.  Do all class members share your view that

8    Google's scanning and display of snippets is something

9    that's objectionable?

10          MR. BONI:  Object to form.

11          A.  The writers I know without exception are

12    covered -- enjoy the protection of the copyright

13    statute.  The fact that they or their publisher gets the

14    copyright protection suggests to me that they wish to be

15    protected.

16          BY MR. GRATZ:

17          Q.  So you don't think there are any class members

18    who don't object to Google's scanning and display of

19    snippets?

20          MR. BONI:  Object to form.  That

21    mischaracterizes the testimony.

22          A.  I have no way of knowing.

23          BY MR. GRATZ:

24          Q.  Have you spoken with any?

25          MR. BONI:  Asked and answered.

50

1      A.   I've not raised the index question with any

2  other writers.

3      BY MR. GRATZ:

4      Q.   Other than Mr. Dickson and others who were at

5  some time a named plaintiff in this case, have you

6  spoken with other writers who do object to Google's

7  scanning and snippet display?

8      A.   Over the years, yes.

9      Q.   About how many?

10     A.   This is a guesstimate.  20, 30.

11     Q.   Did they say why they objected to Google's

12  scanning program?

13     A.   For the same reason I do.  They -- Google is

14  stealing things that don't belong to Google for

15  commercial purposes.

16     Q.   Do you think there are any authors who would be

17  harmed if the Court ordered Google to shut down the

18  snippet display feature of Google books?

19         MR. BONI:  Object to the form.

20     A.   Have no way of knowing.

21     BY MR. GRATZ:

22     Q.   Have any of your out-of-print books come back

23  into print?

24     A.   Yes.

25     Q.   What books are those?

59

1   co-author "The News Manipulators" contributed within the

2   scope of your employment at Accuracy in Media?

3       A.  Yes, it was.

4       Q.  Are all of your books nonfiction?

5       A.  Yes.

6       Q.  What is the purpose for which you wrote your

7   books?

8           MR. BONI:  Object to form.

9       A.  To make a living and to satisfy my long-time

10  desire to be a writer.

11      BY MR. GRATZ:

12      Q.  Are your books works of journalism?

13          MR. BONI:  Object to form.

14      A.  No.

15      BY MR. GRATZ:

16      Q.  You have written works of journalism; is that

17  right?

18      A.  I was a newspaperman for ten years.

19      Q.  What is the difference between your books and

20  what you consider journalism?

21      A.  Journalism seems to be sort of -- it's not

22  the in-depth research that you would do for a book.

23  There's a difference between what I write and what is

24  called journalism.

25      Q.  Because the depth of research, for example,

**EXHIBIT 6**

1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------------X
     THE AUTHORS GUILD, INC., et al.,
 3
                              PLAINTIFFS,
 4
 5        -against-          Case No:
                             05CV8136 (DC)
 6
 7   GOOGLE INC.,
 8                           DEFENDANT.
     -------------------------------------X
 9
10              DATE: January 4, 2012
11              TIME: 1:05 P.M.
12
13
14         DEPOSITION of a Plaintiff, BETTY MILES, taken
15   by the Defendants, pursuant to a Notice and to the
16   Federal Rules of Civil Procedure, held at the offices of
17   MILBERG, LLP, One Pennsylvania Plaza, New York, New York
18   10119, before Deborah Garzaniti, a Notary Public of the
19   State of New York.
20
21
22
23
24
25
```

B. MILES

1          A.  Yes.

2          Q.  So I will ask while we are here today, I

3  want to have a conversation with you, but she also has

4  to write down everything that we are saying.  We should

5  not talk over each other.  We should say yes and no

6  rather than nodding.

7          A.  Okay, yes.

8          Q.  And it is a little warm in here and it is

9  a cold day.  I know you have come a long way.  If you

10  need to take a break at any point, let me know.

11          A.  Thank you.

12          Q.  You are here because you are a Plaintiff

13  in a lawsuit against Google; is that right?

14          A.  That's right.

15          Q.  What is the lawsuit about?

16          A.  The lawsuit is about whether or not

17  Google has the right to have control of my copyrighted

18  books and those of all of the other authors that I

19  represent.

20          Q.  What do you mean by control?

21          A.  I mean being able to do what I want with

22  my own copyrighted books, that is to earn money from

23  them, to sell rights to them.

24          Q.  What is Google doing that is interfering

25  with those rights?

6

B. MILES

1          A.  It is taking control of those rights
2  without asking me whether it has permission to do so.
3          Q.  What are you asking the Court to do about
4  that?
5          A.  To ask permission of me and all of the
6  other authors that I represent before doing something
7  with the books, which have their own copyright, and also
8  to pay damages for the books that they have already
9  taken over, $750.
10          Q.  What is Google doing that you object to?
11          A.  It is not asking my permission as a
12  copyright holder for anything that it is doing,
13  specifically putting quote snippets from the books on
14  the website and sending a copy of a digitized book back
15  to the libraries from which they are cooperating with it
16  in this time.
17          Q.  You mentioned the objection to Google not
18  having asked permission?
19          A.  Yes.
20          Q.  If Google had asked your permission
21  before scanning your book and displaying snippets, what
22  would your response have been?
23          MR. BONI:  Objection to the form.  You can
24  answer.  I am placing an objection into the record.
25          THE WITNESS:  Okay.

B. MILES

1          A.  It is not the problem of my books.  It is
2    the problem of the principle of doing this for all
3    books.
4          Q.  So apart from your desire that Google
5    Books be changed with respect to all books, you don't
6    have a particular desire to have your own books removed?
7          MR. BONI:  It mischaracterizes the testimony.
8    I object to the form.
9          A.  I mean I care about -- this is something
10   that I care about.  I care about it for my own books, of
11   course they are my own books, I care about it for all
12   authors' books.
13         Q.  But you haven't asked Google to remove?
14         A.  No, well, except as this claim is asking.
15         Q.  Do you want Google to remove your books
16   from Google Books?
17         A.  Yes.
18         Q.  What is your role in this litigation?
19         A.  My role is to stand for all other authors
20   and to be aware of the gist of the claim and to approve
21   of that, yes.
22         Q.  When did your involvement in this
23   litigation begin?
24         A.  Back when the original -- I guess that
25   was 2005.

B. MILES

1          Q.  Do you have a written engagement
2  agreement with the law firm of Boni & Zack?
3          A.  No.
4          Q.  Do you have a written engagement
5  agreement with the law firm of Milberg LLP?
6          A.  No.
7          Q.  Do you have a written engagement
8  agreement with the Authors Guild as your lawyers?
9          A.  No.
10          Q.  And the Authors Guild and the staff of
11  the Authors Guild is not acting as your lawyer; is that
12  right?
13          A.  No, not at all.
14          Q.  Do you understand that there was
15  previously a proposed settlement in this case?
16          A.  Yes, I do.
17          Q.  What do you think of that settlement?
18          A.  I can't really talk about the
19  technicalities of that.  I know that Judge Chin asked
20  the parties to -- no, I don't, I don't.
21          MR. BONI:  Do you mean as she is sitting here
22  today or when she was discussing it at the time of the
23  settlement?
24          Q.  As you sit here today?
25          A.  Well, I understand what today's claim is

B. MILES

1  about, yes.

2          Q.  Did you read the settlement agreement?

3          A.  Yes.

4          Q.  Did you think it was a fair settlement?

5          A.  Yes.

6          Q.  Were there any elements of the settlement

7  agreement that, and this a yes or no question, were

8  there any elements of the settlement agreement that you

9  thought were unfair?

10         A.  No.

11         Q.  Do you think that you adequately

12 represented all of the class members in agreeing to the

13 settlement?

14         MR. BONI:  Object to the form.  You can

15 answer the question.

16         A.  I think so.

17         Q.  Did you know that there were objections

18 to the settlement from authors?

19         A.  I do.

20         Q.  What were the grounds of those

21 objections?

22         A.  There were some from another author

23 group, I forget what else.

24         Q.  Do you remember anything else about the

25 objections?

B. MILES

1          A.  No.

2          Q.  Do you think you adequately represented

3   those authors who objected?

4          A.  I think I adequately represented the

5   majority of authors.

6          Q.  But there are some who take a different

7   view?

8          A.  I know that from reading, yes.

9          Q.  With respect to them, do you think you

10  are an adequate representative?

11         MR. BONI:  Object to the form.  It would be

12  helpful to establish what adequate representative means.

13  It is very vague, the question.

14         A.  I do think I can speak for all authors.

15  I think when this claim is settled, all authors are

16  likely to be happy with the kind of outcome we are

17  hoping for.

18         Q.  What outcome are you hoping for?

19         A.  We are hoping that each author will have

20  control of the rights to his or her book and some

21  negatives, that these books will not be in the program

22  that send the digitized copies of a book to libraries.

23         Q.  Anything else?

24         A.  And financial settlement.

25         Q.  Do you think that the financial terms of

B. MILES

 1  the proposed settlement were fair?

 2          A.  Yes.

 3          Q.  But the authors are now asking for a

 4  different amount of money than was in the settlement, is

 5  that your understanding?

 6          A.  I don't know.

 7          Q.  Thinking back to the proposed settlement,

 8  were you in charge of deciding what its terms should be?

 9          A.  No.

10          Q.  Who was?

11          A.  That's a group of people, not whom I am

12  one.

13          Q.  Did you have the independent ability to

14  reject the settlement?

15          A.  No.  I am not a lawyer.

16          Q.  Turning to a different topic in 2011,

17  just by category, what were your sources of income?

18          A.  Royalties.  Well, Social Security, right,

19  pension, TIAA.  Do you know that?

20          Q.  Yes.

21          A.  And royalties from my own books and

22  royalties from my late husband's books.

23          Q.  What is your late husband's name?

24          A.  Matthew B. Miles.

25          Q.  Is your pension related to your work at

B. MILES

1          Q.  This is an article by Katie Hafner,
2   headlined At Harvard, a Man, a Plan and a Scanner; is
3   that right?
4          A.  Yes.
5          Q.  This is an article that you clipped from
6   the newspaper; is that right?
7          MR. BONI:  We produced this in the first
8   production six years ago, five or six years ago.
9          A.  I intend to clip things, yes.
10         Q.  Do you maintain clipping files of
11  interesting articles?
12         A.  Yes, I do.
13         Q.  What led you to clip this article?
14         A.  I have been clipping articles about the
15  Google case from the beginning because I am very
16  invested in this.  My opinion on this has been sought
17  and given and I feel that my role in this case is to
18  weigh in on issues around it, so it is important to me
19  to keep up with.  I mean this is an early one, but I
20  read it, not just in the Times, in the New York review
21  of books.  This is important to me because I feel I am
22  really representing authors who want to control their
23  rights and I am concerned that I will weigh in sensibly
24  and be aware and my opinion bears some weight.
25         Q.  Turning to the second page of Exhibit 13.

B. MILES

1           A.  This is going to be an article from quite
2  far back.  I am not going to remember.
3           MR. BONI:  He didn't ask you a question.
4  Just answer.
5           A.  I am turning to page two.
6           Q.  In the first column in the last full
7  paragraph.
8           A.  Yes.
9           Q.  That paragraph ends, "The thing that
10  consoles me," Mr. Verba said, "is Google's notion of
11  showing only the snippets, which have everything to do
12  with what's in the book, but nothing to do with reading
13  the book."
14           Do you understand what Mr. Verba means by
15  that?
16           A.  I do.
17           Q.  Do you agree?
18           A.  No.
19           Q.  What is your disagreement?
20           A.  Well, can you say it again?  Where is it?
21           MR. BONI:  Down here (indicating).
22           A.  Okay.
23           Q.  It has been indicated to you.  Do you see
24  it now?
25           A.  I know.  You told me.

B. MILES

1           MR. BONI:  I just marked it.  I am sorry.
2           MR. GRATZ:  Let the record reflect that the
3  exhibit has been marked at the place where I was talking
4  about.
5           A.  I see it, but he is not.
6           Q.  Go ahead.
7           A.  No, you ask me.
8           Q.  What were you about to say I am tempted
9  to ask.
10          You said that you disagreed with what Verba
11 is saying here?
12          A.  I didn't say that.
13          Q.  Do you agree that Google's notion of
14 showing only the snippets, which has everything to do
15 with what's in the book, but nothing to do with reading
16 the book?
17          A.  It is that this doesn't summarize what
18 this claim is about to me.
19          Q.  What does it leave out?
20          A.  It leaves out, and this was in 19 --
21 anyway, this was early on and it leaves out the whole
22 point of the Google Books being scanned and copies being
23 given to libraries and nothing is being said about that.
24 It is inadequate.  It is one man's opinion of a
25 particular part of this issue.

B. MILES

```
 1              A.  In the Author Guild's bulletin?

 2              Q.  Yes.

 3              A.  Yes, there were.

 4              Q.  Were those articles provided to your

 5  Counsel as part of discovery in this case?

 6              A.  I have no idea.

 7              MR. BONI:  We are not maintaining privilege

 8  as to those, Joe.

 9              MR. GRATZ:  But they haven't been produced?

10              MR. BONI:  No.

11              MR. GRATZ:  Nothing further.

12              MR. BONI:  I just have a question or two.

13  EXAMINATION BY

14  MR. BONI:

15              Q.  You were just asked among the documents

16  you were shown was the notice with respect to the

17  settlement agreement in the case; is that correct?

18              A.  Yes.

19              Q.  Did you weigh in with respect to the

20  settlement agreement?

21              A.  Yes, I did.

22              Q.  You testified earlier about royalty

23  income with respect to your late husband.  What type of

24  author was your husband?

25              A.  He was an academic author.  He wrote
```

94

B. MILES

1  textbooks.

2          Q.  You were asked earlier about academic

3  authors and whether you can fairly represent or I think

4  the word was adequately represent academic authors.  Do

5  you believe that you can?

6          A.  Very much so.

7          Q.  Why is that?

8          A.  Well, not only in my husband's case, but

9  many of his colleagues.  I know a great many academics,

10  as I know a great many plain authors and I know that no

11  matter what kind of book they are writing, they are all

12  concerned about their copyright and the rights of

13  holders of copyright to control their books.

14          MR. BONI:  I have no further questions.

15  Thank you.

16  CONTINUED EXAMINATION BY

17  MR. GRATZ:

18          Q.  One or two questions.

19          With respect to your husband's books, were

20  they all textbooks?

21          A.  Yes, they were published by Sage

22  Publications, which is essentially a text house in the

23  social sciences essentially, yes.

24          Q.  The publishing contracts with respect to

25  those textbooks, did they provide for that your late

# EXHIBIT 7

# MILLER & COMPANY REPORTERS

**CONFIDENTIAL**

**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC.,          )
Associational Plaintiff, BETTY    )
MILES, JOSEPH GOULDEN, and JIM    )
BOUTON, on behalf of themselves   )
and all other similarly situated, )
                                  )
        Plaintiffs,               )
                                  )  Civil Action No.
Vs.                               )  05 CV 8136 (DC)
                                  )
GOOGLE INC.,                      )
                                  )
        Defendant.                )
_____)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF:   DANIEL CLANCY

TAKEN ON:        February 10, 2012

NO.              REPORTED BY:
        13042                    BRENDA L. MARSHALL
                                 CSR No. 6939

Los Angeles                    San Francisco
                800.487.6278

Pages 96-99, 140-41 and 182-87
of the deposition of Daniel Clancy will be filed under seal

```
 1              DANIEL CLANCY,

 2        a Witness having been duly

 3        sworn, testified as follows:

 4

 5              EXAMINATION

 6  BY MS. ZACK:

 7     Q.   Okay.  Could you state your name and

 8  address for the record.

 9     A.   Yes.   Daniel J. Clancy,

10              REDACTED

11     Q.   And you work for Google; right?

12     A.   Yes.

13     Q.   And what's your current position?

14     A.   Current position is director of

15  engineering for YouTube.

16     Q.   When did you join Google?

17     A.   I joined Google in January 2005.

18     Q.   Okay.  And what was your first position?

19     A.   My first position was engineering

20  director for Google Books.

21     Q.   And how long did you have that position?

22     A.   I kept that role till June of last year.

23  2011.

24     Q.   Okay.  So six and a half years, you were

25  an engineering director for Google Books?
```

09:18:57   10
09:19:07   15
09:19:19   20
09:19:40   25

1

2

3

4

09:19:53      5

6

**REDACTED**

7

8

9

09:20:10     10

11

12       Q.   Okay.   As engineering director for

13   Google Books, how would you describe that

14   position?

09:20:26     15       A.   I was responsible for directing the

16   engineering team that developed the technology

17   for Google Books back-end servers, and I also

18   was heavily involved in strategy and other --

19   other issues involving Google Books.

09:20:49     20       Q.   When you say "strategy," what do you

21   mean?

22       A.   I mean decisions about the product and

23   the -- and the directions we would be going with

24   the product, and I was involved heavily in

09:21:05     25   our -- in our library partnerships.

1          A.    Yes.

2          Q.    And did someone take over Jim Gerber's

3     role?

4          A.    Yes.   Tom Turvey.

09:52:04   5          Q.    And who is the current product counsel

6     for Google Books?

7          A.    I'm not sure.   There have been a few

8     changes lately.

9          Q.    So on February 7, 2012, three days ago,

09:52:47  10     right, you signed this declaration; is that

11     correct?

12          A.    Yes.

13          Q.    Okay.   And paragraph 4, you say, "Google

14     has scanned more than twenty million books as

09:53:02  15     part of Google Books"; correct?

16          A.    Correct.

17          Q.    Did you review any documents to make

18     that assertion?

19          A.    I -- I reviewed our dashboard that

09:53:21  20     keeps -- verifies the number of books.

21          Q.    So you know this case is not about

22     public domain books; right?

23          A.    Yes.

24          Q.    And you understand this case is about

09:53:37  25     in-copyright books; right?

1      A.    Yes.

2      Q.    So this 20 million books includes --

3   that you put in the affidavit or declaration

4   refers to both public domain and copyright?

09:53:48   5      A.    Yes.

6      Q.    And the number of in-copyright books

7   scanned, as you previously testified, is

8   approximately what?  Sixteen or 17 million?

9      A.    So with our Partner Program, we scanned

09:54:14  10   approximately 3 million.  And here, I say 2.5.

11   And these are estimates.  And then the estimate

12   of the number of public domain books is very

13   approximate.

14          So I think in terms of in copyright,

09:54:36  15   including Partner Program books and non Partner

16   Program books, the estimate of about 16 million

17   would be a rough estimate.

18      Q.    Sixteen million?

19      A.    That includes our Partner Program books.

09:54:48  20      Q.    Right.  So would it be correct to --

21   and -- to say that in the public -- there are no

22   Partner Program books that are public domain

23   books?

24      A.    To be precise, there are Partner Program

09:55:06  25   books that are -- the work is in the public

1   domain, but the book they provide to us may also

2   include copyrighted material, such as Topsetter.

3       Q.   We'll consider that an in-copyright book

4   for purposes of this discussion.  Okay?

09:55:21    5       A.   Yes.

6       Q.   But -- and you're not considering those

7   types of books within the approximately four or

8   so million public domain books; correct?

9       A.   Correct.

09:55:32    10       Q.   So of the 16 million in-copyright books

11   that Google has scanned, if we subtract the

12   approximately 3 million from the Partner

13   Program, we're left with 13 million.  Simple

14   math.  Is that correct?

09:55:51    15       A.   That is correct.

16       Q.   Okay.

17       A.   And remember that my estimate for the

18   public domain was very broad.  It was 4 to 6

19   million.  So --

09:55:58    20       Q.   I understand.

21       A.   Yes.

22       Q.   So it could be 11 to 13 million?

23       A.   And these are books that may be in

24   copyright.

09:56:06    25       Q.   Eleven to 13 million books that Google

```
 1   is treating as in copyright?
 2       A.   That we are not displaying the full text
 3   for.
 4       Q.   Because you don't want to be sued for
 5   copyright infringement?
 6            MS. DURIE:  Objection.  Argumentative.
 7   BY MS. ZACK:
 8       Q.   Is that right?
 9            MS. DURIE:  Wait.  Wait.  Objection.
10   Argumentative.  Calls for, potentially, a legal
11   conclusion and attorney-client privileged
12   information.
13            So don't answer to the extent that the
14   answer would necessarily implicate
15   communications with counsel.  If you have a
16   nonprivileged basis on which to answer the
17   question, you can.
18            THE WITNESS:  Yeah.  I don't think we
19   have a nonprivileged basis on which to answer
20   the question.
21   BY MS. ZACK:
22       Q.   All right.  So 11 to 13 million books
23   that are -- that were scanned in libraries;
24   right?  Correct?
25       A.   Yes.
```

09:56:23   (line 5)
09:56:29   (line 10)
09:56:41   (line 15)
09:56:50   (line 20)
09:57:05   (line 25)

1      Q.   And Google is treating -- showing only

2  snippets?

3           MS. DURIE:   Objection.   Mischaracterizes

4  the witness's testimony.

09:57:15   5           But you can answer.

6           THE WITNESS:   These are books that we

7  are showing snippets, and for some of them, we

8  do not show snippets.

9  BY MS. ZACK:

09:57:23  10      Q.   Okay.   But you're not -- for each of

11  these books, you're showing snippets or less?

12      A.   Snippets or less.   Correct.

13      Q.   And these 11 to 13 million books were

14  copied as part of the Library Project; correct?

09:57:40  15      A.   These were copied as part of the Library

16  Project.

17      Q.   And that is a term that people at Google

18  use; right?   The Library Project?

19      A.   Yes.

09:57:48  20      Q.   And what is your understanding of what

21  the Library Project is?

22      A.   The Library Project is our initiative

23  for scanning books that we predominantly obtain

24  from libraries, that, again, some are public

09:58:08  25  domain, some may be in copyright, and that we

```
      1   use for -- to search and index the books to help
      2   users discover the books, and then we provide
      3   links to -- of mechanisms to access the books
      4   either through purchasing them or through a
09:58:27  5   library.
      6       Q.   Right.  And is there any other part of
      7   the Library Project?
      8       A.   I'm not sure what you mean.
      9       Q.   Well, don't you give digital copies of
09:58:37 10   the books back to the libraries?
     11       A.   Oh.  As part of our initiative, we --
     12   we -- the Library Project, we receive a book
     13   from the library, overall, it's a process that
     14   includes the digitization, the indexing, the
09:58:57 15   inclusion in Google search index, the providing
     16   snippets.
     17           In addition, libraries receive a copy,
     18   and with that copy, they may use it for similar
     19   search and indexing or other nondisplay uses,
09:59:16 20   various different research initiatives and,
     21   also, archiving it for posterity.
     22       Q.   So 11 to 13 million books have been
     23   copied by Google in libraries, and as to these
     24   books, Google treats them as if they were in
09:59:48 25   copyright; is that correct?
```

```
 1              MS. DURIE:  Objection.  Mischaracterizes
 2   the witness's testimony.
 3              THE WITNESS:  We -- as I stated, we
 4   display snippets or less for these books.
 5              MS. ZACK:  Okay.  Let's mark as
 6   Plaintiffs' Exhibit 2 a page from Google Books
 7   Web site.
 8              (Whereupon, the document referred to
 9              was marked Plaintiffs' Exhibit 2 for
10              identification by the Reporter, a
11              copy of which is attached hereto.)
12   BY MS. ZACK:
13       Q.   Have you had a chance to look at this?
14       A.   Not prior to you handing it to me.
15       Q.   Well, okay.  Have you had a chance now?
16       A.   Since you handed it to me, yes.
17       Q.   Have you seen it before?
18       A.   Not to my recollection.
19       Q.   Okay.  Did you ever participate in
20   drafting materials for the Google Books Web
21   site?
22       A.   In general, I was not involved in
23   proofreading or drafting these materials.  I
24   may, at times, have seen something.
25       Q.   Okay.  Well, this is currently still
```

10:00:07 (line 5)
10:01:14 (line 15)
10:01:27 (line 20)
10:01:42 (line 25)

1  available on Google Books.  I'll make that

2  representation.  At least as of yesterday.

3      A.   Okay.

4      Q.   For books that are in snippet form --

10:01:57  5      A.   Uh-huh.

6      Q.   -- there's a link, "Why can't I read the

7  entire book?"  If you click on it, come over to

8  this --

9      A.   Yeah.

10:02:03  10      Q.   -- it says, "Many of the books in Google

11  Books come from authors and publishers who

12  participate in our Partner Program."

13          Is that true?

14      A.   Yes.

10:02:11  15      Q.   Okay.  So -- and that we're talking

16  about approximately 3 million books?

17      A.   Approximately.

18      Q.   "For these books, our partners decide

19  how much of the book is browsable - anywhere

10:02:21  20  from a few sample pages to the whole book."

21          Is that true?

22      A.   Yes.

23      Q.   "Some partners offer the entire book in

24  a digital edition through Google eBooks, in

10:02:37  25  which case you can purchase the book."

1          Is that true?

2     A.   Yes.

3     Q.   Okay.   Then it says, "For books that

4 enter Google Books through the Library Project,

10:02:46   5 what you see depends on the book's copyright

6 status."

7          Is that true?

8     A.   So what you see depends if we -- since

9 we -- we cannot conclusively determine the

10:02:57  10 copyright status of a book, I think this is --

11 this is a simplification, and it's to see that

12 if we believe a book is in the public domain.

13          Then, as it says later on, "We then

14 allow you to access the rest of the book.   If we

10:03:15  15 are unsure of the copyright status, then we

16 display snippets."

17     Q.   So is that sentence true or not true?

18          MS. DURIE:   Objection.

19 BY MS. ZACK:

10:03:26  20     Q.   The first sentence.

21          MS. DURIE:   Objection.   Argumentative

22 and asked and answered.

23          THE WITNESS:   I believe I've answered

24 the question.

25 BY MS. ZACK:

1      Q.   The second sentence says, "We respect

2  copyright law and the tremendous creative effort

3  authors put into their work."  Is that true?

4      A.   Yes.

10:03:41  5      Q.   The next sentence says, "If the book is

6  in the public domain and therefore out of

7  copyright, you can page through the entire book

8  and even download it and read it offline."

9       Is that true?

10:03:50  10     A.   So if -- it is a simplification.  If we

11  believe -- if we are confident that a book is in

12  the public domain, then this is true.  There are

13  lots of books in our index that are in the

14  public domain where we do not provide this

10:04:09  15  access, and so you cannot do this.

16       So the statement "If the book is in the

17  public domain," this would be, again, a

18  simplification because there are books in the

19  public domain for which we do not allow users to

10:04:24  20  use this.

21      Q.   Okay.  The next sentence says, "If the

22  book is under copyright and the publisher or

23  author is not part of the Partner Program, we

24  only show basic information about the book,

10:04:33  25  similar to a card catalog, and, in some

```
 1   instances, a few snippets - sentences of your
 2   search terms in context."
 3          Is that true?
 4      A.   Similar -- we can't determine copyright
 5   status, but if we believe the book may be under
 6   copyright, then this is true.
 7      Q.   So it's your testimony that Google is
 8   unable to determine the copyright status of the
 9   books it scans?
10      A.   Google makes a determination of how to
11   present these books to -- to our users, based
12   upon the -- the information we have.  We cannot
13   conclusively confirm that something is under
14   copyright because for the number of books, to do
15   this for each book and to identify who the
16   copyright holders are, whether or not it has
17   gone into the public domain, is -- is very
18   difficult.
19      Q.   So Google -- it's your testimony that
20   Google is unable to determine whether books are
21   or are not in copyright?
22          MS. DURIE:  Objection.  Asked and
23   answered.
24          THE WITNESS:  I believe I've answered
25   the question.
```

10:04:46 (line 5)
10:05:02 (line 10)
10:05:25 (line 15)
10:05:43 (line 20)
10:05:52 (line 25)

```
 1  BY MS. ZACK:
 2       Q.   Is the answer yes or no?
 3            MS. DURIE:  Objection.  Argumentative
 4  and asked and answered.
 5            MS. ZACK:  It's not argumentative.
 6            THE WITNESS:  I believe I've answered
 7  the question.
 8  BY MS. ZACK:
 9       Q.   It's a simple question.  You believe
10  you've answered it.  Are there any books for
11  which Google is confident that it has determined
12  whether the book is not in copyright or is in
13  copyright?
14       A.   There are books that Google has
15  determined that we are confident that they are
16  not in copyright.
17       Q.   And are there any books which Google has
18  determined that it is confident that they are in
19  copyright?
20       A.   Google makes a determination of books
21  that we are confident are under -- are in the
22  public domain.  We have books in our Partner
23  Program that we are getting permission, we do
24  not confirm the copyright status in terms of the
25  records, but we believe those books are under
```

10:05:58 — line 5
10:06:03 — line 10
10:06:16 — line 15
10:06:28 — line 20
10:06:47 — line 25

1  copyright.

2      Q.   Do you believe that Google has copied

3  books that were in copyright?

4          MS. DURIE:  Objection.  Vague.

10:07:08   5          THE WITNESS:  In our effort, we have

6  scanned books that are in copyright.

7  BY MS. ZACK:

8      Q.   In other words, you're not denying that

9  Google scans and copyrights books, are you?

10:07:14  10      A.   I'm not denying it.

11      Q.   Now, getting back to the process that

12  involves your categorizing, for your own

13  purposes, that a book will be -- can we say

14  deemed in copyright by Google?

10:07:34  15      A.   I think it's fair to say deemed in the

16  public domain.  We don't deem it to be in

17  copyright.

18      Q.   All right.  So you only make

19  determinations that you're confident that books

10:07:49  20  are in the public domain?

21      A.   Correct.

22      Q.   So Google does not try to determine

23  whether the books it's copied are actually in

24  copyright?

10:07:55  25          MS. DURIE:  Objection.  Argumentative.

1    Asked and answered.  Mischaracterizes the

2    witness's testimony.

3    BY MS. ZACK:

4         Q.   Is that true?

10:08:01   5         A.   Huh?

6         Q.   Is that true?

7         A.   I think I've -- I think I've answered

8    that.

9         Q.   Now, when you display snippets, how many

10:08:22   10   snippets from a book can a user see?  How would

11   you describe that?

12        A.   The way I would describe it is when you

13   enter search query, it will display up to three

14   snippets of that book in response to that query.

10:08:43   15   For a given book and for a given query, those

16   snippets remain consistent, meaning it's the

17   same snippets.  You issue the query again, you

18   see the same snippets.

19        Q.   And for that book, if another query is

10:08:58   20   entered, would other snippets from the book

21   appear?

22        A.   Yes.

23        Q.   So would it be accurate to describe

24   snippets as being limited to three per book?  Is

10:09:13   25   that an accurate description of Google's display

1   of snippets in a book?

2       A.   As I said, I don't think that's an

3   accurate description.  It is -- for a given

4   query, we might display up to three snippets,

10:09:25   5   but then if you entered a different query, you

6   might see different snippets.

7       Q.   Okay.  And would it be an accurate

8   description, in your view, of the Library

9   Project to discuss it without mentioning that

10:09:39   10   Google returns copies of the books scanned to

11   the libraries?

12          MS. DURIE:  Objection.  That's vague and

13   ambiguous.

14          THE WITNESS:  Yeah.

15   BY MS. ZACK:

16       Q.   Is -- if you gave a description of the

17   Library Project, do you think it would be

18   complete if you omitted to include the fact that

19   Google provides copies of the books it scans to

10:10:01   20   the libraries?

21          MS. DURIE:  Still vague.

22          THE WITNESS:  So if you're asking me to

23   describe the Library Project right now, I would

24   describe the Library Project as I stated before

10:10:16   25   as including the scanning, indexing, search,

1  discovery, snippets, along with the return of

2  the book to the library and the -- and then the

3  uses of those for other forms of nondisplay,

4  nonconsumptive research.

10:10:33  5  BY MS. ZACK:

6      Q.   You would agree with me that a material

7  part of the Library Project is Google's

8  distribution back to the library of a digital

9  copy of the entire book scanned; correct?

10:10:46  10         MS. DURIE:   Objection.   It's vague,

11  ambiguous, calls for a legal conclusion.

12         THE WITNESS:   Yeah.   I'm not a lawyer.

13  So I won't -- I won't conclude, you know,

14  legally.

10:10:57  15  BY MS. ZACK:

16      Q.   Well, you would agree that it's an

17  important part of the Library Project that

18  Google returns back to the library a digital

19  copy of the entire book scanned; correct?

10:11:10  20      A.   As it -- it is part of the Library

21  Project that -- as I stated -- that we provide a

22  copy, the ability to get a copy, for our library

23  partners of the books we scan, in addition to

24  any other uses.

10:11:29  25      Q.   And how many books have been provided to

         1      A.   I think that also would be potentially

         2   overbroad.   I think we would want a database

         3   that would include metadata.

         4           But, then, in terms of our scanning

11:13:38 5   initiative, we had an initiative that would

         6   allow rate holders to opt out.  So we wanted

         7   to -- the ambition would be to create a database

         8   that includes digitized books, as many books as

         9   we -- we could obtain and scan, and you would

11:14:01 10  not include those books where rights holder

        11   requested us not to scan.

        12      Q.   When did Google start allowing people to

        13   opt out of scanning?

        14      A.   I believe the time frame was somewhere

11:14:23 15  in the time frame of summer 2005.  I don't

        16   remember the exact dates, but I think that was

        17   approximately when we initiated our opt-out

        18   program.

        19      Q.   Was that because Google -- let me

11:14:42 20  withdraw that.

        21           Did Google, after it announced --

        22   publicly announced the Library Program, to your

        23   knowledge, receive complaints from publishers

        24   concerning the scanning of books from libraries?

11:14:58 25     A.   I am not aware of a specific complaint,

1  but I believe we -- in general, I believe we did

2  receive complaints from some of our publisher

3  partners and others about the Library Project,

4  yes.

11:15:09    5        Q.   So did you talk to anybody who was

6  complaining?

7        A.   I can't remember any specific meeting,

8  but I -- I believe I would have been

9  participating in meetings with some of our

11:15:28   10  publisher partners that would have been

11  concerned about the Library Project, although I

12  can't tell you about any one particular one.

13        Q.   And you did participate -- how

14  frequently did you meet with Jim Gerber and Tom

11:15:43   15  Turvey?

16        A.   I would meet fairly regularly with Jim

17  and Tom.

18        Q.   Every week or --

19        A.   Yes.

11:15:49   20        Q.   Okay.   And they were the ones that were

21  talking to publishers on a regular basis;

22  correct?

23        A.   Yes.

24        Q.   And did they report to you the

11:15:55   25  publishers were concerned about the Library

```
1   Project?
2       A.   Yes.
3       Q.   And when did they first start telling
4   you that?
11:16:02   5    A.   I can't tell you exactly when, but
6   fairly -- fairly early on.
7       Q.   Now, the Library Project was publicly
8   announced by Google, prior to your joining
9   Google; correct?
11:16:18  10    A.   I am pretty sure.  Yes.  I believe it
11  was a few months before I joined was when it was
12  announced.
13          MS. ZACK:   Let's mark as, I guess, PX 8
14  a document with the Bates Nos. Google 101101
11:16:57  15  through 101116.
16          (Whereupon, the document referred to
17          was marked Plaintiffs' Exhibit 8 for
18          identification by the Reporter, a
19          copy of which is attached hereto.)
11:17:21  20  BY MS. ZACK:
21      Q.   You can look at the entire document --
22      A.   Yeah.
23      Q.   -- but I'm going to refer you to the
24  page that's 010103.
11:17:32  25    A.   Okay.
```

1      A.   No, I don't.

2      Q.   Would it be fair to say that the

3  publishers were briefed extensively by Google

4  concerning the Library Project, after it was

11:38:45   5  publicly announced?

6      A.   I believe there were numerous meetings

7  with publishers after the Library Project was

8  announced.

9      Q.   And those publishers, therefore, were in

11:39:00  10  a position to ask questions and get Google's

11  responses concerning the project?

12      A.   I believe that there were publishers

13  that requested meetings for discussions on it,

14  and if -- if someone requested a meeting, then,

11:39:17  15  yes, we would -- they were able to ask

16  questions.  We were fairly open about our

17  program.

18      Q.   Okay.  And it's fair to say that those

19  publishers who were extensively briefed

11:39:31  20  expressed serious concerns about the Library

21  Project; is that correct?

22          MS. DURIE:  Objection.  Asked and

23  answered.

24          Go ahead.

11:39:39  25          THE WITNESS:  I was not in many of those

1   meetings, but I think it is fair to say, as

2   stated earlier, that a number of publishers had

3   concerns about the Library Project and

4   communicated that to Google.

5   BY MS. ZACK:

6       Q.  And is it fair to say that authors

7   groups also did so?

8       A.  I believe it's also fair to say that,

9   certainly, the Authors Guild expressed concerns

11:40:10  10   about the Library Project.

11       Q.  Do you know of any other authors groups

12   that Google talked to?

13       A.  I do not know of any other one prior to

14   settlement -- settlement agreement and

11:40:25  15   discussions during the settlement.  I do not

16   know if there were other authors groups we

17   talked to.

18       MS. ZACK:  Okay.  Let me mark as the

19   next exhibit document Google 5000439 through

11:40:46  20   446.

21           (Whereupon, the document referred to

22           was marked Plaintiffs' Exhibit 9 for

23           identification by the Reporter, a

24           copy of which is attached hereto.)

11:41:14  25   BY MS. ZACK:

1      A.    I -- I -- not that I -- I expect it was

2  because of changes in the interface that would

3  have reduced the ad's revenue.

4      Q.    What benefits does Google, as a company,

11:47:19   5  get from the Google Books?

6      A.    So when we initiated the project, the

7  motivation was about enhancing the Google search

8  experience by expanding our index to include

9  books that previously were not searchable or

11:47:47  10  indexable, and that users would then be able to

11  find these books and then access the books

12  either by purchasing them or finding them in a

13  library.  By improving Google search, that

14  benefits Google because more people would use

11:48:10  15  search and might do more searches.

16      And then the other benefit was Google

17  had always envisioned this as an ambitious

18  project whose benefits were going to be realized

19  over time in terms of from a societal

11:48:33  20  perspective and that that also benefits Google

21  in ways that by contributing to society, in

22  general, in a positive fashion, that also can be

23  good for the company in terms of establishing a

24  brand and establishing a relationship with

11:48:55  25  users.

1      Q.   And you got that understanding from

2  discussions with senior management of Google?

3      A.   Yes.

4      Q.   And that would be Larry Page, Serge

11:49:29  5  Brent, Eric Schmidt?  Others?

6      A.   I think it's fair to say that I got this

7  understanding from the other leads, when I came

8  in, as to the why are we embarking on this

9  initiative.  And then it was also as much my job

11:49:45  10  to articulate to our executive committee the

11  benefits of this project.

12      Q.   And did -- were there other internal

13  benefits to Google from having the digitized

14  information?

11:50:06  15      A.   So there had been -- I'm aware of one

16  initiative where we used scans of works to help

17  in automated translation, and that is where you

18  would be using the underlying text to

19  automatically learn a system that can translate

11:50:39  20  from one language to another.

21          We predominantly use information

22  obtained from the Web.  So the use of books was

23  actually quite limited in that.  But there had

24  been some use of the -- of the text for that.

11:50:53  25  It was -- it was minor, though.

1            The predominant use, far and away, is to

2     enhance the search experience and have users

3     search either on Google.com or with a restrict,

4     just looking over the books corpus.

11:51:13    5        Q.   Some of the documents I've seen is that

6     Google's mission is to organize and make

7     available the world's content.  Have you seen

8     that?

9        A.   Yes.  I don't remember the organize and

11:51:27   10    make available -- I don't -- yeah.  No.  I know.

11    The precise words, I -- you'll see it in lots of

12    documents.

13        Q.   So Google's mission, as you recall or

14    understand, is to organize and make useful the

11:51:46   15    world's content?

16        A.   Information.

17        Q.   Information.  And that's partly to

18    enhance the search experience?

19        A.   It's -- by enhancing the -- by enhancing

11:52:02   20    the search experience, we accomplish the

21    mission.

22        Q.   And the better the search experience,

23    the more users for Google; is that right?

24        A.   So we believe that as our product

11:52:16   25    improves and users have a better search

1   experience, then more or the same number of

2   people will continue to use Google search.

3        Q.   And then how is that monetized by

4   Google?

11:52:30   5        A.   Google runs advertisements on Google

6   search in response to some but not all queries,

7   and that is traditionally on the right-hand side

8   or above the search results, and then we make

9   money when people click on the advertisements.

11:52:49   10        Q.   And is there any other way that Google

11   makes money besides ads?

12        A.   There are other initiatives within

13   Google, yes.

14        Q.   Do you know about how much or what

11:53:00   15   percent of Google's revenues come from ad

16   revenues?

17        A.   I do not know specifically, but a

18   large -- large percentage comes from

19   advertisements in one form or another.

11:53:13   20        Q.   And as director of engineering for

21   Google Books, did you consider that your

22   initiative was benefitting Google commercially?

23        A.   I believe that this initiative was a

24   good investment for Google in terms of both the

11:53:35   25   ability to enhance search, but also for the

1   public benefits realized from the project.

2          The project was an expensive project,

3   and I never did any analysis to determine if the

4   investment level, if there was a return on that

11:53:58   5   investment.

6          I executed on the project because it was

7   very much of a project that was driven from a

8   vision, and I executed on delivering that vision

9   but never assessed whether or not we actually

11:54:12   10   were financially benefitting when you looked at

11   the overall cost of the project.

12     Q.  Well, Google does not break out its

13   benefits on a product-by-product basis, does it,

14   in it's financials?

11:54:24   15     A.  Correct.  To my knowledge, it does not.

16     Q.  And have you heard the executives state

17   that they believe they cannot do so because all

18   the products are important and create a synergy

19   that benefits Google?

11:54:43   20     A.  I have heard the --

21          MS. DURIE:  Wait.  Wait.  You need to

22   let her finish her question.

23          MS. ZACK:  Sorry.  Going slow.

24          THE WITNESS:  I have not heard the

11:54:51   25   executives state that.  I believe it would be

13:50:

**REDACTED**

13:50:

13:50:

13:51:04  20      Q.   Does Google keep any statistics on how

21  many clicks there are on the Buy the Book's

22  links?

23      A.   We did keep statistics on the

24  click-through rate for the Buy the Book link.

13:51:21  25      Q.   While you were director of engineering?

1        A.   Uh-huh.   Yes.

13:51:41                    **REDACTED**

13:51:58   10        Q.   And did you have any information about

11   whether people ever bought the book after they

12   clicked?

13        A.   In general, we weren't -- we did not

14   have any information.   We made various efforts

13:52:08   15   to get estimates from some of our partners, but

16   I don't remember ever really having a good

17   estimate of what the -- what happened once it

18   went off to partners.

13:52:24

22                         **REDACTED**

23

24

13:52:39   25

**EXHIBIT 8**

# Miller & Company Reporters

CONFIDENTIAL

꜒IFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC.,           )
Associational Plaintiff, BETTY     )
MILES, JOSEPH GOULDEN, and JIM     )
BOUTON, on behalf of themselves    )
and all other similarly situated,  )
                                   )
        Plaintiffs,                )
                                   )  Civil Action No.
        vs.                        )  05 CV 8136 (DC)
                                   )
GOOGLE INC.,                       )
                                   )
        Defendant.                 )
_____)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF:   KURT GROETSCH

TAKEN ON:        February 13, 2012

NO.              REPORTED BY:

    13043                        BRENDA L. MARSHALL
                                 CSR No. 6939

Los Angeles              San Francisco
           800.487.6278

```
 1                    KURT GROETSCH,
 2              a Witness having been duly
 3              sworn, testified as follows:
 4
                       EXAMINATION
 5
 6  BY MS. ZACK:
 7       Q.   Could you state your full name for the
 8  record, please.
 9       A.   Yes.   Kurt McCollester Groetsch.
10       Q.   And your address, please.
11       A.
12
13       Q.   You currently work for Google; is that
14  right?
15       A.   Yes, I do.
16       Q.   What is your position?
17       A.   Technical collections specialist.
18       Q.   When did you join Google?
19       A.   August of 2007.
20       Q.   Can you run through your employment
21  history since college.
22       A.   Since college.
23       Q.   Very briefly.
24       A.   Very briefly.   Sure.   I worked as a
25  freelance graphic designer between 1994 and
```

09:30:46  10
09:30:58  15
09:31:09  20
09:31:19  25

```
 1   BY MS. ZACK:
 2        Q.   Well, what do you understand it to be?
 3             MR. GRATZ:   Objection.   Vague.
 4             THE WITNESS:   We are -- so as I stated
 5   earlier, we are ingesting library catalogs in
 6   order to understand the -- what a library holds
 7   and what may be eligible for digitization as
 8   part of the Library Project.
 9   BY MS. ZACK:
10        Q.   And how do you determine what's eligible
11   for digitization as part of the Library Project?
12        A.   Well, I'm -- how do we -- are you asking
13   a question about the process, or are you asking
14   a question about the criteria that we use for
15   eligibility determination?
16        Q.   Let's start with the criteria.
17        A.   Okay.   There are criteria, three primary
18   criteria, that we use.   The first one is we
19   determine -- we want to determine whether a book
20   has been digitized already.   If a book has been
21   digitized already, it is ineligible.
22             We also want to make sure that a
23   particular volume has been opted out from
24   digitization.   If a book has been opted out, we
25   will not scan it.   If we determine that a book
```

Timestamps (left margin):
- 10:00:45 — line 5
- 10:00:59 — line 10
- 10:01:18 — line 15
- 10:01:32 — line 20
- 10:01:53 — line 25

1    has been opted out, we will not scan it.

2           And then we also eliminate material that

3    has been committed for digitizing by another

4    library.

10:02:08    5           If a book passes all three criteria,

6    then we will place it on a candidate list, which

7    is just a list of all material from a particular

8    library that passes all three criteria.

9       Q.   And when -- after you place a book on

10:02:26   10    the candidate list, what happens to the

11    candidate list?

12       A.   The candidate list is provided to the

13    library, the library partner, for them to

14    analyze, and they will use that to determine

10:02:40   15    what they choose to send to Google.

16       Q.   And do you discuss in any way, either by

17    e-mails or in writing or orally, with libraries

18    what -- how they make that selection process?

19           MR. GRATZ:   Objection.   Vague.

10:03:01   20           THE WITNESS:   Yeah.   I'm not quite sure

21    that I understand the question.   Are we asking

22    about --

23    BY MS. ZACK:

24       Q.   I'll rephrase it if you don't understand

10:03:12   25    it.

1      A.    Sure.

2      Q.    You said that Google, using the criteria

3   you've described, creates a candidate list which

4   it provides to the library; correct?

10:03:19   5      A.    Yes.

6      Q.    To your knowledge -- and then the

7   library chooses books from that list that it's

8   going to allow Google to copy; is that correct?

9      A.    They -- they choose books from that list

10:03:32   10   to provide to Google for digitization.

11      Q.    Okay.   So my question is, do you

12   communicate with the library about their process

13   of making that selection?

14      A.    I generally don't discuss that directly

10:03:47   15   with the libraries.   That would be a

16   conversation between the libraries and the

17   library partner managers.   Yeah.   I generally

18   don't have direct conversations about the

19   specific books that they're going to send from

10:04:03   20   their collections, once they receive the

21   candidate list.

22      Q.    Are you privy to those communications

23   either through e-mail or discussions with your

24   manager?

10:04:13   25      A.    Yes.   I've been included in some e-mails

1  on that.

2       Q.  And do you have any understanding from

3  that as to what criteria, for instance, Michigan

4  uses?

10:04:23  5       A.  Michigan is -- yes.  I do understand the

6  criteria that they use to select books for

7  sending.  Generally, yes, I've been -- I'm

8  familiar with some of the criteria that

9  libraries use.

10:04:42  10       Q.  Can you just tell me what that is?

11       A.  In general, libraries have used

12  logistical considerations to determine what to

13  send to -- to Google for digitization.

14            Libraries are interested in the ease of

10:05:01  15  access to the books, and they've mentioned that

16  they're also concerned about, like, there -- a

17  lot of physical logistical considerations that

18  have to be taken into account.

19            So whether there are facilities for

10:05:20  20  staging books in a particular building, whether

21  there's access to a loading dock to get the

22  books out, and whether -- you know, what the

23  sensibilities of a particular librarian in a

24  particular library are.

10:05:35  25            So, generally, it's logistical

1    considerations that we work with when libraries

2    are determining what to send.

3        Q.    Any other considerations that you've

4    learned of that libraries have brought to

10:05:50   5    Google's attention?

6        A.    Let's see.   There may be some internal

7    discussions about collections that they would

8    care to digitize over others, but, in general,

9    those discussions about particular collections

10:06:12   10    are internal, and they're not decisions that we

11    participate in.

12        Q.    "We" meaning Google?

13        A.    Google, yes.

14        Q.    Now, to -- you mentioned to prepare the

10:06:32   15    candidate list, Google has three mentioned

16    criteria.

17        A.    Uh-huh.

18        Q.    Whether the book has already been

19    digitized, and I assume you mean digitized by

10:06:42   20    Google; correct?

21        A.    Yes.

22        Q.    And that Google has its own records to

23    determine that; correct?

24        A.    Yes.   We know which books have -- are

10:06:51   25    part of the corpus of digitized material.

```
 1  BY MS. ZACK:

 2      Q.   -- in your job at Google?

 3      A.   In my job?  I do not use this set -- no.

 4  I do not use this set of records in my job at

 5  Google.

 6      Q.   Do you ever have occasion to review

 7  copyright renewal records as part of your job at

 8  Google?

 9      A.   I -- copyright renewal records?

10      Q.   Yes.

11      A.   I have viewed them in the past, yes.

12      Q.   While at Google?

13      A.   While at Google.  Yes.

14      Q.   And for what purpose?

15      A.   To determine whether a particular title

16  that was originally registered has a renewal

17  record.

18      Q.   And why were you doing that?

19      A.   In some cases, it is curiosity.  In

20  other cases, it is -- it would be part of --

21  part of my role, sort of a secondary role in --

22  let's see.  I'm trying to characterize it.

23  Looking -- it is to determine whether there is a

24  renewal record present for a particular volume.

25      Q.   And when you want to determine if a
```

Timestamps in left margin:
12:00:31 (line 5)
12:00:46 (line 10)
12:00:57 (line 15)
12:01:18 (line 20)
12:01:51 (line 25)

1    renewal record is present for a particular

2    volume, how do you do that?

3        A.    There are a variety of tools one can

4    use.   One is the Stanford copyright renewal

12:02:08    5    database, which is fairly comprehensive.

6    There's also a -- for 1978 onward, as mentioned

7    in the post, U.S. government -- U.S. copyright

8    office records are available online through

9    their site.

12:02:20   10        Q.    Any other tools that you've used?

11        A.    I believe that is -- those are the

12    primary tools.

13        Q.    And have you -- using those tools, have

14    you been able to determine whether a book --

12:02:35   15    copyright for a given book has or has not been

16    renewed?

17        A.    Using those tools, you can determine

18    whether or not a renewal record is present.

19             MS. ZACK:   Let's mark as the next, PX

12:02:59   20    35, two pages, Google 5000787 through 788.

21             (Whereupon, the document referred to

22             was marked Plaintiffs' Exhibit 35 for

23             identification by the Reporter, a

24             copy of which is attached hereto.)

12:03:21   25    BY MS. ZACK: