# EXHIBIT 9

# MILLER &
# COMPANY
# REPORTERS

**CONFIDENTIAL**

**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC.,              )
Associational Plaintiff, BETTY        )
MILES, JOSEPH GOULDEN, and JIM        )
BOUTON, on behalf of themselves       )
and all other similarly situated,     )
                                      )
        Plaintiffs,                   )
                                      ) Civil Action No.
vs.                                   ) 05 CV 8136 (DC)
                                      )
GOOGLE INC.,                          )
                                      )
        Defendant.                    )
_____  )

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF:    STEPHANE JASKIEWICZ

TAKEN ON:         February 14, 2012

NO.            REPORTED BY:

    13044                BRENDA L. MARSHALL
                         CSR No. 6939

Los Angeles                    San Francisco
            800.487.6278

1      Q.   Director of engineering?   Is that what

2  you said?

3      A.   Yeah.   The exact title was Director of

4  Product Development.

11:04:01  5      Q.   When you joined Google, what position

6  did you take in April 2007?

7      A.   Program manager.

8      Q.   And what were your -- how long did you

9  hold that position?

11:04:14  10      A.   It's not very clear.   Things are often

11  in a continuum.   So I actually didn't act that

12  much as a program manager, mostly as an

13  engineering manager, which is what I'm doing

14  today.

11:04:27  15      Q.   Mostly as an engineering manager?

16      A.   Yeah.

17      Q.   So since about April 2007 till today,

18  you've been an engineering manager, essentially,

19  for Google, or acted in that capacity?

11:04:37  20      A.   Yeah.   It's a continuum.   I started

21  doing project management in the beginning and

22  very quickly moved to more technical issues.

23      Q.   Okay.   And have you been assigned to

24  Google Books for that entire period?

11:04:50  25      A.   Yes.

1  scan center?

2      A.    It is in the scan center, yes.

3      Q.    And does your team write any software

4  for the check-in station?

11:19:18  5      A.    Yes.

6      Q.    And what is the purpose of the check-in

7  station?

8      A.    There -- there are a few of them.  The

9  two main ones are I -- or I guess the main

11:19:33  10  one -- because they all end up determining

11  whether or not the book is fit to scan.  I guess

12  the other one is to register -- register the

13  fact the book is in the scanning center so that

14  we can track it later and inquire about its

11:19:48  15  location in the scanning center.

16      Q.    And when you say determine whether the

17  book is fit to scan, how is that determined?

18      A.    So one of the things is what you asked

19  about, opt-outs, in determining whether or not

11:20:03  20  the book is opted out.  The others have to do

21  with physical conditions of the book.  We have

22  different type of scanning stations for

23  different type of material so they tell us which

24  one is, like, the appropriate one.

11:20:17  25          They also check for the size of the

```
 1   book, make sure that we can actually scan it.
 2   They check for the condition of the book.  If
 3   it's too damaged, we won't scan it.  And they
 4   check for specific conditions, like the text
 5   being too close to the gutter.  If it is, then
 6   we won't scan it because we wouldn't be able to
 7   capture all the text.
 8        Q.  Too close to the what?
 9        A.  The gutter.
10        Q.  The binding of the book?
11        A.  Yeah.  The binding of the book.  Sorry.
12        Q.  So the scan wouldn't end up being useful
13   to view?
14        A.  Correct.
15        Q.  Do you have any responsibility for
16   creating the opt-out list at Google?
17        A.  No.
18        Q.  Do you know who does?
19        A.  So I don't know how to answer that
20   question because Google doesn't decide what the
21   opt-out list is.  It's just publishers coming
22   forward and telling us what the list should be
23   of things we shouldn't scan.
24        Q.  Right.  But does someone have the
25   responsibility for making sure that list is
```

11:20:29 (line 5)
11:20:40 (line 10)
11:20:49 (line 15)
11:21:05 (line 20)
11:21:18 (line 25)

# EXHIBIT 10

CONFIDENTIAL

1    * * *  C O N F I D E N T I A L  * * *

2        UNITED  STATES  DISTRICT  COURT

3        SOUTHERN  DISTRICT  OF  NEW  YORK

4

5    THE  AUTHORS  GUILD,  et         )

     al.,                            )

6                                    )

                 Plaintiffs,         )

7                                    )

         vs.                         )        No.  05  Civ.

8                                    )          8136  (DC)

     GOOGLE  INC.,                   )

9                                    )

                 Defendant.          )

10   - - - - - - - - - - - - - - - - - - - - - - - - )

11

12

13

14

15

16                   February  17,  2012

17                   9:52  a.m.

18

19        Deposition  of  THOMAS  TURVEY,  held  at

20   the  offices  of  Milberg,  One  Penn  Plaza,  New

21   York,  New  York,  before  Laurie  A.  Collins,  a

22   Registered  Professional  Reporter  and  Notary

23   Public  of  the  State  of  New  York.

24

25

Pages 57-61, 81-85, 88-92 and 102-05
of the Deposition of Thomas Turvey will be filed under seal

Page 3

1

2  T H O M A S   T U R V E Y ,

3       called as a witness, having been duly sworn

4       by the notary public, was examined and

5       testified as follows:

6  EXAMINATION BY

7  MS. ZACK:

8       Q.    Good morning.

9       A.    Good morning.

10      Q.    Can you state your full name and

11  address, please?

12      A.    Sure.  Thomas Turvey,

13                        REDACTED

14      Q.    And you work for Google?

15      A.    I do.

16      Q.    What is your position?

17      A.    I am the director of strategic

18  partnerships.

19      Q.    How long have you had that particular

20  position at Google, approximately?

21      A.    Approximately three years.

22      Q.    And when did you join Google?

23      A.    February 2004.

24      Q.    And when you first joined, what was

25  your position?

```
 1                Turvey - Confidential
 2     happened.
 3          Q.    I'm expanding it out and saying aside
 4     from this particular meeting do you recall ever
 5     hearing from any publishers that they took the
 6     position that Google should get permission before
 7     scanning copyrighted materials?
 8          A.    I have heard that from publishers.
 9          Q.    Do you recall which publishers?
10          A.    Not specifically.
11          Q.    Have you heard that from my authors?
12          A.    I have heard that from authors involved
13     in this case that are named in this case.
14          Q.    Which authors are you speaking of?
15          A.    I'm speaking of Jim -- I'm sorry, I
16     forgot the last name.  You're not going to help me
17     with that?  Okay.  Fine.
18                MS. DURIE:  Sorry.
19          Q.    Jim Boughton?
20          A.    No, not Jim Boughton.  Besides --
21          Q.    Jim Glick?
22          A.    Jim Glick, yes.
23          Q.    All right.  So you heard from Jim Glick
24     that -- who is an author?
25          A.    Yes.
```

1                    Turvey - Confidential

2       Q.      What did he say?

3       A.      I don't remember specifically.

4       Q.      Did he say to you that he thought

5   Google should get permission before scanning in

6   copyright materials?

7       A.      It's possible he said that.

8       Q.      There are persons -- rights holders who

9   have said that to you; right?

10      A.      It's possible, yeah.

11      Q.      Well, what I'm saying is you may not

12  recall specifically who said it, but you recall

13  that rights holders have said that to you --

14  correct? -- that they believe that Google should

15  get permission before scanning in copyright

16  materials; correct?

17              MS. DURIE:  Objection, asked and

18         answered.

19              You can answer.

20      A.      As I stated, I have no specific

21  recollection other than Jim Glick, but it's

22  possible that was said to me.

23      Q.      Do you have a general recollection that

24  that was said to you?

25              MS. DURIE:  Objection, asked and

Page 64

1                  Turvey - Confidential

2          answered.

3          A.    I have nothing more to add.

4          Q.    Well, there's a difference between

5    saying it was possible and saying I have a general

6    recollection that it was said to me but I can't

7    identify precisely who said it.

8                What I'm trying to ascertain is if you

9    agree that it was said to you; you just can't

10   recall who said it.

11               MS. DURIE:  Asked and answered.

12               You can answer.

13         A.    I have nothing more to add.

14         Q.    What was the reason that Google met

15   with the AAP?

16               MS. DURIE:  Objection, calls for

17         speculation.

18               You can answer.

19         Q.    To the extent you know.

20         A.    Upon request.

21         Q.    And prior to attending the meeting, did

22   you get some sense of what the meeting was going

23   to be about?

24         A.    I was told it would be about the

25   library project.

Page 96

1                    Turvey - Confidential

2

3

4

5

6                          **REDACTED**

7

8

9

10

11        Q.     Did you at any time get any data about

12   whether after the "buy the book" link was clicked

13   that books were actually purchased?

14        A.     Not that I remember.

15        Q.     Did you ever attempt to get that data?

16        A.     I think we had a discussion or two.

17        Q.     Was there some reason why you didn't

18   get that done?

19        A.     As I remember, no retailer was willing

20   to provide that to us.

21        Q.     Excuse me?

22        A.     As I remember, no retailer was willing

23   to provide that to us.

24                         **REDACTED**

25

# EXHIBIT 11

Perle

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3          Master File No.:  05 CV 8136-DC

4

5

6

7   THE AUTHORS GUILD, et. al.,

8                    Plaintiffs,

9   vs.

10   GOOGLE, INC.,

11                    Defendants.

12   _____/

13

14                    2500 South Ocean Boulevard

                     Apartment 3A5

15                    Palm Beach, Florida

                     Monday, 2:00-3:37 p.m.

16                    March 19, 2012

17

18

19          DEPOSITION OF E. GABRIEL PERLE

20

21

22        Taken on behalf of the Plaintiffs before Janet M.

23   Willitz, RPR, RMR, Notary Public in and for the State of

24   Florida at Large, pursuant to Plaintiffs' Notice of

25   Taking Deposition in the above cause.

Perle

Page 7

1    book publishing industry, is that correct?

2         A.   Yes.

3         Q.   Do you consider Google to be a part of the

4    book publishing industry?

5         A.   What a strange question.  I mean, it's all a

6    matter of definition.  Certainly, Google is

7    participating in the book publishing industry now, but

8    it's not what I would consider to be a book publisher as

9    such.

10        Q.   And then the next sentence says:  I have not

11   been asked to and do not herein render any opinions

12   regarding issues of substantive copyright law.

13             What do you mean by that?

14        A.   Just what it says.

15        Q.   What type of substantive issues are you not

16   rendering opinions about?

17        A.   Oh, what constitutes fair use would be the

18   obvious one, but whether or not something is subject to

19   libel or things of that nature.

20        Q.   So you're not offering any opinions about fair

21   use, right?

22        A.   Correct.

23        Q.   Are you offering any opinions about whether

24   any particular authors are legal or beneficial owners?

25        A.   No.

Perle

Page 19

1       A.    Yes.

2       Q.    I'd like for you to look at paragraph 20 on

3    page 5 of your declaration.

4       A.    I've got it.

5       Q.    And you write:  Some publishing contracts

6    provide for royalty-free promotional uses.  Then you

7    say:  Under such contracts, the author has given up

8    legal ownership of the copyright, but does not have the

9    right to receive royalties for promotional uses.

10      A.    Yes.

11      Q.    What do you mean by legal ownership there?

12      A.    Legal ownership.

13      Q.    As opposed to what?

14      A.    As opposed to just an interest.

15      Q.    Well, are you making any judgments about that

16   official ownership?

17      A.    Not at this point, no.

18      Q.    So you're not suggesting that an author who

19   has given a publisher a royalty-free promotional right

20   has given up its beneficial interest in the copyright,

21   are you?

22      A.    No.

23      Q.    Now in paragraph 21, the first sentence says:

24   Some contracts expressly prohibit royalty-free

25   promotional use, comma, reserving all electronic

Perle

Page 39

1      Q.    No royalties shall be payable on copies

2   furnished gratis to the author or for review,

3   advertising sample, sales promotion or like purposes or

4   on copies destroyed by fire or other accident, but

5   nothing in this clause shall be construed as exempting

6   from royalty copies supplied by the publisher for resale

7   in payment for trade advertising.

8            Do you see that?

9      A.    Yes.

10     Q.    And you would agree that that is a promotional

11  use clause, correct?

12           MR. GRATZ:  Objection, vague.

13           You can answer it.

14           THE WITNESS:  Well, you can call it anything

15        you want to.  You can call it macaroni, but, I

16        mean, you're trying to characterize, by a label, a

17        sentence which has clear meaning in the English

18        language, and in the custom of the trade, people

19        don't refer to clauses in contracts with labels

20        that way.

21  BY MS. ZACK:

22     Q.    So is it correct that in your practice you

23  have never heard the phrase promotional use?

24     A.    Of course, I've heard it.

25     Q.    So it's not a phrase that you're unfamiliar

Perle

Page 40

1   with?

2        A.   Wait a minute.  Did you say promotional use

3   clause?

4        Q.   Yes.

5        A.   No, I've heard the phrase promotional use, the

6   term promotional use clause.

7        Q.   So you've heard the term promotional use.

8             MR. GRATZ:  I'm not sure that the witness was

9        finished with his answer.

10            MS. ZACK:  Oh, I'm sorry, I thought he was.

11            THE WITNESS:  Now I am because I don't

12       remember where I was.

13            MS. ZACK:  The reporter can read it back to

14       you.

15            (Thereupon, the portion referred to was read

16   by the reporter as above recorded.)

17            THE WITNESS:  Okay.

18   BY MS. ZACK:

19       Q.   And so in your trade usage, you've heard the

20   phrase promotional use?

21       A.   Yes.

22       Q.   And you've seen promotional use provisions in

23   contracts?

24       A.   Of course.

25       Q.   But you don't like clause?  You don't like

Perle

Page 41

1    that word, that phrase?

2         A.    You're asking me if that is the customary

3    language.

4         Q.    No, sir, I'm not asking you whether it's

5    customary or not; I'm just asking you whether, in this

6    particular contract, you would consider it a promotional

7    use provision.

8         A.    Of course.

9         Q.    And in trade custom and usage, what is the

10   promotional use?

11        A.    How long is a piece of string?  I can't answer

12   that question.

13        Q.    Well, I mean, what are the reasons why

14   promotional use provisions are included in these

15   contracts?

16        A.    So that the publisher can authorize

17   promotional use of excerpts to benefit the sale of a

18   book.

19        Q.    Right.  And also so the publisher can

20   distribute the book for reviews?

21        A.    Oh, sure.

22        Q.    What other types of uses or what other types

23   of promotional purposes are there?

24        A.    That's almost impossible to answer.  As many

25   ---

Perle

Page 42

1      Q.   You gave an example of excerpts, and that

2  would be excerpts for what?  What type of excerpts would

3  you -- You started practicing in the '50s and '60s,

4  right?

5           MR. GRATZ:  Objection.  So the question is:

6      You started practicing in the '50s or '60s?

7           MS. ZACK:  Yes.

8           THE WITNESS:  Yes.

9  BY MS. ZACK:

10     Q.   And at that time, there were no electronic

11  rights, right?

12     A.   Wrong.

13     Q.   Well, what electronic rights were there at

14  that time?

15     A.   All kinds of mechanical recording rights and

16  transmission rights.

17     Q.   So with respect to the mechanical recording

18  and transmission rights, were there promotional uses

19  with respect to those rights?

20           MR. GRATZ:  Objection, vague as to time.

21           MS. ZACK:  That's fine, I'm talking about back

22      in the '50s and '60s.

23           MR. GRATZ:  That's still vague.

24  BY MS. ZACK:

25     Q.   Did you, as a matter of custom and trade

Perle

Page 43

1   practice, when you were a publisher, use microfiche or

2   microfilm for promotional uses?

3        A.   No.

4        Q.   What types of outlets did you typically use in

5   the '50s and '60s for promotional uses?

6        A.   Trade advertising, newspaper advertising, The

7   Sunday Times Book Review, Publishers Weekly.  Things of

8   that nature.

9        Q.   And that would include excerpts, right?

10       A.   Sure, it could.

11       Q.   And sometimes you would give away the whole

12  book so it could be reviewed, right?

13       A.   Right.

14       Q.   And you used excerpts for advertising,

15  correct?

16       A.   Correct.

17       Q.   And so, I mean, this has been a longstanding

18  practice in the publishing industry, correct?

19       A.   What has?

20       Q.   To have provisions in contracts for

21  promotional uses.

22       A.   Yes, historically, publishing contracts

23  provide for promotional uses of all or part.

24       Q.   Right, and typically they're royalty-free

25  because neither the publisher nor the author is getting

Perle

Page 44

1    any compensation, correct?

2         A.    Correct.

3         Q.    And that's what my point is.  That's not

4    something new that just developed in the last ten years;

5    that's been going on for fifty years, right?

6         A.    In a different context, yes.

7         Q.    Now referring back to the contract that we

8    were looking at, which was, I believe, 60-G, correct?

9         A.    Correct.

10         Q.    Referring you back to the paragraph note that

11   we looked at a little bit before which says:  No royalty

12   shall be payable on copies furnished gratis to the

13   author or for review, advertising sample, sales

14   promotion or like purposes.

15         A.    What paragraph is that?

16         Q.    It's on AG100060, and it's a paragraph that

17   looks like to me that it has got a (k) in it.

18         A.    I've got it.

19         Q.    But it says:  No royalty, et cetera.  Do you

20   see that?

21         A.    Yes.

22         Q.    That's a promotion clause, correct, or a

23   provision of this contract?

24              MR. GRATZ:  Objection, vague.  Asked and

25         answered.

Perle

Page 45

1           MS. ZACK:  Well, I really can't remember

2       whether it has been asked and answered.  I thought

3       he said:  I could call it macaroni.  I'm just

4       trying to get a straight answer here.

5   BY MS. ZACK:

6       Q.   You would agree with me, Mr. Perle, that this

7   is a promotion clause, correct?

8           MR. GRATZ:  Objection, vague.  Asked and

9       answered.

10           You can answer it if you understand the

11       question.

12           THE WITNESS:  Well, you can call it whatever

13       you want to call it.  It covers -- Repeat your

14       question.

15   BY MS. ZACK:

16       Q.   What does it cover?

17       A.   Repeat your question.

18       Q.   My question was:  Would you call it a

19   promotion?  Do you think it covers promotional uses?

20       A.   It covers promotional uses, yes.

21       Q.   All right.

22       A.   It covers promotional royalties on promotional

23   uses.

24       Q.   And it says:  There will be no royalties,

25   right?

Perle

 1        A.    Correct.

 2        Q.    As was standard --

 3              MR. GRATZ:  Objection.

 4   BY MS. ZACK:

 5        Q.    -- in the publishing procedure, correct?

 6              MR. GRATZ:  Objection.  Vague as to the time.

 7   BY MS. ZACK:

 8        Q.    Well, did that ever change in your experience?

 9        A.    Did what ever change?

10        Q.    Was there a time when it was typical to give

11   royalties for promotional uses, and then it changed?

12        A.    No.

13        Q.    So it has pretty much been the same for all

14   your fifty years of practice, right?

15              MR. GRATZ:  Objection, vague in its use of

16        promotional uses.

17              You can answer it if you understand the

18        question.

19              THE WITNESS:  Repeat the question.

20   BY MS. ZACK:

21        Q.    My question was whether -- Well, never mind.

22   I'm going to withdraw it.  It's not necessary at this

23   point.

24              Let's now look at 60-J.

25        A.    I have it.

Perle

Page 53

1      Q.    Now with respect to all of these contracts, PX

2   60-A through the last one, which I guess is 60-Y, in

3   each of these contracts, there were royalty clauses,

4   correct?

5      A.    Correct.

6      Q.    Is that typical in your experience in the book

7   publishing industry?

8      A.    For a book publishing contract to provide for

9   royalties?  Yes.

10     Q.    Have you personally ever registered a

11  copyright?

12     A.    What do you mean by registered a copyright?  I

13  have ---

14     Q.    Not for yourself, but for Time, Inc.?

15     A.    No, I had associates, lawyers and clerks to

16  take care of the clerical functions, and registration

17  was one of those.

18     Q.    Did you have a practice as to whether or not

19  you attempted to register within ninety days of

20  publication when you were at Time, Inc.?

21     A.    I gave orders that all books that were

22  published should have a registration filed within that

23  period of time.

24     Q.    Which is ninety days of the first publication?

25     A.    Yes.

Perle

Page 54

1      Q.    So you gave those orders to the persons

2  working for you?

3      A.    Yes.

4      Q.    And was that because you wanted to have the

5  right to recover statutory damages in the event of an

6  infringement?

7           MR. GRATZ:  Objection, vague as to time.

8  BY MS. ZACK:

9      Q.    When you gave those orders, was that the

10 reason for the orders because you wanted to have the

11 right to recover statutory damages for infringement?

12          MR. GRATZ:  Same objection.

13          THE WITNESS:  That was part of the reason, and

14      it's also the time provided in this statute.

15 BY MS. ZACK:

16     Q.    Have you ever in your practice attempted to

17 determine whether a book was registered, whether the

18 copyright for a book was registered?

19     A.    Yes.

20     Q.    Have you been able to do that?

21     A.    Yes.

22     Q.    How do you do that?

23     A.    I have somebody in my office that works for me

24 do it.

25     Q.    Do you know what steps they take?

Perle

Page 55

1      A.    No.

2      Q.    Were people in your office typically able to

3   determine that information for you?

4      A.    They would, yes.

5      Q.    And did you sometimes ask people working for

6   you to determine whether a copyright in a particular

7   book had been registered within ninety days?

8      A.    Repeat that.

9      Q.    Did you sometimes, in your work, ask those who

10  reported to you, to check to see, with respect to

11  certain books, whether their copyright had, in fact,

12  been registered within ninety days?

13     A.    Probably, but I don't remember any specific

14  instances.

15     Q.    You don't recall having any problems in making

16  determinations as to the registration status of books?

17     A.    No.

18     Q.    And you would agree that if an author has the

19  royalty right under a contract, even if the contract is

20  not reverted, the author is the beneficial owner,

21  correct?

22          MR. GRATZ:  Objection.  Calls for a legal

23      conclusion.

24          You can answer it.

25          THE WITNESS:  No, I have no answer to that.

1  the copyright office or something like that?

2      A.   No, no.  It's just that there is no office

3  that I know of where such requests are collected and

4  archived.  I don't know what the copyright office is

5  doing.

6      Q.   And then 19 says:  Some offices do not

7  maintain records of where the rights have reverted.

8      A.   Correct.

9      Q.   What is your basis for that?

10      A.   Instances that I know of.

11      Q.   Is it also true that some publishers do not

12  maintain records of where the rights have reverted?

13      A.   I don't know the answer to that.

14      Q.   All right.  How many hours have you worked in

15  this matter, Mr. Perle?

16      A.   I honestly don't know.

17      Q.   Just approximately?

18      A.   Twenty.  That's a rough guess.

19      Q.   I understand.  Do you have any knowledge about

20  what purposes Google is using your declaration for?

21      A.   Repeat that.

22      Q.   Do you know why you have been asked to give

23  these opinions?

24      A.   No.

25      Q.   Have you read Google's brief?

Perle

Page 58

1      A.    Yes.  Oh, no, no, not the brief.

2      Q.    And you haven't read Google's brief in which

3  your declaration is cited?

4      A.    No.

5      Q.    So obviously, you can't say whether you agree

6  or disagree with the use that Google is making of your

7  opinion?

8      A.    You are correct.

9      Q.    We're almost done.

10      A.    All right.

11      Q.    Can we look at a couple more contracts?  If

12  you would, please look at PX 60-V.

13           MR. GRATZ:  Is that G as in golf?

14           MS. ZACK:  No, I'm sorry, it's V as in Victor.

15           MR. GRATZ:  V as in Victor?  New American

16      Library?

17           MS. ZACK:  No.

18           THE WITNESS:  I've got it.

19           MS. ZACK:  I think it's Chronicle Books.

20           MR. GRATZ:  Oh, I'm sorry, the U and the V

21      look very similar.

22           MS. ZACK:  Yes, they do look alike.

23  BY MS. ZACK:

24      Q.    It's Chronicle Books, and it's AG100192 is the

25  first Bates number.

**EXHIBIT 12**

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4

5   THE AUTHORS GUILD, et      )
    al.,                       )
6                              )
                Plaintiffs,    )
7                              )
                vs.            )     No. 05 Civ.
8                              )        8136 (DC)
    GOOGLE INC.,               )
9                              )
                Defendant.     )
10  ------------------------   )

11

12

13

14

15                   March 22, 2012

16                   12:50 p.m.

17

18        Deposition of HAL PORET, held at the

19   offices of Milberg, One Penn Plaza, New York,

20   New York, before Laurie A. Collins, a

21   Registered Professional Reporter and Notary

22   Public of the State of New York.

23

24

25

Page 19

1                              Poret

2          Q.    Why?  What was the purpose of looking

3     at it?

4          A.    Just to generally learn about the case.

5          Q.    And did you make use of any information

6     from that complaint in designing your survey?

7          A.    Yes.

8          Q.    What information?

9          A.    Basically how the plaintiffs described

10    the issues and what the case was about.

11         Q.    Then number 2 you say you reviewed the

12    following materials:  Gale Contemporary Authors

13    data.  Which particular Gale Contemporary Authors

14    data did you review?

15         A.    The database that was the list of

16    authors that the survey was done from.

17         Q.    That's in that?

18              MS. DURIE:  I was going to say, Joanne,

19         you had asked to receive a copy of it, and I

20         have a copy of it (handing).

21              MS. ZACK:  Okay.  Thanks.

22         Q.    Now, in your report you say that Gale

23    has, I don't know, 600 databases or something; is

24    that right?

25         A.    Yes.

Page 20

1                      Poret
2      Q.    How did you pick the one you used?
3      A.    Gale maintains a number of different
4   databases that are different subject matter or
5   purposes, and this was their database which is a
6   reference work that consists of authors.  So this
7   was -- since the purpose was to interview authors,
8   that was the relevant database.
9      Q.    And did Gale have any other databases
10  with authors included?
11     A.    I don't know if they have any others.
12  My understanding was this was the most
13  comprehensive attempt to keep track of published
14  authors that they have.
15     Q.    Did you talk to somebody from Gale?
16     A.    No.
17     Q.    How did you choose this particular
18  database, or did someone else choose it?
19     A.    The attorneys from Durie Tangri gave me
20  this database.
21     Q.    So you did not choose the database;
22  that was done by Durie Tangri?
23     A.    Well, I wouldn't say I didn't choose
24  it.  When I was called about the case, we -- I
25  discussed with them the need to have a way to get

Page 21

1                           Poret

2    through to the right types of respondents and that

3    I would need some way -- some way to get through

4    to authors.  And they told me that they had access

5    to this database.  And so we discussed whether

6    that would be suitable for the survey, and I

7    decided that I felt that it would be.  So I --

8         Q.    Did you investigate whether there are

9    other databases with authors information

10   available?

11        A.    Yes.

12        Q.    And you found no other databases?

13        A.    I didn't -- I didn't find -- I wouldn't

14   say that, but when I searched around I didn't find

15   any leads on anything that I thought would be more

16   suitable than this or any reason to think this

17   wouldn't be suitable.

18        Q.    Well, what was the target population

19   for your survey?

20        A.    In a broad sense it was authors -- it

21   was published authors, and in a more narrow sense

22   I understood the class to be limited to authors

23   who I believe have had a copyright registration

24   filed within three months of the book being

25   published, maybe.

Page 22

                        Poret

1
2         So -- so that would have been the
3   narrower definition of the universe that I was
4   going for.
5         Q.    So the universe you were attempting to
6   locate was published authors that had a copyright
7   registration filed within three months?
8         A.    Well, I was attempting to get published
9   authors in general but find out whether they had
10  had a copyright registration filed within that
11  period so as to determine whether they met that
12  definition of the class, if that's what the
13  definition was going to be.
14        Q.    And what did you do to attempt to find
15  those people who had copyrights registered within
16  three months?
17        A.    Just ask questions as part of the
18  survey to determine, once we've reached somebody,
19  did they fall into that description of the class.
20        Q.    Did Google provide you with any data
21  concerning books that were actually copied by them
22  in their library project?
23        A.    No.
24        Q.    Did you ask for that data?
25        A.    No.

1                         Poret

2     have them?  You don't have it on a respondent-by-

3     respondent basis?

4          A.     This is a respondent-by-respondent

5     basis.

6          Q.     I'm just asking you if this is the only

7     format in which this information exists.

8          A.     It exists in an Excel spreadsheet, and

9     this is the Excel spreadsheet printed out.

10          Q.     And there's nothing else that you have

11    concerning the -- no other format in which the

12    data exists other than the Excel spreadsheet?

13          A.     I can't think of what it would be.

14    This is literally every response of every

15    respondent.

16          Q.     Okay.  I'm just trying to ascertain if

17    there's anything else.  You're telling me there

18    isn't.

19          A.     No.

20               MS. ZACK:  Let's mark as the next

21          exhibit, 76, Reference Manual on Scientific

22          Evidence, second edition, Federal Judicial

23          Center 2000.

24               (Plaintiffs' Exhibit 76, Reference

25          Manual on Scientific Evidence, marked for

Page 39

1                          Poret

2          identification.)

3          Q.      Have you seen this before?

4          A.      Yes.

5          Q.      Do you use this in connection with your

6    surveys?

7          A.      I'm familiar with it.  I don't use it

8    in the sense that I consult it as I'm doing a

9    survey.  But I'm familiar with the general

10   principles that are discussed within it.

11         Q.      And do you try to follow the principles

12   discussed in it?

13         A.      Yes.

14         Q.      Are there any principles discussed in

15   it that you disagree with?

16                MS. DURIE:  It's overbroad.

17                But you can answer.

18         Q.      That you can tell me.

19         A.      There are some things discussed in this

20   which are out of date.  There are some things that

21   are discussed in this which I wouldn't put it

22   quite the same way as Dr. Diamond, so perhaps a

23   moderate disagreement.

24                She is also in the process of redoing

25   it right now, but for the most part these are

Page 40

1                    Poret

2   pretty accepted principles on a general basis.

3        Q.    Well, are there any generally accepted

4   survey principles that you do consider to be

5   authoritative?

6             MS. DURIE:  It's vague.

7             You can answer.

8        A.    A lot of what's in here I consider to

9   be generally authoritative.  It's just extremely

10  generally.  And in designing a survey, general

11  statements of survey principles aren't all that

12  helpful.  It's a matter of implementing them

13  specifically for the circumstances of any given

14  survey.

15       Q.    Other than this particular document

16  that we've marked as PX 76, are there other

17  treatises or articles or books that you consider

18  authoritative with respect to designing surveys?

19       A.    There are others that have some

20  guidance that I would look to at various times.

21       Q.    What are they?

22       A.    Well, for trademark matters, the

23  McCarthy on Trademark Treatise is certainly

24  considered authoritative or useful on certain

25  topics.  On occasion I've read law review articles

Page 41

1                         Poret

2    or articles in other publications.

3              But there's nothing that I would single

4    out as an authoritative treatise.

5         Q.    Can you name any others that you use

6    other than McCarthy on Trademark and PX 76?

7         A.    I wouldn't say that I use.  I've seen

8    other works at various times.  There's some book

9    by Phyllis Welter that I've seen before.

10        Q.    In connection with doing your surveys,

11   do you consult PX 76?

12        A.    Only if there's some specific topic

13   that I have reason to think this is going to have

14   some specific guidance on.  But in general I would

15   not go to consult it.  It's something that is in

16   the background of my knowledge and understanding.

17   But it's not a handbook that I can go to to help

18   me in any specific survey, really.

19        Q.    What about McCarthy on Trademark?  When

20   you are doing trademark-related surveys, do you

21   consult McCarthy on Trademark?

22        A.    Again, not unless I happen to think

23   there's something very specific in there that

24   would be useful.

25        Q.    You just follow your own guidelines?

Page 42

1                          Poret

2                MS. DURIE:  Objection, argumentative,

3          and it mischaracterizes the witness's

4          testimony.

5          Q.    For surveys.

6          A.    No.  It's just that a lot of these

7    things that you would call authorities or general

8    guidelines are -- come from many different sources

9    over many years; and they become part of your

10   basic knowledge and experience, and you don't need

11   to consult them on a project-by-project basis as

12   if they are handbooks for how to do something

13   specific.

14         Q.    What are the guidelines that you follow

15   in designing surveys?

16         A.    I don't know that I can answer such a

17   general question.  There are many different --

18         Q.    There must be some big-picture

19   guidelines that you use when you design surveys;

20   right?

21         A.    Yes.

22         Q.    Can you tell me what they are?

23         A.    I can tell you some of them.

24   Attempting to get through to a relevant universe

25   is certainly one.  Attempting to write questions

Page 43

1                          Poret

2     that are clear and understandable and don't bias

3     the results, interpreting data properly and

4     reporting it properly.

5               Those are some of the big ones that

6     come to mind.

7          Q.    Anything else?

8          A.    There are countless other things that

9     would come to mind as principles if I was working

10    through the issues of a specific survey, but it's

11    hard to just name them all in the abstract.

12         Q.    Do you know how many Google has copied

13    in its library project?

14         A.    No.

15         Q.    Do you have any idea at all?

16         A.    No.

17         Q.    Do you know whether it's 100,000 or 100

18    million or 10 million?

19         A.    I don't know.

20         Q.    Is that relevant?

21         A.    To the -- not to --

22         Q.    To the survey.

23         A.    No.

24         Q.    Do you know how many authors' books

25    have been copied by Google in the library project?

Page 44

1                        Poret

2        A.     No.

3        Q.     Do you have any ballpark as to whether

4    it's 100,000 authors, 2 million authors, 880

5    authors?

6        A.     No.  I assume it's far less than 2

7    million, because I don't think there are that many

8    published authors, but I don't -- I couldn't give

9    you a specific estimate.

10        Q.     Did you ask Google if they knew?

11        A.     No.

12        Q.     You don't think that's relevant?

13        A.     I don't see how that's relevant to what

14    the survey was trying to measure.

15        Q.     And the survey was trying to measure

16    what?

17        A.     It was trying to determine whether a

18    published author -- what their attitude was toward

19    the specific issue of having their books scanned

20    so that for the specific purpose of the snippets,

21    these short excerpts being findable and displayed

22    in search results, and that pertains both to

23    somebody whose books have been scanned and are

24    available on Google Books and authors who that has

25    not happened with.

Page 54

1                          Poret

2    but I just don't know if that is part of this

3    program you're describing as opposed to some other

4    program.

5         Q.     And do you know whether those sales are

6    by permission of the author or publisher?

7         A.     I don't know.

8         Q.     Now, on the bottom of the page -- the

9    last paragraph on page 1, second sentence, you

10   say, The purpose of the survey was to determine

11   the extent to which members of the proposed class

12   object to Google's scanning of books and display

13   of short excerpts in Google Books search results

14   and the extent to which they believe they have

15   been negatively impacted by these actions.

16              Right?

17        A.     Yes.

18        Q.     So that was the purpose of the survey?

19        A.     Yes.

20        Q.     So the survey's purpose was not to

21   determine whether authors objected to Google's

22   scanning of books without permission?

23        A.     It was.  That was the purpose.

24        Q.     It was the purpose to determine if

25   authors objected to Google scanning without

Page 55

1                          Poret

2     permission?

3          A.    Yes.

4          Q.    So why doesn't the survey disclose

5     anywhere within its terms that the scanning was

6     without permission?

7          A.    It is intended to do that.

8          Q.    Well, where does it do that?

9          A.    It lays out two different things that

10    can happen in Google Books.  It says that short --

11    that short excerpts -- that Google scans books and

12    provides short excerpts or, with permission,

13    fuller or longer portions are available.  And that

14    is -- that is conveying that one form is with

15    permission and one is without.

16         Q.    Let's look at what we've marked as

17    PX 64, which is Appendix B, which is the survey

18    itself; correct?

19         A.    Yes.

20         Q.    If you go to -- for some reason these

21    pages are not numbered at the bottom, but at the

22    top it says page 5 of 8.  Do you see that?

23         A.    Yes.

24         Q.    Then there's a question or I guess this

25    is 220, which is when you explained to the

Page 56

1                    Poret

2    respondents about Google Books; right?

3         A.    Yes.

4         Q.    It says, As you may or may not know,

5    Google scans books so that their content can be

6    searched online and results displayed in Google

7    Books.  We'd like to ask your opinion about one

8    particular aspect of Google Books.

9              For some books short excerpts of a

10   book, about one-eighth of a page each, are

11   viewable in Google Books search results.  A user

12   who performs a search can see up to three short

13   excerpts of the book containing the relevant

14   search terms.

15             A user can also click on a link to find

16   the book in a bookstore or library.  The scanning

17   of books and displaying of short excerpts and

18   search results is what we would like to ask you

19   about.

20             Where does it say that this scanning is

21   without permission?

22        A.    Because the next thing it says is for

23   some other books the full book or longer portions

24   are available with special permission from the

25   publisher or author.

```
 1                    Poret
 2      Q.    Well, Mr. --
 3            MS. DURIE:  Wait, wait.  Let him finish
 4      his answer.
 5      Q.    Go ahead.  Finish.
 6      A.    The flow of this is here's one thing
 7   that happens and here's the others thing that
 8   happens, and the second thing is saying this is
 9   what happens when there is permission.
10      Q.    Yeah, let's talk about that.  So in the
11   first flow, which is 220, you say for some books
12   short excerpts of the book, about one-eighth of
13   the page, are viewable in Google Books search
14   results.
15            Nowhere do you use the term -- the
16   phrase "without permission"; correct?
17      A.    Not in those words that you just read.
18      Q.    Well, those are two pretty simple
19   words, "without permission"; right?
20            MS. DURIE:  Objection, argumentative.
21      Q.    What would have been so hard to say, As
22   you may or may not know, Google scans books
23   without permission so that their content can be
24   searched online and displayed in Google Books?
25            MS. DURIE:  Objection, argumentative.
```

Page 58

1                        Poret

2        A.    I never said anything would be hard

3    about saying that.  I'm just saying I wrote it in

4    a way that conveys clearly that one version is

5    without permission and one is.  And I think it's

6    perfectly clear.

7        Q.    So you don't think it would have been a

8    little bit more clear if you had added the words

9    "without permission" after "Google scans books"?

10   You don't think that would have been slightly more

11   clear?

12       A.    No, I don't think it would have been

13   more clear.  I think it's as clear as it can be.

14       Q.    Oh, you think it's as clear as it can

15   be?

16       A.    Yes, and partly --

17             MS. DURIE:  Wait, wait.  If you asked a

18        question, please let the witness answer it.

19             MS. ZACK:  The question calls for a

20        "yes" or "no" answer.

21             MS. DURIE:  He does not have to answer

22        the question "yes" or "no," and you shouldn't

23        interrupt his answers.

24       A.    The only thing I'm adding that goes

25   into this, you have to realize the question do you

Page 59

1                          Poret

2    approve of or object to Google doing something in

3    and of itself makes no sense as a question if it's

4    suggesting that it's done with your permission.

5    It makes no sense to somebody to say do you object

6    to something that you have given permission for.

7    It's an illogical question.

8              So even -- it makes no sense to

9    interpret it that way even if there was no

10   explanation at all.  So the explanation that is

11   given here I think is clear without being leading

12   in one direction or the other.

13   Q.    Did you have any discussions with

14   anyone about whether you should include the words

15   "without permission" after "Google scans books"?

16   A.    Not that I recall.

17   Q.    So you just unilaterally decided that

18   those words were unnecessary?

19             MS. DURIE:  Objection, argumentative.

20   A.    I decided that they were -- I have the

21   words "with permission" here --

22   Q.    What --

23             MS. DURIE:  Wait, wait.  Let him finish

24   answering.

25             Go ahead.

Page 60

1                          Poret

2          A.    The answer is I put -- I put "with

3      permission" in as I thought would be the best way

4      to be clear and yet not overly leading.

5          Q.    Oh, so you think if you added the term

6      "without permission" that would be leading?

7          A.    I didn't say --

8          Q.    I'm trying to understand what you're

9      saying.  Are you saying that if the words "without

10     permission" were added it would become leading?

11         A.    Not necessarily, but it could be.

12         Q.    All right.  Let's get to the next

13     sentence, which you say makes it all fine.  You

14     say, For some other books the full book or longer

15     portions of the book are viewable in response to

16     search Google Books with special permission from

17     the publisher or author.  Our questions are not

18     about the display of full books or longer

19     portions.

20               Why did you use the word "special"?

21         A.    Well, just to highlight that we're

22     talking about an instance where Google has

23     affirmatively gone to the author or the publisher

24     and gotten permission.

25         Q.    What was special about it?

Page 61

1                          Poret
2          A.     Well, in other words, that it's a
3    specific effort to have gotten permission for that
4    specific book.
5          Q.     Why didn't you just say "with
6    permission"?
7          A.     I think that would have been fine too.
8          Q.     Yeah, well, don't you think the
9    juxtaposition of these two paragraphs actually,
10   contrary to your view, conveys the impression that
11   the original scanning is with permission and that
12   the secondary, for other books, is with special
13   permission?
14         A.     No.
15         Q.     You don't think so?
16         A.     No.  I think that's completely
17   illogical.
18         Q.     You don't think that that is a
19   reading -- a possible reading for somebody who's
20   over 80-years-old?
21         A.     I don't.  I don't think that hearing
22   that and then hearing a question as it was worded,
23   I don't think it's possible that somebody
24   interpreted a question to be asking do you approve
25   of something or do you object to something that

Page 65

1                         Poret

2    receiving statutory damages for Google's scanning

3    of books without permission of the author or

4    publisher?

5         A.    No.

6         Q.    Is there a particular reason you didn't

7    ask that question?

8         A.    It never would have occurred to me to

9    ask something like that.

10        Q.    Because you didn't want to know the

11   answer; right?

12             MS. DURIE:  Objection, argumentative.

13        A.    No.

14        Q.    Well, if you want to know about whether

15   people want to participate in a lawsuit, don't you

16   have to talk to them about the remedies that they

17   might get if they won?

18        A.    I don't know.  That's not quite how I

19   conceive of the survey.

20        Q.    Okay.  So this survey is not intended

21   to determine whether or not authors want to

22   participate in this lawsuit, is it?

23        A.    I don't know that I'd put it exactly

24   that way.  I'd say it's more whether -- one of the

25   purposes would be whether the lawsuit is

Page 66

1                           Poret

2     consistent with the interests or desires of a

3     significant portion of authors who might be in the

4     class.  I don't know whether you'd call that

5     whether they want to participate or not.

6          Q.    But you would agree that the way the

7     questions are worded here does not really -- is

8     not a fair determination of whether any of these

9     authors want to participate in this lawsuit;

10    right?

11         A.    I do -- I do think it's fair.  I think

12    the fair way to find out is asking their opinion

13    on the substantive topic, not saying to them, hey,

14    If we pay you enough money, would you, you know,

15    change your mind about this.  That's what a survey

16    is not supposed to do.

17         Q.    Oh, so you think it's fair to leave out

18    the fact that Google's scanning books without

19    permission and that they have a right to damages

20    for that --

21              MS. DURIE:  Object.

22         Q.    -- and that that somehow would give you

23    some insight into whether they would want to

24    participate in a lawsuit?

25              MS. DURIE:  Objection, argumentative,

Page 67

1                    Poret

2       lacks foundation, mischaracterizes the

3       witness's testimony.

4       A.    That's not what the survey did.

5       Q.    In the survey from point 220 and the

6  next couple of pages, the phrase "short excerpts"

7  is repeated about eight times.  Was that

8  intentional on your part?

9       A.    I don't know that eight was

10  intentional, but it was intentional to try to make

11  sure that they understand the distinction between

12  the two categories that we're talking about and

13  that they're answering about the right one.

14      Q.    Do you think that someone who has never

15  been on Google would understand from this prose

16  what this all means?

17      A.    I don't know how to answer that across

18  the board, but I know that I looked at the results

19  of the survey and they were consistent among

20  people who said they were very familiar with

21  Google Books versus those who aren't.  So I don't

22  think that was a factor in the results.

23      Q.    How many people did you attempt to

24  reach in the survey?  How many phone calls were

25  made?

1                          Poret

2          A.     I don't know, but the whole intent of

3     that previous description that we gave people was

4     that we're not talking about an extended section

5     of a book, that we're talking about the several-

6     sentence, eighth-of-a-page snippets surrounding a

7     search term.

8               So the intent is by this point, having

9     heard our description a couple of times, we have

10    defined for them what the short excerpt means and

11    that they should now understand that.

12         Q.     Do you know if anybody asked them -- is

13    there some reason why you didn't say something

14    specific like Google has a program called the

15    partner program.  Books are available by

16    permission for preview of up to 10 percent or 20

17    percent of the book.  These are not the type of

18    short excerpts that we're talking about in this

19    survey.

20         A.     That is what I feel we did in the

21    previous section, just not the way you stated it.

22         Q.     Not as clear?

23         A.     No, not -- no, I don't agree with that.

24         Q.     It says, followed by we'd like to know

25    the extent to which you approve of or object to

Page 94

1                          Poret
2      Google scanning your copyrighted books so that
3      they can be searched online and short excerpts
4      delayed in search results.
5                  What's the use -- why are you asking
6      them about the "so that"?
7          A.    Because that is what the -- that's what
8      the survey is about.  It's Google making short
9      excerpts of their books available in search
10     results.
11         Q.    You don't think this conveys an
12     impression that that's the reason why Google scans
13     the books?
14         A.    Well, that -- yes, I do think it partly
15     conveys that that's the reason.  That's what we're
16     asking about.  Assuming somebody is not giving
17     permission, the question is do they approve of
18     Google doing this so that they're -- so that these
19     results can be displayed like this, that that
20     is -- that is a purpose of what Google's doing,
21     and it's the purpose that's relevant to the
22     survey.
23         Q.    So am I to glean from your last answer
24     that you were trying to determine whether or not
25     people, respondents, objected or not to Google

Page 95

1                       Poret

2    scanning without permission?

3         A.    Yes, for the specific purpose of

4    showing these excerpts, short excerpts.

5         Q.    Right.  So you want to know whether or

6    not the respondents object, but you don't include

7    the words "without permission" --

8         A.    Yes.

9         Q.    -- here, just like you didn't include

10   it in the description?

11        A.    We've already talked about how I feel

12   it was included in the description.  But yes, I

13   agree it's not repeated in this question.

14        Q.    Now, there's no choice here of no

15   opinion or not enough information.  Is there some

16   reason why those are not choices?

17        A.    Well, neither approve nor object is --

18        Q.    That could mean they're neutral.  That

19   doesn't necessarily mean they have no opinion,

20   does it?

21        A.    Well, if someone has no opinion, then

22   they neither approve nor object.

23        Q.    So you believe that the phrase "neither

24   approve nor object" is exactly the same as an

25   option of no opinion?

Page 96

1                           Poret

2        A.      I believe it encompasses it.

3        Q.      You do?

4        A.      Yes.

5        Q.      And what about the option of I don't

6    have enough information to answer, or need more

7    information?

8        A.      If some -- well, that -- I never -- I

9    never heard that anybody gave an answer like that.

10   And if that was -- that's the type of thing that

11   if people were giving a response like that, I

12   would have been told and asked about that.  So I

13   don't think that was an issue.

14       Q.      That wasn't an option given to them;

15   correct?

16       A.      That wasn't an option on the scale, but

17   people can obviously say what they want on the

18   phone, at least.  And when people say things like

19   that in the initial phase of a survey, that comes

20   back to me when we talk about it.  And we

21   sometimes make little tweaks.

22               But I never heard anything about

23   anybody giving a response like that.

24       Q.      And you didn't think that it was

25   appropriate to have that as one of the options?

```
 1                         Poret
 2        A.     I'm not saying it's inappropriate; I'm
 3    saying the way I did it I think is appropriate.
 4        Q.     Now, you've mentioned this survey was
 5    limited to the snippets.  You're aware that Google
 6    scanned entire books and gave copies of the entire
 7    scans to libraries; right?
 8        A.     Yes.
 9        Q.     Were you specifically instructed not to
10    ask any questions about that?
11        A.     No.
12        Q.     You just didn't?
13        A.     Nobody said to me don't ask questions
14    about that, but that was not a subject that was
15    brought up as a purpose of the research.
16        Q.     On the top of page 9 it says, The order
17    in which "object" came before "approved" was
18    randomized in both the question text and in the
19    order of the response option, so that half of
20    respondents were always presented with "approved"
21    first and half presented with "object" first.
22               That's done by the computer.  Even
23    though you have a lot of nonrespondents, you can
24    make sure that half and half of the actual
25    respondents had this different order?
```

Page 98

1                           Poret

2        A.    Yes.

3        Q.    How do you do that?

4        A.    Well, there's two ways it can be done

5    technologically.  It can either be that every time

6    you get to this question it literally picks a

7    random number that determines this, or it can be

8    that every other respondent gets a different -- a

9    different order.  I'm pretty sure it was the

10   former option, technologically that it simply

11   randomized.

12       Q.    It randomized only for those actually

13   responding?

14       A.    Yes, because it's literally happening

15   as you're getting to that point of the

16   questionnaire.

17       Q.    I see.

18             Now, going back to -- on page 9 there's

19   this question:  Which of the following best

20   represents your opinion how, if at all, you have

21   been financially impacted by Google scanning your

22   copyrighted books so that they can be searched

23   online and short excerpts displayed in search

24   results?

25             And there's three choices:  I feel I

Page 99

Poret

1   have financially benefited, I feel I have been

2   financially harmed, I feel I have not been

3   financially impacted one way or the other.

4

5          Again, why is there no choice of I

6   don't have current information to answer this

7   question?

8       A.    It's the same answer before.

9       Q.    Well, meaning what?

10       A.    The person either has a perception that

11   they've been harmed or that they've benefited or

12   they don't.  They don't -- they don't need

13   information to answer that question.

14       Q.    So this is only designed to elicit

15   perceptions, not actual facts; right?

16       A.    Well, I don't think the line between

17   perception and fact is that is all that clear.

18   It's certainly intended to get at facts, but of

19   course you necessarily are dealing with somebody's

20   perception of what the facts are.

21       Q.    You could have designed a survey to

22   say, I have been financially benefited; and then

23   the next question would be why; and then they

24   would give a verbal response; right?

25       A.    Well, that is -- that is how it -- that

1                          Poret

2      is what happens in this survey.

3          Q.    The question was I feel I have been.

4      You didn't ask whether they had been; you asked

5      whether I feel I have financially benefited.  It's

6      a different question than I have financially

7      benefited; correct?

8          A.    It's different wording.  But what I was

9      saying is that the other piece of what you said

10     does happen, which is if they give one of these

11     answers they are asked about that.

12         Q.    Right.  But is there a particular

13     reason why you included the "feel" part of the

14     question?

15         A.    Yes, because I don't expect that

16     somebody on the phone is going to -- is going to

17     know for sure how this has affected them.  In

18     other words, I don't know that an author always

19     would have the ability to quantify somehow whether

20     this has financially benefited them or not.

21              So it is phrasing it in a way that is

22     intended to convey we want to know your opinion

23     about this.  You don't have to necessarily have

24     plotted this out with an accountant and figured it

25     out.

Page 101

1                         Poret

2              But that doesn't mean we're not

3    interested in fact.  We're interested in their

4    perception of what the facts are.

5         Q.    Let's go back to page 7, going back to

6    this description that you read to all the

7    respondents or that they read themselves online if

8    they responded to the e-mail version.  There's a

9    sentence that says, A user can also click on a

10   link to find a book in a bookstore or library.

11             Is there a particular reason you put

12   that in there, that text?

13        A.    Yes.

14        Q.    What was the reason?

15        A.    That that is an accurate description of

16   what happens that I think would be relevant to

17   some people's opinions.

18        Q.    Have you ever clicked on any of those

19   links?

20        A.    I did, in some of my searches, see that

21   there were in fact links to buy books.  I can't

22   remember if I clicked on any of those links.

23        Q.    Well, if you click on a link for some

24   of the books and -- you didn't click on any of

25   them, so you don't know what happens when you

Page 102

1                           Poret
2    click?
3         A.    I don't remember if I clicked on links
4    for buying books.
5         Q.    Did you get any information from Google
6    about whether or not they know whether or not
7    those clicks result in any sales of books?
8         A.    I do not have any information about
9    that.
10        Q.    One way or the other?
11        A.    Right.
12        Q.    Did you ask them that question?
13        A.    No.
14        Q.    So in all of these questions you're
15   always asking about feelings, which for the reason
16   you've already testified?  Is that the reason?
17        A.    Again, that's -- I wouldn't quite put
18   it that we're asking about feelings.  I'd put it
19   that we're asking about attitudes in one instance
20   and perceptions of impact on them in the other.
21        Q.    Every question has the word "feel";
22   right?
23        A.    Not every question.  The questions that
24   we are talking about.
25        Q.    These questions about financial impact

Page 103

1                               Poret

2       and demand, et cetera, they all ask about "feel,"

3       feelings; correct?

4            A.    No.  They have the word "feel" in it.

5            Q.    You don't think that means it's a

6       question about how you feel?

7            A.    I think the word "feel" is intended to

8       convey we're not asking for quantitative backup of

9       this; we're asking for your opinion.

10           Q.    For a seat-of-the-pants answer when

11      they get called up by somebody randomly at, you

12      know, 8 o'clock at night?

13                 MS. DURIE:  Objection.

14           Q.    Is that what it's intended to get?

15           A.    No, it's just like saying I think -- I

16      think I've benefited or I feel I've benefited or

17      it's conveying that we're asking for an opinion,

18      not something quantitative.

19           Q.    Okay.  So now go to page 12.  We have

20      these questions about do they feel they were

21      financially impacted, do they feel they were

22      financially benefited, et cetera, do they feel

23      demand has improved or not; right?  That's the way

24      they're all phrased; right?

25           A.    You just said a bunch of things.  I

1                          Poret

2    typical response rates for a population like this.

3        Q.    "Like this" meaning what?

4        A.    Meaning not just an ordinary consumer

5    but -- I don't know if you would say more

6    sophisticated or professional, but a typically

7    higher educated, more sophisticated -- the other

8    thing is that 3 percent number that you came up

9    with is just an arbitrary number because, until we

10   find out, it might be that a thousand of the

11   e-mail addresses were just invalid addresses.

12            It's not as if that means that

13   everybody who didn't respond looked at this and

14   chose not to responsible.  It could be that most

15   of them never even saw it.

16       Q.    Right.  But let's just back up and talk

17   about your sample to begin with was just this Gale

18   database; right?

19       A.    Yes.

20       Q.    And that's not -- that was just

21   given -- you were told to use that by Google;

22   right?

23            MS. DURIE:  Objection, asked and

24       answered, mischaracterizes.

25       Q.    By Google's counsel?

Page 112

1                         Poret

2              MS. DURIE:  Mischaracterizes the

3        witness's testimony.

4        Q.    That's what happened; right?

5        A.    No, I wouldn't put it that way.

6        Q.    They provided it to you?

7        A.    Yes.

8        Q.    Did you make any determination about

9   whether that was an over-inclusive or under-

10  inclusive list with respect to your target

11  population?

12       A.    Yes, I thought about that.  My sense is

13  it might have been over inclusive in that it might

14  contain authors who don't end up meeting a class

15  definition.  But that is not a problem because we

16  can just find out from them if they meet the class

17  definition.  And then if they don't, those people

18  could always be put aside in the analysis.

19            And could it be under inclusive?  By

20  some degree it could be.  You can never have a

21  list that actually has managed to get everybody in

22  an industry.  So I'm sure that there are some

23  authors that Gale didn't manage to get on the list

24  for one reason or another.

25            But my understanding is it's a fairly

```
 1                      Poret
 2    comprehensive list.  If it was missing some
 3    authors, it wouldn't be enough to undermine its
 4    validity for use in a study like this.
 5         Q.    So you said it might be over inclusive
 6    because it includes authors that aren't in the
 7    class; right?
 8         A.    Yes.
 9         Q.    And then you said but you could adjust
10    for that by determining who was in the class and
11    figuring out, as to those, what their responses
12    were; right?
13         A.    What I meant was if you wanted to you
14    could just take anybody who, based on their
15    answers, does not appear to be in the class and
16    put them aside and just look at the data of the
17    people who are in the class.
18         Q.    And how could you determine by your
19    survey who was and who wasn't in the class?
20         A.    One thing you could do is determine
21    which people said yes to -- yes, that there was a
22    copyright registration filed within three months
23    versus the people who said no.  So those are some
24    people -- that would identify some people who were
25    not members of the class.
```

Page 117

1                        Poret

2      information about these 550 that you just

3      mentioned who said their copyright was filed;

4      right?

5           A.    The reason is that I looked at it and

6      the results are so similar to the overall group

7      that it didn't seem -- it didn't strike me as

8      putting in a section about that.

9           Q.    You've put in other tables where you

10     said the results were consistent?

11          A.    Right.

12          Q.    Referring you to page 19 of your

13     report.  I'm sorry, I lost my train of thought.

14     Before you do that, you said the report -- I mean

15     your sample could have been under inclusive;

16     right?  We talked about over inclusive.  You said

17     it also could have been under inclusive.

18               I mean, it was by definition under

19     inclusive, wasn't it?  This Gale list could not

20     possibly be a list of all the authors whose books

21     have been copied in Google Books, could it?

22          A.    I don't know.  Every single list that

23     any survey has ever been done from could be called

24     under inclusive, depending on how you look at it.

25     The question is Gale maintains a reference work

Page 118

```
 1                    Poret
 2   that is designed to have as many authors on it as
 3   they -- as they can manage to keep track of.
 4             I'm saying I'm sure it couldn't
 5   possibly be a hundred percent of authors at all
 6   times, but as a reputable company that maintains
 7   databases like that I think if it's under
 8   inclusive it's not by a concerning amount.
 9        Q.    Nobody is faulting Gale for their
10   database.  What I'm asking you about is as the
11   creator of a survey you -- one of the issues that
12   you have to consider is whether the sample was
13   under inclusive or not; right?
14        A.    Yes.
15        Q.    Because a sample is not necessarily a
16   fair sample if it's grossly under inclusive;
17   right?
18        A.    That may or may not be true.
19        Q.    It may or may not be true.
20             So you could have a sample that was --
21   did you do any kind of testing of this sample to
22   determine that it is representative of all authors
23   in the United States, of the Gale data?
24        A.    The only people who were called were
25   from this database, so I have no way to compare
```

Page 119

1                       Poret

2    that to anybody who isn't in the database.  But my

3    understanding is that this database is a reliable

4    source, that if it's under inclusive it's not --

5    it's not by much.  It's not going to be missing

6    enough of a universe to undermine the results.

7         Q.    Where did you get that information,

8    that it was -- that it's not grossly under

9    inclusive?

10        A.    Well, in look -- in digging around,

11   that seemed to be the best -- the best available

12   source, and the number of authors it has on it is

13   really large.

14              And based on everything that we

15   discussed at the time, I don't have any reason to

16   believe that there's 2 million authors in the U.S.

17   with published books, and yet this only has

18   142,000.  I don't know what the numbers are

19   exactly.  But I think this is -- it's a sizeable

20   list.

21        Q.    Well, it may be that there is no list

22   that has every author on it.  But to say that it's

23   the best list you could find does not mean that it

24   isn't grossly under inclusive, does it?

25        A.    No, that in and of itself doesn't mean

Page 120

1                          Poret

2     that.  But that it has something approaching

3     150,000 authors seems pretty robust.

4          Q.    142,000 authors, you said, but you only

5     had contact information for about a third; right?

6          A.    That may be about right, but we looked

7     for contact information for others.

8          Q.    And you can't tell me, then, what the

9     total number you found contact information was;

10    right?

11         A.    No, I can.  The report discusses that

12    we had a sub sample to deal with this very issue

13    of people who were on the list but had no contact

14    information.  And we found contact information for

15    a lot of other people on the list so that we could

16    get through to a sample of people who had no

17    contact information and confirm that the results

18    among them were basically consistent with the

19    results among everybody else.

20         Q.    Yeah, you have 119 people that you said

21    you had no contact information for from Gale that

22    you somehow got contact information for, and they

23    responded to the survey; correct?

24         A.    Yes.

25         Q.    But you don't tell me how -- you don't

Page 121

1                          Poret

2     say how many others without contact information

3     you got contact information for and they didn't

4     respond?

5          A.    Well, this is the issue we've already

6     talked about.  It has nothing to do with whether

7     they had contact information or not.

8          Q.    Right.  So one of the issues is of the

9     142,000, which is already grossly under inclusive,

10    how many did you ultimately get contact

11    information for.  And we don't know the answer to

12    that question as we sit here; right?

13         A.    Right.

14         Q.    So it could have been -- do you have

15    any idea of what possible number it was?

16              MS. DURIE:  Calls for speculation.

17         A.    I said I'd find out for you.

18         Q.    So then from an already grossly under-

19    inclusive starting point of 142,000, we're down to

20    a yet more grossly under inclusive of probably

21    less than 50,000 people that were contacted;

22    right?

23              MS. DURIE:  Objection.  It's

24         argumentative, it lacks foundation, and it

25         mischaracterizes the witness's testimony.

Page 122

1                        Poret

2        A.      First of all, I never agreed that

3    142,000 is grossly under inclusive.  And what

4    you're talking about now I also don't think is so

5    much an issue of under inclusiveness.

6        Q.      When you did your analysis of the data,

7    did you notice that there weren't too many young

8    authors?

9        A.      Yes.

10       Q.      You don't think that affects the

11   results?

12       A.      Well, I did -- I did look at the

13   results by age, and my assessment of that is that

14   the results were very similar across all the age

15   groups, at least through the forties, fifties,

16   sixties, seventies.  Below that I don't feel like

17   I had enough respondents to really look at those

18   individually.

19              But my sense is that from looking at

20   the data across ages that the results were fairly

21   consistent and that even if you wanted to

22   re-weight the numbers to reflect a different age

23   distribution that the numbers weren't going to

24   change by more than a percentage point or two here

25   and there.

Page 123

1                          Poret

2      Q.    I'm trying to find the results by

3   age -- oh, here it is, page 19.  You say -- you

4   have your chart at the top, and then you say,

5   While the set of authors surveyed more heavily

6   represents older authors, the survey results were

7   reasonably consistent among authors of various

8   ages.

9             What do you mean by "reasonably

10   consistent"?

11      A.    Within a couple of percentage points,

12   nothing that would result in a different

13   conclusion.

14      Q.    So then you have your chart which has

15   authors divided up by under 60, 112; 60 to 69,

16   166; 70 and older, 537.

17             So that doesn't seem to be -- what

18   happened to the 50 to 59, 40 to 49, 30 to 39

19   categories?  You didn't think you should set those

20   out?

21      A.    Obviously we're getting to a smaller

22   sample size at that point, so I figured grouping

23   those together into under 60 made sense.  But you

24   could break it out into 50 to 59, and you could

25   look at 40 to 49; and I did.  And the results

Page 124

1                         Poret

2    among those groups are similar.

3         Q.    So do you know how many respondents

4    were age 20 to 29?

5         A.    None.

6         Q.    How many 30 to 39?

7         A.    Yeah, I think there were four.

8         Q.    Right.  And how many 40 to 49?

9         A.    I think it was something between 25 and

10   30.

11        Q.    Yeah, 25, does that sound right?

12        A.    I said 25 to 30 so...

13        Q.    And 50 to 59, do you know how many?

14        A.    I'd say, you know, 80 to 90.

15        Q.    I counted 80, but that could be off.

16              You didn't really have a heck of a lot

17   of younger respondents?

18        A.    I agree with that.

19        Q.    And yet people in their twenties,

20   thirties, forties, do write books; right?

21        A.    Yes.

22        Q.    In fact, they're the ones that are

23   probably writing books that are in print; right?

24        A.    Well, that -- that did occur to me, and

25   that does seem to make sense.  And that's part of

1                          Poret

2     the reason that I looked at the results between

3     people who have books in print and people whose

4     books are not in print and saw that whether books

5     are in print or not really wasn't making much of a

6     difference in the results.  So I don't think that

7     that would be a basis for young people to have

8     different responses.

9              The other thing that was at work in my

10    consideration as this was going on was that my

11    understanding is the class representatives were in

12    their seventies or older, and they're purporting

13    to represent the interests of a class.

14              So it doesn't seem inappropriate that

15    the survey respondents tended to be toward the age

16    range of the class representatives.  And if

17    somebody thinks that 20-year-olds -- people in

18    their twenties and thirties are just categorically

19    different interests than people in their sixties

20    and seventies, then that's --

21         Q.    I'm not asking what people think; I'm

22    asking whether you think the survey was under

23    inclusive or not.

24         A.    That's what I'm telling you, though.

25    The only reason somebody would worry about a

```
 1                         Poret
 2    survey being under inclusive is if you were
 3    thinking, all right, we're missing a group of
 4    people that might be categorically different.
 5    They might have different issues.  They might have
 6    different interests.
 7              And if you believe that, you know, by
 8    definition this class -- those people couldn't be
 9    part of this class anyway.  So that's why it does
10    not seem to me to be an issue of under
11    inclusiveness.
12         Q.    So your role here is as the designer of
13    a survey; right?
14         A.    Yes.
15         Q.    You seem to be sort of crossing over
16    into opining about what's appropriate in a class
17    action setting.
18         A.    No, I'm just -- I'm just saying that by
19    definition when you raise an issue of should we,
20    in a survey, be overly concerned that we're
21    missing a group of people, the only reason you
22    would be concerned is if you're thinking that
23    group of people might be essentially a different
24    class of people than the ones we reached, who have
25    different answers and different interests.
```

1                           Poret

2               And that does not strike me as

3    problematic in and of itself when the whole basis

4    of -- or a big part of the basis of what we're

5    testing is do the people -- do authors have

6    interests that are consistent across this class

7    with the class leaders.

8         Q.    You had 32 respondents who were over

9    90; right?  You're aware of that?

10        A.    I'm actually not sure at the top, but

11   I'll take your word for it.

12        Q.    Well, approximately 32.  You don't

13   think they might be a little less familiar with

14   the Internet than people in their twenties,

15   thirties, and forties?

16        A.    No, they very well might be.

17        Q.    Is that of any relevance?

18        A.    First of all, 32 people are not going

19   to affect the results one way or the other, but

20   across the survey and across the different ages

21   the survey should be accounting for different

22   levels of familiarity that different people have.

23        Q.    That assumes that it was properly

24   constructed in the first place; right?

25        A.    I don't know.

Page 128

1                              Poret

2          Q.     The survey can only be extrapolated if

3     it was properly designed; right?  It's not ipso

4     facto that just because you do a survey you can

5     say that the results can be extrapolated from one

6     population to another; right?

7          A.     It's hard to tell what you're asking.

8     I basically agree with the idea that a survey

9     should be properly designed for -- to make use of

10    the results.

11         Q.     An do you know what use of the results

12    Google is making of your survey?

13         A.     Not -- I know that this report has been

14    submitted.  I don't know how to characterize what

15    attorneys or Google are doing with it.

16         Q.     Well, all the percentages in your

17    report are based on all the authors sampled,

18    whether or not they're books were actually scanned

19    and Googled in Google's library project; right?

20         A.     I think there are tables in the report

21    that break down people who -- that talk about

22    people who said that their books are available on

23    Google Books in short excerpts and those who

24    didn't or weren't sure.  That issue is to some

25    extent addressed.

Page 129

1                    Poret

2        Q.    But you never got a list from Google of

3   the books that they actually scanned so that you

4   could be sure that those particular books were the

5   ones that were the subject of your survey?

6        A.    I didn't get any kind of list from

7   Google.

8        Q.    On page 16 of your report, Footnote

9   5 --

10       A.    Okay.

11       Q.    -- it says, Out of the total 880

12   respondents, 1 indicated that they or someone in

13   their household works for Google, 16 indicated

14   they or someone in their household works for the

15   U.S. government, and 5 indicated that they or

16   someone in their household works for either a

17   local, state, or federal court.  Removing these

18   respondents would not change the survey findings.

19            Right, you say that?

20       A.    Yes.

21       Q.    I can do simple math, and I added these

22   up.  You're talking about 22 respondents; right?

23       A.    Yes.

24       Q.    22 out of 880 you're saying is not

25   statistically significant?  Is that what you're

1                         Poret

2    which is the point of a pilot or pretest.

3              But I did not see anything that seemed

4    problematic that was going to require any changes,

5    so I sort of just rolled on.  But I would consider

6    the first phase of it essentially a pilot.

7         Q.    So when you say "the first phase," the

8    first how many surveys?

9         A.    I don't -- I don't remember.  I think

10   that we could tell that from -- I know that they

11   e-mailed me a data file, so -- which I'm sure from

12   that I could tell what sample size I first was

13   looking at.

14        Q.    So you looked at the first whatever

15   number of it was surveys, and you didn't make any

16   changes; right?

17        A.    Right.

18        Q.    Are there any such things as generally

19   accepted survey principles?

20        A.    Yes.

21        Q.    Where can one find them?

22        A.    I don't think one can find them in any

23   one place written down.  I think, like a lot of

24   fields, there's -- general principles come from a

25   lot of different sources and from a lot of

Page 146

1                        Poret

2     experience.

3          Q.    So there's nowhere written down

4     anywhere a list of generally accepted survey

5     principles?

6          A.    There are plenty of places that have

7     things, like the reference guide, that have some

8     general principles.  But there's no single place

9     that I would point to.  And I wouldn't even say

10    that these general -- I wouldn't say that any

11    particular source is the authoritative guide on

12    anything.

13         Q.    But yet there are generally accepted

14    survey principles?

15         A.    Yes, I think that's fair to say.

16         Q.    And have you ever criticized someone

17    else's survey?

18         A.    Yes.

19         Q.    And when you criticize someone else's

20    survey, it's because you believe they haven't

21    followed certain survey principles, sometimes?

22         A.    I don't know that I think about it in

23    the abstract like that.  I look at their survey

24    and review it.  And if I think there are serious

25    flaws in it, I would point them out.

1                        Poret

2        Q.    What type of flaws have you found in

3    other people's surveys?

4        A.    That there flaws in the universe,

5    that the questions were poorly done for one reason

6    or the other, that data was analyzed incorrectly.

7    Those are the examples that come to mind.

8        Q.    So "flaws in the universe," you mean

9    flaws in the universe that was sampled?  What do

10   you mean by "flaws in the universe"?

11       A.    That the people who were interviewed

12   were not really the right people.

13       Q.    You ever criticized a survey for being

14   over or under inclusive?

15       A.    I've certainly criticized a survey for

16   being over inclusive.  I'm not sure I have for

17   being under inclusive.

18       Q.    Is that because you think over

19   inclusiveness is more problematic?

20       A.    Not necessarily, but in those -- in the

21   instances where I've done that, there's been the

22   possibility that the majority of the people in the

23   survey didn't actually belong in the survey; and

24   those people who didn't belong, that there's

25   reason to think that they were not even

```
 1                    Poret
 2   appropriate test subjects and their answers could
 3   be -- could make no sense for that survey.
 4        Q.    When you've criticized a survey for
 5   having questions that were poorly done, in what
 6   ways from a survey's -- surveyor's perspective
 7   would a question be poorly done?
 8        A.    It's almost impossible to answer
 9   questions like this in the abstract.  Questions
10   could be worded in a way that they're misleading
11   or that they're not understood.  They could be
12   leading and suggestive.  They could be irrelevant.
13        Q.    Anything else?
14        A.    I think that covers it.
15        Q.    In cases where you found other
16   surveyors to have data -- analyzed data
17   incorrectly, what type of mistakes do people make?
18        A.    Typically that answers are being
19   classified to mean one thing when they don't
20   really mean that.
21        Q.    Anything else?
22        A.    That's all I can think of.
23        Q.    Are there any such thing as generally
24   accepted statistical methods for surveyors?
25        A.    Yes.
```

Page 149

1                          Poret

2          Q.    Can you find them somewhere in writing?

3          A.    You could find textbooks and you could

4    find articles, but there's no source that I would

5    point you to.

6          Q.    Well, when you criticize -- have you

7    ever criticized another surveyor because of their

8    statistical methods?

9          A.    I don't think so.

10         Q.    Do you still have PX 76?

11         A.    Yes.

12         Q.    On the numbered page 262?

13         A.    Okay.

14         Q.    About the middle of the page there.  It

15   says, The report submitted by a survey expert who

16   conducts a telephone survey shall specify, one,

17   the procedures that were used to identify

18   potential respondents; two, the number of

19   telephone numbers for which no contact was made;

20   and three, the number of contacted potential

21   respondents who refused to participate in the

22   survey.

23                Do you agree or disagree with that?

24         A.    I don't agree that that is an automatic

25   rule.

```
                                    Page 150
 1                    Poret
 2        Q.    So that's not part of generally
 3   accepted survey principles, in your view?
 4        A.    No.
 5        Q.    Do you sometimes include that
 6   information in your report?
 7        A.    I don't think I ever have.
 8        Q.    You never have?
 9        A.    I don't believe so.
10        Q.    Have you seen other people who do
11   include it?
12        A.    I've seen it included.  I've seen far
13   more that do not include it, though.
14        Q.    Referring you to page 245?
15        A.    Okay.
16        Q.    The second paragraph says, One
17   suggested formula for quantifying a tolerable
18   level of nonresponse in a probability sample is
19   based on the guidelines for statistical surveys
20   issued by the former U.S. Office of Statistical
21   Standards.
22              Have you seen those guidelines?
23        A.    No.
24        Q.    You've never seen them?
25        A.    No.
```

Page 151

1                        Poret

2        Q.    You've read PX 76 before; right?

3        A.    Yes.

4        Q.    And you've seen that this exists;

5   right?

6        A.    Well, first of all, nobody thinks that

7   any of this makes any sense, including

8   Dr. Diamond, and she's rewriting all of this.

9        Q.    My question is have you seen the U.S.

10  Office of Statistical Standards, and my question

11  is you've seen that it existed -- right? -- these

12  guidelines.

13       A.    I've read this document.  I have not --

14       Q.    You never looked at them to see what

15  they said?

16       A.    I have not, for the reason that I just

17  said to you, which is this is way out of touch

18  with the reality of the market research industry.

19  And Dr. Diamond does not stand behind any of this.

20       Q.    You're talking about the rest of the

21  paragraph.  I'm talking about the fact that

22  there's some guidelines for statistical surveys

23  issued by the former U.S. Office of Statistical

24  Standards.  It's a document that exists; right?

25       A.    It may exist, but this whole section is

Page 152

1                         Poret

2    reporting numbers from that document, which is why

3    I haven't looked at the document, because she's

4    explicitly discussing the numbers that are in that

5    document.

6         Q.    Do you know if that document has other

7    information in it?

8         A.    I'd imagine it does.

9         Q.    But you never thought to look at it?

10        A.    No.

11        Q.    The next portion of this paragraph

12   says, According to these guidelines, response

13   rates of 90 percent or more reliable, et cetera,

14   and then it goes down.  It says, If the response

15   rate drops below 50 percent, the survey should be

16   regarded with significant caution as a basis for

17   precise quantitative statements about the

18   population from which the sample was drawn.

19              You don't agree with that, I take it?

20        A.    Well, I don't -- I don't agree with the

21   number 50 percent.  And I know she's rewriting

22   this section, because no survey would ever come

23   close to that anymore.

24              I do agree with the issue of caution

25   about precise quantitative statements.  But

Page 153

1                            Poret

2       when -- in a survey like this, it's -- to me

3       whether 14 percent is the exact number or it's

4       really 16 percent or 12 percent is not -- is not

5       as important.

6                   In other words, to me whether

7       something's 14 percent as a precise quantitative

8       statement is not so much the point.  The point is

9       more -- it is obviously relevant, but the grander

10      conclusion is that there's a dramatic pattern of

11      people favoring -- saying they approve of

12      something as opposed to objecting to it.  A

13      response -- a low response rate does not call that

14      into question at all.

15          Q.    You don't like her numbers here, but

16      there's no number that you would substitute and

17      agree with, like if the response rate drops below

18      X percent the survey should be regarded with

19      significant caution?

20          A.    I don't know what number I would put on

21      that, but I would tell you that no survey getting

22      a 20 percent rate is miraculous with a survey

23      these days.  The standards for response rates have

24      changed dramatically with the way the world has

25      changed.

Page 154

1                        Poret

2              And I know that -- well, at least from

3       what I've been told, the next version of this

4       reference guide is dramatically changing this

5       section to reflect what the standards are in the

6       industry.

7          Q.    Is that because nobody responds to

8       surveys?

9          A.    It's not because nobody responds; it's

10      because there are heightened security and privacy

11      concerns, and it's not like it used to be where

12      people could walk up -- go door to door doing

13      surveys.  It's harder and harder to reach people.

14         Q.    So because it's harder and harder to

15      reach people, somehow the standards for

16      reliability drop?

17         A.    Yes.  The only -- the standards -- the

18      only standards one can have are what is standard

19      in your field.  And standard response rates are in

20      the 10 to 20 percent range now.  And something

21      that's going to be used as evidence can't be

22      expected to do anything but comply with accepted

23      standards within its field.

24         Q.    Assuming the courts accept standards

25      that are lowered; correct?

```
 1                       Poret
 2           MS. DURIE:  That calls for speculation
 3      and legal conclusion.
 4      A.    I don't think that's right.  I think
 5  it's fairly clear that the rules for courts are
 6  that some -- that scientific evidence has to
 7  satisfy the standards that are accepted within the
 8  relevant field.  And these surveys are accepted
 9  within the field of market research.
10           And companies are spending billions and
11  billions of dollars on surveys with response rates
12  below 20 percent and 10 percent to make decisions
13  of tremendous consequence for them.  And that
14  would not be happening if it wasn't well accepted
15  that surveys with lower response rates are
16  reliable.
17      Q.    People wouldn't be spending money on
18  advertising irrationally?  Is that your testimony?
19      A.    No, I didn't say advertising; I said on
20  market research.  Companies wouldn't be spending
21  billions of dollars to get information that they
22  consider obtained through an unreliable method.
23           MS. DURIE:  Joanne, I should either
24      move my flight --
25           MS. ZACK:  I told Joe that I was going
```