C53FGOOA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
THE AUTHORS GIULD, et al,

                    Plaintiff,

            v.                          05 CV 8136 (DC)

GOOGLE INC.,

                    Defendant.
------------------------------x
THE AMERICAN SOCIETY OF MEDIA
PHOTOGRAPHERS INC., et al,

                    Plaintiff,

            v.                          10 CV 2977 (DC)

GOOGLE INC.,

                    Defendant.
------------------------------x
                                        New York, N.Y.
                                        May 3, 2012
                                        10:00 a.m.
Before:

                    HON. DENNY CHIN,

                                        District Judge

                        APPEARANCES

MISHCON DE REYA NEW YORK , LLP
     Attorneys for Plaintiff American Society of Media
Photographers
JAMES JOSEPH McGUIRE
MARK A. BERUBE

BONI & ZACK LLC
     Attorneys for Plaintiff The Authors Guild
JOANNE E. ZACK, ESQ.
MICHAEL J. BONI, ESQ.

MILBERG LLP
     Attorneys for Plaintiff The Authors Guild
SANFORD P. DUMAIN, ESQ.

C53FGOOA

1

2                          APPEARANCES (Cont'd)

3    DURIE TANGRI LLP
          Attorneys for Defendant
4    DARALYN DURIE, ESQ.
     JOSEPH C. GRATZ, ESQ.

5

6    Also present:

7    Amy Keating, Esq., Google Inc.

8                                   o0o

9              (Case called)

10             (In open court)

11             THE DEPUTY CLERK:  The Authors Guild et al v. Google

12   Inc. and The American Society of Media Photographers, Inc., et

13   al, v. Google, civil cause for motion argument.  Would the

14   parties state their appearances and who they represent?

15             MR. McGUIRE:  Good morning, your Honor.  James McGuire

16   for plaintiffs in the ASMP visual artists case.  With me is my

17   partner, Mark Berube.

18             MS. ZACK:  Your Honor, Joanne Zack from Boni & Zack

19   for the plaintiffs in the Authors Guild v. Google case, along

20   with my partner, Michael Boni.

21             MR. DUMAIN:  Good morning.  Sanford Dumain for the

22   Authors Guild.

23             MS. DURIE:  Good morning, your Honor.  Daralyn Durie

24   and Joe Gratz from Durie Tangri for defendant Google, and I'd

25   like to introduce to the Court Amy Keating who is in-house

C53FGOOA

1     counsel for Google.

2             THE COURT:  Good morning.

3             All right.  We have three motions.  Google has moved

4     to dismiss the associational claims in both cases and in the

5     Authors Guild case we have a motion for class certification.

6     Why don't we start with the motions to dismiss.  I'll hear from

7     Google.

8             MS. DURIE:  Thank you, your Honor.  Good morning.  And

9     with the Court's indulgence I will address both motions to

10    dismiss together, because I think they do present fundamentally

11    the same issue.

12            THE COURT:  Yes.

13            MS. DURIE:  501(b) provides that in order to seek

14    relief for violation of a copyright interest, one must have

15    that copyright interest in the first instance.  And what that

16    means is that relief for violations of the copyright laws must

17    be afforded on the basis of those individualized copyright

18    interests.  That is the key point I think, your Honor, of the

19    AIME case and it resolves the issue that is presented here.

20            We do not disagree that the first two prongs of the

21    Hunt test are met.  The first prong requires as a matter of

22    Article III constitutional standing that at least one member of

23    the association has standing to pursue the claim.

24            THE COURT:  I think we can jump to the third prong,

25    which you agree is prudential.

C53FGOOA

1            MS. DURIE:  I agree that it is prudential, your Honor,

2      in the sense that it is not a constitutional Article III

3      requirement, but the fact that it is prudential does not

4      override the requirements of this statute that only those

5      individuals who have a copyright interest can seek relief for

6      the violation of that interest.  And the importance of that

7      statutory requirement here is that it makes copyright cases

8      different from most other categories of cases for purposes of

9      analyzing associational standing.

10            THE COURT:  There have been some copyright cases where

11      associations have been allowed to pursue them.

12            MS. DURIE:  There have, in very unusual circumstances.

13      And so taking, Itar-Tass, for example, as an example, that was

14      a case that involved the application of Russian copyright law.

15      And in the context of Russian copyright law there were no

16      individual facts relating to the members of the association

17      that were necessary in order to prove the predicate ownership

18      interest.  And that --

19            THE COURT:  The plaintiffs argue that Google did not

20      make individualized considerations when it scanned I guess it's

21      now up to 20 million books.  There were no individualized

22      considerations.  Why do we need to worry about the

23      individualized ownership issues to the extent they might exist

24      now?  Can't that be something that could be addressed at the

25      relief stage, if we ever get there, in other words, if

C53FGOOA

```
 1   plaintiffs were to prevail?  As I understand it, there are only
 2   in terms of the class claims, they're only seeking minimum
 3   statutory damages anyway, and so if plaintiffs prevail we then
 4   set up some mechanism where a member of the association would
 5   then come in and prove up ownership, which at that point one
 6   would think wouldn't be that difficult.  Why would that not
 7   suffice to eliminate the need for individual participation
 8   right now?
 9              MS. DURIE:  Two responses to that, your Honor.  First,
10   as a factual matter, the predicate assumption behind the
11   Court's question is not correct.  It is true that works were
12   scanned in the first instance broadly, some of those works were
13   in copyright, some of those works were not in copyright.  But
14   fundamentally what this action is challenging is the display of
15   small excerpts of those works that were scanned.  The law is
16   clear that where the entire work must be scanned in order to
17   make the use for which fair use is being claimed, the fact that
18   the entire work was scanned in order to make that use
19   permissible is not the legally relevant test.  The action
20   focuses on the actual use that was made.
21              When it came to displaying excerpts of in copyright
22   works, Google does not treat all works the same way.  For
23   example, there are categories of reference works like cookbooks
24   or dictionaries where Google does make individualized
25   determinations that it would not be appropriate to --
```

C53FGOOA

```
 1          THE COURT:  There weren't 20 million individualized

 2    considerations, right?  Even assuming their categories,

 3    couldn't we deal with it -- I mean, how many categories would

 4    you say there were?  How many could there be?

 5          MS. DURIE:  There's poetry -- there are a number of

 6    different categories.

 7          THE COURT:  Poetry, cookbooks, fiction, non-fiction.

 8    How much more would there be?

 9          MS. DURIE:  So for purposes of the determinations that

10    were made, I think that's right, it's categorical, it's not on

11    a work-by-work basis.  But I just want to be clear that it is

12    in fact the case and I think this is more relevant to the class

13    certification motion in some ways than to the motion to

14    dismiss, but it is the case that characteristics of the books

15    were analyzed for purposes of determining what fair uses would

16    be, and that will carry over to the fair use analysis in this

17    case, the characteristics of the book matter for purposes of

18    that.

19          I think as a legal matter in the context of

20    associational standing the issue here is that this is a

21    standing issue and the test for associational --

22          THE COURT:  So the question is why do we need now the

23    participation of individual members?

24          MS. DURIE:  Because there is no way to ascertain

25    which, as to which books relief is being sought without
```

C53FGOOA

1    undertaking an inquiry into ownership, and that inquiry into

2    ownership requires the participation of individual members.

3    And that is the legal test, I think, whether for purposes of

4    associational standing, whether the participation of individual

5    members of the association is required.  And in order to make

6    judgments --

7          THE COURT:  Then why could we not deal with those

8    issues at a relief stage if we were to get that far?

9          MS. DURIE:  I think first, for purposes of

10   associational standing, again, because this is a threshold

11   standing issue as to whether the association has standing, I'm

12   not sure that it is something legally that can be addressed at

13   the relief stage.

14         In addition, the Court said surely it wouldn't be that

15   difficult at the relief stage to figure out which books were in

16   the class and which books were not.  And I think therein lies

17   the crux because it actually is a quite complicated question.

18   The associations are not seeking damages.  They are only

19   seeking injunctive and declaratory relief, but the scope of

20   that injunctive and declaratory relief can only encompass those

21   works for which --

22         THE COURT:  In general, for example, why is individual

23   participation required to address the broad question of whether

24   taking three snippets is fair use?

25         MS. DURIE:  Because the Court only has the power under

C53FGOOA

```
 1   501(b) to enter an order with respect to specific copyrighted
 2   works.  It is not the case that copyright can be adjudicated
 3   without reference to the particular copyright interests, only
 4   those interests and the interests of people before the Court
 5   can be adjudicated by the Court under 501(b).  So the scope of
 6   any order for declaratory or injunctive relief is constrained
 7   by the scope of the copyright interests held by the members of
 8   the association.
 9           With respect to that question, what interests are held
10   by the members of the association, that is not an easy or
11   straightforward inquiry.  The key issue here -- one issue --
12   let me give you a couple of the reasons that this ownership
13   question becomes important.  As the Court knows based on a
14   decision issued from the Second Circuit yesterday which I know
15   your Honor was on the panel, the Closeup International case,
16   copyright interests are divisible.  It is not the case that
17   there is one owner of a copyright interest.  There may be many
18   owners of copyright interests even with respect to one
19   copyrighted work.  That is important in this case, because the
20   ultimate question is who owns, who is the beneficial, either
21   the legal or the beneficial owner of the right to display a
22   small excerpt of a work.  Contractually, many authors who are
23   otherwise beneficial owners and receive royalties for other
24   uses of their work have contracted away that right to their
25   publishers.  They do not receive any royalties for the display
```

C53FGOOA

1    of small excerpts of their works and as a consequence for that

2    class of authors, that group of authors, the publisher and not

3    the author is the owner of that copyright interest.

4          Now, that doesn't mean it's not an interest that can

5    be vindicated, if someone were to think there had been a

6    violation of the right, but the entity who would have to bring

7    that challenge is the publisher, who is not present before the

8    Court, instead of the author.  This question of figuring out

9    who as between the author and the publisher owns that right is

10   in part a contract interpretation question that will depend on

11   the many different kinds of contracts that existed between

12   authors and publishers, and there's evidence before the Court

13   that some contracts are explicit on this point and others are

14   not, as well as whether a work is in or out of print and

15   therefore whether the owner or the publisher has rights to that

16   work at all, whether the publisher has rights to that work at

17   all.

18          THE COURT:  Let me ask you a couple of other

19   questions.  I appreciate what you've just said.  One of the

20   arguments the plaintiffs make, the associational plaintiffs

21   make, is that, well, in the Authors Guild case they've been

22   litigating this case now for more than six years and now

23   suddenly the issue of their standing is being challenged.  Is

24   that a consideration?

25          MS. DURIE:  It is not, your Honor, for the same

C53FGOOA

```
 1   reasons -- in some ways it's not a consideration when we get to
 2   the next measure.  It's not a legal consideration in the sense
 3   that the standing is not waivable.  It should not be a
 4   prudential consideration either.  It is true that the case has
 5   been pending for a long time.  As the Court knows, the vast
 6   bulk of that time was spent negotiating and then litigating
 7   settlement issues.
 8            THE COURT:  In fact, Google has been litigating with
 9   them all these years and now all of a sudden Google is saying,
10   sorry, you don't have standing.
11            MS. DURIE:  Google has not been litigating with them.
12            THE COURT:  Negotiating.
13            MS. DURIE:  Negotiating.
14            THE COURT:  And litigating, I think.
15            MS. DURIE:  We have been negotiating with the class
16   representatives and it is true the Authors Guild participated
17   in those negotiations.  But I think it would be unfortunate to
18   require these types of standing issues when it comes to
19   associational standing to be litigated in advance of engaging
20   in settlement discussions in light of the strong policies
21   favoring settlement, rather than to allow the parties to
22   conduct those settlement negotiations and then litigate issues
23   thereafter.  That is what the Courts uniformly recognize as
24   appropriate and indeed I think encourage in the case of class
25   certification and there's a good policy reason that no -- there
```

C53FGOOA

```
 1   is no presumption from the fact that we settled with these
 2   entities that we thought class certification was appropriated
 3   in a contested proceeding any more than a judge would on the
 4   merits, any more than the standing question that we're raising.
 5           THE COURT:  I'll ask the plaintiffs as well, but I've
 6   got these two sets of motions and there obviously is overlap.
 7   If I grant class certification, is the associational, the
 8   motion to dismiss mooted out?  Does it really matter?
 9           MS. DURIE:  I think it is true that if the Court
10   grants class certification the associational standing motion
11   with respect to the Authors Guild is certainly rendered vastly
12   less important.  It does not resolve the issues with respect to
13   the ASMP, and I would note the ASMP case is in some ways even
14   more complex because they are challenging books that are
15   included within the Partner Program, a subject that I want to
16   talk about in more detail with respect to the author's case
17   when we get to class certification.
18           I would note, your Honor, I think importantly the
19   reverse is not true.  I think if the Court were to conclude
20   that the Authors Guild could proceed as a representative
21   plaintiff for purposes of associational standing that does not
22   at all moot the issues in the class certification motion.
23   Because the Authors Guild is seeking declaratory and injunctive
24   relief and the class is seeking, as the Court said, minimum
25   statutory damages, and so the resolution of the associational
```

C53FGOOA

|    |    |
|----|----|
| 1  | standing issues with respect to the Authors Guild does not |
| 2  | resolve what I think are the even more complicated set of |
| 3  | issues with respect to class certification. |
| 4  |             THE COURT:  Thank you.  I'll let you have some |
| 5  | rebuttal after the plaintiffs go. |
| 6  |             MS. ZACK:  Good morning, your Honor. |
| 7  |             THE COURT:  Good morning. |
| 8  |             MS. ZACK:  On behalf of the Authors Guild I'll respond |
| 9  | first to the issue of the time spent in this case prior to the |
| 10 | motion being made to dismiss on the basis of standing.  The |
| 11 | case was originally filed on September, on a date in |
| 12 | September 2005.  Google actually answered the complaints on |
| 13 | July 26, 2006, not raising any issues with respect to the |
| 14 | Authors Guild's standing.  There was active litigation until -- |
| 15 |             THE COURT:  There's no affirmative defense asserted |
| 16 | for lack of standing?  Actually, I haven't gone and looked. |
| 17 |             MS. ZACK:  I have to look, your Honor.  I don't have |
| 18 | it right here. |
| 19 |             THE COURT:  Is there?  Do we know whether it's in |
| 20 | the -- well, if it's prudential, it may indeed be an |
| 21 | affirmative defense.  Is it in any of the answers? |
| 22 |             MS. DURIE:  Your Honor, I would have to go back.  I |
| 23 | think I know the answer to the question, but I don't want to |
| 24 | make a representation to the Court.  Let us go back and check |
| 25 | and provide that to you. |

C53FGOOA

1          THE COURT:  We can check also.  We'll check.

2          MS. ZACK:  In any event, that type of issue should be

3     raised by motion, your Honor, not by merely stating an

4     affirmative defense.

5          THE COURT:  I understand.  I was just wondering

6     whether it was raised, whether it was flagged six years ago.

7          MS. ZACK:  Right.  But to get to the point, there was

8     litigation in the first year the case was pending.  So the case

9     did not go straight to negotiations.  And the Authors Guild has

10    produced, did produce at that time documents and has been asked

11    frequently in the last eight months to produce quite a few

12    documents even with this motion pending.

13         So since Google is moving only under the third prong

14    which is prudential and which does implicate primarily I would

15    suggest manageability issues, the fact that the case has --

16         THE COURT:  I think it goes more than just

17    manageability issues.  I'm not sure what you mean by that.

18         MS. ZACK:  Well, the manageability of whether

19    participation would be required of all of the members of the

20    organization.  That seems to go to manageability.

21         THE COURT:  I think the principal argument here is

22    that without the participation of the individual members the

23    Court cannot consider the issue of ownership.  Why is that not

24    correct?

25         MS. ZACK:  Well, the Authors Guild as an associational

C53FGOOA

1    plaintiff on behalf of its members is seeking only injunctive

2    relief.  The Copyright Act provides --

3             THE COURT:  There still would have to be a finding of

4    infringement, correct?

5             MS. ZACK:  Correct.

6             THE COURT:  Can I find infringement without addressing

7    the issue of ownership?

8             MS. ZACK:  No.  You would have to address the issue of

9    ownership.  I was going to get to the issue, your Honor, of

10   whether the individual participation of the authors is

11   necessary for you to ascertain ownership, and I don't think it

12   is with respect to this.  And the reason being that only

13   injunctive relief is being requested.  The Copyright Act

14   provides that a beneficial or a legal owner has standing to

15   sue.  The Copyright Act also provides that a certificate of

16   registration made before or within five years after first

17   publication of the work shall constitute prima facie evidence

18   of the validity of the facts stated in the certificate, and in

19   the Second Circuit case of Island Software, the Second Circuit

20   said that includes ownership.

21            Here Google has provided to plaintiffs a list of the

22   books they have copied in a library project.  That list

23   includes the names of the authors.  There are publicly

24   available records of copyright registrations.  One can either

25   personally or by hiring a service from a list that includes the

C53FGOOA

```
1    name of the author and the title of the work get access to the

2    copyright registration certificates to prove copyright

3    registration.  That's the first element that has to be proved.

4              THE COURT:  How about the next step?

5              MS. ZACK:  The next step is ownership.

6              THE COURT:  How do we know that there are members of

7    the association who are invoking their rights?  How do we deal

8    with questions about what happens if an author has transferred

9    rights to a publisher?

10             MS. ZACK:  I want to answer that question, your Honor.

11   Because the legal or beneficial ownership issue, the authors

12   under the Copyright Act are the owners to begin with as a

13   matter of law.  They then customarily for books enter into book

14   publishing contracts in which they retain royalty rights.  The

15   Second Circuit said in Israel v. Cortner and William Patry, who

16   works for Google now and is a recognized copyright expert, says

17   in his treatise that the classic beneficial owner of a

18   copyright interest is the author who retains royalty rights.

19   So in the Supreme Court said Justice O'Connor noted in Harper &

20   Row that its authors customarily retain their royalty rights in

21   contracts.  Moreover, defendant's own witness, Mr. Perle, when

22   I took his deposition, their industry expert, said that it was

23   typical for authors in contracts to retain their royalty

24   rights.  So we're dealing with a common issue here where the

25   authors will either be the legal owners because they never
```

C53FGOOA

1    entered into a contract, because they self published or because

2    the publishing contract --

3             THE COURT:  The terms of the individual publishing

4    contracts are irrelevant, you're saying --

5             MS. ZACK:  Yes.

6             THE COURT:  Because no matter what those contracts say

7    the authors retain at least a beneficial interest.

8             MS. ZACK:  The only way they would not, your Honor, is

9    if they entered into an all rights contract in which for a lump

10   sum they forever disclaimed all interests in their copyright,

11   which is a very rare and edged case for book publishing.

12            THE COURT:  Even if it's rare, though, it happens,

13   apparently.

14            MS. ZACK:  Right.

15            THE COURT:  So why, then, would we not have to have at

16   least some authors come in and say I don't have an all rights

17   contract, I have another contract and I want my rights to be

18   pursued in this case?

19            MS. ZACK:  With respect to the Authors Guild, your

20   Honor, as an associational plaintiff?  Your Honor could require

21   that, I suppose.  I do not think that would be an unmanageable

22   process.

23            THE COURT:  To find copyright infringement I would

24   have to find ownership, right?  And so my question is, just how

25   do we do that here if we don't have, if we're only talking

C53FGOOA

1   about the Authors Guild, how do we do that without individual

2   authors coming forward and saying, indeed, these are my rights,

3   I stand on them, I want vindication.

4           MS. ZACK:  We have provided, your Honor, we have

5   provided defendants, the Authors Guild has provided defendants

6   with a list of their members.

7           THE COURT:  I know you told me you have a list.  Is it

8   something that the authors of those books have said I want in?

9   Does that not mean that we are requiring them to participate?

10          MS. ZACK:  I don't think there's any requirement, your

11  Honor, under the standing rules that the members say that they

12  want in.  The issue here is how ownership will be established,

13  and my argument is that it is established by a copyright

14  registration certificate which are publicly available and which

15  are prima facie under the Copyright Act 501(b) -- 410(c), I'm

16  sorry, certificate of registration is prima facie evidence of

17  ownership.

18          THE COURT:  Maybe it's not so much an ownership

19  question as an infringement question to the extent that how do

20  we know that there isn't incentives in some way?

21          MS. ZACK:  No, your Honor, I would dispute that

22  greatly.

23          THE COURT:  I'm just thinking out loud.

24          MS. ZACK:  We have circumscribed our claim here to the

25  books that Google copied in the Library Project.  Not the books

C53FGOOA

1    copied in the Partner Program.  The reason being that Google

2    did not seek permission from anyone to copy books in the

3    Library Project because they took the position that it was fair

4    use.  Therefore, there is no individualized determination of

5    license or permission with respect to those books.

6         Google raises a fair use defense as to those books,

7    and they were copied en masse in a number of libraries,

8    particularly the University of Michigan, the University of

9    California, where they just went in and took books off the

10   shelves and put them into their patented scanning machines.

11        THE COURT:  I understand that.  What else do you want

12   to tell me on this motion?

13        MS. ZACK:  Well, I do want to respond on the issue of

14   fair use, which is the other issue that Google has said raises

15   individualized issues, and there's a four-factor test.  They

16   conceded that the first factor raises common issues.  The

17   second factor under the law has only two types of categories of

18   books that will be relevant, which are fiction, non-fiction, in

19   print, out of print.  And under common sense you can put those

20   into different categories and just make a determination across

21   the categories of books rather than individually looking at

22   every single book.

23        With respect to the third prong, that's the

24   substantiality of the copying.  Plaintiff's claim here is not

25   just about the snippets per se, it's about copying entire books

C53FGOOA

1    and making complete digital copies, distributing complete

2    digital copies to libraries and then displaying so-called

3    snippets.  Each of those things were done by Google pursuant to

4    blanket policies, not individual determinations.

5             With respect to certain categories of books that they

6    considered to be reference-type materials; poetry,

7    dictionaries, cookbooks, that sort of thing, they do not show

8    snippets at all.  They show only what they call metadata for

9    the books.  But I have a list from Google that lists every book

10   that was copied and whether it was in snippet display or

11   metadata display.  No author has to come forward to present

12   that evidence.

13            On Friday the parties exchanged contention

14   interrogatory responses.  I'd really like to hand them up,

15   because Google's response on the fourth fair use factor in

16   their papers argue somehow is going to raise individualized

17   issues and in their contention interrogatory response they make

18   it crystal clear that they intend to raise issues only that are

19   common, such as the fact that a search engine is not a

20   substitute for a book, that there's no market for selling

21   snippets to search engines, that that isn't a likely to be a

22   developed market or reasonable market.  They're responding to

23   plaintiff's contentions.  But they are not going to argue in

24   this case that they are using the books fairly based on an

25   individualized determination.  They are going to argue that

C53FGOOA

```
 1   their search engine's transformative and that is why they
 2   should win, and that is a common issue, not an individualized
 3   issue.
 4             THE COURT:  All right.
 5             MS. ZACK:  May I hand these up, your Honor?
 6             THE COURT:  Sure.  Any objection?  They're just
 7   interrogatories that were served?
 8             MS. ZACK:  Yes.
 9             THE COURT:  Responses on Friday?  Sure.  Give it to my
10   law clerk.
11             MS. ZACK:  Thank you.
12             THE COURT:  Wait, wait.  Does Mr. McGuire want to add
13   anything?
14             MR. McGUIRE:  Just a couple of points, your Honor.
15   I'll be brief.
16             Thank you, your Honor, may it please the Court.  To be
17   colloquial, my song has already been sung, but I'd like to make
18   a couple of points if I could.  First and perhaps dispositively
19   on this motion, I guess on the one hand you have an Authors
20   Guild case around for six years, our case is in its 26th month.
21   Although we haven't been around the Court very much, we've been
22   active in preparing for full-scale litigation and also
23   negotiating.
24             The bottom line is the Worth case, which I think goes
25   back to the Supreme Court close to 40 years, basically says
```

C53FGOOA

1    colloquially one is enough.  If there's one member of an

2    association that is at the bar pleading associational rights

3    that's good enough for standing and the Court at this stage,

4    and although 25 months in it's hard to say this, at this early

5    stage of the pleadings the Court need not go any further as we

6    point out in our briefs.

7              Secondly, and with respect to Ms. Durie, who is a

8    terrific lawyer, I don't think it's fair for Google to argue

9    that they concede on point one on Hunt.  What they're

10   essentially doing is conflating or putting together points one

11   and three of the Hunt analysis, and if you take their argument

12   to its logical extreme, in every copyright case at least and I

13   would argue in every case according to their thinking there

14   would be no need for the associational point because every

15   member of every association would have to be before the Court

16   and then why would we need collective representation?

17             Moreover, in our case --

18             THE COURT:  And Google says you don't need it.  I

19   think Google is saying you don't need it.

20             MR. McGUIRE:  Well, I read them and hear them saying

21   two different things.  But the point is so far as we are

22   concerned, and I want the Court to understand this because,

23   again, we are new to the case relatively, in our case we're

24   talking about not just 20 million books, but 20 million covers.

25   Not just snippets of covers, the entire covers, and they're not

C53FGOOA

1    just being mentioned, they're being displayed by Google.

2           Now, if we have to even go into a small subset of that

3    20 million and adjudicate rights we're going to be here for

4    quite a long time and we don't have to be because literally

5    we're only at the standing and pleading stage, obviously.

6           Finally, and you made this point, I'll just touch it

7    very lightly because it's already been made.  It is somewhat

8    unfair, inconsistent and respectfully hypocritical for Google

9    after willy-nilly scanning 20 million books and 20 million

10   covers in our view without regard to individual rights to come

11   back and say now upon our motion or upon our attempt to have

12   associational standing, the burden is on us.  They didn't take

13   that into account way back when and at this stage of the case I

14   don't think we need to do that.

15          Beyond, that, your Honor, I'm happy to rest on my

16   brief and whatever the Court has said and I'm happy to answer

17   any question.

18          THE COURT:  I know.  Thank you.

19          MS. DURIE:  Your Honor, there are three points I would

20   like to make in response.  The first is that it is true that

21   the doctrine of associational standing does have much more

22   limited application in a copyright case from most other types

23   of cases and that is because of the requirements of 501(b) and

24   the fact that the relief that is being requested necessarily is

25   directed to a particular copyright interest and cannot extend

C53FGOOA

1   more broadly.  That is why we are not conflating the first and

2   third Hunt factors and why the Court must apply each of them

3   separately as the Supreme Court did in AIME in order to resolve

4   the associational standing question.

5        Second, the issue here is not whether the owner

6   retains any beneficial interest in the copyright, which is to

7   say whether there are any uses for which the author is

8   receiving royalties, instead, the question is whether the

9   author is a beneficial owner of the particular copyright

10  interest that is at issue.  The particular copyright interest

11  that is at issue is the display of small snippets of text, and

12  it is as to that interest that the question of ownership is

13  very murky because of the contractual relationships between the

14  parties and because of the fact that it is conceded that at

15  least in many cases authors receive no royalties from the

16  publisher for those displays.

17       THE COURT:  Would Google want to be litigating that

18  individually?  It would take forever.  It just seems to make

19  sense to address that on a group basis whether through an

20  association or whether through a class action.  I just don't

21  think that Google would want to come in -- obviously, it

22  doesn't.  I guess it's hoping that individual authors won't

23  come forward.

24       MS. DURIE:  No, your Honor.  I think the issue is, the

25  issue is this:  There are other aspects of the rules and Rules

C53FGOOA

1    of Civil Procedure that address that question and its issues of

2    collateral estoppel.  We are fully prepared to litigate this

3    case against the three individual plaintiffs who have brought

4    claims, and there is the availability of attorneys fees and

5    there is the availability of statutory damages, which is the

6    regime that is set up; not associational standing, but the

7    regime that is set up to insure those claims can be litigated.

8    We are fully prepared to litigate those claims.  If in fact

9    there are issues --

10          THE COURT:  Let's finish up, because I had really

11   intended for this part to take --

12          MS. DURIE:  I understand.  If there are issues of

13   common application that is the purpose of collateral estoppel

14   to litigate the issues that are common.  If the issues are not

15   common they shouldn't be litigated in a mass basis in the first

16   place.

17          Final very brief point.  This has become a very acute

18   issue because the publishers are not here.  And with respect to

19   the practical realities of litigation in an environment where

20   we are litigating against both authors and publishers this is

21   perhaps a less important issue.  But now we're just dealing

22   with authors.  As the Court knows the publishers are not here

23   today, are in a separate category, and that is why as a

24   practical matter this is a very important matter as to who has

25   which set of rights.  Thank you.

C53FGOOA

1          THE COURT:  All right.  I'll hear from the Authors

2     Guild on the class certification motion.

3          MS. ZACK:  Your Honor, plaintiffs, representative

4     plaintiffs acting on their own behalf and as class

5     representatives move for class certification under Rule 23(a)

6     and (b)(3) of a class that is defined as follows:  All persons

7     residing in the United States who hold a United States

8     copyright interest in one or more books reproduced by Google as

9     part of its Library Project or either natural persons who are

10    authors of such books or natural persons, family trusts or sole

11    proprietors who are heirs, successors of interest or assigns of

12    such authors.  Book is designed to mean each full length book

13    published in the United States in the English language --

14         THE COURT:  I've read all that.  Why don't you get to

15    the --

16         MS. ZACK:  Sure.

17         THE COURT:  You're only proceeding under (b)(3),

18    right?

19         MS. ZACK:  We're only proceeding under (b)(3), your

20    Honor.  In our opening papers we made arguments as to basically

21    the six requirements here and Google did not contest

22    numerosity.  I really don't think that is an issue, or

23    commonality or typicality.  If your Honor has any questions

24    about those --

25         THE COURT:  I don't.

C53FGOOA

1          MS. ZACK:  Okay.  The other factors are adequacy,

2     predominance and superiority as to which Google does raise

3     issues.  Would your Honor like me to talk about them in any

4     particular order?

5          THE COURT:  No.  Whatever you want to do.

6          MS. ZACK:  Adequacy requires that there be no

7     fundamental conflicts between the representative plaintiffs and

8     the members of the class.  Here the representative plaintiffs

9     hold the same claims as the class as defined and no particular

10    conflicts have been identified with respect to those

11    individuals.  They have the same claims, there are no unique

12    defenses, and their books have been copied and distributed and

13    displayed, and I do want to point out that Ms. Durie keeps

14    saying that this is about snippets only, and it's not.  In

15    order to make snippet display, which is what Google's

16    motivation was, they first scanned entire books digitally and

17    also distributed entire digital scans to the libraries and then

18    make display of excerpts of some of the books, most of the

19    books.  So all of that is at issue, not merely snippets.

20          In their reply papers Google does not take any issue

21    with respect to the adequacy of the representative plaintiffs

22    with respect to copying and distribution.  They limit all their

23    arguments to snippets.

24          The only arguments made, really, as to adequacy seem

25    to be based on two points of fact.  One, a survey, and

C53FGOOA

secondly, a letter of some academic authors.  First of all, as
to the survey, it was of only 880 authors.  Google asserts on
page 9 of its brief that the named plaintiffs are suing to take
away something that most absent class members perceive as a
benefit.  There's no citation for that, but I assume they're
referring to the survey and the academic authors as being
representative of, quote, most absent class members.  However,
even assuming that the survey was valid, only 19 percent of the
880 persons who responded to that survey said I feel I would
financially benefit, so that's not most by any stretch of the
imagination.

            THE COURT:  Why don't you address, I think it's the
same issue about the ownership issues.  I don't know if there's
anything different for these purposes from what we discussed
earlier.  There's a question raised about individual issues
regarding, again, they're similar, nature of the works, the
amount --

            MS. DURIE:  On predominance, your Honor?

            THE COURT:  Yes.  On the snippets, you have to look at
how long is the book, you have to look at the snippets in the
context of what the book is and the size of the book, and the
effect on the market.  Why aren't these individualized
questions?

            MS. ZACK:  Okay.  Those issues were raised in
connection with predominance, your Honor.  And there the test

C53FGOOA

1    is that the common questions of law and fact are more

2    substantial and outweigh individualized issues.  And Google

3    raises two points there; ownership and fair use.  If I could

4    talk about fair use first.  I've handed up the interrogatory

5    responses which make it crystal clear that really Google is not

6    raising any individualized issues.  With respect to the fact

7    that some snippets are one eighth of a page is larger on some

8    books than in other books seems to me to be sort of a de

9    minimis distinction that would never, no case would turn on

10   that distinction.

11           The real issue here is we don't dispute that they have

12   rules that they apply to the books and that they blacked out

13   10 percent of the pages for snippet display and that they

14   blacked out a snippet on each page and that they show response

15   to a given --

16           THE COURT:  When you say blacked out --

17           MS. ZACK:  They divide the page up into eight snippets

18   and they'll black out one of them and then never show that.

19           THE COURT:  Okay.

20           MS. ZACK:  In response to a search request.  So

21   essentially about 10 percent of the book is never displayed in

22   response to search requests.  We don't dispute that.  That's

23   common fact.

24           My point is that these are common procedures applied

25   to books.  There's nothing individualized about it.  They're

C53FGOOA

1     going to argue that everything they did was fair use because

2     they put into play common procedures and common practices that

3     meet fair use and that do not violate the rights of the

4     authors.  They're not individualized issues.  There is just not

5     an individualized issue in any of the fair use factors, your

6     Honor.  They've conceded no individualized issues on factor

7     one.

8          Factor two, as I said earlier, only legally, the only

9     things that are legally applicable here, whether they're

10    fiction or non-fiction, in print or out of print, which are

11    categories that can be adjudicated without individualized

12    looking at books.

13         THE COURT:  In general, why do the plaintiffs believe

14    that the class action mechanism is superior to individual

15    actions?  Sum up for me.

16         MS. ZACK:  Well, your Honor.  Google engaged in a

17    campaign here that affected millions of authors.  To sue Google

18    for every single book, to expect every single author -- first

19    of all, a lot of them don't even know that their book was

20    scanned and is being displayed because it's never been

21    announced to them by Google, certainly, that we're talking

22    about millions of books, probably millions of authors,

23    certainly hundreds of thousands of authors.  To expect each of

24    them to come forward and litigate against a defendant such as

25    Google is unfair.

C53FGOOA

1          The efficiencies and economies in a class action exist

2     here.  This is a classic case for a class action because we're

3     talking about blanket policies that affected millions of people

4     and we're talking primarily about legal issues -- infringement,

5     fair use -- that can be determined based on common questions of

6     law and fact, and it would be a terrible burden on the courts

7     if each individual author chose to litigate or had to litigate

8     or was forced to litigate, and of course Google hopes that

9     nobody will.

10         But that, again, does not undercut superiority.  The

11    case law is clear the class action is superior precisely

12    because they present an avenue and a venue for the vindication

13    of rights by persons who would otherwise have too little in

14    play or be too intimidated by the defendant such as Google

15    here, which is an intimidating defendant, to adjudicate their

16    rights.  There are many, many authors and we saw it with

17    respect to the settlement objections, your Honor, who feel

18    their rights were abused, violated by Google.  This action does

19    cry out for a mass litigation to adjudicate the mass

20    digitization.  It's the only fair procedural route.

21         I mean, Google may win, maybe they're right, maybe it

22    was fair use, maybe that's what the Courts will decide.  But

23    this is a substantial enough and serious enough issue when the

24    rights and copyright interests, intellectual property interests

25    of so many authors are at stake to think that this right should

C53FGOOA

1    not be adjudicated in a forum where it can be fairly

2    adjudicated and all the issues can be brought to the Court's

3    attention, which is harder for individual plaintiffs.  They

4    don't have the resources.  If you have --

5              THE COURT:  I got it.  Thank you.  We'll hear from

6    Google.

7              MS. DURIE:  Thank you, your Honor.

8              THE COURT:  Wouldn't Google be delighted if this is a

9    class action if I find that it is fair use?

10             MS. DURIE:  No.

11             THE COURT:  No?  Really?

12             MS. DURIE:  No, because the class action precedent is

13   important.  It has far-reaching implications not just in this

14   case but in other cases.  We care institutionally about having

15   the law be applied correctly and the correct outcome in this

16   case is not to certify a class.

17             The Library Project was an effort to create an

18   electronic card catalog that would allow the contents of books

19   to be searched and would allow users to find books more easily.

20   With the Court's permission I would like to hand up three

21   things.  Two are screenshots that are merely illustrative.  The

22   third is a very brief excerpt of deposition testimony from

23   Mr. Akin, who is the Authors Guild's 30(b)(6) witness on the

24   subject that the interrogatory responses were handed up on,

25   which is the question of harm.

C53FGOOA

1          THE COURT:  That's fine.

2          MS. DURIE:  Thank you, your Honor.

3          With respect to, you will see, your Honor, there's the

4     deposition testimony and there are two screenshots.

5          THE COURT:  I read Ball Four many, many, many years

6     ago.

7          MS. DURIE:  And I got to depose him.

8          Two things.  There are two books by Mr. Bouton, your

9     Honor.  Ball Four is in snippet view and you will see from that

10    screenshot what a display of the snippet view looks like.

11    There are very short excerpts of texts and there are links to

12    ways to buy the book and find the book in a library.  Foul Ball

13    is part of the Partner Program.  Mr. Bouton's publisher has

14    authorized the display of a larger piece of text from Foul Ball

15    and this illustrates part of the tension here.  The publisher

16    has determined that it makes sense to show more of that text

17    because it advances sales of books.  And significantly,

18    Mr. Akin in the deposition testimony that I handed up agrees,

19    as the Authors Guild's 30(b)(6) witness, that displaying text

20    from books actually advances the sales of those books in many

21    cases as to many categories of work, though not in his view as

22    to all categories of works, and this is a judgment that the

23    publishers have made with respect to many, many books,

24    including --

25          THE COURT:  I understand that, and it makes sense, but

C53FGOOA

1    clearly there are authors who don't want this, even though

2    financially it benefits them, because they're losing some

3    control and so we'll get to that when we get to the summary

4    judgment motion, but the question now is, isn't this being done

5    pursuant to some general guideline or procedure on, you know,

6    there may be categories, but can't this be dealt with more

7    efficiently on a common basis?

8         MS. DURIE:  Let me address each of those issues.  The

9    question whether individual authors would like to have control

10   is not the relevant question here.  First point, the copyright

11   laws in the United States are predicated on protecting economic

12   interests.  Not more rights --

13        THE COURT:  You're getting into the merits.  My

14   question, though, is whether you are correct, is that not a

15   common question --

16        MS. DURIE:  No.

17        THE COURT:    -- that could be dealt more efficiently

18   on a class basis?

19        MS. DURIE:  No.  Because if the question is the

20   economic interests of authors, Mr. Akin says that it depends

21   on -- the extent to which an author receives a benefit depends

22   on the nature of the book.  It might also depend on whether the

23   work is in print or out of print, but also on the type of book

24   and therefore says this is a decision that needs to be made

25   carefully.  And in evaluating the fourth fair use factor the

C53FGOOA

1    Court has to look both at the assertions of harm and at the

2    assertions of benefit.  And the different authors may receive

3    different benefits with respect to different works by virtue of

4    their inclusion in the program and that is evidence that the

5    Court must take into consideration.

6          THE COURT:  Why can't we deal with that in a

7    categorical way, for example, in print, out of print?  Again,

8    cookbooks, fiction, non-fiction, reference books, and there

9    might be, I don't know, eight, nine, ten, twelve categories,

10   but wouldn't that still be more efficient than having

11   10 million individual authors sue?

12         MS. DURIE:  Were there only eight or nine categories,

13   perhaps that would be correct, but the problem is in order to

14   understand the impact of this on a given author you must

15   understand that author's circumstances.  You have received

16   letters from academic -- on behalf of a group of academic

17   authors who contend that they receive a number of benefits.

18   That is not simply a function of the individual work in

19   question, but of who they are, and the fact that they see

20   reputational and other benefits that lead to economic benefits

21   for them by virtue of the inclusion of their works.  It is not

22   simply the case that the Court can or should treat all fiction

23   the same way, regardless of by whom it's written.  The fair use

24   inquiry has to look at the particular book and the economic

25   consequences of Google's activity with respect to that book.

C53FGOOA

1          This is why the survey evidence, I think, your Honor,

2   is very important.  45 percent of authors said that they

3   believe inclusion in snippet view would help sales of their

4   books.  Only a very small number, it is true, 4 percent,

5   disagreed with that conclusion.

6          THE COURT:  Do I decide this motion, this class

7   certification motion based on what percentage I think of

8   authors like the process?  That doesn't seem right.

9          MS. DURIE:  The issue is not whether they like it or

10  they like the process.  The issue, and again, this is why the

11  fact that this is a copyright case matters.

12         THE COURT:  But that's the point that Google is making

13  to me.

14         MS. DURIE:  No, your Honor, respectfully, it's not.

15  The point of the survey is this program has an economic benefit

16  for authors.  It's not whether authors like the lawsuit in an

17  abstract sense.  It is whether they believe that the inclusion

18  of their books in Google Books is to their economic benefit.

19  We have put forward substantial evidence --

20         THE COURT:  That's a factor for fair use.

21         MS. DURIE:  It's a factor for fair use.

22         THE COURT:  An individualized factor.

23         MS. DURIE:  Individualized factor.  We have put

24  forward substantial evidence, the plaintiffs have put forward

25  nothing in response.

C53FGOOA

1          I want to pause here briefly for a moment.  This is

2    remarkable.  We do not have access easily to the authors of

3    works.  Google complains that we only succeeded in contacting

4    something over 800 of them.

5          THE COURT:  You said Google complains.

6          MS. DURIE:  I'm sorry, plaintiffs complains.  The

7    Authors Guild has a registry of its members.  It could easily

8    go to its members and ask them these same questions.  They did

9    not do that.  They did not proffer any evidence of their own in

10   response to this evidence about the economic impact of the

11   program on authors.  And their silence in the face of much

12   easier access to sources of proof, they didn't even put in a

13   survey expert to contradict the results of our survey, is I

14   think very telling and something the Court needs to take

15   seriously.

16         Your Honor, this evidence about benefits has to be in

17   the mix when considering economic impact.  The only argument

18   that the plaintiffs have made with respect to the fourth factor

19   hinges on their two experts.  The Court knows we moved to

20   strike those expert declarations because they were submitted on

21   reply and we were not permitted to depose them.  Neither of

22   them in any event is persuasive here.

23         Mr. Edelman contends that there is a risk from the

24   program that works will be pirated and will be made freely

25   available on the web.  Even if one were to accept that factual

C53FGOOA

predicate as true, and it is not, and subject to serious

challenge, it is absolutely individualized, because many of

these works are already on the web.  Many of these works are

already available in e-book form, many of these books can be

bought on Amazon or previewed on Amazon.  Mr. Edelman himself

says many of the books have already been pirated.  And his

declaration is simply making a statement about theoretical

harm.  He offers no opinion about incremental harm and it is

incremental harm over the existing state of the world, which

includes Amazon, which includes e-books, that would have to be

the inquiry for the Court and that would be individualized.

       Mr. Gervais ironically begins with a premise that

completely contradicts Mr. Edelman.  His premise is that making

books available on line is so good for authors and so important

that if Google is enjoined from doing it Congress will ensure

that it happens anyway or some other unspecified market will

develop in order to allow for that to happen.  That is simply

not cognizable as a matter of law.  The Court cannot rely on

subsequent Congressional action.  Congress has written this

statute and it is this statute that the Court should apply, and

the speculation about potential future markets is not

cognizable because the Court is constrained to look at actual,

actual markets and actual probable markets based on the type of

licensing activity that occurs, not simply to say something is

not fair use because it would be possible to pay money for it,

C53FGOOA

1     that is true for all fair uses.  I could pay money for an

2     excerpt of a work to include in a critical article.  I am not

3     required to, nor am I required to seek permission, that is

4     because of the application of the fair use laws.

5              I want to make one final point, your Honor, because we

6     didn't have a chance to address it.  This is this claim about

7     distribution.  This is a very strange claim.  They contend that

8     they have this whole separate distribution theory.  Google

9     takes the original copies that it makes for the purpose of

10    indexing and snippet display and it provides those original

11    copies to libraries by giving them access to those copies.  The

12    libraries may or may not choose to make their own copies of the

13    works for their own purposes.  Now, the plaintiffs seem to

14    contend that this is an act of distribution.  That is wrong

15    both as a matter of fact and as a matter of law.  The Copyright

16    Act confers --

17             THE COURT:  Again, there's a disagreement about that

18    and why is that not a common question?

19             MS. DURIE:  I don't even know that there's

20    disagreement.  I don't even understand what the claim is.  And

21    the Court is entitled to take a peek at the merits in order to

22    decide whether there's a real issue here.

23             THE COURT:  I agree with that.

24             MS. DURIE:  Section 106-3 says that there is an

25    exclusive right to distribute copies or phonorecords of a

C53FGOOA

```
 1  copyrighted work.  It defines copies in Section 101 as material
 2  objects.
 3          There is no argument that we have distributed any
 4  material object to the library.  As a statutory matter that
 5  claim makes absolutely no sense.  Also as a factual matter we
 6  don't transfer ownership in the copies, we keep them.  The
 7  libraries make their own copies if they do.  It would be some
 8  sort of secondary liability claim.  It's not even clear that
 9  that's even in the case.  But the argument that there's some
10  wholly separate claim other than the claim that has always been
11  in the case based on our making of copies for the purpose of
12  snippet display I think should not influence the Court's
13  analysis on class certification.
14          THE COURT:  All right.  Thank you.
15          MS. ZACK:  May I, your Honor?
16          THE COURT:  Yes, rebuttal.  Briefly.
17          MS. ZACK:  Yes, your Honor.  Your Honor, the first
18  complaint in this case talked about the distribution back to
19  the libraries.  That's not a new issue.  What Google does is
20  make available an interface for the libraries to get copies,
21  digital copies, admittedly, of the books.
22          THE COURT:  Counsel argues --
23          MS. DURIE:  Maybe it's a novel issue --
24          THE COURT:  Counsel argues, as I understand it, that a
25  digital copy is not a material object.
```

C53FGOOA

1          MS. DURIE:  That could be litigated as a common

2     question in this case, your Honor.

3          THE COURT:  You disagree with that.

4          MS. ZACK:  I do disagree.

5          THE COURT:  Is there any law on that?

6          MS. ZACK:  Yeah, I think there is law, because it's a

7     developing area of the law because digital copies are a fairly

8     new area.

9          THE COURT:  I know there's got to be law.  Okay.

10          MS. ZACK:  With respect to -- Ms. Durie said that the

11     issue is financial benefit, economics and I couldn't agree

12     more.  There is no evidence in this record that there is any

13     conflict here between any class members based on financial

14     benefit.

15          THE COURT:  I think the argument is the financial

16     benefit is different for everybody and therefore you have to

17     make individualized evaluations.

18          MS. ZACK:  That could be true if we were talking

19     about --

20          THE COURT:  You're only seeking the minimum statutory

21     damages.

22          MS. ZACK:  We're only seeking minimum statutory

23     damages.  Google is coming forward arguing fair use.  They've

24     put in their contention interrogatories not that anybody is

25     individually benefited by five dollars or ten dollars.  What

C53FGOOA

1    they're saying is their search engine is generally beneficial.

2    That's a common question.  We respond on fair used not based on

3    we're not putting in individualized evidence.  We told you and

4    we put in expert reports that show that under the line of

5    analysis that the Supreme Court has endorsed in its most recent

6    copyright case in this area, Campbell, that if a fair use

7    ruling would mean that wide and unrestricted conduct of the

8    sort engaged in by defendant were to be ruled to be fair use,

9    would that have a dilatory effect on the value of the books and

10   our position is it would across all books.  We're not making

11   that argument on a book by book basis, just as Google is not

12   arguing that its search engine is good for this book but not

13   for this book.  They're arguing that the search engine as a

14   whole is a beneficial concept.  We're arguing that willy-nilly

15   copying and making books and distributing books to libraries,

16   which is a prerequisite to their search engine because that's

17   the way they got the book, and then displaying them presents

18   the problem of widespread -- if this was a widespread practice

19   there would be security issues, piracy issues, and there's no

20   law that says it has to be incremental.

21        If Google is creating a piracy issue we don't have to

22   prove it incrementally, how much more of a piracy issue they're

23   creating.  There's nothing in the copyright law that requires

24   that.  If they're creating a harm that widespreadly affects all

25   books and similarly, if they're foreclosing and pre-empting an

C53FGOOA

1    entire collective licensing market, which is what Professor

2    Gervais' report is about, that's also a common issue.

3              With respect to our expert reports, your Honor, I just

4    want to make a quick response.  The timetable in this case was

5    that we had a very early class certification schedule which was

6    December.  No discovery, renewed discovery had been taken.  The

7    plaintiffs hadn't been taken, we hadn't yet taken defendants.

8    There was an expert due to be deposed and reports in May and

9    June.  Google filed their opposition -- in our initial motion

10   we said we're going to rely on experts.  Google filed an

11   opposition.  They didn't say we should have filed expert

12   reports, they knew we were going to put them into the reply

13   brief.  The only issue here was the timing of the depositions.

14   We didn't deny them depositions.  We said you can take your

15   depositions, you can have a surreply.  We only question the

16   timing of it and also that we wanted to have a sur-surreply, so

17   I think it's a little unfair --

18             THE COURT:  I don't believe in surreplies and

19   sur-surreplies.

20             MS. ZACK:  I understand, your Honor.

21             THE COURT:  Look, both sides, Google's relied on

22   survey evidence, plaintiffs relied on experts.  Both sides have

23   used some factual material.  I'll take a look at both and we'll

24   see and if I have any doubts or questions then we can allow a

25   little more time for additional submissions.  But in the first

C53FGOOA

1   instance I think what I have is probably sufficient.

2                MS. ZACK:  I appreciate that.  Thank you, your Honor.

3                MS. DURIE:  May I make two points, your Honor?

4                THE COURT:  I just said I don't believe in

5   surrebuttal, surreply.  Go ahead.

6                MS. DURIE:  Thank you.

7                First, your Honor, I would simply observe that they

8   did take the depositions of our experts and were afforded an

9   opportunity to examine them.

10               The fourth -- in evaluating the fourth factor the

11  Court is going to have to balance evidence that shows a benefit

12  and evidence that shows a harm, and it is the net result of

13  that balance that has to inform --

14               THE COURT:  And you're saying that balance varies from

15  author to author.

16               MS. DURIE:  I'm saying even if they contend that their

17  evidence of harm will be common, the evidence of benefit is

18  not.  We have put forward evidence, even though we think search

19  engines provide a benefit across the board, and we do, the

20  extent of that benefit varies depending on the nature of the

21  work, their 30(b)(6) witness agreed and the Court is going to

22  have to take that into consideration, the nature of the work

23  and the nature of the author in making the fair use

24  determination.

25               THE COURT:  Thank you.  I will research decision on

C53FGOOA

1    all three motions.   Thanks.

2              (Adjourned)