# EXHIBIT A

FILED IN CHAMBERS
U.S.D.C. - Atlanta

MAY 1 1 2012

James N. Hatten, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS;
OXFORD UNIVERSITY PRESS, INC.;
SAGE PUBLICATIONS, INC.,

        Plaintiffs,

v.

MARK P. BECKER, in his official
capacity as President of
Georgia State University; RISA
PALM, in her official capacity
as Senior Vice President for
Academic Affairs and Provost of
Georgia State University; J.L.
ALBERT, in his official
capacity as Georgia State
University Associate Provost
for Information Systems and
Technology; NANCY SEAMANS, in
her official capacity as Dean
of Libraries at Georgia State
University; ROBERT F. HATCHER,
in his official capacity as
Vice Chair of the Board of
Regents of the University
System of Georgia; KENNETH R.
BERNARD, JR., LARRY R. ELLIS,
W. MANSFIELD JENNINGS, JR.,
JAMES R. JOLLY, DONALD M.
LEEBERN, JR., WILLIAM NESMITH,
JR., DOREEN STILES POITEVINT,
WILLIS J. POTTS, JR., WANDA
YANCEY RODWELL, KESSEL
STELLING, JR., BENJAMIN J.
TARBUTTON, III, RICHARD L.
TUCKER, LARRY WALKER, RUTLEDGE
A. GRIFFIN, JR., C. THOMAS
HOPKINS, JR., NEIL L. PRUITT,
JR., and PHILIP A. WILHEIT,
SR., in their official
capacities as members of the
Board of Regents of the
University System of Georgia,

        Defendants.

CIVIL ACTION NO.
1:08-CV-1425-ODE

# Table of Contents

I. Case History . . . . . . . . . . . . . . . . . . . . . 1

II. Eleventh Amendment Immunity and the *Ex Parte Young*
Doctrine . . . . . . . . . . . . . . . . . . . . . . . . 10

III. Copyright Infringement and the Fair Use Defense . . . . . 18

  A. Findings of Fact . . . . . . . . . . . . . . . . . 20

  B. Conclusions of Law . . . . . . . . . . . . . . . . 42

    1. Prima Facie Case of Copyright Infringement . . . 42

    2. The Fair Use Defense . . . . . . . . . . . . . . 47

      Factor 1: Purpose and Character of the Use,
including whether such use is of a commercial
character or is for nonprofit educational
purposes . . . . . . . . . . . . . . . . . . . . 49

      Factor 2: Nature of the Copyrighted Work . . . . 50

      Factor 3: Amount and Substantiality of the
Portion Used in Relation to the Copyrighted
Work as a Whole . . . . . . . . . . . . . . . . . 55

        a. Classroom Guidelines . . . . . . . . . 55

        b. Amount of the Portion Used in
Relation to the Copyrighted Work
as a Whole . . . . . . . . . . . . . . 59

        c. Substantiality of the Portion
Used in Relation to the
Copyrighted Work as a Whole . . . . . 67

      Factor 4: The Effect of the Use on the
Potential Market for or Value of the
Copyrighted Work . . . . . . . . . . . . . . . . 72

      Additional Considerations . . . . . . . . . . . 81

        a. Limited unpaid copying of excepts
will not deter academic authors
from creating new academic works . . . 81

        b.    The slight limitation of
            permissions income caused by the
            fair use authorized by this Order
            will not appreciably diminish
            Plaintiffs' ability to publish
            scholarly works and will promote
            the spread of knowledge . . . . . . . 82

        Summary of Fair Use Assessment . . . . . . . . . 86

IV.  Individual Infringement Claims . . . . . . . . . . . . . 89

    A.  Professor Murphy . . . . . . . . . . . . . . . 89

       Maymester 2009: AL 8480

       1.  *Pronunciation Games* (Cambridge) . . . . . . . . 91
       2.  *Keep Talking* (Cambridge) . . . . . . . . . . 94
       3.  *More Grammar Games* (Cambridge) . . . . . . . 96
       4.  *Grammar Practice Activities* (Cambridge) . . . . 99
       5.  *Five Minute Activities* (Cambridge) . . . . . . . 101
       6.  *Newspapers* (Oxford) . . . . . . . . . . . . . 104
       7.  *Role Play* (Oxford) . . . . . . . . . . . . . 106

    B.  Professor Kaufmann . . . . . . . . . . . . . . . 108

       Maymester 2009: EPRS 8500

       8.   *The Craft of Inquiry* (Oxford) . . . . . . . . 109
       9.   *Handbook of Feminist Research* (Sage) . . . . . . 112
       10.  *Handbook of Social Theory* (Sage) . . . . . . . . 115
       11.  *The Sage Handbook of Qualitative Research
          (Third)* (Sage) . . . . . . . . . . . . . . 119
       12.  *The Sage Handbook of Qualitative Research
          (Second)* (Sage) . . . . . . . . . . . . . 124
       13.  *Handbook of Critical & Indigenous
          Methodologies* (Sage) . . . . . . . . . . . 127
       14.  *Qualitative Research Practice* (Sage) . . . . . . 131
       15.  *Handbook of Narrative Inquiry* (Sage) . . . . . . 133

       Summer 2009: EPRS 8510

       16.  *The Sage Handbook of Qualitative Research
          (Second)* (Sage) . . . . . . . . . . . . . 136
       17.  *Inside Interviewing* (Sage) . . . . . . . . . . 140

       Fall 2009: EPRS 8500

       18.  *The Craft of Inquiry* (Oxford) . . . . . . . . . 143
       19.  *Approaches to Qualitative Research* (Sage) . . . 145
       20.  *Handbook of Feminist Research* (Sage) . . . . . 148
       21.  *Handbook of Narrative Inquiry* (Sage) . . . . . . 152
       22.  *The Sage Handbook of Qualitative Research
          (Third)* (Sage) . . . . . . . . . . . . . 156

    23. *The Sage Handbook of Qualitative Research
       (Second)* (Sage) . . . . . . . . . . . . . 161
    24. *Handbook of Social Theory* (Sage) . . . . . . 165

C.   Professor Esposito . . . . . . . . . . . . . . . . 168

   Summer 2009: EPSF 8280

    25. *Handbook of Ethnography* (Sage) . . . . . . . 168
    26. *Handbook of Feminist Research* (Sage) . . . . . 170
    27. *The Sage Handbook of Qualitative Research
       (Second)* (Sage) . . . . . . . . . . . . . 172
    28. *The Sage Handbook of Qualitative Research
       (First)* (Sage) . . . . . . . . . . . . . . 176

   Fall 2009: EPRS 8520

    29. *Theoretical Frameworks in Qualitative
       Research* (Sage) . . . . . . . . . . . . . . 179

D.   Professor Kruger . . . . . . . . . . . . . . . . . 182

   Fall 2009: EPY 7090

    30. *Awakening Children's Minds* (Oxford) . . . . . 183

   Fall 2009: EPY 8220

    31. *Understanding Trauma* (Cambridge) . . . . . . . 186

E.   Professor Orr . . . . . . . . . . . . . . . . . . 189

   Summer 2009: MUS 8860

    32. *Liszt: Sonata in B Minor* (Cambridge) . . . . . 190
    33. *The Cambridge Companion to Mendelssohn*
       (Cambridge) . . . . . . . . . . . . . . . . 194
    34. *The Cambridge Companion to Schumann*
       (Cambridge) . . . . . . . . . . . . . . . . 197
    35. *The Cambridge Companion to Beethoven*
       (Cambridge) . . . . . . . . . . . . . . . . 200
    36. *The Music of Berlioz* (Oxford) . . . . . . . . 203

   Fall 2009: MUS 8840

    37. *The Organ as a Mirror of Its Time* (Oxford) . . . 206
    38. *North German Church Music* (Oxford) . . . . . . 209

F.   Professor Dixon . . . . . . . . . . . . . . . . . 210

   Fall 2009: AAS 3000

    39. *The Slave Community* (Oxford) . . . . . . . . . 211
    40. *African American Single Mothers* (Sage) . . . . . 214

-iii-

41. *Black Children* (Sage). . . . . . . . . . . 217
42. *Black Families (Third)* (Sage) . . . . . . . . 221

G. Professor Hartwig . . . . . . . . . . . . . . . 224

   Fall 2009: AH 4900

43. *Ancient Egyptian Materials & Technology*
    (Cambridge) . . . . . . . . . . . . . . . . 225

H. Professor Kim . . . . . . . . . . . . . . . . . 229

   Fall 2009: AL 8550

44. *Criterion Referenced Language Testing*
    Cambridge) . . . . . . . . . . . . . . . . . 230
45. *Assessing Grammar* (Cambridge) . . . . . . . . 232
46. *Assessing Reading* (Cambridge) . . . . . . . . 235
47. *Fundamental Considerations in Language
    Testing* (Oxford) . . . . . . . . . . . . . . 237
48. *Language Testing in Practice* (Oxford) . . . . 242
49. *Assessing Listening* (Cambridge) . . . . . . . 245
50. *Assessing Languages for Specific Purposes*
    (Cambridge) . . . . . . . . . . . . . . . . 247
51. *Assessing Speaking* (Cambridge) . . . . . . . 250
52. *Learning Vocabulary in Another Language*
    (Cambridge) . . . . . . . . . . . . . . . . 254
53. *Assessing Vocabulary* (Cambridge) . . . . . . 258
54. *Assessing Writing* (Cambridge) . . . . . . . . 260

I. Professor McCombie . . . . . . . . . . . . . . . 262

   Fall 2009: ANTH 4440

55. *International Health Organisations*
    (Cambridge) . . . . . . . . . . . . . . . . 263
56. *Evolution of Infectious Disease* (Oxford) . . . 267

J. Professor Gabler-Hover . . . . . . . . . . . . . 269

   Fall 2009: ENGL 4200

57. *A History of Feminist Literary Criticism*
    (Cambridge) . . . . . . . . . . . . . . . . 270

K. Professor Anggoro . . . . . . . . . . . . . . . 272

   Fall 2009: EPY 8960

58. *Language Acquisition & Conceptual
    Development* (Cambridge) . . . . . . . . . . 272

L.   Professor Barker . . . . . . . . . . . . . . . . . . . . 276

Fall 2009: FILM 4750

59. *Film Language* (Oxford) . . . . . . . . . . . . . 277

M.   Professor Gainty . . . . . . . . . . . . . . . . . . . 279

Fall 2009: HIST 4820

60. *The Cambridge History of China, Volume 8, Part 2* (Cambridge) . . . . . . . . . . . . . . . 280

N.   Professor Davis . . . . . . . . . . . . . . . . . . . 283

Fall 2009: HIST 7010

61. *Region, Race & Reconstruction* (Oxford) . . . . . 284
62. *The Unpredictable Past* (Oxford) . . . . . . . . 287

O.   Professor Freeman . . . . . . . . . . . . . . . . . . 290

Fall 2009: JOUR 4800

63. *Living Ethics* (Oxford) . . . . . . . . . . . . 290

P.   Professor Moloney . . . . . . . . . . . . . . . . . . 293

Fall 2009: NURS 8035

64. *Handbook of Mixed Methods* (Sage) . . . . . . . 294

Q.   Professor Lasner . . . . . . . . . . . . . . . . . . 297

Fall 2009: PERS 2001

65. *Crabgrass Frontier* (Oxford) . . . . . . . . . . 298
66. *The Politics of Public Housing* (Oxford) . . . . 300

R.   Professor Hankla . . . . . . . . . . . . . . . . . . 303

Fall 2009: POLS 3450

67. *Contemporary Cases in U.S. Foreign Policy* (Sage) . . . . . . . . . . . . . . . . . . . . . 304
68. *U.S. Foreign Policy* (Sage) . . . . . . . . . . 307

S.   Professor McCoy . . . . . . . . . . . . . . . . . . 31-

Fall 2009: POLS 8250

69. *Regimes & Democracy in Latin America* (Oxford) . . . . . . . . . . . . . . . . . . . 311

T.   Professor Duffield . . . . . . . . . . . . . . . . . . 314

     Fall 2009: POLS 8470

     70.  *Behavior, Society & Nuclear War, Volume I*
          (Oxford) . . . . . . . . . . . . . . . . . . . . 315

U.   Professor Whitten . . . . . . . . . . . . . . . . . . 318

     Fall 2009: PSYC 4030

     71.  *A World of Babies* (Cambridge) . . . . . . . . 318

V.   Professor Harvey . . . . . . . . . . . . . . . . . . 323

     Fall 2009: SOCI 8030

     72.  *The Power Elite* (Oxford) . . . . . . . . . . . 323

W.   Professor Ohmer . . . . . . . . . . . . . . . . . . . 329

     Fall 2009: SW 8200

     73.  *The Sage Handbook of Qualitative Research
          (Second)* (Sage) . . . . . . . . . . . . . . . . 329
     74.  *Utilization-Focused Evaluation* (Sage) . . . . 333

V.   Did Georgia State's 2009 Copyright Policy Cause
     Infringement of Plaintiffs' Copyrights? . . . . . . . 337

VI.  Relief To Be Granted . . . . . . . . . . . . . . . . 339

VII. Costs and Attorneys' Fees . . . . . . . . . . . . . . 330

ATTACHMENT:   Permissions and Book Sales Revenue for Books Involved
              in this Case

<u>**ORDER**</u>

This copyright infringement case brought under 17 U.S.C. § 101 <u>et seq.</u> is before the Court for findings of fact and conclusions of law following a non-jury trial from May 17 through June 7, 2011. Both sides presented oral and documentary evidence and deposition testimony. The parties filed proposed findings of fact and conclusions of law. Before turning to findings and conclusions, the procedural history of the case is noted.

**I.**   <u>**Case History**</u>

The original Complaint was filed on April 15, 2008. It alleged that Defendants, officials of Georgia State University in Atlanta, Georgia, had infringed copyrights held by Plaintiffs, publishing houses, by allowing unlicensed portions of Plaintiffs' copyrighted books to be posted electronically and made available electronically to students. The portions of the books which had been published electronically were listed in Exhibit 1 to Plaintiffs' Complaint. The Complaint sued Defendants in their official capacities and sought injunctive and declaratory relief and an award of attorneys' fees. Defendants filed an Answer which denied infringement, claimed the defense of fair use, and also claimed sovereign immunity and Eleventh Amendment immunity, based on Defendants' positions as state officials.

Plaintiffs filed a First Amended Complaint on December 15, 2008. The First Amended Complaint added as Defendants the various members of the University System of Georgia's Board of Regents, all of whom were sued in their official capacities only. The First Amended

-1-

Complaint alleged that the members of the Board of Regents were ultimately responsible for the alleged infringements which had occurred at Georgia State by virtue of their supervisory authority over the University system. The Answer to the First Amended Complaint again denied the claimed infringements, asserted the defense of fair use, and also asserted sovereign immunity and Eleventh Amendment immunity for all Defendants.

In December 2008, the University System of Georgia, of which Georgia State University is a part, announced that a Select Committee had been formed to review Georgia State's then-existing copyright policy, The Regents Guide to Copyright. On February 17, 2009, the Select Committee announced a new policy ("Copyright Policy"). The new policy required (among other things) that each professor who wanted to post an excerpt of copyrighted material on the electronic reserves system ("ERES") fill out a "fair use checklist" to determine whether the proposed use qualified as fair use. The new policy took effect on February 17, 2009, which was part way through the spring semester.

The initial round of discovery was completed in January 2010. Summary judgment motions were filed by both sides on February 26, 2010. Plaintiffs' motion addressed the claimed inadequacy of the new Copyright Policy and the fair use checklist, but also argued that they were entitled to injunctive relief based on the alleged infringements (listed in Exhibit 1 to the First Amended Complaint) which predated the new policy. They also relied on additional alleged infringements which occurred prior to enactment of the new Copyright Policy in February 2009, but which had not been listed in the Complaint or First Amended Complaint.

-2-

Defendants argued in part in their motion for summary judgment that with respect to Plaintiffs' claim for injunctive relief, only alleged infringements occurring since the 2009 policy was enacted should be considered. Defendants claimed that the 2009 policy had substantially reduced unlicensed electronic copying of copyrighted excerpts at Georgia State. Plaintiffs in turn argued that there have been "massive" infringements since the new policy was enacted.

On August 11 and 12, 2010, the Court issued orders that directed Plaintiffs to produce a comprehensive list of all claimed infringements of their copyrights that had occurred at Georgia State during the three full semesters post-dating enactment of the new Copyright Policy: the 2009 Maymester (a three-week term), the 2009 summer semester and the 2009 fall semester. Also, Plaintiffs were required to provide certain information concerning the infringement claims.[1] Plaintiffs' list was filed on August 20, 2010, showing 126 claimed infringements plus the required information. On August 30, 2010 Defendants filed certain objections.

In a ruling on September 30, 2010, the Court denied Plaintiffs' motion for summary judgment [Doc. 142], which sought judgment on all claims in Plaintiffs' First Amended Complaint. Defendants' motion for summary judgment [Doc. 160] seeking judgment on all claims was

---

[1] The information included the title and a description of each copyrighted work which was allegedly infringed, the name of the owner of the copyright, the number of pages and chapters in the work, the number of pages and chapters copied, the retail price of the book, the cost per student of obtaining licensed copies of each excerpt, the course title, and the instructor's name [Doc. 226], as well as the cost of licensing each of the excerpts at issue [Doc. 227]. Defendants were granted leave to file any objections to the information provided by Plaintiffs [Doc. 226].

granted in part and denied in part. Defendants were granted summary judgment as to Plaintiffs' claim of direct infringement (Count I)[2] and Plaintiffs' claim of vicarious infringement (Count III); Defendants' motion was denied as to Plaintiffs' claim of contributory infringement (Count II) [Doc. 235].

In the summary judgment order, the Court agreed with Defendants that only the infringement claims post-dating the commencement of the 2009 Policy were relevant to Plaintiffs' claims for injunctive and declaratory relief. The Court interpreted Plaintiffs' First Amended Complaint as including a claim that the 2009 policy had led to continuing abuse of the fair use privilege. Because the parties had not had an opportunity to conduct discovery as to these alleged infringements, the Court declined to determine the validity of these claims. Noting that all Defendants were entitled to claim protection under the doctrines of sovereign immunity and Eleventh Amendment immunity, subject to the exception possibly offered by the Ex Parte Young doctrine[3], the Court ruled:

> Plaintiffs must show that the 2009 Copyright Policy resulted in ongoing and continuing misuse of the fair use defense. To do so, Plaintiffs must put forth evidence of a sufficient number of instances of infringement of Plaintiffs' copyrights to show such ongoing and continuous misuse. Defendants will have the burden of showing that each specified instance of 2009 Copyright Policy infringement was a fair use.

---

[2]In an order entered on December 28, 2010 on Plaintiffs' motion for reconsideration, the Court ruled that Count I could proceed, subject to proof on the element of respondeat superior, but noted that Count I was not a "direct" infringement claim against the name Defendants [Doc. 249].

[3]Ex Parte Young, 209 U.S. 123 (1908).

[Doc. 235 at 30 (footnote omitted)]. The parties were directed to confer and to file a proposed scheduling order for additional discovery, which they did on October 20, 2010.

On November 4, 2010, Defendants filed a motion to dismiss Plaintiffs' First Amended Complaint, arguing that the Court lacked jurisdiction to proceed. Defendants' argument was that because none of the named Defendants had copied or caused the electronic copying of the excerpts (they argued this was done by the individual professors who evaluated whether use of each excerpt constituted fair use, based on the fair use checklists they filled out and by others who assisted, e.g. by scanning excerpts into the electronic system), the named Defendants were not responsible for the claimed violations and therefore could not be sued, even for injunctive relief, under the Ex Parte Young exception to sovereign immunity/Eleventh Amendment immunity. Plaintiffs countered that all Defendants have supervisory authority of varying types over the professors and have the power to issue instructions to cease copyright violations.[4]

On March 15, 2011, the parties filed a joint document detailing alleged infringements in the 2009 Maymester, the summer 2009 semester and the fall 2009 semester [Doc. 266]. Ninety nine alleged infringements were listed. This joint filing included Plaintiffs' specification of the name of the copyrighted work, the infringements, and Defendants' objections of various types to each claim of infringement. For example, in some instances Defendants claimed that there was no copyright registration. Defendants also claimed that

---

[4]On March 17, 2011, the Court denied Defendants' motion to dismiss without prejudice to further consideration of the Ex Parte Young issue at trial [Doc. 267].

-5-

all 99 uses were protected by the doctrine of fair use.  Defendants consistently objected to the fact that Plaintiffs' percentage calculations of the ratio between the number of pages in the excerpts and the number of pages in the books were based on only the text portions of the copyrighted books, not including such parts as tables of contents, introductions, and prefaces.  Defendants instead contended that all pages of the copyrighted work should be used when calculating such percentages.  Thus, in all instances Defendants' calculations of what percentage of the copyrighted work had been excerpted and placed in the electronic reserves system were lower than Plaintiffs'.  For the 99 excerpts identified in this filing, the excerpted portions on average represented 9.6% of the pages in the copyrighted books (Defendants' calculations).  The majority of the excerpts were one chapter of a multichapter book.  On average these books contained eighteen chapters.  The joint March 15 filing was admitted into evidence at trial as Joint Exhibit 5.

The trial began on May 17, 2011.  During Plaintiffs' case in chief, representatives of each of the three Plaintiffs testified: Frank Smith, Director of Digital Publishing Global for Cambridge; Carol Richman, Director of Licensing for Sage; and Niko Pfund, Acting President of Oxford.  Mr. Smith, Ms. Richman, and Mr. Pfund testified about the type of works their publishing houses typically publish, the publishing houses' involvement with the Association of American

Publishers[5] ("AAP") and Copyright Clearance Center[6] ("CCC"), as well as permissions revenues each receives annually from CCC. Ms. Richman also testified about Sage's in-house permissions program. Tracey Armstrong, President and CEO of CCC, testified concerning CCC's burgeoning permissions business, including how CCC licenses permissions to users. Plaintiffs called Marjorie Dimsdale, administrator of Georgia State's electronic reserves system; Paula Christopher, project manager for Georgia State's electronic uLearn system; and James Palmour, an information systems specialist at Georgia State. Plaintiffs then called six Georgia State professors to testify: Jodi Kaufmann, Jennifer Esposito, YouJin Kim, Nathaniel Orr, Marni Davis, and Patricia Dixon (by deposition). These professors testified concerning their use (or non-use) of fair use checklists, their understanding (or lack thereof) of the checklists, the training (from Plaintiffs' viewpoint, the lack of adequate training) they had received regarding use of the checklists, and how and why these professors had decided to utilize the excerpts of Plaintiffs' copyrighted works which Plaintiffs deem too extensive. Over half of them testified that they had not attended the training sessions Georgia State had held for professors concerning implementation of the 2009 Copyright Policy. Finally, Plaintiffs

---

[5]The AAP is a professional association that represents publishers' interests [Tr. Vol. 3 at 126]. Each of the Plaintiffs pay membership dues to the AAP [Tr. Vol. 2 at 43, 57; Vol. 3 at 125].

[6]CCC is a not-for-profit organization that licenses the copying of excerpts from copyrighted works to various users on behalf of publishers who make their works available through CCC. All three Plaintiffs use CCC as a licensing agent. CCC is discussed in more detail in Part III.A. _infra_.

called Georgia State's President, Mark Becker (by deposition). He
testified about the structure of the university and his supervisory
capacities at Georgia State, including his responsibility for the
library, as well as enforcement and compliance with the laws [Doc.
387]. Plaintiffs' case in chief closed on May 26, 2011.

At the close of Plaintiffs' case, the Court granted Defendants'
motion for judgment on Count II (contributory infringement), leaving
only the claim under Count I that the 2009 Copyright Policy caused
copyright infringement.

On June 1, 2011, Plaintiffs voluntarily and unilaterally filed
with the Clerk of Court a revised list of 75 claimed infringements
[Doc. 361]. This list dropped 25 of the claimed infringements from
the March 15 joint list and added one new claim.[7] This list also
offered certain information concerning the 75 claimed infringements.[8]
The remaining 75 claimed infringements are those which were addressed
during the trial.

Defendants began their presentation of evidence with additional
deposition testimony of President Mark Becker. Next Defendants

---

[7]The new claim was based on Professor Kaufmann's use of pages
733-768 of *The Sage Handbook of Qualitative Research (Second Edition)*
in fall 2009. Defendants are correct that this new claim was
untimely. However, it addresses the same material Plaintiffs had
alleged (incorrectly) that Professor Kaufmann had used in another
semester. Both sides had a fair opportunity to address it at trial.
The Court will consider it.

[8]Some of the information on the revised list has not been agreed
to by Defendants. Document 361, which contains the revised list of
alleged infringements, is not in evidence and is not an appropriate
evidentiary source. Neither will the Court consider as evidence
Defendants' response [Doc. 384], which was filed with the Clerk of
Court near the end of the trial. The trial evidence alone will be
the source of the Court's findings of fact.

-8-

called as witnesses eleven Georgia State professors:  Charles Hankla, Janet Gabler-Hover, Melinda Hartwig, Patricia Dixon, Denis Gainty (by deposition),  Margaret  Moloney,  Anne  Kruger,  John  Murphy,  John Duffield,  Jennifer  McCoy  (by  deposition),  and  Daphne  Greenberg  (by deposition).  The  professors  testified  concerning  their determinations that use of the copyrighted excerpts they selected was allowable under the fair use doctrine, as well as the steps they took to make such fair use determinations.  They testified to why they selected particular excerpts for the course curriculum.  Most of them did not attend the training sessions concerning the 2009 Copyright Policy.  Defendants called Laura Burtle, Georgia State's Associate Dean for special collections and individual library services, whose testimony concerned the library's process of uploading excerpts to the library's ERES system and the library's practice of flagging excerpts that appear "out of the norm."  Deborah Mariniello, an employee of CCC, testified by deposition[9] regarding CCC's licensing services.  Defendants called Nancy Seamans, Georgia State's Dean of Libraries, who testified about development of the 2009 Copyright Policy as well as the library staff's implementation of the new policy.  Next, Defendants called Kenneth D. Crews, who testified about how Georgia State's 2009 Copyright Policy compares to the copyright policies of other colleges and universities.  Finally, William Potter, University Library and Associate Provost and chair of the Select Committee, testified regarding development of the 2009 Copyright Policy.

---

[9]This deposition was taken on June 30, 2009.

-9-

## II. **Eleventh Amendment Immunity and the *Ex Parte Young* Doctrine**

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. The Eleventh Amendment prohibits suits against a state or state actors by that state's citizens as well as by citizens of another state. Hans v. Louisiana, 134 U.S. 1, 10 (1890). Here, because Defendants are state officials sued in their official capacities, they are state actors protected by the Eleventh Amendment and therefore have immunity from suit. See Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1301 (11th Cir. 2007) (holding that the University System of Georgia and the Board of Regents are state entities for Eleventh Amendment purposes). However, Plaintiffs seek an injunction under the doctrine of Ex Parte Young, a narrow exception to Eleventh Amendment immunity.

In Ex Parte Young, the United States Supreme Court held that when a state actor seeks to enforce an act which violates federal constitutional guarantees, the Eleventh Amendment does not bar suit seeking an injunction for prospective relief from a continuing violation. Ex Parte Young, 209 U.S. 123, 159-60 (1908). The Supreme Court reasoned:

> [T]he use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional.

-10-

Id. at 159. Over the past century, the Ex Parte Young doctrine has been interpreted by the Supreme Court and lower courts many times. The Supreme Court has held that Ex Parte Young applies in suits against state officials who violate federal *laws*, not just federal constitutional guarantees. Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002).

Defendants argue that the case should be dismissed because Plaintiffs' claims are barred by the Eleventh Amendment and the Ex Parte Young doctrine does not apply. Citing Pennington Seed, Inc. v. Produce Exchange No. 299, 457 F.3d 1334 (Fed. Cir. 2006) as persuasive authority, Defendants assert that the Ex Parte Young exception to Eleventh Amendment immunity does not apply to them because Defendants themselves are not violating federal law but instead only oversee Georgia State's policies and personnel. Defendants argue that this is an insufficient connection between Defendants and any violations of the Copyright Act for Ex Parte Young to apply here.

In Pennington Seed, patent holders filed an original complaint against the University of Arkansas (a public state university), and a first amended complaint against the chairman of the board for the Arkansas university system, the president of the Arkansas university system, the chancellor of the University of Arkansas, and a University of Arkansas professor; the patent holders alleged infringement and conversion of their U.S. patent. Id. at 1337. Specifically, they alleged that the defendants were "actively growing, marketing, offering for sale, promoting and selling a product containing [the patentees'] patented product." Id. at 1338. The United States District Court for the Western District of Missouri

-11-

dismissed the original complaint because the Eleventh Amendment
barred the action against the University of Arkansas. Id. The
District Court then dismissed the first amended complaint against the
chairman of the board, the president, and the chancellor (which had
been alleged on the basis of the Ex Parte Young doctrine) based on
Eleventh Amendment immunity because the first amended complaint
"failed to allege a causal connection between those officials and the
enforcement or threatened enforcement of an act."[10] Id.

On appeal to the Federal Circuit, the patent holders argued that
the District Court improperly dismissed the claims against the
chairman of the board, the president, and the chancellor because Ex
Parte Young applied as an exception to Eleventh Amendment immunity.
Id. at 1341.[11] However, the Federal Circuit held that the claims
against the chairman of the board, the president, and the chancellor
were properly dismissed. Id. at 1343. The Federal Circuit reasoned
that Ex Parte Young does not apply in an action "against any random
state official . . . there must be a connection between the state
officer and the enforcement of the act." Id. at 1342. The Federal
Circuit stated, "A nexus between the violation of federal law and the
individual accused of violating that law requires more than simply a
broad general obligation to prevent a violation." Id. Ultimately,
the Federal Circuit held:

---

[10]The District Court dismissed the first amended complaint
against the University of Arkansas professor for failure "to
establish personal jurisdiction by minimum contacts with the state of
Missouri." Pennington Seed, 457 F.3d at 1338.

[11]The patent holders appealed the dismissal of the claims against
the University of Arkansas and the University of Arkansas professor
on other grounds.

> Allegations that a state official directs a University's patent policy are insufficient to causally connect that state official to a violation of federal patent law—i.e., patent infringement. A nexus between the violation of federal law and the individual accused of violating that law requires more than simply a broad general obligation to prevent a violation; it requires an actual violation of federal law by that individual. <u>See Frew</u> [<u>ex rel. Frew v. Hawkins</u>, 540 U.S. 431, 437 (2004)] (holding that the <u>Ex Parte Young</u> doctrine applies when state officials <u>act</u> in violation of state law); <u>see also Shell Oil Co.</u> [<u>v. Noel</u>, 608 F.2d 208, 211 (1st Cir. 1979)] (holding that a general obligation to enforce state laws is not a sufficient nexus). The fact that a University Official has a general, state-law obligation to oversee a University's patent policy does not give rise to a violation of federal patent law.

<u>Id.</u> at 1342-43. The Federal Circuit affirmed the dismissal of plaintiffs' claims against the chairman of the board, the president, and the chancellor. <u>Id.</u> at 1343.

In reaching this conclusion, the Federal Circuit reasoned that the patent holders were asking the federal courts to enjoin the chairman of the board, the president, and the chancellor from neglecting their job duties established by state law; and according to <u>Pennhurst State School & Hospital v. Halderman</u>, 465 U.S. 89 (1984), "a federal court cannot enjoin a state official to perform his or her duty under <u>state</u> law" (emphasis in original). <u>Pennington Seed</u>, 457 F.3d at 1343.

In <u>Pennhurst School</u>, a resident of a Pennsylvania institution for the care of the mentally retarded ("Pennhurst School") brought suit against Pennhurst School on behalf of himself and a class consisting of all persons who were or might become residents of Pennhurst School. <u>Pennhurst School</u>, 465 U.S. at 92. Various state and county officials who allegedly had violated his federal constitutional and statutory rights as well as his rights under the Pennsylvania Mental Health and Mental Retardation Act of 1966 ("MH/MR

-13-

Act") were also named as defendants.  Id.  The resident sought both damages and injunctive relief.[12]  Id.  The trial court found that the inadequate conditions at Pennhurst School violated each resident's right to "minimally adequate habilitation" under the Pennsylvania MH/MR Act and awarded injunctive relief against the state officials who had oversight responsibility for Pennhurst School.  Id. at 92-93. The United States Court of Appeals for the Third Circuit affirmed and held that the MH/MR Act required the state to adopt the "least restrictive environment" approach for the care of the mentally retarded.  Id. at 95.  The Court of Appeals relied on Ex Parte Young to refute the state's argument that injunctive relief under the Pennsylvania MH/MR Act was barred by the Eleventh Amendment; the Court of Appeals noted that "the [Eleventh] Amendment did not bar a federal court from granting prospective injunctive relief against state officials on the basis of federal claims," and concluded "that the same result obtained with respect to a pendent state-law claim." Id. at 96.

The Supreme Court reversed and remanded.  Id. at 125.  The Supreme Court stated that none of the past Eleventh Amendment cases "can be said to hold that injunctive relief could be ordered against State officials for failing to carry out their duties under State statutes."  Id. at 109.  The Supreme Court determined that when a plaintiff alleges that a state official has violated state law, the entire basis for the Ex Parte Young doctrine disappears.  Id. at 106. The Supreme Court held that the Eleventh Amendment barred the federal

---

[12]The trial court determined that the individual defendants had acted in good faith and therefore were immune from the damages claims.  Pennhurst School, 465 U.S. at 93 n.1.

courts from determining how the individual defendants should carry out their duties under the Pennsylvania MH/MR (a state law). <u>Id.</u> The majority opinion explained: "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." <u>Id.</u> at 106.

Plaintiffs here argue that the <u>Ex Parte Young</u> exception to Eleventh Amendment immunity does apply because Defendants are state actors, acting in their official capacities, who are violating federal copyright law. Citing <u>Luckey v. Harris</u>, 860 F.2d 1012 (11th Cir. 1988) as binding authority, Plaintiffs argue that the <u>Ex Parte Young</u> doctrine applies here because the Defendants have the right and ability to stop any alleged copyright violations. Plaintiffs assert that under <u>Luckey</u>, it is sufficient that the Defendants have "some connection" with the alleged copyright violations for <u>Ex Parte Young</u> to apply, and that each of the named Defendants has a connection to the alleged copyright violations at Georgia State.

In <u>Luckey</u>, plaintiff Horrace Luckey brought suit on behalf of a class consisting of "all indigent persons presently charged or who will be charged in the future with criminal offenses in the courts of Georgia and all attorneys who represent or will represent indigent defendants," against the Governor of Georgia, the Chief Judge of the Douglas Judicial Circuit, the Chief Judge of the Clayton Judicial Circuit, and all Georgia judges responsible for providing assistance of counsel to indigents criminally accused in the Georgia courts. <u>Luckey</u>, 860 F.2d at 1013. The case was brought under 42 U.S.C. § 1983, alleging that systemic deficiencies in the Georgia indigent criminal defense system denied indigent defendants their Sixth

-15-

Amendment right to counsel, their due process rights under the Fourteenth Amendment, their right to bail under the Eighth and Fourteenth Amendments, and equal protection of the laws guaranteed by the Fourteenth Amendment.  Id.

The trial court granted defendants' motion to dismiss, holding that the claims were barred under the Eleventh Amendment because Ex Parte Young did not apply, and that the suit failed to state a claim for which relief could be granted.  Id.  On appeal, the United States Court of Appeals for the Eleventh Circuit reversed on both grounds and remanded.  Id.

The Court of Appeals concluded that because plaintiffs sought an order to compel defendants to provide indigent defense services that meet minimum constitutional standards, the relief sought fell within the Ex Parte Young exception to the Eleventh Amendment.  Id. at 1015. The Court of Appeals stated, "[w]hile the state ultimately may finance compliance with such an order, this fact is not determinative" of whether Ex Parte Young applies.  Id.  Next the Court addressed defendants' argument that they did not take any actions personally that violated the Constitution.  Id.  The Court of Appeals held:

> Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity.  All that is required is that the official be responsible for the challenged action.  As the Young court held, it is sufficient that the state officer sued must, "by virtue of his office, ha[ve] some connection" with the unconstitutional act or conduct complained of.

Id. at 1015-16 (internal quotation marks and citation omitted).

Thus, the Court of Appeals found that because the governor was responsible for law enforcement in Georgia and had the residual power

-16-

to commence criminal prosecutions, and because the judges were responsible for administering the system of representation for criminally accused indigent defendants, defendants were "appropriate parties against whom prospective relief could be ordered" and Ex Parte Young applied. Id. at 1016.[13]

While the fact pattern of Pennington Seed is similar in certain respects to the case here (there, state officials were sued for alleged patent infringements in which they were not personally involved; here, state officials were sued for copyright infringements when they did not personally participate in individual fair use decisions or make any copies), it is not quite the same. In the instant case some of the Defendants were responsible for the creation and implementation of the 2009 Copyright Policy, which applies to University System of Georgia schools, including Georgia State [Doc. 278-3 at 11]. The Court infers and finds that the 2009 Copyright Policy had at least the tacit approval of the Board of Regents. The violations which are alleged here may have occurred as a result of application of that policy. In addition, the Supreme Court has held that: "In determining whether the doctrine of Ex Parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (citation omitted). Further,

---

[13]While Pennhurst School does limit the Ex Parte Young doctrine, it does not compel a conclusion that Ex Parte Young is unavailable to Plaintiffs here. Plaintiffs seek relief only under the federal Copyright Act and not under any state law.

the Eleventh Circuit <u>Luckey</u> opinion is binding on this Court. While <u>Luckey</u> is a civil rights case, brought under 42 U.S.C. § 1983, its holding as to the permissible breadth of the <u>Ex Parte Young</u> doctrine has precedential effect in a suit involving claimed infringement of the federal Copyright Act. Finally, the Court notes that in <u>Virginia Office for Protection & Advocacy v. Stewart</u>, 131 S. Ct. 1632 (Apr. 19, 2011) the Supreme Court extended <u>Ex Parte Young</u> to cover a state agency's suit against a state official who violated federal law by refusing the agency access to records which federal law mandated be turned over. The case's holding signals the Supreme Court's continuing commitment to protecting federally guaranteed rights under the <u>Ex Parte Young</u> doctrine.

This Court does have subject matter jurisdiction in this case by virtue of the fact that it is brought under the Copyright Act, 17 U.S.C. § 101 <u>et seq.</u>, a federal law. <u>Ex Parte Young</u> does not create a cause of action; it enables a form of relief (in this case, equitable and declaratory relief under the Copyright Act) which otherwise would be barred by the Eleventh Amendment or sovereign immunity. The Court holds that the <u>Ex Parte Young</u> doctrine applies in this case, such that the Court could issue injunctive relief without offending Eleventh Amendment or sovereign immunity.

## III. **Copyright Infringement and the Fair Use Defense**

The next step is to examine how Georgia State's 2009 Copyright Policy operated in relation to the requirements of copyright law

-18-

during the three 2009 academic terms.[14]  This is a challenging process on at least two levels.  By far the most fundamental difficulty is the very fluid framework for resolving fair use issues which is established by copyright law.  To determine when a particular use is a "fair use," four statutory factors must be considered.  These factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.  This does not exclude consideration of other factors.  Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 588 (1985).  It is hornbook law that there is no across the board rule for what weight should be given to each factor or how the factors should be applied.  Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577-78 (1994); Harper & Row, 471 U.S. at 588.  This determination is made after a fact-intensive, value-laden review in each case of claimed infringement.  In Campbell, the Supreme Court's last fair use decision, the Court reaffirmed that fair use does not rest on "bright-line rules" and must be done on a case-by-case basis.  Campbell, 510 U.S. at 577 (quoting Harper & Row, 471 U.S. at 560).  The Supreme Court then added, "Nor may the four statutory factors be treated in isolation, one from another.  All are

---

[14]The United States Constitution gives Congress the power to protect the works of authors and inventors.  Article I, Section 8 states, "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. CONST. art. 1, § 8, cl. 8.

-19-

to be explored, and the results weighed together, in light of the purposes of copyright."  Id. at 578.

Another difficulty is that there is no precedent on all fours for how the factors should be applied where excerpts of copyrighted works are copied by a nonprofit college or university for a nonprofit educational purpose.  Thus, assuming that there is some efficacy in having a "fair use checklist" that professors must fill out before using a copyrighted excerpt, what should be in it may be open to debate.  The Court believes that the best way to proceed is first to decide how the four fair use factors should be applied in a case such as this one (unpaid copying of excerpts of copyrighted material by a nonprofit college or university for nonprofit educational use in graduate or upper level college courses).  Also, the Court will consider whether any other factor or consideration should be taken into account.  This will be based on the facts of record in the instant case.  Once this decision is made, each of the 75 claimed infringements will be addressed individually.  The Court will then compare the outcome of this process to the outcomes that were achieved under the checklists prescribed under the 2009 Copyright Policy.

### A.  **Findings of Fact**

The Court makes the following findings of fact:

#### Plaintiffs/Plaintiffs' Works Involved in this Case

Plaintiffs Cambridge University Press ("Cambridge"), Oxford University Press, Inc. ("Oxford"), and Sage Publications, Inc. ("Sage") are publishing houses that publish academic works

-20-

[Stipulated Facts, Doc. 278-3 at 2].  Cambridge is the not-for-profit publishing house of the University of Cambridge in England [_Id._]. Its United States headquarters, which operates its Americas Branch, is in New York City [_Id._].   Oxford is a not-for-profit U.S. corporation headquartered in New York City.   Oxford has an affiliation with Oxford University in Oxford, England [_Id._].  Sage is a for-profit Delaware corporation with its headquarters in Thousand Oaks, California, and offices in Los Angeles, London, New Delhi, Singapore, and Washington, D.C. [_Id._].  It is privately owned by a family.  Although Sage is a for-profit company, it makes substantial charitable contributions to an educational institution, as do both Cambridge and Oxford [Frank Smith, Tr. Vol. 1 at 55; Carol Richman, Tr. Vol. 2 at 60].

Plaintiffs collectively represent a tiny part of the higher education publishing market in the United States.  This market is dominated by large publishing houses that have 70-80% of the market. These large publishing houses--not Plaintiffs--publish the large, heavy textbooks which are typically used in entry level college courses.   Plaintiffs Cambridge and Oxford are highly regarded university presses that publish scholarly books and journals, often in niche subject areas.  Sage is a publishing company primarily dedicated to publishing social science books [Carol Richman, Tr. Vol. 2 at 58].  It has been instrumental in the development of the field of qualitative research [_Id._ at 61].  The record does not reflect whether Plaintiffs' publications or practices are representative of those of other firms that publish academic books.

All three Plaintiffs market their books to professors who teach courses in colleges and universities.  Cambridge and Oxford often

send them complimentary copies; Sage will provide a trial copy on request. Plaintiffs hope that professors will read their books and use them in their work. They also hope that professors will assign the books as required reading for the course, so the students will purchase the books. Professors build and maintain personal book collections and use them as a resource for teaching. This would include Plaintiffs' books. Of relevance to this case, some professors assign or suggest reading of excerpts from some of Plaintiffs' books as part of course curricula.[15]

Cambridge and Oxford both publish research-based monographs which they consider the heart of their offerings. These are small, single author books[16] which give in-depth analysis of a narrow topic. These books lend themselves well to use in upper level undergraduate and graduate courses, but many are of general interest in the academic community. Cambridge's and Oxford's books which are

---

[15]Neither side sought to establish, through evidence at trial, the target market for the particular books that are involved in this case. The books themselves are the primary evidence, from which some inferences can be drawn. The target market for virtually all of Sage's books involved in this case is educators who teach upper level undergraduate and graduate students in colleges and universities and, derivatively, their students. Many of Cambridge's and Oxford's books are probably marketed not only to professors who teach courses in colleges and universities (and derivatively their students) but to the broader academic community, and in some cases, beyond the academic community. Some of the books are marketed through Amazon and Google, as well as (presumably) through general readership bookstores.

[16]The term "single author book" is used in this Order to connote a book in which all chapters or parts of the book are written by a single author, as opposed to an "edited book" in which each chapter is written by a different author under the supervision of an external editor; i.e., an editor under contract with the publisher. Some "single author" books may have two or more joint authors. The terms "single author book" and "edited book" are used for simplicity.

-22-

involved in this case are of various types.  They include research-based monographs, instructional books, trade books (general readership books) and other works on academic topics.

Sage publishes, through its Higher Education Division, books which are primarily of interest to educators who teach upper level college or graduate courses for aspiring educators or teachers who are seeking a graduate degree.  Almost all of Sage's books which are at issue in this case fall into that category; almost all of them pertain to the field of qualitative research.[17]

Cambridge, Oxford and Sage all publish edited books prepared by an external editor under contract with the publisher.[18]  These external editors--professors who are experts in their field--determine the scope of the work, select the chapter topics, select the contributing authors, and oversee, collect, review and edit the individual contributions (all subject to the publisher's approval).[19]

With respect to Cambridge's, Oxford's and Sage's books, authors of single author books and external editors receive royalties from book sales which are anywhere from two percent to fifteen percent.

---

[17]Qualitative research concerns the study of approaches to and methods for research in the social sciences and humanities.  The books on qualitative research involved in this case present those approaches and methods which, in the author's opinion, are best in light of contemporary thinking.  Based on the books in evidence, it appears that qualitative research is a highly theoretical field.

[18]Sixteen of Sage's eighteen books which are at issue in this case are edited books in which individual chapters are contributed by various authors, who are professors with expertise in the relevant field.  Ten of Cambridge's 25 books and five of Oxford's 21 books are edited books.

[19]Plaintiffs also conduct an intensive in-house review.  The books are also peer-reviewed.

Contributing authors do not receive royalties. They may receive a small honorarium and a few free books.

### The Copyright Clearance Center ("CCC")/Availability of Plaintiffs' Works Through CCC

CCC is a not-for-profit corporation headquartered in Danvers, Massachusetts [Tr. Vol. 11 at 164]. It licenses the copying of excerpts from copyrighted works to corporate, academic and other users for a fee, acting on behalf of publishers who opt to make their works available through CCC [Tr. Vol. 4 at 6-7]. The fee charged is calculated based on the number of pages the user seeks to copy. The licenses are called "permissions." CCC is the only reproduction rights organization in the United States [Tr. Vol. 11 at 163] and is the world's largest licensing organization for text licensing [Tr. Vol. 11 at 163-164]. It has no real competitors in that arena. CCC opened for business on January 1, 1978, the same day the Copyright Act of 1976, which codified the fair use defense, took effect [Tr. Vol. 4 at 6]. Its gross revenues in FY 2010 (the twelve month period ending June 30, 2010) were $215,000,000. All three Plaintiffs have used and currently use CCC as a licensing agent, though permissions are not available for licensed copying of excerpts from all of Plaintiffs' books. CCC is a well-known source of licensed excerpts of copyrighted materials. Georgia State's 2009 Copyright Policy states that CCC is an available source for such excerpts.

CCC also coordinates and supports litigation efforts by publishers against perceived infringers. In this case, CCC and its counsel did the initial fact gathering concerning unlicensed copying of excerpts in the higher education community. Based on the

testimony of Frank Smith, Niko Pfund, Carol Richman and Tracey Armstrong (that the Plaintiff-publishers agreed to "join" the litigation), the Court infers that CCC and AAP organized the litigation and recruited the three plaintiffs to participate. AAP and CCC are each paying one-half of Plaintiffs' litigation expenses including attorneys' fees in this case.

CCC offers numerous types of permissions services to various categories of users, including corporate, educational, and institutional users. Three of these services were addressed by the evidence in this case. One is the Academic Permissions Service ("APS"), which licenses educational users to make print copies on a per-use basis. APS began in 1991. CCC also offers an electronic course content service ("ECCS") through which college and university libraries may obtain licenses to make digital copies on a per-use basis. This program is directed at electronic reserves systems such as Georgia State's ERES system. ECCS began in 1997. Only a small percentage (twelve percent) of the works that were available through APS were available through ECCS in 2008. There is no specific evidence as to what that percentage was in 2009. The third CCC service discussed at trial, the Academic Repertory License Service, began in 2007.

Overall, CCC is able to license excerpts from 60% of Cambridge's works. Of relevance in this case, Cambridge has chosen not to license, through CCC or otherwise, excerpts from its reference works and some of its books on language including teaching English as a second language [Frank Smith, Tr. Vol. 1 at 70].

Mr. Smith was not asked during his examination to identify the Cambridge books which were available for licensed copying in 2009.

-25-

Oxford's Acting President, Niko Pfund, gave a rough estimate that CCC currently (in 2011) licenses the copying of excerpts from over 90% of Oxford's titles [Niko Pfund, Tr. Vol. 3 at 70]. He did not state what the percentage was in 2009.

Mr. Pfund testified concerning what licenses for various excerpts of Oxford's works would have cost, had permissions been paid. During this examination he was directed to Joint Exhibit 5 which was up on a screen in the courtroom. Plaintiffs' counsel pointed to the portion of the exhibit which showed what a particular excerpt of each book in question would have cost [See Tr. Vol. 3 at 94-109]. Initially the questions were phrased as, for example, "can you confirm that if this excerpt had been permissioned it would have cost X dollars?" [See, e.g., Tr. Vol. 3 at 95, 96, 99 lines 20-22]. The witness looked at the screen and answered yes. Subsequently the form of the questions shifted to this format:

> Q. And back up to the screen, I would ask you again to confirm please that as of the date of this use the suggested retail price, list price for this work was 65 dollars?
>
> A. Yes.
>
> Q. And that it was available or would have been available for permissioning per student for this length of excerpt at a cost of $1.68?
>
> A. Yes.

[Tr. Vol. 3 at 100, 101].

> Q. And back up to the Joint Exhibit please at C-16, ask you to confirm that the suggested retail list price for that work as of the fall of 2009 was $19.59?
>
> A. Correct.

-26-

> Q. And that the excerpt used was available per student for licensing at a cost of $3.12?
>
> A. Yes.

[Tr. Vol. 3 at 103].

These questions did not establish that any of the works were available for permissions. After hearing and observing Pfund's testimony, the Court finds that he probably did not think he was being asked whether the books were available for permissions, as opposed to being asked to publish what was shown on Joint Exhibit 5. It is not clear that this was counsel's intention either. The Court is also unconvinced that Pfund knew whether licensed excerpts of these particular books were available. In any event, Pfund's testimony itself did not establish that these books were available for licensed excerpts. Joint Exhibit 5 does not establish that either, as it does not state whether the works actually were available through CCC. It only states what the excerpt would have cost, based on standard per-page rates charged by CCC for Oxford excerpts. There is documentary evidence showing that some but by no means all of these works were available for permissions in 2009.[20]

CCC currently (2011) handles permissions for all of Sage's works [Carol Richman, Tr. Vol. 2 at 90]. There is no testimony concerning whether this was the case in 2009. However, documentary evidence shows that many though not all of Sage's works at issue in this case generated permissions revenue from CCC during the period from July 1, 2004 to December 1, 2010. Also, Sage has its own in-house

---

[20]A chart attached to this Order shows the APS and ECCS revenue that each work has earned through CCC and through Sage's in-house permissions program.

-27-

permissions and licensing program which markets chapter excerpts in digital form, as discussed below. Thus, it is inferred that licensed excerpts from all of Sage's works were readily available in digital format in 2009.

Users typically access APS and ECCS by going online to CCC's website. They type in the name of the book and page numbers for the excerpt they seek to copy. The system advises whether licenses are available for print and also for digital reproductions. If the publisher has preauthorized release of excerpts from the book, and payment is available through a credit card or existing account, the order is approved instantly and the license is issued within a few hours. If there is no preauthorization, CCC seeks authorization from the publisher. In 2009 it took up to two weeks to obtain permission for these orders. CCC is able to approve 85-90% of all APS requests and about 70% of all ECCS orders [Stipulated Facts, Doc. 278-3 at No. 29].

Each Plaintiff called an executive or management level representative to testify; none of them were asked by either side to identify the books which were preauthorized for release in 2009 or currently. CCC's representatives did not offer this testimony either. Presumably, this information is readily available in CCC's computer system.

Finally, CCC offers an Academic Repertory License Service which affords subscribers access to excerpts from about nine million titles. This service began in 2007. In 2009 digital licenses for excerpts from a million and a half (seventeen percent) of these works were available. The percentage which is currently available is unstated. The lesser availability of digital excerpts is

-28-

attributable to the following: (1) some publishers are concerned that they may not have the right to authorize distribution in digital as opposed to print format; (2) some publishers are reluctant to place digital copies of their works in the stream of commerce; and (3) sometimes publishers, for whatever reason, simply prefer limiting sales to the whole book. Cambridge did not and does not participate in this program; Oxford participated in 2009 only with its journals, not with its books. Oxford currently participates in this program. Sage participates in this program currently and did so in 2009.

The Academic Repertory License Service offers a set group of titles approved by CCC; individual subscribers cannot vary this group. The cost varies for different schools, depending on a variety of factors including the number of students and the ratio of graduate students to the overall student body. Where subscribers wish to copy an excerpt from a work which is not included in the program, they may do so by submitting an order through the APS or ECCS programs at the usual rates. There is no discount for subscribers to the annual program. Georgia State did not and does not participate in the annual licensing program. CCC's estimate is that it would cost Georgia State $114,000 per year plus a 20% start up fee to subscribe to this program.

With respect to both APS and ECCS, publishers determine how much CCC will charge to license copying of their materials. This fee is for permission to copy only; the user must then make the desired number of photocopies or scan and place the electronic excerpt online. Thus, CCC does not provide any material to the user; it

simply charges for a license.[21]  The per-page charge is currently anywhere between 10 and 25 cents for academic users, as chosen by the publisher.  Sage currently stipulates 14 cents per page (unspecified whether APS, ECCS or both); Oxford 12 cents (unspecified whether APS, ECCS or both); and Cambridge 11 cents for APS and 15 cents for ECCS. In addition, CCC charges a $3.50 service charge ($3.00 in 2009) per order.  The permissions fees are split between each publishing house and CCC, with 85% going to the publishing house.  Publishers specify what percentage of book pages may be excerpted.  CCC's "default setting" is 25% or two chapters, whichever is greater.

CCC states that its licensing programs are "net of fair use." This means that the licensing fees do not take fair use into account. CCC does not furnish advice to users concerning whether a particular use is a fair use.

All three Plaintiffs have in-house permissions departments.  Of the permissions income which Oxford currently (2011) receives, about 90% comes from CCC.  Cambridge's estimate is 95%.  The record does not show which of Oxford's and Cambridge's works earned in-house permissions fees in or before 2009.  In-house permissions fees were earned by almost all of Sage's books which are involved in this case in or before 2009.  For some books Sage's in-house permissions fees aggregate to substantial amounts.  For in-house orders Sage charges twelve cents per page, two cents less per page than CCC.  Sage distributes digital copies to users as a PDF file attached to an email [Tr. Vol. 2 at 80].

---

[21]Presumably there is a written license agreement, although it is not in evidence.

All of the Plaintiffs sell books in e-book format. For example, Cambridge offers *Cambridge Companions Online*, a reference book product, and *Cambridge Histories Online*, to which institutions can subscribe. Several books in the *Companion* series, and *The Cambridge History of China*, *Volume 8*, *Part 2*, are at issue in this case.

Plaintiffs earn considerable annual rights and permissions income through CCC. CCC made rights and permissions payments to Cambridge, Oxford and Sage totaling $4,722,686.24 in FY 2009[22] and $5,165,445.10 in FY 2010 [Stipulation Nos. 33 and 34; Doc. 276; Pls. Exs. 3, 4, 199, 200, 346, 347]. The per-Plaintiff average in FY 2009 would be $1,574,228.74. However, these totals include payments which have no demonstrated relevance to this case due to lack of supporting evidence. These payments are: Foreign Authorization Service (FAS), Digital Repertory Amendment (DRA), Annual Authorization Service (AAS), Transactional Reporting Service (TRS), Non-Title FAS (NTS), Digital Permissions Service (DPS), Rightslink (RLNK), and Republication Licensing Service (RLS). They are incorrectly grouped with APS, ECCS, and AACL[23] revenue in the referenced exhibits. In each of the two years only a small portion of permissions were paid under the APS, ECCS, and AACL programs, as follows:

_____

[22]CCC's fiscal year. FY 2009 is the year ending June 30, 2009.

[23]AACL is identified as "Academic Annual Copyright License," which presumably is the same as the Academic Repertory License Service.

-31-

APS, ECCS, AND AACL PERMISSIONS PAID BY CCC TO PLAINTIFFS

Twelve Months Ending June 30, 2009
(Plaintiffs' Exhibits 3, 199, 346)

| Cambridge Americas Branch | | Oxford | | Sage | |
|---|---|---|---|---|---|
| APS | $322,823.55 | APS | $410,136.66 | APS | $267,098.93 |
| ECCS | $ 81,671.35 | ECCS | $ 70,485.81 | ECCS | $ 85,660.91 |
| | $404,494.90 | | $480,622.47 | | $352,759.84 |

Twelve Months Ending June 30, 2010
(Plaintiffs' Exhibits 4, 200, 347)

| Cambridge Americas Branch | | Oxford | | Sage | |
|---|---|---|---|---|---|
| APS | $313,008.39 | APS | $377,938.05 | APS | $273,040.81 |
| ECCS | $ 95,406.38 | ECCS | $ 96,940.75 | ECCS | $124,860.17 |
| | $408,414.77 | AACL | $ 11,592.54 | AACL | $ 55,995.83 |
| | | | $486,471.34 | | $453,896.81 |

APS income is dominated by payments for printed coursepacks [Frank Smith, Tr. Vol. 2 at 34]. It usually is paid by commercial copy shops; to that extent it will be unaffected by the outcome in this case, which is specific to educational uses by not-for-profit educational institutions.

Plaintiffs' aggregate net sales revenues for FY 2009 were $507,804,000.00 [Doc. 278-4, Stipulations 92-94]. Dividing the total by three, the average net sales revenue per Plaintiff was $169,268,000.00.[24] On average, each Plaintiff earned $412,625.73 from permissions through APS and ECCS in FY 2009. Dividing the average per-Plaintiff combined APS and ECCS permissions by the average net revenue earned by each Plaintiff determines that, on average, APS and

---

[24]The fiscal years for the three Plaintiffs vary; none correspond exactly to CCC's fiscal year. Also, the record contains only revenue (not net revenue) figures for Cambridge. Therefore, the percentage calculations are imprecise.

-32-

ECCS permissions represent .0024 (one-quarter of one percent) of net revenue in FY 2009 for each of the Plaintiffs. If the calculation is limited to ECCS income (an average of $79,272 per Plaintiff), the percentage would be .00046 (five one-hundredths of one percent) of average net revenues. Even if all of the types of permissions payments reflected in Plaintiffs' referenced exhibits are included, this income would represent an average of .0093 (nine-tenths of one percent) of net revenues per Plaintiff for FY 2009.

When permissions are paid by CCC to Plaintiffs, Plaintiffs in turn remit a small percentage as royalties to authors (but not contributing authors) and external editors, as set by their contracts, reducing the percentage of CCC revenue retained by each Plaintiff-publisher.

Plaintiffs offered no trial testimony or evidence showing that they lost any book sales in or after 2009 on account of any actions by anyone at Georgia State. The Court finds that no book sales were lost. Plaintiffs did lose a small amount of ECCS or other digital permissions revenue from users at Georgia State in 2009, as detailed below in the discussion of individual infringement claims.

If students at Georgia State had been required to pay for use of small excerpts of Plaintiffs' works in 2009, there would have been some small overall increase in the cost of education, assuming that the charge for excerpts would be included in the tuition and spread across the student body. If individual students had to pay the cost of excerpts, the total of all permissions payments could be significant for an individual student of modest means.

### Georgia State University

Georgia State University ("Georgia State") is a public university that is a unit of the University System of Georgia [Stipulated Facts, Doc. 278-3 at 6]. The Board of Regents of the University System of Georgia ("Board of Regents") has supervisory authority over all of the universities in the University System of Georgia and elects the President of Georgia State [Id.]. Georgia State is located in downtown Atlanta, Georgia, spreading over many blocks [Mark Becker Dep., Doc. 316 at 8]. Over 31,000 students are enrolled, including 8,500 graduate/professional students. Georgia State provides residential facilities for approximately 4,000 students [Id. at 8-9]. Other students either live in apartments nearby or commute [Id. at 13]. A very significant percentage of Georgia State's students commute from outlying counties of the metropolitan Atlanta area [Id.]. Tuition is approximately $3,500 per semester for in-state students [Id. at 10].

Defendant Mark P. Becker is the President of Georgia State [Stipulated Facts, Doc. 278-3 at 6]. He is the chief administrative officer and has supervisory authority over its administrators [Id.]. Defendant Nancy Seamans is the Dean of Libraries [Id.]. She has supervisory authority over the library staff responsible for Georgia State's electronic reserves system and is responsible for ensuring that the library complies with the policies of the Board of Regents [Id.]. Defendant J.L. Albert is the Associate Provost for Information Systems Technology [Id.]. He has supervisory authority over the staff who run Georgia State's electronic uLearn course management system [Id.]. Defendant Risa Palm is the Senior Vice President for Academic Affairs and Provost [Id.]. She is responsible

for monitoring Georgia State's academic administration, including compliance with federal copyright law [Id.]. The remaining Defendants are members of the Board of Regents as previously stated. All of the Defendants have been sued in their official capacities only [Id.].

Georgia State's library budget in 2009 was about $11 million. More than half went to personnel and operating costs; the remainder went to acquisition costs including print and electronic materials [Nancy Seamans, Tr. Vol. 12 at 85]. Georgia State spent close to $4 million on licensed electronic materials in 2009. This includes licensed electronic materials from journals. APS license fees are paid by commercial printers that prepare coursepacks.[25] The coursepacks are sold at cost in Georgia State's bookstore. Georgia State does not pay license fees for electronic distribution of excerpts of copyrighted books when the professor using the work determines that fair use applies.

ERES is an online reserves system of digital files that are stored on a computer server [Tr. Vol. 4 at 95]. Georgia State has used ERES as a means of electronically distributing course materials since 2004 [Tr. Vol. 4 at 94]. Georgia State's library staff is responsible for and manages the ERES system [Tr. Vol. 4 at 95; Doc. 278-3 at 6].

Software is available which would allow the library staff to place a permissions order with CCC using ERES. CCC could approve the order electronically. The potential exists for creating a seamless

---

[25]A coursepack is a collection of excerpts from various sources chosen by a professor and then photocopied and assembled into a packet that students purchase as assigned reading for a course.

interface which would allow orders to be placed and approved in a matter of minutes. Of course, the efficiency of this system would be contingent on the ready availability of an excerpt from the particular copyrighted work. Based on the particular uses involved in this case, the Court is skeptical that this system would have worked for Georgia State in 2009. Library staff would have had to engage in a good bit of back-and-forth communication with CCC and the professors to determine whether the material would be available on a timely basis and if not, what material to substitute. Digital access to many of the works would not have been available at all.

### The Excerpts at Issue in this Case

Almost all of the 75 excerpts at issue were assigned as supplemental readings in graduate level or upper level undergraduate courses. By "supplemental" the Court does not necessarily mean optional; in many cases the excerpts were required reading. All of the courses were in the social science or language fields. Professors specified on the course syllabus[26] that certain books were required to be purchased; in addition, the students were directed to the listed excerpts which were posted on ERES. The supplemental readings are all from books which are properly classified as informational. None are fiction. They all address topics which lend themselves to incorporation into the social science and language courses involved in this case. Most of the books are not textbooks in that they are not specifically intended for student instruction.

---

[26]The course syllabi are in the record, as are all of the books from which the excerpts were taken.

They all address topics which would be of interest to an educator in the subject area addressed by the book. Some of the books would be of interest both within and beyond the academic community. The edited books are "in the halfway house between textbooks and monographs" [Frank Smith, Tr. Vol. 1 at 53-54]. The single author books tend to be small books with a narrow, in-depth focus, averaging 366 pages per book.[27]

The excerpts are extra readings which supplement the purchased books so as to provide a fuller, richer course curriculum at a lesser cost than would be the case if the students had to buy extra books or pay permissions fees for the excerpts.

Seventy five excerpts from 64 books will be examined in this Order. The excerpts were selected by 23 professors for 29 courses in three semesters in 2009. On average these excerpts were 10.1% of the pages in the copyrighted books. Fifty six of the excerpts were comprised of one chapter or less from 54 of the books. On average these books have sixteen chapters. Fifteen of the excerpts are two or more chapters of a multichapter book, with the ratios of chapters used to total chapters being 2/25, 2/9, 2/8, 2/10, 3/12, 2/10, 3/9, 2/15, 4/44, 7/44, 3/36, 2/36, 2/30, 2/10, 2/15.[28] The remaining four excerpts are from books that are not divided into chapters.

-------

[27]The single author books at issue in this case have the following number of pages, on average: Cambridge 295; Oxford 320; Sage 483. The edited books tend to be longer, averaging 494 pages for Cambridge, 427 pages for Oxford, and 614 pages for Sage.

[28]Chapter numbers are rounded up so that an excerpt of between one and two chapters is expressed as two chapters. But most of the chapters are whole chapters.

Case 1:08-cv-01425-ODE Document 423-1 Filed 05/11/12 Page 45 of 351

<u>Georgia State's 2009 Copyright Policy</u>

Between 2004 and early 2009 Georgia State had a copyright policy (the Regents' Guide to Copyright) which described the prohibitions on copying in the Copyright Act and the basic elements of fair use. While the policy did not state what percentage of a copyrighted work could legitimately be copied, some professors who testified at trial believed (and, the Court infers, others did as well) that copying as much as 20% of a copyrighted work was acceptable as fair use. Plaintiffs' First Amended Complaint alleges that the old copyright policy "endorses the unlicensed copying of up to twenty percent of a work" [Doc. 39, ¶ 28 filed Dec. 15, 2008].

On February 17, 2009 the Board of Regents introduced a new copyright policy for University System of Georgia schools, including Georgia State [Doc. 278-3 at 11]. The 2009 Copyright Policy was the result of efforts by a committee which considered whether to revise or replace the Regents' Guide to Copyright [Defs. Ex. 145; Tr. Vol. 12 at 50-54]. Because the 2009 policy did replace the Regents' Guide to Copyright, the Court infers and finds that the 2009 Copyright Policy had at least the tacit approval of the Board of Regents. The 2009 Copyright Policy explicitly makes professors responsible for determining whether a particular use is a fair use [Defs. Ex. 528; Tr. Vol. 12 at 59-68]. Professors must complete a fair use checklist which is included as part of the 2009 Copyright Policy [Defs. Ex. 528].

The 2009 Copyright Policy significantly reduced the unlicensed copying of Plaintiffs' works (and, by inference, the works of other publishers) at Georgia State.

The 2009 Policy includes a set of instructions for using the fair use checklist [Id.]. Professors are instructed to consider all four fair use factors before making a final fair use decision [Id.]; however, where the factors favoring fair use outnumber those against it, reliance on fair use is justified. Where fewer than half of the factors favor fair use, permission must be sought from the publishing company. Where the factors are evenly split, instructors should consider the total facts weighing in favor of fair use as opposed to the total facts weighing against fair use in deciding whether fair use is justified [Id.]. The instructions explicitly state that no single item or factor is determinative of fair use [Id.]. The 2009 policy also contains numerous links to outside licensing companies, including CCC, to assist professors in seeking copyright permissions from rights holders in order to distribute readings that professors determine do not fall under the fair use exception [Id.]. However, Georgia State has not budgeted funds to pay for permissions. The professor would be required to collect from the students for an order he placed, or require the students to place their own orders.

Georgia State held training sessions for professors on the new Policy in the spring of 2009. All professors were asked to attend; some did and some did not. Representatives of the Legal Affairs department discussed how to implement the new Copyright Policy and answered questions including how much copying of individual works would be acceptable as fair use. Professors who attended these sessions were told that there was no across-the-board answer to that question, but that under fifteen percent would likely be safe and that under ten percent would be "really safe" or words to that effect [Jodi Kaufmann, Tr. Vol. 5 at 88-90].

-39-

The 2009 Copyright Policy was in effect at Georgia State at the beginning of the 2009 Maymester [Doc. 278-3 at 11]. From that time through the present, the policy calls for the following actions to post a reading to ERES: a professor starts by submitting a request form to the library [Tr. Vol. 4 at 96]. This is done online. The request form requires the professor to verify that a copy of the book is owned either by Georgia State's library or by the professor. The request form requires the professor to check which of four conditions applies: (1) the reading is from a journal to which the university has a license, (2) the reading is in the public domain, (3) the reading is a fair use, or (4) the professor has obtained permission from the rights holder [Tr. Vol. 4 at 97, 101]. If the professor indicates that the reading qualifies as fair use, the professor is supposed to have completed a fair use checklist which determines that fair use applies [Tr. Vol. 4 at 97]. The library staff does not collect the checklists or ascertain that they have been filled out correctly [Tr. Vol. 4 at 98]. It does not conduct its own fair use analysis [Tr. Vol. 4 at 103]. However, if the amount of copying requested appears suspicious, the library staff is expected to "red flag" the request for further inquiry [Tr. Vol. 4 at 127-129]. If there is no red flag, the library staff finds the book in the library (or obtains the book from the professor) and scans the pages that have been requested, creating a digital PDF file of the reading [Tr. at Vol. 4 at 104-105]. The digital copy is then saved to a local computer in the library, uploaded to the ERES system and placed on a password-protected course page so that it may be accessed by ERES users who have the password for the particular course [Tr. Vol. 4 at 105-106].

-40-

Students access the digital materials on ERES by going to its website [Tr. Vol. 4 at 112]. Once on the ERES website, a student accesses course reading materials by inputting the pass code obtained from the professor for the course [Tr. Vol. 4 at 112-113]. A student may only access the readings for the courses in which she is enrolled [Tr. Vol. 4 at 112]. The student must acknowledge and agree to respect the copyrighted nature of the materials. The student may access a reading as often as desired and is not prohibited from downloading, printing or saving the reading to her hard drive; however, once the semester for which that particular reading was assigned has ended, students can no longer access that reading through the ERES course page [Tr. Vol. 4 at 110-115].

Students frequently bring laptops with them to class to access the assigned excerpts from ERES [See, e.g., Jodi Kaufmann, Tr. Vol. 6 at 61]. Professors also saw students in class with paper copies of the excerpts that they had downloaded and printed from ERES [See, e.g., Jodi Kaufmann, Tr. Vol. 6 at 61; Marni Davis, Tr. Vol. 7 at 109]. In short, students do use the downloaded copies in the classroom.

In the instant case, all but nine[29] of the alleged infringements involve readings that were distributed through Georgia State's ERES system [Tr. Vol. 15 at 84].

For purposes of the copyright law analysis, the Court considers both the professors who caused the excerpts to be uploaded to ERES and the students who accessed them to be "users" of the excerpts. There is no evidence that the named Defendants personally participated in selecting any excerpts for copying, that they made any copies, or that they made any individual fair use determinations.

The trial evidence showed that unlicensed copying of excerpts of copyrighted books at colleges and universities is a widespread practice in the United States. As Defendants' witness Dr. Kenneth Crews testified, many schools' copyright policies allow more liberal unlicensed copying than does Georgia State's 2009 Copyright Policy [Kenneth Crews, Tr. Vol. 13 at 28-43].

### B. Conclusions of Law

#### 1. Prima Facie Case of Copyright Infringement

Plaintiffs allege that Defendants have infringed their copyrights by allowing portions of Plaintiffs' works to be

---

[29]The remaining nine alleged infringements involve excerpts which were uploaded to Georgia State's electronic uLearn system by Professor Kim. uLearn is a course management service which is course- and class-specific. In 2009 access to uLearn was password protected; it is currently password protected [Paula Christopher, Tr. Vol. 5 at 8]. The primary difference between uLearn and ERES of relevance to this case is that professors must scan and post excerpts to uLearn directly, without involvement by the Georgia State library, whereas professors request that the library staff post excepts to ERES. Also, ERES tracks the number of times an excerpt is accessed, whereas uLearn provides no such "hit count." ERES is the professors' preferred site for posting reading excerpts for students.

electronically distributed to users of Georgia State's electronic reserves system without obtaining permissions, in violation of the federal Copyright Act, 17 U.S.C. § 101 et seq. To establish a prima facie case of copyright infringement, Plaintiffs bear the burden of demonstrating (1) that they own valid copyrights in the allegedly infringed books; and (2) that Defendants copied protected elements from the allegedly infringed books. Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287, 1300 (11th Cir. 2008); Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).

It is a constitutional requirement that a work seeking copyright protection be original. Feist, 499 U.S. at 346. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Id. at 345. Also, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." Id. at 348.

Plaintiffs typically must also establish, as a required element of their cause of action, a copyright registration.[30] 17 U.S.C. § 411(a); Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237, 1247 (2010). This element is met in all but one instance in which

---

[30]Registration is not required for works first published in the United Kingdom after March 1, 1989 (the date the United States acceded to the Berne Convention). See 17 U.S.C. § 104(b)(2).

registration is required.[31]  The element of copying protected material is established in all 75 instances of claimed infringement, but Plaintiffs have failed to establish that they own valid copyrights in parts of some of the 64 works involved in this case.

Generally, Plaintiffs are the assignees of the copyrights originally owned by the authors or are exclusive licensees of the right to publish the copyrighted books pursuant to contracts with the authors.  In some cases Sage is deemed to be the author of the edited book or the contributions in edited books by virtue of contracts with Sage which state that the work is made for hire.[32]

---

[31]The exception is the work called *North German Church Music in the Age of Buxtehude*, for which no copyright registration was tendered.  The book (Pls. Ex. 437) states that it was published in the United States in 1996.  There is no evidence that the book was first published in another country.

[32]When a work is made for hire, the Copyright Act provides that the person for whom the work was prepared is considered the author. 17 U.S.C. § 201.  17 U.S.C. § 101 provides the following definition for a work made for hire:

> (1) a work prepared by an employee within the scope of his or her employment; or

> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

None of the authors or external editors of the works at issue in this case are employees of Cambridge, Oxford, or Sage.  Thus, any alleged work made for hire must be accompanied by a written instrument signed by the parties agreeing the work is made for hire pursuant to subparagraph (2).  See also Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 738 (1989).

All of the Plaintiffs have the exclusive right to reproduce, distribute and display all parts of the copyrighted books which are involved in this case[33] <u>unless</u>, in a particular case, Plaintiffs failed to obtain an agreement with the author which is needed to give the Plaintiff-publisher all rights of authorship in the book.

There are a few instances where no contract with a contributing author was offered at trial, and the claimed infringement was for unlicensed copying of that particular contribution. The question which must be answered is whether the Plaintiff-publisher failed to obtain all copyrights which would be required for it to establish a prima facie case of infringement. Sage argues that the assignment from the external editor to the publisher is sufficient to give rights to the book to the publisher because the external editor should be considered the author of the full work.

Some of the contracts between Sage and its external editors and the contracts with its contributing authors do suggest that the external editor's role is much more important than a mere post-creation editing function, such that the external editor could be considered the author of the whole book. Certainly, the external editors are not mere compilers of preexisting materials or collectors/arrangers of preexisting works which appear in the edited books.[34] The chapters are written expressly for the book in question under the direction of the external editor and are part of an

---

[33]A copyright owner has the exclusive right to reproduce, distribute and display the copyrighted work. 17 U.S.C. § 106(1),(3),(5).

[34]While there is no stipulation that the edited books are compilations or collective works, the parties refer to them as one or the other. The Court is not required to rule on this issue.

-45-

integrated whole work.  With respect to some of Sage's edited books, the relationship between the external editors and the contributing authors appears highly interactive, not just in the editing process but also in the <u>creation</u> of the contributed chapters.  <u>See, e.q.</u>, *The Sage Handbook of Qualitative Research (Third Edition)* Preface, p. xvii "Tales of the Handbook," para. 3.  Sage does  consider that the external editors are authors of the books [Carol Richman, Tr. Vol. 2 at 144].  The problem here, however, is that there is no author or external editor testimony describing the creation of the contributions or the creation of any of the edited volumes.  The Court has only the contracts and books which are in evidence.  There is insufficient evidence to warrant a finding that the external editors and the contributing authors are joint authors of the contributed chapters.  Even assuming that there is sufficient evidence of collaboration to support such a finding, there is no evidence of the required element of mutual intent to create a joint work.  1-6 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 6.03 (Matthew Bender, Rev. Ed.).

Further, where a contributing author's contract is missing it cannot be presumed that a contract exists or that the missing contract would contain particular provisions.  Thus, the Court finds that a contract with the contributing author is needed here to establish that the contribution is a work made for hire or that exclusive rights in the contributed chapter have been conveyed to the publisher.  Therefore, where the evidence does not include a contract with a contributing author, that will be fatal to Plaintiffs' prima facie case where the chapter at issue is the subject of the alleged infringement.

-46-

At trial Plaintiffs were unable to produce contracts with certain contributing authors. To fill this void, Plaintiffs elicited testimony from the representatives of two of the three Plaintiffs which was not specific to the book in question, but which asserted generally that their publisher would never proceed to publication without having all necessary contracts [Frank Smith, Tr. Vol. 1 at 64; Carol Richman, Tr. Vol. 2 at 64-65]. While these witnesses certainly expressed their sincere beliefs, neither of them asserted familiarity with the particular document deficiencies in question. Even in the best-run businesses mistakes can occur. These missing contracts are needed to establish a prima facie case of infringement. The Court will not overlook the missing documentation, as set forth in its analysis of certain of the claimed infringements discussed below.

### 2. The Fair Use Defense

Defendants contend that all of Plaintiffs' infringement claims are barred by the doctrine of fair use, pursuant to 17 U.S.C. § 107. Fair use is a defense that may be considered once a prima facie case of infringement has been established. Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1546 n.28 (11th Cir. 1996). 17 U.S.C. § 107 states:

107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Defendants bear the burden of proving that each use was a fair use under the statute. Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287, 1307 n.21 (11th Cir. 2008). The analysis of the fair use defense must be done on a case-by-case basis, Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 561 (1985), and "All [four factors] are to be explored, and the results weighed together, in light of the purposes of copyright." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994); see also Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1268 (11th Cir. 2001).

The Supreme Court's most recent and most important fair use opinion is Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994). In Campbell, a rap group created a commercial rap parody of a rock song. The owner of the copyright in the song brought suit, and the district court granted summary judgment to the defendants on the basis of fair use. The Court of Appeals reversed. In a unanimous opinion, the Supreme Court discussed the four fair use factors and remanded the case due to errors of law as well as remaining issues of material fact as to factor four which precluded summary judgment. Although Campbell was a commercial parody case, its reasoning guides this Court's analysis in the instant case.

-48-

**Factor 1: Purpose and Character of the Use, including whether such use is of a commercial character or is for nonprofit educational purposes**

The language of § 107 itself and the Supreme Court's opinion in Campbell compel the decision that the first fair use factor favors Defendants. This case involves making copies of excerpts of copyrighted works for teaching students and for scholarship, as specified in the preamble of § 107. The use is for strictly nonprofit educational purposes as specified in § 107(1). The fact that the copying is done by a nonprofit educational institution leaves no doubt on this point.

To support their argument that factor one weighs against fair use, Plaintiffs rely heavily on Basic Books, Inc. v. Kinko's Graphics Corp., 758 F. Supp. 1522 (S.D.N.Y. 1991); Princeton University Press v. Michigan Document Services, Inc., 99 F.3d 1381 (6th Cir. 1996); and American Geophysical Union v. Texaco Inc., 60 F.3d 913, 919 (2d Cir. 1994). However, Kinko's and Michigan Document Services involved commercial copiers that produced printed coursepacks and sought unsuccessfully to characterize their use of copyrighted materials as noncommercial, nonprofit uses. Texaco involved a for-profit corporation making unpaid copies for purposes of scientific research, which the Second Circuit characterized as an "intermediate use." Texaco, 60 F.3d at 921. Because Georgia State is a purely nonprofit, educational institution and the excerpts at issue were used for purely nonprofit, educational purposes, this case is distinguishable from Kinko's, Michigan Document Services, and Texaco.

Plaintiffs strongly advocate that the nontransformative nature of the excerpts (mirror images of parts of the books) means that the first fair use factor must favor Plaintiffs. While Supreme Court

-49-

decisions in other factual contexts have emphasized the importance of the transformative nature of the use in applying this factor, in Campbell, the Supreme Court said the following in discussing the first fair use factor[35]:

> The obvious statutory exception to this focus on transformative uses is the straight reproduction of multiple copies for classroom distribution.

Campbell, 510 U.S. at 579 n.11.

Because the facts of this case so clearly meet the criteria of (1) the preamble to fair use factor one, (2) factor one itself, and because (3) Georgia State is a nonprofit educational institution, factor one strongly favors Defendants.[36]

In Campbell the Supreme Court stressed that the fact of a nonprofit educational purpose does not automatically ensure fair use. Campbell, 510 U.S. at 584. Other factors are important. This is considered below.


### Factor 2: Nature of the Copyrighted Work

Copyright protects original works of authorship. 17 U.S.C. § 102(a). Copyright protects expression. Palmer v. Braun, 287 F.3d 1325 (11th Cir. 2002). It does not protect ideas. 17 U.S.C.

---

[35]It is not totally clear that the Supreme Court meant to confine its comment to fair use factor one. The placement of the footnote in the opinion suggests it did.

[36]Some commentators have been critical of the commercial/noncommercial distinction made by factor one of § 107. Professor Nimmer has observed that "[t]he statutory juxtaposition between uses of a 'commercial nature' and those for 'nonprofit educational purposes' divides the world into a Procrustean bed of questionable validity." 4-13 NIMMER ON COPYRIGHT § 13.05[A][1][a]. However, this is but a comment about the perceived shortcomings of the statute. It does not change the plain language of the statute.

§ 102(b). A work is considered original to the author and qualifies for copyright protection if the work is independently created by the author and possesses some minimal degree of creativity. <u>Feist</u>, 499 U.S. at 345. The vast majority of the books involved here meet the independent creation requirement. The level of creativity required for copyrightability is extremely low and the work satisfies that requirement so long as it "possess[es] some creative spark, 'no matter how crude, humble or obvious it might be.' Originality does not signify novelty . . . ." <u>Feist</u>, 499 U.S. at 345 (quoting Nimmer on Copyright § 1.08[C][1]) (internal citations omitted).

All of the books at issue in this case meet the creativity standard set by <u>Feist</u> for copyrightability. Defendants do not claim otherwise. The second fair use factor, "nature of the use," requires the Court to look beyond the standard acknowledged in <u>Feist</u> to examine the relative degree of creativity in the works at issue. In <u>Campbell</u>, the Supreme Court stated: "This factor [the second factor] calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." <u>Campbell</u>, 510 U.S. at 586. It is generally recognized that "Under [the second] factor, the more creative a work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense." 4-13 Nimmer on Copyright, § 13.05[A][2][a].

-51-

As previously stated, none of the books at issue are fictional.[37]
All of them are intended to inform and educate.

Some of the books are not merely descriptive; they contain
material of an evaluative nature, giving the authors' perspectives
and opinions.  To the extent that this is a comment about the
author's mode of expression (as opposed to the substance of her
perspectives and opinions), one could argue that this type of work
merits a finding of a greater degree of creativity, disfavoring fair
use.  Countering this argument, however, is that § 107 itself
recognizes "criticism and comment" as deserving of more public
exposure, not less and hence works of this nature more likely will be
protected by fair use.  See 17 U.S.C. § 107.  On consideration, the
books involved in this case are properly classified as informational
in nature, within the spectrum of factual materials and hence
favoring fair use.

Another issue is whether the scholarly nature of some of the
works at issue may give them more protection; that is, incline
against fair use.  In this regard, the Court credits the testimony of
Plaintiffs' witnesses who testified to the tremendous amount of
effort and expense which goes into creating high quality works of

---

[37]Fictional elements may cause gradations of creativity to occur.
In Peter Letterese & Associates, Inc. v. World Institute of
Scientology Enterprises, International, 533 F.3d 1287 (11th Cir.
2008), the United States Court of Appeals for the Eleventh Circuit
noted that a book about sales techniques ". . . utilizes original
expression that surpasses the bare facts necessary to communicate the
underlying technique."  Id. at 1312.  Noting that the techniques were
described with "a healthy dose of fiction," the Court held that "the
semi-factual nature of Big League Sales neither expands nor
constricts the scope of the fair use defense."  Id. at 1313, 1314.
Thus, factor two was neutral in Peter Letterese.  The works at issue
in this case do not contain fictional elements.

scholarship.  Also, the Court observed during the trial that a high
quality research effort inevitably involves some amount of
creativity; the researcher is required to make qualitative judgments
in the course of the research effort.  However, upon review of the
precedent, the Court concludes that the cost, effort, and level of
creativity required to produce the work are not relevant to the
factor two analysis.  In <u>Feist Publications, Inc. v. Rural Telephone
Service Co.</u>, 499 U.S. 340 (1991), the Supreme Court considered and
rejected the "sweat of the brow" doctrine (that copyright is intended
to protect an author's investment in creating the work) as being
inconsistent with Supreme Court precedent.  <u>Feist</u>, 499 U.S. at 359-
60.

There is only very limited authority to support Plaintiffs'
argument that the second fair use factor disfavors fair use for
scholarly or educational works.  In <u>Princeton University Press v.
Michigan Document Services, Inc.</u>, 99 F.3d 1381 (6th Cir. 1996), the
Sixth Circuit noted, with no discussion, that the nature of the
copyrighted materials which were assembled into coursepacks by the
defendant leaned against fair use under the second statutory factor,
as follows:

> The second statutory factor, "the nature of the
> copyrighted work," is not in dispute here.  The defendants
> acknowledge that the excerpts copied for the coursepacks
> contained creative material, or "expression;" it was
> certainly not telephone book listings that the defendants
> were reproducing.  This factor too cuts against a finding
> of fair use.

<u>Id.</u> at 1389.

A different approach was taken by Judge Motley in <u>Basic Books,
Inc. v. Kinko's Graphics Corp.</u>, 758 F. Supp. 1522 (S.D.N.Y. 1991), in
which she found that excerpts from copyrighted works which had been

-53-

used in commercially printed coursepacks were factual in nature and thus the second factor weighed in favor of defendant. She said:

> The second factor concerns the nature of the copyrighted work. Courts generally hold that "the scope of fair use is greater with respect to factual than non-factual works." Factual works, such as biographies, reviews, criticism and commentary, are believed to have a greater public value and, therefore, uses of them may be better tolerated by the copyright law. Works containing information in the public interest may require less protection. Fictional works, on the other hand, are often based closely on the author's subjective impressions and, therefore, require more protection. These are general rules of thumb. The books infringed in suit were factual in nature. This factor weighs in favor of defendant.

Id. at 1532-33 (citations omitted).

While the books described in the Sixth Circuit's opinion in Michigan Document Services were likely the same types of books as those described in Kinko's, the outcomes on factor two were different. Evidently the Sixth Circuit was influenced by a concession by the defendants; however, it also appears that the parties confused an element of the prima facie case with an element of the fair use doctrine. The latter only comes into play once a prima facie case of infringement is established. If the work is not original and does not possess a certain level of creativity, there can be no prima facie case of infringement.

The Michigan Document Services decision is unhelpful in resolving the question of who the second factor favors. The Kinko's decision is helpful and its treatment of the second factor is persuasive.

Factor two favors Defendants in this case.

**Factor 3: Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole**

Factor three requires consideration of both the quantity and the value of the amount copied in relation to the overall book. The portion used must be reasonable in relation to the work from which it was taken and the purpose for which it was used. Campbell, 510 U.S. at 586. The portions taken averaged about ten percent of the original (though some were considerably more and some were considerably less). The precise purpose for which each excerpt was used varied, but generally the purpose was to enrich and add depth to the course curriculum. Also, the Court must consider whether the amount taken is reasonable given the likelihood of market substitution. Peter Letterese, 533 F.3d at 1314 n.30. The fact that the excerpts were mirror-image copies favors market substitution (thus leaning against fair use), but this tendency is reduced when the excerpt is small. Ultimately a decision as to what amount of copying is permissible as fair use requires consideration of fair use factor three in conjunction with factors one and four.

### a. Classroom Guidelines

A primary argument made by Plaintiffs is that the amount of copying done by Defendants exceeds the standards of the "Agreement on Guidelines for Classroom Copying in Not-For-Profit Educational Institutions with Respect to Books and Periodicals," commonly called the "Classroom Guidelines," set out in H.R. REP. No. 1476 at 68-71, 94th Cong., 2d Sess. (1976). Therefore, Plaintiffs argue fair use factor three weighs in their favor.

The Classroom Guidelines is a 1976 agreement between certain representatives of the publishing industry and certain representatives of the education establishment, which established a safe harbor (not a limit) for educational copying of copyrighted materials. The safe harbor is very restrictive; it allows multiple copies to be made for classroom use only if the copying meets stated tests of brevity, spontaneity, and cumulative effect. To meet the test of brevity, the amount copied of a prose work may be "either a complete article, story or essay of less than 2,500 words" or "an excerpt from any prose work of not more than 1,000 words or 10% of the work, whichever is less." The test of spontaneity requires that the decision to use the work and the moment when it is used "are so close in time that it would be unreasonable to expect a timely reply to a request for permission." Finally, under the cumulative effect test, the copying may only be for one course, no more than three articles from the same collective work or two excerpts from the same author may be used during one class term, and a teacher may not have more than nine instances of such copying for one course. In addition, the Guidelines state a blanket prohibition that copying shall not "substitute for the purchase of books, publishers' reprints or periodicals" nor "be repeated with respect to the same item by the same teacher from term to term."

The Guidelines were the outgrowth of a long period of negotiation between publishers and academics who were concerned about the scope of fair use which might be offered in proposed fair use legislation, particularly concerning educational uses. The negotiations were supervised by the Register of Copyrights and by some members of Congress who exhorted the referenced interest groups

to produce some understandings about fair use which, potentially, Congress could adopt. Jessica D. Litman, *Copyright, Compromise, and Legislative History*, 72 CORNELL L. REV. 857, 862, 865-67 (1987). The hoped-for understanding did not materialize. Section 107 was enacted as a statement of illustrative fair uses, plus factors which should be considered in deciding whether a particular use is "fair." The statute itself did not adopt any part of the Classroom Guidelines. Instead, the text of the Classroom Guidelines was set out in full within the legislative history. The House Committee report, after noting the objections of the American Association of University Professors and the Association of American Law Schools, made several points: that the ad hoc group which signed the Guidelines did include representatives of higher education, and that the purpose of the Guidelines was to state the minimum and not the maximum standards of educational fair use. The Report stated, "The Committee believes the guidelines are a reasonable interpretation of the minimum standards of fair use. Teachers will know that copying within the guidelines is fair use. Thus, the guidelines serve the purpose of fulfilling the need for greater certainty and protection for teachers." H.R. REP. No. 1476 at 72, 94th Cong., 2d Sess. (1976). In the Conference report, H.R. CONF. REP. No. 1733 at 70, 94th Cong., 2d Sess. (1976), the conferees stated they accepted the Classroom Guidelines "as part of their understanding of fair use."

Plaintiffs assert that the Court should enforce, through an injunctive order, the safe harbor limitations of the Guidelines as maximum permissible use, with the exception of the so-called "spontaneity" requirement which Plaintiffs do not insist upon.

-57-

Plaintiffs do not explain their decision to seek acceptance of the minimum standards as the maximum standard.

Legislative history can be useful in construing legislation when a statute is ambiguous and the legislative history sheds light on what the legislators intended the statute to mean.[38]  Fed. Reserve Bank of Atlanta v. Thomas, 220 F.3d 1235, 1239 (11th Cir. 2000).

Here, the statute itself (§ 107) is not ambiguous, though it sets very general standards for determining fair use.  This was by design.  The legislative history itself emphasizes that these standards are to be flexibly applied.  H.R. REP. No. 94-1476 at 66. The Classroom Guidelines were not prepared by the legislators. Litman, 72 CORNELL L. REV. at 887-88.  What actually happened was that interest groups got together and, after intense negotiations over a proper scope for § 107, reached only a safe harbor agreement which was satisfactory to some of the negotiators.  Id.  Also, the

---

[38]Two other courts that have considered the Classroom Guidelines have found them to be helpful in determining the permissible extent of fair use, but both courts noted that they are not binding.  In Basic Books, Inc. v. Kinko's Graphics Corp., 758 F. Supp. 1522 (S.D.N.Y. 1991), the court stated that the Guidelines "are a part of the legislative history of the Copyright Act of 1976."  Id. at 1535. The court noted that while the Guidelines anticipated that fair use standards for permissible copying could exceed the standards set in the Guidelines, that nonetheless "the copying in suit clearly deviates from the letter and spirit of the Guidelines."  Id. at 1536. In Princeton University Press v. Michigan Document Services, Inc., 99 F.3d 1381 (6th Cir. 1996), the Sixth Circuit similarly determined that the Classroom Guidelines were a part of the legislative history, which it deemed helpful because "the statutory factors are not models of clarity, and the fair use issue has long been a particularly troublesome one."  Id. at 1390.  The court specifically stated that the Guidelines do not have the force of law, but that they provide general guidance and "[t]he fact that the [defendant's] copying is light years away from the safe harbor of the guidelines weighs against a finding of fair use." Id. at 1391.

-58-

legislative history expressly states that the Guidelines were not intended to state the maximum extent of fair use.  H.R. REP. No. 94-1476 at 68 ("The purpose of the following guidelines is to state the minimum and not the maximum standards of educational fair use under Section 107 of H.R. 2223.").

Further, the Guidelines establish numerical caps on how many words a teacher may copy and still stay within the safe harbor.  This brightline restriction stands in contrast to the statutory scheme described in § 107, which codified a multi-factorial analysis in which no factor is dispositive.  Thus, the Guidelines' absolute cap, which would preclude a use from falling within the safe harbor solely on the basis of the number of words copied, is not compatible with the language and intent of § 107.  Accordingly, the Court does not accept Plaintiffs' argument that the outcome on the third fair use factor should turn on what is in the Classroom Guidelines.  Thus, the Court will discuss the quantitative and qualitative elements of factor three in turn.

b.  Amount of the Portion Used in Relation to the Copyrighted Work as a Whole

Before beginning this analysis, it is appropriate to note that copying a _de minimis_ part of a copyrighted work is not an infringement at all.  Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 451 n.34 (1984).  Therefore, by definition fair use must look beyond _de minimis_ copying.

Case 1:05-cv-01425-ODE Document 423 Filed 05/11/12 Page 67 of 350

### The number of pages in a book

For each claimed infringement, the amount of the portion used in relation to the copyrighted book as a whole is calculated by dividing the number of pages in the copied excerpt by the number of pages in the book. The parties initially disagree about how many pages are in each book. Plaintiffs contend that the calculation should be based on the number of pages that comprise the text of the book, within the chapters. Defendants contend that the page count should also include material such as the table of contents, acknowledgments, the preface or foreword, an afterword, and indices. In most of the books at issue here, there are several pages that appear before "page 1" of the book. These pages may include a title page, dedications, the copyright information page, the table of contents, acknowledgments, and prefatory remarks (such as a foreword or preface) by the author or editor. These pages are often numbered with lower case roman numerals, also known as romanettes. Often, the first romanette that appears is several pages into the book and does not begin with "i," which indicates that the pages are numbered beginning with the first sheet inside the front cover.

The Court agrees with Defendants that the material appearing before and after the chapter text of the book comprises part of the work as a whole. Material such as dedications and acknowledgments are written expression by the author or editor, and introductory remarks included in a foreword or preface are certainly original expression protected by the copyright for the work. In addition, the Court believes the pages in the index should be counted in the total page count; in most of the works, the index is comprised of whole

-60-

numbered pages, and the decision on what terms to include in the index constitutes copyrightable expression. Thus, for the works at issue here, the Court will accept (with some noted exceptions) the Defendants' contention of the number of pages in each work and will calculate the percent copied based on that page count.

<u>Determining what is "the copyrighted work"</u>

To calculate the percent amount of the work that was copied by Defendants, it is also necessary to first determine what the excerpt will be measured against. In their post-trial Proposed Findings of Fact and Conclusions of Law filed July 22, 2011 and also in their reply brief filed July 30, 2011, Plaintiffs argue that Defendants' copying of a whole chapter of an edited book amounts to a forbidden 100% taking because each of the chapters has a separate author, each addresses a distinct subject and each was originally conceived as a separate work. Therefore, Plaintiffs argue, it does not matter that the particular chapter comprised only a minuscule portion of the overall book, because Defendants copied 100% of the chapter in question. To win this argument Plaintiffs must contend that under § 107(3) the chapters are "the copyrighted works," not the books. Plaintiffs take their cue for this argument from the Second Circuit's opinion in <u>American Geophysical Union v. Texaco Inc.</u>, 60 F.3d 913 (2d

-61-

Cir. 1994 amended 1995).[39]  The Court rejects Plaintiffs' argument

---

[39]<u>Texaco</u> was not a typical copyright infringement case.  As is
explained in Professor Patry's law review article, *American
Geophysical Union v. Texaco, Inc.*: Copyright and Corporate
Photocopying, the complaint did not allege infringement of any
particular work.  William Patry, *American Geophysical Union v.
Texaco, Inc.*: Copyright and Corporate Photocopying, 61 BROOK. L. REV.
429, 431 n.14 (1995).  Texaco was licensed through CCC to make copies
of portions of the plaintiff-publishers' copyrighted journals.
Plaintiffs believed Texaco had under-reported the number of
photocopies its scientists had made.  The suit was brought as a class
action.  One of the defenses asserted by Texaco was fair use.
Pursuant to stipulation, the parties agreed to treat the unpaid
copying practices of one scientist from one journal as indicative of
the likely unpaid uses of the many scientists who were employed by
Texaco.  Following a limited-issue bench trial, the trial court
opinion, 802 F. Supp. 1 (S.D.N.Y. 1992), evaluated the fair use
defense based on the copying of articles from one journal which had
been done by the one scientist.  The opinion noted:

> Because it would involve gigantic expense and inconvenience
> to register separately each of the 20 odd items that appear
> in an individual issue, Academic Press registers each issue
> with the Copyright Office.  It does not follow from the
> manner of registration with the Copyright Office that the
> "copyrighted work" for the purposes of fair use analysis
> consists of the entire issue rather than the separate
> creations of the separate authors.

<u>Id.</u> at 17.  The trial court found that the articles were "the
copyrighted works," not the journals.  Whole articles had been
copied; fair use did not apply.  In affirming the trial court, the
United States Court of Appeals for the Second Circuit emphasized that
". . . by virtue of the parties' stipulation, this case now concerns
the copyrights in the eight articles from *Catalysis* found in
Chickering's files, copyrights now owned by Academic Press." 60 F.3d
at 918.  The stipulations which persuaded the Court of Appeals that
the articles (not the journals) were "the copyrighted works" for
purposes of the § 107(3) and (4) analysis are not set forth in the
opinion.

Typically, a copyright infringement case begins with
identification of exactly what infringement is claimed.  The fact of
copyright registration supporting <u>that</u> <u>claim</u> is a substantive element
of plaintiff's cause of action.  <u>Reed Elsevier, Inc. v. Muchnick</u>, 130
S. Ct. 1237, 1246-47 (2010).  If plaintiff establishes a prima facie

because it was raised too late in the proceedings.

On August 11, 2010, Plaintiffs were directed to identify each claimed infringement including the name of the copyrighted work [Doc. 226].  They did so on August 20, 2010 [Doc. 228].  In this filing, Plaintiffs identified the copyrighted work at issue as the book from which each chapter was taken.  Again, the parties were directed to file an up-to-date list in the spring of 2011, which they did by a joint filing on March 15, 2011 [Doc. 266].  This joint filing identified the copyrighted book as the subject of the infringement claim, and provided the parties' respective statements concerning the percentage of the overall copyrighted book which had been taken.  In this joint filing, Plaintiffs again calculated the percentage taken as the amount copied from the total number of pages in the book.  Plaintiffs filed pretrial proposed Findings of Fact and Conclusions of Law on May 17, 2011, which again referenced the percentage takings based on the number of pages which had been taken from the total copyrighted work.

Plaintiffs' claim concerning the significance of the fact that whole chapters had been copied came up for the first time briefly during the trial, which began on May 17, 2011.  However, Joint Exhibit 5, which lists whole books as the copyrighted works, was introduced into evidence at trial by agreement of the parties.  It was not until Plaintiffs filed their post-trial Proposed Findings of

---

case of infringement, defendant may address its fair use defense to the same claimed infringement which is the subject of plaintiff's claim.  The Texaco opinion is unsatisfying because the factual basis for the Court of Appeals' determination that the articles were "the copyrighted works" (i.e., the precise wording of the stipulations) is not provided in the opinion.

Fact and Conclusions of Law that Plaintiffs' now-asserted theory was fleshed out. In the Appendix to their Proposed Findings of Fact and Conclusions of Law filed on July 22, 2011 [Doc. 412], Plaintiffs claimed that the taking of whole chapters constituted 100% takings, requiring that the factor three analysis be resolved in their favor. Defendants have objected to this shift, arguing that it creates 56 new claimed infringements which they had not been anticipating.

It is far too late for Plaintiffs to assert new infringement claims. Moreover, it is unworkable to treat a chapter as "the copyrighted work" for purposes of the factor three analysis but to treat the whole book as "the copyrighted work" for purposes of the factor four analysis. Also, the work which is the focus of the prima facie case analysis must be the same as the work which is addressed by the fair use defense.

In the Texaco case, the Second Circuit Court of Appeals stated: "From the outset, this lawsuit concerned alleged infringement of the copyrights in individual journal articles, copyrights assigned by the authors to the publishers." Texaco, 60 F.3d at 918. However, the same cannot be said in this case, where Plaintiffs' assertion, as reflected in Joint Exhibit 5, was that the copyrighted work at issue would be the entire book rather than an individual chapter. Accordingly, the Court rejects Plaintiffs' new theory on grounds of untimeliness and unfair surprise to the Defendants.

### What amount is small enough?

Having determined that the amount taken will be calculated as a percentage of the entire book, the Court will now discuss what percentage of the whole book is a sufficiently small amount--that is,

-64-

what amount of copying will shift factor three in favor of either Defendants or Plaintiffs.

Congress intended that use of a smaller portion would be more apt to be acceptable than use of a larger portion.  Taking into account the fact that this case involves only mirror-image, nontransformative uses, the amount used must be decidedly small to qualify as fair use.  Also, other factors must be considered in making this determination.  <u>Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l</u>, 533 F.3d 1287, 1314, n.30 (11th Cir. 2008).

To frame the discussion of this issue, the Court will review the most relevant precedent, noting at the outset that neither case is binding and neither is completely analogous.

In <u>Kinko's</u>, the fact that seven of the excerpts were 5% to 14% of the whole "weigh[ed] against defendant." 758 F. Supp. at 1527-28. The court found that the copying of five other excerpts, ranging from 16% to 28% of the whole "weigh[ed] heavily against defendant."  <u>Id.</u>

The Sixth Circuit, in <u>Michigan Document Services</u>, also noted the quantity of pages that had been copied to form the coursepack excerpts.  Six different works had been excerpted without permission.[40]  In addressing "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," the Court stated:  "'[T]he larger the volume (or the greater the

---

[40]The details on the number of pages copied and the percentages involved in each of the copyings are as follows: (95 pages; 30% of the whole), (45 pages, 18% of the whole), (78 pages, 16% of the whole), (52 pages, 8% of the whole), (77 pages, 18% of the whole), and (17 pages, 5% of the whole).  <u>Mich. Document Servs.</u>, 99 F.3d at 1384-85.

importance) of what is taken, the greater the affront to the interests of the copyright owner and the less likely that a taking will qualify as a fair use.'" <u>Mich. Document Servs.</u>, 99 F.3d at 1389 (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 HARV. L. REV. 1105, 1122 (1990)). The Court did state that the 95 page, 30% copying was more troubling than the 17 page, 5% copying previously referenced. It nonetheless held that the defendants had failed to carry their burden of proof on fair use factor three with respect to all six of the works.

<u>Kinko's</u> and <u>Michigan Document Services</u> are helpful as a beginning point in the factor three analysis in the instant case. However, unlike the instant case, they did not involve nonprofit educational uses by a nonprofit educational institution. Here, fair use factor one strongly favors Defendants and tends to push the amount of permissible copying toward a greater amount than the under 5% amount which <u>Kinko's</u> and <u>Michigan Document Services</u> did not specifically reject, and into the 5%-14% range which <u>Kinko's</u> found weighed against, but did not "weigh heavily against" fair use. <u>Kinko's</u>, 758 F. Supp. at 1527.

Defendants presented evidence at trial that numerous colleges and universities have copyright policies which allow more liberal unpaid copying than the 10.1% average uses which occurred at Georgia State in 2009. This evidence is not entitled to any weight in determining the permissible extent of fair use. In the absence of judicial precedent concerning the limits of fair use for nonprofit educational uses, colleges and universities have been guessing about the permissible extent of fair use.

       c.    <u>Substantiality of the Portion Used in Relation to the
Copyrighted Work as a Whole</u>

The great majority of the excerpts used in this case were a chapter or less from a multi-chapter book. Some of these excerpts came from edited books, in which each chapter is written by a different author.

The word "substantiality" as used in § 107(3) means "value." <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 586 (1994) (quoting <u>Folsom v. Marsh</u>, 9 F.Cas. 342, 348 (C.C. D. Mass. 1841)). The substantiality test under factor three involves the degree to which the excerpts are qualitatively significant "in relation to the copyrighted work as a whole." 17 U.S.C. § 107. Of the excerpts involved in this case, including excerpts made up of one or more chapters, almost none have notable qualitative significance or value "in relation to the work as a whole." That is because the subject matter addressed by the relevant chapters is not a substantively dominant part of the book. Almost none of the chapters which were used from either the single author works or the edited volumes are "the heart of the book," <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 565 (1985), or a "critical part" of the book, <u>Kinko's</u>, 758 F. Supp. at 1533; almost none bear an unusually striking relationship to the book as a whole. The chapters in both the edited books and the single author books cover distinct, separately titled subtopics, so that almost none has a dominant relationship to the substance of the work as a whole.

In <u>Kinko's</u>, the District Court rejected as unfair the copying of twelve different excerpts. It found that the excerpts met the "substantiality" test of factor three because the portions copied

were "critical parts of the books" which was "the likely reason the college professors used them in their classes." <u>Kinko's</u>, 758 F. Supp. at 1533.

In <u>Michigan Document Services</u>, the Sixth Circuit, in addition to noting that the amount of copying involved was "not insubstantial," also stated that the substantiality or "value" of the excerpted materials in relation to the entire work was shown by the fact that the professors had made them required reading. <u>Mich. Document Servs.</u>, 99 F.3d at 1389. The Sixth Circuit did consider that fact in determining that the third factor favored plaintiffs.

While this Court has no knowledge of whether the excerpts in <u>Kinko's</u> and <u>Michigan Document Services</u> were "critical parts" of the books, it disagrees with the suggestion that a professor's selection of an excerpt means that the excerpt is a critical part of the book. It is at least equally likely that the excerpt was selected because it filled a need within the course curriculum. A chapter of an academic book is a unit which, in all likelihood, covers a particular theory or topic, so as to make it suitable for use in a course which covers a broader, related overall subject matter. Because this case does involve strictly educational, nonprofit uses, it is relevant that selection of a whole chapter of a book (either from a typical, single author chapter book or from an edited book) likely will serve a more valuable educational purpose than an excerpt containing a few isolated paragraphs. Professors want students to absorb ideas and useful, context-based information. This can be accomplished better through chapter assignments than through truncated paragraphs. However, the selected excerpt must fill a demonstrated, legitimate

-68-

purpose in the course curriculum and must be narrowly tailored to accomplish that purpose.

Having reviewed the copyrighted works at issue in this case, the Court finds that the chapters of the edited books do not have greater value than the chapters of the single author books. The chapters of the single author books are stand-alone chapters, just as are the chapters of the edited books. Almost none of these books (there are a couple of exceptions) feature chapters which develop sequentially, leading toward a conclusion. Each chapter addresses a single topic or subtopic. For this reason, the chapters of the edited books in this case do not have greater value than the chapters of the single author books.

Plaintiffs implicitly argue that the total or substantial copying of a chapter of one of the edited works should not be allowed, because the chapters of the edited works were originally conceived as separate works. The Court has little sympathy for this argument. In fact, the Plaintiffs own all parts of the copyrighted books as they have been assigned all of the authors' rights by contract.[41] As such they have the exclusive right to publish all parts of the books. Plaintiffs have no incentive to assert the rights of the authors of the chapters in the edited books in this context, except to seek to choke out nonprofit educational use of the chapter as a fair use. The Court will not allow this to happen. This would be contrary to the equitable considerations underlying

_____

[41]In some cases Plaintiffs have granted contributing authors a nonexclusive right to publish all or part of the contribution under certain circumstances. A nonexclusive licensee does not have standing to sue for copyright infringement. Saregama India Ltd. v. Mosley, 635 F.3d 1284 (11th Cir. 2011).

fair use.  <u>Stewart v. Abend</u>, 495 U.S. 207, 236 (1990) ("The doctrine
is an equitable rule of reason, which permits courts to avoid rigid
application of the copyright statute when, on occasion, it would
stifle the very creativity which that law is designed to foster.").
Thus, this Court holds that where the publisher has the exclusive
right to publish the entirety of a copyrighted book, it may not
defeat the user's fair use defense by arguing that too much of a
particular chapter has been copied, even though the chapter in
question was initially conceived as a separate work.

At the same time, the fact that a chapter of a book has more
value to professors than isolated excerpts means that chapters are in
higher demand than isolated parts of chapters.  An extra-long book
with many chapters--whether it be a single author book or an edited
book--is more apt to be the subject of unpaid copying than a shorter
book with fewer chapters.[42]  Plaintiffs are right to seek extra
protection for them in the fair use scheme.  This can be accommodated
through a limit on the number of chapters which can be used without
paying permissions.  But the limits Plaintiffs seek--as embodied in
the Classroom Guidelines--are so restrictive that no book chapters in
this case--from edited volumes or single author books--would qualify
for fair use.  A 1,000 word limit would allow use of a two or three
page excerpt.  In the instant case there literally are no chapters

---

[42]Having examined the books which are at issue in this case, the
Court finds that chapters of the edited volumes and chapters of the
single author books have roughly the same value to professors and
students.  In general, both types of books feature chapters which
cover a discrete topic or subtopic; each chapter can stand on its own
in terms of comprehension; each chapter is separately titled.  The
books involved in this case generally do not have chapters which
build on each other toward a conclusion.

which would fit this word limit. An approach so restrictive undermines the teaching objective favored by § 107. Also, Plaintiffs' (the Guidelines') idea that professors be prohibited from unlicensed use of the same chapter from one academic term to the next is an impractical, unnecessary limitation. The right approach is to select a percentage of pages which reasonably limits copying and to couple that with a reasonable limit on the number of chapters which may be copied. In selecting the limits the Court must keep in mind the "goals of the copyright law," which includes protecting and stimulating incentives for authors to create new works, <u>Campbell</u>, 510 U.S. at 578 n.10, and promoting the spread of knowledge, <u>Golan v. Holder</u>, 132 S. Ct. 873, 888-89 (2012).

Most of the professors who selected the excerpts in this case testified and explained why they selected the particular chapter or other excerpt for the course. The Court finds that all of the selections indeed did further the legitimate educational purposes of the course curriculum. Most were narrowly tailored to accomplish that purpose.

Before determining what amount of copying is appropriate for fair use on the facts of this case, the Court will evaluate fair use factor four and certain additional considerations discussed below. The amount allowed to be excerpted will be determined in the overall fair use assessment thereafter.

In summary, factor three may favor either Plaintiffs or Defendants, depending on the amount taken from each book.

**Factor 4: The Effect of the Use on the Potential Market for or Value of the Copyrighted Work**

Factor four focuses on whether Defendants' (the professors' and the students') use of excerpts of Plaintiffs' copyrighted works adversely affected the potential market for or value of the copyrighted work in question.

Factor four should weigh against defendant only when the harm is significant, Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994); however, because Defendants have the burden of proof on all lements of the fair use defense,[43] a helpful restatement is: to

---

[43]Prior to the Supreme Court's decision in Campbell, most courts and commentators interpreted Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (1984) and Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539 (1985) to say that a non-commercial use is presumed not to cause market harm. See 4-13 NIMMER ON COPYRIGHT § 13.05. In those instances, the burden shifted to the party arguing against the fair use defense to show that the use was still unfair. In Campbell, the Court rejected "hard evidentiary presumptions" in the context of commercial uses and stated, "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." Campbell, 510 U.S. at 590 (internal citations and footnotes omitted). However, the Court did not specify whether this statement was limited to commercial uses, the type at issue in Campbell itself. There is some evidence in the opinion to suggest it was; the Court noted that the lower court had applied "a presumption about the effect of commercial use, a presumption which as applied here we hold to be error." Id. at 591 (emphasis added).

Since Campbell was decided, courts and commentators have disagreed about where the burden of proof lies on factor four. Compare Princeton University Press v. Michigan Document Services, Inc., 99 F.3d 1381, 1385 (6th Cir. 1996) ("The burden of proof as to market effect rests with the copyright holder if the challenged use is of a 'noncommercial' nature."), with 4-13 NIMMER ON COPYRIGHT § 13.05 (noting that in light of Campbell, defendants "will be challenged to develop an appropriate record" to carry their burden of proof on factor four). This Court's best interpretation is that Campbell places the burden of proof for all four factors on the proponent of

-72-

prevail on factor four, Defendants have the burden of proving that any harm from the infringing use is insubstantial. See Campbell, 510 U.S. at 590; Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287, 1307 n.21 (11th Cir. 2008). The factor four analysis calls for determination of whether Defendants' unpaid uses of the excerpts caused or will cause harm to the "potential market for or value of the copyrighted work"; i.e., harm to the marketability of the copyrighted work or the value of the copyrighted work. 17 U.S.C. § 107.

The copyrighted works at issue here are books of which the excerpts are parts. In general, Plaintiffs have the exclusive right to reproduce the books in whole or in part because they own the copyrights, 17 U.S.C. § 106(2)(3) or, by contract, have the exclusive right to reproduce all parts of the books. Although copyright protection extends to derivative works,[44] 17 U.S.C. § 103(a), the excerpts of the copyrighted books are not derivative works. Rather, the excerpts are verbatim copies of parts of the copyrighted books.

The adverse market effect with which fair use is primarily concerned is that of market substitution. Peter Letterese, 533 F.3d at 1315. Where the copyrighted original work and defendant's

_____

the fair use defense.

[44]The term "derivative work" is defined in 17 U.S.C. § 101 as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101.

-73-

infringing copy are identical, defendant's infringing copy substitutes directly for the copyrighted original. This impacts the marketability of the original and reduces its value, causing harm to the copyright owner. This case involves excerpts from whole original works. In general, the larger the excerpt, the greater the potential harm; a large excerpt comes closer to substituting for the whole book. It is relevant here that the excerpts were generally a small part (averaging around 10%) of the whole copyrighted work. Such a small excerpt does not substitute for the book as a whole. The Court is required to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market [for the original]." Campbell, 510 U.S. 569, 590 (1994) (citations omitted); see also Sony, 464 U.S. at 451. Thus, if a professor used an excerpt representing 10% of the copyrighted work, and this was repeated by others many times, would it cause substantial damage to the potential market for the copyrighted work? The answer is no, because the 10% excerpt would not substitute for the original, no matter how many copies were made. In short, Defendants' use of small excerpts did not affect Plaintiffs' actual or potential sales of books.

Plaintiffs' argument that factor four tilts in their favor is based primarily on American Geophysical Union v. Texaco Inc., 60 F.3d 913 (2d Cir. 1994, amended 1995). The Second Circuit found that CCC is "a workable market for institutional users to obtain licenses for the right to produce their own copies of individual articles via photocopying." Id. at 930. The court also said, ". . . it is not unsound to conclude that the right to seek payment for a particular use tends to become legally cognizable under the fourth fair use

-74-

factor when the means for paying for such use is made easier." <u>Id.</u>
at 930-31. In <u>Texaco</u>, an employee of Texaco had made photocopies of
certain articles from a scientific journal to which Texaco
subscribed. Other employees of Texaco had made photocopies as well.
The Second Circuit found that Texaco should have paid license fees to
CCC for the photocopies of the articles. Its failure to have done so
cost the publisher-plaintiff licensing revenues; hence, "the
publishers have demonstrated a substantial harm to the value of their
copyrights through [Texaco's] copying." <u>Id.</u> at 931 (internal
quotation marks and citation omitted).

This Court agrees with <u>Texaco</u> that where excerpts are reasonably
available, at a reasonable price, it is only fair for this fact to be
considered in determining whether Defendants' unpaid uses of excerpts
constitutes a fair use. Fair use is an equitable doctrine. <u>Peter
Letterese</u>, 533 F.3d at 1308. For loss of potential license revenue
to cut against fair use, the evidence must show that licenses for
excerpts of the works at issue are easily accessible, reasonably
priced, and that they offer excerpts in a format which is reasonably
convenient for users. <u>Cf.</u> William F. Patry, PATRY ON FAIR USE § 6:8
(2011) ("easy, inexpensive licensing"); <u>see also</u> <u>Texaco</u>, 60 F.3d at
931 ("[I]t is sensible that a particular unauthorized use should be
considered 'more fair' when there is no ready market or means to pay
for the use, while such an unauthorized use should be considered
'less fair' when there is a ready market or means to pay for the
use.").

Because Plaintiffs advocate that CCC has created an effective
means through which Defendants could have obtained licensed copies of
the excerpts in question here, the Court places the burden on

-75-

Plaintiffs to show that CCC provided, in 2009, reasonably efficient access to the particular excerpts involved in this case. It is true, as <u>Campbell</u> held, that Defendants have the overall burden of proof to show that no substantial damage was caused to the potential market for or the value of Plaintiffs' works by Defendants' unlicensed uses of the excerpts. However, Plaintiffs are advocates of the theory that the availability of licenses shifts the factor four fair use analysis in their favor. Therefore, it is appropriate for them to be called upon to show that CCC provided in 2009 reasonably efficient, reasonably priced, convenient access to the particular excerpts which are in question in this case.

At trial, Plaintiffs called two representatives of CCC who testified concerning CCC's practices. Defendants did not dispute CCC's efficiency or the fairness of the prices charged by CCC for licenses to copy excerpts from Cambridge's, Oxford's, and Sage's works. Defendants articulated no objections in this regard. Defendants' only argument was that the availability of licenses is irrelevant to the fair use analysis; the Court rejects this argument because the availability of licenses impacts the value of the copyrighted work, i.e., the value of the book's copyright, an express concern of § 107(4). A book's ability to command permissions fees has a relationship to the value of the copyrighted book, i.e., to the value of the copyright. If available permissions are not paid, the value of the copyright is less than it otherwise would be.

Plaintiffs produced evidence at trial showing that CCC has a substantial business as a licensing agent. The evidence shows that CCC does represent a very large number of publishers and collects hundreds of millions of dollars in permissions revenues each year on

-76-

their behalf. CCC operates numerous licensing programs, some of which are for the higher education community. However, Cambridge's and Oxford's witnesses did not specifically identify which of their works at issue here were available for licensing through CCC in 2009.

With respect to many of the books involved in this case, there is evidence in the record that the Plaintiff-publisher received APS or ECCS income, or both, through CCC either in or before 2009. Therefore, licenses for excerpts of these works probably were available through CCC in 2009.[45] Beyond that, Plaintiffs' proof encounters difficulties. First, Cambridge's representative, Frank Smith, testified that Cambridge does not allow excerpts of certain categories of books to be licensed through CCC. He specifically mentioned reference books and language books, including English as a second language books. He was not asked to identify which of Cambridge's books were available for licensed excerpts in 2009. Niko Pfund gave testimony regarding some of Oxford's works, but his testimony did not establish that those books likely were available for licensed excerpts in 2009. Second, while Plaintiffs called two representatives of CCC to testify, neither of them testified to whether licenses were available in 2009 to allow copying of parts of the books at issue in this case. Third, the record affirmatively shows that Cambridge has been quite skeptical of granting licenses to create digital excerpts of its works; to a lesser extent that is also true of Oxford. Of the Plaintiff-publishers, Sage has been the most receptive to making digital excerpts available.

---

[45]A chart reflecting this information is attached to this Order.

Plaintiffs seek to overcome the lack of evidence concerning the availability of licenses through two means: by pointing to a portion of Joint Exhibit 5, which indicates what a license to copy the excerpt would have cost through CCC, and through a colloquy between the Court and counsel for Plaintiffs at trial in which counsel stated his belief that excerpts from all of the books involved in this case probably were available through CCC [Tr. Vol. 8 at 10-12]. The fact that a license to copy an excerpt of an individual work would have cost a particular amount is not a substitute for evidence that the license was actually available. The colloquy between counsel and the Court is not evidence.

Furthermore, the record as a whole fails to show that licenses for underlined digital copies of Cambridge's and Oxford's works were generally available in 2009. When an excerpt of a work is available through APS but not ECCS, CCC's license allows making physical copies but not electronic copies. Because Georgia State distributes readings electronically, the lack of licenses for digital excerpts is a disincentive to use CCC's program. While commercially photocopied coursepacks are still in use at Georgia State (and Georgia State pays permissions for such use), this case involves electronic distribution through Georgia State's ERES program. Educational users today want digital materials [Carol Richman, Tr. Vol. 2 at 73-74]. APS permissions to make photocopies are of no value in connection with Georgia State's ERES or uLearn systems. Of the 46 excerpts from Cambridge's and Oxford's works, licenses to make digital copies were shown to be available for only 13 excerpts. In each of the remaining 33 cases the evidence did not show that CCC provided access to licenses to make digital copies in 2009.

-78-

With respect to Defendants' uses of excerpts where digital permissions were not shown to be available, the Court finds that the unpaid use of the excerpts caused no actual or potential damaged to the value of the books' copyrights.  The evidence in this case shows that Defendants' uses (i.e., the professors' and the students' uses) of the materials were under carefully monitored circumstances.  A pass code is required for the students in the class to access the materials; at the end of the semester access terminates.  This is quite different from Campbell, where the parodied version of plaintiff's work was publicly performed and therefore made available to a wide audience.  It is unlikely that the use of excerpts by professors and students resulted in the exposure of the copyrighted materials to people other than the class participants.  For this additional reason, there is little risk of widespread market substitution of the Defendants' copy for the Plaintiffs' original.

In those cases in which digital permissions were available, the Court finds that Defendants' own unpaid uses (the Georgia State professors' and students' uses) of individual excerpts caused extremely small, though actual, damage to the value of the books' copyrights.  A book's ability to command payment of permissions fees has a relationship to the value of the copyrighted book, i.e., to the value of the copyright.  If available permissions are not paid, the value of the copyright is less than it otherwise would be.

Were the fair use analysis to end here, Defendants would prevail as to all of Plaintiffs' infringement claims because the uses of the excerpts by students and professors at Georgia State did not cause substantial harm to Plaintiffs' copyrights. However, two additional considerations weigh against Defendants' position.  The first is the

-79-

Supreme Court's holding in <u>Campbell</u> that courts must consider not only the harm caused by the defendant's own actions, but also what harm would ensue from "widespread conduct of the sort engaged in by the defendant."[46]  <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 590 (1994).  Second, fair use is an equitable doctrine.  The fair use analysis would be deficient if the Court were not to take into account Plaintiffs' right, as owners of the copyrights, to collect fees for use of excerpts from their books.  This is a powerful argument countering fair use, which counsels against Defendants' position when excerpts are readily available, in a convenient format, for a reasonable fee, and the fees are not paid.  This consideration could be treated as a separate fair use factor; the Court includes it as part of the factor four analysis because it pertains to nonpayment of permissions fees, the same as the rest of the factor four analysis.  Taking into account these considerations, factor four weighs heavily in Plaintiffs' favor when permissions for digital excerpts are readily available.  If excerpts are not readily available as stated, factor four weighs in Defendants' favor.

Judges and scholars have noted that there is a circularity problem in evaluating the extent of potential harm or loss of value under the fourth fair use factor.  <u>Peter Letterese</u>, 533 F.3d at 1319 n.37; <u>American Geophysical Union v. Texaco Inc.</u>, 60 F.3d 913, 931 (2d Cir. 1994).  Specifically, it is understood that plaintiff will

_____

[46]This Court, as trier of fact, will consider all evidence in the record to measure the extent of damage to the value of Plaintiffs' copyrights whenever it is necessary to resolve the outcome on the overall four factor analysis.  The burden of proof with respect to each factor, including factor four, remains on Defendants in light of the Supreme Court's opinion in <u>Campbell</u>.

suffer some harm from defendant's use of the copyrighted item when fair use applies.  The objective of the fair use analysis is to determine whether fair use applies.  To say that fair use does not apply because Defendants have made some unpaid use of the copyrighted item is circular reasoning.  There is no ideal solution to this problem.  The approach that will be taken in evaluating individual claims of infringement here will be that all fair use factors will be evaluated independently, without regard to consideration of circularity.  If overall resolution of the fair use issue is close or inconclusive, further analysis will be undertaken.

### Additional Considerations

  a. <u>Limited unpaid copying of excerpts will not deter academic authors from creating new academic works</u>.

   The Constitution itself gives Congress the power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Therefore, a primary consideration must be whether use of small unpaid excerpts, which will slightly limit the amount of permissions income paid to authors and external editors of copyrighted books, would discourage authorship of new academic books.  Plaintiffs do not make the argument that it would, and the evidence does not support it.

   Plaintiffs called no authors of the works at issue to testify on this point.  Several Georgia State professors who testified at trial stated that royalties are not an important incentive for academic writers [<u>See, e.g.</u>, Professor Gabler-Hover's testimony at Tr. Vol. 8

-81-

at 165-66; Professor Kaufmann's testimony at Tr. Vol. 5 at 40]. This testimony was credible. The contributing authors receive no royalties, so potential limitation of permissions income is irrelevant to them. Moreover, the portion of permissions paid over to individual authors and external editors is small[47]; the diminution caused by occasional unpaid use of small excerpts would be extremely small.

Further, all of the authors, contributing authors and external editors of the books at issue are professors at colleges and universities. Presumably, they value education. Such academic authors as a group value publication as an enhancement to professional reputation and achievement and, the Court infers, as a contribution to academic knowledge. This has been recognized in previous reported cases. See, e.g., Texaco, 60 F.3d at 927. There is no reason to believe that allowing unpaid, nonprofit academic use of small excerpts in controlled circumstances would diminish creation of academic works.

        b.    <u>The slight limitation of permissions income caused by the fair use authorized by this Order will not appreciably diminish Plaintiffs' ability to publish scholarly works and will promote the spread of knowledge</u>.

As previously stated, Congress's authority to provide copyright protection comes from the Copyright Clause of the Constitution, which allows Congress "To promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings." U.S. CONST., art. I, § 8, cl. 8. The progress of science

———————————

[47]Royalties to authors of single author books in this case range from 7% to 15%; to external editors, they range from 2% to 15%.

"refers broadly to the creation and spread of knowledge and learning." Golan v. Holder, 132 S. Ct. 873, 888 (2012) (internal quotation marks omitted). Of particular relevance to this case is the Supreme Court's holding that the progress of science is not achieved only by promoting incentives to create new works. Id. The Court has made clear that both the creation and the spread of knowledge are important to serving the aim of the Copyright Clause. Id. Indeed, the Court held in Eldred v. Ashcroft, 537 U.S. 186 (2003), and recently affirmed in Golan, that "the Copyright Clause does not demand that each copyright provision, examined discretely, operate to induce new works. Rather, . . . the Clause 'empowers Congress to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause.'" Golan, 132 S. Ct. at 888 (quoting Eldred, 537 U.S. at 222). Therefore, this Court is guided by the idea that it is consistent with the principles of copyright to apply the fair use doctrine in a way that promotes the dissemination of knowledge, and not simply its creation. See Golan at 888-89; Eldred at 206; Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 558 (1985).

In the context of this case, these holdings are a two-edged sword. Allowing use of unpaid small excerpts of copyrighted works by students does help spread knowledge, because it reduces the cost of education, thereby broadening the availability of education. On the other hand, diminished receipts of permissions income by Plaintiff-publishers could reduce their ability to publish, thereby diminishing the spread of knowledge.

Plaintiffs first argue that reduction in permissions payments could cripple them financially, potentially causing them to cease to

exist  [Doc. 412 at 113-14].  Alternatively, Plaintiffs argue they might be forced to reduce publication of high quality scholarly works [Doc. 412 at 113-14].  The argument that Plaintiffs might be forced out of business is glib.  It is unsupported by evidence.  The argument that Plaintiffs might be forced to cut back on scholarly publications is speculative and unpersuasive on this record.

Plaintiffs' first argument is as follows:  Permissions are an important part of Plaintiffs' revenues.  If permissions are eliminated, Plaintiffs could be forced to "run in the red" and possibly go out of business.  Plaintiffs base this argument on the fact that in 2009 Cambridge's Americas Branch had net income of $3.9 million and in FY 2009 Oxford had net income of $11.4 million and an annual "operating profit" of $1.267 million [Stipulations 92, 93].  Thus, Plaintiffs argue, with such slim margins the very existence of Cambridge's Americas Branch and Oxford could be threatened by loss of permissions revenue.

In fact, permissions income is not a significant percentage of Plaintiffs' overall revenues.  Plaintiffs' 2009 rights and permissions income from all sources (including corporate and other commercial uses) was nine-tenths of one percent of Plaintiffs' average 2009 revenues of $169,268,000.  Plaintiffs' 2009 permissions income relating only to academic book and journal permissions (APS and ECCS) was only .0024--less than one quarter of one percent--of revenues.[48]  Plaintiffs' 2009 permissions income from ECCS was only

_____

[48] 2009 is the only year for which the record contains data for both permissions income and overall revenues.

-84-

.0005 of overall revenues--five one-hundredths of one percent--of revenues.

Further, the evidence shows that Oxford and Cambridge in fact would have been "in the black" in 2009 even if they had received no permissions income at all.[49]

Moreover, comparing the amount of Plaintiffs' permissions receipts to the amount of operating income or operating profit does not determine a causal relationship between the two of them. Net operating income and operating profit are calculated by subtracting expenses of all types, many of which are discretionary or elective, from revenues (See Pls. Exs. 1, 198, 342). Plaintiffs have not demonstrated that a reduction in permissions revenue would "cause" diminished net operating revenue or diminished "operating profit" to any greater degree than, for example, their choice of amortization method, selected writeoffs ($11.730 million for Oxford in 2009) or their charitable contributions would "cause" such diminution. The only conclusion which may be drawn from the evidence is that each dollar of lost permissions income is income that potentially could be used for any number of purposes, including augmenting scholarly publication. Further, any serious effort to prove that Cambridge and Oxford would be financially distressed by diminution of academic permissions income would need to include financial information for more than one year.

---

[49]Oxford's (Oxford University Press-USA) bottom line for 2009 was $4.128 million, not $1.267 million, once an item entitled "Distribution/Fulfillment Income" in the amount of $2.8 million is included [Pls. Ex. 342].

Plaintiffs assume incorrectly that Defendants' fair use defense, if successful, would wipe out all permissions income. But Defendants do not seek such a broad interpretation of fair use. Defendants only seek protection for academic, nonprofit use of small excerpts from Plaintiffs' books. Much of Plaintiffs' permissions revenue comes from corporate and other commercial users. Defendants do not challenge Plaintiffs' entitlement to these permissions revenues. Other forms of income, which Plaintiffs assert would be affected by the interpretation of fair use Defendants advocate, are not connected to this assertion by evidence.

In summary, there is no persuasive evidence that Plaintiffs' ability to publish high quality scholarly books would be appreciably diminished by the modest relief from academic permissions payments which is at issue in this case. There certainly is no evidence that a modest reduction would impact the desire or the ability of academic authors to publish new works. Making small free excerpts available to students would further the spread of knowledge.

### Summary of Fair Use Assessment

This case involves unlicensed copying of 75 excerpts from Plaintiffs' copyrighted books for nonprofit educational use by professors and students at Georgia State University in 2009. The question whether this constitutes a permissible fair use is resolved primarily by reference to 17 U.S.C. § 107 and the Supreme Court's decision in <u>Campbell</u>. The Court <u>must</u> consider all of the statutory elements of § 107; none may be overlooked. However, other factors may be considered. There is no precise manner in which the elements must be weighed in relation to each other; however, it is paramount

-86-

that all factors be weighed and considered "in light of the purposes of copyright." Campbell, 510 U.S. at 578.

Because (1) the excerpts were used for the purpose of teaching (including multiple copies for classroom use) and scholarship, as described in the preamble to § 107, (2) the use was for a noncommercial, nonprofit educational use, as described in § 107(1) and (3) Georgia State is a nonprofit educational institution, fair use factor one weighs heavily in Defendants' favor.

Because all of the excerpts are informational and educational in nature and none are fictional, fair use factor two weighs in favor of Defendants.

With respect to fair use factor three, the amount of the copying as a percentage of the book varies from book to book. In determining what percentage of a book may be copied, the Court looks first to the relationship between the length of the excerpt and the length of the book as a whole. Then, the relationship between the value of the excerpt in relation to the value of the book is examined. The Court also considers the value of a chapter in itself (rather than just a few paragraphs). In the case of extra long books with a large number of chapters, a limit on the number of chapters which may be copied is appropriate. Professors may well have a legitimate educational reason for wanting to use a chapter of a book; it is more apt to contain a complete treatment of a particular topic or subtopic than would a few isolated paragraphs. However, the convenience of using whole chapters from an over-length book may lead to an undue amount of unpaid copying in absolute terms.

Taking into account the foregoing considerations in relation to the books involved in this case, the factor three conclusions are:

Where a book is not divided into chapters or contains fewer than ten chapters, unpaid copying of no more than 10% of the pages in the book is permissible under factor three. The pages are counted as previously set forth in this Order. In practical effect, this will allow copying of about one chapter or its equivalent.[50] Where a book contains ten or more chapters, the unpaid copying of up to but no more than one chapter (or its equivalent) will be permissible under fair use factor three. Excerpts which fall within these limits are decidedly small, and allowable as such under factor three. Access shall be limited only to the students who are enrolled in the course in question, and then only for the term of the course. Students must be reminded of the limitations of the copyright laws and must be prohibited by policy from distributing copies to others. The chapter or other excerpt must fill a demonstrated, legitimate purpose in the course curriculum and must be narrowly tailored to accomplish that purpose. Where the foregoing limitations are met factor three will favor fair use, i.e., will favor Defendants. Otherwise factor three will favor Plaintiffs.

The Court must also consider, under fair use factor four, the effect of the use in question on the potential market for or value of the copyrighted book. Unpaid use of a decidedly small excerpt (as defined under factor three) in itself will not cause harm to the potential market for the copyrighted book. That is because a decidedly small excerpt does not substitute for the book. However, where permissions are readily available from CCC or the publisher for

_____

[50]The respective average length of single author and edited book chapters in this case is the following: Cambridge, 27 pages, 27 pages; Oxford, 25 pages, 30 pages; Sage, 20 pages, 28 pages.

a copy of a small excerpt of a copyrighted book, at a reasonable price, and in a convenient format (in this case, permissions for digital excerpts), and permissions are not paid, factor four weighs heavily in Plaintiffs' favor. Factor four weighs in Defendants' favor when such permissions are not readily available.

The Court has considered whether unlicensed copying of small excerpts as contemplated by this Order would disserve the purposes of the copyright laws, namely, "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Because the unpaid use of small excerpts will not discourage academic authors from creating new works, will have no appreciable effect on Plaintiffs' ability to publish scholarly works, and will promote the spread of knowledge, the Court concludes that it would not.

The Court now turns to examination of the individual infringement claims which have been asserted in this case.

## IV. Individual Infringement Claims

The Court makes the following additional findings of fact and conclusions of law.

### A. Professor Murphy

Professor Murphy is a tenured full time professor in the Department of Applied Linguistics and English as a Second Language at Georgia State [Tr. Vol. 10 at 77].

<u>AL 8480 Classroom Practices in Second/Foreign Language Teaching, Maymester 2009</u>

Ten graduate students were enrolled in Professor Murphy's AL 8480 course during Maymester 2009 [<u>Id.</u> at 78]. Professor Murphy initially created a syllabus for his course in which students were required to purchase two texts; various other required readings were uploaded to ERES without seeking copyright permissions. The day before the course began, Professor Murphy revised the syllabus to state that students were required to purchase four texts, and the readings available on ERES were assigned as supplementary elective readings [Tr. Vol. 10 at 128]. Of the seven different works on Plaintiffs' list of alleged infringements for AL 8480, students were required to purchase two of the books, *Keep Talking: Communicative Fluency Activities for Language Teaching* and *Grammar Practice Activities*. Excerpts from the other five[51] were posted on ERES as supplementary elective readings but were not included as reading assignments on the syllabus [Tr. Vol. 10 at 128-129]. Professor Murphy's testimony, corroborated by the fact that the Maymester 2009 hit list shows that the works on ERES for Professor Murphy's class were accessed between two and five times for each work, indicates that the readings uploaded to ERES were not required readings and that the students did not access them [Jt. Ex. 1 at 42, 43, 55, 56, 79, 95, 96]. The Court credits the testimony of Laura Burtle that when a staff librarian uploads a document to ERES, he or she checks to make sure it has uploaded correctly, which counts as the first

---

[51]These five works were *Pronunciation Games*; *More Grammar Games: Cognitive, Affective and Movement Activities for ESL Students*; *Five Minute Activities*; *Newspapers*; and *Role Play: Resource Books for Teachers*.

hit; the professors themselves usually check to make sure it has been done correctly, which would be the second hit [Tr. Vol. 11 at 131]. Further, counsel for the parties in this litigation have accessed the materials in ERES. Therefore, it is apparent that students did not access the materials uploaded to ERES for Professor Murphy's course.

1.   *Pronunciation Games*

*Pronunciation Games* was first published by Cambridge on December 7, 1995 in the United Kingdom and subsequently published on February 23, 1996 in the United States [Pls. Exs. 138, 140]. The book is authored by Mark Hancock and is comprised of original activities accompanied by advice for teaching English language pronunciation [Jt. Ex. 5 at D-1]. It is part of the *Cambridge Copy Collection*, which is a series of photocopiable resource books that provide teachers with teaching materials such as lesson plans and classroom activities. It contains 112 pages and is not divided into chapters [Pls. Ex. 138]. *Pronunciation Games* retails for $47.00 [Jt. Ex. 5 at D-1]. The net sales revenue from the date of first publication through October 31, 2010 was £445,283 [Pls. Ex. 141]. There is no evidence in the record reflecting that *Pronunciation Games* was available for digital permissions in 2009.

The following language appears at the beginning of *Pronunciation Games*:

> It is normally necessary for written permission for copying to be obtained in advance from a publisher. The worksheets, role play cards, tests and tapescripts at the back of this book are designed to be copied and distributed in class. The normal requirements are waived here and it is not necessary to write to Cambridge University Press for permission for an individual teacher to make copies for use within his or her own classroom. Only those pages which carry the wording "©Cambridge University Press" may be copied.

-91-

[Id.]. Professor Murphy requested pages 8-27 of the book be placed on Georgia State's ERES system [Tr. Vol. 10 at 84; Doc. 393 at 84]. Eleven pages of the excerpt are photocopiable without seeking copyright permissions and nine pages are not [Pls. Ex. 138]. Thus, the protected pages that were copied by Professor Murphy amount to 16.98% of the total protected pages in the book.

Prima Facie Case of Copyright Infringement

*Pronunciation Games* was first published outside the United States on December 7, 1995 and published in the United States on February 23, 1996, more than 30 days after the first publication [Tr. Vol. 1 at 119-120; Pls. Ex. 140]. Thus, *Pronunciation Games* is a foreign work as defined by the Copyright Act and a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 101; 17 U.S.C. § 104(b)(2).[52] If the Court is required to make a determination of "copyrightablity" or "originality" for Plaintiffs' infringement claim to succeed,[53] the

---

[52]When the United States joined the Berne Convention on March 1, 1989, the Copyright Act was revised to provide that the requirement for registration in order to bring an infringement action is limited to "the copyright in any United States work"; the claimant of a copyright in any foreign work of a country that is also a signatory to the Berne Convention may file suit in a United States District Court without proof of copyright registration. Berne Convention Implementation Act of 1988, Mar. 1, 1989, Pub. L. No. 100-568; 17 U.S.C. § 411(a).

[53]The cases to which Defendants cite to support their contention that Plaintiffs must show that a foreign work is "copyrightable" to satisfy the first element of a prima facie case of copyright infringement are not on point; they each involve a plaintiff seeking to bring an infringement action for a United States work that was denied copyright registration, not for a foreign work. Ward v. Nat'l Geographic Soc'y, 208 F. Supp. 2d 429 (S.D.N.Y. 2002); Clarus Transphase Scientific, Inc. v. Q-Ray, Inc., No. 06C4634, 2006 WL 4013750, at *20 (N.D. Ill. Oct. 6, 2006); Morelli v. Tiffany and Co.,

Court finds that this book is an original work[54] with sufficient creativity to be copyrighted. *Pronunciation Games* meets the first prong of the prima facie case of copyright infringement.

As evidenced by Professor Murphy's testimony and the ERES hit count, a copy of an excerpt from *Pronunciation Games* was uploaded to Georgia State's ERES system. The second prong of the prima facie case of copyright infringement has thus been established because Professor Murphy copied protected elements of *Pronunciation Games* [Jt. Ex. 1 at 43; Tr. Vol. 10 at 84]. Although it is obvious that students did not access the excerpt through ERES, the act of uploading the excerpt to ERES technically satisfies the second prong of the infringement analysis.

However, while the reading was uploaded to the ERES course page for AL 8480, it was not included in the syllabus for the course as required reading for AL 8480 [Pls. Ex. 540]. The excerpt had a hit count of three on the ERES system [Jt. Ex. 1 at 43], and all of these hits are likely attributable to the staff librarian, Professor Murphy himself, or counsel for the parties. Thus, the Court finds the use that resulted from this upload to be <u>de minimis</u> such that it "need not be prohibited in order to protect the author's incentive to create." <u>See</u> <u>Sony Corp. of Am. v. Universal City Studios, Inc.</u>, 464 U.S. 417, 450-51, n.34 (1984) and accompanying text ("'In certain situations, the copyright owner suffers no substantial harm from the

_____

No. 00-1961, 2001 WL 179898, at *1 (E.D. Pa. Jan. 10, 2001).

[54]For this finding the Court relies on Cambridge's reputation in its field and Frank Smith's testimony that Cambridge regularly scrutinizes all proposed works. The Court believes this work was reviewed for being original to the author before it was published.

use of the work. . . . Here again, is the partial marriage between the doctrine of fair use and the legal maxim <u>de minimis non curat lex</u>.'") (quoting Alan Latman, FAIR USE OF COPYRIGHTED WORKS (1958)) (additional citations omitted). Accordingly, the Court need not address the fair use defense for Professor Murphy's use of *Pronunciation Games*. This claim of copyright infringement fails.

2. <u>*Keep Talking: Communicative Fluency Activities for Language Teaching*</u>

*Keep Talking* was first published by Cambridge on February 14, 1985 in the United Kingdom and subsequently published on April 26, 1985 in the United States [Pls. Exs. 114, 116]. It is part of the *Cambridge Handbooks for Language Teachers* series, which offers practical ideas, techniques, and activities for teaching language. *Keep Talking* is a 208 page book authored by Friederike Klippel [Pls. Ex. 114]. One subpart of the book is divided into four chapters, and the remainder of the book is not divided into chapters. It is a resource book for teachers and contains communicative fluency activities for language teaching [Pls. Ex. 114]. The book retails for $29.00. The net sales revenue from the date of first publication through October 31, 2010 was £616,445 [Pls. Ex. 117]. There is no evidence in the record reflecting that *Keep Talking* was available for licensed digital excerpts in 2009.

The following paragraph appears at the beginning of the book:

> It is normally necessary for written permission for copying to be obtained *in advance* from a publisher. Certain parts of this book are designed to be copied and distributed in class. The normal requirements are waived here and it is not necessary to write to Cambridge University Press for permission for an individual teacher to make copies for use within his or her own classroom. Only those pages which carry the wording "©Cambridge University Press 1984" may be copied.

[Pls. Ex. 114]. Professor Murphy requested pages 58-98 of *Keep Talking* be placed on Georgia State's ERES system for Maymester 2009 [Tr. Vol. 10 at 93-94]. None of the pages in this 41 page excerpt were photocopiable without permission. The excerpt is part of one chapter and represents 26.11% of the total number of protected pages in the book [Pls. Ex. 114].

### Prima Facie Case of Copyright Infringement

*Keep Talking* was first published outside the United States on February 14, 1985 and published in the United States on April 26, 1985, more than 30 days after the first publication [Tr. Vol. 1 at 120; Pls. Exs. 114, 116]. Thus, *Keep Talking* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement for the reasons stated in the preceding discussion of *Pronunciation Games*. 17 U.S.C. § 104(b)(2). The Court finds that *Keep Talking* is an original work and that it has sufficient creativity to be copyrighted. *Keep Talking* meets the first prong of the prima facie case of copyright infringement.

As evidenced by Professor Murphy's testimony and the ERES hit count, a copy of an excerpt from *Keep Talking* was uploaded to Georgia State's ERES system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Keep Talking* was copied without seeking copyright permissions. Although it is obvious that students did not access the excerpt through ERES, the act of uploading the excerpt to ERES technically satisfies the second prong of the infringement analysis.

However, although the excerpt at issue was uploaded to the ERES system, the course syllabus required students to purchase the book

-95-

[Tr. Vol. 10 at 92-93; Pls. Ex. 540]. The excerpt had a hit count of two on the ERES system [Jt. Ex. 1 at 55], and both of these hits are likely attributable to the staff librarian, Professor Murphy himself, or counsel for the parties. Because the students did not access the excerpt through ERES and instead purchased the book itself, the act of uploading the excerpt on ERES had no impact on the market for *Keep Talking*. Thus, the Court finds the use that resulted from this upload to be <u>de minimis</u> such that it "need not be prohibited in order to protect the author's incentive to create." <u>See</u> <u>Sony</u>, 464 U.S. at 450-51, n.34 and accompanying text ("'In certain situations, the copyright owner suffers no substantial harm from the use of the work. . . . Here again, is the partial marriage between the doctrine of fair use and the legal maxim <u>de minimis non curat lex</u>.'") (quoting Alan Latman, Fair Use of Copyrighted Works (1958)) (additional citations omitted). Accordingly, it is not necessary to address the fair use defense for Professor Murphy's use of *Keep Talking*. This claim of copyright infringement fails.

3. *More Grammar Games: Cognitive, Affective and Movement Activities for ESL Students*

*More Grammar Games* was first published by Cambridge in 1995, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Exs. 134, 136]. It is a 192 page, nine chapter book authored by Mario Rinvolucri and Paul Davis. It is comprised of classroom grammar activities and advice for how to conduct the activities in the classroom [Pls. Ex. 134]. *More Grammar Games* retails for $32.00 [Jt. Ex. 5 at D-3]. The net sales revenue from the date of first publication through October 31, 2010 was £318,880 [Pls. Ex. 137]. There is no evidence in the record

-96-

reflecting that *More Grammar Games* was available for digital permissions in 2009.

The following language appears at the beginning of *More Grammar Games*:

> It is normally necessary for written permission for copying to be obtained *in advance* from a publisher. Certain parts of this book are designed to be copied and distributed in class. The normal requirements are waived here and it is not necessary to write to Cambridge University Press for permission for an individual teacher to make copies for use within his or her own classroom. Only those pages which carry the wording "©Cambridge University Press" may be copied.

[Pls. Ex. 134]. Additionally, in the acknowledgments section at the end of the book, the following language is included: "It has not been possible to identify the sources of all the material used and in such cases the publishers would welcome information from copyright owners." [Id.].

Professor Murphy requested that pages 58-93, or 36 pages, of the book be placed on Georgia State's ERES system for the students in his course [Tr. Vol. 10 at 99]. Ten of the pages from the excerpt were photocopiable without seeking permission from Cambridge [Tr. Vol. 10 at 101]. The pages were uploaded to the ERES course page for AL 8480, but the excerpt was not included in the syllabus for the course [Pls. Ex. 540]. The excerpt had a hit count of five on the ERES system for the Maymester 2009 [Jt. Ex. 1 at 79].

### Prima Facie Case of Copyright Infringement

*More Grammar Games* was first published by Cambridge in 1995, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Ex. 136]. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie

-97-

> evidence of the validity of the copyright and of the facts
> stated in the certificate. The evidentiary weight to be
> accorded the certificate of a registration made thereafter
> shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *More Grammar Games* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *More Grammar Games*.

In the acknowledgments section of *More Grammar Games*, Cambridge included a reservation as to the originality of the contents of the book. By stating "[i]t has not been possible to identify the sources of all the material used and in such cases the publishers would welcome information from copyright owners," Cambridge recognized that it could not prove the originality of all the material used because it had not identified the source and/or authors of some of the material. This acknowledgment is to Cambridge's credit. However, copyright protection in a work extends only to those elements that are original to the author. <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 348 (1991). For the Court to determine whether the excerpt at issue in this case is original or otherwise protected by Cambridge's copyright for the full work, Plaintiffs would have needed to provide evidence about the source of, or Cambridge's rights to, the specific excerpt at issue. Because Plaintiffs did not provide evidence regarding which portions of the book are original and for which portions they did obtain permission, the Court finds that Cambridge has not met its burden of proving the originality of *More Grammar Games.* Therefore, Plaintiffs have failed to establish

-98-

the first prong of the prima facie case of copyright infringement for *More Grammar Games*.  It is not necessary to address Defendants' fair use defense.  This infringement claim fails.

4.  *Grammar Practice Activities*

*Grammar Practice Activities* was first published by Cambridge on December 15, 1988 in the United Kingdom and was subsequently published on February 24, 1989 in the United States [Pls. Ex. 101; Defs. Ex. 788].  The work is authored by Penny Ur [Defs. Ex. 788].  It is part of the *Cambridge Handbooks for Language Teachers* series, which provides practical guides for teachers of English and other languages [Defs. Ex. 788].  *Grammar Practice Activities* is intended for grammar teachers and contains teaching instructions and activities for teaching grammar to students in a communicative methodology [Jt. Ex. 5 at D-4; Tr. Vol. 10 at 105].  It has 296 pages and is divided into four chapters.  The book retails for $30.00.  The net sales revenue from April 2, 2009 through October 31, 2010 was £67,653 [Pls. Ex. 102].  There is no evidence in the record reflecting that *Grammar Practice Activities* was available for licensed digital excerpts in 2009.

The following language appears near the front of the book under the title "copyright":

> It is normally necessary for written permission for copying to be obtained *in advance* from a publisher.  Because *Grammar Practice Activities* contains resource material, those activities which carry the wording "©Cambridge University Press 1988" may be photocopied.  The normal requirements are waived here and it is not necessary to write to Cambridge University Press for permission.

[Defs. Ex. 788].  Professor Murphy requested that pages 44-102 of the book be placed on ERES [Tr. Vol. 10 at 106].  Of the 59 pages in this excerpt, some were copiable without permission, but the parties

-99-

disagree as to how many were photocopiable.  Plaintiffs argue the number of copiable pages is 18; Defendants argue it is 37.  Because it will not change the outcome, the Court assumes without deciding that the number of pages Professor Murphy could have copied without permission is somewhere within this range.

Prima Facie Case of Copyright Infringement

*Grammar Practice Activities* was first published outside the United States on December 15, 1988 and published in the United States on February 24, 1989, more than 30 days after the first publication date [Tr. Vol. 1 at 121-122; Pls. Ex. 101; Defs. Ex. 788].  Thus, *Grammar Practice Activities* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement for the reasons stated in the preceding discussion of *Pronunciation Games*.  17 U.S.C. § 104(b)(2).  The Court finds that *Grammar Practice Activities* is an original work and that it has sufficient creativity to be copyrighted.  *Grammar Practice Activities* meets the first prong of the prima facie case of copyright infringement.

As evidenced by Professor Murphy's testimony and the ERES hit count, a copy of an excerpt from *Grammar Practice Activities* was uploaded to Georgia State's ERES system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Grammar Practice Activities* was copied without seeking copyright permissions.  Although students did not actually access the excerpt through ERES, the act of uploading it to ERES technically satisfies the second prong of the infringement analysis.

However, although Professor Murphy contemplated using only an excerpt from *Grammar Practice Activities* and thus had the excerpt

-100-

uploaded to the ERES system, the course syllabus required students to purchase the entire *Grammar Practice Activities* book [Tr. Vol. 10 at 105; Pls. Ex. 540]. The excerpt on ERES had a hit count of two on the ERES system [Jt. Ex. 1 at 95], and both of these hits are likely attributable to the staff librarian, Professor Murphy himself, or counsel for the parties. Because the students did not access the excerpt through ERES and instead purchased the book itself, the act of uploading the excerpt on ERES did not have an impact on the market for *Grammar Practice Activities*. Thus, the Court finds the use that resulted from this upload to be <u>de minimis</u> such that it "need not be prohibited in order to protect the author's incentive to create." <u>See</u> <u>Sony</u>, 464 U.S. at 450-51, n.34 and accompanying text (citing Alan Latman, FAIR USE OF COPYRIGHTED WORKS (1958)). Accordingly, the Court need not address the fair use defense for Professor Murphy's use of *Grammar Practice Activities*. This claim of copyright infringement fails.

### 5. *Five-Minute Activities*

*Five-Minute Activities* was first published by Cambridge on January 1, 1992, but Cambridge did not obtain a copyright registration with the U.S. Copyright Office until December 27, 2010 [Pls. Exs. 90, 92]. It is a 117 page non-chapter book authored by Penny Ur and Andrew Wright. *Five-Minute Activities* is part of the *Cambridge Handbooks for Language Teachers* series, which offers practical ideas, techniques, and activities for teaching language. It is comprised of advice for language teaching and short language learning activities [Pls. Ex. 90; Jt. Ex. 5 at D-5]. *Five-Minute Activities* retails for $27.00 [Jt. Ex. 5 at A-2]. The net sales revenue from the date of first publication through October 31, 2010

was £928,564 [Pls. Ex. 93]. There is no evidence in the record reflecting that *Five-Minute Activities* was available for digital permissions in 2009.

Professor Murphy requested pages 1-23 of the book be placed on Georgia State's ERES system [Tr. Vol. 10 at 112-113].

<u>Prima Facie Case of Copyright Infringement</u>

*Five-Minute Activities* was first published by Cambridge in 1992; Cambridge did not obtain a certificate of copyright registration until December 20, 2010 [Pls. Ex. 92]. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Five-Minute Activities* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, it is within the Court's discretion to determine the copyrightability/ originality of *Five-Minute Activities*.

To qualify for copyright protection, a work must be the author's original work. <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 345 (1991). To meet the creativity requirement, even a slight amount of creativity will suffice. <u>Id.</u> *Five-Minute Activities* contains advice for teachers and various activities to perform in the

classroom as a means to facilitate language learning. Cambridge, in soliciting a copyright registration, declared that *Five-Minute Activities* is an original work and nothing in the evidence indicates otherwise. The Court further finds that the book meets the creativity requirement. Therefore, the Court finds that *Five-Minute Activities* is copyrightable and the first prong of the prima facie case of copyright infringement has been satisfied.

As evidenced by Professor Murphy's testimony and the ERES hit count, a copy of an excerpt from *Five-Minute Activities* was uploaded to Georgia State's ERES system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Five-Minute Activities* was copied without seeking copyright permissions. Although it is obvious that students did not access the excerpt through ERES, the act of uploading the excerpt to ERES technically satisfies the second prong of the infringement analysis.

However, although 23 pages were uploaded to the ERES course page, the excerpt was not included in the syllabus for the course [Pls. Ex. 540]. The excerpt had a hit count of three on the ERES system for the Maymester 2009 [Jt. Ex. 1 at 96], and all of these hits are likely attributable to the staff librarian, Professor Murphy himself, or counsel for the parties. Because Professor Murphy did not assign the excerpt from *Five-Minute Activities* as required reading, and students did not access it, uploading the excerpt did not have an effect on the market for the work or otherwise harm Cambridge. Thus, the Court finds the use that resulted from this upload to be <u>de minimis</u> such that it "need not be prohibited in order to protect the author's incentive to create." See <u>Sony</u>, 464 U.S. at

-103-

450-51, n.34 and accompanying text (citing Alan Latman, FAIR USE OF
COPYRIGHTED WORKS (1958)). Accordingly, the Court need not address the
fair use defense for Professor Murphy's use of *Five-Minute
Activities*. This claim of copyright infringement fails.

> 6. *Newspapers*

*Newspapers* was first published by Oxford on February 4, 1993 in
the United Kingdom and subsequently published on March 18, 1993 in
the United States [Pls. Exs. 433, 993]. It is authored by Peter
Grundy and makes recommendations on how to use newspapers for the
purpose of language teaching [Pls. Ex. 433; Tr. Vol. 10 at 117; Jt.
Ex. 5 at D-6]. It contains copies of previously published newspaper
articles, along with suggestions for teaching methods using those
articles [Id.]. The book is part of the *Resource Books for Teachers*
series, which gives classroom teachers a guide to language teaching,
discusses current issues and underlying concepts, and provides actual
classroom materials and techniques [Pls. Ex. 433]. The book is 144
pages in length and has six chapters. *Newspapers* retails for $21.50
[Jt. Ex. 5 at D-6]. The net sales revenue from the date of first
publication through November 7, 2010 was $21,079 [Pls. Ex. 357].
There is no evidence in the record reflecting that *Newspapers* was
available for digital permissions in 2009.

The following language appears at the beginning of *Newspapers*:

> The publisher grants permission for the photocopying of
> those pages marked "photocopiable" according to the
> following conditions. Individual purchasers may make
> copies for their own use or for use by classes that they
> teach. School purchasers may make copies for use by staff
> and students, but this permission does not extend to
> additional schools or branches.

[Id.]. Professor Murphy requested pages 30-58 of the book be placed
on the ERES system [Tr. Vol. 10 at 117]. Two pages of the excerpt

-104-

are labeled as photocopiable without seeking permission from the publisher; the remaining 27 are not [Pls. Ex. 433; Tr. Vol. 10 at 117-118].

### Prima Facie Case of Copyright Infringement

*Newspapers* was first published outside the United States on February 4, 1993 and published in the United States on March 18, 1993, more than 30 days after the first publication [Pls. Ex. 993; Pls. Ex. 433]. Thus *Newspapers* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 104(b)(2). The Court further finds, based on Niko Pfund's testimony concerning Oxford's rigorous screening procedures, that the book is original to the author. The book is sufficiently creative to be copyrightable. The first prong of the prima facie case of copyright infringement is met.

As evidenced by Professor Murphy's testimony and the ERES hit count, a copy of an excerpt from *Newspapers* was uploaded to Georgia State's ERES system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Newspapers* was copied without seeking copyright permissions. Although students did not actually access the *Newspapers* excerpt on ERES, the act of uploading the pages to ERES itself satisfies the second prong of the infringement analysis.

However, while the excerpt from *Newspapers* was uploaded to the ERES course page for AL 8480, it was not included in the syllabus for the course [Pls. Ex. 540]. The excerpt had a hit count of three on the ERES system [Jt. Ex. 1 at 42], and all of these hits are likely attributable to the staff librarian, Professor Murphy himself, or counsel for the parties.

-105-

Because the students in Professor Murphy's AL 8480 graduate course were not assigned and did not read the excerpt of *Newspapers*, uploading it onto Georgia State's ERES system did not have an effect on the market for the work and Oxford suffered no harm from the initial copying. Thus, the Court finds the use that resulted from this upload to be <u>de minimis</u> such that it "need not be prohibited in order to protect the author's incentive to create." <u>See</u> <u>Sony</u>, 464 U.S. at 450-51, n.34 and accompanying text (citing Alan Latman, FAIR USE OF COPYRIGHTED WORKS (1958)). Accordingly, the Court need not address the fair use defense for Professor Murphy's use of *Newspapers*. This claim of copyright infringement fails.

       7. *Role Play: Resource Books for Teachers*

*Role Play* was first published by Oxford on April 9, 1987 in the United Kingdom and subsequently published on June 11, 1987 in the United States [Pls. Exs. 458, 993]. It is a 191 page book that is not divided into chapters [Pls. Ex. 458]. *Role Play* is authored by Gillian Porter Ladousse and provides a series of activities and role plays that can be used in language classes as well as guidance on how to use the role play as a teaching technique [Tr. Vol. 10 at 122; Pls. Ex. 458]. The book is part of the *Resource Books for Teachers* series, which gives classroom teachers a guide to language teaching, discusses underlying concepts, and provides actual classroom materials and techniques [Pls. Ex. 433]. *Role Play* retails for $19.95 [Jt. Ex. 5 at D-7]. The net sales revenue from the date of first publication through November 7, 2010 was $23,858 [Pls. Ex. 357]. There is no evidence in the record reflecting that *Role Play* was available for digital permissions in 2009.

The following language appears at the beginning of *Role Play*:

> The publisher grants permission for the photocopying of those pages marked "photocopiable" according to the following conditions. Individual purchasers may make copies for their own use or for use by classes that they teach. School purchasers may make copies for use by staff and students, but this permission does not extend to additional schools or branches.

[Id.]. Professor Murphy requested pages 24-62 of the book be placed on Georgia State's ERES system [Tr. Vol. 10 at 122]. Nine pages of the excerpt are labeled as photocopiable without seeking permission from the publisher; the remaining 30 are not [Pls. Ex. 458; Tr. Vol. 10 at 123-124].

<u>Prima Facie Case of Copyright Infringement</u>

*Role Play* was first published outside the United States on April 9, 1987 and published in the United States on June 11, 1987, more than 30 days after the first publication [Pls. Exs. 458, 993]. Thus *Role Play* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 104(b)(2). The Court finds that *Role Play* is an original work and that it is sufficiently creative to be copyrightable. The first prong of the prima facie case of copyright infringement is met.

As evidenced by Professor Murphy's testimony and the ERES hit count, a copy of an excerpt from *Role Play* was uploaded to Georgia State's ERES system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Role Play* was copied without seeking copyright permissions. Although students did not actually access *Role Play* on ERES, the act of uploading the excerpt to ERES itself technically satisfies the second prong of the infringement analysis.

-107-

While the reading was uploaded to ERES, it was not included in the syllabus for Professor Murphy's AL 8480 course for Maymester 2009 [Pls. Ex. 540]. The *Role Play* excerpt had a hit count of three on the ERES system [Jt. Ex. 1 at 56], and all of these hits are likely attributable to the staff librarian, Professor Murphy himself, or counsel for the parties. Because Professor Murphy did not assign the excerpt from *Role Play* as required reading for AL 8480, and students did not access the reading on ERES, uploading the excerpt of *Role Play* onto Georgia State's ERES system had no effect on the market.

Thus, the Court finds the use that resulted from this upload to be <u>de minimis</u> such that it "need not be prohibited in order to protect the author's incentive to create." <u>See</u> <u>Sony</u>, 464 U.S. at 450-51, n.34 and accompanying text (citing Alan Latman, Fair Use of Copyrighted Works (1958)). Accordingly, the Court need not address the fair use defense for Professor Murphy's use of *Role Play*. This claim of copyright infringement fails.

### B. Professor Kaufmann

Professor Kaufmann is an assistant professor at Georgia State in the College of Education [Tr. Vol. 5 at 35-36]. She has taught at Georgia State since 2006 and is on a tenure track [<u>Id.</u>]. Professor Kaufmann's courses teach students methods for conducting qualitative research [<u>Id.</u>]. Predominantly Ph.D. students enroll in these courses [<u>Id.</u>].

Professor Kaufmann regularly uses Georgia State's ERES system for distributing readings to her students. It is her general practice to assign full chapters from books rather than partial chapters [Tr. Vol. 5 at 74]. She learned about Georgia State's

-108-

Copyright Policy in February 2009 and attended a one-hour training session on the policy on May 6, 2009 [Tr. Vol. 5 at 42-46].

### EPRS 8500 Qualitative/Interpretive Research in Education I, Maymester 2009

EPRS 8500 is a predominantly theoretical course [Tr. Vol. 5 at 37-38]. Approximately thirteen students were enrolled in the course during the Maymester 2009. As evidenced by the syllabus for this course and Professor Kaufmann's testimony, students were required to purchase three texts, as well as complete several required readings posted on ERES [Tr. Vol. 5 at 67-76; Pls. Ex. 516].

8. *The Craft of Inquiry: Theories, Methods, Evidence*

*The Craft of Inquiry* was first published by Oxford in 1998. It is a 176 page, eight chapter book authored by Robert R. Alford. It provides an overview of sociological methodology and the relationships between the various approaches [Pls. Ex. 372]. *The Craft of Inquiry* retails for $32.95 [Jt. Ex. 5 at D-10]. The net sales revenue from the date of first publication through November 7, 2010 was $86,325.00 [Pls. Ex. 357]. Licensed digital excerpts of the book were available in 2009 through CCC. From July 1, 2004 until December 1, 2010, *The Craft of Inquiry* earned $12.36 in ECCS permissions revenue [Pls. Ex. 375; see also Attachment to this Order[55]].

_____

[55]Permissions revenues earned by Plaintiff-publishers serve as a useful proxy for estimating demand for licensed excerpts of the works at issue in this case. However, the Court does acknowledge that permissions revenues may not account for the full extent of copying of excerpts occurring at universities by professors and students. Based on Dr. Crews's report, the Court infers that unpaid use of excerpts occurs at many universities other than Georgia State. However, even if earned permissions revenues do not reflect all uses of an excerpt, they are still instructive as to the relative demand

Professor Kaufmann requested pages 21-31 of *The Craft of Inquiry*, the entirety of chapter two and 6.75% of the book, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 120-121]. Had permissions been paid for the digital distribution of this excerpt, Oxford would have earned less than $14.89 in net revenue from permissions income.[56] The cost to students in the course would have been $20.16.

<u>Prima Facie Case of Copyright Infringement</u>

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *The Craft of Inquiry* [Doc. 411 at 27]. Oxford owns a valid copyright in *The Craft of Inquiry* [Pls. Ex. 374]. The copyright is registered in the name of the author, Robert R. Alford, who assigned his copyright to Oxford [Pls. Ex. 373]. The first prong of the prima facie case of copyright infringement is satisfied. A copy of an excerpt from *The Craft of*

---

for excerpts of various works. For example, it is evident that a work such as *The Sage Handbook of Qualitative Research (Second Edition)*, which has earned $6,324.61 in ECCS revenue, has stronger demand for licensed digital excerpts among academic users than Oxford's *The Craft of Inquiry*, which was used in the same course but has earned only $12.36 through ECCS over the same time period.

Furthermore, in Fiscal Year 2009, CCC paid royalties of $935,450.35 to Cambridge, $1,650,323.00 to Oxford, and $2,136,912.89 to Sage [Stipulations, Doc. 276 ¶ 33]. These figures make clear that Sage and Oxford had a larger presence in the excerpt market in 2009 than did Cambridge.

[56]The amount earned would have been $20.16, the amount charged by CCC, [Jt. Ex. 5 at D-10], less the $3.00 service fee charged by CCC to users, less $2.57 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

*Inquiry* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *The Craft of Inquiry* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kaufmann's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Craft of Inquiry* is a non-fiction work that provides an overview of sociological methodology. The presentation is informational in nature. The second fair use factor weighs in favor of Defendants.

As to the third fair use factor, Professor Kaufmann uploaded one full chapter of an eight chapter book to ERES. Because the book contains less than ten chapters, a limit of 10% of the protected pages of the book applies. The excerpt copied was eleven pages, totaling 6.25% of the total work. This is a decidedly small amount. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of *The Craft of Inquiry* affected the market for purchasing the book as a whole. It is obvious that students would not pay $32.95 for the entire book when only eleven pages were required reading for Professor Kaufmann's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Craft of Inquiry* had a negative effect on the market for purchase of the book itself.

-111-

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of *The Craft of Inquiry* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

9.   *Handbook of Feminist Research: Theory and Praxis*

The *Handbook of Feminist Research* was first published by Sage in 2006 [Pls. Ex. 247]. It is a 767 page, 43 chapter volume edited by Sharlene Nagy Hesse-Biber. The contributed chapters analyze feminist approaches to research methodology [Pls. Ex. 243; Jt. Ex. 5 at D-11]. The *Handbook of Feminist Research* retails for $146.00 [Jt. Ex. 5 at D-11]. The book has earned net sales revenue in the amount of $94,085.88 [Pls. Ex. 248]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009. However, licensed digital excerpts of the book were available through Sage's in-house permissions program, and the book has earned $938.46 in permissions revenue [Pls. Ex. 248].

Professor Kaufmann requested pages 515-534 of the *Handbook of Feminist Research,* the entirety of chapter 26, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 112]. The

-112-

excerpt was a chapter entitled "Feminist Research Ethics" by Judith Preissle [Pls. Ex. 243]. It represents 2.61% of the total work. Had permissions fees been paid via Sage's in-house program for the digital distribution of this excerpt, Sage would have earned $31.30 less royalties payable to the external editor in net revenue from permissions. The cost to students in the course would have been $31.30.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for this excerpt of the *Handbook of Feminist Research* [Doc. 411 at 27]. This is a work made for hire; Sage owns a valid copyright in the *Handbook of Feminist Research* [Pls. Exs. 244, 246, 247]. The copyright is registered in Sage's name. Ms. Hesse-Biber's contract with Sage provides that the material contributed by her for the book shall be considered a work made for hire [Pls. Ex. 244], and the contributing author agreement states that the chapter which consists of pages 515-534 was a work made for hire for Sage [Pls. Ex. 246]. The first prong of the prima facie case of copyright infringement is satisfied. A copy of an excerpt from the *Handbook of Feminist Research* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from the *Handbook of Feminist Research* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of

-113-

students in Professor Kaufmann's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Feminist Research* is a non-fiction work that presents feminist approaches to research methodology.  The presentation is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded one full chapter representing 2.61% of the *Handbook of Feminist Research* to ERES.  Because the work contained more than ten chapters, Professor Kaufmann properly adhered to the one chapter limit; the amount copied was decidedly small.  The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of the *Handbook of Feminist Research* affected the market for purchasing the book as a whole.  It is obvious that students would not pay $146.00 for the entire book when only twenty of 767 pages were required reading for Professor Kaufmann's course.  Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Feminist Research* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009.  The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright.  In addition, widespread use

of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of the *Handbook of Feminist Research* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### 10. *Handbook of Social Theory*

The *Handbook of Social Theory* was first published by Sage in 2001 in the United Kingdom and subsequently published in the United States [Pls. Ex. 288]. It is a 564 page, 39 chapter volume edited by George Ritzer and Barry Smart. The work provides an overview of social theory, and the chapters in the book discuss strengths and weaknesses of contemporary social theory [Pls. Ex. 288; Jt. Ex. 5 at D-12]. The *Handbook of Social Theory* retails for $150.00 in hardcover and $69.95 in paperback [Jt. Ex. 5 at D-12]. The net sales revenue the book has earned amounts to £63,483.74 [Pls. Ex. 291]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in or before 2009. Licensed excerpts of this work were available directly from Sage; the book has earned £2,470.01 through Sage's in-house permissions program [Pls. Ex. 291].

Professor Kaufmann requested pages 217-228 of the *Handbook of Social Theory*, a portion of one chapter, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 113; Pls. Exs. 288, 516]. The excerpt was taken from Chapter 17, "Symbolic Interactionism at the End of the Century," which was written by Kent

-115-

Sandstrom, Daniel Martin, and Gary Alan Fine.  Had permissions fees been paid via Sage's permissions program for the digital distribution of this excerpt, students would have paid--and Sage would have earned--$18.72 in net revenue.[57]

<u>Prima Facie Case of Copyright Infringement</u>

The *Handbook of Social Theory* was first published outside the United States in 2001 and was published in the United States more than 30 days after the first publication [Pls. Ex. 288; Tr. Vol. 2 at 129-130].  Thus, the *Handbook of Social Theory* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement.  17 U.S.C. § 104(b)(2).  The Court finds that the *Handbook of Social Theory* is an original work and that it has sufficient creativity to be copyrighted.

Defendants contend that Plaintiffs have nonetheless failed to establish a prima facie case of copyright infringement because only one of the three authors of the chapter at issue has assigned his copyright interest to Sage.  Defendants argue that all three co-authors must assign their interest in the work to Sage for it to have ownership of the underlying copyright.

Chapter seventeen of the *Handbook of Social Theory* was authored by Kent L. Sandstrom, Daniel D. Martin, and Gary Alan Fine [Pls. Ex. 288].  Plaintiffs have produced evidence of an author agreement with Gary Alan Fine, assigning the exclusive right to publish the chapter to Sage [Pls. Ex. 290], but Defendants point out that there is no

---

[57]The amount Sage earned would have been $18.72, the amount charged through its in-house program, less royalties it is obligated to pay the external editor.

evidence of similar assignments by the other two authors of chapter seventeen.

However, one joint author may properly license the copyright in a joint work to a third party. In <u>Community for Creative Non-Violence v. Reid</u>, 846 F.2d 1485 (D.C. Cir. 1988) (opinion by Judge Ruth Bader Ginsburg), <u>aff'd</u>, 490 U.S. 730 (1989), the Court held that "Joint authors co-owning copyright in a work 'are deemed to be tenants in common,' with 'each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby.'" 846 F.2d at 1498 (quoting William Patry, Latman's The Copyright Law 122 (6th ed. 1986)). Thus, author Gary Alan Fine's grant of "the sole and exclusive right to produce and publish" the chapter to Sage also conveyed to Sage the authorship rights of his co-contributors.

Sage holds the exclusive right to publish the *Handbook of Social Theory* through contract with George Ritzer and Barry Smart. It also holds the exclusive right to publish chapter seventeen of the book by contract with the contributing authors. The first prong of the prima facie case of copyright infringement is satisfied. A copy of an excerpt from the *Handbook of Social Theory* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from the *Handbook of Social Theory* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of

-117-

students in Professor Kaufmann's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Social Theory* is a non-fiction work that analyzes social theories. The presentation is informational in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded part of one chapter representing 2.12% of the *Handbook of Social Theory* to ERES. Because the work contained more than ten chapters, Professor Kaufmann properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of the *Handbook of Social Theory* affected the market for purchasing the book as a whole. The Court infers that students would not pay $69.95 (or $150.00 in hardcover) for the entire book when only twelve of 564 pages were required reading for Professor Kaufmann's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Social Theory* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use

-118-

of similar unlicensed excerpts could cause substantial harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of the *Handbook of Social Theory* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

### 11. *The Sage Handbook of Qualitative Research (Third Edition)*

*The Sage Handbook of Qualitative Research (Third Edition)* was first published by Sage in 2005.  It is a 1,229 page, 44 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln.  The chapters analyze the theory and practice of qualitative research [Pls. Ex. 267].  *The Sage Handbook of Qualitative Research (Third Edition)* retails for $156.00 [Jt. Ex. 5 at D-13].  The book has earned $1,327,804.06 in net sales revenue [Pls. Ex. 283].  Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 358].  From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Third Edition)* earned $1,131.86 in ECCS permissions revenue [Pls. Ex. 287].[58]  In addition, licensed excerpts of this work are available directly from Sage; the book has

---

[58]This amount represents permissions income only for the third edition of this work.  Plaintiffs asserted a higher amount, but that number appears to aggregate the income from multiple editions of the work.

earned $18,711.95[59] through Sage's in-house permissions program [Pls. Ex. 283].

Professor Kaufmann requested pages 1-32, 357-375, 443-465, and 651-679 of *The Sage Handbook of Qualitative Research (Third Edition)*, the entirety of four chapters and 8.38% of the book, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 80-81 and 106-111]. Had permissions been paid via CCC for the distribution of these chapters, Sage would have earned under $159.34 in net revenue from permissions income.[60] The cost to students in the course would have been $190.46.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *The Sage Handbook of Qualitative Research (Third Edition)* [Doc. 411 at 27]. Sage holds the exclusive right to publish the work through contract with the external editors. The contributions are works made for hire. The copyright is registered in Sage's name [Pls. Ex. 282]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Sage Handbook of Qualitative Research (Third Edition)* was uploaded to Georgia State's

---

[59]The amount of in-house permissions revenue asserted by Plaintiffs for this work is higher than the amount reported here. The Court is unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documentary evidence.

[60]The amount earned would have been $190.46, the amount charged by CCC, [Jt. Ex. 5 at D-10], less the $3.00 service fee charged by CCC to users, less $28.12 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *The Sage Handbook of Qualitative Research (Third Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided for the exclusive use of students in Professor Kaufmann's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Sage Handbook of Qualitative Research (Third Edition)* is a non-fiction work that analyzes the theory and practice of qualitative research.  The presentation is informational in nature.  The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded four chapters representing 8.38% of *The Sage Handbook of Qualitative Research (Third Edition)* to ERES.  Because the work contained more than ten chapters, Professor Kaufmann should have adhered to a limit of one chapter of the book.  Professor Kaufmann copied four full chapters; the amount copied was not decidedly small.  The third factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of *The Sage Handbook of Qualitative Research (Third Edition)* affected the market for purchasing the book as a whole.  Students would not pay $156.00 for the entire book when only 8.38% of the book was assigned as required reading.  Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court

-121-

rejects any argument that the use of the excerpt from *The Sage Handbook of Qualitative Research (Third Edition)* had a negative effect on the market for sale of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

A review of the fair use factors in this case shows that factor one strongly favors Defendants, factor two favors Defendants, factor three favors Plaintiffs, and factor four strongly favors Plaintiffs. The Court will therefore conduct a further analysis of the evidence in the record to determine the outcome of the fair use defense.

First, revisiting the factor three analysis, the Court finds that Professor Kaufmann's unlicensed use of four chapters of *The Sage Handbook of Qualitative Research (Third Edition)*, significantly exceeds the permitted one chapter limit, favoring an adjustment of the factor three analysis in Plaintiffs' favor.

Second, the Court also finds that upon revisiting the factor four analysis, an adjustment favoring Plaintiffs' position is warranted. The Court's reasoning is as follows. The evidence shows that in 2008 colleges and universities paid $3,630.59 directly to Sage for excerpts from this book; in 2009 the amount was $11,125.91. In addition, the book earned $3,174.20 in fees from CCC's ECCS and APS programs from 2004 to 2010.

-122-

The original version of *The Sage Handbook of Qualitative Research* was published in 1994; a second edition was published in 2000; the third edition, at issue here, was published in 2005. With respect to the third edition, the documentary evidence [Pls. Ex. 283] shows that book sales began with revenues of $379,940.00 in 2005, with the sales amount going down each year thereafter. In 2009, book sales brought in revenues of $153,234.95. But permissions revenue for Sage's in-house program jumped from $3,630.59 in 2008 to $11,125.91 in 2009.

The same pattern can be seen with respect to the second edition of the handbook; sales of the books reduce over time as the time approaches for the new edition. However, as book sales go down, permissions sales go up. Book sales of the second edition brought in $311,125.03 in 2000, the year of publication, and brought in sales revenues of $197,120.59 in 2004. In 2005, as the third edition came out, book sales of the second edition declined to $9,984.18. But permissions sales continued, rising to $10,150.49 in 2007. In 2009, when the second edition was no longer available, in-house permissions sales for the second edition were $3,814.52. From this data, the Court finds that permissions, particularly Sage's in-house permissions, are an important part of the value of the copyright for *The Sage Handbook of Qualitative Research* series. In addition, the fact that the book has been published in a second and third edition shows how valuable the copyright is. The Court finds that Professor Kaufmann's unlicensed use of excerpts from the third edition in 2009 had some actual, albeit small, negative effect on the value of Sage's copyright. Because there is substantial demand for excerpts, there

is a greater likelihood of repetitive unpaid use.  This determination strengthens the factor four analysis in Plaintiffs' favor.

After considering the foregoing, the Court finds that the overall four factor fair use analysis favors Plaintiffs' position. Accordingly, the Court finds that Defendants have not met their burden of proving that Professor Kaufmann's use of *The Sage Handbook of Qualitative Research (Third Edition)* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement succeeds.

   12. *The Sage Handbook of Qualitative Research (Second Edition)*

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265].  It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters analyze the theory and practice of qualitative research [Pls. Ex. 265; Jt. Ex. 5 at D-14].  *The Sage Handbook of Qualitative Research (Second Edition)* has a retail price of $175.00, but it is out of print [Jt. Ex. 5 at D-14].  The book has earned $1,300,053.54 in net sales revenue [Pls. Ex. 283].  Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286].  From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in ECCS permissions revenue [Pls. Ex. 286].[61]  In addition, licensed excerpts of this work

---

[61]These amounts represents permissions income only for the second edition of this work.  Plaintiffs asserted a higher amount, but that number aggregates the income from multiple editions of the work.

-124-

are available directly from Sage; the book has earned $58,904.47[62] through Sage's in-house permissions program [Pls. Ex. 283].

Professor Kaufmann requested pages 733-768[63] of *The Sage Handbook of Qualitative Research (Second Edition)*, the entirety of chapter 28, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 6 at 1-6; Pls. Ex. 516; Defs. Ex. 512]. The excerpted chapter was entitled "Autoethnography, Personal Narrative, Reflexivity: Researcher as Subject" and authored by Carolyn Ellis and Arthur P. Bochner. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $53.14 in net revenue from permissions income.[64] The cost to students in the course would have been $65.52.

### Prima Facie Case of Copyright Infringement

The certificate of registration for *The Sage Handbook of Qualitative Research (Second Edition)* was filed in Sage's name on

---

[62]The amount asserted by Plaintiffs for this work is higher than the amount reported here. The Court is unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documentary evidence.

[63]In their post-trial filings, Plaintiffs contend that Professor Kaufmann posted three chapters of this work to ERES during Maymester 2009. However, at trial, Professor Kaufmann testified that only one of these chapters was posted during the Maymester and that the other two were posted during the summer semester [Tr. Vol. 6 at 1-6] . The syllabus for the Maymester course confirms that only the chapter appearing on pages 733-768 was used during the Maymester. Accordingly, the Court will evaluate the Maymester infringement claim for this chapter only.

[64]The amount earned would have been $65.52, the amount charged by CCC, [Jt. Ex. 5 at D-14], less the $3.00 service fee charged by CCC to users, less $9.38 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the author.

June 15, 2000 [Pls. Ex. 282]. However, Plaintiffs have failed to produce evidence of contributing author agreements for chapter 28. There is no evidence that the contributing authors either agreed that chapter 28 was a work made for hire or that they assigned the copyright to Sage. The claimed infringement is for material within chapter 28.

*The Sage Handbook of Qualitative Research (Second Edition)* is an edited work comprised of chapters written by different authors. Chapter 28 of *The Sage Handbook of Qualitative Research (Second Edition)* was authored by Carolyn Ellis and Arthur P. Bochner [Pls. Ex. 265]. This chapter is entitled "Autoethnography, Personal Narrative, Reflexivity: Researcher as Subject." [Pls. Ex. 265]. Although the copyright registration, which lists Sage as the claimant of the copyright, states that each chapter in the book is a work made for hire and therefore that Sage is the initial author of each chapter, there is no evidence in the record that Ellis and Bochner agreed that chapter 28 was a work made for hire. <u>See</u> 17 U.S.C. § 101 ("A 'work made for hire' is . . . a work specially ordered or commissioned . . . *if the parties expressly agree in a written instrument signed by them* that the work shall be considered a work made for hire.") (emphasis added).

The evidence includes an agreement between Sage and the editors of this work, Norman K. Denzin and Yvonna S. Lincoln. This agreement assigns the external editors' copyright interest to Sage, but it neither addresses nor assigns the copyrights of the contributing authors of each chapter. Plaintiffs have not produced such a contract with either author of chapter 28, the excerpt assigned by Professor Kaufmann. Accordingly, Plaintiffs have failed to establish

-126-

the first prong of the prima facie case of copyright infringement for *The Sage Handbook of Qualitative Research (Second Edition)*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

   13. *Handbook of Critical and Indigenous Methodologies*

   The *Handbook of Critical and Indigenous Methodologies* was first published by Sage in 2008 [Pls. Ex. 231]. It is a 619 page, 30 chapter volume edited by Norman K. Denzin, Yvonna S. Lincoln, and Linda Tuhiwai Smith. The chapters contain ideas and analysis concerning the relationship between critical methodologies and indigenous perspectives [Pls. Ex. 231]. The book seeks to show "how critical qualitative research can be used to address issues that matter to oppressed, colonized persons . . . ." [Pls. Ex. 231 at xii]. The *Handbook of Critical and Indigenous Methodologies* retails for $146.00 [Jt. Ex. 5 at D-15]. It has earned $161,204.62 in net sales revenue [Pls. Ex. 237]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 238]. From July 1, 2004 until December 1, 2010, the *Handbook of Critical and Indigenous Methodologies* earned $138.04 in ECCS permissions revenue [Pls. Ex. 238]. In addition, licensed excerpts of this work were available directly from Sage; the book has earned $383.15 through Sage's in-house permissions program [Pls. Ex. 237].

   Professor Kaufmann requested pages 85-99 and 135-156 of the *Handbook of Critical and Indigenous Methodologies*, the entirety of two chapters, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 114-116]. The two chapters copied were "Critical Race Theory and Indigenous Methodologies" by

-127-

Christopher Dunbar, Jr. and "Indigenous Knowledges in Education: Complexities, Dangers, and Profound Benefits" by Joe L. Kintheloe and Shirley R. Steinberg. Together, the two chapters represent 5.98% of the total work. Had permissions been paid via CCC for the distribution of these two excerpts, Sage would have earned less than $57.24 in net revenue from permissions income.[65] The cost to students in the course would have been $70.34.

Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for this excerpt of the *Handbook of Critical and Indigenous Methodologies* [Doc. 411 at 27]. By contracts with the external editors and the contributing authors, the book and the contributions are deemed works made for hire. Sage owns a valid copyright, registered in its name, in the *Handbook of Critical and Indigenous Methodologies* [Pls. Ex. 236]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from the *Handbook of Critical and Indigenous Methodologies* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

The Fair Use Defense

As to the first element of fair use, an excerpt from the *Handbook of Critical and Indigenous Methodologies* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for

---

[65]The amount earned would have been $70.34, the amount charged by CCC, [Jt. Ex. 5 at D-15], less the $3.00 service fee charged by CCC to users, less $10.10 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

-128-

the exclusive use of students in Professor Kaufmann's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Critical and Indigenous Methodologies* is a non-fiction work that contains analysis of the relationship between critical research methodologies and indigenous perspectives. It is informational in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded two full chapters totaling 37 pages of the *Handbook of Critical and Indigenous Methodologies* to ERES. Because the work contained more than ten chapters, Professor Kaufmann should have adhered to the one chapter limit; the two chapter amount copied was not decidedly small. The third fair use factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of the *Handbook of Critical and Indigenous Methodologies* affected the market for purchasing the book as a whole. Students would not pay $146.00 for the entire book when only 37 of 619 pages were required reading. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Critical and Indigenous Methodologies* had a negative effect on the market for sale of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition,

-129-

widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

A review of the fair use factors in this case shows that factor one strongly favors Defendants, factor two favors Defendants, factor three favors Plaintiffs, and factor four strongly favors Plaintiffs. The Court will therefore conduct a further analysis of the evidence in the record to determine the outcome of the fair use defense.

Revisiting the factor four analysis, the Court finds that the initial analysis overstates the degree to which factor four favors Plaintiffs. The Court's reasoning is as follows. Since the book's publication in 2008, annual sales have been $76,727.15 in 2008, $54,534.10 in 2009, and $29,943.37 in 2010. During the same period of time Sage had in-house permissions income of $383.15 in 2009 only. Sage earned a total of $37.84 from APS permissions ($17.85 in 2010 and $19.99 in 2009) and $138.04 from ECCS permissions in 2009 and 2010 (half of that in 2009 and half in 2010). CCC royalties were paid to Sage under the FAS and TRS programs in 2009 and 2010 totaling $132.16. This evidence reflects that permissions earnings for this book have been small. There is not much demand for excerpts. The Court finds that it is unlikely that permissions income from this book contributes appreciably to the value of Sage's copyright; also, because there is no significant demand for excerpts, the likelihood of repetitive unpaid use is diminished. This determination undercuts the strength of Plaintiffs' position on the factor four analysis.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of the *Handbook of Critical and*

*Indigenous Methodologies* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

> 14. *Qualitative Research Practice*

*Qualitative Research Practice* was first published by Sage in the United Kingdom in 2004 [Pls. Ex. 298]; it was never published in the United States [Tr. Vol. 2 at 124]. The 639 page, 38 chapter volume provides an overview of the varieties of qualitative research practice [Jt. Ex. 5 at D-16; Pls. Ex. 298]. It was edited by Clive Seale, Giampietro Gobo, Jaber F. Gubrium, and David Silverman.

Professor Kaufmann initially requested that pages 391-406 of the book be placed on ERES for electronic distribution to her class as required reading [Pls. Ex. 516]. The excerpt was the entirety of chapter 25, entitled "Visual Methods," authored by Sarah Pink. After Professor Kaufmann made this request, the library staff informed her that the library did not own a copy of the book. Because Professor Kaufmann also did not own a copy, the library removed the excerpt from the ERES course page [Defs. Ex. 512]. Professor Kaufmann did not assign any portion of *Qualitative Research Practice* in her 2009 Maymester course [Tr. Vol. 5 at 179-180]. The excerpt had a hit count of 2 on the ERES system [Jt. Ex. 1 at 74].

> Prima Facie Case of Copyright Infringement

*Qualitative Research Practice* was only published in the United Kingdom; it was never published in the United States [Tr. Vol. 2 at 124]. Thus, *Qualitative Research Practice* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 104(b)(2). The Court finds that *Qualitative Research Practice* is an original work and that it has sufficient creativity to be

copyrighted. *Qualitative Research Practice* meets the first prong of the prima facie case of copyright infringement.

As evidenced by the email exchange between Professor Kaufmann and the library reserves staff, as well as by the ERES hit count, a copy of an excerpt from *Qualitative Research Practice* was initially uploaded to Georgia State's ERES system. Even though it was subsequently removed before it could be accessed by students, the act of uploading the excerpt to ERES without seeking copyright permissions technically satisfies the second prong of the infringement analysis.

However, although the excerpt at issue was uploaded to the ERES system, the library staff removed the excerpt from the ERES page before the course began and Professor Kaufmann did not assign the excerpt to her students. As a result, the students could not and did not access *Qualitative Research Practice* on ERES. The excerpt was accessed just twice before it was removed; these hits are likely attributable to the staff librarian and Professor Kaufmann herself, as discussed by Laura Burtle [See Tr. Vol. 11 at 131].

Because the excerpt that was uploaded to ERES was removed before it could be accessed by potential licensees of the work, the act of uploading the excerpt on ERES had no impact on the potential market for *Qualitative Research Practice*. Thus, the Court finds the use that resulted from this upload to be de minimis such that it "need not be prohibited in order to protect the author's incentive to create." See Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 450-51, n.34 (1984) and accompanying text ("'In certain situations, the copyright owner suffers no substantial harm from the use of the work. . . . Here again, is the partial marriage between

-132-

the doctrine of fair use and the legal maxim <u>de minimis non curat</u> <u>lex</u>.'") (quoting Alan Latman, FAIR USE OF COPYRIGHTED WORKS (1958)) (additional citations omitted). Accordingly, the Court need not address the fair use defense for Professor Kaufmann's use of *Qualitative Research Practice*. This claim of copyright infringement fails.

15. *Handbook of Narrative Inquiry*: *Mapping a Methodology*

The *Handbook of Narrative Inquiry* was first published by Sage in 2007 [Pls. Ex. 258]. It is a 710 page, 24 chapter volume edited by D. Jean Clandinin. The chapters present an interdisciplinary overview of the methodology of narrative inquiry [Pls. Ex. 258; Jt. Ex. 5 at D-17]. The *Handbook of Narrative Inquiry* retails for $146.00 [Jt. Ex. 5 at D-17]. It has earned $131,515.66 in net sales revenue [Pls. Ex. 262]. Licensed digital excerpts of the book were also available through CCC in 2009 [Pls. Ex. 264]. From July 1, 2004 until December 1, 2010, the *Handbook of Narrative Inquiry* earned $18.52 in ECCS permissions revenue [Pls. Ex. 264]. In addition, licensed digital excerpts of this work were available directly from Sage; the book has earned $437.28 through Sage's in-house permissions program [Pls. Ex. 262].

Professor Kaufmann requested that pages 3-34 of the *Handbook of Narrative Inquiry* be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 117-118]. The excerpt was the entirety of chapter one, which was written by Stefinee Pinnegar and J. Gary Daynes and entitled "Locating Narrative Inquiry Historically: Thematics in the Turn to Narrative." The chapter represents 4.51% of the total work. Had permissions been paid via CCC for the digital

-133-

distribution of this excerpt, Sage would have earned less than $33.32 in net revenue from permissions income.[66]  The cost to students in the course would have been $52.60.

Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for this excerpt of the *Handbook of Narrative Inquiry* [Doc. 411 at 27].  Sage's contracts with the external editor and with the contributing authors establish that the book was made for hire.  Sage owns a valid copyright, registered in its name, in the *Handbook of Narrative Inquiry* [Pls. Ex. 261], satisfying the first prong of the prima facie case of copyright infringement.  A copy of an excerpt from the *Handbook of Narrative Inquiry* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

The Fair Use Defense

As to the first element of fair use, an excerpt from the *Handbook of Narrative Inquiry* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided for the exclusive use of students in Professor Kaufmann's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Narrative Inquiry* is a non-fiction work that provides an overview of the

---

[66]The amount earned would have been $52.60, the amount charged by CCC, [Jt. Ex. 5 at D-17], less the $3.00 service fee charged by CCC to users, less $9.28 in fees charged by CCC to publishers, less any royalties Sage is obligated to pay the author.

methodology of narrative inquiry. It is factual in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded 32 pages totaling 4.51% of the *Handbook of Narrative Inquiry* to ERES. Because the book contains more than ten chapters, Professor Kaufmann properly adhered to the one-chapter limit. The amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of the *Handbook of Narrative Inquiry* affected the market for purchasing the book as a whole. Students obviously would not pay $146.00 for the entire book for which only 32 of 710 pages were required reading for Professor Kaufmann's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Narrative Inquiry* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of

proving that Professor Kaufmann's use of the *Handbook of Narrative Inquiry* was a fair use under the Copyright Act. This claim of copyright infringement fails.

### EPRS 8510 Qualitative Research in Education II-Data Collection, Summer 2009

Professor Kaufmann's EPRS 8510 course looks at ways for students to collect data for qualitative research [Tr. Vol. 5 at 38, 135]. Nine students were enrolled in the course during the summer 2009 semester [Tr. Vol. 5 at 135]. The course lasts roughly six weeks [Tr. Vol. 5 at 136]. As evidenced by the syllabus for this course and Professor Kaufmann's testimony, students were required to purchase three texts for the course, as well as complete several readings posted on ERES [Tr. Vol. 5 at 136; Pls. Ex. 517]. All assigned readings, both from the textbooks and ERES, were required [Tr. Vol. 5 at 136].

### 16. *The Sage Handbook of Qualitative Research (Second Edition)*

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265]. It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters contain research and analysis concerning the theory and practice of qualitative research [Pls. Ex. 265; Jt. Ex. 5 at D-19]. *The Sage Handbook of Qualitative Research (Second Edition)* retails for $175.00, but is out of print [Jt. Ex. 5 at D-19]. The book has earned $1,300,053.54 in net sales revenue [Pls. Ex. 283]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in

-136-

ECCS permissions revenue [Pls. Ex. 286].[67]  In addition, licensed digital excerpts of this work were available directly from Sage; the book has earned $58,904.47[68] through Sage's in-house permissions program [Pls. Ex. 283].

Professor Kaufmann requested pages 717-732 and 923-943 of *The Sage Handbook of Qualitative Research (Second Edition)*, the entirety of chapters 27 and 36, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8510 summer 2009 course as required reading [Tr. Vol. 5 at 136-141; Pls. Ex. 517].  The excerpted chapters were "Reimagining Visual Methods: Galileo to *Neuromancer*" by Douglas Harper and "Writing: A Method of Inquiry" by Laurel Richardson.  Together, the chapters represent 3.01% of the total work.  Had permissions been paid via CCC for the distribution of these excerpts, Sage would have earned less than $34.04 in net revenue from permissions income.[69]  The cost to students in the course would have been $44.98.

<u>Prima Facie Case of Copyright Infringement</u>

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for this excerpt of *The*

---

[67]These amounts represents permissions income only for the second edition of this work.  Plaintiffs asserted a higher amount, but that number aggregates the income from multiple editions of the work.

[68]The amount asserted by Plaintiffs for this work is higher than the amount reported here.  The Court was unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documents provided at trial.

[69]The amount earned would have been $44.98, the amount charged by CCC, [Jt. Ex. 5 at D-19], less the $3.00 service fee charged by CCC to users, less $7.94 in fees charged by CCC to publishers, less any royalties Sage is obligated to pay the author.

*Sage Handbook of Qualitative Research (Second Edition)* [Doc. 411 at 27]. Sage holds the exclusive right to publish the book through contracts with the external editors and through contracts with the contributing authors. The copyright registration is in Sage's name [Pls. Ex. 282], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kaufmann's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Sage Handbook of Qualitative Research (Second Edition)* is a non-fiction work that analyzes the theory and practice of qualitative research. The presentation is informational in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded two full chapters of *The Sage Handbook of Qualitative Research (Second Edition)* to ERES. This represents 37 pages and 3.01% of the total work. Because the work contained more than ten chapters, the one chapter limit applies; the two chapter amount copied here was not decidedly small. The third fair use factor weighs in favor of Plaintiffs.

-138-

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of *The Sage Handbook of Qualitative Research (Second Edition)* affected the market for purchasing the book as a whole. Because the book is no longer in print, students could not have purchased a full copy of the book without paying extra charges for a copy. In addition, an excerpt of 3.01% of the book does not substitute for the book. Therefore, the Court rejects any argument that the use of the excerpts from *The Sage Handbook of Qualitative Research (Second Edition)* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

A review of the fair use factors in this case shows that factor one strongly favors Defendants, factor two favors Defendants, factor three favors Plaintiffs, and factor four strongly favors Plaintiffs. The Court will therefore conduct a further analysis of the evidence in the record to determine the outcome of the fair use defense.

Revisiting the factor four analysis, the Court finds an adjustment favoring Plaintiffs' position is warranted. The Court's reasoning is as follows. The original version of *The Sage Handbook of Qualitative Research* was published in 1994. The second edition, at issue here, was published in 2000, and a third edition was

published in 2005. The second edition retailed for $156.00 or $175.00 in hardcover, but it was out of print in 2009. With respect to the second edition of the book, book sales brought in $311,125.03 in 2000, the year of publication, and brought in sales revenues of $197,120.59 in 2004. Sales of the books fell over time, as the time approached for a new edition. In 2005, as the third edition came out, book sales of the second edition declined to $9,984.18. However, as book sales went down, in-house permissions revenue went up, rising from $6,932.44 in 2006 to $10,150.49 in 2007. In 2009, when the second edition was no longer available, in-house permissions sales for the second edition were $3,814.52. The second edition has also earned $10,351.40 from APS and $6,324.61 from ECCS from 2004 to 2010.

From this data, the Court finds that permissions, particularly Sage's in-house permissions, are an important part of the value of the copyright for *The Sage Handbook of Qualitative Research* series. Because there is a substantial demand for excerpts, there is a greater likelihood of repetitive unpaid use. This determination strengthens the factor four analysis in Plaintiffs' favor.

After considering the foregoing, the Court finds that the overall four factor fair use analysis favors Plaintiffs' position. Accordingly, Defendants have not met their burden of proving that Professor Kaufmann's use of *The Sage Handbook of Qualitative Research (Second Edition)* was a fair use under the Copyright Act. Thus, this claim of copyright infringement succeeds.

17. *Inside Interviewing: New Lenses, New Concerns*

*Inside Interviewing* was first published by Sage in 2003 [Pls. Exs. 293, 295]. It is a 564 page, 24 chapter volume edited by James

-140-

A. Holstein and Jaber F. Gubrium. The chapters in the book present research and analysis on the interview participant [Pls. Ex. 293]. *Inside Interviewing* retails for $79.95 in paperback [Jt. Ex. 5 at D-20]. The book has earned $23,474.26 in net sales revenue [Pls. Ex. 296]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009. However, licensed digital excerpts of this work were available directly from Sage; the book has earned $482.18 through Sage's in-house permissions program [Pls. Ex. 296].

Professor Kaufmann requested pages 415-428 of *Inside Interviewing*, the entirety of chapter twenty, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8510 summer 2009 course as required reading [Pls. Ex. 517].[70] Chapter twenty is entitled "Revisiting the Relationship Between Participant Observation and Interviewing," authored by Paul Atkinson and Amanda Coffey. Had permissions been paid through Sage's in-house program for the distribution of this excerpt, Sage would have earned $15.12 less royalties in net revenue from permissions income. The cost to students in the course would have been $15.12.

<u>Prima Facie Case of Copyright Infringement</u>

---

[70]At trial Professor Kaufmann testified that she assigned pages 311-330, the entirety of chapter fifteen, of *Inside Interviewing* in her summer 2009 EPRS 8010 course [Tr. Vol. 5 at 142]; however, the syllabus for the course and the recreated checklist she completed for the *Inside Interviewing* excerpt indicate that she assigned pages 415-428, the entirety of chapter twenty, of *Inside Interviewing* [Pls. Exs. 517, 629]. The Court notes that Plaintiffs do not allege an infringement for the use of pages 311-330 of *Inside Interviewing*; Plaintiffs only allege Professor Kaufmann's use of pages 415-428 was a copyright infringement [Jt. Ex. 5 at D-20].

The certificate of copyright registration for *Inside Interviewing* was filed in Sage's name on May 5, 2003 [Pls. Ex. 295]. However, Plaintiffs have failed to produce evidence of contributing author agreements for chapter twenty, the excerpt assigned by Professor Kaufmann. There is no evidence that the contributing authors either agreed that chapter twenty was a work made for hire or that they assigned the copyright to Sage.

*Inside Interviewing* is an edited volume comprised of chapters written by different authors. Chapter twenty of *Inside Interviewing* was authored by Paul Atkinson and Amanda Coffey. [Pls. Ex. 265]. Although the copyright registration, which lists Sage as the claimant of the copyright, states that transfer of copyright ownership to Sage was done by written contract, no such contract is in evidence for chapter twenty. Plaintiffs have produced evidence of an agreement between Sage and the editors of this work, James A. Holstein and Jaber F. Gubrium. This agreement assigns the editors' copyright interest to Sage, but it neither addresses nor assigns the copyrights of the contributing authors of each chapter. Plaintiffs have not introduced evidence of a similar assignment by either author of chapter twenty. Accordingly, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Inside Interviewing*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

### EPRS 8500 Qualitative/Interpretive Research in Education II, Fall 2009

In the fall 2009 semester, Professor Kaufmann taught the same EPRS 8500 course she taught in the Maymester 2009 [Tr. Vol. 5 at 143]. Approximately 21 students were enrolled in the course during

the fall 2009 semester [Tr. Vol. 5 at 143]. As evidenced by the syllabus for this course and Professor Kaufmann's testimony, students were required to purchase three texts for the course, as well as complete several readings posted on ERES [Tr. Vol. 5 at 144-145; Pls. Ex. 518].

18. *The Craft of Inquiry: Theories, Methods, Evidence*

*The Craft of Inquiry* was first published by Oxford in 1998. It is a 176 page, eight chapter book authored by Robert R. Alford. It provides an overview of sociological methodology and the relationships between the various approaches [Pls. Ex. 372]. *The Craft of Inquiry* retails for $32.95 [Jt. Ex. 5 at D-57]. The net sales revenue from the date of first publication through November 7, 2010 was $86,325.00 [Pls. Ex. 357]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 375]. From July 1, 2004 until December 1, 2010, *The Craft of Inquiry* earned $12.36 in ECCS permissions revenue [Pls. Ex. 375].

Professor Kaufmann requested pages 21-31 of *The Craft of Inquiry*, the entirety of chapter two and 6.25% of the book, be uploaded to Georgia State's ERES system for distribution to the students in her fall 2009 course as required reading [Tr. Vol. 5 at 120-121]. Had permissions been paid via CCC for the digital distribution of this excerpt, Oxford would have earned less than $23.56 in net revenue from permissions income.[71] The cost to students in the course would have been $30.72.

_____

[71]The amount earned would have been $30.72, the amount charged by CCC, [Jt. Ex. 5 at D-57], less the $3.00 service fee charged by CCC to users, less $4.16 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

## Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *The Craft of Inquiry* [Doc. 411 at 27]. Oxford owns a valid copyright in *The Craft of Inquiry* [Pls. Ex. 374]. The first prong of the prima facie case of copyright infringement is satisfied. A copy of an excerpt from *The Craft of Inquiry* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

## The Fair Use Defense

As to the first element of fair use, an excerpt from *The Craft of Inquiry* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kaufmann's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Craft of Inquiry* is a non-fiction work that provides an overview of sociological methodology. The presentation is informational in nature. The second factor weighs in favor of Defendants.

As to the third fair use factor, Professor Kaufmann uploaded one full chapter of an eight chapter book to ERES. Because the book contains less than ten chapters, a limit of 10% of the protected pages of the book applies. The excerpt copied was eleven pages, totaling 6.25% of the total work. This is a decidedly small amount. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of *The Craft of*

*Inquiry* affected the market for purchasing the book as a whole. It is obvious that students would not pay $32.95 for the entire book when only eleven pages were required reading for Professor Kaufmann's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Craft of Inquiry* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of *The Craft of Inquiry* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

> 19. *Approaches to Qualitative Research: A Reader on Theory and Practice*

*Approaches to Qualitative Research* was first published by Oxford in 2004 [Pls. Ex. 349]. It is a 564 page, 25 chapter volume edited by Sharlene Nagy Hesse-Biber and Patricia Leavy. The chapters provide a comprehensive overview and analysis of the theoretical underpinnings of qualitative research and applications for practice [Pls. Ex. 349]. *Approaches to Qualitative Research* retails for $92.00 in hardcover and $49.95 in paperback [Jt. Ex. 5 at D-58].

-145-

There is no evidence in the record to show how much, if any, net sales revenue the book has earned. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 353]. From July 1, 2004 until December 1, 2010, *Approaches to Qualitative Research* earned $172.59 in ECCS permissions revenue [Pls. Ex. 353].

Professor Kaufmann requested pages 447-472, the entirety of chapter 21, of *Approaches to Qualitative Research* be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 fall 2009 course as required reading [Tr. Vol. 5 at 169-170, Pls. Ex. 518]. Chapter 21, entitled "The Art and Politics of Interpretation," is authored by Norman Denzin and represents 4.61% of the total work [Pls. Ex. 349]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $55.69 in net revenue from permissions income.[72] The cost to students in the course would have been $68.52.

### Prima Facie Case of Copyright Infringement

Although the copyright registration for *Approaches to Qualitative Research* is not in evidence, Defendants do not object to the existence and validity of the copyright registration for *Approaches to Qualitative Research* [Doc. 411; Jt. Ex. 5 at D-58]. Additionally, Joint Exhibit 5 states that the copyright registration number for *Approaches to Qualitative Research* is TX 5-806-220 [Jt. Ex. 5 at D-58]. The Court finds that Oxford has satisfied the first prong of the prima facie case of copyright infringement for

---

[72]The amount earned would have been $68.52, the amount charged by CCC, [Jt. Ex. 5 at D-58], less the $3.00 service fee charged by CCC to users, less $9.83 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

*Approaches to Qualitative Research*.  A copy of an excerpt from *Approaches to Qualitative Research* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Approaches to Qualitative Research* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided for the exclusive use of students in Professor Kaufmann's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Approaches to Qualitative Research* is a non-fiction work that provides an overview and analysis of qualitative research and applications for practice.  The presentation is factual and informational.  The second factor weighs in favor of Defendants.

As to the third fair use factor, Professor Kaufmann uploaded one full chapter of *Approaches to Qualitative Research* to ERES.  Because the work contained more than ten chapters, Professor Kaufmann properly adhered to the one chapter limit; the amount copied was decidedly small.  The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of *Approaches to Qualitative Research* affected the market for purchasing the book as a whole.  Students would not pay $49.95 for the entire book for which only 26 pages were required reading for Professor Kaufmann's course.  Neither would a professor require students to purchase the

-147-

entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Approaches to Qualitative Research* had a negative effect on the market for sale of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of *Approaches to Qualitative Research* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### 20. *Handbook of Feminist Research: Theory and Praxis*

The *Handbook of Feminist Research* was first published by Sage in 2006 [Pls. Ex. 247]. It is a 767 page, 43 chapter volume edited by Sharlene Nagy Hesse-Biber that discusses feminist approaches to research methodology [Pls. Ex. 243]. The *Handbook of Feminist Research* retails for $146.00 [Jt. Ex. 5 at D-59]. The book has earned net sales revenue in the amount of $94,085.88 [Pls. Ex. 248]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009. However, licensed digital excerpts of the book were available directly from Sage, and the book has earned $938.46 in permissions revenue through Sage's in-house permissions program [Pls. Ex. 248].

Professor Kaufmann requested pages 71-106, 155-172, and 515-534 of the *Handbook of Feminist Research*, the entirety of chapters four, eight, and twenty six, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 fall 2009 course as required reading [Tr. Vol. 5 at 156-165; Pls. Ex. 518]. The excerpts were three full chapters: "Postmodern, Poststructural, and Critical Theories" by Susanne Gannon and Bronwyn Davies, "Toward Understandings of Feminist Ethnography" by Wanda S. Pillow and Cris Mayo, and "Feminist Research Ethics" by Judith Preissle [Pls. Ex. 243].

<u>Prima Facie Case of Copyright Infringement</u>

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for pages 155-172 and 515-534 (chapters eight and twenty six) of the *Handbook of Feminist Research* [Doc. 411 at 27]. Ms. Hesse-Biber's contract with Sage provides that the material contributed by her for the book shall be considered a work made for hire [Pls. Ex. 244]. Contributing author agreements state that the chapters which consist of pages 155-172 and 515-534 are works made for hire for Sage [Pls. Exs. 244, 245, 246, 247]. The copyright is registered in Sage's name. Plaintiffs have satisfied the first prong of the prima facie case of copyright infringement. Copies of the two excerpts were uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement. Thus, Plaintiffs' claim for copyright infringement for pages 155-172 and 515-534 of the *Handbook of Feminist Research* may proceed.

As to pages 71-106, however, Plaintiffs have failed to produce evidence of contributing author agreements for chapter four of the

*Handbook of Feminist Research* to Sage.  There is no evidence that the contributing authors of chapter four either agreed that the chapter was a work made for hire or that they agreed to assign the copyright to Sage.

The *Handbook of Feminist Research* is an edited volume comprised of chapters written by different authors.  Chapter four of the book was authored by Susanne Gannon and Bronwyn Davies [Pls. Ex. 243].  Absent an agreement with Sage stating that the chapter was a work made for hire, copyright for the chapter vested in authors Gannon and Davies.  There are no agreements between Gannon or Davies and Sage assigning their copyright interests in the chapter to Sage [Pls. Ex. 259].  As discussed in the analysis of the prima facie case for *Inside Interviewing* above, Plaintiffs have therefore failed to establish the first prong of the prima facie case of copyright infringement for Professor Kaufmann's use of pages 71-106 of *The Handbook of Feminist Research* in her fall 2009 semester EPRS 8500 course.  The infringement claim for pages 71-106 of the *Handbook of Feminist Research* fails.

The Fair Use Defense

The following fair use analysis is with regard to Professor Kaufmann's use only of pages 155-172 and 515-534 of the *Handbook of Feminist Research* in her fall 2009 EPRS 8500 course.

As to the first element of fair use, an excerpt from the *Handbook of Feminist Research* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided for the exclusive use of students in Professor Kaufmann's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Feminist Research* is a non-fiction work that presents feminist approaches to research methodology. The presentation is informational in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded two protected chapters of the *Handbook of Feminist Research* to ERES. Together, they comprised 4.95% of the protected pages in the book. Because the work contained more than ten chapters, the one chapter limit applies; the two chapter amount copied was not decidedly small. The third fair use factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of the *Handbook of Feminist Research* affected the market for purchasing the book as a whole. The Court infers that students would not pay $146.00 for the entire book when only 38 of 767 pages were required reading for Professor Kaufmann's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Feminist Research* had a negative effect on the market for sale of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

-151-

A review of the fair use factors in this case shows that factor one strongly favors Defendants, factor two favors Defendants, factor three favors Plaintiffs, and factor four strongly favors Plaintiffs. The Court will therefore conduct an aggregate assessment of the factors to determine the outcome of the fair use defense.

Revisiting the factor four analysis, the Court finds that the initial analysis overstates the degree to which factor four favors Plaintiffs. The Court's reasoning is as follows. Since the book's publication in 2006, annual sales have been $17,241.00 in 2006, $44,153.45 in 2007, $15,015.80 in 2008, $12,052.55 in 2009, and $5,623.08 in 2010 [Pls. Ex. 248]. During the same period of time Sage had in-house permissions income of $116.29 in 2008, $96.45 in 2009, and $770.72 in 2010 [Pls. Ex. 248]. The record does not reflect any revenue earned through CCC. This evidence reflects that permissions earnings for this book have been small. The Court finds it is unlikely that permissions income from this book contributes appreciably to the value of Sage's copyright. Because permissions have been so modest, it is unlikely that there will be widespread, repetitive use in the future. This determination undercuts the strength of Plaintiffs' position on the factor four analysis.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of the *Handbook of Feminist Research* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

21.  *Handbook of Narrative Inquiry: Mapping a Methodology*

The *Handbook of Narrative Inquiry* was first published by Sage in 2007 [Pls. Ex. 258]. It is a 710 page, 24 chapter volume edited by

-152-

D. Jean Clandinin [Pls. Ex. 258]. The chapters present an interdisciplinary overview of the methodology of narrative inquiry [Pls. Ex. 258]. The *Handbook of Narrative Inquiry* retails for $146.00 [Jt. Ex. 5 at D-60]. It has earned $131,515.66 in net sales revenue [Pls. Ex. 262]. Digital excerpts of the book were available for licensing through CCC in 2009 [Pls. Ex. 264]. From July 1, 2004 until December 1, 2010, the *Handbook of Narrative Inquiry* earned $18.52 in ECCS permissions revenue [Pls. Ex. 264]. In addition, licensed excerpts of this work were available directly from Sage; the book has earned $437.28 through Sage's in-house permissions program [Pls. Ex. 262].

Professor Kaufmann requested pages 35-75 of the *Handbook of Narrative Inquiry*, the entirety of chapter two, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 fall semester 2009 course as required reading [Jt. Ex. 5 at C-9; Pls. Ex. 518]. The chapter is entitled "Mapping a Landscape of Narrative Inquiry: Borderland Spaces and Tensions" by D. Jean Clandinin and Jerry Rosiek. Had permissions fees been paid via CCC for the digital distribution of this excerpt, Sage would have earned less than $102.46 in net revenue from permissions.[73] The cost to students in the course would have been $123.54.

<u>Prima Facie Case of Copyright Infringement</u>

Sage's contracts with the external editor and with the contributing authors establish that the book is made for hire. The

---

[73]The amount earned would have been $123.54, the amount charged by CCC, [Jt. Ex. 5 at D-60], less the $3.00 service fee charged by CCC to users, less $18.08 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editor.

certificate of registration, naming Sage as the copyright claimant, for the *Handbook of Narrative Inquiry* was filed by Sage on February 5, 2007 [Pls. Ex. 261]. Defendants contend that Plaintiffs have nonetheless failed to establish a prima facie case of copyright infringement because only one of the two co-authors of the chapter at issue has assigned his copyright interest to Sage. Defendants argue that all co-authors must assign their interest in the work to Sage for it to have ownership of the underlying copyright.

Chapter two of the *Handbook of Narrative Inquiry* was authored by D. Jean Clandinin and Jerry Rosiek [Pls. Ex. 258]. Plaintiffs have produced evidence of an author agreement between Sage and D. Jean Clandinin, assigning her copyright interest in the chapter to Sage [Pls. Ex. 259], but Plaintiffs have not introduced evidence of a similar assignment by author Rosiek. However, one joint author may properly license the copyright in a joint work to a third party. In Community for Creative Non-Violence v. Reid, 846 F.2d 1485 (D.C. Cir. 1988) (opinion by Judge Ruth Bader Ginsburg), aff'd, 490 U.S. 730 (1989), the Court held that "Joint authors co-owning copyright in a work 'are deemed to be tenants in common,' with 'each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby.'" 846 F.2d at 1498 (quoting William Patry, LATMAN'S THE COPYRIGHT LAW 122 (6th ed. 1986)). Thus, author Clandinin's assignment of her interest in the chapter to Sage also conveyed to Sage the authorship rights of Rosiek, the co-contributor.

Thus, Sage owns a valid copyright in the *Handbook of Narrative Inquiry*, and the first prong of the prima facie case of copyright infringement is satisfied. A copy of an excerpt from the *Handbook of*

-154-

*Narrative Inquiry* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

The Fair Use Defense

As to the first element of fair use, an excerpt from the *Handbook of Narrative Inquiry* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kaufmann's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Narrative Inquiry* is a non-fiction work that provides an overview of the methodology of narrative inquiry. It is factual in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded one full chapter of the *Handbook of Narrative Inquiry* to ERES. Because the work contained more than ten chapters, Professor Kaufmann properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of the *Handbook of Narrative Inquiry* affected the market for purchasing the book as a whole. The Court infers that students would not pay $146.00 for the entire book when only 41 of 710 pages were required reading. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument

that the use of the excerpt from the *Handbook of Narrative Inquiry* had a negative effect on the market for sale of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of the *Handbook of Narrative Inquiry* was a fair use under the Copyright Act. This claim of copyright infringement fails.

  22. *The Sage Handbook of Qualitative Research (Third Edition)*

*The Sage Handbook of Qualitative Research (Third Edition)* was first published by Sage in 2005. It is a 1,229 page, 44 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. It contains research and analysis concerning the theory and practice of qualitative research [Pls. Ex. 267]. *The Sage Handbook of Qualitative Research (Third Edition)* retails for $156.00 [Jt. Ex. 5 at D-61]. The book has earned $1,327,804.06 in net sales revenue. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 358]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Third Edition)* earned

$1,131.86 in ECCS permissions revenue [Pls. Ex. 287].[74] In addition, licensed digital excerpts of this work were available directly from Sage; the book has earned $18,711.95[75] through Sage's in-house permissions program [Pls. Ex. 283].

Professor Kaufmann requested pages 1-32, 109-138, 357-375, 443-465, 547-557, 915-932, and 959-978 of *The Sage Handbook of Qualitative Research (Third Edition)*, the entirety of seven chapters, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 fall 2009 course as required reading [Pls. Ex. 518; Tr. Vol. 5 at 145-152]. Together, these chapters represent 12.29% of the total work. Had permissions fees been paid via CCC for the digital distribution of this excerpt, Sage would have earned less than $467.31 in net revenue from permissions.[76] The cost to students in the course would have been $552.78.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *The Sage Handbook of Qualitative Research (Third Edition)* [Doc. 411 at 27]. A contract with the external editors grants Sage the exclusive right to publish

---

[74]This amount represents permissions income only for the third edition of this work. Plaintiffs asserted a higher amount, but that number aggregates the income from multiple editions of the work.

[75]The amount of in-house permissions revenue asserted by Plaintiffs for this work is higher than the amount reported here. The Court was unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documents provided at trial.

[76]The amount earned would have been $552.78, the amount charged by CCC, [Jt. Ex. 5 at D-61], less the $3.00 service fee charged by CCC to users, less $82.47 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

the work.  Contracts with the contributing authors establish that these contributions are made for hire.  Sage has a valid copyright registration in its name, in *The Sage Handbook of Qualitative Research (Third Edition)* [Pls. Ex. 282], which satisfies the first prong of the prima facie case of copyright infringement.  A copy of an excerpt from *The Sage Handbook of Qualitative Research (Third Edition)* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *The Sage Handbook of Qualitative Research (Third Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided  for the exclusive use of students in Professor Kaufmann's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Sage Handbook of Qualitative Research (Third Edition)* is a non-fiction work that analyzes the theory and practice of qualitative research. The presentation is informational in nature.  The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded seven full chapters and 151 pages of *The Sage Handbook of Qualitative Research (Third Edition)* to ERES.  Because the work contained more than ten chapters, a one chapter limit applies; the amount copied was not decidedly small.  The third fair use factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of *The Sage*

-158-

*Handbook of Qualitative Research (Third Edition)* affected the market for purchasing the book as a whole. The Court infers that students would not pay $156.00 for the entire book when only 12.29% of the book was assigned as required reading. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Sage Handbook of Qualitative Research (Third Edition)* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

A review of the fair use factors in this case shows that factor one strongly favors Defendants, factor two factors Defendants, factor three favors Plaintiffs, and factor four strongly favors Plaintiffs. The Court will therefore conduct a further analysis of the evidence in the record to determine the outcome of the fair use defense.

First, revisiting the factor three analysis, the Court finds that Professor Kaufmann's unlicensed use of seven chapters of *The Sage Handbook of Qualitative Research (Third Edition)* dramatically exceeds the permitted one chapter limit, favoring an adjustment of the factor three analysis in Plaintiffs' favor.

Second, the Court also finds that upon revisiting the factor four analysis, an adjustment favoring Plaintiffs' position is warranted. The Court's reasoning is as follows. The evidence shows

-159-

that in 2008 colleges and universities paid $3,630.59 to Sage for excerpts from this book; in 2009 the amount was $11,125.91. In addition, the book earned $3,174.20 in fees from CCC's ECCS and APS programs from 2004 to 2010. The original version of *The Sage Handbook of Qualitative Research* was published in 1994; a second edition was published in 2000; the third edition, at issue here, was published in 2005. With respect the third edition, the documentary evidence [Pls. Ex. 283] shows that book sales began with revenues of $379,940.00 in 2005, with the sales amount going down each year thereafter. In 2009, book sales brought in revenues of $153,234.95. But permissions revenue to Sage's in-house program jumped from $3,630.59 in 2008 to $11,125.91 in 2009.

The same pattern can be seen with respect to the second edition of the handbook; sales of the books reduce over time, as the time approaches for the new edition. However, at the same time book sales go down, permissions sales go up. With respect to the second edition of the book, book sales brought in $311,125.03 in 2000, the year of publication, and in 2004, brought in sales revenues of $197,120.59. In 2005, as the third edition came out, book sales of the second edition declined to $9,984.18. But permissions sales continued, rising to $10,150.49 in 2007. In 2009, when the second edition was no longer available, in-house permissions sales for the second edition were $3,814.52.

From this data, the Court finds that permissions, particularly Sage's in-house permissions, are an important part of the value of the copyright for *The Sage Handbook of Qualitative Research* series. Also, because there is a substantial demand for excerpts, there is a

greater risk for repetitive unpaid use. This determination strengthens the factor four analysis in Plaintiffs' favor.

After considering the foregoing, the Court finds that the overall four factor fair use analysis favors Plaintiffs' position. Accordingly, the Court finds that Defendants have not met their burden of proving that Professor Kaufmann's use of *The Sage Handbook of Qualitative Research (Third Edition)* was a fair use under the Copyright Act. Thus, this claim of copyright infringement succeeds.

### 23. *The Sage Handbook of Qualitative Research (Second Edition)*[77]

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265]. It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters analyze the theory and practice of qualitative research [Pls. Ex. 265; Jt. Ex. 5 at D-14]. *The Sage Handbook of Qualitative Research (Second Edition)* has a retail price of $175.00. It is out of print [Jt. Ex. 5 at D-14], but copies of the book are available at an extra charge. The book has earned $1,300,053.54 in net sales revenue [Pls. Ex. 283]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in ECCS permissions revenue [Pls. Ex. 286].[78] In addition, licensed excerpts of this work are available

---

[77]In the initial March 15, 2011 filing of alleged infringements, Plaintiffs did not include this excerpt for Professor Kaufmann's fall 2009 semester EPRS 8500 course. However, as discussed above, the Court will nevertheless analyze this excerpt.

[78]These amounts represents permissions income only for the second edition of this work. Plaintiffs asserted a higher amount, but that

directly from Sage; the book has earned $58,904.47[79] through Sage's in-house permissions program [Pls. Ex. 283].

Professor Kaufmann requested pages 733-768 of *The Sage Handbook of Qualitative Research (Second Edition)*, the entirety of chapter 28, be uploaded to Georgia State's ERES system for distribution to the students in her fall 2009 course as required reading [Tr. Vol. 6 at 1-6; Pls. Ex. 516; Defs. Ex. 512]. The excerpted chapter was entitled "Autoethnography, Personal Narrative, Reflexivity: Researcher as Subject" and authored by Carolyn Ellis and Arthur P. Bochner. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $87.41 in net revenue from permissions.[80] The cost to students in the course would have been $105.84.

### Prima Facie Case of Copyright Infringement

The certificate of registration for *The Sage Handbook of Qualitative Research (Second Edition)* was filed in Sage's name on June 15, 2000 [Pls. Ex. 282]. However, Plaintiffs have failed to produce evidence of contributing author agreements for chapter 28. There is no evidence that the contributing authors either agreed that chapter 28 was a work made for hire or that they assigned the

---

number aggregates the income from multiple editions of the work.

[79]The amount asserted by Plaintiffs for this work is higher than the amount reported here. The Court is unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documentary evidence.

[80]The amount earned would have been $105.84, the amount charged by CCC, [Jt. Ex. 5 at D-14], less the $3.00 service fee charged by CCC to users, less $15.43 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the author.

copyright to Sage.  The claimed infringement is for material within chapter 28.

*The Sage Handbook of Qualitative Research (Second Edition)* is an edited work comprised of chapters written by different authors.

Chapter 28 of *The Sage Handbook of Qualitative Research (Second Edition)* was authored by Carolyn Ellis and Arthur P. Bochner [Pls. Ex. 265].  This chapter is entitled "Autoethnography, Personal Narrative, Reflexivity: Researcher as Subject" [Pls. Ex. 265]. Although the copyright registration, which lists Sage as the claimant of the copyright, states that each chapter in the book is a work made for hire and therefore that Sage is the initial author of each chapter, there is no evidence in the record that Ellis and Bochner agreed that chapter 28 was a work made for hire.  <u>See</u> 17 U.S.C. § 101 ("A 'work made for hire' is . . . a work specially ordered or commissioned . . . *if the parties expressly agree in a written instrument signed by them* that the work shall be considered a work made for hire.") (emphasis added).

Plaintiffs have produced evidence of an agreement between Sage and the editors of this work, Norman K. Denzin and Yvonna S. Lincoln. This agreement assigns the editors' copyright interest to Sage, but it neither addresses nor assigns the copyrights of the contributing authors of each chapter.  Plaintiffs have not introduced evidence of a similar assignment by either author of chapter 28, the excerpt assigned by Professor Kaufmann.  Accordingly, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *The Sage Handbook of Qualitative Research (Second Edition)*.  It is not necessary to address Defendants' fair use defense.  This infringement claim fails.

24. *Handbook of Social Theory*

The *Handbook of Social Theory* was first published by Sage in 2001 in the United Kingdom and subsequently published in the United States [Pls. Ex. 288]. It is a 564 page, 39 chapter volume edited by George Ritzer and Barry Smart. The work provides an overview of social theory, and the chapters in the book discuss strengths and weaknesses of contemporary social theory [Pls. Ex. 288]. The *Handbook of Social Theory* retails for $150.00 in hardcover and $69.95 in paperback [Jt. Ex. 5 at D-62]. The net sales revenue the book has earned amounts to £63,483.74 [Pls. Ex. 291]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009. Licensed excerpts of this work are available directly from Sage; the book has earned £2,470.01 through Sage's in-house permissions program [Pls. Ex. 291].

Professor Kaufmann requested pages 217-228 of the *Handbook of Social Theory*, a portion of one chapter, be uploaded to Georgia State's ERES system for distribution to the students in her fall 2009 course as required reading [Tr. Vol. 5 at 113; Pls. Exs. 288, 516]. The excerpt was taken from Chapter 17, "Symbolic Interactionism at the End of the Century," which was written by Kent Sandstrom, Daniel Martin, and Gary Alan Fine. Had permissions fees been paid via Sage's permissions program for the digital distribution of this excerpt, Sage would have earned less than $30.24 in net revenue.[81]

---

[81]The amount earned would have been $30.24, the amount charged by Sage through its in-house program at twelve cents per page, less royalties Sage is obligated to pay the external editor.

<u>Prima Facie Case of Copyright Infringement</u>

The *Handbook of Social Theory* was first published outside the United States in 2001 and published in the United States more than 30 days after the first publication [Pls. Ex. 288]. Thus, the *Handbook of Social Theory* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 104(b)(2). The Court finds that the *Handbook of Social Theory* is an original work and that it has sufficient creativity to be copyrighted.

Defendants contend that Plaintiffs have nonetheless failed to establish a prima facie case of copyright infringement because only one of the three authors of the chapter at issue has assigned his copyright interest to Sage. Defendants argue that all three co-authors must assign their interest in the work to Sage for it to have ownership of the underlying copyright.

Chapter seventeen of the *Handbook of Social Theory* was authored by Kent L. Sandstrom, Daniel D. Martin, and Gary Alan Fine [Pls. Ex. 288]. Plaintiffs have produced evidence of an author agreement with Gary Alan Fine, assigning his copyright interest in the chapter to Sage [Pls. Ex. 290], but Defendants point out that there is no evidence of similar assignments by the other two authors of chapter seventeen.

However, one joint author may properly license the copyright in a joint work to a third party. In <u>Community for Creative Non-Violence v. Reid</u>, 846 F.2d 1485 (D.C. Cir. 1988) (opinion by Judge Ruth Bader Ginsburg), <u>aff'd</u>, 490 U.S. 730 (1989), the Court held that "Joint authors co-owning copyright in a work 'are deemed to be

-165-

tenants in common,' with 'each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby.'" 846 F.2d at 1498 (quoting William Patry, LATMAN'S THE COPYRIGHT LAW 122 (6th ed. 1986)). Thus, author Gary Alan Fine's grant of "the sole and exclusive right to produce and publish" the chapter to Sage also conveyed to Sage the authorship rights of his co-contributors.

Sage holds the exclusive right to publish the *Handbook of Social Theory* through contract with George Ritzer and Barry Smart. It also holds the exclusive right to publish chapter seventeen of the book through contract with the contributing authors. The first prong of the prima facie case of copyright infringement is satisfied. A copy of an excerpt from the *Handbook of Social Theory* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from the *Handbook of Social Theory* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kaufmann's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Social Theory* is a non-fiction work that analyzes social theories. It is informational in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Kaufmann uploaded one full chapter representing 2.12% of the *Handbook of Social Theory* to ERES. Because the work contained more than ten chapters, Professor

-166-

Kaufmann properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kaufmann's use of the *Handbook of Social Theory* affected the market for purchasing the book as a whole. The Court infers that students would not pay $69.95 (or $150.00 in hardcover) for the entire book when only twelve of 564 pages were required reading for Professor Kaufmann's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Social Theory* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kaufmann's use of the *Handbook of Social Theory* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

C. <u>Professor Esposito</u>

Professor Esposito is a professor in the Educational Policy Studies department at Georgia State [Tr. Vol. 6 at 52].

<u>EPSF 8280 Anthropology of Education, Summer 2009</u>

EPSF 8280 is a graduate course that explores the methodology of ethnography and the study of culture in school settings [Tr. Vol. 6 at 81; Pls. Ex. 547]. Twenty two graduate students were enrolled in Professor Esposito's EPSF 8280 course during the summer 2009 semester [Jt. Ex. 5 at D-23; Tr. Vol. 6 at 52]. As evidenced by the syllabus, students were required to purchase five texts for this course, as well as complete several required readings posted on ERES [Pls. Ex. 547; Tr. Vol. 6 at 79].

25. *Handbook of Ethnography*

*Handbook of Ethnography* was first published by Sage in 2001 [Pls. Ex. 239]. It is a 525 page, 33 chapter volume edited by Paul Atkinson, Amanda Coffey, Sara Delamont, John Lofland, and Lyn Lofland. The chapters provide an interdisciplinary overview and analysis of the field of ethnography [Jt. Ex. 5 at D-21]. The book retails for $130.00 [Jt. Ex 5 at D-21]. The net sales revenue the book has earned amounts to £75,826.44 [Pls. Ex. 241]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 242]. From July 1, 2004 until December 1, 2010, the *Handbook of Ethnography* earned $413.03 in ECCS permissions revenue [Pls. Ex. 242]. In addition, licensed digital excerpts of this work were available directly from Sage in 2009; the book has earned £195.29 through Sage's in-house permissions program [Pls. Ex. 291].

Professor Esposito requested that pages 188-203, all of chapter thirteen, of the *Handbook of Ethnography* be uploaded to ERES for

-168-

distribution to students in her EPSF 8280 course [Pls. Ex. 239]. Chapter thirteen is entitled "Ethnographic Research in Educational Settings" by Tuula Gordon, Janet Holland, and Elina Lahelma. The sixteen page excerpt was 3.05% of the total work [Tr. Vol. 6 at 55; Pls. Ex. 239]. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $41.89 in net revenue from permissions.[82] The cost to students in the course would have been $52.28.

### Prima Facie Case of Copyright Infringement

Plaintiffs have failed to produce evidence of contributing author agreements for chapter thirteen, the excerpt assigned by Professor Esposito. There is no evidence that the contributing authors of this chapter either agreed that it was a work made for hire or that they assigned the copyright to Sage.

*Handbook of Ethnography* is an edited volume comprised of chapters written by different authors. Chapter thirteen was authored by Tuula Gordon, Janet Holland, and Elina Lahelma [Pls. Ex. 239]. Plaintiffs have produced evidence of an agreement between Sage and the external editors, which assigns to Sage the exclusive right to publish the work, but it does not assign the copyrights of the contributing authors of each chapter; rather, it states "Contributors shall enter into separate publishing agreements covering their individual chapters." [Pls. Ex. 240]. Plaintiffs have not introduced evidence of a similar assignment by any of the authors of chapter

---

[82]The amount earned would have been $52.28, the amount charged by CCC, [Jt. Ex. 5 at D-21], less the $3.00 service fee charged by CCC to users, less $7.39 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors

thirteen. Accordingly, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Handbook of Ethnography*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

26. *Handbook of Feminist Research: Theory and Praxis*

The *Handbook of Feminist Research* was first published by Sage in 2006 [Pls. Ex. 247]. It is a 767 page, 43 chapter volume edited by Sharlene Nagy Hesse-Biber. The chapters discuss feminist approaches to research methodology [Pls. Ex. 243]. The *Handbook of Feminist Research* retails for $146.00 [Jt. Ex. 5 at D-22]. The book has earned net sales revenue in the amount of $94,085.88 [Pls. Ex. 248]. There is no evidence in the record reflecting that excerpts of the book were available for digital licensing through CCC in 2009. However, licensed digital excerpts of the book were available in 2009 through Sage's in-house permissions program, and the book has earned $938.46 in permissions revenue [Pls. Ex. 248].

Professor Esposito requested that pages 155-172, the entirety of chapter eight, of *Handbook of Feminist Research* be uploaded to ERES for distribution to students in her EPSF 8280 course [Pls. Ex. 243; Tr. Vol. 6 at 56]. The excerpt is entitled "Toward Understandings of Feminist Ethnography" by Wanda Pillow and Cris Mayo. The excerpt totaled eighteen pages or 2.35% of the total work [Tr. Vol. 6 at 56]. Had permissions been paid through Sage's in-house program for the distribution of this excerpt, Sage would have earned $47.52 less royalties payable to the external editor in net revenue. The cost to students in the course would have been $47.52.

-170-

Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for the *Handbook of Feminist Research* [Doc. 411 at 27-28]. Sage's contracts with the external editor and with two of the contributing authors establish that the book and these chapters are made for hire. The copyright is registered in Sage's name [Pls. Exs. 245, 247]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Handbook of Feminist Research* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

The Fair Use Defense

As to the first element of fair use, an excerpt from *The Handbook of Feminist Research* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Esposito's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, the *Handbook of Feminist Research* is a non-fiction work that contains analysis of feminist approaches to methodology. The presentation is informational in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Esposito uploaded eighteen pages, which represents one full chapter or 2.35% of the total work, to ERES. Because the work contained more than ten chapters, Professor Esposito properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

-171-

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Esposito's use of the *Handbook of Feminist Research* affected the market for purchasing the book as a whole. Students would not pay $146.00 for the entire book when only eighteen pages were required reading for Professor Esposito's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Feminist Research* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Esposito and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Esposito's use of the *Handbook of Feminist Research* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

27. *The Sage Handbook of Qualitative Research (Second Edition)*

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265]. It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters analyze the theory and practice of qualitative research

-172-

[Pls. Ex. 265; Jt. Ex. 5 at D-14]. There is conflicting evidence in the record as to the retail price for *The Sage Handbook of Qualitative Research (Second Edition)*; the parties alternatively assert that it retails for $156.00 and for $175.00 [Jt. Ex. 5 at D-19, D-23]. There is conflicting evidence of whether *The Sage Handbook of Qualitative Research (Second Edition)* is currently out of print [Jt. Ex. 5 at D-19, D-23]. A reprint is available for an extra charge. The book has earned $1,300,053.54 in net sales revenue [Pls. Ex. 283]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in ECCS permissions revenue [Pls. Ex. 286].[83] In addition, licensed excerpts of this work were available directly from Sage in 2009; the book has earned $58,904.47[84] through Sage's in-house permissions program [Pls. Ex. 283].

Professor Esposito requested that pages 455-486 of *The Sage Handbook of Qualitative Research (Second Edition)* be uploaded to ERES for distribution to students in her EPSF 8280 course [Pls. Ex. 265; Tr. Vol. 6 at 54]. The excerpted chapter was entitled "Ethnography and Ethnographic Representation" by Barbara Tedlock. The excerpt was one chapter of the book totaling 32 pages, or 2.80% of the total work [Pls. Ex. 265]. Had permissions been paid via CCC for the

---

[83]This amount represents permissions income only for the second edition of this work. Plaintiffs asserted a higher amount, but that number aggregates the income from multiple editions of the work.

[84]The amount asserted by Plaintiffs for this work is higher than the amount reported here. The Court was unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documents provided at trial.

distribution of this excerpt, Sage would have earned less than $83.78 in net revenue from permissions.[85] The cost to students in the course would have been $101.56.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that the Plaintiffs have established a prima facie case of copyright infringement for *The Sage Handbook of Qualitative Research (Second Edition)* [Doc. 411 at 27-28]. As previously stated, the copyright is registered in Sage's name [Pls. Exs. 278, 282], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Esposito's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Sage Handbook of Qualitative Research (Second Edition)* is a non-fiction work that provides analysis on the theory and practice of qualitative research.

---

[85]The amount earned would have been $101.56, the amount charged by CCC, [Jt. Ex. 5 at D-23], less the $3.00 service fee charged by CCC to users, less $14.78 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

The chapters in the work are informational in nature.  The second fair use factor favors Defendants.

As to the third fair use factor, Professor Esposito uploaded 32 pages, which represents one chapter or 2.80% of the total work, of *The Sage Handbook of Qualitative Research (Second Edition)* to ERES. Because the work contained more than ten chapters, Professor Esposito properly adhered to the one chapter limit; the amount copied was decidedly small.  The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Esposito's use of *The Sage Handbook of Qualitative Research (Second Edition)* affected the market for purchasing the book as a whole.  The sales revenue for *The Sage Handbook of Qualitative Research (Second Edition)* in 2009 was $0.00. The book is technically out of print, but a reprint is available at an extra charge.  Moreover, students would not pay $156.00 or $175.00 for an entire book when only 32 pages were required reading for Professor Esposito's course.  Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program.  The unpaid use of the excerpt by Professor Esposito and her students caused very small, but actual, damage to the value of Sage's copyright.  In addition, widespread use of similar unlicensed excerpts could cause substantial

harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Esposito's use of *The Sage Handbook of Qualitative Research (Second Edition)* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

28.  *The Sage Handbook of Qualitative Research (First Edition)*

*The Sage Handbook of Qualitative Research (First Edition)* was first published by Sage in 1994 [Defs. Ex. 739].  It is a 653 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters provide analysis on the theory and practice of qualitative research [Jt. Ex. 5 at D-24].  *The Sage Handbook of Qualitative Research (First Edition)* is out of print [Jt. Ex. 5 at D-24] but reprints are available at an extra charge.  There is no evidence in the record of the net sales revenue from sales of the book itself.  Excerpts from the book were available for digital licensing through CCC in 2009 [Pls. Ex. 287].  From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (First Edition)* earned $4,632.40 in ECCS permissions revenue [Pls. Ex. 287].[86]

Professor Esposito requested that pages 70-82, or the entirety of chapter four, of *The Sage Handbook of Qualitative Research (First Edition)* be uploaded to ERES for distribution to students in her ESPF 8280 course [Defs. Ex. 739; Tr. Vol. 6 at 58].  Chapter four is

---

[86]This figure is the Court's estimation of ECCS revenue based on its review of documentary evidence provided at trial.

-176-

entitled "Working the Hyphens: Reinventing Self and Other in Qualitative Research" by Michelle Fine. The excerpt totaled thirteen pages, or 1.99% of the work [Defs. Ex. 739; Tr. Vol. 6 at 58]. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $34.03 in net revenue from permissions.[87] The cost to students in the course would have been $43.04.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that the Plaintiffs have established a prima facie case of copyright infringement for *The* Sage *Handbook of Qualitative Research (First Edition)* [Doc. 411 at 27-28]. Sage owns a valid copyright, registered in its name, in *The Sage Handbook of Qualitative Research (First Edition)* [Pls. Exs. 282, 271], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Sage Handbook of Qualitative Research (First Edition)* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Sage Handbook of Qualitative Research (First Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for

---

[87]The amount earned would have been $43.04, the amount charged by CCC, [Jt. Ex. 5 at D-24], less the $3.00 service fee charged by CCC to users, less $6.01 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

the exclusive use of students in Professor Esposito's class.   The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Sage Handbook of Qualitative Research (First Edition)* is a non-fiction work with academic analysis about the theory and practice of qualitative research.   The work is informational in nature.   The second fair use factor favors Defendants.

As to the third fair use factor, Professor Esposito uploaded thirteen pages, which represents one chapter or 1.99%, of *The Sage Handbook of Qualitative Research (First Edition)* to ERES.   Because the work contained more than ten chapters, Professor Esposito properly adhered to the one chapter limit; the amount copied was decidedly small.   The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Esposito's use of *The Sage Handbook of Qualitative Research (First Edition)* affected the market for purchasing the book as a whole.   Students could not have purchased a full copy of the book without paying an extra charge. Therefore, the Court rejects any argument that the use of the excerpt from *The Sage Handbook of Qualitative Research (First Edition)* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program.   The unpaid use of the excerpt by Professor Esposito and her students caused very small, but actual, damage to the value of Sage's copyright.   In addition, widespread use of similar unlicensed excerpts could cause substantial

harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Esposito's use of *The Sage Handbook of Qualitative Research (First Edition)* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

### EPRS 8520 Qualitative Research in Education III, Fall 2009

EPRS 8520 is a graduate course that focuses on data analysis [Tr. Vol. 6 at 87]. Fourteen doctoral candidates were enrolled in Professor Esposito's course during the fall 2009 semester [Jt. Ex. 5 at D-63; Tr. Vol. 6 at 61, 88].  As evidenced by the syllabus for this course, students were required to purchase two texts for this course, as well as complete several required readings posted on ERES [Pls. Ex. 513; Tr. Vol. 6 at 86-87].

### 29. *Theoretical Frameworks in Qualitative Research*

*Theoretical Frameworks in Qualitative Research* was first published by Sage in 2006 [Pls. Ex. 305].  It is a 237 page, ten chapter volume edited by Vincent A. Anfara and Norma T. Mertz.  The chapters provide analysis on the role of the theoretical framework in qualitative research through case examples [Jt. Ex. 5 at D-63].  The book retails for $51.95 [Jt. Ex 5 at D-63].  The book has earned $75,320.69 in net sales revenue [Pls. Ex. 308].  There is no evidence in the record of any permissions revenue earned through CCC. However, licensed digital excerpts of the book were available in 2009 through Sage's in-house permissions program, and the book has earned $138.61 in permissions revenue [Pls. Exs. 308, 309].

-179-

Professor Esposito requested that pages xxiii-xxxii[88] and pages 189-196 of *Theoretical Frameworks in Qualitative Research* be uploaded to ERES for distribution to students in her EPRS 8520 course [Tr. Vol. 6 at 88; Pls. Ex. 639]. The two excerpts are a portion of the introduction and the entirety of the conclusion of the book, totaling sixteen pages, or 6.75% of the total work [Pls. Ex. 305]. Both the introduction and conclusion were written by the book's editors, Vincent A. Anfara and Norma T. Mertz. Had permissions been paid through its in-house permissions program to license this excerpt, Sage would have earned $26.88 less royalties payable to the external editors. The cost to students in the course would have been $26.88.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that the Plaintiffs have established a prima facie case of copyright infringement for *Theoretical Frameworks in Qualitative Research* [Doc. 411 at 27-28]. The contract with the external editors establishes that all copyrightable materials contributed by them shall be considered works made for hire. The copyright is registered in Sage's name [Pls. Exs. 306, 307], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Theoretical Frameworks in Qualitative Research* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

---

[88]Although Joint Exhibit 5 states that the entire introduction, appearing on pages xii-xxx, was uploaded to ERES, Professor Esposito testified at trial that she assigned only a portion of the introduction, beginning at page xxiii. The Court credits this testimony. Thus, the Court will consider the smaller excerpt for purposes of the fair use determination.

The Fair Use Defense

As to the first element of fair use, an excerpt from *Theoretical Frameworks in Qualitative Research* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Esposito's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Theoretical Frameworks in Qualitative Research* is a non-fiction work that provides analysis on the role of the theoretical framework in qualitative research through case examples. The chapters in this work are informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Esposito uploaded a portion of the introduction and the entirety of the conclusion, 6.75%, of *Theoretical Frameworks in Qualitative Research.* The book has an average chapter length of eighteen pages. The excerpts here total sixteen pages, which is the equivalent of one chapter. It is a decidedly small amount. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Esposito's use of *Theoretical Frameworks in Qualitative Research* affected the market for purchasing the book as a whole. Students would not pay $51.95 for the entire book when only sixteen pages were required reading for Professor Esposito's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Theoretical*

-181-

*Frameworks in Qualitative Research* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Esposito and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Esposito's use of *Theoretical Frameworks in Qualitative Research* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

D. <u>Professor Kruger</u>

Professor Kruger is an associate professor in Educational Psychology and Special Education at Georgia State [Tr. Vol. 10 at 4]. She began working at Georgia State in 1992 [<u>Id.</u>]. Professor Kruger teaches graduate level courses [<u>Id.</u> at 6].

<u>EPY 7090 Psychology of Learning and the Learner, Summer and Fall 2009</u>

EPY 7090 is a graduate course that addresses the psychological principles that underlie the teaching and learning that occur in school [Pls. Ex. 553; Tr. Vol. 10 at 6-7]. As evidenced by the syllabus, this course was taught over two semesters, summer and fall 2009 [Pls. Ex. 553]. Although all of the required reading for both semesters of the course was posted to ERES at the beginning of the

summer semester, the syllabus, hit count, and Professor Kruger's testimony all demonstrate that students were only required to complete the assigned readings once over the course of the semesters [Pls. Ex. 553; Jt. Ex. 2 at 5; Jt. Ex. 3 at 35; Tr. Vol. 10 at 7, 33]. According to the syllabus, there were no required textbooks for the course; all assigned readings were made available through ERES [Pls. Ex. 553].

30. _Awakening Children's Minds: How Parents and Teachers Can Make a Difference_[89]

_Awakening Children's Minds_ was first published by Oxford in 2001 [Pls. Ex. 354]. It is a 320 page, seven chapter book authored by Laura E. Berk that advises parents and teachers of young children on how they can encourage children's cognitive and social competencies [Pls. Ex. 354; Jt. Ex. 5 at D-26]. The book is highly readable and probably sells well to general audiences such as parents of young children and not just to the academic community. The book retails for $28.00 [Jt. Ex. 5 at D-26]. The net sales revenue from the date of first publication through November 7, 2010 was $130,482.00 [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009, though it earned $171.36 in ECCS permissions revenue in 2010 [Pls. Ex. 358].

---

[89]Although Plaintiffs characterize Professor Kruger's use of _Awakening Children's Minds_ as two separate infringements, one in the summer and one in the fall, the Court finds that the excerpt was posted to ERES only once for the extended course and students accessed the excerpted material only during the fall semester. The hit count in the summer was one, but the hit count during the fall was 40 [Jt. Ex. 2 at 5; Jt. Ex. 3 at 35]. Therefore, the Court evaluates the use of _Awakening Children's Minds_ as one infringement claim.

Professor Kruger requested that pages 181-219 of *Awakening Children's Minds* be uploaded to ERES for distribution to the students in her course [Pls. Ex. 553]. The excerpt was one chapter of the book entitled "Learning in Classrooms" and represents 39 pages or 12.19% of the total work [Pls. Ex. 354]. Had permissions been paid for the distribution of this excerpt through CCC, Oxford would have earned less than $67.63 in net revenue from permissions.[90] The cost to students in the course would have been $82.56. Professor Kruger owns a copy of the book [Tr. Vol. 10 at 84].

<u>Prima Facie Case of Copyright Infringement</u>

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *Awakening Children's Minds* [Doc. 411 at 27-28]. Oxford has the exclusive right to publish *Awakening Children's Minds* pursuant to a contract with the author; the same contract states that the copyright will be registered in Oxford's name. The copyright registration is in Oxford's name [Pls. Exs. 355, 356], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Awakening Children's Minds* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Awakening Children's Minds* was used by a nonprofit educational institution for

---

[90]The amount earned would have been $82.56, the amount charged by CCC, less the $3.00 service fee charged by CCC to users, less $11.93 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kruger's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Awakening Children's Minds* is a non-fiction work that advises parents and teachers of young children on how they can encourage children's cognitive and social competencies. The presentation is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Kruger uploaded one chapter from seven in *Awakening Children's Minds* to ERES. Because the work contained less than ten chapters, Professor Kruger should have adhered to a limit of 10% of the protected pages of the book. The copied excerpt constitutes 39 pages or 12.19% of the total work, which is not a decidedly small amount. The third factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kruger's use of the excerpt from *Awakening Children's Minds* affected the market for purchasing the book as a whole. Students would not pay $28.00 for the entire book when only 39 pages were required reading for Professor Kruger's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Awakening Children's Minds* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four

when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kruger's use of *Awakening Children's Minds* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### EPY 8220 Advanced Developmental Psychology: Personality and Socialization, Fall 2009

EPY 8220 is a doctoral course that addresses research and scholarship of child social and personality development [Pls. Ex. 554; Tr. Vol. 10 at 7-8]. Nineteen students were enrolled in Professor Kruger's course during the fall 2009 semester [Jt. Ex. 5 at D-66]. As evidenced by the syllabus for this course, there were no required textbooks for the course; all assigned readings were made available through ERES [Pls. Ex. 554].

### 31. *Understanding Trauma: Integrating Biological, Clinical and Cultural Perspectives*

*Understanding Trauma: Integrating Biological, Clinical and Cultural Perspectives* ("*Understanding Trauma*") was first published by Cambridge in 2007 [Pls. Ex. 142]. It is a 547 page, 21 chapter volume edited by Laurence J. Kirmayer, Robert Lemelson, and Mark Barad [Pls. Ex. 142]. The book provides interdisciplinary analyses of the individual and collective response to trauma. The book retails for $110.00 in hardback and $35.99 in paperback [Jt. Ex. 5 at D-66]. The net sales revenue from date of first publication to

December 31, 2010 was £33,629.00 [Pls. Ex. 146]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Kruger requested that pages 224-241, the entirety of chapter eleven, of *Understanding Trauma* be uploaded to ERES for distribution to students in her EPY 8220 course as required reading [Pls. Ex. 554; Jt. Ex. 5 at D-66; Tr. Vol. 10 at 11]. Chapter eleven is entitled "The Developmental Impact of Childhood Trauma" by Bessel A. van der Kolk. The excerpt is eighteen pages and 3.29% of the total work [Pls. Ex. 142]. Professor Kruger owns a copy of this book [Tr. Vol. 10 at 27].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that the Plaintiffs have established a prima facie case of copyright infringement for *Understanding Trauma* [Doc. 411 at 27-28]. The external editors and the contributing authors have assigned "all copyrights in the work" to Cambridge. The copyright is registered in Cambridge's name [Pls. Exs. 144, 145], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Understanding Trauma* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *Understanding Trauma* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kruger's class. The first factor weighs strongly in favor of Defendants.

-187-

As to the second element of fair use, *Understanding Trauma* provides interdisciplinary analysis of the individual and collective response to trauma. *Understanding Trauma* is an academic work that is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Kruger uploaded eighteen pages, representing one chapter or 3.29%, of *Understanding Trauma* to ERES. Because the work contained more than ten chapters, Professor Kruger properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kruger's use of *Understanding Trauma* affected the market for purchasing the book as a whole. Students would not pay $35.99 (or $110.00 in hardback) for the entire book when only eighteen pages were required reading for Professor Kruger's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Understanding Trauma* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with

-188-

reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kruger's use of *Understanding Trauma* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### E.   Professor Orr

Professor Orr is a tenured professor in the Music History and Literature Department at Georgia State [Tr. Vol. 7 at 55]. He has taught at Georgia State since 1978 [Tr. Vol. 7 at 55]. Professor Orr testified that he normally keeps his excerpts to around ten percent of an entire work. He stated that if he cannot keep an excerpt around ten percent, then he does not use the book, although there are a few exceptions [Tr. Vol. 7 at 72]. He learned about Georgia State's Copyright Policy when it was sent out in 2009 [Tr. Vol. 7 at 60]. At that time, he read the revised policy but did not attend the training session because he was not told it was mandatory [Tr. Vol. 7 at 61].

### MUS 8860 Romantic Period 1800-1900,[91] Summer 2009

Professor Orr taught MUS 8860, a graduate course, in the 2009 summer semester [Tr. Vol. 7 at 56]. Ten students enrolled in the course [Tr. Vol. 7 at 59]. Professor Orr's syllabus listed two

---

[91]The syllabus for this course refers to its title as Romantic Music. This Order will refer to the course using the title that appears in trial testimony and Joint Exhibit 5, Romantic Period 1800-1900.

required texts [Pls. Ex. 523; Tr. Vol. 7 at 56], and he posted
several additional required readings on ERES without seeking
copyright permissions [Tr. Vol. 7 at 57].

    32.  *Liszt: Sonata in B Minor*

*Liszt: Sonata in B Minor* was first published by Cambridge in
1996 as part of the *Cambridge Music Handbooks* series, which provides
introductions to major musical works for students knowledgeable about
music [Pls. Ex. 130].  The book was written by Kenneth Hamilton [Pls.
Ex. 130].  It has five chapters and a total of 101 pages.  It retails
for $80.00 in hardback or $28.99 in paperback [Jt. Ex. 5 at D-29].
The book has earned £19,322 in net sales revenue from the date of
first publication through October 31, 2010 [Pls. Ex. 133].  There is
no evidence in the record reflecting that the work was available for
licensed digital excerpts in 2009.

Professor Orr requested that pages 28-48 be posted to ERES as
required reading for his MUS 8860 course [Tr. Vol. 7 at 66-67].  This
excerpt is a full chapter entitled "Understanding the Sonata in B
Minor" and represents 20.79% of the book.

          Prima Facie Case of Copyright Infringement

*Liszt: Sonata in B Minor* was first published by Cambridge on
August 28, 1996, but Cambridge did not obtain a certificate of
copyright registration until December 27, 2010 [Pls. Ex. 132].  17
U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a
> registration made before or within five years after first
> publication of the work shall constitute prima facie
> evidence of the validity of the copyright and of the facts
> stated in the certificate.  The evidentiary weight to be
> accorded the certificate of a registration made thereafter
> shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Liszt: Sonata in B Minor* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Liszt: Sonata in B Minor*.

To qualify for copyright protection, a work must be the author's original work. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). To meet the creativity requirement even a slight amount of creativity will suffice. Id. *Liszt: Sonata in B Minor* contains analysis of the sonata and the composer, as well as a chapter aimed at pianists that discusses the performance of the piece [Pls. Ex. 130]. Cambridge, in soliciting a copyright registration, declared that *Liszt: Sonata in B Minor* is an original work and nothing in the evidence indicates otherwise. The Court finds that the book meets the creativity requirement. Therefore, *Liszt: Sonata in B Minor* is copyrightable.

The author assigned "the full copyright in the work" to Cambridge. As stated, the copyright is registered in Cambridge's name. The first prong of the prima facie case of copyright infringement has been satisfied.

A copy of an excerpt from *Liszt: Sonata in B Minor* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

-191-

The Fair Use Defense

As to the first element of fair use, an excerpt from *Liszt: Sonata in B Minor* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Orr's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Liszt: Sonata in B Minor* is a non-fiction book discussing a composer and his work. The presentation is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Orr uploaded one full chapter out of five total chapters of *Liszt: Sonata in B Minor* to ERES. Because the work contains less than ten chapters, Professor Orr should have adhered to a limit of 10% of the protected pages of the book. The amount he actually copied represents 20.79% of the total pages within the book. However, Defendants point out that six pages of the chapter uploaded by Professor Orr contain excerpts of sheet music, which is material in the public domain that is not copyrightable and therefore that these pages should not count toward the total number of pages copied. While it is not correct those pages should be excluded from the page count in their entirety, the Court agrees that the page count should not include the portions of the pages containing material in the public domain. Thus, the Court will conduct its own page count for this work.

Although the book contains 101 pages, nine of these pages include sheet music that is in the public domain and therefore not subject to copyright protection. The author has merely reproduced

-192-

these excerpts in the book for reference and as a basis for his analysis. The total amount of unprotected material on these pages adds up to 4.67 pages. Excluding this amount from the total number of pages in the book reduces the total from 101 to 96.33 pages. The copied chapter at issue here contains 3.16 pages of unprotected material, which reduces the number of copyrightable pages in the chapter from 21 to 17.84. Thus, the excerpt copied by Professor Orr actually represents 18.52% of the work, which is not a decidedly small amount. The third factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Orr's use of *Liszt: Sonata in B Minor* affected the market for purchasing the book as a whole. The Court infers that students would not pay $28.99 for the entire book (or $80.00 for the hardcover version) when only 21 pages were required reading for Professor Orr's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Liszt: Sonata in B Minor* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Orr's use of *Liszt: Sonata in B Minor* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

33. *The Cambridge Companion to Mendelssohn*

*The Cambridge Companion to Mendelssohn* was first published by Cambridge on October 21, 2004 in the United Kingdom and on November 29, 2004 in the United States [Pls. Exs. 65, 68]. It is part of the *Cambridge Companions to Music* series, which provides information on composers, instruments, or musical topics. *The Cambridge Companion to Mendelssohn* has fourteen chapters and a total of 331 pages [Pls. Ex. 65]. The book was edited by Peter Mercer-Taylor and provides analysis of the composer's life and music [Tr. Vol. 7 at 77; Jt. Ex. 5 at D-30]. It retails for $90.00 for hardcover or $32.99 for paperback [Jt. Ex. 5 at D-30]. It earned £24,826 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 69]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Orr requested that pages 96-111, which is a portion of chapter six totaling 4.83% of the book, be posted on the ERES system as required reading [Tr. Vol. 7 at 77]. The excerpt was taken from a chapter entitled "Symphony and Overture" by Douglass Seaton [Pls. Ex. 65].

Prima Facie Case of Copyright Infringement

*The Cambridge Companion to Mendelssohn* was first published outside the United States on October 21, 2004 and published in the

-194-

United States on November 29, 2004, more than 30 days after the first publication. Thus, *The Cambridge Companion to Mendelssohn* is a foreign work as defined by the Copyright Act and a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 101; 17 U.S.C. § 104(b)(2).[92] If the Court is required to make a determination of "copyrightablity" or "originality" for Plaintiffs' infringement claim to succeed,[93] the Court finds that this book is an original work[94] with sufficient creativity to be copyrighted. Also, copyrights in the book and in the contributed chapters were assigned to Cambridge by the external editors and the contributing authors. *The Cambridge Companion to*

---

[92] When the United States joined the Berne Convention on March 1, 1989, the Copyright Act was revised to provide that the requirement for registration in order to bring an infringement action is limited to "the copyright in any United States work"; the claimant of a copyright in any foreign work of a country that is also a signatory to the Berne Convention may file suit in a United States District Court without proof of copyright registration. Berne Convention Implementation Act of 1988, Mar. 1, 1989, Pub. L. No. 100-568; 17 U.S.C. § 411(a).

[93] The cases to which Defendants cite to support their contention that Plaintiffs must show that a foreign work is "copyrightable" to satisfy the first element of a prima facie case of copyright infringement are not on point; they each involve a plaintiff seeking to bring an infringement action for a United States work that was denied copyright registration, not for a foreign work. Ward v. Nat'l Geographic Soc'y, 208 F. Supp. 2d 429 (S.D.N.Y. 2002); Clarus Transphase Scientific, Inc. v. Q-Ray, Inc., No. 06C4634, 2006 WL 4013750, at *20 (N.D. Ill. Oct. 6, 2006); Morelli v. Tiffany and Co., No. 00-1961, 2001 WL 179898, at *1 (E.D. Pa. Jan. 10, 2001).

[94] For this finding the Court relies on Cambridge's reputation in its field and Frank Smith's testimony that Cambridge regularly scrutinizes all proposed works. The Court believes this work was reviewed for being original to the author before it was published.

-195-

*Mendelssohn* meets the first prong of the prima facie case of copyright infringement.

A copy of an excerpt from *The Cambridge Companion to Mendelssohn* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Cambridge Companion to Mendelssohn* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Orr's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Cambridge Companion to Mendelssohn* surveys the life and work of the composer. The chapters are informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Orr copied part of one chapter of *The Cambridge Companion to Mendelssohn* to ERES.[95] Because the work contained more than ten chapters, Professor Orr properly adhered to the one chapter limit; the amount copied was

---

[95]The parties disagree about what percentage of the work that excerpt represents. Defendants contend that two pages of the chapter uploaded by Professor Orr contain excerpts of sheet music, which is material in the public domain that is not copyrightable and therefore that these pages should not count toward the total number of pages copied, lowering the calculated percentage. Plaintiffs contend the copied amount was 5.6% of the book, while Defendants contend it was 4.2%. Because it will not change the outcome, the Court assumes without deciding that the amount Professor Orr copied without permission is somewhere within this range.

-196-

decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Orr's use of *The Cambridge Companion to Mendelssohn* affected the market for purchasing the book as a whole. Students would not pay $32.99 for the entire book (or $90.00 for the hardcover version) when only sixteen pages were required reading for Professor Orr's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Cambridge Companion to Mendelssohn* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Orr's use of *The Cambridge Companion to Mendelssohn* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

34.  *The Cambridge Companion to Schumann*

*The Cambridge Companion to Schumann* was first published by Cambridge on June 28, 2007 in the United Kingdom and on August 13,

-197-

2007 in the United States [Pls. Ex. 77]. It is part of the *Cambridge Companions to Music* series, which provides information on composers, instruments, or musical topics. The book was edited by Beate Perrey and surveys Schumann's life and music [Pls. Ex. 75]. It has thirteen chapters, a total of 324 pages [Pls. Ex. 75], and retails for $94.99 for hardcover or $31.99 for paperback [Jt. Ex. 5 at D-31]. It earned £27,866 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 78]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Orr requested that pages 105-119, which is a portion of one chapter totaling 4.63% of the book, be posted on the ERES system as required reading [Tr. Vol. 7 at 82]. The excerpt was taken from a chapter by Jonathan Dunsby entitled "Why sing? Lieder and song cycles" [Pls. Ex. 75].

### Prima Facie Case of Copyright Infringement

*The Cambridge Companion to Schumann* was first published outside the United States on June 28, 2007 and published in the United States on August 13, 2007, more than 30 days after the first publication. Thus, *The Cambridge Companion to Schumann* is a foreign work as defined by the Copyright Act and a copyright registration is not necessary to bring a claim of copyright infringement for the reasons stated in the preceding discussion of *The Cambridge Companion to Mendelssohn*. 17 U.S.C. § 104(b)(2). The Court finds that *The Cambridge Companion to Schumann* is an original work and that it has sufficient creativity to be copyrighted. The external editor's and the contributing authors' copyrights were assigned to Cambridge by

-198-

contract. *The Cambridge Companion to Schumann* meets the first prong of the prima facie case of copyright infringement.

A copy of an excerpt from *The Cambridge Companion to Schumann* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Cambridge Companion to Schumann* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Orr's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Cambridge Companion to Schumann* surveys the life and work of the composer. The chapters are factual in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Orr copied part of one chapter, comprising 4.63%, of *The Cambridge Companion to Schumann*. Because the work contained more than ten chapters, Professor Orr properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Orr's use of *The Cambridge Companion to Schumann* affected the market for purchasing the book as a whole. Students would not pay $31.99 for the entire book (or $94.99 for the hardcover version) when only fifteen pages were required reading for Professor Orr's course. Neither would a professor require students to purchase the entire book in such an

-199-

instance.  Therefore, the Court rejects any argument that the use of the excerpt from *The Cambridge Companion to Schumann* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009.  As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease.  The absence of a ready market shifts the factor four analysis to favor fair use.  This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Orr's use of *The Cambridge Companion to Schumann* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

### 35.  *The Cambridge Companion to Beethoven*

*The Cambridge Companion to Beethoven* was first published by Cambridge in 2000 [Pls. Ex. 53].  The book is part of the *Cambridge Companions to Music* series, which provides information on composers, instruments, or musical topics.  The book was edited by Glenn Stanley, and it provides an interdisciplinary analysis of the composer's life and music [Tr. Vol. 7 at 82; Pls. Ex. 53].  It has fourteen chapters and a total of 387 pages [Pls. Ex. 53].  The book retails for $34.99 [Jt. Ex. 5 at D-32].  It earned £65,231 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 57].  There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

-200-

Professor Orr requested that pages 165-185, one full chapter of the book, be posted on the ERES system as required reading [Tr. Vol. 7 at 82; Jt. Ex. 5 at D-32]. The excerpt was a chapter by Leon Botstein entitled "Sound and structure in Beethoven's orchestral music" [Pls. Ex. 53]. While the reading was uploaded to the ERES course page for MUS 8860, it was not included in the syllabus for the course [Pls. Ex. 523; Tr. Vol. 7 at 82]. The excerpt had a hit count of two on the ERES system [Jt. Ex. 2 at 86].

<u>Prima Facie Case of Copyright Infringement</u>

*The Cambridge Companion to Beethoven* was first published by Cambridge on May 29, 2000; Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Ex. 56]. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *The Cambridge Companion to Beethoven* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *The Cambridge Companion to Beethoven*.

To qualify for copyright protection, a work must be the author's original work. <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of

-201-

creativity." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S.
340, 345 (1991). To meet the creativity requirement even a slight
amount of creativity will suffice. <u>Id.</u> *The Cambridge Companion to
Beethoven* contains chapters that provide perspective and context on
Beethoven and his work [Pls. Ex. 53]. Cambridge, in soliciting a
copyright registration, declared that *The Cambridge Companion to
Beethoven* is an original work and nothing in the evidence indicates
otherwise. The Court finds that the book easily meets the creativity
requirement. *The Cambridge Companion to Beethoven* is copyrightable.
The external author's copyright and the copyright of contributing
authors were assigned to Cambridge by contract. The first prong of
the prima facie case of copyright infringement has been satisfied.

As evidenced by Professor Orr's testimony and the ERES hit
count, a copy of an excerpt from *The Cambridge Companion to Beethoven*
was uploaded to Georgia State's ERES system [Jt. Ex. 2 at 86; Tr.
Vol. 7 at 81]. Although it is obvious that students did not access
the excerpt through ERES, the act of uploading the excerpt to ERES
technically satisfies the second prong of the infringement analysis.

However, the syllabus for MUS 8860 and Professor Orr's testimony
demonstrate that Professor Orr did not assign the excerpt from *The
Cambridge Companion to Beethoven* as required reading for MUS 8860.
The excerpt had a hit count of two on the ERES system [Jt. Ex. 2 at
86], and both of these hits are likely attributable to the staff
librarian, Professor Orr himself, or counsel for the parties.
Because the students did not access the excerpt through ERES, the act
of uploading it had no impact on the value of the copyright. The use
that resulted from this upload is <u>de minimis</u> such that it "need not
be prohibited in order to protect the author's incentive to create."

See <u>Sony Corp. of Am. v. Universal City Studios, Inc.</u>, 464 U.S. 417,
450-51, n.34 (1984) and accompanying text ("'In certain situations,
the copyright owner suffers no substantial harm from the use of the
work. . . . Here again, is the partial marriage between the doctrine
of fair use and the legal maxim <u>de minimis non curat lex</u>.'") (quoting
ALAN LATMAN, FAIR USE OF COPYRIGHTED WORKS (1958)) (additional citations
omitted).  Accordingly, the Court need not address the fair use
defense for Professor Orr's use of *The Cambridge Companion to
Beethoven*.  This claim of copyright infringement fails.

### 36. *The Music of Berlioz*

*The Music of Berlioz* was first published by Oxford on August 2,
2001 in the United Kingdom and on September 27, 2001 in the United
States [Pls. Exs. 427, 993].  It is a ten chapter, 379 page book
authored by Julian Rushton that provides analysis of Berlioz's
musical style [Pls. Ex. 427; Jt. Ex. 5 at D-33].  The book retails
for $65.95 [Jt. Ex. 5 at D-33].  It earned $9,580 in net sales
revenue from date of first publication through November 7, 2010 [Pls.
Ex. 78].  There is no evidence in the record reflecting that the work
was available for licensed digital excerpts in 2009.

Professor Orr requested that pages 250-267, which is a portion
of one chapter totaling 4.75% of the book, be posted on the ERES
system as required reading [Tr. Vol. 7 at 84].  The excerpt was taken
from chapter nine, entitled "A Fantastic Symphonist" [Pls. Ex. 427].

### Prima Facie Case of Copyright Infringement

*The Music of Berlioz* was first published outside the United
States on  August 2, 2001 and published in the United States on
September 27, 2001, more than 30 days after the first publication.
Thus, *The Music of Berlioz* is a foreign work as defined by the

-203-

Copyright Act and a copyright registration is not necessary to bring a claim of copyright infringement for the reasons stated in the preceding discussion of *The Cambridge Companion to Mendelssohn*. 17 U.S.C. § 104(b)(2). The Court finds that *The Music of Berlioz* is an original work and that it has sufficient creativity to be copyrighted. A contract between the author and Oxford grants Oxford the exclusive right to publish the book. *The Music of Berlioz* meets the first prong of the prima facie case of copyright infringement.

A copy of an excerpt from *The Music of Berlioz* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Music of Berlioz* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Orr's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Music of Berlioz* is a non-fiction book that surveys the work of Berlioz. The chapters are informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Orr uploaded eighteen pages, part of one chapter, of *The Music of Berlioz* to ERES.[96]

---

[96]The parties disagree about what percentage of the work that excerpt represents. Plaintiffs contend the copied amount was 5.2% of the book, while Defendants contend it was 4.2%. Defendants contend that two pages of the chapter uploaded by Professor Orr contain excerpts of sheet music, which is material in the public domain that

Because the work contained more than ten chapters, Professor Orr properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Orr's use of *The Music of Berlioz* affected the market for purchasing the book as a whole. Students would not pay $65.95 for the entire book when only eighteen pages were required reading for Professor Orr's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Music of Berlioz* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Orr's use of *The Music of Berlioz* was a fair

---

is not copyrightable and therefore that these pages should not count toward the total number of pages copied. Because it will not change the outcome, the Court assumes without deciding that the amount Professor Orr copied without permission is somewhere within this range.

use under the Copyright Act. Thus, this claim of copyright infringement fails.

### MUS 8840 Baroque Music, Fall 2009

Professor Orr taught MUS 8840, a graduate course, in the 2009 fall semester [Tr. Vol. 7 at 85]. The course covers three phases of Baroque music [Pls. Ex. 524]. Eighteen students enrolled in the course [Tr. Vol. 7 at 85]. Professor Orr posted several required readings on ERES without seeking copyright permissions [Tr. Vol. 7 at 86].

37. *The Organ as a Mirror of Its Time: North European Reflections 1610-2000*

*The Organ as a Mirror of Its Time* was first published by Oxford in 2002 [Pls. Exs. 441, 444]. It is a 25 chapter, 392 page work edited by Kerala J. Snyder. The book provides analysis of the organ's historical and cultural significance in Northern Europe [Pls. Ex. 441; Jt. Ex. 5 at D-77]. The book retails for $65.00 [Jt. Ex. 5 at D-77]. From date of first publication through November 7, 2010, the book earned $55,831 in net sales revenue [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Orr requested that pages 78-91, which is one chapter totaling 3.57% of the book, be posted on the ERES system as required reading [Tr. Vol. 7 at 87]. The excerpt is the entirety of chapter six, "The Organ in Seventeenth-Century Cosmology" by Hans Davidsson [Pls. Ex. 441].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *The Organ as a Mirror*

*of Its Time* [Doc. 411 at 27-28]. The external editor assigned to Oxford "all rights in the work" and agreed that the copyright would be registered in Oxford's name. The specified contract for contributing authors stated that the contribution would be made for hire. The copyright is registered in Oxford's name [Pls. Ex. 444], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Organ as a Mirror of Its Time* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

                    The Fair Use Defense

As to the first element of fair use, an excerpt from *The Organ as a Mirror of Its Time* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Orr's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Organ as a Mirror of Its Time* is a non-fiction work that discuss various organs in Northern Europe over the past four centuries. The focus is on what organs reveal about the time in which they were built. The chapters are factual in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Orr uploaded fourteen pages, one full chapter, of *The Organ as a Mirror of Its Time* to ERES.[97] Because the work contained more than ten chapters, Professor

---

[97]The parties disagree about what percentage of the work that excerpt represents. Defendants contend that five pages of the chapter uploaded by Professor Orr contain excerpts of sheet music, which is material in the public domain that is not copyrightable and therefore that these pages should not count toward the total number of pages

Orr properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Orr's use of *The Organ as a Mirror of Its Time* affected the market for purchasing the book as a whole. Students would not pay $65.00 for the entire book when only fourteen pages were required reading for Professor Orr's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Organ as a Mirror of Its Time* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Orr's use of *The Organ as a Mirror of Its Time*

---

copied. Plaintiffs contend the copied amount was 4.0% of the book, while Defendants contend it was 2.3%. Because it will not change the outcome, the Court assumes without deciding that the amount Professor Orr copied without permission is somewhere within this range.

-208-

was a fair use under the Copyright Act. Thus, this claim of
copyright infringement fails.

> 38. *North German Church Music in the Age of Buxtehude*

*North German Church Music* was first published by Oxford in 1996
as part of the *Oxford Monographs on Music* series [Pls. Ex. 437]. It
is a nine chapter, 248 page book authored by Geoffrey Webber that
provides a comprehensive survey of North German church music and its
composers [Pls. Ex. 437; Jt. Ex. 5 at D-79]. The book retails for
$115.00 [Jt. Ex. 5 at D-79]. It earned $24,766 in net sales revenue
from date of first publication through November 7, 2010 [Pls. Ex.
357]. There is no evidence in the record reflecting that the work
was available for licensed digital excerpts in 2009.

Professor Orr requested that pages 9-26, which is the entirety
of chapter one and totals 7.26% of the book, be posted on the ERES
system as required reading [Tr. Vol. 7 at 90]. Chapter one is
entitled "Music in Religious Thought and Education" [Pls. Ex. 437].

> Prima Facie Case of Copyright Infringement

Plaintiffs contend that *North German Church Music* is a foreign
work that does not require a United States copyright registration.
When a work is first published outside the United States and is not
subsequently published in the United States within 30 days of
original publication, the work is a foreign work as defined by the
Copyright Act and a copyright registration is not necessary to bring
a claim of copyright infringement. 17 U.S.C. § 101; 17 U.S.C.
§ 104(b)(2).[98]

---

[98]When the United States joined the Berne Convention on March 1,
1989, the Copyright Act was revised to provide that the requirement
for registration in order to bring an infringement action is limited

As with all elements of the prima facie case for copyright infringement, the burden rests with Plaintiffs to show that *North German Church Music* is a foreign work. There is no evidence in the record that allows the Court to determine whether *North German Church Music* was first published outside the United States. The copyright information page at the beginning of the book states: "Published in the United States by Oxford University Press Inc., New York" [Pls. Ex. 437]. The Court finds that Oxford has not met its burden of proving that *North German Church Music* is a foreign work. Plaintiffs have not provided evidence of copyright registration of *North German Church Music* in the United States. Therefore, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *North German Church Music*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

F.    Professor Dixon

Professor Dixon is a tenured professor in the African American Studies department at Georgia State [Tr. Vol. 9 at 55]. At the time of her testimony, she had taught at Georgia State for 17 years [Tr. Vol. 9 at 55]. Professor Dixon attended a training session on Georgia State's Copyright Policy, and she testified that what she learned at the training changed her practices regarding the use of excerpts in her classes [Tr. Vol. 9 at 69-71]. As a result of the

---

to "the copyright"; the claimant of a copyright in any foreign work of a country that is also a signatory to the Berne Convention may file suit in a United States District Court without proof of copyright registration. Berne Convention Implementation Act of 1988, Mar. 1, 1989, Pub. L. No. 100-568; 17 U.S.C. § 411(a).

-210-

training, Professor Dixon decided to place more books on physical reserve with the library instead of on ERES [Tr. Vol. 9 at 71-72].

AAS 3000 African American Family, Fall 2009

AAS 3000 is a course that traces the historical and social transition of African American families from Africa to contemporary times [Tr. Vol. 9 at 56; Pls. Ex. 542]. Fifty nine undergraduate students were enrolled in Professor Dixon's course during the fall 2009 semester [Jt. Ex. 5 at D-37-40; Tr. Vol. 9 at 67]. As evidenced by the syllabus, students were required to purchase three texts for this course [Tr. Vol. 9 at 57; Pls. Ex. 542]. Some required reading excerpts were placed on hard copy reserve in the library, while other required readings were posted to ERES [Tr. Vol. 9 at 56-57; Pls. Ex. 542]. As part of the course, Professor Dixon required students to form groups of two to three students and prepare a presentation for the class. Professor Dixon posted readings on ERES that were required for the students making the presentation; other students in the course were not required to read these excerpts [Tr. Vol. 9 at 61-62].

39. *The Slave Community: Plantation Life in the Antebellum South*

*The Slave Community: Plantation Life in the Antebellum South* ("*The Slave Community*") was first published by Oxford in 1972 [Pls. Ex. 460]. It is a 430 page, eight chapter book authored by John W. Blassingame that presents a heavily documented description of the life of the black slave on Southern plantations before the Civil War [Pls. Ex. 460; Jt. Ex. 5 at D-37]. It is a research-based monograph. The book won awards when it was first published; it is currently in

its thirty-second printing. It has been used extensively in college courses. The book retails for $42.95 [Jt. Ex 5 at D-37].

*The Slave Community* had net sales revenue from date of first publication to November 7, 2010 of $1,602,935.00 [Pls. Ex. 357]. Excerpts from the book were available for licensing through CCC in 2009 [Pls. Ex. 463]. From July 1, 2004 until December 1, 2010, *The Slave Community* earned $191.55 in ECCS permissions revenue and $10,732.20 in APS revenue [Pls. Ex. 463].

Professor Dixon requested that pages 249-283, the entirety of chapter seven, of *The Slave Community* be uploaded to ERES for distribution to students in her AAS 3000 course [Jt. Ex. 5 at D-37; Tr. Vol. 9 at 59]. The excerpt was entitled "Plantation Realities" and totaled 35 pages or 8.14% of the work [Pls. Ex. 460]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $210.63 in net revenue from permissions.[99] The cost to students in the course would have been $250.80. Professor Dixon owned several copies of this book [Tr. Vol. 9 at 59].

### Prima Facie Case of Copyright Infringement

Although the copyright registration for *The Slave Community* is not in evidence, the parties have stipulated that Oxford owns and has registered an exclusive copyright in *The Slave Community* [Doc. 278 at E-11]. The Court concludes that Oxford owns a valid copyright in *The Slave Community*, satisfying the first prong of the prima facie case

---

[99]The amount earned would have been $250.80, the amount charged by CCC, [Jt. Ex. 5 at D-37], less the $3.00 service fee charged by CCC to users, less $37.17 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

of copyright infringement. A copy of an excerpt from *The Slave Community* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Slave Community* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Dixon's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Slave Community* is a non-fiction work describing the heritage, culture, acculturation, behavior and religion of the American slave on plantations. These descriptions are factual in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Dixon uploaded 35 pages or 8.14% of the total work of *The Slave Community* to ERES. This excerpt was one of eight chapters. Because the work contains less than ten chapters, Professor Dixon properly adhered to a limit of 10% of the protected pages of the book; the excerpt was decidedly small. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Dixon's use of *The Slave Community* affected the market for purchasing the book as a whole. Students would not pay $42.95 for the entire book when only 35 pages were required reading for Professor Dixon's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of

-213-

the excerpt from *The Slave Community* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Dixon and her students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Dixon's use of *The Slave Community* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

> 40. *African American Single Mothers: Understanding Their Lives and Families*

*African American Single Mothers* was first published by Sage in 1995 [Pls. Ex. 202]. It is a 232 page, ten chapter volume edited by Bette Dickerson. The book is part of the *Sage Series on Race and Ethnic Relations*, which is designed for academic users studying and working in areas related to race and ethnic relations [Pls. Ex. 202]. The book gives an Afrocentric, feminist perspective on the African American mother-centered family [Pls. Ex. 202]. The book retails for $67.95 in paperback [Jt. Ex. 5 at D38]. The book has earned $53,007.84 in net sales revenue [Pls. Ex. 206]. Excerpts from the book were available for digital licensing through CCC in 2009 [Pls. Ex. 206]. From July 1, 2004 until December 1, 2010, *African American Single Mothers* earned $782.14 in ECCS permissions revenue [Pls. Ex.

206]. In addition, licensed digital excerpts were available directly from Sage through its in-house permissions program in 2009; the book has earned $2,841.57 through Sage's permissions program [Pls. Ex. 206, 207].

Professor Dixon requested that pages 117-145 of *African American Single Mothers* be uploaded to ERES [Jt. Ex. 5 at D-38]. This 29 page excerpt was a chapter written by Suzanne M. Randolph entitled "African American Children in Single-Mother Families" [Pls. Ex. 202]. The chapter represents 12.50% of the book [Pls. Ex. 202; Jt. Ex. 5 at D-38]. The excerpt was not required reading for the entire class; rather, it was used by two to three students to prepare for a class presentation [Tr. Vol. 9 at 62; Pls. Ex. 542]. Only those students responsible for the presentation of this work were required to read the excerpt from *African American Single Mothers* [Tr. Vol. 9 at 62], but the excerpt had a hit count of fifteen on the ERES system [Jt. Ex. 3 at 75]. Had permissions fees been paid via CCC for the digital distribution of this excerpt to the entire class, Sage would have earned less than $203.61 in net revenue from permissions.[100] The cost to students in the course would have been $242.54. Professor Dixon owned a copy of this book [Tr. Vol. 9 at 79].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *African American Single Mothers* [Doc. 411 at 27-28]. The external editor and the

---

[100]The amount earned would have been $242.54, the amount charged by CCC, [Jt. Ex. 5 at D-38], less the $3.00 service fee charged by CCC to users, less $35.93 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editor.

contributing authors have granted Sage exclusive publication rights. The copyright is registered in Sage's name [Pls. Exs. 204, 205], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *African American Single Mothers* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *African American Single Mothers* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Dixon's class. The first factor weighs strongly in favor of Defendants. As to the second element of fair use, *African American Single Mothers* is a non-fiction work evaluating the history, dilemmas, media portrayals, and value of the African American mother-centered family. *African American Single Mothers* is an academic work that is informational in nature. The second factor weighs in favor of Defendants.

As to the third fair use factor, Professor Dixon uploaded 29 pages of *African American Single Mothers* to ERES, which represents 12.50% of the total work. This excerpt was one of ten chapters in *African American Single Mothers*. Because the work contained ten chapters, Professor Dixon properly adhered to the one chapter limit; this was a decidedly small amount. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Dixon's use of *African American Single Mothers* affected the market for purchasing the book

-216-

as a whole.  Students would not pay $67.95 for the entire book when only 29 pages were required reading for Professor Dixon's course. Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from *African American Single Mothers* had a negative effect on the market for sale of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program.  The unpaid use of the excerpt by Professor Dixon and her students caused very small, but actual, damage to the value of Sage's copyright.  In addition, widespread use of similar unlicensed excerpts could cause substantial harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Dixon's use of *African American Single Mothers* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

41.  *Black Children: Social, Educational, and Parental Environments (Second Edition)*

*Black Children (Second Edition)* was first published by Sage in 2002 [Pls. Ex. 209].  It is a 256 page, twelve chapter volume edited by Harriette Pipes McAdoo [Pls. Ex. 209].  The book provides analysis of experiences unique to black children [Jt. Ex. 5 at D-39; Pls. Ex. 209].  The book retails for $114.00 in hardback and $58.95 in paperback [Jt. Ex. 5 at D-39].  The book has earned $104,828.72 in net sales revenue [Pls. Ex. 214].  Digital excerpts from the book

-217-

were available for licensing through CCC in 2009 [Pls. Ex. 215]. From July 1, 2004 until December 1, 2010, *Black Children (Second Edition)* earned $116.03 in ECCS permissions revenue [Pls. Ex. 216]. In addition, licensed digital excerpts of the book are available directly from Sage through its in-house permissions program; the book has earned $1,237.63 through Sage's permissions program [Pls. Exs. 214, 215].

Professor Dixon requested that pages 73-96, the entirety of chapter six, of *Black Children (Second Edition)* be uploaded to ERES for distribution to students in her AAS 3000 course [Pls. Ex. 209]. The excerpted chapter was entitled "Racial Identity Development in African American Children: Cognitive and Experiential Antecedents" by Carolyn Bennett Murray and Jelani Mandara. It totaled 24 pages or 9.38% of the work. The excerpt was not required reading for the entire class; rather, it was used by two to three students to prepare for a presentation to the class [Tr. Vol. 9 at 64; Pls. Ex. at 542]. Only those students responsible for the presentation of this work were required to read the excerpt from *Black Children (Second Edition)* [Tr. Vol. 9 at 64]. The excerpt had a hit count of thirteen on the ERES system [Jt. Ex. 3 at 174]. Had permissions been paid to CCC for the distribution of this excerpt to the entire class, Sage would have earned less than $168.50 in net revenue from permissions.[101] The cost to students in the course would have been

---

[101]The amount earned would have been $201.24, the amount charged by CCC, [Jt. Ex. 5 at D-39], less the $3.00 service fee charged by CCC to users, less $29.74 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editor.

$201.24 [Jt. Ex. 5 at D-39]. Professor Dixon owned a copy of this book [Tr. Vol. 9 at 63].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *Black Children (Second Edition)* [Doc. 411 at 27-28]. The external editor has assigned Sage the exclusive right to publish the book and agreed that the copyright would be registered in Sage's name. The contributing author contract assigns the exclusive right to publish the contribution. The copyright is registered in Sage's name [Pls. Exs. 212, 213], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Black Children (Second Edition)* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *Black Children (Second Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Dixon's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Black Children (Second Edition)* analyzes experiences unique to African American children. *Black Children (Second Edition)* is an academic work that is informational in nature. The second fair use factor favors Defendants.

As to the third element of fair use, Professor Dixon uploaded 24 pages of *Black Children (Second Edition)*. This represents one

-219-

chapter or 9.38% of the total work.  Because the work contained more than ten chapters, Professor Dixon properly adhered to the one chapter limit; the amount copied was decidedly small.  The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court looks to whether Professor Dixon's use of *Black Children (Second Edition)* affected the market for purchasing the book as a whole.  Students would not pay $58.95 (or $114.00 for the hardcover version) for the entire book when only 24 pages were required reading for Professor Dixon's course.  Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from *Black Children (Second Edition)* had a negative effect on the market for the purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program.  The unpaid use of the excerpt by Professor Dixon and her students caused very small, but actual, damage to the value of Sage's copyright.  In addition, widespread use of similar unlicensed excerpts could cause substantial harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Dixon's use of *Black Children (Second Edition)* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

42. *Black Families (Third Edition)*

*Black Families (Third Edition)* was first published by Sage in
1997 [Defs. Ex. 749].[102]  It is a 416 page, 21 chapter volume edited
by Harriette Pipes McAdoo.  The chapters address the historical and
modern challenges experienced by black families in the United States
[Jt. Ex. 5 at D-40].  The book retails for $114.00 in hardback and
$58.95 in paperback [Jt. Ex. 5 at D-40].  The book has earned
$144,388.03 in net sales revenue [Pls. Ex. 222].  Licensed digital
excerpts from the book were available through CCC in 2009 [Pl. Exs.
224, 223].  From July 1, 2004 until December 1, 2010, *Black Families
(Third Edition)* earned $931.60 in ECCS permissions revenue [Pls. Ex.
224].  In addition, the work is available for licensed excerpts
through Sage's in-house permissions program; it has earned $3,561[103]
through Sage's permissions program [Pls. Ex. 222].

Professor Dixon requested that pages 214-233, one full chapter,
of *Black Families (Third Edition)* be uploaded to ERES for
distribution to students in her AAS 3000 course [Jt. Ex. 5 at D-40].
The excerpt was entitled "Out There Stranded: Black Families in White
Communities" by Beverly Tatum.  The chapter was twenty pages or 4.80%
of the total work [Defs. Ex. 749].  The excerpt was not required

---

[102]Plaintiffs' Exhibit 217, the fourth edition of *Black Families*,
was admitted at trial as well. Although the syllabus for the course
lists the fourth edition of the work, the parties stipulated in Joint
Exhibit 5 that the third edition was the one at issue in this case.
The Court analyzes the infringement claim with respect to the third
edition of the work.

[103]This amount represents permissions income only for the edition
of the work at issue in this case.  Plaintiffs asserted a higher
amount, but that number appears to aggregate the income from multiple
editions of the work.

reading for the entire class; rather, it was used by two to three students to prepare for a presentation to the class [Tr. Vol. 9 at 67; Pls. Ex. 542]. Only those students responsible for the presentation of the work were required to read the excerpt from *Black Families (Third Edition)* [Tr. Vol. 9 at 67]. The excerpt had a hit count of nine on the ERES system [Jt. Ex. 3 at 174]. Had permissions been paid via CCC for the distribution of this excerpt to the entire class, Sage would have earned less than $140.42 in net revenue from permissions[104] [Jt. Ex. 5 at D-40]. The cost to students would have been $168.20. Professor Dixon owned several copies of this book [Tr. Vol. 9 at 79].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *Black Families (Third Edition)* [Doc. 411 at 27-28]. The contract between the external editor and Sage grants Sage the exclusive right to publish the book in its name. The contract with contributing authors grants Sage the exclusive right to publish the contributions. The copyright for the book is registered in Sage's name [Pls. Exs. 221, 219], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Black Families (Third Edition)* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

---

[104]The amount earned would have been $168.20, the amount charged by CCC, [Jt. Ex. 5 at D-40], less the $3.00 service fee charged by CCC to users, less $24.78 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editor.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Black Families (Third Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Dixon's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Black Families (Third Edition)* is a non-fiction work which addresses the historical and modern experiences of African Americans. The book emphasizes the diversity of black experiences today, but also emphasizes the challenges faced by many black families in the United States. These chapters are factual in nature. The second factor favors Defendants.

As to the third fair use factor, Professor Dixon uploaded twenty pages or 4.80% of *Black Families (Third Edition)* to ERES. The excerpt was one chapter out of 21. Because the work contained more than ten chapters, Professor Dixon properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court looks to whether Professor Dixon's use of *Black Families (Third Edition)* affected the market for purchasing the book as a whole. Students would not pay $58.95 for the entire book (or $114.00 for the hardcover version) when only twenty pages were required reading for Professor Dixon's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Black*

-223-

*Families (Third Edition)* had a negative effect on the market for the purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage. The unpaid use of the excerpt by Professor Dixon and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Dixon's use of *Black Families (Third Edition)* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### G. <u>Professor Hartwig</u>

Professor Hartwig is a professor in the Art History department at Georgia State and has been teaching at Georgia State since 2001 [Tr. Vol. 9 at 26-27]. Professor Hartwig did not attend any training on Georgia State's Copyright Policy [Tr. Vol. 9 at 46].

#### <u>AH 4900, Materiality of Egyptian Painting, Fall 2009</u>

During the fall 2009 semester, Professor Hartwig taught a course entitled "The Materiality of Ancient Egyptian Painting" [Pls. Ex. 550; Tr. Vol. 9 at 29]. AH 4900 is a seminar for undergraduate and graduate students that examines historical and material aspects of Egyptian art [Pls. Ex. 550; Tr. Vol. 9 at 29-30]. Thirteen students were enrolled in Professor Hartwig's course during the fall 2009 semester [Jt. Ex. 5 at D-41]. As evidenced by the syllabus for this

-224-

course, there were no required textbooks for the course; all assigned readings were made available through ERES [Pls. Ex. 550].

     43. *Ancient Egyptian Materials and Technology*

*Ancient Egyptian Materials and Technology* was first published by Cambridge in 2000 [Pls. Ex. 6]. It is a 724 page, 25 chapter volume edited by Paul T. Nicholson and Ian Shaw [Pls. Ex. 6]. It is a research-based, scholarly work that contains a highly detailed, in-depth study of craftwork, materials, and technology in ancient Egypt [Pls. Ex. 6; Jt. Ex. 5 at D-41]. The book retails for $248.00 [Jt. Ex. 5 at D-41]. The net sales revenue from date of first publication to December 31, 2010 was £170,793.00 [Pls. Ex. 13]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Hartwig requested that pages 44-54 and 104-120 of *Ancient Egyptian Materials and Technology* be uploaded to ERES for distribution to students in her AH 4900 course [Jt. Ex. 5 at D-41]. The first excerpt is a portion of chapter two, entitled "Stone," by Barbara Aston, James Harrell, and Ian Shaw. The second excerpt is the entirety of chapter four, entitled "Painting Materials," by Lorna Lee and Stephen Quirke. The excerpts were eleven and seventeen pages, respectively, totaling 28 pages, or 3.87% of the total work [Pls. Ex. 6]. Neither excerpt was required reading for the class, and the former excerpt was not listed on the syllabus [Pls. Ex. 550; Tr. Vol. 9 at 35]. However, the excerpts were posted to ERES and were accessed 25 times according to the ERES hit list [Jt. Ex. 3 at 191].

### Prima Facie Case of Copyright Infringement

*Ancient Egyptian Materials and Technology* was first published by Cambridge in 2000; Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Ex. 12]. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Ancient Egyptian Materials and Technology* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Ancient Egyptian Materials and Technology*.

To qualify for copyright protection, a work must be the author's original work. <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 345 (1991). To meet the creativity requirement, even a slight amount of creativity will suffice. <u>Id.</u> *Ancient Egyptian Materials and Technology* contains a detailed study of ancient Egyptian materials and technology. Cambridge, in soliciting a copyright registration, declared that *Ancient Egyptian Materials and Technology* is an original work and nothing in the evidence indicates otherwise.

-226-

The Court further finds that the book meets the creativity requirement for the purpose of a prima facie case of copyright infringement. Cambridge was assigned copyrights by external editors and by the authors of the contributions [Pls. Exs. 8, 10]. Therefore, the Court finds that *Ancient Egyptian Materials and Technology* is copyrightable and the first prong of the prima facie case of copyright infringement has been satisfied. Excerpts from the book were uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

The Fair Use Defense

As to the first element of fair use, an excerpt from *Ancient Egyptian Materials and Technology* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Hartwig's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Ancient Egyptian Materials and Technology* is a non-fiction reference work that provides an overview of craftwork, materials and technology in ancient Egypt. It is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Hartwig uploaded one full chapter and a portion of another chapter of *Ancient Egyptian Materials and Technology.* This represents a total of 28 pages or 3.87% of the total work. The work contained more than ten chapters, so Professor Hartwig should have adhered to the one chapter limit. The third factor weighs in favor of Plaintiffs.

-227-

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Hartwig's use of *Ancient Egyptian Materials and Technology* affected the market for purchasing the book as a whole. Students would not pay $248.00 for the entire book to read a 28 page excerpt, especially since the excerpt was not required reading for Professor Hartwig's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Ancient Egyptian Materials and Technology* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Hartwig's use of *Ancient Egyptian Materials and Technology* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

## H. Professor Kim

Professor Kim is a professor in the Applied Linguistics and English as a Second Language departments at Georgia State [Tr. Vol.

-228-

6 at 96]. She began working at Georgia State in the fall of 2009 [Tr. Vol. 6 at 132].

Professor Kim regularly uses both uLearn and ERES to distribute readings to students in her courses in electronic format [Tr. Vol. 6 at 97]. She understands that Georgia State's Copyright Policy applies to uLearn and ERES [Tr. Vol. 6 at 130-131]. Professor Kim's training on Georgia State's Copyright Policy and the use of the fair use checklist was limited to a 20 or 30 minute session during new teacher orientation [Tr. Vol. 6 at 113-114].

Of the alleged infringements discussed in this section, if Professor Kim owned the book, she scanned the excerpt herself and uploaded it to uLearn for distribution to the students in her course; if Professor Kim did not own the book, she requested the library upload the excerpt to ERES for distribution to the students [Tr. Vol. 6 at 97].

### AL 8550 Second Language Evaluation and Assessment, Fall 2009

AL 8550 is a graduate course offered to in-service and pre-service teachers who want to be second language teachers for languages such as English, French, and Spanish [Tr. Vol. 6 at 140]. The purpose of the course is to help the in-service and pre-service teachers learn existing testing items and design effective classroom-based tests as well as score and interpret the tests correctly [Id.]. Approximately sixteen students were enrolled in the course during the fall 2009 semester [Tr. Vol. 6 at 96]. As evidenced by the syllabus for this course and Professor Kim's testimony, students were required to purchase one text for the course, as well as complete several required readings posted on ERES and uLearn [Pls. Ex. 519; Tr. Vol.

6 at 99-111, 135]. Professor Kim testified that for some of the readings initially identified as required on the syllabus, she later announced to the class during the semester that they were no longer required or that only portions of the excerpt were required [Tr. Vol. 6 at 144-145].

44. *Criterion Referenced Language Testing*

*Criterion Referenced Language Testing* was first published by Cambridge in 2002, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Exs. 85, 87]. It is a 336 page, seven chapter book authored by James Dean Brown and Thom Hudson. It is part of the *Cambridge Applied Linguistics* series. Its stated focus is "helping language teachers and curriculum developers with the types of decisions that they must make in their daily work" [Pls. Ex. 85 at xvi]. The Court classifies this book as a textbook. The book retails for $96.00 in hardcover and $37.00 in paperback [Jt. Ex. 5 at D-42]. It has earned £38,033 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 88]. There is no evidence in the record reflecting that *Criterion Referenced Language Testing* was available for licensed digital excerpts in 2009.

Professor Kim initially requested pages 101-148, the entirety of chapter four, of the book be placed on Georgia State's ERES system for distribution to the students in her course as required reading [Tr. Vol. 6 at 110-111].

Prima Facie Case of Copyright Infringement

*Criterion Referenced Language Testing* was first published by Cambridge in 2002, but Cambridge did not obtain a certificate of

copyright registration until December 27, 2010. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Criterion Referenced Language Testing* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Criterion Referenced Language Testing*.

The following language appears in the acknowledgments section of the book:

> The authors and publishers are grateful to those authors, publishers and others who have given permission for the use of copyright material identified in the text. It has not been possible to identify, or trace, sources of all the materials used and in such cases the publishers would welcome information from copyright owners.

[Pls. Ex. 85]. By stating "[i]t has not been possible to identify, or trace, sources of all the materials used," Cambridge recognized that it could not prove the originality of all the material used because it had not obtained permission from some of the authors of the material used. This acknowledgment is to Cambridge's credit. However, copyright protection in a work extends only to those elements that are original to the author. <u>Feist</u>, 499 U.S. at 348. For the Court to determine whether the excerpt at issue in this case is original or otherwise protected by Cambridge's copyright for the

-231-

full work, Plaintiffs would have needed to provide evidence about the source of, or Cambridge's rights to, the specific excerpt at issue. Because Plaintiffs did not provide evidence regarding which portions of the book are original and for which portions they did obtain permission, the Court finds that Cambridge has not met its burden of proving the originality of *Criterion Referenced Language Testing.* Therefore, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Criterion Referenced Language Testing.* It is not necessary to address Defendants' fair use defense. This infringement claim fails.

45. *Assessing Grammar*

*Assessing Grammar* was first published by Cambridge in 2004, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Exs. 15, 17]. It is a 317 page, nine chapter book authored by James E. Purpura. The book is part of the *Cambridge Language Assessment* series. It is aimed at language testing professionals and at classroom second language teachers. It addresses designing and developing tests of grammatical ability. It can be classified as a textbook [Pls. Ex. 15]. The book retails for $36.00 and has earned £40,163 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 18]. There is no evidence in the record reflecting that *Assessing Grammar* was available for licensed digital excerpts in 2009.

Professor Kim requested pages 49-82 and 100-143, the entirety of chapters three and five, of the book be placed on Georgia State's ERES system for distribution to the students in her course as required reading [Tr. Vol. 6 at 103]. This 80 page excerpt

-232-

represents 25.24% of the work.[105]  The excerpt had a hit count of one

on the ERES system for the fall 2009 semester [Jt. Ex. 3 at 210].

<u>Prima Facie Case of Copyright Infringement</u>

*Assessing Grammar* was first published by Cambridge in 2004, but

Cambridge did not obtain a certificate of copyright registration

until December 27, 2010 [Pls. Ex. 17].  17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a
> registration made before or within five years after first
> publication of the work shall constitute prima facie
> evidence of the validity of the copyright and of the facts
> stated in the certificate.  The evidentiary weight to be
> accorded the certificate of a registration made thereafter
> shall be within the discretion of the court.

17 U.S.C. § 410(c).  Accordingly, because the certificate of

registration for *Assessing Grammar* was not made before or within five

years after the first date of publication, the prima facie

presumption of originality does not exist.  Instead, the Court must

use its discretion to determine the copyrightability/originality of

*Assessing Grammar*.

To qualify for copyright protection, a work must be the author's

original work.  <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471

U.S. 539, 547-49 (1985).  Original "means only that the work was

independently created by the author (as opposed to copied from other

works), and that it possesses at least some minimal degree of

creativity."  <u>Feist</u>, 499 U.S. at 345.  To meet the creativity

requirement, even a slight amount of creativity will suffice.  <u>Id.</u>

---

[105]Defendants contend that 33 of the 80 pages were not protected
by the copyright registration because they cite to other authors'
works or contain material in the public domain that is not
copyrightable [Doc. 410 at 128].  Assuming <u>arguendo</u> that Defendants
are correct, Professor Kim uploaded 47 pages that were protected by
copyright, which represents 14.83% of the book.

*Assessing Grammar* contains a comprehensive overview and analysis of assessing language learners' grammatical abilities. Cambridge, in soliciting a copyright registration, declared that *Assessing Grammar* is an original work and nothing in the evidence indicates otherwise. The Court further finds that the book meets the creativity requirement for the purpose of a prima facie case of copyright infringement. The book's author assigned his copyright to Cambridge. Therefore, the Court finds that *Assessing Grammar* is copyrightable and the first prong of the prima facie case of copyright infringement has been satisfied.

As evidenced by Professor Kim's testimony and the ERES hit count, a copy of an excerpt from *Assessing Grammar* was uploaded to Georgia State's ERES system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Assessing Grammar* was copied without seeking copyright permissions.

However, the hit count of one demonstrates that students did not access the excerpt through ERES [Jt. Ex. 3 at 210]; the only hit is likely attributable to the staff librarian, Professor Kim herself, or counsel for the parties [See Laura Burtle, Tr. Vol. 11 at 131]. Because the students did not access the excerpt, the act of uploading it to ERES did not impact the market for *Assessing Grammar* and did not harm Cambridge. Thus, although the act of uploading the excerpt to ERES technically satisfies the second prong of the infringement analysis, the Court finds the use that resulted from this upload to be de minimis such that it "need not be prohibited in order to protect the author's incentive to create." See Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 450-51, n.34 (1984) and

-234-

accompanying text ("'In certain situations, the copyright owner suffers no substantial harm from the use of the work. . . . Here again, is the partial marriage between the doctrine of fair use and the legal maxim <u>de minimis non curat lex</u>.'") (quoting ALAN LATMAN, FAIR USE OF COPYRIGHTED WORKS (1958)) (additional citations omitted). Accordingly, the Court need not address the fair use defense for Professor Kim's use of *Assessing Grammar*. This claim of copyright infringement fails.

46. *Assessing Reading*

*Assessing Reading* was first published by Cambridge on February 24, 2000 in the United Kingdom and subsequently published on March 28, 2000 in the United States [Pls. Exs. 29, 31]. It is 413 pages in length and has nine chapters [Pls. Ex. 29]. The book, authored by J. Charles Alderson, is part of the *Cambridge Language Assessment* series. This book concerns the development, design, and use of reading tests. It is aimed at language testing professionals, including teachers of second language. It can be classified as a textbook [Pls. Ex. 29]. The book retails for $85.00 in hardcover and $40.00 in paperback. It has earned £86,464 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 32]. There is no evidence in the record reflecting that *Assessing Reading* was available for licensed digital excerpts in 2009.

Professor Kim posted pages 202-270, the entirety of chapter seven, of the book to uLearn as required reading for her AL 8550 course [Tr. Vol. 6 at 105-106]. Because the reading was available through uLearn, there is no hit count in evidence to determine how often it was accessed by students. In addition to uploading the

-235-

excerpt to uLearn, Professor Kim placed a copy of *Assessing Reading* on hard copy reserve in the library [Tr. Vol. 6 at 138].

<u>Prima Facie Case of Copyright Infringement</u>

*Assessing Reading* was first published outside the United States on February 24, 2000 and published in the United States on March 28, 2000, more than 30 days after the first publication. Thus, *Assessing Reading* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 104(b)(2).

This book concerns the development, design and use of reading tests. It is aimed at language testing professionals, including teachers of second language. It can be classified as a textbook.

In order to establish the copyrightability of the work, Plaintiffs have the burden of demonstrating its originality. <u>Feist</u>, 499 U.S. at 351 ("[O]riginality is a constitutionally mandated prerequisite for copyright protection.").

The following language appears in the acknowledgments section at the beginning of the book:

> The editors, author and publishers are grateful to the authors, publishers and others who have given permission for the use of copyright material identified in the text. It has not been possible to identify or trace, sources of all the materials used and in such cases the publishers would welcome information from copyright owners.

[Pls. Ex. 29]. By stating "[i]t has not been possible to identify or trace, sources of all the materials used and in such cases the publishers would welcome information from copyright owners," Cambridge recognized that it could not prove the originality of all of the contents because it had not obtained permission from some of the authors of the material used. This acknowledgment is to

-236-

Cambridge's credit. However, for the Court to determine whether the excerpt at issue in this case is original or otherwise protected by Cambridge's copyright for the full work, Plaintiffs would have needed to provide evidence about the source of, or Cambridge's rights to, the specific excerpt at issue. Because Plaintiffs did not provide evidence regarding which portions of the book are original and for which portions they did obtain permission, the Court finds that Cambridge has not met its burden of proving the originality of *Assessing Reading*. Therefore, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Assessing Reading.* It is not necessary to address Defendants' fair use defense. This infringement claim fails.

47. *Fundamental Considerations in Language Testing*

*Fundamental Considerations in Language Testing* was first published by Oxford in 1990, but Oxford did not obtain a certificate of copyright registration until March 15, 2011 [Pls. Exs. 406, 408]. It is a 420 page, eight chapter book authored by Lyle F. Bachman [Pls. Ex. 406]. The book is part of the *Oxford Applied Linguistics* series and provides a comprehensive overview of the context that determines the uses of language tests and the nature of the language abilities to be measured [Jt. Ex. 5 at D-45; Pls. Ex. 406]. It addresses the fundamental questions that must be considered before designing language tests. It is aimed at language testing processionals, including language teachers. *Fundamental Considerations in Language Testing* retails for $33.95 and has earned

-237-

£151,242.15[106] in net sales revenue from date of first publication through November 7, 2010.  There is no evidence in the record reflecting that *Fundamental Considerations in Language Testing* was available for licensed digital excerpts in 2009.

Professor Kim posted pages 81-110 of the book (the entirety of chapter four, entitled "Communicative Language Ability") on uLearn for distribution to the students in her course as optional reading [Tr. Vol. 6 at 101-102, 146-147].  Because the reading was available through uLearn, there is no hit count in evidence to determine whether it was regularly accessed by students.

<u>Prima Facie Case of Copyright Infringement</u>

*Fundamental Considerations in Language Testing* was first published by Oxford in 1990, but Oxford did not obtain a certificate of copyright registration until March 15, 2011.  17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c).  Accordingly, because the certificate of registration for *Fundamental Considerations in Language Testing* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist.  Instead, the Court must use its discretion to determine the

---

[106]This figure is the amount that Plaintiffs assert for this work, but the Court has been unable to verify this amount due to insufficient documentation.

-238-

copyrightability/originality of *Fundamental Considerations in Language Testing*.

To qualify for copyright protection, a work must be the author's original work. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist, 499 U.S. at 345. To meet the creativity requirement, even a slight amount of creativity will suffice. Id. *Fundamental Considerations in Language Testing* consists of a comprehensive overview of measurement, the context that determines the uses of language tests, and the nature of the language abilities to be measured. Oxford, in soliciting a copyright registration, declared that *Fundamental Considerations in Language Testing* is an original work and nothing in the evidence indicates otherwise. The Court further finds that the book easily meets the creativity requirement for the purpose of establishing a prima facie case of copyright infringement. Further, the author has granted Oxford the exclusive right to publish the book. Therefore, the Court finds that *Fundamental Considerations in Language Testing* is copyrightable and the first prong of the prima facie case of copyright infringement has been satisfied.

As evidenced by Professor Kim's testimony, a copy of an excerpt from *Fundamental Considerations in Language Testing* was uploaded to Georgia State's uLearn system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Fundamental Considerations in Language Testing* was copied without seeking copyright permissions. Accordingly, Plaintiffs have

-239-

met their burden of establishing a prima facie case of copyright infringement for Professor Kim's use of *Fundamental Considerations in Language Testing*.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Fundamental Considerations in Language Testing* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kim's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Fundamental Considerations in Language Testing* is a non-fiction book that provides an overview of measuring language abilities, including the context that determines the uses of language tests and the nature of language abilities. The presentation is informational in nature. The second factor weighs in favor of Defendants.

As to the third fair use factor, Professor Kim uploaded 30 pages of *Fundamental Considerations in Language Testing* to uLearn. The excerpt was one full chapter of an eight chapter book and represents 7.14% of the total work. Defendants contend that 25 of the 30 pages were not protected by the copyright registration because they cite to other authors' works or contain material in the public domain that is not copyrightable. Based on Defendants' argument that Professor Kim uploaded only five protected pages, the percentage copied without permission is reduced to 1.19%. Because the book had fewer than ten chapters, Professor Kim should have adhered to a limit of ten percent of the protected pages of the book. Even if the Court accepts Plaintiffs' calculations that the amount copied was 7.14%,

-240-

that is still a decidedly small amount. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kim's use of *Fundamental Considerations in Language Testing* affected the market for purchasing the book as a whole. The Court infers that students would not pay $33.95 for the entire book to read a 30 page excerpt, especially since the excerpt was not required reading for Professor Kim's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Fundamental Considerations in Language Testing* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing through CCC in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing all the factors together, the Court finds that Defendants have met their burden of proving that Professor Kim's use of *Fundamental Considerations in Language Testing* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

-241-

48. *Language Testing in Practice*

*Language Testing in Practice* was first published by Oxford in 1996, but Oxford did not obtain a certificate of copyright registration until March 15, 2011 [Pls. Exs. 418, 420]. It is a 383 page, twelve chapter book authored by Lyle F. Bachman and Adrian S. Palmer [Pls. Ex. 406]. The book is part of the *Oxford Applied Linguistics* series. It addresses designing and developing useful language tests, as well as analyzing data from language tests. It is aimed at classroom language teachers and can be classified as a textbook.

The following language appears at the beginning of the book:

> The Publisher grants permission for the photocopying of those pages marked "photocopiable" according to the following conditions. Individual purchasers may make copies for their own use or for use by classes that they teach. School purchasers may make copies for use by staff and students, but this permission does not extend to additional schools or branches. Under no circumstances may any part of this book be photocopied for resale.

[Pls. Ex. 418]. *Language Testing in Practice* retails for $33.95 and has earned £169,112.15[107] in net sales revenue from date of first publication through November 7, 2010. Licensed digital excerpts of the book are available through CCC [Pls. Ex. 422]. From July 1, 2004 until December 1, 2010, *Language Testing in Practice* earned $99.46 in ECCS permissions revenue [Pls. Ex. 422].

Professor Kim uploaded pages 17-42, 43-60, and 85-94 (the entirety of chapters two, three, and five) on uLearn for distribution

---

[107]This figure is the amount that Plaintiffs assert for this work, but the Court has been unable to verify this amount due to insufficient documentation.

to the students in her course [Tr. Vol. 6 at 137]. This excerpt of three chapters totaled 54 pages, or 14.10% of the book. Professor Kim also placed a copy of the book on hard copy reserve in the library [Tr. Vol. 6 at 137]. Had permissions fees been paid for this excerpt via CCC's ECCS program, Oxford would have earned less than $88.13 in net revenue from permissions income from the class of sixteen students.[108] The cost to students would have been $106.68. Because the reading was made available through uLearn, there is no hit count in evidence to determine how many times it was accessed by students.

Prima Facie Case of Copyright Infringement

*Language Testing in Practice* was first published by Oxford in 1996, but Oxford did not obtain a certificate of copyright registration until March 15, 2011. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Language Testing in Practice* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Language Testing in Practice*.

---

[108]The amount earned would have been $106.68, the amount charged by CCC, [Jt. Ex. 5 at D-45], less the $3.00 service fee charged by CCC to students, less $15.55 in fees charged by CCC to publishers, less any royalties Oxford is obligated to pay the author.

In the acknowledgments section of *Language Testing in Practice*, the following language is included:

> Every effort has been made to trace the owners of copyright material in this book, but we should be pleased to hear from any copyright holder whom we have been unable to contact. We apologize for any apparent negligence. If notified, the publisher will be pleased to rectify any errors or omissions at the earliest opportunity.

[*Id.*].  By stating "[e]very effort has been made to trace the owners of copyright material in this book, but we should be pleased to hear from any copyright holder whom we have been unable to contact . . ." Oxford recognized that it could not prove the originality of all the material used because it had not identified the source and/or authors of some of the material.  This acknowledgment is to Oxford's credit. However, copyright protection in a work extends only to those elements that are original to the author.  <u>Feist</u>, 499 U.S. at 348. For the Court to determine whether the excerpt at issue in this case is original or otherwise protected by Oxford's copyright for the full work, Plaintiffs would have needed to provide evidence about the source of, or Oxford's rights to, the specific excerpt at issue. Because Plaintiffs did not provide evidence regarding which portions of the book are original and for which portions they did obtain permission, the Court finds that Oxford has not met its burden of proving the originality of *Language Testing in Practice.*  Therefore, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Language Testing in Practice.*  It is not necessary to address Defendants' fair use defense.  This infringement claim fails.

-244-

49. *Assessing Listening*

*Assessing Listening* was first published by Cambridge in 2001, but Cambridge did not obtain a certificate of copyright registration until March 7, 2011 [Pls. Exs. 24, 26]. It is a 287 page, nine chapter book authored by Gary Buck [Pls. Ex. 24]. The book is part of the *Cambridge Language Assessment* series. It addresses the major areas of listening research including guidelines for testing [Pls. Ex. 24]. It is aimed at classroom teachers of second language and can be classified as a textbook.

The book retails for $82.00 in hardcover and $30.00 in paperback, and it has earned £63,567 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 27]. There is no evidence in the record reflecting *Assessing Listening* was available for licensed digital excerpts in 2009.

Professor Kim initially uploaded pages 116-153,[109] the entirety of chapter five, to uLearn as required reading for the students in her course [Tr. Vol. 7 at 12; Jt. Ex. 5 at D-47]. Professor Kim testified that the week before students were to complete the reading of this excerpt, she orally modified the assignment to contain only pages 132-146 and 149-150 as required reading [Tr. Vol. 7 at 12-13]. Professor Kim also placed a hard copy of *Assessing Listening* on reserve in the library [Tr. Vol. 6 at 138].

---

[109]Defendants contend that 20 of the 38 copied pages were not protected by the copyright registration because they cite to other authors' works or contain material in the public domain that is not copyrightable.

## Prima Facie Case of Copyright Infringement

*Assessing Listening* was first published by Cambridge in 2001, but Cambridge did not obtain a certificate of copyright registration until March 7, 2011. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Assessing Listening* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Assessing Listening*.

The following language appears in the acknowledgments section at the beginning of the book:

> The authors and publishers are grateful to those authors, publishers and others who have given permission for the use of copyright material identified in the text. It has not been possible to identify, or trace, sources of all the materials used and in such cases the publishers would welcome information from copyright owners.

[Pls. Ex. 24]. By stating "[i]t has not been possible to identify, or trace, sources of all the materials used and in such cases the publishers would welcome information from copyright owners," Cambridge recognized that it could not prove the originality of all the material used because it had not identified the source and/or authors of some of the material. This acknowledgment is to Cambridge's credit. However, copyright protection in a work extends only to those elements that are original to the author. <u>Feist</u>, 499

U.S. at 348. For the Court to determine whether the excerpt at issue in this case is original or otherwise protected by Cambridge's copyright for the full work, Plaintiffs would have needed to provide evidence about the source of, or Cambridge's rights to, the specific excerpt at issue. Because Plaintiffs did not provide evidence regarding which portions of the book are original and for which portions they did obtain permission, the Court finds that Cambridge has not met its burden of proving the originality of *Assessing Listening*. Therefore, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Assessing Listening*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

50. *Assessing Languages for Specific Purposes*[110]

*Assessing Languages for Specific Purposes* was first published by Cambridge on December 9, 1999 in the United Kingdom and subsequently published on February 28, 2000 in the United States [Pls. Exs. 20, 22]. It is 330 pages in length, has eight chapters, and was authored by Dan Douglas [Pls. Ex. 20]. The book is part of the *Cambridge Language Assessment* series and provides analysis of the implementation of language tests for specific purposes, as opposed to general purpose language tests [Pls. Ex. 20; Jt. Ex. 5 at D-48].

The book retails for $75.00 in hardcover and $34.00 in paperback. It has earned £48,384 in net sales revenue from date of

---

[110]During the trial, this book was referred to by several different titles, including "Assessing Language for Specific Purposes," "Assessing Languages for Specific Purposes," and "Assessing Language for Testing Purposes." The correct title of the book, which will be used here, is *Assessing Languages for Specific Purposes* [Pls. Ex. 20].

first publication through October 31, 2010 [Pls. Ex. 23]. There is no evidence in the record reflecting that the work was available for licensed excerpts via CCC or otherwise in 2009.

Professor Kim uploaded pages 24-40[111] of the book to uLearn as required reading for the students in her course [Tr. Vol. 6 at 100-101; Jt. Ex. 5 at C-5]. At trial, Professor Kim testified that during the second week of class she orally modified the assignment to contain only pages 25-29 and 34-36 as required reading, with the remaining pages being optional reading [Tr. Vol. 6 at 144-145]. Professor Kim also placed a hard copy of *Assessing Languages for Specific Purposes* on reserve in the library [Tr. Vol. 6 at 138].

### Prima Facie Case of Copyright Infringement

*Assessing Languages for Specific Purposes* was first published outside the United States on December 9, 1999 and published in the United States on February 28, 2000, more than 30 days after the first publication. Thus *Assessing Languages for Specific Purposes* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 104(b)(2).

In order to establish the copyrightability of the work, Plaintiffs have the burden of demonstrating its originality. Feist, 499 U.S. at 351 ("[O]riginality is a constitutionally mandated prerequisite for copyright protection.").

---

[111]Defendants contend that 10 of the 17 pages were not protected by the copyright registration because they cite to other authors' works or contain material in the public domain that is not copyrightable [Doc. 410 at 126].

The following language appears in the acknowledgments section at the beginning of the book:

> The publishers and I are grateful to the authors, publishers and others who have given permission for the use of copyright material identified in the text. It has not been possible to identify, or trace, sources of all the materials used and in such cases the publishers would welcome information from copyright owners.

[Pls. Ex. 20]. By stating "[i]t has not been possible to identify or trace, sources of all the materials used and in such cases the publishers would welcome information from copyright owners," Cambridge recognized that it could not prove the originality of all the material used because it had not identified the source and/or authors of some of the material. This acknowledgment is to Cambridge's credit. However, copyright protection in a work extends only to those elements that are original to the author. _Feist_, 499 U.S. at 348. For the Court to determine whether the excerpt at issue in this case is original or otherwise protected by Cambridge's copyright for the full work, Plaintiffs would have needed to provide evidence about the source of, or Cambridge's rights to, the specific excerpt at issue. Because Plaintiffs did not provide evidence regarding which portions of the book are original and for which portions they did obtain permission, the Court finds that Cambridge has not met its burden of proving the originality of _Assessing Languages for Specific Purposes._ Therefore, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for _Assessing Languages for Specific Purposes._ It is not necessary to address Defendants' fair use defense. This infringement claim fails.

-249-

51. *Assessing Speaking*

*Assessing Speaking* was first published by Cambridge in 2004, but Cambridge did not obtain a certificate of copyright registration until March 17, 2011 [Pls. Exs. 34, 36]. It is a 228 page, eight chapter book authored by Sari Luoma [Pls. Ex. 34]. The book is part of the *Cambridge Language Assessment* series and addresses developing tests of speaking ability, designed for teachers of second language and language testers [Pls. Ex. 34]. *Assessing Speaking* retails for $88.00 in hardcover and $41.00 in paperback [Jt. Ex. 5 at D-49]. The net sales revenue of the book from the date of first publication through the end of January 2011 was £58,893 [Pls. Ex. 37]. There is no evidence in the record reflecting that *Assessing Speaking* was available for licensed digital excerpts in 2009.

Professor Kim initially posted pages 59-95 and 139-169,[112] the entirety of chapters four and seven, of the book on uLearn for distribution to the students in her course as required reading [Tr. Vol. 6 at 107-108].

Prima Facie Case of Copyright Infringement

*Assessing Speaking* was first published by Cambridge in 2004, but Cambridge did not obtain a certificate of copyright registration until March 17, 2011. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be

_____

[112]Defendants contend that 50 of the 68 pages are not protected by the copyright registration because they cite to other authors' work or contain material in the public domain that is not copyrightable [Doc. 410 at 49, 133]. This issue is addressed in the factor three analysis below.

accorded the certificate of a registration made thereafter
shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of
registration for *Assessing Speaking* was not made before or within
five years after the first date of publication, the prima facie
presumption of originality does not exist. Instead, the Court must
use its discretion to determine the copyrightability/originality of
*Assessing Speaking*.

To qualify for copyright protection, a work must be the author's
original work. Harper & Row Publishers, Inc. v. Nation Enters., 471
U.S. 539, 547-49 (1985). Original "means only that the work was
independently created by the author (as opposed to copied from other
works), and that it possesses at least some minimal degree of
creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S.
340, 345 (1991). To meet the creativity requirement, even a slight
amount of creativity will suffice. Id. *Assessing Speaking* is a
comprehensive overview of the research on the assessment of speaking,
designed for teachers and language testers. Cambridge, in soliciting
a copyright registration, declared that *Assessing Speaking* is an
original work and nothing in the evidence indicates otherwise. The
Court finds that the book easily meets the creativity requirement for
the purpose of establishing a prima facie case of copyright
infringement. Therefore, the Court finds that *Assessing Speaking* is
copyrightable. Also, the Court finds that the author of the book
assigned his copyright to Cambridge. The first prong of the prima
facie case of copyright infringement has been satisfied.

As evidenced by Professor Kim's testimony, a copy of an excerpt
from *Assessing Speaking* was uploaded to Georgia State's uLearn

-251-

system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Assessing Speaking* was copied without seeking copyright permissions. Accordingly, Plaintiffs have met their burden of establishing a prima facie case of copyright infringement for Professor Kim's use of *Assessing Speaking*.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Assessing Speaking* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kim's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Assessing Speaking* is a non-fiction work that provides an overview of existing research on the assessment of speaking. The presentation is informational in nature. The second factor weighs in favor of Defendants.

As to the third fair use factor, Professor Kim uploaded two chapters from *Assessing Speaking* to uLearn. This represents 68 pages and 29.82% of the total work. Defendants contend that 50 of the 68 pages are not protected by the copyright registration because they cite to other authors' works or contain material in the public domain that is not copyrightable. Although the Court agrees with Defendants that material in the public domain is not copyrightable, Defendants' calculations do not accurately reflect that principle because in their calculations, they exclude entire pages from the page count even when only a small fraction of the page contains material in the public domain. Regardless of the actual percentage of protected

-252-

pages that were copied, the Court finds that copying two full chapters out of an eight chapter book, exceeding 20% of the protected material, is not a decidedly small amount. Indeed, it is a large amount. Factor three strongly favors Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kim's use of *Assessing Speaking* affected the market for purchasing the book as a whole. The Court infers that students would not pay $41.00 for the entire book (or $88.00 for the hardcover version) for which only 68 pages were required reading for Professor Kim's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Assessing Speaking* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kim's use of *Assessing Speaking* was a fair use. Thus, this claim of copyright infringement fails.

52. *Learning Vocabulary in Another Language*

*Learning Vocabulary in Another Language* was first published by Cambridge in 2001, but Cambridge did not obtain a certificate of copyright registration until March 7, 2011 [Pls. Exs. 125, 127]. It is a 491 page, eleven chapter book authored by I. S. P. Nation [Pls. Ex. 125]. The book is part of the *Cambridge Applied Linguistics* series and provides a detailed survey of the research and theory on the teaching and learning of vocabulary. It is primarily aimed at teachers of English as a second language. It could be used as a textbook [Pls. Ex. 125]. *Learning Vocabulary in Another Language* retails for $81.00 in hardcover and $43.00 in paperback [Jt. Ex. 5 at D-50]. The net sales revenue of the book from May 30, 2002 until January 31, 2011 was £151,583 [Pls. Ex. 128]. There is no evidence in the record reflecting that *Learning Vocabulary in Another Language* was available for licensed digital excerpts in 2009.

Professor Kim initially posted pages 344-379[113] (the entirety of chapter ten) of the book on uLearn for distribution to the students in her course as required reading [Tr. Vol. 6 at 105]. Professor Kim orally modified the syllabus in class and designated only part of the excerpt as required reading, leaving the remaining portion as optional[114] [Tr. Vol. 7 at 7-8]. Because the reading was available

---

[113]Defendants contend that 25 of the 36 pages are not protected by the copyright registration because they cite to other authors' work or contain material in the public domain that is not copyrightable [Doc. 410 at 48, 131].

[114]Professor Kim testified that she orally altered her syllabus and assigned only a portion of the excerpt from *Learning Vocabulary in Another Language* as required reading and a portion as optional reading. However, she also testified that "it's difficult to say what portion" was required [Tr. Vol. 7 at 7]. Instead, she pointed

-254-

through uLearn, there is no hit count in evidence to determine how often it was accessed by students.

### Prima Facie Case of Copyright Infringement

*Learning Vocabulary in Another Language* was first published by Cambridge in 2001 but Cambridge did not obtain a certificate of copyright registration until March 7, 2011. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Learning Vocabulary in Another Language* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Learning Vocabulary in Another Language*.

To qualify for copyright protection, a work must be the author's original work. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S.

_____

to "some examples" of pages that were required [Id.]. Because no other evidence corroborates Professor Kim's testimony as to which portions were required and which were optional, the Court finds that all 36 pages were required reading, as indicated in the syllabus for Professor Kim's fall 2009 AL 8550 course [Pls. Ex. 519].

340, 345 (1991). To meet the creativity requirement, even a slight amount of creativity will suffice. Id. *Learning Vocabulary in Another Language* consists of a survey of the research and theory on the teaching and learning of vocabulary. Cambridge, in soliciting a copyright registration, declared that *Learning Vocabulary in Another Language* is an original work and nothing in the evidence indicates otherwise. The Court finds that the book easily meets the creativity requirement for the purpose of establishing a prima facie case of copyright infringement. Therefore, the Court finds that *Learning Vocabulary in Another Language* is copyrightable. The author has assigned his copyright to Cambridge. The copyright is registered in Cambridge's name. The first prong of the prima facie case of copyright infringement has been satisfied.

As evidenced by Professor Kim's testimony, a copy of an excerpt from *Learning Vocabulary in Another Language* was uploaded to Georgia State's uLearn system; thus the second prong of the prima facie case of copyright infringement has been established because an excerpt of *Learning Vocabulary in Another Language* was copied without seeking copyright permissions. Accordingly, Plaintiffs have met their burden of establishing a prima facie case of copyright infringement for Professor Kim's use of *Learning Vocabulary in Another Language*.

The Fair Use Defense

As to the first element of fair use, an excerpt from *Learning Vocabulary in Another Language* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Kim's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Learning Vocabulary in Another Language* is a non-fiction survey of existing research and theory on the teaching and learning of vocabulary.  The presentation is factual in nature.  The second factor weighs in favor of Defendants.

As to the third fair use factor, Professor Kim uploaded 36 pages[115] of *Learning Vocabulary in Another Language* to uLearn.  This was one full chapter of the eleven chapter book, which is a decidedly small amount.  The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Kim's use of *Learning Vocabulary in Another Language* affected the market for purchasing the book as a whole.  The Court infers that students would not pay $43.00 for the entire book (or $81.00 for the hardcover version) when only one chapter (36 pages) was required reading for Professor Kim's course.  Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from *Learning Vocabulary in*

---

[115]The parties disagree about what percentage of the work the one chapter excerpt represents.  Defendants contend that 25 of the 36 pages were not protected by the copyright registration because they cite to other authors' works or contain material in the public domain that is not copyrightable.  They argue that these pages should not count toward the total number of pages copied, lowering the calculated percentage.  Plaintiffs contend the copied amount was 8.4% of the book, while Defendants contend it was 2.2%.  Because it will not change the outcome, the Court assumes without deciding that the amount Professor Kim copied without permission is somewhere within this range.

-257-

*Another Language* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Kim's use of *Learning Vocabulary in Another Language* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

>    53. *Assessing Vocabulary*

*Assessing Vocabulary* was first published by Cambridge in 2000, but Cambridge did not obtain a certificate of copyright registration until March 7, 2011 [Pls. Exs. 44, 46]. It is a 293 page, eight chapter book authored by John Read. The book is part of the *Cambridge Language Assessment* series. It addresses tests for assessing the vocabulary knowledge of second language learners [Pls. Ex. 44]. It is aimed primarily at teachers of second language. The book retails for $61.00 in hardcover and $30.00 in paperback [Jt. Ex. 5 at D-51]. It has earned £62,861 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 47]. There is no evidence in the record reflecting that *Assessing Vocabulary* was available for licensed digital excerpts in 2009.

Professor Kim uploaded pages 150-187[116] of the book (the entirety of chapter six) to uLearn as required reading for the students in her course [Tr. Vol. 6 at 104]. Because the reading was available through uLearn, there is no hit count in evidence to determine how often it was accessed by students.

### Prima Facie Case of Copyright Infringement

*Assessing Vocabulary* was first published by Cambridge in 2000, but Cambridge did not obtain a certificate of copyright registration until March 7, 2011. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Assessing Vocabulary* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Assessing Vocabulary*.

In the acknowledgments section of *Assessing Vocabulary*, Cambridge included a reservation as to the originality of the contents of the book, stating that:

> The publishers and I are grateful to the authors, publishers and others who have given permission for the use of copyright material identified in the text. It has not been possible to identify, or trace, sources of all the

---

[116]Defendants contend that 16 of the 38 pages were not protected by the copyright registration because they cite to other authors' works or contain material in the public domain that is not copyrightable.

> materials used and in such cases the publishers would
> welcome information from copyright owners.

[Pls. Ex. 44]. Cambridge recognizes in this statement that it could not prove the originality of all the material used because it had not identified the source and/or authors of some of the material. This acknowledgment is to Cambridge's credit. However, copyright protection in a work extends only to those elements that are original to the author. <u>Feist</u>, 499 U.S. at 348. For the Court to determine whether the excerpt at issue in this case is original or otherwise protected by Cambridge's copyright for the full work, Plaintiffs would have needed to provide evidence about the source of, or Cambridge's rights to, the specific excerpt at issue. Because Plaintiffs did not provide evidence regarding which portions of the book are original and for which portions they did obtain permission, the Court finds that Cambridge has not met its burden of proving the originality of *Assessing Vocabulary*. Therefore, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Assessing Vocabulary*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

### 54. <u>*Assessing Writing*</u>

*Assessing Writing* was first published by Cambridge in 2002, but Cambridge did not obtain a certificate of copyright registration until March 7, 2011 [Pls. Exs. 39, 41]. It is a 282 page, ten chapter book authored by Sara Cushing Weigle [Pls. Ex. 39]. The book is part of the *Cambridge Language Assessment* series and addresses tests for assessing a student's writing abilities [Pls. Ex. 39]. It is aimed at teachers of second language.

-260-

The book retails for $76.00 in hardcover and $29.00 in paperback [Jt. Ex. 5 at D-52]. It has earned £65,392 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 42]. There is no evidence in the record reflecting that *Assessing Writing* was available for licensed digital excerpts in 2009.

Professor Kim initially uploaded pages 77-139[117] (the entirety of chapters five and six) of the book to uLearn as required reading for the students in her course [Tr. Vol. 6 at 109]. Because the reading was available through uLearn, there is no hit count in evidence to determine how often it was accessed by students.

### Prima Facie Case of Copyright Infringement

*Assessing Writing* was first published by Cambridge in 2002, but Cambridge did not obtain a certificate of copyright registration until March 7, 2011. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Assessing Writing* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Assessing Writing*.

---

[117]Defendants contend that 47 of the 63 pages were not protected by the copyright registration because they cite to other authors' works or contain material in the public domain that is not copyrightable [Tr. Vol. 7 at 22-24; Doc. 410 at 137].

In the acknowledgments section of *Assessing Writing*, Cambridge
included the following statement regarding the originality of the
contents of the book:

> The publishers and I are grateful to the authors,
> publishers and others who have given permission for the use
> of copyright material identified in the text. It has not
> been possible to identify, or trace, sources of all the
> materials used and in such cases the publishers would
> welcome information from copyright owners.

[Pls. Ex. 39]. In this statement, Cambridge recognized that it could
not prove the originality of all the material used because it had not
identified the source and/or authors of some of the material. This
acknowledgment is to Cambridge's credit. However, copyright
protection in a work extends only to those elements that are original
to the author. Feist, 499 U.S. at 348. For the Court to determine
whether the excerpt at issue in this case is original or otherwise
protected by Cambridge's copyright for the full work, Plaintiffs
would have needed to provide evidence about the source of, or
Cambridge's rights to, the specific excerpt at issue. Because
Plaintiffs did not provide evidence regarding which portions of the
book are original and for which portions they did obtain permission,
the Court finds that Cambridge has not met its burden of proving the
originality of *Assessing Writing*. Therefore, Plaintiffs have failed
to establish the first prong of the prima facie case of copyright
infringement for *Assessing Writing*. It is not necessary to address
Defendants' fair use defense. This infringement claim fails.


I. <u>Professor McCombie</u>

Professor Susan McCombie is a professor at Georgia State and
teaches in the Department of Anthropology [Pls. Ex. 536].

-262-

ANTH 4440 Epidemiology and Anthropology, Fall 2009

Professor McCombie taught ANTH 4440 during the fall semester of 2009 [Pls. Ex. 536]. The course covers basic principles of epidemiology, including its history and uses in public health interventions [Pls. Ex. 536]. Twenty nine undergraduate and graduate students enrolled in the course in the fall of 2009 [Jt. Ex. 5 at D-54; Pls. Ex. 536]. As evidenced by the syllabus, students were required to purchase one textbook for the course, and one additional book was listed as recommended [Pls. Ex. 536]. The syllabus also included a "reading list" with a link to ERES, but with a note stating that "[d]ue to new copyright guidelines, a few articles may not be posted on Eres. Instructions for obtaining these readings will be given in class." [Pls. Ex. 536]. The library owned copies of both works at issue in this case [Defs. Ex. 518].

55. *International Health Organisations and Movements, 1918-1939*

*International Health Organisations* was first published by Cambridge in 1995, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Exs. 108, 111]. It is a 355 page, fifteen chapter volume edited by Paul Weindling. The book is part of the *Cambridge History of Medicine* series and is comprised of studies (one study per chapter) on international health and welfare organizations between the First and Second World Wars [Pls. Ex. 108]. The Court infers from the book's contents that it is a collective work. *International Health Organisations* retails for $110.00 [Jt. Ex. 5 at D-53]. The net sales revenue from the date of first publication through November 7, 2010 was £16,284 [Pls. Ex.

-263-

112].  There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor McCombie requested that pages 222-243, or the entirety of chapter eleven, of *International Health Organisations* be uploaded to ERES for distribution to students in her fall 2009 ANTH 4440 course [Pls. Ex. 536].  The excerpt, entitled "The cycles of eradication: the Rockefeller Foundation and Latin American public health, 1918-1940" was written by Marcos Cueto and totaled 6.20% of the total work [Pls. Ex. 108].

<u>Prima Facie Case of Copyright Infringement</u>

*International Health Organisations* was first published by Cambridge on July 20, 1995, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Ex. 111].  17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c).  Accordingly, because the certificate of registration for *International Health Organisations* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist.  Instead, the Court must use its discretion to determine the copyrightability/originality of *International Health Organisations*.

To qualify for copyright protection, a work must be the author's original work.  <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547-49 (1985).  Original "means only that the work was independently created by the author (as opposed to copied from other

-264-

works), and that it possesses at least some minimal degree of creativity." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 345 (1991). To meet the creativity requirement even a slight amount of creativity will suffice. <u>Id.</u> *International Health Organisations* contains studies that analyze international health and welfare organizations and their activities and priorities [Pls. Ex. 108]. Cambridge, in soliciting a copyright registration, declared that *International Health Organisations* is an original work and nothing in the evidence indicates otherwise. The Court finds that the book easily meets the creativity requirement. Therefore, *International Health Organisations* is copyrightable. Both the external editor and the contributors of chapters assigned their rights to Cambridge. The copyright is registered in Cambridge's name. The first prong of the prima facie case of copyright infringement has been satisfied.

A copy of an excerpt from *International Health Organisations* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *International Health Organisations* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor McCombie's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *International Health Organisations* is a non-fiction work that contains academic chapters analyzing international health and welfare organizations based on

earlier models. The presentation is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor McCombie uploaded 22 pages of *International Health Organisations* to ERES. This represents 6.20% or one chapter of the total work. Because the work contained more than ten chapters, Professor McCombie properly adhered to the one chapter limit; the amount copied was decidedly small. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor McCombie's use of *International Health Organisations* affected the market for purchasing the book as a whole. Students would not pay $110.00 for the entire book when only 22 pages were required reading for Professor McCombie's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *International Health Organisations* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of

proving that Professor McCombie's use of *International Health Organisations* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

56. *Evolution of Infectious Disease*

*Evolution of Infectious Disease* was first published by Oxford in 1994 [Pls. Ex. 388]. It is a 305 page, eleven chapter work authored by Paul W. Ewald that analyzes the role of evolutionary biology in the fight against infectious disease [Pls. Ex. 388; Jt. Ex. 5 at D-54]. *Evolution of Infectious Disease* retails for $170.00 in hardcover and $60.00 in paperback [Jt. Ex. 5 at D-54]. The net sales revenue from the date of first publication through November 7, 2010 was £222,038.50 [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor McCombie requested that pages 15-34, the entirety of chapter two, of *Evolution of Infectious Disease* be uploaded to ERES for distribution to students in her fall 2009 ANTH 4440 course [Pls. Ex. 536]. Chapter two is entitled "Symptomatic Treatment (Or How to Bind *The Origin of Species* to *The Physician's Desk Reference*)." It represents 6.56% of the total work.

Prima Facie Case of Copyright Infringement

*Evolution of Infectious Disease* was first published by Oxford on January 6, 1994 [Pls. Ex. 390], and Oxford obtained a copyright registration for the work on June 27, 1996, which is within five years of the first date of publication. Accordingly, because the certificate of registration for *Evolution of Infectious Disease* was made before or within five years after the first date of publication, there is a prima facie presumption of originality. 17 U.S.C.

-267-

§ 410(c).  *Evolution of Infectious Disease* was authored by Paul Ewald.  The copyright registration lists the author as the copyright claimant [Pls. Ex. 390], but Plaintiffs have provided evidence that the author assigned his right to enjoin infringement of the copyright in the work to Oxford [Pls. Ex. 389].  Plaintiffs have met their burden to show that Oxford has a valid copyright in the work, and the first prong of the prima facie case of copyright infringement has been satisfied.

A copy of an excerpt from *Evolution of Infectious Disease* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Evolution of Infectious Disease* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor McCombie's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Evolution of Infectious Disease* is a non-fiction work that provides analysis on evolutionary biology and infectious disease.  It is factual in nature.  The second fair use factor favors Defendants.

As to the third fair use factor, Professor McCombie uploaded twenty pages of *Evolution of Infectious Disease* to ERES.  This represents 6.56% or one chapter of the total work.  Because the work contained more than ten chapters, Professor McCombie properly adhered to the one chapter limit; the amount copied was decidedly small.  The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor McCombie's use of the excerpt from *Evolution of Infectious Disease* affected the market for purchasing the book as a whole. Students would not pay $60.00 for the entire book (or $170.00 for the hardcover version) when only twenty pages were assigned for Professor McCombie's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Evolution of Infectious Disease* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor McCombie's use of *Evolution of Infectious Disease* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

J.  Professor Gabler-Hover

Professor Gabler-Hover is a tenured professor in the Department of English at Georgia State [Tr. Vol. 8 at 165]. She generally

-269-

teaches nineteenth century American Literature and Feminist Theory [Tr. Vol. 8 at 165].

<u>ENGL 4200 Cyborgs in American Culture, Fall 2009</u>

Thirty upper level undergraduate students were enrolled in Professor Gabler-Hover's ENGL 4200 course during fall semester 2009 [Tr. Vol. 8 at 167, 169; Jt. Ex. 5 at D-56]. Professor Gabler-Hover created a syllabus for this course in which students were required to purchase five course texts, all of which were fictional works; two additional required readings were uploaded to ERES without seeking copyright permissions [Tr. Vol. 9 at 16; Defs. Ex. 599]. The syllabus instructed students that "many . . . items you will need for the course are on library e-reserve for you to print out immediately, forming a course packet for yourself" [Defs. Ex. 599]. Professor Gabler-Hover owned a copy of the book from which she assigned the excerpt at issue here [Tr. Vol. 9 at 16].

57. *A History of Feminist Literary Criticism*

*A History of Feminist Literary Criticism* was first published by Cambridge on August 30, 2007 in the United Kingdom and on October 8, 2007 in the United States [Pls. Ex. 104]. It provides a comprehensive overview and analysis of feminist literary criticism from the Middle Ages through the present [Tr. Vol. 9 at 7; Jt. Ex. 5 at D-56]. The book's editors are Gill Plain and Susan Sellers. It has seventeen chapters and a total of 364 pages [Pls. Ex. 103]. Professor Gabler-Hover requested that pages 322-335, or one full chapter totaling 3.85% of the book, be posted on the ERES system as required reading [Defs. Ex. 599; Tr. Vol. 9 at 10]. The assigned chapter was called "Feminist criticism and technologies of the body" by Stacy Gillis.

-270-

The book retails for $130.00 in hardcover [Jt. Ex. 5 at D-56]. Professor Gabler-Hover stated that if a less expensive paperback version of the book were available, she would likely assign this book in her courses [Tr. Vol. 9 at 25]. The book had earned £45,357 in net sales revenue as of October 31, 2010 [Pls. Ex. 106]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

### Prima Facie Case of Copyright Infringement

*A History of Feminist Literary Criticism* was first published outside the United States on August 30, 2007 and published in the United States on October 8, 2007, more than 30 days after the first publication [Pls. Ex. 104]. Thus, *A History of Feminist Literary Criticism* is a foreign work as defined by the Copyright Act; a copyright registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 104(b)(2). The Court finds that *A History of Feminist Literary Criticism* is an original work and that it has sufficient creativity to be copyrighted.

However, Plaintiffs have failed to produce evidence of an author agreement assigning copyright in the excerpt at issue to Cambridge. There is no evidence that the contributing author either agreed that chapter seventeen was a work made for hire or that she transferred her rights to Cambridge.

*A History of Feminist Literary Criticism* is an edited volume comprised of chapters written by different authors. Plaintiffs have produced evidence of an editor agreement with both external editors, Professor Susan Sellers and Dr. Gill Plain, assigning their copyright interests in the work to Cambridge [Pls. Ex. 105]. This agreement states that with respect to assignment of rights, "[c]opyright in the

-271-

individual essays shall be assigned to [Cambridge] by individual contributors." [Pls. Ex. 105]. However, Plaintiffs have not introduced evidence of an author assignment by Stacy Gillis, the author of chapter seventeen, the excerpt assigned by Professor Gabler-Hover. The copyright in this chapter vests initially in the author, Stacy Gillis. Accordingly, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *A History of Feminist Literary Criticism.* It is not necessary to address Defendants' fair use defense. This infringement claim fails.

### K. <u>Professor Anggoro</u>

Professor Anggoro is no longer employed at Georgia State. During the fall 2009 semester, she taught a course in the College of Education at Georgia State [Defs. Ex. 610].

<u>EPY 8690 Seminar in Educational Psychology, Fall 2009</u>

EPY 8690 is a course that examines the empirical and theoretical approaches to understanding human thinking across languages and cultures [Defs. Ex. 610]. Nine students enrolled in this seminar in the fall semester of 2009 [Jt. Ex. 5 at D-67]. According to the syllabus, there was no required textbook for the course; all assigned readings were made available online through ERES. [Defs. Ex. 610].

58. *<u>Language Acquisition and Conceptual Development</u>*

*Language Acquisition and Conceptual Development* was first published by Cambridge in 2001 [Pls. Ex. 119]. It is a nineteen chapter, 614 page volume edited by Melissa Bowerman and Stephen C. Levinson [Pls. Ex. 119]. The book is part of the *Cambridge Language, Culture, and Cognition* series, which focuses on the role that various

-272-

aspects of language play in human cognition. The book grew out of a conference in which papers by various authors were presented; the papers were revised by the authors and are reprinted as chapters in the book. The book is probably a collective work. *Language Acquisition and Conceptual Development* analyzes the interaction between language acquisition and early cognition [Pls. Ex. 119]. It is aimed at linguistics scholars. The book retails for $140.00 in hardback and $53.00 in paperback [Jt. Ex. 5 at D-67]. The net sales revenue from January 26, 2010, through October 31, 2010 was £456.00 [Pls. Ex. 123]. Digital excerpts from the book were available for licensing through CCC in 2009 [Pls. Ex. 124]. From July 1, 2004 until December 1, 2010, *Language Acquisition* earned $669.39 in ECCS permissions revenue [Pls. Ex. 124].

Professor Anggoro requested that pages 566-588, or one full chapter totaling 3.75% of the book, be posted on the ERES system [Defs. Ex. 610; Jt. Ex. 5 at D-67]. The excerpt was the entirety of chapter nineteen, which is entitled "Covariation between spatial language and cognition, and its implications for language learning" by Stephen C. Levinson [Pls. Ex. 119]. Had permissions been paid via CCC for the distribution of this excerpt, Cambridge would have earned less than $26.39 in net revenue from permissions.[118] The cost to students would have been $34.05.

---

[118]The amount earned would have been $34.05, the amount charged by CCC, [Jt. Ex. 5 at D-67], less the $3.00 service fee charged by CCC to users, less $4.66 in fees charged by CCC to publishers, less royalties Cambridge is obligated to pay the external editors.

<u>Prima Facie Case of Copyright Infringement</u>

*Language Acquisition* was first published by Cambridge in 2001, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Ex. 122]. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *Language Acquisition* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *Language Acquisition*.

To qualify for copyright protection, a work must be the author's original work. <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 345 (1991). To meet the creativity requirement, even a slight amount of creativity will suffice. <u>Id.</u> *Language Acquisition* contains data and analysis examining the relationship between child language acquisition and cognitive development. Cambridge, in soliciting a copyright registration, declared that *Language Acquisition* is an original work and nothing in the evidence indicates otherwise. The Court finds that the book easily meets the creativity requirement. Therefore, *Language Acquisition* is copyrightable. The

-274-

external editors and the contributing authors assigned their copyrights to Cambridge.  The book is registered in Cambridge's name. The first prong of the prima facie case of copyright infringement has been satisfied.

A copy of an excerpt from *Language Acquisition* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Language Acquisition* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided for the exclusive use of students in Professor Anggoro's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Language Acquisition* is a non-fiction work about language acquisition and its relationship to early cognition.  The chapters are factual in nature.  The second fair use factor favors Defendants.

As to the third fair use factor, Professor Anggoro uploaded 23 pages of *Language Acquisition* to ERES.  This represents one chapter or 3.75% of the total work.  Because the work contained more than ten chapters, Professor Anggoro properly adhered to the one chapter limit; the amount copied was decidedly small.  The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Anggoro's use of *Language Acquisition* affected the market for purchasing the book as a whole. Students would not pay $53.00 for the entire book (or $140.00 for the

-275-

hardcover version) when only 23 pages were assigned for Professor Anggoro's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Language Acquisition* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Anggoro and her students caused very small, but actual, damage to the value of Cambridge's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Cambridge lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Anggoro's use of *Language Acquisition* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### L. Professor Barker

Professor Barker is an Assistant Professor in the Department of Communications at Georgia State [Pls. Ex. 977].

#### FILM 4750 Film Theory and Criticism, Fall 2009

Professor Barker taught FILM 4750 during the fall semester of 2009 [Pls. Ex. 533]. The course provides an introduction to film theories [Pls. Ex. 533]. Twenty two students enrolled in the course [Jt. Ex. 5 at D-69]. As evidenced by Professor Barker's syllabus, students were required to purchase one textbook for the course [Pls.

-276-

Ex. 533].  The syllabus also states that excerpts posted on uLearn and ERES were required reading for the course [Pls. Ex. 533].

    59.  *Film Language: A Semiotics of the Cinema*

    *Film Language* is a translation of Christian Metz's French work *Essais sur la Signification au Cinema, Tome I* [Defs. Ex. 765].  The French edition was published by Editions Klincksieck ("Klincksieck") in 1971 [Defs. Ex. 765].  The English translation by Michael Taylor was published by Oxford in 1974 [Defs. Ex. 765].  The book has ten chapters and a total of 282 pages [Defs. Ex. 765].  It contains translations of a collection of articles previously written by Metz on cinematographic problems [Defs. Ex. 765].  The book is no longer in print, but licensed digital excerpts of the work were available through CCC in 2009 [Tr. Vol. 3 at 96]. From July 1, 2004 until December 1, 2010, *Film Language* earned $119.24 in ECCS permissions revenue [Pls. Ex. 394].

    Professor Barker requested that pages 108-148, or one chapter totaling 14.54% of *Film Language*, be posted on ERES as required reading for her course on Film Theory and Criticism [Jt. Ex. 5 at D-69].  Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $92.01 in net revenue from permissions.[119]  The cost to students would have been $111.24.

    Prima Facie Case of Copyright Infringement

    The certificate of registration for the English translation of *Film Language* was filed on May 16, 1974 [Pls. Ex. 391].  Plaintiffs

---

[119]The amount earned would have been $111.24, the amount charged by CCC, [Jt. Ex. 5 at D-69], less the $3.00 service fee charged by CCC to users, less $16.23 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay to both the translator and to Klincksieck.

have produced evidence of an agreement between Oxford and Klincksieck, the publisher of the original French version, in which Klincksieck assigns to Oxford rights to translate *Film Language* into English and to publish and sell the English translation [Pls. Ex. 393]. However, Plaintiffs have failed to produce evidence of an agreement between Oxford and Michael Taylor, the translator of the French work into English, assigning the copyright interest in the work to Oxford.

A translation is a derivative work. 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works, such as a translation . . . or any other form in which a work may be recast, transformed, or adapted."). 17 U.S.C. § 103(b) states, "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). Thus, although the original author, Metz, or the French publisher, Klincksieck, owns the copyright in the original French chapters,[120] the copyright interest in the English translation vests initially in Michael Taylor, the person who translated them into English.

Although the copyright registration, which lists Oxford as the claimant of the copyright, states that the translation was a work done for hire, there is no evidence in the record that Mr. Taylor

---

[120]Although Plaintiffs assert that Klincksieck owns the copyright interest in Metz's chapters that appear in the book, there is no evidence in the record of an assignment of that interest by Metz to Klincksieck.

agreed it was a work for hire. See 17 U.S.C. § 101 ("A 'work made for hire' is . . . a work specially ordered or commissioned . . . *if the parties expressly agree in a written instrument signed by them* that the work shall be considered a work made for hire.") (emphasis added).

Plaintiffs contend that Oxford's contract with the foreign publisher grants Oxford exclusive rights in the English translation. However, this agreement merely gives Oxford a portion of the rights owned by Klincksieck, namely the rights to translate, publish, and sell the work in English. Klincksieck does not own any interest in the English translation written by Taylor and therefore cannot transfer that interest to Oxford. Without an agreement from Taylor, Oxford does not have the rights to enforce the copyright in the English translation of chapter five of *Film Language.*

Accordingly, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Film Language*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

M. <u>Professor Gainty</u>

Professor Gainty is an Assistant Professor of History at Georgia State [Tr. Vol. 9 at 98]. He began teaching at Georgia State in 2007 and is on a tenure track [Tr. Vol. 9 at 90]. He teaches undergraduate and graduate courses in world history [Tr. Vol. 9 at 99]. Although Professor Gainty is aware that Georgia State's Copyright Policy changed in 2009, he does not recall attending a training session on how to fill out the fair use checklist [Tr. Vol. 9 at 127-128].

-279-

### HIST 4820 Cross-Cultural Encounters in World History, Fall 2009

Professor Gainty was scheduled to teach HIST 4280 during the fall semester of 2009, but the course was canceled after the first class meeting due to insufficient enrollment [Tr. Vol. 9 at 100-101]. The syllabus[121] included five required texts as well as several additional required readings that were to be available on ERES [Pls. Ex. 539].

### 60. *The Cambridge History of China, Volume 8, Part 2: The Ming Dynasty, 1368-1644*

Volume 8, part 2 of *The Cambridge History of China* was first published by Cambridge in 1998 [Pls. Ex. 79]. It is a 1,231 page, fifteen chapter reference work edited by Denis Twitchett and Frederick W. Mote. Volume 8, part 2 of *The Cambridge History of China* provides a comprehensive, highly detailed overview of the Ming Dynasty from 1368 to 1644 [Pls. Ex. 79]. The book retails for $187.00 in hardback [Jt. Ex. 5 at D-72]. The net sales revenue from January 26, 2010, through October 31, 2010 was £155,433 [Pls. Ex. 83]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Gainty requested that pages 272-300, or one chapter totaling 2.36% of *The Cambridge History of China, Volume 8, Part 2*, be posted on ERES as required reading for the course before it was canceled [Pls. Ex. 539; Tr. Vol. 9 at 107]. This excerpt was not

---

[121]Plaintiffs' Exhibit 539 is actually the syllabus Professor Gainty prepared for a fall 2010 course with the same title and subject matter [Tr. Vol. 9 at 102]. After the fall 2009 course was canceled, Professor Gainty did not retain a copy of the syllabus he had prepared for it, but he testified that the fall 2010 syllabus is identical with regard to the content of the course and assigned readings [Tr. Vol. 9 at 102].

assigned for the first class, which was the only session that met before the course was canceled [Pls. Ex. 539]. The hit count for this work was one [Jt. Ex. 3 at 59].

### Prima Facie Case of Copyright Infringement

*The Cambridge History of China, Volume 8, Part 2*, was first published by Cambridge on January 28, 1998, but Cambridge did not obtain a certificate of copyright registration until December 27, 2010 [Pls. Ex. 82]. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *The Cambridge History of China* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist. Instead, the Court must use its discretion to determine the copyrightability/originality of *The Cambridge History of China*.

To qualify for copyright protection, a work must be the author's original work. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). To meet the creativity requirement even a slight amount of creativity will suffice. Id. *The Cambridge History of China* contains chapters that provide a detailed account of China under the Ming Dynasty [Pls. Ex. 79]. Cambridge, in soliciting a

copyright registration, declared that *The Cambridge History of China* is an original work and nothing in the evidence indicates otherwise. The Court finds that the book also meets the creativity requirement. Therefore, the Court finds that *The Cambridge History of China* is copyrightable. The external editors and the contributing authors assigned their copyrights to Cambridge. The copyright is registered in Cambridge's name. The first prong of the prima facie case of copyright infringement has been satisfied.

As evidenced by Professor Gainty's testimony and the ERES hit count, a copy of an excerpt from *The Cambridge History of China* was uploaded to Georgia State's ERES system. Thus, the second prong of the prima facie case of copyright infringement has been established because Professor Gainty copied protected elements of *The Cambridge History of China*. While it is obvious the students did not access the excerpt on ERES, the act of uploading the excerpt to ERES itself satisfies the second prong of the infringement analysis.

However, although the excerpt at issue was uploaded to ERES, the fall 2009 HIST 4820 course was canceled before students were assigned to read the excerpt from *The Cambridge History of China*. For that reason, no students accessed the reading on ERES.[122] The act of

_____

[122]Although the hit count shows that the excerpt was accessed once on ERES, the Court credits the testimony of Laura Burtle that when a staff librarian uploads a document to ERES, he or she checks to make sure it has uploaded correctly, which may account for the first hit; the professors themselves usually check to make sure it has been done correctly, which could also account for the hit [Tr. Vol. 11 at 131]. Further, counsel for the parties in their litigation have accessed the materials on ERES for pretrial preparations. Thus, it is obvious that no student accessed the excerpt of *The Cambridge History of China* uploaded to ERES for Professor Gainty's course.

uploading the excerpt on ERES had no impact on the market for *The Cambridge History of China*. Thus, the Court finds the use that resulted from this upload to be <u>de minimis</u> such that it "need not be prohibited in order to protect the author's incentive to create." <u>See</u> <u>Sony Corp. of Am. v. Universal City Studios, Inc.</u>, 464 U.S. 417, 450-51, n.34 (1984) and accompanying text ("'In certain situations, the copyright owner suffers no substantial harm from the use of the work. . . . Here again, is the partial marriage between the doctrine of fair use and the legal maxim <u>de minimis non curat lex</u>.'") (quoting ALAN LATMAN, FAIR USE OF COPYRIGHTED WORKS (1958)) (additional citations omitted). Accordingly, the Court need not address the fair use defense for Professor Gainty's use of *The Cambridge History of China*. This claim of copyright infringement fails.

### N. Professor Davis

Professor Davis is an Assistant Professor in the Department of History at Georgia State [Tr. Vol. 7 at 95]. Her focus is on American history and ethnic and immigration history in the United States, specifically Jewish history [Tr. Vol. 7 at 96; Doc. 405 at 96]. She has taught at Georgia State since 2008.

Professor Davis regularly uses Georgia State's ERES system for distributing readings to students enrolled in her classes; she prefers the ERES system to using coursepacks, which sell the assigned readings to students in hard copy, because she prefers to distribute the material electronically [Tr. Vol. 7 at 116]. When Professor Davis came to Georgia State in 2008, she talked to her department head and came to the understanding that it was permissible to post excerpts of readings on the ERES system if the amount copied was less

-283-

than twelve percent and was used for a noncommercial purpose [Tr. Vol. 7 at 96-97]. She learned about Georgia State's new Copyright Policy in February 2009 [Tr. Vol. 7 at 97-98]. At that time, she read the policy and paid attention to the checklist provided. However, she did not attend any of the training sessions because she thought they were voluntary [Tr. Vol. 7 at 98-99]. Professor Davis discusses fair use issues with her department head [Tr. Vol. 7 at 99].

### HIST 7010 Issues and Interpretations in American History, Fall 2009

HIST 7010 is a graduate seminar that examines a selection of scholarly works about the social, cultural, political and economic history of the United States from colonization to the present [Tr. Vol. 7 at 104]. Seventeen graduate students were enrolled in Professor Davis's HIST 7010 course during fall semester 2009 [Jt. Ex. 5 at D-73]. As evidenced by the syllabus and Professor Davis's testimony, students were required to purchase fourteen texts for the course, as well as complete several readings posted on ERES [Tr. Vol. 7 at 161; Pls. Ex. 512].

61. *Region, Race, and Reconstruction*

*Region, Race, and Reconstruction* was first published by Oxford in 1982 [Defs. Ex. 769; Pls. Ex. 456]. It is a 500 page, fifteen chapter volume edited by J. Morgan Kousser and James M. McPherson. The book provides historical analysis of the American South [Jt. Ex. 5 at D-73]. Its retail price is $29.95 [Jt. Ex. 5 at D-73], and net sales revenue from the date of first publication through November 7, 2010 was $2,199 [Pls. Ex. 357]. Licensed digital excerpts were available for licensing through CCC in 2009 [Pls. Ex. 457]. From

July 1, 2004 until December 1, 2010, *Region, Race, and Reconstruction* earned $622.80 in permissions revenue from ECCS [Pls. Ex. 457].

Professor Davis requested that pages 143-177, which was one full chapter of *Region, Race, and Reconstruction,* be uploaded to ERES for distribution to students in her fall 2009 HIST 7010 course [Tr. Vol. 7 at 143-144]. The chapter is authored by Barbara J. Fields and entitled "Ideology and Race in American History." It represents 35 pages or 7.00% of the total work. This chapter was assigned as required reading [Tr. Vol. 7 at 113; Pls. Ex. 512]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $60.69 in net revenue from permissions.[123] The cost to students would have been $74.40.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *Region, Race and Reconstruction* [Doc. 411 at 27-28]. The author-editors assigned their copyrights to Oxford. The copyright is registered in Oxford's name [Pls. Ex. 456], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Region, Race and Reconstruction* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

---

[123]The amount earned would have been $74.40, the amount charged by CCC, [Jt. Ex. 5 at D-73], less the $3.00 service fee charged by CCC to users, less $10.71 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the external editors.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Region, Race and Reconstruction* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Davis's class. The first factor weighs strongly in favor of Defendants. As to the second element of fair use, *Region, Race and Reconstruction* is a non-fiction work that contains academic chapters about the American South. These chapters are factual in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Davis uploaded 35 pages, which represents 7.00% or one chapter, of *Region, Race and Reconstruction* to ERES. Because the work contained more than ten chapters, Professor Davis properly adhered to the one chapter limit; the amount copied was decidedly small. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Davis's use of *Region, Race and Reconstruction* affected the market for purchasing the book as a whole. Students would not pay $29.95 for the entire book when only 35 pages were required reading for Professor Davis's course, particularly in light of the fact that there were already fourteen required texts for the course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Region, Race and Reconstruction* had a negative effect on the market for purchase of the book itself.

-286-

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Davis and her students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Davis's use of *Region, Race and Reconstruction* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### 62. *The Unpredictable Past: Explorations in American Cultural History*

*The Unpredictable Past* was first published by Oxford in 1993 [Pls. Exs. 477, 479]. It is a 394 page, fourteen chapter work by Lawrence W. Levine. The book is a collection of Levine's own essays, all of which have been published before in collections and journals [Pls. Ex. 477 at vii]. The essays analyze examples of history changing through the lens of the present [Jt. Ex. 5 at D-74]. *The Unpredictable Past* retails for $34.99 [Jt. Ex. 5 at D-74]. The net sales revenue from the date of first publication through November 7, 2010 was $79,367.92 [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Davis requested that pages 35-58 of *The Unpredictable Past* be uploaded to ERES for distribution to students as required reading for her fall 2009 HIST 7010 course [Jt. Ex. 5 at D-74; Tr.

-287-

Vol. 7 at 152]. The excerpt was a full chapter of the book and totaled 24 pages, or 6.09% of the total work [Pls. Ex. 477]. Professor Davis previously owned a copy of *The Unpredictable Past* but used the library's copy for purposes of copying and uploading the excerpt at issue here [Tr. Vol. 7 at 150]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $41.62 in net revenue from permissions.[124] The cost to students would have been $51.96.

Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have established a prima facie case of copyright infringement for *The Unpredictable Past* [Doc. 411 at 27-28]. The author has assigned "all rights in the work" to Oxford; the contract specifies that the copyright will be registered in the author's name. It also states that the author grants Oxford the right to bring an action to enjoin any infringements [Pls. Ex. 478]. The copyright registration lists author Levine as the copyright claimant [Pls. Ex. 479]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Unpredictable Past* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

The Fair Use Defense

As to the first element of fair use, an excerpt from *The Unpredictable Past* was used by a nonprofit educational institution

---

[124]The amount earned would have been $51.96, the amount charged by CCC, [Jt. Ex. 5 at D-74], less the $3.00 service fee charged by CCC to users, less $7.34 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Davis's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Unpredictable Past* is a non-fiction collection of the author's academic essays on changing notions of American culture and history. It is informational in nature. The second fair use factor weighs in favor of Defendants.

As to the third fair use factor, Professor Davis uploaded 24 pages of *The Unpredictable Past* to ERES. This represents 6.09% or one chapter of the total work. Because the work contained more than ten chapters, Professor Davis properly adhered to the one chapter limit; the amount copied was decidedly small. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Davis's use of *The Unpredictable Past* affected the market for purchasing the book as a whole. Students would not pay $34.99 for the entire book when only 24 pages were required reading for Professor Davis's course, particularly in light of the fact that there were already fourteen required texts for the course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Unpredictable Past* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four

-289-

when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Davis's use of *The Unpredictable Past* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### O.   Professor Freeman

Professor Carrie Freeman is an Assistant Professor of Communication at Georgia State [Pls. Ex. 535].

#### JOUR 4800 Media Ethics & Society, Fall 2009

JOUR 4800 is a course on media ethics [Pls. Ex. 535]. Nineteen students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-76]. According to the syllabus, there was one required textbook for the course; additional assigned readings were to be posted online through uLearn. [Pls. Ex. 535].

##### 63.   *Living Ethics: Across Media Platforms*

*Living Ethics* was first published by Oxford in 2007 [Pls. Ex. 425]. It is a ten chapter, 365 page book authored by Michael Bugeja and contains an interdisciplinary analysis of ethical issues arising across new media platforms [Pls. Ex. 423; Jt. Ex. 5 at D-76]. The preface of the book states that to analyze moral decision-making in the workplace, "the text cites other books, articles, and online materials across media platforms. Such analysis is an act of

-290-

criticism covered by fair use standards of U.S. copyright law." [Pls. Ex. 423 at xi]. The preface goes on to state that in most instances, the author has chosen not to seek permissions for his use of copyrighted material as examples or for criticism [Pls. Ex. 423 at xi]. Professor Freeman posted pages 116-121 and 299-305,[125] or portions of two chapters totaling 3.56% of the total work, on ERES[126] [Jt. Ex. 5 at D-76; Pls. Ex. 423].

*Living Ethics* retails for $69.95. The net sales revenue for the book from the date of first publication through November 7, 2010 was $37,875.00 [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

---

[125]Defendants contend that six pages Professor Freeman copied from *Living Ethics* are not protectable because they contain images from another author's work. However, two of these contested pages include copyrightable text written by the author of *Living Ethics*, and the Court finds that those pages are protected by the *Living Ethics* copyright registration. The remaining four contested pages consist entirely of reprinted photographs and text from another author's work. This reprinted material does not appear to be in the public domain or otherwise available from a free source. The author of *Living Ethics* contends that his use of the reprinted material is a fair use because it is reprinted for the purpose of criticism. Defendants do not refute this argument, and the Court concludes that if the reprinted material was a fair use, then its use in *Living Ethics* is protected by the copyright registration for *Living Ethics.* Therefore, the Court finds that the four pages containing only reprinted materials are protected by the copyright registration for *Living Ethics* and do count toward the number of pages at issue in Professor Freeman's excerpt on ERES.

[126]Although the syllabus for Professor Freeman's course indicates that reading excerpts will be posted on uLearn, it appears from the hit count information that the excerpt from *Living Ethics* was actually posted on ERES [Jt. Ex. 3 at 46]. The hit count for the selections from this work was five.

<u>Prima Facie Case of Copyright Infringement</u>

Defendants do not contest that Plaintiffs have adequately established a prima facie case of copyright infringement for *Living Ethics* [Doc. 411 at 27-28]. A contract between the author and Oxford assigns "all rights in the work" to Oxford and specifies the author grants Oxford the right to seek to enjoin infringement of the copyright. The copyright is registered in the author's name [Pls. Ex. 425]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Living Ethics* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Living Ethics* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Freeman's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Living Ethics* is a non-fiction work that contains analysis of ethical issues arising in media. *Living Ethics* is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Freeman uploaded partial excerpts of two different chapters of *Living Ethics* to ERES. Because the work contains ten chapters, Professor Freeman should have adhered to the limit of one chapter or its equivalent. The average chapter length for this work is 29 pages; Professor Freeman's excerpts were thirteen pages total. Thus, Professor Freeman's

excerpts were decidedly small.  The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Freeman's use of *Living Ethics* affected the market for purchasing the book as a whole.  Students would not pay $69.95 for the entire book when only thirteen pages were assigned for Professor Freeman's course.  Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from *Living Ethics* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009.  As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease.  The absence of a ready market shifts the factor four analysis to favor fair use.  This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Freeman's use of *Living Ethics* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.


P.   Professor Moloney

Professor Margaret Moloney is an Associate Professor at Georgia State's School of Nursing, where she also coordinates the doctoral

-293-

program [Tr. Vol. 9 at 132].  In addition to teaching, Professor Moloney is a practicing nurse practitioner [Tr. Vol. 9 at 132-133]. She has also authored several publications, including research articles that have been published in research journals [Tr. Vol. 9 at 133].  Professor Moloney learned about Georgia State's new Copyright Policy in 2009 but does not recall whether she attended a training session at that time [Tr. Vol 9 at 146].

### NURS 8035 Theoretical and Philosophical Foundations of Nursing, Fall 2009

NURS 8035 is a graduate course that provides a foundation in philosophy to nursing doctoral students [Tr. Vol. 9 at 134]. Fourteen students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-81; Tr. Vol. 9 at 134].  According to the syllabus, there were three required textbooks for the course; additional required readings were made available online through ERES without seeking permission [Pls. Ex. 545; Tr. Vol. 9 at 151].

### 64. Handbook of Mixed Methods in Social and Behavioral Research

Handbook of Mixed Methods was first published by Sage in 2002[127] [Pls. Ex. 254].  It is a 26 chapter, 784 page volume edited by Abbas Tashakkori and Charles Teddlie that addresses combining quantitative and qualitative research approaches for the social and behavioral sciences [Defs. Ex. 773].  The book retails for $151.00 [Jt. Ex. 5 at D-81].  The net sales revenue from date of first publication through 2010 for this edition of the book was $391,077.68 [Pls. Ex. 255]. Licensed digital excerpts of the book were available through CCC in

---

[127]Although not at issue in this case, the Court notes that a second edition of the Handbook of Mixed Methods was published by Sage in 2010.

2009. From July 1, 2004 until December 1, 2010, *Handbook of Mixed Methods* earned $51.41 in ECCS permissions revenue [Pls. Ex. 257]. In addition, licensed digital excerpts of the book were available through Sage's in-house permissions program in 2009, and Sage has earned $2,825.86 in revenue from in-house licensing of excerpts of the book [Pls. Ex. 255].

Professor Moloney requested that pages 541-556, or one full chapter totaling 2.04% of the book, be posted on the ERES system [Defs. Ex. 773; Jt. Ex. 5 at D-81]. The excerpt was written by Sheila Twinn and entitled "Status of Mixed Methods Research in Nursing" [Defs. Ex. 773]. Had permissions been paid to CCC for the distribution of this excerpt, Sage would have earned less than $26.66 in net revenue from permissions.[128] The cost to students would have been $34.36. Professor Moloney owns a personal copy of *Handbook of Mixed Methods* [Tr. Vol. 9 at 148].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have adequately established a prima facie case of copyright infringement for *Handbook of Mixed Methods* [Doc. 411 at 27-28]. The external editors and the contributing authors have granted Sage the exclusive right to publish their works [Pls. Exs. 251, 253]. The copyright for the book is registered in Sage's name. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Handbook of Mixed Methods* was uploaded to Georgia State's ERES

---

[128]The amount earned would have been $34.36, the amount charged by CCC, [Jt. Ex. 5 at D-81], less the $3.00 service fee charged by CCC to users, less $4.70 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Handbook of Mixed Methods* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Moloney's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Handbook of Mixed Methods* is an academic work that addresses combining quantitative and qualitative research approaches for the social and behavioral sciences. It is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Moloney uploaded one chapter totaling sixteen pages of *Handbook of Mixed Methods* to ERES. Because the work contained more than ten chapters, Professor Moloney properly adhered to the one chapter limit; the amount copied was decidedly small. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Moloney's use of *Handbook of Mixed Methods* affected the market for purchasing the book as a whole. Students would not pay $151.00 for the entire book when only sixteen pages were assigned for Professor Moloney's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Handbook of Mixed Methods* had a negative effect on the market for purchase of the book itself.

-296-

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program.  The unpaid use of the excerpt by Professor Moloney and her students caused very small, but actual, damage to the value of Sage's copyright.  In addition, widespread use of similar unlicensed excerpts could cause substantial harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing all four factors together, the Court finds that Defendants have met their burden of proving that Professor Moloney's use of *Handbook of Mixed Methods* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.


Q.    Professor Lasner

During the fall 2009 semester, Professor Lasner taught PERS 2001 Comparative Culture at Georgia State [Pls. Ex. 537].

PERS 2001 Comparative Culture, Fall 2009

PERS 2001 is an undergraduate course that introduces key themes and issues in the growth of modern industrial cities [Pls. Ex. 537]. One hundred fourteen students were enrolled in Professor Lasner's course during the fall 2009 semester [Jt. Ex. 5 at D-82].  As evidenced by the syllabus for this course, there were no required textbooks for the course; all assigned readings were made available through ERES [Pls. Ex. 537].

-297-

65. *Crabgrass Frontier: The Suburbanization of the United States*

*Crabgrass Frontier: The Suburbanization of the United States* ("*Crabgrass Frontier*") was first published by Oxford in 1985 [Pls. Ex. 368]. It is a 405 page, sixteen chapter work written by Kenneth T. Jackson. It is a commentary on the emergence of the American suburb, its establishment, and its negative cultural impact [Pls. Ex. 368]. While the book is frequently used in sociology courses, it is inferred that it was written for general audiences. It retails for $19.95 [Jt. Ex. 5 at D-82], and net sales revenue from the date of first publication through November 7, 2010 was $740,414.00 [Pls. Ex. 357]. Licensed digital excerpts of the book were available through CCC in 2009. From July 1, 2004 until December 1, 2010, *Crabgrass Frontier* earned $94.25 in ECCS permissions revenue [Pls. Ex. 371]. It also earned $2,876.08 in APS revenue during the same period [Pls. Ex. 371].

Professor Lasner requested that pages 246-271 of *Crabgrass Frontier* be uploaded to ERES for distribution to students in his PERS 2001 course [Pls. Ex. 368]. The excerpt, entitled "The Drive-in Culture of Contemporary America," was one chapter of the book, totaling 26 pages or 6.42% of the total work [Pls. Ex. 368]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $302.33 in net revenue from permissions.[129] The cost to students would have been $358.68.

_____

[129]The amount earned would have been $358.68, the amount charged by CCC, [Jt. Ex. 5 at D-82], less the $3.00 service fee charged by CCC to users, less $53.35 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have adequately established a prima facie case of copyright infringement for *Crabgrass Frontier* [Doc. 411 at 27-28]. The author has granted Oxford the exclusive right to publish the book.  The copyright is registered in Oxford's name [Pls. Exs. 369, 370].  This satisfies the first prong of the prima facie case of copyright infringement.  A copy of an excerpt from *Crabgrass Frontier* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *Crabgrass Frontier* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided for the exclusive use of students in Professor Lasner's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Crabgrass Frontier* is a critical commentary on the development and phenomenon of the American suburb.  It is informational in nature.  The second fair use factor favors Defendants.

As to the third fair use factor, Professor Lasner uploaded one chapter of *Crabgrass Frontier* to ERES.  This represents 26 pages or 6.42% of the total work.  Because the work contained more than ten chapters, Professor Lasner properly adhered to the one chapter limit; the amount copied was decidedly small.  The third factor weighs in favor of Defendants.

-299-

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Lasner's use of *Crabgrass Frontier* affected the market for purchasing the book as a whole. Students would not pay $19.95 for the entire book when only 26 pages were required reading for Professor Lasner's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Crabgrass Frontier* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Lasner and his students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Lasner's use of *Crabgrass Frontier* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

66. *The Politics of Public Housing: Black Women's Struggles Against Urban Inequality*

*The Politics of Public Housing: Black Women's Struggles Against Urban Inequality* ("*The Politics of Public Housing*") was first published by Oxford in 2004 [Pls. Ex. 445]. It is a 306 page, six chapter work written by Rhonda Y. Williams. It discusses evolving

socio-political attitudes toward public housing (from the tenants' perspective) from the 1940s through the 1980s. An epilogue discusses further developments in the 1990s [Pls. Ex. 445]. Professor Lasner requested that pages 21-53, a chapter entitled "Creating 'A Little Heaven for Poor People,'" be uploaded to ERES for distribution to students in his PERS 2001 course [Pls. Exs. 445, 537]. The excerpt was one chapter of the book totaling 33 pages, or 10.78% of the total work [Pls. Ex. 445].

The book retails for $25.00 [Jt. Ex. 5 at D-83]. The net sales revenue from the date of first publication through November 7, 2010 was $45,085.00 [Pls. Ex. 366]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that the Plaintiffs have adequately established a prima facie case of copyright infringement for *The Politics of Public Housing* [Doc. 411 at 27-28]. The author has granted Oxford the exclusive right to publish the work. The copyright is registered in Oxford's name [Pls. Exs. 446, 447]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Politics of Public Housing* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Politics of Public Housing* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of

-301-

students in Professor Lasner's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Politics of Public Housing* is a non-fiction overview and analysis of the strengths of affordable public housing from the perspective of poor black women. *The Politics of Public Housing* is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Lasner uploaded one chapter of *The Politics of Public Housing.* Because the work contains less than ten chapters, Professor Lasner should have adhered to a limit of 10% of the protected pages of the book. The amount he actually copied was 33 pages, which represents 10.78% of the protected pages within the book. This is not a decidedly small amount. The third factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Lasner's use of *The Politics of Public Housing* affected the market for purchasing the book as a whole. Students would not pay $25.00 for the entire book when only 33 pages were required reading for Professor Lasner's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Politics of Public Housing* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009. As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could

obtain permission to post excerpts of the work to ERES with reasonable ease. The absence of a ready market shifts the factor four analysis to favor fair use. This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Lasner's use of *The Politics of Public Housing* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### R. Professor Hankla

Professor Charles Hankla is an Associate Professor in the Department of Political Science at Georgia State [Tr. Vol. 8 at 97]. He generally teaches courses in international relations, comparative politics, and research methods [Tr. Vol. 8 at 97]. He has taught at Georgia State since 2004 [Tr. Vol. 8 at 97]. Professor Hankla stated that the two strict rules he applies to his fair use determinations are (1) that either he or the library must own a copy of the book before he will assign an excerpt of it to his class, and (2) that he never assigns more than twenty percent of a work [Tr. Vol. 8 at 134]. He learned about Georgia State's new Copyright Policy in the spring of 2009 and began using the fair use checklist at that time [Tr. Vol. 8 at 111].

### POLS 3450 U.S. Foreign Policy, Fall 2009

POLS 3450 is an undergraduate level course that analyzes the history, development, and current challenges of U.S. foreign policy [Tr. Vol. 8 at 100-101; Defs. Ex. 623]. Forty eight students were enrolled in Professor Hankla's POLS 3450 course during fall semester 2009 [Jt. Ex. 5 at D-84]. As evidenced by the syllabus and Professor

-303-

Hankla's testimony, students were required to purchase two texts for the course; additional required readings were posted on ERES [Defs. Ex. 623; Tr. Vol. 8 at 102].

       67. *Contemporary Cases in U.S. Foreign Policy: From Terrorism to Trade (Second Edition)*

      The second edition of *Contemporary Cases in U.S. Foreign Policy* was published by CQ Press, a division of Sage, in 2005 [Defs. Ex. 776; Tr. Vol. 2 at 59]. It is a 499 page, fifteen chapter volume edited by Ralph G. Carter that addresses various aspects of contemporary U.S. foreign policy through recent case examples [Defs. Ex. 776]. The Court infers that it is a textbook intended for use in college level classes. Its retail price is $38.95 [Jt. Ex. 5 at D-84]. The book has earned $365,751.22 in sales revenue, but the record does not indicate whether this amount is for all of the editions of the book or only the second edition, at issue here [Pls. Ex. 229]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009, but licensed digital excerpts of the book were available through Sage's in-house permissions program in 2009. The book has earned $333.81 through Sage's permissions program, though the record does not reflect whether this amount is for all of the editions of the book or only the second edition [Pls. Ex. 314].

      Professor Hankla requested that pages 89-121 of *Contemporary Cases in U.S. Foreign Policy* be uploaded to ERES for distribution to students in his fall 2009 POLS 3450 course [Tr. Vol. 8 at 107]. The excerpt was a full chapter of the book and totaled 33 pages, or 6.61% of the book [Defs. Ex. 776]. This chapter, entitled "The Return of the Imperial Presidency? The Bush Doctrine and U.S. Intervention in

Iraq," was written by Jeffrey S. Lantis and Eric Moskowitz. It was assigned as background reading for the entire course and was not assigned to be completed for a particular class meeting [Tr. Vol. 8 at 107; Defs. Exs. 623, 776]. Had permissions been paid through its in-house program for the distribution of this excerpt, Sage would have earned $190.08, less royalties payable to the external editor. The cost to students would have been $190.08. Professor Hankla owns a copy of *Contemporary Cases in U.S. Foreign Policy* [Tr. Vol. 8 at 122].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have adequately established a prima facie case of copyright infringement for *Contemporary Cases in U.S. Foreign Policy* [Doc. 411 at 27-28]. The author and Sage agreed to collaborate in the preparation of the book; they agreed Sage would have the right of publication and that the copyright would be registered in Sage's name. Sage's contract with the contributing author specifies that the contribution is a work made for hire. The copyright is registered in Sage's name [Pls. Ex. 228]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *Contemporary Cases in U.S. Foreign Policy* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *Contemporary Cases in U.S. Foreign Policy* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the

exclusive use of students in Professor Hankla's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Contemporary Cases in U.S. Foreign Policy* is a non-fiction work that contains analysis of U.S. foreign policy through recent case examples. It is informational in nature. The second fair use factor favors Defendants.

As to the third use factor, Professor Hankla uploaded 33 pages of *Contemporary Cases in U.S. Foreign Policy* to ERES. This represents 6.61% or one chapter of the total work. Because the work contained more than ten chapters, Professor Hankla properly adhered to the one chapter limit; the amount copied was decidedly small. The third fair use factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Hankla's use of *Contemporary Cases in U.S. Foreign Policy* affected the market for purchasing the book as a whole. The Court infers that students would not pay $38.95 for the entire book when only 33 pages were assigned for Professor Hankla's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Contemporary Cases in U.S. Foreign Policy* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Hankla and his students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use

-306-

of similar unlicensed excerpts could cause substantial harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing all four factors together, the Court finds that Defendants have met their burden of proving that Professor Hankla's use of *U.S. Foreign Policy* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

68.  *U.S. Foreign Policy: The Paradox of World Power*

*U.S. Foreign Policy* was published by CQ Press, a division of Sage, in 2004 [Pls. Ex. 313; Tr. Vol. 2 at 59].  It is a 519 page, twelve chapter book that discusses the various forces that impact the making of contemporary U.S. foreign policy [Defs. Ex. 777].  The Court infers from its content that it is a textbook intended for use in college level classes.  Its retail price in paperback is $84.95 [Jt. Ex. 5 at D-85].  The book has earned $738,328.89 in sales revenue [Pls. Ex. 314].  There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009, but licensed digital excerpts of the book were available through Sage's in-house permissions program in 2009.  The book has earned $285.33 through Sage's permissions program [Pls. Ex. 314].

Professor Hankla requested that pages 153-188 of *U.S. Foreign Policy* be uploaded to ERES for distribution to students in his fall 2009 POLS 3450 course [Jt. Ex. 5 at D-85].  The excerpt, entitled "The Foreign-Policy Bureaucracy," was a full chapter of the book and totaled 36 pages, or 6.94% of the total work [Defs. Ex. 777].  Had permissions been paid through its in-house permissions program for the distribution of this excerpt, Sage would have earned $207.36 less

-307-

any fees it is obligated to pay the external editor. The cost to students would have been $207.36. Professor Hankla owns a copy of *Contemporary Cases in U.S. Foreign Policy* [Tr. Vol. 8 at 134].

### Prima Facie Case of Copyright Infringement

Defendants do not contest that Plaintiffs have adequately established a prima facie case of copyright infringement for *U.S. Foreign Policy* [Doc. 411 at 27-28]. The author/editor and the publisher agreed to collaborate in the preparation of the book; the author/editor granted Sage the right to publish the book; the parties agreed that the copyright would be registered in Sage's name. The contributing author's agreement with Sage states that the contribution will be a work made for hire.[130] The copyright is registered in the name of CQ Press, which is a division of Sage [Pls. Ex. 313]. This satisfies the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *U.S. Foreign Policy* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *U.S. Foreign Policy* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Hankla's class. The first factor weighs strongly in favor of Defendants.

---

[130]This contribution, unlike others, called for payment of a substantial honorarium [Pls. Ex. 312].

As to the second element of fair use, *U.S. Foreign Policy* is a non-fiction work analyzing the shaping of contemporary U.S. foreign policy. It is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Hankla uploaded 36 pages of *U.S. Foreign Policy* to ERES. This represents 6.94% or one chapter of the total work. Because the work contained more than ten chapters, Professor Hankla properly adhered to the one chapter limit; the amount copied was decidedly small. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Hankla's use of *U.S. Foreign Policy* affected the market for purchasing the book as a whole. Students would not pay $84.95 for the entire book when only 36 pages were required reading for Professor Hankla's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *U.S. Foreign Policy* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Hankla and his students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing all four factors together, the Court finds that Defendants have met their

-309-

burden of proving that Professor Hankla's use of *U.S. Foreign Policy* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.

### S.   Professor McCoy

Professor Jennifer McCoy is a tenured professor in the Political Science department at Georgia State [Jennifer McCoy Dep., Doc. 329 at 10]. She has been at Georgia State since 1984 [Id. at 10].

Professor McCoy uses ERES to provide students in her classes with course readings [Doc. 329 at 17-18]. Professor McCoy learned about Georgia State's new Copyright Policy in 2009 when she received an email with the revised policy [Doc. 329 at 12-13]. At that time, she began using the fair use checklist provided in the policy for readings she provided through the ERES system [Doc. 329 at 14]. However, she did not attend a training session on the new policy because she was on leave at the time the policy was revised and was not aware of training sessions that occurred after she returned [Doc. 329 at 18].

#### POLS 8250 Latin American Politics, Fall 2009

POLS 8250 is a graduate course on the history and contemporary politics of Latin American countries with a focus on democratization in Latin America [Pls. Ex. 901; Doc. 329 at 23-24]. Twelve graduate students were enrolled in Professor McCoy's POLS 8250 course during fall semester 2009 [Jt. Ex. 5 at D-87]. As evidenced by the syllabus and Professor McCoy's testimony, students were required to purchase six texts for the course, as well as complete several readings posted on ERES [Doc. 329 at 22-23; Pls. Ex. 901]. Additional recommended articles were also located on ERES [Pls. Ex. 901].

69. _Regimes and Democracy in Latin America: Theories and Methods_

_Regimes and Democracy in Latin America_ was first published by Oxford on May 10, 2007 in the United Kingdom and subsequently published on June 28, 2007 in the United States [Pls. Ex. 993]. It is a 299 page, nine chapter volume edited by Gerardo L. Munck that addresses various perspectives on democracy in Latin America [Pls. Ex. 452]. It is a collective work. The book is part of the series called _Oxford Studies in Democratization_, whose volumes concentrate on the comparative study of post-cold war democratization processes [Pls. Ex. 452]. _Regimes and Democracy in Latin America_ retails for $75.00 [Jt. Ex. 5 at D-87]. The net sales revenue from the date of first publication through November 7, 2010 is $12,689 [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor McCoy requested that pages 1-50 of _Regimes and Democracy in Latin America_ be uploaded to ERES for distribution to students in her fall 2009 POLS 8250 course [Doc. 329 at 25; Jt. Ex. 5 at D-87]. The excerpt included the introduction and two full chapters of the book and totaled 50 pages, or 16.72% of the total work [Pls. Exs. 452, 901]. These chapters were assigned as required reading [Pls. Ex. 901].

### Prima Facie Case of Copyright Infringement

_Regimes and Democracy in Latin America_ was first published outside the United States on May 10, 2007 and published in the United States on June 28, 2007, more than 30 days after the first publication. Thus, _Regimes and Democracy in Latin America_ is a foreign work as defined by the Copyright Act and a copyright

-311-

registration is not necessary to bring a claim of copyright infringement. 17 U.S.C. § 101; 17 U.S.C. § 104(b)(2).[131] The Court finds that *Regimes and Democracy in Latin America* is an original work and that it has sufficient creativity to be copyrighted.

However, Plaintiffs have failed to produce evidence of author agreements assigning the copyright interests of the author of chapter two to Oxford. Professor McCoy posted the introduction and first two chapters of *Regimes and Democracy in Latin America* to ERES. The introduction and chapter one were authored by the editor of the work, Gerardo L. Munck. Plaintiffs have provided an agreement between Oxford and Mr. Munck in which he assigned his copyright in his contributions to the book to Oxford [Pls. Ex. 453]. However, Plaintiffs have not introduced evidence of a similar assignment by Sebastian Mazzuca, the author of chapter two, which Professor McCoy also posted on ERES. There is no evidence that Mazzuca agreed that chapter two was a work made for hire. Accordingly, Plaintiffs have failed to show that they own all copyright interests in chapter two of *Regimes and Democracy in Latin America*, which spans pages 39-50 of the book. Therefore, only pages 1-38 of *Regimes and Democracy in Latin America* meet the first prong of the prima facie case of copyright infringement.

---

[131]When the United States joined the Berne Convention on March 1, 1989, the Copyright Act was revised to provide that the requirement for registration in order to bring an infringement action is limited to "the copyright in any United States work"; the claimant of a copyright in any foreign work of a country that is also a signatory to the Berne Convention may file suit in a United States District Court without proof of copyright registration. Berne Convention Implementation Act of 1988, Mar. 1, 1989, Pub. L. No. 100-568; 17 U.S.C. § 411(a).

A copy of pages 1-38 of *Regimes and Democracy in Latin America* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Regimes and Democracy in Latin America* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship.  Free copies were provided for the exclusive use of students in Professor McCoy's class.  The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Regimes and Democracy in Latin America* is a non-fiction work that focuses on theories and methods for assessing democracies in Latin America.  It is informational in nature.  The second fair use factor favors Defendants.

As to the third fair use factor, Professor McCoy uploaded the introduction and one full chapter of *Regimes and Democracy in Latin America* to ERES.  Because the work contained less than ten chapters, Professor McCoy should have adhered to a limit of 10% of the protected pages of the book.  The amount she actually copied was 39 pages and represents 12.71% of the protected pages within the book, which is not a decidedly small amount.  The third factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor McCoy's use of *Regimes and Democracy in Latin America* affected the market for purchasing the book as a whole.  Students would not pay $75.00 for the entire book when only 39 pages were assigned.  Neither would a professor require

-313-

students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from *Regimes and Democracy in Latin America* had a negative effect on the market for purchase of the book itself.

There is no evidence in the record to show that digital excerpts from this book were available for licensing in 2009.  As discussed in Section III.B.2. (Factor 4) above, Defendants prevail on factor four when there is no proof of a ready market for electronic excerpts of the work because there is no avenue through which Defendants could obtain permission to post excerpts of the work to ERES with reasonable ease.  The absence of a ready market shifts the factor four analysis to favor fair use.  This factor favors Defendants.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor McCoy's use of *Regimes and Democracy in Latin America* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

T.  Professor Duffield

Professor Duffield is a professor in the Department of Political Science at Georgia State [Tr. Vol. 11 at 65].  He generally teaches in the area of International Politics.  He has taught at Georgia State since January 2002 [Id.].

Professor Duffield uses ERES to distribute assigned readings to students enrolled in his courses [Tr. Vol. 11 at 108].  He previously used coursepacks to distribute class material [Tr. Vol. 11 at 107]. He has not utilized coursepacks in some years in part because of

-314-

concerns that students were deterred from purchasing coursepacks due to cost and were not completing assigned readings [Id.].

Professor Duffield attended a training session on Georgia State's 2009 Copyright Policy, but did not recall the contents of the handout from that session [Tr. Vol. 11 at 98-99]. Professor Duffield limits the amount of a book placed on ERES to no more than ten percent of the work [Tr. Vol. 11 at 74, 79].

### POLS 8470 Military Conflict and International Security, Fall 2009

POLS 8470 is a graduate course that introduces students to the literature in political science on violent conflict and security [Tr. Vol. 11 at 95; Pls. Ex. 528]. Fourteen students were enrolled in Professor Duffield's POLS 8470 course during fall semester 2009 [Jt. Ex. 5 at D-88]. Students were not required to purchase a textbook for the course; all the readings for the course were available on ERES or electronic journals [Tr. Vol. 11 at 94]. The majority of the assigned readings were available on electronic journals [Id.].

70. *Behavior, Society and Nuclear War, Volume I*

*Behavior, Society and Nuclear War, Volume I* was first published by Oxford in 1989 [Pls. Ex. 359]. It is a 413 page, five chapter volume edited by Philip E. Tetlock, Jo L. Husbands, Robert Jervis, Paul C. Stern, and Charles Tilly [Pls. Ex. 359]. It addresses, through chapters contributed by various authors, the potential causes of nuclear war [Pls. Ex. 359]. It appears to be a collective work. *Behavior, Society and Nuclear War, Volume I* retails for $42.95 [Jt. Ex. 5 at D-88]. The net sales revenue from the date of first publication through November 7, 2010 was $29,712.00 [Pls. Ex. 357]. Licensed digital excerpts of the book were available through CCC in

-315-

2009. From July 1, 2004 until December 1, 2010, *Behavior, Society and Nuclear War, Volume I* earned $151.98 in ECCS permissions revenue [Pls. Ex. 362].

Professor Duffield requested that pages 8-15 and 19-48 of *Behavior, Society and Nuclear War, Volume I* be uploaded to Georgia State's ERES system for distribution to students in his POLS 8470 course as required reading. [Tr. Vol. 11 at 72; Pls. Ex. 528]. The excerpt was two portions of chapter one of the book, totaling 38 pages or 9.20% of the total work [Pls. Ex. 359]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $54.26 in net revenue from permissions.[132] The cost to students would have been $66.84.

<u>Prima Facie Case of Copyright Infringement</u>

A certificate of registration for *Behavior, Society and Nuclear War, Volume I* was filed in Oxford's name on February 5, 1990 [Pls. Ex. 361]. However, Plaintiffs have failed to produce evidence of a contributing author agreement assigning the author's copyright interests in chapter one of *Behavior, Society and Nuclear War, Volume I* to Oxford. Chapter one was authored by Ole R. Holsti [Pls. Ex. 359]. This chapter, entitled "Crisis Decision Making," is a contribution to the volume which was edited by the external editors listed above.

Plaintiffs have produced evidence of an agreement between Oxford University Press and the National Academy Press for the National

---

[132]The amount earned would have been $66.84, the amount charged by CCC, [Jt. Ex. 5 at D-88], less the $3.00 service fee charged by CCC to users, less $9.58 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the external editors.

Academy of Sciences, assigning its copyright interest in the book to Oxford [Pls. Ex. 360]. The copyright registration lists National Academy Press for the National Academy of Sciences as "author for hire of entire book" [Pls. Ex. 361]. However, the book itself states that the series of which this book is a part "is edited by committee [on Contributions of Behavioral and Social Science to the Prevention of Nuclear War] members Philip E. Tetlock, Robert Jervis, and Charles Tilly and staff members Jo L. Husbands and Paul C. Stern. The editors have been responsible for developing ideas for chapters, selecting the authors, and managing the review process. . . . The views expressed in the chapters, however, are those of the authors." [Pls. Ex. 359 at vi]. A later section entitled "Contributors and Editors" provides biographies of individuals that contributed chapters or edited the book [Pls. Ex. 359 at 387]. Thus, the "author" of the work is the author of each chapter, despite the assertion in the copyright registration.

There is no evidence that the contributing author of chapter one either agreed that the chapter was a work made for hire or that he assigned the copyright to Oxford. See 17 U.S.C. § 101 ("A 'work made for hire' is . . . a work specially ordered or commissioned . . . *if the parties expressly agree in a written instrument signed by them* that the work shall be considered a work made for hire.") (emphasis added). Accordingly, Plaintiffs have failed to establish the first prong of the prima facie case of copyright infringement for *Behavior, Society and Nuclear War, Volume I*. It is not necessary to address Defendants' fair use defense. This infringement claim fails.

-317-

U.  Professor Whitten

Professor Kathleen Whitten taught a class in the Department of Psychology at Georgia State during the fall semester of 2009 [Pls. Ex. 557].

### PSYC 4030 Introduction to Cross-Cultural Psychology,[133] Fall 2009

PSYC 4030 is a course that examines the influence of culture on human cognition, emotion, and behavior with a focus on psychology theory and research [Pls. Ex. 557].  Thirteen students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-89]. According to the syllabus, there was one required textbook for the course; additional required readings were made available online through uLearn or ERES [Pls. Ex. 557].

### 71.  *A World of Babies: Imagined Childcare Guides for Seven Societies*

*A World of Babies* was first published by Cambridge in 2000 [Pls. Ex. 147].  It is an eight chapter, 293 page volume edited by Judy DeLoache and Alma Gottlieb that contains contributions discussing how various societies care for babies [Pls. Ex. 147].  From the contents of the book, the Court infers that it was intended for general readership, although it can be used in an academic setting.  The book retails for $55.99 in hardback and $30.99 in paperback [Jt. Ex. 5 at D-89].  The net sales revenue from August 3, 2000, through October 31, 2010 was £99,831 [Pls. Ex. 152].  Licensed digital excerpts of the book were available through CCC in 2009.  From

---

[133]Joint Exhibit 5 refers to the title of this course as Cross-Cultural Psychology.  This Order will refer to the course using the title that appears on the syllabus, Introduction to Cross-Cultural Psychology.

July 1, 2004 until December 1, 2010, *A World of Babies* earned $62.99 in ECCS permissions revenue [Pls. Ex. 153].

Professor Whitten requested that page 27 and pages 91-112 be posted on the ERES system for distribution to students in her PSYC 4030 course [Pls. Ex. 147; Jt. Ex. 5 at D-89]. Page 27 is a portion of chapter one, which was authored by Judy DeLoache and Alma Gottlieb. Pages 91-112 are a portion of chapter four, which was authored by Marissa Diener [Pls. Ex. 147]. Together, the pages represent 7.85% of the book. Had permissions been paid via CCC for the distribution of this excerpt, Cambridge would have earned less than $36.47 in net revenue from permissions.[134] The cost to students would have been $45.90.

## Prima Facie Case of Copyright Infringement

*A World of Babies* was first published by Cambridge on May 18, 2000, but Cambridge did not obtain a certificate of copyright registration until January 7, 2011 [Pls. Ex. 151]. 17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). Accordingly, because the certificate of registration for *A World of Babies* was not made before or within five years after the first date of publication, the prima facie

---

[134]The amount earned would have been $45.90, the amount charged by CCC, [Jt. Ex. 5 at D-89], less the $3.00 service fee charged by CCC to users, less $6.43 in fees charged by CCC to publishers, less royalties Cambridge is obligated to pay the external editors.

presumption of originality does not exist.  Instead, the Court must use its discretion to determine the copyrightability/originality of *A World of Babies*.

To qualify for copyright protection, a work must be the author's original work.  Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547-49 (1985).  Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991).  To meet the creativity requirement even a slight amount of creativity will suffice.  Id.  *A World of Babies* contains information about infant care practices in different societies in the style of a childcare manual [Pls. Ex. 147].  Cambridge, in soliciting a copyright registration, declared that *A World of Babies* is an original work and nothing in the evidence indicates otherwise.  The Court finds that the book easily meets the creativity requirement.  Therefore, the Court finds that *A World of Babies* is copyrightable and the first prong of the prima facie case of copyright infringement has been satisfied.

Defendants contend that Plaintiffs have failed to establish a prima facie case of infringement for page 27, the excerpt from chapter one, which was authored by Judy DeLoache and Alma Gottlieb.  Plaintiffs have produced evidence of an author agreement with Alma Gottlieb, assigning her copyright interest in the chapter to Oxford [Pls. Ex. 150], but Defendants point out that there is no evidence of a similar assignment by the other author, Judy DeLoache.

However, one joint author may properly license the copyright in a joint work to a third party.  In Community for Creative Non-

<u>Violence v. Reid</u>, 846 F.2d 1485 (D.C. Cir. 1988) (opinion by Judge
Ruth Bader Ginsburg), <u>aff'd</u>, 490 U.S. 730 (1989), the Court held that
"Joint authors co-owning copyright in a work 'are deemed to be
tenants in common,' with 'each having an independent right to use or
license the copyright, subject only to a duty to account to the other
co-owner for any profits earned thereby.'" 846 F.2d at 1498 (quoting
William Patry, Latman's The Copyright Law 122 (6th ed. 1986)). Thus,
author Gottlieb's grant to Cambridge of her "full copyright in the
contribution throughout the world" also conveyed to Cambridge the
authorship rights of her co-contributor [Pls. Ex. 150].

Plaintiffs have provided evidence of the agreement between the
editors and Cambridge assigning the editors' copyright. They have
also provided a proper copyright assignment from the author of the
other excerpt at issue [Pls. Ex. 149]. Thus, Plaintiffs have
satisfied the first prong of the prima facie case of copyright
infringement for both page 27 and pages 91-112. A copy of these
excerpts from *A World of Babies* was uploaded to Georgia State's ERES
system, satisfying the second prong of the prima facie case of
copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *A World of
Babies* was used by a nonprofit educational institution for the
nonprofit, educational purposes of teaching and scholarship. Free
copies were provided for the exclusive use of students in Professor
Whitten's class. The first factor weighs strongly in favor of
Defendants.

As to the second element of fair use, *A World of Babies*
discusses children in different cultures. Each chapter is written in

-321-

the style of a purported childcare manual. The chapters are "solidly based on research on the societies represented in them" [Pls. Ex. 147 at xv] but are creatively expressed. The book is intended to demonstrate that there are many models of raising children. *A World of Babies* is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Whitten uploaded 23 protected pages, which were part of one chapter and one page of another chapter to ERES. Because the work contains less than ten chapters, Professor Whitten should have adhered to a limit of ten percent of the protected pages of the book. The amount she copied represents 7.85% of the work, which is a decidedly small amount. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Whitten's use of *A World of Babies* affected the market for purchasing the book as a whole. Students would not pay $30.99 for the entire book (or $55.99 for the hardcover version) when only 23 pages were required reading for Professor Whitten's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *A World of Babies* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Whitten and her students caused very small, but actual, damage to the value of Cambridge's copyright. In addition, widespread use of similar

-322-

unlicensed excerpts could cause substantial harm. Cambridge lost permissions income. Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing all four factors together, the Court finds that Defendants have met their burden of proving that Professor Whitten's use of *A World of Babies* was a fair use under the Copyright Act. Thus, this claim of copyright infringement fails.


### V.   Professor Harvey

Professor Harvey is a Professor in the Sociology Department at Georgia State [Pls. Ex. 530].

#### SOCI 8030 Social Theory I, Fall 2009

SOCI 8030 is a graduate level course focused on analysis of classical social theory [Pls. Ex. 530]. Sixteen students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-93]. According to the syllabus, there were two required textbooks for the course; additional required readings were made available online through ERES [Pls. Ex. 530].

#### 72.  *The Power Elite (New Edition)*

*The Power Elite* was first published by Oxford in 1956 [Pls. Ex. 450]. It is a fifteen chapter, 448 page work authored by C. Wright Mills that critiques the organization of power in the United States [Pls. Ex. 448]. It was written originally for general audiences, but has been used frequently in college sociology courses. At issue here is the new edition of the work, which contains a new afterword by Alan Wolfe and was published by Oxford in 2000 [Pls. Ex. 450]. This book retails for $19.95 in paperback [Jt. Ex. 5 at D-93]. The net sales revenue from date of first publication in 2000 through

-323-

November 7, 2010 was $232,467.00 [Pls. Ex. 357]. Licensed digital excerpts of the book were available through CCC in 2009. From July 1, 2004 until December 1, 2010, the new edition of *The Power Elite* earned $315.59 in ECCS permissions revenue [Pls. Ex. 451]. It also earned $4,645.89 in APS revenues.

Professor Harvey requested that pages 269-297 and 298-324, or two full chapters totaling 12.50% of the work, be posted on ERES for distribution to students in her SOCI 8030 course [Jt. Ex. 5 at D-93]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $91.39 in net revenue from permissions.[135]  The cost to students would have been $110.52.

### Prima Facie Case of Copyright Infringement

The new edition of *The Power Elite* was published by Oxford on February 17, 2000; Oxford did not obtain a certificate of copyright registration until December 30, 2008 [Pls. Ex. 450].  17 U.S.C. § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c).  Accordingly, because the certificate of registration for *The Power Elite* was not made before or within five years after the first date of publication, the prima facie presumption of originality does not exist.  Instead, the Court must

---

[135]The amount earned would have been $110.52, the amount charged by CCC, [Jt. Ex. 5 at D-93], less the $3.00 service fee charged by CCC to users, less $16.13 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

use its discretion to determine the copyrightability/originality of *The Power Elite*.

To qualify for copyright protection, a work must be the author's original work. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547-49 (1985). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). To meet the creativity requirement even a slight amount of creativity will suffice. Id. *The Power Elite* contains analysis and criticism of the power structures in the United States [Pls. Ex. 448]. Oxford, in soliciting a copyright registration, declared that *The Power Elite* is an original work and nothing in the evidence indicates otherwise. The Court finds that the book meets the originality requirement and is copyrightable.

However, the copyright registration in evidence for *The Power Elite* is the one covering the second edition, in which the only new material was the afterword [Pls. Ex. 450]. This registration certificate states that the original text of the book written by the author, C. Wright Mills, is excluded from this copyright claim [Pls. Ex. 450]. The excerpt assigned and copied by Professor Harvey was taken from the text written by the author and is not covered by the copyright registration in evidence [Jt. Ex. 5 at D-93]. Although the copyright registration for the 1956 original edition of *The Power Elite* is not in evidence, in their Findings of Fact and Conclusions of Law, as well as in Joint Exhibit 5, Defendants do not contend that the relevant copyright registration is not in evidence; Defendants object to the copyright in this work only on the basis of the lack of

-325-

five-year statutory presumption of copyrightability [Doc. 411; Jt. Ex. 5 at D-93]. It appears from Joint Exhibit 5 that the copyright registration number for the original edition of *The Power Elite* is A00000236642 [Jt. Ex. 5 at D-93]. Thus, the Court finds that Oxford owns a valid copyright in *The Power Elite*, satisfying the first prong of the prima facie case of copyright infringement.

A copy of an excerpt from The Power Elite was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Power Elite* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Harvey's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Power Elite* is a non-fiction work that contains social criticism and analysis of the organization of power in the United States. *The Power Elite* is informational in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Harvey uploaded 56 protected pages, which was two full chapters or 12.50% of the pages in the book, to ERES. Because the work contained more than ten chapters, Professor Harvey should have adhered to a limit of one chapter; the amount copied was not decidedly small. The third factor weighs in favor of Plaintiffs.

-326-

As to the fourth fair use factor, effect on the market, the
Court first looks to whether Professor Harvey's use of *The Power
Elite* affected the market for purchasing the book as a whole.
Students would not pay $19.95 for the entire book when only 12.50% of
it was required reading for Professor Harvey's course.  Neither would
a professor require students to purchase the entire book in such an
instance.  Therefore, the Court rejects any argument that the use of
the excerpt from *The Power Elite* had a negative effect on the market
for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a
ready market for licensed digital excerpts of this work in 2009
through CCC.  The unpaid use of the excerpt by Professor Harvey and
her students caused very small, but actual, damage to the value of
Oxford's copyright.  In addition, widespread use of similar
unlicensed excerpts could cause substantial harm.  Oxford lost
permissions income.  Factor four strongly favors Plaintiffs.

A review of the fair use factors in this case shows that factor
one strongly favors Defendants, factor two favors Defendants, factor
three favors Plaintiffs, and factor four strongly favors Plaintiffs.
The Court will therefore conduct a further analysis of the data in
the record to determine the outcome of the fair use defense.

Revisiting the factor three analysis, the Court finds that the
initial analysis understates the degree to which factor three favors
Plaintiffs.  The Court's reasoning is as follows.  From the content
of the book, the Court infers that *The Power Elite* was not originally
written as a strictly academic book, though it has been used
extensively in college courses, particularly sociology courses.  This

book is best classified as a trade book, meaning it was a book for a general readership. The arrangement of the material in the book is sequential; each chapter leads to the next.

The material Professor Harvey assigned for reading on ERES was chapter twelve, entitled "The Power Elite," and chapter thirteen, "The Mass Society." In the Court's opinion, these selections are the heart of the work in that they essentially sum up the ideas in the book. The first ten chapters of The Power Elite describe the powerful groups that Mills believed dominated the socio-political structure of the United States in 1956 (the date of publication of the original work). Chapter twelve argues that these groups have coalesced into a powerful structure which, through its most influential representatives, are able to direct public policy and political affairs. These individuals act in the interest of those they represent, not in the public interest. Chapter thirteen, entitled "The Mass Society," argues that while the citizenry is classically described as the seat of power in politics, modern society (in 1956)[136] is increasingly stratified; the power elite rule, the middle class is stalemated and at the bottom a mass society has emerged which is passive and increasingly powerless. Thus, there is no real democracy.

Because the chapters Professor Harvey selected were "the heart of the work," the excerpt has greater value in relation to the book

---

[136]The new afterword in the 2000 edition, by Alan Wolfe, is a retrospective critique of The Power Elite. He credits The Power Elite as a contemporary classic, but points out that some of Mills's predictions did not come true and that Mills's outrage at the anti-democratic nature of the American politic was simplistic and overstated.

as a whole, causing fair use factor three to favor Plaintiffs to a greater degree than in the Court's initial analysis.

After considering the foregoing, the Court finds that the overall four factor fair use analysis favors Plaintiffs' position. Accordingly, the Court finds that Defendants have not met their burden of proving that Professor Harvey's use of *The Power Elite (New Edition)* was a fair use under the Copyright Act. Thus, this claim of copyright infringement succeeds.

### W. <u>Professor Ohmer</u>

Professor Mary Ohmer is a professor in the School of Social Work at Georgia State [Pls. Ex. 522].

#### <u>SW 8200 Evaluation and Technology, Fall 2009</u>

SW 8200 is a course that addresses the role of evaluation and technology in the modern social work practice environment [Pls. Ex. 522]. Forty two students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-98]. According to the syllabus, there were two required textbooks for the course; additional required readings were made available online through ERES [Pls. Ex. 522].

73. *The Sage Handbook of Qualitative Research (Second Edition)*

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265]. It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters analyze the theory and practice of qualitative research [Pls. Ex. 265]. There is conflicting evidence in the record as to the retail price for *The Sage Handbook of Qualitative Research (Second Edition)*; the parties alternatively assert that it retails

for $156.00 and for $175.00 [Jt. Ex. 5 at D-19, D-23, D-98]. There is also conflicting evidence as to whether *The Sage Handbook of Qualitative Research (Second Edition)* is out of print [Jt. Ex. 5 at D-19, D-23, D-98].

In 2009, the book had $0.00 in net sales revenue, but it has earned $1,300,053.54 in total net sales revenue [Pls. Ex. 283]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in ECCS permissions revenue [Pls. Ex. 286].[137] In addition, licensed excerpts of this work are available directly from Sage; the book has earned $58,904.47[138] through Sage's in-house permissions program [Pls. Ex. 283].

Professor Ohmer requested that pages 803-820 of *The Sage Handbook of Qualitative Research (Second Edition)* be uploaded to ERES for distribution to students in her SW 8200 course as required reading [Pls. Ex. 522]. The excerpt was one chapter of the book totaling eighteen pages, or 1.58% of the total work [Pls. Ex. 265]. The excerpted chapter was entitled "Software and Qualitative Research" and authored by Eben A. Weitzman. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have

---

[137]These amounts represents permissions income only for the second edition of this work. Plaintiffs asserted a higher amount, but that number aggregates the income from multiple editions of the work.

[138]The amount asserted by Plaintiffs for this work is higher than the amount reported here. The Court is unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documentary evidence.

earned less than $89.96 in net revenue from permissions income.[139] The cost to students would have been $108.84.

### Prima Facie Case of Copyright Infringement

Defendants do not contest that the Plaintiffs have adequately established a prima facie case of copyright infringement for this work [Doc. 411 at 27-28]. Sage owns a valid copyright, registered in its name, in *The Sage Handbook of Qualitative Research (Second Edition)* [Pls. Ex. 282], satisfying the first prong of the prima facie case of copyright infringement. A copy of an excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

### The Fair Use Defense

As to the first element of fair use, an excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Ohmer's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *The Sage Handbook of Qualitative Research (Second Edition)* is a non-fiction work presenting research and analysis concerning the theory and practice of qualitative research. It is an academic work that is

---

[139]The amount earned would have been $108.84, the amount charged by CCC, [Jt. Ex. 5 at D-98], less the $3.00 service fee charged by CCC to users, less $15.88 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

informational in nature. The second fair use factor favors
Defendants.

As to the third fair use factor, Professor Ohmer uploaded one
chapter of *The Sage Handbook of Qualitative Research (Second
Edition)*. This represents eighteen pages or 1.58% of the total work.
Because the work contained more than ten chapters, Professor Ohmer
properly adhered to the one chapter limit; the amount copied was
decidedly small. The third factor weighs in favor of Defendants.

As to the fourth fair use factor, effect on the market, the
Court first looks to whether Professor Ohmer's use of *The Sage
Handbook of Qualitative Research (Second Edition)* affected the market
for purchasing the book as a whole. Students would not pay $156.00
or $175.00 for an entire book when only eighteen pages were required
reading for Professor Ohmer's course. Neither would a professor
require students to purchase the entire book in such an instance.
The sales revenue for *The Sage Handbook of Qualitative Research
(Second Edition)* in 2009 was $0.00, and the book may currently be out
of print. Therefore, the Court rejects any argument that the use of
the excerpt from *The Sage Handbook of Qualitative Research (Second
Edition)* had a negative effect on the market for purchase of the book
itself.

Plaintiffs produced evidence demonstrating that there was a
ready market for licensed digital excerpts of this work in 2009
through CCC and through Sage's in-house program. The unpaid use of
the excerpt by Professor Ohmer and her students caused very small,
but actual, damage to the value of Sage's copyright. In addition,
widespread use of similar unlicensed excerpts could cause substantial

harm.  Sage lost permissions income.  Factor four strongly favors Plaintiffs.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have met their burden of proving that Professor Ohmer's use of *The Sage Handbook of Qualitative Research (Second Edition)* was a fair use under the Copyright Act.  Thus, this claim of copyright infringement fails.

74. *Utilization-Focused Evaluation: The New Century Text (Third Edition)*

*Utilization-Focused Evaluation (Third Edition)* was first published by Sage in 1996 [Pls. Ex. 318].  It is a 447 page, fifteen chapter work written by Michael Quinn Patton that advocates user-based evaluation of government and institutional programs.  It prescribes standards and evaluation methods [Pls. Ex. 316].  The third edition of *Utilization-Focused Evaluation* retails for $115.00 in hardcover and $77.95 in paperback, but is currently out of print[140] [Jt. Ex. 5 at D-99].  The net sales revenue from the date of first publication through 2010 was $812,595.44 [Pls. Ex. 319].  By 2007, sales had virtually ceased.  However, permissions income continued to accrue from both CCC permissions and Sage's in-house program.  Licensed digital excerpts of the book were available through CCC in 2009.  From July 1, 2004 until December 1, 2010, *Utilization-Focused Evaluation* earned $2,688.92 in ECCS permissions revenue[141] [Pls. Ex. 320].  In addition, licensed digital excerpts were available through Sage's in-house permissions program in 2009; the third edition of the

---

[140]In 2008, the fourth edition of the book was published.

[141]This amount of ECCS revenue may include permissions fees earned by earlier editions of the book.

book has earned $15,490.85[142] through in-house licensing permissions revenue [Pls. Ex. 319].

Professor Ohmer requested that pages 2-38 of *Utilization-Focused Evaluation* be uploaded to ERES for distribution to students in her fall 2009 SW 8200 course [Pls. Ex. 522].  The excerpt included two full chapters of the book and totaled 37 pages, or 8.28% of the total work [Pls. Ex. 316].  These chapters were assigned as required reading [Pls. Ex. 522].  Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $189.92 in net revenue.[143]  The cost to students would have been $226.44.

Prima Facie Case of Copyright Infringement

Defendants do not contest that the Plaintiffs have adequately established a prima facie case of copyright infringement for *Utilization-Focused Evaluation* [Doc. 411 at 27-28].  Sage owns a valid copyright, registered in its name, in *Utilization-Focused Evaluation* [Pls. Ex. 318], satisfying the first prong of the prima facie case of copyright infringement.  A copy of an excerpt from *Utilization-Focused Evaluation* was uploaded to Georgia State's ERES system, satisfying the second prong of the prima facie case of copyright infringement.

---

[142]The amount asserted by Plaintiffs for this work is higher than the amount reported here.  The Court was unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documentary evidence provided at trial.

[143]The amount earned would have been $226.44, the amount charged by CCC, [Jt. Ex. 5 at D-99], less the $3.00 service fee charged by CCC to users, less $33.52 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the author.

<u>The Fair Use Defense</u>

As to the first element of fair use, an excerpt from *Utilization-Focused Evaluation* was used by a nonprofit educational institution for the nonprofit, educational purposes of teaching and scholarship. Free copies were provided for the exclusive use of students in Professor Ohmer's class. The first factor weighs strongly in favor of Defendants.

As to the second element of fair use, *Utilization-Focused Evaluation* is a non-fiction work that discusses program evaluations. The chapters are factual in nature. The second fair use factor favors Defendants.

As to the third fair use factor, Professor Ohmer uploaded two chapters of *Utilization-Focused Evaluation*. This represents 37 pages or 8.28% of the total work. Because the work contained more than ten chapters, Professor Ohmer should have adhered to a limit of one chapter; the amount copied was not decidedly small. The third factor weighs in favor of Plaintiffs.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Ohmer's use of *Utilization-Focused Evaluation* affected the market for purchasing the book as a whole. The parties state in their joint exhibit that the book is currently out of print, so students could not have purchased a copy. Therefore, the Court rejects any argument that the use of the excerpt from *Utilization-Focused Evaluation* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program. The unpaid use of

-335-

the excerpt by Professor Ohmer and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly favors Plaintiffs.

A review of the fair use factors in this case shows that factor one strongly favors Defendants, factor two favors Defendants, factor three favors Plaintiffs, and factor four strongly favors Plaintiffs. The Court will therefore conduct a further analysis of the data in the record to determine the outcome of the fair use defense.

The Court finds that upon revisiting the factor four analysis, an adjustment favoring Plaintiffs' position is warranted. The Court's reasoning is as follows. The original version of *Utilization-Focused Evaluation* was published in 1978. A second edition was published in 1986; the third edition, at issue here, was published in 1996, and a fourth edition was published in 2008. The third edition retailed for $115.00 in hardcover and $77.95 in paperback. It was out of print in 2009, but a copy could have been obtained at an extra charge.

With respect to the third edition, the documentary evidence shows that book sales began with revenues of $7,993.02 in 1996 and $83,394.21 in 1997.[144] Book sales remained sustained in the $60,000 to $90,000 range every year until 2009. In addition to book sales, the third edition earned permissions fees of $1,268.93 in 2008 through Sage's in-house program, $1,853.66 in 2009, and $1,390.77 in

---

[144]These revenue amounts reflect sales of both the hardcover and paperback versions of the text [Pls. Ex. 319].

2010 [Pls. Ex. 319]. The total in-house permissions fees earned by all editions of the book is $15,490.85 [Pls. Ex. 319]. It also earned $2,688.92 in fees from CCC for licensed digital excerpts and $1,671.61 in APS revenues [Pls. Ex. 320].

From this data, the Court finds that permissions, particularly Sage's in-house permissions, are an important part of the value of the copyright for the *Utilization-Focused Evaluation* series. There is significant demand for excerpts from this series, thereby increasing the likelihood of repetitive unlicensed use. This determination strengthens the factor four analysis in Plaintiffs' favor.

After considering all four fair use factors and weighing them together, the Court finds that Defendants have not met their burden of proving that Professor Ohmer's use of *Utilization-Focused Evaluation (Third Edition)* was a fair use under the Copyright Act. Thus, this claim of copyright infringement succeeds.


**V.   Did Georgia State's 2009 Copyright Policy Cause Infringement of Plaintiffs' Copyrights?**

Of the 99 alleged infringements that Plaintiffs maintained at the start of trial, only 75 were submitted for post-trial findings of fact and conclusions of law. This Order concludes that the unlicensed use of five excerpts (of four different books) infringed Plaintiffs' copyrights. The question now is whether Georgia State's 2009 Copyright Policy caused those infringements. The Court finds that it did, in that the policy did not limit copying in those instances to decidedly small excerpts as required by this Order. Nor did it proscribe the use of multiple chapters from the same book.

-337-

Also, the fair use policy did not provide sufficient guidance in determining the "actual or potential effect on the market or the value of the copyrighted work," a task which would likely be futile for prospective determinations (in advance of litigation). The only practical way to deal with factor four in advance likely is to assume that it strongly favors the plaintiff-publisher (if licensed digital excerpts are available).

The Court does believe that Defendants, in adopting the 2009 policy, tried to comply with the Copyright Act. The truth is that fair use principles are notoriously difficult to apply. Nonetheless, in the final analysis Defendants' intent is not relevant to a determination whether infringements occurred. Accordingly, Plaintiffs are entitled to prevail on the following infringement claims:

<u>Maymester 2009</u>:

- *The Sage Handbook of Qualitative Research (Third Edition)* (Professor Kaufmann, EPRS 8500 Qualitative/Interpretive Research in Education I)

<u>Summer 2009</u>:

- *The Sage Handbook of Qualitative Research (Second Edition)* (Professor Kaufmann, EPRS 8510 Qualitative Research in Education II – Data Collection)

<u>Fall 2009</u>:

- *The Sage Handbook of Qualitative Research (Third Edition)* (Professor Kaufmann, EPRS 8500 Qualitative/Interpretive Research in Education II)

- *The Power Elite* (Professor Harvey, SOCI 8030 Social Theory I)

- *Utilization-Focused Evaluation (Third Edition)* (Professor Ohmer, SW 8200 Evaluation and Technology)

With respect to the remaining 94 infringement claims, Defendants are entitled to prevail.

## VI. **Relief To Be Granted**

In light of the findings of fact and conclusions of law contained in this Order, Plaintiffs are DIRECTED to file, within twenty (20) days of entry of this Order, the proposed text of any injunctive and declaratory relief they seek, together with the rationale supporting their request. Alternative proposals are acceptable. Defendants may state their opposition, if any, and may propose one or more alternative orders, within fifteen (15) days after Plaintiffs' filing. If Defendants object to Plaintiffs' proposal(s) or if Defendants suggest one or more alternative order(s), the rationale shall be stated. These filings shall not exceed thirty (30) pages each.

## VII. **Costs and Attorneys' Fees**

Section 505 of the Copyright Act, 17 U.S.C. § 505 provides:

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

Both sides have requested an award of costs and attorneys' fees [Doc. 1 at 29; Doc. 415 at 47 n.18; Doc. 411 at 61-62]. Consideration of these requests will be deferred until further order of the Court.

-339-

The Clerk is DIRECTED to re-submit the file thirty six (36) days after entry of this Order.

SO ORDERED, this __11__ day of May, 2012.

_____
ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

| **Cambridge** | | | | |
|---|---|---|---|---|
| **Work** | **Publica-tion Date** | **APS Income** (Pls. Ex. #) (7/1/2004-12/1/2010) | **ECCS Income** (Pls. Ex. #) (7/1/2004-12/1/2010) | **Net Sales Revenue** (Pls. Ex. #) (through 10/31/2010) |
| *Pronunciation Games* | 1995 (U.K.) 1996 (U.S.) | None | None | £445,283 (141) |
| *Keep Talking:  Communicative Fluency* | 1985 | $118.87 (118) | None | £616,445 (117) |
| *More Grammar Games* | 1995 | None | None | £318,880  (137) |
| *Grammar Practice Activities* | 1988 (U.K.) 1989 (U.S.) | None | None | £67,653 (data for second ed.) (102) |
| *Five Minute Activities* | 1992 | None | None | £928,564  (93) |
| *Liszt: Sonata in B Minor* | 1996 | None | None | £19,322 (133) |
| *The Cambridge Companion to Mendelssohn* | 2004 | $20.66 (70) | None | £24,826 (69) |
| *The Cambridge Companion to Schumann* | 2007 | None | None | £27,866 (78) |
| *The Cambridge Companion to Beethoven* | 2000 | $163.86 (58) | $60.69 (58) | £65,231 (57) |
| *Ancient Egyptian Materials* | 2000 | $241.49 (14) | None | £170,793 (13) |
| *Criterion-Referenced Language Testing* | 2002 | None | None | £38,033 (88) |
| *Assessing Grammar* | 2004 | $125.67 (19) | None | £40,163 (18) |
| *Assessing Reading* | 2000 | $161.27 (33) | None | £86,464  (32) |
| *Assessing Listening* | 2001 | $158.36 (28) | None | £63,567  (27) |
| *Assessing Language for Specific Purposes* | 1999 (U.K.) 2000 (U.S.) | None | None | £48,384 (23) |
| *Assessing Speaking* | 2004 | $72.93 (38) | None | £58,893 (37) |
| *Learning Vocabulary in Another Language* | 2001 | $214.74 (129) | None | £151,583 (128) |
| *Assessing Vocabulary* | 2000 | $31.98 (48) | None | £62,861 (47) |
| *Assessing Writing* | 2002 | None | None | £65,392 (42) |
| *International Health Organisations* | 1995 | $52.62 (113) | None | £16.284 (112) |
| *A History of Feminist Literary Criticism* | 2007 | $11.97 (107) | None | £45,357  (106) |
| *Understanding Trauma* | 2007 | None | None | £33,629 (146) |
| *Language Acquisition and Conceptual Development* | 2001 | $257.43 (124) | $669.39 (124) | £456 (123) |
| *The Cambridge History of China  (Vol. 8 Pt. 2)* | 1998 | None | None | £155,433 (83) |
| *A World of Babies* | 2000 | $1,382.01 (153) | $62.99 (153) | £99,831 (152) |

## Oxford

| Work | Publica-tion Date | APS Income (7/1/2004 - 12/1/2010) (Pls. Ex. #) | ECCS Income (7/1/2004 - 12/1/2010) (Pls. Ex. #) | Net Sales Revenue (through 11/7/10) (Pls. Ex. 357 & 366) |
|---|---|---|---|---|
| *Newspapers* | 1993 | None | None | $21,079.00 |
| *Role Play* | 1987 | None | None | $23,858.00 |
| *The Craft of Inquiry* | 1998 | $188.62 (375) | $12.36 (375) | $86,325.00 |
| *Awakening Children's Minds* | 2001 | none | $140.55 (358) | $130,628.78 |
| *The Music of Berlioz* | 2001 | None | None | 9580 |
| *The Slave Community* | 1972 | $10,732.20 (463) | $191.55 (463) | $1,602,935.00 |
| *Fundamental Considerations in Language Testing* | 1990 | $555.68 (409) | none | £151,242.15 |
| *Language Testing in Practice* | 1996 | $5.51 (422) | $99.46 (422) | £169,112.15 |
| *Evolution of Infectious Disease* | 1994 | None | None | £222,038.50 |
| *Approaches to Qualitative Research* | 2004 | $131.29 (353) | $172.59 (353) | None |
| *Film Language* | 1974 | $248.48 (394) | $119.24 (394) | $21,406 |
| *Region, Race and Reconstruction* | 1982 | $1,835.73 (457) | $622.80 (457) | $2,199 |
| *The Unpredictable Past* | 1993 | $701.05 (480) | None | $79,367.92 |
| *Living Ethics* | 2008 | $114.24 (426) | None | $37,875.00 |
| *The Organ as a Mirror of its Time* | 2002 | None | None | $55,831.00 |
| *North German Church Music* | 1996 | None | None | $24,766.00 |
| *Crabgrass Frontier* | 1985 | $2,876.08 (371) | $94.25 (371) | $741,148.99 |
| *The Politics of Public Housing* | 2004 | None | None | $45,254.40 |
| *Regimes and Democracy in Latin America* | 2007 | $348.33 (454) | None | $12,972.45 |
| *Behavior, Society and Nuclear War* | 1989 | $193.80 (362) | $151.98 (362) | $29,712.00 |
| *The Power Elite* | 1956 | $4,645.89 (451) | $315.59 (451) | $233,350.31 |

| **Sage** | | | | | |
|---|---|---|---|---|---|
| **Work** | **Publica-tion Date** | **APS Income** (7/1/2004-12/1/2010) (Pls. Ex. #) | **ECCS Income** (7/1/2004-12/1/2010) (Pls. Ex. #) | **In-House Permissions Income** (from date of publication) (Pls. Ex. #) | **Net Sales Revenue** (Pls. Ex. #) |
| *Handbook of Feminist Research* | 2007 | None | None | $983.46 (248) | $94,085.88 (248) |
| *Handbook of Social Theory* | 2001 | $504.90 (292) | None | £2,470.01 (291) | £63,483.74 (291) |
| *The Sage Handbook of Qualitative Research (Third)* | 2005 | $2,042.34 (287) | $1,131.86 (287) | $18,711.95 (283) | $1,327,804.06 (283) |
| *The Sage Handbook of Qualitative Research (Second)* | 2000 | $10,351.40 (286) | $6,324.61 (286) | $58,904.47 (283) | $1,300,053.54 (283) |
| *Handbook of Critical and Indigenous Methodologies* | 2008 | $37.84 (238) | $138.04 (238) | $383.15 (237) | $161,204.62 (237) |
| *Qualitative Research Practice* | 2004 | $208.09 (304) | $192.78 (304) | £65.78 (302) + $119 (303) | $74,005.82 (302) |
| *Handbook of Narrative Inquiry* | 2007 | $94.08 (264) | $18.52 (264) | $437.28 (262) | $131,515.66 (262) |
| *Inside Interviewing* | 2003 | $26.58 (297) | None | $482.18 (296) | $23,474.26 (296) |
| *Handbook of Ethnography* | 2001 | $694.77 (242) | $413.03 (242) | £195.29 (241) | $75,826.44 (241) |
| *The Sage Handbook of Qualitative Research (First)* | 1994 | $5,672.22 | $4,632.40 | $10,934.62 | None |
| *African American Single Mothers* | 1995 | $151.47 (208) | $782.14 (208) | $2,841.57 (206, 207) | $53,007.84 (206) |
| *Black Children (Second)* | 2002 | $819.40 (216) | $116.03 (216) | $1,237.63 (214, 215) | $104,828.72 (214) |
| *Black Families (Third)* | 1997 | $1,217.87 (224) | $931.60 (224) | $3,561 (222) | $144,388.03 (222) |
| *Theoretical Frameworks in Qualitative Research* | 2006 | None | None | $138.61 (308, 309) | $75,320.69 (308) |
| *Handbook of Mixed Methods* | 2003 | $1,033.78 (256) | $51.41 (256) | $2,825.86 (255) | $391,077.68 (255) |
| *Contemporary Cases in U.S. Foreign Policy* | 2005 | $415.16 (230) | None | $333.81 (314) | $365,751.22 (314) |
| *U.S. Foreign Policy: The Paradox of World Power* | 2005 | $137.70 (315) | None | $285.33 (314) | $738,238.89 (314) |
| *Utilization-Focused Evaluation (Third)* | 1997 | $1,671.61 (321) | $2,688.92 (321) | $15,490.85 (319) | $812,595.44 (319) |