DURIE TANGRI LLP
DARALYN J. DURIE (*Pro Hac Vice*)
ddurie@durietangri.com
JOSEPH C. GRATZ (*Pro Hac Vice*)
jgratz@durietangri.com
DAVID McGOWAN (*Pro Hac Vice*)
dmcgowan@durietangri.com
GENEVIEVE P. ROSLOFF (*Pro Hac Vice*)
grosloff@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     415-362-6666
Facsimile:     415-236-6300

Attorneys for Defendant
Google Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES, JOSEPH GOULDEN, and JIM BOUTON, on behalf of themselves and all other similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOOGLE INC.,<br><br>        Defendant. | Civil Action No. 05 CV 8136 (DC)<br><br>**ECF Case** |

## DEFENDANT GOOGLE INC.'S
## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR IN
## THE ALTERNATIVE SUMMARY ADJUDICATION

TABLE OF CONTENTS

PAGE NO.

I.      INTRODUCTION ...................................................................................... 1

II.     SUMMARY OF UNDISPUTED FACTS ................................................. 4

        A.      Google's Effort To Improve Over Previous Methods Of Indexing Books..............5

        B.      The Google Books Project .......................................................................6

                1.      Book Scanning and Indexing .............................................6

                2.      The Books in the Corpus.....................................................7

                3.      Display of Text ....................................................................7

                4.      Uses of Google Books .......................................................12

                5.      Copies Downloaded by Libraries........................................15

        C.      Browsing Books Promotes Sales .............................................17

III.    ARGUMENT .......................................................................................... 18

        A.      The Purpose of Copyright, and of Fair Use, is to Encourage Learning and
                Benefit the Public..........................................................................19

        B.      Google Books' Use Of Books Is Fair. .............................................20

                1.      Scanning books and displaying small portions thereof in response
                        to search queries, for the purpose of helping users find books of
                        interest, is highly transformative........................................20

                        a.      Google Books transforms expressive text into a word
                                index.........................................................................21

                        b.      Google's status as a commercial entity does not tip the
                                scales against a finding of fair use .................................23

                2.      The works at issue are all published, but are otherwise of every
                        conceivable "nature."...................................................................25

                3.      Google's scanning of the entire book is necessary to create a full-
                        text index, and Google displays only as much of the book as is
                        necessary to allow the user to determine whether the book is of
                        interest....................................................................................26

                4.      Scanning and snippet display has no negative effect on any
                        cognizable market. ...................................................................28

                        a.      Google Books does not substitute for the book itself ..................28

b.      There is no market for Google's uses ..........................................29

5.      Google Books Creates a Significant Public Benefit. ................................31

6.      Google Books is a fair use. ..........................................................32

C.      The undisputed facts show that Plaintiffs' claim for infringement of the distribution right with respect to library copies fails. ..............................................32

1.      Google's conduct with respect to the library copies is fair use. ...............33

2.      In any event, the library copies do not involve any distribution "to the public." ........................................................................35

3.      The libraries created and downloaded the library copies, and Google did not engage in any volitional acts constituting public distribution. ..........................................................................36

IV.     CONCLUSION ..................................................................... 39

TABLE OF AUTHORITIES

PAGE NO(S).

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms,*
    562 F.3d 630 (4th Cir. 2009) ................................................................. 21, 30

*Am. Geophysical Union v. Texaco Inc.,*
    60 F.3d 913 (2d Cir. 1994) ......................................................................... 29

*Arica Inst., Inc. v. Palmer,*
    970 F.2d 1067 (2d Cir. 1992) ..................................................................... 26

*Arista Records, LLC v. Doe 3,*
    604 F.3d 110 (2d Cir. 2010) ....................................................................... 38

*Atl. Recording Corp v. Howell,*
    554 F. Supp. 2d 976 (D. Ariz. 2008) .......................................................... 38

*Atl. Recording Corp. v. Brennan,*
    534 F. Supp. 2d 278 (D. Conn. 2008) ......................................................... 39

*Baker v. Selden,*
    101 U.S. 99 (1879) ..................................................................................... 19

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006) ................................................................ *passim*

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006) ................................................................ *passim*

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) ............................................................................ *passim*

*Capitol Records, Inc. v. Thomas,*
    579 F. Supp. 2d 1210 (D. Minn. 2008) .................................................. 38, 39

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d Cir. 2008) ................................................................ *passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,*
    150 F.3d 132 (2d Cir. 1998) ................................................................. 24, 30

*Elektra Entertainment Group, Inc. v. Barker,*
    551 F. Supp. 2d 234 (S.D.N.Y. 2008) ........................................................ 39

*Feist Publications, Inc. v. Rural Telephone Service Co.,*
    499 U.S. 340 (1991) ................................................................................... 19

*Harper & Row, Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985) ............................................................................. 19, 26

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2003) ....................................................... 22, 23, 26, 27

*London-Sire Records, Inc. v. Doe 1*,
   542 F. Supp. 2d 153 (D. Mass. 2008) ........................................................ 39

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253 (2d Cir. 1986) .................................................................... 24

*MCA, Inc. v. Wilson*,
   677 F.2d 180 (2d Cir. 1981) ...................................................................... 28

*NXIVM Corp. v. Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004) ...................................................................... 24

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ............................................................ *passim*

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ............................................................... 1, 26, 28, 34

*Stewart v. Abend*,
   495 U.S. 207 (1990) ................................................................................. 25

*The Authors Guild, Inc. v. HathiTrust*,
   No. 11-cv-6351-HB (S.D.N.Y. filed Sep. 12, 2011) ................................ 33

*Twentieth Century Music Corp.* v. *Aiken*,
   422 U.S. 151 (1975) ................................................................................. 31

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
   292 F.3d 512 (7th Cir. 2002) .................................................................... 27

*Wolk v. Kodak Imaging Network, Inc.*,
   No. 10 Civ. 4135, 2012 WL 11270 (S.D.N.Y. Jan. 3, 2012) .................... 38

*Wright v. Warner Books*,
   953 F.2d 731 (2d Cir. 1991) ..................................................................... 30

**Statutes**

17 U.S.C. § 106(3) ......................................................................... 33, 35

17 U.S.C. § 107 ........................................................................... 1, 2, 20

17 U.S.C. § 107(1) ........................................................................ 20, 25

17 U.S.C. § 107(2) .............................................................................. 25

17 U.S.C. § 108 .................................................................................. 34

17 U.S.C. § 121 .................................................................................. 34

**Rules**

Fed R. Civ. P. 56(a) ............................................................................ 18

**Commentators**

Brian Lavoie and Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially In-copyright*
   *Print Books in Library Collections*, 15 D-LIB 11/12 (2009) ..................... 7

Maurice S. Lee, *Evidence, Coincidence, and Superabundant Information*, 54 VICTORIAN STUDIES 87 (2011) ................................................................................................ 13

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990) ................ *passim*

Jean-Baptiste Michel et al., *Quantitative Analysis of Culture Using Millions of Digitized Books*, 331 SCIENCE 176 (2011) ................................................................................ 14

Catherine Rampell, *The 'New Normal' Is Actually Pretty Old*, NEW YORK TIMES ECONOMIX BLOG (January 11, 2011) ...................................................................................... 14

Benjamin Schmidt, *The Foreign Language of Mad Men*, THE ATLANTIC (March 21, 2012) ...... 15

Uszkoreit et al., *Large Scale Parallel Document Mining for Machine Translation*, in PROCEEDINGS OF THE 23RD INTERNATIONAL CONFERENCE ON COMPUTATIONAL LINGUISTICS 1101 (2010) .............................................................................................. 15

**Court Documents**

Decl. Hal Poret Supp. Google Inc.'s Opp'n Plas.' Mot. Class Certification Ex. 1, ECF No. 1001-1 ................................................................................................ 18

HathiTrust Mot. Summ. J.,
*The Authors Guild v. HathiTrust*,
No. 11-cv-6351 (S.D.N.Y. June 29, 2012), ECF No. 112 ................................... 16, 33

Nat'l Fed'n of the Blind Mot. Summ. J.,
*The Authors Guild v. HathiTrust*,
No. 11-cv-6351 (S.D.N.Y. June 29, 2012), ECF No. 105 ................................... 16, 33

Pet. Def.-Pet'r Permission Appeal Pursuant Fed. R. Civ. P. 23(f),
*The Authors Guild Inc. v. Google Inc.*,
No. 12-2402 (2d Cir. June 14, 2012), ECF No. 1 ................................................ 19

## I.      INTRODUCTION

Google Books gives people a new and more efficient way to find books relevant to their interests.  The project makes tens of millions of library books searchable by words and phrases and (in some cases) returns snippets showing the context in which the user's search term appears. The tool is not a substitute for the books themselves—readers still must buy a book from a store or borrow it from a library to read it.  Rather, Google Books is an important advance on the card-catalogue method of finding books.  The advance is simply stated:  unlike card catalogues, which are limited to a very small amount of bibliographic information, Google Books permits full-text search, identifying books that could never be found using even the most thorough card catalog. Readers benefit by being able to find relevant books.  Authors benefit because their books can be more readily found, purchased, and read.  The public benefits from the increase of knowledge that results.

The heart of Plaintiffs' claim is that Google could not create those benefits without first obtaining permission from the authors of the books that were copied in the process of making the index.  That argument fundamentally misunderstands the copyright laws, which have "never accorded the copyright owner complete control over all possible uses of his work."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984).  "[C]opyright is not a natural right inherent in authorship."  Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1124 (1990).  If it were, the fair use privilege codified in 17 U.S.C. § 107 would not exist. Copyright is instead a "utilitarian concept," created entirely by statute.  *Id*.

Under that utilitarian statutory scheme, Google was not required to seek permission from authors:  if "the use is otherwise fair, then no permission need be sought or granted."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994).  The guiding principle in this case is not a natural right of authors to control their works:  no such right exists under United States law.

What matters instead is whether Google Books furthers the objectives of the copyright laws because of the public benefits (including benefits to authors) flowing from Google Books. *See id.* at 578. Those objectives and benefits must be considered in light of, among other things, the statutory fair use factors: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used, and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

Those statutory fair use factors strongly support a finding of fair use.

*First*, Google Books' purpose and character is highly transformative. Reproduction is transformative where the original work "is used as raw material, transformed in the creation of new information[.]" *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quoting Leval, *supra*, at 1124). Google made digital copies of books in order to create a searchable index linking each word found in any book to all books in which that word appears. That index provides a wealth of new information, allowing a user to find every book mentioning a particular topic or using a particular phrase together with up to three short snippets of text showing the context in which that term appears. Google Books does not in any way "supersede[] the objects of the original." *Campbell*, 510 U.S. at 578-79 (internal quotation marks omitted). Books exist to be read. Google Books exists to help readers find those books. Like a paper index or a card catalogue, it does not substitute for reading the books themselves, and Plaintiffs do not contend that it does.

*Second*, the Google Books corpus contains works of every type, and thus the nature of the works does not weigh one way or the other on a classwide basis. The only relevant common consideration is that all the books were published, which weighs in favor of a finding of fair use.

2

*Third*, Google copied no more of the books than was necessary to create a searchable index, and displays no more of the works than is necessary to allow readers to determine whether the book might be of interest to them.

*Fourth*, there is no reasonable dispute that Google Books benefits authors as a whole by helping members of the public locate and buy books.  The Authors Guild agrees that many authors benefit when excerpts of their works are displayed to potential readers.  Plaintiffs point to no economic harm flowing directly from scanning of the work, creation of the index, or display of snippets of text.  Instead, Plaintiffs speculate that if Google had not used their works without payment, they might have been able to charge for those uses, even though there is no licensing market in which authors are paid for the inclusion of books in indices or search results. The Second Circuit has rejected this circular argument, because "[b]y definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties."  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006) (quoting Leval, *supra*, at 1124).

Finally, Plaintiffs contend that Google engaged in an act of unauthorized distribution when it permitted the libraries to make their own digital copies of works that had been scanned from their particular collections.  But the library copies are a fair use:  the libraries use these copies to make their own searchable indices, as well as to provide statutorily-sanctioned access to the visually impaired and for the preservation of their collections.  Moreover, any distribution to the libraries does not involve a distribution "to the public" because a digital copy of a book is retrievable *only* by the particular library that owned and provided the unique physical book that was scanned.  In addition, provision of the library copies does not involve any volitional conduct by Google that could amount to distribution. *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,

3

536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), holds that a copyright is directly infringed only by the person or entity that performs the volitional act causing the creation and downloading of a copy. Google does not perform those acts—the libraries do—and thus Google can be at most subject to secondary liability, which is not alleged here.

Google moves for summary judgment of noninfringement because application of the statutory factors and consideration of the public benefit compel the conclusion that Google's use is fair. Google Books creates enormous transformative benefits without reducing the value of the authors' work. Google's use of books therefore passes with ease "[t]he ultimate test of fair use . . . . [because] the copyright law's goal of 'promoting the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than by preventing it.'" *Blanch*, 467 F.3d at 251 (citations omitted).

## II.     SUMMARY OF UNDISPUTED FACTS

Google Books was born of the realization that much of the store of human knowledge lies in books on library shelves where it is very difficult to find. Decl. Dan Clancy Supp. Def. Google Inc.'s Mot. Summ. J. ("Clancy Decl.") ¶ 3. Research libraries house millions of books. *Id.* These works span all types: most are academic publications; most are out of print; many were obscure even when first published. *Id.* Despite the importance of this vast store of human knowledge, there exists no centralized way to search these texts to identify which might be germane to the interests of a particular reader. *Id.* Google Books aimed to solve that problem by giving everyone access to a full-text searchable index of these books. *Id.* ¶ 4. Informed by the results of a search of that index, users can click on links in Google Books to locate a library from which to borrow those books of particular interest to them or a bookseller from which to buy them. *Id.*

A.      **Google's Effort To Improve Over Previous Methods Of Indexing Books**

Beginning in the late nineteenth century, libraries indexed books using index cards, which recorded some bibliographical information and classified the book under a handful of subject headings chosen by librarians.  Decl. Gloriana St. Clair Supp. Def. Google Inc.'s Mot. Summ. J. ("St. Clair Decl.") Ex. A ¶ 40.  In the second half of the twentieth century, the gradual digitization of card catalogues allowed library users to perform electronic searches for the names of authors and to search within a book's title; they could also search the few subject fields per book.  They could not, however, search the full text of a book.  *Id*. ¶ 41.  As a result, there was no way to search for information not tied to one of the specific subject fields.  Decl. Joseph C. Gratz Supp. Def. Google Inc.'s Mot. Summ. J. ("Gratz Decl.") Ex. 1, Courant Dep. Tr. 96:16-97:2.

Google Books allows a user to search the full text of the Google Books corpus using a query of the user's own design.  Clancy Decl. ¶ 7.  A search for "Archimedes" using Google Books, for example, locates many thousands of books in less than one second, and returns the most relevant books that contain any reference to Archimedes.  *Id.*  This result can be achieved only by digitizing the full texts of the books contained in the index.  Gratz Decl. Ex. 1, Courant Dep. Tr. 96:16-97:2; Gratz Decl. Ex. 2, Aiken Dep. Tr. 104:7-105:2.  Without digitizing the whole book, there is no way to know whether a particular book mentions Archimedes (unless Archimedes happens to be one of the subject headings assigned to the book by the librarian who cataloged it) unless one spends thousands of hours reading the index at the back of every book about ancient Greece (and even then one would miss the mentions of Archimedes in, for example, novels or books about levers).  Clancy Decl. ¶ 7.

**B.      The Google Books Project**

**1.      Book Scanning and Indexing**

In 2004 Google began scanning books in the collections of several significant research libraries, including the University of Michigan and the University of California.  Clancy Decl. ¶ 5.  Google entered into agreements with these libraries pursuant to which the libraries' books would be scanned, after which the physical copies of the books would be returned to the libraries.  *Id.*  The agreements also provide a mechanism for the libraries to make digital copies of their own books for their own uses, and the libraries promise contractually to abide by the copyright laws with respect to the copies they make.  *Id.*

A book is scanned at one of a small number of scan centers.  *Id.* ¶ 6.  Physical access to the centers is limited to Google employees and contractors.  *Id.*  Images of the book pages are stored in a secure manner for processing.  Decl. Stephane Jaskiewicz Supp. Def. Google Inc.'s Mot. Summ. J. ("Jaskiewicz Decl.") Decl. ¶ 3.  Optical character recognition (OCR) is performed on the images to generate machine-readable text, which is also stored on Google servers.  *Id.*  Those servers are not publicly accessible and are protected by the same security Google employs to protect its own confidential information.  Decl. Brad Hasegawa Supp. Def. Google Inc.'s Mot. Summ. J. ("Hasegawa Decl.") ¶ 3.  Google is aware of no security breaches resulting in unauthorized access to books.  *Id.* ¶ 7.

Google analyzes each scan and creates an overall index of all the books that have been scanned.  Clancy Decl. ¶ 6.  This index links each word or phrase appearing in each book with all of the locations in all of the books in which that word or phrase is found.  *Id.*  It allows a search for a particular word or phrase to return a result that includes the most relevant books in which that word or phrase is found.  *Id.*

### 2.    The Books in the Corpus

The Google Books corpus contains every imaginable type of book:  novels, biographies, children's books, reference works, textbooks, instruction manuals, treatises, dictionaries, cookbooks, books of poetry, memoirs and so on.  Jaskiewicz Decl. ¶ 4.  Researchers have analyzed the holdings of books at the libraries from which Google has scanned the most books, and their published findings show that, of books held by those libraries that were published in the United States (as required by the class definition), 93% are non-fiction and 7% are works of fiction.  Brian Lavoie and Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially In-copyright Print Books in Library Collections*, 15 D-LIB 11/12 (2009), *available at* http://www.dlib.org/dlib/november09/lavoie/11lavoie.html.  The same research shows that 1% of the nonfiction books are works commonly found in school libraries; 21% are works of general interest; and 78% are works primarily of scholarly interest.  *Id.*  Among those nonfiction books, the most common subjects are History (12%), Language, Linguistics, and Literature (11%), and Health and Medicine (9%).  *Id.*

Google Books includes both in print and out of print works, though the great majority are out of print.  Jaskiewicz Decl. ¶ 4.  Almost the only common characteristic of the works at issue in this case is that all of them were published and, pursuant to the class definition, must be "full length."  Gratz Decl. Ex. 3, Plas.' Resp. Obj. Def. Google Inc.'s 1st Set Interrogs. No. 1 at B(1).

### 3.    Display of Text

When a user performs a search, Google Books uses the index to generate search results for a user's query, returning a list of books in which that user's search term appears.  Clancy Decl. ¶ 8.  This is a search results page for the query "Steve Hovley" (a baseball player).



*Id.* A user can click on a particular result to be directed to an "About the Book" page, allowing the user to obtain more information about the book in question. *Id.* ¶ 9. This page includes links to sellers of the book and/or libraries listing the book as part of their collections. *Id.* No advertisements have ever appeared on any About the Book page for any book that is part of the Library Project. *Id.* The below screen shot shows the About the Book page that is displayed when one clicks on *Ball Four* in the search results page pictured above.



In some cases, users will also see a small amount of text from the book.  Clancy Decl. ¶ 10.  *Ball Four* is in "snippet view," so the user looking for books that discuss Steve Hovley can see, on the About the Book page, that there are 34 references to Hovley in the book, and can see three of those references in the context of short "snippets," each about an eighth of a page long:



*Id.*

9

Google employs security measures to ensure that users cannot recover the entire text of a snippet view book or even one complete page.  Hasegawa Decl. ¶ 4.  A user cannot cause the system to return different sets of snippets for the same search query, and Google Books does not allow the searcher to copy the text of those snippets, instead presenting them in the form of an image snippet.  *Id.*  The position of each snippet is fixed within the page, and does not represent a "sliding window" around the search term.  *Id.*  Only the first responsive snippet available on any given page will be returned in response to a query—so even if the term appears eight times on the page, only one snippet from that page will be displayed.  *Id.*  One of the snippets on each page is blacklisted (meaning that it will not be shown).  In addition, at least one out of ten entire pages in each book is blacklisted.  *Id.*  Additional protections are in place to prevent automated downloading of snippets.  *Id.* ¶ 5.  These protections are designed to prevent a user from conducting multiple searches in order to reconstruct any substantial portion of a book.  *Id.*  In this way, the Project is limited to its intended purpose of assisting searches and cannot become a substitute for buying or borrowing a book.  Even if an "attacker" had a physical copy of the book in question in front of him, and used that physical copy to identify words appearing in successive passages to use as the basis for the attack, the most complete patchwork of snippets he could end up with (assuming further that he was somehow able to circumvent the copy protections) would still be missing at least one snippet from every page and 10% of all pages.  *Id.*  (Of course, if the attacker had the book in front of him, it would be much easier for him to scan it himself than to try to circumvent Google's security measures.)

Not all books are placed in "snippet view."  Works whose text is organized in short "chunks"—for example, dictionaries, cookbooks, and books of haiku—are excluded from snippet view altogether.  Clancy Decl. ¶ 11.  This determination is made by human operators

who examine each book to ascertain whether it is organized in short chunks, and no book is designated for "snippet view" without such a manual review. *Id.* Google also has a policy of excluding works a rightsholder has asked Google not to display and takes steps to render the text of those books unsearchable. *Id.* Any rightsholder can exclude a book simply by filling out an online form which was been available since 2005. *Id.*

For excluded works, users may view bibliographic information about the book but not text from the book itself. *Id.* ¶ 12. For example, Google has scanned several editions of *Black's Law Dictionary*, but none is searchable or viewable, as indicated by the "No preview" designation in the screenshot below—except the 1910 edition, which is in the public domain:



Public-domain books like the 1910 edition of *Black's Law Dictionary* can be viewed and downloaded in their entirety.

Rightsholders may also request that Google display more text through the Partner Program. *Id.* ¶ 13. The rightsholder can choose what percentage of the text of the book to display—usually at least 20%. *Id.* For example, Jim Bouton's book *Foul Ball* is in the Partner Program, and his publisher has chosen to allow some pages to be viewed:



Over 45,000 publishers have included works within the Partner Program, including HarperCollins, Penguin, Simon & Schuster, and Macmillan.  Clancy Decl. ¶ 14.  Public domain and Partner Program books are not at issue in this case.

### 4.    Uses of Google Books

The purpose of Google Books is to help users find books that are of interest to them. Research and scholarly uses range from literary research to helping fifth-graders find books for their book reports.  *See, e.g.*, Clancy Decl. Ex. G (http://books.google.com/googlebooks/ testimonials.html); Gratz Decl. Ex. 4, Chevalier Dep. Tr. 88:18-22.  As a group of 64 academic authors explained earlier in this litigation, Google Books' "indexes and snippets advance scholarly research and improve access to knowledge, especially when, as with [Google Book Search], searches yield links to libraries from which the relevant books can be obtained."  Gratz Decl. Ex. 5, Samuelson Letter.  Indeed, it is no overstatement to say that Google Books has

transformed scholarly research.  St. Clair Decl. Ex. A ¶ 43.  One scholarly paper illustrates this point: commenting on a thesis written in 1983, it notes that the thesis "evinced time well spent in the stacks" but pointed out that "ten minutes on Google Books offers up evidence that was practically unobtainable in 1983."  Maurice S. Lee, *Evidence, Coincidence, and Superabundant Information*, 54 VICTORIAN STUDIES 87, 89 (2011).

Searching the full text of a book provides benefits that would otherwise not exist.  As noted above, a search on Google Books for "Steve Hovley" returns dozens of books that discuss that major leaguer, including *Ball Four* and a book about the 1969 Seattle Pilots (for whom Hovley played).  But a search in of the catalogue of even the Library of Congress produces no results whatsoever, because there are no books with "Steve Hovley" in their title or as their author, and Mr. Hovley is not among the few subject categories that have been assigned to books by cataloging librarians.  Decl. Kurt Groetsch Supp. Def. Google Inc.'s Mot. Summ. J. ("Groetsch Decl.") ¶¶ 11-12.

Similarly, a researcher looking for books containing information about Minoru Yasui, the Oregon lawyer who challenged the constitutionality of curfews targeted at minority groups, will have little success searching library catalogs.  If that researcher searches the catalog of the Library of Congress for "Minoru Yasui," for example, he will find only one book containing information about Mr. Yasui (though the search will return a handful of books written by a linguist of the same name).  *Id*. ¶ 13.  But if he searches Google Books, the researcher will find dozens of books available in bookstores and libraries with information about Mr. Yasui, from a reproduction of the Supreme Court filings in *Yasui v. United States* to an oral history of Japanese settlers in Oregon containing a whole chapter in which Mr. Yasui recounts his story.  *Id.* ¶ 14.

Authors and readers alike recognize these benefits.  One user's search "turned up several references to an ancestor in historical works I would probably never have found" without Google Books.  Clancy Decl. Ex. G (http://books.google.com/googlebooks/testimonials.html).  Another "cannot physically nor financially travel to distant libraries for my research on Latin American history that is contained in hard to find or out of print books," but can identify particular books of interest using Google Books.  *Id.*  Another uses Google Books to find particular parts of a book he already owns, but which was difficult to use "because [the book] did not have an index."  *Id.*  And another needed to find books which discussed a particular method of designing chips, called "simulated annealing in VLSI."  *Id.*  There were no books with that phrase in their title or subject listings in the library catalog, but Google Books allowed that user to find and buy the books he was looking for.  *Id.*

The corpus has enabled new types of research as well.  Text from the books was used as an input to the "n-grams" research project.  This project provides a tool for users to determine how frequently different terms or phrases appear in books published at different times.  Clancy Decl. ¶ 15.  It has resulted in the publication of a paper in the journal *Science* discussing "how this approach can provide insights about fields as diverse as lexicography, the evolution of grammar, collective memory, the adoption of technology, the pursuit of fame, censorship, and historical epidemiology."  Jean-Baptiste Michel et al., *Quantitative Analysis of Culture Using Millions of Digitized Books*, 331 SCIENCE 176 (2011) (Clancy Decl. Ex. H).  For example, economists have analyzed the prevalence of the phrases "new normal" and "new plateau" as a historical signal of market sentiment.  Catherine Rampell, *The 'New Normal' Is Actually Pretty Old*, NEW YORK TIMES ECONOMIX BLOG (January 11, 2011), http://economix.blogs.nytimes.com/2011/01/11/the-new-normal-is-actually-pretty-old/.  Analysis

of the dialogue of the television program *Mad Men* has identified phrases not found in books published in the era in which that program is set. *See* Benjamin Schmidt, *The Foreign Language of Mad Men*, THE ATLANTIC (March 21, 2012),

http://www.theatlantic.com/entertainment/archive/2012/03/the-foreign-language-of-mad-men/254668/. And the corpus has allowed new types of research into linguistics and machine translation. *See* Uszkoreit et al., *Large Scale Parallel Document Mining for Machine Translation*, *in* PROCEEDINGS OF THE 23RD INTERNATIONAL CONFERENCE ON COMPUTATIONAL LINGUISTICS 1101 (2010), *available at* http://www.aclweb.org/anthology-new/C/C10/C10-1124.pdf.

### 5. Copies Downloaded by Libraries

Pursuant to its agreement with Google, a library that has submitted a book to be scanned may make and download a copy of the scan of its book using a system called the Google Return Interface (GRIN). Jaskiewicz Decl. ¶ 6. No library may obtain a digital copy created from another library's book—even if both libraries own identical copies of that book (although libraries may delegate that task to a technical service provider such as HathiTrust). *Id.* ¶ 8.

To make this copy, a library first submits a request to the GRIN system, which in turn triggers the creation of an encrypted copy of the book that is placed on a secure Google server. *Id.* Each book is encrypted, and each library has a unique encryption key. *Id.* The library may then download this encrypted copy that it made of the book. *Id.* Some but not all of the books in the class have been copied by the libraries using GRIN. *Id.* ¶ 9. Where a library takes no action with respect to a particular book, the GRIN system does not do anything with respect to that book. *Id.*

Under their contracts with Google, the libraries are bound to make only lawful uses of the scans. There is no evidence that any library has loaned out any digital copy it made using GRIN

(other than to blind students, as discussed below).  To the contrary, recognizing that "[f]ull-text searching easily constitutes the most significant advance in library search technology in the last five decades," HathiTrust Mot. Summ. J. at 6, *The Authors Guild v. HathiTrust*, No. 11-cv-6351 (S.D.N.Y. June 29, 2012), ECF No. 112, libraries use the downloaded copies to make their own full-text indices of the works in their collections.  Gratz Decl. Ex. 1, Courant Dep. Tr. 105:2-12.  And, as 17 U.S.C. § 121 expressly permits, libraries have made the digital copies available to the blind, so that, for example, "blind student[s] c[an] search for books and skim them just as a sighted student browses the stacks and flips through titles to gauge their relevance."  Nat'l Fed'n of the Blind Mot. Summ. J. at 3, *The Authors Guild v. HathiTrust*, No. 11-cv-6351 (S.D.N.Y. June 29, 2012), ECF No. 105; *see also* Gratz Decl. Ex. 1, Courant Dep. Tr. 43:2-15.  In addition, faced with "annually losing hundreds of thousands of 'out-of-print' books" through deterioration, and the risk that irreplaceable collections could be lost through wars or floods, the libraries have archived digital copies for the purpose of preservation.  HathiTrust Mot. Summ. J. at 3; *see also* Gratz Decl. Ex. 1, Courant Dep. Tr. 85:12-86:11.  The libraries have taken security precautions to protect their copies and there is no evidence that any security breach has occurred with respect to any of these library copies.  Gratz Decl. Ex. 1, Courant Dep. Tr. 107:5-107:8.

There is no evidence that any library has reduced its purchasing of books as a result of downloading of scans using GRIN, and the libraries do not use the copies they make and download as substitutes for materials they could otherwise have purchased.  *Id*., Courant Dep. Tr. 108:15-19.  Nor do libraries that choose to download copies deprive authors of other revenue they otherwise might have received:  libraries historically have not paid authors or publishers for the right to scan books in order to index or search them.  *Id*., Courant Dep. Tr. 112:6-9; St. Clair Decl. Ex. A ¶¶ 5(c), 9.

16

### C.    Browsing Books Promotes Sales

One traditional way to promote book sales is to provide readers with the ability to browse books.  Decl. Bruce S. Harris Supp. Def. Google Inc.'s Mot. Summ. J. ("Harris Decl.") Ex. A ¶¶ 10-14.  Historically this browsing occurred in bookstores, where books are typically displayed on shelves or tables to facilitate that browsing (rather than being kept behind the counter).  Gratz Decl. Ex. 2, Aiken Dep. Tr. 146:10-147:19; Harris Decl. Ex. A ¶ 15.  Today, browsing can occur through websites such as Amazon.com, where publishers and authors can agree to allow users to "Search Inside the Book."  Harris Decl. Ex. A ¶ 17; Decl. Albert N. Greco Supp. Def. Google Inc.'s Mot. Summ. J. ("Greco Decl.") Ex. A ¶ 15; Gratz Decl. Ex. 2, Aiken Dep. Tr. 147:20-23.  Some but not all of the books at issue in this case can be browsed on Amazon's site using "Search Inside the Book" which displays excerpts (that are much larger than the Google Books snippets) of the book being searched.  Rightsholders give permission for online browsing on Amazon without compensation to authors, as is the case with Google's Partner Program.  Decl. Judith A. Chevalier Supp. Def. Google Inc.'s Mot. Summ. J. ("Chevalier Decl.") Ex. A ¶¶ 41; Gratz Decl. Ex. 2, Aiken Dep. Tr. 183:20-184:20.

The Authors Guild believes that online browsing has a net positive effect on book sales.  Gratz Decl. Ex. 2, Aiken Dep. Tr. 186:14-17.  *See also* Chevalier Decl. Ex. A ¶¶ 21-27, 40-42.  As a result, the Authors Guild recommends to its members that they make the entire first chapter of a book freely available on the Internet because "allowing a book to be browsed in this way promotes the sale of the book."  Gratz Decl. Ex. 2, Aiken Dep. Tr. 176:1-8, 13-24.[1]

---

[1] This recommendation is made pursuant to a program established by the Authors Guild called "Back in Print."  This program allows authors to digitize their out-of-print books and make them available for sale through a company called iUniverse.  Gratz Decl. Ex. 2, Aiken Dep. Tr. 173:2-175:25.

William Morris Endeavor, a leading representative of authors, concurs.  William Morris is the largest literary agency in the world, both in terms of number of agents and number of clients, representing numerous bestselling authors like Judy Blume, Vice-President of the Authors Guild.  Gratz Decl. Ex. 6, Zohn Dep. Tr. 12:24-13:2.  William Morris believes that inclusion in Google Books "is a fair use and not detrimental to the copyright owner in any way."  Gratz Decl. Ex. 7, Zohn Dep. Ex. 2 at 1  William Morris holds this view because it "appears to be in an author's best interest to have their work come up in a search through the database, just as website rankings are desirable in connection with Google searches.  Additionally, Google Book Search currently lists, on the right of the screen, which distributors have the book for sale, along with a link for purchase."  *Id*. at 1-2.  As the representative from William Morris explained:  "I think any tool that helps readers or buyers find your product above someone else's is beneficial."  Gratz Decl. Ex. 6, Zohn Dep. Tr. 19:23-24.

Plaintiffs have adduced no evidence that Google Books has displaced the sale of even a single book.  A survey of authors has shown that the majority of authors approve of their inclusion in Google Books, and that the vast majority do not perceive any harm from such inclusion.  Decl. Hal Poret Supp. Google Inc.'s Opp'n Plas.' Mot. Class Certification Ex. 1 at 14, ECF No. 1001-1.  Economic logic compels the same conclusion.  Chevalier Decl. Ex. A ¶ 47.  Plaintiffs have adduced no evidence that returning search results, either with or without snippets of text, has any direct adverse economic effect on authors.

## III.    ARGUMENT

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  Courts in the Second Circuit have "on a number of occasions resolved fair use determinations at the summary judgment stage where . . . there are no genuine issues of material fact."  *Blanch v.*

*Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).[2]

### A.    The Purpose of Copyright, and of Fair Use, is to Encourage Learning and Benefit the Public.

The purpose of copyright is central to the fair use inquiry:  the ultimate test of fair use is whether the challenged use advances the purpose of the copyright laws.  *Blanch*, 467 F.3d at 251. A central purpose of the copyright laws is to advance human knowledge.  The U.K. statute that was the basis for our first copyright statute—the 1710 Statute of Anne—was called "An Act For The Encouragement Of Learning," as was that first U.S. Copyright Act, enacted in 1790.  *Baker v. Selden*, 101 U.S. 99, 105 (1879).  As the Supreme Court explained in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349 (1991), the "primary objective of copyright" is as set forth in the Constitution:  "to promote the Progress of Science and useful Arts.  U.S. Const. art. I, § 8, cl. 8."

Part of that purpose, of course, is to encourage authors to create books, but from "the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill" that purpose as well.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994).  The fair use doctrine allows for the stimulation of "productive thought and public instruction without excessively diminishing the incentives for creativity."  Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1110 (1990).  As Judge Leval observed:  "Fair use should not be considered a bizarre, occasionally tolerated departure from the

---

[2] In addition to the facts and arguments set forth herein, Google has additional defenses with respect to many individual works at issue.  The arguments set forth in this brief demonstrate that even setting aside those individualized facts, Google can prevail as to all works as a matter of law, though Google believes that it could prevail as to many individual works on individualized grounds.  *See* Pet. Def.-Pet'r Permission Appeal Pursuant Fed. R. Civ. P. 23(f) at 12-18, *The Authors Guild Inc. v. Google Inc.*, No. 12-2402 (2d Cir. June 14, 2012), ECF No. 1.

grand conception of the copyright monopoly.  To the contrary, it is a necessary part of the overall design."  *Id*.

### B.     Google Books' Use Of Books Is Fair.

A use is fair when the purposes of the Copyright Act would be advanced more by allowing the use than by prohibiting it.  *Blanch*, 467 F.3d at 251.  The non-exclusive statutory factors to be considered in making that determination are:  (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used, and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.  "The factors do not represent a score card that promises victory to the winner of the majority.  Rather, they direct courts to examine the issue from every pertinent corner and to ask in each case whether, and how powerfully, a finding of fair use would serve or disserve the objectives of copyright."  Leval, *supra*, at 1110-11.  Because there is no genuine dispute that Google Books serves the public interest, and benefits rather than harms authors, summary judgment must be granted to Google.

### 1.     Scanning books and displaying small portions thereof in response to search queries, for the purpose of helping users find books of interest, is highly transformative.

The first statutory factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  The "central purpose of this investigation is to see . . . whether the new work merely 'supersede[s] the objects' of the original creation or instead adds something new, with a further purpose or different character . . . it asks, in other words, whether and to what extent the new work is 'transformative.'"  *Campbell*, 510 U.S. at 579 (first citation omitted; second quotation citing Leval, *supra*, at 1111).  *See also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) ("Most important to the court's analysis of the first factor is the

'transformative' nature of the work.") (citing Leval, *supra*, at 1111).  Other elements, including whether the use is to some degree commercial, are less significant.  *Campbell*, 510 U.S. at 569.

### a.    Google Books transforms expressive text into a word index.

Google digitizes books to create a comprehensive index that helps users locate books responsive to their interests.  Because Google Books helps users find books, and is not a tool to read them, it has a different purpose and character than the books that were copied:  it does not "supersede the objects of the original."  *Campbell*, 510 U.S. at 579 (internal quotation marks omitted).  Instead, Google Books allows for "the creation of new information, . . . new insights and understandings . . ."  Leval at 1111.  It is, in other words, a transformative use.

The Second Circuit's analysis in *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605 (2d Cir. 2006), is instructive.  At issue in that case was the unlicensed reproduction of entire concert posters in a book about the Grateful Dead.  The Second Circuit held that this use was "transformatively different from the original expressive purpose."  *Id*. at 609.  The court explained that "[w]hile the small size is sufficient to permit readers to recognize the historical significance of the posters, it is inadequate to offer more than a glimpse of their expressive value."  *Id*. at 611.  And the Second Circuit held that the use was "transformative both when accompanied by referencing commentary and when standing alone," because the posters were being used for a purpose different than the purpose for which they had been created.  *Id*.[3]

---

[3] The Second Circuit's analysis in *Bill Graham Archives* is consistent with the approach taken by other courts.  In *A.V. ex rel. Vanderhye v. iParadigms*, 562 F.3d 630 (4th Cir. 2009), for example, the court analyzed the first factor in a similar vein.  iParadigms offered a plagiarism-checking service to which an instructor could submit a student paper.  That paper would be compared to a corpus of previously-submitted student papers and other sources to identify any plagiarized passages.  The submitted student papers would then be included in the iParadigms database and used as part of the corpus for future plagiarism checks.  A group of students challenged the copying and inclusion of their works in the iParadigms database, contending that

In *Bill Graham Archives*, the Second Circuit cited the Ninth Circuit's decision in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003). *Kelly* held that use of works to facilitate search is "highly transformative" because it improves access to information rather than satisfying demand for artistic expression. The defendant, Arriba, operated a search engine on the Internet that allowed for the search and display of images. Arriba copied, stored and displayed small, "thumbnail" versions of images appearing on various websites, and provided those thumbnail images in response to search queries. Some of those images were copyrighted photographs owned by Kelly, who sued for copyright infringement. Arriba asserted a defense of fair use, primarily on the ground that incorporating images into an image search engine is a transformative use. Kelly argued that because Arriba did not add any commentary or other expression to the images, Arriba's use was not transformative. The Ninth Circuit disagreed, holding that "Arriba's use of the images serves a different function than Kelly's use—improving access to information on the internet versus artistic expression." *Id.* at 819. The court held that "[b]ecause Arriba's use is not superseding Kelly's use but, rather, has created a different purpose for the images, Arriba's use is transformative." *Id.*

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), which adopted the *Kelly* analysis, is to similar effect. There, the Ninth Circuit upheld the inclusion of thumbnail

----

iParadigms' use of their works was not transformative because the archiving and searching process did not add anything to the works themselves. The court squarely rejected that argument as "misguided" because "[t]he use of a copyrighted work need not alter or augment the work to be transformative in nature." *Id.* at 640 (citing *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007)). To the contrary, a use "can be transformative in function or purpose without altering or actually adding to the original work." *Id.* at 639. The court concluded that the first factor weighed strongly in favor of fair use because "iParadigms' use of these works was completely unrelated to expressive content and was instead aimed at detecting and discouraging plagiarism." *Id.* at 640.

images in search results because "[a]lthough an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information." *Id.* at 1165.  Citing *Campbell*, the court observed that "a search engine may be more transformative than a parody because a search engine provides an entirely new use for the original work, while a parody typically has the same entertainment purpose as the original work." *Id.*  "In other words, a search engine puts images in a different context so that they are transformed into a new creation." *Id.* (internal quotation marks omitted).

The inclusion of snippets of book text in search results is similarly transformative.  Just as the thumbnail images in *Kelly* "allow users to recognize the image and decide whether to pursue more information about the image or the originating [web site]," *Perfect 10, Inc.*, 508 F.3d at 1167 (quoting *Kelly*, 336 F.3d at 821), the snippets help users to determine whether a particular book is of interest to them and decide whether to pursue more information about it (for example, by clicking a nearby link to buy the book).  Google Books "has created a different purpose for the [book content]," it is "an entirely new use" of the content, wherein the content is used "in a different context," solely as "a pointer directing a user to a source of information." Indeed, Google Books presents an easier case than *Kelly* and *Perfect 10* because only a very small portion of a copyrighted work, and not the entirety of an image, is made visible as part of the search results.

### b.    Google's status as a commercial entity does not tip the scales against a finding of fair use

"[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.  "If, indeed, commerciality carried presumptive force against a finding of fairness, the

presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of §107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities are generally conducted for profit in this country." *Id*. at 584 (internal quotation omitted). Therefore, the fact that Google is a commercial entity is of limited significance in the first factor analysis.

Much more significant is that a student or professor (or indeed anyone who finds a Library Project book on Google Books) is engaging in precisely the sort of use historically favored as noncommercial under the first fair use factor. *See Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir. 1986) (noting that the "commercial nature of a use is a matter of degree, not an absolute," and concluding that the "educational elements of" the book at issue "far outweigh the commercial aspects of the book"). The research uses to which Google Books has been put are manifold, as described in Part II.B.4 above.

Moreover, fair use has frequently been found by the Second Circuit even in cases where the defendant benefited commercially by selling content that referenced or included the plaintiff's work explicitly (which is not the case here). *See, e.g.*, *Blanch*, 467 F.3d at 253 (defendant was paid $2 million for art work found to be fair use); *Bill Graham Archives*, 448 F.3d at 612 (defendant's publication of book containing copyrighted images was "a commercial venture" but nonetheless fair). *See also Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (the Second Circuit does "not give much weight to the fact that the secondary use was for commercial gain"); *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477-78 (2d Cir. 2004) (same).

Google is several steps more favorably removed from these cases. Google does not sell the scans it has made of Plaintiffs' books and therefore does not engage in the sort of direct

commercialization of a work that 17 U.S.C. § 107(1) is most concerned about.  *Campbell*, 510

U.S. at 578-79.  Google does not sell the snippets (nor could it:  there is no market for tiny book

snippets).  It does not run ads on the About the Book pages that contain the snippets.  Compare

this to *Perfect 10*, where the thumbnail images were alleged to generate advertising revenue for

Google because in some instances the images linked to third-party sites with Google ads placed

alongside infringing images:  the court held that even if such a "minor" commercial element

existed, it was outweighed by Google's "significant transformative use" and the public benefits it

created.  508 F.3d at 1166-67.

Because Google's use is highly transformative, the critically important first factor

strongly supports Google's fair use defense.

> **2.      The works at issue are all published, but are otherwise of every conceivable "nature."**

The second fair use factor analyzes "the nature of the copyrighted work."  17 U.S.C. §

107(2).  This factor recognizes that "some works are closer to the core of intended copyright

protection than others," so that the fair use analysis may differ across different works.  *Campbell*,

510 U.S. at 586.  Google Books encompasses almost every imaginable type of book—though, as

noted above, works organized in short "chunks" are excluded from snippet view.  It follows that

no conclusions may be drawn as to whether all the books within Google Books are closer to the

core or the periphery of copyright law—though, as noted, 93% of those books are non-fiction.

*See Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("fair use is more likely to be found in factual

works than in fictional works").  There are only two respects in which the Court may draw any

general conclusion relevant to the second factor.

First, the degree of transformation affects analysis of the second factor, which "may be of

limited usefulness where the creative work of art is being used for a transformative purpose."

*Bill Graham Archives*, 448 F.3d at 612 (finding fair use notwithstanding that Grateful Dead posters were creative works of artistic expression).  As a result, the second factor is less significant as to all the works in the corpus.

Second, all of the works in the corpus have been published.  This case therefore differs from those in which an author seeks to suppress a work altogether, or in which an author has been denied the chance to orchestrate a work's introduction to the market.  *Cf. Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985).  Authors have been denied neither the choice of whether to make their works public nor the chance for their works to make a splash in the crowded pool of books.  This fact favors Google's defense.  *Cf. Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (that plaintiff's work was "a published work available to the general public" favored a finding of fair use), *Perfect 10*, 508 F.3d at 1167 (second factor less significant for published than for unpublished works); *Kelly*, 336 F.3d at 820 ("Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.").

To the extent that the second factor is relevant here, it tilts in favor of Google's defense.

**3.    Google's scanning of the entire book is necessary to create a full-text index, and Google displays only as much of the book as is necessary to allow the user to determine whether the book is of interest.**

The inquiry under the third factor is whether the amount copied "[is] reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  "[T]he extent of permissible copying varies with the purpose and character of the use."  *Id*. at 586-87.  The Supreme Court and the Second Circuit have both held that copying the entirety of a work may be fair use where that copying is necessary to the purpose of the fair use.  *Sony Corp. of Am. v. Universal City*

*Studios, Inc.*, 464 U.S. 417, 449-450 (1984); *Bill Graham Archives*, 448 F.3d at 613.[4]  The Second Circuit explained (citing favorably the Ninth Circuit's search engine opinion in *Kelly*) that "copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham Archives*, 448 F.3d at 613.

Because Google copies no more of a work than is necessary for its highly transformative use, the third factor does not does not detract from Google's fair use defense.  Google scans the full text of works because full-text scanning is necessary for full-text search.  A computer cannot search the full text of a book without the full text of that book available to it.  Full-text search, in turn, is one of the ways Google Books improves on previous methods of finding books.  The necessity for full-work reproduction in this case is therefore greater than the degree of necessity the Second Circuit in *Bill Graham Archives* found consistent with fair use.  The court there held that miniaturized full-text reproductions of concert posters were "necessary to ensure the reader's recognition of the images as historical artifacts of Grateful Dead concert events" which in turn was necessary for the purpose of employing in the book "historical artifacts that could document Grateful Dead concert events and provide a visual context for the accompanying text."  448 F.3d at 613.  Other artifacts could have served a similar purpose, from news accounts of the concert to concert t-shirts to album covers, but this fact did not tilt the third factor against the defendant.  Google has no alternative but to scan the full text of books in order to facilitate full-text search— without full-text scanning, the Google Books project could not be what it is.  Google likewise displays no more of a work than is necessary to allow users to assess whether a book is

---

[4] The Fourth, Seventh, and Ninth Circuits have also so held.  *iParadigms, LLC*, 562 F.3d at 630; *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 521 (7th Cir. 2002); *Perfect 10*, 508 F.3d at 1167; *Kelly*, 336 F.3d at 821.

responsive to their query.  The amount of text actually displayed to users is only a very small

portion of the copyrighted work.[5]

### 4.      Scanning and snippet display has no negative effect on any cognizable market.

The fourth fair use factor asks whether the use harms the author by harming a potential

market for the work or the value of the work.  This analysis "requires a balancing of 'the benefit

the public will derive if the use is permitted and the personal gain the copyright owner will

receive if the use is denied.'"  *Bill Graham Archives*, 448 F.3d at 613 (quoting *MCA, Inc. v.

Wilson*, 677 F.2d 180, 183 (2d Cir. 1981)).  Cases like this one, in which the public receives a

large benefit from the use but owners will receive no gain if the use is denied, present the most

compelling case for the role that fair use plays in advancing the public purpose of the copyright

laws.  That is because "a use that has no demonstrable effect upon the potential market for, or the

value of, the copyrighted work need not be prohibited in order to protect the author's incentive to

create."  *Sony*, 464 U. S. at 450.  Here, there is no harm to the market for or value of Plaintiffs'

works.  As a result, this factor strongly supports a finding of fair use.

### a.      Google Books does not substitute for the book itself

In order to buy a book, a would-be reader first must discover that the book exists and then

find a location to buy it.  Because discovering a book that interests a reader is the first step in

making a sale, the ability to search for and browse a book helps, rather than hurts, the sale of

books.  *See supra* Part II.C.  It therefore is no surprise that there is no evidence in this record that

---

[5] Just how small a portion varies depending on the length of the work in question:  for a book of
100 pages, one query will display at most 0.0075% of the book; for a book of 500 pages, one
fifth that percentage.

any Plaintiff or other author has been harmed by Google Books.  Indeed, the undisputed facts are to the contrary.

### b.      There is no market for Google's uses

There are no "traditional, reasonable, or likely to be developed markets" for the copying of works for purposes of indexing and snippet display.  *See Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 930 (2d Cir. 1994).  Publishing industry history confirms this fact:  booksellers have never been charged to allow the browsing of texts, and authors are not paid merely for the right to index their books or for allowing their books to be browsed.  Indeed, the economics of publishing show that no such market is likely to form because these uses benefit authors.

Three important pieces of evidence place this point beyond reasonable dispute.  First, more than 45,000 publishers have agreed to allow Google to display much larger excerpts of text in a context where authors receive no royalties from such a promotional use.  *See supra* Part II.A.4.  Second, large numbers of publishers and authors opt in to search services such as Amazon's "Search Inside the Book" program and do so without compensation.  Part II.C and II.E.4.  Third, the Authors Guild itself recommends that its members make entire chapters of their books available for free.  Part II.C.2.  Thus, as in *Blanch*, "nothing in the record here suggests that there was a derivative market for" Plaintiffs "to tap into that is in any way related to" Google's use of their works, "even if [they] dearly wanted to."  467 F.3d at 258 n.9.  And, in the absence of evidence of any extant market to license even larger text excerpts for browsing, it is "plain" that the use "had no deleterious effect upon the potential market for or value of the copyrighted work."  *Id*. at 258 (internal quotation marks omitted).

Plaintiffs do not dispute these points.  They point to no market in which authors are paid to allow their works to be indexed or any market in which excerpts of text are displayed as search results.  With no evidence to support their claims, they resort to speculation that, absent

29

Google's copying, a licensing market for the scanning and display of works in search engines *might* develop even though no such market presently exists and that Google Books has preempted the development of that market.  In other words, Plaintiffs contend that in the absence of a finding of fair use, Google might be willing to pay to license their works for the purpose of indexing and snippet display.

First, Plaintiffs have proffered no competent evidence that any such market would ever exist.  Harms that are "theoretical and speculative" are not considered in the fourth factor analysis.  *iParadigms, LLC*, 562 F.3d at 644.  *See also Wright v. Warner Books*, 953 F.2d 731 (2d Cir. 1991) (speculative nature of alleged potential harm tilted fourth factor in favor of fair use).  Here, there is no non-speculative evidence that a licensing market for indexing and snippet display would come into being but for a finding of fair use.

Second, Plaintiffs' argument fails because it proves too much:  *all* fair uses of a copyrighted work could in theory preempt the development of a licensing market for that use.  As the Second Circuit has explained, "[b]y definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties."  *Bill Graham Archives*, 448 F.3d at 614 (quoting Leval at 1124).  That is true even when a plaintiff has tried to cultivate licensing within such a market (which is not the case here):  a copyright holder cannot prevent others from entering fair use markets merely "by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work."  *Bill Graham Archives*, 448 F.3d at 615 (quoting *Castle Rock*, 150 F.3d at 146 n.1).  Indeed, even a publisher's willingness to pay license fees for the reproduction of images does not establish that the publisher may not, in the alternative, make fair use of those images.  *Id.* at 607 (finding fair use even where the defendant had "directly contacted [the copyright holder] seeking to negotiate a

30

license agreement, but the parties disagreed as to an appropriate license fee").  For these reasons, in *Bill Graham Archives* the Second Circuit held that the plaintiff had not suffered harm to a cognizable market even though the plaintiff "established a market for licensing its images, and in this case expressed a willingness to license images to" the defendant.  That was because neither act showed "impairment to a traditional, as opposed to a transformative market."  *Id*. at 614.

### 5. Google Books Creates a Significant Public Benefit.

In evaluating whether Google Books fulfills the purpose of the copyright laws, the Court must consider the public benefits flowing from it:  "courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest."  *Blanch*, 467 F.3d at 253.  Google Books vastly improves on previous book search methods by allowing users to locate information that otherwise could not be found, thereby enhancing our collective knowledge.  The copyright laws are premised on the belief that this increased knowledge benefits us all.  *Campbell*, 510 U.S. at 575.  "Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts."  *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).  Plaintiffs do not, and cannot, deny that searching for books "stimulate[s] productive thought and public instruction," Leval at 1110, and "promote[s] the Progress of Science and the useful Arts."  *Campbell*, 510 U.S. at 575 (internal quotation marks omitted).

It is undisputed that Google Books gives the public, for the first time, the ability to find books by searching their full text.  Google Books allows for the development of new insights and understandings of history and literature.  It yields greater access to knowledge which otherwise might never be found.  *See* Part II.B.4, *supra*.  Google Books yields a literally unprecedented public benefit, and that benefit militates strongly in favor of a finding that Google's scanning, indexing, and snippet display constitute fair use.

### 6.   Google Books is a fair use.

Analyzing the four fair use factors together with the public benefits created by Google Books compels the conclusion that Google Books is a fair use.  Google Books makes use of works for the purpose of allowing readers to find them, not to read them directly.  It does not preempt the publication of those works, it reproduces no more of the work than is necessary, and it does not displace any extant market for those works.  It provides enormous public benefits.  None of these facts is in dispute, and no court has rejected a finding of fair use on facts akin to these.

### C.   The undisputed facts show that Plaintiffs' claim for infringement of the distribution right with respect to library copies fails.

Google also is entitled to summary judgment as to Plaintiffs' claim with respect to copies of scanned books that are made and downloaded by the libraries.  That activity is a fair use because the purpose of the library copies is to advance the libraries' lawful uses of the books consistent with copyright law.  Those uses include the creation of the libraries' own text-searchable index of the books, the maintenance of copies for book preservation purposes, and the facilitation of access to books for the blind.

But Plaintiffs' claims fail even without resolving those fair use issues.  With respect to the library copies, Plaintiffs have advanced only a limited claim of direct infringement based on *distribution* of the library copies.  Plaintiffs claim that Google has violated § 106(3), which grants copyright holders the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  Gratz Decl. Ex. 3, Plas.' Resp. Interrog. No. 1 at A(2).  They argue that "Google *distributes* digital copies of in-copyright books in their entirety to libraries without the permission of the copyright owners in violation of 17 U.S.C. § 106(3)."  *Id*., Plas.' Resp. Interrog. No. 1 at A(2) & B(2) (emphasis

added).  Plaintiffs rightly do *not* claim that Google is liable as a contributory or vicarious infringer based on the libraries' (lawful) uses.  By focusing their claim solely on distribution of the library copies, Plaintiffs have properly reserved issues regarding the libraries' own use of digital copies for decision in the Authors Guild's separate litigation against HathiTrust.  *See The Authors Guild, Inc. v. HathiTrust*, No. 11-cv-6351-HB (S.D.N.Y. filed Sep. 12, 2011).

The issue left for this Court is therefore whether a library's acquisition of a digital copy of a book scanned from its collection represents a "distribution" of the book "to the public."  *See* 17 U.S.C. § 106(3).  It does not.  To begin with, because only the library that provided the book for scanning (or its agent) can obtain a digital copy of that book, there is no distribution "to the public."  Moreover, the undisputed facts show that it is the *libraries* that make the library copies, not Google, and that Google provides only a technological system that enables libraries to create digital copies of books in their collections.  Under established Second Circuit precedent, Google cannot be held directly liable for infringement because Google itself has not engaged in any volitional act constituting distribution.

### 1.    Google's conduct with respect to the library copies is fair use.

Even if Plaintiffs could claim direct infringement of the distribution right by Google, that claim nonetheless would fail because Google's actions with respect to the library copy constitute fair use, as the libraries have shown in parallel litigation also brought by the Authors Guild.  *See* HathiTrust Mot. Summ. J., *The Authors Guild v. HathiTrust*, No. 11-cv-6351, ECF No. 112; *see also* Nat'l Fed'n of the Blind Mot. Summ. J., *The Authors Guild v. HathiTrust*, No. 11-cv-6351, ECF No. 105.

**Purpose and character of the use.**  Here, as with respect to Google's scanning and snippet display, the first factor militates strongly in favor of fair use.  The sole purpose of the library copies is to facilitate the libraries' lawful uses of the digitized books, and Google requires

that the libraries use the copies only in compliance with copyright law.  The libraries make the same types of transformative uses of the books that Google does by creating their own full-text searchable index of the books.  They also make other fair uses, such as maintaining copies for the purpose of preservation.  Certain library uses are also protected by specific statutory provisions of the Copyright Act.  *See* 17 U.S.C. § 108 (facilitating inter-library loan); 17 U.S.C. § 121 (access to blind patrons).  The purpose and character of the library copies is entirely noncommercial, and the libraries' uses are either transformative or otherwise noninfringing.

**Nature of the work.**  The nature of the works here is the same as for the Google Books Library Project.  The majority of the library copies relate to published out-of-print books, and most of the books are also books of a factual nature.

**Amount and substantiality of the portion used.**  Although the library copies include the entirety of the books that the libraries choose to copy and download, the use of the whole book does not weigh against a finding of fair use because, as with Google Library Project itself, the use of the whole is necessary to the transformative purpose of making an index.  *Campbell*, 510 U.S. at 586; *Sony*, 464 U.S. at 449-50; *Bill Graham Archives*, 448 F.3d at 613.  The use of the whole is also necessary, of course, to make the books available to blind patrons and to retain the books for the purpose of preservation.  Thus, because the use of the whole is necessary to transformative or otherwise noninfringing purposes, this factor does not weigh against a finding of fair use.

**The effect on the market.**  As discussed above with respect to scanning and snippet display, facilitating search complements the consumption of books but does not substitute for such consumption.  The libraries' search-related uses therefore do not harm authors, but benefit them by making their works easier to find and to read.  The libraries' other uses, such as

providing services to the blind and maintaining books for the purpose of preservation, are noninfringing and therefore not cognizable under the fourth factor.

Nor does Google's conduct with respect to the library copies result in any market harm from lost revenue authors could have earned from library acquisitions or licenses. The undisputed evidence shows that the availability of digital copies has *not* reduced libraries' purchases of books or their spending on licenses—indeed, that spending has *increased*. The libraries have not used the scans in any way that substitutes for copies they could have purchased or licenses they could have paid for. The fourth factor therefore weighs in favor of fair use as well.

Taken together, the public-minded and scholarly purpose of the library copies, along with the lack of an extant licensing market for the libraries' uses, compels a finding that the public purpose of copyright law "would be better served by allowing the use than by preventing it." *Blanch*, 467 F.3d at 251.

### 2.    In any event, the library copies do not involve any distribution "to the public."

Even without resolving the fair use issues presented by the library copies, Plaintiffs' distribution claim fails because the exclusive right of distribution extends only to distribution "*to the public*" and there is no such "public" distribution here. 17 U.S.C. § 106(3). A library (or its agent) may only download a digital copy of a book through the Google Return Interface (GRIN) if that particular scan of that particular book was created by scanning the physical book provided by the library. Jaskiewicz Decl. ¶ 8. As a result, there is no distribution "to the public" because each book is available only to the library that owns the unique physical book that was scanned.

The public distribution claim here is analogous to the public performance claim in *Cartoon Network, LP, LLLP v. CSC Holdings, Inc.*, 536 F.2d 121, 130-31 (2d Cir. 2008)

(*Cablevision*).  In that case, users of Cablevision's automated RS-DVR system caused

Cablevision's servers to create copies of television programs.  *Id.* at 130-31.  One question was

whether Cablevision transmitted those television programs "to the public" when it transmitted to

a user a performance of the copy the user had caused Cablevision's system to make.  *Id.* at 134-

36.  On these analogous facts, the Second Circuit held that a transmission made to a user from a

server copy accessible only to that user was not a transmission "to the public" because the

potential audience for the transmission was limited to that user, and no other user could be the

recipient of a transmission from that particular copy.  *Id.* at 138.  As the court of appeals

explained, "because the RS-DVR system, as designed, only makes transmissions to one

subscriber using a copy made by that subscriber, we believe that the universe of people capable

of receiving an RS-DVR transmission is the single subscriber whose self-made copy is used to

create that transmission."  *Id.* at 137.  That is how Google's GRIN system works:  a digital copy

is accessible only to the particular library that created the copy (*i.e.* the one from which the book

was scanned in the first instance).  Just as the transmissions in *Cablevision* were not "to the

public," so too here no copies are distributed "to the public" because a copy is made accessible

only to the single library that owned the scanned work.

> **3.      The libraries created and downloaded the library copies, and Google
>              did not engage in any volitional acts constituting public distribution.**

Plaintiffs' distribution claim also fails because it is the libraries, not Google, who by their

volitional acts create and cause the distribution of the library copies.  Google has created an

automated technological system, known as the Google Return Interface, or GRIN, that an

authorized library may use to create and then download an encrypted version of a particular book

scanned from that library's collection.  First, the library causes the GRIN system to create an

encrypted copy of the book on a portion of a Google server that is available to the library.

Jaskiewicz Decl. ¶ 8.  Second, the library downloads that encrypted copy from the Google server.  *Id.*

Google's GRIN system allows libraries to create and download copies of books scanned from their collections.  Google does not initiate the creation of the encrypted copies of books that libraries download, and Google does not initiate the transmissions of those books to the libraries themselves.  The libraries, not Google, do these things.  Where a library takes no action with respect to a particular scan, the GRIN system does not do anything with respect to that scan.  *Id.* ¶ 9.

The Second Circuit's analysis in *Cablevision* makes clear that there can be no direct infringement claim against Google based on this activity because Google has merely provided the libraries' "access to a system that automatically produces copies on command."  536 F.3d at 132.  In *Cablevision*, as here, the defendant provided a system used by others to create copies. As the court of appeals explained, the "only two instances of volitional conduct" at issue in the case were "Cablevision's conduct in designing, housing, and maintaining a system that exists only to produce a copy, and a customer's conduct in ordering that system to produce a copy of a specific program."  *Id.* at 131.

The court of appeals held that a *user's* volitional act to use the system to generate a copy could constitute direct infringement *by the user*, but that merely providing "a system, which automatically obeys commands and engages in no volitional conduct" does not render the provider directly liable for copyright infringement.  *Id.*  Rather, "the person who actually presses the button to make the recording, supplies the necessary element of volition, not the person who manufactures, maintains, or, if distinct from the operator, owns the machine."  *Id.  See also, e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, No. 10 Civ. 4135, 2012 WL 11270, at *15 (S.D.N.Y. Jan.

3, 2012) (granting summary judgment in favor of defendant where there was "no evidence of volitional conduct, thereby preventing [the plaintiff] from establishing direct liability").[6]

*Cablevision* compels the rejection of Plaintiffs' distribution claim here.  It is undisputed that the GRIN system is an automated system designed, housed, and maintained by Google, and used by libraries to create and download copies of books.  It is undisputed that employees of the libraries, not employees of Google, choose which books are reproduced by GRIN and press the button that initiates the copying and transmission of a particular book.  Under *Cablevision*, Google cannot be directly liable for copies made using, or downloaded through, the GRIN system.

Nor does Google's mere act of making digitized scans of books available to be copied by libraries through the GRIN system amount to distribution.  Although the Second Circuit has not ruled on "the question of whether copyright infringement occurs when a work is simply made available," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 122 (2d Cir. 2010), this theory has been rejected by most courts that have considered it.  In particular, courts have held that an act of distribution is not complete unless and until a download or other transfer takes place.  *See, e.g.*, *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1226 (D. Minn. 2008) ("Liability for violation of the exclusive distribution right found in § 106(3) requires actual dissemination."); *Atl. Recording Corp v. Howell*, 554 F. Supp. 2d 976, 981 (D. Ariz. 2008) ("The general rule, supported by the great weight of authority, is that infringement of the distribution right requires an actual dissemination of either copies or phonorecords.") (internal quotation marks omitted);

---

[6] The court of appeals was also careful to note that "[t]o the extent that we may construe the boundaries of direct liability more narrowly, the doctrine of contributory liability stands ready to provide adequate protection to copyrighted works." *Cablevision*, 536 F.3d at 121.  Plaintiffs do not assert any contributory liability claim in this action.

*London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 169 (D. Mass. 2008) ("[T]he defendants cannot be liable for violating the plaintiffs' distribution right unless a 'distribution' actually occurred."); *Atl. Recording Corp. v. Brennan*, 534 F. Supp. 2d 278, 282 (D. Conn. 2008) ("[W]ithout actual distribution of copies there is no violation of the distribution right.") (internal quotation marks and modification omitted).[7]

Each of these three arguments—that any distribution would constitute fair use, that there is no distribution "to the public," and that there is no volitional act by Google under *Cablevision* —independently disposes of the public distribution claim with respect to library copies.

## IV.   CONCLUSION

We conclude where modern fair use analysis began, with Judge Leval's assessment: "Fair use is not a grudgingly tolerated exception to the copyright owner's rights of private property, but a fundamental policy of the copyright law."  Leval at 1135.  Consistent with that analysis, decisions of both the Supreme Court and the Second Circuit preserve a "disciplined focus on the utilitarian, public-enriching objectives of copyright" and "resist[] the impulse to import extraneous policies."  *Id.*

---

[7] In *Elektra Entertainment Group, Inc. v. Barker*, 551 F. Supp. 2d 234, 244 (S.D.N.Y. 2008), the court correctly rejected the "making available" theory, but held that the Copyright Act's broader definition of "publication," which encompasses not only distribution but also offers related to distribution, should be read into the scope of the § 106(3) exclusive right.  This was error.  "The statutory definition of publication is broader than the term distribution as used in § 106(3)," and thus "simply because all distributions within the meaning of § 106(3) are publications does not mean that all publications within the meaning of § 101 are distributions."  *Capitol Records, Inc.*, 579 F. Supp. 2d at 1220.  As the *London-Sire* court explained, "all 'distributions . . . to the public' are publications . . . [b]ut not all publications are distributions to the public—the statute explicitly creates an additional category of publications that are not themselves distributions." 542 F. Supp. 2d at 169.

Plaintiffs seek to displace those objectives with a regime of complete control by the author over all uses of his works—without regard to the use's transformative and beneficial public purpose, and even without regard to the undisputed benefits derived by the author himself.

That is not the law.  Google's use of books is fair because it provides vast public benefits without any demonstrated harm to Plaintiffs.  No case has ever found such a balance of benefits and harms to be anything other than fair use.  Both policy and governing case law dictate that this not be the first such case.  The Court should therefore grant judgment in Google's favor on each of Plaintiffs' claims.

Dated:  July 27, 2012                                     Respectfully submitted,

                                         By:      */s/ Joseph C. Gratz*
                                                  Daralyn J. Durie (*pro hac vice*)
                                                  ddurie@durietangri.com
                                                  Joseph C. Gratz (*pro hac vice*)
                                                  jgratz@durietangri.com
                                                  David McGowan (*pro hac vice*)
                                                  dmcgowan@durietangri.com
                                                  Genevieve P. Rosloff (*pro hac vice*)
                                                  DURIE TANGRI LLP
                                                  217 Leidesdorff Street
                                                  San Francisco, CA  94111
                                                  Telephone:  415-362-6666
                                                  Facsimile:  415-236-6300

                                                  Attorneys for Defendant Google Inc.