**EXHIBIT 1**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4   THE AUTHORS GUILD, et al.,
 5          Plaintiffs,
 6                                    Master File No.
 7       -vs-                         05 CV 8136-DC
 8
 9   GOOGLE, INC.,
10          Defendant.
11   _____/
12
13
14
15       The Videotaped Deposition of PAUL N. COURANT,
16       Ph.D., Taken at 503 Thompson Street,
17       5021 Fleming Administration Building,
18       Ann Arbor, Michigan,
19       Commencing at 2:00 p.m.,
20       Monday, April 23, 2012,
21       Before Jennifer L. Ward, CSR-3717.
22
23                       .
24
25
```

1  there.
2      Q.   Great.  So -- thank you.  You mentioned
3  that the digital files are used by people with print
4  disabilities.  Are those people limited to the
5  University of Michigan community, or anyone?
6      A.   With respect to works that are from the
7  University of Michigan files, yes, I believe it is
8  limited to just the University of Michigan certified
9  users.
10     Q.   And what is a certified user?  What makes
11 someone a certified user?
12     A.   There's an office in the university that
13 determines whether people have print disabilities, and
14 then of course the person has to be a member of the
15 university community.
16     Q.   With respect to digital files of books that
17 are in copyright and that were digitized without the
18 authorization of the rights holder, to whom are those
19 works or those digital files available for search
20 purposes?
21          MR. PETERSEN:  Objection to form.
22 BY MR. BONI:
23     Q.   You said you made them available for search.
24 I'm asking available to whom?
25     A.   So to search for the -- search text as

1  where we do have authorization from the rights holder.
2  BY MR. BONI:
3       Q.   Right.  So let me limit it to those works
4  where the rights holder did not give authorization.
5       A.   So let me just try to see if I can get this
6  set winnowed down to what it is.  These are works that
7  are in copyright, digitized by Google, a copy has come
8  to the University of Michigan, and you're asking who
9  can read the text of those works?
10      Q.   Correct.
11      A.   Right.
12      Q.   You mentioned those at the University of
13 Michigan with print disabilities and then staff for
14 technical and computer purposes --
15      A.   Yes.
16      Q.   -- and I'm asking you whether there is
17 anyone else.
18      A.   There are some staff who are not staff at
19 the University of Michigan associated with the mirror
20 site at Indiana, and that's all I can think of.
21      Q.   Okay.  Do you know whether any research
22 has been conducted on the digital files which -- where
23 the research does not involve reading the text of the
24 books?
25                 MR. PETERSEN:  Objection to form.

VERITEXT REPORTING COMPANY
212-279-9424           www.veritext.com           212-490-3430

Page 85

1     A.     She's the Chief Information Officer.
2     Q.     All right, okay.  Chief information, CIO,
3  all right.  Who replicated the digital works and
4  associated metadata to the active mirror site at IU's
5  Indianapolis campus?
6               MR. PETERSEN:  Objection to form.
7               THE WITNESS:  That work would have
8  been done under the general direction of John Wilkin
9  and his counterpoints at Indiana -- counterparts at
10 Indiana.
11 BY MR. BONI:
12    Q.     Okay.  On page 19 in paragraph 67, it's
13 right in the middle of the page, it says in the
14 second sentence, Defendants also admit that the
15 Hathi Trust Service preserves and secures books that
16 are in copyright, published, and commercially
17 available.  Do you see that language, Dr. Courant?
18    A.     I do.
19    Q.     In what way does Hathi Trust preserve the
20 books referenced here?
21              MR. PETERSEN:  Objection to form.
22              THE WITNESS:  The Hathi Trust is an
23 operation of the library and has a time scale for
24 preserving its assets that extends into the indefinite
25 future.

Page 86

1  BY MR. BONI:
2      Q.   What are its assets?
3      A.   Its holdings, copies of works.  Assets may
4  not have been the best word, but copies of works.  And
5  works are subject to -- print works are subject to all
6  manner of risk of deterioration and destruction over
7  time, and so the sense in which these works are
8  preserved is that we would intend to keep a copy, as I
9  said, into the indefinite future against the
10 possibility that the -- that other copies would
11 disappear.
12            MS. DURIE:  Can you do me a favor?
13 Can I just get you to move the bottle to one side?  The
14 videographer was just saying it was blocking.
15            THE WITNESS:  Oh, sure.
16            MS. DURIE:  Thanks.
17 BY MR. BONI:
18     Q.   Let me ask you to turn to page 21, paragraph
19 78.
20     A.   I'm there.
21     Q.   There is a block quote there.  It appears to
22 be a statement from Michigan Library.  And it states,
23 this tells us that our pilot process is flawed,
24 referring to the potential orphan works.  Can you tell
25 me what that -- what is meant by the pilot process

Page 96

1  that?
2       A.    I thought it was an extremely interesting
3  and positive development.
4       Q.    Why was that?
5       A.    So really a number of reasons.  We had been
6  digitizing our collections ourselves at the rate of
7  about 10,000 volumes a year give or take, and at that
8  rate it was going to take 900 years or so to get the
9  job done.  And in fact, it would have taken longer
10 because we're still acquiring works.
11                  And so suddenly it became possible
12 to imagine digitizing close to the whole -- the whole
13 library, and that provided in turn a number of benefits
14 that struck me then and strike me now as being very,
15 very important.  One, which is really huge, is this
16 notion of search that I talked about earlier.  Having
17 the full text available for search of the works in the
18 library allows people, scholars, students, faculty, to
19 find works that have subject matter that might not be
20 apparent until the old card catalogs.
21                  The old catalog would give you three
22 entries, and if it turned out there something else
23 important that was number four, it's not there.  But if
24 it turns out that that 4th or 5th or 6th use has words
25 that are characteristic, you can find them in the works

Page 97

1    in the library and then come to the library and use
2    them.
3                    The second enormous advantage has to
4    do with preservation.  Many works in the library,
5    millions certainly, several millions, were printed on
6    acid paper, which means that they have within them the
7    seeds of their own -- their own destruction.  It's a
8    phenomenon you will have noticed.  You know, from time
9    to time you take an old paperback especially or an old
10   newspaper off the shelf and it just turns into
11   cornflakes and then dust in your hands.  That's what
12   happens to works on acid paper, and in time it happens
13   to all of them.
14                   And by -- knowing that there are
15   millions of such works, identifying them one by one is
16   sort of inconceivably difficult.  You have to go to the
17   shelves.  I mean it just -- you know, millions or --
18   that's a big number, and, you know, I just can't
19   imagine the amount of effort that would be involved in
20   finding them one by one.
21                   If we go through this process of
22   digitizing essentially the whole collection we then
23   have a preservation copy of works that would otherwise
24   disappear without replacement.  These works now will in
25   due course disappear, in due time, but we will be able

1   BY MS. DURIE:
2       Q.   I'm sorry, I apologize.  Is it correct that
3   the University of Michigan has used copies of --
4   digital copies of books that were scanned by Google to
5   create a searchable index?
6       A.   As part of this project?
7       Q.   Yes.
8       A.   Yes.
9       Q.   And what was the reason for doing that?
10      A.   I think I described it earlier, that it
11  enables users to find things reliably and easily that
12  they would otherwise not be able to find.
13      Q.   You also mentioned the display, using the
14  work to allow people with print disabilities to gain
15  access to works that they otherwise would not be able
16  to read.  Has the University of Michigan made any
17  actual displays of works in its collection of any of
18  the works as part of the search -- strike that.  That
19  was terrible question.
20                  In connection with this
21  searchable index, does the University of Michigan allow
22  users to read works that are returned from that
23  searchable index if those works are deemed to be in
24  copyright?
25                  MR. PETERSEN:  So we're off the

1    subject of students with print disabilities?
2                 MS. DURIE:  Correct.
3                 MR. PETERSEN:  This is a
4    different -- okay.
5                 THE WITNESS:  In cases where the
6    rights holder has authorized it, yes.
7    BY MS. DURIE:
8        Q.    To the extent that the rights holder has not
9    authorized it, does the University of Michigan allow
10   individuals to see the complete copies of works that
11   are returned as search results if those works are in
12   copyright?
13                MR. PETERSEN:  And you're excluding
14   students with print disabilities?
15   BY MS. DURIE:
16       Q.    Excluding students with print disabilities.
17       A.    If the works are either in copyright or not
18   known to be not in copyright, no.
19       Q.    Has the University of Michigan --
20       A.    Did I get that grammar right?
21       Q.    Yeah.
22       A.    I believe so.
23       Q.    Yes.  Has the University of Michigan put
24   security measures in place to protect all of the
25   various digital copies that exist of these works?

1    A.    Again, we're talking about this set of works
2  that we do not know to be in the public domain?
3    Q.    Correct.
4    A.    Yes.
5    Q.    Are you aware of any breaches that have
6  taken place that have allowed those works to become
7  part of the public domain --
8    A.    No.
9    Q.    -- security breaches?  Does the University
10 of Michigan have a budget for the acquisition of new
11 works?
12   A.    Yes.
13   Q.    Is that budget broken down in some fashion
14 departmentally or --
15   A.    It's -- so actually I should back up.  The
16 University of Michigan Library has such a budget.
17 Several other libraries have budgets.  Departmental
18 libraries have budgets.  So there are probably dozens
19 of entities within the University of Michigan who
20 have -- make budgeted expenditures on library
21 acquisitions, and by far the largest of those entities,
22 but only one of them, is the one of which I am the
23 dean.
24   Q.    With respect to the entity of which you are
25 the dean, what is the acquisition budget for that

Page 108

1  entity?
2      A.   Approximately 20 -- a little bit under
3  20 million dollars a year.
4      Q.   Has that budget been affected in any way by
5  the Google Library Project?  In other words, has that,
6  for example, caused your budget to go down?
7              MR. PETERSEN:  When you say budget,
8  for acquisitions?
9  BY MS. DURIE:
10     Q.   For acquisitions, acquisitions.
11     A.   Certainly not in any direct way.  Indirectly
12  the Google Library Project has enhanced the reputation
13  of the library, therefore possibly improved our
14  political ability to get resources from the provost.
15     Q.   Okay.  But it is not then the case I take it
16  that the fact that you have digital copies of the works
17  in your collection has itself caused you to start
18  spending less money on book acquisition?
19     A.   No.
20     Q.   Have there ever been circumstances where the
21  University of Michigan has bought additional paper
22  copies of books that it has in digital form as a result
23  of its participation in the Google Library Project?
24     A.   So we have a dangling modifier here.  So we
25  have it in digital form as a result of the Google

1   connection with search functionality?
2   BY MS. DURIE:
3       Q.   Any.  Just in general.  Presumably yes,
4   right?
5       A.   Yes.
6       Q.   Okay.  And has the University of Michigan
7   ever paid a rights holder for permission to include a
8   work simply in that index?
9       A.   Not to my knowledge.
10      Q.   Okay.  Now let me take indices that
11  encompass the full text of the work.  Has the
12  University of Michigan ever paid a rights holder for
13  permission to have that rights holder's work included
14  in the index where it was an index of the full text of
15  works?
16      A.   Again --
17           MR. BONI:  Object to form.
18           THE WITNESS:  I had no knowledge of
19  such circumstances.
20  BY MS. DURIE:
21      Q.   Okay.
22      A.   So no, as far as I know.
23      Q.   Now, you also mentioned earlier in your
24  testimony the importance of being able to maintain
25  duplicate copies of works as part of a digital archive;