**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

THE AUTHORS GUILD, *et al*.,         :

          Plaintiffs,        :     1:05-cv-08136-DC

     v.          :     ECF CASE

GOOGLE INC.,         :

          Defendant.       :

-------------------------------------------------------------x

**BRIEF OF AMICI CURIAE**
**AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF COLLEGE AND**
**RESEARCH LIBRARIES, ASSOCIATION OF RESEARCH LIBRARIES, AND**
**ELECTRONIC FRONTIER FOUNDATION**
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ............................................................................1

INTRODUCTION ...............................................................................................2

ARGUMENT .....................................................................................................4

I.  GBS SERVES THE PUBLIC INTEREST ...............................................................4

    A.  GBS Has Become An Essential Research Tool ...........................................5

    B.  GBS Enables New Forms of Research ......................................................7

    C.  GBS Benefits Authors ..........................................................................8

II.  GBS'S TREMENDOUS PUBLIC BENEFIT TILTS THE ANALYSIS FIRMLY IN
    FAVOR OF FAIR USE ...................................................................................10

    A.  Fair Use Is Designed to Protect the Copyright Balance and Ensure that Copyright
        Serves the Public Interest .................................................................10

    B.  The Fair Use Factors, Taken Together and Viewed in Light of the Purpose of
        Copyright, Favor a Fair Use Finding .....................................................11

III.  PLAINTIFFS HELPED FOSTER PUBLIC RELIANCE ON GBS; IN EQUITY THEY
    SHOULD NOT BE PERMITTED NOW TO DEPRIVE THE PUBLIC OF THAT
    RESOURCE. .............................................................................................15

IV.  A LEGISLATIVE "FIX" IS BOTH UNNECESSARY AND UNWORKABLE. .................16

CONCLUSION.................................................................................................17

APPENDIX......................................................................................................19

# TABLE OF AUTHORITIES

## Federal Cases

*American Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994)..................................................................... 11

*Authors Guild, et al., v. HathiTrust, et al.*,
   Case No. 1:11-cv-6351 HB (S.D.N.Y. July 6, 2012).......................... 4

*Berlin v. E.C. Publ'n Inc.*,
   329 F.2d 541 (2d Cir. 1964).................................................................. 10

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006).............................................................. 10, 11

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)................................................................... 4, 10, 11

*Kane v. Comedy Partners*,
   No. 00 Civ. 158 (GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003) ........................ 15

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ................................................................ 4

*Mathieson v. Associated Press*,
   90 CIV. 6945 (LMM), 1992 WL 164447 (S.D.N.Y. June 25, 1992) ...................... 11, 13

*MCA v. Wilson*,
   677 F. 2d 180 (1981).......................................................................... 13, 15

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ......................................................... 4, 11, 12

*Rosemont Enters., Inc. v. Random House, Inc.*,
   366 F.2d 303 (2d Cir. 1966)............................................................... 10, 11

*Sony Corp. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)............................................................................... 18

*Time Inc. v. Bernard Geis Assoc.*,
   293 F. Supp. 130 (S.D.N.Y. 1968) ...................................................... 10

*Wright v. Warner Books, Inc.*,
   953 F.2d 731 (2d Cir. 1991).................................................................. 13

## Federal Statutes

17 U.S.C. § 107 (2006) ..................................................................................... 4, 17

## Constitutional Provisions

U.S. Const., Art. I, § 8, cl. 8............................................................................... 10, 18

## Treatises

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2005) ........................................ 15

## Legislative Materials

*Hearing on: Competition and Commerce in Digital Books before the H. Comm. on the Judiciary*, 111th Cong. 66 (2009) ........................................................................ 17

Orphan Works Act, H.R. 5439, 109th Cong. (2006) ................................................. 16

Orphan Works Act, H.R. 5889, 110th Cong. (2008) ................................................. 16

Shawn Bentley Orphan Works Act, S. 2913, 110th Cong. (2008) ............................... 16

## Other Authorities

Association of Research Libraries, *Expenditure Trends in ARL Libraries*, 1986-2010 .............. 14

Caralee Adams, *State Funding for Higher Ed. Drops by 7.6 Percent in a Year*, Education Week (June 27, 2012) ....................................................................................... 14

Glenn S. McGuigan & Robert D. Russell, *The Business of Academic Publishing: A Strategic Analysis of the Academic Journal Publishing Industry and its Impact on the Future of Scholarly Publishing*, 9 Electronic J. Acad. Special Librarianship (2008) ..................... 15

John Quinterno & Viany Orozco, *The Great Cost Shift: How Higher Education Costs Undermine the Future Middle Class*, Demos (Apr. 3, 2012) ........................................... 14

Patricia Cohen, *In 500 Billion Words, New Window on Culture*, N.Y. Times, Dec. 16, 2010 ...... 8

Paul Basken, *Lawmakers Offer Struggling Research Universities Sympathy, Not Cash*, The Chronicle of Higher Education (June 27, 2012) ........................................................ 14

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L.Rev. 1105 (1990) .................. 10, 13

Press Release, Inst. of Museum and Library Servs., State Library Agencies Continue to Provide Valuable Services Despite Severe Cuts in Funding and Staff (Feb. 6, 2012) ..... 14

Sara Hebel, *State Cuts Are Pushing Public Colleges into Peril*, Chron. of Higher Ed. (Mar. 14, 2010) .............................................................................................. 13

*Saying Costly Subscriptions 'Cannot Be Sustained,' Harvard Library Committee Urges Open Access*, Chronicle of Higher Education (Apr. 23, 2012) ................................................. 15

Sean Wilsey, *Why John Updike Is So Wrong About Digitized Books*, Time, May 31, 2006 ......... 9

## INTEREST OF AMICI CURIAE

The Association of Research Libraries ("ARL") is a nonprofit organization of 126 research libraries in North America.  ARL's members include university, public, governmental, and national libraries.  ARL programs and services promote equitable access to and effective use of recorded knowledge in support of teaching and research.  The American Library Association ("ALA"), established in 1876, is a nonprofit professional organization of more than 67,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.  The Association of College and Research Libraries ("ACRL"), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals.  It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.  Collectively, these three library associations represent over 100,000 libraries and 350,000 librarians and other personnel in the United States that serve the needs of their patrons in the digital age.  As a result, the associations share a strong interest in the balanced application of copyright law to new digital dissemination technologies.

The Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization that has worked for more than 20 years to protect consumer interests, innovation, and free expression in the digital world.  Founded in 1990, EFF has more than 19,000 dues-contributing members.  EFF's mission is to ensure that the civil liberties and due process guaranteed by our Constitution and laws do not diminish as communication, commerce, government, and much of daily life move online.  EFF and its members have a strong interest in assisting the courts and policy-makers in striking the appropriate balance between copyright law and the public interest.  EFF has contributed its expertise to many cases regarding copyright law and the Internet, as *amicus curiae*, as party counsel, and as court-appointed attorneys *ad litem*.

Amici's previous experience with this case gives them a useful perspective about Google's motion for summary judgment on the fair use issue.  In summary, EFF filed objections

1

to the proposed class action settlement on behalf of certain publishers and authors (and itself, as EFF is also a member of the class by virtue of its own publication of some books).  Among other things, those objections argued that the settlement's lack of privacy protections would deter readers and harm their expressive and financial interests in sustaining and building a readership that browses, reviews, and purchases their works.  EFF and the other Privacy Authors and Publishers were concerned that the proposed settlement included no limitations on collection and use of reader information, and had no privacy standards for retention, modification, or disclosure of that information to third parties or the government.  *See* Privacy Authors and Publishers' Objection to Proposed Settlement, ECF No. 281 (September 8, 2009).  EFF appeared at the settlement hearing to argue this point.  *See* Notice Appear., ECF No. 824 (January 27, 2010).  EFF here represents only itself and not the other Privacy Authors and Publishers, however.

On their part, ALA, ACRL and ARL (which also are class members) filed comments expressing concern that the digital library enabled by the proposed settlement would be under the control of Google and the Book Rights Registry, so that lack of competition might lead to abuse by those entities – particularly with respect to the pricing of the institutional subscription.  ALA, ACRL and ARL thus urged the Court to conduct "rigorous oversight" of implementation of the settlement.  Nonetheless, these library associations did not oppose approval of the settlement. *See* Library Association Comments on the Proposed Settlement and Supplemental Library Association Comments on the Proposed Settlement, ECF No. 387 (September 9, 2009).

Thus, amici have studied this case in detail and are familiar with how it affects the public interest.  Although amici had different views on whether this Court should have approved the settlement, they all strongly agree that Google Book Search is tremendously beneficial to the public and precisely the kind of project the fair use doctrine was designed to protect.

## INTRODUCTION

Imagine it is 2004 and you are a researcher at a small, chronically underfunded university researching indigenous astronomy.  Your librarian wants to help you but struggles to find potential sources and determine what is relevant.  You both know that chances are you are

missing some possible sources because the topic is a bit obscure and books on the subject may be out of print, and/or buried in other libraries collections that may or may not be well-indexed.

Or, imagine that you are busy mom who is interested in researching your family's history to present at a reunion that's coming up.  You've used census data to identify the names and locations of some of your ancestors, but you'd love to see if their names appear in any historical accounts.  You don't have a lot of time to spend tracking down obscure texts, much less working with your local library to get hold of them.

Or finally, imagine you are an avid sports fan and you want to learn everything you can about the history of your team.  You hear that one of the first players wrote a book about his life, but you can't seem to find it in any library or on Amazon.com.

Now fast forward to 2012.  Thanks to a service Google introduced in 2005, now called Google Book Search ("GBS"), librarians can identify and efficiently sift through possible research sources, amateur historians have access to a wealth of previously obscure material, and everyday readers and researchers can find books that were once buried in research library archives.

That is what this case is about, and why amici file this brief.  There is a great deal more at stake in this case than any company or author's bottom line.  If the Authors Guild succeeds, the public could be denied access to a tremendous resource – even though no author will see a penny of additional revenue.  Copyright, intended to be an engine for the promotion of creative expression, will instead stifle that promotion, to the detriment of readers and authors alike.

Fortunately, copyright law incorporates a crucial safety valve that prevents such an outcome: the fair use doctrine.  As explained in detail in Google's own briefing, the fair use doctrine clearly shelters Google's Book Search project.  Google Inc.'s Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment, ECF No. 1032 (July 27, 2012)

("Google Br."), 20-32.  Fair use provides the Court with the equitable means to allow the public to benefit from this resource in a manner that respects the law and the interests of authors.[1]

Indeed, an adverse ruling would run directly contrary to the precedents most directly on point, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) and *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).  In both cases, the court properly asked whether the defendants use "added a further purpose" or had a "different character" from the original use, and found that not only was the use different, it conferred an important public benefit by improving access to information.  *See Kelly*, 336 F.3d at 819 ("Arriba's use of the images serves a different function than Kelly's use—improving access to information on the internet versus artistic expression."); *Perfect 10*, 508 F.3d at 1166 ("In conducting our case-specific analysis of fair use in light of the purposes of copyright, we must weigh Google's superseding and commercial uses of thumbnail images against Google's significant transformative use, as well as the extent to which Google's search engine promotes the purposes of copyright and serves the interests of the public.") (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 581 (1994)).

That is precisely what GBS does.  Every day, users throughout the United States—librarians, students, scholars, scientists, general readers and authors—use GBS to find information to assist them in a wide variety of tasks ranging from the esoteric to the mundane, from the sacred to the profane.

## ARGUMENT

## I.    GBS SERVES THE PUBLIC INTEREST

Section 107 explicitly recognizes that the use of copyrighted works "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use),

---

[1] This brief does not address the issue of the library copies.  *See* Google Br. 32-35. However, amici agree with Google that the library copies are a fair use.  *See* Br. Amici Curiae American Library Association et al., *Authors Guild, et al., v. HathiTrust, et al.*, Case No. 1:11-cv-6351 HB (S.D.N.Y. July 6, 2012), ECF No. 121.

scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107 (2006).  GBS is serving all of these purposes.

A.    **GBS Has Become An Essential Research Tool.**

In preparation for filing this brief, amici ALA and ACRL conducted an informal survey asking librarians about their experiences with GBS.  Their responses reveal that GBS has become an indispensable research tool, particularly for students and faculty at small and remote educational institutions.  Some illustrative responses are discussed below. (Other librarians reported similar uses, which are summarized in the attached Appendix.)  These uses are consistent with Google's reported uses.  Decl. Dan Clancy ¶¶ 3-4, 15 and Ex. G; Decl. Gloriana St. Clair Ex. A.

*First*, GBS has become an important means for identifying valuable research sources.  One librarian for a small "chronically-underfunded tribal college library" characterized GBS as "a lifesaver" and "indispensable":

> Because my students, and even some of my faculty members, face significant challenges and barriers to accessing resources (including transportation challenges, limited or no internet access, etc.), Google Book Search helps us find if resources exist, to identify if those resources may be helpful to their academic purposes, and get us started on the path to access through other means if not our own library. . . . I cannot overemphasize how much more difficult my job would be and how lacking my faculty's and students' experiences would be without access to a free tool like Google Book Search.

Statement of Melissa Pond, Director of Library Services, Leech Lake Tribal College, Cass Lake, Minnesota (on file with amici).

That resource is valuable not just for research, but also for developing curricula and collections:

> [GBS] has led us to several titles that my faculty have gladly and gratefully ordered for their private research collections and helped me to identify the best uses of our very, very limited collection development resources.
>
> [For example] one of our science faculty instructors was looking to put together a course on Indigenous astronomy (also called ethnoastronomy and star knowledge and also related to the term archaeoastronomy) and was curious as to what

> resources existed on the topic. Google Books helped me identify several resources that the instructor purchased for his own personal professional development library and for our LLTC campus library.

*Id*. Thus, GBS's public benefits accrue, in turn, to copyright holders who received royalties when books are purchased *as a result* of research using GBS.

Sometimes, GBS can be used to identify material that is housed by the library itself but nonetheless hard to find. Jill Gremmels, Director of the Davidson College Library, used GBS to find sources in her own stacks:

> A couple of years ago I was helping a Davidson student look for information on a speech that Khrushchev made to the National Press Club. It wasn't one of his famous, shoe-pounding speeches. We struggled mightily for a long time, until we looked at Google Books. There we found a reference to the speech in a book that seems to be one of the important biographies of Khrushchev, and we had the book. So the student went to the shelf, picked up the book, and got the info he needed.

Statement of Jill Gremmels, Library Director, Davidson College, Davidson, North Carolina (on file with amici).

*Second*, and relatedly, librarians can then decide whether to request those books via interlibrary loan. Such decisions can be vital to conserving strapped library budgets and speeding research. At the "geographically isolated" University of Guam, for example, getting books through interlibrary loan can take weeks, with significant postage costs. By using GBS to identify the specific chapters needed, the library can narrow its request and obtain the material in a day or two. Statement of Paul Drake, User Services and Document Delivery Librarian, University of Guam, Guam (on file with amici).

*Third,* GBS has become a crucial tool for finding and checking citations. One example involved Lisa Hinchliffe, Coordinator for Information Literacy Services and Instruction at the University of Illinois at Urbana-Champaign. Ms. Hinchliffe notes that she has used GBS "to find full citations and or corrected citations to works I see in bibliographies, to verify quotations and particularly when I am reviewing a manuscript and want to confirm that the author has cited the original correctly, to determine where a quotation is from when a full cite isn't given." She

also uses it to decide whether to buy a book and call for it via interlibrary loan. Statement of Lisa Hinchliffe, Coordinator for Information Literacy Services and Instruction, University of Illinois at Urbana-Champaign, Urbana, Illinois (on file with amici).

The ability to efficiently check citations saves libraries (and scholars) both money and time.  One librarian described working with a historian to check a citation where the historian had only a quotation in a paper copy of a single page of an older multi-volume biography of President Abraham Lincoln.  Using GBS, they were able to track down the quotation and a full citation for the original source.  Without GBS, the scholar would have had to wait for an interlibrary loan of printed copies and might not have been able to access the texts at all. Statement of Scott Vine, Information Services Librarian and Deputy College Librarian, Franklin & Marshall College, Lancaster, Pennsylvania (on file with amici).  Instead, the scholar was able to complete the research quickly and move on to the rest of the project.

*Fourth*, GBS is thoroughly integrated into the educational system – it is part of the information literacy curriculum, included in research methods taught to students at all levels and integrated into online library catalogs.  Indeed, one librarian believes it is simply "unethical not to teach Google Books.  We often teach it before our own library catalog."  Statement of Elizabeth Kocevar-Weidinger, Instruction/Reference and Interim E-Resources Services Librarian, Longwood University, Farmville, Virginia (on file with amici).  Here, too, that education and use can lead to book sales that would not have occurred but for the use of GBS.  For example, one librarian described a senior student in a Gender, Women's and Sexuality Studies course who reported that she bought the books she planned to use in research after discovering them via GBS because she liked to own copies that she could mark up. Statement of Barbara Fister, Library Professor, Gustavus Adolphus College, Saint Peter, Minnesota (on file with amici).

## B.   GBS Enables New Forms of Research.

We understand that another amicus brief will be filed by Digital Humanities Scholars and Law Professors, which will explain that GBS has become more than a reference tool: it is also a

database of human language that can be mined to identify linguistic, cultural and political trends. For example, the GBS database was used to create a data set of 500 billion words contained in books published between 1500 and 2008 in English, French, Spanish, German, Chinese and Russian.  A recent study, published in Science, quantitatively analyzed the data set to track a variety of trends.  The researchers learned, among other things, that

- Fame is ever more fleeting: written references to celebrities faded twice as quickly in the mid-20th century as they did in the early 19th century.

- Technology is moving faster: technological advances took an average of 66 years to be adopted by the larger culture in the early 1800s, but only 27 years between 1880 and 1920.

- The English lexicon has grown by 70 percent to more than a million words in the last 50 years.

Famed linguist Steven Pinker, who has been studying changes in grammar and past tense forms for 20 years, suggests the language database is an extraordinary and important resource. "There is so much ignorance.  We've had to speculate what might have happened to the language . . . What we report in this paper is just the beginning."[2]

### C.   GBS Benefits Authors.

As noted in Google's Opposition to Motion for Class Certification, a majority of authors approve of GBS.  Opp. 4.  They recognize that the service helps readers find them, which helps grow their audience and, not incidentally, improve sales.  As noted above, the experience of librarians supports that perception: both librarians and their patrons use GBS to identify books to purchase.

But the database is valuable to authors for yet another reason: as a research tool.  As author Sean Wilsey predicted in 2006:

---

[2] Patricia Cohen, *In 500 Billion Words, New Window on Culture*, N.Y. Times, Dec. 16, 2010, *available at* http://www.nytimes.com/2010/12/17/books/17words.html?pagewanted=all. This web site and the other web sites cited in this brief were last visited on July 31, 2012.

> What I never have enough of as a writer is time.  Writing, for me, is all about
> finding the time to write . . . a universal library of scanned and searchable books
> would be the greatest imaginable gift to writers and future readers alike.  It will
> help us do what we do.

Sean Wilsey, *Why John Updike Is So Wrong About Digitized Books*, Time, May 31, 2006.[3]

It turns out that Wilsey was right.  Author Warren Kozak had this to say about using the service while writing a new book:

> I'm writing a biography, so I . . . typed in my subject's name [into GBS].
> Instantly, I got all these references to books where he appeared.  Each reference
> would give me the two to three pages where he was the subject, and I could tell
> from reading that short synopsis whether the book was something I could use.  I
> went out and bought books, borrowed books from libraries, and even tracked
> down some from my own collection that I hadn't realized before were relevant.

Statement of Warren Kozak (on file with amici).  Contacted several years later, Kozak continues to praise the service, stating that it saved him "an incredible amount of time" and, while he hadn't used it recently, he "definitely would not want to lose the service."  Statement of Warren Kozak (on file with amici).

Science journalist and author Annalee Newitz shares this view.  She uses the service regularly to verify scientific claims and explore alternative viewpoints.  As she notes, a great deal of scientific literature is housed in books, which are often expensive and not easily accessible online.

> I started using Google Books as soon as it was available.  As a science journalist,
> I need to do a lot of digging to make sure what I am saying is accurate, understand
> the research I am reporting on, and discover contradictory points of view.  Google
> Books helps me identify sources, check for accuracy and decide if it is worthwhile
> to travel to the nearest academic library to obtain the book, or even buy it.  Over
> the years, I have purchased dozens as a result of using Google Books.

Statement of Annalee Newitz (on file with amici).  Thus, as Wilsey puts it, "[authors] have most to benefit and the least to lose from bookscanning."  Wilsey, *supra*.

---

[3] *Available at*
http://www.time.com/time/arts/article/0,8599,1199593,00.html#ixzz1xu9wqZIW.

## II.   GBS'S TREMENDOUS PUBLIC BENEFIT TILTS THE ANALYSIS FIRMLY IN FAVOR OF FAIR USE

### A.   Fair Use Is Designed to Protect the Copyright Balance and Ensure that Copyright Serves the Public Interest.

The right to make socially beneficial uses of copyrighted works without permission has been part of U.S. copyright law since its inception, precisely because it helps ensure that copyright serves, rather than thwarts, its purpose of promoting expression and innovation. "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, 'To promote the Progress of Science and useful Arts.'"  *Campbell*, 510 U.S. at 575 (quoting U.S. Const., Art. I, § 8, cl. 8). The Second Circuit has noted how copyright must serve the public benefit:

> As Judge Leval observed in his seminal law review article on the subject, the law of copyright "is intended to motivate the creative activity of authors and inventors by the provision of a special reward . . . . The monopoly created by copyright thus rewards the individual author in order to benefit the public."

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (citing Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L.REV. 1105, 1108 (1990)).  Thus, "courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry."  *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966), quoting *Berlin v. E.C. Publications Inc.*, 329 F.2d 541, 544 (2d Cir. 1964).  As *Rosemont* stated:

> Whether the privilege may justifiably be applied to particular materials turns initially on the nature of the materials, *e.g.*, whether their distribution would serve the public interest in the free dissemination of information and whether their preparation requires some use of prior materials dealing with the same subject matter.  Consequently, the privilege has been applied to works in the fields of science, law, medicine, history and biography.

*Rosemont*, 366 F.2d at 307 (biography of Howard Hughes was a fair use).  *See also Time Inc. v. Bernard Geis Assoc.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (finding fair use of the Zapruder films, and noting the "public interest in having the fullest information available on the murder of President Kennedy").

**B.     The Fair Use Factors, Taken Together and Viewed in Light of the Purpose of Copyright, Favor a Fair Use Finding.**

Google has explained in detail why the fair use doctrine shelters GBS, and amici will not replicate that argument here.  Rather, we focus here on two factors to which the public interest is particularly relevant: purpose and market harm.

Consideration of the public interest is an integral part of the analysis of factor one, the purpose and character of the secondary use.  Even in cases where the user has a commercial motive, courts give precedence to a significant public benefit.  In *Blanch v. Koons,* for example, the Second Circuit held this factor favored the defendant despite his commercial and profitable use of the plaintiff's image in a "pop art" painting, noting that "courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest."  *Blanch*, 467 F.3d at 253 (quoting *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)); s*ee also Rosemont*, 366 F.2d at 307 ("[W]e conclude that whether an author or publisher has a commercial motive or writes in a popular style is irrelevant to a determination of whether a particular use of copyrighted material in a work which offers some benefit to the public constitutes a fair use"); *Mathieson v. Associated Press*, 90 CIV. 6945 (LMM), 1992 WL 164447, at *3 (S.D.N.Y. June 25, 1992) (under the first factor, it was fair use and "a matter of legitimate public interest" for the Associated Press to illustrate a news article with copyrighted photos from a sales brochure depicting Oliver North).

In this case, there can be little doubt that Google's GBS project has a commercial motive, and that Google hopes to profit from the project.  However, as the Supreme Court has noted, Congress could not have intended the fair use analysis to turn on commerciality alone; after all, "[n]o man but a blockhead ever wrote, except for money."  *Campbell*, 510 U.S. at 584 (quoting 3 Boswell's Life of Johnson 19 (G. Hill ed. 1934)).  Rather, the guiding question must be whether the work is transformative, and where appropriate, whether that transformative use benefits the public.  *Id*. at 579.  With respect to GBS, the answer to both parts of that question is yes.

*Perfect 10*, while not controlling, is on all fours with this case and provides strong persuasive authority.  Perfect 10, the plaintiff in that case, marketed and sold copyrighted images

of nude models.  Other publishers had reproduced some of those images on their own websites, which Google automatically indexed by copying content from the sites into Google's own database.  When users entered queries, Google Image Search provided thumbnails (smaller, lower-resolution versions of relevant images, hosted on Google's own servers) from those websites.  Clicking on a thumbnail would take the user to the website where the original image could be found.  The Ninth Circuit found that Google's use of thumbnails was "highly transformative": it transformed the image into a "pointer directing a user to a source of information."  *Id.* at 1165.  The court stressed, moreover, the social benefit of that transformation.  *Id.* ("[A] search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool.").  That benefit, in the court's view, tilted the first factor firmly in Google's favor:

> We conclude that the significantly transformative nature of Google's search engine, *particularly in light of its public benefit,* outweighs Google's superseding and commercial uses of the thumbnails in this case . . . the transformative nature of Google's use is more significant than any incidental superseding use or the minor commercial aspects of Google's search engine and website.  Therefore, this factor weighs heavily in favor of Google.

*Id.* at 1166-67 (emphasis added).

That reasoning applies here.  GBS is an electronic reference tool, providing snippets of works (the textual equivalent of thumbnails) that allow the viewer, in turn, to track down more information.  As explained above, that reference work is already providing an enormous public benefit, and will continue to do so as more students, researchers and general readers incorporate it into their everyday practice.  Like Google Image Search (and Google web search, for that matter), GBS cannot operate without creating an index of the works to be searched, and creating an index requires the making of copies.

The public benefit of a given use (or lack thereof) is equally relevant to the fourth fair use factor, the effect of the use upon the potential market of the copyrighted work.  This factor requires the court "to balance 'the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.'"  *Wright v. Warner Books,*

*Inc.*, 953 F.2d 731, 739 (2d Cir. 1991) (quoting the district court's opinion in that case and affirming the lower court's fair use finding for a biography of Richard Wright); *see also MCA v. Wilson*, 677 F. 2d 180, 183 (1981) ("[W]here a claim of fair use is made, a balance must sometimes be struck between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied."); *Mathieson*, 1992 WL 164447, at *9 (fourth factor analysis must consider "the benefit gained by the public when the use is held to be fair").

Here, that balance again favors Google.  As explained above, the public derives tremendous benefit from GBS, but authors stand to gain very little if the public is deprived of this resource.  "The fourth factor disfavors a finding of fair use only when the market is impaired because the quoted material serves the consumer as a substitute, or, in Story's words "supersede[s] the use of the original.'"  Leval, 103 Harv. L. Rev at 1112.  GBS is hardly a market substitute: while GBS allows the public to *search* all of the books in its database, it provides only snippets of non-public domain works.  Google Br. 10, 28-31.

Plaintiffs may argue that GBS impairs their ability to license their works for just this purpose, *i.e.*, creating a search index, and that the public could still benefit if the works were licensed.  However, no entity appears willing and able to pay the monumental costs this would impose, even if the per book license fee were nominal.  Most if not all libraries – the prime theoretical "market" – would be unable to afford the licenses for millions of books and the cost of administering those millions of licenses.  Between 2008 and 2010, research library budgets fell from a median of $24 million to $22.7 million.  Sara Hebel, *State Cuts Are Pushing Public Colleges into Peril*, Chron. of Higher Ed. (Mar. 14, 2010).[4]  Moreover, the trend of state spending on higher education not keeping up with enrollment growth and inflation, which was exacerbated during the recession, suggests that many library budgets, particularly those in state institutions, will not recover any time soon.  *Id*.  Funding per public full-time equivalent student

---

[4] *Available at* http://chronicle.com/article/In-Many-States-Public-High/64620.

dropped by 26.1 percent from 1990–1991 to 2009–2010.  John Quinterno & Viany Orozco, *The Great Cost Shift: How Higher Education Costs Undermine the Future Middle Class*, Demos (Apr. 3, 2012).[5]  Total fiscal support for higher education declined by another 7.6 percent from fiscal year 2011 to fiscal year 2012, with cuts occurring in 41 states.  Caralee Adams, *State Funding for Higher Ed. Drops by 7.6 Percent in a Year*, Education Week (June 27, 2012).[6]  The average return on university endowments is lower, and federal stimulus funds for education are running low.  Congress has made it clear that it will not increase its support for research universities to make up for the decline of state funding.  Paul Basken, *Lawmakers Offer Struggling Research Universities Sympathy, Not Cash*, The Chronicle of Higher Education (June 27, 2012).[7]  Likewise, the funding of state libraries has decreased by 24.1 percent over the past decade, resulting in a significant reduction in staff.  Press Release, Inst. of Museum and Library Servs., State Library Agencies Continue to Provide Valuable Services Despite Severe Cuts in Funding and Staff (Feb. 6, 2012).[8]

At the same time, other library costs have increased dramatically.  For example, between 1986 and 2010, research library expenditures on academic journals increased 379 percent, more than double the rate of overall library expenditures.  *See* Association of Research Libraries, *Expenditure Trends in ARL Libraries*, 1986-2010.[9]  In 1986, journal subscriptions represented 16.8 percent of median research library expenditures; by 2010, journal subscriptions grew to 31.1 percent of expenditures.  *Id.*  At one Big Ten university, "if the average changes in library

---

[5] *Available at* http://www.demos.org/publication/great-cost-shift-how-higher-education-cuts-undermine-future-middle-class.

[6] *Available at* http://blogs.edweek.org/edweek/college_bound/2012/01/_in_a_commentary_by.html?utm_source=twitterfeed&utm_medium=twitter.

[7] *Available at* http://chronicle.com/article/Lawmakers-Offer-Struggling/132659/?cid=at&utm_source=at&utm_medium=en.

[8] *Available at* http://www.imls.gov/state_library_agencies_continue_to_provide_valuable_services.aspx?CategoryId=1&F_All=y.

[9] *Available at* http://www.arl.org/stats/annualsurveys/arlstats/arlstats10.shtml.

budgets were compared to the average increase in serial costs from the years 2001-2005, the entire library budget would be consumed by journal costs by the year 2014."  Glenn S. McGuigan & Robert D. Russell, *The Business of Academic Publishing: A Strategic Analysis of the Academic Journal Publishing Industry and its Impact on the Future of Scholarly Publishing*, 9 Electronic J. Acad. Special Librarianship 3 (2008).[10]  And, of course, journal costs are only the tip of the iceberg that is threatening library budgets.  In short, libraries do not have the resources to pay license fees for the "right" to index the books in their collections.

Further, courts have properly rejected similar circular arguments.  *Kane v. Comedy Partners,* No. 00 Civ. 158 (GBD), 2003 WL 22383387, at *7 (S.D.N.Y. Oct. 16, 2003) (to avoid danger of circularity, copyright owner not entitled to license fees for uses that otherwise qualify as fair uses); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4] (2005) ("[I]t is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar.").

Finally, authors actually benefit substantially from GBS, as readers, researchers, librarians, and others use the service to find, and often purchase, books of interest.  "The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use."  *MCA*, 677 F.2d at 183.  Where, as here, there is no meaningful adverse effect, the use is surely justified.

## III.   PLAINTIFFS HELPED FOSTER PUBLIC RELIANCE ON GBS; IN EQUITY THEY SHOULD NOT BE PERMITTED NOW TO DEPRIVE THE PUBLIC OF THAT RESOURCE

As the Court performs the equitable analysis that is at the heart of the fair use calculus, it should be aware that the current situation – where the Court must consider the legality of an

---

[10] Even Harvard University, arguably the most well resourced institution of higher education in the nation, has told faculty that the rising cost of journals has created an "untenable situation."  Now costing $3.75 million a year, these subscriptions "cannot be sustained."  *Saying Costly Subscriptions 'Cannot Be Sustained,' Harvard Library Committee Urges Open Access*, Chronicle of Higher Education (Apr. 23, 2012), http://chronicle.com/blogs/ticker/saying-costly-subscriptions-cannot-be-sustained-harvard-library-committee-urges-open-access/42589.

existing digital database of over twelve million books – is in large measure the result of litigation choices made by the Plaintiffs.  When Plaintiffs sued Google in 2005, they could have sought preliminary relief – but they chose not to.  When the Plaintiffs entered into settlement discussions with Google, they could have demanded that Google cease scanning books – but they chose not to.  During the course of the three years of settlement negotiations with Google, they could have demanded that Google discontinue scanning – but they chose not to.  When the Plaintiffs agreed to a settlement with Google in 2008, they once again could have insisted that Google cease scanning pending approval of the settlement – but they chose not to.  In short, Plaintiffs' litigation decisions over the past seven years have allowed Google to scan millions of books into its search index, and the public to grow reliant on GBS's research capabilities.

## IV.   A LEGISLATIVE "FIX" IS BOTH UNNECESSARY AND UNWORKABLE

It may be tempting for the Court and Plaintiffs to suggest that the issues raised in this case should be resolved through some type of Congressional action.  If so, amici urge the Court to resist that temptation, keeping in mind the unfortunate fate of recent efforts to adopt legislation to resolve the orphan works problem.

In a nutshell, that legislation would have limited the remedies for infringement if the user made a reasonably diligent search for the copyright owner prior to commencing the use.  A user would have had to bear the significant cost of searching for the copyright owner before making any use of a work; and if the copyright owner emerged after the use occurred, the user would have had to pay the owner reasonable compensation.  Even this legislation, which was very protective of the interests of the absent copyright owners and had the support of the Copyright Office, the publishers, and the library associations, failed to pass Congress because of the opposition of photographers and illustrators.  *See* Orphan Works Act, H.R. 5889, 110th Cong. (2008); Orphan Works Act, H.R. 5439, 109th Cong. (2006); Shawn Bentley Orphan Works Act, S. 2913, 110th Cong. (2008).

There is no reason to believe that legislation resolving the copyright issues relating to GBS would fare better than the orphan works legislation did in 2008.  The vociferous opposition

of some authors' groups to the Google Books Settlement (notwithstanding Plaintiffs' support of the settlement) indicates the high probability that a constituency will emerge to oppose forcefully any legislation that would attempt to address the copyright issues relating to GBS.  Moreover, the copyright issues relating to GBS are far broader than the scope of the orphan works legislation, which did not address mass digitization.  For example, a comprehensive legislative solution satisfactory to Plaintiffs might require enactment of a compulsory license such as an extended collective license.  It seems unlikely that Congress will adopt such a complex regulatory approach.[11]

To the extent that the Court or the Plaintiffs are contemplating yet another alternative remedy, such as allowing the GBS project to continue if authors explicitly offer permission, amici urge the Court the reject the idea.  Unfortunately, it is unlikely that many copyright holding authors will know about the opt-in option or will exercise it.  This is particularly true, of course, for orphan, or "hostage" works; by definition their owners are unknown.  Thus, the database is likely to shrink dramatically and be much less useful, to the detriment of the public interest.

Fortunately, a legislative solution already exists: the fair use doctrine, codified at 17 U.S.C. § 107.  This Court should use the equitable power granted it by Congress in section 107 to allow GBS to continue to thrive and to offer socially valuable services, such as search and non-consumptive research, that cause Plaintiffs no economic harm.

## CONCLUSION

The touchstone of any fair use analysis is whether the use in question furthers the purposes of copyright law, *i.e.*, "[t]o promote the Progress of Science and useful Arts," U.S.

---

[11] At a hearing in 2009 on the Google Books Settlement, then-Register of Copyrights Marybeth Peters suggested that a statutory compulsory license for the mass digitization of books might be inconsistent with international treaty obligations.  *Hearing on: Competition and Commerce in Digital Books before the H. Comm. on the Judiciary*, 111th Cong. 66 (2009).  At the very least, Register Peters believed that such a statutory compulsory license would subject the United States to "diplomatic stress." *Id.* at 8.

Const. art. I, § 8, cl. 8, and to serve "the welfare of the public."  *Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 429 n.10 (1984).  GBS does both.  Amici urge the Court to find that the fair use doctrine shelters it, and the activities that make it possible.

Dated: August 1, 2012

/s/ Jonathan Band
Jonathan Band
   (admitted *pro hac vice*)
JONATHAN BAND PLLC
21 Dupont Circle, NW
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com
*Counsel for Amici Curiae*
*American Library Association, Association*
*of College And Research Libraries, and*
*Association of Research Libraries*

/s/ Cindy Cohn
Cindy Cohn
   (admitted *pro hac vice*)
Corynne McSherry
Michael Barclay
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110-1914
(415) 436-9333 x122
cindy@eff.org
*Counsel for Amicus Curiae*
*Electronic Frontier Foundation*

**APPENDIX**

In May 2012, amici American Library Association and Association of College and Research Libraries conducted an informal survey asking librarians about their experiences with Google Book Search ("GBS").  Excerpts from the responses received are included in the accompanying amicus brief.  Numerous librarians reported similar uses.  For the convenience of the Court, these similar reports are summarized below (the reports are on file with amici).

1.   <u>GBS helps find valuable research sources</u>

- Rebecca Hedreen, Sciences and Distance Learning Librarian, Buley Library, Southern Connecticut State University, New Haven CT ("The main uses I see are taking advantage of the full text search capabilities to find things that aren't findable in traditional book search venues and viewing either the full text or enough of the text to determine if getting a full copy is worth the hassle.").

- Bryan Skib, Associate University Librarian for Collections, University of Michigan, Ann Arbor MI (Noticed in the acknowledgements to UM Professor Juan Cole's book *Napoleon's Egypt* that Cole praised GBS.  In later conversations with Cole, Skib learned that GBS had unearthed several "needles in the haystack" that Cole felt would have been difficult or impossible to find with other research tools.).

- Nancy McClements, University of Wisconsin, Madison WI ("It assists our patrons in the middle of the night, when they cannot enter a particular library with a particular book . . . ."  McClements reports using GBS to locate books for a variety of patron research projects, including: scholarship on the role of women in bars and taverns in the nineteenth and twentieth centuries; a graduate thesis about Orson Wells' radio career; and art historical antecedents to ladies almanacs.).

19

- Lindsay Sarin, University of the District of Columbia, Washington DC (Used GBS to find the names of Haitian soldiers who fought in the American Revolution.  "At times I point students to Google Books to view snippets while they wait for a copy to be returned or to arrive from a library in our consortium."  Sarin believes GBS soon will be getting even more use for searching and browsing print journals and microfiche/microfilm, as her library is moving its collections off-site.  "In my own research I use Google Books frequently to locate old book chapters.  I can't always find them in full-text, but I usually find them as snippets so I can decide if I need to get a copy of the book or not . . . . I'm starting to look at how democratic theory and democratic ideals have been used in library advocacy.  Eventually, this will turn into a longitudinal analysis . . . . That means I've been looking at some older library and information science books.  Many of these I can find in my library or through the consortium, but since they're older many are in our storage facility.  I use Google Books to look at snippets or at least the table of contents before requesting a title be sent over from storage.  Basically I want to make sure that it's worth getting . . . . Google Books was a lot easier to use than our catalog to locate [a particular book] and allowed me to verify that it was the book I needed" before requesting it from storage.  "The related books feature was extremely helpful when I looked for this book.  Library catalogs don't do a great job of finding related titles so this was much faster than browsing the shelves or catalog.").

- Anne Larrivee, Binghamton University State University of New York, Binghamton NY ("Google Book Search is helpful when you are looking for very precise information, if patrons would like to see books that specifically mention a rare ritual, event, etc. Google Book Search can help pinpoint which books might have a small chapter or paragraph about that topic that may not

often be mentioned as the primary topic in articles and books.").

- Barbara Fister, Gustavus Adolphus College, St. Peter MN ("I have been impressed by how often students in the past couple of years have used GBS to discover books on topics they are studying.").

- Mary Jane Cedar Face, Southern Oregon University, Ashland OR ("I helped a student with her senior capstone research on Methodist circuit rider preachers of the west.  We found a few books that held promise.").

- Cathy Rettberg, Head Librarian, Menlo School, Atherton CA ("Our kids are very adept at using Google Books, and use it frequently.  It's a great resource.").

- Thomas T. Kaun, Teacher Librarian, Bessie Chin Library, Redwood High School, Larkspur CA (Students "have successfully used it as a tool for finding books in a local library.  The really neat thing about it is the ability to find obscure information since the entire text can be searched even if the page is not available for perusal.").

- Halsted Mencotti Bernard, Wayne State University, Detroit MI (Describing how he used GBS to locate materials on the 1967 Detroit riot.).

- Rachel Gollub ("When I was doing research for my Master's thesis in Military History, I found Google Book Search a valuable resource.  Several of the topics I wrote about were somewhat obscure (references to early bayonets, the first uses of gunpowder in the west, etc.).  Being able to do a Google Books Search was highly useful, because I found mentions of my topics in obscure books that I otherwise wouldn't have found . . . . I would hate to lose a resource like that.").

2.    <u>GBS helps in collection development</u>

- Judy Panitch, Director of Library Communications, University of North Carolina at Chapel Hill, Chapel Hill NC ("Google Books [is] a terrific

resource[] for examining books, or for patrons to do so, before purchase, ILL [inter-library loans], retrieval from storage, etc., and for checking citations, quotes, and the like."  Panitch also describes a student's use of GBS to identify books discussing the runaway slave Dolly.).

- Susan Whitehead, Union Institute & University, Montpelier VT ("Our faculty and students use Google Book Search all the time" for "previewing books for purchase/requesting.").

- Rebecca Hedreen, Sciences and Distance Learning Librarian, Buley Library, Southern Connecticut State University, New Haven, CT ("I've used Google Books for collection development – especially when we're looking for something that covers a very specific topic" such as nursing theorists.).

- Lindsay Sarin, University of the District of Columbia, Washington DC ("I usually use it to read a small section in order to determine if I should get the book in-print either from a library or purchasing it.").

3.   GBS helps screen books for interlibrary-loan

- Scott Cohen, Library Director, Jackson State Community College, Jackson TN ("Our students used Google Books . . . for their papers in World Literature.  While some used it and gleaned information from the book online, others used it for interlibrary loan purposes.  We used it to order printed books that we didn't have.").

- Mary Jane Cedar Face, Southern Oregon University, Ashland OR ("The snippets are useful for determining if it's worth the effort to actually get the book in hand" via ILL.).

- Naulayne Enders, Kentucky Christian University, Grayson KY ("Our faculty and students are encouraged to look at previews of books that they have ordered through Interlibrary Loan.").

- Stewart Baker, California State University, Dominguez Hills, Carson CA ("[W]hen students need a book right away, I tend to see if it's available on Google Books, and suggest they browse through it there before requesting it in ILL.  This both avoids unnecessary loans and makes the student's life more convenient, as they can start their research right away instead of waiting 1-2 weeks.  We don't generally, however, recommend using GB *instead* of ILL, due to restrictions on pageviews . . .").

- Barbara Fister, Gustavus Adolphus College, St. Peter MN ("We have fast and free interlibrary loan, but GBS is nevertheless a helpful discovery tool.").

- Michael Dudley, Senior Research Associate and Library Coordinator, University of Winnipeg, Winnipeg MB, Canada ("Google Books has come in very handy … letting people know that an ILL or even running over to the main campus to get something we don't have will be worth their while.").

4.   <u>GBS helps find and check citations</u>

- Sarah B. Cornell, Librarian, Daniel Webster College, Nashua NH (Describing how GBS enabled a student to discover that an article had misquoted "Leadership" by James Burns – "a remarkable demonstration of how Google . . . rescues the unwary researcher.").

-  Irene M.H. Herold, Dean of the Library, Keene State College, Keene NH ("I used Google Book Search to avoid requesting materials via ILL when I just needed to see one page or a chapter that I was tracking down from another source's citations.").

- Serenity Ibsen, Technical Services and Archives Librarian, Pacific Northwest College of Art, Portland OR ("I [] find GBS helpful to determine whether an essay has been printed in multiple anthologies or whether an artist is in a certain book" when "faculty do not supply students with a full citation for

every essay or article they assign . . . I have even used it to see whether a quote was correct.").

- Beverly Geller, Librarian, The Frisch School, Paramus NJ ("A student needed to know which book a quote was from (he had forgotten to make a note of it for his footnotes) . . . [GBS] came up with the book and the page [number] in a matter of seconds.  I loved it.").

- Lindsay Sarin, University of the District of Columbia, Washington DC ("Sometimes I come across citations for articles or books that are incomplete, wrong, or illegible.  I can use Google Books to help find the complete citations and other items that have cited the original work via full text searching . . . . I use Google Books to find citations . . . when I actually have a book but can't find the passage I'm looking for.").

- Nancy McClements, University of Wisconsin, Madison WI ("I have been very successful in finding elusive quotations" using GBS, such as quotations by author Colette about erotic dance.  It is also helpful "when a student doesn't have an entire citation.").

- Rebecca Hedreen, Southern Connecticut State University, New Haven CT ("I used Google Books this morning in the hopes of tracking down an 'article' mistily remembered by an emeritus professor.").

- John Gottfried, Reference Coordinator, Western Kentucky University Libraries, Bowling Green KY ("We recently made considerable use of Google Books as we struggled to accurately cite quotations submitted by a large number of contributors working on a campus project.  Many of the quotes were simply attributed to a well-known figure, but included no information on where or when the quote had been published.  We located several of them through Google Books.").

- Susan Whitehead, Union Institute & University, Montpelier VT ("[GBS is] a wonderful tool for locating original quotations and page numbers (for citations).").

5. GBS is integrated into library research and education systems

- Mary Jane Cedar Face, Southern Oregon University, Ashland OR ("We teach students to use Google Books as a way to keyword search within/across content (full[]- text) of the universe of Google Books.  It's especially useful if they have very specific search terms.  Then, we show them how to access the book by checking our catalog, the union catalog of our consortium, or request the book by ILL. . . . We have added Google Books links to almost all Lib Guides in a 'Finding Books' box.").

- Michael Mitchell, Technical Services Librarian, Brazosport College, Lake Jackson TX ("I've got our catalog set to include a link to Google Preview (Books) in its search results," which "adds a great deal of supplemental information to our catalog for students and faculty. . . .").

- Tina M. Hovekamp, Associate College Librarian, Barber Library, Central Oregon Community College, Bend OR ("I often pick a catalog search result to show students how they may preview the book on GBS.").

- Lindsay Sarin, University of the District of Columbia, Washington DC ("We [] teach students to use Google Books in their research, especially if they're doing historical or primary research.  We even link to it in our Research Guides."  "Some faculty members [] have created assignments that require that students use primary source materials especially magazines . . . Because many of these are digitized in Google Books students are using more sources in their assignments than they would if they had to use microfiche (getting students to use that is like pulling teeth). . . .").

25

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Southern District of New York by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 1, 2012                         By: /s/ Jonathan Band
                                                     Jonathan Band