Michael J. Boni (pro hac vice)
Joanne Zack
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
(610) 822-0200 (phone)
(610) 822-0206 (fax)
MBoni@bonizack.com
JZack@bonizack.com


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| The Authors Guild, Inc., Associational Plaintiff, Betty Miles, Joseph Goulden, and Jim Bouton, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Google Inc.,<br><br>Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

Case No. 05 CV 8136-DC

~~FILED UNDER SEAL~~

**ECF CASE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**(PUBLIC REDACTED VERSION)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................ 4

    A.     Plaintiffs ................................................................................................ 4

    B.     Defendant .............................................................................................. 5

    C.     Google Books ........................................................................................ 5

          1.     The Partner Program ................................................................ 5

          2.     The Library Project .................................................................. 6

                 a.     Google's Library Project Policies and Practices............................ 7

                 b.     Google's Agreements With Its Library Partners ......................... 10

                 c.     Google's Commercial Purpose .................................................... 12

LEGAL STANDARD ........................................................................................... 13

ARGUMENT ........................................................................................................ 13

I.     SUMMARY JUDGMENT SHOULD BE GRANTED AS TO GOOGLE'S
      UNLAWFUL REPRODUCTION, DISTRIBUTION AND DISPLAY OF BOOKS ..... 13

    A.     Google Reproduced Books in Violation of 17 U.S.C. § 106(1) .......................... 13

    B.     Google Distributed Books in Violation of 17 U.S.C. § 106(3)............................ 15

    C.     Google Displayed Books in Violation of 17 U.S.C. § 106(5) ............................ 16

II.    SUMMARY JUDGMENT SHOULD BE GRANTED AS TO GOOGLE'S DEFENSE
      OF FAIR USE UNDER 17 U.S.C. § 107 ......................................................... 17

    A.     The First Fair Use Factor Favors Plaintiffs and the Class ................................... 21

          1.     Google's Use Is Not "Transformative"...................................................... 21

          2.     Google Has Engaged in Purely Exploitative Commercial Use ............... 34

    B.     The Second Fair Use Factor Favors Plaintiffs and the Class or is Neutral.......... 36

          1.     Fiction Books................................................................................. 36

          2.     Nonfiction Books.......................................................................... 37

3.     In-Print Books ............................................................... 38

4.     Out-of-Print Books ......................................................... 38

C.    The Third Fair Use Factor Favors Plaintiffs and the Class .................................. 39

D.    The Fourth Fair Use Factor Favors Plaintiffs and the Class .............................. 41

E.    Aggregate Assessment ...................................................... 46

III.   SUMMARY JUDGMENT SHOULD BE GRANTED ASSESSING STATUTORY DAMAGES OF $750 PER BOOK TO PLAINTIFFS AND THE CLASS ................... 47

CONCLUSION ........................................................................ 48

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*Cases*

*Acuff-Rose Music v. Campbell,*
    972 F.2d 1429 (6th Cir. 1992) .................................................. 40

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009) ................................................... 32

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad.–Paramount Theatres, Inc.,*
    388 F.2d 272 (2d Cir. 1967)..................................................... 3

*Am. Geophysical Union v. Texaco Inc.,*
    60 F.3d 913 (2d Cir. 1994).............................................. passim

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................ 13

*Authors Guild, Inc. v. Google, Inc.,*
    770 F. Supp. 2d 666 (S.D.N.Y. 2011)................................... 20

*Bagdadi v. Nazar,*
    84 F.3d 1194 (9th Cir. 1996) ................................................. 15

*Basic Books, Inc. v. Kinko's Graphics Corp.,*
    758 F. Supp. 1522 (S.D.N.Y. 1991).......................... 29, 37, 38

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006)................................................... 30

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)................................................... 30

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)........................................................ passim

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,*
    150 F.3d 132 (2d Cir. 1998).......................................... passim

*Craft v. Kobler,*
    667 F. Supp. 120 (S.D.N.Y. 1987) ........................................ 38

*Davis v. Gap, Inc.,*
    246 F.3d 152 (2d Cir. 2001).......................................... passim

*Eldred v. Ashcroft,*
    537 U.S. 186 (2003) ......................................................................................... 19, 20

*Folsom v. Marsh,*
    9 F.Cas. 342 (Cir. Ct. D. Mass. 1841) ........................................................... 41

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
    471 U.S. 539 (1985) ...................................................................................... passim

*Home Ins. Co. v. Aetna Cas. and Sur. Co.,*
    528 F.2d 1388 (2d Cir.1976) ............................................................................ 3

*Infinity Broad. Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir. 1998) ........................................................................ passim

*In re Visa Check/ Mastermoney Antitrust Litig.,*
    280 F.3d 124 (2d Cir. 2001), *overruled on other grounds by*
    *In re Initial Pub. Offering Sec. Litig.,* 471 F.3d 24 (2d Cir. 2006) ............................................. 1

*Island Software & Computer Serv., Inc.  v. Microsoft Corp.,*
    413 F.3d 257 (2d Cir. 2005) .......................................................................... 15

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2003) ......................................................................... 31

*Lennon v. Premise Media Corp.,*
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) ........................................................... 31

*London-Sire Records, Inc. v. Doe 1,*
    542 F. Supp. 2d 153 (D. Mass 2008) ............................................................ 15

*Matthew Bender & Co. v. West Publ'g Co.,*
    158 F.3d 693 (2d Cir. 1998) .......................................................................... 14

*Maxtone-Graham v. Burtchaell,*
    631 F. Supp. 1432 (S.D.N.Y.), *aff'd*, 803 F.2d 1253 (2d Cir. 1986) ...................................... 38

*Meeropol v. Nizer,*
    560 F.2d 1061 (2d Cir. 1977) ........................................................................ 38

*N.Y. Times Co. v. Tasini,*
    533 U.S. 483 (2001) .................................................................................. 14, 15

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,*
    166 F.3d 65 (2d Cir. 1999) ................................................................. 26, 29, 37

*NXIVM Corp. v. Ross Institute,*
    364 F.3d 471 (2d Cir. 2004) .......................................................................... 30

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007) .................................................................. 31, 32

*Rains v. Cascade Indus., Inc.,*
    402 F.2d 241 (3d Cir. 1968) ............................................................................ 3

*Reyher v. Children's Television Workshop,*
    533 F.2d 87 (2d Cir. 1976) ............................................................................ 37

*Ringgold v. Black Entertainment Television, Inc.,*
    126 F.3d 70 (2d Cir. 1997) ............................................................. 26, 29, 34

*Rosemont Enters., Inc. v. Random House, Inc.,*
    366 F.2d 303 (2d Cir. 1966) .......................................................................... 37

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) ...................................................................... 28, 36

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417, 429 (1984) ....................................................................... 20, 41, 42

*Stewart v. Abend,*
    495 U.S. 207 (1990) ............................................................................... 33, 36

*Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.,*
    996 F.2d 1366 (2d Cir. 1993) ................................................................. passim

*UMG Recordings, Inc. v. MP3.com, Inc.,*
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ...................................................... 18, 29

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,*
    342 F.3d 191 (3d Cir. 2003) .......................................................................... 31

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................ 13

**Statutes**

17 U.S.C. § 101 ....................................................................................... 13, 16

17 U.S.C. § 106(1) ........................................................................................ passim

17 U.S.C. § 106(3) ........................................................................................ passim

17 U.S.C. § 106(5) ........................................................................................ passim

17 U.S.C. § 107 ...................................................................................................... passim

17 U.S.C. § 108(c) ...................................................................................................... 20

17 U.S.C. § 302(a) ...................................................................................................... 19

17 U.S.C. § 504(c)(1) .............................................................................................. 1, 13


*Legislative History*

H.R. Rep. No. 94-1476, at 66 (1976) ................................................................... 19, 39

S. Rep. No. 94-473, at 64 (1975) .............................................................................. 39


*Other Authorities*

Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L. Rev. 1105 (1990) ......... 23

4-13 *Nimmer on Copyright* § 13.05 (2012) ......................................................... 36, 39

4 *Patry on Copyright*, §13:10 (2012) ......................................................................... 15

William F. Patry, *Patry on Fair Use* § 4:1 (2011) ..................................................... 36

## INTRODUCTION

This litigation arose from Google's business decision to gain a competitive edge over its rivals in the search engine market by making digital copies of millions of printed books. As part of this digitization project, Google unilaterally decided to copy not just books in the public domain, but also books still in-copyright.

This case is brought under Section 106 of the Copyright Act. Representative Plaintiffs Jim Bouton, Joseph C. Goulden, and Betty Miles, on behalf of themselves and the certified class (Order, ECF No. 1026), and Associational Plaintiff The Authors Guild, Inc., now move for summary judgment against Google on the following issues: Google's unauthorized reproduction of in-copyright books, 17 U.S.C. § 106(1); Google's unauthorized distribution of in-copyright books, 17 U.S.C. § 106(3); Google's unauthorized display of in-copyright books, 17 U.S.C. § 106(5); Google's defense of fair use, 17 U.S.C. § 107; and the assessment of statutory damages of $750 per Book for Google's copyright infringement, 17 U.S.C. § 504(c)(1).[1] Plaintiffs are not moving for summary judgment on the ownership element of their claims, or for equitable relief.[2]

The undisputed facts show that Google's unauthorized uses fall far outside the parameters of Section 107's fair use doctrine. Google's unauthorized uses are for a commercial purpose; involve verbatim copying, distribution, and display of protected expression; are not

---

[1] "Books" are each full-length in-copyright book published in the United States in the English language and registered with the United States Copyright Office within three months after first publication.

[2] The ownership and copyright status of Books can be established in the remedy phase of the case. *See* Opinion, ECF No. 1023, at 30. This process can be overseen by a Magistrate or Special Master, as appropriate. *See In re Visa Check/ Mastermoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006). Appropriate equitable relief can also be determined by the Court at the remedy phase.

"transformative"; and, if they became widespread, would adversely affect actual and potential markets for copyrighted books.

Google argues that its uses are "fair" because they allegedly involve copying and short "snippet" displays for the purpose of online search, and are therefore beneficial to copyright owners and the public. *See* Defendant Google Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories at 4-5, 8-9, 12-13 (Zack SJ Decl. Ex. 43).[3] Google disingenuously ignores the facts that (1) the books, and snippets displayed from these books, do not magically appear in its search engine out of the ether, (2) Google's search engine displays far more than three short excerpts from each book, and (3) Google's commercial interests are the driving force behind its unauthorized book digitization project (the "Library Project").

In order to "index" books and display snippets online, Google needs complete digital copies of books. For its Library Project, rather than seeking permission from copyright owners before digitally reproducing their in-copyright books, Google engaged in a massive campaign of bulk copying of print books of all types, regardless of their content. Google obtained these print books by entering into contracts with libraries that agreed to supply the books in bulk to Google and to receive in exchange from Google digital copies of the libraries' print books.

In addition to providing complete digital copies of these books to libraries, Google maintains multiple complete digital copies on its servers and on back-up tapes. Google makes the vast majority of each displayed book's content available online in verbatim selections which Google terms "snippets." With multiple searches, a single user of Google's search engine can see

---

[3] "Zack SJ Decl. Ex. __" refers to the corresponding Exhibit to the Declaration of Joanne Zack in Support of Plaintiffs' Motion for Partial Summary Judgment.

multiple snippets from the same book, and all of Google's users through their collective searches can view over time the substantial majority of that book.

Google implemented its Library Project in 2004, even though it was having success in its newly launched Partner Program, where it sought and obtained permission from publishers to copy and display books, and where it shared ad revenues with its partners. Google implemented its Library Project for commercial reasons to gain a competitive advantage over its competitors, particularly Microsoft and Amazon, which were also digitizing books, but with copyright owner permission. Simply stated, Google put its commercial interests above the interests of copyright owners.

As shown below, Google's actions violate the Copyright Act and are not a fair use of books. Google's uses are not transformative because they involve verbatim digital copying of entire books and create no new works. Plaintiffs and the class are entitled to an award of minimum statutory damages of $750 for each Book reproduced, distributed and/or displayed in Google's Library Project.[4]

---

[4] Plaintiffs move for summary judgment, but reserve all rights to a jury trial in the event the Court determines that their motion should not be granted. *See Home Ins. Co. v. Aetna Cas. and Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir. 1976) ("The fact that both sides in the instant case sought summary judgment does not make it more readily available.") (citing *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.–Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967)); *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.") (citation omitted).

## STATEMENT OF UNDISPUTED FACTS

### A.  Plaintiffs

Representative plaintiff Jim Bouton holds the United States copyright in BALL FOUR (registration number A173097). Undisp. Fact No. 1.[5] Representative plaintiff Betty Miles holds the United States copyright in THE TROUBLE WITH THIRTEEN (registration number TX0000338841). Undisp. Fact No. 2. Representative plaintiff Joseph Goulden holds the United States copyright in THE SUPERLAWYERS: THE SMALL AND POWERFUL WORLD OF THE GREAT WASHINGTON LAW FIRMS (registration number A346254). Undisp. Fact No. 3. Each of these books has been copied and displayed by Google in its Library Project without plaintiffs' permission. Undisp. Fact No. 4.[6]

The Authors Guild, Inc., the nation's largest organization of published authors (Undisp. Fact No. 7), is an associational plaintiff (but not a Rule 23 class representative) in this case. The Authors Guild advocates for and supports the copyright and contractual interests of published writers (Undisp. Fact No. 8), and seeks equitable relief here for authors affected by Google's copyright infringement.

---

[5] "Undisp. Fact No. ___" refers to the corresponding paragraph in Plaintiffs' Statement of Undisputed Facts, which is being filed concurrently with Plaintiffs' Motion for Partial Summary Judgment.

[6] As of March 26, 2012 (the date Google produced the document), Google had distributed approximately 2.7 million scanned books to the partnering libraries, which are identified in a spreadsheet Google produced in discovery. Undisp. Fact No. 5. Several representative pages from this spreadsheet are attached as Zack SJ Decl. Ex. 9. Because the spreadsheet is voluminous, the entire document has not been attached. At the Court's request, plaintiffs will provide an electronic copy of the spreadsheet to the Court. (On July 24, 2012, Google produced an updated version of this spreadsheet, which lists additional books.)

Digital copies of BALL FOUR and SUPERLAWYERS have been distributed to the University of California library: BALL FOUR on July 20, 2010, and SUPERLAWYERS twice, on July 29, 2009, and November 16, 2010. Undisp. Fact No. 6.

### B.      Defendant

Defendant Google owns and operates the largest Internet search engine in the world. Undisp. Fact No. 9.

Each day, millions of people use Google's search engine free of charge, while commercial and other entities pay to display ads to visitors to Google's websites and other websites that contain Google ads. Undisp. Fact No. 10. For the year ended December 31, 2011, Google reported over $36.5 billion in "advertising revenues." Undisp. Fact No. 11; *see also* Undisp. Fact No. 12.

### C.      Google Books

In October 2004, Google first announced its digital books program, calling it Google Print. Undisp. Fact No. 13. This project later became known as Google Books. Undisp. Fact No. 14. Significantly, Google began (and was having success with) a program that displayed portions of books only with the permission of the publishers of each book. *See* Undisp. Fact Nos. 16-17, 22-24. The Partner Program, together with Google's Library Project – where Google copies, distributes and displays books *without* permission, comprise the Google Books program. Undisp. Fact Nos. 15, 16, 55, 57.

#### 1.      The Partner Program

Since 2004, the Partner Program has allowed publishers and other rightsholders to permit Google to display their works in exchange for a split of ad revenue. Undisp. Fact No. 17. The program is aimed at "help[ing] publishers sell books" and "help[ing] books become discovered," while "adding authoritative content" to Google's website. Undisp. Fact No. 18.

Works in the Partner Program are displayed with permission of the rightsholder. Undisp. Fact No. 16. To participate in the program, rightsholders enter into a contract with Google and

send a printed copy of their books to Google for scanning (or provide Google with an existing digital copy). Undisp. Fact No. 19. Partners decide "how much of the book is browsable" on Google, "anywhere from a few sample pages to the whole book." Undisp. Fact No. 20. Google agrees to share with its partners a portion of the revenue it earns from ads shown next to pages of books searched in the Partner Program. Undisp. Fact No. 21.

The program was successful. *See* Undisp. Fact Nos. 22-24. During 2004, Google entered into dozens of contracts with publishers covering tens of thousands of books. Undisp. Fact No. 22. By 2004 year end, Google had received nearly 200,000 books for the Partner Program, even though Google's extensive outreach efforts focused almost exclusively on publishers, with little or no attempt to sign up authors. Undisp. Fact No. 23. As of early 2012, the Partner Program included approximately 2.5 million books, by permission of approximately 45,000 rightsholders, with the number of partners continuing to grow. Undisp. Fact No. 24. Because the Partner Program operates with rightholder authorization, it is not the subject of this lawsuit.

### 2.     The Library Project

In 2004, Google also embarked on a program of wholesale copying without rightsholders' permission, which is the subject of this lawsuit. Google publicly announced this program in December 2004, stating that it had entered into agreements with four university libraries (Harvard, Stanford, the University of Michigan, and Oxford) and the New York Public Library to "digitally scan books from their collections so that users worldwide can search them in Google." Undisp. Fact No. 25. Google refers to this endeavor as its Library Project. Undisp. Fact No. 26.

Since its December 2004 announcement, Google has entered into agreements with additional libraries (such as the Library of Congress, University of Texas at Austin, University of

Virginia, University of Wisconsin-Madison, Columbia University, Cornell University, Princeton University, University of California, and the Committee on Institutional Cooperation (a consortium of twelve research universities)), developed and patented scanning technology that allows library books to be copied, and copied the entirety of over twenty million books. Undisp. Fact Nos. 27-29.

In exchange for access to a library's print books, Google distributes digital copies of the scanned books to the contributing library. Undisp. Fact No. 30.

### a.    Google's Library Project Policies and Practices

To carry out its scanning *en masse*, Google set up scanning facilities in Mountain View, California, where Google is headquartered, as well as in Ann Arbor and near Boston. Undisp. Fact No. 31.[7] Google engaged in "bulk scanning," with libraries providing "carts of books" for Google to scan. Undisp. Fact No. 34. Google's scanning operations involved approximately three hundred scanning machines, and reached an annual budget of $30 to $40 million for the scanning alone. Undisp. Fact No. 35. Some libraries (*e.g.*, the New York Public Library, Harvard, Columbia, and Princeton) allowed Google to scan only public domain works, while others (*e.g.*, the Universities of California, Michigan, Wisconsin, Cornell, University of Virginia, CIC, Stanford, and Texas) allowed Google to scan in-copyright works as well. Undisp. Fact No. 36.

A "large number" of independent contractors – "on the order of hundreds" – served as Google's scanning operators who performed the physical scanning, often working five to six days per week, two shifts per day. Undisp. Fact No. 37. In scanning up to four million books per

---

[7] For some libraries, Google undertook "selective scanning," which entailed a library identifying a collection or set of books, and Google determining which books it had already scanned or planned to scan from another library partner, to avoid duplicative scanning and to "increase efficiency." Undisp. Fact No. 32. This "selection" process was unrelated to the content of the book. Undisp. Fact No. 33.

year, Google's contractors did not make any judgments concerning a book's content. Undisp. Fact No. 38.

Google copies every book its library partners provide, regardless of content, unless (a) Google determines that it already has or will copy the book from another library; (b) the book is physically not fit to be copied; or (c) Google has received a specific request from a copyright owner not to scan the book. Undisp. Fact No. 39.

Each book copied by Google as part of its Library Project was copied by Google in its entirety multiple times. Undisp. Fact No. 40. Google maintains digital copies of these books on its servers and on back-up tapes. Undisp. Fact No. 41. In response to search inquiries by users of its search engine, Google searches the complete text of books copied in its Library Project. Undisp. Fact No. 42.

Since 2005, pursuant to uniform rules of its own devising, Google has displayed verbatim expression from these books on the Internet in response to search requests by users of its search engine. Undisp. Fact No. 43. To produce snippets, Google generally divides each page into eighths, each of which Google calls a snippet. Undisp. Fact No. 44.

Google states that each search by a user "only" displays three snippets of each book, Google Br. in Opp'n to Class Cert., ECF No. 1000, at 5. It fails to disclose that, by performing multiple searches using different search terms (including multiple search terms suggested by Google), a single user can view far more than three snippets from a Library Project book. Undisp. Fact No. 45. For Example, Exhibit 4 (to the Zack SJ Decl.) demonstrates that Google displayed to one user – making a series of consecutive searches within BALL FOUR – about 37 different snippets, consisting of over **1900** words of verbatim expression. Undisp. Fact No. 46.

Even minor variations in search terms will result in different displays of text. Undisp. Fact No. 47.

Google shows its users snippets from all portions of the books displayed in its Library Project, except for the small proportion of each book that it "blacklists." Undisp. Fact No. 48. Google blacklists 10% of the pages of books and one snippet per page. Undisp. Fact  No. 49. Thus, Google makes the vast majority of the text of these books available for verbatim display to its users collectively. Undisp. Fact No. 50.[8]

To date, as part of Google Books, Google has digitally copied over 20 million books, including over four million in-copyright English language books, Google has distributed complete digital copies of over 2.7 million in-copyright books to libraries, and displayed verbatim expression as snippets from millions of in-copyright books over the Internet in response to search requests of its users. Undisp. Fact No. 53. Google did not seek or obtain permission from copyright owners before it made these uses. Undisp. Fact No. 54.[9] Google has not compensated copyright owners for its copying, distribution to libraries, or display of verbatim expression from these books. Undisp. Fact No. 55.

---

[8] Some of the books copied in the Library Project are placed by Google into metadata-only view, where no text is displayed. Undisp. Fact No. 51. In general, reference works (*i.e.*, encyclopedias, almanacs, dictionaries, thesauri, trivia books, books of quotations, bibliographies, indexes, poetry books, sheet music, pricing guides, travel guides, joke books, recipe books and catalogs), books published within the preceding two years which would have been placed in snippet view, and works for which the rightsholder has instructed Google not to display the work are placed in metadata-only view. Undisp. Fact No. 52. As to these books, plaintiffs seek summary judgment under 17 U.S.C. §§ 106(1) and (3).

[9] Google has admitted in its responses to Plaintiffs' Requests for Admissions that it digitally copies books in their entirety – including in-print and out-of-print books, fiction and nonfiction books, reference books, anthologies, educational books, textbooks, dissertations, monographs, journals, government publications, and other types of works; provides entire digital copies of books to libraries, and displays snippets from books in response to user requests, all without copyright owner permission. Undisp. Fact No. 56.

#### b.   Google's Agreements With Its Library Partners

Pursuant to their cooperative agreements with Google, each library provides books to
Google, Google scans the books, makes a digital file of the books for Google's use, and
distributes digital copies of scanned books to the providing library. Undisp. Fact No. 57. One of
Google's earliest library agreements, its digitization agreement with Stanford University,
summarizes their agreement as follows:

Undisp. Fact No. 58.

Google's library agreement refer to dissemination of information or making information
publicly available, often stating that "Google and the University share a mutual interest in
making information available to the public."[10] Undisp. Fact No. 59. To facilitate that interest,
Google will "digitize" mass quantities of books, with "digitize" defined as "to convert content
from a tangible, analog form into a digital representation of that content."[11] Undisp. Fact No. 63.
After digitization, the agreements require that Google provide the libraries with digital copies of
the books supplied to Google by each library. Undisp. Fact No. 64.

---

[10] Google's agreements with each of the libraries have many of the same or similar terms.
Undisp. Fact No. 60. Four libraries, however, Harvard University, Princeton University,
Columbia University, and the New York Public Library, only permitted Google to scan books in
the public domain or for which Google received authorization from the copyright holder. Undisp.
Fact No. 36.

[11] Google scanned the covers and every page of in-copyright books, performing optical
character recognition on the scanned images to obtain machine-readable text, and then, through
an "automated process compil[ing] a digital copy of the book." Undisp. Fact No. 62.

10

Google itself has explained that after the library requests a copy of a particular book that Google has scanned, Google provides its digital copy by placing the file of the book on a server that the requesting library can access to download the file over the Internet. Undisp. Fact No. 65. Indeed, the distribution of the digital copies to the libraries was an important component of the Library Project. Undisp. Fact No. 66. As Google's Dan Clancy stated at his deposition, "it is part of the Library Project that – as I stated – that we provide a copy, the ability to get a copy, for our library partners of the books we scan, in addition to any other uses." Undisp. Fact No. 67.

Google also transfers ownership of the distributed copies to the libraries, as the agreements clarify that the libraries solely own the rights to use the digital copies provided by Google. Undisp. Fact No. 68. For example, the University of Virginia's agreement states that, regarding the library's copy, "As between Google and University... University shall own all rights, title, and interest to the University Digital Copy." Undisp. Fact No. 69. Each of the agreements contains a similar transfer of ownership clause. Undisp. Fact No. 70.

Finally, Google's cooperative agreements with the libraries presume the libraries' further use of the digitized works. Undisp. Fact No. 71. For example, Google's agreement with the University of Michigan specifically allows for the use of Michigan's copies for "inclusion in Michigan's search services." Undisp. Fact No. 72. ████████████████████████ ████████████████████████████████████████████ Undisp. Fact No. 73. Michigan's Dean of Libraries, Dr. Paul Courant, testified that "Google did scan works from the University of Michigan libraries, and Google – and we did indeed receive copies of those scans"; ████████████████████████████████████ ████████████████████████████████████████

███████████████████████████████

████████ Undisp. Fact No. 74.

### c.    Google's Commercial Purpose

Google undertook the Library Project for commercial reasons. Undisp. Fact No. 75. A Google internal presentation in 2003 states that "[w]e want web searchers interested in book content to come to Google not Amazon;" "[e]verything else is secondary . . . but make money." Undisp. Fact No. 76.

An October 15, 2004 Google PowerPoint presentation states that Google's purpose is to "[g]ain a competitive advantage." Undisp. Fact No. 77. Google's Dan Clancy testified that, "to the extent other search engines were not similarly investing in such a project, then the belief [within Google] would be that this would enhance our experience for users and, therefore, improve the product we might offer, which would tend to give us an advantage." Undisp. Fact No. 78. Google monetizes its search product by running advertisements in response to search queries. Undisp. Fact No. 79. As such, when Microsoft initiated a project "similar to [Google's] Partner Program" it was the subject of internal discussions at Google. Undisp. Fact No. 80.

Clancy testified that during the six years he was chief engineer for Google Books, Google invested at least $180 million in its books scanning operations alone, and that this amount does not include the salary and other expenses associated with the Google Book team of over twenty people. Undisp. Fact No. 81. To protect this commercial investment, Google even restricts the way its Library Partners can disseminate access to out-of-copyright (public domain) works that Google distributes to the library. Undisp. Fact No. 82. As Clancy testified, "[w]e were investing a fair amount in digitizing these documents, and so this was an investment where we did not want third parties that might be building an equivalent service to be able to obtain the documents

directly from us." Undisp. Fact No. 83. He reiterated that Google did not want its competitors to obtain a "complete corpus of all the public domain documents" that Google had scanned. Undisp. Fact No. 84.

For Google, a for-profit corporation, its commercial interests were the driving purpose behind its massive Library Project.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

For the reasons set forth below, there is no genuine dispute as to any material fact that Google's unauthorized reproduction, distribution, and display of in-copyright books violates 17 U.S.C. §§ 106(1), (3), and (5) and is not "fair use" pursuant to 17 U.S.C. § 107, and that class members are entitled to statutory damages of $750 per Book for Google's copyright infringement under 17 U.S.C. § 504(c)(1). Accordingly, this Court should grant plaintiffs' motion for partial summary judgment.

## ARGUMENT

## I.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO GOOGLE'S UNLAWFUL REPRODUCTION, DISTRIBUTION, AND DISPLAY OF BOOKS

### A.   Google Reproduced Books in Violation of 17 U.S.C. § 106(1)

Section 106(1) of the Copyright Act provides in relevant part that, subject to Section 107, the "owner of copyright under this title has the exclusive rights" to "reproduce the copyrighted work in copies." Section 101 of the Copyright Act defines "copies" as "material objects" in

which a work "is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or a device."[12]

The Second Circuit Court of Appeals has explained that the definition of copies in the Copyright Act is "intended to expand the 'fixation' requirement to include material objects that embody works capable of being perceived with the aid of a machine, thereby ensuring that reproductions of copyrighted works contained on media such as floppy disks, hard drives, and magnetic tapes would meet the Copyright Act's 'fixation' requirement." *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 703 (2d Cir. 1998); *see also N.Y. Times Co. v. Tasini*, 533 U.S. 483, 498 (2001) ("LEXIS/NEXIS' central discs and UMI's CD-ROMs 'reproduce . . . copies'" under Section 106(1)) (alteration in original).

The undisputed evidence demonstrates that, in its Library Project, Google has digitally reproduced millions of print books and created multiple digital copies of each book for itself and its library partners. Undisp. Fact Nos. 40, 41, 53, 56, 57. Google maintains multiple digital copies on its servers, as well as on back up tapes. Undisp. Fact Nos. 40, 41.

Google has reproduced these books without any license or permission from the copyright owners. *See* Undisp. Fact Nos. 54-56.

These undisputed facts establish a *prima facie* case against Google under 17 U.S.C. § 106(1) of infringement by unauthorized reproduction.

---

[12] Section 101 provides that a "work consisting of sounds, images, or both, that are being transmitted, is 'fixed' for purposes of this title if a fixation of the work is being made simultaneously with its transmission."

**B.      Google Distributed Books in Violation of 17 U.S.C. § 106(3)**

Section 106(3) of the Copyright Act provides in relevant part that, subject to Section 107, the copyright owner has the exclusive right to "distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." Distribution under Section 106(3) includes distribution of digital files. *N.Y. Times*, 533 U.S. at 498 ("it is clear, moreover, that…UMI, by selling those CD-ROMS, and LEXIS/NEXIS, by selling copies of the Articles through the NEXIS database, 'distribute copies' of the Articles 'to the public by sale,' §106(3)"); *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 173 (D. Mass 2008) ("An electronic file transfer is plainly within the sort of transaction that § 106(3) was intended to reach."). Distribution to a single entity comprised of multiple people constitutes a distribution to the public. *Bagdadi v. Nazar*, 84 F.3d 1194, 1198 (9th Cir. 1996); *see also* 4 *Patry on Copyright*, §13:10 (2012) (a distribution is to the public if it is not a "private" distribution, such as to a family member, friend or colleague). Distribution under Section 106(3) occurs with the transfer of ownership of an unauthorized copy of a copyrighted work. *See, e.g.*, *Island Software & Computer Serv., Inc.  v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).

The undisputed facts show that Google distributed copies of in-copyright books to the libraries whose books Google scanned for its Library Project. Undisp. Fact Nos. 5, 30, 53, 64-70. As Google has stated: "Google admits that it has entered into agreements with certain libraries, pursuant to which those libraries have requested that Google scan books, including in-copyright works, provided to Google by the library, and Google has provided digital copies of millions of those books to the libraries…." Undisp. Fact No. 85. Google distributed copies of copyrighted works when it provided the libraries with millions of digital copies of the libraries' print books

and transferred ownership of those digital copies to the libraries. *See* Undisp. Fact Nos. 5, 53-59, 64-70.

These undisputed facts establish a *prima facie* case against Google under 17 U.S.C. § 106(3) for infringement by unauthorized distribution.

### C.    Google Displayed Books in Violation of 17 U.S.C. § 106(5)

Section 106(5) of the Copyright Act provides in relevant part that, subject to Section 107, the "owner of copyright under this title has the exclusive rights," in the case of literary works, "to display the copyrighted work publicly." Section 101 defines "display" as "to show a copy of [a work], either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially."[13] Section 101 provides that, to display a work "publicly" means:

> **(1)** to…display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

> **(2)** to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

The undisputed evidence demonstrates that Google publicly displays over the Internet verbatim expression, which it refers to as snippets, from millions of books copied in its Library Project.[14] *See* Undisputed Fact Nos. 43, 48, 50, 53, 56, 88.

---

[13] Google also makes a number of non-display uses of Books it copies in its Library Project. Undisp. Fact No. 86. These non-display uses have commercial benefits to Google. Undisp. Fact No. 87.

[14] Google has produced to plaintiffs a list of over eight million English language books that Google has copied and determined not to be in the public domain. Undisp. Fact No. 53. The
*footnote continued*

These undisputed facts establish a *prima facie* case against Google under 17 U.S.C.

§ 106(5) of infringement by unauthorized display.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO GOOGLE'S DEFENSE OF FAIR USE UNDER 17 U.S.C. § 107

Google's unauthorized reproduction, distribution and display of books in its Library

Project is not a fair use of the books under Section 107 of the Copyright Act. Section 107

provides in relevant part that:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> **(1)** the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> **(2)** the nature of the copyrighted work;
>
> **(3)** the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> **(4)** the effect of the use upon the potential market for or value of the copyrighted work.

Google's unauthorized uses do not meet the criteria for fair use in Section 107. Google's

conduct is far removed from the usual fair use case, where a defendant uses a portion of one

---

list includes over four million books that Google makes available over the Internet in snippet
display. Undisp. Fact No. 88. Several representative pages from this spreadsheet are attached as
Zack SJ Decl. Ex. 30. Because the spreadsheet is voluminous, the entire document has not been
attached. At the Court's request, plaintiffs will provide an electronic copy of the spreadsheet to
the Court.

work in another new work. Instead, in its Library Project, Google used its massive financial and technological resources (1) to indiscriminately create complete digital copies of print books for use in its commercial search engine from which Google has reaped substantial profits since 2004, as well as for use by its library partners; (2) to distribute complete digital copies of these book to libraries as a *quid pro quo* for those libraries providing print books to Google for digitization; and (3) to display verbatim expression from millions of books to users of its search engine.[15]

As the Second Court of Appeals stated in *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994), a defendant's copying of an entire document "is obviously an activity entirely different from creating a work of authorship. Whatever social utility copying of this sort achieves, it is not concerned with creative authorship." *Id.* at 917.

Google has the burden of proof on this defense. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Summary judgment on the fair use defense is appropriate where, as here, the material facts are not in dispute. "[T]his court has on a number of occasions resolved fair use determinations at the summary judgment stage where, as here, there are no genuine issues of material fact." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (granting summary judgment in favor of plaintiff copyright holder and against defense of fair use) (internal quotation and citation omitted); *see also UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350-51 (S.D.N.Y. 2000) (granting summary judgment to plaintiffs after

---

[15] Google's reproduction, distribution, and display are not for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." While Google may argue that some of its search engine users use "snippet" displays for some of these purposes, it is Google's uses, not that of its users, which are relevant under Section 107. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108-09 (2d Cir. 1998).

applying fair use factors to entire website that permitted users to download "tens of thousands of popular CDs").

In determining whether Google's uses are fair, the full scope of Google's Library Project must be considered. Congress expressly intended that the fair use doctrine be adapted to the facts of each particular case, and had "no disposition to freeze" the doctrine, "especially during a period of rapid technological change." H.R. Rep. No. 94-1476, at 66 (1976).

Despite Google's arguments to the contrary, its mass digitization project does not become a fair use because (a) it is allegedly difficult to locate copyright owners to obtain permission from them for Google's uses and/or (b) Google Books benefits libraries. First, despite assertions that it is difficult to locate copyright owners because of the length of the copyright term, Congress has *increased* the term of copyright protection. *See generally* United States Copyright Office, Circular 15A, *Duration of Copyright* (available at http://www.copyright.gov/circs/circ15a.pdf) (recounting the history of Congressional action to significantly extend the term of copyright protection such that today works created on or after January 1, 1978 are protected "for a term consisting of the life of the author and 70 years after the author's death" under 17 U.S.C. § 302(a)); *see also Eldred v. Ashcroft*, 537 U.S. 186, 192-93 (2003) (upholding the Copyright Term Extension Act, which extended, by 20 years, the terms of existing copyrights).

Also despite such pleas, Congress has *not* passed Orphan Works legislation which would permit the display of books whose copyright owners cannot be located. *See* United States Copyright Office, Office of the Register of Copyrights, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (Oct. 2011), at 25-29 (discussing legislation concerning "orphan works" that has been introduced but not adopted) (available at

http://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf); *see also* Marybeth Peters, Register of Copyrights, *The Importance of Orphan Works Legislation* (Sept. 25, 2008) (available at http://www.copyright.gov/orphan/).

Second, Congress has not permitted libraries to engage in mass digitization efforts without the permission of copyright owners. To the contrary, Section 108 of the Copyright Act strictly limits the circumstances under which libraries may digitize books in their collections. Libraries may make [up to three] digital copies of published works only to replace a work "that is damaged, deteriorating, lost, or stolen, or if the existing format in which the work is stored has become obsolete," where the library cannot locate an unused replacement at a fair price, or, where a work is within the last twenty years of its copyright term, is not subject to "commercial exploitation," and could not be found at a reasonable price. 17 U.S.C § 108(c) and (h). Notably, digital replacement copies must not be "made available to the public in that format outside the premises of the library or archives in lawful possession of such copy." 17 U.S.C. § 108(c).

Google's argument that it, a commercial entity, should be permitted under Section 107's fair use provision to engage in unauthorized mass digitizations, distributions and displays that Congress has not even permitted to not-for-profit libraries has no merit. As this Court stated in its opinion in this case denying final approval of the proposed settlement:

> [T]he Supreme Court has held that "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." *Eldred v. Ashcroft*, 537 U.S.186, 212 (2003); *accord Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) ("[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product.").

*Authors Guild, Inc. v. Google, Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011).

Google cannot arrogate to itself the right to determine whether or not it is in the public interest, or in the interest of copyright owners, for it to indiscriminately digitally reproduce, distribute and display millions of copyrighted works without the permission of the owners of those copyrights. Such determinations are for copyright owners (or Congress), not Google.

The unprecedented scope of Google's copying here, as outlined above, in itself warrants a finding that Google's uses are not fair. The four non-exclusive factors set out in Section 107 further buttress such a conclusion.

**A.      The First Fair Use Factor Favors Plaintiffs and the Class**

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." The key issue is whether Google's use is "transformative." Numerous cases by the Supreme Court and the Second Circuit explain why Google's use is not transformative.

**1.      Google's Use Is Not "Transformative"**

Google's verbatim copying is a "superseding" or "supplanting" use – *i.e.,* a verbatim substitution – which is not entitled to fair use protection. This was made clear in the seminal fair use decision, *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985). Harper & Row owned the exclusive copyright to President Ford's memoir, *A Time to Heal. The Nation* magazine obtained an unauthorized pre-publication copy of the manuscript, kept the manuscript for 24 hours and (without making a copy), prepared a 2,500 word description from the complete manuscript, and then returned the original. *The Nation's* 2,500 word description included 300 to 400 words taken *verbatim* from the manuscript, or about 13% of *The Nation's* article (and a smaller fraction of the complete manuscript itself).

*The Nation* defended on the basis of fair use. The Supreme Court rejected this defense.
The Court quoted a landmark decision by Justice Story, in which portions of George
Washington's letters had been copied in a scholarly journal:

> "[I]t is as clear, that if he thus cites the most important parts of the
> work, with a view, not to criticise, but to supersede the use of the
> original work, and substitute the review for it, such a use will be
> deemed in law a piracy."

> As Justice Story's hypothetical illustrates, the fair use doctrine has
> always precluded a use that "supersede[s] the use of the original."
> *Ibid.* Accord, S.Rep. No. 94-473, p. 65 (1975) (hereinafter Senate
> Report).

471 U.S. at 550 (citation omitted). Here, Google's use is clearly a "superseding" one. Its purpose
and effect are to substitute verbatim electronic copies and excerpts for the printed words of the
copyright holder.

*Harper & Row* also explained why a program like Google's Library Project cannot be
assessed by considering each use by Google in isolation. On the contrary, even "[i]solated
instances of minor infringements, when multiplied many times, become in the aggregate a major
inroad on copyright that must be prevented." *Id.* at 569 (quoting with approval Senate Report).

Five years after *Harper & Row*, Judge Leval wrote an influential law review
commentary, which contrasted Justice Story's "superseding" use, *i.e.,* piracy, with what Judge
Leval termed a "transformative" use, which he deemed essential to any genuine fair use:

> I believe the answer to the question of justification turns primarily
> on whether, and to what extent, the challenged use is
> transformative. The use must be productive and must employ the
> quoted matter in a different manner or for a different purpose from
> the original. *A quotation of copyrighted material that merely
> repackages or republishes the original is unlikely to pass the test*;
> in Justice Story's words, it would merely "supersede the objects"
> of the original. If, on the other hand, the secondary use adds value
> to the original – if the quoted matter is used as raw material,
> transformed in the creation of new information, new aesthetics,

> new insights and understandings – this is the very type of activity
> that the fair use doctrine intends to protect for the enrichment of
> society.
>
> Transformative uses may include criticizing the quoted work,
> exposing the character of the original author, proving a fact, or
> summarizing an idea argued in the original in order to defend or
> rebut it. They also may include parody, symbolism, aesthetic
> declarations, and innumerable other uses.
>
> The existence of any identifiable transformative objective does not,
> however, guarantee success in claiming fair use. The
> transformative justification must overcome factors favoring the
> copyright owner. ….[E]xtensive takings may impinge on creative
> incentives.

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111-12 (1990)

(emphasis supplied; footnotes omitted).

The Supreme Court and the Second Circuit have consistently used this concept as an

important fair use touchstone. *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*, 996 F.2d

1366 (2d Cir. 1993), concerned a popular television series, *Twin Peaks*. The defendant published

a book, *Welcome to Twin Peaks: A Complete Guide to Who's Who and What's What*, based on

the first eight episodes. The book contained chapters dealing with the show's popularity, its

characters and actors, producer, director, music, and location. One chapter contained detailed

plot summaries. The copyright holder contended the plot summaries constituted infringement,

and the defendant claimed they were protected by fair use. Citing the *Leval* article, the Court

held this was not fair use, because the plot summaries were not "transformative criticism or

comment" about those episodes:

> PIL's use of the protected expression in the teleplays consists
> primarily of summarizing in great detail the plots of the first eight
> episodes….

23

> [The] detailed report of the plots goes far beyond merely identifying their basic outline *for the transformative purposes of comment or criticism.* What PIL has done is simply to recount for its readers precisely the plot details of each teleplay.

*Id.* at 1375 (emphasis supplied). The Court continued:

> Where, as here, the abridgment serves no transformative function and elaborates in detail far beyond what is required to serve any legitimate purpose, the first factor cannot be weighted in favor of the fair use defense.

*Id.* at 1376. Google also has not added "criticism or comment" to any of its copying.

The next year, the Supreme Court, citing the *Leval* comment, adopted and utilized the concept of transformation in *Campbell, supra.* The case involved a parody by the rock band 2 Live Crew of the lyrics to Roy Orbison's song, "Oh, Pretty Woman." As the district court held, the parody was principally "a play on words, substituting predictable lyrics with shocking ones" to show "how bland and banal the Orbison song" was. 510 U.S. at 573. The Court held as to the first factor:

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, *Folsom v. Marsh, supra,* at 348; accord, *Harper & Row, supra,* 471 U.S. at 562….("supplanting" the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." Leval, *supra,* at 1111.

*Id.* at 579. Because the 2 Live Crew's parody had transformative elements ("commenting on and criticizing the original work," *id.* at 582), and because the Court of Appeals had given no consideration to this issue (*id.* at 583-84), the case was remanded. In the present case, Google's verbatim reproduction, distribution and display of books is a "superseding" and "supplanting" use, not a "transformative" one. Google does not add any "new expression, meaning or message" to the books.

Following *Campbell,* the Second Circuit again applied this standard in *American Geophysical Union, supra.* Because that case, like the present case, involved verbatim copying of an entire copyrighted work, it bears close scrutiny. Texaco purchased two to three library subscriptions to many technical publications. Its library circulated the originals among its 400 to 500 research scientists, and encouraged them to make photocopies of those particular articles they deemed useful for their research. A representative test case scientist had photocopied eight copyrighted articles from the journal *Catalysis* for his personal research file. Each month *Catalysis* published 20 to 25 articles, and hence this copying was a small fraction of the complete set of *Catalysis* journals in Texaco's library, and a miniscule fraction of the total journals to which Texaco subscribed. Texaco admitted infringement, but claimed fair use, asserting that for the scientist to have the articles readily at hand in his laboratory promoted research.

The Second Circuit held that there was nothing transformative about Texaco's copying, and therefore the first factor militated against the fair use defense:

> The "transformative use" concept is pertinent to a court's investigation under the first factor .... *To the extent that the secondary use involves merely an untransformed duplication, the value generated by the secondary use is little or nothing more than the value that inheres in the original.* Rather than making some contribution of new intellectual value and thereby fostering the advancement of the arts and sciences, an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of use.

60 F.3d at 923 (emphasis supplied).

In *Castle Rock Entertainment, supra,* the Second Circuit adjudicated whether a book of trivia questions about the Jerry Seinfeld television show ("*Seinfeld*") titled *The Seinfeld Aptitude Test* ("*SAT*") infringed *Seinfeld's* copyright. The book's author had taken notes from 84 broadcast episodes, and generated 643 trivia questions for the book. The episode most heavily

drawn upon generated 20 questions that directly quoted about 5% of that episode. 150 F.3d at

136. The Court granted summary judgment in favor of the plaintiff copyright holder and against

the defendant on the fair use defense, holding there was no transformative purpose:

> Any transformative purposes possessed by *The SAT* is
> slight to non-existent …. [E]ven viewing *The SAT* in the
> light most favorable to defendants, we find scant reason to
> conclude that this trivia quiz book seeks to educate,
> criticize, parody, comment, report upon, or research
> *Seinfeld,* or otherwise serve a transformative purpose. The
> book does not contain commentary or analysis about
> *Seinfeld,* nor does it suggest how *The SAT* can be used to
> research *Seinfeld* …

*Id.* at 142-43.

The Second Circuit again applied the requirement of transformation in *Nihon Keizai*

*Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65 (2d Cir. 1999). The plaintiff

published newspapers in the Japanese language. The defendant made and sold English

"abridgements" which were little more than "rough translations." *Id.* at 69. The Court found

there was nothing transformative, and no fair use:

> If the second work is substantially transformative, this factor
> favors a finding of fair use …. We agree with the district court that
> Comline's infringing abstracts are "not in the least
> 'transformative.'" As we note above, the abstracts are for the most
> part direct translations of Nikkei articles; defendants added almost
> nothing new in their works. This factor weighs strongly against fair
> use.

*Id.* at 72. If the translations and abridgements are not transformative, then Google's verbatim

copying and distribution of entire books and its display of verbatim snippets are certainly not

transformative.

In *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997), an artist

made "quilt art," and licensed reproduction posters to be sold. An HBO television sit-com

displayed one of these reproductions very briefly in background of an episode. Portions of the

poster were displayed nine times, for between two and four seconds each, for an aggregate

display of 27 seconds. *Id.* at 76. The Court held there was no transformative use: "In no sense is

the defendants' use 'transformative.'"... The defendants have used Ringgold's work for

precisely a central purpose for which it was created – to be decorative." *Id.* at 78-79. Similarly,

Google has used the author's text for precisely the purpose for which it was created.

In *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108-09 (2d Cir. 1998), in the days

before Internet radio, the defendant connected radio receivers to telephones with unlisted

numbers. This allowed defendant's subscribers throughout the United States to use long-distance

telephone lines to dial up and hear radio broadcasts that were airing in any given regional

market. Its purpose was for "auditioning on-air talent, verifying the broadcast of commercials,

and listening to a station's programming format and feel." *Id.* at 106. The defendant argued that

this service was fair use, because it was used by talent scouts, verifiers of commercials, and other

specialized users, and therefore the "uses" under Section 107 were different from that of average

listeners in the original regional broadcast radio market. The Second Circuit disagreed. It held

that "*Campbell* instructs that transformativeness is the critical inquiry under this factor," *id.* at

108, and that while there were arguably different *uses,* that this did not constitute transformation:

> [Defendant] argues that Dial-Up's users transform the broadcasts
> by using them for their factual, not entertainment, content.
> However, it is Kirkwood's own retransmission of the broadcasts,
> not the acts of his end-users, that is at issue here and all Kirkwood
> does is sell access to unaltered radio broadcasts.
> ….
> In sum, we think the different, and possibly beneficial, purposes of
> Kirkwood's customers are outweighed by the total absence of
> transformativeness in Kirkwood's acts of retransmission. We find
> that the first statutory factor leans in [plaintiff's] favor, rather than
> in [defendant's].

*Id.* at 108-09. The Second Circuit reversed summary judgment for defendant, and held there was no fair use. *Id.* at 112. Likewise, Google here has asserted that its massive copying program creates an "index" (or search engine) of the millions of books it copied.[16] Labeling its infringing copies an "index" does not make Google's uses transformative, when the uses required to create the "index" are unauthorized verbatim copying, distribution and display of copyright owners' texts.

In *Davis v. Gap, Inc.*, 246 F.3d 152, 174-76 (2d Cir. 2001), the Gap ran advertisements for its clothing that depicted a group of young adults. They had been told by the Gap's photographers to wear their own jewelry to the photo shoot. One subject wore his eyeglass-shaped jewelry ("Onoculii") made by On Davis. On Davis sued the Gap for copyright infringement. The Second Circuit rejected the Gap's fair use argument, holding there was no transformation:

> [W]e find nothing transformative about the Gap's presentation of Davis's copyrighted work. The ad shows Davis's Onoculii being worn as eye jewelry in the manner it was made to be worn-looking much like an ad Davis himself might have sponsored for his copyrighted design.

*Id.* at 174.

Most recently, in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), the Second Circuit held there was no transformative purpose to a book of fiction titled *60 Years Later: Coming Through*

---

[16] An "index" of books' metadata already exists. Undisp. Fact No. 89. Libraries use what is known as MARC records to catalog books. Undisp. Fact No. 90. "MARC records are essentially the electronic version of a card catalog record," and contain the book's metadata, such as author, title, publishing information. Undisp. Fact No. 91. To create MARC records, the book does not need to be scanned or copied. Undisp. Fact No. 92. The cataloging of metadata through MARC records is done by hand with the cataloger reviewing the physical book and identifying enumerated fields of information. Undisp. Fact No. 93.

*the Rye*, even though it had clearly different elements from J.D. Salinger's *Catcher in the Rye*. It told the fictionalized story of a supposedly 76-year-old Holden Caulfield ("Mr. C"), who travels to Cavendish, New Hampshire to interact with a fictionalized version of his 90-year-old author Salinger, and of a struggle between Salinger to kill off his famous creation, and of "Mr. C" to set himself free of Salinger. The Second Circuit found this "lack[ed] a transformative *purpose*" because, as the district court had found, the purpose was not "to critique Salinger and his persona." *Id.* at 83 (emphasis in original); *see also Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F. Supp. 1522, 1530-31 (S.D.N.Y. 1991) (sale of course packets to college students not a fair use; "[i]n this case, there was absolutely no literary effort made by Kinko's to expand upon or contextualize the materials copied."); *UMG Recordings*, 92 F. Supp. 2d at 351 (mere retransmission of unauthorized copies in another medium is not by itself a fair use).

In sum, the Supreme Court found there was no transformation in *The Nation's* summary of, and quotations of verbatim text from, the Ford manuscript, and the Second Circuit has found there was no transformation in a variety of circumstances: in the detailed plot summaries of *Twin Peaks*; in the copying of articles by the Texaco research scientist in *American Geophysical*; in the *Seinfeld* trivia book; in the English abridgments of Japanese news articles in *Comline*; in the display of a poster of artwork in a television sit-com in *Ringgold;* in the use by talent scouts and others of radio broadcasts in *Infinity Broadcast*; in the display of eye-glass jewelry in *Gap*; and in the fictionalized interaction of a 76-year-old "Mr. C" with his author in *Coming through the Rye*. Each of these cases makes clear that Google's use is "superseding" or "supplanting" and not "transformative."

In contrast to the above are cases in this Circuit which have considered new uses to be genuinely transformative. In each case, (1) a different work was created that (2) had a substantially different purpose and character from the original copyrighted work.

In *NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 477 (2d Cir. 2004), excerpts of a manual used in a business training seminar were quoted by an internet site for purposes of criticizing the business seminar as a form of mind control. The Court held this was transformative because "criticism" is one of the explicit fair use factors in Section 107. Google has added no criticism here.

In *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609-10 (2d Cir. 2006), a 480-page book about the Grateful Dead displayed 2000 images in chronological order, combining those images with text and graphic art to narrate the history of the Grateful Dead. Defendant used images of seven concert posters belonging to plaintiff (among the 2,000 total images in the book), which were interspersed with narrative text and graphic art about those concerts. The Court held this use was transformative because its purpose was "enhancing the biographical information in *Illustrated Trip*, a purpose separate and distinct from the original artistic and promotional purpose for which the images were created." *Id.* at 610. Here, Google has copied and displayed language verbatim, without creating any new work.

In *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006), a visual artist copied a photograph of a woman's sandal-clad legs from a glossy fashion magazine, and incorporated them into a painting, altering the photograph and juxtaposing the image with other legs and footwear. *Id.* at 247 ("[Koons] included in the painting only the legs and feet from the photograph,…inverted the orientation of the legs[,]…added a heel to one of the feet and modified the photograph's coloring."). His purpose was to create a social commentary. The Court held this was

transformative because the artist used the original image "as fodder for his commentary on the social and aesthetic consequences of mass media" which was an "entirely different purpose and meaning" from the original photograph. *Id.* at 253. "[H]e intended to 'comment on the ways in which some of our most basic appetites—for food, play, and sex—are mediated by popular images.'" *Id.* at 247. Significantly, the Court stated that if the artist, Koons, had merely translated the photograph verbatim from one medium to another, as Google has done, that would *not* constitute fair use:

> Koons does not argue that his use was transformative solely because Blanch's work is a photograph and his a painting, or because Blanch's photograph is in a fashion magazine and his painting is displayed in museums. He would have been ill advised to do otherwise. *We have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work.*

*Id.* at 252 (emphasis supplied; citations omitted).

Similarly, in *Lennon v. Premise Media Corp., 556 F. Supp. 2d 310, 322-24 (S.D.N.Y. 2008), two lines of John Lennon's popular song "Imagine" were used in a 1.5 hour movie that promoted teaching Intelligent Design as an alternative to Darwinian Evolution, in the context of a film where a scientist discussed whether religion is declining in importance. "Defendants' use is transformative because the movie incorporates an excerpt of 'Imagine' for purposes of criticism and commentary." *Id.* at 322.

Google's reliance on *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), to justify its uses as transformative, is misplaced. Those cases both involved the defendant's indexing on the Internet of visual materials already available on the Internet. In neither case did the defendant digitally

reproduce, distribute and display millions of offline printed works without permission of copyright owners, as Google has done in its Library Project.[17]

In *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191 (3d Cir. 2003), the Third Circuit affirmed the entry of a preliminary injunction prohibiting Video Pipeline's online display of "clip previews" – approximately two-minute segments of a movie copied without authorization from the film's copyright owner. Video Pipeline stored clip previews in its database, displayed them on the internet, and permitted users of its website to link to retailers' websites to purchase authorized copies of the movies whose clip previews were displayed. *Id.* at 195. The court held that Video Pipeline was using these clip previews in the same way as an unauthorized movie "trailer." *Id.* at 194. The court distinguished *Kelly* – which involved locating thumbnail images on other websites and providing links to those websites – because Video Pipeline's uses did "not improve access to authorized previews located on other web sites." *Id.* at 199. The Third Circuit rejected Video Pipeline's fair use defense, concluding that Video Pipeline merely "*indexes* and displays unauthorized copies of copyrighted works." *Id.* (emphasis added). Similarly, here, Google "indexes and displays unauthorized copies" of Books. This is not a transformative fair use. *Id.* As the Third Circuit stated: "[Defendant] does permit viewers to link to legitimate retailers' web sites, but a link to a legitimate seller of authorized copies does not here, if it ever would, make *prima facie* infringement a fair use." *Id.* at 199.

Further, to the extent that *Perfect 10* held that Google's search engine is "transformative" because "a search engine transforms the image into a pointer directing a user to a source of

---

[17] Similarly distinguishable is *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009). There, the defendant did not make unauthorized copies of offline materials, but instead indexed papers that high school students were required by their teachers to submit online for plagiarism review. *Id.* at 634.

information" and a "search engine…[is] incorporating an original work into a new work, namely, an electronic reference tool," 508 F.3d at 1165, that is not consistent with the manner in which the Second Circuit has applied the concept of transformation. In the case at bar, Google has made and placed on its servers complete digital copies of each work. Its search engine reads through that digital copy and displays verbatim portions of that work to the public. Verbatim copying and display cannot be "transformative" under *American Geophysical, supra,* which held that a "secondary use [that] involves merely an untransformed duplication" is non-transformative because "the value generated by the secondary use is little or nothing more than the value that inheres in the original." 60 F.3d at 923. *Perfect 10* is inconsistent with, *inter alia*, *Infinity Broadcast, supra,* which held there was no transformation when the defendant used a new electronic technology (a combination of a radio receiver and long distance telephone line) for a "retransmission of the broadcasts." 150 F.3d at 108-09.

Simply using new technology for the purposes of copying and verbatim display of text is not "transformative." Rather, to be transformative, there must be the creation of *a new and different work,* which can incorporate elements of the prior work, but solely for the purposes of "comment or criticism" (*Twin Peaks, supra,* 996 F.2d at 1374), or "new expression, meaning, or message" (*Campbell, supra,* 510 U.S. at 579), or "commentary or analysis" (*Castle Rock, supra,* 150 F.3d at 143). Google does not create any new work for any of these purposes, and hence there is no transformation.

Many cases have rejected the notion that shifting from one technology to another constitutes transformation. *Stewart v. Abend*, 495 U.S. 207 (1990), involved shifting from a print short story, on the one hand, to a movie and television medium (the Hitchcock movie *Rear Window*). The Court held there was no fair use. *Castle Rock* and *Twin Peaks* involved shifting

from television to print technology; *Ringgold* involved shifting from poster art to television; *Gap* involved shifting from physical jewelry to photographs; *Infinity Broadcast* involved shifting from radio to long distance telephone lines. None of these uses was found to be transformative.

Accordingly, the critical issue of "transformation" weighs heavily against Google.

## 2.      Google Has Engaged in Purely Exploitative Commercial Use

A second aspect of "use" is whether the use is commercial or non-commercial, as Section 107 expressly states. Here, Google's uses are clearly of a "commercial nature." *See* Undisp. Fact Nos. 75-84, and pages 11-12, *supra*. The fact that a use is commercial as opposed to nonprofit "tends to weigh against a finding of fair use." *Harper & Row, supra*, 471 U.S. at 562. *Accord Campbell, supra*, 510 U.S. at 585. "The crux of the profit/nonprofit distinction is . . . whether the user [here, Google] stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. Here, Google stands to profit from the improvement of its commercial search engine through the addition to it of digital copies of copyrighted print books that are not available in the search engines of its competitors who have elected to respect copyright law. Google is obtaining these commercial benefits without paying copyright owners the "customary price" for use of their materials, *i.e.*, a payment, license fee and/or share of ad revenues (as in its own Partner Program).

However, the fact that Google's is a for-profit venture does not, in and of itself, preclude fair use. As the Court made clear in *Campbell*, "nearly all of the illustrative uses listed in the preamble paragraph of Section 107, including news reporting, comment, criticism, teaching, scholarship, and research ... are generally conducted for profit," 510 U.S. at 584 (internal quotations and citation omitted). Otherwise stated, 2 Live Crew's parody of "Oh, Pretty Woman," arguably protected as fair use, was intended to make money, just as were the infringing

34

*Seinfeld* trivia book, infringing *Twin Peaks* book, infringing *Nation* article, and infringing Gap advertisement.

Rather, under *Campbell*, there is an inverse relationship between the degree of transformation and the importance of the "commercial/non-commercial" distinction:  the more transformative the use, the less important is its commercial nature; conversely, the less transformative, the more the commercial nature weighs against fair use. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." 510 U.S. at 579. As the Second Circuit held in *Gap,* when there is little or no transformation, *"*[t]he question whether the new use is commercial thus acquires an importance it does not have when the new work is transformative." 246 F.3d at 175. Here, Google's use is non-transformative, and accordingly its commercial nature weighs heavily against fair use.

*American Geophysical* is also significant because Texaco made a fair use argument – which the Second Circuit rejected – that is not even available to Google. Texaco argued that its research scientist with the eight *Catalysis* articles in his personal research library did not cause Texaco to receive any "direct" commercial benefit. Rather, there would be no commercial benefit unless and until the scientist actually used those articles to produce a product from which Texaco made money. The Court rejected this argument:

> [C]ourts will not sustain a claimed defense of fair use when the secondary use can fairly be characterized as a form of "commercial exploitation," *i.e.*, when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted materials. …

> ….[I]t is not obvious why it is fair for Texaco to avoid having to pay at least some price to copyright holders for the right to photocopy the original articles.

60 F.3d at 922. Here, Google's purpose is direct commercial exploitation to enhance its search engine, and it is not obvious why Google should not pay a price to copyright holders.

Accordingly, the first factor tilts strongly in favor of plaintiff and the class.

## B.      The Second Fair Use Factor Favors Plaintiffs and the Class or is Neutral

The second fair use factor focuses on "the nature of the copyrighted work."[18] Google has copied fiction and nonfiction books, as well as in-print and out-of-print books, in its Library Project. These are the categories of books relevant here as a matter of law under this second factor, as Google acknowledges in its responses to plaintiffs' contention interrogatories. *See* Defendant Google Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories at 3,7,11 (Zack SJ Decl. Ex. 43) (discussing Books that are "more" or "less" "factual" in nature, and "in print" or "out of print").

### 1.      Fiction Books

Works of fiction are entitled to great protection under the Copyright Act. *Stewart v. Abend*, *supra*, 495 U.S. at 237; *Twin Peaks*, 996 F.2d at 1376 (the second factor "must favor a creative and fictional work"). As *Salinger v. Colting, supra,* illustrates, even a secondary work of fiction that contains no verbatim quotes from the original and has a totally different plot may not constitute fair use. The second factor therefore tilts strongly in favor of plaintiffs and the class as to fiction books.

---

[18] As a practical matter, the second fair use factor – the nature of the work – plays little role in the ultimate fair use determination. *See Gap*, *supra*, 246 F.3d at 175 (the second factor is "rarely found to be determinative"); 4-13 *Nimmer on Copyright* § 13.05 [A][2][a] (2012) ("this second factor more typically recedes into insignificance in the greater fair use calculus"); William F. Patry, *Patry on Fair Use* § 4:1 (2012) ("Outside of unpublished works, the [second] factor typically receives little attention.").

### 2.   Nonfiction Books

"In general, fair use is more likely to be found in factual works than in fictional works." *Abend, supra,* 495 U.S. at 237. Nevertheless, courts often find that factual works have been used unfairly. *See, e.g., Nihon Keizai Shimbun,* 166 F.3d at 72-73 (abstracts of news articles); *Am. Geophysical Union,* 60 F.3d at 925, 931 (scientific articles); *Basic Books,* 758 F. Supp. at 1533, 1547 (course packets). *Infinity Broadcast, supra,* involved the retransmission of all radio broadcasts, both nonfiction (*e.g.,* news broadcasts) as well as every other type: the Second Circuit held none was protected by fair use.

This is because, although the Copyright Act does not protect "facts" themselves, it does protect an author's manner of expressing those facts, and it is not "fair use" to appropriate an author's "particular expression." *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir. 1976). That is what Google does in its Library Project, since it reproduces the books in full, whether fiction or nonfiction. *See* Undisp. Fact No. 56; *see also Rosemont Enters., Inc. v. Random House, Inc.,* 366 F.2d 303, 310 (2d Cir. 1966) ("The fair use privilege is based on the concept of reasonableness and extensive verbatim copying or paraphrasing of material set down by another cannot satisfy that standard."); *Harper & Row,* 471 U.S. at 546 (the purpose of copyright – to reward individual authors in order to benefit the public – "applies equally to works of fiction and nonfiction.").

Accordingly, as to nonfiction books, the second factor is at best neutral here due to Google's verbatim copying of entire books.

### 3.    In-Print Books

Google argues that "going out of print" should be considered in connection with the second fair use factor. *See* Google Br. in Opp'n to Class Cert., at 19 (citing *Maxtone-Graham v. Burtchaell*, 631 F. Supp. 1432, 1438 (S.D.N.Y.), *aff'd*, 803 F.2d 1253 (2d Cir. 1986)). Google has not suggested – nor is there support for the proposition – that the fact that a book is *in print* militates in favor of fair use. To the contrary, being in-print clearly weighs against a fair use determination. *See* Defendant Google Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories at 3,7,11 (Zack SJ Decl. Ex. 43) ("Some of the Books at issue are in print, and as to those Books, this factor tilts less strongly in favor of a finding of fair use.")

### 4.    Out-of-Print Books

Courts have occasionally considered a book being out of print in analyzing fair use. *Cf. supra*, at 34 n.18. As the Second Circuit has explained, the fact that works have been out of print "does not necessarily mean that they have no future market which can be injured." *Meeropol v. Nizer*, 560 F.2d 1061, 1070 (2d Cir. 1977); *see also* 17 U.S.C. § 107 ("effect . . . upon the *potential* market…") (emphasis added); *Craft v. Kobler*, 667 F. Supp. 120, 129 (S.D.N.Y. 1987) ("The fact that plaintiff's books are out of print and that [the author] testified he had no interest in writing further on Stravinsky is not determinative.").

Indeed, the impact of infringement may be greater where the work has gone out of print, as permissions fees may be an important revenue source to the author. *See Basic Books, supra*, 758 F. Supp. at 1534 ("This court further finds that Kinko's copying unfavorably impacts upon plaintiffs' sales of their books and collections of permissions fees. This impact is more powerfully felt by authors and copyright owners of the out-of-print books, for whom permissions fees constitute a significant source of income. This factor weighs heavily against defendant.");

38

*see also id.* at 1533 ("damage to out-of-print works may in fact be greater since permissions fees may be the only income for authors and copyright owners").[19]

With respect to out-of-print books, the second factor is neutral, at best, for Google.

## C.     The Third Fair Use Factor Favors Plaintiffs and the Class

The third fair use factor focuses on "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."

With respect to Google's reproduction of books in its Library Project, the "portion used" is the entire book, since Google digitally copies verbatim each book in full and maintains complete digital copies of the books on its servers and back-up tapes. *See* Undisp. Fact Nos. 29, 40, 41, 62.

With respect to Google's distribution of books to libraries, the "portion used" is again the entire book, as Google distributes entire digital copies of the books to the supplying libraries as a *quid pro quo* for the libraries allowing Google to digitally copy their printed books. *See* Undisp. Fact Nos. 30, 56-70.

With respect to Google's display of books in snippets, Google maintains entire digital copies of the books on its servers and searches the complete book to respond to search queries by its users. Undisp. Fact Nos. 40-42. Each individual search query by a user of Google's search

---

[19] Google cites certain legislative history in support of its argument that the Court should consider whether a book has gone out of print in connection with fair use. Google Br. in Opp'n to Class Cert. at 19 (citing S. Rep. No. 94-473, at 64 (1975); H.R. Rep. No. 94-1476, at 67 (1976)). The extent to which this portion of the legislative history is instructive here is unclear, however, as it discusses reproduction for classroom purposes, not the purposes for which Google used the books. *See id.* Further, the legislative history explains that the existence of licensing organizations weighs against fair use, which cuts against Google's arguments. *See* 4-13 *Nimmer on Copyright* § 13.05 [A][2][b][i] (describing  S. Rep., p. 64 as "double-edged"). As explained in the Report of Daniel Gervais (Zack SJ Decl. Ex. 37), the Copyright Clearance Center presently licenses "essentially printed content, much of the same nature as the material scanned by Google." Undisp. Fact No. 94.

engine returns a display of up to three excerpts of verbatim expression (snippets) from the book. *See* Undisp. Fact No. 47. Multiple search queries by the same user in the same book will yield up to three new snippets for each query. Undisp. Fact Nos. 45-47. Further, since Google uniformly makes the entire text of its displayed Library Project books searchable and available for snippet display to its collective users (with the exception of a small percentage of "blacklisted" portions from each book), Google over time will display most of the verbatim expression from the books to its users collectively. Undisp. Fact Nos. 48-50.

In *Infinity Broadcast Corp.*, 150 F.3d at 109-10, the Second Circuit found militating against fair use the fact that the "collective" action of a "plurality of subscribers" to the defendant's radio retransmission service would likely cause the defendant to transmit "most" of a copyrighted radio program. So too, here, the likelihood that Google will eventually display most of the verbatim expression from its Library Project books to its users collectively militates against a finding of fair use. *See Harper & Row*, 471 U.S. at 548 (copying of 300 to 400 words of an entire book-length manuscript was not a fair use); *see also* Undisp. Fact Nos. 48-50; Zack SJ Decl Ex. 4 (Google displayed about 37 different snippets from BALL FOUR, consisting of over **1900** words of verbatim expression).

The Supreme Court stated in *Campbell* that, whether "'a substantial portion of the infringing work was copied verbatim' from the copyrighted work is a relevant question [under the third factor], ... for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; a work composed primarily of an original, *particularly its heart*, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original." 510 U.S. at 587-88 (quoting *Acuff-Rose Music v. Campbell*, 972 F.2d 1429, 1438 (6th Cir. 1992)) (citation omitted) (emphasis supplied);

*see also Gap*, 246 F.3d at 175 ("Fragmentary copying is more likely to have a transformative purpose than wholesale copying."). Here, Google engaged in verbatim copying and distribution of entire books, and makes all of the verbatim expression from the books, except for the small percentage it "blacklists," available to be searched and viewed in snippet display in its Library Project. Undisp. Fact Nos. 40, 43, 48-50, 53, 56. It therefore reproduces, distributes and displays the "heart" of each work. *See Harper & Row*, 410 U.S. at 610.

The third factor therefore tilts strongly in favor of plaintiffs and the class.

### D.      The Fourth Fair Use Factor Favors Plaintiffs and the Class

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the original work." The Supreme Court stated in *Campbell* that, "when a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects.' . . . of the original and serves as a market replacement for it, making it likely that cognizable harm to the original will occur." *Campbell*, 510 U.S. at 591 (quoting *Folsom v. Marsh*, 9 F.Cas. 342, 348 (Cir. Ct. D. Mass. 1841) (citations omitted); *accord Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

Here, Google's verbatim digital reproduction of books for itself and its library partners, and its distribution of entire digital copies of books to libraries, clearly supersedes the originals, serving as a market replacement for them. Because Google digitally copies entire print books supplied by libraries, Google does not purchase or license the books from the copyright owners for the purpose of using them in its search engine. Because Google distributes entire digital copies to libraries, those libraries do not purchase or license such digital copies from the copyright owners. When Google displays verbatim expression from books on its search engine without permission, it deprives copyright owners of a license fee for this digital use from which

41

Google is profiting. Google's actions therefore deprive the copyright owners of revenues for its uses of their books. Google thus used its Library Project unfairly to reproduce, distribute, and display books for the benefit of its commercial search engine without paying the "customary price."

Further, to defeat a defense of fair use, the Supreme Court has stated that "one need **only** show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" *Harper & Row*, 471 U.S. at 568 (quoting *Sony*, 464 U.S. at 451) (bold added; italics added by *Harper & Row*); *accord Campbell*, 510 U.S. at 590 (fourth factor considers "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market'" for the original) (citation omitted).

The potential markets to be considered include those "'that creators of original works would in general develop or license others to develop.'" *See Castle Rock*, 150 F.3d at 145 (quoting *Campbell*, *supra*, 510 U.S. at 592); *Am. Geophysical Union*, 60 F.3d at 930 (courts should consider "traditional, reasonable, or likely to be developed markets" when assessing the fourth fair use factor).

This case involves a massive digitization campaign by Google involving millions of books. If Google's uses are found to be fair, this will legitimize widespread digital copying without permission, thereby impeding the development of collective licenses for digital uses of books and excerpts from books by search engines, libraries, and others. Undisp. Fact No. 95.

Plaintiffs' expert, Professor Daniel Gervais of Vanderbilt Law School, has extensively studied "collective management" of copyright, "meaning how aggregations of individual copyrights are legally protected, licensed, and marketed." Report of Daniel Gervais (Zack SJ

Decl. Ex. 37) ¶ 4; *see also id.*, Exhibit A (*Curriculum Vitae*). Collective management provides important advantages in licensing uses of copyrighted works, as it reduces transaction costs, benefitting authors and users. Undisp. Fact No. 96.

Collective management of copyright has existed for more than two centuries and is indispensable for many types of copyright uses. Undisp. Fact No. 97. For example, in the United States, ASCAP, BMI and SESAC are well-known organizations that license the use of music. Undisp. Fact No. 98. The Copyright Clearance Center ("CCC") is another well-known collective management organization ("CMO"). Undisp. Fact No. 99. If they wish to participate, authors or publishers register their works with the CCC, which offers per-use and annual repertory licenses. Undisp. Fact No. 100. A business or academic institution can enter into an agreement with the CCC that permits it to, for instance, photocopy a periodical article or create an electronic coursepack. Undisp. Fact No. 101. CMOs typically pay authors and other rightsholders based on actual usage of their works, Undisp. Fact No. 102, which can result in substantial revenue to rightsholders. In its 2011 fiscal year, CCC reported revenues in excess of $238 million, with payments to rightsholders exceeding $171 million. Undisp. Fact No. 103.

Collective licensing markets have often developed in response to new technologies: "Often, after a new form of use has emerged, collective management systems are established to license uses that have been found to be desirable but unauthorized." Undisp. Fact No. 104. In Professor Gervais's opinion, a collective management system "would develop here if some or all of Google's uses are found not to be fair." Undisp. Fact No. 105. However, if Google's conduct is permitted as fair use and becomes widespread, such an outcome can be expected to thwart the development of collective management systems for the digital uses of books (and book excerpts) that would otherwise likely develop. Undisp. Fact No. 106.

43

Further, the Second Circuit stated in *American Geophysical* that "Congress has impliedly suggested that the law should recognize licensing fees for photocopying as part of the 'potential market for or value of' journals." 60 F.3d at 931. The Second Circuit explained that Section 108 of the Copyright Act narrowly circumscribes the conditions under which libraries are permitted to make copies of copyrighted works, implicitly suggesting that copyright owners possess the right to restrict copying. The Second Circuit further noted that Congress "apparently prompted the development of [the Copyright Clearance Center] by suggesting that an efficient mechanism be established to license photocopying." *Id.* The Court found it "difficult to understand why Congress would recommend establishing such a mechanism if it did not believe that fees for photocopying should be legally recognized as part of the potential market" for copyrighted works. *Id.*

Similarly, as technology has developed, making digital copying now feasible on a large scale, copyright owners should be afforded the opportunity to develop collective digital licenses through the CCC or other entities. Google should not be permitted to preempt the development of such collective licenses merely because it had the audacity to engage in wholesale copyright infringement.

In addition to impeding the development of collective licenses, Google's unauthorized uses create risks of book piracy. Google admits in its Form 10-K that its security is not perfect: Google's "security measures may be breached due to the actions of outside parties, employee error, malfeasance, or otherwise, and, as a result, an unauthorized party may obtain access to our data or our users' or customers' data. Additionally, outside parties may attempt to fraudulently induce employees, users, or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data. Any such breach or unauthorized access could result in

significant legal and financial exposure, damage to our reputation, and a loss of confidence in the security of our products and services that could potentially have an adverse effect on our business. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures." Undisp. Fact No. 107.

Moreover, Google is not contractually obligated to, and does not in practice, monitor or control the security of the digital copies of books provided by it to libraries in its Library Project, and the security measures of libraries who receive digital copies of books from Google are subject to similar breaches. Undisp. Fact No. 108. Subsequent copying by the libraries of the digital files received by them from Google, risks further security breaches. Undisp. Fact No. 109.[20] As the number of unlawful copies of an in copyright book increases, so does the risk of further infringement and/or piracy of the work. Undisp. Fact No. 110. The copyright holder's control over the distribution and publication of his or her work becomes increasingly threatened when multiple unauthorized digital copies are created, and even more so when they are placed on and/or distributed over the Internet. Undisp. Fact No. 111; *see generally* Report of Benjamin Edelman (Zack SJ Decl. Ex. 39).[21]

---

[20] Such copying is not sanctioned by Section 108 of the Copyright Act, which sets forth the limited circumstances under which libraries can copy in-copyright books. *See* pages 19, 42, *supra*. Significantly, prior to the commencement of litigation, the HathiTrust digital library intended to display the full text from scanned books that were in copyright, but for which HathiTrust did not know their ownership, *i.e.*, it's self-deemed "orphan" works. *See generally The Authors Guild, Inc. et al, v. HathiTrust et al.*, S.D.N.Y. No. 11 Civ. 06351 (HB).

[21] Professor Benjamin Edelman of Harvard Business School has "studied and written about questions of information security, accidental information revelation, and information distributed more broadly than online services anticipated." *Id.* ¶ 2; *see also id.*, Exhibit A (*Curriculum Vitae*).

If Google's bulk and indiscriminate copying is found to be "fair," other website operators, no matter how small, will also be given sanction to create online databases of books and other works. Undisp. Fact No. 112. These website operators may have insufficient security to prevent widespread piracy of such works. Undisp. Fact No. 113. In particular, less sophisticated operators have a reduced capability to design, install, and maintain systems to secure books, as well as a lesser ability to screen their internal staff to prevent data theft by rogue employees or to adapt their systems to prevent hacking by outsiders. Undisp. Fact No. 114. These concerns will only be amplified if "numerous companies and organizations scan books," because "attackers can focus their efforts on whichever installs the weakest security. Similarly, attackers can take advantage of even a brief period when a single book provider is insecure." Undisp. Fact No. 115. These are not merely hypothetical risks, but reveal a real danger to authors, as book piracy is already occurring. Undisp. Fact No. 116.

A security breach could have a "devastating impact" on the Class. Undisp. Fact No. 117. Conversely, if Google's unauthorized reproduction, distribution and display is found not to be fair, licenses will be required for such uses, and copyright owners can require in such licenses that financial responsibility for the risks of unauthorized uses of the copies be fairly allocated between the parties to the license. Undisp. Fact No. 118.

The fourth factor therefore tilts strongly in favor of plaintiffs and the class.

### E.    Aggregate Assessment

An assessment of the four fair use factors expressly included in Section 107 of the Copyright Act leads to the clear conclusion that Google's uses of the Books of plaintiffs and the class are not "fair uses." Factors one, three and four strongly tilt in plaintiffs' favor. Factor two strongly tilts in plaintiffs' favor as to fiction and in-print Books, and is neutral at best as to

nonfiction and out-of-print Books.

The massive scale of Google's indiscriminate and bulk copying, distribution and display of Books for the commercial benefit of its search engine must be given substantial weight here. As the Supreme Court stated in *Harper & Row*, 471 U.S. at 599: "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented."

Here, each time Google copies an entire Book, distributes an entire digital copy of that Book to a library, and displays verbatim text from that Book to users of its search engine without permission, Google engages in a substantial, not minor, infringement. In the aggregate, these infringements are clearly a "major inroad on copyright that must be prevented." *Id.*

## III.   SUMMARY JUDGMENT SHOULD BE GRANTED ASSESSING STATUTORY DAMAGES OF $750 PER BOOK TO PLAINTIFFS AND THE CLASS

Under 17 U.S.C. § 504(c)(1), "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, ... in a sum of not less than $750 or more than $30,000 as the court considers just."  In this case, plaintiffs and the class have elected to seek the statutory minimum of $750 per Book.

Because Google has violated Sections 106(1), (3) and (5) as to the Books copied in its Library Program, and its activities are not a fair use of the Books under Section 107, summary judgment should be entered in favor of plaintiffs and the class in the amount of $750 for each Book that Google copied, distributed and/or displayed in its Library Project.

## CONCLUSION

Based on the entire record, plaintiffs respectfully request that their Motion for Partial

Summary Judgment be granted.

Dated: July 26, 2012

Joanne Zack
Michael J. Boni (*pro hac vice*)
Joshua D. Snyder
Joanne Noble
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA  19004
Tel: (610) 822-0200
Fax : (610) 822-0206
jzack@bonizack.com
mboni@bonizack.com
jsnyder@bonizack.com
jnoble@bonizack.com

Robert J. LaRocca
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel:  (215) 238-1700
Fax:  (215) 238-1968
rlarocca@kohnswift.com

Sanford P. Dumain
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229
sdumain@milberg.com

*Counsel for Plaintiffs*