**EXHIBIT 33**

Page 1

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

3

4    THE AUTHORS GUILD, et al.,

5          Plaintiffs,

6                              Master File No.

7       -vs-                   05 CV 8136-DC

8

9    GOOGLE, INC.,

10          Defendant.

11    _____/

12

13

14

15       The Videotaped Deposition of PAUL N. COURANT,

16       Ph.D., Taken at 503 Thompson Street,

17       5021 Fleming Administration Building,

18       Ann Arbor, Michigan,

19       Commencing at 2:00 p.m.,

20       Monday, April 23, 2012,

21       Before Jennifer L. Ward, CSR-3717.

22

23

24

25

Page 2

```
 1 APPEARANCES:
 2
 3 MICHAEL J. BONI, ESQ.
 4 Boni & Zack, LLC
 5 15 St. Asaphs Road
 6 Bala Cynwyd, Pennsylvania 19004
 7 (610) 822-0200
 8 mboni@bonizack.com
 9      Appearing on behalf of Plaintiffs, via
10      Speakerphone.
11
12 DARALYN J. DURIE, ESQ.
13 Durie Tangri
14 217 Leidesdorff Street
15 San Francisco, California 94111
16 (415) 362-6666
17 ddurie@durietangri.com
18      Appearing on behalf of Defendant Google.
19
20
21
22 (Appearances continued on Page 3.)
23
24
25
```

Page 4

```
 1 APPEARANCES:  (Continued)
 2
 3 ALSO PRESENT:
 4      Steve Alfonsi, Videographer
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1 APPEARANCES:  (Continued)
 2
 3 JOSEPH PETERSEN, ESQ. and
 4 ALLISON SCOTT ROACH, ESQ.
 5 Kilpatrick Townsend & Stockton, LLP
 6 The Grace Building
 7 1114 Avenue of the Americas
 8 New York, New York, 10036-7703
 9 (212) 775-8715
10 jpetersen@ktslaw.com
11 ascott@kilpatricktownsend.com
12      Appearing on behalf of the University of
13      Michigan and the Deponent.
14
15 JACK BERNARD, ESQ.
16 Associate General Counsel
17 The University of Michigan
18 Office of the Vice President and General Counsel
19 5010 Fleming Administration Building
20 503 Thompson Street
21 Ann Arbor, Michigan 48109
22 (734) 764-0304
23 bernar@umich.edu
24      Appearing on behalf of the University of
25      Michigan.
```

Page 5

```
 1          INDEX TO EXAMINATIONS
 2
 3 WITNESS                        PAGE
 4 PAUL N. COURANT, Ph.D.
 5
 6 EXAMINATION BY MR. BONI            7
 7 EXAMINATION BY MS. DURIE          92
 8 REEXAMINATION BY MR. BONI        116
 9
10
11
12
13          INDEX TO EXHIBITS
14
15 EXHIBIT                        PAGE
16
17 EXHIBIT 1
18 Complaint                        6
19
20 EXHIBIT 2
21 Answer and Defenses              6
22
23 EXHIBIT 3
24 Cooperative Agreement          101
25
```

2 (Pages 2 - 5)

Page 6

1 Ann Arbor, Michigan
2 Monday, April 23, 2012
3 About 1:51 p.m.
4       DEPOSITION EXHIBITS 1 AND 2
5       (Identified in Index to Exhibits)
6       WERE MARKED BY THE REPORTER
7       FOR IDENTIFICATION
8             THE VIDEOGRAPHER:  On the record.
9 This is the videotaped deposition of Paul Courant being
10 taken in Ann Arbor, Michigan.  Today is April 23rd,
11 2012.  The time is 1:51 p.m.
12             Will the attorneys please introduce
13 themselves and the court reporter please swear in the
14 witness.
15             MS. DURIE:  This is Daralyn Durie
16 representing Google.
17             MR. PETERSEN:  This is Joe Petersen
18 representing the University of Michigan and the
19 witness, Dr. Paul Courant.
20             MR. BONI:  And this is Michael Boni
21 representing the Plaintiffs in the matter Authors Guild
22 et al v. Google.
23             PAUL N. COURANT, Ph.D.,
24 having first been duly sworn, was examined and
25 testified on his oath as follows:

Page 7

1 EXAMINATION BY MR. BONI:
2       Q.   Good afternoon, Doctor.  Is it okay to refer
3 to you --
4       A.   You just cut out.
5       Q.   Is it okay to refer to you --
6             MR. PETERSEN:  Mike, you're cutting
7 out.  I'm not sure what's causing that, but we should
8 fix that before proceeding.
9             MR. BONI:  Oh, great.
10             MS. DURIE:  Why don't you -- I think
11 you may need to just pick up your handset.
12             MR. BONI:  Yeah.  Is this better?
13             MS. DURIE:  Yes, it is.
14             MR. BERNARD:  Yes.
15             MR. BONI:  All right.  I'll do my
16 best when it comes time to dealing with the Answer, but
17 okay.
18 BY MR. BONI:
19       Q.   Dr. Courant, is it okay that I refer to you
20 as Dr. Courant?
21       A.   Sure.
22       Q.   Okay.  Could you please spell your name for
23 the record?
24       A.   P-a-u-l, space, N-o-a-h, space,
25 C-o-u-r-a-n-t.

Page 8

1       Q.   Dr. Courant, you understand that you're here
2 pursuant to a subpoena that Plaintiffs in the Google
3 matter served on the University of Michigan?
4       A.   I'm actually here because my attorney tells
5 me to be here, but that sounds plausible.
6             MR. PETERSEN:  And as to --
7 Joe Petersen speaking, Mike, just I'll add as well the
8 subpoena was in fact to the University of Michigan.
9             MR. BONI:  Right, that's what I said
10 in the question, yeah.
11 BY MR. BONI:
12       Q.   And you are here, Dr. Courant, representing
13 the University of Michigan as a result of that
14 subpoena?
15       A.   That's correct.
16       Q.   Okay.  Dr. Courant, what are your -- what
17 are your duties at the University of Michigan?
18       A.   I'm a professor of economics and a professor
19 of public policy and a professor of information, and in
20 those contexts I teach, advise dissertations, go to
21 department meetings, engage in the life of the faculty,
22 and I'm also Dean of Libraries and the university
23 librarian, and in that context I am responsible for the
24 activities of the largest library or set of libraries
25 on campus.

Page 9

1       Q.   It will be in your role as Dean of Libraries
2 that we -- that I'll be asking you questions today.
3 Can you describe very briefly what your role is as
4 Dean of Libraries?
5       A.   I am the chief -- I mean this is not a
6 formal title, but I am responsible for the activities
7 of, again, most of the university libraries, so -- we
8 have several hundred employees and many millions of
9 books, and lots of other materials as well, and the
10 library functions to bring academic works to the campus
11 and also more broadly to the community of scholars and
12 interested parties nationwide and worldwide.  It does
13 what libraries -- I mean I could go on at great length
14 what libraries do if that's what you want me to do.
15       Q.   No, that's fine.  I just really needed a
16 brief -- just a brief explanation.
17       A.   And I am the one who is responsible to the
18 president and then to the regents for the activities of
19 the library.
20       Q.   And how long have you held the role of
21 Dean of Libraries at University of Michigan?
22       A.   A little over five years.
23       Q.   Okay.  Prior to your -- prior to your title
24 of Dean of Libraries, what position did you hold?
25       A.   Immediately prior I was professor of

3 (Pages 6 - 9)

Page 10

1 economics, professor of public policy, and professor of
2 information. Some years -- sometime before that I was
3 vice president for academic -- executive vice president
4 for academic affairs and provost, and I can go through
5 another long list if you wish.
6    Q.   Not necessary. Did you have any role prior
7 to the time you were Dean of Libraries with respect to
8 University of Michigan's library system?
9    A.   Well, yes, of course. As provost I was --
10 the library reported to me. The provost is the chief
11 academic officer of the university, and the library is
12 a big academic unit. As a faculty member I used the
13 library frequently.
14    Q.   In your capacity as provost did you have any
15 involvement in -- strike that. Let me ask this
16 question. Are you familiar with an initiative known as
17 the Google Library Project?
18         MR. PETERSEN: Objection to form.
19         THE WITNESS: I am familiar with
20 that project, yes.
21 BY MR. BONI:
22    Q.   When you were provost did you have any role
23 with respect to the Google Library Project?
24    A.   Yes, I did.
25    Q.   Could you describe that role?

Page 11

1    A.   I was the -- I was the reporting line for
2 the librarian, so as that project emerged he kept me
3 generally informed about what was going on, and also
4 sought my approval for various major aspects. I didn't
5 get into the details.
6    Q.   Who did get into -- who at University of
7 Michigan was more responsible than you with respect to
8 the -- getting into the details of the Google Library
9 Project?
10         MR. PETERSEN: Objection to form.
11         THE WITNESS: Yeah, it's -- you
12 know, it -- in terms of getting into details,
13 John Wilkin was the lead person in the library.



Page 12



Page 13

1    Q.   Okay. And you agree, Dr. Courant, that the
2 University of Michigan entered into a cooperative
3 agreement with Google in connection with the Google
4 Library Project?
5         MR. PETERSEN: Objection to form and
6 objection to the extent it calls for a legal
7 conclusion.
8         THE WITNESS: There was a
9 cooperative agreement. There's a document of that
10 title executed between the University of Michigan and
11 Google.
12 BY MR. BONI:
13    Q.   As a result of the -- strike that. At any
14 time did the University of Michigan receive digital
15 copies of the books that the University of Michigan
16 Library permitted Google to scan?
17         MR. PETERSEN: Objection to form and
18 objection to the extent it calls for a legal conclusion
19 as to what constitutes a copy.
20         MR. BONI: Okay. Where we are, Joe,
21 there's no need -- you can just say "objection to form"
22 or this could be a very long deposition. So if you say
23 "objection to form," it will count.
24         MR. PETERSEN: Thank you. Thanks
25 for the advice, Michael. I am defending the

4 (Pages 10 - 13)

Page 14

1 deposition.
2          MR. BONI: I'm not finished. I'm
3 sorry, I'm not finished. And also, I'm happy to
4 stipulate that there's no need to join one another's
5 objections. That will -- that will be fine. I'm just
6 trying to -- I'm just trying to move it along, that's
7 all.
8          MR. PETERSEN: Michael, understood.
9 I make the objections that I see fit to make. I am
10 happy if Daralyn makes an objection, if you agree that
11 I join automatically to that I will not be redundant
12 then, and I imagine Daralyn feels likewise.
13          MS. DURIE: I do indeed. Thanks.
14 Thanks for that, Mike.
15          MR. BONI: Great. Thank you.
16 BY MR. BONI:
17    Q.   So I'm sorry, I didn't hear whether you
18 answered the question or not.
19    A.   I didn't, and I've forgotten what it was,
20 so --
21    Q.   I'll just -- I'll just ask it -- I'll just
22 ask it again. Has the University of Michigan ever
23 received digital copies of books that Michigan
24 permitted Google to scan from the University of
25 Michigan's libraries?

Page 15

1          MR. PETERSEN: And I make my same
2 objection.
3          THE WITNESS: I -- let me just
4 restate it slightly.
5 BY MR. BONI:
6    Q.   Sure.
7    A.   Google did scan works from the University of
8 Michigan libraries, and Google -- and we did indeed
9 receive copies of those scans. Well, copies made from
10 those scans, digital copies, not legal copies. I don't
11 know what those are.
12    Q.   Okay. So you did -- Michigan does have
13 digital copies that it received from Google, correct?
14          MR. PETERSEN: Objection to form.
15          THE WITNESS: That is correct.
16 BY MR. BONI:
17    Q.   And --
18    A.   Unless there's some term of art about
19 "received from" that I'm missing, which is always
20 possible in these kinds of proceedings.
21    Q.   Well, if you have anything to clarify, that
22 would be welcome.
23          MR. PETERSEN: Well, Mike, I think
24 the issue -- part of the issue with your question, you
25 said copies. It's unclear whether or not you're

Page 16

1 talking about works in total or an individual work.
2          MR. BONI: Oh, good. Well, thank
3 you. Thank you. Okay.
4 BY MR. BONI:
5    Q.   So let me clarify then, Dr. Courant. Has
6 the University of Michigan received digital copies of
7 books that Michigan permitted Google to
8 digitize --
9          MR. PETERSEN: Objection.
10 BY MR. BONI:
11    Q.   -- from Michigan's collection?
12          MR. PETERSEN: Objection to form.
13          THE WITNESS: So I think -- I mean
14 there are -- yes, except I'm nervous about the word
15 copies as distinct from a copy of a book and a copy of
16 another book, etcetera.



Page 18

Page 20

Page 19

Page 21

2    Q.   Tell me what the Hathi Trust is,
3  Dr. Courant.
4          MR. PETERSEN:  Objection to form.
5  BY MR. BONI:
6    Q.   As you just used that term.
7    A.   It is an entity that is resident add and run
8  by the University of Michigan that is a -- stores and
9  makes available under certain circumstances works
10 deposited by academic libraries, mostly from the
11 United States, although we have some non-U.S. members
12 as well.
13   Q.   Does the University of Michigan have a role
14 with respect to the Hathi Trust?
15   A.   Yeah, I think -- I thought I just said that.
16 The University of Michigan is the -- is the entity that
17 operates the Hathi Trust.
18   Q.   I see.  And is there any one person more
19 than another at the University of Michigan who is in
20 charge of the Hathi Trust?
21         MR. PETERSEN:  Objection to form.
22         THE WITNESS:  John Wilkin is the
23 executive director of the Hathi Trust.
24 BY MR. BONI:
25   Q.   Did the University of Michigan form

6 (Pages 18 - 21)

Page 22

1 Hathi Trust in conjunction with any other university?
2    A.   The Hathi Trust as such came out of a
3 conversation that we had with Indiana University.
4    Q.   What is Indiana University's role with
5 respect to Hathi Trust?
6    A.   It has contributed substantial financial and
7 technical support, and also operates the mirror site
8 for the works in the Hathi Trust.
9    Q.   Tell me what you mean by the mirror site.
10    A.   To a first approximation, as I understand
11 it, and we're again skating away from what I know well,
12 there is a copy of the deposits in the Hathi Trust in
13 Ann Arbor, and an identical copy in Bloomington.
14 Actually, it's not in Bloomington, I believe -- I have
15 to be careful here.  It might be Bloomington, it might
16 be Indianapolis.  I'd have to check.
17    Q.   Are there any other such mirror copies to
18 your knowledge?
19    A.   No, not to my knowledge.
20    Q.   Are you aware of whether any university
21 other than the University of Michigan and the
22 University of Indiana -- or Indiana University who has
23 a copy of the files that the Hathi Trust has?
24         MR. PETERSEN:  Objection to form,
25 vague.  I'm not clear what files you're referring to.

Page 23

1 BY MR. BONI:
2    Q.   I mean the digital copies of books.
3         MR. PETERSEN:  Same objection.
4         THE WITNESS:  I don't know how
5 to -- I would be surprised if anybody had the complete
6 set.  I -- that's all I know.
7 BY MR. BONI:
8    Q.   Okay.  You are aware, are you not,
9 Dr. Courant, that other universities have digital
10 copies of the books that Google scanned at those
11 libraries as well, correct?
12         MR. PETERSEN:  Objection to form.
13         THE WITNESS:  So two points.  One,
14 of course a great deal of what's in the Hathi Trust is
15 in the public domain, and there are many copies in
16 many places of those works widely used.  And second,
17 there are libraries that participated in scanning
18 projects with Google that have not deposited all of the
19 works they received in Hathi Trust, and presumably some
20 of those hold their own copies.  I wouldn't know what
21 they do.
22 BY MR. BONI:
23    Q.   At the University of Michigan are there
24 any -- are there any file copies -- I'm sorry.  Are
25 there any digital copies of the books that the

Page 24

1 University of Michigan Library permitted Google to scan
2 held outside of the aegis of the Hathi Trust?
3         MR. PETERSEN:  Objection to form.
4 If the witness knows what you're referring to, he can
5 answer.
6         THE WITNESS:  I -- if you're
7 referring to the tape backups --
8         MR. PETERSEN:  Only if you know.
9         THE WITNESS:  Yes.
10         MR. PETERSEN:  Mike, why don't you
11 rephrase that question?
12         THE WITNESS:  Otherwise I don't
13 know.
14 BY MR. BONI:
15    Q.   Yeah, I'm sorry.  Let me rephrase it.  I
16 couldn't answer it myself.  Are -- well, let's do this.
17 Dr. Courant, when I referred to the phrase digital
18 copies, could I ask you to agree whether if I use that
19 phrase I'm referring to the files that Google sent to
20 the University of Michigan as part of the Google
21 Library Project?
22         MS. DURIE:  Objection, lacks
23 foundation.
24         MR. PETERSEN:  I think that's gonna
25 be cumbersome, Mike.  I think you just need to take

Page 25

1 each question at a time, and I think you should note
2 my continuing objection to the use of copies to the
3 extent it calls for any legal conclusions from this
4 witness.
5         THE WITNESS:  But I'm supposed to
6 try to answer it anyhow?
7 BY MR. BONI:
8    Q.   Yeah.
9    A.   Okay.  So -- so again, my issue with copies
10 is counsel tells me about the legal issues.
11         MR. PETERSEN:  I don't want you --
12 yeah.
13         THE WITNESS:  But I -- you know, the
14 way in which computers and files work, the physical
15 integrity of things is fluid, so there's a copy and
16 then it gets moved from one place to another, and so I
17 don't -- the actual molecules of things -- actually
18 they aren't even molecules, the actual electrons, you
19 seem to be asking if we -- about the specific
20 configurations of electrons that Google made --
21 returned or allowed -- made copies of or allowed us to
22 make -- to acquire in the first place as a result of
23 copying here, and I don't know enough about how these
24 things work to be able to say anything about what
25 happens to those particular bundles of electrons.

Page 26

1 BY MR. BONI:
2    Q.   Right.  I got it.  I think you're giving --
3 you give me too much credit.  I guess I was asking
4 in response to something you testified to earlier
5 that -- when I asked where these copies were -- why
6 don't I -- why don't I say digital files if the word I
7 used --
8    A.   Yes, that's better.
9    Q.   -- is problematic.  Is that a better phrase
10 to describe what Google has given back to the
11 University of Michigan?
12         MS. DURIE:  Objection, lacks
13 foundation.
14         THE WITNESS:  So digital -- digital
15 files that contain -- contain in some form these works?
16 BY MR. BONI:
17    Q.   The books, right.
18    A.   That's -- that's okay with me.  I know -- I
19 think I know what we're talking about now.
20    Q.   So we talked earlier about the -- where the
21 digital files were kept, and at one point you said that
22 at some point they were kept under the aegis of the
23 Hathi Trust, and my question was whether any such files
24 today are kept outside of the aegis of the Hathi Trust?
25    A.   Anywhere in the world by somebody?

Page 27

1    Q.   No, at the University of Michigan.
2    A.   Here I am -- there exist tape backups of the
3 files, and whether those tape backups are being held
4 under the aegis of the Hathi Trust or the University of
5 Michigan Library, not the Hathi Trust, is an
6 organizational matter that I simply don't know.
7    Q.   What form do these tape backups take?  Do
8 you know, Dr. Courant?
9         MR. PETERSEN:  Objection to form,
10 vague.
11         THE WITNESS:  And you're not --
12 again, we're talking about technical details.  They're,
13 you know, tapes.  Magnetic tapes I assume.
14 BY MR. BONI:
15    Q.   Okay.  These are physical tapes that you can
16 hold, correct?
17         MR. PETERSEN:  Objection to form.
18         THE WITNESS:  Again, I don't know
19 their size, but they would -- they are -- they're --
20 yes is my guess is the right answer to that question.
21 BY MR. BONI:
22    Q.   Okay.  Other than the tape backups, are you
23 aware of any other tapes that hold in digital form the
24 books that Google digitized from the University of
25 Michigan's libraries collection?

Page 28

1         MR. PETERSEN:  Objection to form.
2         THE WITNESS:  There are of course
3 many public domain works held in many places in digital
4 form.
5 BY MR. BONI:
6    Q.   Are you aware of whether among the books
7 that Google scanned are books that are not in the
8 public domain, but rather are in copyright?
9         MR. PETERSEN:  Objection to form.
10 Objection, calls for a legal conclusion.
11         THE WITNESS:  There are works that
12 are -- yes, there are works that are in copyright that
13 were scanned as part of the project.
14 BY MR. BONI:
15    Q.   Do you know whether the University of
16 Michigan has tapes of digitized copies of in copyright
17 books from the University of Michigan Library other
18 than the tape backups that you just testified about?
19    A.   I am not aware of any such.
20    Q.   Okay.  Dr. Courant, are you aware of an
21 initiative called the Orphan Works Project?
22    A.   I am.
23    Q.   What is the Orphan Works Project?
24    A.   The idea behind the Orphan Works Project was
25 to identify works that were determined to be in

Page 29

1 copyright through a set of investigations where the
2 rights holder could not be found, and to make available
3 to authorized, authenticated users of the University of
4 Michigan libraries the ability to read those works
5 online, limited to the number of copies of the original
6 physical works that we had originally purchased.  So
7 all of these works were works where the University of
8 Michigan acquired a physical copy at some point.
9         The works were then scanned by
10 Google or could also have been scanned by the
11 university or -- then the works -- we would explore
12 to establish that we couldn't find a rights holder, and
13 once that was established, well established, we would
14 make the works available on this limited time basis to
15 members of our community.
16    Q.   Are you aware of any person who has primary
17 responsibility for the oversight of the Orphan Works
18 Project?
19         MR. PETERSEN:  Objection to form.
20         THE WITNESS:  Again, the project has
21 been largely led by John Wilkin.
22 BY MR. BONI:
23    Q.   Was it John Wilkin's idea?
24         MR. PETERSEN:  Objection to form.
25         THE WITNESS:  It came out of

8 (Pages 26 - 29)

Page 30

1  discussions among a number of leaders both in the
2  library and the university.
3  BY MR. BONI:
4      Q.    And who are those leaders?
5      A.    John Wilkin, myself, members of the
6  General Counsel's office, and then consultation with
7  the provost and the president, and others -- surely
8  others on the library staff.  We discussed it quite
9  widely before we proceeded.



Page 31

Page 32

Page 33

9 (Pages 30 - 33)

Page 34

6           MR. PETERSEN: Objection to form. I
7 think you need to define what the cooperative agreement
8 is, which one you're talking about.
9 BY MR. BONI:
10     Q.    The operative cooperative agreement between
11 the University of Michigan and Google regarding the
12 Google Library Project.
13           MR. PETERSEN: Well, your idea of
14 what's operative might be different than the witness',
15 Mike, so I think if you're referring to an agreement, I
16 think it's appropriate to identify that agreement and
17 perhaps put it in front of the witness.
18 BY MR. BONI:
19     Q.    Dr. Courant, are you aware of several
20 cooperative agreements that are between the University
21 of Michigan and Google?
22     A.    I'm specifically aware of two. There may be
23 more.

Page 35

17     A.    Not to my knowledge, no.
18     Q.    Has the university -- strike that. Has
19 Hathi Trust displayed any in copyright books in full in
20 connection with the Orphan Works Project?
21           MR. PETERSEN: Objection to form.
22           THE WITNESS: No.
23 BY MR. BONI:
24     Q.    Do you know whether the University of
25 Michigan has displayed in full copyright books from

Page 36

1 the digital files it received from Google?
2           MR. PETERSEN: Objection to form.
3           THE WITNESS: And that's a very
4 different question, right?
5 BY MR. BONI:
6     Q.    Yes.
7     A.    Okay. So could you -- would you state it
8 again?
9     Q.    Sure. Has the University of Michigan
10 displayed in full any in copyright books from the digit
11 files it received from Google?
12           MR. PETERSEN: You're talking about
13 regardless of licensing status? It's a very broad
14 question, Mike. It's essentially a meaningless
15 question, so I'll note my objection.
16           MR. BONI: Okay.
17           THE WITNESS: The answer -- so
18 there's a subtlety around the question, the use of the
19 word display. So there are certainly some in copyright
20 works that were produced in connection with the Google
21 project that have been and indeed in a moment, I want
22 to be very careful about this, are available to the
23 general public. The ones that are, in every case
24 that we know of have been specifically authorized to be
25 so by the rights holder. This happens quite

Page 37

1 frequently. So that -- so that answer is yes in that
2 limited way.
3 BY MR. BONI:
4     Q.    So let's -- has the University of Michigan
5 displayed any in copyright book from the digital files
6 it received from Google as part of the Google Library
7 Project that was not authorized by the rights holder?
8     A.    To my knowledge there have been a handful of
9 such cases.
10     Q.    Under what circumstances have those displays
11 been made?
12     A.    The Copyright Review Management System,
13 which we use to ascertain the copyright status of works
14 published after 1922 and before some important date in
15 the late '60s that I can't remember, maybe it's the
16 early '60s, has misidentified a -- as I said, a handful
17 of cases that were then available for a time.
18     Q.    All right. Misidentified a handful of cases
19 that what?
20     A.    That were then available on the -- from the
21 website for a time.
22     Q.    And to whom were they made available?
23           MR. PETERSEN: Objection.
24 BY MR. BONI:
25     Q.    Not the individual names obviously, but

10 (Pages 34 - 37)

Page 38

1 generally to whom were they made available?
2         MR. PETERSEN: Objection to form.
3 Objection, mischaracterizes Dr. Courant's testimony.
4         THE WITNESS: They could have been
5 found by somebody with an Internet connection in the
6 United States.
7 BY MR. BONI:
8     Q.   And when you say a handful, how many are
9 you -- how many books are you referring to?
10     A.   I would be really surprised if it got very
11 far into the double digits and not surprised if it
12 didn't get into the double digits at all.
13     Q.   So somewhere between 10 and 99?
14         MR. PETERSEN: Objection to form,
15 mischaracterizes the testimony.
16         THE WITNESS: I would be very, very
17 surprised if it were anywhere near 99.
18 BY MR. BONI:
19     Q.   You think it was closer to 10?
20     A.   Yes.
21     Q.   And for how long were those books made
22 available as a result of the misidentification of those
23 books' copyright status?
24         MR. PETERSEN: Objection to form.
25         THE WITNESS: One would have to look

Page 39

1 at the record case by case, which I certainly haven't
2 done.
3 BY MR. BONI:
4     Q.   Who would be the person in the best position
5 to answer that question?
6     A.   Again, John Wilkin.
7     Q.   Okay. Dr. Courant, are you aware of any
8 other university that displayed in copyright books to
9 anyone without the authorization of the rights holder?
10         MR. PETERSEN: Objection. Objection
11 to form.
12         THE WITNESS: So I would not -- I
13 don't know -- when you say other you're presumably
14 including the University of Michigan, and I'm not sure
15 that these instances I've described rise to the level
16 of display, and I don't specifically know of other
17 cases.
18 BY MR. BONI:
19     Q.   Well, I'm referring to any instances outside
20 of the University of Michigan.
21         MR. PETERSEN: Objection to form,
22 asked and answered.
23         THE WITNESS: Right. And so if
24 you're asking -- I could speculate that this plausibly
25 has happened, but I do not know of any particular

Page 40

1 cases.
2 BY MR. BONI:
3     Q.   You don't have actual knowledge of that
4 occurring anywhere outside of the University of
5 Michigan, correct?
6         MR. PETERSEN: Objection to form.
7         THE WITNESS: I have -- I have no
8 specific knowledge of it happening elsewhere.
9 BY MR. BONI:
10     Q.   Okay. What are Hathi Trust -- Hathi Trust's
11 plans going forward with respect to the Orphan Works
12 Project?
13     A.   The University of Michigan has plans to
14 continue to work to identify orphan works, and
15 that's -- in fact, we are continuing to work to
16 identify orphan works.
17     Q.   Anything else? Is it limited to the
18 identification of orphan works?
19         MR. PETERSEN: Objection to form.
20         THE WITNESS: That work is certainly
21 work that we are committed to doing. We said at the
22 time that we suspended the movement towards actually
23 allowing members of our authorized and authenticated
24 campus community to read these works one at a time in
25 digital form, we said that we intended to learn and

Page 41

1 study and reassess our procedures and practices, and
2 that's what we're currently engaged in.
3 BY MR. BONI:
4     Q.   Is it the intention of the Orphan Works
5 Project to present for reading the full text of in
6 copyright books without the authorization of the rights
7 holder?
8         MR. PETERSEN: Objection to form.
9 Objection, asked and answered.
10         THE WITNESS: It's a -- it's -- is
11 it the intention of the project to do that? It
12 certainly was in its -- well, I don't -- without the
13 authority of the right holder, given that we already
14 bought a copy and we're just substituting for it, I can
15 dance around, but that was the original intention as I
16 described it, that we would make individual copies
17 available to members of the community where the library
18 had already purchased a copy of the book, and the
19 current status of the project is that we are -- we are
20 considering what comes next.
21 BY MR. BONI:
22     Q.   Okay. Dr. Courant, could you describe for
23 me the -- all of the uses which you are aware of that
24 the University of Michigan has made with the digital
25 files it received from Google as part of the Google

11 (Pages 38 - 41)

Page 42

1  Library Project?
2          MR. PETERSEN: Objection to form.
3  Objection, calls for a narrative. Can you ask a more
4  focused question?
5          MR. BONI: Yeah, I just want an
6  answer as to all of the uses. I don't think it calls
7  for a narrative at all. It calls for a list. It's
8  okay.
9          MR. PETERSEN: Same objection.
10         THE WITNESS: So our uses of digital
11 files?
12 BY MR. BONI:
13     Q.  Yes.
14     A.  They're available for search, the works
15 where -- that are in the public domain or where the
16 rights holder have authorized us to do so are available
17 to be read, and in some cases downloaded. The works
18 that we believe -- that we do not know to be in the
19 public domain or authorized by the rights holder are
20 only available for search.
21         And the works have also been
22 used to be -- by people with certified print
23 disabilities under -- under the university's relevant
24 office for such certification. I'm trying to think
25 what else. We have not yet -- yeah, I think I'll stop

Page 43

1  there.
2      Q.  Great. So -- thank you. You mentioned
3  that the digital files are used by people with print
4  disabilities. Are those people limited to the
5  University of Michigan community, or anyone?
6      A.  With respect to works that are from the
7  University of Michigan files, yes, I believe it is
8  limited to just the University of Michigan certified
9  users.
10     Q.  And what is a certified user? What makes
11 someone a certified user?
12     A.  There's an office in the university that
13 determines whether people have print disabilities, and
14 then of course the person has to be a member of the
15 university community.
16     Q.  With respect to digital files of books that
17 are in copyright and that were digitized without the
18 authorization of the rights holder, to whom are those
19 works or those digital files available for search
20 purposes?
21         MR. PETERSEN: Objection to form.
22 BY MR. BONI:
23     Q.  You said you made them available for search.
24 I'm asking available to whom?
25     A.  So to search for the -- search text as

Page 44

1  distinct from to read? Yes?
2      Q.  Yeah. Fair distinction. Let's take both.
3      A.  Big distinction.
4      Q.  To search the text.
5      A.  To search the text for phrases or names or
6  something like that, essentially the entire corpus
7  of works held in the Hathi Trust, including the
8  works contributed to the Hathi Trust by the University
9  of Michigan, are available to search by essentially
10 everyone in the United States with an Internet
11 connection.
12     Q.  And then the same question with respect to
13 availability to read the text of those works; that is
14 to say, works that are in copyright and were not
15 digitized with the authorization of the rights holders?
16         MR. PETERSEN: Mike, that was
17 complicated. Can you put that question together? It
18 was a complicated question to begin with, and I --
19         MR. BONI: Yeah, sure.
20 BY MR. BONI:
21     Q.  Who -- to whom does the University of
22 Michigan make available for reading purposes the
23 digital files of in copyright books that were digitized
24 by Google without the authorization of the rights
25 holders?

Page 45

1          MR. PETERSEN: Objection to form.
2          THE WITNESS: Again, the -- not
3  knowing specifically about what the rights holders
4  would think of such matters, the people with certified
5  print disabilities who are members of the university
6  community and incidentally to their duties to preserve
7  the integrity of the files and such, so technical
8  library work and computer work, the staff who are
9  responsible for doing that work. They don't read the
10 whole book, but they would have to read parts of books
11 in order to do their work. That's it.
12 BY MR. BONI:
13     Q.  And nobody other than those members of the
14 University of Michigan community with print
15 disabilities or those staff members in connection with
16 the library or computer work are able to read the text
17 of in copyright books whose digital files were given to
18 the University of Michigan by Google?
19         MS. DURIE: Objection, lacks
20 foundation.
21         THE WITNESS: Whose -- and it's
22 not -- if you put it that way, then that's not right
23 because there are works that were -- in copyright works
24 that were made available to the University of Michigan
25 through the -- from Google as part of this project

12 (Pages 42 - 45)

Page 46

1 where we do have authorization from the rights holder.
2 BY MR. BONI:
3     Q.    Right. So let me limit it to those works
4 where the rights holder did not give authorization.
5     A.    So let me just try to see if I can get this
6 set winnowed down to what it is. These are works that
7 are in copyright, digitized by Google, a copy has come
8 to the University of Michigan, and you're asking who
9 can read the text of those works?
10    Q.    Correct.
11    A.    Right.
12    Q.    You mentioned those at the University of
13 Michigan with print disabilities and then staff for
14 technical and computer purposes --
15    A.    Yes.
16    Q.    -- and I'm asking you whether there is
17 anyone else.
18    A.    There are some staff who are not staff at
19 the University of Michigan associated with the mirror
20 site at Indiana, and that's all I can think of.
21    Q.    Okay. Do you know whether any research
22 has been conducted on the digital files which -- where
23 the research does not involve reading the text of the
24 books?
25             MR. PETERSEN: Objection to form.

Page 47

1 Research by whom?
2 BY MR. BONI:
3     Q.    Anyone at the University of Michigan.
4     A.    So I actually don't specifically know
5 because the cases that I know of, the kind of research
6 you're describing, have largely been done on Google's
7 files, but I would -- you know, so I don't specifically
8 know is the right answer.
9     Q.    What research has been done on Google's
10 files?
11    A.    Well, there's the engram project, which
12 looks for the frequency of words in various languages
13 over time, other elements of linguistic research,
14 largely around questions of language, language
15 development.
16    Q.    Has the University of Michigan been involved
17 at all with those projects?
18    A.    The University of Michigan as a corporate
19 entity has not. It's possible that faculty and staff
20 and students at the University of Michigan have done
21 some of that work.
22    Q.    Dr. Courant, does Google have any role,
23 active role in connection with the operations of
24 Hathi Trust?
25    A.    Google continues to digitize works, and we

Page 48

1 continue to take works from the project and put them
2 into the Hathi Trust, so in that sense that's an active
3 role I would say.
4     Q.    In any other sense?
5     A.    What sort of sense did you have in mind?
6     Q.    Well, for example, does it have a role in
7 the governance of Hathi Trust?
8             MR. PETERSEN: Objection to form.
9             THE WITNESS: No.
10 BY MR. BONI:
11    Q.    Does it control Hathi Trust's activities in
12 any way?
13    A.    In the conventional use of the word control,
14 no.



Page 49

Page 50

Page 52

Page 51

Page 53

6           MR. BONI:  All right.  Let me --
7   here's what I'd like to do.  I'd like to take a
8   five-minute break, and then I'm going to spend a few
9   minutes on the Answer, and then I'll be finished.
10          MS. DURIE:  Okay.
11          MR. PETERSEN:  That sounds good.
12  Thanks, Mike.
13          MR. BONI:  Okay.
14          THE VIDEOGRAPHER:  We're going off
15  the record, the time is 2:56 p.m.
16          (There was a recess taken.)
17          THE VIDEOGRAPHER:  We're back on the
18  record, the time is 3:10 p.m.
19  BY MR. BONI:
20      Q.   Dr. Courant, is Google still digitizing
21  books from the University of Michigan libraries
22  collection?
23      A.   Yes.

14 (Pages 50 - 53)



15 (Pages 54 - 57)



Page 58

Page 60

Page 59

Page 61

1         MR. BONI:  Let me ask the court
2  reporter to put in front of the witness what has been
3  premarked UM 1 and UM 2.
4         MR. PETERSEN:  So it's actually --
5  it's marked Courant 1 and Courant 2 --
6         MR. BONI:  Oh, Courant.
7         MR. PETERSEN:  -- Mike, and I'll let
8  you know that Courant 1 is the First Amended Complaint
9  and Courant 2 is the joint Answer and Defenses.
10        MR. BONI:  Great.  Thanks.  And do
11  you guys -- I take it you and Daralyn have a copy?
12        MS. DURIE:  We do.
13        MR. BONI:  Okay.  It doesn't matter
14  to me, but I know that there -- there is a deposition
15  in the other case, and I didn't want to confuse that
16  this was a -- this is a subpoena to the University of
17  Michigan, but Courant 1 and Courant 2 is fine with me.
18  BY MR. BONI:
19     Q.   Dr. Courant, let me ask you whether you
20  recognize what has been marked Courant 1?
21     A.   I haven't flipped through this copy of it,
22  but yes.
23        MR. PETERSEN:  Why don't we give
24  Dr. Courant a few moments, Mike, to take a look at what
25  has been marked Exhibit 1.

16 (Pages 58 - 61)

Page 62

1  BY MR. BONI:
2      Q.   Take all the time you need.
3      A.   I may need more time if you start asking
4  specific questions about it, but I've seen this
5  document before I read it.
6      Q.   Right. I only asked whether you recognized
7  it and if you could simply, in your own words, describe
8  what it is?
9      A.   Well, I recognize it, and it's my
10 understanding that it is a Complaint from the
11 Authors Guild and a number of other entities against
12 the University of Michigan and a number of other
13 entities with respect -- with regard to copying and
14 holding a number of digital files at the University of
15 Michigan and in the Hathi Trust.
16     Q.   Have you read the Complaint, the First
17 Amended Complaint prior to today, sir?
18     A.   Yes.
19     Q.   How recently have you read it?
20     A.   Quite some time ago.
21     Q.   Okay. And am I right that a copy of the
22 Complaint is kept somewhere at the University of
23 Michigan, at the offices of the University of Michigan?
24          MR. PETERSEN: Objection.
25 Objection, lacks foundation.

Page 63

1          THE WITNESS: I just -- I would be
2  shocked if it were otherwise, but I do not know.
3  BY MR. BONI:
4      Q.   Let me ask you to look at Courant 2. Take
5  all the time you need review it, and then I'll ask you
6  questions about it.
7      A.   Yes.
8      Q.   Do you recognize that document, Dr. Courant?
9      A.   I do.
10     Q.   What is it?
11     A.   It is, as I understand it, since these are
12 all matters of legal form in which I have no expertise,
13 but this is the response of our attorneys to that
14 Complaint that we just discussed.
15     Q.   Okay. And have you read -- have you read
16 this document before today?
17     A.   Yes.
18     Q.   Do you know how recently you read this
19 document?
20     A.   I read it first quite some time ago, and I
21 looked through it over the last few days.
22     Q.   Let me ask you to turn to the bottom of page
23 three, the last two lines, where it reads, the uni --
24 this is the second -- this is the latter part of a
25 long sentence. The university stored these digital

Page 64

1  copies in a repository called the Hathi Trust Digital
2  Library, which contains at least 9.7 million volumes.
3  My question is whether that number is accurate today
4  or do you have another number for the number of
5  volumes?
6      A.   The number of volumes now exceeds
7  10 million. I don't have an exact number for today.
8      Q.   Okay. But it exceeds 10 million?
9      A.   Yes.
10     Q.   Do you have any sense of what percentage of
11 the volumes are protected by U.S. copyright laws?
12          MR. PETERSEN: Objection to form,
13 vague. Objection, calls for a legal conclusion.
14 Objection, lack of foundation.
15          THE WITNESS: I have a -- I could
16 speculate within a range, but I have no exact knowledge
17 of what works are in copyright because it's actually
18 quite difficult to determine whether a work is in
19 copyright in many cases.
20 BY MR. BONI:
21     Q.   Okay. On what do you base your ability to
22 speculate as to a range of the percentage?
23          MR. PETERSEN: Objection to form,
24 vague. Mike, can you rephrase that?
25          MR. BONI: Yeah.

Page 65

1  BY MR. BONI:
2      Q.   You said that you can speculate as to the
3  percentage, so I'm asking --
4          MR. PETERSEN: I don't think you
5  want a record with speculation on it, Mike. I think
6  you need to --
7  BY MR. BONI:
8      Q.   I didn't ask for that. I'm asking how you
9  can -- how you can give us a range of the percentage,
10 Dr. Courant?
11     A.   Well, I may be being a little too much the
12 empirical economist that I am, and so I make -- I make
13 speculations on such data as I have. We consistently
14 find -- we know that somewhere around 27 or 28 percent
15 of the works are in the public domain, and I think it's
16 reasonable to expect that the majority of the works
17 that we haven't made that determination of are in
18 copyright, and that would be a pretty broad range. So
19 that's about as far as I can go.
20     Q.   Okay. Did you serve any role in the
21 preparation of the Answer to the First Amended
22 Complaint, what you have before you as Courant 2?
23          MR. PETERSEN: Objection to form,
24 vague.
25          THE WITNESS: I looked at parts of

1  it when it was being drafted.

2  BY MR. BONI:

3      Q.   Prior to the time that it was filed?

4          MR. PETERSEN:  Mike, you're getting

5  close.  Obviously this is a legal document that was

6  filed in connection with a lawsuit.  There's a

7  privilege issue.

8          He can answer if he's seen the

9  document before, but I'm going to assert privilege with

10  respect to communications with counsel concerning the

11  document and those types of issues on timing as to --

12  as to timing as well, so --

13          MR. BONI:  Well, I'm not asking with

14  whom -- actually, I could ask with whom he spoke, but

15  I'm not, and I'm not asking what was said.  I'm simply

16  asking whether Dr. Courant reviewed the Answer prior to

17  the time that it was filed with the court.

18          MR. PETERSEN:  He can answer that

19  question -- if he recalls, then he can answer that, but

20  in terms of any issue of substance, I'm going to assert

21  the privilege.

22          MR. BONI:  Okay.

23          THE WITNESS:  I believe that I was

24  in on discussions of the content of this before it was

25  filed, but I may be remembering incorrectly.

1  BY MR. BONI:

2      Q.   Okay.  At paragraph three on page four, it

3  states that Defendants admit that UM and UC have

4  announced their participation in the Orphan Works

5  Project, an initiative to, inter alia, identify orphan

6  works, and then hyphen, in copyright works for which

7  the copyright holder cannot be found, hyphen, and

8  eventually to make lawful uses of these works.  Do you

9  have an understanding of what is meant in that

10  admission by the word eventually?

11          MR. PETERSEN:  Objection to form.

12          THE WITNESS:  In the -- in the

13  context of the announcement, after there was

14  determination that the work was an orphan work,

15  including an open period in which the work would be

16  displayed to the world as a potential orphan work, we

17  would get to I think eventually.

18  BY MR. BONI:

19      Q.   And as you sit here today, is it still

20  the -- is it still the aim of the Orphan Works Project

21  to identify orphan works?

22          MR. PETERSEN:  Objection to form,

23  and objection, asked and answered.  I believe

24  Dr. Courant has already --

25          MR. BONI:  Yeah.  You know what, I

1  think you're right, so let me strike that.  I do recall

2  asking that question before.

3  BY MR. BONI:

4      Q.   What is meant in that statement by the term

5  to make lawful uses of these works?

6          MR. PETERSEN:  Objection to form and

7  objection, calls for a legal conclusion.

8          THE WITNESS:  So there are lots of

9  plausible lawful uses of works -- of these works.  One

10  of them would be to make a list of them and make that

11  list public.  And, you know -- and -- and there may

12  well be uses -- reading uses of these works that are

13  lawful, including ones for the print disabled, and

14  when this project -- as this project was designed on

15  advice of counsel we had intended to make the works

16  available to members of our community and --

17          MR. PETERSEN:  I instruct the

18  witness not to divulge any attorney/client information.

19          THE WITNESS:  I'm sorry, okay.  So

20  the uses that we talked about earlier in response to a

21  similar question.

22  BY MR. BONI:

23      Q.   Did anyone tell you why Indiana University

24  has not announced plans to participate in the Orphan

25  Works Project?

1      A.   I don't recall having a specific

2  conversation with people from Indiana about that.

3      Q.   Do you have any knowledge as you sit here

4  today as to why Indiana University has not announced

5  plans to participate in the Orphan Works Project?

6          MR. PETERSEN:  Objection to form and

7  objection to the extent it calls for speculation.

8          THE WITNESS:  Yeah, I just, you

9  know -- I find that speculating on other people's

10  motives isn't a very good move.

11  BY MR. BONI:

12      Q.   You have no idea why it made that decision?

13          MR. PETERSEN:  Objection, asked and

14  answered.

15          THE WITNESS:  Am I supposed to

16  respond?

17  BY MR. BONI:

18      Q.   Yeah, you can respond.

19      A.   So I have lots of ideas.  I just have no

20  knowledge.

21      Q.   Right.  What are those ideas?

22          MR. PETERSEN:  Objection, it calls

23  for speculation.  The witness told you he has no

24  knowledge.

25          MR. BONI:  I'd like to know what his

18 (Pages 66 - 69)

1  ideas are.  He just testified as to having ideas.
2          THE WITNESS:  Somewhere in their
3  decision process they decided not to.
4  BY MR. BONI:
5      Q.   Why not?
6      A.   I don't know.
7          MR. PETERSEN:  Same objection.
8  BY MR. BONI:
9      Q.   And so when you testified that you had
10  ideas, do you have any other ideas as to why
11  Indiana University has not announced plans to
12  participate in the Orphan Works Project?
13          MR. PETERSEN:  Objection to form.
14  Objection, calls for speculation.  Objection, asked and
15  answered.
16          THE WITNESS:  I assume that they
17  didn't -- haven't announced plans because they don't
18  mean to participate.
19  BY MR. BONI:
20      Q.   Do you know why they don't mean to
21  participate --
22      A.   I do not know why.
23      Q.   -- in the Orphan Works Project?
24          MR. PETERSEN:  And objection, asked
25  and answered.

1          THE WITNESS:  I don't know why.
2  BY MR. BONI:
3      Q.   Let me ask you to turn to paragraph 13 on
4  page five.  Are you there?
5      A.   Um-hum.
6      Q.   I have the handicap of not seeing whether
7  you're here or not.
8      A.   I'm here.
9      Q.   Okay.  The first sentence says, Defendants
10  admit that a book entitled "Good Troupers All:  The
11  Story of Joseph Jefferson" by Gladys Malvorn was
12  digitized and included in the HDL and was
13  preliminary -- preliminarily identified as a book that
14  UM planned to make available on the limited basis
15  contemplated as part of the OWP if the copyright holder
16  were not identified, and then the sentence goes on.  Do
17  you see that language, Dr. Courant?
18      A.   I do.
19      Q.   Can you tell me what is meant by the phrase
20  on the limited basis contemplated?
21          MR. PETERSEN:  Objection to form.
22          THE WITNESS:  Yes.  As I believe
23  we've already discussed, works that were identified
24  as a -- as orphan works, which this work was not, it
25  was only preliminarily identified as an orphan works,

1  would be made available to authorized and authenticated
2  members of the University of Michigan community on the
3  basis that they could, on a -- such that they could
4  have reading access to it digitally online per the
5  number of books of that -- works of that title that we
6  had purchased in print form.  In other words, they
7  would have essentially exactly the same use of the work
8  that they would have if they went into the library and
9  checked it out, but they could do it from their dorm
10  room.
11  BY MR. BONI:
12      Q.   Okay.  Let me ask you to turn to page ten.
13  The last sentence of paragraph 34, it's at the top of
14  page 10, says the Defendants further admit that UM is a
15  co-founder, host, and primary administrator of the
16  Hathi Service -- I'm sorry, the Hathi Trust Service and
17  is the largest contributor to the HDL, which contains
18  the collection of digital works with respect to which
19  the Hathi Trust Service operates.  Do you see that
20  language, Dr. Courant?
21      A.   Yes, poetry.
22      Q.   What is meant by the term host in that
23  statement?
24          MR. PETERSEN:  Objection, lacks
25  foundation.

1          THE WITNESS:  The U of M is the
2  place where and whence the works are held and can be
3  found and searched, etcetera.
4  BY MR. BONI:
5      Q.   Do you know how it came to be that the
6  University of Michigan would be a host of the works, of
7  the digital files?
8          MR. PETERSEN:  Objection to form,
9  vague.
10          THE WITNESS:  The U of M at the time
11  that the Hathi Trust was founded already had the -- as
12  it says in this sentence actually, the largest
13  collection of such works and a active and functional
14  set of procedures for hosting them, and so we continued
15  in that role because we were the entity that was doing
16  that work already.
17  BY MR. BONI:
18      Q.   How did the U of M come to develop an active
19  and functional set of services in that regard?
20          MR. PETERSEN:  Objection to form.
21          THE WITNESS:  We've discussed -- we
22  discussed earlier today the relationship -- the
23  U of M's making -- having files that came from the
24  Google scans.  We put those -- used those files -- used
25  those files.  We store those files on servers

19 (Pages 70 - 73)

Page 74

1 maintained by U of M subject to a set of protocols, and
2 the -- and so the starting place of Hathi Trust was
3 that there were already many books that were being held
4 by U of M, the U of M library at that point, in this
5 way.
6 BY MR. BONI:
7    Q.   And that is as a result of the Google
8 Library Project?
9         MR. PETERSEN:  Objection to form.
10        THE WITNESS:  Yes.
11 BY MR. BONI:
12    Q.   What is meant by -- so is UM the only host,
13 or are there any other hosts?  Is Indiana University --
14 let me ask this question.  Is Indiana University also a
15 host?
16    A.   So if the word host is a legal term of art
17 then I have to pull back because I don't know what
18 its -- what its meaning is.
19    Q.   I'm not asking it as a legal term of art at
20 all.
21        MR. PETERSEN:  Mike, why don't you
22 just define --
23 BY MR. BONI:
24    Q.   I don't know how it would be a legal term of
25 art.

Page 75

1         MR. PETERSEN:  Why don't you define
2 host, Mike?  That might be helpful.
3         MR. BONI:  Well, it's in your
4 Answer, and we asked anyone to step forward on behalf
5 of the University of Michigan to speak about the
6 Answer, and here's Dr. Courant, so I'm asking what is
7 meant in the Answer by host.
8         MR. PETERSEN:  And to the extent the
9 witness knows, he can answer.  To the extent he doesn't
10 know, it's appropriate for him to say he doesn't know.
11        THE WITNESS:  So as the -- as a host
12 for a copy of the files, both Michigan and Indiana are
13 hosts.
14 BY MR. BONI:
15    Q.   University of Michigan is a primary
16 administrator of the Hathi Trust Service; is that
17 correct?
18        MR. PETERSEN:  Objection to form.
19        THE WITNESS:  The Hathi Trust
20 Service takes place under a series, a set of -- a
21 large set of bilateral contracts between the University
22 of Michigan and other universities and research
23 entities, research libraries around the country, and
24 thus the University of Michigan is the primary
25 administrator.

Page 76

1 BY MR. BONI:
2    Q.   Is Google also an administrator of the Hathi
3 Trust Service?
4    A.   Not in any sense that I understand.
5    Q.   Okay.  Are the other -- are the other
6 schools in which U of M have those bilateral agreements
7 considered administrators of the Hathi Trust Service?
8         MR. PETERSEN:  Objection to form.
9         THE WITNESS:  No, I shouldn't think
10 so.
11 BY MR. BONI:
12    Q.   So is U of M the only administrator of the
13 Hathi Trust Service?
14        MR. PETERSEN:  Objection to form.
15        THE WITNESS:  I think that this --
16 this language either contemplates the U of M alone or
17 U of M and Indiana, Indiana in its role as the mirror
18 site.
19 BY MR. BONI:
20    Q.   Fair enough.  Let me ask you to turn to the
21 bottom of page 11.  The last sentence on that -- I'm
22 sorry, the second to last sentence on that page reads,
23 Defendants admit that a fully operational, synchronized
24 and live mirror site of the HDL is located on IU's
25 Indianapolis campus.  Do you see that language,

Page 77

1 Dr. Courant?
2    A.   Yes.
3    Q.   Is this what you were referring to
4 previously as Indiana's mirror site --
5    A.   Yes.
6    Q.   -- of the Hathi Trust Digital Library?
7    A.   Yes.
8    Q.   What is meant by synchronized?  Do you know?
9    A.   I think that's a technical term in the
10 context of the computing activity, and so I would not
11 opine on what it means in detail.
12    Q.   Do you know whether Indiana University
13 offers for reading the full text of copyright books
14 to members of its community who are print disabled?
15        MR. PETERSEN:  Objection to form.
16        THE WITNESS:  I do not know.
17 BY MR. BONI:
18    Q.   Do you know -- do you know what uses
19 Indiana University makes of its mirror site of the
20 Hathi Trust Digital Library?
21        MR. PETERSEN:  Objection to form.
22        THE WITNESS:  The principal use
23 would be to store a duplicate set of the files.
24 BY MR. BONI:
25    Q.   Do you know whether it does anything with

20 (Pages 74 - 77)

Page 78

1 the mirror set of the Hathi Trust digital files other
2 than that?
3          MR. PETERSEN: Objection to form.
4          THE WITNESS: I do not know.
5 However, I would expect that they would -- the use --
6 any use would be through the Hathi Trust interface.
7 BY MR. BONI:
8     Q.   What do you mean by the Hathi Trust
9 interface?
10    A.   www.hathitrust.org gives one a way of
11 getting to many services of the Hathi Trust, largely
12 around -- search around all works, as I've pointed out,
13 and reading use of public domain works or other works
14 that have been authorized for such use, and the
15 institutions -- both institutions who are part of the
16 Hathi Trust and institutions who are not, and just
17 ordinary folks anywhere can go there and make those
18 uses, and that is the mechanism that people use in
19 order to make uses -- any uses of those files.
20    Q.   So by Hathi Trust interface you meant
21 Hathi Trust's website, correct?
22    A.   Yeah.

Page 79

23    Q.   Let me ask you to turn to page 17, please.
24 At paragraph 63, the second sentence reads, UM Regents,
25 the Hathi Trust Service, and UC Regents admit that

Page 80

1 digital copies deposited in the HDL by some
2 institutions have been delivered to the HDL over the
3 Internet or via removable media, and then the sentence
4 goes on.  Do you see that language, Dr. Courant?
5    A.   Yes.
6    Q.   By whom have the digital copies been
7 delivered to the Hathi Trust Digital Library?
8          MR. PETERSEN: Objection to form.
9          THE WITNESS: Do you want the names
10 of people? 'Cause I wouldn't know.
11 BY MR. BONI:
12    Q.   Or entities.  Either one.
13          MR. PETERSEN: Objection.  Same
14 objection.
15          THE WITNESS: The -- many
16 entities --
17 BY MR. BONI:
18    Q.   Well, let me cut it short.  Is Google one of
19 those entities?
20    A.   Yes.
21    Q.   And earlier today you testified that the
22 digital copies were delivered to the HDL over the
23 Internet, but that you didn't know the inner workings
24 of that.  I'm paraphrasing.  Do you recall that
25 testimony?

Page 81

1          MR. PETERSEN: Objection,
2 mischaracterizes the testimony.
3          MR. BONI:  Yeah, I don't mean to do
4 that.
5          THE WITNESS: I actually resisted
6 the phrase "over the Internet" because I was concerned
7 that that might imply the open web, and -- but so -- is
8 that good enough?
9 BY MR. BONI:
10    Q.   What term would you have used?
11          MR. PETERSEN: Objection, asked and
12 answered.  He did answer these questions, Mike, at the
13 beginning of the deposition.
14          MR. BONI:  I don't think he answered
15 what term he would use instead of "over the Internet."
16          MR. PETERSEN: I think he said
17 secured server or words to that effect.
18          THE WITNESS: Yeah, I would -- I
19 would have said something about optical -- optical
20 fiber networks.  Optical fiber networks.
21 BY MR. BONI:
22    Q.   Okay, all right.  But not over the worldwide
23 web?
24    A.   Again, I don't know the details of how these
25 things work, but not in an insecure way.

21 (Pages 78 - 81)

Page 82

1 Q. Okay. And then where it says via removable
2 media, do you have an idea of what is meant by
3 removable media?
4 A. At least in some cases hard drives, maybe
5 other media as well.
6 Q. Okay. Does UM have those hard drives today?
7 A. I do not know.
8 Q. So you would not know that if you had them
9 where they would be kept, right?
10 MR. PETERSEN: Objection. Objection
11 to form.
12 THE WITNESS: I think that follows,
13 yes.
14 BY MR. BONI:
15 Q. Okay. Let me ask you to go to paragraph 64
16 on page 18. It says at the top of the page, Defendants
17 admit that the incorporation of digital works and
18 their associated metadata into the HDL is performed at
19 MLibrary. What is -- what exactly goes into
20 incorporating the digital works and their associated
21 metadata?
22 MR. PETERSEN: Objection to form.
23 THE WITNESS: I can't tell you
24 exactly, but the HDL has a bibliographic record for the
25 works in it, and so when the works are taken into the

Page 83

1 HDL, the associated metadata, title, author, publisher,
2 date, all this stuff that we carry around with records
3 of works has to be carefully linked to the works
4 themselves, made findable and so forth, and so
5 that's -- that's in broad outline the work that's being
6 done here as I understand it.
7 BY MR. BONI:
8 Q. And who at Michigan Library does that
9 incorporating?
10 A. The -- largely John Wilkin's staff. In
11 fact, I think exclusively John Wilkin's staff.
12 Q. Okay. In the next sentence it says
13 UM Regents, the Hathi Trust Service and IU Trustees
14 admit that the digital works and associated metadata
15 are replicated to an active mirror site located on
16 IU's Indianapolis campus and are stored on backup tapes
17 located at UM's facilities. Do you know -- and then
18 the sentence goes on. Do you know where at UM's
19 facilities the backup tapes are located?
20 MR. PETERSEN: Objection, vague.
21 THE WITNESS: I don't off the top of
22 my head, although there are addresses where those sites
23 are.
24 BY MR. BONI:
25 Q. Do you have any idea of whether those backup

Page 84

1 tapes are secured in any way from theft or misuse?
2 A. I believe that they are.
3 Q. Do you know how?
4 A. We're now way beyond my expertise. I
5 know that the people who are responsible for holding
6 those tapes are experienced in holding such things
7 securely.
8 Q. Are they employees -- those people to whom
9 you are referring, are they employed by University of
10 Michigan?
11 A. Yes.
12 Q. Okay. So this is U of M staff who are
13 responsible for the security of the backup tapes?
14 MR. PETERSEN: Objection to form.
15 Objection, asked and answered.
16 THE WITNESS: Yes.
17 BY MR. BONI:
18 Q. Who -- do you know who is in charge of that
19 staff?
20 A. The tapes are held by the Information
21 Technology Services at the university. The director of
22 that operation, the Chief Information Officer of the
23 university, is named Laura Patterson.
24 Q. And she's the chief technology officer at
25 U of M?

Page 85

1 A. She's the Chief Information Officer.
2 Q. All right, okay. Chief information, CIO,
3 all right. Who replicated the digital works and
4 associated metadata to the active mirror site at IU's
5 Indianapolis campus?
6 MR. PETERSEN: Objection to form.
7 THE WITNESS: That work would have
8 been done under the general direction of John Wilkin
9 and his counterpoints at Indiana -- counterparts at
10 Indiana.
11 BY MR. BONI:
12 Q. Okay. On page 19 in paragraph 67, it's
13 right in the middle of the page, it says in the
14 second sentence, Defendants also admit that the
15 Hathi Trust Service preserves and secures books that
16 are in copyright, published, and commercially
17 available. Do you see that language, Dr. Courant?
18 A. I do.
19 Q. In what way does Hathi Trust preserve the
20 books referenced here?
21 MR. PETERSEN: Objection to form.
22 THE WITNESS: The Hathi Trust is an
23 operation of the library and has a time scale for
24 preserving its assets that extends into the indefinite
25 future.

22 (Pages 82 - 85)

Page 86

BY MR. BONI:

2    Q.    What are its assets?

3    A.    Its holdings, copies of works.  Assets may
4  not have been the best word, but copies of works.  And
5  works are subject to -- print works are subject to all
6  manner of risk of deterioration and destruction over
7  time, and so the sense in which these works are
8  preserved is that we would intend to keep a copy, as I
9  said, into the indefinite future against the
10  possibility that the -- that other copies would
11  disappear.

12              MS. DURIE:  Can you do me a favor?
13  Can I just get you to move the bottle to one side?  The
14  videographer was just saying it was blocking.

15              THE WITNESS:  Oh, sure.

16              MS. DURIE:  Thanks.

17  BY MR. BONI:

18    Q.    Let me ask you to turn to page 21, paragraph
19  78.

20    A.    I'm there.

21    Q.    There is a block quote there.  It appears to
22  be a statement from Michigan Library.  And it states,
23  this tells us that our pilot process is flawed,
24  referring to the potential orphan works.  Can you tell
25  me what that -- what is meant by the pilot process

Page 87

1  being flawed?

2    A.    Yeah.  It's actually stated very well in the
3  previous sentence.  The close and welcome scrutiny of
4  the list of potential orphan works has revealed a
5  number of errors, some of them serious.  The errors
6  were classifying some things as potential orphan works
7  that in -- that -- that we should have been able to see
8  more easily than we did were actually not potential
9  orphan works.

10    Q.    Has the pilot process changed as a result of
11  the errors --

12              MR. PETERSEN:  Objection to form.

13  BY MR. BONI:

14    Q.    -- discovered?

15              MR. PETERSEN:  Objection, lacks
16  foundation.

17              THE WITNESS:  We are -- we are -- we
18  have changed a good deal of the process in response to
19  what we learned last fall.

20  BY MR. BONI:

21    Q.    How so?

22    A.    Here, to get into the details I would have
23  to refer to the people who do the work in detail, but
24  more time, more care, more eyeballs on the case.

25    Q.    Are there other sources that are considered?

Page 88

1              MR. PETERSEN:  Objection to form,
2  vague.

3              THE WITNESS:  Other than what?

4  BY MR. BONI:

5    Q.    Sources.  Do the people who do the -- who
6  try to identify orphan -- you know what, let me ask you
7  this question.  Throughout the deposition you've
8  referred to the term orphan works.  What do you mean by
9  orphan works?

10    A.    Works that are in copyright for which a
11  rights holder cannot be found.

12    Q.    For those at U of M seeking to identify --
13  trying to identify the rights holders of potential
14  orphan works, do you know whether those people have, as
15  a result of the errors identified, considered other
16  sources, other sources to determine the identity of the
17  rights holders?

18              MR. PETERSEN:  Objection, form,
19  vague.  Objection, lacks foundation.

20              THE WITNESS:  And I need ask, other
21  sources than what?

22  BY MR. BONI:

23    Q.    Yeah, other -- other -- other sources of
24  investigation, of research?

25              MR. PETERSEN:  Objection, same

Page 89

1  objection.  And it lacks foundation.

2              THE WITNESS:  So I don't know at --
3  I mean when you improve a process you do things other
4  than what you did before, so that answer would be yes.
5  But I -- the use of the word sources, this isn't a
6  matter of looking things up in the International
7  Register of Orphan Works.  If we had that we would in
8  much better -- this it wouldn't be a problem.

9  BY MR. BONI:

10    Q.    Understood.  So tell me -- tell me what you
11  know about what is done to identify the rights holders
12  of potential orphan works --

13              MR. PETERSEN:  Objection.

14  BY MR. BONI:

15    Q.    -- as part of the Orphan Works Project?

16              MR. PETERSEN:  Objection, asked and
17  answered.

18              THE WITNESS:  I note that it's very
19  important here to be considering -- there's a potential
20  orphan works part of the process, and then there is a
21  part of the process that involves publishing the list
22  of potential orphan works and inviting the world to
23  comment on that, and that part of the process actually
24  has worked well in that it has identified a number of
25  works that were potential orphans that proved not to

Page 90

1 be, and I actually believe that that will be a vital
2 part of any process going forward to identify -- to
3 identify orphan works.
4        The first thing was to look for is
5 the publisher still alive, does the publisher still
6 exist. If the answer to that question was yes, we
7 stopped. Note that in many cases where the publisher
8 exists, the work still might well be out of copyright
9 and we could go back and look, keep a record of those
10 works. We were developing a record of publishers that
11 are -- that are findable.
12        And then move from publisher to
13 author, similar set of questions. And then the
14 question of whether then look for the -- if the book
15 were for sale that would obviously mean that it wasn't
16 an orphan.
17        So there is a nested set of
18 searches starting with actually is it for sale and then
19 going to publisher and then looking for information
20 about authors, and also a mechanism whereby a second
21 investigator would go through the process without
22 having information from the first investigator.
23 BY MR. BONI:
24    Q.   Dr. Courant, are you aware that the
25 Authors Guild identified at least one rights holder of

Page 91

1 a book that was on the list that you referred to in
2 your previous testimony that was considered a potential
3 orphan works?
4    A.   Yes.
5    Q.   Orphan work, I'm sorry.
6    A.   Considered a potential orphan work, yes.
7    Q.   Right. And do you know whether -- had the
8 Authors Guild not advised the Hathi Trust of that book,
9 would Hathi Trust have displayed the full text of that
10 work?
11        MR. PETERSEN: Objection. Objection
12 to form, calls for speculation.
13        THE WITNESS: Yeah, we will -- it
14 is -- this is speculative, and the only accurate answer
15 is we will never know.
16 BY MR. BONI:
17    Q.   Why is that?
18    A.   Because we had a good long time before the
19 work was scheduled to be displayed, and many people
20 other than members of the Authors Guild had access to
21 that list of works.
22    Q.   Is the Hathi Trust process -- I'm sorry, the
23 Orphan Works Project, the process of identifying orphan
24 works wholly dependent on rights holders coming forward
25 and notifying the project that they are there, that

Page 92

1 they exist?
2        MR. PETERSEN: Objection to form,
3 vague. Objection, mischaracterizes testimony as to the
4 process.
5 BY MR. BONI:
6    Q.   You can answer.
7    A.   The answer is certainly not. Certainly not.
8        MR. BONI: All right. Thank you,
9 Dr. Courant. I have no further questions.
10        MS. DURIE: Great, thank you. I
11 have a few questions for you. Do you want to take a
12 short break first?
13        THE WITNESS: I would like that.
14        MS. DURIE: Great, then we can do
15 that.
16        THE VIDEOGRAPHER: We're going off
17 the record, the time is 4:01 p.m.
18        (There was a recess taken.)
19        THE VIDEOGRAPHER: We are back on
20 the record, the time is 4:12 p.m.
21        MS. DURIE: Thanks.
22 EXAMINATION BY MS. DURIE:
23    Q.   Good afternoon, Dr. Courant. I introduced
24 myself off the record. As you know, I represent Google
25 in the Authors Guild versus Google litigation. I have

Page 93

1 just a few questions for you, and I will endeavor to be
2 brief.
3        When did you join the faculty of the
4 University of Michigan?
5    A.   1973.
6    Q.   Can you just describe for me very briefly
7 your educational background?
8    A.   I went to high school in Bayport,
9 Long Island, and then went to college at Swarthmore
10 College, got my BA in history in 1968, and then did a
11 few things for a few years and went to Princeton, got a
12 Ph.D. from Princeton in economics. Actually, the
13 degree was awarded in 1974, shortly after I got here.
14    Q.   Can you give me a brief overview of your
15 academic career at the University of Michigan?
16    A.   I was hired as an assistant professor in
17 economics and public policy. As I said, I got here in
18 1973. My work in those days was largely on urban
19 economics, housing, housing discrimination and
20 segregation, then moved more broadly into public
21 policy, behavior of governments, taxes at the local and
22 state level and economic development as well, and also
23 federal tax policy and budget policy.
24        I spent a year on the staff of the
25 Council of Economic Advisers in Washington in the late

24 (Pages 90 - 93)

Page 94

1  '70s doing principally budget policy and health
2  policy. I came back to Michigan. I've stayed in those
3  fields, although I've done a fair amount of work on
4  gender discrimination as well, and then moved into
5  administrative roles. I became director of what was
6  then called the Institute of Public Policy Studies, it
7  might have been 1982, somewhere around there. It's now
8  the Ford School.
9        And then after several years in
10 that role went back to the faculty for a while, then
11 did that again for a while, was Chair of the Economics
12 Department and was appointed -- I wrote a good book
13 about federal budget deficits along the way there,
14 which is -- which I've turned into public domain, is
15 available on Google Book Search for free if anybody
16 wants to read it.
17        Came to work for the provost then,
18 Nancy Cantor, in 1998 maybe, '97, '98. She hired me as
19 vice provost for budget. Did that for several years.
20 When she left the university, after a brief interim
21 period I was appointed provost and executive vice
22 president for academic affairs and served in that role
23 from 2002 through most of 2005.
24        Back to the faculty. Now in that
25 period I got interested in libraries and started

Page 95

1  writing papers about libraries, and then along the way
2  had written -- done a fair amount of research on the
3  economic and policy aspects of higher education, areas
4  in which I still continue to do some work, and then
5  was appointed library dean in -- whatever that would
6  be, 2007.

25 Q.   What was your reaction when you heard about

Page 96

1  that?
2    A.   I thought it was an extremely interesting
3  and positive development.
4    Q.   Why was that?
5    A.   So really a number of reasons. We had been
6  digitizing our collections ourselves at the rate of
7  about 10,000 volumes a year give or take, and at that
8  rate it was going to take 900 years or so to get the
9  job done. And in fact, it would have taken longer
10 because we're still acquiring works.
11        And so suddenly it became possible
12 to imagine digitizing close to the whole -- the whole
13 library, and that provided in turn a number of benefits
14 that struck me then and strike me now as being very,
15 very important. One, which is really huge, is this
16 notion of search that I talked about earlier. Having
17 the full text available for search of the works in the
18 library allows people, scholars, students, faculty, to
19 find works that have subject matter that might not be
20 apparent until the old card catalogs.
21        The old catalog would give you three
22 entries, and if it turned out there was something else
23 important that was number four, it's not there. But if
24 it turns out that that 4th or 5th or 6th use has words
25 that are characteristic, you can find them in the works

Page 97

1  in the library and then come to the library and use
2  them.
3        The second enormous advantage has to
4  do with preservation. Many works in the library,
5  millions certainly, several millions, were printed on
6  acid paper, which means that they have within them the
7  seeds of their own -- their own destruction. It's a
8  phenomenon you will have noticed. You know, from time
9  to time you take an old paperback especially or an old
10 newspaper off the shelf and it just turns into
11 cornflakes and then dust in your hands. That's what
12 happens to works on acid paper, and in time it happens
13 to all of them.
14        And by -- knowing that there are
15 millions of such works, identifying them one by one is
16 sort of inconceivably difficult. You have to go to the
17 shelves. I mean it just -- you know, millions or --
18 that's a big number, and, you know, I just can't
19 imagine the amount of effort that would be involved in
20 finding them one by one.
21        If we go through this process of
22 digitizing essentially the whole collection we then
23 have a preservation copy of works that would otherwise
24 disappear without replacement. These works now will in
25 due course disappear, in due time, but we will be able

25 (Pages 94 - 97)

Page 98

1  to construct a replacement from the digital files.  So
2  that struck me as being, you know, an independence of
3  two now big uses of the digitized files.  The third,
4  obviously very important, is to be able to make
5  available to people with print disabilities in a timely
6  way access to these works.
7      Q.   You mentioned earlier in your testimony
8  making works available to people with print
9  disabilities.  What does it mean to have a print
10  disability?
11      A.   I'm no expert in this field, but basically
12  it means to have basically bad eyesight, to make it
13  such that it is difficult to read text in the form in
14  which it -- difficult or impossible to read text in the
15  form in which -- I mean one form of print disability is
16  total blindness.
17      Q.   And how is it that you're able to make these
18  works available to people who do have a difficult time
19  reading them?
20      A.   Again, this is not my field of expertise,
21  but in some cases it's as simple as being able to blow
22  up the size of a font so that things can be read, or to
23  work with contrast.  In some cases where people's
24  disability is more serious than that such that they
25  really can't read at all, there are text-to-voice

Page 99

1  protocols that allow the work to be rendered in a form
2  where it can be heard, indeed at very high speed for
3  people who are trained to hear this way, rather than
4  read in the usual physical way.
5      Q.   Did you consider the potential impact of
6  this project on authors?
7          MR. BONI:  I'm sorry, I didn't hear
8  the question.
9  BY MS. DURIE:
10      Q.   Did you consider the potential impact of
11  this project on authors?
12      A.   We were -- authors as a group.  Of course I
13  am an author.  We did, in a -- but in a -- in a sort of
14  what impact kind of way.  So the impact of these
15  digitizations on authors, we saw no market effect.  We
16  spent some time talking about that.  And indeed, seems
17  likely to me, although by no means a sure thing, so
18  this is speculation, and it was speculation at the
19  time, that the search capability would lead to some
20  works that were otherwise never gonna be found being
21  found and market might appear for them, who knows.
22      Q.   You said that you did have discussions
23  regarding potential market effects.  What did you
24  discuss in that regard?
25          MR. PETERSEN:  I'm going to object

Page 100

1  and I'm going to instruct the witness not to divulge
2  any attorney/client privileged information.  The
3  General Counsel's office at the University of Michigan
4  was involved in those discussions, and so again, I
5  caution the witness to not divulge attorney/client
6  privileged information.
7          THE WITNESS:  So the General
8  Counsel's office was indeed involved in most of those
9  or at least many of those discussions, and certainly
10  was involved in the ones that led to the policy choices
11  that we made.
12  BY MS. DURIE:
13      Q.   Okay, fair enough.  You testified earlier
14  that Google and the University of Michigan entered into
15  a cooperative agreement; is that right?
16      A.   That's correct.
17      Q.   Did that cooperative agreement provide that
18  the parties would respect copyright laws?
19      A.   Pardon me?  Say it again?
20      Q.   Did the cooperative agreement provide that
21  the parties would respect the copyright laws?
22          MR. PETERSEN:  I'm going to object.
23  If you want to show him a copy of the agreement --
24          MS. DURIE:  Sure.
25          MR. PETERSEN:  -- I think that's the

Page 101

1  appropriate way to do that, so --
2          MS. DURIE:  I'm happy to do that.
3  Let's --
4          MR. BONI:  Let me just add, Daralyn,
5  I'm straining to hear you.
6          MS. DURIE:  Sorry.
7          MR. BONI:  Yeah.
8          MS. DURIE:  I'll try to keep my
9  voice up, Mike.
10          MR. BONI:  Thank you.
11          MS. DURIE:  And if I can have marked
12  as the next exhibit a copy of a document GOOG 05000355
13  through 366.  Sorry, Mike, I can't hand you a copy.
14          MR. BONI:  I have it.  I just
15  couldn't mark it before.
16          MR. PETERSEN:  This is 3?
17          MS. DURIE:  Yeah.
18  DEPOSITION EXHIBIT 3
19  Cooperative Agreement
20  WAS MARKED BY THE REPORTER
21  FOR IDENTIFICATION

26 (Pages 98 - 101)



Page 102

12    Q.    That's fine. You can set that aside. That
13 was my only question --
14    A.    Okay.
15    Q.    -- with respect to that document. Can you
16 give me a sense, Dr. Courant of the size of the
17 University of Michigan collection?
18    A.    Oddly enough, that is not as simple as you
19 would think. For one thing, the University of
20 Michigan's agreement for digitization involves several
21 libraries in the university that I'm not responsible
22 for. The law school library, the business school
23 library, which is called the Kellogg -- no, yeah,
24 the -- is that right? The business school library,
25 yeah, the Michigan historical collection, which is the

Page 103

1 Bentley Library, and a special collections library
2 called the Clements Library, are all contemplated by
3 the project and the agreement but are not part of the
4 University of Michigan Library System.
5          That said, the University Library
6 System holds approximately -- oh, and I should also
7 mention the University of Michigan at Flint and the
8 University of Michigan at Dearborn are also
9 contemplated in the agreement and are not part of the
10 University of Michigan Library System. The University
11 of Michigan Libraries, the part that I'm dean of, has
12 approximately 8 million volumes in it.
13    Q.    Can you give me a sense of, and I realize
14 this is a very broad question, but the types of works
15 that are encompassed within those 8 million volumes?
16          MR. BONI: Object to form.
17          THE WITNESS: Lots of works of
18 many types. So without knowing what you mean by
19 types --
20 BY MS. DURIE:
21    Q.    I just want to get a sense of what kinds of
22 works are in there, what is the age range of these
23 works, what are the kinds of topics that they embrace,
24 what is the diversity within this collection?
25          MR. PETERSEN: I'm going to object

Page 104

1 to form on that as well.
2          THE WITNESS: The works range from
3 the -- there's some bound volumes, which was the
4 purview of the agreement, range from the very beginning
5 of publishing to the present day and all manners of
6 subject matters. I often say that we hold the
7 scholarly and cultural record, so if you could construe
8 it as part of the scholarly or cultural record, we are
9 likely to have significant numbers of works in it, also
10 reference. So a very -- it's a very diverse, very
11 broad collection of works.
12 BY MS. DURIE:
13    Q.    You testified earlier that the University of
14 Michigan had used digital copies that it had
15 obtained of works in this collection to create its own
16 searchable index; is that right?
17          MR. PETERSEN: Objection to form.
18          MR. BONI: I'm sorry, I couldn't
19 hear the tail end of that question.
20          MS. DURIE: Sorry. To create its
21 own searchable index.
22          THE WITNESS: Not as such. Although
23 those works were searchable, the number is so small
24 that having an index of a tiny fraction of a collection
25 is uninteresting.

Page 105

1 BY MS. DURIE:
2    Q.    I'm sorry, I apologize. Is it correct that
3 the University of Michigan has used copies of --
4 digital copies of books that were scanned by Google to
5 create a searchable index?
6    A.    As part of this project?
7    Q.    Yes.
8    A.    Yes.
9    Q.    And what was the reason for doing that?
10    A.    I think I described it earlier, that it
11 enables users to find things reliably and easily that
12 they would otherwise not be able to find.
13    Q.    You also mentioned the display, using the
14 work to allow people with print disabilities to gain
15 access to works that they otherwise would not be able
16 to read. Has the University of Michigan made any
17 actual displays of works in its collection of any of
18 the works as part of the search -- strike that. That
19 was terrible question.
20          In connection with this
21 searchable index, does the University of Michigan allow
22 users to read works that are returned from that
23 searchable index if those works are deemed to be in
24 copyright?
25          MR. PETERSEN: So we're off the

27 (Pages 102 - 105)

Page 106

1 subject of students with print disabilities?
2          MS. DURIE:  Correct.
3          MR. PETERSEN:  This is a
4 different -- okay.
5          THE WITNESS:  In cases where the
6 rights holder has authorized it, yes.
7 BY MS. DURIE:
8    Q.   To the extent that the rights holder has not
9 authorized it, does the University of Michigan allow
10 individuals to see the complete copies of works that
11 are returned as search results if those works are in
12 copyright?
13          MR. PETERSEN:  And you're excluding
14 students with print disabilities?
15 BY MS. DURIE:
16    Q.   Excluding students with print disabilities.
17    A.   If the works are either in copyright or not
18 known to be not in copyright, no.
19    Q.   Has the University of Michigan --
20    A.   Did I get that grammar right?
21    Q.   Yeah.
22    A.   I believe so.
23    Q.   Yes.  Has the University of Michigan put
24 security measures in place to protect all of the
25 various digital copies that exist of these works?

Page 107

1    A.   Again, we're talking about this set of works
2 that we do not know to be in the public domain?
3    Q.   Correct.
4    A.   Yes.
5    Q.   Are you aware of any breaches that have
6 taken place that have allowed those works to become
7 part of the public domain --
8    A.   No.
9    Q.   -- security breaches?  Does the University
10 of Michigan have a budget for the acquisition of new
11 works?
12    A.   Yes.
13    Q.   Is that budget broken down in some fashion
14 departmentally or --
15    A.   It's -- so actually I should back up.  The
16 University of Michigan Library has such a budget.
17 Several other libraries have budgets.  Departmental
18 libraries have budgets.  So there are probably dozens
19 of entities within the University of Michigan who
20 have -- make budgeted expenditures on library
21 acquisitions, and by far the largest of those entities,
22 but only one of them, is the one which I am the
23 dean.
24    Q.   With respect to the entity of which you are
25 the dean, what is the acquisition budget for that

Page 108

1 entity?
2    A.   Approximately 20 -- a little bit under
3 20 million dollars a year.
4    Q.   Has that budget been affected in any way by
5 the Google Library Project?  In other words, has that,
6 for example, caused your budget to go down?
7          MR. PETERSEN:  When you say budget,
8 for acquisitions?
9 BY MS. DURIE:
10    Q.   For acquisitions, acquisitions.
11    A.   Certainly not in any direct way.  Indirectly
12 the Google Library Project has enhanced the reputation
13 of the library, therefore possibly improved our
14 political ability to get resources from the provost.
15    Q.   Okay.  But it is not then the case I take it
16 that the fact that you have digital copies of the works
17 in your collection has itself caused you to start
18 spending less money on book acquisition?
19    A.   No.
20    Q.   Have there ever been circumstances where the
21 University of Michigan has bought additional paper
22 copies of books that it has in digital form as a result
23 of its participation in the Google Library Project?
24    A.   So we have a dangling modifier here.  So we
25 have it in digital form as a result of the Google

Page 109

1 project.
2    Q.   Correct.
3    A.   Stop.  And have we as a result of that, of
4 having it not -- have we bought --
5    Q.   Let me ask the question again.
6    A.   Okay.
7    Q.   I want to direct your attention to those
8 books where you have a digital copy as a result of the
9 Google Library Project.  Have there been circumstances
10 where the University of Michigan has nonetheless gone
11 out and bought additional paper copies of those books
12 for the library?
13    A.   So I can say certainly, but I don't have
14 specific knowledge of such cases.  But knowing our
15 practices, we would not take into account that we had a
16 digital copy of an in copyright work, and we buy stuff
17 all the time.
18    Q.   Okay.  So having a digital copy of an in
19 copyright work has not affected your purchasing
20 decisions?
21    A.   That's correct.
22          MR. BONI:  Object to form.
23 BY MS. DURIE:
24    Q.   Have there been circumstances, again
25 referring your attention to this category of books that

28 (Pages 106 - 109)

1 are in copyright where you have a digital copy --
2    A.   That are not known not to be in copyright?
3    Q.   That are not known -- fair enough. That's
4 a very good correction. Let me start again. Have
5 there been circumstances where with respect to books
6 that are not known not to be in copyright and for
7 which you have a digital copy that the University of
8 Michigan has paid publishers for digital full view
9 access to those books?
10   A.   Again, certainly, although I can't cite
11 specific instances.
12   Q.   Okay. Would having the digital copy have
13 impacted that purchasing decision?
14   A.   No. Actually, I can site specific I mean.
15 So in the scientific journal and e-book, scientific
16 e-books area where we digitized, we also continue to
17 license those same works frequently.
18   Q.   Okay. Has the University of Michigan ever
19 paid money simply for the right to include a work in a
20 searchable index as opposed to the ability to view or
21 display the full text of that work?
22           MR. BONI:  Object to form.
23           THE WITNESS:  So I'm just -- I need
24 a little help with the activity that you contemplate
25 here.

1 BY MS. DURIE:
2    Q.   So in a situation in which the University of
3 Michigan is creating an index of books in its
4 collection, has the University of Michigan ever paid a
5 rights holders simply for permission to include their
6 book as an entry in the search results as opposed to
7 paying the rights holder for permission to be able to
8 read the book?
9            MR. PETERSEN:  I'm going to object
10 to form, but the witness can certainly answer to the
11 extent he understands the question.
12           MR. BONI:  Right.
13           THE WITNESS:  So if you're asking if
14 we paid for the right to use a full text, no, no. I
15 think the answer to your question is no.
16 BY MS. DURIE:
17   Q.   Okay. Let me make sure we're clear. So
18 have there been situations where the -- the University
19 of Michigan has created indices of works in its
20 collection; is that right?
21   A.   So indices of the contents of works so -- is
22 what you're talking about?
23   Q.   Well, let me just start with indices of
24 works in its collection.
25           MR. PETERSEN:  Do you mean in

1 connection with search functionality?
2 BY MS. DURIE:
3    Q.   Any. Just in general. Presumably yes,
4 right?
5    A.   Yes.
6    Q.   Okay. And has the University of Michigan
7 ever paid a rights holder for permission to include a
8 work simply in that index?
9    A.   Not to my knowledge.
10   Q.   Okay. Now let me take indices that
11 encompass the full text of the work. Has the
12 University of Michigan ever paid a rights holder for
13 permission to have that rights holder's work included
14 in the index where it was an index of the full text of
15 works?
16   A.   Again --
17           MR. BONI:  Object to form.
18           THE WITNESS:  I had no knowledge of
19 such circumstances.
20 BY MS. DURIE:
21   Q.   Okay.
22   A.   So no, as far as I know.
23   Q.   Now, you also mentioned earlier in your
24 testimony the importance of being able to maintain
25 duplicate copies of works as part of a digital archive;

1 is that correct?
2    A.   I'm not quite sure what you're referring to.
3    Q.   You mentioned the importance of being able
4 to keep works for posterity --
5    A.   Yes.
6    Q.   -- is that right?
7    A.   Um-hum.
8    Q.   How is it that the library project has
9 enabled Michigan to do that?
10   A.   The library project has led to our
11 possession of digital files of many millions of our
12 works, and so those files are available. They exist
13 and are available as a record of the contents of those
14 works should the works deteriorate, disappear, have
15 other things happen to them.
16   Q.   Okay. Has the University of Michigan ever
17 paid rights holders money for the inclusion of works
18 purely in an archive, a duplicate copy of a work for
19 purely archival purposes?
20   A.   Specifically actually here, if I may, a dark
21 archive?
22   Q.   Correct, where the works are not being
23 accessed for any purpose, but --
24   A.   Not to my knowledge.
25   Q.   Okay.

Page 114

1    A.   No, no, we haven't, okay.
2    Q.   You also mentioned earlier in your testimony
3 the Orphan Works Project.  What was the rationale for
4 undertaking the Orphan Works Project?
5         MR. BONI:  Object to form.  Whose
6 rationale, Daralyn?
7 BY MS. DURIE:
8    Q.   Were you involved in early discussions
9 regarding the desirability of embarking on the Orphan
10 Works Project?
11    A.   Yes.
12    Q.   What was your understanding of the
13 University of Michigan's rationale for embarking on
14 that project?
15    A.   The project arose out of the decision by
16 Judge Chin to -- not to approve the amended settlement
17 agreement.  And under that agreement, the -- many
18 orphan works would have been made readable, usable as
19 part of the product that Google and the Authors Guild
20 and the publishers agreed to.
21         And so we asked ourselves following
22 that, is there some way that we could get orphan works,
23 which would of course by definition, if they were well
24 established, their orphanage was -- orphan-ness was
25 well established, not to have any consequence for a

Page 115

1 rights holder, was there any way we could make digital
2 uses of those works, which was something that there was
3 a great interest in on the campus, because actually
4 digital works are much easier to get at and use than
5 print works for many purposes.  So that was the genesis
6 of the idea.
7    Q.   You said that digital copies are easier to
8 use in some cases than print copies.  Why is that?
9    A.   Well, there's lot of things you can do with
10 them that you can't do with print copies.  One of them
11 is read them at distance.  One of them, again, if you
12 can combine searching and reading, which you can for
13 works in the public domain, you can look at the way in
14 which phrases were used on a given subject over
15 different periods of time and do a kind of scholarship
16 and study that really is much more difficult to do
17 using only print volumes.
18         MS. DURIE:  Okay.  Thanks very much.
19 I don't have any further questions.
20         MR. BONI:  I just have a few
21 follow-up questions.  I will not be long.  We can break
22 or not.  I'm ready to go now if you want.
23         MS. DURIE:  There's three minutes on
24 the tape, Mike, so as long as you can get done then, I
25 think we can keep going.

Page 116

1         MR. BONI:  All right.  Let's try.
2 REEXAMINATION BY MR. BONI:
3    Q.   Dr. Courant, you testified just now that
4 University of Michigan has not paid any rights holder
5 for books that were stored in a dark archive.  My
6 question is whether any rights holders have been paid
7 for books in any other kind of archive at the
8 University of Michigan?
9         MR. PETERSEN:  Objection to form,
10 vague.
11         THE WITNESS:  We have about
12 8 million books in the library, and we paid for pretty
13 much every one of them.
14 BY MR. BONI:
15    Q.   Got it.  So my question is, you drew a
16 distinction in your response between dark archive and
17 other -- any other type of archive as the question was
18 presented, and my question is, did the University of
19 Michigan ever pay a rights holder for a book purely for
20 storage for archival purposes?
21    A.   So in a light archive it just isn't purely
22 for storage.  It's automatically by definition of light
23 readable, and we certainly have paid rights holders on
24 millions of occasions for reading access to works,
25 including reading access to digital works.

Page 117

1    Q.   Is there any other type of archive other
2 than one that has books available for reading in a dark
3 archive?
4         MR. PETERSEN:  Objection to form.
5         THE WITNESS:  There -- one could
6 hold an archive of -- usually -- usually there are not
7 other archives of published works, of printed works,
8 although one could imagine very rare books being held
9 in a way that would be principally archival,
10 principally to take care of them and only rarely,
11 rarely for use.
12 BY MR. BONI:
13    Q.   Were you -- Dr. Courant, were you personally
14 in favor of the amended settlement in the Google Books
15 case?
16    A.   Yes.
17    Q.   Do you know whether --
18    A.   Generally.
19    Q.   Generally.  Do you know whether that view
20 was held by your colleagues at the University of
21 Michigan?
22         MR. PETERSEN:  Objection, calls for
23 speculation.
24         THE WITNESS:  It was surely held by
25 some of them and surely not held by others.

30 (Pages 114 - 117)

Page 118

17          MR. PETERSEN:  The videotape is up,
18  Mike.
19          MR. BONI:  All right.  That's all I
20  have.
21          MS. DURIE:  Perfect.
22          THE VIDEOGRAPHER:  This concludes
23  the deposition, the time is 4:46 p.m.
24          (The deposition was concluded
25          at 4:46 p.m.)

Page 119

1          CERTIFICATE OF DEPONENT
2      I, PAUL N. COURANT, Ph.D., do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true
5  and accurate record of my testimony (with the
6  exception of the corrections listed below):
7  Page  Line          Correction
8  ____|____|_____|_____
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20
21  _____
           PAUL N. COURANT, Ph.D.
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS _____ DAY OF _____, 20___.
24
   _____   _____
25 (NOTARY PUBLIC)    MY COMMISSION EXPIRES:

Page 120

1          CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN  )
3                     ) SS
4  COUNTY OF OAKLAND  )
5      I, Jennifer L. Ward, Certified Shorthand Reporter,
6  a Notary Public in and for the above county and state,
7  do hereby certify that the above deposition was taken
8  before me at the time and place hereinbefore set forth;
9  that the witness was by me first duly sworn to testify
10 to the truth, and nothing but the truth, that the
11 foregoing questions asked and answers made by the
12 witness were duly recorded by me stenographically and
13 reduced to computer transcription; that this is a true,
14 full and correct transcript of my stenographic notes so
15 taken; and that I am not related to, nor of counsel to
16 either party nor interested in the event of this cause.
17
18
19  _____
20      Jennifer L. Ward, CSR-3717
21  Notary Public,
22  Oakland County, Michigan
23
24 My Commission expires:  10-27-2013
25

31 (Pages 118 - 120)

Page 119
(part 1)

1        CERTIFICATE OF DEPONENT

2        I, PAUL N. COURANT, Ph.D., do hereby certify

3    that I have read the foregoing transcript of my

4    testimony, and further certify that it is a true

5    and accurate record of my testimony (with the

6    exception of the corrections listed below):

7    Page    Line                  Correction

8     8   | 22-23 | university librarian | University Librarian

9    11   |  2   | the librarian       | the University Librarian

10   12   | 16   | university librarian | University Librarian

11   21   |  7   | add                 | at

12   29   | 14   | limited time basis  | limited basis

13   36   | 10   | digit               | digital

14   47   | 11   | engram              | Ngram

15   53   | 21   | Michigan libraries  | Michigan Library's

16   61   |  9   | joint Answer and    | Joint Answer and

17   62   |  5   | before I read it.   | before.  I read it.

18   71   | 25   | orphan works        | orphan work

19   73   |  3   | etcetera            | et cetera

20                (continued on next page)

21        _____

          PAUL N. COURANT, Ph.D.

22

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS _____ DAY OF _____, 20____.

24

25   _____        _____
     (NOTARY PUBLIC)            MY COMMISSION EXPIRES:

(continued from previous page)                    **Page 119**
                                                   (part 2)

1                    CERTIFICATE OF DEPONENT

2        I, PAUL N. COURANT, Ph.D., do hereby certify

3    that I have read the foregoing transcript of my

4    testimony, and further certify that it is a true

5    and accurate record of my testimony (with the

6    exception of the corrections listed below):

7    Page    Line                    Correction

8    96  |  20  |  apparent until the  |  apparent under the

9    98  |  2   |  an independence of  |  an instance of

10   109 |  16  |  an in copyright work | an in-copyright work

11   117 |  2   |  for reading in a dark | for reading and a dark

12   ____ | ____ | _____ | _____

13   ____ | ____ | _____ | _____

14   ____ | ____ | _____ | _____

15   ____ | ____ | _____ | _____

16   ____ | ____ | _____ | _____

17   ____ | ____ | _____ | _____

18   ____ | ____ | _____ | _____

19   ____ | ____ | _____ | _____

20

21        _____

          PAUL N. COURANT, Ph.D.

22                                        DENISE M. TRUESDELL
                                          NOTARY PUBLIC - STATE OF MICHIGAN
                                          COUNTY OF WASHTENAW
     SUBSCRIBED AND SWORN TO BEFORE ME    My Commission Expires December 1, 2015
                                          Acting in the County of Washtenaw
23   THIS 22nd  DAY OF June_____, 2012.

24

     _____       ___12/1/15_____
25   (NOTARY PUBLIC)                   MY COMMISSION EXPIRES:

**EXHIBIT 34**

**FILED UNDER SEAL**

**EXHIBIT 35**


**FILED UNDER SEAL**