**EXHIBIT 36**

Page 1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4     THE AUTHORS GUILD, et al.,

5              Plaintiffs,

6                             Master File No.

7     vs-                     05 CV 8136-DC

8

9     GOOGLE, INC.,

10             Defendant.

11    _____/

12

13

14

15             DEPOSITION OF GLORIANA ST. CLAIR,

16    taken at Carnegie Mellon University, 4909 Frew

17    Street, Pittsburgh, PA 15213, commencing at

18    10:00 a.m., Thursday, May 31, 2012,

19    before Gloria Donavich, RPR, CRR.

20

21

22

23

24

25

1  APPEARANCES:
2
3  Joanne Zack, Esq.
4  Boni & Zack, LLC
5  15 St. Asaphs Road
6  Bala Cynwyd, Pennsylvania 19004
7  (610) 822-0200
8  JZack@bonizack.com
9  Appearing on behalf of Plaintiffs, via
10 Speakerphone
11
12
13 David McGowan, Esq.
14 Genevieve Rosloff, Esq.
15 Durie Tangri
16 217 Leidesdorff Street
17 San Francisco, California 94111
18 (415) 362-6666
19 dMcGowan@durietangri.com
20 Appearing on behalf of Defendant Google
21
22 Also present:
23 DF Ryan, CMU
24
25

1        EXAMINATION INDEX
2
3  GLORIANA ST. CLAIR
4    BY MS. ZACK                4
5
6
7
8        EXHIBIT INDEX
9  PLAINTIFF'S EXHIBIT
10 Exhibit 87  Report                7
11 Exhibit 88  Denise Troll Covey Article  60
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        GLORIANA ST. CLAIR,
2        having been duly sworn,
3   was examined and testified as follows:
4        - - - -
5        EXAMINATION
6        - - - -
7  BY MS. ZACK:
8  Q.  Good morning, Ms. St. Clair.  What do you
9      prefer to be called?  "Doctor"?
10 A.  "Dean."
11 Q.  "Dean"?  Did you say "dean"?
12 A.  I did.
13 Q.  Just one instruction.  If you can't hear me,
14     please let me know since we're not in the same
15     room, and I'll do the same for you.  Also, if
16     you don't understand my question, I'll
17     rephrase it.
18        Could you state your full name for
19     the record, please.
20 A.  My name is Gloriana St. Clair.
21 Q.  Uh-huh.  And where are you currently employed?
22 A.  At Carnegie Mellon University.
23 Q.  You're the dean of the university libraries.
24     Is that correct?
25 A.  Yes.

1  Q.  And you've held that position since April,
2      1998?
3  A.  Correct.
4  Q.  You've been retained by Google as an expert in
5      this matter?
6  A.  Yes.
7  Q.  Approximately when were you retained?
8  A.  A couple of months ago.
9  Q.  And what do you consider to be your area of
10     expertise?
11 A.  The running of libraries and the research
12     around copyright clearance.
13 Q.  Are you trained in any way as a lawyer?
14 A.  No.
15 Q.  Do you have a legal staff that's assigned to
16     you as dean of the university libraries?
17 A.  Yes.
18 Q.  And who is that?
19 A.  Variously; Mary Jo Dively is the university
20     counsel.  I often work with Jim Mercolini who
21     is our human resources specialist lawyer.
22     I've worked in the past with Mary Beth Shaw
23     and one other attorney employed by the
24     University.
25 Q.  And is any of those persons particularly

1   assigned to work with you on copyright
2   clearance matters?
3 A.  I don't remember which of those people helped
4   us with copyright clearance.
5 Q.  In connection with preparing your report in
6   this matter, did you speak to anyone from
7   Google?
8 A.  No.
9 Q.  Did you speak to any of the other experts
10   retained by Google in this matter?
11 A.  No.
12 Q.  Did you receive assistance from anyone else in
13   preparing the report?
14 A.  From some members of my staff and from the
15   attorneys at Durie Tangri.
16 Q.  Which members of your staff?
17 A.  My assistant Dan Ryan, my scholarly
18   communications librarian Denise Troll Covey,
19   and my associate dean Erika Linke.
20 Q.  What type of assistance did you receive from
21   those people?
22 A.  From all of them just a variety of assistance
23   in discussing the issues in doing the research
24   for the report.
25 Q.  Who wrote the report?

1 A.  I did with the help of my attorneys at Durie
2   Tangri.
3 Q.  Have you served as an expert before in any
4   cases?
5 A.  No.
6 Q.  Never?
7 A.  No.
8 Q.  Have you ever testified before?
9 A.  No.
10 Q.  Your report at Exhibit B listed some material
11   that you considered. Do you have that in
12   front of you? Perhaps we should mark your
13   report as --
14      I'm going to mark it as Plaintiffs'
15   Exhibit 87, please.
16      MR. McGOWAN: 87, Joanne?
17      MS. ZACK: Yes.
18     - - - -
19   (Plaintiffs' Exhibit No. 87 marked for
20     identification.)
21     - - - -
22 BY MS. ZACK:
23 Q.  At least in my version the last page is a list
24   of materials considered
25 A.  Yes.

1 Q.  Did you use any of these materials in your
2   report?
3 A.  Yes.
4 Q.  And in a case where you used the materials,
5   did you cite them?
6 A.  Yes.
7      MR. INGBER: Objection. Vague with
8   respect to use, but you may answer.
9      THE WITNESS: Yes.
10 BY MS. ZACK:
11 Q.  So just to be clear, the list of materials
12   considered includes the Fourth Amended Class
13   Action Complaint. Did you use that document
14   in your report?
15 A.  Yes.
16 Q.  And in what way?
17 A.  Well, I read it and I thought about it and
18   talked about it with my team here at Carnegie
19   Mellon.
20 Q.  Is that true of each item that's listed here?
21      MR. McGOWAN: Objection. Compound.
22   You may answer.
23 BY MS. ZACK:
24 Q.  You can answer separately. There are fifteen
25   items listed. Would your answer be the same

1   for each of those items or would it be
2   different?
3 A.  It would be different.
4 Q.  Okay. Are there any items that you did not
5   read?
6 A.  No .
7 Q.  Are there any that you did not consider in
8   connection with your report?
9      MR. McGOWAN: Objection. Vague.
10   You may answer.
11      THE WITNESS: No.
12 BY MS. ZACK:
13 Q.  Are there any that you did not discuss with
14   others?
15 A.  Yes.
16 Q.  Which ones would those be?
17 A.  Perle.
18 Q.  Mr. Perle; he pronounces it "Perle,"
19   P-E-R-L-E?
20 A.  Yes.
21 Q.  Anything else?
22 A.  Jaskiewicz I didn't discuss with Carnegie
23   Mellon people. Aiken I only discussed with
24   Dan and Denise Troll Covey and Dave and Jenny,
25   and the same for Courant.

3 (Pages 6 - 9)

1  Q.  Have you ever met Mr. Courant?
2  A.  Yes.
3  Q.  In what connection?
4  A.  The University of Michigan and the Carnegie
5      Mellon University libraries were both members
6      of the Digital Library Federation.
7  Q.  How long have you known him?
8  A.  I'm not certain.
9  Q.  Have you ever discussed with Mr. Courant the
10     matters discussed in this lawsuit?
11 A.  No.
12 Q.  Have you discussed with him the Google Books?
13 A.  No.
14 Q.  Or the Google Library project?
15 A.  No.
16 Q.  Anything about Google --
17 A.  No.
18 Q.  -- with Mr. Courant?
19         MR. McGOWAN:  I'll just caution Dean
20     St. Clair to make sure that Mrs. Zack is
21     finished with her question because especially
22     in this setup we don't want you to speak over
23     each other.
24         I think the record is clear on that.
25         MS. ZACK:  Yes.  Thank you.

1  BY MS. ZACK:
2  Q.  You also produced some documents that are
3      E-mails and some other materials.  Do you know
4      what I'm referring to?
5  A.  No.
6          MS. ZACK:  Dave, do you know what
7      I'm referring to?
8          MR. McGOWAN:  Yeah.  It might help
9      if you identified specifically what you're
10     referring to.
11 BY MS. ZACK:
12 Q.  Well, there were a number of documents
13     produced by Google to us as plaintiffs that
14     were represented to be your materials, and
15     they consist of some E-mails and other matters
16     relating or appearing to relate to the Million
17     Book Project.
18         Did you produce documents to Google?
19 A.  Yes.
20 Q.  What type of documents did you produce to
21     Google?
22 A.  I don't understand "to Google."
23 Q.  Did you provide some of your E-mails or other
24     internal documents to Google attorneys?
25 A.  Yes.

1  Q.  And did they ask you for those?
2          MR. McGOWAN:  I'm going to insert a
3      caution because I think that the agreement as
4      I understand it in this case under Rule 26 is
5      that communications are treated as work
6      product.  I don't mind at a high level of
7      generality; I just ask that we be mindful of
8      that.
9          MS. ZACK:  Yeah.  I'm just trying to
10     establish a foundation, because Dean St. Clair
11     doesn't appear to know what I'm asking about
12     at this point.
13         MR. McGOWAN:  I disagree with that,
14     but, as I say --
15 BY MS. ZACK:
16 Q.  Are you familiar with the documents that I'm
17     talking to you about, Dean St. Clair?
18 A.  No.
19 Q.  All right.  You provided some documents to
20     Google.  Correct?
21 A.  Yes.
22 Q.  Okay.  What type of documents did you provide
23     to Google?
24 A.  A wide variety of documents.
25 Q.  And can you describe what they were as the

1      variety?
2  A.  Articles, E-mails, National Science Foundation
3      reports.
4  Q.  Did you produce to Google all of the E-mails
5      that you generated or received in connection
6      with the Million Book Project?
7  A.  No.
8  Q.  Did you produce some subset of those E-mails?
9  A.  Yes.
10 Q.  What particular subset did you produce?
11 A.  We made several points in the report about our
12     work in the Million Book Project, and I
13     produced documents that I thought would make
14     appropriate footnotes.
15 Q.  So it would be fair to say that you have many
16     more documents concerning the Million Book
17     Project that were not produced to Google.  Is
18     that correct?
19 A.  Yes.
20 Q.  Do you know approximately how many documents
21     you have that relate to the Million Book
22     Project in total?
23 A.  A couple of filing cabinet drawers' worth.
24 Q.  And do others in your organization have
25     additional documents?

Page 14

1  A.   Yes.
2  Q.   Did you produce documents from anyone else's
3       files other than your own?
4  A.   Yes.
5  Q.   Who else's files?
6  A.   Denise Troll Covey's files.
7  Q.   Anyone else?
8  A.   I don't think so.
9  Q.   Did you produce all of her documents or again
10      a subset?
11 A.   No, a subset.
12 Q.   And that was to illustrate points in your
13      report?
14 A.   Yes.
15 Q.   Referring you now to your report --
16          Before I do that, let me ask you a
17      different question.  Have you other than
18      speaking to Google's attorneys about this
19      particular report, have you communicated in
20      the past with Google or personnel from Google
21      on any other matters?
22 A.   Yes.
23 Q.   And what matters?
24 A.   The --
25          Well, of course, you know there are

Page 15

1       many Carnegie Mellon faculty members who do
2       research for Google.  Google has a research
3       facility here at Carnegie Mellon, and most
4       particularly one of our alums is the head of
5       Google Scholar, and he visited here perhaps a
6       year, year and a half ago, and we had a very
7       robust and enlightening conversation about
8       Google Scholar.
9  Q.   And what is that person's name?
10 A.   Ahurag Acharya.
11 Q.   Can you spell that?
12 A.   No.
13 Q.   Ahurag --
14 A.   -- Acharya.
15 Q.   Can you do some phonetics on that?  I'm on the
16      phone.  It's very hard for me to pick it up.
17 A.   I think the last name is A-C-H-Y-A, but on the
18      break we could look it up.
19 Q.   A-C-H-Y-A?  Okay.  Thank you.
20          Any other communications with
21      personnel from Google other than Mr. Acharya?
22 A.   I was on the commencement platform when Eric
23      Schmidt got his honorary doctorate, but I
24      don't believe that I spoke with him.
25 Q.   That was at Carnegie Mellon?

Page 16

1  A.   Yes.
2  Q.   What year was that?
3  A.   I don't know.
4  Q.   Any other connections or communications with
5       Google?
6  A.   Nothing memorable.
7  Q.   Did you ever have any discussions with or
8       communications of any kind with anyone from
9       Google concerning the Google Books?
10 A.   I need to amend.
11 Q.   Uh-huh.
12 A.   I just recalled that Dan Clancy was on campus,
13      and Raj Reddy, Mike Shamos, Jaime Carbonell
14      and I had lunch with him and discussed with
15      him over several months the possibility of
16      putting the Million Book Project's books into
17      Google Books because the U.S. partners of the
18      Million Book Project believe that Google Books
19      is the best destiny for our corpus.
20 Q.   And at what time period did those discussions
21      take place, what year?
22 A.   I think about four years ago.
23 Q.   That would be 2007, 2008?
24 A.   I can call somebody at the break if you need
25      something more definite.

Page 17

1  Q.   Okay.  Thank you.
2          MR. McGOWAN:  You should provide
3       your best recollection.  It's not a research
4       project.
5  BY MS. ZACK:
6  Q.   You're saying it was approximately four years
7       ago.  Right?
8  A.   Yes.
9  Q.   Do you recall if it was before or after the
10      Google Book settlement was announced?
11 A.   Before.
12 Q.   You said those discussions occurred over
13      several months?
14 A.   Yes.
15 Q.   And how many is "several"?
16 A.   I think we carried on that conversation for
17      maybe seven or eight months.
18 Q.   All right.  And that was with -- among -- the
19      conversation you said was among yourself, Dan
20      Clancy, Raj Reddy, and who were the others?
21      I'm sorry.
22 A.   Michael Shamos and Jaime Carbonell.
23 Q.   Okay.
24 A.   Raj Reddy and Dan Clancy were the primaries.
25 Q.   What was the ultimate decision the Million

5 (Pages 14 - 17)

Page 18

1   Book Project reached as to that, whether or
2   not to join -- or provide your corpus to
3   Google?
4   A.   The American directors of the Universal
5       Library Project wanted to do that.  The
6       Chinese partners said they would think about
7       it, and the Indian partners were skeptical.
8   Q.   Yes.  And that was the end of the discussion?
9   A.   Yes.
10  Q.   Did Carnegie Mellon ever consider --
11      Let me withdraw that.  Did Carnegie
12      Mellon University ever become a library
13      partner with Google?
14  A.   No.
15  Q.   Did you ever discuss that with Google?
16  A.   No.
17  Q.   Google never approached you to become a
18      library partner?
19  A.   Correct.
20  Q.   And you didn't approach them to become a
21      library partner?
22  A.   No.
23  Q.   Did you discuss it internally at Carnegie
24      Mellon?
25          MR. McGOWAN:  Objection.  Vague.

Page 19

1       You may answer.
2   BY MS. ZACK:
3   Q.   Did you discuss internally at Carnegie Mellon
4       the possibility of becoming a library partner
5       with Google?
6   A.   No.
7   Q.   Did you ever personally consider that option?
8   A.   I don't know.
9   Q.   When you say you don't recall, do you mean you
10      don't recall or --
11  A.   I mean, we had our own project.  We wanted to
12      join our project with the Google project, and
13      we were working on that with Dan Clancy.
14  Q.   And after that failed to come to fruition, you
15      don't recall whether you considered having
16      Carnegie Mellon become a library partner with
17      Google separately?
18  A.   It was my impression that partners were
19      invited, that they didn't volunteer.
20  Q.   Do you personally own any copyrights?
21  A.   Yes.
22  Q.   Are they in books?
23  A.   I have one book which I have on the Web under
24      a creative comments license.
25  Q.   Okay.  Anything else?

Page 20

1   A.   Any other copyrights?
2   Q.   Uh-huh.
3   A.   That I own?
4   Q.   Yes.
5   A.   Yes.  I've written over a hundred articles.
6   Q.   And are they all available on the Web?
7   A.   No.
8   Q.   Are some available on the Web?
9   A.   Yes.
10  Q.   Approximately how many?
11  A.   Thirty.
12  Q.   Is there some reason the rest are not?
13  A.   I haven't done the work necessary to clear
14      with the publishers.
15  Q.   Okay, now turning to your report, please --
16          MR. McGOWAN:  Is there a page,
17      Joanne?
18          MS. ZACK:  Sure; Page 1, please.
19          MR. McGOWAN:  We have it.
20          MS. ZACK:  Thank you.
21  BY MS. ZACK:
22  Q.   Under Summary of Opinions which is near the
23      bottom of Page 1 --
24  A.   Yes.
25  Q.   -- Paragraph 5, there's a lead-in that says in

Page 21

1   brief my opinions are, and then there are A,
2   B, C, D, four subparagraphs.
3       Do you see that?
4   A.   I do.
5   Q.   All right.  The first subparagraph, A, says in
6       thinking about digitization of books, it is
7       critical to distinguish between digitization
8       to facilitate search to find a book and
9       digitization for the purpose of displaying the
10      whole text of a book.
11          Has Carnegie Mellon at Carnegie
12      Mellon libraries digitized books to facilitate
13      search?
14  A.   No.
15  Q.   Was that ever done in the Million Book
16      Project?
17  A.   Yes.
18  Q.   Okay.
19  A.   Let me amend.  We have digitized books to
20      facilitate search.
21  Q.   "We" being --
22  A.   Carnegie Mellon University libraries.
23  Q.   And what books have you digitized to
24      facilitate search?
25  A.   Most obviously the Posner collection.

6 (Pages 18 - 21)

Page 22

1 Q.   Anything else?

2 A.   Well, we've digitized two million pages of
3       archival content, some of which is books, and
4       we did that to provide access to them and, of
5       course, search, for instance, the books and
6       papers of Herbert Simon, our Nobel laureate --
7       one of our Nobel laureates.

8 Q.   Was that in connection with --
9            In connection with what endeavor was
10      that done?

11 A.  When Senator Heinz died in the airplane crash,
12      the Heinz family asked Carnegie Mellon
13      University to digitize his papers and bring
14      them to the Web so that they could be used by
15      as many people as possible.

16 Q.  And the Heinz family asked Carnegie Mellon to
17      digitize Senator Heinz' papers?

18 A.  Correct.

19 Q.  And did Carnegie Mellon do that?

20 A.  Yes.

21 Q.  And that was at the request of the family?

22 A.  Yes.

23 Q.  And with respect to Herbert Simon, is that the
24      same or a different initiative?

25 A.  It was at Herbert Simon's request.

Page 23

1 Q.   So again that was with permission of
2       Mr. Simon?

3 A.   Dr. Simon.

4 Q.   Dr. Simon.  Excuse me.

5 A.   Yes.

6 Q.   And when the Posner collection was digitized
7       by Carnegie Mellon, isn't it correct that
8       Carnegie Mellon did not digitize any
9       in-copyright books unless it had permission?

10 A.  Precisely we did not open for access any books
11      for which we did not have permission, any
12      books that were in copyright for which we did
13      not have permission.

14 Q.  My question is did you digitize any books in
15      copyright without permission?

16 A.  No.

17 Q.  Not even for search?

18 A.  Well, okay, to be precise, we digitized all
19      the books that we could digitize without doing
20      them physical harm.

21          We opened to the Web only those
22      books which were either out of copyright or
23      for which we had permission.

24          I'm not certain whether you can
25      search books that we digitized but didn't

Page 24

1       open.

2 Q.   When you say "open," what do you mean?

3 A.   Open to the Web, make accessible on the Web.

4 Q.   Let's take it a step at a time.  At a certain
5       point Carnegie Mellon made a decision to
6       attempt to digitize the Posner collection.
7       Correct?

8 A.   Yes.

9 Q.   And this was before the Million Book Project.
10      Right?

11 A.  No.

12 Q.  What were the time frames?  When was the
13      decision made by Carnegie Mellon to attempt to
14      just digitize the Posner collection?

15 A.  About ten years ago.

16 Q.  And what when was the Million Book Project
17      begun?

18 A.  About fourteen years ago.

19 Q.  And in connection with the Posner collection,
20      is it correct the collection included
21      materials that were out of copyright as well
22      as materials that were in copyright?

23 A.  Yes.

24 Q.  My question is did Carnegie Mellon digitize
25      the in-copyright books before it received any

Page 25

1       permissions.

2 A.   Both of those projects, the digitization of
3       the books and the searching for -- seeking
4       copyright permission were lengthy and
5       ongoing.

6 Q.   Yes, but as a matter of actual practice, did
7       Carnegie Mellon digitize any books in the
8       Posner collection that were in copyright
9       before it had received a permission?

10 A.  I'm not sure.

11 Q.  Part of the work that Carnegie Mellon did in
12      connection with the Posner collection
13      digitization effort was work to attain
14      permissions for in-copyright books.  Right?

15 A.  Yes.

16 Q.  So you're not sure of the sequence as to
17      whether or not Carnegie Mellon ever digitized
18      an in-copyright work before it had a
19      permission to do so?

20 A.  Correct.

21 Q.  Who would know that at Carnegie Mellon?

22 A.  I'm not certain we kept records at that
23      detail, and I'm not certain whether the
24      machines recorded --

25          We are using a home-grown system.

7 (Pages 22 - 25)

1 Q.   A home-grown system of --
2 A.   To store the copies of all of our digital
3       content and to allow search engines to search.
4 Q.   When you say a "home-grown system," you're
5       talking about the actual system that houses
6       the copies?
7 A.   Yes.
8 Q.   And that's on servers?
9 A.   Yes.
10 Q.   Do you also keep backup copies?
11 A.   Yes.
12 Q.   Who actually creates the copies?
13 A.   Our library information technology staff.
14 Q.   Who's in charge of the home-grown system at
15       Carnegie Mellon that stores the digital
16       copies?
17 A.   Melanie Myers.
18 Q.   What's her position?
19 A.   She's the head of library information
20       technology.
21 Q.   Are the books from the Posner collection that
22       have been digitized stored on that home-grown
23       system?
24 A.   Yes.
25 Q.   And are the books from the Million Book

1       Project that have been digitized stored
2       there?
3 A.   No.
4 Q.   Aside from the Posner collection, what other
5       books are stored on the home-grown system
6       you're referring to?
7           MR. McGOWAN:  Objection.  Lacks
8       foundation.
9           You may answer.
10           THE WITNESS:  Are you just
11       interested in books, or are you interested in
12       a broader range of materials?
13 BY MS. ZACK:
14 Q.   Well, let's just stay with books.
15 A.   I'm thinking.
16           Well, the archival collections of
17       Dr. Simon and Dr. Newell, Dr. Traub, have
18       books in them, so those are there.
19           I think we have scanned some costume
20       books with permission or out of copyright and
21       they're there, but our main book collection
22       that we're hosting ourselves is the Posner
23       collection.
24 Q.   Okay.  So Carnegie Mellon began its efforts to
25       digitize the Posner collection in about 2002,

1       you said, about ten years ago?
2 A.   Yes.
3 Q.   And again the Million Book Project was about
4       fourteen years ago, and that was about the
5       time you joined Carnegie Mellon?
6 A.   Yes.
7 Q.   And those were fairly significant digitization
8       efforts, wouldn't you agree?
9           MR. McGOWAN:  Objection.  Vague.
10           You may answer.
11           THE WITNESS:  Yes.
12 BY MS. ZACK:
13 Q.   Were you aware of any other libraries that
14       were engaged in any digitization efforts at
15       that time in the early part of this
16       millennium?
17 A.   Yes.
18 Q.   What other libraries?
19 A.   Other members of the Digital Library
20       Federation.
21 Q.   Which ones in particular?
22 A.   Michigan, Penn State, Cornell, Harvard,
23       Berkeley, New York Public, Tennessee --
24 Q.   That's all you can recall?
25 A.   Perhaps Texas, Virginia, Princeton, Yale,

1       Oxford, National Archives, Library of
2       Congress, University of Pennsylvania.
3 Q.   So each of those institutions was involved in
4       some digitization efforts in 2000 or
5       thereabouts or shortly after that?
6 A.   Yes.
7 Q.   And the last sentence of Paragraph 5 A which
8       is on the top of Page 2 --
9 A.   Yes.
10 Q.   -- it says no large-scale digitization
11       projects were under way in the U.S.
12 A.   Yes.
13 Q.   And you're talking about 2004?
14 A.   Yes.
15 Q.   But in 2004 the Million Book Project was under
16       way.  Correct?
17 A.   Correct.
18 Q.   And that was a large-scale digitization
19       project, was it not?
20 A.   Yes, but not in the U.S.
21 Q.   Weren't you digitizing books present in the
22       U.S.?
23 A.   No.
24 Q.   So you're talking about the physical location
25       of the books?

8 (Pages 26 - 29)

| Page 30 | Page 32 |
|---|---|

**Page 30**

1  A.    And of the digitization.

2  Q.    Well, when the books were digitized in the

3  Million Book Project, were they available for

4  display in the U.S.?

5  A.    Sometimes.

6  Q.    How many books in the Million Book Project are

7  available for display at Carnegie Mellon?

8         MR. McGOWAN: Objection.  Vague as to

9  timing.

10        You may answer.

11        THE WITNESS:  Certainly when their

12  servers are up, students at Carnegie Mellon

13  can look at about 300,000 books that were

14  digitized by our project in China, they can

15  look at some books from the library at

16  Alexandria that were digitized as part of our

17  project, they can look at some books on the

18  Internet archive that were digitized in China

19  and in India as part of our project.

20        There are, I believe, almost two

21  million books that were digitized in China,

22  and if a university has a license to the

23  database, then that university's students can

24  look at those books.

25  BY MS. ZACK:

**Page 31**

1  Q.    Okay.  So you said there are two million books

2  digitized in China approximately, and that was

3  through the Million Book Project?

4  A.    Yes.

5  Q.    And that's to date?

6  A.    Yes.

7  Q.    And you say if the university has a license to

8  the database.  Who provides the license?

9  A.    CADAL, C-A-D-A-L.

10  Q.    Is that an acronym?

11  A.    Yes.

12  Q.    What does it stand for?

13  A.    I'm not sure.  Chinese something, and the L is

14  for library.

15  Q.    Okay.  So if the university obtains a license

16  from CADAL to the database, the university

17  student can look at these two million books.

18  Correct?

19  A.    Correct.

20  Q.    Does Carnegie Mellon have such a license?

21  A.    No.

22  Q.    And why not?

23  A.    We don't have Chinese --

24        We don't offer very many --

25        Well, we can't afford it.

**Page 32**

1  Q.    Are these two million books in Chinese?

2  A.    Primarily.

3  Q.    As part of the Million Book Project, how many

4  books in English were digitized?

5  A.    I don't know.

6  Q.    Do you know approximately?

7  A.    I've heard the figure, but I can't recall it.

8  Q.    Is it more than a million, less than a

9  million?

10  A.    Of the total books in the Million Book

11  Project?

12  Q.    Uh-huh.

13  A.    Less than a million.

14  Q.    You mentioned that there were 300,000 books

15  digitized in China that are available to

16  Carnegie Mellon students for display.  Is that

17  correct?

18  A.    No.

19  Q.    When their servers are up, you said?

20  A.    In India when their servers are up.

21  Q.    Well, you I believe said there were 300,000

22  books digitized in China.

23  A.    No.

24  Q.    Did your mean to say India?

25  A.    Yes.

**Page 33**

1  Q.    All right.  Were those books in English?

2  A.    Some.

3  Q.    And does Carnegie Mellon have a license to

4  display those books?

5  A.    Those books are free to read.

6  Q.    And is that because they're out of copyright

7  or why are they free to read?

8  A.    They're either out of copyright, they're

9  government publications and, therefore, either

10  not in -- never in copyright or there has been

11  copyright permission granted.

12  Q.    How many books were digitized in the Posner

13  collection?

14  A.    Around a thousand.

15  Q.    You mentioned that Carnegie Mellon, I think,

16  and correct me if I'm wrong, digitized --

17        We previously discussed the archival

18  collections of Dr. Simon, and then you

19  mentioned Drs. Newell and someone else.  Who

20  was the other person?

21  A.    Dr. Joseph Traub.

22  Q.    Traub?

23  A.    T-R-A-U-B.

24  Q.    And in each case was that done by permission?

25  A.    Yes.

9 (Pages 30 - 33)

1 Q.   Were these books or personal papers?
2 A.   Both.
3 Q.   Now, Paragraph 5 B of your report, which is on
4      Page 2, you talk about how digitization helps
5      libraries achieve their mission.
6 A.   Yes.
7 Q.   Does Carnegie Mellon engage in any -- to the
8      extent you're aware -- engage in any
9      digitizations pursuant to Section 108 of the
10     Copyright Act?
11          MR. McGOWAN:  Objection to the
12     extent it calls for a legal conclusion.
13          You may answer.
14          THE WITNESS:  What is Section 108?
15 BY MS. ZACK:
16 Q.   Are you familiar with that section?
17 A.   Is that orphan works?
18 Q.   Section 108 is the --
19          I don't want you to testify about it
20     if you're not familiar with it, but it is a
21     provision that deals specifically with
22     libraries making replacement copies,
23     et cetera, under certain circumstances?
24 A.   Yes.
25 Q.   You are familiar with it?

1 A.   Somewhat.
2 Q.   Is that something you discussed with your --
3      just yes or no -- that you've discussed with
4      university counsel?
5 A.   I don't recall.
6 Q.   Do you know whether Carnegie Mellon makes
7      digital copies pursuant to Section 108 of the
8      Copyright Act?
9          MR. McGOWAN:  Same objection on a
10     legal conclusion.
11          You may answer.
12          MS. ZACK:  Only if you know.
13          THE WITNESS:  Are we talking about
14     putting work on E-reserves?
15 BY MS. ZACK:
16 Q.   Well, let me ask a different question.  Does
17     Carnegie Mellon put works on E-reserves?
18 A.   Yes.
19 Q.   And what circumstances or what are the steps
20     that Carnegie Mellon goes through before it
21     allows its professors to put works on
22     E-reserves?
23          MR. McGOWAN:  Objection.  Lacks
24     foundation, compound.
25          MS. ZACK:  If you know.

1          MR. McGOWAN:  You may answer.
2          THE WITNESS:  We have procedures and
3      documents and practices.  Mary Jo Dively, who
4      is our university counsel, pays Jonathan Band
5      to regularly give us advice on how to run our
6      E-reserves operations.
7 BY MS. ZACK:
8 Q.   To give advice as to how Carnegie Mellon
9      should run its E-reserves operations to comply
10     with copyright law?
11 A.   Yes.
12 Q.   Now, it would serve the mission of Carnegie
13     Mellon, would it not, if Carnegie Mellon were
14     to digitize all of its works for full text
15     viewing?
16 A.   I don't understand the question.
17 Q.   Well, if you take away the restrictions of the
18     Copyright Act and talk about only what would
19     serve Carnegie Mellon's mission as a library,
20     wouldn't its mission be served if you just
21     digitized all the books you have and put them
22     up on the Web for full text viewing?
23 A.   Probably.
24 Q.   But you haven't done that.  Right?
25 A.   No.

1 Q.   And why not?
2 A.   Several reasons; copyright law, money are the
3      top two.
4 Q.   Referring you to Paragraph 5 C of your
5      report --
6 A.   Yes.
7 Q.   -- you talk about the payment of money for
8      books and for digitization, et cetera.
9 A.   Uh-huh.
10 Q.   Now, Carnegie Mellon does pay for print
11     books.  Right?
12 A.   Yes.
13 Q.   And does Carnegie Mellon now sometimes pay for
14     digital works in lieu of print books?
15          MR. McGOWAN:  Objection.  Vague.
16          You may answer.
17          MS. ZACK:  Do you understand what
18     I'm asking?
19          THE WITNESS:  So you're asking if
20     sometimes we pay to buy the E-book version of
21     a book rather than buying the print version of
22     a book?
23          MS. ZACK:  Yes.
24          THE WITNESS:  Yes.
25          MS. ZACK:  And how do you determine

10 (Pages 34 - 37)

Page 38

1  whether to buy a print version or an E-book
2  version?
3        MR. McGOWAN: Objection.
4  Foundation.
5        You may answer.
6        THE WITNESS: We prefer buying
7  E-books.
8  BY MS. ZACK:
9  Q.   So if you're buying a book for the first time
10     and you have a choice, you would buy an E-book
11     rather than a print book?
12 A.   Yes.
13 Q.   And does Carnegie Mellon buy subscriptions to
14     E-journals or that type of product?
15 A.   Yes.
16 Q.   What particular subscriptions does Carnegie
17     Mellon purchase that you can recall?
18 A.   Association For Computing Machinery, tons of
19     things from Elsevier, tons of things from
20     Springer Verlag, tons of things from all of
21     the sci-tech publishers for which we pay a
22     lot.
23        All of our clients prefer us to buy
24     things in digital format. We buy as many
25     databases and electronic journals and

Page 39

1  electronic books as we can afford in the areas
2  that our university, which is a very focused
3  university, teaches and does research.
4  Q.   You said "all of our clients." Who do you
5  consider the library's clients to be?
6  A.   Our students, faculty, staff, our OSHER life-
7  long learning group, and everyone who walks
8  into one of our library buildings.
9  Q.   Can the general public walk into your library
10     buildings and use -- get digital access?
11 A.   Yes, but they have to get a day pass to do
12     that.
13 Q.   Are there any requirements to get a day pass?
14 A.   You have to have an ID.
15 Q.   It doesn't have to be a Carnegie Mellon ID?
16 A.   No.
17 Q.   In other words, a driver's license or
18     something like that would work?
19 A.   Yes.
20        MR. McGOWAN: Joanne?
21        MS. ZACK: Do you need a break?
22        MR. McGOWAN: Yeah. If we could
23     take a quick break, that would be good.
24        MS. ZACK: Okay. Is five minutes
25     enough or do you need more?

Page 40

1        MR. McGOWAN: Can we do ten?
2        MS. ZACK: That's fine.
3        - - - -
4     (There was a recess in the proceedings.)
5        - - - -
6  BY MS. ZACK:
7  Q.   Dean St. Clair, do the patrons of Carnegie
8     Mellon libraries have access to Google?
9  A.   Yes.
10 Q.   So persons -- or your clients as you call
11     them -- persons using your library can go on
12     computers within Carnegie Mellon's libraries
13     and have access to Google Search. Is that
14     correct?
15 A.   Correct.
16 Q.   Do you know what benefits Google obtains from
17     its digitization of books?
18        MR. McGOWAN: Objection. Lacks
19     foundation.
20        You may answer.
21        THE WITNESS: Not precisely.
22 BY MS. ZACK:
23 Q.   Have you ever been involved in testifying
24     before Congress on orphan works legislation?
25 A.   No.

Page 41

1  Q.   Have you submitted any materials to Congress
2     in connection with orphan works legislation?
3  A.   Yes.
4  Q.   Did you say yes? I'm sorry.
5  A.   Yes.
6  Q.   Okay. And on how many occasions have you
7     submitted material?
8  A.   Several.
9  Q.   And what position have you taken?
10 A.   We are pro open access and --
11 Q.   When you say "pro open access," what do you
12     mean?
13 A.   Well, when calls come out about things like
14     the NIH, we take a positive position on the
15     creation of that database and the continuing
16     of that database and the financial
17     arrangements around that database.
18 Q.   Have you ever taken any position on particular
19     bills that contain suggested provisions about
20     how much procedurally needs to done to try to
21     locate copyright owners before a book is
22     declared to be an orphan work?
23 A.   Yes.
24 Q.   And specifically do you recall any specific
25     decisions that you've taken or that Carnegie

11 (Pages 38 - 41)

1    Mellon has taken?
2  A.  Well, we believe that there should be a
3    reasonable effort to locate copyright owners,
4    but that there should be some provision
5    for orphan works.
6  Q.  Would it be fair to say you believe the
7    current copyright laws are inadequate in that
8    regard?
9        MR. McGOWAN:  Objection.  Vague.
10        You may answer.
11        THE WITNESS:  Yes.
12  BY MS. ZACK:
13  Q.  You would like them to be changed?
14  A.  Yes.
15  Q.  You said Carnegie Mellon believes there should
16    be a reasonable effort to locate copyright
17    owners?
18  A.  Yes.
19  Q.  What does Carnegie Mellon consider to be a
20    reasonable effort?
21  A.  Mary Jo Dively has worked with us to put
22    together a work flow that we can use to
23    determine -- to work on copyright issues,
24    gaining permission.
25  Q.  You mean the steps you should take?

1  A.  Yes.
2  Q.  And what steps does that entail?
3  A.  We try to locate the rights-holder, and then
4    if we are unable to locate the rights-holder,
5    we think about putting the work -- making the
6    work available on the Web with the idea that
7    if a rights-holder objected, we would
8    instantly take the work down.
9  Q.  Have you ever done that?
10  A.  Yes.
11  Q.  You've put work on the Web without permission
12    even though it was in copyright?
13  A.  Yes.
14  Q.  And when did you begin doing that?
15  A.  Seven, eight years ago.
16  Q.  How many such works have you placed on the Web
17    that were in copyright without permission?
18  A.  I don't know.
19  Q.  Has anyone come forward and asked you to take
20    them down?
21  A.  One.
22  Q.  I'm sorry?
23  A.  One.
24  Q.  Do you recall the name of that --
25  A.  No.

1  Q.  -- book or person?
2  A.  No.
3  Q.  Who keeps records of these matters at Carnegie
4    Mellon?
5  A.  Denise Troll Covey, Gabrielle Michalek, Ann
6    Marie Mesco.
7  Q.  Now, turning to Paragraph 6 of your report,
8    you talk about the Google Books project.  All
9    of that is secondhand knowledge, I take it.
10  A.  Yes, or based on what I read in Clancy.
11        - - - -
12    (There was a discussion off the record.)
13        - - - -
14  BY MS. ZACK:
15  Q.  Referring you to Paragraph 6 of your report,
16    looking at all the sentences in that paragraph
17    other than the last sentence, does that all
18    come from your review of materials rather than
19    your firsthand knowledge?
20  A.  A review.
21  Q.  You're saying yes, it comes from a review?
22  A.  Primarily.
23  Q.  Does it come in any way from firsthand
24    knowledge?
25  A.  Well, I was a member of the Digital Library

1    Federation and all of these people were
2    members of the Digital Library Federation, and
3    we met together twice a year.
4  Q.  And did they discuss with you at that time
5    their participation in Google Books or Google
6    Library project?
7  A.  No.
8  Q.  So did you --
9        You became aware, I assume, from
10    public information that this was happening.
11    Right?
12  A.  Yes.
13  Q.  And you never discussed it with anyone from
14    Michigan or Harvard or Stanford or Oxford or
15    any other public library?
16  A.  No.
17  Q.  All right.  The last sentence of Paragraph 6
18    says as discussed below, Google's interest in
19    digitizing books stemmed in part from the
20    Million Book Project, of which I am a
21    director.
22        Did you ever have a discussion with
23    anyone from Google about this?
24  A.  No.
25  Q.  All right.  So you gleaned that from their

12 (Pages 42 - 45)

Page 46

1    website?
2  A.   Yes.
3  Q.   Referring you to Paragraph 9 of your report,
4      you talk about the history of indexing from
5      card catalogs to computerized MARC records.
6        Do you see that?
7  A.   I do.
8  Q.   The MARC system, what does MARC stand for?
9  A.   Machine something readable something.
10  Q.   All right.  Is that --
11        What exactly are MARC records?
12  A.   MARC records are essentially the electronic
13      version of a catalog card record.
14  Q.   Who creates that version?
15  A.   Catalogers.
16  Q.   And does Carnegie Mellon pay for access to
17      MARC records?
18  A.   Yes.
19  Q.   And MARC is a separate entity from any given
20      library?
21  A.   MARC is a format.  It's a template that you
22      use to describe a book, a journal article, a
23      piece of realia.
24  Q.   And what company creates MARC records?
25  A.   The Library of Congress creates many MARC

Page 47

1      records, and libraries around the country
2      create their own subset of MARC records and
3      contribute those to a nonprofit entity called
4      OCLC.
5  Q.   And then Carnegie Mellon pays OCLC to use MARC
6      records?
7  A.   Yes.
8  Q.   Is what is that subscription fee?
9  A.   It varies back and forth.  I believe right now
10      we may have a subscription that allows us to
11      do X amount of use of MARC records for our
12      own -- to move those records from OCLC into
13      our local library system.
14  Q.   And MARC records are, as you said, basically a
15      digital version of the old card catalog?
16  A.   Yes.
17  Q.   So they contain --
18        And they're searchable on the
19      computer?
20        MR. McGOWAN:  Objection.  Vague.
21        You may answer.
22        MS. ZACK:  Can you search MARC
23      records on a computer?
24        THE WITNESS:  You can both search
25      them on the Web and you can --

Page 48

1        Yes.  You can search them on a
2      computer.
3  BY MS. ZACK:
4  Q.   And the search would be limited there to what,
5      title, title information?
6  A.   Author, title, publishing information,
7      typically two or three subject headings and
8      some kinds of notes about additions and so
9      forth.
10  Q.   Okay.  So there's no searching within the
11      books in connection with those records.
12      Right?
13  A.   Right.
14  Q.   It's like searching a card catalog on a
15      computer?
16  A.   Yes.
17  Q.   Do you know how much Carnegie Mellon pays MARC
18      on a yearly basis for access to the use of
19      those MARC records?  Or pays OCLC; excuse me.
20  A.   Probably a dollar something.
21  Q.   When you say a dollar something, what do you
22      mean?
23  A.   I can recall at one time we were paying
24      78 cents, and at one time we were paying
25      $1.04.  I'm not sure what we're paying today.

Page 49

1  Q.   For the entire year for the entire use of the
2      record?
3  A.   Per record, a one-time fee for long-term use.
4  Q.   Per record or for all records?
5  A.   Per record.  So for --
6  Q.   Does that mean per book or --
7  A.   Well --
8  Q.   If it was a book, it would be a one-time
9      fee --
10        For the record, for that particular
11      book if we're talking about a book, would it
12      be forever?  Is that what you're saying?
13  A.   Yes.
14  Q.   So if you had a million books you would
15      multiply it by a dollar to get the the amount
16      you would be paying?
17  A.   Yes.
18  Q.   Do you purchase any --
19        Do the Carnegie Mellon libraries
20      purchase any services from Bowker?
21  A.   Probably.
22  Q.   What type of services?
23  A.   I believe that Bowker produces some things
24      that I would call databases, and we license
25      those databases.

13 (Pages 46 - 49)

Page 50

1           Bowker also produces --
2  Q.   I'm sorry.  Go ahead.
3  A.   Bowker --
4           Bowker also produces print books.
5  Q.   What databases does Carnegie Mellon libraries
6      purchase from Bowker?
7  A.   I don't know.
8  Q.   Are there any other computerized records other
9      than the MARC records that Carnegie Mellon
10     libraries uses?
11          MR. McGOWAN:  Objection.  Vague.
12          You may answer.
13          THE WITNESS:  We also use EAD which
14     is an archival format, and we use Dublin Core
15     which I would call MARC light, and we're
16     beginning to use a new format that I will call
17     for lay purposes MARC heavy.
18 BY MS. ZACK:
19 Q.   I'm sorry.  I got Dublin Core and MARC heavy.
20     What was the third, the first one you
21     mentioned, A --
22 A.   E, as in Edgar, AD.
23 Q.   Does that stand for something?
24 A.   Probably encoding archival description or
25     something like that.

Page 51

1  Q.   Is that something that Carnegie Mellon
2      acquires from a third party?
3  A.   No.
4  Q.   Is that produced in-house?
5  A.   Yes.
6  Q.   What about Dublin Core?
7  A.   Produced in-house.
8  Q.   What about MARC heavy?
9  A.   We will both produce it in-house and acquire
10     it.
11 Q.   Where do you acquire it from?
12 A.   OCLC.
13 Q.   And is that something that's also paid for --
14 A.   Yes.
15 Q.   -- when acquired from OCLC?
16 A.   Yes.
17 Q.   And what's the difference between this product
18     that you're calling MARC heavy and the product
19     you previously described, the MARC product?
20 A.   MARC itself is -- grew up maybe thirty years
21     ago, and MARC heavy is an effort to make it
22     work better with digital resources.
23 Q.   Does it have any additional information or is
24     it just a functionality improvement?
25 A.   It has additional information.

Page 52

1  Q.   Such as?
2  A.   Such as the nature of the electronic files,
3      who produced them, when they were produced,
4      where they were produced, what kind of files
5      they are, file protocols.
6  Q.   So it has additional metadata about the book?
7  A.   MARC, MARC heavy and MARC light are all
8      metadata.
9  Q.   Right, so I'm saying it has additional
10     metadata.
11 A.   Yes.
12 Q.   And MARC heavy?
13 A.   Right.
14 Q.   But there's no searching within the book with
15     MARC heavy either.  Right?
16 A.   Yes.
17 Q.   And do the MARC heavy records cost more per
18     book?
19 A.   I don't know.
20 Q.   But like the regular MARC records they're
21     purchased on a licensed basis?
22 A.   Well, yes.  We would acquire them in the same
23     way that we acquire regular MARC records.
24 Q.   Is that considered a license or --
25          MR. McGOWAN:  Objection to the

Page 53

1      extent it calls for a legal conclusion.
2          MS. ZACK:  If you know.
3          MR. McGOWAN:  You may answer.
4          THE WITNESS:  I don't know.
5  BY MS. ZACK:
6  Q.   Okay.  There's a sentence within Paragraph 9
7      on Page 3 that carries over to Page 4 at the
8      very bottom of Page 3.  It says but over the
9      history of indexing --
10          Do you see where I am?
11 A.   Yes.
12 Q.   -- from card catalogs to computerized MARC
13     records, libraries have not paid authors nor
14     sought their permission merely to index or to
15     search through their books?
16 A.   Yes.
17 Q.   I wasn't sure what you meant by "or to search
18     through their books."
19 A.   We've never paid authors for our people to
20     come in and flip through a book.
21 Q.   Are you talking about browsing?
22 A.   Yes.
23 Q.   Referring you to Paragraph 12 of your report
24     which is at the bottom of Page 4, you're
25     setting examples of digitization projects not

14 (Pages 50 - 53)

Page 54

1   affiliated with academic or local libraries.
2   Correct?
3 A.   In Paragraph 12?
4 Q.   Yes, which carries over --
5 A.   Carries over onto Page 5.
6 Q.   Right.
7 A.   Yes.
8 Q.   You mentioned project Gutenberg?
9 A.   Yes.
10 Q.   Do you know if that involved any in-copyright
11   books?
12 A.   It did not.
13 Q.   What about the Library of Congress' American
14   Memory project?
15   Did that involve any in-copyright
16   books?
17 A.   No.
18 Q.   What about the Making of America project?
19 A.   No.
20 Q.   No in-copyright books?
21 A.   None.
22 Q.   And then you mention lastly the Million Book
23   Project which we'll discuss, you know, more
24   fulsomely in a moment.
25   Turning to the Million Book Project,

Page 55

1   you mentioned before the break or earlier in
2   the deposition that you had a series of
3   conversations with Dan Clancy about it.
4   Did Google ever offer to provide any
5   funding for the Million Book Project?
6 A.   That's the conversation we were having.
7 Q.   Did they ever offer to provide any funding?
8 A.   We were asking them to give us funding in
9   return for our scanned content.
10 Q.   And those conversations culminated in nothing
11   coming of that, I guess. Right?
12 A.   Right.
13 Q.   Because of the objections of your foreign
14   partners?
15 A.   I'm not certain what all the factors were, but
16   certainly our foreign partners were not as
17   eager to do that as the directors of the
18   universal library were.
19 Q.   Referring you to Page 7 of your report, the
20   top of the page which is part of
21   Paragraph 19 --
22 A.   Yes.
23 Q.   -- there occurs in your report in a discussion
24   of your attempts to interest various libraries
25   to engage in some sort of major digitization

Page 56

1   project. Correct?
2 A.   Correct.
3 Q.   There's a --
4   On the top of Page 7 there's a
5   sentence that says in spring and summer of
6   1999, many librarians dismissed this idea even
7   though it would have brought work to their
8   states and even though the NSF program
9   officer, Michael Lesk, made clear that NSF
10   believed it could provide $25 million in
11   supplemental funding for such efforts if
12   libraries showed initiative in pursuing them.
13   So NSF here is the National Science
14   Foundation. Is that correct?
15 A.   Correct.
16 Q.   Are you saying that the National Science
17   Foundation was willing to provide $25 million
18   in funding for a major library digitization
19   project?
20 A.   The National Science Foundation was willing to
21   ask Congress to provide $25 million if these
22   libraries which were in these states would
23   undertake this project.
24 Q.   Was that a project similar to the Million Book
25   Project you were considering?

Page 57

1 A.   Yes.
2 Q.   But in the U.S.?
3 A.   Yes.
4 Q.   So it would have involved digitization of
5   books in the U.S.?
6 A.   Yes.
7 Q.   And would that have been with permission for
8   in-copyright books?
9 A.   I don't know.
10 Q.   Well, at the time wasn't that your practice,
11   to get permission for in-copyright books?
12 A.   Well --
13   MR. McGOWAN: Objection. Vague.
14   You may answer.
15   THE WITNESS: Our thinking at that
16   time was that we would work on books that were
17   pre-'23.
18   In that same time period we
19   created -- we scanned all of the copyright
20   renewal records, and Dr. Lesk himself
21   personally programmed them so that they became
22   searchable so that we could look at the
23   copyright status of books that were published
24   between 1923 and 1963, and that database is
25   still available. Stanford hosts it.

15 (Pages 54 - 57)

1  BY MS. ZACK:
2  Q.   Right.  That was to facilitate a potential
3       digitization project?
4  A.   Yes.
5  Q.   So the National Science Foundation was willing
6       to put up $25 million for libraries to
7       digitize.  Correct?
8            MR. McGOWAN:  Objection.  Asked and
9       answered.
10  BY MS. ZACK:
11  Q.   Correct?
12  A.   They were willing to ask Congress for
13       $25 million.
14  Q.   But the libraries didn't want to do the
15       digitization?
16  A.   Correct.
17  Q.   And why was that?
18  A.   They didn't have the vision.
19  Q.   Now, with respect to the Million Book Project,
20       do you know the total amount of funding that
21       has been received for that project from its
22       inception to date?
23  A.   The National Science Foundation project from
24       the National Science Foundation?
25  Q.   No, I'm sort of changing subjects a little

1       bit.
2  A.   Okay.
3  Q.   Back just generally to the Million Book
4       Project, and I'm saying from all sources, what
5       is the total funding that has been received
6       for that project from its inception to date?
7  A.   U.S. funding has only been from the National
8       Science Foundation to the tune of about
9       $3.6 million.
10  Q.   And what about other sources of funding?
11  A.   The government of China, the government of
12       Egypt, and the government of India each
13       provided funding for all of the labor and all
14       of the research that went on in their
15       countries and the value of that was many
16       times -- many, many, many times more than the
17       funding provided by the National Science
18       Foundation.
19  Q.   Has that ever been quantified?
20  A.   Yes.  It's in my published works.
21  Q.   And you don't recall those numbers right now?
22  A.   No.
23  Q.   So you discuss in your report --
24            I believe you discuss three
25       different digitization efforts.  One you call

1       the feasibility study, one is the Posner
2       collection study, and one is the Million Book
3       Project study.  Is that right?
4  A.   They're not digitization efforts.
5  Q.   Well, you generally discuss in your report the
6       feasibility study, the Posner collection
7       study, and the Million Book project study.
8       Correct?
9  A.   Correct.
10            MS. ZACK:  Can we mark as Exhibit
11       PX --
12            I guess it's 88.  Correct?
13            MR. McGOWAN:  It is 88.  Yes.
14            MS. ZACK:  -- an article entitled --
15       dated January, 2005, and it's entitled
16       Acquiring Copyright Permission to Digitize and
17       Provide Open Access to Books, and it says from
18       the selected works of Denise Troll Covey, 63
19       pages
20            MR. McGOWAN:  We have that, Joanne.
21            MS. ZACK:  You have that?
22            MR. McGOWAN:  Yes.
23            - - - -
24  (Plaintiffs' Exhibit No. 88 marked for
25            identification.)

1            - - - -
2            MS. ZACK:  And it's been marked?
3            MR. McGOWAN:  Correct.
4  BY MS. ZACK:
5  Q.   Now, you cite this article in your report.
6       Correct?
7  A.   Correct.
8  Q.   And Denise Troll Covey works for you.
9       Correct?
10  A.   She works for Carnegie Mellon University
11       libraries.
12  Q.   Does she report to you?
13  A.   She does.
14  Q.   And she also did so in 2005.  Correct?
15  A.   Correct.
16  Q.   And then in 2005 and prior to that she was the
17       is principal librarian for special projects at
18       Carnegie Mellon University library?
19  A.   Yes.
20  Q.   Was she --
21            What was her role with respect to
22       these three studies, the feasibility study,
23       the Posner collection study and the Million
24       Book Project study?
25            MR. McGOWAN:  Objection.  Compound.

Page 62

1      You may answer.
2          THE WITNESS:  She was in charge of
3    them.
4  BY MS. ZACK:
5  Q.   She was in charge of all three studies?
6  A.   Yes.
7  Q.   This article which we've marked as PX 87 is a
8    fairly comprehensive discussion and
9    description by her of those three studies.
10    Correct?
11          MR. McGOWAN:  I just want to note
12    for the record, Joanne, it's 88.
13          MS. ZACK:  Oh, it's 88?
14          MR. McGOWAN:  Yes.
15          MS. ZACK:  Sorry.
16          MR. McGOWAN:  And then I'm going to
17    object that it's vague.
18          You may answer.
19          THE WITNESS:  It's a description of
20    these projects.
21  BY MS. ZACK:
22  Q.   Did you read this before it was published?
23  A.   Not that I recall.
24  Q.   Did you read it after it was published?
25  A.   Yes.

Page 63

1  Q.   Do you consider it to be accurate?
2  A.   Yes.
3  Q.   And you relied on it in your report.  Correct?
4  A.   Yes.
5  Q.   And this article has, you know, quite a bit
6    more detail than you have included in your
7    report.  Correct?
8  A.   Yes.
9  Q.   Now, if you could open, I guess -- I believe
10    they're numbered at the top so we'll refer to
11    the numbers at the top of the pages -- with
12    NPXAD 8, Page 1, and it also says
13    Introduction.
14  A.   Yes.
15  Q.   And the first paragraph of the introduction,
16    the last sentence, it says realizing this
17    dream -- creating a digital library that is
18    comparable to an excellent traditional library
19    and providing open access to it -- requires
20    negotiating copyright permission.
21          Do you agree with that statement?
22  A.   Yes.
23  Q.   Referring you to numbered Page 8 --
24  A.   Yes,
25  Q.   -- the first full sentence on Page 8 says

Page 64

1    copyright law also allows digitization for
2    preservation purposes in certain
3    circumstances, but access to the online copy
4    must be restricted to users physically in the
5    library that created the digital copy.
6  A.   Yes.
7  Q.   Do you agree with that?
8          MR. McGOWAN:  Objection.  Vague.
9          You may answer.
10          MS. ZACK:  I mean do you agree with
11    that statement.
12          THE WITNESS:  I'm reading.
13          MR. McGOWAN:  And I'll object to the
14    extent it calls for a legal conclusion.
15          You may answer.
16          THE WITNESS:  Yes.  I agree.
17  BY MS. ZACK:
18  Q.   The next sentence, it says to provide open
19    access or even authenticated remote access to
20    those digitized works requires permission from
21    the copyright owner of each title.
22          Do you agree with that?
23  A.   I think so.
24  Q.   The second full paragraph on this page which
25    begins, however, on January 26, 2005 --

Page 65

1          Do you see that?
2  A.   I do.
3  Q.   It says the U.S. Copyright Office issued a
4    notice of inquiry regarding orphan works, and
5    then it says further down the Copyright Office
6    received 721 additional comments and 146
7    replied comments.
8          Do you know if you at Carnegie
9    Mellon made any comments in connection with
10    this particular legislation or call for
11    legislation on January 6, 2005?
12  A.   Probably.
13  Q.   And you expressed the opinion that you
14    previously testified about?
15  A.   Yes.
16  Q.   Referring you to Page 10 at the very bottom,
17    the carry-over sentence that goes to Page 11,
18    it says creating a digital library that is
19    comparable to an excellent traditional library
20    requires negotiating copyright permission to
21    digitize and to provide open access to an
22    array of materials.
23          Would you agree with that?
24  A.   I'm reading.
25          I see some kind of sequence problems

17 (Pages 62 - 65)

Page 66

1    possibly in that sentence.
2 Q.   What do you mean?
3 A.   I mean that I wouldn't see that you
4    necessarily had to seek permission before you
5    digitized.  I would see that you should --
6    that it would be desirable for you to seek
7    permission before you opened the text to the
8    Web to be read in full text form.
9 Q.   But you previously testified, did you not,
10   that you are not aware that Carnegie Mellon
11   has ever digitized before it received
12   permission.  Correct?
13          MR. McGOWAN:  Objection.  Misstates
14   prior testimony.
15          You may answer.
16          THE WITNESS:  Could you ask the
17   question again, please?
18 BY MS. ZACK:
19 Q.   I think you previously testified that you
20   could not state that Carnegie Mellon had ever
21   digitized a book before it received -- an
22   in-copyright book -- before it received
23   permission to do so.
24 A.   I don't make those kind of sequential
25   distinctions.

Page 67

1 Q.   Well, whether you do or don't, as a matter of
2    fact, books have been digitized at Carnegie
3    Mellon, and either permission was granted or
4    was not granted prior to the digitization, so
5    do you know whether it was or was not?
6 A.   I don't know.
7 Q.   The first full sentence on the top of Page 11
8    says given the cost of acquiring and storing
9    redundant library collections, it behooves
10   libraries to explore the possibility of
11   acquiring permission to digitize and provide
12   open access to different kinds of materials.
13          Did you agree with that in 2005?
14 A.   Well, I didn't read this before she published
15   it.
16 Q.   But you said you read it after she published
17   it.
18 A.   Yeah, recently I read it.
19 Q.   Did you read it shortly after she published
20   it?
21 A.   No.
22 Q.   Do you agree with that sentence today?
23 A.   I believe that libraries must try to seek
24   permission in some form.  There's more than
25   one way to do that, and I'm --

Page 68

1          Well, let's stop there.
2 Q.   Okay.
3          MR. McGOWAN:  I'll note for the
4    record, and I don't know that this matters to
5    you, Joanne, "open access" is a defined term
6    in this paper, and I don't know if that's part
7    of what your questions are concerning, but
8    I'll just note it so it's clear.
9 BY MS. ZACK:
10 Q.   Referring you to the next -- further down, the
11   random sample feasibility study then is
12   discussed, is that correct, on Page 11?
13 A.   Yes.
14 Q.   And it says between 1999 and 2001 the Carnegie
15   Mellon University libraries conducted a
16   feasibility study to determine the likelihood
17   of publishers granting nonexclusive permission
18   to digitize and provide surface Web access to
19   their copyrighted books.
20          The primary goal of the project was
21   to develop an understanding of the process,
22   the time it takes, and the problem
23   encountered.
24          We also wanted to ascertain whether
25   different types of publishers responded

Page 69

1    differently and whether they responded
2    differently on the basis of the type or print
3    status of their publications.
4          So is that an accurate description
5    of the random sample feasibility study's
6    purposes?
7 A.   Yes.
8 Q.   Was this a study that you participated in
9    designing?
10 A.   Yes.
11 Q.   And this study took place between 1999 and
12   2001.  Correct?
13 A.   Yes.
14 Q.   And on Page 12, the first paragraph, last
15   sentence, it says in PX 88 the final sample
16   for which we were seeking copyright permission
17   included 277 titles published by 209
18   publishers.
19          Is that right?
20 A.   Yes.
21 Q.   Your overall results on Page 13 talks about
22   the various results of this feasibility study
23   conducted between 1999 and 2001.  Correct?
24 A.   Yes.
25 Q.   And you said you've recently read this

18 (Pages 66 - 69)

Page 70

1  publication?
2 A.  Yes.
3 Q.  And you've cited it in your report fairly
4  extensively.  Correct?
5 A.  Correct.
6 Q.  Is there anything in these overall results
7  that you think is inaccurate?
8 A.  I don't recall that I had -- that there was
9  anything that I thought was particularly
10  inaccurate.  I thought some of the figures
11  were designed in a way that was confusing.
12 Q.  Well, whether it was confusing, did you still
13  consider it accurate?
14 A.  Yes.
15 Q.  Now, on Page 21 there begins a discussion in
16  PX 88, the fine and rare book study.  Is that
17  the same as the Posner study?
18 A.  "Posner."
19 Q.  "Posner."  Excuse me.
20 A.  Yes.
21 Q.  And that was commenced in 2001?
22 A.  Yes.
23 Q.  Do you know when that ceased?  It says 2004 on
24  Page 21, so does that sound right?
25 A.  Yes.

Page 71

1 Q.  And the bottom paragraph on Page 21, it says
2  we knew that the selection, referring to the
3  Posner collection, or "Posner" collection --
4  Right?
5 A.  No, "Posner."
6 Q.  Now I'm confused.
7  We knew that the collection
8  contained some copyrighted titles and
9  therefore that the project entailed acquiring
10  copyright permission.
11  The Posner project, which took place
12  between 2001 and 2004, became our second
13  copyright-permission study.
14  Is that an accurate description of
15  the study?
16 A.  It is.
17 Q.  It was a copyright permission study?
18 A.  Yes.
19 Q.  And again did you find in reading this in
20  connection with your report anything that you
21  considered inaccurate?
22 A.  I think there are some phrases that are not
23  the phases I would have used.
24 Q.  Yes, but is there anything that's inaccurate?
25 A.  Not that I observed.

Page 72

1 Q.  Did you personally participate in attempting
2  to get copyright permissions in connection
3  with either the feasibility study or the
4  Posner study?
5 A.  Yes.
6 Q.  How much time did you spend on that?
7 A.  Whatever is recorded on the cost sheets.
8 Q.  On the what?  I'm sorry.
9 A.  On the cost sheets.
10 Q.  Did you personally speak to publishers?
11 A.  I personally spoke to the employees of
12  publishers.
13 Q.  One of the statements in this article, PX 88,
14  is that university presses were less likely to
15  give permission than some other types of
16  publishers.  Do you recall that?
17  MR. McGOWAN:  Can you direct us to
18  where you are referring to, Joanne?
19  MS. ZACK:  Sure.
20  MR. McGOWAN:  Thank you.
21  MS. ZACK:  Okay.  If you look at
22  Page 31, which is at the end of the section
23  called Analysis by Publisher Type, it says
24  more than half of the commercial publishers
25  granted permission.

Page 73

1  University presses were the least
2  likely to grant permission.
3  Do you see that?
4  THE WITNESS:  In the Posner study?
5 BY MS. ZACK:
6 Q.  Uh-huh.
7 A.  I haven't found this yet.
8 Q.  It's on Page 31.
9 A.  Oh, here it is.  Yes.  So that's about the
10  Posner study.
11 Q.  Correct.
12 A.  Yes.  That was what Denise concluded.
13 Q.  Do you disagree with that?
14 A.  No.
15 Q.  Did you have any view about why that was the
16  case?
17 A.  Well, the Posner collection is a fine and rare
18  book collection, so there weren't very many
19  university presses' titles in it, and it was
20  such a relatively small --
21  It wasn't a random sample.  It was a
22  collection.  It was a quirk.
23 Q.  You think it was just a quirk?
24 A.  Yes.
25  MR. McGOWAN:  Joanne, when it's

19 (Pages 70 - 73)

Page 74

1  convenient, I think we could use a break on
2  this end.
3      MS. ZACK: All right. Just give me
4  one second to follow up and finish off this
5  one.
6      MR. McGOWAN: Sure.
7      MS. ZACK: All right. Well, let's
8  take a break now. How long do you want to
9  take?
10     MR. McGOWAN: Can we do lunch right
11 now?
12     MS. ZACK: You want to do lunch?
13     MR. McGOWAN: Yes. Well, it's
14 twelve. Let's go off the record and we can
15 talk about it.
16     - - - -
17 (There was a discussion off the record for lunch.)
18     - - - -
19 BY MS. ZACK:
20 Q.  Before the break I had asked you about the
21     university presses and specifically about the
22     Posner study, and I just wanted you to take a
23     look at Page 46 of PX 88, which is the article
24     requiring copyright permission.
25 A.  Okay.

Page 75

1  Q.  At the top of the page the sentence begins as
2      in the Posner study --
3          Do you see that?
4  A.  Yes.
5  Q.  -- special publishers, authors --
6          - - - -
7  (There was a discussion off the record.)
8          - - - -
9  BY MS. ZACK:
10 Q.  I'm referring to Page 46 --
11 A.  Yes.
12 Q.  -- of PX 88.
13          At the top is a sentence that says
14     as in the Posner study, special publishers,
15     authors, and estates and scholarly
16     associations were the most likely to grant
17     permission. University presses were the least
18     likely.
19          Do you see that?
20 A.  I do.
21 Q.  And that's in connection with the Million Book
22     Project. Correct?
23 A.  Correct.
24 Q.  You had previously said that you thought on
25     the Posner study there weren't enough

Page 76

1  university press books involved and that it
2  was just a quirk that university presses were
3  the least likely to get permission. Correct?
4  A.  I did say that.
5  Q.  Okay, but it appears that that was true also
6      with the Million Book Project. Do you have
7      any explanation for that?
8  A.  No.
9  Q.  Referring you back to Page 24, PX 88, it would
10     be the acquiring copyright permission article
11     we have been discussing.
12 A.  24?
13 Q.  24.
14 A.  Okay. Yes.
15 Q.  This is again relating back to the Posner
16     study.
17 A.  Okay.
18 Q.  The last sentence of the next-to-the-last
19     paragraph says by the conclusion of the study
20     we determined that these 284 copyrighted works
21     were owned by 104 different copyright-owners.
22          Do you see that?
23 A.  Yes.
24 Q.  So the Posner study then examines Carnegie
25     Mellon's ability to get permission for these

Page 77

1  284 copyrighted works. Is that correct?
2  A.  Yes.
3  Q.  On Page 27 and 28, the --
4          There's a heading Overall Result on
5  Page 26, and on Page 27 and then carrying over
6  to Page 28 there's a couple paragraphs talking
7  about the result of the study. It says --
8          Do you see the paragraph that says
9  to better understand the outcome?
10 A.  I do.
11 Q.  To better understand the outcome of our
12     efforts, we must look strictly at the
13     publishers we located.
14          Of those we contacted, almost all
15     responded and most granted permission. As
16     shown in Figure 11, the permissions granted
17     enabled us to digitize and provide Web access
18     to 71 percent of the copyrighted titles
19     published by those we contacted.
20          Do you have any disagreement with
21     that as a matter of fact?
22 A.  No.
23 Q.  Page 28 at the top it says looking only at the
24     publishers with which we have completed
25     negotiations and the titles in the Posner

20 (Pages 74 - 77)

1   collection to which they hold copyright, the
2   overall success rate was 70 percent, granting
3   permission for 75 percent of the titles
4   published by those that responded
5       So that's correct?
6  A.   Yes.
7  Q.   So for those titles I take it they were then
8   digitized and made available on the Web.
9   Right?
10  A.   They were digitized and you can get to them
11   from the Web.
12  Q.   And that was as a result of permission
13   received from the publishers.  Correct?
14  A.   Correct.
15  Q.   On Page 33 of PX 88 --
16  A.   My pages are kind of shuffled, ma'am, so it
17   may take me a minute to try to find it --
18       I have it now.
19  Q.   -- there's a couple bullet points in the
20   middle of the page.
21       Do you see that?
22  A.   Yes.
23  Q.   Referring you to the first one, it says
24   publishers of older material in the Posner
25   collection were not conspicuously more

1   difficult to locate than were publishers of
2   more recent material.
3       More diligence and persistence were
4   expended on locating and following up with
5   publishers in the Posner study than in the
6   feasibility study; consequently, more
7   publishers were found and more of them
8   responded than in the feasibility study.
9       Do you agree with that?
10  A.   Yes.
11  Q.   And that is more diligence and persistence
12   were expended by personnel at Carnegie
13   Mellon.  Correct?
14  A.   Yes.
15  Q.   On Page 5, there's a heading Conclusions and
16   Lessons Learned.  It says although we located
17   fewer of the publishers of copyrighted content
18   in the Posner project than in the feasibility
19   study, we greatly increased the response and
20   success rates during the Posner study.
21       Is that true?
22  A.   Yes.
23  Q.   And further down the page it says we
24   attributed the increased success in the Posner
25   project to a more informative initial request

1   letter to prompt follow-up by E-mail or
2   telephone and to the publishers' ability to
3   see the quality of the digitized books in the
4   Posner collection on the Web.
5  A.   Yes.
6  Q.   Do you agree with that?
7  A.   I do.
8  Q.   Further down is a paragraph that begins the
9   Posner project confirmed our belief that it is
10   possible to secure copyright permission to
11   digitize books and to provide open access to
12   them on the Web.
13       Do you agree with that?
14  A.   Yes.
15       MR. McGOWAN:  I'll object just for
16   rule of completeness' sake to the cherry-
17   picking element, but I'll note that for the
18   record.
19  BY MS. ZACK:
20  Q.   It says it also confirmed what we had learned
21   in the feasibility study about how difficult
22   and time-consuming it is to determine
23   copyright status and to identify and locate
24   copyright-holders, particularly authors and
25   estates.

1       However, by dedicating personnel and
2   adjusting our processes, we significantly
3   reduced the cost per title for which
4   permission was granted.
5       Further adjustments to our work flow
6   or refinements to our negotiation strategies
7   would yield even greater cost savings.
8       Do you agree with that?
9  A.   It says "could," not "would," and yes, I
10   agree.
11  Q.   Then on Page 38 of PX 88 it begins a
12   discussion of the Million Book Project study.
13   Correct?
14  A.   Correct.
15  Q.   You had partners in China and India.  Did you
16   have any U.S. partners in this Million Book
17   Project?
18  A.   Kind of.
19  Q.   Yes?  Who were they?
20  A.   Well, certainly Brewster Kahle was our partner
21   for quite a long time.  I went and gave a talk
22   at Hopkins, and they talked to us about it.
23   At various points --
24       We had communications with Cornell
25   at various points.  We had dealings with the

21 (Pages 78 - 81)

1  University of Merced as they were building
2  their collection -- the University of
3  California at Merced.
4  Q.  Any others?
5  A.  I think the University of Washington helped us
6  out and traveled with us at one point.
7      Oregon State University did part of
8  a project that was under the umbrella of the
9  Million Book Project.
10  Q.  Anyone else?
11  A.  Not that I recall.
12  Q.  What was Brewster Kahle's involvement in the
13  Million Book Project?
14  A.  Brewster Kahle actually believed that he had
15  thought up the idea of the Million Book
16  Project, and he was very actively involved
17  with the library at Alexandria.
18      He traveled with us in our trip to
19  India and -- in our first trip to India and in
20  our first trip to China.
21  Q.  Yes, and did he participate in negotiations
22  with your partners there?
23  A.  At Alexandria, certainly.  Yes, he did.  When
24  we had partner meetings, he attended.
25  Q.  Was he considered a partner?

1  A.  Yes, at the beginning of the project.
2  Q.  And did he cease to be a partner at some
3  point?
4  A.  Yes.
5  Q.  When was that?
6  A.  At some point he didn't think we were doing
7  things quickly enough, and so he founded a
8  group called the Open Content Alliance and
9  pulled together a partnership with Microsoft
10  in order to have control of his own project.
11  Q.  So when he founded the Open Contents Alliance
12  , did he cease to be a partner with the
13  Million Book Project?
14  A.  No, not from our perspective.
15  Q.  When did he cease to be a partner?
16      MR. McGOWAN:  I think that misstates
17  the answer.
18  BY MS. ZACK:
19  Q.  Oh.  Did he ever cease to be a partner from
20  your perspective?
21  A.  No.
22  Q.  From his perspective did he cease to be a
23  partner?
24  A.  I don't know.
25  Q.  I previously asked you did he cease to be a

1  partner and you said yes.
2  A.  I misspoke.
3  Q.  So you're saying now you're not sure whether
4  he is or isn't a partner currently?
5  A.  From the perspective of the universal digital
6  library directors he is still a partner.
7  Q.  And has he ever expressed anything to the
8  opposite?
9  A.  I don't know.
10  Q.  Does he attend partner meetings?
11  A.  One of his staff attended a partner meeting
12  that was held in Pittsburgh.
13  Q.  Recently?
14  A.  Perhaps five years ago.
15  Q.  Okay.  So since that meeting five years ago
16  has he or any of his representatives attended
17  any meetings of the Million Book Project
18  partners?
19  A.  Him, I don't know.
20  Q.  Do you keep minutes of that group --
21  A.  No.
22  Q.  -- of the meetings?
23  A.  No.
24  Q.  Have you discussed with him the Million Book
25  Project in the last five years?

1  A.  No.  Well, five years.  When would that be?
2  2007?
3  Q.  Well, at the time that he --
4      From the time he began Open Contents
5  Alliance, have you discussed the Million Book
6  Project with him?
7  A.  Yes.
8  Q.  And in more recent years, say from 2007 on,
9  have you discussed it with him?
10  A.  When we met here in Pittsburgh and he sent a
11  representative, who to my recollection did not
12  attend the partner meeting, that was our last
13  kind of quasiformal contact with him.
14      Dr. Reddy is often in San Francisco,
15  and I don't know what other discussions they
16  may have had.
17  Q.  Now, you said that Brewster Kahle believed he
18  had thought up the idea for the Million Book
19  Project?
20  A.  Yes.
21  Q.  Had he thought up the idea?
22  A.  Probably.
23  Q.  And when he expressed that he didn't think you
24  were moving quickly enough, what did he want
25  you to do to move quicker?

22 (Pages 82 - 85)

Page 86

1 A.  He wanted to have all of our books to load
2     into the Internet archive more quickly.
3 Q.  When you say "our books," you're talking about
4     the Million Book Project books?
5 A.  Yes, the project in India and the project in
6     China.
7 Q.  And from your perspective why was it taking so
8     long to load books into the Internet archive?
9 A.  We had originally anticipated that we would
10    use file transfer protocol to move books
11    around, but in the end the network in India
12    was not robust enough to accomplish that.
13 Q.  Any other reasons?
14 A.  Well, I think there were also political
15    reasons.  Our memoranda of understanding
16    required the partners to share books with each
17    other, to share digital copies of books with
18    each other, but in practice we were very
19    surprised to find out that the librarians and
20    to an extent the computer scientists in those
21    countries didn't want to share.
22 Q.  You're talking about in India and in China?
23 A.  Yes.
24 Q.  Now, with respect to these other U.S. partners
25    in the Million Book Project you named,

Page 87

1     Hopkins, Cornell, University of California at
2     Merced, University of Washington, Oregon
3     State, did they digitize any books for you?
4 A.  No.
5 Q.  What types of things did they do?
6 A.  Well, sometimes they traveled and attended
7     strategy meetings with us, and sometimes they
8     loaned books to the project, loaned physical
9     books to the project.
10 Q.  And were those books then sent out of the U.S.
11    to be copied?
12 A.  Yes.
13 Q.  Why didn't you copy them here?
14 A.  It was too expensive.
15 Q.  I --
16       MR. McGOWAN:  I think you guys may
17    have talked over each other.
18 BY MS. ZACK:
19 Q.  I'm sorry.  My question, I didn't know if it
20    was clear.  Why were they not copied in the
21    U.S.?
22 A.  My answer was it was too expensive.
23 Q.  I see.
24       Now, you mentioned earlier that lack
25    of vision had prevented various libraries in

Page 88

1     the early 2000s from embarking on a
2     digitization project even though the National
3     Science Foundation had offered significant
4     funding.  Is that right?
5 A.  In 1999.
6 Q.  Right.  1999 that happened.  Right?
7 A.  Yes.
8 Q.  And I assume since 1999 there has been a
9     change in librarians' views about
10    digitization.
11 A.  Yes.
12 Q.  A fairly significant change?
13 A.  Yes.
14 Q.  Not just at Carnegie Mellon but all over the
15    country.  Right?
16 A.  Yes.
17 Q.  And has any consortium of libraries, to your
18    knowledge, attempted to go back to the
19    National Science Foundation and get funding
20    for a digitization project?
21 A.  No.
22 Q.  And why not?
23       MR. McGOWAN:  Well, I'm going to
24    object.
25       MS. ZACK:  To your knowledge.  I'm

Page 89

1     only asking for what you know.
2       MR. McGOWAN:  I'm going to object to
3     this intrinsically.  Very compound and calls
4     for speculation, but you may answer.
5       THE WITNESS:  I only know of two
6     librarians who have gotten funding from the
7     National Science Foundation.  I'm one of them,
8     and Michael -- what's his name -- who's the
9     director of the libraries at Stanford is the
10    other.
11 BY MS. ZACK:
12 Q.  Do you know of others who have tried to get
13    funding?
14 A.  Yes.
15 Q.  And have been turned down?
16 A.  Yes.
17 Q.  Do you know of any consortium of university
18    libraries that has attempted to get National
19    Science Foundation funding for book
20    digitization and has been turned down?
21 A.  No.
22 Q.  Have you attempted to put together a
23    consortium --
24 A.  No.
25 Q.  -- in more recent years?

23 (Pages 86 - 89)

1 A.   No.
2 Q.   And surely that's crossed your mind.  Right?
3 A.   No.
4 Q.   Why not?
5 A.   Well, I had my own consortium.  I had the
6      Million Book Project.
7 Q.   Right.  You didn't think you could start
8      another project?
9 A.   Not while I was doing the Million Book
10     Project.
11 Q.  Referring you back to PX 88 beginning at
12     Page 38, the Million Book Project study is
13     discussed.  I assume you've read this
14     recently.  Correct?
15 A.  Yes.
16 Q.  Did you find anything you considered to be
17     inaccurate as a matter of fact?
18 A.  No.
19 Q.  From my understanding from reading this, a
20     decision was made to approach publishers to
21     get permission for large amounts of their
22     books.  Correct?
23 A.  Yes.
24 Q.  Because that would be more efficient.  Is that
25     right?

1 A.   Yes.
2 Q.   On Page 42 there's a heading that says
3      Tracking the Data.
4 A.   Yes.
5 Q.   Above there is a sentence that says the data
6      analyses in this report are based on the 364
7      publishers with which we sought to close
8      negotiations.
9 A.   Yes.
10 Q.  Does that mean that in the Million Book
11     Project with respect to in-copyright books the
12     various partners sought to negotiate
13     permission from 364 publishers for as many
14     books as you could get them to agree to?
15     MR. McGOWAN:  Objection.  Vague.
16     You may answer.
17     THE WITNESS:  Yes.
18 BY MS. ZACK:
19 Q.  Referring you on Page 46 --
20     Forget that.  Sorry.  We already
21     went over that.
22     On Page 53 at the bottom of the page
23     it talks about contacting the Authors Registry
24     in an attempt to get permission directly from
25     authors for some books.

1 A.   Yes.
2 Q.   And on Page 54, first full paragraph, it says
3      while the experiment demonstrated that the
4      Authors Registry is a cost-effective way to
5      locate authors, the benefit of contacting
6      authors or their estates for the Million Book
7      Project was quite small.
8      Do you agree with that?
9 A.   Yes.
10 Q.  Outside the Million Book Project have you ever
11     at Carnegie Mellon used the Authors Registry
12     to locate authors?
13 A.  Outside of the work that's reported in
14     acquiring copyright?
15 Q.  For the Million Book Project.
16 A.  For the Million Book Project?
17 Q.  Outside of what you did with the Million Book
18     Project, have you ever used the Authors
19     Registry as a way to contact authors for other
20     permissions?
21 A.  I think we might have used it in the Posner
22     project permissions.
23 Q.  Have you used other agencies to get author
24     permissions?
25 A.  No.

1 Q.   Are you aware that there are many freelance
2      independent contractor people who deal in
3      getting permissions for copyrights?
4      MR. McGOWAN:  Objection.  Lacks
5      foundation.
6      You may answer.
7      THE WITNESS:  No.
8 BY MS. ZACK:
9 Q.   At the bottom of Page 54 is a heading
10     Conclusions and Lessons Learned.
11 A.  Yes.
12 Q.  And near the bottom of the page there's a
13     sentence not counting the publishers we
14     abandoned early in the project --
15     Do you see that?
16 A.  I do.
17 Q.  -- almost all of the publishers we contacted
18     in the MBP responded to our request.
19     Is that correct?
20 A.  Yes.
21 Q.  In the middle of Page 55 there's a paragraph
22     that starts Figure 24 --
23     Do you see that?
24 A.  I do.
25 Q.  -- suggests that the Posner study is our most

24 (Pages 90 - 93)

Page 94

1 successful project to date in terms of
2 response and success rates. However, the
3 transaction costs per title for permissions
4 granted in the Posner study, though
5 significantly better than the feasibility
6 study, is far too high to pursue on a large
7 scale.
8         Despite the lower overall success
9 rate, the per-publisher approach taken in the
10 MBP garnered permission for significantly more
11 titles at less cost than the per-title
12 approach of the previous projects.
13         Do you agree with that?
14 A.   I do.
15 Q.   And that per-title -- or that per-publisher
16 approach ended up with you, Carnegie Mellon or
17 the Million Book Project, obtaining permission
18 for 52,900 titles. Right?
19 A.   Right.
20 Q.   And there is a chart in the middle of Page 55
21 that compares the various studies, the
22 feasibility, the Posner, the Million Book
23 studies, and various costs and success rates.
24 Correct?
25 A.   Correct.

Page 95

1 Q.   And the feasibility study, 209 publishers were
2 attempted to be contacted. Correct?
3 A.   Yes.
4 Q.   And as a result of that, permission for only
5 66 titles was granted?
6 A.   Yes.
7 Q.   At a transaction cost of $200 per title?
8 A.   That was a partial cost.
9 Q.   That's an estimated partial cost. Correct?
10 A.   Yes.
11 Q.   For the Posner study there were 104 publishers
12 sought to be contacted, and as a result
13 permission was granted for 178 books at a
14 transaction cost per title granted of $78 per
15 book. Is that right?
16 A.   Yes.
17 Q.   And then for the million books project there
18 were 364 publishers attempted to be contacted
19 ending up in permissions granted for 52,900
20 books at a transaction cost per title granted
21 at 69 cents per title. Correct?
22 A.   That was a partial cost.
23 Q.   They were all partial costs. Correct?
24 A.   Yes.
25 Q.   So there was a tremendous difference in the

Page 96

1 transaction costs from the feasibility study
2 to the Million Book study. Right?
3 A.   Yes.
4 Q.   Referring you to Page 57 --
5 A.   Yes.
6 Q.   -- at the very bottom of the page it says the
7 MBP, meaning the Million Book Project,
8 confirmed that dedicated personnel,
9 experimentation, and flexibility are critical
10 to success in acquiring copyright permission
11 to digitize and provide open access to books.
12         Do you agree with that?
13 A.   Yes.
14 Q.   Then it says adapting strategies and adjusting
15 processes to accommodate what we learn day-to-
16 day could further improve the results of our
17 efforts.
18         Do you agree with that?
19 A.   Yes.
20 Q.   Again we need to develop a better way to
21 manage the data and routinely calculate
22 statistics. More sophisticated ongoing
23 analyses might expose trends that could be
24 leveraged during the project to reduce the
25 cost and increase the success of seeking

Page 97

1 copyright permission for open access.
2 A.   Yes.
3 Q.   This article was written in 2005. Has a
4 similar article with updated statistics been
5 published since then?
6 A.   Not to my knowledge.
7 Q.   Are you intending to do that or is someone at
8 Carnegie Mellon intending to do that?
9 A.   As far as I know, we don't have it on our
10 list.
11 Q.   Again on Page 58 under looking ahead, there's
12 a discussion about meetings between I take it
13 the Million Book Project personnel and
14 Carnegie Mellon legal counsel.
15         Do you see that?
16 A.   No.
17 Q.   It says initial meetings with Carnegie Mellon
18 legal counsel in October of 2002 led to the
19 preparation --
20         See that?
21 A.   Yes.
22 Q.   There's a sentence that says the understanding
23 was that if we designed and followed a
24 rigorous work flow approved by legal counsel
25 and documented our efforts, then we could

25 (Pages 94 - 97)

Page 98

1    digitize and provide Web access to books
2    without permission under certain conditions
3    (for example, if the publisher had gone out of
4    business or we could not ascertain who owned
5    the copyright to a work).
6          We agreed that if we digitized a
7    book and made it Web-accessible without
8    permission and the copyright owner then
9    contacted us, we would remove that book from
10   the Web at the owner's request.
11         However, in May, 2003, university
12   legal counsel changed their minds and took a
13   more conservative approach; no permission, no
14   digitization and access.  They are now
15   reconsidering this decision.
16         To your knowledge, has that decision
17   made in May, 2003, been changed?
18 A.   No.
19 Q.   So the current status is no permission, no
20   digitization and access?
21 A.   Yes.
22 Q.   The last paragraph on Page 58 says invited by
23   the OITP, which apparently stands for the
24   American Library Association Office of
25   Information Technology Policy --

Page 99

1          Correct?
2  A.   Yes.
3  Q.   And the American Library Association is a
4    trade association for libraries.  Is that
5    right?
6  A.   Yes.
7  Q.   And the OITP is an arm of the ALA.  Is that
8    correct?
9  A.   Yes.
10 Q.   It says invited by the OITP, I presented the
11   results of Carnegie Mellon's copyright
12   permission research to ALA congressional
13   lobbyists in November, 2004.
14         Did you participate in that?
15 A.   No.
16 Q.   The lobbyists responded that the per-publisher
17   approach used in the MBP which reduced the
18   transaction cost to 69 cents per title would
19   not persuade Congress that acquiring copyright
20   permission is prohibitively expensive under
21   the current copyright regime.
22         The transaction cost of the
23   per-title approach taken in the Posner
24   project, $78 per book, is more likely to be
25   persuasive and yield changes in public policy.

Page 100

1          We all agreed that though the
2    per-publisher approach of the MBP is
3    consistent with the vision of the Universal
4    Library Project, the approach is artificial in
5    terms of what libraries typically do in
6    regards to digitizing collections.
7          Were you part of that agreement?
8  A.   No.
9  Q.   So were you aware that the ALA OITP lobbyists
10   did not want you to argue to Congress based on
11   the transaction cost of 69 cents per title
12   that had been achieved in the Million Book
13   Project?
14         MR. McGOWAN:  Objection.  Misstates
15   the document.
16         You may answer.
17         MS. ZACK:  I asked whether she was
18   aware of it.
19         MR. McGOWAN:  That's not what the
20   statement was.  It's still been misstated.
21         You may answer.
22         THE WITNESS:  I don't know what the
23   question is, so I don't know how to answer.
24 BY MS. ZACK:
25 Q.   Denise Troll --

Page 101

1          This paragraph says that I, meaning
2    Denise Troll Covey, presented the results to
3    this ALA group.
4          Did she ever report back to you
5    about this discussion that she had?
6  A.   Probably.
7  Q.   I'm sorry?
8  A.   Probably.
9  Q.   You don't have any recollection of it?
10 A.   No.
11 Q.   Did you participate in strategy discussions
12   about the best way to persuade Congress to
13   change copyright laws?
14 A.   Yes.
15 Q.   And as part of those strategy discussions did
16   you discuss whether or not the transaction
17   costs of the Million Book Project should be
18   highlighted or not?
19 A.   I don't recall.
20 Q.   Well, is there some reason why in your report
21   filed in this case you never mentioned the 69
22   percent per-title transaction cost?
23         MR. McGOWAN:  Objection.
24   Argumentative.  Percent is incorrect.
25         You may answer,

26 (Pages 98 - 101)

1        THE WITNESS: But the cost sheets --
2        We did provide cost sheets as part
3   of our report. Right?
4   BY MS. ZACK:
5   Q.   Well, your report, Pages 1 through 15, does
6        not mention a 69 cent transaction cost.
7   A.   Correct.
8   Q.   Is there some reason why you left that out?
9   A.   Advice of counsel.
10  Q.   Are you talking about Durie Tangri?
11  A.   I'm not certain why we left it out.
12  Q.   There's some discussion in here about why it's
13       inefficient to seek permission for publishers
14       across all books, and can you explain to me
15       why based on the Million Book Project it's
16       more efficient to seek permission from a
17       publisher for all his books why you wouldn't
18       continue to do that?
19       MR. McGOWAN: Objection. Vague.
20       You may answer if you followed that.
21       THE WITNESS: We are not engaged in
22   any digitization project in the U.S.
23  BY MS. ZACK:
24  Q.   So since the publishing of this article in
25       2005 you have not since then sought to obtain

1   permission from U.S. publishers?
2   A.   No, we have not.
3   Q.   Is there a reason why you haven't chosen to
4        seek additional permission?
5   A.   We're doing other things.
6   Q.   So you did not expand the Million Book Project
7        based on these results and try to get
8        additional permissions from U.S. publishers on
9        a per-publisher basis?
10  A.   No.
11  Q.   Referring you back to your report --
12  A.   Yes.
13  Q.   -- on Page 12, Paragraph 38 says on balance,
14       therefore, rights clearance poses significant
15       obstacles to furthering the public good
16       through digitization. Relying on the random
17       sample study --
18       By that do you mean the feasibility
19       study?
20  A.   Yes.
21  Q.   -- relying on the random sample or feasibility
22       study as the most statistically reliable --
23       Why are you saying that that study
24   is the most statistically reliable as between
25   the Posner study, the Million Book Project

1   study, and the feasibility study? Why is the
2   feasibility study the most statistically
3   reliable?
4   A.   It was a random sampling of the books in the
5        Carnegie Mellon University library's
6        collection.
7   Q.   A random sample of --
8   A.   The titles.
9   Q.   It was a random sample of 277 works.
10  A.   Correct.
11  Q.   And you consider that statistically reliable?
12  A.   The statisticians at Carnegie Mellon
13       University advised us that it was
14       statistically reliable.
15  Q.   Based on that study which was conducted in the
16       period of time of what, 2001 to 2002?
17  A.   Yes.
18  Q.   It says copyright clearance research indicates
19       that for approximately one-third of the books,
20       rights clearance either cannot occur at all or
21       will not be attempted, et cetera.
22       Haven't your methods for locating
23       copyright owners improved through your
24       experiences in 2001?
25  A.   Yes.

1        MR. McGOWAN: Objection. Vague.
2   BY MS. ZACK:
3   Q.   Have they?
4   A.   I believe so.
5   Q.   And hasn't, frankly, the public information
6        available improved with respect to locating
7        persons in general?
8        MR. McGOWAN: Objection. Vague.
9        I'm also --
10       MS. ZACK: Wouldn't you agree that
11   between 2001 and currently, 2012, it's a lot
12   easier to find people?
13       MR. McGOWAN: Same objection.
14       You may answer.
15       THE WITNESS: Yes.
16  BY MS. ZACK:
17  Q.   So would you agree that the results of your
18       searches in 2001 would not be particularly
19       pertinent to searches done in the period after
20       2010?
21  A.   No.
22  Q.   You wouldn't agree?
23  A.   No.
24  Q.   You think the numbers would still be the same?
25  A.   More or less.

27 (Pages 102 - 105)

1 Q.   But you haven't done any searches in the
2      period after 2005 you're saying.  Right?
3           MR. McGOWAN:  Asked and answered.
4      You may answer.
5 BY MS. ZACK:
6 Q.   Just to clarify, since 2005 Carnegie Mellon
7      has not engaged in any efforts to locate
8      copyright owners pursuant to any studies in
9      the U.S.  Correct?
10 A.   We haven't done any large projects.
11 Q.   And you've been a librarian for many years.
12      Correct?
13 A.   Yes.
14 Q.   And the switchover to digital media, when
15      would you say that primarily occurred?
16           MR. McGOWAN:  Objection.  Vague.
17      Lacks foundation.
18           You may answer.
19           THE WITNESS:  I left the profession
20      and worked as a professor of English for a
21      number of years.
22           When I came back from that jaunt
23      through the agency of having gotten a master's
24      of business administration, I found the field
25      to be in the beginning of what has been a

1      profound change, a change so profound that my
2      boss, the provost, has called the library the
3      most changed place on the campus.
4 BY MS. ZACK:
5 Q.   Uh-huh.  And in 1999 when you attempted to get
6      other libraries to engage in a digitization
7      project, they didn't yet have the vision to do
8      so.  Right?
9 A.   Right.
10 Q.   And so would you agree that it was sometime
11      after 1999 that other librarians came to your
12      view that digitization was the wave of the
13      future?
14 A.   It was excruciatingly slow.
15 Q.   Right.  And when do you think that there was
16      significant momentum among other libraries
17      other than just Carnegie Mellon which is a
18      university with a mission in line with
19      digitization?
20 A.   The Digital Library Federation was active for
21      a number of years from around the time I came
22      to Carnegie Mellon -- well, before I came to
23      Carnegie Mellon, up until about three years
24      ago, and it was about three years ago that the
25      Digital Library Federation members concluded

1      that the job of making most libraries see that
2      the future of libraries is digital had been
3      accomplished.
4 Q.   So you're talking about 2009?
5 A.   Approximately.
6           MS. ZACK:  All right.  I don't have
7      anymore questions.  Thank you very much for
8      your time.
9           MR. McGOWAN:  Very good.
10           Joanne, the court reporter is asking
11      what you would like by way of transcript.  I
12      don't know if you heard that.
13           MS. ZACK:  Yeah.  I'm sorry.  I
14      would like a rough and then I will --
15           I've got to go back and look at the
16      various options in terms of how quickly the
17      delivery is, but I'll E-mail somebody about
18      that.  Is that all right?
19           THE COURT REPORTER:  Yes.
20           MS. ZACK:  All right.  Thank you
21      very much.
22           MR. McGOWAN:  Very good.   I'll see
23      you in New York on Friday.
24           MS. ZACK:  Okay.  Have a good
25      flight.

1           MR. McGOWAN:  Take care.
2                - - - -
3 (The proceedings were concluded at 1:38 p.m.)
4                - - - -

Page 110

1 COMMONWEALTH OF PENNSYLVANIA
2 COUNTY OF ALLEGHENY
3    I, G. Donavich, CRR, RPR, a Court Reporter and
4 Notary Public in and for the Commonwealth of
5 Pennsylvania, do hereby certify that the witness,
6 GLORIANA ST. CLAIR, was by me first duly sworn to
7 testify to the truth; that the foregoing deposition
8 was taken at the time and place stated herein; and
9 that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.
13    I further certify that the inspection, reading
14 and signing of said deposition were not waived by
15 counsel for the respective parties and by the
16 witness.
17    I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.
21    IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 5th day of June,
23 2012.
24    _____
25         Notary Public

Page 111

1       ACKNOWLEDGMENT OF DEPONENT
2
3       I have read the foregoing transcript of
4 my deposition and except for any corrections or
5 changes noted on the errata sheet, I hereby
6 subscribe to the transcript as an accurate record
7 of the statements made by me.
8
9    _____
10       GLORIANA ST. CLAIR
11
12       SUBSCRIBED AND SWORN before and to me
13 this _____ day of _____, 20___.
14
15
16    _____
17       NOTARY PUBLIC
18
19
20 My Commission expires:
21
22
23
24
25

Page 112

1       E R R A T A  S H E E T
2 IN RE: AUTHORS GUILD, ET AL. V. GOOGLE, INC.
3 DATE: MAY 31, 2012
4 PAGE  LINE       CORRECTION AND REASON
5 _____ _____ _____
6 _____ _____ _____
7 _____ _____ _____
8 _____ _____ _____
9 _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23
24 _____    _____
25 (DATE)          GLORIANA ST. CLAIR

29 (Pages 110 - 112)

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I have read the foregoing transcript of

4  my deposition and except for any corrections or

5  changes noted on the errata sheet, I hereby

6  subscribe to the transcript as an accurate record

7  of the statements made by me.

8

9

10            GLORIANA ST. CLAIR

11

12       SUBSCRIBED AND SWORN before and to me

13  this 20 day of June, 2012.

14

15

16

17            NOTARY PUBLIC

18

19

20  My Commission expires:

21

22

23

24

25

Page 111

1                    E R R A T A   S H E E T

2    IN RE:  AUTHORS GUILD, ET AL. V. GOOGLE, INC.

3    DATE:  MAY 31, 2012

4    PAGE        LINE              CORRECTION AND REASON

5     7           7       McGowan is written as INGBAR

6     18          24        Creative commons license

7     31          ____       Did you mean to say

8     47          8        Notes about editions

9     62         11-12     Within PX 88

10     73          24      The article, *Acquiring Copyright Permission*

11    83-84        4        content

12     85          8       Archive

13

14

15

16

17

18

19

20

21

22

23

24    June 20, 2012     Gloriana St Clair

25    (DATE)            GLORIANA ST. CLAIR

**EXHIBIT 37**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
The Authors Guild, Inc., Associational Plaintiff,
Betty Miles, Joseph Goulden, and Jim Bouton,
individually and on behalf of all others similarly
situated,

                                    Case No. 05 CV 8136-DC

       Plaintiffs,

v.

                                      **ECF Case**

Google Inc.,

       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPORT OF PROFESSOR DANIEL GERVAIS

**A.    INTRODUCTION AND BACKGROUND**

1.    I have been retained by Plaintiffs as an expert on issues of intellectual property, and collective licensing of intellectual property.

2.    I am FedEx Research Professor of Law at Vanderbilt University Law School and Director of the Vanderbilt Intellectual Property Program.

3.    I am an expert in the field of intellectual property law.  I have taught intellectual property law at various institutions in the U.S., Europe, and Canada.  I have edited or contributed to 33 books related to intellectual property; and have written publications on intellectual property law for journals around the world, including the *Journal of the Copyright Society of the USA* (my article won the Charles B Seton Award in 2002-03), *Columbia Journal of Law & the Arts, Fordham Law Review, Cardozo Arts & Entertainment Law Journal,  European Intellectual Property Review, American Journal of International Law, Chicago-Kent Law Review, Vanderbilt Journal of Technology and Entertainment Law* and the *Journal of Intellectual Property Law.* I have been cited in a decision by the Supreme Court of the United States (Golan v. Holder, 2011),

and in decisions by many other courts. A recent article was republished in *Intellectual Property Law Review (2011)* as one of the best intellectual property articles of 2010.

4.      One of my special interests is in "collective management" of copyright, meaning how aggregations of individual copyrights are legally protected, licensed, and marketed.  I authored the first chapter of a 2010 book I edited on this subject, entitled "Collective Management of Copyright: Theory and Practice in the Digital Age."

5.      In January 2011, I gave the keynote talk at an event on collective management of copyright organized by the Kernochan Center for Law, Media and the Arts at Columbia Law School. An updated version of my presentation was published under the title "The Landscape of Collective Management."[1]

6.      Prior to my teaching career, I served as Head of the Copyright Projects Section at the World Intellectual Property Organization (WIPO). In that capacity, I was asked to help establish new, or improve the functioning of existing, Collective Management Organizations (CMOs) in various countries around the world.

7.      I also served as Deputy Secretary General of the International Confederation of Societies of Authors and Composers, the largest association of copyright collectives in the world; and as Vice-President of Copyright Clearance Center, Inc., based in Danvers, MA, during which time I was also Deputy Chair of the International Federation of Reprographic Rights Organizations (IFRRO), a worldwide association of CMOs, specializing in reprography (photocopying and digital reproduction of printed content). I have spoken at over 130 academic, professional and other conferences and events, discussing various issues related to intellectual property, including copyright law of the United States, international copyright law and the TRIPS Agreement.

---

[1] 24:4 COLUM-VLA J. L & ARTS 423-449 (2011).

8.      I also serve as Editor-in-Chief of the *Journal of World Intellectual Property,* published jointly by John Wiley & Sons (New York) and Blackwell Publishing (Oxford, UK).

9.      My complete curriculum vitae is attached here to as Exhibit A. The facts and data I considered in forming my opinion are listed on Exhibit B.  I have not testified as an expert at trial or by deposition in the last four years.  I am being compensated for my time at the rate of $400 per hour.

**B.    MY OPINION**

10.      It is my understanding that Google has engaged in the digital copying of millions of books in libraries, the distribution of digital copies of these books to libraries, and display of "snippets" from these books in search results. I have been asked my opinion (a) whether collective licensing markets will continue to develop for the digital uses of books and (b) whether unrestricted and widespread conduct of the type engaged in by Google will harm the development of such markets. As I discuss in greater detail below, in my opinion, the answer to each of these questions is the affirmative.

11.      I believe that, if Google's uses are determined not to be fair uses, the market would intervene and one or more CMOs (with proper authorizations from right holders) would license Google (and potentially others) to scan, distribute and display copyrighted works. In fact, as discussed further below, the type of copyrighted content that Copyright Clearance Center, Inc. presently licenses is essentially printed content, much of the same nature as the material scanned by Google.   The rights involved are also essentially the same. In other words, this type of licensing is already a reality.

12.      Collective management is already indispensable for many categories of content creators and for many types of copyright uses, including online uses. The value of copyright

3

rights to authors and other copyright owners is often monetized not in individual transactions (authorizing the use of one or more specific works) but in licensing their rights in aggregated form, as part of a "repertory" of works or rights. This allows markets for those repertoires of works and rights to form and to operate, allowing access to and uses of copyrighted material while compensating creators for their work. Collective licensing markets have often developed in response to new technologies and uses and will continue to develop for digital uses of books unless widespread copying of entire books is permitted as a fair use, thus discouraging the development of such collective licenses.

13. Making books and other copyrighted works available online is desirable both for authors and readers. Technologically, it may be inevitable. It is likely to become a major form of access to content. It may also facilitate access by people with disabilities.

14. Allowing the market, or Congress, to develop a collective licensing system for the types of uses that Google has been making would not prevent these uses. Instead, it would compensate those who created and published the content and whose ability to earn a living often depends on being able to monetize online uses. The actual scope of the uses could be taken into account in determining appropriate rates. Collective management solutions can be applied to manage this type of licensing transaction, as the existence of successful similar collective systems demonstrates.

15. An argument that collective management is not possible or desirable in this case because there are many different types of books is negated by the existence of successful licensing systems for more than two centuries that have combined works of a similar form but with different content into repertoires. Collective Management Organizations license old and new works. Today, existing collective rights music organizations license everything from Philip

Glass to the latest hip-hop hit.  CMOs typically pay authors and other right holders based on actual usage.

16.     Collective licensing was the thrust of the proposed settlement in this case. The proposed Book Rights Registry was a form of collective management with a repertory license allowing Google to use millions of titles. The Registry would have maintained a database of rights information, received on behalf of the rightsholders the agreed payments from Google, and distributed those payments to rightsholders who had registered their works with the Registry.

17.     It is my opinion that a similar type of collective management system, most likely one requiring that rightsholders opt their books in to participate in collective management, would develop here if some or all of Google's uses are found not to be fair. Further, it is my opinion that, if conduct such as Google's is permitted and becomes widespread, this will harm or impede the development of such a collective management model.

## C.     BASES FOR THE OPINION

### (1)     The Emergence and Basic Operations of Copyright Management Organizations

18.     Collective management reportedly emerged around 1777 in France, when authors of theatrical plays formed an association to license their plays.[2]  In the United States, collective

---

[2] In 1838, Honoré de Balzac and Victor Hugo established the Society of French Writers, (known in French as Société des gens de lettres. *See* online : <http://www.sgdl.org/> (last visited : March 28, 2012), which was mandated with the collection of royalties from print publishers.  A net of authors' societies, shaped by the cultural environment of each country, slowly spread throughout the world.  *Id.* at 10. Around the same time, the Universal Theatrical Society was established.
*See* www.answers.com/topic/firmin-g-mier (last visited: March 28, 2012).
  Both of these initiatives led to the founding congress in 1926 of the International Confederation of Societies of Authors (CISAC) . *See* www.cisac.org (last visited: March 28, 2012).
  The founding members identified the need to establish both uniform principles and methods in each country for the collection of royalties and the protection of works, and to ensure that copyright was protected throughout the world. (By "world", I am referring only to the Western World.  This is inclusive of the Anglo-Saxon and *droit d'auteur* traditions of copyright.)
  Today, CISAC has 232 members in 121 countries. *See*
http://www.cisac.org/CisacPortal/initConsultDoc.do?idDoc=22994 (last visited: March 28, 2012).

management developed as technology and markets made possible the widespread and dispersed infringement of copyrights. Broadcasters were considered "pirates," until their use of music was licensed by performing rights organizations (PROs). ASCAP, BMI and SESAC are the three PROs identified as such in 17 U.S.C. §101. The first PRO, the American Society of Composers and Publishers (ASCAP), was formed in 1914.

19.     Collective management provides a number of advantages in licensing uses of copyrights. CMOs are a single-source for the licensing of specific uses, thereby eliminating the need for individually negotiated licenses from each copyright owner. By reducing the transaction costs associated with enforcing, on the one hand, and licensing, on the other, they help convert widespread infringement into markets. This benefits authors and users.

### (2)     Collective Management in the Copyright Act

20.     The Copyright Act regulates CMOs in the United States in a variety of ways. For example, PROs are named in section 101. Section 115 establishes a compulsory license for making and distributing phonorecords. When certain uses are determined by Congress to be desirable but subject to a payment to authors, Congress may establish a compulsory license. Such a system is now in place to set rates for non-interactive transmissions of sound recordings.[3]

21.     A brief review of the legislative history might be helpful to illuminate the issue at hand.

22.     The initial focus of legislative action was the collective management of music. In the 1897 Act, Congress prohibited unauthorized public performances generally.[4] However, in the Copyright Act of 1909, Congress limited the prohibition to those done "for profit."[5]

---

 For 2010, CISAC members reported collections of $9.9 billion. *See id.*
[3] Section 114 and chapter 8 of Title 17 of the United States Code.
[4] *Id.*
[5] *Id.*

23.     Not surprisingly, within a few years of the 1909 Act's enactment, the need to

define "for profit" emerged.[6]  In *Herbert*, the Supreme Court, in the words of Justice Holmes,

explained that the notion should be defined fairly broadly:

> The defendants' performances are … part of a total for which the public pays, and
> the fact that the price of the whole is attributed to a particular item which those
> present are expected to order, is not important.  It is true that the music is not the
> sole object, but neither is the food, which probably could be got cheaper
> elsewhere.  The object is a repast in surroundings that to people having limited
> powers of conversation or disliking the rival noise give a luxurious pleasure not to
> be had from eating a silent meal.  If music did not pay it would be given up.  If it
> pays it pays out of the public's pocket.  Whether it pays or not the purpose of
> employing it is profit and that is enough.[7]

24.     The Court thus established the need for the public performance licenses that

ASCAP and now the other PROs provide.[8]  This is a good example of infringement preceding

the establishment of a working collective licensing system.

25.     When Congress enacted the Copyright Act of 1976,[9]  it did away with the "for

profit" language of the 1909 Act.  However, Congress also expressly exempted from copyright

liability "the public reception of [a transmission embodying a performance of a work] on a single

receiving apparatus" where no separate charge was made to see or hear the transmission.[10]

26.     In an effort to adapt the statute to technological change, in the Digital

Performance Right in Sound Recordings Act of 1995, Congress enacted a limited digital public

---

[6] *See* Herbert v. Shanley Co., 242 U.S. 591 (1917) [Herbert]; John Church Co. v. Hilliard Hotel Co., 221
F. 229 (2nd Cir. 1915).  The named plaintiff in Herbert v. Shanley Co., Victor Herbert, was a founding
member of ASCAP, and brought the case as a test case to establish a broader scope for the right of public
performance.
[7] *See* Herbert, *id.*
[8] Exempted from license fees in the 1909 Act were certain charitable performances and for jukeboxes.
[9] Act of October 19, 1976, Pub. L. No. 553, 94th Cong., 1st Sess., 90 Stat. 2586, codified as amended at 15
U.S.C. §§ 1-1332 (2005).
[10] *Id.* at § 110(1), (2), (3), (4), (6), (8), (9), codified as amended 17 U.S.C. § 110(1), (2), (3), (4), (6), (8),
(9) (2005).

performance right for sound recordings, contained in 17 U.S.C.§114.[11]  Congress then provided

a compulsory license for non-interactive transmissions - that do not enable a member of the

public to receive, on request, a transmission of a particular sound recording or a program

specially created for the recipient.[12]  The Act also tasked the U.S. Copyright Office to designate

a CMO to administer the license, which it did, naming SoundExchange, Inc.[13]

27.     The 1995 amendments did not follow the antitrust regulation model that applies to

ASCAP and BMI. Instead, Congress opted for a more specialized and modern form of regulation

of collective management. Under this new regulatory model, the Act gave the Library of

Congress (of which the Copyright Office forms part) the authority to set rates and licensing

conditions. The Act also set a distribution key according to which SoundExchange distributes

50% of the revenues to the sound recording copyright owners, 45% to the featured artists, and

5% to an independent administrator to distribute to non-featured artists and vocalists. Licensing

rates are set by Copyright Royalty Judges (CRJs)[14] appointed by the Librarian of Congress for

six-year terms.

### (3)      The Copyright Clearance Center

28.     A different, voluntary model emerged when Copyright Clearance Center, Inc.

("CCC") was formed in 1978 as a New York not-for-profit corporation. Publishers and authors

register their works with the CCC and set the fee for use of their works in CCC's several per-use

license services.  CCC also offers annual repertory licenses in both the business and academic

---

[11] 104 Pub. L. No. 39, 109 Stat. 336 (1995).
[12] 17 U.S.C. §114(d)(2), (f)(2) (2009); *see also* Bonneville Int'l Corp. v. Peters, 347 F.3d 485, (3d Cir. 2003) (affirming Copyright Office's decision to require a compulsory license for simultaneous transmission of a radio station's broadcast through the Internet).
[13] *See* 17 U.S.C. § 114(g)(2); and Notice of Designation As Collective Under Statutory License filed with the Licensing Division of the Copyright Office in accordance with Copyright Office regulation 270.5(c), 37 C.F.R. § 270.5(c).
[14] 17 U.S.C. §§ 801-805 (2009).

markets.  For the year ended June 30, 2011, CCC reported revenues in excess of $238 million

and payments to right holders in excess of $171 million.[15] According to its website, CCC

licenses business users, under one or more of its repertory or per-use licenses, the right to

photocopy an article from a newspaper, magazine, book, journal, research report or other

published document; e-mail an online article or PDF; post digital content on their corporate Web

sites, intranets and extranets; print out Web-based and other digital content onto paper and

overhead slides; republish content in a newsletter, book or journal; and scan printed content into

digital form when an electronic version is not readily available.[16] For academic institutions,

again under one or more of its repertory or per-use services, it licenses the right to photocopy

material from books, newspapers, journals and other publications for use in coursepacks and

classroom handouts; use and share information in library reserves, interlibrary loan and

document delivery services; post and share content electronically in e-reserves, course

management systems, e-coursepacks and other e-learning environments; distribute content via e-

mail or post it to their intranets, Internet and extranet sites; and republish an article, book excerpt

or other content in their own books, journals, newsletters and other materials.[17]

### (4)      Other Collective Management Organizations

29.      Today, CMOs in the United States license: (a) musical works (primarily the three

PROs and Harry Fox Agency (HFA) which licenses mostly the reproduction of musical works);

(b) sound recordings and the artists' performances they contain (Sound Exchange); and (c)

photocopying and digital reprography (Copyright Clearance Center, Inc. or CCC), to name the

---

[15] The difference between the two numbers includes but is not all a service charge. Due to the time period
required to process usage data, the 2011 distributions were mostly of 2010 collections which were
significantly lower than 2011 collections. *See* http://annualreport.copyright.com/management-summary-
financial-data.
[16] *See* www.copyright.com.
[17] *See id.*

most well-known organizations.  In addition, a form of collective management is used to collect

and distribute residuals to certain actors, directors and screenwriters by the audiovisual guilds.

30.     CMOs typically operate as follows:  Once established (sometimes an

authorization is required to operate as a CMO, as was the case for SoundExchange[18]), a CMO

needs the authority to license a repertory of works, performances or recordings and/or to collect a

license fee. The authority may be granted by law, as when a compulsory or statutory license is in

place[19], or by contracts with individual right holders or other CMOs.  With that authority, a

CMO can license and/or collect fees on the basis of rates (also known as "tariffs").  Those rates

may be set by a governmental authority such as the Legislative Branch as in section 115 of the

Copyright Act or in section 114 by the Copyright Royalty Judges for SoundExchange, or by the

Judiciary Branch, such as the federal judges operating as rate courts under the ASCAP and BMI

consent decrees.[20]  At other times, the rates are set by rightholders, as is the case with CCC.[21]

---

[18] *See infra* note 13.

[19] According to the US Copyright Office, there are eight compulsory and statutory licenses in the
Copyright Act (the Copyright Office also notes that the "terms 'compulsory' and 'statutory' are
interchangeable"):
Section 111 - Statutory License for Secondary Transmissions by Cable Systems
Section 112 - Statutory License for Making Ephemeral Recordings
Section 114 - Statutory License for the public performance of Sound Recordings by Means of a Digital
Audio Transmission
Section 115 - Compulsory License for Making and Distributing Phonorecords
Section 118 - Compulsory License for the use of Certain Works in Connection with Non-Commercial
Broadcasting
Section 119 - Statutory License for Secondary Transmissions for Satellite Carriers
Section 122 - Statutory License for Secondary Transmissions by Satellite Carriers for Local
Retransmissions
Section 1003 - Statutory Obligation for Distribution of Digital Audio Recording Devices and Media
(Chapter 10).
*See* www.copyright.gov/licensing/
[20] *See, e.g.,* United States v. Am. Soc'y of Composers, Authors and Publishers, No. 41-1395, 2001 WL
1589999, (S.D.N.Y. June 11, 2001); and Michael A. Einhorn, *Intellectual Property and Antitrust:  Music
Performing Rights in Broadcasting*, 24 COLUM.-VLA J.L. & ARTS 349, 361 (2001).
[21] Sometimes the price is set by a governmental authority without the need to seek a voluntary agreement
first.

31.     Having thus obtained the authority to license and/or collect fees, the CMO will normally proceed to sign agreements with users that provide for the collection of license fees and usage data. For example, radio stations (broadcasters) provide logs (often in digital form) of the recordings they used to the PROs in an agreed format.  While a radio station may use computer logs to report the recordings used, for other types of users (hotels, bars, restaurants), it is difficult to require 100% reporting.  Sometimes statistical surveys are used instead. For example, a number of (representative) users may be surveyed for a specific period of time, and the data thus gathered will then be extrapolated to the class of users concerned using statistical regressions and other similar models.

32.     The CMO will process such data and apply them to distribute the funds to copyright holders.[22]  Identification data (metadata) is generally used to match usage data reported by users or generated by the CMO to specific works, recordings or performances and the right holders therein.

**(5)     Collective management is a major part of copyright in practice**

33.     As I see it, in practice there are six ways in which copyrights are currently treated in the United States:

> (A)     Full individual exercise of rights by the copyright owner
>
> (B)     Voluntary collective management of rights by the copyright owner
>
> (C)     Presumption/designation of uses by statute
>
> (D)     Statutory limitations on damages to the applicable CMO rate
>
> (E)     Statutory or judicial compulsory licensing

---

[22] Payment to foreign copyright holders is often done through local CMOs in each territory on the basis of a contract usually referred to as a Reciprocal Representation Agreement. Worldwide databases of identification data have been created by CISAC and IFRRO.  This allows their members to identify foreign works, performances and recordings licensed to them under those reciprocal representation agreements.

(F)     Exceptions allowing uncompensated uses (such as fair use)

34.     In a full individual exercise scenario (level A), a user must contact the copyright owner to obtain permission to make uses.  Examples would be a book author's contract with a publisher or an author allowing the making of a derivative work, such as a film made based upon a novel. This often entails significant transaction costs (negotiation, etc.).

35.     Then there are four levels of right at which the author loses the ability to say no to certain uses by others but retains a right to be paid for such uses. Such is the case when an author voluntarily joins a CMO (level B) because CMOs in most cases will not prohibit the use of a work in their repertory.[23]

36.     At level C, a CMO may be designated by governmental authorities to manage a right.  This system is applied in the United States under section 114 (SoundExchange is the designated CMO).

37.     Another option (level D) is to statutorily limit the damages available for certain uses. A number of options under consideration for orphan works resemble this option.[24]

38.     The next level is a compulsory license (level E). This may be managed by a private CMO (for example Harry Fox Agency under the section 115 compulsory license). A governmental authority can also be designated for this purpose. The U.S. Copyright Office directly administers royalty fee collections from cable operators for retransmitting television and radio broadcasts (under 17 U.S.C. § 111), from satellite carriers for retransmitting non-network

---

[23] Often they simply cannot or should not, as would arguably be the case with ASCAP and BMI under their respective consent decrees.

[24] *See* http://www.copyright.gov/orphan/ (last accessed March 28, 2012). One of the proposals most discussed would  limit damages (conditions apply) to a "reasonable compensation" mutually agreed by the owner and the user or, failing that, be decided by a court and the suppression of statutory damages. My point is that if a collective rate was in place, it would likely inform the reasonable compensation determination by a court.

and network signals (17 U.S.C. § 119), and from importers or manufacturers for distributing digital audio recording products ((17 U.S.C. § 1003).[25]

39.    At level F, a statute takes away from the copyright owner the right to receive remuneration for certain uses. Fair use is such a situation.

40.    I believe that if Google's uses are not determined to be fair uses, the market, or Congress, will develop a collective licensing system for the types of uses that Google has been making so that Google would not have to negotiate a transactional license for each book or other work it wishes to use. Such an approach would compensate those who created and published the content and whose ability to earn a living often depends on being able to monetize online uses.

### (6)    Collective management and the digitization of, and mass access to, books

41.    Often after a new form of use has emerged, collective management systems are established to license uses that have been found to be desirable but unauthorized. The purpose of collective management is not to put roadblocks in the utilization of works but rather to reconcile the needs of users and authors, to ensure that copyright rights are duly reflected in new forms of use that do not constitute fair uses or are otherwise exempt.  Using collective management, users can obtain licenses with limited transaction costs (such as the annual licenses granted by the PROs and by CCC) or at least a single interlocutor.   CMOs can also aggregate usage data to protect the privacy of individuals and the confidentiality of institutional and business users.

---

[25] See Circular 75: The Licensing Division of the Copyright Office, available at http://www.copyright.gov/circs/circ75.pdf (last accessed March 28, 2012).

## CONCLUSION

42.    Allowing practices like Google's as fair use may be expected to thwart the development of collective management systems for the digital uses of books and book excerpts that authors and publishers would otherwise likely develop, join or license others to develop.

Dated: April 2, 2012

_____
Daniel Gervais, Ph.D.

# EXHIBIT A

---

*CURRICULUM VITAE*

## Daniel J. Gervais

## PART I – EMPLOYMENT & HONORS

### a) CURRENT POSITION

Professor of Law
Co-Director, Vanderbilt Intellectual Property Program
Vanderbilt University Law School

### b) EDUCATION

- Doctorate, University of Nantes (France), 1998
  - *magna cum laude ("très honorable")*
- Diploma of Advanced International Studies, Geneva (Switzerland), 1989
  - *summa cum laude ("très bien")*
- LL.M., University of Montreal, 1987
- Computer science studies University of Montreal, 1984-1985
- LL.B. (McGill University/University of Montreal), 1984
- D.E.C. (Science, Jean-de-Brébeuf College, Montreal), 1981

### c) PREVIOUS EMPLOYMENT & OTHER ACADEMIC EXPERIENCE

- Acting Dean, Common Law Section, University of Ottawa (Feb-Jul 2006 and Sep-2007-July 2008)
- University Research Chair, Common Law Section, University of Ottawa (2006-2008)
- Vice-Dean, Research, Common Law Section, University of Ottawa (2003-2006)
- Full Professor, Common Law Section, University of Ottawa (2005-2008)
- Associate Professor, Common Law Section, University of Ottawa (2001-2005)
- Vice-President, International, Copyright Clearance Centre, Inc., Massachusetts, USA, 1997-2000
- Consultant, Organization for Economic Cooperation and Development (OECD), Paris, 1997
- Assistant Secretary General, International Confederation of Societies of Authors and Composers (CISAC), Paris, 1995-1996
- Head of Section, World Intellectual Property Organization (WIPO), Geneva, 1992-1995
- Consultant & Legal Officer, General Agreement on Tariffs and Trade (GATT/WTO), Geneva, 1990-1991
- Lawyer, Clark, Woods, (Montreal), 1985-1990.

*Visits:*
- Visiting Lecturer, Washington College of Law, American University, June 2011;
- Visiting Professor, University of Liège (Belgium), March 2010 and 2011;

- Visiting Professor, University of Strasbourg (Centre for International Intellectual Property Studies (CEIPI), France), Nov.-Dec. 2009;
- Visiting Professor, Université de Montpellier, France (Feb. 2007 and Apr. 2008)
- Visiting Professor, Univesity of Haifa (2005)
- 2004 Trilateral Distinguished Scholar-in-Residence, Michigan State University, Detroit College of Law (April-May 2004)
- Visiting Scholar, Stanford Law School, Feb-Apr. 2004
- Visiting Professor, DEA (graduate) program, Faculty of Law, University of Nantes, France (May 2003)
- Visiting Professor, Faculty of Law, Graduate program in intellectual property (DESS), Centre universitaire d'enseignement et de recherché en propriété intellectuelle (CUERPI), Université Pierre Mendès-France (Grenoble II), France
- Visiting Professor, Faculty of Law, University of Puerto Rico (June-July 2002--instruction in Spanish and English)
- Lecturer, Institute for Information Law, Faculty of Law, University of Amsterdam, Postdoctoral Summer Program in International Copyright Law (every year since 2000; last in July 2011)

### d) HONORS

- Ontario Research Excellence Award (ex PREA), 2005[*]
- Charles B. Seton Award, 2003 (see under "Scholarly Articles" below)
- Quebec Bar 1985.   Finished first ex aequo out of 600+ candidates—received all available awards, including:
  - o Quebec Bar Award
  - o Quebec Young Bar Award
  - o Paris Bar Prize
- Two Excellence Awards, Faculty of Law, University of Montreal, 1984

### e) OTHER RELEVANT

1. Editor-in-Chief, *Journal of World Intellectual Property*, Wiley-Blackwell (2006-)
2. Panelist, UDRP, WIPO Arbitration and Mediation Center
3. International editor, *Journal of Intellectual Property Law & Practice* (Oxford Univ. Press) (2005-2008)
4. Member, International Association for the Advancement of Teaching and Research in Intellectual Property (ATRIP)
5. Member of the Law Society of Upper Canada (Ontario Bar) and of the Bar of Quebec
6. Languages: English, French, Spanish.  German (functional). One year of Mandarin.

---

[*] Of the 64 awards in 2005, only one given to a law professor.

**f) ACADEMIC CONFERENCES:**

- Invited speaker, Copyright in a borderless online environment Symposium, Thoresta, Sweden, October 27-28, 2011

- Invited moderator, Max-Planck Institute Workshop on Economic Partnership Agreements of the EU: A Step Ahead an International IP Law?", Frauenchiemsee, Germany, June 26-28, 2011

- Invited keynote speaker, 39e Colloque Annuel International de l'AFEC, Stretching borders: How far can Canada Go?, Montpellier, France, June 15-17, 2011

- Moderator, Vanderbilt University Law School Program, Beijing, May 21, 2011

- Invited moderator and panelist, 19th Annual Conference on Intellectual Property Law & Policy, Fordham University Law School, New York, April 28-29, 2011

- Invited Chair, Invitation-only Intellectual Property Workshop, Canadian International Council, Ottawa, March 31-April 1, 2011

- Moderator, Patent Unrest, Vanderbilt Law School. February 24, 2011

- Keynote Speaker, Annual Symposium of the Kernochan Center for Law, Media & the Arts, Columbia Law School, New York, January 28, 2011

- Invited speaker, Intellectual Property Institute of Australia (IPRIA), University of Melbourne, Australia, December 13, 2010

- Invited speaker, Trade, Intellectual Property and the Knowledge Assets of Indigenous Peoples: The Developmental Frontier, Victoria University, Wellington, New Zealand, December 8-10, 2010

- Invited speaker, Computer Programs and TRIPS, TRIPS@10 Conference, Columbia University, November 16-18, 2010

- Speaker, International Law Weekend, American Branch of the International Law Association, Fordham Law School, New York, October 22-23, 2010

- Invited speaker, Bits Without Borders conference, Michigan State University, East Lansing, MI, September 25-26, 2010;

- Invited speaker, World Trade Forum, Bern, Switzerland, September 3-4, 2010

- Invited speaker, Copyright @ 300, UC Berkeley School of Law, Berkeley, CA, April 9-10, 2010

- Invited speaker, The Statute of Anne 300 Birthday, Cardozo Law School, New York, March 24-25, 2010

- Invited panelist, Access to Knowledge (A2K) conference, Yale Law School, February 12-13, 2010

- Invited speaker, IUS COMMUNE, Reinventing the Lisbon Agreement, Maastricht University, The Netherlands, November 26, 2009

- Invited speaker, The Lisbon Agreement, CEIPI (Université de Strasbourg, France), November 17, 2009

- Invited keynote speaker, Signifiers in Cyberspace: Domain Names and Online Trademarks

Conference, Case Western Reserve University, Cleveland, Ohio, November 12, 2009
- Invited speaker, Beyond TRIPS: The Current Push for Greater International Enforcement of Intellectual Property, American University (Washington College of Law), November 5, 2009
- Invited speaker, Intellectual Property Developments in China: Global Challenge, Local Voices conference, Drake University, Des Moines, Iowa, October 15-16, 2009
- Invited speaker, University of Hong Kong, June 12-13, 2009
- Invited speaker, Conference on 100th Anniversary of the 1909 Copyright Act, Santa Clara University, April 27, 2009
- Invited panelist, Fordham International Intellectual Property law & Policy Conference, Cambridge, England, April 15-16, 2009
- Invited participant, University of Cambridge-University of Queensland Copyright History Roundtable, Cambridge, England, April 15, 2009
- Commentator, Vanderbilt Roundtable on User-Generated Content, Social Networking & Virtual Worlds, Nashville, November 14, 2008
- Distinguished Finnegan Lecturer, Washington College of Law, Washington, D.C., October 18, 2008
- Invited panelist, International Law Weekend, New York, October 16, 2008
- Invited speaker, IP Speaker Series, Cardozo Law School, September 22, 2008
- Invited lecturer, Intellectual Property Research Institute of Australia (IPRIA), Melbourne, June 3, 2008
- Invited speaker, International Conference on Patent Law, University of New Zealand, Wellington, May 29-30, 2008
- Invited speaker, Law School of National Taiwan University, March 21, 2008
- Invited commentator, EDGE Project Conference on Intellectual Property and Development, Hong Kong, March 17-18, 2008
- Invited speaker, Cardozo Law School Conference on Harmonizing Exceptions and Limitations to Copyright Law, New York, March 30-31, 2008
- Invited panelist, Fordham Conference on International Intellectual Property Law & Policy, New York, March 27-28, 2008
- *Rapporteur*, International Literary and Artistic Association Biennial Congress (ALAI), Punta del Este, Uruguay, Oct. 31 – Nov. 3 2007
- Invited speaker, Vanderbilt University, Nashville, Tennessee, Oct. 16-17, 2007. "Collective Management of Copyright in North America", (conference organized in cooperation with WIPO)
- Invited speaker, University of South Carolina, Columbia, SC, October 12, 2007 "The Future of Copyright Law"
- Invited panellist, Fordham University Conference on International Intellectual Property Law & Policy, New York, April 12-13, 2007
- Invited speaker, Dean's lectures on intellectual property, George Washington University School of Law, Washington D.C., March 13, 2007
- Invited Speaker, UCLA Conference on the WIPO Development Agenda, Los Angeles, March 9-11, 2007
- Invited speaker, International Conference on Impact of TRIPS: Indo-US Experience. NALSAR University of Law, Hyderabad (India), Dec. 15-16, 2006
- Invited speaker, International intellectual property conference, University of Chicago-Kent, October 12-13, 2006
- Speaker, Study days of the International Literary and Artistic Association, Barcelona, June 18-21, 2006

- Invited moderator, Fourteenth Annual Conference on International Intellectual Property Law & Policy, New York, April 20-21 2006
- Invited speaker, University of Michigan, Ann Arbor. Intellectual Property & Development, April 14 2006;
- Invited speaker, Michigan State University College of Law (MSU), East Lansing, The International
- Intellectual Property Regime Complex, April 7-8 2006
- Invited Roundtable participant, Vanderbilt University Law School, Nashville, Tennessee. Private International Law and Intellectual Property Law: Theory and Practice, March 24-25, 2006
- Invited panelist, Federalist Society, Annual Lawyers Convention. Washington, D.C., November 2005
- Panel Chair, Annual meeting of the International Association for the Advancement of Teaching and Research in Intellectual Property (ATRIP), Montréal, July 11-13, 2005
- Invited lecturer, Institute of European Studies, Macau (IEEM), Advanced IP course (25 June-1 July 2005)
- Invited lecturer, Advanced IP conference, Macau, June 27-30, 2005
- Invited speaker, Conference on the Relationship between international and domestic law McGill University, June 15-16, 2005
- Invited speaker, Conference on the Collective Management of Copyright, Oslo, May 19-21, 2005
- Invited keynote speaker, Conference of the Department of Justice on intellectual property and Internet Law, Ottawa, April 21, 2005
- Invited keynote speaker, LSUC Annual Communications Law Conference, Toronto, April 8-9, 2005
- Invited speaker, Law & the Information Society Conference, Fordham University, New York, April 6-7, 2005
- Invited panelist, Fordham International Intellectual Property Law & Policy Conference, New York, March 31-April 1, 2005
- Invited Speaker, Shanghai 2004: Intellectual Property Rights and WTO Compliance. University of East China, Shanghai, China, Nov. 24, 2004
- Invited speaker, "The Internet: A Global Conversation" Conference, University of Ottawa, Oct. 1-2, 2004
- Invited lecturer, Office for Harmonization in the Internal Market (Trade Marks and Designs). Alicante (Spain), July 2004
- Organizer and speaker, Rethinking Copyright Conference, University of Ottawa, May 20-21, 2004
- Invited panelist, American Intellectual Property Lawyers Association (AIPLA), Dallas TX, May 13-14, 2004
- Invited speaker , 2004 Computers Freedom & Privacy Conference, Berkeley, California Apr. 20-23, 2004
- Invited speaker, Intellectual Property, Sustainable Development & Endangered Species Conference. Detroit College of Law, Michigan State University, March 26-27, 2004
- Invited Speaker, Securing Privacy in the Internet Age Symposium, Stanford Law School, March 13-14, 2004
- Invited keynote speaker, "US Copyright Office Comes to California" Conference, Hastings College of Law, San Francisco, CA, March 3, 2004
- Invited speaker, Global Arbitration Forum, Geneva, Switzerland, Dec. 4-5, 2003;

- Invited Panel Chair and speaker, "Copyright and the Music Industry: Digital Dilemmas", Institute for Information Law, Amsterdam, July 4-5, 2003. Topic: "Collective Rights Management & the Future of Copyright";
- Conference Fellow, "International Public Goods and Transfer of Technology under a Globalized Intellectual Property Regime" Conference, Duke Law School, Raleigh, NC, USA, Apr. 4-6, 2003
- Invited speaker, Roundtable on questions arising out of the intersections of technology and questions of social justice, University of Ottawa, March 28, 2003. Topic: "Democracy, Technology and Social Justice" (available at commonlaw.uottawa.ca);
- Invited speaker, Conference of Copyright Law Association of Japan (CLAJ), Tokyo, Dec. 7, 2002. Topic : "Transactional Copyright: Licensing Tailored Uses"
- Invited speaker, Facultés universitaires de Saint-Louis, Belgique, May 25-26 2002. Topic : «De l'œuvre à l'auteur »
- Invited speaker. Institutions administratives du droit d'auteur, colloquium organized by the Université de Montréal, Montreal, Oct. 2001. Topic : « La gestion collective au Canada : fragmentation des droits ou gestion fragmentaire »
- Invited speaker, Annual Meeting of the International Literary and Artistic Association (ALAI International), Columbia University, New York, 2001. Topic: " Rights Management Systems"
- Invited lecturer, Swedish School of Economics and the Finnish IPR Institute, Helsinki, Finland, 2000. Topic: "Copyright and Electronic Commerce", lecture presented to graduate students
- Invited speaker, Fordham University Conference on International Intellectual Property, New York, April 2001. Topic "Electronic Commerce and Copyright"
- Invited speaker, Fordham University Conference on International Intellectual Property, New York, April 2000. Topic: "The TRIPS Agreement After Seattle"
- Invited speaker, Ohio State University, Columbus, Ohio, 2000. Topic: "Digital Licensing of Copyright"
- Invited speaker, Fordham University Conference on International Intellectual Property, New York, April 1999. Topic: "Digital Distance Education: Exemption or Licensing?"
- Invited speaker, Fordham University Conference on International Intellectual Property, New York, April 1999. Topic: "An Overview of TRIPS: Historical and Current Issues"

## g) PUBLIC LECTURES:

- Invited speaker and session leader, High-level (Ministerial) Forum on Intellectual Property for the Least-Developed Countries, WIPO, Geneva, July 24-25, 2009
- Invited moderator, Copyright Counseling, Management, and Litigation Law Seminar, Seattle, WA, April 26-27, 2009
- Invited speaker, Annual Meeting. Commission on Intellectual Property, International Chamber of Commerce, Cambridge, England, April 17, 2009
- Invited keynote speaker, Asian Copyright Seminar, Tokyo, Japan, February 25-27, 2009
- Invited speaker, International Copyright Institute, Washington DC, Nov. 28, 2006
- Invited speaker, International Trademark Association, Trademarks Administrators Conference, Crystal City, Virginia, September 19-20, 2006
- Invited speaker, General Assembly of the National Association of Publishers (ANEL), Montréal, September 14, 2006

- Invited speaker, Federalist Society Annual Lawyers Convention, Washington D.C. November 2005.
- Invited keynote speaker. InSIGHT, Old Mill Inn, Toronto, September 2005. Topic: "Copyright Reform in Canada"
- Invited speaker. Canadian Institute, , Montréal, 5-6 June, 2005;
- Invited speaker, Canadian Bar Association, Montreal, Nov. 9, 2004. Topic: "Recent developments in Canadian copyright law"
- Invited speaker, Peer-to-Peer Luncheon speech, The 45th Circuit, Ottawa Centre for Research and Innovation (OCRI), Oct. 5, 2004. Topic: "Peer-to-Peer File-Sharing"
- Invited speaker, Luncheon conference, ALAI Canada, Toronto, Sept. 13, 2004. Topic: "The Supreme Court decision in *SOCAN v. Can. Ass'n of Internet Providers*"
- Invited Lecturer, International Copyright Institute, Washington, D.C., May 5, 2004. Topic: "Collective management of copyright"
- Invited speaker, Biannual Canadian Bar Association/Law Society of Upper Canada Communications Law Conference, Ottawa, April 23-24, 2004. Topic: "The Supreme Court decision in *CCH v. Law Society of Upper Canada*"
- Invited Speaker, Association pour l'avancement des sciences et des techniques de la documentation (ASTED), Annual Meeting, Gatineau, Quebec, Nov. 7, 2003. Topic : "Copyright Exceptions and Librarians"
- Invited Keynote Speaker, International Conference on National Copyright Administrative Institutions, Ottawa, Oct. 8-10, 2003. Topic: "Status Report on Internet Tariffs";
- Invited Panelist, Intellectual Property Institute of Canada (IPIC), Annual Meeting, Halifax, Sept. 19, 2003. Topic: "Technical Protection Measures and Copyright";
- Invited Speaker, North American Workshop on Intellectual Property and Traditional Knowledge, Ottawa, Sept. 7-9, 2003. Topic: Traditional Knowledge and Intellectual Property: The Issues (overview)";
- Invited speaker, Association des juristes d'expression française de l'Ontario (AJEFO), Ottawa, June 21, 2003. Topic: Law & Technology
- Invited speaker, Editors Association of Canada, Ottawa, June 15, 2003. Topic : "A Walk Through the Copyright Labyrinth";
- Keynote speaker, Computer Assisted Language Instruction Consortium (CALICO), Ottawa, May 22, 2003. Topic : "Copyright, Copyleft, Copywrong?";
- Invited speaker, Expert Roundtable on Transactions in Intellectual Property, Amsterdam, May 17-18, 2003. Topic: "Fragmentation of Copyright and Rights Management";
- Invited speaker, "The 45th Circuit" (OCRI), Ottawa, Apr. 1, 2003. Topic : "Emerging Issues in Digital Rights Management";
- Invited speaker, Information Highways Conference, Toronto, March 24, 2003. Topic : Digital Rights Management : Balancing Creators Rights and User Interests";
- Invited speaker, Literary and Artistic Association (ALAI Canada), Montreal, Oct. 22, 2002. Topic : « La gestion collective es-elle en crise? »;
- Invited instructor, World Trade Organization (WTO), Nairobi, Sept. 2002. Topic: The TRIPS Agreement after Doha";
- Invited instructor, World Trade Organization (WTO), Casablanca, Sept. 2002. Topic: "The TRIPS Agreement After Doha";
- Invited speaker, Literary and Artistic Association (ALAI Canada), Montreal, May 7, 2002. Topic: « La décision de la Cour suprême dans l'affaire *Galeries d'art du Petit Champlain Inc. c. Théberge* »;

- Invited instructor. International Copyright Institute (Washington, D.C.), Nov. 2000 and Nov. 2001. Topic: "Collective Management of Copyright in the Digital Age";
- Invited speaker. Annual Meeting of the International Trademark Association (INTA), Denver, CO, USA, May 2000. Topic: "The TRIPS Agreement: Implementation and Dispute Settlement Issues";
- Invited speaker, New York Bar (NYCLA), 2000. Topic : "Current Rights Clearance Issues";
- Invited speaker, Society of Scholarly and Professional Publishers (SSP), Boston, Mass., 1999. Topic: "Copyright Licensing Issues" ;
- Invited speaker, Canadian Writers Union Conference, Toronto, 2000. Topic: "Copyright Management in the Digital Age";
- Invited Speaker, Heritage Canada Roundtable on Copyright Management, Ottawa, 1999. Topic: "Copyright Management: US Practices";
- Invited speaker, International Publishers Association (IPA) Congress, Tokyo, Japan, 1998. Topic: "Copyright, Publishing in the Face of Technological Change";
- Invited speaker, Marché international du multimédia (MILIA), Cannes, France, 1995. Topic : "Droit d'auteur et multimédia";
- Invited speaker, Chilean Book Fair, Santiago, Chile, 1999. Topic: "El papel de las sociedades de derechos reprográficos y de la IFRRO";
- Invited speaker, Sydney Bar, NSW, Australia, 1996. Topic: "Intellectual Property and Technology"
- Invited speaker, Congress of the International Publishers Association, Barcelona, Spain, 1996. Topic: "Online Copyright Licensing";
- Invited speaker, Pan African Film Festival (FESPACO), Ouagadougou, Burkina Faso, 1994. Topic: "Protection of Intellectual Property in Film" ;
- Invited speaker, Chambre française du commerce et de l'exportation (CFCE), Paris, 1990. Topic : "TRIPS: Le point à dix semaines de Bruxelles";

h)   **Publications** [†]

i)   **Summary**

Books authored ............................................................................................8
Books edited ................................................................................................3
Book chapters ....................................................................................... 23+7
Articles ................................................................................................. 50+2
Conference proceedings (refereed) ...........................................................1
Major reports ............................................................................................15
Other publications ....................................................................................26
Commissioned Reports ...............................................................................6

ii)   **Detailed description**

**Books (authored)**

1.   INTELLECTUAL PROPERTY: THE LAW IN CANADA, 2[d] ed. (Carswell, 2011) --with Prof. Elizabeth Judge, 1223 p.

---

[†] Only ACCEPTED publications are indicated as forthcoming.

2.    L'ACCORD SUR LES ADPIC: PROPRIÉTÉ INTELLECTUELLE À L'OMC (Larcier, 2010), 733 p.

3.    THE TRIPS AGREEMENT: DRAFTING HISTORY AND ANALYSIS, 3rd ed. (Sweet & Maxwell, December 2008), 785 p.

4.    LE DROIT DE LA PROPRIETE INTELLECTUELLE, (Yvon Blais, 2006). 702 pages--with Professors Elizabeth Judge and Mistrale Goudreau

5.    INTELLECTUAL PROPERTY: THE LAW IN CANADA (Carswell, 2005), with Prof. Elizabeth Judge

6.    THE TRIPS AGREEMENT: DRAFTING HISTORY AND ANALYSIS, 2ND ed. (Sweet & Maxwell, June 2003). 590 p.

7.    THE TRIPS AGREEMENT: DRAFTING HISTORY AND ANALYSIS. (Sweet & Maxwell, 1998). 444 p.

8.    LA NOTION D'ŒUVRE DANS AA CONVENTION DE BERNE ET EN DROIT COMPARÉ. (Librairie Droz, 1998). 276 p.

## Books (edited)

1.    COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS, 2nd ed. (Kluwer Law International, 2010) 495 p.

2.    INTELLECTUAL PROPERTY, TRADE AND DEVELOPMENT (Oxford Univ. Press, 2007). 564 p.

3.    COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS (Kluwer Law International, 2006), 464 p.

## Book Chapters[‡]

1.    *Traditional Innovation and the Ongoing Debate on the Protection of Geographical Indications*, INTELLECTUAL PROPERTY AND INDIGENOUS INNOVATION (P Drahos and S Frankel, eds) (forthcoming)

2.    *The International Legal Framework of Border Measures in the Fight against Counterfeiting and Piracy*, ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS THROUGH BORDER MEASURES, 2D ED. (O. Vrins and M. Schneider eds.).  Oxford Univ. Press, 2011  (forthcoming)

3.    *Adjusting Patentability Criteria to Optimize Innovation: A Look at China and India*, GLOBAL PERSPECTIVES ON PATENT LAW (M Bagley and R Okediji, eds). Oxford Univ. Press, x (forthcoming)

4.    *The TRIPS Agreement and Climate Change,* in RESEARCH HANDBOOK ON INTELLECTUAL PROPERTY AND CLIMATE CHANGE (Joshua Sarnoff, ed.) (forthcoming)

5.    *Copyright, Culture and the Cloud*, in BITS WITHOUT BORDERS (Sean Pager & Adam Candeub, eds.) (forthcoming)

6.    *Country Clubs, Empiricism, Blogs and Innovation: The Future of International Intellectual Property Norm-Making in the Wake of ACTA,* TRADE GOVERNANCE IN THE DIGITAL AGE, Mira Burri and Thomas Cottier (eds). Cambridge University Press, 2011 (forthcoming)

---

[‡] R= refereed publication.

7. **R** *The TRIPS Agreement,* MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW; (forthcoming, 2011)

8. *TRIPS Articles 10; 63-71,* in CONCISE INTERNATIONAL AND EUROPEAN IP LAW, 2D ED. (Th. Cottier and P. Véron, eds). Kluwer Law International, 2011, pp. 38-42 and 168-186

9. *User-Generated Content and Music File-Sharing: A Look at Some of the More Interesting Aspects of Bill C-32,* in FROM "RADICAL EXTREMISM" TO "BALANCED COPYRIGHT": CANADIAN COPYRIGHT AND THE DIGITAL AGENDA (M. Geist, ed.)

10. *Of Silos and Constellations: Comparing Notions of Originality in Copyright Law,* in INTELLECTUAL PROPERTY PROTECTION OF FACT-BASED WORKS (Robert F. Brauneis, ed) (Edward Elgar, 2010) 74-106--with Professor Elizabeth Judge;

    - Also published as an article (see below)

11. *Policy Calibration and Innovation Displacement,* in DEVELOPING COUNTRIES IN THE WTO LEGAL SYSTEM (J. Trachtman, and Ch. Thomas, eds.) (Oxford Univ. Pr., 2009) 363-394;

12. *TRIPS 3.0,* in THE DEVELOPMENT AGENDA : GLOBAL INTELLECTUAL PROPERTY AND DEVELOPING COUNTRIES (N. Netanel, ed) 51-75. (Oxford Univ. Pr., 2009)

13. **R** *A Uniquely Canadian Institution: The Copyright Board of Canada,* in A NEW INTELLECTUAL PROPERTY PARADIGM: THE CANADIAN EXPERIENCE (Y. Gendreau ed). (Edward Elgar, 2009)

14. *TRIPS Article 10; Articles 63-71,* in CONCISE INTERNATIONAL AND EUROPEAN IP LAW (Th. Cottier and P. Véron, eds). (Kluwer Law International, 2008), 39-42 et 153-170

15. *Intellectual Property and Human Rights: Learning to Live Together,* in INTELLECTUAL PROPERTY AND HUMAN RIGHTS (P. Torremans, ed). (Wolters Kluwer, 2008) 3-24

16. **R** *A Canadian Copyright Narrative,* in COPYRIGHT LAW: A HANDBOOK OF CONTEMPORARY RESEARCH. (P. Torremans, ed.) (Edward Elgar, 2007) 49-82;

17. *The Changing Landscape of International Intellectual Property, in,* INTELLECTUAL PROPERTY AND FREE TRADE AGREEMENTS. (Christopher Heath and Ansel Kamperman Sanders, eds) (Oxford: Hart Publishing, 2007), 49-86;

18. *TRIPS and Development,* in INTELLECTUAL PROPERTY, TRADE AND DEVELOPMENT (D. Gervais, ed--see under Books (edited) above), 3-60

19. *A TRIPS Implementation Toolbox, in idem,* 527-545

20. *Traditional Knowledge and Intellectual Property; A TRIPS Compatible Approach, in,* IPR PROTECTION AND TRIPS COMPLIANCE. (Veena, ed.) (Amicus/ICFAI University Press, 2007), 146-178;

    - Republication of article listed under No. 24 below

21. *Em busca de uma Norma Internacional para os Direito de Autor: O 'Teste dos Três Passos Reversos', in* PROPIEDADE INTELECTUAL (Edson Beas Rodrigues Jr et Fabrício Polido, eds), (Rio de Janeiro, Elsevier, 2007), 201-232 (republication of article listed under No 22 in list below)

22. *The TRIPS Agreement and the Changing Landscape of International intellectual Property,* in INTELLECTUAL PROPERTY AND TRIPS COMPLIANCE IN CHINA. (Paul Torremans et al., eds). (Edward Elgar, 2007), 65-84

23. *The TRIPS Agreement and the Doha Round: History and Impact on Development,* in

INTELLECTUAL PROPERTY AND INFORMATION WEALTH. (Peter Yu, ed), (Praeger, 2006), vol. 3, 23-72.

24. *The Changing Role of Copyright Collectives*, *in* COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS. (Daniel Gervais, ed.) (Kluwer Law International, 2006), 3-36

25. **R** *The Role of International Treaties in the Interpretation of Canadian Intellectual Property Statutes*, *in* THE GLOBALIZED RULE OF LAW: RELATIONSHIPS BETWEEN INTERNATIONAL AND DOMESTIC LAW. (O. FITZGERALD, ED), (Toronto: Irwin Law, 2006), 549-572

26. **R** *Le rôle des traits internationaux dans l'interprétation des lois canadiennes sur la propriété intellectuelle, in* O. Fitzgerald (ed), RÈGLE DE DROIT ET MONDIALISATION : RAPPORTS ENTRE LE DROIT INTERNATIONAL ET LE DROIT INTERNE (Yvon Blais, 2006), 679-712;

- French version of previous item in list

27. **R** *The TRIPS Enforcement Provisions*, *in*, CONCISE COMMENTARY OF EUROPEAN INTELLECTUAL PROPERTY LAW (Thomas Dreier, Charles Gielen, Richard Hacon, eds.) (Kluwer Law International, 2006)

28. *The TRIPS Agreement*, *in* BORDER MEASURES IN THE EUROPEAN UNION. (OLIVIER VRINS AND MARIUS SCHNEIDER, EDS.), (Oxford University Press, 2006), 37-62;

29. **R** *Use of Copyright Content on the Internet: Considerations on Excludability and Collective Licensing*, *in* IN THE PUBLIC INTEREST: THE FUTURE OF COPYRIGHT LAW IN CANADA (Michael Geist, ed). (Toronto: Irwin Law, Oct. 2005);

30. *Copyright and eCommerce: License or Lock-up?*, *in* INTELLECTUAL PROPERTY IN THE GLOBAL MARKETPLACE : 2001 UPDATE. (Neil Wilkof et al. eds.), (New York: John Wiley & Sons, 2002). 18 p.

## Articles in English[§]

1. *The Landscape of Collective Management*, COLUM-VLA J. L & ARTS (2011) (forthcoming)

2. *Cloud Control: Copyright, Global Memes and Privacy*, J. TELECOM. & HIGH TECH L. (2011) (coauthored with Dan Hyndman) (forthcoming)

3. *Making Copyright Whole: A Principled Approach to Copyright Exceptions and Limitations*, 5:1/2 UNIV. OTTAWA L. & TECH. J. 1-41 (2008)*

- Published in March 2011

4. *The Google Book Settlement and the TRIPS Agreement*, 2011 STAN. TECH. L.R. 1-11;

5. *Fair Use, Fair Dealing, Fair Principles: Efforts to Conceptualize Exceptions and Limitations to Copyright*, 57:3 J. COPYRIGHT. SOC.Y OF THE USA 499-520 (2010);

- **Reprinted in INTELLECTUAL PROPERTY LAW REVIEW (2011) as one of best intellectual property articles of 2010**

6. *Reinventing Lisbon: The Case for a Protocol to the Lisbon Agreement*, 11:1 CHICAGO J. INT'L L.67-126 (2010);

---

[§] Only accepted publications indicated as forthcoming.  Book reviews are listed separately.

7. *The Regulation of Inchoate Technologies*, 47 HOUSTON L. REV. 665 (2010);

8. *The 1909 Copyright Act in Historical Context*, 26:2 SANTA CLARA HIGH TECH L.J.185-214 (2010);

9. *L'Arrangement de Lisbonne, un véhicule pour l'internationalisation du droit des indications géographiques* ? 35 PROPRIÉTÉS INTELLECTUELLES 691 (2010) (coauthored with Prof. Christophe Geiger, Norbert Olszak and Vincent Ruzek)

10. *Towards a Flexible International Framework for the Protection of Geographical Indications*, 1:2 WIPO JOURNAL 147-158 (2010) (coauthored with Prof. Christophe Geiger, Norbert Olszak and Vincent Ruzek)

    - English version of previous title

11. *The Misunderstood Potential of the Lisbon Agreement*, 1:1 WIPO JOURNAL 87-102 (inaugural issue - on invitation) (2010)

12. *Of Silos and Constellations: Comparing Notions of Originality in Copyright Law*, 27:2 CARDOZO ARTS & ENTERTAINMENT L. J. 375-408 (2009)--with Professor Elizabeth Judge;

13. *Traditional Knowledge: Are We Closer to the Answers?*,15:2 ILSA J. OF INT'L. AND COMP. LAW 551-567 (2009);

14. *The Tangled Web of User-Generated Content*, 11:4 VAND. J. OF TECHNOLOGY AND ENTERTAINMENT LAW 841-870 (2009);

15. *World Trade Organization panel report on China's enforcement of intellectual property rights*, 103:3 AM. J. INT'L L.549-554 (2009) (International Decision--on invitation);

16. *Of Clusters and Assumptions: Innovation as Part of a Full TRIPS Implementation*, 77:5 FORDHAM L. R. 2353-2377 (2009)

17. **R** *A Canadian Copyright Narrative*, 21 INT. PROP. J. (Can.) 269 (2009)

    - Republication of book chapter with same title

18. *The Protection of Databases*, 82:3 CHI-KENT L. REV. 1101-1169 (2007);

19. **R** *The Purpose of Copyright Law in Canada*, 2:2 UNIV. OTTAWA. J. L. & TECH. 315-356 (2006);

20. **R** *The Changing Landscape of International Intellectual Property*, 2 J. OF INTELL. PROP. LAW & PRACTICE 1-8 (2006);

21. *Intellectual Property and Development: The State of Play*, 74 FORDHAM LAW REVIEW *505-535* (2005);

22. *Towards A New Core International Copyright Norm: The Reverse Three-Step Test*, 9 MARQ. INTELL. PROP. L. REV. 1-37 (2005);

23. *Copyright in Canada: An Update After CCH*, REVUE INT. DROIT D'AUTEUR RIDA 2-61(2005);

    - Also published in French (see below)

24. *Traditional Knowledge & Intellectual Property: A TRIPS-Compatible Approach*, [2005] MICH. ST. L. REV. *137-166;*

25. **R** *International Intellectual Property and Development: A Roadmap to Balance?*, 2:4 J. OF GENERIC MEDICINES *327-334* (2005);

26. *The Price of Social Norms: Towards a Liability Regime for File-Sharing*, 12 J. INTELL. PROP. L. 39-74 (2004);

27. **R** *The Compatibility of 'Skill & Labour' with the Berne Convention and the TRIPS Agreement*, [2004] 2 EUR. INT. PROP REV. 75-80;

28. *Canadian Copyright Law Post CCH*, 18:2 INTELL. PROP. J. (Can.) 131-168 (2004);

29. *Spiritual but Not Intellectual? The Protection of Sacred Intangible Traditional Knowledge*, 11 CARDOZO J. OF INT'L & COMP. LAW 467-495(2003);

30. **R** *TRIPS, Doha & Traditional Knowledge: A Proposal*, 6 J. WORLD INT. PROP. 403-419 (2003);

31. **R** *Fragmented Copyright, Fragmented Management: Proposals to Defrag Copyright Management*, 2 CAN .J. OF L. & TECH 15-34 (2003) (with Prof. Alana Maurushat)

32. **R** *Feist Goes Global: A Comparative Analysis of the Notion of Originality in Copyright Law*, 49:4 J. COPYRIGHT. SOC.Y OF THE USA 949-981(2002);*

    - Winner, **Charles Best Seton Award,** Best Article of 2002-3, Copyright Society of the USA
    - Article cited by the Chief Justice of Canada in *CCH Canadian Inc. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339 (Can.), at para. 18.

33. *The Internationalization of Intellectual Property: New Challenges from the Very Old and the Very New*, 12:4: FORDHAM INTELL. PROP., MEDIA & ENTERTAINMENT L. J. 929-990 (2002);

34. **R** *Collective Management of Copyright and Neighboring Rights in Canada: An International Perspective*, 1 CAN. J. OF LAW & TECH. 21-50 (2002);

35. *Transmission of Music on the Internet: A Comparative Study of the Laws of Canada, France, Japan, the U.K. and the United States*, 34:3 VANDERBILT J. OF TRANSNAT'L L. 1363-1416 (2001);

    - Article cited in the majority opinion of the Supreme Court of Canada in *Society of Composers, Authors and Music Publishers of Canada v. Canadian Association of Internet Providers*, 2004 SCC 45 (Can.), at para. 75.

36. **R** *The TRIPS Agreement After Seattle: Implementation and Dispute Settlement Issues* 3 J. OF WORLD INT. PROP. 509-523(2000);

37. **R** *Electronic Rights Management Systems*, 3 J. OF WORLD INT. PROP. 77-95 (2000);

38. **R** *The TRIPS Agreement: Interpretation and Implementation*, 3 EUR. INT. PROP. REV., 156-162 (1999);

39. **R** *Intellectual Property in the MAI: Lessons to Be Learned*, 2 J. WORLD INT. PROP. 257-274 (1999) (with Vera Nicholas)

40. **R** *Electronic Rights Management and Digital Identifier Systems*, J. ELEC. PUBLISHING, online only, March 1999.  Available at http://www.press.umich.edu/jep/04-03.  (18 pages)

41. **R***The Protection Under International Copyright Law of Works Created with or by Computers*, 5 IIC INTERN'L REV. INDL PROP. AND COPYRIGHT L. 629-660 (1991).

## Articles in French and other languages

1. *Trente ans de droit d'auteur à la Cour suprême du Canada*, 21 :2 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 419-448  (2009)
2. *Propiedad intelectual y derechos humanos: aprediendo a vivir juntos,* 3:5 REVISTA IBEROAMERICANA DE DERECHO DE AUTOR (2009)
   - o   Edited translation of book chapter with same title
3. Roberston c. Thomson Corp. : *Un commentaire sur le droit des pigistes à la lumière de l'intervention de la Cour suprême du Canada*, 3 :2  REVUE DE DROIT & TECHNOLOGIE DE L'UNIVERSITÉ D'OTTAWA/UNIVERSITY OF OTTAWA LAW & TECHNOLOGY JOURNAL, 601-614 (2006)*;*
   - o   French version of article mentioned at no 25 in list above.
4. **R** *Le droit d'auteur au Canada après* CCH, 203 REVUE INT. DROIT D'AUTEUR RIDA 2-61(2005);
5. **R** *Essai sur la fragmentation du droit d'auteur : Deuxième partie* 16 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 501-536 (2004);
6. **R** *Etre au parfum: La protection des marques olfactives en droit canadien,*  15 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 865-904(2003);
7. **R** *Essai sur la fragmentation du droit d'auteur : Première partie, 15* CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 501-536 (2003);
8. **R**  *L'affaire* Théberge,  15 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 217-240 (2002);
9. **R** *Los sistemas básicos de derecho de autor y copyright: La noción de obra y la gestión de los derechos de autor*, 26 REVISTA DE DERECHO PRIVADO, 15-27(2001);
10. **R** *La Responsabilité des États à l'égard des actes des organes judiciaires*, 6 R.Q.D.I. 71-82 (1989-1990);
11. **R***Le Droit de refuser un traitement psychiatrique au Québec*; 26 CAHIERS DE DROIT 807 (1985)

## Conference Proceedings (Refereed)

- **R** *Le droit d'auteur au Canada: fragmentation ou gestion fragmentaire*, *in* INSTITUTIONS ADMINISTRATIVES DU DROIT D'AUTEUR.( Y. Gendreau, ed.). (Cowansville : Éditions Yvon Blais, 2002),  459-477

## Other Publications—All languages

1. <u>*The Google Book Settlement and International Intellectual Property Law*</u>, 15:9 ASIL INSIGHT (Apr, 11, 2011)

2. *Foreword, in* IMPLEMENTING THE WIPO DEVELOPMENT AGENDA (Jeremy DeBeer, Ed.). Ottawa: Wilfrid Laurier University Press. 2009.  *ix-xii;*

3. *Collective Management of Copyright and Related Rights in North America, in* ASIAN COPYRIGHT SEMINAR, (Tokyo, Feb. 25, 2009) 17-72;

4. *La Parodie et le moyen de défense fondé sur l'« intérêt du public »,* in DROIT D'AUTEUR ET LIBERTÉ D'EXPRESSION/COPYRIGHT AND FREEDOM OF EXPRESSION, 2006 BARCELONE, (ALAI, 2008);

5. *Litigation, not politics, drives change in IP*, 25:28, THE LAWYERS WEEKLY (November 25, 2005) 2 pages;

6.  *TRIPS: A Question of Balance.* IPR INFO (Helsinki: Immateriaalioikeuinstituutti), 2/2005, 26-27;

7.  *The Realignment of Copyright in Canada.* Twelfth National Conference on Communications Law, Toronto, April 7, 2005 (51 pages);

8.  *The Changing Face of Copyright*, 7:4 COPYRIGHT & NEW MEDIA LAW NEWSLETTER, 3 pages (2003);

9.  *Arbitration Concerning Intellectual property Rights: A Key to the Success of the Doha Round*, 7:2 J. OF WORLD INT. PROP. 245-248 (2004);

10. *The Evolving Role(s) of Copyright Collectives*, in DIGITAL RIGHT MANAGEMENT - THE END OF COLLECTING SOCIETIES?" (Christoph Beat Graber, ed.) (Lucerne, 2005);

11. *A Viable Rights Clearance Scheme*, 6:2 COPYRIGHT & NEW MEDIA LAW NEWSLETTER 3 (2002);

12. "Copyright and the Use Paradigm," *in* COPYMART: THE PRODUCT AND ITS PROSPECTS: PROCEEDINGS OF THE BERLIN SYMPOSIUM. (Z. Kitagawa, ed.), (Kyoto: IIAS, 2003), 109-116;

13. "Traditional Knowledge: A Challenge to the International Intellectual Property System," *in*, 7 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 2002). ch 76-1;

14. "The TRIPS Agreement: Life After Seattle*?*," *in* 6 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 2001). ch. 40-1;

15. *E-Commerce and Intellectual Property: Lock-it Up or License?*, *in* 6 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 2001). ch. 87-1;

16. *Electronic Rights Management Systems*, *in* Y2C: COPYRIGHT LAW 2000 (Jon A. Baumgarten and Marybeth Peters, eds),. (New Jersey: Glasser Legal Works: 2000) (15 pages);

17. *An Overview of TRIPS: Historical and Current Issues*, *in* 5 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 2000), ch. 40;

18. *Digital Distance Education: Exemption or Licensing?*, *in*, 4 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 1999), ch. 87;

19. *Copyright Aspects of Electronic Publishing*, *in* PROCEEDINGS OF EP'94, (Beijing: The Science Press, 1994) 4-12;

20. *ECMS: From Rights Trading to Electronic Publishing*, *in* THE PUBLISHER IN THE CHANGING MARKETS. PROCEEDINGS OF IPA FOURTH INTERNATIONAL COPYRIGHT SYMPOSIUM. (Tokyo: Ohmsha, 1998). 194-212 (18 pages);

21. *The TRIPS Agreement: Enforcement and Dispute-Settlement Provisions*, *in* THE PUBLISHER IN THE CHANGING MARKETS. PROCEEDINGS OF IPA FOURTH INTERNATIONAL COPYRIGHT SYMPOSIUM (Tokyo : Ohmsha, 1998). 230-236 (7 pages);

22. « L'état des lieux:  la gestion collective dans le monde, en Europe et en France ».  (Paris: SACEM, 1996).  (11 pages);

23. « Gestion des droits », *in* ACTES DU COLLOQUE LES AUTOROUTES DE L'INFORMATION : ENJEUX ET DÉFIS », HUITIÈMES ENTRETIENS DU CENTRE JACQUES CARTIER RHÔNE-ALPES. (Lyons: Université de Lyon-2, 1996);

24. « Les 'œuvres multimédia' : le point de vue de l'OMPI », *in* LE MULTIMÉDIA : MARCHÉ, DROIT ET PRATIQUES JURIDIQUES. ACTES DU JURISCOPE 94. (Paris : P.U.F., 1995). (8 pages);

25. « Identificación de las obras utilizadas en sistemas digitales », *in* NUM NOVO MUNDO DO DIREITO DE AUTOR. (Lisbon: COSMOS/Arco-Iris, 1994). (17 pages);

26. "El principio del trato nacional en los acuerdos internacionales de propiedad intelectual", same book— (15 pages);

## Book Reviews

- *T. Scassa and M. Deturbide. Electronic Commerce Law In Canada* (Toronto: CCH, 2004). Reviewed at 42 CAN. BUS. L. J. 292-310 (2005);
- *Le Droit du Commerce Électronique.* (*V. Gautrais, ed.).* (Montréal, Thémis, 2002. 709 pp.), reviewed at 33 REVUE GÉNÉRALE DE DROIT 489-505 (2003)

## Technical Reports, Law Reform, and Commissioned Research Work

1. *Fair Dealing, the Three Step test and Exceptions in the Canadian* Copyright Act, Report commissioned by Industry Canada, November 2007

2. *Application of an Extended Licensing Regime in Canada: Principles and Issues Related to Implementation.* Department of Canadian Heritage, July 2003*

3. *Collective Management of Copyright and Neighboring Rights in Canada: An International Perspective.* Department of Canadian Heritage, August 2001*

4. *Intellectual Property Practices in the Field of Biotechnology.* Report published by the Trade Directorate, Organization for Economic Co-operation and Development (OECD), Paris 1999. Document No. TD/TC/WP(98)15/FINAL.(23 pages);

5. THE LAW AND PRACTICE OF DIGITAL ENCRYPTION. (Amsterdam: University of Amsterdam, 1998). (64 pages)

6. *ECMS: The Policy Issues*, *in* IMPRIMATUR CONSENSUS FORUM. 21/22 NOVEMBER 1996. (London: Imprimatur, 1996).

**EXHIBIT B**

## Exhibit B to Gervais Report

1.   The Fourth Amended Class Action Complaint

2.   Google Objections and Responses to Plaintiffs' First Requests for Admissions

3.   Plaintiffs' Brief in Support of Their Motion for Class Certification

4.   Zack Decl. and Exhibits in support of motion for class certification

5.   Google's Brief in Opposition to Class Certification

6.   Clancy Decl., Gratz Decl., Perle Decl., Poret Decl. and Report, filed with Google class certification opposition

7.   Google's brief and reply brief in support of its motion to dismiss the Authors Guild

8.   Plaintiffs' brief in opposition to Google's motion to dismiss the Authors Guild

9.   The materials cited in my report

10.  The article available at http://papers.ssrn.com/so13/papers.cfm and materials cited therein

11.  The books.google.com website

12.  The Complaint, Answer and Plaintiffs' brief in support of motion for partial judgment on the pleadings in *Authors Guild, et al. v. Hathitrust*, et al., 11 Civ. 6351 (HB)(S.D.N.Y.)