**EXHIBIT 38**

**FILED UNDER SEAL**

**EXHIBIT 39**

Expert Report of Ben Edelman

## Introduction and qualifications

1.      I am an assistant professor at Harvard Business School.  My research focuses on the design of electronic marketplaces including Internet advertising, search engines, privacy, and information security.  I hold a Ph.D. in Economics from Harvard University, a J.D. from Harvard Law School, an A.M. in statistics from Harvard University, and an A.B. in economics from Harvard College.  Further information concerning my background and qualifications is provided in my curriculum vitae, which is attached hereto as Exhibit A.

2.      My experience includes more than 15 years as a computer programmer, in which time I developed software for my own use, end-user computers, local networks, and web servers; and administered servers for myself and others.  My technical experience includes efforts to verify the security of other programmers' code including uncovering shortfalls in others' security systems.  I have studied and written about questions of information security, accidental information revelation, and information distributed more broadly than online services anticipated.  For example, I have personally uncovered multiple Google privacy flaws, including improper data collection by Google Toolbar as well as improper data distribution by Google JotSpot.  I also found and demonstrated to a court's satisfaction that an early online video service, iCraveTV, had failed to secure video contents in the way that it had previously represented to that court.

3.      My academic publications explore a variety of aspects of online business, including multiple articles considering the difficulty of limiting access to and use of information systems.  A full list of my publications is provided in my curriculum vitae, which is attached hereto as Exhibit A.  Among the publications relevant to questions at issue in this matter are the following articles: In "Shortcomings and Challenges in the Restriction of Internet Retransmissions of Over-the-air Television Content to Canadian Internet Users," a submission to Industry Canada, I evaluated the difficulty of imposing certain access restrictions when distributing video material over the Internet.  In "Securing Online Advertising: Rustlers and Sheriffs in the New Wild West," I presented the challenges of designing online advertising markets to satisfy the requirements of advertisers, online publishers, and advertising platforms while  unauthorized activities such as advertising fraud are taking place.  In numerous articles, I have presented all manner of online miscreants using information systems in ways their providers did not intend, did not anticipate, sought to prevent, and/or claimed to seek to prevent.

4.      My teaching assignment currently consists of a HBS elective course called *The Online Economy*, which analyzes strategies for all manner of online businesses.  The course includes concerns arising out information security.

5.      I have testified as an expert witness in federal courts, and I have testified to committees of the United States House of Representative and United States Senate.  I have offered expert testimony in the U.S. District Courts for Michigan and Pennsylvania and in Utah State Court.  A listing of the cases in which I have testified as an expert at trial or by deposition during the past four years is attached as Exhibit B.

6.      I am being compensated for my work in this matter at the rate of $450 per hour.

**Scope of retention**

7.      I understand Google is asserting a fair use defense to the allegations that, without permission from rights-holders, it digitized millions of in-copyright books from a number of university libraries, maintains digital copies of those books on its servers, distributed digital copies of those books to the libraries, and displays on the Internet verbatim content from the books.  In this report, I address and opine on risks of a security breach exposing widely online the contents of in-copyright books from (a) the scanning,  storage and display of books (or book excerpts) by smaller, less sophisticated entities that, under an adverse fair use ruling, would be permitted to engage in conduct similar to Google's Library Project, (b) Google's distribution of digital copies of scanned books to libraries, and (c) Google's retention and storage of multiple copies of the millions of books it digitizes in its Library Project.

8.      I conclude that unrestricted and widespread conduct of the sort engaged in by Google would result in a substantially adverse impact on the potential market for books.

9.      If the Google Library Project is found not to be a fair use, then the books could be digitally copied, distributed and displayed through licenses that include security protocols and a damages structure for breaches of those protocols.  Conversely, if such uses are deemed permissible without requiring permission from rights-holders -- i.e., if fair use were to be found here -- then rights-holders will have little or no means to reduce the security risks identified in this report.

10.      Exhibit C lists the documents I reviewed and sources I considered.

**Piracy of books is already a real, not hypothetical problem**

11.      The electronic distribution of electronic copies of books, without authorization from publishers or rights-holders, is already occurring.  For example, consider a user seeking a copy of "American Sniper," the number one bestseller hardcover nonfiction book according to the New York Times bestseller list dated April 1, 2012.  Such a user might run a Google search for "american sniper mobi" (without quotes), using the word "mobi" to indicate interest in a ".mobi" book (a popular electronic book file format).  The first, second, third, fourth, fifth, sixth, eighth, ninth, and tenth-listed links all offer or purport to offer copies of the specified book.  I checked these nine links; I found that all but one confirmed that the book was available and offered a download link or download instructions.  Of the ten links, only one (the seventh) pointed to a site (Amazon) that charged for access to the book.  Of course the book is a top-selling in-copyright commercial publication; anyone offering no-charge copies is almost certainly doing so without permission from the copyright holder.

12.      Sites with pirated books fall into several categories.  Some sites charge for pirated book copies, though they do not share the resulting revenues with those who created the books.  Other sites distribute pirated book copies for free.  Among sites offering free book copies, some offer direct web-based downloads, providing pirated book copies when a user simply clicks to request a copy.  Other sites offer links to Bit torrent ".torrent" files that direct a user's computer to other computers from which a desired file may be copied.

**Similar Scanning Operations Could Allow Book Copies to Be Copied and Redistributed**

13.     If Google's conduct is found to be a fair use and others engage in similar conduct, a risk is created of book redistribution through piracy.

14.     If other providers ("providers") scan books, the resulting digital book copies could enter widespread public circulation via any of several channels.  First, pirates could extract book copies through defects in the security of a provider's systems.  Once books are scanned, the resulting digital files are stored on a server or, more often, multiple servers.  Defects in the access controls of any such server could allow pirates to gain access to digital book copies.  Defects could arise through flaws in the operating system, database server, web server, or other software run on a provider's servers; such flaws have been widespread in even the most popular server software.  Defects could also arise through the provider's custom software, which is likely to be less secure because custom software usually receives a lesser level of scrutiny, testing, and verification than software that is distributed and used more broadly.

15.     Second, pirates could extract books via errors in the security configuration of a provider's systems.  If even one of a provider's servers lacks a required update or other security feature, pirates could use that server to obtain the book copies.

16.     Third, pirates could extract books by impersonating provider staff to access provider systems.  Suppose an attacker can obtain the username and password of a person with full access to a provider's book copies.  The attacker can log in with that password to access and copy the provider's book copies.  Similar attacks are frequent: For example Amazon Zappos,[1] Gawker,[2] and Microsoft Hotmail[3] suffered similar attacks in 2009-2011.  Even the United Nations suffered a breach of the same type.[4]  If a single staff person at a single book provider used the same password for a hacked site and for access to book copies, then a hacker could use that password to access book copies, copy book copies to the hacker's own systems, and redistribute book copies further from there.

17.     Fourth, a rogue employee could intentionally redistribute book copies.  Rogue employees gain and exploit privileged access to data despite organizations' efforts to screen and supervise key staff.  Consider the classified US State Department material distributed by Wikileaks in 2010 – information obtained via a rogue employee.  A rogue employee with access to book copies could intentionally make those copies available to the public.

18.     Fifth, when books are scanned by a smaller and less sophisticated provider, there is a particularly acute risk of book contents being accessed and redistributed.  For one, less sophisticated organizations have a reduced capability to design, install, and maintain suitable web site, database, and related security systems as well as anti-reconstruction

---

[1] Dominic Rushe.  "Zappos Database Hit by Cyberattack."  The Guardian.  January 16, 2012.
[2] Zachary Seward and Albert Sun.  "The Top 50 Gawker Media Passwords."  Wall Street Journal - Digits.  December 13, 2010.
[3] Bogdan Calin.  "Statistics from 10,000 Leaked Hotmail Passwords."  Acunetix.  October 6, 2009.  http://www.acunetix.com/blog/news/statistics-from-10000-leaked-hotmail-passwords/ .
[4] Chloe Albanesius.  "Team Poison Hacks UN, Leaks Usernames, Passwords."  PC Magazine.  November 30, 2011.

systems to secure books. Furthermore, less sophisticated organizations have a lesser ability to screen key staff to prevent data loss through rogue employees, and a lesser ability to configure security systems to exclude hackers. Thus, if other companies and organizations follow Google's lead in scanning books, a risk exists that book contents will be accessed and redistributed.

19.      As set out in the section captioned "A Single Breach Could Cause Devastating Harm to the Class," one instance of book copying can have large effects. For example, if numerous companies and organizations scan books, attackers can focus their efforts on whichever installs the weakest security. Similarly, attackers can take advantage of even a brief period when a single book provider is insecure (for example, through failure to properly update a server). Once attackers obtain book copies, they can then redistribute the copies as desired. If many providers begin scanning and storing digital book copies, the affected books are only as secure as the least secure provider – so the diligent efforts of some providers would be undermined by lax security of others.

**Breaches in Libraries' Systems Could Facilitate Book Piracy**

20.      I understand that the Google Library Project includes providing to its library partners a full digital copy of the books the libraries allowed Google to scan. Breaches in the security systems at these libraries could facilitate book piracy.

21.      I have not been informed of all the ways that libraries intend to use the book contents data they receive from Google, nor have I been informed how libraries intend to secure that data. But the information currently available indicates that libraries' actions present a risk of book piracy.

22.      If libraries provide book contents in a way where authorized library users can access the data, it is likely that some users will attempt to exceed the intended scope of authorization to access and copy book contents en masse. For example, in July 2011, a student used MIT library access to download 4.8 million articles and other documents.[5]

23.      Structural factors also increase the difficulty of libraries properly securing book contents. University libraries typically serve myriad users including students, visitors, and others with limited long-term connection to the library – limiting a library's ability to establish accountability. Moreover, libraries typically specialize in making information available rather than in restricting how information may be used. While some libraries offer electronic resources that are subject to restrictions on use, these restrictions are typically implemented by keeping the information on the information provider's servers so that the information provider, not the library, can monitor usage and attempt to assure compliance. For example, when a library licenses journals and articles and other documents from the JSTOR digital archive, libraries do not receive full copies of the articles to store on library servers. Instead, libraries receive secure access to JSTOR servers, allowing library patrons to access individual documents on JSTOR without ever receiving the full corpus of all articles JSTOR holds. Access to documents held by Lexis-Nexis and Westlaw is similar. In contrast, the book contents here at issue would be stored on libraries' servers without an outside third party to assure and enforce compliance with access restrictions.

---

[5] United States of America v. Aaron Swartz. Indictment. July14, 2011.

24.     The likely uses of digital book copies further exacerbate the risk of copying.  A natural use of digital book copies is to analyze patterns in book text.  From the perspective of a researcher seeking to perform such analysis, it is natural to begin by copying digital book copies onto a system the researcher controls, allowing the researcher to run flexible and high-speed searches of those book copies using the researcher's preferred tools.  (In contrast, if the researcher had to run analyses on a server controlled by the library, the researcher would ordinarily be able to use only those tools the library provides, and the speed of the researcher's analysis might be constrained by server capacity and availability.)  Crucially, once a researcher copies the data onto his own system, the library's prior security efforts (whatever they might be) are largely irrelevant.  A researcher might even store digital book copies on a laptop or USB drive, where loss and theft are particularly frequent.  When book copies are processed into text using optical character recognition, the resulting files can be quite small – making it feasible to store tens of thousands of book copies on an ordinary laptop or USB drive.

25.     A further risk of book piracy from or via university libraries comes from the culture of "pranks" enjoyed by many software and engineering students.  For example, the MIT Hack Gallery presents hundreds of hacks including public displays of the Apple logo, the logo of the Boston Red Sox, and the logos of various movies.[6]

26.     In its agreement with the University of Michigan, Google has specifically avoided responsibility for monitoring how libraries store or use book contents.  The University of Michigan agreement specifically speaks to Google's duty of care over physical books in Google's custody (including the risk of loss, damage, pests, fire, theft, and the like).[7]  However, the agreement offers limited commitments as to the University of Michigan's duty to keep secure its Digital Copy of the book contents.[8]  For example, Google's agreement with University of Michigan provides the use of robots.txt as a supposed "technological measure … to restrict automated access" to the Digital Copy, but robots.txt offers no genuine security protection and instead relies on a requester's compliance with stated restrictions on access.  The other provisions of Google's agreement with University of Michigan are vague ("reasonable efforts," "cooperate in good faith to mutually develop methods," etc.).  These vague provisions offer significantly lower protection than Google provides for even its routine business confidences.[9]

**Google Itself Is Not Immune to Design Flaws and Security Breaches**

27.     Despite Google's considerable resources, Google products and services nonetheless suffer from design flaws and security breaches which result in information flowing in ways Google and/or users did not intend.

---

[6] http://hacks.mit.edu/
[7] Cooperative Agreement between Google Inc. and Regents of the University of Michigan, sections 2.3.1 and 2.7.
[8] Cooperative Agreement between Google Inc. and Regents of the University of Michigan, sections 4.4.1-2.
[9] For example, the Google NDA presented at http://valleywag.com/230407/this-nda-never-existed offers greater protection including greater restrictions on the circumstances in which information can be shared, greater restrictions on the permissible recipients of such information, and more precise requirements as to how information must be secured.

28.     In general, Google faces each of the vulnerabilities detailed in "Similar Scanning Operations Could Allow Book Copies to Be Copied and Redistributed" above.  The following sections flag specific problems that could occur, as well as noting similar problems Google has already faced.

*Google's Security Systems are not Failproof*

29.     In other information and distribution services, Google has failed to comply with its commitments to users and the public.  For example, in January 2010, I found and reported the popular Google Toolbar program – installed on "hundreds of millions" of computers[10] – continuing to track users' browsing (including every web page visited) even after users had specifically requested that the Toolbar be "disable[d]" and even after the Toolbar had confirmed users' request and disappeared from screen.[11]  The user browsing at issue was users' most sensitive online activities: reasonable users would activate the Toolbar's "disable tracking" feature exactly when they sought to engage in private activities they did not wish Google to track.  Google subsequently characterized its nonconsensual information collection as "an issue"[12] but offered no explanation for why it collected information users had specifically indicated, and Google had agreed, should not be collected.  Google has paid no compensation to affected users.  Neither did Google promise to undo the error: Google never offered to let affected users identify themselves so Google could delete their data from its records.

30.     In spring 2010, Google introduced Buzz, a social network for connecting to online colleagues and sharing information about who is doing what.  For users of Google's email service, Gmail, Buzz shared with the general public the names of the persons Gmail users corresponded with – information Google had previously indicated it would keep confidential.  Google subsequently faced class litigation for this information breach, alleging that affected users suffered direct economic loss as a result of Google's information revelation.  For example, Buzz revealed the persons sending email to and receiving email from Andrew McLaughlin, who had previously served as a Google lobbyist, and was working in the White House as deputy Chief Technology Officer of the United States.  Buzz's information revelation indicated that Mr. McLaughlin had engaged in impermissible activities with his prior employers, in violation of White House ethics rules.  After Buzz-posted information prompted a complaint and an investigation, Mr. McLaughlin was formally reprimanded for the improper communications.[13]  To the best of my knowledge, Google never offered any compensation to Mr. McLaughlin or other affected Gmail users.

---

[10] Ian Paul.  "Google Toolbar Tracks Some Browsing Even When It's Not Supposed To."  PC World.  January 25, 2010.
http://www.pcworld.com/article/187670/google_toolbar_tracks_some_browsing_even_when_its_not_supp osed_to.html .

[11] Benjamin Edelman.  "Google Toolbar Tracks Browsing Even After Users Choose 'Disable'."  January 26, 2010. http://www.benedelman.org/news/012610-1.html .

[12] Barry Schwarz.  "Disabling The Google Toolbar Doesn't Stop Google From Tracking You."  January 26, 2010.  http://searchengineland.com/disabling-the-google-toolbar-doesnt-stop-google-from-tracking-you-34438

[13] J. Nicholas Hoover.  "White House Reprimands Deputy CTO."  Information Week.  May 17, 2010. http://www.informationweek.com/news/government/leadership/224900083 .

31.     In addition, during February 2012, researchers discovered that Google was bypassing Safari and Internet Explorer privacy settings to collect data that those browsers would ordinarily decline to provide.[14]  While Google ceased further collection via these methods, Google has not offered to delete information improperly collected, nor has Google offered to compensate affected users.

32.     In each of these examples, Google's services worked in exactly the way Google's engineers designed, in a way any Google engineer could have noticed through straightforward testing and, in many instances, in a way Google staff specifically intended.  Yet Google lacked authorization for these information collection and distribution practices.

*Rogue Google Employees Could Access or Redistribute Book Contents*

33.     In September 2010, news reports revealed that David Barksdale, a senior Google engineer, had used his privileged position at Google to spy on four teenagers for months.  Because Barksdale was a Site Reliability Engineer at Google, he was able to tap into call logs for Google Voice (records of phone calls to and from the youths), read the youths' instant message chat logs, and unblock himself from buddy lists in order to send instant messages to and from the youths.  Barksdale used each of these methods to access the communications of the affected youths.  While Google terminated Barksdale's employment after these practices became known, Barksdale was able to continue his practices for months without Google's internal controls noticing what he was doing.[15]  Google subsequently admitted that it had previously caught at least one other Google staff person accessing user data without authorization.[16]

*Hackers Could Access or Redistribute Book Contents*

34.     Outside hackers could access or redistribute book contents.  Many hackers disagree with the public policy embodied in applicable copyright law.  For example, during January 2012, hackers disabled web sites of the U.S. Department of Justice and FBI, trade associations Recording Industry Association of America and Motion Picture Association of America, and record labels Universal, BMI, and Warner Music Group, when hackers disapproved of possible revisions to copyright law then under discussion in Congress.[17]  Google's digitized book contents thus could attract hackers seeking to redistribute notable information.

35.     In January 2010, Google reported a "highly sophisticated and targeted attack on our corporate infrastructure originating from China that resulted in the theft of intellectual

---

[14] Jonathan Mayer.  "Safari Trackers."  February 17, 2012.  http://cyberlaw.stanford.edu/blog/2012/02/safari-trackers .
[15] Adrian Chen.  "GCreep: Google Engineer Stalked Teens, Spied on Chats."  Gawker.  September 14, 2010.  http://gawker.com/5637234/gcreep-google-engineer-stalked-teens-spied-on-chats .
[16] Jacon Kincaid.  "This Is the Second Time a Google Engineer Has Been Fired for Accessing User Data."  TechCrunch.  September 14, 2010.
[17] Ingrid Lunden.  "SOPA Blackout, Anonymous-Style: FBI, DOJ Sites Downed In Megaupload Protest."  paidContent.org.  January 19, 2012.  http://paidcontent.org/article/419-sopa-blackout-anonymous-style-doj-riaa-hacked-in-megaupload-protest/.

property from Google."[18]  A subsequent analysis by McAfee indicated that hackers had specifically sought access to the source code for Google systems, and that hackers had even obtained the ability to alter the source code for Google systems.[19]  If Google cannot keep its own intellectual property secure from attackers, it is plausible to conclude that Google cannot keep book contents invulnerable to security breaches.

**A Single Breach Could Cause Devastating Harm to the Class**

36.     A single breach of the systems that store book contents could allow book contents to become ubiquitous online.  In particular, after that single breach occurs, users are likely to copy and/or share the material en masse, preventing any subsequent efforts to resecure book contents.  For example, on August 4, 2006, AOL posted twenty million searches performed by more than 650,000 users over a three-month period.  Once AOL realized that posting this information was inadvisable (because it included myriad sensitive subjects and could be easily linked to individual AOL users), AOL removed the file from its servers the same week, but the file remains easily available, including on the web and via BitTorrent.[20]  Similarly, Wikileaks in February 2010 began publishing hundreds of thousands of pages of classified material.  The information remains easily available, including via straightforward Google searches.  The information simply cannot be "unpublished" once it has become publicly available on the Internet.

37.     Thus, if book contents become available once – via a breach of book copies scanned by others, via a breach in libraries' copies of books scanned by Google, or via a breach of Google's own systems – the book contents are likely to be available easily and indefinitely.

38.     However remote one may consider the risk of book contents becoming available, that risk must be considered in light of the devastating impact to the Class if book contents become available.

**Conclusion**

39.     If Google's practices of digitally copying, distributing and displaying books without rightsholder permission are found to be fair uses and become widespread, the market for books will be adversely impacted by the potential for security breaches.  Conversely, requiring Google and others to obtain the permission of rights-holders before engaging in such practices could prompt negotiations between rights-holders and those who seek to digitally use their works, thereby fostering standards for the allocation of the costs and risks of any harm flowing from such security breaches.

---

[18] David Drummond.  Official Google Blog.  January 12, 2010. http://googleblog.blogspot.com/2010/01/new-approach-to-china.html .
[19] McAfee Labs.  "Protecting Your Critical Assets: Lessons Learned from 'Operation Aurora.'"  March 2010.  http://www.wired.com/images_blogs/threatlevel/2010/03/operationaurora_wp_0310_fnl.pdf .
[20] For example, I searched Google for "AOL search torrent" (without quotes) on March 27, 2012.  Among the first ten results, I found six locations where I could download the files.  http://gregsadetsky.com/aol-data/ presents nine different locations where the data remains available.

Signed April 2 2012,

Benjamin Edelman

# EXHIBIT A

27a Linnaean St.
Cambridge, MA 02138

# Benjamin G. Edelman

ben@benedelman.org
(617) 359-3360

## Experience

Assistant professor, Harvard Business School.  Negotiations, Organizations & Markets unit.  (April 2007 – present)

Fields: Industrial organization, market design, information economics.
Research interests: Electronic markets.  Internet advertising, reputation, and fraud.  Automated data collection.
Teaching: Networked businesses, market design, information systems, online marketing, negotiation.

Independent consultant and expert witness  (November 1999 – present)

Conducted quantitative analyses and empirical testing for a variety of clients including the American Civil Liberties Union, AOL, Microsoft, National Association of Broadcasters, National Football League, New York Times, Universal Music Group, and Washington Post on topics including online advertising, advertising fraud, spyware, spam, pay-per-click advertising and click fraud, Internet filtering, geolocation and targeting, privacy, security, automated data collection, and user interface design. Qualified as an expert in Federal court on multiple occasions, and provided oral testimony under direct and cross examination.

Student Fellow / Technology Analyst, Berkman Center for Internet & Society  (May 1998 – January 2004)

Conducted empirical studies of the Internet's domain name system, spyware/adware, content filtering by network intermediaries. Developed software systems for interactive real-time communication among class/meeting participants.  Designed and operated system for webcast of and remote participation in numerous Berkman Center, Harvard Law School, and Cambridge community events as well as twelve ICANN public meetings.

## Education

Harvard Graduate School of Arts & Sciences - Ph.D., Economics, 2007.  Dissertation: "Topics in Internet Advertising."

Harvard Law School - J.D., 2005.

Harvard Graduate School of Arts & Sciences - A.M., Statistics, 2002.

Harvard College - A.B., Economics, *summa cum laude*, 2002; Phi Beta Kappa.

Woodrow Wilson Senior High School - Washington, DC: 1998; valedictorian.

## Representative Research

Internet Advertising and the Generalized Second Price Auction  (*American Economic Review*, 2007)
with Michael Ostrovsky and Michael Schwarz

Optimal Auction Design and Equilibrium Selection in Sponsored Search Auctions  (*American Economic Review*, 2010)
with Michael Schwarz

Strategic Bidder Behavior in Sponsored Search Auctions  (*Decision Support Systems*, 2007)  with Michael Ostrovsky

Measuring the Perpetrators and Funders of Typosquatting  (*FC'10, SV LNCS*)   with Tyler Moore; web introduction and appendix also available

Greedy Bidding Strategies for Keyword Auctions  (*Proceedings of the 9th ACM Conference on Electronic Commerce, 2007*)
with Matthew Cary, Aparna Das, Ioannis Giotis, Kurtis Heimerl, Anna Karlin, Claire Mathieu, and Michael Schwarz

On Best-Response Bidding in GSP Auctions  (2008)
with Matthew Cary, Aparna Das, Ioannis Giotis, Kurtis Heimerl, Anna Karlin, Claire Mathieu, and Michael Schwarz

Running Out of Numbers: Scarcity of IPv4 Addresses and What To Do About It  (*Proceedings of AMMA, 2009*)

Adverse Selection in Online "Trust" Certifications  (*Proceedings of ICEC 2009*)
Adverse Selection in Online "Trust" Certifications and Search Results  (*Electronic Commerce Research and Applications, 2011*)

Deterring Online Advertising Fraud Through Optimal Payment in Arrears  (*FC'09, SV LNCS*)

Securing Online Advertising: Rustlers and Sheriffs in the New Wild West  (published in *Beautiful Security*, 2009)

Assessing and Improving the Safety of Internet Search Engines  (published in *The Rising Power of Search Engines on the Internet*, 2006)

Web Sites Sharing IP Addresses: Prevalence and Significance  (2003)  cyber.law.harvard.edu/people/edelman/ip-sharing

Empirical Analysis of Internet Filtering in China  (2002)  with Jonathan Zittrain   cyber.law.harvard.edu/filtering/china
Published in *IEEE Internet Computing* as "Internet Filtering in China" (March-April 2003)

## Long-Term Research Projects

Strategies and Outcomes in Search Engine Advertising  (2004-)

"Spyware": Research, Testing, Legislation, and Suits  (2002-) benedelman.org/spyware

Resources for Affiliates and Affiliate Merchants  (2004-) benedelman.org/affiliates

Documentation of Internet Filtering Worldwide  (2002-2003)  with Jonathan Zittrain   cyber.law.harvard.edu/filtering

The Top-Level Domain Evaluation Project  (2002-2003)  with Jonathan Zittrain   cyber.law.harvard.edu/tlds

Classroom and Meeting Technology Tools  (1998-2002) cyber.law.harvard.edu/meetingtools

ICANN Public Meeting Archives, Notes, and Briefing Books  (1998-2001) cyber.law.harvard.edu/icann
cyber.law.harvard.edu/ifwp

## Additional Writings

Advertising Disclosures: Measuring Labeling Alternatives in Internet Search Engines   (2012)
with Duncan Gilchrist    *Information Economics and Policy*

Internet Protocol Numbers and the American Registry for Internet Numbers: Suggested Guidance for
Bankruptcy Trustees, Debtors-in-Possession, and Receivers.  BNA's Bankruptcy Law Reporter  (2012)   with
Steven Ryan and Matthew Martel

Pricing and Efficiency in the Market for IP Addresses  (2011)  with Michael Schwarz

The Design of Online Advertising Markets  (forthcoming)  *Handbook of Market Design*

Earnings and Ratings at Google Answers  (forthcoming)  *Economic Inquiry*

Bias in Search Results?: Diagnosis and Response  (2011)   *The Indian Journal of Law and Technology*

Measuring Bias in "Organic" Web Search  (2011)  with Ben Lockwood   benedelman.org/searchbias

To Groupon or Not to Groupon: The Profitability of Deep Discounts  (2010)  *HBS Working Paper* – with Scott
Kominers and Sonia Jaffe
*and* To Groupon or Not To Groupon: New Research on Voucher Profitability  (2011)  *HBR Blogs*

Least-Cost Avoiders in Online Fraud and Abuse   (2010)   *IEEE Security and Privacy*

The Pathologies of Online Display Advertising Marketplaces  (2010)  *ACM Sigecom Exchanges*

Competing Ad Auctions: Multi-homing and Participation Costs  (2010)  with Itai Ashlagi and Hoan Soo Lee

Priced and Unpriced Online Markets  (2009)  (*Journal of Economic Perspectives*, summer 2009)

Red Light States: Who Buys Online Adult Entertainment?  (2009)  (*Journal of Economic Perspectives*, winter 2009)

Who Owns Metrics?: Building a Bill of Rights for Online Advertisers  (2009)  (*Journal of Advertising Research*, Dec. 2009)

How to Combat Online Ad Fraud  (2009)  *Harvard Business Review*

The Dark Underbelly of Online Advertising  (2009)  *Harvard Business Review Online – HBR Now*

2

Fraud in Online Advertising  (2009)  *The Business Standard (India)*

Typosquatting: Unintended Adventures in Browsing  (2008)  McAfee Security Journal

CPC/CPA Hybrid Bidding in a Second Price Auction  (2008)  with Hoan Soo Lee

When the Net Goes Dark and Silent  (2002)  South China Morning Post (op-ed)

The Effect of Editorial Discretion Book Promotion on Sales at Amazon.com  (2001-2002)
Seymour and Ruth Harris Prize for Best Thesis in Economics, Thomas Temple Hoopes Prize for Undergraduate Research

## Web Site Writings

Search My Logs of Affiliate Fraud and Affiliate Fraud Information Lookup  (2012)  with Wesley Brandi

Hack-Based Cookie-Stuffing by Bannertracker-script  (2012)  benedelman.org/news/022712-1.html
with Wesley Brandi

Large-Scale Cookie-Stuffing at Eshop600.co.uk  (2012)  benedelman.org/news/013012-1.html  with Wesley Brandi

Advertising Disclosures in Online Apartment Search  (2012)  benedelman.org/adlabeling/apartmentsearch
with Paul Kominers

Google Tying Google Plus and Many More  (2012)  benedelman.org/news/011212-1.html

Revisiting Search Bias at Google  (2011)  benedelman.org/news/111111-1.html

Understanding the Purposes – and Weaknesses – of Online-to-Offline Discounting    Pymnts.com    (2011)

Towards Improvement in Singapore's Transportation Efficiency and Environmental Impact  (2011)
submission to the National Climate Change Secretariat of Singapore

Google's Dominance – And What To Do About It   and   Finding and Preventing Biased Results  (2011)
American Constitution Society for Law and Policy – Blog Debate

Advertisers' Missing Perspective in the Google Antitrust Hearing  (2011)  benedelman.org/news/092011-1.html

Implications of Google's Pharmacy Debacle  (2011)  benedelman.org/news/082611-1.html  and republished at Betanews

Online Discount Vouchers – Letter-Writing Tool  (2011)  vouchercomplaints.org  with Paul Kominers &  Xiaoxiao Wu

Consumer Protection in Online Discount Voucher Sales   (2011)  benedelman.org/voucher-consumer-protection
with Paul Kominers

Revisiting Unlawful Advertisements at Google  (2011)  benedelman.org/news/051811-1.html   and excerpted at
Huffington Post

Personal Rapid Transport - Environmental Issues for Earth Day  (2011)  hbs.edu/news/releases/earthday042011.html

Remedies for Search Bias  (2011)  benedelman.org/news/022211-1.html

In Accusing Microsoft, Google Doth Protest Too Much  (2011)  *HBR Blogs*

Knowing Certain Trademark Ads Were Confusing, Google Sold Them Anyway -- for $100+ Million  (2010)
benedelman.org/news/113010-1.html

Advertisers Should Raise Their Voices Against Arrogant Google  (2010)  *mUmBRELLA*

Hard-Coding Bias in Google 'Algorithmic' Search Results  (2010)  benedelman.org/hardcoding

A Closer Look at Google's Advertisement Labels  (2010)  benedelman.org/adlabeling/google-nov2010.html

On Facebook and Privacy  (2010)  www.hbs.edu/news/releases/facultyonfacebookprivacy.html

Tying Google Affiliate Network  (2010)  benedelman.org/news/092810-1.html

Facebook Leaks Usernames, User IDs, and Personal Details to Advertisers  (2010)
benedelman.org/news/052010-1.html

3

Sony's Crackle: Invisible Traffic Galore  (2010)  benedelman.org/news/042710-1.html

Protecting Privacy by Design  (2010)  *McAfee AVERT Blog*

Google's Privacy Breach: Lessons for Companies  (2010)  *Harvard Business Review Online – HBR Now*

Google Toolbar Tracks Browsing Even After Users Choose "Disable"  (2010)  benedelman.org/news/012610-1.html

Upromise Savings -- At What Cost?  (2010)  benedelman.org/news/012110-1.html

Google Still Charging Advertisers for Conversion-Inflation Traffic  (2010)  benedelman.org/news/010510-1.html

Towards a Bill of Rights for Online Advertisers  (2009)  benedelman.org/advertisersrights
(excerpted in Advertising Week Welcome Guide, excerpted in Huffington Post)

Payment Card Network Rules Prohibit Aggressive Post-Transaction Tactics  (2009)
benedelman.org/posttransaction/cardnetworks

Deception in Post-Transaction Marketing Offers  (2009)  benedelman.org/posttransaction  (including Senate testimony)

How Google and Its Partners Inflate Measured Conversion Rates and Increase Advertisers' Costs  (2009)
benedelman.org/news/051309-1.html

In Support of Utah's HB450  (2009)  benedelman.org/news/030909-1.html

False and Deceptive Display Ads at Yahoo's Right Media  (2009)  benedelman.org/rightmedia-deception

Privacy Lapse at Google JotSpot  (2008)  benedelman.org/google-jot-privacy

Hydra Media's Pop-Up Problem -- Ten Examples  (2008)  benedelman.org/news/101408-1.html

CPA Advertising Fraud: Forced Clicks and Invisible Windows  (2008)  benedelman.org/news/100708-1.html

Auditing Spyware Advertising Fraud: Wasted Spending at VistaPrint  (2008)  benedelman.org/news/093008-1.html

PPC Platform Competition and Google's "May Not Copy" Restriction  (2008)  benedelman.org/news/062708-1.html

Debunking Zango's "Content Economy"  (2008)  benedelman.org/news/052808-1.html

Coupons.com and TRUSTe: Lots of Talk, Too Little Action  (2008)  benedelman.org/news/031808-1.html

Delaying Payment to Deter Online Advertising Fraud  (2008)  benedelman.org/paymentdelay

Critiquing C-NetMedia's Anti-Spyware Offerings and Advertising Practices  (2008)
benedelman.org/news/021408-1.html

Sears Exposes Customer Purchase History in Violation of Its Privacy Policy  (2008)
benedelman.org/news/010408-1.html

The Sears "Community" Installation of ComScore  (2008)  benedelman.org/news/010108-1.html

A Closer Look at Coupons.com  (2007)  benedelman.org/news/082807-1.html

Spyware Still Cheating Merchants and Legitimate Affiliates  (2007)  benedelman.org/news/052107-1.html

How Spyware-Driven Forced Visits Inflate Web Site Traffic Counts  (2007)  benedelman.org/news/050707-1.html

Advertising Through Spyware -- After Promising To Stop  (2007)  benedelman.org/news/031407-1.html

Why I Can Never Agree with Adware and Spyware  (2007)
technology.guardian.co.uk/online/insideit/story/0,,1997629,00.html

Bad Practices Continue at Zango  (2006)  with Eric Howes   benedelman.org/news/112006-1.html

Intermix Revisited  (2006)  benedelman.org/news/110806-1.html

Current Ask Toolbar Practices  (2006)  benedelman.org/spyware/ask-toolbars

False and Deceptive Pay-Per-Click Ads  (2006)  benedelman.org/ppc-scams

4

Cookies Detected by Anti-Spyware Programs: The Current Status (2006)
www.vinnylingham.com/specialreports/cookiedetections

How Vonage Funds Spyware (2006) benedelman.org/news/071806-1.html

Spyware Showing Unrequested Sexually-Explicit Images (2006) benedelman.org/news/062206-1.html

Banner Farms in the Crosshairs (2006) benedelman.org/news/061206-1.html

The Safety of Internet Search Engines (2006) siteadvisor.com/studies/search_safety_may2006   with Hannah Rosenbaum

New York v. Direct Revenue, LLC - Documents and Analysis (2006) benedelman.org/spyware/nyag-dr

The Spyware - Click-Fraud Connection - and Yahoo's Role Revisited (2006) benedelman.org/news/040406-1.html

Advertisers Funding Direct Revenue (2006) benedelman.org/spyware/images/dr-mar06

Critiquing ITSA's Pro-Adware Policy (2006) benedelman.org/news/033106-2.html

Advertisers Funding 180solutions (2006) benedelman.org/spyware/images/180-jan06

Nonconsensual 180 Installations Continue (2006) benedelman.org/news/022006-1.html

Pushing Spyware through Search (2006) benedelman.org/news/012606-1.html

Affiliate Hall of Shame (2006) benedelman.org/news/011606-1.html

180solutions's Misleading Installation Methods - Dollidol.com (2006)
benedelman.org/spyware/installations/dollidol-180

Scanning for Solutions (2005) publications.mediapost.com/index.cfm?fuseaction=Articles.san&s=37284

What Claria Doesn't Disclose (Any More) (2005) benedelman.org/news/111505-1.html

Claria Shows Ads Through Exploit-Delivered Popups (2005) benedelman.org/news/101805-1.html

Video: New.net Installed through Security Holes (2005) benedelman.org/news/100505-1.html

How Affiliate Programs Fund Spyware (2005) benedelman.org/news/091405-1.html

How Expedia Funds Spyware (2005) benedelman.org/news/090705-1.html

How Yahoo Funds Spyware (2005) benedelman.org/news/083105-1.html

What Passes for "Consent" at 180solutions (2005) benedelman.org/news/062805-1.html

Google's Role: Syndicated Ads Shown Through Ill-Gotten Third-Party Toolbars (2005)
benedelman.org/news/060605-1.html

Ask Jeeves Toolbar Installs via Banner Ads at Kids Sites (2005)
benedelman.org/spyware/installations/askjeeves-banner

Hotbar Installs via Banner Ads at Kids Sites (2005) benedelman.org/spyware/installations/kidzpage-hotbar

The 180 Turnaround That Wasn't (2005) adbumb.com/adbumb159.html

The PacerD Installation Bundle (2005) benedelman.org/spyware/installations/pacerd

Claria's Misleading Installation Methods - Ezone.com (2005) benedelman.org/spyware/installations/ezone-claria

Claria's Misleading Installation Methods - Dope Wars (2005) benedelman.org/spyware/installations/dopewars-claria

180solutions's Misleading Installation Methods - Ezone.com (2005) benedelman.org/spyware/installations/ezone-180

3D Desktop's Misleading Installation Methods (2005) benedelman.org/spyware/installations/3d-screensaver

Comparison of Unwanted Software Installed by P2P Programs (2005) benedelman.org/spyware/p2p

Advertisers Supporting eXact Advertising (2005) benedelman.org/spyware/exact-advertisers

How Google's Blogspot Helps Spread Unwanted Software  (2005)  benedelman.org/news/022205-1.html

How VeriSign Could Stop Drive-By Downloads  (2005)  benedelman.org/news/020305-1.html

Intermediaries' Role in the Spyware Mess  (2005)  benedelman.org/news/052305-1.html

Media Files that Spread Spyware  (2005)  benedelman.org/news/010205-1.html

Video: Ebates Installed through Security Holes  (2004)  benedelman.org/news/121504-1.html

Direct Revenue Deletes Competitors from Users' Disks  (2004)  benedelman.org/news/120704-1.html

Who Profits from Security Holes?  (2004)  benedelman.org/news/111804-1.html

Gator's EULA Gone Bad  (2004)  benedelman.org/news/112904-1.html

Grokster and Claria Take Licenses to New Lows, and Congress Lets Them Do It  (2004)
    benedelman.org/news/100904-1.html

California's Toothless Spyware Law  (2004)  benedelman.org/news/092904-1.html

The Effect of 180solutions on Affiliate Commissions and Merchants  (2004)  benedelman.org/spyware/180-affiliates

WhenU Spams Google, Breaks Google "No Cloaking" Rules  (2004)  benedelman.org/spyware/whenu-spam

WhenU Copies 26+ Articles from 20+ News Sites  (2004)  benedelman.org/spyware/whenu-copy

Advertisers Using WhenU  (2004)  benedelman.org/spyware/whenu-advertisers

WhenU Security Hole Allows Execution of Arbitrary Software  (2004)  benedelman.org/spyware/whenu-security

WhenU Violates Own Privacy Policy  (2004)  benedelman.org/spyware/whenu-privacy

Methods and Effects of Spyware (FTC Comments)  (2004)  benedelman.org/spyware/ftc-031904.pdf

A Close Reading of Utah's Spyware Control Act  (2004)  benedelman.org/spyware/utah-mar04

Blocked Sites will Return, but with Limited Access  (2003)  South China Morning Post (op-ed)

Web Sites Sharing IP Addresses: Prevalence and Significance  (2003)
    cyber.law.harvard.edu/people/edelman/ip-sharing

Documentation of Gator Advertisements and Targeting  (2003)  cyber.law.harvard.edu/people/edelman/ads/gator

Empirical Analysis of Google SafeSearch  (2003)  cyber.law.harvard.edu/people/edelman/google-safesearch

Large-Scale Registration of Domains with Typographical Errors  (2003)  cyber.law.harvard.edu/people/edelman/typo-
    domains

Technical Responses to Unilateral Internet Authority: The Deployment of VeriSign "Site Finder" and ISP
    Response  (2003)  with Jonathan Zittrain  cyber.law.harvard.edu/tlds/sitefinder

Compliance with UDRP Decisions: A Case Study of Joker.com  (2003)  cyber.law.harvard.edu/people/edelman/udrp-
    compliance

Domain Name Typosquatter Still Generating Millions  (2003)  circleid.com/article/101_0_1_0_C

Localized Google Search Result Exclusions  (2002-2003)  with Jonathan Zittrain   cyber.law.harvard.edu/filtering/google

Defensive Registrations: Why They're Still Needed, and How to Make Them Earn Their Keep  (2002)
    Verisign Digital Brand Management Digital Branding Bulletin, www.verisign.com/services/cdns/news/columnist_200212.html

Documentation of Internet Filtering in Saudi Arabia  (2002)  with Jonathan Zittrain
    cyber.law.harvard.edu/filtering/saudiarabia

Localized Google Search Result Exclusions  (2002)  wth Jonathan Zittrain  cyber.law.harvard.edu/filtering/filtering/google

Analysis of Domain Reregistrations Used for Distribution of Sexually-Explicit Content  (2002)
    cyber.law.harvard.edu/people/edelman/renewals

6

Large-Scale Intentional Invalid WHOIS Data  (2002) cyber.law.harvard.edu/people/edelman/invalid-whois

.NAME Registrations Not Conforming to .NAME Registration Restrictions  (2002)
cyber.law.harvard.edu/people/edelman/name-restrictions

Alternative Perspectives on Registrar Market Share  (2002)  cyber.law.harvard.edu/people/edelman/registrar-choice

DNS as a Search Engine: A Quantitative Evaluation  (2002)  cyber.law.harvard.edu/people/edelman/dns-as-search

Disputed Registrations in .BIZ  (2002)  cyber.law.harvard.edu/people/edelman/biz-sunrise

TLD Registration Enforcement: A Call for Automation  (2002)  circleid.com/article/66_0_1_0_C
circleid.com/article/72_0_1_0_C

Invalid WHOIS Data: Who Is Responsible?  (2002)  circleid.com/article/79_0_1_0_C

iCravetv.biz/Entervision Retransmits CNN, Cartoon Network, PAX TV, California NBC Affiliate  (2002)
cyber.law.harvard.edu/people/edelman/icrave

Analysis of Registrations in Alternative Root TLDs  (2001)
cyber.law.harvard.edu/people/edelman/dotbiz  and  /people/edelman/dotweb

Documentation of Privacy and Security Shortcomings at Buy.com  (2000)
cyber.law.harvard.edu/people/edelman/buy-privacy.html

Understanding and Critiquing ICANN's Policy Agenda  (2000)
cyber.law.harvard.edu/icann/pressingissues2000/briefingbook

Software Environments for Online Deliberative Discourse  (1999-2000)  cyber.law.harvard.edu/projects/deliberation

Executive Summaries of Formative ICANN Documents  (1999)
cyber.law.harvard.edu/pressbriefings/icann/briefingbook/executivesummaries.html

ICANN and the Public Interest: Pressing Issues  (1999)  cyber.law.harvard.edu/icann/workshops/la/briefingbook

Using Trumpet Winsock on Netcom Netcruiser Accounts  (1995)  cyber.law.harvard.edu/people/edelman/trumpet.html

## Teaching Cases and Notes

Airbnb (A) and (B)  (HBS Case 912-019, -020)  (and TN)  (2011)   with Michael Luca

Attack of the Clones: Birchbox Defends Against Copycat Competitors  (HBS Case 912-010)  (2011)   with Peter
Coles

The Online Economy: Strategy and Entrepreneurship - Course Architecture Note (HBS Note 911-069) (2011)
with Peter Coles

Mobilizing Online Businesses  (HBS Module Note 911-048)  (2011)  with Peter Coles

Online Marketing at Big Skinny  (HBS Case 911-033)  (and TN)  (2011)   with Scott Kominers

The iPhone at IVK (TN)  (HBS Teaching Note 911-414)  (2010)

Akamai, Inc.  (HBS Case 804-158)  (2010)   with Thomas Eisenmann and Eric Van den Steen

Google Inc. and Google Inc. (Abridged)  (HBS Case 910-036 and 910-032)  (2010)  (and TN)   with Thomas
Eisenmann

Personal Rapid Transport at Vectus, Inc.  (HBS Case 910-010)  (2010)  (and TN)

eBay Partner Network (A), (B), and (C)  (HBS Case 910-008, -009, and -012)  (2009)  (and TN)   with Ian Larkin

Symbian, Google & Apple in the Mobile Space (A) and (B)  (HBS Case 909-055, -056)  (2009)
with F. Suarez & A. Srinivasan

Distribution at American Airlines  (A) and (B)  (HBS Case 909-035 and -036)  (and TN)  (2009)

Windows Vista  (HBS Case 909-038)  (2009)

Online Restaurant Promotions   (HBS Case 909-034)   (and TN)   (2009)

Ad Classification at Right Media   (HBS Case 909-032)   (and TN)   (2009)

Consumer Payment Systems – United States   (HBS Case 909-006)   (2009)   (and TN)   with Andrei Hagiu

Consumer Payment Systems – Japan   (HBS Case 909-007)   (2009)   (and TN)   with Andrei Hagiu

TheLadders   (HBS Case 908-061)   (2008)   (and TN)   with Peter Coles, Brian Hall, and Nicole Bennett

Opening Dot EU (A) and (B)   (HBS Case 908-052 and -053)   (2008)

Microsoft adCenter   (HBS Case 908-049)   (and TN)   (2008)   with Peter Coles

## Programming Experience

| | | |
|---|---|---|
| Microsoft Visual Basic (15+ years experience), VB.NET | Mathworks MatLab | Stata |
| SPlus / R | Python | PHP |

## Awards

Emerald Citations of Excellence Award   (2011)

ECCH Award for Outstanding Contribution to the Case Method – Strategy and General Management   (2011)

Best Paper Award, Honorable Mention – The 11th International Conference on Electronic Commerce   (2009)

Harvard University Graduate Economics Fellowship   (2003-2006)

John M. Olin Fellowship in Law and Economics   (2003-2004, 2004-2005)

Hoopes Prize for Undergraduate Research   (2002)

Seymour and Ruth Harris Prize for Best Honors Thesis in Economics   (2002)

John Harvard Scholarship, Harvard College   (1998-1999, 1999-2000, 2000-2001)

Rank I Honors, Harvard College   (1998-1999, 1999-2000, 2000-2001)

Phi Beta Kappa, Harvard College   (2001)

Undergraduate Honors Research Scholarship, Department of Economics, Harvard College   (2001)

Detur Prize, Harvard College   (1999)

## Congressional and Expert Testimony

US Senate, Commerce Committee   (2009)   (statement for the record)

US House of Representatives, Committee on the Judiciary   (2008)   (invited / hearing cancelled)

US Senate, Committee on Commerce, Science, and Transportation   (2008)

Federal Trade Commission Public Hearing on Effectiveness of CAN-SPAM   (2005)

District Court, Third Judicial District of Utah   (2004)

US Federal Court, Eastern District of Michigan   (2003)

US House of Representatives, Committee on the Judiciary   (2003)

US Federal Court, Eastern District of Pennsylvania   (2002)

US Federal Court, Western District of Pennsylvania   (2000)

8

**Academic Service**

Associate Editor: Journal of Economic Perspectives (2008-2012)

Referee: American Economic Review, Quarterly Journal of Economics, Journal of Applied Economics, RAND Journal of Economics, Management Science, Journal of Economics & Management Strategy, Sponsored Search Workshop, Workshop on the Economics of Information Security, Workshop on the Economics of Securing the Information Infrastructure, Manufacturing & Services Operations Management, The International Conference on Electronic Commerce (2009), International Review of Law and Economics, Journal of Industrial Economics, Operations Research, Berkeley Electronic Press – Policy & Internet, Review of Economic Studies, Economics Letters, Management Science, Review of Industrial Organization, Telecommunications Policy, Emerald Program

Program committee: Workshop on the Economics of Securing the Information Infrastructure (2006), Sponsored Search Workshop (2007), WWW2008, Fourth Workshop on Ad Auctions (2008), The First Conference on Auctions, Market Mechanisms and Their Applications (2009), ACM Conference on Electronic Commerce (2010), Workshop on the Economics of Information Security (2010) , Workshop on the Economics of Information Security (2011), Seventh Workshop on Ad Auctions (2011), The Second Conference on Auctions, Market Mechanisms and Their Applications (2011), WWW2012

Co-organizer: Sixth Workshop on Ad Auctions (2010)

Non-resident tutor / senior common room member: Cabot House (2004-2012)

9

# EXHIBIT B

**Benjamin Edelman – Prior Testimony at Trial or Deposition**

| Proceeding | Court | Reference | Context | Year | On behalf of |
|---|---|---|---|---|---|
| State of South Carolina v. Casale Media, Inc., et al. | South Carolina Court of Common Pleas, Richland County | 08-CP-40-0729 | Deposition | 2008 | Plaintiff |
| UMG Recordings, Inc., et al. v. Veoh Networks, Inc., et al. | U.S. District Court, Central District of California | No. CV 07-5744 AHM (AJWx) | Deposition | 2009 | Plaintiff |
| Netscape Communications Corp. v. Valueclick, Inc., et al., | U.S. District Court, Eastern District of Virginia | No. 1:09-cv-225-TSE-IDD | Deposition | 2009 | Plaintiff |
| Arista Records, et al., v. Myxer, Inc., et al. | U.S. District Court, Central District of California | No. CV 08-03935 GAF (JCx) | Deposition | 2009 | Plaintiff |
| Stephanie Lens v. Universal Music Corp., et al. | United States District Court, Northern District of California | No. C 07-03783 JF (PVT) | Deposition | 2010 | Defendant |

# EXHIBIT C

**Exhibit C to Edelman Report**

1.    The Fourth Amended Class Action Complaint

2.    Google Objections and Responses to Plaintiffs' First Requests for Admissions

3.    Plaintiffs' Brief in Support of Their Motion for Class Certification

4.    Zack Decl. and Exhibits in support of motion for class certification

5.    Google's Brief in Opposition to Class Certification

6.    Declarations of Daniel Clancy, dated February 11, 2010, and February 7, 2012

7.    Plaintiffs' brief in opposition to Google's motion to dismiss the Authors Guild

8.    Cooperative Agreement between Google and the University of Michigan (from the University of Michigan website)

9.    The Complaint and Plaintiffs' brief in support of motion for partial judgment on the pleadings in *Authors Guild, et al. v. Hathitrust*, et al., 11 Civ. 6351 (HB)(S.D.N.Y.)

10.   Defendant Google Inc.'s Supplemental Narrative Responses and Objections to Plaintiffs Second Request for Production of Documents and Things – Public Redacted Version

11.   The books.google.com website

12.   The materials cited in my report

**EXHIBIT 40**

Page 1

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3

    Master File No. 05 CV 8136-DC

4   - - - - - - - - - - - - - - - - - -x

5   THE AUTHORS GUILD, et al.,

6                        Plaintiffs,

7           -against-

8   GOOGLE, INC.,

9                        Defendant.

10  - - - - - - - - - - - - - - - - - -x

11                        June 1, 2012

12                        9:55 a.m.

13

14          Deposition of BRUCE S. HARRIS,

15  taken by attorneys for Plaintiffs, pursuant to

16  notice, held at the offices of Milberg LLP, One

17  Pennsylvania Plaza, New York, New York, before

18  Helen Mitchell, a Shorthand Reporter and Notary

19  Public.

20

21

22

23

24

25

Page 2

1
2 A P P E A R A N C E S :
3
4     BONI & ZACK LLC
      Attorneys for Plaintiffs
5        15 St. Asaphs Road
         Bala Cynwyd, Pennsylvania 19004
6
      BY:  JOANNE ZACK, ESQ.
7        jzack@bonzack.com
8
9     DURIE TANGRI LLP
      Attorneys for Defendant
10       217 Leidesdorff Street
         San Francisco, California 94111
11
      BY:  DAVID McGOWAN, ESQ.
12       dmcgowan@durietangri.com
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2     S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND AGREED
5  by and between counsel for the
6  respective parties hereto, that the
7  filing, sealing and certification of the
8  within deposition shall be and the same
9  are hereby waived;
10      IT IS FURTHER STIPULATED AND
11 AGREED that all objections, except as to
12 the form of the question, shall be
13 reserved to the time of the trial.
14      IT IS FURTHER STIPULATED AND
15 AGREED that the within deposition may be
16 signed and sworn to before any officer
17 authorized to administer an oath with
18 the same force and effect as if signed
19 and sworn to before the Court.
20
21
22
23
24
25

Page 4

1
2       B R U C E   S.   H A R R I S,
3  having been first duly sworn by the Notary
4  Public (Helen Mitchell), was examined and
5  testified as follows:
6  EXAMINATION
7  BY MS. ZACK:
8      Q    Good morning, Mr. Harris.
9      A    Good morning.
10     Q    Would you state your full name for
11 the record, please.
12     A    Bruce Harris.
13     Q    And where are you employed
14 currently?
15     A    I'm a consultant, and I'm
16 self-employed.
17         MS. ZACK:  I'm going to mark as PX
18     89 your expert report in this matter.
19         (Expert report by Mr. Harris
20     marked Exhibit PX 89 for
21     identification.)
22     Q    Mr. Harris, is PX 89 your report
23 in this matter?
24     A    Yes, it is.
25     Q    And you've been retained as an

Page 5

1           Harris
2  expert; is that correct?
3      A    That's correct.
4      Q    By Google?
5      A    Yes.
6      Q    And what is your expertise in?
7      A    Custom and practice in the
8  publishing industry.
9      Q    Approximately when were you
10 retained?
11     A    I guess two months ago, two and a
12 half months ago.
13     Q    And did you write this report
14 yourself?
15     A    Yes, I did.
16     Q    Did you have any assistance?
17     A    Yes.  I wrote the first draft, and
18 Dave helped me.
19     Q    Dave McGowan?
20     A    Um-hum.
21     Q    Anyone else?
22     A    No.
23     Q    So you didn't use any research
24 assistants --
25     A    No.

2 (Pages 2 - 5)

Page 6

1              Harris
2      Q    -- or anything like that?
3              MR. McGOWAN:  I'll caution you,
4    Mr. Harris, wait until Miss Zack is
5    finished with the questions so you don't
6    speak over each other for the court
7    reporter.
8              MS. ZACK:  For the sake of the
9    court reporter.
10     Q    Referring you to Exhibit A to your
11   declaration, which is your CV or biography, it
12   says you began your publishing career at the
13   Crown Publishing Group; is that right?
14     A    Correct.
15     Q    And what approximate years did you
16   work at Crown publishing?
17     A    From 1960 through 1988.
18     Q    What positions did you hold there?
19     A    I was a promotion assistant,
20   salesman, marketing manager, sales manager,
21   director of publishing and publisher.
22     Q    And then your next employment was
23   where?
24     A    Random House.
25     Q    And that was what approximate

Page 7

1              Harris
2    years?
3      A    From '88 to '99.
4      Q    And what positions did you hold
5    there?
6      A    I was director of publishing, and
7    then I was president of trade, sales and
8    marketing.
9      Q    And then your next employment was?
10     A    At Workman Publishers.
11     Q    From which dates, approximately?
12     A    Ninety-nine to 2004.
13     Q    And your positions there?
14     A    I was publisher and chief
15   operating officer.
16     Q    And your next position?
17     A    I became a consultant.
18     Q    So that was in 2004?
19     A    Yes.
20     Q    Who did you consult for,
21   generally?
22     A    Publishing companies and authors.
23     Q    In what areas?
24     A    Basically sales and marketing, and
25   now self-publishing.

Page 8

1              Harris
2      Q    Can you give some examples of
3    clients?
4      A    Yes.  Presently I'm working with
5    The Cooking Lab, which is a laboratory that was
6    founded by Nathan Myhrvold, M-y-h-r-v-o-l-d.
7    We're publishing a book called Modernist
8    Cuisine.  And I'm working for The Anomaly Group,
9    A-n-o-m-a-l-y, and we're publishing a graphic
10   novel called Anomaly.
11             I'm also working for Skyhorse
12   Publishing here in New York.
13     Q    When you say -- you said when you
14   were at Crown Publishing you ultimately became
15   publisher?
16     A    Yes.
17     Q    What does it mean to be publisher?
18     A    The editorial and marketing
19   functions generally report to the publisher.
20     Q    What are the marketing functions,
21   generally, in a publishing company?
22     A    Promotion, publicity, subsidiary
23   rights, sales.
24     Q    Now, have you ever consulted for
25   authors directly?

Page 9

1              Harris
2      A    Yes.
3      Q    What types of things have you
4    consulted on?
5      A    Mostly non-fiction books.
6      Q    And consulted about what sort of
7    things?
8      A    By "things" do you mean topics?
9      Q    What did you give them advice
10   about?
11     A    I gave them advice about whether
12   they should be published by existing firms or
13   publish on their own, marketing strategies,
14   distribution, sales and fulfillment.
15     Q    Are you involved at all in any --
16   you mentioned self-publishing.
17     A    Um-hum.
18     Q    What do you do as a consultant for
19   self-publishers?
20     A    Set up a framework where an author
21   can find distribution, sales and fulfillment
22   from independent sources.
23     Q    Have you ever advised authors to
24   publish in e-book form?
25     A    It's part of the publishing

3 (Pages 6 - 9)

Harris

1
2 process today.
3     Q     E-books?
4     A     Yeah.
5     Q     Have you ever previously --
6 switching topics slightly -- done any work for
7 Google?
8     A     No.
9     Q     Amazon?
10     A     No.
11     Q     Any e-book publishers?
12     A     No.
13     Q     Have you been an expert -- I see
14 in your -- I think it's Exhibit B -- that you
15 were an expert in one other case -- or C --
16 another case that's listed; is that correct?
17     A     Yes.
18     Q     And which case was that?
19     A     That was JK Rowling versus RTR
20 Publishing.
21     Q     And who did you testify for?
22     A     RTR Publishing.
23     Q     And what was that case about?
24     A     RTR was putting out a Harry Potter
25 encyclopedia, and Miss Rowling objected.

Harris

1
2     Q     And what was the subject matter of
3 your expert report in that case?
4     A     Whether the publication of a Harry
5 Potter encyclopedia would hurt her commercial
6 sales of the Harry Potter books.
7     Q     And what was your opinion there?
8     A     I said it would not hurt the sales
9 of Harry Potter books.
10     Q     And do you know what the court
11 ruled in that case?
12     A     They ruled for Miss Rowling, and
13 she settled the case.
14     Q     You mean while it was on appeal?
15     A     I guess so, yeah.
16     Q     Have you been an expert in any
17 other matters?
18     A     No.
19     Q     Have you talked to any of the
20 other experts retained by Google in this case?
21     A     No.
22     Q     Did you speak to Miss Chevalier?
23     A     Yes.
24     Q     When was that?
25     A     That was several weeks ago.

Harris

1
2     Q     And what was it you talked to her
3 about?
4     A     Custom and practice in the book
5 business.
6     Q     And what did you tell her?
7     A     We were talking about how
8 conditions actually apply in publishing.
9     Q     Can you be more specific?
10     A     I'm not sure I remember exactly
11 what we discussed.
12     Q     How long was the discussion?
13     A     About 45 minutes.
14     Q     Was it over the telephone?
15     A     Yes.
16     Q     Did anyone else participate?
17     A     I don't think so.
18     Q     And you can't remember what you
19 discussed with her other than that it was custom
20 and practice in the book business?
21     A     Yeah.
22     Q     You've attached to your report
23 various exhibits.
24     A     Yes.
25     Q     Are these all exhibits from books

Harris

1
2 that you had some connection to?
3     A     No, but they're things that came
4 to hand in the last few months.
5     Q     Well, let's look at Exhibit D.
6     A     Okay.
7     Q     And what is this?
8     A     These are the back covers of two
9 books published by Penguin.
10     Q     And did you have anything -- were
11 you in any way involved in the publication of
12 these books?
13     A     No, they were just in my library.
14     Q     So do you have any knowledge about
15 whether anything on these back covers was there
16 by permission or not of the publisher or author?
17     A     I don't have any direct knowledge
18 of that.
19     Q     Looking at Exhibit E, which is
20 "Weird things customers say in bookstores," did
21 you represent in any way the publisher or author
22 of this book?
23     A     No.  I had worked for this
24 publisher previously.
25     Q     Which publisher is that?

4 (Pages 10 - 13)

Page 14

```
1              Harris
2      A   The Overlook Press.
3      Q   You worked for them as a
4  consultant?
5      A   Yes, I did.
6      Q   But with this particular book you
7  had no involvement?
8      A   No.
9      Q   Do you know whether these
10 selections were made by permission of the
11 publisher or author?
12     A   I don't know.
13     Q   Where did you find these?
14     A   This is a little booklet,
15 promotional booklet, that has been made by
16 Overlook, which they're going to distribute next
17 week at the book expo, give out to people -- to
18 bookstores.
19     Q   So this Exhibit E, if we had the
20 original rather than a copy, would be in the
21 form of a booklet?
22     A   Yeah.
23     Q   And it's a promotional booklet
24 that Overlook, the publisher, prepared itself?
25     A   Yes.
```

Page 15

```
1              Harris
2      Q   And distributes at -- where?
3      A   At conventions, places where
4  booksellers gather, and I assume they'll also
5  probably let bookstores have them to give out to
6  their customers.
7      Q   So it's an attempt by the
8  publisher of the book to promote the book?
9      A   Exactly.
10     Q   And sales of the book; correct?
11     A   Yes.
12     Q   So we would assume that was by
13 permission of a rights holder; correct?
14         MR. McGOWAN:  Objection, lacks
15     foun --
16     Q   Do you have any reason to believe
17 it lacks permission?
18         MR. McGOWAN:  Let me finish my
19     objection.
20         MS. ZACK:  All you need to say is
21     "objection."
22         MR. McGOWAN:  I can answer your
23     question if you want me to.  You can let
24     me state my objection and not speak over
25     it.
```

Page 16

```
1              Harris
2          MS. ZACK:  Well...
3          MR. McGOWAN:  Objection, lacks
4      foundation, calls for speculation.
5          If you want to argue about the
6      sequencing of questions and objections,
7      we can do that, but I don't --
8          MS. ZACK:  I don't want to argue
9      that, I just want to say that --
10         MR. McGOWAN:  I don't see the
11     point.
12         MS. ZACK:  I'm just going to say
13     that all objections -- all you need to
14     do is say "object to the form."  All
15     objections are preserved other than to
16     the form, and stating grounds for
17     objections is a form of coaching.
18         MR. McGOWAN:  And that's
19     incorrect.
20     Q   Exhibit F, could we turn to that,
21 please.
22     A   Yes.
23     Q   And this is "Death Will Extend
24 Your Vacation" by Elizabeth Zelvin; is that
25 correct?
```

Page 17

```
1              Harris
2      A   Yes.
3      Q   Do you know who the publisher is?
4      A   I don't know who the publisher is.
5      Q   Did you at any time represent
6  Elizabeth Zelvin?
7      A   No.
8      Q   Where did you find this?
9      A   My wife is a mystery writer, and
10 we go to mystery gatherings, and this was being
11 given out.
12     Q   By whom?
13     A   By the author.
14     Q   So this, Exhibit F -- was this
15 also in booklet form?
16     A   Yes.
17     Q   So if we had the original, what is
18 Exhibit F would have been a booklet of what
19 looks to be a chapter of the book Death Will
20 Extend Your Vacation by Elizabeth Zelvin; is
21 that correct?
22     A   Yes.
23     Q   And you received this at a
24 gathering from the author herself?
25     A   Yes.
```

5 (Pages 14 - 17)

Harris

1
2     Q     Did you discuss this with the
3  author?
4     A     No.
5     Q     Did you buy the book?
6     A     No.
7     Q     Exhibit G is a series of pages.
8          Is this all one handout?
9     A     Yes.
10     Q     Where did you get this, Exhibit G?
11     A     I got this from the publisher.
12     Q     And who is that?
13     A     Clarkson Potter, which is a part
14  of Crown, which is a part of Random House.
15     Q     And was this also in booklet form
16  when you received it?
17     A     Yes.  It's called a blad.
18     Q     What is blad?
19     A     A blad is when you have
20  illustrated books, it's a selling tool for
21  publishers to show booksellers and reviewers
22  what they're going to be coming out with in a
23  highly illustrated format.
24     Q     So Exhibit G is what you're
25  calling a blad, which was in booklet form and

Harris

1
2  distributed by the publisher; is that correct?
3     A     That's correct.
4     Q     What was it a blad for, which
5  book?
6     A     Well, it's for all the books that
7  they were publishing this season.  I think the
8  next-to-last page is a listing of the books.  At
9  least some of the books, so they're both
10  cookbooks and style books.
11     Q     This page (indicating) --
12     A     That lists some of them, yes.
13     Q     I can't read the text at the top.
14  Can you?  Do you know what it says?  It's very
15  light.
16     A     I think it's an Amphoto -- Watson
17  Guptil -- it's the name of a different division
18  of Clarkson Potter, so it's Watson Guptil,
19  Potter Style and Amphoto.
20     Q     And it says "Spring" -- two
21  thousand and --
22     A     2012.  I think it's 2012.  Yeah,
23  these are recent books.
24     Q     Referring you to Exhibit H, what
25  is this?

Harris

1
2     A     This is from the Huffington Post,
3  and it was a page on Katie Workman's cookbook,
4  The Mom 100 Cookbook.
5     Q     Did you have any connection to
6  this cookbook?
7     A     No.  I know Katie, but I have no
8  connection to the book.
9     Q     And do you know who published it?
10     A     Yes.  This is published by
11  Workman.
12     Q     Do you know if this -- what would
13  you call this page?  Would you call this a promo
14  or --
15     A     Yes.
16     Q     Do you know if this promo was in
17  the Huffington Post by permission of the author
18  or publisher?
19          MR. McGOWAN:  Objection, compound
20     and vague.
21          You may answer.
22     A     I don't know.
23     Q     You don't know?
24     A     I don't know particularly.
25     Q     You're familiar with Google Books?

Harris

1
2     A     Yes.
3     Q     And you're familiar with the fact
4  that Google Books includes both books from the
5  Google Partner Program and books throughout the
6  Google Library Project?
7     A     Yes.
8     Q     The Google Partner Program
9  includes books by permission of the rights
10  holder; is that correct?
11     A     Yes.
12     Q     Did you -- I guess you became a
13  consultant in 2004, is that what you said?
14     A     Yes.
15     Q     At any time -- and your last
16  employment was at Workman?
17     A     Yes.
18     Q     Any time at Workman did you put
19  any books into the Google Partner Program?
20     A     I don't recall.
21     Q     Since then have you advised any of
22  your consulting clients to put books into the
23  Google Partner Program?
24     A     No.
25     Q     Have you advised any not to put

1           Harris
2    books in the Google Partner Program?
3        A    No.
4        Q    Just haven't given them advice
5    about the Google Partner Program?
6        A    Right.
7        Q    Have you ever talked to anyone at
8    Google, prior to your retention as their expert,
9    about the Google Partner Program?
10       A    No.
11       Q    When did you first learn about the
12   Google Library Project?
13       A    Oh, I think I read about it in the
14   paper when it was first occurring.
15       Q    Did you ever discuss that with
16   anyone from Google?
17       A    No.
18       Q    With anyone in the publishing
19   industry?
20       A    Not that I recall.
21       Q    Are you aware that Google copies
22   books for its Library Project without
23   permission?
24       A    Yes.
25       Q    Referring you to the text of your

1           Harris
2    report -- well, before I do that, have you ever
3    used Google Books?
4        A    For myself?
5        Q    Yes.
6        A    Yes.
7        Q    Have you looked at entire chapters
8    of books in the Google -- in Google book search?
9        A    Occasionally I've seen, you know,
10   longer...
11       Q    Seen longer?
12       A    Excerpts.
13       Q    Have you also seen shorter
14   excerpts?
15       A    Yes.
16       Q    Referring you back to your report,
17   on page 2 of your report, paragraph five, you
18   talk about "Google has scanned more than 20
19   books," et cetera.
20            Do you see that?
21       A    Yes.
22       Q    Was the information in this
23   paragraph based on your review of documents
24   provided to you by Google?
25       A    Yes.

1           Harris
2        Q    You don't have any independent
3    knowledge of that?
4        A    No.
5        Q    What about paragraph six?
6        A    Same.
7        Q    When you're a publisher and you
8    want to sell books, you're interested in getting
9    the books visibility; is that correct?
10       A    Yes.
11       Q    Did you ever have any
12   responsibility for permissions for the use of
13   quotes from books that you had published by
14   other persons or books?
15            MR. McGOWAN:  Objection, lacks
16       foundation.
17            You may answer.
18       Q    Permission fees.
19       A    I'm not sure I understand the
20   question.
21       Q    Are you conversant with the
22   concept of permission fees --
23       A    Yes.
24       Q    -- for the use of books --
25       A    Yes.

1           Harris
2        Q    -- or some content of books?
3        A    Yes.
4        Q    Was that part of the business of
5    Crown Publishing under your jurisdiction at any
6    time while you were there?
7        A    Yes.
8        Q    And did you have a permissions
9    department?
10       A    Not a whole department, but there
11   was somebody who was responsible.
12       Q    What did they do?
13       A    When people asked for permissions
14   they would set a rate and ask for money if
15   somebody was going to use it, or they would let
16   them use it for free.
17       Q    How was it determined whether to
18   pay for the use of the text or to do it for
19   free?
20       A    They were individual cases.
21       Q    So you mean it was decided based
22   on how much was asked for, and --
23       A    What the book was, who was asking,
24   what the use was going to be.
25       Q    And was a permissions department

7 (Pages 22 - 25)

                    Harris
1
2  ever under your jurisdiction at Random House?
3      A    No, because they worked for the
4  editors and publishers rather than the sales
5  department.
6      Q    What about at Workman?
7      A    Yes.
8      Q    It was under your jurisdiction?
9      A    Yes.
10     Q    And was the procedure at Workman
11 the same as it had been at Crown Publishing?
12     A    Yes.
13     Q    So you had one or more persons who
14 worked in that area?
15     A    Yes.
16     Q    It was the case that fees were
17 sometimes charged for permission to use excerpts
18 of books?
19         MR. McGOWAN:  Objection, vague.
20         You may answer.
21     Q    Is that correct, as a matter of
22 custom and practice in the publishing industry?
23     A    Sometimes.
24     Q    Are you aware of any promotional
25 uses of the books for which you were responsible

                    Harris
1
2  at Crown that were not done by permission of
3  Crown?
4      A    I'm not sure I understand what
5  you're asking.
6      Q    While you were at Crown, Crown
7  promoted its books.
8      A    Yeah.
9      Q    So Crown was deciding how to
10 promote the books; correct?
11     A    Yes.
12     Q    And one of the ways they would
13 promote them is to create little pamphlets;
14 correct?
15     A    Yes.
16     Q    And when those pamphlets were
17 created, Crown would decide what portion of the
18 book to put into the pamphlets; correct?
19     A    That's correct, yes.
20     Q    And Crown had a contract with the
21 author that gave it the right to promote the
22 books; correct?
23         MR. McGOWAN:  Objection, vague,
24         calls for a legal conclusion.
25         You may answer.

                    Harris
1
2      A    Yes, each contract can be a little
3  bit different.
4      Q    Was it your understanding that
5  Crown had the right vis-a-vis the author to
6  promote the books --
7      A    Yes.
8      Q    -- that Crown was publishing?
9      A    Yes.
10     Q    And then Crown would take
11 responsibility for the best way to promote the
12 book; correct?
13     A    Yes.
14     Q    And if Crown decided it didn't
15 want to release a chapter of the book for -- it
16 would not do so; right?
17     A    Correct.
18     Q    You didn't create pamphlets with
19 chapters for all your books, did you?
20     A    No.
21     Q    And how were those decisions made?
22     A    They were made by the marketing
23 people and the editorial people.
24     Q    And what criteria did they take
25 into account?

                    Harris
1
2      A    Effectiveness; what would be
3  effective, what they thought would be effective
4  in the sale of the book.
5      Q    And did they do that based on
6  their knowledge of the book itself?
7      A    Yes.
8      Q    And what they thought would best
9  promote the sales of the book?
10     A    Yes.
11     Q    And did you ever sue anyone for
12 copyright infringement while you were at Crown?
13     A    No.
14     Q    Never?
15     A    I didn't.
16     Q    Did someone on your behalf?
17     A    I don't think so.
18     Q    What about at Random House?
19     A    I'm sure there were suits, but I
20 had nothing to do with them.
21     Q    What about at Workman?
22     A    No, I don't think so.
23     Q    You're not litigious?
24     A    No.  Thank God.
25     Q    While you worked at Crown, did

1              Harris
2 anyone other than the author or publisher, in
3 your experience, ever come out with a booklet
4 that had a whole chapter of one of your books?
5      A    Not that I know of.
6      Q    How about a booklet that had
7 excerpts from 30 pages of one of your books?
8      A    Not that I know of.
9      Q    How about a booklet that had
10 excerpts from 75 percent of your books?
11     A    No.
12     Q    What about at Random House?
13     A    No.
14     Q    What about at Workman?
15     A    I don't think so.
16     Q    Now, in this modern world of
17 digital computers which we've all come into,
18 there are many ways to promote books that there
19 didn't used to be; isn't that correct?
20     A    Yes.
21     Q    Including authors have websites;
22 is that right?
23     A    That's correct.
24     Q    And you advise authors with
25 respect to how they can promote books on their

1              Harris
2 own websites?
3      A    Yes.
4      Q    And is it your understanding that
5 if an author puts up a website promoting his or
6 her book, that the result -- that that website
7 will be searched and results will show up on
8 Google?
9          MR. McGOWAN:  Objection,
10         incomplete hypothetical and radically
11         compound.
12         MS. ZACK:  It's a hypothetical.
13     A    I don't know about the results
14 appearing on Google.
15     Q    You've never checked that to see
16 whether it did or didn't?
17     A    No.
18     Q    Do you understand how Google
19 search engine works?
20     A    I think so, roughly.
21     Q    How does it work?
22     A    They're looking for key phrases.
23     Q    Well, is it your understanding
24 that Google's search engine indexes the World
25 Wide Web, what we call the internet, so that

1              Harris
2 when you search on -- I'm talking about the main
3 Google -- if you put a search term in, they will
4 search the web to find a match?
5      A    Yes.
6          MR. McGOWAN:  I'll object, vague
7         with respect to the phrase "index."
8      Q    Well, let me ask you this --
9          MR. McGOWAN:  Miss Zack may
10         actually want to specify what she's
11         talking about.  I suspect what's going
12         on is that we're dealing in adjectives
13         that have not been specified.
14     Q    Looking at Exhibit A, which is
15 your bio that we previously looked at, is that
16 on the internet?
17     A    Yes.
18     Q    And if I go to Google and I type
19 in "Bruce Harris" do you know if I'll get a link
20 to your bio?
21     A    Eventually.
22     Q    Have you ever done that?
23     A    I haven't.  I think there's a
24 judge in New Jersey, though.
25     Q    I'm sorry.

1              Harris
2      A    Same name, a judge in New Jersey.
3      Q    So you're not really familiar with
4 the way Google's main search engine works?
5      A    No.
6      Q    What kind of advice do you give
7 your author clients about whether or not they
8 should put excerpts from their books on their
9 own websites?
10     A    I think they should have the most
11 promotional website that they can have with the
12 best material, whether it's from the book or
13 featuring features in the book.
14     Q    Have you ever advised an author to
15 not include portions of the book, but to promote
16 the book in other ways?
17     A    I don't -- that's too broad, I
18 can't -- I can't say yes or no.
19     Q    Have you ever given an author
20 advice about how much of the book they should
21 make available in order to promote it?
22     A    No.
23     Q    Have you about a publisher?
24     A    We've talked about different ways
25 to promote chapters or topics.

9 (Pages 30 - 33)

Harris

1
2    Q    And what different ways have you
3  suggested to publishers?
4    A    Using single topics, which can be
5  then used in a variety of ways.  So not just the
6  entire book, but parts of it.
7    Q    Do you think it's easier for
8  authors to promote books nowadays with the World
9  Wide Web, or harder?
10    A    Both.
11    Q    How is it easier?
12    A    Easier because the web obviously
13  gives you the facility to reach a wide audience
14  at meaningful cost, but harder because there's
15  so much more activity, which I call static.
16    Q    Do you ever advise authors or
17  publishers of out-of-print books as to how to
18  promote their books?
19    A    No.
20    Q    Why not?
21    A    I've never had a client with
22  out-of-print books.
23    Q    Is there any point in promoting an
24  out-of-print book?
25        MR. McGOWAN:  Objection, lacks

Harris

1
2       foundation, it's a hypothetical.
3          You may answer.
4    A    I like to say a book is new to
5  somebody who hasn't read it, so I don't know.
6    Q    In your report you mention Amazon
7  Search Inside the Book.
8    A    Yes.
9    Q    And that's a feature of Amazon
10  that is -- required permission of the author or
11  the publisher or the rights holder of the book;
12  is that right?
13    A    I think so.
14    Q    You don't know for sure?
15    A    I don't know for sure.
16        MS. ZACK:  Let's mark as PX 90
17       materials from the internet concerning
18       Amazon.com Search Inside the Book
19       program, five pages.
20          (Amazon Search Inside the Book
21       FAQs marked Exhibit PX 90 for
22       identification.)
23    Q    Have you ever seen these --
24    A    No.
25    Q    -- FAQs concerning Amazon's Search

Harris

1
2  Inside the Book program?
3    A    No, I've never seen this before.
4    Q    Have you ever advised any of your
5  clients regarding Amazon's Search Inside the
6  Book program or feature?
7    A    No.
8    Q    If you look at page 2 of this
9  exhibit, there's print book FAQs.
10        Do you see that?
11    A    Yes.
12    Q    It says:
13        "What rights do I need to have to
14  participate in Look Inside the Book program?
15        "In order to submit books for Look
16  Inside you must hold the merchandising rights
17  for the book you wish to submit and the region
18  you're submitting for."
19        Do you see that?
20    A    I see it.
21    Q    Did you ever have an understanding
22  that Amazon could -- that Amazon's program was
23  not by permission?
24    A    No.
25    Q    Could you look at page 4, numbered

Harris

1
2  page 4, it says "4 of 5" at the top.  About
3  two-thirds down there's a question, "What is the
4  flexible percent viewing limit feature?
5        And it says, "The flexible percent
6  viewing limit feature gives print book
7  publishers control over how much of the book is
8  available for customers to view."
9        Do you see that?
10    A    I see the flexible percent viewing
11  limit feature; is that what you're --
12    Q    Yes.
13        It states that it gives publishers
14  control over how much of a book is available for
15  customers to view.
16    A    Um-hum.
17    Q    Is that similar to the control
18  that you had as a publisher when you decided how
19  much of a book to promote?
20        MR. McGOWAN:  Objection, lacks
21       foundation.
22          You may answer.
23    A    As a publisher and promotion
24  person, I thought I could use almost any
25  material that would help promote the book.

1            Harris
2       Q    And is it your opinion that
3    Google, with no permission from either the
4    author or publisher, can do the same thing?
5            MR. McGOWAN:  Objection to the
6       extent it calls for a legal conclusion.
7            You may answer.
8            And vague with respect to "same
9       thing."
10           You may answer.
11      Q    Well, I'll make it clear.
12           You said you thought as a
13   publisher you could promote the book in any way
14   you thought fit, basically; correct?
15      A    Yes.
16      Q    Are you offering an opinion here
17   that Google, without any permission from a
18   rights holder of the book, can do that?
19      A    Yes.
20      Q    So if I, Joanne Zack, decide that
21   I love a book, let's say one of the books you
22   published previously for Crown -- what books did
23   you love --
24      A    Let's say Hitchhiker's Guide to
25   the Galaxy.

1            Harris
2       Q    Hitchhiker's Guide to the Galaxy,
3    I love that book.  It's still in copyright,
4    isn't it?
5       A    Yes.
6       Q    I decide I want to promote it.  So
7    I decide to put up five chapters on Boni & Zack
8    and I say, "I love this book, you will too"; is
9    that okay?
10      A    I think that would be okay.
11      Q    It's okay with you?
12      A    Yes.
13      Q    You're not litigious?
14      A    No.
15      Q    Are you expressing an opinion
16   whether that violates the copyright laws?
17      A    No, I don't know about the
18   copyright law, I'm not an expert on it.
19      Q    Have you ever seen that happen,
20   where a publisher looks the other way when
21   someone --
22           MR. McGOWAN:  On the Boni & Zack
23      website.
24      Q    -- publishes on a website five
25   chapters of a book in copyright?

1            Harris
2            MR. McGOWAN:  Objection, vague
3       with respect to "looks the other way,"
4       incomplete hypothetical.
5            You may answer.
6       A    I think most authors would be
7    delighted to have third parties say "I love this
8    book" and give examples.
9       Q    Your opinion is that most authors
10   would be delighted.
11      A    Yes.
12      Q    My question was have you seen it
13   happen?
14      A    You said five chapters?  No.
15      Q    Have you seen third parties with
16   no permissions publish one chapter?
17      A    Not a chapter, but certainly
18   paragraphs from books that appear on websites,
19   "I love this book," and then quotes.
20      Q    Paragraphs?
21      A    Yeah.
22      Q    Anything more than paragraphs.
23      A    Not that I know of.
24      Q    And you're not offering any
25   opinions as a matter of law here?

1            Harris
2       A    No.
3       Q    Have you written any books?
4       A    Way back when.
5       Q    Are they still in copyright?
6       A    Probably not.
7       Q    Probably not?
8       A    Probably not.  Well, maybe.  I
9    don't know.
10      Q    Were they registered?
11      A    Yes.
12      Q    Do you promote them?
13      A    No.
14           It was more editing than writing;
15   they were art books.
16      Q    Are you familiar with any revenues
17   that are derived from either Search Inside the
18   Book or the Partner Program, Amazon's Search
19   Inside the Book or the Google Partner Program,
20   by the persons who participate?
21      A    No.
22      Q    You don't know anything about
23   that?
24      A    No.
25      Q    Do you know of any revenues that

11 (Pages 38 - 41)

Harris

1
2 are derived from any promotional uses of books?
3        MR. McGOWAN: Objection, vague
4    with respect to "derived."
5        You may answer.
6    Q    Earned.
7        MR. McGOWAN: By whom is the
8    objection?
9        MS. ZACK: Anyone.
10   A    I don't know.
11       MS. ZACK: Let's take a short
12   break.
13       (Recess taken)
14       MS. ZACK: Let's mark as PX 91
15   four pages entitled "Google Books
16   Partner Program Standard Terms and
17   Conditions," from the internet.
18       (Document entitled "Google Books
19   Partner Program Standard Terms and
20   Conditions" marked Exhibit PX 91 for
21   identification.)
22   Q    Have you seen this before,
23 Mr. Harris?
24   A    No.
25   Q    This is a Partner Program,

Harris

1
2 basically contract, or terms and conditions,
3 that a rights holder can enter into with Google
4 to participate in the Partner Program.
5    A    (Nodding)
6    Q    If you look on page 2, you'll see
7 paragraph eight, "Ads Payment."
8    A    Yes.
9    Q    It talks about payment for ads on
10 pages with authorized content.
11       You have no knowledge about this
12 feature of the Partner Program?
13   A    No.
14   Q    Do you understand the Partner
15 Program to be promotional?
16   A    Yes.
17   Q    And do you understand that Google
18 places ads on some portions of the content that
19 is authorized by participants in the Partner
20 Program?
21   A    Yes.
22   Q    And do you understand that Google
23 shares a portion of the ad revenues based on
24 clicks with its Partner Program participants?
25   A    I see that.

Harris

1
2    Q    You didn't know that before today?
3    A    No.
4    Q    Now, if a book is out of print,
5 how does Google's displaying it help the author
6 sell the book?
7    A    I assume that people can search
8 and find it.
9    Q    But if it's out of print, how
10 can -- what is the author or the publisher
11 getting out of it?
12   A    It may be available in e-book
13 form.
14   Q    What if it's not?
15   A    I don't know.
16   Q    You don't know whether --
17   A    I don't know how it would help.
18 It's possible that if a lot of people click on
19 that title, a publisher or an author will bring
20 it back into print if there was demand.
21   Q    Do you have any evidence that
22 that's happening?
23   A    No.
24   Q    Do you know if Google reports to
25 authors and publishers of books that it puts

Harris

1
2 into Google Books through the Library Project
3 how much people have clicked on ads?
4    A    No.
5    Q    You don't know one way or the
6 other?
7    A    No.
8    Q    Do you know how Google earns money
9 from its business?
10       MR. McGOWAN: Objection, vague.
11       You may answer.
12   A    Only what I've read in the papers
13 about advertising revenue.
14   Q    So what's your understanding?
15   A    People pay money to advertise
16 their services or products, and when the ad is
17 read, Google gets money from the advertiser.
18   Q    Do you know what percentage of
19 books copied by Google in the Library Project
20 were out of print as opposed to in print?
21   A    No, I don't.
22   Q    Have you ever advised any
23 publishers or authors of out-of-print books how
24 best to put those books back into print?
25   A    No.

12 (Pages 42 - 45)

Page 46

```
1              Harris
2     Q    Are you familiar with services
3  such as iUniverse, which will create e-books of
4  out-of-print works?
5     A    Yes.
6     Q    Are you familiar with any other
7  services like that?
8     A    I know there are quite a few, but
9  I don't know the names of them.
10    Q    Have you ever advised any author
11 or publisher to use any of those services?
12    A    No.
13    Q    Do you consider yourself an expert
14 in e-book publishing?
15    A    No.
16    Q    Do you consider yourself an expert
17 in using the internet for promotional purposes?
18        MR. McGOWAN:  Objection, lacks
19 foundation.
20        You may answer.
21    A    I'm familiar with using the
22 internet as a promotional vehicle.
23    Q    Do you consider yourself an expert
24 in it?
25    A    It's changing so fast, I wouldn't
```

Page 47

```
1              Harris
2  say I'm an expert.
3     Q    You left Workman in 2004.
4     A    Yes.
5     Q    And a lot has happened since then.
6     A    That's right.
7     Q    With respect to the internet,
8  anyway.
9     A    Yeah.
10    Q    Do you think you've kept up with
11 all that?
12    A    I've --
13        MR. McGOWAN:  Objection, vague.
14    A    I've kept up with as much as I
15 can.
16    Q    Do you work full-time as a
17 consultant?
18    A    No.
19    Q    Approximately how much time do you
20 work now?
21    A    About four days a week.
22    Q    How much of your time is devoted
23 to working on matters involving digital rights,
24 digital promotion or digital publication?
25        MR. McGOWAN:  Objection, compound.
```

Page 48

```
1              Harris
2        You may answer.
3     A    It's part of what I do.  I don't
4  know how much.
5     Q    Would it be fair to say that you
6  focus more of your consulting practice on print
7  publishing?
8     A    No, I think at this point it's
9  50/50.
10    Q    When did it become 50/50?
11    A    Oh, I guess about five years ago.
12    Q    Have you personally made any
13 promotional decisions for any books since you
14 left Workman Publishers?
15    A    Yes.
16    Q    So you've done that in your
17 capacity as a consultant?
18    A    Yes.
19    Q    Has that been for publishers?
20    A    For authors and publishers.
21    Q    Have any of them delegated to you
22 the right to make their promotional decisions?
23        MR. McGOWAN:  Objection, vague.
24        You may answer.
25    A    In consultation.
```

Page 49

```
1              Harris
2     Q    So you've given them advice,
3  basically?
4     A    Yes.
5     Q    With respect to approximately how
6  many books?
7     A    Say about 25 or 30.
8     Q    So 25 or 30 books since 2004?
9     A    Yeah.
10    Q    With respect to none of these
11 books have you advised your client to utilize
12 Google Library Project?
13    A    No.
14    Q    You have not?
15    A    It has not been part of what I've
16 advised, no.
17    Q    And with respect to those 25 or 30
18 books, you have not advised any of them to use
19 Amazon's Search Inside the Book function?
20    A    I recommended that they use it.
21    Q    Oh, you did recommend that?
22    A    Yes.
23    Q    With respect to how many books?
24    A    I would say all of them.
25    Q    Did you recommend any other
```

13 (Pages 46 - 49)

Page 50

1            Harris
2  digital promotions other than Amazon for any of
3  the 25 to 30 books?
4       MR. McGOWAN:  Objection, vague.
5       You may answer.
6       A    Yes.
7       Q    What other types of digital
8  promotion?
9       A    Book trailers, contests, games.
10      Q    Anything else?
11      A    Nothing specific I can remember.
12      Q    What's a book trailer?
13      A    A book trailer is a -- like a
14 movie trailer, like a small feature, video
15 feature, about the book.
16      Q    Like an interview with the author?
17      A    Could be an interview with the
18 author, it could be pages from the book, it
19 could be sound and light; it could be anything.
20      Q    So you didn't give the same advice
21 for each of these 25 to 30 books?
22      A    No, no.
23      Q    And when you gave advice about how
24 to promote the book, what were your
25 considerations?

Page 51

1            Harris
2       A    The target market and the amount
3  of money of you could spend, our budget.
4       Q    Anything else?
5       A    No.
6       Q    Now, with respect -- going back to
7  Google Books itself, you said you had done a
8  search for a book title or some sort of search?
9       A    Yeah.
10      Q    Did you do any search within the
11 books, where you put -- after you found a book,
12 you then searched within the book?
13      A    No.
14      Q    When you've done your searches,
15 have you used the Google main search engine or
16 have you gone to the Google Books --
17      A    I went to the Google Books.  Both,
18 I guess.
19      Q    Let's talk about Google Books.
20           When you went to Google Books, how
21 did you search?  Did you put in the name of a
22 book, or did you put in just a general search
23 term?
24      A    Both.
25      Q    And what type of results did you

Page 52

1            Harris
2  see?
3       A    I would get -- book titles would
4  come up.
5       Q    And with respect to those titles,
6  did you ever look -- do any searches within the
7  books?
8       A    Yes.
9       Q    Did you ever see a search result
10 that was snippets only and it said that this was
11 from the Library Project?
12      A    Yes.
13      Q    And how many searches did you do
14 within a single book?
15      A    Two or three.
16      Q    And you stopped?
17      A    Yeah.
18      Q    What was the purpose of doing the
19 searches?
20      A    Just to see how it worked, find
21 out a particular piece of information.
22      Q    Was that in connection with your
23 retention?
24      A    Lately, yes.
25      Q    Through Google?

Page 53

1            Harris
2       A    Yes.
3       Q    Had you done that before you were
4  retained by Google?
5       A    No.
6       MS. ZACK:  I don't have any other
7  questions.
8       MR. McGOWAN:  I don't have any
9  questions.
10      (Time noted:  11:03 a.m.)
11
12 _____
13      BRUCE S. HARRIS
14
15 Signed and subscribed to before me
16 this _____ day of _____, 2012.
17
18 _____
19      Notary Public
20
21
22
23
24
25

Page 54

```
1                                          1250 BROADWAY
2       C E R T I F I C A T E
3
4       I, HELEN MITCHELL, a Shorthand
5   Reporter and Notary Public, do hereby
6   certify:
7       I reported the proceedings in the
8   within-entitled matter, and that the
9   within transcript is a true record of
10  such proceedings.
11      I further certify that I am not
12  related, by blood or marriage, to any of
13  the parties in this matter and that I am
14  in no way interested in the outcome of
15  this matter.
16      IN WITNESS WHEREOF, I have
17  hereunto set my hand this 6th day
18  of June, 2012.
19
20      _____
21          HELEN MITCHELL
22
23
24
25
```

Page 56

```
1           ERRATA SHEET
        VERITEXT REPORTING COMPANY
2            1250 BROADWAY
         NEW YORK, NEW YORK 10001
3            800-362-2520
4   CASE: AUTHORS GUILD, ET AL. VS. GOOGLE, INC.
        DEPOSITION DATE: JUNE 1, 2012
5   DEPONENT:  BRUCE S. HARRIS
6   PAGE LINE(S)  CHANGE        REASON
7   ___|____|_____|_____
8   ___|____|_____|_____
9   ___|____|_____|_____
10  ___|____|_____|_____
11  ___|____|_____|_____
12  ___|____|_____|_____
13  ___|____|_____|_____
14  ___|____|_____|_____
15  ___|____|_____|_____
16  ___|____|_____|_____
17  ___|____|_____|_____
18  ___|____|_____|_____
19  ___|____|_____|_____
20
21      _____
            BRUCE S. HARRIS
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20___.
24
    _____    _____
25  (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

Page 55

```
1
2   June 1, 2012
3       I N D E X
4   WITNESS         EXAMINATION BY      PAGE
5   BRUCE S. HARRIS   Ms. Zack        4
6
7       E X H I B I T S
8
    FOR IDENTIFICATION              PAGE
9
    Exhibit PX 89   Expert report by Mr.    4
10          Harris
11  Exhibit PX 90   Amazon Search Inside the   36
            Book FAQs
12
    Exhibit PX 91   Document entitled       43
13          "Google Books Partner
            Program Standard Terms
14          and Conditions"
15
16
17
18
19
20
21
22
23
24
25
```

Page 52

```
 1                    Harris

 2        A    Yes.

 3        Q    Had you done that before you were

 4  retained by Google?

 5        A    No.

 6             MS. ZACK:  I don't have any other

 7        questions.

 8             MR. McGOWAN:  I don't have any

 9        questions.

10             (Time noted:  11:03 a.m.)

11

12

13        BRUCE S. HARRIS

14

15  Signed and subscribed to before me

16  this _____ day of _____, 2012.

17

18  _____

19             Notary Public

20

21

22

23

24

25
```

**EXHIBIT 41**

Page 1

1

2                 IN THE UNITED STATES DISTRICT COURT

             FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4    THE AUTHORS GUILD, INC.,          )
     Associational Plaintiff, BETTY    )
5    MILES, JOSEPH GOULDEN, and JIM    )
     BOUTON, on behalf of themselves   )
6    and all other similarly situated,)
                                       )
7                 Plaintiffs,          )
                                       )   Civil Action No.
8         -  against  -                )   05 CV 8136 (DC)
                                       )
9    GOOGLE INC.,                      )
                                       )
10                Defendant.           )
     ──────────────────────────────────)

11

12

13                                 One Penn Plaza
                                   New York, New York

14

                                   June 6, 2012
15                                 10:31 a.m.

16

17

18         Deposition of ALBERT N. GRECO, held at the

19    offices of MILBERG LLP, before LINDA DEVECKA, a

20    Notary Public of the State of New York.

21

22

23

24

25

Page 2

```
 1
 2  A P P E A R A N C E S :
 3
 4    BONI & ZACK, LLC
 5    Attorneys for Plaintiffs
 6       15 St. Asaphs Road
 7       Bala Cynwyd, Pennsylvania  19004
 8    BY:  JOANNE ZACK, ESQ.
 9
10
11    DURIE TANGRI LLP
12    Attorneys for Defendant
13       217 Leidesdorff Street
14       San Francisco, California  94111
15    BY:  DAVID McGOWAN, ESQ.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED, by
 3   and among counsel for the respective
 4   parties hereto, that the filing, sealing and
 5   certification of the within deposition shall be
 6   and the same are hereby waived;
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form of
 9   the question, shall be reserved to the time
10   of the trial;
11        IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed
13   before any Notary Public with the same
14   force and effect as if signed and sworn to
15   before the Court.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        MS. ZACK:  Mark this, please.
 3        (Plaintiff's Exhibit 92, document titled
 4   "Expert Report of Professor Albert N. Greco May
 5   3, 2012", marked for identification, as of this
 6   date.)
 7   A L B E R T   N.   G R E C O , called as a
 8   witness, having been duly sworn by a Notary
 9   Public, was examined and testified as follows:
10   EXAMINATION BY
11   MS. ZACK:
12   Q.   Good morning, Professor Greco.
13        Could you just state your full name for
14   the record, please.
15   A.   Sure.  Albert N. Greco, G-r-e-c-o.
16   Q.   What is your current position?
17   A.   I am a professor of marketing, Fordham
18   University, New York City, in the Schools of Business
19   Administration.
20   Q.   You have been retained in this matter by
21   Google as an expert?
22   A.   Yes.
23   Q.   When were you retained?
24   A.   Sometime in March of 2012.  Perhaps the
25   middle of the month.  Somewhere in that time period.
```

Page 5

```
 1                Greco
 2   Q.   What is your area of expertise?
 3   A.   I have done research on customs and
 4   practices in the book industry, also the scholarly
 5   journal business which is obviously not of any
 6   interest today.
 7   Q.   When you say you have done research on the
 8   customs and practices in the book industry, what
 9   research are you speaking of?
10   A.   I am the author or editor of 12 scholarly
11   books, most of which dealt with some aspect of the
12   book publishing industry, including a book called
13   "The Book Publishing Industry," another one called
14   "The Culture and Commerce of Publishing in the 21st
15   Century."  A series of journal articles in a variety
16   of journals here and in Europe on various aspects of
17   the book publishing industry.  Presentations at
18   conferences.
19   Q.   Are there particular aspects of the book
20   publishing industry that you focus on in your
21   research?
22   A.   A great deal of the research is spent on
23   sales, marketing, distribution.  I look at the other
24   areas of the industry, too.
25   Q.   Do you have any expertise in legal matters
```

2 (Pages 2 - 5)

Greco

2 concerning the book publishing industry?

3    A.    I am not an attorney.  I have written

4 about contracts in various publications.

5    Q.    Do you consider yourself an expert on fair

6 use?

7    A.    I am familiar with fair use.

8    Q.    But not an expert?

9    A.    I have never written extensively on fair

10 use.

11    Q.    You have been an expert before, I take it?

12    A.    Yes.

13        MR. McGOWAN:  Let me just caution you to

14    wait until Ms. Zack is finished speaking because

15    it's important that you not speak over each

16    other.

17        THE WITNESS:  Okay.

18    Q.    We have marked as PX 92 your expert

19 report.  You have that, right?

20    A.    Yes, I do.

21    Q.    If you look at what was marked as Exhibit

22 B to your expert report which comes very near the

23 end.

24    A.    Exhibit B, yes.

25    Q.    There is a list of, I think, four cases

Greco

2 that you served as an expert in, is that correct?

3    A.    Yes.

4    Q.    In the last five years or four years or is

5 this all the ones you have --

6    A.    This is a complete list covering the

7 period from 2008 to the present.

8    Q.    It's a complete list from 2008 to the

9 present?

10    A.    Yes.

11    Q.    Prior to 2008, did you serve as an expert

12 in any litigation matters?

13    A.    The first matter actually started, I

14 believe, in 2007.  It was settled in 2008.

15    Q.    Is that on this list?

16    A.    Yes, it is.

17    Q.    Which one is that?

18    A.    Number 1.

19    Q.    Which side did you serve as an expert for

20 in that case number 1, Pottker versus Feld?

21    A.    Feld.

22    Q.    What type of case was that?

23        MR. McGOWAN:  Objection, vague.  You may

24    answer.

25    A.    It involved a variety of issues.  I was

Greco

2 retained to discuss book marketing, book selling and

3 book distribution in the United States.

4    Q.    You served as an expert for Feld, you

5 said?

6    A.    Yes, Feld.

7    Q.    Is that a person or a publisher?

8    A.    Mr. Feld is a business executive.

9    Q.    Do you recall the claims against him?

10    A.    In terms of the book publishing industry,

11 there were allegations that Pottker, who was and I

12 still believe is an author, there were allegations

13 that Mr. Feld tried to hurt her career as an author.

14    Q.    What was the nature of your expert

15 opinion?

16    A.    Well, there was a confidentiality

17 agreement.  I was asked to look into book sales,

18 marketing and book distribution during the period of

19 time in which the allegations centered on.

20    Q.    Did this case have anything to do with

21 eBooks?

22    A.    No.

23    Q.    Or digital marketing of books?

24    A.    I don't believe so.

25    Q.    Is there anything else you can tell me

Greco

2 about that case?

3    A.    It was settled, and I have no idea about

4 the terms of the settlement.

5    Q.    Other than the settlement.  I mean, under

6 your confidentiality agreement as you understand it,

7 is there any other matters that you can tell me about

8 concerning your report?

9    A.    I analyzed sales data for a period of

10 time, looked at marketing customs and trends during

11 that period of time, talked about distribution of

12 books into the channels of distribution during that

13 time.  It dealt really with those three areas.

14    Q.    But your report didn't deal with the eBook

15 channel of distribution?

16    A.    No.

17    Q.    And it didn't deal with marketing online?

18    A.    No.

19    Q.    Did it deal with digital copying?

20    A.    I don't believe so.

21    Q.    The second case listed is Health

22 Communications, Inc. versus Chicken Soup For the Soul

23 Publishing.

24        Who were you retained as expert for?

25    A.    Health Communications, Inc.

3 (Pages 6 - 9)

Greco

1
2    Q.    What line of business were they in?
3    A.    They are a book publisher publishing a
4 variety of different kinds of books, often in
5 inspirational, self-help psychology areas and other
6 areas.
7    Q.    What was the nature of the claim in that
8 litigation?
9    A.    Two authors had a long-term contract with
10 Health Communications. The contract reached a
11 termination point and the two authors left. As I was
12 told, Health Communications had the legal authority
13 to print and distribute backlist titles that were
14 originally printed under the then terms and
15 conditions of a contract.
16        When the two authors left -- and they were
17 the two primary editors of this book series called
18 "Chicken Soup For the Soul." When they left and went
19 to a new publisher, and they had every right to do
20 that, the allegation was that material that had
21 originally appeared in books published by Health
22 Communications, Inc. was being used in new books
23 published by a new publisher, and there was a request
24 for an injunction to stop the sale of these new books
25 that allegedly used material from

Greco

1
2 previously-published books.
3    Q.    What was the nature of your opinion as an
4 expert?
5    A.    I was asked to deal with the sales and
6 marketing and distribution issues, customs,
7 traditions, during the period in which the matter
8 centered on.
9    Q.    Did that case have anything to do with
10 eBooks?
11    A.    I don't believe it had anything to do with
12 eBooks.
13    Q.    Did it have anything to do with digital
14 marketing of books?
15    A.    Only in the sense that books by that point
16 were available online, but that was not a major
17 issue. It was very much a secondary issue in the
18 matter.
19    Q.    And it says "Matter will go to trial."
20        Did it ever go to trial?
21    A.    I don't know. I have a feeling the
22 parties may have settled or perhaps the one party
23 just dropped the suit.
24        MR. McGOWAN: I caution you not to guess.
25        If you know or --

Greco

1
2        THE WITNESS: I really don't know for
3 sure.
4    Q.    In any event, you are not aware of a
5 trial? You are not aware of any trial?
6    A.    No, I'm not.
7    Q.    And you didn't testify at a trial?
8    A.    There was a hearing before a judge.
9    Q.    You did testify at the injunction hearing?
10    A.    Yes.
11    Q.    That was in Connecticut?
12    A.    Yes.
13    Q.    Was an injunction granted?
14    A.    No.
15    Q.    Was there a confidentiality agreement in
16 that case?
17    A.    Yes.
18    Q.    Do you recall more specifically what you
19 testified about sales and marketing in that case?
20        MR. McGOWAN: Objection, asked and
21 answered. You may answer.
22        MS. ZACK: I said "more specifically."
23    Q.    You don't have to repeat what you already
24 said.
25    A.    I was asked a series of questions

Greco

1
2 regarding customs, practices, traditions in the
3 selling of books, the marketing of books, the
4 distribution of books, and a whole series of
5 questions on those three topics.
6    Q.    You don't remember what questions there
7 were, what you answered?
8    A.    Not really, in all candor.
9    Q.    Referring you to case number 3 on your
10 list, the National Federation of the Blind versus the
11 Arizona Board of Regents, who retained you as an
12 expert?
13    A.    National Federation of the Blind.
14    Q.    What was the nature of the claims at issue
15 in that case?
16    A.    The National Federation of the Blind had
17 represented individuals that had vision impairment
18 problems. Arizona State University had an honors
19 program, which is very typical, and they were using
20 an electronic handheld device, an eReader called the
21 Kindle, and the National Federation of the Blind felt
22 that individuals that had a vision problem could not
23 use that device. It really centered on higher
24 education college textbooks.
25    Q.    When you say "centered on," what do you

4 (Pages 10 - 13)

Page 14

Greco

1
2 mean?
3     A.    They asked me to discuss trends in higher
4 education textbook publishing, sales, marketing,
5 distribution.
6     Q.    What did you say about those areas?
7     A.    They asked specifically about the use of
8 textbooks in colleges in the United States and in
9 terms of the use of eReaders and the potential growth
10 of eReaders in that market.
11     Q.    Anything else that you talked about?
12     A.    That was really the extent of it.
13     Q.    Did that case go to trial?
14     A.    No.  The parties settled.
15     Q.    You said you testified in an injunction in
16 case number 2, Health Communications, Inc.
17          Did you ever testify at a deposition in
18 the Pottker case?
19     A.    I gave depositions in the Pottker case.
20     Q.    And in the National Federation of the
21 Blind case?
22     A.    Yes.
23     Q.    The fourth case is Illinois Computer
24 Research versus Harpo Productions.
25          Who retained you there?

Page 15

Greco

1
2     A.    Harpo Productions, Inc.
3     Q.    What is their line of business?
4     A.    It is a primarily but not -- it's
5 primarily a television -- it's a company with
6 television operations and a magazine.  They may have
7 other -- they have been involved in the motion
8 picture industry also.  They may have other
9 businesses that I am not aware of.
10     Q.    What was the claim in that case or claims?
11     A.    It was a patent -- the allegations were
12 that it was a patent infringement case involving
13 books and book excerpts.
14     Q.    Patent infringement of book excerpts?
15     A.    Yes.
16     Q.    Was there a copyright claim, too?
17     A.    I don't believe there was any copyright
18 claim in this matter.
19     Q.    What type of matters did you offer an
20 expert opinion on for Harpo Productions?
21     A.    Book sales, book marketing, book
22 distribution of printed books and excerpts in the
23 United States back to approximately the middle of the
24 19th century and some work on those issues in the
25 United Kingdom back to the 19th century.

Page 16

Greco

1
2     Q.    You talked about historical or custom and
3 practices as to book distributions of printed books?
4     A.    Of printed books and excerpts.
5     Q.    So what was your opinion?
6     A.    That there was a long tradition in the
7 United States and a long tradition in the U.K. but
8 specifically a long tradition in the United States
9 about sales, marketing and distribution of printed
10 books and the use of excerpts in the United States.
11     Q.    Excerpts for what purpose?
12     A.    Book excerpts.
13     Q.    Used for what purpose of book excerpts?
14     A.    Several different uses.  One was
15 marketing, and one centered on the fact that certain
16 authors released books as excerpts over a period of
17 time.  In a sense in serials, magazines.
18     Q.    You are saying it was a custom and
19 practice for authors to release portions of their
20 books as excerpts in magazines over time as serials?
21     A.    Some authors did that going back to the
22 mid 19th century in the United States.
23     Q.    What did you say about marketing?
24     A.    Specifically, you know, why excerpts were
25 released.  In some cases it was to market the entire

Page 17

Greco

1
2 book.
3     Q.    Why excerpts were released by whom?
4     A.    It included author Conan Doyle, James
5 Michener and more than a dozen other authors.  I
6 can't remember all of them.
7     Q.    So you analyzed the circumstances under
8 which those authors released excerpts for marketing
9 purposes?
10     A.    Yes.
11     Q.    What did you conclude about that?
12     A.    That it was as very longstanding tradition
13 in the United States and in the U.K. for some authors
14 to release excerpts in order to generate interest in
15 their writings and the ultimate publication of a book
16 or the use of excerpts after a book had been
17 published in order to generate interest in the sales
18 of their book or books.
19     Q.    How is that relevant to the case, this
20 Illinois Computer Research versus Harpo Productions
21 case?
22          MR. McGOWAN:  Objection to the extent it
23     calls for a legal conclusion.  You may answer.
24     Q.    How is it pertinent to the case?
25     A.    The allegation from Illinois Computer

5 (Pages 14 - 17)

Page 18

Greco

1
2 Research LLC was that they had a patent on the use of
3 excerpts online.
4     Q.   They had a patent on the use of excerpts
5 from certain books?
6     A.   I believe the allegation was for all
7 content, not just books, but this matter that I was
8 involved in centered only on books.
9     Q.   Illinois Computer Research was alleging it
10 had a patent on the use of excerpts online from all
11 books?
12     A.   I don't believe they said all books.  They
13 were dealing specifically with Harpo Productions,
14 Inc.
15     Q.   So they said they had a patent on the use
16 of excerpts from books that Harpo Productions, Inc.
17 had an interest in?
18         MR. McGOWAN:  I am going to object.
19     Q.   Is that your understanding?
20         MR. McGOWAN:  I am going to object to the
21 extent it calls for claim construction.  It is a
22 pending case.  I think his testimony establishes
23 the relevance.  You may answer.
24     Q.   You can say you don't know if you don't
25 know.

Page 19

Greco

1
2     A.   I don't know the full extent of their
3 claim.  I only was asked to discuss the Harpo
4 Productions matter.
5     Q.   Did you give a deposition in that case?
6     A.   Yes.
7     Q.   Are you under a confidentiality agreement
8 there?
9     A.   Yes.
10     Q.   Do you know the disposition of that case?
11     A.   It was settled.
12     Q.   Have you ever served as an expert for
13 Google in any matter?
14     A.   No.
15     Q.   Have you ever been retained previously by
16 Google in any capacity?
17     A.   No.
18     Q.   Have you ever served as an expert for
19 Durie Tangri in any matter?
20     A.   No.
21     Q.   For Keker Van Nest?
22     A.   No.
23     Q.   Is it the case that you served as an
24 expert in only these four cases and that's it?
25     A.   Only those four cases.

Page 20

Greco

1
2     Q.   And now this one?
3     A.   Yes.
4         MR. McGOWAN:  Exhibit C.
5     Q.   If you look at the last page of PX 92
6 which is Exhibit C, it's a list of materials
7 considered.
8     A.   Yes.
9     Q.   Did you read all these materials that are
10 listed cover-to-cover?
11     A.   Yes.
12     Q.   Most of them are not cited in your report,
13 you would agree, correct?
14     A.   Correct.
15     Q.   What use did you make of these materials
16 on this list?
17     A.   It provided background information about
18 the matter between the Authors Guild and Google.
19     Q.   Before you were retained, did you have any
20 awareness of this case?
21     A.   Yes.
22     Q.   You mention in your report, the body of
23 your report, that you have a copyright interest in a
24 book, is that right?
25     A.   Yes.

Page 21

Greco

1
2     Q.   Were you aware of this settlement that
3 never was approved finally in this case?
4     A.   Yes.
5     Q.   Did you file a claim?
6     A.   No.
7     Q.   Did you object?
8     A.   No.
9     Q.   Have you talked to anyone at Google
10 personally other than counsel about the matters that
11 you were retained to be expert about?
12     A.   No.
13     Q.   Have you talked to anyone else about those
14 matters?
15     A.   My wife is aware of this.
16     Q.   So you talked to your wife.
17         I presume you talked to counsel at Durie
18 Tangri.
19     A.   Yes.
20     Q.   Anyone else?
21     A.   No.
22     Q.   Did anyone assist you in writing your
23 report?
24     A.   No.
25     Q.   Not even Durie Tangri?

6 (Pages 18 - 21)

Page 22

Greco

1
2     MR. McGOWAN:  Objection, vague.
3     Q.   You can answer yes or no.
4     A.   No.
5     Q.   Have you ever written any articles about
6  Google Books?
7     A.   No.  I may have mentioned it, but I don't
8  believe so.
9     Q.   Have you written any articles about Amazon
10  Search Inside the Book?
11     A.   No, but I may have mentioned it.
12     Q.   Have you written articles about digital
13  marketing?
14     A.   Articles, probably if it was -- not an
15  article on digital marketing as such.  It's possible
16  it's been mentioned in a book or articles that I have
17  done but I have never done an exclusive study on this
18  matter.
19     Q.   And you never studied Google Books from a
20  research point of view?
21     MR. McGOWAN:  Objection, vague.  You may
22     answer.
23     A.   I don't believe I have written anything
24  specifically about Google Books except in passing.
25     Q.   What about anything about Google in

Page 23

Greco

1
2  general, have you written any articles about Google
3  general business?
4     A.   No article specifically on Google.
5     Q.   Articles about search engines?
6     A.   No article specifically about search
7  engines.
8     Q.   Have you studied or written articles about
9  digital copying?
10     A.   No article specifically on that topic.
11     Q.   Generally?
12     A.   In general terms I have mentioned it in
13  various publications because it's significant.
14     Q.   Have you written any articles about
15  libraries engaging in digital copying of any type?
16     A.   Nothing specifically on that topic.
17     Q.   How about libraries setting up or engaging
18  in their own search engines?
19     MR. McGOWAN:  Objection, vague.  You may
20     answer.
21     A.   I have looked at libraries in very general
22  terms.  So, not really.
23     Q.   Have you ever studied Google's market
24  power?
25     MR. McGOWAN:  Objection.  Lacks

Page 24

Greco

1
2  foundation, vague.  You may answer.
3     A.   I have never done anything specifically on
4  Google.
5     Q.   You talk in your report about mergers and
6  acquisitions, et cetera, in the publishing industry,
7  is that correct?
8     A.   Yes.
9     Q.   Is that something you studied?
10     A.   Yes.
11     Q.   What is the purpose of those studies?
12     MR. McGOWAN:  Objection.  Compound, vague.
13     You may answer.
14     A.   Scholars are interested in what has
15  happened in various industries and sectors.  I
16  happened to study this sector in this industry.
17  There have been a series of mergers and acquisitions
18  in this industry in the United States going back into
19  the 19th century.  I thought it was an interesting
20  topic.  Not a lot of scholars have addressed the
21  issue.  I did a series of studies on it.
22     Q.   Did you compare the rate of mergers and
23  acquisitions in the publishing industry to the rate
24  of mergers and acquisitions in other industries?
25     A.   If I did, only in passing.

Page 25

Greco

1
2     Q.   Referring you back to the first page of
3  the body of your report which is PX 92.
4     A.   Yes.
5     Q.   Paragraph 2 says "I have been asked to
6  describe the following:", and then subparagraph A
7  says "Characteristics and practices in the book
8  industry, such as mergers, acquisitions, and
9  reversions, that affect one's ability to locate
10  rights holders for books."
11     You were asked by Google to talk about
12  that in your report?
13     A.   Yes.
14     Q.   Had you previously written about that
15  subject in particular, the effect of mergers,
16  acquisitions and reversions on the ability to locate
17  rights holders for books?
18     A.   Not in terms of the last part of the
19  sentence "to locate rights holders for books."
20     Q.   You have published no articles about how
21  the mergers, acquisitions and reversions have
22  historically affected one's ability to locate rights
23  holders for books?
24     A.   If I did, it was in passing.
25     Q.   Do you recall doing that?

7 (Pages 22 - 25)

Greco

1
2    A.   I have worked on 12 books, 20 articles, 10
3    professional books.  It's certainly possible
4    somewhere I referred to that, off the top of my head.
5    I would have to go back and look, in all candor.  I
6    may have.
7        Q.   You don't cite any articles of that
8    nature?
9        A.   No.
10       Q.   Have you ever engaged in a study whose
11   object was an attempt to locate rights holders for
12   books?
13       A.   I have never done such a study on that
14   topic.
15       Q.   Have you asked others to do it for you?
16       A.   No.
17       Q.   Have you researched studies, if any, by
18   others on that topic?
19       A.   I believe there have been some articles on
20   those issues in a variety of publications that I
21   almost certainly read and may have even cited
22   somewhere along the line.
23       Q.   But you didn't cite them in your report?
24       A.   No.
25       Q.   Have you ever attempted to locate a rights

Greco

1
2    holder for a book?
3        A.   Yes.
4        Q.   In what context?
5        A.   A colleague named John Tebbel wrote what I
6    believe was the definitive four-volume history of the
7    book publishing industry in the United States.  The
8    book was published by a company that, if I remember
9    correctly, put the books out of print, out of stock,
10   and the company no longer did books.
11          I was in discussions with a university
12   press director about possibly bringing those four
13   books back into print.  The author died, and I could
14   not find out who held the rights, whether his estate
15   or the initial publisher, and we dropped the matter.
16       Q.   When you say you couldn't find out, what
17   did you do to attempt to find out?
18       A.   I believe I tried to reach out to people
19   in Bowker, the original publisher, but they no longer
20   were doing books.  They had sold certain operations
21   to another company and, unfortunately, John Tebbel
22   passed on, and we just dropped the matter.
23       Q.   Any other times other than that time?
24       A.   Yes.  I was talking to a series editor --
25   a book series editor who was trying to bring older

Greco

1
2    books back in print, and I gave him some suggestions
3    for titles, and the matter seemed to die.
4        Q.   Other than passing on the suggestion, did
5    you do anything there to attempt to locate anyone?
6        A.   Not really.
7        Q.   Anything else; any other times that you
8    attempted to locate a rights holder for a book?
9        A.   Not that I can remember.
10       Q.   2 B says "The benefits to authors of
11   making it easy for potential readers to find their
12   books."
13          That was something that Google asked you
14   to opine about?
15       A.   Yes.
16       Q.   Have you previously written on that
17   subject?
18       A.   I have written about new title output, the
19   number of backless books, books in print, and about
20   what is often called in the marketing literature
21   "clutter in the marketplace."
22       Q.   In connection with any of those writings,
23   did you write about the benefits to authors of making
24   it easy for potential readers to find their books?
25       A.   I wrote about the problem authors face in

Greco

1
2    getting publicity for books in a business environment
3    where there is a very large number of new titles
4    published every hour of the day.
5        Q.   Anything else on that subject?
6        A.   I would have to go back and reread the
7    various things that I wrote about.
8        Q.   Have you ever written about the question
9    of whether the Internet allows authors to get more
10   noticed through their own websites?
11       A.   I probably have certainly mentioned that
12   in some of the publications that I worked on, yes.
13       Q.   What about publisher websites?
14       A.   I believe I have written about publisher
15   websites as a marketing tool.
16       Q.   And you have written about author websites
17   as a marketing tool?
18       A.   I am sure I have.  If you write about
19   marketing books, these are very typical topics that
20   you would at least mention.
21       Q.   Are there any other digital tools aside
22   from search engines that you have written about with
23   respect to marketing books?
24          MR. McGOWAN:  Objection, vague.  You may
25   answer.

8 (Pages 26 - 29)

Greco

1        Greco
2    A.   I have probably written about blogs and
3  other digital sites that discuss books, analyze
4  books, talk about books or authors.  Those have grown
5  in popularity in the last few years.
6    Q.   2 C says "Industry custom and practice
7  pertaining to the sales and marketing of books, and
8  in particular to the practice of allowing potential
9  buyers to search within books."
10   A.   Yes.
11   Q.   Google asked you to opine about that?
12   A.   I have written a lot about the sales and
13  marketing of books.  This is the first time I have
14  put ink on paper dealing with "allowing potential
15  buyers to search within books."
16   Q.   The second portion of 2 C which says "and
17  in particular to the practice of allowing potential
18  buyers to search within books," you haven't written
19  about that before?
20   A.   If so, only in passing.
21   Q.   Have you discussed that particular
22  practice with publishers?
23   A.   I have discussed it with individuals in
24  the book publishing industry in the United States.
25   Q.   Have you discussed it with authors?

Greco

1        Greco
2    A.   I have had discussions with authors.
3    Q.   Who have you discussed it with?  Which
4  individuals in the book publishing industry have you
5  discussed that topic with?
6    A.   From 1985 to the present, I have talked to
7  a sizeable number of people in this industry.
8    Q.   Let me stop you there.
9        I mean, this particular practice didn't
10  start in 1987, right?
11   A.   Right.
12   Q.   We are talking more recent conversations
13  you would have had, correct?
14   A.   Yes.
15   Q.   What I am asking you is, since this
16  practice developed, allowing potential buyers to
17  search within books, do you know when the practice
18  first developed online?
19   A.   I couldn't give you a month or a year
20  without going back and looking at some documents.  I
21  would assume it was sometime after August 1995.
22   Q.   Do you know who first developed a tool
23  online that allowed potential buyers to search within
24  books?
25   A.   I believe Amazon.com was involved in this.

Greco

1        Greco
2  I couldn't say for sure whether they were the very
3  first one.
4    Q.   Who else do you understand to be engaged
5  in this practice other than Amazon.com?
6        MR. McGOWAN:  Objection, vague.  You may
7    answer.
8    A.   Barnes&Noble.com, companies that are
9  involved in selling new or backless books online, and
10  that list would be, I would assume, dozens of various
11  companies.
12   Q.   Can you give me an example of one such
13  company?
14   A.   In addition to Amazon.com or
15  Barnes&Noble.com?
16   Q.   Yes.
17   A.   Google.  I assume Apple.  I am sure there
18  are many, many others.
19   Q.   Have you, yourself, searched inside a book
20  at Amazon?
21   A.   Yes.
22   Q.   What have you done with respect to Barnes
23  & Noble?
24       MR. McGOWAN:  Objection, vague.  You may
25   answer.

Greco

1        Greco
2    Q.   With respect to this practice of allowing
3  potential buyers to search within books.
4    A.   I have used the Barnes&Noble.com website
5  and other websites doing various research projects.
6    Q.   Do you know whether or not the books that
7  you can search through at Amazon.com are there by
8  permission of the author or publisher?
9        MR. McGOWAN:  Objection, vague.  You may
10   answer.
11   A.   I would have to assume yes.
12   Q.   Why do you say that?
13   A.   Amazon.com is a well-known company, and I
14  couldn't list all the various books or book
15  publishers, but let's assume it's HarperCollins, any
16  of those major publishers, any of the major
17  university presses, I would assume that they will
18  have a contract stipulating what can and cannot be
19  posted on Amazon.com, Barnes&Noble.com, et cetera.
20   Q.   What about Google?
21       MR. McGOWAN:  Objection, vague.
22   Q.   Do you assume that --
23   A.   I would have to assume.  I have not read
24  any contracts between a publisher and/or an online
25  site.  I would assume there has to be a contract

9 (Pages 30 - 33)

1                    Greco
2 stipulating terms and conditions.
3         MR. McGOWAN:  I will caution the witness
4 not to assume as opposed to testifying as to
5 knowledge.
6         THE WITNESS:  Okay.
7     Q.   Did you have that assumption when you
8 wrote your report?
9     A.   Yes.
10     Q.   Just to be clear, when you wrote your
11 report which is PX 92, you assumed that all of the
12 excerpts that show up in Google Books are shown by
13 permission of the publisher or author?
14     A.   I assume that's correct.
15     Q.   Referring you to paragraph 3 which says
16 "In brief, my opinion on these topics is as follows:
17 Given the many factors that make it difficult to
18 trace rights holders, it would be infeasible to clear
19 rights for any comprehensive attempt to digitize
20 books, such as the 20 million plus books in Google
21 Books."
22     A.   That's what I wrote, yes.
23     Q.   When you say "infeasible," what do you
24 mean?
25     A.   When you look at new title output and when

1                    Greco
2 you look at backless books in print, you are dealing
3 with a very, very large number of titles.  Some of
4 those titles would be relatively easy to find who is
5 the rights holder.
6         Looking at this industry, it would be
7 difficult to find certain rights holders.
8     Q.   Do you draw any further conclusions from
9 that?
10     A.   20 million plus books probably had well
11 more than 20 million authors because many books have
12 coauthors.
13     Q.   You said you read Dan Clancy's deposition,
14 right?
15     A.   Yes.
16     Q.   In his deposition he explained that these
17 20 million books include public domain books?
18     A.   That's my understanding.
19     Q.   Is it your understanding that it's not
20 necessary to clear rights for public domain books?
21     A.   As I understand it, if a book is in public
22 domain, anyone can publish it.
23     Q.   A substantial portion of the 20 million
24 books are in the public domain and don't require
25 rights clearance, right?

1                    Greco
2         MR. McGOWAN:  Objection.  Vague, lacks
3 foundation.  You may answer.
4     A.   I do not remember what the percentage was
5 of the 20 million that were or were not in public
6 domain.
7     Q.   3 B says "Custom and practice in the book
8 industry recognize that it is both difficult for
9 authors to have their works discovered by potential
10 readers and important for authors to make it easy for
11 readers to find their works."  Then it says "Search
12 tools such as Google Books, which make it easier for
13 authors to be found, benefit rather than harm
14 authors."
15     A.   Correct.
16     Q.   Is it your opinion that any marketing tool
17 that makes it easier for authors to be found benefits
18 rather than harms authors?
19         MR. McGOWAN:  Objection, vague.  You may
20 answer.
21     A.   In light of the new title output in the
22 last eight to ten years, it is amazingly difficult
23 for any author aside from what you would call a star
24 author to have his or her books marketed effectively.
25     Q.   Is it your opinion that any tool that

1                    Greco
2 helps authors market their books is a good thing?
3         MR. McGOWAN:  Objection, vague.  Asked and
4 answered.  You may answer.
5     A.   I believe anything that helps market a
6 book helps theoretically sell the book, and that
7 ultimately helps the author.
8     Q.   Do you believe that marketing without
9 permission of a publisher and author is a good thing?
10         MR. McGOWAN:  Objection, vague.  You may
11 answer.
12     A.   That requires a legal conclusion.  I am
13 not an attorney.
14         MR. McGOWAN:  We have been going about an
15 hour.  When you get a chance to change
16 direction, I would like to take a break.
17         MS. ZACK:  I just want to get through this
18 one paragraph.
19     Q.   3 C, it says "Authors are paid for sales,
20 not searches.  Both as matter of industry custom and
21 practice, and in my own personal experience, authors
22 do not receive royalties in return for allowing their
23 works to be searched."
24         What do you mean by that?
25     A.   The first sentence in 3 C, an author is

10 (Pages 34 - 37)

Page 38

Greco

1     Greco
2 paid when -- an author would receive some sort of a
3 royalty payment when a book is sold.  I have seen
4 nothing in the literature or I have heard nothing
5 from individuals that I have talked to that authors
6 are paid anything for a search.
7         As for the second sentence, including my
8 own personal experiences, authors do not receive a
9 royalty in return for allowing their works to be
10 searched.  They receive a royalty based on the terms
11 and conditions of whatever the contract stipulates
12 for sales, not searches.
13        The third part of the third sentence,
14 search benefits authors in the sense that if you are
15 looking for a book on the French Revolution, you
16 would have to do a search in order to perhaps find
17 that book.  So if the search leads to someone finding
18 the book and possibly buying the book, then that can
19 lead to, depending on the terms and conditions of
20 contract, a royalty payment.
21        I have no reason to believe that authors
22 are paid for "the development of things that help
23 them sell books."
24     Q.   When you say you have no reason to
25 believe, that means because you have never seen it

Page 39

1     Greco
2 happen?
3     A.   As far as I know, the industry custom and
4 practice is that if an author gets involved in
5 marketing his or her book, a publisher -- it depends
6 on the nature of the publisher and the author and the
7 book.  If you are talking about a big trade book, a
8 big trade publisher, the general practice is that an
9 author who might do a five or ten-city hype tour, go
10 out and perhaps read from your book, perhaps sign
11 books, the custom and practice in the industry is
12 that the publisher pays for all costs related to
13 taking that individual from New York to Chicago, et
14 cetera, et cetera, but the author is not paid for his
15 or her time.  They would cover airfare, room and
16 board, cab fare, et cetera, et cetera.
17        So that is my understanding of the
18 industry practice in terms of big trade books and big
19 trade publishers.  If you are talking about small
20 publishers and especially university presses, I think
21 it's fair to say that university presses are happy if
22 an author goes out on a tour, but they rarely pay for
23 those costs.
24     MS. ZACK:  Okay.  Do you want to take a
25 break?

Page 40

1     Greco
2     MR. McGOWAN:  Yes.
3     (Recess.)
4     Q.   Turning to page 2, Professor Greco, of
5 your report.
6     A.   Yes.
7     Q.   Paragraph 4, did you write that yourself?
8     A.   Yes, based on --
9     Q.   That is based on the materials --
10     A.   From Clancy.
11     Q.   -- provided by Google; primarily
12 Mr. Clancy's declaration?
13     A.   Yes, I read through the declaration.
14 That's where the stats came from.
15     Q.   In paragraph 5 you mention that your book
16 called "The Book Publishing Industry" is in the
17 Google partner program, is that right?
18     A.   Yes.
19     Q.   Who is the publisher of that book?
20     A.   The publisher is Erl Baum, but Erl Baum
21 was sold to Informer Plc, a British company, which in
22 the United States is known as Taylor, Francis &
23 Routledge.  At this minute, the official publisher is
24 Taylor, Francis & Routledge, even though an older
25 name appears on the spine.

Page 41

1     Greco
2     Q.   How is your book, the book publishing
3 industry, in the partner program?  Is that by
4 permission of your publisher?
5     A.   It's my understanding that the 45,000
6 publishers, including the publisher that I deal with,
7 has an agreement with Google, unlike the library
8 program.
9     Q.   I'm not asking about all those other
10 books, I am asking about your book.
11     A.   How did it end up in the program?
12     Q.   Yes.
13     A.   I was never even informed.  It was just
14 done between in this case Taylor & Francis, as one of
15 the 45,000 publishers involved in the partner
16 program.
17     Q.   Do you know how much of your book is being
18 displayed in the partner program?
19     A.   Perhaps a chapter or large portions of a
20 chapter.  I have never really measured it.
21     Q.   Do you get royalties from that book?
22     A.   Yes.
23     Q.   Was that a work for hire or is the
24 copyright in your name?
25     A.   I wrote the original book --

11 (Pages 38 - 41)

Page 42

Greco

1
2      MR. McGOWAN:  Objection to the extent that
3   that's not the legal universe.  It calls for a
4   legal conclusion.  You may answer.
5      MS. ZACK:  Let me withdraw it.
6   Q.   Is the copyright to that book in your
7   name?
8   A.   No.
9   Q.   Whose name is it in?
10  A.   Either Informer Plc, Taylor & Francis or
11  Routledge.  However they are structured in the United
12  States.
13  Q.   So it's in the publisher's name?
14  A.   It's in the publisher's name.
15  Q.   You said you are not quite sure how much
16  of your book is displayed in the partner program; you
17  think it's perhaps a chapter?
18  A.   It's perhaps a chapter or very close to a
19  chapter.
20  Q.   Are you aware that in the partner program
21  Google shares ad revenues with its partners?
22      MR. McGOWAN:  Objection.  Lacks
23  foundation, compound.  You may answer.
24  A.   I have a very vague understanding of that.
25  Q.   When you say a "vague understanding," do

Page 43

Greco

1
2   you understand at all what the relationship is there?
3   A.   No.  I understand there is some sort of a
4   sharing, but I have no idea about it and have never
5   received any royalty from it, at least to the best of
6   my knowledge.
7   Q.   Over the last few years, have you received
8   royalty payments for your book?
9   A.   For that book, yes.
10  Q.   When you say "for that book," you have
11  other books that you receive royalty payments for?
12  A.   Yes.
13  Q.   How many others?
14  A.   Could I look at the list?
15      MS. ZACK:  Sure.
16      (Witness reviewed document.)
17  A.   I receive a royalty payment from the book
18  publishing industry for a book called "The Culture
19  and Commerce of Book Publishing in the 21st Century";
20  for a book called "Access For All:  Closing the Book
21  Gap For Children in Early Education"; for a book
22  called "The Media and Entertainment Industries"; and
23  three books were translated into Chinese where I
24  received a payment, and that took place, and I
25  believe that's all.

Page 44

Greco

1
2   Q.   Are any of those other books included in
3   Google Books?
4   A.   I believe "The Culture and Commerce of
5   Book Publishing in the 21st Century" is included.  I
6   don't know about the others.
7   Q.   Who is the publisher of that book?
8   A.   Stanford University Press.
9   Q.   Do you know how "The Culture and Commerce
10  of Book Publishing in the 21st Century," how that
11  book came to be in Google Books?
12  A.   I believe it's part of the publisher
13  program but I have never discussed it with anyone at
14  Stanford.
15  Q.   For that particular book, in whose name is
16  the copyright?
17  A.   Stanford University Press.
18  Q.   Let me show you what was previously marked
19  as PX 91.  "Google Books Partner Program Standard
20  Terms and Conditions."
21      Have you ever seen this before?
22  A.   No.
23  Q.   Referring you to the second page where it
24  says "Ad Payment."
25  A.   Item 8?

Page 45

Greco

1
2   Q.   Yes.
3   A.   I see item 8.
4   Q.   This talks about the payment and sharing
5   of ad revenues between Google and the partner.
6      You are not familiar with that?
7      MR. McGOWAN:  Objection, vague.  You may
8   answer.
9   A.   I'm not familiar with this document or any
10  of the items in the document.
11  Q.   Are you aware that Google scans books that
12  it receives from libraries; digitally scans books
13  that it gets from libraries?
14  A.   Yes.
15  Q.   Have you talked to any libraries that
16  participate in that scanning project?
17      MR. McGOWAN:  Objection.  Vague as it's
18  phrased.  It might be useful to narrow that one.
19  Q.   Do you understand the question?
20  A.   I don't believe I have ever talked to a
21  librarian about that program.  I have talked to
22  librarians but I don't believe about that program.
23  Q.   Other than what you read in the materials
24  that you listed on Exhibit C to your report, is it
25  fair to say you don't have any information about the

Greco

1
2 library scanning project that Google was engaged in?
3    A.   I have read articles over the years in
4 Publishers Weekly about the program.
5    Q.   Anything else?
6    A.   It's possible it's been covered in the New
7 York Times or the Wall Street Journal.  I couldn't
8 say definitively at this point.  I think it's fair to
9 say I remember reading in Publishers Weekly, possibly
10 in any of the book industry daily blogs.
11    Q.   Any other source of information about
12 that?
13    A.   I can't remember any other source.
14    Q.   There was a deposition in this case taken
15 of Paul Courant of the University of Michigan.
16         Did you read that?
17    A.   Which number is that, please?
18    Q.   It's not on your list.
19    A.   These are the only documents.
20    Q.   So you didn't read that, Mr. Courant's
21 deposition?
22    A.   No, these are the only documents that I
23 read through.
24    Q.   Referring to page 3 of your report,
25 paragraph 7.

Greco

1
2    A.   I see it.
3    Q.   The second line, there's a sentence that
4 starts "The Commerce Department, for example, tracks
5 slightly more than 3,000 publishing firms."
6         Are you referring to the United States
7 Department of Commerce?
8    A.   Yes.  It's cited in footnote 10.
9    Q.   When you say "3,000 publishing firms," are
10 those U.S. publishing firms?
11    A.   As far as I know, these are publishing
12 firms in the United States.  They could possibly be
13 owned by foreign entities.  These are publishing
14 firms operating in the United States.
15    Q.   In that sentence where you say "tracks,"
16 what do you mean by "tracks"?
17    A.   There's a federal law that in years ending
18 in '2 and '7, publishers have to submit confidential
19 information to the U.S. Department of Commerce.  The
20 Department of Commerce collects, aggregates and
21 releases aggregated data about the book industry in
22 the United States.  They have indicated that
23 approximately 3,000 firms participate in those
24 surveys that are done every five years.
25    Q.   The next sentence of paragraph 7 of your

Greco

1
2 report says "That 45,000 publishers participate in
3 Google's Partner program indicates that the Commerce
4 Department data reveal just the tip of the iceberg."
5         Are you aware that those 45,000 publishers
6 include publishers not in the U.S.?
7    A.   I have never seen a master list of the
8 45,000 publishers.  To be tracked by the Department
9 of Commerce, as I understand it, a company has to
10 have a federal ID number, at least one paid employee,
11 and its primary business has to be in publishing.
12    Q.   Right.  Now I am asking you whether you
13 are aware that the 45,000 publishers that participate
14 in the Google's partner program include foreign
15 publishers?
16    A.   I have no knowledge about who is in that
17 45,000 database.
18    Q.   Are you aware that the 20 million books in
19 Dan Clancy's declaration includes books published
20 outside the United States?
21    A.   That's my recollection.  I would have to
22 reread Clancy to verify that.
23    Q.   I am handing you PX 1.  PX 1 that I have
24 handed to you, Professor Greco, is the Declaration of
25 Daniel Clancy in Support of Google Inc.'s Opposition

Greco

1
2 to Plaintiffs' Motion For Class Certification.
3    A.   Yes, I see it.
4    Q.   Referring to paragraph 4 which says
5 "Google has scanned more than 20 million books as
6 part of Google Books"; do you see that?
7    A.   Yes, I do.
8    Q.   Then it says "Users of Google Books can
9 see search results that include snippets of text in
10 English for more than 4 million of these books."
11         Do you see that?
12    A.   I see that.
13    Q.   Are you offering any opinions in this case
14 about whether or not it's infeasible to locate the
15 rights holders of 4 million books that are subject to
16 U.S. copyright?
17    A.   I believe a search of that size would be
18 in many ways difficult.
19    Q.   For the same reasons you previously
20 testified?
21    A.   Yes, because you may or may not be dealing
22 with 4 million authors, you may be dealing with more
23 than 4 million authors; coauthors.
24    Q.   Referring you to the next page of your
25 report, page 4.

13 (Pages 46 - 49)

Page 50

Greco

1
2    A.   I see it.
3    Q.   This says in paragraph 9 "I have signed 12
4  book contracts and have obtained reversions of the
5  rights in my own books."
6        So you have reverted rights to 12 books,
7  is that right?
8    A.   No.  I have signed 12 contracts, and in a
9  few instances I asked for the copyright back when the
10  book was declared out of print.
11   Q.   How many books have reverted back to you?
12   A.   Can I look?
13        MS. ZACK:  Oh, sure.
14        (Witness reviewed document.)
15   A.   The first edition of "The Book Publishing
16  Industry" was originally signed with Simon &
17  Schuster.  They sold it to Penguin Plc.  They
18  declared it out of print.  I asked for the copyright.
19  They gave it to me.  I then took that material and
20  revised it to then Lawrence Erl Baum Associates.  The
21  second one was "Advertising Management in the Book
22  Publishing Industry," originally published by NYU
23  Press.  The third one was "Business Journalism," also
24  published by New York University Press.
25   Q.   For the two that were published by NYU

Page 51

Greco

1
2  Press that were reverted to you, have you placed
3  those books into Google Books?
4    A.   No.
5    Q.   Or into the partner program?
6    A.   No.
7    Q.   Has anyone from Google ever asked you to
8  do that?
9    A.   I'm not aware of any correspondence.
10   Q.   Would you like for those books to be in
11  Google Books?
12   A.   It wouldn't hurt.  But they were done a
13  few years ago.  I would probably want to update them.
14   Q.   Paragraph 11 of your report that starts at
15  the bottom of page 4.
16   A.   I see it.
17   Q.   You say "As part of my scholarly study of
18  the book publishing industry, I have discussed sales
19  and marketing practices with over 50 academic
20  publishers and with large commercial publishers such
21  as Random House, Penguin, HarperCollins, Simon &
22  Schuster, Hachette, and Macmillan.  I am of course
23  familiar with the sales and marketing efforts for my
24  books."
25   A.   That's what is stated in item 11.

Page 52

Greco

1
2    Q.   Let's start with the last sentence.
3        What sales and marketing efforts were made
4  for your books?
5    A.   It depended on the publisher.  I have done
6  a number of books with university presses.  So if I
7  go out and give a lecture at an institution, another
8  institution aside from Fordham, I might mention that
9  material was taken from book X or article Y,
10  depending on what was relevant.
11        If I do an interview with a reporter, I
12  might mention that I am the author of article X or
13  book Y, depending on what the article and the
14  reporter is interested in.
15        When you deal with university presses they
16  have for the most part limited resources.  And in
17  some cases exceptionally limited resources.  So an
18  author in that case would be expected to try to
19  publicize the book as best as he or she can.  Often
20  at academic conferences or whatever the event would
21  be.
22        If you deal with what is called a
23  commercial scholarly publisher, for example Taylor &
24  Francis, Erl Baum, they have never paid for any of
25  those marketing efforts on my part.  Even though they

Page 53

Greco

1
2  may have more resources, it's just the nature of the
3  business.  So that's what I have tried to do.
4        One other thing you can do is if you write
5  a book, let's say, in 2007, and you then write an
6  article in 2009 or 2010, you may cite it.  That
7  citation could pop up somewhere in another book,
8  another article, et cetera.
9        There are various things you might do, and
10  these are the various things that I have done.  I
11  have not published with -- I don't do trade books, so
12  I have not published with any of those what are
13  called the big six, the trade publishers in the
14  United States.
15   Q.   You say you have discussed with them,
16  though, marketing?
17   A.   Yes.
18   Q.   Who specifically at Random House have you
19  talked about this issue with?
20   A.   Over the years I have talked to Alberto
21  Vitale, Jack Hoeft.  I have talked to the director of
22  research there.  The name is Dave.  I have to get
23  back to you about his last name.  I have talked to --
24  I have had two sons that worked at Random House.
25  Three, I am sorry.  Three that have worked at Random

14 (Pages 50 - 53)

Page 54

1          Greco
2 House. One son is currently at Penguin. We had
3 discussions about this business. I have had lunch
4 with Peter Mayer when he ran Penguin. I have had
5 lunch with Michael Pietsch who runs Little Brown. If
6 you go to the Book Expo America, you run into these
7 people. I had another son that worked at Simon &
8 Schuster. I have had students who were working at
9 those houses or may have been placed as interns or
10 employees at those big six houses. Over a period of
11 time you meet a lot of people at these places.
12     Q.   Have you discussed Google's library
13 project with any of those people?
14     A.   Only when it came up with my sons because
15 it was public information in Publishers Weekly. I
16 don't believe I discussed Google with what you would
17 call a major executive at any of the big six. I may
18 have discussed it with some of the academic
19 university press publishers but just in passing.
20 People in this business meet and talk.
21     Q.   Are you aware that Simon & Schuster was a
22 plaintiff or is a plaintiff in the case against
23 Google for their scanning of books without permission
24 for use in Google Books?
25          MR. McGOWAN: Objection, lacks foundation.

Page 55

1          Greco
2 You may answer.
3     A.   I am not aware of any publishing company
4 that is currently suing Google over the matter
5 related in Civil Action 05 CV 8136 (DC).
6     Q.   Are you aware of any publisher that was
7 ever suing Google over that?
8     A.   I am aware that certain publishers were at
9 one point, but not at the current time.
10     Q.   Why do you say that they are not currently
11 suing?
12     A.   The matter before me is the Authors Guild,
13 Incorporated versus Google. I have never seen any
14 document indicating that in this civil action that a
15 publisher is suing Google.
16     Q.   Well, I didn't ask you about this
17 particular civil action. The question was whether
18 you were aware that publishers were suing Google for
19 the same practices that are at issue in this
20 particular matter.
21          MR. McGOWAN: That question has been asked
22     and answered.
23     A.   It's my understanding that at some point
24 in the past they were involved but not at the current
25 time.

Page 56

1          Greco
2     Q.   Where did you get that understanding?
3          MR. McGOWAN: Objection, asked and
4     answered. You may answer.
5     A.   It was covered in Publishers Weekly. I
6 would have to assume it was covered in the New York
7 Times and the Wall Street Journal. It was common
8 knowledge I think in the book publishing industry in
9 New York City.
10     Q.   Let's go back in time.
11          At the time that you believed that the
12 publishers were suing, which publishers did you
13 understand to be suing Google?
14     A.   I never read any legal documents. I
15 relied entirely on newspaper and magazine articles,
16 so I couldn't say definitively which one or which
17 ones of the big six were involved in any litigation.
18     Q.   Were you aware that the AAP sued Google?
19     A.   Off the top of my head, I don't remember
20 that, but I am sure it was covered in Publishers
21 Weekly.
22          MR. McGOWAN: Again, you should offer your
23     best recollection if you have it. You should
24     not speculate.
25          THE WITNESS: I don't remember.

Page 57

1          Greco
2     Q.   Do you have any information about the
3 nature of the claims made by the publishers against
4 Google?
5     A.   No.
6     Q.   Or any understanding of what claims were
7 made?
8     A.   No. I haven't read anything lately. So
9 it was at some point in the past.
10     Q.   Would it surprise you if I told you that
11 the publishers claimed that Google was violating the
12 Copyright Act by scanning books in libraries without
13 permission?
14          MR. McGOWAN: Objection. Lacks
15     foundation, relevance with respect to surprise.
16     He may answer.
17     A.   If you are telling me that information, I
18 would have to assume you are telling me the truth. I
19 can't verify any of the issues that you are raising.
20 I just don't have that information. I never really
21 followed the case close enough to be able to respond
22 yes or no to your statement.
23     Q.   Based on your understanding of the
24 publishing industry, you wouldn't be at all surprised
25 for publishers to sue Google for copying their books

15 (Pages 54 - 57)

1              Greco
2 without permission, would you?
3       MR. McGOWAN:  Same objection.  It calls
4    for speculation.  You may answer.
5    A.   If I went back an read the earlier
6 articles, I would be in a position to answer that
7 question definitively.  At this point I just don't
8 have the information.
9    Q.   Directing you to paragraph 14 of your
10 report.
11   A.   Yes, I see it.
12   Q.   The first sentence says "To get the
13 attention of consumers in this environment,
14 publishers often use some of a book's content to
15 promote the book and they do not pay royalties for
16 such uses."
17   A.   I see that.
18   Q.   That's been a fact for many years, hasn't
19 it?
20   A.   It's a fact that goes back decades.
21   Q.   That publishers don't pay royalties to
22 authors for promotion?
23   A.   That's my understanding.
24   Q.   Can you tell me any promotional uses of
25 books in the publishing industry that you are

1              Greco
2 familiar with that are done without the permission of
3 the rights holders?
4       MR. McGOWAN:  Objection, vague.  You may
5    answer.
6    A.   Without the permission of the rights
7 holder?
8    Q.   Yes.
9    A.   Most of the research I have done has
10 centered on sales and marketing by publishers.
11   Q.   Who were rights holders?
12   A.   Not every author conveys the copyright to
13 the publisher.  Some authors hold the copyright.
14   Q.   Did you have an understanding that the
15 publishers had an agreement with the authors in the
16 cases where they were promoting the book?
17   A.   It's my understanding if you convey the
18 copyright to the publisher, the publisher handles all
19 sales and marketing operations.  So if the publisher
20 then decided to send out a galley print and/or
21 digital galley or post things in a company magazine
22 or website, they just do it.  Except for the star
23 authors, the publisher really controls that
24 exclusively.
25   Q.   Let's talk about your book.  "The

1              Greco
2 Publishing Industry" in which you have a copyright
3 interest, correct?
4    A.   Yes.
5    Q.   And in which your publisher has a
6 copyright interest, correct?
7    A.   Yes.
8    Q.   And in which I have no copyright interest?
9    A.   You mean you personally?
10   Q.   I have no copyright interest, right?
11   A.   I'm not aware that you have any copyright
12 interest.
13   Q.   Can I promote that book?
14       MR. McGOWAN:  Objection, vague.
15   A.   Sure.
16   Q.   Without your permission?
17   A.   Sure.
18   Q.   I could put the entire book on my website?
19       MR. McGOWAN:  Objection.  Vague,
20 argumentative.  You may answer.
21       MS. ZACK:  I am asking a question.
22       MR. McGOWAN:  Now you are distorting
23 language.
24   A.   If you wrote a letter to a friend, if you
25 had a website and you indicated that you read my book

1              Greco
2 and liked the book and encouraged your friends to
3 read it, I wouldn't necessarily know you did that.
4    Q.   Well, let's say I posted the text, the
5 actual text of your book on my website and said "I
6 love this book," is that okay with you?
7       MR. McGOWAN:  Objection, vague.  You may
8    answer.
9    A.   I would refer that to my editor.
10   Q.   Has anyone ever done that to any of your
11 books?
12       MR. McGOWAN:  Objection, vague.  You may
13 answer.
14   A.   I don't know.
15   Q.   Do you know how Google makes money?
16       MR. McGOWAN:  Objection, foundation.  You
17 can answer.
18   A.   It's my understanding that they make money
19 from a variety of business operations including
20 advertising.
21   Q.   What are the other operations that you are
22 aware of that are moneymaking for Google?
23       MR. McGOWAN:  Same objection.
24   A.   I have never gone through their quarterly
25 reports, their annual reports, conference call

16 (Pages 58 - 61)

Page 62

Greco

1                     Greco
2  transcripts, so I really couldn't say.
3      Q.   Do you consider Google a commercial
4  operation?
5         MR. McGOWAN:  Objection, vague.  It calls
6  for a legal conclusion.  You may answer.
7      A.   I believe it's a business incorporated in
8  the United States.
9      Q.   Are you familiar with the Copyright
10 Clearance Center?
11     A.   I have read about the Copyright Clearance
12 Center.
13     Q.   What do you know about it?
14     A.   I believe it's an organization.  I believe
15 it's based in New England, and that they clear
16 copyrights for various publications.
17     Q.   Are you aware of any licensing offered by
18 them on behalf of authors and publishers?
19     A.   I have never looked into that matter.
20     Q.   So you don't know whether or not the CCC
21 offers collective licenses?
22        MR. McGOWAN:  Objection, vague, to the
23 extent it calls for a legal conclusion, but you
24 may answer.
25     A.   I never looked into it, so I really

Page 63

Greco

1                     Greco
2  couldn't say yes or no.
3      Q.   Are you familiar with ASCAP or BMI?
4      A.   Yes, I am familiar with those two
5  entities.
6      Q.   Has any of your research been in the music
7  industry?
8      A.   I once coauthored a chapter on the radio
9  industry a number of years ago, so it's likely I may
10 have referred to them.
11     Q.   Are you aware of any licenses offered by
12 the ASCAP or BMI?
13        MR. McGOWAN:  Objection, vague.  You may
14 answer.
15     A.   Only in very general terms.
16     Q.   What general terms are you aware of?
17     A.   Well, ASCAP and BMI represent, as I
18 understand it, individuals that write music and
19 lyrics and music publishers, and that they work with
20 an organization called Harry Fox to collect fees
21 whenever a song is played or in the case of
22 synchronization fees when a song is used in a motion
23 picture, television, commercial, et cetera.  That's
24 my understanding of those organizations.
25     Q.   Have you ever done any research on the

Page 64

Greco

1                     Greco
2  issue of possible licenses for digital copying of
3  books?
4         MR. McGOWAN:  Objection, vague.  You may
5  answer.
6      A.   I don't believe so.
7      Q.   Have you ever done any research on the
8  book purchasing practices of libraries?
9      A.   I am familiar with those practices.
10     Q.   Are you aware that libraries are currently
11 buying both print books and eBooks?
12        MR. McGOWAN:  Objection.  Lacks
13 foundation, vague and compound.  You may answer.
14     A.   Yes.
15     Q.   Are you aware that libraries, including
16 university libraries, purchase licenses for scholarly
17 works?
18        MR. McGOWAN:  Objection, vague.  You may
19 answer.
20     A.   Yes.
21     Q.   Do you know if any of your works are
22 included in any such license?
23     A.   Yes.
24     Q.   Which works?
25     A.   Bear with me for a second.

Page 65

Greco

1                     Greco
2         (Witness reviewed document.)
3      A.   I believe that the journal articles
4  published by the Journal of Scholarly Publishing; the
5  journal articles published by -- the journal article
6  published by Learned Publishing; I believe the
7  article published in the Journal of Cultural
8  Economics; I believe the article published in the
9  Journal of Media Management; I believe the articles
10 published in Publishing Research Quarterly or Book
11 Publishing Quarterly are available on various online
12 sites.
13     Q.   Available as part of a subscription?
14        MR. McGOWAN:  Objection, compound.  You
15 may answer.
16     A.   I don't know what the terms and conditions
17 are.
18     Q.   Do you not get any royalties for that?
19     A.   I have never received a royalty for an
20 article.
21     Q.   Do you have a right to receive royalties
22 for articles?
23        MR. McGOWAN:  Objection to the extent it
24 calls for a legal conclusion.  You may answer.
25     A.   Perhaps if it's reprinted in an anthology,

17 (Pages 62 - 65)

Page 66

Greco

1
2 but that would be the only case, and I have never
3 received a payment based on an article in an
4 anthology.
5    Q.   So you have seen these general articles
6 that you have mentioned in an online subscription, is
7 that what you are telling me?
8    A.   I have seen them in online services.
9    Q.   But you are not aware of how they got
10 there?
11    A.   I listed many different publishing --
12 journal publishing operations, so I'm not aware of
13 those terms and conditions.  But I have seen them on
14 Project Muse and elsewhere.
15    Q.   Project Muse, and where else can you tell
16 me?
17    A.   It's possible that it's been on Proquest.
18 It's possible it's on the Springer website.  They
19 bought Publishing Research Quarterly and Book
20 Research Quarterly from Irving Horowitz.  There could
21 be others.
22    Q.   Referring you to your c.v. on page 25 of
23 PX 92.
24    A.   Yes, I see page 25.
25    Q.   There is a heading "Papers Delivered

Page 67

Greco

1
2 Before Scholarly and Professional Associations."
3 Then there's an entry for September 16, 2011, at The
4 Library of Congress.  It says "Books in Our Digital
5 Future."
6       Is that your presentation, "Books in Our
7 Digital Future"?
8    A.   Yes.
9    Q.   Is that available online?
10    A.   I don't know.  It's possible the Library
11 of Congress has posted it.  I don't know.
12    Q.   What did you say generally; what was your
13 thesis?
14    A.   I dealt with the growth in print books and
15 digital books over a period of time, and gave some
16 historical overview and some outlook on what was
17 happening in the digital book sectors in all of the
18 book categories; adult, juvenile, mass market, et
19 cetera.
20    Q.   And that was based on what type of
21 statistic?
22    A.   Some of the statistical data came from the
23 U.S. Department of Commerce, Bureau of the Census.
24 Some of the statistical data came from other federal
25 agencies.  U.S. Department of Education, the U.S.

Page 68

Greco

1
2 Department of Labor, industry statistical data from
3 other reliable sources regarding the sale of books in
4 various retail channels.  The sale of eReaders,
5 various types, et cetera.
6    Q.   Is it your understanding that Google Books
7 includes both partner program books and library
8 project books?
9    A.   I have looked at it as two separate
10 operations.  The partnership program of 45,000 or so
11 publishers, and the library.  I have never commingled
12 the two, although at times I may commingle them in a
13 presentation but they are really two very separate --
14 as far as I know, two separate operations.
15    Q.   They are both Google Books, though, right?
16    A.   Right, but they have different parameters.
17    Q.   But in your report when you refer to
18 "Google Books," you are referring to both, right?
19       MR. McGOWAN:  Objection, vague.  You may
20    answer.
21    Q.   You say "I understand that Google has
22 scanned more than 20 million books in connection with
23 the Google Books project."
24    A.   That's correct.
25    Q.   When you refer to "Google Books," you are

Page 69

Greco

1
2 referring to both partner program and the library
3 project, correct?
4    A.   In that sentence, yes.
5    Q.   Is there any sentence in which that's not
6 the case?
7    A.   Well, on page 2, item number 5, I refer
8 specifically to the partner program.
9    Q.   Right, I understand.  But I am saying when
10 you use the term "Google Books," you are referring
11 both to the partner program and the library project,
12 correct?
13    A.   Yes.  And I probably should have separated
14 the two in a more precise manner.
15       MS. ZACK:  I don't have any more
16    questions.
17       MR. McGOWAN:  I have two because I want to
18    make sure the record is clear on what Ms. Zack
19    was just alluding to.
20 EXAMINATION BY
21 MR. McGOWAN:
22    Q.   Dr. Greco, you just said that you
23 understand the partner program and the library
24 project have different parameters, is that correct?
25    A.   Yes.

18 (Pages 66 - 69)

Page 70

Greco

1              Greco
2        MS. ZACK:  I object to the form.
3      Q.   In the library program, do you understand
4  that Google copies books that are provided by
5  libraries?
6      A.   Yes.
7      Q.   With respect to that program, do you
8  understand that Google does not contact all, at
9  least, of the rights holders in connection with that
10 program?
11     A.   That's my understanding.
12     Q.   Did you understand that when you wrote
13 your report?
14     A.   Yes.
15     Q.   You testified as to steps that you
16 personally have taken to publicize your books.
17        In addition to steps that you have taken,
18 did your publishers do things such as distribute
19 copies to get reviews, that sort of thing?
20     A.   That's my understanding.
21     Q.   In paragraph 14 on page 5, you refer to
22 publishers using some of a book's content to promote
23 the book, do you see that?
24     A.   Paragraph 14, yes, "to promote the book,"
25 yes, the first sentence.

Page 71

Greco

1              Greco
2      Q.   Is it your understanding that it is the
3  use of the book's content that is what gets the
4  attention of the consumers in this environment, which
5  is the beginning of the sentence?
6        MS. ZACK:  Objection to form.
7      A.   I believe it's almost always the book
8  content.
9        MR. McGOWAN:  I have nothing further.
10 (CONTINUED) EXAMINATION
11 BY MS. ZACK:
12     Q.   Are you aware of any books shown in Google
13 Books without permission of authors or publishers?
14        MR. McGOWAN:  Objection, vague.  You may
15 answer.
16     A.   I believe the library portion.
17     Q.   You believe what?
18     A.   I believe the books that were scanned in
19 the library portion of Google Books may or may not
20 have been done with prior permission.
21     Q.   Did you discuss that topic with
22 Mr. McGowan during the break?
23     A.   It may have come up just in passing.
24     Q.   We have only been here a short time.
25        Did you or did you not discuss that topic

Page 72

Greco

1              Greco
2  with Mr. McGowan during the break?
3        MR. McGOWAN:  Objection, asked and
4  answered.  You may answer.
5      A.   We did discuss the library portion and the
6  publisher portion.  The publisher program portion.
7        MS. ZACK:  I have no other questions.
8        (Time noted 12:40 p.m.)
9
10
11  _____
12        ALBERT N. GRECO
13
14 Subscribed and sworn to before me
15 this _____ day of _____, 2012.
16
17  _____
18        NOTARY PUBLIC
19
20
21
22
23
24
25

Page 73

1
2        C E R T I F I C A T E
3
4  STATE OF NEW YORK   )
5                  ) s.s.:
6  COUNTY OF NEW YORK  )
7
8        I, LINDA DEVECKA, a Notary Public
9  within and for the State of New York, do
10 hereby certify:
11       That ALBERT N. GRECO, the witness whose
12 deposition is hereinbefore set forth, was duly
13 sworn by me and that such deposition is a true
14 record of the testimony given by such witness.
15       I further certify that I am not related to
16 any of the parties to this action by blood or
17 marriage; and that I am in no way interested in
18 the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto set my
20 hand this 12th day of June, 2012.
21
22       _____
23             LINDA DEVECKA
24
25

19 (Pages 70 - 73)

Page 74

1
2      -------------------- I N D E X --------------------
3    WITNESS        EXAMINATION BY        PAGE
4    ALBERT N. GRECO    MS. ZACK        4
5            MR. McGOWAN        69
6            MS. ZACK        71
7
8      -------------------- EXHIBITS --------------------
9    PLAINTIFF'S        DESCRIPTION        FOR ID
10    Exhibit 92, document titled "Expert        4
11    Report of Professor Albert N. Greco May
12    3, 2012"
13
14    The reporter retained the exhibit to annex to the
15    transcript.
16
17
18
19
20
21
22
23
24
25

Page 75

1          ERRATA SHEET
          VERITEXT REPORTING COMPANY
2           1250 BROADWAY
          NEW YORK, NEW YORK 10001
3           800-362-2520
4    CASE: THE AUTHORS GUILD, INC. v GOOGLE INC.
     DEPOSITION DATE: JUNE 6, 2012
5    DEPONENT:  ALBERT N. GRECO
6    PAGE LINE(S)  CHANGE        REASON
7    _____|_____|_____|_____
8    _____|_____|_____|_____
9    _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19   _____|_____|_____|_____
20
21      _____
          ALBERT N. GRECO
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20___.
24
     _____
25   (NOTARY PUBLIC)    MY COMMISSION EXPIRES:

Page 72

1                        Greco

2    with Mr. McGowan during the break?

3            MR. McGOWAN:  Objection, asked and

4        answered.  You may answer.

5        A.      We did discuss the library portion and the

6    publisher portion.  The publisher program portion.

7            MS. ZACK:  I have no other questions.

8            (Time noted 12:40 p.m.)

9

10

11        _____

12            ALBERT N. GRECO

13

14   Subscribed and sworn to before me

15   this _10th_ day of _July_____, 2012.

16

17   _____

18            NOTARY PUBLIC

19

20            EVELYN R. RIZZO
             NOTARY PUBLIC OF NEW JERSEY
21           My Commission Expires June 19, 2016
                    I.D. #2090030

22

23

24

25

EVELYN R. RIZZO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 15, 2016
ID 2500405

PAGE 75 #1

Page 75

**ERRATA SHEET**

**VERITEXT REPORTING COMPANY**

**1250 BROADWAY**

**NEW YORK, NEW YORK 10001**

**800-362-2520**

CASE: **THE AUTHORS GUILD, INC. v GOOGLE INC.**

DEPOSITION DATE: **JUNE 6, 2012**

DEPONENT: **ALBERT N. GRECO**

| PAGE | LINE(S) | CHANGE | REASON |
|------|---------|--------|--------|
| 17 | 4 | ARTHUR | SPELLING ERROR |
| 40 | 20 | ERLBAUM | ONE WORD |
| 40 | 21 | INFORMA | SPELLING ERROR |
| 40 | 22 | TAYLOR & FRANCIS | DELETE COMMA; ADD & |
| 40 | 24 | TAYLOR & FRANCIS | DELETE COMMA; ADD & |
| 46 | 4 | ITALICS: PUB. WEEKLY | ADD ITALICS |
| 46 | 6+7 | ITALICS: NEW YORK TIMES | " |
| 46 | 7+8 | ITALICS: WALL St. JUVA | " |
| 46 | 9 | ITALICS: PUB. WEEKLY | " |
| 50 | 20 | ERLBAUM | ONE WORD |
| 52 | 24 | ERLBAUM | ONE WORD |
| 53 | 22+23 | DAVE THOMPSON | ADDED LAST NAME |
| 54 | 15 | ITALICS: PUB. WEEKLY | ADD ITALICS |

EVELYN R. RIZZO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 19, 2016
I.D. #2090030

**ALBERT N. GRECO**

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 10th DAY OF July , 2012.

6/19/2016

(NOTARY PUBLIC)          MY COMMISSION EXPIRES:

PAGE 75 #2

Page 75

ERRATA SHEET

VERITEXT REPORTING COMPANY

1250 BROADWAY

NEW YORK, NEW YORK 10001

800-362-2520

CASE: THE AUTHORS GUILD, INC. v GOOGLE INC.

DEPOSITION DATE: JUNE 6, 2012

DEPONENT: ALBERT N. GRECO

| PAGE | LINE(S) | CHANGE | REASON |
|------|---------|--------|--------|
| 56 | 5 | Italics: Pub. Weekly | Add Italics |
| 56 | 6 | Italics: New York | " |
| 56 | 7 | Italics: Times | " |
| 56 | 7 | Italics: Wall St. Jour. | " |
| 65 | 4 | Italics: J. of Schl Pub | " |
| 65 | 6 | Italics: Learned Pub. | " |
| 65 | 7 | Italics: J. of Cul Har | " |
| 65 | 9 | Italics: J. of Media Mtg | " |
| 66 | 19 | Italics: Pub. R. Quar | " |
| 66 | 19 20 | Italics: Book | " |
| 66 | 20 & 19 | Italics: Res. Quar. | " |
| | | | |
| | | | |

EVELYN R. RIZZO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 19, 2016
I.D. #2090030

ALBERT N. GRECO

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 10th DAY OF JULY , 20 12 .

_____          6/19/2016
(NOTARY PUBLIC)                  MY COMMISSION EXPIRES:

ERRATA SHEET

VERITEXT REPORTING COMPANY

1250 BROADWAY

NEW YORK, NEW YORK 10001

212-279-9424

CASE: THE AUTHORS GUILD, INC. - GOOGLE INC.

DEPOSITION DATE: JUNE 6, 2012

DEPONENT: ALBERT N GRECO

| PAGE | LINE(S) | CHANGE | REASON |
| --- | --- | --- | --- |
| [illegible] | [illegible] | [illegible] | [illegible] |

ALBERT N. GRECO

EVELYN R. RIZZO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 19, 2016
I.D. 020[illegible]

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___ DAY OF ___, 2012

(NOTARY PUBLIC) MY COMMISSION EXPIRES:

VERITEXT REPORTING COMPANY

212-490-3430 www.veritext.com