# EXHIBIT 42

# PART 1

Page 1

1    **C O N F I D E N T I A L**

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------------------X

5    THE AUTHORS GUILD, et al.,

6                                            CONFIDENTIAL

7                        Plaintiffs,

8        - against-              Master File No.

9                                05 CV 8136-DC

10

11   GOOGLE, INC.,

12                        Defendant.

13   ---------------------------------------X

14

15                    June 8, 2012

16                    9:30 a.m.

17

18        Deposition of JUDITH A. CHEVALIER,

19     held at the offices of Milberg, LLP, One

20     Penn Plaza, New York, New York, pursuant to

21     Agreement, before NANCY SORENSEN, a Notary

22     Public of the State of New York.

23

24

25

Page 2

```
 1
 2  A P P E A R A N C E S :
 3     BONI & ZACK, LLC
 4     Attorneys for Plaintiffs
 5        15 St. Asaphs Road
 6        Bala Cynwyd, Pennsylvania  19004
 7     BY:  JOANNE ZACK, ESQ.
 8
 9     DURIE TANGRI
10     Attorneys for Defendant
11        217 Leidesdorff Street
12        San Francisco, California  94111
13     BY:  DAVID McGOWAN, ESQ.
14
15
16
17  ALSO PRESENT:
18     ANY KEATING, ESQ. - GOOGLE
19     SAMUEL WEGLEIN, Ph.D. - Analysis Group
20
21
22
23
24
25
```

Page 3

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED,
 3  by and between the attorneys for the respective
 4  parties herein, that filing and sealing be and
 5  the same are hereby waived.
 6        IT IS FURTHER STIPULATED AND AGREED
 7  that all objections, except as to the form
 8  of the question, shall be reserved to the
 9  time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to
12  and signed before any officer authorized to
13  administer an oath, with the same force and
14  effect as if signed and sworn to before the
15  Court.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        JUDITH A. CHEVALIER,
 3  called as a witness, having been duly sworn by a
 4  Notary Public, was examined and testified as
 5  follows:
 6  EXAMINATION BY
 7  MS. ZACK:
 8        (Plaintiff's Exhibits 95 and 96,
 9        Expert Report of Judith A. Chevalier and a
10        number of pages collected from Google's
11        website concerning the Partner Program,
12        marked for identification, as of this
13        date.)
14     Q.   Good morning.
15     A.   Morning.
16     Q.   Could you state your full name for
17  the record, please?
18     A.   Sure, Judith Ann Chevalier.
19     Q.   What is your current position?
20     A.   I'm a professor at the Yale School of
21  Management.
22     Q.   We have your CV which outlines your
23  various positions.  I take it that's up to date;
24  is that right?
25     A.   I think so, yes.
```

Page 5

```
 1  J.A. Chevalier - C O N F I D E N T I A L
 2     Q.   You've brought with you someone else.
 3  Could you just tell us who that is?
 4     A.   Sure, that's Samuel Weglein.  He's
 5  from the Analysis Group.
 6     Q.   How do you spell his last name?
 7     A.   W-E-G-L-E-I-N.
 8     Q.   Did Mr. Weglein assist you with your
 9  report?
10     A.   Yes.
11     Q.   Anyone else?
12     A.   The staff of the analysis group, in
13  general, assisted with my report.
14     Q.   What kind of assistance did they
15  provide?
16     A.   So I drafted the report.  But the
17  staff at Analysis Group helped with tracking
18  down references, wordsmithing, finding things.
19  Things like that.
20     Q.   You've been retained by Google; is
21  that right?
22     A.   Correct.
23     Q.   Approximately when were you retained?
24     A.   I think mid to late March.
25     Q.   You've been retained as an expert;
```

2 (Pages 2 - 5)

Page 6

1   J.A. Chevalier - C O N F I D E N T I A L
2   correct?
3      A.   Correct.
4      Q.   What do you consider to be your area
5   or areas of expertise?
6      A.   So economics, industrial
7   organization, and the economics of technology,
8   and competitive strategy, actually.
9      Q.   Have you ever done any work for
10  Google before?
11     A.   No.
12     Q.   Have you ever done any work for any
13  search engine before?
14     A.   No.
15     Q.   Do you consider yourself an expert on
16  publishing?
17     A.   No.
18     Q.   Have you ever been retained by Durie
19  Tangri before as an expert?
20     A.   No, I have not.
21     Q.   By Keker Van Nest?
22     A.   I worked on a case in which lawyers
23  from Keker were involved.  But I wasn't retained
24  by Keker, I believe.
25     Q.   Which case was that?

Page 7

1   J.A. Chevalier - C O N F I D E N T I A L
2      A.   That was the State Attorney General
3   of New York versus Intel.
4      Q.   We have pre-marked as PX 95 your
5   report, and here is a copy.  I'm sorry, I don't
6   have copies for the others.
7           I think that we'll start by looking
8   at the list of your previous engagements, which
9   is Exhibit B, I believe, to your report?
10     A.   Yes.
11     Q.   This is a list within the past four
12  years; correct?
13     A.   Actually, as I was reviewing this
14  yesterday, I noticed that I believe the prior,
15  the first three engagements are a little bit
16  older.  I should have fixed that.
17     Q.   Other than these five engagements,
18  have you been an expert in any other cases?
19     A.   So these are the only cases where
20  I've filed reports.
21     Q.   Have you consulted as an expert in
22  other cases?
23     A.   I've consulted as an expert in cases
24  that have, you know, settled or, you know,
25  somehow ended before I filed a report.

Page 8

1   J.A. Chevalier - C O N F I D E N T I A L
2      Q.   With respect to these five, did you,
3   you did provide a report in all five, you said?
4      A.   Yes.
5      Q.   Did you attend a deposition in all
6   these cases?
7      A.   No, I attended a deposition in number
8   3, Presstek versus Creo, and in number five,
9   State Attorney General of New York.
10     Q.   With respect to the first case, which
11  is the Procter & Gamble Company versus the
12  Coca-Cola Company?
13     A.   Yes.
14     Q.   Who engaged you there, which side of
15  the litigation?
16     A.   Coca-Cola.
17     Q.   What type of expert opinion did you
18  provide in that case, generally?
19     A.   Yes, that was a patent infringement
20  case, and I calculated lost profits.
21     Q.   Anything else other than calculating
22  lost profits?
23     A.   I don't think so.
24     Q.   What about the second case, which
25  apparently was an arbitration; correct?

Page 9

1   J.A. Chevalier - C O N F I D E N T I A L
2      A.   Correct.
3      Q.   It says, I guess that's SESAC, Inc.
4   versus Television Music License Committee?
5      A.   Yes.
6      Q.   Which side were you retained by?
7      A.   SESAC.
8      Q.   What does SESAC stand for?
9      A.   I think technically it doesn't stand
10  for anything anymore.
11     Q.   Okay.
12     A.   They once did.
13     Q.   What do they do?
14     A.   They license performance rights for
15  music.
16     Q.   What expert opinion were you, did you
17  provide there, generally?
18     A.   There, I was asked to provide an
19  opinion about the structure of the contract that
20  the television stations would receive from
21  SESAC.
22     Q.   What was the nature of your opinion?
23     A.   Well, I think that's under -- I mean
24  I believe it's under protective order.  So, but
25  generally speaking, my opinion had to do with

3 (Pages 6 - 9)

1   J.A. Chevalier - C O N F I D E N T I A L
2 different -- yeah, I'm not sure exactly a good
3 way to say it, different type of contractual
4 forms and the effect they would have.
5     Q.   These were SESAC contracts?
6     A.   Yes.
7     Q.   In order to prepare that expert
8 report, did you study the market for the
9 licensing of music?
10        MR. McGOWAN:  Object, foundation.
11 You may answer.
12    A.   I studied, I studied -- the market
13 for licensing music is very complicated, and
14 there's a number of different pieces.  I studied
15 a narrow piece.
16    Q.   Just generally, what was the narrow
17 piece that you studied?
18    A.   So performance licenses for
19 television.
20    Q.   So performance licenses for music on
21 television?
22    A.   Correct.
23    Q.   Number 3 on your list is Presstek,
24 Inc. versus Creo, Inc.  Who engaged you there?
25    A.   Creo.

1   J.A. Chevalier - C O N F I D E N T I A L
2     Q.   What is the nature of their business?
3     A.   They make printing products.  Well,
4 they may do other things, but the case involved
5 printing products.
6     Q.   Generally, what was the nature of
7 your report in that case?
8     A.   That was also a patent infringement
9 case, and I also calculated lost profits.
10    Q.   Did you do regression analyses in
11 these cases where you calculated lost profits?
12    A.   I think so.
13    Q.   What was the -- I'm guessing that the
14 first case was a 2002 case, is that right, case
15 number one?
16    A.   That's my -- I don't remember.  But
17 that sounds approximately the right time frame.
18    Q.   Referring you to number 4, Advanced
19 Micro Devices, Inc. versus Intel Corporation.
20       Who retained you there?
21    A.   Intel.
22    Q.   What was the nature of your opinion?
23    A.   So that in that case, I provided an
24 analysis of how competitive strategies in the
25 market would succeed or fail in a but for

1   J.A. Chevalier - C O N F I D E N T I A L
2 environment.
3     Q.   Was it a patent case or --
4     A.   No, it's an antitrust case.
5     Q.   Did you, in that case, opine on a
6 relevant market or --
7     A.   No.
8     Q.   You didn't do damages in that case?
9     A.   I did not.
10    Q.   Case number five, is that another
11 antitrust case?
12    A.   Yes.
13    Q.   I take it you were retained by Intel?
14    A.   Yes.
15    Q.   Was your opinion the same there or
16 different than in the other Intel case?
17    A.   It was a different report.  And the
18 assignment was slightly different.  But it was,
19 it was, you know, at a high level, it was the
20 same.  It was to analyze the success or failure
21 of competitive strategies in the but for
22 environment.
23    Q.   So that was to assist the damage
24 analysis?
25    A.   I think it might have assisted both

1   J.A. Chevalier - C O N F I D E N T I A L
2 liability and damages.
3     Q.   Have you testified before Congress?
4     A.   No.
5     Q.   Have you written any articles on
6 copyright matters?
7     A.   No.
8     Q.   On patent matters?
9     A.   No.
10    Q.   Have you written any articles on
11 search engines?
12    A.   No.
13    Q.   On Google?
14    A.   No.
15    Q.   Amazon?
16    A.   Amazon, I've written an article on
17 Amazon, yes.
18    Q.   What about Microsoft?
19    A.   No.
20    Q.   What was your article on Amazon
21 about?
22    A.   I have three.
23    Q.   Um-hmm?
24    A.   Two of them were about loosely
25 estimating cross price elasticities between

1    J.A. Chevalier - C O N F I D E N T I A L
2    Amazon and Barnes & Noble in the book selling
3    market.
4         A second was about user reviews and
5    the effect of user reviews at Amazon and Barnes
6    & Noble.
7    Q.   Right.
8    A.   Actually, I have another paper that
9    used data from Amazon, so I don't know if you
10   want to count that.  That used data from the
11   used book marketplace at Amazon.
12   Q.   What type of data about used books?
13   A.   Prices and sales.  Well, I guess
14   prices, prices and attributes.
15   Q.   Not sales?
16   A.   No.  They were, in all of these
17   cases, these weren't data that we received from
18   Amazon, it was data we collected from the
19   website.
20   Q.   Any other articles that -- three or
21   four, I'm sorry, I thought you said there were
22   three.
23        Were you including this one that
24   you --
25   A.   So there were three about Amazon.

1    J.A. Chevalier - C O N F I D E N T I A L
2    There were three that I would say were, you
3    know, explicitly more about Amazon, so --
4    Q.   The first one was the cross price
5    elasticity --
6    A.   There were two related to the cross
7    price elasticity.
8         MR. McGOWAN:  I just caution that you
9    need to take turns speaking.
10   A.   Sorry.
11   Q.   Just for the sake of the record.
12   A.   Sorry.
13   Q.   That's all right.
14        Referring you to, do you have Exhibit
15   C of your report, which is PX 95?
16   A.   Yes.
17   Q.   Is this a comprehensive list of
18   everything that you reviewed in connection with
19   your report?
20   A.   I believe so, yes.
21   Q.   The first category here is legal
22   filings, and you list various legal documents
23   from this lawsuit.
24        Since you've written the report, have
25   you reviewed any other documents?

1    J.A. Chevalier - C O N F I D E N T I A L
2    A.   Since I've written the report, I
3    reviewed deposition testimony from Bruce Harris
4    and Gloriana St. Clair.
5    Q.   Anything else?
6    A.   No.
7    Q.   Did anything you read in those
8    depositions cause you to have any changes or
9    additions to your report?
10   A.   No.
11   Q.   You didn't read the reports of
12   plaintiff's experts?
13   A.   Oh, I did, yes, sorry.
14   Q.   Which reports did you read?
15   A.   I read the report of Ben Edelman.
16   Q.   Um-hmm?
17   A.   And I read the report of Mr. Gervais.
18   Q.   Did anything in those reports cause
19   you to have any changes or additions to your
20   report?
21   A.   No.
22   Q.   In paragraph 8 of page 2 of your
23   report, you say, "My work in this case is
24   ongoing, and I may amend or supplement this
25   report in light of new information, additional

1    J.A. Chevalier - C O N F I D E N T I A L
2    discovery, or expert testimony and opinion in
3    this case."
4         So as of now, having reviewed these
5    additional materials, you have nothing to amend
6    or supplement?
7    A.   Correct.
8    Q.   So you were retained mid to late
9    March?
10   A.   Correct.
11   Q.   Did you talk to anybody from Google
12   in connection with writing this report?
13   A.   No.
14   Q.   I take it you talked to Google's
15   counsel; right?
16   A.   Correct.
17   Q.   Did you talk to in-house counsel?
18   A.   No, I only talked to Mr. McGowan.
19   Q.   You didn't talk to any of the
20   business personnel at Google?
21   A.   No.
22   Q.   Did you seek to talk to them?
23   A.   No.
24   Q.   Did you do any empirical research for
25   this report?

5 (Pages 14 - 17)

Page 18

1　J.A. Chevalier - C O N F I D E N T I A L
2　　　MR. McGOWAN: Objection, vague.
3　　　You may answer.
4　Q.　Do you understand my question?
5　A.　Yes. So, well, actually, let me
6　clarify your question. So do you mean did I use
7　any numbers for the report?
8　Q.　Did you do any research involving any
9　review of data or numbers?
10　A.　Yes.
11　Q.　What research was that?
12　A.　So we obtained a listing of members
13　of publishers that were members of the Partner
14　Program, and we compared that to -- I compared
15　that to -- I instructed my staff to find a list
16　of top publishers in the U.S., and there's a
17　discussion in the report of a comparison between
18　those lists. So it's data that we used.
19　Q.　Any other data?
20　A.　There was data from the Partner
21　Program that I looked at.
22　Q.　What type of data?
23　A.　Data about the -- data about the
24　members of the Partner Program and the records
25　from the Partner Program.

Page 19

1　J.A. Chevalier - C O N F I D E N T I A L
2　Q.　What do you mean by records?
3　A.　So there's a listing of the partners
4　and their relationships over time, and the
5　payments.
6　Q.　What type of payments?
7　A.　Payments relating to the Partner
8　Program. So payments to the partners.
9　Q.　Anything else? Any other data?
10　A.　No, I don't think so.
11　Q.　You didn't personally do any analysis
12　of Google's costs in connection with either the
13　Partner Program or the Library Project?
14　A.　No, I did not.
15　Q.　Is the data that you looked at
16　included in the list that is Exhibit C to your
17　report, the data you just referred to?
18　A.　I think so. Let me check exactly how
19　that -- well, the, the Nielson BookScan Report
20　is included. I don't, as I see here, see the
21　list of participants in the Publishers Program
22　included, though it may be included by reference
23　in another piece.
24　Q.　What about the data about payments?
25　A.　So that's the same data source. Yes,

Page 20

1　J.A. Chevalier - C O N F I D E N T I A L
2　that's the piece that I don't see here, as I sit
3　here. Though, it I may be forgetting where it's
4　put.
5　RQ　　MS. ZACK: If that data has not been
6　　produced to plaintiffs, I would request
7　　that it be produced.
8　　　MR. McGOWAN: It has been produced.
9　　　MS. ZACK: Are you talking about
10　　particular PX's or documents with Bates
11　　numbers?
12　　　MR. McGOWAN: It's a Bates labeled
13　　document.
14　　　MS. ZACK: Can you amend, tell me
15　　what the numbers are, so we can amend this,
16　　and I can know what we're referring to.
17　　　MR. McGOWAN: Perhaps at the break if
18　　you give me a moment.
19　　　MS. ZACK: Yes, sure. I'm not asking
20　　you to do it this second.
21　　　MR. McGOWAN: I understand.
22　Q.　You say in your report that you had a
23　conversation with Bruce Harris; is that correct?
24　A.　I did.
25　Q.　That was over the telephone?

Page 21

1　J.A. Chevalier - C O N F I D E N T I A L
2　A.　Yes.
3　Q.　Was that at your request?
4　A.　Yes.
5　Q.　How long was that conversation?
6　A.　I don't recall precisely. I would
7　say on the order of a half an hour.
8　Q.　Did you take notes?
9　A.　I don't think so.
10　Q.　So you didn't take any notes?
11　A.　No.
12　Q.　What did he tell you?
13　A.　I asked about common practice in the
14　industry, and I asked about advice he would give
15　his clients.
16　Q.　Anything else?
17　A.　Not that I recall.
18　Q.　You asked him about common practice
19　in the industry about what?
20　A.　So I asked him about common practice
21　about the use of excerpts to promote books.
22　Q.　Anything else? Any other common
23　practices?
24　A.　We discussed, in general, the
25　difficulty in the industry of being found, of a

Page 22

1    J.A. Chevalier - C O N F I D E N T I A L
2    book being found by readers.
3        So, and the common practices in the
4    industry for publishers to help their books
5    reach readers.
6    Q.    Anything else about common practices?
7    A.    That's what I recall.
8    Q.    You asked him about advice he would
9    give his clients, and that was on what subjects,
10   advice he would give them on what subjects?
11   A.    So I asked whether he would encourage
12   clients to make their books available to
13   programs like Amazon Search Inside the Book or
14   other programs that would display parts of the
15   book to consumers.
16   Q.    You asked him about whether he would
17   encourage his clients to make their books
18   available in Amazon Search Inside the Book.
19       Did you ask him about whether he
20   would encourage his clients to make their books
21   available in Google Books?
22   A.    Yes.  I did similar, yes.
23   Q.    Anything else?
24   A.    That's what I recall.
25   Q.    What did he tell you about whether he

Page 23

1    J.A. Chevalier - C O N F I D E N T I A L
2    would or wouldn't encourage his clients to make
3    their books available in Amazon Search Inside
4    the Book?
5    A.    So my recollection is that he
6    answered that he would encourage his clients, in
7    general, to make their books available in a wide
8    variety of platform that would allow customers
9    to see the book.  So including Search Inside the
10   Book.
11   Q.    Did he specifically say he encouraged
12   the use of Search Inside the Book by his
13   clients?
14   A.    I don't recall whether I asked him if
15   he did encourage his clients or whether he would
16   encourage his clients.
17       I asked, I believe I asked if his
18   clients were seeking advice, would he encourage
19   them to make the book available to programs,
20   such as Google Books or Amazon Search Inside the
21   Book, and he answered that he would.
22   Q.    So you didn't ask him whether he
23   actually did it, you just asked him whether you
24   would do it?
25   A.    I can't recall, but I believe that's

Page 24

1    J.A. Chevalier - C O N F I D E N T I A L
2    correct.
3    Q.    You didn't care about whether he
4    really did it?
5        MR. McGOWAN:  Objection,
6    argumentative.
7        You may answer.
8    A.    I believe I asked what type of advice
9    he would give his clients, and I don't believe I
10   clarified whether that was advice he had given
11   his clients or whether that was advice that if a
12   client asked, he would give.
13   Q.    So did your conversation with him
14   form the basis of any of your conclusions?
15   A.    My conversation with him contributed
16   to my conclusions.  Though, I also relied, you
17   know, on his reports and the other reports.
18       My conversation with him was not the
19   sole basis of any conclusion.
20   Q.    I'm just talking about the subject
21   matter of industry custom and practice.
22       What were the bases of your
23   conclusions about that subject matter?
24   A.    Oh, so more generally, is your
25   question more generally in the report, what are

Page 25

1    J.A. Chevalier - C O N F I D E N T I A L
2    the bases of my conclusions about industry
3    practice?
4    Q.    Right.  You cite Mr. Harris quite
5    extensively.
6    A.    I do.  So my conversation with
7    Mr. Harris, Mr. Harris's report, Mr. Greco's
8    report, Mr. Aiken's deposition, Mr. Zohn's
9    deposition, and Mr. Perle's deposition and
10   report, all contributed to my understanding of
11   practice in the industry.
12   Q.    Anything else?
13   A.    So there are other materials I cite
14   that are related to practice in the industry,
15   but I would say the ones I described were the
16   main ones.
17   Q.    What other materials that you cite
18   were relevant to that issue?
19   A.    So, for example, I cite here --
20   Q.    Can you just tell me the page?
21   A.    Sure.  I'm sorry, the page is not
22   numbered, but towards the end of Appendix C,
23   Publicly Available Sources.
24       For example, I quote an industry
25   practitioner from the Investors Business Daily

Page 26

J.A. Chevalier - C O N F I D E N T I A L

1   J.A. Chevalier - C O N F I D E N T I A L
2   article, and that's in the report.
3        These iUniverse citations, for
4   example, have to do with -- they're mostly in a
5   footnote, but have to do with promotional
6   practices in the industry.
7        These are the ones that I notice,
8   offhand. For example, well, this is "Amazon
9   announces the first publicly available source.
10  Amazon announces sales impact from new Search
11  Inside the Book features." There's some
12  information that, that I used to describe
13  practice in the industry.
14       Q.   Okay, now you've read Mr. Harris's
15  deposition?
16       A.   I have.
17       Q.   You saw that he said that he had
18  never actually advised any clients to put their
19  books in the Google Partner Program?
20       A.   Yes.
21       Q.   Does that affect your analysis in any
22  way?
23       A.   It doesn't affect my analysis,
24  because my understanding from my conversation
25  with him and my understanding from my -- from

Page 27

1   J.A. Chevalier - C O N F I D E N T I A L
2   his report, and my understanding from his
3   deposition, and my understanding from the other
4   materials that I relied on, was that, in
5   general, he and many of the other industry
6   practitioners that I'm referring to, as a
7   general practice, encouraged authors or
8   publishers to participate in any programs that
9   had the feature of allowing consumers to find
10  their books through excerpts.
11       Q.   So you understand that it's the
12  general practice in the publishing industry for
13  publishers to allow their books to be placed in
14  search engines without permission?
15       MR. McGOWAN:  Objection, misstates.
16       Q.   Is that your understanding?
17       A.   That's not what I said.
18       Q.   Well, do you understand that to be
19  the practice?
20       A.   What I understand to be the practice
21  is that it is common, it is common practice in
22  the industry for publishers to make excerpts
23  available through a variety of programs.
24       Q.   Amazon within Search, Amazon's Search
25  Within the Book is by permission; correct?

Page 28

1   J.A. Chevalier - C O N F I D E N T I A L
2       A.   Correct.
3       Q.   Partner Program is by permission?
4       A.   Correct.
5       Q.   Are you aware of any programs, other
6   than the portion of Google Books that we call
7   the Library Project, that involve the placement
8   of books that are in copyright into search
9   engines, without permission?
10       A.   I think -- could you clarify what you
11  mean by placement into search engines?
12       I mean, so, for example, reviews
13  contain excerpts of books, and excerpts of books
14  are therefore, you know, found in search
15  engines. But I don't think, I don't know if
16  that's your question.
17       Q.   Are we talking, is your report about
18  Google's search engine or about Google Books?
19       A.   My report is about Google Books, but
20  you asked about search engines.
21       Q.   Are you aware of any book search
22  engine in which books have been placed without
23  permission, in copyright books, other than in
24  Google Books?
25       A.   So I guess what I'm trying to get at

Page 29

1   J.A. Chevalier - C O N F I D E N T I A L
2   is I think you mean by that, where the full text
3   of the book has been placed in the search
4   engine.
5       Q.   No, I don't mean that. I mean text
6   of the books.
7       MR. McGOWAN: :  Asked and answered.
8       MS. ZACK: No, it isn't.
9       Q.   Let me ask it a different way.
10       A.   Okay.
11       Q.   You tell me every search engine where
12  you understand that books are available by
13  search, for search?
14       A.   So again, my question, my -- why I
15  don't completely understand your question is
16  when you say books are available for search, do
17  you mean the entirety of the book is available
18  for search?
19       Q.   Yes.
20       A.   Okay, then I can answer your
21  question.
22       Q.   Okay.
23       A.   So I believe that Google Books is the
24  only program, that I'm aware of, that has that
25  feature.

8 (Pages 26 - 29)

1  J.A. Chevalier - C O N F I D E N T I A L
2     Q.   What portion?  It's not in the
3  Partner Program that has that feature; correct?
4        MR. McGOWAN:  Objection, vague.
5     Q.   Does Google Partner Program allow the
6  search of the full book?
7     A.   My understanding is that the Google
8  Partner Program, that -- I believe that books in
9  the Google Partner Program can be searched, so
10 that when a search term that the consumer uses
11 is found in the book, the book will appear.
12    Q.   That's by permission; correct?
13    A.   That is by permission; correct.
14    Q.   The same for Amazon Search Within the
15 Book?
16    A.   Correct, that's by permission.
17    Q.   Are you aware of any other search
18 engine that searches the entire book by
19 permission?
20    A.   No.
21    Q.   The only search engine that you are
22 aware of that searches the entire book, without
23 permission, is Google Books?
24    A.   Correct.
25    Q.   As to Google Books, it's only books

1  J.A. Chevalier - C O N F I D E N T I A L
2  that were copied in the Library Project that had
3  that feature, correct, of being without
4  permission?
5     A.   Correct.
6     Q.   Do you think a sample of one
7  establishes a custom and practice?
8        MR. McGOWAN:  Objection, vague.
9        You may answer.
10    A.   So your question was not about
11 permission.  Your question originally -- I guess
12 I don't understand your question.
13    Q.   I will rephrase it because I did, you
14 know, segue a little bit further back.
15       Do you think that having one search
16 engine that displays without permission -- or
17 searches, excuse me, without permission the
18 entire book, establishes a custom and practice
19 in an industry?
20    A.   I haven't -- I described to you the
21 custom and practice in the industry with regard
22 to making promotional materials available.  So I
23 guess I don't understand your question.
24    Q.   So you're not opining that there's a
25 custom and practice in the publishing industry

1  J.A. Chevalier - C O N F I D E N T I A L
2  to allow entire books to be searched on search
3  engines, without permission of copyright owners;
4  are you?
5     A.   I guess since you've used the term
6  "allow" and "without permission" in the same
7  sentence, I'm finding it very difficult to
8  answer this question.
9     Q.   You can't answer the question?  All
10 right, let me hear it restated, and I'll restate
11 it.
12       (The record was read.)
13    Q.   You can't answer that question?
14    A.   I can't answer that question.
15    Q.   You're not opining here that there is
16 a custom and practice in the publishing industry
17 whereby publishers permit, without permission,
18 their books to be searched in search engines,
19 their entire books to be searched in search
20 engines?
21       MR. McGOWAN:  Objection, vague.
22    Q.   Can you answer that?
23    A.   I'm sorry, so you're asking me
24 whether publishers permit, without permission, I
25 just, I can't, I don't understand what you mean

1  J.A. Chevalier - C O N F I D E N T I A L
2  by that.
3     Q.   You don't understand the concept of
4  permission in publishing?
5     A.   I do understand the concept of
6  permission in publishing.
7     Q.   Well, why don't you tell me what that
8  is then?  What do you understand about
9  publishing permission?
10    A.   So I understand that, for example, in
11 this case, publishers permit Amazon Search
12 Inside the Book to search inside the book.
13       And I also understand that publishers
14 permit the Google Partner Program to Search
15 Inside the Book and to display excerpts of the
16 book, so I understand that.
17       And I understand that the publisher,
18 yes, I understand that the publisher gives
19 permission for those programs.
20       And I understand that the books in
21 the Library Project have not received that
22 permission.
23    Q.   You can't tell me any other search
24 engine that searches the entire book, that does
25 so without permission; correct?

9 (Pages 30 - 33)

J.A. Chevalier - C O N F I D E N T I A L
1
2      MR. McGOWAN:  Asked and answered.
3      You may answer.
4   Q.   Correct?
5   A.   Correct.
6   Q.   So what I'm asking you is from all
7  that information, do you discern a custom and
8  practice with respect to the placement and
9  search of in copyright books in Google Books?
10  A.   By custom and practice, it is my
11 understanding that publishers in a wide variety
12 of formats and authors, encourage sampling from
13 their books.
14      I also understand that the Google
15 Books provides sampling from the books.
16  Q.   So do you understand from any source
17 that publishers and authors encourage sampling
18 of their books in search engines that display or
19 search entire books without a copyright
20 permission?
21      MR. McGOWAN:  Objection.  Vague and
22 compound.
23      You may answer.
24  A.   Sorry, can you repeat that?
25      MS. ZACK:  Please re-read it.

J.A. Chevalier - C O N F I D E N T I A L
1
2      (The record was read.)
3   A.   So I think perhaps the difficulty
4  here is that the permission is, the -- as I
5  explained in my report, the getting noticed of
6  the book, the advertising, the creation of
7  awareness, is the economic construct in which,
8  you know, publishers and authors have an
9  interest.
10      They give permission for that in many
11 circumstances.  But it's not, it's not the
12 giving of permission that creates value for
13 them.  It's the advertising of the book.
14      So I understand that -- what I
15 understand, my inference from the Google Partner
16 Program, is that when given an opportunity to
17 provide more materials, have a greater display
18 of the book, many publishers, all of the large
19 publishers in the U.S., have found that to be a
20 valuable opportunity.
21  Q.   Do you understand that all the
22 publishers who are members of the Partner
23 Program, allow all their books to be placed in
24 the Partner Program?
25  A.   I don't know that they do.

J.A. Chevalier - C O N F I D E N T I A L
1
2   Q.   Have you asked anyone whether that's
3  true or not?
4   A.   I have not.
5   Q.   You didn't ask Google?
6   A.   I imagine there may be books that
7  they don't place in the Partner Program, but I
8  didn't ask.
9   Q.   So you imagined that a publisher
10 might make a choice not to put certain books
11 into the Partner Program; correct?
12  A.   They might.
13  Q.   Why might they not do that?
14      MR. McGOWAN:  Objection.  Calls for
15 speculation.
16      You may answer.
17      MS. ZACK:  She said she imagined.
18  A.   Yes, so I concede that it is possible
19 that publishers may not put all of the books in
20 the partner Program.
21      But I have not investigated whether,
22 to what extent that is true or why that might
23 be.
24  Q.   You don't think that's relevant to
25 your report?

J.A. Chevalier - C O N F I D E N T I A L
1
2   A.   I investigated the participation of
3  publishers in the Partner Program.  I do not
4  know of -- I do not know of books that are
5  exceptions to that program, you know.
6   Q.   If I told you that there were, would
7  that change your analysis?
8   A.   If you told me that there were some
9  exceptions, that would not change my analysis.
10      If you told me that, if you told me
11 that -- yes, if you told me there were some
12 exceptions, that would not change my analysis.
13  Q.   Suppose I told you that 30 percent of
14 the books aren't put in the Partner Program,
15 would that change your analysis?
16  A.   No.
17  Q.   How about 50 percent?
18  A.   No.
19  Q.   Seventy percent of the books?
20  A.   If you told me that the publishers
21 are participating in the Partner Program --
22 I mean I recognize not all publisher participate
23 in the Partner Program.
24      If you told me that of the publishers
25 that participate in the Partner Program, they

10 (Pages 34 - 37)

Page 38

1    J.A. Chevalier - C O N F I D E N T I A L
2  chose to keep 30 percent of -- sorry, chose to
3  keep 70 percent of new books out of the Partner
4  Program, that might change my -- that would
5  change my analysis.
6      Q.   It might or it would?
7      A.   I would have to think about it. I
8  think it would. Now I note that I think that's
9  true, there are some cost to publishers of
10 participating in a Partner Program.
11          So I would have to think about
12 exactly -- I would have to think about it, you
13 know. I think what I say is true for, you know,
14 new books being created by the publisher.
15     Q.   Well, you haven't talked to
16 publishers about why they put their books into
17 the Partner Program; have you?
18     A.   I haven't talked to publishers about
19 why they put their books into the Partner
20 Program.
21          Though some of the material in my
22 report discusses, you know, why my understanding
23 from industry practice, about why publishers put
24 their books in the Partner Program.
25     Q.   Is it your understanding that

Page 39

1    J.A. Chevalier - C O N F I D E N T I A L
2  publishers want to control the publicity for the
3  books that they have published?
4          MR. McGOWAN: Objection, vague.
5          You may answer.
6      A.   My understanding is that publishers
7  allow a wide variety of sampling with different
8  degrees of control over what that sampling
9  involves.
10          For example, books are reviewed
11 without the publisher's permission. And they
12 don't control whether the book is reviewed or
13 the nature of reviews.
14          Consumers browse books in bookstores
15 and sample. The publisher doesn't control which
16 parts of the book the consumer reads or how
17 much.
18          So there are pieces of the marketing
19 of the book that the publisher controls, and
20 there are pieces of the marketing of the book
21 that the publisher does not control.
22     Q.   Which pieces does the publisher
23 control, to your knowledge?
24     A.   So, to my knowledge, the publisher
25 controls, you know, co-marketing arrangements

Page 40

1    J.A. Chevalier - C O N F I D E N T I A L
2  with the bookstore. They, you know, as
3  described in Mr. Harris's report, you know, they
4  create blads, they create, you know, sample
5  chapters. Things like that.
6      Q.   Anything else?
7      A.   I think there's a myriad of things
8  that they do that are described in the reports.
9  But I'm, you know, I'm not an expert in
10 publishing marketing.
11     Q.   Is there any value to a copyright
12 owner in the copyright?
13          MR. McGOWAN: Objection.
14     Q.   From an economic point of view?
15     A.   Is there a value to the owner in the
16 copyright?
17     Q.   Yes.
18     A.   So by that you mean is there monetary
19 value to the copyright?
20     Q.   Economic value of any type.
21     A.   Well, okay, so by economic value, I
22 think I would take that to mean monetary value.
23 And I would say there certainly are for some
24 copyrights.
25     Q.   You don't think there's any other

Page 41

1    J.A. Chevalier - C O N F I D E N T I A L
2  value, other than monetary value, in owning a
3  copyright?
4          MR. McGOWAN: Objection, misstates.
5          You may answer.
6      A.   So there's, you know, economic value
7  would be the monetary value of the copyright or
8  the possible future monetary value created by
9  the copyright.
10     Q.   Does the copyright basically give the
11 owner of the copyright a monopoly?
12     A.   Well, the copyright gives the
13 copyright owner a -- not a monopoly in the
14 antitrust sense, but exclusive rights to the
15 copyrighted work, subject to the limitations in
16 the copyright law.
17     Q.   From an economic sense, is it a
18 monopoly?
19          MR. McGOWAN: I object. It's very
20 compound, but you may answer.
21     A.   So is the copyright a monopoly?
22     Q.   Um-hmm.
23     A.   So I think in order to answer that
24 question, you would first have to ask the
25 question of whether the copyrighted goods

11 (Pages 38 - 41)

1  J.A. Chevalier - C O N F I D E N T I A L
2  constitutes a market over which we can normally
3  use the term monopoly.
4       So copyrighted works compete with one
5  another. So in that sense, I don't think I
6  would -- I would not use the term monopoly as an
7  economist.
8  Q.  So you would agree that the copyright
9  provides some value, in an economic sense, to
10 the copyright owner, but you limit it to
11 monetary value; is that what your testimony is?
12     MR. McGOWAN:  Objection.
13 A.  I have -- you asked me actually about
14 economic value?
15 Q.  Right.
16 A.  The economic value is the monetary
17 value created by the copyright, and the
18 potential future monetary value created by the
19 copyright.
20 Q.  Referring you back to your report,
21 which is PX 95, referring to you page 2.
22     Page 2, paragraph 6, you state, "I
23 understand that plaintiffs, three individual
24 authors and the Authors Guild, allege that
25 Google, Inc., ("Google") has infringed the

1  J.A. Chevalier - C O N F I D E N T I A L
2  plaintiffs' copyrights by scanning and indexing
3  several million books as part of its Google
4  Books project, ("Google Books"), as well as by
5  making certain related uses of those works, such
6  as displaying snippets."
7       Where did you get that understanding?
8  A.  So that's my understanding from the,
9  for example, the complaint.
10 Q.  Anything else?
11 A.  Sorry, what is your question?
12 Q.  Did you get that understanding from
13 anything other than the complaint?
14 A.  You know, I think that, you know,
15 that this is the controversy is, you know,
16 probably, it's most notably in the complaint.
17 But any of the legal filings, you know, have
18 some discussion of that.
19 Q.  So you understand this is a copyright
20 case; right?
21 A.  I do.
22 Q.  You don't consider yourself an expert
23 in copyright; do you?
24     MR. McGOWAN:  Vague.
25     You may answer.

1  J.A. Chevalier - C O N F I D E N T I A L
2  A.  So I consider myself an expert in the
3  areas that I've told you, competitive strategy,
4  industrial organization and economics. You
5  know, copyrights play a role in that, but I'm
6  not a -- for example, I'm not a legal expert in
7  copyrights.
8  Q.  Well, with respect to copyright
9  specifically, is there some area of copyright,
10 that concept, that you do consider yourself an
11 expert in?
12 A.  So within the area of copyright, a
13 copyright, a copyright is a, is an input to an
14 economic process.
15     And I'm an expert in industrial
16 organization, and so to the extent that, you
17 know, copyrights and perhaps they play a
18 particular role in the economics of technology.
19     So I'm an expert in -- I'm an expert
20 in the economic processes that use copyrights,
21 but I'm not a specific expert in copyright law.
22 Q.  Both of these types of industrial
23 organizations and technology involve a lot of
24 different subject matter; right?
25 A.  Correct.

1  J.A. Chevalier - C O N F I D E N T I A L
2  Q.  You could apply them to various
3  different subject matters, including copyright;
4  correct.
5  A.  Correct.
6  Q.  But you don't consider yourself an
7  expert on all these subjects that you might
8  apply your area of expertise to; do you?
9      MR. McGOWAN:  Objection, vague.
10 A.  So I've already answered that I'm not
11 an expert in the legal theory of copyright. I
12 am an expert in industrial organization, which
13 is the study of competition in markets, to which
14 copyrights and other forms of intellectual
15 property are an important input.
16 Q.  Is your report at all about
17 industrial organization here?
18 A.  Yes, my report is about, yes. The,
19 yes, my report is about industrial organization.
20 Q.  In what sense is your report about
21 industrial organization?
22 A.  So, for example, my report discusses,
23 my report discusses the topic of whether Google
24 Books is a new good. And that is a topic -- the
25 study of new books is a -- sorry.

12 (Pages 42 - 45)

1   J.A. Chevalier - C O N F I D E N T I A L
2      Q.   New goods?
3      A.   Strike that.  New goods is a study,
4   an important area of study in industrial
5   organization.
6         I discuss whether Google Books, the
7   services provided by Google Books are a
8   substitute or a compliment for the purchase of
9   the book.  That is also an area of industrial
10  organization.
11     Q.   When you discuss those topics in this
12  report, did you include or make any special
13  allowances for the fact that this product that
14  you're studying is a, has a copyright, which
15  distinguishes it from a lot of goods in the
16  marketplace that don't have that legal
17  protection?
18        MR. McGOWAN:  Objection, foundation.
19        You may answer.
20        MS. ZACK:  I should restate it.
21     Q.   When you wrote your report, you were
22  writing about books.  In this case, we're
23  talking about copyrighted books which have a
24  certain legal protection.
25     A.   Yes.

1   J.A. Chevalier - C O N F I D E N T I A L
2      Q.   Which distinguish these goods, these
3   books, from many other goods that you could
4   study in industrial organization.
5         Does your report take account of
6   that?
7         MR. McGOWAN:  Objection.
8      Q.   And if it does, how so?
9         MR. McGOWAN:  Objection, compound.
10        Go ahead, you may answer.
11     A.   So my report, my report -- I might
12  have to go vague.  My report discusses the --
13  let's see, my report discusses the question, for
14  example, whether or not Google Books is a new
15  good.
16        And I understand that, and I think I
17  discuss, that an input to the production of that
18  new good is the copyrighted works that are
19  searched.
20     Q.   Right, but you don't discuss any
21  ramifications of the fact that there is a
22  copyright for the works; right?
23     A.   That's, that's not, it's -- let me
24  see.  I think, you know, the questions that I
25  answer in the report, the issues that I discuss,

1   J.A. Chevalier - C O N F I D E N T I A L
2   you know, recognize that the products are --
3   that the books are copyrighted, but my analysis,
4   and my analysis, you know, understands that
5   those products are copyrighted, but the
6   opinions, the opinions are opinions about their
7   relationship of the product to other products in
8   the marketplace.
9      Q.   Have you ever done any reports where
10  you've analyzed barriers to entry in markets?
11     A.   Expert reports for academic --
12     Q.   No, any kind of academic writing on
13  barriers to entry?
14     A.   Sure, I have.
15     Q.   If you wrote about barriers to entry
16  in a market, would you consider the effect of
17  regulation?
18     A.   Sure, of course.
19     Q.   Would you consider the effect of
20  patents and copyrights?
21     A.   Yes.
22     Q.   So you would consider that in that
23  analysis to barriers to entry; correct?
24     A.   Yes.
25     Q.   Going back to paragraph 6, you make

1   J.A. Chevalier - C O N F I D E N T I A L
2   no specific mention in paragraph 6 about the
3   distribution by Google to libraries of entire
4   digital copies of books?
5      A.   I do not mention the library copy
6   here.
7      Q.   Is there a reason why you don't
8   mention that?
9      A.   So I, I mention the scanning.  And my
10  understanding is the scanning -- my
11  understanding is that Google has made the scan,
12  and they have allowed libraries to download that
13  scan, if they choose to do so.
14        So I understand, I understand that
15  the issue of the library copy, but I would, I
16  would, in paragraph 6, the issue of the library
17  copy, to me, is encompassed in the term scanning
18  that I've used.
19     Q.   So Google's giving the library a
20  copy, you understand; is that right?
21        MR. McGOWAN:  Objection.
22     Q.   You understand that that occurs?
23     A.   I understand that Google provides
24  facilities from which the library can, if they
25  choose, to make a copy.

13 (Pages 46 - 49)

1     J.A. Chevalier - C O N F I D E N T I A L
2     Q.   Have you read the agreements between
3   Google and the libraries?
4     A.   I think I have not.  I have read the
5   deposition of -- I'm not sure I can pronounce
6   it.
7     Q.   Paul Courant?
8     A.   Well, I have read the deposition of
9   Paul Courant, which discusses that issue, but
10  I've also read the deposition Stephane
11  Jaskiewicz, which discusses that issue.
12    Q.   You haven't read the actual contracts
13  between Google and its library partners?
14    A.   No.
15    Q.   Google has contractually agreed to
16  provide digital copies to the libraries; are you
17  aware of that?
18    A.   As I said before, my understanding
19  from these materials that I've just described to
20  you, is that Google has provided the facilities
21  from which the libraries can make a copy.
22    Q.   What do you mean by providing the
23  facilities?
24    A.   So my understanding is that the
25  libraries can download a copy, if they choose to

1     J.A. Chevalier - C O N F I D E N T I A L
2   do so.
3     Q.   But you don't understand that
4   Google's contractually obligated to allow them
5   to download the books?
6     A.   Yes, I understand that Google does
7   allow them to download the books, and that's --
8   and I understand that that's part of the
9   agreement with the libraries.
10    Q.   Because there's a difference between
11  allowing someone to do something and having a
12  contractual obligation to do it; isn't there?
13        MR. McGOWAN:  Objection.
14    Q.   As a matter of economics?
15        MR. McGOWAN:  Objection to the extent
16    it calls for a legal conclusion.
17    A.   So I'm not a legal expert.  My
18  understanding is that Google has agreed to make
19  the facilities available to the libraries so
20  that they can download a copy, if they choose to
21  do so.
22        MR. McGOWAN:  We have been going a
23    little over an hour.
24        MS. ZACK:  If you want to take a
25    break.

1     J.A. Chevalier - C O N F I D E N T I A L
2       (Brief recess taken.)
3   FURTHER EXAMINATION
4   BY MS. ZACK:
5     Q.   Paragraph 7 of your report -- I'm
6   sorry, before I get to paragraph 7, I wanted to
7   ask you something about flipping further back in
8   your report to page 15?
9     A.   Um-hmm.
10    Q.   If you look at your footnote 64, do
11  you see that?
12    A.   Yes.
13    Q.   You talk about "The preceding
14  analysis," do you see where I am?
15    A.   Um-hmm.
16    Q.   "The preceding analysis suggests that
17  such a market could only be created by law
18  because the relevant economic principles would
19  not sustain it otherwise"; do you see that?
20    A.   Yes.
21    Q.   Those relevant economic principles,
22  are those the same principles you discuss
23  elsewhere in your report or are they different
24  principles?
25    A.   So those are the economic principles

1     J.A. Chevalier - C O N F I D E N T I A L
2   that I discussed from point -- all of section,
3   the section labeled B starting on page 14.
4     Q.   So you're not referring there to any
5   additional economic principles, other than the
6   ones you've otherwise described in your report;
7   that's just what I want to know; right?
8     A.   Right.
9     Q.   So the answer is you're not referring
10  to anything outside the report?
11    A.   I am -- right.  I'm referring to the
12  preceding analysis, which actually perhaps
13  preceding is a poor choice of words, because I'm
14  referring to the analysis in points 48 to 54.
15    Q.   Going back to paragraph 7 on page 2,
16  it's a summary of your conclusions.
17        It says, "I conclude based on the
18  evidence I have seen, that: (1) Google Books is
19  new good - it provides benefits to consumers
20  that previous goods did not."
21        When you use the term "Google Books"
22  there, are you saying that Google Books itself
23  is a new good?
24    A.   I am saying Google Books itself is a
25  new good.

14 (Pages 50 - 53)

Page 54

1   J.A. Chevalier - C O N F I D E N T I A L
2      Q.   So that includes both the Partner
3   Program and the Library Project?
4      A.   It includes all of the elements of
5   Google Books.
6      Q.   If we took Google Books and put it
7   into the two categories, the Partner Program
8   first, is the Partner Program a new good?
9      A.   Do you mean the product Google Books
10  implementing only books, only the Partner
11  Program, but not the other books?
12     Q.   Yes, let's just say hypothetically,
13  Google Books only included Partner Program
14  books, would that be a new good, in your
15  opinion?
16     A.   That would be a new good, but it
17  would be a good of lower value to consumers than
18  the totality of Google Books.
19     Q.   Is Amazon Search Within the Book, a
20  new good?
21     A.   I haven't analyzed that.

Page 55



Page 56

8      A.   So, in other words, if you took the
9   45,000 partners in the most recent year, and you
10  asked what's the total amount of revenue they
11  received, the mode, the most frequent number.
12     Q.   Oh, the modal partner?
13     A.   Modal, yes.  The mode would be zero.
14     Q.   So you're saying the fact that ad
15  revenues are shared, doesn't play a large role
16  in your analysis.
17          Does it play any role in your
18  analysis?
19     A.   As I just said, I considered it.  But
20  I decided since the ad revenues are small, they
21  don't play a substantial role in my analysis.
22     Q.   That's what I'm trying to say.  What
23  role do they play?  You didn't say it plays no
24  role, so what role does it play?
25     A.   I -- I evaluated the Partner Program

Page 57

1   J.A. Chevalier - C O N F I D E N T I A L
2   and determined that the ad revenue, for most
3   partners, the partner would have to gain
4   substantial benefits from being in the program,
5   apart from the ad revenue, in order to
6   participate.  Because for the typical partner,
7   the ad revenues are zero.
8      Q.   Is that because nobody is clicking on
9   the books?
10     A.   No, I don't think that's right.
11     Q.   How do the partners get revenue in
12  the Partner Program, the publishing partners get
13  revenue?
14     A.   My understanding is they get revenue
15  if they click on -- if, if consumers click on
16  ads.
17          The publishing partners, of course,
18  also get revenue if the consumer goes and buys
19  the book.
20     Q.   Is it your understanding that the
21  publishing partner gets any revenue from the
22  Partner Program, if someone clicks on the Amazon
23  link?
24     A.   So my understanding is that the
25  partner gets revenue -- I would actually like to

15 (Pages 54 - 57)

Page 58

1    J.A. Chevalier - C O N F I D E N T I A L
2  double-check this because I would like to get
3  this right.
4        But my understanding is that the
5  partner gets revenue only as it might flow
6  through the Amazon transaction, if the consumer
7  buys the book.
8    Q.   So they get revenue from Google?
9    A.   My understanding is they do not.
10   Q.   Well, all right, now I'm confused.
11 It's not your understanding that Google is
12 paying ad revenues to partners when books are
13 purchased at Amazon; are you?
14   A.   It's my understanding that Google is
15 paying ad revenues to partners when consumers
16 click on ads.
17   Q.   Is the Amazon link considered an ad?
18   A.   My understanding is that it is not.
19   Q.   Where did you get that understanding?
20   A.   So that's my understanding from the
21 materials I cite here regarding the -- this is
22 my reading of the description of the Google
23 Partners Program that are cited in my report.
24      So I cite the Google Partner Program
25 description pages on the Google website, and

Page 59

1    J.A. Chevalier - C O N F I D E N T I A L
2  that's my understanding from that.
3    Q.   So you didn't ask anybody from Google
4  how it works?
5        MR. McGOWAN:  Objection.  Asked and
6    answered.
7        You may answer.
8    A.   I did not.  I did not.  As I
9  mentioned before, I did not speak to Google
10 employees in preparing this report.
11   Q.   Do you think the materials that you
12 looked at are crystal clear?
13   A.   I think the materials -- to me, the
14 materials I looked at were clear.
15   Q.   I pre-marked PX 96, which is from
16 Google's website.  It's a number of pages
17 collected from Google's website concerning the
18 Partner Program.
19      Take your time and flip through it,
20 but have you seen any of these pages before?
21   A.   Yes.
22   Q.   Are these the same things that you
23 looked at?
24   A.   Roughly, I think I have looked at
25 these pages.  I also cite some other pages that

Page 60

1    J.A. Chevalier - C O N F I D E N T I A L
2  are from the Partner Program website.  But
3  roughly speaking, these are what I've seen.
4    Q.   Did you look at the Partner Program
5  contract that was on-line?
6    A.   Yes, previously.
7    Q.   Let me hand you what's been
8  previously marked as PX 91.
9        Have you seen this before?
10   A.   I think so, yes.  I believe this is
11 the standard downloadable one, correct.
12   Q.   Yes.  So can you just show me, in
13 these documents, where you gained your
14 understanding as to how and on what basis
15 partners receive funds from Google?
16   A.   So in item 96 --
17   Q.   PX 96?
18   A.   -- PX 96, that includes a summary.
19 On the preview page for your book, we display a
20 set of links to buy the books at the major
21 retailers, as well as to a site of your choice.
22      These links are not paid for by the
23 site features.  Clicking on a link to purchase
24 your book at an on-line retailer, won't generate
25 any revenue directly.

Page 61

1    J.A. Chevalier - C O N F I D E N T I A L
2        So that, that's, so that's one piece
3  of it.  And then my understanding is Section 8,
4  ads payment.
5        "You agree that Google may serve
6  third-party and/or Google provided
7  advertisements, collectively, in connection
8  with the authorized content using Google's
9  advertising serving technology.  Such ads will
10 appear in the style and format that may be
11 offered generally by Google when such
12 advertising inventory is available.
13      "You shall receive a payment related
14 to the number of valid clicks on ads displayed
15 on content excerpt pages as determined by Google
16 for its participants in the program."
17      So Section 8, combined with what do I
18 earn from the program, I can't say that this is
19 the exact page I looked at, at the time, but my
20 ████████████████████████████████████████
21 ████████████████████████████████████████
22 ████████████████████████████████████████
23 partners are payments for ads clicked through
24 for standard Google style ads; and that the
25 partner additionally would earn revenues, but

16 (Pages 58 - 61)

1  J.A. Chevalier - C O N F I D E N T I A L
2  not through the partner -- not through Google
3  for, you know, any incremental sales of the book
4  that might occur.
5      Q.   Are these revenues from these
6  incremental sales that copyright owners might
7  earn, important to your report?
8      A.   So because, because those sales occur
9  in other places, you know, they occur at Amazon
10  or at Barnes & Noble, I don't have, I don't have
11  a mechanism to measure them.
12      But the fact -- and it is not
13  necessarily the case that incremental sales that
14  take place, would only take place, you know,
15  from the search page from a click.
16      But the fact that displaying the book
17  in Google, Google Books, in the Partner Program,
18  would provide incremental sales, is important to
19  my report.
20      Because, because as I've said, I
21  think that the revenues from the ad program are
22  de minimis.
23      And so the opportunity for readers to
24  learn about the book and, hopefully, buy the
25  book, is -- I have concluded the main benefit

1  J.A. Chevalier - C O N F I D E N T I A L
2  from participating in the Partner Program.
3      Q.   The main benefit to publishers and
4  authors?
5      A.   The main benefit to publishers and
6  authors.
7      Q.   Is that also the main benefit to
8  publishers and authors, in your opinion, of
9  having their books available for search through
10  the Library Project?
11      MR. McGOWAN:  Objection, vague.
12      You may answer.
13      A.   So I think the -- yes, I should note
14  that because many of the books in the Library
15  Program are out of print, the consumer may have
16  limited opportunities to purchase those books.
17      But to the extent that there is an
18  opportunity to purchase the book or the consumer
19  becomes interested in the author and purchases
20  the author's other books, you know, on net, I
21  think the publisher and author would receive a
22  benefit from being in the Google Library
23  Project, because it would stimulate interest in
24  demand for the books.
25      Q.   So with respect to out-of-print

1  J.A. Chevalier - C O N F I D E N T I A L
2  books, it would stimulate demand and how is the
3  author monetizing that or the publisher?
4      A.   So it will clearly be more difficult
5  for the author to monetize that interest, that
6  increased demand for an out-of-print book.
7      So there may be circumstances when
8  monetarily the -- there are probably many
9  circumstances where, you know, the consumer may
10  be interested in purchasing the book, but, you
11  know, there's no mechanism for that to occur.
12      The consumer may purchase, you know,
13  in some circumstances, a used book.  That
14  doesn't directly benefit the author.
15      To the extent, I think it's, I think
16  it's reasonable that, you know, the search, you
17  know -- in circumstances where there's an
18  opportunity for the consumer to buy the book or
19  to buy another book by the author, you know,
20  then the author will benefit; or if enough
21  consumers have interest, you know, there are
22  programs to bring books back into print, which
23  are possible ways in which the author would
24  ultimately benefit.
25      Q.   Does Google provide any information

1  J.A. Chevalier - C O N F I D E N T I A L
2  to copyright owners about how many, who are not
3  in the Partner Program, so copyright owners
4  whose books are in Google Books through the
5  Library Project, to your knowledge, does Google
6  provide copyright owners with any information
7  about how many searches have been made on their
8  book?
9      A.   I believe they do not.
10      Q.   So how would they know, how does that
11  benefit the author or publisher if they don't
12  know how many, how much demand is being
13  expressed?
14      A.   Well, if, for example, a number of
15  consumers, if consumers -- so they won't know
16  that the consumer searched for the book.
17      But if consumers seek the book
18  through Amazon, if the consumer, if the consumer
19  seeks out the author's other books, the author
20  may not be able to track the extent to which
21  Google Books has driven demand for their books,
22  but it nonetheless exists.
23      Q.   How do you think Google tracks that?
24      A.   Well, there are things that are
25  outside of Google's ability to track.  So they

17 (Pages 62 - 65)

1    J.A. Chevalier - C O N F I D E N T I A L
2  presumably know what terms people searched on.
3  They probably do not know what things that came
4  up on a page, unless the person clicks the
5  individual was interested in, they may know --
6  they do know whether the person clicked on a
7  link, but they don't know of the -- they
8  ultimately, do not know whether -- Google, my
9  understanding is, does not ultimately know
10  whether the consumer made a purchase, unless
11  they did so through Google Play, made a purchase
12  in response to having searched for the book.
13      Q.   My question is do you know whether
14  Google tracks searches in books?
15      MR. McGOWAN:  Objection, vague.
16      You may answer.
17      A.   So what do you mean by searches in
18  books?
19      So do you mean does Google keep track
20  of the search terms?
21      Q.   Yes, that people use.
22      A.   I'm sure that Google has a record of
23  the search terms that people use.
24      Q.   Do you think they have a record of
25  what books are displayed as a result of those

1    J.A. Chevalier - C O N F I D E N T I A L
2  search terms?
3      A.   I imagine they do.
4      Q.   Do you think that when people search
5  inside a given book with additional search
6  terms, that Google keeps records of that?
7      A.   I am sure in some raw data form, any
8  click that the consumer made within a Google
9  site is, you know, whether it's kept, how it's
10  aggregated, I don't know, but at some moment,
11  Google has a record of the clicks that the
12  consumers make in Google sites.
13      Q.   Well, I don't know what you mean by
14  click, but I'm saying do they keep a record of a
15  search term entered by a user, that in their
16  function that's called Search Within the Book?
17      MR. McGOWAN:  Objection.  I think you
18  crossed companies in that question.
19      MS. ZACK:  I may have.  I'm sorry.
20  Well, there is a Search Inside the Book
21  feature of Google.
22      A.   So, yes, so my understanding is the
23  main way consumers interact with Google Books is
24  they enter a search term at the main Google
25  website or possibly at Google Books.  I

1    J.A. Chevalier - C O N F I D E N T I A L
2  sometimes search that way.
3      But, you know, I don't know even how
4  frequent it is for consumers to undertake a
5  secondary search within the book, and I don't
6  even recall that.  I don't, haven't used that
7  feature of the website.
8      But they, you know, the entries that
9  the consumer has made in Google websites, I'm
10  sure Google at some moment knows.
11      Though it's, you know, obviously, a
12  mass of data that's probably, you know, in a
13  very raw form.  But at some point, they know it.
14      Q.   You don't think Google uses that data
15  for its own purposes?
16      MR. McGOWAN:  Objection.
17      You may answer.
18      A.   I, for example, know that the search
19  terms used at the Google search page are used to
20  sell ads, so they use the, you know, that's the
21  whole business model.
22      Q.   What do you know about Google's
23  business model?
24      A.   Well, Google's, obviously, a pretty
25  complicated company with a number of different

1    J.A. Chevalier - C O N F I D E N T I A L
2  products and services.  Are you talking about
3  search?
4      Q.   Yes, let's talk about search.
5      A.   So is your question what is the
6  business model of Google?
7      Q.   Um-hmm.
8      A.   So my understanding is that Google
9  provides search functionality, and they sell ads
10  that are key to search terms.
11      Q.   Do they have any way of targeting ads
12  to users?
13      MR. McGOWAN:  Objection as to form.
14      You may answer.
15      A.   So I'm not an expert on Google search
16  engine.  My understanding is that, for example,
17  I am more likely to receive ads for businesses
18  in New Haven, Connecticut than someone who
19  doesn't live in New Haven, Connecticut.
20      So there is some targeting, but I
21  don't know the intricacies of it, and I'm not an
22  expert on that.
23      Q.   Do you know whether or not Google
24  uses information it obtains from searches made
25  within Google Books for purposes of its general

18 (Pages 66 - 69)

Page 70

1  J.A. Chevalier - C O N F I D E N T I A L
2  ad targeting?
3      MR. McGOWAN:  Objection, foundation.
4   A.   So I don't know about that
5  specifically.
6   Q.   Isn't it relevant to your report,
7  what benefits Google is getting from Google
8  search and Google Books?
9      MR. McGOWAN:  Objection, foundation.
10     You may answer.
11  A.   Actually, I don't think it's that
12 relevant to the specific questions that I
13 addressed in my report, no.
14  Q.   So you're saying to me that you don't
15 think understanding Google's financial
16 interests, with respect to its search engine, is
17 relevant to the conclusions you have reached in
18 your report?
19     MR. McGOWAN:  Objection, foundation.
20     You may answer.
21  A.   So, for example, I don't think it's
22 relevant to the question of whether Google Books
23 is a new good.
24  Q.   Okay, anything else it's not relevant
25 to?

Page 71

1  J.A. Chevalier - C O N F I D E N T I A L
2   A.   I don't think it's particularly
3  relevant to the question of whether the search
4  output is a compliment or substitute to the
5  purchase of the good -- of the book.
6      I, I can -- in the final section of
7  the report, I considered, you know, whether a
8  market for search terms would occur.  I think
9  it's not that relevant to that either.
10  Q.   Referring you to, back to page 2,
11 paragraph 7, you conclude, your conclusion
12 number 2 is Google Books provides value to
13 authors; correct?
14  A.   Correct.
15  Q.   Does Google Books provide value to
16 Google?
17  A.   I believe Google Books probably
18 provides value to Google, that it's -- I
19 obviously didn't express an opinion about it.
20  Q.   Do you have any doubt that Google
21 Books provides value to Google?
22     MR. McGOWAN:  Objection, vague.
23     You may answer.
24  A.   I, I am not -- I have, I am not
25 convinced that the Google Books project was a,

Page 72

1  J.A. Chevalier - C O N F I D E N T I A L
2  if you count up all the costs and benefits that
3  Google's received, I am not convinced that the
4  Google Books project was a positive, what we in
5  economics call a net present value project for
6  Google.  But that's, you know, not germane to my
7  conclusions.
8   Q.   You're not convinced?  Have you
9  analyzed that?
10  A.   It's not germane to my conclusions.
11  Q.   Whether it's germane or not, you have
12 not done any analysis of the benefits to Google,
13 so how could you possibly express an opinion
14 about it?
15     You haven't even asked Google; have
16 you?
17     MR. McGOWAN:  Objection,
18 argumentative, compound.
19     MS. ZACK:  I'll withdraw it.
20  Q.   You've been retained by Google.
21     You haven't asked anyone at Google
22 how much money they make or from Google Books?
23     MR. McGOWAN:  Objection, foundation,
24 asked and answered.
25     You may answer.

Page 73

1  J.A. Chevalier - C O N F I D E N T I A L
2   A.   There is not -- I was retained to
3  answer specific questions.  The answer to that
4  question is not germane to these three
5  conclusions summarized in point 7.
6   Q.   Seven (3), you say "Economic analysis
7  provides no reason to believe that Google Books
8  has superceded any potential market for books or
9  licenses to scan and index books," and your
10 reference there to economic analysis, is that
11 the economic analysis in your report?
12  A.   Correct.
13  Q.   You are not referring to any other
14 economic analysis?
15  A.   Correct.
16  Q.   Referring you to paragraph 9, "Google
17 Books is a search tool developed by Google."
18  A.   Yes.
19  Q.   What do you mean by a search tool?
20  A.   I mean that Google Books is a
21 mechanism for consumers to, or users, to search.
22  Q.   Do you consider Google, Google's
23 general search engine, to be a search tool?
24  A.   I do.
25  Q.   Are there any differences that you're

19 (Pages 70 - 73)

Page 74

1   J.A. Chevalier - C O N F I D E N T I A L
2   aware of that you consider material between the
3   Google search engine, generally, and Google
4   Books?
5       A.   Well, so Google Books is the marriage
6   of the Google digitization project, Google
7   search functionality and, you know, a display
8   mechanism that's particular to books.
9          So it's, you know, Google Books is
10  distinct from the rest of the search engine.
11  Though, it, obviously, uses expertise related to
12  the general search expertise.
13      Q.   So Google's -- can we -- I don't know
14  what to call it, but the general search engine.
15         You know what I'm talking about when
16  we talk about Google's general search engine, to
17  distinguish it from the Google Books search
18  engine, can we use those terms generally here?
19         MR. McGOWAN:  Object, vague,
20     foundation.
21         MS. ZACK:  I don't want to be vague.
22  I want to make sure the witness understands
23  what we're talking about.
24      Q.   Do you understand those distinctions?
25      A.   So you're going to use the term the

Page 75

1   J.A. Chevalier - C O N F I D E N T I A L
2   general Google search engine and Google Books
3   separately?
4       Q.   Right.
5       A.   Okay.
6       Q.   Is it your understanding that
7   Google's general search engine crawls the Web?
8       A.   It is my understanding that Google
9   search engine searches Web pages, yes.
10      Q.   Those Web pages are not placed on the
11  Web by Google; right?
12      A.   In general, those Web pages are not
13  placed on the Web by Google.
14      Q.   With respect to Google Books, do you
15  understand that Google actually digitizes
16  material for purposes of searching and placing
17  it on the Web?
18         MR. McGOWAN:  Objection, foundation.
19     Calls for speculation.
20         You may answer.
21      A.   So my understanding is that Google
22  digitizes material.  That that material is
23  searched in Google's servers, and then the
24  material -- and then, you know, the material
25  displayed is, you know, depending on the

Page 76

1   J.A. Chevalier - C O N F I D E N T I A L
2   program, the snippet, the whole text, the, the
3   partner.
4       Q.   Do you understand that Google Books
5   involves Google obtaining off-line content and
6   making it available on the Internet?
7          MR. McGOWAN:  Objection, vague.
8          You may answer.
9       A.   I understand that the Google Books
10  project involved Google digitizing physical
11  books.
12      Q.   That's different than the general
13  Google Web engine?
14         MR. McGOWAN:  Objection, vague.
15     Calls for speculation.
16      A.   So I'm not aware of every program
17  that Google has undertaken.  For example, I
18  don't know whether there's a digitization
19  component in, say, Google Scholar.
20         But when we think about the Google
21  search engine, certainly, the most common thing
22  that we could -- that my understanding is it
23  searches materials, you know, in large part, on
24  the Web.
25      Q.   In order to search the off-line

Page 77

1   J.A. Chevalier - C O N F I D E N T I A L
2   material, the books, Google digitizes it;
3   correct?
4       A.   Yes, correct.
5       Q.   So Google Books then involves not
6   just a search tool, but the creation of an
7   entire database of digital books; correct?
8       A.   The Google search, the Google Books,
9   you know, in order to create the search tool,
10  the search tool is the product facing consumers.
11  As an input to that, Google created this digital
12  database.
13      Q.   So wouldn't it be more correct to say
14  Google Books is a digital database of books,
15  coupled with the search tool?
16      A.   I think you could say that.  I
17  wouldn't say it's more correct.  I think that
18  Google Books -- I mean, you know, those are both
19  pieces of the project.
20         You know, when I describe the Google
21  Books, I'm thinking of the product that's
22  relevant to consumers in the marketplace, and
23  that's a search tool.
24         That is a search tool that relies on
25  the comprehensiveness of the database that's

20 (Pages 74 - 77)

Page 78

1    J.A. Chevalier - C O N F I D E N T I A L
2  created.  So, you know, obviously, the
3  digitization is an important input to the final
4  product.
5        Q.   Is the provision of the books to the
6  library, the digital copies of the books to the
7  library, an important component of the project?
8        MR. McGOWAN:  Objection, foundation.
9        You may answer.
10       A.   So, again, I understand that as part
11 of its agreement with the libraries, Google
12 provides the facilities that allow the libraries
13 to make a digital copy.
14       I don't -- I, I imagine, I think that
15 -- I won't say imagine -- I think that's an
16 important piece of, I understand, from, say,
17 Mr. Courant's deposition, that that's an
18 important component of the library's
19 participation.
20       But, again, I would think that for
21 the purposes of the consumer product, which is
22 what I'm focused on in Section 1 of the report,
23 the digital copy to the library is not the
24 consumer product that I'm really describing.
25       Q.   But from Google's point of view, it's

Page 79

1    J.A. Chevalier - C O N F I D E N T I A L
2  an important component because that's how Google
3  gets the physical books to copyright?
4        MR. McGOWAN:  Objection, vague.
5        You may answer.
6        A.   So my understanding is from, say,
7  Mr. Courant's deposition, is that the ability to
8  make a digital copy on the part of the
9  libraries, is a value to the libraries.
10       Q.   I wasn't asking what was the value to
11 the libraries.
12       I was asking what was the value to
13 Google.
14       And I said isn't it important to
15 Google, the library digital copy, since that is
16 necessary for Google to get the print books and
17 digitizes, puts into its search tool, and then
18 provides digital copies back to the libraries?
19       MR. McGOWAN:  Can I have that read
20 back, please.
21       (The record was read.)
22       MS. ZACK:  I will restate it.
23       Q.   I was saying my question is not about
24 the library's perspective, but about Google's
25 perspective.

Page 80

1    J.A. Chevalier - C O N F I D E N T I A L
2        Isn't it important to Google to have
3  books to digitize?
4        A.   It is important to Google to have
5  books to digitize.
6        Q.   Is it your understanding that they
7  get the books from the libraries?
8        A.   It is my understanding that the
9  books, that the core of the books that are
10 included, were from the libraries.
11       Q.   Is it your understanding that the
12 libraries provide those books to Google for
13 digitization in exchange for a digital copy to
14 the libraries?
15       MR. McGOWAN:  Objection to the extent
16 it calls for a limited conclusion.
17       You may answer.
18       A.   So is my understanding that the
19 libraries provide the books to Google for
20 digitization.
21       It's also my understanding that the
22 opportunity to make a digital copy is of value
23 to the libraries.
24       So, you know, I cannot, I cannot say
25 exactly what was essential to the participation

Page 81

1    J.A. Chevalier - C O N F I D E N T I A L
2  of every partner.  But I think the facility to
3  make a digital copy, would be an important
4  component of the library's participation.
5  That's my understanding from Mr. Courant.
6        Q.   That's what got the libraries to
7  participate; correct?
8        MR. McGOWAN:  Objection.  Calls for
9  speculation.
10       You may answer.
11       A.   So as I just said, I understand the
12 opportunity to make a digital copy is of value
13 to the libraries, but I really can't say whether
14 that was the crucial element for every library.
15       Q.   What kind of value is it to the
16 libraries to get the digital copy?
17       A.   So my understanding from, for
18 example, Mr. Courant's deposition, is that, you
19 know, the library's fundamental mission
20 includes, for example, preservation.
21       And so the mere existence of the
22 opportunity to make a digital copy, could be of
23 value to the library.
24       So I think Mr. Courant, you know,
25 mentions the floods in New Orleans, so that, you

21 (Pages 78 - 81)

1   J.A. Chevalier - C O N F I D E N T I A L
2   know, the mere existence of the digital copy,
3   even if it's not used, you know, the existence
4   of the potential to make the digital copy is of
5   value to the libraries.
6        My understanding is the libraries,
7   you know, exactly the totality of what the
8   libraries plan to do and whether they will all
9   take advantage of the opportunity to make a
10  digital copy, has not yet been completely, you
11  know, resolved.
12       Q.   How do you know that, how do you know
13  it hasn't been resolved?
14       A.   Well, since technology's evolving,
15  the set of things that the libraries can do
16  with, if they were to make a digital copy today,
17  is smaller than the set of things they could do
18  if they were to make a digital copy at some
19  point in the future.
20       And I think, you know, in
21  Mr. Courant's deposition, he discusses, you
22  know, he mentions things like accessibility
23  features for the disabled and suggests that the
24  full set of things the library might do, given
25  that the opportunity created digital copy

1   J.A. Chevalier - C O N F I D E N T I A L
2   exists, has not been fully explored.
3        Q.   Would you say that the digital copy
4   to the library has a monetary value to the
5   library?
6        A.   If the library makes a digital copy,
7   depending on what it does with it, it could.
8   But I don't know for a fact that in many or most
9   cases, it would.
10       Q.   Well, I'm just talking about this
11  particular project, Google Books, where Google
12  makes available to libraries, digital copies.
13       Does that have a monetary value to
14  the libraries?
15       MR. McGOWAN:  Objection, asked and
16  answered.
17       You may answer.
18       A.   I think what I said was if the
19  library makes a copy, it may, depending on what
20  the library does with it.
21       Q.   Well, does the fact, does having a,
22  is the fact that the library has in its
23  possession a digital copy, is that worth
24  something monetarily?
25       MR. McGOWAN:  Same objection.

1   J.A. Chevalier - C O N F I D E N T I A L
2        A.   I don't think it's necessarily clear
3   that it does.  So, for example, if the
4   opportunity to make a digital copy is, you know,
5   if the library's plan is to not make the digital
6   copy until such time, you know, not -- if the
7   library's, for example, primary purpose is
8   preservation, it's not clear to me that the
9   digital copy has any monetary value.
10       I think it depends on what the
11  library does with it.
12       Q.   Well, does it have monetary value if
13  they would have to otherwise pay for the digital
14  copy and they get it for free?
15       MR. McGOWAN:  Same objection.
16       You may answer.
17       A.   I think that's a tricky question
18  because my understanding is that while,
19  obviously, libraries, many libraries have
20  digitization projects, it's not at all clear
21  that the books digitized as part of the Google
22  Library Project would have, in large part,
23  certainly not all or in large part, been
24  digitized by those libraries in the world where
25  the Google Library Project didn't exist.

1   J.A. Chevalier - C O N F I D E N T I A L
2        So I don't think I can assert, as you
3   have, that the Google Library Project has saved
4   them from another digitization effort.
5        Certainly, in some circumstances, it
6   may.  But, you know, I think there may be
7   circumstances in which the library, simply
8   because of resource constraints, was not going
9   to undertake a digitization project.
10       Q.   So just to make sure I understand.
11       If in my house I have 10 couches, and
12  someone gives me an 11th, and I don't really
13  need it, that provides no monetary value to me,
14  in your view?
15       A.   Well, monetary -- you may derive some
16  utility, some happiness from having the couch.
17  But you are not going to receive any monetary
18  value for it, unless you do something to
19  monetize it.
20       Q.   So the only value I get is the
21  utility value?
22       A.   So it depends on what you do with the
23  couch.
24       Q.   So you're saying, switching back to
25  the libraries, there would be, is it your view

22 (Pages 82 - 85)

1   J.A. Chevalier - C O N F I D E N T I A L
2   that the libraries would have a utility value in
3   the digital copies they get from Google?
4       A.   So my understanding, as I've said
5   before, is that the libraries value the
6   opportunity to create a digital copy.
7           Whether that's a monetary value, I
8   mean it's a little hard to think about utility
9   when you think of an entity like the library.
10          You know, so, for example, if the
11  library chooses to make no digital copy, but,
12  you know, thinks about, you know, except in the
13  eventuality where the library burns down, you
14  know, I think the librarian is probably happier
15  in that circumstance, but I don't think there's
16  a monetary value.
17      Q.   Do you know how many digital copies
18  have been provided by Google to libraries in the
19  Google Library Project?
20          MR. McGOWAN:  Objection, foundation.
21          You may answer.
22      A.   So my understanding is that the
23  libraries have the opportunity to make a digital
24  copy, and I do not know how many digital copies
25  the libraries have made.

1   J.A. Chevalier - C O N F I D E N T I A L
2   digital copies is not germane to your report?
3       A.   Whether or not the libraries have
4   made a digital copy and what it is that the
5   library will do with them, is not, is outside
6   the scope of my assignment.
7           It may be important to the case, but
8   it is not important to my report.
9       Q.   Do you know with respect to the
10  Google Library Project, not the Partner Program
11  portion, how many of the books that Google scans
12  and includes in the search tool, as you describe
13  it, were commercially available books, as
14  opposed to not commercially available books?
15      A.   I don't know that.
16      Q.   If I told you that 90 percent of the
17  books were not commercially available, would
18  that affect your opinions in any way?
19      A.   That would not affect my opinions.
20      Q.   If I told you that they were 10
21  percent, would that affect your opinion?
22      A.   No.
23      Q.   Referring you to paragraph 10 on page
24  3 of your report, about a little, you know, over
25  halfway down, there is a sentence that begins,

1   J.A. Chevalier - C O N F I D E N T I A L
2       Q.   So you didn't get that information
3   from Google?
4       A.   I did not get that information from
5   Google, if Google has it.
6       Q.   They have it.
7       A.   Okay.
8       Q.   Would it matter to you how many
9   libraries have chosen to afford themselves of
10  that right to get a digital copy?
11          MR. McGOWAN:  Objection, calls for
12  conclusion.
13          You may answer.
14      A.   So I think that's beyond the scope of
15  my report.  In my report, I opine on whether
16  Google Books is a new book, whether it provides
17  value to authors, and whether Google Books has
18  superseded any potential market for licenses to
19  scan and index books.
20          I don't think that the exact extent
21  to which the libraries have or have not used
22  their digital -- their opportunity to make a
23  digital copy, is germane to any of those three
24  questions.
25      Q.   So the libraries' uses of their

1   J.A. Chevalier - C O N F I D E N T I A L
2   "Google provides a snippet view for works that
3   have not been confirmed to be in the public
4   domain and for which the author or publisher has
5   not requested that the book be removed from
6   snippet view."
7       A.   Yes.
8       Q.   That's based -- you cite the
9   supplemental narrative responses of Google?
10      A.   Um-hmm, yes.
11      Q.   Have you personally looked at
12  snippets in Google Books?
13      A.   I have.
14      Q.   But you say you haven't used the
15  search within Inside the Book tool?
16      A.   To search inside a specific book, as
17  opposed to within the set of books that use the
18  search terms, I do not recall doing that.
19      Q.   What snippets have you seen?
20          From what book snippets have you
21  seen?
22          I mean give me an example of how you
23  did a search in Google and then how snippets
24  came up?
25      A.   Well, I mean let me point out that

23 (Pages 86 - 89)

Page 90

1    J.A. Chevalier - C O N F I D E N T I A L
2  while, you know, I've described what I've done
3  for the report in the report, Google Books has
4  been around for a long time, and I'm a scholar,
5  so I've used Google search tools extensively.
6        So, you know, I cannot count how many
7  times I have used Google Books.
8        So an example that I describe in my
9  report, you know, I was curious about the term
10  choke price, which I use in my report.
11        I searched the term choke price.  A
12  number of books, many books came up.  Some in
13  snippet view.  Some with more Partner Program --
14  some in the public domain, some in snippet view
15  -- or I infer in the public domain, some in
16  snippet view, and some Partner Program books
17  where large sections of the book were available.
18    Q.    So did you search out the ones that
19  were in snippet view?
20    A.    What do you mean did I search on the
21  ones in snippet view?
22    Q.    You got a list of books -- you put in
23  the term choke price?
24    A.    Um-hmm.
25    Q.    You got a list of books; right?

Page 91

1    J.A. Chevalier - C O N F I D E N T I A L
2    A.    I got, yeah, a display of books, I
3  would say, yes.
4    Q.    I did it too.  I saw 2,700 books,
5  choke price.
6        Did you click on any of the books
7  that came up?
8    A.    Yes.
9    Q.    You're saying that some of the books
10  that you clicked on were in snippet view?
11    A.    So it is a good -- I have seen many
12  Books in snippet view on Google Books.  Whether
13  the choke price search led to books in snippet
14  view, I can't specifically remember, but I
15  believe so, yes.
16    Q.    So if you click on a book that's in
17  snippet view, there is a window that comes up
18  that says search within the book.
19        You're not familiar with that?
20    A.    I don't remember -- so I don't, I
21  don't think I've used that functionality
22  specifically.
23        I have looked -- I, generally, when I
24  find a book in snippet view, I look at the
25  snippets because that's what I'm interested in.

Page 92

1    J.A. Chevalier - C O N F I D E N T I A L
2  And, you know, make a decision about whether or
3  not the book is relevant to me and then, you
4  know, maybe get the book.
5    Q.    So you haven't done any further
6  searches, using that search box, for further
7  snippets in the book?
8    A.    I don't believe -- I mean I may have
9  at some point in a research, in research, but I
10  don't think I did it for this report.
11    Q.    Do you recall that you can do
12  many snippets -- I mean do you have any
13  recollection or knowledge that you can, using
14  that search box, you can do repetitive or
15  multiple searches within a book and get
16  different snippets?
17        MR. McGOWAN:  Objection, vague.
18        You may answer.
19    A.    So I know that there are limits to
20  the extent to which you can undertake searches
21  and get snippets, different snippets from the
22  same books.
23        But I do not remember exactly what
24  those limits are.  I mean I know each snippet is
25  about three lines, and I know there are limits

Page 93

1    J.A. Chevalier - C O N F I D E N T I A L
2  as to how many snippets totally you can receive
3  and how many for a given search term and how
4  many for different search terms, but I don't
5  recall those, offhand.
6        I have received the message you have
7  searched this book too many times, that's come
8  up.
9        But I think that's on repeated visits
10  to the site that that happens to have happened
11  to me.
12        So I know such security terms exist,
13  both from my reading and from my personal
14  experience.
15    Q.    When you say three lines, are you
16  talking about three lines like this or three
17  sentences?
18    A.    My understanding is three long lines.
19    Q.    Three lines of snippets?  You've
20  never seen snippets longer than three lines?
21    A.    Well, certainly for Partner Program
22  books and for books in the public domain, you
23  see long things.
24    Q.    I'm talking about books in snippet
25  view.

24 (Pages 90 - 93)

1    J.A. Chevalier - C O N F I D E N T I A L
2    A.   I don't think I've seen snippets
3  longer than three lines.  I think it's about an
4  8th of a page.
5    Q.   Have you determined how much of the
6  books that Google makes available in snippet
7  view, are available by Google's users, totally,
8  to see snippets?
9        MR. McGOWAN:  Objection.
10   Q.   In other words, how much of the book
11 is available?
12   A.   So my understanding is, as I said,
13 each, each session, each user limits, you know,
14 each, for each session and for each user, there
15 is a limited number of snippets that can be
16 returned to the -- in response to the user's
17 search.
18   Q.   But that wasn't my question.
19   A.   So your question was across all
20 users?
21   Q.   Yes, I'm saying how much of the book
22 is available to be searched across all users?
23       MR. McGOWAN:  Objection, compound.
24       You may answer.
25   A.   So my understanding is that the

1    J.A. Chevalier - C O N F I D E N T I A L
2  entirety of the book is available to be
3  searched, in general.
4        (Brief recess taken.)
5  FURTHER EXAMINATION
6  BY MS. ZACK:
7    Q.   Paragraph 15 of your report, please,
8  on page 4, it starts by saying, "There is basic
9  agreement in the field of economics that the
10 introduction of new goods is an important
11 contributor to improved consumer well-being."
12       I mean is that a blanket statement
13 true to any new good, even something like slave
14 labor?
15       MR. McGOWAN:  Objection, foundation.
16       You may answer.
17   A.   So I'm not sure slave labor is a
18 good.  I think slave labor is a production
19 input.
20       I think what I say is right, that the
21 introduction of new goods is an important
22 contributor to improved consumer well-being.
23       I imagine you could consider a
24 situation in which a new good is introduced
25 that, you know, subsequently, for example, is,

1  you know, determined to be harmful and, you
2  know, has hurt consumers.
3
4        But I'm describing the economic
5  literature on new goods, and I think I describe
6  it accurately.
7    Q.   So I mean let's just take an example
8  of something like cigarettes.
9        I mean at a certain point in time,
10 that was a new good?
11   A.   Well, probably.  I think cigarettes,
12 yeah, cigarettes, you know, people have been
13 drying and rolling tobacco for before there were
14 markets for it.
15       But commercial cigarettes, at some
16 point, were probably a new good.
17   Q.   So the determination of it being a
18 new good, does not depend on it improving
19 consumer well-being; does it?
20   A.   Well, as I explained in the report,
21 what makes a new good, a good new, is its
22 ability to satisfy previously unmet or at least
23 badly met needs.
24   Q.   Including addiction?
25   A.   So I believe that cigarettes satisfy

1    J.A. Chevalier - C O N F I D E N T I A L
2  some consumer desires.  Whether, you know, that,
3  you know, subsequent to the introduction of
4  cigarettes, they turned out to, you know, have
5  very harmful health effects, you know, doesn't,
6  I think negate the basic principle that the
7  advance of consumer well-being has been driven,
8  in large part, by the introduction of new goods.
9    Q.   But I mean economics generally
10 doesn't really look at the morality of the
11 situation; right?
12       MR. McGOWAN:  Objection, vague.
13       You may answer.
14   A.   I mean, you know, there is a
15 literature on economics and ethics.  But, you
16 know, there's a literature on economics and
17 morals.
18   Q.   Right, but what I asked was
19 generally, does economics consider morals in its
20 determinations?
21       MR. McGOWAN:  Objection, vague.
22       You may answer.
23   A.   So I, the field of economics that I
24 am relying on here, do not contain explicit
25 discussions of morality in any, to any great