**EXHIBIT 42**

**PART 2**

Page 98

J.A. Chevalier - C O N F I D E N T I A L

1  extent.
2
3      Q.   Then in paragraph 16, you begin your
4  analysis, I guess.
5          You say, "Economics often model the
6  introduction of a new good by describing a world
7  in which the new good was always available in
8  theory, but was only available at a
9  prohibitively high price - a price at which no
10  one would be willing to buy the good (often
11  called the choke price).
12          "Once a firm is able to offer the new
13      good at a price that's is not prohibitively
14      high, (i.e., at a price for which there will
15      be positive demand and which makes sense, on
16      the whole, for the firm), the firm will then
17      introduce that good into the market"; right?
18      A.   That's what it says.
19      Q.   Correct. So it says "Once a firm is
20  able to offer the new goods." So the firm here
21  is Google; right?
22      A.   Well, here, I'm describing there's no
23  -- I mean here I'm describing an economic
24  principle.
25      Q.   When you're applying that economic

Page 99

J.A. Chevalier - C O N F I D E N T I A L

1  principle to this scenario, the firm is Google;
2  right?
3
4      A.   Correct.
5      Q.   When you talk about the choke price,
6  you say, "It's a prohibitively high price - a
7  price at which no one would be willing to buy
8  the good."
9          Now the price is set by the firm;
10  correct?
11      A.   The price is set by the firm.
12      Q.   The firm here is Google?
13      A.   Well, again, here I'm describing a
14  general context. When I apply it later, I'm
15  talking about Google.
16      Q.   But I'm talking about theory, the
17  firm is the seller or the provider of the good;
18  correct?
19      A.   Here when I'm talking about the firm,
20  I'm talking about the provider of the good,
21  correct.
22      Q.   Google has never charged for its
23  search tool; right?
24      A.   Google has not charged for its search
25  tool.

Page 100

J.A. Chevalier - C O N F I D E N T I A L

1
2      Q.   So from the consumer perspective,
3  they're not paying a price?
4      A.   The consumer is not paying to use a
5  search tool, correct.
6      Q.   So the analysis of the choke price
7  here really should look at Google's price
8  or cost, the cost to Google; correct?
9      A.   Sorry, could you repeat that?
10      Q.   It says, "Once a firm," here Google,
11  "is able to offer the new good at a price that
12  is not prohibitively high," don't we have to
13  consider the cost to Google of providing the
14  good?
15      MR. McGOWAN:  I just object.  That's
16      actually not the sentence you were reading,
17      and it sounds like you were quoting.
18          You may answer.
19      MS. ZACK:  I quoted the whole
20      paragraph.
21      MR. McGOWAN:  You inserted a couple
22      of words.
23      MS. ZACK:  I'm sorry.
24      Q.   "Once a firm is able to offer the new
25  good at a price that is not prohibitively high,

Page 101

J.A. Chevalier - C O N F I D E N T I A L

1
2  (i.e., at a price for which there will be
3  positive demand and which makes sense, on the
4  whole, for the firm), the firm will then
5  introduce that good into the market."
6          So in the context of this case, we're
7  talking about Google; correct?
8      A.   We are talking about Google in this
9  case.
10      Q.   So this sentence could read once
11  Google is able to offer the new good, and the
12  new good here is the Google Book search tool; is
13  that right?
14      A.   The new good is the Google Book
15  search tool.
16      Q.   So once Google is able to offer the
17  Google Books search tool at a price that is not
18  prohibitively high, i.e., at a price for which
19  there will be positive demand and which makes
20  sense on the whole for Google, Google will then
21  introduce that good into the market, meaning the
22  search tool; is that right?
23      MR. McGOWAN:  Can I have the
24      question.
25      A.   Yeah, what is the question?

26 (Pages 98 - 101)

Page 102

J.A. Chevalier - C O N F I D E N T I A L

1
2   Q.   Is that the application of this
3   sentence to this case?
4   A.   So in this, in this paragraph, I'm
5   explaining how economists model the introduction
6   of a new good.
7         So a convenience that economists use
8   to model or a framework that economists use to
9   model the introduction of a new good is to
10  behave as if the good always existed, but was
11  available at a very high price.
12        And then in our models, we think
13  about, at some point, the product becomes viable
14  in the marketplace.  Usually, that may mean when
15  it's invented.
16        So here, for Google, what I'm saying
17  is, you know, at some point, this product was
18  impossible.  It could not have produced this
19  product.
20        At some point, it made sense for
21  Google to embark on producing this product, and
22  they produced this product.
23  Q.   But there's a price or a cost to
24  Google to producing the product; correct?
25  A.   There was definitely a cost to Google

Page 103

J.A. Chevalier - C O N F I D E N T I A L

1
2   of producing the product.
3   Q.   That goes into what the price would
4   be that they have to charge for?
5   A.   Well, you know, I guess here we
6   might, you know, you know, in this paragraph
7   since I'm, you know, speaking of the general
8   economic modeling framework, I'm describing the
9   price of the good quite straightforwardly.
10        Of course, for Google, you know, like
11  broadcast television, the consumer doesn't pay
12  to consume it.  But, you know, advertising and
13  other things are sold.
14        So what I'm saying is, you know,
15  Google introduced this product when, you know,
16  when it probably; A, had the idea; and B, made
17  sense for Google to embark on this project.
18  Q.   Well, I mean what it says is that,
19  "Once a firm," meaning here Google, "is able to
20  offer the new good at a price that is not
21  prohibitively high."
22        Now in considering that in this case,
23  don't you think Google would have had to
24  consider the cost of copyright infringement
25  suits?

Page 104

J.A. Chevalier - C O N F I D E N T I A L

1
2        MR. McGOWAN:  Objection.  Lacks
3   foundation.  Calls for legal conclusion.
4   A.   So I am sure, as any firm, when they
5   launch a new project, Google had to consider all
6   of the, you know, potential benefits of the
7   project and the potential costs.
8        And I would imagine that all
9   potential -- all potential costs should, as an
10  economic principle, be included in that
11  analysis.
12  Q.   In this particular case, a cost is
13  possible, that engaged in, that they are
14  violating copyrights; correct?
15        MR. McGOWAN:  Objection to the extent
16  it calls for legal conclusion, foundation.
17        You may answer.
18  A.   So in undertaking this project, I
19  would -- any firm that's undertaking the start
20  of any project, should include all potential
21  costs in, you know, and the probability of
22  paying them, in assessing whether the project
23  makes sense.
24        And so for Google, potential
25  litigation costs of this project should, should

Page 105

J.A. Chevalier - C O N F I D E N T I A L

1
2   have been considered as a matter of economics,
3   when thinking about whether or not to launch the
4   project, as it should for any production
5   process.
6   Q.   Would this analysis that you have in
7   paragraph 16, would any firm seeking to offer a
8   new good to the market, consider whether it was
9   legal or not to do so?
10  A.   So any firm offering a new good to
11  the market would, you know, have to consider
12  whether it was legal to offer the new good to
13  the market or not.
14  Q.   Referring you to paragraph 17.  Well,
15  before I get there, what other factors would
16  Google consider in determining whether the
17  product or the new good made sense for the firm?
18  A.   So they would consider, I think, the
19  potential revenues from the product.  They would
20  consider the cost for the -- some estimate of
21  the cost of the product.
22        They may, there may be issues
23  regarding thinking about the fit of the product
24  with the rest of the company's offerings.  And
25  the fit of the product, the relationship of the

27 (Pages 102 - 105)

1    J.A. Chevalier - C O N F I D E N T I A L
2  product to the general mission of the company.
3      Q.   Would it be your view that the
4  potential benefits to Google, as a firm, would
5  have to substantially outweigh the costs before
6  they would go to market with a new good?
7      A.   So, of course, many times when a firm
8  makes a new product launch, you know, after the
9  fact, it may or may not turn out to be, you
10 know, it may not turn out to be valuable for the
11 firm.
12         But at the time of making the launch,
13 the firm would consider whether the benefits on
14 net to the firm, in this case Google, exceed the
15 costs.
16         But the benefits and the costs may
17 be, you know, very widespread.  So, you know, it
18 may not just be -- the benefits may be, you
19 know, this product will, you know, further
20 Google's mission or this product will, you
21 know -- the benefits have to be appropriately
22 considered, but the benefits have to exceed the
23 costs for any product to be launched.
24     Q.   So as a matter of economics, you
25 would assume here that Google determined that

1    J.A. Chevalier - C O N F I D E N T I A L
2  the benefits to it of launching Google Books,
3  exceeded the cost, including the cost of
4  litigation?
5        MR. McGOWAN:  Objection, foundation,
6  compound.
7        You may answer.
8      A.   So, you know, as a matter of
9  strategy, Google should undertake an analysis of
10 the benefits and costs of the project upon
11 launch.
12         But I don't have any basis for which
13 to know whether, you know they appropriately,
14 whether they, you know -- I don't have any
15 insight into the analysis that they undertook,
16 other than what's contained in the record.
17     Q.   Because you didn't ask them?
18     A.   There's some discussion of it in the
19 record, but I did not ask for a separate
20 analysis of that.
21     Q.   Is that because you didn't care about
22 the benefits to Google?
23     A.   As I've explained before, my report
24 covers three questions.  The question of whether
25 Google Books is a new good, whether Google Books

1    J.A. Chevalier - C O N F I D E N T I A L
2  provides value to authors, or whether Google
3  Books has superceded a potential market for
4  books or licenses.
5        Well, I may find the question of how
6  Google made the decision to launch the Library
7  Project interesting, it's not germane to the
8  answer to those three questions.
9      Q.   You assessed in answering the
10 question whether or not it was a new good,
11 meaning Google Books, you assessed the
12 consumer's side of the equation; correct?
13     A.   I did.
14     Q.   But you didn't assess the Google side
15 of the equation?
16     A.   So in the literature on new goods,
17 and in the literature and in the practice of how
18 to assess whether a good is a new good, the
19 consumer side is the, the consumer -- the
20 important test for whether tests for whether a
21 good is a new good, are on the consumer side.
22         We observe that the product has been
23 introduced.  Then we can assess whether that
24 product meets needs that have previously been
25 unmet or poorly met.

1    J.A. Chevalier - C O N F I D E N T I A L
2      Q.   Do you think the Partner Program
3  poorly meets the needs of consumers?
4        MR. McGOWAN:  Objection, vague.
5        You may answer.
6      A.   I'm sorry, do you mean does the
7  Partner Program, alone, poorly meet the needs of
8  consumers?
9      Q.   Yes.
10     A.   The Partner Program, alone, does not
11 meet the needs of the consumers, to the extent
12 to which the entire project does.
13         Surely, some consumers would find
14 benefit in the Partner Program.
15     Q.   Would consumer needs be more fully
16 met if Google displayed entire books?
17     A.   So you mean with the existing search
18 functionality, but simply returned to the entire
19 book?
20     Q.   Yes.
21     A.   Consumer needs, I think, consumers
22 would, consumers would certainly benefit from
23 being able to obtain more than the snippets.
24     Q.   Well, if Google displayed, in
25 response to consumer requests, entire digital

Page 110

1    J.A. Chevalier - C O N F I D E N T I A L
2  copies of all books, whether in copyright or out
3  of copyright, wouldn't that be a benefit to
4  consumers?
5     A.   Yes, that would be a benefit to
6  consumers.
7     Q.   Would that be a new good?
8        MR. McGOWAN:  Objection, vague.
9        You may answer.
10     A.   Yes, it would be a benefit to
11  consumers and, yes, it would be a new good.  It
12  would be a, it would certainly be a benefit to
13  the consumers, using the site at that moment.
14     Q.   I'm not quite sure I understand the
15  caveat there?
16     A.   So the caveat is if Google, if Google
17  or another entity were to do something that
18  actually destroyed the market for books by --
19  well, of course, it wouldn't single handedly
20  destroy the market for books, but if Google were
21  to do something that substantially diminished
22  the market for books, then one might worry as
23  is, you know, the basis for intellectual
24  property law, that the market for books would
25  ultimately shrink.

Page 111

1    J.A. Chevalier - C O N F I D E N T I A L
2        In this case, as I discuss in my
3  later section, I believe that the functionality
4  that Google provides is a compliment for the
5  market for books, rather than a substitute.  So
6  no such concern arises.
7     Q.   Can't a new good benefit consumers
8  and also destroy a different market?
9     A.   I think the concern is that if you --
10  it depends, you know, I think the time horizon
11  is an issue here.
12        If Google were to display entire
13  copies of books, the consumers who, without, you
14  know, entire copies of books for which there was
15  otherwise a market, and that led consumers to
16  buy fewer books, then that would lead to fewer
17  books being produced, which would ultimately
18  harm consumers.
19     Q.   Since the price that consumers pay
20  for Google Books search is zero, is there any
21  reason why they wouldn't be benefited by Google
22  Books?
23     A.   So since the price that consumers pay
24  is zero -- well, I described one scenario where
25  consumers could ultimately be harmed.  That's

Page 112

1    J.A. Chevalier - C O N F I D E N T I A L
2  not the case at hand.
3        But in general, you know, given that
4  consumers don't pay to use the search
5  functionality, they can't, you know, they can't
6  be -- they would, in general, not be worse off
7  from the existence of the search functionality.
8        But the extent to which they benefit
9  is a function of the quality of the search
10  functionality and the comprehensiveness of the
11  works included.
12     Q.   Well, in order for something to be a
13  new good, do consumers have to benefit?
14     A.   Yes.  So in order for something to
15  be -- well, as I explained in the thing, in
16  order for something to be a new good, consumers
17  have to have a willing -- consumers have to have
18  -- it has to meet a need that was previously
19  unmet.  So the need implies consumers have to
20  benefit.
21     Q.   So if we think of a new good that
22  consumers don't have to pay for because it's
23  given away free, but it was a neutral on
24  benefit --
25        MS. ZACK:  Withdraw that.

Page 113

1    J.A. Chevalier - C O N F I D E N T I A L
2     Q.   -- a new product that, is given away
3  free, sort of neutral to the consumers, that's
4  not a new good?
5     A.   That's if's, if it's a product that
6  is given away free and consumers, you know,
7  don't derive substantially utility from it,
8  different from previous goods, then they, then I
9  wouldn't consider that a new good.
10     Q.   Referring you to page 6 of your
11  report, footnote 28, please?
12     A.   Yes.
13     Q.   You write, "It is important to note
14  that the search and index capabilities that
15  define Google Books are feasible only through
16  the scanning and digitization of the underlying
17  book in its entirety.  In order to present
18  results that are relevant to each user's search,
19  the entire book must be scanned and digitized.
20  Therefore, while it is true that an input to
21  Google Books is the scan, digitized book in its
22  entirety, the output, which represents the
23  actual use of the Google books, employs only
24  small portions of the book, at most."
25     A.   Yes.

29 (Pages 110 - 113)

Page 114

1  J.A. Chevalier - C O N F I D E N T I A L
2      Q.   Now the input or in the output,
3  includes digital copies to the libraries; right?
4          MR. McGOWAN:  Objection, vague.
5          You may answer.
6      A.   So as I've said before, it is my
7  understanding that Google has provided the
8  functionality of two libraries for libraries to
9  make their own digital copy.
10         I am not, you know, clearly here, I
11 am describing the Google Books, I'm describing
12 the Google Books website.
13     Q.   Well, when you talk about input to
14 Google Books, and output -- all right, so an
15 input to Google Books, do you consider the scan,
16 library scan, to be an input to Google Books?
17         MR. McGOWAN:  Objection, vague.
18         You may answer.
19     A.   So as I say here, "Therefore, while
20 it is true that an input to Google books is the
21 scanned, digitized book," yes.
22     Q.   Then you're talking about the output
23 being the Google Books itself?
24     A.   Yes.
25     Q.   You say it "employs only small

Page 115

1  J.A. Chevalier - C O N F I D E N T I A L
2  portions of book, at most"?
3          You previously testified that the,
4  even for the Google Library Project, the entire
5  book was available for search; right?
6      A.   So for the Google Library Project,
7  yes, the entire book is searched, but the output
8  is the search result that the consumer receives.
9          And the output is only a small
10 portion of the book.
11     Q.   That's for one consumer you're
12 saying.  What about all consumers?
13         MR. McGOWAN:  Objection, vague.
14         You may answer.
15     A.   So I think it is what I said, that at
16 the output for any given book, for any given
17 search, for any given consumer, is a small
18 portion of the book.
19     Q.   Well, that's not what you're saying
20 says?
21         MR. McGOWAN:  Objection,
22 argumentative.
23     Q.   Your sentence says, "While it is true
24 that an input to Google Books is the scanned,
25 digitized book in its entirety, the output,

Page 116

1  J.A. Chevalier - C O N F I D E N T I A L
2  which represents the actual use of Google Books,
3  employs only small portions of the book, at
4  most."
5          Now the Google Books allows search of
6  entire books; correct?
7      A.   So it allows, it searches the book in
8  its entirety.
9      Q.   And that it also allows consumers
10 access to virtually the entirety of the book;
11 right?
12         MR. McGOWAN:  Objection, vague.
13     Q.   Or employs, you used the word
14 employs?
15     A.   I see.  So is your objection to the
16 use of the word employs?
17     Q.   It's not an objection.  I mean Google
18 employs more than small portions of the book;
19 doesn't it?
20         MR. McGOWAN:  Objection, vague.
21         You may answer.
22     A.   Okay, so I use the term input and
23 output.  And by employs, I mean that the output
24 consists of only a small portion of the book.
25         I believe that your question is, by

Page 117

1  J.A. Chevalier - C O N F I D E N T I A L
2  using the word employs some what differently,
3  your question is doesn't the production of the
4  snippet that the consumer views, rely on
5  Google's having the entirety of the book,
6  because the consumers search, searches the
7  entirety of the book, and that is true.
8      Q.   What about the fact that Google
9  employs the entire book to allow snippets to be
10 displayed to many different consumers and in
11 different snippets from virtually all of the
12 book?
13         MR. McGOWAN:  Objection.  Foundation.
14         You may answer.
15     A.   So my understanding is that, yes,
16 different snippets will be viewed by different
17 consumers.
18     Q.   Those snippets, over different
19 consumers, will consist of virtually the entire
20 book, except for the parts that Google
21 blacklists; correct?
22         MR. McGOWAN:  Same objection.
23         You may answer.
24     A.   So are you asking me as an empirical
25 matter, would it be the case that consumer

30 (Pages 114 - 117)

Page 118

1    J.A. Chevalier - C O N F I D E N T I A L
2    search of a particular book would lead to across
3    all consumers, the entirety of the content of
4    that book being eventually displayed over some
5    period of time?
6        Q.   Yes.
7        A.   Are you asking will that happen as an
8    empirical matter or are you asking could that
9    happen?
10       Q.   Well, could that happen?
11       A.   So I suppose it is the case that
12   other than the piece of the book, the parts of
13   the book that is blacked -- well, it would be
14   tricky because no consumer is allowed -- gets
15   the same search terms more than a limited number
16   of times.
17           I suppose we could write a program --
18   no, no, we couldn't.  I suppose if I had the
19   book, I could -- and I had millions of
20   helpers -- no, I think it -- no, I don't think
21   it could happen because when you search -- I
22   think, I think it is un -- I'm not a computer
23   scientist, and I don't profess expertise in
24   consumer science, but I think it, the entirety
25   of -- across all consumers, across all time,

Page 119

1    J.A. Chevalier - C O N F I D E N T I A L
2    it's very unlikely, it seems impossible,
3    actually, that the entirety of the text of the
4    book would be displayed.
5        Q.   You're saying you understand that
6    Google divides, generally, the practice is to
7    divide the book into eighths, and they call each
8    eighth of the book a snippet; is that right?
9            MR. McGOWAN:  Objection, foundation,
10       and that's actually an incorrect statement.
11       A.   Do you mean the page?
12       Q.   I meant page, yes.  Sorry.
13       A.   So my understanding is that a snippet
14   is about an eighth of a page.
15       Q.   You understand that those snippets
16   are displayed in response to search requests?
17       A.   I understand that snippets are
18   displayed in -- a limited number of snippets are
19   displayed in response to search requests.
20       Q.   A limited number are -- three are
21   displayed in response to each search request;
22   correct?
23       A.   Yes.
24       Q.   But how many users does Google have?
25       A.   It has a lot.

Page 120

1    J.A. Chevalier - C O N F I D E N T I A L
2        Q.   Do you know how many?
3        A.   I don't know how many have searches
4    -- I don't know, off the top of my head.
5        Q.   I think they post on their website
6    that they have billions of users?
7        A.   Okay.
8        Q.   I don't know if they're all using
9    Google Books; do you?
10       A.   Well, Google Books, you know, is
11   returned from the core search engine, they may
12   or may not be.
13       Q.   Google also states that it blacklists
14   about 10 percent of a book, one out of 10 pages,
15   I'm saying 10 percent; do you understand that?
16       A.   I understand that.
17       Q.   So that's the blacklisted portion,
18   and then they blacklist the snippet per page.
19           Have you read that?
20       A.   I have read that.
21       Q.   So there's a portion of the book
22   that's blacklisted?
23       A.   Correct.
24       Q.   Other than that portion, Google makes
25   the rest available for display in snippets;

Page 121

1    J.A. Chevalier - C O N F I D E N T I A L
2    right?
3            MR. McGOWAN:  Objection, vague.
4        You may answer.
5        A.   Yes, my understanding is that the
6    rest is searchable and viewable through
7    snippets.
8        Q.   So Google employs all of the book,
9    except the blacklisted parts; correct?
10           MR. McGOWAN:  Objection, vague.
11       You may answer.
12       A.   Google uses as an input, all of the
13   book, but they don't output all of the book.
14       Q.   They don't output all of the books on
15   a single search, but they make, they certainly
16   will output it all, if they can, if they get
17   enough users, they'll output it all, right,
18   except for the blacklisted pages?
19       A.   So I'm pretty sure I'm not the best
20   person to answer this, but my understanding is
21   that actually wouldn't happen because, for
22   instance, when I search for a term, say the term
23   heart, the first three instances of the use of
24   the term heart appear.
25           I don't, I don't even know across

31 (Pages 118 - 121)

Page 122

1   J.A. Chevalier - C O N F I D E N T I A L
2   consumers how it is one would get to the
3   subsequent uses of the term heart.  So, so, so,
4   I don't believe it is the case that anything
5   resembling the book, the actual book, could be
6   outputted via the Google search engine.
7        Q.   The snippet, when you search for
8   heart and you get some snippets that includes
9   the word heart, but there's a lot of other words
10  on that page than that snippet; right?
11       MR. McGOWAN:  Objection, vague.
12       You may answer.
13   A.   Correct, there are other words.
14       Q.   People could search for those other
15  words, right, different people?
16   A.   Let us, let us stipulate, I do not
17  know whether it is, and I'm not an expert in the
18  exactity of exactly how -- I know, in general,
19  how this search engine snippet function works.
20       I believe it not to be the case that
21  you could receive, you know, that a billion
22  consumers put together, could somehow assemble
23  the entire book from the results of the Google
24  search engine.
25       They certainly can't because of the

Page 123

1   J.A. Chevalier - C O N F I D E N T I A L
2   blacklisted pieces, but I think, it is my
3   understanding, they can't just in general.  But,
4   you know, I don't know that for a fact.
5        Q.   Oh, okay, I didn't ask you about who
6   was assembling anything.
7        I asked you whether Google employs
8   it?
9    A.   So the output, which is the
10  screenshot, employs only a small portion of the
11  book.
12       Q.   So this sentence is only about a
13  single search?
14   A.   This sentence certainly applies to a
15  set of searches, but this sentence was intended
16  to describe the output as relevant to a
17  consumer.
18       Q.   So you're talking about basically one
19  or two searches by a single consumer?
20       MR. McGOWAN:  Objection, misstates.
21       You may answer.
22   A.   I'm talking about the set of searches
23  that a consumer would experience.  I'm not going
24  to say one or two.
25       I've done many more than one or two.

Page 124

1   J.A. Chevalier - C O N F I D E N T I A L
2   So this -- for a consumer, what is the output of
3   Google Go Books for the set of books that are in
4   copyright, but not in the Partner Program, it is
5   snippets, which represent a small fraction of
6   the book.
7        Q.   So you're talking about the
8   experience of a single consumer using Google
9   Books?
10   A.   Well, in this footnote --
11       Q.   Right, in this sentence?
12   A.   -- in this footnote, I'm talking
13  about the product as it is experienced by the
14  consumer.  And so it's, you know, it is the
15  output as experienced by the consumer.
16       Q.   But not consumers as a whole?
17       MR. McGOWAN:  Objection, asked and
18  answered.
19       You may answer.
20   A.   So consumers, as a whole, all
21  experience snippets.  You know, the question of
22  whether, you know, a number, you know -- yes,
23  consumers, as a whole, experience snippets.
24       Q.   So paragraph 20 on page 7, this is
25  the concluding paragraph of your analysis about

Page 125

1   J.A. Chevalier - C O N F I D E N T I A L
2   new goods; is that right?
3    A.   Correct.
4        Q.   So this is, again, your analysis here
5   is part of the economic theory involving the
6   development of new goods?
7    A.   Correct.
8        MS. ZACK:  We can take a break for
9   lunch.
10       MR. McGOWAN:  Before we do that, let
11  me note for the record, the document number
12  you asked for is Google 05004751.
13       MS. ZACK:  I know what that is, so
14  that's the big long list.
15       (Luncheon recess:  12:26 p.m.)
16
17
18
19
20
21
22
23
24
25

32 (Pages 122 - 125)

1    J.A. Chevalier - C O N F I D E N T I A L
2        A F T E R N O O N   S E S S I O N
3        (Time noted: 1:15 p.m.)
4  J U D I T H   A.   C H E V A L I E R,   resumed
5  and testified as follows:
6  CONTINUED EXAMINATION
7  BY ZACK:
8    Q.    Referring you to page 9 of your
9  report, please?  You have discussion throughout
10  this section about Google Books as a complement,
11  not substitute?
12    A.    Correct.
13    Q.    And which you talk about the fact
14  that books get noticed, etcetera --
15    A.    Correct.
16    Q.    -- through Google Books, and that
17  that's a benefit.  You conclude that's a benefit
18  to authors; right?
19    A.    Correct.
20    Q.    That benefit is virtually exclusive
21  to in-print authors; correct?
22    A.    I wouldn't say that.  I think
23  in-print authors will benefit more, but
24  out-of-print authors may benefit under certain
25  circumstances.

1    J.A. Chevalier - C O N F I D E N T I A L
2    Q.    Can you tell me those circumstances
3  in which you think they'll benefit, given the
4  way Google Books works?
5    A.    Yes.  So I think they will benefit in
6  a number of circumstances.  One would be if,
7  even though some of the authors' books are out
8  of print and some of the books -- if in
9  circumstances where some of the authors' books
10  are out of print and other of the authors' books
11  are in print, consumers may, you know, if they
12  discover a book they're interested in via Google
13  Books, that might lead them to other books by
14  those authors.
15        It may lead them to other books on
16  the same topic, probably benefitting different
17  authors.  But I think also, there are some
18  mechanisms and those mechanisms, I think, are
19  becoming more relevant in the marketplace, where
20  if consumers, say, buy used books on Amazon and,
21  you know, there are used books on Amazon that
22  are selling for very high prices because there's
23  a demand for the book to come back into print.
24        There may be circumstances in which,
25  you know, a book could be driven back into print

1    J.A. Chevalier - C O N F I D E N T I A L
2  by consumer demand.
3    Q.    That's true whether there is or isn't
4  Google Books; isn't it?
5    A.    That's true whether there is or there
6  isn't Google Books, but it's my testimony that
7  Google Books helps drive consumer demand for
8  books.
9    Q.    So if consumers are buying used books
10  on Amazon, that helps drive consumer books for
11  new books by those authors?
12    A.    I'm saying that -- I said, I think,
13  two distinct things.  The consumer may look for
14  other books by the same author.
15        And, you know, when consumers buy
16  used books on Amazon, when used books, you know,
17  when it becomes apparent that there's a lot of
18  demand for a used book, that may assist in
19  bringing the book back into print.
20    Q.    How does the author know if there's a
21  lot of demand for a used book on Amazon?
22    A.    Well, for example, the price at which
23  the book is selling in the Amazon Marketplace,
24  reflects the, reflects the supply and demand of
25  the book.

1    J.A. Chevalier - C O N F I D E N T I A L
2    Q.    Right, so it could have a high price
3  because it's in rare supply, but that doesn't
4  mean there's a lot of demand; does it?
5    A.    If there's a high price for the book,
6  and, you know, I suppose it's possible that a
7  seller posted a high price for the book and
8  never sells it, but if transactions are taking
9  place at a high price, that means that there's
10  high demand relative to supply.
11    Q.    Is that reported to authors or
12  publishers?
13    A.    An author could easily look that up.
14    Q.    Could easily look it up where?  Have
15  you looked it up?
16    A.    Yes, so if you go to Amazon and you
17  look at Amazon Marketplace, you would see -- and
18  I would do this, I would advise, ff I were an
19  author doing this for other book sellers too, I
20  would look at the copies of my used book, and
21  the prices that they're selling for.
22    Q.    Does that functionality tell you the
23  prices that -- the actual sales prices?
24    A.    So it tells you the prices that
25  sellers have posted.  If you, if you were to,

33 (Pages 126 - 129)

Page 130

1  J.A. Chevalier - CONFIDENTIAL
2  you know, look over the course of some period of
3  time, you would observe, you would observe -- I
4  don't know that it directly provides data on
5  sales.
6       But, you know, if you were to look
7  over time, you would see that, you know, sellers
8  who have posted a book at a particular price
9  have, you know, moved to those books off, which
10  would lead an author to infer that they've been
11  bought.
12     Q.  Or taken down by the seller?
13     A.  I suppose that's possible.  But since
14  the purpose of the seller is to sell books, and
15  it doesn't really cost them anything to keep the
16  books on Amazon Marketplace, unless the seller
17  had some other desire to have the book or sell
18  it off-line or some other place, which is
19  selling the book, I think it's reasonable to
20  infer that, you know, a book, if your book, you
21  know, that books that are removed from Amazon
22  Marketplace were being sold.
23     Q.  Have you ever looked at any data from
24  Amazon about that?
25     A.  So I don't have data from Amazon

Page 131

1  J.A. Chevalier - CONFIDENTIAL
2  available to me about that.  I've used data from
3  Amazon Marketplace for books, but not for the
4  purpose that you have just asked.
5     Q.  You have some data -- or I shouldn't
6  say data -- discussion in here about
7  advertising; is that right?
8     A.  Yes.
9     Q.  So you're analogizing Google Books to
10  advertising?
11     MR. McGOWAN:  I just ask for a
12  reference to where you're reading.
13     MS. ZACK:  I'm sorry, it's basically
14  throughout in different places, but an
15  example is on page 9, paragraph 28.
16     MR. McGOWAN:  Thank you.
17     A.  So I am saying that Google Books
18  serves a function like advertising.  And that it
19  informs the consumer about the existence of
20  books.
21     Q.  When companies decide to advertise
22  products, they do choose where to advertise
23  them; don't they?
24     A.  So when companies purchase
25  advertising, they choose where to purchase the

Page 132

1  J.A. Chevalier - CONFIDENTIAL
2  advertising.
3     Q.  Right, and that choice of where to
4  place an ad can be quite important; right?
5     A.  So, yes, I think firms' decisions
6  about where to place ads are important.
7     Q.  There are sometimes places where
8  firms don't want ads; right?
9     MR. McGOWAN:  Objection, foundation.
10     You may answer.
11     A.  I understand there are circumstances
12  where, you know, a firm would not want to
13  advertise, say, in a venue that's a mismatch for
14  the firm's message or product.
15     Q.  In paragraph 34 on page 10, you say
16  "I understand that it is Mr. Harris's view that
17  the excerpts were snippets provided by Google
18  Books in response to a user's search bear a
19  resemblance to these mechanisms that consumers
20  may use to "find" a book."
21     A.  Yes.
22     Q.  Find is in quotes.
23     So there you use the term Google
24  Books, but again, there are two parts to it, the
25  Partner Program and the Library Project; right?

Page 133

1  J.A. Chevalier - CONFIDENTIAL
2     A.  Correct.
3     Q.  You think that both bear a
4  resemblance to mechanisms that consumers may use
5  to find a book?
6     A.  So as I say in the next sentence,
7  "whether a more extensive sample of text is
8  accessible (as in the case of the books that
9  enter Google Books via the Partner Program) or
10  whether snippets are available, Google Books
11  makes it easier for a book to get noticed," so
12  yes.
13     Q.  The previous paragraph 33 where you
14  discuss Mr. Harris, you talked about in the
15  second sentence, "A major role of the publisher
16  is to attempt to achieve consumer awareness of
17  the publisher's books.  Consequently, publishers
18  employ many tools to generate publicity about
19  the book and to get the book noticed.  These
20  include:  provision of excerpts," etcetera; you
21  see that?
22     A.  I see that.
23     Q.  So I thought that paragraph 34
24  related back to 33; is that true?
25     MR. McGOWAN:  Objection, vague, and

34 (Pages 130 - 133)

Page 134

1    J.A. Chevalier - C O N F I D E N T I A L
2      you may answer.
3      Q.   When you say "These mechanisms" in
4  paragraph 34, aren't you referring to the
5  mechanisms that you've mentioned in paragraph
6  33?
7      A.   Yes, in 34, I am saying that the
8  excerpts or snippets resemble the mechanisms
9  that consumers may use to find a book or that
10 publishers may use to help consumers find a
11 book.
12     Q.   Let's just stick with the first
13 sentence in paragraph 34.
14         So "these mechanisms" refers back to
15 the tools employed by publishers; right?
16     A.   Yes.
17     Q.   These tools that you've mentioned
18 here that are employed by publishers, are all
19 done pursuant to contracts with third-parties;
20 correct?
21         MR. McGOWAN:  Objection, foundation.
22         You may answer.
23     A.   Sorry, so you mean that the publisher
24 undertakes these promotional activities as part
25 of its agreement with the author?

Page 135

1    J.A. Chevalier - C O N F I D E N T I A L
2      Q.   Correct.
3      A.   Yes, I believe that the publisher,
4  that the publishers -- the publisher, I think,
5  has some discretion in their marketing
6  activities.
7          But it's my understanding that the
8  reason authors use a publisher is so -- one of
9  the reasons an author uses a publisher is to
10 obtain some access to some of these marketing
11 services.
12     Q.   A snippet view in Google Books
13 through the Library Project, involves no
14 contract between Google and any rights holder;
15 right?
16     A.   Correct.
17     Q.   So in that sense, there's not a
18 resemblance, there's a difference between the
19 mechanisms in paragraph 33 and what Google does;
20 right?
21         MR. McGOWAN:  Objection, vague.
22         You may answer.
23     A.   I think my language states exactly
24 what I mean, that the type of mechanisms
25 provided by Google are -- bear a resemblance,

Page 136

1    J.A. Chevalier - C O N F I D E N T I A L
2  are similar to the mechanisms that consumers, on
3  the buy side or publishers on the sell side,
4  use.
5      Q.   But there is -- they bear a
6  resemblance, but there's a major difference in
7  that the mechanisms listed in paragraph 33
8  involve contractual permission; correct?
9          MR. McGOWAN:  Objection, vague.
10         You may answer.
11     A.   So I think the point, that one of the
12 points of this section is to explain that the,
13 that the, that the mechanisms used that involve
14 permission, are similar to the mechanism
15 provided by Google.  That they look the same to
16 the consumer and should have the same effect.
17     Q.   But they look different to the
18 author; right?
19         MR. McGOWAN:  Objection, foundation.
20         You may answer.
21     A.   As I've said, as you have said, one
22 involves, one involves the permission, at least
23 of the publisher, and the other does not.
24     Q.   The permission of the publisher or
25 the author; right?

Page 137

1    J.A. Chevalier - C O N F I D E N T I A L
2      A.   The permission of the publisher --
3  sorry, so in Section 33, generally, I'm talking
4  about the publisher undertaking the marketing
5  function.
6          There may be circumstances, say, for
7  self-published books where the author undertakes
8  the marketing function, but, yes.
9      Q.   In paragraph 34, at the end of the
10 second sentence, let's -- I will start with the
11 whole second sentence.
12         You say, "Whether a more extensive
13 sample of text is accessible (as in the case of
14 books that enter Google Books via the Partner
15 Program) or whether snippets are available,
16 Google makes it easier for a book to get
17 noticed, which may increase demand for that book
18 and benefit the author."
19         Have you done any empirical research
20 concerning that conclusion?
21     A.   So the research I've done or the
22 foundation for that statement are the things
23 that I cite.
24         I don't, there's, there, you know, I
25 don't, I do not believe there's a data set that

Page 138

J.A. Chevalier - C O N F I D E N T I A L
1  J.A. Chevalier - C O N F I D E N T I A L
2  would help me to measure empirically whether,
3  whether more book sales take place as a result
4  of the existence of the Google Partner Program.
5       So there's a number of just --
6  there's a number sites in the record and
7  referenced in my report, but I didn't undertake
8  an empirical analysis.
9    Q.   That's because you don't think that
10  would be possible or --
11   A.   I don't have access -- I don't
12  believe, I don't believe it would be possible to
13  measure the effect of Google Books on the sales
14  of books.
15   Q.   In paragraph -- I'm sorry, page 11,
16  paragraph 36, you state in the second sentence,
17  "That is, there is market-based evidence that
18  market participants - authors and publishers --
19  see value in Google Books, so much so that
20  through the Partner Program, they have opted to
21  have even larger excerpts than snippets
22  available for consumers to read."
23   A.   Correct.
24   Q.   In the Partner Program, you are aware
25  that the partners can have control over how

Page 139

1  large the excerpt is that is viewed; right?
2    A.   I understand that, yes.
3    Q.   There is no snippet view in the
4  Partner Program?
5    A.   As though I understand that the
6  entire book is searched, as it is in the Google,
7  in the library program.
8    Q.   The entire book is searched, and then
9  what happened?
10   A.   So my understanding is that the
11  entire -- so if you type in the word guitar, the
12  entire book is searched for the word guitar.
13      But the partner controls the
14  percentage of the book that the, that the user's
15  able to see.
16   Q.   So if a book in the Partner Program
17  includes the word guitar, but if that word
18  itself is not in the excerpt that the partner
19  has permitted to be viewed, what happens?
20   A.   So I would, my understanding is that,
21  my understanding is that the -- my understanding
22  is that the partner chooses the percentage of
23  the book that can be seen, provides the book for
24  scanning.
25

Page 140

J.A. Chevalier - C O N F I D E N T I A L
1  J.A. Chevalier - C O N F I D E N T I A L
2       I guess I don't know exactly what
3  happens, if it is actually feasible that -- I
4  know the whole book is searched.
5       I'm exactly sure what happens if the
6  partner can block specific pages or simply
7  determines the percentage of the book that can
8  be seen. I would have to double-check on that.
9    Q.   Isn't it your understanding that the
10  amount of pages that can be seen in the Partner
11  Program is fixed to certain pages?
12      MR. McGOWAN:  Objection.  Asked and
13      answered.
14   A.   Yes, so I said I understand that the
15  fraction of the book that the user will be able
16  to browse is, is controlled by the partner in
17  the Partner Program.
18      But I do not precisely know the
19  implementation of it and, therefore, the exact
20  answer to your question.
21   Q.   Does that have any bearing on your
22  report, the answer to that question?
23   A.   No, the statement I make in the
24  report, the statements I make in the report are
25  still, don't, don't bear on that distinction.

Page 141

1  J.A. Chevalier - C O N F I D E N T I A L
2    Q.   Are you aware that a number of
3  publishers sued Google under the copyright laws
4  with respect to Google's Library Project?
5    A.   I understand that a number of
6  publishers -- that some publishers sued Google
7  as part of the Library Project, but I don't
8  believe they're currently parties to this
9  complaint or a complaint.
10   Q.   What is your understanding about what
11  the publisher's claim was?
12      MR. McGOWAN:  Objection to the extent
13      it calls for conclusion.
14      You may answer.
15   A.   So I did not review documents from
16  that prior litigation, and so I don't know the
17  answer to your question.
18   Q.   Were you aware that the publishers
19  and the publishers trade association, the AAP,
20  were parties to the same claims as the authors?
21   A.   So I understood, I understand that
22  there was a previous litigation involving the
23  publishers.
24      My understanding is that that
25  litigation is not in existence anymore.  So I

36 (Pages 138 - 141)

Page 142

J.A. Chevalier - C O N F I D E N T I A L
1  J.A. Chevalier - C O N F I D E N T I A L
2  assumed that that litigation was ended to the
3  publishers' satisfaction, but I don't know
4  anything more about it.
5      Q.  You haven't asked Google about that?
6      A.  No.
7      Q.  Where did you gain the information or
8  assumption that the publishers' case is closed?
9      A.  They are not -- I haven't read
10  anything about the publishers' case and, you
11  know, they are not a party to this, to this
12  litigation.
13      Q.  So from that, you assume their case
14  was closed?
15      A.  I assume their case was closed.
16      Q.  You don't know on what terms?
17      A.  I do not.
18      Q.  Is that relevant to you?
19      A.  No.
20      Q.  Well, you're talking here about the
21  publishers seem to be pleased with Google;
22  correct?
23      A.  I believe what I've said is that the
24  publishers have found Google Books, the Partner
25  Program, to be a program that they

Page 143

1  J.A. Chevalier - C O N F I D E N T I A L
2  overwhelmingly want to participate in.
3      Q.  Have you ever found evidence that the
4  Google Library Project is a program that the
5  publishers want to participate in?
6      MR. McGOWAN:  Objection, vague.
7      You may answer.
8      A.  So since the Google library project
9  is housed under the same search engine and
10  integrates search with the Google Partner
11  Program, I believe the way that a publisher
12  expresses an interest in -- you know, the
13  publisher doesn't have to do anything to have
14  its book available in snippet view.
15      If the publisher doesn't want its
16  book available in snippet view, it can tell
17  Google to remove the books.
18      If the publisher wasn't more than
19  snippets view, it joins the Partner Program.
20      So the fact that publishers have
21  joined the Partner Program, means that the
22  publishers have chosen to have a larger fraction
23  of the book viewable than would take place under
24  the Library Program.
25      Q.  That's what you believe happens when

Page 144

1  J.A. Chevalier - C O N F I D E N T I A L
2  the publishers enter the Partner Program, that
3  they have a larger portion of the book available
4  for view?
5      A.  So the snippet -- instead of the
6  three line snippets, what's returned in the
7  Partner Program is, in general, a larger
8  fraction of a, a larger readable chunk.
9      Q.  But it's a fixed chunk chosen by the
10  publisher; correct?
11      MR. McGOWAN:  Objection.
12      A.  So as I said before, my understanding
13  is that the publisher chooses the fraction of
14  the book that's viewable to the consumer.
15      Q.  Have you talked to any publishers
16  about this matter?
17      A.  I have not talked to any publishers
18  about this matter, except Mr. Harris, who is a
19  publishing strategist and former publisher.
20      Q.  Have you talked to anyone at Random
21  House about this?
22      A.  I have not talked to anyone at Random
23  House about this, though, of course, Mr. Harris
24  is formerly of Random House.
25      Q.  Did you look at the settlement that

Page 145

1  J.A. Chevalier - C O N F I D E N T I A L
2  was reached by publishers and authors with
3  Google, and it was then not approved finally by
4  the court?
5      A.  I have familiarity with that
6  settlement.  I mean I've seen it.  I didn't
7  review it for the purposes of writing this
8  report, but I have read it previously.
9      Q.  Are you aware that the publishers
10  consider -- that Random House, Penguin,
11  HarperCollins, Simon & Schuster, Hachette,
12  Macmillan, John Wiley, Houghton Mifflin and
13  other publishers consider it extremely important
14  that their books not be available to be
15  digitized without a license?
16      MR. McGOWAN:  Objection, foundation.
17      A.  I know that they participate in the
18  Partner Program.  And I know that my
19  understanding is that there is a, not a live
20  case between these entities and Google.
21      Q.  That wasn't my question.
22      My question was do you have any
23  knowledge that Random House considers it
24  important for there to be a license before its
25  books are digitized?

37 (Pages 142 - 145)

1    J.A. Chevalier - C O N F I D E N T I A L
2        MR. McGOWAN:  Objection, foundation.
3      A.   So as I said, I have not spoken to
4    anyone at Random House.
5      Q.   Do you know if there is a resolution
6    between publishers and Google of this case that
7    you're referring, to that requires a license?
8        MR. McGOWAN:  Objection, asked and
9    answered.
10        You may answer.
11      A.   I've told you pretty much everything
12    I know about the case.
13      Q.   Well, you're making assumptions --
14    you made some assumptions about the fact that
15    publishers would want to participate in Google
16    Library Project; correct?
17      A.   I have made, I have explained, as
18    supported by the individuals I reference and as
19    supported by the, you know, Web pages I
20    reference, that publishers have decided to
21    participate in the Partner Program.
22        I have stated that the Partner
23    Program involves larger pieces of the book being
24    viewable to consumers.
25        And I have, from that, from that

1    J.A. Chevalier - C O N F I D E N T I A L
2    analysis, noted that the Library Program
3    provides snippets that are smaller than what the
4    consumer sees under the Partner Program, and
5    that the Library Program, therefore -- I have,
6    I've concluded that the publishers -- no, have
7    chosen to be part of the Partner Program, rather
8    than merely the Library Program, which provide
9    smaller snippets, nor, you know, in large part,
10    removing the books from, you know, asking Google
11    to remove the books entirely.
12      Q.   Have you concluded that publishers
13    wanted their books to be digitized in the
14    Library Project?
15      A.   I have not concluded that publishers
16    wanted -- at the time the Library Project was
17    undertaken, I have not concluded that publishers
18    necessarily wanted their books to be digitized.
19      Q.   Have you concluded that authors
20    wanted their books to be digitized in the
21    Library Project?
22        MR. McGOWAN:  Objection, vague and
23    compound.
24        You may answer.
25      A.   So I have concluded that the Library

1    J.A. Chevalier - C O N F I D E N T I A L
2    Project on net, economically benefits authors.
3    I have not seen any evidence in the record that
4    that's not true -- that from the named
5    plaintiffs or from Mr. Aiken's deposition, that
6    that's, you know, incorrect.
7        But clearly, the named plaintiffs
8    assert that they did not want their books to be
9    digitized.
10        So I concede that I have seen that
11    those plaintiffs did not want their books to be
12    digitized.
13      Q.   Have you seen evidence that other
14    plaintiffs, other persons, excuse me, who are
15    authors, did not want their books to be
16    digitized without permission?
17      A.   I would say the -- well, it's not
18    quite the same question.  I have not.
19        I could note the survey that asks,
20    the Porett Survey that asks a question close to
21    that question, but it's not quite the same
22    question, so I'll say no, I haven't seen such
23    evidence.
24      Q.   Google didn't provide to you copies
25    of objections to the settlement from various

1    J.A. Chevalier - C O N F I D E N T I A L
2    authors who stated that they didn't want their
3    books digitized by Google without their
4    permission?
5      A.   I have not seen those.  I'm sure I,
6    you know, I -- yes, I have not seen those.
7      Q.   It wouldn't surprise you that those
8    letters exist; right?
9        MR. McGOWAN:  Objection, foundation,
10    vague.
11        You may answer.
12      A.   So my report addresses the question
13    of whether the authors are benefited or harmed,
14    in an economic sense, from the project.
15        I have, I have not seen the letters
16    that you refer to, but, you know, I, I, I can
17    imagine -- I would not be surprised that some
18    letters of that sort exist.
19      Q.   Well, if I have a home, and let's say
20    the fair market value is $500,000, and it's on a
21    nice piece of property, and a builder keeps
22    telling me that he will give me a million
23    dollars for my house because he's going to knock
24    it down, build a bigger house, and I say no.
25        And then one day I come home, and the

38 (Pages 146 - 149)

Page 150

1    J.A. Chevalier - C O N F I D E N T I A L
2  house is knocked down, and there's a check for a
3  million dollars, how does that fit into your
4  economic theory?
5       MR. McGOWAN:  Objection, incomplete
6  hypothetical.
7       You may answer.
8  Q.   I've benefited?
9  A.   Well --
10      MR. McGOWAN:  Objection,
11  argumentative.  I'd like to proceed one
12  question at a time, please.
13      MS. ZACK:  Certainly.  I'll withdraw
14  the last question.
15  A.   So I am not a lawyer, but my
16  understanding is that while there are very few
17  limitations to your rights, as an owner of the
18  house, though, of course, you know, the
19  government could declare your house, you know,
20  knock it down.
21      But, you know, there are very few
22  limitations to what your ownership rights mean
23  as an owner of a house.
24      There are, indeed, limitations to the
25  rights of a copyright holder.  And my

Page 151

1    J.A. Chevalier - C O N F I D E N T I A L
2  understanding, though I'm not a lawyer and
3  cannot express an opinion about exactly how my
4  economic analysis, you know, fits with, you
5  know, the case law, my understanding is, as a
6  copyright holder, there are limitations to the
7  copyright holder's rights, in that whether a
8  usage of the copyright holder's works
9  economically harms or benefits the copyright
10  holder, is a relevant factor in a way in which
11  it may not be for your house.
12  Q.   So your analysis is assuming that
13  what Google does is a fair use?
14      MR. McGOWAN:  Objection, misstates.
15      You may answer.
16  A.   My analysis is neither assuming, nor
17  expressing an opinion about what Google does.
18  It's about what whether Google does is a fair
19  use.
20      My analysis is simply stating that
21  the usage of the copyrighted works for the
22  production of Google Books, is a complement,
23  rather than a substitute for the sale of the
24  book.
25      So the search is a complement to the

Page 152

1    J.A. Chevalier - C O N F I D E N T I A L
2  item being searched.
3  Q.   You've also said it's a benefit to
4  the authors?
5  A.   I have said it's a benefit to the
6  authors.
7  Q.   Have you done any analysis about how
8  quickly, over time, new books were added to the
9  Partner Program?
10  A.   I have not done an analysis of how
11  quickly, over time, new books were added to the
12  Partner Program.
13  Q.   You have some footnotes on the bottom
14  of page 11, and these all refer -- well, not --
15  I will take them one by one.
16      The footnote 44, U.S. top 15
17  publisher sales data, that's for in-print books;
18  right?
19  A.   Yes.
20  Q.   Footnote 45 talks about the Partner
21  Program.  That's about in-print books; right?
22  A.   I would -- I would imagine that,
23  largely, the Partner Program is about in-print
24  books.
25      Though, I believe you can be a member

Page 153

1    J.A. Chevalier - C O N F I D E N T I A L
2  in the Partner Program.  I think there could be
3  examples of not-in-print Books that are
4  publishers, who are members of the Partner
5  Program.
6      So, for example, if they do, if
7  there's a link to a, there's a print-on-demand
8  feature, such a thing.
9      I believe it's not necessarily the
10  case that a member of the Partner Program is
11  providing in-print books.
12  Q.   You don't consider a print-on-demand
13  book to be in print?
14  A.   I don't know if a book that can be
15  printed on demand, would count as in print from
16  the perspective of the contract between the
17  publisher and the author, in all circumstances.
18      I simply cannot say that all of the
19  books, that all of the publishers in the Partner
20  Program, that a hundred percent of what they've
21  put in the Partner Program is an in-print book.
22  Q.   Let's use the term commercially
23  available, instead of in print, to eliminate
24  that ambiguity.
25      Do you have any information that

39 (Pages 150 - 153)

Page 154

J.A. Chevalier - C O N F I D E N T I A L

1  Books that are not commercially available, are
2  available in the Partner Program?
3     A.   Well, so I believe that, so my -- I
4  think, in general, the books in the Partner
5  Program will be commercially available.
6        I believe it to be the case, though
7  I'm not certain that there may be
8  print-on-demand books or printable books in the
9  Partner Program that are, that you don't, that
10 are in copyright, but you don't -- but the
11 publisher has decided to make them available
12 without pay.  I believe such things exist in the
13 Partner Program.
14    Q.   That's based on?
15    A.   So the reason I am hesitant, I -- so
16 for example, I have a number of works that
17 appear when you search me in Google Books, and
18 those are National Bureau of Economic Research
19 working papers.
20       And those works are in copyright, and
21 I believe the National -- I believe, though I
22 have not checked, that the National Bureau of
23 Economic Research just let's you print them,
24 since their primarily goal is dissemination.  I

Page 155

J.A. Chevalier - C O N F I D E N T I A L

1  would have to double check that.
2     Q.   Do you know if they're in through the
3  Partner Program?
4     A.   I think so.  They're in copyright,
5  and I believe the full text appears.
6     Q.   So you think so, but you're not sure?
7     A.   I think so, but I'm not sure.  I
8  would be hesitant to, therefore, say
9  categorically that all books in the Partner
10 Program are commercially available.
11    Q.   Would you say that the vast majority
12 are?
13    MR. McGOWAN:  Objection, vague.
14       You may answer.
15    A.   I would, I would assume that the
16 majority of the books in the Partner Program are
17 commercially available.
18    Q.   In footnote 47, you talk about
19 Richard Lowry's book, The Gulf War Chronicles,
20 and that's an in-print book; right?
21    A.   Yes, I believe so.
22    Q.   Do you know whether Mr. Harris
23 represents any out-of-print books?
24    A.   I do -- well, Mr. Harris's primary

Page 156

J.A. Chevalier - C O N F I D E N T I A L

1  function is assisting individuals find
2  marketing.  I do not know whether he represents
3  any out-of-print books.
4     Q.   What about Mr. Zohn and his company
5  William Morris, do you know if they represent
6  out-of-print books?
7     MR. McGOWAN:  Objection, vague.
8        Maybe you didn't mean authors.
9     MS. ZACK:  Books of authors.
10    Q.   They represent authors.  Do they
11 represent authors with respect to books that are
12 out of print?
13    A.   They represent authors.  I do not
14 know for a fact whether or not those authors
15 have out-of-print books.
16    Q.   Referring to page 13 of your report.
17 I guess -- sorry, it carries over from page 12.
18 Paragraph 43, talks about iUniverse
19 back in print.
20       Did you look at any other
21 back-in-print programs other than iUniverse?
22    A.   No, I did not.
23    Q.   IUniverse makes books available for
24 sale for authors; right?

Page 157

J.A. Chevalier - C O N F I D E N T I A L

1     A.   Yes, my understanding is that
2  back-in-print program makes, allows, yeah, makes
3  books available for sale that were out of print,
4  yeah.
5     Q.   Pursuant to contracts with copyright
6  holders; correct?
7     A.   Yes, authors must choose to be part
8  of the program.
9     Q.   Right, authors who have the right to,
10 as a copyright owner; right?
11    A.   Correct.
12    Q.   The contract provides for royalties;
13 correct?
14    A.   My understanding is that if consumers
15 buy books from iUniverse, yes, the author gets
16 royalties.
17    Q.   Part of that is authors can then
18 permit portions of their book to be viewed in
19 order to spur sales; correct?
20    A.   Authors can choose to have parts of
21 their book browsable, so that, in order to
22 encourage sales.
23    Q.   If there is a sale, iUniverse
24 provides a royalty to the author; correct?

40 (Pages 154 - 157)

## Page 158

1    J.A. Chevalier - C O N F I D E N T I A L
2         MR. McGOWAN:  Objection, form.
3         You may answer.
4    A.   My understanding is that if there's a
5    sale, iUniverse provides a royalty to the
6    author.
7    Q.   Referring you to paragraph 46, you
8    say, "A related benefit of the search capability
9    of Google Books is its ability to increase
10   interest in and sales of books that may be
11   relatively unknown, rare, or out-of-print.
12   Research on the effect of the Internet supports
13   the theory of a "long tail" or the creation of
14   marketplaces where buyers and sellers, who
15   otherwise would not find each other, can meet."
16        And you say, "I expect that Google
17   Books has the same effect."
18        Do you have any empirical evidence to
19   back that up?
20   A.   So empirical evidence to back up that
21   consumers can find books through Google Books or
22   empirical evidence that they, that they will buy
23   used books, that they have bought used books as
24   an outcome of that?
25        I do not have any -- I have not done

## Page 159

1    J.A. Chevalier - C O N F I D E N T I A L
2    any empirical analysis of the sales of books
3    that were on Google Books.
4    Q.   Can you provide me an example where
5    there's been a marketplace created where a
6    particular buyer and a particular seller found
7    each other after using Google Books concerning
8    an out-of-print book?
9         MR. McGOWAN:  Object to form.
10        You may answer.
11   A.   No, I don't have any data about that.
12        MR. McGOWAN:  I will note for the
13   record, I think a fire alarm went off.
14        Off the record.
15        (Discussion off the record.)
16   Q.   Paragraph 47 on page 14, you say,
17   "While I do find substantial evidence that
18   Google Books is a complement to the purchase of
19   a book and thus, should stimulate book sales, I
20   have not found evidence that Google Books
21   searches are a substitute for the purchase of
22   books."
23        So where did you look for the
24   evidence?
25   A.   So I think the resources are in the

## Page 160

1    J.A. Chevalier - C O N F I D E N T I A L
2    record.  So, you know, first, for example, in
3    the depositions of the named plaintiffs, they do
4    not cite any evidence that Google Books is a
5    substitute for the purchase of the book, that
6    using Google Books as a substitute for the
7    purchase of the books.
8         Mr. Aiken, in his deposition, says
9    that it is his belief, and he's an expert in the
10   industry, that Google Books, the Google Book
11   search function on net is a compliment to the
12   sale of the books.
13        And the, I might add, you know, the
14   various, of course, these aren't a random
15   sample, but I don't know where I would obtain
16   one, the, you know, testimonials that I cite
17   from the Google Books website, describe authors,
18   you know, have discussions of authors who view
19   the Google Books project as a complement to the
20   sale of their books.
21        So I'm, I haven't seen anything in
22   the record, provided by the plaintiffs, to
23   suggest that the snippets provided by Google
24   Books are substitutes for the sale of the book.
25   Q.   Well, the -- you referred to author

## Page 161

1    J.A. Chevalier - C O N F I D E N T I A L
2    endorsements on Google Books.
3         Were those endorsements of snippets
4    or Partner Program books?
5    A.   So there, so for example, Mr., Mr. --
6    sorry, Mr. Lowry, my understanding from his
7    snippets, from his discussion, is that after his
8    book appeared in Google Books as part of the
9    Library Program, the sales increased.
10        But I, the description there may not
11   have been in, you know, entirely complete.  So I
12   believe what I said is exactly right, I have not
13   seen any evidence that snippets have served as a
14   substitute for the book.
15   Q.   Have you done any -- but you haven't
16   done any empirical analysis where you've
17   identified certain books that are available in
18   snippet view, and then any research about their
19   sales?
20   A.   So since I don't have any access to
21   data about the sales of books, I can't do that.
22   Q.   Where would you, where would you get
23   access to data about the sales of books?
24   A.   Well, I mean I, for -- I mean I
25   could, I think it would be a difficult, if not

41 (Pages 158 - 161)

Page 162

1   J.A. Chevalier - C O N F I D E N T I A L
2   impossible project, nonetheless.
3         But, for example, if one had, you
4   know, access to Amazon data, there may be things
5   that one could do.
6   Q.   Any other data that you can think of?
7   A.   I think similarly, if you had access
8   to, you know -- well, I think Amazon data would
9   be probably the primary or best source, but
10  there could be other, you know, other book
11  sellers' data.
12  Q.   You don't have access to that because
13  it hasn't been provided to you by Google or any
14  ████████████████████████████████████████
15  ████████████████████████████████████████
16  compound.
17        You may answer.
18  A.   So, I don't have access to Amazon's
19  proprietary data.
20  Q.   Referring you to paragraph 48, you
21  say, "A related question to the one discussed
22  above is whether, in the absence of Google
23  Books, a market might have arisen in which
24  authors stood to benefit in ways they do not
25  currently."

Page 163

1   J.A. Chevalier - C O N F I D E N T I A L
2         Did you consider any markets for
3   collective licensing for digitization of books?
4         MR. McGOWAN:  Objection, foundation.
5         You may answer.
6   A.   So as I discuss in the report, I
7   considered, I considered markets for licensing
8   of -- I observed that authors have been paid in
9   situations in which books were digitized for the
10  purpose of allowing, using, displaying to users
11  the full text of the book, but I have not seen
12  an example where firms pay authors for the right
13  to scan and index their work.
14  Q.   There is, albeit, as you have said, a
15  small amount of revenue, but there is a revenue
16  component to the Partner Program; correct?
17  A.   There is a revenue component to the
18  Partner Program.
19  Q.   Have you looked at other collective
20  licenses for other copyrighted content --
21        MR. McGOWAN:  Objection, foundation.
22  Q.   -- to determine how those collective
23  licenses operate?
24  A.   So can you be more specific?
25  Q.   Did you do any research concerning

Page 164

1   J.A. Chevalier - C O N F I D E N T I A L
2   the Copyright Clearance Center, for instance?
3   A.   So, I have a, I have a familiarity
4   with that Copyright Clearance Center.  That
5   Copyright Clearance Center is in the category of
6   entities that I describe in my report that
7   provides more than snippets, that provide users
8   with not full text, like chapters, something
9   like chapters of work.
10        So that is in the category of works
11  that I describe -- of licensing scenarios that I
12  describe and report in my report as dissimilar
13  to the services provided by Google Books.
14  Q.   What would you consider to be a
15  similar licensing service, if any, to licensing
16  of snippets?
17        MR. McGOWAN:  Objection, foundation.
18        You may answer.
19  A.   So there are commercial entities that
20  provide indexing functions and searchability --
21  some index and search functions.
22        They are different from Google Books,
23  but such entities, you know, serve a somewhat
24  similar function to users, and I have not found
25  any examples of such entities that pay the

Page 165

1   J.A. Chevalier - C O N F I D E N T I A L
2   authors to index their work.
3   Q.   Have you found evidence where
4   entities have paid for indexes?
5         MR. McGOWAN:  Objection, vague.
6         You may answer.
7   A.   So is the indexing -- are there
8   entities that, that want to purchase indexes?
9   Q.   Um-hmm.
10  A.   Yes.
11  Q.   Can you give me some examples of
12  that?
13  A.   So for example, I was a member of the
14  American Economic Association Executive
15  Committee.
16        The American Economic Association
17  creates a product called Econlit.  Econlit is a
18  product where a human being reads -- I would
19  have used the word scan, but that might be
20  confusing in this context.
21        A human being reads economics
22  articles, writes down key words, and the product
23  that is sold to libraries is a searchable index
24  of those key words.
25  Q.   So the library pays for the index?

42 (Pages 162 - 165)

Page 166

1   J.A. Chevalier - C O N F I D E N T I A L
2       A.   The library pays for the index.
3       Q.   Have you heard of Marc Indexing for
4   libraries?
5       A.   I have heard of that.
6       Q.   Do you know whether or not libraries
7   pay for that?
8       A.   My understanding is that libraries
9   pay for that.
10      Q.   In the area of music, would you
11  consider a ring tone to be analogous to a
12  snippet?
13          MR. McGOWAN:  Objection, vague.
14          You may answer.
15      A.   No, I wouldn't consider a ring tone
16  to be analogous to a snippet.
17      Q.   Why not?  I meant a snippet from a
18  book.
19      A.   Yes, I think a ring tone is a --
20  well, I have not analyzed the market for ring
21  tones, but I would say that snippet is a de
22  minimis fraction of the total book, and that a
23  ring tone is not.
24      Q.   On what basis do you say that one is
25  de minimis and one isn't?

Page 167

1   J.A. Chevalier - C O N F I D E N T I A L
2       A.   The snippet is, given the number of
3   snippets that are displayed for a user, the
4   snippet is a small fraction of the total book.
5          And I have not studied the market for
6   ring tones, but, you know, I have heard ring
7   tones, and ring tones are recognizable chunks of
8   a song.
9       Q.   Do you know whether there's a market
10  for licenses for ring tones?
11      A.   I believe there is a market for
12  licenses for ring tones.
13      Q.   Where do you have that information --
14  what is the basis for that belief?
15      A.   I believe that I have read in the,
16  you know, press that there's a market for ring
17  tones.  But I don't know much about it.
18          MR. McGOWAN:  If you wouldn't mind
19      taking a very short break when you're done
20      with this line, that would be useful.
21          MS. ZACK:  Sure.  Let me just see
22      where I am.  We can take a break now, if you
23      want.
24          (Brief recess taken.)
25  FURTHER EXAMINATION

Page 168

1   J.A. Chevalier - C O N F I D E N T I A L
2   BY MS. ZACK:
3       Q.   Back to page 14.
4       A.   Okay.
5       Q.   In paragraph 49 you state, "The
6   underlying premise of any hypothetical market
7   runs counter to the basic economics of this
8   industry outlined above - there is no reason to
9   expect that a market would arise between
10  copyright holders (as sellers) and Google (as
11  the buyer), when, as discussed above, it is the
12  copyright holder who is benefitting from the use
13  of the copyrighted material."
14          Are you taking the position that
15  Google does not benefit from the use of the
16  copyrighted material?
17      A.   No, so Google clearly uses the
18  copyrighted material as an input to its product.
19  Just as, you know, other indexers who sell
20  indexes, use the material as an input to their
21  products.
22          So, and then they sell that product
23  or in Google's case, advertise around that
24  product.  So I'm not taking the position that
25  Google does not benefit.

Page 169

1   J.A. Chevalier - C O N F I D E N T I A L
2       Q.   So you agree that Google does benefit
3   from the use of the copyrighted materials?
4          MR. McGOWAN:  Objection, vague.
5          You may answer.
6       A.   So Google, you know, Google, Google
7   benefits from the use of the copyrighted
8   materials, in that they use the copyrighted
9   materials as an input to the product.
10      Q.   You believe that Google benefits from
11  the product; right?
12          MR. McGOWAN:  Objection, vague.
13          You may answer.
14      A.   So I believe that Google, I believe
15  that Google, on net, benefits from continuing to
16  offer the product.
17      Q.   Have you discussed with anyone from
18  Google whether or not Google would pay for the
19  product if they -- for the copyrighted
20  materials, if they were required to by the
21  Doctrine of Fair Use?
22          MR. McGOWAN:  What?
23          MS. ZACK:  I'll restate it.
24      Q.   Have you discussed with anyone from
25  Google whether they would pay for the

43 (Pages 166 - 169)

Page 170

1    J.A. Chevalier - C O N F I D E N T I A L
2  copyrighted material, if it was determined that
3  they could not use it under the Copyright Act
4  without a license?
5        MR. McGOWAN:  Vague.
6        You may answer.
7    A.    Okay, so as I said before, I have not
8  entered into conversations with executives at
9  Google.
10    Q.    You don't really have a full
11  understanding of how Google benefits from the
12  use of the copyrighted materials; do you?
13        MR. McGOWAN:  Objection, vague.
14        You may answer.  Foundation.
15        You may answer.
16    A.    I understand the types of ways in
17  which Google benefits from the use of the
18  copyrighted materials, but I don't -- I can't
19  add up the benefit to Google of the use of the
20  copyrighted materials.
21    Q.    Well, you haven't, you don't fully
22  understand how they use all the materials that
23  they accumulate in their search engine to
24  benefit their business; right?
25        MR. McGOWAN:  Objection, vague.

Page 171

1    J.A. Chevalier - C O N F I D E N T I A L
2        You may answer.
3    A.    So I do not know all of the -- I do
4  not all -- I cannot catalog all of the benefits
5  to Google of their, of providing the search
6  functionality.
7    Q.    Have you looked at their public
8  documents?
9    A.    I've looked at a number of Google
10  public documents.
11    Q.    Have you looked at their 10-K?
12    A.    I have not looked at their 10-K's
13  pursuant to this matter.
14    Q.    Have you looked at any of their
15  earning statements?
16    A.    I have not looked at their earning
17  statements pursuant to this matter.
18    Q.    So your statement that there is no
19  reason to expect that a market would arise
20  between the copyright holders and Google because
21  the copyright holders benefit, discounts the
22  fact that Google also benefits?
23        MR. McGOWAN:  Objection, vague.
24        You may answer.
25    A.    So as I describe in the report, my

Page 172

1    J.A. Chevalier - C O N F I D E N T I A L
2  conclusion that no alternative market would
3  arise for payment for the indexing functions,
4  derives from my, from, from a few things.
5        One piece is that the substantial
6  benefit that the copyright holder gets from
7  being indexed.
8        And the second is that I am not aware
9  of other markets in which index service --
10  indexing services are provided where the author
11  or publisher is paid for being included in that
12  indexing service.
13    Q.    Well, Google Books is more about just
14  indexing, it's also about digitizing entire
15  books; right?
16        MR. McGOWAN:  Objection, vague.
17        You may answer.
18    A.    I understand that books are
19  digitized.  The word digitized for it create
20  Google Books.
21    Q.    Do you know whether or not Google
22  makes other use of the digitized books beyond
23  merely indexing them?
24        MR. McGOWAN:  Same objection.
25        You may answer.

Page 173

1    J.A. Chevalier - C O N F I D E N T I A L
2    A.    So I don't know whether they have
3  used the books for some other purpose, outside
4  of the Google Books Project.
5    Q.    You don't know one way or the other?
6    A.    I don't know whether they have made
7  use of the books for some purpose other than the
8  Google Books project.
9    Q.    So you don't know whether they've
10  used the digitized books for purposes of
11  improving their general search engine?
12        MR. McGOWAN:  Objection, vague.
13        You may answer.
14    A.    I don't know whether they have used
15  the books for a purpose other than providing the
16  Google Books project.
17    Q.    You don't consider that relevant to
18  your analysis?
19    A.    I don't consider that relevant to my
20  analysis.
21    Q.    You say at the end, "I have seen no
22  evidence that any firm has paid, for example,
23  for permission to display snippets"?
24    A.    Correct.
25    Q.    Are you talking about in search

44 (Pages 170 - 173)

Page 174

1   J.A. Chevalier - C O N F I D E N T I A L
2   engines or anywhere?
3       A.   I'm talking about in general.
4       Q.   Are you familiar with the market for
5   permissions for display of portions of books in
6   other copyrighted books and other matter?
7           MR. McGOWAN:  Objection, foundation,
8   vague.
9           You may answer.
10      A.   Sorry, can you be more specific?
11      Q.   Sure.  Are you familiar at all with
12  the concept that if excerpts are used from one
13  book, copyrighted book, and either another book
14  or television or something like that, that
15  permission fees are paid?
16          MR. McGOWAN:  Objection, foundation.
17          You may answer.
18      A.   So, for example, so I haven't studied
19  that.
20      Q.   Were you aware that that market
21  existed?
22          MR. McGOWAN:  Objection, foundation.
23          You can answer.
24      A.   I think it depends on the extent of
25  the market.  So, for example, I know that

Page 175

1   J.A. Chevalier - C O N F I D E N T I A L
2   permission fees are paid for the inclusion of
3   chapters of books in my course packet.
4       Q.   Do you know whether permission fees
5   are sometimes paid for quotes that are included
6   in books, you know, at the beginning of, above
7   like chapter one, where there's a quote, do you
8   know if permission fees are ever paid for that
9   type of citation?
10          MR. McGOWAN:  Objection, foundation.
11          You may answer.
12      A.   I don't know the answer to that.
13      Q.   Your definition of snippets is, as
14  you previously stated, just three lines?
15          MR. McGOWAN:  Objection.  Misstates,
16  asked and answered.
17          You can answer.
18          MS. ZACK:  I don't want to misstate.
19      A.   So my understanding is -- oh, I'm
20  using the term snippets here to describe very
21  short sections of text which, you know, in the
22  case of the Google Books, is roughly three
23  lines.
24      Q.   If snippets are 10 lines, would your
25  opinion change?

Page 176

1   J.A. Chevalier - C O N F I D E N T I A L
2           MR. McGOWAN:  Objection.  Incomplete
3   hypothetical.
4           You may answer.
5       A.   Would my opinion about what change?
6       Q.   You said it was de minimis?
7       A.   So if -- I said it was de minimus for
8   what purpose.  So would my opinion about what
9   section of my report change, if snippets were
10  more than three lines?
11      Q.   Any section of your report.
12      A.   So if a snippet were 10 lines, I
13  don't think there's any section of my report
14  where my conclusions would change.
15      Q.   Is there some amount of lines where
16  you can pick -- conclusions would change?
17      A.   As I've said in my report, I know
18  that the amount of text that Google displays,
19  under the Library Program, is smaller than the
20  amount of text that appears to be chosen by
21  publishers and authors to display in standard
22  commercial use.
23          So to the extent that that's true, my
24  conclusions would remain the same.
25      Q.   Do you think there's a market for

Page 177

1   J.A. Chevalier - C O N F I D E N T I A L
2   digital copies of books?
3           MR. McGOWAN:  Objection, vague.
4           You may answer.
5       A.   So what do you mean do I think
6   there's a market for digital copies of books?
7       Q.   A market in which someone would pay
8   for digital copies of books.
9       A.   Do I think a market exists or could
10  exist?
11      Q.   Either.  Well, does it exist?
12      A.   So I think, you know, ebooks are
13  bought and sold, so I think, you know, I would
14  say that there's a market for digitized books.
15      Q.   So there's currently a market for
16  digitized books?
17          MR. McGOWAN:  Objection, vague.
18          You may answer.
19      A.   If I think ebooks are digitized
20  books, I think there's a markets for ebooks.
21      Q.   I mean Google's currently selling
22  ebooks; right?
23      A.   Yeah, you can -- you mean the books
24  that you can purchase via Google Play?  Is that
25  what you mean?

45 (Pages 174 - 177)

Page 178

1   J.A. Chevalier - C O N F I D E N T I A L
2   Q.   I'm asking you whether Google's
3   currently selling ebooks?
4   A.   So okay --
5   Q.   It could be a yes-or-no answer.
6   A.   Okay, fine.  All right, okay, I
7   wasn't sure what you were referring to.
8   Yes, my understanding is you can buy
9   ebooks through Google Play.
10  Q.   You understand that libraries buy
11  ebooks too; right?
12  A.   I understand that libraries sometimes
13  buy ebooks, yes.
14  Q.   When Google digitized its books in
15  the Library Program, it didn't pay the copyright
16  owners for that right; did it?
17  MR. McGOWAN:  Objection to the extent
18  it calls for a legal conclusion.
19  You may answer.
20  A.   So my understanding is that when
21  Google digitized books as part of the Library
22  Program, it did not pay authors or publishers
23  for the, for the scanning.
24  Q.   I previously asked you about the
25  collective licensing, and I asked you about the

Page 179

1   J.A. Chevalier - C O N F I D E N T I A L
2   CCC.
3   Are you aware of any other collective
4   licensing organizations?  Are you familiar with
5   any?
6   A.   Do you mean collective licenses
7   organizations for books?
8   Q.   For copyrighted material.
9   A.   So I have some familiarity, as you
10  know, as I said I've I disclosed some work for
11  SESAC, and I have some familiarity with
12  licensing of performance rights for music.
13  But music licensing is very
14  complicated, and I've only worked on narrow
15  portions of it.  So I have some familiarity with
16  it, but --
17  Q.   What about licensing for music
18  lyrics, as opposed to performance rights?
19  A.   I'm not familiar with that market, if
20  it exists.
21  Q.   In paragraph -- I'm sorry, footnote
22  63 on page 15?
23  A.   Um-hmm, yes.
24  Q.   You do talk about ASCAP and BMI?
25  A.   I do.

Page 180

1   J.A. Chevalier - C O N F I D E N T I A L
2   Q.   You say they "arose as a solution to
3   the problems of widely, disbursed rights holders
4   and widely disbursed music users."
5   A.   Correct.
6   Q.   With respect to Google Books, are
7   there widely disbursed rights holders?
8   A.   There are widely disbursed rights
9   holders.
10  Q.   Are there widely disbursed users of
11  Google Books?
12  A.   So here I'm referring to the entity
13  that -- not the end user, but the entity that
14  would, that is making use of the license.
15  And so in the music case, the music
16  users were widely disbursed.  But in the Google
17  Books case, Google Books is a single entity.
18  It's not widely disbursed.
19  Q.   So here you are saying the music
20  users are like restaurants, etcetera?
21  A.   Correct.
22  Q.   This is all about performance rights?
23  A.   This discussion is about performance
24  rights.
25  MS. ZACK:  Let's mark as the next

Page 181

1   J.A. Chevalier - C O N F I D E N T I A L
2   exhibit, a series of pages from the Internet
3   concerning the acquisition by Google of
4   Rightsflow.
5   (Defendant's Exhibit 97, a series of
6   pages from the Internet concerning the
7   acquisition by Google of Rightsflow,
8   marked for identification, as of this
9   date.)
10  Q.   Are you familiar with Rightsflow?
11  A.   No.
12  Q.   Or Google's acquisition of this
13  collective licensing company?
14  A.   No.
15  Q.   If you look at the second page of
16  this document, it says -- the second page,
17  second paragraph, "The acquisition gives
18  video-sharing service YouTube access to
19  technology to help it manage its relationship
20  with one of the most fragmented and unwieldy
21  parts of the music industry:  Music publishing.
22  Music publishing concerns the copyrights on
23  songs' lyrics and melodies, as distinct from a
24  particular recording of a given song."
25  Do you see that?

Page 182

1   J.A. Chevalier - C O N F I D E N T I A L
2       A.   Yes.
3       Q.   So you were not aware, prior to now,
4   that there was a -- there is a collective
5   licensing organization for copyrighted lyrics?
6           MR. McGOWAN:  Objection.  Misstates.
7       A.   So as I read this, it says, "Music
8   publishing concerns the copyrights on songs'
9   lyrics and melodies, as distinct from a
10  particular recording of a given song."
11          My understanding is that, my
12  understanding of your previous question was
13  performance rights are also rights for -- that
14  flow to the composer and lyricist of the song.
15          Those are composer's rights.  So I
16  don't, I -- from what I read here, I don't know
17  this to be different than what I described.
18          It may be, but I don't know this to
19  be different than what I described ASCAP and BMI
20  to be.
21      Q.   Would you agree that the collective
22  licensing has developed in response to changes
23  in technology?
24          MR. McGOWAN:  Objection, vague.
25          You may answer.

Page 183

1   J.A. Chevalier - C O N F I D E N T I A L
2       A.   As I described in my report,
3   collective, the collective licensing that we
4   observe in music -- well, this is, this is a new
5   entity by which I don't know anything.
6           But the description that I gave of
7   the music rights organizations, that collective
8   licensing process is a very old process.
9       Q.   When you say, "very old," how old are
10  you talking about?
11      A.   Well, I don't remember precisely, but
12  my recollection is, you know, dates from Tin Pan
13  Alley in the 1920's.
14      Q.   Do you have any information about
15  whether or not different types of licenses have
16  been developed as new technologies have come
17  into existence?
18          MR. McGOWAN:  Objection, vague.
19          You may answer.
20      A.   The performance license that I
21  describe, I believe, incorporates new
22  technologies, but I do not know about the
23  development of new types of licenses.  That may
24  exist, but I haven't studied it.
25      Q.   So you don't know one way or the

Page 184

1   J.A. Chevalier - C O N F I D E N T I A L
2   other?
3       A.   Correct.
4       Q.   Have you looked at any of the
5   licenses available from Copyright Clearance
6   Center?
7           MR. McGOWAN:  Objection, foundation.
8       Q.   In connection with this assignment?
9           MR. McGOWAN:  Objection, foundation.
10          You may answer.
11      A.   I have not looked at licenses from
12  Copyright Clearance Center.
13      Q.   Have you looked at licenses from any
14  other organization in connection with this
15  assignment?
16      A.   I think the list of materials I have
17  is complete.  I have not looked at other
18  licenses that are not referenced here.
19      Q.   If a license for book digitization
20  developed a collective license, would that be a
21  new good?
22          MR. McGOWAN:  Objection, vague.
23          You may answer.
24      A.   So what do you mean by a collective
25  license for book digitization?

Page 185

1   J.A. Chevalier - C O N F I D E N T I A L
2       Q.   A license where various rights
3   holders give an intermediary the right to
4   license all or portions of their work to third
5   parties.
6       A.   So if you mean an organization where
7   existing rights holders contribute their works
8   in order for those works to be jointly licensed,
9   I don't believe that that would be a new good
10  under the definition I've proffered, because a
11  new good serves a previously unmet or poorly met
12  need.
13      Q.   So it could be a new product, but not
14  a new good?
15      A.   I believe an amalgamation of -- an
16  amalgamation of opt-in rights holders who have
17  come together to form an organization, would not
18  really constitute a new good because it doesn't,
19  it doesn't particularly meet an unmet need.
20          So it would be a product.  It would
21  be a product, but it wouldn't substantially meet
22  an unmet need.
23      Q.   When you say, "It wouldn't meet an
24  unmet need," from whose perspective would it not
25  meet an unmet need?

47 (Pages 182 - 185)

Page 186

1  J.A. Chevalier - C O N F I D E N T I A L
2      A.   So as I describe in the report, as
3  I've discussed, locating rights holders is a
4  very, you know, as Dr. St. Clair reports,
5  locating rights holders is a very difficult and
6  costly process.
7          If you're referring to an
8  organization where book rights holders, you
9  know, provide, you know, register or provide
10 their books, I think there are already, I think
11 there are already mechanisms in the marketplace
12 for book rights holders who want to, you know,
13 who want to -- I don't, I think the problem is
14 the rights holders who cannot be found, largely
15 speaking, or the rights holders who, the orphan
16 works problem.
17         And the thing you're describing to me
18 does not solve the orphan works problem.
19         Sorry, I don't, I cannot, since I
20 can't tell you whose need would be met, it's
21 hard for me to tell you why it doesn't fill an
22 unmet need.
23         The product you describe, I can't, I
24 cannot figure out whose need would be met by
25 that product.

Page 187

1  J.A. Chevalier - C O N F I D E N T I A L
2      Q.   Well, what about the need of
3  copyright owners to obtain compensation for the
4  digitization of their books?
5      MR. McGOWAN:   Objection, foundation.
6      You may answer.
7      A.   So as I've said in the report, I
8  don't think, I don't think there are a body of,
9  for example, libraries or other entities, with
10 an interest in digitizing books, who are willing
11 to pay for licenses for less than the full text
12 of books.
13         And if this product helped those
14 libraries, let's say, find the copyright
15 holders, it might be valuable.
16         But if it, if it doesn't solve that
17 problem, I don't think it would be --it wouldn't
18 meet an unmet need of a buyer.
19     Q.   What if it, what if the collective
20 licensing organization created efficiencies for
21 entities like libraries and others who are
22 trying to get rights to use books?
23     A.   So it may be the case that some
24 entities could create some efficiencies, but I
25 don't -- I think what I'm saying is I don't see

Page 188

1  J.A. Chevalier - C O N F I D E N T I A L
2  how an entity that relies on the active
3  depository of rights with it, would solve unmet
4  needs of libraries in the short run.
5      Q.   I'm not just talking about libraries.
6          What about unmet needs of Google, if
7  that was the only way it could get the books?
8      MR. McGOWAN:   Objection, incomplete
9  hypothetical, foundation.
10     You may answer.
11     A.   So I guess I -- in this case, as
12 opposed to the case I cite in the footnote, I
13 don't quite see the service -- that the source
14 of the efficiencies are not apparent to me.
15     Q.   Well, AMCAP and BMI -- ASCAP, excuse
16 me, and BMI, were created because the rights
17 holders had a legal copyright interest; correct?
18     MR. McGOWAN:   Objection, foundation.
19     You may answer.
20     A.   So my understanding is that ASCAP and
21 BMI arose -- yes, so the rights holders, yeah,
22 the composers, mostly, yes, or the rights
23 holders, yes, as I say in my report.
24     Q.   Right, so it's not just that there
25 were problems of widely disbursed rights holders

Page 189

1  J.A. Chevalier - C O N F I D E N T I A L
2  and widely disbursed music users, there was also
3  the issue that the rights holders had a right to
4  withhold the music users from listening to their
5  works; right?
6      MR. McGOWAN:   Objection, incomplete
7  hypothetical, lacks foundation
8  significantly.
9      You may answer.
10     A.   Sorry, so my understanding is that
11 the purpose of ASCAP and BMI was that rights
12 holders, you know, deposit their rights with
13 ASCAP and BMI, and ASCAP and BMI provide an
14 efficiency by tracking down and monitoring the
15 disbursed rights users on the other side.
16     Q.   Do you understand that ASCAP and BMI
17 arose after music users attempted to use music
18 without paying royalties?
19     MR. McGOWAN:   Objection, foundation.
20     You may answer.
21     A.   I don't know exactly. I don't know
22 the history of ASCAP and BMI that completely.
23         My understanding is that, you know,
24 that these disbursed rights holders were
25 required to pay for the music that they were

48 (Pages 186 - 189)

Page 190

1   J.A. Chevalier - C O N F I D E N T I A L
2   performing, and that ASCAP and BMI served the
3   intermediary function of negotiating and
4   transacting with those disbursed rights holders.
5       Q.   So you don't know the genesis of it
6   beyond what you said here?
7       A.   I know that ASCAP and BMI are a
8   solution -- are a solution to the economic
9   problem of disbursed rights holders.
10       I don't know that much more about the
11   history than that.  Sorry, disbursed rights
12   holders and disbursed users.
13       Q.   Right, but there would be no problem
14   to solve from the perspective of the music
15   users, if they didn't have to pay for the use of
16   the music; right?
17       MR. McGOWAN:  Objection, foundation,
18       calls for legal conclusion.
19       A.   So my understanding is that, yes, the
20   users -- that the purpose of ASCAP and BMI, is
21   to track down the users and get them to pay.
22       Q.   Because what they're using is
23   copyrighted music?
24       MR. McGOWAN:  Same objections.
25       A.   So my understanding is that the user

Page 191

1   J.A. Chevalier - C O N F I D E N T I A L
2   -- my understanding is that the users have to
3   pay because the performance rights are a right
4   that has, it has been determined by some, by a
5   court that users of music, in these
6   circumstances, have to pay.
7       But the full scope of when users of
8   music have to pay, etcetera, you know, is
9   factually fairly complicated.
10       Q.   But you would agree that music users
11   wouldn't be paying unless they had to; right?
12       A.   I am sure some music users would be
13   paying, you know, if they didn't have to.
14       But the point of ASCAP and BMI is to
15   make sure they all pay, to collect from them.
16       Q.   So if it was determined that Google
17   could not display snippets without permission
18   under the copyright laws, are you expressing an
19   opinion about whether a market would or would
20   not develop for Google to pay for the use of the
21   materials necessary for them to produce the
22   snippets?
23       MR. McGOWAN:  Objection, incomplete
24       hypothetical.
25       You may answer.

Page 192

1   J.A. Chevalier - C O N F I D E N T I A L
2       A.   So I think as I've described in my
3   report, what I said in my report is absent the
4   existence of Google Books, I do not believe a
5   market for snippet display would arise.  That's
6   the opinion I express in my report.
7       Q.   But you're not expressing the
8   opposite?
9       A.   So I'm surely not expressing the
10   opposite of the opinion in my report, but what's
11   the -- what is your question?
12       Q.   You're not expressing the opinion
13   that if Google, we have -- Google Books now
14   exists?
15       A.   Yes.
16       Q.   And if a court determined that Google
17   could not legally display snippets, are you
18   expressing an opinion about whether or not
19   Google, as a matter economics, would enter into
20   a license to display snippets?
21       MR. McGOWAN:  Objection, incomplete
22       hypothetical.
23       You may answer.
24       A.   So I'm not expressing an opinion
25   about whether Google would enter into licenses

Page 193

1   J.A. Chevalier - C O N F I D E N T I A L
2   with rights holders.  They may well abandon the
3   project.  I don't know the answer to that.
4       MS. ZACK:  I don't have anymore
5       questions.
6       (Time noted:  2:59 p.m.)
7
8   _____
9   JUDITH A. CHEVALIER
10
11   Subscribed and sworn to before me
12   this _____ day of _____, 2012.
13
14   _____
15       Notary Public
16
17
18
19
20
21
22
23
24
25

49 (Pages 190 - 193)

Page 194

```
 1
 2            C E R T I F I C A T E
 3
 4  STATE OF NEW YORK    )
 5                 : ss.
 6  COUNTY OF NEW YORK   )
 7
 8      I, NANCY SORENSEN, Notary Public
 9  within and for the State of New York, do
10  hereby certify:
11      That JUDITH A. CHEVALIER, the witness
12  whose deposition is hereinbefore set forth,
13  was duly sworn by me and that such
14  deposition is a true record of the
15  testimony given by the witness.
16      I further certify that I am not
17  related to any of the parties to this
18  action by blood or marriage, and that I am
19  in no way interested in the outcome of this
20  matter.
21      IN WITNESS WHEREOF, I have hereunto
22  set my hand this 8TH day of JUNE, 2012.
23
24      _____
25            NANCY SORENSEN
```

Page 196

```
 1
 2  E X H I B I T S  (Cont'd)
 3
 4  Defendant's Exhibit 97, a series of pages   181
 5  from the Internet concerning the acquisition
 6  by Google of Rightsflow
 7
```

Page 195

```
 1
 2  ----------------- I N D E X -----------------
 3  WITNESS          EXAMINATION BY       PAGE
 4  JUDITH A. CHEVALIER MS. ZACK          4
 5
 6
 7  ---------- INFORMATION REQUESTS -------------
 8  DIRECTIONS:
 9  RULINGS:
10  TO BE FURNISHED:
11  REQUESTS: 20
12  MOTIONS:
13
14  ----------------- EXHIBITS -----------------
15  PLAINTIFF'S               FOR ID.
16
17  Plaintiff's Exhibit 95, Expert        4
18  Report of Judith A. Chevalier
19
20  Plaintiff's Exhibit 96, a number of   4
21  pages collected from Google's website
22  concerning the Partner Program
23
24
25
```

Page 197

```
 1      ERRATA SHEET
        VERITEXT REPORTING COMPANY
 2        1250 BROADWAY
          NEW YORK, NEW YORK 10001
 3        800-362-2520
 4  CASE: AUTHORS GUILD, ET AL. VS. GOOGLE, INC.
        DEPOSITION DATE: JUNE 8, 2012
 5  DEPONENT:  JUDITH A. CHEVALIER
 6  PAGE LINE(S)  CHANGE        REASON
 7  ___|___|_____|_____
 8  ___|___|_____|_____
 9  ___|___|_____|_____
10  ___|___|_____|_____
11  ___|___|_____|_____
12  ___|___|_____|_____
13  ___|___|_____|_____
14  ___|___|_____|_____
15  ___|___|_____|_____
16  ___|___|_____|_____
17  ___|___|_____|_____
18  ___|___|_____|_____
19  ___|___|_____|_____
20
21  _____
        JUDITH A. CHEVALIER
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20___.
24
    _____     _____
25  (NOTARY PUBLIC)     MY COMMISSION EXPIRES:
```

50 (Pages 194 - 197)

*Confidential*

**Errata Sheet**

Name of Case: THE AUTHORS GUILD, et al. v. GOOGLE, INC.

Date of Deposition: June 8, 2012

Name of Deponent: Professor Judith A. Chevalier

| Page | Line | Change | To | Reason |
|------|------|--------|-----|--------|
| 5 | 12 | analysis group | Analysis Group | Typographical error |
| 11 | 23 | So that in that case | So in that case | Misquote |
| 18 | 12 | listing of members of publishers that were | listing of members - of publishers that were members | Punctuation error |
| 22 | 22 | I did similar | I did similarly | Misquote |
| 23 | 8 | variety of platform | variety of platforms | Misquote |
| 24 | 17 | on his reports | on his report | Typographical error |
| 26 | 8-11 | this is "Amazon announces the first publicly available source. Amazon announces sales impact from new Search Inside the Book features." | this is "Amazon announces..." – the first publicly available source – "Amazon announces sales impact from new Search Inside the Book features." | Punctuation error |
| 36 | 19-20 | all of the books in the partner Program | all of their books in the Partner Program` | Misquote |
| 38 | 9 | some cost | some costs | Typographical error |
| 38 | 22 | why my understanding | why -- my understanding | Typographical error |
| 44 | 16-18 | and so to the extent that, you know, copyrights and perhaps they play a particular role in the economics of technology | and so to the extent that, you know, copyrights and patents play a particular role in the economics of technology | Misquote |
| 46 | 8 | compliment | complement | Misquote |
| 48 | 6 | opinions about their | opinions about the | Misquote |
| 48 | 11 | Expert reports for academic | Expert reports or academic | Misquote |
| 50 | 10 | the deposition Stephane | the deposition of Stephane | Missing word |
| 55 | 24 | the add revenues | the ad revenues | Misquote |

*Confidential*

| 60 | 19-25 | On the preview page for your book, we display a set of links to buy the books at the major retailers, as well as to a site of your choice.<br><br>    These links are not paid for by the site features. Clicking on a link to purchase your book at an on-line retailer, won't generate any revenue directly. | "On the preview page for your book, we display a set of links to buy the books at the major retailers, as well as to a site of your choice.<br><br>    "These links are not paid for by the site features. Clicking on a link to purchase your book at an on-line retailer, won't generate any revenue directly." | Missing punctuation |
|---|---|---|---|---|
| 61 | 17-18 | combined with what do I earn from the program, | combined with "what do I earn from the program," | Missing punctuation |
| 61 | 20-21 | and what do I earn from this program | and "what do I earn from this program" | Missing punctuation |
| 63 | 23-24 | interest in demand | interest and demand | Misquote |
| 71 | 4 | is a compliment | is a complement | Misquote |
| 80 | 18 | So is my understanding | So it is my understanding | Missing word |
| 93 | 6-7 | the message you have searched this book too many times | the message "you have searched this book too many times" | Missing punctuation |
| 108 | 5 | Well, I may | While I may | Misquote |
| 108 | 19-21 | the important test for whether tests for whether a good is a new good | the important test for whether -- tests for whether a good is a new good | Missing punctuation |
| 111 | 4 | is a compliment | is a complement | Misquote |
| 112 | 15 | as I explained in the thing | as I explained in the beginning | Misquote |
| 113 | 5 | That's if's | That's if | Misquote |
| 113 | 21 | is the scan | is the scanned | Typographical error |
| 114 | 7-8 | Google has provided the functionality of two libraries for libraries | Google has provided the functionality to libraries --  for libraries | Misquote |
| 115 | 15-16 | that at the output | that the output | Misquote |
| 116 | 16 | use of the word employs | use of the word "employs" | Missing punctuation |

*Confidential*

| 122 | 17-18 | I'm not an expert in the exactity of exactly how | I'm not an expert in exactly how | Misquote |
|-----|-------|---------------------------------------------------|----------------------------------|----------|
| 124 | 3 | Google Go Books | Google Books | Typographical error |
| 127 | 19 | more relevant in the marketplace | more prevalent in the marketplace | Misquote |
| 129 | 18 | ff I | if I | Typographical error |
| 130 | 9 | moved to those books off | sold those books off | Misquote |
| 138 | 6 | there's a number sites | there's a number of cites | Misquote |
| 139 | 6 | As though | Although | Typographical error |
| 140 | 5 | I'm exactly sure | I'm not exactly sure | Missing word |
| 143 | 18 | If the publisher wasn't more | If the publisher wants more | Typographical error |
| 151 | 16-19 | My analysis is neither assuming, nor expressing an opinion about what Google does. It's about what whether Google does is a fair use | My analysis is neither assuming, nor expressing an opinion about whether what Google does.  It isn't about whether what Google does is fair use | Misquote |
| 154 | 25 | primarily | primary | Misquote |
| 160 | 11 | compliment | complement | Misquote |
| 172 | 5 | is that the | is the | Extra word |
| 172 | 19 | The word | they were | Misquote |
| 180 | 8 | disbursed | dispersed | Misquote |
| 180 | 16 | disbursed | dispersed | Misquote |
| 180 | 18 | disbursed | dispersed | Misquote |
| 183 | 5 | by which | about which | Misquote |
| 189 | 15 | disbursed | dispersed | Misquote |
| 189 | 24 | disbursed | dispersed | Misquote |
| 190 | 4 | disbursed | dispersed | Misquote |
| 190 | 9 | disbursed | dispersed | Misquote |
| 190 | 11 | disbursed | dispersed | Misquote |
| 190 | 12 | disbursed | dispersed | Misquote |

*Confidential*

Judith A. Chevalier
July 11, 2012

Page 193

1      J.A. Chevalier  -  C O N F I D E N T I A L

2    with rights holders.  They may well abandon the

3    project.  I don't know the answer to that.

4             MS. ZACK:  I don't have anymore

5       questions.

6             (Time noted:  2:59 p.m.)

7

8    _____

9      JUDITH A. CHEVALIER

10

11   Subscribed and sworn to before me

12   this _____ day of _____, 2012.

13

14   _____

15             Notary Public

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 43**

DURIE TANGRI LLP
DARALYN J. DURIE (*Pro Hac Vice*)
ddurie@durietangri.com
JOSEPH C. GRATZ (*Pro Hac Vice*)
jgratz@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

Attorneys for Defendant
Google Inc.

### IN THE UNITED STATES DISTRICT COURT

### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES, JOSEPH GOULDEN, and JIM BOUTON, on behalf of themselves and all other similarly situated, | |
| Plaintiffs, | Civil Action No. 05 CV 8136 (DC) |
| v. | **ECF Case** |
| GOOGLE INC., | |
| Defendant. | |

### DEFENDANT GOOGLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 26 and 33, Defendant Google Inc. ("Google"), by its attorneys, hereby responds and objects to Plaintiffs' First Set of Interrogatories (the "Interrogatories") dated March 14, 2012.

These responses are based on the information currently available to Google.  Google reserves the right to amend, supplement or modify its responses and objections at any time in the event that it obtains additional or different information.

## GENERAL OBJECTIONS

1.      Google objects to the preface, instructions, and definitions to the Requests to the extent that they purport to impose obligations that exceed those imposed by the Federal Rules of Civil Procedure, relevant local rules, and applicable case law.  In responding to these requests, Google has followed the applicable law and has ignored the improper preface, instructions, and definitions.

2.      Google objects to the Requests in their entirety and to each request to the extent that the documents and information sought are protected from discovery by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

3.      Google objects to each and every request to the extent that it seeks information that is confidential and/or proprietary information.  To the extent not otherwise subject to objection, Google will provide such confidential information in accordance with the terms of the protective order entered in this case.

4.      Google objects to Plaintiffs' definition of "Google" as vague, ambiguous, unintelligible, and overly broad.  For purposes of responding to these discovery requests, Google will interpret "Google" to mean Google, Inc. and/or its agents.

1

<u>**RESPONSES AND OBJECTIONS TO INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 1:**</u>

Identify all factual and legal bases supporting Google's defense that its digital copying in libraries of Books in their entirety is a fair use under 17 U.S.C. § 107, including without limitation all facts Google intends to rely on with respect to the four factors set forth in Section 107.

<u>**RESPONSE TO INTERROGATORY NO. 1:**</u>

Google objects to this interrogatory to the extent it calls for attorney-client privileged information, attorney work product, or information protected by any other privilege or immunity. Google objects to this interrogatory's use of the term "digital copying in libraries of Books" is vague and ambiguous, and understands it to refer to Google's digitization of Books from library collections. Google objects to this interrogatory to the extent it seeks more than "the claims and contentions" of Google, as permitted by Local Civil Rule 33.3(c). Subject to and without waiving these objections, Google responds as follows:

Google's digitization of Books from library collections is a fair use under 17 U.S.C. § 107. Specifically:

- The "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," weighs in favor of a finding of fair use.
    - The purpose and character of Google's use is transformative, because it adds something new, with a further purpose or different character, and does not merely supersede the objects of the original.
        - The purpose of Google's use is to assist users in identifying Books which may be of interest by creating a search engine by which the text of Books may be searched.

- Google's digitized copies do not serve as a substitute for Books, but rather are necessary to create Google's book search engine, which is a new tool for finding books.

  - The nature of Google's use is at least partially noncommercial, because the use facilitates access to the collections of libraries, enables research and scholarship, and does not directly generate revenue for Google.

- The "nature of the copyrighted work" weighs in favor of a finding of fair use.

  - All of the Books at issue have been published.

  - Some of the Books at issue are factual in nature, and as to those Books, this factor tilts more strongly in favor of a finding of fair use.

  - Some of the Books at issue are less factual in nature, and as to those Books, this factor tilts less strongly in favor of a finding of fair use.

  - Some of the Books at issue are out of print, and as to those Books, this factor tilts more strongly in favor of a finding of fair use.

  - Some of the Books at issue are in print, and as to those Books, this factor tilts less strongly in favor of a finding of fair use.

- The "amount and substantiality of the portion used in relation to the copyrighted work as a whole" weighs in favor of a finding of fair use.

  - Because the use is transformative, and the use of the whole is necessary to the transformative purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified, the digitization of the entire work does not militate against a finding of fair use.

- The "effect of the use upon the potential market for or value of the copyrighted work" weighs in favor of a finding of fair use.
  - A search engine is not a market substitute for a book.
  - The effect of the use on the traditional market for the sale of Books is positive, because it enables the creation of a search engine by which the text of books may be searched so that books of interest may be identified.
  - There is no market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified.
  - The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified is not a traditional market.
  - The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified is not a reasonable market.
  - The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified is not a market which is likely to be developed.
  - The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified is a transformative market, and is thus not cognizable.
- Balanced in light of the purposes of copyright, the four factors favor fair use.
  - Each factor either favors fair use or is neutral.

- A finding of fair use promotes the purpose of copyright, which is to promote the dissemination of knowledge by granting limited exclusive rights to authors. Google's use promotes the dissemination of knowledge, by assisting users in identifying books which may be of interest, while not serving as a substitute for the Books themselves.

In addition, Google's use is fair because it is necessary to the fair use purpose set forth in Google's response to Interrogatory No. 3.  Google reserves the right to make different or additional contentions for the purpose of rebutting Plaintiffs' contentions.  Pursuant to the agreement of the parties, Google is willing to meet and confer in good faith in the event Plaintiffs require additional details regarding the contentions identified herein.

**INTERROGATORY NO. 2:**

Identify all factual and legal bases supporting Google's defense that its distribution to libraries of entire digital copies of Books is a fair use under 17 U.S.C. § 107, including without limitation all facts Google intends to rely on with respect to the four factors set forth in Section 107.

**RESPONSE TO INTERROGATORY NO. 2:**

Google objects to this interrogatory to the extent it calls for attorney-client privileged information, attorney work product, or information protected by any other privilege or immunity. Google objects to this interrogatory to the extent it seeks more than "the claims and contentions" of Google, as permitted by Local Civil Rule 33.3(c).  Subject to and without waiving these objections, Google responds as follows:

Google does not distribute entire digital copies of Books to libraries.  Rather, Google makes available to libraries an automated system, called GRIN, by which a library may choose to create and download digital copies of Books which have been scanned from its collection.  A

library performs the volitional acts which result in the creation of the digital copies which are created by the GRIN system and which result in the transmission of the content of those digital copies to that library.  Accordingly, Google can be at most liable under doctrines of secondary liability, and cannot be directly liable for the library copies.

Google is not secondarily liable with respect to the library copies.  First, Google is not secondarily liable with respect to the library copies under any theory of secondary liability because there is no underlying act of direct infringement by the libraries, since the libraries' volitional acts in creating and downloading the library copies are fair use, not infringement. Second, Google is not vicariously liable because vicarious liability requires a financial benefit directly attributable to the particular infringing activity, and Google does not derive any financial benefit directly attributable to the library copies.  Third, Google is not liable under a theory of contributory liability because (1) the GRIN system has at least substantial noninfringing uses; (2) the libraries were and are contractually bound to use the GRIN system only in a noninfringing manner; and (3) Google lacks knowledge of any use of the GRIN system which is infringing, as opposed to fair use.

The libraries' volitional acts in creating and downloading the library copies are fair use under 17 U.S.C. § 107.  Specifically:

- The libraries' use is in part for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research.

- The "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," weighs in favor of a finding of fair use.

- o The purpose and character of the libraries' use is transformative, because it adds something new, with a further purpose or different character, and does not merely supersede the objects of the original.

    - ▪ One purpose of the libraries' use is to assist users in identifying books which may be of interest by creating a search engine by which the text of books may be searched.

    - ▪ The libraries' digitized copies do not serve as a substitute for Books, but rather are necessary to create the libraries' book search engine, which is a new tool for finding books.

- o The nature of the libraries' use is entirely for nonprofit educational purposes.

- The "nature of the copyrighted work" weighs in favor of a finding of fair use.

    - o All of the Books at issue have been published.

    - o Some of the Books at issue are factual in nature, and as to those Books, this factor tilts more strongly in favor of a finding of fair use.

    - o Some of the Books at issue are less factual in nature, and as to those Books, this factor tilts less strongly in favor of a finding of fair use.

    - o Some of the Books at issue are out of print, and as to those Books, this factor tilts more strongly in favor of a finding of fair use.

    - o Some of the Books at issue are in print, and as to those Books, this factor tilts less strongly in favor of a finding of fair use.

- The "amount and substantiality of the portion used in relation to the copyrighted work as a whole" weighs in favor of a finding of fair use.

- o Because the use is transformative, and the use of the whole is necessary to the transformative purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified, the digitization of the entire work does not militate against a finding of fair use.

- The "effect of the use upon the potential market for or value of the copyrighted work" weighs in favor of a finding of fair use.

  - o A search engine is not a market substitute for a Book.

  - o The effect of the use on the traditional market for the sale of Books is positive, because it enables the creation of a search engine by which the text of books may be searched so that books of interest may be identified.

  - o There is no market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified or for the creation of a "dark archive."

  - o The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified or for the creation of a "dark archive" is not a traditional market.

  - o The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified or for the creation of a "dark archive" is not a reasonable market.

  - o The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified or for the creation of a "dark archive" is not a market which is likely to be developed.

- o The market for a license to scan Books for the purpose of creating a search engine by which the text of books may be searched so that books of interest may be identified or for the creation of a "dark archive" is a transformative market, and is thus not cognizable.

- Balanced in light of the purposes of copyright, the four factors favor fair use.
  - o Each factor either favors fair use or is neutral.
  - o A finding of fair use promotes the purpose of copyright, which is to promote the dissemination of knowledge by granting limited exclusive rights to authors.  The libraries' use promotes the dissemination of knowledge, by assisting users in identifying books which may be of interest, while not serving as a substitute for the Books themselves.

Google provides this response as a courtesy to Plaintiffs, and the burden of proving infringement (be it direct or secondary) remains with Plaintiffs.  To the extent Google performed any volitional act with respect to library copies, which Google denies, Google's conduct was fair use because it was necessary to the foregoing fair use purposes and was conducted at the behest of the libraries expressly for the purpose of achieving the foregoing fair use purposes.  Google reserves the right to make different or additional contentions for the purpose of rebutting Plaintiffs' contentions.  Pursuant to the agreement of the parties, Google is willing to meet and confer in good faith in the event Plaintiffs require additional details regarding the contentions identified herein.

**INTERROGATORY NO. 3:**

Identify all factual and legal bases supporting Google's defense that its display of verbatim expression from Books in response to search requests is a fair use under 17 U.S.C. §

107, including without limitation all facts Google intends to rely on with respect to the four factors set forth in Section 107.

## RESPONSE TO INTERROGATORY NO. 3:

Google objects to this interrogatory to the extent it calls for attorney-client privileged information, attorney work product, or information protected by any other privilege or immunity. Google objects to this interrogatory's use of the term "display of verbatim expression from Books in response to search requests" is vague and ambiguous, and understands it to refer to Google's display of snippets of Books from library collections in response to search requests. Google objects to this interrogatory to the extent it seeks more than "the claims and contentions" of Google, as permitted by Local Civil Rule 33.3(c). Subject to and without waiving these objections, Google responds as follows:

Google's display of snippets of Books from library collections in response to search results is a fair use under 17 U.S.C. § 107. Specifically:

- The "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," weighs in favor of a finding of fair use.
    - The purpose and character of Google's use is transformative, because it adds something new, with a further purpose or different character, and does not merely supersede the objects of the original.
        - The display of snippets is important to helping users find books which may be of interest.
        - The snippets displayed do not serve as a substitute for Books, but instead serve as a tool to identify books which are of interest.

- ▪ Snippets are not displayed with respect to those Books for which there is a possibility that a snippet could serve as a substitute for a Book, such as dictionaries and books of quotations.
    - o The nature of Google's use is at least partially noncommercial, because the use facilitates access to the collections of libraries, enables research and scholarship, and does not directly generate revenue for Google.
- The "nature of the copyrighted work" weighs in favor of a finding of fair use.
    - o All of the Books at issue have been published.
    - o Some of the Books at issue are factual in nature, and as to those Books, this factor tilts more strongly in favor of a finding of fair use.
    - o Some of the Books at issue are less factual in nature, and as to those Books, this factor tilts less strongly in favor of a finding of fair use.
    - o Some of the Books at issue are out of print, and as to those Books, this factor tilts more strongly in favor of a finding of fair use.
    - o Some of the Books at issue are in print, and as to those Books, this factor tilts less strongly in favor of a finding of fair use.
    - o Some of the snippets at issue are factual in nature, and as to those snippets, this factor tilts more strongly in favor of a finding of fair use.
    - o Some of the snippets at issue are less factual in nature, and as to those snippets, this factor tilts less strongly in favor of a finding of fair use.
- The "amount and substantiality of the portion used in relation to the copyrighted work as a whole" weighs in favor of a finding of fair use.
    - o Snippets are displayed only in response to user search queries.

- o Each snippet is only approximately one-eighth of a page.

- o At maximum, three snippets are displayed in response to a particular search query.

- o Only snippets containing the user's search query are displayed.

- o The location of a snippet on a page is fixed.

- o Some snippets are blacklisted.

- o Some pages are blacklisted.

- o Measures are in place to prevent any one user, or users in the aggregate, from abusing the system by repeated queries.

- o Some of the snippets at issue are taken from long books, and as to those snippets this factor tilts more strongly in favor of fair use.

- o Some of the snippets at issue are taken from short books, and as to those snippets this factor tilts less strongly in favor of fair use.

- The "effect of the use upon the potential market for or value of the copyrighted work" weighs in favor of a finding of fair use.

  - o A snippet is not a market substitute for a Book.

  - o The effect of the use on the traditional market for the sale of Books is positive, because it enables the creation of a search engine by which the text of books may be searched so that books of interest may be identified.

  - o There is no market for a license to display short snippets as part of a search engine so that books of interest may be identified.

  - o The market for a license to display short snippets as part of a search engine so that books of interest may be identified is not a traditional market.

12

- o The market for a license to display short snippets as part of a search engine so that books of interest may be identified is not a reasonable market.

- o The market for a license to display short snippets as part of a search engine so that books of interest may be identified is not a market which is likely to be developed.

- o The market for a license to display short snippets as part of a search engine so that books of interest may be identified is a transformative market, and is thus not cognizable.

- Balanced in light of the purposes of copyright, the four factors favor fair use.

  - o Each factor either favors fair use or is neutral.

  - o A finding of fair use promotes the purpose of copyright, which is to promote the dissemination of knowledge by granting limited exclusive rights to authors. Google's use promotes the dissemination of knowledge, by assisting users in identifying books which may be of interest, while not serving as a substitute for the Books themselves.

Google reserves the right to make different or additional contentions for the purpose of rebutting Plaintiffs' contentions.  Pursuant to the agreement of the parties, Google is willing to meet and confer in good faith in the event Plaintiffs require additional details regarding the contentions identified herein.

**<u>INTERROGATORY NO. 4:</u>**

Identify by title, author, publisher and ISBN (if applicable) all Books as to which Google claims a license to digitally copy in full, and for each Book identify all factual and legal bases supporting the defense of license.

**RESPONSE TO INTERROGATORY NO. 4:**

Google objects to this interrogatory to the extent it calls for attorney-client privileged information, attorney work product, or information protected by any other privilege or immunity. Google objects to this interrogatory to the extent it seeks more than "the claims and contentions" of Google, as permitted by Local Civil Rule 33.3(c).  Subject to and without waiving these objections, Google responds as follows:

Google claims the defense of license with respect to those Books listed in the document bearing Bates number GOOG05004752.  Google is permitted by law, at least under the doctrine of fair use, to digitally copy in full all of the remaining Books at issue, as set forth in Google's response to Interrogatory No. 1.  Google reserves the right to make different or additional contentions for the purpose of rebutting Plaintiffs' contentions.  Pursuant to the agreement of the parties, Google is willing to meet and confer in good faith in the event Plaintiffs require additional details regarding the contentions identified herein.

**INTERROGATORY NO. 5:**

Identify by title, author, publisher and ISBN (if applicable) all Books as to which Google claims a license to distribute digital copies to libraries, and for each Book identify all factual and legal bases supporting the defense of license.

**RESPONSE TO INTERROGATORY NO. 5:**

Google objects to this interrogatory to the extent it calls for attorney-client privileged information, attorney work product, or information protected by any other privilege or immunity. Google objects to this interrogatory to the extent it seeks more than "the claims and contentions" of Google, as permitted by Local Civil Rule 33.3(c).  Subject to and without waiving these objections, Google responds as follows:

Google claims the defense of license with respect to those Books listed in the document bearing Bates number GOOG05004752.  Google is permitted by law, at least under the doctrine of fair use, to digitally copy in full all of the remaining Books at issue, as set forth in Google's response to Interrogatory No. 1.  Google reserves the right to make different or additional contentions for the purpose of rebutting Plaintiffs' contentions.  Pursuant to the agreement of the parties, Google is willing to meet and confer in good faith in the event Plaintiffs require additional details regarding the contentions identified herein.

**INTERROGATORY NO. 6:**

Identify by title, author, publisher and ISBN (if applicable), all Books as to which Google claims a license to display verbatim expression in response to search requests, and for each book identify all factual and legal bases supporting the defense of license.

**RESPONSE TO INTERROGATORY NO. 6:**

Google objects to this interrogatory to the extent it calls for attorney-client privileged information, attorney work product, or information protected by any other privilege or immunity. Google objects to this interrogatory to the extent it seeks more than "the claims and contentions" of Google, as permitted by Local Civil Rule 33.3(c).  Subject to and without waiving these objections, Google responds as follows:

Google claims the defense of license with respect to those Books listed in the document bearing Bates number GOOG05004752.  Google is permitted by law, at least under the doctrine of fair use, to digitally copy in full all of the remaining Books at issue, as set forth in Google's response to Interrogatory No. 1.  Google reserves the right to make different or additional contentions for the purpose of rebutting Plaintiffs' contentions.  Pursuant to the agreement of the parties, Google is willing to meet and confer in good faith in the event Plaintiffs require additional details regarding the contentions identified herein.

## INTERROGATORY NO. 7:

Identify any and all affirmative defenses other than fair use and license which Google claims in this case and, for each such defense, identify all factual and legal bases supporting such defense.

## RESPONSE TO INTERROGATORY NO. 7:

Google objects to this interrogatory to the extent it calls for attorney-client privileged information, attorney work product, or information protected by any other privilege or immunity. Google objects to this interrogatory to the extent it seeks more than "the claims and contentions" of Google, as permitted by Local Civil Rule 33.3(c).  Subject to and without waiving these objections, Google responds as follows:

Google does not claim any affirmative defenses other than fair use and license affirmative defenses with respect to Plaintiffs' claims of direct copyright infringement as to Books scanned from the collections of libraries, but does not intend to waive any such defenses to the extent they overlap with Google's fair use and license defenses.  Google reserves the right to present different or additional affirmative defenses in the event Plaintiffs make other or further claims, or for the purpose of rebutting Plaintiffs' contentions.  Google reserves the right to present defenses which rebut or negate elements upon which Plaintiffs bear the burden, which defenses are not encompassed within this interrogatory because they are not affirmative defenses.  Pursuant to the agreement of the parties, Google is willing to meet and confer in good faith in the event Plaintiffs require additional details regarding the contentions identified herein.

Dated:  April 27, 2012                    Respectfully submitted,


By:   _/s/ Joseph C. Gratz_____
        Daralyn J. Durie (*pro hac vice*)
        ddurie@durietangri.com
        Joseph C. Gratz (*pro hac vice*)
        jgratz@durietangri.com
        DURIE TANGRI LLP
        217 Leidesdorff Street
        San Francisco, CA  94111
        Telephone:  415-362-6666
        Facsimile:  415-236-6300

        Attorneys for Defendant Google Inc.

## <u>PROOF OF SERVICE</u>

I am a citizen of the United States and resident of the State of California.  I am employed in San Francisco County, State of California, in the office of a member of the State Bar of California, at whose direction the service was made.  I am over the age of eighteen years, and not a party to the within action.  My business address is 217 Leidesdorff Street, San Francisco, CA 94111.

On April 27, 2012, I served the following document(s) in the manner described below:

**DEFENDANT GOOGLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**



☐ (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Durie Tangri LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Francisco, California.

☐ (BY MESSENGER SERVICE) by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐ (BY FACSIMILE)  I am personally and readily familiar with the business practice of Durie Tangri LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Durie Tangri LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE:  By electronically mailing a true and correct copy through Durie Tangri's electronic mail system from jcotton@durietangri.com to the email addresses set forth below.

☐ (BY PERSONAL DELIVERY) I caused such envelope to be delivered by hand to the offices of each addressee below.

On the following part(ies) in this action:

> Michael J. Boni
> Joanne E. Zack
> BONI & ZACK LLC
> 15 St. Asaphs Road
> Bala Cynwyd, PA 19004
> Telephone:  610-822-0200
> Fax:  610-822-0206
> Email: mboni@bonizack.com
>       jzack@bonizack.com
>
> Attorneys for Plaintiffs

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 27, 2012, in San Francisco, California.

_____
*/s/ Janelle Cotton*
Janelle Cotton

19