Michael J. Boni (pro hac vice)
Joanne Zack
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
(610) 822-0200 (phone)
(610) 822-0206 (fax)
MBoni@bonizack.com
JZack@bonizack.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| The Authors Guild, Inc., Associational Plaintiff, Betty Miles, Joseph Goulden, and Jim Bouton, individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>Google Inc.,<br><br>　　　　　　　Defendant. | ：<br>：<br>：<br>：<br>：<br>：<br>：<br>：<br>：<br>：<br>：<br>：<br>：<br>： | Case No. 05 CV 8136-DC<br><br><br>~~FILED UNDER SEAL~~<br><br>**ECF CASE** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**(PUBLIC REDACTED VERSION)**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(a) of the Local

Rules of the Southern District of New York, Representative Plaintiffs Betty Miles, Joseph C.

Goulden, and Jim Bouton, and Associational Plaintiff The Authors Guild, Inc., individually and

on behalf of all others similarly situated, submit the following statement of undisputed facts.

## UNDISPUTED FACTS

1. Representative plaintiff Jim Bouton holds the United States copyright in BALL FOUR (registration number A173097). *See* Copy of U.S. Copyright Registration No. A173097 for JIM BOUTON, BALL FOUR (Declaration of Joanne Zack in Support of Plaintiffs' Motion for Partial Summary Judgment (hereinafter "Zack SJ Decl.") Ex. 1).

2. Representative plaintiff Betty Miles holds the United States copyright in THE TROUBLE WITH THIRTEEN (registration number TX0000338841). *See* Copy of U.S. Copyright Registration No. TX0000338841 for BETTY MILES, THE TROUBLE WITH THIRTEEN (Zack SJ Decl. Ex. 2).

3. Representative plaintiff Joseph Goulden holds the United States copyright in THE SUPERLAWYERS: THE SMALL AND POWERFUL WORLD OF THE GREAT WASHINGTON LAW FIRMS (registration number A346254). *See* Copy of U.S. Copyright Registration No. A346254 for JOSEPH GOULDEN, THE SUPERLAWYERS: THE SMALL AND POWERFUL WORLD OF THE GREAT WASHINGTON LAW FIRMS (Zack SJ Decl. Ex. 3).

4. Each of the books identified in Nos. 1-3 above has been copied and displayed by Google in its Library Project without plaintiffs' permission. *See* Print-outs from Google's website displaying search results in JIM BOUTON, BALL FOUR (Zack SJ Decl. Ex. 4); Print-outs from Google's website displaying search results for the term "pitch" in JIM BOUTON, BALL FOUR (Zack SJ Decl. Ex. 5); Print-outs from Google's website displaying search results for the term "pitches" in JIM BOUTON, BALL FOUR (Zack SJ Decl. Ex. 6); Print-outs from Google's website displaying search results in BETTY MILES, THE TROUBLE WITH THIRTEEN (Zack SJ Decl. Ex. 7); Print-outs from Google's website displaying search results in JOSEPH GOULDEN, THE SUPERLAWYERS: THE SMALL AND POWERFUL WORLD OF THE GREAT WASHINGTON LAW FIRMS

(Zack SJ Decl. Ex. 8); Defendant Google Inc.'s Responses and Objections to Plaintiff's First Set of Requests for Admission (hereinafter "Google Admissions") at 11 (Zack SJ Decl. Ex. 27).

5.      Google had distributed approximately 2.7 million scanned books to the partnering libraries, as of March 26, 2012. *See* Zack SJ Decl. Ex. 9 (excerpts from spreadsheet produced by Google to plaintiffs on March 26, 2012).

6.      Digital copies of BALL FOUR and SUPERLAWYERS have been distributed to the University of California library: BALL FOUR on July 20, 2010, and SUPERLAWYERS twice, on July 29, 2009, and November 16, 2010. *See id.*

7.      The Authors Guild, Inc. is the nation's largest organization of published authors. Print-out from http://www.authorsguild.org/about/history.html (Zack SJ Decl. Ex. 10).

8.      The Authors Guild advocates for and supports the copyright and contractual interests of published writers. *Id.*

9.      Defendant Google Inc. ("Google") owns and operates the largest Internet search engine in the world. *See* Print-out from http://investor.google.com/corporate/faq.html ("Google is now widely recognized as the world's largest search engine.") (Zack SJ Decl. Ex. 11, p.1).

10.     Each day, millions of people use Google's search engine free of charge, while commercial and other entities pay to display ads to visitors to Google's websites and other websites that contain Google ads. *See* Google Dec. 14, 2004 press release, "Google Checks Out Library Books," p.2 (Zack SJ Decl. Ex. 12).

11.     For the year ended December 31, 2011, Google reported over $36.5 billion in "advertising revenues." 2011 Google Form 10-K, p.56 (Zack SJ Decl. Ex. 13).

12.     For the year ended December 31, 2010, Google reported over $29 billion in revenue generated "primarily by delivering relevant, cost-effective online advertising."

*See* 2010 Google Form 10-K, p.3 (Zack SJ Decl. Ex. 14).

13.    In October 2004, Google first announced its digital books program, calling it Google Print. *See* GOOG000101103 (noting that Google Print was launched on October 6, 2004) (Zack SJ Decl. Ex. 15); *see also* Transcript of deposition of Daniel Clancy taken February 10, 2012 (hereinafter "Clancy Dep.") at 93-94 (Zack SJ Decl. Ex. 16).

14.    Google Print later became Google Books. Clancy Dep. at 94 (Zack SJ Decl. Ex. 16).

15.    Google's Partner Program together with Google's Library Project comprise the Google Books program. *Id.*

16.    Works in the Partner Program are displayed with permission of the rightsholder. Clancy Dep. at 215 (Zack SJ Decl. Ex. 16); Google Books Partner Program Standard Terms and Conditions (hereinafter "Terms and Conditions") ¶¶ 2-3 (Zack SJ Decl. Ex. 17).

17.    Since 2004, the Partner Program has allowed publishers and other rightsholders to permit Google to display their works in exchange for a split of ad revenue. GOOG000101103 (Zack SJ Decl. Ex. 15); Clancy Dep. at 93 (Zack SJ Decl. Ex. 16).

18.    The Partner Program is aimed at "help[ing] publishers sell books" and "help[ing] books become discovered," while "adding authoritative content" to Google's website. Transcript of the deposition of Thomas Turvey taken February 17, 2012 (hereinafter "Turvey Dep.") at 18-19 (Zack SJ Decl. Ex. 18).

19.    To participate in the program, rightsholders enter into a contract with Google and send a printed copy of their books to Google for scanning (or provide Google with an existing digital copy). Clancy Dep. at 215 (Zack SJ Decl. Ex. 16); Terms and Conditions ¶¶ 2-3 (Zack SJ Decl. Ex. 17).

20.    Partners decide "how much of the book is browsable" on Google, "anywhere from a few sample pages to the whole book." *See* Print-out from http://support.google.com/books/bin/answer.py?hl=en&answer=43729/ (Zack SJ Decl. Ex. 19).

21.    Google agrees to share with its partners a portion of the revenue it earns from ads shown next to pages of books searched in the Partner Program. Turvey Dep. at 31 (Zack SJ Decl. Ex. 18); Terms and Conditions ¶ 8 (Zack SJ Decl. Ex. 17).

22.    During 2004, Google entered into dozens of contracts with publishers covering tens of thousands of books. GOOG000101103 (Zack SJ Decl. Ex. 15).

23.    By 2004 year end, Google had received nearly 200,000 books for the Partner Program, even though Google's extensive outreach efforts focused almost exclusively on publishers, with little or no attempt to sign up authors. *Id.*; Turvey Dep. at 76-80 (Zack SJ Decl. Ex. 18); Clancy Dep. at 93 (Zack SJ Decl. Ex. 16).

24.    As of early 2012, the Partner Program included approximately 2.5 million books, by permission of approximately 45,000 rightsholders, with the number of partners continuing to grow. Turvey Dep. at 32 (Zack SJ Decl. Ex. 18).

25.    Google publicly announced a new program in December 2004, stating that it had entered into agreements with four university libraries (Harvard, Stanford, the University of Michigan, and Oxford) and the New York Public Library to "digitally scan books from their collections so that users worldwide can search them in Google." Dec. 14, 2004 Google press release, "Google Checks Out Library Books" (Zack SJ Decl. Ex. 12, p.1).

26.    Google refers to the endeavor identified above in No. 25 as its Library Project. Clancy Dep. at 33-34 (Zack SJ Decl. Ex. 16); June 6, 2007 Google press release, "Committee on Institutional Cooperation (CIC) Joins Google's Library Project" (Zack SJ Decl. Ex. 20).

27.    Since its December 2004 announcement, Google has entered into agreements with additional libraries (such as the Library of Congress, University of Texas at Austin, University of Virginia, University of Wisconsin-Madison, Columbia University, Cornell University, Princeton University, University of California, and the Committee on Institutional Cooperation (a consortium of twelve research universities)). June 6, 2007 Google press release, "Committee on Institutional Cooperation (CIC) Joins Google's Library Project" (Zack SJ Decl. Ex. 20); Zack SJ Decl. Ex. 23 (compilation of agreements between Google and the various libraries, hereinafter "Library Agreements").

28.    Google has also developed and patented scanning technology that allows library books to be copied. Clancy Dep. at 14, 211 (Zack SJ Decl. Ex. 16).

29.    Google has used this technology to copy the entirety of over twenty million books. *See id.* at 30; Declaration of Daniel Clancy in Support of Google Inc.'s Opposition to Plaintiffs' Motion for Class Certification (hereinafter "Clancy Decl.") ¶ 4 (Zack SJ Decl. Ex. 21).

30.    In exchange for access to a library's print books, Google distributes digital copies of the scanned books to the contributing library. *See* Print-out from http://support.google.com/books/bin/answer.py?hl=en&answer=43751 ("Each library will receive a digital copy of every book we scan … from their respective collections.") (Zack SJ Decl. Ex. 22); Clancy Dep. at 44-45 (Zack SJ Decl. Ex. 16).

31.    To carry out its scanning *en masse*, Google set up scanning facilities in Mountain View, California, where Google is headquartered, as well as in Ann Arbor and near Boston. Clancy Dep. at 180-81 (Zack SJ Decl. Ex. 16).

32.    For some libraries, Google undertook "selective scanning," which entailed a library identifying a collection or set of books, and Google determining which books it had

6

already scanned or planned to scan from another library partner, to avoid duplicative scanning and to "increase efficiency." *Id.* at 185-86.

33.     The "selection" process identified in No. 32 above was unrelated to the content of the book. *Id.* at 187.

34.     Google engaged in "bulk scanning," with libraries providing "carts of books" for Google to scan. *Id.* at 15, 103.

35.     Google's scanning operations involved approximately three hundred scanning machines, and reached an annual budget of $30 to $40 million for the scanning alone. *Id.* at 84-85, 179.

36.     Some libraries (*e.g.*, the New York Public Library, Harvard, Columbia, and Princeton) allowed Google to scan only public domain works, while others (*e.g.*, the Universities of California, Michigan, Wisconsin, Cornell, University of Virginia, CIC, Stanford, and Texas) allowed Google to scan in-copyright works as well. *See generally* Library Agreements (Zack SJ Decl. Ex. 23); Clancy Dep. at 19 ("Harvard, New York Public Library, Columbia, and I believe Princeton is only providing us public domain.").

37.     A "large number" of independent contractors – "on the order of hundreds" – served as Google's scanning operators who performed the physical scanning, often working five to six days per week, two shifts per day. Clancy Dep. at 14, 181 (Zack SJ Decl. Ex. 16).

38.     In scanning up to four million books per year, Google's contractors did not make any judgments concerning a book's content. *Id.* at 182-83.

39.     Google copies every book its library partners provide, regardless of content, unless (a) Google determines that it already has or will copy the book from another library; (b) the book is physically not fit to be copied; or (c) Google has received a specific request from a

copyright owner not to scan the book. *See* Transcript of the deposition of Kurt Groetsch (hereinafter "Groetsch Dep.") at 27-31 (Zack SJ Decl. Ex. 24); Transcript of the deposition of Stephane Jaskiewicz (hereinafter "Jaskiewicz Dep.") at 16-17 (Zack SJ Decl. Ex. 25); Clancy Dep. at 182-87 (Zack SJ Decl. Ex. 16).

40.     Each book copied by Google as part of its Library Project was copied by Google in its entirety multiple times. Jaskiewicz Dep. at 22-29 (Zack SJ Decl. Ex. 25); Defendant Google Inc.'s Supplemental Narrative Responses and Objections to Plaintiffs' Second Request for Production of Documents and Things (hereinafter "Supplemental Narrative") at 5-6 (Zack SJ Decl. Ex. 26); Google Admissions at 8 (Zack SJ Decl. Ex. 27).

41.     Google maintains digital copies of each book it copied as part of its Library Project on its servers and on back-up tapes. Jaskiewicz Dep. at 22-29, 69 (Zack SJ Decl. Ex. 25).

42.     In response to search inquiries by users of its search engine, Google searches the complete text of books copied in its Library Project. *Id.* at 45-46; Supplemental Narrative at 8 (Zack SJ Decl. Ex. 26); Google Admissions at 11 (Zack SJ Decl. Ex. 27).

43.     Since 2005, pursuant to uniform rules of its own devising, Google has displayed verbatim expression from these books on the Internet in response to search requests by users of its search engine. *See* Google Admissions at 10 (Zack SJ Decl. Ex. 27); Supplemental Narrative at 11-12 (Zack SJ Decl. Ex. 26).

44.     Google generally divides each page into eighths, each of which Google calls a snippet. Supplemental Narrative at 11-12 (Zack SJ Decl. Ex. 26); Print-out from http://www.google.com/googlebooks/library.html (Zack SJ Decl. Ex. 28); *see also* Print-out from http://support.google.com/books/bin/answer.py?hl=en&answer=43729/ (Zack SJ Decl. Ex. 19).

45.     By performing multiple searches using different search terms (including multiple search terms suggested by Google), a single user can view far more than three snippets from a Library Project book. *See* Print-outs from Google's website displaying search results in JIM BOUTON, BALL FOUR (Zack SJ Decl. Ex. 4); Clancy Dep. at 43-45 (Zack SJ Decl. Ex. 16).

46.     Zack SJ Decl. Ex. 4 demonstrates that Google displayed to one user – making a series of consecutive searches within BALL FOUR – about 37 different snippets, consisting of over **1900** words of verbatim expression.

47.     Even minor variations in search terms will result in different displays of text. *Compare* snippet results for search term "pitch" in BALL FOUR (Zack SJ Decl. Ex. 5) *with* snippet results for search term "pitches" in BALL FOUR (Zack SJ Decl. Ex. 6); *see also* Clancy Dep. at 44 (Zack SJ Decl. Ex. 16) ("[F]or a given query, we might display up to three snippets, but then if you entered a different query, you might see different snippets.").

48.     Google shows its users snippets from all portions of the books displayed in its Library Project, except for the small proportion of each book that it "blacklists." Supplemental Narrative at 11 (Zack SJ Decl. Ex. 26); Clancy Decl. ¶ 10 (Zack SJ Decl. Ex. 21).

49.     For those books in snippet view, Google blacklists 10% of the pages of books and one snippet per page. *See* Supplemental Narrative at 11 (Zack SJ Decl. Ex. 26); Clancy Decl. ¶ 10 (Zack SJ Decl. Ex. 21).

50.     For those books in snippet view, Google makes the vast majority of the text available for verbatim display to its users collectively. *See* Supplemental Narrative at 6-7 (Zack SJ Decl. Ex. 26); *see also* Zack SJ Decl. Ex. 4.

51.     Some of the books copied in the Library Project are placed by Google into metadata only view, where no text is displayed. *See* Supplemental Narrative at 6-7 (Zack SJ Decl. Ex. 26).

52.     In general, reference works (*i.e.*, encyclopedias, almanacs, dictionaries, thesauri, trivia books, books of quotations, bibliographies, indexes, poetry books, sheet music, pricing guides, travel guides, joke books, recipe books and catalogs), books published within the preceding two years which would have been placed in snippet view, and works for which the rightsholder has instructed Google not to display the work are placed in metadata only view. *Id*; "QA Training Manual," at GOOG05002440 (Zack SJ Decl. Ex. 29).

53.     To date, in its Library Project, Google has digitally copied over four million in-copyright English language books (Clancy Decl. ¶ 4) (Zack SJ Decl. Ex. 21); *see also* Zack SJ Decl. Exs. 30-31 (spreadsheet and accompanying email from Google identifying a list of over eight million English language books copied and that Google has determined not to be in the public domain); distributed complete digital copies of over 2.7 million of in-copyright books to libraries (*see* Zack SJ Decl. Ex. 9) (spreadsheet from Google identifying the scanned books which have been distributed to the partnering libraries, including certain books distributed more than once); and displayed verbatim expression as snippets from millions of in-copyright books over the Internet in response to search requests from its users. Google Admissions at 10 (Zack SJ Decl. Ex. 27).

54.     Google did not seek or obtain permission from copyright owners before it made the uses described in No. 53 above. Google Admissions at 12-14 (Zack SJ Decl. Ex. 27).

55.     Google has not compensated copyright owners for its copying, distribution to libraries, or display of verbatim expression from these books. *Id.* at 13.

56.     Google has admitted in its responses to Plaintiffs' Requests for Admissions that it digitally copies books in their entirety – including in-print and out-of-print books, fiction and nonfiction books, reference books, anthologies, educational books, textbooks, dissertations, monographs, journals, government publications, and other types of works; provides entire digital copies of books to libraries, and displays snippets from books in response to user requests, all without copyright owner permission. *Id.* at 5-12; *see also* Supplemental Narrative at 5-9 (Zack SJ Decl. Ex. 26).

57.     Pursuant to their cooperative agreements with Google, each library provides books to Google, Google scans the books, makes a digital file of the books for Google's use, and distributes digital copies of scanned books to the providing library. Clancy Dep. at 44-45 (Zack SJ Decl. Ex. 16); Library Agreements (Zack SJ Decl. Ex. 23).

58.     One of Google's earliest library agreements, its digitization agreement with Stanford University, summarizes their agreement as follows:

*See* Digitization Agreement with Leland Stanford Junior University, p.1 (Zack SJ Decl. Ex. 23 at GOOG05002264).

59.     Google's library agreements refer to dissemination of information or making information publicly available, often stating that "Google and the University share a mutual interest in making information available to the public." *See, e.g.*, Cooperative Agreement with the University of California, p.1 (Zack SJ Decl. Ex. 23 at GOOG05000306).

11

60.     Google's agreements with each of the libraries have many of the same or similar terms. *See* Library Agreements (Zack SJ Decl. Ex. 23).

61.

62.     Google executed the digitization by scanning the covers and every page of in-copyright books, performing optical character recognition on the scanned images to obtain machine-readable text, and then, through an "automated process compil[ing] a digital copy of the book." Supplemental Narrative at 5-6 (Zack SJ Decl. Ex. 26); *see also* Jaskiewicz Dep. 25-30 (Zack SJ Decl. Ex. 25).

63.     To facilitate the mutual interest in making information available to the public (*see* No. 59 above), Google will "digitize" mass quantities of books, with "digitize" defined as "to convert content from a tangible, analog form into a digital representation of that content." Cooperative Agreement with the University of Michigan, p.1 (Zack SJ Decl. Ex. 23 at GOOG0500355).

64.     After digitization, the agreements require that Google provide the libraries with digital copies of the books provided to Google from each library. *See, e.g.*,

12

65.     Google itself explained that after the library requests a copy of a particular book that Google has scanned, Google provides its digital copy by placing the file of the book on a server that the requesting library can access to download the file over the Internet. *See* Supplemental Narrative at 8 (Zack SJ Decl. Ex. 26); *see also* Jaskiewicz Dep. at 65 (Zack SJ Decl. Ex. 25); Clancy Dep. at 217-19 (Zack SJ Decl. Ex. 16).

66.     The distribution of the digital copies to the libraries was an important component of the Library Project. *See* Clancy Dep. at 44 (Zack SJ Decl. Ex. 16); Zack SJ Decl. Ex. 23.

67.     Dan Clancy stated at his deposition, "it is part of the Library Project that – as I stated – that we provide a copy, the ability to get a copy, for our library partners of the books we scan, in addition to any other uses." Clancy Dep. at 45 (Zack SJ Decl. Ex. 16).

68.     Google also transfers ownership of the distributed copies to the libraries, as the agreements clarify that the libraries solely own the rights to use the digital copies provided by Google. *See, e.g.*, Cooperative Agreement with the United States Library of Congress, p.4 (Zack SJ Decl. Ex. 23 at GOOG05000237);

69.     The University of Virginia's agreement states that, regarding the library's copy, "As between Google and University… University shall own all rights, title, and interest to the University Digital Copy." Cooperative Agreement with the University of Virginia, p.5 (Zack SJ Decl. Ex. 23 at GOOG05000385).

70.     Each of the agreements in Exhibit 23 contains a similar transfer of ownership clause. *See, e.g.*, Cooperative Agreement with the University of Michigan, p.5 (Zack SJ Decl.

13

Ex. 23 at GOOG05000359) ("As between Google and U of M . . . U of M shall own all rights, title, and interest to the U of M Digital Copy."); ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

71.     Google's cooperative agreements with the libraries presume the libraries' further use of the digitized works. *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮; Cooperative Agreement with the University of Wisconsin-Madison, p.5 (Zack SJ Decl. Ex. 23 at GOOG05000432) ("University shall have the right to use the University Digital Copy . . . as part of services offered openly on University's website and internally for research, scholarly and academic purposes.").

72.     For example, Google's agreement with the University of Michigan specifically allows for the use of Michigan's copies for "inclusion in Michigan's search services." Cooperative Agreement with the University of Michigan, p.1 (Zack SJ Decl. Ex. 23 at GOOG0500355); *see also* Clancy Dep. at 35 (Zack SJ Decl. Ex. 16) ("In addition, libraries receive a copy, and with that copy, they may use it for similar search and indexing or other nondisplay uses, various different research initiatives and, also, archiving it for posterity.")

73.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

74.     Michigan's Dean of Libraries, Dr. Paul Courant, testified that "Google did scan works from the University of Michigan libraries, and Google – and we did indeed receive copies

14

of those scans"; ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ Courant Dep. at 15, 20-21, 43-45 (Zack SJ Decl. Ex. 33).

75.      Google undertook the Library Project for commercial reasons. GOOG05004756 (Zack SJ Decl. Ex. 34); GOOG000645741 (Zack SJ Decl. Ex. 35); Supplemental Narrative at 9 (Zack SJ Decl. Ex. 26); Clancy Dep. at 84-85, 117, 120, 141, 198-203 (Zack SJ Decl. Ex. 16)

76.      A Google internal presentation in 2003 states that "[w]e want web searchers interested in book content to come to Google not Amazon;" "[e]verything else is secondary . . . but make money." GOOG05004756 (Zack SJ Decl. Ex. 34).

77.      An October 15, 2004 Google PowerPoint presentation states that Google's purpose is to "[g]ain a competitive advantage." GOOG000645741 (Zack SJ Decl. Ex. 35).

78.      Dan Clancy testified that, "to the extent other search engines were not similarly investing in such a project, then the belief [within Google] would be that this would enhance our experience for users and, therefore, improve the product we might offer, which would tend to give us an advantage." Clancy Dep. at 141 (Zack SJ Decl. Ex. 16).

79.      Google monetizes its search product by running advertisements in response to search queries. *Id.* at 117.

80.      As such, when Microsoft initiated a project "similar to [Google's] Partner Program" it was the subject of internal discussions at Google. *Id.* at 142.

81.      Clancy testified that during the six years he was chief engineer for Google Books, Google invested at least $180 million in its books scanning operations alone, and that this

amount does not include the salary and other expenses associated with the Google Book team of over twenty people. *Id.* at 84-85, 120.

82.     To protect this commercial investment, Google even restricts the way its Library Partners can disseminate access to out-of-copyright (public domain) works that Google distributes to the library. *Id.* at 198-203.

83.     As Clancy testified, "[w]e were investing a fair amount in digitizing these documents, and so this was an investment where we did not want third parties that might be building an equivalent service to be able to obtain the documents directly from us." *Id.* at 200.

84.     Clancy testified that Google did not want its competitors to obtain a "complete corpus of all the public domain documents" that Google had scanned. *Id.* at 200-01.

85.     Google has stated: "Google admits that it has entered into agreements with certain libraries, pursuant to which those libraries have requested that Google scan books, including in-copyright works, provided to Google by the library, and Google has provided digital copies of millions of those books to the libraries...." Google Admissions at 7 (Zack SJ Decl. Ex. 27).

86.     Google also makes a number of non-display uses of Books it copies in its Library Project. Supplemental Narrative at 9 (Zack SJ Decl. Ex. 26).

87.     The non-display uses identified in No. 86 above have commercial benefits to Google. *Id.*

88.     Google makes available over four million books on the Internet in snippet display. *See* Zack SJ Decl. Exs. 30-31.

89.     An "index" of books' metadata already exists. Transcript of the deposition of Gloriana St. Clair taken May 31, 2012 (hereinafter "St. Clair Dep.") at 46-48 (Zack SJ Decl. Ex. 36).

90.     Libraries use what is known as MARC records to catalog books. *Id.* at 48.

91.     "MARC records are essentially the electronic version of a card catalog record," and contain the book's metadata, such as author, title, publishing information. *Id.* at 46, 48.

92.     To create MARC records, the book does not need to be scanned or copied. Clancy Dep. at 25-26 (Zack SJ Decl. Ex. 16); Groetsch Dep. at 21-25 (Zack SJ Decl. Ex. 24).

93.     The cataloging of metadata through MARC records is done by hand with the cataloger reviewing the physical book and identifying enumerated fields of information. *See* Groetsch Dep. at 21-25 (Zack SJ Decl. Ex. 24).

94.     The Copyright Clearance Center presently licenses "essentially printed content, much of the same nature as the material scanned by Google." *See* Report of Daniel Gervais ¶ 11 (Zack SJ Decl. Ex. 37).

95.     If Google's uses are found to be fair, this will legitimize widespread digital copying without permission, thereby impeding the development of collective licenses for digital uses of books and excerpts from books by search engines, libraries, and others. *Id.* ¶ 17, 42.

96.     Collective management of copyright provides important advantages in licensing uses of copyrighted works, as it reduces transaction costs, benefitting authors and users. *Id.* ¶ 19.

97.     Collective management of copyright has existed for more than two centuries and is indispensable for many types of copyright uses. *Id.* ¶¶ 12, 15.

98.     For example, in the United States, ASCAP, BMI and SESAC are well-known organizations that license the use of music. *See id.* ¶ 18.

99.     The Copyright Clearance Center ("CCC") is another well-known collective management organization ("CMO"). *Id.* ¶ 28.

100.   If they wish to participate, authors or publishers register their works with the CCC, which offers per-use and annual repertory licenses. *Id.*

101.   A business or academic institution can enter into an agreement with the CCC that permits it to, for instance, photocopy a periodical article or create an electronic coursepack. *Id.*

102.   CMOs typically pay authors and other rightsholders based on actual usage of their works, *id.* ¶ 15, which can result in substantial revenue to rightsholders.

103.   In its 2011 fiscal year, CCC reported revenues in excess of $238 million, with payments to rightsholders exceeding $171 million. *Id.* ¶ 28. The difference between the two numbers includes but is not all a service charge. Due to the time period required to process usage data, the 2011 distributions were mostly of 2010 collections which were significantly lower than 2011 collections. *Id.* at 9 n.15.

104.   Collective licensing markets have often developed in response to new technologies: "Often, after a new form of use has emerged, collective management systems are established to license uses that have been found to be desirable but unauthorized." *Id.* ¶ 41.

105.   A collective management system "would develop here if some or all of Google's uses are found not to be fair." *Id.* ¶ 17.

106.   If Google's conduct is permitted as fair use and becomes widespread, such an outcome can be expected to thwart the development of collective management systems for the digital uses of books (and book excerpts) that would otherwise likely develop. *Id.* ¶ 42; *see also Id.* ¶ 17.

107.   Google admits in its Form 10-K that its "security measures may be breached due to the actions of outside parties, employee error, malfeasance, or otherwise, and, as a result, an unauthorized party may obtain access to our data or our users' or customers' data. Additionally,

outside parties may attempt to fraudulently induce employees, users, or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data. Any such breach or unauthorized access could result in significant legal and financial exposure, damage to our reputation, and a loss of confidence in the security of our products and services that could potentially have an adverse effect on our business. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures." Google 2011 Form 10-K, at 15 (Zack SJ Decl. Ex. 13).

108.    Google is not contractually obligated to, and does not in practice, monitor or control the security of the digital copies of books provided by it to libraries in its Library Project, and the security measures of libraries who receive digital copies of books from Google are subject to similar breaches. Clancy Dep. at 195-202 (Zack SJ Decl. Ex. 16); ▬▬▬▬▬ ▬▬▬▬▬▬; Transcript of the deposition of James Crawford taken April 10, 2012 (hereinafter "Crawford Dep.") at 56 (Zack SJ Decl. Ex. 38); *see generally* Expert Report of Benjamin Edelman (hereinafter, "Edelman Report") (Zack SJ Decl. Ex. 39).

109.    Subsequent copying by the libraries of the digital files received by them from Google, *see* Courant Dep. at 22-27 (Zack SJ Decl. Ex. 33), risks further security breaches. Edelman Report ¶¶ 20-26 (Zack SJ Decl. Ex. 39).

110.    As the number of unlawful copies of an in copyright book increases, so does the risk of further infringement and/or piracy of the work. *Id.* ¶¶ 14-19.

111.    The copyright holder's control over the distribution and publication of his or her work becomes increasingly threatened when multiple unauthorized digital copies are created, and even more so when they are placed on and/or distributed over the Internet. *Id.* ¶¶ 34, 36.

112.    If Google's bulk and indiscriminate copying is found to be "fair," other website operators, no matter how small, will also be given sanction to create online databases of books and other works.). *Id.* ¶¶ 9, 13, 18.

113.    These website operators may have insufficient security to prevent widespread piracy of such works. *Id.* ¶¶ 18-19.

114.    In particular, less sophisticated operators have a reduced capability to design, install, and maintain systems to secure books, as well as a lesser ability to screen their internal staff to prevent data theft by rogue employees or to adapt their systems to prevent hacking by outsiders. *Id.* ¶ 18.

115.    These concerns will only be amplified if "numerous companies and organizations scan books," because "attackers can focus their efforts on whichever installs the weakest security.  Similarly, attackers can take advantage of even a brief period when a single book provider is insecure...." *Id.* ¶ 19.

116.    These are not merely hypothetical risks, but reveal a real danger to authors, as book piracy is already occurring. *Id.* ¶¶ 11-12; *see also id.* ¶¶ 13-17 (discussing multiple ways in which books may be redistributed through piracy).

117.    A security breach could have a "devastating impact" on the Class. *Id.* ¶ 38; *see also id.* ¶ 36 (describing how information may remain widely available, even after measures are taken to correct the breach, as information cannot be "unpublished" once it becomes publicly available on the Internet).

118.    If Google's unauthorized reproduction, distribution and display is found not to be fair, licenses will be required for such uses, and copyright owners can require in such licenses that financial responsibility for the risks of unauthorized uses of the copies be fairly allocated between the parties to the license. *Id.* ¶¶ 9, 39.

Dated: July 16, 2012

Joanne Zack
Michael J. Boni (*pro hac vice*)
Joshua D. Snyder
Joanne Noble
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA  19004
Tel: (610) 822-0200
Fax : (610) 822-0206
jzack@bonizack.com
mboni@bonizack.com
jsnyder@bonizack.com
jnoble@bonizack.com

Robert J. LaRocca
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel:  (215) 238-1700
Fax:  (215) 238-1968
rlarocca@kohnswift.com

Sanford P. Dumain
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229
sdumain@milberg.com

*Counsel for Plaintiffs*