**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| The Authors Guild, Inc., Associational Plaintiff, Betty Miles, Joseph Goulden, and Jim Bouton, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Google Inc.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Case No. 05 CV 8136-DC

~~FILED UNDER SEAL~~

**PUBLIC VERSION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' RESPONSE TO**
**DEFENDANT GOOGLE INC.'S LOCAL RULE 56.1 STATEMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(a) of the Local

Rules of the Southern District of New York, Representative Plaintiffs Betty Miles, Joseph C.

Goulden, and Jim Bouton, individually and on behalf of all others similarly situated, and

Associational Plaintiff The Authors Guild, Inc., submit the following response to Defendant

Google Inc.'s Local Rule 56.1 statement (ECF No. 1033).

1.      Research libraries house millions of books. Decl. Dan Clancy Supp. Def. Google
Inc.'s Mot. Summ. J. ("Clancy Decl.") ¶ 3.

**RESPONSE:**  Uncontroverted.


2.      Most books included in the Google Books Library Project are academic works.
Clancy Decl. ¶ 3.

**RESPONSE**:  Controverted.  The term "academic" is undefined and vague in the context

of this statement, there is no factual basis for Clancy's statement, which refers to works in

unspecified research libraries in general rather than books included in the Google Books Library

Project, and the statement otherwise lacks foundation and any factual basis.

3.     Most books included in the Google Books Library Project are non-fiction. Brian Lavoie and Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially In-copyright Print Books in Library Collections*, 15 D-Lib 11/12 (2009), *available at* http://www.dlib.org/dlib/november09/lavoie/11lavoie.html.

**RESPONSE**: Controverted.  The cited reference does not support the paragraph as the article "characterizes the aggregate collection of US-published print books in WorldCat," an online collective library catalog, and does not purport to undertake any analysis of books actually included in the Google Books Library Project.

4.     Most books included in the Google Books Library Project are out of print. Clancy Decl. ¶ 3; Decl. Stephane Jaskiewicz Supp. Def. Google Inc.'s Mot. Summ. J. ("Jaskiewicz Decl.") ¶ 4.

**RESPONSE**:  Controverted.  There is no factual basis for Clancy's statement, which refers to works in unspecified research libraries in general rather than books included in the Library Project, and Jaskiewicz's statement refers to "Google Books" in general, which encompasses both a "Partner Program" (under which Google displays portions of books with rightsholder permission), *see* Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment, ECF No. 1054 ("Pls.' 56.1 Stmt.")  ¶¶ 15-24, and a "Library Project" (where Google copies, distributes, and displays books without permission), *id.* ¶¶25-85.

5.     All of works in the Google Books corpus were published. Decl. Joseph C. Gratz Supp. Def. Google Inc.'s Mot. Summ. J. ("Gratz Decl.") Ex. 3, Plas.' Resp. Obj. Def. Google Inc.'s 1st Set Interrogs. No. 1 at B(1).

**RESPONSE**:  Controverted as stated.  Uncontroverted if re-stated as follows:  "All of the works in the Library Project corpus were published in print form."  Additionally, the statement is irrelevant as stated.  The only relevant corpus is the Library Project, as Google Books includes both a Partner Program and a Library Project (as differentiated in response to Paragraph 4, above).

6.      The Google Books corpus contains novels, biographies, children's books, reference works, textbooks, instruction manuals, treatises, dictionaries, cookbooks, books of poetry, and memoirs, among other works. Jaskiewicz Decl. ¶ 4.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant as stated.  The only

relevant corpus is the Library Project, as Google Books includes both a Partner Program and a

Library Project (as differentiated in response to Paragraph 4, above).

7.      Beginning in the late nineteenth century, libraries indexed books using index cards, which recorded some bibliographical information and classified the book under a handful of subject headings chosen by librarians. Decl. Gloriana St. Clair Supp. Def. Google Inc.'s Mot. Summ. J. ("St. Clair Decl.") Ex. A ¶ 40.

**RESPONSE:**  Controverted as stated.  Uncontroverted if re-stated as follows:  "From the

late 19th century through the first half of the 20th century, libraries used small index cards stored

in file drawers. These cards recorded some information about a book-its title, author, publication

date and publisher, and three or four general subject headings."  *See* St. Clair Decl. Ex. A. ¶ 40.

8.      In the second half of the twentieth century, the gradual digitization of card catalogues allowed library users to perform electronic searches for the names of authors and to search within a book's title as well as a few subject fields per book. St. Clair Decl. Ex. A ¶ 41.

**RESPONSE:** Uncontroverted. By way of further response, libraries use MARC records

as electronic versions of card catalogs, which generally contain "Author, title, publishing

information, typically two or three subject headings and some kinds of notes about additions and

so forth."  Declaration of Joanne Zack in Support of Plaintiffs' Motion for Summary Judgment,

ECF No. 1053 ("Zack Decl.") Ex. 36, St. Clair Dep. at 48:4-9.

9.      Electronic card catalogue searches do not allow a user to search for information not tied to the author, title, or one of the specific subject fields. Gratz Decl. Ex. 1, Courant Dep. Tr. 96:16-97:2.

**RESPONSE:**  Controverted.  The deposition testimony cited does not refer to "author,"

"title," or "subject" fields, and the deponent refers to only the possibility that full text searching

3

will lead to results (referring to "subject matter that *might* not be apparent") that differ from those using the card catalog.  Gratz Decl. Ex. 1, Courant Dep. at 96 (emphasis added).

10.     Google Books allows a user to search the full text of the Google Books corpus using a query of the user's own design. Clancy Decl. ¶ 7.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).

11.     A search for "Archimedes" using Google Books locates many thousands of books in less than one second. Clancy Decl. ¶ 7.

**RESPONSE:** Controverted as stated.  Uncontroverted if re-stated as follows:  "A search for 'Archimedes' using Google Books locates many thousands of books in less than one second, according to information provided by Google in connection with its display of search results." However, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).

12.     A search for Archimedes using Google Books returns the most relevant books in the Google Books corpus that contain any reference to Archimedes. Clancy Decl. ¶ 7.

**RESPONSE:**  Controverted.  The phrase "most relevant books" is undefined, subjective, and vague in the context of this statement, and searches using Google Books return results that may not be pertinent to the user.  For example, a user who searches for books about the mathematician "Archimedes" will locate the book, ARCHIMEDES AND THE SEAGLE: A NOVEL, by David Ireland.

**Archimedes** and the seagle: a novel
books.google.com/books?isbn=0140080902
David Ireland - 1986 - Snippet view - More editions
Archimedes, a dog, offers his opinions on life, people, seagulls, and the way of the world

Additionally, the statement is irrelevant and/or overbroad inasmuch as it refers to Google

Books generally and not the Library Project (*see* response to Paragraph 4, above).


13.    The ability to search electronically the full text of books can be achieved only by digitizing the full texts of those books. Gratz Decl. Ex. 1, Courant Dep. Tr. 96:16-97:2; Gratz Decl. Ex. 2, Aiken Dep. Tr. 104:7-105:2.

**RESPONSE:**  Controverted in part as stated and as overbroad. The term "digitizing" is

undefined and vague.  To the extent the term implies that the ability to search electronically the

full text of books can only be achieved by all of the conduct Google has undertaken with respect

to the books in the Library Project, including the copying, retention, display, and distribution of

.jpeg or other image files of the pages of books, the statement is denied.  For example, the ability

to search electronically does not require the retention or display of full or partial images of pages

of a book as opposed to optical character recognition (OCR) text files. *See generally* Declaration

of Michael J. Boni in Support of Plaintiffs' Opposition to Defendant Google's Motion for

Summary Judgment ("Boni Decl.") Ex. 7, ███████████████████████████

███████████████████████████████████████████████

████████.


14.    In 2004 Google began scanning books in the collections of several significant research libraries, including the University of Michigan and the University of California. Clancy Decl. ¶ 5.

**RESPONSE:**  Uncontroverted.

15. A book is scanned at one of a small number of scan centers. Clancy Decl. ¶ 6.

**RESPONSE:**  Uncontroverted.

16.     Physical access to the scan centers is limited to Google employees and contractors. Clancy Decl. ¶ 6.

**RESPONSE:**  Controverted in part as incomplete.  It is uncontroverted that Google's policy is to limit access to its scan centers to its employees and independent contractors. However, the statement is incomplete inasmuch as it obscures the fact that the overwhelming majority of the individuals—"[o]n the order of hundreds"—who have access to the scan centers are independent contractors, not Google employees.  Zack Decl. Ex. 16, Clancy Dep. at 14.

17.     Images of the book pages are stored in a secure manner for processing. Jaskiewicz Decl. ¶ 3.

**RESPONSE**:  Controverted in part.  The phrase "secure manner" is vague and ambiguous as neither the statement nor the declaration cited in support of the statement describes the steps to secure the stored images of book pages.  It is uncontroverted that Google intends to store these images in a secure manner.  However, Google is not immune from design flaws and security breaches. *See* Zack Decl. Ex. 39, Edelman Report ¶¶ 27-35. Additionally, Google recognizes the risk of a security breach.  *See* Zack Decl. Ex. 13, Google 2011 Form 10-K, at 15; *see also* ████████████████████████████████████████ ██████████.

18.     Optical character recognition (OCR) is performed on the images to generate machine-readable text, which is also stored on Google servers. Jaskiewicz Decl. ¶ 3.

**RESPONSE:**  Uncontroverted.

19.     The Google servers on which books are stored are not publicly accessible. Decl. Brad Hasegawa Supp. Def. Google Inc.'s Mot. Summ. J. ("Hasegawa Decl.") ¶ 3.

**RESPONSE:**  Controverted as stated.  The phrases "Google servers on which books are stored" and "publicly accessible" as used in this statement are undefined, vague, and potentially misleading.  It is undisputed that, subject to rules of its own devising, Google has displayed verbatim expression from books on the Internet in response to search requests by users of its search engine.  *See* Zack Decl. Ex. 27, Google Resp. to Pls.' RFAs at 10; Zack Decl. Ex. 26, Supplemental Narrative at 11-12. ██████████████████████████████

████████████. *See* Boni Decl. ████████████████████.

20.     The Google servers on which books are stored are protected by the same security Google employs to protect its own confidential information. Hasegawa Decl. ¶ 3.

**RESPONSE:**  Uncontroverted.  However, Google is not immune from design flaws and security breaches. *See* Zack Decl. Ex. 39, Edelman Report ¶¶ 27-35; Zack Decl. Ex. 13, Google 2011 Form 10-K, at 15.

21.     Google is aware of no security breaches resulting in unauthorized access to books. Hasegawa Decl. ¶ 7.

**RESPONSE:**  Controverted. ██████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████

22.     Google analyzes each scan and creates an overall index of all the books that have been scanned. Clancy Decl. ¶ 6.

**RESPONSE:**  Controverted as stated.  The statement lacks foundation and the terms and phrases "analyzes each scan" and "overall index" are vague in the context of this statement and oversimplify the actual processes involved.  *See* Zack Decl. Ex. 26, Supplemental Narrative at 5-8.

23.     The Google Books index links each word or phrase appearing in each book with all of the locations in all of the books in which that word or phrase is found. Clancy Decl. ¶ 6.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).

24.     The Google Books index allows a search for a particular word or phrase to return a result that includes the most relevant books in which that word or phrase is found. Clancy Decl. ¶ 6.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).

25.     When a user performs a search, Google Books uses the index to generate search results for a user's query. Clancy Decl. ¶ 8.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).

26.     The search results return a list of books in which that user's search term appears. Clancy Decl. ¶ 8.

**RESPONSE:**  Uncontroverted.

8

27.     A user can click on a particular result to be directed to an "About the Book" page. Clancy Decl. ¶ 9.

**RESPONSE:**  Controverted as stated and potentially misleading.  It is uncontroverted that users can click a particular search result and see another webpage.  However, the title "About the Book" does not appear on that page, *see* Clancy Decl. Ex. C, but rather is how Google refers to that page.  Moreover, the statement is misleading to the extent it implies that this page is uniform for different books scanned as part of the Library Project.  *See* Zack Decl. Ex. 16, Clancy Dep. at 126:7-17.

28.     The "About the Book" page allows the user to obtain more information about the book in question. Clancy Decl. ¶ 9.

**RESPONSE:**  Controverted as stated, potentially misleading, and incomplete.  *See* Pls.' Response to Paragraph 27.  Additionally, the statement is incomplete and misleading to the extent that the statement the "page *allows* the user to obtain more information" implies that such information would be unavailable in the absence of the Library Project.  For many books, this page would only provide metadata on the book, *see* Zack Decl. Ex. 16, Clancy Dep. at 126-127, which is available from other existing electronic card catalogs, *see, e.g.*, Paragraph 8, above; *see also* Pls.' 56.1 Stmt. ¶ 89.

29.     The About the Book page includes links to sellers of the book. Clancy Decl. ¶ 9.

**RESPONSE:**  Controverted as stated and as incomplete.  *See* Pls.' Response to Paragraph 27.  Additionally, the page may include links to sellers of the book with respect to books that are in print or link to sellers of used books for out-of-print books where the author gets no royalties for such sales.  For example, by clicking the link to Amazon.com on the Google Books page for Joseph Goulden's *The Super-Lawyers*, a user is taken to a page on the Amazon website listing used copies of that book for sale, along with links to numerous other unrelated

books for sale.  *See* Boni Decl. Ex. 8.  By way of further response. ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████; *see also* Declaration of Paul Aiken in

Support of Plaintiffs' Opposition to Defendant Google's Motion for Summary Judgment ("Aiken

Decl.") ¶¶ 4-5, 32-33, and generally.

30.     The About the Book page includes links to libraries listing the book as part of
their collections. Clancy Decl. ¶ 9.

**RESPONSE:**  Controverted as stated and as incomplete.  *See* Pls.' Response to

Paragraph 27.  Additionally, rather than "links to libraries," the page includes a link titled "Find

in a Library," *see* Clancy Decl. Ex. C, which when clicked runs a search for libraries the book

may be found on a separate website using the WorldCat online catalog, at

http://www.worldcat.org.

31.     No advertisements have ever appeared on any About the Book page for any book
that is part of the Library Project. Clancy Decl. ¶ 9.

**RESPONSE:**  Controverted.  *See* Pls.' Response to Paragraph 27.  Additionally, the term

"advertisements" as used in this statement is vague and ambiguous. The page attached as Exhibit

C to the Clancy Declaration includes links for the sale of books at various online booksellers, as

well as Google's own advertisement to "Shop for Books on Google Play," which it states is "the

world's largest eBookstore."  *See, e.g.*, Clancy Decl. Ex. C.  Moreover, there are links on the

page to Google's search engine and other services, *see id.*, and the statement is misleading and

incomplete inasmuch as it omits the fact that the primary aim of the Library Project is for Google

to gain a competitive advantage and drive traffic to its search engine where it does generate

advertising revenue.  *See* Pls.' 56.1 Stmt. ¶¶ 75-79.

32.     In some uses of Google Books, users can also see a small amount of text from the book (a "snippet"). Clancy Decl. ¶ 10.

**RESPONSE:**  Controverted as stated.  Uncontroverted if re-stated as follows:  "For all of the millions of books in 'snippet display,' users can also see text from the book (a 'snippet')." However, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).


33.     Google employs security measures to ensure that users cannot recover the entire text of a snippet view book. Hasegawa Decl. ¶ 4.

**RESPONSE:**  Controverted as stated.  Uncontroverted if restated as follows:  "Google employs security measures that attempt to prevent users from recovering the entire text of a snippet view book."  Google's security measures cannot "ensure" anything as there is always the risk that its "security measures may be breached due to the actions of outside parties, employee error, malfeasance, or otherwise, and, as a result, an unauthorized party may obtain access to our data or our users' or customers' data."  Pls.' 56.1 Stmt. ¶ 107; *see also* Zack Decl. Ex. 39, Edelman Report ¶¶ 27-35.


34.     Google employs security measures to ensure that users cannot recover one complete page of a snippet view book. Hasegawa Decl. ¶ 4.

**RESPONSE:**  Controverted as stated.  Uncontroverted if restated as follows:  "Google employs security measures that attempt to prevent users from recovering one complete page of a snippet view book."  Google's security measures cannot "ensure" anything as there is always the risk that its "security measures may be breached due to the actions of outside parties, employee error, malfeasance, or otherwise, and, as a result, an unauthorized party may obtain access to our data or our users' or customers' data."  Pls.' 56.1 Stmt. ¶ 107; *see also* Zack Decl. Ex. 39, Edelman Report ¶¶ 27-35.

11

35.     A user cannot cause the system to return different sets of snippets for the same search query. Hasegawa Decl. ¶ 4.

**RESPONSE:**  Uncontroverted.  However, even minor variations in search terms will result in different displays of text.  *See* Pls.' 56.1 Stmt. ¶ 47.

36.     Google Books does not allow the searcher to copy the text of snippets. Hasegawa Decl. ¶ 4.

**RESPONSE:**  Controverted.  Users can take a screen shot of the text of snippet images. *See* Boni Decl. Exs. 1, 2, and 3; *see also* Zack Decl. Ex. 16, Clancy Dep. at 149:15-24; Boni Decl. Ex. 7, Hasegawa Dep. at 61, 79-80.

37.     The position of each snippet is fixed within the page, and does not represent a "sliding window" around the search term. Hasegawa Decl. ¶ 4.

**RESPONSE:**  Uncontroverted.

38.     Only the first responsive snippet available on any given page will be returned in response to a query. Hasegawa Decl. ¶ 4.

**RESPONSE:**  Uncontroverted.

39.     One of the snippets on each page is blacklisted (meaning that it will not be shown). Hasegawa Decl. ¶ 4.

**RESPONSE:**  Uncontroverted.

40.     At least one out of ten entire pages in each book is blacklisted. Hasegawa Decl. ¶ 4.

**RESPONSE:**  Uncontroverted.

41.     Even if an "attacker" had a physical copy of the book in question in front of him, and used that physical copy to identify words appearing in successive passages to use as the basis for the attack, the most complete patchwork of snippets he could end up with would still be missing at least one snippet from every page and 10% of all pages. Hasegawa Decl. ¶ 5.

**RESPONSE:**  Uncontroverted.  However, as alternatively stated, by removing just 10% of the pages and only 1 out of 8 snippets on the remaining pages, approximately 78% of the work is available to such an "attacker."

42.     Not all books are placed in "snippet view." Clancy Decl. ¶ 11.

**RESPONSE:**  Uncontroverted.

43.     Works whose text is organized in short "chunks" such as dictionaries, cookbooks, and books of haiku are excluded from snippet view. Clancy Decl. ¶ 11.

**RESPONSE:**  Uncontroverted.

44.     The determination whether to place a work in snippet view is made by human operators who examine each book to ascertain whether it is organized in short chunks. Clancy Decl. ¶ 11.

**RESPONSE:**  Controverted. ███████████████

███████████████████████████

███████████████████████████

████████████████████████

███████████████████████████████

███████████████████████████

45.     No book is designated for "snippet view" without a manual review. Clancy Decl.¶ 11.

**RESPONSE:**  Controverted. ██████████████████

███████████████████████████████

██████████████████████████████████████████

████████████████████

46.     Google has a policy of excluding works a rightsholder has asked Google not to display. Clancy Decl. ¶ 11.

**RESPONSE:**  Controverted.  The statement is misleading and confusing inasmuch as it does not state from what it is that Google has "a policy of excluding" works under such circumstances.  Uncontroverted if re-stated as follows:  "Google has a policy of excluding from snippet display works a rightsholder has asked Google not to display."

47.     Any rightsholder can ask to exclude a book by filling out an online form which has been available since 2005. Clancy Decl. ¶ 11.

**RESPONSE:**  Controverted as stated.  The statement is misleading and confusing inasmuch as it does not state from what it is a rightsholder can ask to exclude a book under such circumstances.  Uncontroverted if re-stated as follows:  "Any rightsholder can ask to exclude a book from snippet display by filling out an online form which has been available since 2005."  Moreover, the statement omits the fact that in order to seek such exclusion, the rightsholder would first need to be made aware of the fact that Google has made the work available in snippet display and Google does not first seek permission from the rightsholder to do so nor does it notify the rightsholder that it has done so.  *See* Pls.' 56.1 Stmt. ¶ 54.

48.     For excluded works, users may view bibliographic information about the book but not text from the book itself. Clancy Decl. ¶ 12.

**RESPONSE:**  Controverted as stated.  Uncontroverted if re-stated as follows:  "For works excluded from snippet display, users may view bibliographic information about the book but not text from the book itself."

14

49.      Rightsholders may request that Google display text through the Partner Program. Clancy Decl. ¶ 13.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant in that it refers to the Partner Program, which is not at issue in this litigation, rather than the Library Project, which is at issue.  *See* Response to Paragraph 4, above.

50.      The rightsholder can choose what percentage of the text of the book to display as part of the Partner Program. Clancy Decl. ¶ 13.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant in that it refers to the Partner Program, which is not at issue in this litigation, rather than the Library Project, which is at issue.  *See* Response to Paragraph 4, above.

51.      Most rightsholders in the Partner Program choose to display at least 20% of the text of their books. Clancy Decl. ¶ 13.

**RESPONSE:**  Controverted as stated.  The term "most" as used in the statement is vague and the statement otherwise lacks a factual basis as the supporting declaration only states that "usually" the rights holder chooses to display "at least 20%."  Additionally, the statement is irrelevant in that it refers to the Partner Program, which is not at issue in this litigation, rather than the Library Project, which is at issue.  *See* Response to Paragraph 4, above.

52.      Over 45,000 publishers have included works within the Partner Program, including HarperCollins, Penguin, Simon & Schuster, and Macmillan. Clancy Decl. ¶ 14.

**RESPONSE:**  Uncontroverted.  However, the statement is irrelevant in that it refers to the Partner Program, which is not at issue in this litigation, rather than the Library Project, which is at issue.  *See* Response to Paragraph 4, above.

15

53.    Google Books advances scholarly research. Gratz Decl. Ex. 5, Samuelson letter to Judge Chin at 1; St. Clair Decl. Ex. A ¶ 43.

**RESPONSE:** Controverted.  The statement is irrelevant and/or overbroad inasmuch as it and the cited materials refer to Google Books generally, including books for which permission of the rightsholder has been obtained in the Partner Program, and are not specific to the Library Project, which is the only program at issue here.  For example, the St. Clair declaration speaks primarily of the advantage of a student who "sits comfortably in his office reading the relevant texts on his or her computer," St. Clair Decl. Ex. A ¶ 43, which would only be applicable to books either made available through the Partner Program or available in the public domain.

54.    A search on Google Books for "Steve Hovley" returns dozens of books that discuss that major leaguer, including *Ball Four* and a book about the 1969 Seattle Pilots (for whom Hovley played). Decl. Kurt Groetsch Supp. Def. Google Inc.'s Mot. Summ. J. ("Groetsch Decl.") ¶ 12.

**RESPONSE:**  Controverted in part as misleading and incomplete.  The statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally, including books for which permission of the rightsholder has been obtained in the Partner Program, which is not at issue in this litigation, and is not specific to the Library Project, which is at issue.  *See* Response to Paragraph 4, above.  The statement is also misleading inasmuch as it purports to imply that Google Books is the only way to search for "Steve Hovley" to find books that discuss the major leaguer.  For example, a search for "Steve Hovley" on Amazon.com, where works are searched by permission of the rightsholder, returns dozens of books on the subject, including *Ball Four*: *See* Boni Decl. Ex. 9, Printout from Amazon.com; *see also* Gratz Decl. Ex. 2, Aiken Dep. at 105:3-24 (discussing other searchable databases); *see generally* Aiken Decl.

55.     A search in of the catalogue of the Library of Congress produces no results for Steve Hovley. Groetsch Decl. ¶ 11.

**RESPONSE:**  Uncontroverted.  However, the statement is potentially misleading and incomplete for the reasons set forth in response to paragraph 54.

56.     A researcher searching the catalog of the Library of Congress for information about attorney Minoru Yasui will find only one book containing information about Mr. Yasui. Groetsch Decl. ¶ 13.

**RESPONSE:**  Uncontroverted.

57.     A search of Google Books for attorney Minoru Yasui will identify dozens of books available in bookstores and libraries with information about Mr. Yasui, from a reproduction of the Supreme Court filings in *Yasui v. United States* to an oral history of Japanese settlers in Oregon containing a whole chapter in which Mr. Yasui recounts his story. Groetsch Decl. ¶ 14.

**RESPONSE:**  Controverted in part as misleading and incomplete.  The statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally, including books for which permission of the rightsholder has been obtained in the Partner Program, which is not at issue in this litigation, and is not specific to the Library Project, which is at issue.  *See* Response to Paragraph 4, above.  The statement is also misleading inasmuch as it purports to imply that Google Books is the only way to search for "Minoru Yasui" to find books that discuss Mr. Yasui.  For example, a search for "Minoru Yasui" on Amazon.com, where works are searched by permission of the rightsholder, returns dozens of books on the subject:  *See* Boni Decl. Ex. 10, Printout from Amazon.com; *see also* Gratz Decl. Ex. 2, Aiken Dep. at 105:3-24 (discussing other searchable databases); *see generally* Aiken Decl.

17

58.     Text from the books in the Google Books corpus was used as an input to the "ngrams" research project. Clancy Decl. ¶ 15.

**RESPONSE:**  The statement in paragraph 58 is neither controverted nor relevant to the issues in this lawsuit.  Additionally, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).

59.     The n-grams project provides a tool for users to determine how frequently different terms or phrases appear in books published at different times. Clancy Decl. ¶ 15.

**RESPONSE:**  The statement in paragraph 59 is neither controverted nor relevant to the issues in this lawsuit.  Additionally, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally and not the Library Project (*see* response to Paragraph 4, above).

60.     The n-grams project has resulted in the publication of a paper in the journal *Science*. Jean-Baptiste Michel et al., *Quantitative Analysis of Culture Using Millions of Digitized Books*, 331 Science 176 (2011), a*vailable at* http://www.sciencemag.org/content/early/2010/12/15/science.1199644.

**RESPONSE:**  The statement in paragraph 58 is neither controverted nor relevant to the issues in this lawsuit.

61.     Google entered into agreements with participating libraries pursuant to which the libraries' books would be scanned, after which the physical copies of the books would be returned to the libraries. Clancy Decl. ¶ 5.

**RESPONSE:**  Uncontroverted.

62.     The libraries promise contractually to abide by the copyright laws with respect to their copies. Clancy Decl. ¶ 5.

**RESPONSE:**  Controverted.  Google's agreements with libraries, collectively attached at Zack Decl. Ex. 23, are the best evidence of the contractual terms referred to in this statement.

18

The obligations with respect to copyright law are not uniform among those agreements, and the statement does not accurately and completely capture the provisions relating to copyright law set forth in those agreements.  For example, ████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████. (Notwithstanding that provision, there have been instances where the University of Michigan inadvertently displayed in copyright books from the digital files it received from Google as part of the Library Project that was not authorized by the rightsholder.  Zack Decl. Ex. 33, Courant Dep. at 37-39.) ████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████. ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████

63.    Pursuant to its agreement with Google, a library that has submitted a book to be scanned may make and download a copy of the scan of its book using a system called the Google Return Interface (GRIN). Jaskiewicz Decl. ¶ 6.

**RESPONSE:**  Controverted as stated and as incomplete.  The statement is incomplete and potentially misleading inasmuch as it purports to imply that Google does not actually make and provide the digital copies of the books to the libraries.  Google has admitted that it "provided digital copies of millions of those books to the libraries."  Pls.' 56.1 Stmt. ¶ 85; *see also* Zack Decl. Ex. 27, Google Resp. to Pls.' 1st Set of RFAs Nos. 6 and 8; Pls.' 56.1 Stmt. ¶¶ 30, 57, 64-70.

64.     No library may use GRIN to make a digital copy created from another library's book. Jaskiewicz Decl. ¶ 8.

**RESPONSE:**  Controverted in part as incomplete.  The statement is also potentially misleading inasmuch as it purports to imply that no library may obtain a digital copy of another library's book scanned by Google.  Libraries that received copies of books digitized by Google have deposited copies of those digital books in the HathiTrust database, which is a collective depository of numerous research libraries.  *See*, *e.g.*, Zack Decl. Ex. 33, Courant Dep. at 20-25.

65. To make a copy, a library first submits a request to the GRIN system. Jaskiewicz Decl. ¶ 8.

**RESPONSE:**  Controverted as stated.  *See* Pls.' Response to Paragraph 63. Uncontroverted if re-stated as follows:  "To obtain its copy, a library first submits a request to the GRIN system."

66.     The library's request to the GRIN system triggers the creation of an encrypted copy of the book that is placed on a secure Google server. Jaskiewicz Decl. ¶ 8.

**RESPONSE:**  Controverted as stated.  *See* Pls.' Response to Paragraph 63. Uncontroverted if re-stated as follows:  "The library's request to the GRIN system triggers the creation by Google of an encrypted copy of the book that is placed on a secure Google server."

67.     Each book is encrypted, and each library has a unique encryption key. Jaskiewicz Decl. ¶ 8.

**RESPONSE:**  Uncontroverted.

68.     The library may download the encrypted copy of the book it made. Jaskiewicz Decl. ¶ 8.

**RESPONSE:**  Controverted.  *See* Pls.' Response to Paragraph 63.  Uncontroverted if re-stated as follows:  "The library may download the encrypted copy of the book made by Google."

20

69.     Some but not all of the books in the class have been copied by the libraries using GRIN. Jaskiewicz Decl. ¶ 9.

**RESPONSE:**   Controverted.  *See* Pls.' Response to Paragraph 63.  Additionally, the phrase "books in the class" is vague.  Uncontroverted if re-stated as follows:  "Some but not all of the books meeting the definition of 'Books' in the class definition have been distributed by Google to libraries using GRIN."

70.     Where a library takes no action with respect to a particular book, the GRIN system does not do anything with respect to that book. Jaskiewicz Decl. ¶ 9.

**RESPONSE:**   Controverted as vague and potentially misleading.  *See* Pls.' Response to Paragraph 63.  Uncontroverted if re-stated as follows: "Because the library's request to the GRIN system triggers the creation by Google of an encrypted copy of the book that is placed on a secure Google server, Google will not create such a copy for the library where the library has taken no action to request that particular book."

71.     No library has loaned out any digital copy it made using GRIN. Gratz Decl. Ex. 1, Courant Dep. Tr. 46:3-20.

**RESPONSE:**   Controverted.  The statement lacks foundation and is not supported by the cited material as the deponent speaks only for the University of Michigan and does not purport to testify as to what any other library has done.

72.     Libraries have used the downloaded copies to make their own full-text indices of the works in their collections. Gratz Decl. Ex. 1, Courant Dep. Tr. 105:2-12.

**RESPONSE:**   Uncontroverted.

73.     Libraries have used the downloaded copies to make the digital copies available to the blind. Gratz Decl. Ex. 1, Courant Dep. Tr. 43:2-15.

**RESPONSE:**   Uncontroverted.

21

74.     Libraries have used the downloaded copies to archive digital copies for the purpose of preservation. HathiTrust Mot. Summ. J. at 3; *see also* Gratz Decl. Ex. 1, Courant Dep. Tr. 85:12-86:11.

**RESPONSE:** Uncontroverted.

75.     The participating libraries have taken security precautions to protect their copies of works included in the Google Books corpus. Gratz Decl. Ex. 1, Courant Dep. Tr. 106:23-107:8.

**RESPONSE:** Controverted.  The statement lacks foundation and is not supported by the

cited material as the deponent speaks only for the University of Michigan and does not purport to

testify as to what any other library has done.  The statement is further controverted to the extent

that it implies that a university's security "protections" eliminate the risk that its security

measures may be breached.  *See* Pls.' 56.1 Stmt. ¶¶ 107-109; *see also* Zack Decl. Ex. 39,

Edelman Report ¶¶ 27-35.

76.     There is no evidence that any security breach has occurred with respect to any of the library copies of works included in the Google Books corpus. Gratz Decl. Ex. 1, Courant Dep. Tr. 107:5-8.

**RESPONSE:** Controverted. The statement lacks foundation and is not supported by the

cited material as the deponent speaks only for the University of Michigan and does not purport to

testify as to what any other library has done.

77.     No library has reduced its purchasing of books as a result of downloading of scans using GRIN. Gratz Decl. Ex. 1, Courant Dep. Tr. 108:15-19.

**RESPONSE:** Controverted.  The statement lacks foundation and is not supported by the

cited material as the deponent speaks only for the University of Michigan and does not purport to

testify as to what any other library has done.

78.     Libraries historically have not paid authors or publishers for the right to scan books in order to index them. Gratz Decl. Ex. 1, Courant Dep. Tr. 112:6-9; St. Clair Decl. Ex. A ¶¶ 5(c), 9.

**RESPONSE:**  Controverted as misleading and incomplete.  The statement as to whether libraries historically paid authors or publishers for the right to scan books in order to index them is meaningless in the absence of evidence that libraries did, in fact, scan books in order to index them, which not supported by the cited materials and contrary to Google's own statements concerning the relatively new development of such practice.  *See, e.g.*, Google 56.1 Stmt. ¶¶ 7-9, above.  With the development of new forms of use found to be desirable, collective management systems are often developed to license such uses.  *See* Zack Decl. Ex. 37, Gervais Report ¶ 41.

79.     Libraries historically have not paid authors or publishers for the right to scan books in order to search them. Gratz Decl. Ex. 1, Courant Dep. Tr. 112:6-9; St. Clair Decl. Ex. A ¶¶ 5(c), 9.

**RESPONSE:**  Controverted as misleading and incomplete.  The statement as to whether libraries historically paid authors or publishers for the right to scan books in order to search them is meaningless in the absence of evidence that libraries did, in fact, scan books in order to search them, which is not supported by the cited materials and contrary to Google's own statements concerning the relatively new development of such practice.  *See, e.g.*, Google 56.1 Stmt. ¶¶ 7-9, above.  With the development of new forms of use found to be desirable, collective management systems are often developed to license such uses.  *See* Zack Decl. Ex. 37, Gervais Report ¶ 41.

80.     One traditional way to promote book sales is to provide readers with the ability to browse books. Decl. Bruce S. Harris Supp. Def. Google Inc.'s Mot. Summ. J. ("Harris Decl.") Ex. A ¶¶ 10-14.

**RESPONSE:**  Uncontroverted.

81.     Books in bookstores are typically displayed on shelves or tables where they can be browsed. Gratz Decl. Ex. 2, Aiken Dep. Tr. 146:10-147:19; Harris Decl. Ex. A ¶ 15.

**RESPONSE:** Uncontroverted.


82.     Browsing can occur through websites such as Amazon.com, where publishers and authors can agree to allow users to "Search Inside the Book." Harris Decl. Ex. A ¶ 17; Decl. Albert N. Greco Supp. Def. Google Inc.'s Mot. Summ. J. ("Greco Decl.") Ex. A ¶ 15; Gratz Decl. Ex. 2, Aiken Dep. Tr. 147:20-23.

**RESPONSE:** Controverted as stated.  The term "[b]rowsing" is vague as used in the

context of this statement and is misleading to the extent that it implies that the vast majority of a

book is subject to "browsing" on Amazon's site without the rightsholder's permission.


83.     Some but not all of the books at issue in this case can be browsed on Amazon's site using "Search Inside the Book." Decl. Judith A. Chevalier Supp. Def. Google Inc.'s Mot. Summ. J. ("Chevalier Decl.") Ex. A ¶¶ 40-42; Gratz Decl. Ex. 2, Aiken Dep. Tr. 183:20-184:20.

**RESPONSE:** Controverted as unsupported by the cited materials.  None of the material

cited, which discuss Amazon's "Search Inside the Book" feature generally, address whether any

of the "books at issue in this case" are available using that feature.  To the contrary, materials

cited that reflect that are available on the Amazon's "Search Inside the Book" feature are books

that are subject to the control of the publisher whereas the majority of the "books at issue in this

case" are likely to be out of print.  In addition, the statement is misleading to the extent that it

implies that the vast majority of a book is subject to "browsing" on Amazon's site without the

rightsholder's permission.  *See generally* Aiken Decl.


84.     Search Inside the Book displays excerpts that are larger than the Google Books snippets. Chevalier Decl. Ex. A ¶ 47; Gratz Decl. Ex. 2, Aiken Dep. Tr. 183:20-184:20.

**RESPONSE:** Controverted.  The cited materials do not support the statement.  The

Chevalier Declaration only generally speaks of "excerpts often voluntarily provided by

publishers," not the Amazon.com Search Inside the Book feature, and the deposition testimony

24

cited makes no mention of the size of the display of excerpts on the Search Inside the Book

feature.  Moreover, the statement and any comparison between the Search Inside the Book

feature, which only displays excerpts with the permission of the rightsholders, *see* Gratz Decl.

Ex. 2, Aiken Dep. Dep. 183:20-184:20, and the Library Project's snippet display of a book,

which occurs without such permission, is irrelevant.  *See generally* Aiken Decl.

85.    Rightsholders give permission for online browsing using "Search Inside the
Book" without compensation to authors. Chevalier Decl. Ex. A ¶ 41; Gratz Decl. Ex. 2, Aiken
Dep. Tr. 183:20-184:20.

**RESPONSE:**  Controverted as stated as "without compensation" is undefined and vague

in this context.  In addition, the statement is controverted as misleading, as rightsholders may

receive compensation for certain books that are sold from Amazon.com, unlike the out-of-print

books in the Library Project, which provide no compensation to the author.

86.    The Authors Guild believes that online browsing has a net positive effect on book
sales. Gratz Decl. Ex. 2, Aiken Dep. Tr. 186:14-17.

**RESPONSE:**  Controverted in part.  The statement cited is limited to the Amazon.com

Search Inside the Book feature.  Gratz Decl. Ex. 2, Aiken Dep. at 186:14-17.  Further, the users

of Amazon.com can only view those portions of a book that are permitted to be viewed by the

permission of the rightsholder.  Gratz Decl. Ex. 2, Aiken Dep. Dep. 183:20-184:20; *see also*

Aiken Decl.

87.    The Authors Guild has recommended to its members that they make the entire
first chapter of a book freely available on the Internet. Gratz Decl. Ex. 2, Aiken Dep. Tr. 176:1-8,
13-24.

**RESPONSE:**  Controverted.  The statement mischaracterizes the testimony cited, which

is limited to recommendations made "in conjunction with the Back in Print Program."  Gratz

Decl. Ex. 2, Aiken Dep. at 176:18-19.

88.     The "Back in Print" program allows authors to digitize their out-of-print books and make them available for sale through a company called iUniverse. Gratz Decl. Ex. 2, Aiken Dep. Tr. 172:25-175:25.

**RESPONSE:**  Controverted in part as incomplete.  The Back in Print program, which

operates with the permission of the rightsholder, allows authors to provide copies of their out-of-

print books to iUniverse, which creates digitized image (not text) files of those books.  Gratz

Decl. Ex. 2, Aiken Dep. at 172-176.  Those image files are then used to create print-on-demand

copies of those books.  *Id.*; *see also* Aiken Decl. ¶ 29.

89.     William Morris is the largest literary agency in the world. Gratz Decl. Ex. 6, Zohn Dep. Tr. 12:24-13:9.

**RESPONSE:**  Controverted.  The statement lacks any foundation or factual basis as the

witness qualified his characterization of William Morris's size with terms, such as "probably"

and "I believe."  Gratz Decl. Ex. 6, Zohn Dep. at 12:24-13:9.

90.     William Morris believes that inclusion in Google Books "is a fair use and not detrimental to the copyright owner in any way." Gratz Decl. Ex. 7, Zohn Dep. Ex. 2 at 1.

**RESPONSE:**  Controverted as stated.  The statement is vague and ambiguous with

respect to the phrase "inclusion in Google Books."  The document quoted refers to "simple

inclusion in the database."  Gratz Decl. Ex. 7, Zohn Dep. Ex. 2 at 1.  Additionally, the statement

is irrelevant and/or overbroad inasmuch as it refers to Google Books generally, including books

for which permission of the rightsholder has been obtained in the Partner Program, and is not

specific to the Library Project, which is at issue.  Moreover, the statement is an improper legal

conclusion lacking any factual basis.

91.    Google Books has not displaced the sale of even a single book. Chevalier Decl. Ex. A ¶ 47.

**RESPONSE:** Controverted.  The source cited does not support the statement and any opinions offered by Prof. Chevalier concerning the whether Google Books has displaced the sale of any books does not satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the Federal Rules of Evidence.  However, such an opinion is meaningless speculation because at her deposition, Prof. Chevalier testified "I have not done any empirical analysis of the sales of books that were on Google Books."  Zack Decl. Ex. 42, Chevalier Dep. at 158:25-159:3.  Moreover, Prof. Chevalier further testified that, with regard to analyzing the sales of books that had been displayed in snippet view on Google Books, "I think it would be a difficult, if not impossible project." Zack Decl. Ex. 42, Chevalier Dep. at 161:24-162:2.  Additionally, the statement is irrelevant and/or overbroad inasmuch as it refers to Google Books generally, including books for which permission of the rightsholder has been obtained in the Partner Program, and is not specific to the Library Project, which is the only program at issue here.  *See also* Aiken Decl. ¶¶ 4-5, 32-33 and generally.

92.    A survey of authors has shown that the majority of authors approve of their inclusion in Google Books. Decl. Hal Poret Supp. Google Inc.'s Opp'n Plas.' Mot. Class Certification Ex. 1 at 14, ECF No. 1001-1.

**RESPONSE:** Controverted.  The survey cited in this statement is irrelevant, misleading and does not support the statement.  The phrase "inclusion in Google Books" is vague and ambiguous.  The survey asked respondents about "the extent to which" they "approve of or object to Google scanning your copyrighted books so that they can be searched online and short excerpts displayed in search results."  *See* ECF No. 1001-3, at Question 245.  However, the survey did not specifically inquire as to whether authors approved of or objected to Google doing so without permission from or notice to authors and without any compensation.  The majority of

the authors surveyed (508 out of 880—57.7%) were not at all familiar with or had never heard of Google Books. *See* Poret Decl. at 26, ECF No. 1001-1.  Moreover, most of the authors surveyed (759 out of 880—86.25%) were unaware of whether their books were available on Google Books or thought that they were not available.  *See* Poret Decl. at 22, ECF No. 1001-1.

The survey was conducted in 2012 for the purpose of opposing class certification.  This was after two detailed published class notices from the Court stating they would receive substantial monetary benefits from Google Books (67% of revenue from each book sold, and a substantial up-front amount for each book scanned) *See* ECF No. 56, Ex. 1 thereto, at pp. 8 and 21-41. Thus, to the extent any of those surveyed were settlement class members, certain responses favorable to Google's Library Project could have mistakenly reflected the belief that the settlement benefits were in force. In fact, Google actually played on this misassumption.  Google misleadingly asked those surveyed if they "felt" they benefitted financially from Google Books, and 17.6% answered "yes" (no doubt because they either received class notices or read the widespread publicity about the proposed class settlement).  This is reflected in at least the following verbatim answers: "You can download my book if you want, you still have to pay for it." ECF No. 1001-7, Response No. 100357.  "A lot of them are ebooks.  One of my publishers went through Google to get the book electronically.  I get royalties through that from the publisher." *Id,* Response No. 100057.  "I have a vague memory of informing [sic] I might be able to get royalties from Google books." *Id.,* Response No. 100756. "I do get a check for permission to download a chapter or whatever is download[ed]."  *Id.,* Response No. 100357.

Others believed that Google scanned and displayed only books in the public domain.  Google's survey did not disabuse them of this misapprehension.  Google did not explain it was scanning and displaying books that were in copyright without the rightsholders' permission.

(E.g., "They're often old books.  They are orphans meaning the author of the book cannot be found or they're out of copyright." (ECF No. 1001-7, No. 100040);  "Plan to do public domain books in Harvard library." (*Id.,* No. 100116); "Know that they are out of copyright books that are online and some in copyright books are available with arrangements with the publishers." (*Id.* No. 100528); "That it's a project to make electronically available all published books that are not under copyright I assume . . . ." (*Id.* No. 100188).

Additionally, the statement and the underlying survey are irrelevant and/or overbroad inasmuch as they refer to Google Books generally, including books for which permission of the rightsholder has been obtained in the Partner Program, and is not specific to the Library Project, which is at issue.  Google's reliance on this survey is further controverted for the reasons set forth in their Memorandum of Law in Opposition to Google's Motion for Summary Judgment and in their Reply in Support of the their Motion for Class Certification (ECF No. 1008).

93.     A survey of authors has shown that the majority of authors do not perceive any harm from their inclusion in Google Books. Decl. Hal Poret Supp. Google Inc.'s Opp'n Plas.' Mot. Class Certification Ex. 1 at 14, ECF No. 1001-1.

**RESPONSE:**  Controverted.  There was no question in the survey asking respondents whether they perceived "any harm," only questions specifically concerning financial harm and the impact on the demand for books.  Additionally, the survey is unreliable and misleading because the majority of respondents were not at all familiar with or had never heard of Google Books and the open-ended responses demonstrate fundamental misunderstandings of how Google Books operates.  *See* Pls.' Resp. to ¶ 92, above.  Additionally, the statement and the underlying survey are irrelevant and/or overbroad inasmuch as they refer to Google Books generally, including books for which permission of the rightsholder has been obtained in the Partner Program, and is not specific to the Library Project, which is at issue.  Google's reliance

on this survey is further controverted for the reasons set forth in their Memorandum of Law in Opposition to Google's Motion for Summary Judgment and in their Reply in Support of the their Motion for Class Certification (ECF No. 1008).

Dated: August 26, 2013

Michael J. Boni (*pro hac vice*)
Joshua D. Snyder
John E. Sindoni
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA  19004
Tel: (610) 822-0200
Fax : (610) 822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

Robert J. LaRocca
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel:  (215) 238-1700
Fax:  (215) 238-1968
rlarocca@kohnswift.com

Sanford P. Dumain
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229
sdumain@milberg.com

*Counsel for Plaintiffs*