DURIE TANGRI LLP
DARALYN J. DURIE (*Pro Hac Vice*)
ddurie@durietangri.com
JOSEPH C. GRATZ (*Pro Hac Vice*)
jgratz@durietangri.com
DAVID McGOWAN (*Pro Hac Vice*)
dmcgowan@durietangri.com
GENEVIEVE P. ROSLOFF (*Pro Hac Vice*)
grosloff@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

Attorneys for Defendant
Google Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES, JOSEPH GOULDEN, and JIM BOUTON, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE INC.,<br><br>Defendant. | Civil Action No. 05 CV 8136 (DC) |

**DEFENDANT GOOGLE INC.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

### TABLE OF CONTENTS

PAGE NO.

I.   INTRODUCTION ...................................................................................................... 1

II.  STATEMENT OF FACTS ........................................................................................ 2

A.   Google Books creates new information and new insights. ..................................3

B.   The Library Project has a public purpose. .........................................................6

C.   Google copies no more text than is necessary for Google's transformative purpose. ...............................................................................................................6

D.   Google Books does not compete with or substitute for the books in its corpus. .................................................................................................................8

E.   Google Books benefits authors. .........................................................................9

F.   Google Books does not deprive authors of actual or hypothetical licensing revenue. ...............................................................................................................10

G.   Plaintiffs have shown no harm from any actual or likely security breach. ............12

H.   Google does not distribute copies to libraries. ..................................................13

III. ARGUMENT ............................................................................................................ 14

A.   Google's Library Project is a fair use. ...............................................................14

1.   Google Books is a transformative use. ......................................................15

a.   Google Books creates new information and new insights. ............15

b.   Google Books is not used for the same purpose as the books in the corpus and therefore is not a substitute for them .......................................................................................................18

c.   Google's use is only indirectly commercial ...................................24

2.   The nature of many of the works at issue supports a finding of fair use ........................................................................................................26

3.   The amount used does not weigh against a finding of fair use. ................28

4.   Google Books has only positive effects on the market for books. ............30

a.   Plaintiffs point to no evidence of any loss of sales of the copyrighted works or other harm to the value of those works ..........................................................................................................31

b.    Plaintiffs' assertion that a new market might form is legally irrelevant and factually unfounded. ................................................32

c.    Plaintiffs' doomsday hacker scenarios are legally irrelevant and refuted by experience. .............................................................35

d.    Plaintiffs ignore the benefit to authors from Google Books. .........38

5.    The public interest favors a finding of fair use. ........................................38

B.    Plaintiffs cannot prevail on their distribution claim on summary judgment. ........39

1.    Plaintiffs have not established that Google distributes books to the public. ............................................................................................................39

2.    There is at least a disputed question of fact as to whether the libraries' uses are fair. .............................................................................................41

IV.    CONCLUSION ............................................................................................................ 44

TABLE OF AUTHORITIES

PAGE NO.

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ............................................................... 23, 24

*Am. Geophysical Union v. Texaco*,
  60 F.3d 913 (2d Cir. 1994) ................................................................. *passim*

*Am. Inst. of Physics v. Schwegman Lundberg*
  *& Woessner, P.A.*, Civ. No. 12-528
  (RHK/JJK) (D. Minn. July 30, 2013) ........................................................ 22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................... 2

*Arica Inst., Inc. v. Palmer*,
  970 F.2d 1067 (2d Cir. 1992) ................................................................. 27

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
  350 F.3d 640 (7th Cir. 2003) .................................................................. 17

*Authors Guild, Inc. v. HathiTrust*,
  902 F. Supp. 2d 445 (S.D.N.Y. 2012) ............................... 14, 41, 42, 43

*Bagdadi v. Nazar*,
  84 F.3d 1194 (9th Cir. 1996) ............................................................ 39, 40

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ................................................................. *passim*

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) .......................................................... 15, 17, 38

*Campbell v. Acuff-Rose*,
  510 U.S. 569 (1994) ................................................................................. *passim*

*Capitol Records, Inc. v. Thomas*,
  579 F. Supp. 2d 1210 (D. Minn. 2008) ................................................. 40

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) .......................................................... 15, 24

*Cartoon Network LP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) .......................................................... 40, 41

*Cen. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
   56 F.3d 359 (2d Cir.1995) ................................................................................ 42

*Davis v. Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) ........................................................................... 23

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
   471 U.S. 539 (1985) ...................................................................... 20, 25, 27, 30

*Infinity Broadcast Corp. v. Kirkwood*,
   150 F.3d 104 (2d Cir. 1998) ............................................................... 21, 22, 26

*Island Software & Computer Service, Inc. v. Microsoft Corp.*,
   413 F.3d 257 (2d Cir. 2005) ........................................................................... 41

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ........................................................... 23, 24, 28, 29

*Lish v. Harper's Magazine Found.*,
   807 F. Supp. 1090 (S.D.N.Y. 1992), *amended on reconsideration*,
   No. 91 Civ. 0782 (MEL), 1993 WL 7576 (S.D.N.Y. Jan. 7, 1993) ......................... 25

*London-Sire Records, Inc. v. Doe 1*,
   542 F. Supp. 2d 153 (D. Mass. 2008) ............................................................ 40

*Maxtone-Graham v. Burtchaell*,
   631 F. Supp. 1432 (S.D.N.Y.),
   *aff'd*, 803 F.2d 1253 (2d Cir. 1986) ............................................................... 27

*Meeropol v. Nizer*,
   560 F.2d 1061 (2d Cir. 1977) ......................................................................... 2

*Nihon Keizai Shimbun, Inc. v. Comline Business Data*,
   166 F.3d 65 (2d Cir. 1999) ............................................................................ 21

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ......................................................... 23, 24, 28, 29

*Ringgold v. Black Entertainment Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997) ............................................................................ 22

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ............................................................................ 23

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ....................................................................... 17

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) ................................................................. 17

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)............................................................................... 28

*Stewart v. Abend*,
  495 U.S. 207 (1990)......................................................................... 23, 27

*Twin Peaks Productions, Inc. v. Publications International, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ............................................................... 20

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
  292 F.3d 512 (7th Cir. 2002) ........................................................... 26, 28

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
  342 F.3d 191 (3d Cir. 2003) ................................................................. 21

*WNET, Thirteen v. Aereo, Inc.*,
  712 F.3d 676 (2d Cir. 2013) ................................................................. 40

**Statutes**

17 U.S.C. § 101 ........................................................................................ 40

17 U.S.C. § 106(3) ................................................................................... 40

17 U.S.C. § 107 ............................................................................... 1, 42, 44

17 U.S.C. § 108 ........................................................................... 12, 22, 42

17 U.S.C. § 108(c) ................................................................................... 42

17 U.S.C. § 108(f)(4) ............................................................................... 42

17 U.S.C. § 121 ............................................................................... 14, 42

Fed. R. Civ. P. 56(a) ................................................................................. 2

**Other Authorities**

Marc Egnal, *Evolution of the Novel in the United States:*
  *The Statistical Evidence*, 37:2 Soc. Sci. Hist. 231 (2013)........................ 5

Brian Lavoie & Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially*
  *In-copyright Print Books in Library Collections*, 15 D-LIB 11/12 (2009) ......... 3, 27

Pierre N. Leval, *Toward a Fair Use Standard*,
  103 Harv. L. Rev. 1105 (1990) ............................................... 1, 15, 32

Pierre N. Leval, *Nimmer Lecture: Fair Use
     Rescued*, 44 UCLA L. REV. 1449 (1997)............................................................... 24

Jean-Baptiste Michel et al., *Quantitative Analysis of Culture
     Using Millions of Digitized Books*, 331 SCIENCE 176 (2011)....................................... 5

Catherine Rampell, *The 'New Normal' Is Actually Pretty Old*,
     New York Times Economix Blog (January 11, 2011) ................................................ 5

Benjamin Schmidt, *The Foreign Language of Mad Men*,
     The Atlantic (March 21, 2012) ..................................................................... 5

Jean M. Twenge et al., *Changes in Pronoun Use in American Books and the Rise of
     Individualism, 1960-2008*, 44 J. CROSS-CULTURAL PSYCH. 406 (2013) .................................. 5

Uszkoreit et al., *Large Scale Parallel Document Mining for Machine Translation*,
     PROCEEDINGS OF THE 23RD INTERNATIONAL CONFERENCE ON COMPUTATIONAL
     LINGUISTICS 1101 (2010)............................................................................ 6

## I.       INTRODUCTION

Plaintiffs' Motion for Summary Judgment betrays a fundamental misapprehension of the fair use doctrine and this Court's role in applying it.  Plaintiffs contend that whether Google Books is "in the public interest, or in the interest of copyright owners" is "for copyright owners (or Congress)" to decide.  Motion at 21.  But copyright owners do not have the legal power to veto uses of their works that are fair.  As Plaintiffs' licensing expert testified: "You don't need a license for a fair use."  In enacting Section 107, Congress has directed "courts [to] continue the common-law tradition of fair use adjudication."  *Campbell v. Acuff-Rose*, 510 U.S. 569, 577 (1994).  Congress has thus provided the framework for this Court—not copyright owners—to decide whether Google Books constitutes a fair use.

The copyright laws exist to further learning, and the significant extent to which Google Books furthers that purpose is an indispensable part of the fair use analysis.  Google Books uses the text of books as "raw material, transformed in the creation of new information, . . . new insights and understandings[.]"  Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990).  As Judge Leval explained, "this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  *Id.*  Google Books provides readers who search its index with information that could not be gleaned using previous search methods such as card catalogues.  Persons and events important to history, but passed over by library cataloguers, leap to life when their names are searched in Google Books.

Plaintiffs do not acknowledge this public benefit.  Instead, Plaintiffs rely on a long litany of cases involving uses that substitute for the direct consumption of a copyrighted work.  Indeed, the casual reader of Plaintiffs' motion might assume that Google's Library Project reproduces the entire text of copyrighted works online.  It does nothing of the sort.  A key question to be asked in any fair use case is:  "Does the accused use supplant the original use?"  Or to put it

more starkly:  "Does the existence of the challenged use cost the author anything, by replacing a sale or license of the copyrighted work with a sale of the accused work?"  The answer in this case is "No."  Plaintiffs cannot identify even a single Authors Guild member who has lost a book sale on account of Google Books or is likely to do so in the future.  Quite the opposite:  the undisputed facts establish that the Library Project can only help authors, by allowing millions of users to locate, read, and purchase works that previously had been impossible or difficult to find.

Plaintiffs thus get both sides of the fair use balance wrong.  They ignore the substantial benefits Google Books delivers to authors and the reading public and fail to show cognizable harm.  This Court should reject Plaintiffs' motion.

## II.    STATEMENT OF FACTS

To prevail on their motion Plaintiffs must show the absence any factual dispute material to their claim.  Fed. R. Civ. P. 56(a).  "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  *See Meeropol v. Nizer*, 560 F.2d 1061, 1071 (2d Cir. 1977) ("[t]he availability of the fair use defense depends on all the circumstances surrounding the use of copyrighted material[,]" and "on a motion for summary judgment the court cannot try issues of fact; . . . it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, . . . with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute . . . .") (internal quotation marks omitted and alterations in original).  Plaintiffs' motion rests on a number of factual assertions that are disputed and ignores other facts material to the fair use analysis.  In evaluating Plaintiffs' summary judgment motion, this Court is bound to accept the following facts, all of which are supported by competent evidence, as true.

Because the Court of Appeals vacated this Court's order certifying a class in this action, ECF No. 1065, Plaintiffs' motion for summary judgment is necessarily limited to the works owned by Betty Miles, Joseph Goulden and Jim Bouton (with respect to their individual claims) and the members of the Authors Guild (with respect to the claims brought by that entity).

A.    **Google Books creates new information and new insights.**

Google Books allows users to search the text of millions of published books.  Decl. Dan Clancy Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1035 ("Clancy Decl.") ¶¶ 3-4.  Most of the books are out of print.  Decl. Stephane Jaskiewicz Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1041 ("Jaskiewicz Decl.") ¶ 4.  The overwhelming majority are non-fiction, and most are written by and for academics.  Brian Lavoie & Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially In-copyright Print Books in Library Collections*, 15 D-LIB 11/12 (2009), *available at* http://www.dlib.org/dlib/november09/lavoie/11lavoie.html (analyzing the collections of the three largest academic libraries from which Google scanned books).

Google Books allows readers to search the full text of these books using any search term that relates to their particular interests, rather than being limited to terms predetermined by cataloguing librarians.  Clancy Decl. ¶ 7.  A page of search results generated from the Google Books index contains information not available from any individual book or from any other source.  Decl. Gloriana St. Clair Supp. Def. Google Inc.'s Mot. Summ. J., Ex. A, ECF No. 1042-1 ("St. Clair Decl.") ¶¶ 40-44; Decl. Judith A. Chevalier Supp. Def. Google Inc.'s Mot. Summ. J., Ex. A, ECF No. 1034-1 ("Chevalier Decl.") ¶¶ 19-20, 30; Decl. Kurt Groetsch Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1038 ("Groetsch Decl.") ¶¶ 4-10, 13-14 (results for the search "Minoru Yasui"); Clancy Decl. ¶ 8 & Ex. B (results for the search "Steve Hovley").

Examples abound.  The Library of Congress catalog, for example, returns no results for a search for "500 Pearl Street."  Decl. Joseph Gratz Opp'n Plas.' Mot. Summ. J. ("Gratz Opp'n

Decl.") Ex. 1.  Through Google Books, one is pointed, as one might expect, to the *U.S. Court Directory* and to the page in the *Congressional Record* containing Senator Schumer's floor speech introducing the bill to name the courthouse for Daniel Patrick Moynihan.  Gratz Opp'n Decl. Ex. 2.  But one is also pointed to books that would not have been found on library shelves by those seeking courthouse information, like Arthur Bonner's 1996 book *Alas! What Brought Thee Hither?: The Chinese in New York, 1800-1950*, which reveals that in the 1800s, the address was the site of a cigar factory operated by William A. Hong, one of three Chinese Civil War veterans from New York, whose Chinese name was Hong Kee Kang.  Gratz Opp'n Decl. Ex. 3 (Partner Program display of page from *Alas! What Brought Thee Hither?*).  A search for "Hong Kee Kang" provides a link to a snippet view book with more information on Mr. Hong (the collection *Chinese America: History and Perspectives 1996*) which can be found in libraries or purchased from Amazon.com, used, for $14.98.  Gratz Opp'n Decl. Ex. 4 (search results page), Ex. 5 (snippet view page), Ex. 6 (Amazon.com listing).

Google Books searches a far more comprehensive index of books than could be searched before and does so in a tiny fraction of the time it took to perform the less comprehensive searches of the past.  It can be searched from any location with a computer and an Internet connection; proximity to physical collections of books is not required.  Chevalier Decl. ¶¶ 17-30; St. Clair Decl. ¶¶ 5, 40, 41; Decl. Joseph C. Gratz Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1036 ("Gratz SJ Decl.") Ex. 1, Courant Dep. Tr. 96:16-97:2.  Google Books thus allows users to find books they otherwise would not be able to find.  Chevalier Decl. ¶¶ 18-19, 30; Groetsch Decl. ¶¶ 12-14.  The degree of improvement is so substantial that, as a matter of economics, Google Books is not merely a variation on what came before but a new good:  it

improves substantially on previous search methods and creates benefits that did not exist before. Chevalier Decl. ¶¶ 15-20.

Google Books has opened new methods of studying our culture, generating new knowledge and information that extends beyond the new information contained in Google Books' search results.  It has given rise to Google's Ngram research project, which provides a tool for users to determine how frequently different terms or phrases appear in books published at different times.  Clancy Decl. ¶ 15.  The Ngram project has enabled the creation of "insights about fields as diverse as lexicography, the evolution of grammar, collective memory, the adoption of technology, the pursuit of fame, censorship, and historical epidemiology."  Jean-Baptiste Michel et al., *Quantitative Analysis of Culture Using Millions of Digitized Books*, 331 SCIENCE 176 (2011) (Clancy Decl. Ex. H); *see also, e.g.*, Catherine Rampell, *The 'New Normal' Is Actually Pretty Old*, New York Times Economix Blog (January 11, 2011), http://economix.blogs.nytimes.com/2011/01/11/the-new-normal-is-actually-pretty-old/; Benjamin Schmidt, *The Foreign Language of Mad Men*, The Atlantic (March 21, 2012), http://www.theatlantic.com/entertainment/archive/2012/03/the-foreign-language-of-mad-men/254668/.  It has been used to analyze the evolution of the American novel and how word usage reflects "changes in American society and values."  Marc Egnal, *Evolution of the Novel in the United States: The Statistical Evidence*, 37:2 SOC. SCI. HIST. 231 (2013) (Gratz Opp'n Decl. Ex. 7); *see also, e.g.*, Jean M. Twenge et al., *Changes in Pronoun Use in American Books and the Rise of Individualism, 1960-2008*, 44 J. CROSS-CULTURAL PSYCH. 406 (2013) (Gratz Opp'n Decl. Ex. 8).  And the corpus has allowed new types of research into linguistics and machine translation.  *See, e.g.*, Uszkoreit et al., *Large Scale Parallel Document Mining for Machine Translation*, PROCEEDINGS OF THE 23RD INTERNATIONAL CONFERENCE ON COMPUTATIONAL

LINGUISTICS 1101 (2010), *available at* http://www.aclweb.org/anthology-new/C/C10/C10-1124.pdf.

Google books has "transformed the way citizens and scholars worldwide can find books" and thus created an "immense public benefit." St. Clair Decl. ¶ 44. The books at issue here all existed before Google Books, but the benefits did not. Chevalier Decl. ¶ 20.

### B. The Library Project has a public purpose.

Google Books is free to the public. Its purpose is to make information in books discoverable, thereby enhancing research, scholarship and the store of human knowledge. Clancy Decl. ¶¶ 3-4. Although Google is a commercial entity, Google does not receive any direct commercial benefit from the Library Project: No advertisements have ever been run on About the Book pages for Library Project books.[1] Clancy Decl. ¶ 9.

### C. Google copies no more text than is necessary for Google's transformative purpose.

Because Google Books facilitates full-text searches tailored to the needs of particular users, it provides users with information that could not be created absent the digitization and indexing of books. Plaintiffs concede that it is necessary to scan the entire work to make a full-text index. Mem. Law Supp. Plas.' Mot. Partial Summ. J. ("Mot.") at 40; Gratz Opp'n Decl. Ex. 9, Aiken Dep. Tr. 115:1-18. In making a copy of the entire book as a predicate to its indexing,

---

[1] Plaintiffs selectively quote from a 2003 Google internal presentation to create the impression that Google embarked on the Library Project solely to make money. Nowhere does that presentation, entitled "Google Print *Full Text* Book Mini-GPS" even mention libraries or snippet display. As its title suggests, the presentation discusses the potential *full text* display of works with rightsholder permission, in what became the Partner Program. The only other presentation cited by Plaintiffs similarly relates to the Partner Program. Neither has any bearing on the Library Project.

Google has copied no more than is necessary to achieve its transformative purpose and give rise to the social benefits of full-text search.  Chevalier Decl. ¶ 19 n.28.

Google also displays no more text than is necessary to allow the user to determine whether a book is relevant to his or her search.  Gratz Opp'n Decl. Ex. 10, Miles Dep. Tr. 24:25-25:5 (an excerpt "gives a flavor of the style.").  Google does not display the full text of in-copyright books in the Library Project.  For works in the Library Project that are organized in short "chunks," such as reference works and poetry and recipe books, no content is displayed at all.  Clancy Decl. ¶ 11.

Google determines whether to display any text or no text by checking the relevant books manually.  For works in snippet display, the amount of text displayed to users is only a small portion of the copyrighted work.  Decl. Brad Hasegawa Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1040 ("Hasegawa Decl.") ¶ 4.  A snippet reproduces approximately an eighth of a page.  Clancy Decl. ¶ 10.  The amount of text in the snippet, or any collection of snippets, is far too little to substitute for the book itself.  Chevalier Decl. ¶¶ 44-47.

Google employs security measures to ensure that users cannot recover the entire text of a snippet view book or even one complete page.  Hasegawa Decl. ¶ 4.  No more than three snippets from any one book are returned in response to a given query.  A user cannot cause the system to return different sets of snippets for the same search query, and Google Books does not allow the searcher to copy the text of those snippets, instead presenting them in the form of an image.  *Id*.  Additional protections are in place to prevent automated downloading of snippets. *Id*. ¶ 6.  These protections are designed to prevent a user from conducting multiple searches in order to reconstruct any substantial portion of a book.  *Id*.  Google also blacklists at least one snippet per page and at least 10% of pages in each book, so even if the attacker had a physical

copy of the book in front of him, and used that physical copy to identify words appearing in successive snippets to use as the basis for the attack, he would still be missing significant portions of the book (and at any rate would have had an easier time simply scanning the physical copy in his possession).  *Id.* ¶ 5.  The Library Project is thus limited to its intended purpose of assisting searches and cannot become a substitute for buying or borrowing a book.

### D.  Google Books does not compete with or substitute for the books in its corpus.

Google Books' searchable index serves a purpose different than the purpose of the underlying works.  The index does not compete with or substitute for purchase of the books indexed; to the contrary, like all good indexes, the purpose of a Google Books search result is to direct a user to a book potentially relevant to his interests.  The purpose of a snippet is to help the user evaluate whether that book is pertinent to his search.  The underlying book, of course, exists to be read (and, in many instances, purchased).  The Book Search project provides the means by which those seeking to read books can find them; after all, you can't read something if you don't know it exists and don't know how to locate it.  *See* Gratz Opp'n Decl. Ex. 11, Plas.' Resps. Def. Google's 1st Set Interrogs., Interrog. No. 8 (purpose "is to entertain, educate, teach and/or express thoughts, feelings and ideas.").  As a result, Google Books serves a different purpose than does any particular book.  Chevalier Decl. ¶ 20; Gratz Opp'n Decl. Ex. 11, Plas.' Resps. Def. Google's 1st Set Interrogs., Interrog. No. 8.

The use of Google Books cannot substitute for the reading of a book.  Google Books has not displaced the sale of any of the individual Plaintiffs' books or indeed of any book.  The three named Plaintiffs admit that they have not lost sales or do not know whether they have been harmed as a result of their book being included in snippet display, and they have presented no evidence of any harm.  Gratz Opp'n Decl. Ex. 10, Miles Dep. Tr. 14:5-20; Ex. 12, Bouton Dep. Tr. 29:1-8; Ex. 13, Goulden Dep. Tr. at 38:2-39:1.  There is no evidence that any other Authors

Guild member has lost a sale of a book as a result of Google Books.  Gratz SJ Decl. Ex. 6, Zohn

Dep. Tr. 12:24-13:2; Gratz SJ Decl. Ex. 7, Zohn Dep. Ex. 2 (statement by literary agency

William Morris that Google Books "is a fair use and not detrimental to the copyright owner in

any way.").  As discussed below, the evidence is entirely to the contrary.

     **E.**     **Google Books benefits authors.**

Google Books increases sales of books by helping readers find books to buy.  Chevalier

Decl. ¶¶ 32-47.  Book browsing facilitates sales, both of the book being browsed and of other

books by the same author.  *Id.*  In 2004, the Authors Guild advised its members: "We think

Google Print will likely prove to be useful in promoting certain titles.  Midlist and backlist books

that are receiving little attention, for example, may benefit from additional exposure in searches."

Gratz Opp'n Decl. Ex. 14, Aiken Dep. Ex. 6 (October 2004 AG Membership Alert); *see also*

Chevalier Decl. ¶¶ 40-42.  And the Authors Guild recommends to its members that, if they seek

to bring one of their works back in print through digitization, they make an entire chapter

available for browsing online.  Gratz SJ Decl. Ex. 2, Aiken Dep. Tr. 176:13-24.

Google Books also benefits authors by providing them with a new research tool.  Many

authors consult the work of other authors in the process of creation, and Google Books enables

authors to locate those works.  In the words of Authors Guild Executive Director Paul Aiken:

> Authors of every type read, reinterpret and rely on their fellow authors, and those who
> have come before them.  This is true of the scholarly writer and of the author of popular
> nonfiction.  It's as true for authors of books for children as it is for authors of books for
> adults.  Authors of literary fiction also rely heavily on those who've come before them.
> The creative expressions are new, but many of the ideas underlying literary works are
> eternal.  Writers of genre fiction are no exception.  Romance writers read romance novels
> and other works and offer their own interpretation and variations on the romance
> theme . . . .  Authors, in short, want not only to realize the untapped value of their out-of-
> print works, they want access to this new, vast online library so that they can more easily
> create new works that readers will value.

Gratz Opp'n Decl. Ex. 8 at 5 (September 10, 2009 testimony of Paul Aiken before the House

Judiciary Committee).  Numerous authors have extolled the value of Google Books as a source

of such information.  *See, e.g.*, Brief of Amici Curiae American Library Association *et al.*, ECF

No. 1048, at 1-9; Clancy Decl. ¶ 15 & Ex. G.

Most authors themselves agree that inclusion in Google Books benefits rather than harms

them.  Decl. Hal Poret Supp. Google Inc.'s Opp'n Plas.' Mot. Class Certification Ex. 1, ECF No.

1001-1, at 14 (survey of authors showing that the majority of authors approve of their inclusion

in Google Books and do not perceive any harm from such inclusion).

F.     **Google Books does not deprive authors of actual or hypothetical licensing
       revenue.**

Authors do not receive licensing fees when their works are included in search services

that do not allow full-text display of their books (or, more generally, for any promotional use).

St. Clair Decl. ¶¶ 5(c), 9, 25; Decl. Bruce S. Harris Supp. Def. Google Inc.'s Mot. Summ. J., Ex.

A, ECF No. 1039-1 ("Harris Decl.") ¶ 17; Decl. Albert N. Greco Supp. Def. Google Inc.'s Mot.

Summ. J., Ex. A, ECF No. 1037-1 ("Greco Decl.") ¶ 15.  Plaintiffs' expert, Canadian law

professor Daniel Gervais, is unaware of a single instance in which the Copyright Clearance

Center ("CCC") has licensed a book for indexing and snippet display.  Gratz Opp'n Decl. Ex. 15,

Gervais Dep. Tr. 119:7-22.  And book industry professionals have long made available text (in

larger quantities than snippets) to drive book sales.  Harris Decl. ¶¶ 10-14.

Publishers frequently authorize, free of charge, uses more extensive than those for which

Plaintiffs seek compensation:  for example, 45,000 publishers, including the top publishers in the

United States, participate in Google's Partner Program.  Clancy Decl. ¶ 14.  As part of the

Partner Program, publishers request that Google display more text than is displayed in snippet

view.  Chevalier Decl. ¶¶ 36-37.  Historically, publishers received a share of advertising revenue

for advertisements shown on Partner Program About the Book pages.  Decl. Scott Dougall Opp'n Plas.' Mot. Summ. J. ("Dougall Opp'n Decl.") ¶ 5.  Even that revenue (for uses far more significant than the uses at issue in this case) was so low, however, that the advertising revenue share was discontinued:  today, publishers receive no compensation for these uses.  Dougall Opp'n Decl. ¶¶ 6-8.  Authors likewise receive no compensation for the inclusion of their books in Amazon's Search Inside The Book, which displays up to two chapters for free.  Gratz SJ Decl. Ex. 2, Aiken Dep. Tr. 183:20-184:6.

Far from receiving payment for the use of small excerpts of their work in connection with search, authors often pay for the privilege.  iUniverse, with whom the Authors Guild partners as part of its "Back in Print" program, offers services in which authors can pay a fee to have their works promoted through various online channels, including through Google Books and Amazon's Search Inside The Book.  Chevalier Decl. ¶¶ 40-45 & 49 n.61.  (Google does not receive any revenue from these fees paid to iUniverse, and invites authors and publishers alike to submit their books for inclusion in the Partner Program free of charge.  Dougall Opp'n Decl. ¶ 3.)

In sum, there is no traditional market in which authors are paid merely to have their books indexed or for allowing their books to be browsed.  St. Clair Decl. ¶¶ 5(c), 9, 25; Harris Decl. ¶ 17; Greco Decl. ¶ 15.  Google does not and would not pay for such uses.  Dougall Opp'n Decl. ¶ 9.  Like other promotional uses, Google's search functionality and snippet display benefit authors by driving sales,  Harris Decl. ¶¶ 15-16; Gratz SJ Decl. Ex. 2, Aiken Dep. Tr. 186:14-17, and there is thus no reason to expect that a market for such uses is likely to develop in the future.  Harris Decl. ¶ 17; Greco Decl. ¶ 15; Chevalier Decl. ¶¶ 31-47, 49.

11

Libraries were not about to embark on widespread digitization programs when Google Books began.  St. Clair Decl. ¶¶ 13-23.  They did not have the resources to do so, even when the National Science Foundation signaled that it would be willing to seek funding for digitization. *Id.* ¶¶ 13, 18-20.

Libraries have not paid nor ever would pay authors to index their works.  Gratz SJ Decl. Ex. 1, Courant Dep. Tr. 112:6-9; St. Clair Decl. Ex A ¶¶ 5(c), 9.[2]  Google Books thus did not pre-empt any efforts that would have inured to the benefit of authors.  Libraries have not reduced their purchasing of books as a result of downloading scans of their books from Google, nor have they used the copies they make and download as substitutes for materials they would otherwise have purchased.  Gratz SJ Decl. Ex. 1, Courant Dep. Tr. 108:15-19.

### G.    Plaintiffs have shown no harm from any actual or likely security breach.

As detailed in Section II-C, *supra*, Google employs security measures to ensure that users cannot recover the entire text of a snippet view book or even one complete page.  The scans of books in the Library Project are also protected—they are stored on secure servers that are not publicly accessible and are protected by the same security system Google employs to protect its own confidential information.  Hasegawa Decl. ¶ 3.  Google began scanning books in 2004. Clancy Decl. ¶ 5.  There has been no security breach resulting in unauthorized access to library books during the ensuing years.  Hasegawa Decl. ¶ 7; Gratz Opp'n Decl. Ex. 16, Edelman Dep. Tr. 249:14-17.

---

[2] Google also excludes works a rightsholder has asked Google not to display and takes steps to render the text of those books unsearchable.  Jaskiewicz Decl. ¶ 5.  Any rightsholder can exclude a book simply by filling out an online form which was been available since 2005.  *Id.*

Libraries have also taken security precautions to protect copies of Google's digital scans. Gratz SJ Decl. Ex. 1, Courant Dep. 106:23-107:8. Plaintiffs have not identified any way in which libraries' security is inadequate, and there is no evidence that any security breach has occurred with respect to any of the copies downloaded by libraries. *Id.*

Plaintiffs' own security expert admitted that "Google is fortunate to have ample resources and top-notch technical talents[,]" Gratz Opp'n Decl. Ex. 16, Edelman Dep. Tr. 244:13-14, and testified that a security concern arises only if "others begin to install similar services" *without* the security measures put in place by Google. *Id.* at 199:3-4.

Some works at issue in this case are available through Amazon's Search Inside The Book. Gratz Opp'n Decl. Ex. 17, Bouton Dep. Ex. 5 (Amazon display of a full page from Jim Bouton's book *Ball Four*); Gratz Opp'n Decl. Ex. 18, Miles Dep. Ex. 2 (Amazon display of a full page from Betty Miles' book *The Real Me*). The standard contracts relating to those services provide for no specific security protections. Gratz Opp'n Decl. Ex. 19, Edelman Dep. Ex. 16. There is no evidence in the record of any deficiencies in Google's (or libraries') security, and abundant evidence of its effectiveness.

### H.    Google does not distribute copies to libraries.

Pursuant to its agreement with Google, a library provides Google with a physical copy of a book from which Google makes a digital copy. Google owns that digital copy and never parts with it. Jaskiewicz Decl. ¶ 8. Google, through the automated Google Return Interface (GRIN) system, makes that digital copy available to the library for the purpose of allowing the library to make a further copy of it. The library (or its agent) may or may not make such a copy. *Id.* ¶ 9. If it does, the library owns the new copy from its inception. *Id.* Google's copy never changes hands. Jaskiewicz Decl. ¶¶ 8-9. No library may copy a digital file created from another library's book—even if both libraries own identical copies of that book. *Id.* ¶ 6.

Under their contracts with Google, the libraries are bound to make only lawful uses of the scans.  Clancy Decl. ¶ 5.  There is no evidence that any library has allowed any patron to read any digital copy it made using GRIN (other than qualified patrons with disabilities, as discussed below).  To the contrary, "the copies serve an entirely different purpose than the original works: the purpose is superior search capabilities rather than actual access to copyrighted material."  *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 460 (S.D.N.Y. 2012).  And, as 17 U.S.C. § 121 expressly permits, libraries have provided access to the blind, enabling "the unprecedented ability of print-disabled individuals to have an equal opportunity to compete with their sighted peers . . . ."  *Id.* at 464; *see also* Gratz SJ Decl. Ex. 1, Courant Dep. Tr. 43:2-15.  In addition, libraries have archived digital copies for the purpose of preservation.  Gratz SJ Decl. Ex. 1, Courant Dep. Tr. 85:12-86:11; *see also HathiTrust*, 902 F. Supp. 2d at 459.

## III.    ARGUMENT

### A.    Google's Library Project is a fair use.

The principal dispute concerning Plaintiffs' display and reproduction claims centers on Google's fair use defense.  Plaintiffs condemn Google Books as unfair, even when no text from the book is displayed to users and no copy of the book is made by a library—in other words, where Google Books is nothing more an improved electronic card catalogue that displays only bibliographical information about a book.  Plaintiffs present no evidence that any use of Google Books competes with or substitutes for the reading of the books in its corpus, no evidence of a single lost sale, no evidence of licenses actually struck or royalties actually paid for the uses at issue here, no evidence of prior indexing systems providing even a remote fraction of the benefits Google Books generates, and no evidence of security breaches at Google.  Plaintiffs' case boils down to the assertion, restated or implied many times in many ways, that authors have

14

a moral right, as opposed to an economic right, to control the uses of their works. United States copyright law says otherwise.

### 1. Google Books is a transformative use.

The "central purpose" of the investigation into the first fair use factor is to see "whether the new work merely 'supersede[s] the objects' of the original creation or instead adds something new, with a further purpose or different character, . . . it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (citing Leval, *Toward a Fair Use Standard* at 1111) (first and second internal citations omitted). Put simply, does the use (1) have a different communicative purpose than the original and (2) does it compete with the original in markets Congress intended to reserve for the original? The answer to the first question is, as a matter of law, yes. The answer to the second question is, as a matter of law, no. Google Books search results do not supersede the objects of the original books; instead, they provide new information about the collection of works in the Google Books corpus. Google Books thus easily satisfies the *Campbell* test.

### a. Google Books creates new information and new insights.

A transformative use involves "making some contribution of new intellectual value and thereby fostering the advancement of the arts and sciences, . . . ." *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 923 (2d Cir. 1994). Plaintiffs themselves posit that a transformative use is one in which "the secondary use adds value to the original – . . . the quoted material is used as raw material, transformed in the creation of new information, . . ." Mot. at 22 (quoting Leval, *Toward a Fair Use Standard* at 1111); *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). In other words, the use "must be productive and must employ the quoted matter in a different manner or for a different purpose from the original." *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013) (quoting Leval, *Toward a Fair Use Standard* at 1111).

A page of Google Books search results for this Court's address, 500 Pearl Street, exemplifies the ways in which Google Books satisfies that test.  Gratz Opp'n Decl. Ex. 2.  That search results page contains new information about books that discuss that address.  That information is different from the information contained in any individual book because it shows the breadth and variety of contexts in which that address has appeared.  It is different from the information in all books because it points to specific sources of information.  It is different from the information contained in indices, such as card catalogues, that preceded Google Books: a search for "500 Pearl Street" in the Library of Congress catalog returns no results.  Gratz Opp'n Decl. Ex. 1.

Plaintiffs note that an index of books already exists in the form of MARC records, the electronic version of a traditional card catalog, which contain author, title, publishing information and a few subject fields.  Mot. at 28 n.16.   But the those records vividly illustrate the *limitations*—not the merits—of an index that provides only a small number of human-curated subject categories for each book and does not support search of the full text of books.  Plaintiffs do not argue, because they cannot, that an index created from those MARC records would have anything approaching the same level of information as is found in Google Books.  A search of those records would yield no information about 500 Pearl Street, or about countless other potential searches (like a search for Steve Hovley, who returns no results in the Library of Congress catalog but dozens in Google Books, as discussed in Google's Motion for Summary Judgment).  Groetsch Decl. ¶ 10-12.  Indeed, such electronic records form part of the baseline from which Dean St. Clair assesses Google's contribution to book search, St. Clair ¶¶ 9, 41-42, a contribution she characterizes as providing immense social benefits.  *Id*. at ¶ 44; *see also* Chevalier Decl. ¶¶ 17-20.  The only reasonable conclusion to be drawn from these facts—and

16

without doubt *one* reasonable conclusion—is that Google improved on existing indices so substantially that its use was transformative.

Because Plaintiffs cannot credibly deny that Google Books search results contain new information, they point to Google's original scan of the entire work in isolation and contend that this scan is not transformative in itself because the scan alone does not give rise to new information until the index and search results are created.  As Plaintiffs put it, "the books, and snippets displayed from these books, do not magically appear in its search engine out of the ether[.]"  Mot. at 2.  But Plaintiffs cannot separate Google's scans from the use to which they are put.  Indeed, were it otherwise, *Bill Graham Archives* would have been decided differently:  the publisher had to make a copy of each of the several posters at issue in order to reproduce them in the book, but the court applied the fair use factors to the display in the book, not the intermediate copy.  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006).  The same is true of *Koons*, 467 F.3d at 252-53, in which the Second Circuit focused on the ultimate use of a portion of a photograph rather than the intermediate scan that made that use possible.  *Cf. Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) (intermediate copying necessary to a noninfringing purpose constitutes fair use); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992) (same); *see also Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 645 (7th Cir. 2003) (Posner, J.) (endorsing the reasoning of *Sony Computer Entertainment* and *Sega Enterprises*).  The court therefore cannot evaluate the intermediate copy in isolation: the fairness of that copy depends on the fairness of the use to which it is put.

As the Second Circuit noted in *American Geophysical Union*, "it is overly simplistic to suggest that the 'purpose and character of the use' can be fully discerned without considering the

nature and objectives of the user." 60 F.3d at 922.  Google is a search company.  Google Books is a search tool.  It makes no sense to discuss Google Books as if search were not the point of the project.[3]

> **b.  Google Books is not used for the same purpose as the books in the corpus and therefore is not a substitute for them.**

Plaintiffs argue that *American Geophysical Union* supports their position because "Google has used the author's text for precisely the purpose for which it was created[,]" Mot. at 27, and because "Google's verbatim copying is a 'superseding' or 'supplanting use' – *i.e.*, a verbatim substitution . . . " *Id.* at 21.[4]  In order for Google's copying to be a superseding or supplanting use, Google would need to display a copy of the work for it to be read, such that the reading of the copy would supplant the need to read the original.  Plaintiffs of course do not contend that Google reproduces entire books online.  Nor does it proffer any evidence, let alone undisputed evidence, that the review of a search result (with or without the display of a snippet) has ever substituted for the purchase of a book.

Indeed, any such assertion would be flatly inconsistent with all the record evidence.  The named plaintiffs testified that they do not consider snippets to substitute for books.  *See* Gratz Opp'n Decl. Ex. 13, Goulden Dep. Tr. 46:17-20; Ex. 10, Miles Dep. Tr. 49:20-23.  The only economic evidence on this point is that Google Books facilitates book consumption rather than substituting for it.  Chevalier Decl. ¶¶ 32-47.  Historical evidence showing a long tradition of

---

[3] Google does not argue, as Plaintiffs suggest, that digitizing a book is inherently a fair use.  Whether the digitization of a book is a fair use depends on the use to which the digital copy of the book is put.  Nor does Google argue that a use is transformative simply because it involves new technology or a new medium; this case would be very different if Google had reproduced the entire text of books so that they could be read online in their entirety.

[4] Plaintiffs' allusion to legislation that would allow full-text display of books, Mot. at 19, is thus entirely irrelevant to this case.

18

publishers using book text to promote sales—far more text than is included in snippets—
contradicts this assertion as well.  *Id.* ¶¶ 33-38.  The Author's Guild itself advises members to
display a full chapter of books they seek to return to print.  Gratz SJ Decl. Ex. 2, Aiken Dep. Tr.
176:13-24.  These practices are inconsistent with the unsupported assertion that such small
amounts of text substitute for purchases of the book.

There is a sharp contrast between Google's use of books to create a search tool and
Texaco's use of journal articles in the *American Geophysical Union* case.  60 F.3d at 915.  The
journal published and sold articles so scientists would read and learn from them.  Texaco copied
the articles for precisely the same purpose: so its scientists could read the articles and learn what
they had to say.  The articles were used for their original purpose and in their original form.  As a
result, *American Geophysical Union* involved copying for the purpose of satisfying the demand
that the original work itself sought to meet.  The copying was an "untransformed duplication":
the copies made and used by Texaco's research scientists were identical to the copies sold by the
journal.  The consequence of this untransformed duplication was that Texaco's copying
substituted for sales to those research scientists that the journal otherwise might have been able
to make.[5]  *American Geophysical Union* is inapposite because that case dealt with a use that
substitutes for the original; Google's use does not, and Plaintiffs have presented no evidence that
it does.

_____

[5] For this reason, Plaintiffs are wrong to assert that "verbatim copying and display cannot be
transformative under *American Geophysical Union*."  Mot. at 33.  *American Geophyiscal Union*
holds no such thing because not all verbatim copies or displays substitute for purchases of the
original.  *Bill Graham Archives*, for example, involved verbatim replication, but the Second
Circuit did not find that fact to be dispositive of its analysis.  *Bill Graham Archives*, 448 F.3d at
609.

The same is true of the other cases Plaintiffs rely on: in those cases, courts rejected a defense of fair use precisely because a review of the copy superseded the need for the original copyrighted work, and are similarly inapposite:

- *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985), dealt with a magazine story reproducing 300-400 words from a then-unpublished memoir by Gerald Ford.  President Ford's pardon of President Nixon was the most anticipated part of the book:  *Time* magazine had paid for the right to excerpt from the book on precisely that topic.  The *Nation* story featured the Nixon pardon and thus, the district court found, took "'the heart' of 'a soon-to-be published' work."  *Id*. at 544.  *Time* cancelled its story and refused to pay its license fee.  Once a reader had consumed President Ford's remarks regarding the pardon in *The Nation*, the reader had no reason to re-read the same remarks in the forthcoming autobiography.  The record contains no evidence that Google Books has displaced a sale, as was undisputed in *Harper & Row*.  *Id*. at 543-44.

- *Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366 (2d Cir. 1993), involved a book "summarizing in great detail" the plots of several episodes of a television program.  *Id*. at 1375.  The court treated the summaries as an abridgement that "serves no transformative function and elaborates in detail far beyond what is required to serve any legitimate purpose, . . . ."  *Id.* at 1376.  The court concluded that the defendant's book threatened to impair a market for books derived from the series, into which the rightsholder already had licensed two books of its own, and that the defendant's book could substitute for rental of a videotape of an episode abridged in the book.  *Id.* at 1377.

20

- *Nihon Keizai Shimbun, Inc. v. Comline Business Data*, 166 F.3d 65 (2d Cir. 1999), involved translations of newspaper stories originally published in Japanese.  The defendant's works were "for the most part direct translations of Nikkei articles; defendants added almost nothing new in their works[,]" and consumers of the defendants' works thereafter had no need for the originals.  *Id.* at 72. The Second Circuit found defendant's works "compete with and supersede" the originals, and were not transformative.  *Id*. at 73.

- *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc*., 342 F.3d 191 (3d Cir. 2003), involved defendant's creating and display of movie "previews" explicitly intended to serve the same purpose as, and substitute for, movie trailers the defendant previously had licensed (which were themselves derivative works independent from the underlying films).  *Id.* at 195.  The previews did not direct users to the studios' trailers, and rightsholders derived benefits from the licensing of their trailers (which were used in conjunction with other promotional activities).  *Id*. at 195-96.  The court found that the relevant question to be whether the previews substituted for the authorized trailers (not whether they substituted for the underlying movies).  Because the previews did, and were intended to, substitute for the trailers, the use was not fair.  *Id*. at 199.

- *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), involved the retransmission, in unaltered form, of entire radio broadcasts.  The retransmissions were (and were intended to be) listened to by the defendant's customers.  The defendant sought to rely on the possible motivations listeners might have for listening to the copied broadcasts, suggesting that they were listening to the

broadcasts for different reasons than typical radio station listeners. The court agreed that these reasons might evince a different purpose, and thus tended to support a finding of fair use, *id.* at 108, but found that this difference in purpose did not amount to transformation. That conclusion made sense: listening to the copied broadcasts substituted for listening to the original copyrighted transmissions. *Id.* at 110. The analogy would be if Google displayed the full text of works and suggested that the transformation lay in the reasons that its users read the books.[6] Instead, Google has indexed the works at issue and turned them into a powerful search tool that does not substitute for the books, and it is that transformation that has created the substantial social benefits documented in this record. *See, e.g.*, St. Clair Decl. ¶ 44; Chevalier Decl. ¶ 20.

In each of these cases the plaintiff's purpose was to provide content to readers or viewers, to be consumed in a continuous, narrative form. Defendant's purpose was the same; it thus superseded the purpose of the original works. Google Books does not: it surfaces only minute discontinuous fragments, and is useless for consuming content in continuous form. It uses text to create a tool that allows users not to read books but to find books that interest them. That different purpose also distinguishes this case from *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997), which found a material factual dispute concerning the display of the entirety of a poster for the same decorative purpose the original poster served; *Davis v.*

---

[6] Even this argument has been adopted by some courts, but this Court does not need to go that far in order for Google to prevail here. *See, e.g., Am. Inst. of Physics v. Schwegman Lundberg & Woessner, P.A.*, Civ. No. 12-528 (RHK/JJK) (D. Minn. July 30, 2013), ECF No. 250 (holding that verbatim duplication of scientific articles by patent attorneys was transformative because the articles were written to be read by scientists, not patent attorneys).

*Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001), which dealt with an advertising photograph that displayed a direct frontal view pair of decorative eyeglasses for the same decorative purpose served by the original; and *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), which affirmed an order granting a preliminary injunction against a book that had been marketed as a sequel to *The Catcher in the Rye*, where the court noted that it saw no clear error in the district court's ruling that the book served the same purpose as the original.[7]

Precisely because search results do not substitute for the underlying works, Plaintiffs can point to no substantive difference between Google Books and the search engines at issue in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003) and *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), which were held transformative because they served as pointers to the original works rather than as substitutes for them, or the plagiarism detection service at issue in *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009), which included the unaltered text of the underlying works but likewise did not substitute for them.

Plaintiffs point out that the works being indexed in *Perfect 10* were already online, whereas in this case the original works were physical books, but offer no explanation as to the purported relevance of this fact: it is hard to imagine why indexing and pointing to a physical book would be less transformative than indexing and pointing to an online one.  If anything, it would heighten the degree to which Google's use of books is transformative because searching millions of books in hard copy form is effectively impossible.  Chevalier Decl. ¶ 17.  Because

---

[7] Plaintiffs suggest that the Supreme Court held that *Rear Window,* Alfred Hitchcock's film adaptation of a short story and the subject of *Stewart v. Abend*, 495 U.S. 207 (1990), was not "transformative."  But that case was decided before *Campbell* introduced the concept of transformative use into Supreme Court jurisprudence, and the case was argued in January 1990, before the publication of Judge Leval's seminal article in March of that year.

Plaintiffs have no coherent basis on which to distinguish *Kelly*, *Perfect 10* and *iParadigms*, they are forced to argue that Ninth Circuit and Fourth Circuit law are inconsistent with Second Circuit law, notwithstanding that the Second Circuit cited *Kelly* with approval in *Bill Graham Archives*, 448 F.3d at 611. Plaintiffs appear to be alone in that view; we are aware of no court to have identified any such Circuit split.

Plaintiffs also contend that uses are transformative only when accompanied by criticism and commentary on the original. That is flatly contrary to Second Circuit law (though, to be fair, the clearest statement on the topic by the Court of Appeals had not yet been issued when the Plaintiffs filed their motion). "The law imposes no requirement that a work comment on the original or its author in order to be considered transformative, and a secondary work may constitute a fair use even if it serves some purpose other than those (criticism, comment, news reporting, teaching, scholarship, and research) identified in the preamble to the statute." *Cariou*, 714 F.3d at 706. This holding is consistent with the holding in *Bill Graham Archives* that the reproduction of concert posters was "transformative both when accompanied by referencing commentary and when standing alone," because the posters were being used for a purpose different than the purpose for which they had been created: the posters were created as advertising for live concerts; defendant's use was in a biography about the band in the posters, decades after the concerts were over. *Bill Graham Archives*, 448 F.3d at 611.

### c.    Google's use is only indirectly commercial.

The parties agree that most fair uses are commercial. As Judge Leval put it, "the proposition that commercial uses are unfair is extraordinarily inappropriate and harmful. The heart of fair use lies in commercial activity. Most undertakings in which we expect to find well-justified instances of fair use are commercial." Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued*, 44 UCLA L. REV. 1449, 1456 (1997). "The question under factor one is the purpose

and character of the use, not of the alleged infringer." *Lish v. Harper's Magazine Found.*, 807 F. Supp. 1090, 1101 (S.D.N.Y. 1992), *amended on reconsideration*, No. 91 Civ. 0782 (MEL), 1993 WL 7576 (S.D.N.Y. Jan. 7, 1993).  The weight given to the commercial purpose element of fair use analysis thus depends largely on the degree to which a use is transformative:  "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell,* 510 U.S. at 579. Google Books uses books in a highly transformative way:  it is able to provide new information as the result of Google's work in creating a searchable index, not because of any individual author's expression.

Google does not make any money from the display of any individual author's work: Google does not run any advertisements on "About the Book" pages associated with Library Project books.[8]  Clancy Decl. ¶ 9.  Plaintiffs contend that under *American Geophysical Union* the lack of a direct financial benefit is not dispositive.  But in that case Texaco simply wanted each researcher to be able to read the article without having to pay for it.  Indeed, Plaintiffs themselves contend that "the crux of the profit/non-profit distinction is . . . whether the user [here, Google] stands to profit from exploitation of the copyrighted material *without paying the customary price*."  Mot. at 34 (emphasis added and other alterations in original) (quoting *Harper & Row*, 471 U.S. at 562).  As discussed in more detail below, there is no customary price for the

---

[8] Plaintiffs reference two documents in an effort to show that Google's purpose for embarking on the Library Project was predominantly commercial, but neither document relates to that project, but instead to the Partner Program, in which publishers provide books to Google for hosting and display.  *See* Decl. Joanne Zack Supp. Plas.' Mot. Partial Summ. J. ("Zack Decl.") Ex. 34 at GOOG05004757 (discussing acquiring books from publishers for "full-text" display) & Ex. 35 at GOOG000645731 (describing a program in which "Publisher provides physical copy of books to Google").

inclusion of books in searchable indices.  Nor does Google exploit Plaintiffs' works by allowing

them to be read (the purpose for which a customary price does exist).  Even any indirect benefit

to Google does not come at the expense of the author—the concern animating this analysis,

*Campbell*, 510 U.S. at 579—but instead benefits both readers and authors by making it easier for

readers to find books they want to read.  Chevalier Decl. ¶¶ 21-29; 31-47.  *Cf. Ty, Inc. v. Publ'ns*

*Int'l Ltd.*, 292 F.3d 512, 517 (7th Cir. 2002) ("publishers want their books reviewed and wouldn't

want reviews inhibited and degraded by a rule requiring the reviewer to obtain a copyright

license from the publisher if he wanted to quote from the book.").

For this reason, Plaintiffs are wrong to suggest that the uses made of Google Books are

irrelevant to Google's fair use defense.  Mot. at 27-28.  As noted above, the authority Plaintiffs

cite for this proposition, the *Infinity Broadcasting* case, dealt with hypothetical user motivations

for listening to an unaltered retransmission of entire copyrighted works.  What consumers *do*

with a defendant's use is necessarily part of fair use analysis because it is impossible to assess

whether a use supersedes the objects of a plaintiff's work without assessing whether the use

substitutes for the original.  And in this case, unlike *Infinity*, the product *cannot* be used in the

only way that would displace the original.  The widely varying uses that have been made of

Google Books confirm that it does not displace the originals but instead makes them more

valuable by making them easier to find and use.  Chevalier Decl. ¶¶ 44-47.

## 2.     The nature of many of the works at issue supports a finding of fair use.

Plaintiffs contend that the nature of the individual book has little relevance to the analysis

in this case.  Mot. at 36 n.18.  The accuracy of that statement depends on the specific work at

issue.  There are three relevant questions:  whether the work is published, whether and to what

extent the work is fictional or factual in nature, and whether the book is in print.  *See Arica Inst.,*

*Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (that plaintiff's work was "a published work

available to the general public" favored a finding of fair use); *Stewart v. Abend*, 495 U.S. 207,

237 (1990) ("fair use is more likely to be found in factual works than in fictional works.");

*Maxtone-Graham v. Burtchaell*, 631 F. Supp. 1432, 1438 (S.D.N.Y.), *aff'd*, 803 F.2d 1253, 1265

(2d Cir. 1986) (that the book at issue was out of print weighed in favor of a finding of fair use).

First, all of the works are published, so the authors in this case have already voted in

favor of the dissemination of their works.  Gratz Opp'n Decl. Ex. 11, Plas.' Resps. Def. Google's

1st Set Interrogs., Interrog. No. 10.  This is not a case where, as in *Harper & Row*, the use

interferes with the plaintiff's introduction of the work to the public.

Second, many of the works at issue are non-fiction, and Plaintiffs concede that those

works receive a lesser degree of protection under the copyright laws.  Mot. at 37.  Most of the

works of the three individual plaintiffs are non-fiction works.  *See, e.g.*, Gratz Opp'n Decl.

Ex.13, Goulden Dep. Tr. 59:4-5 ("Q.  Are all of your books nonfiction?  A.  Yes.").  The same is

no doubt true of many other Authors Guild members; ninety-three percent of the works Google

scanned are works of non-fiction.  Lavoie & Dempsey, *supra*.

Third, the vast majority of the books at issue are out of print. Betty Miles is not aware

that any of her books is in print.  Gratz Opp'n Decl. Ex. 10, Miles Dep. Tr. 14:21-25.  Of Joseph

Goulden's 17 books, all are out of print except for *The Dictionary of Espionage* (whose publisher

has placed it in the Google Books Partner Program) and a Chinese translation of his book on the

Korean War.  Gratz Opp'n Decl. Ex. 13, Goulden Dep. Tr. 73:15-21; *see also id*. at 50:22-51:12.

Plaintiffs argue Google Books may have an adverse impact on authors whose work is out of print

because some authors may receive permission fees.  Mot. at 38.  Plaintiffs proffer neither

evidence that any Authors Guild member has ever received permission fees for indexing and

search nor evidence that any Authors Guild member would ever receive such permission fees in the future—a problem that we address in greater detail below.  And Plaintiffs ignore the fact that Google Books may help readers find out-of-print books and that demand for such books may drive up prices in used book markets, signaling demand and thus a market for a book, which could help authors determine when it is worth their while to attempt to bring a book back into print.  Gratz Opp'n Decl. Ex. 20, Chevalier Dep. Tr. 125:20-129:22.[9]

### 3.     The amount used does not weigh against a finding of fair use.

Plaintiffs contend that Google has made a copy of the entire work, and thus that the third fair use factor weighs against a finding of fair use.  But full-text copying does not weigh against fair use when it is necessary to facilitate a use that is otherwise fair.  The question is whether the amount copied "[is] reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  The Supreme Court, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-450 (1984); the Second Circuit, *Bill Graham Archives*, 448 U.S. at 613; and the Ninth Circuit, *Perfect 10*, 508 F.3d at 1167-68 and *Kelly*, 336 F.3d at 221, have all found that copying the entirety of a work may be fair use.  The Second Circuit summarized the law on this point (citing favorably the Ninth Circuit's search engine opinion in *Kelly*) when it held that "copying the entirety of a work is sometimes necessary to make a fair use of the image."  *Bill Graham Archives*, 448 F.3d at 613.  *See also Ty, Inc.*, 292 F.3d at 521 (copying of the entirety was fair

---

[9] Plaintiffs also ignore the converse of this argument:  For many published works, any such fees would be paid to the publisher, not the author, and the publishers have already widely authorized royalty-free uses of much greater portions of the text to enable search. Harris Decl. ¶ 17; Greco Decl. ¶ 15; *see* Gratz Opp'n Decl. Ex. 9, Aiken Dep. Tr. 186:14-17 (online browsing has a new positive effect on sales).  *See also* Chevalier Decl. ¶¶ 40-42.

use due to the nature of the defendant's work: "a collectors' guide, to compete in the marketplace, has to be comprehensive").

Google scans the full text of works because full-text scanning is necessary to facilitate full-text search.  *Cf. Perfect 10*, 508 F.3d at 1167; *Kelly*, 336 F.3d at 821.  Full-text search, in turn, is one of the ways Google Books improves on previous methods of finding books.  Gratz Opp'n Decl. Ex. 9, Aiken Dep. Tr.115:1-18.

Plaintiffs make no serious argument that the amount of text shown in any given snippet, or even any set of three snippets, constitutes a sufficiently significant portion of the work to weigh against a finding of fair use.  Gratz Opp'n Decl. Ex. 10, Miles Dep. Tr. 49:20-23; Chevalier Decl. ¶¶ 32-45.  Indeed, the Authors Guild recommends to its members that they make available for browsing far more text than is displayed in snippets.  Gratz SJ Decl. Ex 2, Aiken Dep. Tr. 176:13-24.  The voluntary choice of 45,000 publishers, including the top publishers in the United States, to make more than snippets available, is powerful evidence on this point.  Chevalier Decl. ¶¶ 36-37.

Instead of arguing that the results of any search are not a fair use, plaintiffs observe that it is possible for a given user to make repetitive searches in the same book.  But the record contains no evidence that users in the real world have conducted such targeted and repetitive searches with respect to any book of an Authors Guild member, much less with respect to all of them.  Nor have Plaintiffs introduced any evidence, let alone undisputed evidence, suggesting that even this idiosyncratic targeting of one book produces a collection of search results that would substitute for the reading of the book.  A searcher can, for example, get three snippets from Betty Miles' book *The Trouble with Thirteen* that contain the name of the character Annie, *see* Zack Decl. Ex. 7 at 1, or three that contain the name of the character Nora, *id.* at 4, or three that

mention pajamas, *id*. at 7.  But looking at these snippets is no substitute for reading *The Trouble with Thirteen*, and Ms. Miles concurs.  Gratz Opp'n Decl. Ex. 10, Miles Dep. Tr. 49:20-23.

Plaintiffs cite no authority for the proposition that different displays of text may be aggregated across large numbers of users reading small portions of a work at different places and times.  That notion conflicts with established doctrines such as *de minimis* use and fair use quotation; where no single individual obtains access to more than a small portion of the original, that access does not threaten to supplant the original in any way.  It makes no sense to aggregate all the portions among many different users and deem those users, collectively, to have accessed all or a substantial amount of the original work.

Basic economics also undercuts Plaintiffs' suggestion because Plaintiffs offer no evidence, nor any reason to believe, that these searches have influenced or would influence purchasing decisions made by different users conducting searches for different purposes at different times, none of whom are coordinating with or, probably, even aware of, the others.  That proposition is implausible on its face.  Absent such coordination, the sheer number of snippets displayed from a book over time and around the world says nothing about even one purchasing decision, or even one person's impression of a work.  Plaintiffs' argument is the very opposite of the facts of *Harper & Row,* in which a small but demonstrably valuable amount of text was reproduced by a single entity rather than being searched as part of a multi-million-book database.

### 4.    Google Books has only positive effects on the market for books.

The most striking feature of Plaintiffs' arguments concerning the fourth fair use factor is their complete lack of factual support.  They offer no percipient testimony at all.  Instead, after eight years of litigation, they offer conjectures from two experts, and those conjectures are vastly overstated.  The great weight of evidence shows that Google Books benefits rather than harms

authors.  In truth, there is no dispute regarding these benefits.  Plaintiffs have no economic case to make and no evidence with which to do so.

> a.     **Plaintiffs point to no evidence of any loss of sales of the copyrighted works or other harm to the value of those works.**

Plaintiffs do not contend that Google Books has displaced the sale of even a single book in the nine years in which the program has been in existence.  No Plaintiff testified to such a loss.  Any such evidence would conflict with:

(i)     Evidence from the Author's Guild's Paul Aiken that features such as Amazon's "Search Inside the Book" on balance probably increase sales, Gratz SJ Decl. Ex. 2, Aiken Dep. Tr. 186:14-17;

(ii)      Evidence from Eric Zohn of the William Morris Agency that Google Books benefits authors by helping consumers find their works, Gratz SJ Decl. Ex. 6, Zohn Dep. Tr. 18:10-19:24 and Gratz SJ Decl. Ex. 7, Zohn Decl. Ex. 2;

(iii)     Evidence that in the current marketplace authors and publishers opt in to Amazon's book search tool without receiving royalties, Gratz SJ Decl. Ex. 2, Aiken Dep. Tr. 183:20-184:22;

(iv)     Evidence from expert witness and publishing executive Bruce Harris that publishers traditionally make royalty-free uses of text to help drive sales and that Google Books serves a similar function, Harris Decl. ¶¶ 16-17;

(v)     Evidence that the Author's Guild itself advises its members to make available online a full chapter of works they wish to bring back in print, Gratz SJ Decl. Ex. 2, Aiken Dep. Tr. 176:1-24;

(vi)     Evidence from Dr. Chevalier that authors derive economic benefits from such uses, Chevalier Decl. ¶¶ 32-47;

(vii)    Evidence from the only survey before the Court, which finds that most authors approve of Google scanning their copyrighted books to facilitate online search and the display of short excerpts of text, Poret Decl. at 17;

(viii)    Evidence from Mr. Harris that there is no reason to expect that in the future authors will be compensated for allowing consumers to search for their books or browse through them, as Google Books does, Harris Decl. ¶¶ 17-18;

(ix)    Evidence from Dean St. Clair that libraries never have paid authors to index their books and will not do so in the future, St. Clair Decl. ¶¶ 5(c), 9, 51;

(x)    Evidence from Dr. Chevalier that both Mr. Harris's assessment and Dean St. Clair's assessment are consistent with economic principles, Chevalier Decl. ¶ 49;

(xi)    Evidence from Dr. Courant that the University of Michigan would never pay authors simply to search their books and has not reduced its book purchases in light of Google Books, Gratz SJ Decl. Ex. 1, Courant Dep. Tr. 107:9-112:19.

Against this evidence Plaintiffs offer two experts.  We show that neither has submitted evidence showing the slightest harm to authors from Google Books.

> **b.    Plaintiffs' assertion that a new market might form is legally irrelevant and factually unfounded.**

Plaintiffs contend that when Google copied books provided by libraries, it did not purchase or license them for that purpose.  That observation is true, as it would be in any fair use case.  As a matter of law, fair uses do not require permission.  Thus, as the Second Circuit has made clear, "[b]y definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties[.]"  *Bill Graham Archives*, 448 F.3d at 614 (quoting Leval, *Toward a Fair Use Standard* at 1124).

The legal definition of harm relevant to the fourth fair use factor is narrower.  The court may only consider "traditional, reasonable, or likely to be developed markets[]" in assessing whether a use has superseded the plaintiff's market.  *Bill Graham Archives*, 448 F.3d at 614 (quoting *American Geophysical Union*, 60 F.3d at 930). In an effort to show the existence of such a market, Plaintiffs offer Professor Daniel Gervais, currently of the Vanderbilt University Law School, as an expert in collective licensing.

Professor Gervais' opinions are irrelevant to the actual facts of this case.  His primary opinion is less an expert opinion regarding licensing than a legal tautology:  because fair uses need not be licensed, he testified, a finding of fair use in this case would impair a theoretical licensing market.  Gratz Opp'n Decl. Ex. 15, Gervais Dep. Tr. 95:7-14.  That is true in every case, of course, and this proposition does nothing to show harm to a traditional market or one reasonably likely to be developed.

Professor Gervais never opines that there are "traditional" licensing markets for displaying tiny excerpts from books, let alone for indexing books or for searching through them.  Indeed, though his report is ostensibly about Google Books, and even though Plaintiffs contend that Google Books is an infringement even when no book text is displayed to users, Professor Gervais never explicitly addresses the search function in his report.  *Id*. at 192:22-24.  Instead, he treats Google Books' 20-million-book text-searchable database as if it were a clipping service licensing purely consumptive uses of the books contained within it.

When it comes to "consideration of the precise facts at hand," which the *American Geophysical Union* court found essential in assessing fair use, 60 F.3d at 916, Professor Gervais' testimony refutes the notion that there is a traditional market for licensing the uses at issue here.  Professor Gervais has never seen a license for search alone, Gratz Opp'n Decl. Ex. 15, Gervais

Dep. Tr. 168:3-5; 210:5-8, does not believe the Copyright Clearance Center has ever licensed the mere indexing of books, *id.* at 119:7-10, and was not aware that authors opt in to Amazon's book search feature on a royalty-free basis. *Id.* at 167:4-11. Contrary to the claims in Plaintiffs' motion, Mot. at 44, Professor Gervais identified no markets that would have formed but for the existence of Google Books and did not opine that a licensing market would have arisen in the project's absence. Gratz Opp'n Decl. Ex. 15, Gervais Dep. Tr. 218:6-221:6. In any event, there is no record evidence whatsoever to support such conjecture.

With respect to potential future markets, Professor Gervais does not opine that Google would be willing to bargain with authors to keep Google Books alive if the program were found an infringing, rather than a fair, use. *Id.* at 188:5-10. Professor Gervais is not even willing to opine that authors would be paid for search or snippet display if Google's use of books were found not to be fair. *Id.* at 86:18-21, 164:11-17. Critically, rather than opining about the market for the type of use at issue in this case, Professor Gervais hypothesizes about potential licenses that might be struck for other uses, such as selling entire works online. *Id.* at 207:21-208:8. As a result, the hypothetical licenses about which he conjectures are not limited, as *American Geophysical Union* requires, to the precise uses at issue here. Absent the prospect of royalty-bearing licenses for indexing and search, authors could suffer no economic harm either from the use of books at issue here or from a fair use finding in this case.[10]

---

[10] Indeed, both Plaintiffs' extensive discussion of collective licensing and Professor Gervais' testimony as an expert on collective licensing are sideshows in this case. Collective licensing arose to solve the problem of widely dispersed rightsholders attempting to deal with widely dispersed users. Chevalier Decl. ¶ 49 n.63. That problem does not exist here, as the 45,000-plus partner program agreements attest. An author who wants to deal with Google or Amazon can simply deal with Google or Amazon; they do not need the CCC or any other intermediary to get in the way. Professor Gervais, however, performed no analysis whatsoever to determine whether

Moreover, even reading Professor Gervais to say things he was unwilling to say, his opinions would not show the absence of a material factual dispute. Google has proffered evidence that it would not pay to license content for search or snippet display. Dougall Opp'n Decl. ¶ 9. Professor Gervais made no effort to rebut evidence from Dr. Chevalier, Mr. Harris, and Dr. Greco, all of whom confirm that search tools benefit authors, and therefore authors would not receive royalties for allowing their works to be searched or displayed in snippet form. Nor did Professor Gervais make any effort to rebut evidence from Dean St. Clair, who confirmed that libraries have not paid authors to index works in the past and will not do so in the future. In short, his opinions, if stretched as suggested beyond his report, cannot support summary judgment in light of the opposing evidence.

### c. Plaintiffs' doomsday hacker scenarios are legally irrelevant and refuted by experience.

Lacking evidence of actual harm, Plaintiffs attempt to trade on anxiety. They offer testimony from Professor Benjamin Edelman, who opines on security risks relating to online book content.

Professor Edelman's opinion does not show the absence of a factual issue with respect to Google's fair use defense. First and most fundamentally, he explicitly is *not* opining about Google's actual conduct to date. Gratz Opp'n Decl. Ex. 16, Edelman Dep. Tr. 206:14-18. He does not even take issue with Google's own security: to the contrary, he concedes that "Google is fortunate to have ample resources and top-notch technical talents." *Id.* at 244:13-15. Instead,

---

collective licensing would be a more efficient method of licensing in this case than going through the CCC; he conceded that collective licensing, and thus his entire area of expertise, could represent a second-best approach to the economic structure presented by this case. Gratz Opp'n Decl. Ex. 15, Gervais Dep. Tr. 110:3-9.

as with Professor Gervais, Professor Edelman's opinions are drawn largely to hypothetical conduct unrelated to this case.  He opines that if Google's use of books is found to be fair then other entities might engage in book projects that might differ from Google's, and (unlike Google's) face security issues that could harm the interests of authors.  *Id.* at 193:12-195:5.  He concedes, however, that he knows of no such companies displaying books in snippet form right now.  *Id.* at 246:19-26.  And he concedes, as he must, that a future book-scanning project with bad security would be evaluated on its own merits, and might be found not to be fair use, while Google's project, with its concededly excellent security, may be fair use nonetheless.  *Id.* at 193:12-195:5.

Even as to the purely hypothetical world it addresses, Professor Edelman's opinion pertains not so much to security as to contracts.  He opines that if Google's uses are found not to be fair then authors might have a chance to negotiate favorable contract terms with respect to book search.  All the evidence recounted above shows that authors historically have not negotiated such contracts, and thus refutes Professor Edelman's opinion as well.  At a minimum, therefore, Professor Edelman at most creates a disputed issue of fact rather than showing the absence of such an issue.

But Professor Edelman's opinion does not actually do even that.  He has absolutely no foundation for his claim that authors could secure the contract terms about which he speculates.  He talked to no authors, no publishers, nor even the Authors Guild to determine how the market deals with such issues today.  *Id.* at 296:9-21.  He reviewed no actual contracts, not even the Authors Guild's contract pursuant to which it urges its members to digitize content to place books "Back in Print," to determine whether the terms he hypothesizes in his report are struck in practice and he is aware of no contracts containing such terms.  *Id.* at 211:9-212:2.  He

performed no analysis to assess the probability that any actual author would secure such terms. *Id*. at 296:6-8.  He does not in fact opine that authors would secure favorable terms should such hypothetical bargaining occur.  *Id*. at 226:24-227:10.

The sum and substance of Professor Edelman's testimony is that authors have a greater chance of securing such terms if Google's use is not found to be fair than they would if Google's use is found to be fair.  His testimony therefore simply repeats the legal tautology underlying Professor Gervais' opinion:  if no license is needed, the chance of getting a license term is lower than if a license is required.  That is true in every case, as discussed above, and it does not reflect harm to a traditional or reasonably probable market.

Google began scanning books in 2004.  To date there have been no security breaches resulting in the unauthorized publication of a book Google has scanned.  There is no evidence in this record that hackers have pirated any text from a Library Project book, and Edelman refers to none.[11]  It is, therefore, undisputed that *Google's* digitization of books has not reduced the value of any Plaintiffs' books through a security breach.  To the extent this case is about "consideration of the precise facts at hand," *American Geophysical Union*, 60 F.3d at 916, Edelman's only relevant opinions are that Google's security is excellent, and that there have been no known breaches.[12]

---

[11] Paul Aiken testified that "[e]arly on after the announcement of Google's Library Project" hackers were able to pull repeated search strings from (apparently) snippet views.  Gratz Opp'n Decl. Ex. 9, Aiken Dep. Tr. 136:8-14.  Mr. Aiken did not know, however, that Google blacklists portions of texts to prevent aggregation of a full text; he knew generally that Google employs technical means to prevent snippets being aggregated to a full book but he did not know whether these means were effective.  *Id*. at 136:15-137:8.  Mr. Aiken did not know whether the attempts he referenced resulted in unauthorized publication of a book on the Internet.  *Id*. at 138:5-8.

[12] There similarly is no evidence in this record of any security breach at any library that has chosen to copy a scan of a book it made available to Google.

### d.    Plaintiffs ignore the benefit to authors from Google Books.

The Court may also consider the benefit that flows to authors from their inclusion in Google Books.  The evidence recounted above shows that those benefits are considerable.  They are of two types.

First, authors obtain an economic benefit from Google Books.  To the extent that an author's book is in print, a search in Google Books may direct a reader to that book, resulting in a sale.  Even to the extent that the book is not in print, Google Books may reveal interest in that book sufficient to warrant its republication.  That is the entire premise of the Authors Guild's "Back in Print" program.

Second, authors stand on the shoulders of other authors; they benefit as authors when their research is made easier and more comprehensive.  This is particularly true of the authors of non-fiction and works of academic scholarship which make up the substantial majority of the Google Books corpus.

Plaintiffs simply ignore these obvious benefits.  But Google Books' benefit to authors is part of what makes it fair.  There is no way to decouple the fair use analysis from the consequences of an adverse ruling.

### 5.    The public interest favors a finding of fair use.

Plaintiffs ask this Court to condemn Google Books while ignoring its substantial benefits to scholars and students as well as the reading public.  But this Court must take those benefits into account in making a fair use determination; they cannot be ignored.  "[C]ourts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest."  *Koons*, 467 F.3d at 253 (quoting *American Geophysical Union*, 60 F.3d at 922).  Millions of Americans have used Google Books to find information of interest to them.  Many of them found books that could not have been located in any other practicable way.  Google books

38

democratizes access to information: few people can afford to travel to Harvard (or Stanford or Michigan) to find out whether those collections contain information about their great-great-uncle or the ship on which he came to America. But they can search in Google Books and find that information. *See* St. Clair Decl. ¶¶ 5(b), 43. And the societal benefits of Google Books go beyond its central purpose of helping people to find books of interest: the existence of the database has permitted research in the humanities and social sciences that would otherwise be impossible, and has led to new insights and understandings not just of particular books, but of the whole of language and literature. *See* Section II-A, *supra*; *see also* Amicus Brief of Digital Humanities and Law Scholars, ECF No. 1055, at 4-11.

### B. Plaintiffs cannot prevail on their distribution claim on summary judgment.

#### 1. Plaintiffs have not established that Google distributes books to the public.

Plaintiffs assert as a fact that Google distributes copies of books to libraries. To the extent that is properly characterized as a fact, it is a disputed one. Plaintiffs do not set forth any subsidiary facts on which they base that conclusion. Plaintiffs have thus identified no undisputed facts on the basis of which the Court could enter summary judgment in Plaintiffs' favor on its distribution claim.

Plaintiffs' distribution claim also fails for several additional, independent reasons.

First, the library makes a copy of a physical book in its own collection; it cannot make such a copy of a work owned by any other library. Plaintiffs argue that this activity constitutes a distribution to the public because the library, while a single institution, is comprised of many people, relying on *Bagdadi v. Nazar*, 84 F.3d 1194, 1198 (9th Cir. 1996). The *Bagdadi* case does not stand for the proposition for which it is cited by Plaintiffs—namely, that "[d]istribution to a single entity comprised of multiple people constitutes a distribution to the public." Mot. at

15.  The *Bagdadi* case interprets the definition of the term "publication" under 17 U.S.C. § 101.[13]
While the *Bagdadi* court's analysis of that term has never been cited or analyzed by any other
court, other courts have made clear that "[t]he statutory definition of publication is broader than
the term distribution as used in § 106(3)."  *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d
1210, 1220 (D. Minn. 2008); *see London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 169
(D. Mass. 2008).  In addition to acts of public distribution falling within Section 106(3), "a
publication may *also* occur by 'offering to distribute copies or phonorecords to a group of
persons for purposes of further distribution, public performance, or public display.'"  *Capitol
Records*, 579 F. Supp. 2d at 1220 (quoting 17 U.S.C. § 101).  It is that additional statutory
language—which appears in the definition of "publication," but not in the narrower right of
public distribution at issue here—that was at issue in *Bagdadi*.  The holding of *Bagdadi* is that "a
single entity comprised of multiple people constitutes a 'group of persons' within the meaning of
the statute."  *Bagdadi*, 84 F.3d at 1198.  That holding sheds no light on the meaning of 17 U.S.C.
§ 106(3), which does not make any reference to a "group of persons" and does not include within
its ambit any offer to distribute copies to such a group for purposes of further distribution.

Second, even if Plaintiffs otherwise could state a distribution claim, there would be at
least a factual dispute regarding whether Google is the distributor.  Under *Cartoon Network LP
v. CSC Holdings, Inc.*, 536 F.3d 121, 131-32 (2d Cir. 2008) ("*Cablevision*"), the direct infringer
is the person or entity that performs the volitional act causing the creation and downloading of a
copy.  *Accord WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 692 (2d Cir. 2013) (applying the

---

[13] The underlying dispute in the *Bagdadi* case was about the interpretation of the term "publicly
distributed" in 17 U.S.C. § 406(a), but the parties had stipulated that that term as it appears in
Section 406(a) "is equated with 'publication'" as defined in 17 U.S.C. § 101, and it was the
language of Section 101 that the court interpreted.  *Bagdadi*, 84 F.3d at 1198.

volitional conduct rule from *Cablevision*).  Plaintiffs accuse Google only of direct infringement.

Google provides the GRIN apparatus that the libraries may use to make a copy but does not

cause that apparatus to download the copy: libraries push the button to make a copy, not Google.

Jaskiewicz Decl. ¶¶ 8-9.  Under *Cablevision*, Google cannot be held liable as the direct infringer.

Finally, Plaintiffs argue that distribution occurs when ownership of a copy changes

hands.  Mot. at 15-16.   But no such transfer of ownership occurs in this case.  Google owns the

digital copy and never transfers ownership to any library.  Rather, Google allows a library access

to Google's digital copy, via the GRIN system, for the purpose of allowing the library to make a

further copy.  This case is therefore unlike *Island Software & Computer Service, Inc. v.

Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005), which involved the sale of pirated software to

an investigator posing as a member of the public and in which ownership of the copy did pass

from one entity to another.[14]

> **2.    There is at least a disputed question of fact as to whether the libraries' uses are fair.**

With respect to the legality of the libraries' use of digitized books, the Authors Guild

advances precisely the same theories that it advanced in its case against the libraries.  *See

Authors Guild v. HathiTrust*, No. 11-cv-6351 (S.D.N.Y. filed Sept. 12, 2011).  The court ruled

against the Authors Guild on summary judgment.  *Authors Guild v. HathiTrust*, 902 F. Supp. 2d

445 (S.D.N.Y. 2012).  The Authors Guild has appealed, and that appeal is fully briefed and

---

[14] Even under Plaintiffs' theory, only some books are subject to the distribution claim.  Plaintiffs
have not identified the works as to which they seek summary judgment, making it impossible for
the Court to enter judgment as to any particular work or set of works.

awaiting argument before the Second Circuit.  *Authors Guild v. HathiTrust*, No. 12-4547 (2d Cir. filed Nov. 14, 2012).[15]

The Authors Guild's arguments fail here for the same reasons they failed in the *HathiTrust* action.  Plaintiffs' principal argument with respect to the libraries' use of the scans they have made is that Section 108 of the Copyright Act provides libraries with certain affirmative rights to make particular uses of copyrighted works, such as making up to three digital copies to replace a published work that is damaged, deteriorating, lost, or stolen, where an unused replacement copy cannot be found at a fair price.  17 U.S.C. § 108(c).  But Plaintiffs utterly fail to apply Section 107 or to examine whether the libraries' uses are fair under that statutory section.  That failure is contrary to the statutory language.  Section 108(f)(4) provides that nothing in Section 108 "in any way affects the right of fair use as provided by Section 107 . . . ."  Plaintiffs therefore are wrong to suggest that Section 108 sets forth "*the* limited circumstances in which libraries can copy in-copyright books[,]" Mot. at 45 n.20 (emphasis added).  *Accord HathiTrust*, 902 F. Supp. 2d at 457 ("fair use does not undermine Section 108, but rather supplements it").

The libraries at issue here have worked together to make their copies searchable, and Michigan has allowed its copies to be used so visually impaired students can read its books, a use for which the Copyright Act provides explicit authorization.  17 U.S.C. § 121.  As discussed above, the creation of a full-text search tool is transformative, and the libraries' use is purely

---

[15] When and if that decision is affirmed, to the extent it does not have that preclusive effect already, the judgment will have preclusive effect against the Authors Guild in this litigation, and the Authors Guild will be barred from relitigating the issues decided in that case, such as whether the libraries' conduct is fair use.  *See Cen. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.1995).

noncommercial.  The books are as widely varied as in Google Books, and, as with Google

Books, full-text copies are needed to facilitate full-text search.  These purposes lie at the heart of

the fair-use doctrine's protection.  *See HathiTrust*, 902 F. Supp. 2d at 464 ("I cannot imagine a

definition of fair use that would not encompass the transformative uses made by Defendants'

[Mass Digitization Project] and would require that I terminate this invaluable contribution to the

progress of science and cultivation of the arts that at the same time effectuates the ideals

espoused by the ADA.").

Evidence from Dean St. Clair and Dr. Courant, uncontradicted by Plaintiffs, shows that

libraries have not traditionally paid authors to index works, or to allow browsing, that libraries

were not engaged in widespread digitization efforts that were pre-empted by Google, much less

efforts that would have paid any royalties to authors, and that there is no prospect that authors

will in the future earn royalties for the uses at issue here.

For his part, Professor Edelman is unaware of the security measures employed by the

University of Michigan and does not know how those security measures compare to those

employed by iUniverse, which the Author's Guild affirmatively recommends to its members.

Gratz Opp'n Decl. Ex. 16, Edelman Dep. 248:7-22.  He is aware of no pirating of scans libraries

have downloaded using the GRIN.  *Id*. at 249:14-17.  And this is not surprising: the libraries'

security is excellent.  Gratz SJ Decl. Ex. 1, Courant Dep. 106:23-107:9; *see also HathiTrust*, 902

F. Supp. 2d at 463 (the Authors Guild "fails to demonstrate a meaningful likelihood of future

harm" with respect to the security of copies held by libraries).

Given Plaintiffs' failure to produce evidence on these topics, at a minimum a reasonable

juror could find that these facts establish the fairness of the libraries use of the copies they have

downloaded from Google.

**IV.      CONCLUSION**

Summary judgment motions must demonstrate the absence of material factual disputes. The most striking thing about Plaintiffs' motion is the absence of facts.  Plaintiffs present literally no evidence of harm to authors from Google Books.  No author testifies to lost sales or hacking, no licensing executives relate negotiations undercut by the project or a history of licensing the uses at issue here, no consumers attest that they consider snippets substitutes for books.  On all these points there is no factual evidence.  Instead, there is only conjecture from experts who quite conspicuously opine on everything except the search function Google Books actually serves and the security measures Google actually employs.

Plaintiffs introduce no such evidence because no such evidence exists.  Plaintiffs make no practical case about the economic effects of Google Books because there is no case to make. Plaintiffs' case is instead about what they conceive as a moral right to be asked, and given the chance to say "no," before any use is made of their works.  Even *indexing alone*, without display of any text at all, is unlawful under Plaintiffs' theories in this case, though no remotely plausible case could be made that helping people find books harms authors.

Congress refused to allow the tolerance of authors to be the exclusive measure of the public interest.  That is why Section 107 exists.  That is why fair uses need not be licensed.  The evidence of public benefits is all on Google's side of this case.  And, remarkably, the evidence of the lack of harm is all on Google's side as well.  No balance need be struck in this case, because the moral right to say "no" is not entitled to any weight under the Copyright Act.  Controlling law requires the Court to deny Plaintiffs' motion.

///

///

///

44

Dated:  August 26, 2013                    Respectfully submitted,


By:      _/s/ Joseph C. Gratz_____
         Daralyn J. Durie (*pro hac vice*)
         ddurie@durietangri.com
         Joseph C. Gratz (*pro hac vice*)
         jgratz@durietangri.com
         DURIE TANGRI LLP
         217 Leidesdorff Street
         San Francisco, CA  94111
         Telephone:  415-362-6666
         Facsimile:  415-236-6300

         Attorneys for Defendant Google Inc.