**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

The Authors Guild, Inc., Associational Plaintiff, :
Betty Miles, Joseph Goulden, and Jim Bouton, :
individually and on behalf of all others similarly :
situated, :
               :  Case No. 05 CV 8136-DC
    Plaintiffs, :
               :
    v. :
               :
Google Inc., :
               :
    Defendant. :
               :
               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF PAUL AIKEN IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY**
**JUDGMENT**

   I, Paul Aiken, hereby declare as follows:

   1.  I am the Executive Director of the Authors Guild, Inc.  I have been

employed by the Authors Guild since April 1993, first as a staff attorney, then as

Assistant Director, and finally at my current position since 1996.  I am a 1985 graduate of

Cornell Law School and an attorney licensed to practice in New York.

   2.  I submit this declaration in opposition to Defendant's Motion for

Summary Judgment and specifically to correct Google's repeated distortions and misuse

of my deposition testimony.  I have personal knowledge of the facts set forth in this

Declaration and could testify competently at a hearing if called upon to do so.

   3.  At my deposition, Google's counsel asked whether I, and the Authors

Guild, thought browsing of physical books in bookstores helped to sell books (transcript

pp. 146-147) and whether Amazon's Search Inside the Book program promoted sales (transcript p. 186). I answered yes to both. Google's brief now seeks to mischaracterize my answers for a different, broad proposition that: "The Authors Guild believes that online browsing has a net positive effect on book sales" (Google Br. p. 17), implying that the Authors Guild endorses Google's practices at issue in this litigation. To explain my actual answer in more detail, and to rebut Google's false inference, I provide the following description of Amazon's practices. We do not support Google's far different actions, which we consider to be copyright infringement, and which prompted the Authors Guild to become a plaintiff in this lawsuit.

4.      While it is true that displaying book excerpts *at an online bookstore* is believed by most people in the book industry (including me) to increase sales of most books, there is no evidence I am aware of that displaying "snippets" of copyrighted text *at an online search engine* increases book sales at all. I do believe that displaying snippets of copyrighted text helps Google sell its ads, however.

5.      Google's search engine has many merits, but as an online shopping environment, it's a poor substitute for Amazon.com. To the extent Google's unauthorized display of snippets lures readers away from online bookstores such as Amazon, which has displayed lengthy, authorized previews of books for a decade, there can be little doubt that Google is actively harming book sales.

6.      A look at the history of Google's library project and its competition with Amazon, which had launched its own historic book-scanning project years before Google initiated its unauthorized scanning of millions of copyright-protected books, makes it inescapably apparent that luring readers from Amazon's online bookstore, the most

successful online shopping environment on the Internet, to Google's search engine, the
most successful advertising environment on the Internet, is precisely what Google had in
mind when it began scanning millions of copyright-protected books.

### Amazon's Book-Scanning Project

7.     Because of its potential effects on our members' copyright interests, the
Guild's board of directors and legal staff have followed book-scanning efforts with great
interest.

8.     On October 23, 2003, Amazon.com launched "Search Inside the Book,"
which allowed users of Amazon's website to search more than 120,000 books, or 33
million pages, at the time it launched, according to Amazon's press release. (See
Attachment A: Amazon Press Release: "Amazon.com Launches 'Search Inside the Book'
Enabling Customers to Discover Books by Searching and Previewing the Text Inside:
Leading-Edge Search Technology Delivers a Book-Buying Experience Previously
Unavailable in the Physical or Online Worlds.")

9.     With "Search Inside the Book," not only could Amazon's customers
search these 120,000 books, they could preview entire book pages containing the search
terms. Customers were required to log in with their Amazon user names and passwords to
preview entire book pages, so they could instantly purchase the books they were
browsing. As Amazon explained in its press release:

Here's how it works:

- Customers interested in resistojet propulsion can search for
  "resistojet" and will automatically see a list of the many books at
  Amazon.com that contain this term in the text, in addition to those
  books that contain the term in the title.
- Books with "resistojet" in the text will display an excerpt including
  that word or phrase and a link that says "See more references to

'resistojet' in this book." By clicking on this link, customers will
see a list of excerpts from all pages on which "resistojet" appears
in the book they selected, as well as a link to view the full page
from the book on which the excerpt appears.

- Once customers have clicked on the link to a specific page and
signed in with their Amazon.com user name and password, they
can preview relevant pages, including the page they selected, and
search for other terms of interest within the book.

*Id.*

10.    The announcement was a momentous one in the book world. It was clear
to most industry observers that Amazon's ambitions for the program were enormous.
Indeed, Amazon had agreements with more than 190 publishers to digitize books for
Search Inside the Book, according to its press release, including many of the largest U.S.
publishers, such as John Wiley & Sons (publisher of plaintiff Jim Bouton's *Ball Four*),
Random House, Simon & Schuster, Time Warner, HarperCollins, McGraw-Hill, and
Holtzbrinck. The number of participating publishers would rapidly grow to include nearly
every book publisher in the U.S.

11.    A critical component of "Search Inside the Book" is that users had to log
in with their Amazon user names and passwords before they could view full pages of the
books. In that way, those virtually browsing the books would have Amazon's famous
one-click purchase button at the ready. While there was disagreement as to the magnitude
of the impact of Search Inside the Book on book sales, all early reports – and all reports
to this day – agreed that Search Inside the Book boosted sales for most of the books in the
program.

**Amazon and the Search Engine Market**

12.    The implications for Search Inside the Book went far beyond the book industry, however. Amazon was offering searchable content that no other entity, not even Google, had, and that content was based on contracts negotiated with hundreds of publishers. A November 12, 2003, article in *Wired* magazine made this abundantly clear:

> Of course, Amazon is not merely part of the book business. The Internet as a whole is going through a similar transition. Revenue for Internet companies increasingly comes from users seeking to buy something - from transactions made in the physical world. Even Google, which doesn't sell anything directly, earns most of its cash from advertisers whose messages pop up when users search for info about specific products, such as computers or cars - or books. With retail at the center of the Internet industry, Google is a key competitor because customers begin their online shopping trips at search engines that offer neat algorithms for comparing prices across multiple vendors. Everybody - Yahoo!, eBay, AOL, Microsoft, and, of course, Amazon - wants to be the site of first resort.

> All the leading retail sites have better knowledge of their customers than Google. But Google is the leading Internet information tool, period. Google is a window onto the entire Web. *On the other hand, the contents of books may be the only publicly accessible data set with the potential to match Google's Web index both for size and utility. Search Inside the Book makes Amazon the sole guide to tens and ultimately hundreds of millions of pages of information. And while Google's business is vulnerable to any competitor that builds a better search engine, Amazon's book archive is the product of negotiated contracts with hundreds of publishers. Amazon has cornered the market on information that was once hidden away in books.* The burden of the physical - the fact that the database Amazon uses is linked into a complex system involving real things - gives it a stunning, if perhaps temporary, advantage.

"The Great Library of Amazonia," Wired Magazine, November 12, 2003. Attachment B. (Emphasis added.)

13.    Gary Wolf, author of the *Wired* article, wrote about the critical limitations placed on Search Inside the Book:

> The archive is intentionally crippled. A search brings back not text, but pictures -- pictures of pages. You can find the page that responds to your

query, read it on your screen, and browse a few pages backward and
forward. But you cannot download, copy, or read the book from beginning
to end. There is no way to link directly to any page of a book. If you want
to read an extensive excerpt, you must turn to the physical volume --
which, of course, you can conveniently purchase from Amazon. Users will
be asked to give their credit card number before looking at pages in the
archive, and they won't be able to view more than a few thousand pages
per month, or more than 20 percent of any single book.

*Id.*

14.     Wolf reported that he spoke to Amazon CEO Jeff Bezos about the project,

who was emphatic about his purposes:

Bezos is vehement on this point. He has sold publishers on the idea that
digitizing hundreds of thousands of copyright books won't undermine the
conventional bookselling business. *"It is critical that this be understood
as a way to get publishers and authors in contact with customers," he says
in an interview at Amazon's Seattle headquarters. "We're perfectly
aligned with these folks. Our goal is to sell more books!"*

Bezos has some good evidence to back up his argument. Amazon has
consistently added features that have proven to increase book sales.
Through its customer reviews, used-book business, and personalized
recommendations, the company constantly puts its customers in contact
with new titles. *Amazon is a machine that stimulates the acquisitive urge
of readers. It appeals to their specialized interests.
It makes people buy books.*

*Id.* (Emphasis added.)

15.     While the Authors Guild has had its disagreements with Amazon over the

years, many of them quite sharp, our concerns are focused on Amazon's behavior, which

I personally view as frequently monopolistic and unfairly undermining the livelihoods of

brick-and-mortar bookstores, which many authors depend on for marketing their books. I

have never doubted, however, Amazon's mastery of the online bookselling environment.

My conversations with publishers at the time and since then have confirmed that they

agreed to participate in Search Inside the Book because they believed it would sell more

books, and the evidence Amazon provided them supported that belief.

    16.    Wolf also visited the home of Udi Manber, the computer scientist hired by

Amazon who had conceived of Search Inside the Book and headed up its implementation

right in Google's backyard, in Palo Alto, California. Manber made the project's limitless

ambitions clear:

> Manber invites copyright holders to offer nonexclusive searching and browsing
> rights to Amazon, which will digitize the titles and offer access to audiences
> forever. "Give the books to me," Manber says. "I am glad to do it."

*Id.*

    17.    Amazon was unmistakably on its way to making nearly all in-print books

available for searching and previewing at its online bookstore.

    18.    Google had conquered online content, but Amazon, by negotiating

agreements with hundreds of publishers, had gone where Google could not, making tens

of millions of pages of carefully written, edited, and published works, all previously off

line, available to its shoppers. Amazon, by cornering the market on book content, was

suddenly a competitor unlike any Google had ever faced.

    19.    The threat to Google's search dominance became even more apparent just

five months later, when Amazon unwrapped its beta version of A9, Amazon's search

engine competitor to Google. John Battelle, a visiting professor at the University of

California, and author of a widely followed blog covering search engines, was one of the

first to report on Amazon's search effort. "A9, Amazon's Search Portal, Goes Live:

Reverberations Felt in Valley," John Battelle's Search Blog, April 14, 2004. Attachment

C.

20. Battelle was impressed by Amazon's foray into search:

It seems to me, Google's position in Amazon's A9 implementation is at best a step backwards. If A9 is as good as it seems to be, every customer that uses and/or switches to A9 becomes an A9 search customer, and, more likely than not, a deeper and far more loyal Amazon customer. (The service incorporates a personal search history and many other really neat tweaks, including a wicked good Toolbar.) *In essence, Amazon seems to be making a play for Google's customers.*

*Id.* (Emphasis added.)

21. Battelle even suggested that Google might be trying to hire Udi Manber, the brains behind Search Inside the Book and the head of Amazon's innovative and disruptive A9 search engine project, noting that "Work at Google" was the top paid link you searched Manber's name at Google. *Id.*

22. Battelle interviewed Udi Manber about Amazon's A9 project for Business 2.0 in an article provocatively entitled "Can Amazon Unplug Google?" Mr. Battelle writes:

Is Amazon (AMZN) taking on Google? Last fall the giant online retailer announced that it was launching a company focused exclusively on search. Lest anyone miss the implications, Amazon promptly rented an office far from its Seattle headquarters — in the epicenter of Silicon Valley, near Stanford University. That's where both Google and Yahoo (YHOO) were born.

\*\*\*

Amazon recently took the wraps off its initial public beta version of A9, and we got the first sneak peek. It's easy to see why the new engine might set Google and other search-driven companies on edge: A9 is a credible step toward making a search engine that knows you and acts as your agent online.

"Can Amazon Unplug Google?" Business 2.0, April 15, 2004. Attachment D.

23. In September 2004, A9 moved out of beta. The *New York Times* reported:

> Amazon.com, the e-commerce giant, plans to take aim at the Internet
> search king Google… Amazon's entry into the search engine wars will
> certainly raise the stakes in an already heated battle for control of what is
> believed to be the high ground in Internet commerce and advertising.

The A9 search engine offered user content Google could not match: the millions of book

pages available (to those who logged in with their user names and passwords) through

Search Inside the Book.. "Amazon to Take Searches on Web to a New Depth," New

York Times, September 15, 2004. Attachment E.

24.     A9's launch came at a critical time in the corporate history of Google, six

years after the company was incorporated, and, as the *Times* noted, just one month after

Google made its initial public offering of stock. *Id.* Google had a well-financed,

innovative, disruptive competitor in its own back yard.

### Google Trumps Amazon, by Avoiding Rights Holders and Their Interests

25.     Google didn't stand still. Three months after the formal launch of

Amazon's A9 search engine, with its unique access to an expanding list of in-print,

copyright-protected books Amazon scanned with the permission of the books' publishers,

Google struck back. It announced that it would begin scanning copyright protected books

for its search engine. "All Booked Up," Google's Official Blog, December 14, 2004

(available here: http://googleblog.blogspot.com/2004/12/all-booked-up.html); Zack Decl.

Ex. 12.

26.     Google had come up with a way to neatly leapfrog Amazon's scanning

efforts: it would scan copyright-protected books without permission, claiming that its

scanning and snippet display were covered by fair use (even when it was scanning and

displaying in-print books that had been scanned, or were eligible for scanning, by

Amazon).

27.    Rather than painstakingly seeking permission from rights holders, who might require a share in advertising revenue, or who might require that users be logged in to one-click purchasing accounts before viewing portions of their books, or who might demand control over the display, storage and security of their books, Google chose instead to negotiate with libraries, offering copies of the authors' and publishers' own books in compensation for access to the libraries' repositories.

28.    Google's library project would soon begin displaying snippets of authors' and publishers' in-print books in competition with the authorized displays available at Amazon and, later, BarnesandNoble.com and other online retailers. To the extent Google succeeds in luring readers to its search engine and away from online bookstores, Google surely harms book sales.

29.    It isn't just in-print books that are affected. By December 2004, when Google announced its massive scanning-and-display project, thousands of formerly out-of-print books were being made available by print-on-demand technology, including more than a thousand works by Authors Guild members we made available through our Backinprint.com program. Since then, surely tens of thousands of more out-of-print books are commercially available again, brought into print by countless publishers such as university presses, newcomers such as Open Road Media, and publishing programs at Amazon and Barnes & Noble.

30.    Amazon and Udi Manber, incidentally, were not done with their disruptive innovation of the search business. In January 2005, The month after Google announced its copyright-infringing leap into getting books into its search engine, Manber and A9

10

caught Google flat-footed by unveiling another groundbreaking set of content unavailable

at Google: street views for A9's maps:

> "We allow people from their computer to look at the street, to walk to the
> left, to walk to the right, to see the neighborhood, to see parking—it's virtually
> like you're there," said Udi Manber, president of A9.com. "Pictures get you
> information faster than any other way. Very often you remember a place but not
> its name. This is a very easy way to find it."
>
> To create this system, A9 developed technology that combined digital
> cameras, GPS location systems and other hardware, and equipped vehicles with
> this technology to capture images of buildings and geotag them with location
> information. The company then hired drivers to cover 'tens of thousands of miles'
> to acquire images, according to Manber.
>
> The system is almost entirely automated, and drivers make their rounds
> through cities at normal speed. "We can do that at a very large scale very
> efficiently and at very low cost," said Manber.

"Amazon's A9 Launches Visual Yellow Pages," Search Engine Watch, January 26, 2005.

Attachment F.

31.    Google addressed the Udi Manber problem a year later, hiring him in

February 2006. "Google Hires Amazon Search Chief," Seattle Post-Intelligencer,

February 7, 2006. Attachment G. A9 would then quickly fade as an innovative threat to

Google, and Google would introduce its A9 street view equivalent in May 2007, more

than two years after A9's version became available. "Google Announces New Mapping

Innovations at Where 2.0 Conference," News from Google, May 29, 2007, Attachment

H.

**Book Excerpts Do Sell Books, at Online Bookstores**

32.    The Authors Guild, as Google points out, does believe that allowing

readers to search and view selections of books online can promote the sale of books. But

the context for those book displays is crucial. If the book excerpts are displayed in a

bookselling environment, then book sales are generally promoted. If book excerpts are displayed in a search engine's advertising-driven environment, then ad sales are generally promoted.

33.     To the extent Google's unauthorized displays of books encourages readers to search at its ad-supported search engine, rather than logging in to Amazon's retail environment, Google is hurting the sales of authors' books. For this reason, and many, many others, authors and other rights holders should have control of when their books are copied in their entirety, and where their books are displayed.

34.     Google, in other words, disrupted the commercial, permission-driven development of book-search-and-display at online bookstores in order to gain a competitive advantage over other search engines. In the process, it distributed millions of digitized books to universities, placing those books beyond the control of authors and publishers and putting them at plain risk of widespread infringement.

I declare under penalty of perjury that the foregoing is true and correct.

Paul Aiken

Dated:  New York, New York
        August 26, 2013