**EXHIBIT 8**

# Statement of Paul Aiken
# On the Google Book Settlement

# Committee on the Judiciary
# House of Representatives

**September 10, 2009**

# I.    EXECUTIVE SUMMARY

## Overview

My name is Paul Aiken.  I'm the executive director of the Authors Guild, the largest society of published authors in the U.S., representing more than 8,500 book authors and freelance writers.  Our members represent the broad sweep of American authorship, including literary and genre fiction, nonfiction, trade, academic, and children's book authors, textbook authors, freelance journalists and poets.[1]  Guild members have won countless honors and all major literary awards, including the Nobel Prize for Literature.[2]

The Authors Guild promotes the professional interests of authors:  we're advocates for effective copyright protection, fair contracts, and free expression.

## The Challenges Facing Print Media

It's a pleasure to be here before this committee, at this moment in book publishing history.  Never in the Authors Guild's long history has its straightforward mission – to maintain writing as a viable livelihood – been so daunting.  The digital environment is brutal for print media.  As we meet here today, the newspaper industry is dying.  Credible estimates say that one newspaper is closing each week in America.  The magazine industry isn't much better off, as week by week we see venerable publications shrink in size and ambition.  The loss to our society from the collapse of these industries is

---

[1] The Guild had its beginnings as the Authors League of America, which was founded in 1912 by a group of book authors (including Theodore Roosevelt, who served as the League's founding vice president), short story writers, freelance journalists and a smattering of dramatists.  In the 1920s, the Authors League broke into two groups: the Authors Guild and the Dramatists Guild of America.

[2] Pearl S. Buck (1938) (who served as Authors Guild president), William Faulkner (1949), John Steinbeck (1962), and Isaac Bashevis Singer (1978).  One Guild member, Elie Wiesel (1986), has won the Nobel Peace Prize.

immeasurable.

The book industry, happily, has to date fared better than our colleagues in the print media. This is, no doubt, partly due to our medium: print books are still superior in almost every way to their electronic counterparts. That advantage is rapidly fading, however; our transition to digital form is underway, and things change quickly in a digital environment.

The portents are not encouraging. Finding a sustainable business model for creative work in digital form seems nearly impossible on the Internet: if piracy doesn't get you, the aggregators will.

We'll likely need many things to go right to avoid the fate of our colleagues in the print industries.

### The Opportunity

Yet, there are reasons for optimism. One of those reasons is our settlement with Google, which brings us here today. That settlement promises to address one of the oldest and most vexing of market failures: the loss to the commercial market of out-of-print books.

If you had asked knowledgeable people a couple of years ago whether we were close to delivering a near universal library to public libraries, colleges, and universities across the country, they would have scoffed. The technical challenges seemed too daunting, the rights clearance issues insurmountable, the passions stirred by the ongoing copyright wars far too intense for such a result to be achieved in the foreseeable future.

But here we are, on the cusp of that extraordinary achievement: the marriage of

much of our collective library with the Internet.  The benefits to readers, students, and scholars would be profound.  Here are a few:

1.     The settlement would turn every library into a world-class research facility, by offering every public library building in the U.S. – all 16,500 of them – a free portal to millions of out-of-print books.  The settlement would also offer a free portal to that same vast database of out-of-print books to more than 4,000 higher education institutions, from community colleges to our most elite universities.

2.     Students and professors at colleges with the most modest of endowments would find an important part of the academic playing field had come to level, as they gain full access from every computer on campus to a library exceeding that of the finest Ivy League schools.

3.     The visually and reading impaired would find the stacks of libraries open up to them as never before, gaining access to orders of magnitude more books than they currently have.

4.     The settlement would offer anyone online in the U.S. free "preview" access to hundreds of millions of pages of text (up to 20% of each book).[3] Readers from their own home computers would be able to review hundreds of accounts of the Battle of Vicksburg, or of the beginnings of the Industrial Revolution, or of the sources and interpretation of Moby Dick, at no charge.

---

[3] Here's the math: we expect the settlement to make at least 10 million out-of-print books available, which, at an average of 300 pages per book, represents at least 3 billion pages of professionally written, professionally edited text.  20% of that is 600 million pages of text available at every desktop computer in the U.S. as a free preview. (For comparison, Encyclopedia Britannica is about 44,000 pages in print form; Wikipedia's featured articles total about 5,000 pages. All English Wikipedia articles, including stubs, total perhaps 3 million pages.)

Should a reader find one book particularly compelling, she could buy access to the entire book.  Access to public domain books is free, of course, and authors controlling the rights to their books can choose to give away access for free.

Authors and publishers are willing to make this deal for several reasons.  We of course hope to profit from the market that's created.  We would like to have the Internet work for us, creating a market of the previously unmarketable.  We also have a vital interest in keeping books central to our students, scholars, and culture.  We're confident that making this vast library available online will help do just that.

Authors have another strong interest in making this deal work:  authors need libraries.  Libraries fuel their work.  Authors of every type read, reinterpret and rely on their fellow authors, and those who have come before them.  This is true of the scholarly writer and of the author of popular nonfiction.  It's as true for authors of books for children as it is for authors of books for adults.  Authors of literary fiction also rely heavily on those who've come before them.  The creative expressions are new, but many of the ideas underlying literary works are eternal.  Writers of genre fiction are no exception.  Romance writers read romance novels and other works and offer their own interpretation and variations on the romance theme.

Authors, in short, want not only to realize the untapped value of their out-of-print works, they want access to this new, vast online library so that they can more easily create new works that readers will value.

### The Opposition

Opposition to the settlement falls into several broad categories.  We'll address two important objections in this Executive Summary.

*Objection #1:  Copyright doesn't permit a system that asks authors and publishers to specifically exclude their out-of-print works from uses negotiated on their behalf.*

This simply isn't so.  There is ample precedent around the world for dealing with market failures in copyright in precisely this way.  For example, Germany today operates a system that nearly parallels the one the settlement would put in place.  The German system allows for

(a) routine copying of out-of-print works written by foreign and domestic authors,

(b) including routine copying of "orphan" (unclaimed) works, and

(c) without regard to whether those authors and publishers have expressly approved those uses.

The German system, however, actually denies authors and publishers any ability to exclude their works.

The German system goes even further, allowing the copying of in-print works without the permission of the author or publisher (in our settlement, the author and publisher must both approve of any displays of in-print works).  Germany's photocopy licensing system is perfectly legal, and meets with the norms of international copyright law.

In fact, this is the typical way for countries to deal with the market failure represented by the unlicensed photocopying of copyrighted materials, although many countries allow authors and publishers to exclude their works from such licensing.  Other countries with similar photocopy licensing systems include Australia, Canada, the United Kingdom and the Nordic countries, among many others.  The market for photocopy licensing often fails without intervention, because the transaction costs of the license,

including the labor costs of the licensee, are simply too high relative to the value of the individual copy.

The inability to license out of print works to colleges, libraries and individual users presents a market failure on an epic scale.  Here, as with photocopy licensing, a major component of the transaction costs involve rights clearance issues.  Another impediment is the sheer scope of the project, and the capital and technological resources it demands.  This settlement, with a financially strong and sophisticated technology partner, addresses the market failure.  The societal value in bringing these works back to the market is incalculable, but until our settlement there was no practical way to do so.[4]

---

[4] The impediments to making systematic use of the digital rights in out-of-print books are many, but they fall into two broad categories:

    A.    Rights clearance issues.  Here, there are three different obstacles. First, it may be unclear who controls the rights because no one knows whether rights to a particular out-of-print book have reverted to the author or not (most standard trade book contracts ask an author to demand a reversion of rights before the contract formally terminates and the rights revert to the author).  Second, it may be unclear who controls the digital rights for a particular out-of-print book, since many (but not all) older contracts make no mention of digital or analogous rights.  Third, it may be difficult to find the author or publisher who controls the rights, particularly for older works.  This is the so-called orphan works problem.  (More on this later.)

    B.    Digitization and presentation issues.  Here, the obstacles are capital and technological sophistication.

The rights clearance issues are largely addressed in Attachment A to the settlement, which deals with author-publisher issues and was the result of laborious negotiations between author and publisher representatives, and through the operation of class-action law.

The digitization and presentation issues have been handled with money and clever technology. Estimates of Google's costs in scanning, digitizing and building the technical infrastructure to support the display of millions of out-of-print books run to about a billion dollars.  (We have no special knowledge of Google's costs.)  Part of the challenge for Google was to find an efficient way to scan library books without damaging them by flattening them onto the scanner's surface. It solved this through a patented technology that corrects for the distortions caused by the scanning of a book page that curves away from the scanner's surface towards the book's binding.

*Objection #2.  The settlement inappropriately permits the use of unclaimed (orphan) works.*

No issue has been more misunderstood or misreported regarding this settlement than the unclaimed or "orphan" works issue.

The primary misconception is the size of the problem:  it's much smaller than has commonly been reported, for several reasons.  First, finding the rights owner of a book is not as daunting as many seem to believe.  Books do not present the classic orphan works problem, photographs do.  Photographs, both in the physical world and online, often become separated from their identifying information.  This makes finding the rights owner a near impossibility.  Books, however, always contain author and publisher information, and there's often a copyright registration record to help locate the rights owner.  Second, although a copyright-protected book may have been published as long ago as 1923, the vast majority copyright-protected books in our libraries are far more recent.[5]

Another major misconception is the failure to recognize that countries around the globe are already dealing with the orphan works issue in a productive way.  The photocopy-licensing systems in other English-speaking countries permit the use of orphan works.  This, as previously discussed, is a natural result of those nations' attempts to cope with the market failure represented by unlicensed photocopying of copyrighted works.  As the licensing societies collect photocopy royalties and start to cut checks to

---

[5] This is because, for books published between 1923 and 1963, authors had to file renewal registrations to prevent their works from falling into the public domain. More importantly, the number of titles produced by the book publishing industry was far lower through most of the 20th Century than it was in its concluding decades.  The median age of a copyright-protected book in a U.S. library is far younger than many commentators assume.

authors, word spreads, quickly, and authors step forward to register themselves. The pool of unlicensed works shrinks. The licensing societies are duty-bound to actively seek out authors[6] for whom they have money. Year by year, they locate more and more authors, and the orphan works problem diminishes further.

We have some experience with this, since we helped found and long provided financial support to the Authors Registry, an independent, non-profit, rights-payment agency. The Authors Registry collects photocopy and other use fees from overseas, particularly from photocopy uses in the U.K., and pays authors in the U.S. the amounts due them. A sample of our success in paying authors of out-of-print works last year suggests that we reach 85% of such authors. The success rate of larger, more developed systems – such as that of the Authors' Licensing and Collecting Society (ALCS) in the U.K. – demonstrates that even higher success rates are possible. (The ALCS, representing more than 30,000 published writers, is an enthusiastic supporter of the settlement, for good reason. They know it can work, because they've achieved great success finding and paying photocopy revenues to authors of out of print books.)

Thus, this settlement presents a practical solution for the problem of orphan works for books. When an author is identified, then requests for all kinds of other uses – for permission to use an excerpt from the author's work, reprint it, or to translate it into a foreign language – can be relayed to the author or the author's agent and acted upon.

The orphan works issue is far smaller, and far more tractable, than some objectors would have you believe. The settlement itself is a big part of the solution.

---

[6] Publishers are sought out too, of course. In some systems, such as in the U.K., different societies represent authors and publishers. In others, such as in Australia and Canada, the same society represents both authors and publishers.

**Conclusion**

We urge this committee to recognize this settlement for what it is:  the outstanding result of a rare and productive truce in the copyright wars, negotiated by strong-willed and pragmatic representatives of the author, publisher, and library communities and a sophisticated technology partner.

To a dispassionate observer, we believe the solution presented by this settlement is how a rational, useful market for out-of-print books should operate in the digital age. The means of getting there, a class-action settlement, may be novel, but that shouldn't distract us from the great good – for readers, students, scholars, authors and publishers – that this settlement accomplishes.  Similar systems, inevitably, will develop around the world.

This settlement doesn't pre-empt congressional action, but there's no need to act now, before we see how well this solution works in the real world.  We suspect many of the concerns – including all of the major objections – will prove unwarranted as this settlement goes into operation.  There's no need to fix that which likely isn't broken at all.

Allowing this opportunity to slip through our grasp would be a tragic loss to all those who value the riches stored in our nation's libraries.

## II.      INTRODUCTION TO THE SETTLEMENT

In 2004, Google Inc. ("Google") announced that, as part of its Google Library Project (or "GLP"), it would reproduce millions of copyrighted books located in U.S. libraries and display "snippets" of those books on its website.  These books had been published within and outside the United States and their copyright owners included

publishers and authors domiciled in both the United States and around the world.  In copying and displaying content from books as part of the GLP, Google did not seek the permission of the copyright owners of those books.

The Settlement resolves two copyright infringement actions brought against Google by authors and publishers that alleged that Google's unauthorized copying of books and display of snippets without permission constituted copyright infringement under the U.S. copyright laws.  Google defended its actions as non-infringing fair uses, as authorized by 17 U.S.C. § 107.

At the end of October 2008, after a negotiation that lasted more than two years, the author and publisher plaintiffs and Google announced that they had reached a comprehensive settlement of the litigation.  The Settlement avoids further discovery and litigation, which could have been protracted.

The Settlement was carefully negotiated to protect the copyright interests of, and to provide meaningful benefits to a class of authors (and their heirs) and publishers of books covered by the Settlement (essentially, books published on or before January 5, 2009).  One of the Settlement's crowning achievements for the class -- and for the United States public -- is that it breathes new life into millions of out-of-print books, which until now have been relegated to the dusty stacks of university libraries.  The Settlement also provides new marketing and revenue opportunities for rightsholders of in-print books (should they choose to take advantage of them), in a way that does not harm the existing markets for those books.

If approved, the Settlement will provide the following material benefits to authors and publishers:

- **Payment to Rightsholders:** Google will be authorized to use class members' works in several revenue models, and will pay 63% of the revenues earned from its exploitation to a Book Rights Registry (the "Registry"), for disbursement (after an administrative charge) to the Rightsholders of those works;

- **Rightsholders Retain Control:** The Settlement is non-exclusive and does not involve any transfer of copyright ownership interests or any other property interests to Google.   Additionally, Rightsholders at all times will retain control over their works, with the ability to determine the extent to which their works are to be included in or excluded from Google's uses, and to license their works to others;

- **Compensation to Rightsholders for Past Alleged Infringement:** Google will pay at least $45 million to compensate class members whose works Google digitized without permission before May 6, 2009.

- **Establishment of Registry:** Google will pay $34.5 million both for notice and settlement administration costs and to fund the Registry, a non-profit organization that will be managed by a Board representing authors and publishers, that will locate rightsholders, maintain a database of their contact information, collect and pay revenues to the class for Google's use of copyrighted works through this Settlement, and otherwise protect and represent the interests of the class.

As explained in more detail below, the Settlement provides extraordinary and previously unattainable benefits to authors and publishers in the United States and all over the world, along with remarkable benefits to the reading public, students, scholars and researchers in the United States.

## III.     THE MATERIAL TERMS OF THE SETTLEMENT

### A.     The Settlement Class and Sub-Classes.[7]

The Settlement Class is defined as follows:

> All persons or entities that, as of January 5, 2009, have a Copyright Interest in one or more Books or Inserts.  All Settlement Class members are either members of the Author Sub-Class or the Publisher Sub-Class, or both.  Settlement Agreement ("SA") § 1.142.

---

[7]  Capitalized terms used have the same meaning as in the Settlement Agreement.

- **Author Sub-Class**

All members of the Settlement Class who are authors, and their heirs, successors, and assigns, and any other members of the Settlement Class who are not members of the Publisher Sub-Class.  SA § 1.14.

- **Publisher Sub-Class**

All members of the Settlement Class that are (a) companies that publish books, and their exclusive licensees, successors, and assignees, and (b) companies that publish periodicals and have a Copyright Interest in one or more Inserts, and their exclusive licensees, successors, and assignees.  SA § 1.120.[8]

## B.     The Parties.

The Representative Plaintiffs for the Author Sub-Class are authors Paul Dickson, Joseph Goulden, Daniel Hoffman, Betty Miles, and Herbert Mitgang.  SA § 1.125.  The Representative Plaintiffs for the Publisher Sub-Class are The McGraw-Hill Companies, Inc., Pearson Education, Inc., Penguin Group (USA) Inc., Simon & Schuster, Inc., and John Wiley & Sons, Inc.  *Id*.  The Authors Guild and the AAP are "Associational Plaintiffs."  SA § 1.12.  The Associational Plaintiffs participated in the litigation to advance the rights and interests of the Author Sub-Class and Publisher Sub-Class, respectively, and served as consultants to counsel for the respective sub-classes.

---

[8]   A "Copyright Interest" refers to a United States copyright interest to the extent implicated by a use covered by the Settlement Agreement, i.e., reproduction of a Book and the Display Uses and Non-Display Uses (described below).  SA § 1.38.   A "Book" refers to a written or printed, bound work that was published or distributed prior to January 6, 2009 and, if a "United States work" under 17 U.S.C. § 101, registered with the United States Copyright Office.  The Settlement excludes from the definition of Book works that are Periodicals, unbound personal papers, and works in the public domain (including government works).  SA § 1.16.  An "Insert" refers to copyrighted textual (but not pictorial) content in a book whose rightsholder is different from the book's rightsholder.  SA § 1.72.  *See* the sections of the SA cited in this footnote for more details concerning these definitions.

Google was the sole defendant in the cases.  In addition, though not parties to the litigation, the libraries of the University of Michigan, Stanford University, and the University of California took part in the settlement negotiations.   They, along with a large number of other libraries, have entered into digitization agreements with Google, to allow their collections to be digitized.  Numerous university libraries plan to participate in the GLP as well.  A list of libraries that are authorized to provide books to Google for copying, and to receive digital copies, can be found at Attachment G of the SA.

### C.    Benefits To Authors and Publishers.

### 1.    Revenues From Google's Use Of Books And Inserts

The Settlement authorizes Google, on a non-exclusive basis, to digitize Books and Inserts, to develop a searchable electronic books database, and to display and make commercial use of Books and Inserts, including the following "Display Uses":

- sell institutional subscriptions to schools, corporations, and government offices ("Institutional Subscriptions") (SA § 4.1);

- sell online access to Books to consumers ("Consumer Purchases") (SA § 4.2);

- display "previews" (up to 20% of a Book (SA § 4.3)) and "snippets" (several lines of a Book (SA § 1.147)) in order to spur Book sales and earn advertising revenues;

- place advertisements next to Book text (SA § 4.4); and

- provide free Public Access Services to all public and school libraries, with any printing from these services subject to a per-page fee (SA § 4.8).[9]

---

[9]  Also, subject to agreement with the Registry, Google may, in the future, be authorized to exploit works in other revenue models, such as consumer subscriptions, print on demand, custom publishing, .pdf downloads, and summaries, abstracts and compilations.  SA § 4.7.

Note that all authorizations, including the right to digitize books and to display and make commercial uses of Books and Inserts, are confined to the United States and Google obtains no rights under the Settlement under any law other than United States law.

Revenues earned from Display Uses will be split 63/37 in favor of the Rightsholders.  SA § 4.5.  ("Rightsholders" are members of the Settlement Class that do not opt out of the Settlement.)  Google will pay 63% of these revenues to the Registry, for disbursements to the Rightsholders.

## 2.   Classification of Books.

The Settlement differentiates between Commercially Available (generally, in-print) and not Commercially Available (generally, out of print) Books.  The purpose of this distinction is to ensure that Google's Display Uses do not cannibalize the existing markets for Commercially Available books.  Thus, the Settlement treats Commercially Available Books differently from Books that are not Commercially Available (i.e., Books that are not being marketed or sold by the publishers of the Books).  SA §§ 3.2-3.3.  Specifically, Google may not make any Display Uses of Commercially Available Books – both the revenue models described above and "snippet display" – unless both the author and publisher authorize Google to do so.  *Id.*  In contrast, Books that are not classified as Commercially Available will, by default, be included automatically in all Display Uses.  At any time, however, the Rightsholder of a Book can change the default and instruct Google to exclude any Book from any one or more Display Uses.  *Id.*

Google will initially determine whether or not a Book is Commercially Available as of January 5, 2009 (the Notice Commencement Date).  SA § 3.2(d) (referred to in the SA as the "Commercially Available" classification).  Google and the Registry will

continue to be assessing whether Books are Commercially Available using multiple sources of information.  Rightsholders who claim their Books will be informed if a change is made in the Commercially Available classification of those Books.

Rightsholders can challenge the determination of whether a Book is Commercially Available, and any disputes with Google will be resolved through the Settlement's arbitration procedures (*see* SA Article IX).  SA § 3.2(d)(iv).

### 3.    Rightsholders' Do-Not-Digitize/Removal Rights.

Rightsholders can tell Google not to digitize their Books, or if already digitized, to remove their Books from Google's database and from the digital copies provided by Google to participating libraries.  SA §§ 1.124, 3.5(a)(i).  Google and the libraries must honor all do-not-digitize/removal requests made by April 5, 2011; thereafter requests will be honored only if the Books have not already been digitized.  SA § 3.5(a)(iii).[10]

### 4.    Rightsholders' Exclusion Rights.

Even if they do not remove a Book from Google's and the libraries' databases, Rightsholders at any time can exclude their Books (or portions thereof) from any or all Display Uses.  SA § 3.5(b).  Insert Rightsholders at any time can exclude Inserts (or portions thereof) from all (but not less than all) Display Uses.  *Id.*  Rightsholders can change their mind at any time and turn Display Uses back on for some or all of their Books and Inserts.  *Id.*

### 5.    Rightsholders' Pricing Rights for Consumer Purchase

Rightsholders have two options under the Settlement for setting the sale price of their Books made available in the Consumer Purchase revenue model: they can set the

---

[10]  Exercise of the removal right does not vitiate Rightsholders' eligibility for the Cash Payment, described below.

price themselves (Specified Pricing) (SA § 4.2(b)(i)(1)) or they can rely on the "Settlement-Controlled Price" developed by Google. (SA § 4.2(b)(i)(2)).  Settlement-Controlled Prices will be algorithmically designed by Google to find the optimal revenue-maximizing price for each Book.  (SA §§ 4.2(b)(i)(2) & (c)).

Plaintiffs have heard from a number of academic and other authors (e.g., university professors) who are interested in making their books freely available to others through the Settlement.  The Settlement Agreement enables Rightsholders to do so.  The Settlement Agreement will support Creative Commons licenses.  In addition, Rightsholders can set the sale price for their Books at zero.  In those situations neither Google nor the Registry will receive revenues from any Consumer Purchase of those Books.

## 6. Establishment of The Book Rights Registry, and Payment for Notice and Claims Administration.

Google has agreed to pay $34.5 million to fund the newly formed Book Rights Registry, to pay for notice to the Settlement Class and to pay for claims administration services.  SA § 2.1(c). The Registry will be an independent not-for-profit entity, and all funds received by the Registry will be for the benefit of Rightsholders.  SA § 6.2(a).  The Registry will have a Board of Directors composed at all times of an equal number of Author Sub-Class and Publisher Sub-Class representatives.  SA § 6.2(b).  Thus, the Registry will not, as some have suggested, by controlled by Google.  The Registry will establish and maintain a database of Rightsholders' contact information and information regarding Rightsholders' Books and Inserts.  SA § 6.1(b).  The Registry will locate Rightsholders, identify and coordinate payments to Rightsholders, and otherwise represent the interests of Rightsholders under the Settlement Agreement.  *Id.*  The

Registry will able, with express rightsholder approval, to do deals with anyone, including competitors of Google.

The Registry will be funded at first by Google's $34.5 million payment (net of notice and claims administration expenses).  SA §§ 1.6, 2.1(c), 5.2.  Thereafter, the Registry will also be funded by an administrative fee taken as a percentage of Rightsholders' revenues.  SA, Attachment C (Plan of Allocation) § 4.2.

### 7.    **Payment For Already Digitized Books**.

To settle plaintiffs' claims for actual infringement, Google has agreed to pay Rightsholders a minimum of $45 million for Books and Inserts digitized without permission as of May 5, 2009 (i.e., the original opt-out deadline).  SA §§ 2.1(b), 5.1.  For every such work that is claimed by January 5, 2010, Google will make a "Cash Payment" of at least $60 per Principal Work, $15 per Entire Insert, and $5 per Partial Insert.[11]

If more than $45 million is required to pay all of the eligible claims for Cash Payments, then Google will pay the additional funds necessary to make all such Cash Payments, with no cap on such additional payments.  SA § 5.1(b).  If the total amount of all eligible claims is less than $45 million, the claiming Rightsholders can receive up to $300 per Principal Work, $75 per Entire Insert, and $25 per Partial Insert.  Any remaining funds thereafter from the $45 million will go to the Registry for operations. SA, Attachment C (Plan of Allocation) § 3.2.

---

[11]  "Principal Work" refers to a book's principal written work (such as a novel, or a collection of short stories).  SA §1.111.  "Entire Inserts" are complete works, such as short stories, forewords and poems.  "Partial Inserts" are all other content that meet the definition of an Insert, such as quotes from other works.  SA §§ 1.50, 1.100.

### D.   Author-Publisher Procedures.

Because, for most Books, authors and their publishers each have copyright interests, the authors' and publishers' respective interests are addressed in the Author-Publisher Procedures (SA, Attachment A).  Among other things, the Author-Publisher Procedures set forth the authors' and the publishers' respective rights concerning in-print and out-of-print Books under the Settlement.

### 1.   In-Print Books.

With respect to in-print books (other than works-for-hire), both the author and the publisher must agree to include the Book in the GLP; if they do not agree, it will not be included.  Author-Publisher Procedures ("A-P") § 5.1.  Cash Payments for in-print Books, as well as all revenues earned from Google's future uses of in-print Books, will be paid to the publishers of the Books, who will then pay the authors under the book publishing contract between the author and the publisher.  A-P § 5.5.  If an author wishes to challenge the revenue split offered by the publisher under that contract, the dispute may (except for Educational Books) be resolved in the Settlement's arbitration process. *Id*.  The A-P also sets forth the respective rights of authors and publishers as to exclusion, removal, pricing, and changes in Display Uses of in-print Books.  A-P §§ 5.2-5.4.

### 2.   Out-Of-Print Books.

The A-P includes provisions concerning exclusion, removal, control of pricing, and changes in Display Uses of out-of-print Books, which vary depending on whether the Book is (1) a work-for-hire under United States copyright law (100% of Cash Payments and revenues paid by the Registry directly to the publisher), or (2) reverted (100% of Cash Payments and revenues paid by the Registry directly to the author).  A-P § 6.1.

Cash Payments and future revenues earned for unreverted out-of-print Books will be split between the author and publisher of the Book as follows: (a) for Books first published prior to 1987, the Registry will pay 65% to the author and 35% to the publisher; and (b) for Books first published during or after 1987, the Registry will pay each of the author and the publisher 50%.  A-P § 6.2(c).[12]  In addition, for Books that are not reverted and are not works-for-hire, in general, both the author and the publisher have the right to manage the Books.  (*See* A-P for further details concerning the A-P.)

### E.      Other Provisions.

#### 1.      Public Access Service.

The Parties have agreed to provide, upon request, free access to the entire subscription database at a computer terminal in every public library building in the United States that requests one and at least one computer terminal at each not-for-profit higher educational institution.  SA §§ 1.66, 1.119, 4.8.  Anyone in any urban or small town library building in the U.S. could have free, full access to the entire database of Books.

#### 2.      Non-Display Uses.

In addition to the Display Uses, Google will be permitted to make "Non-Display Uses" of Books, including full-text indexing (without displaying the text), geographic indexing, algorithmic listings of key terms for chapters of Books, and other internal research.  SA §§ 1.91, 3.4.

---

[12]   Based on discovery taken by the author plaintiffs, most form book publishing contracts in the late 1980s began to include express electronic rights grants to the publisher.  Counsel for the authors and publishers thus agreed that authors would receive a greater revenue split for out of print Books published prior to 1987 than those published thereafter.

3.      **Security Provisions.**

Google and plaintiffs developed security standards to prevent security breaches and unauthorized use of Google's books database.  SA §§ 8.1-8.2 and Attachment D. The SA provides remedies to Rightsholders for security breaches and unauthorized access.  SA §§ 8.3-8.7.

4.      **Dispute Resolution Mechanism.**

If disputes concerning the Settlement arise among Rightsholders and Google or the libraries, they will be subject to arbitration.  Examples are disputes (1) between authors and publishers of the same Books; (2) over claimed security breaches; (3) over whether a Book is in-print, out-of-print, or in the public domain; and (4) over whether Google or a participating library has made a use of a Book that is not authorized under the Settlement.  *See generally* SA Article IX.  The Settlement Agreement also provides that the court will have continuing jurisdiction over other disputes concerning the parties' obligations under the Settlement Agreement.  SA § 17.23.  Disputes between publishers are not subject to arbitration.

5.      **Non-Exclusive Rights.**

The authorizations granted to Google under the Settlement Agreement are non-exclusive only.  Rightsholders retain all their rights to use and license their Books in any way, including ways identical to those authorized to Google.  No authorization under the Settlement constitutes a transfer of any copyright ownership interest in any Book or Insert.  SA §§ 2.4, 3.1(a).

IV.    **COPYRIGHT ISSUES**

The Settlement has been the subject of substantial discussion.  I would like to

elaborate on my remarks in the Executive Summary regarding the Settlement's treatment of so-called "orphan works," and I will then address the potential effect of including foreign rightsholders in the Settlement Class on U.S. foreign relations.

### A.      The Question of "Orphan Works"

A number of critics of the Google Book Search Settlement have complained that the Settlement will confer on Google a monopoly over "orphan works."  These critics have stated – without any evidence – that "orphan works" will include millions of books, comprising anywhere from 50% to 70% of the books covered by the Settlement.  These percentages are over-inflated, principally because at least some of the critics appear to have equated the term "out-of-print books" with "orphan works," which is erroneous, and, further, because they incorrectly assume that the rightsholders of out-of-print books are either unknown or cannot be found.

The term "orphan works," however, has no meaning under the Copyright Act; the Act only recognizes works only as in-copyright or not in-copyright.  That term, however, has been typically understood and used – both in the context of legislative proposals considered by the Congress, including this Committee, over the last several years, as well as by the Copyright Office – to refer to a work for which the copyright owner cannot be identified or found (such as a photograph with no attributed photographer).

Contrary to the use of that term by the Settlement's critics, we start with the principle that published books found in U.S. libraries – unlike many other types of copyrighted works – are generally quite unlikely to be orphan works.  They are published works.  They have identifiable authors and publishers.  Published books include readily accessible information as to their author, publisher and date of publication.

Moreover, as to all United States works, the Settlement only covers those that are "registered" with the United States Copyright Office. So, at least with respect to United States works, the Copyright Office registration is available as an important starting point in attempting to identify and locate the current copyright owner. There is no reason to believe that a significant number of the copyright owners of books covered by the Settlement cannot be identified and found – by anyone, including would-be competitors of Google – if due diligence efforts are made to do so.

Prior to the Settlement, at least for purposes of large scale commercial exploitation, few such efforts have been made. That is because there has been no commercial market for a collection of out-of-print books, and thus no incentives to identify rightsholders of out-of-print books or for them to come forward to associate themselves with their works for purposes of licensing others to use them. Now, for the first time, the settlement provides just such a product, and brand new incentives for rightsholders of out-of-print books to participate. Not only have meaningful, ambitious efforts been made to locate these rightsholders, those efforts will be continued into the future by the Registry. In addition and importantly, the prospect of earning money under the Settlement – and the very availability of revenues generated by the Settlement – will provide powerful incentives for rightsholders to come forward to claim their works. Once they do so, of course, such works would have identifiable copyright owners and could not be considered to be "orphans."

First, approval of the Settlement required the parties to undertake an unprecedented, worldwide Notice Program that was designed to reach as many members of the Settlement Class as possible. As a result of the Notice Program, many

rightsholders of out-of-print books have already claimed their books. Because there is no deadline to claim one's books through the Settlement, it is reasonable to expect that the numbers of claimed out-of-print books will grow exponentially.

Second, one of the Registry's core missions will be to locate rightsholders of out-of-print books that have not yet been claimed.  This is for the purpose of having the Registry assist them in claiming their works and, ultimately, to pay to them the revenues they are owed under the Settlement's revenue models.

Also, as noted above, the Registry will want to enter into licensing arrangements with others, not just Google.  For this purpose, the Registry and claiming rightsholders will want as many rightsholders as possible to come forward and authorize the Registry to include their books in those arrangements.  In this way, there will be a more robust set of books available for license, which will redound to the benefit of all rightsholders..

The goals of the Notice Program and the Registry are achievable precisely because the settlement creates meaningful incentives for copyright owners of out-of-print works to claim their books.  The new services authorized by the Registry (which include the subscriptions and consumer purchase options offered by Google, as well as alternative, even competing products that others may establish) will begin earning rightsholders new revenue.

Most authors write for two reasons, for their books to be read, and to be compensated.  Because the Settlement has given new exposure and commercial life to out-of-print books, authors are more likely to claim their books and the Registry will have a greater chance of finding them.

What does that mean for the so-called "orphan books?"  We've already learned

through the Settlement's claiming process that many out-of-print books' "parents" are alive and claiming their books. And, as "parent" rightsholders claim their books, the number of books that might arguably be considered "orphans" will be dramatically reduced.

Significantly, the Registry will maintain a publicly accessible database of which books are claimed. The database will also make public who has claimed those books (except where the claimant has asked that his or her name not be disclosed). This database will make it far, far easier than at present for anyone to identify rightsholders of books and obtain permission to use them. The experiences of the Authors Registry and the ALCS, reported in the Executive Summary, bear this out. Thus, where it might once have been difficult to find the copyright owners of books it will now become much more feasible to license out-of-print books, either through the Registry or directly from their copyright owners.

Of course, there may still be books whose rightsholders prove difficult to find. The Settlement is not a panacea. But the facts suggest, contrary to the gloomy scenarios painted by the critics, that the number of such books ultimately will be quite low.

**B. The Settlement is Wholly Consistent with the International Obligations of the United States**

Questions also have been asked as to whether the Settlement complies with the international treaty obligations of the United States. These issues have been raised under two provisions of the 1971 Berne Convention for the Protection of Literary & Artistic Works (the "Berne Convention"), to which the United States adhered effective March 1,

1989.[13]  The first provision is that of national treatment, found in Article 5(1) of the

Berne Convention. The second provision is Article 5(2) of the Berne Convention, which

bans the imposition of certain "formalities."  Examining both provisions, we believe that

the Settlement is fully consistent with our country's treaty obligations.

To begin, the Berne Convention is not itself self-executing in the United States.

In the Berne Convention Implementation Act of 1988 (BCIA), which implemented the

Berne Convention,[14] Congress was crystal clear that the Berne Convention itself does not

create any rights or obligations under U.S. law.[15]  Thus, if any provision of the enacted

laws of the United States is inconsistent with our country's Berne Convention

obligations, the only remedy is for another *country* to take the United States to the

International Court of Justice, or to invoke the dispute resolution provisions set forth in

---

[13] The United States has entered into other international agreements that incorporate the
United States' Berne Convention obligations by reference, such as the 1994 GATT
TRIPS agreement.  However, because these other agreements are derivative of the Berne
obligations, we do not discuss them separately.

[14] 102 Stat. 2853-2861.

[15] Section 2 of the BCIA provides:

    (1) The Convention for the Protection of Literary and Artistic Works, signed at
        Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions
        thereto (hereafter in this Act referred to as the "Berne Convention") are not self-
        executing under the Constitution and laws of the United States.

    (2) The obligations of the United States under the Berne Convention may be
        performed only pursuant to appropriate domestic law.

    (3) The amendments made by this Act, together with the law as it exists on the date of
        the enactment of this Act, satisfy the obligations of the United States in adhering
        to the Berne Convention and no further rights or interests shall be recognized or
        created for that purpose.

Section 3(a) declares:

    (a) Relationship with Domestic Law.--The provisions of the Berne Convention--
        (1) shall be given effect under title 17, as amended by this Act, and any other
            relevant provision of Federal or State law, including the common law; and
        (2) shall not be enforceable in any action brought pursuant to the provisions of the
            Berne Convention itself.

the GATT, leading possibly to a WTO panel. With respect to the pending approval of the Settlement, the District Court must follow the Copyright Act, and it has no authority to deviate from it in an effort to comply with its understanding of the United States' treaty obligations.

### 1.    National Treatment

The Settlement is fully consistent with the national treatment principle of Article 5(1) of the Berne Convention,[16] which Congress implemented in the BCIA, and is now enshrined in Section 104 of the Copyright Act, as amended.  In the United States, that principle "simply assures that if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors."  *See Itar-Tass Russian Newspaper Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 89 (2d Cir. 1998).  Thus, Article 5(1) applies only to national *laws* granting *substantive* rights. A private settlement agreement is, by definition, not a law nor can it grant substantive statutory rights.  As Congress made clear, only Congress can grant such rights. The Settlement does not provide or grant any substantive copyright rights; only Congress can do so.  Instead, it is the settlement of copyright litigation between private parties that provides extensive remedies to members of the class.

Most importantly, the Settlement is careful to treat all covered books identically, without regard to whether their rightsholders are United States or foreign publishers or authors.  Consistent with Section 104 of the Copyright Act, all copyright owners of books

---

[16] Article 5(1) of the Berne Convention provides:
    (1) Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

covered by the Settlement, regardless of their nationality, are entitled to exactly the same rights and receive exactly the same remedies under the Settlement.

## 2.    Formalities and the Means of Redress

The Settlement and the class action opt-out procedure do not constitute a prohibited formality within the meaning of Article 5(2) of the Berne Convention.[17]  The term "formality" is not defined in the Article.  The World Intellectual Property Organization's guide to the Berne Convention provides some guidance.  It states: "The word 'formality' must be understood in the sense of a condition which is necessary for the right to exist -- administrative obligations laid down by national law, which is not fulfilled, lead to loss of copyright." *See WIPO Guide to the Berne Convention for the Protection of Literary and Artistic Works* (Paris Act 1971) at 33 (1978).  As the WIPO drafted the Berne Convention and is charged by the United Nations with administering it, its views should be entitled to great deference.

The process for reviewing and approving class action settlements under Rule 23(b)(3) of the Federal Rules of Civil Procedure necessarily includes a mechanism to allow class members to opt out.  That requirement of federal law is not a formality.  It cannot lead to a loss of statutory copyright protection under the Copyright Act.  Nor is the Settlement itself or the opt-out procedure of Rule 23(b)(3) an administrative obligation laid down by national law that is necessary for the copyright right to exist.

---

[17] Article 5(1) of the Berne Convention provides:
The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

The Rule constitutes, instead, a *procedural* device.

The language of Article 5(2) makes clear that such procedural mechanisms – which are the means by which copyright infringement suits may be brought and resolved – fall exclusively within the province of national law and, as such, can be adopted by Congress and applied by federal courts consistently with the United States' obligations. *See* Article 5(2) (providing that "the extent of protection, as well as the *means of redress* afforded to the author to protect his rights, shall be governed *exclusively* by the laws of the country where protection is claimed [emphasis supplied]).

### C.     The Settlement is not "Legislating"

Some have expressed concern that the Settlement constitutes "judicial legislating" or that approval of this particular class action settlement is not otherwise properly within the province of the federal courts. That is not the case. Whatever one's view of judicial activism, a class action settlement negotiated by parties to a lawsuit and approved by a federal court only binds members of the class who have chosen not to opt out. It does not bind – or supplant the role of – Congress.

Moreover, settlements of litigation do not establish rights or obligations of general applicability, which is, by contrast, in the very nature of statutes. In this case, the Settlement only pertains to the rights of class members vis-à-vis Google, which is obtaining a non-exclusive license from rightsholders who have chosen to remain in the Settlement.

Furthermore, the class action device is widely used in all manner of state and federal common law and statutory claims. It has also been used in the context of federal copyright claims. Such actions have been settled, and those settlements are subject to the

29

requirements of the Federal Rules and to judicial decisions interpreting such Rules. Congress has not chosen to exempt copyright infringement actions from the Federal Rules that authorize the use of the class action device in appropriate circumstances. Parties utilizing a congressionally created procedural device, and courts approving class action settlements, are, therefore, fully adhering to federal law.

Finally, nothing in the Settlement prevents Congress from legislating in the future as broadly as it wishes.  Congress could, for example, pass orphan works legislation, to enable users to make use of a work after a due diligence effort to identify and locate the copyright owner.