**EXHIBIT 15**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC., ET AL.,
    Plaintiffs,
    vs.        No.  05 CV 8136 (DC)
GOOGLE, INC.,
    Defendants.
_____

VIDEOTAPED DEPOSITION OF DANIEL GERVAIS
San Francisco, California,
Tuesday, June 12, 2012
Volume I

Reported by:
STACEY M. DIODATI
CSR No. 11925
Job No. #147938

PAGES 1 - 239

---

Page 2

1       UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF NEW YORK
3
4  THE AUTHORS GUILD, INC., ET AL.,
5      Plaintiffs,
6      vs.     No.  05 CV 8136 (DC)
7  GOOGLE, INC.,
8      Defendants.
9  _____
10
11
12
13
14      Videotaped Deposition of DANIEL GERVAIS, taken
15  on behalf of Defendants, at Durie Tangri, 217
16  Leidesdorff Street, San Francisco, California, beginning
17  at 9:59 a.m. and ending at 4:33 p.m. on Tuesday, June
18  12, 2012, before Stacey M. Diodati, Certified Shorthand
19  Reporter No. 11925.
20
21
22
23
24
25

---

Page 3

1    APPEARANCES:
2
3     For Plaintiff:
4       BONI & ZACK, LLC
5       BY:  JOSHUA D. SNYDER, ESQ.
6       15 St. Asaphs Road
7       Bala Cynwyd, PA 19004
8       610.822.0200
9       jsnyder@bonizack.com
10
11    For Defendant:
12       DURIE TANGRI
13       BY:  DAVID McGOWAN, ESQ.
14       217 Leidesdorff Street
15       San Francisco, CA 94111
16       415.362.6666
17       dmcgowan@durietangri.com
18
19    Also Present:
20       Peter Hibdon, Videographer
21
22
23
24
25

---

Page 4

1       I N D E X   O F   E X H I B I T S
2

| Exhibits | Description | Page |
|---|---|---|
| Exhibit 1 | Photocopy of Webpage SSRN.com | 18 |
| Exhibit 2 | Report of Professor Daniel Gervais | 23 |
| Exhibit 3 | The Protection of Databases by Daniel J. Gervais | 39 |
| Exhibit 4 | Article Titled "Internet anti-piracy legislation is flawed, says Vanderbilt professor" | 48 |
| Exhibit 5 | The Internationalization of Intellectual Property: New Challenges from the Very Old and the Very New | 54 |

Page 5

INDEX OF EXHIBITS (cont.)

| Exhibits | Description | Page |
|---|---|---|
| Exhibit 6 | Advisory Committee on Management of Copyright and Related Rights in Global Information Networks, First Session, Geneva, December 14 & 15, 1998 | 64 |
| Exhibit 7 | Written Comments f Copyright Clearance Center, Inc., dated 2/5/99 | 97 |
| Exhibit 8 | Keynote: The Landscape of Collective Management Schemes | 124 |
| Exhibit 9 | The Tangled Web of UGC: Making Copyright Sense of User-Generated Content | 144 |

Page 6

INDEX OF EXHIBITS (cont.)

| Exhibits | Description | Page |
|---|---|---|
| Exhibit 10 | Email from Daniel Gervais to Frederic Haber, dated 3/25/12 | 177 |
| Exhibit 11 | Document Titled "Insights" | 180 |
| Exhibit 12 | Condensed Deposition Transcript of Betty Miles, dated 1/4/12 | 188 |

Page 7

INDEX OF EXAMINATION

Page

By Mr. McGowan ................................8

---

Page 8

 1    San Francisco, California
 2    Tuesday, June 12, 2012; 9:59 a.m.
 3
 4       VIDEOGRAPHER:  Good morning.  We are on the
 5  record at 9:59 a.m., on June 12, 2012.  This is the
 6  video recorded deposition of Daniel Gervais.  My name is
 7  Peter Hibdon, here with our court reporter, Stacey
 8  Diodati.  We are here from Veritext National Deposition
 9  & Litigation Services.
10       The caption of this case is the Authors Guild
11  versus Google, Inc.
12       At this time, will Counsel and all present
13  please identify themselves for the record.
14       MR. McGOWAN:  David McGowan, Durie Tangri for
15  Google.
16       MR. SNYDER:  Joshua Snyder, Boni & Zack, for
17  class representatives in the class and the witness, the
18  expert witness.
19          DANIEL GERVAIS,
20  being administered the oath by the Certified Shorthand
21  Reporter to tell the truth, the whole truth, and nothing
22  but the truth, testified as follows:
23          EXAMINATION BY MR. McGOWAN:
24  BY MR. McGOWAN:
25     Q   Good morning, Professor Gervais.

1    A    Good morning.
2    Q    Thank you for coming here.
3    A    Happy to be here.
4    Q    If called as a witness at trial, do you
5    propose to offer expert testimony in this case?
6    A    I suppose so.
7    Q    In what fields of expertise?
8    A    My field of expertise in my report is
9    collective management of copyright.
10    Q    Any other fields?
11    A    I consider myself an expert in international
12    intellectual property as well.
13    Q    What do you mean by "international
14    intellectual property"?
15    A    The application of international treaties and
16    norms concerning intellectual property rights such as
17    copyrights, trademarks, patents, geographical
18    indications --
19        THE REPORTER:  What's that one?
20    "Geographical"?
21        THE WITNESS:  Indications.
22        -- industrial designs, and so on.
23    BY MR. McGOWAN:
24    Q    Is that intellectual property law?
25    A    Law and policy.

1    Q    What opinions do you propose to offer?
2    A    In the report I state in Paragraph 10 what I
3    am opining for the purposes of this case, which is
4    whether there is a role for collective management and
5    whether a fair use determination with Google is doing
6    might affect that likelihood.
7    Q    A role for collective management in what?
8    A    In licensing rights to use books or parts of
9    books online, including the types of uses that Google is
10    doing in the -- that is described in the case, in the
11    materials that I reviewed to prepare my report.
12    Q    What do you understand those types of uses to
13    be?
14    A    Well, my understanding is that Google has
15    scanned the entire text of millions of books and is
16    making those books available in a number of a ways; in
17    some cases, only bibliographic data, but many cases it
18    makes available snippets, which I believe were defined
19    in the materials I reviewed as being very often 1/8th of
20    a page.
21        And then there's a certain number of snippets
22    per book. I don't recall the exact way in which Google
23    does that.
24    Q    In preparing your report, did you speak to
25    anyone?

1    A    Counsel.
2    Q    Anyone else?
3    A    I ran one paragraph, which I believe -- I
4    don't have the report in front of me, but Paragraph 18,
5    which deals with deals Copyright Clearance Center. And
6    I sent a draft of that paragraph to a lawyer there to
7    review for accuracy.
8    Q    What was the name of the lawyer?
9    A    Frederick Haber, H-a-b-e-r.
10    Q    When did you send him a paragraph of your
11    report?
12    A    As I was preparing it, which would have been
13    late February, early March, I'm thinking.
14    Q    Did you receive any comments from Mr. Haber?
15    A    Yes. He pointed a few things that he thought
16    could be said differently. And I considered those
17    suggested changes and incorporated some of of them in
18    the report.
19    Q    Was -- when you say "he pointed," how did he
20    point? Was this in an email?
21    A    I think we had an email exchange and a
22    conference -- or not a conference, but had a telephone
23    call.
24    Q    Did you rely on his connections in drafting
25    Paragraph 18?

1    A    Rely on -- he pointed me to a page on their
2    website which described one of their programs more fully
3    than I had in my draft. And I incorporated additional
4    details from the website into Paragraph 18. So to that
5    extent, I guess, yes.
6    Q    Did you list your conversation with him as one
7    of the materials you considered?
8        THE REPORTER:  "As one of the materials . . ."
9        MR. McGOWAN:  You considered.
10        THE WITNESS:  I'm not sure. I don't have the
11    exhibit in front of me. To be honest, I don't recall if
12    I listed it or not.
13    Q    Did you speak to anyone else at CCC?
14    A    No.
15    Q    Do you know Tracy Andrews?
16    A    No. If you mean Armstrong --
17    Q    Armstong. My apologies.
18    A    Yes, I do know Tracy Armstrong.
19    Q    You did not speak to her about --
20    A    Not about my report, no.
21    Q    Have you ever spoken to her about Google?
22    A    Yes.
23    Q    When was the first time you spoke to
24    Ms. Armstrong about Google?
25    A    I believe when she was on the panel in

1  New York. That would have been well before I was
2  retained in the case. And this was during the
3  settlement negotiations. And I think she and Mr. Haber
4  might have been there too, were talking about the case
5  on the panel which, I -- as I recall, was at Columbia.
6       And I wasn't on the panel, but I spoke to them
7  on that occasion. And I think the conversation went
8  something like, "It's interesting, this proposed
9  settlement, this is something that CCC could do."
10      And my recollection was that they seemed to
11 agree with that suggestion. But that was the extent of
12 that discussion.
13    Q    Other than the conversations with Mr. Haber
14 you just mentioned, did you speak to anyone else in
15 connection with preparing your report?
16    A    No.
17    Q    Did you review any contracts in connection
18 with preparing your report?
19    A    Contracts, no.
20    Q    Did you review the deposition of Paul Aikan?
21    A    I think I saw -- I scanned part of that, yes.
22 But I can't remember if it was after or before my
23 report.
24    Q    Let me -- let me divide. From the time you
25 submitted your report, have you continued to review

1  materials pertaining to the case?
2    A    Yes.
3    Q    Have any of those materials caused you to
4  alter any of the opinions that you express in your
5  report?
6    A    No.
7    Q    What materials do you recall having reviewed?
8    A    I recall reviewing the expert report by Harris
9  Greco Chevalier. And I scanned, in the last few days,
10 the rough transcripts of parts of their depositions. I
11 also read part of the judge's opinion on class
12 certification.
13      I think that's it.
14    Q    And you think you may also have read the
15 deposition of Paul Aikan?
16    A    I remembering reading part of it, scanning
17 part of it. But I remember it was a very long document,
18 and I didn't have time to go through all of it. And I
19 don't remember if it was after or before my report, but
20 most likely would have been after my report was filed.
21    Q    Eric Zohn, Z-o-h-n?
22    A    No, that does not ring a bell.
23    Q    The plaintiffs, Betty Miles?
24    A    No.
25    Q    Jim Boutin? Boutin?

1    A    No, that doesn't ring a bell.
2    Q    Have you been deposed before?
3    A    Have I been deposed before? Certainly not
4  recently. I'm trying to think, if I go back in time.
5  I've written expert reports before, but I have not
6  deposed, no.
7    Q    How many expert reports have you written?
8    A    I have written at least two others in U.S.
9  cases. And then I've written expert reports for
10 international cases as well.
11    Q    Let's start with the U.S. cases. What's the
12 the name of the first case in which you can recall
13 writing an expert report?
14    A    I remember writing a report in the case
15 involving a publisher called Elsevier in the Southern
16 District of New York. That would have been
17 approximately two years ago. I understand the case was
18 dismissed on summary judgment, and I wasn't deposed in
19 the case.
20    Q    What's the next case subsequent in time to the
21 Elsevier case that you recall?
22    A    Actually, I misspoke. I didn't file an expert
23 report. I was thinking of my Amicus Brief at the 10th
24 Circuit and then in the Supreme Court, and then in the
25 Golan v. Holder case. So it was not an expert report.

1    Q    Golan and Holder is a brief?
2    A    It was a brief on my own behalf, yes, filed
3  both in the 10th Circuit and the Supreme Court.
4    Q    In addition to the Elsevier report that you
5  mentioned, have you submitted other expert reports in
6  other U.S. cases?
7    A    Not yet. I am retained as an expert in the
8  settlement in a state case in California involving the
9  so-called audio visual guild on the Screen Actors Guild,
10 Directors Guild of America, and the Writers Guild of
11 America West.
12    Q    Who retained you?
13    A    The plaintiffs' counsel. The settlement, as I
14 understand it, specifically directs that two experts
15 should be appointed to overview the distribution of
16 foreign levies that are received by the guilds, and I am
17 one of two experts.
18    Q    Who is the other?
19    A    His name is Donald Jasko, J-a-s-k-o.
20    Q    Have you submitted expert reports in any other
21 U.S. cases?
22    A    No.
23    Q    International cases in which you have
24 submitted expert reports, what is the first in time that
25 you can recall?

1     A   I am advising counsel on that case involving
2   the packaging of tobacco.  That is a case that is
3   pending before -- actually several cases pending before
4   different international jurisdictions.
5     Q   Who are the counsel?
6     A   They are in London.  A firm called Fresh
7   Fields.
8     Q   Who is their client?
9     A   To what extent am I -- I'm not sure to what
10  extent I can disclose that.
11        THE REPORTER:  I'm sorry.  I can't hear you.
12  What was that?
13        THE WITNESS:  I'm not sure to what extent I
14  can disclose that.  It's really not a copyright
15  management related case.
16  BY MR. McGOWAN:
17    Q   I understand.  And if you wish to consult with
18  your counsel, I understand that as well.  Let's take one
19  step at a time.
20        Did you sign a confidentiality undertaking
21  with respect to that case?
22    A   I believe I did.
23    Q   And that's a current case?
24    A   Yes.
25    Q   Any other international cases in which you

1   have prepared a report?
2     A   Prepared the report, no.
3     Q   Any other international cases in which you
4   have given testimony by deposition?
5     A   No.
6         MR. McGOWAN:  Let me have marked as Exhibit
7   Gervais 1 --
8         (Exhibit 1 was marked for identification.)
9         MR. McGOWAN:  -- a copy of a web page.
10  BY MR. McGOWAN:
11    Q   I will ask you, Professor Gervais, do you
12  recognize this web page?
13    A   Yes.  This looks like a list of the papers
14  that I made available on the site called SSRN.com.
15    Q   SSRN stands for the Social Science Research
16  Network?
17    A   Correct.
18    Q   The papers that are listed here, can these be
19  downloaded from this site?
20    A   I believe so.
21    Q   All of them?
22    A   I believe so.  In some cases, you can only put
23  in abstract, and in some cases you can put full text
24  depending on -- some of my papers are not there because
25  I'm not allowed to put them there.

1     Q   To the extent that you are allowed to put them
2   there, have you done so?
3     A   I think that's an incomplete list, but let's
4   say I've put -- most recent papers are there, yes.
5     Q   And if I were to, for example, want to
6   download traditional knowledge and intellectual
7   property, the first paper listed, can I get the entire
8   paper?
9     A   Yes.
10    Q   At the top left-hand corner underneath your
11  name there's an entry that says, "SSRN, Author, Rank."
12        Do you see that.
13    A   Yes.
14    Q   What does that refer to?
15    A   I don't know.
16    Q   On the -- above the listing, there's a box
17  that says aggregate statistics.  Do you see that?
18        THE REPORTER:  "Aggregate"?
19        MR. McGOWAN:  Aggregate statistics.
20        THE WITNESS:  Where, exactly?  I don't see it.
21  BY MR. McGOWAN:
22    Q   In the rectangular box titled, "Daniel J.
23  Gervais Scholarly Papers," on the right-hand side?
24    A   Oh, yes.  Yes, I do.
25    Q   Total downloads, 7619?

1     A   Correct.
2     Q   Total citations 19?
3     A   Yes.
4     Q   Do you know what those refer to?
5     A   I can only assume that the first number refers
6   to the number of times my papers were downloaded, not
7   knowing which one, unless I look at the rest of the
8   list.  And citations, I don't have a clue what that
9   number means because, frankly, even in context I don't
10  understand the number.
11    Q   Why don't you put your articles, or at least
12  your more recent ones, up on SSRN?
13    A   It's a practice of Vanderbilt Law School that
14  is strongly encouraged.  Actually, our administrative
15  assistants are encouraged to help us do so.
16    Q   Why did you do it personally?
17    A   I did not give it much thought.  As I said,
18  it's a practice that is encouraged, and I have no
19  objection to having people download my papers.  I'm
20  actually happy if they do so.
21    Q   Why are you happy?
22    A   Because it's part of legal scholarship, I
23  suppose, as of any scholarship that you would want
24  people to access your material and review and critique
25  it and use it and build on it.

Page 21

1    Q   Do you benefit when people are able to access
2  your papers and read your ideas?
3         MR. SNYDER: Objection to form.
4         THE WITNESS: Do I benefit? I'm not sure what
5  you mean. Financially, or otherwise?
6  BY MR. McGOWAN:
7    Q   In terms of your scholarly goals.
8         MR. SNYDER: Objection.
9         THE WITNESS: I really don't know. I'm just
10 really having trouble with "benefit." The fact that
11 people refer to my scholarship, is that a benefit? Very
12 hard to answer that question.
13        I know financially SSRN offers the option of
14 sending paper -- bound paper copies for a fee. But I
15 have not looked into that program. I know some of my
16 colleagues have, and I haven't.
17   Q   Have you done that with any of these papers
18 listed on Exhibit 1?
19   A   No. I have not -- I've not given it much
20 thought, to be honest, whether I should join that system
21 or not. I just put my papers up there when I am allowed
22 to do so by my publishing agreement.
23   Q   Is one of your aspirations in writing
24 scholarship to expose others to your ideas?
25   A   Well, I think it's the aspiration of a writer

Page 22

1  to be read, so yes, to that extent.
2    Q   Does posting papers and allowing readers to
3  download them help you achieve that aspiration?
4         MR. SNYDER: Objection to form.
5         THE WITNESS: Empirically, I cannot verify
6  that. But it looks, intuitively, like that could be the
7  case.
8    Q   Do you ever receive offprints of your
9  articles?
10   A   Yes, regularly.
11   Q   Do you circulate offprints to your colleagues?
12   A   Yes.
13   Q   And by offprint, so the record is clear, that
14 would be a soft bound version of the specific article
15 you wrote; correct?
16   A   Correct.
17   Q   Do you charge the people you send your
18 offprints to for them?
19   A   No, I have not charged to send offprints to.
20 The law school pays the offprints when they come in, and
21 then I send them out, through my assistant, to
22 colleagues I think might be interested.
23   Q   Are you familiar with a practice in legal
24 academe of measuring scholarly influence by citation
25 count?

Page 23

1    A   I'm aware that some people do that. And one
2  of my colleagues actually knows a system he told me to
3  look into. But Geiger -- Eiger, something. But to be
4  very honest, I haven't paid any attention to that.
5    Q   Do you know if the rankings are based on the
6  number of times that a person's work is cited so that a
7  greater number implies greater influence?
8    A   I don't know how the system works.
9    Q   We'll go through some of these in particular.
10 But as you sit here now, looking at your list of recent
11 papers, has your work in this case led you to modify any
12 of the opinions you expressed in any of them?
13        MR. SNYDER: Objection.
14        THE WITNESS: In any of the papers I have ever
15 written? I can't think of any opinion that would have
16 changed, but obviously I would have to reread every
17 single paper, going back to the first one.
18        THE REPORTER: Going back to what?
19        THE WITNESS: To the first one.
20        MR. McGOWAN: Let me have marked as Exhibit 2
21 your report.
22        (Exhibit 2 was marked for identification.)
23 BY MR. McGOWAN:
24   Q   Let me ask you to turn to the last page, which
25 is Exhibit B.

Page 24

1    A   (Witness complies.)
2        Um-hum.
3    Q   This is -- what is Exhibit B?
4    A   It's a list of materials I considered prior to
5  writing the report.
6    Q   I do not see your email to the lawyer at the
7  CCC on here. Did you omit that?
8        MR. SNYDER: Objection to form.
9        THE WITNESS: To the extent that that would
10 qualify as material considered for -- you know, I didn't
11 put discussions with counsel either. To that extent it
12 is not there, yes.
13 BY MR. McGOWAN:
14   Q   Why not?
15   A   I don't -- I don't recall thinking of it as
16 material considered. I really was thinking of material
17 that I directly used. I just sent that paragraph for
18 verification, and so I just didn't -- didn't indicate it
19 here.
20   Q   Do you have a copy of the email he sent you?
21   A   Not with me.
22        MR. SNYDER: Objection.
23 BY MR. McGOWAN:
24   Q   Do you have a copy of the email he sent you
25 anywhere?

Page 25

1    A   Oh, it's likely somewhere in my -- in my email
2  system, yes.
3        MR. McGOWAN:  We can discuss it at break.
4  We'll ask for production of that.  It should have been
5  listed.
6        MR. SNYDER:  We can discuss it at the break.
7        THE WITNESS:  I defer to counsel on that one.
8  BY MR. McGOWAN:
9    Q   Let's go to Exhibit A, please.
10   A   The C.V.?
11   Q   Yes?
12   A   Okay.
13   Q   Under "Education" you list a doctorate from
14  the University of Nates.
15   A   Correct.
16   Q   What is the doctorate in?
17   A   Intellectual property.  Copyright,
18  specifically.
19   Q   Copyright law?
20   A   It was -- the dissertation part of the
21  doctorate was on the notion of work on the Berne
22  Convention, copyrighted work.  The Berne Convention
23  being an important international copyright treaty.
24  Berne is B-e-r-n-e.
25   Q   Is it a doctorate of law?

Page 26

1    A   Yes.  Well, it's called Ph.D. in law in
2  political science, I think, technically.  I'd have to
3  look at the degree.  It goes back awhile.
4    Q   Are you an economist at all?
5    A   No.
6    Q   Your previous employment -- I want to make
7  sure we've got that.  The answer is?
8        THE REPORTER:  No.
9  BY MR. McGOWAN:
10   Q   Okay.  Previous employment, let's go down to
11  lawyer Clark Woods in Montreal?
12   A   Um-hum.
13   Q   Are you admitted to practice in any
14  United States jurisdiction?
15   A   No.
16   Q   Have you ever sought admission in any United
17  States jurisdiction?
18   A   No.  I'd rather not -- not be admitted.  To be
19  honest, I'm very happy not -- to be able to tell people,
20  naturally when they call several times a week to get IP
21  advice, that I'm not a lawyer in Tennessee.
22   Q   Do you seek -- did you seek admission to the
23  Bar when you submitted your Amicus Brief?
24   A   No, I submitted the brief through a lawyer
25  in -- I think he's based in Denver.

Page 27

1    Q   In your C.V., the third entry from the bottom,
2  it says, "Head of Section" --
3    A   On which page, please.
4    Q   Under -- on the first page.
5    A   You're on previous employment?
6    Q   Yes.  Previous employment.
7    A   Um-hum.
8    Q   Third entry from the bottom.  "Head of
9  Section, World Intellectual Property Organization."
10   A   Um-hum.
11   Q   What were your responsibilities in that
12  position?
13   A   The section was called Copyright Project
14  Section, which ask not very descriptive.  The main
15  responsibility was to overview the conferences, meetings
16  having to do with the future of copyright.  So
17  basically, organizing international events, including
18  one at Harvard Law School, where we invited people to
19  come and talk about where they thought copyright policy,
20  copyright law might go in the future.
21        These were typically very international in
22  nature, bringing people from both developed and
23  developing countries and the proceedings of these
24  meetings were systematically published by WIPO, which is
25  the World Intellectual Property Organization.

Page 28

1        In addition to that, I attended meetings
2  dealing with copyright at WIPO, and occasionally would
3  prepare the report of the meeting.  It could be a
4  committee of experts; it could be a diplomatic
5  conference; it could be an informal discussion.
6        And again, those reports were made available
7  publicly by the organization.
8    Q   Did you negotiate any licenses while you were
9  at WIPO on behalf of third parties?
10   A   I can't -- I don't recall negotiating a
11  license with anyone.
12   Q   Were you involved in the publishing of books
13  while you were at WIPO?
14   A   No.
15   Q   So there are three things I have.  You held
16  conferences, and assisted in preparation of publication
17  papers relating to those conferences; correct?
18   A   I assisted in making sure we had the papers,
19  that they were proper in terms of both substance and
20  form.  But the publication of the book itself was
21  handled by the publications division.  I think there are
22  1200 employees.  It's a big shop, and they have a
23  specialized publications division.
24   Q   And you attended meetings and would sometimes
25  write reports concerning those meeting?

1   A   Well, I would prepare the report in advance of
2   the meeting so people would have, obviously, discussion
3   papers to consider, and then we would prepare a report.
4   And occasionally, I would write the whole report;
5   occasionally, parts of the report, depending on how long
6   the meeting was and how quickly we needed the minutes
7   adopted.
8        It might be useful to add that reports that
9   are adopted at WIPO meetings will typically suspend at
10  the end of two or three days, the conferencing will
11  suspend for a day, so we have to draft overnight so that
12  the report can actually be voted on the next day.
13      Q   Following your work at WIPO, you moved to
14  SESAC in Paris?
15      A   Correct.
16      Q   What were your responsibilities at SESAC?
17      A   I was an assistant secretary general.  So this
18  was a very broad mandate, basically, management of the
19  office, their policy and legal papers.  There was a
20  director of legal affairs that was -- it's a fairly
21  small organization of about 10 or 12 employees at the
22  time at the headquarters.  And then there were offices
23  in Singapore and Buenos Aires as well.
24      But for the Paris office, I was doing both
25  substance on collective management and administrative of

1   the office.  I also helped set up collectives in a few
2   countries, both at WIPO.  I actually did one of those I
3   forgot to mention, and then at SESAC, I did a number of
4   those where I would go to a country, very often from
5   scratch, we would train people, install software, get
6   them going.  And then I would go back, typically, a year
7   or two later to see how they're doing and help them in
8   the process.
9       Q   Let's go back to WIPO then.  In which
10  countries did you assist?
11      A   For WIPO it was Burkina Faso.
12          THE REPORTER:  I'm sorry.
13          THE WITNESS:  Burkina Faso, formerly known as
14  Upper Volta.  B-u-r-k-i-n-a, second word, F-a-s-o; it is
15  somewhere between Ivory Coast and Senegal.
16  BY MR. McGOWAN:
17      Q   And when you say set up collectives, can you
18  tell me what was being collectivized?
19          THE REPORTER:  I can't hear you.
20          MR. McGOWAN:  What was being collectivized.
21          THE WITNESS:  These were typically what we
22  would call either performing rights organizations or
23  music rights organizations by which, I mean, both
24  performing rights and mechanical rights.
25  BY MR. McGOWAN:

1       Q   And what did you do to set up the collective?
2       A   Basically everything.  In the case of Burkina
3   Faso, I flew in with the computers.  And the software,
4   we had trained people in Geneva.  We basically then
5   installed the machines, made sure they were -- the data
6   base was working, and then trained additional people
7   locally.  And I stayed until basically the operations
8   were up and running.
9       Q   Where did you obtain the data for the
10  databases?
11      A   This was provided by -- there was an agreement
12  at the time between by WIPO and SESAC to have access to
13  a database that was not totally complete at the time, so
14  that part of the processing, the data processing, was
15  done locally.  And part of the data processing, in the
16  case of specifically Burkina Faso, because it's a French
17  speaking country, was done in Paris by the French Music
18  Rights Organization as a service to help this new
19  collective.
20      Q   What data were collected in the database?
21      A   It would be what we call meta data.  So
22  basically titles of songs, names of performers, names of
23  songwriters, names of music publishers, record
24  companies, and I think the part of the database that was
25  still in Paris was addresses to send payments to and the

1   splits.
2       Q   The splits between the collective and --
3       A   No, between the publisher and the songwriter,
4   typically.
5       Q   Was your work at SESAC in setting up
6   collectives similar in nature to your work --
7       A   Very much so.
8       Q   I'll just mention, we need to be careful to
9   take turns speaking so that the court reporter can get
10  each of our statements.
11      A   Good point.
12      Q   You joined Copyright Clearance Center in 1997?
13      A   That sounds right.
14      Q   When you began work there, what was your
15  title?
16      A   Briefly, director of international -- I'm not
17  sure of the exact title, but something director of
18  internationals affairs or operations and very -- fairly
19  quickly, though I don't remember the exact date, became
20  vice president, international.
21      Q   And what did you do as vice president
22  international?
23      A   Basically, my job was to negotiate reciprocal
24  representation agreements between CCC, which is the U.S.
25  Reprographic Rights Organization, which we usually

Page 33

1   abbreviate to RRO, and foreign RROs in Europe, Asia,
2   Latin America. So that was a very significant part of
3   the job.
4          Then obviously, once these agreements are
5   signed, they need to be administered. So you basically
6   then deal with issues that come up occasionally between
7   RROs, anything from technical information on data to
8   payments to basically anything else that can happen
9   between two collectives.
10     Q   Anything else?
11     A   I participated as a senior executive at senior
12  management team meetings. I advised the CEO on whenever
13  he asked for advice.
14     Q   Who was the CEO while you were --
15     A   Joseph Alen, A-l-e-n.
16     Q   The agreements that you negotiated, were they
17  all between or among collective rights organizations?
18     A   They were not all between RROs. Almost all of
19  them were -- we negotiated some tripartite agreements
20  concerning some revenue that is from, I believe, Norway
21  where the bylaws of the Norwegian RRO required that the
22  payment be sent to not the RRO itself, but to
23  organizations representing right holders, namely authors
24  and publishers, separately.
25         And so that was a more complicated

Page 34

1   negotiation. But all of the others, as I recall, were
2   fairly typical contracts between two collectives.
3      Q   Where were the authors and publishers located
4   who received these proceeds that you mentioned?
5      A   I believe they were all in the United States.
6      Q   And these were payments from Norwegian?
7      A   Well, Norwegian is the one contract that was
8   more complicated because of their disbursement policies.
9   Everything else was very typical. In other words, you
10  get payment from a foreign RRO with data. Then you
11  process the data and pay the U.S. rights holders
12  accordingly.
13     Q   During your time at CCC did you negotiate any
14  agreements with a U.S. publisher?
15     A   Yes.
16     Q   How many?
17     A   Several. I don't recall. So at some point
18  during my tenure as vice president international, the
19  vice president of rights holders relations, which is
20  authors and publisher relations, left the company. And
21  I took over on an interim basis, which must have lasted
22  six months or so.
23         And during that time, I did negotiate
24  agreements with publishers. Now, I typically would not
25  negotiate the exact legal terms of the contract. That's

Page 35

1   something the general counsel would usually take over
2   from me. But I would negotiate on a more business
3   level, I suppose.
4      Q   Business as opposed to the terms? I'm not
5   sure I follow that.
6      A   No, basically explaining to -- these were
7   agreements by which, for example, a publisher or an
8   author would want to join CCC, so very often, they have
9   a long list of questions. Many of them are very
10  concrete questions about how often do I get paid, what
11  data do I receive with my payment, how do you base your
12  payments to authors and publishers. So you would
13  explain all of that. And then when it came time to
14  actually negotiating the exact terms of the contract
15  with CCC, that would be taken over by the legal
16  department.
17     Q   So you did not negotiate the terms; you
18  provided information?
19     A   I did not negotiate terms of the actual
20  contract, yes, that's right.
21     Q   Did you negotiate the terms of an actual
22  contract with authors?
23     A   The role would be the same. So I would talk
24  to the author, explain the services, and then very often
25  I would attend these negotiations but I would not

Page 36

1   typically be very active. I would let the general
2   counsel take over.
3      Q   Did you have any other responsibilities at the
4   CCC during your tenure there?
5      A   That's a hard question. As I said, as member
6   of a senior executive team, all kinds of things can
7   happen. And sometimes you just, you know, due to an
8   emergency, something that shows up -- comes up, and then
9   you basically help the team. I can't recall anything
10  specific. But anything from fire evacuation to -- you
11  know, so it's very hard to answer your question
12  categorically.
13     Q   Any other responsibilities pertaining to the
14  negotiation of agreements with either publishers or
15  authors?
16     A   Not beyond what I have already indicated.
17     Q   Did you have responsibilities for dealing with
18  users of CCC?
19     A   As a rule, no. Did it happen on occasion,
20  probably. But that was a separate part of the company
21  that would negotiate user agreements. So I don't recall
22  any specific instance where I would have certainly not
23  negotiated the terms of the contract with the user.
24  Attended the negotiation or discussion, yes.
25     Q   Do you recall any particular user whose

Page 37

1  negotiations you attended?
2      A   No, I don't recall any specific names.
3      Q   Do you recall, for example, whether they were
4  business users or academic users?
5      A   I think both.  I certainly attended with
6  business users.  I think I attended a discussion with, I
7  think it might have been, Penn State, but I'm not
8  100 percent sure.  I think was Penn State, though, at
9  the time.
10         I remember visiting the campus, so there must
11  have been discussions involved there.  But I don't
12  recall the specifics of -- this was probably when the
13  electronic course back service was being launched.
14     Q   Did you have any role in the development of
15  the terms for the electronic course back service?
16     A   Depends on the how you define terms.  I did
17  not negotiate for the contract, but I did provide input
18  on how the service should function.
19     Q   What input do you recall providing?
20     A   These were half-day or sometimes even longer
21  meetings with the entire team, on into, you know, how
22  user friendly the interface should be to what to do if
23  the title doesn't show up when the user searches it
24  online, to, in other words, customer service to those
25  kinds of issues.

Page 38

1         So I really honestly don't remember specific
2  advice.  I just remember being part of that, those
3  meetings, and contributing what I could.
4      Q   During the time that you were at CCC, was
5  there any offering by CCC targeted at general consumers
6  as opposed to business or academic users?
7      A   Yes.  They started a program.  The name has
8  since changed.  I don't remember what it was called at
9  the time.  But basically, this was a service that
10  allowed any user, including individual users -- you have
11  to recall these were the days where people were setting
12  up -- starting to set up so-called personal websites and
13  wanting to put content on them.
14         And there was a service at CCC that we had
15  launched to allow people take contact from, for example,
16  newspapers and so on to put on a personal website.
17  There were rates specific to that use.
18         And then the service was exported so that --
19  what I mean by that is the -- there was an icon at the
20  bottom of the -- of an article, say, in the New York
21  Times page.  You could click on that and then the window
22  would open to process a transaction, a licensing
23  transaction.  Even though you never left the New York
24  Times site, the actual processing of the data was done
25  at CCC.

Page 39

1      Q   Did that service have a title?
2      A   Yes.  But I don't remember -- it was Write,
3  something.  To be honest, I don't remember.
4      Q   Did it have standard terms associated with it?
5      A   I assume so.  I did not review those terms.
6      Q   Come back to the report in a bit.  Set that
7  aside for a moment.
8      A   Set the report aside?
9         MR. McGOWAN:  Yes.  I'm going to mark as
10  Exhibit 3 an article entitled, "The Protection of
11  Databases."
12         (Exhibit 3 was marked for identification.)
13  BY MR. McGOWAN:
14     Q   Did you write this article?
15     A   Yes.
16     Q   The -- I want to direct your attention to
17  Page 1157.
18     A   Yes.
19     Q   In Section 3, the first sentence says, "My
20  quote, The Internet was built with information.
21  Information on the Internet has value not because it is
22  scarce.  The model in which applied in traditional
23  microeconomics to goods, including informational goods
24  such as books, but because those who value it most are
25  able to find it."

Page 40

1         Do you see that that?
2      A   Yes.
3      Q   What did you mean by that?
4      A   Well, it's something that was repeated at the
5  conference yesterday and which I mentioned in several
6  other publications almost in the same terms.  So this is
7  something I obviously believe.  It's that the best way
8  to generate value for creators on the Internet for their
9  content to be found, the challenge being for them to get
10  paid.
11         For example, I have written extensively that
12  the solution to music file sharing is not to sue
13  teenagers or take content down, but to license it, as I
14  actually believe Google does with its AdSense program or
15  YouTube.
16         But I think that's the right way to go.  It's
17  to make contect available, simply to find ways to have
18  financial flows that adequately reward the people who
19  created the content.
20     Q   So if I understand you correctly, you've
21  described a two-step process.  Step 1 is search, in
22  which the consumer finds an object of content on the
23  Internet?
24     A   I did not discover a two-step process.  I
25  discovered a process with two objectives.  One is making

1  the content available, and second objective being to
2  make that happen in a way that rewards creators.
3      Q   Okay.  Do you have to search -- strike that.
4          Do you have to find the content before you
5  have any dealings with it on the Internet?
6          MR. SNYDER:  Objection to form.
7          THE WITNESS:  The true answer to that is,
8  frankly, it depends.  So if you're -- if you're talking
9  about certain types of content, where searching it means
10 you've -- you've acquired enough of the content that you
11 don't need more, then both operations happen at the same
12 time.  For other types of content, you would need to
13 search it and then make a decision.
14         So it really depends on which exact element of
15 content one is looking at.
16 BY MR. McGOWAN:
17     Q   When you say it depends, is it your testimony
18 that there are elements of content on the Internet that
19 do not need to be found before they can it be consumed?
20     A   Again, it depends on what "found" means.
21 Let's say you want the latest book by a certain author,
22 the latest song by a certain artist, and you have the
23 title.  Have you not already found it?  It is really
24 unnecessary at that point to download the song to say, I
25 found it, or to download the book?

1          I think the answer is probably no.
2      Q   How do you get the title in the first place?
3      A   It could be on -- it could be anywhere from
4  Facebook to a conversation at the local coffee shop to
5  you've heard it on the radio, to you've read the review
6  in the New York Times book section.  Who knows.
7      Q   To searching on the Internet?
8      A   Possibly.
9      Q   Have you undertaken any study to find out how
10 common it is to find, say, books on the Internet through
11 coffee shop conversations?
12     A   No.
13         MR. SNYDER:  Objection; form.
14 BY MR. McGOWAN:
15     Q   Have you taken any study to find out how
16 common it is to find books on the Internet through any
17 means?
18     A   I have not seen those studies.  I have not
19 performed them myself, no.
20     Q   Are you an expert in search?
21     A   No, I don't consider myself an expert in
22 search.
23     Q   When you say that -- in this sentence on
24 Page 1157, that information has value not because it is
25 scarce, but because who value it most are able to find

1  it?
2      A   Um-hum.
3      Q   When you say, "able to find it," why do you
4  say "able"?
5          MR. SNYDER:  I'd like to object and point out
6  this is a long article written several years ago.  You
7  are focusing on a specific part.  I assume Professor
8  Gervais can review it for context, if it -- if he would
9  like.
10         THE WITNESS:  Well, actually, I was going to
11 say the paper is not about what is in the database, but
12 is about incentives to create databases in the first
13 place, and make the case that the European union
14 approach, which was to create a specific right in
15 databases, does not seem to have generated more
16 databases.  There are various explanations as to why
17 that did or did not happen, which I explore in the
18 paper.
19         So I -- I stand by the sentence that you've
20 pointed out, that content -- online content business
21 models presuppose accessibility, but they only will work
22 if there is proper compensation of creators.
23 BY MR. McGOWAN:
24     Q   I see you followed your counsel's lead.  My
25 question was, what do you mean by the word "able"?

1          MR. SNYDER:  Objection to form.
2          THE WITNESS:  How do I define the word able?
3  That they have the ability to.
4  BY MR. McGOWAN:
5      Q   And they need the ability because there's a
6  lot of content on the Internet?
7      A   There is, indeed.
8      Q   That could be difficult to find what you want?
9      A   It can be.
10     Q   At the end of this paragraph, you say, "Some
11 forms of restrictions sought by database owners almost
12 as knee jerk attachment to, quote/unquote, property, may
13 not, in the end, be their own interest."
14         Do you see that?
15     A   Yes.
16     Q   What forms of restriction are you referring
17 to?
18     A   I think some types of databases.  The paper
19 is -- makes some of these distinctions.  Some types of
20 databases are, more naturally, going to work subject to
21 access restrictions, such as passwords and payments.
22 One example might be Westlaw Nex-Lexis, which seem to
23 work at that business models.
24         Other databases might work better if they work
25 on a different model.  And what the sentence says is

1    that to consider any use of the database as, say
2    trespass in the property context is incorrect, that this
3    needs to be contextual.  You look at the database, you
4    look at the business models, and you should make the
5    call based on that, not based on a knee jerk attachment
6    to the fact that it is, quote/unquote, property.
7        Q    I would like you to take a look at Page 1165
8    at the end in the conclusion.
9        A    Um-hum.
10       Q    At the end of the first paragraph there is a
11   quotation from Professor Cornish.
12            Do you see that?
13       A    Yes, I do.
14       Q    It says, "Industrial and commercial
15   developments in competitive economies have always
16   turned, in large measure, upon the borrowing of ideas.
17   Intellectual property, including rights of unfair
18   competition should be restricted to cases where the
19   borrowing is unacceptably parasitic.  It should not be
20   allowed to a blocking mechanism lurking in every
21   crevice of endeavor."
22            Do you see that?
23       A    Yes, I do.
24       Q    Did you seek Professor Cornish's permission to
25   quote that?

1        A    No, I did not.
2        Q    Did you pay him a royalty?
3        A    No, I did not.
4        Q    Do you agree with his comment?
5        A    I would not have said it exactly that way, but
6    I thought he made an interesting point there, in the
7    words, like "unacceptably parasitic" are the kind of
8    words that we could write books about.  But I like the
9    way that he makes the point that this goes back to not
10   just Isaac Newton, but before, that we all stand on the
11   shoulders of the giants.
12            That's not -- the point of my report in this
13   case, is about whether there should be payment for some
14   online uses and how that payment can be effective.
15       Q    You agree with the proposition that we all
16   stand on the shoulders of giants?
17       A    Well, I think what I was saying is that
18   Professor Cornish's point follows in the same line of
19   thought, when he talks about the borrowing of ideas.
20       Q    Which is a creation invariably draws on
21   previous ideas, previous creation?
22       A    Yes, and Copyright has numerous doctrines from
23   derivative rights to idea expression dichotomy and so on
24   that handles the proper limits of that borrowing,
25   especially when it's done without compensation.

1        Q    De minimis use is one of those documents?
2        A    I haven't looked recently at the de minimis
3    cases.  I know there are cases about de minimis in
4    copyright law, yes.
5        Q    Is it one of the doctrines that you're
6    referring to in that context?
7        A    Well, the idea of a quotation of right is a
8    very complicated one, which was your question about
9    whether I sought permission.
10            As I indicated at the beginning of my
11   testimony, I consider myself reasonably versant in --
12   conversant in international copyright.  It just so
13   happens that the quotation right, in other words, using
14   a short quote in the context of creating a new work is a
15   mandatory exception under international treaty.  It's
16   actually the only mandatory exception in the Berne
17   Convention.
18            And so it is my belief that taking a short
19   quote in the context of preparing another work is
20   acceptable.  And because there's no specific quotation
21   exception in the U.S. statute, we have to rely on
22   doctrines such as de minimis, for example.
23       Q    And fair use?
24       A    And fair use.
25       Q    This is published in the Chicago law library;

1    correct?
2        A    Yes.
3        Q    Published in the United States?
4        A    Yes.
5        Q    Not published internationally, as far as you
6    know?
7        A    It is distributed internationally.
8        Q    Original publication in the United States?
9        A    Correct.
10       Q    Is your report in this case based on your
11   understanding of international laws?
12       A    My report is really on collective management
13   and based on, to the extent I talk about the U.S.
14   statute, yes, obviously, it is based on my understanding
15   of U.S. law.  I did not specifically write the report
16   with international considerations in mind.
17       Q    Did you bring to bear in your analysis your
18   knowledge of international law?
19       A    Possibly indirectly.  I did not intend that,
20   but it is possible.  It's part of what I know.
21            MR. McGOWAN:  Let me ask to have it marked as
22   Exhibit 3?
23            THE REPORTER:  4.
24            MR. McGOWAN:  4, sorry.
25            (Exhibit 4 was marked for identification.)

1   BY MR. McGOWAN:
2   Q   Exhibit 4 is a -- I'll represent to you is a
3   printout of a web page from what appears to be the
4   Vanderbilt News, and it has your photograph on it.
5   A   It does.  An old one, too.
6   Q   And it says -- you must get them to update.
7   A   Yes, I do, indeed.
8   Q   "Internet anti-piracy legislation is flawed,
9   says Vanderbilt professor."
10      Do you see that?
11  A   Yes, I do.
12  Q   The last two paragraphs of this article depict
13  quotations attributed to you.
14      Do you see that?
15  A   Yes.
16  Q   Did you make these comments that are here in
17  the last two paragraphs?
18  A   No.  The piece was drafted based on the
19  conversation I had on the phone with a media person at
20  Vanderbilt, and they sent me this draft.  And then I
21  looked at it, and then they put it up on the website.
22  Q   Did you approve it?
23  A   It's, to a certain extent, media speak in the
24  sense that I would probably not say things exactly this
25  way.  But I agree with the gist of what is there.

1   Q   Okay.  This article pertains to SOPA?
2   A   Correct.
3   Q   What is SOPA?
4   A   It's a bill that was pending in Congress
5   called Stop Online Piracy Act.  And there was a Senate
6   version in PIPA which is also mentioned in the exhibit.
7   Q   You say in the second sentence of the next to
8   the last paragraph, "Unless substantially amended, it
9   might reach a level of over enforcement by unjustifiably
10  targeting search engines that reference other sites and
11  also end users of those sites."
12      Do you see that?
13  A   Yes.
14  Q   What did you mean by "unjustifiably targeting
15  search engines"?
16  A   I had several issues with SOPA, still do.  One
17  reason is the one I already mentioned, which I don't
18  think the way to get online business models to go is to
19  take content down, but rather to monetize it.
20      Second, is I think there were provisions in
21  SOPA that were imposing burdensome requirements on
22  whether search engines or other intermediaries that
23  really seemed both unnecessary and normatively dubious
24  in the sense that this is another step in what I call
25  the over-enforcement of copyright against particular

1   individual users.  I would much rather see an
2   environment in which use is licensed and not limited in
3   ways that don't -- you know, that are unnecessary.
4   Q   Now, you refer to search engines here
5   separately from end users.
6       Do you see that?
7   A   Yes, I do.
8   Q   What unjustifiable targeting of search engines
9   were you referring to when you made this comment?
10  A   Well, there were -- I don't recall exact
11  language of the bill.  I looked at it at the time.  This
12  was six months ago or so.
13      There were burdens imposed on intermediaries
14  such as search engines to take down content, but also
15  possibly liability for simply linking to content that
16  was then found to be illegal, or it could be read that
17  way.  And I thought that was actually a very difficult
18  burden to meet for anyone to know whether what they're
19  linking to is infringing or not.
20  Q   Why?
21  A   Because it is a very hard determination, in
22  some cases, to decide what is infringing and what is
23  not.
24  Q   What is would be wrong with imposing liability
25  notwithstanding that difficulty?

1       MR. SNYDER:  Objection to form.
2       THE WITNESS:  "Wrong" is a moral question.
3   Can you -- do you mean it as a moral question or legal
4   wrong or . . .
5   BY MR. McGOWAN:
6   Q   Well, let me ask you in terms of the second
7   sentence.  "This could have a chilling effect and could
8   damage the development of the very technology that is
9   revolutionizing how consumers receive information in the
10  arts."
11      Do you see that?
12  A   Yes.
13  Q   "Wrong" in the sense of bad effects.
14  A   I -- I certainly think SOPA could have had
15  chilling effects in the way that it was written.  Again,
16  I don't recall the exact language of the statutes, but
17  it seemed overbroad, in particular, in dealing with -- I
18  believe there were felony provisions dealing with even
19  individual users.  I really think that's excessive.
20      So I basically did not like the legislation.
21  I was -- I am not against efforts to enforce copyright.
22  I just think this effort was excessive, and I think it
23  was defeated for that reason.
24  Q   You refer to the very technology that is
25  revolutionizing how consumers receive information in the

1    arts.
2        Do you see that?
3    A    Yes.
4    Q    What is that technology?
5    A    Again, I didn't -- I'm not the author of the
6    quote, although I agree with the gist of it.  I think
7    the technology is, in one word, online and that would
8    include anything from computers to mobile devices to
9    access to digital content, generally.
10   Q    Search?
11   A    Search would be part of it, yes.
12   Q    And although, as you have said, you didn't
13   really draft this, you reviewed it and authorized its
14   publications?
15   A    I agree with the gist of it.  As I said --
16       THE REPORTER:  "Authorized its . . ."?
17       MR. McGOWAN:  Authorized its publications.
18       THE WITNESS:  I answered that question, I
19   believe, already.
20   BY MR. McGOWAN:
21   Q    And your answer is "yes"?
22   A    The answer is I agree with the gist of it.  I
23   made a point that the language seemed a little media
24   speak to me, which is not the way I typically write,
25   but . . .

1    Q    I'm referring to the process of its
2    publication.  You received a draft; correct?
3    A    Yes.
4    Q    You reviewed it?
5    A    Yes.
6    Q    And you said it was okay for Vanderbilt to
7    post?
8    A    Yes.
9        MR. SNYDER:  I think we've been going about an
10   hour.
11       MR. McGOWAN:  Yeah.
12       MR. SNYDER:  Let's take a couple of minutes.
13       MR. McGOWAN:  Fine.
14       VIDEOGRAPHER:  Off the record at 11 a.m.
15       (Recess taken.)
16       VIDEOGRAPHER:  On the record at 11:12.
17       MR. McGOWAN:  Professor Gervais, I'm going to
18   mark as Exhibit 5 one of your articles.
19       (Exhibit 5 was marked for identification.)
20   BY MR. McGOWAN:
21   Q    An article published in the Fordham
22   Intellectual Property Media and Entertainment Law
23   Journal.
24       Did you write this?
25   A    Yes.

1    Q    And direct your attention to Page 982.
2    A    Yes.
3    Q    At the end of the first carry-over
4    paragraph --
5    A    Um-hum.
6    Q    -- adjacent to Footnote 271, you state, "One
7    major advantage of e-content is that it can be
8    word-searched and previously unavailable archives are
9    often searchable as well."
10   A    Yes.
11   Q    What did you mean by that?
12   A    Well, first of all, the paper was written 11
13   years ago, one thing to bear in mind.  But what I was
14   trying to say at the time was that I thought -- I was
15   trying to figure out what would change the title of the
16   piece, is where the challenges are coming, to
17   intellectual property and, in this case, copyright.
18       And I was trying to explain that there is an
19   advantage to having content available digitally because
20   it can be word searched, whereas if you have the paper
21   version, that is, obviously, harder to do.
22   Q    Why is it an advantage that it can be word
23   searched?
24   A    There's types of content of which that is
25   advantageous.  I would think for many types of

1    nonfiction content, in particular, that would be
2    advantageous.
3    Q    What advantage would it provide?
4    A    It would allow a user to locate the parts of
5    the work that are relevant for that user's purposes.
6    Q    On Page 983 --
7    A    Um-hum.
8    Q    -- the first full sentence after the call for
9    Footnote 275, you say, "Sometimes only an abstract or a
10   few seconds of the song or film trailer are available to
11   illustrate the content, but fees are charge to download,
12   view, and listen to the complete work.
13       Do you see that?
14   A    Yes, I do.
15   Q    What are you referring to there?
16   A    Well, this was -- I hope makes clear about
17   music and film that consumption model for music and film
18   is sometimes that the user will access, in the case of a
19   film, an actually authorized trailer which is
20   essentially an ad for the film made available by the
21   producer or the film studio.  And for a song, there are
22   services.
23       At the time these were only very beginning.
24   But now they're fairly common where the user will be
25   able to listen to parts of the song.  There are debates

Page 57

1   as to whether that is a use that needs to be licensed or
2   not.  And then the user obviously will access, who
3   wishes to access the full work, will then get a licensed
4   copy of the entire song or movie, either by download or
5   stream.
6       Q    So the abstract for a few seconds is free and
7   then the full content is paid?
8       A    In those cases, yes.
9       Q    Is it your testimony that your discussion in
10  this article is limited to sound reportings and film?
11      A    No.  In that sentence, I think that is the
12  context.
13      Q    Is there any reason that sentence does not
14  apply to text?
15      A    Well, it -- it could be, yes, that there would
16  be differences between, for example, certain types of
17  nonfiction content, where once you have figured out a
18  few snippets of the book are sufficient, and you no
19  longer need to access the whole work.  This would hardly
20  make sense for a song or film, unless the user is
21  obviously not interested in the content at all.
22      Q    Unless they just wanted to hook to the song;
23  right?
24      A    The hook is a technical word in music, so I'm
25  not sure what you mean.

Page 58

1       Q    The hook meaning the characteristic portion of
2   the song.
3       A    And that may or may not be the excerpt that is
4   made available.  And again, that is a decision that is
5   typically made by whoever's making the song available
6   online, whether they make the first 30 seconds
7   available, the first five seconds, the hook.  I do not
8   know if there is data as to what parts of songs are made
9   available in this form.
10      Q    Now, we are going to talk about this in detail
11  later.  But you just said it's possible that somebody
12  could look at a snippet of text and be satisfied with
13  it?
14      A    Yes.
15          MR. SNYDER:  Objection.
16          THE WITNESS:  It is possible.
17  BY MR. McGOWAN:
18      Q    How do you know that?  Have you studied it?
19      A    I have done it myself.
20      Q    What text?
21      A    I don't recall.  In using both before and
22  after preparing this report, I have used a Google book
23  site, and very often was -- I got a snippet; sometimes
24  might be for a quote, but I would use for other purposes
25  to get information that was in the book.  And I no

Page 59

1   longer needed to access the whole book.
2       Q    Okay.  So other than your personal practice,
3   which we will discuss, do you know any person who has
4   foregone the purchase of a book because they saw a
5   snippet?
6       A    I can't recall anyone specifically.
7       Q    You didn't talk to anyone who did so in
8   connection with this report; correct?
9       A    In connection with this report, no.
10      Q    Have you performed any studies to determine
11  whether this possibility you hypothesize is a reality?
12          MR. SNYDER:  Objection.
13          THE WITNESS:  Which possibility?
14  BY MR. McGOWAN:
15      Q    The possibility that somebody would forego a
16  purchase because they saw a snippet?
17      A    No, I did not study that empirically.
18      Q    And you didn't actually say that anyone would
19  forego a purchase, did you?  You just said they might
20  see what they wanted to see in a snippet; correct?
21      A    I think I said they no longer need the whole
22  book.  Whether they acquire the book, go to a library,
23  or other form of access, would be -- you know, depend on
24  many factors, availability, for example.
25      Q    So the testimony that you just gave, you're

Page 60

1   not actually saying that the snippet is a substitute for
2   a purchase; correct?
3       A    I actually said it could be, yes.
4       Q    Okay.  You said it could be, and you haven't
5   studied it; correct?
6       A    I'm referring to personal experience only.
7       Q    Which book were you willing to purchase until
8   you saw a snippet?
9       A    I purchase a lot of books for my research
10  because I like to write in the margins.  And, therefore,
11  I have limited use of library books.  Occasionally, I
12  have used snippets on Google.  And because of technology
13  restrictions I will make a screen capture and then put
14  that in a PowerPoint slide.  And then I have that page
15  print and write in the margin, so I have a copy of the
16  page.  I've done that on a couple of occasions.  I don't
17  recall the exact titles of of the book.  But I did do
18  that on a few occasions.
19      Q    Were you otherwise planning to purchase the
20  whole book for the one quote?
21      A    It's actually not as easy to annotate,
22  obviously, a printed PowerPoint.  But it was sufficient
23  that I did not need to spend to buy.  These books are
24  very often nonfiction books that can be scholarly books
25  too.  They are expensive sometimes.  Some cases I

Page 61

1  probably would have bought the book.
2      Q   Which cases?
3      A   I would have to go back in my research over
4  the last couple of years.  I may or may not have some of
5  these PowerPoint files.  Usually when I finish the
6  paper, I don't necessary keep all of that, but I may
7  have kept some of them.  I don't know.
8      Q   You don't recall the books; correct?
9      A   That's right.
10     Q   You don't recall the snippet; correct?
11     A   No, but I do recall using the technique that I
12  just described.
13     Q   When I say "snippet," the segment of text that
14  you used, what did it say?
15     A   I don't remember.
16     Q   Did you review these files in connection with
17  your report?
18     A   No.
19     Q   How many books would you say you would have
20  purchased had it not been for these snippets?
21     A   I can't say.  I would have to go back and
22  check.  I don't know.
23     Q   On Page 985 of your article carrying over to
24  Page 986, you say, "To put it simply, for all content
25  providers, digitization is inevitable and it is a

Page 62

1  resource to be harnessed, not feared."
2      Do you see that?
3      A   Yes.
4      Q   Why is it not to be feared?
5      A   Well, again, this paper was written 11 years
6  ago.  And the discussion at the time was very much about
7  whether content should be available online.  I've
8  since -- actually, before this paper, I believe my first
9  paper on the topic goes back to 1998.  I've been saying
10  that the proper way to use the Internet is to make the
11  content available, not to restrict access to the
12  content, although there would be various business models
13  that accommodate different types of content.
14      My point simply is that because I believe this
15  is a major mode of access, that there should be a way to
16  monetize this type of use for the content creators.  And
17  actually, I believe I used the word "inevitable" in my
18  report itself.
19     Q   You do.  Why did you use the word "fear" here?
20     A   Because it was very much a fear in the those
21  days.  The large publishers, the record companies, and
22  others -- the film companies were all discussing how
23  much content should be made available online and how.
24  And the business models hadn't really started to emerge
25  again 11 years ago.

Page 63

1      This is one year after the Napster injunction
2  was issued.  We are in the very early days of business
3  models.  So I was trying to make the point that -- and
4  the metaphor in the following sentence you see that the
5  Internet train is coming, it will not stop.
6      I don't think it can be any clearer than that.
7      Q   Why won't it stop?
8      A   Because the Internet is a technology that is
9  very difficult to stop, as record companies have --
10  would probably be able to tell you more -- better than
11  me.  But my point is more of a normative nature.  I
12  don't believe it is desirable to make -- to take content
13  off the Internet in most cases.  I believe, however,
14  that creators should be compensated for many online
15  uses.
16     Q   It is not going to stop, in part, because it's
17  useful to consumers?
18     A   It's not going to stop, first, as a matter of
19  of technology.  The Internet, as I understand the story,
20  was designed with a grant from the Department of Defense
21  of United States as a network that is inherently hard to
22  control.  And as I said, my point is more of a normative
23  nature.  I think it is a good, desirable thing to make
24  content desirable -- to make content available online.
25      I believe I say so in my report.

Page 64

1      MR. McGOWAN:  Mark as Exhibit 6.
2      (Exhibit 6 was marked for identification.)
3      THE WITNESS:  Well, there we go, 1998.
4  BY MR. McGOWAN:
5      Q   A document entitled Advisory Committee on
6  Management Copyright and Related Works -- and Related
7  Rights in Global Information Networks.
8      Your name is listed on the first page.
9      A   Um-hum.
10     Q   Do you recognize this document?
11     A   I do.  It's actually the document that I was
12  referring to earlier.  It's my first paper on the topic.
13     Q   On Page 8 --
14     A   Um-hum.
15     Q   -- of this document, in the next to the last
16  paragraph, you say, "For individual creators, this new
17  technology means access to existing material creating,
18  as it were, a realtime universal library of ideas and
19  content."
20      Do you see that?
21     A   Yes, I do.
22     Q   Why is that important for individual creators?
23     A   Well, I believe we touched on this earlier,
24  the idea being that creators rarely create in a vacuum.
25  They very often look at what's already available,

1    especially in the nonfiction world.  People will want to
2    know what's already published or what information is
3    already available.
4         And this paper, which I consider reasonably
5    perceptive for something that was written in early 1998,
6    over 14 years ago, made the point that digital networks
7    should make it easier to get access to information.
8         Q    Because it's useful to creators?
9         A    It is useful to creators and others, yes.
10        Q    You then say, "Digital networks allow access
11   not only to various manifestations of protected works,
12   but to information generally.  And many users are, in
13   fact, submerged by this worldwide flow of information.
14   Without management, information is practically
15   inaccessible and cannot reach a proper audience."
16        Do you see that?
17        A    Yes.
18        Q    What do you mean by that?
19        A    Well,  this is an inquorate version of the
20   point I was making, that I have made subsequently about
21   the -- the need for information to be available out
22   there so that connections can be established between the
23   users and the content, users who value the content then
24   the content.
25        I was -- you see the germ of this idea here,

1    if I can call it that, that obviously information being
2    made available online, there's then a challenge to
3    locate it.  It's a challenge that is, in part, a matter
4    of search; in part, a matter of nowadays social networks
5    and other tools that people use to find information
6    online.
7         There are several ways that people can locate
8    information, but they need information tools of one form
9    or another.
10        Q    At the top of Page 9, you say, "Finding the
11   material that one wants or needs is a challenge."
12        And then the last sentence in this paragraph
13   says, "To answer these" -- "The answer to those
14   questions really depends on the quality and intelligence
15   of search engines, hopefully ECMS providers will be able
16   to rely on advance search engines to help users locate
17   what they need.
18        Do you see that?
19        A    Yes.
20        Q    ECMS in this paper refers to what?
21        A    It's a term that was used early in the days of
22   the Internet.  It stands for Electronic Copyright
23   Management System.  In those -- in more recent parlance,
24   I suppose, one might call it rights management system.
25        And in those days, essentially there -- this

1    was pre-XML and other types of tools of that nature, so
2    that we were very much using word searches in the type
3    of search engines that are mentioned later in that
4    paragraph.
5         Q    And what will, in this context, ECMS use
6    search engines to do?
7         A    ECMS basically managed copyright by providing
8    metadata as to who is the author and owner of the work
9    and can also provide information on at least where to
10   get a license or, in some cases, even what the licensing
11   terms might be.  It's a point made later in the paper
12   that what should happen on the Internet, which is the
13   same point I've been making for those 14 years, the
14   content should be available online; however, creators
15   should be compensated for uses when this is appropriate.
16        Q    On Page 31, if I can ask you to turn there.
17        A    Yes.
18        Q    The second full paragraph beginning "ECMS."
19        A    Um-hum.
20        Q    Says, "ECMS should also be flexible enough to
21   allow users to access material in such a way that they
22   know what they are buying."
23        A    Yes.
24        Q    Why is it important for users to know what
25   they are buying?

1         A    I'm not sure how to answer that question.  I
2    assume that buyers want to know what they're buying.
3    Beyond that, the sentence, I think, speaks for itself.
4         Q    It makes them more willing to engage in the
5    transaction?
6         A    Well, you cannot want to turn to a transaction
7    to buy something you don't -- you don't know what it is,
8    but you don't necessarily need access to -- as I said
9    earlier, if you know the song you want by title, you
10   don't need the excerpt.  It depends on the context and
11   the type of content we're talking about.
12        Q    So you think for some types of content, people
13   will buy what they don't know about?
14        A    No.  They will know enough from, say, the
15   title.  I will buy every novel by certain authors, for
16   example.  I don't need to read an excerpt.  I will just
17   download or buy the book, because it is a new book by a
18   certain author.  So I don't need more.
19        Q    And that's because you're familiar with the
20   author's work from previous exposure?
21        A    Usually, yes.
22        Q    And you'll extrapolate from your previous
23   exposure to your probable consumption experience on the
24   new book?
25        A    Correct.

1    Q    Is that what you mean when you say sometimes
2  people just need the title of a song?
3    A    That's part of what I mean.  What I also mean
4  is I know my -- one of of my teenage daughters will
5  download a song on iTunes if a particular friend
6  recommends it,  she will not hesitate.  She will just do
7  it because a friend recommended it and then she goes by
8  the song title.
9    Q    So word of mouth would be one way?
10   A    Word of mouth is another way.
11   Q    Which would be a way of gaining familiarity
12 through the recommendation of a trusted third party?
13   A    Yes.  You could stretch that, I suppose, to
14 include that.
15   Q    You say, "For example, a viable commercial
16 model might allow users to browse part of the content
17 for free, a few pages of an article, 30 seconds of
18 music, a film trailer, et cetera, or the work at reduced
19 graphic resolution; e.g., for photographs, while full
20 viewing, reading, listening would require payment.
21       Do you see that?
22   A    Yes.
23   Q    Are you aware of such models being used on the
24 Internet?
25   A    Well, this paper was written, as I said, 14

1  years ago.  I was trying to feel my way in the dark,
2  this being one of the first papers on the topic as to
3  what might emerge as possible business models.  I
4  certainly did not, at the time, have in mind any of the
5  current practices online.
6    Q    You are aware now, however, that this model
7  is, in fact, employed?
8    A    Yes.
9    Q    It's employed in publishing?
10   A    It's employed in publishing and -- music
11 publishing and in film trailers, yes, at least.
12   Q    Have you ever seen anyone do the reverse,
13 which is offer only a few pages of text, but not offer
14 to sell or display an entire work?
15   A    Yes.
16   Q    What sources are those?
17   A    Well, I think it's very common for a publisher
18 to put an excerpt from a forthcoming novel, for example,
19 available without making the work available -- as a
20 temporal matter it is not available at the time when the
21 excerpt is made available.
22   Q    The author does that or the publisher does
23 that because they want to drive sales when the book is
24 released?
25   A    I don't know.  It is possible.

1    Q    Are you aware of any models in which some text
2  is made available, but there is no expectation by the
3  person displaying the test -- text that it will make a
4  future sale?
5    A    I -- yes.  I can think of situations where a
6  work would be made available -- part of a work would be
7  made available to test the waters, see if there might or
8  might not be a reaction to that excerpt, and then maybe
9  the decision will be made not to make available the
10 whole work.
11   Q    Are you hypothesizing or speaking from factual
12 knowledge?
13   A    I can't recall a specific example, but I
14 think, with time, I could.
15        I can, yes, recall one example of a play that
16 was controversial, and then the parts of the play were
17 made available.  There was a public uproar.  This was in
18 Canada, years ago.  And then the play was never
19 released.
20   Q    When you say "made available," what do you
21 mean?
22   A    I think they were -- I can't recall if they
23 were selling or distributing the excerpt from the play
24 at the time.
25   Q    Are you -- so you don't know whether there was

1  any payment?
2    A    I don't know.
3    Q    Are you aware of any publisher that charges
4  for a chapter of a book, but does not sell the full
5  book?
6    A    Well, other than the temporal issue that I
7  mentioned earlier, I am not aware of a specific case,
8  no.
9    Q    You agree today that the model that you
10 describe here is a viable commercial model?
11   A    It certainly seems to have worked for music
12 and film to make parts available.  Obviously, at the
13 time I had no idea that social networks would emerge the
14 way they have, which have changed the equation to a
15 certain degree.  And I think for a book or an article,
16 it might make sense for a publisher, depending on
17 context, to make a few pages available, yes.
18   Q    You have read the expert report of Bruce
19 Harris; right?
20   A    Yes.
21   Q    And you've seen the examples he provides;
22 correct?
23   A    I recall scanning them, but I can't say I have
24 them fresh in mind right now.
25   Q    Do you have any factual basis for disagreeing

Page 73

1  with the conclusions he reaches about these use of text
2  in his report?
3         MR. SNYDER:  Objection to form.
4         THE WITNESS:  No specific examples.
5  BY MR. McGOWAN:
6     Q   In this paragraph, you say at the end, "The
7  highest level of right, i.e., the right to commercially
8  reuse material, would require a higher level of
9  clearance."
10        Do you see that?
11    A   Yes.
12    Q   Is the concept that you are conveying in this
13 paragraph that for greater uses, greater payment may be
14 expected?
15    A   No, the -- not necessarily.  The idea is that
16 some type of transactions, when I say higher, means it
17 may be the payment, but it's certainly the transaction
18 itself will be typically more complicated when
19 commercial reuse is involved.  The contract may very
20 well be negotiated, as opposed to being a form that is
21 used for mass uses.
22        So my view at the time, again, 14 years ago,
23 was that for these type of content reuses, it may not be
24 possible to automate the process.
25    Q   Do ECMS providers usually use form agreements?

Page 74

1     A   I have not done an empirical study of how ECMS
2  provides use forms.  I know some of them do use forms.
3     Q   You mentioned earlier that you have sometimes
4  found text that you're interested in in a snippet and
5  made a screen shot of it.
6         Do you recall that?
7     A   Um-hum.
8     Q   In those cases, would you be able to make the
9  same use by photocopying a page?
10    A   Probably.
11    Q   Did you consider that as an option for putting
12 together your PowerPoint?
13    A   I have done that.  And I don't know if they
14 were in the same cases, but I have photocopied pages so
15 I could annotate when I don't have my own copy of the
16 book.  Obviously, I don't write in library copies.
17    Q   On Page 24 of your WIPO report.
18    A   The same document you were referring to?
19    Q   Yes.
20    A   Yes.
21    Q   You refer to U.S. Marc, M-a-r-c.
22    A   Yes.
23    Q   What is U.S. Marc?
24    A   Oh, you're taking me back 15 years or so.
25        Marc was a database that, I believe, was put

Page 75

1  together by the Copyright offices as a part of the
2  Library of Congress of the United States and other
3  metadata providers.  And so again metadata -- oh, it's
4  described on Page 25.  I haven't looked at Marc in 15
5  years, so I need to refresh my memory here.
6         But I -- I believe the description on Page 25
7  is accurate.  I have no reason to doubt that I got it
8  wrong at the time.
9     Q   You have no reason to question what you wrote
10 at the time?  I think you said you have no reason to
11 doubt that you got it wrong.
12    A   I misspoke.
13    Q   That's what I thought you meant.
14        What do you mean -- what do you mean by
15 "metadata"?
16    A   Metadata in copyrite -- well, it depends on
17 the type of work, but it would typically be, at the very
18 least, name of the author, year of publication, the
19 title, the publisher, producer -- producer in the case
20 of music or film, for example.  It might include the
21 country of first publication.  It might include the
22 birth year of the author and the birth -- the year of
23 death, which is important to calculate copyright term.
24 Obviously, this is if the author is deceased.
25        So it's basically information about the work.

Page 76

1  Metadata is data about data.
2     Q   Who creates them?
3     A   Many people do.  Publishers have metadata that
4  they generate.  Author associations, collectives,
5  governmental organizations.  A lot of people create
6  metadata.
7     Q   You wrote this document while you were at the
8  Copyright Clearance Center; is that correct?
9     A   I believe I -- yes.  I -- I switched -- this
10 was written early in '98.  It was for a meeting in late
11 '98, but I believe I wrote it fairly early in '98 for an
12 international meeting in Geneva on -- on, as the title
13 indicates, how rights would be managed and copyrighted
14 works identified in, what at the time we called, global
15 information networks.  We could maybe simplify to online
16 environment.
17    Q   Does this document state the position of the
18 CCC at the time?
19    A   It does, right on the cover.
20    Q   Let me ask you to return to your report, which
21 is Exhibit 2.
22        Do you know whether you listed your report in
23 the Elsevier case in this report here?
24    A   I don't think I did.  I -- I believe -- I
25 believe I had to list cases in which I had been examined

1  or deposed, and I haven't been in that case.  So I did
2  not list it, no.  Nor did I consider it in preparing the
3  report.
4      Q   Sure.  Did you read Rule 26?
5      A   Not recently.
6      Q   Did you read it in connection with this?
7      A   No, I don't think I reread it in connection
8  with this.
9      Q   Okay.  What year was the Elsevier report?
10     A   Three years ago.  Three or four years ago.
11     Q   Within four?
12     A   I believe so.  I would have to check.
13     Q   In Paragraph 13 of your report, you say,
14  "Making books and other copyrighted works available
15  online" --
16     A   Which paragraph.
17     Q   13?
18     A   Paragraph or page?
19     Q   Paragraph 13?
20     A   Okay.
21     Q   Page 4.
22     A   Um-hum.
23     Q   You say, "Making books and other copyrighted
24  works available online is desirable for both -- "both
25  for authors and readers."

1      Why is it desirable for authors?
2      A   Because it's a very interesting way to make
3  some forms of content and increasing all forms of
4  content available to users.
5      Q   And in some forms here, you specifically
6  mention books?
7      A   That's right.
8      Q   When you say "interesting," what do you mean?
9      A   Well, I would think that for authors, it is a
10  quick access to a potentially worldwide dissemination
11  network of their works.  And so that would be an
12  interesting way to be published.  And I understand that
13  there are, in fact, increasingly authors who
14  self-publish, using this technology, which I think is
15  another use that is desirable for authors.
16     Q   Where did you gain that understanding?
17     A   Press reports.  But I can't recall one
18  specifically.
19     Q   When you say "available," making books and
20  other material available online, what do you mean by
21  "available"?
22     A   Well, in the case of a book, it depends,
23  again, on the type of book.  If it's fiction, I would
24  presume that it's the entire book.  If it's a nonfiction
25  book, it may or may not be the entire book.

1      Q   Have you talked to any authors about the
2  distinction you just drew between fiction and nonfiction
3  books?
4      A   Not for the purposes of preparing this report.
5  But that is a discussion I remember having a number of
6  times at conferences on panels with people who work for
7  trade associations and others representing authors and
8  publishers.  And I've heard the distinction made between
9  fiction and nonfiction, made a number of times.
10     Q   And have you talked -- so in these
11  discussions, those include publishers as well?
12     A   Occasionally.
13     Q   Do you remember any specific names of
14  publishers?
15     A   Again, I did not speak to any publisher for
16  purposes of preparing the report, so nothing recent.
17     Q   I'm just asking about the conversations you
18  just mentioned.
19     A   I can recall one conversation only
20  specifically with a lawyer from Wiley.  But I can't
21  recall his name.
22     Q   Do you remember what he said, or she said?
23     A   He was a he.  Not specifically, no.  But --
24  but it was about what you -- you know, making -- Wiley
25  is a publisher of the journal in which I am editor in

1  chief.  And we were discussing online, and we moved from
2  from the distinctions between articles and books.  And I
3  don't recall the specifics of the discussion, but that's
4  the way the discussion generally went.
5      Q   What distinctions between articles and books
6  did you discuss?
7      A   That it is -- that the markets may be a little
8  different for both.  He indicated that, but I don't,
9  again, recall -- this was at least two years ago -- that
10  books respond differently, I think is the word he used,
11  to online availability.  But I -- I honestly cannot
12  recall specifically more than that.
13     Q   Do you recall in these discussions any
14  particular conversation with an author?  And what I'm
15  looking for is the name of any author.
16     A   I was in the panel in Washington at the
17  American Bar Association, I believe, last February.  And
18  there was a lawyer representing authors on the panel.
19  And I believe she made that distinction.  But I do not
20  recall her name.  But it should be easy to locate.
21     Q   In Paragraph 10, you begin to summarize your
22  opinion.
23     A   Yes.
24     Q   You mentioned that you used Google books
25  yourself?

Page 81

1    A   Yes.
2    Q   When did you first use it?
3    A   Don't recall.  Well before I prepared this
4  report, though.
5    Q   Have you used it regularly since you began
6  using it?
7    A   I would say occasionally more than regularly.
8    Q   Once every two months, once every three
9  months?
10    A   Something like that.
11    Q   Did you have -- have you used Google books in
12  connection with your scholarly work?
13    A   Occasionally.
14    Q   As a way finding materials that you use in
15  connection with your work?
16    A   Occasionally.
17    Q   In Paragraph 10 you say, "It is my
18  understanding that Google has engaged in the digital
19  copying of millions of books in libraries."
20    A   Um-hum.
21    Q   And you gain that understanding from?
22    A   From -- you're asking me from where?
23    Q   Um-hum.
24    A   This was from the material that I reviewed
25  that was filed in the case.  It was, I believe, a

Page 82

1  declaration made by somebody from Google.  His name
2  escapes me now, though.
3    Q   Um-hum.  Are are you also familiar that Google
4  has, in Google books, some books that originate with
5  publishers?
6    A   I have heard of something called the Partner
7  Programs, if that's what you're referring to.  I haven't
8  looked into that specifically more than what is
9  described in the material that is in Exhibit B.
10    Q   Do you have any understanding of the Partner
11  Program?
12    A   I believe some books are made available
13  voluntarily by publishers for access via Google books,
14  but beyond that, no, I don't.
15    Q   Did you know you have a book in the Partner
16  Program?
17    A   No, I didn't know I had a book in the Partner
18  Program.
19    Q   You were the editor.
20    A   Okay.
21    Q   Do you know how much text is available to
22  people who search books  -- is made available to people
23  who search books in the Partner Program?
24    A   No, I don't.
25    Q   You say -- strike that.

Page 83

1    Q   Do you know how many publishers have joined
2  the Partner Program?
3    A   No, I don't.
4    Q   Do you know that it is over 45,000?
5    A   I have no reason to doubt your number, but I
6  don't know.
7    Q   Did you consider it important, in drafting
8  your report, to know the extent to which publishers deal
9  with Google already?
10    A   Well, the -- the gist of the report is that
11  there is, in copyright, of an exclusive right in books,
12  but my point is that it is not -- it shouldn't be used
13  mostly to take content off the Internet; rather, to make
14  it available in a way that is monetized.
15        It is obviously up to a right holder, for
16  example, to make a decision that they want the content
17  available without payment.  That is a possible use of
18  copyright to make it available without payment.
19        But I believe that for authors in particular,
20  if this becomes a major form of distribution, they
21  should have the option of monetizing these online uses.
22    Q   We'll talk about that in a moment.  My
23  question is did you consider, in drafting this report,
24  it important to know how publishers deal with Google
25  books?

Page 84

1    A   I don't understand exactly what you mean, how
2  publishers deal with Google books.
3    Q   For example, the amount of text that they make
4  available to be browsed freely?
5    A   I would assume that's a decision they make
6  case by case on the book, but I don't know specifically
7  how each publisher arrives at that decision.
8    Q   Was it important to you, in talking about the
9  contract behavior to understand the contracting behavior
10  of publishers?
11    A   I'm not sure I understand the question.
12    Q   Do you understand what a contract is?
13    A   Yes, I do.
14    Q   Do you understand what contracting behavior
15  is?
16    A   That's where I -- I'm trying to understand
17  when you say -- whether publishers decide to use a
18  certain service as a tool or not, doesn't mean that
19  there cannot be a licensing market, especially on the
20  author's side, for use of that content.
21        So I'm trying to see, when you say contracting
22  behavior, what exactly you're referring to.
23    Q   The terms on which publishers voluntarily join
24  Google books, was that important to you in opining about
25  contracting behavior in your report?

1    A   Yes, to the extent that I reviewed the
2    proposed settlement and looked at what uses authors and
3    publishers were willing to license in that draft
4    settlement.
5    Q   Did you review the draft settlement in
6    connection with your preparing your report?
7    A   I had reviewed the draft settlements well
8    before a year ago or two when I wrote a paper on the
9    Google book settlement in international law.  I did not
10   review the settlement after being engaged in this
11   report.
12   Q   Does your report rely on the settlement?
13   A   It doesn't rely on the settlement, but I have
14   knowledge of the settlement.
15   Q   Does it rely, in part, on your understanding
16   of the settlement?
17   A   It's something that's in my mind, so to that
18   extent, it's possible that I -- it's something that I --
19   that, you know, I have relied on indirectly, but I have
20   not relied on it directly.
21   Q   Okay. setting aside the settlement, was it
22   important in your opinion about contracting to
23   understand what, right now, publishers are doing in
24   their agreements with Google as they pertain to Google
25   books?

1    A   Well, I don't know what each publisher is
2    doing specifically with Google books at this time.  It's
3    something that might be relevant if there was a
4    licensing system to be put in place.  The report, the
5    opinion is as to whether there is a potential collective
6    licensing market here, to which I answer in the
7    affirmative.
8        I don't need to know the specifics of the
9    existing contracts with publishers to know what the
10   exist -- what the market exactly would be in such a
11   negotiation.  Presumably, there would be a discussion of
12   what uses need -- need to be compensated and which, if
13   any, need not be compensated, or in which publishers
14   need not be paid.
15       That is a negotiation that is not -- that does
16   not change a conclusion that there is a collective
17   licensing market that could develop here.
18   Q   You're not opining in this case on the terms
19   that would actually be reached through a collective
20   licensing market?
21   A   The exact terms, no.
22   Q   You use the word "distribution" in the second
23   line of Paragraph 10.
24   A   Um-hum.
25   Q   Do you intend to use that as a legal term of

1    art?
2    A   No.  The opinion is not about infringement,
3    and so I did not specifically refer to distribution in
4    that specific context.  It's really a word that could be
5    making available or other similar terminology.
6    Q   Yet, the clause says, "distribution of digital
7    copies of these books to libraries."
8        Do you know how that process actually happens?
9    A   Only what I've read in the materials that were
10   filed in the case that --
11   Q   And what --
12   A   -- I reviewed.
13   Q   Sorry.  What is your understanding?
14   A   Of the copying or the distribution?
15   Q   Of the manner in which libraries may obtain
16   copies?
17   A   I understand that there is a -- that -- that
18   these digital copies are made available to libraries.  I
19   believe there is a password or other form of
20   technological restriction in the way that the books are
21   made available.  That is the essence of my understanding
22   of how that works.
23   Q   Prior to Google books, were you aware of any
24   digitization projects in which full texts of books could
25   be searched?

1    A   Well, there are, or have been, small scale
2    efforts to digitize books.  I know some publishers have
3    digitized some older titles.  And I believe some foreign
4    libraries have engaged in that conduct.  But I can't --
5    I don't know the specifics, in particular, whether those
6    uses were licensed or not.
7    Q   They -- when you say smaller, they were less
8    comprehensive?
9    A   That's correct.
10   Q   In the second sentence of Paragraph 10, you
11   say, "I have been asked my opinion, A, whether
12   collective licensing markets will continue to develop
13   for the digital uses of books."
14   A   Um-hum.
15   Q   Do you see that?
16   A   I do.
17   Q   Markets.  How many markets -- well, strike
18   that.
19       You say, "continue to develop."  Is it your
20   testimony that there are presently collective licensing
21   markets for digital uses of books?
22   A   Yes.
23   Q   How many?
24   A   Several.
25   Q   Three, four?

1      A   Depends how one counts.  It's a matter of how
2  you categorize them.  So it's very hard to answer the
3  question numerically.
4      Q   How do you categorize them?
5      A   In the report I don't categorize them.
6      Q   Do you categorize them as a matter of your own
7  understanding?
8      A   Not in -- in a way that could be numerically
9  identified as such.  I think there are markets for
10  anything from electronic course backs to reuses of text
11  on -- on websites, to excerpts in -- online and other
12  publications, to use of text in online advertising.
13         There are some -- these could be identified as
14  separate markets or not.  It's a matter of market
15  definition.  My report does not opine on market
16  definition here, but there are clearly existing and, I
17  would think, future markets for digital uses of books.
18      Q   And you are not an expert on market
19  definition; correct?
20      A   That's correct.
21      Q   So we're going to look at markets and say
22  there's more than one; we don't know the precise number.
23  Fair?
24      A   Fair.
25      Q   "Continue to develop for the digital uses of

1  books."
2         What uses are currently licensed in these one
3  to more markets?
4      A   I would think there are major existing markets
5  in the reuse of excerpts of books in paper and
6  electronic course backs.  I don't know the exact number,
7  for example, of CCC issued licenses in that area, but it
8  is very substantial.  There is a licensing market for
9  corporate and other entities of this type -- corporate
10  users and entities of this type to put content on their
11  intranets or other similar networks.  There are
12  licensing markets for reuses of parts of books in the
13  creation of other books.  It can be anthologies or
14  things of that nature.
15         These markets exist.  I do not have numbers to
16  the extent to which they generate revenue.  But in the
17  case of CCC specifically, it is a significant part of
18  their income.  There are other entities that do this.
19  icopyright.com would be an example.
20      Q   icopyright.com?
21      A   Yes.  That would be another example of a
22  company that does specifically only digital licensing of
23  digital reuses of text, not just books, but text.
24      Q   And what do they license -- they license any
25  kind of text?

1      A   I don't know if they license every type of
2  text.  I -- I haven't looked at their exact list of
3  titles.  I think they license almost essentially --
4  essentially nonfiction material.  But it's not a company
5  that I know extremely well.  I just know they exist and
6  generally what they do.
7      Q   What is the source of your knowledge?
8      A   I have certainly been on their website a few
9  times.  I have, years ago, met somebody who worked
10  there, but this was at least seven or eight years ago.
11  So I don't recall the name the person.  It was at a
12  conference somewhere.
13      Q   Do you know to whom they license?
14      A   No, I don't.
15      Q   Do you know whether they license trade books?
16      A   I don't.
17      Q   What uses, as you use the term here, do you
18  understand Google to make of books as relevant to your
19  report?
20      A   Well, they make a full copy of books.  Then
21  they make available those books to libraries in a way
22  that includes, as I said earlier, some technological
23  restrictions.  And then they make snippets available to
24  the general public.
25      Q   Anything else?

1      A   Those are the three that come to mind.
2      Q   With respect to the licensing market you opine
3  on in your report, are these the only uses that will be
4  traded in that market?
5      A   I -- I can't say they're the only uses.  And I
6  can't say that all three would be.  But these are
7  certainly three candidates that could be licensed, yes.
8      Q   Does Google make available through the Google
9  books program the full text of any book, as you
10  understand it?
11      A   I believe I read somewhere that it may do this
12  for public domain books, but I haven't seen that myself.
13      Q   Fair clarification.  In copyright books?
14      A   Not to my knowledge.
15      Q   Is full text display in copyright books
16  something that will be traded in the licensing market
17  you opine about in this report?
18      A   That would be something to be negotiated
19  between the parties.
20      Q   In Paragraph B you say, "Whether unrestricted
21  and widespread conduct of the type engaged in by Google
22  will harm the development of such markets."
23         Do you see that?
24      A   I do.
25      Q   What do you mean by "unrestricted"?

Page 93

1  A  Unlicensed.
2  Q  Unrestricted means unlicensed.  What do you
3  mean by "widespread"?
4  A  Well, obviously if we were talking about five
5  books, making them available would not have the same
6  impact as several dozens of millions of books.  So
7  widespread basically means which part of the potential
8  licensing market, if we were to look at it as a
9  horizontal plane, which part of that plane is captured
10  by the making available by Google.
11       If it's essentially all books, say, in the
12  English language or all books published in the
13  United States or some extremely important subset of all
14  books, then obviously that greatly reduces the
15  possibility that a licensing market would emerge
16  successfully for the rest.
17  Q  For the rest of the books?
18  A  Correct.
19  Q  You say "obviously."  Is this something you
20  studied?
21  A  I have to answer yes to that.  That is
22  something I've been working on for quite awhile.
23  Q  Tell me what that work entails?
24  A  Well, it's my work inside of Copyright
25  Collective, and my work at WIPO, and my work as law

Page 94

1  professor in part dealing with collective management of
2  rights.  Collective management of rights has three
3  parts.  I have compared it in a book chapter that we may
4  come to later in that book entitled Collective
5  Management of Copyright Related Rights to a plumbing
6  system where you need water to come in, water to be
7  processed, and water to be pumped out.
8       And the incoming part is composed essentially
9  of rights.  So if there is no right to license, there is
10  very little to pump or process.  So that would be the
11  shortest answer I can give you.
12  Q  People license different uses, don't they?
13  A  Yes.
14  Q  So it's not the fact of copying that would
15  preclude a license market for other uses, is it?
16  A  The fact of copying books?
17  Q  Sure.
18  A  Well, there might be a market in the copying
19  of the books themselves, that if there is no right to
20  prevent the copying or to license the copying, that
21  prevents that market from emerging.
22  Q  All right.  Have you studied that?
23  A  I would give the same answer earlier.  You
24  need rights to license, you need water to come to the
25  mill.

Page 95

1  Q  You're not an economist; we've established
2  that.
3  A  That's correct.
4  Q  Okay.  When you say you need rights to
5  license, if you don't have rights, then you can't
6  license.  That's your point?
7  A  My point is, as I begin Paragraph 11, I say,
8  "If the uses are not fair uses, then there will be a
9  licensing market.  Conversely, if the uses are fair
10  uses, then there is no or very small licensing market
11  that would be possible.
12  Q  Because if it's a fair use, you don't need
13  permission?
14  A  That's correct.
15       MR. McGOWAN:  We need to change the tape, and
16  it's 10 after 12:00, so if you guys want to grab lunch,
17  that might be a fine time.
18       THE WITNESS:  Fine by me.
19       VIDEOGRAPHER:  This is the end of Disk 1.  Off
20  the record at 12:07.
21       (Lunch recess taken.)
22       VIDEOGRAPHER:  This is Disk 2 of Daniel
23  Gervais.  On the record at 12:54.
24  BY MR. McGOWAN:
25  Q  Professor Gervais, let me direct your

Page 96

1  attention once more to Paragraph 10 of your report.
2       I want to make sure that I understand your use
3  of the word "widespread" in Subpart B of Paragraph 10.
4  If I understood your testimony before lunch correctly,
5  widespread refers to the fractions of books that would
6  be encompassed in a particular endeavor; is that
7  correct?
8  A  Well, I don't know what you mean by
9  "particular endeavor."  I mean in my report I believe
10  there is an existing and future market for digital uses
11  of books.  If those uses are determined not to be
12  covered by copyright right, then -- or if a lot of the
13  books are in -- are already in a program such as Google,
14  then that leaves the space for others.
15  Q  So widespread refers to books, not users; is
16  that correct?
17  A  Those two are linked.  So you -- there would
18  be, obviously, more uses if there's more content.  So I
19  would not associate the two.
20  Q  Okay.  Is widespread referring to other people
21  or companies who might undertake book search projects?
22  A  Well, it says engaged in by Google -- of the
23  type engaged in by Google, so it could be done by
24  others, yes.  But at this point, I'm referring to
25  Google.

1     MR. McGOWAN:  I'm going to have marked as
2  Exhibit 7 a document captioned, "Written Comments
3  Copyright Clearance Center."
4     (Exhibit 7 was marked for identification.)
5  BY MR. McGOWAN:
6     Q   Do you recognize this document, Professor
7  Gervais?
8     A   Vaguely.
9     Q   Your name appears on the last page?
10    A   Yes.  I -- I remember having something to do
11  with this document.  I don't -- I think it was a team
12  effort in terms of drafting.  And I think the decision
13  was that I would be the point person for follow-up, yes.
14    Q   You participated in the drafting?
15    A   I did.
16    Q   You were the point person?
17    A   Point person for follow-up.
18    Q   On Page 5, in the first full paragraph, in the
19  middle of the paragraph this document discusses the
20  electronic course content service.
21       Do you see that?
22    A   I'm sorry.  Where are you exactly on the page?
23    Q   In the second sentence following the colon.
24    A   You're in the second paragraph?  Yes.
25    Q   The first full paragraph.

1     A   Yeah, the first full paragraph.
2     Q   So following, colon, ECCS includes standard --
3     A   Yes.
4     Q   -- limitations --
5     A   Correct.  I see that.
6     Q   -- on the amount of material that may be used?
7     A   Um-hum.
8     Q   What were those limitations at the time this
9  document was written?
10    A   I don't recall.
11    Q   Do you know currently whether the ECCS program
12  at the Copyright Clearance Center has standard
13  limitations?
14    A   It certainly has its limitations.  I don't
15  know how standard they are or if they differentiate by
16  each, you know, title or type of material.
17    Q   Did they differentiate by title and type of
18  material at the time you prepared --
19    A   I don't recall.  This is just too long ago.
20    Q   Were the terms -- strike that.
21       Were the forms employed in licensing in the
22  ECSS program standard forms?
23    A   You mean ECCS?
24    Q   Yes.
25    A   Would the forms -- my job at CCC was foreign

1  and rightsholder relations.  I did not do much work on
2  the user side.  I would not have been involved in
3  preparing or negotiating otherwise those contracts for
4  ECCS users, which would typically be, I assume,
5  higher -- higher education users.
6     Q   At the end of this paragraph there is a
7  reference for service fees.
8       Do you see that?
9     A   Yes.
10    Q   And you mention those also in your report?
11    A   Yes.
12    Q   What is the service fee you're referring to in
13  your report?
14    A   Well, collectives typically charge service
15  fees.  CCC is no different.  It charges a service fee.
16  I think on this program -- but this would be subject to
17  verification -- I think they charge a service fee both
18  to the user and rightsholders authors and publishers,
19  but I'm not sure.
20    Q   You didn't look that up in connection with
21  your report?
22    A   My report is not about ECCS specifically so,
23  no.
24    Q   Would it encompass the type of use you discuss
25  in your report?

1     A   Electronic course backs are one of the types
2  of uses of online -- online uses of books that is
3  mentioned in Paragraph 10, yes.  Whether or not there's
4  a fee charged on one and or both really doesn't change
5  the substance of my conclusions in any way.
6     Q   Do you know in the hypothetical world in which
7  there would be a license emerge from the type of
8  bargaining you describe in your report whether it would
9  have a service charge?
10    MR. SNYDER:  Objection to form.
11    THE WITNESS:  Well, collective has expenses,
12  so somebody would have to pay for those services,
13  whether it's done through a service fee or otherwise.
14  It would be something to be negotiated.
15  BY MR. McGOWAN:
16    Q   On Page 6 of this document, at the end of the
17  full paragraph on the page, the document said -- says,
18  "It is also important to note that because CCC acts as
19  an intermediary as the trading floor of the market, as
20  it were, the ECCS program also does not take a position
21  on issues of fair use, as is true of ECCS's other
22  licensing programs as well.  Instead, like ECCS's other
23  programs, ECCS serves to license that which is not fair
24  use.
25       Do you see that?

Page 101

1    A   I do.
2    Q   Is that CCC's policy at the time you were
3  there?
4    A   That's my understanding, yes.
5    Q   Is that its current policy, as far as you
6  know?
7    A   I believe so.  But I can't speak for them,
8  obviously.
9    Q   Why doesn't CCC try to license fair uses?
10    A   The view at the time -- and I don't know that
11  it has changed -- is that users take a license for
12  certain uses, and it may be that some of them, if a
13  case-by-case determination was made, would be a fair
14  use.  I think it's fair to describe the CCC system as an
15  honor system.
16         And basically users take licenses in a way of
17  agreeing to disagree on fair use or -- or not having
18  a case-by-case determination made.  But their licenses
19  cover uses that would not be fair uses.  You don't need
20  a license for a fair use.
21    Q   Let me go back to Paragraph 10, where you
22  describe --
23    A   10.
24    Q   Of your report, sorry.  Exhibit 2.
25         In the first sentence you say that you

Page 102

1  understand Google has engaged in the copying of millions
2  of books and display of snippets.  Do you also
3  understand that Google has facilitated search of those
4  texts?
5    A   I -- I -- I understand it when books are in
6  the Google Books -- by Google Books, I refer to the
7  snippet part, right, of -- of what Google does.  So I'm
8  not talking about -- about the whole books.  But when
9  there's a snippet function, that's how you find a
10  snippet by searching.
11    Q   Do you understand that Google indexes books to
12  facilitate, sir?
13    A   I don't know how it does its indexing.
14    Q   Do you know that it does indexing?
15    A   I know it uses a certain technology to make
16  the works searchable, but I do not know what that
17  technology is.
18    Q   Is there any reason you didn't mention the
19  fact that Google uses technology to make the works
20  searchable in your report?
21    A   There was no -- no reason to mention it.
22    Q   In Paragraph 11 of your report you say, "I
23  believe that if Google's uses are determined not to be
24  fair uses, the market would intervene and one or more
25  CMOs would license Google."

Page 103

1         I want to focus on "one or more" in that
2  phrase.
3    A   Okay.
4    Q   Which would it be?
5    A   I don't know.  It could very well be Copyright
6  Clearance Center, but it could be an organization that
7  performs the same type of function.  I understand that
8  in the proposed settlement there was a registry that was
9  to be set up to do this function.  My report says that
10  this is a function that can be performed by a CMO, which
11  stands for Collective Management Organization, and it
12  really is not necessary to identify which one.
13         A -- a CMO needs a data database.  It needs
14  expertise.  It needs resources.  Currently, CCC has all
15  three.  But it doesn't mean that CCC would be the
16  organization to perform this function necessarily.
17    Q   You have written in your works about barriers
18  to entering collective management organizations?
19    A   I have.
20    Q   We still go over each other, but . . .
21    A   I'm sorry.
22    Q   Um-hum.  You have written in your works about
23  barriers entry in collective management; correct?
24    A   That's correct.  They are essentially the ones
25  that I just described.

Page 104

1    Q   Can you name another collective management
2  organization that has the three capabilities you just
3  testified to, other than the CCC at the moment?
4    A   Do you mean for books or any other types of
5  content?
6    Q   For books in the United States.
7    A   It is possible that icopyright.com does.  I
8  don't know them enough.  But based on my superficial
9  knowledge of their operations, it looks like they may
10  have these resources.  I just don't know that for a
11  fact.
12    Q   Did you contact anyone --
13    A   No.
14    Q   -- at --
15    A   Sorry.
16    Q   Are you confident that if the court were to
17  rule as you suggest in Paragraph 11, that the CCC itself
18  could be the collective management organization you
19  refer to in this paragraph?
20    A   If your question is could they do this, the
21  answer is yes.
22    Q   Are you confident that anyone else in the
23  United States could?
24    A   I don't know for a fact that icopyright.com
25  could.

1    Q   And you don't know of any others?
2    A   Well, it's -- it could.  Obviously it's
3  something that needs to be defined.  So a CMO that's
4  operating in a different field already has the expertise
5  and structure in terms of a database and so on.  What it
6  doesn't have is probably the data, and it may need some
7  additional expertise that is specific to books.
8        But it is not inconceivable that an
9  organization that is managing music rights, for example,
10  would be able to do so this.
11    Q   I am interested in knowing -- so
12  hypothetically -- if the court rules as you suggest in
13  Paragraph 11 on Friday.  On Monday --
14    A   Yeah.
15    Q   -- can you give me the names of the
16  organizations that have the capability to serve the CMO
17  function you describe in Paragraph 11 in the
18  United States for books?
19    A   I think CCC could turn around very quickly and
20  make this available.  It is possible that an
21  organization like icopyright.com can do so as well.
22    Q   But you don't know?
23    A   In the latter case, I'm not sure.
24    Q   Why do you need a collective management
25  organization for authors to contract with Google?

1    A   Collective management organizations are useful
2  when you have a plurality of a rightsholders on one side
3  trying to negotiate a license for the use of their
4  content with one or more users.  It's not essential to
5  have a collective management organization, but it is a
6  way to make the process more efficient to reduce
7  transaction costs.
8        It is unrealistic, in my experience, to expect
9  individual rightsholders to do this one by one.  It is
10  much easier in terms of processing usage data as well to
11  have a collective management organization to process
12  that organization and pay rightsholders accordingly.
13    Q   So let's break this down.
14        An individual rightsholder would need to
15  contact CCC in order to derive the contract you describe
16  in Paragraph 11; correct?
17    A   It may or may not already be something that
18  CCC can license under its current agreements with
19  rightsholders.  That I would have to look at their
20  latest rightsholders' agreements.  I don't know if they
21  need additional rights.
22    Q   Let us assume an author who is not currently
23  in a contract with the CCC, they need to find and
24  contact the CCC to convey rights; correct?
25    A   In the optimum system, yes.

1    Q   Have you attempted to measure the relative
2  difficulty of finding the Copyright Clearance Center in
3  Danvers, Massachusetts and finding Google?
4    A   I can speak from experience here that we
5  received payments at CCC when I was there for authors;
6  in other words, authors that were not signed up.  So in
7  those cases CCC will contact these authors and in almost
8  every case, an agreement will be signed.  So it's CCC's
9  job at that point to locate the rightholder in question.
10        So that is very typical of not just books, but
11  in music as well.  If there's a song that is broadcast
12  and ASCAP or BMI don't have that songwriter because it's
13  a self-published song, for example, they will locate the
14  person and try to get them to join.
15        So it is fairly easy for authors at that
16  point.  All they have to do is respond to the request
17  that they receive.  And CCC has an extensive database of
18  authors and publishers.
19    Q   So I'd ask you to listen to my question.
20        Have you attempted to measure the relative
21  difficulty of an author finding the CCC as compared to
22  an author finding Google?
23    A   I have not measured the difficulty.
24    Q   Have you undertaken any analysis of that
25  question whatsoever?

1    A   Yes.  I -- in determining that there was a
2  reasonable market for a collective management system to
3  operate in this area, I took into account that authors
4  would have to be contacted or would have to opt-in in
5  some way, shape, or form.  I took into account that the
6  fact that the Authors Guild already has a database, that
7  CCC already has the database, and foreign RROs that have
8  contracts -- contracts with CCC or, in some cases, with
9  U.S. author organizations have a data, it would not be
10  tremendously complicated to get a lot of authors into
11  the system who are not in currently to participate.
12    Q   Now, my question was comparative.  Do you
13  recall that?
14    A   And I answered that I did not measure
15  comparatively whether typing google.com or copyright.com
16  is more or less complicated.
17    Q   Did you do any comparative analysis of that
18  question whatsoever?
19    A   I think by "comparative" you're trying to ask
20  me to quantify something.  I'm giving you a sense that
21  authors could join a system, whether it's
22  icopyright.com, which is a CCC's website, or when they
23  are contacted by some other organizations.  And that
24  system would be workable.
25    Q   By the phrase "whatsoever," I mean to indicate

Page 109

1  either qualitative or quantitative, but let's break them
2  down.  You performed no comparative quantitative
3  analysis; correct?
4      A   No, I gave a -- my previous answer was a
5  qualitative answer.
6      Q   And you prepared no quantitative analysis of
7  the relative difficulty of contacting the CCC as
8  compared to Google; correct?
9      A   Quantitative, no.
10     Q   Qualitatively, what steps did you take to
11 ascertain how difficult it would be for an author to
12 contact Google?
13     A   I -- as ascertained whether it would be a
14 significant step for authors to contact a CMO that would
15 be asked to operate in this field, and I determined that
16 it would not be an insurmountable problem -- far from
17 it -- based on experience.
18     Q   My question was drawn to Google.  Did you
19 understand that?
20         MR. SNYDER:  Objection to form.
21         THE WITNESS:  I -- I have not -- as I said,
22 measured or tried to determine qualitatively how
23 difficult it is for an author to contact Google.
24     Q   So you don't know?
25     A   It is not irrelevant to the conclusion in my

Page 110

1  report, which is that there is a collective licensing
2  market here, and authors can participate fairly easily.
3      Q   Have you any opinion in this case about
4  whether a collective solution through the CCC is the
5  most efficient means for authors to contract?
6      A   It is an efficient means, I cannot say.  I
7  wonder who can, what is the most way in the abstract.
8      Q   It could be second best; correct?
9      A   It's conceivable.
10     Q   Now, how many people, individual authors, are
11 in the CCC's author database?
12     A   At this point, I do not know.
13     Q   Did you ever know?
14     A   The exact number, no.  But we are certainly
15 talking about millions of books.  So you can extrapolate
16 from that the number of authors.
17     Q   What calculation would you use to perform the
18 extrapolation?
19     A   They could provide the number of authors.
20 They would know.  The database people there can give you
21 a number fairly quickly.  That was not what I was in
22 charge of.
23     Q   Is it relevant to your report that you agree
24 to which the CCC can contract with authors?
25     A   Yes.  A CMO who would operate this kind of

Page 111

1  system would need to contact authors, and the more they
2  have in their database or already signed up as
3  participating rightsholders would be material, yes.
4      Q   Then why didn't you ask them?
5      A   Because I know that the collective licensing
6  market in this area is viable and I know that authors
7  can be contacted, from experience there.  When the
8  author relations people were trying to contact authors
9  they were almost always able to find them.
10     Q   Did you personally attempt to contact authors
11 as part of your responsibilities at the CCC?
12     A   Occasionally.
13     Q   How many times?
14     A   I don't recall exactly.
15     Q   The people you are referring to, did you ever
16 ask them how many times they had failed to contact an
17 author?
18     A   All I remember is we had meetings where we
19 were discussing the number of authors we could not find
20 and how we could find authors that were hard to locate.
21 And it was a very small number.  But I do not remember
22 in percentage or other terms, what the number was.
23     Q   So you don't know how many authors are in the
24 CCC's database; correct?
25     A   Exactly, no.

Page 112

1      Q   You don't know what fraction of total authors
2  that unknown number represents; correct?
3      A   Total number of book authors?
4      Q   Yes.
5      A   I personally do not know that number, no.
6      Q   And you didn't ask?
7      A   Correct.
8      Q   With respect to the Authors Guild, you
9  mentioned the Authors Guild has a list of authors?
10     A   I did.
11     Q   What was the significance of that fact to your
12 report?
13     A   Well, it's one more tool that can be used
14 to -- if resources are pooled, to contact authors.
15 There are several others that could be used in addition
16 to existing databases.  You can use the copyright office
17 as another example.  You can -- obviously, if there is
18 great publicity around a case like this, this generates
19 interest.  Publishers can contact their authors.
20         There are several ways that authors can be
21 contacted to participate in this kind of system.
22     Q   Have you ever studied the success rate of any
23 of those mechanisms in contacting authors?
24     A   Well, I don't know what you mean by "studied."
25 But as I've answered before, I -- it was my experience

1   at CCC that we were successful in a very large number of
2   cases in contacting authors with relatively little work.
3   There are databases of authors that exist.  There are
4   trade associations that exist.  And I know collectives
5   who have used other systems like posting names of
6   authors on the website to whom payments are owed
7   et cetera.  And the success rate tends to be fairly
8   high.
9        Q   Do you know the success rate of the Copyright
10  Clearance Center as opposed to the number of times
11  somebody told you they found someone?
12       A   There were numbers at the time when I worked
13  there 13 years ago.  I do not recall those numbers now.
14       Q   You don't know them at the present day, do
15  you?
16       A   At the present day, I don't.
17       Q   You just referred to success rate on websites.
18  What website are you referring to that posts a
19  percentage of success in its efforts to contact authors?
20       A   Well, either I misspoke or you misunderstood.
21  What I said is there are CMOs that post names of authors
22  to which -- to whom, rather -- money is payable, not
23  CCC, to my knowledge, but I know that some of the audio
24  visual guilds have done this with a certain degree of
25  success.

1        I do not know the exact degree of success.
2   What I'm trying to convey is that there are several
3   tools to locate authors, and that by combining those
4   tools, people who run CMOs and know what they're doing
5   are able to locate authors in a very high percentage of
6   cases.
7        Q   What fraction?
8        A   I do not know the exact number.
9        Q   Did you read the expert report of Glorianna
10  St. Clair?
11       A   St. Clair.  I'm not sure I -- I recall the
12  report.
13       Q   Are you aware that there are studies that show
14  the Authors Guild is successful .5 of the time it seeks
15  out authors?
16       A   Well, the Authors Guild is, at this point, not
17  something I would consider a CMO.  It's part of the
18  constellation of tools and databases that could be used.
19  I am not familiar with the contents of their database or
20  with their success rate.  It is just one more tool that
21  would be available.
22       Q   Do you have any reason -- strike that.
23           So you're not actually saying, are you, that a
24  CMO would be necessary for authors to strike agreements
25  with Google; correct?

1        A   Necessary --
2            MR. SNYDER:  Objection to form.
3            THE WITNESS:  -- is -- necessary is -- again,
4   we can discuss that term.  It would be an efficient way
5   to do this.  I can't think of a more efficient way of
6   doing this at this point.
7        Q   But not necessary?
8        A   It's -- necessary in the strict sense, no.
9        Q   For example, can you think of anything
10  prohibiting an author from contacting Google today if
11  they want to?
12       A   Prohibiting?  No.
13       Q   In Paragraph 11 -- strike that.
14           So let's suppose an author contacts the CCC,
15  in your hypothetical world.  What benefit does that give
16  the author relative to contacting Google directly?
17       A   I think I can think of number of -- first of
18  all, it reduces that author's need to spend time on both
19  getting paid and getting -- knowing for when -- what one
20  is getting paid.  It allows that author possibly to
21  participate in other licensing programs that the CMO
22  has.  It might actually provide the author advice that
23  may not be available from Google.  I don't know what
24  advice Google gives authors who contact Google.
25           A very good example of this is, in the

1   performing rights world, there are two major performing
2   rights organizations, ASCAP and BMI.  Both have
3   nonexclusive agreements with their song writers, yet
4   there are relatively few songwriters who decide to
5   license outside of those channels.
6            That I take as an indication that there must
7   be some value to them in doing it by those
8   organizations.  And this has been the situation for
9   decades, since the consent decrease.  I would take that
10  as an indication that authors may see an interest in
11  dealing with a CMO.
12       Q   Now, in the ASCAP case, one of the things
13  ASCAP does is go around to bars and skating rinks and
14  restaurants and try to sign them up to pay royalties for
15  public performances of sound performances; correct?
16       A   That's my understanding of some of what they
17  do, yes.
18       Q   Is that your testimony about this hypothetical
19  bargaining world you were discussing here, is that CCC
20  is going to go out to each end user individually?
21       A   My testimony is it might be in the author's
22  interest to be part of a collective system that will
23  negotiate on behalf of authors with a user, whether it's
24  Google or somebody else.
25       Q   Well, if it were only Google, it wouldn't be

1  like the ASCAP going out to bars and skating rinks and
2  restaurants, would it?
3      A   That's one of the differences between the two,
4  that ASCAP does some licensing that would be certainly
5  impracticable for an individual songwriter.
6      Q   At the end of Paragraph 11, you say, "The
7  rights involved are also essentially the same."
8          Do you see that?
9      A   Yes.
10     Q   What do you mean by "essentially"?
11     A   Well, it's essentially the right of
12 reproduction that comes to mind first.  CCC licenses the
13 reproduction of parts of books and articles, which that is
14 a large part where the Google Books system does as well.
15 So that's -- that's what I mean by the rights are
16 essentially the same.
17     Q   And the reproduction; right?
18     A   Well, that's certainly the first one that
19 comes to mind, yes.
20     Q   So you're are not talking about uses; you're
21 talking about the legal Section 106?
22     A   I'm talking about 106, that's correct.
23     Q   In Paragraph 12 on Page 4 you're saying,
24 "Collective licensing markets have often developed in
25 response to new technologies and will continue to

1  develop for digital uses of books unless widespread
2  copying of entire books is permitted as a fair use;
3  thus, discouraging the development of such collective
4  licenses."
5          Do you see that?
6      A   I do.
7      Q   This is a causal claim, as I understand it.
8  My question is what does the "unless" mean?  Is this a
9  statement that markets will continue to develop unless
10 no permission is required?
11     A   Yes.  If -- if widespread copying is permitted
12 as a fair use, and there is no right to license, and
13 therefore, the market for licensing of those uses would
14 either fail to develop or develop in a much, much
15 smaller way.
16     Q   Why would it develop -- strike that.
17         Have you ever seen a license that pays
18 royalties to an author of a licensee indexing a book?
19     A   Indexing specifically, no.
20     Q   Are you aware that there's testimony from the
21 University of Michigan in this case that it would not
22 pay the author for the right to index a book?
23     A   I don't recall seeing that testimony.
24     Q   Did you see the deposition of Mr. Courant?
25     A   No.  The depositions I saw were Harris, Greco

1  & Chevalier.  They were rough transcripts by the way.
2      Q   Aikan?
3      A   Aikan I saw -- yes, I did see parts of the
4  Aikan transcript.  As I think -- I believe I said
5  earlier, it was very long, and I only had time to scan a
6  very small part of it.
7      Q   Fair enough.  Insofar as you know, has CCC
8  ever obtained a licensee who paid an author the right to
9  index a book?
10     A   Specifically to make index, I don't think so.
11     Q   To make a mark record?
12     A   I don't know.
13     Q   So when you say, "continue to develop," you're
14 not referring to a market print of right to index a
15 book; correct?
16     A   When I -- I mentioned digital uses, I mean
17 access and possibly a reuse of books or parts of books.
18     Q   But not indexing?
19     A   I am not aware that there is a licensing
20 market specifically for indexing.  There may be, as part
21 of other licensing arrangements.  I haven not seen it
22 myself.
23     Q   In Paragraph 14, you say, "allowing the market
24 or congress to develop a collective licensing system."
25         Do you see that?

1      A   Yes, I do.
2      Q   Is it part of your opinion in this matter --
3  is part of your opinion in this matter about what
4  congress is likely to do?
5      A   Well, at least indirectly, so congress can do
6  obviously one thing, which is adopt legislation, like it
7  has done for the online availability of music by digital
8  audio transmissions, in which case there's a specific
9  section of the statute; namely, 114, which deals with
10 that process.
11         Congress can also act in a nonlegislative way.
12 I think it's fair to say that CCC was created because
13 there were signals at the time.  This was the late '70s
14 from congress that an organization of that type should
15 exist.  And so it could be that kind of impetus from
16 congress, so in other words, nonlegislative in nature.
17     Q   Congress -- what does that opinion have to do
18 with this case, meaning congress can do what congress
19 chooses, can't it?
20     A   Yes.  I'm basing my report here, the words "or
21 congress" were there -- were put there because it is
22 possible that if that market doesn't, for whatever
23 reason, react quickly enough or achieve the solution
24 that congress considers undesirable, that they would do
25 here what they've done in the sound exchange case, which

Page 121

1    is the CMO that licenses sound recorded audio
2    transmissions.
3           And that CMO is specifically designated to do
4    so under the statute via the copyright office.
5      Q   But you're not opining what terms that CMO
6    would be authorized to offer; correct?
7      A   Specifically what congress impose, no, I
8    don't -- I'm not opining on exactly what congress would
9    do.
10     Q   It would be difficult?
11     A   Possibly.
12     Q   In the second sentence in Paragraph 14, you
13   say -- I'm sorry.  The third sentence -- oh, I'm sorry.
14   Second sentence, "Instead we compensate those who
15   created and published the content and whose ability to
16   earn a living often depends on being able to monetize
17   online uses."
18          Do you see that?
19     A   I do.
20     Q   Have you undertaken a study of what fraction
21   of publishers' ability to earn a living, or what
22   fraction of authors' ability to earn a living depends on
23   their ability to monetize online use?
24     A   While I have not quantified that, it is
25   certainly my understanding that their online uses are

Page 122

1    increasingly important.  And if you carve those out as
2    noncompensatable [sic] because they're fair use, then
3    the ability to monetize online content diminishes.
4      Q   And monetize could include the business model
5    you described earlier, which is make some available for
6    free and then charge for the rest?
7      A   Well, that would be a business model if it's
8    not a fair use that rightsholders could decide that they
9    want.  If it's a fair use, then rightsholders lose their
10   ability to make those decisions.
11     Q   When you say "it," what is "it"?
12     A   If the use is that the online uses are fair,
13   what -- whatever percentages of those uses are
14   determined to be fair, that the ability of rightsholders
15   to make decision on licensing is obviously nonexistent.
16     Q   All right.  Monetization does not exclude the
17   concept of show the consumer a little bit content,
18   familiarize them, and then charge them for the full
19   content, if they choose?
20     A   I -- that would not it be excluded.
21     Q   In the next sentence you say, "The actual
22   scope of the uses could be taken in account in
23   determining appropriate rates."
24          Do you see that?
25     A   Yes.

Page 123

1      Q   What does that mean?
2      A   Well, I'm referring here to the process of
3    rate determination.  So rate determination in a
4    collective context can be done in a number of ways.  It
5    can be negotiated as part of a contract between a user
6    and a collective representing rightsholders.
7           It can be imposed by a court, as in the ASCAP
8    and BMI case, where the consent to create provide for a
9    rate court to be established.
10          It can be established by the copyright royalty
11   judges, in -- as in the sound exchange case.  But in all
12   of those cases, what is necessarily taken into account,
13   in my opinion, is the actual scope of uses of material.
14     Q   Let's focus on negotiated agreements over the
15   use of book text.
16     A   Okay.
17     Q   In that context, what does the sentence mean?
18     A   Well, for example, if there was a solution
19   such as the -- the one suggested in the proposed
20   settlement, I would assume that it would be negotiation
21   as to which uses are licensed and for what amount.
22   Therefore, the actual uses that are licensed would be
23   determined in that agreement.
24     Q   Let me -- so some uses in that agreement might
25   be for compensation, and other uses might be without

Page 124

1    compensation to an author?
2      A   It's a negotiation.  So it is up to the
3    parties to decide at that point how the payment is to be
4    made and what is the proper basis for that payment.
5      Q   But it could be that some uses would be
6    uncompensated to authors and other uses would be;
7    correct?
8      A   It's possible.
9           MR. McGOWAN:  Let me mark as Exhibit 8 your
10   keynote.
11          (Exhibit 8 was marked for identification.)
12   BY MR. McGOWAN:
13     Q   This is -- no, strike that.
14          Do you recognize this document, Professor
15   Gervais?
16     A   I do.
17     Q   Is this an article you wrote?
18     A   It's the text of a lecture I gave at Columbia
19   Law School, which I updated for publication.  So I
20   wouldn't call it an article, but it's the text of a
21   lecture.
22     Q   And this actually is one of the documents
23   referenced in your report as a document you reviewed in
24   connection with your report?
25     A   I did reread this article before filing my

1  report; correct.
2     Q   The link you gave us was broken, but I tracked
3  it down.
4     A   I do apologize.  The link was incomplete.  We
5  sent you, I believe, a --
6     Q   Yes.
7     A   -- complete link.
8     Q   I appreciate that.  Thank you.
9        Can you go to Page 445, please, in Subpart G.
10    A   Yes.
11    Q   In the second sentence of Subpart G, you say,
12  "The United States has a fair use rule that is flexible,
13  adaptable, and dynamic."
14       Do you see that?
15    A   I do.
16    Q   Is that a view you hold?
17    A   I do.
18    Q   What do you mean by "flexible"?
19    A   Flexible means that unlike certain national
20  laws that impose very specific conditions on exceptions,
21  fair use rule is really a rule that is applied by -- by
22  courts.  And so, to that extent, it is flexible because
23  it -- its application does not require an amendment of
24  the statute.
25    Q   Adaptable?

1     A   More or less the same idea, that it adapts
2  over time to changes and technology and uses, or at
3  least it can.
4     Q   Dynamic?
5     A   Again, very similar ideas.
6     Q   In the next paragraph, the first sentence
7  says, "Fair use does suffer from the fact that it is
8  fundamentally designed to be applied case by case by
9  courts."
10       Do you see that?
11    A   I do.
12    Q   What do you mean by, "case by case by courts"?
13    A   Well, it doesn't mean literally each and every
14  case because you can rely on precedent to determine that
15  certain uses are fair, at least to a certain extent.  To
16  have 100 percent certainty that a use is fair requires a
17  court determination.
18    Q   On Page -- and the determination might vary,
19  depending on the facts of a particular case?
20    A   I think every case depends on particular
21  facts.
22    Q   It might vary depending on the character of a
23  particular work?
24       MR. SNYDER:  Objection to form.
25       THE WITNESS:  I mean, that's -- I believe

1  that's -- that the type of use might be relevant, yes,
2  under Section 107.  But I did not review Section 107 or
3  various criteria when preparing my report.
4  BY MR. McGOWAN:
5     Q   Sure.  Your report describes you as an expert
6  in intellectual property law.
7        MR. SNYDER:  Objection.
8        THE WITNESS:  Yes.  There's areas of
9  intellectual property law that I know very well, but I
10  did not do a fair use analysis in this case.
11 BY MR. McGOWAN:
12    Q   That's fine.  I'm just asking about the
13  statement in your keynote lecture?
14    A   Okay.
15    Q   The case-by-case facts that might vary might
16  include the type of work; right?
17    A   Yeah.  Radically different types of works
18  might definitely get a court to view the outcome
19  differently.
20    Q   You previously drew a distinction between
21  fiction and nonfiction; correct?
22    A   Yes.
23    Q   That might matter?
24       MR. SNYDER:  Objection.
25       THE WITNESS:  To be honest, I'd have to reread

1  the case law.  Whether courts -- how much importance
2  courts have attached to -- to whether work is fiction or
3  nonfiction is not something I recall exactly.
4  BY MR. McGOWAN:
5     Q   It would be a fact that might be considered in
6  a particular case?
7     A   Might be, yes.
8     Q   On Page 446, you say, "In a license with or
9  through a CMO, rightsholders and users could agree to
10  disagree on the exact scope of fair use, yet include
11  some of the marginal uses in the scope of the license
12  and reflect that fact in the price."
13       Do you see that?
14    A   I do.
15    Q   What do you mean by "marginal"?
16    A   Well, uses on -- that are at the margin, so
17  there's a core of uses that are -- that are infringing,
18  that are uses that are fair at some point beyond that
19  core.  And then there would typically be some
20  disagreement as to where to draw the line.  Let's call
21  that the margin.  And the point I'm making here is in
22  the CMO contract, you could decide that if uses fall
23  within that margin, they may be fair use, they may not
24  be fair use, but they will be covered by the license in
25  case they're not.  And that can be reflected in the

Page 129

1  price, for example, those uses could be at a different
2  price.
3      Q   It could be zero?
4      A   Anything's possible.  It's a negotiation.
5      Q   What's the core of fair use that you just
6  referred to?
7      A   I did not refer to the core --
8      Q   I said the --
9      A   -- uses that are not fair.
10     Q   What are those.  My apologies.  What are
11  those?
12     A   Well, there's an unlimited list of uses
13  almost, that I've -- you know, for example, you -- to
14  take the most obvious example, you go and buy a book and
15  you make full copies of the whole book and you start
16  selling those.  To me, that is the right in the middle
17  of core uses that are definitely not fair.  But beyond
18  that, as I said, I did not make an analysis --
19     Q   Um-hum.
20     A   -- in this case exactly where the line is for
21  fair uses or not.
22     Q   What are the core fair uses?
23     A   That is a much harder question to answer.
24  Fair use is a concept that is a little harder to -- to
25  pin down.  So I did not review what uses in the case of

Page 130

1  online books might be fair or not.
2      Q   Well, in your -- one of the previous exhibits
3  we saw that you used a quotation about three sentences
4  long.  Is that core fair use?
5      A   I think the quotation in the context of
6  creating another work might be fair use.  It depends on
7  the size of the quote.  It depends on, for example, if
8  you were to quote a poem in its entirety, you know,
9  somebody might say that's not a fair use.
10         Somebody -- if you quote 300 words from Gerald
11  Ford's memoirs, that may not be a fair use.  It's really
12  contextual, so I cannot answer your question in the
13  abstract.
14     Q   Did you think that the quotation you used was
15  fair?
16     A   I did in that case.
17     Q   On Page 447 of your keynote address, in the
18  first full paragraph you say, "I hasten to add that I am
19  not suggesting a faired-use world."
20         Do you see that?
21     A   Yes.  I took that term from Tom Bell's article
22  at Footnote 128.
23     Q   What do you understand the phrase, "faired
24  use," to refer to?
25     A   I -- I think that there's no question that

Page 131

1  fair use must remain.  They are essential, they are part
2  of the system, 107 is important, which means that not
3  every use of content is something that needs to be
4  licensed.
5          But beyond that, I cannot be specific as to
6  which uses in this case would or would not be fair use.
7  That is not what my opinion is about.
8      Q   Sure, I understand.  Some licenses without
9  permission must exist because you've got Section 107,
10  and that necessarily follows; right?
11     A   Well, 107 says what it is says, and it's for a
12  court to determine how it applies in this case.  I am
13  not giving an opinion on that.
14     Q   Sure.  My question was actually what fared use
15  refers to?
16     A   Well, it really refers to the use in the
17  context of Tom Bell's article where he wrote this
18  article, as you can see, fairly early on in the context
19  of discussions in the late 1990s where the idea was that
20  every piece of content would circulate online with a
21  meter that would then be basically crossing what people
22  were referring to toll booths, very much using those
23  kind of highway metaphors.  And basically, that each
24  time you would use a work for any purpose, you would
25  have a small payment made.

Page 132

1          I don't think that's an optimal solution.  I
2  think in some cases aggregate payment is better.  So
3  that, I think, was Tom Bell's point, and to that extent,
4  I agree with him.
5      Q   In the next sentence you say, "Free uses must
6  remain, both because that is what some authors want and
7  because fair uses are essential."
8          Do you see that?
9      A   I do.
10     Q   Why must some free uses -- well, strike that.
11         What authors are you referring to?
12     A   Not one in particular.  I say some authors.
13  I -- I know some authors might be very happy with free
14  uses of their work, and if that's a determine -- the
15  determination that author makes, that his or her work
16  should be available for free, that is that author's
17  right.
18     Q   Well, you don't need fair use to come into
19  play for an author to make that determination, do you?
20     A   You don't need fair use for that.
21     Q   Is free use, in this sentence, connected to
22  fair use?
23     A   Fair use is one form of free use.
24     Q   Why are fair uses essential?
25     A   I believe they're really part of the system.

1    To take a simple example, if you are going to ask
2    somebody for a license to make fun of them in a parody,
3    it's possible the license will be refused.  Yet, I think
4    that society gains something by letting parodies exist.
5    So that's a fair use that is essential as a societal
6    matter.  And that I would favor, and that should be
7    free.
8        Q    Any others?
9        A    I really cannot possibly give you a list of
10   everything that could or should be a fair use.
11       Q    And "essential" here means because there are
12   social benefits to the use?
13       A    In the case of parody, yes.
14       Q    In other cases?
15       A    Possibly.
16       Q    Uses would hardly be essential if they were
17   not beneficial; would you agree?
18       A    Would you repeat the question.
19       Q    Uses would hardly be essential if they were
20   not beneficial?
21       MR. SNYDER:  Objection.
22       THE WITNESS:  Beneficial to whom, in what
23   context?  I mean, I assume if somebody's making a use is
24   because they're getting some benefit from it, but it
25   doesn't mean it's fair use because somebody's getting a

1    benefit from it.
2    BY MR. McGOWAN:
3        Q    And we'll talk about your writing on that in a
4    little bit.  Essential to whom, since you raised the
5    question?
6        A    Systemically, essential.
7        Q    Essential to society?
8        A    In the case of parody, for example, yes.
9        Q    In other cases?
10       A    Possibly.
11       Q    Do you know?
12       A    I have -- I have not given it any thought.  I
13   have not analyzed that for the report.  It's very
14   possible that other fair uses are essential, but I did
15   not compile or prepare a list, and I would have to give
16   it some thought.
17       Q    Did you analyze parody for the report?
18       A    No.  That's really, the one example that comes
19   to mind very quickly.  Others would have to think
20   about.
21       Q    Is quotations in law review articles?
22       THE REPORTER:  "Quotations . . ."?
23       MR. McGOWAN:  In law review articles.
24       THE WITNESS:  Again, I -- I think I answered
25   quotations just a few minutes ago.  To the extent to

1    which they are fair uses is contextual.
2    BY MR. McGOWAN:
3        Q    You say in the end of the sentence, "Fair use
4    should be partially factored into rates for mass access
5    to commercial content.  This would not prevent an
6    acknowledgment that certain uses remain outside the
7    scope of those contractual umbrellas, and new test cases
8    will be needed.  A license covering some fair uses need
9    not be painted, as some uses can be licensed, but zero
10   rated."
11       Do you see that?
12       A    I do.
13       Q    Zero rated means they don't bear royalty to a
14   rightsholder?
15       A    So the footnote refers to a very specific
16   case, where there was significant disagreement between
17   parties in a case in Canada about what uses should be
18   covered by the license and the copyright board, which is
19   essentially the equivalent of copyright royalty judges
20   under Section 114 --
21       THE REPORTER:  Slow down a little bit, please.
22       THE WITNESS:  Sorry.  The equivalent of
23   copyright royalty judges under the U.S. statute
24   determined that some limited uses of -- covered by the
25   license should indeed be covered by the license, but

1    zero rate, in other words, not paid for.
2        And I believe the case is before the Supreme
3    Court in that country, but I would have to check that.
4    BY MR. McGOWAN:
5        Q    So the answer zero rated means not royalty
6    bearing to the author?
7        A    It means no royalty paid because it's a
8    marginal case that, based on the determination of the
9    board, should be included in the license, but not paid
10   for, yes.
11       Q    And in the context you're discussing your
12   report, that might be a conclusion the parties would
13   bargain to?
14       A    In a voluntary system, yes.
15       Q    The next paragraph you say, "There are
16   legitimate questions concerning access and culture.  And
17   this debate should not detract from a duty to consider
18   their substantive merit," and you cite Jessica Litman.
19       A    Um-hum.
20       Q    What are those questions?
21       A    Well, there's a long list, some of which are
22   listed by Professor Litman in Footnote 130.  In simple
23   terms, I think there are only two essential players in
24   the copyright, the author and the user.  And everything
25   else is essentially contingent.

1          There are intermediaries between the two, but
2     they come and go and they change.  But the user or
3     reader is essential because the authors need people to
4     read or watch or listen to what they do.  And what I say
5     here is we need to be mindful of both sides.
6          I'm also, in that sentence, thinking of some
7     international issues.  I've worked on access to books in
8     developing countries by certain users.  For example, I
9     think all of these are relevant parts of the debate, and
10    my paragraph here is really to say there are legitimate
11    concerns that need to be addressed concerning access and
12    culture.
13    Q    And access is by readers in this context?
14    A    It would be by users whether they are readers,
15    reusers, or listeners, viewers.
16    Q    In Paragraph 15 --
17    A    We're back on the report?
18    Q    Back on the report.  I don't think the lecture
19    was paragraph numbered.
20    A    No, that's right.  I'm just checking.
21    Q    Back to the report.
22         You say that "Collective management
23    organizations license old and new works," at the bottom
24    of Page 4, "from Philip Glass to the latest hip hop hit,
25    CMO's typically pay authors and other rightsholders

1     based on actual usage."
2          Do you see that?
3     A    I do.
4     Q    What usage are you referring to?
5     A    If can I go back to the plumbing metaphor I
6     used earlier, where the CMO has rights coming in that
7     are processed and then paid.  What happens inside the
8     CMO is they match usage data, which will be usage data
9     provided by users against their database of names and
10    titles, and that's how they will determine who gets paid
11    what.
12         This depends on the type of work and type of
13    CMO concern.  But that's why I use the word "typically."
14    Most CMOs -- and I would be temped to say almost all
15    CMOs -- proceed on that basis, matching usage data to --
16    to their database of names and rights.
17    Q    So usage here would refer to viewing portions
18    of text?
19    A    Whatever usage has been licensed would be the
20    actual usage that would be based for distribution.
21    Q    Let me draw your attention to Paragraph 17.
22    You say, "It is my opinion that a similar type of
23    collective management system most likely run requiring
24    that rightsholders opt their books in to participate in
25    collective management would develop here if some or all

1     of Google's uses are found to be fair."
2     A    Not to.
3          MR. SNYDER:  Objection.
4     BY MR. McGOWAN:
5     Q    Not to be fair.  "Most likely."  Do you mean
6     to say that there is, in your view, a possibility for
7     something other than an opt-in form of management?
8     A    Well, it's -- Paragraph 17 follows 16, where I
9     refer to the proposed settlement and the registry.  And
10    I have actually been critical in another article that
11    you may bring out later of the opt-out function,
12    especially vis-a-vis foreign authors and publishers.
13         I believe that an opt-in is a better way to
14    operate a collective management organization in any --
15    in any event, because it creates buy-in, it allows the
16    collective to get the authors and publishers to
17    understand from the get-go exactly what's going on.
18         So I would favor an opt-in system.  But
19    obviously, there was a discussion of something that
20    looked like an opt-out before.
21    Q    So when you say, "most likely," you're
22    actually referring back up to 16?
23    A    Well, that's the context.  Obviously, I was
24    saying in 17 that if a system, given that there was some
25    negative reaction, including as I read it, at least by

1     the judge, to the opt-out system, I would think that an
2     opt-in is more likely.
3     Q    Is it the basis of your report that something
4     like the registry system might result in this case, even
5     if the court holds as you hypothesize?
6     A    Would you rephrase or repeat the question.
7     Q    Yeah.  I'm just -- in your report you say if
8     Google uses are found not to be fair, then certain
9     things may be possible.
10    A    Correct.
11    Q    Is a system, such as you describe in
12    Paragraph 16, of the things that you believe would still
13    be possible?
14         MR. SNYDER:  Objection to form.
15         THE WITNESS:  Well, there's nothing that
16    prevents the type of solution like what was in the -- in
17    the proposed settlement to be renegotiated with
18    different terms, taking account in particular of the
19    court's decision on the matter.
20         But can a specific system be set up to license
21    Google's uses or some of them?  The answer is, yes.
22    BY MR. McGOWAN:
23    Q    Did you talk to anyone at Google about that?
24    A    No.
25    Q    Have you expressed an opinion anywhere on what

1  Google would be willing to do?
2      A    Not since I was engaged to prepare this
3  report.  It's a matter I -- I discussed when the
4  settlement was being discussed.  But not since I was
5  engaged to -- retained to do this report.
6      Q    Which wasn't my question.
7           When were you engaged -- when were you
8  retained?
9      A    Very early in February, 3rd, maybe.
10     Q    The month before that?
11     A    Not as -- as I recall, it was when the
12  settlement was being discussed and then adjudicated
13  upon.  So I'd have go back in the calendar, but it
14  strikes me as significantly earlier than January of this
15  year.
16     Q    You are aware that you expressed such an
17  opinion?
18          MR. SNYDER:  Objection to form.
19          THE WITNESS:  Expressed what?
20  BY MR. McGOWAN:
21     Q    You are aware that you have expressed such an
22  opinion?
23          MR. SNYDER:  Objection.
24          THE WITNESS:  That I have expressed such an
25  opinion?

1  BY MR. McGOWAN:
2      Q    On what Google would be willing to do in an
3  opt-in world?
4          MR. SNYDER:  Objection.
5          THE WITNESS:  I'm not sure I follow your
6  question.
7  BY MR. McGOWAN:
8      Q    Well, let me ask, in Paragraph 17 is it your
9  testimony that Google, in the event that its use is
10  found not to be fair --
11     A    Yes.
12     Q    -- is going to be a licensor?
13     A    Licensee.
14     Q    Sorry, licensee?  Is that your testimony?
15     A    My testimony is one of the things I considered
16  was that, as Paragraph 10 says, there is a feasibility
17  part of my report and then there's -- which I -- I think
18  we've discussed.  We can go back to it.
19          I did consider the fact that there was a draft
20  settlement in which Google seemed to agree to collective
21  licensing of some of its uses.  I'm also aware that
22  Google owns a collective management organization, though
23  in a different field.  So I assume that Google would not
24  be completely allergic to the idea of collective
25  management.

1      Q    What organization are you referring to?
2      A    I believe it's called the Right Flow.
3      Q    When did you become aware of that
4  organization?
5      A    I've been aware of the organization for quite
6  awhile.  I was not aware that it had been acquired by
7  Google until fairly recently.
8      Q    In Paragraph 17 you say here that "A
9  collective management system, most likely an opt-in
10  system, would develop if some or all of Google's uses
11  are found not to be fair."
12          Is it possible, in your view, that some would
13  be fair and others would not be?
14     A    I am not opining on which uses may or may not
15  be fair.  I have deliberately not expressed an opinion
16  on that in this report.
17     Q    Then why did you say some or all?
18     A    Because I don't know.
19          MR. SNYDER:  I couldn't hear you.
20  BY MR. McGOWAN:
21     Q    Why did you say some or all?
22     A    It is conceivable that some are.  I don't
23  know.
24     Q    And which are the uses that you're referring
25  to here?

1      A    All of the uses that I see in the -- in the --
2  in the reproduction and make available of snippets.  And
3  all that -- I don't know if some of that is or isn't a
4  fair use.  I have not done that analysis.
5          MR. McGOWAN:  Request for a break.  It has
6  been an hour, so why don't we take a short break.
7          VIDEOGRAPHER:  Off the record at 1:57.
8          (Recess taken.)
9          VIDEOGRAPHER:  On the record at 2:06.
10          MR. McGOWAN:  Professor Gervais, I'm going to
11  mark as Exhibit 9 --
12          (Exhibit 9 was marked for identification.)
13          MR. McGOWAN:  -- a paper entitled, "A [sic]
14  tangled Web of UGC."
15  BY MR. McGOWAN:
16     Q    Do you recognize this paper?
17     A    I do.
18     Q    Did you write it?
19     A    I did.
20     Q    I want to direct your attention to Page 859.
21     A    859, yes.
22     Q    Under Section 3, "Users Copied Content," in
23  the second full paragraph, you say, "The ratio issue
24  might become relevant if only a short excerpt is used.
25  This issue is not limited to the online environment."

1      Do you see that?
2      A   I do.
3      Q   And then in Note 78, you state, "The ratio is
4  the amount used measured against the totality of the
5  work from which it is taken."
6      Do you see that?
7      A   Yes.
8      Q   What is the significance of the ratio issue?
9      A   In what context?
10     Q   In the context you are discussing in this
11 paper?
12     A   I am discussing this paper -- it proposes a
13 taxonomy of the types of content that one finds online
14 that is referred to user-generated content.  In my
15 proposed taxonomy there are three types of content:
16 User authored, user derived, and user copied content.
17     My point is that user copied content is
18 typically infringing, but I make allowance here for the
19 possibility that some forms of copying of content would
20 not be.  And in one of those cases it would be because
21 of a very small portion, qualitatively and
22 quantitatively presumably, of something has been made
23 available.
24     And as I say specifically here, the issue's
25 not limited to the underlying environment, Footnote 78

1  refers to articles in cases that have help along those
2  lines.
3      Q   And one of those cases is Bill Graham Archives
4  versus Dorling Kindersley.
5      Do you see that?
6      A   Yes.
7      Q   And your description of that case in the
8  parentheticals says, "Finding the copying the entirety
9  of work is sometimes necessary to make the fair use."
10     Do you see that?
11     A   Yes.
12     Q   Is that your understanding of the holding of
13 Dorling Kindersley?
14     A   Well, I believe there's a quote from the case
15 here in the brackets, but I -- I've not checked this
16 article recently.  I believe is a quote from the case.
17 It's obviously a fairly extreme example of copying the
18 entirety of work, but as I said earlier, fair use is
19 flexible and adaptable, and that would be an example of
20 that.
21     Q   Is that your understanding of that portion of
22 the holding of Dorling Kindersley?
23     A   I do not recall the specifics of the case.  I
24 would have to reread it.
25     Q   Did you have an understanding at the time you

1  described it?
2      A   Yes.  I would have at the time, but as I said,
3  I don't -- I haven't reread that case in quite awhile.
4      Q   On Page 861, Section A, 3A, the third --
5  second -- third full paragraph, second under Section A,
6  you say, "This doctrine may have been extended by the
7  Google defense."
8      A   Um-hum.
9      Q   Do you see that?
10     A   Yes.
11     Q   What is the Google defense?
12     A   I am referring to -- it's Footnote 87, makes
13 clear the Perfect 10, Inc., the Google case from 2006.
14     Q   And what is the Google defense?
15     A   It's explained in the following sentence.  The
16 court found that the 9th Circuit specifically felt that
17 thumbnails were a fair use.  And I called that the
18 Google defense, in part because I believe this case is
19 an outlier, and I'm not sure other circuits would hold
20 the same thing.
21     Obviously, I can't prove that, but I call it
22 the Google defense because I think the court was, in
23 part, taking into account the fact that Google was
24 involved as a significant player in the online world.
25     Q   And what was done with the thumbnails?  How

1  did they relate to the case?
2      A   I'd have to reread the case.  I remember there
3  were thumbnails of so-called adult images that were made
4  available in, obviously, lower resolution than the
5  higher resolution images that one could purchase in
6  Perfect Ten site.  But beyond that, I would have to
7  reread the case.
8      Q   Do you recall if they were used for purposes
9  of search?
10     A   I don't.
11     Q   On Page 863 you say in the second sentence in
12 the first full Paragraph, "Dissemination may also be
13 fair use on other grounds.  One may argue that there are
14 public policy imperatives that will allow thumbnail
15 access and, more generally, favor broad access to
16 material on search engines such as Google."
17     Do you see that?
18     A   Yes.
19     Q   Do you agree that that is an argument that
20 could be made?
21     A   I -- I point to Footnote 102, to the 9th
22 Circuit's holding again, in the parallel case and -- I
23 mean, the case it speaks for itself.  I -- I say one may
24 argue because the 9th Circuit accepted that argument.  I
25 again believe that that case is an outlier in fair use

Page 149

1   juris prudence.
2       Q   We'll come to that in a moment.
3           "Public policy imperatives."  What are the
4   public policy imperatives?
5       A   Well, if you read the sentence, it does not
6   refer to thumbnail access.  I say there that the public
7   policy imperatives deal with broad access to material.
8           I can think of examples.  The first that comes
9   to mind was -- for some reason, is the copyrightholder
10  tried to prevent the use of the images of Princess Diana
11  leaving her hotel the day she died in a car accident in
12  Paris.  And a court -- that was a British court -- held
13  there was a public policy imperative to make that image
14  available, in spite of copyright law.
15          I thought that was an interesting example of a
16  rare public policy imperative that might trump
17  copyright.  These, again, are fairly rare cases, which
18  is why my sentence begins with a very careful, "One may
19  argue."
20      Q   The Princess Diana case that you mentioned,
21  did that involve a search engine?
22      A   I don't recall.  It's an old case.
23      Q   You specifically mentioned search engine, such
24  as Google?
25      A   Yes.

Page 150

1       Q   What are the public policy imperatives that
2   relate to search engines such as Google?
3       A   Well, you would want people to be able to find
4   an image such as the one I just described, and they
5   would typically use a search engine to find that image.
6       Q   Does this relate to the statements you made in
7   the papers we examined previously that it is important
8   for people to be able to find information on the
9   Internet?
10      A   Yes.  Indirectly, at least.
11      Q   On Page 865 in Footnote 111, you say,
12  "So-called here because it is the making available of
13  content in a different form through a search engine that
14  the court considered transformative."
15          Do you see that?
16      A   Yes.
17      Q   Is that your understanding of the Perfect Ten
18  court's ruling?
19      A   What is the question?  I'm sorry.
20      Q   Your first sentence states --
21      A   Yes.
22      Q   -- "It is so called here because it is making
23  available content in a different form through a search
24  engine that the court considered transformative."
25          My question is, does that state your

Page 151

1   understanding of the Perfect Ten court's ruling?
2           MR. SNYDER:  Objection to form.
3           THE WITNESS:  I think the case speaks for
4   itself.  As I said, I think that case is an outlier.  I
5   don't think the use, as I recall it, was transformative
6   in the way I would be tempted to describe it.  But I
7   take the 9th Circuit's word for what it's worth.
8   BY MR. McGOWAN:
9       Q   This is your description of the case, however.
10  It is not a quotation; correct?
11      A   There are no quotation marks in 111.  That's
12  all I can say.
13      Q   Is it your description?
14      A   I don't know to what extent the language
15  follows the words of the case, but it's not a quotation
16  from the case.
17      Q   Did you have a research assistant write it?
18      A   I usually work with research assistants.
19  Whether I did for that particular paper -- that was four
20  years ago -- I'm not sure.  It's likely, but I'm not
21  sure.
22      Q   Did you have a research assistant write this
23  sentence for you?
24      A   That is very unlikely.
25      Q   This is your prose?

Page 152

1       A   Yeah.  I think the use of the words, "the
2   court considered transformative" are what I would
3   underline here.
4       Q   Your next sentence -- does that mean, yes, it
5   is your prose?
6       A   It is likely to be.  Certainly it's an article
7   I've written, and I take responsibility for Footnote 111.
8       Q   Your next sentence says, "If this type of
9   transformation is indeed a fair use, then presumably it
10  would apply to many categories of content that Google
11  users may locate on the Internet, using search engines
12  such as Google."
13      A   Yes.
14      Q   Do you agree with that statement?
15      A   I use quotations around transformation to
16  signal this agreement with the fact that it is, but if,
17  indeed, the 9th Circuit's view was often frank, it might
18  apply to other types of uses.
19      Q   In your article you said, "would apply";
20  correct?
21      A   The word "presumably" you seem to have
22  forgotten.  Presumably it would apply.  I am not saying
23  just "it would apply."
24      Q   Since undertaking this assignment, have you
25  come across any information that causes you to alter

Page 153

1  that presumption?
2      A   The presumption that if we have -- that
3  reading of those 9th Circuit opinions, there would be
4  other uses that would be potentially covered, that
5  opinion has not changed.
6      Q   On Page 863 -- I apologize.  Let me ask you to
7  go back one page.
8          In the Footnote 100, you have the quotation
9  from Judge Leval's article, "Toward a Fair Use
10 Standard."
11         Do you see that?
12     A   Yes.
13     Q   Did you seek permission from the Harvard Law
14 Review for that excerpt?
15     A   I don't believe I did.
16     Q   Pay royalty?
17     A   I don't believe I did.
18     Q   Are you familiar with Judge Leval's 1990
19 article?
20     A   I would have reread it at the time.
21     Q   Are you aware that it has been cited by the
22 Supreme Court and circuit courts in many cases?
23     A   I'm aware that it has been cited.  I did not
24 count the cases in which it has been cited, but it's
25 considered a fairly well-known piece, I believe.

Page 154

1      Q   In this excerpt that you quote, Judge Lovoll
2  says, "The use" -- in the third full paragraph, "The use
3  must be productive and must employ the quoted matter in
4  a different manner or for a different purpose from the
5  original."
6          Do you see that?
7      A   Um-hum.
8      Q   Why did you quote that language?
9      A   I would -- I'd have to go back four years and
10 think of how the creative process was for this article.
11 I think it's a relevant quote in context.  Why I chose
12 that exact part, I would have to go back to the original
13 article and see why I picked those four paragraphs.  I
14 don't -- I cannot tell you beyond that.
15     Q   Okay.  In the last paragraph, Judge Lovoll
16 states, "Transformative uses may include criticizing the
17 quoted work, exposing the character of the original
18 author," and then he concludes his passage by saying,
19 "They also may include parody, symbolism, aesthetic
20 declarations, and innumerable other uses."
21         Do you see that.
22     A   I do.
23     Q   Do you agree with that?
24     A   I -- I would probably have a quibble with
25 "innumerable," unless it means that it's hard to put an

Page 155

1  exact number.  But parody, I already said I agreed.  The
2  other two, not necessarily.  Symbolism and aesthetic
3  declarations is something I would consider contextual.
4          But you asked me earlier for a list of fair
5  uses.  I cannot provide one, so to that extent it may
6  well be that these innumerable.  And to that extent, the
7  word is correct.
8      Q   When you say symbolism may be contextual, you
9  mean --
10     A   I don't know what Judge Lovoll meant.
11     Q   Do you know why you quoted him?
12     A   At the time, those four paragraphs looked like
13 they belonged there.
14     Q   What do you mean when you say symbolism is
15 contextual?  Do you mean whether it's transformed or
16 depends on its context?
17         MR. SNYDER:  Objection to form.
18         THE WITNESS:  It depends what symbolism means
19 in that context.  It could be defined in a number of
20 ways.  I think it includes certain forms of art uses and
21 artistic uses and others that really, I cannot say in
22 any abstract, say they're always transformative or not.
23 I certainly agree with the parody part.
24 BY MR. McGOWAN:
25     Q   Whether they are transformative will depend on

Page 156

1  the facts?
2          MR. SNYDER:  Objection to form.
3          THE WITNESS:  Yes.
4  BY MR. McGOWAN:
5      Q   And that's consistent with what you said
6  earlier about case by case?
7      A   Case by case.  Subject to the fact that, in
8  some cases, we have precedent that acts as a useful
9  guide.
10     Q   On Page 867 at the top of the page -- and
11 this, I believe, is in a section in which you refer to
12 user derived content?
13     A   Right.
14     Q   You say at the beginning of this page, "The
15 availability of a technological licensing solution
16 should not, in itself, be sufficient evidence that a
17 market exists.  It is sign that a market is possible."
18         Do you see that?
19     A   Yes.
20     Q   What did you mean by that?
21     A   Well, the -- this is an explanation of my
22 reading of Texaco, which, in the simplest term, is that
23 one of the relevant factors in the fair use analysis is
24 whether a licensing transaction is reasonably possible.
25 So that's what the words, "in itself," are meant to

Page 157

1  convey.  It's not because the rightsholder says, I'm
2  licensing parody, that parody is not a fair use.  It's
3  the fact that there's a licensing market is a sign that
4  it may not be a fair use.
5       I believe that's consistent with Texaco, but I
6  would have to reread the case.  I did not do so to
7  prepare this opinion --
8    Q   So let me --
9    A   -- or this report, rather.
10   Q   Let's talk about your parody example for a
11 minute.  Can you explain what you mean by your comment,
12 just about parody.  If I understood you correctly, you
13 said the fact that somebody stands up and says "I'm
14 willing to license parody," has significance.  I did not
15 understand the significance.
16   A   What the sentence, the words, "in itself,"
17 convey is that it's not because a rightsholder, for
18 example, says, "I'm making my work available for parody
19 purposes by others."  That would necessarily negate fair
20 use.  I don't consider that a reasonable licensing
21 market.
22       A reasonable licensing market is for uses that
23 are not fair uses, and so what I'm saying is if there is
24 such a licensing market, or if one is clearly possible,
25 that is relevant in a fair use analysis.

Page 158

1    Q   So "clearly possible," by that you don't mean
2  technically possible?
3    A   That would be part of it.
4    Q   Here you say, "The availability of a
5  technological licensing solution should not, in itself,
6  be sufficient evidence that a market exists."
7    A   Um-hum.
8    Q   So it's not the technical feasibility that
9  matters; correct?
10   A   It's one of the things that matters.
11   Q   Standing alone, that's insufficient?
12   A   It's not because the license is
13 technologically available that the use is necessarily
14 not a fair use.  That's one of the factors that would be
15 taken into account, I believe, based on my reading of --
16 or my recollection, rather, of Texaco.
17   Q   Is that your understanding generally?
18   A   That strikes me as a reasonable proposition.
19   Q   And it's not, standing alone, the fact that a
20 rightsholder would be willing to license; correct?
21   A   In itself, is not sufficient evidence.  You
22 need to look at existing market practices and other
23 factors that are discussed in my report.
24   Q   So let's add the two together.  If it's
25 technically possible that a rightsholder is willing to

Page 159

1  license a parody, those two factors, even put together,
2  would not mean that the parodic use was unfair?
3    A   In the case of parody, that's correct.
4    Q   Now, when you talk about the factors that have
5  to be considered for a licensing -- make sure I
6  understand you correctly.  What factors have to be
7  considered before you would conclude that a reasonable
8  licensing market does exist?
9    A   I would consider the existence of similar
10 licensing markets or systems, and I would consider
11 whether those current licensing systems can be adapted
12 or can be paralleled to license the uses in question.
13 And I believe in the case of the online parts of books,
14 that is the case.
15   Q   All right.  Let's break it down because
16 "online use" is a broad term.  Would
17 you agree?
18   A   We discussed that earlier what I meant by
19 that, but yes, it is a broad term.
20   Q   Similar markets.
21   A   Um-hum.
22   Q   Are you aware of any opt-in market in which
23 authors allow their works to be searched?
24   A   No.  I can't think of a system where authors
25 specifically license that use currently.

Page 160

1    Q   You didn't investigate that as part of your
2  report?
3    A   I did not investigate the search functions
4  specifically as part of my report.
5    Q   You've read the Chevalier report?
6    A   Correct.
7    Q   You skimmed the Aikan deposition?
8    A   Parts of it.
9    Q   In each of those it is established that
10 Amazon's Search Inside the Book program is an opt-in
11 which does not pay royalties to authors.
12       Did you know that when you wrote your report?
13       MR. SNYDER:  Objection.
14       THE WITNESS:  I knew of Amazon's system.  I
15 did know the amount of payment or absence thereof.
16 That's a matter that's obviously been negotiated between
17 the parties.
18 BY MR. McGOWAN:
19   Q   Is it a premise of your opinion in this case
20 that Amazon negotiates price with each individual
21 author?
22   A   It's not a premise.  It's the authors agree to
23 free uses, as I mentioned before.  That's their
24 prerogative as copyrightholder.
25   Q   Is Search Inside the Book on Amazon a fair

1    use?

2        A   I have no idea.

3        Q   Then why did you just say "fair uses"?  You

4    said if authors agree to --

5        A   I said "free."

6            (Court reporter interrupted the proceedings

7            to preserve the record.)

8            MR. McGOWAN:  Sorry.  Speak up just a touch.

9            MR. SNYDER:  I heard him.

10           THE WITNESS:  I did say "free."  It should be

11   on the record.

12   BY MR. McGOWAN:

13       Q   Similar markets.  Is Amazon Search Inside the

14   Book a similar market to Google Books?

15       A   The rights involved are in both cases, the

16   right -- you certainly have the right to reproduction,

17   possibly other rights under Section 106.

18           Once an organization holds the right to -- or

19   the authority to license those rights, it could license

20   those uses if they are found to be not fair uses.  It's

21   a very simple thing to do at that point.

22       Q   Are they similar?

23       A   I would say yes.  I mean, when you say "they,"

24   maybe you should be specific, make sure --

25       Q   Amazon --

1        A   -- we're saying the exact same thing.

2        Q   Amazon Search Inside the Book programs and

3    Google Books?

4        A   Well, there are certainly many parallels.  I

5    have not used Amazon's system more than, maybe, once.

6    So I'm -- would not qualify similarity there very -- in

7    a very steadfast, but I'm not sure.

8        Q   Can you do a full text search of a book and

9    return a display of a portion of text on Amazon and

10   Search Inside the Book?

11       A   I don't recall.

12       Q   Have you ever done that?

13       A   I've used Amazon search engine -- or Search

14   Inside, I think, maybe once.  I don't recall what the

15   return was in terms of how much was returned in the

16   search result.

17       Q   Do you recall that some text was returned?

18       A   Yes.

19       Q   Do you know whether the entire text of the

20   book can be searched?

21       A   No, I don't.

22       Q   Assume with me that in both Google Books and

23   Amazon Search Inside the Books, a user can search the

24   full text of a book and see a display of a portion of

25   the text of the book.

1        A   Um-hum.

2        Q   Do you understand?

3        A   You want me to assume that a user can word

4    search the entire book in both cases?

5        Q   Um-hum.

6        A   Okay.

7        Q   And get a display that is similar in length to

8    the snippet display that you did testify earlier you

9    were familiar with?

10       A   The snippet I have used, yes.

11       Q   So with respect to the searchability and the

12   display, would you consider Amazon Search Inside the

13   Book to be a similar market, as you were just describing

14   in the market availability analysis in your paper?

15       A   Well, again -- I -- I -- I have not used the

16   Amazon system to an extent that I remember how it works.

17   I assume that they will then try to sell the book or

18   some other function.  Maybe that's why authors agree.  I

19   have not spoken to authors why they use Amazon.  I

20   really can't -- it's -- it's beyond just searching and

21   what you return.  It's what happens after that would

22   also be relevant.

23           And so the answer to your question is I'm not

24   sure that I would call them similar.  They certainly

25   have some parallels, but you've asked me to assume that

1    similarity.  I -- you know, beyond that, I can't really

2    say Amazon is the same as Google.

3        Q   It's not something you researched for purposes

4    of your opinion?

5        A   I have not researched the Amazon system for

6    purposes of my report.

7        Q   Do you have any basis whatsoever to think that

8    in the event there was a collective license for Google

9    Books, the price for search would be anything other than

10   the zero, as it is in Amazon?

11       A   Again, I don't know why authors, and again how

12   many authors have participated in the system.  It is a

13   decision that authors have made in the case, unlike in

14   the Google case.  And whether the price would be zero

15   and how many authors would be willing to do it for zero

16   is not something I can speculate on in terms of

17   percentage or books or authors.

18       Q   What facts do you possess now that would

19   support the notion of there being anything different?

20       A   As I said, there may be differences between

21   the Amazon system and the Google system I'm not aware

22   of.  What I -- my report states is that it is fairly

23   easily -- it would be fairly easy for a CMO to license

24   those uses, should it be determined that they need to be

25   licensed, as I, from what you're saying, understand is

Page 165

1   the case with Amazon.  The price of the license is a
2   matter to be negotiated.
3      Q   Do authors use a collective management
4   organization to opt-inside the book?
5      A   I don't know.
6      Q   Did you look at that?
7      A   No, I did not look at Search Inside the Book
8   in Amazon for my report.
9      Q   Did you ask anyone from CCC whether they ever
10  approached Amazon and offered anyone to license search
11  inside the book?
12     A   No.
13     Q   Do you know whether, in Google Books, if you
14  see a return on a book on a search, you are then
15  presented with a link to a place where you can buy the
16  book?
17     A   I read that in one of the documents in -- that
18  I used to my prepare report.  I believe it's a
19  declaration by somebody that Google -- that works at
20  Google.  The name escapes me.
21     Q   Have you seen that in your own use of it?
22     A   No.
23     Q   You've never seen a page where there's been a
24  link to Amazon or Barnes or Nobel?
25     A   I have not looked for one, but I have not seen

Page 166

1   one.
2      Q   So on the topic of what markets are similar
3   markets, as you phrase.  So in forming your opinion with
4   respect to search of the full text of a book, what
5   similar markets did you look at?
6      A   Online uses of parts of books.
7      Q   Okay.  Who is the seller in the Search Inside
8   the Book that you looked at?
9      A   I did not look at Search Inside the Book.
10     Q   I'm trying to distinguish uses, okay?
11     A   Okay.
12     Q   One use is search, agreed?  That's one thing
13  Google Books allows users to do?
14     A   Yes.  It allows people to search inside books
15  and read snippets, yes.
16     Q   And you agree with me, as a copyright expert,
17  that you could license search separately from display of
18  snippets; correct?
19       MR. SNYDER:  Objection to form.
20       THE WITNESS:  If you're talking about
21  contracts, parties can negotiate a contract the way they
22  want.  They can license different uses in different
23  contracts.
24  BY MR. McGOWAN:
25     Q   They could do that; right?

Page 167

1     A   They could.
2     Q   I want to focus on search.
3     A   Okay.
4     Q   Are you aware of any seller in a market that
5   sells a license for search only?
6     A   For search only, I'm not aware of a license
7   that is limited to that, although what you've described
8   from the Amazon system looks like it's a license to do
9   that but with a zero rate.
10     Q   You didn't look at that?
11     A   Not for this report.
12     Q   You didn't look for any others?
13     A   I do not have access to the contract that
14  Amazon provides for search inside.  I did not have that
15  access, so I did not look for it.
16     Q   So just so you know, it's an exhibit
17  downloaded from the Internet in other depositions in
18  this case.  Did you -- did you not go to the web page
19  and try and download it?
20     A   I did not see that exhibit.  The Amazon
21  contract, I did not see it for some reason.
22     Q   Did you look on Amazon?
23     A   I did not look at the Search Inside the Book
24  for purposes of this report.
25     Q   And you don't know of any other market in

Page 168

1   which the right that is traded is the right to search
2   inside a book?
3     A   Well, other than the Amazon situation that
4   you've described, I cannot come up with an example of a
5   search only license, no.
6     Q   Can you come up with an example of a right to
7   reproduce a work where the only use allowed is search?
8     A   I can think of licenses for reproduction.  The
9   search obviously returns a snippet so that you're
10  separating things that are very hard to separate.  The
11  reproduction happens, then the search happens, and then
12  the snippet happens.
13     Q   You'll agree with me, I take it -- tell me if
14  you disagree.  Is it a premise of your opinion that it
15  is technically impossible to perform search without
16  snippet display?
17     A   I don't know.  If you search, you must return
18  something.  Presumably, you could return something other
19  than the snippet, yes.
20     Q   Page number?
21     A   Pardon?
22     Q   Page number?
23     A   I suppose so.
24     Q   It would be less useful?
25     A   You know, the bibliographic data could be

1  returned.  I don't -- I'm not sure what could be
2  returned other than the snippet.  I'm sure there are
3  options.
4       Q   So focusing now on an agreement in which the
5  use licensed is, you may reproduce the work and search
6  within the work and return, let's say, bibliographic
7  information only, or a page number only.
8           Are you aware of a market in which such a
9  license is sold?
10      A   Bibliographic data, I don't think there's a
11  license that I can think of now that does only that.
12      Q   Okay.  Snippet --
13      A   Um-hum.
14      Q   -- three Lines.  Has CCC even licensed, to
15  your knowledge, 3 lines of display only?
16      A   I don't know about three lines, but they've
17  certainly licensed very short excerpts for use on
18  websites or in newsletters, those kinds of uses.
19  Whether it's three lines or a little bit more or less, I
20  cannot say exactly.
21      Q   What is the shortest excerpt you can think of?
22      A   I can't think of a -- I can think of fairly
23  short excerpts, but I can't quantify them.
24      Q   You don't know as a percentage?
25      A   No.

1       Q   Do you know the -- the default limitation in
2  CCC's course pack, services is two chapters or
3  20 percent?
4       A   That's the upper limit.
5       Q   Upper limit, yes.
6       A   Um-hum.
7       Q   Two chapters --
8       A   Sounds right.  I haven't checked it recently,
9  but that sounds right.
10      Q   On Page 867 --
11      Q   Of what?  Sorry.
12      Q   Of your tangled web paper.
13      A   Yes.
14      Q   You say near the bottom of Page 867, "A
15  distinction must be made between use value gained by the
16  user and lost exchange value by the rightsholders."
17          Do you see that?
18      A   Yes, I do.
19      Q   The proper test is when a commercial
20  exploitation and seems to focus on the latter --  sorry.
21  The proper test is commercial exploitation and seems to
22  focus on the latter.  Put in blunt returns, is the
23  derivation parasitic or simply free writing?
24      A   I do.
25      Q   Do you agree that that is a distinction that

1  must be made?
2       A   This part of the paper refers to, very
3  specifically, derived content which is defined earlier
4  in the paper as reuse of content to create other
5  content.
6           And so I was -- I'm referring here to
7  terminology suggested by others, which goes back to fair
8  use and juris prudence and other cases where the impact
9  on commercial exploitation is a relevant factor.
10      Q   These phrases that I just read are not in
11  quotation marks; correct?
12      A   They are not in quotation marks.  Whether they
13  track what is said in, for example, David Gauthier's
14  paper, I don't recall.
15      Q   Morals By Agreement is a book on ethics?
16      A   Yes, that's what I recall.
17      Q   What do you mean by the term you use, which is
18  parasitic or simply free writing, is the derivation of
19  parasitic or simply free writing?
20      A   I was trying to draw a distinction in the
21  paper because this area of copyright law is very complex
22  in the forms of derivation which, again, means reuse to
23  create something else.  And earlier in the paper, I
24  believe it's 18 -- I say the issue of derivative rights
25  is not fully addressed in the paper.  It is a very

1  complex issue.
2           What I describe here is that there are various
3  types of derivation.  If it's simple free writing, it's
4  not the same as a parasite on an existing work that may
5  have a type of value that would be sufficient, allow it
6  to survive a fair use analysis.
7           But if it's free writing, it's very unlikely
8  that this would happen.  If you read the following
9  sentence, "Parasitic behavior imposes negative --
10          (Court reporter interrupted the proceedings
11          to preserve the record.
12          THE WITNESS:  Sorry.  "Parasitic behavior
13  imposes," for whatever reason there's some British
14  spelling -- "imposes negative externalities on the
15  rightholder, a free rider merely benefits from positive
16  externalities."
17          So I'm really focusing on the impact of the
18  reuse.  So I think the paragraph makes the -- answers
19  your question in a way.
20      Q   So free writing, in the context you're using
21  it here, is not objectionable from the point of view of
22  the analysis that you are discussing?
23      A   No.  They both might be objectionable.
24      Q   Well, when you say a free writer merely
25  benefits from positive externality, in what way is that

1    different from parasitism?
2       A    Parasitisms will -- a parasite attacks the
3    host.  So it basically impacts the original work.  The
4    free writer only rides the wave of the original work.
5    But that doesn't necessarily impose negative
6    externalities on the -- on the original work.
7       Q    So if I can modify the biologic metaphor
8    slightly.
9       A    Um-hum.
10      Q    A parasite is undercutting a market in which
11   the work has been derived from is being exploited?
12      A    Parasitic behavior might include free use of
13   an existing work in a way that affects that work, but we
14   might still decide that that is allowable.  Criticism
15   parity, free writer doesn't do that.  Free writer
16   basically takes something out there and rides the wave.
17   It's -- it does not affect negatively the original work.
18      Q    And the -- the free writer is less likely to
19   be objectionable than the parasite, though neither is --
20      A    I would not say that.  I think they might both
21   be objectionable.  It's contextual.
22      Q    It depends on the facts?
23      A    It depends, as I say, on -- it depends on the
24   facts, yes, to the extent that you come to fair use
25   analysis.  And I say then you would look at the fair use

1    analysis and apply the criteria.
2       Q    And the facts might vary one work to another?
3          MR. SNYDER:  Objection to form.
4          THE WITNESS:  Might, yes.
5    BY MR. McGOWAN:
6       Q    So what work is this distinction doing for you
7    here?  Why are you drawing it in this paper?
8       A    Well, I think the distinction is made to
9    inform a fair use analysis in the way that is explained
10   in the following sentence, which says if there are no
11   demonstrable lost sales, user derives content might fit
12   in the free writing category.
13          But if there are demonstrable lost sales, then
14   it's parasitic because of the negative externalities.
15   And I say that that's relevant to fair use analysis.
16   But I didn't push it.  And again, I refer you to earlier
17   in the paper where I say issue of derivation in
18   copyright is something that I planned when I wrote this
19   article to get back to because I consider it, perhaps,
20   the harder -- hardest question in copyright law at this
21   point --
22      Q    Is it your understanding --
23      A    -- with Note 76.
24      Q    Sorry.  Are you done?
25      A    I'm done.

1       Q    Is it your understanding that Plaintiff Miles
2    has lost any sales as a result of Google's conduct in
3    this case?
4       A    I did not check who lost or who didn't lose
5    sales.
6       Q    Do you know, one way or the other whether any
7    of the plaintiffs lost any sales?
8       A    No.  I believe that is for the plaintiffs to
9    establish, and I did not look or ask them.
10      Q    Assume with me that -- if you had read their
11   depositions, you would have seen that each of them said
12   that they were not aware of having lost any sales --
13   would that put them on the nonparasitic side of the
14   distinction you just drew?
15      A    It is a relevant distinction for the purposes
16   of derivation.  In here we're talking not about creating
17   other works, at least not the -- the definition of
18   derivation in the context of user generative content
19   does not apply to these plaintiffs.
20      Q    Yes.  The economic consequences that you're
21   discussing, the difference between parasitism and free
22   writing as economic matter is not limited to any
23   particular form of use, is it?
24      A    You say that.  But in my paper, I say -- I'm
25   talking about derived content as a subset of

1    user-generated content.  I would not take that paragraph
2    beyond that.
3       Q    I am asking for your opinion as a professor of
4    law at Vanderbilt University.  I'm asking whether, in
5    your opinion, the distinction that you draw in the paper
6    is limited to only derived uses and, therefore,
7    inapplicable to any others?
8       A    I don't know.  I would have to give it more
9    thought.  I mean, you take one paragraph from a
10   four-year-old paper and ask me to broaden it.  I can't
11   do that in two minutes.  I'd need to think it.
12      Q    You've cited the Landes and Posner copy of
13   Intellectual Property Foundations book in your work from
14   time to time, have you not?
15      A    I've consulted that book and sure, I've cited
16   it, yes.
17      Q    Do you know whether it contains any limitation
18   of the distinction between parasitic and free writing to
19   derive works only?
20      A    I don't recall.
21      Q    Are you aware of any text in copyright law
22   that says that distinction is limited only to derived
23   works?
24      A    I'm limiting it to my paper, but other authors
25   are obviously free to take it elsewhere.  And all I'm

1    saying is I don't have, now, the ability to do so.  I
2    would have to think it through.
3        Q    I understand that you're talking about how you
4    have used it in the paper.  What I'm asking is whether
5    you are actually affirmatively stating that it does not
6    apply outside of the context?
7        A    I am not making any statement one way or the
8    other.  It may or may not.  I don't know.  I would have
9    to think it through.
10            MR. McGOWAN:  Let me ask that we mark as
11   Exhibit 10 the email that you reference earlier to
12   Mr. Haber.
13           THE WITNESS:  Yes.
14           MR. McGOWAN:  And my thanks for forwarding it
15   to us during the deposition.  I appreciate that.
16           (Exhibit 10 was marked for identification.)
17   BY MR. McGOWAN:
18       Q    This was written on March 25th.  Is this the
19   email that you referenced?
20       A    It is.
21       Q    Had you spoken to Mr. Haber about your work on
22   this report before sending this email?
23       A    I don't believe so, no.
24       Q    Okay.  At the top of your Page 1 it says, "I
25   will be able to give you the context fairly quickly.

1    You will see why I had to get this right."
2        A    Correct.
3        Q    Did you give him the context?
4        A    I believe I spoke to him since and told him
5    that I had filed a report and -- in the Google case.  He
6    was already aware of it, for some reason.
7        Q    What did you tell him about your work?
8        A    Just what I said, that I said -- I filed the
9    report.  The report that I was talking to you in March
10   was for the Google case.  And I think his answer was, I
11   know, or something -- I don't think he indicated he had
12   seen it, but he was aware of it.
13       Q    Did you tell him anything about the case?
14       A    No.
15       Q    Did you tell him who had retained you?
16       A    No.
17       Q    Did you tell him which side your report was
18   going to be filed on?
19       A    My sense was he was aware already.  So the
20   discussion did not move further.
21       Q    You sensed that he was aware that you had been
22   retained by the plaintiffs?
23       A    He was aware what was going on in terms of my
24   report having been filed on behalf of the authors, yes.
25       Q    Well, let me -- let me back up.  It appears to

1    me from this email that he has taken some of your text
2    and edited it and sent it back to you?
3        Q    Is that what happened?
4        A    I sent him a draft of one paragraph, and he
5    sent it back, yes --
6        Q    Okay.
7        A    -- with some line edits, as you can see.
8        Q    Do you have the email in which you -- is the
9    email in which you sent the draft the one at the top?
10       A    No.  The email I sent him is at the middle of
11   Page 1.  And I say, "On a strictly confidential
12   basis" -- there is a typo -- "I'm writing a report."
13           But at that time, I had not disclosed that I
14   was writing this report to anybody, so I hadn't
15   mentioned that here.  I said, "It includes a paragraph
16   on CCC.  If you have a second" --
17           THE REPORTER:  Could you please slow down.
18           THE WITNESS:  -- "could you check to make sure
19   all is accurate, please."
20           And so what he did is he returned the email to
21   me with his edits on my paragraph.
22       Q    In the red line?
23       A    In the -- yes, correct.  So you have my email.
24           And then he added -- the language at the end
25   is actually part of his response to me that is part of

1    Footnote 1.
2        Q    And that footnote in which he says, "I hope
3    there is some mention that most of the 171 million is
4    not from the amount collected."
5        A    Um-hum.
6        Q    Did you copy that, or portions of that, I
7    should say, into your report?
8        A    As I recall, it's the footnotes that uses more
9    or less the substance, but not the exact language.
10   Yeah, Footnote 15.  I did not reproduce the numbers, but
11   the substance.
12       Q    Have you had any discussions with him since
13   the exchange reflected in Exhibit 10?
14       A    About the case, no.
15       Q    And I take it, just to be sure, you haven't
16   had discussions with anyone else at CCC about the case.
17       A    About the case, no.  Absolutely not.
18       Q    Do you have any financial interest in CCC?
19       A    No.  It is a not-for-profit, in any event.
20           MR. McGOWAN:  I need to ask that we mark as
21   Exhibit 11 --
22           (Exhibit 11 was marked for identification.)
23           MR. McGOWAN:  -- a document called "Insights."
24           THE WITNESS:  Um-hum.
25   BY MR. McGOWAN:

1    Q   And is this an article that you wrote, or how
2  would you describe it?
3    A   This is a summary of a longer piece that is
4  published in the Stanford Technology of Law Review that
5  the editor of Insight -- I forget her name -- having
6  seen my Stanford piece said, "Would you be willing to do
7  a condensed version for Insights?"
8        And I agreed to do that.
9    Q   This is available for download?
10   A   The Stanford piece, absolutely.
11   Q   This one, as well?
12   A   I -- I don't know if this piece is online or
13  for members only.
14   Q   The very last paragraph which is --
15   A   On which page?
16   Q   The next to the last page.  And the page --
17  the paragraph just before your bio.
18   A   Yes.
19   Q   It says, "At this stage, Judge Chin has asked
20  the parties to revise their agreement, possibly making
21  it opt-in for all rightsholders.  This would not solve
22  the orphan works issue" --
23   A   Um-hum.
24   Q   -- but it might solve the MFN issue if all
25  foreign rightsholders have an equal opportunity to

1  join."
2    Q   What is the orphan works issue?
3    A   The orphan works issue is the use of works,
4  the rightsholder in which is unknown or unlocatable.
5    Q   Is that a problem?
6    A   Orphan works --
7        MR. SNYDER:  Objection to form.
8        THE WITNESS:  -- are something that many
9  people, including U.S. Copyright Office, have been
10  working on.  It is an issue as a certainly theoretical
11  matter to figure out what to do with orphan works,
12  specifically in terms of damages.
13       And so, to that extent, there has been work
14  going on on orphan works.  The extent to which it is a
15  problem is that it's starting to be quantified, as far
16  as I know, by studies done by other people.  And I -- I
17  don't recall what the numbers are.  But I know there is
18  work being done to quantify how big the issue actually
19  is.
20  BY MR. McGOWAN:
21   Q   Let me take these in order.  What is the
22  issue?
23   A   Well, the issue is if you don't know who the
24  rightsholder is, and the work, that there is no one to
25  contact to obtain a license to use the work.  And so

1  that can create some obstacles.
2        Collective management organizations have
3  actually been dealing with this issue -- sorry.  Just
4  saw the name of the editor.
5        -- have been working on this for a quite some
6  time.  Some collective management organizations have
7  actually, more or less, solved the problem by collecting
8  money for the use of works, not knowing who the exact
9  rightsholder is, and then keep that money and pay
10  it if the rightsholder materializes.  So that's one way.
11       But the U.S. Copyright Office has proposed
12  other options in terms of limiting damages for the use
13  of those works.  Those are all worthy for their
14  consideration.  An opt-in system does not, by itself,
15  solve that issue.
16   Q   Let me -- we have five minutes left.  Let me
17  ask one more question, and then we'll come back to this.
18       If you can't find the rightsholder, then the
19  difficulty is that you can't use the work?
20   A   You can't --
21   Q   To the extent you need permission; correct?
22   A   Unless permission is given by law or some
23  other way, yes.
24   Q   And the rightsholder can't get paid?
25   A   The rightsholder can get paid, if there's a

1  collective that collects and pays, and that is quite
2  common, in fact.
3    Q   Are this collectives collectors that are
4  granting permissions when they don't have the rights?
5    A   Very often, they operate under compulsory
6  licensing or other similar systems and --
7        (Court reporter interrupted the proceedings
8        to preserve the record.)
9        THE WITNESS:  Compulsory licensing.
10  BY MR. McGOWAN:
11   Q   So we're not talking about books in the
12  United States?
13   A   We are not talking about books in the
14  United States here, no.
15       MR. McGOWAN:  Let's change the tape.
16       VIDEOGRAPHER:  This is the end of Disk 2 of
17  Daniel Gervais.  Off the record at 2:57.
18       (Recess taken.)
19       VIDEOGRAPHER:  This is Disk 3 of Daniel
20  Gervais.  On the record at 3:06.
21  BY MR. McGOWAN:
22   Q   Professor Gervais, before we broke, we were
23  speaking about the orphan works issue that you described
24  in your Insights paper.
25       Did I understand you to say that you

Page 185

```
 1    understood that collective management organizations had
 2    solved the orphan works problem -- or strike that.
 3            Did you say that?
 4        A   I said that in some context they've certainly
 5    done what they could to solve it by collecting.  I
 6    mentioned specifically a compulsory which is a case
 7    where you don't need a license, but you do need to pay
 8    somebody.  But if you can't find a person, then the CMO
 9    has the duty to find that person to make sure that the
10    money actually gets paid.
11           So in those cases, they do, to a large extent,
12    solve the problem.  In the case where a license is, in
13    fact, required, it may be that a legislative solution
14    would be a better option.
15        Q   With respect to in copyright books in the
16    United States, do you believe that there persists an
17    orphan works issue, as you put it here?
18        A   I have just recently started to look at
19    material on how extensive the problem is.  I don't have
20    enough data to answer the question one way or the other.
21        Q   When you refer to the orphan works issue here,
22    were you referring to the United States?
23        A   The piece is really an international piece.
24    And so it refers, certainly, not just to the
25    United States.  There are authors from foreign countries
```

Page 186

```
 1    that would certainly be concerned here as well.
 2        Q   You don't know what fraction of orphan works
 3    rightsholders have been found?
 4        A   All I can say is I read -- scanned a report
 5    that I believe Berkeley Law School made available.  And
 6    it said that it was very hard to quantify.  So to that
 7    extent, that's all I know about quantification of the
 8    problem.
 9        Q   In the next sentence in this paragraph you
10    say, "It is not at all clear that Google -- which has
11    the money to withstand a protracted legal battle with
12    publishers -- will find an opt-in settlement
13    commercially worthwhile."
14            Do you see that?
15        A   I do.
16        Q   Was that correct at the time you wrote it?
17        A   Well, my -- my sense is we had no indication,
18    and I don't think there has been since from Google --
19    that they favor an opt-in settlement.  But I don't have
20    specific information.  I just have not seen information
21    to that effect.
22        Q   Your testimony, then, is not that if the court
23    rules against Google and the fair use defense, as you
24    posit in the report, that there will, in fact, be
25    bargaining?
```

Page 187

```
 1            MR. SNYDER:  Objection to form.
 2            THE WITNESS:  There was -- there were three
 3    clauses there, so I will have to ask to you repeat the
 4    question.
 5    BY MR. McGOWAN:
 6        Q   Okay.  Let me break it down.
 7            In your report, you hypothesize a situation in
 8    which Google's fair use defense is not accepted.  And as
 9    I understand your opinion, it's that in the event
10    Google's fair use defense is not accepted, collective
11    management organizations will facilitate bargaining.
12            Is that fair?
13        A   Or possibly congress, as mentioned in the
14    report, yes.  But I do believe that the voluntary
15    non-congress solution would, in fact, emerge.
16            What the report says is, if it's not fair use
17    or to the extent that it is not fair use, it is possible
18    to license it using the technology and expertise that we
19    have.  And it is then possible to create a licensing
20    environment for the uses that are not considered to be
21    fair.
22        Q   Are you actually opining that Google would
23    participate in such negotiations?
24        A   I -- as I opined earlier, Google agreed, as
25    far as I understand, to the terms of a previous
```

Page 188

```
 1    settlement.  It owns a collective management
 2    organization.  I don't have a reason to think that
 3    Google would be incapable of considering a collective
 4    management solution here.
 5        Q   I didn't ask whether it was capable of
 6    considering it.  I asked if you are opining that Google
 7    will, in fact, participate in such negotiations?
 8        A   That will, in fact, participate --
 9        Q   Yes.
10        A   I don't know.
11        Q   In this paragraph that you wrote, you say that
12    it's not clear; correct?
13        A   That's right.  That's why I say I don't know.
14            MR. McGOWAN:  I'm going to hand you what's to
15    be marked Exhibit 12 --
16            (Exhibit 12 was marked for identification.)
17            MR. McGOWAN:  -- the transcript of the
18    deposition of one of the named plaintiffs.
19            THE WITNESS:  Okay.
20    BY MR. McGOWAN:
21        Q   Betty Miles.  And just to be clear, you have
22    not previously read this?
23        A   I do not recall reading this.  You know, I
24    reviewed a whole bunch of documents in early February.
25    I'd have to -- I don't recall.  It's possible that I
```

Page 189

1  did.
2      Q   On the second page, so if you turn this over.
3      A   Yes.
4      Q   At the very bottom it says, Page 9 to 12 of
5  111.  And in the rectangular pages, it's Page 11?
6      A   I see it.
7      Q   In this portion of Ms. Miles' testimony, the
8  question is put to Ms. Miles, "Is one of the things you
9  are asking the court to do is to stop Google from
10 displaying snippets of books on Google Books?"
11         Do you see that?
12     A   Yes.
13     Q   And she says, "Yes."
14         And she is then asked at Line 7 and 8 -- and
15 feel free to read down to the full page.  At Lines 14 to
16 19 she's asked why does she want the court to stop the
17 display of snippets.
18         She says, "I don't want people to read books
19 that they search via the snippet without my control or
20 permission."
21         Do you see that?
22     A   I do.
23     Q   Is that a position you endorse, that people
24 should not be able to read snippets on the internet
25 without permission of an author?

Page 190

1      A   I don't know what she means here.  As I said
2  before, I believe the optimal solution is that material
3  should be available and monetized.  I can't, from this
4  excerpt, know whether she's talking about the fact that
5  she's afraid that, via snippet, they'll get too much of
6  the book or is she opposed to a single snippet.  And so
7  it's very difficult to -- to understand.
8          What I am also saying, however, I'm not sure,
9  as a matter of law, we should take away her right to
10 decide that.
11         I'm saying, as an optimal solution, if I were
12 an author, I would put my material out there and look
13 for a way to monetize it.
14     Q   Now, I thought you said you had made no fair
15 use determination in this case; correct?
16     A   It's not a fair use determination.  This is
17 me saying, as an author, I would authorize, as I
18 actually do, the use of my material.  And if I were
19 writing the type of content that, I suppose, that -- I
20 don't even know what she writes.  She might be looking
21 for a way to monetize that, but she might have decided
22 snippets are not for her.
23     Q   When you say the right to decide that?
24     A   The right to opt out entirely.
25     Q   You are not referring to a determination you

Page 191

1  have made in this case that authors have a right to
2  control individual snippets?
3      A   I don't know if they do.
4      Q   Do you want Google Books to be taken down?
5      A   No.  I say it's desirable in my report.
6      Q   If Ms. Miles seeks to have it taken down, do
7  you think that would be a bad thing?
8      A   I think if she wants her content off Google
9  Books, she could get that; right.
10     Q   Do you know if Google Book allows authors to
11 opt out?
12     A   I read somewhere they do in the materials that
13 I reviewed.  Again, I don't recall which declaration it
14 was.
15     Q   Are you aware that none of the named
16 plaintiffs have asked that their books be removed?
17     A   I'm not aware of that.
18     Q   So let me go back to my question that I
19 originally asked, is would it be good thing if Google
20 Books were taken out?
21     A   My report --
22         MR. SNYDER:  Objection to form.
23         THE WITNESS:  I answer that question already.
24 It's in my report.
25 BY MR. McGOWAN:

Page 192

1      Q   The answer is no?
2      A   The answer's on the record.  I say in my
3  report, I think it's a desirable and probably inevitable
4  use that material will be made available online.
5      Q   Including in Google Books?
6      A   Including in Google books.
7      Q   Let me take you back to Exhibit 2, which is
8  your report.
9      A   What is 2?
10     Q   Your report.
11     A   Oh, okay.  Yes.
12     Q   Paragraph 42 on Page 14.
13     A   Last one, yes.
14     Q   Says, "Allowing practices like Google's as
15 fair use."
16         Practices.  What practices do you refer to?
17     A   Of scanning entire books, making snippets
18 available.  The type of practices that I described
19 earlier, which I understand to be the Google Books
20 system.
21     Q   Scanning, snippets, search?
22     A   Search is not specifically discussed in my
23 report.
24     Q   Why not?
25     A   I didn't -- you know, the types of uses that

Page 193

1   are licensed that I'm familiar with are copying and
2   making these snippets available is something that could
3   also be licensed because it very much resembles reuses
4   of parts of books.  And so that's something that can be
5   there.  You asked me if I was aware of a search license.
6   I am not aware of a search license.  There may very well
7   be one out there.
8       Q   Let me -- do you understand that after Google
9   scans a book, it enables search of that book by
10  indexing?
11          MR. SNYDER:  Objection to form.
12          THE WITNESS:  You asked that question earlier.
13  I -- again, I don't know how technology is used by
14  Google.  I don't know what even indexing means in that
15  context.  But I know that Google makes the work
16  searchable online using words.
17      Q   And the scan is, in a sense, an input to the
18  search function?
19      A   I don't -- I assume the scan is -- is a
20  function part -- a function or a part of the process to
21  make the book searchable, but that is not my area of
22  expertise.
23      Q   You understand, do you not, that one of the
24  things you can do with Google Books is search a large
25  number of books very quickly?

Page 194

1       A   That sounds -- strikes me correct, yes.
2       Q   Quicker than you could do in a card catalog?
3           MR. SNYDER:  Objection to form.
4           THE WITNESS:  Most likely.  I haven't used the
5   card catalog in so long, but that certainly sounds
6   right.
7   BY MR. McGOWAN:
8       Q   And using full text instead of catalog key
9   words?
10      A   Using full text?  Yes.  Yes, although, you
11  know, is that necessarily a win in every case, isn't
12  something I would be prepared to say yes to.  Going to a
13  library and seeing the book on the shelf and seeing
14  other books in the same indexed part of the library is
15  something I've done several times.
16          So what I'm saying is Google books allows
17  users to do things that you can't do with card catalogs,
18  but maybe there are things you can do with card catalogs
19  or other types of indexes that you can't do with Google
20  Books.
21          I have not made the comparison fully, so I
22  wouldn't say that Google Books is necessarily better in
23  every case.  I don't know.
24      Q   You would say faster?
25      A   Faster strikes me as definitely accurate, yes.

Page 195

1       Q   And full text as opposed to an arrangement
2   dictated by key words?
3       A   Yes.  That strikes me as accurate as well.
4       Q   And as opposed to a bibliographic system
5   adopted by a library?
6       A   Which has, as I just mentioned, potentially
7   other advantages.  But that's not a comparison I have
8   studied specifically.
9       Q   Okay.  You understand, in general, that Google
10  Books is a search tool?
11      A   Yeah.  We'd have to define words again.  But
12  it's certainly -- one of the things Google Books allows
13  people to do is to search the context of books.
14      Q   Okay.  Is that among the practices you refer
15  here to in Paragraph 42?
16      A   The practices that I really focus on in this
17  report is copying entire books and making snippets
18  available.  I do not know whether these are fair uses.
19  If they are not fair uses, they can be licensed.
20      Q   And as you have said, "can be" in a physical
21  technical sense is, in and of itself, not evidence that
22  a use is unfair?
23      A   In itself, I say, yes.
24      Q   And you haven't made a fair use determination
25  here, you have mentioned that?

Page 196

1       A   Correct.
2       Q   So what I'm trying to understand, very simply,
3   is does this report exclude search from the scope of its
4   opinion?
5       A   Well, if the reproduction is not a fair use,
6   then there can be no search based on the way that you've
7   explained reproduction earlier as a necessary part of
8   search on which I have to take your word for it because
9   I don't know.  It sounds reasonable.
10          Searching inside the book is, again, not
11  something I have seen specifically licensed as a -- as a
12  single function.  It may be that in some case it is.
13  What you've referred as indexing, I can't say because I
14  would need to define the word.  But I've not -- I don't
15  recall the contract licensing agreement specifically
16  directed to just the indexing function.
17      Q   Sure.  I understand that.
18          I want to ask, with respect to your report --
19      A   Um-hum.
20      Q   -- how do you account for the fact that the
21  reason the texts are scanned is to facilitate the
22  search?
23          MR. SNYDER:  Objection to form.
24          THE WITNESS:  I understand that's one of the
25  purposes.  If you reread Paragraph 13 in my reports --

1    in my report -- it says, "Making books and other
2    copyrighted works available online is desirable both for
3    authors and readers."
4           Now, Google Books make snippets available, and
5    in many cases that may, indeed, be desirable.  But I
6    actually believe it would make sense, in fact, in some
7    cases, to allow authors to make more than snippets
8    available.  That's also something that could be
9    licensed.  I understand that's not part of the snippet
10   program, but the thrust of my report is that the current
11   uses can be licensed and a license would also allow a
12   license to do more.  I believe that, in fact, is
13   specifically what the proposed settlement envisions.
14   BY MR. McGOWAN:
15        Q    Is your report basically saying that you could
16   do the proposed settlement again?
17           MR. SNYDER:  Objection to form.
18           THE WITNESS:  My report doesn't speak to
19   whether you can do the proposed settlement again.  My
20   report says that if there's a settlement or other
21   outcome of this case that says that some uses need to be
22   licensed, that can happen fairly quickly and easily.
23        Q    Through the CCC?
24        A    As one example.
25        Q    But you don't have any others?

1        A    I mentioned the possibility of icopyright.com.
2    I would have to check what their exact ability is.  But
3    that's what they do.  But whether it is scalable, I
4    don't know.
5           THE REPORTER:  Whether it's what?
6           THE WITNESS:  Scalable.
7    BY MR. McGOWAN:
8        Q    So Paragraph 13, which you just referred to me
9    to answer my question about search, does not mention
10   search?
11       A    No.  I did not make a specific determination
12   with respect to licensing just search.
13       Q    I'm asking where, in the report, you take into
14   the account the fact that the purpose of the scan is
15   facilitating search.  I want to see the paragraph where
16   you take that into account and discuss it.
17       A    Search is mentioned in Paragraph 10.  It
18   displays snippets of these books and search results, so
19   clearly there's an understanding that this is what this
20   system is used for.  And there is somewhere else in the
21   report -- I don't see a specific discussion of search
22   beyond the mention in Paragraph 10.
23       Q    And the mention in Paragraph 10 pertains to
24   the results?
25       A    But it shows an understanding of what the

1    system is, which is you search and you get results.
2        Q    Okay.
3        A    I believe that's why a user would typically
4    engage in a search process.
5        Q    Is it relative to your analysis that the
6    purpose of scanning is to facilitate search?
7        A    You're asking me as a matter fair use?
8        Q    I'm asking you as a matter of your report.
9        A    My report's very clear.  It is not a fair use
10   to make copies of entire books.  This can be licensed.
11   I do not make -- I am not opining.  I am not making a
12   determination as to whether the copying of these books,
13   whether it's for research or some other reason is fair
14   use.  That is not something I am making a claim about in
15   any way.
16       Q    Would your report read differently, other than
17   the one referenced in Paragraph 10, if this copying were
18   not for the purpose and did not, in fact, facilitate
19   search?
20           MR. SNYDER:  Objection to form.
21           THE WITNESS:  Very difficult hypothetical
22   question.  I did not -- I would have to rethink my
23   report with a different set of facts.
24       Q    You only mention it once --
25       A    Um-hum.

1        Q    -- in terms of display?
2        A    Yes.  The report at the end of Paragraph 12,
3    for example, refers to digital use of books, and then it
4    refers to widespread copying of entire books.  That's
5    one of the issues -- one of the -- whether it's for
6    search or not, and whether that impacts a fair use
7    determination, is for someone else than me to decide.
8        Q    Sure.  Does it impact licensing?
9        A    If it's not a fair use, it will, in order to
10   continue, need to be licensed.  And so . . .
11       Q    Does the fact that a scanned book may be
12   searched, in your view, affect any of the licensing you
13   hypothesize?
14       A    I assume, only thing I can answer, is that the
15   search function would be something that would be
16   addressed in the license as I, again, assume from your
17   earlier comment, that it is in the Amazon case.  But I
18   have not researched the Amazon book display or whatever
19   it's called directly, search inside function.
20           It might be something that would be covered in
21   the license, and -- and -- and how it would be covered
22   would be something to be negotiated by the parties.
23           My point is, it can be licensed.  And one way,
24   and the efficient way to do this, is for collective
25   management.

Page 201

1    Q   It might or might not; right?
2    A   Might or might not what?
3    Q   It might not be included in the license.  You
4  don't know; right?
5        MR. SNYDER:  Objection to form.
6        THE WITNESS:  I am not expressing an opinion
7  as to whether a search should be separately licensed
8  here.
9  BY MR. McGOWAN:
10   Q   And if the court rules against Google's
11 defense, you don't know whether it would be, do you?
12       MR. SNYDER:  Objection to form.
13       THE WITNESS:  My report, actually, on this
14 point says that I think the market would respond and
15 make a such a license possible.
16   Q   Okay.  So we're on paragraph -- such a license
17 possible.  My question is whether a license would be
18 struck.  I'm not asking whether it is physically
19 possible.
20   A   Um-hum.
21   Q   Is that --
22   A   You're asking?
23   Q   -- distinction clear?
24   A   Yes.  You're asking a question about the
25 future.  I cannot say for sure what the future holds.

Page 202

1  What I can say, as an expert in this case, having looked
2  at existing practices based on the old saying that the
3  past is prologue, I'm saying that I am confident that a
4  collective management system would emerge to license the
5  type of uses that I consider desirable which includes
6  making books available online.
7        I believe that is a both feasible, logical,
8  and commercially viable thing that would happen.
9    Q   By making available online do you mean like in
10 the iTunes, Apple Bookstore, like E-Books?
11   A   I'm not using "making available" in the
12 technical sense in which it is used in international
13 treaties.  I'm using it in a colloquial sense of making
14 material available.  But whether it's by download or
15 streaming or some other way is not something I was
16 trying to parse in that use of the word.
17   Q   Or whether it is all of the work or part of a
18 work?
19   A   That doesn't affect the making available
20 method, whether, it's a whole work or part of a work.
21   Q   Whether a whole work is made available or only
22 a part is made available?
23   A   Again, if that's not a fair use and needs to
24 be licensed, whether it is a whole work or part of a
25 work is -- is not -- doesn't change the substance of the

Page 203

1  opinion, which is this can be licensed.
2    Q   When you say "can be," what, in addition to
3  it's physically possible to accomplish such a license
4  does your report opine?
5    A   That --
6        MR. SNYDER:  Objection to form.
7        THE WITNESS:  My report states quite clearly
8  that there are online uses of parts of books that are
9  currently licensed, have been for several years,
10 successfully.  And I believe that the same type of would
11 apply, as indeed envisioned in the proposed settlement,
12 if this -- these uses, or some of them, are not fair
13 uses.
14 BY MR. McGOWAN:
15   Q   Okay.  When you say "would apply," is that a
16 probabilistic statement?
17   A   I'm making a determination in this report
18 about future behavior, so it is necessarily problem --
19 you know, probabilistic.
20   Q   Probabilistic.  Okay.
21       Past is prologue, your phrase.
22   A   Correct.
23   Q   If past is prologue with respect to --
24   A   Actually not my phrase technically, but yes.
25   Q   The past is prologue with respect to searching

Page 204

1  inside a book, then Amazon's royalty free system would
2  be prologued for what would emerge in your licensing
3  world; correct?
4    A   Well, both in the sense that it is licensed,
5  and what you're saying is that license fee is zero,
6  there have been uses in the past that were licensed at
7  zero, close to zero, and eventually the price changed as
8  the market evolved and a better understanding of
9  business models emerged.
10       I don't know if this would happen here, but a
11 licensing transaction at whatever the price to be
12 negotiated is, is, I believe, entirely consistent with
13 existing practice.
14   Q   Okay.  If the price is zero, authors are not
15 going to get money; correct?
16   A   They are going to get the right to decide,
17 which I think has value to them.  Whether that's a
18 dollar value in the specific case or not --
19   Q   Okay.  They're not going to get money; right?
20   A   If it's part of a broader deal in which
21 they're getting paid for certain uses, and that's part
22 of the negotiation, certain uses are unpaid for, that is
23 something that, you know, people can negotiate.
24   Q   All right.  I'm asking with respect to the
25 search function, if it's royalty free, they don't get

1   money from the search function; correct?
2       A    If it's royalty free, licensed as such, they
3   wouldn't get paid for the search function, per se.
4       Q    If they were to get paid, it would have to
5   come from additional uses; right?
6       A    Other uses, additional.
7       Q    If they are not going to get paid from
8   licensing search, then the failure to license search is
9   not costing them money; correct?
10      MR. SNYDER:  Objection to form.
11      THE WITNESS:  In the -- in the very tentative
12  hypothesis that you're making, that this would be
13  licensed at zero, going forward, which I don't know, you
14  mentioned one example I am not familiar with in any
15  detail.  And what the deal was, why those authors and
16  how many authors made the deal that you referred to with
17  Amazon is something that would need to be explored to
18  see if it can be extrapolated.  I have not done that
19  work.
20      Q    If they're not getting any royalty, then
21  they're not losing any from the failure to license;
22  correct?
23      A    No, that's in incorrect.  They can -- in a
24  contract where they agree to certain uses at zero,
25  consider that those uses are worth granting at zero

1   because they're getting paid in other ways.
2       What you're assuming as a separate search
3   license at zero with no other consideration, that is not
4   my assumption.
5       Q    I assure you we will through each tranche.  I
6   want to start with the visible tranche of search.
7       A    Okay.
8       Q    If, in the current market, the opt-in price
9   for search is zero and is past is prologue, as you have
10  stated, then the payment to be derived from that would
11  be zero; correct?
12      MR. SNYDER:  Objection to form.
13      THE WITNESS:  No.  Incorrect.  That is
14  incorrect.
15      As I've tried to say -- I'll repeat it a third
16  time.  You are making the assumption that licensed --
17  that authors would be willing to license the search for
18  zero with no other consideration.  I don't know that
19  that's what's happening.
20  BY MR. McGOWAN:
21      Q    What other consideration do you assume will be
22  licensed?  I am going to come back to this.
23      A    I am not assuming anything.  Your question is
24  asking me whether something is correct.  I am saying no,
25  it's not correct.

1       Q    Are you saying in the bargaining that you
2   hypothesized in the event Google's fair use defense is
3   not accepted, that there will be no licenses for search
4   only?
5       THE REPORTER:  "No license . . ."
6       MR. McGOWAN:  For search only.
7       THE WITNESS:  I don't know.
8   BY MR. McGOWAN:
9       Q    You don't know one way or the other?
10      A    It's possible that there would be license for
11  search only, but it seems it would make more sense that
12  encompasses a broader array of uses.
13      Q    Why would it make more sense?
14      A    I think that both parties would win.  I think
15  all three parties would win.  Authors would win because
16  more uses would be made of their work for which they
17  would be getting paid; google would be able to monetize
18  more uses of the books that it has scanned; and users
19  would get more uses of those books that Google has
20  scanned.
21      Q    Okay.  Let me come back to search.
22      Are you saying that you know that in the world
23  in which Google's fair use defense is not accepted that
24  there would be licensed in which users are compensated
25  for royalty free search because additional uses would be

1   included in the license?
2       A    I am saying that my best educated guess, based
3   on what I know and what I've explained in the report is
4   that this kind of licensing would emerge for uses that
5   are not fair uses beyond just search.  I think the
6   license -- it would be in everybody's commercial
7   interest and other interest to have a license that
8   covers more than search.
9       Q    Okay.  What's the probability that would
10  happen?
11      A    I think fairly high.
12      Q    Can you give me an estimate?
13      A    A number estimate, no.
14      Q    You're not an economist; we know that.
15      A    Exactly.  And I'm not venturing a number.  It
16  is probabilistic, but I'm saying that I think the
17  probability is fairly significant that is what happened.
18      Q    Describe to me the method you used to derive
19  the conclusion that the probability is high?
20      A    Okay.  Well, I am using a number of criteria
21  such as existing licenses, past practice of the parties
22  involved, including the proposed settlement, and the
23  simple fact that it is usually fair to assume people
24  will act according to their best interest.  And I see it
25  as this kind of broader license being in the best

1   interest of all the parties I've already mentioned.
2       Q   How many similar licenses have you personally
3   negotiated, similar to the ones that you're
4   hypothesizing?
5       A   Personally negotiated?
6       Q   Yeah.
7       A   None.
8       Q   How many did you review in connection with
9   your report?
10      A   I'm not sure what you mean, licenses of the
11  typo that I -- there is no exact license that covers
12  exactly what I have described. I'm just saying that the
13  rights that would be covered by a such a license are
14  already aggregated, to the most part, so it would be
15  fairly easy to come up with a licensing arrangement to
16  be negotiated.
17      Q   You said the probability was high, didn't you?
18      A   Yes.
19      Q   The probability is high, even though no such
20  license exists now?
21      A   Yes.
22      Q   And you know that because it makes sense to
23  you?
24      A   Because I believe -- my understanding is it
25  makes sense for all the parties involved, and it is

1   consistent with behavior I have observed, including, for
2   example, the proposed settlement, the fact that a lot of
3   major users of digital content are licensing that
4   content.
5       Q   How many are licensing search?
6       A   Alone? Search alone? Separate from other
7   functions, I have not seen a license that applies
8   strictly to search.
9       Q   How many are licensing the return of snippets
10  in connection with search?
11      MR. SNYDER: Objection to form.
12      THE WITNESS: I don't -- I don't know beyond
13  the example that you've mentioned that you called the
14  Amazon search in the book. You described that as a
15  snippet, so . . .
16      Q   So we've got one data point for display of
17  snippets in connection with search?
18      A   Well, it's not an insignificant data point if
19  it is Amazon, but okay.
20      Q   It's not one you looked at; correct?
21      A   Not to prepare this report.
22      Q   So we've got one data point of -- for a
23  license in connection with a license -- strike that.
24      One data point in which people opt-into a
25  search program. Your testimony, as I understand it, is

1   that there's a high probability that that functionality
2   would be included in a license that would include
3   additional terms; is that your point?
4       A   Yes.
5       Q   What are those additional terms?
6       A   Other uses that would be licensed in the same
7   contract would include, for example, making copies of
8   entire books, allowing Google to profit from its
9   scanning efforts in other ways. And I assume that this
10  would not be restricted by the license. I don't know.
11      Q   Copies of entire books?
12      A   That's what Google is doing, according to the
13  documents filed by Google in the case.
14      Q   Is it displaying targets?
15      A   Not in the snippet program, and what I
16  described -- what you described in the partner program,
17  I think they do that. But to my mind, that's not the --
18  when I am talking Google Books, I'm talking snippets,
19  right. So in the snippet program, I'm not aware that
20  they display entire books.
21      Q   Is it your understanding that the partner
22  program displays entire books?
23      A   I remember reading that it displays more than
24  snippets. Whether it's entire books, I don't know.
25      Q   So when we go back to the royalty-free

1   question, which is where we began, your point was that
2   even if search is royalty free, under the license
3   authors who agreed might derive revenue from additional
4   uses. Is that your point?
5       A   My point is that search might be free for now.
6   I don't know it would be forever. And, yes, I think
7   authors might sign that agreement if they saw value in
8   allowing search, without compensation, because they were
9   compensated in some other ways. That would be for them
10  to make that determination.
11      Q   Does that compensation come from things that
12  Google is not presently doing?
13      A   It may come from things that Google's not
14  presently doing, but would have an interest in doing to
15  exploit this database of millions of books that it has
16  scanned.
17      Q   Have you asked anyone at Google whether they
18  have such an interest?
19      A   No. My -- my understanding is based on what
20  would have been allowed under the proposed settlement
21  that I understand that Google had agreed to.
22      Q   Do you understand that the settlement was not
23  accepted?
24      A   I do, but not by Google. As I understand it,
25  it had been accepted by Google and other parties in the

Page 213

1  case.
2      Q   And do you think that that is an important
3  foundation for the inference you draw that there is a
4  high probability?
5      A   No.  It's one factor I -- I took into
6  consideration.  I'm much more basing my opinion on the
7  fact that I believe it's in the interest of all parties
8  involved to make this work.
9      Q   Okay.  It can work as it is right now; right?
10         MR. SNYDER:  Objection to form.
11         THE WITNESS:  Technically or legally?
12  BY MR. McGOWAN:
13     Q   Well, legally, you told me you -- you don't --
14     A   Exactly.
15     Q   -- take a position?
16     A   That's correct.
17     Q   Technically, obviously, it can?
18     A   Technically is a matter -- technology seem
19  that it's working.  But whether it's legal or not, I
20  don't know.
21     Q   Let me take you to Paragraph 42.  I want to
22  make sure that we have this clear on the record.
23         We began this line of inquiry when I asked you
24  what practices were included in the first line of 42,
25  and you said, as I recall, scanning and snippets.  And I

Page 214

1  asked if search were included.  And you say practices
2  like Google's -- "Allowing practices like Google's as
3  fair use may be expected to thwart the development of
4  collective management systems."
5         What do you mean by collective management
6  systems?  Is that CCC?
7      A   That is one example of such a system.  A
8  collective management system is rights aggregated by the
9  plurality of rightsholders typically for one type of
10  content that is licensed to one or more users.  And so I
11  do believe that if a court finds that what Google is
12  doing here is fair use, it will be harder, hence the
13  word "thwart" here, to develop collective management
14  systems for digital uses of books and specifically book
15  excerpts.
16     Q   So would it be harder to develop systems for
17  the display of full text if what Google is doing here is
18  found to it be fair use?
19     A   It could.  It might affect existing markets
20  for digital uses of book experts as well.  It's very
21  hard to predict what would happen if there was a fair
22  use determination.  It would depend on how the court
23  arrives at that determination, what conditions it
24  imposes.  It is very difficult to call the exact impact
25  of that determination.

Page 215

1      Q   Why?
2      A   For the reason I just stated.
3      Q   So why would it affect the display of full
4  text of books, which Google does not do?
5      A   I said it could.
6      Q   Okay.  What is the probability?
7      A   That it would affect -- I just told you.  It's
8  very hard to call exactly what a fair use determination
9  would have.  If for example, a snippet is fair use and
10  people will say, well, how about double snippet or
11  triple snippet, and then we're going to get into
12  arguments about how far the exception goes.  And I don't
13  know how that far it would be taken.  It really depends
14  on if and how a court would make that determination.
15     Q   So are those arguments that people do not have
16  now?
17     A   They are not based on an actual determination
18  by a court about whether snippets and reproduction of
19  entire books by Google is, indeed, a fair use or not.
20         If we have that case determination, I believe
21  that the landscape changes very dramatically for
22  authors.
23     Q   Because you now have an opinion pertaining to
24  an eighth of a page snippet?
25     A   Because you have an opinion that would either

Page 216

1  say that -- that would -- if it's said it's not a fair
2  use, then it would need to be licensed.  And I -- as I
3  said in my report, I fully expect that there would be
4  some collective management system that would emerge as a
5  result of a determination that this is not fair use.
6      Q   Are you familiar with the Georgia State
7  opinion?
8      A   I've heard about it; I have not read it.
9      Q   Has it had an effect on CCC?
10     A   I don't know.
11     Q   Has it had an effect on collective licensing?
12     A   I don't -- I'd have to check whether it's on
13  appeal.  I'd have to ask CCC.
14     Q   Well, you don't have appeal in here in
15  Paragraph 42, do you?
16     A   Yes, of course, I do.  I mean, determination
17  is something that is fair use is a final determination
18  in the case, that it is a fair use, which would
19  presumably be made by the 2nd Circuit of the Supreme
20  Court of the United States.
21     Q   I see.  You are --
22     A   Assuming the final determination.
23     Q   So you don't know whether a decision that just
24  came down in a case underwritten by the copyright
25  clearance center suing one of its users that had an

Page 217

1  influence similar to the one you hypothesize here; is
2  that correct?
3      A   I have not read that opinion.  I understand
4  that a number of very important uses were determined not
5  to be fair.  But I don't -- that's -- I read that on
6  blogs.  I have not read the opinion.  So I don't know
7  more.
8      Q   Okay.  Can you point me to an effect it's had?
9      A   I have not researched that, so I don't know.
10     Q   Do you have any reason to expect that the
11  decision in that case would have a different effect than
12  a decision in this case?
13     A   If in Georgia State -- well, Georgia State, I
14  would have to check what exact uses were found not to be
15  fair uses and whether a license was already available,
16  whether there's been a change in the take-up rate for
17  that license.  Again, I don't even know if that case is
18  a final determination.  I seem to recall it's a district
19  court opinion, not a circuit opinion, but I may be
20  wrong.  I have not read it, so . . .
21     Q   Well, let me ask you this.  Google Books
22  project started in 2004.  Are you aware of that?
23         THE REPORTER:  I'm sorry?
24         MR. McGOWAN:  Started in 2004.
25  BY MR. McGOWAN:

Page 218

1      Q   Are you aware of that?
2      A   I wasn't aware of the exact start date, but I
3  have no reason to doubt that.
4      Q   Approximately, were you aware?
5      A   Approximately.
6      Q   Since its inception, has it had -- do you
7  opine in this case that it has thwarted the development
8  of markets?
9      A   Well, there's -- there is no licensing market
10  for those type of uses.  But I don't know that -- how
11  many other players are in the -- in the process or are
12  not getting in the process of offering similar services.
13  There is -- you're asking a negative determination about
14  nonfacts, which is very, very difficult.
15         Are there other companies that would do this
16  if there was clarity, if this was licensed.  Amazon is
17  doing it, but it apparently is doing it, from what
18  you're saying, under license.  It is very difficult to
19  know alternative universes or futures based on the fact
20  that Google has been doing this.  I think everybody, or
21  a lot of people, know there's pending litigation, and it
22  may very well be that the outcome of this litigation
23  will, in fact, lead to developments that are hard to
24  predict.
25     Q   Well, you opine on a hypothetical universe in

Page 219

1  Paragraph 42, don't you?
2      A   Yes.  I'm saying that if there is a fair use
3  determination, it will have a significant impact.  I
4  cannot quantify that impact.
5      Q   You also actually can't describe that impact
6  in terms of contract terms; correct?
7      A   Well, I guess I could.  You know, you have a
8  license to perform certain uses of parts of books.  And
9  if, for example, they had been the fair use
10  determination, I'm pretty sure that those uses would not
11  be covered in the license.
12         In addition, uses that are close to those, the
13  so-called marginal uses I referred to earlier, would
14  likely be fought over in terms of both licensing rate
15  and possible additional litigation.  So this would
16  definitely impact the contract in that way.
17         I can't point to specific words, but I can
18  really see how it would affect the contract negotiation.
19     Q   I'm asking about terms.  I'm trying to get an
20  understanding of what terms would differ?
21     A   The uses that would be licensed would likely
22  differ.
23     Q   Okay.  So you said a moment ago that you don't
24  know whether by virtue of Google undertaking the Google
25  Books project, you don't know how that affected the

Page 220

1  market?
2      A   It may have prevented certain developments.
3  It may have interrupted chains of events.  It is very
4  difficult to make those calls.  I also believe that the
5  fact that there's pending litigation as to whether this
6  is or isn't fair use may have impacted the development
7  of licensing systems because people are not sure to the
8  extent that this case is concerned.  But even more
9  broadly, what uses of book excerpts online are or aren't
10  fair use.
11         And so it's very hard to negotiate a
12  license -- I'm talking about other players here -- with
13  this uncertainty.  You would have to basically be
14  playing licensing poker by trying to figure out if this
15  is fair use or not.
16     Q   Let's break this down.  When you say "may,"
17  what steps have you taken in connection with your report
18  to determine whether the project has, in fact, had an
19  effect of altering licensing practices?
20     A   I have not made a determination in this
21  specific case that something did not happen because of
22  the case, if that's your question.
23     Q   You don't know?
24     A   I don't know.
25     Q   Whether something did not happen because of

1  the project?
2      A   No.  It's very hard to know something that did
3  not happen.
4      Q   That's not opinion that you're expressing?
5      A   What is not an opinion that I'm not
6  expressing?
7      Q   That there are licensing events that would
8  have occurred had it not been for the Google Books
9  project, but did not occur because of the project.
10     A   I said I'm not aware of specific examples of
11 cases where this did not happen.  It is entirely logical
12 to think that when the scope of what needs to be
13 licensed is unclear, people will hesitate to enter into
14 licensing transactions.
15     Q   Well, the scope was unclear before the Google
16 Books project, wasn't it?
17     MR. SNYDER:  Objection to form.
18     THE WITNESS:  I'm not sure what -- you know,
19 you said 2004.  So we're looking at 2004 and making
20 available book excerpts online.  Situation may have
21 changed now.  There may be companies that do not exist
22 because they don't -- because there's no venture capital
23 in this area.
24     What I'm saying, is there may very well be
25 interrupted chains of events.  What I'm saying, though,

1  as a matter of my report is that the uncertainty, and
2  specifically in my report, paragraph 42, I say, a fair
3  use determination that scanning entire books, making
4  snippets available as a fair use is likely to thwart --
5  may be expected to thwart the development of collective
6  management system for digital uses of book excerpts and
7  books because there will be that determination and then
8  there will be other determinations that people will try
9  to make, based on whatever the determination is made in
10 this case -- there will be a period of uncertainty.
11 Uncertainty is unlikely to be conducive to these new
12 systems emerging rapidly.
13     If you're an investor, that, to me, is just --
14 I'm using a simple determination here that to have a
15 collective management system, you have to have rights to
16 license.
17     Q   When you say "thwart," do you mean to imply
18 that there are waiting in the wings services that would
19 develop if Google does not succeed in its fair use
20 defense?
21     A   Well --
22     Q   That are only not visible now because there is
23 no decision yet?
24     A   If I return to the settlement for a second,
25 there were uses there that were well beyond snippet that

1  Google was interested in performing.  It may have
2  changed it's mind, that's entirely possible, I don't
3  know.  But at the time, those uses were possible.  It
4  would have been possible under the settlement.  So there
5  would have been an interest, apparently, in making those
6  additional uses.
7      That's one example of something that did not
8  happen.  It's also the case that if other players were
9  looking at the situation, saying, Hey, we probably think
10 to do this same type of thing, they're probably thinking
11 we're not going to do it because of the pending
12 indeterminacy on the scope of fair use.
13     Q   Who are those other players?
14     A   I don't know.
15     Q   How do you distinguish what you just said from
16 pure speculation?
17     A   Well, there's a limit between speculation and
18 educated guessing.  What I am saying is, there is -- I
19 expect that there is a broader market for digital books
20 out there, broader than just snippets.  And that market
21 seems to be thwarted in -- in the same way that there's
22 this indeterminacy on the production of snippets, there
23 is an indeterminacy on these other markets that would
24 develop if we had a license.
25     Q   Okay.  You say authors and publishers would

1  likely development.  "Likely develop" does not refer to
2  the search only license?
3      A   "Likely" refers to the three verbs that
4  follow, so develop, join, or license.  I think it's
5  likely that authors and publishers would do one of these
6  three things.
7      Q   They likely would --
8      A   Either develop their own system, join an
9  existing system, or license a third party to develop a
10 system.  I think that the online availability of books
11 beyond snippets, so not just snippets, is a desirable
12 outcome, but I believe it should be licensed and, in
13 appropriate cases, paid for.
14     Q   Okay.  So develop, join, or license, no one's
15 going to join a search only license because we don't
16 know of any; correct?
17     A   I don't know that no one would ever join one.
18 I just said I can't identify one.
19     Q   Is it your opinion that there likely will be a
20 search only license if the court does not accept
21 Google's fair use defense?
22     A   I believe it's in everybody's interest to have
23 a system that makes available books and book excerpts in
24 a way that allows authors to be paid, Google to monetize
25 its investment in digitizing these books, and allowing

Page 225

1    users access to those book excerpts.
2         And so based on that, my appreciation, which
3    hasn't changed since 1998 of how the market has evolved
4    online, I believe that these users are desirable, and
5    that the market is likely to make them happen.  Hence,
6    the word likely in Paragraph 42.
7         Q    When you say "likely," are you talking about
8    full text display and full text availability?
9         A    Not necessarily.  Book and book excerpts.
10        Q    How long are these excerpts?
11        A    This is not something that can be uniformly
12   answered.  So it may very well be that it will depend on
13   each book and each book or author or publisher.  It may
14   very well be a case-by-case determination by the
15   rightsholder in that case.
16        Or it may not be.  It may be a standard
17   licensing term you were referring to the CCC which had
18   the 20 percent upper limit on electronic course backs I
19   think the market should be allowed to develop.
20        Q    So the excerpts, you don't know how long it
21   would be.  It might be book to book, author to author?
22        A    It might be.  Or it might be a standard
23   solution.  It depends on the companies offering the
24   service, how many competitors Google ends up having if
25   this sees the light of day, et cetera, et cetera.  There

Page 226

1    are, admittedly, a number of unknowns but what is a
2    known quantity is, at least in my opinion, the
3    desirability of making books available online legally
4    and in a way that allows authors to get paid.
5         Q    Desirability is going to be a function of cost
6    at some level, isn't it?
7         A    Yes.
8         Q    So the excerpts you're talking about here, are
9    these larger than snippets, or do you mean to include
10   snippets?
11        A    I -- I did not consider snippet when I said
12   book excerpt, but to me a snippet is, technically, an
13   excerpt from a book.
14        Q    The excerpts that you're talking about here,
15   are these tied to search or not?
16        A    Not necessarily.
17        Q    So in Paragraph 42, your conclusion, the
18   collective management systems, include excerpts that are
19   not connected to a search function, but are just posted?
20        A    It would include that, but it would also
21   include search.  You could find a book excerpt -- if you
22   know for a fact that you need Chapter 3 of a certain
23   book, is that a search, if you know exactly what you
24   want?  I would -- I'm not sure I would qualify that as a
25   search, but there might very well be a market for making

Page 227

1    available chapter 3 of that book and I know I want that
2    chapter.  And I download or otherwise access that one
3    chapter, and the author gets compensated for that
4    access.
5         Q    All right.  Suppose I find that I want
6    Chapter 3 by picking the book up in a library and
7    browsing through it.  Does the author get royalty when I
8    do that?
9         A    When you browse a book in the library?  Well,
10   the library had to buy the book, in the first place, so
11   to that extent, the author got paid for that.
12        Q    For my browsing?
13        A    For your browsing, under U.S. law, no, they
14   don't.  In certain countries they do, but not in the
15   United States.
16        Q    So in your excerpts example, where I know that
17   I'm going to use a full chapter of a book --
18        A    Yes.
19        Q    -- my process of browsing in the library to
20   find the book is not a royalty bearing process; correct?
21        A    The royalty -- no.  In the United States,
22   browsing in a library is not something that entails
23   payment of a royalty.  But if you download the book
24   excerpt, then you can work with it.  You can annotate
25   it, you can print it, you can do a number of things with

Page 228

1    it that have value to the user that you cannot do with
2    the library copy.
3         Q    Sure.  I just want to take this one step at a
4    time.
5         So the browsing in the library doesn't
6    generate royalty to the author in the United States.
7    Does browsing in a bookstore enter into the royalty in
8    the United States?
9         A    Browsing in the bookstore, no.
10        Q    And the excerpts, which may not may not
11   connected to search, you don't know how large they would
12   be in that --
13        A    I'm saying that excerpts can it be licensed
14   independently of how long the excerpt is.  There's a
15   possible licensing transaction.  I'm also saying I
16   believe there's a market for excerpts of various
17   lengths.  If snippets are not fair use, there is a
18   market for that, I believe.  And I believe there's a
19   market for more than snippets --
20        Q    Okay.
21        A    -- as in the electronic course back example.
22        Q    Let's focus on snippet.  You said earlier, and
23   we read in one of your articles, that are you not in
24   favor of fair use?
25        A    As I defined it earlier in my testimony.

Page 229

```
 1      Q   Are you in favor of word-by-word licensing of
 2   quotations by books?
 3      A   As a general principle, I can't answer that
 4   question.  I actually think there are cases where that
 5   may be appropriate.  Word-by-word licensing is not a
 6   very common practice.  I have not seen a lot of
 7   licenses.  I don't think I've ever seen a license that
 8   counted the exact number of words, although I've seen
 9   licenses that identified excerpts.
10      Q   Like the Chapter 3 example?
11      A   Or smaller excerpts.
12      Q   The -- have you considered in your report the
13   likelihood that if Google does not prevail in its fair
14   use defense, a license would be created limited to the
15   actual uses in this case?
16      A   That is a possibility.
17      Q   Unaffiliated with any additional making
18   available of chapters or whole texts?
19      A   My educated guess is that this is a suboptimal
20   result of the parties involved, so it is not most likely
21   outcome, but it is a possible outcome.
22      Q   What methodology did you employ in reaching
23   that conclusion?
24      A   I have answered that question at least twice.
25      Q   It's an educated guess?
```

Page 230

```
 1      A   An educated guess based on the interest of the
 2   parties, existing practices, the existence of an agreed
 3   settlement, though rejected by the court, and the other
 4   factors that I mentioned earlier in my testimony.
 5      Q   Okay.  The settlement -- and the reason I'm
 6   framing the question to focus on the actual uses -- you
 7   said that settlement went beyond what we're actually
 8   now discussing; correct?
 9      A   A future settlement?  What you do you mean?
10      Q   I thought in your testimony you were referring
11   to the settlement that the court had not accepted.
12      A   Yes, I was.  That's what he said, a
13   settlement.
14      Q   That pertained to things in addition to what
15   the case is currently about?
16      A   The proposed settlement that was not accepted
17   by the court would have covered uses beyond snippets as
18   I read it.
19      Q   Okay.  And so -- I just want to make sure I
20   understand where your probabilities are coming from and
21   how they've been derived.
22          Your probability with respect to scanning and
23   indexing and search doesn't rest on an existing license
24   because you don't know of an existing license limited to
25   scanning, indexing, and search; correct?
```

Page 231

```
 1          MR. SNYDER:  Objection to form.
 2          THE WITNESS:  I do not know a license limited
 3   to scanning, indexing, and search.  But the rights
 4   involved are already aggregated, the rights that are
 5   necessary to make those snippets, and more, available.
 6      Q   I was setting snippets aside.
 7      A   Well, the search function, you've been doing
 8   that for the entire afternoon, separating the search
 9   from the snippet.  But the search has to return
10   something, and if it returns a snippet, it's very hard,
11   in my mind at least, to separate the two entirely.
12      Q   Okay.  We went through that the things that
13   could be aggregated.  I will add snippet in a moment.
14          The probability of a snippet licensing market,
15   meaning one-eighth of a page, roughly three lines, what
16   existing practices limited in length, two, three lines,
17   1/8th of a page, are you using as a foundation for your
18   probabilistic assertion?
19      A   Well, this is, first of all, very common among
20   publishers to license short excerpts among one another.
21   I don't know if it's limited to three lines.  I also
22   know that, as I said earlier, CCC licenses fairly short
23   excerpts for reuse in the commercial context.  And
24   again, I don't have an exact number of words that they
25   would have licensed in this way.  But I -- I know for a
```

Page 232

```
 1   fact that they've licensed short excerpts for things
 2   like corporate newsletters, websites, and other uses of
 3   that nature.
 4          I don't think they called them snippets, but
 5   they resemble what you define as a snippet.  So these
 6   are fairly short excerpts, so these markets exist.
 7          The rights involved mostly the right of
 8   reproduction.  This right is already aggregated in a
 9   CMO, which is, in my mind, evidence that this could
10   apply to snippets or beyond.
11      Q   The right of reproduction is the same right,
12   whether it's a paragraph or a whole book, isn't it?
13      A   That is my exact point.
14      Q   So you cannot, using the right of
15   reproduction, distinguish between reproduction of one
16   sentence in one book.  It's the same right?
17      A   It's the same right --
18          MR. SNYDER:  Objection to form.
19          THE WITNESS:  -- as per the statute, it is not
20   the same, necessarily, for a CMO perspective.  The CMO
21   may have limits in its authority to license on the
22   amount of the book.  I don't -- I don't know that CCC
23   does, but I know of cases where, you know, a publisher
24   will specifically limit the amount of a book that can be
25   licensed in a single transaction.
```

1    You know, those are -- those -- those things
2  are -- are possible.  They were negotiated based on
3  these existing services that I have described earlier.
4  But the right involved is the same.  The owner of the
5  right is known.  The rights are aggregated so that it's
6  fairly easy to go from the existing situation to a
7  situation where Google's current uses are licensed and
8  other uses that the parties might, I believe, find
9  desirable, would also be licensed.
10    Q    All right.  You mentioned two sources of your
11  probability.  One was that you said it's common for
12  people to license excerpts for use in business
13  environments?
14    A    I didn't say -- I said I am aware that CCC
15  does that on a regular basis.  I did not use the work
16  "common," I believe.
17    Q    Okay.  It's regularly done.  Is that done in
18  conjunction with search?
19    A    I don't know how the people who want to
20  license a short excerpt from -- whether it's a newspaper
21  article, someone found that article.  Were they reading
22  it on the plane.  Did they find it online.  I don't know
23  how they find it.  But they find it, and they want to
24  license it for their newsletter or their website, and
25  they get the right to do that.

1    Q    But their licensing is reproduction for
2  purposes of display or distribution?
3    A    I assume depending on what's in the website or
4  a newsletter that the license might read differently.
5    Q    Okay.  The question I'm asking is the examples
6  you're referring to, is CCC licensing the paragraph that
7  you put in your newsletter, or is it licensing you to
8  create a search engine and render text searchable?
9    A    I have not looked at the license recently.  My
10  understanding is what they allow you to do is make a
11  reproduction of the excerpt and then display it or
12  distribute it, depending on the medium.
13    Q    And you say fairly short excerpts?
14    A    I have seen one paragraph.  Now, whether that
15  would correspond to three lines in a book, four lines in
16  a book.  One newspaper paragraph.  How is that?  I
17  remember seeing at least one example of that.  So, is
18  that three lines in the book?
19    Q    Who is the licensor?
20    A    I don't recall, plus I believe that would be
21  confidential.  If I did recall, which I don't, which the
22  company was at the time.  But it was their
23  newsletter and a website.  I remember that transaction.
24  But I don't recall who the licensor is.
25    Q    Why do you remember it?

1    A    Why do I remember it?  I think it may have
2  been something that came up in a meeting where they
3  wanted -- somebody wanted to show us an example of this
4  new licensing system that they had made available at CCC
5  that I described earlier that the user point licensing,
6  where it's actually not on the website of CCC, on the
7  website of user.  I think it was an example in a
8  management meeting, but I do not recall which company it
9  was.
10    Q    Do you remember what kind of text -- it was a
11  newspaper article?
12    A    Newspaper article.
13    Q    Do you remember what fraction of the article?
14    A    Paragraph.
15    Q    What fraction of the whole article?
16    A    I do not recall.
17    Q    And that was not in conjunction with search?
18    A    I do not know how they found the paragraph.
19    Q    Sorry.  CCC did not license the paragraph to
20  enable a search function; they licensed it for inclusion
21  of a bulletin or something like that?
22    A    For reproduction display or distribution, yes.
23    Q    The probabilities that a market would likely
24  develop, to the extent they incorporate search and do
25  not extend beyond snippet display, are there any other

1  examples that you can think of in the current practices
2  that inform your thinking, that inform your --
3    A    The company --
4    Q    -- probability?
5    THE REPORTER:  I'm sorry.  What was the last
6  word?
7    MR. McGOWAN:  Your thinking.
8    THE WITNESS:  The company I mentioned earlier,
9  icopyright.com, at the time I checked which was a while
10  back -- by this, I mean, it would have been over a year
11  or two ago -- but was precisely in the business of
12  licensing short excerpts of digital content for online
13  uses.  But I did not review their website for the
14  preparation of this report.
15  BY MR. McGOWAN:
16    Q    I understand that.  What I'm trying to do is
17  find out in connection with ascertaining the method by
18  which you derived your probability, your educated guess.
19  I'm trying to find out what the closest case to Google
20  Books is, and I want to include the search component in
21  the base case because search is a component of Google
22  books.  And I want to know what the closest case you
23  have examined to Google Books, including search, is?
24    MR. SNYDER:  Objection to form.
25    THE WITNESS:  I did not opine about search.  I

Page 237

1  opined about reproduction of whole books and making
2  snippets available mostly.  I did not opine specifically
3  about search.  And what I am saying is, if the
4  reproduction and the display of snippets are not fair
5  uses, they can be licensed because this very much
6  resembles the reproduction of books and book excerpts
7  that is currently licensed by CCC, probably by
8  icopyright.com and by RROs in 30 countries, at least
9  now, worldwide.
10        MR. McGOWAN:  Let's take a short break.
11        VIDEOGRAPHER:  Off the record at 4:14.
12          (Recess taken.).
13        VIDEOGRAPHER:  On the record at 4:31.
14  BY MR. McGOWAN:
15     Q   Professor Gervais, with respect to the
16  licenses that the Copyright Clearance Center has entered
17  into with universities, do you know whether, as part of
18  those licenses, the Copyright Clearance Center sometimes
19  allows universities to scan content and make it
20  available digitally for students to use?
21     A   I believe they do in their electronic course
22  back service.
23     Q   Do you know whether, in connection with those
24  licenses the Copyright Clearance Center requires
25  universities to adopt specified security protocols

Page 238

1  pertaining to that content?
2     A   At the time I was there, I believe they did.
3  I do not know if they do that now.
4     Q   Do you recall what they were?
5     A   I recall that they had conditions imposed, but
6  as I said, I was on the rightsholders side and
7  international side.  I did not deal with individual
8  users.  So I had with limited contact with users and
9  with the contracts with users.
10     Q   You don't remember any specific terms?
11     A   No.
12        MR. McGOWAN:  That is all I have.  Thank you
13  for your time.
14        MR. SNYDER:  I have no questions.  Thank you.
15        VIDEOGRAPHER:  This the end of Disk 3 of
16  Daniel Gervais.  Off the record at 4:33.
17        THE REPORTER:  Would you like a copy?
18        MR. SNYDER:  Yes.
19          (WHEREUPON, the deposition of DANIEL GERVAIS
20          was concluded at 4:33 p.m.)
21
22
23
24
25

Page 239

1  STATE OF CALIFORNIA      )  ss:
2  COUNTY OF SAN FRANCISCO  )
3
4        I, STACEY M. DIODATI, C.S.R. #11925, a Certified
5  Shorthand Reporter in and for the State of California,
6  do hereby certify:
7        That prior to being examined, the witness named in
8  the foregoing deposition was by me duly sworn to testify
9  the truth, the whole truth, and nothing but the truth.
10        That said deposition was taken before me at the
11  time and place set forth and was taken down by me in
12  shorthand and thereafter reduced to computerized
13  transcription under my direction and supervision, and I
14  hereby certify the foregoing deposition is a full, true
15  and correct transcript of my shorthand notes so taken.
16        I further certify that I am neither counsel for nor
17  related to any party to said action nor in anywise
18  interested in the outcome thereof.
19        IN WITNESS WHEREOF, I have hereunto subscribed
20  my name this 18th day of June, 2012.
21
22        _____
23        Stacey M. Diodati
        Certified Shorthand Reporter
24
25