# EXHIBIT 16

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------

THE AUTHORS GUILD, INC., )
ASSOCIATIONAL PLAINTIFF, )
BETTY MILES, JOSEPH     )
GOULDEN, AND JIM BOUTON, )
INDIVIDUALLY AND ON     )
BEHALF OF ALL OTHERS    )
SIMILARLY SITUATED,     ) C.A. 05 CV 8136-DC

    Plaintiffs     ) Volume: I

    vs.           )

GOOGLE, INC.     )

    Defendant     )

-------------------------

    DEPOSITION OF EXPERT WITNESS, BENJAMIN G. EDELMAN,

before Avis P. Barber, a Notary Public and Registered

Professional Reporter, in and for the Commonwealth

of Massachusetts, at the Harvard Business School,

Baker Library, 25 Harvard Way, Boston, Massachusetts,

on Thursday, June 14, 2012, commencing at 10:03 a.m.

Job No. 148413

PAGES 1 - 312

---

Page 2

1  APPEARANCES:
2
3  On behalf of the Plaintiffs:
4   BONI & ZACK, LLC
5   15 St. Asaphs Road
6   Bala Cynwyd, Pennsylvania 19004
7   By:  Michael J. Boni, Esquire
8    Tel: 610-822-0201
9    Fax: 610-822-0206
10   mboni@bonizack.com
11
12  On behalf of the Defendant
13  DURIE TANGRI
14  217 Leidesdorff Street
15  San Francisco, California 94111
16  By:  Joseph C. Gratz, Esquire
17   Tel: 415-362-6666
18   Fax: 415-236-6300
19   jgratz@durietangri.com
20
21  ALSO PRESENT:  Jody Urbati, Videographer
22
23
24
25

---

Page 3

1     I N D E X
2
  WITNESS   DIRECT CROSS  REDIRECT  RECROSS
3
  BENJAMIN G. EDELMAN
4
  BY MR. GRATZ  6
5
6
7     E X H I B I T S
8
  NUMBER                    PAGE
9
  Exhibit 1  Expert Report of Benjamin Edelman    17
10
  Exhibit 2  Whenu.com Emergency Motion      98
11
  Exhibit 3  Initial Expert Report of Doctor
12     Benjamin Edelman Concerning Industry
     Practices and Activities of
13     Valueclick    101
14  Exhibit 4  Expert Report of Benjamin Edelman  112
15  Exhibit 5  Document entitled "Google Toolbar
     Tracks Browsing even after User
16     Choose Disable"    129
17  Exhibit 6  Search Engine Land, Blog Post,    131
     1/26/10
18
  Exhibit 7  Document entitled "Privacy Lapse at
19     Google JotSpot"    137
20  Exhibit 8  Document entitled "Google's JotSpot
     Exposes User Data"    139
21
  Exhibit 9  Declaration of Benjamin Edelman    143
22
  Exhibit 10 Supplemental Declaration of Benjamin
23     Edelman       143
24
25

---

Page 4

1
2     E X H I B I T S (Continued)
  NO.                    PAGE
3
4  Exhibit 11 Document entitled "The Online
     Economy: Strategy and
5     Entrepreneurship"    156
6  Exhibit 12 Declaration of Benjamin G. Edelman   161
7  Exhibit 13 Document entitled "Advertisers Using
     WhenU"    164
8
  Exhibit 14 Exhibit 1              171
9
  Exhibit 15 Document entitled "Google Books
10     Partner Program Standard Terms and
     Conditions"    213
11
  Exhibit 16 Search Inside, Publisher Sign-Up    221
12
  Exhibit 17 Participating Authors' Reprint
13     Agreement v2.0    228
14  Exhibit 18 Cooperative Agreement        267
15  Exhibit 19 Document entitled "NDA Never Existed" 270
16  Exhibit 20 Benjamin Edelman's Thesis    306
17
18
19     EXHIBITS RETAINED BY THE COURT REPORTER
20
21
22
23
24
25

Veritext National Deposition & Litigation Services
866 299-5127

Page 5

```
 1              P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  Good morning.  We
 3   are on the record at 10:03 A.M. on June 14th,
 4   2012.  This is the videotaped deposition of
 5   Benjamin Edelman.  My name is Jody Urbati, here
 6   with our court reporter Barbara Avis.  We are
 7   here from Veritext National Deposition and
 8   Litigation Services at the request of counsel.
 9        This deposition is being held at
10   Harvard Business School in the city of Boston,
11   Massachusetts.  The caption of this case is the
12   Authors Guild versus Google, Inc.  Please note
13   that the audio and video recording will take
14   place unless all parties agree to go off the
15   record.  Microphones are sensitive and may pick
16   up whispers, private conversations and cellular
17   interference.
18        At this time will counsel and all
19   present identify themselves for the record.
20        MR. GRATZ:  Joseph Gratz from Durie
21   Tangri, LLP in San Francisco for defendant
22   Google.
23        MR. BONI:  Michael Boni from Boni &
24   Zach, Bala Cynwyd, Pennsylvania for plaintiffs.
25        THE WITNESS:  Benjamin --
```

Page 6

```
 1        MR. BONI:  I'm sorry, and here
 2   representing the witness.
 3        THE VIDEOGRAPHER:  Thank you.  The
 4   witness will be sworn in and we can proceed.
 5           BENJAMIN G. EDELMAN,
 6   A witness called for examination, having been
 7   duly sworn, testified as follows:
 8           DIRECT EXAMINATION
 9   BY MR. GRATZ:
10     Q.  Good morning.
11     A.  Good morning.
12     Q.  Could you state your name for the
13   record, please.
14     A.  Benjamin Edelman.
15     Q.  And you're an assistant professor at
16   Harvard Business School; is that right?
17     A.  Yes.
18     Q.  Do you have tenure?
19     A.  No.
20     Q.  You have a number of degrees from
21   Harvard; is that right?
22     A.  Yes.
23     Q.  Are any of those degrees in computer
24   science?
25     A.  No.
```

Page 7

```
 1     Q.  You have an undergraduate degree and
 2   a Ph.D. in economics; is that right?
 3     A.  Yes.
 4     Q.  Do any of the opinions stated in your
 5   report apply economic analysis?
 6     A.  I think they do broadly understood,
 7   yes.
 8     Q.  How so?
 9     A.  The report considers the incentives
10   of various parties, the factors motivating them
11   to act or not to act and the likely consequences
12   of those incentives.
13     Q.  Are there any specific economic
14   methods that are applied in your report?
15        MR. BONI:  Object to form.
16     A.  I'm not sure I understand what you
17   mean.
18     Q.  What economic methods are applied in
19   your report?
20        MR. BONI: Same objection.
21     A.  My training and economics teaches me
22   to understand and analyze incentives in
23   considering the actions of any rational actor.
24   That method of analysis of considering and
25   applying incentives is applied throughout the
```

Page 8

```
 1   report.
 2     Q.  Can you tell me more about that
 3   method?
 4        MR. BONI:  Objection to form.
 5     A.  Well, you know I think it's pretty
 6   intuitive.  It can be structured in a formal
 7   algebraic model when a particular situation
 8   calls for that approach.  It can be studied
 9   empirically through large sample or small sample
10   data when the context calls for that approach.
11   It can also inform understanding and analysis
12   without specific application of modeling or of
13   large sample data analysis.
14     Q.  Did you apply any algebraic modeling
15   in preparing your report?
16     A.  No.
17     Q.  Did you apply any empirical large
18   sample data analysis in preparing your report?
19     A.  I wouldn't call it large sample data
20   analysis.  There are sections that draw on
21   specific examples considered individually which
22   probably is a better example of small sample
23   data analysis.
24     Q.  And those are the particular
25   anecdotes that you set forth in your report?
```

Page 9

1          MR. BONI:  Object to form.
2      A.  The particular examples that are
3  detailed in my report, yes.
4      Q.  And do you extrapolate from those
5  examples to reach conclusions that are more
6  general?
7      A.  I interpret those examples in order
8  to reach conclusions that are more general, yes.
9      Q.  By what means do you interpret those
10 examples to reach more general conclusions?
11     A.  I'm thinking in particular of a
12 section of my report about defects in other
13 Google offerings and the security and design
14 thereof.  And I examine a series of such defects
15 and conclude that defects are possible, indeed
16 even likely, even for products coming from a
17 company as esteemed and trusted as Google.  So
18 an argument from analogy, I suppose it's an
19 existence proof.  If one exists, then others
20 could also exist.  Straightforward, logical
21 reasoning to my eye.
22     Q.  And the proposition that if one
23 exists than others could also exist is an
24 application of your training in economics?
25         MR. BONI:  Object to form.

Page 10

1      A.  You know, I think it's a principle
2  that comes from multiple disciplines, training
3  and mathematics, statistics, economics, logic,
4  all the areas in which I have some training.
5  And all of which speak to the same underlying
6  logical principle which I don't think really
7  requires all that much specialized training.
8      Q.  And that principle is that the
9  existence of one example suggests that such an
10 example is, at least, not impossible and there
11 might be others.
12     A.  Precisely.  If one thought there were
13 no needles in a haystack, finding the first
14 needle suggests there might be more.
15     Q.  It doesn't make it certain that there
16 are any others; is that right?
17     A.  That's right.
18     Q.  And the only thing it tells you about
19 the probability of there being others is that --
20 strike that.
21         The only thing it tells you about the
22 probability of there being any needles in the
23 haystack -- strike that.
24         The only thing it tells you is about
25 the existence of any needles in the haystack,

Page 11

1  not whether there are necessarily other needles
2  in the haystack; is that right?
3      A.  I'm not sure.  Looking at the
4  specific examples can be quite informative and
5  understanding the kinds of problems that occur,
6  the frequency with which they occur, the
7  probability with which they occur.
8      Q.  How can you determine a probability
9  by looking at a single example?
10         MR. BONI:  Object to form.
11 Mischaracterizes the testimony.
12     A.  At first you can draw inferences
13 about a probability from a single example.  If
14 we saw that it rained on one out of five days,
15 we could draw inferences about the probability
16 of rain, even if those were the only five days
17 in which we had ever experienced a particular
18 city.  We could say the probability of rain
19 probably isn't 90 percent and probably isn't one
20 one-thousandth of a percent.  It's probably
21 something closer to 20 percent, and of course
22 with more data points you could draw a better
23 inference.
24     Q.  And those are the types of inferences
25 that you draw in your report?

Page 12

1      A.  That method of analysis consistent
2  with my training and my research and my
3  background informs the conclusions drawn in my
4  report.
5      Q.  That if something happens with a
6  certain frequency, it's likely to happen with
7  that frequency in the future?
8      A.  I wouldn't have put it quite as
9  simply as that, but that looking at the past can
10 inform inferences about the future.  That much,
11 absolutely.
12     Q.  Does that require economic analysis?
13     A.  I think economic analysis is quite
14 useful, particularly in understanding the
15 incentives that make it more or less likely that
16 a given problem will or won't occur.
17     Q.  Does the existence of the issue in
18 the first place inform you about what the
19 incentive structure is?
20         MR. BONI:  Object to form.
21     A.  Sometimes it does.  Sometimes seeing
22 a specific example helps crystalize
23 understanding of the problem.  Ah, I see because
24 of this problem, well, that resulted because of
25 this incentive, and so the specific example

3 (Pages 9 to 12)

1   really can help inform understanding.
2        Q.  Can you give me an understanding of
3   such an instance?
4        A.  Sure.
5        Q.  Please go ahead and do so.
6        A.  In January 2010 I uncovered the
7   Google Toolbar continuing to track user
8   behavior, what web pages users viewed even after
9   users had specifically disabled the toolbar,
10  even after the toolbar had confirmed that it was
11  disabled and even after the toolbar had
12  disappeared from view, seemingly further
13  confirming that it had ceased operation, but, in
14  fact, it continued operation.  It continued to
15  track users' most sensitive online activities.
16       That example helped me understand
17  Google's incentive to collect the data at issue,
18  users browsing.  Namely, it was always in
19  Google's interests to collect more data, the
20  more data the better for reasons that Google
21  well knows.
22       Users, meanwhile, were most concerned
23  about the appearance of their data being
24  collected.  What bugged users wasn't the actual
25  collection but the knowledge that the data was

1   being collected.  Users really had no way to
2   tell one way or the other whether or not the
3   data was being collected.  All they could tell
4   was whether they thought the data was being
5   collected.
6        So the understanding of the
7   incentives on both ends helped me understand the
8   cause of this problem, how it came to be that
9   Google allowed this defect to occur in quite a
10  widely used product and how it came to be that
11  users had failed to notice this defect, even
12  when it had been extant for several months at
13  that point.
14       Q.  This led you to the conclusion that
15  Google had an incentive to cause its software to
16  operate in that manner?
17       A.  At the very least, Google had little
18  incentive to check for this defect or to prevent
19  this defect.  One could consider the opposite
20  defect.  Suppose the toolbar had failed to
21  collect any of the data that Google wanted to
22  collect.  Would anyone have noticed that?
23  Absolutely.  Because the whole purpose of this
24  data collection system was, in fact, to collect
25  data.

1        Had it failed to collect any data
2   someone at Google would have noticed that in a
3   hurry; whereas, when it collected too much, that
4   was something that the Google engineers were
5   much less likely to notice.
6        Q.  Your master's degree is in
7   statistics; is that right?
8        A.  Yes.
9        Q.  Do any of the opinions stated in your
10  report apply statistical methods?
11       A.  As in our prior discussion, I think
12  the report is grounded in the approach of
13  statistics, in the analytical structure of
14  statistics, but doesn't apply the formal methods
15  of statistics; for example, the algebraic method
16  of statistics.
17       Q.  What methods of statistics does your
18  report apply?
19       A.  Hereto drawing on information from a
20  sample, history, in order to make inferences
21  about a larger population, that is, the future.
22  That's the essence of statistical inference, and
23  that's something that my report does repeatedly.
24       Q.  Does your report draw on any
25  statistical methods that are different from the

1   economic methods we've already discussed?
2        A.  I don't always draw a crisp
3   distinction between statistical methods and
4   economic methods, but I think we've discussed
5   the relevant methods of both of those
6   disciplines.
7        Q.  You have a law degree as well; is
8   that right?
9        A.  Yes.
10       Q.  Do you express any legal opinions in
11  your report?
12       A.  No.
13       Q.  In your course work, did you take any
14  courses dedicated to how to secure networked
15  computers from intrusion?
16       A.  I did not take any such courses as a
17  student.
18       Q.  Are you familiar with the
19  certification known as Certified Information
20  Systems Security Professional or CISSP?
21       A.  Yes.
22       Q.  What is it?
23       A.  It's a certification consistent with
24  the name, purporting to certify the skills and
25  background of a certified person in the area of

4 (Pages 13 to 16)

1  information security.
2      Q.  Are you certified as a CISSP?
3      A.  No.
4      Q.  Do you hold any other certifications
5  related to information security?
6      A.  Nothing comes to mind.
7          MR. GRATZ:  I'd like to mark as
8  Edelman Exhibit 1, this document.
9          (Report marked as Exhibit No. 1 for
10  identification.)
11     Q.  Do you recognize this document,
12  Mr. Edelman?
13     A.  Yes.
14     Q.  What is it?
15     A.  It's my expert report on this matter.
16     Q.  Turning your attention to
17  Paragraph 1, you say, "My research focuses on
18  the design of electronic marketplaces, including
19  Internet advertising, search engines, privacy
20  and information security.  Do you see that?
21     A.  Yes.
22     Q.  Turning first to advertising, what
23  Internet advertising systems have you done
24  research on?
25     A.  I've written about a variety of

1  Internet advertising systems, including search
2  engines and their paper click advertising
3  platforms, display advertising systems, and
4  display advertising exchanges, affiliate
5  marketing, listing services, for example, real
6  estate listings, apartment rentals.  There
7  probably are some more online advertising that
8  permeates my writing of the last decade.
9      Q.  What aspects of Internet advertising
10  systems did you research?
11         MR. BONI:  Object to form.  You can
12  answer.
13     A.  My best known academic article
14  explores the game theory of online advertising
15  and search engines, how much to bid, assuming
16  that the rules are structured in a particular
17  way.  I've written about fraud in advertising
18  marketplaces, whereby advertisers are
19  overcharged.  I've written about fraud, whereby
20  consumers are deceived, where an advertisement
21  offers something other than what it purports to
22  offer.
23         I've written about advertisement
24  labeling, whether advertisements are labeled as
25  such, whether applicable legal doctrines require

1  them to be labeled in a way different from the
2  way they are labeled.  Whether consumers can
3  distinguish between advertising content and
4  non-advertising content.
5      Q.  Did your research into advertising
6  relate to information security as it relates to
7  those marketplaces?
8      A.  In some instances, yes.
9      Q.  What instances are those?
10     A.  My understanding of information
11  security in the context of advertising would
12  certainly need to include whether an advertiser
13  charged the right amount, whether their ads are
14  placed in the correct places, whether they are
15  given truthful information about where and how
16  their ads performed.  And I've written about all
17  of those questions, including defects and
18  shortfalls in those areas.
19     Q.  Have you ever written about
20  intrusions into advertising systems by hackers?
21     A.  I have.
22     Q.  In what instances?
23     A.  I've written about a series of
24  hackers, fraudsters of multiple sorts who have
25  taken money from advertisers, money that they

1  were not entitled to according to any applicable
2  contract.  I've written about the methods
3  whereby they did so, the computer code that
4  allowed them to take the money, and the methods
5  that I used in order to catch them, the proposed
6  remediation of this problem, both in the short
7  run, how to get the money back, and in the long
8  run, how to make sure that it doesn't reoccur in
9  the future.
10     Q.  The code that you spoke of in your
11  previous answer, did it result in intrusion into
12  any computer systems?
13     A.  Yes.
14     Q.  What computer systems are those?
15     A.  The advertising tracking systems of
16  the victims of the respective frauds.
17     Q.  And how were those systems intruded
18  upon?
19     A.  Well, it varies from example to
20  example.  In one example that I'm -- that I'm
21  thinking of the intruder caused other people's
22  computers to connect to the victim's computer in
23  a way that caused false records to be created as
24  to the supposed efficacy of an advertising
25  system that, in fact, wasn't working at all, but

Page 21

1  the intrusion caused records to indicate that
2  the system was working quite well and caused the
3  advertiser to pay actually in the millions of
4  dollars of unearned commission payments.
5      Q.  Have they hacked into the tracking
6  system itself or merely caused other computers
7  to make false reports of ad impressions?
8      MR. BONI:  Object to form.
9      A.  I'm not sure I know what you mean by
10  the word "hacked" in that context.
11      Q.  Had they gained access to the --
12  strike that.
13      In the instance you're discussing,
14  had the fraudsters gained access to confidential
15  information on the systems of the ad network,
16  and by that I mean stored on the servers
17  operated by the ad network?
18      A.  In the example that I described, no
19  confidential information was involved one way or
20  the other.
21      Q.  It was a situation in which the
22  fraudsters were causing third-party computers to
23  make false reports to that ad tracking system;
24  is that right?
25      A.  That was one aspect of the problem.

Page 22

1      Q.  What were the other aspects?
2      A.  The fraudster was causing the ad
3  tracking system to believe that the
4  advertisements had been delivered and had caused
5  purchases to occur, when, in fact, neither of
6  those was the case.
7      Q.  How did they achieve that?
8      MR. BONI:  Object to form.
9      A.  That was achieved by a set of
10  computer codes using multiple programming
11  languages, at least one server, multiple client
12  computers and the victim's server all operating
13  in concert in a way directed by the perpetrator
14  in order to cause the false records to be
15  created.
16      Q.  Did the fraudsters have control of
17  the ad networks server?
18      A.  I don't know what you mean by
19  "control" in this circumstance.
20      Q.  Did the fraudsters gain information
21  from the ad networks server?
22      A.  I don't think the fraudsters wanted
23  information so much as millions of dollars which
24  they did gain successfully.
25      Q.  Was this a Botnet?

Page 23

1      A.  No.
2      Q.  Were the fraudsters operating a
3  server?
4      A.  Yes.
5      Q.  And that server communicated with
6  third-party computers?
7      A.  Yes.
8      Q.  And the communication between the
9  third-party computers and the server caused
10  those third-party computers to make reports to
11  the ad network; is that right?
12      A.  Yes.
13      Q.  And that was the method by which the
14  fraud was achieved; is that right?
15      A.  That's the essence of it.
16      Q.  And it was because those false
17  reports were made that the fraudsters were able
18  to make millions of dollars; is that right?
19      A.  That was one of the necessary steps,
20  multiple lines of causation, of course,
21  necessary to get such a large check.
22      Q.  Sure.  They had to actually write the
23  check.  They had to not have it caught by the
24  fraud systems and so on?
25      A.  Among others, yes.

Page 24

1      Q.  Any other instances in which your
2  research on advertising has related to
3  information security?
4      A.  So of course, there are other
5  examples in the realm of advertising fraud of
6  which I've just given you one.  A big one with a
7  large amount of money at issue and a criminal
8  indictment and so forth, but there are others
9  very much in the same vein.
10      Q.  In which the fraudsters are causing
11  false reports to be made to advertisers or
12  advertising networks; is that right?
13      A.  Broadly understood, yes.
14      Q.  What peer review publications
15  resulted from your research on Internet
16  advertising systems?
17      A.  The best known is my American
18  Economic Review article as to the gain theory of
19  sponsored search auctions.  There are various
20  others, I believe each of them listed on my CV.
21      Q.  Is your research on Internet
22  advertising a basis for any of the opinions in
23  your report?
24      A.  Not specifically.  In some areas
25  probably what I've learned about Internet

6 (Pages 21 to 24)

Page 25

1 advertising informs my understanding of other
2 information security matters and other matters
3 detailed in my report.
4     Q.  In what way?
5     A.  For example, information in
6 electronic form can be copied, often quite
7 easily and at minimal cost.  A gives it to B, B
8 gives it to C, and the chain can continue more
9 quickly and more easily and more accurately in
10 electronic form than, for example, on paper.
11 I've seen that in spades in online advertising
12 where the supply chain between an advertiser and
13 a publisher can have literally a dozen
14 intermediaries all made possible by the low cost
15 of electronic copying.  That's broadly at issue
16 in this case also and comes up in my report in
17 several areas.
18     Q.  Are there any other ways in which
19 your research on Internet advertising systems
20 forms a basis for any of the opinions in your
21 report?
22     A.  I'm just not sure.  I could reread
23 the report with an eye to that question.  I
24 considered the totality of my experience and
25 research, professional activities and so forth

Page 26

1 in drawing the conclusions that are in the
2 report.
3     Q.  Nothing else, specifically, comes to
4 mind right now?
5     A.  Not right now.
6     Q.  The second item you mentioned is
7 search engines.  What search engines have you
8 done research on?
9     A.  I've looked at a variety of search
10 engines.  I spent most of my time looking at
11 Google's practices, and Google is, of course,
12 the largest and most popular search engine in
13 most countries.  I've also looked at Yahoo.
14 I've looked at Bing and its predecessors.  I've
15 looked at Ask.com.  I've looked at AOL.  Various
16 others whose names aren't familiar to the
17 typical American consumer, but whose practices
18 I've also examined.
19     Q.  What research did you do relating to
20 search engines?
21     A.  I've written a variety of articles
22 about search engines.  I've written about the
23 labeling of advertising on search engines.  I've
24 written about the patterns of which results
25 appear where.  My first article about search

Page 27

1 engines was about certain results that were
2 systematically missing in certain countries.  So
3 you'd go to the French version of Google, and
4 there would be some sites that would never come
5 up.  Sometimes sites with terrible content that
6 might even be unlawful in France and sometimes
7 sites that seemed pretty unremarkable but
8 strangely would be missing nonetheless.
9         Other articles about quote unquote
10 bias, that is, the systematic favorable
11 treatment of some sources or some viewpoints
12 relative to others, methods of evaluating
13 whether such bias exists, preserving proof,
14 drawing comparisons and drawing inferences
15 between search engines on that question.
16     Q.  Anything else?
17     A.  I believe I've written about privacy
18 on search engines, about privacy of records of
19 users' activities.
20     Q.  Anything else?
21     A.  The size and prevalence of
22 advertising on search engines, other changes to
23 the layout, structure of visual presentation of
24 search engine results, the interaction between
25 Spyware and Adware on users' computers and

Page 28

1 search engines, search engine results.
2     Q.  Anything else?
3     A.  There probably are some more aspects
4 of search engines that I've written about.
5     Q.  Do they come to mind?
6     A.  Not right now.
7     Q.  Did any of your research relate to
8 the security of search engines against attacks
9 from hackers?
10     A.  Some of it, yes.
11     Q.  What research is that?
12     A.  For example, the research on Spyware
13 and Adware speaks to security issues on multiple
14 levels, security of the users' computers as
15 against the Spyware and Adware that have some
16 effects, potentially harmful effects, and
17 security and integrity of the search engine
18 result page to present results in the order and
19 format that the search engine intended, rather
20 than in some modified presentation, modified in
21 large part by the Spyware or Adware.
22     Q.  The security issues you described in
23 your previous answer are security issues that
24 relate to the security of an Internet user's
25 computer rather than to a server; is that right?

7 (Pages 25 to 28)

1    MR. BONI:  Object to form.
2        A.  I guess I don't think of it quite
3    that way.
4        Q.  Are you aware of any instance in
5    which Spyware or Adware has been installed on a
6    search engine's server?
7        A.  I guess I wouldn't use those terms to
8    describe the kinds of problems that I've been
9    looking at.
10       Q.  Are you aware of any situation in
11   which the data being served by a search engine's
12   servers has been affected by Spyware or Adware?
13       A.  I'm aware of many instances where the
14   data served by a web server has been affected by
15   software installed onto the web server.  Whether
16   that has occurred with search engines
17   specifically, I'm not sure one way or the other.
18       Q.  You don't know of any such instance?
19       A.  I guess it wouldn't usually be via
20   the mechanism of spyware or adware.  If one
21   wanted to influence the results shown by a
22   search engine, there would be other ways to make
23   that influence, but typically one wouldn't use
24   the words Spyware or adware to describe those
25   practices.

1        Q.  Are you aware of any instance in
2    which a party seeking a higher search engine
3    ranking has been successful in installing
4    software on a search engine's servers to achieve
5    that goal?
6        A.  Yes.
7        Q.  What instance is that?
8        A.  Google, itself, in order to grant its
9    own services preferred ranking installs software
10   onto its own search engine in order to achieve
11   that goal.
12       Q.  Are you aware of any other such
13   instances?
14       A.  Yes.
15       Q.  What instances are you aware of?
16       A.  I think other search engines also
17   typically do that to favor their own services
18   and their partner services and their prospective
19   partner services and others consistent with
20   their business objectives.
21       Q.  Does Bing do that?
22       A.  In some areas they do.
23       Q.  What areas are those?
24       A.  Well, I need to look at specific
25   searches, but, for example, if you were to

1    search for a map, if you typed in Boston map
2    into Bing, I would expect that a map would
3    appear, and that it would be a Bing map, and
4    that there's a software program installed into
5    the Bing server that causes that Bing map to
6    appear.
7        Q.  And that software was installed with
8    the authorization of the operator of that
9    server; is that right?
10       A.  That's right.
11       Q.  Are you aware of any instance in
12   which search rankings have been modified by
13   software which was installed without the
14   authorization of the operator of the search
15   engine?
16       A.  I've perceived some ambiguity in your
17   question which makes it hard for me to answer.
18       Q.  What's ambiguous about it?
19       MR. BONI:  Object to form.
20       A.  Why don't you just restate the
21   question.
22       Q.  Sure.  Are you aware of any instance
23   in which someone other than the search engine
24   has been successful in installing software on a
25   search engine's server for some purpose that was

1    not authorized by the search engine?
2        MR. BONI:  Object to form.
3        A.  Well, the notion of installing
4    software onto the server has multiple levels.
5    Certainly, providing data to a server that the
6    server then processes, it's quite routine for
7    publishers to provide data to a search engine in
8    hopes that the search engine process it in a way
9    that provides the publisher with preferred
10   listings.  And it's quite routine to do that
11   with predictable consequences; namely, obtaining
12   the preferred placement that is sought.  That
13   happens, sadly, every day.
14       Q.  What is the nature of the data that
15   you referred to that's sent to the server in
16   your previous answer?
17       A.  Well, it's computer code.  It's
18   interpreted by the server.  Is it executed by
19   the server?  I guess it depends.  Some of the
20   code actually does have to be executed in order
21   to have meaning because it doesn't have any
22   meaning until it is executed.  It can't stand
23   alone.
24       Q.  What programming language is that
25   data written in?

1     A.  It can be written in multiple
2  languages.  Classically, it would be written
3  simply in HTML.  More recently it would often be
4  written in JavaScript, in Flash.  It could be
5  written in a variety of other languages also.
6  Typically, a modern search engine would
7  nonetheless be able to receive that computer
8  code, execute it, interpret it and draw
9  conclusions about its implications.
10     Q.  And the code that you're talking
11  about is code that someone would post on their
12  website in order for the search engine to
13  download and index or otherwise -- or otherwise
14  use; is that right?
15     A.  That's one way it could happen.
16     Q.  What are the other ways?
17     A.  One could provide that code solely to
18  the search engine and not to anyone other than
19  the search engine, and indeed I've found
20  examples of that and have written about that.
21  In fact, was invited to the Google campus for
22  the first time after I had found a particularly
23  notable example of that.
24     Q.  And that is a situation in which a
25  web server operator would give a different

1  response to a request coming from a search
2  engine than coming from some other user?
3     A.  That's right.
4     Q.  And that response would be in the
5  form of sort of the elements that would
6  otherwise make up a web page like HTML,
7  JavaScript, CSS and so on?
8     A.  Yes.
9     Q.  Are you aware of any instance in
10  which the way in which the search engine
11  operates has been able -- has been able to be
12  modified by code that was downloaded from a
13  website that search engine was attempting to
14  index?
15        MR. BONI:  Object to form.
16     A.  I perceive some ambiguity in the
17  phrased way in which the search engine operates.
18     Q.  The point of these web pages that are
19  served just to the search engine is to try and
20  get a higher search engine ranking for that
21  website, generally; is that right?
22     A.  That is a common objective.  It's not
23  the only objective, but it probably is the most
24  common.
25     Q.  It might also be to try and reduce

1  the search engine ranking for some other website
2  or increase the search engine ranking for some
3  other website; is that right?
4     A.  Those are other common objectives.
5     Q.  And the way that they're trying to do
6  that is by providing input to the search engine
7  that the search engine will interpret in a way
8  that causes it to give that page a higher
9  ranking, for example; is that right?
10     A.  That's one common strategy.
11     Q.  They're not changing the algorithm
12  that's used to rank web pages; is that right?
13     A.  The examples we've been discussing so
14  far don't change the algorithm.
15     Q.  Are you aware of any instance in
16  which a hacker has been able to change the
17  search engine's algorithm.
18     A.  Yes.
19     Q.  What instances are those?
20     A.  Google engineers last year fed
21  systemically deceptive, maybe false data, to
22  Microsoft's search engine in an attempt to
23  sabotage Microsoft search engine and cause it to
24  display results that were nonsensical and
25  purportedly incriminating.

1     Q.  Could you tell me more about that?
2     A.  Google engineers believed correctly
3  that Microsoft Internet Explorer and certain
4  Microsoft toolbars when configured with certain
5  optional advanced features would track users'
6  clicking on results both at Microsoft's search
7  engines and other search engines such as Google
8  in order to draw inferences about developments
9  of particular results to particular queries.
10        Google engineers on multiple
11  computers, all off of the Google campus, rather
12  in the engineers' residences, intentionally
13  provided false data to Microsoft in order to
14  contaminate the data collected by Microsoft in
15  order to demonstrate that this feature was
16  working exactly as Microsoft had stated that it
17  would work and exactly as Microsoft had intended
18  it to work.  But by providing false data, they
19  were able to push the algorithm towards results
20  that were, in fact, nonsensical, thereby in
21  Google's view and the view of these staff
22  persons in some way demonstrating the
23  impropriety of Microsoft's activities in this
24  regard.
25     Q.  Do you think that was wrong?

1      A.  I'm not sure.
2      Q.  What factors go into that answer?
3          MR. BONI:  Object to form.
4      A.  Well, on one hand, it's fair game to
5  do what you want on your own computer in
6  general; to install software, run searches and
7  click results.  One wouldn't think that by
8  taking those steps with nothing more one had
9  done anything improper.  All of these searches
10  were actual searches run by people, not by
11  robots or automation.  The results were clicked
12  again by people not by robots or automation.
13      Where I thought Google went the most
14  astray was in their interpretation of what
15  occurred.  Had Microsoft done anything wrong?
16  Google says they had.  Google says that
17  Microsoft shouldn't have collected this data.
18  That even when users granted permission for
19  Microsoft to collect the data, the permission
20  wasn't the users' permission to give.  Only
21  Google can grant the permission for this data to
22  be collected or so Google would have us believe,
23  according to Google's statements on the subject.
24  And there I'm not so sure that's a notion of
25  two-party consent that, I think, just isn't

1  grounded in any principle, regulation, law or
2  other such authority in this area.
3      Q.  So the thing that Microsoft had done
4  that Google said was inappropriate in your view,
5  Google was not correct in their -- in their
6  assessment?
7      A.  I'm sorry.  I got a little bit
8  muddled about who thought what.
9      Q.  Sorry.  Do you think that Google was
10  correct in their assessment of what Microsoft
11  had done?
12      A.  I think they were correct on the
13  facts of what data Microsoft had collected and
14  how Microsoft had analyzed it.
15      Q.  Are you aware of any -- actually let
16  me ask another question.
17      Did the Bing search ranking algorithm
18  change the result of Google's actions?
19      A.  I'm not sure.
20      Q.  Are you aware of any instance in
21  which -- actually, strike that.
22      Did any internal portion of the Bing
23  search engine other than, of course, its index
24  of all of the websites that it had indexed
25  change as a result of Google's actions?

1      A.  I'm not sure.
2      Q.  Are you aware of any instance in
3  which the operation of a search engine has been
4  modified by hackers other than the instance in
5  which you just described?
6      A.  Yes.
7      Q.  What instance is that?
8      A.  I'm aware of a series of instances
9  whereby hackers have intentionally sent clicks,
10  either genuine clicks or fake clicks in order to
11  inflate the apparent click-through rate of
12  particular algorithmic results and particular
13  advertisements in order to influence search
14  engines' decisions about which algorithmic
15  results and which advertisements to display and
16  in what order to display them.
17      Q.  So by appearing to interact with the
18  search engine as if they were search engine
19  users, but, in fact, intending to manipulate the
20  search engine itself, these hackers were able to
21  change the internals of the search engine in
22  that way?
23          MR. BONI:  Object to form.
24      A.  They were certainly able to change
25  the order in which results appeared and which

1  results appeared.  You asked about the internals
2  of the search engine.  I'm not so sure about
3  that, but it seems to me that the essence of the
4  search engine is the output, and so if they were
5  able to change the output, I think they were
6  probably content with that.
7      Q.  But you don't know of any changes
8  that have ever been made other than to the
9  output as a result of hackers attempting to
10  intrude upon search engines; is that right?
11      A.  As to hackers attempting to intrude
12  on search engines, I know about some changes
13  other than -- well, I know about some actions
14  taken other than changes to the output.
15      Q.  Actions taken by whom?
16      A.  By the hackers.
17      Q.  What actions are those?
18      A.  It was reported in public news
19  sources, I believe cited in my expert report
20  that the Chinese hackers or suspected Chinese
21  hackers who intruded into Google systems one to
22  two years ago obtained access to source code,
23  including obtaining the ability to change source
24  code.  Whether or not they used that ability,
25  news coverage indicated that they obtained that

1    ability.  And that would be an action taken
2    other than the action of changing result
3    ordering.
4        Q.  Do you know whether those news
5    reports were accurate?
6        A.  I think there were multiple indicia
7    of accuracy.
8        Q.  Do you know what source code was
9    accessed?
10       A.  I don't recall specifically.
11       Q.  Do you know whether that source code
12   had anything to do with books?
13       A.  I'm not sure.
14       Q.  Do you know one way or the other?
15       A.  I think the source cited in my expert
16   report probably could tell us in short order,
17   but I don't recall sitting here today.
18       Q.  What is the source cited in your
19   expert report?
20       A.  Shall I flip to it?
21       Q.  Sure.  I'll direct your attention to
22   the top of page 8, the bottom of page 7.
23       A.  Great.  So you've directed my
24   attention correctly first as to the indicia
25   of the liability.  Footnote 18 cites the official

1    Google blog and a statement from none other than
2    David Drummond.  So if David says it is so, I
3    think that's a good prima facia reason to think
4    that it is.
5             Secondly, the analysis by McAfee, one
6    notch removed from Google to be sure, but with
7    the defensible methodology grounded in data that
8    they obtained from multiple sources, and
9    McAfee's trustworthiness I think requires no
10   further elaboration.  Look, if McAfee says that
11   this is what happened and no one rebuts it, I
12   think that's a pretty good reason to believe
13   that it is so.
14       Q.  Does the statement from David
15   Drummond that you cite in this report discuss
16   whether the hackers had access to source code?
17       A.  It does not.
18       Q.  Does the McAfee Labs blog post that
19   you cite in your report discuss whether hackers
20   had access to Google's source code?
21       A.  I think the report does discuss it.
22   Footnote 19 gives you the URL to the full
23   original report.  I'd want to review it further
24   before attempting to opine on exactly what it
25   says.

1        Q.  Do you recall one way or the other
2    whether that cited article discusses whether
3    those responsible for the intrusion discussed in
4    the blog post or the intrusion discussed in
5    Paragraph 35 gained access to Google's source
6    code?
7        A.  I don't recall.
8        Q.  Do you know whether the McAfee report
9    mentions Google at all?
10       A.  I think it does, but I'd want to go
11   and look at it again.  It seems like the easier
12   way to answer your questions would be to review
13   the document itself.
14       Q.  So you don't have a recollection as
15   to whether the document cited states that
16   hackers had specifically sought access to the
17   source code for Google systems and that hackers
18   had obtained the ability to alter the source
19   code for Google systems?
20       A.  That quoting verbatim from my expert
21   report when I wrote that sentence of my report,
22   I reviewed the McAfee document at issue and
23   summarized it in that sentence, and I believe
24   the summary is accurate as written.
25       Q.  But you don't remember whether that

1    document mentioned Google at all?
2        MR. BONI:  Object to form.
3        A.  I think it did.  It's just that the
4    fact that you ask about it in that way suggests
5    maybe you think it didn't, and rather than
6    speculate sitting here, I'd just take a moment
7    to go back and read the document to find out one
8    way or the other.
9        Q.  Maybe we'll do that later today.
10   What peer review publications -- actually strike
11   that.
12            Other than the instances we've
13   discussed, that is, attempting by interaction
14   with the search engine by its ordinary
15   interfaces to modify search engine rankings or
16   by the intrusions described in Paragraph 35 of
17   your report, are you aware of any other
18   intrusions into search engines?
19       A.  Yes.
20       Q.  What intrusions are those?
21       A.  First, I'm not sure that I'd describe
22   the actions of Google engineers using the
23   toolbar manipulation as the ordinary interfaces.
24   There's some of that that's ordinary, and
25   there's some of that that's quite extraordinary.

1   Putting that aside, I'm aware of other instances
2   in which website publishers have managed to
3   modify the operation of search engines in ways
4   not yet discussed.
5       Q.  And did they do that by manipulating
6   the data that their own web pages sent to the
7   search engine's crawler?
8       A.  In the example I'm thinking of right
9   now, yes.
10      Q.  Do you know of any instances in which
11  that -- a different method was used?
12      A.  Yes.
13      Q.  What instance is that?
14      A.  Some search engines including Google
15  search engine obtain a portion of their data,
16  not by a crawl but by a data feed, a particular
17  document using a particular pre-agreed structure
18  that provides particular information in a
19  particular format.  And through certain methods
20  pertaining to the data feed, putting data in a
21  particular format, it's possible to manipulate
22  the results obtained by that data feed collector
23  in order to alter both the substance of the
24  results that are displayed and the format of the
25  display.

1       Q.  Is that data feed known as a site
2   map?
3       A.  A site map is an example of a data
4   feed, but that's not what I was thinking of,
5   specifically.
6       Q.  What were you thinking of?
7       A.  I was thinking of a product data
8   feed.
9       Q.  What's a product data feed?
10      A.  Typically, it's a list of products
11  usually accompanied by descriptions, pricing
12  availability, perhaps images, other such
13  details.
14      Q.  That's information that a search
15  engine takes in in order to know what products
16  are offered by a particular website; is that
17  right?
18      A.  That's right.
19      Q.  And by manipulating the data that's
20  given to the search engine you might be able to
21  appear to have products you don't or appear to
22  have products with different qualities than your
23  actual products; is that right?
24      A.  Among other benefits.
25      Q.  And that's the -- that's the type of

1   intrusion that you're discussing right now; is
2   that right?
3       A.  No.  I had in mind a different kind
4   of intrusion.
5       Q.  What did you have in mind?
6       A.  It's possible, at least historically
7   has sometimes been possible, to produce an
8   invalid syntax in your data feed such that the
9   very attempts to process your invalid data feed
10  can corrupt either the data stored in the search
11  engine servers or the method whereby the search
12  engine presents results to users causing
13  something else altogether to appear when a user
14  runs a search.
15      Q.  What search engines have been the
16  victims of that type of attack?
17      A.  I think multiple search engines have
18  been the victims of that kind of attack.
19      Q.  Can you list the ones that you know
20  of?
21      A.  I can't recall specifically.  They're
22  not the big five U.S. search engines.
23      Q.  And by providing data in a corrupted
24  form to these search engines, the fraudsters
25  were able to manipulate the results or change

1   them in some way?
2       A.  Yes.
3       Q.  Were they able to gain root access to
4   the search engine's servers?
5       A.  I don't think they sought root access
6   to the search engine's servers.  I don't know
7   whether they were able to obtain it.
8       Q.  Are you familiar with the term "root
9   access"?
10      A.  Yes.
11      Q.  What does root access mean?
12      A.  Typically, the term "root access" is
13  used to refer to an operation mode of a computer
14  system where it's possible to change any aspect
15  of the computer system without any limitation
16  whatsoever.
17      Q.  Are you aware of any situation in
18  which an outside intruder has been able to gain
19  root access to a search engine's servers?
20      A.  I'm not aware one way or the other.
21      Q.  What peer review publications have
22  resulted from your research on search engines?
23      A.  Can I flip through the CV?
24      Q.  Sure.
25      A.  Be quickest that way.  So that papers

Page 49

1  previously discussed as to advertising, many of
2  them are as to search engine advertising and
3  thus fit dually.  For example, the first three
4  under the heading "Representative Research" all
5  are as to search engine advertising.  Others in
6  this list also as to search engine advertising,
7  the article about typo-squatting is about a
8  particular place where advertisements can be
9  placed via a search engine onto other sites.  If
10  there's an element of advertising, there's an
11  element of search engines.
12          The article titled "Adverse
13  Selection" and "Online Trust Certifications" in
14  search results contains quite an extended
15  discussion of the trustworthiness of certain
16  search results.
17          The "Rustlers and Sheriff's" piece
18  considers certain practices at search engines.
19  Internet filtering in China discusses the
20  filtering of certain search results, advertising
21  disclosures, label search engines.  It
22  continues.  There are quite a few.
23      Q.  Is your research on search engines a
24  basis for any of the opinions in your report?
25      A.  I think it is generally, yes.

Page 50

1      Q.  How so?
2      A.  My work on search engines explores
3  the operation and incentives of interconnected
4  systems the way that the systems can be used and
5  have been used and the consequences of that use.
6      Q.  What does that have to do with the
7  opinions you set forth in your report?
8      A.  My report discusses the way that
9  certain books search services can be used and
10  what's likely to happen if they are used in that
11  way, which is informed by the way other online
12  systems that are already more broadly in use,
13  the way that they have been used and what has
14  happened there.
15      Q.  So they influence your opinions in
16  that which has happened already to search
17  engines may happen to book search engines in the
18  future?
19      A.  That's right.
20      Q.  The next area of interest or research
21  that you mention is privacy.  What research have
22  you done on electronic privacy?
23      A.  I mentioned one article as to the
24  Google Toolbar privacy problems.  I've written a
25  series of other pieces about privacy.  I think

Page 51

1  my writing in this area began with an instance
2  in which Buy.com, a popular online retailer, was
3  mistakenly publishing the names, street address
4  and phone number of every customer who had ever
5  made a product return to Buy.com.  That was an
6  error, a breach of their privacy policy, which
7  to they credit, they corrected after I brought
8  to their attention.
9          I've uncovered other privacy errors,
10  instances in which the Google JotSpot service
11  was sharing documents specifically contrary to
12  users' instructions to JotSpot.  You tell it not
13  to share your document with anyone, and they
14  share it anyway.  And a problem that was
15  corrected by Google somewhat after I brought it
16  to their attention.
17      Q.  Did any of your research on privacy
18  relate to security against computer intrusion?
19      A.  I think of privacy and security as
20  two sides of the same coin.  Privacy is security
21  of your private information, and so I would say
22  that all of the privacy matters relate to
23  security.  Security from what?  Security from
24  viewing, security from intrusion, broadly
25  understood.

Page 52

1      Q.  Do you draw a distinction between
2  unauthorized access to computer systems and
3  malfunctioning computer systems that disclose
4  private information?
5          MR. BONI:  Object to form.
6      A.  I certainly draw a distinction
7  between systems that are malfunctioning versus
8  systems that are functioning in the way that
9  their designers intended.  Though, of course,
10  figuring out what their designers intended and
11  whether a malfunction has actually occurred can
12  sometimes be difficult.  I'm not so sure about
13  the specific distinction that you raise.  Maybe
14  you could rephrase it, and I could give you a
15  better answer.
16          MR. GRATZ:  Let's change the tape.
17          THE VIDEOGRAPHER:  The end of Tape 1.
18  Off the record 11:03 a.m.
19          (Brief recess.)
20          THE VIDEOGRAPHER:  Here begins Tape
21  No. 2 in today's deposition of Benjamin Edelman.
22  Back on the record 11:09 a.m.
23      Q.  Mr. Edelman, when you refer to
24  security, you're speaking broadly of everything
25  from avoiding intrusions into computer systems

13 (Pages 49 to 52)

Page 53

1  to steal confidential data to ensuring that the
2  data collected by websites is fully disclosed to
3  users; is that right?
4      MR. BONI:  Object to form.
5      A.  I wouldn't ordinarily say that
6  disclosing information collection practices
7  falls within security.  I think it does on a
8  broad understanding of security, but I probably
9  wouldn't have used the term that way in the
10  ordinary course.
11      Q.  In your report when you discuss
12  security, are you applying the broad -- the
13  broad view of security you mention in your last
14  answer or some narrower view?
15      A.  In general, I think I'm applying a
16  slightly narrower view than the -- than my last
17  answer and then the question that preceded my
18  last answer.
19      Q.  What scope of the term "security" do
20  you apply in your report?
21      A.  When I use the term "security" in the
22  report, I begin with notions that attach to
23  changing the underlying code of the computer
24  system; for example, obtaining root access and
25  the benefits associated with that, but I

Page 54

1  definitely also include taking advantage of the
2  computer system working in exactly the way that
3  it's installed or operator intended.
4      So for example, Frank calls in the
5  middle of the night calling your telephone over
6  and over when you're trying to sleep.  That's
7  not a malfunction of the telephone.  The
8  telephone is working exactly as intended when
9  someone calls you, the ringer activates and
10  makes a sound.  And yet from your perspective,
11  your telephone is quite insecure because it
12  keeps waking you up when you're trying to sleep.
13      So too in the context of obtaining
14  information online.  If a large amount of
15  information can be obtained perhaps piece by
16  piece, that could be an example of a lack of
17  security.
18      Q.  What security issue is presented by
19  prank calls in the middle of the night?  I'm
20  asking in what sense is that a security issue?
21      A.  One wouldn't ordinarily use the word
22  security to describe the freedom from being
23  awoken by the telephone.  The sense in which
24  that example is helpful is that it gives an
25  example of a system working exactly as the

Page 55

1  engineer intended, that the telephone rings when
2  it is called, and yet in a way quite contrary to
3  what the user intended, probably even contrary
4  to what the phone company intended, at least in
5  a marketing sense when they touted the benefits
6  of obtaining a telephone to your residence.
7      Q.  And that is encompassed in the use of
8  the term "security" as you use it in your
9  report?
10      A.  The analog in an information system
11  is encompassed.
12      Q.  What is the -- sorry, I don't mean to
13  interrupt.  What is the analog in an information
14  system?
15      MR. BONI:  Why don't you ask the
16  question and let him answer the question.  You
17  were in the middle of an answer, but let's make
18  sure we're clear on what the question was.  So
19  that you can answer it.  You want to read back
20  the last question, please.
21      (Last question read back.)
22      Q.  Are prank calls in the middle of the
23  night encompassed within the term "security" as
24  you use it in your report?
25      A.  I think prank calls may not be the

Page 56

1  most helpful example in understanding what I
2  mean by the word "security."  But a very similar
3  example actually may be more helpful; Spam
4  e-mail, unsolicited commercial e-mail, is an
5  example of the e-mail system on one view working
6  completely reliably.  The Spamer sends you 4,000
7  e-mails, and your e-mail program displays to you
8  4,000 e-mails.  It's working perfectly, a
9  hundred percent, and yet from your perspective
10  as a user, your e-mail is quite insecure.  It
11  has been clogged up by the Spamer, and then the
12  important message from your friend or associate
13  is buried under the mountain of Spam.  So I
14  would use the word "security" to describe that
15  problem and that concern.
16      Q.  And that category of concern and that
17  scope of security is -- strike that.
18      That's the scope of the term
19  "security" that you use in your report?
20      A.  That kind of problem, a system that
21  works maybe too well, that works in a way
22  different from what the marketing folks
23  intended, yet consistent with what the
24  engineering folks intended, that's an example of
25  something that I believe does fall within the

14 (Pages 53 to 56)

1  meaning of the word "security."
2     Q.  Is your research on electronic
3  privacy a basis for any of the opinions in your
4  report?
5     A.  It is.
6     Q.  What opinions are those?
7     A.  I have opinions on the difficulty of
8  securing access to information, of limiting
9  access so that particular users can obtain
10  particular information in particular
11  circumstances, but not other information in
12  other circumstances. Those are questions and
13  concerns that arise often in the context of
14  privacy and also arise in the context of the
15  book services here at issue.
16     Q.  What has your research into privacy
17  shown you that you relied on in forming your
18  opinions in your report?
19     A.  First, my research into privacy has
20  shown me just how difficult these challenges
21  are, that even excellent companies with capable
22  engineers and diligent managers sometimes fail
23  to achieve what they set out to achieve. They
24  make mistakes, frankly. These are difficult
25  areas where perfection is unlikely and not often

1  seen.
2     Second, my work on privacy has
3  distinctively shown the difficulty of securing
4  information so that some people can get some of
5  it some of the time, but not everyone can get
6  everything all of the time. I suspect it
7  wouldn't be hard to design an information system
8  for which no one can get information ever. Step
9  one, set the information on fire. Step two,
10  wait for the fire to consume it completely. The
11  end. That would be straightforward actually. I
12  think we could run that system so reliably that
13  it would operate with a very, very high level of
14  performance.
15     On the other hand, securing the
16  information so that only some people can get it
17  or people can only get part of it, requires
18  engineering decisions that are actually quite a
19  bit more difficult.
20     Q.  Is that a task that is undertaken by
21  every electronic information storage system?
22     MR. BONI: Object to form.
23     A.  I wouldn't say every electronic
24  information storage system undertakes that task.
25     Q.  What electronic information storage

1  systems other than the example you gave of
2  setting the information on fire and never
3  looking at it again, what infor -- electronic
4  information storage systems do not present that
5  difficulty?
6     A.  For example, information that is
7  freely available to the public in unlimited
8  quantity and without restriction, the U.S.
9  government printing office allows you to obtain
10  the U.S. code in whatever quantity you want as
11  often as you want, free of charge. They face
12  minimal need to restrict access to the
13  information that they provide.
14     Even ordinary Google search, you can
15  run as many searches as you want and no great
16  harm results if you run too many searches. The
17  operators of the search service might try to
18  figure out if you're a robot, and if you are,
19  they might try to stop you from running
20  searches, but if they fail to stop some robots
21  some of the time, no great harm results. So
22  those are much lower stakes games.
23     Q.  Is there an index underlying the
24  Google search service?
25     MR. BONI: Object to form.

1     A.  My understanding is that there is an
2  index underlying the Google search service.
3     Q.  And one can by running searches query
4  that index at least in part; is that right?
5     A.  Yes.
6     Q.  Are you aware of any instance in
7  which the entire Google search index has been
8  acquired by an outside party?
9     A.  I'm not aware of any instance in
10  which an outside party has obtained the entire
11  Google search index.
12     Q.  So in that sense, Google has been
13  successful in permitting access to certain
14  information under certain circumstances and not
15  to a bulk download of the whole; is that right?
16     A.  I don't think that the facts just
17  discussed supported the conclusion in your last
18  question.
19     Q.  Why not?
20     A.  There have been instances in which
21  users have used the Google search service to
22  obtain more information than Google intended to
23  provide and use that information even for
24  harmful purposes. So the fact that Google
25  managed to prevent any single person from

Veritext National Deposition & Litigation Services
866 299-5127

1    obtaining all of the information doesn't mean
2    that the system is working as well as your last
3    question suggested.
4        Q.  Google has successfully permitted
5    access to certain information and not other
6    information with respect to its search service;
7    is that right?
8        A.  You know the word "successful" is
9    tricky.  When an editor at CNET obtained the
10   home address and charitable contributions of the
11   then CEO of Google, Google, using the Google
12   search tools, Google responded in quite a
13   negative way, including banning that publication
14   from interviewing any Google staff for a full
15   year.
16           So that seems to be an instance
17   wherein Google thought that its own search
18   service had either malfunctioned or had been
19   abused by someone who had taken advantage of the
20   search engine providing more information than it
21   should have provided.
22       Q.  Did the search engine malfunction in
23   that instance?
24       A.  In my view it did not.  In my view it
25   functioned exactly as the engineers intended.

1        Q.  Did the search engine provide any
2    information in that instance that its technical
3    design indicated that it should not provide?
4        A.  I don't think so.
5        Q.  That was an instance in which the
6    search engine provided information that had been
7    indexed from a third-party website; is that
8    right?
9        A.  At least in part.
10       Q.  And the information, the presence of
11   the information on a third-party website was
12   that which was objected to rather than the fact
13   that Google search engine had made that
14   information able to be found; is that right?
15       A.  I'm not quite sure what --
16           MR. BONI:  Object.
17       A.  -- Google objected to in that
18   circumstance.
19       Q.  Do you think that that was a security
20   breach -- strike that.
21           Do you think that the instance in
22   which a Google employee's home address was able
23   to be found from a third-party website using the
24   Google search engine was a security breach?
25           MR. BONI:  Object to form.

1        A.  I probably wouldn't have used the
2    phrase "security breach" to characterize that
3    occurrence.
4        Q.  Are you aware of any instance in
5    which Google's search ranking algorithm has been
6    made public?
7        A.  I'm aware of some instances where a
8    portion of -- portions of the algorithm,
9    specific decisions and specific circumstances
10   have been made public.
11       Q.  That's because they had been deduced
12   by looking at the results of searches; is that
13   right?
14       A.  That's one way, but it's not the only
15   way.
16       Q.  Had they been acquired by intruding
17   into Google's servers?
18       A.  I'm not sure.  It's possible that
19   some have, but I don't have any examples of that
20   in mind.
21       Q.  You don't know that that's ever
22   happened?
23       A.  I don't know that anyone has ever
24   obtained information about algorithms by, for
25   example, obtaining root level access as

1    discussed.
2        Q.  Would you agree with me that the
3    Google search engine is not -- strike that.
4            Would you agree with me that the
5    Google search engine is a way of allowing people
6    to get access to some but not all of the
7    information that Google stores?
8            MR. BONI:  Object to form.
9        A.  Certainly there's some information
10   that Google stores that you can't access using
11   the Google search engine.  You can't access
12   Google's internal payroll data using Google
13   search engine, and yet that is data that Google
14   stores.  So does the Google search engine
15   provide access to some but not all?  Yes, it
16   provides access to some but not all.
17       Q.  And there are some search results
18   that would otherwise be displayed in Google's
19   search results that have been removed for one
20   reason or another; are you familiar with that?
21       A.  Yes.
22       Q.  And those search results are not
23   displayed to users; is that right?
24       A.  In certain circumstances some of the
25   results are not displayed to users.

16 (Pages 61 to 64)

Page 65

1    Q.  Are you aware of any instance in
2  which an intruder has been able to gain access
3  to those search results which Google has
4  removed?
5    A.  Yes, I think I've done that
6  personally.
7    Q.  Could you tell me about that?
8    A.  So the project I described previously
9  where certain sites were missing from Google.FR,
10  the French version of Google, I ran a set of
11  comparisons, and I recall tens of thousands of
12  comparisons between Google.com and Google.FR.
13  As an intruder I was able to nonetheless make
14  that comparison between the two Google search
15  services and determine which results were
16  omitted.
17    Q.  In what sense were you an intruder?
18    A.  I was certainly an outsider to
19  Google.  I had no privileged access to their
20  computer systems, no special account, no root
21  access, and yet I was able to obtain this
22  information which Google didn't otherwise make
23  available to the public and use that information
24  to demonstrate that Mr. Drummond himself had
25  made false statements on an official written

Page 66

1  statement of Google policy statements that
2  turned out to be contrary to the facts as I
3  demonstrated them.
4    Q.  Do you think that Mr. Drummond was
5  lying?
6    A.  He wasn't telling the truth.
7    Q.  Do you think that that was wrong?
8    A.  I'm not sure if he knew subjectively,
9  internally at the time when he made the false
10  statement, I don't know whether he knew that it
11  was false.
12    Q.  Do you think that Google should be
13  punished for that?
14    A.  You know, the damage to the consumer
15  public was that people thought Google was a
16  little bit better as a search engine than it
17  really was.  Of all of the misrepresentations of
18  product attributes or qualities, I don't think
19  this is the most significant or the most
20  material.
21    Q.  Of all of Google's
22  misrepresentations?
23    A.  Yes.
24    Q.  Tell me about Google's other
25  misrepresentations?

Page 67

1    A.  One that I've been thinking about in
2  some detail is the claim that results come from
3  an algorithm, which I think is at the very least
4  deceptive because it fails to give full credit
5  to the significant control and judgment that
6  staff exercised in configuring the algorithm and
7  in otherwise overriding the algorithm, adjusting
8  search results.  I think that that false
9  statement probably is material.  It's quite a
10  few users who care quite a bit about whether
11  they're getting a computer's opinion or a
12  person's opinion, and that's a subject on which
13  Google has made very firm commitments over a
14  period of years.
15    Q.  Do you think that Google was doing
16  something bad by making those commitments?
17    MR. BONI:  Object to form.
18    A.  I think there were multiple forces
19  within Google.  Some staff wanted the service to
20  work in one way.  Some wanted it to work in a
21  different way.  And we see that internal tension
22  borne out in inconsistent statements by various
23  Google staff, as well as inconsistent practices,
24  both inconsistent at a given moment in time and
25  inconsistent over time.

Page 68

1    Q.  Do you think that Google lied to the
2  public?
3    MR. BONI:  Object to form.
4    A.  I think there are some subjects on
5  which Google has been less than forthright.
6  There probably are some areas where Google's
7  staff simply didn't tell the truth.  But
8  sometimes, perhaps mistakenly, based on
9  incomplete information available to the given
10  person making the statement, there might be
11  instances in which Google affirmatively made
12  false statements.
13    Just yesterday, I suppose the UK
14  privacy commissioner announced their
15  investigation alleging exactly that, and so I
16  wouldn't be alone in thinking that some false
17  statements may have been made.
18    Q.  Do you think that Google should be
19  punished for making those statements?
20    MR. BONI:  Object to form.
21    A.  I guess you'd have to look at the
22  specific statement, the specific statutory basis
23  for any enforcement action, but I think all the
24  laws should be enforced strictly as to all
25  potential violators, and so I'd have to look one

Page 69

1   by one.
2       Q.  Have you ever created a data
3   base-backed website?
4       A.  Yes.
5       Q.  Could you give me an example of such
6   a site?
7       A.  Sure.  I have a website that gives
8   examples of false and deceptive advertisements
9   that I saw at Google, and I stored those
10  advertisements in a database and then displayed
11  that database to interested viewers of that
12  portion of my website.
13      Q.  What's the URL of that website?
14      A.  Ben Edelman.org/PPC-scams maybe slash
15  list.  I'm not sure about the slash list, but I
16  think that's correct.
17      Q.  This is a website that you've created
18  that includes a number of advertisements shown
19  via Google's ad network; is that right?
20      A.  These are all advertisements that I
21  personally saw on the Google search engine which
22  is -- you could call it the Google ad network.
23  I'd probably call it just the Google search
24  engine, to be very clear about it.  There might
25  be a very few that were submitted by outsiders

Page 70

1   that I personally verified before adding them to
2   this list.
3       Q.  Does this include ads from any other
4   search engines?
5          MR. BONI: I'm sorry, Joe, does what
6   include?  The list?
7       Q.  Does your PPC -- so this web page is
8   about false or deceptive paper click ads; is
9   that right?
10      A.  Yes.
11      Q.  Does it include false or deceptive
12  paper click ads from anywhere but Google?
13      A.  I don't recall.
14      Q.  Can you think of any ads that it
15  includes from places other than Google?
16      A.  I suspect that many of these
17  advertisers were using other search engine
18  advertising platforms, also.
19      Q.  But your website is just about the
20  Google ads; is that right?
21      A.  I believe my website lists the search
22  term that I entered into Google and the position
23  and location on which I saw that ad at Google,
24  and, in fact, in general provides an image
25  screen shot, a partial image screen shot of the

Page 71

1   portion of the Google results page where I saw
2   that advertisement.
3       Q.  What sort of database is behind this
4   page?
5       A.  I believe this one actually is a text
6   file that is processed by text to database
7   engine and then sorted and output into the HTML
8   in the way that you may be viewing now.
9       Q.  Do any database queries occur at the
10  time a user visits the web page?
11      A.  Yes.
12      Q.  Is there any information in the
13  database that's not displayed?
14      A.  Yes.
15      Q.  What information is that?
16      A.  I think the exact date and time of
17  submission, the IP address of submission, the
18  e-mail address of the user who made the
19  submission.  There probably are some other
20  fields.
21      Q.  And have you been successful in
22  preventing that other information from being
23  displayed?
24      A.  I've been successful in preventing
25  that information from being displayed at the

Page 72

1   specific URL that I dictated to you.  Whether
2   I've been successful in preventing that
3   information from being obtained by others at
4   other URLs, I'm not sure.
5       Q.  Could you explain your last answer.
6       A.  Maybe someone knows how to get that
7   material from my web server even though I didn't
8   intend to provide it.
9       Q.  Do you know whether anyone has?
10      A.  I don't know one way or the other.
11      Q.  Have you taken measures to prevent
12  that?
13      A.  I've attempted to.
14      Q.  And as far as you know, you've been
15  successful?
16         MR. BONI:  He just said he doesn't
17  know one way or the other.
18      A.  I'm really not sure in that if I had
19  been unsuccessful, I doubt anyone would tell me
20  that I had been unsuccessful.
21      Q.  How many submissions on this page are
22  from people other than you?
23      A.  I think not very many.  It never
24  really took off.  I wouldn't be surprised if it
25  was less than ten.

18 (Pages 69 to 72)

Page 73

1        MR. BONI:  Joe, by "this page," could
2 you just put into the record what you're
3 referring to that you have up on your laptop,
4 the website URL in question.
5        MR. GRATA:  Sure.
6        MR. BONI:  So the record's complete.
7        MR. GRATZ:  It was the URL -- I'm
8 referring by "this page" to the URL that
9 Mr. Edelman dictated to me; namely,
10 www.BenEdelman.org/PPC-scams/list.
11        MR. BONI:  Thank you.
12    Q.  If you were unsuccessful in
13 preventing that information in the database from
14 being taken by an intruder, the private e-mail
15 addresses of those who submitted advertisements
16 to you for display on this page would be
17 disclosed; is that right?
18    A.  Yes.
19    Q.  And their IP addresses would be
20 disclosed; is that right?
21    A.  I believe it would be the IP address
22 of the user at the time of submission, which
23 might or might not be quote unquote their IP
24 address in any lasting sense.
25    Q.  Do you consider that to be private

Page 74

1 information nonetheless?
2    A.  It depends, but sometimes it is.
3    Q.  And you consider this security of
4 this website from intrusion good enough to
5 include that private information in the database
6 which lies behind it; is that right?
7    MR. BONI: I'm sorry.  Object to
8 form.  That characterizes the witness's
9 testimony.
10    A.  I consider this approach suitable
11 under the circumstances, primarily due to the
12 nature and quantity of the information being
13 secured.
14    Q.  And if there were higher value
15 information, you would regard greater security
16 measures as being necessary?
17    A.  Certainly appropriate and possibly
18 necessary.
19    Q.  Have you -- do you operate any other
20 database-backed website?
21    A.  Yes.
22    Q.  What websites are those?
23    A.  I have a website called Voucher
24 Complaints.org whereby users can register their
25 consumer law grievance as to Groupon vouchers,

Page 75

1 Google offers vouchers and similar prepurchase
2 discounts.  And then in light of the user's
3 concern, this tool will actually write a
4 complaint letter grounded in applicable law at
5 the user's direction customized in light of the
6 user's concerns, the user's state of residence,
7 the merchant's states of the residence, the
8 voucher services state of residence, citing
9 appropriate authority for the user then to
10 submit if they so choose.
11    Q.  Does it store the submission in a
12 database?
13    A.  It does.
14    Q.  And those submissions include the
15 e-mail addresses of those who submit?
16    A.  Yes.
17    Q.  Are you aware of any intrusion into
18 that database resulting in the -- resulting in
19 the taking of those e-mail addresses?
20    A.  I am not.
21    Q.  What security measures do you have in
22 place to prevent that sort of intrusion?
23    A.  One important security measure that
24 my technician student installed at my direction
25 was that the system never stores the voucher

Page 76

1 number of a user's pre-purchased voucher.  That
2 means that the most important piece of
3 information, the information that actually has
4 cash redeemable value is not in our server ever,
5 not even for instant.  So if we got hacked,
6 there wouldn't be any money to be taken, nor
7 anything that's redeemable for goods or
8 services.
9    Q.  Do you operate any other data
10 based-back websites?
11    A.  Yes.
12    Q.  What websites are those?
13    A.  The website query.ipensatori.com.
14 That's i-p-e-n-s-a-t-o-r-i.com.
15    Q.  What is ipensatori.com?
16    A.  That's a domain name registered by my
17 friend, and for some purposes, business partner,
18 Wesley Brandi.
19    Q.  For what purposes is Mr. Brandi your
20 business partner?
21    A.  We have a collaboration in detecting
22 certain online advertising fraud and certain
23 other improprieties.
24    Q.  What other improprieties are those?
25    A.  We're still figuring it out.  But we

19 (Pages 73 to 76)

Page 77

1  have a general purpose detection tool that can
2  detect all manner of things happening on the
3  Internet that shouldn't happen, and depending on
4  client needs, I suppose we configure it
5  appropriately.
6      Q.   The database that lies behind
7  query.ipensatori.com, does it include any
8  confidential information?
9      A.   It does.
10     Q.   What information is that?
11     A.   There are two separate data bases.
12 There's a database of the users who have made
13 requests to the query tool, and the query tool
14 retains information about who used it, name,
15 e-mail address, employer, what the search was.
16 Some of those fields, of course, being optional.
17     And secondly, there's a database of
18 our research findings. The purpose of the tool
19 is to allow users to view a portion of our
20 research findings, and so our research findings
21 are embodied in the database that the tool
22 accesses as needed.
23     Q.   Do you make the entirety of your
24 research findings available for bulk download?
25     MR. BONI:  Object to form.

Page 78

1      A.   We do not make the entirety available
2  for bulk download.
3      Q.   Why not?
4      A.   We prefer to obtain some records.
5  I'll be it, limited and minimal, but still some
6  of who accesses which portions of the database.
7      Q.   Would fraudsters be interested in the
8  results of your research?
9      A.   I'm not sure.
10     MR. BONI:  Object to form.  Go ahead,
11 Ben.
12     A.   We thought about that at some length
13 and concluded that we could publish this data
14 such that even if a fraudster took the entirety
15 of the data, it wouldn't really give them any
16 significant advantage in perpetrating their
17 fraud or in avoiding detection by us or anyone
18 else.
19     Q.   Do you know whether the entirety of
20 the data lying behind the query.ipensatori.com
21 website that you operate has been taken by an
22 intruder?
23     A.   I believe that it has not been, but
24 it's hard to say for sure.
25     Q.   And you say it's hard to say for sure

Page 79

1  because even a well-secured electronic system is
2  not entirely foolproof in all circumstances?
3      A.   That's one of the reasons.
4      Q.   Why else?
5      A.   There are quite a few attack modes
6  that would be unlikely to leave any records or
7  fingerprints or other evidence that could be
8  detected, or if it could be detected, then I
9  would actually successfully detect personally,
10 given my skills and capabilities, and given that
11 I have other activities and don't spend that
12 much time each day checking whether anyone has
13 attacked this tool.
14     Q.   With additional skills and additional
15 time to do so, would that it make it more likely
16 that you would detect an attack?
17     A.   Sure.  Putting more time into it
18 would make it more likely that I would detect
19 it.  Conversely, if I put better data into the
20 tool, that would make it more likely that
21 someone would want to attack it and would
22 redouble his efforts to attack it without being
23 detected.  So there are multiple factors that
24 can make it both more and less likely that an
25 attack would occur or would be detected if it

Page 80

1  did occur.
2      Q.   So you're not aware of any such
3  attacks sitting here today?
4      A.   That's right.
5      Q.   Do you operate any other data
6  based-backed websites?
7      A.   I do.
8      Q.   Could you list them for me?
9      A.   I think there are many of them.  And
10 even the tense of your question operate versus
11 used to operate.
12     Q.   Just sticking with right now which of
13 the data based-backed sites -- which of the data
14 based-backed websites that you operate contains,
15 in your estimation, the most high value data?
16     MR. BONI:  Object to form.
17     Q.   And by "high value," let me -- let me
18 clarify that.  The data most attractive to an
19 intruder?
20     MR. BONI:  Same objection.  Joe, do
21 you mean relative to his universe of data based
22 backed websites or more in the absolute.
23     Q.   Rank them in order in your head and
24 give me the first one.
25     A.   Yes.  The first one is the internal

20 (Pages 77 to 80)

1  database that Wesley and I access internally
2  that keeps records of all of the advertising
3  fraud incidents that our tools have identified.
4       Q.   Is that database connected directly
5  to any web server?
6       A.   No.
7       Q.   And it's a portion of that database
8  that's extracted and then used to provide the
9  query.ipensatori.com website; is that right?
10      A.   That's one use of a portion of the
11 database.
12      Q.   That database, where is it stored?
13      A.   It's stored in Wesley's basement.
14      Q.   Is it stored in the same computer
15 that runs the query.ipensatori.com website?
16      A.   No.
17      Q.   Why not?
18      A.   We believe that it is more likely to
19 be secure if we store it on a separate computer.
20 Well, really there are a variety of reasons of
21 which that's just one.
22      Q.   Is the computer on which its stored
23 connected to the Internet.
24      A.   It is.
25      Q.   Is it behind a firewall.

1       A.   I think broadly understood, it's
2  behind a fire wall.  It's behind some security
3  apparatus that would colloquially be called a
4  firewall.
5       Q.   Are you aware of any intrusion that
6  has allowed access to that database of all of
7  your research results with respect to
8  advertising fraud?
9       A.   No.
10      Q.   What's the next most valuable
11 database among those that you operate?
12           MR. BONI:  Object to form.
13      A.   Next most is probably the query tool
14 which we've already discussed.
15      Q.   Turning back to Paragraph 1 of your
16 report, you list information security as one of
17 the areas of your research focus.  Is research
18 on information security a more or a less
19 significant focus of your research than research
20 on Internet advertising, search engines or
21 privacy?
22           MR. BONI:  Object to form.
23      A.   There are multiple ways of thinking
24 about that.  In terms of my academic vitae, I
25 think most people would say my work on search

1  engine and advertising dominates my vitae.  On
2  the other hand, I'm proud of my work on
3  information security.  Some of it was original
4  and important and set the stage for other's work
5  that followed.  And often information security
6  work lays an important groundwork for some other
7  activity such as understanding advertising fraud
8  or understanding privacy problems.  So they are
9  definitely all interrelated.
10      Q.   When you say the "information
11 security work," you're referring to the
12 activities that we've discussed relating to
13 security previously today?
14      A.   I think there also are quite a few
15 that we haven't discussed.
16      Q.   Do any of them relate to gaining root
17 access on a server connected to the Internet?
18      A.   I've largely been looking at aspects
19 of information security other than gaining
20 access at a root server level.
21      Q.   Has any of your research looked at
22 gaining access to Internet connected servers on
23 a root level?
24      A.   I certainly have written about
25 gaining access to Internet connected devices on

1  a root level.  Much of the Spyware and adware
2  work entails exactly that, and I had some
3  important work in that vein that I could tell
4  you about.  But those are end users devices
5  rather than servers.
6       Q.   And gaining root access to an end
7  user device is a different enterprise than
8  gaining root access to an Internet connected
9  server; is that right?
10      A.   Sometimes it is, and sometimes it
11 isn't.
12      Q.   But as we've discussed, you're not
13 aware of any instances in which executable
14 Spyware has been executed on Internet-connected
15 servers; is that right?
16      A.   I think I'm aware of such instances.
17      Q.   Were those -- who operated those
18 servers in those instances?
19      A.   There have been a set of instances in
20 which the servers operated by both banks and
21 retailers as to credit card processing have been
22 infiltrated by a set of devices that obtained
23 either root level access or other access
24 sufficient to obtain user's credit card numbers,
25 expiration dates, billing addresses and zip

Page 85

1  codes and so forth, the information that the
2  attackers sought in any event.  And those had
3  been attacks perpetrated by obtaining access to
4  servers with the required security levels.
5      Q.  So what you're saying is banks'
6  servers had been hacked into, and root level
7  access or similar access gained somehow passed?
8      A.  Both banks and merchants.
9      Q.  Can you recall an instance in which
10  you described the areas on which your research
11  focuses without including information security?
12      A.  Yes.
13      Q.  What instance is that?
14      A.  I suspect the bio on HBS website
15  doesn't use the phrase "information security,"
16  although I'm confident that it discusses some of
17  my work in the area of information security.
18      Q.  Why didn't it use the phrase
19  "information security"?
20      A.  I'm not sure.  I wrote it.  So I
21  could have used that phrase had I wanted to.  I
22  think I was attempting to fit more within the
23  area of research of my colleagues of this
24  hallway who are largely economists.  And so I
25  was there structuring my focus to emphasize the

Page 86

1  economics aspects of my research and to somewhat
2  downplay the computer science aspects of the
3  research.
4      Q.  Are you -- can you recall any other
5  instance in which you describe the areas on
6  which your research focuses without including
7  information security?
8      A.  Sure.
9      Q.  What instance is that?
10      A.  I'm sure bios and converse
11  description and description of the speaker and
12  so forth, typically.  Usually, any reference to
13  any information security.
14      Q.  Why is that?
15      A.  Usually, I find myself speaking to
16  advertisers or publishers or online business
17  people more generally, and they usually would
18  not be drawn to information security and such.
19  Even though it's important to what they do, they
20  wouldn't regard it as important or strategic,
21  and so presenting other aspects of my work would
22  be more likely to capture their interest and
23  attention.
24      Q.  What other instances can you recall
25  in which you describe these areas on which your

Page 87

1  research focuses without including information
2  security?
3      A.  I was recently evaluated for a
4  promotion by the Harvard Business School and had
5  to prepare a personal statement.  I know that
6  the personal statement discussed my work in the
7  area of information security, but I doubt that
8  it used the phrase "information security."
9      Q.  And the work in information security
10  that was discussed is the -- is the work on
11  spyware, advertising, privacy and so on that
12  we've discussed?
13      A.  I think it includes those.  There's
14  others also.
15      Q.  Is there any work that you've done
16  that is more germane to Internet security --
17  strike that.
18          Is there any work that you've done
19  that is more germane to information security
20  than the work that we have discussed thus far
21  today?
22      A.  I think there is actually.
23      Q.  What work is that?
24      A.  The first matter which I was retained
25  as an expert was the matter captioned National

Page 88

1  Football League versus I Crave TV, and that was
2  1999 or 2000.  In that matter a Canadian company
3  was copying American network television to a
4  video format, not unlike YouTube except live
5  rather than recorded.  My work in that case and
6  subsequent publications, comments to regulators
7  and so forth, were grounded in the remarkable
8  difficulty of securing that video content
9  against those who might further copy and wish to
10  access it in violation of applicable law.
11      Q.  Anything else that is more germane to
12  information security than that which we have
13  discussed so far today?
14      A.  Yes.
15      Q.  What's that?
16      A.  I had a set of projects as to
17  Internet filtering, attempting to determine what
18  websites were blocked by what commercial
19  filters, by what library filters, by what school
20  filters, by what national filters.  In some
21  instances affecting entire countries.  Well, in
22  a portion of that project, I wished to take
23  apart a series of commercial Internet filters in
24  order to determine what websites those filters
25  blocked.  The list was installed on a server in

22 (Pages 85 to 88)

Page 89

1    m office, in my custody, and I needed to access
2    this data secured within the server, although
3    there were, in fact, some impediments to
4    accessing the data.
5        Q.  And did you circumvent those
6    impediments?
7        A.  I developed some methods to
8    circumvent a portion of the impediments.  Other
9    impediments were more difficult, both for
10   technical and for legal reasons.
11       Q.  Did this project result in
12   litigation?
13       A.  One aspect of it did.
14       Q.  Were you the plaintiff in that
15   litigation?
16       A.  Yes.
17       Q.  What was the claim that you made in
18   that litigation, and actually -- sorry, let me
19   ask.  Was that the Edelman versus N2H2
20   litigation?
21       A.  Yes.
22       Q.  What was your claim as a plaintiff in
23   that litigation?
24       A.  That was a declaratory judgment
25   action seeking guidance from the court as to

Page 90

1    whether it would be lawful for me to circumvent
2    an information system that constrained access to
3    a list of websites being filtered.
4        Q.  What was the result of that
5    litigation?
6        A.  The court refused to give any
7    guidance one way or the other.
8        Q.  On what grounds did the court so
9    refuse?
10       A.  I believe it was standing mootness.
11   Something procedural and early in that vein.
12       Q.  Following the court's decision, did
13   you proceed with the project?
14       A.  I abandoned the project, at least in
15   that respect.
16       Q.  Who was your counsel in that
17   litigation?
18       A.  The American Civil Liberties Union,
19   national office.
20       Q.  Do you have any other areas of
21   research that are more germane to information
22   security than those we've already discussed?
23       A.  Well, we've discussed spyware and
24   adware only to a limited extent, but that's
25   clearly important to information security,

Page 91

1    particularly as to the significant security
2    vulnerabilities that had given rise to the
3    installation of spyware and adware and about
4    which I have written in great detail.
5        Q.  Anything else?
6        A.  And my first publication on any
7    subject was a manual on how to use software
8    called Trumpet Winsock to connect to Net.com.
9    Net.com, being an early unlimited Internet
10   service provider, which I believe uniquely at
11   that time would provide unlimited Internet
12   access for $20 a month.  This was in an era of
13   monthly charges.  I think I was about
14   15-years-old at the time and figured out how to
15   use Trumpet to connect to Netcom, which was
16   important at that point because Trumpet would
17   allow you to use Netscape and Udora and other
18   software that you might very much want to use.
19       Well, this was an information
20   security project because the Netcom service was
21   bundled with software called Net Cruiser which
22   was viewed as strategically significant from
23   Netcom corporation.  I think mistakenly viewed.
24   They thought that it would be good for them to
25   provide your e-mail program and your web browser

Page 92

1    and your Internet access service.  They were
2    mistaken.  They would have been better off
3    providing only Internet access, but they didn't
4    know that.
5        So they wanted users to accept the
6    entire bundle.  I wanted to use only a portion
7    of the bundle and to bring my own software at my
8    own expense for other services, and I determined
9    how to do that and wrote an article explaining
10   how to do it which raised significant questions
11   of security, frankly; namely, was their system
12   secure against people like me, and it turned out
13   that it was not.
14       Q.  Was that a peer-reviewed article?
15       A.  Well, it wasn't published in a
16   traditional journal.  On the other hand, I
17   discussed it with genuine peers, people who
18   really knew this material, including the
19   software developers who wrote development
20   software and later the engineers at the Netcom
21   Corporation.  So the relevant experts were
22   absolutely consulted and offered feedback and
23   opinions in great detail.
24       Q.  Of your research, can you recall any
25   other research, other than that which we've

23 (Pages 89 to 92)

Page 93

1  discussed today, which is more germane to
2  information security than that which we've
3  discussed already?
4      A.  Yes.  Here's another one that's more
5  germane than much of what we've discussed.
6  Yahoo operates an advertising service called
7  Right Media which has a very, very large
8  proportion of deceptive advertisements.  Perhaps
9  30 percent or more of the Right Media
10  advertisements are deceptive by Yahoo's own
11  classification system, and here's how I know
12  that:  As a Right Media publisher, a person
13  authorized to put Right Media advertisements
14  onto my website, I logged into the Right Media
15  interface and carefully excluded each of the
16  various categories of deceptive ads,
17  individually and in various combinations and
18  noted the proportion of advertisements that were
19  respectively excluded when I activated the
20  various category exclusions.
21      In that way, I was able to obtain
22  from Yahoo's server the proportion of Yahoo's
23  advertisement that according to Yahoo's own
24  staff were deceptive and indeed unlawful.  And
25  to demonstrate that a very sizable fraction of

Page 94

1  Yahoo's advertisements had this problem and then
2  to post those screen shots to my website along
3  with a discussion of the business, marketing and
4  legal questions posed, which prompted an
5  investigation by a state attorney general,
6  compelling Yahoo to change some of those
7  practices.
8      Q.  Do you consider your work on Right
9  Media an intrusion into a computer system?
10      A.  I believe Yahoo considered it an
11  intrusion into their computer system.
12      Q.  Do you consider it an intrusion into
13  a computer system?
14      A.  I'm not sure.  I see both sides of
15  it.
16      Q.  Were you able through your intrusion
17  to gain access to any confidential Yahoo or
18  Right Media information?
19      MR. BONI:  Object to form.
20  Mischaracterizes the testimony.
21      A.  Yahoo took the position that the
22  information they provided to me in my capacity
23  as publisher was confidential and should not
24  have been presented on my website or disclosed
25  to anyone else.

Page 95

1      Q.  You nonetheless published it; is that
2  right?
3      A.  Yes.
4      Q.  Had you entered into any agreements
5  with Yahoo at the time that you published that
6  information?
7      A.  There was a standard click-through
8  agreement for which, frankly, I don't recall the
9  terms one way or another.
10      Q.  Do you recall whether there were
11  confidentiality terms?
12      A.  I don't recall one way or the other.
13      Q.  Did you check whether there were
14  confidentiality terms before publishing this
15  information?
16      A.  I think I thought about the legal
17  questions posed, and I expect that I would have
18  checked the confidentiality terms and resolved
19  the question to my satisfaction before
20  proceeding.
21      Q.  If there had been confidentiality
22  terms, would you have proceeded?
23      A.  I might have.
24      Q.  Why?
25      A.  I might have concluded that the terms

Page 96

1  didn't apply to the information that I was
2  publishing, didn't apply to this purpose, to
3  demonstrate unlawful conduct and Yahoo's
4  knowledge thereof, were contrary to public
5  policy, and therefore, unenforceable or for some
6  other reason were deficient or defective.
7      Q.  Do you remember what conclusion you
8  came to on those questions?
9      A.  The bottom line was that I should
10  publish the article, and I don't recall the
11  specific intermediary steps that took me to that
12  conclusion.
13      Q.  How is Right Media research germane
14  to information security?
15      A.  There was a set of information that
16  Yahoo wanted to keep away from public view and
17  away from, for example, the attorneys general
18  who ultimately investigated.  They wanted their
19  own employees to be able to classify
20  advertisements, and they wanted publishers to
21  make informed decisions about which categories
22  of advertisements to accept.  After all,
23  accepting the deceptive advertisements was
24  actually quite important to Yahoo's business
25  because they could make significant money from

Page 97

1    their revenue share, their commission for
2    putting the deceptive advertisements onto
3    publishers' sites.
4          So they wanted publishers to be able
5    to accept the deceptive advertisements, but they
6    didn't want it to be required.  Good publishers
7    would insist on excluding them.  Well, Yahoo had
8    this set of complicated business objectives.
9    They wanted the ads classified in this way.
10   They wanted these people to see this
11   information, and these people not to see it.
12   And unfortunately for them, it was difficult to
13   thread the needle, that is, difficult to provide
14   exactly that information only to the people that
15   Yahoo wanted to provide it to because as I
16   demonstrated, one of the people who received the
17   information might elect to republish it to
18   Yahoo's detriment.
19        Q.  Even in the face of a confidentiality
20   agreement requiring to the contrary?
21        A.  Perhaps.
22          MR. GRATZ:  Let's change the tape.
23          THE VIDEOGRAPHER:  Here ends Tape 2.
24   Off the record 12:09 p.m.
25          (Brief recess.)

Page 98

1          THE VIDEOGRAPHER:  Here begins Tape
2    No. 3 in today's deposition of Benjamin Edelman.
3    Back on the record, 12:13 p.m.
4        Q.  Mr. Edelman, have you ever been the
5    subject of a contempt motion?
6        A.  I have.
7        Q.  Could you tell me about that?
8        A.  This was a contempt motion brought by
9    WhenU, a spyware or adware company, depending on
10   who you ask, that alleged that I had violated a
11   portion of a protective order.
12          MR. GRATZ:  We'll mark this as
13   Edelman 2.
14          (Document marked as Exhibit No. 2 for
15   identification.)
16        Q.  You have before you what's been
17   marked as Edelman 2.  Do you recognize this
18   document?
19        A.  Yes.
20        Q.  What is it?
21        A.  It's WhenU's motion.
22        Q.  Did WhenU settle -- excuse me.
23          Do you know whether this motion was
24   ruled upon?
25        A.  It was not.

Page 99

1        Q.  And it wasn't ruled upon because the
2    case settled very shortly after it was filed; is
3    that right?
4        A.  I don't think that's correct.
5        Q.  Why wasn't it ruled on?
6        A.  I think it wasn't ruled on because
7    WhenU withdrew the motion.
8        Q.  Did WhenU withdraw the motion
9    contemporaneously or roughly contemporaneously
10   with a settlement of litigation?
11        A.  No.  I think the litigation continued
12   for more than a year thereafter, as I recall.
13   Well, I'm not sure.  But in any event, if there
14   was a settlement, it was unrelated to the
15   withdrawal of the motion, to the best of my
16   knowledge.
17        Q.  What was the allegation in that
18   contempt motion?
19        A.  The allegation was that I disclosed
20   or otherwise used testimony that was given under
21   seal in writing an article on my website.
22        Q.  In describing your expertise in
23   previous expert reports, have you ever omitted
24   to include any mention of information security?
25        A.  Usually, in an expert report, I

Page 100

1    discuss the experience that is relevant to that
2    matter.  Thinking about the most recent
3    instances in which I've served as an expert, I
4    don't think information security would have been
5    particularly relevant, and therefore, I probably
6    wouldn't have mentioned it.
7        Q.  Do you consider Internet advertising
8    search engines and privacy particularly relevant
9    to the issues in this case?
10        A.  Some more than others, but because
11   those are so central to the overwhelming
12   majority of my research, I mentioned them almost
13   as a matter of course, whether or not they're
14   relevant.
15        Q.  And information security falls into a
16   different category?
17          MR. BONI:  Object to form.
18        A.  I think information security is
19   somewhat less prominent in my research.  It
20   still permeates the research, but particularly
21   given widespread view that information security
22   is somehow less important or is best left to
23   technicians and is not of general significance,
24   it's something I'd be less likely to mention
25   unless it was specifically at the core of the

25 (Pages 97 to 100)

Page 101

1  matter.
2       MR. GRATZ:  Let's mark this as
3  Exhibit 3.
4       (Document marked as Exhibit No. 3 for
5  identification.)
6    Q.  Do you recognize this document?
7    A.  Yes.
8    Q.  Turning to -- actually what is this
9  document?
10   A.  It begins with my expert report in a
11 dispute between AOL, owner of Netscape, and
12 Valueclick.  It looks like it continues with a
13 set of attachments.  I'd need to flip through it
14 all to be sure.
15   Q.  In your expert report in the
16 Valueclick case, did you opine on issues of
17 information security?
18   A.  I need to think back for a moment to
19 remember what was at issue in that case.
20       MR. BONI:  Take your time and look at
21 the report.
22   A.  I think Paragraph 11 purports to
23 summarize my opinions, and as I recall, it does
24 summarize my opinions.  This is largely about
25 the structure of online advertising markets and

Page 102

1  the import of cookies in online advertising
2  markets.  There's significant technical analysis
3  of whether or not the cookies work as
4  instructed, whether or not the cookies are
5  defective in some way, whether browsers
6  correctly process the cookies.  All questions
7  very much grounded in whether information
8  systems work in the way that they might have
9  been expected to or whether they malfunction in
10 some way.  Whether that's information security
11 or not, that's  diagnosis and analysis of the
12 functioning of information systems.
13   Q.  Would you say that your opinions in
14 the Valueclick case have more or less to do with
15 information security than your opinions in this
16 case?
17   A.  Less.
18   Q.  And in describing your background and
19 qualifications in the Valueclick case, you don't
20 identify any expertise in information security;
21 is that right?
22   A.  Let me check.  Well, in Paragraph 1,
23 for example, I discuss various aspects of
24 advertising which is what was at issue in the
25 case here, the Valueclick case.  I don't discuss

Page 103

1  information security in Paragraph 1.
2    Q.  Do you identify expertise and
3  information security in any other portion of the
4  description of your background and
5  qualifications?
6    A.  I'm sure I attach my CV to the expert
7  report as required by the applicable rules, and
8  that does discuss information security via the
9  various articles on that subject.  The word
10 secure, securing does appear in the title of an
11 article in Paragraph 3.  I think there's --
12 there's discussion of information and security.
13   Q.  But it's not an important enough
14 reason or interest to appear in the second
15 sentence of Paragraph 1?
16   A.  I don't think that's the reason why
17 it doesn't appear.  It doesn't appear in the
18 second sentence of Paragraph 1 because it's not
19 as germane to the expert opinions presented in
20 this expert report.
21   Q.  Whereas affiliate marketing is
22 described there, but does not appear in
23 Paragraph 1 of your report of this case; is that
24 right?
25   A.  That's true.  If we were to flip

Page 104

1  through a variety of my expert reports, I think
2  we'd find that, first, they copied this
3  paragraph, and second, the end of that sentence
4  especially tends to be customized a bit
5  according to the context in which that report is
6  being prepared.
7    Q.  Turning to your CV in this case,
8  attached to your report, under experience you
9  identify certain research interests.  Do you see
10 that?
11   A.  Yes.
12   Q.  Is information security listed among
13 those research interests?
14   A.  Automated data collection actually is
15 quite closely related to information security,
16 but -- and information security permeates the
17 other listed research interests, but it's not
18 listed specifically by that name.
19   Q.  Have you ever provided consulting
20 services or expert witness services with respect
21 to subject matter as to which you did not
22 consider yourself an expert?
23   A.  No.
24   Q.  Do you consider yourself an expert on
25 the subject matter of computer security?

26 (Pages 101 to 104)

1       MR. BONI:  Object to form.
2       A.   There are aspects of computer
3   security on which I do consider myself an
4   expert, and there are other aspects of computer
5   security on which I don't consider myself an
6   expert.
7       Q.   On which aspects of computer security
8   do you consider yourself an expert?
9       A.   I consider myself an expert in areas
10  of information security in a multiuser online
11  information system, partial access to
12  information, context in which some information
13  is made available to some people but not others,
14  information systems where some information is
15  available to the general public without
16  restriction or login.
17          Conversely, at the other end of the
18  spectrum, for example, as to the most technical
19  aspects of hacking, finding the specific
20  security defects that allowed an attacker to
21  circumvent a security control, in general,
22  that's something that I would have less to say
23  about.
24      Q.   But you nonetheless consider yourself
25  qualified to opine on the subject of computer

1   security generally?
2       MR. BONI:  Object to form.  You can
3   answer.
4       A.   I'm sure there are some questions of
5   computer security that I wouldn't consider
6   myself qualified to opine on, but as to the
7   questions presented in this report, the
8   questions on which I was asked to opine, I
9   consider myself an expert for the purpose of
10  those questions.
11      Q.   So you said you don't consider
12  yourself an expert in sort of determining the
13  means by which a particular intrusion occurred
14  at the code level; is that right?
15      MR. BONI:  Object to form.
16      A.   I think that slightly
17  mischaracterizes it, but it's probably
18  satisfactory in many purposes.
19      Q.   In what other areas of computer
20  security do you not consider yourself an expert?
21      A.   There are people with specialized
22  expertise on physical security, vaults, tamper
23  proof screws, tamper evidence seals.  Some very
24  important work, frankly.  And I haven't written
25  on that subject, haven't learned much about it

1   beyond what an ordinary computer professional
2   would be likely to know.
3       Q.   Anything else?
4       A.   Sure.  You know, there are many
5   facets of information security.  And we could go
6   through the numerous specialized fields.
7   Hardware security modules, specialized computer
8   chips that provide security benefits, I'm
9   familiar about them only incidentally from a
10  particular single matter, but wouldn't consider
11  myself an expert in hardware security modules in
12  general.
13      Q.   How to conduct a penetration test of
14  a system?
15      A.   Well, I wouldn't be so quick on that
16  one.  There are some systems for which I could
17  appropriately design a penetration test.  Some
18  systems for which I have personally performed a
19  penetration test and have achieved the
20  penetration.  So it all depends on the kind of
21  system and the kind of testing that is under
22  consideration.
23      Q.   Have you ever designed or performed a
24  penetration test with respect to a system which
25  stored digital books?

1       A.   No.
2       Q.   Do you consider yourself an expert on
3   the subject of online advertising?
4       A.   Yes.
5       Q.   Do you consider yourself an expert on
6   the subject of advertising fraud?
7       A.   Yes.
8       Q.   Do you consider yourself an expert on
9   the subject of spyware?
10      A.   Yes.
11      Q.   Do you consider yourself an expert on
12  the subject of Spam?
13      A.   Some aspects of Spam more than
14  others.  I wouldn't be as unqualified with that
15  one.
16      Q.   Do you consider yourself an expert on
17  the subject of Internet filtering?
18      A.   Certainly there was a time when I was
19  as close to that subject as anyone.  Now I'm
20  less sure, but there certainly are aspects of it
21  where I put myself out as an expert.
22      Q.   Do you consider yourself an expert on
23  the subject of geolocation?
24      MR. BONI:  Just to be fair, what it
25  says in his CV is geolocation and targeting.

27 (Pages 105 to 108)

Page 109

1      Q.  Mr. Edelman, do you consider yourself
2  an expert on the subject of geolocation?
3          MR. BONI:  Object to form.
4      A.  There are aspects of geolocation on
5  which I have offered expert opinions.  And
6  geolocation has changed somewhat since that time
7  and has become more complicated in multiple
8  respects, so there are portions of geolocation
9  on which I would not put myself out as an
10  expert.
11      Q.  Do you have greater or lesser degree
12  of expertise in the area of geolocation than in
13  information security?
14      A.  It's hard to make that comparison
15  because the term "information security" is just
16  such a broad term that encompasses so much.
17  There are portions of information security where
18  I have a much deeper understanding and a much
19  more current understanding than I have today of
20  geolocation.
21      Q.  Do you consider yourself an expert on
22  the subject of privacy?
23      A.  On some aspects of privacy.  Privacy
24  also is quite broad.  Probably even broader than
25  information security.

Page 110

1      Q.  Do you consider yourself an expert on
2  the subject of online privacy?
3      A.  Even there the term is quite broad
4  and comparable in breadth to information
5  security.
6      Q.  What areas of online privacy do you
7  consider yourself an expert in?
8      A.  I have expertise in data collection
9  from personal computers, especially Windows
10  computers, data collected by websites, data
11  collected through mechanisms in websites such as
12  HTML, JavaScript and Flash, methods of
13  determining forensically what data is collected
14  or has been collected, interpreting log files,
15  forensically interpreting historic records.
16  Those are the areas of privacy where I have done
17  the most work.
18      Q.  Do you consider yourself an expert in
19  the subject of automated data collection?
20      A.  Yes.
21      Q.  Do you consider yourself an expert on
22  the subject of user interface design?
23      A.  Some aspects of user interface
24  design.
25      Q.  On what aspects of user interface

Page 111

1  design do you consider yourself an expert?
2      A.  I think my greatest expertise is at
3  the intersection of user interface design and
4  consumer law, disclosures.  I would make myself
5  less than expert on the ordinary questions of
6  ease of use and user friendliness, intuitiveness
7  and so forth.
8      Q.  Of the areas of expertise that we've
9  just discussed, are there any in which you have
10  a greater degree of expertise than in the area
11  of information security?
12      A.  The thing about these areas is that
13  they vary just dramatically in their breadth.
14  So you see on the list that we just discussed,
15  you see something like advertising fraud, where
16  I might have coined the term "online advertising
17  fraud."  In any event, I think I have the single
18  best website on that subject on the whole
19  Internet.  I'm the guy if you want to talk about
20  online advertising fraud.  In part because it's
21  kind of a small subject, and at least in the
22  sense that not that many people are interested.
23  Maybe more people should be interested.
24          Conversely, for a huge subject like
25  privacy or information security, there are just

Page 112

1  many more subfields, and so it's like apples and
2  oranges to try to compare those two.
3          MR. GRATZ:  Let's mark this as I
4  guess, we're on Exhibit 4.
5          (Document marked as Exhibit No. 4 for
6  identification.)
7      Q.  We have before you what's been marked
8  as Exhibit 4.  Do you recognize this document?
9      A.  Yes.
10      Q.  Is this a true and correct copy of an
11  expert report you submitted in Multnomah County
12  Public Library versus United States on October
13  15, 2001?
14      A.  It seems to be.
15      Q.  Turning to page 2, you say, "My
16  experience includes six years as an Internet web
17  server administrator, including operation of a
18  server ordinarily receiving more than 20,000
19  hits per day."  Do you see that?
20      A.  Yes.
21      Q.  What server was that?
22      A.  I think I must have been referring to
23  the main Berkman Center server as it stood at
24  that time.
25      Q.  Were you the primary administrator of

28 (Pages 109 to 112)

Page 113

1    that server as of October 15, 2001?
2         MR. BONI: Object to form.
3         A.  I'm not sure if October 15th, 2001 is
4    the date of this report.  Just take a moment to
5    check that.  I certainly was during a period on
6    or about that time.  I think my time as the
7    primary administrator might have ended shortly
8    before then.
9         Q.  Are you aware of any intrusions --
10   actually strike that.
11        The primary Berkman web server, are
12   you referring to the web server at
13   Ciber.law.Harvard.edu?
14        A.  That was the domain name that
15   associated with the server that I administered.
16        Q.  Was that a data based-backed website?
17        A.  It was in part.
18        Q.  Are you aware of any intrusions that
19   resulted in the disclosure of confidential
20   information from that server when you were its
21   administrator?
22        A.  There were intrusions into that
23   server.  I don't know what information, if any,
24   was obtained during those intrusions.
25        Q.  What intrusions were those?

Page 114

1         A.  That was a Windows server, and it was
2    subject to the -- I believe it was called SQL
3    slammer, was an early worm.  There were some
4    other worms.  It's hard to recall a decade later
5    which one specifically managed to infect that
6    server and which ones I successfully blocked.
7         Q.  But you don't recall any that
8    resulted in the disclosure of confidential
9    information?
10        A.  Well, if they did result in that
11   disclosure, I don't think I learned about it.  I
12   don't know one way or the other.  One of our
13   main protection strategies, of course, was to
14   try not to keep sensitive, high-risk,
15   confidential information on that server for a
16   variety of reasons, including the perceived
17   vulnerabilities of the server and the fact that
18   it was connected to the Internet in quite an
19   exposed way.
20        Q.  Did your work as an Internet web
21   server administrator begin in about 1995?
22        A.  Yes.
23        Q.  How old were you in 1995?
24        A.  I was 15.
25        Q.  Has the security of Internet web

Page 115

1    servers improved since 1995?
2         A.  I think the security of the servers
3    has improved, although some confounding factors
4    have caused reductions in security at the same
5    time, such that I'm not sure on the whole
6    information is a whole lot more secure than it
7    was in that time period.  Perhaps, it's less
8    security.
9         Q.  And what confounding factors are
10   those?
11        A.  Attackers have become significantly
12   more skillful.  Automatic attacking tools have
13   become more widely used.  Information sharing
14   among attackers has become more common through
15   specialized information sharing websites such
16   that one defect can readily be known to others.
17   Economic incentives to monetize stolen
18   information have become significantly more
19   widespread such that there's a much improved
20   business model to attacking servers.  Servers
21   have become much more complicated with more
22   software installed, more interconnections and
23   more exposure to possible attacks.
24        Q.  Turning back to Exhibit 1 of your
25   report, in the second sentence of Paragraph 2,

Page 116

1    you say "My technical experience includes
2    efforts to verify the security of other
3    programmers' code, including uncovering
4    shortfalls in others' security systems."  Is
5    there anything referred to in that sentence that
6    we haven't yet discussed today?
7         A.  Yes.
8         Q.  What's that?
9         A.  There are several instances in which
10   I found significant security defect in others'
11   codes.  I can tell you about all of them that I
12   remember, and you can check my CV for more.  One
13   that's particularly vivid was the WhenU software
14   that we discussed on a couple of occasions.  The
15   WhenU software had a remote execution
16   vulnerability; namely, it was possible for
17   anyone to send a purported update to the WhenU
18   spyware, adware application, which the WhenU
19   application would then install on the user's
20   computer with full administrative privileges,
21   allowing the attacker to obtain complete control
22   over the user's computer.
23        I uncovered that, brought it to the
24   attention of both WhenU and the general public,
25   and subsequent to my report, it was corrected.

Veritext National Deposition & Litigation Services
866 299-5127

Page 117

1  That's one. There are several other examples.
2     Q. Do any of those examples relate to
3  the security of code which is run on servers?
4     A. Well, much of this code is right at
5  the intersection of desktop computers and
6  servers. This was a vulnerability relating to
7  the way that the client connected to the server.
8  For example, they failed to use any
9  cryptographic verification, and so the
10 correction to the problem that I just described
11 required changes both to the client and to the
12 server.
13    Q. It wasn't a security defect in the
14 server that you found though; isn't that right?
15    A. It was a security defect in the
16 overall architecture that encompassed both the
17 server and the client.
18    Q. Did the defect that you identified
19 allow intrusion into the server?
20    A. I'm not sure.
21    Q. It did allow intrusion into the
22 client, in that one could install any software
23 one wanted and take complete control of the
24 client; is that right?
25    A. That much definitely could be done.

Page 118

1     Q. Do you know of any other instances in
2  which you have verified or uncovered shortfalls
3  in the security of other security systems where
4  the security was protecting a server from
5  intrusion?
6     A. Google acquired a service called
7  JotSpot which suffered a defect that could be
8  styled as either a privacy defect or a security
9  defect. The result of the defect was that any
10 user could view the documents, even when the
11 author of those documents had instructed the
12 documents were to be kept private and secure
13 from other users.
14    Q. And that's in a situation where the
15 administrator of the particular wiki that was
16 involved had set all pages to be public; is that
17 right?
18       MR. BONI: Object to form.
19    A. As I recall, there were multiple
20 inconsistent settings areas, so you might set it
21 to be public in one place and private in another
22 place, and it looked from the user interface
23 like the private settings, the stricter of the
24 two settings should govern, when the fact of the
25 matter was that the looser of the two settings

Page 119

1  should -- would govern.
2        It was complicated and confusing. I
3  prefer to reread the underlying article which I
4  think offers a precise description of what went
5  wrong. Sitting here today, recalling an article
6  of half a decade ago, it's difficult for me to
7  summon the details with precision.
8     Q. Was that a situation in which there
9  was an intrusion that went past a designed
10 security system or a situation in which the
11 security settings through the security interface
12 didn't end up doing sort of what the user
13 intended?
14       MR. BONI: Object to form. You can
15 answer.
16    A. I think there are other possibilities
17 beyond the two in your question. I believe the
18 system didn't operate in the way that the
19 technical documentation said that it would
20 operate. I believe it didn't operate in the way
21 that a reasonable user would have expected it to
22 operate in light of the technical documentation
23 and the configuration screen. It's possible
24 that there's an engineer who knew that it would
25 operate this way because he designed it that

Page 120

1  way, and he knew that he designed it that way.
2        Nonetheless, I would say there was a
3  defect in the design, if that's how he designed
4  it, particularly in light of the technical
5  documentation.
6     Q. Was there any security measure that
7  needed to be circumvented in order to access the
8  information in the JotSpot situation?
9     A. I think the main tactic that an
10 attacker would need to utilize was to ask. It's
11 like the joke about God and the lottery ticket,
12 meet me halfway. Buy a ticket. You have to ask
13 for the private information in order to get it.
14 The main thing, protecting the private
15 information here was that no one would bother to
16 ask, and, therefore, no one would get it.
17    Q. And that was the security scheme that
18 was circumvented in that circumstance?
19    A. As I recall, the main request -- the
20 main circumvention technique was to ask for it.
21 To know of something obscure, to know of the
22 possible existence of something obscure and to
23 ask for it and receive the response.
24    Q. Are there any other instances of
25 uncovering shortfalls in server-based security

30 (Pages 117 to 120)

1  systems -- strike that.
2       Are there any other instances in
3  which you have uncovered shortfalls in the
4  security systems that allowed intrusions into
5  servers other than those which we've discussed
6  so far?
7       A.  Yes.  Here's one actually not
8  reflected in my CV because it didn't result in a
9  published article.  It did result in a New York
10 Times article.  American Airlines had an
11 internal website whereby documents were provided
12 to flight attendants and ground staff, maybe one
13 or the other, maybe both.  Training documents,
14 policy documents and so forth.  It turned out
15 thereto that the method of securing documents
16 was importantly defective.  Documents provided
17 as plain text were appropriately secured with a
18 user name and password, and I guess you could
19 guess someone's user name and password to access
20 them, but I didn't do that.
21      In contrast, documents provided as
22 attachments were available to anyone who
23 happened to guess the attachment number, and the
24 numbers were sequential beginning with one and
25 continuing to some maximum, such that it was

1  quite straightforward to download all of them,
2  which I did.
3       And then I read the documents in
4  sequence from one to the last and found some
5  that were quite embarrassing to the company, in
6  fact, which I provided to the New York Times
7  which wrote an article about them.
8       Q.  Do you think that what you did was an
9  intrusion into American Airlines systems?
10      A.  I'm not sure.  Actually, I found the
11 articles using Google.  I found the first one
12 using Google because Google had previously found
13 the very same PDF attachments and directed me to
14 one of them as I was attempting to find records
15 of a relevant American Airlines policy.  So if
16 it was an intrusion, Google did it first, and
17 then I identified the pattern and continued it
18 from there.
19      Q.  That was because the files at issue
20 were publicly available on the Internet.  All
21 one had to do was type in the URL, and they
22 would come up; is that right?  If one knew the
23 URL?
24      A.  If one knew the URL, they were
25 available upon request.

1       Q.  Do you know of any techniques that
2  can be used to avoid such an attack?
3       A.  Yes.
4       Q.  What techniques are those?
5       A.  One could avoid publishing these
6  files with predictable file names.  Instead of
7  using numbers like 1.PDF, you could have a
8  lengthy number too long to guess.  You could
9  restrict access to -- even to these raw binary
10 files, restrict access to those users who have,
11 in fact, entered a user name and password.
12 That's a little bit more complicated but
13 certainly doable for an engineer who needs to.
14      Q.  And those are two separate methods.
15 One would be choosing file names that are
16 predicable.  Another would be sort of requiring
17 a user name and password before providing access
18 to the files?
19      A.  There are some other methods also.
20 Certainly it could be done for someone who
21 recognized the vulnerability and elected to take
22 steps to defend against it.
23      Q.  Are there any other instances in
24 which you have uncovered shortfalls in the
25 security of servers against intrusion other than

1  those we've discussed?
2       A.  We discussed Buy.com previously.
3       Q.  Yes.
4       A.  That was very much in the same vein
5  as the American Airlines example just discussed.
6  Namely, the name, address and phone number were
7  provided on UPS prepaid shipping labels, which
8  were posted in some binary format like a gift or
9  a PDF or a PNG with sequential numbers, so that
10 by guessing numbers, Buy.com/returns/17 dot,
11 yes, you'd be able to see the seventeenth return
12 and thereby obtain that information directly
13 from the Buy.com server, again, without any
14 defect in any client software.
15      Q.  That would be avoided by choosing
16 unpredictable file names or the other methods
17 which we've discussed?
18      A.  Yes.
19      Q.  Anything else?
20      A.  The I Crave TV case which we've
21 discussed already.
22      Q.  And in what sense was that a -- why
23 don't we discuss that in more detail.  Anything
24 else?
25      A.  I think there probably are more.  I

1  have never thought of myself as limited to
2  client-side security. I've certainly always
3  been interested in server security. It's just
4  that there were other people doing server-side
5  security, and so I was better able to
6  distinguish myself in the realm client-side
7  security which others weren't focused on. But I
8  think there are other publications. I could
9  flip through my whole CV line by line to try to
10 identify some more for you.
11     Q.  Do any others come to mind?
12     MR. BONI:  Do you want him to look
13 through his CV?
14     Q.  You're welcome to look through your
15 CV?
16     A.  Sure, I'll take a minute and look.
17        Okay, here we go, the second item
18 under the heading "website writings" on page 3
19 of the CV is entitled "Hack-based
20 Cookie-Stuffing by Bannertracker-script."
21     Q.  And what's that?
22     A.  So this is an article very much at
23 the intersection of security and advertising,
24 advertising fraud. Bannertracker-script is the
25 controlling domain name used by a set of hackers

1  who attack discussion board sites, online
2  bulletin boards, to insert their code into the
3  bottom of the bulletin board site, and having
4  inserted their code, they then perpetrate
5  advertising fraud, primarily against Amazon,
6  claiming to have referred users to Amazon, such
7  that if users make a purchase from Amazon within
8  the 24 hours after the putative referral, Amazon
9  will pay a commission of as much as 8 percent to
10 the putative referrer.
11     Q.  And this is a way in which sites
12 which display advertisements from certain ad
13 networks may result in the unintended data going
14 to users?
15     A.  Not at all of. This is a genuine
16 hack. The perpetrators of this hack identify a
17 defect in the code that allows them to put their
18 code onto the fixed-in websites without any
19 permission whatsoever. It's not via an ad
20 network. It's via a security exploit. I
21 reserve the word "hack" typically for that kind
22 of circumstance. So they exploit a defect in
23 the victims's web server or application level
24 server sitting on top of the web server and use
25 that defect to install the JavaScript reference

1  to their own code and use their own code to
2  create the invisible eye frame window that loads
3  Amazon that makes the putative referral.
4     Q.  And this is through an exploit in
5  software called vBulletin?
6     A.  That's my understanding.
7     Q.  Anything else? Actually let me ask
8  this: Did you analyze that exploit in
9  vBulletin?
10    A.  I didn't analyze the exploit. I was
11 able to determine forensically from the location
12 of the insertion and from others discussing this
13 method of insertion that it had been perpetrated
14 by exploit. It was clear from the circumstance,
15 the same insertion on hundreds, even thousands
16 of unrelated websites, that it had to be an
17 exploit, and I quickly confirmed to my
18 satisfaction that it was.
19    Q.  Do you know whether any confidential
20 information from these bulletin board sites was
21 compromised as a result of this exploit?
22    A.  There were some losses to the
23 bulletin board sites. The bulletin board sites
24 began to load more slowly for users. Users had
25 to waste bandwidth, and Amazon, of course, pays

1  significant funds. But the main losses here are
2  not in user privacy. The losses here are
3  measured in dollars actually, dollars taken out
4  of the pockets of Amazon shareholders.
5     Q.  So the answer to that question is,
6  no, you don't know of any confidential
7  information having been taken as a result of
8  this exploit?
9     A.  I think what was taken was money and
10 bandwidth but not information.
11    Q.  In the next sentence of paragraph --
12 little bit lower down in Paragraph 2, you say,
13 "For example, I have personally uncovered
14 multiple Google privacy flaws, including
15 improper data collection by Google Toolbar as
16 well as improper data distribution by Google
17 JotSpot." Do you see that?
18    A.  Yes.
19    Q.  Do you claim to have uncovered any
20 Google privacy flaws other than the two you
21 claim to have uncovered in this sentence?
22    A.  It's possible that there are some
23 more Google privacy flaws that I know about and
24 could be taking credit for, but I can't remember
25 any sitting here today. I don't think I've

Page 129

1  written about any others.  I think there
2  probably are some more.  There probably are some
3  that I know about that I haven't written about
4  or have disclosed only peripherally in
5  presentations or otherwise.
6      Q.  Do any come to mind?
7      A.  No.
8          MR. GRATZ:  We'll mark as Exhibit 5.
9          (Document marked as Exhibit No. 5 for
10  identification.)
11     Q.  Do you recognize Exhibit 5?
12     A.  Yes.
13     Q.  What is it?
14     A.  This is a article published on my
15  website in January 2010.
16     Q.  Is this the research referred to by
17  the phrase "improper data collection" by Google
18  Toolbar in Paragraph 2 of your report?
19     A.  Yes.
20     Q.  What methodology did you use to reach
21  these results?
22     A.  I tested Google Toolbar forensically
23  using a virtual computer, using a set of virtual
24  computers in my home office.
25     Q.  And your research found that Google

Page 130

1  Toolbar -- certain features of Google Toolbar
2  continued to operate after the feature had been
3  turned off and the toolbar had been hidden, at
4  least until the user restarted the browser; is
5  that right?
6      A.  That's right.
7      Q.  And if the user restarted their
8  browser, than the settings would take effect; is
9  that right?
10     A.  When the user restarted his or her
11  web browser, the disabling which had always been
12  described as only for this window would by its
13  term expire, and, therefore, the feature would
14  be re-enabled, the toolbar would reappear, and
15  the user would rightly expect that the tracking
16  would continue.
17     Q.  Does your research discuss only the
18  disable only for this window feature?
19     A.  That's right.
20     Q.  Turning to the second page of Exhibit
21  5, it says, "Google Toolbar continues tracking
22  browsing even when users disable the toolbar via
23  manage add-ons."  Do you see that?
24     A.  Yes.
25     Q.  Is that the same thing or a different

Page 131

1  thing than disabling the Google Toolbar only for
2  this window that you've been tracking?
3      A.  You're right, that's a different
4  thing, and, in fact, there's yet another example
5  on page 3 that's another different thing.
6      Q.  These -- and all of these settings
7  properly take effect after the user restarts
8  their browser; is that right?
9      A.  That's right.
10     Q.  But what you found was that these
11  settings didn't properly take effect until the
12  user restarted their browser; is that right?
13     A.  That's true, with the additional
14  concern that as to the first example, the whole
15  purpose was for it to take effect immediately
16  for the current browsing session.  By the terms
17  of the user's instruction, it was to take effect
18  only for that session and for no other, and so
19  restarting your browser was supposed to
20  terminate it, meaning the feature was completely
21  defective in the mechanism presented in the
22  first section.
23         MR. GRATZ:  We'll mark this document
24  as Exhibit 6.
25         (Document marked Exhibit No. 6 for

Page 132

1  identification.)
2      Q.  Turning back to Exhibit 5 for a
3  moment, this is a blog post from January 26,
4  2010; is that right?
5      A.  Yes.
6      Q.  Turning to Exhibit 6, this is also a
7  blog post from January 26 of 2010 on a blog
8  called Search Engine Land; is that right?
9      A.  Yes.
10     Q.  This includes a statement from Google
11  responding to your blog post; is that right?
12     A.  Yes.
13     Q.  The last sentence of that statement
14  is "A fix that doesn't require a browser restart
15  is now available on www.Google.com/toolbar and
16  in an automatic update to Google Toolbar that we
17  are starting tomorrow."  Is that right?
18     A.  That's what it says.
19     Q.  Do you know whether that was a true
20  statement as of January 26, 2010?
21     A.  I agree that effective roughly 24
22  hours thereafter the Google Toolbar began to
23  update itself to a version that no longer had
24  the defects described in my article.
25     Q.  The next sentence, and this is not

33 (Pages 129 to 132)

Page 133

1  from Google's statement, but from the author of
2  the blog post on Search Engine Land, says, "I
3  wonder if Ben Edelman knew about restarting I.E.
4  would fix the issue and left it out."  When you
5  wrote Exhibit 5, did you know that restarting
6  Internet Explorer would cause the settings to
7  take effect?
8       A.  I think this misunderstands -- the
9  Barry Schwartz article misunderstands the scope
10  of the problem, particularly as to the first
11  section of my article.
12       Q.  Turning your attention to the
13  sections of your article other than the first
14  section, were you aware at the time you
15  published Exhibit 5 that restarting the browser
16  would cause the settings to take effect?
17       A.  Well, when I published the article,
18  it included the first and second sections, and
19  the third section, captioned, "Google Toolbar
20  Continues Tracking Browsing When Users Disable
21  the Toolbar Via Right Click," was added late on
22  the night of January 26th, and it even includes
23  a parenthetical and italics to that effect.  So
24  we should be limiting ourselves to the first two
25  sections for purposes of discussing what I knew

Page 134

1  when I published the article.
2       Q.  Let me be -- let me be very precise
3  as to the time.  When you published the section
4  of Exhibit 5 marked "Google Toolbar Continues
5  Tracking Browsing Even When Users Disable the
6  Toolbar Via Manage Add-Ons."  Do you see that
7  portion?
8       A.  Yes.
9       Q.  Did you know that that disabling
10  setting took effect when the user restarted
11  their browser?
12       A.  Well, the article right now as I'm
13  looking at it, page 3, says -- not only says
14  that I knew, but alerts readers to that very
15  fact in the paragraph that begins "In my tests,"
16  towards the top of page 3.  It says exactly
17  that.  Maybe Barry Schwartz didn't notice that
18  paragraph of the article.
19       Q.  Are you aware of any intrusion to
20  Google's servers related to the issue set forth
21  in Exhibit 5?
22       A.  This problem isn't about intrusion
23  into Google's servers.
24       Q.  Other than what's described in
25  Exhibit 5, have you found any other improper

Page 135

1  data collection by Google Toolbar?
2       A.  Well, an interesting twist about
3  Exhibit 5 is that I know Google knew about the
4  problem for more than a month before I wrote it
5  up on my website.
6       Q.  How do you know that?
7       A.  A state attorney general told me,
8  staff of a state attorney general.
9       Q.  What's that person's name?
10       A.  I can't recall.
11       Q.  What state was it?
12       A.  I don't recall.
13       Q.  About when did they make that
14  statement to you?
15       A.  I was at a meeting of staff of state
16  attorneys general in Florida, somewhere in Miami
17  vicinity, and someone told me that.
18       Q.  When was that roughly?
19       A.  It was in the same winter when I
20  published this article, so it must have been
21  February or March 2010.
22       Q.  Was it before or did -- so it was
23  after the publication of this article?
24       A.  That's right.
25       Q.  And what basis did the person who

Page 136

1  told you this have for making that statement?
2       MR. BONI:  Object to form.
3       A.  It purported to be personal
4  knowledge.
5       Q.  Personal knowledge of that?
6       MR. BONI:  Object to form.
7       A.  Personal knowledge as conveyed to me
8  of some sort of a dispute between Google and
9  Microsoft pursuant to a Microsoft antitrust
10  consent decree and the ongoing oversight
11  therefrom; wherein, Google complained that
12  Microsoft was doing this, and Microsoft
13  complained that Google was doing that.  And the
14  state attorney general staff person was on a
15  phone call where all of that was discussed and
16  perhaps an e-mail exchange.  In some other way
17  it was all made known to this person.
18       Q.  Do you think that person was telling
19  the truth?
20       A.  I do.  I wish I knew the person's
21  name.  Unfortunately, it was all in, you know, a
22  reception or other social function at that
23  event.
24       Q.  Turning back to Paragraph 2 of your
25  report, you mention improper data distribution

34 (Pages 133 to 136)

Page 137

1  by Google JotSpot.  Do you see that?
2      A.  Yes.
3          MR. GRATZ:  I'd like to mark this as
4  Exhibit 7.
5          (Document marked as Exhibit No. 7 for
6  identification.)
7      Q.  You have before you what's been
8  marked as Exhibit 7.  Do you recognize this as
9  an October 30th, 2008 blog post by you?
10     A.  I don't recall the date, but maybe
11 if --
12         MR. BONI:  There's a different --
13 there's a different date on that.
14     A.  That's the date on the last page.  I
15 think that's probably correct.
16     Q.  Is this the research referred to by
17 the phrase "improper data collection" by Google?
18 Excuse me.
19         Is this the research referred to by
20 the phrase "improper data distribution" by
21 Google JotSpot in your report?
22     A.  This is what I had in mind, yes.
23     Q.  What methodology did you use to reach
24 the results set forth in Exhibit 7?
25     A.  Direct hands-on testing and screen

Page 138

1  shot evidence.
2      Q.  You used a web browser; is that
3  right?
4      A.  A web browser, a screen shot tool,
5  potentially a packet sniffer.  I don't recall.
6      Q.  What is a packet sniffer?
7      A.  A packet sniffer is a specialized
8  tool for reviewing and confirming all data sent
9  over a network connection.
10     Q.  Did you use a packet sniffer in
11 conducting the research set forth in Exhibit 7?
12     A.  I often run one in the background
13 while doing this kind of test.  Let me skim
14 through the article and see whether there's any
15 discussion of the fruits of that methodology.
16         Okay, there's no discussion of use a
17 packet sniffer.  I believe I probably ran one
18 anyway, checked its output, found that there was
19 nothing notable in the packet sniffer output,
20 above and beyond what the screen shot showed,
21 and, therefore, had no need to mention it.
22     Q.  Were there any other elements of your
23 methodology?
24     A.  No.  I think what's beautiful about
25 this article is it's just so simple, a typical

Page 139

1  third grader could do it also.
2      Q.  MR. GRATZ:  Mark this as Exhibit 8.
3          (Document marked as Exhibit No. 8 for
4  identification.)
5      Q.  Do you recognize what's been placed
6  before you as Exhibit 8?
7      A.  I don't really recall it one way or
8  the other, but I can see what it must be.
9      Q.  What is it?
10     A.  It seems to be news coverage of the
11 Google JotSpot article that I wrote.
12     Q.  Turning to the second page of Exhibit
13 8, under the screen shot, there's a statement
14 from a Google spokesman; do you see that?
15     A.  Yes.
16     Q.  Could you read that statement,
17 please.
18     A.  This is a statement from a Google
19 spokesperson, giving his view of the issue.  He
20 says, "This is not a security issue.  The
21 information in these wikis is accessible because
22 they have been set to public on the site
23 permissions page.  Users are always in control
24 of the information they share.  If wikis are set
25 to private, no information will be publically

Page 140

1  accessible."
2      Q.  Was it true that the information in
3  the wikis which were the subject of your article
4  had been set to public in the site permissions
5  page?
6      A.  I think it may not be as simple as
7  that.  I think there was an import from one
8  JotSpot system to another as part of the
9  acquisition, and something might have been
10 changed during the import.  I definitely think
11 this engineer is only telling part of the story.
12     Q.  Do you know what the other parts of
13 the story are?
14     A.  I think it's along the lines just
15 described, that some options had been added,
16 something had been converted, perhaps subsequent
17 to the acquisition or in some other upgrade.
18 And so things that had started out more private
19 had become less private over time.
20     Q.  Were you aware that the wikis that
21 were the subject of your blog post had been set
22 to public on their site permissions page?
23         MR. BONI:  Object to form.
24     A.  First had been set is nicely in the
25 passive voice.  Who did the setting is exactly

35 (Pages 137 to 140)

Page 141

1 the question. Whether it was the site
2 administrator or Google who set it that way.
3 But I think, yes, the article discusses that and
4 discusses the contrary and inconsistent
5 statements, inconsistencies between this screen
6 and that screen and the help file all discussed
7 in the body of Exhibit 7 as it is before us.
8     Q.  Google fixed this issue within 48
9 hours; is that right?
10     A.  That wasn't my recollection actually.
11     Q.  How long did it take for Google to
12 fix this issue, in your recollection?
13     A.  I thought Google's initial position
14 was that everything was working perfectly.
15 Nothing at all was wrong, and that's consistent
16 with the quote from the Google spokesman in the
17 CNET article. I don't really recall
18 specifically.
19     Q.  Turning to the last paragraph of
20 Exhibit 7, does this refresh your recollection
21 as to the time that it took to remedy this
22 issue?
23     A.  That suggests it took about a week
24 after I first notified Google. I had thought it
25 took longer than that. But this paragraph seems

Page 142

1 to indicate that a week is about as long as it
2 took.
3     Q.  This was a week after you sent
4 notification to Google, but as of the same day
5 you posted this publicly; is that right?
6         MR. BONI:  Object to form.
7     A.  That's what this says. It's possible
8 that my last paragraph here is inaccurate, that
9 in some sense the problem lingered. I just --
10 I just don't know. But if the paragraph of my
11 article is correct, then it was fixed the same
12 day that I posted the article. Although it
13 wasn't fixed during the intervening week when I
14 hadn't posted the article. When Google was just
15 on notice of the problem, but there was no
16 public concern and no article neatly laying it
17 out, Google dragged its feet a little bit. Then
18 when I twisted their arm, they finally fixed it
19 that same day.
20         MR. GRATZ:  We can change the tape.
21         THE VIDEOGRAPHER:  Here ends Tape
22 No. 3. Off the record 1:15 p.m.
23         (Recessed for lunch.)
24         THE VIDEOGRAPHER:  Here begins Tape
25 No. 4 in today's deposition of Benjamin Edelman.

Page 143

1 Back on the record 2:13 p.m.
2     Q.  Turning your attention to the final
3 paragraph of Paragraph -- strike that.
4         Turning your attention to the final
5 sentence in Paragraph 2 of Exhibit 1, it says,
6 "I also found and demonstrated to a court's
7 satisfaction that an early online video service,
8 iCraveTV, had failed to secure video contents in
9 the way that it had previously represented to
10 that court." Do you see that?
11     A.  Yes.
12         MR. GRATZ:  I'd like to mark this as
13 Exhibit 9.
14         (Documents marked as Exhibit Nos. 9
15 and 10 for identification.)
16     Q.  You have before you what has been
17 marked as Exhibit 9 and 10. Do you recognize
18 these documents?
19     A.  Yes.
20     Q.  Is Exhibit 9 your initial declaration
21 in a case titled "National Football League
22 versus TVRadioNow Corporation"?
23     A.  Yes.
24     Q.  And is Exhibit 10 a supplemental
25 declaration that you submitted in that case?

Page 144

1     A.  Yes.
2     Q.  Are these expert declarations?
3     A.  Yes.
4     Q.  You are an expert retained by the
5 plaintiffs in that case; is that right?
6     A.  Yes.
7     Q.  And these declarations were submitted
8 in January and February of the year 2000
9 respectively; is that right?
10     A.  Yes.
11     Q.  What opinions did you render?
12     A.  I could take a moment to refresh my
13 recollection of these documents of 12 years ago,
14 but generally I offered the opinion that
15 iCraveTV security systems were not properly
16 designed to limit access to Canadian users only,
17 and, that, in fact, significant American and
18 other users could access and were accessing the
19 video contents that was supposed to be limited
20 to Canadians only.
21     Q.  So the system was designed based on
22 the IP address of the user to either grant or
23 deny access based on whether that user was
24 coming from an IP address associated with the
25 United States; is that right?

36 (Pages 141 to 144)

Page 145

1    A.  Well, there were a series of security
2  systems.  You described a portion of one of the
3  security systems.
4    Q.  What were the other security systems
5  about which you rendered opinions in Exhibits 9
6  and 10?
7    A.  Some of the security systems predated
8  my opinions, and I believe are not discussed
9  here.  There was one that was grounded in typing
10  in an area code.  If you knew a Canadian area
11  code, that would prove that you were Canadian.
12  I don't know that I had to offer an opinion as
13  to the defects of that security, but that was
14  one that was also an issue.
15    You describe restrictions based on
16  the IP address which is true but only in part.
17  That was a restriction on access to a portion of
18  the web server; whereas, what was actually
19  desired was the video which was provided by a
20  different server; namely, a streaming video
21  server from a company called Real Networks,
22  which didn't have any such access restriction.
23  And so it was possible completely to circumvent
24  the IP address filter that you just described
25    Q.  Did your opinions in the National

Page 146

1  Football League case relate to the area
2  code-based security system?
3    MR. BONI:  Object to form.
4    A.  I know that I formed opinions.
5  Whether those opinions are expressed in this
6  declaration, I'd need to read through both of
7  the declarations to say for sure.  My opinion
8  was and is that the area code system didn't work
9  very well for reasons that are probably
10  apparent, and I might have mentioned that in a
11  paragraph, or that might have gotten deleted
12  when the defendants abandoned that system.
13    Q.  So the opinion that you were
14  rendering in this case is that users from the
15  United States were, in fact, able to access
16  television programming where the system had been
17  attempted to be designed to prevent users in the
18  United States from accessing that program; is
19  that right?
20    A.  I demonstrated both the users were
21  able to and that they, in fact, and did so in
22  significant quantities.
23    Q.  Did you demonstrate anything else in
24  these reports?
25    A.  I gave specific examples of specific

Page 147

1  users who, in fact, have done so.  There might
2  have been students at Harvard College, and we
3  could even identify them by name from
4  information present within the defendant's log
5  files.  I don't recall whether we identified any
6  of them by names in the context of the
7  declaration.  We might have thought that was a
8  much notch too personal, but we could, and I
9  think that might have come out in the oral
10  testimony, if not in the deposition.
11    Q.  This was a system that had both a web
12  server and a media server or a set of web
13  servers instead of media servers; is that right?
14    A.  That's right.
15    Q.  And on the web servers, there was an
16  attempt to restrict access to users outside the
17  United States; is that right?
18    A.  That's right.
19    Q.  And on the media servers, there was
20  no such attempt; is that right?
21    A.  That's true.
22    Q.  Were the log files you were looking
23  at log files from the media servers?
24    A.  I believe I looked at both sets of
25  log files.

Page 148

1    Q.  Did you find that the IP -- what is
2  IP geolocation?
3    A.  IP geolocation is a set of systems
4  that convert an IP address to a geographic
5  location or a likely geographic location, an
6  inference as to geographic location.
7    Q.  In your report did you find errors in
8  the IP geolocation database used by the
9  defendant in this case, in Exhibits 9 and 10?
10    A.  I believe I did find and discuss some
11  errors.
12    Q.  Did you also find that users from the
13  United States had, in fact, accessed the media
14  server?
15    A.  I found that users from the United
16  States could access the media server.  I believe
17  there was evidence that they actually had done
18  so, including discussions on web pages directing
19  users as to how to do so.
20    Q.  Were those people hackers?
21    MR. BONI:  Object to form.
22    A.  It depends on the definition of the
23  word "hackers," but on some definitions
24  including reasonable definitions, they were.
25    Q.  In that they were gaining access to a

37 (Pages 145 to 148)

Page 149

1  system when they knew that they weren't supposed
2  to have access to it?
3     A.  Right.
4     Q.  They weren't -- they didn't have the
5  root access to the system; is that right?
6     A.  They didn't even want root access.
7  All they wanted was to watch the video content
8  that was available via this much easier
9  mechanism.
10     Q.  And this much easier mechanism more
11  or less amounted to directing their software to
12  a particular address which held the video
13  content in an unprotected form; is that right?
14     A.  Yes.
15     Q.  Other than that, are you aware of any
16  intrusion into iCraveTV's servers relating to
17  the issues discussed in Exhibits 9 and 10?
18     A.  Immediately after that, they faced an
19  injunction requiring them to shut down the
20  servers, and at that point, I don't think it
21  would have been possible to intrude because they
22  were no longer operating.  So that was the end
23  of the line for them.
24     Q.  But you're not aware of any intrusion
25  prior to the time the servers were shut down; is

Page 150

1  that right?
2     A.  I didn't really look at it one way or
3  the other, but I'm not aware of any intrusion
4  like that.
5     Q.  Other than that which we have
6  discussed so far, do you have any other
7  technical experience on which you rely in
8  forming your opinions in this case?
9     A.  As I walked back in from lunch, I saw
10  the related project as to the Sears' privacy
11  violation linked at the top of Exhibit 7.  It's
12  not that I specifically relied on it, but it is
13  yet another of these examples of a server side
14  security defect that allows the access of
15  information the users weren't intended to be
16  able to access.
17     Q.  And was that through predictable
18  URLs?
19     A.  No, it wasn't.
20     Q.  By what means were they able to
21  access that information?
22     A.  I think last name, plus street
23  address, plus zip code.  You could see what
24  anyone had bought from Sears, maybe what major
25  appliances anyone had bought from Sears if you

Page 151

1  knew their name and their home address.
2     Q.  And that was a designed feature of
3  that website; is that right?
4     A.  I think it was, although some --
5  subject to some caveats.  Maybe it wasn't
6  supposed to be quite so easy to put in someone
7  else's name and address.  I'd need to refresh my
8  recollection by rereading that article.
9     Q.  Anything else?
10     MR. BONI:  Anything else what?
11     Q.  Any other relevant technical
12  experience other than that which we've discussed
13  on which you've relied in preparing your report?
14     MR. BONI:  Object to the form.  Vague
15  and ambiguous to the extent of what you mean by
16  technical as opposed to any other kind of
17  experience.
18     A.  There have been other defects in the
19  privacy and security -- privacy and information
20  security of software systems that I've examined.
21  There was, I think, a compete toolbar that would
22  send your credit card number in plain text, so
23  that anyone in a nearby Internet cafe could see
24  your credit card number.  That sort of
25  difficulty of properly securing information in a

Page 152

1  multiuser information service is again on my
2  mind when I evaluate the book service here at
3  issue, but it's not that I specifically relied
4  on it.  It just informs the totality of my
5  professional experience in this area.
6     Q.  Anything else?
7     A.  Nothing else comes to mind.
8     Q.  Turning to Paragraph 3, you highlight
9  two publications as being particularly relevant
10  to the opinions you render in your report, and
11  the first of those is titled "Shortcomings and
12  Challenges in the restriction of Internet
13  Retransmissions of Over-the-Air Television
14  Content to Canadian Internet Users."  Do you see
15  that?
16     A.  Yes.
17     Q.  Was that about largely the same
18  subject matter as your expert reports in the NFL
19  case?
20     A.  Well, it was related, but a little
21  bit broader.
22     Q.  Broader in what way?
23     A.  The NFL case was limited to the
24  specific facts at hand.  One specific defendant
25  with one specific set of security systems.  In

38 (Pages 149 to 152)

Page 153

1  contrast, the submission to Industry Canada was
2  about all the matters that could potentially
3  arise if such retransmissions were to be
4  permitted, all of the possible systems that
5  future defendant infringers might design and the
6  likely defects and consequences of those
7  systems.
8      Q.  Is the thesis of that article that IP
9  geolocation as a security mechanism is
10 imperfect?
11     A.  That was one of the points raised and
12 one of the bases for concern.
13     Q.  Were there any other bases for
14 concern that were of the same level of
15 importance?
16     A.  Well, it's not just that it's
17 imperfect in the sense of one in a thousand
18 times it makes an error or two in 10,000 times
19 it makes an error.  It's imperfect in the sense
20 that once an error is identified, it can be
21 systematically exploited such that 1,000 users
22 drive through that one-in-a-thousand hole, and
23 then it becomes a thousand in a thousand because
24 everyone knows that's where the hole is.  Just
25 like a hole in a damn, you might say there's

Page 154

1  only one square inch of the damn that has a
2  hole, but never mind, a lot of water can pour
3  through that one hole.
4          I also pointed out in that article
5  the importance of user incentives, that users
6  will jump through quite a few hoops to get the
7  content that they want, particularly if they
8  don't have another good way to get it.  And so
9  the users' willingness to find the hole and to
10 exploit the hole is likely to be commensurate
11 with the value of the content that they would
12 receive.  So one shouldn't assume that users
13 won't do it because they haven't done it to get
14 something they didn't want very much.  The more
15 they want it, the more they'll be willing to do
16 to get it.
17     Q.  So the amount of effort that one
18 needs to put into securing a system is
19 commensurate with the level of demand for the
20 material being protected?
21     MR. BONI:  Object to form.
22     A.  I think that's right, with the right
23 understanding of demand, the level of user
24 interest vis-a-vis possible alternatives.
25     Q.  In Paragraph 3 you also say --

Page 155

1  mention "Securing Online Advertisers, Rustlers
2  and Sheriffs in the New Wild West."  What was
3  that article about?
4      A.  That's a cross-cutting article really
5  surveying a series of other articles, including
6  problems affecting consumers; for example,
7  deceptive advertising, as well as problems
8  affecting advertisers, including overcharging in
9  advertising fraud and presenting the
10 relationship between those problems and the
11 underlying computer security systems that are
12 closer to the core of what the readers of this
13 multiple author bound volume would be likely to
14 be familiar with.
15     Q.  That relates primarily to the
16 security of end user computers; is that right?
17     A.  A portion of it does, but not all.
18 For example, the deceptive advertisements are
19 equally deceptive no matter how well secured
20 your end user device might be.
21     Q.  Does this article mention in
22 Paragraph 3, securing online advertising,
23 discuss intrusion to servers connected to the
24 Internet?
25     A.  I don't recall one way or the other.

Page 156

1  I can't think of a specific section in which it
2  would be likely to do so.  But it might.
3      Q.  Are there any other academic
4  publications of yours which you consider more
5  relevant to the questions at issue in this case
6  than those identified at the end of Paragraph 3?
7      A.  I don't usually draw a distinction
8  between academic publications and other
9  publications.  They're all important to me.
10 Some are peer reviewed and some aren't.  I think
11 we've discussed all of the publications, be they
12 peer reviewed or otherwise, that are most
13 relevant to my opinions.
14     Q.  In Paragraph 4, it says that your
15 teaching assignment currently consists of a
16 Harvard Business School elective course called
17 "The Online Economy" which analyzes strategies
18 for all manner of online businesses, and that
19 the course includes concerns arising out of
20 information security.  Do you see that?
21     A.  Yes.
22     MR. GRATZ:  Mark this as Exhibit
23 13 -- 11.
24     (Document marked as Exhibit No. 11
25 for identification.)

39 (Pages 153 to 156)

Page 157

1    Q.   Do you recognize this document?
2    A.   Yes.
3    Q.   What is it?
4    A.   This is the syllabus of the course as
5    presented on the course website.
6    Q.   Could you identify for me the section
7    of the course that deals with information
8    security?
9    A.   Information security is a theme that
10   arises in a variety of the cases taught in this
11   course.  I can go through the cases, the days of
12   the course one by one and flag contents in which
13   information security arises.  In online
14   apartment rentals as to Rent Jungle and its
15   scrapers, there's quite a bit of discussion
16   there, of whether scrapers are an appropriate
17   technique, whether it's appropriate to scrape
18   your competitors' sites in order to make your
19   own site, how would your competitors feel about
20   that, is there anything they can do to stop you,
21   is there anything you can do to stop them from
22   stopping you.
23   Q.   What do you mean by scraping?
24   A.   In this context the term "scraper"
25   refers to a software system that collects

Page 158

1    information from another website.
2    Q.   That's information that that other
3    website makes available publicly; is that right?
4         MR. BONI:   Object to form.
5    A.   It makes it available on its website,
6    perhaps to the general public, perhaps only to
7    users who log in with a password, perhaps
8    without restriction of any kind, perhaps
9    subject to a terms of use restriction imposed in
10   some way.
11   Q.   And the same restrictions that would
12   be imposed on an ordinary web browser are
13   imposed on a scraper; is that right?  For
14   example, if an ordinary user would need to enter
15   a user name and password, then the scraper would
16   need to provide the same credentials; is that
17   right?
18   A.   Often that's true, although I
19   wouldn't want to be too sweeping about it.
20   There might be ways to circumvent that sort of
21   thing, and I've seen some of those ways from
22   time to time.
23   Q.   Do you discuss any of those ways in
24   your class?
25   A.   Sometimes we discuss that American

Page 159

1    Airlines PDF example I just discussed where to
2    get the underlying text would require a user
3    name and password, but to get the attachments
4    mistakenly, no password was required.
5    Q.   Does any of the material in your
6    online economy course relate to the intrusion
7    into servers for the purpose of gaining root
8    access?
9    A.   I don't think we discussed security
10   in that context in this class.  It comes up more
11   in some of the executive education teaching that
12   I've done, and other notions of security other
13   than obtaining root access arise often in this
14   class.
15   Q.   Do they include gaining access to
16   information hosted on web servers which one is
17   not permitted to access?
18   A.   Yes.
19   Q.   In any situations other than those
20   which we've already discussed to today?
21   A.   No.  I think we've discussed the
22   examples that arise.
23   Q.   Turning to Paragraph 5, Paragraph 5
24   of your report, you discuss previous expert
25   work.  Was your first expert engagement the NFL

Page 160

1    versus TVRadioNow case?
2    A.   Yes.
3    Q.   Was your second expert engagement the
4    Multnomah County Libraries versus the United
5    States case?
6    A.   I'm not sure that was second or if
7    there was something else in between.  That was
8    surely the next significant engagement.
9    Q.   Was the next significant engagement
10   Washington Post versus Gator Corporation?
11   A.   That was certainly shortly
12   thereafter, and was one of the larger cases.
13   There might have been something else in between.
14   Whether that was significant or not...
15   Q.   In what area of expertise did you
16   testify in the Washington Post case?
17   A.   My testimony there consisted solely
18   of expert reports and deposition.  The case
19   settled before trial.
20   Q.   And what were your opinions in that
21   case?
22   A.   That was a case about spyware and
23   adware installed on users' computers.  Initially
24   replacing the ads on websites with other ads,
25   later showing pop-up ads and pop-under ads.  My

40 (Pages 157 to 160)

Page 161

1    opinions went to the methods of installation,
2    the disclosures that were shown, the pop-ups
3    themselves, the circumstances in which the
4    pop-ups would appear, user perception of the
5    pop-ups, perhaps other aspects of the pop-ups.
6        Q.  Did you render any opinions in that
7    case?
8        A.  I think I did.
9        Q.  What opinions were those?
10       A.  It's a little bit difficult to recall
11   based on the duration, since the case as well as
12   the significant subsequent work in that area.
13           MR. GRATZ:  We'll mark this as
14   Exhibit 12.
15           (Document marked as Exhibit No. 12
16   for identification.)
17       Q.  Do you recognize this document?
18       A.  This is a declaration I wrote in the
19   Gator matter.
20       Q.  Is it an expert declaration?
21       A.  I believe I was anticipating being
22   designated as an expert, or maybe I had been
23   designated as an expert, so yes, it is an expert
24   declaration.
25       Q.  What opinions are contained in

Page 162

1    Exhibit 12?
2        A.  I discussed the Gator software
3    generally, including its methods of installation
4    and the advertisements that it displayed.
5        Q.  Are those facts or expert opinions?
6           MR. BONI:  Object to the form.
7        A.  Some of the contents of this
8    declaration reflects my firsthand personal
9    observation and would be appropriate for a fact
10   witness.  Other portions of the declaration
11   reflect the judgment and experience of an expert
12   and probably would require that.
13       Q.  Did any of your work in the
14   Washington Post case relate to intrusions into
15   servers?
16       A.  Significantly at issue was how
17   exactly Gator managed to replace the ads on
18   websites with Gator's own ads and later to show
19   pop-ups and pop-unders.  That was all done
20   wholly on the client side, without making an
21   intrusion onto web servers.  Although users
22   probably wouldn't understand that and would
23   perceive it otherwise.
24       Q.  So no intrusion into servers was
25   involved in the Washington Post case; is that

Page 163

1    right?
2           MR. BONI:  Object to form.
3        A.  Gator did not intrude onto the
4    plaintiff's servers in that case.
5        Q.  In 2003 did you submit an expert
6    report in connection with the case, Wells Fargo
7    & Company and Quicken Loans Inc. versus
8    WhenU.com?
9        A.  Yes.
10       Q.  What was the subject matter of your
11   declaration in that case?
12       A.  It was generally similar to the Gator
13   declaration just discussed.  Namely, methods of
14   installation, methods of operation and the
15   advertisements that were displayed.
16       Q.  Did it involve any intrusions into
17   servers?
18       A.  WhenU software also didn't intrude
19   onto plaintiffs' servers.
20       Q.  Did it intrude onto anyone's servers?
21       A.  WhenU never needed to place code into
22   the server in order to accomplish its business
23   objectives.
24           MR. GRATZ:  I'd like to mark this as
25   Exhibit 13.

Page 164

1           (Document marked as Exhibit No. 13
2    for identification.)
3        Q.  Do you recognize this document?
4        A.  Yes.
5        Q.  Is this the blog post that gave rise
6    to the motion for contempt in the WhenU case?
7        A.  It is.
8        Q.  At the time you wrote this blog post,
9    were you in possession of confidential WhenU
10   information?
11       A.  I believe I had been present in the
12   courtroom at a time when confidential
13   information was presented orally.  I don't know
14   whether I was in possession of any written
15   confidential information.
16       Q.  Did you in -- strike that.
17           Did you testify in a case called
18   WhenU versus State of Utah?
19       A.  Yes.
20       Q.  Was the subject matter of your
21   testimony in that case similar to that in the
22   other WhenU case and in the Gator case?
23       A.  Similar, although with some different
24   twists based on the procedural context in the
25   specific substantive issues in dispute there.

Page 165

1    Q.  How was it different?
2        A.  WhenU argued that it would be
3    difficult for WhenU to keep out of the state of
4    Utah because their software operated the same on
5    a nationwide or worldwide basis.  I demonstrated
6    that quite the contrary, WhenU's system utilized
7    geolocation to identify the users' geographic
8    location or apparent geographic location, that
9    WhenU told advertisers that the system worked
10   reliably, and that WhenU's system had an
11   adequate geolocation system to substantially
12   avoid showing certain ads or even all ads in
13   Utah.
14       Q.  Was it your opinion that WhenU could
15   effectively limit usage to users outside of
16   Utah?
17       A.  It could certainly avoid showing ads
18   to users in Utah and could otherwise allow usage
19   of its software if they so chose.
20       Q.  That would be through -- by means of
21   geolocation; is that right?
22       A.  The existing geolocation system that
23   they had already installed for their own
24   business purposes.
25       Q.  It was your opinion that that

Page 166

1    geolocation system was effective?
2        A.  That it was sufficiently effective
3    for WhenU's own business purposes and
4    sufficiently effective to comply with the
5    statute in the state of Utah.
6        Q.  Is that consistent with your opinion
7    in the National Football League case regarding
8    the reliability of geolocation?
9        A.  It is.
10       Q.  How so?
11       A.  Users attempting to get copyrighted
12   media content would be highly likely to find
13   ways to circumvent any geolocation that was
14   denying them access.  You want to watch the
15   video, you pretend you're in Chicago so you can
16   watch the video.  In contrast, it would be quite
17   unusual for a user to pretend they were in a
18   different state in order to receive extra pop-up
19   ads which are widely regarded as unwanted rather
20   than as desirable.
21       Q.  Did you testify in a case called
22   South Carolina v. Casale Media?
23       A.  Yes.
24       Q.  What was the subject matter of your
25   testimony in that case?

Page 167

1        A.  Casale Media produced a software
2    program purporting to clean spyware off of a
3    user's computer, and it was advertised as having
4    that benefit, even when it didn't really do all
5    that much, and furthermore, at least as
6    important, the advertisements overstated the
7    user's need for the software, in particular, the
8    advertisements would make statements like, your
9    computer is infected when the fact of the matter
10   was Casale had no information one way or the
11   other as to whether or not your computer was
12   infected.
13       Q.  And what were the opinions to which
14   you testified in that case?
15       A.  First, I needed to reconstruct
16   historic records of what advertisements were
17   shown and how they looked.  The advertisements
18   were no longer running as of the commencement of
19   litigation, and I needed to reconstruct how the
20   software worked, what the software said.  The
21   software also had been withdrawn from the market
22   by the date of commencement of the litigation.
23   So there was significant forensic work necessary
24   to lay the groundwork.
25           Then, for basically just fact witness

Page 168

1    work to say what was on the screen after I got
2    it to work again.  I believe there was also
3    discussion of user perceptions of these offers,
4    how a user would respond upon receiving a
5    particular message.
6        Q.  Did you do any forensic work as a
7    basis for the opinions you expressed in your
8    report in this case?
9            MR. BONI:  Object to form.
10       A.  I didn't examine any historic sources
11   or any archives or anything of that sort.
12       Q.  Did you examine any computer systems?
13       A.  Yes.
14       Q.  What computer systems did you
15   examine?
16       A.  Well, I reviewed the documents that
17   are cited in the attachment to the report.  I
18   also wanted to check the availability of
19   copyright infringing books right now online as
20   it stands.  If you wanted to find a copy of
21   Malcolm Gladwell's new book, how easily could
22   you do that.  And if you wanted to find some
23   other book, again in copyright, how easily could
24   you do that, how easily could you get it for
25   free via some unlawful copyright infringement

42 (Pages 165 to 168)

1  website.
2      Q.  Did you examine the security of any
3  computers in connection with this report?
4      A.  I wasn't checking for security.  I
5  was checking for the availability of the
6  copyright infringement materials.
7      Q.  And it wasn't copyright infringement
8  materials that were available by breaking
9  through security but because the infringing
10 materials were intended to be accessible by the
11 operator of that website; is that right?
12     A.  That's right.
13     Q.  Did you testify in a case called
14 Arista against Myxer?
15     A.  Yes.
16     Q.  In what area of expertise did you
17 testify in that case?
18     A.  As I recall that, my expert work in
19 that case was as to the financial benefit that
20 the defendant there reaped by showing
21 advertising on a website with copyright
22 infringing material.
23     Q.  Did you render any opinions about
24 copyright law?
25     A.  No, I didn't render any opinions

1  about any law.
2      Q.  Did you render any opinions about
3  security in the Myxer case?
4      A.  I don't recall.
5      Q.  You don't recall any such opinions?
6      A.  I don't recall one way or the other.
7  There were a series of these cases.  I get them
8  confused to this day.  I think there might have
9  been three.  There were the number that are
10 listed in the attachment to my expert report.
11 All of them are properly listed, and what was at
12 issue in one versus what was at issue in
13 another, I would be on very thin ice if I tried
14 to recite that from memory.
15     Q.  The three cases you're talking about
16 are Arista against Myxer in which Arista is a
17 record Company on the one side; UMG against
18 Veoh, which UMG is a record company on one side;
19 and Lens verus UMG, which UMG is a record
20 company.  You're talking about the three record
21 company cases?
22     A.  There are those three.  There might
23 have been another one that didn't make it to the
24 point where I had my deposition taken, and,
25 therefore, it isn't disclosed.  It probably

1  isn't publicly known.
2      Q.  What was the name of that case?
3      A.  I would have great difficulty
4  summoning it for you from memory and I
5  apologize.
6      Q.  In the UMG against Veoh case, in what
7  area of expertise did you testify?
8      A.  I think it was the same as the Myxer
9  case just described.
10     Q.  In the Lens against UMG case, in what
11 area of expertise did you testify?
12     A.  I think it was the same as what was
13 just discussed, but I prefer to check the expert
14 report to confirm.
15     Q.  So it is before you as I believe -- I
16 believe it's before you.  It's not before you.
17         MR. GRATZ:  We'll mark this as
18 Exhibit 14.
19         (Document mark as Exhibit No. 14 for
20 identification.)
21     Q.  So you have before you what's been
22 marked as Exhibit 14.  You recognize this as
23 your expert report in the Lens against UMG case?
24     A.  Yes.
25     Q.  In what areas of expertise did you

1  testify in that case?
2      A.  I believe Paragraph 7 details the
3  expert opinions as to the scope of copyright
4  infringing material or in any event copyrighted
5  material present without permission from the
6  rights holders, the difficulty of applying fair
7  use analysis, the information that the defendant
8  in that case considered before sending his
9  take-down request and the damage that results
10 from a mistaken take-down request in light of
11 the counter-notification provided by law.
12     Q.  Did you render any legal opinions in
13 your report in the Lens case?
14     A.  My intension was not to render any
15 legal opinions, and I believe I succeeded in not
16 rendering any legal opinions.
17     Q.  When you say at the top of -- I want
18 to direct your attention at the top of what's
19 marked at the bottom as page 3 in Exhibit 14.
20 Do you see that?
21     A.  Yes.
22     Q.  It says, "The type of fair use
23 analysis that would be conducted in infringement
24 litigation cannot readily be conducted using the
25 information available to a rights-holder upon

Page 173

1  sending a takedown request." Do you see that?
2      A.  Yes.
3      Q.  Was that one of the opinions you
4  expressed in the report in the Lens case?
5      A.  Yes.
6      Q.  Is that still your opinion today?
7      A.  It's my opinion as to the facts of
8  this matter.  There might be other contacts in
9  which it would be possible to conduct that fair
10 use analysis with the information available, but
11 thinking about the context in which I offered
12 this report, I think this opinion is correct,
13 and it's still my view.
14     Q.  When you say the type of fair use
15 analysis that would be conducted in infringement
16 litigation, what do you mean by that?
17     A.  I believe the expert report details
18 that further, for example, 13, and follows from
19 there, listing the factors that need to be
20 considered in order to apply a fair use
21 analysis.
22     Q.  And that's set forth in Paragraph 14?
23     A.  Fourteen discusses the factors, and
24 then 15 and 16 discussed the limited information
25 available to rights-holder confronting an

Page 174

1  unauthorized video at YouTube.
2      Q.  In Paragraph 14 you say, "Nor do the
3  examples of Section 107 limit what may be fair
4  use." What do you mean by that?
5      A.  I think the portion of the sentence
6  after the colon is informative, quoting some
7  authority from a case interpreting the Section
8  107, fair use defense.
9      Q.  It says that the examples in the
10 preamble to Section 107 are illustrative and not
11 limitative.  You see that?
12     A.  Yes.
13     Q.  Do you agree with that today?
14     A.  I think I correctly characterized the
15 holding of Campbell.  Whether or not I would
16 have decided it the same way had I been
17 presiding in that matter, I guess I haven't
18 really thought it through, but I don't hold that
19 position.
20     Q.  You agree that that's currently the
21 law?
22     A.  I don't know.  I'm not enough of a
23 scholar --
24         MR. BONI:  Objection.
25     A.  -- of fair use law to attempt to

Page 175

1  offer an opinion.
2          MR. BONI:  Joe, we're not proffering
3  him as a fair use expert at all.  This has
4  nothing to do with the report he's doing in this
5  case.
6      Q.  Turning your attention to Paragraph
7  17, in the middle of the paragraph it says,
8  "Even when all the facts are known, it is
9  difficult to apply the required legal standards
10 to those facts, which makes fair use
11 particularly difficult to apply in any sort of
12 perfunctory or quick look review." Do you see
13 that?
14     A.  Yes.
15     Q.  Is that a statement that you can
16 continue to consider true?
17         MR. BONI:  Object to form.
18     A.  I think it's true in context.  Of
19 course, there would be some sets of facts that
20 are sufficiently clear-cut that one could make a
21 fair use determination one way or the other.
22 It's not that every case is a difficult case,
23 but that there are some difficult cases.
24     Q.  Did you identify any of those
25 difficult cases in your report in the Lens case?

Page 176

1      A.  I guess I cited some cases that were
2  reversed, including the three cases cited within
3  Paragraph 17.  So those must have been difficult
4  facts if in each of those three instances the
5  cases were twice reversed.
6      Q.  Do you know what the use at issue in
7  the Lens case was?
8      A.  It was background music to a home
9  video.
10     Q.  Do you think that the use in the Lens
11 case was fair use?
12         MR. BONI:  Object to form.
13     A.  I'm not sure.
14         MR. BONI:  Joe, we're not proffering
15 him as a fair use expert.  This is improper
16 questioning.
17     Q.  You weren't asked to opine on that
18 matter in the Lens case?
19     A.  That's correct, I was not asked.
20     Q.  And you never, in fact, formed an
21 opinion on the question?
22     A.  I didn't.  It's a difficult question
23 to me, and no one wanted to pay me to figure it
24 out, so I spent my time on other matters
25 instead.

44 (Pages 173 to 176)

1      Q.  What makes it a difficult question?
2          MR. BONI:  Object to form.
3      A.  Well, some of the factors cut in one
4  direction.  Some of the factors cut in the other
5  direction.  And it leaves me uncertain about the
6  correct way to apply the Section 107 factors.
7      Q.  Which factors cut against fair use in
8  the Lens case?
9          MR. BONI:  Object to form.  Joe, I'm
10  going to stop the questioning.  You keep going
11  down this path that has nothing whatsoever to do
12  with qualifying him for the report for which he
13  proffered in this case.  It has nothing to do
14  with security or his report.
15      Q.  You can answer the question.
16      A.  For example, the Lens video used the
17  most distinctive part of a song.  I can't recall
18  what song it was.  But, you know, it has a
19  chorus or something, the part that everyone
20  hums, and wouldn't you know it, in her 30-second
21  clip, she manages to get that part.  The video
22  was set to be viewable by the entire world.  It
23  wasn't limited just to her family and friends.
24  It was accessible by everyone.  Those are
25  factors that would seem to cut against fair use.

1      Q.  What factors weighed in favor of fair
2  use in your view in the Lens case?
3      A.  It would be seem to be a
4  noncommercial use, although to be sure, these
5  days Google pays significant royalties to those
6  who upload videos.  So maybe not so
7  noncommercial after all.  The quality of the
8  audio and video were consistent with a home
9  recording which is to say not all that good,
10  which maybe could cut either direction, in fact,
11  depending on how you think about it.  It's not
12  much of a substitute, but then again, the artist
13  would never have allowed his recorded music to
14  be presented in this way.
15      Q.  And on balance, you don't have a view
16  one way or the other as to how the fair use
17  analysis comes out?
18          MR. BONI:  Asked and answered.
19      A.  I don't have a view one way or the
20  other.
21      Q.  In addition to your expert work, have
22  you practiced as an attorney?
23      A.  Yes.
24      Q.  In what cases?
25          MR. BONI:  In what cases?

1      Q.  In what cases have you practiced as
2  an attorney?
3          MR. BONI:  Object to form.
4      A.  I brought a class action against
5  Yahoo as to overcharging of certain advertisers.
6      Q.  Anything else?
7      A.  I was co-counsel in a class action
8  against Google as to certain type of squatting
9  practices.
10      Q.  Anything else?
11      A.  I am currently counsel in a case
12  against Apple as to charges incurred by minors
13  and charges without a user entering a password
14  to authorize the charges.
15      Q.  Anything else?
16      A.  I'm currently counsel in a case
17  against Facebook as to charges incurred by
18  minors.
19      Q.  Who's your co-counsel in the Facebook
20  case?
21      A.  I need to discuss with my attorney.
22      Q.  Do you need to discuss --
23      A.  Yeah.
24      Q.  Okay.
25          THE VIDEOGRAPHER:  You want to go

1  off.
2          MR. BONI:  Go off.
3          THE VIDEOGRAPHER:  Off the record
4  3:02 p.m.
5          (Brief recess.)
6          THE VIDEOGRAPHER:  Back on the record
7  3:07 p.m.  Could we have the last question read
8  back please.
9          (Last question read back.)
10      A.  The firm is Kershaw, K-e-r-s-h-a-w.
11  There are some more names after that.
12      Q.  Are there any other cases in which
13  you are or have been counsel?
14      A.  There are.
15      Q.  How many?
16      A.  Some individual disputes, you know,
17  airline overcharged money.  There are some for
18  which I have a confidential role, not on the
19  paper as an advisor, co-counsel.  I think I've
20  listed all of the significant matters, all of
21  the matters in which I appear on the papers, for
22  example.
23      Q.  Turning to Paragraph 6 of your report
24  it says, "I am being compensated for my work in
25  this matter at the rate of $450 per hour"; is

Page 181

1  that right?
2      A.  Yes.
3      Q.  Is payment contingent on the outcome
4  of the litigation?
5      A.  No.
6      Q.  Is payment contingent on any opinions
7  you render?
8      A.  No.
9      Q.  When were you first contacted by
10 counsel for plaintiffs in this case?
11     A.  Several years ago counsel for
12 plaintiffs asked me about a different aspect of
13 this case.
14     Q.  What aspect was that?
15         MR. BONI:  I'm going to instruct the
16 witness not to answer on the grounds of the
17 attorney work product.
18     Q.  When did counsel for plaintiffs first
19 contact you about putting forward subject matter
20 set forth in Exhibit 1?
21     A.  That's sometime this winter to spring
22 after the new year.
23     Q.  Who contacted you?
24     A.  Mr. Boni.
25     Q.  Have you spoken with any of

Page 182

1  plaintiffs' counsel other than Mr. Boni?
2      A.  Ms. Zack.
3      Q.  Anyone else?
4      A.  A fellow named Josh.
5      Q.  Anyone else?
6      A.  I think that's all.
7      Q.  Have you spoken with anyone regarding
8  this engagement other than Mr. Boni, Ms. Zack
9  and Josh?
10     A.  I discussed it with my father,
11 spiritual guidance on all important questions.
12     Q.  What did you discuss with your
13 father?
14     A.  The case generally, my role in it,
15 the extent of my opinions, the substance of my
16 opinions.
17     Q.  What did your father tell you?
18     A.  He supports my work and supportive of
19 my work in this area.
20     Q.  Anything else?
21         MR. BONI:  Anything else that his
22 father told him?
23         MR. GRATZ:  Correct.
24     A.  Nothing of any great significance.
25     Q.  Nothing that comes to mind?

Page 183

1      A.  Not really.
2      Q.  Before today, how many hours had you
3  spent on this engagement?
4      A.  I'd estimate about 20.
5      Q.  Did anyone assist you?
6      A.  No.
7      Q.  Have you received payment for your
8  work on this case?
9      A.  No.
10     Q.  Do you anticipate receiving payment
11 for your work on this case?
12     A.  Yes.
13     Q.  Who is going to be paying you?
14     A.  I think the Boni & Zach firm will be
15 paying me.
16     Q.  Turn to Paragraph 7 of your report.
17 In the middle of that paragraph it says, in this
18 report I address and opine on risks of a
19 security breach exposing widely online the
20 contents of in-copyright books from a number of
21 sources.  Do you see that?
22     A.  Yes.
23     Q.  Do you provide opinions in your
24 report regarding any matters other than risks of
25 a security breach exposing widely online the

Page 184

1  contents of in-copyright books?
2      A.  I'm sure I do.
3      Q.  What opinions can you identify in
4  your report where you express those opinions?
5      A.  Well, for example --
6          MR. BONI:  Go ahead.  That's okay.
7      A.  The boldface heading midway through
8  this page 2 that piracy of books is already
9  real.  I don't think that speaks to the risks of
10 a security breach exposing in-copyright books.
11 This is something that's already happening
12 without any security breach above and beyond
13 what has already happened.
14     Q.  Any other opinions that are not
15 related to the risks of a security breach
16 exposing widely online the contents of
17 in-copyright books?
18         MR. BONI:  Let me object to the form,
19 and say that the report speaks for itself.  It
20 is what it is.  If you want a thorough, complete
21 answer, then the witness should go through line
22 by line and see what exactly there is other than
23 what he saw on this page.
24     Q.  Mr. Edelman, you're welcome to take a
25 look at any portions of the report you need to

46 (Pages 181 to 184)

Page 185

1    to fully answer my question.  The question is
2    could you identify for me other than the portion
3    you identified in your previous answer about
4    present book piracy any opinions you expressed
5    in your report other than opinions on the risks
6    of a security breach exposing widely online the
7    contents of in-copyright books?
8          A.  I think the rest of the declaration
9    fits within that sentence, broadly understood.
10         Q.  Is it your opinion that the level of
11   security afforded to the scanned books is
12   relevant to the fair use analysis in this case?
13         MR. BONI:  Object to form.
14         A.  I think it could be.
15         Q.  How?
16         A.  In a couple of ways.  One, the level
17   of security that Google is providing, can
18   provide, will provide speaks to the effect on
19   the market for the books, a factor under Section
20   107.  Second, the practices of other sites that
21   might engage in book scanning of their own with
22   quite different security practices potentially,
23   could certainly affect those same Section 107
24   factors.
25         Q.  By those same Section 107 factors, do

Page 186

1    you mean the fourth factor, the effect on the
2    market?
3          A.  That one in particular, yes.
4          Q.  Is there any other way in which the
5    level of security afforded to the scanned books
6    is relative to the fair use analysis?
7          A.  The level of security is certainly
8    related to the character of the use.  If the
9    level of security was to store them on a hard
10   drive, put the hard drive-in a vault, put the
11   vault at the bottom of the ocean, that would be
12   one character of use.  And a different character
13   of use is to connect the hard drive to a set of
14   servers and display the contents in some form
15   for all the world to see, but I think it could
16   go to the first factor also.
17         Q.  So a site with better security would
18   have a purpose or character of use that is more
19   likely to favor fair use?
20         MR. BONI:  Object to form.  He's not
21   here as a fair use expert, Joe.  And he's not
22   offering an opinion for that reason.
23         Q.  You can answer.
24         A.  I think all else equal, that's the
25   way I've been taught to apply the fair use

Page 187

1    factors.  Subject to the proviso that, of
2    course, we must consider all of the other sites,
3    book scanning services that might seek to engage
4    in similar conduct if this were ruled to be a
5    fair use.
6          Q.  Is there any other way in which it's
7    your opinion that the level of security afforded
8    to the scanned books is relevant to the fair use
9    analysis?
10         MR. BONI:  Object to form.
11         A.  I think it's mostly through the
12   fourth factor, as I've already discussed.
13         Q.  In Paragraph 8 you say, "I conclude
14   that unrestricted and widespread conduct of the
15   sort engaged in by Google would result in a
16   substantially adverse impact on the potential
17   market for books."
18         A.  Yeah.
19         Q.  Do you see that?
20         A.  Yes.
21         Q.  Is that the conclusion of your
22   report?
23         MR. BONI:  Object to form.
24         A.  That is a conclusion of my report.
25         Q.  Is that the most important conclusion

Page 188

1    of your report?
2          MR. BONI:  Object to form.
3          A.  I guess I hadn't ranked the
4    conclusions in order of importance.
5          MR. BONI:  Important to whom?
6    Important in what way?  It's too vague and
7    ambiguous a question.
8          MR. GRATZ:  Please let the witness
9    finish.
10         MR. BONI:  I'm sorry.
11         MR. GRATZ:  I'll ask it again.  Could
12   we have the question read back.
13         Q.  Is the statement in Paragraph 8 the
14   most important conclusion in your report?
15         MR. BONI:  Object to form.  Vague and
16   ambiguous as to the term "important."
17         A.  I hadn't ranked the conclusions by
18   importance, so I'm not sure.
19         Q.  Referring to Paragraph 8, what do you
20   mean by unrestricted?
21         A.  There are several kinds of
22   restrictions that could in principle attach to
23   anyone engaged in the kind of conduct Google has
24   been engaged in.  By unrestricted I meant to
25   convey that perhaps few to none of those

47 (Pages 185 to 188)

Page 189

1    restrictions would, in fact, be in place.
2        Q.   What are those restrictions?
3        A.   For example, there could be
4    restrictions as to the length of each snippet,
5    the number of snippets per page, the number of
6    times a user can view snippets from a single
7    work, the systems to keep out automated crawling
8    software, the systems to prevent users from
9    pooling their snippets in order to slowly piece
10   back together the entire work, a variety of
11   restrictions in that vein.
12       Q.   And your conclusion is that without
13   those restrictions, the use would result in a
14   substantially adverse impact on the potential
15   market for books?
16       A.   That's certainly true.
17           MR. BONI:  Object to form.  Doesn't
18   limit it to unrestricted.  You're not reading it
19   accurately, Joe.  You left out unrestricted and
20   widespread conduct of the sort engaged in by
21   Google.
22       Q.   So I just want to make sure I
23   understand what you mean by unrestricted, and by
24   unrestricted in your previous answer I
25   understand you to mean that it's not -- it

Page 190

1    wouldn't be subject to restrictions such as
2    restricting the length of the snippet,
3    restricting the number of snippets per page and
4    so on; is that right?
5        A.   That's what I have in mind sitting
6    here today rereading the sentence.  There may be
7    other restrictions that could reasonably be read
8    into that word.
9        Q.   The next word is -- it says
10   unrestricted and widespread.  What do you mean
11   by widespread?
12       A.   Affecting a large number of works, a
13   large number of books, accessible to a large
14   number of users, unreasonable price.  If you
15   told me that, you know, the subscription would
16   be $1 million a year to be able to search the
17   books, that wouldn't be widespread.  Few people
18   would be willing to pay it.  It would be less
19   likely to have an adverse impact on the
20   potential market for books.
21       Q.   In Paragraph 8 you referred to
22   unrestricted and widespread conduct of the sort
23   engaged in by Google.  Do you see that?
24       A.   Yes.
25       Q.   What do you mean by conduct of the

Page 191

1    sort engaged in by Google?
2        A.   I mean the large-scale scanning of a
3    large number of in-copyright books, the digital
4    archival of those scans, and the presentation
5    of, at least, portions of those works through an
6    interactive website.
7            THE VIDEOGRAPHER:  Here ends Tape 4.
8    Off the report, 3:21 p.m.
9            (Brief recess.)
10           THE VIDEOGRAPHER:  We're back on the
11   record.  It's 3:24 p.m.
12       Q.   Mr. Edelman, I understand that
13   following our break and your discussion with
14   Mr. Boni, you have a clarification for one of
15   your previous responses.
16       A.   Yes.
17       Q.   Go ahead.
18       A.   The word "unrestricted" in Paragraph
19   8, what I meant to convey when I wrote this
20   paragraph was that the word "unrestricted"
21   refers to the sort of conduct that might be
22   permitted if the court were to rule that
23   Google's conduct was a fair use, and, therefore,
24   that other sites and services could engage in
25   the same conduct, consistent with that ruling.

Page 192

1        Q.   What restrictions would not be in
2    place in such a circumstance making it
3    unrestricted?
4        A.   The restrictions of the copyright
5    act, I suppose, would not be in place if this
6    were deemed to be a fair use, and, therefore,
7    permissible notwithstanding restrictions of the
8    copyright act.
9        Q.   So do I understand you to be
10   testifying that what unrestricted means is
11   permissible under the Fair Use Doctrine?
12       A.   What I intended to convey in
13   Paragraph 8 was that if the fair use ruling were
14   in Google's favor and if other sites arose on a
15   widespread basis with conduct similar to
16   Google's, then there would be a substantially
17   adverse impact on the potential market for
18   books.
19       Q.   Does the word "unrestricted" in
20   Paragraph 8 refer to restrictions on the length
21   of a snippet?
22       A.   The length of a snippet is surely a
23   factor that would be considered for purposes of
24   a finding of fair use, but the word
25   "unrestricted" there was intended, perhaps

48 (Pages 189 to 192)

Page 193

1    somewhat unclearly, but intended to capture all
2    that would follow if a fair use ruling were to
3    find that the Google conduct in this area is a
4    fair use.
5        Q.  When you refer in this sentence to
6    conduct of the sort engaged in by Google, are
7    you including or excluding from what you mean by
8    that phrase the security measures put in place
9    by Google?
10       MR. BONI:  Object to form.  You can
11   answer.
12       A.  Well, the security measures
13   encompasses certainly multiple aspects; for
14   example, one could think of the duration, the
15   length in words of a snippet as a security
16   measure, the number of snippets per page as a
17   security measure, the way Google secures its
18   network and secures its server is surely a
19   security measure.
20       What I envision here is the state of
21   affairs in which a court offers a fair use
22   finding in Google's favor, and then others begin
23   to install similar services in their own way.
24   They probably do it somewhat differently than
25   Google.  They might have 20 percent more words

Page 194

1    in their snippet.  Their servers might be a
2    little bit less secure because they're not quite
3    as clever as Google in securing them.  Exactly
4    which things they do differently and how they do
5    them differently is hard to predict sitting here
6    today, but in Paragraph 8, I intended to
7    contemplate the state of affairs where they
8    begin to head down that road.
9        Q.  Could those differences between those
10   later users and Google affect whether the use by
11   the later user you're hypothesizing is, in fact,
12   a fair use?
13       A.  Yes, they could.
14       Q.  So a ruling that what Google is doing
15   is fair use doesn't necessarily mean that what
16   someone else would be doing, to the extent it
17   was different from what Google was doing, would,
18   likewise, be a fair use; is that right?
19       A.  I think that's true.  At least when
20   taken to the extreme.  If there was a site whose
21   idea of a snippet was up to 500 words, one would
22   scoff at the idea that a snippet could have 500
23   words, and it's possible that Google's use is a
24   fair use, and that site's use is not a fair use.
25       On the other hand, whatever Google is

Page 195

1    doing, I bet you could add 20 percent to it, and
2    if Google's use is a fair use, that plus 20
3    percent version might also be a fair use, and
4    how about plus 40 percent.  One gets into some
5    interesting questions of the gray area.
6        Q.  Is it your view that if what Google
7    is doing is found to be a fair use, then showing
8    20 percent larger snippets is necessarily also a
9    fair use?
10       A.  Not necessarily.  There has to be a
11   line somewhere.  But, surely, there will be some
12   difficult line-drawing exercises in that event.
13       Q.  Who would be the arbitrator in those
14   line-drawing exercises?
15       MR. BONI:  Object to form.
16       A.  I think it's beyond the scope of my
17   report, but I'm happy to try to answer.  I think
18   it would have to be a judge when the case was
19   brought, if such a case was brought.
20       Q.  And that judge could decide whether
21   these different circumstances were, likewise,
22   fair use or whether the differences meant that
23   the later user was not engaged in fair use; is
24   that right?
25       A.  I think that would be the question

Page 196

1    posed, yes.
2        Q.  What does "substantially adverse
3    impact" mean in Paragraph 8?
4        A.  I was thinking about the word
5    substantial with its meaning in multiple
6    contexts, material, substantial, that is,
7    something that an author or publisher would need
8    to consider when deciding whether or not to
9    engage in the economic enterprise of writing or
10   publishing a book.
11       Q.  And you use the word "would" in
12   Paragraph 8.  Do you see that?
13       A.  Yes.
14       Q.  Does that indicate that it is your
15   view that the probability of such a
16   substantially adverse impact is 100 percent?
17       A.  In this state of affairs discussed
18   here, I think the probability is very, very
19   high.  I wouldn't call it 100 percent.  Nothing
20   is certain.  But it's sufficiently likely that
21   the word "would" is an appropriate word to use.
22       Q.  You've referred in your previous
23   answer "the state of affairs discussed here."
24   What did you mean by that?
25       A.  The hypothesis of Paragraph 8.

49 (Pages 193 to 196)

1      Q.  The hypothesis is that if
2  unrestricted and widespread conduct of the sort
3  engaged in by Google, that is, widespread
4  scanning, archiving and presentation of portions
5  through web services without necessarily the
6  limitations and security measures put in place
7  by Google were to occur, then that would result
8  in a substantially adverse impact on the
9  potential market for books; is that right?
10      A.  I was with you except for the clause
11  that began "without."
12      Q.  Did you not understand it or not
13  agree with it?
14      A.  I thought that when you said it it
15  differed from what I intended to convey.  The
16  meaning of the word "unrestricted," as I
17  intended to use it here, is not restricted by
18  the Copyright Act because the fair use defense
19  offers that exception of the Copyright Act.
20      Q.  So if that conduct, that is,
21  scanning, archiving, and presentation of
22  portions of works was found to be fair use,
23  regardless of security measures, it's your view
24  that that would result in a substantially
25  adverse impact on the potential market for

1  books?
2          MR. BONI:  Object to form.  Joe,
3  that's mischaracterizing the nature of our
4  claims by leaving out the fact that we also
5  allege that the conduct engaged in by Google
6  includes distribution of the scans back to the
7  libraries.
8      Q.  You can answer the question, Mr.
9  Edelman.
10      A.  Again, you've inserted into the
11  question the hypothesis that the other sites
12  have no restriction as to snippet length or
13  quantity or what have you, and that certainly
14  makes the conclusions of Paragraph 8 even more
15  certain.  If the other sites are offering
16  snippets of exceptional length, then I
17  definitely stand by the conclusion of
18  Paragraph 8.  But even if we don't add that
19  additional hypothesis, I still stand by
20  Paragraph 8 as written.
21      Q.  So is it your view, as expressed in
22  Paragraph 8, that if there were a dozen or 100
23  other enterprises doing in every respect exactly
24  what Google does with all of Google's security
25  measures and all of Google's resources, that

1  that would result in a substantially adverse
2  impact on the potential market for books?
3      A.  If they were doing it exactly the
4  same as Google, that is not my view.  But I
5  didn't intend to address that situation either.
6  I intended to address the situation where
7  they're doing it like Google except, except that
8  they're doing it themselves, and they're not
9  quite as diligent, or they're cutting some
10  corners, but nonetheless, they manage to fall
11  within the Google fair use ruling.
12      Q.  You say it would result in a
13  substantially adverse impact on the potential
14  market for books.  Do you mean that on balance
15  the effect would be negative?
16      A.  We haven't discussed any positive
17  effects.
18          MR. BONI:  Object to form.
19      Q.  Does Google's current conduct with
20  respect to in-copyright books have any positive
21  effects on copyright-holders?
22      A.  It could in some situations.
23      Q.  Would the conduct you hypothesize in
24  Paragraph 8 have any positive impact on
25  copyright-holders?

1      A.  It might.  We'd need to look at the
2  sites and their specific practices to see.
3      Q.  By the "sites," you mean the future
4  sites that could come into being?
5      A.  Precisely.
6      Q.  Is the effect you hypothesize on
7  books in general or on particular books?
8      A.  I meant to cover the full universe of
9  books that are subject to the scanning.
10      Q.  The scanning by the future users?
11      A.  Right.  Although to be sure, in
12  principle, there might be some effect even on
13  books that were never scanned.  The book that I
14  declined to write because I anticipated that it
15  would be scanned, not knowing that every single
16  one of the scanners would hate my book so much
17  that they wouldn't bother to scan it.  It's the
18  threat of scanning and the threat of
19  distribution that has the preclusive effect,
20  discouraging the production of the book, for
21  example.
22      Q.  Would the effect be the same for all
23  authors?
24          MR. BONI:  Object to form.
25      A.  I think there are some important

50 (Pages 197 to 200)

Page 201

1    effects that would be the same, substantially
2    the same for all authors.  There might be some
3    others that would differ in idiosyncratic ways.
4        Q.  How would those differ?
5        A.  There might be some authors for whom
6    the snippet better captures the essence of the
7    work than others, where the work must be read as
8    a whole.  There might be some authors who are so
9    well known that they've already sold every
10   possible copy they could sell, others who could
11   benefit from visibility links to Google, others
12   who would suffer because the online copy of
13   their book would be a realistic substitute for
14   purchasing the book.
15       Q.  Any other way?
16       MR. BONI:  Again, this is not what
17   the witness is here to testify about.  He's here
18   to testify about security.
19       MR. GRATZ:  Well, I'm asking about
20   his opinion that something would result in a
21   substantially adverse impact on the potential
22   market for books, and I want to figure out what
23   he means by that.
24       Q.  So is there any other way that
25   books -- that the conduct you hypothesize would

Page 202

1    differ in its effect from book to book?
2        MR. BONI:  Object to form.
3        A.  There probably are some books that
4    are more amenable to being used in snippets.
5    Others for which having the entire work is
6    particularly important.  Probably some you need
7    in your bag, and some where you can accept an
8    online substitute.  There could be differences
9    of this sort.  I think these differences in
10   general are smaller than the overall effect.
11       Q.  Would it matter to the amount of the
12   adverse impact on the potential market for a
13   book in the situation you hypothesized if that
14   book was in print or out of print?
15       MR. BONI:  Object to form.  He's not
16   here as a fair use expert, Joe.
17       MR. GRATZ:  I'm not asking about fair
18   use.
19       MR. BONI:  You are.  That's a ---
20   that's a legal -- you're calling for a legal
21   conclusion there, and you know you are.
22       Q.  You can answer the question.
23       MR. BONI:  No, at this point, I'm
24   going to cut it off.  That's not what he's here
25   to -- that's not what he's proffered himself as

Page 203

1    an expert about.  He's not here to tell you
2    whether in print or out of print differs.
3    That's a legal question, and he is not here to
4    opine about that area of this case.  You really
5    ought to stick to what he's proffered for.
6        Q.  Referring to Paragraph 8 of your
7    report, Mr. Edelman, the last word in that
8    paragraph is "books."  Do you see that?
9        A.  Yes.
10       Q.  And I want to ask you a question
11   about what books you are referring to by that
12   reference in Paragraph 8 of your report.  The
13   substantially adverse impact you referred to in
14   Paragraph 8 of your report on the potential
15   market for books, does that substantially
16   adverse impact, will it vary, depending whether
17   the book is in print or out of print?
18       MR. BONI:  Object to form.
19       A.  It's not a question I thought about
20   when drafting the report.
21       Q.  The substantially adverse --
22   actually.
23       Let me ask this:  Do you have a view
24   about it?
25       A.  Every book is in print when it's

Page 204

1    published.  The day I publish it, it's in print.
2    The day I consider writing it, I'm planning for
3    it to be in print for a while, so that I can
4    sell some copies and be paid for my efforts in
5    writing it.  No one expects their book to be in
6    print forever.  You do expect it to be in print
7    for a while.  If digital copies reduced your
8    ability to sell it when it's in print for a
9    while, then you'll enjoy lesser revenue and
10   lesser profit from selling it.
11       So I would think it would affect all
12   books.  As to the guys who are dead, we can't
13   motivate Ben Franklin to write any more books.
14   No matter what we do with the Copyright Act,
15   he's still dead, and he's not going to write any
16   more books for us, be that as it may.
17       Q.  That means that with respect to books
18   that are already out of print, there wouldn't be
19   an impact one way or the other, as long as they
20   were out of print at the time the scanning took
21   place; is that right?
22       MR. BONI:  Object to form.
23       A.  That's beyond what I've thought about
24   previously.  There might be some factors I'm not
25   considering.

51 (Pages 201 to 204)

1    MR. BONI:  You should stick to what
2  you were --
3    MR. GRATZ:  Please don't interrupt
4  the witness.
5    MR. BONI:  He was finished -- he was
6  finished, and I'm cautioning the witness to
7  testify about the subject matter of the expert
8  report and your qualifications.
9    Q.  So, Mr. Edelman, that means that with
10 respect to books that are already out of print
11 at the time the hypothesized scanning took
12 place, the substantially adverse impact on the
13 potential market for those books couldn't occur
14 because they're already exited from the market;
15 is that right?
16    MR. BONI:  Object to form.  You can
17 answer.
18    A.  I'm not sure.  There could be --
19 there could be effects that I haven't
20 considered.  It's just so far outside of what
21 the expert report is about that I shouldn't
22 speculate.
23    Q.  So you didn't consider the effect on
24 in-print versus out-of-print books in forming
25 the opinions set forth in your expert report?

1    A.  I considered all books taken as a
2  whole, taken collectively.
3    Q.  Did you take any steps to quantify
4  the effect referred to in Paragraph 8?
5    A.  I did not.
6    Q.  The effect referred to in Paragraph
7  8, is it an effect that would result -- it's an
8  effect that would result from follow-on behavior
9  by third parties in the event of a ruling of a
10 certain sort in your view, not as a result of
11 Google's current actions; is that right?  In
12 other words, you aren't opining here about the
13 effects of what Google has done to date?
14    A.  I'm not opining on the effects of
15 what Google has done to date.  It's about
16 something else, either what Google might do in
17 the future or what others might do in the
18 future.
19    Q.  Turning to Paragraph 9 of your
20 report, you say "If the Google Library Project
21 is found not to be a fair use, then books could
22 be digitally copied, distributed and displayed
23 through licenses that include security protocols
24 and a damages structure for breaches of those
25 protocols."  Do you see that?

1    A.  Yes.
2    Q.  If -- if the Google Library Project
3  is found to be a fair use, then books could,
4  likewise, in your view, be digitally copied,
5  distributed and displayed in their entirety
6  through licenses that include secured protocols
7  and a damages structure for breaches of those
8  protocols; is that also true?
9    A.  Thanks to the breadth of the word
10 "could," it's true, but the reality is that the
11 Google Library Project would have no reason to
12 enter into a license that includes security
13 protocols, nor would any other site have reason
14 to enter into a license that includes security
15 protocols because they can instead take the
16 material without license and without security
17 protocols.
18    Q.  What security terms do you
19 hypothesize?
20    A.  My thinking here is guided by
21 approaches used in other sectors.  For example,
22 the credit card network has quite well-developed
23 security rules as to what a merchant or bank
24 must do to secure this valuable material in
25 order to avoid causing harm to others in that

1  ecosystem.  So there are specific actions that
2  must be taken, specific audits, specific
3  technologies that must be used, and then there
4  are a set of damages, both actual damages and
5  liquidated damages in the event of breach,
6  compensation to be paid to those who suffer harm
7  as a result of a breach.
8    Q.  And those damages are -- in your
9  previous answer are you referring to something
10 called PCI?
11    A.  PCI is one of the requirements of
12 that web of contract, although there are others
13 beyond PCI.  PCI largely refers to the technical
14 standards, but then there's a set of contracts.
15 If you fail your PCI, if you had a breach during
16 a period where you hadn't complied with your
17 PCI, then you must pay this much money to these
18 victims.
19    Q.  Are you aware of any such agreements
20 in The Book Space?
21    A.  My understanding is that the
22 proposed, now defunct settlement agreement in
23 this case had provisions in that vein.
24    Q.  Are you aware of any others?
25    A.  In the related context of digital

52 (Pages 205 to 208)

Page 209

1   music and digital movies, my understanding is
2   that there are confidential contracts typically
3   between the right-holders and the technology
4   providers offering certain compensation in the
5   event of certain breaches.
6        Q.  Do you know the terms of those
7   contracts?
8        A.  Some of them may be publicly
9   available.  My understanding was that most of
10  them are confidential and not readily available.
11       Q.  I'm not asking whether they are
12  available.  I'm asking whether you know the
13  terms of any of those contracts governing the
14  storage of digital music or movies?
15       A.  I haven't had the opportunity to read
16  the contract.  I know about them only
17  secondhand.
18       Q.  And what you know secondhand is that
19  they include liquidated damages for security
20  breaches?
21       A.  They include the kinds of methods
22  just discussed, some combination of liquidated
23  damages, perhaps actual damages, perhaps
24  specific actions to be taken, specific
25  technologies to be implemented.

Page 210

1        Q.  And how do you know that?
2        A.  I'm not sure.  I've a few
3   possibilities in mind.  People who might have
4   told me this previously.
5        Q.  What are those people?
6        A.  My contact at Universal Music Group
7   pursuant to the cases previously discussed is
8   the general counsel at Universal Music Group,
9   and I think his name is a Mr. Geller.
10       Q.  Is that Harvey Geller?
11       A.  That's right.  It might be from him.
12  It might be from someone else.  It might be from
13  discussions at an executive education program
14  here on the HBS campus where I spent some time
15  with music industry participants.
16       Q.  Did you rely on your conversations
17  with Harvey Geller in forming your opinions set
18  forth in Paragraph 9 of your report?
19       A.  No.
20       Q.  Did you rely on any discussions with
21  any content industry participant in forming the
22  opinions set forth in Paragraph 9 of your
23  report?
24       A.  No.
25       Q.  On what did you rely in forming the

Page 211

1   opinions set forth in the first sentence of
2   Paragraph 9 of your report?
3        A.  The first sentence there discusses
4   what could be done, and to see what could be
5   done, I need look no further than the proposed
6   settlement agreement in this case and consider
7   what I as an attorney or a business person might
8   do if I were trying to solve this problem.
9        Q.  Did you do a survey of contracts
10  governing the digital storage of books in
11  connection with forming the opinions you
12  expressed in your report?
13       A.  I did not do such a survey.
14       Q.  Have you ever seen such a contract,
15  setting aside the settlement agreement in this
16  case that was rejected by the court?
17       A.  I'm not sure.
18       Q.  Do any come to mind?
19       A.  Nothing comes to mind.
20       Q.  Were there any on which you relied in
21  forming the opinions set forth in your report?
22       A.  No.
23       Q.  Do you know whether any such
24  contracts include the security term which you
25  hypothesize in the first sentence of

Page 212

1   Paragraph 9?
2        A.  I guess I don't know for sure.
3        Q.  Do you know whether any include the
4   damages term which you hypothesize in the first
5   sentence of Paragraph 9?
6        A.  I don't know for sure.
7        Q.  Are you aware of something called the
8   Google Books Partner Program?
9        A.  Yes.
10       Q.  What is it?
11       A.  That's a program whereby publishers
12  can provide copies of their books to Google for
13  display in any of several versions to users who
14  enter relevant searches.
15       Q.  Is it your understanding that there
16  are more than 45,000 publishers participating in
17  that program?
18       A.  I'm not sure.
19       Q.  Do you know the terms of any of the
20  Google Books Partner Program agreement?
21       A.  I'm not sure.  If the contract is
22  posted.  I might have read it, but I don't
23  recall one way or the other.
24       MR. GRATZ:  I'd like that marked as
25  Exhibit 19, this document.

53 (Pages 209 to 212)

Page 213

1    (Document marked as Exhibit No. 15
2  for identification.)
3    Q.  Have you seen this document before,
4  Mr. Edelman?
5    A.  I think I've seen this at least once,
6  yes.
7    Q.  What is it?
8    A.  It says it's the "Google Books
9  Partner Program standard terms and conditions."
10   Q.  Does Exhibit 15 include the security
11  and damages terms that you hypothesize in
12  Paragraph 9 of your report?
13   A.  It includes at least some, for
14  example, Paragraph 4.
15   Q.  In Paragraph 4 says that, "Google
16  will use commercially reasonable efforts to
17  limit the number of pages viewed and to disable
18  right-click cut, copy and paste functions,
19  provided that Google does not guarantee that its
20  efforts to prevent or limit the actions stated
21  above will in every instance be effective."  Is
22  that right?
23   A.  Yes.
24   Q.  Does that differ from the terms you
25  have hypothesized would be negotiated in

Page 214

1  Paragraph 9 of your report?
2    A.  Well, this is an agreement negotiated
3  between Google and a publisher.  The publisher
4  gives up some rights.  On the other hand, they
5  stand to gain advertisement revenue from Google
6  pursuant to Section 8 and perhaps visibility,
7  perhaps some other benefits.  So it's a contract
8  negotiated between two parties.  This is a fine
9  example of the kind of outcome that might
10  result.
11   Q.  So in your view -- actually let me
12  ask this.
13        Does Exhibit 15 include the damages
14  terms that you hypothesize in Paragraph 9 of
15  your report?
16   A.  It doesn't include explicit terms to
17  that effect.  On the other hand, it includes a
18  specific commitment, commercially reasonable
19  efforts, words that have meaning.  If it should
20  turn out that Google used less than commercially
21  reasonable efforts, and if damages ensued, you'd
22  expect the relying party to be able to bring
23  suit for the damages that resulted from that
24  breach, subject to any exclusions or waivers
25  that might be provided elsewhere in the

Page 215

1  contract.
2    Q.  So when you say in Paragraph 9 that
3  books could be copied through licenses that
4  include a damages structure for breaches of
5  those protocols, do you mean anything other than
6  include promises not to breach those protocols
7  which could then result in contract expectation
8  damages in a breach of contract suit?
9        MR. BONI:  Object to form.
10  Mischaracterizes his testimony.
11   A.  I did envision something other than
12  expectation damages.  I envisioned something
13  that would look more like liquidated damages due
14  to the significant difficulty of proving out
15  one's expectation damages, but in principle, the
16  parties could agree to do it either way.  It
17  would be a negotiation between them, and I'm not
18  going to tell them where they have to end up in
19  that negotiation.
20   Q.  Do you have a view as to what the
21  probability would be that the parties to a
22  license of the -- the license -- strike that.
23        Do you have a view as to what the
24  probability would be that the parties to your
25  license you identify in Paragraph 9 of your

Page 216

1  report would, in fact, negotiate inclusion of
2  liquidated damages as a term of the contract?
3    A.  Well, I think they just might because
4  Google is so confident in its excellent security
5  that they would view that kind of promise as
6  cost free.  If we are invaded by martians or
7  someone hacks our server, we'll give you a
8  million dollars, and neither of those things is
9  going to happen.  We're so confident in our
10  engineers, that we're willing to put a million
11  dollars behind it.
12   Q.  Is Exhibit 15 a counter example to
13  that hypothesis, in that it does not include
14  provision for liquidated damages?
15   A.  You know, this is the standard terms
16  and conditions.  Whether every publisher gets
17  this, I'm not sure.  I wouldn't be surprised if
18  a big publisher, a publisher with works that
19  Google particularly wanted, a publisher that
20  possessed some market power, frankly, was able
21  to insist on terms superior to these standard
22  terms.
23   Q.  But it's not your view that every
24  copyright-holder would have the power to insist
25  on such terms in the negotiation you hypothesize

54 (Pages 213 to 216)

Page 217

1  in Paragraph 9 of your report?
2       MR. BONI:  You mean with Google or
3  with anybody?  It's a very vague question,
4  unless you limit it.
5       Q.  With anybody?
6       A.  Yeah, if there were a marketplace of
7  many companies all needing permission to scan
8  books or digitally post books, some of whom had
9  great difficulty getting traction, I wouldn't be
10  surprised if the ones having the most difficulty
11  were willing to put their money behind it, some
12  kind of a performance bond or what have you.
13  There have been sectors in which this sort of
14  thing has occurred where performance bonds
15  actually are quite routine for folks to
16  demonstrate their capability and the adequacy of
17  their systems.
18       Q.  Has it occurred with respect to books
19  to date?
20       A.  There haven't been that many
21  different companies wanting to license book
22  content to date, so that sort of competition
23  hasn't occurred with books to date.  I was
24  thinking of construction project performance
25  bonds and real estate agent performance bonds

Page 218

1  and the myriad of other contexts in which
2  service providers actually do put liquidated
3  damages in their contract in order to prove
4  their seriousness about providing the required
5  performance.
6       Q.  So it's your view that in the event
7  of competition between multiple service
8  providers, a market might result in which
9  liquidated damages clauses were included in the
10  licenses you discussed in Paragraph 9, but they
11  might or might not, depending on the market
12  dynamics?
13       A.  I think that's largely consistent
14  with my views.  To what extent it requires
15  competition and many services scanning or
16  digitally producing books, I'm not so sure, but
17  I do think that if a license were required, if
18  agreement from the publisher and/or author was
19  required, it would be more likely that the terms
20  would end up including provisions favorable to
21  the publisher and/or author, and the provisions
22  could well include these sorts of security
23  benefits.
24       Q.  But that outcome would depend on the
25  particular parties to that negotiation and what

Page 219

1  each one wanted and was willing to give up; is
2  that right?
3       MR. BONI:  Object to form.
4       A.  It might.  It might be that if Google
5  needs to enter into these contracts with
6  thousands of publishers, Google's standard
7  offer, their stock offer, their opening offer
8  and the standard terms and conditions would
9  actually become more generous because they
10  warned a large number of publishers to accept.
11       Q.  Do you know what proportion of the
12  publishers in the Google Books Partner Program
13  are participating pursuant to the terms in
14  Exhibit 15 as opposed to other terms?
15       A.  I don't know.
16       Q.  Would that fact affect your last
17  answer or rather the answer before the answer --
18  let me ask a slightly better question.
19       Would that fact affect your view of
20  the extent to which publishers would in the
21  situation you hypothesize in Paragraph 9 of your
22  report negotiate for and receive security terms?
23       A.  It might.  But one shouldn't read too
24  much into the past because publishers' decision
25  to accept the standard terms document in the

Page 220

1  past could reflect a variety of factors, causing
2  them to accept it even when in reality they
3  would have preferred a document rather
4  different.
5       Q.  Does the acceptance of Exhibit 15 by
6  many publishers suggest to you that the
7  publishers regard the bargain set forth in
8  Exhibit 15 as one that is satisfactory?
9       MR. BONI:  Objection to form.
10  There's no foundation for that question, Joe.
11       A.  That's not the conclusion that I
12  would draw from that fact.
13       Q.  Would you draw any conclusion from
14  that fact?
15       A.  No, I wouldn't -- I would draw a
16  different conclusion from that fact.
17       Q.  What conclusion would you draw?
18       A.  I would find it evidence of Google's
19  market power.
20       MR. GRATZ:  I'd like to mark as
21  Exhibit 16 this document.  Actually before I
22  mark this as Exhibit 16.
23       Q.  Are you familiar with something
24  called Amazon Search Inside the Book?
25       A.  Yes.

55 (Pages 217 to 220)

Page 221

1      Q.   What is it?
2      A.   It's a program whereby publishers can
3  provide copies of their book contents to be
4  presented on the Amazon website for users to
5  browse or search.
6      Q.   Have you ever seen the agreement
7  governing the terms under which Amazon may use
8  the books which are submitted through Search
9  Inside the Book?
10      A.   I think I looked at it once.
11          MR. GRATZ:  Mark this as Exhibit 16.
12          (Document marked as Exhibit No. 16 for
13  identification.)
14      Q.   Is this the agreement governing
15  Amazon's use of books submitted through Search
16  Inside the Book?
17      A.   It seems to be.  It seems to be at
18  least the standard version, and what variance
19  might exist, I don't know.
20      Q.   Does it include the security terms
21  that you hypothesize in Paragraph 9 of your
22  report?
23      A.   It includes a portion of them.
24      Q.   How do the terms of Exhibit 16 differ
25  from the agreement that you hypothesize in

Page 222

1  Paragraph 9 of your report?
2      A.   Certainly the substantive commitment
3  is rather narrow here in Exhibit 16.  Amazon
4  will employ available technologies to hinder
5  downloading.  But it's something.  It says
6  they'll do something, and if they don't, you
7  could try to sue them for your actual damages
8  that resulted from that breach.
9      Q.   Does it include liquidated damages
10  for breach?
11      A.   I don't see any liquidated damages.
12  I do see the remedy that at least an author or
13  publisher can take their books out which is a
14  benefit.  Better than nothing, from their
15  perspective.
16      Q.   Do you consider that an important
17  remedy for an author or publisher?
18      A.   It's a limited remedy.  You know, one
19  shouldn't be too effusive in the praise, but the
20  alternative is even worse.
21      Q.   The alternative being the provider
22  being deaf to requests for removal?
23      A.   Correct.
24      Q.   Does the existence of Exhibit 16 as
25  an -- actually strike that.

Page 223

1          Do you know how many books are in
2  Search Inside the Book by Amazon?
3      A.   Quite a lot.  But I don't know
4  specifically.
5      Q.   Does the existence of Exhibit 16 as
6  the terms by which those books are digitized,
7  stored and shown to the public change any of the
8  views expressed in your report?
9      A.   No.
10      Q.   Is Exhibit 16 the sort of agreement
11  that you are referring to in the first sentence
12  of Paragraph 9 of your report?
13      A.   It's the sort of agreement; albeit,
14  not with the substantive terms that I was
15  anticipating.  It's a contract between the right
16  parties.  It has the right kind of title on it.
17      Q.   What reason do you have to think that
18  in the future parties would bargain for
19  different terms than they have in Exhibits 15
20  and 16?
21      A.   In the context of Exhibits 15 and 16,
22  these are books in print for which the publisher
23  might reasonably expect to sell more if they go
24  along with the contracts provided in 15 and 16.
25  The publisher at least gets something; namely,

Page 224

1  they get the possibility of more sales, thanks
2  to these examples being available.
3          In contrast, as to older books for
4  which there is less likelihood of additional
5  sales, maybe books out of print, it's harder to
6  see what the publisher's upside is.  Furthermore
7  here, the publisher gets to choose which
8  specific books they want to do it for one by
9  one, opting in; whereas, in other contexts, the
10  books are chosen by someone else, not by the
11  publisher.
12      Q.   In your previous answer, are you
13  distinguishing between a program like Amazon
14  Search Inside the Book and unrestricted fair use
15  of books or between a program like Amazon Search
16  Inside the Book and a future in which the Google
17  Library Project is found not to be a fair use?
18          MR. BONI:  Object to form.
19      A.   I'm getting a little bit muddled
20  here.  I think maybe both of those, but there
21  might be some part of it that only makes sense
22  in one or the other.
23      Q.   Let me ask this:  In the first
24  sentence of Paragraph 9 of your report, you're
25  discussing the situation in which the Google

56 (Pages 221 to 224)

Page 225

1  Library Project is found not to be a fair use;
2  is that right?
3      A.  Yes.
4      Q.  And you're hypothesizing certain
5  terms that would be bargained for as between
6  parties who wanted to make use of the books and
7  copyright-holders of those books in that
8  circumstance; is that right?
9      A.  Yes.
10     Q.  The terms that you hypothesize in
11  that hypothetical negotiation, in the event the
12  Google Library Project is found not to be a fair
13  use, do they differ from the terms set forth in
14  Exhibit 16?
15         MR. BONI:  Object to form.
16     A.  Who's to say what the parties might
17  come up with, but the most pro-publisher,
18  pro-author of those terms would certainly differ
19  significantly.
20     Q.  And the most pro -- the most pro-user
21  or most pro-Amazon version of those terms would
22  differ from these terms as well?
23     A.  I suppose there's a spectrum, and you
24  could go either way on the spectrum.
25     Q.  Do you know what the probability --

Page 226

1  so it could be -- it could be -- the negotiation
2  could end up anywhere on the spectrum, is that
3  right, between the most anti-copyright-holder
4  terms and the most pro-copyright-holder terms;
5  is that right?
6      A.  It could end up along the spectrum, I
7  suppose, anywhere, although there are factors
8  that might make it more likely to end up on one
9  end or the other end.
10     Q.  What is the probability of it ending
11  up on the most anti-copyright-holder end?
12     A.  The spectrum doesn't even necessarily
13  have an end.  You can always go further, but I
14  think the likelihood is that it would end up
15  somewhere in the middle; whereas, when I look at
16  15 and 16, they look like unilateral contracts
17  drafted by the service providers.  They seem to
18  have an awful lot of disclaimers of liability
19  and disclaimers of warranty.  They look like
20  they were drafted by Google's lawyers and
21  Amazon's lawyers.  I think they look like that
22  because they were, and those lawyers did a good
23  job of representing their clients' interest.
24     Q.  So you can't rule out the possibility
25  that the hypothetical negotiation set forth in

Page 227

1  the first sentence of Paragraph 9 of your report
2  would result in precisely the terms set forth in
3  Exhibit 15 or precisely the terms set forth in
4  Exhibit 16?
5      A.  That could happen.
6      Q.  Indeed, the terms could be worse for
7  the copyright-holders than these or they could
8  be better?
9      A.  They could be worse or they could be
10  better.
11     Q.  In your view, is one of the factors
12  that would make them better for
13  copyright-holders having an organization making
14  the use that was more sensitive to
15  copyright-holder concerns?  Would that make it
16  more likely that the damages and security terms
17  would be in the agreement?
18     A.  If the service provider needed this
19  agreement, because absent the agreement they
20  couldn't provide the service they aspire to
21  provide, then they would be more likely to come
22  with hat in hand, willing to bend over backwards
23  in order to make sure that they got the contract
24  that they needed.
25         Conversely, if they thought we don't

Page 228

1  really need this because it's just fair use
2  anyway, we can do what we want; if we get a
3  contract, that's great, if not, that's okay too,
4  well, then they'd be less likely to agree to
5  contract terms that were on the side of the
6  publishers.
7      Q.  Do you think the identity of the
8  service provider matters in that a service
9  provider that was affiliated with
10  copyright-holders, for example, would be more
11  likely to include a security term in liquidated
12  damages?
13         MR. BONI:  Object to form.
14     A.  I think it's probably true that a
15  company that comes from the world of copyright,
16  and has as its constituents its management team,
17  its attorneys, folks who come from that world
18  and that view, would be more likely to be
19  sensitive of the concerns of those constituents.
20         MR. GRATZ:  Mark this as Exhibit 17.
21         (Document marked as Exhibit No. 17 for
22  identification.)
23         MR. BONI:  Seventeen?
24         MR. GRATZ:  Yes, 17.
25     Q.  Do you recognize what's been marked

57 (Pages 225 to 228)

Page 229

1  as Exhibit 17?
2      A.  I don't.
3      Q.  Do you know -- are you aware of
4  something called Back In Print?
5      A.  I think so.  But I'm not sure
6  specifically.  It's well beyond anything I
7  opined on in this report.
8      Q.  Are you aware that the Authors Guild
9  is a party to this lawsuit?
10     A.  Yes.
11     Q.  And that's the party for which you --
12 in favor of whom you submitted your expert
13 report; is that right?
14         MR. BONI:  Object to form.
15     A.  Yes.
16         MR. BONI:  On its face for all
17 plaintiffs, not one as opposed to any other, but
18 if that's the import of your question, Joe.
19         MR. GRATZ:  No.
20         MR. BONI:  You said "the party," on
21 whose behalf.
22         MR. GRATZ:  Sorry.  One of the
23 parties on whose behalf.
24         MR. BONI:  Right, I understand.  I
25 just want it to be clear.

Page 230

1      Q.  The author -- that same Authors Guild
2  is one of the parties to the Exhibit 17; is that
3  right?
4      A.  Yes.
5      Q.  Exhibit 17 is an agreement by which
6  an entity called iUniverse, along with the
7  Authors Guild, can, among other things, make
8  certain books of signatories to this agreement
9  available as eBooks; is that right?
10     A.  So it seems.
11     Q.  Does Exhibit 17 include any security
12 terms?
13         MR. BONI:  When you say --
14         MR. GRATZ:  There's a new question
15 pending.
16     A.  I don't see any security terms.
17     Q.  Are there any liquidated damages
18 terms in exhibit -- are there any liquidated
19 damages terms in Exhibit 17?
20     A.  I don't see any.
21     Q.  Do the terms of Exhibit 17 differ
22 from the terms you hypothesize in Paragraph 9 of
23 your report?
24     A.  As I understand it, so far this is
25 quite a different service than what I was

Page 231

1  contemplating in Paragraph 9 or what we've been
2  discussing in Exhibits 15 and 16.
3      Q.  In that this is a service to sell
4  eBooks rather than a service to help people find
5  books?
6          MR. BONI:  Object to form.  That
7  wholly mischaracterizes the contract which says
8  both print copies and eBook copies.  This is not
9  an exclusively eBook program.  I mean, let's be
10 accurate here.
11     Q.  Let me ask some foundational
12 questions.  eBooks are electronic books; is that
13 right?
14     A.  Yes.
15     Q.  And eBooks are sold through
16 electronic means, at least today; is that right?
17     A.  Yes.
18     Q.  Through -- through computer networks
19 of one kind or another?
20     A.  Yes.
21     Q.  And eBook purchases take place
22 frequently through eCommerce websites; is that
23 right?
24     A.  Yes.
25     Q.  And eBooks are stored on those

Page 232

1  websites, and access is given to those eBooks
2  only after payment is made; is that right?
3      A.  Yes.
4      Q.  Thus eBooks present a similar
5  security concern as any other service that makes
6  available portions of books under certain
7  circumstances to certain people; is that right?
8      A.  Now I'm no longer with you.
9      Q.  So do eBooks -- does the offering of
10 eBooks bring with it security concerns?
11     A.  It does, but they're different
12 security concerns than the security concerns
13 associated with snippets.
14     Q.  They relate to making sure that only
15 the people who should have access to a given
16 work or portion thereof have access to a given
17 work or portion thereof; is that right?
18     A.  In the eBooks that I'm familiar with,
19 there's much less of a notion of portion.  A
20 user who buys an eBook has access to the
21 entirety of the eBook.  Typically, the eBook is
22 a single encrypted file which is provided in its
23 totality to the user for deployment to an eBook
24 reader, and that's the end of that.  That
25 security is pretty well understood at this point

58 (Pages 229 to 232)

Page 233

1    thanks to experience with similar technologies
2    in music and movies.
3        Q.  The provider of eBooks needs to store
4    the entire book on its servers; is that right?
5        A.  Yes.
6        Q.  It's at least possible that the book
7    could be stolen from the servers by one who
8    intrudes upon those servers; is that right?
9        A.  It could happen.
10       Q.  Do you consider that more or less
11   likely than the taking of books from one who
12   stores those books who is not an eBook provider?
13       A.  I think the snippet provider is more
14   vulnerable than the seller of eBooks.
15       Q.  Why?
16       A.  The snippet provider is offering in
17   all likelihood orders of magnitude more
18   transactions, giving away a very, very large
19   number of free snippets, versus selling a more
20   modest number of eBooks.  Furthermore, giving
21   things away at a cost of zero, the structure of
22   the web services that provide that tool uses
23   ordinary HTML images, JavaScript, maybe Flash,
24   probably not, uses the most standard and
25   insecure of web-based systems; whereas, the

Page 234

1    provision of an encrypted eBook uses highly
2    specialized secure file formats designed
3    specifically for that purpose.
4        Q.  Do any popular eBook formats not use
5    encryption?
6        A.  There are some that don't use
7    encryption.
8        Q.  Can one buy unencrypted eBooks from
9    Barnes & Noble?
10       A.  I don't recall one way or the other.
11       Q.  Can one buy unencrypted eBooks from
12   the Google eBooks store?
13       A.  I'm sure there are some.
14       Q.  And with respect to those, do the
15   risks associated with running that sort of
16   service similarly -- are they comparable to
17   running a snippet-based or indexing service?
18       A.  Even then, notwithstanding that the
19   file itself is unencrypted, the tasks are just
20   rather different to provide a single, large file
21   for deployment to the user's reader versus
22   providing a snippet in the browser, providing,
23   to be sure, orders of magnitude more snippets on
24   a per-second basis, just a voluminous task,
25   limiting the kinds of security that can be

Page 235

1    installed.
2        MR. GRATZ:  We can change the tape.
3        THE VIDEOGRAPHER:  Here ends Tape 5.
4    Off the record at 4:24 p.m.
5        (Brief recess.)
6        THE VIDEOGRAPHER:  Here begins Tape
7    No. 6 in today's deposition of Benjamin Edelman.
8    Back on the record.  It's 4:31 p.m.
9        Q.  Turning to Paragraph 11 of your
10   report, Paragraphs 11 and 12 discuss the current
11   state of book -- eBook piracy; is that right?
12       A.  Yes.
13       Q.  This eBook piracy discussed in
14   Paragraphs 11 and 12 isn't piracy that's
15   occurring via Google Books; is that right?
16       A.  That's true.
17       Q.  And it isn't a risk that Google Books
18   created; is that right?
19       A.  That's true.
20       Q.  And the contents of Paragraph 11 and
21   12 would be true whether or not Google Books
22   existed; is that right?
23       A.  That's true, although it's possible
24   that Google Books will make the problem worse.
25       Q.  The files you're referring to, the

Page 236

1    .mobi files, those are files that did not come
2    from Google Books; is that right?
3        A.  That's true.
4        Q.  Do the pirate sites referred to in
5    Paragraphs 11 and 12 offer snippets or whole
6    books?
7        A.  Whole books.
8        Q.  Why whole books instead of just
9    snippets?
10       A.  Once you're a pirate, there's no need
11   to use snippets.
12       Q.  Is it because the snippets aren't a
13   substitute for the whole books?
14       MR. BONI:  Object to form.
15       A.  In some circumstances I'm sure the
16   snippets are.  In others, they might not be.
17       Q.  In what circumstances would they be?
18       A.  When one just needs a quote, needs to
19   find the book that has a certain distinctive
20   phrase, in certain reference contexts, of
21   course, whether or not those reference contexts
22   would be included in the Google program as
23   currently envisioned.  There are other contexts
24   in which snippets could be sufficient.
25       Q.  Do you know whether any pirated books

59 (Pages 233 to 236)

Page 237

1   have ever come from Google's scans?
2       A.  I don't know.
3       Q.  Turning to Paragraph 13 of your
4   report, it says, "If Google's conduct is found
5   to be a fair use and others engage in similar
6   conduct, the risk is created of book
7   redistribution through piracy."  By "similar
8   conduct" do you mean scanning, archiving and the
9   presentation of the portions of books through a
10  web service?
11      A.  Yes.
12      Q.  Turning to Paragraph 14, you discuss
13  the risk that pirates could extract book copies
14  through defects in the security of a provider's
15  systems; is that right?
16      A.  Yes.
17      Q.  Is that a risk that, likewise,
18  applies to Amazon's Search Inside the Book
19  service?
20      A.  It does.
21      Q.  Is it inherent in any sort of digital
22  storage of a digitized book that makes portions
23  of that book available, either sort of -- or
24  makes the whole book available to those who have
25  purchased it?

Page 238

1       A.  With the others that we're
2   discussing, for example, Amazon Search Inside
3   the Book or those that sell books reflect a
4   contract, an agreement between the rights-holder
5   that owns rights in the books and the service
6   providers that's distributing it.
7           In contrast, this section
8   contemplates a finding of fair use and others
9   beginning to engage in similar conduct without
10  needing to get that permission, and so the
11  quality and caliber and capability of the folks
12  engaged in this task could be quite different.
13      Q.  Does the risk of extraction through
14  defects in the security of a provider's system
15  necessarily depend on whether or not there is an
16  agreement in place regarding security?
17          MR. BONI:  Object to form.
18      A.  It's not that the agreement itself
19  changes the risks, but that agreements might be
20  entered into only with those whose risks are
21  appropriate, for example, because of their
22  higher level of capability or their higher level
23  of care that they promised to exercise.
24      Q.  And the circumstances in which those
25  agreements would be entered into and the terms

Page 239

1   that would be negotiated is a subject that we
2   discussed previously, right?
3       A.  Right.
4       Q.  Turning to Paragraph 16, you
5   discussed the risk that someone could use a
6   staff member's user name and password to access
7   books; is that right?
8       A.  Yes.
9       Q.  And that would happen by stealing the
10  service provider's staff member's user name and
11  password and then using it, right?
12      A.  That's right.
13      Q.  Is the risk you discussed in
14  Paragraph 16 a risk which could be mitigated by
15  two-factor authentication?
16      A.  That would mitigate the risk.  It
17  wouldn't eliminate it, but it would make some
18  progress.
19      Q.  What is two-factor authentication?
20      A.  Two-factor authentication is a
21  security practice whereby a user is verified
22  using two distinct, distinctive characteristics,
23  a password perhaps being one, but another also
24  being required.
25      Q.  An example of one of those would be a

Page 240

1   one-time code number that appears on a key chain
2   sized screen and changes every once in a while;
3   is that right?
4       A.  That's an example.
5       Q.  And so the risk hypothesized in
6   Paragraph 16 would be one that service providers
7   who did not use two-factor authentication
8   properly could be subject to; is that right?
9       A.  Even two-factor authentication,
10  depending on how it's implemented, could still
11  be subject to this risk, but the risk is more
12  severe when a vendor uses only one-factor
13  authentication.
14      Q.  And two-factor authentication would
15  still be subject to this risk because somebody
16  could steal an employee's physical key chain as
17  well as stealing their user name and password;
18  is that right?
19      A.  If the second factor was, in fact, a
20  physical key chain, if it was something easier
21  to steal or easier to impersonate, tell me the
22  name of your first pet, something like that, or
23  you're logging in from a computer I recognize,
24  but maybe the attacker can impersonate that
25  computer, it might still be possible.

**60 (Pages 237 to 240)**

Page 241

1  Q.  Turning to Paragraph 17, it says,
2  "Fourth, a rogue employee could intentionally
3  redistribute book copies."  Is that true of any
4  electronic system to which employees of an
5  organization have access?
6      MR. BONI:  Object to form.
7      A.  It's true that any employee with
8  access to digital works could potentially
9  distribute them.  However, in general, employees
10 only have access to the works licensed by their
11 employer for their distribution or resale;
12 whereas, this section as detailed in
13 Paragraph 13 is about companies that might begin
14 to redistribute books pursuant to a finding of
15 fair use and without permission from the
16 rights-holders, an important difference that
17 would greatly expand the number of employees who
18 might potentially have access.
19     Q.  Are you aware of any circumstance in
20 which a rogue employee has distributed copies of
21 books from a book-service provider?
22     A.  I'm not aware of anything responsive
23 to that specific request.
24     Q.  How can that risk be mitigated?
25     A.  One way to mitigate is to allow

Page 242

1  rights-holders in books to approve the specific
2  vendors who are holding and distributing their
3  works.
4      Q.  How is that -- sorry.
5      A.  For example, pursuant to a contract,
6  and the contract could, if the parties so chose,
7  specify background checks or three-factor
8  authentication or authentication by two
9  different people, you need the guy and his
10 manager in order to get the digital file out of
11 repository, or you can only do it during
12 business hours.  There are lots of internal
13 controls that could be required through contract
14 if this were pursuant to the contract.
15     Q.  Do you know of any book-related
16 contracts that includes those terms?
17     A.  I don't know of that in the context
18 of books.
19     Q.  And in fact, the three book-related
20 contracts that we've looked at today all do not
21 include those terms; is that right?
22     A.  I'm not sure that those contracts
23 each to be exercised by -- to be entered into by
24 an individual publisher, those aren't
25 necessarily where we would look for it if it

Page 243

1  were to exist, but you're right that it's not
2  there.
3      Q.  Where would we look for it?
4      A.  We're talking about a class of
5  hundreds of thousands of works of market value,
6  God knows how much.  I'd want to know how Steven
7  Spielberg secures the pre-release copies of his
8  next big movie, and there, I bet the contract
9  between Spielberg and his movie company and the
10 guy who drives the truck with the master print
11 actually does say something about the way that
12 truck has to be locked and the GPS to be
13 installed on the roof of the truck and the
14 background check required for the driver.  I
15 would expect that all of those sorts of things
16 would be discussed in that contract.
17     Q.  What's the basis for your previous
18 answer?
19     A.  I've read a little bit about that
20 actually during the transition to digital movie
21 distribution, rather than movies being loaded
22 onto trucks.  A lot of these questions were
23 reopened and were the subject even of the
24 Wall Street Journal style news coverage.
25     Q.  What did you read?

Page 244

1      A.  I don't recall specifically.
2      Q.  Did you rely on the articles that you
3  referred to in your previous answer in forming
4  the opinions set forth in your report?
5      A.  No.
6      Q.  Turning to Paragraph 18, in the first
7  sentence you say, "Fifth, when books are scanned
8  by a smaller and less sophisticated provider,
9  there is a particular acute risk of book
10 contents being accessed and redistributed."
11 What do you mean by smaller and less
12 sophisticated?
13     A.  Google is fortunate to have ample
14 resources and top-notch technical talents.  Not
15 everyone will enjoy those benefits.  The
16 discussion in Paragraph 13 at the top of the
17 page contemplates others entering into the book
18 provider sector and potentially doing that
19 without the significant resources that Google is
20 able to bring to bear.
21     Q.  What's your basis for saying that
22 smaller companies do not have the capabilities
23 necessary to secure books adequately?
24     A.  I'm not sure that those are my exact
25 words, for example, "adequately."  But I think

61 (Pages 241 to 244)

Page 245

1 it's pretty straightforward that if you have
2 more limited resources, your ability to expand
3 those resources on any given project is going to
4 be correspondently limited.
5     Q.  In your view is it necessarily the
6 case that smaller and less sophisticated
7 entities have worse security than larger and
8 more sophisticated entities?
9         MR. BONI:  Object to form.
10    A.  Not always.  Sometimes with simpler
11 systems or with less valuable contents to
12 safeguard, the security of a smaller entity can
13 be more than satisfactory.  On the other hand,
14 when one flips around those conditions, a small
15 entity guarding a very large gem, one could
16 quickly get into trouble.
17    Q.  Are your statements in Paragraph 18
18 of your report based on a survey of companies of
19 various sizes considering their security
20 measures?
21    A.  No.
22    Q.  Can you provide an example of one of
23 the smaller and less sophisticated companies to
24 which you refer?
25    A.  For example, in the context of domain

Page 246

1 names, there used to be one company, VeriSign
2 Network Solutions that was the sole vendor of
3 .com domain names.  When that market was opened
4 up to competition, there were a variety of
5 benefits, but there have also been some
6 downsides, including that some of the smaller
7 guys have been hacked in various ways, have
8 allowed their servers to be taken down by
9 something as routine as a power outage and have
10 otherwise failed to lived up to their
11 contractual commitments.  In contrast, the
12 larger vendors in that space have largely
13 succeeded in living up to their contractual
14 commitments.
15    Q.  Are you aware of any in The Book
16 Space?
17        MR. BONI:  Do you understand the
18 question?
19    A.  I do, but I think it's a little bit
20 speculative at this point that there aren't that
21 many smaller sites holding digital copies of
22 books and presenting them in snippet form.  If
23 there are any small such companies, I guess I
24 don't know about them.
25    Q.  Turning to Paragraph 19 of your

Page 247

1 report, you say that attackers can take
2 advantage of even a brief period when a single
3 book provider is insecure.  You see that?
4    A.  Yes.
5    Q.  Is that true today?
6    A.  Today there aren't so many book
7 providers.  We've discussed only two today.
8 Both of them large, sophisticated companies with
9 impressive information security defenses;
10 whereas, the premise of this section,
11 Paragraph 13, is that there might be
12 significantly more in the future, and they might
13 look quite different.
14    Q.  In the event of a fair use ruling?
15    A.  Correct, which has been the premise
16 of the entire section where we've been here.
17    Q.  Have you -- so it's your view that
18 today's book providers like Google and Amazon
19 have a different and higher level of security
20 than tomorrow's book providers might in event of
21 a fair use ruling, such that smaller entities
22 would enter the market and present the risks
23 discussed in this section; is that right?
24    A.  That's right.
25    Q.  Turning to Paragraph 20, you say, "I

Page 248

1 understand that the Google Library Project
2 includes providing to the library partners a
3 full digital copy of the books the libraries
4 allowed Google to scan.  Breaches at the
5 security systems at these libraries" -- excuse
6 me -- "breaches in the security systems at these
7 libraries, could facilitate book piracy."  Do
8 you know what security systems the libraries who
9 store books such as the University of Michigan
10 have in place?
11    A.  I don't know about all of the
12 security systems that they have.
13    Q.  How do they compare to the security
14 systems that, for example, iUniverse which is
15 the party to the agreement in Exhibit 17 has in
16 place?
17        MR. BONI:  Object to form.  He just
18 said he's not sure what the security systems are
19 in the libraries.
20    A.  I'm also not sure what the security
21 systems are at iUniverse, so I really don't
22 think I can make a comparison.
23    Q.  You, likewise, couldn't make a
24 comparison to the security systems that Google
25 or Amazon has in place?

Page 249

1      A.  I don't know everything that I'd want
2  to know in order to make that comparison.  In
3  general, I think there's good reason to suspect
4  that the libraries will have significantly lower
5  levels of security.
6      Q.  But you don't know one way or the
7  other?
8      A.  I don't know one way or the other,
9  and furthermore, I'm not sure the answer is
10  knowable just yet.  We need to think about what
11  level of security libraries will have several
12  years from now.  It's hard to say, sitting here
13  today what they'll do in several years.
14      Q.  Are you aware of any books being
15  pirated or stolen from a research library
16  archived with scans made by Google?
17      A.  No.
18      Q.  Turning to Paragraph 21, you say,
19  "I've not been informed of all the ways that
20  libraries intend to use the book contents data
21  they receive from Google, nor have I been
22  informed how libraries intend to secure that
23  data.  But the information currently available
24  indicates that libraries' actions present a risk
25  of book piracy."  You see that?

Page 250

1      A.  Yes.
2      Q.  You don't know what security measures
3  the libraries have in place today; is that
4  right?
5      A.  I don't know all of what they have in
6  place.
7      Q.  What do you mean by "information
8  currently available" as you use it in Paragraph
9  21?
10      A.  Yes, in Exhibit C, I cite the
11  Hathitrust materials which I did review.  That
12  gives some information about some of the
13  libraries' security systems.  I actually have
14  quite a bit of experience with library
15  information systems from the Multnomah County
16  Public Library case that we discussed
17  previously.
18          I've spent time interviewing
19  librarians.  I've spent time with the CIOs of
20  libraries.  I've spent time in the library
21  computer systems, understanding how they work
22  and how they interoperate and have come to have
23  a general understanding of the overall culture
24  and approach to information sharing that's
25  common in libraries.

Page 251

1      Q.  Did any of your work on the Multnomah
2  County case or the interviews with librarians
3  and other librarian staff members in that case
4  form a basis for any of the opinions you render
5  in your report in this case?
6      A.  It's not a basis.  It's part of my
7  overall professional background consistent with
8  expert service.
9      Q.  Do you know whether the University of
10  Michigan is storing book scans in its normal
11  library information systems or in a separate
12  system?
13          MR. BONI:  Object to form.
14      A.  I don't know one way or the other.
15      Q.  What information, additional to the
16  information you have about the library's
17  security measures, would permit you to better
18  assess the risks?
19          MR. BONI:  What risks?
20      Q.  The risks you discussed in Paragraphs
21  20 and 21.
22      A.  Understanding both what they do now
23  and what they will do in the future, what they
24  commit in some sort of a binding contractual
25  sense to do or not to do.  I need to understand

Page 252

1  the servers on which the data is to be stored,
2  the physical security, the network security, the
3  logical security, software level, user accounts,
4  credentialing.
5          This sounds like a full security
6  audit.  I'm not sure I'm the best person to do
7  it, but in any event, it requires understanding
8  quite a bit about their practices, both in the
9  present and their future practices, which is a
10  little bit harder to investigate in
11  anticipation.
12      Q.  Turning to Paragraph 22, you refer to
13  a student who used MIT library access to
14  download 4.8 million articles and other
15  documents.  You see that?
16      A.  Yes.
17      Q.  Is that man named Aaron Swartz?
18      A.  Yes.
19      Q.  Aaron Swartz is being charged
20  criminally for that activity; is that right?
21      A.  Yes.
22      Q.  And those charges are currently
23  pending; is that right?
24      A.  That's my understanding.
25      Q.  What was the effect on the value of

63 (Pages 249 to 252)

Page 253

1    the articles from Mr. Swartz' actions?
2         A.   As I understand it, Mr. Swartz copied
3    the articles but didn't redistribute them at
4    all.  I'm not sure he even got around to
5    analyzing them.  The effect from those actions
6    is probably minimal.  It's probably zero.
7              On the other hand, had Mr. Swartz
8    sent them all to WikiLeaks or put them all on
9    BitTorrent, the consequences would have been
10   absolutely devastating, and I don't think it
11   would have been very hard for him to do that,
12   once he got the 4.8 million files sitting on his
13   hard drive.  I think it would have been less
14   than an hour of additional work for him.
15        Q.   Do you know Aaron Swartz?
16        A.   I've met him.
17        Q.   Do you charge for access to your
18   blog?
19        A.   No.
20        Q.   Why not?
21        A.   I'm happy to give it away.  Anyone
22   who wants to read my blog is welcome to do so.
23        Q.   Would the distribution of articles
24   from your blog on BitTorrent harm the market for
25   those posts?

Page 254

1              MR. BONI:  Object to form.
2         A.   I would be disappointed and unhappy
3    if someone put my articles on BitTorrent.  As to
4    the market for it, I'm not sure, because I don't
5    sell these materials.  It's hard to think about
6    what the concept of the market even means here.
7         Q.   Would the answer be the same with
8    respect to your published journal articles?
9         A.   Well, there, I don't sell them,
10   although the journal publisher does, which is
11   sometimes a source of some contention.  I might
12   prefer that they gave it away, in fact, and they
13   might prefer to charge for it.  So it's kind of
14   a messy one.
15             If I found those on BitTorrent -- I'm
16   fortunate in that all of my articles actually
17   can be obtained for free from my
18   website because I've arranged that -- so it
19   wouldn't make a whole lot of difference to me,
20   but again, I'm in a very special situation,
21   thanks to other sources of revenue.
22        Q.   Turning to Paragraph 23, you refer to
23   JSTOR; do you see that?
24        A.   Yes.
25        Q.   Do you have articles posted on JSTOR?

Page 255

1         A.   I think some of my articles are in
2    JSTOR.
3         Q.   Have you done anything to insure the
4    security of JSTOR's systems?
5         A.   I have not.  I leave that to JSTOR.
6         Q.   Do you know whether JSTOR's systems
7    are more or less secure than Google's?
8         A.   I think there are some respects in
9    which they are more secure and some respects in
10   which they are less secure.
11        Q.   What are the respects in which they
12   are less secure?  Let me ask a slightly better
13   question.
14             What are the respects in which, in
15   your view, JSTOR systems are less secure than
16   Google's?
17        A.   I would expect that Google has more
18   staff dedicated to security, to making sure that
19   all of their servers are patched with the latest
20   security updates, generally to treating security
21   as the high priority that it should be.  JSTOR,
22   in contrast, I would think, has fewer resources
23   to have a dedicated security team to have
24   round-the-clock monitoring and so forth.
25        Q.   Do you know of any instances in which

Page 256

1    content providers allow their licensed content
2    to be placed on university servers?
3         A.   Yes.
4         Q.   What instances are you aware of?
5         A.   Typically, in exchange for payment of
6    a fee.
7         Q.   What types of content are involved in
8    those transactions that you're aware of?
9         A.   Journal articles, groups of journal
10   articles, books, groups of books, periodicals,
11   almost any sort of printed media or electronic
12   media could be subject to such a license.
13        Q.   Do all content providers who allow
14   such content to be placed on university servers
15   require oversight of the university's
16   information security implementation?
17        A.   Do you all of them require it?  I'm
18   sure there are some who don't require it,
19   particularly for the right price.  If you pay
20   enough, they won't necessarily ask any more
21   questions.
22        Q.   Do you know whether any content
23   providers who allow content to be placed on
24   university servers require oversight of the
25   university's information security

64 (Pages 253 to 256)

Page 257

1  implementation?
2      A.  I know that some of them do.  For
3  example, the one where we're sitting right now
4  does have exactly that requirement.
5      Q.  By "the one where we're sitting right
6  now," what do you mean?
7      A.  I mean Harvard Business School
8  Publishing provides information products on a
9  licensed basis, but oversees some aspect of the
10  security of the licensees' servers.
11      Q.  What aspect of security of the
12  licensees' servers does it oversee?
13      A.  It oversees the requirement that a
14  user name and password are provided before
15  access is available and specifically searches
16  for and affirmatively pursued anyone who posts
17  files in a way that's available to the general
18  public.
19      Q.  Anything else?
20      A.  I think there are some additional
21  requirements.  There's a team of multiple,
22  full-time employees who do nothing but this all
23  day.  Actually I do know of some additional
24  requirements that they impose.
25      Q.  What are those?

Page 258

1      A.  They disallow libraries from
2  collecting our case materials.  A library can't
3  buy these.  If a library did buy them, they
4  would be subject to for-sale rights, but a
5  library is ineligible to purchase.  And in order
6  to make a purchase, you must certify that you're
7  not a library, which offers additional
8  protection to prevent this valuable,
9  intellectual property from being distributed in
10  a way that they prefer to prevent.
11      Q.  You wrote a case study on Google; is
12  that right?
13      A.  The -- I would present it in the
14  following way:  I updated someone else's case
15  study to a sufficient extent, changing enough of
16  the sentences and enough of the paragraphs that
17  it was deemed a new document and given a new
18  document number.  I would still characterize it
19  as an update and a revision.
20      Q.  Do you know how much it cost to
21  purchase a PDF of that case study from Harvard
22  Business School Press website?
23      A.  I think it's 4 and $6.  There are
24  some discounts available.
25      Q.  I think it's six ninety-five.

Page 259

1      A.  It's a good case.
2      Q.  Is it posted on your website?
3      A.  It is not.
4      Q.  Have you done anything to insure the
5  information security of Harvard Business School
6  Press?
7      A.  I've offered them some advice on
8  various aspects of their information, security
9  and their user interface and multiple other
10  facets of their business.  Acting more as a
11  friend and colleague than as an author wanting
12  to protect my interests.  It doesn't really
13  matter to me how many copies they sell.  My
14  royalties are pretty small either way.  So I'm
15  not thinking about it from that purpose.
16      Q.  Turning to Paragraph 24 of your
17  report, you discuss libraries permitting
18  researchers to copy books in their entirety
19  under the researcher's systems; is that right?
20      A.  Yes.
21      Q.  Do you know whether any of the
22  libraries to whom Google has -- with whom Google
23  has cooperated in the Library Project have
24  permitted researchers to store digital copies of
25  books on their own computers rather than on

Page 260

1  secured servers?
2      A.  I don't know.
3      Q.  The type of research that you
4  describe in Paragraph 24, analyzing patterns in
5  book text, can you name any researchers who are
6  engaged in that type of research?
7      A.  I know that there are some.  I've
8  read some of the papers, but I don't have their
9  names on the tip of my tongue.
10      Q.  Have you ever engaged in such
11  research yourself?
12      A.  I haven't analyzed patterns in book
13  texts.  I certainly have used large data sets
14  obtained from library-based data set archives.
15  I've had to learn the processes for obtaining
16  that and analyzing that.
17      Q.  Have you ever spoken with a
18  researcher doing analysis of book text?
19      A.  I think so.  We've had at least one
20  come to campus for a seminar, and I spoke to him
21  pursuant to that.
22      Q.  When was that?
23      A.  Within the last two years.
24      Q.  Did you talk to any in connection
25  with this report?

65 (Pages 257 to 260)

Page 261

1    A.  No.
2    Q.  Did you do a survey of book text
3  analysis researchers to find out how they would
4  want to use book text in their research?
5    A.  No.
6    Q.  What is your view as to the
7  probability that the library would permit a book
8  text analysis researcher to copy the entire text
9  of a large corpus of books onto their own
10  computers in terms of a percentage?
11    A.  I think it would be unlikely that any
12  library would allow that right now during the
13  pendency of this litigation, given the
14  significant concerns that are extant right now.
15    On the other hand, my experience with
16  other aspects of information security and
17  library information security is that there tends
18  to be a decrease over time where folks become
19  more liberal as they become more confident, and
20  sometimes that confidence turns out to be
21  misplaced confidence.  I have some specific
22  examples in mind.
23    Q.  What examples are those?
24    A.  For example, sticking with the
25  Harvard Business School, it used to be that when

Page 262

1  we sold an electronic copy of a case, we sold it
2  in a special encrypted format that required that
3  you install a reader, not the PDF reader.  You
4  had to get from us a special reader, and that
5  reader had a variety of special purpose
6  functions that would prevent you from printing
7  it, prevent you from showing it on a computer
8  connected to a projector, prevent you from
9  taking a screen capture image.  It had a number
10  of security features.
11    Later, we decided to abandon that
12  software because it was unpleasant for users to
13  install a special purpose program and have
14  subsequently found that while our new
15  replacement is much more convenient to users, it
16  has created a certain amount of piracy, which is
17  a source of some concern.
18    Q.  Does the risk set forth in Paragraph
19  24 of your report exist at Amazon today?
20    MR. BONI:  At Amazon?
21    MR. GRATZ:  Yes.
22    A.  Gee, I really don't think so.  I
23  hadn't been thinking of that as a risk that
24  would occur with Amazon today.
25    Q.  Does Amazon engage in analysis or

Page 263

1  research on the text of books?
2    A.  Amazon has limited automated analysis
3  of specific fixed factors that are embodied in
4  known proven code designed by professional
5  full-time Amazon engineers who did this once and
6  then leave it running.  I'm thinking about, for
7  example, the statistically improbable phrases
8  analysis that Amazon at least previously ran on
9  most books.
10    In contrast, what we were discussing
11  in Paragraph 24 is ad hoc analysis by professors
12  who come and go, students who come and go,
13  visiting researchers who really come and go all
14  in the context of a library relationship where
15  there's much less of a culture of supervision,
16  management and oversight when compared to
17  professional engineers designing software.
18    Q.  That's not a necessary but instead
19  only a potential result of a fair use finding in
20  this case; is that right?
21    A.  I didn't mean Paragraph 24 to be
22  limited to a fair use finding.  Right now the
23  data sitting in libraries could already be
24  analyzed in this way and could give rise to the
25  sorts of problems discussed in Paragraph 24,

Page 264

1  even prior to a court's fair use finding one way
2  or the other.
3    Q.  Do you know whether problems of this
4  type have occurred?
5    A.  I don't.
6    Q.  Have you done anything to try and
7  find out?
8    A.  I asked Mr. Boni.
9    Q.  What did he tell you?
10    A.  I think he told me he didn't know of
11  any specifically.
12    Q.  Turning to Paragraph 25, have you
13  ever heard of a prank involving book piracy?
14    A.  I've heard of a prank involving other
15  kinds of piracy.
16    Q.  What other kinds of piracy?
17    A.  For example, when I went to the MIT
18  Hack Gallery, I found quite a few that involved
19  use of other company's trademarks which might or
20  might not be trademark infringement, depending
21  on whether or not a fair use defense would
22  apply.
23    Q.  Can you tell me about the Apple -- so
24  in Paragraph 25 you refer to an Apple -- the
25  Apple -- a prank involving the Apple logo?

66 (Pages 261 to 264)

Page 265

1      A.  Yes.
2      Q.  Do you consider that to be in
3  violation of intellectual property rights?
4      A.  I think it's an infringement of the
5  trademark, and the question is whether a fair
6  use defense applies.  There is a doctrine of
7  fair use for trademarks and stylized images.  I
8  think it's a plausible fair use defense.  There,
9  I'd really have to apply the factors and read
10  the cases.  I'm much less familiar with the Fair
11  Use Doctrine as it applies to stylized images
12  and logos.
13      Q.  The Apple prank which you refer
14  occurred in October of 2011; is that right?
15      A.  I don't recall.
16      Q.  Did it occur shortly after the death
17  of Steve Jobs?
18      A.  If you say so.
19      Q.  Did students display the Apple logo
20  in the clock tower of Maseeh Hall at MIT in
21  honor of Steve Jobs in the prank you referred to
22  in Paragraph 25?
23      A.  Now, that could be.  I don't recall.
24      Q.  Do you think that that prank is
25  relevant to the issues in this case?

Page 266

1      A.  I can certainly see how it would seem
2  peripheral.  On the other hand, the fact that
3  students are well known to disregard
4  intellectual property is anything but
5  peripheral.  It's well known that Napster was
6  most used on college campuses.  There were
7  distinctive trends.  You could see the number of
8  users signed into Napster decrease when major
9  schools went onto spring break.  So the
10  relationship between students, university
11  libraries and piracy is not peripheral.
12      Q.  Could you tell me about the Red Sox
13  logo prank you referred to in Paragraph 25?
14      A.  I don't recall.  I went through the
15  site, looked at the distinctive images
16  memorializing the pranks, but I didn't note them
17  in great specificity.
18      Q.  Do you consider that an instance of
19  piracy?
20      A.  I'm not sure.  I do think it's
21  probably an instance of trademark infringement,
22  and it might be subject to a fair use defense.
23      Q.  The prank you referred to in
24  Paragraph 25 with respect to the logo of the
25  Boston Red Sox, did that prank occur in October

Page 267

1  of 2004?
2      A.  I don't know.
3      Q.  Did it occur when the Red Sox made it
4  to the World Series?
5      A.  I don't know.
6      Q.  Were the -- do you think that the
7  students celebrating the Red Sox making it to
8  the World Series by displaying the logo on the
9  dome of the university building was intellectual
10  property infringement?
11      A.  The law is what it is, and it's not
12  for me to rewrite trademark law.  I wouldn't be
13  surprised if that is infringement as a matter of
14  law, and fair use defense might or might not
15  apply.  It wouldn't shock me if you said that to
16  do that a license must be paid to the Red Sox,
17  and if you don't pay it, then you're in
18  violation of the law.
19      MR. GRATZ:  Mark as Exhibit 19, this
20  document.  I want to note for the record before
21  I hand it to the witness that despite the
22  confidential legend at the bottom of this
23  document, this is not a confidential document.
24      (Document marked as Exhibit No. 18
25  for identification.)

Page 268

1      Q.  You have before you what's been
2  marked as Exhibit 18.  Do you recognize this
3  document?
4      A.  Yes.
5      Q.  Is this the document to which you
6  refer in Paragraph 26 of your report?
7      A.  I think so.
8      Q.  Do you know what security measures
9  the University of Michigan has in place?
10      A.  That's discussed in part in this
11  document.
12      Q.  Aside from this document, do you have
13  any knowledge other than what is in this
14  document of security measures that the
15  University of Michigan has in place?
16      A.  Aside from what's discussed in this
17  document, I don't think I have knowledge of
18  their current security.
19      Q.  Is it your opinion that an author
20  would not agree to have his work stored by the
21  University of Michigan without greater security
22  terms than those set forth in Exhibit 18?
23      MR. BONI:  Object to form.
24      A.  I'm not sure.  It all depends on what
25  the author gets in exchange.  If they get zero,

67 (Pages 265 to 268)

Page 269

1    it might be a pretty tough sell.  If you give
2    them some money, that could be quite different.
3        Q.  Can you -- do you have an assessment
4    of the probability that an author without
5    further payment would agree to the terms in
6    Exhibit 18?
7        A.  I don't know.  I'm sure some would
8    and some wouldn't.
9        Q.  Referring to the terms of Exhibit 18
10   at the end of Paragraph 26 of your report, you
11   say that, "These vague provisions offer
12   significantly lower protection than Google
13   provides for even its routine business
14   confidences."  Do you see that?
15       A.  Yes.
16       Q.  Do you mean that in terms of the
17   security required for the protection of the
18   information?
19       A.  I meant to reference the comparisons
20   cited in Footnote 9 for which I note differences
21   in the circumstances in which information can be
22   shared, restrictions on recipients and
23   requirements as to security.  I believe that the
24   Google NDA cited in Footnote 9 actually offers
25   greater protections, at least greater

Page 270

1    specificity than what we see in Exhibit 18.
2        MR. GRATZ:  I'd like to mark as
3    Exhibit 19 this document.
4        (Document marked as Exhibit No. 19 for
5    identification.)
6        Q.  Do you recognize what's been marked
7    as Exhibit 19?
8        A.  Yes.
9        Q.  What is it?
10       A.  It's the document cited in the
11   Footnote 9.
12       Q.  Do you know whether this is a
13   nondisclosure agreement which has been entered
14   into by Google and various parties?
15       A.  It purports to be.
16       Q.  Do you know whether it, in fact, is?
17       A.  I know that when I visited the Google
18   campus twice at the invitation of Google staff,
19   I was presented with a similar NDA, which in at
20   least one instance I refused to sign, perhaps in
21   both instances.
22       Q.  Could you identify for me the more
23   precise requirements as to how information must
24   be secured in Exhibit 19 as compared to Exhibit
25   18?

Page 271

1        A.  All right, I'll need just a moment.
2    I've done half of it.  I need to find two
3    different provisions, and I'm working on the
4    second.
5        So we are comparing Provision 3 of
6    Exhibit 19 with Provision 4.4.1 of Exhibit 18.
7        Q.  Okay.  And how are those -- what's
8    the difference that you intended to identify?
9        A.  Well, I said there are greater
10   restrictions on the circumstances in which
11   information can be shared; to wit, I think the
12   Exhibit 19 NDA doesn't allow information to be
13   shared, and the Exhibit 18 provision does allow
14   information to be shared.
15       Q.  Within the confines of copyright law;
16   is that right?
17       A.  Well, I'm not sure.  Perhaps even
18   beyond the confines of copyright law.
19       Q.  I direct your attention to Part 4.1
20   of Exhibit 18.
21       A.  Fair enough.  That section says at
22   least that this will be within the confines of
23   copyright law.
24       Q.  So that takes care of sharing.
25   Certainly a nondisclosure agreement requires no

Page 272

1    sharing, and Exhibit 18 permits sharing under
2    certain circumstances.  The question I asked is
3    with respect to precise requirements as to how
4    information must be secured.
5        A.  Yes.  So in the NDA, Exhibit 19, the
6    second sentence of Provision 3 calls for the
7    same degree of care, no less than a reasonable
8    degree of care as used with respect to the
9    participants' own similar information, and it
10   continues, they must prevent, they must try to
11   prevent, they must actually do it.  Sounds like
12   strict liability.
13       MR. BONI:  Say where you are.
14       A.  Within Clause 3, somewhere around
15   there.  Must actually succeed in doing the tasks
16   detailed within A and B of that second sentence.
17       Q.  I'm not seeing the words "must
18   prevent."  I'm sorry.
19       A.  The word "prevent" is on the fifth
20   line of --
21       Q.  And followed with a colon?
22       A.  Yes.
23       Q.  So "Participant will use the same
24   degree of care, but no less than a reasonable
25   degree of care, as participant uses with respect

68 (Pages 269 to 272)

Page 273

1  to its own similar information to protect the
2  confidential information and to protect --
3  prevent."
4       So you understand "prevent" in
5  Exhibit 19, the "prevent" immediately before
6  that colon to be an absolute requirement, not a
7  requirement subject to the degree of care
8  previous -- previously in that sentence?
9       A.  You know, when I first read this, I
10 thought it was subject to the degree of care
11 previously in the sentence.  When I just
12 characterized it orally a moment ago, I thought
13 it was strict liability.  Now I'm back to the
14 first interpretation which I think may have been
15 right all along.  So --
16      Q.  At any rate, you're saying that this
17 requires the same degree of care as the
18 participant used with respect to its own similar
19 information and that Exhibit 18 does not; is
20 that right?
21      A.  That's my recollection, and now we
22 can go back to 4.4.1.  The 4.4 --
23      Q.  So and 4.4.1 says U of M shall also
24 make reasonable efforts to prevent third parties
25 from downloading or otherwise obtaining any

Page 274

1  portion of the U of M digital copy for
2  commercial purposes, redistributing, etcetera.
3  So you're drawing the distinction between taking
4  reasonable measures and using no less than a
5  reasonable degree of care as participant uses
6  with respect to its own similar information?
7       A.  It's the -- it's that last part, what
8  they do for their own similar information that
9  first seems stricter.  Secondly, a preceding
10 sentence in 4.4.1, implementing technological
11 measures, e.g. robots.txt -- technological
12 measures, e.g. robots.txt, to restrict automated
13 access seemed sort of laughable to me because
14 that's a known defective measure, and if one
15 were serious about blocking automated access,
16 Google is probably the world expert on having to
17 do that properly, and it's not via robots.txt.
18      Q.  You're referring to the second
19 sentence of 4.4.1?
20      A.  That's right.
21      Q.  Does the second sentence of 4.4.1
22 limit the commitment made in the third sentence
23 of 4.4.1?
24      A.  No.  There are additional
25 commitments, so the third sentence stands, not

Page 275

1  withstanding the very, very limited commitments
2  in the second sentence.
3       Q.  I want to turn to Paragraphs 27
4  through 32 of your report.
5       MR. BONI:  Done with these for now,
6  Joe?
7       MR. GRATZ:  Yes, you can set those
8  aside.
9       Q.  In Paragraphs 27 through 32, you
10 describe a number of flaws in Google's systems
11 which were identified.  Did any result in
12 piracy?
13      A.  I didn't choose any of the flaws that
14 resulted in piracy.
15      Q.  Are there other flaws of which you're
16 aware that did result in piracy?
17      A.  Yes.
18      Q.  Which flaws are those?
19      A.  The Google YouTube service, by
20 Google's own evaluation prior to acquiring
21 YouTube, was a massive source of privacy.
22      MR. BONI:  Piracy.
23      A.  Of piracy, excuse me.
24      Q.  Was that as the result of security
25 breaches or because people were uploading

Page 276

1  infringing videos to YouTube?
2       A.  It was a result of a design flaw.
3       Q.  What was the design flaw?
4       A.  The design flaw had several
5  manifestations, but it included the absence of a
6  report piracy button, a button that was tested
7  temporarily until it was removed in haste by
8  YouTube managers who realized that too many
9  users were reporting piracy.
10      Q.  How do you know that?
11      A.  That was all in Google documents
12 provided in the Viacom litigation and then
13 unsealed and made available for public review.
14      Q.  Are those documents -- do those
15 documents form the basis for any of the material
16 in your report?
17      A.  No.  I relied on other Google design
18 flaws and security breaches to form the
19 conclusion in my report.
20      Q.  And the design flaws that you're
21 alleging with respect to YouTube are not design
22 flaws that resulted in the unauthorized breach
23 of security measures which permitted piracy, but
24 instead, in your view, were measures that were
25 designed to -- strike that.

69 (Pages 273 to 276)

Page 277

1        MR. BONI:  Good idea.
2     Q.  Start that question over.
3        The design flaws that you referred to
4   with respect to YouTube, were they, in your
5   view, design flaws that resulted in the breach
6   of security measures?
7     A.  These were not design flaws that
8   resulted in the breach of security measures.
9   Instead these design flaws resulted in the
10  massive and unprecedented copyright infringement
11  of a large number of copyrighted video and audio
12  recordings.
13     Q.  Do you know of any instance in which
14  third-party copyrighted material has been stolen
15  from Google servers?
16     A.  I'm not sure what you mean by "stolen
17  from Google servers."
18     Q.  I mean taken from Google servers
19  without Google's authorization?
20        MR. BONI:  Object to form.  Same
21  ambiguity.
22     A.  There are multiple tools for, quote
23  unquote, YouTube stealing.  Often they have
24  names like "YouTube stealer."  These are
25  programs that allow a user to take the video and

Page 278

1   audio of a recording on YouTube and save it to a
2   file on their hard drive, so that, for example,
3   they can watch it on airline, or they can
4   continue to watch it, even if the file is
5   removed from YouTube, and they can watch it
6   without advertisements.  Those programs exist.
7        Google seems to have a bit of a cat
8   and mouse program with them, where Google is the
9   cat, but it doesn't always catch the mouse.
10  I've confirmed repeatedly that they work, and
11  that Google has been less than effective in
12  stomping them out.
13     Q.  How have you confirmed that they
14  work?
15     A.  I've attempted to use them from time
16  to time.
17     Q.  Do you know of any such tools with
18  respect to books?
19     A.  I've looked for such tools and
20  couldn't find them in the first few minutes of
21  searching.
22     Q.  Did you continue past the first few
23  minutes of searching?
24     A.  Not really.
25     Q.  Turning to Paragraph 34 of your

Page 279

1   report, you say that outside hackers could
2   access or redistribute book contents.  Do you
3   know of any instances in which hackers have
4   accessed or redistributed books from Amazon?
5     A.  I have heard of that happening.
6     Q.  Was that following the download of a
7   Kindle eBook file?
8     A.  That's one mechanism by which it can
9   happen, but not the only mechanism.
10     Q.  What other mechanisms are you
11  familiar with?
12     A.  I understand that it is possible to
13  use Search Inside the Book to browse selected
14  pages later or another user or another computer
15  to browse other pages and for the book to be
16  stitched together, and I have found programs
17  that purport to do that all, although I wasn't
18  able to verify the efficacy of those programs.
19     Q.  Not withstanding the existence of
20  those programs, publishers keep their books in
21  Search Inside the Book, to your knowledge; is
22  that right?
23     A.  Yes.
24        MR. GRATZ:  Let's change the tape.
25        THE VIDEOGRAPHER:  Here ends Tape

Page 280

1   No. 6.  Off the record 5:33 p.m.
2        (Brief recess.)
3        THE VIDEOGRAPHER:  Here begins Tape
4   No. 7 in today's deposition of Benjamin Edelman.
5   Back on the record, 5:41 p.m.
6     Q.  Turning to Paragraph 36 of your
7   report, you say, "A single breach of the systems
8   that store book contents could allow book
9   contents to become ubiquitous online."  What is
10  the basis for your statement?
11     A.  There's an expression about putting
12  the genie back in the bottle.  I think that
13  applies in spades here.  I give two examples in
14  the paragraph:  AOL search data that should
15  never have been put on the Internet and U.S.
16  State Department wires that again should never
17  have seen the light of day.  Once those
18  materials make it onto the Internet, as we all
19  well know, there's no taking them off the
20  Internet and so too here.
21     Q.  What's your basis for thinking that
22  the AOL search data is the still available on
23  BitTorrent?
24     A.  I checked.
25     Q.  Do you possess a copy of that file?

Page 281

1      A.  I've downloaded it maybe more than
2   once.  I wouldn't be surprised if I still have a
3   copy floating around.
4      Q.  With respect to WikiLeaks, what's
5   your basis for saying the information is
6   available?
7      A.  I've read other sources indicating
8   that it's available, although I actually haven't
9   checked personally in any great detail.
10      Q.  Have you downloaded any of the
11   WikiLeaks cables yourself?
12      A.  I should be clear, I've read it at
13   the New York Times site, for example.  So to the
14   extent that you can read the primary sources
15   there, as you can often, and in significant
16   quantities, I've read some of them there.
17      Q.  Have you read them anywhere else?
18      A.  Maybe other mainstream major media
19   publications.
20      Q.  How large is the AOL search data in
21   megabytes approximately?
22      A.  Approximately one gigabyte.
23      Q.  How large do you estimate that
24   scanned images of 20 million books would be?
25      A.  Scanned images would be much larger,

Page 282

1   although after OCR, they might become much
2   smaller.  I would think a few gigabytes of text
3   after OCR would probably be about right.
4          MR. BONI:  I just want to place an
5   objection on the record that it's a slightly
6   misleading question.  We're not talking about
7   20 million in-copyright books or books that fall
8   under the class definition.  That's a much lower
9   number.
10      Q.  Is the risk associated with a single
11   breach of all books resulting in the genie
12   coming out of the bottle, as you say, a risk
13   that also exists with any other digitized corpus
14   of a large number of books?
15          MR. BONI:  Object to form.
16      A.  The risk differs in some important
17   respects from the other corpuses we've talked
18   about, such as Amazon Search Inside the Book.
19      Q.  How does it differ?
20      A.  First, it differs because here we
21   must consider the effect of a possible fair use
22   ruling and the other travelers coming along and
23   storing the data in ways that might be somewhat
24   less secure than Google.
25      Q.  That makes, in your view, the risk of

Page 283

1   book contents being available, the likelihood
2   rather than the magnitude of the harm larger if
3   there were a proliferation of book scanners?
4          MR. BONI:  Object to form.  You can
5   answer.
6      A.  It makes the probability larger.
7      Q.  Does it affect the magnitude of the
8   harm?
9      A.  The magnitude also, I would expect,
10   to be larger in this context.  In the context of
11   Search Inside the Book, only a portion of books
12   are available.  I understand that the number of
13   books there available is smaller than the number
14   of books here at issue, and those, of course,
15   are publishers and authors who made the
16   considered decision to go down that route;
17   whereas, here no one was asked.
18      Q.  Does Amazon store the entirety of
19   books in Search Inside the Book?
20          MR. BONI:  Object to form.
21      A.  I don't know.  I would think they'd
22   need to store either all of it or most of it.
23      Q.  And if Amazon's entire corpus of
24   digitized books, including, for example, their
25   eBooks were taken and distributed in the manner

Page 284

1   discussed in Paragraph 36 of your report, would
2   the magnitude of that be similar to the
3   magnitude of a breach at a library?
4          MR. BONI:  Object to form.
5      A.  Paragraph 36 isn't about libraries.
6   I can consider the question nonetheless.  Shall
7   I consider the question?
8          MR. BONI:  Why don't you --
9      Q.  If Paragraph 36 isn't about
10   libraries, that clears it up for me.
11          In Paragraph 38 you say, "However
12   remote one may consider the risk of book
13   contents becoming available, that risk must be
14   considered in light of the devastating impact to
15   the class if book contents become available."
16   Here you're comparing the probability of an
17   event to the magnitude of harm in case -- in the
18   case where that event occurs; is that right?
19      A.  The sentence discusses both the
20   probability and the magnitude and suggests that
21   in light of the large magnitude, even a small
22   probability should be significant cause for
23   concern.
24      Q.  What is the probability of the events
25   discussed in Paragraphs -- Paragraph 37 coming

1  to pass in the event of a fair use ruling in
2  favor of Google?
3          MR. BONI:  Object to form.  You want
4  a mathematical response to that question?
5          MR. GRATZ:  Whatever the response the
6  witness has for me.
7          MR. BONI:  Object to form.
8      A.  I don't know.  It would be easier to
9  say once that fair ruling resulted, if it did
10  result, once we see who comes along and scans
11  which books and stores them in what ways, until
12  then, it's just a little bit too speculative for
13  me to want to put a number on it, but it
14  certainly is a serious concern.
15      Q.  What's the magnitude of the harm in
16  dollars?  The harm here, I mean the harm that
17  you were discussing in Paragraph 38.
18          MR. BONI:  Object to form.
19      A.  I'm not sure.  It's difficult to put
20  a dollar value on it, but I do think it's
21  significant.  If you asked a publisher what
22  would they be willing to pay to have a complete
23  protection against piracy, to be able to print
24  their books on uncopyable paper or with magical
25  ink, I think you'd find publishers would be

1  willing to pay a significant portion of their
2  enterprise values in order to get that magical
3  technology.
4      Q.  And you consider that to be the
5  measure of the magnitude of the harm set forth
6  in Exhibit -- in Paragraph 38?
7          MR. BONI:  Object to form.
8      A.  It's not that that's how you'd
9  measure it, but that's the sort of thought
10  experiment one would do.
11      Q.  How would you measure it?
12      A.  On thinking about the way that other
13  large harms are measured, how do we assess the
14  value of a life when a life is taken away from a
15  person?  How do we assess the value of a plane
16  crash or a nuclear disaster?  It's really not my
17  area of expertise.  It's not something I've
18  opined on here.  But here I consider the
19  totality of future lost profits.  So I do my
20  best to figure out what profits would have been
21  and then what they will be as a result of the
22  loss, and I subtract those two numbers, and that
23  would be the starting point for the harm.
24      Q.  Have you done that in preparing your
25  report?

1          MR. BONI:  Objection.  You know he's
2  not a damages expert, Joe.
3      Q.  You can answer.
4      A.  I have not.  I'm not a damages
5  expert.
6      Q.  Has a company ever come to you and
7  asked you to evaluate the risk of intrusion into
8  their computer systems which protects books?
9      A.  No.
10      Q.  Has a company ever come to you and
11  asked you to evaluate the risk of intrusion into
12  their computer systems at all?
13      A.  That seems like the kind of thing
14  someone would have asked me to do at some point.
15  I just need to take a moment to think about it.
16          Certainly I've thought about that
17  question for the organizations which -- with
18  which I've had long-term relationships.  So, for
19  example, when I was running the Berkman Center
20  server, that was a question I thought about.  I
21  thought about it with ICANN.  I've thought about
22  it as to portions of Harvard Business School.
23  I've thought about it with Wesley as to the
24  servers that we operate together, as to paying
25  clients that come specifically for that.

1          I think it would be unusual for
2  anyone to seek my assistance for that solely and
3  specifically, but if they already knew me from
4  something else, I can think of a couple of
5  clients who have sought assistance with problems
6  generally in that vein based on prior
7  relationships.
8      Q.  If a company came to you and asked
9  you to evaluate the risk of intrusion into its
10  computer systems which protect books, would you
11  accept the assignment?
12          MR. BONI:  Object to form.  That's
13  the entire hypothetical?
14          MR. GRATZ:  That's the question.
15      A.  I don't think I would be the best
16  person to evaluate their security systems, but I
17  think I would be able to assist them in
18  selecting an appropriate person.  I would be
19  able to guide that person towards the areas of
20  greatest concern, perhaps review their initial
21  report, and suggest areas for extension and
22  further inquiry.
23      Q.  What process would you recommend be
24  undertaken to evaluate the risk of intrusion
25  into those computer systems that protect books?

1     A.  I suppose it would all depend on what
2  books I was trying to protect, what I was trying
3  to protect them from, what access I needed to
4  allow.  The easiest thing to do to prevent
5  unauthorized access is to prevent all access by
6  destroying the digital records, but I imagine
7  that wouldn't be what someone hired me to tell
8  them.  They'd want some way to use it for some
9  purposes while disallowing use for other
10  purposes.
11     Q.  If a company came to you and asked
12  you to evaluate the risk of an intrusion into
13  their computer systems which protect books and
14  which host books for the purpose of making
15  snippets available in response to searches, what
16  process would you take to under -- to make that
17  evaluation?
18     A.  Well, I think I would -- I would
19  consider the sorts of security systems that
20  we've discussed a couple times today in
21  different parts of our time together as to
22  physical security, network security, software
23  security, application level security, human
24  resources and internal controls.  I'd consider
25  each of those.  Each would be significant.  Each

1  would have multiple facets within it.
2          And then my analysis would be
3  informed, importantly, by the material that I
4  was holding.  If it was unique and one of a kind
5  and highly sought after, then I would be
6  particularly concerned about the skills of my
7  intruders.  And if I needed to allow massive,
8  high-volume access by a large number of
9  different users, potentially some of them fake
10  or automated or robotic, I would be even more
11  concerned, and I would need to be open to the
12  possibility, the very real possibility that I
13  couldn't do this with the required level of
14  quality and would need to revisit my plans.
15     Q.  What information would you need to
16  evaluate the risk of intrusion into such a
17  system which stores books for the purpose of
18  making snippets available in response to
19  searches, for example?
20     A.  One would need to think about each of
21  the aspects of security just discussed.  So for
22  example, as to human resources security, making
23  sure that there isn't a rogue employee who takes
24  the data in the way that other rogue employees
25  have done other untoward things, including even

1  at Google.  I'd look at my organizations's
2  experience or the client's organization's
3  experience with rogue employees.
4          When we have a thousand engineers,
5  how many of them turn out to be bad apples, how
6  many bad ones do you get out of a thousand?  Is
7  there any way to prevent two of them from acting
8  together in concert?  Could we have an audit
9  trail that prevents this kind of copying and
10  that kind of copying?  Is it possible to make an
11  audit trail that's so robust that even a senior
12  engineer can't turn it off?  Because we know
13  some of the problems occur from senior engineers
14  who can bypass the ordinary control.
15          So that's the kind of question I'd be
16  asking as to that facet, but to be sure, each of
17  the facets would require a different type of
18  analysis.
19     Q.  Did you do any of that in preparing
20  your report in this case?
21     A.  I considered those kinds of
22  approaches.  The data and information required
23  aren't available to me and weren't necessary in
24  order to reach the conclusions set out in my
25  report.

1     Q.  Why weren't they necessary?  Would
2  having them have aided you in reaching your
3  conclusions?
4     A.  Perhaps I could have reached
5  additional conclusions.  I imagine that with
6  enough study, I might get to the point where I
7  was prepared to put a number on some of the
8  probabilities.  There's this probability per
9  year of this kind of bad thing happening if you
10  use these controls.  I think that is an
11  estimatable number.  One can estimate even these
12  very small probabilities with enough analysis
13  and enough review, but it's quite difficult, and
14  I didn't consider it necessary or appropriate,
15  given what I was asked to do in this  report at
16  this time.
17     Q.  Did you run any bargaining
18  experiments in connection with your report?
19     A.  No.
20     Q.  Did you perform any statistical
21  analysis in connection with your report?
22     A.  No.
23     Q.  In signing your own consulting
24  agreements, have you performed market checks
25  regarding terms?

Page 293

1        MR. BONI:  Object to form.  I don't
2   know what that means.  Can you explain that.
3        Q.  Mr. Edelman, are you familiar with
4   the term "market checks"?
5        A.  I've a general understanding.
6        Q.  What is it?
7        A.  A market check would be a comparison
8   of a price term or some other term with possible
9   alternatives, benchmarks, competitors, in order
10  to see whether that term is consistent with
11  others that are in other respects similar.
12       Q.  Have you done that with respect to
13  your own consulting agreements and your
14  consulting rates?
15       A.  In some instances I have.
16       Q.  Did you do that in connection with
17  any of the facts or opinions you set forth in
18  your report?
19       A.  I'm sorry, I don't understand.
20       MR. BONI:  I don't understand it
21  either.
22       Q.  Did you review the terms of any
23  agreements -- strike that.
24       In reaching the conclusions set forth
25  in your report, did you perform any market

Page 294

1   checks?
2        MR. BONI:  I object to form.  I just
3   don't understand the line of questioning.
4        A.  I didn't see a basis for comparison
5   to compare the contents of my expert report with
6   three similar expert reports written by others.
7   I didn't see the comparison group.
8        MR. BONI:  Not what you're asking.
9        MR. GRATZ:  Not what I --
10       Q.  Did you do a market check of -- so
11  some of the -- some of the opinions you state,
12  one of the opinions you state in your report is
13  it that certain hypothetical contracts would
14  have certain terms; is that right?
15       A.  At least they could if they were
16  subject to negotiation.
17       Q.  Or that -- right.  Or that certain
18  hypothetical contracts could at least -- at
19  least potentially have certain terms?
20       A.  Yes.
21       Q.  In determining -- did you form an
22  opinion as to what the likelihood is that either
23  the security term or the liquidated damages term
24  would, in fact, end up being an element of a
25  bargained-for agreement?

Page 295

1        A.  I didn't approach it that way.
2        Q.  Did you determine the probabilities
3   for either of those terms, that the parties
4   would reach those terms in a negotiation?
5        MR. BONI:  What parties?  Object to
6   form.
7        Q.  The parties to the hypothetical
8   agreement that you hypothesize in Paragraph 9 of
9   your report.
10       A.  One thing that I did put a
11  probability on was the chance of any liquidated
12  damages clause becoming available without a
13  contract, and that was zero.  So it can only go
14  up from there, and that much was clear to me.
15       As to whether or not it would go up,
16  it seems to me that -- that publishers, if
17  acting together in some way, bargaining
18  collectively, bargaining with Google, with
19  Google in a position of weakness for whatever
20  legal or business reason, it's possible that the
21  publishers would be able to get quite a bit of
22  the ground, particularly if they could use
23  Google's confidence as to the efficacy of its
24  security systems, frankly, to use that against
25  Google.

Page 296

1        If Google is so sure that its
2   security is robust, then it shouldn't have any
3   problem making a guarantee of a thousand dollars
4   per work in the event of a defect, since Google
5   says that will absolutely never happen.
6        Q.  Did you assign a probability to the
7   likelihood that that would occur?
8        A.  I didn't assign a probability to it.
9        Q.  Did you talk to any authors in
10  preparing your report?
11       A.  No.
12       Q.  Did you talk to any publishers in
13  preparing your report?
14       A.  No.
15       Q.  Did you talk to any staff members of
16  the Authors Guild in preparing your report?
17       A.  No.
18       Q.  Did you review the contract governing
19  the Back In Print program in preparing your
20  report?
21       A.  No.
22       Q.  Did you review any other publishing
23  agreements in preparing your report?
24       MR. BONI:  He listed what he
25  reviewed, Joe, Exhibit C.

74 (Pages 293 to 296)

Page 297

1    Q.  You can answer the question.
2    A.  No.
3    Q.  Have you ever talked to anyone at
4  Microsoft about its book program?
5    A.  Not recently.  It would have been a
6  couple of years ago.  If I did, I don't really
7  recall it specifically.
8    Q.  In preparing your report, did you
9  investigate Google's security for books?
10   A.  I don't know what you mean by
11 "investigate" in this context.
12   Q.  Did you seek to determine the
13 strength of Google's security for books?
14   A.  I checked for secondary sources
15 indicating that others had already bypassed the
16 security.  I didn't find sources to that effect.
17   Q.  You didn't find any sources
18 indicating that others had bypassed Google's
19 security for books?
20   A.  That's right, and that's something I
21 would have wanted to know about, if such sources
22 existed already.
23   Q.  Do you possess any Google
24 confidential information regarding its book
25 project?

Page 298

1    A.  I have specifically indicated that I
2  don't want any such information, and I believe I
3  don't have any.
4    Q.  Have you ever tried to pirate a book
5  from Google Book Search?
6    A.  I have not.
7    Q.  Have you ever advised a -- strike
8  that.
9        Have you ever advised an author
10 regarding piracy?
11   A.  I've discussed it with some authors.
12   Q.  What was the -- what authors were
13 those?
14   A.  Most recently I discussed it with my
15 colleague, Deepak Malhotra.
16   Q.  Any others?
17   A.  I have discussed it with others.  I'm
18 having trouble recalling specifically.
19   Q.  What did you discuss with Deepak
20 Malhotra?
21   A.  The likelihood of piracy, the extent
22 to which a pirated copy might detract from a
23 ordinary purchased copy, his remedies, if any,
24 as against piracy and those who profit from it.
25   Q.  What did you say to him?

Page 299

1    A.  In short, my advice to him -- well,
2  he came to me as an attorney.
3        MR. BONI:  I was going to ask you
4  that.  Were you rendering legal advice?
5        THE WITNESS:  I wasn't retained.
6  Nonetheless --
7        MR. BONI:  Doesn't matter.
8        THE WITNESS:  -- I think we should
9  stop right here.
10       MR. BONI:  Yeah, I agree.
11   Q.  So it's your testimony that in your
12 discussion with Deepak Malhotra regarding
13 piracy, you were having attorney/client
14 communications with Mr. Malhotra?
15   A.  I think I was, yes.
16   Q.  Other than Mr. Malhotra, have you
17 discussed piracy with any other authors?
18   A.  I know that I have.  But I'm having
19 trouble recalling specifically who.
20   Q.  Do you remember what you said to
21 them?
22   A.  Generally, my advice to individual
23 authors is that it's hard for any individual
24 author to do much about it, so they're probably
25 better off individually focusing their efforts

Page 300

1  on writing a great book and selling as many
2  copies as they can to whoever is willing to pay
3  for it.
4    Q.  Have you ever advised an author not
5  to post digital contents for fear of piracy?
6    A.  In fact, I reached that own -- that
7  conclusion for myself as to the Google case.  I
8  declined to post it on my website, even though I
9  have the right to do that.  So I advised myself
10 not to do it.
11   Q.  And by the "Google case," you mean
12 the case study regarding Google that you wrote
13 for Harvard Business School Press?
14   A.  That's what I meant, yes.
15   Q.  Why didn't you -- why did you decide
16 not to post it?
17   A.  The school would prefer that those
18 cases be purchased directly from the school at
19 the per copy price that you saw.  And so even
20 though it is an author's right to post it if the
21 author so chooses, I decided not to for that
22 case.
23   Q.  Do you understand the Authors Guild
24 to be advising authors not to post digital
25 content for fear of piracy?

Veritext National Deposition & Litigation Services
866 299-5127

1          MR. BONI:  Object to form.
2      A.  I'm not sure.
3      Q.  Are any of your articles available
4  for licensing by the Copyright Clearance Center?
5      A.  I expect that they are.
6      Q.  Have you ever negotiated with the
7  Copyright Clearance Center regarding those
8  issues?
9          MR. BONI:  Regarding?
10     Q.  Those issues?
11         MR. BONI:  What issues?
12     Q.  Regarding the availability of your
13  articles for licensing through the Copyright
14  Clearance Center?
15     A.  I believe there's a standard form
16  that I filled out when I submitted by Ph.D. to
17  the Harvard Library system, my Ph.D.
18  dissertation.  That is a Copyright Clearance
19  Center form, as I call it.
20     Q.  Was it a UMI microfilms form?
21     A.  This was seven years ago.  Perhaps I
22  should refresh my recollection in some other
23  way.  It seems perfunctory, and I signed it,
24  although if there were choices to be made, I
25  can't tell you what choice I made.

1          MR. BONI:  You want to show him
2  something or are you just fishing?
3          MR. GRATZ:  Neither.
4      Q.  Does the CCC, the Copyright Clearance
5  Center, negotiate security protocols with those
6  who license content from the CCC for posting on
7  the web, for example?
8      A.  I don't know.
9      Q.  Does the CCC negotiate liquidated
10  damages terms with its licensees?
11     A.  I don't know.
12     Q.  You've done consulting work apart
13  from your -- the expert engagements that we've
14  discussed; is that right?
15     A.  Yes.
16     Q.  And some of that consulting work has
17  been for Microsoft; is that right?
18     A.  Yes.
19     Q.  Overall how much money has Microsoft
20  paid you?
21     A.  That's confidential information.
22     Q.  Have you ever spoken with anyone at
23  Microsoft about Google?
24     A.  Yes.
25     Q.  What was said?

1          MR. BONI:  If there's any
2  confidential relationship or privileged
3  relationship, then you shouldn't answer.
4      A.  There are both confidential and
5  privileged issues raised by that question.
6          MR. BONI:  If there's anything you
7  can say outside the confines of the privilege,
8  to be fair, you should say that.
9      A.  What I've said publicly and what
10  Microsoft has authorized me to say publicly is
11  that I've offered them guidance on a variety of
12  questions.  Most of the work focused on things
13  other than Google, actually.  Integrity and
14  auditing and advertising fraud and so forth.
15  Routine business matters, from my perspective.
16     Q.  But some of the work focused on
17  Google?
18     A.  I think I can give you a yes to that
19  without implicating the confidentiality or the
20  privilege, but beyond that, I feel I'm obliged
21  to tread lightly.
22     Q.  How much money has Microsoft paid you
23  for your work related to Google?
24     A.  I think that's confidential.
25     Q.  You were opposing counsel -- strike

1  that.
2          You were counsel for the plaintiff's
3  in the Vulcan Gulf case in which the plaintiffs
4  were suing Google; is that right?
5      A.  Yes.
6      Q.  Did you receive a fee in connection
7  with that litigation?
8      A.  I did not.
9      Q.  Was that a contingent fee
10  arrangement?
11     A.  The agreement with the class
12  representative, the putative class
13  representative, was that the fees would be paid
14  only upon the successful conclusion of the
15  litigation.
16     Q.  Did the litigation conclude
17  successful or successfully enough to result in
18  the payment of any money to you?
19     A.  Not successfully enough to result in
20  the payment of any money to me.
21     Q.  How many blog posts have you written
22  which were critical of Google?
23     A.  I'm not sure.  I think more than 20.
24     Q.  How many blog posts have you written
25  which were supportive of Google?

Page 305

1     A.  More than five.
2     Q.  Fewer than 20?
3     A.  I think it's fair to say fewer than
4  20.
5     Q.  Are you familiar with an economist
6  named Judith Chevalier?
7     A.  Yes.
8     Q.  Who is Judith Chevalier?
9     A.  She was at the Yale School of
10  Management.  She's an excellent economist.
11     Q.  Have you ever cited Judith
12  Chevalier's work regarding the economics of the
13  market for books?
14     A.  I have in at least two instances that
15  I'm aware.
16     Q.  In what instances were those?
17     A.  My undergraduate thesis used a method
18  that Ms. Chevalier and Austan Goolsbee developed
19  to convert an Amazon sales rank into an
20  estimated sales quantity.  And so I cited their
21  work in the context of that in the graduate
22  thesis.
23         Then I recently published an article
24  about collecting data from the Internet and
25  using that data for economic research, and I

Page 306

1  cited that same article again for substantially
2  the same purpose.
3     Q.  And you cited Ms. Chevalier's work
4  multiple times in your thesis; is that right?
5     A.  I should think I cited it multiple
6  times, yes.
7     Q.  How about six times; is that right?
8         MR. BONI:  But who's counting?
9     A.  I don't know.  I haven't read that
10  often, recently.
11         MR. GRATZ:  Let's mark as Exhibit 20
12  this document.
13         (Document marked as Exhibit No. 20 for
14  identification.)
15     Q.  Mr. Edelman, is this your
16  undergraduate senior thesis?
17     A.  Well, it seems to be.  It's not so
18  easy to get.  Usually, people have to ask me for
19  it, so I'm intrigued you managed to find it
20  without asking me for it.  But it seems to be
21  what it purports to be.
22     Q.  This is the document in which you
23  cited Ms. Chevalier's work?
24     A.  I think so.  Let's check the
25  references section.  Cited under "G" for

Page 307

1  Goolsbee, the first author on that paper.
2     Q.  Turning to page 3 of the thesis, you
3  cite the Goolsbee and Chevalier paper in the
4  center of that page; is that right?
5     A.  Yes.
6     Q.  Turning to page 8 of the thesis, you
7  cite the Goolsbee and Chevalier paper in the
8  last line of that page; is that right?
9     A.  Yes.
10     Q.  And it's also cited on the following
11  page in the second to last line; is that right?
12     A.  Yes.
13     Q.  As well as in the middle of the page?
14     A.  So it is.
15     Q.  Turning to page 31, you cite the
16  Goolsbee and Chevalier paper at the beginning of
17  the page?
18     A.  I do.
19     Q.  And then turning to page 70, you cite
20  the Goolsbee and Chevalier paper in the center
21  of the page in the middle of the line; is that
22  right?
23     A.  Yes.
24     Q.  What is your opinion of Judith
25  Chevalier's expertise regarding economics?

Page 308

1     A.  Well, I just loved this paper and
2  found it very clever.  She's been quite
3  prolific, and I really haven't read the majority
4  of her work.  I look forward to taking the time
5  to do that sometime soon I hope.  But beyond
6  that, she's very well-published in top journals,
7  which means that the prevailing view among her
8  peer reviewers is that her work is quite good.
9     Q.  What is your opinion of Judith
10  Chevalier's expertise regarding the economics of
11  the market for books?
12         MR. BONI:  Object to form.
13     Q.  What is your opinion of Judith
14  Chevalier's expertise regarding the economics of
15  the market for books?
16         MR. BONI:  Object to form.
17     A.  I'm not sure.  I haven't read her
18  opinions on that in general.  I know the
19  findings that are in the Goolsbee and Chevalier
20  2001 paper.  As to her other conclusions, I'd
21  need to review both the conclusions and the
22  methodologies to see what I think.
23     Q.  Are you familiar with a man by the
24  name of Albert Greco?
25     A.  I don't think so.

77 (Pages 305 to 308)

Page 309

1      Q.   Turning to the references cited page
2   of your senior thesis on page 77, under G, do
3   you see a citation to a book by A. Greco called
4   The Book Publishing Industry?
5      A.   Yes.
6      Q.   And turning to page 33 of your senior
7   thesis, you see the bottom of page 33 it says,
8   "I further add two promotion-specific variables
9   to investigate market trends noted by Greco
10  (1997) in discussing clumping of book sales over
11  time"?
12     A.   Yes.
13     Q.   Is that a citation to the Greco work
14  titled The Book Publishing Industry cited in
15  your references cited section?
16     A.   Seems to be.
17     Q.   Do you have an opinion as to Albert
18  Greco's expertise regarding The Book Publishing
19  Industry?
20     A.   Not really.
21           MR. BONI:  Are you done with this,
22  Joe?
23           MR. GRATZ:  Yes.  Nothing further.
24           MR. BONI:  I have nothing.
25           THE VIDEOGRAPHER:  Here ends this

Page 310

1   deposition.  Off the record, 6:18 p.m.
2           (Whereupon, the deposition was
3   concluded at 6:18 p.m.)

Page 311

1                C E R T I F I C A T E
2   COMMONWEALTH OF MASSACHUSETTS.
    MIDDLESEX, SS.
3
       I, Avis Barber, Registered Professional
4   Reporter and Notary Public, in and for the
    Commonwealth of Massachusetts, do hereby certify
5   that:
6      BENJAMIN G. EDELMAN, the witness whose
    deposition is hereinbefore set forth, was duly
7   sworn by me, that I saw a picture identification
    for him in the form of his Harvard College
8   Identification card, and that the foregoing
    transcript is a true and accurate transcription
9   of my stenotype notes to the best of my
    knowledge, skill and ability.
10
       I further certify that I am not related to
11  any of the parties in this matter by blood or
    marriage and that I am in no way interested in
12  the outcome of this matter.
       IN WITNESS WHEREOF, I have hereunto set my
13  hand and notarial seal this 20th day of June
    2012.
14
15  ---------------------
    Avis Barber, RPR
16  Notary Public
    My commission expires:  July 30, 2015
17

Page 312

1         I declare under penalty of perjury
2   under the laws that the foregoing is
3   true and correct.
4
5         Executed on _____ , 20___,
6   at _____, _____.
7
8
9
10
11         _____
12         BENJAMIN G. EDELMAN

                    78 (Pages 309 to 312)