DURIE TANGRI LLP
DARALYN J. DURIE (*Pro Hac Vice*)
ddurie@durietangri.com
JOSEPH C. GRATZ (*Pro Hac Vice*)
jgratz@durietangri.com
DAVID McGOWAN (*Pro Hac Vice*)
dmcgowan@durietangri.com
GENEVIEVE P. ROSLOFF (*Pro Hac Vice*)
grosloff@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     415-362-6666
Facsimile:     415-236-6300

Attorneys for Defendant
Google Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, INC., Associational Plaintiff, BETTY MILES, JOSEPH GOULDEN, and JIM BOUTON, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE INC.,<br><br>Defendant. | Civil Action No. 05 CV 8136 (DC)<br><br>**ECF Case** |

**REPLY IN SUPPORT OF DEFENDANT GOOGLE INC.'S
MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE
SUMMARY ADJUDICATION**

TABLE OF CONTENTS

PAGE NO.

I.    INTRODUCTION ........................................................................................................1

II.   PLAINTIFFS' INVENTED "TWO-TRACK" ANALYTICAL FRAMEWORK HAS
      NO BASIS IN THE STATUTE OR IN CASE LAW. ..........................................2

III.  THE FIRST FACTOR STRONGLY FAVORS A FINDING OF FAIR USE. ......................3

      A.  Google Books search results, including snippets, are transformative. ..........................3

      B.  Scanning books is necessary to indexing and snippet display.......................................8

      C.  Google's for-profit status does not drive the fair use analysis.......................................9

IV.   THE FOURTH FACTOR STRONGLY FAVORS A FINDING OF FAIR USE. .................9

      A.  Previewing promotes the sale of books. ........................................................................9

      B.  There is no evidence of a licensing market for the type of use made by Google. .......10

      C.  That Plaintiffs have licensed some of their works for full-page display
          strengthens, rather than weakens, the fair use argument. ...........................................11

V.    GOOGLE'S CONDUCT WITH RESPECT TO THE LIBRARY COPIES WAS NOT
      INFRINGING.............................................................................................................12

      A.  Google performed no act of distribution to the public...................................................12

          1.  Google's creation and maintenance of the GRIN system is not an act of
              "distribution."..................................................................................................12

          2.  The single library whose book was scanned is not "the public" with
              respect to a scan of that book. .......................................................................14

      B.  Google is not secondarily liable for libraries' activities. .............................................16

          1.  Proving secondary liability would require showing that the libraries are
              direct copyright infringers, which Plaintiffs do not even begin to do. ............17

          2.  Key elements of all accepted theories of secondary copyright liability
              are missing here. ...........................................................................................17

      C.  Even if Google is deemed to have done some volitional act with respect to the
          library copies, those acts are fair use. .........................................................................19

VI.   CONCLUSION .........................................................................................................20

TABLE OF AUTHORITIES

PAGE NO(S).

## Cases

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994).................................................................... 10, 11

*Am. Geophysical Union v. Texaco Inc.*,
  802 F. Supp. 1 (S.D.N.Y. 1992)...................................................................... 2

*Artists Music, Inc. v. Reed Publ'g (US), Inc.*,
  93 CIV. 3428(JFK), 1994 WL 191643 (S.D.N.Y. May 17, 1994) ......................... 18

*Authors Guild, Inc. v. HathiTrust*,
  902 F. Supp. 2d 445 (S.D.N.Y. 2012)................................................... 17, 18, 19

*Bagdadi v. Nazar*,
  84 F.3d 1194 (9th Cir. 1996) ...................................................................... 14

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)................................................................... 7, 11

*Blackwell Publ'g, Inc. v. Excel Research Grp., LLC*,
  661 F. Supp. 2d 786 (E.D. Mich. 2009).......................................................... 14

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)............................................................................ 2, 5, 7, 9

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)......................................................................... 3

*Cartoon Network LP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008).................................................................. passim

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998)..................................................................... 9, 11

*Cen. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
  56 F.3d 359 (2d Cir. 1995).......................................................................... 17

*Deutsch v. Arnold*,
  98 F.2d 686 (2d Cir. 1938).......................................................................... 18

*Ford Motor Co. v. Summit Motor Products, Inc.*,
  930 F.2d 277 (3d Cir. 1991)......................................................................... 15

TABLE OF AUTHORITIES (CONT'D)

PAGE NO(S).

*Hotaling v. Church of Jesus Christ of Latter-Day Saints,*
   118 F.3d 199 (4th Cir. 1997) ............................................................... 16

*Infinity Broad. Corp. v. Kirkwood,*
   150 F.3d 104 (2d Cir. 1998) ............................................................. 6, 19

*Kelly v. Arriba Soft Corp.,*
   336 F.3d 811 (9th Cir. 2003) ................................................................. 3

*Matthew Bender & Co. v. W. Publ'g Co.,*
   158 F.3d 693 (2d Cir. 1998) ............................................................... 17

*MCA, Inc. v. Wilson,*
   677 F.2d 180 (2d Cir. 1981) ................................................................. 9

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
   545 U.S. 913 (2005) ........................................................................... 18

*National Football League v. PrimeTime 24 Joint Venture,*
   211 F.3d 10 (2d Cir. 2000) ................................................................. 15

*Paramount Pictures Corp. v. Labus,*
   No. 89-C-797-C, 1990 WL 120642 (W.D. Wis. Mar. 23, 1990) ............ 16

*Petrella v. Siegel,*
   843 F.2d 87 (2d Cir. 1988) ................................................................. 17

*Shapiro, Bernstein & Co. v. H.L. Green Co.,*
   316 F.2d 304 (2d Cir. 1963) ............................................................... 18

*United States v. Nysco Labs., Inc.,*
   318 F.2d 817 (2d Cir. 1963) ............................................................... 17

*Wechsler v. Hunt Health Sys. Ltd.,*
   No. 94 CIV. 8294, 1999 WL 672902 (S.D.N.Y. Aug. 27, 1999) ............ 16

*WNET, Thirteen v. Aereo, Inc.,*
   712 F.3d 676 (2d Cir. 2013) ........................................................... 13, 14

TABLE OF AUTHORITIES (CONT'D)

PAGE NO(S).

**Statutes**

17 U.S.C. § 106 ................................................................................................................ 8

17 U.S.C. § 107 .............................................................................................................. 19

17 U.S.C. § 121 .............................................................................................................. 19

**Other Authorities**

2 NIMMER ON COPYRIGHT § 8.11 .................................................................................. 15

## I.       INTRODUCTION

Plaintiffs' opposition to Google's motion for summary judgment provides no competent evidence that any author has suffered any economic loss that can be attributed to Google Books. Because Plaintiffs cannot show actual harm, they theorize about security breaches that can be imagined, but never occurred, and licensing markets that can be imagined, but never arose and never plausibly will arise.  Hypothesis cannot substitute for evidence that does not exist.

Plaintiffs' Opposition makes two critical concessions.  First, Plaintiffs concede that the creation of digital copies does not give rise to liability if the copies are put to fair uses, and that "intermediate use is not relevant to the practices challenged in this lawsuit."  Opp'n. at 41. Second, Plaintiffs no longer challenge indexing and the N-gram project as a fair use, contending that these uses are "beside the point."  *Id.* at 6.  Plaintiffs are thus left with their assertion that Google distributes digital copies to libraries and their challenge to the display of snippets.

Plaintiffs offer no facts to dispute that libraries, not Google, perform the volitional act that results in a library copy.  *Cablevision* controls the result here, and this Court is not the appropriate audience for an argument that *Cablevision* was wrongly decided.

Snippets help users find the books most relevant to their searches.  Indeed, Plaintiffs concede that publishers have recognized this benefit by making much larger excerpts available on Amazon (without any compensation to rightsholders).  Plaintiffs thus argue Google Books entices users away from Amazon, "transform[ing] Amazon customers into Google ad-clickers." Opp'n at 1.  This assertion is unsupported by any evidence because it makes no sense:  Google's snippet-view pages display no advertisements and instead direct users to Amazon (and other booksellers).  The undisputed facts establish that Google Books is a tool for finding books.  As such, it is a fair use under the governing law.

1

## II.   PLAINTIFFS' INVENTED "TWO-TRACK" ANALYTICAL FRAMEWORK HAS NO BASIS IN THE STATUTE OR IN CASE LAW.

Plaintiffs' fair use analysis is predicated on the assertion that the four statutory factors are "of [l]ittle [h]elp" in determining whether Google Books constitutes fair use, and that "this case requires a different type of analysis than a methodical application of the four factors set forth in Section 107."  Plas.' Mem. Law Opp'n Google's Mot. Summ. J., ECF No. 1070 ("Opp'n") at 20. In support of this proposition, Plaintiffs rely on Judge Leval's district court opinion in the *American Geophysical Union* case, contending that he set forth in that opinion two "categories" of fair use cases: "(1) transformative (or productive) nonsuperseding use of the original, or (2) noncommercial use, generally for a socially beneficial or widely accepted purpose."  Opp'n at 20 (quoting *Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 12 (S.D.N.Y. 1992)).  Plaintiffs contend that "[t]hose in the first category are the typical fair use cases triggering typical four-factor analysis," while the second category requires a two-factor test in which "the Court must determine whether a use that [sic] is purely 'noncommercial' and is 'generally for a socially beneficial or widely accepted purpose.'"  Opp'n at 20.

That is not what Judge Leval said.  Instead, he explicitly described "a two-track pattern **of interpretation of the first factor**," not an alternate framework that disregards some of the statutory factors altogether.  *Am. Geophysical Union*, 802 F. Supp. at 12 (emphasis added). Indeed, in the *American Geophysical Union* case itself, after analyzing the first factor by asking whether the use was justified as transformative or was instead justified as noncommercial, Judge Leval analyzed the remaining statutory factors.  *Id.* at 16-22.

The Supreme Court has set forth the analytical framework that governs this case:  the fair use factors "are to be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).  As set forth in the

sections that follow, the application of those fair use factors leads to the inescapable conclusion that Google prevails as a matter of law.

## III.     THE FIRST FACTOR STRONGLY FAVORS A FINDING OF FAIR USE.

Because Google's use is transformative, the first factor strongly favors a finding of fair use.  Recognizing that indexing is a paradigmatic transformative purpose, Plaintiffs shift their focus to the display of snippets, and now contend that indexing and other non-display uses are "beside the point."  Opp'n at 6.  First, that position is starkly at odds with Plaintiffs' position on class certification, where Plaintiffs sought to certify a class including works as to which no snippets are shown, implicitly contending that the display of snippets is incidental to the fair use analysis.[1]  Second, Google Books search results, including the snippets displayed within them, are transformative because they provide information that helps users identify books of interest to them.

### A.     Google Books search results, including snippets, are transformative.

Google Books shows search results in the context of the user's chosen search terms.  The display of snippets allows the Google Books product to achieve its transformative purpose of helping users identify the most relevant books to buy or borrow.  *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (holding a use transformative because it "serves a different function than Kelly's use—improving access to information on the internet versus artistic expression."); *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013) (productive use for a different

---

[1] In the present procedural posture, the only works before the Court are those of the named plaintiffs and those owned by the associational plaintiffs.  There is no evidence that snippets were shown with respect to any books other than *Ball Four*, *The Trouble With Thirteen*, and *The Super-Lawyers*, and thus Plaintiffs cannot avoid summary judgment on their public-display claim as to all other books.  *See* Decl. Joanne Zack Supp. Plas.' Mot. Partial Summ. J. ("Zack Decl.") ¶¶ 5-9; Decl. Michael J. Boni Supp. Plas.' Opp'n Def. Google's Mot. Summ. J., ECF No. 1073 ¶¶ 2-4.

purpose than the original is transformative).  Without snippets, users would see a list of results, but they would not be able to understand why those results were returned.  Decl. Gloriana St. Clair Supp. Def. Google Inc.'s Mot. Summ. J., Ex. A, ECF No. 1042-1 ("St. Clair Decl.") ¶¶ 39-44; Decl. Judith A. Chevalier Supp. Def. Google Inc.'s Mot. Summ. J., Ex. A, ECF No. 1034-1 ("Chevalier Decl.") ¶¶ 21-25.  As a result, they could not determine which books contain information relevant to them.

Plaintiffs object to snippets on two counts.  First, they complain about the display of any text from the book, no matter how small, on the theory that it might substitute for the reading of the book.  Opp'n at 11.  Second, they complain that, when it comes to selling books, snippets are less useful than the much larger excerpts available on Amazon and through Google's Partner Program.  Opp'n at 30; Decl. Paul Aiken Supp. Plas.' Opp'n Def. Google's Mot. Summ. J., ECF No. 1074 ("Aiken Opp'n Decl.") ¶¶ 4-5, 32-33.  To Plaintiffs, the porridge is both too hot and too cold.

Plaintiffs' first theory—that the display of snippets might substitute for the reading of the book—lacks any evidentiary support.  Publishing industry expert Bruce Harris has explained that being able to see a portion of a book is critical to consumers' purchasing decisions.  Decl. Bruce S. Harris Supp. Def. Google Inc.'s Mot. Summ. J., Ex. A, ECF No. 1039-1 ("Harris Decl.") ¶¶ 10-18.  Plaintiffs have not come forward with any evidence to create a factual dispute on this point.  They have not proffered any evidence that anyone ever decided not to buy a book because they looked at snippets on Google Books.  Indeed, Plaintiffs have not even come forward with a plausible hypothesis as to why this might occur.  Plaintiffs try to dream up an edge case in which a user "might want to know what Mr. Bouton had to say about Mickey Mantle."  Opp'n at 10.  But even this hypothetical scenario fails, because there are 17 pages containing the words

4

"Mickey Mantle" in *Ball Four*, and the user can see only three snippets when searching for that term.[2]  Google has taken care to design its system so that snippets will not substitute for books, by displaying only three snippets, ensuring that those three snippets always come from different pages of the book, and always displaying the same three snippets for a given search query.  Decl. Brad Hasegawa Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1040 ("Hasegawa Decl.") ¶ 4.  That design makes snippets an excellent tool for evaluating whether a book contains relevant information about a particular subject but, by design, no substitute for a copy of the book.

Plaintiffs cannot seriously contest this point, so they argue that the display of snippets must be aggregated across all users, so the fact that a particular user sees a very small portion of the book does not matter.  Opp'n at 10-11.  But users cannot be aggregated for fair use purposes because users do not decide collectively whether to buy a book.  The text seen by an aggregate of people cannot displace any sales or supplant any ordinary use of any book, and that is what matters to the fair use analysis.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 588 (1994) (a superseding, non-transformative use "fulfill[s] demand for the original").[3]

---

[2] Zack Decl. Ex. 4 at 35 (displaying only three matching snippets from *Ball Four* but noting that there are "17 pages matching mickey mantle in this book").  *See also* Zack Decl. Ex. 7 at 1 (displaying only three matching snippets from Miles' *The Trouble With Thirteen* for the search "annie" but noting that there are "33 pages matching annie in this book"); Zack Decl. Ex. 8 at 1 (displaying only three matching snippets from Goulden's *The Super-Lawyers* for the search "wall street" but noting that there are "21 pages matching wall street in this book").

[3] Plaintiffs complain that Google's argument that it "displays no more of a work than is necessary to allow users to assess whether a book is responsive to their query" is circular, because "whatever a reader wants to read from the book is necessary to display to that reader," and this argument would justify displaying "100% of the book's verbatim contents without permission."  Opp'n at 37-38.  This response completely misses the point.  Google has not argued that it displays as much text as is ultimately "necessary to display to the reader" to satisfy the reader's demand for information from the book.  Instead, Google has argued that it displays no more text than is necessary for the reader to assess whether the book is responsive to the user's query.  Of course displaying the entire book could substitute for the book itself, but no one

The context of the pages on which snippets are displayed also makes clear that those snippets are a tool for finding books to buy or borrow, not a substitute for the books themselves. *See* Decl. Dan Clancy Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1035 ("Clancy Decl.") Exs. C & D (snippet view page for the query "Steve Hovley" in *Ball Four*).  The most prominent links on the page are to online bookstores where one can buy the book.  Where the bookstore provides pricing information, the page lists prices at the various bookstores.  *See* Clancy Decl. Ex. C (listing prices of $10.85 at Amazon and $10.95 at Barnes & Noble).  (Plaintiffs' unsupported assertion that Google Books is designed to turn book buyers "into Google ad-clickers," Opp'n at 1-2, is particularly implausible because there are no ads on pages displaying snippets.  Clancy Decl. Ex. C.)  Every time a user sees a snippet, that user is two clicks away from buying the book from Amazon (or Barnes & Noble, or Books-A-Million) or from finding the book in a nearby independent bookstore using IndieBound, or from finding the book in a nearby library using OCLC WorldCat.  *Id.*

Plaintiffs seem to be complaining that Google provides various ways to buy or borrow a book, rather than selling the book directly like Amazon.  But Plaintiffs provide neither fact nor logic to suggest that these options diminish the extent to which Google Books is a tool for finding books.  In his declaration, Mr. Aiken opines that "as an online shopping environment, it's a poor substitute for Amazon.com."  Aiken Opp'n Decl. ¶ 5.  But he does not explain why having a choice among several booksellers (and a chance to review their competing retail prices) is a bad thing.  Mr. Aiken admits that Amazon (including its Search Inside the Book feature) "is

---

contends that is what Google Books does.  *Cf. Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998) (use was not transformative where the system was designed to allow a single user to listen to a station "for hours at a time[,]" substituting for listening to entire programs).

believed by most people in the book industry (including [Mr. Aiken]) to increase sales of most books."  *Id*. ¶ 4.  Although Mr. Aiken asserts, without any evidentiary support, that Google Books "lures readers away from online bookstores" and thus "is actively harming book sales," he ignores the fact that Google Books pages link directly to Amazon.  *Id.* ¶ 5.  Snippet display pages are just as much a tool for finding books as Amazon.  The only relevant differences are that Google provides a selection of booksellers, and that Amazon displays a much greater percentage of the work.

Nor does the existence of Amazon's "Search Inside the Book" feature make Google's use less "transformative" because it is no longer "something new."  Opp'n at 1.  First, whether a use is transformative does not depend on whether that use has been made before.  The Second Circuit's decision in *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605 (2d Cir. 2006), does not render future authors *less* free to use small photographs in future books. Similarly, Microsoft's Bing search engine is no less transformative of the web pages it copies and indexes because Google's search engine already exists; Google's book search tool is no less transformative because Amazon has some limited book-search functionality.  "Something new" in the *Campbell* formulation of the test for transformative use does not refer to something that has never been attempted before; it refers, instead, to a purpose or message not present in the original work.  *Campbell*, 510 U.S. at 579 (asking whether the use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message").  *See Bill Graham Archives*, 448 F.3d at 615 (even where the copyright holder is already engaging in a particular transformative use, that does not take away its transformative character when others engage in that use, because "copyright owners may not preempt exploitation of transformative markets").

Second, Google Books is "something new," even relative to Amazon's Search Inside the Book. As Dr. Chevalier explains, Google Books is a new good, providing value that is not found in any particular book or any extant book search tool: the ability to search through the text of millions of in-print and out-of-print books to find a set of books of interest, including books that in print, out of print, and books found only in libraries. Plaintiffs do not dispute that the comprehensiveness of the results is much greater in the case of Google Books, providing results that Amazon will never provide. *See* Chevalier Decl. ¶¶ 15-30.

### B.     Scanning books is necessary to indexing and snippet display.

A book cannot be indexed unless it has first been scanned and its text recognized through OCR; snippets cannot be displayed unless the pages on which those snippets appear have been scanned. Clancy Decl. ¶¶ 6-7. Plaintiffs argue that although scanning the entirety of a book is necessary to Google's other uses, such as indexing and creation of the N-Gram Viewer, there is no need "to retain complete image and text files comprising every page of every book[.]" Opp'n at 37.[4] But copyright law concerns itself with the creation and dissemination of copies; there is no exclusive right "to retain" a copy of a copyrighted work. 17 U.S.C. § 106. As a result, the retention of a copy cannot itself be an act of infringement. The retention of a copy is only relevant insofar as it results in incremental harm that could weigh against a finding of fair use. As discussed in more detail below, Plaintiffs' only allegations of harm from the retention of copies are predicated on speculation, not evidence.

---

[4] Google's technology for processing images from books, and for indexing text from books, improves over time. For that reason, when there is an improvement in that technology, Google's systems refer back to the original scanned images in order to derive more accurate text, and to refer to that text in order to derive a more complete and efficient index of the book's contents. Zack Decl. Ex. 26 at 5 (Def. Google Inc.'s Suppl. Narrative Resps. Objs. Plas.' 2d Req. Prod. Docs. Things).

**C.      Google's for-profit status does not drive the fair use analysis.**

Plaintiffs spend pages discussing the idea that Google's activities with respect to library books were commercial.  These arguments miss the mark for three reasons.

First, the uses at issue are transformative, as discussed above.  Where the use is transformative, it matters little whether the use is commercial.  *Campbell*, 510 U.S. at 584.

Second, even where the use is not transformative, courts in the Second Circuit "do not give much weight to the fact that the secondary use was for commercial gain."  *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (use was not transformative).

Finally, the degree of commerciality here is small.  Google is not making money from the sale of copies of books.  There are no ads on pages that display snippets.  Google doesn't even make any money from the buy-the-book links.  The benefits to Google are indirect, and are incidental to the public benefits of improved search.  *See MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981) (in considering the fourth factor, weighing the balance "between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.").

## IV.     THE FOURTH FACTOR STRONGLY FAVORS A FINDING OF FAIR USE.

**A.      Previewing promotes the sale of books.**

Plaintiffs complain that "Google cannot identify the sale of a single book as a result of snippet display."  Opp'n at 29.  But, as discussed above, Google has presented evidence that Google Books is designed to push people to bookstores, and that "buy-the-book" links are the most prominent elements on pages displaying snippets.  Harris Decl. ¶¶ 7-18; Decl. Albert N. Greco Supp. Def. Google Inc.'s Mot. Summ. J., Ex. A, ECF No. 1037-1 ("Greco Decl.") ¶¶ 11-15; Clancy Decl. Exs. C & D.  Plaintiffs concede that Amazon's search functionality does help to

sell books.  Aiken Opp'n Decl. ¶ 32.  And even if Plaintiffs were correct that this evidence is not

sufficient to establish that Google Books generates sales, Plaintiffs have not pointed to a single

lost sale as a result of snippet display.  Decl. Joseph Gratz Opp'n Plas.' Mot. Summ. J., ECF No.

1075 ("Gratz Opp'n Decl.") Ex. 10, Miles Dep. Tr. 14:5-20; Ex. 12, Bouton Dep. Tr. 29:1-8; Ex.

13, Goulden Dep. Tr. 38:2-39:1.  Thus, at worst, Google Books' "effect on the market for" the

books at issue would be neutral.  Chevalier Decl. ¶¶ 32-47.

### B.      There is no evidence of a licensing market for the type of use made by Google.

Plaintiffs theorize that they may have lost license revenues from a potential licensing

market as a result of Google Books, Opp'n at 42-43, but they do not demonstrate that the market

was "traditional, reasonable, or likely to be developed."  *Am. Geophysical Union v. Texaco Inc*.,

60 F.3d 913, 930 (2d Cir. 1994).  The Second Circuit imposed this requirement to prevent

precisely the circular argument Plaintiffs make here:  that if a particular fair use were instead

found to be infringing, then a license would be necessary to undertake that use, and thus every

fair use does harm to some imaginable, "potential" licensing market.  *Id.* at 930 & n.17.  The

undisputed facts show that there is no such "traditional, reasonable, or likely to be developed"

licensing market.  *See* Def. Google Inc.'s Opp'n Plas.' Mot. Partial Summ. J., ECF No. 1072

("Google SJ Opp'n") at 31-32 (collecting evidence).  Even Plaintiffs' expert Mr. Gervais does

not say that there is.  Instead, he opines that there would be a licensing market for uses much

greater than those at issue in this case.  And even Mr. Gervais does not opine that a licensing

market for these particular uses would have arisen in the project's absence.  Gratz Opp'n Decl.

Ex. 15, Gervais Dep. Tr. 119:7-10; 168:3-5; 210:5-8; 218:6-221:6.

Plaintiffs cite the discussion of licensing in the *American Geophysical Union* case, and

characterize it as holding that "if Texaco's practices were not deemed fair use, licensing for the

individual articles would develop through the Copyright Clearance Center, Inc."  Opp'n at 45.

That characterization is not correct, because a market had already developed for precisely the

type of non-transformative use made by defendants in that case.  As a result, there was an extant,

"traditional" licensing market.  *Am. Geophysical Union*, 60 F.3d at 930 (describing "a workable

market for institutional users to obtain licenses for the right to produce their own copies of

individual articles via photocopying.").  Indeed, "Texaco itself [had] been paying royalties to the

CCC."  *Id.*  Here, by contrast, there is no evidence that any copyright holder has ever offered, or

that any user has ever accepted, a license to scan, index, or display snippets of books for the

purpose of returning search results.  Gratz Opp'n Decl. Ex. 15, Gervais Dep. Tr. 168:3-170:9.

> **C.     That Plaintiffs have licensed some of their works for full-page display
> strengthens, rather than weakens, the fair use argument.**

Plaintiffs argue that Google's Partner Program, in which Google hosts, indexes, and

displays copies of books for publishers, is evidence of a relevant market.  Opp'n at 44-45.  But

the Partner Program is very different:  it does not involve the display of snippets, but instead a

full display of a minimum of twenty percent of the pages of the book.  Clancy Decl. ¶¶ 13-14 &

Ex. F.  The Partner Program does not tell us anything about whether there is a market to display

only eighth-of-a-page "snippets."[5]

Indeed, if anything, the Partner Program is compelling evidence of the absence of a

market in which rightsholders receive compensation for the uses at issue here.  Rightsholders

have never received any guaranteed license fee for the inclusion of their books in the Partner

---

[5] Even if it did, it would not matter:  a copyright holder's entry into a market for a transformative
use such as snippet display does not enter into the fourth-factor analysis, because "a copyright
holder cannot prevent others from entering fair use markets merely 'by developing or licensing a
market for . . . transformative uses of its own creative work.'"  *Bill Graham Archives v. Dorling
Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006) (quoting *Castle Rock Entm't, Inc. v. Carol
Publ'g Grp., Inc.*, 150 F.3d 132, 146 n.11 (2d Cir. 1998)).

Program.  In the past, they received a share of revenue from any advertisements placed next to the pages of the book.  Decl. Scott Dougall Opp'n Plas.' Mot. Summ. J., ECF No. 1076 ("Dougall Opp'n Decl.") ¶¶ 4-7.  But there are no such advertisements shown next to library books in Google Books, so there is no advertising revenue to share.  Clancy Decl. ¶ 9.  And Google phased out advertisements in the Partner Program in 2012.  Dougall Opp'n Decl. ¶¶ 7-8. Today, publishers in the Partner Program receive no payments whatsoever from Google (and their participation is undiminished as a result).  *Id.*  If anything, the Partner Program shows that if there were a licensing market for snippet display, it would be on the same zero-dollar licensing terms as the Partner Program.  *Cf.* Gratz Opp'n Decl. Ex. 15, Gervais Dep. Tr. 160:9-165:2.

Google has presented ample evidence that its conduct with respect to library books does not harm the market for or value of any of Plaintiffs' books.  Plaintiffs provide only speculation in response.  The fourth factor strongly favors a finding of fair use.

## V.   GOOGLE'S CONDUCT WITH RESPECT TO THE LIBRARY COPIES WAS NOT INFRINGING.

### A.   Google performed no act of distribution to the public.

#### 1.   Google's creation and maintenance of the GRIN system is not an act of "distribution."

Plaintiffs argue that even though the libraries are the ones who "push the button" and set the system into motion each time they make a copy or transmit a scan to a library, Google is nonetheless the party engaging in distribution.[6]  But the Second Circuit has laid down a bright-line rule:  providing "access to a system that automatically produces copies on command" is not in itself copyright infringement.  *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 132

---

[6] Notably, Plaintiffs do not present any evidence that any library has "pushed the button" to download any of the individual plaintiffs' books, so Plaintiffs cannot at any rate avoid summary judgment on the distribution claim as to works other than those identified in Exhibit 30 to the Zack Declaration, to the extent those works are owned by Authors Guild members.

(2d Cir. 2008) ("*Cablevision*").  And the Second Circuit reaffirmed that rule in *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 692 (2d Cir. 2013).  As in *Cablevision*, the copies made by the GRIN system can be accessed only by the party that made the copy.  Decl. Stephane Jaskiewicz Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1041 ("Jaskiewicz Decl.") ¶¶ 6-9.  And as in *Cablevision*, the material being copied is material to which the party making the copy already had access; a library can only download scans of its own books through GRIN.  Jaskiewicz Decl. ¶¶ 6-9.  Google is not the party engaging in "distribution" under the governing law.

The GRIN system makes no copies unless and until the user triggers the creation of a copy, just as the RS-DVR in *Cablevision* recorded programs to disk only upon a user's request.  Plaintiffs try to distinguish *Cablevision* by asserting "Google itself makes at least one digital copy of the entirety of each book as part of its placement of the book on the GRIN system, whether or not that book has been requested by its library partner."  Opp'n at 18.  But Plaintiffs offer no evidence in support of this claim because they cannot:  it is false.  Jaskiewicz Decl. ¶¶ 8-9.  Google scans the book and keeps a copy for its fair uses, like indexing and snippet display.  *Id.*  Only when a library "presses the button" does the GRIN system do anything.  *Id.*  Until that point, there are no GRIN-specific copies; if libraries do not request a book, the existence of GRIN does not lead to the creation of any copies of that book.  *Id.* ¶ 9.  Google's central copy of the scan, from which copies are made by the libraries using the GRIN system, exists for purposes unrelated to GRIN (namely, to support indexing, snippet display, the N-Gram viewer, and so on).  *Id.* ¶ 8.  It would be unchanged if the GRIN system did not exist at all; its creation is not part of the operation of the GRIN system.  Plaintiffs have presented no competent evidence to raise a disputed question of fact on this issue.

Against *Cablevision* and *Aereo*, cases that are binding on this Court, Plaintiffs proffer a district-court case from the Eastern District of Michigan holding a copy shop liable for some copies made by its customers, where the copy shop itself supplied the material to be copied. *Blackwell Publ'g, Inc. v. Excel Research Grp., LLC*, 661 F. Supp. 2d 786, 788 (E.D. Mich. 2009). This is a curious case to cite for the proposition that the volitional conduct requirement imposed in *Cablevision* does not apply here, because that opinion does not mention the volitional act requirement at all. *Id.* No wonder: the defendant did not raise the volitional conduct requirement and the Sixth Circuit (unlike the Second Circuit) has not explicitly recognized it. *See* Defs.' Mot. Summ. J., *Blackwell Publ'g*, 2007 WL 4914304 (filed Dec. 3, 2007). Moreover, it was undisputed that the defendant had engaged in a volitional act of distribution to the public: the defendant's employees lent physical copies of coursepacks to any member of the public who walked in off the street. *Blackwell Publ'g*, 661 F. Supp. 2d at 792. *Blackwell Publishing* tells us nothing about the present case, which is on all fours with *Cablevision* and *Aereo*.

**2.    The single library whose book was scanned is not "the public" with respect to a scan of that book.**

Only libraries can use the GRIN system to download scans of books. (Indeed, as noted above, a library can only access scans created using that library's own copy of a particular book.) Nevertheless, Plaintiffs argue that if Google is found to have performed a volitional act of distribution with respect to those copies, that distribution is "to the public," as required by 17 U.S.C. § 107(3). Opp'n at 15 n.5. Plaintiffs appear to have abandoned the theory, discussed in their summary judgment brief and refuted in Google's opposition, that *Bagdadi v. Nazar*, 84 F.3d 1194, 1198 (9th Cir. 1996), stands for the proposition that every distribution to an entity composed of more than one person is a distribution "to the public." *See* Mem. Law Supp. Plas.' Mot. Partial Summ. J. at 15; Google SJ Opp'n at 39-40. Instead, they cite the Third Circuit's

14

decision in *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 299-300 (3d Cir.

1991).  *See* Opp'n at 15 n.5.  Plaintiffs note, correctly, that the Second Circuit criticized that

opinion in *Cablevision*, finding that it reads the phrase "to the public" "out of existence."

*Cablevision*, 536 F.3d at 139.  They note, equally correctly, that *Cablevision* was interpreting the

phrase "to the public" in the context of Section 106(4), dealing with public performance, not

Section 106(3), dealing with distribution to the public.  But there is no reason to think that the

Second Circuit would be willing to read the words "to the public" out of Section 106(3) when it

was unwilling to read those words out of Section 106(4).[7]

   Plaintiffs argue that one must look "downstream" to determine whether a distribution is

"to the public," citing *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d

Cir. 2000).  Opp'n at 17 n.6.  The *Cablevision* opinion distinguished that case, and it is

inapplicable here for similar reasons.  In the *National Football League* case, the question was

whether it was an act of public performance to transmit television programming to a satellite,

which automatically broadcast it widely to Canadian viewers.  *Nat'l Football League*, 211 F.3d

at 12.  The defendant argued that it was transmitting the programming solely to one satellite, so it

wasn't a transmission "to the public."  *Id.*  The court disagreed, holding that because the

transmission to the satellite was one leg of a transmission that was intended to reach the public, it

was a public performance.  Whereas in *National Football League*, the defendant triggered an

---

[7] The only response Plaintiffs provide to the *Cablevision* court's criticism of *Ford* is that "*Nimmer on Copyright* suggests an interpretation in which *Ford Motor* may be correct."  Opp'n at 15 n.5 (citing 2 NIMMER ON COPYRIGHT § 8.11[C][1][b] at 8-154.16 n.139).  True, the footnote on page 8-154.16 of Nimmer's treatise does suggest such an interpretation.  But that footnote continues on the next page: "On examination, that argument cannot stand."  It goes on to say that "private sales should fall outside the scope of infringement liability"—precisely the opposite of the holding of the *Ford* case.

automatic process that caused the work to reach the public, Google contractually prohibits those who receive scans from any further distribution that would infringe copyright.

Nor do the two other cases Plaintiffs cite help them show distribution "to the public." The *Labus* case involved handing physical copies of copyrighted works to anyone who walked in off the street and rented a hotel room. *Paramount Pictures Corp. v. Labus*, No. 89-C-797-C, 1990 WL 120642, at *4-5 (W.D. Wis. Mar. 23, 1990). The *Hotaling* case involved placement in a public library, where anyone who walked in off the street could check it out of the library. *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997). GRIN is a private system, which can only be used by libraries to make and download a copy of their very own books. It does not involve any distribution "to the public."

**B.      Google is not secondarily liable for libraries' activities.**

Plaintiffs gesture in a cursory manner at doctrines of secondary liability. Opp'n at 18. But, like the plaintiffs in *Cablevision*, they chose to pursue direct liability to the exclusion of any secondary-liability theory, and they must be held to that choice. The complaint includes no mention of a claim for secondary liability, and Plaintiffs' contention interrogatory responses preclude them from advancing such a theory for the first time now. *See* Gratz Opp'n Decl. Ex. 11, Plas.' Resps. Objs. Def. Google Inc.'s 1st Set Interrogs to Plas. at 2 ("Google's Library Project involves the following infringements of copyright: . . . Google distributes digital copies of in-copyright books in their entirety to libraries . . . ."). *See also Wechsler v. Hunt Health Sys. Ltd.*, No. 94 CIV. 8294, 1999 WL 672902, at *2-3 (S.D.N.Y. Aug. 27, 1999) (precluding a plaintiff from pursuing a legal theory omitted from contention interrogatory responses).

But even if Plaintiffs were not precluded from advancing a secondary-liability theory for the first time eight years into this litigation, their brief falls far short of anything that would preclude summary judgment in favor of Google. Plaintiffs do not engage in any analysis of the

16

prongs of any secondary-liability theory.  Their failure to do so is easy to explain; as set forth below, there can be no secondary liability without direct liability of another, and no theory of secondary liability fits these facts.

> **1.** **Proving secondary liability would require showing that the libraries are direct copyright infringers, which Plaintiffs do not even begin to do.**

All types of secondary liability, including inducement, require proof of underlying direct infringement by some third party.  *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998).  Thus, Plaintiffs would need to show as a threshold matter that the libraries' conduct is not fair use, but infringement.  They make no effort to do so.  Indeed, the libraries' conduct was held to be fair use on summary judgment.  *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012).  As a party to that case, the Authors Guild is precluded from relitigating the same issues here.  *See Cen. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995); *see also United States v. Nysco Labs., Inc.*, 318 F.2d 817 (2d Cir. 1963) (judgment retains its preclusive effect during appeal); *Petrella v. Siegel*, 843 F.2d 87, 90 (2d Cir. 1988) (same).  Thus, the holding in the *HathiTrust* case dooms any secondary-liability argument:  because the libraries did not engage in direct infringement, Google cannot be liable for contributory, vicarious, or inducement liability with respect to the libraries' conduct.

> **2.** **Key elements of all accepted theories of secondary copyright liability are missing here.**

There would be gaping holes in any attempt to impose secondary liability on Google, even if Plaintiffs could show that libraries' underlying conduct was infringing.

Under a "contributory liability" theory, Plaintiffs would have to prove that Google knew that the libraries' conduct was infringing, and not fair use.  *See, e.g.*, *Matthew Bender & Co*, 158 F.3d at 706.  To the contrary, Google required the libraries to abide by the copyright laws.

Clancy Decl. ¶ 5.  Far from demonstrating that Google knew of infringement, the activities of the libraries have been held to be fair use.  *HathiTrust*, 902 F. Supp. 2d at 464.  Because they cannot establish the knowledge prong, Plaintiffs cannot establish that Google is liable as a contributory infringer.

Under a "vicarious liability" theory, Plaintiffs would have to prove that Google had an "obvious and direct financial interest" in infringing activity that it had the "right and ability to supervise."  *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963).  The only library activity that Google had the right and ability to control was the libraries' use of the GRIN system.  This theory of liability requires that Google's interest be both "direct" and "financial"; any benefit to Google from the operation of the GRIN system was highly indirect, since Google does not make money when libraries download books through GRIN.  Plaintiffs have pointed to no "direct" financial benefit which could give rise to liability as a vicarious infringer.  *See, e.g.*, *Deutsch v. Arnold*, 98 F.2d 686, 687-88 (2d Cir. 1938) (collecting a fixed rent from an infringer was insufficient to impose vicarious copyright infringement liability); *Artists Music, Inc. v. Reed Publ'g (US), Inc.*, 93 CIV. 3428(JFK), 1994 WL 191643, at *6 (S.D.N.Y. May 17, 1994) (where company would have made just as much money if a third party had chosen not to engage in infringement, there is no direct financial benefit from infringement).

Under an "inducement" theory, Plaintiffs would have to prove that Google had "the object of promoting [GRIN's] use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement[.]"  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919 (2005).  This species of secondary liability "premises liability on purposeful, culpable expression and conduct," and cannot be used to "discourage innovation having a lawful promise."  *Id.* at 937.  Thus, even if Google were found to have induced libraries

to use GRIN, that inducement is of an activity Google (and Judge Baer) believed and believes to be fair use, not an inducement of infringement.

### C.  Even if Google is deemed to have done some volitional act with respect to the library copies, those acts are fair use.

As noted above in Section V.B.1, Google cannot be liable as a direct infringer with respect to copies made by libraries.  But even in the event the Court holds, contrary to *Cablevision*, that Google may be liable for operating the technical system used to make copies sent to the libraries, that conduct is fair use.[8]

As to the first factor, the conduct is entirely for "nonprofit educational purposes," 17 U.S.C. § 107(1):  nothing about the GRIN system is designed to make money, but instead to serve the libraries.  The GRIN system is operated for a transformative purpose:  it is necessary to the libraries' creation of an index to their books.  *HathiTrust*, 902 F. Supp. 2d at 460-61.  It also directly facilitates uses by the libraries that may not be fair use, but instead fall within the exception to copyright liability set forth in 17 U.S.C. § 121.  *HathiTrust*, 902 F. Supp. 2d at 462.

The analysis of the second and third factors with respect to the library copies is the same as with respect to the uses made by Google.

As to the fourth factor, there is no evidence of any lost sales; indeed, the libraries have said they increased their spending.  Gratz Decl. Supp. Def. Google Inc.'s Mot. Summ. J., ECF No. 1036, Ex. 1, Courant Dep. Tr. 107:9-108:19.  Nor is there any evidence that the operation of

---

[8] Plaintiffs argue, in a footnote, that the uses libraries make play no part in the analysis of whether Google's creation of the GRIN system is fair use.  Opp'n at 22 n.7.  But facilitating libraries' lawful uses is the only purpose the GRIN system serves.  Each library is prohibited from using the scans for any infringing purpose, and can only download scans made using the library's own books.  That makes the present circumstances markedly different from those in *Infinity Broadcasting Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998), where nothing prevented any member of the public from using the service at issue as a substitute for listening to radio broadcasts to which they otherwise would not have had access.

the GRIN system implicates any "traditional, reasonable, or likely to be developed" licensing market. *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994). The operation of that system allows libraries to download a digital copy of books they already own, with no greater rights than those already given them by law. They are in largely the same position they would have been in had they scanned the books themselves. Plaintiffs say the libraries would pay for copies of books, and this shows a licensing market. But Plaintiffs hypothesize a market for something very different from what the libraries actually received. There is no evidence of a licensing market for a copy that you can only use for purposes that don't otherwise violate copyright law; that is no "license" at all. Thus the issue is not "whether libraries would pay to own, display on their websites, and distribute to faculty, staff, library patrons, and others full electronic copies of works." Opp'n at 49. It is whether libraries would pay copyright holders to get the copies they actually got, with the restrictions that came with them to use them only consistent with copyright law. Copyright holders do not offer, and libraries would not pay for, that type of "license." St. Clair Decl. ¶¶ 5(c), 9; Chevalier Decl. ¶ 51.

## VI.    CONCLUSION

The undisputed evidence shows that Google's scanning, indexing, and snippet display are transformative uses with no negative effect on the market for or value of any book. They provide a tool for research and scholarship, and make books discoverable in a way that was never before possible. The Court should grant Google's motion for summary judgment.

Dated: September 9, 2013                              Respectfully submitted,

                                     By:   */s/ Joseph C. Gratz*
                                          Daralyn J. Durie (*Pro Hac Vice*)
                                          ddurie@durietangri.com
                                          Joseph C. Gratz (*Pro Hac Vice*)
                                          jgratz@durietangri.com
                                          David McGowan (*Pro Hac Vice*)
                                          dmcgowan@durietangri.com

Genevieve P. Rosloff (*Pro Hac Vice*)
grosloff@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:  415-362-6666
Facsimile:  415-236-6300

Attorneys for Defendant Google Inc.