**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

The Authors Guild, Inc., Associational Plaintiff,  :
Betty Miles, Joseph Goulden, and Jim Bouton,      :
individually and on behalf of all others similarly :
situated,                                          :
                                                   :        Case No. 05 CV 8136-DC
                Plaintiffs,                         :
                                                   :
            v.                                      :
                                                   :
Google Inc.,                                       :
                                                   :
                Defendant.                          :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. Google's Uses Are Highly Commercial ................................................................2

II. Google's Justification For Its Infringing Conduct—That It Helps Authors—Must Be Rejected ................................................................5

III. That Some Rightsholders May License Excerpts Of Their Works Does Not Give Google The Unfettered Right To Do So ................................................................6

IV. Google Has Infringed Plaintiffs' Distribution Right ................................................................7

V. Google's Uses Are Not Transformative ................................................................9

VI. Google Took Far More Than It Needed For Its Indexing Purposes ................................................................11

VII. The Google Library Project Is Likely To Cause Substantial Market Harm ................................................................14

    A. There Is An Existing And Potential Market For The Four Million Books Google Digitized And Used................................................................14

    B. Google Blithely Ignores The Security Risk It Has Caused................................................................16

    C. If Everyone Were Free To Engage In Google's Conduct, It Would Have An Adverse Effect Upon A Potential Market For Plaintiffs' Works................................................................17

VIII. Congress, Not Google, Should Decide Whether There Is A Need To Adjust The Balance Between Copyright Owners And Users................................................................18

IX. Conclusion ................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009) ........................................................................10, 13

*Am. Geophysical Union v. Texaco Inc.,*
   60 F.3d 913 (2d Cir. 1994).........................................................................9, 11, 18

*Associated Press v. Meltwater U.S. Holdings, Inc.,*
   12 Civ. 1087 DLC, 2013 WL 1153979 (S.D.N.Y. Mar. 21, 2013) .......................13

*Authors Guild v. Google Inc.,*
   770 F. Supp. 2d 666 (S.D.N.Y. 2011)........................................................ 3-4, 7, 18

*Authors Guild v. HathiTrust,*
   902 F. Supp. 2d 445 (S.D.N.Y. 2012)..............................................................8, 12

*Bouchat v. Baltimore Ravens Ltd. P'ship,*
   619 F.3d 301 (4th Cir. 2010) ..............................................................................13

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994).......................................................................4, 5, 9, 16, 17

*Capitol Records, LLC v. ReDigi, Inc.,*
   No. 12 Civ. 95, 2013 WL 1286134 (S.D.N.Y.  Mar. 30, 2013) ...........................19

*Cariou v. Prince,*
   714 F. 3d 694 (2d Cir. 2013)..................................................................................9

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,*
   150 F.3d 132 (2d Cir. 1998)...................................................................................9

*DC Comics Inc. v. Reel Fantasy, Inc.,*
   696 F.2d 24 (2d Cir. 1982).....................................................................................5

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003)..............................................................................................18

*Fox Film Corp. v. Doyal,*
   286 U.S. 123 (1932)................................................................................................7

*Harper & Row Publishers, Inc. v. Nation Enters.,*
   471 U.S. 539 (1985).................................................................................11, 14, 17

*Infinity Broad. Corp. v. Kirkwood,*
   150 F.3d 104 (2d Cir. 1998).............................................................................. 9-10

*Joffe v. Google, Inc.*,
No. 11-17483, 2013 WL 4793247 (9th Cir. Sept 10, 2013) ....................................17

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ..........................................................................10

*Kirtsaeng v. John Wiley & Sons*,
133 S. Ct. 1351 (2013) ............................................................................ 18-19

*L.A. Times v. Free Republic*,
No. 98 Civ. 7840, 2000 WL 565200 (C.D. Cal. Apr. 4, 2000) ...............................6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ....................................................................10, 13

*Princeton University Press v. Michigan Document Servs., Inc.*,
99 F.3d 1381 (6th Cir. 1996) ...........................................................................4

*Ringgold v. Black Entm't Television, Inc.*,
126 F.3d 70 (2d Cir. 1997)................................................................................5

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)........................................................................................18

*UMG Recordings, Inc. v. MP3.com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)................................................................5, 9

*United States v. ASCAP*,
599 F. Supp. 2d 415 (S.D.N.Y. 2009)...........................................................4-5, 6

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
342 F.3d 191 (3d Cir. 2003)........................................................................ 10-11

*WNET, Thirteen v. Aereo, Inc.*,
712 F.3d 676 (2d Cir. 2013)............................................................................19

**OTHER AUTHORITIES**

Andrew Richard Albanese & Norman Oder,
*Corner Office: Google's Dan Clancy*, Libr. J., May 1, 2009, at 26 .......................12

*Campuses Face Rising Threat from Hackers*,
N.Y. TIMES, July 17, 2013, at A1 ...................................................................16

Electronic Frontier Foundation, Google Book Search Settlement and Reader Privacy for
Authors and Publishers, https://www.eff.org/issues/privacy/google-book-search-
settlement-for-authors-and-publishers ..............................................................17

3 GEORGE S. GROSSMAN, OMNIBUS COPYRIGHT REVISION LEGISLATIVE HISTORY (2001)...........19

Letter from James H. Billingon, Librarian of Congress, and Maria A. Pallante, Acting
Register of Copyrights, to Chairman Patrick Leahy and Senator Charles Grassley of
the Senate Judiciary Committee (Apr. 1, 2011), *available at*
http://www.copyright.gov/docs/massdigitization/statements/gbs_joint_letter.pdf.................19

Fred von Lohmann, Google Book Search Settlement: A Reader's Guide,
Electronic Frontier Foundation Deep Links Blog, Oct. 31, 2008,
http://www.eff.org/deeplinks/2008/10/google-books-settlement-readers-guide .......................3

3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05 ...........................18

Maria A. Pallante, *The Next Great Copyright Act*,
36 COLUM. J.L. & ARTS 315 (2013).........................................................................................20

Eric Pfanner, *Google Has Deal in France For Book-Scanning Project*, N.Y. TIMES, June
12, 2012, at B5 ......................................................................................................................16

Press Release, Chairman Goodlatte Announces Comprehensive
Review of Copyright Law (Apr. 24, 2013), *available at*
http://judiciary.house.gov/news/2013/04242013_2.html.........................................................20

GINI GRAHAM SCOTT, THE BATTLE AGAINST INTERNET BOOK PIRACY 12 (2013).......................16

U.S. Copyright Office, Orphan Works,
*available at* http://www.copyright.gov/orphan.......................................................................19

In its opposition to plaintiffs' motion for summary judgment, Google portrays itself as an altruistic provider of "new information and new insights," and falsely depicts plaintiffs as luddites who seek to destroy all the good Google purportedly has done.  Google completely ignores that it is the Authors, including plaintiffs in this case, who created the works that Google has copied in order to enhance its own search engine and related enterprises.  Google also denigrates the security concerns raised by plaintiffs, callously suggesting that just because it has not yet suffered a data breach like the ones that have made recent front-page news (including at universities), it somehow is immune from cyberattack.

By downplaying the overwhelmingly commercial nature of its Google Library Project, Google obscures the fact that the unauthorized use of copyrighted works has helped it to dominate the search engine market, ensuring vast corporate profits.  Google even has the audacity to contend that its infringing conduct actually benefits plaintiffs and other copyright owners, ignoring the fact that numerous courts have rejected this precise argument.

Google's financial might and temerity allowed it to do something that no one else could or would do before.  For all intents and purposes, it paid libraries for the right to digitize and copy much of our nation's literary heritage and then used the resulting digital library to gain a competitive advantage over search engine competitors that respected the rights of authors by limiting their digitization programs to books that were either licensed or were no longer protected by copyright.  Aided by its infringing conduct, Google's search engine has proven remarkably successful—to the point where "google" has become a widely used verb in the English language.

 Google has completely disregarded the exclusive rights of copyright holders to choose whether, where and how to permit the copying and display of their works.  It also has done an

end run around Congress, which is in the best position to determine whether changes should be made to the established balance between the rights of copyright owners and users.

For the reasons set forth below, Google's motion for summary judgment must be denied and plaintiffs should be granted summary judgment on their claims of copyright infringement.

## I.    GOOGLE'S USES ARE HIGHLY COMMERCIAL

Google argues its use is "only indirectly commercial" and that it "does not make money from the display of any individual author's work" (Google Opp'n Br. at 24-26), but these arguments obscure the undeniable fact that the primary motivation for Google's exploitation of the authors' books is for Google to gain a competitive advantage in the online search marketplace.  It does so by enriching its search engine with the content from authors' books, which keeps Internet users on Google's web pages and promotes clicks on Google ads.

When a user goes to Google and types in a search request, he or she is presented with advertisements linked to the subject of the search.  For example, a search for "Baseball Books" or for "Mickey Mantle" yields paid advertising links.  Whether or not Google places ads on the actual landing pages for specific books is irrelevant because by the time the user reaches that page, Google already has accomplished its commercial purpose.

The Google Library Project was designed to, and has succeeded in, giving Google a substantial competitive edge over its search engine competitors.  This was explained by Yahoo! in its objection to the proposed settlement of this case:

> This exclusive market has yet one more anti-competitive effect:  it secures for Google access to a database capable of vastly improving Google's central product, Google Search.  With sole access to this data, Google can better refine its search algorithm and gain a tremendous advantage against other search providers.  This result is unreasonable and unfair to class members, competitors, and consumers alike.  As a consequence of Google's singular position in the emerging book search marketplace and its control of orphan works, as discussed above, Google will gain a tremendous advantage in its core business area:  Google Search.

Obj. of Yahoo! Inc. to Final Approval of the Proposed Class Action Settlement, ECF No. 288, at 25-26 (emphasis added); *accord* Mem. of Amicus Curiae Open Book Alliance in Opp'n to the Proposed Settlement Between the Authors Guild, Inc., Association of American Publishers, Inc., et al. and Google Inc., ECF No. 282, at 12-13; *see also* Declaration of Paul Aiken in Support of Pls. Mem. in Opp'n to Google's Motion for Summary Judgment, ECF No. 1074 ("Aiken Decl.") ¶¶ 25-26 (Google began digitizing copyright-protected books in direct response to Amazon's announcement that it was launching a *licensed* full-text book search portal).

Moreover, the commercial benefits to Google extend far beyond raising advertising dollars in connection with search results involving Library Project books. Google uses the copyrighted material for myriad purposes, all designed to enhance the functionality of Google's services and, as a result, increase its dominance in the information technology market. As one commentator explained: "It seems likely that the 'nondisplay uses' of Google's scanned corpus of text *will end up being far more important than anything else in the agreement*. Imagine the kinds of things that data mining all the world's books might let Google's engineers build: automated translation, optical character recognition, voice recognition algorithms. And those are just the things we can think of today. Under the agreement, Google has unrestricted, royalty-free access to this corpus." Fred von Lohmann, *Google Book Search Settlement: A Reader's Guide*, Electronic Frontier Foundation Deep Links Blog, Oct. 31, 2008 (emphasis added), http://www.eff.org/deeplinks/2008/10/google-books-settlement-readers-guide.

While its competitors went through the "painstaking" and "costly" process of obtaining permissions before scanning copyrighted books, "Google by comparison took a shortcut by copying anything and everything regardless of copyright status." *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 679 (S.D.N.Y. 2011) (quoting Hr'g Tr. 43 (Thomas Rubin, counsel for

Microsoft)).  "As one objector put it: 'Google pursued its copyright project in calculated

disregard of authors' rights. Its business plan was:  "So, sue me."'" *Id.* (quoting Obj. of Robert

M. Kunstadt to Proposed Settlement at 3, ECF No. 74).

Although Google's competitors (and this Court) were addressing the proposed settlement,

the points they made are just as applicable to Google's unilateral conduct challenged here,

which, like the proposed settlement, involves the widespread, anticompetitive, infringing uses of

millions of orphan works and other out-of-print and in-print copyrighted books.  Since 2004

Google has engaged in mass digitization without authorization, has secured for itself a dominant

position in the search engine market at least in part through the introduction of its Library Project

in its search engine, and has garnered enormous profits with its enriched search engine and ad

revenues. It has done so by gambling its conduct would be found to be a fair use, while its

competitors obeyed the law and sought to create digital libraries solely with rightsholder

authorization.  (Objs. of Microsoft Corp. to Proposed Settlement at 7-9, ECF No. 276; *see also*

Obj. of Amazon.com to Proposed Settlement. at 7-12, ECF No. 206 (same).)

For these reasons, this case is very different from those cited by Google for the

proposition that many instances of fair use involve commercial enterprises.  It is worlds apart

from cases such as *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), which involved the

commercial sale of a single song, not an enterprise built on the backs of others' copyrighted

works.  This case is much more analogous to cases such as *Princeton University Press v.*

*Michigan Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996), where the duplication of

copyrighted materials by a copyshop was "for sale by a for-profit corporation that has decided to

maximize its profits—and give itself a competitive edge over other copyshops—by declining to

pay the royalties requested by the holders of the copyrights."  *Id.* at 1386; *see also United States*

4

*v. ASCAP*, 599 F. Supp. 2d 415, 429 (S.D.N.Y. 2009) ("Because the [free ringtone] previews constitute a form of advertisement for applicant's ringtones and ringback tones . . . , applicant's use of ASCAP music to increase revenues from sales of ringtones and ringback tones is commercial."); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (commercial use where defendant offered free subscriptions to its service and did not sell the songs it had illegally copied in order "to attract a sufficiently large subscription base to draw advertising and otherwise make a profit").

## II.  GOOGLE'S JUSTIFICATION FOR ITS INFRINGING CONDUCT—THAT IT HELPS AUTHORS—MUST BE REJECTED

Google claims, over and over again in its brief, that Google Books benefits copyright holders and has a "positive effect on the books market."  Google suggests that it is in a better position than authors and publishers to decide whether and how to market copyrighted works.

Courts have routinely rejected this defense of "we were only trying to help."  *See, e.g., Campbell*, 510 U.S. at 590 n.21 (hypothetically, even if a "film producer's appropriation of a composer's previously unknown song . . . turns the song into a commercial success[,] the boon to the song does not make the film's simple copying fair"); *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 n.16 (2d Cir. 1997) ("Even if the unauthorized use of plaintiff's work in the televised program might increase [plaintiff's] poster sales, that would not preclude her entitlement to a licensing fee.") (citations omitted); *DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir. 1982) ("Since one of the benefits of ownership of copyrighted material is the right to license its use for a fee, even a speculated increase in [plaintiff's] comic book sales as a consequence of [defendant's] infringement would not call the fair use defense into play as a matter of law."); *UMG Recordings, Inc.*, 92 F. Supp. 2d at 352 ("Any allegedly positive impact of defendant's activities on plaintiffs' prior market in no way frees defendant to usurp a further

market that directly derives from reproduction of the plaintiffs' copyrighted works."); *L.A. Times v. Free Republic*, No. 98 Civ. 7840, 2000 WL 565200, at *20 (C.D. Cal. Apr. 4, 2000).[1]

### III. THAT SOME RIGHTSHOLDERS MAY LICENSE EXCERPTS OF THEIR WORKS DOES NOT GIVE GOOGLE THE UNFETTERED RIGHT TO DO SO

Google notes that rightsholders, including publishers, sometimes permit uses of excerpts from books that are more extensive than those challenged in this case. (Google Opp'n Br. at 10.) Google points to its own Google Partner Program (*id.*) as well as programs such as Amazon's "Search Inside the Book" feature (*id.* at 31).

Google deliberately misses the point. A decision by an individual rightsholder to authorize the use of a portion of his or her own work is a completely different animal than the Library Project, where Google has copied all of these works indiscriminately, assuming the role of deciding what is best for the copyright owner. As Mr. Aiken points out, Amazon had agreements with 190 publishers to permit digitizing and searching of books in a controlled situation where users were required to log into a site and then could buy books using Amazon's famous "One-click" purchase button. (Aiken Decl. ¶¶ 7-11.) According to Mr. Aiken, this type of display in a bookselling environment is likely to drive sales of books, while display in a search engine's advertising-driven environment does not. (*Id.* ¶¶ 32-34.) *See also ASCAP*, 599 F. Supp. 2d at 432-33 ("We recognize the strong possibility that ASCAP and its members lose current and future revenue when consumers access free previews from a website or wireless

---

[1] Google has not submitted any evidence that Google Books ever resulted in the sale of a single book. (Zack Decl. Ex. 16, Clancy Dep. at 163:10-18; Zack Decl. Ex. 18, Turvey Dep. at 96:11-20.) Similarly, Google's supposed expert on this subject testified that she had "not done any empirical analysis of the sales of books that were on Google Books." (Zack Decl. Ex. 42, Chevalier Dep. at 158:25-159:3.)

application to listen to, and possibly copy, previews of ASCAP music in lieu of accessing music segments from sources that pay licensing fees to ASCAP.").

But even if Mr. Aiken and others are wrong, and Amazon's program does not drive sales, it does not change the fact that the decision as to when and how to promote the sales of books through displays of copyrighted content, be it serialization, text display or snippets, must be made by the copyright owner, not an unauthorized corporation primarily interested in its bottom line. As this Court has recognized, "[a] copyright owner's right to exclude others from using his property is fundamental and beyond dispute." *Authors Guild*, 770 F. Supp. 2d at 681 (citing *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932)).

## IV.   GOOGLE HAS INFRINGED PLAINTIFFS' DISTRIBUTION RIGHT

Google offers no justification for its distribution of digital copies to the libraries. Instead, it suggests it is not a "distribution" if Google makes the copies available for the libraries to take as opposed to sending the libraries these digital copies by email or other means. This is a distinction without a difference, since the evidence shows that each of the libraries received a vast number of the digital copies of the books they had provided to Google for digitization. As of March 2012, the libraries had downloaded over 2.7 million copies of books not known to be in the public domain out of over four million in-copyright books Google has copied as part of the Library Project. (*See* Pls. 56.1 Stmt., ECF No. 1054, ¶¶ 5, 53 (citing Zack Decl. Exs. 9, 30 & 31) & Google's Response thereto, ECF No. 1077.) In lieu of a straightforward distribution, with its GRIN system Google has concocted a "drop off point" for the digital copies.

The GRIN system represents Google's attempt to devise a distribution platform for the purpose of circumventing copyright law. As described in plaintiffs' prior submissions, this case bears little resemblance to the facts in *Cablevision* where the cable company had a right to the copyrighted material in the first place and simply allowed customers to create copies of a

7

television program that they already were entitled to receive by virtue of their subscription with the cable provider. (*See* Pls. Br. at 15-16; Pls. Opp'n Br. at 14-18.) Here, in stark contrast, Google had no right to the digital copies of any of the works, but under the Cooperative Agreements was *obligated* to provide to the libraries digital copies as payment for allowing Google to digitize and commercially exploit their entire library collections. Moreover, in contrast to the situation in *Cablevision* where subscribers recorded a copy of a program on a one-by-one basis, here the libraries received digital copies of a vast majority of the millions of books that they had allowed Google to digitize and copy. (Pls. 56.1 Stmt. ¶¶ 5, 53.)

Google further argues, citing *Authors Guild v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012), that even if it did infringe plaintiffs' distribution right "at a minimum a reasonable juror could find that these facts establish the fairness of the libraries [sic] use of the copies they have downloaded from Google." (Google Opp'n Br. at 43.) But the possibility that some ultimate user might be able to make a fair use of an illegally copied work does not justify either the initial copying or the act of making the work available to such user. Here Google has digitized and made multiple copies of copyrighted works, and placed copies of such works on a server where they are available to the libraries for wholesale download.

In short, Google has engaged in blatant copyright infringement. It has intruded upon the rights of thousands of authors by taking their written works published in print form and converting them to a new medium, storing electronic copies of those books on the Internet and subjecting them to security risks of further unauthorized copying, displaying portions of those works on the Internet, and reproducing and distributing those electronic copies to the libraries— all without permission of the authors. Such conduct goes far beyond what could reasonably be deemed fair use.

## V.     GOOGLE'S USES ARE NOT TRANSFORMATIVE

In their prior submissions, plaintiffs demonstrated that Google's use of copyrighted works is not transformative.[2]  Under *Campbell*, merely repurposing a work without adding anything new to the original is not enough.  510 U.S. at 579 (the secondary use must add "something new, with a further purpose or different character, altering the first with new expression, meaning or message); *see also Cariou v. Prince*, 714 F. 3d 694, 706 (2d Cir. 2013) (while a work need not "comment on the original or its author to be considered transformative," it still must "alter the original with 'new expression, meaning or message.'") (quoting *Campbell*, 510 U.S. at 579).[3]  The Second Circuit has made clear that converting a book from print to digital format and "preserving" it in on a hard drive does not transform the book.  *See Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 923 (2d Cir. 1994) (archiving material for "future retrieval and reference" "merely transforms the material object embodying the intangible article that is the copyrighted original work"); *see also UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) ("space shifting" CDs to Internet storage is not transformative); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 n.2 (2d Cir. 1998)

---

[2]  Google trumpets the benefits of its "index" and "Ngram viewer" (Google Opp. Br. at 3-6, 16-17), but plaintiffs do not take issue with those uses. Plaintiffs' position is that the following uses are not intermediate, are infringing and do not constitute fair use: (1) reproduction of 100% of millions of books to use as payment to the libraries, (2) distribution to the libraries of those digital copies, and (3) display of 78% of the books. Accordingly, the question of whether a searchable index is transformative of the books that are the subject of the index is not relevant to plaintiffs' claims here. The same is true with respect to the Ngram viewer.

[3]  Google completely ignores *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 145 (2d Cir. 1998), where the Second Circuit found that a use that was more transformative than what Google has done—using short excerpts of a television show as a basis for a quiz book—did not constitute fair use.

(changing "format of [radio] broadcasts so that they are available by telephone rather than radio . . . though useful, is not technically a transformation").

Google continues to rely on a series of cases from other Circuits for the proposition that search engine functionality is transformative.  *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009).  It may be that the outcome of these cases (*i.e.*, that that there was no copyright infringement) was correct, but plaintiffs strongly disagree with the notion that the mechanical copying of print books into digital format for the purpose of enhancing search engine functionality is inherently "transformative" or that this conclusion should drive the ultimate determination as to liability.

The fact that the books at issue were not previously available in digital format on the Internet distinguishes the present facts from those in *Perfect 10* and *Kelly*.  In those cases, the plaintiffs made the voluntary decision to place their works on the Internet.  As a result of their own decision to publish their works in that format, the rightsholders subjected their works to search engines' web crawlers.  Any risk of copying or piracy already existed *prior* to the defendants' conduct.  Moreover, defendants did not retain full-sized, original copies of the copyrighted images at issue on its servers, *Perfect 10*, 508 F.3d at 1156; *Kelly*, 336 F.3d at 815, and did not pose any additional security risk beyond that caused when the copyright owner first permitted online access to its works.[4]  A much more analogous precedent is the Third Circuit's decision in *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191 (3d Cir.

---

[4] These cases are further distinguishable because the Internet as we know it would cease to operate if search engines were required to obtain an express license before indexing a web page. In contrast, requiring a license under the circumstances of this case would have no adverse impact on the day-to-day operation of Internet architecture.

2003), where the defendant compiler of video clips tried to invoke *Kelly* to justify its database of unauthorized movie trailers and clips.  In words that easily apply to this case, the court held that:

> Video Pipeline's database does not, however, serve the same function as did Arriba Soft's search engine.  As used with retailers' websites, VideoPipeline.net does not improve access to authorized previews located on other websites.  Rather, it indexes and displays unauthorized copies of copyrighted works.  VideoDetective.com does permit viewers to link to legitimate retailers' web sites, but a link to a legitimate seller of authorized copies does not here, if it ever would, make *prima facie* infringement a fair use.

*Id*. at 199; *see also id.* at 200 (Video Pipeline's clip previews lack any significant transformative quality and the commercial nature of the clip previews weighs more strongly against their use).

Furthermore, the fact that in each of these cases the copyright owner at least implicitly gave permission for further public consumption makes them distinguishable from the facts of the case at hand.  As the Supreme Court has recognized, fair use has been defined as a privilege to use copyrighted material in a "reasonable" manner: "[T]he fair use doctrine [is] predicated on the author's implied consent to 'reasonable and customary' use when he release[s] his work for public consumption . . . ."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 550 (1985); *see also Texaco*, 60 F.3d at 939.  The Supreme Court in *Harper* further recognized the "importance of the material copied or performed from the point of view of the reasonable copyright owner. In other words, *would the reasonable copyright owner have consented to the use*?"  *Harper*, 471 U.S. at 549-50 (citations omitted).

## VI.  GOOGLE TOOK FAR MORE THAN IT NEEDED FOR ITS INDEXING PURPOSES

The heart of Google's defense is its argument that its search index is vastly superior to an "index that provides only a small number of human-curated subject categories for each book and does not support search of the full text of books."  (Google Opp'n Br. at 16.)  Google's submissions are full of examples of search results purporting to show that Google Books is a

technological advancement over the traditional card catalog.  Google's almost single-minded focus on the search/indexing component of Google Books—while perhaps unsurprising in light of the fact that Google's highly-successful business model has been built upon searching and indexing information in the digital age—translates into legal arguments, which if accepted, would result in a profoundly mistaken re-working of copyright law.

Even accepting, *arguendo*, that it might be fair use to digitize books for the sole purpose of creating a searchable index, the undisputable facts show that Google went much, much further.  It made and has kept multiple copies of the image and text files, even though there is no search-related purpose served by the retention of such files after they are ingested into the search index.  It made digital copies of the books available to its library partners, not in furtherance of its indexing project, but rather as in-kind payment for the right it received from the libraries to take and digitize printed copies of books.  It displays significant portions of the books available to Google Library Project users even though its library partners concluded that no such display was required to fulfill the index and search purposes.  *HathiTrust*, 902 F. Supp. 2d at 448.[5]

In short, Google tries to justify its taking of copyrighted works by focusing on one aspect of its program—index and search—in isolation, and ignoring the broader picture.  As plaintiffs have demonstrated in their prior submission, separate uses must be analyzed separately.  (*See* Pls. Opp'n Br. at 12-18.)  Courts analyzing fair use have refused to allow one type of an infringing use that may be held to satisfy section 107's test to excuse other infringing uses that

---

[5]  Even Google's internal communications contradict the suggestion that snippets provide any value for users.  (*See* Pls. Opp'n Br. at 11, 30, 42 & Boni Decl. Ex. 4.)  Further, the Google Library Project's chief architect, Dan Clancy, admitted, "The snippets we've been showing are a far cry from what the user wants . . . ."  Amazon.com Obj. at 39 n.28, ECF No. 206 (quoting Andrew Richard Albanese & Norman Oder, *Corner Office: Google's Dan Clancy*, Libr. J., May 1, 2009, at 26, *available at* http://www.libraryjournal.com/article/CA6652445.html).

do not.  *See id*. at 13-14 (citing *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 306,

308-17 (4th Cir. 2010); *Perfect 10*, 508 F.3d 1146); *see also Associated Press v. Meltwater U.S.*

*Holdings, Inc.,* 12 Civ. 1087 DLC, 2013 WL 1153979, at *16 (S.D.N.Y. Mar. 21, 2013) ("The

fact that [defendant] also offers a number of analysis tools does not render its copying and

redistribution of article excerpts transformative.").

Google's index-centric arguments also gloss over the great extent to which it displays

authors' expression.  In the few instances in which Google directly speaks to the fact that it is

displaying verbatim text, it minimizes the significance of such display by unfairly characterizing

its "snippets" as merely incidental to the overall search and index function of Google Books,

such that allowing its users to read from the author's own words is lawful so long as it occurs in

connection with its "improved electronic card catalogue."  (Google Opp'n Br. at 14.)[6]

Google's own example demonstrates the difference between a mere index and the display

of verbatim text from a copyrighted work.  If the Library Project were to merely enable a user to

search for books that reference "Steve Hovley," or view the number of times that the name

"Steve Hovley" appears in a book, that would be one thing.  But permitting users to read

excerpts from Jim Bouton's memoir about Steve Hovley, which bring to bear all of the author's

originality, subjective insights, creative spirit, and unique voice, is quite another:

> Had a long chat with Steve Hovley in the outfield.  He's being called "Tennis Ball
> Head" because of his haircut, but his real nickname is Orbit, or Orbie, because
> he's supposed to be way out.
>
> * * *

---

[6]  Google's display of expressive content underscores why Google's uses of plaintiffs' works are
vastly different than those at issue in the Fourth Circuit's *iParadigms* decision, which involved a
database comprised of student papers that was designed to detect and discourage plagiarism and
where defendant iParadigms did not "publicly disseminate or display plaintiffs' works."  *A.V. ex
rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 641 (4th Cir. 2009).

> [As I] watched Hovley struggling out there against the best reliever in the league, I thought, how can a guy with friends like Dostoevski be scared in this kind of situation?  He wasn't.  He hung in for another foul ball and then got the base on balls, forcing in the run.[7]

These, of course, are but two examples.  Google users are able to view other displays of authors' expression from millions of in-copyright books *ad infinitum.*  Google's appropriation and display of expression has occurred on a massive, unprecedented scale that goes far beyond what is meaningfully connected to search and indexing functions.

## VII.   THE GOOGLE LIBRARY PROJECT IS LIKELY TO CAUSE SUBSTANTIAL MARKET HARM

Google touts the purported benefits of its Library Project to authors and argues that no harm has come to the books.  The issue, however, is not whether the rightsholders have demonstrated actual present harm, but whether there is likelihood that unrestricted and widespread conduct of the sort engaged in by Google would result in a substantially adverse impact on the potential market for or value of the work.  *See Harper*, 471 U.S. at 567 ("Rarely will a case of copyright infringement present such clear-cut evidence of actual damage.").  Plaintiffs have shown that Google's unprecedented and commercial use eviscerates the potential market for collective licensing and poses an intolerable security risk.

### A.   There Is An Existing And Potential Market For The Four Million Books Google Digitized And Used

Google's argument that there is no potential market for a program like the Google Library Project comes down to a fairly simple premise.  Essentially, Google's point is that the program is so all-encompassing that no one ever would be able to create or pay for what it

---

[7]  *See* Google Book search results for "Steve Hovley" and "Hovley," for Jim Bouton, *Ball Four: My Life and Hard Times Throwing the Knuckleball in the Big Leagues* (1970), *at* http://books.google.com/books?id=FSs9AAAAIAAJ (last visited Sept. 13, 2013).

describes as a "20-million-book-text searchable database."  (Google Opp'n Br. at 33.)[8]  Google denigrates the possible collective license schemes proposed by plaintiffs' expert Daniel Gervais on the ground that such programs only are useful in dealing with "widely dispersed rightsholders attempting to deal with widely dispersed users" (*id.* at 34 n.10) or that such a program logically might include broader uses than Google is making of the copyrighted books (e.g., an opt-in version of the scheme agreed to by Google in the proposed settlement agreement).

The notion that a commercial entity such as Google can get away with massive copyright infringement by arguing that its program is too gigantic ever to be the subject of a licensing scheme is troubling.  It suggests that control of copyrights belongs in the hands of the powerful commercial entity, rather than in those of the creators.  It dismisses the fact that collective licensing markets have often developed in response to new technologies and uses (*see* Zack Decl. Ex. 37, Gervais Report ¶¶ 12, 41), and it preempts the role Congress should play in balancing the rights of owners and users (*see* Point VIII, below).

Finally, although Google insists that such a market is hypothetical or not likely to develop (Google Opp'n Br. at 32-35), the evidence suggests otherwise.  Case in point is the proposed settlement in this action, which demonstrates how a licensing system could operate. Additional examples include Google's resolution of a copyright dispute in France where Google

---

[8]  Google proffers the self-serving declaration of one of its employees that "it would not pay to license content for search or snippet display."  (Google Opp'n Br. at 35.)  However, such a statement ignores that Google *has* paid for the ability to use the authors' works, it just has refused to pay the authors themselves.  It has paid hundreds of millions of dollars to independent contractors and scanning vendors.  It has paid its partner libraries in the form of valuable digital copies of the books.  As a presumably rational economic actor (and publicly-held company accountable to its shareholders), Google evidently believes that the digital copies of the works it is exploiting have real and substantial value and likely expects the return on its investment to exceed its expenditures.

announced last year that "it had an industry wide book-scanning agreement in place to cover works that are out of print but still under copyright—a category that covers most of the world's books," and that Google was "interested in exporting these deals elsewhere." Eric Pfanner, *Google Has Deal in France For Book-Scanning Project*, N.Y. Times, June 12, 2012, at B5.

### B.    Google Blithely Ignores The Security Risk It Has Caused

Google's conduct has an adverse effect upon a potential market for plaintiffs' works by converting them to a new medium the authors never authorized and thereby exponentially increasing the risk of piracy.  Although Google dismisses plaintiffs' security concerns as "doomsday hacker scenarios" (Google Opp'n Br. at 35), there is nothing remote or speculative about such online security risks.  *See, e.g.*, Campuses Face Rising Threat from Hackers, *N.Y. Times*, July 17, 2013, at A1.  Nor is there anything remote or speculative about the fact that piracy can have devastating consequences for rightsholders.  Indeed, a 2010 study showed that publishers lost almost $3 billion in sales as a result of e-book piracy.  GINI GRAHAM SCOTT, THE BATTLE AGAINST INTERNET BOOK PIRACY 12 (2013).  Google focuses on its own security to date, but the standard for the Court to consider is the adverse impact if conduct becomes "unrestricted and widespread."  *Campbell*, 510 U.S. at 590.

The proposed settlement illustrates the importance of allowing rightsholders to be involved in the process of deciding whether and how to make their works available on the Internet.  It included specific security procedures agreed upon by authors, a procedure for security audits, and remedies in the event of any potential breaches.  (*See* Am. Settlement Agmt., ECF No. 770-2, Art. VIII.)  In sharp contrast, Google's unilateral mass digitization offers none of these protections.  Rightsholders should have the power to decide whether their works are going to be subjected to risks of Internet piracy and to insist upon procedures to mitigate those

risks if they choose to have their works converted to digital format and stored on computers connected to the Internet.[9]

### C. If Everyone Were Free To Engage In Google's Conduct, It Would Have An Adverse Effect Upon A Potential Market For Plaintiffs' Works

If Google's mass digitization and copying of copyrighted books becomes accepted practice through a fair use determination in this case, others inevitably will engage in their own unauthorized book digitization programs, putting more books within the reach of digital thieves on countless more servers. *See Campbell*, 510 U.S. at 590 (court must consider adverse impact if conduct becomes "unrestricted and widespread"). Absent a legal obligation, these actors are unlikely to implement the security measures necessary to safeguard intellectual property that does not belong to them, especially when armed with a decision that the public interest in disseminating information easily trumps the interests of copyright holders. *See Harper*, 471 U.S. at 559 ("[T]o propose that fair use be imposed whenever the social value [of dissemination] . . . outweighs any detriment to the artist, would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it.")

---

[9]  Piracy is not the only threat posed by digitizing the works without the consent of the authors. Consider what the Electronic Frontier Foundation ("EFF") had to say concerning the proposed settlement:  "Our argument, first to Google—and if we cannot convince it, to the court overseeing the lawsuit—is that the settlement does not sufficiently protect authors and publishers because it fails to provide the same privacy protections for readers in the digital world that apply to reading physical books from libraries, bookstores, etc. These include protections from subpoenas, law enforcement investigations, and other forms of surveillance and profiling."  EFF, Google Book Search Settlement and Reader Privacy for Authors and Publishers, *at* https://www.eff.org/issues/privacy/google-book-search-settlement-for-authors-and-publishers. Of course, the same privacy concerns exist today.  Google profiles Internet users, tracks searches on the books it made available on the Internet, and might have to provide such information pursuant to a government subpoena.  *See also Joffe v. Google, Inc.*, No. 11-17483, 2013 WL 4793247 (9th Cir. Sept 10, 2013) (affirming District Court denial of Google's motion to dismiss plaintiffs' putative class action claim that Google's collection of data for its Street View feature infringed federal and state law by collecting data from unprotected Wi-Fi networks).

(alteration in original).  In *Texaco*, the Second Circuit identified the key issues as whether

"unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in

a substantially adverse impact on the potential market for or value of the plaintiff's present

work." 60 F.3d at 927 n.12 (quoting 3 *Nimmer on Copyright* § 13.05[A][4], at 13-183 to 13-184).

In other words, the question is if everyone were free to engage in Google's conduct, would this

have an adverse effect upon a potential market for plaintiffs' works.  The answer is undeniably

"yes."

## VIII.   CONGRESS, NOT GOOGLE, SHOULD DECIDE WHETHER THERE IS A NEED TO ADJUST THE BALANCE BETWEEN COPYRIGHT OWNERS AND USERS

The fair use doctrine is not designed to address the enormity of Google's infringement.

The digital reproduction, distribution and Internet display of four million copyrighted books—

many of which are orphan works—are the sort of cutting edge technological uses that are best

left for Congress to address.  *Authors Guild v. Google, Inc.,* 770 F. Supp. 2d 666, 677-78

(S.D.N.Y. 2011) ("[I]t was Congress's responsibility to adapt the copyright laws in response to

changes in technology . . . ."), *quoting Sony Corp. of Am. v. Universal City Studios, Inc.*, 464

U.S. 417, 429 (1984) ("From its beginning, the law of copyright has developed in response to

significant changes in technology. Indeed, it was the invention of a new form of copying

equipment—the printing press—that gave rise to the original need for copyright protection.

Repeatedly, as new developments have occurred in this country, it has been the Congress that

has fashioned new rules that new technology made necessary.")); *see Eldred v. Ashcroft*, 537

U.S. 186, 212 (2003) ("[I]t is generally for Congress, not the courts, to decide how best to pursue

the Copyright Clause's objectives."); *see also Kirtsaeng v. John Wiley & Sons*, 133 S. Ct. 1351,

1357 (2013) ("Whether copyright owners should, or should not, have more than ordinary

commercial power to divide international markets is for Congress to decide.  We do no more

18

here than try to determine what decision Congress has taken."); *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 695 (2d Cir. 2013) (noting that "unanticipated technological developments" may require legislative action); *Capitol Records, LLC v. ReDigi, Inc.*, No. 12 Civ. 95, 2013 WL 1286134, at *11 (S.D.N.Y.  Mar. 30, 2013) ("It is left to Congress, not this Court" to determine whether first sale principles should apply to digital copies).[10]

In April 2011, the Librarian of Congress and Acting Register of Copyrights wrote in a letter to Congress that "the basic tenets that exclusive rights afforded by copyright law may not be usurped as a matter of convenience and policy initiatives, including those that would redefine the relationship of copyright and technology, are the proper domain of Congress, not the Courts."[11]

Significantly, the process of considering whether changes to existing copyright law are necessary, including those directly related to new and emerging technologies is well under way. In October 2012, the Copyright Office published a Notice of Inquiry regarding orphan works and mass digitization.  *See* U.S. Copyright Office, Orphan Works, *available at* http://www.copyright.gov/orphan.  Even more recently, the Register of Copyrights has called for new copyright legislation that would, among other things, consider the critical issues raised by

---

[10]  As far back as the early 1960s, witnesses before the House Judiciary Committee considering revisions to copyright law, including the Register of Copyrights, expressed concern that machine reproduction could destroy the value of the copyright in a book.  In 1963, a witness noted that "[T]he copyright owner must control the right at the very outset when his book is placed into the machine, because it is the cumulative effect of the multiple fair uses which will effectively destroy the value of his copyright."  3 GEORGE S. GROSSMAN, OMNIBUS COPYRIGHT REVISION LEGISLATIVE HISTORY 126 (2001), *available at* http://www.heinonline.org.

[11]  *See* Letter from James H. Billingon, Librarian of Congress, and Maria A. Pallante, Acting Register of Copyrights, to Chairman Patrick Leahy and Senator Charles Grassley of the Senate Judiciary Committee (April 1, 2011), *available at* http://www.copyright.gov/docs/massdigitization/statements/gbs_joint_letter.pdf.

mass digitization.  *See* Maria A. Pallante, *The Next Great Copyright Act*, 36 COLUM. J.L. & ARTS 315, 340 (2013).  In April 2013, House Judiciary Committee Chairman Bob Goodlatte (R-Va.) announced that his Committee would begin a comprehensive review of U.S. copyright law over the coming months.  Press Release, Chairman Goodlatte Announces Comprehensive Review of Copyright Law (Apr. 24, 2013), *available at* http://judiciary.house.gov/news/ 2013/04242013_2.html.

Until Congress addresses these critically important issues, courts must defer to the choices already made by Congress.  Google's unilateral and profit-driven effort to upset the established balance between copyright owners and users must be rejected.

## IX.    CONCLUSION

For reasons set forth above and in plaintiffs' opening brief, partial summary judgment should be granted to plaintiffs and summary judgment should be denied to Google.

Respectfully submitted,

Dated: September 16, 2013

/s/ Michael J. Boni

Michael J. Boni (*pro hac vice*)
Joshua D. Snyder
John E. Sindoni
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA  19004
Tel: (610) 822-0200
Fax: (610) 822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

Edward H. Rosenthal
Jeremy S. Goldman
FRANKFURT KURNIT KLEIN & SELZ PC
488 Madison Avenue, 10th Floor
New York, New York 10022
Tel. (212) 980-0120
Fax: (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com

Robert J. LaRocca (*pro hac vice*)
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel:  (215) 238-1700
Fax:  (215) 238-1968
rlarocca@kohnswift.com

Sanford P. Dumain
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229
sdumain@milberg.com

*Counsel for Plaintiffs*