1

D9cxgito

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   HERBERT MITGANG, et al.,

4                  Plaintiffs,

5          v.                         05 Civ. 8136 (DC)

6   GOOGLE, INC.,
                                      Argument
7                  Defendant.

8   ------------------------------x

9                                     New York, N.Y.
                                      September 23, 2013
10                                    2:30 p.m.

11  Before:

12          HON. DENNY CHIN

13                                    District Judge

14
            APPEARANCES
15

16  FRANKFURT KURNIT KLEIN & SELZ P.C.
            Attorneys for Plaintiffs
17  BY:  EDWARD H. ROSENTHAL
            JEREMY S. GOLDMAN
18

19  BONI & ZACK LLC
            Attorneys for Plaintiffs
20  BY:  MICHAEL J. BONI

21

    MILBERG LLP
22          Attorneys for Plaintiffs
    BY:  SANFORD P. DUMAIN
23

24  DARALYN J. DURIE
    JOSEPH C. GRATZ
25          Attorneys for Defendant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Documit

2

 1              (Case called)

 2              THE COURT:  Good afternoon.  We are ready to proceed?

 3              MR. ROSENTHAL:  Yes.

 4              THE COURT:  We want to discuss procedure.  We have

 5    cross-motions.  I think it makes sense for plaintiff to go

 6    first, defendant second.  Plaintiff can have a little rebuttal

 7    and the defendant can have a little rebuttal.  I'm hoping to

 8    keep this under an hour.  And it's great to be in this classic

 9    renovated courtroom.

10              MR. ROSENTHAL:  Your Honor, I want to make several

11    main points here.  The first point I would like to make is that

12    Google has used copyrighted works belonging to the plaintiffs

13    and other copyright owners to enhance its search and related

14    capabilities.  The more content Google has, the better it will

15    do.  By having the most robust, biggest search engine with the

16    most content, Google will have the most users, most eyeballs,

17    most advertising revenue.

18              Google has built its gigantic commercial enterprise in

19    significant part on the backs of the owners of copyrighted

20    works.  It's managed to push aside most of its potential

21    competitors to the point where the term "to Google" has become

22    a verb in the English language.

23              Google claims that its scanning, digitization, and

24    copying of millions of copyrighted works is fair because some

25    of the ultimate users of those works may use it for research or

3

1    scholarship.  But that is not the proper inquiry, your Honor.

2    When the Court looks at the purpose and character of the use --

3          THE COURT:  Isn't it one of the queries?  Is it not an

4    appropriate factor to look at?

5          MR. ROSENTHAL:  I think it may be a factor, your

6    Honor.  But the main factor is how Google is using it, what is

7    Google's purpose and character.  The Second Circuit in the

8    Infinity-Kirkwood case said specifically that:  You have to

9    look at the user, not whether some hypothetical or actual

10   ultimate user may benefit from the use.

11         THE COURT:  Even if we assume there is ultimately a

12   commercial purpose to this, that doesn't preclude finding of

13   fair use.

14         MR. ROSENTHAL:  No, it does not preclude a finding of

15   fair use.  But I want to point out that this case is very

16   different from the kinds of cases where this commercial/

17   noncommercial inquiry usually comes up.  Usually, those are

18   cases where you have a commercial enterprise, like a book

19   publisher, movie company, record label, that sells a product

20   and that product may be sold for commercial profit.  But this

21   case is different.  In this case the commercialism goes to the

22   heart of the enterprise.

23         THE COURT:  This case is different because entire

24   works are being copied, millions upon millions of entire works.

25   But ultimately the fair use question is whether there is a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Document

4

 1    benefit to society.  There is a very helpful amicus brief, two

 2    very helpful amicus briefs, the librarians and the professors.

 3         The Google Books search mechanism enables us to have

 4    things like data mining.  My law clerk on the Columbia Law

 5    Review last year used Google Books all the time for site

 6    checking to check the accuracy of books, the titles and the

 7    authors.  There is anecdotal evidence of people finding useful

 8    books in their own collections that they had forgotten about

 9    through Google Books search.  The librarian brief points out

10    that this facilitates interlibrary loans and helps to narrow

11    searches, to expedite searches.

12         Aren't these transformative uses and don't they

13    benefit society?

14         MR. ROSENTHAL:  I think you have to look at each of

15    the things that Google did separately.

16         THE COURT:  The things that I just asked about, I just

17    listed a bunch of things, do you agree that they benefit

18    society?

19         MR. ROSENTHAL:  I think that including to make works

20    searchable and findable may benefit society in some instances.

21    Then the question is should Google have to pay for that right.

22         THE COURT:  Do you agree that these uses are

23    transformative in the sense that they don't supplant the

24    original purpose but they add something new and different and

25    useful?

5

1          MR. ROSENTHAL:  The way you phrased the question, I

2     think that they do do something new and that they added

3     authority to find things.  I don't know whether that satisfies

4     the Supreme Court's decision that it has to be not just for a

5     different purpose but add new meaning.  I don't know whether

6     simply taking the words in a book and making them findable adds

7     new meaning or content to them.

8          THE COURT:  The professors' brief talks about this

9     concept of data mining or text mining and the ability to find

10    out.  The example they use is whether the United States is

11    referred to as a collection of states or as a single entity,

12    that is, whether it is referred to in the plural versus in the

13    singular.  They have done a statistical analysis, and over the

14    years we can see a trend going one way versus the other that

15    tells us something.  Is that not a useful thing?  Is that not

16    different?

17         MR. ROSENTHAL:  It tells us something and it may be

18    useful.  But the question is, the inquiry is, is that worth

19    taking millions of copyrighted books and putting them into the

20    search engine without compensating the authors or asking the

21    authors' permission.

22         THE COURT:  I agree that is all one factor to be

23    thrown into the hopper.  What are some of the factors that

24    favor a finding that it's not fair use?

25         MR. ROSENTHAL:  I want to look at each of the things

6

1    Google did.  First of all, they copied all of these books, made

2    multiple copies, and keep them on servers.

3         Secondly, they allow verbatim display of portions of

4    the books.  Google argues that just helps people find the

5    books.  But interestingly enough, the libraries from which

6    Google got the books, in that HathiTrust library they didn't

7    have any kind of display or snippet views.  They were content

8    simply to permit returns of page numbers where information

9    could be had.

10        It is kind of interesting that the library, the place

11   where scholars and academics live, didn't feel it was necessary

12   to have actual display of text and Google felt that it was.  I

13   think the reason Google did that is Google knows that is going

14   to keep eyeballs on its sites, that is going to help people use

15   its search engine.

16        THE COURT:  Is that a bad thing, to keep eyeballs on

17   the site?  One of the arguments you make in your brief is that

18   a user can do variations of a search, multiple searches, and

19   thereby acquire essentially all of a work.  Ball Four, somebody

20   can put in many different searches and come up with most of

21   Ball Four.  I guess my question is, is that really a reasonable

22   example?  Will there be many people who will go through the

23   trouble of trying to pull up hundreds of snippets so that they

24   can then, like a puzzle, put them back together in the right

25   order?  Is this a real concern?

Document

7

1          MR. ROSENTHAL:  I think it is possible people will do

2    that or try to develop tools that will do that.  But I think

3    the bigger issue with the display is that people may find all

4    that they need or all that they want in looking at a book

5    simply from the return on the display.

6          For example, in the Ball Four book that I read when I

7    was a certain age and many other people read, I might want to

8    know what Mr. Jim Bouton said about Mickey Mantle or his

9    manager Joe Schultz.  I can go to The Library Project, type it

10   in, and get returned a quote, highly expressive quote, about

11   what Jim Bouton said about Mickey Mantle or Steve Hovley.  When

12   I was thinking about this in preparing, that is a lot like some

13   of the other cases, like the Kraft v. Kohlberg case.

14         THE COURT:  Isn't the more likely scenario that when

15   you pop it in, you do your Google Books search, you get

16   directed to Ball Four, and suddenly it brings back these

17   memories, you have lost your copy from years ago, you click on

18   the Amazon link, and boom, you order another one?  Isn't that

19   the more likely scenario?

20         MR. ROSENTHAL:  I don't know that it is at all, your

21   Honor.  I don't know that that is what will happen.  I think it

22   is more likely, especially in an example like this, that people

23   will look to remember something about Ball Four, find it, will

24   not buy the book; libraries won't have to have the book,

25   because people won't need to go to the library to look at it.

Document

8

1          THE COURT:  The amicus briefs give anecdotal examples

2    of precisely this happening, where folks went on, did a search,

3    saw some books, were intrigued, and then ordered them.

4          MR. ROSENTHAL:  Defendants in copyright cases often

5    argue that our infringing conduct helps people find the book:

6    If we hadn't included your song in our movie, your song

7    wouldn't be popular and people wouldn't be interested in it, so

8    we did this great service to you by using your copyrighted work

9    and making it more visible.

10         But the courts have held that that is not enough.  It

11   is up to the rights holder to decide if he or she wants his

12   book to be included in some sort of display mechanism.  In

13   fact, Google makes quite a bit of this.  Some authors, many

14   copyright owners, holders, like publishers, have contracted

15   with Amazon or others to allow displays of their works.  But

16   those displays are with the permission and at the request of

17   the author.

18         THE COURT:  Does the Google Books search hurt in those

19   instances?  I think Ball Four is one of the examples.  Ball

20   Four has an agreement with Amazon and they can show parts of

21   it.  How do we know that the availability of Google Books'

22   search hurts Amazon or Mr. Bouton in terms of the sales?

23         MR. ROSENTHAL:  The more people use Google as their

24   for-all-purpose search engine, the more likely they are simply

25   to go to Google Books to find the information they are looking

9

 1    for.

 2           THE COURT:  The point is if someone is interested,

 3    they can't buy it on Google, they have to click the link and

 4    then get sent to Amazon or some other book seller.  As I

 5    understand it, Google doesn't take a piece of that.

 6           MR. ROSENTHAL:  Amazon, for a lot of publishers and

 7    authors, is a great place to sell books because not only do

 8    they have the search inside the book feature, they have the

 9    one-click purchase.  You can simply push a button.  You go to

10    Amazon because you are interested in books, at least

11    presumably --

12           THE COURT:  I understand that.  But my question is how

13    does it hurt Amazon or the authors that Google enables people

14    to do a search?

15           MR. ROSENTHAL:  Because they are now much more likely

16    to go to Google rather than go to Amazon, which was the choice

17    of the rights holders as to where they wanted to promote their

18    books and how.

19           THE COURT:  If they go to Google, they can get three

20    snippets unless, unless, they have the patience to sit there

21    and keep putting in many different variants of the search.  I

22    don't know what Mr. Bouton's book sells for now on Amazon.  Ten

23    bucks probably.  They can get a nice hardcopy of it.

24           MR. ROSENTHAL:  They could, or they could decide that

25    they got all they wanted from the Google return and they don't

Document

1    want to bother with Amazon or it's too difficult for them.

2          THE COURT:  I agree that what you have just said is a

3    possibility, but I wonder whether it's a reasonable

4    possibility.  Is it really likely?  Isn't it more likely that

5    someone who is really interested in the book would go and click

6    on the link to Amazon and order the book?

7          MR. ROSENTHAL:  I may not be able to answer that

8    question definitively.  I think it is quite likely that a

9    significant number of users who go to Google as opposed to

10   Amazon will not take advantage of the Amazon ease of

11   purchase -- the fact they already have an account there, the

12   fact that there is the one click -- and will not perform

13   clicking on a link to another book seller and buying the book.

14         Just because Google directs you to Amazon doesn't mean

15   that that takes away from the author's rights to decide where

16   it wants its books to be shown, including the security concerns

17   that we have mentioned which are belittled by Google.  Rights

18   holders have a right to decide where they want and don't want

19   their books to be not only displayed but also stored.  In this

20   case Google has simply co-opted that for it itself.  Again, I

21   believe authors should be able to make this decision.

22         THE COURT:  Both sides have moved, and in some of your

23   briefs you refer to issues of fact.  Are there really any

24   genuine issues of material fact that require a trial, or can I

25   just decide the fair use issue?

Document

```
 1            MR. ROSENTHAL:  I think that the answer is that
 2   Google's use cannot possibly be found to be fair use given what
 3   is in the record here.  If there are questions about market
 4   harm or how people are using the books, there may be fact but I
 5   tend to think that it really is a matter at this point of law.
 6   I don't want to say there can't be any fact issues, but I
 7   believe that the --
 8            THE COURT:  One fact, I don't know if you agree or
 9   disagree, I think the number is 95 percent of the books are
10   nonfiction, 7 percent are fiction.  Is that disputed?
11            MR. ROSENTHAL:  I don't believe that is disputed.
12   Actually, in terms of applying the other factors, factors 2 and
13   3, it seems to me the fact that 7 percent of the works are
14   fiction, which get a higher degree of protection, even if that
15   is only 7 percent of the millions of books, that is still
16   hundreds of thousands.
17            THE COURT:  That was my question.
18            MR. ROSENTHAL:  I don't think there is a dispute about
19   that.
20            THE COURT:  Whether there is a dispute as to the
21   significance of the numbers, of course.
22            MR. ROSENTHAL:  Yes.
23            THE COURT:  Got it.
24            MR. ROSENTHAL:  I would also like to talk about
25   another element of the infringement here, which is the
```

Document

1   providing the books to the libraries.  Essentially, what

2   happened here, your Honor, and I know your Honor is familiar

3   with this case, Google essentially bought the right to digitize

4   all these books, put them in its search engine, build its

5   search engine, by paying the libraries for the right to do it.

6   The way they paid them is by returning a digital copy to the

7   libraries.

8           THE COURT:  I understand that.  But part of the

9   agreement is the libraries can only use the copies, the digital

10  copies, in a way that is consistent with the copyright laws.

11          MR. ROSENTHAL:  That's what some of the agreements

12  say.  The agreement, for example, with Stanford allows a

13  widespread use with display and printing of large amounts of

14  text.  It allows sharing with other libraries.  Just because

15  somebody puts in an agreement, and I'm not sure how relevant it

16  is that it was put in an agreement --

17          THE COURT:  Are there any examples of one of these

18  participating libraries violating the agreement or doing

19  something that violates the copyright laws?

20          MR. ROSENTHAL:  Just to site cite one potential

21  example, in the other case, the case against the libraries, the

22  HathiTrust, the conglomeration of libraries, was about to make

23  certain works available that they had considered orphan works

24  until they were sued, and then they stopped their orphan works

25  program.  They were about to make full texts.

Document

1          THE COURT:  Because they are not orphan books?

2          MR. ROSENTHAL:  The HathiTrust put together a list of

3    candidates of orphaned works, published them, and said if

4    nobody comes forward in 90 days to claim them, we are going to

5    make them available for display and download.  After the

6    lawsuit was filed and it was identified that some of those

7    supposed candidates weren't orphan works, they suspended the

8    program and have not recommenced it.  But that would be an

9    example of works being made available.

10         THE COURT:  Google argues that the gild is precluded

11   because of Judge Baer's decision in that case.

12         MR. ROSENTHAL:  That gets back to an earlier comment I

13   made.

14         THE COURT:  Judge Baer held it was fair use, that the

15   libraries were using the works within the fair use exception.

16   Aren't you bound by that in this case?

17         MR. ROSENTHAL:  First of all, that case is on appeal

18   and about to be argued in the Second Circuit.  All we have at

19   this point is the district court decision, which we disagree

20   with.  We also represent the Authors Gild in that case.

21         But as I said earlier, the fact that the ultimate use

22   of a copyright infringement might be fair use can't

23   automatically excuse the copier themselves.  What Google did

24   here is it paid for copyrighted content by making those books

25   available.  How the libraries say they are going to use it or

Document

 1   in fact do use it is separate from the fact that giving them

 2   the books and allowing them to copy the books is in and of

 3   itself a copyright violation.

 4              THE COURT:  Did you make this claim in your complaint?

 5              MR. ROSENTHAL:  In this case?

 6              THE COURT:  In your complaint, yes.  Google argues

 7   that it wasn't raised before in this claim and that you are

 8   raising it for the first time after eight years.

 9              MR. ROSENTHAL:  The amended complaint sets forth the

10   facts and it says that Google has infringed the plaintiffs'

11   copyrights.

12              THE COURT:  Did it claim secondary liability?

13              MR. ROSENTHAL:  I don't think the word "secondary

14   liability" or "contributory infringement" is used in the

15   complaint, but I don't think it has to be.  I'm not aware that

16   there is a pleading requirement that requires --

17              THE COURT:  There has to be fair notice that you are

18   asserting the claim.  If you don't use the exact words, that is

19   one question.  But if you are not fairly asserting or giving

20   notice of the claim, that is a different question.

21              MR. ROSENTHAL:  I would think in this case, given all

22   that's gone on, Google has fair notice of the fact that we are

23   arguing that making the books available to the libraries, no

24   matter how it was done, was part of our case here, and making

25   the copies and then allowing the libraries to take copies of

Case 1:05-cv-08136-DC   Document 1086   Filed 10/03/13   Page 15 of 30

1  them was part of our claim here.

2          THE COURT:  Thank you.  I'll give you a few minutes

3  after I hear from defense counsel.

4          MS. DURIE:  Thank you, your Honor, and good afternoon.

5          THE COURT:  Good afternoon.

6          MS. DURIE:  I'd like to begin with your Honor's

7  question as to whether there are really any disputed facts here

8  or whether this is a situation in which your Honor simply can

9  decide the issue.  We believe your Honor can decide the issue.

10  There are disputes about the inferences to be drawn from facts,

11  but we do not think there are disputes about the underlying

12  facts themselves.

13          Much of the plaintiffs' argument reduces to the

14  proposition that rights holders should be required to give

15  their permission before various uses can be made of their

16  works.  But we believe that emphasis on permission is

17  inconsistent with the copyright laws and will argue a

18  utilitarian and pragmatic approach of trying to figure out what

19  the real world consequences are and whether the conduct

20  ultimately redounds to the benefit of society taking the

21  authors' interests into account as part of that equation.  Here

22  we believe, on the undisputed facts, the answer to that

23  question should be yes, that there is a net societal benefit as

24  a result of Google Books and that there has not been a showing

25  that there is any economic harm to the interests of authors.

Document

1          The principal argument that we have heard advanced

2    from the Authors Gild is that searches on Google Books will

3    detract from searches on Amazon, which publishers have

4    authorized as being in the best interests of rights holders.

5    The argument endeavors to distinguish between going to an

6    online bookstore, which is how plaintiffs characterize Amazon,

7    as opposed to obtaining search results, which is how plaintiffs

8    characterize Google Books.

9          The only evidence that has been presented on that

10   point in support of this motion is a declaration from Mr.

11   Aiken, which endeavors to draw that distinction.  I would note,

12   your Honor, however, that at his deposition, and the excerpts

13   of his deposition are in the record, Mr. Aiken was asked

14   specifically not only about his testimony with respect to

15   Amazon, which he describes in his declaration, but also asked

16   about the Google Books program.

17         He was asked, "Do you have a view as to whether the

18   ability to see a few pages of books on Google Books helps or

19   hurts the sale of those books?"

20         His answer was, "I believe it helps the sale of

21   commercially available books."

22         He was discussing the inclusion of text as part of the

23   partner program, where more content is displayed.

24   Nevertheless, he acknowledged in his deposition testimony that

25   even the ability to search and obtain search results directing

1   you to a book of interest is something that is net of benefit

2   to authors rather than a harm to them.  I would suggest to you

3   that plaintiffs cannot rely on a declaration before this Court

4   that is inconsistent with that deposition testimony under Brown

5   v. Henderson, 257 F.3d 246, which is a Second Circuit case on

6   that point.

7          THE COURT:  This case is different in that there is

8   wholesale copying of entire works, millions and millions of

9   works.  How do you respond to that argument?

10         MS. DURIE:  Your Honor, there is.  Those are

11  intermediate copies that were made for the purpose of

12  facilitating fair uses and were necessary to engage in those

13  fair uses.  Plaintiffs don't dispute that there was no way to

14  create a searchable index of this content without making

15  digital copies of all the works in the first instance.

16         THE COURT:  What about instead of scanning entire

17  books, scanning portions of books, chunks of books?

18         MS. DURIE:  The issue there, your Honor, is that you

19  would not be able to search for terms and content that appears

20  in the pages that were not scanned.  Often Google Books is most

21  helpful for the most obscure searches for information that may

22  be scattered across a wide variety of books and small places in

23  many of them.  In that instance, if you only were to scan the

24  first 50 pages of the book, you would be losing from the search

25  index all of the content that appears in the remaining text of

1    the book.

2              THE COURT:  A full text search is much better

3    qualitatively than something that is less than full text is

4    what you are saying?

5              MS. DURIE:  It is.  It is.  Importantly, your Honor,

6    as I understand the plaintiffs' opposition and reply briefs,

7    they do not contest any longer that that original predicate act

8    of scanning was the making of an intermediate copy, and they do

9    not seek to predicate liability on the making of that

10   intermediate copy.  I also understand the plaintiffs now to

11   concede that the search index capabilities, engram, all of the

12   various uses, many of the various uses that can be made of that

13   copy they are not challenging.

14             THE COURT:  But it is more useful to look at the whole

15   package, it seems to me.

16             MS. DURIE:  That is absolutely correct, your Honor.

17   We think for purposes of the fair use analysis it is critical

18   for the Court to look at the whole package.  My observation is

19   simply that the plaintiffs appear to have conceded that the

20   digital copies that were made in the first instance and the

21   search index that was made using those digital copies are a

22   fair use.  They are challenging only the display of small

23   snippets of text that are included within the search results.

24             This is a different position from the position that

25   plaintiffs articulated in their opening summary judgment

DOarmiito

1   motion.  That is significant because many of the plaintiffs'

2   allegations of harm, for example, the idea that there was a

3   risk that someone would hack into a system and obtain copies,

4   were predicated on the argument that that original act of

5   scanning was a copyright violation rather than focused simply

6   on the display of snippets as we understand plaintiffs'

7   argument to be now.

8           THE COURT:  How do you respond to the argument that a

9   diligent user could sit there and put in many different

10  variants of words and thereby acquire essentially an entire

11  work?

12          MS. DURIE:  I would suggest, your Honor, most

13  charitably, it is extremely unlikely to happen.  In order to be

14  able to do that effectively, you would need to have a copy of

15  the book in front of you in order to identify all of the

16  various words that you would use to run all of those searches.

17  If you had the book in front of you, you could simply put it

18  into a scanner and make a digital copy of it yourself, which

19  would be a far less labor-intensive exercise.

20          The plaintiffs have not adduced any evidence that this

21  happens in the real world.  The only example they have put

22  forward is a repetitive series of searches that they themselves

23  did in order to create evidence for this case.  But there is no

24  reason to think that Google Books is not used for the purpose

25  for which it was designed, which is to allow people to see very

Document

1    small amounts of content that can help them determine whether

2    this book in fact contains the information that is relevant to

3    them.

4         I agree with the observation that was made that it is

5    hypothetically possible that somebody could in a particular

6    instance see a search result and decide that their needs had

7    been satisfied.  That is true in virtually any fair use case.

8    Somebody might listen to the rap version of Oh Pretty Woman

9    because they were interested in what the bass line was and

10   decide they don't need to listen to the original.  Although

11   that is certainly theoretically possible, it is quite unlikely.

12   That is why it didn't drive the decision in that case.  It is

13   also why it should not drive the decision here.

14        The utilitarian lens for copyright right law says we

15   look to the effects in the real world.  No reason has been

16   presented to believe that these are in fact effects in the real

17   world.

18        In the case plaintiff Bouton's book, is it possible

19   that someone would merely want to know what he said about a

20   particular player?  Perhaps.  Using Google Books would only

21   return three snippets, so you would not know that that was the

22   entirety of comments that Mr. Bouton had made.  If that were

23   truly all you were interested in, you could go into a bookstore

24   and look in the index and look for that one reference.  There

25   is no reason to think this is substituting for a sale of the

Document

1    book that would have an adverse economic impact on the

2    interests of rights holders.

3            In evaluating that, obviously, the job for this Court

4    is to evaluate that hypothetical risk, which has not been shown

5    to occur in the real world, versus the many benefits this Court

6    has referenced.

7            THE COURT:  Maybe the second part, the library part,

8    you should address.

9            MS. DURIE:  The library part, yes, your Honor.  We

10   believe here, respectfully, that the issue was effectively

11   resolved by the court's decision in Cablevision and that the

12   issue here is one --

13           THE COURT:  I am not a fan of that decision, as you

14   probably know.

15           MS. DURIE:  I understand.

16           THE COURT:  But it is still the law of the circuit.

17           MS. DURIE:  It is the law of the circuit.  It may be

18   that there will be en banc proceedings in this case or some

19   other case where that issue will be revisited.  But for

20   purposes of these proceedings today, we believe that the

21   question of who the volitional actor is governs the result and

22   that the facts are undisputed that it is the library that

23   chooses whether or not to make a copy of a particular work.

24           I want to suggest that the relevance of the

25   Cablevision decision here is to the question of primary versus

Case 1:05-cv-08136-DC   Document 1086   Filed 10/03/13   Page 22 of 30

1    secondary liability.  What Cablevision ultimately means is that

2    because the libraries are the volitional actors, Google cannot

3    be held primarily liable for copyright infringement, because

4    they are the ones choosing which books to make and what uses to

5    make of those books.

6         The lens through which Google's conduct would have to

7    be evaluated would be through the lens of secondary liability,

8    and the plaintiffs have not brought and never suggested that

9    they were bringing a secondary liability claim.  There is a

10   good reason for that.  That claim would have to be predicated

11   on acts of infringement that had occurred by the libraries.

12        The HathiTrust case has resolved that issue adversely

13   to the Authors Gild in a decision that we believe is collateral

14   estoppel as against them.  It is true that it is up on appeal

15   and perhaps that could change.  But as we sit here today, we do

16   not think the plaintiffs could seek to predicate a claim on the

17   contention that the libraries' uses were not fair use.

18        THE COURT:  Thank you.

19        Mr. Rosenthal.

20        MR. ROSENTHAL:  Let me address a few different points.

21   First of all, your Honor, we are not conceding that the

22   original copying of the works is permitted here.  Google copied

23   our works and continues to keep them on servers.  It has made

24   multiple copies of them.  Even if the search indexing itself

25   theoretically were a transformative fair use, there is

Deposition

23

1    absolutely no need to maintain copies where they are

2    susceptible to hacking or other security risks.

3           I realize one of the interesting things about this

4    case that makes it difficult is Google decided to copy

5    everything and they basically say there is no way you could

6    ever have a licensing scheme to copy everything, it would be

7    too expensive.  But there is no question that Google could have

8    gone and licensed lots of incredibly valuable content.  It

9    could have gone to the libraries as it did in its partner

10   product and actually license from publishers.  It could have

11   gone to scientific journals and said we want to license the

12   right to digitize and include lots of stuff so that our search

13   engine is more robust.

14          But they instead decided to choose everything, from

15   orphan works to unpublished dissertations to Harry Potter.  So

16   every single work, whether it could have been licensed or not,

17   is part of the search engine.

18          I also want to talk a little bit about Cablevision,

19   your Honor.  I think the facts of that case, and you know them

20   much better than I do, but I think they are so completely

21   different here.  In that case you had a cable company that had

22   the right to the content.  You had users, consumers, that had a

23   right to the content.  Users got to choose if they wanted to

24   make a simultaneous recording, to make a recording of a program

25   that they had the right to anyway.

Deposition

 1          This case is very different.  Here Google didn't have

 2     any rights to the copyrighted materials until they got them

 3     from the libraries, and essentially they paid the libraries by

 4     saying we have to, we are contractually obligated, to give the

 5     libraries a copy of the book back.  The libraries said OK, give

 6     us the book back.  In fact, that is what happened.  I think at

 7     least as of the time a year ago, 2.7 of the 4 million

 8     copyrighted books have been taken book by the libraries.

 9          So this isn't a one-off hey I want to record the

10     program.  This is a quid pro quo where Google is allowing the

11     libraries to make copies of books that Google is obligated to

12     give the libraries.  The idea that there is a difference

13     between emailing them or sending them a disk or simply saying

14     we are going to set up the system and let you get them because

15     you are going to push the button that allows the copy to be

16     made instead of us pushing the button seems to me a completely

17     artificial distinction.

18          THE COURT:  If the decision that what the libraries

19     are doing is fair use holds up, none of this matters, isn't

20     that so?

21          MR. ROSENTHAL:  I don't agree.  I think the copying by

22     Google and giving the libraries a copy in order to make Google

23     a more robust search engine, have more content -- because

24     content is what it is all about with search engines.  The more

25     content they have, the better they do.  That they are paying

Depamian

1   the libraries for it and the book is payment for them, that is

2   the use to be looked at, not whether somebody down the line may

3   use these works for scholarship or academic purposes.

4          I don't think there is a general principle.  If you

5   look at some of the other cases of mass copying, like MP3.com

6   or the course book cases, the Copy Shop cases, the argument is

7   some or even many of our users are actually using them for

8   scholarship purposes, therefore we can make money, we can

9   actually make money by selling you the book, because ultimately

10  somebody using the book may have a fair use to do it.

11         THE COURT:  But Google is not doing that.  It is not

12  selling the book.

13         MR. ROSENTHAL:  Our contention in this case is that in

14  fact Google is selling the book, the digital copy, back to the

15  library in exchange for its right to include it in its digital

16  library.  In a sense, your Honor, I think Google has become the

17  Copy Shop of the 21st century in that it is now in a position

18  where it can facilitate copies to be made by ultimate users for

19  scholarly purposes or completely different purposes.

20         I wanted to comment on one thing that Google argued.

21  She said there are no fact issues but that there are inferences

22  to be drawn from the facts.  I want to point out that under

23  established law inferences have to be drawn in favor of the

24  nonmoving party.

25         THE COURT:  You are both nonmoving parties.

Document

1          MR. ROSENTHAL:  Exactly.  The extent that these are

2     inferences that are required for Google to gain summary

3     judgment, those inferences should be drawn in favor of the

4     plaintiffs.

5          THE COURT:  What issues are there where the drawing of

6     the inferences would make a difference?

7          MR. ROSENTHAL:  I'm not sure that there really are.

8          THE COURT:  That's what I'm trying to find out.  Are

9     there any, or can I decide this?

10         MR. ROSENTHAL:  I believe you can decide it on the

11    facts as presented to you, your Honor.  But if there are open

12    questions that you feel about market harm, about licensing

13    opportunities, about the way people use The Library Project or

14    the Partners Project or Amazon, those would be the kind of

15    questions that might raise factual issues.

16         THE COURT:  If you believe there is an issue of fact

17    that would preclude the awarding of summary judgment in favor

18    of Google, you need to tell me what those are.  Are there any?

19         MR. ROSENTHAL:  I do not believe that there are any

20    specific facts that we have identified.

21         THE COURT:  Specific facts.  Any general facts?  Any

22    facts at all?

23         MR. ROSENTHAL:  You asked before about the 93/7

24    percent.  We agree, we are not disagreeing with that 93 versus

25    7 percent.  But there might be other facts that the Court would

Document

1    identify.

2           THE COURT:  There is no disagreement about 93 percent

3    versus 7 percent.  There could be an argument as to whether 7

4    percent fiction is significant, but it seems to me that is a

5    question of law.

6           MR. ROSENTHAL:  Or how those 7 percent are broken

7    down, how many of them are -- there is stuff in the record

8    about this, too.

9           THE COURT:  My understanding is 7 percent is fiction.

10   Obviously, there are different implications.  But it seems to

11   me whether it is 7 percent, that is a question of fact, and I'm

12   hearing that you don't disagree 7 percent are fiction.  Whether

13   7 percent is a significant number, it seems to me that that is

14   a question of law.

15          Again, it is one of these things where there isn't one

16   determinative factor.  I have to weigh all of these different

17   things.  What weight do I give 7 percent?  I'm going to give it

18   some weight, but it is going to be in there along with all of

19   the other considerations.

20          My question is, are there any issues of fact that

21   would preclude my granting summary judgment in favor of Google?

22   I think you are saying you don't know of any.

23          MR. ROSENTHAL:  There are very broad factual

24   questions, like whether verbatim display of the type that

25   Google does is good for society or not.

Document

1          THE COURT:  Is that a issue of fact?

2          MR. ROSENTHAL:  It could be.  It could be the kind of

3     thing that, as we have seen from submissions, people have

4     dramatically different viewpoints on.

5          THE COURT:  Do you bring in a witness, an expert

6     witness, or do I just do the best I can?  It is one of those

7     things that judges are called upon to decide, and in some ways

8     maybe you could characterize it as an issue of fact.  But it is

9     the type of thing that we decide all the time as a question of

10    law, I believe.

11         MR. ROSENTHAL:  One final point, your Honor?

12         THE COURT:  Sure.

13         MR. ROSENTHAL:  Which we made in our briefs but I want

14    to bring it up here.  Google is proposing a dramatic change in

15    the balance between rights holders and rights users.  Congress,

16    in fact, in the 1976 act, in amending it in the DMCA and

17    otherwise, has thought about that balance, has considered mass

18    digitization.

19         THE COURT:  Do you think it is a question for

20    Congress?

21         MR. ROSENTHAL:  I think it is a question for Congress.

22         THE COURT:  Is anything done in Congress these days?

23    How long would it take reasonably for this to be resolved in

24    Congress?  Even the issue of orphan books has been percolating

25    in Congress for years and years and years.

Document 1:05

 1          MR. ROSENTHAL:  That may be.  If it is that

 2   important --

 3          THE COURT:  What are you suggesting?  That I don't

 4   decide the summary judgment motion and I wait for Congress?

 5          MR. ROSENTHAL:  Not at all.  I am suggesting that

 6   Google's position here is a major change in the balance that

 7   has already been established by Congress and that Congress,

 8   when it has thought about it, has taken very careful steps to

 9   prevent mass digitization and mass reproduction.

10          For example, in the limited right that libraries and

11   archives have to make copies of books because they are lost or

12   stolen, in section 108 of the Copyright Act.  In enacting the

13   1976 act, Congress gave a lot of thought to what the

14   implications of what they called back in the 60s machine

15   readable copies were going to be.  Congress could have, and it

16   didn't, said it's OK for libraries to make copies, it's OK for

17   search engines to make copies.

18          Before Google can come in and say this is great for

19   society and upset this balance that goes back to the earliest

20   copyright statutes, between the authors' rights, the rights

21   holders' rights to decide how to work is going to be used, the

22   incentive to rights holders to create, that should be something

23   that is done by Congress.  If Congress doesn't do it because

24   Congress doesn't do it, then Google should have to wait.  But

25   it shouldn't be done on our back.

Document

1          Thank you.

2          THE COURT:  Thank you.  I understand the point.

3          Ms. Durie.

4          MS. DURIE:  Your Honor, we believe that Congress did

5   address this issue by passing a statute that provides for fair

6   use, and the courts have interpreted the correct application of

7   that statute.  We are simply asking the Court to apply the law

8   as Congress passed it and as it exists.

9          Unless the Court has any further questions, we will

10  submit.

11         THE COURT:  I don't have any other questions.  Thank

12  you very much.  I will reserve decision.

13         (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25